**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re: Highland Capital Management, L.P.**

|   |   |   |
|---|---|---|
| | § | |
| | § | Case No. **19-34054-sgj11** |
| **The Dugaboy Investment Trust et al- Appellant** | | |
| | § | |
| vs. | § | |
| | | |
| **Highland Capital Management, L.P.** | | |
| **Et al- Appellee** | | |
| | § | **3:25-cv-02072-S** |
| | § | |

   **[4333]  Memorandum of Opinion and Order Regarding Stay Requests (Addressing DE #4326 and 4308) entered on 7/21/25**

# Volume 23

# APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | |

*INDEX*

## APPELLANT THE DUGABOY INVESTMENT TRUST'S STATEMENT OF ISSUES TO BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL FROM THE BANKRUPTCY COURT'S ORDER REGARDING STAY REQUESTS [ADDRESSING DE ## 4326 & 4308]

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4353] on August 4, 2025 in the above-captioned case from the Bankruptcy Court's July 21, 2025 *Memorandum Order and Opinion Regarding Stay Requests [Addressing DE ## 4326 & 4308]*[Docket No. 4333], hereby submits this *Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the items listed herein to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1. **Did the Bankruptcy Court err in faulting Dugaboy's Stay Request because Dugaboy did not make a "standard" request for a stay pending appeal pursuant to Federal Bankruptcy Rule 8007?**

2. **Did the Bankruptcy Court err in determining that the Bankruptcy Rule 9019 settlement proceeding was not "a proceeding involving a charitable trust"?**

3. **Did the Bankruptcy Court err in concluding there was insufficient evidence connecting Mark Patrick's involvement in this Court's Rule 9019 settlement proceedings to the allegations of wrongdoing against Patrick in the Cayman Islands proceeding?**

4. **Did the Bankruptcy Court err in failing to recognize that the new evidence of Mark Patrick's misconduct exposed in the Cayman Islands proceeding fatally undermines the 9019 settlement by establishing that Patrick lacked authority to enter into the settlement?**

5. **Did the Bankruptcy Court err in concluding that a stay was unnecessary because Dugaboy could still pursue remedies against Mark Patrick in the Cayman Islands proceeding?**

6. **Did the Bankruptcy Court err in failing to recuse itself under 28 U.S.C. § 455 due to the appearance of partiality created by the presiding judge's authorship of novels that bear striking factual and thematic similarities to the Highland Capital Management bankruptcy proceedings and portray hedge fund principals in an overtly negative**

---

[1] Because of its voluminous nature, Docket #4255 will be delivered to the Clerk on a flash drive which will arrive tomorrow.

1

light, thereby depriving Dugaboy of an impartial judge with respect to the stay motion?

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

*Vol. 1*

*000001*

1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4353] filed by Appellant;

*000023*

2. Bankruptcy Court's *Memorandum Opinion and Order Regarding Stay Requests [Addressing DE ## 4236 & 4308* [Docket No. 4333];

*000039*

3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings: Transcript of hearing held June 25, 2025 before Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297]; and

5. Each of the additional documents and items designated below:

*Vol. 2*

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s)1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 3/18/2021 | 2060 | Motion to recuse Judge Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| 3/18/2021 | 2061 | Brief in support filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/18/2021 | 2062 | Support/supplemental document Appendix to Motion to Recuse filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/23/2021 | 2083 | Order denying motion to recuse (related document #2060) Entered on 3/23/2021. (Okafor, M.) |

*000569*

*000730*

*000734*

*Vol. 3*

*000771*
*Thru Vol. 5*

*Vol. 5*
*003493*

2

| | | | |
|---|---|---|---|
| *Vol. 5*<br>00 3504 | 4/6/2021 | 2169 | Amended notice of appeal filed by Interested Party James Dondero (RE: related document(s)2149 Notice of appeal). (Lang, Michael) |
| 00 3519 | 4/15/2022 | 2205 | Statement of issues on appeal, filed by Interested Party James Dondero (RE: related document(s)2083 Order on motion to recuse Judge). (Lang, Michael) |
| 00 3521 | 4/15/2021 | 2206 | Appellant designation of contents for inclusion in record on appeal filed by Interested Party James Dondero (RE: related document(s)2169 Amended notice of appeal). Appellee designation due by 04/29/2021. (Lang, Michael) |
| 00 3530 | 2/9/2022 | 3264 | DISTRICT COURT MEMORANDUM OPINION AND ORDER - The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292 (a) and the Court is without jurisdiction over this appeal of the Bankruptcy Court's Recusal Order. The Court further denies Appellants leave to appeal the Recusal Order under § 1292 (b), denies Appellants' request to withdraw the reference of their motion to recuse, and denies Appellants' request to construe their appeal as a petition for writ of mandamus. Accordingly, the Court dismisses this appeal for lack of jurisdiction. (Ordered by Judge Ed Kinkeade on 2/9/2022). Civil Action number:3:21-cv-00879-K, DISMISSED for lack of jurisdiction (RE: related document(s)2083 Order on motion to recuse Judge). Entered on 2/9/2022 (Whitaker, Sheniqua) Modified on 2/25/2022 (Whitaker, Sheniqua). (Entered: 02/25/2022) |
| *Vol 6*<br>00 3544 | 7/20/2022 | 3406 | Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: #1 Appendix Appendix (Lang, Michael) Modified text on 7/21/2022 (Ecker, C.). |
| 00 3909 | 8/1/2022 | 3422 | Notice of hearing on Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.).). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3406, (Lang, Michael) |

| | | | |
|---|---|---|---|
| *Vol 6*<br><br>*003912* | 8/15/2022 | 3444 | Response opposed to (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Attachments: #1 Exhibit  A (Annable, Zachery) |
| *Vol. 7*<br><br>*003936*<br>*Thru End of Vol 14* | 8/15/2022 | 3445 | Exhibit List (Appendix in Support of Highland Capital Management, L.P.'s Objection to Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 USC 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3444 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Index 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 (Annable, Zachery) |
| *Vol 15*<br><br>*011840* | 8/15/2022 | 3446 | Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

4

| | | | |
|---|---|---|---|
| *vol. 15* | | | Depositions) Filed by Debtor Highland Capital Management, L.P. (Annable, Zachery) |
| *011855* | 8/15/2022 | 3447 | Declaration re: (Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi). (Annable, Zachery) |
| *011864* | 8/17/2022 | 3456 | Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.)). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3446 and for 3449, (Annable, Zachery) |
| *011869* | 8/22/2022 | 3463 | Reply to (related document(s): 3444 Response filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. (Lang, Michael) |
| *011874* | 8/24/2022 | 3466 | Amended Notice of hearing filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.)., 3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

Vol 15

| | 8/26/2022 | 3470 | Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.), 3462 Order converting the August 31, 2022 at 9:30 AM Hearing on (A) The motion for final appealable order and supplement to motion to recuse and (B) related motions to strike and compel to a preliminary status/scheduling conference (RE: related document(s)3406 Motion for leave filed by Interested Party James Dondero, 3446 Motion to strike document filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel filed by Debtor Highland Capital Management, L.P.). Entered on 8/19/2022 (Ecker, C.)). Status Conference to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga. (Lang, Michael) |
|---|---|---|---|
| 011877 | 8/26/2022 | 3470 | Amended motion for final appealable order and proposed supplement to the record filed by Interested Party James Dondero (RE: related document(s)3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support). (Attachments: #1 Appendix (Lang, Michael) MODIFIED text to match PDF on 9/1/2022 (Ecker, C.). |
| 012039 | 8/26/2022 | 3471 | Stipulation by James Dondero and Highland Capital Management, L.P.. filed by Interested Party James Dondero (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi, 3449 Motion to compel Lawyers' Depositions.). (Lang, Michael) |
| | 8/31/2022 | 3478 N/A NO PDF AVAiLAble | 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomerantz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.) (Edmond, Michael) |
| 012047 | 9/1/2022 | 3479 | Order denying amended motion of James Dondero, Highland Capital Management Fund Advisors, L.P., Nexpoint Advisors, |

*Vol. 15*

| | | | |
|---|---|---|---|
| | | | L.P. The Dugaboy Investment Trust Get Good Trust and, Nexpoint Real Estate Partners, LLC, F/K/A HCRE Partners, A Delaware Limited Liability Company for final appealable order and supplement to motion to recuse pursuant to 28 U.S.C. Section 455 (RE: related document(s)3470 Brief filed by Interested Party James Dondero). Entered on 9/1/2022 (Okafor, Marcey) |
| | 9/1/2022 | 3480 | Transcript regarding Hearing Held 08/31/2022 (27 pages) RE: Status Conference Re: Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 (#3406). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 11/30/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.)). Transcript to be made available to the public on 11/30/2022. (Rehling, Kathy) |
| | 9/27/2022 | 3541 | Motion to recuse Judge Stacey G. C. Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| | 9/72/2022 | 3542 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3541 Motion to recuse Judge Stacey G. C. Jernigan). (Attachments: #1 Appendix (Lang, Michael) |
| | 10/14/2022 | 3567 | Agreed Scheduling Order on renewed motion to recuse (related document #3541) Entered on 10/14/2022. (Okafor, Marcey) |

*012050*

*012077*
*Vol. 16*
*012079*

*012357*

| | 10/17/2022 | 3570 | Motion to recuse Judge Stacey G. C. Jernigan - AMENDED Filed by Interested Party James Dondero (Lang, Michael) |
|---|---|---|---|
| | 10/17/2022 | 3571 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Attachments: #1 Appendix (Lang, Michael) |
| | 10/31/2022 | 3595 | Response opposed to (related document(s): 3541 Motion to recuse Judge Stacey G. C. Jernigan filed by Interested Party James Dondero, 3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| | 10/31/2022 | 3596 | Support/supplemental document (Appendix in Support of Highland's Objection to Renewed Motion to Recuse Pursuant to 28 U.S.C. 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3595 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 (Annable, Zachery) |
| | 3/3/2023 | 3673 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Lang, Michael) |
| | 3/6/2023 | 3675 | Memorandum of Opinion and Order Denying Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. Section 455 (RE: related document(s)3570 Motion to recuse Judge filed by Interested Party James Dondero). Entered on 3/6/2023 (Okafor, Marcey) |
| | 3/6/2023 | 3676 | Order Denying Amended Renewed Motion to Recuse Pursuant to U.S.C. Section 455 (related document #3570) Entered on 3/6/2023. (Okafor, Marcey) |
| | 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland |

Handwritten annotations in left margin:
Vol. 16 012361
Vol. 17 012363
012641
Vol. 18 012697 Thru End of Vol. 21
Vol. 22 016732
016737
016773
016809

| | | | |
|---|---|---|---|
| *Vol. 22* | | | Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| *016827* | 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery) |
| *016830* | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| *016855* | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| *016863* | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *016865* | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *Vol. 23* *016867* *Thru end of Vol. 25* | 6/20/2025 | 4255 *(to be submitted to Clerk on flash drive)* | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 |

| | | | |
|---|---|---|---|
| | | | Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| | 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |
| | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent |

*Vol. 26*

*019524*

*019527*

| | | | |
|---|---|---|---|
| | | | Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart, #3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
| *Vol. 27*<br>*019847* | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| *019871* | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4257 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8 ,8, Exhibit 9 (Curry, David) |
| *019998* | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| *Vol. 28*<br>*020013* | 6/23/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4255 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |
| *020230* | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 (Deitsch-Perez, Deborah) |
| *020241* | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic). (Attachments: #1 Exhibit 126 (Annable, Zachery) |

| | | | |
|---|---|---|---|
| *Vol. 28* *020266* | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| *Vol. 29* *020267* | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4223 Objection). (Annable, Zachery) |
| *020271* | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust. Entered on 6/27/2025 (Okafor, M.) |
| *020282* | 7/1/2025 | 4299 | Motion to withdraw document Consent Motion to Dismiss HMIT Remand Proceedings with Prejudice (related document(s) 3699 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| *020289* | 7/1/2025 | 4300 | Motion to withdraw document Consent Motion to Dismiss Delaware Action Proceedings with Prejudice (related document(s) 4000 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |

| | | | |
|---|---|---|---|
| *Vol. 29* | 7/7/2025 | 4304 | Order withdrawing Emergency Motion for Leave to File Adversary Proceeding [Dkt. 3699] with prejudice (RE: related document(s)4299 Motion to withdraw document filed by Interested Party Hunter Mountain Trust, Creditor Hunter Mountain Investment Trust). IT IS THEREFORE ORDERED that the proceedings defined in the Dismissal Motion as: Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P., Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including Hunter Mountain Investment Trusts Emergency Motion for Leave to File Adversary Proceeding filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating thereto), are dismissed with prejudice. Entered on 7/7/2025 (Okafor, M.) |
| *020296* | | | |
| *020298* | 7/10/2025 | 4308 | Notice Letter from the Office of the Texas Attorney General Requesting a Stay filed by Interested Party State of Texas. (Stone, Johnathan) |
| *020300* | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| *020309* | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *020311* | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
| *Vol. 30* *020407* | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related |

| | | | |
|---|---|---|---|
| | | | document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| | 7/21/2025 | 4333 | Memorandum of opinion (RE: related document(s)4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| | 7/21/2025 | 4334 | Order denying stay requests (related document 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order and 4308 Notice). Entered on 7/21/2025. (Okafor, M.) Additional attachment(s) added on 7/21/2025 (Okafor, M.) |
| | 8/4/2025 | 4353 | Notice of appeal. Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: #1 Exhibit A) (Harper, Geoffrey) |
| | 8/5/2025 | 4359 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-02072-S. (RE: related document(s)4353 Notice of appeal filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). (Almaraz, Jeanette) |
| | 8/15/2025 | 4372 | Motion to recuse Judge Filed by Interested Parties James Dondero, NexPoint Advisors, L.P., NexPoint Asset Management, L.P., NexPoint Real Estate Advisors, L.P., The Dugaboy Investment Trust, The Get Good Non Exempt Trust No 2 (Attachments: #1 Proposed Order (Harper, Geoffrey) |

Dated: August 18, 2025        Respectfully submitted,

**WINSTON & STRAWN LLP**

By: */s/ Geoffrey S. Harper*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
**CRAWFORD, WISHNEW & LANG PLLC**
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

***Counsel for Appellant The Dugaboy Investment
Trust***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 18, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Jordan A. Kroop (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910

QUINN EMANUEL URQUHART &
SULLIVAN LLP
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Counsel for Highland Capital Management,*
*L.P. and the Highland Claimant Trust*

*Co-Counsel for Marc S. Kirschner, as*
*Litigation Trustee of The Highland*
*Litigation Sub-Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | | |

## HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND CLAIMANT TRUST, AND LITIGATION SUB-TRUST WITNESS AND EXHIBIT LIST WITH RESPECT TO HEARING TO BE HELD ON JUNE 25, 2025

Highland Capital Management, L.P., the reorganized debtor (the "Debtor" or "Highland," as applicable) in the above-captioned chapter 11 case (the "Bankruptcy Case"), the Highland

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357).  The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

Claimant Trust (the "Claimant Trust"), and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust," and together with Highland and the Claimant Trust, the "Movants"), by and through their undersigned counsel, submit the following witness and exhibit list with respect to the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4216], which the Court has set for hearing at 9:30 a.m. (Central Time) on June 25, 2025 (the "Hearing") in the Bankruptcy Case.

A. **Witnesses**:

1. James P. Seery, Jr.;

2. James Dondero;

3. Deborah Deitsch-Perez, Esq;

4. Any witness identified by or called by any other party; and

5. Any witness necessary for rebuttal.

B. **Exhibits**:

| Number | Exhibit | Offered | Admitted |
|---|---|---|---|
| A. | **Settlement Agreement** | | |
| 1. | *Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to a Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Agreement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4217]<br>[HCMLPHMIT00002688-HCMLPHMIT00002715] | | |
| B. | **Negotiation Documents** | | |
| 2. | Email from L. Phillips to J. Morris dated March 5, 2025<br>[HCMLPHMIT00000015-HCMLPHMIT00000017] | | |
| 3. | Email from L. Phillips to J. Morris dated March 13, 2025<br>[HCMLPHMIT00000022-00000026] | | |

016868

| Number | Exhibit | Offered | Admitted |
|---|---|---|---|
| 4. | Email from L. Phillips to J. Morris dated March 18, 2025 [HCMLPHMIT00000028-HCMLPHMIT00000029] | | |
| 5. | Email from L. Phillips to J. Morris dated March 19, 2025 [HCMLPHMIT00000030-HCMLPHMIT00000031] | | |
| 6. | Confidentiality Agreement-M Patrick and Related Entities [HCMLPHMIT00000032-HCMLPHMIT00000045] | | |
| 7. | Email from L. Phillips to J. Morris and A. Hurt dated March 22, 2025 [HCMLPHMIT00000046-HCMLPHMIT00000048] | | |
| 8. | Email from L. Phillips to J. Morris dated March 24, 2025 [HCMLPHMIT00000052-HCMLPHMIT00000054] | | |
| 9. | Email from L. Phillips to J. Morris dated March 24, 2025 [HCMLPHMIT00000055-HCMLPHMIT00000056] | | |
| 10. | Email from L. Phillips to J. Morris dated March 28, 2025 [HCMLPHMIT00000057] | | |
| 11. | Email from L. Phillips to J. Morris dated March 30, 2025 [HCMLPHMIT00000058] | | |
| 12. | Email from L. Phillips to J. Morris dated March 31, 2025 [HCMLPHMIT00000059] | | |
| 13. | HCLOM Intercreditor and Participation Agreement [HCMLPHMIT00000060-HCMLPHMIT00000063] | | |
| 14. | Email from L. Phillips to J. Morris dated April 2, 2025 [HCMLPHMIT00000075-HCMLPHMIT00000078] | | |
| 15. | Email from L. Phillips to J. Morris dated April 2, 2025 [HCMLPHMIT00000079-HCMLPHMIT00000080] | | |
| 16. | Email from L. Phillips to J. Morris dated April 3, 2025 with attachment - Paul Murphy Joinder to Confidentiality Agreement [HCMLPHMIT00000081-HCMLPHMIT00000083] | | |
| 17. | Email from L. Phillips to J. Morris dated April 4, 2025 [HCMLPHMIT00000089] | | |
| 18. | Email from L. Phillips to J. Morris dated April 7, 2025 [HCMLPHMIT00000090-HCMLPHMIT00000092] | | |

| Number | Exhibit | Offered | Admitted |
|---|---|---|---|
| 19. | Email from L. Phillips to J. Morris dated April 7, 2025 with attachment – Shawn Raver Joinder to Confidentiality Agreement [HCMLPHMIT00000093-HCMLPHMIT00000096] | | |
| 20. | Email from L. Phillips to J. Morris dated April 7, 2025 [HCMLPHMIT00000099-HCMLPHMIT00000102] | | |
| 21. | Email from L. Phillips to J. Morris dated April 7, 2025 with attachments- Phillips Joinder to Confidentiality Agreement (signed by Phillips) and A. Hurt Joinder to Confidentiality Agreement (signed by Hurt) [HCMLPHMIT00000103-HCMLPHMIT00000107] | | |
| 22. | Email from L. Phillips to J. Morris dated April 8, 2025 with fully executed HCLOM Remittance Agreement [HCMLPHMIT00000108-HCMLPHMIT00000112] | | |
| 23. | Email from L. Phillips to J. Morris dated April 10, 2025 with HMIT 2022 Settlement Agreement [HCMLPHMIT00000118-HCMLPHMIT00000130] | | |
| 24. | Email from L. Phillips to J. Morris dated April 17, 2025 with attachment James Shields Joinder to Confidentiality Agreement [HCMLPHMIT00000135-HCMLPHMIT00000150] | | |
| 25. | Email from L. Phillips to J. Morris dated May 9, 2025 [HCMLPHMIT00000157-HCMLPHMIT00000158] | | |
| 26. | Email from L. Phillips to J. Morris dated May 9, 2025 [HCMLPHMIT00000159-HCMLPHMIT00000161] | | |
| 27. | Email from L. Phillips to J. Morris dated May 13, 2025 [HCMLPHMIT00000162-HCMLPHMIT00000163] | | |
| 28. | Email from L. Phillips to J. Morris dated May 14, 2025 [HCMLPHMIT00000164-HCMLPHMIT00000166] | | |
| 29. | Email from L. Phillips to J. Morris dated May 14, 2025 with Redlines of Settlement Agreement [HCMLPHMIT00000167-HCMLPHMIT00000218] | | |
| 30. | Email from L. Phillips to J. Morris dated May 15, 2025 [HCMLPHMIT00000226-HCMLPHMIT00000234] | | |
| 31. | Email from L. Phillips to J. Morris dated May 16, 2025 with Clean and Redline of Rand Settlement Agreement [HCMLPHMIT00000235-HCMLPHMIT00000283] | | |

WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025                    PAGE 4 OF 14
SF 4897-3339-1694.4 36027.002 DOCS_NY:42648.1 36027/002

016870

| Number | Exhibit | Offered | Admitted |
|---|---|---|---|
| 32. | Email from L. Phillips to T. Cournoyer dated May 16, 2025 [HCMLPHMIT00000287-HCMLPHMIT00000289] | | |
| 33. | Email from L. Phillips to J. Seery, M. Patrick, S. Raver, J. Shields, A. Hurt dated May 17, 2025 [HCMLPHMIT00000290] | | |
| 34. | Email from L. Phillips to J. Morris dated May 17, 2025 [HCMLPHMIT00000291-HCMLPHMIT00000292] | | |
| 35. | Email from L. Phillips to J. Morris, J. Pomerantz dated May 19, 2025 with attachment HMIT Redlined Pages only to Settlement Agreement [HCMLPHMIT00000295-HCMLPHMIT00000297] | | |
| 36. | Email from L. Phillips to G. Demo, A. Hurt, J. Shields dated May 19, 2025 [HCMLPHMIT00000342-HCMLPHMIT00000344] | | |
| 37. | Email from L. Phillips to G. Demo, J. Morris, J. Pomerantz dated May 19, 2025 with attachment - M. Patrick signature o HMIT Rand Settlement Agreement [HCMLPHMIT00000345-HCMLPHMIT00000370] | | |
| 38. | Email from L. Phillips to G. Demo, J. Morris, J. Pomerantz date May 19, 2025 [HCMLPHMIT00000371-HCMLPHMIT00000372] | | |
| 39. | Email from L. Phillips to G. Demo, J. Morris, J. Pomerantz dated May 19, 2025 [HCMLPHMIT00000373-HCMLPHMIT00000374] | | |
| 40. | Email from L. Phillips to G. Demo, J. Morris, J. Pomerantz dated May 19, 2025 [HCMLPHMIT00000423-HCMLPHMIT00000428] | | |
| 41. | Email from J. Morris to L. Phillips dated March 22, 2025 [HCMLPHMIT00000562-HCMLPHMIT00000563] | | |
| 42. | Email from J. Morris to L. Phillips, A. Hurt dated March 22, 2025 with attachment – fully executed Confidentiality Agreement [HCMLPHMIT00000564-HCMLPHMIT00000580] | | |
| 43. | Email from J. Morris to L. Phillips dated April 4, 2025 with attachment Litigation Protections M. Patrick [HCMLPHMIT00000621-HCMLPHMIT00000631] | | |
| 44. | Email from J. Morris to L. Phillips dated April 7, 2025 [HCMLPHMIT00000642-HCMLPHMIT00000644] | | |

WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025          PAGE 5 OF 14
SF 4897-3339-1694.4 36027.002 DOCS_NY:42648.1 36027/002

016871

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 45. | Email from J. Morris to L. Phillips dated April 8, 2025 with attachment – current snapshot of remaining assets<br>[HCMLPHMIT00000656--HCMLPHMIT00000661] | | |
| 46. | Email from J. Morris to L. Phillips dated April 16, 2025 with attachment – Second Amended and Restated Indemnity Trust Agreement<br>[HCMLPHMIT00000672-HCMLPHMIT00000727] | | |
| 47. | April 15, 2025 Draft Illustrative Highland Indemnity Trust Payout Schedule<br>[HCMLPHMIT00000724-HCMLPHMIT00000727] | | |
| 48. | Email from J. Morris to L. Phillips dated May 15, 2025 with attachment – Draft Rand Settlement Agreement and Redline<br>[HCMLPHMIT00000766-HCMLPHMIT00000820] | | |
| 49. | Email from J. Morris to L. Phillips dated May 15, 2025 with Clean and Redline Settlement Agreement<br>[HCMLPHMIT00000829-HCMLPHMIT00000877] | | |
| 50. | Email from L. Phillips to D. Klos dated April 17, 2025<br>[HCMLPHMIT00000947] | | |
| 51. | Email re: Microsoft Teams call from D. Klos to J. Seery, T. Cournoyer, K. Hendrix, J. Morris, G. Demo, M. Patrick, S. Raver, Paul, L. Phillips, A. Hurt dated April 7, 2025<br>[HCMLPHMIT00000949] | | |
| 52. | Microsoft Teams Appointment for J. Seery, T. Cournoyer, K. Hendrix, J. Morris, G. Demo, M. Patrick, S. Raver, Paul, L. Phillips, A. Hurt scheduled for April 8, 2025<br>[HCMLPHMIT00000950] | | |
| 53. | Email from D. Klos to J. Shields dated April 22, 2025 with attachment – Potential Settlement Structure with DAF and HMIT<br>[HCMLPHMIT00000987-HCMLPHMIT00001000] | | |
| 54. | Email from J. Seery to M. Patrick, S. Raver, L. Phillips, A. Hurt, J. Shields dated April 28, 2025 with attachment – Draft Rand Settlement Agreement<br>[HCMLPHMIT00001001-HCMLPHMIT00001025] | | |
| 55. | Email Microsoft Teams appointment from D. Klos to J. Seery, K. Hendrix, M. Patrick, S. Raver, Paul dated April 3, 2025<br>[HCMLPHMIT00001037] | | |

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 56. | Email from D. Klos to M. Patrick dated April 2, 2025 [HCMLPHMIT00001042] | | |
| 57. | Email from J. Seery to J. Morris, T. Cournoyer, D. Klos, M. Gray dated June 11, 2025 with attachment – Class 9 Consent to Rand Settlement and Release [HCMLPHMIT00001220-HCMLPHMIT00001245] | | |
| **C.** | **Class 9 Documents** | | |
| 58. | Letter to P. Daugherty from J. Seery re: Eighth Distribution re: Highland Claimant Trust dated May 20, 2025 [HCMLPHMIT00002329] | | |
| 59. | Written Consent of Holders of Class 9 Subordinated Claim Trust Interests in the Highland Claimant Trust dated May 16, 2025 [HCMLPHMIT00002677-HCMLPHMIT00002682] | | |
| 60. | Tolling Agreement Extending Claim Objection Deadline dated July 27, 2022 | | |
| 61. | Amendment No. 1 to Tolling Agreement Extending the Claim Objection Deadline dated December 21, 2022 | | |
| 62. | Amendment No. 2 to Tolling Agreement Extending Claim Objection Deadline dated November 6, 2023 | | |
| 63. | Amendment No. 3 to Tolling Agreement Extending Claim Objection Deadline dated November 20, 2024 | | |
| **D.** | **HCLOM/HMIT** | | |
| 64. | Email from L. Phillips to J. Morris dated January 6, 2025 [HCMLPHMIT00000008-HCMLPHMIT00000009] | | |
| 65. | Email from L. Phillips to J. Morris, A. Hurt dated January 11, 2025 [HCMLPHMIT00000010-HCMLPHMIT00000012] | | |
| 66. | *Highland Capital Management, L.P.'s Motion for (A) a Bad Faith Finding and (B) and Award of Attorney's Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with HCLOM Claims 3.65 and 3.66* [Docket No. 4176] [HCMLPHMIT00000441-HCMLPHMIT00000500] | | |

WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025    PAGE 7 OF 14
SF 4897-3339-1694.4 36027.002 DOCS_NY:42648.1 36027/002

016873

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 67. | Hearing Transcript dated December 18, 2024 [Docket No. 4197]<br>[HCMLPHMIT00003829-HCMLPHMIT00003859] | | |
| 68. | *Stipulated and Agreed Order Resolving (A) HCLOM, Ltd.'s Scheduled Claims 3.65 and 3.66; and (B) Highland Capital Management, L.P.'s (1) Objection and (2) Motion for a Bad Faith Finding and an Award for Attorney's Fees Against HCLOM, Ltd. and James Dondero in Connection Therewith [Docket Nos. 3657, 4716]* [Docket No. 4199]<br>[HCMLPHMIT00003860-HCMLPHMIT00003866] | | |
| 69. | Intercreditor and Participation Agreement with HCLOM dated January 10, 2025<br>[HCMLPHMIT00003868-HCMLPHMIT00003871] | | |
| **E.** | **Patrick Authority** | | |
| 70. | Trust Agreement of Hunter Mountain dated December 17, 2015<br>[HCMLPHMIT00004103-HCMLPHMIT00004114] | | |
| 71. | Show Cause Hearing Transcript June 8, 2021<br>[HCMLPHMIT00002716-HCMLPHMIT00003013] | | |
| 72. | HMIT Hearing Transcript June 8, 2023<br>[HCMLPHMIT00003014-HCMLPHMIT00003402] | | |
| 73. | Limited Liability Company Agreement of Atlas IDF GP, LLC dated October 29, 2015<br>[HCMLPHMIT00003511-HCMLPHMIT00003517] | | |
| 74. | HOLDCO Responses and Disclosures Related to the Court's Order Requiring Disclosures [Docket No. 2547]<br>HCMLPHMIT00003523-HCMLPHMIT00003828] | | |
| 75. | HMIT Appointment of Successor Administrator dated 8/12/2022<br>[HCMLPHMIT00003872] | | |
| 76. | Limited Liability Company Agreement of Rand PE Fund Management, LLC dated October 29, 2015<br>[HCMLPHMIT00003873-HCMLPHMIT00003879] | | |
| 77. | Limited Liability Company Agreement of Rand Advisors, LLC dated August 28, 2013<br>[HCMLPHMIT00003880-HCMLPHMIT00003886] | | |

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 78. | Agreement of Limited Partnership of Rand PE Fund I, L.P. dated October 29, 2015<br>[HCMLPHMIT00003887-HCMLPHMIT00003893] | | |
| 79. | Amended and Restated Limited Partnership Agreement of Atlas IDF, LP dated November 30, 2015<br>[HCMLPHMIT00003894-HCMLPHMIT00003928] | | |
| 80. | Atlas IDF, LP Offering of Series 1 Limited Partnership Interests dated November 30, 2015<br>[HCMLPHMIT00003929-HCMLPHMIT00004023] | | |
| 81. | Rand PE Fund I, LP Offering Series 1 Limited Partnership Interests dated November 30, 2015<br>[HCMLPHMIT00004024-HCMLPHMIT00004095] | | |
| 82. | Member and Manager Consent of Atlas IDF GP, LLC dated October 13, 2022<br>[HCMLPHMIT00004124-HCMLPHMIT00004126] | | |
| 83. | Amended and Restated Company Agreement of Atlas IDF GP, LLC dated August 8, 2022<br>[HCMLPHMIT00004127-HCMLPHMIT00004151] | | |
| 84. | Amended and Restated Company Agreement of Rand Advisors, LLC dated August 1, 2022<br>[HCMLPHMIT00004152-HCMLPHMIT00004176] | | |
| 85. | Amended and Restated Company Agreement of Rand PE Fund Management, LLC dated August 1, 2022<br>[HCMLPHMIT00004177-HCMLPHMIT00004201] | | |
| 86. | Membership Interest Purchase Agreement Rand Advisors dated August 1, 2022<br>[HCMLPHMIT00004202-HCMLPHMIT00004215] | | |
| 87. | Member and Manager Consent of Rand Advisors, LLC dated October 13, 2022<br>[HCMLPHMIT00004216-HCMLPHMIT00004218] | | |
| 88. | Member and Manager Consent of Rand PE Fund Management, LLC dated October 13, 2022<br>[HCMLPHMIT00004219-HCMLPHMIT00004221] | | |
| 89. | 3/17/2025 Rand Advisors Form ADV<br>[HCMLPHMIT00003465-HCMLPHMIT00003493] | | |
| 90. | Atlas IDF, LP Subscription 12/21/2015 (signature pages only) | | |

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 91. | Atlas IDF, LP Subscription 12/23/2015 (signature page only) | | |
| 92. | Atlas IDF LP SEC Form D dated February 24, 2025 [HCMLPHMIT00003518-HCMLPHMIT00003522] | | |
| 93. | Rand PE Fund I, L.P. SEC Form D dated February 24, 2025 [HCMLPHMIT00004096-HCMLPHMIT00004100] | | |
| 94. | Amended and Restated Limited Liability Company Agreement of Beacon Mountain LLC dated September 24, 2015 [HCMLPHMIT00004115-HCMLPHMIT00004123] | | |
| 95. | Second Amended and Restated Limited Liability Company Agreement of Beacon Mountain LLC dated February 12, 2025 | | |
| 96. | Bylaws of The Okada Family Foundation, Inc. (final version) | | |
| 97. | Bylaws of Empower Dallas Foundation, Inc. | | |
| 98. | Crown Global DVA Policy 30218 (signed) | | |
| 99. | Crown Global DVA Termsheet 30218 | | |
| 100. | Crown Global DVA Policy 30219 (signed) | | |
| 101. | Crown Global DVA Termsheet 30219 | | |
| 102. | Crown Global Rand Participation Agreement (Executed) | | |
| 103. | S&G HMIT Opinion Rep Letter dated January 29, 2016 | | |
| 104. | S&G HMIT Opinion dated January 29, 2016 | | |
| F. | **Dugaboy Note** | | |
| 105. | Promissory Note $24,268,621.69 dated May 31, 2017 [HCMLPHMIT00001327-HCMLPHMIT00001328] | | |

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 106. | The Dugaboy Investment Trust Offering of $1817M Promissory Note Owed to HCMLP February 2024<br>[HCMLPHMIT00002323-HCMLPHMIT00002327] | | |
| 107. | Participation Agreement for Par/Near Par Trades dated July 18, 2024<br>[HCMLPHMIT00002594-HCMLPHMIT00002600] | | |
| 108. | $18.5mm Dugaboy Note Attempted Sale – Process Update<br>[HCMLPHMIT00002601] | | |
| 109. | The Dugaboy Investment Trust $18.17M Promissory Note Owed to HCMLP February 2024<br>[HCMLPHMIT00002602-HCMLPHMIT00002607] | | |
| 110. | The Dugaboy Investment Trust $18.17M Promissory Note Owed to HCMLP February 2024<br>[HCMLPHMIT00002608-HCMLPHMIT00002630] | | |
| 111. | Highland Claimant Trust Recommended Dugaboy Note Contribution dated June 7, 2024<br>[HCMLPHMIT00002631-HCMLPHMIT00002636] | | |
| 112. | Email from D. Klos to DC Sauter dated May 23, 2024<br>[HCMLPHMIT00002637-HCMLPHMIT00002639] | | |
| **G.** | **Capital Account Amounts** | | |
| 113. | Highland Capital Management, L.P. Consolidated Financial Statement and Supplemental Information dated December 31, 2018<br>[HCMLPHMIT00002548-HCMLPHMIT00002593] | | |
| 114. | Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. dated December 24, 2015<br>[HCMLPHMIT00002641-HCMLPHMIT00002676] | | |
| 115. | 2018 Tax Return for Highland Capital Management, LP (sig page, p. 1 of return, p. 1 of each partners' Schedule K-1 (Strand, Okada, MAP 1, MAP 2, Dugaboy, HMIT)<br>[HCMLPHMIT00001332; HCMLPHMIT00001336; HCMLPHMIT00001414; HCMLPHMIT00001419; HCMLPHMIT00001424; HCMLPHMIT00001429; HCMLPHMIT00001434; HCMLPHMIT00001439] | | |

WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025                    PAGE 11 OF 14
SF 4897-3339-1694.4 36027.002 DOCS_NY:42648.1 36027/002

016877

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 116. | 2019 Tax Return for Highland Capital Management, LP (sig page, p. 1 of return, p. 1 of each partners' Schedule K-1 (Strand, Okada, MAP 1, MAP 2, Dugaboy, HMIT) [HCMLPHMIT00001726; HCMLPHMIT00001766; HCMLPHMIT00001865; HCMLPHMIT00001870; HCMLPHMIT00001875; HCMLPHMIT00001880; HCMLPHMIT00001885; HCMLPHMIT00001890] | | |
| 117. | Monthly Operating Report – FINAL November 2019 [HCMLPHMIT00001329] | | |
| 118. | Hunter Mountain Note Receivable October 15, 2019 [HCMLPHMIT00001330] | | |
| **H.** | **Dallas Foundation Issues** | | |
| 119. | Affidavit of James Dondero in the Grand Court of Cayman Islands FSD2025-0099 dated April 16, 2025 [HCMLPHMIT00003429-HCMLPHMIT00003438] | | |
| 120. | Email from J. Pomerantz to D. Curry, M. Okin dated June 19, 2025 | | |
| **I.** | **Plan, CTA, and Litigation Trust Agreement** | | |
| 121. | *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Pages 26-29, (entire document can be found at Docket No. 1808) Excerpts: Article IV. B.1-5 (pages 26-28) Article IV. B.5 (pages 28-29) Article IV. B.7 (page 30) Article IV. B.10 (page 31) Article IV. D. (pages 34-35) Article VII. D.1-2 (pages 44-45) Article XI (pages 53-55) | | |

**WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**    **PAGE 12 OF 14**
SF 4897-3339-1694.4 36027.002 DOCS_NY:42648.1 36027/002

016878

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 122. | *Claimant Trust Agreement*, (entire document can be found at Docket No. 1811-2, as modified by Docket No. 1875-4)<br><br><u>Excerpts:</u><br>Fourth "Whereas" clause (page 1)<br>Section 2.2(a)-(b) (page 8)<br>Section 3.2(a)-(b) (pages 11-12)<br>Section 3.2(c)(iv) (page 12)<br>Section 2.3(b)(ix) (page 9) | | |
| 123. | *Litigation Sub-Trust Agreement*, (entire document can be found at Docket No. 1811-4)<br><br><u>Excerpts:</u><br>Fourth "Whereas" clause (page 1)<br>Section 2.2 (page 5)<br>Section 3.2(a) (page 7)<br>Section 3.2(b) (page 7)<br>Section 3.2(c)(v) (page 7)<br>Section 3.3 (b)(iii) (page 9) | | |
| 124. | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | | |
| 125. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| 126. | All exhibits identified by or offered by any other party at the Hearing | | |

Dated: June 20, 2025

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Jordan A. Kroop (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
jkroop@pszjlaw.com
hwinograd@pszjlaw.com

 - and -

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.
and the Highland Claimant Trust*

**QUINN EMANUEL URQUHART &
SULLIVAN LLP**

Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

-and-

**SIDLEY AUSTIN LLP**

Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Co-Counsel for Marc S. Kirschner, as
Litigation Trustee of the Highland Litigation
Sub-Trust*

016880

# EXHIBIT 1

016881

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910

QUINN EMANUEL URQUHART &
SULLIVAN LLP
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Counsel for Highland Capital Management,*
*L.P. and the Highland Claimant Trust*

*Co-Counsel for Marc S. Kirschner, as*
*Litigation Trustee of The Highland*
*Litigation Sub-Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**DECLARATION OF GREGORY V. DEMO IN SUPPORT OF MOTION FOR ENTRY**
**OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363**
**APPROVING SETTLEMENT WITH THE HMIT ENTITIES AND AUTHORIZING**
**ACTIONS CONSISTENT THEREWITH**

I, Gregory V. Demo, pursuant to 28 U.S.C. § 1746, under penalty of perjury, declare as

follows:

---

[1] The last four digits of the Debtor's taxpayer identification number are 8357. The headquarters and service address
for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.



016882

1934054250519000000000003

HCMLPHMIT00002688

1.    I am an attorney at the law firm Pachulski Stang Ziehl & Jones LLP, counsel to Highland Capital Management, L.P., and I submit this Declaration in support of the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith*, being filed concurrently with this Declaration.  I submit this Declaration based on my personal knowledge and review of the documents listed below.

2.    Attached as **<u>Exhibit 1</u>** is a true and correct copy of the *Settlement Agreement and General Release*, dated as of May 19, 2025, by and among, Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, and the Highland Indemnity Trust, on the one hand, and Hunter Mountain Investment Trust, Beacon Mountain LLC, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Atlas IDF, LP, Atlas IDF GP, LLC, on the other hand.

*[Signature Page Follows]*

016883

HCMLPHMIT00002689

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated: May 19, 2025.                              _/s/ Gregory V. Demo_
                                                  Gregory V. Demo

016884

HCMLPHMIT00002690

# EXHIBIT 1

HCMLPHMIT00002691

EXECUTION VERSION

## SETTLEMENT AGREEMENT & GENERAL RELEASE

THIS SETTLEMENT AGREEMENT & GENERAL RELEASE (this "**Agreement**") is entered into as of May 19, 2025 (the "**Agreement Date**"), by and among Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), the Highland Claimant Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Claimant Trust**"), the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Litigation Sub-Trust**"), and the Highland Indemnity Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Indemnity Trust**", and together with Highland, the Claimant Trust and the Litigation Sub-Trust, the "**Highland Entities**"), on the one hand, and Hunter Mountain Investment Trust, a Delaware statutory trust ("**HMIT**"), Beacon Mountain LLC, a Delaware limited liability company ("**Beacon Mountain**"), Rand Advisors, LLC, a Delaware limited liability company ("**Rand Advisors**"), Rand PE Fund I, LP, a Delaware series limited partnership ("**Rand PE Fund**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**"), Atlas IDF, LP, a Delaware limited partnership ("**Atlas IDF**"), Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP and Atlas IDF, the "**HMIT Entities**"), on the other hand. The Highland Entities and the HMIT Entities are collectively referred to as the "**Parties**," and each individually, as a "**Party**".

### DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Claimant Trust Agreement or the Plan, as applicable (in each case, as hereinafter defined). For purposes of this Agreement, the following capitalized terms have the following meanings:

"**9019 Motion**" means the motion seeking entry of the Bankruptcy Court Order pursuant to Bankruptcy Rule 9019 and in accordance with Section 18.

"**Action**" means any action, claim, demand, arbitration, hearing, charge, complaint, investigation, examination, indictment, litigation, suit or other civil, criminal, administrative or investigative proceedings, including any petition under Rule 202 of the Texas Rules of Civil Procedure.

"**Affiliate**" means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, a specified Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by contract or otherwise.

"**Amended Complaint**" means the *Amended Complaint and Objection to Claims*, filed as docket number 158 in *Kirschner v. Dondero*, Adv. Pro. No. 21-03076-sgj (Bankr. N.D. Tex. May 19, 2022).

016886

HCMLPHMIT00002692

"**Bankruptcy Case**" means *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex.) and its related proceedings.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division.

"**Bankruptcy Court Approval Date**" means the date on which the Bankruptcy Court Order is issued.

"**Bankruptcy Court Order**" means an order of the Bankruptcy Court approving the allowance of the HMIT's Class 10 Interest as provided in this Agreement pursuant to the 9019 Motion.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than (i) a Saturday or a Sunday, (ii) a day on which the Federal Reserve Bank of New York or the New York Stock Exchange is closed, or (iii) a day on which banks in the States of Texas are required, or authorized by law, to close.

"**Claimant Trust Agreement**" means that certain Claimant Trust Agreement of the Claimant Trust (as may have been or may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 11, 2021, by and among Highland, as settlor, James P. Seery, Jr., a Claimant Trustee, and Wilmington Trust, National Association, a national banking association, as Delaware trustee.

"**Claims**" means any claims, debts, liabilities, demands, obligations, breaches of contract, breaches of duty or any relationship, misfeasance, malfeasance, promises, acts, omissions, agreements, liens, losses, costs and expenses (including attorney's fees and related costs), damages, injuries, suits, Actions, and causes of action of whatever kind or nature, whenever and however, arising, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise.

"**Class 10**" means the class of Claims or Equity Interests described in Article II. Section H.10. of the Plan.

"**Class 11**" means the class of Claims or Equity Interests described in Article II. Section H.11. of the Plan.

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Case.

"**Confirmation Order**" means that certain *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943], as conformed in accordance with the Fifth Circuit's rulings.

2

016887

HCMLPHMIT00002693

"**Dugaboy Note**" means that certain Promissory Note dated May 31, 2017, in the original face amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

"**Final Court Approval Date**" means the date on which the Bankruptcy Court Order becomes a Final Order.

"**Final Order**" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Highland Entities, as applicable, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

"**Gatekeeper**" means the gatekeeping provision contained in Article IX. F of the Plan as of August 11, 2021.

"**Governmental Authority**" means any federal, provincial, state, local or foreign government or political subdivision thereof, court of competent jurisdiction, administrative agency, judicial or arbitral body, or commission or other governmental or regulatory authority or instrumentality.

"**Highland Released Parties**" means collectively (i) the Highland Entities, (ii) any Affiliate of any Highland Entity and any Person directly or indirectly majority-owned by any Highland Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any Highland Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i)-(iii), collectively, the "**Highland Parties**"), (iv) each of the Highland Parties' current and former trustees and administrators (including the trustees of any of the Claimant Trust, the Litigation Sub-Trust, or the Indemnity Trust), officers, executives, agents, directors, advisors, advisory representatives, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, (v) the current and former members of the Oversight Board of the Claimant Trust in any capacity (including Richard Katz) and their Affiliates, (vi) Farallon Capital Management, LLC, Stonehill Capital Management, LLC, Muck Holdings LLC, and Jessup Holdings LLC, in each case, in any capacity, (vii) the Independent Board and its members John Dubel, James P. Seery, Jr., and Russell Nelms, (viii) James P. Seery, Jr., individually and in all capacities for any Highland Released Party, including as Chief Executive Officer of Highland Capital Management, L.P., Claimant Trustee of the Claimant

3

016888

HCMLPHMIT00002694

Trust, and the Indemnity Trust Administrator of the Indemnity Trust, (ix) Marc S. Kirschner, individually and as Trustee of the Litigation Sub-Trust, (x) the Committee and each of its members, (xi) the professionals (and their respective firms) (a) retained by Highland or the Committee during the Bankruptcy Case or which provided services to Highland or the Committee during the Bankruptcy Case or (b) retained by any Highland Released Party on or after August 11, 2021, (xii) any Person indemnified by any Highland Party (the Persons described in clauses (i)-(xii), collectively, the "**Highland Covered Parties**"), and (xii) each Highland Covered Party's current and former officers, executives, agents, attorneys (and their respective firms), directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "Highland Covered Parties;" provided, however, and for the avoidance of doubt, and without in any way limiting the scope of the foregoing, "Highland Covered Parties" shall include Highland CLO Funding, Ltd., Highland HCF Advisor, Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Multi Strategy Credit Fund GP, L.P., Highland Multi Strategy Credit GP, LLC, Highland Multi Strategy Credit Fund, Ltd., Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., Highland Select Equity Fund, L.P., Highland Restoration Capital Partners Master, L.P., Highland Restoration Capital Partners GP, LLC, Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Offshore Director, LLC, Acis CLO Management, LLC, Neutra, Ltd., Pollack, Ltd., Acis CLO Management Holdings, L.P., Acis CLO Management Intermediate Holdings I, LLC, Acis CLO Management Intermediate Holdings II, LLC, Acis CLO Assets Holdings Limited, CHG Houston Holdings, LLC, Penant Management, L.P., Penant Management GP, LLC, Gunwale, LLC, HE Capital, LLC, Gleneagles CLO, Ltd., Aberdeen Loan Funding, Ltd Highland Argentina Regional Opportunity Fund GP, LLC, Highland Argentina Regional Opportunity Fund, L.P., Highland Argentina Regional Opportunity Fund, Ltd., Highland Argentina Regional Opportunity Master Fund, L.P., Highland Latin America Consulting, Ltd., Highland Capital Management Korea Limited, Highland Capital Management Latin America, L.P., Highland Latin America GP, Ltd., Highland Latin America LP, Ltd., Highland Offshore Partners, L.P. (Diversified), Brentwood CLO, Ltd., Eastland CLO, Ltd., Bristol Bay Funding Ltd., Jasper CLO Ltd., Highland Legacy Limited, Grayson CLO, Ltd., Greenbriar CLO, Ltd.,  Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Liberty CLO, Ltd., Valhalla CLO, Ltd., Stratford CLO Ltd., Southfork CLO, Ltd., Pam Capital Funding, L.P., Stonebridge-Highland Healthcare Private Equity Fund, Pamco Cayman Ltd., Red River CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO, Ltd., Westchester CLO, Ltd. Longhorn Credit Funding, LLC, PensionDanmark Pensionsforsikringsaktieselskab, Highland Dynamic Income Master Fund L.P., Highland Dynamic Income Fund GP, LLC, Highland Dynamic Income Fund, L.P., Highland Dynamic Income Fund, Ltd., Highland JHT Holdings, LLC, Highland Prometheus Master Fund, L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland Sunbridge GP, LLC, Trussway Holdings, LLC, Trussway Industries, LLC, TW Company, Inc., T-Way Investments, LLC, SSP Holdings, LLC, Highland Flexible Income UCITS Fund, and Acis CLO 2017-7, Ltd. *Notwithstanding the forgoing or anything herein to the contrary*, none of "Highland Released Parties", "Highland Parties", nor "Highland Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming

016889

HCMLPHMIT00002695

through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner and none of such Persons are released from any Claim by any Person in connection with this Agreement.

"**HMIT Class 10 Interest**" means the unvested, contingent Class 10 interest in the Claimant Trust (a) to be allowed on account of HMIT's pre-petition equity interest in Highland, and (b) subject to the terms and conditions, as applicable, of the Plan, the Plan Documents, the Claimant Trust Agreement, and in accordance with this Agreement, and applicable law.

"**HMIT Note**" means that certain Secured Promissory Note dated December 21, 2015, in the original face amount of $63,000,000 from HMIT, as maker, and Highland, as payee.

"**HMIT Note Claims**" means any Claim related to, in connection with or arising out of the HMIT Note.

"**HMIT Released Parties**" means collectively (i) the HMIT Entities, (ii) any Affiliate of any HMIT Entity and any Person directly or indirectly majority owned by any HMIT Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any HMIT Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i) – (iii), collectively, the "**HMIT Parties**"), (iv) each of the HMIT Parties' current and former trustees, administrators, officer, executives, agents, directors, advisors, consultants, manager, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns (v) the professionals (and their respective firms (a) retained by any HMIT Party during the Bankruptcy Case or which provided services to any HMIT Party during the Bankruptcy Case or (b) retained by any HMIT Released Party on or after August 11, 2021, (vi) any Person indemnified by any HMIT Party (the Persons described in clauses (i) – (vi), collectively, the "**HMIT Covered Parties**"), and (vii) each HMIT Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "HMIT Covered Parties." *Notwithstanding the forgoing*, none of "HMIT Released Parties", "HMIT Parties", nor "HMIT Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner, and none of such Persons are released from any Claims by any Person in connection with this Agreement.

"**Indemnity Trust Administrator**" has the meaning given to it in the Indemnity Trust Agreement.

"**Indemnity Trust Agreement**" means that certain *Second Amended and Restated Indemnity Trust Agreement of the Indemnity Trust* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of [April 28], 2025, by and among the Claimant Trust, as grantor, James P. Seery, Jr., as indemnity

016890

HCMLPHMIT00002696

trust administrator, and Wilmington Trust, National Association, a national banking association, as indemnity trustee and Delaware trustee.

"**Indemnity Trust Assets**" has the meaning set forth in the Indemnity Trust Agreement, but excluding Highland, the Claimant Trust, and their respective assets.

"**Independent Board**" means the independent board appointed by the Bankruptcy Court on January 9, 2020, pursuant to that certain *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 339].

"**Kirschner Claims**" means all Claims and causes of action that were asserted or could have been asserted by the Litigation Trustee of the Litigation Sub-Trust, in the Amended Complaint.

"**Liability**" means any liability, debt, obligation, loss, damage, claim, cost or expense (including costs of investigation and defense and attorney's fees, costs and expenses), in each case, whether direct or indirect, whether accrued or contingent, whether or not involving a third-party claim, and including incidental and consequential damages and diminution of value.

"**Litigation Protections**" means, individually and collectively, the rights, duties, and obligations set forth in Sections 1 – 2 and Sections 9 - 16.

"**Litigation Sub-Trust**" means the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act.

"**Litigation Sub-Trust Agreement**" means that certain Litigation Sub-Trust Agreement of the Litigation Sub-Trust (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 16, 2021, by and among James P. Seery, Jr., as Claimant Trustee of the Claimant Trust, Wilmington Trust, National Association, a national banking association, as Delaware Trustee, and the Litigation Trustee.

"**Litigation Trustee**" means Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust.

"**LPA**" means that certain *Sixth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), dated as of October 4, 2021.

"**Operating Expenses**" means, except for the expenses of the Indemnity Trust (including any payments to Trust Indemnified Parties or Indemnified Parties (in each case, as defined, and pursuant to the terms and conditions set forth, in the Indemnity Trust Agreement)), the expenses of operating and administering the Highland Entities, including legal expenses, employee compensation, Claimant Trustee/CEO and other trust and trustee related compensation, incentive compensation, and customary general and administrative expenses.

6

016891

HCMLPHMIT00002697

"**Original Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* attached as Exhibit A to the *Order (A) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as modified) and (B) Granting Related Relief*, filed at Docket No. 1943 on the Bankruptcy Court's docket.

"**Oversight Board**" means the oversight board of the Highland Claimant Trust.

"**Pending Litigation**" means (i) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including *Hunter Mountain Investment Trust's Emergency Motion for Leave to File Adversary Proceeding* filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating there); (ii) *Dugaboy Investment Trust v. Highland Cap. Mgmt, L.P.*, 3:24-cv-01531-X (N.D. Tex.) (only as to HMIT), and (iii) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:24-cv-01786-L (N.D. Tex.).

"**Permitted Investments**" has the meaning set forth in the Indemnity Trust Agreement.

"**Person**" means any natural person, partnership, limited liability partnership, corporation, limited liability company, association, joint stock company, trust, estate, joint venture, unincorporated organization or Governmental Authority.

"**Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* as conformed in accordance with the Fifth Circuit's rulings.

"**Plan Documents**" has the meaning given to it in the Plan.

"**Plan Protections**" means, collectively, the provisions of the Plan contained in Article IX thereof.

"**Pro Rata**" means the proportion that (a) the allowed amount of a particular Claim or Equity Interest in Class 10 bears to (b) the aggregate allowed amount of all Claims or Equity Interests in Class 10.

"**Threats**" means any written threats of legal action, legal demands, filed complaints, petitions for pre-suit discovery, suits, litigations, arbitrations, actual or threatened restraining orders or injunctions made in writing, or similar written actions of any kind, or sworn statements evidencing the same, in any forum against any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), excluding any such action that would otherwise be a Threat except that any applicable statute of limitations that could be applicable to such action has expired.

"**Threats Notice**" means the written notice of any Threats received by the Indemnity Trust with respect to any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), that is hereby required to be provided by the Indemnity Trust to the HMIT Entities, within five (5) Business Days after receipt of such Threat.

## RECITALS

7

016892

HCMLPHMIT00002698

**WHEREAS**, as of the Petition Date, HMIT held Class B and Class C Limited Partnerships Interests in Highland;

**WHEREAS**, on December 21, 2015, HMIT entered into the HMIT Note with Highland, which had a total outstanding principal balance of Fifty-Seven Million Six Hundred Ninety Thousand Six Hundred Forty and 95/100 Dollars ($57,690,640.95) as of the Petition Date (the "**HMIT Note Balance**");

**WHEREAS**, HMIT's Class B and Class C Limited Partnership Interests in Highland were extinguished on August 11, 2021, in accordance with the Plan;

**WHEREAS**, pursuant to the LPA, HMIT's capital account balance at Highland on account of its Class B and Class C Limited Partnership Interests on the Petition Date was Three Hundred Ninety-Four Million Six Hundred Thirty Thousand Eight Hundred Seventy-One and 53/100 Dollars ($394,630,871.53) (the "**HMIT Capital Account Balance**");

**WHEREAS**, some or all of the HMIT Entities have asserted certain Claims against certain Highland Entities and certain other Highland Covered Parties, including those asserted in the Pending Litigation;

**WHEREAS**, certain distributions to be made to the holders of allowed Class 10 Claims or Equity Interests pursuant to the terms and subject to the conditions set forth herein are premised on the consent of certain Highland Covered Parties in their capacity as Holders of Class 9 Interests, and such Persons are only willing to provide such consent in exchange for the releases as set forth in this Agreement;

**WHEREAS**, some or all of the Highland Entities have asserted certain Claims against certain HMIT Entities, including the HMIT Note Claims;

**WHEREAS**, the Parties wish to terminate, extinguish, and release any and all rights, duties, obligations and Claims that (a) any of the Highland Released Parties owed or have, or may have owed or have, to or with respect to any of the HMIT Released Parties, and (b) any of the HMIT Released Parties owed or have, or may have owed or have, to or with respect to any of the Highland Released Parties, as provided in this Agreement (collectively, the "**Rights and Obligations**");

**WHEREAS**, the Parties agree that the Litigation Protections are intended to enact a permanent cessation of all litigation concerning or related to the Highland Released Parties through and including the Agreement Date; and

**WHEREAS**, the Parties, individually and collectively, wish to (a) resolve all disputes between and/or among any of the Highland Entities and their respective indemnitees, on the one hand, and any of the HMIT Entities, on the other hand, including those asserted or attempted to be asserted in the Pending Litigation, (b) fix and allow HMIT's Class 10 Interest at the amount and on the terms provided herein; and (c) terminate, extinguish, and release all Rights and Obligations on the terms provided herein.

016893

HCMLPHMIT00002699

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

1.      Stay and Dismissal of Pending Litigation With Prejudice.

(a)      Within five (5) Business Days after the Agreement Date, the HMIT Entities shall take all steps necessary (at their own cost) to stay the Pending Litigation.

(b)      Within five (5) Business Days after the Bankruptcy Court Approval Date, the HMIT Entities shall take all steps necessary (at their own cost) to dismiss the Pending Litigation with prejudice.

2.      Maintenance of Stay and Dismissal of Certain Defendants from the Amended Complaint.

(a)      The Litigation Trustee shall continue to maintain the stay of Adv. Proc. No. 21-03076-sgj and all related proceedings arising therefrom through the Bankruptcy Court Approval Date. Within five (5) Business Days after the Bankruptcy Court Approval Date, the Litigation Sub-Trust shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand PE from Counts I, II, III, and XXIV of the Amended Complaint.

3.      Cash Payment to HMIT.  Within five (5) Business Days following the Bankruptcy Court Approval Date, Highland shall pay HMIT a one-time, lump sum of Five Hundred Thousand Dollars (US$500,000.00) (the "**Payment**") by wire transfer:

> Hunter Mountain Investment Trust
> C/o CLO Holdco, LLC
> Hancock Whitney
> Account # - 071173413
> Routing # - 113000968
> (469) 604-0955

4.      HMIT Class 10 Interest.

(a)      Subject to entry of the Bankruptcy Court Order, and the terms of this Agreement, the HMIT Class 10 Interest shall be deemed allowed in the amount of Three Hundred Thirty-Six Million Nine Hundred Forty Thousand Two Hundred Thirty and 58/100 Dollars (US$336,940,230.58), which amount represents the HMIT Capital Account Balance, less the HMIT Note Balance.

(b)      Notwithstanding anything to the contrary in the Plan or the Claimant Trust Agreement, as an integral part of this Agreement to consent to the allowance of the HMIT Class 10 Interest and the other considerations in this Agreement, HMIT shall not be deemed, and no holder of the HMIT Class 10 Interest shall be, a Claimant Trust Beneficiary or a "Beneficiary" under the Claimant Trust Agreement, and the Highland Released Parties, individually and collectively, shall owe no duty to any HMIT Releasor (whether contractual, fiduciary, equitable,

9

016894

HCMLPHMIT00002700

statutory or otherwise), including with respect to the HMIT Class 10 Interest, in each case, except as expressly set forth in this Agreement.  Furthermore, without limiting the foregoing and for the avoidance of doubt, the contractual right of the holder of the HMIT Class 10 Interest to receive or recover any payments or Indemnity Trust Assets from the Indemnity Trust as set forth in this Agreement or the Indemnity Trust Agreement does not make any HMIT Releasor or any other Person a beneficiary of the Indemnity Trust or under the Indemnity Trust Agreement.

(c)     Notwithstanding anything to the contrary in the Plan, the Claimant Trust Agreement or the Indemnity Trust Agreement, in no event shall HMIT sell, transfer, assign, pledge, hypothecate, participate or otherwise dispose of or encumber the HMIT Class 10 Interest or any rights (including any right to payment) with respect thereto (collectively, a "**Class 10 Assignment**"), and any attempted Class 10 Assignment shall be null and void.

(d)     For the avoidance of doubt, the HMIT Class 10 Interest is and shall remain senior to the not yet allowed, unvested contingent Class 11 Claims of Equity Interests as provided for in the Plan, the Plan Documents, and the Claimant Trust Agreement.

5.     <u>Initial Interim Distributions on the Allowed Class 10 Interests</u>.

(a)     Within five (5) Business Days after the Bankruptcy Court Approval Date, the Indemnity Trust shall distribute (the date on which such distribution is made, the "**Initial Interim Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Ten Million Dollars (US$10,000,000.00) (the "**Initial Interim Cash Distribution Amount**"), by means of wire transfer with the Pro Rata portion in respect of the HMIT Class 10 Interest sent to the wire instructions contained in Section 3 ("**Wire Transfer**").

(b)     Within five (5) Business Days after the Bankruptcy Court Approval Date (the "**Note Assignment Date**"), the Highland Entities shall cause the portion of the Dugaboy Note held by the Highland Entities to be distributed to HMIT in-kind and take all actions necessary for HMIT to become the holder of such portion of the Dugaboy Note, and shall in addition pay to HMIT cash in the aggregate amount of all principal and interest payments actually received on the Dugaboy Note by the Highland Entities, including the Indemnity Trust, from the Agreement Date to the Note Assignment Date.  Prior to the Bankruptcy Court Approval Date, HMIT will engage an independent valuation service provider to value the Dugaboy Note for purposes of determining the magnitude of reduction to the outstanding allowed Class 10 Interests on account of such in-kind distribution, which shall not be less than Fifty percent (50%) of the current balance owed under the Dugaboy Note. The HMIT Entities acknowledge and agree that none of the Highland Entities are representing or warranting that the Dugaboy Note can be sold, or the price, if any, that could be received for the Dugaboy Note and further acknowledge and agree that any such purchase price may be de minimis.

6.     <u>Subsequent Distribution(s) on the Allowed Class 10 Interests</u>.

(a)     On December 1, 2027, the Indemnity Trust shall distribute (such distribution, collectively, the "**First Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**First Subsequent Distribution Date**") Pro Rata to the

016895

HCMLPHMIT00002701

Holders of allowed Class 10 Claims or Equity Interests: cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$6,500,000.00), by Wire Transfer.

(b)     On December 1, 2028, the Indemnity Trust shall distribute (such distribution, collectively, the "**Second Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**Second Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$6,500,000.00) by Wire Transfer.

(c)     Notwithstanding anything herein to the contrary, the obligations of the Indemnity Trust to make the First Subsequent Distribution or Second Subsequent Distribution is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII, Section 8.1(c) of the Indemnity Trust Agreement that the Indemnity Trust Assets comprising such distributions are not reasonably necessary to satisfy current or potential Indemnification Obligations (as defined in the Indemnity Trust Agreement) to all persons who are or might become Beneficiaries (as defined in the Indemnity Trust Agreement).

7.     Final Distribution on the Allowed Class 10 Interests.

(a)     On the later of the Final Court Approval Date and April 1, 2029, the Indemnity Trust will distribute all excess remaining Indemnity Trust Assets in accordance with Article VIII of the Indemnity Trust Agreement; provided, however, that the obligation of the Indemnity Trust to make any such distributions and/or dissolve and wind up the affairs of the Indemnity Trust is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII of the Indemnity Trust Agreement that (1) a Final Order(s) (as defined in the Indemnity Trust Agreement) has been entered resolving all litigation, claims or proceedings in any forum of any kind which could give rise to Indemnity Obligations (as defined in the Indemnity Trust Agreement) and payment in full of all such Indemnity Obligations and (2) all applicable statutes of limitations and any applicable tolling of such statutes of limitation have expired.

(b)     The Indemnity Trust agrees to not use Indemnity Trust Assets to fund Operating Expenses.

(c)     Following the Bankruptcy Court Approval Date, at the request of Mark Patrick, solely in his capacity, and to the extent he remains, as administrator of HMIT, but not more often than quarterly, Highland and the Indemnity Trust Administrator agree to review (i) the status of their respective assets, (ii) the balance of cash held, (iii) the status of any claims made for indemnification and any resolutions thereof, (iv) the status of any litigation, and (v) forecasted operating expenses with Mr. Patrick, and will each work in good faith to reduce operating expenses where reasonably practicable; provided, however, that all such reporting shall be subject to Mr. Patrick's agreement to maintain confidentiality with respect to any non-public information.

8.     Transfer Kirschner Claims; Dismissal of HMIT Note Claims.

(a)     Within five (5) Business Days after the Bankruptcy Court Approval Date, but after the dismissal provided for in Section 2, the Litigation Sub-Trust shall execute a short-

016896

HCMLPHMIT00002702

form assignment in in favor of the HMIT Entities transferring all of the Litigation Sub-Trust's right, title, and interest in and to the Kirschner Claims (the "**Kirschner Transfer**"). Such assignment shall be in a form mutually acceptable to the Parties and its substance shall be consistent with the terms, conditions and limitations set forth in this Agreement, including Section 8(b) below. Each HMIT Entity acknowledges and agrees that none of the Highland Entities will have any duty or obligation to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof, except as provided in this Agreement, including the terms of Section 8(c) below.

(b)     THE HMIT ENTITIES SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THE LITIGATION SUB-TRUST IS TRANSFERRING THE KIRSCHNER CLAIMS ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT THE HMIT ENTITIES ARE NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM THE HIGHLAND ENTITIES OR THEIR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE KIRSCHNER CLAIMS AND AMENDED COMPLAINT, INCLUDING WITH RESPECT TO THE ENFORCEABILITY, TRANSFERABILITY, VIABILITY, STRENGTH, OR VALUE OF ANY OF THE KIRSCHNER CLAIMS OR THE AMENDED COMPLAINT.  The HMIT Entities hereby specifically acknowledge that they have carefully reviewed this Section and have had the opportunity to discuss its import with legal counsel and that the provisions of this Section are a material part of this Agreement.  Thus, if for any reason HMIT is precluded from or is otherwise unable to prosecute all or any of the Kirschner Claims, (i) the HMIT Releasors shall have no recourse against any Highland Released Parties whatsoever and shall not be entitled to compensation of any kind, it being agreed that the HMIT Entities are otherwise receiving adequate consideration for the duties and obligations they are undertaking pursuant to this Agreement and (ii) there will be no effect whatsoever on the validity and enforceability of this Agreement or any of the other transactions contemplated hereby.

(c)     As promptly as reasonably practicable following the Bankruptcy Court Approval Date, the Highland Entities shall provide to the HMIT Entities electronic copies of written discovery requests and responses thereto, and documents produced in discovery in respect of the Kirschner Claims and the Amended Complaint.  The Highland Entities will not provide any other documents regarding the Kirschner Claims including any attorney-client communications and any documents subject to the attorney work-product doctrine or similar privileges or immunities concerning the Kirschner Claims (collectively, the "**Kirschner Privileges**"), it being understood and agreed that the Highland Entities are retaining, and not transferring or waiving, the Kirschner Privileges.

(d)     Each Party acknowledges and agrees that if (i) the Kirschner Transfer is found or deemed to be impermissible or invalid, for any reason, or (ii) any HMIT Entity materially breaches this Agreement, the Kirschner Claims and Amended Complaint will revert to, and remain an asset of, the Litigation Sub-Trust.

9.     <u>General Release By The HMIT Entities</u>. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the HMIT Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its and their respective current and former advisors, consultants,

016897

HCMLPHMIT00002703

administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the HMIT Entities, the "**HMIT Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each Highland Released Party from, and waives and relinquishes, any and all Claims, which the HMIT Releasors, or any Person claiming through, under, or on behalf of any of the HMIT Releasors, ever had, now has, or hereafter can, shall, or may have against any of the Highland Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Agreement Date, including any fact, matter, transaction, or occurrence asserted by any HMIT Entity in the Pending Litigation or in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the Highland Released Parties, or the Highland Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**HMIT Entity Released Claims**").

10. <u>General Release By The Highland Entities</u>. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the Highland Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its or their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the Highland Entities, the "**Highland Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, any and all Claims which the Highland Releasors, or any Person claiming through, under, or on behalf of any of the Highland Releasors, ever had, now has, or hereafter can, shall, or may have against any of the HMIT Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Bankruptcy Court Approval Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the HMIT Released Parties, or the HMIT Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**Highland Released Claims**").

11. <u>Further Provisions Concerning The General Releases</u>.

(a) **FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASES ARE INTENDED TO BE GENERAL AND INCLUDE A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE AGREEMENT DATE.**

13

HCMLPHMIT00002704

(b)     To the maximum extent permitted by law, each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefit of any statute or other principle of law or equity that limits the applicability of a release with respect to Claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release.

(c)     Without limiting the scope of the foregoing waiver, in connection with the foregoing release, each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefits of Section 1542 of the California Civil Code (to the extent, if any, that Section 1542 might apply to the foregoing release), which provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees that the provisions of Section 1542 of the Civil Code of the State of California and all similar federal or state law, rights, rules or legal principles, legal or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY EACH OF THE HMIT ENTITIES AND THE HIGHLAND ENTITIES, ON THEIR OWN BEHALF AND ON BEHALF OF THE OTHER HMIT RELEASORS AND HIGHLAND RELEASORS, RESPECTIVELY,** in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

In connection with such waiver and relinquishment, each of the HMIT Entities and Highland Entities acknowledges that it is aware that it may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein.  Nevertheless, it is the intent of each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, in executing this Agreement fully, finally, and forever to settle and release all such matters, and all Claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

(d)     As an integral component of this Agreement, and notwithstanding the Parties' intent set forth in the preamble hereto and the general nature of the releases in <u>Sections 9 and 10</u>, should:

016899

HCMLPHMIT00002705

(i)    any HMIT Releasor contend or assert that any Claim of any kind whatsoever held by any HMIT Releasor against any Highland Released Party survives this Agreement and is in any way related to or arising from or in connection with any HMIT Entity Released Claim (such claim or cause of action, a "**HMIT Alleged Claim**"), such HMIT Releasor will be deemed to have irrevocably, fully, and finally assigned such HMIT Alleged Claim to the Highland Entities and the Highland Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such HMIT Alleged Claim.

(ii)    any Highland Releasor contend or assert that any Claim of any kind whatsoever held by any Highland Releasor against any HMIT Released Party survives this Agreement and is in any way related to or arising from or in connection with any Highland Entity Released Claim (such claim or cause of action, a "**Highland Alleged Claim**"), such Highland Releasor will be deemed to have irrevocably, fully, and finally assigned such Highland Alleged Claim to the HMIT Entities and the HMIT Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such Highland Alleged Claim.

12.    <u>Covenant Not To Sue; Limitation on Standing</u>. Upon the Agreement Date:

(a)    Each of the HMIT Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the Highland Released Parties, to recover, enforce, investigate, or collect any HMIT Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(b)    Each of the Highland Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the HMIT Released Parties, to recover, enforce, investigate, or collect any Highland Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(c)    For the avoidance of doubt, this Agreement shall not operate to give any HMIT Entity standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except for the limited purpose of seeking Court approval of this Agreement (including with respect to any appeal concerning any order entered granting or denying such approval), and except for the limited purpose of enforcing this Agreement, no HMIT Entity shall commence any Action in connection with the HMIT Class 10 Interest.

13.    <u>Representations and Warranties</u>.

(a)    Each of the HMIT Entities hereby represents and warrants that every HMIT Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any HMIT Releasor.

(b)    The HMIT Entities, on their own behalf and on behalf of the other HMIT Releasors, acknowledge and agree that each Plan Provision is lawful, effective, and binding on the HMIT Releasors. The HMIT Entities further agree, on their own behalf and on behalf of the

016900

HCMLPHMIT00002706

other HMIT Releasors, that the HMIT Releasors will never, in any way, challenge or seek to modify, nullify, vacate, or revoke, or induce, encourage or direct any other Person to do so or act in concert with or assist (financially or otherwise) any other Person in doing so the Confirmation Order, the Plan, the Plan Protections, or any Plan Document, including the Claimant Trust Agreement, the LPA, the Indemnity Trust Agreement or the Litigation Sub-Trust Agreement, in the Bankruptcy Court, in any other state or federal court, in any other forum or tribunal, or otherwise, including administrative or regulatory tribunals and foreign courts.

(c)     Each of the Highland Entities hereby represents and warrants that every Highland Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any Highland Releasor.

(d)     Each Party severally represents and warrants as to itself only that: (i) it has taken all necessary action to authorize and approve the execution, delivery and performance of this Agreement; (ii) such Party has full power and authority to execute and deliver this Agreement; and (iii) this Agreement constitutes a valid, legal and binding obligation of such Party, and is enforceable subject to its terms.  Each individual signatory hereto individually warrants and represents to all Parties hereto that such individual has full power and authority to act on behalf of and bind the Party for which he or she has executed this Agreement; provided, however that no signatory shall otherwise provide any warranty or representation or otherwise be a party to this Agreement on an individual basis.

14.     <u>No Continuing Rights, Duties or Obligations</u>.  Except for the rights, duties, and obligations expressly set forth in this Agreement, all Rights and Obligations that existed or may have existed shall be deemed terminated, extinguished, and released upon the Agreement Date. For the avoidance of doubt, from and after the Agreement Date, (a) the Highland Released Parties, individually and collectively, shall owe no duty, past or present, including with respect to the Kirchner Claims, to the HMIT Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement, and (b) the HMIT Released Parties, individually and collectively, shall owe no duty to the Highland Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement.

15.     <u>Gatekeeper Standard</u>.

(a)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that, notwithstanding the United States Court of Appeals for the Fifth Circuit's decision in *Highland Capital Management Fund Advisors, L.P. v. Highland Capital Management, L.P.*, No. 23-10534 (5th Cir. Mar. 18, 2025), the "Gatekeeper" provisions contained in Highland's Original Plan is forever binding on each of the HMIT Entities and any Persons claiming through, under or on behalf of any of them, and for a claim or cause of action to be  "colorable" for purposes of the Gatekeeper, it must be found by final order of the Bankruptcy Court (the "**Gatekeeper Court**"), which order shall be subject to appeal to a court of competent jurisdiction, to have satisfied the "Gatekeeper Colorability Test" as such term is defined in *In re Highland Capital Management, L.P.*, 2023 Bankr. LEXIS 2104 at *124-36 (Bankr. N.D. Tex. Aug. 24, 2023).

016901

HCMLPHMIT00002707

(b)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that compliance with the Gatekeeper requires (i) a motion seeking leave to sue an Exculpated Party (as that term is defined in Highland's original Plan) and a finding that the litigant's claims and causes of action are "colorable" attaching a complaint setting forth the basis for such claims or causes of action and (ii), in the Gatekeeper Court's sole discretion, an evidentiary hearing (during which the Gatekeeper Court may, among other things, hear testimony and assess the credibility of any witness(es)) to determine whether a proposed claim or cause of action is "colorable."

(c)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, further acknowledge and agree that the moving party under the Gatekeeper has the burden of satisfying the "Gatekeeper Colorability Test," and that the dismissal of the Pending Litigation shall have res judicata effect.

16.     <u>Indemnification</u>.

(a)     Without in any manner limiting the available remedies for any breach of this Agreement, the HMIT Entities, severally but not jointly, agree to indemnify, defend, and hold the Highland Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any HMIT Entity set forth in <u>Section 13</u> or (y) any Actions brought or prosecuted by or on behalf of, any HMIT Releasor or that are induced, encouraged, assisted  or directed by any HMIT Releasor or brought or prosecuted in concert with any HMIT Releasor against any Highland Released Party with respect to or related to any HMIT Entity Released Claims.  Without limiting the scope of the foregoing in any manner, any HMIT Entity that breaches <u>Section 12</u> shall be liable to the Highland Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such Highland Released Party in defending against or otherwise responding to such Action.  Each HMIT Entity acknowledges and agrees that the HMIT Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

(b)     Without in any manner limiting the available remedies for any breach of this Agreement, the Highland Entities, severally but not jointly, agree to indemnify, defend, and hold the HMIT Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any Highland Entity set forth in <u>Section 13</u> or (y) any suits, proceedings, or other actions brought or prosecuted by or on behalf of, any Highland Releasor or that are induced, encouraged, assisted  or directed by any Highland Releasor or brought or prosecuted in concert with any Highland Releasor against any HMIT Released Party with respect to or related to any Highland Entity Released Claims.  Without in any manner limiting the scope of the foregoing, any Highland Entity that breaches <u>Section 12</u> shall be liable to the HMIT

016902

HCMLPHMIT00002708

Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such HMIT Released Party in defending against or otherwise responding to such Action. Each Highland Entity acknowledges and agrees that the Highland Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

17.    <u>Execution</u>. This Agreement may be executed by the exchange of signatures by facsimile or by PDF attachment to an email transmittal and in counterparts, and if so executed, shall be fully executed when a counterpart has been executed and delivered by all Parties hereto through counsel. All counterparts taken together shall constitute one and the same agreement and shall be fully enforceable as such.

18.    <u>Bankruptcy Court Order</u>. The allowance of the allowed HMIT Class 10 Interest pursuant to <u>Section 4</u> is subject to the entry of the Bankruptcy Court Order. To that end, the Highland Entities shall file the 9019 Motion no later than five (5) Business Days after the Agreement Date. Each Party shall, and shall cause each of their respective Affiliates to, undertake any and all actions in compliance with applicable law to obtain the Bankruptcy Court Order as promptly as practicable, and without limiting the foregoing, if an Action is threatened or instituted by any Person opposing the 9019 Motion or otherwise challenging the validity or legality, or seeking to restrain the consummation, of the transactions contemplated by this Agreement or the Bankruptcy Court Order, each Party shall, and shall cause its respective Affiliates to, use their commercially reasonable best efforts to avoid, resist, resolve or, if necessary, and defend to effectuate this Agreement and consummate the transactions hereby. If the 9019 Motion is not approved by entry of the Bankruptcy Court Order or if the Bankruptcy Court Approval is precluded from becoming a Final Order, (a) there will be no effect on, adjustment to, or impairment of, in any way, the validity and enforceability of the remainder of this Agreement, and the other transactions contemplated hereby, all of which shall remain in full force and effect and (b) each Party shall, and shall cause its respective Affiliates to, use their best efforts to seek the allowance of the HMIT Class 10 Interest in a substantially similar amount and on substantially similar terms as set forth in <u>Section 4</u> to the fullest extent possible so as to give effect to the original intent of the Parties as closely as possible.

19.    <u>Fees and Expenses</u>. Whether or not the transactions contemplated hereby are consummated or the Bankruptcy Court Order is obtained, and except as otherwise expressly provided in this Agreement, each Party will bear its respective fees, costs and expenses (including legal, accounting and other professional fees) incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the transactions contemplated hereby, including with respect to each Party's respective obligations pursuant to <u>Section 18</u>. Notwithstanding the foregoing, if any Party hereto, any Highland Released Party, or any HMIT Released Party brings an Action to enforce or interpret the terms and provisions of this Agreement, the prevailing Person in that Action shall be entitled to have and recover from the non-prevailing Person all such fees, costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Person may suffer or incur in the pursuit or defense of such action or proceeding.

18

016903

20.   <u>Entire Agreement; No Other Representations</u>.   **THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF ANY PERSON OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT.  THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS (COLLECTIVELY, "<u>REPRESENTATIONS</u>"), EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT.  THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT; AND THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT RELIED ON ANY REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY ARE ENTERING INTO THIS AGREEMENT RELYING SOLELY ON THEIR OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS BY ANY PARTY, EXCEPT FOR THOSE REPRESENTATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT.  THE PARTIES AGREE THAT REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT SHALL NOT BE USED IN THE INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT, AND NEITHER THE HMIT RELEASED PARTIES NOR THE HIGHLAND RELEASED PARTIES SHALL HAVE ANY LIABILITY FOR ANY CONSEQUENCES ARISING AS A RESULT OF ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT**.

21.   <u>Agreement and Release Knowing and Voluntary</u>.   The Parties acknowledge that they have considered this Agreement with their respective attorneys and have carefully read this Agreement, that it has been fully explained by their attorneys, and that they have had a reasonable opportunity to consider this Agreement.  The Parties further represent that they know and fully understand the contents of this Agreement, that they intend to be legally bound by this Agreement and the releases and covenants contained herein, and that they are signing this Agreement, including the release provisions herein, voluntarily and of their own free will and without coercion, and with the benefit of advice of counsel.

22.   <u>Cooperation</u>.   The Parties agree to perform any services or actions reasonably necessary to carry out the terms and conditions of this Agreement or the transactions contemplated hereby, including the execution and delivery of reasonable additional documents, instruments, conveyances and/or assurances, in good faith, and to reasonably communicate and cooperate with one another in this regard.  For the avoidance of doubt, nothing in this Section shall obligate the Highland Entities to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof.

23.   <u>Governing Law</u>.   This Agreement shall be construed pursuant to and governed by the laws of the State of Delaware (substantive and procedural) without reference to principles of conflicts of law that would result in the application of any other State's laws.

24.   <u>Jurisdiction/Venue</u>.   The Parties hereby irrevocably submit to the jurisdiction and venue of the Bankruptcy Court with respect to any Action arising out of or related to this Agreement or the subject matter hereof; if (and only if) the Bankruptcy Court lacks personal or

016904

HCMLPHMIT00002710

subject matter jurisdiction to adjudicate an Action arising out of or related to this Agreement or the subject matter hereof, then the Parties irrevocably submit to the jurisdiction and venue of the United States District Court for the Northern District of Texas.

25.     <u>No Admissions</u>.  All Parties acknowledge and agree that the matters set forth in this Agreement constitute the settlement and compromise of disputed Claims and that this Agreement shall not constitute the admission of any fact or liability by any of them regarding any Claim, including the Claims released hereunder, and neither the terms hereof, nor the fact of this Agreement itself, shall be evidence of any kind in any Action, other than an Action to enforce the terms of the Agreement or any instrument executed in connection herewith or any claim for damages or other relief for breach of any representation or warranty contained herein or in any instrument executed in connection herewith.

26.     <u>Other Provisions</u>.

(a)     No representation, inducement, agreement, promise or understandings altering, modifying, amending, taking from or adding to, the terms and conditions hereof shall have any force or effect unless the same is in writing and validly executed by each of the Parties hereto.

(b)     The waiver by any Party of any breach of, or default under, any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or default; provided, however, that for any such waiver to be enforceable, it shall be in writing and executed by the non-breaching Party.

(c)     The headings contained in this Agreement are for convenience only and shall in no way restrict or otherwise affect the construction of the provisions hereof.

(d)     The Parties shall each execute all documents and perform all acts necessary and proper to effectuate the terms of this Agreement.

27.     <u>Notices</u>.  All notices required or permitted to be provided hereunder shall be afforded to the respective parties to and through their counsel, and shall be transmitted simultaneously by electronic mail (with PDF attachments, as necessary) and by telefax, addressed as follows:

To the Highland Entities:

**PACHULSKI STANG ZIEHL AND JONES LLP**
Jeffrey N. Pomerantz
John A. Morris
10100 Santa Monica Boulevard
Los Angeles, California 90067-4003
310.277.6910
jpomerantz@pszjlaw.com
jmorris@pszjlaw.com

To the HMIT Entities:

016905

HCMLPHMIT00002711

**KELLY HART PITRE**
Louis M. Phillips
Amelia Hurt
301 Main Street, Suite 1600
225.381.9643
Louis.Phillips@Kellyhart.com
Amelia.Hurt@Kellyhart.com

28.   <u>Severability</u>. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity and enforceability of any other provision of this Agreement.

29.   <u>Interpretive Provisions</u>. Unless the express context otherwise requires: (a) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) words defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (c) the words "Dollars" and "$" mean U.S. dollars; (d) references herein to a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement; (e) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words ",without limitation,"; (f) references herein to any gender shall include each other gender; (g) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement; (h) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (i) the word "or" shall be disjunctive but not exclusive; (j) the headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties; and (k) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

[*Signature page follows*]

016906

HCMLPHMIT00002712

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**HUNTER MOUNTAIN INVESTMENT TRUST**

By        /s/ Mark Patrick
Name:     Mark Patrick
Title:    Administrator
Date:     May 19, 2025

**BEACON MOUNTAIN LLC**

By        /s/ Mark Patrick
Name:     Mark Patrick
Title:    President
Date:     May 19, 2025

**RAND ADVISORS, LLC**

By        /s/ Mark Patrick
Name:     Mark Patrick
Title:    President
Date:     May 19, 2025

**RAND PE FUND I, LP**
By: Rand PE Fund Management, LLC, its General Partner

By        /s/ Mark Patrick
Name:     Mark Patrick
Title:    President
Date:     May 19, 2025

**RAND PE FUND MANAGEMENT, LLC**

By        /s/ Mark Patrick
Name:     Mark Patrick
Title:    President
Date:     May 19, 2025

016907

HCMLPHMIT00002713

**ATLAS IDF, LP**
By: Atlas IDF GP, LLC, its General Partner


By      /s/ Mark Patrick
     Name:     Mark Patrick
     Title:      President
     Date:      May 19, 2025

**ATLAS IDF GP, LLC**


By      /s/ Mark Patrick
     Name:     Mark Patrick
     Title:      President
     Date:      May 19, 2025

**HIGHLAND CAPITAL MANAGEMENT, L.P.**


By      /s/ James P. Seery, Jr.
     Name:     James. P. Seery, Jr.
     Title:      Chief Executive Officer
     Date:      May 19, 2025

**HIGHLAND CLAIMANT TRUST**


By      /s/ James P. Seery, Jr.
     Name:     James P. Seery, Jr.
     Title:      Claimant Trustee
     Date:      May 19, 2025

**HIGHLAND LITIGATION SUB-TRUST**


By      /s/ Marc S. Kirschner
     Name:     Marc S. Kirschner
     Title:      Litigation Trustee
     Date:      May 19, 2025

016908
HCMLPHMIT00002714

**HIGHLAND INDEMNITY TRUST**

By     ___/s/ James P. Seery, Jr._____

      Name:      James P. Seery, Jr.

      Title:       Indemnity Trust Administrator

      Date:      May 19, 2025

016909

HCMLPHMIT00002715

# EXHIBIT 2

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>
**Subject:** RE: Highland: Confidentiality Agreement (draft)
**Date:** Wed, 5 Mar 2025 13:23:52 +0000
**Importance:** Normal
**Inline-Images:** image003.png

---

Appreciate it.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Wednesday, March 5, 2025 7:22 AM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Subject:** Re: Highland: Confidentiality Agreement (draft)

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**

---

Thanks, Louis.

016911

HCMLPHMIT00000015

I hope your mother is comfortable and stable. I can relate to caring for elderly parents . . .

Anyway, I'll wait to hear from you.

Chat soon,

John

Sent from my iPhone


On Mar 5, 2025, at 8:16 AM, Louis M. Phillips <Louis.Phillips@kellyhart.com> wrote:


Thank you John,

I have fallen a bit behind.  After I talked to you from Wisconsin my mother had to be hospitalized and I had to rearrange my travel to get back to LA.  She got home yesterday evening, but still involved with getting home health, sitters, etc.

I hope to get back at things close to full time by tomorrow.  To be sure, my clients are pushing me.



**Louis M. Phillips**
*Partner*

<image001.png>

KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

louis.phillips@kellyhart.com
www.kellyhart.com

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

HCMLPHMIT00000016

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Tuesday, March 4, 2025 4:32 PM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Subject:** Highland: Confidentiality Agreement (draft)

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**

Louis,

Following up, to aid our discussions, attached is a draft Confidentiality Agreement under which Highland would consider providing confidential information.

We look forward to hearing from you on this and related matters.

Regards,

John
**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

<image004.jpg>
Los Angeles | New York | Wilmington, DE | Houston | San Francisco

016913

HCMLPHMIT00000017

**EXHIBIT 3**

016914

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>
**Subject:** RE: Slight interruption
**Date:** Thu, 13 Mar 2025 21:35:13 +0000
**Importance:** Normal
**Inline-Images:** image006.png; image007.jpg; image008.jpg; image001.png

---

Slight but nothing big.  Hopefully by first of week

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Thursday, March 13, 2025 4:26 PM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Subject:** RE: Slight interruption

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**

---

Wow.

HCMLPHMIT00000022

You can't catch a break.

I hope there's no injuries.

Chat soon.

---

**From:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Sent:** Thursday, March 13, 2025 5:10 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Subject:** FW: Slight interruption

John,

Please see below. Hope to finish my draft proposal for my client to review tomorrow. Then as soon as possible to get It to you.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT: 225-338-5308

louis.phillips@kellyhart.com
www.kellyhart.com

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

---

**From:** Louis Phillips <louis.phillips10505@gmail.com>
**Sent:** Thursday, March 13, 2025 4:09 PM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Subject:** Slight interruption

HCMLPHMIT00000023

EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.



HCMLPHMIT00000024



**Louis M. Phillips**
*Partner*


KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

Licensed to Practice in the State of Louisiana

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the

016918

HCMLPHMIT00000025

Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

016919

HCMLPHMIT00000026

**EXHIBIT 4**

016920

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>
**Cc:** "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>
**Subject:** RE: Confidentiality Agreement - M. Patrick and Related Entities.001(Highland Draft 03.04.2025).docx
**Date:** Tue, 18 Mar 2025 16:03:57 +0000
**Importance:** Normal
**Inline-Images:** image003.png

---

Sure.  Take care.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Tuesday, March 18, 2025 10:52 AM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Cc:** Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Subject:** Re: Confidentiality Agreement - M. Patrick and Related Entities.001(Highland Draft 03.04.2025).docx

HCMLPHMIT00000028

EXTERNAL SENDER WARNING - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.

Thank you, Louis.

I'm in LA for a deposition today but will be in touch shortly, hopefully tomorrow.

Chat soon.

John

Sent from my iPhone


On Mar 18, 2025, at 8:18 AM, Louis M. Phillips <Louis.Phillips@kellyhart.com> wrote:


John,

Please see a very minor set of proposed revisions.  While I am finalizing our proposal with my clients, a couple of questions:  (i) Do you have a proposed form of joinder as described in Section 4?  (ii) is it sufficient as far as you are concerned for me to send you via email a list of Representatives as defined in Section 4 for your review and approval?


**Louis M. Phillips**
*Partner*

<image003.png>

KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

louis.phillips@kellyhart.com
www.kellyhart.com

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.


<Confidentiality Agreement - M. Patrick and Related Entities.001(Highland Draft 03.04.2025).docx>

016922

**EXHIBIT 5**

016923

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>
**Cc:** "Jeff Pomerantz" <jpomerantz@pszjlaw.com>, "Amelia L. Hurt"
<Amelia.Hurt@kellyhart.com>
**Subject:** RE: Highland: NDA w/ Patrick and Related Entities
**Date:** Wed, 19 Mar 2025 17:55:25 +0000
**Importance:** Normal
**Inline-Images:** image004.jpg; image001.png

---

John,

One thing I noticed, and should mention up front:  Re #3 on Exhibit A, if we get to a settlement then
HMIT can withdraw its appeal, but we have no influence with respect to Dugaboy. Just mentioning up
front. I will get back with you.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18
U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the
use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually
receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the
communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225)
381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be
used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose
of marketing or recommending to any other party any transaction or other matter.

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Wednesday, March 19, 2025 12:35 PM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>

HCMLPHMIT00000030

**Cc:** Pomerantz, Jordan S. <jpomerantz@pszjlaw.com>; Patterson, Mark (US-Dallas) <Mark.Patterson@kellyhart.com>
**Subject:** Highland: NDA w/ Patrick and Related Entities

EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.

Louis,

After accepting all your changes, we made a few further changes and added the Exhibits, all of which are reflected in the blackline.

If this version is acceptable, please have it signed and sent back to us at your earliest convenience and we'll promptly send a countersigned copy.

Let's chat to discuss any questions you may have or how you envision this proceeding.

I look forward to speaking with you.

Regards,

John
**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

016925

HCMLPHMIT00000031

# EXHIBIT 6

# CONFIDENTIALITY AGREEMENT

This CONFIDENTIALITY AGREEMENT (this "**Agreement**") is entered into as of March 18, 2025 (the "**Effective Date**") by and among Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**" or the "**Disclosing Party**"), on the one hand, and Mark Patrick, a United States citizen and resident of Dallas, Texas ("**Mr. Patrick**"), Hunter Mountain Investment Trust, a Delaware statutory trust ("**Hunter Mountain**"), Charitable DAF Holdco, Ltd., a Cayman Islands exempted company ("**DAF Holdco**"), CDH GP, Ltd., a Cayman Islands exempted company ("**DAF GP**"), Charitable DAF Fund, L.P., a Cayman Islands exempted limited partnership ("**DAF Fund**"), and CLO Holdco, Ltd., a Cayman Islands exempted company ("**CLO Holdco**", and together with DAF Holdco, DAF GP and DAF Fund, the "**DAF Entities**"), Rand Advisors, LLC, a Delaware limited liability company ("**Rand Advisors**"), Rand PE Fund I, LP, a Delaware series limited partnership ("**Rand PE Fund**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**"), Atlas IDF, LP, a Delaware limited partnership ("**Atlas IDF**"), Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**" and together with Rand Advisors, Rand PE Fund, Rand GP and Atlas IDF, the "**Rand Entities**", and the Rand Entities together with Mr. Patrick, Hunter Mountain and the DAF Entities, the "**Recipients**"), on the other hand.  Highland and the Recipients are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

## Recitals

WHEREAS, Mr. Patrick hereby represents and warrants that he is a control person for each of Hunter Mountain, the DAF Entities and the Rand Entities;

WHEREAS, there are several active litigations to which Highland or one of its affiliates, on the one hand, and one or more of the Recipients, on the other hand, are parties, including, without limitation, the matters set forth on Exhibit A hereto (collectively, the "**Pending Litigations**");

WHEREAS, the Parties desire to enter into good faith settlement discussions in an effort to reach a mutually acceptable global resolution to the Pending Litigations and all potential claims and causes of action against each other (the "**Potential Settlement**");

WHEREAS, in connection with negotiating the Potential Settlement, it is anticipated that Highland will provide the Recipients with certain Confidential Information (as hereinafter defined); and

WHEREAS, as a condition to Highland providing Recipients with any such Confidential Information, the Recipients agree to the terms and conditions set forth in this Agreement.

## Agreement

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, the Parties, intending to be legally bound, hereby agree as follows:

016927

## 1.    Representations and Warranties

(a)    Each Party hereby represents and warrants to the other Parties as follows:

(i)    <u>Existence and Good Standing</u>.  Such Party is a legal entity duly organized, validly existing and, to the extent applicable in such jurisdiction, in good standing under the Laws (as hereinafter defined) of the jurisdiction in which it is incorporated or formed.  Such Party has all requisite corporate or similar right, power, authority and capacity to own, lease and operate the properties and assets it owns, leases and operates.  Each Party is qualified to do business as a foreign entity in each jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify.

(ii)    <u>Authority; Enforceability</u>. Such Party has the full power and authority to execute this Agreement and to perform its obligations under this Agreement.  The execution, delivery and performance of this Agreement have been duly and validly authorized by all required action on behalf of such Party in accordance with its respective Organizational Documents (as hereinafter defined) and applicable Law.  This Agreement constitute the valid and binding obligations of, and enforceable against, such Party.

(iii)    <u>No Violations</u>.  The execution and delivery by such Party of this Agreement, the performance and compliance with the terms and conditions hereof and thereof by such Party, and the performance by such Parent of its obligations contemplated hereby, in each case, will not (with or without notice or passage of time, or both):

(1) violate, conflict with, result in a breach of or constitute a default under any of the provisions of the Organizational Documents of such Party; or

(2) breach, violate or conflict with any provision of any Law or Permit applicable to such Party.

(iv)    <u>Legal Proceedings</u>.  There are no judicial, administrative or arbitral actions, suits, hearings, inquiries, charges, investigations, administrative proceedings, grievances or formal complaints or other proceedings (public or private) commenced, brought, conducted or heard before, or otherwise involving, any Governmental Entity or arbitrator, in each case, pending nor threatened that (i) challenge the validity or enforceability of Party's obligations under this Agreement or (b) seek to prevent or delay, or otherwise would reasonably be expected to adversely affect, the performance by such Party of its obligations hereunder.

(b)    Each Recipient hereby represents and warrants to Highland as follows:

(i) None of James Dondero, nor any Person directly or indirectly owned or controlled by Mr. Dondero (including, without limitation, Dugaboy Investment Trust) nor or any attorney, agent, employee, or representative engaged or working for benefit of Mr. Dondero nor any Person directly or indirectly owned or controlled by him (collectively, the "**Dondero Related Parties**") directly or indirectly owns any interest in, or directly or indirectly has any control over, such Recipient, including, without limitation, as the result of any written or oral contract, agreement, arrangement or obligation.

2

016928

HCMLPHMIT00000033

(ii) Such Recipient does not represent and is not acting on behalf of any Dondero Related Party.

(iii) Such Recipient has no duty or obligation to provide any Confidential Information to any Person not a party to this Agreement, whether through a common or joint interest agreement or otherwise, and is not representing or acting on behalf of any Person with such a duty or obligation.

## 2.    Confidential and Proprietary Nature of the Information

Recipients acknowledge the confidential and proprietary nature of the Confidential Information, agree to hold and keep the Confidential Information in strict confidence as provided in this Agreement, agree that the use of any such Confidential Information is expressly limited to the pursuit of a Potential Settlement and shall not be used for any other purpose or in any other manner except as expressly provided in this Agreement, and otherwise agree to each and every restriction and obligation in this Agreement.

## 3.    Confidential Information

As used in this Agreement, the term "**Confidential Information**" means and includes (a) any and all of the following items that will be disclosed to any Recipient or any of their respective Representatives (as hereinafter defined) by or on behalf of Highland, whether orally or in writing and without regard to whether Highland has specifically designated such item as confidential, proprietary or non-public: any and all confidential, proprietary or non-public information concerning the business or affairs of Highland or any of its affiliates or related accounts, or other Persons (as hereinafter defined) (which includes, for the avoidance of doubt and without limitation, Highland Claimant Trust, Highland Litigation Sub-Trust, Highland Indemnity Trust, each of their and Highland's direct and indirect subsidiaries, and each of their respective affiliates, and its and their respective parent entities, beneficiaries, members, shareholders, owners, creditors, trustees, oversight boards, directors, managers, officers, employees, agents, advisors and representatives (collectively, the "**Highland Related Parties**")), including, without limitation, any written or oral information, reports and data concerning financial statements, assets, liabilities, indemnity and other obligations, cash flow, income, and expenses; past, current or planned investment or portfolio information; contracts and agreements; know-how, inventions and ideas, whether past, current or planned; partner, beneficiary, owner or investor lists; partner, beneficiary, owner or investor information; business plans; entity structure details; all compliance-related reports, records and information; and any other information, however documented, that is proprietary or non-public or is a trade secret within the meaning of applicable state trade secret Law, and (b) any and all statements or representations made in the course of discussing, negotiating or evaluating a Potential Settlement, including, without limitation, the terms of any Potential Settlement and the fact that (i) Confidential Information has been disclosed to Recipient and (ii) any discussions or negotiations are taking place concerning a Potential Settlement.

To the extent that any Confidential Information includes information or materials subject to the attorney-client privilege, work-product doctrine, or any other applicable privilege concerning pending or threatened legal proceedings or governmental investigations, the Parties understand and agree that they have a commonality of interest with respect to such matters, and it

3

016929

HCMLPHMIT00000034

is their desire, intention, and mutual understanding that the sharing of such information or materials is not intended to, and shall not, waive or diminish in any way the confidentiality of such information or material or its continued protection under the attorney-client privilege, work-product doctrine, or other applicable privilege.  Accordingly, all Confidential Information disclosed by or on behalf of Highland that is entitled to protection under the attorney-client privilege, work-product doctrine, or other applicable privilege shall remain entitled to such protection under these privileges and this Agreement.

## 4.      Restricted Use of Confidential Information

Recipients agree that the Confidential Information (a) shall be kept strictly confidential by each Recipient and (b) without limiting the foregoing, shall not be disclosed by or on behalf of any Recipient to any Person (as hereinafter defined) except as otherwise expressly permitted by this Agreement.  It is understood and the Recipients agree that Confidential Information may only be disclosed to Mr. Patrick and such specific legal counsel, accountants and financial advisors of the Recipients to whom such disclosure has been consented to in writing by Highland in its sole discretion (which consent may be given via email) (collectively "**Representatives**") and who (i) require such Confidential Information for the purpose of evaluating, negotiating or consummating a Proposed Settlement (ii) are informed by Recipient of the confidential nature of the Confidential Information and the obligations set forth in this Agreement, and (iii) execute a written joinder in the form annexed hereto as Exhibit B pursuant to which the Representative agrees to be bound to this Agreement as if they were an original Party hereto, with such joinder including, without limitation, a representation and warranty that such Representative (1) does not currently represent any Dondero Related Party and (2) has no duty or obligation to provide any Confidential Information to any Person not a party to this Agreement, whether through a common or joint interest agreement or otherwise, and does not represent any Person with such a duty or obligation. Recipients further agree that Recipients and their Representatives shall not use any of the Confidential Information to the detriment of Highland or any Highland Related Party or for any reason or purpose other than evaluating, negotiating or consummating a Proposed Settlement. Recipients shall enforce this Agreement as to its Representatives and take such action, legal or otherwise, to the extent necessary to cause them to comply with this Agreement and thereby prevent any disclosure of Confidential Information by any of its Representatives (including, without limitation, all actions that any Recipient would take to protect its own confidential information).

Without limiting the generality of the foregoing and for the avoidance of doubt, the Recipients and their Representatives shall not disclose or refer to any Confidential Information to (a) subject to Section 5 below, any Governmental Entity (as hereinafter defined), including, without limitation, in any pleadings or submissions, or (b) any Dondero Related Party. The Parties acknowledge that it is their collective intent that no Confidential Information disclosed hereunder may be examined in any proceeding of a Governmental Entity (or any discovery relating to any such proceeding), and all Confidential Information shall be entitled to all protections applicable under Federal Rule of Evidence 408 and any other protections afforded to settlement and compromise communications under any other applicable Law.

4

016930

HCMLPHMIT00000035

**5.     Legally Compelled Disclosure**

If any Recipient or any of its Representatives becomes compelled by Law (whether by oral questions, interrogatories, requests for information or documents, subpoena, civil or criminal investigative demand, or similar process) to make any disclosure that is prohibited or otherwise constrained by this Agreement, such Recipient or its Representative, as the case may be, shall provide Highland with immediate notice of such legal proceedings, including all related documentation, so Highland may (a) seek an appropriate protective order or other appropriate relief, or (b) waive compliance with the provisions of this Agreement.  In the absence of a protective order or Recipients receiving a written waiver from Highland, Recipients or their Representatives are permitted (with Highland's cooperation but at Recipient's expense) to disclose that portion (and only that portion) of the Confidential Information that Recipient or its Representative is legally compelled by an order of an applicable Governmental Entity of competent jurisdiction to disclose; provided, however, that Recipient and its Representatives must use best efforts to obtain reliable assurance that confidential treatment will be accorded by any Person to whom any Confidential Information is so disclosed.

**6.     Return or Destruction of Confidential Information**

If Highland notifies Recipients that it wishes Recipients to return all Confidential Information, then Recipients (i) shall promptly deliver to Highland all documents or other materials disclosed by or on behalf of Highland to Recipient or its Representatives constituting Confidential Information, together with all copies and summaries thereof in the possession or under the control of Recipients or their Representatives, and (ii) will destroy materials generated by Recipients or their Representatives that include or refer to any part of the Confidential Information, without retaining any copies, including, without limitation, any electronically stored copies or attachments to emails, of any such documents or materials.  Written notice of return or destruction shall constitute a valid termination of access to Confidential Information and shall be deemed to have been given at the time Highland sends such notice.  Such notice may be sent in any manner reasonably calculated to notify Recipients of the termination.

**7.     No Obligation to Negotiate a Potential Settlement**

None of the Parties shall have rights or obligations of any kind whatsoever with respect to any Potential Settlement by virtue of this Agreement other than for the matters specifically agreed to herein.  Without limiting the preceding sentence, nothing in this Agreement requires any Party to enter into any Potential Settlement or to negotiate the same for any specified period of time or on any specific terms.

**8.     No Representations or Warranties**

Highland shall have no obligation to provide any information—confidential or otherwise—to the Recipients and retains the right to determine, in its sole discretion, what information, if any, it wishes to make available to Recipients, and neither Highland nor any Highland Related Party makes any representation or warranty (express or implied) concerning the completeness or accuracy of the Confidential Information.

5

HCMLPHMIT00000036

9.      **Miscellaneous**

(a)     <u>Modification</u>.  This Agreement may only be modified or waived by a separate writing signed by the Party or Parties expressly modifying or waiving this Agreement.

(b)     <u>Waiver</u>.  Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.

(c)     <u>Certain Definitions</u>.

(i) The term "**Governmental Entity**" means any federal, national, state, foreign, provincial, local or other government or any governmental, regulatory, administrative or self-regulatory authority, agency, bureau, board, commission, court, judicial or arbitral body, department, political subdivision, tribunal or other instrumentality thereof, including any fiscal intermediary or administrative contractor acting on behalf of any of the foregoing.

(ii) The term "**Law**" means any law, rule, regulation, statute, code, ordinance, decree or other restriction of any Governmental Entity or any order, injunction, judgment, decree, ruling, writ, assessment or award of a Governmental Entity.

(iii) The term "**Organizational Documents**" means certificates of incorporation, bylaws, certificates of formation, certificates of trust, limited liability company agreements, limited liability partnership agreements, partnership or limited partnership agreements, trust agreements or other similar formation or governing documents of any Person, in each case, as amended, restated or otherwise modified to date.

(iv) The term "**Person**" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, any other business entity, or a Governmental Entity.

(d)     <u>Severability</u>.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, which shall remain in full force and effect.  If any of the terms, covenants or provisions of this Agreement are determined to be unenforceable by reason of its extent, duration, scope or otherwise, then the Parties contemplate and intend that the authority making such determination shall reduce such extent, duration, scope or other provision and enforce them in their reduced form for all purposes contemplated by this Agreement.

(e)     <u>Breach</u>.  Recipients agree that Highland will be irreparably injured by a breach of this Agreement by any Recipient or its Representatives, that monetary remedies will be inadequate to protect Highland against any actual or threatened breach of this Agreement by any Recipient or by its Representatives, and that Highland shall be entitled to an injunction or other equitable relief as a remedy for any breach as a matter of right and without the necessity of having to post a bond. Such remedy shall not be deemed to be the exclusive remedy for a breach of this Agreement, but

016932

HCMLPHMIT00000037

shall be in addition to all other remedies available at law or equity.  The non-prevailing Party shall pay the other Party's costs and expenses in any action to enforce the terms of this Agreement.

(f)   <u>Liability and Indemnity</u>.  Recipients shall, jointly and severally, be liable to and shall indemnify and hold Highland and the Highland Related Parties harmless from and against any and all claims, suits, losses, damages, costs or expenses, including reasonable attorney fees, incurred or suffered by Highland or any Highland Related Party as a result of any Recipient or its Representatives violation of this Agreement, including, without limitation, using or disclosing any Confidential Information other than in accordance with this Agreement, whether such use or disclosure is performed negligently or otherwise.

(g)   <u>Notices</u>.  All notices, requests, demands, claims, and other communications hereunder shall be in writing.  Any notice, request, demand, claim or other communication hereunder shall be deemed duly delivered: (a) four (4) business days after it is sent by registered or certified mail, return receipt requested, postage prepaid; (b) one (1) business day after it is sent for next business day delivery via a reputable nationwide overnight courier service; (c) when sent, if emailed on a business day; and (d) the next business day following the day on which the email is sent if emailed on a day that is not a business day, in each case to the intended recipient as set forth below:

| | |
|---|---|
| If to Highland: | Highland Capital Management, L.P. |
| | 100 Crescent Court, Suite 1850 |
| | Dallas, Texas 75201 |
| | Attention: James P. Seery, Jr. |
| | Email: jpseeryjr@gmail.com AND notices@highlandcapital.com |
| | |
| | With copies to: |
| | |
| | Pachulski Stang Ziehl & Jones LLP |
| | 780 3rd Avenue #34 |
| | New York, New York 10017 |
| | Attention: John A. Morris |
| | Email: jmorris@pszjlaw.com |
| | |
| If to Recipients: | c/o Mark Patrick |
| | 6716 Glenhurst Dr. |
| | Dallas, Texas 75254 |
| | Email: mpatrick@dafholdco.com |
| | |
| | With copies to: |
| | |
| | Kelly Hart & Pitre |
| | 301 Main Street Suite 1600 |
| | Baton Rouge, Louisiana 70801 |
| | Attention: Louis M. Phillips |
| | Email: Louis.Phillips@kellyhart.com |

016933
HCMLPHMIT00000038

(h)      Governing Law; Jurisdiction.  This Agreement shall be interpreted and construed in accordance with the laws of the State of Delaware, without regard to conflict of laws provisions. Each Party hereby irrevocably submits and acknowledges and recognizes the exclusive jurisdiction of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (which court, for purposes of this Agreement, is the only court of competent jurisdiction), over any suit, action or other proceeding arising out of, under or in connection with this Agreement or its subject matter.  Each Party irrevocably consents to service of process in any action or proceeding arising out of or relating to this Agreement in the manner provided for notices in Section 9(g) above. Nothing in this Agreement shall affect the right of any Party to serve process in any manner permitted by law.

(i)      Execution of Agreement.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which, when taken together, shall be deemed to constitute one and the same agreement.  The exchange of copies of this Agreement and of signature pages by email shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the Parties transmitted by email shall be deemed to be their original signatures for any purpose whatsoever.

(j)      Headings.  The headings of the sections of this Agreement are inserted for convenience of reference only and shall not control or affect the meaning or construction of any of the terms of this Agreement in any manner.

(k)      Construction.  This Agreement has been fully negotiated by the Parties. Accordingly, in interpreting this Agreement, no weight shall be placed on which Party to this Agreement or its counsel drafted the provision being interpreted.

[SIGNATURES ON FOLLOWING PAGE]

016934

HCMLPHMIT00000039

IN WITNESS WHEREOF, the Parties have executed this Agreement to be effective as of the Effective Date.

**HIGHLAND:**

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name: James P. Seery, Jr.
Title: Chief Executive Officer

**RECIPIENTS:**

_____
MARK PATRICK

HUNTER MOUNTAIN INVESTMENT TRUST

By: _____
Name: Mark Patrick
Title: Administrator

CHARITABLE DAF HOLDCO, LTD.

By: _____
Name: Mark Patrick
Title: Director

CDH GP, LTD.

By: _____
Name: Mark Patrick
Title: Director

016935

HCMLPHMIT00000040

CHARITABLE DAF FUND, L.P.
By: CDH GP, Ltd., its General Partner

By: _____
Name: Mark Patrick
Title: Managing Member


CLO HOLDCO, LTD.

By: _____
Name: Mark Patrick
Title: Director


RAND ADVISORS, LLC

By: _____
Name: Mark Patrick
Title: President


RAND PE FUND I, L.P.
By: Rand PE Fund Management, LLC, its General
Partner

By: _____
Name: Mark Patrick
Title: President


RAND PE FUND MANAGEMENT, LLC

By: _____
Name: Mark Patrick
Title: President


Type text here


S IGNATURE P AGE TO C ONFIDENTIALITY A GREEMENT

016936

HCMLPHMIT00000041

ATLAS IDF, LP
By: Atlas IDF GP, LLC its General Partner

By: _____
Name: Mark Patrick
Title: President

Type text here

ATLAS IDF GP, LLC

By: _____
Name: Mark Patrick
Title: President

SIGNATURE PAGE TO CONFIDENTIALITY AGREEMENT

016937

HCMLPHMIT00000042

# EXHIBIT A

## <u>PENDING LITIGATION</u>

1.    DAF/CLOH appeal of Seery Retention Order (21-cv-01585-S)

2.    HMIT appeal of Order denying leave to file Claims Trading Complaint (23-cv-02071-E)

3.    HMIT appeal of Order dismissing Valuation Complaint (24-cv-01531-X)

4.    HMIT appeal of Order staying motion for leave to remove Seery (24-cv-01786)

5.    DAF appeal of decision affirming dismissal of HarbourVest Complaint (24-10880)

4910-0725-4050.6 36027.003

016938
HCMLPHMIT00000043

## EXHIBIT B

## JOINER TO CONFIDENTIALITY AGREEMENT

This JOINDER TO CONFIDENTIALITY AGREEMENT (this "**Joinder**") is entered into as of _____, _____, 2025 (the "**Effective Date**") by and between Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), and _____ (the "**Joining Party**").  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Confidentiality Agreement (as hereinafter defined).

WHEREAS, reference is made to that certain Confidentiality Agreement as of March 18, 2025 by and among Highland, on the one hand, and Mark Patrick, a United States citizen and resident of Dallas, Texas, Hunter Mountain Investment Trust, a Delaware statutory trust, Charitable DAF Holdco, Ltd., a Cayman Islands exempted company, CDH GP, Ltd., a Cayman Islands exempted company, Charitable DAF Fund, L.P., a Cayman Islands exempted limited partnership, and CLO Holdco, Ltd., a Cayman Islands exempted company, Rand Advisors, LLC, a Delaware limited liability company, Rand PE Fund I, LP, a Delaware series limited partnership, Rand PE Fund Management, LLC, a Delaware limited liability company, Atlas IDF, LP, a Delaware limited partnership, Atlas IDF GP, LLC, a Delaware limited liability company, on the other hand (the "**Confidentiality Agreement**");

WHEREAS, the Joining Party is a Representative of Recipients and desires to receive certain Confidential Information for the sole limited purpose of advising Recipients in connection with its evaluation, negotiation and consummation of a Proposed Settlement; and

WHEREAS, in accordance with Section 4 of the Confidentiality Agreement and as a condition to Highland providing, or permitting Recipients to provide, such Confidential Information to the Joining Party, the Joining Party agrees to the terms and conditions set forth in this Joinder.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      The Joining Party acknowledges that it has received and reviewed a copy of the Confidentiality Agreement.  The Joining Party hereby joins as a Party to, and agrees to be bound by all of the terms, provisions and conditions set forth in, the Confidentiality Agreement as a "Recipient" thereunder, with the same force and effect as if originally named therein as a "Recipient."

2.      Without limiting the generality of the foregoing, the Joining Party hereby (a) makes each of the representations and warranties set forth in Section 1 of the Confidentiality Agreement to Highland and (b) represents and warrants to Highland that such Joining Party (i) does not currently represent any Dondero Related Party and (ii) has no duty or obligation to provide any

016939

HCMLPHMIT00000044

Confidential Information to any Person not a party to this Agreement, whether through a common or joint interest agreement or otherwise, and does not represent any Person with such a duty or obligation.

      3.    Each of the terms, provisions and conditions set forth in Section 9 of the Confidentiality Agreement are incorporated herein by reference in their entirety and shall apply to this Agreement *mutatis mutandis*.

      IN WITNESS WHEREOF, the parties hereto have executed this Joinder to be effective as of the Effective Date.

**HIGHLAND:**

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name: James P. Seery, Jr.
Title: Chief Executive Officer

**JOINING PARTY:**

_____
Name: _____

SIGNATURE PAGE TO CONFIDENTIALITY AGREEMENT

016940

HCMLPHMIT00000045

**EXHIBIT 7**

016941

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>, "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>
**Cc:** "Jeff Pomerantz" <jpomerantz@pszjlaw.com>
**Subject:** Re: Confidentiality Agreement
**Date:** Sat, 22 Mar 2025 17:32:58 +0000
**Importance:** Normal
**Inline-Images:** image002.png; image001.jpg; image002(1).png; image001(1).jpg

---

Thank you John. We will be in touch very soon

Louis M. Phillips
On March 22, 2025 at 12:35:38 PM EDT, John A. Morris <jmorris@pszjlaw.com> wrote:

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**

Louis and Amelia,

Attached is a fully executed copy of the Confidentiality Agreement.

Please let us know when you expect to send a proposal.  We are prepared to meet with you and Mark (and any other Representatives who sign the NDA) in Dallas or New York promptly thereafter.

I'm available if you want to discuss anything in the interim.  Otherwise, have a good weekend.

Regards,

John
**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

**From:** jpseeryjr@gmail.com <jpseeryjr@gmail.com>
**Sent:** Saturday, March 22, 2025 11:34 AM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** David Klos <DKlos@highlandcapital.com>; Tim Cournoyer <TCournoyer@highlandcapital.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; Jordan A. Kroop <Jkroop@pszjlaw.com>
**Subject:** Re: Confidentiality Agreement

016942

HCMLPHMIT00000046

EXECUTED

Best.  Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

_____

**From:** John A. Morris <jmorris@pszjlaw.com>
**Date:** Saturday, March 22, 2025 at 10:20 AM
**To:** jpseeryjr@gmail.com <jpseeryjr@gmail.com>
**Cc:** David Klos <DKlos@highlandcapital.com>, Tim Cournoyer
<TCournoyer@highlandcapital.com>, Jeff Pomerantz <jpomerantz@pszjlaw.com>, Gregory V.
Demo <GDemo@pszjlaw.com>, Hayley R. Winograd <hwinograd@pszjlaw.com>, Jordan A. Kroop
<Jkroop@pszjlaw.com>
**Subject:** FW: Confidentiality Agreement
Jim,

Louis sent back a signed NDA.

There is at least one change (the deletion of the word "Dugaboy" from item 3 of Exhibit A, which is fine), but
he didn't send a black line so I'm trying to confirm there is nothing else.

If anyone knows how to compare, please do so.

But send me the signed version in the meantime at your convenience.

Also, it might make sense to dust off the "litigation protections" and conform them to the Patrick parties.
Please let me know if you and Tim want to handle that or if you want us to do so; I'm not sure when we
present them to Louis, but we should be prepared.

I'll be available to talk between 11:30 and 5 pm today.

Chat soon,

John

**From:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Sent:** Saturday, March 22, 2025 8:45 AM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Subject:** Confidentiality Agreement

John,

I missed that Mark had executed a slightly revised version (word document attached), but found it
last evening.  Apologies.  Please get mean executed version from Mr. Seery.  Thanks.

**Louis M. Phillips**
*Partner*

016943



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT: 225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at *louis.phillips@kellyhart.com*.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.



HCMLPHMIT00000048

# EXHIBIT 8

016945

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>
**Cc:** "Jeff Pomerantz" <jpomerantz@pszjlaw.com>, "Amelia L. Hurt"
    <Amelia.Hurt@kellyhart.com>
**Subject:** RE: Question re settlement process/term sheet
**Date:** Mon, 24 Mar 2025 16:00:18 +0000
**Importance:** Normal
**Inline-Images:** image005.jpg; image006.png; image001.png

---

I have the same view, and think it is the best approach.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Monday, March 24, 2025 9:59 AM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Subject:** FW: Question re settlement process/term sheet

HCMLPHMIT00000052

EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.

Louis,

Under Article IX of the Plan, the Bankruptcy Court retains jurisdiction to approve, among other things, the resolution of Claims, Equity Interests, and pending litigation. Based on that, HCMLP and the Claimant Trust expect to seek Bankruptcy Court approval of any settlement we may reach.

Please let me know if you have a different view.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Sent:** Monday, March 24, 2025 6:49 AM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Subject:** Question re settlement process/term sheet

John,

I would like your view as to whether a settlement agreement, if we reach one, should be made subject to Court approval (or, maybe if it can be). I know we need to account for our agreement with HCLOM, as our agreement supersedes the effect of the agreed order, and says in part that HCLOM has no Class 10 interest. Maybe that is the basis for the Court having authority. Would like your thoughts on what you are assuming re the process and of the Court's authority post-effective date. I admit I did not consult the plan or confirmation order before sending this

**Louis M. Phillips**
*Partner*

016947

HCMLPHMIT00000053

KELLY
HART
PITRE
——————
ATTORNEYS AT LAW

KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

016948

HCMLPHMIT00000054

**EXHIBIT 9**

016949

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>
**Cc:** "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>, "Jeff Pomerantz"
        <jpomerantz@pszjlaw.com>
**Subject:** Re: The proposed list of Representatives under the CA
**Date:** Tue, 25 Mar 2025 21:43:09 +0000
**Importance:** Normal
**Inline-Images:** image001.jpg; image002.png; image001(1).jpg; image002(1).png

---

Thank you John

Louis M. Phillips
On March 25, 2025 at 4:29:51 PM CDT, John A. Morris <jmorris@pszjlaw.com> wrote:

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**

---

Louis,

Assuming everyone reads and can stand by the representations in the CA and Joinder, the Highland side has no objection to any of the individuals listed below.

Regards,

John
**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

**From:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Sent:** Monday, March 24, 2025 10:36 AM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Subject:** The proposed list of Representatives under the CA

John,

We propose the following list of Representatives under the Confidentiality Agreement.  Please advise.  Once you have approved I will get the joinders executed.

Louis M. Phillips and Amelia L. Hurt -- Kelly Hart

Shawn Raver -- Chief Operating Officer and Assistant General Counsel Charitable DAF Holdco, Ltd.
Sawnie A. McEntire -- Parsons McEntire McCleary PLLC
Brian P. Shaw -- Carrington Coleman
James D. Shields -- Shields Legal Group
Paul Murphy -- Director CLO HoldCo - Stanbrook Prudhoe (Cayman)

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT: 225-338-5308

louis.phillips@kellyhart.com
www.kellyhart.com

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.



016951

**EXHIBIT 10**

016952

|          |                                                                                                      |
|---------:|------------------------------------------------------------------------------------------------------|
| **From:** | "Louis M. Phillips" <Louis.Phillips@kellyhart.com>                                                  |
| **To:** | "John A. Morris" <jmorris@pszjlaw.com>                                                               |
| **Cc:** | "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>                                                         |
| **Subject:** | Draft Settlement Term Sheet 3.28 Clean.DOCX -- Subject to Rule 408; Confidential Settlement Discussions |
| **Date:** | Fri, 28 Mar 2025 20:49:20 +0000                                                                     |
| **Importance:** | Normal                                                                                        |
| **Attachments:** | Draft_Settlement_Term_Sheet_3.28_Clean.DOCX                                                 |
| **Inline-Images:** | image003.png                                                                             |

---

John,

Please see our draft Settlement Term Sheet ("Draft").  As we assume there will be comments we have not included signature blocks or attached exhibits.  I can send Exhibit B either later today or over the weekend (trying to get something else out).  I look forward to hearing from you.


**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

016953

**EXHIBIT 11**

016954

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>
**Cc:** "Jeff Pomerantz" <jpomerantz@pszjlaw.com>
**Subject:** Re: Follow up
**Date:** Sun, 30 Mar 2025 23:51:41 +0000
**Importance:** Normal

---

John,

Either works tomorrow. Probably earlier is better for me.

Louis M. Phillips
On March 30, 2025 at 6:17:02 PM CDT, John A. Morris <jmorris@pszjlaw.com> wrote:

EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.

Hi.

Are you free to chat with Jeff and me either tomorrow, between 11 and noon or 5:30 pm eastern or Tuesday between 1 and 3 pm or 4 to 6 pm  eastern?

If you want one other lawyer to join, that's fine. We'd prefer not a big group for the initial call.

Let us know.

Thanks.


Sent from my iPhone

HCMLPHMIT00000058

**EXHIBIT 12**

016956

| | |
|---|---|
| **From:** | "Louis M. Phillips" <Louis.Phillips@kellyhart.com> |
| **To:** | "John A. Morris" <jmorris@pszjlaw.com>, "Jeff Pomerantz" <jpomerantz@pszjlaw.com> |
| **Cc:** | "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com> |
| **Subject:** | FW: Executed Intercreditor Agreement -- settlement Discussions subject to Rule 408; Confidential and Protected |
| **Date:** | Mon, 31 Mar 2025 17:12:01 +0000 |
| **Importance:** | Normal |
| **Attachments:** | HCLOM__Intercreditor_Agreement_(HMIT)_Execution_Version.pdf |
| **Inline-Images:** | image001.png |

---

John and Jeff,

Please see Exhibit B.



**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

HCMLPHMIT00000059

**EXHIBIT 13**

## INTERCREDITOR AND PARTICIPATION AGREEMENT

This Intercreditor and Participation Agreement (the "Agreement") is entered into as of January 10, 2025 (the "Effective Date") by and between Highland CLO Management, Ltd. (together with its successors and assigns in such capacities, "HCLOM Ltd.") and Hunter Mountain Investment Trust (together with its successors and assigns in such capacities, "HMIT"). HCLOM Ltd. and HMIT are each referred to herein individually as a "Party" and jointly as the "Parties."

## RECITALS

WHEREAS, on September 22, 2020, Highland Capital Management, L.P. filed a Notice of Filing of Debtor's Amended Schedules in its pending Chapter 11 Case No. 19-34054-sgj11 (the "Bankruptcy Case") in which it, among other things, scheduled a creditor's claim by HCLOM Ltd. (the "HCLOM Claim"); and

WHEREAS, on December 27, 2024, the Bankruptcy Court entered a Stipulated and Agreed Order Resolving (A) HCLOM, Ltd.'s Scheduled Claims 3.65 and 3.66; and (B) Highland Capital Management, L.P.'s (1) Objection and (2) Motion for a Bad Faith Finding and an Award of Attorneys' Fees Against HCLOM, Ltd. and James Dondero in Connection Therewith [Docket Nos. 3657, 4176] in the Bankruptcy Case (the "Stipulation and Agreed Order"); and

WHEREAS, the Stipulation and Agreed Order converted the HCLOM Claim to a Class 10 interest/claim (as such is defined in Article III.H. ¶ 10 of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) in the Bankruptcy Case) (the "Plan") in the amount of $10,140,633.26; and

WHEREAS, the Parties have agreed to certain rights and priorities solely as between themselves regarding HCLOM Ltd.'s participation in the payment of Class 10 interests/claims;

THEREFORE, for and in consideration of the promises, covenants, conditions, stipulations, benefits, and obligations described and provided herein, the sufficiency and adequacy of which is expressly hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1.     **HMIT Payment Obligation to HCLOM Ltd.** Upon HMIT's receipt of distributions on account of its Class 10 interest/claim (the "Distributions"), HMIT will pay to HCLOM Ltd. an amount equal to five percent (5%) of the funds received by HMIT within two (2) business days after receipt of indefeasible funds by HMIT (the "HMIT Payment Obligation"). HMIT shall be entitled to deduct from the Distributions the fees and expenses billed by Kelly Hart Hallman, LLP which directly relate to the Stipulation and Agreed Order or this Agreement (the "HMIT Expenses") until all HMIT Expenses are paid in full.

2.     **No Additional Duties to HCLOM Ltd.** HMIT shall retain and have the sole discretion to act with respect to its Class 10 interest/claim, and shall owe no additional duties to HCLOM Ltd. or any other person or entity, including without limitation, with respect to (i) the amount of Distributions or recovery by HMIT on account of its Class 10 interests/claims,

ACTIVE 706075387v4

016959

HCMLPHMIT00000060

(ii) the amount of Distributions that could be received by any holder of Class 10 interests/claims, (iii) the rights of any holder of Class 10 interests/claims, or (iv) any pleading or document that could or should be filed in any way related to the Bankruptcy Case, the Plan, or the HMIT Class 10 interests/claims.

3.      **No Liens or Encumbrances**. HMIT will not take any action that could reasonably be expected to encumber HMIT's Class 10 interests/claims, limit or affect HMIT's right or ability to fulfil and perform the HMIT Payment Obligation, or limit or affect HCLOM Ltd.'s right to receive the Distributions.

4.      **This Agreement Supersedes the Effects of the Stipulated and Agreed Order Among the Parties**. HCLOM acknowledges and agrees that, notwithstanding the Stipulated and Agreed Order, the terms of this Agreement amends and supersedes the effect of the Stipulation and Agreed Order as between the Parties and HCLOM's rights to payment under the Plan are limited solely to the HMIT Payment Obligation.

5.      **Non-Interference; No Cause of Action**. Notwithstanding Paragraph 3, HCLOM will not have any rights to object to or otherwise interfere with the rights of HMIT as a holder of Class 10 interest to reach a settlement with Highland Capital Management, LP ("Highland"). HCLOM acknowledges that it shall have no right to notice or approval of such a settlement nor will it have any cause of action against HMIT arising out of any such settlement.

6.      **Remittance Agreement**. The Parties acknowledge that contemporaneously herewith NREA SB II Holdings, LLC (together with its successors and assigns in such capacities, "NexPoint Small Bay."), Charitable DAF Holdings Corp. (together with its successors and assigns in such capacities, "Charitable DAF"), and Liberty CLO Holdco, Ltd. (together with its successors and assigns in such capacities, "Liberty CLO") have entered into that certain Remittance Agreement effective January 10, 2025 (the "Remittance Agreement"). HCLOM agrees that if NexPoint Small Bay fails to make the DAF Bridge Equity Payment (as defined in the Remittance Agreement) pursuant to the terms of the Remittance Agreement, HMIT will have no obligations to make the HMIT Payment Obligation, and HMIT shall not receive any distribution from HMIT or any other party related to any Class 10 interest/claim. Notwithstanding any failure of NexPoint Small Bay to adhere to the terms of the Remittance Agreement, HCLOM acknowledges that by executing this Agreement, it shall have no other recourse or rights to payment under the Plan other than the terms of this Agreement.

7.      **Choice of Law; Jurisdiction; Venue**. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without regard to conflict of law provisions. Each Party to hereby consents and agrees that the courts located in Texas shall have sole and exclusive jurisdiction to hear and determine any claims or disputes between the parties pertaining to this Agreement or to any matter arising out of or relating to this Agreement. Each Party expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and each Party hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue, or *forum non conveniens*.

8.      **Amendments; Waivers**. No amendment, modification, or waiver of any of the provisions of this Agreement shall be deemed to be made unless the same shall be in writing signed on behalf of each Party, and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the Party making such waiver or the obligations of the other Party in any other respect or at any other time.

016960

HCMLPHMIT00000061

9.      **Binding Effect**. Except as otherwise expressly provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Parties and their respective successors, assigns, executors, representatives, and administrators.

10.      **Entire Agreement**. The Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into this Agreement.

11.      **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument. Signature by facsimile or other similar electronic transmission shall have the same force and effect as an original signature.

IN WITNESS WHEREOF, the Parties have executed this Intercreditor and Participation Agreement as of the Effective Date set forth above and in the capacities set forth below.

016961

HCMLPHMIT00000062

HIGHLAND CLO MANAGEMENT, LTD.

By: _____

Name: __James Dondero_____

Title: ___President_____


HUNTER MOUNTAIN INVESTMENT TRUST

By: _____

Name: _____

Title: _____

016962

HCMLPHMIT00000063

**EXHIBIT 14**

016963

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>
**Cc:** "Jeff Pomerantz" <jpomerantz@pszjlaw.com>, "Amelia L. Hurt"
<Amelia.Hurt@kellyhart.com>
**Subject:** Re: Highland: Follow Up
**Date:** Wed, 2 Apr 2025 19:34:59 +0000
**Importance:** Normal
**Inline-Images:** image003.png; image003(1).png

---

Makes sense. I think having the non-outside lawyers is fine as a first step. Will send our list and appreciate your folks gathering what they think is involved.

Louis M. Phillips
On April 2, 2025 at 2:14:41 PM CDT, John A. Morris <jmorris@pszjlaw.com> wrote:

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**

---

Louis.

Dave Klos will contact Mark and Shawn to set up a business Zoom meeting for tomorrow morning.  We do not intend to have outside lawyers on the call but can if you think that would be best (we know Mark and Shawn are businessmen lawyers, and that's fine).

Please provide the list of information in advance of the call so we can be as responsive as possible.

To be efficient, the Highland team intends to present certain financial information tomorrow (subject to Fed. R. Evid. 408 and the Confidentiality Agreement) that we believe is relevant in all cases.

Please let us know if this makes sense; if so, we'll proceed.

Regards,

John

---

**From:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Sent:** Wednesday, April 2, 2025 1:29 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Subject:** RE: Highland: Follow Up

Correct. Thought that was implicit.


**Louis M. Phillips**
*Partner*

HCMLPHMIT00000075



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT: 225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy
Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended
only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the
person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution,
or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify
us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and
cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or
for the purpose of marketing or recommending to any other party any transaction or other matter.

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Wednesday, April 2, 2025 12:15 PM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Subject:** Re: Highland: Follow Up

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise
caution when opening attachments, following links or responding to this message.**

I assume we have the "green light" in the nothing discussed on Monday is a conceptual deal breaker?

Please confirm.

Thanks.

Sent from my iPhone

On Apr 2, 2025, at 1:05 PM, Louis M. Phillips <Louis.Phillips@kellyhart.com> wrote:

John,

Would it be possible to do an initial Zoom call with those people?  Shawn is out of town for the rest
of the week and he is needed.  Maybe your side could discuss the range of information they think
is involved and my two people could give their view, in anticipation of a meeting maybe next week?

Mark and Shawn are available tomorrow morning until 1:00 pm central.

I am getting Shawn's Joinder, hopefully today

HCMLPHMIT00000076

**Louis M. Phillips**
*Partner*

<image003.png>

KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications
Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is
intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by
email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use,
dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in
error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at
louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and
cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or
for the purpose of marketing or recommending to any other party any transaction or other matter.

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Tuesday, April 1, 2025 7:24 AM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Subject:** RE: Highland: Follow Up

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise
caution when opening attachments, following links or responding to this message.**

---

This assumes, of course, that you'll give the "green light" (*i.e.*, nothing discussed yesterday is a
showstopper) in advance.

---

**From:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Sent:** Tuesday, April 1, 2025 7:14 AM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Subject:** Re: Highland: Follow Up

That sounds good. I will get back

Louis M. Phillips
On March 31, 2025 at 8:15:03 PM CDT, John A. Morris <jmorris@pszjlaw.com> wrote:

HCMLPHMIT00000077

EXTERNAL EMAIL ALERT: This email message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.

Louis,

Dave Klos, Kirstin Hendrix, and some others are available later this week to share information with Mark and Shawn at Highland's offices.  Jim Seery would likely participate by Zoom.

We thought meeting without lawyers might a good first step.  If that makes sense, let me know how Dave can reach out to Mark and Shawn to set something up.

Chat soon,

John

Sent from my iPhone



016967

HCMLPHMIT00000078

**EXHIBIT 15**

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>
**Cc:** "Jeff Pomerantz" <jpomerantz@pszjlaw.com>, "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>
**Subject:** Re: Highland: Confidentiality Agreement
**Date:** Wed, 2 Apr 2025 21:53:34 +0000
**Importance:** Normal
**Inline-Images:** image001.jpg; image001(1).jpg

---

We agree. I have sent Shawn the rider. He is out of town but will get it back to me

Louis M. Phillips
On April 2, 2025 at 4:30:31 PM CDT, John A. Morris <jmorris@pszjlaw.com> wrote:

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**

Louis:

Attached is a copy of the Confidentiality Agreement signed by Mr. Seery in his capacities as the CEO of Highland and as the Claimant Trustee of the Highland Claimant Trust.

While the source of the information to be provided is HCMLP, we should have included the Highland Claimant Trust as an express signatory.

If you can acknowledge that Mr. Patrick agrees and understands that—notwithstanding any statement in the Agreement to the contrary—the Highland Claimant Trust is an intended signatory and beneficiary of the Agreement, we can proceed and amend the Agreement tomorrow to make that explicit.

Assuming that's not problematic, please also have Shawn execute the Rider in advance of tomorrow's meeting.

Thank you,

John
**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

016969

HCMLPHMIT00000079

016970
HCMLPHMIT00000080

**EXHIBIT 16**

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>, "Jeff Pomerantz" <jpomerantz@pszjlaw.com>
**Cc:** "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>
**Subject:** Paul Murphy Joinder
**Date:** Thu, 3 Apr 2025 12:43:06 +0000
**Importance:** Normal
**Attachments:** Paul_Murphy_Joinder_to_CA.pdf

---

John and Jeff,

Please see the Joinder executed by Paul Murphy.  He will be with Mark and Shawn. I should have Shawn's this morning.

Louis M. Phillips
Partner

KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

louis.phillips@kellyhart.com
www.kellyhart.com

Licensed to Practice in the State of Louisiana

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

## JOINDER TO CONFIDENTIALITY AGREEMENT

This JOINDER TO CONFIDENTIALITY AGREEMENT (this "**Joinder**") is entered into as of March 18, 2025 (the "**Effective Date**") by and between Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), and Paul Murphy (the "**Joining Party**"). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Confidentiality Agreement (as hereinafter defined).

WHEREAS, reference is made to that certain Confidentiality Agreement as of March 18, 2025 by and among Highland, on the one hand, and Mark Patrick, a United States citizen and resident of Dallas, Texas, Hunter Mountain Investment Trust, a Delaware statutory trust, Charitable DAF Holdco, Ltd., a Cayman Islands exempted company, CDH GP, Ltd., a Cayman Islands exempted company, Charitable DAF Fund, L.P., a Cayman Islands exempted limited partnership, and CLO Holdco, Ltd., a Cayman Islands exempted company, Rand Advisors, LLC, a Delaware limited liability company, Rand PE Fund I, LP, a Delaware series limited partnership, Rand PE Fund Management, LLC, a Delaware limited liability company, Atlas IDF, LP, a Delaware limited partnership, Atlas IDF GP, LLC, a Delaware limited liability company, on the other hand (the "**Confidentiality Agreement**");

WHEREAS, the Joining Party is a Representative of Recipients and desires to receive certain Confidential Information for the sole limited purpose of advising Recipients in connection with its evaluation, negotiation and consummation of a Proposed Settlement; and

WHEREAS, in accordance with Section 4 of the Confidentiality Agreement and as a condition to Highland providing, or permitting Recipients to provide, such Confidential Information to the Joining Party, the Joining Party agrees to the terms and conditions set forth in this Joinder.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      The Joining Party acknowledges that it has received and reviewed a copy of the Confidentiality Agreement.  The Joining Party hereby joins as a Party to, and agrees to be bound by all of the terms, provisions and conditions set forth in, the Confidentiality Agreement as a "Recipient" thereunder, with the same force and effect as if originally named therein as a "Recipient."

2.      Without limiting the generality of the foregoing, the Joining Party hereby (a) makes each of the representations and warranties set forth in Section 1 of the Confidentiality Agreement to Highland and (b) represents and warrants to Highland that such Joining Party (i) does not currently represent any Dondero Related Party and (ii) has no duty or obligation to provide any Confidential Information to any Person not a party to this Agreement, whether through a common or joint interest agreement or otherwise, and does not represent any Person with such a duty or obligation.

Paul Murphy Joinder to CA.DOCX

016973

HCMLPHMIT00000082

3. Each of the terms, provisions and conditions set forth in Section 9 of the Confidentiality Agreement are incorporated herein by reference in their entirety and shall apply to this Agreement *mutatis mutandis*.

IN WITNESS WHEREOF, the parties hereto have executed this Joinder to be effective as of the Effective Date.

**HIGHLAND:**

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name: James P. Seery, Jr.
Title: Chief Executive Officer

**JOINING PARTY:**

_____
Name: Paul Murphy

Paul Murphy Joinder to CA.DOCX

016974

HCMLPHMIT00000083

**EXHIBIT 17**

016975

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>
**Subject:** Re: Catch up
**Date:** Fri, 4 Apr 2025 16:26:41 +0000
**Importance:** Normal

---

Will call as soon as I walk out

Louis M. Phillips
On April 4, 2025 at 11:26:06 AM CDT, John A. Morris <jmorris@pszjlaw.com> wrote:

> **EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**
>
> ---
>
> Ok.  I have a call at 1 Eastern so please before then if time permits.
>
> Thanks,
>
> John
>
> Sent from my iPhone
>
>
> On Apr 4, 2025, at 12:16 PM, Louis M. Phillips <Louis.Phillips@kellyhart.com> wrote:
>
>
> Will break in 30 minutes
>
> Louis M. Phillips
> On April 4, 2025 at 10:14:42 AM CDT, John A. Morris <jmorris@pszjlaw.com> wrote:
>
> EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.
>
> Hi Louis.
>
> Give me a call when there is a break in the action down there: 1.646.341.3686
>
> Thanks,
>
> John
>
> Sent from my iPhone

016976

HCMLPHMIT00000089

**EXHIBIT 18**

016977

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>
**Cc:** "Jeff Pomerantz" <jpomerantz@pszjlaw.com>, "Amelia L. Hurt"
<Amelia.Hurt@kellyhart.com>
**Subject:** RE: Highland/DAF/HMIT: Follow up
**Date:** Mon, 7 Apr 2025 12:11:45 +0000
**Importance:** Normal
**Inline-Images:** image004.jpg; image001.png

---

John,

As I mentioned on the phone Friday, we request a breakdown and documentation with specificity of any (i) accrued liabilities, (ii) anticipated success or severance (or completion) payments or bonuses, (iii) continuing admin budget for the Claimant trust, Indemnification sub trust and/or litigation sub trust, and (iv) the identity and amount and basis for any holdback(s).

We are available Tuesday in Dallas.  How many from your side would be participating in person?  I am trying to get my travel plans situated and to make sure my travel might add to the process (for example if you, Jeff, et al from Pachulski are attending remotely so might I). I believe I can get an early flight out in the morning arriving around 7:00 am or a bit later one arriving around 8:45.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be

016978

use. If you are not the intended recipient or authorized to receive for the intended recipient, and have received this communication in error, please advise the sender by reply email and delete the message. Any tax advice contained in this email was not intended or written to be used, and cannot be used, by you (i) to avoid any penalties imposed under the Internal Revenue Code or (ii) to promote, market or recommend to any other party any transaction or other matter.

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Friday, April 4, 2025 3:54 PM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Subject:** Highland/DAF/HMIT: Follow up

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**

Louis:

I'm writing to follow up on several things.

1. <u>Litigation Protections</u>.  Attached are the "Litigation Protections" I mentioned.  They are still subject to review and material change but wanted to share them now.

2. <u>Follow up information</u>.  It sounds like yesterday's Zoom meeting was helpful.  Please let us know if there is any other information your clients need to assess the situation.

3. <u>HCMLP's diligence</u>.  We'll have some questions on our end, but for now, please send us the Remittance Agreement referred to in the Intercreditor Agreement.

4. <u>Joinder signature</u>.  For completeness, please send us Shawn's signature page.

5. <u>Preliminary terms/structure</u>.  We hope to provide over the weekend a set of bullet points concerning possible terms and structure of an agreement.

6. <u>Further meeting</u>.  Some or all of us are prepared to meet in Dallas on Tuesday at a time to be determined (some may participate by Zoom).  Please let us know if that is possible as soon as you're able so we can make travel arrangements.

Please let me know if you have any questions and thank you for your continued cooperation.

Regards,

John


**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



016980

HCMLPHMIT00000092

**EXHIBIT 19**

016981

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>, "Jeff Pomerantz" <jpomerantz@pszjlaw.com>
**Cc:** "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>
**Subject:** FW: Joinder Agreement
**Date:** Mon, 7 Apr 2025 14:08:57 +0000
**Importance:** Normal
**Attachments:** Raver_Joinder.pdf
**Inline-Images:** image003.png

---

John,

Please see the Joinder executed by Shawn Raver.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

**From:** Shawn Raver <sraver@dafholdco.com>
**Sent:** Monday, April 7, 2025 9:04 AM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Subject:** Re: Joinder Agreement

HCMLPHMIT00000093

**EXTERNAL SENDER ALERT** - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.

HCMLPHMIT00000094

## JOINDER TO CONFIDENTIALITY AGREEMENT

This JOINDER TO CONFIDENTIALITY AGREEMENT (this "**Joinder**") is entered into as of March 18, 2025 (the "**Effective Date**") by and between Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), and Shawn Raver (the "**Joining Party**"). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Confidentiality Agreement (as hereinafter defined).

WHEREAS, reference is made to that certain Confidentiality Agreement as of March 18, 2025 by and among Highland, on the one hand, and Mark Patrick, a United States citizen and resident of Dallas, Texas, Hunter Mountain Investment Trust, a Delaware statutory trust, Charitable DAF Holdco, Ltd., a Cayman Islands exempted company, CDH GP, Ltd., a Cayman Islands exempted company, Charitable DAF Fund, L.P., a Cayman Islands exempted limited partnership, and CLO Holdco, Ltd., a Cayman Islands exempted company, Rand Advisors, LLC, a Delaware limited liability company, Rand PE Fund I, LP, a Delaware series limited partnership, Rand PE Fund Management, LLC, a Delaware limited liability company, Atlas IDF, LP, a Delaware limited partnership, Atlas IDF GP, LLC, a Delaware limited liability company, on the other hand (the "**Confidentiality Agreement**");

WHEREAS, the Joining Party is a Representative of Recipients and desires to receive certain Confidential Information for the sole limited purpose of advising Recipients in connection with its evaluation, negotiation and consummation of a Proposed Settlement; and

WHEREAS, in accordance with Section 4 of the Confidentiality Agreement and as a condition to Highland providing, or permitting Recipients to provide, such Confidential Information to the Joining Party, the Joining Party agrees to the terms and conditions set forth in this Joinder.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, the parties hereto, intending to be legally bound, hereby agree as follows:

1. The Joining Party acknowledges that it has received and reviewed a copy of the Confidentiality Agreement. The Joining Party hereby joins as a Party to, and agrees to be bound by all of the terms, provisions and conditions set forth in, the Confidentiality Agreement as a "Recipient" thereunder, with the same force and effect as if originally named therein as a "Recipient."

2. Without limiting the generality of the foregoing, the Joining Party hereby (a) makes each of the representations and warranties set forth in Section 1 of the Confidentiality Agreement to Highland and (b) represents and warrants to Highland that such Joining Party (i) does not currently represent any Dondero Related Party and (ii) has no duty or obligation to provide any Confidential Information to any Person not a party to this Agreement, whether through a common or joint interest agreement or otherwise, and does not represent any Person with such a duty or obligation.

Shawn Raver Joinder to CA (2).DOCX

016984

HCMLPHMIT00000095

3.    Each of the terms, provisions and conditions set forth in Section 9 of the Confidentiality Agreement are incorporated herein by reference in their entirety and shall apply to this Agreement *mutatis mutandis*.

IN WITNESS WHEREOF, the parties hereto have executed this Joinder to be effective as of the Effective Date.

**HIGHLAND:**

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name: James P. Seery, Jr.
Title: Chief Executive Officer

**JOINING PARTY:**

_____
Name: Shawn Raver

Shawn Raver Joinder to CA (2).DOCX

016985

HCMLPHMIT00000096

**EXHIBIT 20**

016986

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>
**Cc:** "Jeff Pomerantz" <jpomerantz@pszjlaw.com>, "Amelia L. Hurt"
  <Amelia.Hurt@kellyhart.com>
**Subject:** RE: Highland/DAF/HMIT: Follow up
**Date:** Mon, 7 Apr 2025 15:17:39 +0000
**Importance:** Normal
**Inline-Images:** image005.jpg; image006.png; image001.png

---

The structure suits me fine.  I will get with Mark and Shawn.  They would be the only ones.

You are correct you do not have joinders from Amelia and I.  The same thing occurred to me last night.  We will send (getting a pre-trial order and brief out for Noon, so maybe a bit after then).  Will get the Remittance Agreement out as well, and will get information re the other matters (I do not have it directly)

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Monday, April 7, 2025 10:09 AM

HCMLPHMIT00000099

**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Subject:** Highland/DAF/HMIT: Follow up

EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.

Louis,

Following up.

1. <u>Meeting</u>.  We propose that the business folks (including Mark and Jim) meet in person at Highland's offices at 10:30 am Central Time tomorrow (casual dress, no suits), with lawyers participating by Zoom; if you want to attend in person, Jeff may attend in person as well so let me know (I am unable to attend in person because of other commitments).

2. <u>DAF/HMIT information request</u>.  During tomorrow's meeting, Highland will provide the information requested below (and can quickly walk through the same information that was presented the other day for your benefit if that would be helpful).

3. <u>Highland information request</u>.  As requested, please provide a copy of the Remittance Agreement referred to in the Intercreditor Agreement and share with us any other agreements or information concerning any current or former connection between DAF/CLOH/HMIT and Dondero/Okada/Dugaboy, including the funding of the HMIT litigation (that Mark testified to in June 2023) and the disposition of the HMIT Notes made in favor of Dugaboy and Okada. We just need to know how any agreement may impact the Dondero side, if at all.

4. <u>NDA signatures</u>.  Please let us know who will be participating on your side and send any Joinders not previously sent (I'm not sure we received one for you and Amelia).

We look forward to your prompt response.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Sent:** Monday, April 7, 2025 8:12 AM
**To:** John A. Morris <jmorris@pszjlaw.com>

HCMLPHMIT00000100

Cc: Jeff Pomerantz <jpomerantz@pszjlaw.com>; Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Subject:** RE: Highland/DAF/HMIT: Follow up

John,

As I mentioned on the phone Friday, we request a breakdown and documentation with specificity of any (i) accrued liabilities, (ii) anticipated success or severance (or completion) payments or bonuses, (iii) continuing admin budget for the Claimant trust, Indemnification sub trust and/or litigation sub trust, and (iv) the identity and amount and basis for any holdback(s).

We are available Tuesday in Dallas.  How many from your side would be participating in person?  I am trying to get my travel plans situated and to make sure my travel might add to the process (for example if you, Jeff, et al from Pachulski are attending remotely so might I). I believe I can get an early flight out in the morning arriving around 7:00 am or a bit later one arriving around 8:45.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

louis.phillips@kellyhart.com
www.kellyhart.com

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Friday, April 4, 2025 3:54 PM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Subject:** Highland/DAF/HMIT: Follow up

EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.

Louis:

I'm writing to follow up on several things.

1. <u>Litigation Protections</u>. Attached are the "Litigation Protections" I mentioned. They are still subject to review and material change but wanted to share them now.

2. <u>Follow up information</u>. It sounds like yesterday's Zoom meeting was helpful. Please let us know if there is any other information your clients need to assess the situation.

3. <u>HCMLP's diligence</u>. We'll have some questions on our end, but for now, please send us the Remittance Agreement referred to in the Intercreditor Agreement.

4. <u>Joinder signature</u>. For completeness, please send us Shawn's signature page.

5. <u>Preliminary terms/structure</u>. We hope to provide over the weekend a set of bullet points concerning possible terms and structure of an agreement.

6. <u>Further meeting</u>. Some or all of us are prepared to meet in Dallas on Tuesday at a time to be determined (some may participate by Zoom). Please let us know if that is possible as soon as you're able so we can make travel arrangements.

Please let me know if you have any questions and thank you for your continued cooperation.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
<u>jmorris@pszjlaw.com</u>
<u>vCard</u> | <u>Bio</u> | <u>LinkedIn</u>



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

HCMLPHMIT00000102

**EXHIBIT 21**

016991

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>, "Jeff Pomerantz" <jpomerantz@pszjlaw.com>
**Cc:** "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>
**Subject:** LMP and ALH Joinders Confidentiality Agreement
**Date:** Mon, 7 Apr 2025 21:02:23 +0000
**Importance:** Normal
**Attachments:** 1408_001.pdf; Amelia_Joinder_to_CA.pdf
**Inline-Images:** image003.png

John,

Please see the attached joinders.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT: 225-338-5308

louis.phillips@kellyhart.com
www.kellyhart.com

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

HCMLPHMIT00000103

# JOINDER TO CONFIDENTIALITY AGREEMENT

This JOINDER TO CONFIDENTIALITY AGREEMENT (this "**Joinder**") is entered into as of March 18, 2025 (the "**Effective Date**") by and between Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), and Louis M. Phillips (the "**Joining Party**"). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Confidentiality Agreement (as hereinafter defined).

WHEREAS, reference is made to that certain Confidentiality Agreement as of March 18, 2025 by and among Highland, on the one hand, and Mark Patrick, a United States citizen and resident of Dallas, Texas, Hunter Mountain Investment Trust, a Delaware statutory trust, Charitable DAF Holdco, Ltd., a Cayman Islands exempted company, CDH GP, Ltd., a Cayman Islands exempted company, Charitable DAF Fund, L.P., a Cayman Islands exempted limited partnership, and CLO Holdco, Ltd., a Cayman Islands exempted company, Rand Advisors, LLC, a Delaware limited liability company, Rand PE Fund I, LP, a Delaware series limited partnership, Rand PE Fund Management, LLC, a Delaware limited liability company, Atlas IDF, LP, a Delaware limited partnership, Atlas IDF GP, LLC, a Delaware limited liability company, on the other hand (the "**Confidentiality Agreement**");

WHEREAS, the Joining Party is a Representative of Recipients and desires to receive certain Confidential Information for the sole limited purpose of advising Recipients in connection with its evaluation, negotiation and consummation of a Proposed Settlement; and

WHEREAS, in accordance with Section 4 of the Confidentiality Agreement and as a condition to Highland providing, or permitting Recipients to provide, such Confidential Information to the Joining Party, the Joining Party agrees to the terms and conditions set forth in this Joinder.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      The Joining Party acknowledges that it has received and reviewed a copy of the Confidentiality Agreement.  The Joining Party hereby joins as a Party to, and agrees to be bound by all of the terms, provisions and conditions set forth in, the Confidentiality Agreement as a "Recipient" thereunder, with the same force and effect as if originally named therein as a "Recipient."

2.      Without limiting the generality of the foregoing, the Joining Party hereby (a) makes each of the representations and warranties set forth in Section 1 of the Confidentiality Agreement to Highland and (b) represents and warrants to Highland that such Joining Party (i) does not currently represent any Dondero Related Party and (ii) has no duty or obligation to provide any Confidential Information to any Person not a party to this Agreement, whether through a common or joint interest agreement or otherwise, and does not represent any Person with such a duty or obligation.

4233814_1.docx

016993

HCMLPHMIT00000104

3.      Each of the terms, provisions and conditions set forth in Section 9 of the Confidentiality Agreement are incorporated herein by reference in their entirety and shall apply to this Agreement *mutatis mutandis*.


        IN WITNESS WHEREOF, the parties hereto have executed this Joinder to be effective as of the Effective Date.

**HIGHLAND:**

HIGHLAND CAPITAL MANAGEMENT, L.P.


By: _____
Name: James P. Seery, Jr.
Title: Chief Executive Officer


**JOINING PARTY:**

_____
Name: Louis M. Phillips

4233814_1.docx

016994

HCMLPHMIT00000105

## JOINDER TO CONFIDENTIALITY AGREEMENT

This JOINDER TO CONFIDENTIALITY AGREEMENT (this "**Joinder**") is entered into as of March 18, 2025 (the "**Effective Date**") by and between Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), and Amelia L. Hurt (the "**Joining Party**"). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Confidentiality Agreement (as hereinafter defined).

WHEREAS, reference is made to that certain Confidentiality Agreement as of March 18, 2025 by and among Highland, on the one hand, and Mark Patrick, a United States citizen and resident of Dallas, Texas, Hunter Mountain Investment Trust, a Delaware statutory trust, Charitable DAF Holdco, Ltd., a Cayman Islands exempted company, CDH GP, Ltd., a Cayman Islands exempted company, Charitable DAF Fund, L.P., a Cayman Islands exempted limited partnership, and CLO Holdco, Ltd., a Cayman Islands exempted company, Rand Advisors, LLC, a Delaware limited liability company, Rand PE Fund I, LP, a Delaware series limited partnership, Rand PE Fund Management, LLC, a Delaware limited liability company, Atlas IDF, LP, a Delaware limited partnership, Atlas IDF GP, LLC, a Delaware limited liability company, on the other hand (the "**Confidentiality Agreement**");

WHEREAS, the Joining Party is a Representative of Recipients and desires to receive certain Confidential Information for the sole limited purpose of advising Recipients in connection with its evaluation, negotiation and consummation of a Proposed Settlement; and

WHEREAS, in accordance with Section 4 of the Confidentiality Agreement and as a condition to Highland providing, or permitting Recipients to provide, such Confidential Information to the Joining Party, the Joining Party agrees to the terms and conditions set forth in this Joinder.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, the parties hereto, intending to be legally bound, hereby agree as follows:

1. The Joining Party acknowledges that it has received and reviewed a copy of the Confidentiality Agreement. The Joining Party hereby joins as a Party to, and agrees to be bound by all of the terms, provisions and conditions set forth in, the Confidentiality Agreement as a "Recipient" thereunder, with the same force and effect as if originally named therein as a "Recipient."

2. Without limiting the generality of the foregoing, the Joining Party hereby (a) makes each of the representations and warranties set forth in Section 1 of the Confidentiality Agreement to Highland and (b) represents and warrants to Highland that such Joining Party (i) does not currently represent any Dondero Related Party and (ii) has no duty or obligation to provide any Confidential Information to any Person not a party to this Agreement, whether through a common or joint interest agreement or otherwise, and does not represent any Person with such a duty or obligation.

Amelia Joinder to CA.DOCX

016995

HCMLPHMIT00000106

3. Each of the terms, provisions and conditions set forth in Section 9 of the Confidentiality Agreement are incorporated herein by reference in their entirety and shall apply to this Agreement *mutatis mutandis*.

IN WITNESS WHEREOF, the parties hereto have executed this Joinder to be effective as of the Effective Date.

HIGHLAND:

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name: James P. Seery, Jr.
Title: Chief Executive Officer

JOINING PARTY:

_____
Name: Amelia L. Hurt

016996

HCMLPHMIT00000107

**EXHIBIT 22**

016997

| | |
|---|---|
| **From:** | "Louis M. Phillips" <Louis.Phillips@kellyhart.com> |
| **To:** | "John A. Morris" <jmorris@pszjlaw.com>, "Jeff Pomerantz" <jpomerantz@pszjlaw.com> |
| **Cc:** | "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com> |
| **Subject:** | Remittance Agreement |
| **Date:** | Tue, 8 Apr 2025 13:17:06 +0000 |
| **Importance:** | Normal |
| **Attachments:** | HCLOM__Remittance_Agreement_(Charitable_DAF_Liberty_CLO)(706141854.2).pdf; Remittance_Agreement.pdf |
| **Inline-Images:** | image001.png |

---

John and Jeff,

Please find the Remittance Agreement, executed version.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

## REMITTANCE AGREEMENT

This Remittance Agreement (the "Agreement") is entered into as of January 10, 2025 (the "Effective Date") by and between NREA SB II Holdings, LLC (together with its successors and assigns in such capacities, "NexPoint Small Bay."), Charitable DAF Holdings Corp. (together with its successors and assigns in such capacities, "Charitable DAF"), and Liberty CLO Holdco, Ltd. (together with its successors and assigns in such capacities, "Liberty CLO"). NexPoint Small Bay, Charitable DAF, and Liberty CLO are each referred to herein individually as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, the Charitable DAF and Liberty CLO jointly previously provided temporary bridge funding and equity to NexPoint Small Bay, with repayment required in accordance with the Limited Liability Company Agreement of NexPoint Small Bay (the "DAF Bridge Equity"); and

WHEREAS, NexPoint Small Bay currently owes $8,265,050.74 to Charitable DAF and Liberty CLO, jointly, as repayment for the DAF Bridge Equity;

THEREFORE, for and in consideration of the payment, promises, covenants, conditions, stipulations, benefits, and obligations described and provided herein, the sufficiency and adequacy of which is expressly hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1.      **Payment to DAF.** On or before January 14, 2025, NexPoint Small Bay shall pay to Charitable DAF and Liberty CLO, jointly, the amount of $8,265,050.74 (the "DAF Bridge Equity Payment").

2.      **Satisfaction and Release of Claims.** Charitable DAF and Liberty CLO each stipulates and agrees that the DAF Bridge Equity Payment will fully and completely satisfy all obligations arising out of or relating to the DAF Bridge Equity, that they each, upon receipt of the DAF Bridge Equity Payment, automatically and forever release and discharge NexPoint Small Bay and its affiliates, members, successors, and assigns, of and from all claims, demands, damages, liability, and responsibility, of any type or kind arising from or relating to the DAF Bridge Equity and/or their membership in NexPoint Small Bay, and Charitable DAF and Liberty CLO shall cease to be Members of NexPoint Small Bay and cease to have any rights under the Limited Liability Company Agreement of NexPoint Small Bay. Charitable DAF and Liberty CLO hereby provide any consent that is required by them under the Limited Liability Company Agreement of NexPoint Small Bay.

3.      **Choice of Law; Jurisdiction; Venue.** This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without regard to conflict of law provisions. Each Party to hereby consents and agrees that the courts located in Texas shall have sole and exclusive jurisdiction to hear and determine any claims or disputes between the parties pertaining to this Agreement or to any matter arising out of or relating to this Agreement. Each Party expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and each Party hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue, or *forum non conveniens*.

016999

HCMLPHMIT00000109

4.     **Amendments; Waivers.** No amendment, modification, or waiver of any of the provisions of this Agreement shall be deemed to be made unless the same shall be in writing signed on behalf of each Party, and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the Party making such waiver or the obligations of the other Party in any other respect or at any other time.

5.     **Binding Effect.** Except as otherwise expressly provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Parties and their respective successors, assigns, executors, representatives, and administrators.

6.     **Entire Agreement.** The Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such matters, which the Parties acknowledge have been merged into this Agreement.

7.     **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument. Signature by facsimile or other similar electronic transmission shall have the same force and effect as an original signature.

IN WITNESS WHEREOF, the Parties have executed this Remittance Agreement as of the Effective Date set forth above and in the capacities set forth below.

**NREA SB II Holdings, LLC,**
a Delaware limited liability company

By: _____

Name:  Anthony Scavo
Title:   Authorized Signatory

CHARITABLE DAF HOLDINGS CORP.

By:_____
Name:_____
Title:_____

LIBERTY CLO HOLDCO, LTD.

By:_____
Name:_____
Title:_____

ACTIVE 706141854v2

017000

HCMLPHMIT00000110

## REMITTANCE AGREEMENT

This Remittance Agreement (the "Agreement") is entered into as of January 10, 2025 (the "Effective Date") by and between NREA SB II Holdings, LLC (together with its successors and assigns in such capacities, "NexPoint Small Bay."), Charitable DAF Holdings Corp. (together with its successors and assigns in such capacities, "Charitable DAF"), and Liberty CLO Holdco, Ltd. (together with its successors and assigns in such capacities, "Liberty CLO"). NexPoint Small Bay, Charitable DAF, and Liberty CLO are each referred to herein individually as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, the Charitable DAF and Liberty CLO jointly previously provided temporary bridge funding and equity to NexPoint Small Bay, with repayment required in accordance with the Limited Liability Company Agreement of NexPoint Small Bay (the "DAF Bridge Equity"); and

WHEREAS, NexPoint Small Bay currently owes $8,265,050.74 to Charitable DAF and Liberty CLO, jointly, as repayment for the DAF Bridge Equity;

THEREFORE, for and in consideration of the payment, promises, covenants, conditions, stipulations, benefits, and obligations described and provided herein, the sufficiency and adequacy of which is expressly hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1.    **Payment to DAF.** On or before January 14, 2025, NexPoint Small Bay shall pay to Charitable DAF and Liberty CLO, jointly, the amount of $8,265,050.74 (the "DAF Bridge Equity Payment").

2.    **Satisfaction and Release of Claims.** Charitable DAF and Liberty CLO each stipulates and agrees that the DAF Bridge Equity Payment will fully and completely satisfy all obligations arising out of or relating to the DAF Bridge Equity, that they each, upon receipt of the DAF Bridge Equity Payment, automatically and forever release and discharge NexPoint Small Bay and its affiliates, members, successors, and assigns, of and from all claims, demands, damages, liability, and responsibility, of any type or kind arising from or relating to the DAF Bridge Equity and/or their membership in NexPoint Small Bay, and Charitable DAF and Liberty CLO shall cease to be Members of NexPoint Small Bay and cease to have any rights under the Limited Liability Company Agreement of NexPoint Small Bay. Charitable DAF and Liberty CLO hereby provide any consent that is required by them under the Limited Liability Company Agreement of NexPoint Small Bay.

3.    **Choice of Law; Jurisdiction; Venue.** This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without regard to conflict of law provisions. Each Party to hereby consents and agrees that the courts located in Texas shall have sole and exclusive jurisdiction to hear and determine any claims or disputes between the parties pertaining to this Agreement or to any matter arising out of or relating to this Agreement. Each Party expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and each Party hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue, or *forum non conveniens*.

4.      **Amendments; Waivers.** No amendment, modification, or waiver of any of the provisions of this Agreement shall be deemed to be made unless the same shall be in writing signed on behalf of each Party, and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the Party making such waiver or the obligations of the other Party in any other respect or at any other time.

5.      **Binding Effect.** Except as otherwise expressly provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Parties and their respective successors, assigns, executors, representatives, and administrators.

6.      **Entire Agreement.** The Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such matters, which the Parties acknowledge have been merged into this Agreement.

7.      **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument. Signature by facsimile or other similar electronic transmission shall have the same force and effect as an original signature.

IN WITNESS WHEREOF, the Parties have executed this Remittance Agreement as of the Effective Date set forth above and in the capacities set forth below.

NREA SB II Holdings, LLC

By:_____
Name:_____
Title:_____


CHARITABLE DAF HOLDINGS CORP.

By:_____
Name:__Mark Patrick_____
Title:_President_____


LIBERTY CLO HOLDCO, LTD.

By:_____
Name:__Mark Patrick_____
Title:_Director_____

HCMLPHMIT00000112

**EXHIBIT 23**

017003

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>, "Jeff Pomerantz" <jpomerantz@pszjlaw.com>
**Cc:** "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>
**Subject:** FW: 2022 settlement
**Date:** Thu, 10 Apr 2025 20:57:55 +0000
**Importance:** Normal
**Attachments:** Hunter_Mountain_Settlement_--_Final_Execution_Version_(All_Signatures).pdf
**Inline-Images:** image002.png

John and Jeff,

Please see the 2022 Settlement Agreement re the HMIT note(s) that we discussed during the call.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

## CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

This Confidential Settlement Agreement and Release (the "Agreement") is entered into as of June 21, 2022 (the "Effective Date"), by and between Hunter Mountain Investment Trust, a Delaware statutory trust ("HMIT") and Rand PE Fund I, LP, Series 1, a Delaware series limited partnership ("Rand") (and together with HMIT, the "Cross-Plaintiffs"), on the one hand, and James D. Dondero ("Dondero"), Mark K. Okada ("Okada), The Dugaboy Investment Trust, a Delaware statutory trust ("Dugaboy"), The Mark and Pamela Okada Family Trust – Exempt Trust #1, a Delaware statutory trust ("MAP#1"), and The Mark and Pamela Okada Family Trust – Exempt Trust #2, a Delaware statutory trust ("MAP#2") (and collectively with Dondero, Okada, Dugaboy, and MAP #1, the "Cross-Defendants"), on the other hand.  In this Agreement, Cross-Plaintiffs and Cross-Defendants are referred to collectively as the "Parties" and each individually as a "Party."

## RECITALS

WHEREAS, on or about December 21, 2015, Highland Capital Management, L.P. ("HCMLP"), a Delaware limited partnership, and its limited partners Dugaboy, Okada, MAP#1, MAP#2, and HMIT (together, the "HCMLP Limited Partners") entered into a Second Amended and Restated Buy-Sell and Redemption Agreement, pursuant to which HMIT agreed to purchase certain limited partnership interests in HCMLP from the HCMLP Limited Partners, which interests, prior to any subsequent transaction, represented 99.5% of the then existing limited partnership interests of HCMLP;

WHEREAS, on or about December 21, 2015, HCMLP and HMIT executed a Contribution Agreement, pursuant to which HMIT agreed to contribute Seventy Million Dollars ($70,000,000.00) of capital (the "Capital Contribution") in the form of cash and a note to HCMLP in return for the issuance of limited partnership interests in HCMLP which when combined with those held by the HCMLP Limited Partners, represented a Fifty-Five Percent (55%) of the limited partnership interests in HCMLP.

WHEREAS, HCMLP required Rand to execute a Guaranty Agreement in which Rand guaranteed the full and prompt payment and performance of all indebtedness, liabilities, and obligations of HMIT arising under or in connection with the Capital Contribution.

WHEREAS, on December 21, 2015, HMIT issued to HCMLP a Secured Promissory Note in which HMIT agreed to pay HCMLP the principal amount of Sixty-Three Million Dollars ($63,000,000.00), together with interest on the outstanding principal amount at the rate of Two and Sixty-One One Hundredths Percent (2.61%) per annum for the purchase of the limited partnership interests described in the Contribution Agreement;

WHEREAS, on December 24, 2015, HMIT, in addition to cash considerations, issued Security Promissory Notes to the HCMLP Limited Partners in which HMIT agreed to (i) pay Dugaboy the principal amount of Sixty-Two Million, Six Hundred Fifty-Seven Thousand, Six-Hundred and Forty Seven Dollars and Twenty-Seven Cents ($62,657,647.27), (ii) pay Okada the principal amount of Sixteen Million, Three Hundred and Fifty-One Thousand, Three Hundred and Fifty-Seven Hundred Dollars and Seventy-Two Cents ($16,351,357.12), (iii) pay MAP#1 the

1

017005
HCMLPHMIT00000119

principal amount of Three Million, Two Hundred Eighty-Three Thousand, Six Hundred Eight-Eight Dollars and Nine Cents ($3,283,688.09), (iv) pay MAP#2 the principal amount of One Million, Four Hundred Seven Thousand, Three Hundred Six Dollars and Ninety-Two Cents ($1,407,306.92), and (v) pay interest on the outstanding principal amounts of each of the Secured Promissory Notes at the rate of Two and Sixty-One One Hundredths Percent (2.61%) per annum, in order to pay for HMIT's acquisition of the limited partnership interests in HCMLP from the HCMLP Limited Partners (44.5% post issuance per the Contribution Agreement) in accordance with the Partnership Interest Purchase Agreement;

WHEREAS, as a condition to HMIT's acquiring the referenced limited partnership interests from the HCMLP Limited Partners, the HCMLP Limited Partners each required Rand to execute Guaranty Agreements in which Rand guaranteed the full and prompt payment and performance of all indebtedness, liabilities, and obligations of HMIT arising under or in connection with the Secured Promissory Notes;

WHEREAS, on or about December 24, 2015, HCMLP and the HCMLP Limited Partners executed a Fourth Amended and Restated Agreement of Limited Partnership admitting HMIT as a limited partner of HCMLP;

WHEREAS, on or about October 16, 2019, HCMLP filed a chapter 11 petition in bankruptcy ("HCMLP Bankruptcy");

WHEREAS, on or about April 2, 2020, HMIT filed a proof of claim in the HCMLP Bankruptcy totaling $60,298,739.00;

WHEREAS, HCMLP objected to HMIT's proof of claim, and HCMLP sought subordination of HMIT's claim by instituting an adversary proceeding styled *Highland Capital Management, L.P. v. Hunter Mountain Investment Trust* Adv. Proc. No. 20-03105-sgj (Bankr. N.D. Tex) (the "HMIT Adversary Proceeding");

WHEREAS, by stipulation entered in the HMIT Adversary Proceeding and in the HCMLP Bankruptcy, HMIT withdrew its proof of claim;

WHEREAS, on or about October 15, 2021, Marc A. Kirschner ("Kirschner"), as Trustee of the Litigation Sub-Trust, filed an adversary proceeding, styled *Kirschner v. Dondero, et al.*, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex.) (the "Kirchner Litigation"), in which Kirschner named HMIT and Rand as defendants and asserted claims (i) against HMIT for avoidance and recovery of allegedly constructive and/or intentional fraudulent transfers, illegal distributions under the Delaware Revised Uniform Limited Partnership Act, and breach of contract, and (ii) against Rand for breach of contract;

WHEREAS, on or about March 23, 2022, HMIT and Rand filed cross-claims in the Kirschner Litigation against Cross-Defendants, alleging generally that Cross-Defendants are liable for and should be required to pay any and all damages for which HMIT or Rand may be liable in the Kirschner Litigation (the "Cross-Complaint");

2

017006
HCMLPHMIT00000120

WHEREAS, the Cross-Defendants dispute their liability to Cross-Plaintiffs and all allegations contained in the Cross-Complaint; and

WHEREAS, the Parties now wish to resolve the Cross-Complaint and all other potential disputes between them;

NOW THEREFORE, in consideration of the foregoing recitals, the promises contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties stipulate and agree as follows:

## TERMS OF AGREEMENT

### 1. Consideration for Settlement

1.1 <u>Settlement Payment</u>. The Parties agree that, simultaneously with the execution of this Agreement, and no later than the Effective Date, Cross-Defendants shall make a one-time payment of Fifty Thousand Dollars ($50,000.00) (the "<u>Settlement Payment</u>") to Cross-Plaintiffs consistent with the instructions set forth in Sections 1.3 and 1.4 below.

1.2 <u>Payment of Past Attorneys' Fees, Audit Fees, and Bank Fees</u>. In addition to the Settlement Payment, Cross-Defendants shall, within ten (10) business days of receiving a written demand by Cross-Plaintiffs, which demand shall include relevant back-up documentation, including at a minimum documentation of attorney rates and time entries, pay (i) all attorneys' fees incurred by Cross-Plaintiffs in connection with either the HCMLP Bankruptcy or the Kirschner Lawsuit, (ii) all audit fees incurred by Cross-Plaintiffs during the pendency of the HCMLP Bankruptcy, and (iii) all bank fees incurred by Cross-Plaintiffs during the pendency of the HCMLP Bankruptcy (the "<u>Past Fees Payment</u>"). The Past Fees Payment shall be made consistent with the instructions set forth in Sections 1.3 and 1.4 below.

1.3 <u>Manner of Payments</u>. The Settlement Payment, and any other payments to be made pursuant to this Agreement, shall be deemed made when received by wire transfer, without set-off, in immediately available funds. All such payments should be made in a manner to ensure receipt not later than 5:00 p.m., Central Standard Time, on the date when due under this Agreement. Whenever any payment to be made hereunder is due on a day which is not a Business Day (as defined below), such payment shall be made on the next Business Day thereafter, and any such payment shall be deemed timely made. "<u>Business Day</u>" means a day of the year (other than a Saturday, Sunday, legal holiday, or other day on which banking institutions in the State of Texas are authorized or required by law to close) in which banking institutions are open for the purpose of conducting commercial business.

1.4 <u>Wire Transfer Instructions</u>. Unless Cross-Plaintiffs instruct Cross-Defendants otherwise in writing, all payments to be made pursuant to this Agreement shall be made pursuant to the wire transfer instructions set forth below:

|  |  |
|---|---|
| To: | Rand PE Fund I LP |
| Bank: | PNC Bank |
| Bank Address: | PO Box 640750 |
|  | Pittsburgh, PA 15264-0570 |

3

HCMLPHMIT00000121

ABA Routing:      043000096
Account No:       4947568529

    1.5    <u>Agreement to Fund Defense</u>.  In addition to the payments contemplated in this Section 1, as further consideration for settlement, Cross-Plaintiffs agree to fund Cross-Plaintiffs' defense costs in the same manner as set forth in Section 1.2 through 1.4 above with regard to any and all claims now or hereafter asserted against Cross-Plaintiffs in the Kirschner Litigation.  Such defense shall include, at a minimum, the retention of a licensed attorney to represent Cross-Plaintiffs in the Kirschner Litigation and payment of all costs and attorneys' fees associated with Cross-Plaintiffs' defense.  For the avoidance of doubt, the Parties agree that Cross-Defendants may select any counsel of their choosing, in their sole discretion, to replace Cross-Plaintiffs' existing counsel and may retain counsel already representing other named defendants in the Kirschner Litigation, so long as no ethical or other legal conflict bars such dual representation.  Cross-Plaintiffs shall retain full control of their defense in the Kirschner Litigation; provided however, that upon the substitution of counsel for Cross-Plaintiffs as contemplated in this Agreement, Cross-Defendants shall only control Cross-Plaintiffs' defense (hereinafter referred to as a "<u>Change of Litigation Control</u>").  In the event of a Change of Litigation Control, Cross-Plaintiffs shall: a) continue to be promptly apprised of all Kirschner Litigation events, issues, and circumstances which may affect Cross-Plaintiffs in said litigation by substitute counsel; and b) retain the right to consent to any resolution of the claims asserted against Cross-Plaintiffs in the Kirschner Litigation that involves (i) the payment of money by Cross-Plaintiffs, or (ii) any admission of liability by Cross-Plaintiffs, whether by settlement, default judgment, or otherwise.

## 2.    Dismissal of Cross-Complaint.

    4.1    <u>Timing of Dismissal</u>.  Within five (5) business days of the Effective Date of this Agreement, the Parties shall stipulate to the dismissal of the Cross-Complaint with prejudice.

    4.2    <u>Responsibility for Filing</u>.  Cross-Plaintiffs shall bear responsibility for ensuring that appropriate notice of the Parties' stipulation of dismissal of the Cross-Complaint is timely filed with the United States Bankruptcy Court for the Northern District of Texas.

## 3.    Releases

    3.1    <u>Release by Cross-Plaintiffs of Cross-Defendants</u>.  Cross-Plaintiffs, on behalf of themselves, their predecessors, successors, affiliates, and assigns, and each of their past, present, and future officers, directors, managers, agents, employees, representatives, and any person acting by, through, or under the direction of them (collectively, the "<u>Cross-Plaintiff Releasing Parties</u>") hereby fully and irrevocably release and discharge Cross-Defendants, together with their predecessors, successors, affiliates, and assigns, and each of their past, present, and future officers, directors, managers, agents, employees, representatives, and any person acting by, through, or under the direction of them (collectively, the "<u>Cross-Defendant Released Parties</u>"), from all claims, rights, demands, actions, lawsuits, causes of action, grievances, liabilities, obligations, controversies, damages, costs, expenses, losses, and debts, of any nature whatsoever, present or future, known or unknown, contingent or definitive, conditional or unconditional, that the Cross-Plaintiff Releasing Parties had, have, or may have against the Cross-Defendant Released Parties, which arise out of or relate in any manner to the subject matter of this Agreement or the Cross-

4

HCMLPHMIT00000122

Complaint, or any other agreements executed by and between the Parties prior to the Effective Date.

3.2    Release by Cross-Defendants of Cross-Plaintiffs.  Cross-Defendants, on behalf of themselves, their predecessors, successors, affiliates, and assigns, and each of their past, present, and future officers, directors, managers, agents, employees, representatives, and any person acting by, through, or under the direction of them (collectively, the "Cross-Defendant Releasing Parties") hereby fully and irrevocably release and discharge Cross-Plaintiffs, together with their predecessors, successors, affiliates, and assigns, and each of their past, present, and future officers, directors, managers, agents (inclusive of counsels for Cross-Plaintiffs), employees, representatives, and any person acting by, through, or under the direction of them (collectively, the "Cross-Plaintiff Released Parties"), from all claims, rights, demands, actions, lawsuits, causes of action, grievances, liabilities, obligations, controversies, damages, costs, expenses, losses, and debts, of any nature whatsoever, present or future, known or unknown, contingent or definitive, conditional or unconditional, that the Cross-Defendant Releasing Parties had, have, or may have against the Cross-Plaintiff Released Parties, which arise out of or relate in any manner to the subject matter of this Agreement or the Cross-Complaint, or any other agreements executed by and between the Parties prior to the Effective Date, including but not limited to any and all guarantees or debt obligations facially owed by Cross-Plaintiffs to Cross-Defendants.

## 4.    Confidentiality and Non-Disparagement

4.1    Duty of Confidentiality.  The terms of this Agreement and all correspondence relating to this Agreement are and shall remain confidential.  The Parties shall not disclose any information relating to this Agreement or its contents, nor shall any Party cause any individual, entity, affiliate, or agent acting under its direction or control to disclose any information relating to this Agreement or its contents, to any third party whatsoever, except (i) with the prior written consent of the other Party to this Agreement; (ii) as may be required by applicable law, regulation, or order of a governmental authority of competent jurisdiction; (iii) during the course of litigation so long as the disclosure is subject to the same restrictions as are embodied in a court-ordered protective order limiting disclosure to outside counsel; or (iv) in confidence to the Party's counsel, accountants, financial advisors, or tax professionals, whom the Party shall advise of the confidential nature of this Agreement.

4.2    Requirements Prior to Disclosure.  Should any Party disclose any information relating to this Agreement or its contents under any of the circumstances specified in Section 3.1, the disclosing Party shall notify the other Parties in writing before any disclosure of the same.  In such case, the disclosing Party shall: (i) make available as soon as practicable (and in any event prior to disclosure), for inspection and copying, a copy of the Agreement or other information the Party intends to disclose; (ii) where applicable, identify the law, regulation, order, or other legal basis for the disclosure; and (iii) to the extent possible, refrain from disclosing anything for at least ten (10) business days following the disclosing Party's written notice of disclosure to give the other Parties an opportunity to resist disclosure or seek other appropriate legal relief.  In any event, the Parties shall use reasonable efforts to limit the disclosure of the terms and conditions of this Agreement and seek a protective order or other confidential treatment of the disclosed information.

017009

HCMLPHMIT00000123

4.3   <u>Duty of Non-Disparagement</u>.   Subject to applicable law, each of the Parties covenant and agree that neither they nor any of their respective agents, subsidiaries, affiliates, successors, assigns, officers, employees or directors, will in any way publicly disparage, call into disrepute, defame, slander or otherwise criticize the opposing Parties or such other Parties' agents, subsidiaries, affiliates, successors, assigns, officers, employees, agents, or directors.

4.4   <u>Violation of Duties of Confidentiality and Non-Disparagement</u>.   Any Party violating their duties of confidentiality or non-disparagement shall be responsible for payment of any damages incurred by the other Parties as a result of the violation.  The Parties also shall have the right and standing to seek an injunction against any person and/or entity violating this Section 5, or any person and/or entity who has announced an intention to violate this Section 5 or who has failed to desist from any such violation after written demand to do so, from further or future violations.  All attorneys' fees, costs, and expenses incurred by a Party in enforcing its rights pursuant to this Section 5 shall be the liability of and borne by each and every person and/or entity against whom injunctive, monetary, or other relief is obtained.

5.   **Covenants, Representations, and Warranties**

5.1   <u>Authority to Enter Into Agreement</u>. The Parties covenant and warrant that they have the full power and authority to enter into this Agreement and to carry out its terms and that they have not previously assigned, sold, or otherwise pledged or encumbered any right, title, or interest in the claims released herein or their right, power, or authority to enter into this Agreement.

5.2   <u>Authority to Execute on Behalf of Another</u>.  Any person signing this Agreement on behalf of another person or entity represents and warrants that he or she has full power and authority to do so and that said other person or entity is bound hereby.

5.3   <u>No Admission of Liability</u>.  By entering into this Agreement, no Party is admitting any liability to any other Party or any other person or entity.  Neither this Agreement, nor any document or instrument delivered hereunder, nor any statement, transaction, or proceeding in connection with the negotiation, execution, or implementation of this Agreement, is intended to be or shall be construed as or deemed to be evidence of an admission or concession of any liability or wrongdoing or of the truth of any allegations asserted by any Party against another, and no such statement, transaction, or proceeding shall be admissible in evidence for any such purpose except as required to enforce this Agreement.

5.4   <u>Covenant Not To Sue.</u>  The Parties, for themselves, their heirs, and successors hereby covenant and agree not to file any lawsuit or other action concerning the claims released herein, other than an action to enforce the Agreement.

5.5   <u>Representation by Counsel.</u>  Each Party has executed this Agreement upon its own independent judgment and upon the advice of its independent legal counsel, and not in reliance upon any representation, express or implied, of any kind or nature from any other Party or Party's counsel.

017010
HCMLPHMIT00000124

## 6.     Miscellaneous Provisions

6.1     <u>Governing Law</u>.   The provisions of this Agreement shall be interpreted in accordance with, and governed by, the laws of the State of Texas, without regard to conflict of laws principles.

6.2     <u>Dispute Resolution</u>.  In the event there is an unresolved legal dispute between the Parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the Parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that any Party may pursue a temporary restraining order and/or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief.  The arbitration will be conducted by the American Arbitration Association pursuant to the rules governing complex commercial disputes. A panel of three arbitrators will preside over the arbitration and will together deliberate, decide, and issue the final award.  The arbitrators shall be duly licensed to practice law in the state of Texas. The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law.  All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site.  Each party shall bear its own attorneys' fees, costs, and expenses, including any costs of experts, witnesses, and/or travel.

6.3     <u>Waiver of Right to Jury Trial</u>.

EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, AND (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY.

6.4     <u>Cooperation</u>.  Each of the Parties hereto shall execute such additional documents and take such additional actions as are or may be reasonably necessary to effectuate the purposes of this Agreement.

017011
HCMLPHMIT00000125

6.5 <u>Counterparts</u>.  This Agreement may be executed in counterparts.  All counterparts so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all Parties are not signatory to the original or to the same counterpart.

6.6 <u>Entire Agreement/No Other Agreements</u>.

THE PARTIES EXPRESSLY ACKNOWLEDGE, COVENANT, AND AGREE THAT THIS AGREEMENT AND ITS EXHIBITS CONSTITUTE THE ENTIRE AGREEMENT OF THE PARTIES WITH RESPECT TO THE SUBJECT MATTER CONTAINED THEREIN.  THE PARTIES EXPRESSLY WAIVE AND DISAVOW ALL PRIOR AGREEMENTS, COVENANTS, REPRESENTATIONS, AND WARRANTIES, EXPRESS OR IMPLIED, WRITTEN OR ORAL, OF THE PARTIES CONCERNING THE SUBJECT MATTER OF THIS AGREEMENT.

6.7 <u>Modification</u>.  This Agreement shall not be modified or amended except by an instrument in writing signed by an authorized representative of each Party.

6.8 <u>No Third-Party Beneficiaries</u>.  This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and Released Parties, and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable rights, benefit, or remedy of any nature whatsoever.

6.9 <u>No Waiver</u>.  The failure by any Party to enforce any term of this Agreement shall not be deemed a waiver of the term or any other term of the Agreement, nor shall any Party be deemed to have waived any right to performance under this Agreement unless such waiver is made expressly in writing by the Party making the waiver.

6.10 <u>Severability</u>.  It is expressly understood and agreed that each provision of this Agreement shall be deemed to be severable, and if any provision herein is determined to be invalid, illegal, or unenforceable by a court of competent jurisdiction for any reason, then such invalidity, illegality, and/or unenforceability shall not affect the validity, legality, and enforceability of the remaining provisions of this Agreement.

6.11 <u>Mutual Interpretation</u>.  The Parties agree and stipulate that this Agreement was negotiated on an "arms-length" basis between parties of equal bargaining power, and that this Agreement has been drafted jointly by the Parties and their respective Counsel.  Accordingly, this Agreement shall be neutral, and no ambiguity shall be construed in favor of or against either Party.

6.12 <u>Binding Effect; Successors and Assigns</u>.  This Agreement, and each provision of this Agreement, shall inure to the benefit of, and shall be binding upon, the Parties as well as the legal successors and assigns of the Parties.

017012

HCMLPHMIT00000126

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date shown below.

**Hunter Mountain Investment Trust**

Name: _John W. Havic_

Title: _Trustee_

Date: _6 / 21 / 22_

**Rand PE Fund I, LP, Series 1.**

Name: _John W. Havic_

Title: _Manager, Rand PE I, GP_

Date: _6 / 21 / 22_

_____

**James D. Dondero**

Date: _____

_____

**The Mark and Pamela Okada Family Trust – Exempt Trust #1**

Name: _____

Title: _____

Date: _____

_____

**Mark K. Okada**

Date: _____

_____

**The Dugaboy Investment Trust,**

Name: _____

Title: _____

Date: _____

_____

**The Mark and Pamela Okada Family Trust – Exempt Trust #2**

Name: _____

Title: _____

Date: _____

9

017013

HCMLPHMIT00000127

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date shown below.

_____

**Hunter Mountain Investment Trust**

Name: _____

Title: _____

Date: _____

_____

**Rand PE Fund I, LP, Series 1.**

Name: _____

Title: _____

Date: _____

_____

**James D. Dondero**

Date: _____June 21, 2022_____

Title: _____

Date: _____

_____

**Mark K. Okada**

Date: _____

_____

**The Mark and Pamela Okada Family Trust – Exempt Trust #1**

Name: _____

Title: _____

_____

**The Dugaboy Investment Trust,**

Name: _____

9

017014

HCMLPHMIT00000128

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date shown below.

---

**Hunter Mountain Investment Trust**

Name: _____

Title: _____

Date: _____

---

**James D. Dondero**

Date: _____

---

**Mark K. Okada**

Date: _____

---

**The Dugaboy Investment Trust,**

Name: _____

Title: _____

Date: _____

---

**Rand PE Fund I, LP, Series 1.**

Name: _____

Title: _____

Date: _____

---

**The Mark and Pamela Okada Family Trust – Exempt Trust #1**

Name: _____

Title: Trustee

Date: June 21, 2022

---

**The Mark and Pamela Okada Family Trust – Exempt Trust #2**

Name: _____

Title: Trustee

Date: June 21, 2022

017015
HCMLPHMIT00000129

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date shown below.

_____

**Hunter Mountain Investment Trust**

Name: _____

Title: _____

Date: _____


_____

**James D. Dondero**

Date: _____


_____

**Mark K. Okada**

Date: _____


_____

**The Dugaboy Investment Trust,**

Name: _____

Title: TRUSTEE

Date: 6|21|22


_____

**Rand PE Fund I, LP, Series 1.**

Name: _____

Title: _____

Date: _____


_____

**The Mark and Pamela Okada Family Trust – Exempt Trust #1**

Name: _____

Title: _____

Date: _____


_____

**The Mark and Pamela Okada Family Trust – Exempt Trust #2**

Name: _____

Title: _____

Date: _____


9

017016
HCMLPHMIT00000130

**EXHIBIT 24**

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>, "Jeff Pomerantz" <jpomerantz@pszjlaw.com>
**Cc:** "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>
**Subject:** FW: Joinder to Confidentiality Agreement
**Date:** Thu, 17 Apr 2025 17:33:36 +0000
**Importance:** Normal
**Attachments:** James_D._Shields_Joinder_to_CA.pdf
**Inline-Images:** image001.png

---

John,

Please see attached Joinder from Jim Shields.  Please have Mr. Seery execute and then return it to me so I can forward to Mr. Shields.  Thank you.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

---

**From:** Jim Shields <jshields@shieldslegal.com>
**Sent:** Wednesday, April 16, 2025 11:53 AM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>

HCMLPHMIT00000135

**Cc:** Kasey Rose <krose@shieldslegal.com>
**Subject:** RE: Joinder to Confidentiality Agreement

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**

017019

HCMLPHMIT00000136

# JOINDER TO CONFIDENTIALITY AGREEMENT

This JOINDER TO CONFIDENTIALITY AGREEMENT (this "**Joinder**") is entered into as of March 18, 2025 (the "**Effective Date**") by and between Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), and James D. Shields (the "**Joining Party**"). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Confidentiality Agreement (as hereinafter defined).

WHEREAS, reference is made to that certain Confidentiality Agreement as of March 18, 2025 by and among Highland, on the one hand, and Mark Patrick, a United States citizen and resident of Dallas, Texas, Hunter Mountain Investment Trust, a Delaware statutory trust, Charitable DAF Holdco, Ltd., a Cayman Islands exempted company, CDH GP, Ltd., a Cayman Islands exempted company, Charitable DAF Fund, L.P., a Cayman Islands exempted limited partnership, and CLO Holdco, Ltd., a Cayman Islands exempted company, Rand Advisors, LLC, a Delaware limited liability company, Rand PE Fund I, LP, a Delaware series limited partnership, Rand PE Fund Management, LLC, a Delaware limited liability company, Atlas IDF, LP, a Delaware limited partnership, Atlas IDF GP, LLC, a Delaware limited liability company, on the other hand (the "**Confidentiality Agreement**");

WHEREAS, the Joining Party is a Representative of Recipients and desires to receive certain Confidential Information for the sole limited purpose of advising Recipients in connection with its evaluation, negotiation and consummation of a Proposed Settlement; and

WHEREAS, in accordance with Section 4 of the Confidentiality Agreement and as a condition to Highland providing, or permitting Recipients to provide, such Confidential Information to the Joining Party, the Joining Party agrees to the terms and conditions set forth in this Joinder.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      The Joining Party acknowledges that it has received and reviewed a copy of the Confidentiality Agreement.  The Joining Party hereby joins as a Party to, and agrees to be bound by all of the terms, provisions and conditions set forth in, the Confidentiality Agreement as a "Recipient" thereunder, with the same force and effect as if originally named therein as a "Recipient."

2.      Without limiting the generality of the foregoing, the Joining Party hereby (a) makes each of the representations and warranties set forth in Section 1 of the Confidentiality Agreement to Highland and (b) represents and warrants to Highland that such Joining Party (i) does not currently represent any Dondero Related Party and (ii) has no duty or obligation to provide any Confidential Information to any Person not a party to this Agreement, whether through a common or joint interest agreement or otherwise, and does not represent any Person with such a duty or obligation.

James D. Shields Joinder to CA (002)

017020

HCMLPHMIT00000137

3.     Each of the terms, provisions and conditions set forth in Section 9 of the Confidentiality Agreement are incorporated herein by reference in their entirety and shall apply to this Agreement *mutatis mutandis*.

4.     A true and correct copy of the Confidentiality Agreement, as modified in paragraph 9(f) by agreement of Highland and Joining Party, is attached hereto as Exhibit "A".

IN WITNESS WHEREOF, the parties hereto have executed this Joinder to be effective as of the Effective Date.

**HIGHLAND:**

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name: James P. Seery, Jr.
Title: Chief Executive Officer

**JOINING PARTY:**

_____
Name: James D. Shields

James D. Shields Joinder to CA (002)

017021

HCMLPHMIT00000138

Execution Version

*Joinder of confidentility Agreement*

# CONFIDENTIALITY AGREEMENT

This CONFIDENTIALITY AGREEMENT (this "**Agreement**") is entered into as of March 18, 2025 (the "**Effective Date**") by and among Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**" or the "**Disclosing Party**"), on the one hand, and Mark Patrick, a United States citizen and resident of Dallas, Texas ("**Mr. Patrick**"), Hunter Mountain Investment Trust, a Delaware statutory trust ("**Hunter Mountain**"), Charitable DAF Holdco, Ltd., a Cayman Islands exempted company ("**DAF Holdco**"), CDH GP, Ltd., a Cayman Islands exempted company ("**DAF GP**"), Charitable DAF Fund, L.P., a Cayman Islands exempted limited partnership ("**DAF Fund**"), and CLO Holdco, Ltd., a Cayman Islands exempted company ("**CLO Holdco**", and together with DAF Holdco, DAF GP and DAF Fund, the "**DAF Entities**"), Rand Advisors, LLC, a Delaware limited liability company ("**Rand Advisors**"), Rand PE Fund I, LP, a Delaware series limited partnership ("**Rand PE Fund**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**"), Atlas IDF, LP, a Delaware limited partnership ("**Atlas IDF**"), Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**" and together with Rand Advisors, Rand PE Fund, Rand GP and Atlas IDF, the "**Rand Entities**", and the Rand Entities together with Mr. Patrick, Hunter Mountain and the DAF Entities, the "**Recipients**"), on the other hand.  Highland and the Recipients are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

## Recitals

WHEREAS, Mr. Patrick hereby represents and warrants that he is a control person for each of Hunter Mountain, the DAF Entities and the Rand Entities;

WHEREAS, there are several active litigations to which Highland or one of its affiliates, on the one hand, and one or more of the Recipients, on the other hand, are parties, including, without limitation, the matters set forth on Exhibit A hereto (collectively, the "**Pending Litigations**");

WHEREAS, the Parties desire to enter into good faith settlement discussions in an effort to reach a mutually acceptable global resolution to the Pending Litigations and all potential claims and causes of action against each other (the "**Potential Settlement**");

WHEREAS, in connection with negotiating the Potential Settlement, it is anticipated that Highland will provide the Recipients with certain Confidential Information (as hereinafter defined); and

WHEREAS, as a condition to Highland providing Recipients with any such Confidential Information, the Recipients agree to the terms and conditions set forth in this Agreement.

## Agreement

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, the Parties, intending to be legally bound, hereby agree as follows:

017022

HCMLPHMIT00000139

1.      **Representations and Warranties**

(a)      Each Party hereby represents and warrants to the other Parties as follows:

(i)      <u>Existence and Good Standing</u>.  Such Party is a legal entity duly organized, validly existing and, to the extent applicable in such jurisdiction, in good standing under the Laws (as hereinafter defined) of the jurisdiction in which it is incorporated or formed.  Such Party has all requisite corporate or similar right, power, authority and capacity to own, lease and operate the properties and assets it owns, leases and operates.  Each Party is qualified to do business as a foreign entity in each jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify.

(ii)      <u>Authority; Enforceability</u>. Such Party has the full power and authority to execute this Agreement and to perform its obligations under this Agreement.  The execution, delivery and performance of this Agreement have been duly and validly authorized by all required action on behalf of such Party in accordance with its respective Organizational Documents (as hereinafter defined) and applicable Law.  This Agreement constitute the valid and binding obligations of, and enforceable against, such Party.

(iii)      <u>No Violations</u>.  The execution and delivery by such Party of this Agreement, the performance and compliance with the terms and conditions hereof and thereof by such Party, and the performance by such Parent of its obligations contemplated hereby, in each case, will not (with or without notice or passage of time, or both):

(1) violate, conflict with, result in a breach of or constitute a default under any of the provisions of the Organizational Documents of such Party; or

(2) breach, violate or conflict with any provision of any Law or Permit applicable to such Party.

(iv)      <u>Legal Proceedings</u>.  There are no judicial, administrative or arbitral actions, suits, hearings, inquiries, charges, investigations, administrative proceedings, grievances or formal complaints or other proceedings (public or private) commenced, brought, conducted or heard before, or otherwise involving, any Governmental Entity or arbitrator, in each case, pending nor threatened that (i) challenge the validity or enforceability of Party's obligations under this Agreement or (b) seek to prevent or delay, or otherwise would reasonably be expected to adversely affect, the performance by such Party of its obligations hereunder.

(b)      Each Recipient hereby represents and warrants to Highland as follows:

(i) None of James Dondero, nor any Person directly or indirectly owned or controlled by Mr. Dondero (including, without limitation, Dugaboy Investment Trust) nor or any attorney, agent, employee, or representative engaged or working for benefit of Mr. Dondero nor any Person directly or indirectly owned or controlled by him (collectively, the "**Dondero Related Parties**") directly or indirectly owns any interest in, or directly or indirectly has any control over, such Recipient, including, without limitation, as the result of any written or oral contract, agreement, arrangement or obligation.

017023

HCMLPHMIT00000140

(ii) Such Recipient does not represent and is not acting on behalf of any Dondero Related Party.

(iii) Such Recipient has no duty or obligation to provide any Confidential Information to any Person not a party to this Agreement, whether through a common or joint interest agreement or otherwise, and is not representing or acting on behalf of any Person with such a duty or obligation.

## 2. Confidential and Proprietary Nature of the Information

Recipients acknowledge the confidential and proprietary nature of the Confidential Information, agree to hold and keep the Confidential Information in strict confidence as provided in this Agreement, agree that the use of any such Confidential Information is expressly limited to the pursuit of a Potential Settlement and shall not be used for any other purpose or in any other manner except as expressly provided in this Agreement, and otherwise agree to each and every restriction and obligation in this Agreement.

## 3. Confidential Information

As used in this Agreement, the term **"Confidential Information"** means and includes (a) any and all of the following items that will be disclosed to any Recipient or any of their respective Representatives (as hereinafter defined) by or on behalf of Highland, whether orally or in writing and without regard to whether Highland has specifically designated such item as confidential, proprietary or non-public: any and all confidential, proprietary or non-public information concerning the business or affairs of Highland or any of its affiliates or related accounts, or other Persons (as hereinafter defined) (which includes, for the avoidance of doubt and without limitation, Highland Claimant Trust, Highland Litigation Sub-Trust, Highland Indemnity Trust, each of their and Highland's direct and indirect subsidiaries, and each of their respective affiliates, and its and their respective parent entities, beneficiaries, members, shareholders, owners, creditors, trustees, oversight boards, directors, managers, officers, employees, agents, advisors and representatives (collectively, the **"Highland Related Parties"**)), including, without limitation, any written or oral information, reports and data concerning financial statements, assets, liabilities, indemnity and other obligations, cash flow, income, and expenses; past, current or planned investment or portfolio information; contracts and agreements; know-how, inventions and ideas, whether past, current or planned; partner, beneficiary, owner or investor lists; partner, beneficiary, owner or investor information; business plans; entity structure details; all compliance-related reports, records and information; and any other information, however documented, that is proprietary or non-public or is a trade secret within the meaning of applicable state trade secret Law, and (b) any and all statements or representations made in the course of discussing, negotiating or evaluating a Potential Settlement, including, without limitation, the terms of any Potential Settlement and the fact that (i) Confidential Information has been disclosed to Recipient and (ii) any discussions or negotiations are taking place concerning a Potential Settlement.

To the extent that any Confidential Information includes information or materials subject to the attorney-client privilege, work-product doctrine, or any other applicable privilege concerning pending or threatened legal proceedings or governmental investigations, the Parties understand and agree that they have a commonality of interest with respect to such matters, and it

3

HCMLPHMIT00000141

is their desire, intention, and mutual understanding that the sharing of such information or materials is not intended to, and shall not, waive or diminish in any way the confidentiality of such information or material or its continued protection under the attorney-client privilege, work-product doctrine, or other applicable privilege.    Accordingly, all Confidential Information disclosed by or on behalf of Highland that is entitled to protection under the attorney-client privilege, work-product doctrine, or other applicable privilege shall remain entitled to such protection under these privileges and this Agreement.

## 4.    Restricted Use of Confidential Information

Recipients agree that the Confidential Information (a) shall be kept strictly confidential by each Recipient and (b) without limiting the foregoing, shall not be disclosed by or on behalf of any Recipient to any Person (as hereinafter defined) except as otherwise expressly permitted by this Agreement.    It is understood and the Recipients agree that Confidential Information may only be disclosed to Mr. Patrick and such specific legal counsel, accountants and financial advisors of the Recipients to whom such disclosure has been consented to in writing by Highland in its sole discretion (which consent may be given via email) (collectively "**Representatives**") and who (i) require such Confidential Information for the purpose of evaluating, negotiating or consummating a Proposed Settlement (ii) are informed by Recipient of the confidential nature of the Confidential Information and the obligations set forth in this Agreement, and (iii) execute a written joinder in the form annexed hereto as Exhibit B pursuant to which the Representative agrees to be bound to this Agreement as if they were an original Party hereto, with such joinder including, without limitation, a representation and warranty that such Representative (1) does not currently represent any Dondero Related Party and (2) has no duty or obligation to provide any Confidential Information to any Person not a party to this Agreement, whether through a common or joint interest agreement or otherwise, and does not represent any Person with such a duty or obligation. Recipients further agree that Recipients and their Representatives shall not use any of the Confidential Information to the detriment of Highland or any Highland Related Party or for any reason or purpose other than evaluating, negotiating or consummating a Proposed Settlement. Recipients shall enforce this Agreement as to its Representatives and take such action, legal or otherwise, to the extent necessary to cause them to comply with this Agreement and thereby prevent any disclosure of Confidential Information by any of its Representatives (including, without limitation, all actions that any Recipient would take to protect its own confidential information).

Without limiting the generality of the foregoing and for the avoidance of doubt, the Recipients and their Representatives shall not disclose or refer to any Confidential Information to (a) subject to Section 5 below, any Governmental Entity (as hereinafter defined), including, without limitation, in any pleadings or submissions, or (b) any Dondero Related Party. The Parties acknowledge that it is their collective intent that no Confidential Information disclosed hereunder may be examined in any proceeding of a Governmental Entity (or any discovery relating to any such proceeding), and all Confidential Information shall be entitled to all protections applicable under Federal Rule of Evidence 408 and any other protections afforded to settlement and compromise communications under any other applicable Law.

4

HCMLPHMIT00000142

5.    **Legally Compelled Disclosure**

If any Recipient or any of its Representatives becomes compelled by Law (whether by oral questions, interrogatories, requests for information or documents, subpoena, civil or criminal investigative demand, or similar process) to make any disclosure that is prohibited or otherwise constrained by this Agreement, such Recipient or its Representative, as the case may be, shall provide Highland with immediate notice of such legal proceedings, including all related documentation, so Highland may (a) seek an appropriate protective order or other appropriate relief, or (b) waive compliance with the provisions of this Agreement.  In the absence of a protective order or Recipients receiving a written waiver from Highland, Recipients or their Representatives are permitted (with Highland's cooperation but at Recipient's expense) to disclose that portion (and only that portion) of the Confidential Information that Recipient or its Representative is legally compelled by an order of an applicable Governmental Entity of competent jurisdiction to disclose; provided, however, that Recipient and its Representatives must use best efforts to obtain reliable assurance that confidential treatment will be accorded by any Person to whom any Confidential Information is so disclosed.

6.    **Return or Destruction of Confidential Information**

If Highland notifies Recipients that it wishes Recipients to return all Confidential Information, then Recipients (i) shall promptly deliver to Highland all documents or other materials disclosed by or on behalf of Highland to Recipient or its Representatives constituting Confidential Information, together with all copies and summaries thereof in the possession or under the control of Recipients or their Representatives, and (ii) will destroy materials generated by Recipients or their Representatives that include or refer to any part of the Confidential Information, without retaining any copies, including, without limitation, any electronically stored copies or attachments to emails, of any such documents or materials.  Written notice of return or destruction shall constitute a valid termination of access to Confidential Information and shall be deemed to have been given at the time Highland sends such notice.  Such notice may be sent in any manner reasonably calculated to notify Recipients of the termination.

7.    **No Obligation to Negotiate a Potential Settlement**

None of the Parties shall have rights or obligations of any kind whatsoever with respect to any Potential Settlement by virtue of this Agreement other than for the matters specifically agreed to herein.  Without limiting the preceding sentence, nothing in this Agreement requires any Party to enter into any Potential Settlement or to negotiate the same for any specified period of time or on any specific terms.

8.    **No Representations or Warranties**

Highland shall have no obligation to provide any information—confidential or otherwise—to the Recipients and retains the right to determine, in its sole discretion, what information, if any, it wishes to make available to Recipients, and neither Highland nor any Highland Related Party makes any representation or warranty (express or implied) concerning the completeness or accuracy of the Confidential Information.

017026

HCMLPHMIT00000143

## 9. Miscellaneous

(a)    <u>Modification</u>.  This Agreement may only be modified or waived by a separate writing signed by the Party or Parties expressly modifying or waiving this Agreement.

(b)    <u>Waiver</u>.  Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.

(c)    <u>Certain Definitions</u>.

(i)    The term **"Governmental Entity"** means any federal, national, state, foreign, provincial, local or other government or any governmental, regulatory, administrative or self-regulatory authority, agency, bureau, board, commission, court, judicial or arbitral body, department, political subdivision, tribunal or other instrumentality thereof, including any fiscal intermediary or administrative contractor acting on behalf of any of the foregoing.

(ii)    The term **"Law"** means any law, rule, regulation, statute, code, ordinance, decree or other restriction of any Governmental Entity or any order, injunction, judgment, decree, ruling, writ, assessment or award of a Governmental Entity.

(iii)    The term **"Organizational Documents"** means certificates of incorporation, bylaws, certificates of formation, certificates of trust, limited liability company agreements, limited liability partnership agreements, partnership or limited partnership agreements, trust agreements or other similar formation or governing documents of any Person, in each case, as amended, restated or otherwise modified to date.

(iv)    The term **"Person"** means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, any other business entity, or a Governmental Entity.

(d)    <u>Severability</u>.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, which shall remain in full force and effect.  If any of the terms, covenants or provisions of this Agreement are determined to be unenforceable by reason of its extent, duration, scope or otherwise, then the Parties contemplate and intend that the authority making such determination shall reduce such extent, duration, scope or other provision and enforce them in their reduced form for all purposes contemplated by this Agreement.

(e)    <u>Breach</u>.  Recipients agree that Highland will be irreparably injured by a breach of this Agreement by any Recipient or its Representatives, that monetary remedies will be inadequate to protect Highland against any actual or threatened breach of this Agreement by any Recipient or by its Representatives, and that Highland shall be entitled to an injunction or other equitable relief as a remedy for any breach as a matter of right and without the necessity of having to post a bond.  Such remedy shall not be deemed to be the exclusive remedy for a breach of this Agreement, but

6

017027

HCMLPHMIT00000144

shall be in addition to all other remedies available at law or equity. The non-prevailing Party shall pay the other Party's costs and expenses in any action to enforce the terms of this Agreement.

(f)    <u>Liability and Indemnity</u>.  Recipients shall, ~~jointly and severally~~ be liable to and shall indemnify and hold Highland and the Highland Related Parties harmless from and against any and all claims, suits, losses, damages, costs or expenses, including reasonable attorney fees, incurred or suffered by Highland or any Highland Related Party as a ~~result of any~~ Recipient ~~or its Representatives~~ violation of this Agreement, including, without limitation, using or disclosing any Confidential Information other than in accordance with this Agreement, whether such use or disclosure is performed negligently or otherwise.



(g)    <u>Notices</u>.  All notices, requests, demands, claims, and other communications hereunder shall be in writing.  Any notice, request, demand, claim or other communication hereunder shall be deemed duly delivered: (a) four (4) business days after it is sent by registered or certified mail, return receipt requested, postage prepaid; (b) one (1) business day after it is sent for next business day delivery via a reputable nationwide overnight courier service; (c) when sent, if emailed on a business day; and (d) the next business day following the day on which the email is sent if emailed on a day that is not a business day, in each case to the intended recipient as set forth below:

If to Highland:    Highland Capital Management, L.P.
100 Crescent Court, Suite 1850
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Email: jpseeryjr@gmail.com AND notices@highlandcapital.com

With copies to:

Pachulski Stang Ziehl & Jones LLP
780 3rd Avenue #34
New York, New York 10017
Attention: John A. Morris
Email: jmorris@pszjlaw.com

If to Recipients:    c/o Mark Patrick
6716 Glenhurst Dr.
Dallas, Texas 75254
Email: mpatrick@dafholdco.com

With copies to:

Kelly Hart & Pitre
301 Main Street Suite 1600
Baton Rouge, Louisiana 70801
Attention: Louis M. Phillips
Email: Louis.Phillips@kellyhart.com

7

017028

HCMLPHMIT00000145

(h)   Governing Law; Jurisdiction.   This Agreement shall be interpreted and construed in accordance with the laws of the State of Delaware, without regard to conflict of laws provisions. Each Party hereby irrevocably submits and acknowledges and recognizes the exclusive jurisdiction of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (which court, for purposes of this Agreement, is the only court of competent jurisdiction), over any suit, action or other proceeding arising out of, under or in connection with this Agreement or its subject matter.   Each Party irrevocably consents to service of process in any action or proceeding arising out of or relating to this Agreement in the manner provided for notices in Section 9(g) above. Nothing in this Agreement shall affect the right of any Party to serve process in any manner permitted by law.

(i)   Execution of Agreement.   This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which, when taken together, shall be deemed to constitute one and the same agreement.   The exchange of copies of this Agreement and of signature pages by email shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.   Signatures of the Parties transmitted by email shall be deemed to be their original signatures for any purpose whatsoever.

(j)   Headings.   The headings of the sections of this Agreement are inserted for convenience of reference only and shall not control or affect the meaning or construction of any of the terms of this Agreement in any manner.

(k)   Construction.   This Agreement has been fully negotiated by the Parties. Accordingly, in interpreting this Agreement, no weight shall be placed on which Party to this Agreement or its counsel drafted the provision being interpreted.

[SIGNATURES ON FOLLOWING PAGE]

8

017029

HCMLPHMIT00000146

IN WITNESS WHEREOF, the Parties have executed this Agreement to be effective as of the Effective Date.

**HIGHLAND:**

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name: James P. Seery, Jr.
Title: Chief Executive Officer

**RECIPIENTS:**

_____
MARK PATRICK

HUNTER MOUNTAIN INVESTMENT TRUST

By: _____
Name: Mark Patrick
Title: Administrator

CHARITABLE DAF HOLDCO, LTD.

By: _____
Name: Mark Patrick
Title: Director

CDH GP, LTD.

By: _____
Name: Mark Patrick
Title: Director

SIGNATURE PAGE TO CONFIDENTIALITY AGREEMENT

017030

HCMLPHMIT00000147

CHARITABLE DAF FUND, L.P.
By: CDH GP, Ltd., its General Partner

By: _____
Name: Mark Patrick
Title: Managing Member


CLO HOLDCO, LTD.

By: _____
Name: Mark Patrick
Title: Director


RAND ADVISORS, LLC

By: _____
Name: Mark Patrick
Title: President


RAND PE FUND I, L.P.
By: Rand PE Fund Management, LLC, its General Partner

By: _____
Name: Mark Patrick
Title: President


RAND PE FUND MANAGEMENT, LLC

By: _____
Name: Mark Patrick
Title: President


Type text here


SIGNATURE PAGE TO CONFIDENTIALITY AGREEMENT

017031

HCMLPHMIT00000148

ATLAS IDF, LP
By: Atlas IDF GP, LLC its General Partner

By: _____
Name: Mark Patrick
Title: President

Type text here

ATLAS IDF GP, LLC

By: _____
Name: Mark Patrick
Title: President

SIGNATURE PAGE TO CONFIDENTIALITY AGREEMENT

017032

HCMLPHMIT00000149

## EXHIBIT A

## PENDING LITIGATION

1.  DAF/CLOH appeal of Seery Retention Order (21-cv-01585-S)

2.  HMIT appeal of Order denying leave to file Claims Trading Complaint (23-cv-02071-E)

3.  HMIT appeal of Order dismissing Valuation Complaint (24-cv-01531-X)

4.  HMIT appeal of Order staying motion for leave to remove Seery (24-cv-01786)

5.  DAF appeal of decision affirming dismissal of HarbourVest Complaint (24-10880)

4910-0725-4050.6 36027.003

017033

HCMLPHMIT00000150

**EXHIBIT 25**

017034

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>
**Cc:** "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>
**Subject:** Possibility of brief call?
**Date:** Fri, 9 May 2025 19:02:46 +0000
**Importance:** Normal
**Inline-Images:** image003.png

---

John,

I just got back from Turkey, and am amazed at the increased toll that come with increased age.  But am in the office today.

While I was over there we got together and went through the settlement agreement draft.  We aim to get a responsive redline by Monday or Tuesday.  I just want to update as to a shift represented by our thinking about the timing of the releases, a proposed agreement to stay pending bankruptcy court approval, and how we are searching for a slightly different approach to money.  Let me know if you want/have time to visit.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

HCMLPHMIT00000157

017036
HCMLPHMIT00000158

**EXHIBIT 26**

017037

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>
**Cc:** "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>, "Jeff Pomerantz" <jpomerantz@pszjlaw.com>
**Subject:** RE: Possibility of brief call?
**Date:** Fri, 9 May 2025 19:18:10 +0000
**Importance:** Normal
**Inline-Images:** image003.png; image004.png

---

Sure.  I will be working tomorrow.  We can visit.  Good luck.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Friday, May 9, 2025 2:09 PM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Cc:** Amelia L. Hurt <Amelia.Hurt@kellyhart.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>
**Subject:** Re: Possibility of brief call?

HCMLPHMIT00000159

EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution
when opening attachments, following links or responding to this message.

Welcome back.

I am in Court in Delaware so today is out?

Any appetite for a call tomorrow?

Otherwise, Monday will work.

Let us know.

Thanks.

Sent from my iPhone


On May 9, 2025, at 3:02 PM, Louis M. Phillips <Louis.Phillips@kellyhart.com> wrote:


John,

I just got back from Turkey, and am amazed at the increased toll that come with increased age.  But am in the office today.

While I was over there we got together and went through the settlement agreement draft.  We aim to get a responsive redline by Monday or Tuesday.  I just want to update as to a shift represented by our thinking about the timing of the releases, a proposed agreement to stay pending bankruptcy court approval, and how we are searching for a slightly different approach to money.  Let me know if you want/have time to visit.



**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

louis.phillips@kellyhart.com
www.kellyhart.com

*Licensed to Practice in the State of Louisiana*

HCMLPHMIT00000160

18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

017040

HCMLPHMIT00000161

**EXHIBIT 27**

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>

**To:** "John A. Morris" <jmorris@pszjlaw.com>

**Cc:** "Jeff Pomerantz" <jpomerantz@pszjlaw.com>, "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>

**Subject:** RE: Checking in

**Date:** Tue, 13 May 2025 23:04:58 +0000

**Importance:** Normal

---

John,

My fault.  It took a few days longer than I expected to get over my trip to Turkey (actually the travel back).  I sent my proposed version to the client group today and proposed a call early morning tomorrow with an eye toward getting it to you by Noon.

Louis M. Phillips
Partner

KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

louis.phillips@kellyhart.com
www.kellyhart.com

Licensed to Practice in the State of Louisiana

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

-----Original Message-----
From: John A. Morris <jmorris@pszjlaw.com>
Sent: Tuesday, May 13, 2025 6:00 PM
To: Louis M. Phillips <Louis.Phillips@kellyhart.com>
Cc: Jeff Pomerantz <jpomerantz@pszjlaw.com>; Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
Subject: Checking in

EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.

Hi Louis.

HCMLPHMIT00000162

Checking in.

Jim had understood from Mark that we were to receive comments on the draft agreement yesterday or today.

Any ETA?  Let us know if call would be helpful.

We look forward to hearing from you.

Regards,

John

Sent from my iPhone

HCMLPHMIT00000163

**EXHIBIT 28**

017044

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>
**Cc:** "Jeff Pomerantz" <jpomerantz@pszjlaw.com>, "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>
**Subject:** RE: Checking in
**Date:** Wed, 14 May 2025 23:08:10 +0000
**Importance:** Normal

---

Typing transmittal email.

Louis M. Phillips
Partner

KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

louis.phillips@kellyhart.com
www.kellyhart.com

Licensed to Practice in the State of Louisiana

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

-----Original Message-----
From: John A. Morris <jmorris@pszjlaw.com>
Sent: Wednesday, May 14, 2025 6:03 PM
To: Louis M. Phillips <Louis.Phillips@kellyhart.com>
Cc: Jeff Pomerantz <jpomerantz@pszjlaw.com>; Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
Subject: Re: Checking in

EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.

Hi Louis.

Everything ok?

017045

HCMLPHMIT00000164

We'd like to move this forward.  Let us know.

Thanks.

Sent from my iPhone


> On May 13, 2025, at 7:05 PM, Louis M. Phillips <Louis.Phillips@kellyhart.com> wrote:
>
> John,
>
> My fault.  It took a few days longer than I expected to get over my trip to Turkey (actually the travel back).  I sent my proposed version to the client group today and proposed a call early morning tomorrow with an eye toward getting it to you by Noon.
>
>
>
>
> Louis M. Phillips
> Partner
>
>
>
> KELLY HART & PITRE
> 301 MAIN STREET SUITE 1600
> BATON ROUGE, LOUISIANA 70801
> TELEPHONE: 225-381-9643
> FAX: 225-336-9763
> DIRECT:  225-338-5308
>
> louis.phillips@kellyhart.com
> http://www.kellyhart.com
>
> Licensed to Practice in the State of Louisiana
>
> Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.
>
> IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.
>
> -----Original Message-----
> From: John A. Morris <jmorris@pszjlaw.com>
> Sent: Tuesday, May 13, 2025 6:00 PM
> To: Louis M. Phillips <Louis.Phillips@kellyhart.com>
> Cc: Jeff Pomerantz <jpomerantz@pszjlaw.com>; Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
> Subject: Checking in
>
> EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.
>
> Hi Louis.
>
> Checking in.
>
> Jim had understood from Mark that we were to receive comments on the draft agreement yesterday or today.
>
> Any ETA?  Let us know if call would be helpful.

017046

HCMLPHMIT00000165

> We look forward to hearing from you.
>
> Regards,
>
> John
>
> Sent from my iPhone
>

**EXHIBIT 29**

017048

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>, "Jeff Pomerantz" <jpomerantz@pszjlaw.com>
**Cc:** "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>, "Jim Shields" <jshields@shieldslegal.com>
**Subject:** KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14 against Highland v9.PDF
**Date:** Wed, 14 May 2025 23:20:51 +0000
**Importance:** Normal
**Attachments:** KH_clean_of_Redline_of_v9_Settlement_Agreement_after_comments_5.14.DOCX; Redline_KH_5.14_against_Highland_v9.PDF
**Inline-Images:** image003.png

---

John,

Please see the HMIT Entities' responsive version of the settlement agreement along with the redline from your version 9. First, I apologize for the delay, as the last version, sent by Mr. Seery, arrived on the day I landed in Istanbul, and scheduling on my side plus my schedule while overseas made it difficult to get things done. And then I just took longer to get over the lag from traveling back.

We have made some proposed changes. First major change is that we are willing to have the releases made effective as of bankruptcy court approval, and live with that in the event of an appeal. We also think, because the bankruptcy court will have approved the agreement, that the assignment of the Dugaboy Note and the Kirchner litigation should be done within the revised timeline set forth, and that there is no reason for any reservation of HMIT Note Claims by the Litigation Sub Trust (and no reason that we can see for continued day to day activity of the sub-trust, as the litigation would only be returned if an appeal is successful (which none of us think will be the case – at least I think none of us do)). We have added an agreed abatement of everything pending bankruptcy court approval. We have also accelerated funding, though propose an agreement to escrow funds in the event of reversal on appeal. We have reviewed the information provided by Mr. Seery and his group and think our structure and timing of funding leaves plenty of money aside for indemnification. We also have tried to identify and make clear what a Threat would be, to get something objective we can rely on and receive notice of.

I am around tomorrow and Friday. I will be working this weekend (without jet lag) and in my New Orleans office Monday preparing for an all day trial on Tuesday. We should be able to corral my side quickly.

There are some other tweaks that are minor we think, with the changes mentioned above being the major changes in structure.

Also, John, while the parties have discussed this matter the attached draft agreement does not contain any reference. That is ok with us, but my clients request from your side an answer to the following question: "Did any of the Highland Entities or their affiliates, for their own account or on behalf of Highland CDO Holding Company, affirmatively give consent to the transfer by Sentinel Reinsurance, Ltd. or its affiliates of that certain promissory note in the original principal amount of app.$32.8M and dated December 13, 2010, and executed by CLO Holdco, Ltd.?"

I really appreciate your patience. Look forward to visiting soon.

017049

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

017050

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/25/25
5/14/2025

## SETTLEMENT AGREEMENT & GENERAL RELEASE

THIS SETTLEMENT AGREEMENT & GENERAL RELEASE (this "**Agreement**") is entered into as of ~~April [   ],~~ May [], 2025 (the "**Agreement Date**"), by and among Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), the Highland Claimant Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Claimant Trust**"), the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Litigation Sub-Trust**"), and the Highland Indemnity Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Indemnity Trust**", and together with Highland, the Claimant Trust and the Litigation Sub-Trust, the "**Highland Entities**"), on the one hand, and Hunter Mountain Investment Trust, a Delaware statutory trust ("**HMIT**"), Rand Advisors, LLC, a Delaware limited liability company ("**Rand Advisors**"), Rand PE Fund I, LP, a Delaware series limited partnership ("**Rand PE Fund**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**"), Atlas IDF, LP, a Delaware limited partnership ("**Atlas IDF**"), Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**" and together with HMIT, Rand Advisors, Rand PE Fund, Rand GP and Atlas IDF, the "**HMIT Entities**"), on the other hand.  The Highland Entities and the HMIT Entities are collectively referred to as the "**Parties**," and each individually, as a "**Party**".

## DEFINITIONS

"**9019 Motion**" means the motion seeking entry of the Bankruptcy Court Order pursuant to Bankruptcy Rule 9019 and in accordance with <u>Section 18</u>.

"**Action**" means any action, claim, demand, arbitration, hearing, charge, complaint, investigation, examination, indictment, litigation, suit or other civil, criminal, administrative or investigative proceedings.

"**Affiliate**" means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, a specified Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by contract or otherwise.

"**Amended Complaint**" means the *Amended Complaint and Objection to Claims*, filed as docket number 158 in *Kirschner v. Dondero*, Adv. Pro. No. 21-03076-sgj (Bankr. N.D. Tex. May 19, 2022).

"**Bankruptcy Case**" means *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex.) and its related proceedings.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended).

017051

HCMLPHMIT00000169

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

"**Bankruptcy Court**" means the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division.

"**Bankruptcy Court Approval Date**" means the date on which the Bankruptcy Court Order is issued.

"**Bankruptcy Court Order**" means an order of the Bankruptcy Court approving the allowance of the HMIT's Class 10 Interest as provided in this Agreement pursuant to the 9019 Motion.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than (i) a Saturday or a Sunday, (ii) a day on which the Federal Reserve Bank of New York or the New York Stock Exchange is closed, or (iii) a day on which banks in the States of Texas are required, or authorized by law, to close.

"**Claimant Trust Agreement**" means that certain Claimant Trust Agreement of the Claimant Trust (as may have been or may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 11, 2021, by and among Highland, as settlor, James P. Seery, Jr., a Claimant Trustee, and Wilmington Trust, National Association, a national banking association, as Delaware trustee.

"**Claims**" means any claims, debts, liabilities, demands, obligations, breaches of contract, breaches of duty or any relationship, misfeasance, malfeasance, promises, acts, omissions, agreements, liens, losses, costs and expenses (including attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whenever and however, arising, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise.

"**Class 10**" means the class of Claims or Equity Interests described in Article II. Section H.10. of the Plan.

"**Class 11**" means the class of Claims or Equity Interests described in Article II. Section H.11. of the Plan.

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Case.

"**Confirmation Order**" means that certain *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943], as conformed in accordance with the Fifth Circuit's rulings.

"**Dugaboy Note**" means that certain Promissory Note dated May 31, 2017, in the original face amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

017052

HCMLPHMIT00000170

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

5/14/2025

"**Final Court Approval Date**" means the date on which the Bankruptcy Court Order becomes a Final Order.

"**Final Order**" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Highland Entities, as applicable, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

"**Gatekeeper**" means the gatekeeping provision contained in Article IX. F of the Plan as of August 11, 2021.

"**Governmental Authority**" means any federal, provincial, state, local or foreign government or political subdivision thereof, court of competent jurisdiction, administrative agency, judicial or arbitral body, or commission or other governmental or regulatory authority or instrumentality.

"**Highland Released Parties**" means collectively (i) the Highland Entities, (ii) any Affiliate of any Highland Entity and any Person directly or indirectly majority-owned by any Highland Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any Highland Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i)-(iii), collectively, the "**Highland Parties**"), (iv) each of the Highland Parties' current and former trustees and administrators (including the trustees of any of the Claimant Trust, the Litigation Sub-Trust, or the Indemnity Trust), officers, executives, agents, directors, advisors, advisory representatives, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, (v) the current and former members of the Oversight Board of the Claimant Trust in any capacity (including Richard Katz) and their Affiliates, including Farallon Capital Management, LLC, Stonehill Capital Management, LLC, Muck Holdings LLC, and Jessup Holdings LLC, (vi) the Independent Board and its members John Dubel, James P. Seery, Jr., and Russell Nelms, (vii) James P. Seery, Jr., individually and in all capacities for any Highland Released Party, including as Chief Executive Officer of Highland Capital Management, L.P., Claimant Trustee of the Claimant Trust, and the Indemnity Trust Administrator of the Indemnity Trust, (viii) Marc S. Kirschner, individually and as Trustee of the Litigation Sub-Trust, (ix) the Committee and each of its members, (x) the professionals (and their respective firms) (a) retained by Highland or the Committee during the Bankruptcy Case or which provided services to Highland or the Committee during the Bankruptcy Case or (b) retained by any Highland Released Party on

017053

HCMLPHMIT00000171

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

5/14/2025

or after August 11, 2021, (xi) any Person indemnified by any Highland Party (the Persons described in clauses (i)-(xi), collectively, the "**Highland Covered Parties**"), and (xii) each Highland Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "Highland Covered Parties;" provided, however, and for the avoidance of doubt, and without in any way limiting the scope of the foregoing, "Highland Covered Parties" shall include Highland CLO Funding, Ltd., Highland HCF Advisor, Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Multi Strategy Credit Fund GP, L.P., Highland Multi Strategy Credit GP, LLC, Highland Multi Strategy Credit Fund, Ltd., Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., Highland Select Equity Fund, L.P., Highland Restoration Capital Partners Master, L.P., Highland Restoration Capital Partners GP, LLC, Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Offshore Director, LLC, Acis CLO Management, LLC, Neutra, Ltd., Pollack, Ltd., Acis CLO Management Holdings, L.P., Acis CLO Management Intermediate Holdings I, LLC, Acis CLO Management Intermediate Holdings II, LLC, Acis CLO Assets Holdings Limited, CHG Houston Holdings, LLC, Penant Management, L.P., Penant Management GP, LLC, Gunwale, LLC, HE Capital, LLC, Gleneagles CLO, Ltd., Aberdeen Loan Funding, Ltd. Highland Argentina Regional Opportunity Fund GP, LLC, Highland Argentina Regional Opportunity Fund, L.P., Highland Argentina Regional Opportunity Fund, Ltd., Highland Argentina Regional Opportunity Master Fund, L.P., Highland Latin America Consulting, Ltd., Highland Capital Management Korea Limited, Highland Capital Management Latin America, L.P., Highland Latin America GP, Ltd., Highland Latin America LP, Ltd., Highland Offshore Partners, L.P. (Diversified), Brentwood CLO, Ltd., Eastland CLO, Ltd., Bristol Bay Funding Ltd., Jasper CLO Ltd., Highland Legacy Limited, Grayson CLO, Ltd., Greenbriar CLO, Ltd.,  Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Liberty CLO, Ltd., Valhalla CLO, Ltd., Stratford CLO Ltd., Southfork CLO, Ltd., Pam Capital Funding, L.P., Stonebridge-Highland Healthcare Private Equity Fund, Pamco Cayman Ltd., Red River CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO, Ltd., Westchester CLO, Ltd. Longhorn Credit Funding, LLC, PensionDanmark Pensionsforsikringsaktieselskab, Highland Dynamic Income Master Fund L.P., Highland Dynamic Income Fund GP, LLC, Highland Dynamic Income Fund, L.P., Highland Dynamic Income Fund, Ltd., Highland JHT Holdings, LLC, Highland Prometheus Master Fund, L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland Sunbridge GP, LLC, Trussway Holdings, LLC, Trussway Industries, LLC, TW Company, Inc., T-Way Investments, LLC, SSP Holdings, LLC, Highland Flexible Income UCITS Fund, and Acis CLO 2017-7, Ltd. *Notwithstanding the forgoing or anything herein to the contrary*, none of "Highland Released Parties", "Highland Parties", nor "Highland Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner and none of such Persons are released from any Claim by any Person in connection with this Agreement.

"**HMIT Class 10 Interest**" means the unvested, contingent Class 10 interest in the Claimant Trust (a) to be allowed on account of HMIT's pre-petition equity interest in Highland,

017054
HCMLPHMIT00000172

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

5/14/2025

and (b) subject to the terms and conditions, as applicable, of the Plan, the Plan Documents, the Claimant Trust Agreement, and in accordance with this Agreement, and applicable law.

"**HMIT Note**" means that certain Secured Promissory Note dated December 21, 2015, in the original face amount of $63,000,000 from HMIT, as maker, and Highland, as payee.

"**HMIT Note Claims**" means any Claim related to, in connection with or arising out of the HMIT Note.

"**HMIT Released Parties**" means collectively (i) the HMIT Entities, (ii) any Affiliate of any HMIT Entity and any Person directly or indirectly majority owned by any HMIT Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any HMIT Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i) – (iii), collectively, the "**HMIT Parties**"), (iv) each of the HMIT Parties' current and former trustees, administrators, officer, executives, agents, directors, advisors, consultants, manager, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns (v) the professionals (and their respective firms (a) retained by any HMIT Party during the Bankruptcy Case or which provided services to any HMIT Party during the Bankruptcy Case or (b) retained by any HMIT Released Party on or after August 11, 2021, (vi) any Person indemnified by any HMIT Party (the Persons described in clauses (i) – (vi), collectively, the "**HMIT Covered Parties**"), and (vii) each HMIT Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "HMIT Covered Parties." *Notwithstanding the forgoing*, none of "HMIT Released Parties", "HMIT Parties", nor "HMIT Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner, and none of such Persons are released from any Claims by any Person in connection with this Agreement.

"**Indemnity Trust Administrator**" has the meaning given to it in the Indemnity Trust Agreement.

"**Indemnity Trust Agreement**" means that certain *Second Amended and Restated Indemnity Trust Agreement of the Indemnity Trust* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of [April 28], 2025, by and among the Claimant Trust, as grantor, James P. Seery, Jr., as indemnity trust administrator, and Wilmington Trust, National Association, a national banking association, as indemnity trustee and Delaware trustee.

"**Indemnity Trust Assets**" has the meaning set forth in the Indemnity Trust Agreement.

"**Independent Board**" means the independent board appointed by the Bankruptcy Court on January 9, 2020, pursuant to that certain *Order Approving Settlement with Official Committee*

017055
HCMLPHMIT00000173

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

5/14/2025

*of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 339].

"**Kirschner Claims**" means all Claims and causes of action other than the HMIT Note Claims that were asserted or could have been asserted by the Litigation Trustee of the Litigation Sub-Trust, in the Amended Complaint.

"**Liability**" means any liability, debt, obligation, loss, damage, claim, cost or expense (including costs of investigation and defense and attorney's fees, costs and expenses), in each case, whether direct or indirect, whether accrued or contingent, whether or not involving a third-party claim, and including incidental and consequential damages and diminution of value.

"**Litigation Protections**" means, individually and collectively, the rights, duties, and obligations set forth in <u>Section 1</u> and <u>Sections 9 - 16</u>.

"**Litigation Sub-Trust**" means the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act.

"**Litigation Sub-Trust Agreement**" means that certain Litigation Sub-Trust Agreement of the Litigation Sub-Trust (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 16, 2021, by and among James P. Seery, Jr., as Claimant Trustee of the Claimant Trust, Wilmington Trust, National Association, a national banking association, as Delaware Trustee, and the Litigation Trustee.

"**Litigation Trustee**" means Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust.

"**LPA**" means that certain *Sixth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), dated as of October 4, 2021.

"Operating Expenses" means the expenses of operation and administration of the Highland Entities except for the Indemnity Trust, including legal expenses, employee compensation, Claimant Trustee/CEO and other trust and trustee related compensation, incentive compensation, and customary general and administrative expenses.

"**Original Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* attached as Exhibit A to the *Order (A) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as modified) and (B) Granting Related Relief*, filed at Docket No. 1943 on the Bankruptcy Court's docket.

"**Oversight Board**" means the oversight board of the Highland Claimant Trust.

"**Pending Litigation**" means (i) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including *Hunter Mountain Investment Trust's Emergency Motion for Leave to File Adversary Proceeding* filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders

017056

HCMLPHMIT00000174

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

5/14/2025

relating there); (ii) *Dugaboy Investment Trust v. Highland Cap. Mgmt, L.P.*, 3:24-cv-01531-X (N.D. Tex.) (only as to HMIT), and (iii) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:24-cv-01786-L (N.D. Tex.).

"**Permitted Investments**" has the meaning set forth in the Indemnity Trust Agreement.

"**Person**" means any natural person, partnership, limited liability partnership, corporation, limited liability company, association, joint stock company, trust, estate, joint venture, unincorporated organization or Governmental Authority.

"**Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* as conformed in accordance with the Fifth Circuit's rulings.

"**Plan Documents**" has the meaning given to it in the Plan.

"**Plan Protections**" means, collectively, the provisions of the Plan contained in Article IX thereof.

"**Pro Rata**" means the proportion that (a) the allowed amount of a particular Claim or Equity Interest in Class 10 bears to (b) the aggregate allowed amount of all Claims or Equity Interests in Class 10.

"**Threats**" means any written threats, of legal action, legal demands, filed complaints, petitions for pre-suit discovery, suits, litigations, arbitrations, actual or threated restraining orders or injunctions made in writing, or similar written actions of any kind in any forum against any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement).), excluding any such action that would otherwise be a Threat except that any applicable Statute of Limitations that could be applicable to such action has expired.

"**Threats Notice**" means the written notice of any Threats made to any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), that is hereby required to be provided by such Party to the HMIT Entities, within Five (5) business days after receipt of such Threat.

## RECITALS

**WHEREAS**, as of the Petition Date, HMIT held Class B and Class C Limited Partnerships Interests in Highland;

**WHEREAS**, on December 21, 2015, HMIT entered into the HMIT Note with Highland, which had a total outstanding principal balance of Fifty-Seven Million Six Hundred Ninety Thousand Six Hundred Forty and 95/100 Dollars ($57,690,640.95) as of the Petition Date (the "**HMIT Note Balance**");

**WHEREAS**, HMIT's Class B and Class C Limited Partnership Interests in Highland were extinguished on August 11, 2021, in accordance with the Plan;

017057

HCMLPHMIT00000175

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

**WHEREAS**, pursuant to the LPA, HMIT's capital account balance at Highland on account of its Class B and Class C Limited Partnership Interests on the Petition Date was Three Hundred Ninety-Four Million Six Hundred Thirty Thousand Eight Hundred Seventy-One and 53/100 Dollars ($394,630,871.53) (the "**HMIT Capital Account Balance**");

**WHEREAS**, some or all of the HMIT Entities have asserted certain Claims against certain Highland Entities, including those asserted in the Pending Litigation;

**WHEREAS**, some or all of the Highland Entities have asserted certain Claims against certain HMIT Entities, including the HMIT Note Claims;

**WHEREAS**, the Parties wish to terminate, extinguish, and release any and all rights, duties, obligations and Claims that (a) any of the Highland Released Parties owed or have, or may have owed or have, to or with respect to any of the HMIT Released Parties, and (b) any of the HMIT Released Parties owed or have, or may have owed or have, to or with respect to any of the Highland Released Parties, as provided in this Agreement (collectively, the "**Rights and Obligations**");

**WHEREAS**, the Parties agree that the Litigation Protections are intended to enact a permanent cessation of all litigation concerning or related to the Highland Released Parties through and including the Agreement Date; and

**WHEREAS**, the Parties, individually and collectively, wish to (a) resolve all disputes between and/or among any of the Highland Entities, on the one hand, and any of the HMIT Entities, on the other hand, including those asserted in the Pending Litigation, (b) fix and allow HMIT's Class 10 Interest at the amount and on the terms provided herein; and (c) terminate, extinguish, and release all Rights and Obligations on the terms provided herein.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

**AGREEMENT**

1.    Abatement and Dismissal of Pending Litigation With Prejudice.

(a)    Within three (3) Business Days after the Agreement Date, the HMIT Entities shall take all steps necessary (at their own cost) to abate the Pending Litigation.

~~1~~(b)    Within three (3) Business Days after the Bankruptcy Court Approval Date, the HMIT Entities shall take all steps necessary (at their own cost) to dismiss the Pending Litigation with prejudice.

2.    Maintenance of Abatement and Dismissal of Certain Defendants from the Amended Complaint.

(a)    ~~Within three (3) Business Days after the Effective Date, the Litigation Trustee shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand~~

017058

HCMLPHMIT00000176

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

<u>5/14/2025</u>

~~PE Fund from Counts I, II, and III of the Amended Complaint. For the avoidance of doubt, Counts I, II, and III constitute all Kirschner Claims that are not HMIT Note Claims, and such dismissal shall not affect or impair any HMIT Note Claims or any liability or obligation of  HMIT with respect to the HMIT Note, if any.~~

~~(b)~~<u>(a)</u>   ~~Within three (3) Business Days after the Final~~<u>The Litigation Trustee shall continue to maintain the abatement of Adv. Proc. No. 21-03076-sgj and all related proceedings arising therefrom through the Bankruptcy Court Approval Date. Within three (3) Business Days after the Bankruptcy</u> Court Approval Date, the Litigation Sub-Trust shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand PE from ~~Count~~ <u>Counts</u> I, II, III, and XXIV of the Amended Complaint~~, which constitutes all HMIT Note Claims against HMIT and Rand PE.~~.

3.     <u>Cash Payment to HMIT</u>.   In consideration for the dismissal of the Pending Litigation, within three (3) Business Days following the ~~Agreement~~<u>Bankruptcy Court Approval</u> Date, Highland shall pay HMIT a one-time, lump sum of [Five Hundred Thousand Dollars (US$500,000.00)~~]~~]) (the "**Payment**") by wire transfer:

[wire instructions]

4.     <u>HMIT Class 10 Interest</u>.

(a)     Subject to entry of the Bankruptcy Court Order, and the terms of this Agreement, the HMIT Class 10 Interest shall be deemed allowed in the amount of Three Hundred Thirty-Six Million Nine Hundred Forty Thousand Two Hundred Thirty and 58/100 Dollars (US$336,940,230.58), which amount represents the HMIT Capital Account Balance, <u>less</u> the HMIT Note Balance.

(b)     Notwithstanding anything to the contrary in the Plan or the Claimant Trust Agreement, as an integral part of this Agreement to consent to the allowance of the HMIT Class 10 Interest and the other considerations in this Agreement, HMIT shall not be deemed, and no holder of the HMIT Class 10 Interest shall be, a Claimant Trust Beneficiary or a "Beneficiary" under the Claimant Trust Agreement, and the Highland Released Parties, individually and collectively, shall owe no duty to any HMIT Releasor (whether contractual, fiduciary, equitable, statutory or otherwise), including with respect to the HMIT Class 10 Interest, in each case, except as expressly set forth in this Agreement.  Furthermore, without limiting the foregoing and for the avoidance of doubt, the contractual right of the holder of the HMIT Class 10 Interest to receive or recover any payments or Indemnity Trust Assets from the Indemnity Trust as set forth in this Agreement or the Indemnity Trust Agreement does not make any HMIT Releasor or any other Person a beneficiary of the Indemnity Trust or under the Indemnity Trust Agreement.

(c)     Notwithstanding anything to the contrary in the Plan, the Claimant Trust Agreement or the Indemnity Trust Agreement, in no event shall HMIT sell, transfer, assign, pledge, hypothecate, participate or otherwise dispose of the HMIT Class 10 Interest or any rights (including any right to payment) with respect thereto.

017059
HCMLPHMIT00000177

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

(d)     For the avoidance of doubt, the HMIT Class 10 Interest is and shall remain senior to the not yet allowed, unvested contingent Class 11 Claims of Equity Interests as provided for in the Plan, the Plan Documents, and the Claimant Trust Agreement.

5.     Initial Interim ~~Cash~~ Distributions on the Allowed Class 10 Interests.

(a)     Within ten (10) Business Days ~~of~~after the ~~Final~~Bankruptcy Court Approval Date, the Indemnity Trust shall distribute (the date on which such distribution is made, the "**Initial Interim Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests~~: (i)~~ cash in the aggregate amount of ~~[Ten~~Twelve Million Dollars (US$~~10~~12,000,000.00~~)]~~]) (the "**Initial Interim Cash Distribution Amount**")~~; and (ii) cash in the aggregate amount of all principal and interest payments paid on the Dugaboy Note and actually received by Highland or the Indemnity Trust from and after the Bankruptcy Court Approval Date (the "**Initial Interim Dugaboy Distribution Amount**"). "~~).

(b)     ~~Upon~~HMIT shall deposit and hold Ten Million Dollars (US$10,000,000) of the Initial Interim Cash Distirbution Amount in an interest bearing escrow account (the "**HMIT Escrow Account**") pending the Final Court Approval Date.

~~(b)     Within ten (10) Business Days after~~ the Bankruptcy Court Approval Date~~, the Indemnity Trust shall establish a balance sheet reserve in respect of the Initial Interim Cash Distribution Amount and the Initial Interim Dugaboy Distribution Amount (if and when received), which reserve will be held solely in cash or Permitted Investments and otherwise on~~ ("**Note Assignment Date**"), the ~~same terms as other Indemnity Trust Assets pursuant to the Indemnity Trust Agreement pending distribution in accordance with Section 5(a).~~

~~6.     Subsequent Distribution(s) on~~Highland Entities shall cause the Dugaboy Note to be assigned to HMIT and take all actions necessary for HMIT to become the ~~Allowed Class 10 Interests.~~

~~(a)~~(c)     ~~On the later~~holder of the ~~Final Court Approval Date and April 1, 2028, the Indemnity Trust shall distribute (such distribution, collectively, the "**Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests: (i) cash in the aggregate amount of [Five Million Dollars (US$5,000,000.00)]; and (ii)(x)(1) if HMIT elects in writing that it desires for the Indemnity Trust to sell the~~ Dugaboy Note, ~~the net proceeds, if any, actually received by the Indemnity Trust from such sale, or (2) if HMIT instead elects that it desires~~and shall in addition pay ~~to receive the Dugaboy Note in kind, the Dugaboy Note in kind, plus (y)~~HMIT cash in the aggregate amount of all principal and interest payments actually received on the Dugaboy Note by the ~~the~~ Highland Entities including the Indemnity Trust ~~from and after the Initial Interim Distributions~~as of the Note Assignment ~~(the amount pursuant~~ Date. ~~Prior to subclause (y), the "**Subsequent Dugaboy P+I Amount**"). If~~ the ~~Dugaboy Note is distributed in kind~~Bankruptcy Court Approval Date, HMIT will engage an independent valuation service provider to value the Dugaboy Note for purposes of determining the magnitude of reduction to the outstanding allowed Class 10 Interests on account of such in-kind distribution~~.~~, which shall not be less than Fifty percent (50%) of the current balance owed under the Dugaboy Note. The HMIT Entities acknowledge and agree that none of the Highland Entities are representing or warranting

017060
HCMLPHMIT00000178

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

that the Dugaboy Note can ~~or will~~ be sold~~,~~ or the price, if any, _that could be_ received for the Dugaboy Note and further acknowledge and agree that any such purchase price may be de minimis.

~~(b)   Upon the Initial Interim Distribution Date, the Indemnity Trust shall establish a balance sheet reserve in respect of the cash portion of the Subsequent Dugaboy P+I Amount, which will be held solely in cash or Permitted Investments and otherwise on the same terms as other Indemnity Trust Assets pursuant to the Indemnity Trust Agreement pending distribution in accordance with Section 6(a).~~

6.   Subsequent Distribution(s) on the Allowed Class 10 Interests.

(a)   On December 1, 2027, the Indemnity Trust shall distribute (such distribution, collectively, the "**First Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**First Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests: cash in the aggregate amount of Eight Million Dollars (US$8,000,000.00). . HMIT shall deposit and hold Six Million Dollars (US$6,000,000) of the First Subsequent Distribution in the HMIT Escrow Account pending the Final Court Approval Date.

(b)   On Decemeber 1, 2028, the Indemnity Trust shall distribute (such distribution, collectively, the "**Second Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**Second Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Eight Million Dollars (US$8,000,000.00).

(c)   HMIT shall deposit and hold Six Million Dollars (US$6,000,000) of the Second Subequent Distribution in the HMIT Escrow Account pending the Final Court Approval Date.

~~(c)~~(d)   Notwithstanding anything herein to the contrary, the obligations of the Indemnity Trust to make the _First_ Subsequent Distribution~~, including any Cash, the Dugaboy Note,~~ or ~~the~~Second Subsequent ~~Dugaboy P+I Amount,~~Distribution is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII, Section 8.1(c) of the Indemnity Trust Agreement that the Indemnity Trust Assets comprising such distributions are not reasonably necessary to satisfy current or potential Indemnification Obligations (as defined in the Indemnity Trust Agreement) to all persons who are or might become Beneficiaries (as defined in the Indemnity Trust Agreement).

7.   Final Distribution on the Allowed Class 10 Interests.

(a)   On the later of the Final Court Approval Date and April 1, 2029, the Indemnity Trust will distribute all excess remaining Indemnity Trust Assets in accordance with Article VIII of the Indemnity Trust Agreement; _provided_, _however_, that the obligation of the Indemnity Trust to make any such distributions and/or dissolve and wind up the affairs of the Indemnity Trust is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII of the Indemnity Trust Agreement that (1) a Final Order(s) (as defined in the Indemnity Trust Agreement) has been entered resolving all litigation, claims or

017061

HCMLPHMIT00000179

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

proceedings in any forum of any kind which could give rise to Indemnity Obligations (as defined in the Indemnity Trust Agreement) and payment in full of all such Indemnity Obligations and (2) all applicable statutes of limitations and any applicable tolling of such statutes of limitation have expired.

(b)     The Indemnity Trust agrees to not use Indemnity Trust Assets to fund ~~the operating expenses of Highland.~~Operating Expenses.

(c)     Following the Bankruptcy Court Approval Date, at the request of Mark Patrick, solely in his capacity, and to the extent he remains, as administrator of HMIT, but not more often than quarterly, Highland and the Indemnity Trust Administrator agree to review (i) the status of their respective assets, (ii) the balance of cash held, (iii) the status of any claims made for indemnification and any resolutions thereof, (iv) the status of any litigation, and (v) forecasted operating expenses with Mr. Patrick, and will each work in good faith to reduce operating expenses where reasonably practicable; provided, however, that all such reporting shall be subject to Mr. Patrick's agreement to maintain confidentiality with respect to any non-public information.

8.     <u>Transfer Kirschner Claims; Dismissal of HMIT Note Claims</u>.

(a)     In consideration of the dismissal of the Pending Litigation and the releases provided herein, within ten (10) Business Days ~~of~~after the ~~Agreement~~Bankruptcy Court Approval Date, but after the dismissal provided for in <u>Section 2</u>~~, and solely to the extent permitted by the Plan, the Litigation Sub-Trust Agreement and applicable law~~, the Litigation Sub-Trust shall execute an assignment in the form attached hereto as **Exhibit [_]** in favor of the HMIT Entities transferring all of the Litigation Sub-Trust's right, title, and interest in and to the Kirschner Claims (~~which, for the avoidance of doubt, shall not include any HMIT Note Claims) (~~the "**Kirschner Transfer**").[1] Each HMIT Entity acknowledges and agrees that none of the Highland Entities will have any duty or obligation to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof<u>, except as provided in this Agreement, including without limitation the terms of Section 8(c) below</u>.

(b)     THE HMIT ENTITIES SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THE LITIGATION SUB-TRUST IS TRANSFERRING THE KIRSCHNER CLAIMS ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT THE HMIT ENTITIES ARE NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM THE HIGHLAND ENTITIES OR THEIR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE KIRSCHNER CLAIMS AND AMENDED COMPLAINT, INCLUDING WITH RESPECT TO THE ENFORCEABILITY, TRANSFERABILITY, VIABILITY, STRENGTH, OR VALUE OF ANY OF THE KIRSCHNER CLAIMS OR THE AMENDED COMPLAINT.  The HMIT Entities hereby specifically acknowledge that they have carefully reviewed this Section and have had the opportunity to discuss its import with legal counsel and that the provisions of this Section are a material part of this Agreement.  Thus, if for any reason HMIT is precluded from or is otherwise unable to prosecute all or any of the Kirschner Claims, (i) the HMIT Releasors shall have no

---

[1] ~~NTD: HMIT Claim to be dismissed without prejudice.~~

017062

HCMLPHMIT00000180

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

recourse against the Highland Released Parties whatsoever and shall not be entitled to compensation of any kind, it being agreed that the HMIT Entities are otherwise receiving adequate consideration for the duties and obligations they are undertaking pursuant to this Agreement and (ii) there will be no effect whatsoever on the validity and enforceability of this Agreement or any of the other transactions contemplated hereby.

(c)    As promptly as reasonably practicable following the ~~Effective~~Bankruptcy Court Approval Date, the Highland Entities shall provide to the HMIT Entities electronic copies of written discovery requests and responses thereto, and documents produced in discovery in respect of the Kirschner Claims and the Amended Complaint.  The Highland Entities will not provide any other documents regarding the Kirschner Claims including any attorney-client communications and any documents subject to the attorney work-product doctrine or similar privileges or immunities concerning the Kirschner Claims (collectively, the "**Kirschner Privileges**"), it being understood and agreed that the Highland Entities are retaining, and not transferring or waiving, the Kirschner Privileges.

(d)    Each Party acknowledges and agrees that if (a) the Kirschner Transfer is found or deemed to be impermissible or invalid, for any reason, or (b) the Final Court Approval Date does not occur, the Kirschner Claims and Amended Complaint will revert to, and remain an asset of, the Litigation Sub-Trust.

9.    <u>General Release By The HMIT Entities</u>. On the ~~Agreement~~Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the HMIT Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its and their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) (collectively with the HMIT Entities, the "**HMIT Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each Highland Released Party from, and waives and relinquishes, any and all Claims, which the HMIT Releasors, or any Person claiming through, under, or on behalf of any of the HMIT Releasors, ever had, now has, or hereafter can, shall, or may have against any of the Highland Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Agreement Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the Highland Released Parties, or the Highland Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**HMIT Entity Released Claims**").

10.    <u>General Release By The Highland Entities</u>.

(a)    On the ~~Agreement~~Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the Highland Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and

017063
HCMLPHMIT00000181

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

its or their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise)(collectively with the Highland Entities, the "**Highland Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, any and all Claims, excepting any HMIT Note Claims, which the Highland Releasors, or any Person claiming through, under, or on behalf of any of the Highland Releasors, ever had, now has, or hereafter can, shall, or may have against any of the HMIT Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the ~~Agreement~~Bankruptcy Court Approval Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the HMIT Released Parties, or the HMIT Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "~~**Initial Highland Released Claims**~~"). ~~For the avoidance of doubt and notwithstanding anything herein to the contrary, the HMIT Note Claims shall not be released until Final Court Approval Date, at which time the HMIT Note will be applied to calculate the allowed HMIT Class 10 Interest set forth in Section 4 and the balance of the HMIT Note and any HMIT Note Claims shall be released pursuant to Section 10(b).~~

~~(b)~~10.   ~~Upon the Final Court Approval Date, and to the maximum extent permitted by law, each of the Highland Releasors hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, the HMIT Note Claims (the "**Subsequent Highland Released Claims**" and together with the Initial Highland Released Claims, the "**Highland Entity Released Claims**" and together with the HMIT Entity Released Claims, the "**Released Claims**").**Highland Released Claims**").

11.   <u>Further Provisions Concerning The General Releases</u>.

(a)   **FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASES ARE INTENDED TO BE GENERAL AND INCLUDE A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE AGREEMENT DATE.**

(b)   To the maximum extent permitted by law, each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefit of any statute or other principle of law or equity that limits the applicability of a release with respect to Claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release.

(c)   Without limiting the scope of the foregoing waiver, in connection with the foregoing release, each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefits of

017064

HCMLPHMIT00000182

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

Section 1542 of the California Civil Code (to the extent, if any, that Section 1542 might apply to the foregoing release), which provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees that the provisions of Section 1542 of the Civil Code of the State of California and all similar federal or state law, rights, rules or legal principles, legal or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY EACH OF THE HMIT ENTITIES AND THE HIGHLAND ENTITIES, ON THEIR OWN BEHALF AND ON BEHALF OF THE OTHER HMIT RELEASORS AND HIGHLAND RELEASORS, RESPECTIVELY,** in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

In connection with such waiver and relinquishment, each of the HMIT Entities and Highland Entities acknowledges that it is aware that it may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein. Nevertheless, it is the intent of each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, in executing this Agreement fully, finally, and forever to settle and release all such matters, and all Claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

   (d)  As an integral component of this Agreement, and notwithstanding the Parties' intent set forth in the preamble hereto and the general nature of the releases in <u>Sections 9 and 10</u>, should:

     (i)  any HMIT Releasor contend or assert that any Claim of any kind whatsoever held by any HMIT Releasor against any Highland Released Party survives this Agreement and is in any way related to or arising from or in connection with any HMIT Entity Released Claim (such claim or cause of action, a "**HMIT Alleged Claim**"), such HMIT Releasor will be deemed to have irrevocably, fully, and finally assigned such HMIT Alleged Claim to the Highland Entities and the Highland Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such HMIT Alleged Claim.

017065

HCMLPHMIT00000183

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

5/14/2025

(ii)     any Highland Releasor contend or assert that any Claim of any kind whatsoever held by any Highland Releasor against any HMIT Released Party survives this Agreement and is in any way related to or arising from or in connection with any Highland Entity Released Claim (such claim or cause of action, a "**Highland Alleged Claim**"), such Highland Releasor will be deemed to have irrevocably, fully, and finally assigned such Highland Alleged Claim to the HMIT Entities and the HMIT Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such Highland Alleged Claim.

12.     <u>Covenant Not To Sue; Limitation on Standing</u>. Upon the Agreement Date:

(a)     Each of the HMIT Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the Highland Released Parties, to recover, enforce, or collect any HMIT Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(b)     Each of the Highland Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the HMIT Released Parties, to recover, enforce, or collect any Highland Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(c)     For the avoidance of doubt, this Agreement shall not operate to give any HMIT Entity standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except for the limited purpose of seeking Court approval of this Agreement (including with respect to any appeal concerning any order entered granting or denying such approval), and except for the limited purpose of enforcing this Agreement, no HMIT Entity shall commence any Action in connection with the HMIT Class 10 Interest.

13.     <u>Representations and Warranties</u>.

(a)     Each of the HMIT Entities hereby represents and warrants that every HMIT Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any HMIT Releasor.

(b)     The HMIT Entities, on their own behalf and on behalf of the other HMIT Releasors, acknowledge and agree that each Plan Provision is lawful, effective, and binding on the HMIT Releasors. The HMIT Entities further agree, on their own behalf and on behalf of the other HMIT Releasors, that the HMIT Releasors will never, in any way, challenge or seek to modify, nullify, vacate, or revoke, or induce, encourage or direct any other Person to do so or act in concert with or assist (financially or otherwise) any other Person in doing so the Confirmation Order, the Plan, the Plan Protections, or any Plan Document, including the Claimant Trust Agreement, the LPA, the Indemnity Trust Agreement or the Litigation Sub-Trust Agreement, in the Bankruptcy Court, in any other state or federal court, in any other forum or tribunal, or otherwise, including administrative or regulatory tribunals and foreign courts.

017066
HCMLPHMIT00000184

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

5/14/2025

(c)     Each of the Highland Entities hereby represents and warrants that every Highland Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any Highland Releasor.

(d)     Each Party severally represents and warrants as to itself only that: (i) it has taken all necessary action to authorize and approve the execution, delivery and performance of this Agreement; (ii) such Party has full power and authority to execute and deliver this Agreement; and (iii) this Agreement constitutes a valid, legal and binding obligation of such Party, and is enforceable subject to its terms. Each individual signatory hereto individually warrants and represents to all Parties hereto that such individual has full power and authority to act on behalf of and bind the Party for which he or she has executed this Agreement; provided, however that no signatory shall otherwise provide any warranty or representation or otherwise be a party to this Agreement on an individual basis.

14.     <u>No Continuing Rights, Duties or Obligations</u>.  Except for the rights, duties, and obligations expressly set forth in this Agreement, all Rights and Obligations that existed or may have existed shall be deemed terminated, extinguished, and released upon the Agreement Date. For the avoidance of doubt, from and after the Agreement Date, (a) the Highland Released Parties, individually and collectively, shall owe no duty, past or present, including with respect to the Kirchner Claims, to the HMIT Releasors, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement, and (b) the HMIT Released Parties, individually and collectively, shall owe no duty to the Highland Releasors, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement.

15.     <u>Gatekeeper Standard</u>.

(a)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that, notwithstanding the United States Court of Appeals for the Fifth Circuit's decision in *Highland Capital Management Fund Advisors, L.P. v. Highland Capital Management, L.P.*, No. 23-10534 (5th Cir. Mar. 18, 2025), the "Gatekeeper" provisions contained in Highland's Original Plan is forever binding on each of the HMIT Entities and for a claim or cause of action to be "colorable" for purposes of the Gatekeeper, it must be found by final order of the Bankruptcy Court (the "**Gatekeeper Court**"), which order shall be subject to appeal to a court of competent jurisdiction, to have satisfied the "Gatekeeper Colorability Test" as such term is defined in *In re Highland Capital Management, L.P.*, 2023 Bankr. LEXIS 2104 at *124-36 (Bankr. N.D. Tex. Aug. 24, 2023).

(b)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that compliance with the Gatekeeper requires (i) a motion seeking leave to sue an Exculpated Party (as that term is defined in Highland's original Plan) and a finding that the litigant's claims and causes of action are "colorable" attaching a complaint setting forth the basis for such claims or causes of action and (ii), in the Gatekeeper Court's sole discretion, an evidentiary hearing (during

017067
HCMLPHMIT00000185

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

5/14/2025

which the Gatekeeper Court may, among other things, hear testimony and assess the credibility of any witness(es)) to determine whether a proposed claim or cause of action is "colorable."

(c)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, further acknowledge and agree that the moving party under the Gatekeeper has the burden of satisfying the "Gatekeeper Colorability Test."

16.   Indemnification.

(a)     Without in any manner limiting the available remedies for any breach of this Agreement, the HMIT Entities, severally but not jointly, agree to indemnify, defend, and hold the Highland Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any HMIT Entity set forth in Section 13 or (y) any Actions brought or prosecuted by or on behalf of, any HMIT Releasor or that are induced, encouraged, assisted  or directed by any HMIT Releasor or brought or prosecuted in concert with any HMIT Releasor against any Highland Released Party with respect to or related to any HMIT Entity Released Claims.  Without limiting the scope of the foregoing in any manner, any HMIT Entity that breaches Section 12 shall be liable to the Highland Released Party against whom the applicable Action has been brought or prosecuted in violation of Section 12 for the reasonable attorneys' fees and costs incurred by such Highland Released Party in defending against or otherwise responding to such Action.  Each HMIT Entity acknowledges and agrees that the HMIT Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

(b)     Without in any manner limiting the available remedies for any breach of this Agreement, the Highland Entities, severally but not jointly, agree to indemnify, defend, and hold the HMIT Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any Highland Entity set forth in Section 13 or (y) any suits, proceedings, or other actions brought or prosecuted by or on behalf of, any Highland Releasor or that are induced, encouraged, assisted  or directed by any Highland Releasor or brought or prosecuted in concert with any Highland Releasor against any HMIT Released Party with respect to or related to any Highland Entity Released Claims.  Without in any manner limiting the scope of the foregoing, any Highland Entity that breaches Section 12 shall be liable to the HMIT Released Party against whom the applicable Action has been brought or prosecuted in violation of Section 12 for the reasonable attorneys' fees and costs incurred by such HMIT Released Party in defending against or otherwise responding to such Action.  Each Highland Entity acknowledges and agrees that the Highland Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

017068
HCMLPHMIT00000186

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

5/14/2025

17.    Execution.  This Agreement may be executed by the exchange of signatures by facsimile or by PDF attachment to an email transmittal and in counterparts, and if so executed, shall be fully executed when a counterpart has been executed and delivered by all Parties hereto through counsel.  All counterparts taken together shall constitute one and the same agreement and shall be fully enforceable as such.

18.    Bankruptcy Court Order.  The allowance of the allowed HMIT Class 10 Interest pursuant to Section 4 is subject to the entry of the Bankruptcy Court Order.  To that end, the Highland Entities shall file the 9019 Motion no later than five (5) Business Days after the Agreement Date.  Each Party shall, and shall cause each of their respective Affiliates to, undertake any and all actions in compliance with applicable law to obtain the Bankruptcy Court Order as promptly as practicable, and without limiting the foregoing, if an Action is threatened or instituted by any Person opposing the 9019 Motion or otherwise challenging the validity or legality, or seeking to restrain the consummation, of the transactions contemplated by this Agreement or the Bankruptcy Court Order, each Party shall, and shall cause its respective Affiliates to, use their commercially reasonable best efforts to avoid, resist, resolve or, if necessary, and defend to effectuate this Agreement and consummate the transactions hereby.  If the 9019 Motion is not approved by entry of the Bankruptcy Court Order or if the Bankruptcy Court Approval is precluded from becoming a Final Order, (a) there will be no affect on, adjustment to, or impairment of, in any way, the validity and enforceability of the remainder of this Agreement, and the other transactions contemplated hereby, all of which shall remain in full force and effect and (b) each Party shall, and shall cause its respective Affiliates to, use their best efforts to seek the allowance of the HMIT Class 10 Interest in a substantially similar amount and on substantially similar terms as set forth in Section 4 to the fullest extent possible so as to give effect to the original intent of the Parties as closely as possible.

19.    Fees and Expenses.  Whether or not the transactions contemplated hereby are consummated or the Bankruptcy Court Order is obtained, and except as otherwise expressly provided in this Agreement, each Party will bear its respective fees, costs and expenses (including legal, accounting and other professional fees) incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the transactions contemplated hereby, including with respect to each Party's respective obligations pursuant to Section 18.  Notwithstanding the foregoing, if any Party hereto brings an Action to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that Action shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

20.    Entire Agreement; No Other Representations.  **THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF ANY PARTY OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT.  THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS (COLLECTIVELY, "REPRESENTATIONS"), EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT.  THE PARTIES EXPRESSLY AGREE THAT THEY**

017069

HCMLPHMIT00000187

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

5/14/2025

**HAVE NOT BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT; AND THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT RELIED ON ANY REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY ARE ENTERING INTO THIS AGREEMENT RELYING SOLELY ON THEIR OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS BY ANY PARTY, EXCEPT FOR THOSE REPRESENTATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES AGREE THAT REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT SHALL NOT BE USED IN THE INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT, AND NEITHER THE HMIT RELEASED PARTIES NOR THE HIGHLAND RELEASED PARTIES SHALL HAVE ANY LIABILITY FOR ANY CONSEQUENCES ARISING AS A RESULT OF ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT**.

21.    <u>Agreement and Release Knowing and Voluntary</u>.  The Parties acknowledge that they have considered this Agreement with their respective attorneys and have carefully read this Agreement, that it has been fully explained by their attorneys, and that they have had a reasonable opportunity to consider this Agreement.  The Parties further represent that they know and fully understand the contents of this Agreement, that they intend to be legally bound by this Agreement and the releases and covenants contained herein, and that they are signing this Agreement, including the release provisions herein, voluntarily and of their own free will and without coercion, and with the benefit of advice of counsel.

22.    <u>Cooperation</u>.  The Parties agree to perform any services or actions reasonably necessary to carry out the terms and conditions of this Agreement or the transactions contemplated hereby, including the execution and delivery of reasonable additional documents, instruments, conveyances and/or assurances, in good faith, and to reasonably communicate and cooperate with one another in this regard.  For the avoidance of doubt, nothing in this Section shall obligate the Highland Entities to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof.

23.    <u>Governing Law</u>.  This Agreement shall be construed pursuant to and governed by the laws of the State of Delaware (substantive and procedural) without reference to principles of conflicts of law that would result in the application of any other State's laws.

24.    <u>Jurisdiction/Venue</u>.  The Parties hereby irrevocably submit to the jurisdiction and venue of the Bankruptcy Court with respect to any action or proceeding arising out of or related to this Agreement or the subject matter hereof; if (and only if) the Bankruptcy Court lacks personal or subject matter jurisdiction to adjudicate an action or proceeding arising out of or related to this Agreement or the subject matter hereof, then the Parties irrevocably submit to the jurisdiction and venue of the United States District Court for the Northern District of Texas.

25.    <u>No Admissions</u>.  All Parties acknowledge and agree that the matters set forth in this Agreement constitute the settlement and compromise of disputed Claims and that this Agreement shall not constitute the admission of any fact or liability by any of them regarding any Claim,

017070
HCMLPHMIT00000188

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

5/14/2025

including the Claims released hereunder, and neither the terms hereof, nor the fact of this Agreement itself, shall be evidence of any kind in any Action, other than an Action to enforce the terms of the Agreement or any instrument executed in connection herewith or any claim for damages or other relief for breach of any representation or warranty contained herein or in any instrument executed in connection herewith.

26. <u>Other Provisions.</u>

(a) This Agreement contains the entire agreement and understanding of the parties and supersedes any and all prior or contemporaneous agreements, arrangements, and understandings relating to the subject matter of this Agreement. No representation, inducement, agreement, promise or understandings altering, modifying, amending, taking from or adding to, the terms and conditions hereof shall have any force or effect unless the same is in writing and validly executed by each of the Parties hereto.

(b) The waiver by any Party of any breach of, or default under, any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or default; provided, however, that for any such waiver to be enforceable, it shall be in writing and executed by the non-breaching Party.

(c) The headings contained in this Agreement are for convenience only and shall in no way restrict or otherwise affect the construction of the provisions hereof.

(d) The Parties shall each execute all documents and perform all acts necessary and proper to effectuate the terms of this Agreement.

27. <u>Notices.</u> All notices required or permitted to be provided hereunder shall be afforded to the respective parties to and through their counsel, and shall be transmitted simultaneously by electronic mail (with PDF attachments, as necessary) and by telefax, addressed as follows:

To the Highland Entities:

**PACHULSKI STANG ZIEHL AND JONES LLP**
Jeffrey N. Pomerantz
John A. Morris
10100 Santa Monica Boulevard
Los Angeles, California 90067-4003
310.277.6910
jpomerantz@pszjlaw.com
jmorris@pszjlaw.com

To the HMIT Entities:

**KELLY HART PITRE**
Louis M. Phillips
Amelia Hurt

017071
HCMLPHMIT00000189

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

5/14/2025

301 Main Street, Suite 1600
225.381.9643
Louis.Phillips@Kellyhart.com
Amelia.Hurt@Kellyhart.com

28.      <u>Severability</u>. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity and enforceability of any other provision of this Agreement.  For the avoidance of doubt, if any provision of this Agreement is overturned on appeal after the Bankruptcy Court Approval Date, any portion that is not overturned on appeal shall remain in full force and effect.

29.      <u>Interpretive Provisions</u>. Unless the express context otherwise requires: (a) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) words defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (c) the words "Dollars" and "$" mean U.S. dollars; (d) references herein to a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement; (e) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words ",without limitation,"; (f) references herein to any gender shall include each other gender; (g) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement; (h) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (i) the word "or" shall be disjunctive but not exclusive; (j) the headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties; and (k) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

[*Signature page follows*]

017072
HCMLPHMIT00000190

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**HUNTER MOUNTAIN INVESTMENT TRUST**

By     _____

     Name:     Mark Patrick
     Title:      Administrator
     Date:     ~~April~~May __, 2025

**RAND ADVISORS, LLC**

By     _____

     Name:     Mark Patrick
     Title:      President
     Date:     ~~April~~May __, 2025

**RAND PE FUND I, LP**
By: Rand PE Fund Management, LLC, its General Partner

By     _____

     Name:     Mark Patrick
     Title:      President
     Date:     ~~April~~May __, 2025

**RAND PE FUND MANAGEMENT, LLC**

By     _____

     Name:     Mark Patrick
     Title:      President
     Date:     ~~April~~May __, 2025

**ATLAS IDF, LP**
By: Atlas IDF GP, LLC, its General Partner

By     _____

017073

HCMLPHMIT00000191

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Name:     Mark Patrick
Title:       President
Date:      ~~April~~May __, 2025

**ATLAS IDF GP, LLC**


By   _____
Name:     Mark Patrick
Title:       President
Date:      ~~April~~May __, 2025


**HIGHLAND CAPITAL MANAGEMENT, L.P.**


By   _____
Name:     James. P. Seery, Jr.
Title:       Chief Executive Officer
Date:      ~~April~~May __, 2025


**HIGHLAND CLAIMANT TRUST**


By   _____
Name:     James P. Seery, Jr.
Title:       Claimant Trustee
Date:      ~~April~~May __, 2025

**HIGHLAND LITIGATION SUB-TRUST**


By   _____
Name:     Marc S. Kirschner
Title:       Litigation Trustee
Date:      ~~April~~May __, 2025

017074
HCMLPHMIT00000192

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

**HIGHLAND INDEMNITY TRUST**

By _____

| | |
|---|---|
| Name: | James P. Seery, Jr. |
| Title: | Indemnity Trust Administrator |
| Date: | ~~April~~May __, 2025 |

017075

HCMLPHMIT00000193

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT ~~4/25/25~~
5/14/2025

## SETTLEMENT AGREEMENT & GENERAL RELEASE

THIS SETTLEMENT AGREEMENT & GENERAL RELEASE (this "**Agreement**") is entered into as of ~~April [ ], ~~May [], 2025 (the "**Agreement Date**"), by and among Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), the Highland Claimant Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Claimant Trust**"), the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Litigation Sub-Trust**"), and the Highland Indemnity Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Indemnity Trust**", and together with Highland, the Claimant Trust and the Litigation Sub-Trust, the "**Highland Entities**"), on the one hand, and Hunter Mountain Investment Trust, a Delaware statutory trust ("**HMIT**"), Rand Advisors, LLC, a Delaware limited liability company ("**Rand Advisors**"), Rand PE Fund I, LP, a Delaware series limited partnership ("**Rand PE Fund**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**"), Atlas IDF, LP, a Delaware limited partnership ("**Atlas IDF**"), Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**" and together with HMIT, Rand Advisors, Rand PE Fund, Rand GP and Atlas IDF, the "**HMIT Entities**"), on the other hand.  The Highland Entities and the HMIT Entities are collectively referred to as the "**Parties**," and each individually, as a "**Party**".

### DEFINITIONS

"**9019 Motion**" means the motion seeking entry of the Bankruptcy Court Order pursuant to Bankruptcy Rule 9019 and in accordance with <u>Section 18</u>.

"**Action**" means any action, claim, demand, arbitration, hearing, charge, complaint, investigation, examination, indictment, litigation, suit or other civil, criminal, administrative or investigative proceedings.

"**Affiliate**" means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, a specified Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by contract or otherwise.

"**Amended Complaint**" means the *Amended Complaint and Objection to Claims*, filed as docket number 158 in *Kirschner v. Dondero*, Adv. Pro. No. 21-03076-sgj (Bankr. N.D. Tex. May 19, 2022).

"**Bankruptcy Case**" means *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex.) and its related proceedings.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended).

4923-8662-5850.9 36027.003

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

"**Bankruptcy Court**" means the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division.

"**Bankruptcy Court Approval Date**" means the date on which the Bankruptcy Court Order is issued.

"**Bankruptcy Court Order**" means an order of the Bankruptcy Court approving the allowance of the HMIT's Class 10 Interest as provided in this Agreement pursuant to the 9019 Motion.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than (i) a Saturday or a Sunday, (ii) a day on which the Federal Reserve Bank of New York or the New York Stock Exchange is closed, or (iii) a day on which banks in the States of Texas are required, or authorized by law, to close.

"**Claimant Trust Agreement**" means that certain Claimant Trust Agreement of the Claimant Trust (as may have been or may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 11, 2021, by and among Highland, as settlor, James P. Seery, Jr., a Claimant Trustee, and Wilmington Trust, National Association, a national banking association, as Delaware trustee.

"**Claims**" means any claims, debts, liabilities, demands, obligations, breaches of contract, breaches of duty or any relationship, misfeasance, malfeasance, promises, acts, omissions, agreements, liens, losses, costs and expenses (including attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whenever and however, arising, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise.

"**Class 10**" means the class of Claims or Equity Interests described in Article II. Section H.10. of the Plan.

"**Class 11**" means the class of Claims or Equity Interests described in Article II. Section H.11. of the Plan.

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Case.

"**Confirmation Order**" means that certain *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943], as conformed in accordance with the Fifth Circuit's rulings.

"**Dugaboy Note**" means that certain Promissory Note dated May 31, 2017, in the original face amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

017077
HCMLPHMIT00000195

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

"**Final Court Approval Date**" means the date on which the Bankruptcy Court Order becomes a Final Order.

"**Final Order**" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Highland Entities, as applicable, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

"**Gatekeeper**" means the gatekeeping provision contained in Article IX. F of the Plan as of August 11, 2021.

"**Governmental Authority**" means any federal, provincial, state, local or foreign government or political subdivision thereof, court of competent jurisdiction, administrative agency, judicial or arbitral body, or commission or other governmental or regulatory authority or instrumentality.

"**Highland Released Parties**" means collectively (i) the Highland Entities, (ii) any Affiliate of any Highland Entity and any Person directly or indirectly majority-owned by any Highland Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any Highland Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i)-(iii), collectively, the "**Highland Parties**"), (iv) each of the Highland Parties' current and former members and administrators (including the trustees of any of the Claimant Trust, the Litigation Sub-Trust, or the Indemnity Trust), officers, executives, agents, directors, advisors, advisory representatives, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, (v) the current and former members of the Oversight Board of the Claimant Trust in any capacity (including Richard Katz) and their Affiliates, including Farallon Capital Management, LLC, Stonehill Capital Management, LLC, Muck Holdings LLC, and Jessup Holdings LLC, (vi) the Independent Board and its members John Dubel, James P. Seery, Jr., and Russell Nelms, (vii) James P. Seery, Jr., individually and in all capacities for any Highland Released Party, including as Chief Executive Officer of Highland Capital Management, L.P., Claimant Trustee of the Claimant Trust, and the Indemnity Trust Administrator of the Indemnity Trust, (viii) Marc S. Kirschner, individually and as Trustee of the Litigation Sub-Trust, (ix) the Committee and each of its members, (x) the professionals (and their respective firms) (a) retained by Highland or the Committee during the Bankruptcy Case or which provided services to Highland or the Committee during the Bankruptcy Case or (b) retained by any Highland Released Party on

017078

HCMLPHMIT00000196

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

or after August 11, 2021, (xi) any Person indemnified by any Highland Party (the Persons described in clauses (i)-(xi), collectively, the "**Highland Covered Parties**"), and (xii) each Highland Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "Highland Covered Parties;" *provided*, however, and for the avoidance of doubt, and without in any way limiting the scope of the foregoing, "Highland Covered Parties" shall include Highland CLO Funding, Ltd., Highland HCF Advisor, Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Multi Strategy Credit Fund GP, L.P., Highland Multi Strategy Credit GP, LLC, Highland Multi Strategy Credit Fund, Ltd., Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., Highland Select Equity Fund, L.P., Highland Restoration Capital Partners Master, L.P., Highland Restoration Capital Partners GP, LLC, Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Offshore Director, LLC, Acis CLO Management, LLC, Neutra, Ltd., Pollack, Ltd., Acis CLO Management Holdings, L.P., Acis CLO Management Intermediate Holdings I, LLC, Acis CLO Management Intermediate Holdings II, LLC, Acis CLO Assets Holdings Limited, CHG Houston Holdings, LLC, Penant Management, L.P., Penant Management GP, LLC, Gunwale, LLC, HE Capital, LLC, Gleneagles CLO, Ltd., Aberdeen Loan Funding, Ltd. Highland Argentina Regional Opportunity Fund GP, LLC, Highland Argentina Regional Opportunity Fund, L.P., Highland Argentina Regional Opportunity Fund, Ltd., Highland Argentina Regional Opportunity Master Fund, L.P., Highland Latin America Consulting, Ltd., Highland Capital Management Korea Limited, Highland Capital Management Latin America, L.P., Highland Latin America GP, Ltd., Highland Latin America LP, Ltd., Highland Offshore Partners, L.P. (Diversified), Brentwood CLO, Ltd., Eastland CLO, Ltd., Bristol Bay Funding Ltd., Jasper CLO Ltd., Highland Legacy Limited, Grayson CLO, Ltd., Greenbriar CLO, Ltd., Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Liberty CLO, Ltd., Valhalla CLO, Ltd., Stratford CLO Ltd., Southfork CLO, Ltd., Pam Capital Funding, L.P., Stonebridge-Highland Healthcare Private Equity Fund, Pamco Cayman Ltd., Red River CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO, Ltd., Westchester CLO, Ltd. Longhorn Credit Funding, LLC, PensionDanmark Pensionsforsikringsaktieselskab, Highland Dynamic Income Master Fund L.P., Highland Dynamic Income Fund GP, LLC, Highland Dynamic Income Fund, L.P., Highland Dynamic Income Fund, Ltd., Highland JHT Holdings, LLC, Highland Prometheus Master Fund, L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland Sunbridge GP, LLC, Trussway Holdings, LLC, Trussway Industries, LLC, TW Company, Inc., T-Way Investments, LLC, SSP Holdings, LLC, Highland Flexible Income UCITS Fund, and Acis CLO 2017-7, Ltd. *Notwithstanding the forgoing or anything herein to the contrary,* none of "Highland Released Parties", "Highland Parties", nor "Highland Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated with, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner and none of such Persons are released from any Claim by any Person in connection with this Agreement.

"**HMIT Class 10 Interest**" means the unvested, contingent Class 10 interest in the Claimant Trust (a) to be allowed on account of HMIT's pre-petition equity interest in Highland,

017079

HCMLPHMIT00000197

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

and (b) subject to the terms and conditions, as applicable, of the Plan, the Plan Documents, the Claimant Trust Agreement, and in accordance with this Agreement, and applicable law.

"**HMIT Note**" means that certain Secured Promissory Note dated December 21, 2015, in the original face amount of $63,000,000 from HMIT, as maker, and Highland, as payee.

"**HMIT Note Claims**" means any Claim related to, in connection with or arising out of the HMIT Note.

"**HMIT Released Parties**" means collectively (i) the HMIT Entities, (ii) any Affiliate of any HMIT Entity and any Person directly or indirectly majority owned by any HMIT Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any HMIT Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i) – (iii), collectively, the "**HMIT Parties**"), (iv) each of the HMIT Parties' current and former trustees, administrators, officer, executives, agents, directors, advisors, consultants, manager, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns (v) the professionals (and their respective firms (a) retained by any HMIT Party during the Bankruptcy Case or which provided services to any HMIT Party during the Bankruptcy Case or (b) retained by any HMIT Released Party on or after August 11, 2021, (vi) any Person indemnified by any HMIT Party (the Persons described in clauses (i) – (vi), collectively, the "**HMIT Covered Parties**"), and (vii) each HMIT Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "HMIT Covered Parties." *Notwithstanding the forgoing,* none of "HMIT Released Parties", "HMIT Parties", nor "HMIT Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner, and none of such Persons are released from any Claims by any Person in connection with this Agreement.

"**Indemnity Trust Administrator**" has the meaning given to it in the Indemnity Trust Agreement.

"**Indemnity Trust Agreement**" means that certain *Second Amended and Restated Indemnity Trust Agreement of the Indemnity Trust* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of [April 28], 2025, by and among the Claimant Trust, as grantor, James P. Seery, Jr., as indemnity trust administrator, and Wilmington Trust, National Association, a national banking association, as indemnity trustee and Delaware trustee.

"**Indemnity Trust Assets**" has the meaning set forth in the Indemnity Trust Agreement.

"**Independent Board**" means the independent board appointed by the Bankruptcy Court on January 9, 2020, pursuant to that certain *Order Approving Settlement with Official Committee*

4923-8662-5850.9 36027.003                    5

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

*of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 339].

"**Kirschner Claims**" means all Claims and causes of action ~~other than the HMIT Note Claims~~ that were asserted or could have been asserted by the Litigation Trustee of the Litigation Sub-Trust, in the Amended Complaint.

"**Liability**" means any liability, debt, obligation, loss, damage, claim, cost or expense (including costs of investigation and defense and attorney's fees, costs and expenses), in each case, whether direct or indirect, whether accrued or contingent, whether or not involving a third-party claim, and including incidental and consequential damages and diminution of value.

"**Litigation Protections**" means, individually and collectively, the rights, duties, and obligations set forth in Section 1 and Sections 9 - 16.

"**Litigation Sub-Trust**" means the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act.

"**Litigation Sub-Trust Agreement**" means that certain Litigation Sub-Trust Agreement of the Litigation Sub-Trust (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 16, 2021, by and among James P. Seery, Jr., as Claimant Trustee of the Claimant Trust, Wilmington Trust, National Association, a national banking association, as Delaware Trustee, and the Litigation Trustee.

"**Litigation Trustee**" means Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust.

"**LPA**" means that certain *Sixth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), dated as of October 4, 2021.

"Operating Expenses" means the expenses of operation and administration of the Highland Entities except for the Indemnity Trust, including legal expenses, employee compensation, Claimant Trustee/CEO and other trust and trustee related compensation, incentive compensation, and customary general and administrative expenses.

"**Original Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* attached as Exhibit A to the *Order (A) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as modified) and (B) Granting Related Relief*, filed at Docket No. 1943 on the Bankruptcy Court's docket.

"**Oversight Board**" means the oversight board of the Highland Claimant Trust.

"**Pending Litigation**" means (i) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including *Hunter Mountain Investment Trust's Emergency Motion for Leave to File Adversary Proceeding* filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders

017081

HCMLPHMIT00000199

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

relating there); (ii) *Dugaboy Investment Trust v. Highland Cap. Mgmt, L.P.*, 3:24-cv-01531-X (N.D. Tex.) (only as to HMIT), and (iii) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:24-cv-01786-L (N.D. Tex.).

"**Permitted Investments**" has the meaning set forth in the Indemnity Trust Agreement.

"**Person**" means any natural person, partnership, limited liability partnership, corporation, limited liability company, association, joint stock company, trust, estate, joint venture, unincorporated organization or Governmental Authority.

"**Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* as conformed in accordance with the Fifth Circuit's rulings.

"**Plan Documents**" has the meaning given to it in the Plan.

"**Plan Protections**" means, collectively, the provisions of the Plan contained in Article IX thereof.

"**Pro Rata**" means the proportion that (a) the allowed amount of a particular Claim or Equity Interest in Class 10 bears to (b) the aggregate allowed amount of all Claims or Equity Interests in Class 10.

"**Threats**" means any written threats, of legal action, legal demands, filed complaints, petitions for pre-suit discovery, suits, litigations, arbitrations, actual or threated restraining orders or injunctions made in writing, or similar written actions of any kind in any forum against any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement).), excluding any such action that would otherwise be a Threat except that any applicable Statute of Limitations that could be applicable to such action has expired.

"**Threats Notice**" means the written notice of any Threats made to any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), that is hereby required to be provided by such Party to the HMIT Entities, within Five (5) business days after receipt of such Threat.

## RECITALS

**WHEREAS**, as of the Petition Date, HMIT held Class B and Class C Limited Partnerships Interests in Highland;

**WHEREAS**, on December 21, 2015, HMIT entered into the HMIT Note with Highland, which had a total outstanding principal balance of Fifty-Seven Million Six Hundred Ninety Thousand Six Hundred Forty and 95/100 Dollars ($57,690,640.95) as of the Petition Date (the "**HMIT Note Balance**");

**WHEREAS**, HMIT's Class B and Class C Limited Partnership Interests in Highland were extinguished on August 11, 2021, in accordance with the Plan;

4923-8662-5850.9 36027.003

7

017082

HCMLPHMIT00000200

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

**WHEREAS**, pursuant to the LPA, HMIT's capital account balance at Highland on account of its Class B and Class C Limited Partnership Interests on the Petition Date was Three Hundred Ninety-Four Million Six Hundred Thirty Thousand Eight Hundred Seventy-One and 53/100 Dollars ($394,630,871.53) (the "**HMIT Capital Account Balance**");

**WHEREAS**, some or all of the HMIT Entities have asserted certain Claims against certain Highland Entities, including those asserted in the Pending Litigation;

**WHEREAS**, some or all of the Highland Entities have asserted certain Claims against certain HMIT Entities, including the HMIT Note Claims;

**WHEREAS**, the Parties wish to terminate, extinguish, and release any and all rights, duties, obligations and Claims that (a) any of the Highland Released Parties owed or have, or may have owed or have, to or with respect to any of the HMIT Released Parties, and (b) any of the HMIT Released Parties owed or have, or may have owed or have, to or with respect to any of the Highland Released Parties, as provided in this Agreement (collectively, the "**Rights and Obligations**");

**WHEREAS**, the Parties agree that the Litigation Protections are intended to enact a permanent cessation of all litigation concerning or related to the Highland Released Parties through and including the Agreement Date; and

**WHEREAS**, the Parties, individually and collectively, wish to (a) resolve all disputes between and/or among any of the Highland Entities, on the one hand, and any of the HMIT Entities, on the other hand, including those asserted in the Pending Litigation, (b) fix and allow HMIT's Class 10 Interest at the amount and on the terms provided herein; and (c) terminate, extinguish, and release all Rights and Obligations on the terms provided herein.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

**AGREEMENT**

1.        Abatement and Dismissal of Pending Litigation With Prejudice.

(a)      Within three (3) Business Days after the Agreement Date, the HMIT Entities shall take all steps necessary (at their own cost) to abate the Pending Litigation.

1.(b)    Within three (3) Business Days after the Bankruptcy Court Approval Date, the HMIT Entities shall take all steps necessary (at their own cost) to dismiss the Pending Litigation with prejudice.

| Formatted: Level 2, Indent: First line: 0" |

2.        Maintenance of Abatement and Dismissal of Certain Defendants from the Amended Complaint.

(a)      Within three (3) Business Days after the Effective Date, the Litigation Trustee shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand

4923-8662-5850.9 36027.003                                          8

017083

HCMLPHMIT00000201

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025
~~PE Fund from Counts I, II, and III of the Amended Complaint. For the avoidance of doubt, Counts I, II, and III constitute all Kirschner Claims that are not HMIT Note Claims, and such dismissal shall not affect or impair any HMIT Note Claims or any liability or obligation of HMIT with respect to the HMIT Note, if any.~~

~~(b)~~(a)   ~~Within three (3) Business Days after the Final~~The Litigation Trustee shall continue to maintain the abatement of Adv. Proc. No. 21-03076-sgj and all related proceedings arising therefrom through the Bankruptcy Court Approval Date. Within three (3) Business Days after the Bankruptcy Court Approval Date, the Litigation Sub-Trust shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand PE from ~~Count~~ Counts I, II, III, and XXIV of the Amended Complaint~~, which constitutes all HMIT Note Claims against HMIT and Rand PE.~~.

3.   <u>Cash Payment to HMIT</u>.   In consideration for the dismissal of the Pending Litigation, within three (3) Business Days following the ~~Agreement~~Bankruptcy Court Approval Date, Highland shall pay HMIT a one-time, lump sum of [~~Five Hundred Thousand Dollars (US$500,000.00)~~] (the "**Payment**") by wire transfer:

[wire instructions]

4.   <u>HMIT Class 10 Interest</u>.

(a)   Subject to entry of the Bankruptcy Court Order, and the terms of this Agreement, the HMIT Class 10 Interest shall be deemed allowed in the amount of Three Hundred Thirty-Six Million Nine Hundred Forty Thousand Two Hundred Thirty and 58/100 Dollars (US$336,940,230.58), which amount represents the HMIT Capital Account Balance, less the HMIT Note Balance.

(b)   Notwithstanding anything to the contrary in the Plan or the Claimant Trust Agreement, as an integral part of this Agreement to consent to the allowance of the HMIT Class 10 Interest and the other considerations in this Agreement, HMIT shall not be deemed, and no holder of the HMIT Class 10 Interest shall be, a Claimant Trust Beneficiary or a "Beneficiary" under the Claimant Trust Agreement, and the Highland Released Parties, individually and collectively, shall owe no duty to any HMIT Releasor (whether contractual, fiduciary, equitable, statutory or otherwise), including with respect to the HMIT Class 10 Interest, in each case, except as expressly set forth in this Agreement. Furthermore, without limiting the foregoing and for the avoidance of doubt, the contractual right of the holder of the HMIT Class 10 Interest to receive or recover any payments or Indemnity Trust Assets from the Indemnity Trust as set forth in this Agreement or the Indemnity Trust Agreement does not make any HMIT Releasor or any other Person a beneficiary of the Indemnity Trust or under the Indemnity Trust Agreement.

(c)   Notwithstanding anything to the contrary in the Plan, the Claimant Trust Agreement or the Indemnity Trust Agreement, in no event shall HMIT sell, transfer, assign, pledge, hypothecate, participate or otherwise dispose of the HMIT Class 10 Interest or any rights (including any right to payment) with respect thereto.

> Formatted: Not Highlight

> Formatted: Not Highlight

4923-8662-5850.9 36027.003

9

017084

HCMLPHMIT00000202

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

(d)     For the avoidance of doubt, the HMIT Class 10 Interest is and shall remain senior to the not yet allowed, unvested contingent Class 11 Claims of Equity Interests as provided for in the Plan, the Plan Documents, and the Claimant Trust Agreement.

5.     Initial Interim ~~Cash~~ Distributions on the Allowed Class 10 Interests.

(a)     Within ten (10) Business Days ~~of~~after the ~~Final~~Bankruptcy Court Approval Date, the Indemnity Trust shall distribute (the date on which such distribution is made, the "**Initial Interim Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests:~~(i)~~ cash in the aggregate amount of ~~[Ten~~Twelve Million Dollars (US$~~10~~12,000,000.00)~~])~~ (the "**Initial Interim Cash Distribution Amount**")~~; and (ii) cash in the aggregate amount of all principal and interest payments paid on the Dugaboy Note and actually received by Highland or the Indemnity Trust from and after the Bankruptcy Court Approval Date (the "Initial Interim Dugaboy Distribution Amount"). ~~").

(b)     ~~Upon~~HMIT shall deposit and hold Ten Million Dollars (US$10,000,000) of the Initial Interim Cash Distiburdion Amount in an interest bearing escrow account (the "**HMIT Escrow Account**") pending the Final Court Approval Date.

~~(b)~~     Within ten (10) Business Days after the Bankruptcy Court Approval Date~~,~~ ~~the Indemnity Trust shall establish a balance sheet reserve in respect of the Initial Interim Cash Distribution Amount and the Initial Interim Dugaboy Distribution Amount (if and when received), which reserve will be held solely in cash or Permitted Investments and otherwise on~~ ("**Note Assignment Date**"). ~~the same terms as other Indemnity Trust Assets pursuant to the Indemnity Trust Agreement pending distribution in accordance with Section 5(a).~~

6.     ~~Subsequent Distribution(s) on~~Highland Entities shall cause the Dugaboy Note to be assigned to HMIT and take all actions necessary for HMIT to become the ~~Allowed Class 10 Interests.~~

~~(a)~~(c)     ~~On the later~~holder of the ~~Final Court Approval Date and April 1, 2028, the Indemnity Trust shall distribute (such distribution, collectively, the "Subsequent Distribution", and the date on which such Subsequent Distribution is made, the "Subsequent Distribution Date") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests: (i) cash in the aggregate amount of [Five Million Dollars (US$5,000,000.00)]; and (ii)(x)(1) if HMIT elects in writing that it desires for the Indemnity Trust to sell the~~Dugaboy Note, ~~the net proceeds, if any, actually received by the Indemnity Trust from such sale, or (2) if HMIT instead elects that it desires~~and shall in addition pay ~~to receive the Dugaboy Note in kind, the Dugaboy Note in kind, plus (y)~~HMIT cash in the aggregate amount of all principal and interest payments actually received on the Dugaboy Note by the the Highland Entities including the Indemnity Trust ~~from and after the Initial Interim Distribution~~as of the Note Assignment Date ~~(the amount pursuant~~. Prior to ~~subclause (y), the "Subsequent Dugaboy P+I Amount"). If the~~Bankruptcy Court Approval Date ~~Dugaboy Note is distributed in kind~~, HMIT will engage an independent valuation service provider to value the Dugaboy Note for purposes of determining the magnitude of reduction to the outstanding allowed Class 10 Interests on account of such in-kind distribution~~,~~ which shall not be less than Fifty percent (50%) of the current balance owed under the Dugaboy Note. The HMIT Entities acknowledge and agree that none of the Highland Entities are representing or warranting

017085

HCMLPHMIT00000203

<u>5/14/2025</u>

that the Dugaboy Note can ~~or will~~ be sold, or the price, if any, <u>that could be</u> received for the Dugaboy Note and further acknowledge and agree that any such purchase price may be de minimis.

Formatted: Not Highlight

~~(b)      Upon the Initial Interim Distribution Date, the Indemnity Trust shall establish a balance sheet reserve in respect of the cash portion of the Subsequent Dugaboy P+I Amount, which will be held solely in cash or Permitted Investments and otherwise on the same terms as other Indemnity Trust Assets pursuant to the Indemnity Trust Agreement pending distribution in accordance with Section 6(a).~~

6.      <u>Subsequent Distribution(s) on the Allowed Class 10 Interests.</u>

(a)      <u>On December 1, 2027, the Indemnity Trust shall distribute (such distribution, collectively, the "**First Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**First Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests: cash in the aggregate amount of Eight Million Dollars (US$8,000,000.00).  . HMIT shall deposit and hold Six Million Dollars (US$6,000,000) of the First Subsequent Distribution in the HMIT Escrow Account pending the Final Court Approval Date.</u>

(b)      <u>On Decemeber 1, 2028, the Indemnity Trust shall distribute (such distribution, collectively, the "**Second Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**Second Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Eight Million Dollars (US$8,000,000.00).</u>

(c)      <u>HMIT shall deposit and hold Six Million Dollars (US$6,000,000) of the Second Subequent Distribution in the HMIT Escrow Account pending the Final Court Approval Date.</u>

~~(c)~~<u>(d)</u>  Notwithstanding anything herein to the contrary, the obligations of the Indemnity Trust to make the <u>First</u> Subsequent Distribution~~, including any Cash, the Dugaboy Note,~~ or ~~the~~<u>Second</u> Subsequent ~~Dugaboy P+I Amount,~~<u>Distribution</u> is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII, Section 8.1(c) of the Indemnity Trust Agreement that the Indemnity Trust Assets comprising such distributions are not reasonably necessary to satisfy current or potential Indemnification Obligations (as defined in the Indemnity Trust Agreement) to all persons who are or might become Beneficiaries (as defined in the Indemnity Trust Agreement).

7.      <u>Final Distribution on the Allowed Class 10 Interests.</u>

(a)      On the later of the Final Court Approval Date and April 1, 2029, the Indemnity Trust will distribute all excess remaining Indemnity Trust Assets in accordance with Article VIII of the Indemnity Trust Agreement; provided, however, that the obligation of the Indemnity Trust to make any such distributions and/or dissolve and wind up the affairs of the Indemnity Trust is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII of the Indemnity Trust Agreement that (1) a Final Order(s) (as defined in the Indemnity Trust Agreement) has been entered resolving all litigation, claims or

4923-8662-5850.9 36027.003

11

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

proceedings in any forum of any kind which could give rise to Indemnity Obligations (as defined in the Indemnity Trust Agreement) and payment in full of all such Indemnity Obligations and (2) all applicable statutes of limitations and any applicable tolling of such statutes of limitation have expired.

(b)     The Indemnity Trust agrees to not use Indemnity Trust Assets to fund ~~the operating expenses of Highland.~~Operating Expenses.

(c)     Following the Bankruptcy Court Approval Date, at the request of Mark Patrick, solely in his capacity, and to the extent he remains, as administrator of HMIT, but not more often than quarterly, Highland and the Indemnity Trust Administrator agree to review (i) the status of their respective assets, (ii) the balance of cash held, (iii) the status of any claims made for indemnification and any resolutions thereof, (iv) the status of any litigation, and (v) forecasted operating expenses with Mr. Patrick, and will each work in good faith to reduce operating expenses where reasonably practicable; provided, however, that all such reporting shall be subject to Mr. Patrick's agreement to maintain confidentiality with respect to any non-public information.

8.     Transfer Kirschner Claims; Dismissal of HMIT Note Claims.

(a)     In consideration of the dismissal of the Pending Litigation and the releases provided herein, within ten (10) Business Days ~~of~~after the ~~Agreement~~Bankruptcy Court Approval Date, but after the dismissal provided for in Section 2, ~~and solely to the extent permitted by the Plan, the Litigation Sub-Trust Agreement and applicable law~~, the Litigation Sub-Trust shall execute an assignment in the form attached hereto as **Exhibit [_]** in favor of the HMIT Entities transferring all of the Litigation Sub-Trust's right, title, and interest in and to the Kirschner Claims ~~(which, for the avoidance of doubt, shall not include any HMIT Note Claims)~~ (the "**Kirschner Transfer**").[‡] Each HMIT Entity acknowledges and agrees that none of the Highland Entities will have any duty or obligation to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof, except as provided in this Agreement, including without limitation the terms of Section 8(c) below.

(b)     THE HMIT ENTITIES SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THE LITIGATION SUB-TRUST IS TRANSFERRING THE KIRSCHNER CLAIMS ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT THE HMIT ENTITIES ARE NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM THE HIGHLAND ENTITIES OR THEIR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE KIRSCHNER CLAIMS AND AMENDED COMPLAINT, INCLUDING WITH RESPECT TO THE ENFORCEABILITY, TRANSFERABILITY, VIABILITY, STRENGTH, OR VALUE OF ANY OF THE KIRSCHNER CLAIMS OR THE AMENDED COMPLAINT.  The HMIT Entities hereby specifically acknowledge that they have carefully reviewed this Section and have had the opportunity to discuss its import with legal counsel and that the provisions of this Section are a material part of this Agreement.  Thus, if for any reason HMIT is precluded from or is otherwise unable to prosecute all or any of the Kirschner Claims, (i) the HMIT Releasors shall have no

---

[‡] ~~NTD: HMIT Claim to be dismissed without prejudice.~~

017087

HCMLPHMIT00000205

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

recourse against the Highland Released Parties whatsoever and shall not be entitled to compensation of any kind, it being agreed that the HMIT Entities are otherwise receiving adequate consideration for the duties and obligations they are undertaking pursuant to this Agreement and (ii) there will be no effect whatsoever on the validity and enforceability of this Agreement or any of the other transactions contemplated hereby.

(c)    As promptly as reasonably practicable following the ~~Effective~~Bankruptcy Court Approval Date, the Highland Entities shall provide to the HMIT Entities electronic copies of written discovery requests and responses thereto, and documents produced in discovery in respect of the Kirschner Claims and the Amended Complaint.  The Highland Entities will not provide any other documents regarding the Kirschner Claims including any attorney-client communications and any documents subject to the attorney work-product doctrine or similar privileges or immunities concerning the Kirschner Claims (collectively, the "**Kirschner Privileges**"), it being understood and agreed that the Highland Entities are retaining, and not transferring or waiving, the Kirschner Privileges.

(d)    Each Party acknowledges and agrees that if (a) the Kirschner Transfer is found or deemed to be impermissible or invalid, for any reason, or (b) the Final Court Approval Date does not occur, the Kirschner Claims and Amended Complaint will revert to, and remain an asset of, the Litigation Sub-Trust.

9.    General Release By The HMIT Entities.  On the ~~Agreement~~Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the HMIT Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its and their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) (collectively with the HMIT Entities, the "**HMIT Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each Highland Released Party from, and waives and relinquishes, any and all Claims, which the HMIT Releasors, or any Person claiming through, under, or on behalf of any of the HMIT Releasors, ever had, now has, or hereafter can, shall, or may have against any of the Highland Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Agreement Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the Highland Released Parties, or the Highland Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**HMIT Entity Released Claims**").

~~10.~~    General Release By The Highland Entities.

~~(a)~~    On the ~~Agreement~~Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the Highland Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and

4923-8662-5850.9 36027.003

13

017088

HCMLPHMIT00000206

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

its or their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise)(collectively with the Highland Entities, the "**Highland Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, any and all Claims, ~~excepting any HMIT Note Claims,~~ which the Highland Releasors, or any Person claiming through, under, or on behalf of any of the Highland Releasors, ever had, now has, or hereafter can, shall, or may have against any of the HMIT Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the ~~Agreement~~Bankruptcy Court Approval Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the HMIT Released Parties, or the HMIT Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "~~Initial Highland Released Claims~~"). ~~For the avoidance of doubt and notwithstanding anything herein to the contrary, the HMIT Note Claims shall not be released until Final Court Approval Date, at which time the HMIT Note will be applied to calculate the allowed HMIT Class 10 Interest set forth in Section 4 and the balance of the HMIT Note and any HMIT Note Claims shall be released pursuant to Section 10(b).~~

~~(b)~~10.    ~~Upon the Final Court Approval Date, and to the maximum extent permitted by law, each of the Highland Releasors hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, the HMIT Note Claims (the "**Subsequent Highland Released Claims**" and together with the Initial Highland Released Claims, the "**Highland Entity Released Claims**" and together with the HMIT Entity Released Claims, the "**Released Claims**").~~Highland Released Claims").

11.    Further Provisions Concerning The General Releases.

(a)    FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASES ARE INTENDED TO BE GENERAL AND INCLUDE A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE AGREEMENT DATE.

(b)    To the maximum extent permitted by law, each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefit of any statute or other principle of law or equity that limits the applicability of a release with respect to Claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release.

(c)    Without limiting the scope of the foregoing waiver, in connection with the foregoing release, each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefits of

017089
HCMLPHMIT00000207

5/14/2025

Section 1542 of the California Civil Code (to the extent, if any, that Section 1542 might apply to the foregoing release), which provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees that the provisions of Section 1542 of the Civil Code of the State of California and all similar federal or state law, rights, rules or legal principles, legal or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY EACH OF THE HMIT ENTITIES AND THE HIGHLAND ENTITIES, ON THEIR OWN BEHALF AND ON BEHALF OF THE OTHER HMIT RELEASORS AND HIGHLAND RELEASORS, RESPECTIVELY,** in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

In connection with such waiver and relinquishment, each of the HMIT Entities and Highland Entities acknowledges that it is aware that it may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein. Nevertheless, it is the intent of each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, in executing this Agreement fully, finally, and forever to settle and release all such matters, and all Claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

(d)    As an integral component of this Agreement, and notwithstanding the Parties' intent set forth in the preamble hereto and the general nature of the releases in <u>Sections 9 and 10</u>, should:

(i)    any HMIT Releasor contend or assert that any Claim of any kind whatsoever held by any HMIT Releasor against any Highland Released Party survives this Agreement and is in any way related to or arising from or in connection with any HMIT Entity Released Claim (such claim or cause of action, a "**<u>HMIT Alleged Claim</u>**"), such HMIT Releasor will be deemed to have irrevocably, fully, and finally assigned such HMIT Alleged Claim to the Highland Entities and the Highland Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such HMIT Alleged Claim.

4923-8662-5850.9 36027.003

15

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

(ii)      any Highland Releasor contend or assert that any Claim of any kind whatsoever held by any Highland Releasor against any HMIT Released Party survives this Agreement and is in any way related to or arising from or in connection with any Highland Entity Released Claim (such claim or cause of action, a "**Highland Alleged Claim**"), such Highland Releasor will be deemed to have irrevocably, fully, and finally assigned such Highland Alleged Claim to the HMIT Entities and the HMIT Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such Highland Alleged Claim.

12.     <u>Covenant Not To Sue; Limitation on Standing</u>. Upon the Agreement Date:

(a)      Each of the HMIT Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the Highland Released Parties, to recover, enforce, or collect any HMIT Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(b)      Each of the Highland Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the HMIT Released Parties, to recover, enforce, or collect any Highland Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(c)      For the avoidance of doubt, this Agreement shall not operate to give any HMIT Entity standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except for the limited purpose of seeking Court approval of this Agreement (including with respect to any appeal concerning any order entered granting or denying such approval), and except for the limited purpose of enforcing this Agreement, no HMIT Entity shall commence any Action in connection with the HMIT Class 10 Interest.

13.     <u>Representations and Warranties</u>.

(a)      Each of the HMIT Entities hereby represents and warrants that every HMIT Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any HMIT Releasor.

(b)      The HMIT Entities, on their own behalf and on behalf of the other HMIT Releasors, acknowledge and agree that each Plan Provision is lawful, effective, and binding on the HMIT Releasors. The HMIT Entities further agree, on their own behalf and on behalf of the other HMIT Releasors, that the HMIT Releasors will never, in any way, challenge or seek to modify, nullify, vacate, or revoke, or induce, encourage or direct any other Person to do so or act in concert with or assist (financially or otherwise) any other Person in doing so the Confirmation Order, the Plan, the Plan Protections, or any Plan Document, including the Claimant Trust Agreement, the LPA, the Indemnity Trust Agreement or the Litigation Sub-Trust Agreement, in the Bankruptcy Court, in any other state or federal court, in any other forum or tribunal, or otherwise, including administrative or regulatory tribunals and foreign courts.

017091

HCMLPHMIT00000209

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

(c)      Each of the Highland Entities hereby represents and warrants that every Highland Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any Highland Releasor.

(d)      Each Party severally represents and warrants as to itself only that: (i) it has taken all necessary action to authorize and approve the execution, delivery and performance of this Agreement; (ii) such Party has full power and authority to execute and deliver this Agreement; and (iii) this Agreement constitutes a valid, legal and binding obligation of such Party, and is enforceable subject to its terms.  Each individual signatory hereto individually warrants and represents to all Parties hereto that such individual has full power and authority to act on behalf of and bind the Party for which he or she has executed this Agreement; provided, however that no signatory shall otherwise provide any warranty or representation or otherwise be a party to this Agreement on an individual basis.

14.    No Continuing Rights, Duties or Obligations.  Except for the rights, duties, and obligations expressly set forth in this Agreement, all Rights and Obligations that existed or may have existed shall be deemed terminated, extinguished, and released upon the Agreement Date. For the avoidance of doubt, from and after the Agreement Date, (a) the Highland Released Parties, individually and collectively, shall owe no duty, past or present, including with respect to the Kirchner Claims, to the HMIT Releasors, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement, and (b) the HMIT Released Parties, individually and collectively, shall owe no duty to the Highland Releasors, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement.

15.    Gatekeeper Standard.

(a)      The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that, notwithstanding the United States Court of Appeals for the Fifth Circuit's decision in *Highland Capital Management Fund Advisors, L.P. v. Highland Capital Management, L.P.*, No. 23-10534 (5th Cir. Mar. 18, 2025), the "Gatekeeper" provisions contained in Highland's Original Plan is forever binding on each of the HMIT Entities and for a claim or cause of action to be "colorable" for purposes of the Gatekeeper, it must be found by final order of the Bankruptcy Court (the "**Gatekeeper Court**"), which order shall be subject to appeal to a court of competent jurisdiction, to have satisfied the "Gatekeeper Colorability Test" as such term is defined in *In re Highland Capital Management, L.P.*, 2023 Bankr. LEXIS 2104 at *124-36 (Bankr. N.D. Tex. Aug. 24, 2023).

(b)      The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that compliance with the Gatekeeper requires (i) a motion seeking leave to sue an Exculpated Party (as that term is defined in Highland's original Plan) and a finding that the litigant's claims and causes of action are "colorable" attaching a complaint setting forth the basis for such claims or causes of action and (ii), in the Gatekeeper Court's sole discretion, an evidentiary hearing (during

017092

HCMLPHMIT00000210

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

which the Gatekeeper Court may, among other things, hear testimony and assess the credibility of any witness(es)) to determine whether a proposed claim or cause of action is "colorable."

(c)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, further acknowledge and agree that the moving party under the Gatekeeper has the burden of satisfying the "Gatekeeper Colorability Test."

16.    Indemnification.

(a)     Without in any manner limiting the available remedies for any breach of this Agreement, the HMIT Entities, severally but not jointly, agree to indemnify, defend, and hold the Highland Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any HMIT Entity set forth in Section 13 or (y) any Actions brought or prosecuted by or on behalf of, any HMIT Releasor or that are induced, encouraged, assisted  or directed by any HMIT Releasor or brought or prosecuted in concert with any HMIT Releasor against any Highland Released Party with respect to or related to any HMIT Entity Released Claims.  Without limiting the scope of the foregoing in any manner, any HMIT Entity that breaches Section 12 shall be liable to the Highland Released Party against whom the applicable Action has been brought or prosecuted in violation of Section 12 for the reasonable attorneys' fees and costs incurred by such Highland Released Party in defending against or otherwise responding to such Action.  Each HMIT Entity acknowledges and agrees that the HMIT Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

(b)     Without in any manner limiting the available remedies for any breach of this Agreement, the Highland Entities, severally but not jointly, agree to indemnify, defend, and hold the HMIT Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any Highland Entity set forth in Section 13 or (y) any suits, proceedings, or other actions brought or prosecuted by or on behalf of, any Highland Releasor or that are induced, encouraged, assisted  or directed by any Highland Releasor or brought or prosecuted in concert with any Highland Releasor against any HMIT Released Party with respect to or related to any Highland Entity Released Claims.  Without in any manner limiting the scope of the foregoing, any Highland Entity that breaches Section 12 shall be liable to the HMIT Released Party against whom the applicable Action has been brought or prosecuted in violation of Section 12 for the reasonable attorneys' fees and costs incurred by such HMIT Released Party in defending against or otherwise responding to such Action.  Each Highland Entity acknowledges and agrees that the Highland Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

017093

HCMLPHMIT00000211

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

17.    Execution.  This Agreement may be executed by the exchange of signatures by facsimile or by PDF attachment to an email transmittal and in counterparts, and if so executed, shall be fully executed when a counterpart has been executed and delivered by all Parties hereto through counsel.  All counterparts taken together shall constitute one and the same agreement and shall be fully enforceable as such.

18.    Bankruptcy Court Order.  The allowance of the allowed HMIT Class 10 Interest pursuant to Section 4 is subject to the entry of the Bankruptcy Court Order.  To that end, the Highland Entities shall file the 9019 Motion no later than five (5) Business Days after the Agreement Date.  Each Party shall, and shall cause each of their respective Affiliates to, undertake any and all actions in compliance with applicable law to obtain the Bankruptcy Court Order as promptly as practicable, and without limiting the foregoing, if an Action is threatened or instituted by any Person opposing the 9019 Motion or otherwise challenging the validity or legality, or seeking to restrain the consummation, of the transactions contemplated by this Agreement or the Bankruptcy Court Order, each Party shall, and shall cause its respective Affiliates to, use their commercially reasonable best efforts to avoid, resist, resolve or, if necessary, and defend to effectuate this Agreement and consummate the transactions hereby.  If the 9019 Motion is not approved by entry of the Bankruptcy Court Order or if the Bankruptcy Court Approval is precluded from becoming a Final Order, (a) there will be no affect on, adjustment to, or impairment of, in any way, the validity and enforceability of the remainder of this Agreement, and the other transactions contemplated hereby, all of which shall remain in full force and effect and (b) each Party shall, and shall cause its respective Affiliates to, use their best efforts to seek the allowance of the HMIT Class 10 Interest in a substantially similar amount and on substantially similar terms as set forth in Section 4 to the fullest extent possible so as to give effect to the original intent of the Parties as closely as possible.

19.    Fees and Expenses.  Whether or not the transactions contemplated hereby are consummated or the Bankruptcy Court Order is obtained, and except as otherwise expressly provided in this Agreement, each Party will bear its respective fees, costs and expenses (including legal, accounting and other professional fees) incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the transactions contemplated hereby, including with respect to each Party's respective obligations pursuant to Section 18.  Notwithstanding the foregoing, if any Party hereto brings an Action to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that Action shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

20.    Entire Agreement; No Other Representations.  **THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF ANY PARTY OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT.  THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS (COLLECTIVELY, "REPRESENTATIONS"), EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT.  THE PARTIES EXPRESSLY AGREE THAT THEY**

4923-8662-5850.9 36027.003                                    19

**Formatted:** No underline

HCMLPHMIT00000212

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

**HAVE NOT BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT; AND THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT RELIED ON ANY REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY ARE ENTERING INTO THIS AGREEMENT RELYING SOLELY ON THEIR OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS BY ANY PARTY, EXCEPT FOR THOSE REPRESENTATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES AGREE THAT REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT SHALL NOT BE USED IN THE INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT, AND NEITHER THE HMIT RELEASED PARTIES NOR THE HIGHLAND RELEASED PARTIES SHALL HAVE ANY LIABILITY FOR ANY CONSEQUENCES ARISING AS A RESULT OF ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT**.

21.    Agreement and Release Knowing and Voluntary.  The Parties acknowledge that they have considered this Agreement with their respective attorneys and have carefully read this Agreement, that it has been fully explained by their attorneys, and that they have had a reasonable opportunity to consider this Agreement.  The Parties further represent that they know and fully understand the contents of this Agreement, that they intend to be legally bound by this Agreement and the releases and covenants contained herein, and that they are signing this Agreement, including the release provisions herein, voluntarily and of their own free will and without coercion, and with the benefit of advice of counsel.

22.    Cooperation.  The Parties agree to perform any services or actions reasonably necessary to carry out the terms and conditions of this Agreement or the transactions contemplated hereby, including the execution and delivery of reasonable additional documents, instruments, conveyances and/or assurances, in good faith, and to reasonably communicate and cooperate with one another in this regard.  For the avoidance of doubt, nothing in this Section shall obligate the Highland Entities to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof.

23.    Governing Law.  This Agreement shall be construed pursuant to and governed by the laws of the State of Delaware (substantive and procedural) without reference to principles of conflicts of law that would result in the application of any other State's laws.

24.    Jurisdiction/Venue.  The Parties hereby irrevocably submit to the jurisdiction and venue of the Bankruptcy Court with respect to any action or proceeding arising out of or related to this Agreement or the subject matter hereof; if (and only if) the Bankruptcy Court lacks personal or subject matter jurisdiction to adjudicate an action or proceeding arising out of or related to this Agreement or the subject matter hereof, then the Parties irrevocably submit to the jurisdiction and venue of the United States District Court for the Northern District of Texas.

25.    No Admissions.  All Parties acknowledge and agree that the matters set forth in this Agreement constitute the settlement and compromise of disputed Claims and that this Agreement shall not constitute the admission of any fact or liability by any of them regarding any Claim,

017095

HCMLPHMIT00000213

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

5/14/2025

including the Claims released hereunder, and neither the terms hereof, nor the fact of this Agreement itself, shall be evidence of any kind in any Action, other than an Action to enforce the terms of the Agreement or any instrument executed in connection herewith or any claim for damages or other relief for breach of any representation or warranty contained herein or in any instrument executed in connection herewith.

26.    Other Provisions.

(a)    This Agreement contains the entire agreement and understanding of the parties and supersedes any and all prior or contemporaneous agreements, arrangements, and understandings relating to the subject matter of this Agreement.  No representation, inducement, agreement, promise or understandings altering, modifying, amending, taking from or adding to, the terms and conditions hereof shall have any force or effect unless the same is in writing and validly executed by each of the Parties hereto.

(b)    The waiver by any Party of any breach of, or default under, any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or default; provided, however, that for any such waiver to be enforceable, it shall be in writing and executed by the non-breaching Party.

(c)    The headings contained in this Agreement are for convenience only and shall in no way restrict or otherwise affect the construction of the provisions hereof.

(d)    The Parties shall each execute all documents and perform all acts necessary and proper to effectuate the terms of this Agreement.

27.    Notices.    All notices required or permitted to be provided hereunder shall be afforded to the respective parties to and through their counsel, and shall be transmitted simultaneously by electronic mail (with PDF attachments, as necessary) and by telefax, addressed as follows:

To the Highland Entities:

**PACHULSKI STANG ZIEHL AND JONES LLP**
Jeffrey N. Pomerantz
John A. Morris
10100 Santa Monica Boulevard
Los Angeles, California 90067-4003
310.277.6910
jpomerantz@pszjlaw.com
jmorris@pszjlaw.com

To the HMIT Entities:

**KELLY HART PITRE**
Louis M. Phillips
Amelia Hurt

017096
HCMLPHMIT00000214

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT 4/28/25~~

5/14/2025

301 Main Street, Suite 1600
225.381.9643
Louis.Phillips@Kellyhart.com
Amelia.Hurt@Kellyhart.com

28.    _Severability_. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity and enforceability of any other provision of this Agreement.  For the avoidance of doubt, if any provision of this Agreement is overturned on appeal after the Bankruptcy Court Approval Date, any portion that is not overturned on appeal shall remain in full force and effect.

29.    _Interpretive Provisions_. Unless the express context otherwise requires: (a) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) words defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (c) the words "Dollars" and "$" mean U.S. dollars; (d) references herein to a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement; (e) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words ",without limitation,"; (f) references herein to any gender shall include each other gender; (g) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement; (h) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (i) the word "or" shall be disjunctive but not exclusive; (j) the headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties; and (k) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

[_Signature page follows_]

017097
HCMLPHMIT00000215

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**HUNTER MOUNTAIN INVESTMENT TRUST**

By _____
      Name:     Mark Patrick
      Title:      Administrator
      Date:     ~~April~~May __, 2025

**RAND ADVISORS, LLC**

By _____
      Name:     Mark Patrick
      Title:      President
      Date:     ~~April~~May __, 2025

**RAND PE FUND I, LP**
By: Rand PE Fund Management, LLC, its General Partner

By _____
      Name:     Mark Patrick
      Title:      President
      Date:     ~~April~~May __, 2025

**RAND PE FUND MANAGEMENT, LLC**

By _____
      Name:     Mark Patrick
      Title:      President
      Date:     ~~April~~May __, 2025

**ATLAS IDF, LP**
By: Atlas IDF GP, LLC, its General Partner

By _____

017098

HCMLPHMIT00000216

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Name:    Mark Patrick
Title:    President
Date:    ~~April~~May __, 2025

**ATLAS IDF GP, LLC**


By _____
Name:    Mark Patrick
Title:    President
Date:    ~~April~~May __, 2025


**HIGHLAND CAPITAL MANAGEMENT, L.P.**


By _____
Name:    James. P. Seery, Jr.
Title:    Chief Executive Officer
Date:    ~~April~~May __, 2025


**HIGHLAND CLAIMANT TRUST**


By _____
Name:    James P. Seery, Jr.
Title:    Claimant Trustee
Date:    ~~April~~May __, 2025

**HIGHLAND LITIGATION SUB-TRUST**


By _____
Name:    Marc S. Kirschner
Title:    Litigation Trustee
Date:    ~~April~~May __, 2025

4923-8662-5850.9 36027.003

24

017099
HCMLPHMIT00000217

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

**HIGHLAND INDEMNITY TRUST**


By  _____

|  |  |
|---|---|
| Name: | James P. Seery, Jr. |
| Title: | Indemnity Trust Administrator |
| Date: | ~~April~~May __, 2025 |

017100

HCMLPHMIT00000218

**EXHIBIT 30**

017101

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>
**Cc:** "Jeff Pomerantz" <jpomerantz@pszjlaw.com>, "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>
**Subject:** RE: Highland/HMIT: Settlement Agreement (HCMLP comments)
**Date:** Thu, 15 May 2025 18:22:12 +0000
**Importance:** Normal
**Inline-Images:** image006.jpg; image007.png; image008.png; image002.png

---

Thanks


**Louis M. Phillips**
*Partner*



**KELLY HART & PITRE**
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Thursday, May 15, 2025 1:21 PM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Subject:** RE: Highland/HMIT: Settlement Agreement (HCMLP comments)

HCMLPHMIT00000226

**EXTERNAL SENDER ALERT** - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.

Louis,

The Highland team will send a Teams invite for 4:00 pm Eastern Time.

Chat soon,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Houston

---

**From:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Sent:** Thursday, May 15, 2025 2:08 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Subject:** RE: Highland/HMIT: Settlement Agreement (HCMLP comments)

John,

We are available at either time.  Let us know which you prefer.  Thanks

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

louis.phillips@kellyhart.com
www.kellyhart.com

017103

HCMLPHMIT00000227

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Thursday, May 15, 2025 12:07 PM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Subject:** Highland/HMIT: Settlement Agreement (HCMLP comments)

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**

---

SETTLEMENT COMMUNICATION PURSUANT TO FED. R. EVID. 408
<u>WITHOUT PREJUDICE</u>

Louis:

Thank you for sending the revised version of the draft agreement.

Attached is another black line, this one showing Highland's changes to HMIT's last draft.

Are you and your team available at either **4 or 6 pm Eastern Time today** so we can walk you through this?

Please let me know.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Houston

---

**From:** Tim Cournoyer <TCournoyer@HighlandCapital.com>
**Sent:** Thursday, May 15, 2025 12:45 PM

<MGray@HighlandCapital.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>; John A. Morris <jmorris@pszjlaw.com>;
Gregory V. Demo <GDemo@pszjlaw.com>
**Subject:** RE: PRIVILEGED: RE: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH
5.14 against Highland v9.PDF

Revised draft attached incorporating the change to Section 8(a).  Thanks

**From:** jpseeryjr@gmail.com <jpseeryjr@gmail.com>
**Sent:** Thursday, May 15, 2025 11:42 AM
**To:** David Klos <DKlos@HighlandCapital.com>; Tim Cournoyer <TCournoyer@HighlandCapital.com>; Matthew Gray
<MGray@HighlandCapital.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>; John A. Morris <jmorris@pszjlaw.com>;
Gregory V. Demo <GDemo@pszjlaw.com>
**Subject:** Re: PRIVILEGED: RE: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH
5.14 against Highland v9.PDF

Makes sense.  New version coming now

Best.  Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

---

**From:** David Klos <DKlos@HighlandCapital.com>
**Date:** Thursday, May 15, 2025 at 12:40 PM
**To:** Tim Cournoyer <TCournoyer@highlandcapital.com>, Jim Seery <jpseeryjr@gmail.com>, Matthew Gray
<MGray@highlandcapital.com>, Jeff Pomerantz <jpomerantz@pszjlaw.com>, John A. Morris
<jmorris@pszjlaw.com>, Gregory V. Demo <GDemo@pszjlaw.com>
**Subject:** RE: PRIVILEGED: RE: KH clean of Redline of v9 Settlement Agreement after comments
5.14.DOCX; Redline KH 5.14 against Highland v9.PDF

The deleted provision in Section 3 is similar to a remaining provision in the lead in to Section 8.  Should that be
removed as well?

---

**From:** Tim Cournoyer <TCournoyer@HighlandCapital.com>
**Sent:** Thursday, May 15, 2025 11:35 AM
**To:** Jim Seery <jpseeryjr@gmail.com>; David Klos <DKlos@HighlandCapital.com>; Matthew Gray
<MGray@HighlandCapital.com>; 'Jeff Pomerantz' <jpomerantz@pszjlaw.com>; 'John A. Morris'
<jmorris@pszjlaw.com>; 'Gregory V. Demo' <GDemo@pszjlaw.com>
**Subject:** RE: PRIVILEGED: RE: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH
5.14 against Highland v9.PDF

Jim – As discussed with you and Dave, attached is a revised draft with one change to Section 3 (removing the
provision tying the $500k payment to any specific component of the settlement).

@Jeff Pomerantz, @John A. Morris, @Gregory V. Demo – Please let us know if you expect to have any
comments and expected timeframe.

We need to circulate drafts to Class 9's, CTOB and HMIT.  We can likely send a draft to Class 9's and CTOB
now subject to ongoing review, since I don't believe you will have any changes to the economic proposal we're
making, but obviously want everyone signed off asap for purposes of getting a draft back to HMIT.

HCMLPHMIT00000229

Thank you.

---

**From:** Tim Cournoyer <TCournoyer@HighlandCapital.com>
**Sent:** Thursday, May 15, 2025 10:40 AM
**To:** Jim Seery <jpseeryjr@gmail.com>; David Klos <DKlos@HighlandCapital.com>; Matthew Gray
<MGray@HighlandCapital.com>; 'Jeff Pomerantz' <jpomerantz@pszjlaw.com>; 'John A. Morris'
<jmorris@pszjlaw.com>; 'Gregory V. Demo' <GDemo@pszjlaw.com>
**Subject:** RE: PRIVILEGED: RE: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH
5.14 against Highland v9.PDF

All,

Attached are revised drafts of the Settlement Agreement and the Class 9 Written Consent, together with redlines
in PDF.  Please let me know if you have any comments ASAP.

---

**From:** Tim Cournoyer <TCournoyer@HighlandCapital.com>
**Sent:** Thursday, May 15, 2025 8:23 AM
**To:** Matthew Gray <MGray@HighlandCapital.com>; Jim Seery <jpseeryjr@gmail.com>; 'John A. Morris'
<jmorris@pszjlaw.com>
**Cc:** David Klos <DKlos@HighlandCapital.com>; 'Gregory V. Demo' <GDemo@pszjlaw.com>; 'Jeff Pomerantz'
<jpomerantz@pszjlaw.com>
**Subject:** PRIVILEGED: RE: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14
against Highland v9.PDF

Below is a quick checklist items to be accomplished.  Please respond if anyone can think of others:

- Settlement Agreement
  - Finalize internal comments among Highland, PSZJ and QE
  - **Need to draft Form of Assignment for Kirschner Claims**
  - Circulate revised draft to:
    - HMIT
    - CTOB
    - Class 9 Holders
- 9019 Motion
  - PSZJ to draft
  - Finalize comments among Highland, QE and PSZJ
  - Circulate final draft to HMIT

- CTOB Resolutions
  - Finalize internal comments among Highland and PSZJ
  - Circulate to:
    - CTOB
    - QE

- Class 9 Consent
  - Finalize internal comments to written consent among Highland and PSZJ
  - Finalize payment schedule to be attached as Exhibit
  - Circulate to:
    - Muck
    - Jessup
    - UBS

- Pay Daugherty Class 9 Claim (can likely happen post-signing)

HCMLPHMIT00000230

Case 19-34054-sgj11    Doc 4255-30    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 15    Exhibit 30    Filed 09/05/25    Page 258 of 1017    PageID 18140
25 To be completed promptly following receipt of Class 9 Consent

**From:** Tim Cournoyer <TCournoyer@HighlandCapital.com>
**Sent:** Wednesday, May 14, 2025 10:19 PM
**To:** Matthew Gray <MGray@HighlandCapital.com>; Jim Seery <jpseeryjr@gmail.com>; 'John A. Morris' <jmorris@pszjlaw.com>
**Cc:** David Klos <DKlos@HighlandCapital.com>; 'Gregory V. Demo' <GDemo@pszjlaw.com>; 'Jeff Pomerantz' <jpomerantz@pszjlaw.com>
**Subject:** Re: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14 against Highland v9.PDF

Thanks - I got those on the issues list as well.

TIMOTHY J. COURNOYER
D: 972.628.4153 | M: 305.479.0804

---

**From:** Matthew Gray <MGray@HighlandCapital.com>
**Sent:** Wednesday, May 14, 2025 10:18 PM
**To:** Tim Cournoyer <TCournoyer@HighlandCapital.com>; Jim Seery <jpseeryjr@gmail.com>; 'John A. Morris' <jmorris@pszjlaw.com>
**Cc:** David Klos <DKlos@HighlandCapital.com>; 'Gregory V. Demo' <GDemo@pszjlaw.com>; 'Jeff Pomerantz' <jpomerantz@pszjlaw.com>
**Subject:** RE: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14 against Highland v9.PDF

Two principal comments: 1) we don't own the entire Dugaboy Note as defined in the agreement, so we can't assign the amount of the note owed to Get Good. If language as drafted is fine then no worries, 2) clarifying we pay all P&I received on Dugaboy note between execution date and assignment date.

---

**From:** Tim Cournoyer <TCournoyer@HighlandCapital.com>
**Sent:** Wednesday, May 14, 2025 9:42 PM
**To:** Matthew Gray <MGray@HighlandCapital.com>; Jim Seery <jpseeryjr@gmail.com>; 'John A. Morris' <jmorris@pszjlaw.com>
**Cc:** David Klos <DKlos@HighlandCapital.com>; 'Gregory V. Demo' <GDemo@pszjlaw.com>; 'Jeff Pomerantz' <jpomerantz@pszjlaw.com>
**Subject:** RE: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14 against Highland v9.PDF

Matt – can you send a PDF of your comments?  I think the colors of the various comments is dependent on each user's individual Word settings.

---

**From:** Matthew Gray <MGray@HighlandCapital.com>
**Sent:** Wednesday, May 14, 2025 8:59 PM
**To:** Jim Seery <jpseeryjr@gmail.com>; 'John A. Morris' <jmorris@pszjlaw.com>
**Cc:** Tim Cournoyer <TCournoyer@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>; 'Gregory V. Demo' <GDemo@pszjlaw.com>; 'Jeff Pomerantz' <jpomerantz@pszjlaw.com>
**Subject:** RE: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14 against Highland v9.PDF

Apologies, for some reason my red comments did not show up in prior version. Attached has comments in red.

017107

HCMLPHMIT00000231

**From:** Matthew Gray
**Sent:** Wednesday, May 14, 2025 8:46 PM
**To:** jpseeryjr@gmail.com; John A. Morris <jmorris@pszjlaw.com>
**Cc:** Tim Cournoyer <TCournoyer@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>; 'Gregory V. Demo'
<GDemo@pszjlaw.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>
**Subject:** RE: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14 against
Highland v9.PDF


I've attached a few comments in red, mostly on the Dugaboy note. Continuing to review.

---

**From:** jpseeryjr@gmail.com <jpseeryjr@gmail.com>
**Sent:** Wednesday, May 14, 2025 7:26 PM
**To:** Matthew Gray <MGray@HighlandCapital.com>
**Subject:** FW: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14 against
Highland v9.PDF



Best.  Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Date:** Wednesday, May 14, 2025 at 7:33 PM
**To:** James Seery <jpseeryjr@gmail.com>, Tim Cournoyer <TCournoyer@highlandcapital.com>, David Klos
<DKlos@highlandcapital.com>, Jeff Pomerantz <jpomerantz@pszjlaw.com>, Gregory V. Demo
<GDemo@pszjlaw.com>
**Subject:** Fwd: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14
against Highland v9.PDF

Sent from my iPhone

Begin forwarded message:

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**Date:** May 14, 2025 at 7:21:19 PM EDT
**To:** "John A. Morris" <jmorris@pszjlaw.com>, Jeff Pomerantz <jpomerantz@pszjlaw.com>
**Cc:** "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>, Jim Shields <jshields@shieldslegal.com>
**Subject: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14
against Highland v9.PDF**


John,

Please see the HMIT Entities' responsive version of the settlement agreement along with the redline
from your version 9.  First, I apologize for the delay, as the last version, sent by Mr. Seery, arrived on
the day I landed in Istanbul, and scheduling on my side plus my schedule while overseas made it
difficult to get things done.  And then I just took longer to get over the lag from traveling back.

We have made some proposed changes.  First major change is that we are willing to have the
releases made effective as of bankruptcy court approval, and live with that in the event of an appeal.

HCMLPHMIT00000232

We also think, because the bankruptcy court will have approved the agreement, that the assignment of the Dugaboy Note and the Kirchner litigation should be done within the revised timeline set forth, and that there is no reason for any reservation of HMIT Note Claims by the Litigation Sub Trust (and no reason that we can see for continued day to day activity of the sub-trust, as the litigation would only be returned if an appeal is successful (which none of us think will be the case – at least I think none of us do)).  We have added an agreed abatement of everything pending bankruptcy court approval.  We have accelerated funding, though propose an agreement to escrow funds in the event of reversal on appeal.  We have reviewed the information provided by Mr. Seery and his group and think our structure and timing of funding leaves plenty of money aside for indemnification.  We also have tried to identify and make clear what a Threat would be, to get something objective we can rely on and receive notice of.

I am around tomorrow and Friday.  I will be working this weekend (without jet lag) and in my New Orleans office Monday preparing for an all day trial on Tuesday. We should be able to corral my side quickly.

There are some other tweaks that are minor we think, with the changes mentioned above being the major changes in structure.

Also, John, while the parties have discussed this matter the attached draft agreement does not contain any reference.  That is ok with us, but my clients request from your side an answer to the following question:  "Did any of the Highland Entities or their affiliates, for their own account or on behalf of Highland CDO Holding Company, affirmatively give consent to the transfer by Sentinel Reinsurance, Ltd. or its affiliates of that certain promissory note in the original principal amount of app.$32.8M and dated December 13, 2010, and executed by CLO Holdco, Ltd.?"

I really appreciate your patience. Look forward to visiting soon.

**Louis M. Phillips**
*Partner*


KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

017109

HCMLPHMIT00000233

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

HCMLPHMIT00000234

**EXHIBIT 31**

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>

**To:** "John A. Morris" <jmorris@pszjlaw.com>, "Jeff Pomerantz" <jpomerantz@pszjlaw.com>

**Cc:** "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>, "Jim Shields" <jshields@shieldslegal.com>

**Subject:** SETTLEMENT AND RELEASE AGREEMENT KHH FINAL REDLINE COMMENTS 5.16.PDF; Highland HMIT-Rand Settlement Agreement.012(Highland Draft 05.15.25) KHH Clean for Execution 5.16.DOCX

**Date:** Fri, 16 May 2025 15:39:55 +0000

**Importance:** Normal

**Attachments:** SETTLEMENT_AND_RELEASE_AGREEMENT_KHH_FINAL_REDLINE_COMMENTS_5.16.PDF; Highland_HMIT-Rand_Settlement_Agreement.012(Highland_Draft_05.15.25)_KHH_Clean_for_Execution_5.16.DOCX

---

John and Jeff,

Please see a final redline with wire instructions added, a bold of a WHEREAS, and references to payments being made by Wire Transfer. I did not add the Wire Transfer to the final distribution part because of the reference to "assets" versus payment and did not want to go into the body of the document to deal with that. Also the attached PDF (redlined against John's clean from yesterday) does not include the header clean up contained in the word version. We are prepared to execute this version. Mark will be out for a while today so just let us know if we can get his signatures or whether you have any further comments. Thank you.

017112

HCMLPHMIT00000235

EXECUTION VERSION

## SETTLEMENT AGREEMENT & GENERAL RELEASE

THIS SETTLEMENT AGREEMENT & GENERAL RELEASE (this "**Agreement**") is entered into as of May 16, 2025 (the "**Agreement Date**"), by and among Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), the Highland Claimant Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Claimant Trust**"), the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Litigation Sub-Trust**"), and the Highland Indemnity Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Indemnity Trust**", and together with Highland, the Claimant Trust and the Litigation Sub-Trust, the "**Highland Entities**"), on the one hand, and Hunter Mountain Investment Trust, a Delaware statutory trust ("**HMIT**"), Beacon Mountain LLC, a Delaware limited liability company ("**Beacon Mountain**"), Rand Advisors, LLC, a Delaware limited liability company ("**Rand Advisors**"), Rand PE Fund I, LP, a Delaware series limited partnership ("**Rand PE Fund**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**"), Atlas IDF, LP, a Delaware limited partnership ("**Atlas IDF**"), Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP and Atlas IDF, the "**HMIT Entities**"), on the other hand.  The Highland Entities and the HMIT Entities are collectively referred to as the "**Parties**," and each individually, as a "**Party**".

## DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Claimant Trust Agreement or the Plan, as applicable (in each case, as hereinafter defined). For purposes of this Agreement, the following capitalized terms have the following meanings:

"**9019 Motion**" means the motion seeking entry of the Bankruptcy Court Order pursuant to Bankruptcy Rule 9019 and in accordance with Section 18.

"**Action**" means any action, claim, demand, arbitration, hearing, charge, complaint, investigation, examination, indictment, litigation, suit or other civil, criminal, administrative or investigative proceedings, including any petition under Rule 202 of the Texas Rules of Civil Procedure.

"**Affiliate**" means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, a specified Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by contract or otherwise.

"**Amended Complaint**" means the *Amended Complaint and Objection to Claims*, filed as docket number 158 in *Kirschner v. Dondero*, Adv. Pro. No. 21-03076-sgj (Bankr. N.D. Tex. May 19, 2022).

"**Bankruptcy Case**" means *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex.) and its related proceedings.

017113

HCMLPHMIT00000236

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division.

"**Bankruptcy Court Approval Date**" means the date on which the Bankruptcy Court Order is issued.

"**Bankruptcy Court Order**" means an order of the Bankruptcy Court approving the allowance of the HMIT's Class 10 Interest as provided in this Agreement pursuant to the 9019 Motion.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than (i) a Saturday or a Sunday, (ii) a day on which the Federal Reserve Bank of New York or the New York Stock Exchange is closed, or (iii) a day on which banks in the States of Texas are required, or authorized by law, to close.

"**Claimant Trust Agreement**" means that certain Claimant Trust Agreement of the Claimant Trust (as may have been or may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 11, 2021, by and among Highland, as settlor, James P. Seery, Jr., a Claimant Trustee, and Wilmington Trust, National Association, a national banking association, as Delaware trustee.

"**Claims**" means any claims, debts, liabilities, demands, obligations, breaches of contract, breaches of duty or any relationship, misfeasance, malfeasance, promises, acts, omissions, agreements, liens, losses, costs and expenses (including attorney's fees and related costs), damages, injuries, suits, Actions, and causes of action of whatever kind or nature, whenever and however, arising, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise.

"**Class 10**" means the class of Claims or Equity Interests described in Article II. Section H.10. of the Plan.

"**Class 11**" means the class of Claims or Equity Interests described in Article II. Section H.11. of the Plan.

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Case.

"**Confirmation Order**" means that certain *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943], as conformed in accordance with the Fifth Circuit's rulings.

"**Dugaboy Note**" means that certain Promissory Note dated May 31, 2017, in the original face amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

017114

HCMLPHMIT00000237

"**Final Court Approval Date**" means the date on which the Bankruptcy Court Order becomes a Final Order.

"**Final Order**" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Highland Entities, as applicable, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

"**Gatekeeper**" means the gatekeeping provision contained in Article IX. F of the Plan as of August 11, 2021.

"**Governmental Authority**" means any federal, provincial, state, local or foreign government or political subdivision thereof, court of competent jurisdiction, administrative agency, judicial or arbitral body, or commission or other governmental or regulatory authority or instrumentality.

"**Highland Released Parties**" means collectively (i) the Highland Entities, (ii) any Affiliate of any Highland Entity and any Person directly or indirectly majority-owned by any Highland Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any Highland Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i)-(iii), collectively, the "**Highland Parties**"), (iv) each of the Highland Parties' current and former trustees and administrators (including the trustees of any of the Claimant Trust, the Litigation Sub-Trust, or the Indemnity Trust), officers, executives, agents, directors, advisors, advisory representatives, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, (v) the current and former members of the Oversight Board of the Claimant Trust in any capacity (including Richard Katz) and their Affiliates, (vi) Farallon Capital Management, LLC, Stonehill Capital Management, LLC, Muck Holdings LLC, and Jessup Holdings LLC, in each case, in any capacity, (vii) the Independent Board and its members John Dubel, James P. Seery, Jr., and Russell Nelms, (viii) James P. Seery, Jr., individually and in all capacities for any Highland Released Party, including as Chief Executive Officer of Highland Capital Management, L.P., Claimant Trustee of the Claimant Trust, and the Indemnity Trust Administrator of the Indemnity Trust, (ix) Marc S. Kirschner, individually and as Trustee of the Litigation Sub-Trust, (x) the Committee and each of its members, (xi) the professionals (and their respective firms) (a) retained by Highland or the Committee during the Bankruptcy Case or which provided services to Highland or the Committee during the Bankruptcy Case or (b) retained by any Highland Released Party on or after August 11, 2021, (xii) any Person indemnified by any

3

017115

HCMLPHMIT00000238

Highland Party (the Persons described in clauses (i)-(xii), collectively, the "**Highland Covered Parties**"), and (xii) each Highland Covered Party's current and former officers, executives, agents, attorneys (and their respective firms), directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "Highland Covered Parties;" provided, however, and for the avoidance of doubt, and without in any way limiting the scope of the foregoing, "Highland Covered Parties" shall include Highland CLO Funding, Ltd., Highland HCF Advisor, Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Multi Strategy Credit Fund GP, L.P., Highland Multi Strategy Credit GP, LLC, Highland Multi Strategy Credit Fund, Ltd., Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., Highland Select Equity Fund, L.P., Highland Restoration Capital Partners Master, L.P., Highland Restoration Capital Partners GP, LLC, Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Offshore Director, LLC, Acis CLO Management, LLC, Neutra, Ltd., Pollack, Ltd., Acis CLO Management Holdings, L.P., Acis CLO Management Intermediate Holdings I, LLC, Acis CLO Management Intermediate Holdings II, LLC, Acis CLO Assets Holdings Limited, CHG Houston Holdings, LLC, Penant Management, L.P., Penant Management GP, LLC, Gunwale, LLC, HE Capital, LLC, Gleneagles CLO, Ltd., Aberdeen Loan Funding, Ltd. Highland Argentina Regional Opportunity Fund GP, LLC, Highland Argentina Regional Opportunity Fund, L.P., Highland Argentina Regional Opportunity Fund, Ltd., Highland Argentina Regional Opportunity Master Fund, L.P., Highland Latin America Consulting, Ltd., Highland Capital Management Korea Limited, Highland Capital Management Latin America, L.P., Highland Latin America GP, Ltd., Highland Latin America LP, Ltd., Highland Offshore Partners, L.P. (Diversified), Brentwood CLO, Ltd., Eastland CLO, Ltd., Bristol Bay Funding Ltd., Jasper CLO Ltd., Highland Legacy Limited, Grayson CLO, Ltd., Greenbriar CLO, Ltd., Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Liberty CLO, Ltd., Valhalla CLO, Ltd., Stratford CLO Ltd., Southfork CLO, Ltd., Pam Capital Funding, L.P., Stonebridge-Highland Healthcare Private Equity Fund, Pamco Cayman Ltd., Red River CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Westchester CLO, Ltd. Longhorn Credit Funding, LLC, PensionDanmark Pensionsforsikringsaktieselskab, Highland Dynamic Income Master Fund L.P., Highland Dynamic Income Fund GP, LLC, Highland Dynamic Income Fund, L.P., Highland Dynamic Income Fund, Ltd., Highland JHT Holdings, LLC, Highland Prometheus Master Fund, L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland Sunbridge GP, LLC, Trussway Holdings, LLC, Trussway Industries, LLC, TW Company, Inc., T-Way Investments, LLC, SSP Holdings, LLC, Highland Flexible Income UCITS Fund, and Acis CLO 2017-7, Ltd. *Notwithstanding the forgoing or anything herein to the contrary*, none of "Highland Released Parties", "Highland Parties", nor "Highland Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner and none of such Persons are released from any Claim by any Person in connection with this Agreement.

"**HMIT Class 10 Interest**" means the unvested, contingent Class 10 interest in the Claimant Trust (a) to be allowed on account of HMIT's pre-petition equity interest in Highland, and (b) subject to the terms and conditions, as applicable, of the Plan, the Plan Documents, the Claimant Trust Agreement, and in accordance with this Agreement, and applicable law.

017116

HCMLPHMIT00000239

"**HMIT Note**" means that certain Secured Promissory Note dated December 21, 2015, in the original face amount of $63,000,000 from HMIT, as maker, and Highland, as payee.

"**HMIT Note Claims**" means any Claim related to, in connection with or arising out of the HMIT Note.

"**HMIT Released Parties**" means collectively (i) the HMIT Entities, (ii) any Affiliate of any HMIT Entity and any Person directly or indirectly majority owned by any HMIT Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any HMIT Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i) – (iii), collectively, the "**HMIT Parties**"), (iv) each of the HMIT Parties' current and former trustees, administrators, officer, executives, agents, directors, advisors, consultants, manager, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns (v) the professionals (and their respective firms (a) retained by any HMIT Party during the Bankruptcy Case or which provided services to any HMIT Party during the Bankruptcy Case or (b) retained by any HMIT Released Party on or after August 11, 2021, (vi) any Person indemnified by any HMIT Party (the Persons described in clauses (i) – (vi), collectively, the "**HMIT Covered Parties**"), and (vii) each HMIT Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "HMIT Covered Parties." *Notwithstanding the forgoing*, none of "HMIT Released Parties", "HMIT Parties", nor "HMIT Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner, and none of such Persons are released from any Claims by any Person in connection with this Agreement.

"**Indemnity Trust Administrator**" has the meaning given to it in the Indemnity Trust Agreement.

"**Indemnity Trust Agreement**" means that certain *Second Amended and Restated Indemnity Trust Agreement of the Indemnity Trust* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of [April 28], 2025, by and among the Claimant Trust, as grantor, James P. Seery, Jr., as indemnity trust administrator, and Wilmington Trust, National Association, a national banking association, as indemnity trustee and Delaware trustee.

"**Indemnity Trust Assets**" has the meaning set forth in the Indemnity Trust Agreement, but excluding Highland, the Claimant Trust, and their respective assets.

"**Independent Board**" means the independent board appointed by the Bankruptcy Court on January 9, 2020, pursuant to that certain *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 339].

017117

HCMLPHMIT00000240

"**Kirschner Claims**" means all Claims and causes of action that were asserted or could have been asserted by the Litigation Trustee of the Litigation Sub-Trust, in the Amended Complaint.

"**Liability**" means any liability, debt, obligation, loss, damage, claim, cost or expense (including costs of investigation and defense and attorney's fees, costs and expenses), in each case, whether direct or indirect, whether accrued or contingent, whether or not involving a third-party claim, and including incidental and consequential damages and diminution of value.

"**Litigation Protections**" means, individually and collectively, the rights, duties, and obligations set forth in Sections 1 – 2 and Sections 9 - 16.

"**Litigation Sub-Trust**" means the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act.

"**Litigation Sub-Trust Agreement**" means that certain Litigation Sub-Trust Agreement of the Litigation Sub-Trust (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 16, 2021, by and among James P. Seery, Jr., as Claimant Trustee of the Claimant Trust, Wilmington Trust, National Association, a national banking association, as Delaware Trustee, and the Litigation Trustee.

"**Litigation Trustee**" means Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust.

"**LPA**" means that certain *Sixth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), dated as of October 4, 2021.

"Operating Expenses" means, except for the expenses of the Indemnity Trust (including any payments to Trust Indemnified Parties or Indemnified Parties (in each case, as defined, and pursuant to the terms and conditions set forth, in the Indemnity Trust Agreement)), the expenses of operating and administering the Highland Entities, including legal expenses, employee compensation, Claimant Trustee/CEO and other trust and trustee related compensation, incentive compensation, and customary general and administrative expenses.

"**Original Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* attached as Exhibit A to the *Order (A) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as modified) and (B) Granting Related Relief*, filed at Docket No. 1943 on the Bankruptcy Court's docket.

"**Oversight Board**" means the oversight board of the Highland Claimant Trust.

"**Pending Litigation**" means (i) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including *Hunter Mountain Investment Trust's Emergency Motion for Leave to File Adversary Proceeding* filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating there); (ii) *Dugaboy Investment Trust v. Highland Cap. Mgmt, L.P.*, 3:24-cv-01531-X

017118

HCMLPHMIT00000241

(N.D. Tex.) (only as to HMIT), and (iii) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:24-cv-01786-L (N.D. Tex.).

"**Permitted Investments**" has the meaning set forth in the Indemnity Trust Agreement.

"**Person**" means any natural person, partnership, limited liability partnership, corporation, limited liability company, association, joint stock company, trust, estate, joint venture, unincorporated organization or Governmental Authority.

"**Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* as conformed in accordance with the Fifth Circuit's rulings.

"**Plan Documents**" has the meaning given to it in the Plan.

"**Plan Protections**" means, collectively, the provisions of the Plan contained in Article IX thereof.

"**Pro Rata**" means the proportion that (a) the allowed amount of a particular Claim or Equity Interest in Class 10 bears to (b) the aggregate allowed amount of all Claims or Equity Interests in Class 10.

"**Threats**" means any written threats of legal action, legal demands, filed complaints, petitions for pre-suit discovery, suits, litigations, arbitrations, actual or threated restraining orders or injunctions made in writing, or similar written actions of any kind, or sworn statements evidencing the same, in any forum against any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), excluding any such action that would otherwise be a Threat except that any applicable statute of limitations that could be applicable to such action has expired.

"**Threats Notice**" means the written notice of any Threats received by the Indemnity Trust with respect to any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), that is hereby required to be provided by the Indemnity Trust to the HMIT Entities, within five (5) Business Days after receipt of such Threat.

## RECITALS

**WHEREAS**, as of the Petition Date, HMIT held Class B and Class C Limited Partnerships Interests in Highland;

**WHEREAS**, on December 21, 2015, HMIT entered into the HMIT Note with Highland, which had a total outstanding principal balance of Fifty-Seven Million Six Hundred Ninety Thousand Six Hundred Forty and 95/100 Dollars ($57,690,640.95) as of the Petition Date (the "**HMIT Note Balance**");

**WHEREAS**, HMIT's Class B and Class C Limited Partnership Interests in Highland were extinguished on August 11, 2021, in accordance with the Plan;

017119

HCMLPHMIT00000242

**WHEREAS**, pursuant to the LPA, HMIT's capital account balance at Highland on account of its Class B and Class C Limited Partnership Interests on the Petition Date was Three Hundred Ninety-Four Million Six Hundred Thirty Thousand Eight Hundred Seventy-One and 53/100 Dollars ($394,630,871.53) (the "**HMIT Capital Account Balance**");

**WHEREAS**, some or all of the HMIT Entities have asserted certain Claims against certain Highland Entities and certain other Highland Covered Parties, including those asserted in the Pending Litigation;

**WHEREAS**, certain distributions to be made to the holders of allowed Class 10 Claims or Equity Interests pursuant to the terms and subject to the conditions set forth herein are premised on the consent of certain Highland Covered Parties in their capacity as Holders of Class 9 Interests, and such Persons are only willing to provide such consent in exchange for the releases as set forth in this Agreement;

**WHEREAS**, some or all of the Highland Entities have asserted certain Claims against certain HMIT Entities, including the HMIT Note Claims;

**WHEREAS**, the Parties wish to terminate, extinguish, and release any and all rights, duties, obligations and Claims that (a) any of the Highland Released Parties owed or have, or may have owed or have, to or with respect to any of the HMIT Released Parties, and (b) any of the HMIT Released Parties owed or have, or may have owed or have, to or with respect to any of the Highland Released Parties, as provided in this Agreement (collectively, the "**Rights and Obligations**");

**WHEREAS**, the Parties agree that the Litigation Protections are intended to enact a permanent cessation of all litigation concerning or related to the Highland Released Parties through and including the Agreement Date; and

**WHEREAS**, the Parties, individually and collectively, wish to (a) resolve all disputes between and/or among any of the Highland Entities and their respective indemnitees, on the one hand, and any of the HMIT Entities, on the other hand, including those asserted or attempted to be asserted in the Pending Litigation, (b) fix and allow HMIT's Class 10 Interest at the amount and on the terms provided herein; and (c) terminate, extinguish, and release all Rights and Obligations on the terms provided herein.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

1.    <u>Stay and Dismissal of Pending Litigation With Prejudice</u>.

(a)    Within five (5) Business Days after the Agreement Date, the HMIT Entities shall take all steps necessary (at their own cost) to stay the Pending Litigation.

017120

HCMLPHMIT00000243

(b)     Within five (5) Business Days after the Bankruptcy Court Approval Date, the HMIT Entities shall take all steps necessary (at their own cost) to dismiss the Pending Litigation with prejudice.

2.     <u>Maintenance of Stay and Dismissal of Certain Defendants from the Amended Complaint</u>.

(a)     The Litigation Trustee shall continue to maintain the stay of Adv. Proc. No. 21-03076-sgj and all related proceedings arising therefrom through the Bankruptcy Court Approval Date. Within five (5) Business Days after the Bankruptcy Court Approval Date, the Litigation Sub-Trust shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand PE from Counts I, II, III, and XXIV of the Amended Complaint.

3.     <u>Cash Payment to HMIT</u>.  Within five (5) Business Days following the Bankruptcy Court Approval Date, Highland shall pay HMIT a one-time, lump sum of Five Hundred Thousand Dollars (US$500,000.00) (the "**Payment**") by wire transfer:

Hunter Mountain Investment Trust
C/o CLO Holdco, LLC
Hancock Whitney
Account # - 071173413
Routing # - 113000968
(469) 604-0955

4.     <u>HMIT Class 10 Interest</u>.

(a)     Subject to entry of the Bankruptcy Court Order, and the terms of this Agreement, the HMIT Class 10 Interest shall be deemed allowed in the amount of Three Hundred Thirty-Six Million Nine Hundred Forty Thousand Two Hundred Thirty and 58/100 Dollars (US$336,940,230.58), which amount represents the HMIT Capital Account Balance, <u>less</u> the HMIT Note Balance.

(b)     Notwithstanding anything to the contrary in the Plan or the Claimant Trust Agreement, as an integral part of this Agreement to consent to the allowance of the HMIT Class 10 Interest and the other considerations in this Agreement, HMIT shall not be deemed, and no holder of the HMIT Class 10 Interest shall be, a Claimant Trust Beneficiary or a "Beneficiary" under the Claimant Trust Agreement, and the Highland Released Parties, individually and collectively, shall owe no duty to any HMIT Releasor (whether contractual, fiduciary, equitable, statutory or otherwise), including with respect to the HMIT Class 10 Interest, in each case, except as expressly set forth in this Agreement.  Furthermore, without limiting the foregoing and for the avoidance of doubt, the contractual right of the holder of the HMIT Class 10 Interest to receive or recover any payments or Indemnity Trust Assets from the Indemnity Trust as set forth in this Agreement or the Indemnity Trust Agreement does not make any HMIT Releasor or any other Person a beneficiary of the Indemnity Trust or under the Indemnity Trust Agreement.

(c)     Notwithstanding anything to the contrary in the Plan, the Claimant Trust Agreement or the Indemnity Trust Agreement, in no event shall HMIT sell, transfer, assign, pledge, hypothecate, participate or otherwise dispose of or encumber the HMIT Class 10 Interest

9

HCMLPHMIT00000244

or any rights (including any right to payment) with respect thereto (collectively, a "**Class 10 Assignment**"), and any attempted Class 10 Assignment shall be null and void.

(d)    For the avoidance of doubt, the HMIT Class 10 Interest is and shall remain senior to the not yet allowed, unvested contingent Class 11 Claims of Equity Interests as provided for in the Plan, the Plan Documents, and the Claimant Trust Agreement.

5.    Initial Interim Distributions on the Allowed Class 10 Interests.

(a)    Within five (5) Business Days after the Bankruptcy Court Approval Date, the Indemnity Trust shall distribute (the date on which such distribution is made, the "**Initial Interim Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Ten Million Dollars (US$10,000,000.00) (the "**Initial Interim Cash Distribution Amount**"), by means of wire transfer through the address contained in Section 3 ("**Wire Transfer**").

(b)    Within five (5) Business Days after the Bankruptcy Court Approval Date (the "**Note Assignment Date**"), the Highland Entities shall cause the portion of the Dugaboy Note held by the Highland Entities to be distributed to HMIT in-kind and take all actions necessary for HMIT to become the holder of such portion of the Dugaboy Note, and shall in addition pay to HMIT cash in the aggregate amount of all principal and interest payments actually received on the Dugaboy Note by the Highland Entities, including the Indemnity Trust, from the Agreement Date to the Note Assignment Date. Prior to the Bankruptcy Court Approval Date, HMIT will engage an independent valuation service provider to value the Dugaboy Note for purposes of determining the magnitude of reduction to the outstanding allowed Class 10 Interests on account of such in-kind distribution, which shall not be less than Fifty percent (50%) of the current balance owed under the Dugaboy Note. The HMIT Entities acknowledge and agree that none of the Highland Entities are representing or warranting that the Dugaboy Note can be sold, or the price, if any, that could be received for the Dugaboy Note and further acknowledge and agree that any such purchase price may be de minimis.

6.    Subsequent Distribution(s) on the Allowed Class 10 Interests.

(a)    On December 1, 2027, the Indemnity Trust shall distribute (such distribution, collectively, the "**First Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**First Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests: cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$6,500,000.00), by Wire Transfer.

(b)    On December 1, 2028, the Indemnity Trust shall distribute (such distribution, collectively, the "**Second Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**Second Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$6,500,000.00) by Wire Transfer.

(c)    Notwithstanding anything herein to the contrary, the obligations of the Indemnity Trust to make the First Subsequent Distribution or Second Subsequent Distribution is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with

017122

HCMLPHMIT00000245

Article VIII, Section 8.1(c) of the Indemnity Trust Agreement that the Indemnity Trust Assets comprising such distributions are not reasonably necessary to satisfy current or potential Indemnification Obligations (as defined in the Indemnity Trust Agreement) to all persons who are or might become Beneficiaries (as defined in the Indemnity Trust Agreement).

7.   Final Distribution on the Allowed Class 10 Interests.

(a)   On the later of the Final Court Approval Date and April 1, 2029, the Indemnity Trust will distribute all excess remaining Indemnity Trust Assets in accordance with Article VIII of the Indemnity Trust Agreement; provided, however, that the obligation of the Indemnity Trust to make any such distributions and/or dissolve and wind up the affairs of the Indemnity Trust is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII of the Indemnity Trust Agreement that (1) a Final Order(s) (as defined in the Indemnity Trust Agreement) has been entered resolving all litigation, claims or proceedings in any forum of any kind which could give rise to Indemnity Obligations (as defined in the Indemnity Trust Agreement) and payment in full of all such Indemnity Obligations and (2) all applicable statutes of limitations and any applicable tolling of such statutes of limitation have expired.

(b)   The Indemnity Trust agrees to not use Indemnity Trust Assets to fund Operating Expenses.

(c)   Following the Bankruptcy Court Approval Date, at the request of Mark Patrick, solely in his capacity, and to the extent he remains, as administrator of HMIT, but not more often than quarterly, Highland and the Indemnity Trust Administrator agree to review (i) the status of their respective assets, (ii) the balance of cash held, (iii) the status of any claims made for indemnification and any resolutions thereof, (iv) the status of any litigation, and (v) forecasted operating expenses with Mr. Patrick, and will each work in good faith to reduce operating expenses where reasonably practicable; provided, however, that all such reporting shall be subject to Mr. Patrick's agreement to maintain confidentiality with respect to any non-public information.

8.   Transfer Kirschner Claims; Dismissal of HMIT Note Claims.

(a)   Within five (5) Business Days after the Bankruptcy Court Approval Date, but after the dismissal provided for in Section 2, the Litigation Sub-Trust shall execute a short-form assignment in in favor of the HMIT Entities transferring all of the Litigation Sub-Trust's right, title, and interest in and to the Kirschner Claims (the "**Kirschner Transfer**"). Such assignment shall be in a form mutually acceptable to the Parties and its substance shall be consistent with the terms, conditions and limitations set forth in this Agreement, including Section 8(b) below. Each HMIT Entity acknowledges and agrees that none of the Highland Entities will have any duty or obligation to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof, except as provided in this Agreement, including the terms of Section 8(c) below.

(b)   THE HMIT ENTITIES SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THE LITIGATION SUB-TRUST IS TRANSFERRING THE KIRSCHNER CLAIMS ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT THE HMIT

11

017123

HCMLPHMIT00000246

ENTITIES ARE NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM THE HIGHLAND ENTITIES OR THEIR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE KIRSCHNER CLAIMS AND AMENDED COMPLAINT, INCLUDING WITH RESPECT TO THE ENFORCEABILITY, TRANSFERABILITY, VIABILITY, STRENGTH, OR VALUE OF ANY OF THE KIRSCHNER CLAIMS OR THE AMENDED COMPLAINT. The HMIT Entities hereby specifically acknowledge that they have carefully reviewed this Section and have had the opportunity to discuss its import with legal counsel and that the provisions of this Section are a material part of this Agreement. Thus, if for any reason HMIT is precluded from or is otherwise unable to prosecute all or any of the Kirschner Claims, (i) the HMIT Releasors shall have no recourse against any Highland Released Parties whatsoever and shall not be entitled to compensation of any kind, it being agreed that the HMIT Entities are otherwise receiving adequate consideration for the duties and obligations they are undertaking pursuant to this Agreement and (ii) there will be no effect whatsoever on the validity and enforceability of this Agreement or any of the other transactions contemplated hereby.

(c)     As promptly as reasonably practicable following the Bankruptcy Court Approval Date, the Highland Entities shall provide to the HMIT Entities electronic copies of written discovery requests and responses thereto, and documents produced in discovery in respect of the Kirschner Claims and the Amended Complaint. The Highland Entities will not provide any other documents regarding the Kirschner Claims including any attorney-client communications and any documents subject to the attorney work-product doctrine or similar privileges or immunities concerning the Kirschner Claims (collectively, the "**Kirschner Privileges**"), it being understood and agreed that the Highland Entities are retaining, and not transferring or waiving, the Kirschner Privileges.

(d)     Each Party acknowledges and agrees that if (i) the Kirschner Transfer is found or deemed to be impermissible or invalid, for any reason, or (ii) any HMIT Entity materially breaches this Agreement, the Kirschner Claims and Amended Complaint will revert to, and remain an asset of, the Litigation Sub-Trust.

9.     <u>General Release By The HMIT Entities</u>. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the HMIT Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its and their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the HMIT Entities, the "**HMIT Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each Highland Released Party from, and waives and relinquishes, any and all Claims, which the HMIT Releasors, or any Person claiming through, under, or on behalf of any of the HMIT Releasors, ever had, now has, or hereafter can, shall, or may have against any of the Highland Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Agreement Date, including any fact, matter, transaction, or occurrence asserted by any HMIT Entity in the Pending

017124

HCMLPHMIT00000247

Litigation or in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the Highland Released Parties, or the Highland Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**HMIT Entity Released Claims**").

      10.    <u>General Release By The Highland Entities</u>. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the Highland Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its or their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the Highland Entities, the "**Highland Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, any and all Claims which the Highland Releasors, or any Person claiming through, under, or on behalf of any of the Highland Releasors, ever had, now has, or hereafter can, shall, or may have against any of the HMIT Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Bankruptcy Court Approval Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the HMIT Released Parties, or the HMIT Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**Highland Released Claims**").

      11.    <u>Further Provisions Concerning The General Releases</u>.

      (a)    **FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASES ARE INTENDED TO BE GENERAL AND INCLUDE A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE AGREEMENT DATE.**

      (b)    To the maximum extent permitted by law, each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefit of any statute or other principle of law or equity that limits the applicability of a release with respect to Claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release.

      (c)    Without limiting the scope of the foregoing waiver, in connection with the foregoing release, each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefits of Section 1542 of the California Civil Code (to the extent, if any, that Section 1542 might apply to the foregoing release), which provides as follows:

017125

HCMLPHMIT00000248

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees that the provisions of Section 1542 of the Civil Code of the State of California and all similar federal or state law, rights, rules or legal principles, legal or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY EACH OF THE HMIT ENTITIES AND THE HIGHLAND ENTITIES, ON THEIR OWN BEHALF AND ON BEHALF OF THE OTHER HMIT RELEASORS AND HIGHLAND RELEASORS, RESPECTIVELY,** in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

In connection with such waiver and relinquishment, each of the HMIT Entities and Highland Entities acknowledges that it is aware that it may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein. Nevertheless, it is the intent of each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, in executing this Agreement fully, finally, and forever to settle and release all such matters, and all Claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

(d) As an integral component of this Agreement, and notwithstanding the Parties' intent set forth in the preamble hereto and the general nature of the releases in Sections 9 and 10, should:

(i) any HMIT Releasor contend or assert that any Claim of any kind whatsoever held by any HMIT Releasor against any Highland Released Party survives this Agreement and is in any way related to or arising from or in connection with any HMIT Entity Released Claim (such claim or cause of action, a "**HMIT Alleged Claim**"), such HMIT Releasor will be deemed to have irrevocably, fully, and finally assigned such HMIT Alleged Claim to the Highland Entities and the Highland Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such HMIT Alleged Claim.

(ii) any Highland Releasor contend or assert that any Claim of any kind whatsoever held by any Highland Releasor against any HMIT Released Party survives this Agreement and is in any way related to or arising from or in connection with any Highland Entity Released Claim (such claim or cause of action, a "**Highland Alleged Claim**"), such Highland

14

017126

HCMLPHMIT00000249

Releasor will be deemed to have irrevocably, fully, and finally assigned such Highland Alleged Claim to the HMIT Entities and the HMIT Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such Highland Alleged Claim.

12.    <u>Covenant Not To Sue; Limitation on Standing</u>. Upon the Agreement Date:

(a)    Each of the HMIT Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the Highland Released Parties, to recover, enforce, investigate, or collect any HMIT Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(b)    Each of the Highland Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the HMIT Released Parties, to recover, enforce, investigate, or collect any Highland Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(c)    For the avoidance of doubt, this Agreement shall not operate to give any HMIT Entity standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except for the limited purpose of seeking Court approval of this Agreement (including with respect to any appeal concerning any order entered granting or denying such approval), and except for the limited purpose of enforcing this Agreement, no HMIT Entity shall commence any Action in connection with the HMIT Class 10 Interest.

13.    <u>Representations and Warranties</u>.

(a)    Each of the HMIT Entities hereby represents and warrants that every HMIT Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any HMIT Releasor.

(b)    The HMIT Entities, on their own behalf and on behalf of the other HMIT Releasors, acknowledge and agree that each Plan Provision is lawful, effective, and binding on the HMIT Releasors.  The HMIT Entities further agree, on their own behalf and on behalf of the other HMIT Releasors, that the HMIT Releasors will never, in any way, challenge or seek to modify, nullify, vacate, or revoke, or induce, encourage or direct any other Person to do so or act in concert with or assist (financially or otherwise) any other Person in doing so the Confirmation Order, the Plan, the Plan Protections, or any Plan Document, including the Claimant Trust Agreement, the LPA, the Indemnity Trust Agreement or the Litigation Sub-Trust Agreement, in the Bankruptcy Court, in any other state or federal court, in any other forum or tribunal, or otherwise, including administrative or regulatory tribunals and foreign courts.

(c)    Each of the Highland Entities hereby represents and warrants that every Highland Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any Highland Releasor.

017127

HCMLPHMIT00000250

(d)     Each Party severally represents and warrants as to itself only that: (i) it has taken all necessary action to authorize and approve the execution, delivery and performance of this Agreement; (ii) such Party has full power and authority to execute and deliver this Agreement; and (iii) this Agreement constitutes a valid, legal and binding obligation of such Party, and is enforceable subject to its terms. Each individual signatory hereto individually warrants and represents to all Parties hereto that such individual has full power and authority to act on behalf of and bind the Party for which he or she has executed this Agreement; provided, however that no signatory shall otherwise provide any warranty or representation or otherwise be a party to this Agreement on an individual basis.

14.     <u>No Continuing Rights, Duties or Obligations</u>.  Except for the rights, duties, and obligations expressly set forth in this Agreement, all Rights and Obligations that existed or may have existed shall be deemed terminated, extinguished, and released upon the Agreement Date. For the avoidance of doubt, from and after the Agreement Date, (a) the Highland Released Parties, individually and collectively, shall owe no duty, past or present, including with respect to the Kirchner Claims, to the HMIT Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement, and (b) the HMIT Released Parties, individually and collectively, shall owe no duty to the Highland Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement.

15.     <u>Gatekeeper Standard</u>.

(a)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that, notwithstanding the United States Court of Appeals for the Fifth Circuit's decision in *Highland Capital Management Fund Advisors, L.P. v. Highland Capital Management, L.P.*, No. 23-10534 (5th Cir. Mar. 18, 2025), the "Gatekeeper" provisions contained in Highland's Original Plan is forever binding on each of the HMIT Entities and any Persons claiming through, under or on behalf of any of them, and for a claim or cause of action to be  "colorable" for purposes of the Gatekeeper, it must be found by final order of the Bankruptcy Court (the "**Gatekeeper Court**"), which order shall be subject to appeal to a court of competent jurisdiction, to have satisfied the "Gatekeeper Colorability Test" as such term is defined in *In re Highland Capital Management, L.P.*, 2023 Bankr. LEXIS 2104 at *124-36 (Bankr. N.D. Tex. Aug. 24, 2023).

(b)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that compliance with the Gatekeeper requires (i) a motion seeking leave to sue an Exculpated Party (as that term is defined in Highland's original Plan) and a finding that the litigant's claims and causes of action are "colorable" attaching a complaint setting forth the basis for such claims or causes of action and (ii), in the Gatekeeper Court's sole discretion, an evidentiary hearing (during which the Gatekeeper Court may, among other things, hear testimony and assess the credibility of any witness(es)) to determine whether a proposed claim or cause of action is "colorable."

(c)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, further acknowledge

017128

HCMLPHMIT00000251

and agree that the moving party under the Gatekeeper has the burden of satisfying the "Gatekeeper Colorability Test," and that the dismissal of the Pending Litigation shall have res judicata effect.

16.    <u>Indemnification</u>.

(a)    Without in any manner limiting the available remedies for any breach of this Agreement, the HMIT Entities, severally but not jointly, agree to indemnify, defend, and hold the Highland Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any HMIT Entity set forth in <u>Section 13</u> or (y) any Actions brought or prosecuted by or on behalf of, any HMIT Releasor or that are induced, encouraged, assisted  or directed by any HMIT Releasor or brought or prosecuted in concert with any HMIT Releasor against any Highland Released Party with respect to or related to any HMIT Entity Released Claims.  Without limiting the scope of the foregoing in any manner, any HMIT Entity that breaches <u>Section 12</u> shall be liable to the Highland Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such Highland Released Party in defending against or otherwise responding to such Action.  Each HMIT Entity acknowledges and agrees that the HMIT Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

(b)    Without in any manner limiting the available remedies for any breach of this Agreement, the Highland Entities, severally but not jointly, agree to indemnify, defend, and hold the HMIT Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any Highland Entity set forth in <u>Section 13</u> or (y) any suits, proceedings, or other actions brought or prosecuted by or on behalf of, any Highland Releasor or that are induced, encouraged, assisted  or directed by any Highland Releasor or brought or prosecuted in concert with any Highland Releasor against any HMIT Released Party with respect to or related to any Highland Entity Released Claims.  Without in any manner limiting the scope of the foregoing, any Highland Entity that breaches <u>Section 12</u> shall be liable to the HMIT Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such HMIT Released Party in defending against or otherwise responding to such Action.  Each Highland Entity acknowledges and agrees that the Highland Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

17.    <u>Execution</u>.  This Agreement may be executed by the exchange of signatures by facsimile or by PDF attachment to an email transmittal and in counterparts, and if so executed, shall be fully executed when a counterpart has been executed and delivered by all Parties hereto through counsel.  All counterparts taken together shall constitute one and the same agreement and shall be fully enforceable as such.

017129

HCMLPHMIT00000252

18. <u>Bankruptcy Court Order</u>.  The allowance of the allowed HMIT Class 10 Interest pursuant to <u>Section 4</u> is subject to the entry of the Bankruptcy Court Order.  To that end, the Highland Entities shall file the 9019 Motion no later than five (5) Business Days after the Agreement Date.  Each Party shall, and shall cause each of their respective Affiliates to, undertake any and all actions in compliance with applicable law to obtain the Bankruptcy Court Order as promptly as practicable, and without limiting the foregoing, if an Action is threatened or instituted by any Person opposing the 9019 Motion or otherwise challenging the validity or legality, or seeking to restrain the consummation, of the transactions contemplated by this Agreement or the Bankruptcy Court Order, each Party shall, and shall cause its respective Affiliates to, use their commercially reasonable best efforts to avoid, resist, resolve or, if necessary, and defend to effectuate this Agreement and consummate the transactions hereby.  If the 9019 Motion is not approved by entry of the Bankruptcy Court Order or if the Bankruptcy Court Approval is precluded from becoming a Final Order, (a) there will be no affect on, adjustment to, or impairment of, in any way, the validity and enforceability of the remainder of this Agreement, and the other transactions contemplated hereby, all of which shall remain in full force and effect and (b) each Party shall, and shall cause its respective Affiliates to, use their best efforts to seek the allowance of the HMIT Class 10 Interest in a substantially similar amount and on substantially similar terms as set forth in <u>Section 4</u> to the fullest extent possible so as to give effect to the original intent of the Parties as closely as possible.

19. <u>Fees and Expenses</u>.  Whether or not the transactions contemplated hereby are consummated or the Bankruptcy Court Order is obtained, and except as otherwise expressly provided in this Agreement, each Party will bear its respective fees, costs and expenses (including legal, accounting and other professional fees) incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the transactions contemplated hereby, including with respect to each Party's respective obligations pursuant to <u>Section 18</u>. Notwithstanding the foregoing, if any Party hereto brings an Action to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that Action shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

20. <u>Entire Agreement; No Other Representations</u>.  **THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF ANY PERSON OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT. THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS (COLLECTIVELY, "<u>REPRESENTATIONS</u>"), EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT; AND THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT RELIED ON ANY REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY ARE ENTERING INTO THIS AGREEMENT RELYING SOLELY ON THEIR OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS BY ANY PARTY, EXCEPT FOR THOSE REPRESENTATIONS**

017130

HCMLPHMIT00000253

EXPRESSLY SET FORTH IN THIS AGREEMENT.  THE PARTIES AGREE THAT
REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT SHALL
NOT BE USED IN THE INTERPRETATION OR CONSTRUCTION OF THIS
AGREEMENT, AND NEITHER THE HMIT RELEASED PARTIES NOR THE
HIGHLAND RELEASED PARTIES SHALL HAVE ANY LIABILITY FOR ANY
CONSEQUENCES ARISING AS A RESULT OF ANY REPRESENTATIONS NOT SET
FORTH IN THIS AGREEMENT.

21.    <u>Agreement and Release Knowing and Voluntary</u>.  The Parties acknowledge that
they have considered this Agreement with their respective attorneys and have carefully read this
Agreement, that it has been fully explained by their attorneys, and that they have had a reasonable
opportunity to consider this Agreement.  The Parties further represent that they know and fully
understand the contents of this Agreement, that they intend to be legally bound by this Agreement
and the releases and covenants contained herein, and that they are signing this Agreement,
including the release provisions herein, voluntarily and of their own free will and without coercion,
and with the benefit of advice of counsel.

22.    <u>Cooperation</u>.  The Parties agree to perform any services or actions reasonably
necessary to carry out the terms and conditions of this Agreement or the transactions contemplated
hereby, including the execution and delivery of reasonable additional documents, instruments,
conveyances and/or assurances, in good faith, and to reasonably communicate and cooperate with
one another in this regard.  For the avoidance of doubt, nothing in this Section shall obligate the
Highland Entities to assist the HMIT Entities in any way with respect to the Kirschner Claims,
including the prosecution thereof.

23.    <u>Governing Law</u>.  This Agreement shall be construed pursuant to and governed by
the laws of the State of Delaware (substantive and procedural) without reference to principles of
conflicts of law that would result in the application of any other State's laws.

24.    <u>Jurisdiction/Venue</u>.  The Parties hereby irrevocably submit to the jurisdiction and
venue of the Bankruptcy Court with respect to any Action arising out of or related to this
Agreement or the subject matter hereof; if (and only if) the Bankruptcy Court lacks personal or
subject matter jurisdiction to adjudicate an Action arising out of or related to this Agreement or
the subject matter hereof, then the Parties irrevocably submit to the jurisdiction and venue of the
United States District Court for the Northern District of Texas.

25.    <u>No Admissions</u>.  All Parties acknowledge and agree that the matters set forth in this
Agreement constitute the settlement and compromise of disputed Claims and that this Agreement
shall not constitute the admission of any fact or liability by any of them regarding any Claim,
including the Claims released hereunder, and neither the terms hereof, nor the fact of this
Agreement itself, shall be evidence of any kind in any Action, other than an Action to enforce the
terms of the Agreement or any instrument executed in connection herewith or any claim for
damages or other relief for breach of any representation or warranty contained herein or in any
instrument executed in connection herewith.

26.    <u>Other Provisions</u>.

017131

HCMLPHMIT00000254

(a)    No representation, inducement, agreement, promise or understandings altering, modifying, amending, taking from or adding to, the terms and conditions hereof shall have any force or effect unless the same is in writing and validly executed by each of the Parties hereto.

(b)    The waiver by any Party of any breach of, or default under, any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or default; provided, however, that for any such waiver to be enforceable, it shall be in writing and executed by the non-breaching Party.

(c)    The headings contained in this Agreement are for convenience only and shall in no way restrict or otherwise affect the construction of the provisions hereof.

(d)    The Parties shall each execute all documents and perform all acts necessary and proper to effectuate the terms of this Agreement.

27.    <u>Notices</u>.  All notices required or permitted to be provided hereunder shall be afforded to the respective parties to and through their counsel, and shall be transmitted simultaneously by electronic mail (with PDF attachments, as necessary) and by telefax, addressed as follows:

To the Highland Entities:

**PACHULSKI STANG ZIEHL AND JONES LLP**
Jeffrey N. Pomerantz
John A. Morris
10100 Santa Monica Boulevard
Los Angeles, California 90067-4003
310.277.6910
jpomerantz@pszjlaw.com
jmorris@pszjlaw.com

To the HMIT Entities:

**KELLY HART PITRE**
Louis M. Phillips
Amelia Hurt
301 Main Street, Suite 1600
225.381.9643
Louis.Phillips@Kellyhart.com
Amelia.Hurt@Kellyhart.com

28.    <u>Severability</u>. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity and enforceability of any other provision of this Agreement.

017132
HCMLPHMIT00000255

29.     <u>Interpretive Provisions</u>. Unless the express context otherwise requires: (a) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) words defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (c) the words "Dollars" and "$" mean U.S. dollars; (d) references herein to a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement; (e) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words ",without limitation,"; (f) references herein to any gender shall include each other gender; (g) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement; (h) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (i) the word "or" shall be disjunctive but not exclusive; (j) the headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties; and (k) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

*[Signature page follows]*

017133

HCMLPHMIT00000256

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**HUNTER MOUNTAIN INVESTMENT TRUST**

By    _____

       Name:     Mark Patrick
       Title:      Administrator
       Date:     May __, 2025

**BEACON MOUNTAIN LLC**

By    _____

       Name:
       Title:
       Date:     May __, 2025

**RAND ADVISORS, LLC**

By    _____

       Name:     Mark Patrick
       Title:      President
       Date:     May __, 2025

**RAND PE FUND I, LP**
By: Rand PE Fund Management, LLC, its General Partner

By    _____

       Name:     Mark Patrick
       Title:      President
       Date:     May __, 2025

**RAND PE FUND MANAGEMENT, LLC**

By    _____

       Name:     Mark Patrick
       Title:      President

SIGNATURE PAGE TO SETTLEMENT AGREEMENT & GENERAL RELEASE

017134

HCMLPHMIT00000257

Date: May __, 2025

**ATLAS IDF, LP**
By: Atlas IDF GP, LLC, its General Partner

By _____
      Name:     Mark Patrick
      Title:     President
      Date:     May __, 2025

**ATLAS IDF GP, LLC**

By _____
      Name:     Mark Patrick
      Title:     President
      Date:     May __, 2025

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By _____
      Name:     James. P. Seery, Jr.
      Title:     Chief Executive Officer
      Date:     May __, 2025

**HIGHLAND CLAIMANT TRUST**

By _____
      Name:     James P. Seery, Jr.
      Title:     Claimant Trustee
      Date:     May __, 2025

**HIGHLAND LITIGATION SUB-TRUST**

By _____
      Name:     Marc S. Kirschner
      Title:     Litigation Trustee

SIGNATURE PAGE TO SETTLEMENT AGREEMENT & GENERAL RELEASE

HCMLPHMIT00000258

Date:          May __, 2025

**HIGHLAND INDEMNITY TRUST**

By     _____
       Name:      James P. Seery, Jr.
       Title:     Indemnity Trust Administrator
       Date:      May __, 2025

017136

HCMLPHMIT00000259

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/16/2025 EXECUTION VERSION

## SETTLEMENT AGREEMENT & GENERAL RELEASE

THIS SETTLEMENT AGREEMENT & GENERAL RELEASE (this "**Agreement**") is entered into as of May 16, 2025 (the "**Agreement Date**"), by and among Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), the Highland Claimant Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Claimant Trust**"), the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Litigation Sub-Trust**"), and the Highland Indemnity Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Indemnity Trust**", and together with Highland, the Claimant Trust and the Litigation Sub-Trust, the "**Highland Entities**"), on the one hand, and Hunter Mountain Investment Trust, a Delaware statutory trust ("**HMIT**"), Beacon Mountain LLC, a Delaware limited liability company ("**Beacon Mountain**"), Rand Advisors, LLC, a Delaware limited liability company ("**Rand Advisors**"), Rand PE Fund I, LP, a Delaware series limited partnership ("**Rand PE Fund**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**"), Atlas IDF, LP, a Delaware limited partnership ("**Atlas IDF**"), Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP and Atlas IDF, the "**HMIT Entities**"), on the other hand.  The Highland Entities and the HMIT Entities are collectively referred to as the "**Parties**," and each individually, as a "**Party**".

## DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Claimant Trust Agreement or the Plan, as applicable (in each case, as hereinafter defined). For purposes of this Agreement, the following capitalized terms have the following meanings:

"**9019 Motion**" means the motion seeking entry of the Bankruptcy Court Order pursuant to Bankruptcy Rule 9019 and in accordance with Section 18.

"**Action**" means any action, claim, demand, arbitration, hearing, charge, complaint, investigation, examination, indictment, litigation, suit or other civil, criminal, administrative or investigative proceedings, including any petition under Rule 202 of the Texas Rules of Civil Procedure.

"**Affiliate**" means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, a specified Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by contract or otherwise.

"**Amended Complaint**" means the *Amended Complaint and Objection to Claims*, filed as docket number 158 in *Kirschner v. Dondero*, Adv. Pro. No. 21-03076-sgj (Bankr. N.D. Tex. May 19, 2022).

"**Bankruptcy Case**" means *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex.) and its related proceedings.

017137
HCMLPHMIT00000260

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/16/2025

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division.

"**Bankruptcy Court Approval Date**" means the date on which the Bankruptcy Court Order is issued.

"**Bankruptcy Court Order**" means an order of the Bankruptcy Court approving the allowance of the HMIT's Class 10 Interest as provided in this Agreement pursuant to the 9019 Motion.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than (i) a Saturday or a Sunday, (ii) a day on which the Federal Reserve Bank of New York or the New York Stock Exchange is closed, or (iii) a day on which banks in the States of Texas are required, or authorized by law, to close.

"**Claimant Trust Agreement**" means that certain Claimant Trust Agreement of the Claimant Trust (as may have been or may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 11, 2021, by and among Highland, as settlor, James P. Seery, Jr., a Claimant Trustee, and Wilmington Trust, National Association, a national banking association, as Delaware trustee.

"**Claims**" means any claims, debts, liabilities, demands, obligations, breaches of contract, breaches of duty or any relationship, misfeasance, malfeasance, promises, acts, omissions, agreements, liens, losses, costs and expenses (including attorney's fees and related costs), damages, injuries, suits, Actions, and causes of action of whatever kind or nature, whenever and however, arising, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise.

"**Class 10**" means the class of Claims or Equity Interests described in Article II. Section H.10. of the Plan.

"**Class 11**" means the class of Claims or Equity Interests described in Article II. Section H.11. of the Plan.

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Case.

"**Confirmation Order**" means that certain *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943], as conformed in accordance with the Fifth Circuit's rulings.

"**Dugaboy Note**" means that certain Promissory Note dated May 31, 2017, in the original face amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

2

HCMLPHMIT00000261

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/16/2025

"**Final Court Approval Date**" means the date on which the Bankruptcy Court Order becomes a Final Order.

"**Final Order**" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Highland Entities, as applicable, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

"**Gatekeeper**" means the gatekeeping provision contained in Article IX. F of the Plan as of August 11, 2021.

"**Governmental Authority**" means any federal, provincial, state, local or foreign government or political subdivision thereof, court of competent jurisdiction, administrative agency, judicial or arbitral body, or commission or other governmental or regulatory authority or instrumentality.

"**Highland Released Parties**" means collectively (i) the Highland Entities, (ii) any Affiliate of any Highland Entity and any Person directly or indirectly majority-owned by any Highland Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any Highland Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i)-(iii), collectively, the "**Highland Parties**"), (iv) each of the Highland Parties' current and former trustees and administrators (including the trustees of any of the Claimant Trust, the Litigation Sub-Trust, or the Indemnity Trust), officers, executives, agents, directors, advisors, advisory representatives, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, (v) the current and former members of the Oversight Board of the Claimant Trust in any capacity (including Richard Katz) and their Affiliates, (vi) Farallon Capital Management, LLC, Stonehill Capital Management, LLC, Muck Holdings LLC, and Jessup Holdings LLC, in each case, in any capacity, (vii) the Independent Board and its members John Dubel, James P. Seery, Jr., and Russell Nelms, (viii) James P. Seery, Jr., individually and in all capacities for any Highland Released Party, including as Chief Executive Officer of Highland Capital Management, L.P., Claimant Trustee of the Claimant Trust, and the Indemnity Trust Administrator of the Indemnity Trust, (ix) Marc S. Kirschner, individually and as Trustee of the Litigation Sub-Trust, (x) the Committee and each of its members, (xi) the professionals (and their respective firms) (a) retained by Highland or the Committee during the Bankruptcy Case or which provided services to Highland or the Committee during the Bankruptcy Case or (b) retained by any Highland Released Party on or after August 11, 2021, (xii) any Person indemnified by any

3

017139
HCMLPHMIT00000262

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/16/2025

Highland Party (the Persons described in clauses (i)-(xii), collectively, the "**Highland Covered Parties**"), and (xii) each Highland Covered Party's current and former officers, executives, agents, attorneys (and their respective firms), directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "Highland Covered Parties;" provided, however, and for the avoidance of doubt, and without in any way limiting the scope of the foregoing, "Highland Covered Parties" shall include Highland CLO Funding, Ltd., Highland HCF Advisor, Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Multi Strategy Credit Fund GP, L.P., Highland Multi Strategy Credit GP, LLC, Highland Multi Strategy Credit Fund, Ltd., Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., Highland Select Equity Fund, L.P., Highland Restoration Capital Partners Master, L.P., Highland Restoration Capital Partners GP, LLC, Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Offshore Director, LLC, Acis CLO Management, LLC, Neutra, Ltd., Pollack, Ltd., Acis CLO Management Holdings, L.P., Acis CLO Management Intermediate Holdings I, LLC, Acis CLO Management Intermediate Holdings II, LLC, Acis CLO Assets Holdings Limited, CHG Houston Holdings, LLC, Penant Management, L.P., Penant Management GP, LLC, Gunwale, LLC, HE Capital, LLC, Gleneagles CLO, Ltd., Aberdeen Loan Funding, Ltd. Highland Argentina Regional Opportunity Fund GP, LLC, Highland Argentina Regional Opportunity Fund, L.P., Highland Argentina Regional Opportunity Fund, Ltd., Highland Argentina Regional Opportunity Master Fund, L.P., Highland Latin America Consulting, Ltd., Highland Capital Management Korea Limited, Highland Capital Management Latin America, L.P., Highland Latin America GP, Ltd., Highland Latin America LP, Ltd., Highland Offshore Partners, L.P. (Diversified), Brentwood CLO, Ltd., Eastland CLO, Ltd., Bristol Bay Funding Ltd., Jasper CLO Ltd., Highland Legacy Limited, Grayson CLO, Ltd., Greenbriar CLO, Ltd., Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Liberty CLO, Ltd., Valhalla CLO, Ltd., Stratford CLO Ltd., Southfork CLO, Ltd., Pam Capital Funding, L.P., Stonebridge-Highland Healthcare Private Equity Fund, Pamco Cayman Ltd., Red River CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO, Ltd., Westchester CLO, Ltd. Longhorn Credit Funding, LLC, PensionDanmark Pensionsforsikringsaktieselskab, Highland Dynamic Income Master Fund L.P., Highland Dynamic Income Fund GP, LLC, Highland Dynamic Income Fund, L.P., Highland Dynamic Income Fund, Ltd., Highland JHT Holdings, LLC, Highland Prometheus Master Fund, L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland Sunbridge GP, LLC, Trussway Holdings, LLC, Trussway Industries, LLC, TW Company, Inc., T-Way Investments, LLC, SSP Holdings, LLC, Highland Flexible Income UCITS Fund, and Acis CLO 2017-7, Ltd. *Notwithstanding the forgoing or anything herein to the contrary*, none of "Highland Released Parties", "Highland Parties", nor "Highland Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner and none of such Persons are released from any Claim by any Person in connection with this Agreement.

"**HMIT Class 10 Interest**" means the unvested, contingent Class 10 interest in the Claimant Trust (a) to be allowed on account of HMIT's pre-petition equity interest in Highland, and (b) subject to the terms and conditions, as applicable, of the Plan, the Plan Documents, the Claimant Trust Agreement, and in accordance with this Agreement, and applicable law.

4

HCMLPHMIT00000263

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/16/2025

"**HMIT Note**" means that certain Secured Promissory Note dated December 21, 2015, in the original face amount of $63,000,000 from HMIT, as maker, and Highland, as payee.

"**HMIT Note Claims**" means any Claim related to, in connection with or arising out of the HMIT Note.

"**HMIT Released Parties**" means collectively (i) the HMIT Entities, (ii) any Affiliate of any HMIT Entity and any Person directly or indirectly majority owned by any HMIT Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any HMIT Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i) – (iii), collectively, the "**HMIT Parties**"), (iv) each of the HMIT Parties' current and former trustees, administrators, officer, executives, agents, directors, advisors, consultants, manager, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns (v) the professionals (and their respective firms (a) retained by any HMIT Party during the Bankruptcy Case or which provided services to any HMIT Party during the Bankruptcy Case or (b) retained by any HMIT Released Party on or after August 11, 2021, (vi) any Person indemnified by any HMIT Party (the Persons described in clauses (i) – (vi), collectively, the "**HMIT Covered Parties**"), and (vii) each HMIT Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "HMIT Covered Parties." *Notwithstanding the forgoing,* none of "HMIT Released Parties", "HMIT Parties", nor "HMIT Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner, and none of such Persons are released from any Claims by any Person in connection with this Agreement.

"**Indemnity Trust Administrator**" has the meaning given to it in the Indemnity Trust Agreement.

"**Indemnity Trust Agreement**" means that certain *Second Amended and Restated Indemnity Trust Agreement of the Indemnity Trust* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of [April 28], 2025, by and among the Claimant Trust, as grantor, James P. Seery, Jr., as indemnity trust administrator, and Wilmington Trust, National Association, a national banking association, as indemnity trustee and Delaware trustee.

"**Indemnity Trust Assets**" has the meaning set forth in the Indemnity Trust Agreement, but excluding Highland, the Claimant Trust, and their respective assets.

"**Independent Board**" means the independent board appointed by the Bankruptcy Court on January 9, 2020, pursuant to that certain *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 339].

017141

HCMLPHMIT00000264

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/16/2025

"**Kirschner Claims**" means all Claims and causes of action that were asserted or could have been asserted by the Litigation Trustee of the Litigation Sub-Trust, in the Amended Complaint.

"**Liability**" means any liability, debt, obligation, loss, damage, claim, cost or expense (including costs of investigation and defense and attorney's fees, costs and expenses), in each case, whether direct or indirect, whether accrued or contingent, whether or not involving a third-party claim, and including incidental and consequential damages and diminution of value.

"**Litigation Protections**" means, individually and collectively, the rights, duties, and obligations set forth in Sections 1 – 2 and Sections 9 - 16.

"**Litigation Sub-Trust**" means the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act.

"**Litigation Sub-Trust Agreement**" means that certain Litigation Sub-Trust Agreement of the Litigation Sub-Trust (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 16, 2021, by and among James P. Seery, Jr., as Claimant Trustee of the Claimant Trust, Wilmington Trust, National Association, a national banking association, as Delaware Trustee, and the Litigation Trustee.

"**Litigation Trustee**" means Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust.

"**LPA**" means that certain *Sixth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), dated as of October 4, 2021.

"Operating Expenses" means, except for the expenses of the Indemnity Trust (including any payments to Trust Indemnified Parties or Indemnified Parties (in each case, as defined, and pursuant to the terms and conditions set forth, in the Indemnity Trust Agreement)), the expenses of operating and administering the Highland Entities, including legal expenses, employee compensation, Claimant Trustee/CEO and other trust and trustee related compensation, incentive compensation, and customary general and administrative expenses.

"**Original Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* attached as Exhibit A to the *Order (A) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as modified) and (B) Granting Related Relief,* filed at Docket No. 1943 on the Bankruptcy Court's docket.

"**Oversight Board**" means the oversight board of the Highland Claimant Trust.

"**Pending Litigation**" means (i) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.,* Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including *Hunter Mountain Investment Trust's Emergency Motion for Leave to File Adversary Proceeding* filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating there); (ii) *Dugaboy Investment Trust v. Highland Cap. Mgmt, L.P.,* 3:24-cv-01531-X

6

017142
HCMLPHMIT00000265

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/16/2025

(N.D. Tex.) (only as to HMIT), and (iii) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:24-cv-01786-L (N.D. Tex.).

"**Permitted Investments**" has the meaning set forth in the Indemnity Trust Agreement.

"**Person**" means any natural person, partnership, limited liability partnership, corporation, limited liability company, association, joint stock company, trust, estate, joint venture, unincorporated organization or Governmental Authority.

"**Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* as conformed in accordance with the Fifth Circuit's rulings.

"**Plan Documents**" has the meaning given to it in the Plan.

"**Plan Protections**" means, collectively, the provisions of the Plan contained in Article IX thereof.

"**Pro Rata**" means the proportion that (a) the allowed amount of a particular Claim or Equity Interest in Class 10 bears to (b) the aggregate allowed amount of all Claims or Equity Interests in Class 10.

"**Threats**" means any written threats of legal action, legal demands, filed complaints, petitions for pre-suit discovery, suits, litigations, arbitrations, actual or threated restraining orders or injunctions made in writing, or similar written actions of any kind, or sworn statements evidencing the same, in any forum against any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), excluding any such action that would otherwise be a Threat except that any applicable statute of limitations that could be applicable to such action has expired.

"**Threats Notice**" means the written notice of any Threats received by the Indemnity Trust with respect to any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), that is hereby required to be provided by the Indemnity Trust to the HMIT Entities, within five (5) Business Days after receipt of such Threat.

## RECITALS

**WHEREAS**, as of the Petition Date, HMIT held Class B and Class C Limited Partnerships Interests in Highland;

**WHEREAS**, on December 21, 2015, HMIT entered into the HMIT Note with Highland, which had a total outstanding principal balance of Fifty-Seven Million Six Hundred Ninety Thousand Six Hundred Forty and 95/100 Dollars ($57,690,640.95) as of the Petition Date (the "**HMIT Note Balance**");

**WHEREAS**, HMIT's Class B and Class C Limited Partnership Interests in Highland were extinguished on August 11, 2021, in accordance with the Plan;

017143
HCMLPHMIT00000266

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/16/2025

**WHEREAS**, pursuant to the LPA, HMIT's capital account balance at Highland on account of its Class B and Class C Limited Partnership Interests on the Petition Date was Three Hundred Ninety-Four Million Six Hundred Thirty Thousand Eight Hundred Seventy-One and 53/100 Dollars ($394,630,871.53) (the "**HMIT Capital Account Balance**");

**WHEREAS**, some or all of the HMIT Entities have asserted certain Claims against certain Highland Entities and certain other Highland Covered Parties, including those asserted in the Pending Litigation;

**WHEREAS**, certain distributions to be made to the holders of allowed Class 10 Claims or Equity Interests pursuant to the terms and subject to the conditions set forth herein are premised on the consent of certain Highland Covered Parties in their capacity as Holders of Class 9 Interests, and such Persons are only willing to provide such consent in exchange for the releases as set forth in this Agreement;

> Formatted: Font: Bold

**WHEREAS**, some or all of the Highland Entities have asserted certain Claims against certain HMIT Entities, including the HMIT Note Claims;

**WHEREAS**, the Parties wish to terminate, extinguish, and release any and all rights, duties, obligations and Claims that (a) any of the Highland Released Parties owed or have, or may have owed or have, to or with respect to any of the HMIT Released Parties, and (b) any of the HMIT Released Parties owed or have, or may have owed or have, to or with respect to any of the Highland Released Parties, as provided in this Agreement (collectively, the "**Rights and Obligations**");

**WHEREAS**, the Parties agree that the Litigation Protections are intended to enact a permanent cessation of all litigation concerning or related to the Highland Released Parties through and including the Agreement Date; and

**WHEREAS**, the Parties, individually and collectively, wish to (a) resolve all disputes between and/or among any of the Highland Entities and their respective indemnitees, on the one hand, and any of the HMIT Entities, on the other hand, including those asserted or attempted to be asserted in the Pending Litigation, (b) fix and allow HMIT's Class 10 Interest at the amount and on the terms provided herein; and (c) terminate, extinguish, and release all Rights and Obligations on the terms provided herein.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

<u>**AGREEMENT**</u>

1. <u>Stay and Dismissal of Pending Litigation With Prejudice.</u>

(a) Within five (5) Business Days after the Agreement Date, the HMIT Entities shall take all steps necessary (at their own cost) to stay the Pending Litigation.

8

HCMLPHMIT00000267

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/16/2025

(b)      Within five (5) Business Days after the Bankruptcy Court Approval Date, the HMIT Entities shall take all steps necessary (at their own cost) to dismiss the Pending Litigation with prejudice.

2.      <u>Maintenance of Stay and Dismissal of Certain Defendants from the Amended Complaint</u>.

(a)      The Litigation Trustee shall continue to maintain the stay of Adv. Proc. No. 21-03076-sgj and all related proceedings arising therefrom through the Bankruptcy Court Approval Date. Within five (5) Business Days after the Bankruptcy Court Approval Date, the Litigation Sub-Trust shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand PE from Counts I, II, III, and XXIV of the Amended Complaint.

3.      <u>Cash Payment to HMIT</u>.  Within five (5) Business Days following the Bankruptcy Court Approval Date, Highland shall pay HMIT a one-time, lump sum of Five Hundred Thousand Dollars (US$500,000.00) (the "**Payment**") by wire transfer:

Hunter Mountain Investment Trust
C/o CLO Holdco, LLC
Hancock Whitney
Account # - 071173413
Routing # - 113000968
(469) 604-0955 [wire instructions]

4.      <u>HMIT Class 10 Interest</u>.

(a)      Subject to entry of the Bankruptcy Court Order, and the terms of this Agreement, the HMIT Class 10 Interest shall be deemed allowed in the amount of Three Hundred Thirty-Six Million Nine Hundred Forty Thousand Two Hundred Thirty and 58/100 Dollars (US$336,940,230.58), which amount represents the HMIT Capital Account Balance, <u>less</u> the HMIT Note Balance.

(b)      Notwithstanding anything to the contrary in the Plan or the Claimant Trust Agreement, as an integral part of this Agreement to consent to the allowance of the HMIT Class 10 Interest and the other considerations in this Agreement, HMIT shall not be deemed, and no holder of the HMIT Class 10 Interest shall be, a Claimant Trust Beneficiary or a "Beneficiary" under the Claimant Trust Agreement, and the Highland Released Parties, individually and collectively, shall owe no duty to any HMIT Releasor (whether contractual, fiduciary, equitable, statutory or otherwise), including with respect to the HMIT Class 10 Interest, in each case, except as expressly set forth in this Agreement.  Furthermore, without limiting the foregoing and for the avoidance of doubt, the contractual right of the holder of the HMIT Class 10 Interest to receive or recover any payments or Indemnity Trust Assets from the Indemnity Trust as set forth in this Agreement or the Indemnity Trust Agreement does not make any HMIT Releasor or any other Person a beneficiary of the Indemnity Trust or under the Indemnity Trust Agreement.

(c)      Notwithstanding anything to the contrary in the Plan, the Claimant Trust Agreement or the Indemnity Trust Agreement, in no event shall HMIT sell, transfer, assign, pledge, hypothecate, participate or otherwise dispose of or encumber the HMIT Class 10 Interest

9

HCMLPHMIT00000268

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/16/2025

or any rights (including any right to payment) with respect thereto (collectively, a "**Class 10 Assignment**"), and any attempted Class 10 Assignment shall be null and void.

(d)      For the avoidance of doubt, the HMIT Class 10 Interest is and shall remain senior to the not yet allowed, unvested contingent Class 11 Claims of Equity Interests as provided for in the Plan, the Plan Documents, and the Claimant Trust Agreement.

5.      Initial Interim Distributions on the Allowed Class 10 Interests.

(a)      Within five (5) Business Days after the Bankruptcy Court Approval Date, the Indemnity Trust shall distribute (the date on which such distribution is made, the "**Initial Interim Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Ten Million Dollars (US$10,000,000.00) (the "**Initial Interim Cash Distribution Amount**"), by means of wire transfer through the address contained in Section 3 ("**Wire Transfer**").

Formatted: Font: Bold, Underline

(b)      Within five (5) Business Days after the Bankruptcy Court Approval Date (the "**Note Assignment Date**"), the Highland Entities shall cause the portion of the Dugaboy Note held by the Highland Entities to be distributed to HMIT in-kind and take all actions necessary for HMIT to become the holder of such portion of the Dugaboy Note, and shall in addition pay to HMIT cash in the aggregate amount of all principal and interest payments actually received on the Dugaboy Note by the Highland Entities, including the Indemnity Trust, from the Agreement Date to the Note Assignment Date.  Prior to the Bankruptcy Court Approval Date, HMIT will engage an independent valuation service provider to value the Dugaboy Note for purposes of determining the magnitude of reduction to the outstanding allowed Class 10 Interests on account of such in-kind distribution, which shall not be less than Fifty percent (50%) of the current balance owed under the Dugaboy Note. The HMIT Entities acknowledge and agree that none of the Highland Entities are representing or warranting that the Dugaboy Note can be sold, or the price, if any, that could be received for the Dugaboy Note and further acknowledge and agree that any such purchase price may be de minimis.

6.      Subsequent Distribution(s) on the Allowed Class 10 Interests.

(a)      On December 1, 2027, the Indemnity Trust shall distribute (such distribution, collectively, the "**First Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**First Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests: cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$6,500,000.00), by Wire Transfer.

(b)      On December 1, 2028, the Indemnity Trust shall distribute (such distribution, collectively, the "**Second Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**Second Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$6,500,000.00) by Wire Transfer.

(c)      Notwithstanding anything herein to the contrary, the obligations of the Indemnity Trust to make the First Subsequent Distribution or Second Subsequent Distribution is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with

10

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/16/2025

Article VIII, Section 8.1(c) of the Indemnity Trust Agreement that the Indemnity Trust Assets comprising such distributions are not reasonably necessary to satisfy current or potential Indemnification Obligations (as defined in the Indemnity Trust Agreement) to all persons who are or might become Beneficiaries (as defined in the Indemnity Trust Agreement).

      7.    <u>Final Distribution on the Allowed Class 10 Interests</u>.

      (a)    On the later of the Final Court Approval Date and April 1, 2029, the Indemnity Trust will distribute all excess remaining Indemnity Trust Assets in accordance with Article VIII of the Indemnity Trust Agreement; <u>provided</u>, <u>however</u>, that the obligation of the Indemnity Trust to make any such distributions and/or dissolve and wind up the affairs of the Indemnity Trust is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII of the Indemnity Trust Agreement that (1) a Final Order(s) (as defined in the Indemnity Trust Agreement) has been entered resolving all litigation, claims or proceedings in any forum of any kind which could give rise to Indemnity Obligations (as defined in the Indemnity Trust Agreement) and payment in full of all such Indemnity Obligations and (2) all applicable statutes of limitations and any applicable tolling of such statutes of limitation have expired.

      (b)    The Indemnity Trust agrees to not use Indemnity Trust Assets to fund Operating Expenses.

      (c)    Following the Bankruptcy Court Approval Date, at the request of Mark Patrick, solely in his capacity, and to the extent he remains, as administrator of HMIT, but not more often than quarterly, Highland and the Indemnity Trust Administrator agree to review (i) the status of their respective assets, (ii) the balance of cash held, (iii) the status of any claims made for indemnification and any resolutions thereof, (iv) the status of any litigation, and (v) forecasted operating expenses with Mr. Patrick, and will each work in good faith to reduce operating expenses where reasonably practicable; provided, however, that all such reporting shall be subject to Mr. Patrick's agreement to maintain confidentiality with respect to any non-public information.

      8.    <u>Transfer Kirschner Claims; Dismissal of HMIT Note Claims</u>.

      (a)    Within five (5) Business Days after the Bankruptcy Court Approval Date, but after the dismissal provided for in <u>Section 2</u>, the Litigation Sub-Trust shall execute a short-form assignment in in favor of the HMIT Entities transferring all of the Litigation Sub-Trust's right, title, and interest in and to the Kirschner Claims (the "**Kirschner Transfer**"). Such assignment shall be in a form mutually acceptable to the Parties and its substance shall be consistent with the terms, conditions and limitations set forth in this Agreement, including <u>Section 8(b)</u> below. Each HMIT Entity acknowledges and agrees that none of the Highland Entities will have any duty or obligation to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof, except as provided in this Agreement, including the terms of <u>Section 8(c)</u> below.

      (b)    THE HMIT ENTITIES SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THE LITIGATION SUB-TRUST IS TRANSFERRING THE KIRSCHNER CLAIMS ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT THE HMIT

017147

HCMLPHMIT00000270

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/16/2025

ENTITIES ARE NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM THE HIGHLAND ENTITIES OR THEIR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE KIRSCHNER CLAIMS AND AMENDED COMPLAINT, INCLUDING WITH RESPECT TO THE ENFORCEABILITY, TRANSFERABILITY, VIABILITY, STRENGTH, OR VALUE OF ANY OF THE KIRSCHNER CLAIMS OR THE AMENDED COMPLAINT. The HMIT Entities hereby specifically acknowledge that they have carefully reviewed this Section and have had the opportunity to discuss its import with legal counsel and that the provisions of this Section are a material part of this Agreement. Thus, if for any reason HMIT is precluded from or is otherwise unable to prosecute all or any of the Kirschner Claims, (i) the HMIT Releasors shall have no recourse against any Highland Released Parties whatsoever and shall not be entitled to compensation of any kind, it being agreed that the HMIT Entities are otherwise receiving adequate consideration for the duties and obligations they are undertaking pursuant to this Agreement and (ii) there will be no effect whatsoever on the validity and enforceability of this Agreement or any of the other transactions contemplated hereby.

(c)     As promptly as reasonably practicable following the Bankruptcy Court Approval Date, the Highland Entities shall provide to the HMIT Entities electronic copies of written discovery requests and responses thereto, and documents produced in discovery in respect of the Kirschner Claims and the Amended Complaint. The Highland Entities will not provide any other documents regarding the Kirschner Claims including any attorney-client communications and any documents subject to the attorney work-product doctrine or similar privileges or immunities concerning the Kirschner Claims (collectively, the "**Kirschner Privileges**"), it being understood and agreed that the Highland Entities are retaining, and not transferring or waiving, the Kirschner Privileges.

(d)     Each Party acknowledges and agrees that if (i) the Kirschner Transfer is found or deemed to be impermissible or invalid, for any reason, or (ii) any HMIT Entity materially breaches this Agreement, the Kirschner Claims and Amended Complaint will revert to, and remain an asset of, the Litigation Sub-Trust.

9.     <u>General Release By The HMIT Entities</u>. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the HMIT Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its and their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the HMIT Entities, the "**HMIT Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each Highland Released Party from, and waives and relinquishes, any and all Claims, which the HMIT Releasors, or any Person claiming through, under, or on behalf of any of the HMIT Releasors, ever had, now has, or hereafter can, shall, or may have against any of the Highland Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Agreement Date, including any fact, matter, transaction, or occurrence asserted by any HMIT Entity in the Pending

017148
HCMLPHMIT00000271

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/16/2025

Litigation or in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the Highland Released Parties, or the Highland Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**HMIT Entity Released Claims**").

10.    General Release By The Highland Entities. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the Highland Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its or their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the Highland Entities, the "**Highland Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, any and all Claims which the Highland Releasors, or any Person claiming through, under, or on behalf of any of the Highland Releasors, ever had, now has, or hereafter can, shall, or may have against any of the HMIT Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Bankruptcy Court Approval Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the HMIT Released Parties, or the HMIT Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**Highland Released Claims**").

11.    Further Provisions Concerning The General Releases.

(a)    **FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASES ARE INTENDED TO BE GENERAL AND INCLUDE A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE AGREEMENT DATE.**

(b)    To the maximum extent permitted by law, each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefit of any statute or other principle of law or equity that limits the applicability of a release with respect to Claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release.

(c)    Without limiting the scope of the foregoing waiver, in connection with the foregoing release, each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefits of Section 1542 of the California Civil Code (to the extent, if any, that Section 1542 might apply to the foregoing release), which provides as follows:

017149

HCMLPHMIT00000272

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/16/2025

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees that the provisions of Section 1542 of the Civil Code of the State of California and all similar federal or state law, rights, rules or legal principles, legal or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY EACH OF THE HMIT ENTITIES AND THE HIGHLAND ENTITIES, ON THEIR OWN BEHALF AND ON BEHALF OF THE OTHER HMIT RELEASORS AND HIGHLAND RELEASORS, RESPECTIVELY,** in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

In connection with such waiver and relinquishment, each of the HMIT Entities and Highland Entities acknowledges that it is aware that it may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein. Nevertheless, it is the intent of each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, in executing this Agreement fully, finally, and forever to settle and release all such matters, and all Claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

(d)     As an integral component of this Agreement, and notwithstanding the Parties' intent set forth in the preamble hereto and the general nature of the releases in <u>Sections 9 and 10</u>, should:

(i)     any HMIT Releasor contend or assert that any Claim of any kind whatsoever held by any HMIT Releasor against any Highland Released Party survives this Agreement and is in any way related to or arising from or in connection with any HMIT Entity Released Claim (such claim or cause of action, a "**HMIT Alleged Claim**"), such HMIT Releasor will be deemed to have irrevocably, fully, and finally assigned such HMIT Alleged Claim to the Highland Entities and the Highland Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such HMIT Alleged Claim.

(ii)     any Highland Releasor contend or assert that any Claim of any kind whatsoever held by any Highland Releasor against any HMIT Released Party survives this Agreement and is in any way related to or arising from or in connection with any Highland Entity Released Claim (such claim or cause of action, a "**Highland Alleged Claim**"), such Highland

14

HCMLPHMIT00000273

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/16/2025

Releasor will be deemed to have irrevocably, fully, and finally assigned such Highland Alleged Claim to the HMIT Entities and the HMIT Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such Highland Alleged Claim.

12.  <u>Covenant Not To Sue; Limitation on Standing</u>. Upon the Agreement Date:

(a)  Each of the HMIT Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the Highland Released Parties, to recover, enforce, investigate, or collect any HMIT Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(b)  Each of the Highland Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the HMIT Released Parties, to recover, enforce, investigate, or collect any Highland Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(c)  For the avoidance of doubt, this Agreement shall not operate to give any HMIT Entity standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except for the limited purpose of seeking Court approval of this Agreement (including with respect to any appeal concerning any order entered granting or denying such approval), and except for the limited purpose of enforcing this Agreement, no HMIT Entity shall commence any Action in connection with the HMIT Class 10 Interest.

13.  <u>Representations and Warranties</u>.

(a)  Each of the HMIT Entities hereby represents and warrants that every HMIT Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any HMIT Releasor.

(b)  The HMIT Entities, on their own behalf and on behalf of the other HMIT Releasors, acknowledge and agree that each Plan Provision is lawful, effective, and binding on the HMIT Releasors.  The HMIT Entities further agree, on their own behalf and on behalf of the other HMIT Releasors, that the HMIT Releasors will never, in any way, challenge or seek to modify, nullify, vacate, or revoke, or induce, encourage or direct any other Person to do so or act in concert with or assist (financially or otherwise) any other Person in doing so the Confirmation Order, the Plan, the Plan Protections, or any Plan Document, including the Claimant Trust Agreement, the LPA, the Indemnity Trust Agreement or the Litigation Sub-Trust Agreement, in the Bankruptcy Court, in any other state or federal court, in any other forum or tribunal, or otherwise, including administrative or regulatory tribunals and foreign courts.

(c)  Each of the Highland Entities hereby represents and warrants that every Highland Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any Highland Releasor.

15

HCMLPHMIT00000274

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/16/2025

(d)    Each Party severally represents and warrants as to itself only that: (i) it has taken all necessary action to authorize and approve the execution, delivery and performance of this Agreement; (ii) such Party has full power and authority to execute and deliver this Agreement; and (iii) this Agreement constitutes a valid, legal and binding obligation of such Party, and is enforceable subject to its terms.  Each individual signatory hereto individually warrants and represents to all Parties hereto that such individual has full power and authority to act on behalf of and bind the Party for which he or she has executed this Agreement; provided, however that no signatory shall otherwise provide any warranty or representation or otherwise be a party to this Agreement on an individual basis.

14.    No Continuing Rights, Duties or Obligations.  Except for the rights, duties, and obligations expressly set forth in this Agreement, all Rights and Obligations that existed or may have existed shall be deemed terminated, extinguished, and released upon the Agreement Date. For the avoidance of doubt, from and after the Agreement Date, (a) the Highland Released Parties, individually and collectively, shall owe no duty, past or present, including with respect to the Kirchner Claims, to the HMIT Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement, and (b) the HMIT Released Parties, individually and collectively, shall owe no duty to the Highland Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement.

15.    Gatekeeper Standard.

(a)    The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that, notwithstanding the United States Court of Appeals for the Fifth Circuit's decision in *Highland Capital Management Fund Advisors, L.P. v. Highland Capital Management, L.P.*, No. 23-10534 (5th Cir. Mar. 18, 2025), the "Gatekeeper" provisions contained in Highland's Original Plan is forever binding on each of the HMIT Entities and any Persons claiming through, under or on behalf of any of them, and for a claim or cause of action to be  "colorable" for purposes of the Gatekeeper, it must be found by final order of the Bankruptcy Court (the "**Gatekeeper Court**"), which order shall be subject to appeal to a court of competent jurisdiction, to have satisfied the "Gatekeeper Colorability Test" as such term is defined in *In re Highland Capital Management, L.P.*, 2023 Bankr. LEXIS 2104 at *124-36 (Bankr. N.D. Tex. Aug. 24, 2023).

(b)    The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that compliance with the Gatekeeper requires (i) a motion seeking leave to sue an Exculpated Party (as that term is defined in Highland's original Plan) and a finding that the litigant's claims and causes of action are "colorable" attaching a complaint setting forth the basis for such claims or causes of action and (ii), in the Gatekeeper Court's sole discretion, an evidentiary hearing (during which the Gatekeeper Court may, among other things, hear testimony and assess the credibility of any witness(es)) to determine whether a proposed claim or cause of action is "colorable."

(c)    The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, further acknowledge

017152
HCMLPHMIT00000275

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/16/2025

and agree that the moving party under the Gatekeeper has the burden of satisfying the "Gatekeeper Colorability Test," and that the dismissal of the Pending Litigation shall have res judicata effect.

16.    <u>Indemnification</u>.

(a)    Without in any manner limiting the available remedies for any breach of this Agreement, the HMIT Entities, severally but not jointly, agree to indemnify, defend, and hold the Highland Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any HMIT Entity set forth in <u>Section 13</u> or (y) any Actions brought or prosecuted by or on behalf of, any HMIT Releasor or that are induced, encouraged, assisted  or directed by any HMIT Releasor or brought or prosecuted in concert with any HMIT Releasor against any Highland Released Party with respect to or related to any HMIT Entity Released Claims.  Without limiting the scope of the foregoing in any manner, any HMIT Entity that breaches <u>Section 12</u> shall be liable to the Highland Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such Highland Released Party in defending against or otherwise responding to such Action.  Each HMIT Entity acknowledges and agrees that the HMIT Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

(b)    Without in any manner limiting the available remedies for any breach of this Agreement, the Highland Entities, severally but not jointly, agree to indemnify, defend, and hold the HMIT Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any Highland Entity set forth in <u>Section 13</u> or (y) any suits, proceedings, or other actions brought or prosecuted by or on behalf of, any Highland Releasor or that are induced, encouraged, assisted  or directed by any Highland Releasor or brought or prosecuted in concert with any Highland Releasor against any HMIT Released Party with respect to or related to any HMIT Entity Released Claims.  Without in any manner limiting the scope of the foregoing, any Highland Entity that breaches <u>Section 12</u> shall be liable to the HMIT Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such HMIT Released Party in defending against or otherwise responding to such Action.  Each Highland Entity acknowledges and agrees that the Highland Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

17.    <u>Execution</u>.  This Agreement may be executed by the exchange of signatures by facsimile or by PDF attachment to an email transmittal and in counterparts, and if so executed, shall be fully executed when a counterpart has been executed and delivered by all Parties hereto through counsel.  All counterparts taken together shall constitute one and the same agreement and shall be fully enforceable as such.

17

017153

HCMLPHMIT00000276

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/16/2025

18.    <u>Bankruptcy Court Order</u>.  The allowance of the allowed HMIT Class 10 Interest pursuant to <u>Section 4</u> is subject to the entry of the Bankruptcy Court Order.  To that end, the Highland Entities shall file the 9019 Motion no later than five (5) Business Days after the Agreement Date.  Each Party shall, and shall cause each of their respective Affiliates to, undertake any and all actions in compliance with applicable law to obtain the Bankruptcy Court Order as promptly as practicable, and without limiting the foregoing, if an Action is threatened or instituted by any Person opposing the 9019 Motion or otherwise challenging the validity or legality, or seeking to restrain the consummation, of the transactions contemplated by this Agreement or the Bankruptcy Court Order, each Party shall, and shall cause its respective Affiliates to, use their commercially reasonable best efforts to avoid, resist, resolve or, if necessary, and defend to effectuate this Agreement and consummate the transactions hereby.  If the 9019 Motion is not approved by entry of the Bankruptcy Court Order or if the Bankruptcy Court Approval is precluded from becoming a Final Order, (a) there will be no affect on, adjustment to, or impairment of, in any way, the validity and enforceability of the remainder of this Agreement, and the other transactions contemplated hereby, all of which shall remain in full force and effect and (b) each Party shall, and shall cause its respective Affiliates to, use their best efforts to seek the allowance of the HMIT Class 10 Interest in a substantially similar amount and on substantially similar terms as set forth in <u>Section 4</u> to the fullest extent possible so as to give effect to the original intent of the Parties as closely as possible.

19.    <u>Fees and Expenses</u>.  Whether or not the transactions contemplated hereby are consummated or the Bankruptcy Court Order is obtained, and except as otherwise expressly provided in this Agreement, each Party will bear its respective fees, costs and expenses (including legal, accounting and other professional fees) incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the transactions contemplated hereby, including with respect to each Party's respective obligations pursuant to <u>Section 18</u>.  Notwithstanding the foregoing, if any Party hereto brings an Action to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that Action shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

20.    <u>Entire Agreement; No Other Representations</u>.  **THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF ANY PERSON OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT.  THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS (COLLECTIVELY, "<u>REPRESENTATIONS</u>"), EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT.  THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT; AND THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT RELIED ON ANY REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY ARE ENTERING INTO THIS AGREEMENT RELYING SOLELY ON THEIR OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS BY ANY PARTY, EXCEPT FOR THOSE REPRESENTATIONS**

18

017154
HCMLPHMIT00000277

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/16/2025

**EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES AGREE THAT REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT SHALL NOT BE USED IN THE INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT, AND NEITHER THE HMIT RELEASED PARTIES NOR THE HIGHLAND RELEASED PARTIES SHALL HAVE ANY LIABILITY FOR ANY CONSEQUENCES ARISING AS A RESULT OF ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT**.

21.     <u>Agreement and Release Knowing and Voluntary</u>.  The Parties acknowledge that they have considered this Agreement with their respective attorneys and have carefully read this Agreement, that it has been fully explained by their attorneys, and that they have had a reasonable opportunity to consider this Agreement.  The Parties further represent that they know and fully understand the contents of this Agreement, that they intend to be legally bound by this Agreement and the releases and covenants contained herein, and that they are signing this Agreement, including the release provisions herein, voluntarily and of their own free will and without coercion, and with the benefit of advice of counsel.

22.     <u>Cooperation</u>.  The Parties agree to perform any services or actions reasonably necessary to carry out the terms and conditions of this Agreement or the transactions contemplated hereby, including the execution and delivery of reasonable additional documents, instruments, conveyances and/or assurances, in good faith, and to reasonably communicate and cooperate with one another in this regard.  For the avoidance of doubt, nothing in this Section shall obligate the Highland Entities to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof.

23.     <u>Governing Law</u>.  This Agreement shall be construed pursuant to and governed by the laws of the State of Delaware (substantive and procedural) without reference to principles of conflicts of law that would result in the application of any other State's laws.

24.     <u>Jurisdiction/Venue</u>.  The Parties hereby irrevocably submit to the jurisdiction and venue of the Bankruptcy Court with respect to any Action arising out of or related to this Agreement or the subject matter hereof; if (and only if) the Bankruptcy Court lacks personal or subject matter jurisdiction to adjudicate an Action arising out of or related to this Agreement or the subject matter hereof, then the Parties irrevocably submit to the jurisdiction and venue of the United States District Court for the Northern District of Texas.

25.     <u>No Admissions</u>.  All Parties acknowledge and agree that the matters set forth in this Agreement constitute the settlement and compromise of disputed Claims and that this Agreement shall not constitute the admission of any fact or liability by any of them regarding any Claim, including the Claims released hereunder, and neither the terms hereof, nor the fact of this Agreement itself, shall be evidence of any kind in any Action, other than an Action to enforce the terms of the Agreement or any instrument executed in connection herewith or any claim for damages or other relief for breach of any representation or warranty contained herein or in any instrument executed in connection herewith.

26.     <u>Other Provisions</u>.

017155

HCMLPHMIT00000278

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/16/2025

(a)    No representation, inducement, agreement, promise or understandings altering, modifying, amending, taking from or adding to, the terms and conditions hereof shall have any force or effect unless the same is in writing and validly executed by each of the Parties hereto.

(b)    The waiver by any Party of any breach of, or default under, any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or default; provided, however, that for any such waiver to be enforceable, it shall be in writing and executed by the non-breaching Party.

(c)    The headings contained in this Agreement are for convenience only and shall in no way restrict or otherwise affect the construction of the provisions hereof.

(d)    The Parties shall each execute all documents and perform all acts necessary and proper to effectuate the terms of this Agreement.

27.    Notices.  All notices required or permitted to be provided hereunder shall be afforded to the respective parties to and through their counsel, and shall be transmitted simultaneously by electronic mail (with PDF attachments, as necessary) and by telefax, addressed as follows:

To the Highland Entities:

**PACHULSKI STANG ZIEHL AND JONES LLP**
Jeffrey N. Pomerantz
John A. Morris
10100 Santa Monica Boulevard
Los Angeles, California 90067-4003
310.277.6910
jpomerantz@pszjlaw.com
jmorris@pszjlaw.com

To the HMIT Entities:

**KELLY HART PITRE**
Louis M. Phillips
Amelia Hurt
301 Main Street, Suite 1600
225.381.9643
Louis.Phillips@Kellyhart.com
Amelia.Hurt@Kellyhart.com

28.    Severability. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity and enforceability of any other provision of this Agreement.

20

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/16/2025

29.    <u>Interpretive Provisions</u>. Unless the express context otherwise requires: (a) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) words defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (c) the words "Dollars" and "$" mean U.S. dollars; (d) references herein to a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement; (e) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words ",without limitation,"; (f) references herein to any gender shall include each other gender; (g) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement; (h) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (i) the word "or" shall be disjunctive but not exclusive; (j) the headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties; and (k) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

[*Signature page follows*]

017157
HCMLPHMIT00000280

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

### HUNTER MOUNTAIN INVESTMENT TRUST

By    _____

       Name:      Mark Patrick
       Title:       Administrator
       Date:       May __, 2025

### BEACON MOUNTAIN LLC

By    _____

       Name:
       Title:
       Date:       May __, 2025

### RAND ADVISORS, LLC

By    _____

       Name:      Mark Patrick
       Title:       President
       Date:       May __, 2025

### RAND PE FUND I, LP
By: Rand PE Fund Management, LLC, its General Partner

By    _____

       Name:      Mark Patrick
       Title:       President
       Date:       May __, 2025

### RAND PE FUND MANAGEMENT, LLC

By    _____

       Name:      Mark Patrick
       Title:       President

SIGNATURE PAGE TO SETTLEMENT AGREEMENT & GENERAL RELEASE

017158

HCMLPHMIT00000281

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Date:          May __, 2025

**ATLAS IDF, LP**
By: Atlas IDF GP, LLC, its General Partner


By _____
Name:          Mark Patrick
Title:          President
Date:          May __, 2025

**ATLAS IDF GP, LLC**


By _____
Name:          Mark Patrick
Title:          President
Date:          May __, 2025


**HIGHLAND CAPITAL MANAGEMENT, L.P.**


By _____
Name:          James. P. Seery, Jr.
Title:          Chief Executive Officer
Date:          May __, 2025


**HIGHLAND CLAIMANT TRUST**


By _____
Name:          James P. Seery, Jr.
Title:          Claimant Trustee
Date:          May __, 2025

**HIGHLAND LITIGATION SUB-TRUST**


By _____
Name:          Marc S. Kirschner
Title:          Litigation Trustee


SIGNATURE PAGE TO SETTLEMENT AGREEMENT & GENERAL RELEASE

017159

HCMLPHMIT00000282

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Date:        May ___, 2025

**HIGHLAND INDEMNITY TRUST**


By    _____
       Name:        James P. Seery, Jr.
       Title:        Indemnity Trust Administrator
       Date:        May ___, 2025

SIGNATURE PAGE TO SETTLEMENT AGREEMENT & GENERAL RELEASE

**EXHIBIT 32**

017161

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "Tim Cournoyer" <TCournoyer@HighlandCapital.com>
**Cc:** "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>, "Jim Shields"
<jshields@shieldslegal.com>, "John A. Morris" <jmorris@pszjlaw.com>, "Jeff Pomerantz"
<jpomerantz@pszjlaw.com>
**Subject:** RE: SETTLEMENT AND RELEASE AGREEMENT KHH FINAL REDLINE
COMMENTS 5.16.PDF; Highland HMIT-Rand Settlement Agreement.012(Highland Draft
05.15.25) KHH Clean for Execution 5.16.DOCX
**Date:** Fri, 16 May 2025 20:15:55 +0000
**Importance:** Normal
**Inline-Images:** image004.jpg; image001.png

---

Everyone,

I am holding Mark's signatures.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT: 225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

---

**From:** Tim Cournoyer <TCournoyer@HighlandCapital.com>
**Sent:** Friday, May 16, 2025 1:24 PM

To: Louis M. Phillips <Louis.Phillips@kellyhart.com>
Cc: Amelia L. Hurt <Amelia.Hurt@kellyhart.com>; Jim Shields <jshields@shieldslegal.com>; John A. Morris
<jmorris@pszjlaw.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>
**Subject:** FW: SETTLEMENT AND RELEASE AGREEMENT KHH FINAL REDLINE COMMENTS 5.16.PDF; Highland HMIT-Rand
Settlement Agreement.012(Highland Draft 05.15.25) KHH Clean for Execution 5.16.DOCX

---

EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution
when opening attachments, following links or responding to this message.

---

Louis,

Please find attached a revised draft with just two clean-up changes as reflected in the Redline.

We have received verbal approval of the Claimant Trust's Oversight Board to proceed, and we are in the process
of collecting signatures to the written consents of the Class 9 holders and the Oversight Board, and our internal
signatures to the Settlement Agreement.  If you could begin to do the same on your end, we will confirm once we
are ready to exchange signature pages.

Thanks and please let us know if you have any questions or concerns.

Best,

**TIMOTHY J. COURNOYER**
Managing Director and Assistant General Counsel



100 Crescent Court  |  Suite 1850  |  Dallas, Texas 75201
D: 972.628.4153  |  M: 305.479.0804  |  F: 972.628.4147
TCournoyer@HighlandCapital.com  |  www.highlandcapital.com

---

**From:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Sent:** Friday, May 16, 2025 11:40 AM
**To:** John A. Morris <jmorris@pszjlaw.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>
**Cc:** Amelia L. Hurt <Amelia.Hurt@kellyhart.com>; Jim Shields <jshields@shieldslegal.com>
**Subject:** SETTLEMENT AND RELEASE AGREEMENT KHH FINAL REDLINE COMMENTS 5.16.PDF; Highland HMIT-Rand
Settlement Agreement.012(Highland Draft 05.15.25) KHH Clean for Execution 5.16.DOCX

John and Jeff,

Please see a final redline with wire instructions added, a bold of a WHEREAS, and references to
payments being made by Wire Transfer.  I did not add the Wire Transfer to the final distribution part
because of the reference to "assets" versus payment and did not want to go into the body of the
document to deal with that.  Also the attached PDF (redlined against John's clean from yesterday)
does not include the header clean up contained in the word version.  We are prepared to execute this
version.  Mark will be out for a while today so just let us know if we can get his signatures or whether
you have any further comments.  Thank you.

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any
attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto
without prior consent of a member of the legal department at Highland Capital Management.

---

017163

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

**EXHIBIT 33**

017165

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "jpseeryjr@gmail.com" <jpseeryjr@gmail.com>, "mpatricktax1040@gmail.com"
<mpatricktax1040@gmail.com>, "Shawn Raver" <sraver@dafholdco.com>,
"jshields@shieldslegal.com" <jshields@shieldslegal.com>, "Amelia L. Hurt"
<Amelia.Hurt@kellyhart.com>
**Cc:** "John A. Morris" <jmorris@pszjlaw.com>, "Tim Cournoyer"
<TCournoyer@HighlandCapital.com>, "David Klos" <DKlos@HighlandCapital.com>,
"Matthew Gray" <MGray@HighlandCapital.com>
**Subject:** Re: Timing
**Date:** Sat, 17 May 2025 00:50:45 +0000
**Importance:** Normal

---

We will review the 9019 this weekend

Louis M. Phillips
On May 16, 2025 at 5:14:22 PM CDT, jpseeryjr@gmail.com wrote:

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**

All:

We have approvals on our side except UBS which is going through its process.  I expect them to be done and approved on Monday.

John plans to circulate the 9019 tomorrow.

If we are set on the 9019 and get our last approval, we would like to release signatures and file the 9019 on Monday afternoon.

Thank you.

Best.  Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

HCMLPHMIT00000290

**EXHIBIT 34**

017167

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>
**Cc:** "Jeff Pomerantz" <jpomerantz@pszjlaw.com>, "Gregory V. Demo"
<GDemo@pszjlaw.com>, "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>
**Subject:** Re: Highland: Rule 9019 Motion (revised)
**Date:** Sat, 17 May 2025 13:16:39 +0000
**Importance:** Normal
**Inline-Images:** image001.jpg; image002.png; image001(1).jpg; image002(1).png

---

Thanks

Louis M. Phillips
On May 17, 2025 at 7:43:19 AM CDT, John A. Morris <jmorris@pszjlaw.com> wrote:

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when
opening attachments, following links or responding to this message.**

---

Further changes have been made, Louis.

Please review this version.

Chat soon,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Houston

---

**From:** John A. Morris
**Sent:** Saturday, May 17, 2025 8:42 AM
**To:** James Seery <jpseeryjr@gmail.com>
**Cc:** Tim Cournoyer <TCournoyer@HighlandCapital.com>; David Klos (dklos@highlandcapital.com)
<DKlos@HighlandCapital.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo
<GDemo@pszjlaw.com>
**Subject:** Highland: Rule 9019 Motion (revised)

Sorry.

HCMLPHMIT00000291

I did not realize HCMLP's changes had not been incorporated.

They have been now.

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Houston





HCMLPHMIT00000292

**EXHIBIT 35**

017170

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>, "Jeff Pomerantz" <jpomerantz@pszjlaw.com>
**Cc:** "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>, "Jim Shields" <jshields@shieldslegal.com>
**Subject:** FW: Highland: HMIT Settlement Agreement (final change?)
**Date:** Mon, 19 May 2025 11:36:33 +0000
**Importance:** Normal
**Attachments:** CHANGED_PAGE_ONLY_-_HMIT_Settlement_Agreement.pdf
**Inline-Images:** image002.jpg; image003.png; image005.png

---

John and Jeff,

These changes are fine.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT: 225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Sunday, May 18, 2025 8:47 AM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Amelia L. Hurt

<Amelia.Hutz@kellyhart.com>
**Subject:** Highland: HMIT Settlement Agreement (final change?)

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**

Good morning, Louis.

One of our Oversight Board members requested that paragraph 19 be modified to include all "Highland Released Parties."

While the issue is arguably addressed in Section 16(a), we see no harm and attach a proposed revision that is, of course, reciprocal.

Please let us know if this is acceptable.  If so, we'll send a fully revised agreement.

Please also let us know if you have any comments on the draft Rule 9019 motion.  If we can obtain UBS' consent tomorrow, we want to get this filed.

Thank you,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Houston

HCMLPHMIT00000296

18.     <u>Bankruptcy Court Order</u>.  The allowance of the allowed HMIT Class 10 Interest pursuant to <u>Section 4</u> is subject to the entry of the Bankruptcy Court Order.  To that end, the Highland Entities shall file the 9019 Motion no later than five (5) Business Days after the Agreement Date.  Each Party shall, and shall cause each of their respective Affiliates to, undertake any and all actions in compliance with applicable law to obtain the Bankruptcy Court Order as promptly as practicable, and without limiting the foregoing, if an Action is threatened or instituted by any Person opposing the 9019 Motion or otherwise challenging the validity or legality, or seeking to restrain the consummation, of the transactions contemplated by this Agreement or the Bankruptcy Court Order, each Party shall, and shall cause its respective Affiliates to, use their commercially reasonable best efforts to avoid, resist, resolve or, if necessary, and defend to effectuate this Agreement and consummate the transactions hereby.  If the 9019 Motion is not approved by entry of the Bankruptcy Court Order or if the Bankruptcy Court Approval is precluded from becoming a Final Order, (a) there will be no effect on, adjustment to, or impairment of, in any way, the validity and enforceability of the remainder of this Agreement, and the other transactions contemplated hereby, all of which shall remain in full force and effect and (b) each Party shall, and shall cause its respective Affiliates to, use their best efforts to seek the allowance of the HMIT Class 10 Interest in a substantially similar amount and on substantially similar terms as set forth in <u>Section 4</u> to the fullest extent possible so as to give effect to the original intent of the Parties as closely as possible.

19.     <u>Fees and Expenses</u>.  Whether or not the transactions contemplated hereby are consummated or the Bankruptcy Court Order is obtained, and except as otherwise expressly provided in this Agreement, each Party will bear its respective fees, costs and expenses (including legal, accounting and other professional fees) incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the transactions contemplated hereby, including with respect to each Party's respective obligations pursuant to <u>Section 18</u>. Notwithstanding the foregoing, if any Party hereto<u>, any Highland Released Party, or any HMIT Released Party</u> brings an Action to enforce or interpret the terms and provisions of this Agreement, the prevailing ~~Party~~<u>Person</u> in that Action shall be entitled to have and recover from the non-prevailing ~~Party~~<u>Person</u> all such fees, costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing ~~Party~~<u>Person</u> may suffer or incur in the pursuit or defense of such action or proceeding.

20.     <u>Entire Agreement; No Other Representations</u>.  **THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF ANY PERSON OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT.  THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS (COLLECTIVELY, "<u>REPRESENTATIONS</u>"), EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT.  THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT; AND THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT RELIED ON ANY REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY ARE ENTERING INTO THIS AGREEMENT RELYING SOLELY ON THEIR OWN JUDGMENT AND NOT ON ANY**

017173

HCMLPHMIT00000297

**EXHIBIT 36**

017174

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "Gregory V. Demo" <GDemo@pszjlaw.com>, "Amelia L. Hurt"
<Amelia.Hurt@kellyhart.com>, "Jim Shields" <jshields@shieldslegal.com>
**Cc:** "John A. Morris" <jmorris@pszjlaw.com>, "Jeff Pomerantz" <jpomerantz@pszjlaw.com>
**Subject:** RE: Highland - 9019 Motion (HMIT)
**Date:** Mon, 19 May 2025 14:42:26 +0000
**Importance:** Normal
**Inline-Images:** image005.jpg; image006.png; image002.png

---

I can get those to you in a bit.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

---

**From:** Gregory V. Demo <GDemo@pszjlaw.com>
**Sent:** Monday, May 19, 2025 9:41 AM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>; Amelia L. Hurt <Amelia.Hurt@kellyhart.com>; Jim Shields <jshields@shieldslegal.com>
**Cc:** John A. Morris <jmorris@pszjlaw.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>
**Subject:** RE: Highland - 9019 Motion (HMIT)

HCMLPHMIT00000342

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**

Louis,

We can use Mark's prior signatures.  Can you send them to me know and we'll hold them in escrow pending your release?

Best,
Greg

**Gregory V. Demo**
Pachulski Stang Ziehl & Jones LLP
Tel: 212.561.7730 | Cell: 312.662.3573 | Fax: 212.561.7777
GDemo@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Sent:** Monday, May 19, 2025 10:37 AM
**To:** Gregory V. Demo <GDemo@pszjlaw.com>; Amelia L. Hurt <Amelia.Hurt@kellyhart.com>; Jim Shields <jshields@shieldslegal.com>
**Cc:** John A. Morris <jmorris@pszjlaw.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>
**Subject:** RE: Highland - 9019 Motion (HMIT)

Thanks Greg.  Will get back shortly.  Also, I asked John this morning (I improvidently left you off the message) about whether Mark will need to sign a final execution version (I have his signatures ion the version immediately prior to the few changes made Saturday).

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

louis.phillips@kellyhart.com
www.kellyhart.com

*Licensed to Practice in the State of Louisiana*

HCMLPHMIT00000343

Confidential Information intended for the named recipient and contains information protected under federal law, including but not limited to communications under 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

**From:** Gregory V. Demo <GDemo@pszjlaw.com>
**Sent:** Monday, May 19, 2025 9:27 AM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>; Amelia L. Hurt <Amelia.Hurt@kellyhart.com>; Jim Shields <jshields@shieldslegal.com>
**Cc:** John A. Morris <jmorris@pszjlaw.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>
**Subject:** Highland - 9019 Motion (HMIT)

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**

Louis,

Attached is a revised draft of the 9019 motion with a redline against what you sent this morning.  We accepted all your changes—with a few stylistic modifications—and include a few additional changes.

With John traveling, please keep me copied on future emails.

Best,
Greg

**Gregory V. Demo**
Pachulski Stang Ziehl & Jones LLP
Tel: 212.561.7730 | Cell: 312.662.3573 | Fax: 212.561.7777
GDemo@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

HCMLPHMIT00000344

**EXHIBIT 37**

017178

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "Gregory V. Demo" <GDemo@pszjlaw.com>, "John A. Morris" <jmorris@pszjlaw.com>, "Jeff Pomerantz" <jpomerantz@pszjlaw.com>
**Cc:** "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>, "Jim Shields" <jshields@shieldslegal.com>
**Subject:** Settlement Agreement Executed by Mark Patrick
**Date:** Mon, 19 May 2025 16:09:14 +0000
**Importance:** Normal
**Attachments:** Highland_HMIT-Rand_Settlement_Agreement.014(Execution_Version).docx; CHANGED_PAGE_ONLY_-_HMIT_Settlement_Agreement.pdf
**Inline-Images:** image001.png

---

Greg,

Attached is the version of the Settlement Agreement executed by Mark Patrick.  You are authorized to hold in escrow, pending a written release from escrow from me.  You are also authorized to substitute the changed page attached for purposes of a final execution version.


**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

louis.phillips@kellyhart.com
www.kellyhart.com

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

017179

HCMLPHMIT00000345

EXECUTION VERSION

## SETTLEMENT AGREEMENT & GENERAL RELEASE

THIS SETTLEMENT AGREEMENT & GENERAL RELEASE (this "**Agreement**") is entered into as of May 16, 2025 (the "**Agreement Date**"), by and among Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), the Highland Claimant Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Claimant Trust**"), the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Litigation Sub-Trust**"), and the Highland Indemnity Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Indemnity Trust**", and together with Highland, the Claimant Trust and the Litigation Sub-Trust, the "**Highland Entities**"), on the one hand, and Hunter Mountain Investment Trust, a Delaware statutory trust ("**HMIT**"), Beacon Mountain LLC, a Delaware limited liability company ("**Beacon Mountain**"), Rand Advisors, LLC, a Delaware limited liability company ("**Rand Advisors**"), Rand PE Fund I, LP, a Delaware series limited partnership ("**Rand PE Fund**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**"), Atlas IDF, LP, a Delaware limited partnership ("**Atlas IDF**"), Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP and Atlas IDF, the  "**HMIT Entities**"), on the other hand.  The Highland Entities and the HMIT Entities are collectively referred to as the "**Parties**," and each individually, as a "**Party**".

## DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Claimant Trust Agreement or the Plan, as applicable (in each case, as hereinafter defined). For purposes of this Agreement, the following capitalized terms have the following meanings:

"**9019 Motion**" means the motion seeking entry of the Bankruptcy Court Order pursuant to Bankruptcy Rule 9019 and in accordance with Section 18.

"**Action**" means any action, claim, demand, arbitration, hearing, charge, complaint, investigation, examination, indictment, litigation, suit or other civil, criminal, administrative or investigative proceedings, including any petition under Rule 202 of the Texas Rules of Civil Procedure.

"**Affiliate**" means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, a specified Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by contract or otherwise.

"**Amended Complaint**" means the *Amended Complaint and Objection to Claims*, filed as docket number 158 in *Kirschner v. Dondero*, Adv. Pro. No. 21-03076-sgj (Bankr. N.D. Tex. May 19, 2022).

"**Bankruptcy Case**" means *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex.) and its related proceedings.

017180

HCMLPHMIT00000347

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division.

"**Bankruptcy Court Approval Date**" means the date on which the Bankruptcy Court Order is issued.

"**Bankruptcy Court Order**" means an order of the Bankruptcy Court approving the allowance of the HMIT's Class 10 Interest as provided in this Agreement pursuant to the 9019 Motion.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than (i) a Saturday or a Sunday, (ii) a day on which the Federal Reserve Bank of New York or the New York Stock Exchange is closed, or (iii) a day on which banks in the States of Texas are required, or authorized by law, to close.

"**Claimant Trust Agreement**" means that certain Claimant Trust Agreement of the Claimant Trust (as may have been or may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 11, 2021, by and among Highland, as settlor, James P. Seery, Jr., a Claimant Trustee, and Wilmington Trust, National Association, a national banking association, as Delaware trustee.

"**Claims**" means any claims, debts, liabilities, demands, obligations, breaches of contract, breaches of duty or any relationship, misfeasance, malfeasance, promises, acts, omissions, agreements, liens, losses, costs and expenses (including attorney's fees and related costs), damages, injuries, suits, Actions, and causes of action of whatever kind or nature, whenever and however, arising, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise.

"**Class 10**" means the class of Claims or Equity Interests described in Article II. Section H.10. of the Plan.

"**Class 11**" means the class of Claims or Equity Interests described in Article II. Section H.11. of the Plan.

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Case.

"**Confirmation Order**" means that certain *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943], as conformed in accordance with the Fifth Circuit's rulings.

"**Dugaboy Note**" means that certain Promissory Note dated May 31, 2017, in the original face amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

017181

HCMLPHMIT00000348

"**Final Court Approval Date**" means the date on which the Bankruptcy Court Order becomes a Final Order.

"**Final Order**" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Highland Entities, as applicable, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

"**Gatekeeper**" means the gatekeeping provision contained in Article IX. F of the Plan as of August 11, 2021.

"**Governmental Authority**" means any federal, provincial, state, local or foreign government or political subdivision thereof, court of competent jurisdiction, administrative agency, judicial or arbitral body, or commission or other governmental or regulatory authority or instrumentality.

"**Highland Released Parties**" means collectively (i) the Highland Entities, (ii) any Affiliate of any Highland Entity and any Person directly or indirectly majority-owned by any Highland Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any Highland Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i)-(iii), collectively, the "**Highland Parties**"), (iv) each of the Highland Parties' current and former trustees and administrators (including the trustees of any of the Claimant Trust, the Litigation Sub-Trust, or the Indemnity Trust), officers, executives, agents, directors, advisors, advisory representatives, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, (v) the current and former members of the Oversight Board of the Claimant Trust in any capacity (including Richard Katz) and their Affiliates, (vi) Farallon Capital Management, LLC, Stonehill Capital Management, LLC, Muck Holdings LLC, and Jessup Holdings LLC, in each case, in any capacity, (vii) the Independent Board and its members John Dubel, James P. Seery, Jr., and Russell Nelms, (viii) James P. Seery, Jr., individually and in all capacities for any Highland Released Party, including as Chief Executive Officer of Highland Capital Management, L.P., Claimant Trustee of the Claimant Trust, and the Indemnity Trust Administrator of the Indemnity Trust, (ix) Marc S. Kirschner, individually and as Trustee of the Litigation Sub-Trust, (x) the Committee and each of its members, (xi) the professionals (and their respective firms) (a) retained by Highland or the Committee during the Bankruptcy Case or which provided services to Highland or the Committee during the Bankruptcy Case or (b) retained by any Highland Released Party on or after August 11, 2021, (xii) any Person indemnified by any

3

017182

HCMLPHMIT00000349

Highland Party (the Persons described in clauses (i)-(xii), collectively, the "**Highland Covered Parties**"), and (xii) each Highland Covered Party's current and former officers, executives, agents, attorneys (and their respective firms), directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "Highland Covered Parties;" provided, however, and for the avoidance of doubt, and without in any way limiting the scope of the foregoing, "Highland Covered Parties" shall include Highland CLO Funding, Ltd., Highland HCF Advisor, Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Multi Strategy Credit Fund GP, L.P., Highland Multi Strategy Credit GP, LLC, Highland Multi Strategy Credit Fund, Ltd., Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., Highland Select Equity Fund, L.P., Highland Restoration Capital Partners Master, L.P., Highland Restoration Capital Partners GP, LLC, Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Offshore Director, LLC, Acis CLO Management, LLC, Neutra, Ltd., Pollack, Ltd., Acis CLO Management Holdings, L.P., Acis CLO Management Intermediate Holdings I, LLC, Acis CLO Management Intermediate Holdings II, LLC, Acis CLO Assets Holdings Limited, CHG Houston Holdings, LLC, Penant Management, L.P., Penant Management GP, LLC, Gunwale, LLC, HE Capital, LLC, Gleneagles CLO, Ltd., Aberdeen Loan Funding, Ltd. Highland Argentina Regional Opportunity Fund GP, LLC, Highland Argentina Regional Opportunity Fund, L.P., Highland Argentina Regional Opportunity Fund, Ltd., Highland Argentina Regional Opportunity Master Fund, L.P., Highland Latin America Consulting, Ltd., Highland Capital Management Korea Limited, Highland Capital Management Latin America, L.P., Highland Latin America GP, Ltd., Highland Latin America LP, Ltd., Highland Offshore Partners, L.P. (Diversified), Brentwood CLO, Ltd., Eastland CLO, Ltd., Bristol Bay Funding Ltd., Jasper CLO Ltd., Highland Legacy Limited, Grayson CLO, Ltd., Greenbriar CLO, Ltd., Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Liberty CLO, Ltd., Valhalla CLO, Ltd., Stratford CLO Ltd., Southfork CLO, Ltd., Pam Capital Funding, L.P., Stonebridge-Highland Healthcare Private Equity Fund, Pamco Cayman Ltd., Red River CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO II Ltd., Westchester CLO, Ltd. Longhorn Credit Funding, LLC, PensionDanmark Pensionsforsikringsaktieselskab, Highland Dynamic Income Master Fund L.P., Highland Dynamic Income Fund GP, LLC, Highland Dynamic Income Fund, L.P., Highland Dynamic Income Fund, Ltd., Highland JHT Holdings, LLC, Highland Prometheus Master Fund, L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland Sunbridge GP, LLC, Trussway Holdings, LLC, Trussway Industries, LLC, TW Company, Inc., T-Way Investments, LLC, SSP Holdings, LLC, Highland Flexible Income UCITS Fund, and Acis CLO 2017-7, Ltd. *Notwithstanding the forgoing or anything herein to the contrary*, none of "Highland Released Parties", "Highland Parties", nor "Highland Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner and none of such Persons are released from any Claim by any Person in connection with this Agreement.

"**HMIT Class 10 Interest**" means the unvested, contingent Class 10 interest in the Claimant Trust (a) to be allowed on account of HMIT's pre-petition equity interest in Highland, and (b) subject to the terms and conditions, as applicable, of the Plan, the Plan Documents, the Claimant Trust Agreement, and in accordance with this Agreement, and applicable law.

017183

HCMLPHMIT00000350

"**HMIT Note**" means that certain Secured Promissory Note dated December 21, 2015, in the original face amount of $63,000,000 from HMIT, as maker, and Highland, as payee.

"**HMIT Note Claims**" means any Claim related to, in connection with or arising out of the HMIT Note.

"**HMIT Released Parties**" means collectively (i) the HMIT Entities, (ii) any Affiliate of any HMIT Entity and any Person directly or indirectly majority owned by any HMIT Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any HMIT Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i) – (iii), collectively, the "**HMIT Parties**"), (iv) each of the HMIT Parties' current and former trustees, administrators, officer, executives, agents, directors, advisors, consultants, manager, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns (v) the professionals (and their respective firms (a) retained by any HMIT Party during the Bankruptcy Case or which provided services to any HMIT Party during the Bankruptcy Case or (b) retained by any HMIT Released Party on or after August 11, 2021, (vi) any Person indemnified by any HMIT Party (the Persons described in clauses (i) – (vi), collectively, the "**HMIT Covered Parties**"), and (vii) each HMIT Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "HMIT Covered Parties." *Notwithstanding the forgoing*, none of "HMIT Released Parties", "HMIT Parties", nor "HMIT Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner, and none of such Persons are released from any Claims by any Person in connection with this Agreement.

"**Indemnity Trust Administrator**" has the meaning given to it in the Indemnity Trust Agreement.

"**Indemnity Trust Agreement**" means that certain *Second Amended and Restated Indemnity Trust Agreement of the Indemnity Trust* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of [April 28], 2025, by and among the Claimant Trust, as grantor, James P. Seery, Jr., as indemnity trust administrator, and Wilmington Trust, National Association, a national banking association, as indemnity trustee and Delaware trustee.

"**Indemnity Trust Assets**" has the meaning set forth in the Indemnity Trust Agreement, but excluding Highland, the Claimant Trust, and their respective assets.

"**Independent Board**" means the independent board appointed by the Bankruptcy Court on January 9, 2020, pursuant to that certain *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 339].

017184

HCMLPHMIT00000351

"**Kirschner Claims**" means all Claims and causes of action that were asserted or could have been asserted by the Litigation Trustee of the Litigation Sub-Trust, in the Amended Complaint.

"**Liability**" means any liability, debt, obligation, loss, damage, claim, cost or expense (including costs of investigation and defense and attorney's fees, costs and expenses), in each case, whether direct or indirect, whether accrued or contingent, whether or not involving a third-party claim, and including incidental and consequential damages and diminution of value.

"**Litigation Protections**" means, individually and collectively, the rights, duties, and obligations set forth in Sections 1 – 2 and Sections 9 - 16.

"**Litigation Sub-Trust**" means the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act.

"**Litigation Sub-Trust Agreement**" means that certain Litigation Sub-Trust Agreement of the Litigation Sub-Trust (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 16, 2021, by and among James P. Seery, Jr., as Claimant Trustee of the Claimant Trust, Wilmington Trust, National Association, a national banking association, as Delaware Trustee, and the Litigation Trustee.

"**Litigation Trustee**" means Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust.

"**LPA**" means that certain *Sixth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), dated as of October 4, 2021.

"**Operating Expenses**" means, except for the expenses of the Indemnity Trust (including any payments to Trust Indemnified Parties or Indemnified Parties (in each case, as defined, and pursuant to the terms and conditions set forth, in the Indemnity Trust Agreement)), the expenses of operating and administering the Highland Entities, including legal expenses, employee compensation, Claimant Trustee/CEO and other trust and trustee related compensation, incentive compensation, and customary general and administrative expenses.

"**Original Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* attached as Exhibit A to the *Order (A) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as modified) and (B) Granting Related Relief*, filed at Docket No. 1943 on the Bankruptcy Court's docket.

"**Oversight Board**" means the oversight board of the Highland Claimant Trust.

"**Pending Litigation**" means (i) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including *Hunter Mountain Investment Trust's Emergency Motion for Leave to File Adversary Proceeding* filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating there); (ii) *Dugaboy Investment Trust v. Highland Cap. Mgmt, L.P.*, 3:24-cv-01531-X

017185

HCMLPHMIT00000352

(N.D. Tex.) (only as to HMIT), and (iii) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:24-cv-01786-L (N.D. Tex.).

"**Permitted Investments**" has the meaning set forth in the Indemnity Trust Agreement.

"**Person**" means any natural person, partnership, limited liability partnership, corporation, limited liability company, association, joint stock company, trust, estate, joint venture, unincorporated organization or Governmental Authority.

"**Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* as conformed in accordance with the Fifth Circuit's rulings.

"**Plan Documents**" has the meaning given to it in the Plan.

"**Plan Protections**" means, collectively, the provisions of the Plan contained in Article IX thereof.

"**Pro Rata**" means the proportion that (a) the allowed amount of a particular Claim or Equity Interest in Class 10 bears to (b) the aggregate allowed amount of all Claims or Equity Interests in Class 10.

"**Threats**" means any written threats of legal action, legal demands, filed complaints, petitions for pre-suit discovery, suits, litigations, arbitrations, actual or threated restraining orders or injunctions made in writing, or similar written actions of any kind, or sworn statements evidencing the same, in any forum against any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), excluding any such action that would otherwise be a Threat except that any applicable statute of limitations that could be applicable to such action has expired.

"**Threats Notice**" means the written notice of any Threats received by the Indemnity Trust with respect to any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), that is hereby required to be provided by the Indemnity Trust to the HMIT Entities, within five (5) Business Days after receipt of such Threat.

## RECITALS

**WHEREAS**, as of the Petition Date, HMIT held Class B and Class C Limited Partnerships Interests in Highland;

**WHEREAS**, on December 21, 2015, HMIT entered into the HMIT Note with Highland, which had a total outstanding principal balance of Fifty-Seven Million Six Hundred Ninety Thousand Six Hundred Forty and 95/100 Dollars ($57,690,640.95) as of the Petition Date (the "**HMIT Note Balance**");

**WHEREAS**, HMIT's Class B and Class C Limited Partnership Interests in Highland were extinguished on August 11, 2021, in accordance with the Plan;

017186

HCMLPHMIT00000353

**WHEREAS**, pursuant to the LPA, HMIT's capital account balance at Highland on account of its Class B and Class C Limited Partnership Interests on the Petition Date was Three Hundred Ninety-Four Million Six Hundred Thirty Thousand Eight Hundred Seventy-One and 53/100 Dollars ($394,630,871.53) (the "**HMIT Capital Account Balance**");

**WHEREAS**, some or all of the HMIT Entities have asserted certain Claims against certain Highland Entities and certain other Highland Covered Parties, including those asserted in the Pending Litigation;

**WHEREAS**, certain distributions to be made to the holders of allowed Class 10 Claims or Equity Interests pursuant to the terms and subject to the conditions set forth herein are premised on the consent of certain Highland Covered Parties in their capacity as Holders of Class 9 Interests, and such Persons are only willing to provide such consent in exchange for the releases as set forth in this Agreement;

**WHEREAS**, some or all of the Highland Entities have asserted certain Claims against certain HMIT Entities, including the HMIT Note Claims;

**WHEREAS**, the Parties wish to terminate, extinguish, and release any and all rights, duties, obligations and Claims that (a) any of the Highland Released Parties owed or have, or may have owed or have, to or with respect to any of the HMIT Released Parties, and (b) any of the HMIT Released Parties owed or have, or may have owed or have, to or with respect to any of the Highland Released Parties, as provided in this Agreement (collectively, the "**Rights and Obligations**");

**WHEREAS**, the Parties agree that the Litigation Protections are intended to enact a permanent cessation of all litigation concerning or related to the Highland Released Parties through and including the Agreement Date; and

**WHEREAS**, the Parties, individually and collectively, wish to (a) resolve all disputes between and/or among any of the Highland Entities and their respective indemnitees, on the one hand, and any of the HMIT Entities, on the other hand, including those asserted or attempted to be asserted in the Pending Litigation, (b) fix and allow HMIT's Class 10 Interest at the amount and on the terms provided herein; and (c) terminate, extinguish, and release all Rights and Obligations on the terms provided herein.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

**AGREEMENT**

1.  <u>Stay and Dismissal of Pending Litigation With Prejudice</u>.

(a)     Within five (5) Business Days after the Agreement Date, the HMIT Entities shall take all steps necessary (at their own cost) to stay the Pending Litigation.

017187

HCMLPHMIT00000354

(b)      Within five (5) Business Days after the Bankruptcy Court Approval Date, the HMIT Entities shall take all steps necessary (at their own cost) to dismiss the Pending Litigation with prejudice.

2.    <u>Maintenance of Stay and Dismissal of Certain Defendants from the Amended Complaint</u>.

(a)      The Litigation Trustee shall continue to maintain the stay of Adv. Proc. No. 21-03076-sgj and all related proceedings arising therefrom through the Bankruptcy Court Approval Date. Within five (5) Business Days after the Bankruptcy Court Approval Date, the Litigation Sub-Trust shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand PE from Counts I, II, III, and XXIV of the Amended Complaint.

3.    <u>Cash Payment to HMIT</u>.  Within five (5) Business Days following the Bankruptcy Court Approval Date, Highland shall pay HMIT a one-time, lump sum of Five Hundred Thousand Dollars (US$500,000.00) (the "**Payment**") by wire transfer:

Hunter Mountain Investment Trust
C/o CLO Holdco, LLC
Hancock Whitney
Account # - 071173413
Routing # - 113000968
(469) 604-0955

4.    <u>HMIT Class 10 Interest</u>.

(a)      Subject to entry of the Bankruptcy Court Order, and the terms of this Agreement, the HMIT Class 10 Interest shall be deemed allowed in the amount of Three Hundred Thirty-Six Million Nine Hundred Forty Thousand Two Hundred Thirty and 58/100 Dollars (US$336,940,230.58), which amount represents the HMIT Capital Account Balance, <u>less</u> the HMIT Note Balance.

(b)      Notwithstanding anything to the contrary in the Plan or the Claimant Trust Agreement, as an integral part of this Agreement to consent to the allowance of the HMIT Class 10 Interest and the other considerations in this Agreement, HMIT shall not be deemed, and no holder of the HMIT Class 10 Interest shall be, a Claimant Trust Beneficiary or a "Beneficiary" under the Claimant Trust Agreement, and the Highland Released Parties, individually and collectively, shall owe no duty to any HMIT Releasor (whether contractual, fiduciary, equitable, statutory or otherwise), including with respect to the HMIT Class 10 Interest, in each case, except as expressly set forth in this Agreement.  Furthermore, without limiting the foregoing and for the avoidance of doubt, the contractual right of the holder of the HMIT Class 10 Interest to receive or recover any payments or Indemnity Trust Assets from the Indemnity Trust as set forth in this Agreement or the Indemnity Trust Agreement does not make any HMIT Releasor or any other Person a beneficiary of the Indemnity Trust or under the Indemnity Trust Agreement.

(c)      Notwithstanding anything to the contrary in the Plan, the Claimant Trust Agreement or the Indemnity Trust Agreement, in no event shall HMIT sell, transfer, assign, pledge, hypothecate, participate or otherwise dispose of or encumber the HMIT Class 10 Interest

017188

HCMLPHMIT00000355

or any rights (including any right to payment) with respect thereto (collectively, a "**Class 10 Assignment**"), and any attempted Class 10 Assignment shall be null and void.

(d)    For the avoidance of doubt, the HMIT Class 10 Interest is and shall remain senior to the not yet allowed, unvested contingent Class 11 Claims of Equity Interests as provided for in the Plan, the Plan Documents, and the Claimant Trust Agreement.

5.    <u>Initial Interim Distributions on the Allowed Class 10 Interests.</u>

(a)    Within five (5) Business Days after the Bankruptcy Court Approval Date, the Indemnity Trust shall distribute (the date on which such distribution is made, the "**Initial Interim Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Ten Million Dollars (US$10,000,000.00) (the "**Initial Interim Cash Distribution Amount**"), by means of wire transfer with the Pro Rata portion in respect of the HMIT Class 10 Interest sent to the wire instructions contained in Section 3 ("**Wire Transfer**").

(b)    Within five (5) Business Days after the Bankruptcy Court Approval Date (the "**Note Assignment Date**"), the Highland Entities shall cause the portion of the Dugaboy Note held by the Highland Entities to be distributed to HMIT in-kind and take all actions necessary for HMIT to become the holder of such portion of the Dugaboy Note, and shall in addition pay to HMIT cash in the aggregate amount of all principal and interest payments actually received on the Dugaboy Note by the Highland Entities, including the Indemnity Trust, from the Agreement Date to the Note Assignment Date.  Prior to the Bankruptcy Court Approval Date, HMIT will engage an independent valuation service provider to value the Dugaboy Note for purposes of determining the magnitude of reduction to the outstanding allowed Class 10 Interests on account of such in-kind distribution, which shall not be less than Fifty percent (50%) of the current balance owed under the Dugaboy Note. The HMIT Entities acknowledge and agree that none of the Highland Entities are representing or warranting that the Dugaboy Note can be sold, or the price, if any, that could be received for the Dugaboy Note and further acknowledge and agree that any such purchase price may be de minimis.

6.    <u>Subsequent Distribution(s) on the Allowed Class 10 Interests.</u>

(a)    On December 1, 2027, the Indemnity Trust shall distribute (such distribution, collectively, the "**First Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**First Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests: cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$6,500,000.00), by Wire Transfer.

(b)    On December 1, 2028, the Indemnity Trust shall distribute (such distribution, collectively, the "**Second Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**Second Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$6,500,000.00) by Wire Transfer.

(c)    Notwithstanding anything herein to the contrary, the obligations of the Indemnity Trust to make the First Subsequent Distribution or Second Subsequent Distribution is

017189

HCMLPHMIT00000356

subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII, Section 8.1(c) of the Indemnity Trust Agreement that the Indemnity Trust Assets comprising such distributions are not reasonably necessary to satisfy current or potential Indemnification Obligations (as defined in the Indemnity Trust Agreement) to all persons who are or might become Beneficiaries (as defined in the Indemnity Trust Agreement).

7.    <u>Final Distribution on the Allowed Class 10 Interests.</u>

(a)    On the later of the Final Court Approval Date and April 1, 2029, the Indemnity Trust will distribute all excess remaining Indemnity Trust Assets in accordance with Article VIII of the Indemnity Trust Agreement; <u>provided</u>, <u>however</u>, that the obligation of the Indemnity Trust to make any such distributions and/or dissolve and wind up the affairs of the Indemnity Trust is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII of the Indemnity Trust Agreement that (1) a Final Order(s) (as defined in the Indemnity Trust Agreement) has been entered resolving all litigation, claims or proceedings in any forum of any kind which could give rise to Indemnity Obligations (as defined in the Indemnity Trust Agreement) and payment in full of all such Indemnity Obligations and (2) all applicable statutes of limitations and any applicable tolling of such statutes of limitation have expired.

(b)    The Indemnity Trust agrees to not use Indemnity Trust Assets to fund Operating Expenses.

(c)    Following the Bankruptcy Court Approval Date, at the request of Mark Patrick, solely in his capacity, and to the extent he remains, as administrator of HMIT, but not more often than quarterly, Highland and the Indemnity Trust Administrator agree to review (i) the status of their respective assets, (ii) the balance of cash held, (iii) the status of any claims made for indemnification and any resolutions thereof, (iv) the status of any litigation, and (v) forecasted operating expenses with Mr. Patrick, and will each work in good faith to reduce operating expenses where reasonably practicable; provided, however, that all such reporting shall be subject to Mr. Patrick's agreement to maintain confidentiality with respect to any non-public information.

8.    <u>Transfer Kirschner Claims; Dismissal of HMIT Note Claims.</u>

(a)    Within five (5) Business Days after the Bankruptcy Court Approval Date, but after the dismissal provided for in <u>Section 2</u>, the Litigation Sub-Trust shall execute a short-form assignment in in favor of the HMIT Entities transferring all of the Litigation Sub-Trust's right, title, and interest in and to the Kirschner Claims (the "**Kirschner Transfer**"). Such assignment shall be in a form mutually acceptable to the Parties and its substance shall be consistent with the terms, conditions and limitations set forth in this Agreement, including <u>Section 8(b)</u> below. Each HMIT Entity acknowledges and agrees that none of the Highland Entities will have any duty or obligation to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof, except as provided in this Agreement, including the terms of <u>Section 8(c)</u> below.

(b)    THE HMIT ENTITIES SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THE LITIGATION SUB-TRUST IS TRANSFERRING THE KIRSCHNER

017190
HCMLPHMIT00000357

CLAIMS ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT THE HMIT ENTITIES ARE NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM THE HIGHLAND ENTITIES OR THEIR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE KIRSCHNER CLAIMS AND AMENDED COMPLAINT, INCLUDING WITH RESPECT TO THE ENFORCEABILITY, TRANSFERABILITY, VIABILITY, STRENGTH, OR VALUE OF ANY OF THE KIRSCHNER CLAIMS OR THE AMENDED COMPLAINT. The HMIT Entities hereby specifically acknowledge that they have carefully reviewed this Section and have had the opportunity to discuss its import with legal counsel and that the provisions of this Section are a material part of this Agreement. Thus, if for any reason HMIT is precluded from or is otherwise unable to prosecute all or any of the Kirschner Claims, (i) the HMIT Releasors shall have no recourse against any Highland Released Parties whatsoever and shall not be entitled to compensation of any kind, it being agreed that the HMIT Entities are otherwise receiving adequate consideration for the duties and obligations they are undertaking pursuant to this Agreement and (ii) there will be no effect whatsoever on the validity and enforceability of this Agreement or any of the other transactions contemplated hereby.

(c)    As promptly as reasonably practicable following the Bankruptcy Court Approval Date, the Highland Entities shall provide to the HMIT Entities electronic copies of written discovery requests and responses thereto, and documents produced in discovery in respect of the Kirschner Claims and the Amended Complaint. The Highland Entities will not provide any other documents regarding the Kirschner Claims including any attorney-client communications and any documents subject to the attorney work-product doctrine or similar privileges or immunities concerning the Kirschner Claims (collectively, the "**Kirschner Privileges**"), it being understood and agreed that the Highland Entities are retaining, and not transferring or waiving, the Kirschner Privileges.

(d)    Each Party acknowledges and agrees that if (i) the Kirschner Transfer is found or deemed to be impermissible or invalid, for any reason, or (ii) any HMIT Entity materially breaches this Agreement, the Kirschner Claims and Amended Complaint will revert to, and remain an asset of, the Litigation Sub-Trust.

9.    <u>General Release By The HMIT Entities</u>. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the HMIT Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its and their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the HMIT Entities, the "**HMIT Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each Highland Released Party from, and waives and relinquishes, any and all Claims, which the HMIT Releasors, or any Person claiming through, under, or on behalf of any of the HMIT Releasors, ever had, now has, or hereafter can, shall, or may have against any of the Highland Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Agreement Date,

017191

HCMLPHMIT00000358

including any fact, matter, transaction, or occurrence asserted by any HMIT Entity in the Pending Litigation or in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the Highland Released Parties, or the Highland Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**HMIT Entity Released Claims**").

10.    General Release By The Highland Entities. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the Highland Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its or their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the Highland Entities, the "**Highland Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, any and all Claims which the Highland Releasors, or any Person claiming through, under, or on behalf of any of the Highland Releasors, ever had, now has, or hereafter can, shall, or may have against any of the HMIT Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Bankruptcy Court Approval Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the HMIT Released Parties, or the HMIT Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**Highland Released Claims**").

11.    Further Provisions Concerning The General Releases.

(a)    **FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASES ARE INTENDED TO BE GENERAL AND INCLUDE A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE AGREEMENT DATE.**

(b)    To the maximum extent permitted by law, each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefit of any statute or other principle of law or equity that limits the applicability of a release with respect to Claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release.

(c)    Without limiting the scope of the foregoing waiver, in connection with the foregoing release, each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefits of Section 1542 of the California Civil Code (to the extent, if any, that Section 1542 might apply to the foregoing release), which provides as follows:

017192

HCMLPHMIT00000359

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees that the provisions of Section 1542 of the Civil Code of the State of California and all similar federal or state law, rights, rules or legal principles, legal or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY EACH OF THE HMIT ENTITIES AND THE HIGHLAND ENTITIES, ON THEIR OWN BEHALF AND ON BEHALF OF THE OTHER HMIT RELEASORS AND HIGHLAND RELEASORS, RESPECTIVELY,** in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

In connection with such waiver and relinquishment, each of the HMIT Entities and Highland Entities acknowledges that it is aware that it may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein.  Nevertheless, it is the intent of each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, in executing this Agreement fully, finally, and forever to settle and release all such matters, and all Claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

(d)     As an integral component of this Agreement, and notwithstanding the Parties' intent set forth in the preamble hereto and the general nature of the releases in <u>Sections 9 and 10</u>, should:

(i)     any HMIT Releasor contend or assert that any Claim of any kind whatsoever held by any HMIT Releasor against any Highland Released Party survives this Agreement and is in any way related to or arising from or in connection with any HMIT Entity Released Claim (such claim or cause of action, a "**HMIT Alleged Claim**"), such HMIT Releasor will be deemed to have irrevocably, fully, and finally assigned such HMIT Alleged Claim to the Highland Entities and the Highland Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such HMIT Alleged Claim.

(ii)     any Highland Releasor contend or assert that any Claim of any kind whatsoever held by any Highland Releasor against any HMIT Released Party survives this Agreement and is in any way related to or arising from or in connection with any Highland Entity Released Claim (such claim or cause of action, a "**Highland Alleged Claim**"), such Highland

14

017193

HCMLPHMIT00000360

Releasor will be deemed to have irrevocably, fully, and finally assigned such Highland Alleged Claim to the HMIT Entities and the HMIT Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such Highland Alleged Claim.

12.    <u>Covenant Not To Sue; Limitation on Standing</u>. Upon the Agreement Date:

(a)    Each of the HMIT Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the Highland Released Parties, to recover, enforce, investigate, or collect any HMIT Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(b)    Each of the Highland Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the HMIT Released Parties, to recover, enforce, investigate, or collect any Highland Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(c)    For the avoidance of doubt, this Agreement shall not operate to give any HMIT Entity standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except for the limited purpose of seeking Court approval of this Agreement (including with respect to any appeal concerning any order entered granting or denying such approval), and except for the limited purpose of enforcing this Agreement, no HMIT Entity shall commence any Action in connection with the HMIT Class 10 Interest.

13.    <u>Representations and Warranties</u>.

(a)    Each of the HMIT Entities hereby represents and warrants that every HMIT Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any HMIT Releasor.

(b)    The HMIT Entities, on their own behalf and on behalf of the other HMIT Releasors, acknowledge and agree that each Plan Provision is lawful, effective, and binding on the HMIT Releasors.  The HMIT Entities further agree, on their own behalf and on behalf of the other HMIT Releasors, that the HMIT Releasors will never, in any way, challenge or seek to modify, nullify, vacate, or revoke, or induce, encourage or direct any other Person to do so or act in concert with or assist (financially or otherwise) any other Person in doing so the Confirmation Order, the Plan, the Plan Protections, or any Plan Document, including the Claimant Trust Agreement, the LPA, the Indemnity Trust Agreement or the Litigation Sub-Trust Agreement, in the Bankruptcy Court, in any other state or federal court, in any other forum or tribunal, or otherwise, including administrative or regulatory tribunals and foreign courts.

(c)    Each of the Highland Entities hereby represents and warrants that every Highland Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any Highland Releasor.

017194

HCMLPHMIT00000361

(d) Each Party severally represents and warrants as to itself only that: (i) it has taken all necessary action to authorize and approve the execution, delivery and performance of this Agreement; (ii) such Party has full power and authority to execute and deliver this Agreement; and (iii) this Agreement constitutes a valid, legal and binding obligation of such Party, and is enforceable subject to its terms. Each individual signatory hereto individually warrants and represents to all Parties hereto that such individual has full power and authority to act on behalf of and bind the Party for which he or she has executed this Agreement; provided, however that no signatory shall otherwise provide any warranty or representation or otherwise be a party to this Agreement on an individual basis.

14. <u>No Continuing Rights, Duties or Obligations</u>.  Except for the rights, duties, and obligations expressly set forth in this Agreement, all Rights and Obligations that existed or may have existed shall be deemed terminated, extinguished, and released upon the Agreement Date. For the avoidance of doubt, from and after the Agreement Date, (a) the Highland Released Parties, individually and collectively, shall owe no duty, past or present, including with respect to the Kirchner Claims, to the HMIT Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement, and (b) the HMIT Released Parties, individually and collectively, shall owe no duty to the Highland Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement.

15. <u>Gatekeeper Standard</u>.

(a) The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that, notwithstanding the United States Court of Appeals for the Fifth Circuit's decision in *Highland Capital Management Fund Advisors, L.P. v. Highland Capital Management, L.P.*, No. 23-10534 (5th Cir. Mar. 18, 2025), the "Gatekeeper" provisions contained in Highland's Original Plan is forever binding on each of the HMIT Entities and any Persons claiming through, under or on behalf of any of them, and for a claim or cause of action to be  "colorable" for purposes of the Gatekeeper, it must be found by final order of the Bankruptcy Court (the "**Gatekeeper Court**"), which order shall be subject to appeal to a court of competent jurisdiction, to have satisfied the "Gatekeeper Colorability Test" as such term is defined in *In re Highland Capital Management, L.P.*, 2023 Bankr. LEXIS 2104 at *124-36 (Bankr. N.D. Tex. Aug. 24, 2023).

(b) The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that compliance with the Gatekeeper requires (i) a motion seeking leave to sue an Exculpated Party (as that term is defined in Highland's original Plan) and a finding that the litigant's claims and causes of action are "colorable" attaching a complaint setting forth the basis for such claims or causes of action and (ii), in the Gatekeeper Court's sole discretion, an evidentiary hearing (during which the Gatekeeper Court may, among other things, hear testimony and assess the credibility of any witness(es)) to determine whether a proposed claim or cause of action is "colorable."

(c) The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, further acknowledge

017195

HCMLPHMIT00000362

and agree that the moving party under the Gatekeeper has the burden of satisfying the "Gatekeeper Colorability Test," and that the dismissal of the Pending Litigation shall have res judicata effect.

16.   Indemnification.

(a)   Without in any manner limiting the available remedies for any breach of this Agreement, the HMIT Entities, severally but not jointly, agree to indemnify, defend, and hold the Highland Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any HMIT Entity set forth in Section 13 or (y) any Actions brought or prosecuted by or on behalf of, any HMIT Releasor or that are induced, encouraged, assisted  or directed by any HMIT Releasor or brought or prosecuted in concert with any HMIT Releasor against any Highland Released Party with respect to or related to any HMIT Entity Released Claims.  Without limiting the scope of the foregoing in any manner, any HMIT Entity that breaches Section 12 shall be liable to the Highland Released Party against whom the applicable Action has been brought or prosecuted in violation of Section 12 for the reasonable attorneys' fees and costs incurred by such Highland Released Party in defending against or otherwise responding to such Action.  Each HMIT Entity acknowledges and agrees that the HMIT Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

(b)   Without in any manner limiting the available remedies for any breach of this Agreement, the Highland Entities, severally but not jointly, agree to indemnify, defend, and hold the HMIT Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any Highland Entity set forth in Section 13 or (y) any suits, proceedings, or other actions brought or prosecuted by or on behalf of, any Highland Releasor or that are induced, encouraged, assisted  or directed by any Highland Releasor or brought or prosecuted in concert with any Highland Releasor against any HMIT Released Party with respect to or related to any Highland Entity Released Claims.  Without in any manner limiting the scope of the foregoing, any Highland Entity that breaches Section 12 shall be liable to the HMIT Released Party against whom the applicable Action has been brought or prosecuted in violation of Section 12 for the reasonable attorneys' fees and costs incurred by such HMIT Released Party in defending against or otherwise responding to such Action.  Each Highland Entity acknowledges and agrees that the Highland Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

17.   Execution.  This Agreement may be executed by the exchange of signatures by facsimile or by PDF attachment to an email transmittal and in counterparts, and if so executed, shall be fully executed when a counterpart has been executed and delivered by all Parties hereto through counsel.  All counterparts taken together shall constitute one and the same agreement and shall be fully enforceable as such.

017196

HCMLPHMIT00000363

18.    <u>Bankruptcy Court Order</u>.  The allowance of the allowed HMIT Class 10 Interest pursuant to <u>Section 4</u> is subject to the entry of the Bankruptcy Court Order.  To that end, the Highland Entities shall file the 9019 Motion no later than five (5) Business Days after the Agreement Date.  Each Party shall, and shall cause each of their respective Affiliates to, undertake any and all actions in compliance with applicable law to obtain the Bankruptcy Court Order as promptly as practicable, and without limiting the foregoing, if an Action is threatened or instituted by any Person opposing the 9019 Motion or otherwise challenging the validity or legality, or seeking to restrain the consummation, of the transactions contemplated by this Agreement or the Bankruptcy Court Order, each Party shall, and shall cause its respective Affiliates to, use their commercially reasonable best efforts to avoid, resist, resolve or, if necessary, and defend to effectuate this Agreement and consummate the transactions hereby.  If the 9019 Motion is not approved by entry of the Bankruptcy Court Order or if the Bankruptcy Court Approval is precluded from becoming a Final Order, (a) there will be no effect on, adjustment to, or impairment of, in any way, the validity and enforceability of the remainder of this Agreement, and the other transactions contemplated hereby, all of which shall remain in full force and effect and (b) each Party shall, and shall cause its respective Affiliates to, use their best efforts to seek the allowance of the HMIT Class 10 Interest in a substantially similar amount and on substantially similar terms as set forth in <u>Section 4</u> to the fullest extent possible so as to give effect to the original intent of the Parties as closely as possible.

19.    <u>Fees and Expenses</u>.  Whether or not the transactions contemplated hereby are consummated or the Bankruptcy Court Order is obtained, and except as otherwise expressly provided in this Agreement, each Party will bear its respective fees, costs and expenses (including legal, accounting and other professional fees) incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the transactions contemplated hereby, including with respect to each Party's respective obligations pursuant to <u>Section 18</u>.  Notwithstanding the foregoing, if any Party hereto brings an Action to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that Action shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

20.    <u>Entire Agreement; No Other Representations</u>.  **THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF ANY PERSON OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT.  THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS (COLLECTIVELY, "<u>REPRESENTATIONS</u>"), EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT.  THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT; AND THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT RELIED ON ANY REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY ARE ENTERING INTO THIS AGREEMENT RELYING SOLELY ON THEIR OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS BY ANY PARTY, EXCEPT FOR THOSE REPRESENTATIONS**

017197

HCMLPHMIT00000364

**EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES AGREE THAT REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT SHALL NOT BE USED IN THE INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT, AND NEITHER THE HMIT RELEASED PARTIES NOR THE HIGHLAND RELEASED PARTIES SHALL HAVE ANY LIABILITY FOR ANY CONSEQUENCES ARISING AS A RESULT OF ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT**.

21.     <u>Agreement and Release Knowing and Voluntary</u>.  The Parties acknowledge that they have considered this Agreement with their respective attorneys and have carefully read this Agreement, that it has been fully explained by their attorneys, and that they have had a reasonable opportunity to consider this Agreement.  The Parties further represent that they know and fully understand the contents of this Agreement, that they intend to be legally bound by this Agreement and the releases and covenants contained herein, and that they are signing this Agreement, including the release provisions herein, voluntarily and of their own free will and without coercion, and with the benefit of advice of counsel.

22.     <u>Cooperation</u>.  The Parties agree to perform any services or actions reasonably necessary to carry out the terms and conditions of this Agreement or the transactions contemplated hereby, including the execution and delivery of reasonable additional documents, instruments, conveyances and/or assurances, in good faith, and to reasonably communicate and cooperate with one another in this regard.  For the avoidance of doubt, nothing in this Section shall obligate the Highland Entities to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof.

23.     <u>Governing Law</u>.  This Agreement shall be construed pursuant to and governed by the laws of the State of Delaware (substantive and procedural) without reference to principles of conflicts of law that would result in the application of any other State's laws.

24.     <u>Jurisdiction/Venue</u>.  The Parties hereby irrevocably submit to the jurisdiction and venue of the Bankruptcy Court with respect to any Action arising out of or related to this Agreement or the subject matter hereof; if (and only if) the Bankruptcy Court lacks personal or subject matter jurisdiction to adjudicate an Action arising out of or related to this Agreement or the subject matter hereof, then the Parties irrevocably submit to the jurisdiction and venue of the United States District Court for the Northern District of Texas.

25.     <u>No Admissions</u>.  All Parties acknowledge and agree that the matters set forth in this Agreement constitute the settlement and compromise of disputed Claims and that this Agreement shall not constitute the admission of any fact or liability by any of them regarding any Claim, including the Claims released hereunder, and neither the terms hereof, nor the fact of this Agreement itself, shall be evidence of any kind in any Action, other than an Action to enforce the terms of the Agreement or any instrument executed in connection herewith or any claim for damages or other relief for breach of any representation or warranty contained herein or in any instrument executed in connection herewith.

26.     <u>Other Provisions</u>.

19

017198
HCMLPHMIT00000365

(a)    No representation, inducement, agreement, promise or understandings altering, modifying, amending, taking from or adding to, the terms and conditions hereof shall have any force or effect unless the same is in writing and validly executed by each of the Parties hereto.

(b)    The waiver by any Party of any breach of, or default under, any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or default; provided, however, that for any such waiver to be enforceable, it shall be in writing and executed by the non-breaching Party.

(c)    The headings contained in this Agreement are for convenience only and shall in no way restrict or otherwise affect the construction of the provisions hereof.

(d)    The Parties shall each execute all documents and perform all acts necessary and proper to effectuate the terms of this Agreement.

27.    <u>Notices</u>.  All notices required or permitted to be provided hereunder shall be afforded to the respective parties to and through their counsel, and shall be transmitted simultaneously by electronic mail (with PDF attachments, as necessary) and by telefax, addressed as follows:

To the Highland Entities:

**PACHULSKI STANG ZIEHL AND JONES LLP**
Jeffrey N. Pomerantz
John A. Morris
10100 Santa Monica Boulevard
Los Angeles, California 90067-4003
310.277.6910
jpomerantz@pszjlaw.com
jmorris@pszjlaw.com

To the HMIT Entities:

**KELLY HART PITRE**
Louis M. Phillips
Amelia Hurt
301 Main Street, Suite 1600
225.381.9643
Louis.Phillips@Kellyhart.com
Amelia.Hurt@Kellyhart.com

28.    <u>Severability</u>. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity and enforceability of any other provision of this Agreement.

017199
HCMLPHMIT00000366

29.   <u>Interpretive Provisions</u>. Unless the express context otherwise requires: (a) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) words defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (c) the words "Dollars" and "$" mean U.S. dollars; (d) references herein to a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement; (e) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words ",without limitation,"; (f) references herein to any gender shall include each other gender; (g) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement; (h) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (i) the word "or" shall be disjunctive but not exclusive; (j) the headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties; and (k) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

*[Signature page follows]*

017200

HCMLPHMIT00000367

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**HUNTER MOUNTAIN INVESTMENT TRUST**

By _____
      Name:      Mark Patrick
      Title:       Administrator
      Date:      May 16, 2025

**BEACON MOUNTAIN LLC**

By _____
      Name:      Mark Patrick
      Title:       President
      Date:      May 16, 2025

**RAND ADVISORS, LLC**

By _____
      Name:      Mark Patrick
      Title:       President
      Date:      May 16, 2025

**RAND PE FUND I, LP**
By: Rand PE Fund Management, LLC, its General Partner

By _____
      Name:      Mark Patrick
      Title:       President
      Date:      May 16, 2025

017201

HCMLPHMIT00000368

**RAND PE FUND MANAGEMENT, LLC**

By _____
    Name:    Mark Patrick
    Title:    President
    Date:    May 16, 2025

**ATLAS IDF, LP**
By: Atlas IDF GP, LLC, its General Partner

By _____
    Name:    Mark Patrick
    Title:    President
    Date:    May 16, 2025

**ATLAS IDF GP, LLC**

By _____
    Name:    Mark Patrick
    Title:    President
    Date:    May 16, 2025

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By _____
    Name:    James. P. Seery, Jr.
    Title:    Chief Executive Officer
    Date:    May __, 2025

017202

HCMLPHMIT00000369

**HIGHLAND CLAIMANT TRUST**

By    _____
       Name:     James P. Seery, Jr.
       Title:      Claimant Trustee
       Date:     May __, 2025

**HIGHLAND LITIGATION SUB-TRUST**

By    _____
       Name:     Marc S. Kirschner
       Title:      Litigation Trustee
       Date:     May __, 2025

**HIGHLAND INDEMNITY TRUST**

By    _____
       Name:     James P. Seery, Jr.
       Title:      Indemnity Trust Administrator
       Date:     May __, 2025

017203
HCMLPHMIT00000370

**EXHIBIT 38**

017204

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "Gregory V. Demo" <GDemo@pszjlaw.com>, "John A. Morris" <jmorris@pszjlaw.com>, "Jeff Pomerantz" <jpomerantz@pszjlaw.com>
**Cc:** "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>, "Jim Shields" <jshields@shieldslegal.com>
**Subject:** Re: Settlement Agreement Executed by Mark Patrick
**Date:** Mon, 19 May 2025 16:14:16 +0000
**Importance:** Normal
**Inline-Images:** image002.jpg; image003.png; image002(1).jpg; image003(1).png

---

That is fine

Louis M. Phillips
On May 19, 2025 at 11:12:52 AM CDT, Gregory V. Demo <GDemo@pszjlaw.com> wrote:

> **EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**
>
> ---
>
> Thank you.  Can I roll forward the dates on the signature pages to May 19?
>
> We are planning on filing a version of the settlement agreement with /s/ signatures rather than formal signatures.  We'll still have a version with actual signatures that I'll circulate once everyone is released.
>
> **Gregory V. Demo**
> Pachulski Stang Ziehl & Jones LLP
> Tel: 212.561.7730 | Cell: 312.662.3573 | Fax: 212.561.7777
> GDemo@pszjlaw.com
> vCard | Bio | LinkedIn
>
> 
>
> Los Angeles | New York | Wilmington, DE | Houston | San Francisco
>
> ---
>
> **From:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
> **Sent:** Monday, May 19, 2025 12:09 PM
> **To:** Gregory V. Demo <GDemo@pszjlaw.com>; John A. Morris <jmorris@pszjlaw.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>
> **Cc:** Amelia L. Hurt <Amelia.Hurt@kellyhart.com>; Jim Shields <jshields@shieldslegal.com>
> **Subject:** Settlement Agreement Executed by Mark Patrick
>
> Greg,
>
> Attached is the version of the Settlement Agreement executed by Mark Patrick.  You are authorized to hold in escrow, pending a written release from escrow from me.  You are also authorized to substitute the changed page attached for purposes of a final execution version.

HCMLPHMIT00000371

Louis M. Phillips

*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at *louis.phillips@kellyhart.com*.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.



HCMLPHMIT00000372

**EXHIBIT 39**

017207

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "Gregory V. Demo" <GDemo@pszjlaw.com>, "John A. Morris" <jmorris@pszjlaw.com>,
"Jeff Pomerantz" <jpomerantz@pszjlaw.com>
**Cc:** "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>, "Jim Shields"
<jshields@shieldslegal.com>
**Subject:** FW: Highland - 9019 Motion (HMIT)
**Date:** Mon, 19 May 2025 16:29:10 +0000
**Importance:** Normal
**Attachments:** 4911-7411-2063.v9_HCMLP_-_9019_Motion_(HMIT).docx; Redline_-_HCMLP_-
_9019_Motion_(HMIT)_KHH_final_responsive_version_Clean_5.19-4898-9315-1301-
v1_and_HCMLP_-_9019_Motion_(HMIT)-4911-7411-2063-v9.pdf
**Inline-Images:** image001.jpg; image003.png

---

Greg,

These changes are approved.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT: 225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

017208
HCMLPHMIT00000373

**From:** Gregory V. Demo <GDemo@pszjlaw.com>
**Sent:** Monday, May 19, 2025 9:27 AM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>; Amelia L. Hurt <Amelia.Hurt@kellyhart.com>; Jim Shields <jshields@shieldslegal.com>
**Cc:** John A. Morris <jmorris@pszjlaw.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>
**Subject:** Highland - 9019 Motion (HMIT)

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**

Louis,

Attached is a revised draft of the 9019 motion with a redline against what you sent this morning.  We accepted all your changes—with a few stylistic modifications—and include a few additional changes.

With John traveling, please keep me copied on future emails.

Best,
Greg

**Gregory V. Demo**
Pachulski Stang Ziehl & Jones LLP
Tel: 212.561.7730 | Cell: 312.662.3573 | Fax: 212.561.7777
GDemo@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

**EXHIBIT 40**

017210

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "Gregory V. Demo" <GDemo@pszjlaw.com>, "John A. Morris" <jmorris@pszjlaw.com>,
"Jeff Pomerantz" <jpomerantz@pszjlaw.com>
**Cc:** "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>, "Jim Shields"
<jshields@shieldslegal.com>
**Subject:** RE: Highland - 9019 Motion (HMIT)
**Date:** Mon, 19 May 2025 21:47:28 +0000
**Importance:** Normal
**Inline-Images:** image007.jpg; image008.png; image009.png; image010.png; image001.png

---

Thank you Greg.



**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

---

**From:** Gregory V. Demo <GDemo@pszjlaw.com>
**Sent:** Monday, May 19, 2025 4:44 PM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>; John A. Morris <jmorris@pszjlaw.com>; Jeff Pomerantz
<jpomerantz@pszjlaw.com>
**Cc:** Amelia L. Hurt <Amelia.Hurt@kellyhart.com>; Jim Shields <jshields@shieldslegal.com>
**Subject:** RE: Highland - 9019 Motion (HMIT)

HCMLPHMIT00000423

EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.

Louis,

Attached is a fully executed copy of the settlement agreement.  All signatures are released.

We are filing now.

Best,
Greg

**Gregory V. Demo**
Pachulski Stang Ziehl & Jones LLP
Tel: 212.561.7730 | Cell: 312.662.3573 | Fax: 212.561.7777
GDemo@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Sent:** Monday, May 19, 2025 1:24 PM
**To:** Gregory V. Demo <GDemo@pszjlaw.com>; John A. Morris <jmorris@pszjlaw.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>
**Cc:** Amelia L. Hurt <Amelia.Hurt@kellyhart.com>; Jim Shields <jshields@shieldslegal.com>
**Subject:** RE: Highland - 9019 Motion (HMIT)

Thank you Greg.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

louis.phillips@kellyhart.com
www.kellyhart.com

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

---

**From:** Gregory V. Demo <GDemo@pszjlaw.com>
**Sent:** Monday, May 19, 2025 12:18 PM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>; John A. Morris <jmorris@pszjlaw.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>
**Cc:** Amelia L. Hurt <Amelia.Hurt@kellyhart.com>; Jim Shields <jshields@shieldslegal.com>
**Subject:** RE: Highland - 9019 Motion (HMIT)

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**

Louis,

Attached are the Highland Entities' signatures, which are to be held in escrow.  Once we get final sign off on the Highland side, all signatures will be released and we'll file everything per your email below.  I'll also send a fully compiled settlement agreement for your records.

Best,
Greg

**Gregory V. Demo**
Pachulski Stang Ziehl & Jones LLP
Tel: 212.561.7730 | Cell: 312.662.3573 | Fax: 212.561.7777
GDemo@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Sent:** Monday, May 19, 2025 12:45 PM
**To:** Gregory V. Demo <GDemo@pszjlaw.com>; John A. Morris <jmorris@pszjlaw.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>
**Cc:** Amelia L. Hurt <Amelia.Hurt@kellyhart.com>; Jim Shields <jshields@shieldslegal.com>
**Subject:** RE: Highland - 9019 Motion (HMIT)

Movants' counsel is authorized to file the agreed version of the 9019 Motion and to affix my electronic signature to it. Mark Patrick's signatures are released upon full execution by the signing parties after obtaining the represented required consents.  Please send me the Highland parties' signatures once received.

017213

And I guess you will send around a full version of the fully executed version, correct?

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

---

**From:** Gregory V. Demo <GDemo@pszjlaw.com>
**Sent:** Monday, May 19, 2025 11:30 AM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>; John A. Morris <jmorris@pszjlaw.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>
**Cc:** Amelia L. Hurt <Amelia.Hurt@kellyhart.com>; Jim Shields <jshields@shieldslegal.com>
**Subject:** RE: Highland - 9019 Motion (HMIT)

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**

Thank you.  Can you please confirm that we can file and that Mr. Patrick's signatures are released upon final approval on the Highland side?

**Gregory V. Demo**
Pachulski Stang Ziehl & Jones LLP
Tel: 212.561.7730 | Cell: 312.662.3573 | Fax: 212.561.7777
GDemo@pszjlaw.com
vCard | Bio | LinkedIn

HCMLPHMIT00000426



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Sent:** Monday, May 19, 2025 12:29 PM
**To:** Gregory V. Demo <GDemo@pszjlaw.com>; John A. Morris <jmorris@pszjlaw.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>
**Cc:** Amelia L. Hurt <Amelia.Hurt@kellyhart.com>; Jim Shields <jshields@shieldslegal.com>
**Subject:** FW: Highland - 9019 Motion (HMIT)

Greg,

These changes are approved.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

louis.phillips@kellyhart.com
www.kellyhart.com

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

---

**From:** Gregory V. Demo <GDemo@pszjlaw.com>
**Sent:** Monday, May 19, 2025 9:27 AM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>; Amelia L. Hurt <Amelia.Hurt@kellyhart.com>; Jim Shields

HCMLPHMIT00000427

**Cc:** John A. Morris <jmorris@pszjlaw.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>
**Subject:** Highland - 9019 Motion (HMIT)

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**

Louis,

Attached is a revised draft of the 9019 motion with a redline against what you sent this morning.  We accepted all your changes—with a few stylistic modifications—and include a few additional changes.

With John traveling, please keep me copied on future emails.

Best,
Greg

**Gregory V. Demo**
Pachulski Stang Ziehl & Jones LLP
Tel: 212.561.7730 | Cell: 312.662.3573 | Fax: 212.561.7777
GDemo@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

HCMLPHMIT00000428

**EXHIBIT 41**

017217

**From:** "John A. Morris" <jmorris@pszjlaw.com>
**To:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**Cc:** "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>
**Subject:** RE: Confidentiality Agreement
**Date:** Sat, 22 Mar 2025 14:13:07 +0000
**Importance:** Normal
**Inline-Images:** image001.png

---

Louis,

Can you either send a black line or confirm that the only change from the version I sent to you on Wednesday is that the reference to Dugaboy was deleted from item 3 on Exhibit A?

Thanks.

---

**From:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Sent:** Saturday, March 22, 2025 8:45 AM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Subject:** Confidentiality Agreement

John,

I missed that Mark had executed a slightly revised version (word document attached), but found it last evening.  Apologies.  Please get mean executed version from Mr. Seery.  Thanks.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually

017218

HCMLPHMIT00000562

Case 3:25-cv-02072-S    Document 15-20    Filed 06/03/25    Page 370 of 1017    PageID 18252

reading and other review or reading this communication is not the intended recipient, any use, dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

017219
HCMLPHMIT00000563

**EXHIBIT 42**

017220

**From:** "John A. Morris" <jmorris@pszjlaw.com>
**To:** "Louis M. Phillips" <louis.phillips@kellyhart.com>, "Amelia L. Hurt"
<amelia.hurt@kellyhart.com>
**Cc:** "Jeff Pomerantz" <jpomerantz@pszjlaw.com>
**Subject:** FW: Confidentiality Agreement
**Date:** Sat, 22 Mar 2025 16:35:15 +0000
**Importance:** Normal
**Attachments:** EXECUTED_Confidentiality_Agreement_-
_M_Patrick_and_Related_Entities_(Execution_Version).pdf
**Inline-Images:** image002.png; image001.jpg

---

Louis and Amelia,

Attached is a fully executed copy of the Confidentiality Agreement.

Please let us know when you expect to send a proposal.  We are prepared to meet with you and Mark (and any other
Representatives who sign the NDA) in Dallas or New York promptly thereafter.

I'm available if you want to discuss anything in the interim.  Otherwise, have a good weekend.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** jpseeryjr@gmail.com <jpseeryjr@gmail.com>
**Sent:** Saturday, March 22, 2025 11:34 AM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** David Klos <DKlos@highlandcapital.com>; Tim Cournoyer <TCournoyer@highlandcapital.com>; Jeff Pomerantz
<jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd
<hwinograd@pszjlaw.com>; Jordan A. Kroop <Jkroop@pszjlaw.com>
**Subject:** Re: Confidentiality Agreement

EXECUTED

Best.  Jim

HCMLPHMIT00000564

Jim Seery
631-804-2049
jpseeryjr@gmail.com

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Date:** Saturday, March 22, 2025 at 10:20 AM
**To:** jpseeryjr@gmail.com <jpseeryjr@gmail.com>
**Cc:** David Klos <DKlos@highlandcapital.com>, Tim Cournoyer <TCournoyer@highlandcapital.com>,
Jeff Pomerantz <jpomerantz@pszjlaw.com>, Gregory V. Demo <GDemo@pszjlaw.com>, Hayley R.
Winograd <hwinograd@pszjlaw.com>, Jordan A. Kroop <Jkroop@pszjlaw.com>
**Subject:** FW: Confidentiality Agreement

Jim,

Louis sent back a signed NDA.

There is at least one change (the deletion of the word "Dugaboy" from item 3 of Exhibit A, which is fine), but he didn't
send a black line so I'm trying to confirm there is nothing else.

If anyone knows how to compare, please do so.

But send me the signed version in the meantime at your convenience.

Also, it might make sense to dust off the "litigation protections" and conform them to the Patrick parties.  Please let me
know if you and Tim want to handle that or if you want us to do so; I'm not sure when we present them to Louis, but
we should be prepared.

I'll be available to talk between 11:30 and 5 pm today.

Chat soon,

John

---

**From:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Sent:** Saturday, March 22, 2025 8:45 AM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Subject:** Confidentiality Agreement

John,

I missed that Mark had executed a slightly revised version (word document attached), but found it last
evening.  Apologies.  Please get mean executed version from Mr. Seery.  Thanks.

**Louis M. Phillips**
*Partner*

017222

HCMLPHMIT00000565

KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

017223

# CONFIDENTIALITY AGREEMENT

This CONFIDENTIALITY AGREEMENT (this "**Agreement**") is entered into as of March 18, 2025 (the "**Effective Date**") by and among Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**" or the "**Disclosing Party**"), on the one hand, and Mark Patrick, a United States citizen and resident of Dallas, Texas ("**Mr. Patrick**"), Hunter Mountain Investment Trust, a Delaware statutory trust ("**Hunter Mountain**"), Charitable DAF Holdco, Ltd., a Cayman Islands exempted company ("**DAF Holdco**"), CDH GP, Ltd., a Cayman Islands exempted company ("**DAF GP**"), Charitable DAF Fund, L.P., a Cayman Islands exempted limited partnership ("**DAF Fund**"), and CLO Holdco, Ltd., a Cayman Islands exempted company ("**CLO Holdco**", and together with DAF Holdco, DAF GP and DAF Fund, the "**DAF Entities**"), Rand Advisors, LLC, a Delaware limited liability company ("**Rand Advisors**"), Rand PE Fund I, LP, a Delaware series limited partnership ("**Rand PE Fund**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**"), Atlas IDF, LP, a Delaware limited partnership ("**Atlas IDF**"), Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**" and together with Rand Advisors, Rand PE Fund, Rand GP and Atlas IDF, the "**Rand Entities**", and the Rand Entities together with Mr. Patrick, Hunter Mountain and the DAF Entities, the "**Recipients**"), on the other hand.  Highland and the Recipients are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

## Recitals

WHEREAS, Mr. Patrick hereby represents and warrants that he is a control person for each of Hunter Mountain, the DAF Entities and the Rand Entities;

WHEREAS, there are several active litigations to which Highland or one of its affiliates, on the one hand, and one or more of the Recipients, on the other hand, are parties, including, without limitation, the matters set forth on Exhibit A hereto (collectively, the "**Pending Litigations**");

WHEREAS, the Parties desire to enter into good faith settlement discussions in an effort to reach a mutually acceptable global resolution to the Pending Litigations and all potential claims and causes of action against each other (the "**Potential Settlement**");

WHEREAS, in connection with negotiating the Potential Settlement, it is anticipated that Highland will provide the Recipients with certain Confidential Information (as hereinafter defined); and

WHEREAS, as a condition to Highland providing Recipients with any such Confidential Information, the Recipients agree to the terms and conditions set forth in this Agreement.

## Agreement

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, the Parties, intending to be legally bound, hereby agree as follows:

017224

HCMLPHMIT00000567

## 1.   Representations and Warranties

(a)   Each Party hereby represents and warrants to the other Parties as follows:

(i)   <u>Existence and Good Standing</u>.  Such Party is a legal entity duly organized, validly existing and, to the extent applicable in such jurisdiction, in good standing under the Laws (as hereinafter defined) of the jurisdiction in which it is incorporated or formed.  Such Party has all requisite corporate or similar right, power, authority and capacity to own, lease and operate the properties and assets it owns, leases and operates.  Each Party is qualified to do business as a foreign entity in each jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify.

(ii)   <u>Authority; Enforceability</u>. Such Party has the full power and authority to execute this Agreement and to perform its obligations under this Agreement.  The execution, delivery and performance of this Agreement have been duly and validly authorized by all required action on behalf of such Party in accordance with its respective Organizational Documents (as hereinafter defined) and applicable Law.  This Agreement constitute the valid and binding obligations of, and enforceable against, such Party.

(iii)   <u>No Violations</u>.  The execution and delivery by such Party of this Agreement, the performance and compliance with the terms and conditions hereof and thereof by such Party, and the performance by such Parent of its obligations contemplated hereby, in each case, will not (with or without notice or passage of time, or both):

(1) violate, conflict with, result in a breach of or constitute a default under any of the provisions of the Organizational Documents of such Party; or

(2) breach, violate or conflict with any provision of any Law or Permit applicable to such Party.

(iv)   <u>Legal Proceedings</u>.  There are no judicial, administrative or arbitral actions, suits, hearings, inquiries, charges, investigations, administrative proceedings, grievances or formal complaints or other proceedings (public or private) commenced, brought, conducted or heard before, or otherwise involving, any Governmental Entity or arbitrator, in each case, pending nor threatened that (i) challenge the validity or enforceability of Party's obligations under this Agreement or (b) seek to prevent or delay, or otherwise would reasonably be expected to adversely affect, the performance by such Party of its obligations hereunder.

(b)   Each Recipient hereby represents and warrants to Highland as follows:

(i) None of James Dondero, nor any Person directly or indirectly owned or controlled by Mr. Dondero (including, without limitation, Dugaboy Investment Trust) nor or any attorney, agent, employee, or representative engaged or working for benefit of Mr. Dondero nor any Person directly or indirectly owned or controlled by him (collectively, the "**Dondero Related Parties**") directly or indirectly owns any interest in, or directly or indirectly has any control over, such Recipient, including, without limitation, as the result of any written or oral contract, agreement, arrangement or obligation.

2

HCMLPHMIT00000568

(ii)  Such Recipient does not represent and is not acting on behalf of any Dondero Related Party.

(iii)  Such Recipient has no duty or obligation to provide any Confidential Information to any Person not a party to this Agreement, whether through a common or joint interest agreement or otherwise, and is not representing or acting on behalf of any Person with such a duty or obligation.

## 2.      Confidential and Proprietary Nature of the Information

Recipients acknowledge the confidential and proprietary nature of the Confidential Information, agree to hold and keep the Confidential Information in strict confidence as provided in this Agreement, agree that the use of any such Confidential Information is expressly limited to the pursuit of a Potential Settlement and shall not be used for any other purpose or in any other manner except as expressly provided in this Agreement, and otherwise agree to each and every restriction and obligation in this Agreement.

## 3.      Confidential Information

As used in this Agreement, the term "**Confidential Information**" means and includes (a) any and all of the following items that will be disclosed to any Recipient or any of their respective Representatives (as hereinafter defined) by or on behalf of Highland, whether orally or in writing and without regard to whether Highland has specifically designated such item as confidential, proprietary or non-public: any and all confidential, proprietary or non-public information concerning the business or affairs of Highland or any of its affiliates or related accounts, or other Persons (as hereinafter defined) (which includes, for the avoidance of doubt and without limitation, Highland Claimant Trust, Highland Litigation Sub-Trust, Highland Indemnity Trust, each of their and Highland's direct and indirect subsidiaries, and each of their respective affiliates, and its and their respective parent entities, beneficiaries, members, shareholders, owners, creditors, trustees, oversight boards, directors, managers, officers, employees, agents, advisors and representatives (collectively, the "**Highland Related Parties**")), including, without limitation, any written or oral information, reports and data concerning financial statements, assets, liabilities, indemnity and other obligations, cash flow, income, and expenses; past, current or planned investment or portfolio information; contracts and agreements; know-how, inventions and ideas, whether past, current or planned; partner, beneficiary, owner or investor lists; partner, beneficiary, owner or investor information; business plans; entity structure details; all compliance-related reports, records and information; and any other information, however documented, that is proprietary or non-public or is a trade secret within the meaning of applicable state trade secret Law, and (b) any and all statements or representations made in the course of discussing, negotiating or evaluating a Potential Settlement, including, without limitation, the terms of any Potential Settlement and the fact that (i) Confidential Information has been disclosed to Recipient and (ii) any discussions or negotiations are taking place concerning a Potential Settlement.

To the extent that any Confidential Information includes information or materials subject to the attorney-client privilege, work-product doctrine, or any other applicable privilege concerning pending or threatened legal proceedings or governmental investigations, the Parties understand and agree that they have a commonality of interest with respect to such matters, and it

3

017226

HCMLPHMIT00000569

is their desire, intention, and mutual understanding that the sharing of such information or materials is not intended to, and shall not, waive or diminish in any way the confidentiality of such information or material or its continued protection under the attorney-client privilege, work-product doctrine, or other applicable privilege. Accordingly, all Confidential Information disclosed by or on behalf of Highland that is entitled to protection under the attorney-client privilege, work-product doctrine, or other applicable privilege shall remain entitled to such protection under these privileges and this Agreement.

### 4.      Restricted Use of Confidential Information

Recipients agree that the Confidential Information (a) shall be kept strictly confidential by each Recipient and (b) without limiting the foregoing, shall not be disclosed by or on behalf of any Recipient to any Person (as hereinafter defined) except as otherwise expressly permitted by this Agreement. It is understood and the Recipients agree that Confidential Information may only be disclosed to Mr. Patrick and such specific legal counsel, accountants and financial advisors of the Recipients to whom such disclosure has been consented to in writing by Highland in its sole discretion (which consent may be given via email) (collectively "**Representatives**") and who (i) require such Confidential Information for the purpose of evaluating, negotiating or consummating a Proposed Settlement (ii) are informed by Recipient of the confidential nature of the Confidential Information and the obligations set forth in this Agreement, and (iii) execute a written joinder in the form annexed hereto as Exhibit B pursuant to which the Representative agrees to be bound to this Agreement as if they were an original Party hereto, with such joinder including, without limitation, a representation and warranty that such Representative (1) does not currently represent any Dondero Related Party and (2) has no duty or obligation to provide any Confidential Information to any Person not a party to this Agreement, whether through a common or joint interest agreement or otherwise, and does not represent any Person with such a duty or obligation. Recipients further agree that Recipients and their Representatives shall not use any of the Confidential Information to the detriment of Highland or any Highland Related Party or for any reason or purpose other than evaluating, negotiating or consummating a Proposed Settlement. Recipients shall enforce this Agreement as to its Representatives and take such action, legal or otherwise, to the extent necessary to cause them to comply with this Agreement and thereby prevent any disclosure of Confidential Information by any of its Representatives (including, without limitation, all actions that any Recipient would take to protect its own confidential information).

Without limiting the generality of the foregoing and for the avoidance of doubt, the Recipients and their Representatives shall not disclose or refer to any Confidential Information to (a) subject to Section 5 below, any Governmental Entity (as hereinafter defined), including, without limitation, in any pleadings or submissions, or (b) any Dondero Related Party. The Parties acknowledge that it is their collective intent that no Confidential Information disclosed hereunder may be examined in any proceeding of a Governmental Entity (or any discovery relating to any such proceeding), and all Confidential Information shall be entitled to all protections applicable under Federal Rule of Evidence 408 and any other protections afforded to settlement and compromise communications under any other applicable Law.

017227

HCMLPHMIT00000570

**5.      Legally Compelled Disclosure**

If any Recipient or any of its Representatives becomes compelled by Law (whether by oral questions, interrogatories, requests for information or documents, subpoena, civil or criminal investigative demand, or similar process) to make any disclosure that is prohibited or otherwise constrained by this Agreement, such Recipient or its Representative, as the case may be, shall provide Highland with immediate notice of such legal proceedings, including all related documentation, so Highland may (a) seek an appropriate protective order or other appropriate relief, or (b) waive compliance with the provisions of this Agreement.  In the absence of a protective order or Recipients receiving a written waiver from Highland, Recipients or their Representatives are permitted (with Highland's cooperation but at Recipient's expense) to disclose that portion (and only that portion) of the Confidential Information that Recipient or its Representative is legally compelled by an order of an applicable Governmental Entity of competent jurisdiction to disclose; provided, however, that Recipient and its Representatives must use best efforts to obtain reliable assurance that confidential treatment will be accorded by any Person to whom any Confidential Information is so disclosed.

**6.      Return or Destruction of Confidential Information**

If Highland notifies Recipients that it wishes Recipients to return all Confidential Information, then Recipients (i) shall promptly deliver to Highland all documents or other materials disclosed by or on behalf of Highland to Recipient or its Representatives constituting Confidential Information, together with all copies and summaries thereof in the possession or under the control of Recipients or their Representatives, and (ii) will destroy materials generated by Recipients or their Representatives that include or refer to any part of the Confidential Information, without retaining any copies, including, without limitation, any electronically stored copies or attachments to emails, of any such documents or materials.  Written notice of return or destruction shall constitute a valid termination of access to Confidential Information and shall be deemed to have been given at the time Highland sends such notice.  Such notice may be sent in any manner reasonably calculated to notify Recipients of the termination.

**7.      No Obligation to Negotiate a Potential Settlement**

None of the Parties shall have rights or obligations of any kind whatsoever with respect to any Potential Settlement by virtue of this Agreement other than for the matters specifically agreed to herein.  Without limiting the preceding sentence, nothing in this Agreement requires any Party to enter into any Potential Settlement or to negotiate the same for any specified period of time or on any specific terms.

**8.      No Representations or Warranties**

Highland shall have no obligation to provide any information—confidential or otherwise—to the Recipients and retains the right to determine, in its sole discretion, what information, if any, it wishes to make available to Recipients, and neither Highland nor any Highland Related Party makes any representation or warranty (express or implied) concerning the completeness or accuracy of the Confidential Information.

017228

HCMLPHMIT00000571

9. **Miscellaneous**

(a)   <u>Modification</u>.  This Agreement may only be modified or waived by a separate writing signed by the Party or Parties expressly modifying or waiving this Agreement.

(b)   <u>Waiver</u>.  Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.

(c)   <u>Certain Definitions</u>.

(i)  The term "**Governmental Entity**" means any federal, national, state, foreign, provincial, local or other government or any governmental, regulatory, administrative or self-regulatory authority, agency, bureau, board, commission, court, judicial or arbitral body, department, political subdivision, tribunal or other instrumentality thereof, including any fiscal intermediary or administrative contractor acting on behalf of any of the foregoing.

(ii)  The term "**Law**" means any law, rule, regulation, statute, code, ordinance, decree or other restriction of any Governmental Entity or any order, injunction, judgment, decree, ruling, writ, assessment or award of a Governmental Entity.

(iii)  The term "**Organizational Documents**" means certificates of incorporation, bylaws, certificates of formation, certificates of trust, limited liability company agreements, limited liability partnership agreements, partnership or limited partnership agreements, trust agreements or other similar formation or governing documents of any Person, in each case, as amended, restated or otherwise modified to date.

(iv)  The term "**Person**" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, any other business entity, or a Governmental Entity.

(d)   <u>Severability</u>.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, which shall remain in full force and effect.  If any of the terms, covenants or provisions of this Agreement are determined to be unenforceable by reason of its extent, duration, scope or otherwise, then the Parties contemplate and intend that the authority making such determination shall reduce such extent, duration, scope or other provision and enforce them in their reduced form for all purposes contemplated by this Agreement.

(e)   <u>Breach</u>.  Recipients agree that Highland will be irreparably injured by a breach of this Agreement by any Recipient or its Representatives, that monetary remedies will be inadequate to protect Highland against any actual or threatened breach of this Agreement by any Recipient or by its Representatives, and that Highland shall be entitled to an injunction or other equitable relief as a remedy for any breach as a matter of right and without the necessity of having to post a bond. Such remedy shall not be deemed to be the exclusive remedy for a breach of this Agreement, but

017229

HCMLPHMIT00000572

shall be in addition to all other remedies available at law or equity. The non-prevailing Party shall pay the other Party's costs and expenses in any action to enforce the terms of this Agreement.

(f) <u>Liability and Indemnity</u>. Recipients shall, jointly and severally, be liable to and shall indemnify and hold Highland and the Highland Related Parties harmless from and against any and all claims, suits, losses, damages, costs or expenses, including reasonable attorney fees, incurred or suffered by Highland or any Highland Related Party as a result of any Recipient or its Representatives violation of this Agreement, including, without limitation, using or disclosing any Confidential Information other than in accordance with this Agreement, whether such use or disclosure is performed negligently or otherwise.

(g) <u>Notices</u>. All notices, requests, demands, claims, and other communications hereunder shall be in writing. Any notice, request, demand, claim or other communication hereunder shall be deemed duly delivered: (a) four (4) business days after it is sent by registered or certified mail, return receipt requested, postage prepaid; (b) one (1) business day after it is sent for next business day delivery via a reputable nationwide overnight courier service; (c) when sent, if emailed on a business day; and (d) the next business day following the day on which the email is sent if emailed on a day that is not a business day, in each case to the intended recipient as set forth below:

If to Highland:        Highland Capital Management, L.P.
                                  100 Crescent Court, Suite 1850
                                  Dallas, Texas 75201
                                  Attention: James P. Seery, Jr.
                                  Email: jpseeryjr@gmail.com AND notices@highlandcapital.com

                                  With copies to:

                                  Pachulski Stang Ziehl & Jones LLP
                                  780 3rd Avenue #34
                                  New York, New York 10017
                                  Attention: John A. Morris
                                  Email: jmorris@pszjlaw.com

If to Recipients:      c/o Mark Patrick
                                  6716 Glenhurst Dr.
                                  Dallas, Texas 75254
                                  Email: mpatrick@dafholdco.com

                                  With copies to:

                                  Kelly Hart & Pitre
                                  301 Main Street Suite 1600
                                  Baton Rouge, Louisiana 70801
                                  Attention: Louis M. Phillips
                                  Email: Louis.Phillips@kellyhart.com

017230

HCMLPHMIT00000573

(h)     Governing Law; Jurisdiction.  This Agreement shall be interpreted and construed in accordance with the laws of the State of Delaware, without regard to conflict of laws provisions. Each Party hereby irrevocably submits and acknowledges and recognizes the exclusive jurisdiction of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (which court, for purposes of this Agreement, is the only court of competent jurisdiction), over any suit, action or other proceeding arising out of, under or in connection with this Agreement or its subject matter.  Each Party irrevocably consents to service of process in any action or proceeding arising out of or relating to this Agreement in the manner provided for notices in Section 9(g) above. Nothing in this Agreement shall affect the right of any Party to serve process in any manner permitted by law.

(i)     Execution of Agreement.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which, when taken together, shall be deemed to constitute one and the same agreement.  The exchange of copies of this Agreement and of signature pages by email shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the Parties transmitted by email shall be deemed to be their original signatures for any purpose whatsoever.

(j)     Headings.  The headings of the sections of this Agreement are inserted for convenience of reference only and shall not control or affect the meaning or construction of any of the terms of this Agreement in any manner.

(k)     Construction.  This Agreement has been fully negotiated by the Parties. Accordingly, in interpreting this Agreement, no weight shall be placed on which Party to this Agreement or its counsel drafted the provision being interpreted.

[SIGNATURES ON FOLLOWING PAGE]

8

017231

HCMLPHMIT00000574

IN WITNESS WHEREOF, the Parties have executed this Agreement to be effective as of the Effective Date.

**HIGHLAND:**

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name: James P. Seery, Jr.
Title: Chief Executive Officer

**RECIPIENTS:**

_____
MARK PATRICK

HUNTER MOUNTAIN INVESTMENT TRUST

By: _____
Name: Mark Patrick
Title: Administrator

CHARITABLE DAF HOLDCO, LTD.

By: _____
Name: Mark Patrick
Title: Director

CDH GP, LTD.

By: _____
Name: Mark Patrick
Title: Director

SIGNATURE PAGE TO CONFIDENTIALITY AGREEMENT

HCMLPHMIT00000575

CHARITABLE DAF FUND, L.P.
By: CDH GP, Ltd., its General Partner

By: _____
Name: Mark Patrick
Title: Managing Member


CLO HOLDCO, LTD.

By: _____
Name: Mark Patrick
Title: Director


RAND ADVISORS, LLC

By: _____
Name: Mark Patrick
Title: President


RAND PE FUND I, L.P.
By: Rand PE Fund Management, LLC, its General
Partner

By: _____
Name: Mark Patrick
Title: President


RAND PE FUND MANAGEMENT, LLC

By: _____
Name: Mark Patrick
Title: President


Type text here


SIGNATURE PAGE TO CONFIDENTIALITY AGREEMENT

017233

HCMLPHMIT00000576

ATLAS IDF, LP
By: Atlas IDF GP, LLC its General Partner

By: _____
Name: Mark Patrick
Title: President

Type text here

ATLAS IDF GP, LLC

By: _____
Name: Mark Patrick
Title: President

SIGNATURE PAGE TO CONFIDENTIALITY AGREEMENT

017234

HCMLPHMIT00000577

## EXHIBIT A

## <u>PENDING LITIGATION</u>

1.      DAF/CLOH appeal of Seery Retention Order (21-cv-01585-S)

2.      HMIT appeal of Order denying leave to file Claims Trading Complaint (23-cv-02071-E)

3.      HMIT appeal of Order dismissing Valuation Complaint (24-cv-01531-X)

4.      HMIT appeal of Order staying motion for leave to remove Seery (24-cv-01786)

5.      DAF appeal of decision affirming dismissal of HarbourVest Complaint (24-10880)

4910-0725-4050.6 36027.003

017235

HCMLPHMIT00000578

**EXHIBIT B**

**JOINDER TO CONFIDENTIALITY AGREEMENT**

This JOINDER TO CONFIDENTIALITY AGREEMENT (this "**Joinder**") is entered into as of _____, _____, 2025 (the "**Effective Date**") by and between Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), and _____ (the "**Joining Party**"). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Confidentiality Agreement (as hereinafter defined).

WHEREAS, reference is made to that certain Confidentiality Agreement as of March 18, 2025 by and among Highland, on the one hand, and Mark Patrick, a United States citizen and resident of Dallas, Texas, Hunter Mountain Investment Trust, a Delaware statutory trust, Charitable DAF Holdco, Ltd., a Cayman Islands exempted company, CDH GP, Ltd., a Cayman Islands exempted company, Charitable DAF Fund, L.P., a Cayman Islands exempted limited partnership, and CLO Holdco, Ltd., a Cayman Islands exempted company, Rand Advisors, LLC, a Delaware limited liability company, Rand PE Fund I, LP, a Delaware series limited partnership, Rand PE Fund Management, LLC, a Delaware limited liability company, Atlas IDF, LP, a Delaware limited partnership, Atlas IDF GP, LLC, a Delaware limited liability company, on the other hand (the "**Confidentiality Agreement**");

WHEREAS, the Joining Party is a Representative of Recipients and desires to receive certain Confidential Information for the sole limited purpose of advising Recipients in connection with its evaluation, negotiation and consummation of a Proposed Settlement; and

WHEREAS, in accordance with Section 4 of the Confidentiality Agreement and as a condition to Highland providing, or permitting Recipients to provide, such Confidential Information to the Joining Party, the Joining Party agrees to the terms and conditions set forth in this Joinder.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, the parties hereto, intending to be legally bound, hereby agree as follows:

1. The Joining Party acknowledges that it has received and reviewed a copy of the Confidentiality Agreement. The Joining Party hereby joins as a Party to, and agrees to be bound by all of the terms, provisions and conditions set forth in, the Confidentiality Agreement as a "Recipient" thereunder, with the same force and effect as if originally named therein as a "Recipient."

2. Without limiting the generality of the foregoing, the Joining Party hereby (a) makes each of the representations and warranties set forth in Section 1 of the Confidentiality Agreement to Highland and (b) represents and warrants to Highland that such Joining Party (i) does not currently represent any Dondero Related Party and (ii) has no duty or obligation to provide any

017236

HCMLPHMIT00000579

Confidential Information to any Person not a party to this Agreement, whether through a common or joint interest agreement or otherwise, and does not represent any Person with such a duty or obligation.

3.      Each of the terms, provisions and conditions set forth in Section 9 of the Confidentiality Agreement are incorporated herein by reference in their entirety and shall apply to this Agreement *mutatis mutandis*.

IN WITNESS WHEREOF, the parties hereto have executed this Joinder to be effective as of the Effective Date.

**HIGHLAND:**

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name: James P. Seery, Jr.
Title: Chief Executive Officer

**JOINING PARTY:**

_____
Name: _____

SIGNATURE PAGE TO CONFIDENTIALITY AGREEMENT

017237

HCMLPHMIT00000580

**EXHIBIT 43**

017238

**From:** "John A. Morris" <jmorris@pszjlaw.com>
**To:** "Louis Phillips" <Louis.Phillips@kellyhart.com>
**Cc:** "Jeff Pomerantz" <jpomerantz@pszjlaw.com>, "amelia.hurt@kellyhart.com" <Amelia.Hurt@kellyhart.com>
**Subject:** Highland/DAF/HMIT: Follow up
**Date:** Fri, 4 Apr 2025 20:54:20 +0000
**Importance:** Normal
**Attachments:** 4923-0508-6766.v3_Litigation_Protections_M._Patrick.docx
**Inline-Images:** image001.jpg

---

Louis:

I'm writing to follow up on several things.

1. <u>Litigation Protections</u>.  Attached are the "Litigation Protections" I mentioned.  They are still subject to review and material change but wanted to share them now.

2. <u>Follow up information</u>.  It sounds like yesterday's Zoom meeting was helpful.  Please let us know if there is any other information your clients need to assess the situation.

3. <u>HCMLP's diligence</u>.  We'll have some questions on our end, but for now, please send us the Remittance Agreement referred to in the Intercreditor Agreement.

4. <u>Joinder signature</u>.  For completeness, please send us Shawn's signature page.

5. <u>Preliminary terms/structure</u>.  We hope to provide over the weekend a set of bullet points concerning possible terms and structure of an agreement.

6. <u>Further meeting</u>.  Some or all of us are prepared to meet in Dallas on Tuesday at a time to be determined (some may participate by Zoom).  Please let us know if that is possible as soon as you're able so we can make travel arrangements.

Please let me know if you have any questions and thank you for your continued cooperation.

Regards,

John


**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

017239

HCMLPHMIT00000621



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

017240

HCMLPHMIT00000622

## PREAMBLE

The provisions below are collectively referred to as the "Litigation Protections."  The Parties agree that the intent of the Litigation Protections is to enact a permanent cessation of all litigation concerning or related to the Highland Entities through and including the Effective Date.

## GENERAL AND UNCONDITIONAL RELEASE

Upon the Effective Date, and to the maximum extent permitted by law, each of the DAF/HMIT Entities[1] on behalf of himself, herself, or itself and each of its respective current or former advisors, trustees, directors, officers, managers, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, affiliates (including affiliated and/or controlled funds and other investment vehicles), successors, predecessors, designees, and assigns (whether by operation of law or otherwise) (collectively with the DAF/HMIT Entities, the "DAF/HMIT Releasors") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each Highland Released Party from, and waives and relinquishes, any and all Claims, which the DAF/HMIT Releasors, or any person or entity claiming through, under, or on behalf of any of the DAF/HMIT Releasors, ever had, now has, or hereafter can, shall, or may have against any of the Highland Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Effective Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management of the Highland Entities, or the Highland Entities' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "DAF/HMIT Entity Released Claims").

Upon the Effective Date, and to the maximum extent permitted by law, each of the Highland Entities on behalf of itself and each of its respective current or former advisors, trustees, directors, officers, managers, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, affiliates (including affiliated and/or controlled funds and other investment vehicles), successors, predecessors, designees, and assigns (whether by operation of law or otherwise) in each case from and including August 11, 2021 (collectively with the Highland Entities, the "Highland Releasors") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each DAF/HMIT Released Party from, and waives and relinquishes, any and all Claims, which the Highland Releasors, or any person or entity claiming through, under, or on behalf of any of the Highland Releasors, ever had, now has, or hereafter can, shall, or may have against any of the DAF/HMIT

---

[1] The "DAF/HMIT Entities" means, individually and collectively, Mr. Mark Patrick, Mr. Shawn Raver, Mr. Paul Murphy, Hunter Mountain Investment Trust, a Delaware statutory trust, Beacon Mountain LLC, a Delaware limited liability compay, Charitable DAF Holdco, Ltd., a Cayman Islands exempted company, CDH GP, Ltd., a Cayman Islands exempted company, Charitable DAF Fund, L.P., a Cayman Islands exempted limited partnership, Liberty CLO Holdco, Ltd, [a Cayman Islands, exempted company], and CLO Holdco, Ltd., a Cayman Islands exempted company, Rand Advisors, LLC, a Delaware limited liability company, Rand PE Fund I, LP, a Delaware series limited partnership, Rand PE Fund Management, LLC, a Delaware limited liability company, Atlas IDF, LP, a Delaware limited partnership, and Atlas IDF GP, LLC, a Delaware limited liability company.

017241
HCMLPHMIT00000623

Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Effective Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management of the Highland Entities, or the Highland Entities' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "Highland Entity Released Claims" and together with the DAF/HMIT Entity Released Claims, the "Released Claims"). *Notwithstanding the forgoing*, "Highland Releasors" does not include James Dondero, Scott Ellington, Isaac Leventon, or any entity directly or indirectly owned (in whole or in part) and/or controlled by Mr. Dondero or Mr. Ellington or Mr. Leventon.

**FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASE IS INTENDED TO BE GENERAL AND INCLUDES, WITHOUT LIMITATION, A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE EFFECTIVE DATE.**

To the maximum extent permitted by law, each of the DAF/HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other DAF/HMIT Releasors and Highland Releasors, respectively, waives the benefit of any statute or other principle of law or equity that limits the applicability of a release with respect to claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release.

Without limiting the scope of the foregoing waiver, in connection with the foregoing release, each of the DAF/HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other DAF/HMIT Releasors and Highland Releasors, respectively, waive the benefits of Section 1542 of the California Civil Code (to the extent, if any, that Section 1542 might apply to the foregoing release), which provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Each of the DAF/HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other DAF/HMIT Releasors and Highland Releasors, respectively, hereby agrees that the provisions of Section 1542 of the Civil Code of the State of California and all similar federal or state law, rights, rules or legal principles, legal or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY EACH OF THE DAF/HMIT ENTITIES AND THE HIGHLAND ENTITIES, ON THEIR OWN BEHALF AND ON BEHALF OF THE OTHER DAF/HMIT RELEASORS AND HIGHLAND RELEASORS, RESPECTIVELY,** in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each of the DAF/HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other DAF/HMIT Releasors and Highland Releasors, respectively, hereby

017242

HCMLPHMIT00000624

agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

In connection with such waiver and relinquishment, each of the DAF/HMIT Entities and Highland Entities acknowledges that it is aware that it may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein.  Nevertheless, it is the intent of each of the DAF/HMIT Entities and the Highland Entities in executing this Agreement fully, finally, and forever to settle and release all such matters, and all claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

As an integral component of this Agreement, and notwithstanding the Parties' intent set forth in the preamble hereto and the general nature of the releases in Section [_] hereof, should:

(a) any DAF/HMIT Releasor contend or assert that any Claim of any kind whatsoever held by any DAF/HMIT Releasor against any Highland Released Party survives this Agreement and is in any way related to or arising from or in connection with any DAF/HMIT Entity Released Claim (such claim or cause of action, a "Patrick Alleged Claim"), such DAF/HMIT Releasor will be deemed to have irrevocably, fully, and finally assigned such Patrick Alleged Claim to the Highland Claimant Trust and the Highland Claimant Trust will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such Patrick Alleged Claim.

(b) any Highland Releasor contend or assert that any Claim of any kind whatsoever held by any Highland Releasor against any DAF/HMIT Released Party survives this Agreement and is in any way related to or arising from or in connection with any Highland Entity Released Claim (such claim or cause of action, a "Highland Alleged Claim"), such Highland Releasor will be deemed to have irrevocably, fully, and finally assigned such Highland Alleged Claim to Mr. Mark Patrick and Mr. Mark Patrick will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such Highland Alleged Claim.

**THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF EITHER PARTY OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT. THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS (COLLECTIVELY, "REPRESENTATIONS"), EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT; AND THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT RELIED ON ANY REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY ARE ENTERING INTO THIS AGREEMENT RELYING SOLELY ON THEIR OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS BY ANY PARTY, EXCEPT FOR THOSE REPRESENTATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT.  THE PARTIES AGREE THAT REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT SHALL NOT BE USED IN THE INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT, AND NEITHER THE DAF/HMIT RELEASED PARTIES NOR THE HIGHLAND RELEASED PARTIES SHALL HAVE ANY LIABILITY FOR ANY CONSEQUENCES ARISING AS A RESULT OF ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT.**

017243

HCMLPHMIT00000625

## COVENANT NOT TO SUE; LIMITATION ON STANDING

Subject to the occurrence of the Effective Date:

(a) each of the DAF/HMIT Releasors covenants and agrees that it will not institute or prosecute any action, suit, or proceeding, in law, in equity or otherwise, against any of the Highland Released Parties, to recover, enforce, or collect any DAF/HMIT Entity Released Claim and will not (i) induce, encourage or direct any other party to do so or (ii) act in concert with or assist (financially or otherwise) any other party in doing so.

(b) each of the Highland Releasors covenants and agrees that it will not institute or prosecute any action, suit, or proceeding, in law, in equity or otherwise, against any of the DAF/HMIT Released Parties, to recover, enforce, or collect any Highland Entity Released Claim and will not (i) induce, encourage or direct any other party to do so or (ii) act in concert with or assist (financially or otherwise) any other party in doing so.

(c) For the avoidance of doubt, (i) except for the limited purpose of seeking Court approval of this Agreement (including with respect to any appeal concerning any order entered granting or denying such approval), no DAF/HMIT Entity shall file any pleading, motion, adversary proceeding, or other paper in the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court expect with respect to any order granting or denying the motion to approve this Settlement), including but not limited to, in connection with HMIT's status as a holder of a Class 10 interest; and (ii) this Agreement shall not operate to give any Patrick Party standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except for the limited purpose of seeking Court approval of this Agreement (including with respect to any appeal concerning any order entered granting or denying such approval).

## NO PRIOR ASSIGNMENT OF CLAIMS

Each of the DAF/HMIT Entities hereby represents and warrants that every DAF/HMIT Entity Released Claim has not heretofore been assigned or encumbered, and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any DAF/HMIT Releasor.

Each of the Highland Entities hereby represents and warrants that every Highland Entity Released Claim has not heretofore been assigned or encumbered, and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any Highland Releasor.

## ACKNOWLEDGEMENT OF IRREVOCABLY BINDING AND ENFORCEABLE NATURE OF ALL PLAN PROTECTIONS; DISMISSAL WITH PREJUDICE BY DAF/HMIT ENTITIES OF ALL PENDING LITIGATION

The DAF/HMIT Entities, on their own behalf and on behalf of the other DAF/HMIT Releasors, acknowledge and agree that each Plan Provision is lawful, effective, and binding on the DAF/HMIT Releasors.  The DAF/HMIT Entities further agree, on their own behalf and on behalf of the other DAF/HMIT Releasors, that the DAF/HMIT Releasors will never, in any way, challenge or seek to modify, nullify, vacate, or revoke, or induce, encourage or direct any other party to do so or act in concert with or assist (financially or otherwise) any other party in doing so the Confirmation Order, the Plan, the Plan Protections, or any Plan Document, including the Trust

017244
HCMLPHMIT00000626

Agreement, the LPA, or the Sub-Trust Agreement, in the Bankruptcy Court, in any other state or federal court, in any other forum or tribunal, or otherwise, including administrative or regulatory tribunals and foreign courts.

Within two Business Days following the Effective Date, the DAF/HMIT Entities will dismiss, or cause to be dismissed, with prejudice any action, suit, or proceeding, in law, in equity or otherwise, or withdraw, or cause to be withdrawn, with prejudice any claim or cause of action against, affecting, or related to any Released Party or any DAF/HMIT Entity Released Claim, including (i) *Charitable DAF Fund v. Highland Capital Management, L.P.*, 24-10880 (Fifth Circuit), (ii) *Charitable DAF Fund, L.P., et al v. Highland Cap. Mgmt., L.P.*, Case No. 3:21-cv-01585-S (N.D. Tex.), (iii) *Hunter Mountain Investment Trust v. Highland Capital Management, L.P.*, 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court; (iv) *Dugaboy Investment Trust v. Highland Capital Management, L.P.*, 3:24-cv-01531-X (N.D. Tex.) (dismissal only of plaintiff Hunter Mountain Investment Trust); and (v) *Hunter Mountain Investment Trust v. Highland Capital Management, L.P.*, 3:24-cv-01786-L (N.D. Tex.).

## NO INDEPENDENT DUTY OWED

The Highland Entities, individually and collectively, shall owe no duty to the DAF/HMIT Entities, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement.

## GATEKEEPER STANDARD

The DAF/HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other DAF/HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that, notwithstanding the United States Court of Appeals for the Fifth Circuit's decision in *Highland Capital Management Fund Advisors, L.P. v. Highland Capital Management, L.P.*, No. 23-10534 (5th Cir. Mar. 18, 2025), the "Gatekeeper" provisions contained in Highland's Original Plan is forever binding on each of the DAF/HMIT Entities and for a claim or cause of action to be "colorable" for purposes of the Gatekeeper, it must be found by final order of the Bankruptcy Court (the "Gatekeeper Court"), which order shall be subject to appeal to a court of competent jurisdiction, to have satisfied the "Gatekeeper Colorability Test" as such term is defined in *In re Highland Capital Management, L.P.*, 2023 Bankr. LEXIS 2104 at *124-36 (Bankr. N.D. Tex. Aug. 24, 2023).

The DAF/HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other DAF/HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that compliance with the Gatekeeper requires (i) a motion seeking leave to sue an Exculpated Party (as that term is defined in Highland's Original Plan) and a finding that the litigant's claims and causes of action are "colorable" attaching a complaint setting forth the basis for such claims or causes of action and (ii), in the Gatekeeper Court's sole discretion, an evidentiary hearing (during which the Gatekeeper Court may, among other things, hear testimony and assess the credibility of any witness(es)) to determine whether a proposed claim or cause of action is "colorable."

The DAF/HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other DAF/HMIT Releasors and Highland Releasors, respectively, further acknowledge and agree that

017245
HCMLPHMIT00000627

the moving party under the Gatekeeper has the burden of satisfying the "Gatekeeper Colorability Test."

## INDEMNIFICATION

Without in any manner limiting the available remedies for any breach of this Agreement, the DAF/HMIT Entities, severally but not jointly, agree to indemnify, defend, and hold the Highland Released Parties harmless from and against any and all liability, actions, claims, demands, liens, losses, damages, judgments, and expenses, including attorneys' fees and costs, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties set forth in [NON-ASSIGNMENT PROVISION] or (y) any suits, proceedings, or other actions brought or prosecuted by or on behalf of, any DAF/HMIT Releasor or that are induced, encouraged, assisted or directed by any DAF/HMIT Releasor or brought or prosecuted in concert with any DAF/HMIT Releasor against any Highland Released Party with respect to or related to any DAF/HMIT Entity Released Claims. Without in any manner limiting the scope of the foregoing, any DAF/HMIT Entity that breaches Section [COVENANT NOT TO SUE] of this Agreement shall be liable to the Highland Released Party against whom the applicable suit, action, or other proceeding has been brought or prosecuted in violation of Section [_] for the reasonable attorneys' fees and costs incurred by such Highland Released Party in defending against or otherwise responding to such suit, action, or proceeding. Each DAF/HMIT Entity acknowledges and agrees that the DAF/HMIT Entities are and shall be severally but not jointly liable for any costs, liabilities, or damages arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement as set forth in this Section [_].

Without in any manner limiting the available remedies for any breach of this Agreement, the Highland Entities, severally but not jointly, agree to indemnify, defend, and hold the DAF/HMIT Released Parties harmless from and against any and all liability, actions, claims, demands, liens, losses, damages, judgments, and expenses, including attorneys' fees and costs, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties set forth in [NON-ASSIGNMENT PROVISION] or (y) any suits, proceedings, or other actions brought or prosecuted by or on behalf of, any Highland Releasor or that are induced, encouraged, assisted or directed by any Highland Releasor or brought or prosecuted in concert with any Highland Releasor against any DAF/HMIT Released Party with respect to or related to any Highland Entity Released Claims. Without in any manner limiting the scope of the foregoing, any Highland Entity that breaches Section [COVENANT NOT TO SUE] of this Agreement shall be liable to the DAF/HMIT Released Party against whom the applicable suit, action, or other proceeding has been brought or prosecuted in violation of Section [_] for the reasonable attorneys' fees and costs incurred by such DAF/HMIT Released Party in defending against or otherwise responding to such suit, action, or proceeding. Each Highland Entity acknowledges and agrees that the Highland Entities are and shall be severally but not jointly liable for any costs, liabilities, or damages arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement as set forth in this Section [_].

017246

HCMLPHMIT00000628

## DEFINITIONS

"Bankruptcy Case" means *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex.) and its related proceedings.

"Bankruptcy Court" means the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division.

"Business Day" means any day other than (i) a Saturday or a Sunday, (ii) a day on which the Federal Reserve Bank of New York or the New York Stock Exchange is closed, or (iii) a day on which banks in the States of Texas are required, or authorized by law, to close.

"Claims" means any claims, debts, liabilities, demands, obligations, breaches of contract, breaches of duty or any relationship, misfeasance, malfeasance, promises, acts, omissions, agreements, liens, losses, costs and expenses (including attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whenever and however, arising, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise.

"Committee" means the official committee of unsecured creditors appointed in the Bankruptcy Case.

"Confirmation Order" means that certain *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943], as conformed in accordance with the Fifth Circuit's rulings.

"DAF/HMIT Released Parties" means [PATRICK TO PROVIDE].

"Effective Date" means the date on which the Bankruptcy Court enters an order approving the material terms of this Agreement.

"Gatekeeper" means the gatekeeping provision contained in Article IX. F of the Plan as of August 11, 2021.

"Highland" means Highland Capital Management, L.P.

"Highland Entities" means collectively Highland, the Highland Claimant Trust, the Highland Litigation Sub-Trust, and the Highland Indemnity Trust.

"Highland Released Parties" means collectively (i) the Highland Entities, (ii) any entity directly or indirectly majority-owned and/or controlled by any Highland Entity, (iii) any entity directly or indirectly managed by any Highland Entity whether by contract or otherwise (the entities described in clauses (i)-(iii), collectively, the "Highland Parties"), (iv) each of the Highland Parties' trustees and administrators (including the trustees of the Highland Claimant Trust, Highland Litigation Sub-Trust, and Highland Indemnity Trust), current and former officers, executives, agents, directors, advisors, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, affiliates, successors, designees, and assigns, (v) the current and

017247

HCMLPHMIT00000629

former members of the Oversight Board of the Highland Claimant Trust and their affiliates, including Farallon Capital Management, LLC, Stonehill Capital Management, LLC, Muck Holdings LLC, and Jessup Holdings LLC, (vi) the Independent Board and its members John Dubel, James P. Seery, Jr., and Russell Nelms, (vii) James P. Seery, Jr., individually and in all capacities for any Highland Released Party or Covered Party, including, but not limited to, as Chief Executive Officer of Highland Capital Management, L.P., Claimant Trustee of the Highland Claimant Trust, and the Indemnity Trust Administrator of the Highland Indemnity Trust, (viii) the Committee and each of its members, (ix) the professionals (and their respective firms) (a) retained by Highland or the Committee during the Bankruptcy Case or which provided services to Highland or the Committee during the Bankruptcy Case and (b) retained by any Highland Party on or after August 11, 2021, (x) any person or entity indemnified by any Highland Entity (the entities described in clauses (i)-(x), collectively, the "Covered Parties"), and (xi) each Covered Party's current and former officers, executives, agents, directors, advisors, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, affiliates, successors, designees, and assigns, if not otherwise included in the defined term "Covered Parties;" provided, however, and for the avoidance of doubt, and without in any way limiting the scope of the foregoing, "Covered Parties" include Highland CLO Funding Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Multi Strategy Credit Fund GP, L.P., Highland Multi Strategy Credit Fund, Ltd., Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., Highland Select Equity Fund, L.P., Highland Restoration Capital Partners Master, L.P., Highland Restoration Capital Partners GP, LLC, Highland Restoration Capital Partners, L.P., Gleneagles CLO, Ltd., Aberdeen Loan Funding, Ltd. Argentina Regional Opportunity Fund, Highland Offshore Partners, L.P. (Diversified), Brentwood CLO, Ltd., Eastland CLO, Ltd., Bristol Bay Funding Ltd., Jasper CLO Ltd., Highland Legacy Limited, Grayson CLO, Ltd., Greenbriar CLO, Ltd., Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Liberty CLO, Ltd., Valhalla CLO, Ltd., Stratford CLO Ltd., South fork CLO, Ltd., Pam Capital Funding, L.P., Stonebridge-Highland Healthcare Private Equity Fund, Pamco Cayman Ltd., Red River CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO, Ltd., Westchester CLO, Ltd. Longhorn Credit Funding A, Longhorn Credit Funding B, PensionDanmark Pensionsforsikringsaktieselskab, Highland Dynamic Income Master Fund L.P., Highland Prometheus Master Fund, L.P., Highland Flexible Income UCITS Fund, and Acis CLO 2017-7, Ltd. *Notwithstanding the forgoing*, "Highland Released Parties" does not include James Dondero, Scott Ellington, Isaac Leventon, or any entity directly or indirectly owned (in whole or in part) and/or controlled by Mr. Dondero or Mr. Ellington or Mr. Leventon.

"Indemnity Trust Administrator" has the meaning given to it in the Indemnity Trust Agreement.

"Indemnity Trust Agreement" means that certain *Indemnity Trust Agreement*, effective as of August 16, 2021.

"Independent Board" means the independent board appointed by the Bankruptcy Court on January 9, 2020, pursuant to that certain *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 339].

"LPA" means that certain *Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.*

017248

HCMLPHMIT00000630

"Original Plan" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* attached as Exhibit A to the *Order (A) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as modified) and (B) Granting Related Relief*, filed at Docket No. 1943 on the Bankruptcy Court's docket.

"Oversight Board" means the oversight board of the Highland Claimant Trust.

"Parties" means [insert signatories].

"Plan" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* as conformed in accordance with the Fifth Circuit's rulings.

"Plan Documents" has the meaning given to it in the Plan.

"Plan Protections" means, collectively, the provisions of the Plan contained in Article IX thereof.

"Sub-Trust Agreement" means that certain *Highland Litigation Sub-Trust Agreement*.

"Trust Agreement" means that certain *Highland Claimant Trust Agreement*.

017249

HCMLPHMIT00000631

**EXHIBIT 44**

017250

**From:** "John A. Morris" <jmorris@pszjlaw.com>
**To:** "Louis M. Phillips" <louis.phillips@kellyhart.com>
**Cc:** "Jeff Pomerantz" <jpomerantz@pszjlaw.com>, "Amelia L. Hurt"
<amelia.hurt@kellyhart.com>
**Subject:** Highland/DAF/HMIT: Follow up
**Date:** Mon, 7 Apr 2025 15:09:00 +0000
**Importance:** Normal
**Inline-Images:** image001.png; image002.jpg

---

Louis,

Following up.

1. <u>Meeting</u>.  We propose that the business folks (including Mark and Jim) meet in person at Highland's offices at 10:30 am Central Time tomorrow (casual dress, no suits), with lawyers participating by Zoom; if you want to attend in person, Jeff may attend in person as well so let me know (I am unable to attend in person because of other commitments).

2. <u>DAF/HMIT information request</u>.  During tomorrow's meeting, Highland will provide the information requested below (and can quickly walk through the same information that was presented the other day for your benefit if that would be helpful).

3. <u>Highland information request</u>.  As requested, please provide a copy of the Remittance Agreement referred to in the Intercreditor Agreement and share with us any other agreements or information concerning any current or former connection between DAF/CLOH/HMIT and Dondero/Okada/Dugaboy, including the funding of the HMIT litigation (that Mark testified to in June 2023) and the disposition of the HMIT Notes made in favor of Dugaboy and Okada. We just need to know how any agreement may impact the Dondero side, if at all.

4. <u>NDA signatures</u>.  Please let us know who will be participating on your side and send any Joinders not previously sent (I'm not sure we received one for you and Amelia).

We look forward to your prompt response.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

017251

**From:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Sent:** Monday, April 7, 2025 8:12 AM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Subject:** RE: Highland/DAF/HMIT: Follow up

John,

As I mentioned on the phone Friday, we request a breakdown and documentation with specificity of any (i) accrued liabilities, (ii) anticipated success or severance (or completion) payments or bonuses, (iii) continuing admin budget for the Claimant trust, Indemnification sub trust and/or litigation sub trust, and (iv) the identity and amount and basis for any holdback(s).

We are available Tuesday in Dallas.  How many from your side would be participating in person?  I am trying to get my travel plans situated and to make sure my travel might add to the process (for example if you, Jeff, et al from Pachulski are attending remotely so might I). I believe I can get an early flight out in the morning arriving around 7:00 am or a bit later one arriving around 8:45.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

louis.phillips@kellyhart.com
www.kellyhart.com

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

HCMLPHMIT00000643

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Friday, April 4, 2025 3:54 PM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Subject:** Highland/DAF/HMIT: Follow up

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**

Louis:

I'm writing to follow up on several things.

1. <u>Litigation Protections</u>.  Attached are the "Litigation Protections" I mentioned.  They are still subject to review and material change but wanted to share them now.

2. <u>Follow up information</u>.  It sounds like yesterday's Zoom meeting was helpful.  Please let us know if there is any other information your clients need to assess the situation.

3. <u>HCMLP's diligence</u>.  We'll have some questions on our end, but for now, please send us the Remittance Agreement referred to in the Intercreditor Agreement.

4. <u>Joinder signature</u>.  For completeness, please send us Shawn's signature page.

5. <u>Preliminary terms/structure</u>.  We hope to provide over the weekend a set of bullet points concerning possible terms and structure of an agreement.

6. <u>Further meeting</u>.  Some or all of us are prepared to meet in Dallas on Tuesday at a time to be determined (some may participate by Zoom).  Please let us know if that is possible as soon as you're able so we can make travel arrangements.

Please let me know if you have any questions and thank you for your continued cooperation.

Regards,

John


**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

**EXHIBIT 45**

017254

**From:** "John A. Morris" <jmorris@pszjlaw.com>
**To:** "Louis Phillips" <Louis.Phillips@kellyhart.com>
**Cc:** "Jeff Pomerantz" <jpomerantz@pszjlaw.com>, "amelia.hurt@kellyhart.com" <Amelia.Hurt@kellyhart.com>
**Subject:** Highland: Privileged and confidential settlement communication and materials
**Date:** Tue, 8 Apr 2025 20:22:22 +0000
**Importance:** Normal
**Attachments:** Privileged_and_confidential_-_DRAFT_4.8.25_discussion_materials.pdf; PRIVILEGED_AND_CONFIDENTIAL_DRAFT_SETTLEMENT_STRUCTURE_4.8.25.pdf; HFP_-_Entity_Chart_-_2011.pdf
**Inline-Images:** image001.jpg

---

E-MAIL AND ATTACHMENTS DELIVERED PURSUANT TO FED. R. EVID. 408
AND APPLICABLE CONFIDENTIALITY AGREEMENT

Louis,

Thank you and your team for your time today.

As a follow up, attached are the following:

1. Discussion materials from today (draft numbers)
2. Discussion materials from today (draft structure)
3. HFP entity chart from 2011

On your end, please send us the following at your earliest convenience:

1. Copy of settlement agreement circa 2022 between HMIT and Dugaboy/Okada entities
2. Copy of operative document relating to the [redemption] of the Dolomiti/Hakusan entities limited partnership interest in Rand PE Fund I
3. Copy of operative document providing for the [extinguishment] of participating shares of the supporting organizations of Charitable DAF Holdco, Ltd.

Let's confer as soon as you've had a chance to consider these matters with your team.

Please let us know if you have any questions in the interim.

Regards,

John
**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

017255



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

Case 19-34054-sgj11    Doc 4255-45    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Exhibit 45    Page 4 of 7

Privileged and confidential - provided pursuant to Rule 408 and the binding Confidentiality Agreement executed amongst the Parties

**Current Snapshot - remaining assets [1]**
*in USD millions, except percentages*

| Asset description | Ref | Claimant Trust [2] | Indemnity Trust [3] | Combined |
|---|---|---|---|---|
| Cash/treasuries | [4] | $    20.3 | $    67.9 | $    88.1 |
| Disputed Claims Reserve | [5] | 2.7 | - | 2.7 |
| Dugaboy Note receivable | [6] | - | 17.6 | 17.6 |
| HCM Korea (note and equity) | [7] | 3.0 | - | 3.0 |
| HCLOF shares | [8] | 2.5 | - | 2.5 |
| HCRE bad faith sanction | [9] | 0.9 | - | 0.9 |
| Kirschner Litigation (main adversary) | [10] | *See footnote* | - | - |
| HMIT note | [11] | *See footnote* | - | - |
| **Total assets** | | **$    29.4** | **$    85.5** | **$    114.8** |

[1] As of April 3, 2025.  This disclosure is NOT a balance sheet prepared in accordance with US GAAP.  In some instances, values are estimated and actual amounts retained may ultimately differ materially.  No liabilities are included herein, including existing liabilities, contingent liabilities, indemnification obligations, or considerations for future expenses, including costs of liquidation that have not yet been, but will be incurred.

[2] Claimant Trust, including consolidation of the various "Plan" entities other than the Indemnity Trust (HCMLP GP, LLC, Highland Capital Management, LP, Litigation Sub-Trust), each on a standalone basis, with intercompany balances eliminated.

[3] Stand-alone assets retained by the Indemnity Trust.  Other than less than <$1M retained in cash, remainder of cash is invested in US treasuries with maturities less than 1 year.  Excludes <$1M of cash/treasuries on account of the Okada settlement.  Pursuant to the Okada settlement, these funds are segregated and are to be repaid to Okada as first-out funds to the extent that any excess exists in the Indemnity Trust.  Accordingly, in a settlement scenario, these funds would not be available to Class 10 interest holders.

[4] Cash and treasuries includes full face amount of treasuries maturing within 6 months and has also been adjusted up to assume the near-term receipt of approximately $5 million from Highland CLO Funding, Ltd.

[5] Segregated funds invested in US treasuries with near-term maturities.  Funds are reserved for the Daugherty tax proof of claim, which remains pending.  If Highland successfully objects to the proof of claim, funds would be released from the Disputed Claims Reserve.  If the claim is ultimately allowed in full or in part, funds would be paid to Daugherty on account of the allowed claim and any excess remaining would be released from the Disputed Claims Reserve.

[6] Note receivable from The Dugaboy Investment Trust ("Dugaboy").  ~$17.4M principal and ~$0.2M interest currently outstanding, accruing at approximately $1,553/day.  Fair value is less than face value as the note is long-dated, accruing interest at 3.26% and makes annual principal and interest payments through 2046, with the last of such payments due December 31, 2046.  Dugaboy is current on its payments, including with the most recent payment completed for year-end 2024.  Principal payments due are $790,215 yearly, plus accrued interest, which declines each year as principal declines.  The next interest payment due December 31, 2025 is $566,677.  No assurance that Dugaboy will continue making the annual principal and interest payments when due, although the holder of the note could accelerate and pursue collection in that event.

[7] 100% equity interest in Highland Capital Management Korea Limited ("HCM Korea"), plus $2.5 million note from HCM Korea.  Ultimate value dependent on the monetization of the Caris Life Sciences investment through an expected 2025 IPO, which is expected to be in the range of $2 million to $5 million, but could also exceed or fall short of this range.

[8] Shares of Highland CLO Funding, Ltd. ("HCLOF"), a Guernsey company.  Value has been adjusted down to assume a near-term cash dividend of approximately $5 million.  Remaining value is primarily tied up in the "Acis 6" asset, for which a NexPoint entity has recently initiated an appeal in the 2nd Circuit Court of Appeals.  Ultimate value dependent on the Acis 6 litigation and costs of winding down HCLOF and expected to be in the range of $2 million to $4 million, but could also exceed or fall short of this range.

[9] Bad faith sanction against HCRE of $825,940.55, currently on appeal in the District Court.  Fully briefed since November 2024.  Award was posted in the court registry and is accruing post-judgment interest at a rate of $118.80/day.  Approximately $870k is outstanding, including post-judgment interest currently.  No assurance that the appeal will resolve favorably and as a result, there is no assurance that any amounts will ultimately be collected.

[10] Litigation brought by Marc Kirschner as Litigation Trustee to the Litigation Sub-Trust.  Adversary proceeding is currently stayed.  The value of the claims, their collectibility, and the costs of their continued pursuit is ultimately unknown.  For purposes of aggregating the current value of assets for this illustrative presentation, no value has been ascribed.

[11] Within the litigation brought by Marc Kirschner as Litigation Trustee to the Litigation Sub-Trust were claims against HMIT relating to the "HMIT note" receivable, which had originally been a portion of the consideration HMIT paid for acquiring limited partnership interests in Highland in 2015.  These claims are also stayed as part of the overall stay in the case.  The value of the note, its collectibility, and the costs of their continued pursuit is ultimately unknown.  For purposes of aggregating the current value of assets for this illustrative presentation, no value has been ascribed.

HCMLPHMIT00000658

Case 19-34054-sgj11    Doc 4255-45    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Exhibit 45    Page 5 of 7

**Privileged and confidential - provided pursuant to Rule 408 and the binding Confidentiality Agreement executed amongst the Parties**

**Uses: how much could be left after satisfying Class 9 claims?**
*in USD millions*

| | | |
|---|---|---|
| **Total combined assets** | $ | **114.8** *see "current snapshot"* |
| Less: | | |
| Oustanding Class 9, including interest | | (21.0) |
| Existing Incentive Compensation triggered through full payment of Class 9 | | (2.5) |
| Long-dated assets - Dugaboy Note receivable | | (17.6) [1] |
| Wind down expenses and accrued liabilities | | (20.0) [2] |
| Pending Class 8 claims (Daugherty tax) | | *See footnote* [3] |
| Indemnification obligations | | *See footnote* [4] |
| **Net expected cash prior to any indemnification considerations and necessary reserves** | $ | **53.7** [5] |
| **Plus: Non-cash assets - Dugaboy Note receivable** | $ | **17.6** |

[1] Note receivable from The Dugaboy Investment Trust ("Dugaboy"). ~$17.4M principal and ~$0.2M interest currently outstanding, accruing at approximately $1,553/day. Fair value is less than face value as the note is long-dated, accruing interest at 3.26% and makes annual principal and interest payments through 2046, with the last of such payments due December 31, 2046. Dugaboy is current on its payments, including with the most recent payment completed for year-end 2024. Principal payments due are $790,215 yearly, plus accrued interest, which declines each year as principal declines. The next interest payment due December 31, 2025 is $566,677. No assurance that Dugaboy will continue making the annual principal and interest payments when due, although the holder of the note could accelerate and pursue collection in that event.

[2] Amount is ultimately TBD and will ultimately depend on litigation, timing of monetization of remaining assets, and operational needs. For example, if additional litigation is brought forth, outside counsel will incur additional time and expense and certain employees may need to be retained for a longer period of time. If actual expenses exceed $20 million, less cash would be potentially available after Class 9; if actual expenses fall short of $20 million, more cash would be potentially available after Class 9.

[3] For illustrative purposes of this presentation, $0 is assumed. However, if the claim is ultimately allowed in full or in part, funds would be paid to Daugherty on account of the allowed claim, which would reduce cash potentially available after Class 9. No assurances can be provided that the claim will be completely disallowed.

[4] For illustrative purposes of this presentation, $0 is assumed. Thus, all funds utilized for purposes of satisfying indemnification obligations will reduce the funds available dollar for dollar. Under current conditions, it is believed that at least $100 million may be needed for indemnification obligations and as a result, there is not sufficient liquidity at this time to even make any further payments to Class 9 interest holders. Assuming a final/non-appealable order, providing for among other things, a complete cessation of litigation and comprehensive releases from the HMIT/DAF parties, the need for indemnification reserves could be greatly reduced.

[5] Assumes HCM Korea, HCLOF, and HCRE bad faith sanctions are monetized for the amounts described on the "current snapshot" ($6.4 million in aggregate). Monetization in excess of these amounts would result in more cash remaining; monetization below those amounts would result in less cash remaining.

DRAFT - SUBJECT TO REVISION/AMENDMENT

Case 19-34054-sgj11    Doc 4255-45    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Exhibit 45    Page 6 of 7

*Privileged and confidential - provided pursuant to Rule 408 and the binding Confidentiality Agreement executed amongst the Parties*
**Information request made April 7, 2025**

**(i) Accrued liabilities**

| | Entity | | Amount | |
|---|---|---|---|---|
| End of case/severance bonuses - remaining employees | HCMLP | $ | 1,230,000 | |
| Accounts payable book balance (as of March 31, 2025) | HCMLP | | 576,207 | |
| Estimate of other incurred, but not invoiced for work performed | HCMLP | | 500,000 | general estimate |
| **Sub-total (i)** | | **$** | **2,306,207** | A |

| **Other liabilities not included in section totals above** | Entity | | Amount | |
|---|---|---|---|---|
| Distribution payable | HCT | $ | 2,656,732 | previously authorized distributions related to pending Daugherty claim (has offsetting cash reserve; see current snapshot); to be released following resolution of the pending claim |
| Okada settlement payable | Indemnity Trust | $ | 870,000 | first-out dollars in treasuries (amount is face of such treasuries) - for purposes of settlement discussions, the cash reserved related to the Okada settlement and the potential first-out dollars are excluded as irrelevant |

**(ii) Anticipated success or severance (or completion) payments or bonuses**

| | Entity | | Amount | Basis for amount |
|---|---|---|---|---|
| Incentive Compensation Plan | HCMLP/HCT | | 2,480,088 | assuming full payment of the Class 9's; calc'd as 14.71516% on remaining distributions to Class 9 with a time discount applied to the gross dollars distributed |
| Retention Date payments - employees | HCMLP | | 925,000 | Retention Date is 9/30/2025 |
| Nate Burns (employee) incentive comp | HCMLP | | -- | Nate receives a portion of the performance fees earned related to HCM Korea; assuming zero for presentation purposes as amounts would be a percentage of incremental value received from HCM Korea |
| **Sub-total (ii)** | | **$** | **3,405,088** | B |

**(iii) Continuing admin budget for the Claimant Trust, Indemnification sub trust and/or litigation sub trust**

| | | | | |
|---|---|---|---|---|
| See subsequent page; Sub-total (iii) | | $ | 16,768,874 | C - additional detail contained on separate page |

| **Sum of A, B, and C** | | **$** | **22,480,169** | |
|---|---|---|---|---|

**(iv) Identity and amount and basis for any holdback(s)**

| Identity: | | | Amount | Basis for amount |
|---|---|---|---|---|
| Sum of A, B, and C from above | | $ | 22,480,169 | from above; See notes and assumptions related to items A, B, and C |
| Incremental operational reserve | | | 5,000,000 | Excess cash to retain to cover potential cost overages - largest risk is incremental litigation and resulting time and expense of PSZJ plus longer retention of employees/CEO to assist with litigation, if applicable |
| Indemnification reserves | | | 35,000,000 | Assumes comprehensive releases and settlement amongst the HMIT/DAF Parties; at least $100 million if no settlement |
| Sum of items above | | $ | 62,480,169 | to below |

| Calc of estimated cash available for a prelim distribution to Class 10, assuming settlement | | | $ millions | |
|---|---|---|---|---|
| Current cash/treasuries (see previous page) | | | 88.1 | Cash and treasuries (including all Plan entities) |
| Assets expected to monetize in next 12 months | | | 6.4 | HCM Korea, remainder of HCLOF, bad faith sanction (but excluding near-term Dugaboy Note P&I amortization due December 2025) |
| **Sub-total** | | | **94.5** | |
| less: outstanding Class 9, including interest | | | (21.0) | current outstanding Class 9 with interest |
| less: holdbacks (from above) | | | (62.5) | from above |
| Remaining cash available for initial distribution to Class 10 | | $ | 11.1 | [1] |
| **Round to nearest million** | | **$** | **11.0** | |

[1] Possibility of incremental amount of up to $2.7 million in the event of a successful opposition to the pending Daugherty tax POC, along with incremental interim cash received from Dugaboy Note P&I amortization.  Amount also does not include non-cash assets (litigation, outstanding Dugaboy Note, etc).

017259

HCMLP/HMIT00000660

Case 19-34054-sgj11　　Doc 4255-45　　Filed 06/20/25　　Entered 06/20/25 21:39:29　　Desc
Exhibit 45　　Page 7 of 7

*Privileged and confidential - provided pursuant to Rule 408 and the binding Confidentiality Agreement executed amongst the Parties*
**Projected Budget Build-Up**

Remaining expected budget assuming a comprehensive settlement with HMIT/DAF Parties (excluding accrued liabilities and contingencies separately discussed)

| Description | Total for budget | Notes and assumptions |
|---|---|---|
| Pachulski Stang and other litigation or BK-related | $ 5,000,000 | Primary issues: expected new litigation to defend (actual causes of action unknown) from Dondero parties, incorporation of HMIT/DAF settlement and approval/appeals of same, appeals of "valuation complaint" and "HCRE bad faith", extension of the Trust for 1 yr. and dissolution issues. Ultimate amount required could vary materially higher or lower. |
| HCMLP employees salary and benefits (other than CEO) | 4,084,354 | Assumes declining headcount from 6 to 3, ending August 2026 (monthly trending from approx. $300k/month currently to approx. $200k/month at end) |
| Claimant Trustee/CEO salary | 2,700,000 | Assumes 18 months at $150k/month |
| Litigation Trustee | 360,000 | Assumes 18 months at $20k/month |
| Independent Member | 225,000 | Assumes 18 months at $12.5k/month |
| Litigation trust (other than Trustee) | 250,000 | Assuming minimal time and expense other than in conjunction with transfer of main case |
| Incentive Compensation on distributions to Cl. 10 | TBD | Provide for alignment in regards to quantum and timing of distributions and management of costs |
| *Overhead related* | | |
| Facilities/offsite storage and related | 1,079,121 | Office space through end of 2026 and offsite document retention through 2028 |
| External tax | 1,000,000 | Declining each year with final year for tax year 2027 |
| IT costs | 701,760 | Cloud storage, network infrastructure through 2027, email storage through 2030 |
| Accounting systems and information | 331,045 | General retention and maintenance through 2028 (primarily Oracle maintenance) |
| Other professionals | 200,000 | Misc reserve for other professionals |
| Other misc overhead | 200,000 | Misc reserve for other overhead, T&E, entity wind-up costs, etc |
| Indemnification expenses | 200,000 | Assuming misc. expenses from misc. matters |
| US Trustee | 437,594 | Assuming 0.8% of budget + accruals + distributions (assuming $30M total) |
| **Grand total** | **$ 16,768,874** | *to previous page* |



017260

HCMLPHMIT00000661

**EXHIBIT 46**

017261

**From:** "John A. Morris" <jmorris@pszjlaw.com>
**To:** "Louis Phillips" <Louis.Phillips@kellyhart.com>
**Cc:** "Jeff Pomerantz" <jpomerantz@pszjlaw.com>, "amelia.hurt@kellyhart.com"
 <Amelia.Hurt@kellyhart.com>
**Subject:** Highland: Confidential Settlement Communication
**Date:** Wed, 16 Apr 2025 20:58:17 +0000
**Importance:** Normal
**Attachments:** PRIVILEGED_AND_CONFIDENTIAL_DRAFT_SETTLEMENT_STRUCTURE_CLEAN
 _4.16.25.pdf;
 PRIVILEGED_AND_CONFIDENTIAL_DRAFT_SETTLEMENT_STRUCTURE_REDLI
 NE_4.16.25.pdf; Privileged_and_Confidential_-_Indemnity_Trust_2025-4-16_Draft.pdf;
 Highland_Indemnity_Trust_-
 _Second_Amended_and_Restated_Indemnity_Trust_Agreement.pdf
**Inline-Images:** image001.jpg

---

**COMMUNICATION TENDERED PURSUANT TO FED. R. EVID. 408
AND THE PARTIES' CONFIDENTIALITY AGREEMENT**

Louis,

We're following up on recent discussions, including the call last Friday between Mark Patrick and Jim Seery.

We are providing three groups of documents: (a) a revised settlement structure (and black line) that takes into account the discussion between Mark and Jim; (b) an illustration of sources/uses and plausible timeline for payments; and (c) the Second Amended and Restated Indemnity Trust Agreement (which we expect to be executed in the coming days).

Specifically, please find attached the following:

1. Revised draft of settlement structure (Clean)
2. Revised draft of settlement structure (Redlined against version from last week)
3. Illustrative sources and uses of timing/amounts of potential future Indemnity Trust payouts
4. Second Amended and Restated Indemnity Trust Agreement
    a. The provisions we believe the HMIT team should focus on to understand the uses and limitations of the Indemnity Trust are:
        i. Intro and First Whereas Clause with certain definitions
        ii. Section 1.1

        1. Beneficiaries
        2. Indemnified Parties
        3. Indemnity Obligations
        4. Indemnity Trust Account
        5. Indemnity Trust Assets
        6. Trust Indemnified Parties
        iii. Section 2.1(c)
        iv. Section 2.4
        v. Section 3.5
        vi. Article VIII
        vii. Section 9.12 (Okada)

017262
HCMLPHMIT00000672

John and his team would like to walk you and your team through these documents. We have a board call tomorrow afternoon so if we could speak tomorrow until 3:00 pm Eastern, that would be ideal (we believe 90 minutes is sufficient). If that is not feasible, we can also be available until 1:00 pm Eastern on Friday.

Finally, if Mr. Shields is going to review any of the attached documents or participate in our discussions, please be sure to send his Joinder in advance.

Please let us know what works for your side.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

## SECOND AMENDED AND RESTATED INDEMNITY TRUST AGREEMENT

This Second Amended and Restated Indemnity Trust Agreement (this "Agreement"), dated as of [●], 2025, by and among the Highland Claimant Trust, a Delaware statutory trust, as grantor (the "Grantor"), James P. Seery, Jr., as indemnity trust administrator (the "Indemnity Trust Administrator," which term shall include any successor Indemnity Trust Administrator), Wilmington Trust, National Association, a national banking association ("WTNA"), as indemnity trustee, for the benefit of the Beneficiaries (in such capacity hereunder, and not in its individual capacity, the "Indemnity Trustee"), and WTNA, as the Delaware trustee (in such capacity hereunder, and not in its individual capacity, the "Delaware Trustee") (collectively, the "Parties"), amends and restates the First Amended and Restated Indemnity Trust Agreement entered into by and among the Parties, effective as of July 1, 2024 (the "Prior Agreement"). Capitalized terms used herein but not defined shall have the respective meanings assigned thereto in Section 1.1.

## RECITALS

WHEREAS, the Parties entered into the Indemnity Trust Agreement, effective as of August 16, 2021 (the "Original Indemnity Trust Agreement") to establish a Delaware statutory trust, the Indemnity Trust, for the benefit of the Beneficiaries, (a) to secure the performance by each of the Claimant Trust, the Litigation Sub-Trust and the Reorganized Debtor of its indemnity obligations as specified in (i) Section 8.2 of that certain Claimant Trust Agreement, (ii) Section 8.2 of the Litigation Sub-Trust Agreement and (iii) Section 10 of the Reorganized Limited Partnership Agreement, establishing the Reorganized Debtor pursuant to the Plan (the foregoing (i)-(iii), the "Indemnity Obligations"), and (b) following the dissolution of the Claimant Trust, the Litigation Sub-Trust or the Reorganized Debtor, as applicable, to be the primary source of indemnification for the respective Indemnity Obligations, in each case regardless of whether such Indemnity Obligations survive the dissolution of the Claimant Trust, the Litigation Sub-Trust or the Reorganized Debtor, as applicable;

WHEREAS, the Indemnity Trust Administrator agreed to act as administrator hereunder to direct the Indemnity Trustee with respect to the transfer, distribution and release of Indemnity Trust Assets;

WHEREAS, the Indemnity Trustee agreed to act as trustee hereunder to hold and apply the Indemnity Trust Assets on behalf of the Indemnity Trust, as specified herein, for the sole use and exclusive benefit of the Beneficiaries;

WHEREAS, the Indemnity Trust is the payee under the Indemnification Funding Note;

WHEREAS, the Indemnification Funding Note requires the payors thereunder to make payments on the Indemnification Funding Note so that the Indemnity Trust Assets are not less than $25 million;

WHEREAS, the Grantor initially funded the Indemnity Trust by depositing $2.5 million in cash and the Indemnification Funding Note into the Indemnity Trust Account;

017264

HCMLPHMIT00000674

WHEREAS, the payors funded the Indemnification Funding Note so that the Indemnity Trust Account held approximately $25 million in cash Assets;

WHEREAS, Section 2.3(b) of the Original Indemnity Trust Agreement authorized the Grantor to transfer Assets into the Indemnity Trust Account in excess of the amount due on the Indemnification Funding Note;

WHEREAS, the Grantor regularly assesses the potential magnitude of Indemnity Obligations and whether the Indemnity Trust Assets are sufficient to cover all current or potential Indemnity Obligations;

WHEREAS, the Grantor's assessment and re-assessment of the magnitude of potential Indemnity Obligations is continually informed by developments in litigations related to the Plan, and the costs related thereto, taken against the Grantor and other Trust Indemnified Parties, as well as actions against third-parties that relate to the Plan or Trust Indemnified Parties;

WHEREAS, based upon the Grantor's initial re-assessment of the potential magnitude of Indemnity Obligations, the Grantor determined that $25 million in the Indemnity Trust Account was likely insufficient to satisfy all Indemnity Obligations then existing or arising in the future, on March 13, 2023, the Grantor transferred an additional interim amount of $7 million in cash into the Indemnity Trust Account;

WHEREAS, effective May 3, 2023, the Parties amended the Original Indemnity Trust Agreement by entering into the First Amendment to Indemnity Trust Agreement to clarify that the transfer of additional Assets to the Indemnity Trust and any additional transfers of Assets to the Indemnity Trust will be subject to the Indemnity Trust Administrator's ability to transfer Indemnity Trust Assets from the Indemnity Trust Account to the Claimant Trust if he determines, in his sole and absolute discretion, that amounts in excess of $32 million (the then approximate amount of Indemnity Trust Assets) in cash or other Assets are not then required to satisfy potential Indemnity Obligations;

WHEREAS, based upon the Grantor's further re-assessment of Indemnity Obligations and its determination that the Indemnity Trust Assets were then likely insufficient to satisfy all Indemnity Obligations then existing or arising in the future, on May 3, 2023, the Grantor transferred an additional interim amount of $3 million in cash into the Indemnity Trust Account;

WHEREAS, based upon the Grantor's further re-assessment of Indemnity Obligations and its determination that the Indemnity Trust Assets were then likely insufficient to satisfy all Indemnity Obligations then existing or arising in the future, on August 29, 2023, the Grantor transferred an additional interim amount of $15 million in cash into the Indemnity Trust Account;

WHEREAS, that certain Settlement Agreement was entered into as of January 11, 2024, by and among (a) Highland Capital Management, L.P.; (b) the Litigation Trustee; (c) the Claimant Trust; (d) the Indemnity Trust; (e) Mark K. Okada ("Okada"); (f) Mark & Pamela Okada Family Trust – Exempt Trust # 1 ("MAP Trust 1"); (g) Mark & Pamela Okada Family Trust – Exempt Trust #2 ("MAP Trust 2"); and (h) Lawrence Tonomura, solely in his capacity as Trustee of MAP

2

017265
HCMLPHMIT00000675

Trust 1 and MAP Trust 2 ("Tonomura," and together with Okada, MAP Trust 1, and MAP Trust 2, the "Okada Parties"), and such Settlement Agreement became effective when approved by the Bankruptcy Court on February 7, 2024 (as so approved by the Bankruptcy Court, the "Okada Settlement Agreement");

WHEREAS, based upon the Grantor's further re-assessment of Indemnity Obligations and its determination that the Indemnity Trust Assets were then likely insufficient to satisfy all Indemnity Obligations then existing or arising in the future, on December 24, 2024, the Grantor transferred an additional interim amount of $10 million in cash into the Indemnity Trust Account;

WHEREAS, the Grantor continually re-assesses all existing and potential Indemnity Obligations, and based on developing litigation threats and litigation actions involving Trust Indemnified Parties it has determined the current cash and US Treasury balance of the Indemnity Trust Account of approximately $68.7 million (including the face value of US Treasuries with maturities of less than 1 (one) year, but excluding non-cash assets) is likely insufficient to satisfy existing and potential future Indemnification Obligations and additional Assets will be required to satisfy all Indemnification Obligations absent final court resolution of certain litigation issues and/or comprehensive settlements;

WHEREAS, the Grantor has a limited life and (a) certain of the books and records and privileges of its subsidiaries are required by regulation to be maintained beyond its permitted life, and (b) certain of its books and records and privileges and the books and records and privileges of its subsidiaries are essential to support Indemnified Obligations for the benefit of Beneficiaries;

WHEREAS, in order for the Indemnity Trust to efficiently support its obligation to satisfy all Indemnity Obligations for the benefit of the Beneficiaries, it must maintain records and privileges currently maintained for the benefit of the Beneficiaries beyond the life of the Grantor, including by owning additional non-cash Assets contributed to it by the Grantor;

WHEREAS, the Parties desire to make additional amendments consistent with the Prior Agreement in order to facilitate the efficient management of the Indemnity Trust and the Indemnity Trust Assets for the benefit of the Beneficiaries; and

WHEREAS, in consideration of the mutual covenants and promises, and upon the terms and conditions, set forth herein, the Parties agree to amend and restate the Prior Agreement in its entirety as follows:


## DECLARATION OF TRUST

NOW, THEREFORE, in order to declare the terms and conditions hereof, and in consideration of the premises and mutual agreements and covenants herein contained and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, each of the Grantor, the Indemnity Trust Administrator, and the Indemnity Trustee have executed this Agreement for the benefit of the Beneficiaries.

3

017266

HCMLPHMIT00000676

TO HAVE AND TO HOLD unto the Indemnity Trustee and his successors or assigns in trust, under and subject to the terms and conditions set forth herein and for the benefit of the Beneficiaries, and for the performance of and compliance with the terms hereof.

IT IS FURTHER COVENANTED AND DECLARED that the Indemnity Trust Assets are to be strictly held and applied by the Indemnity Trustee on behalf of the Indemnity Trust subject to the specific terms set forth below.

## ARTICLE I.
## DEFINITION AND TERMS

1.1     <u>Certain Definitions</u>.  Unless the context shall otherwise require and except as contained in this <u>Section 1.1</u> or as otherwise defined herein, the capitalized terms used herein shall have the respective meanings assigned thereto in the "Definitions," Section 1.1 of the Claimant Trust Agreement, or if not defined therein, shall have the respective meanings assigned thereto in the Plan.  For all purposes of this Agreement, the following terms shall have the following meanings:

(a)     "<u>Acis 7 Proceeds</u>" has the meaning ascribed to it in the Okada Settlement Agreement.

(b)     "<u>Advisory Representatives</u>" means the following individuals who are also current Oversight Board representatives as of the date of this Agreement: (i) independent member Richard Katz, (ii) Muck Holdings LLC representative Michael Linn, and (iii) Jessup Holdings LLC representative Christopher Provost, each to the extent they desire to and do act as Advisory Representatives hereunder.

(c)     "<u>Agreement</u>" has the meaning set forth in the preamble hereto.

(d)     "<u>Assets</u>" means all assets, property, rights, benefits, or privileges that a "liquidated trust" within the meaning of Treasury Regulation Section 301.7701-4(d) may be permitted to hold, which, for the avoidance of doubt, need not be in the form of cash or cash equivalents.

(e)     "<u>Bankruptcy Court</u>" means the Bankruptcy Court for the Northern District of Texas, Dallas Division.

(f)     "<u>Beneficiaries</u>" means the Trust Indemnified Parties.

(g)     "<u>Beneficiary Withdrawal Request</u>" has the meaning set forth in <u>Section 2.4(c)</u>.

(h)     "<u>Business Day</u>" means any day other than a Saturday, a Sunday or a day on which banking institutions or trust companies in Wilmington, Delaware are authorized or obligated by law, regulation or executive order to remain closed.

(i)     "<u>Cause</u>" means (i) a person's willful failure to perform his material duties hereunder, which is not remedied within thirty (30) days of notice; (ii) a person's commission of

4

017267

HCMLPHMIT00000677

an act of fraud, theft, or embezzlement during the performance of his or her duties hereunder; (iii) a person's conviction of a felony (other than a felony that does not involve fraud, theft, embezzlement, or jail time) with all appeals having been exhausted or appeal periods lapsed; or (iv) a person's gross negligence, bad faith, willful misconduct, or knowing violation of law in the performance of his or her duties hereunder.

(j)    "Claimant Trust Agreement" means that certain agreement effective as of the Effective Date of the Plan (as may be amended, supplemented, or otherwise modified in accordance with the terms thereof), by and among Highland Capital Management, L.P., the Claimant Trustee, and the Delaware Trustee (as defined in the Claimant Trust Agreement) for the benefit of the Claimant Trust Beneficiaries (as defined in the Claimant Trust Agreement) filed with the Plan Supplement [Docket No. 1811].

(k)    "Claimant Trustee" means James P. Seery, Jr., as the initial "Claimant Trustee" under the Claimant Trust Agreement and as defined in the Plan, and any successor Claimant Trustee that may be appointed pursuant to the terms of the Claimant Trust Agreement.

(l)    "Claimant Trust" means the "Highland Claimant Trust" established in accordance with the Delaware Statutory Trust Act and Treasury Regulation Section 301.7701-4(d) pursuant to the Claimant Trust Agreement.

(m)    "Delaware Statutory Trust Act" means the Delaware Statutory Trust Act, 12 Del. C. §3801, et seq.

(n)    "Delaware Trustee" has the meaning set forth in the preamble hereto.

(o)    "Final Order" means an order or judgment of a court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek reconsideration, seek a new trial, reargument, or rehearing and, where applicable, petition for certiorari has expired and no appeal, motion for reconsideration, motion for a new trial, reargument or rehearing or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought, or as to which any motion for reconsideration that has been filed or any motion for a new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

(p)    "Indemnification Funding Note" means that certain $25 million note made by Highland Capital Management, L.P., Grantor, and Litigation Sub-Trust, dated August 11, 2021, in favor of the Indemnity Trust, a form of which is attached hereto as Exhibit A.

(q)    "Indemnified Amount" has the meaning set forth in Section 2.4(c).

(r)    "Indemnified Party" has the meaning set forth in Section 7.2(a).

(s)    "Indemnity Obligations" has the meaning set forth in the Recitals hereof.

017268

HCMLPHMIT00000678

(t)　　"Indemnity Trust" means the "Highland Indemnity Trust" established in accordance with the Delaware Statutory Trust Act and Treasury Regulation Section 301.7701-4(d) pursuant to this Agreement.

(u)　　"Indemnity Trust Account" has the meaning set forth in Section 2.1(c).

(v)　　"Indemnity Trust Administrator" has the meaning set forth in the preamble hereto.

(w)　　"Indemnity Trust Assets" means (i) all Assets, including, but not limited to, cash, the Indemnification Funding Note, and any cash equivalents, notes, or other Assets held in the Indemnity Trust Account or otherwise owned by the Indemnity Trust or held for the benefit of the Indemnity Trust, and any proceeds realized or received from or with respect to such Assets, and (ii) any Assets transferred by or on behalf of the Grantor to the Indemnity Trust Account on or after the Effective Date.

(x)　　"Indemnity Trustee" has the meaning set forth in the preamble hereto.

(y)　　"Investment Company Act" means the Investment Company Act of 1940.

(z)　　"IRS" means the Internal Revenue Service.

(aa)　　"Liability" means any claim, expense, debt, obligation, liability, loss, damages, injury (to person, property or natural resources), penalty, stamp or other similar tax, action, suits, judgment, cost and expense (including costs of investigation and defense and attorneys' fees, costs and expenses), in each case, whether direct or indirect and whether accrued or contingent.

(bb)　　"Litigation Sub-Trust" means the sub-trust created pursuant to the Litigation Sub-Trust Agreement, which shall hold the Claimant Trust Assets that are Estate Claims (as defined in the Plan) and investigate, litigate, and/or settle the Estate Claims for the benefit of the Claimant Trust.

(cc)　　"Litigation Sub-Trust Agreement" means the litigation sub-trust agreement to be entered into by and between the Claimant Trustee and Litigation Trustee establishing and setting forth the terms and conditions of the Litigation Sub-Trust and governing the rights and responsibilities of the Litigation Trustee.

(dd)　　"Litigation Trustee" means Marc S. Kirschner, and any successor Litigation Trustee that may be appointed pursuant to the terms of the Litigation Sub-Trust Agreement, who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

(ee)　　"MAP Trust 1" has the meaning set forth in the Recitals hereof.

(ff)　　"MAP Trust 2" has the meaning set forth in the Recitals hereof.

017269

HCMLPHMIT00000679

(gg)  "<u>Okada</u>" has the meaning set forth in the Recitals hereof.

(hh)  "<u>Okada Parties</u>" has the meaning set forth in the Recitals hereof.

(ii)  "<u>Okada Settlement Agreement</u>" has the meaning set forth in the Recitals hereof.

(jj)  "<u>Original Indemnity Trust Agreement</u>" has the meaning set forth in the preamble hereto.

(kk)  "<u>Oversight Board</u>" means the Oversight Board of the Claimant Trust consisting of (x) independent member Richard Katz, (y) Jessup Holdings LLC, and (z) Muck Holdings LLC.

(ll)  "<u>Permitted Investments</u>" has the meaning set forth in <u>Section 3.1(b)</u>.

(mm)  "<u>PetroCap Proceeds</u>" has the meaning set forth in <u>Section 9.12(a)</u>.

(nn)  "<u>PetroCap Proceeds Demand</u>" has the meaning set forth in <u>Section 9.12(a)</u>.

(oo)  "<u>Plan</u>" means the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) [Docket No. 1808] (as amended [Docket No. 1875]) confirmed pursuant to that certain *Order (i) Confirming the Fifth Amended Plan of Reorganization (as Modified) and (ii) Granting Related Relief* [Docket No. 1943].

(pp)  "<u>Prior Agreement</u>" has the meaning set forth in the preamble hereto.

(qq)  "<u>SLP</u>" has the meaning set forth in <u>Section 9.12(a)</u>.

(rr)  "<u>Termination Date</u>" has the meaning set forth in <u>Section 8.1(d)</u>.

(ss)  "<u>Tonomura</u>" has the meaning set forth in the Recitals hereof.

(tt)  "<u>Trust Indemnified Parties</u>" means the following:

(i)  "Indemnified Parties" under Section 8.2 of the Claimant Trust Agreement and their respective employees, agents and professionals, which are also indemnitees under the same provision;

(ii)  "Indemnified Parties" under Section 8.2 of the Litigation Sub-Trust Agreement and their respective employees, agents and professionals, which are also indemnitees under the same provision; and

(iii)  "Covered Persons" under Section 10 of the Reorganized Limited Partnership Agreement.

(uu)  "<u>Withdrawal Notice</u>" has the meaning set forth in <u>Section 2.4(e)</u>.

7

017270

HCMLPHMIT00000680

(vv)   "WTNA" has the meaning set forth in the preamble hereto.

1.2   General Construction.  As used in this Agreement, the masculine, feminine and neuter genders, and the plural and singular terms or numbers shall be deemed to include the others in all cases where they would apply.  Terms defined in the current tense shall have a comparable meaning when used in the past or future tense and vice versa.  "Includes" and "including" are not limiting and "or" is not exclusive.  References to "Articles," "Sections" and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules, or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Agreement, and the words "herein," "hereafter," "hereof" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or subdivision of this Agreement.  Amounts expressed in dollars or following the symbol "$" shall be deemed to be in United States dollars.  References to agreements, instruments or other documents shall be deemed to refer to such agreements, instruments or other documents as the same may be amended, restated, supplemented or otherwise modified in accordance with the terms thereof.  Any statute or regulation referred to herein means such statute or regulation as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, includes any rules and regulations promulgated under such statute), and references to any section of any statute or regulation include any successor to such section.

## ARTICLE II.
## INDEMNITY TRUST AND INDEMNITY TRUST ACCOUNT

2.1   Creation of Trust and Establishment of Account.

(a)   Pursuant to the Original Indemnity Trust Agreement, the Indemnity Trust was created as a statutory trust under the Delaware Statutory Trust Act and shall be called the "Highland Indemnity Trust", and the Indemnity Trust is hereby continued.  The Indemnity Trustee shall be empowered to conduct all business and hold all property constituting the Indemnity Trust Assets in such name in accordance with the terms and conditions set forth herein.

(b)   Pursuant to the Original Indemnity Trust Agreement, the Delaware Trustee and the Indemnity Trustee have caused to be executed and filed in the office of the Secretary of State of the State of Delaware a Certificate of Trust for the Indemnity Trust, and each of them agree to execute, such certificates as may from time to time be required under the Delaware Statutory Trust Act or any other Delaware law, in accordance with the terms and conditions set forth herein.

(c)   Pursuant to the Original Indemnity Trust Agreement, the Grantor established a trust account with the Indemnity Trustee in the name of the Indemnity Trust with account no. 150474-000 (the "Indemnity Trust Account"), which shall be a segregated non-interest bearing trust account for the sole use and exclusive benefit of the Beneficiaries upon the terms and conditions hereinafter set forth.  For all purposes of this Agreement, the term "Indemnity Trust Account" means the funds and Assets held by the Indemnity Trustee on behalf of the Indemnity Trust hereunder constituting the corpus of the Indemnity Trust, upon the terms and conditions hereinafter set forth.

017271

HCMLPHMIT00000681

2.2     <u>Authorization to Receive Assets.</u>  The Indemnity Trustee and its lawfully appointed successors are authorized and shall have the power to receive such Assets as the Grantor shall transfer or cause to be transferred to the Indemnity Trustee on behalf of the Indemnity Trust, and to hold, invest, reinvest, manage and dispose of the same for the uses and purposes and in the manner and according to the provisions hereinafter set forth.  All such Assets placed in the Indemnity Trust shall at all times be maintained in the Indemnity Trust Account, separate and distinct from all other assets of the Grantor, and within the dominion and control of the Indemnity Trustee on behalf of the Indemnity Trust for the benefit of the Beneficiaries.

2.3     <u>Deposit of Assets to the Indemnity Trust Account.</u>

(a)     Pursuant to the Original Indemnity Trust Agreement, the Grantor transferred to the Indemnity Trustee on behalf of the Indemnity Trust, for deposit in the Indemnity Trust Account, cash in an amount equal to $2,500,000 and an Indemnification Funding Note, the form of which is attached hereto as <u>Exhibit A</u>.

(b)     Thereafter, the Grantor (or any other person on behalf of the Grantor) may from time to time transfer to the Indemnity Trustee on behalf of the Indemnity Trust, for deposit to the Indemnity Trust Account or to be otherwise held by the Indemnity Trustee for the benefit of the Beneficiaries, any Assets, including pursuant to <u>Section 9.12(a)</u> or <u>Section 9.12(b)</u>, as payments under the Indemnification Funding Note or otherwise for the benefit of the Beneficiaries; <u>provided</u> that such Assets shall be valued according to their current fair market value.  Any interest or investment income on such Assets, to the extent not invested or reinvested, shall be retained in the Indemnity Trust Account and will be considered a part of the corpus of the Indemnity Trust and included in the balance of the Indemnity Trust Account.  The Indemnity Trustee shall not be responsible for valuing any Indemnity Trust Assets.

(c)     Upon receipt at any time of a contribution or payment from the Grantor (or any other person on behalf of the Grantor) and after giving effect to any payments required to be made hereunder, the Indemnity Trustee shall invest available Indemnity Trust Assets in Permitted Investments but only at and in accordance with the written direction of the Indemnity Trust Administrator; <u>provided</u>, that whether any Indemnity Trust Asset should be held in its original form, disposed of or liquidated, or invested in Permitted Investments shall be determined by the Indemnity Trust Administrator in his sole and absolute discretion.  The Indemnity Trustee may conclusively and exclusively rely on any such investment direction and shall bear no Liability for any loss or other injury based on acting or omitting to act in accordance with such investment direction.  All such Permitted Investments shall constitute Indemnity Trust Assets and be held by the Indemnity Trustee on behalf of the Indemnity Trust in the Indemnity Trust Account for the benefit of the Beneficiaries.  In the absence of such written direction, the Indemnity Trust Assets including any available funds shall be held uninvested in the Indemnity Trust Account.  Any earnings and income shall become part of the Indemnity Trust Assets and disbursed in accordance with this Agreement.  The Indemnity Trustee is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required or permitted under this Agreement; <u>provided</u> that the Acis 7 Proceeds and any PetroCap Proceeds may be expended only in the order contemplated in <u>Section 9.12(d)</u> as instructed in writing by the Indemnity Trust Administrator.  The Indemnity Trustee shall have no responsibility or Liability for any loss which may result from any investment or sale of

9

017272

HCMLPHMIT00000682

investment made pursuant to this Agreement or any disbursement instructed by the Indemnity Trust Administrator. The Indemnity Trustee is hereby authorized, in making or disposing of any investment permitted by this Agreement, to deal with itself (in its individual capacity) or with any one or more of its affiliates, whether it or any such affiliate is acting as agent of the Indemnity Trustee or for any third person or dealing as principal for its own account. The Parties acknowledge that the Indemnity Trustee is not providing investment supervision, recommendations, or advice.

2.4    <u>Withdrawals on Behalf of the Beneficiaries</u>.

(a)    The Indemnity Trust shall pay or reimburse the applicable Beneficiary for the amounts requested by such Beneficiary (i) to be paid by the Claimant Trust, the Litigation Sub-Trust or the Reorganized Debtor, as applicable, with respect to its Indemnity Obligations to the extent not otherwise paid by the Claimant Trust, the Litigation Sub-Trust or the Reorganized Debtor, as applicable, and (ii) following the dissolution of the Claimant Trust, the Litigation Sub-Trust or the Reorganized Debtor, as applicable, for any claims that if brought against such Beneficiary would have been subject to indemnification under Section 8.2 of the Claimant Trust Agreement, Section 8.2 of the Litigation Sub-Trust or Section 10 of the Reorganized Limited Partnership Agreement, as applicable, in each case regardless of whether such Indemnity Obligations survive the dissolution or termination and cancellation of the Claimant Trust, the Litigation Sub-Trust or the Reorganized Debtor, as applicable, pursuant to the procedures set forth below. With respect to clause (ii) above, the Indemnity Trust shall assume for the benefit of the Beneficiaries the Indemnity Obligations on the terms set forth herein.

(b)    The Indemnity Trustee shall (i) make withdrawals of Indemnity Trust Assets, as instructed in writing by the Indemnity Trust Administrator as described herein pursuant to a Withdrawal Notice, to satisfy amounts due under the Indemnity Obligations in accordance with this Agreement, and (ii) take any action with respect to the Indemnity Trust Assets, as instructed by the Indemnity Trust Administrator, promptly and, in any event, within three (3) Business Days following receipt of such instruction. The Indemnity Trustee shall be entitled to conclusively and exclusively rely upon any Withdrawal Notice or other written instruction provided to it by the Indemnity Trust Administrator with respect to any withdrawals of Indemnity Trust Assets or other action with respect to the Indemnity Trust Assets in accordance with this Agreement without further inquiry or Liability.

(c)    At any time prior to the dissolution of the Claimant Trust, any Beneficiary who has made a claim for indemnity to the Claimant Trust pursuant to Section 8.2 of the Claimant Trust Agreement, Section 8.2 of the Litigation Sub Trust Agreement or Section 10 of the Reorganized Limited Partnership Agreement, as applicable, but has not been paid in full within fourteen (14) days of such claim for indemnification may make a request for withdrawal of Indemnity Trust Assets from the Indemnity Trust Account by delivering a written notice to the Indemnity Trust Administrator (with a copy to the Indemnity Trustee), substantially in the form attached hereto as <u>Exhibit B</u> ("<u>Beneficiary Withdrawal Request</u>"), setting forth (i) a certification that such Beneficiary has made a claim for indemnification to the Claimant Trust, the Litigation Sub-Trust or the Reorganized Debtor, as the case may be, which was not paid in full within fourteen (14) days of such claim for indemnification and (ii) the amount owed to such Beneficiary with respect to such claim for indemnification (the "<u>Indemnified Amount</u>"). For the

10

017273
HCMLPHMIT00000683

avoidance of doubt, the Indemnity Trustee shall have no duty or Liability to review any Beneficiary Withdrawal Request or verify any information contained therein, it being understood and agreed that the Indemnity Trust Administrator shall be solely responsible for doing so.

(d)    At any time following the dissolution of the Claimant Trust, the Litigation Sub-Trust or the Reorganized Debtor, as applicable, any Beneficiary may make a claim for the Indemnified Amount by making a request for withdrawal of Indemnity Trust Assets from the Indemnity Trust Account by delivering a Beneficiary Withdrawal Request to the Indemnity Trust Administrator (with a copy to the Indemnity Trustee);

(e)    Following receipt of a Beneficiary Withdrawal Request, the Indemnity Trust Administrator shall (i) verify whether such Beneficiary has made a claim for indemnification and has not been paid in full by the Claimant Trust, the Litigation Sub-Trust or the Reorganized Debtor, within fourteen (14) days of such claim for indemnification (provided that this clause (i) shall not be applicable to claims made pursuant to Section 2.4(d)); (ii) review the supporting documents attached to such Beneficiary Withdrawal Request; and (iii) deliver a written notice to the Indemnity Trustee (with a copy to the applicable Beneficiary) in the form attached hereto as Exhibit C (the "Withdrawal Notice"). The Withdrawal Notice shall specify the amount to be paid to the applicable Beneficiary and any applicable wire transfer instructions as may be required by the Indemnity Trustee to make such payment. All payments by the Indemnity Trustee to any Beneficiary hereunder shall be sent by wire transfer. The Indemnity Trustee shall have no obligation to determine whether the Indemnity Trust Administrator has complied with the provisions of this Section 2.4(e). If the Indemnity Trust Administrator does not issue a Withdrawal Notice within two (2) Business Days of receipt of a Beneficiary Withdrawal Request, the Indemnity Trust Administrator shall provide the applicable Beneficiary, no later than the third (3rd) Business Day following receipt of the Beneficiary Withdrawal Request, with an explanation in writing of the reasons for the denial of the Beneficiary Withdrawal Request. All disputes related to Beneficiary Withdrawal Requests shall be resolved by the Bankruptcy Court, or another court of competent jurisdiction, in accordance with Section 9.10 of this Agreement. The Indemnity Trustee is entitled to conclusively rely on any order from the Bankruptcy Court or other court of competent jurisdiction concerning any such disputes.

(f)    Within three (3) Business Days of receipt of such Withdrawal Notice, the Indemnity Trustee shall pay by wire transfer of immediately available funds to the applicable Beneficiary the lesser of (i) the Indemnified Amount and (ii) the amount of funds in the Indemnity Trust Account, provided that if the Indemnity Trust Account contains insufficient funds to pay the amounts set forth in such Withdrawal Notice, any such unpaid amounts will be paid by the Indemnity Trustee within three (3) Business Days of receipt by the Indemnity Trustee in the Indemnity Trust Account of sufficient funds (including, for the avoidance of doubt, from any funds subsequently received as payments on the Indemnification Funding Note) to pay any portion thereof.

(g)    If any Beneficiary who has made a claim for indemnification hereunder receives payment with respect to such claim for indemnification from the Claimant Trust or any other source, such Beneficiary must promptly notify the Indemnity Trust Administrator (with a copy to the Indemnity Trustee), upon which the applicable request for payment from the

11

017274
HCMLPHMIT00000684

Indemnity Trust will be revised accordingly, and to the extent that any such amounts were already received from the Indemnity Trust, the Indemnity Trust Administrator, in his reasonable discretion, shall cause such Beneficiary to repay or return such amounts to the Indemnity Trust Account, without interest, or offset such amounts against any future requests for indemnification.

(h)     For the avoidance of doubt, the Indemnity Trustee shall withdraw Indemnity Trust Assets credited to the Indemnity Trust Account without notice to or the consent of the Grantor at any time and from time to time upon a Withdrawal Notice or other written instructions from the Indemnity Trust Administrator in accordance with the terms of this Section 2.4.  No other statement or document need be presented to the Indemnity Trustee by the Indemnity Trust Administrator in order to withdraw Indemnity Trust Assets credited to the Indemnity Trust Account.  Upon receipt of a Withdrawal Notice or other written instructions from the Indemnity Trust Administrator in accordance with the terms of this Section 2.4 by the Indemnity Trustee, the Indemnity Trustee shall promptly take any and all necessary steps to pay the applicable Beneficiary and, when appropriate, to liquidate (but only at the written direction of the Indemnity Trust Administrator) non-cash Indemnity Trust Assets in the Indemnity Trust to pay the applicable Beneficiary.  The Indemnity Trustee shall be fully protected in conclusively relying upon any such Withdrawal Notice or other written instructions from the Indemnity Trust Administrator delivered in accordance with this Agreement for such withdrawal and shall not be obligated to investigate or ascertain that the applicable Beneficiary intends to use or uses the Indemnity Trust Assets withdrawn for the purposes set forth herein.  Except for acts or omissions involving its own gross negligence or willful misconduct, the Indemnity Trustee shall not be liable to the Grantor, any Beneficiary, the Indemnity Trust Administrator or any third party, for any withdrawals or payments made pursuant to a Withdrawal Notice or other written instructions from the Indemnity Trust Administrator delivered in accordance with this Agreement.

## ARTICLE III.
## INDEMNITY TRUST ADMINISTRATOR

3.1     Authority.

(a)     For any action contemplated or required in connection with the operation of the Indemnity Trust, and for any guidance or instruction to be provided to the Indemnity Trustee, such function, rights and responsibility shall be vested in the Indemnity Trust Administrator.  The Indemnity Trust Administrator is an express agent of the Indemnity Trust and is not a delegatee of the Indemnity Trustee.

(b)     The Indemnity Trust Administrator shall have the power to take any actions the Indemnity Trust Administrator, in his sole and absolute discretion, deems desirable or necessary in connection with the operation of the Indemnity Trust.  Notwithstanding the foregoing, the right and power of the Indemnity Trust Administrator to direct the Indemnity Trustee to invest the Indemnity Trust Assets, the proceeds thereof, or any income earned by the Indemnity Trust shall be limited to the right and power to invest such Indemnity Trust Assets only in cash and U.S. Government securities as defined in section 29(a)(16) of the Investment Company Act; provided, however, that the scope of any such permissible investments shall be further limited to include only those investments that a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d) may be permitted to hold pursuant to the Treasury

12

017275
HCMLPHMIT00000685

Regulations, or any modification in the Internal Revenue Guidelines, whether set forth in IRS rulings, other IRS pronouncements, or otherwise; including, for the avoidance of doubt, any obligations of the United States Treasury, including bills, notes, bonds, or TIPS having a remaining maturity of less than one year at the time of investment ("Permitted Investments"). The Indemnity Trustee shall have no duty to determine if any investment direction provided to it by the Indemnity Trust Administrator satisfies the definition of "Permitted Investments" hereunder.  In the event that market conditions are such that negative interest applies to amounts deposited in the Indemnity Trust Account, the Grantor shall be responsible for the payment of such interest and the Indemnity Trustee shall be entitled to deduct from amounts on deposit with it an amount necessary to pay such negative interest.  For the avoidance of doubt, the indemnification protections afforded to the Indemnity Trustee under Section 7.2 shall cover any interest-related expenses (including, but not limited to, negative interest) incurred by the Indemnity Trustee in the performance of its duties hereunder.

(c)     The Indemnity Trust Administrator shall have the power and authority to retain counsel, tax advisors, consultants, brokers and other experts or advisors, as he considers appropriate to address any matter relating to the Indemnity Trust.  Without limiting the generality of the foregoing, to the extent the Indemnity Trust Administrator identifies any conflict of interest in his capacity as a Beneficiary, on the one hand, and the Indemnity Trust Administrator, on the other, or otherwise relating to the Indemnity Trust, the Indemnity Trust Administrator may retain such advisors or experts, as he, in his sole and absolute discretion, considers appropriate to evaluate and resolve any such conflict of interest.  The cost of any such advisors or experts will be paid by the Claimant Trust, and if not paid in a timely fashion, may represent a claim for indemnity under this Agreement.  The Indemnity Trust Administrator shall keep a record of such fees and expenses incurred and upon the request of the Grantor or any Beneficiary, the Indemnity Trust Administrator shall promptly permit the requesting Party or Beneficiary, its respective agents, employees or independent auditors to examine, audit, excerpt, transcribe and copy such records, during normal business hours at the expense of such requesting Party or Beneficiary.

3.2     Records; Reporting.

(a)     The Indemnity Trust Administrator shall create and maintain a record of any Beneficiary who makes a claim hereunder at his office or at such other place or places as it shall designate from time to time, which shall be subject to inspection by any Beneficiary upon request; provided that such Beneficiary may be required to agree to maintain confidentiality with respect to any non-public information.

(b)     The Indemnity Trust Administrator shall provide quarterly reporting to the Oversight Board (for so long as it exists) of the Claimant Trust and the Advisory Representatives of (i) the status of the Indemnity Trust Assets, (ii) the balance of cash held by the Indemnity Trust, (iii) the status of any claims made by Beneficiaries and any resolutions thereof, (iv) the status of any litigation, and (vii) operating expenses; provided, however, that the Indemnity Trust Administrator may, with respect to any member of the Oversight Board of the Claimant Trust or Advisory Representative, redact any portion of such reports that relate to such person's or entity's claim for indemnification hereunder, as applicable, and any reporting provided hereunder may be subject to such member of the Oversight Board of the Claimant Trust

017276

HCMLPHMIT00000686

or Advisory Representative's agreement to maintain confidentiality with respect to any non-public information.

3.3     Term of Service.  The Indemnity Trust Administrator shall serve as the Indemnity Trust Administrator for the duration of the Indemnity Trust, subject to death, disability, resignation or removal.

3.4     Resignation or Removal of the Indemnity Trust Administrator.

(a)     The Indemnity Trust Administrator may resign as Indemnity Trust Administrator at any time by giving not less than thirty (30) days' written notice thereof to the Grantor and the Indemnity Trustee.  Upon the resignation of the Indemnity Trust Administrator, the successor Indemnity Trust Administrator will be appointed in accordance with Section 3.4(d).  The resignation of the Indemnity Trust Administrator shall become effective on the acceptance of appointment by a successor Indemnity Trust Administrator.

(b)     The Indemnity Trust Administrator may be removed for Cause immediately upon notice thereof by the Grantor as the Grantor deems appropriate or upon the request of a Beneficiary; provided that such notice shall be accompanied by a final order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, by a final order of such other court of competent jurisdiction establishing Cause.

(c)     [Reserved]

(d)     In the event of a vacancy by reason of Cause, or the death or Disability of the Indemnity Trust Administrator or prospective vacancy by reason of resignation, the successor Indemnity Trust Administrator shall be Richard Katz (the Independent Member of the Oversight Board of Grantor as of the date hereof), and in the event of a vacancy by reason of Cause, or the death or Disability of the fallback successor Indemnity Trust Administrator, the contingent successor shall be David Klos (the CFO of Highland Capital Management, L.P. as of the date hereof).  In the event that neither Richard Katz nor David Klos is able or willing to serve as Indemnity Trust Administrator, a majority of the Advisory Representatives willing to vote shall select the successor.  Any such successor Indemnity Trust Administrator shall be appointed as soon as practicable, but in any event no later than thirty (30) days after the occurrence of the vacancy or, in the case of resignation, on the effective date of the resignation of the-then acting Indemnity Trust Administrator.

3.5     Expenses and Other Payments to the Indemnity Trust Administrator.

(a)     The Indemnity Trust Administrator shall not be compensated for its services under this Agreement; provided that the Indemnity Trust Administrator shall be paid or reimbursed for all of the Indemnity Trust Administrator's reasonable and documented out-of-pocket expenses and disbursements in connection with his duties under this Agreement (including reasonable attorney's fees and expenses in his capacity as such), except any such expense or disbursement as may arise from the Indemnity Trustee's fraud, willful misconduct or gross negligence.  The Indemnity Trust Administrator shall keep a record of such expenses and upon the request of the Grantor or any Beneficiary, the Indemnity Trust Administrator shall

14

HCMLPHMIT00000687

promptly permit the requesting Party or Beneficiary, its respective agents, employees or independent auditors to examine, audit, excerpt, transcribe and copy such records, during normal business hours at the expense of such requesting Party or Beneficiary.

(b)    In the event that the Grantor is dissolved and Assets or Liabilities are transferred to the Indemnity Trust in accordance with this Agreement, nothing in this Agreement shall prohibit the Indemnity Trust from (i) compensating the Indemnity Trust Administrator in his capacity as an officer, other employee, or agent of such Assets or Liabilities for managing such Assets or Liabilities or (ii) compensating any other officers, employees, or agents of such Assets or Liabilities in assisting in the management of such Assets or Liabilities; provided, however, that any such compensation shall be paid solely from funds advanced to the Indemnity Trust with (or in connection with) the Assets or Liabilities transferred, and such funds shall be accounted for and managed by the Indemnity Trust Administrator separate and apart from the Indemnity Trust Assets.

## ARTICLE IV.
## THE INDEMNITY TRUSTEE AND DELAWARE TRUSTEE

4.1    Indemnity Trustee Authority and Duties.

(a)    The Indemnity Trustee shall have the power and authority to hold legal title on behalf of the Indemnity Trust to any and all Assets and rights of the Indemnity Trust in accordance with the terms hereof.  For the avoidance of doubt, the Beneficiaries shall be the sole beneficiaries of the Indemnity Trust and the Indemnity Trustee on behalf of the Indemnity Trust shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein.

(b)    The Indemnity Trustee shall take written directions from the Indemnity Trust Administrator, in such form specified herein and otherwise satisfactory to the Indemnity Trustee, and shall be entitled to conclusively and exclusively rely upon any such written directions from the Indemnity Trust Administrator without further inquiry or Liability.

(c)    The Indemnity Trustee's duties and responsibilities hereunder shall be determined solely by the express provisions of this Agreement and no other or further duties or responsibilities shall be implied.  The duties and responsibilities of the Indemnity Trustee hereunder shall be deemed purely ministerial in nature, and the Indemnity Trustee shall not be liable except for the performance of such duties, and no implied covenants or obligations shall be read into this Agreement against the Indemnity Trustee.  The Indemnity Trustee shall not be liable or responsible for any loss to the Indemnity Trust Account unless the same is caused by its own willful misconduct or gross negligence.  In no event shall the Indemnity Trustee be responsible or liable for special, indirect, punitive, incidental or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Indemnity Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.  To the extent that, at law or in equity, the Indemnity Trustee has duties (including fiduciary duties) and Liabilities relating thereto to the Indemnity Trust, the other parties hereto or any beneficiary of the Indemnity Trust, it is hereby understood and agreed by the other parties hereto that such duties and Liabilities are replaced by the duties and Liabilities

017278

HCMLPHMIT00000688

of the Indemnity Trustee expressly set forth in this Agreement. The Indemnity Trustee shall have no Liability for any action taken, or errors in judgment made, in good faith by it or any of its officers, employees or agents, unless it shall have been grossly negligent in ascertaining the pertinent facts. The permissive rights of the Indemnity Trustee to do things enumerated in this Agreement shall not be construed as a duty and, with respect to such permissive rights, the Indemnity Trustee shall not be answerable for other than its gross negligence or willful misconduct. The Indemnity Trustee shall not be liable for any amount in excess of the value of the Indemnity Trust Assets.

(d) The Indemnity Trustee shall take all steps and execute all instruments and documents necessary to effectuate the purpose of the Indemnity Trust and the activities contemplated herein, and take all actions necessary to comply with this Agreement and the obligations hereunder, but only upon receipt of appropriate written instructions from the Indemnity Trust Administrator. The Indemnity Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Agreement at the request or direction of the Indemnity Trust Administrator, pursuant to the provisions of this Agreement, if the Indemnity Trustee is not satisfied that reasonable security or indemnity (satisfactory to the Indemnity Trustee in its sole and absolute discretion) against the costs, expenses and Liabilities which may be incurred by it in compliance with such request or direction is available to the Indemnity Trustee.

(e) The Indemnity Trustee shall have no duty or responsibility whatsoever to determine that any Indemnity Trust Assets withdrawn from the Indemnity Trust Account pursuant to this Agreement will be used and applied in the manner provided for by this Agreement. The Indemnity Trustee shall only be liable for such losses, damages or expenses which have been finally adjudicated by a court of competent jurisdiction to have directly resulted from its own fraud, willful misconduct, or gross negligence.

(f) The Indemnity Trustee shall not be responsible for the existence, genuineness or value of any of the Indemnity Trust Assets, for the validity of title to the Indemnity Trust Assets, or for insuring the Indemnity Trust Assets or for the payment of taxes, charges, assessments or liens upon the Indemnity Trust Assets.

(g) The Indemnity Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement. The Indemnity Trust shall promptly advance and reimburse the Indemnity Trustee for all reasonable out-of-pocket costs and expenses (including reasonable legal fees and expenses) incurred by the Indemnity Trustee in connection with the performance of its duties hereunder. The terms of this paragraph shall survive termination of this Agreement and/or the earlier resignation or removal of the Indemnity Trustee.

(h) The Indemnity Trustee shall not be required to risk or expend its own funds in performing its obligations under this Agreement.

(i) The Indemnity Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document provided to the Indemnity Trustee by the Indemnity Trust

16

017279

HCMLPHMIT00000689

Administrator or the Beneficiaries. The Indemnity Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, attorneys, custodians or nominees, and the Indemnity Trustee shall not be responsible for any misconduct or negligence on the part of, or for the supervision of, any such agent, attorney, custodian or nominee appointed with due care by it.

        (j)     The Indemnity Trustee shall be protected in acting upon any statement, notice, resolution, request, consent, order, certificate, report, appraisal, opinion, facsimile, electronic media, letter or other paper or document believed by the Indemnity Trustee to be genuine and to have been signed, sent or presented by the proper Party or Parties. All notices to the Indemnity Trustee (unless otherwise provided therein) shall be deemed to be effective when received by an officer of the Indemnity Trustee with direct responsibility for the administration of this Agreement.

        (k)     Unless otherwise provided in this Agreement, the Indemnity Trustee is authorized to follow and rely upon all written instructions given by the Indemnity Trust Administrator and by attorneys-in-fact acting under written authority furnished to the Indemnity Trustee by the Indemnity Trust Administrator, including instructions given by electronic media, letter and facsimile transmission, if the Indemnity Trustee believes such instructions to be genuine and to have been signed by the proper party or parties. The Indemnity Trustee shall not incur any Liability to anyone resulting from actions taken by the Indemnity Trustee in reliance in good faith on such written instructions.

        (l)     The Indemnity Trustee represents and warrants that (i) it is a national banking association; and (ii) it is not a parent, subsidiary or affiliate of the Grantor, any Beneficiary or the Indemnity Trust Administrator.

        (m)     The Indemnity Trustee shall be entitled to rely on and shall not be liable for any action taken or omitted to be taken by the Indemnity Trustee in accordance with the advice of counsel or other professionals retained or consulted by the Indemnity Trustee.

        (n)     The Indemnity Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document other than this Agreement, whether or not an original or a copy of such agreement has been provided to the Indemnity Trustee. The Indemnity Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument, or document other than this Agreement.

        (o)     Neither the Indemnity Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for nor have any duty to monitor the performance or any action of the Grantor or the Indemnity Trust Administrator, or any of their directors, members, officers, agents, affiliates or employee, nor shall it have any Liability in connection with the malfeasance or nonfeasance by such party. The Indemnity Trustee may assume performance by all such Persons of their respective obligations. The Indemnity Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other Person.

17

017280

HCMLPHMIT00000690

(p)      In the event that any Indemnity Trust Assets or other Assets of the Indemnity Trust shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the Indemnity Trust Assets or other Assets of the Indemnity Trust, the Indemnity Trustee is hereby expressly authorized, in its sole discretion, to respond as it deems appropriate or to comply with all writs, orders or decrees so entered or issued, or which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction.  In the event that the Indemnity Trustee obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other person, firm or corporation, should, by reason of such compliance notwithstanding, such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

(q)      The Indemnity Trustee shall be entitled to request and receive written instructions from the Indemnity Trust Administrator and shall have no responsibility or Liability for any losses or damages of any nature that may arise from any action taken or not taken by the Indemnity Trustee in accordance with the written direction of the Indemnity Trust Administrator.

(r)      Notwithstanding anything to the contrary herein, the Indemnity Trustee shall have no duty to prepare or file any Federal or state tax report or return with respect to any funds held pursuant to this Agreement or any income earned thereon, except for the delivery and filing of tax information reporting forms required to be delivered and filed with the Internal Revenue Service.  With respect to the preparation, delivery and filing of such required tax information reporting forms and all matters pertaining to the reporting of earnings on funds held under this Agreement, the Indemnity Trustee shall be entitled to request and receive written instructions from the Indemnity Trust Administrator, and the Indemnity Trustee shall be entitled to rely conclusively and without further inquiry on such written instructions.   With respect to any other payments made under this Agreement, the Indemnity Trustee shall not be deemed the payer and shall have no responsibility for performing tax reporting.  The Indemnity Trustee's function of making such payments is solely ministerial and upon express direction of the Indemnity Trust Administrator.

4.2      Term of Service.  The Indemnity Trustee shall serve as the Indemnity Trustee for the duration of the Indemnity Trust, subject to resignation or removal.

4.3      Resignation or Removal of the Indemnity Trustee.

(a)      The Indemnity Trustee may resign at any time by giving not less than thirty (30) days' written notice thereof to the Indemnity Trust Administrator.  The Indemnity Trustee may be removed by the Indemnity Trust Administrator's delivery of not less than thirty (30) days' written notice of removal to the Indemnity Trustee.  Such resignation or removal shall become effective on the acceptance of appointment by a successor Indemnity Trustee and the transfer to such successor Indemnity Trustee of all Indemnity Trust Assets in accordance with Section 4.3(b) and any undisputed fees, expenses and indemnity due to the outgoing Indemnity Trustee are paid.  If the Indemnity Trust Administrator does not act within such 30-day period, the Indemnity Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Indemnity Trustee.

18

017281

HCMLPHMIT00000691

(b)     Upon receipt of the Indemnity Trustee's notice of resignation or delivery of notice of Indemnity Trustee's removal, the Indemnity Trust Administrator shall appoint a successor Indemnity Trustee.  Any successor Indemnity Trustee shall be a bank or trust company that is a member of the Federal Reserve System or chartered in the State of Delaware and shall not be a parent, a subsidiary or an affiliate of the Grantor or any of the Beneficiaries.  Upon the acceptance of the appointment as Indemnity Trustee hereunder by a successor Indemnity Trustee and the transfer to such successor Indemnity Trustee of all Indemnity Trust Assets, the resignation or removal of the Indemnity Trustee shall become effective.  Thereupon, such successor Indemnity Trustee shall succeed to and become vested with all the rights, powers, privileges and duties of the resigning or removed Indemnity Trustee, and the resigning or removed Indemnity Trustee shall be discharged from any future duties and obligations under this Agreement.

4.4     Reporting.    The Indemnity Trustee shall provide the Indemnity Trust Administrator, upon the inception of the Indemnity Trust Account, online electronic access to view the Indemnity Trust Account.  Thereafter, the Indemnity Trust Administrator will make available to any Beneficiary a written statement identifying in reasonable detail the balance of the Indemnity Trust Assets as of the applicable reporting date, plus a full accounting of all deposits (including amounts collected under the Indemnification Funding Note and any interest or investment income) and any withdrawals made during the applicable period and the effect of any investment losses; provided, however, that such written statements may be redacted for any sensitive information, as determined by the Indemnity Trust Administrator, in his sole and absolute discretion.

4.5     Books and Records.

(a)     The Indemnity Trustee shall maintain in respect of the Indemnity Trust books and records reflecting Indemnity Trust Assets in its possession and the income of the Indemnity Trust and payment of expenses, Liabilities, and claims against or assumed by the Indemnity Trust in such detail and for such period of time as is customary for the Indemnity Trustee in accordance with its ordinary and customary corporate trust business.  Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of the Indemnity Trust.  Except as otherwise provided herein, nothing in this Agreement requires the Indemnity Trustee to file any accounting or seek approval of any court with respect to the administration of the Indemnity Trust, or as a condition for managing any payment or distribution out of the Indemnity Trust Assets.

(b)     The Indemnity Trustee will provide the Indemnity Trust Administrator any books and records concerning the Indemnity Trust Assets upon the Indemnity Trustee's receipt of written direction from the Indemnity Trust Administrator.  The Indemnity Trust Administrator will thereafter promptly permit the Grantor, any Beneficiary or its respective agents, employees or independent auditors to examine, audit, excerpt, transcribe and copy, any non-privileged and non-confidential books, documents, papers and records relating to the Indemnity Trust Account or the Indemnity Trust Assets at the expense of such requesting Party or Beneficiary.  It is understood and agreed that the Indemnity Trustee shall only provide the information in its possession to the Indemnity Trust Administrator and shall have no duty or obligation to provide such information to any other person or entity.

19

017282

HCMLPHMIT00000692

4.6    [Reserved]

4.7    WTNA, as Indemnity Trustee or Delaware Trustee, shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

4.8    Any corporation or association into which WTNA may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Delaware Trustee or the Indemnity Trustee is a party, will be and become the successor Delaware Trustee or Indemnity Trustee, as applicable, under this Agreement and will have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

4.9    Delaware Trustee.

(a)    The Delaware Trustee shall have the limited power and authority, and is hereby authorized and empowered, to (i) accept legal process served on the Indemnity Trust in the State of Delaware; and (ii) execute any certificates that are required to be executed under the Delaware Statutory Trust Act and file such certificates in the office of the Secretary of State of the State of Delaware, and take such action or refrain from taking such action under this Agreement, in either case as may be directed in a writing delivered to the Delaware Trustee by the Indemnity Trust Administrator and upon which the Delaware Trustee shall be entitled to conclusively and exclusively rely; provided, however, that the Delaware Trustee shall not be required to take or to refrain from taking any such action if the Delaware Trustee shall believe, or shall have been advised by counsel, that such performance is likely to involve the Delaware Trustee in personal Liability or to result in personal Liability to the Delaware Trustee, or is contrary to the terms of this Agreement or of any document contemplated hereby to which the Indemnity Trust or the Delaware Trustee is or becomes a party or is otherwise contrary to law. The Parties agree not to instruct the Delaware Trustee to take any action or to refrain from taking any action that is contrary to the terms of this Agreement or of any document contemplated hereby to which the Indemnity Trust or the Delaware Trustee is or becomes party or that is otherwise contrary to law. Other than as expressly provided for in this Agreement, the Delaware Trustee shall have no duty or power to take any action for or on behalf of the Indemnity Trust. For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder. The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Indemnity Trustee or the Indemnity Trust Administrator set forth herein. The Delaware Trustee shall be one of the trustees of the Indemnity Trust for the sole and limited purpose of fulfilling the requirements of Section 3807 of the Delaware Statutory Trust Act and

017283
HCMLPHMIT00000693

for taking such actions as are required to be taken by a Delaware Trustee under the Delaware Statutory Trust Act. The duties (including fiduciary duties), Liabilities and obligations of the Delaware Trustee shall be limited to those expressly set forth in this Section 4.9(a) and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and Liabilities relating thereto to the Indemnity Trust, the other parties hereto or any beneficiary of the Indemnity Trust, it is hereby understood and agreed by the other parties hereto that such duties and Liabilities are replaced by the duties and Liabilities of the Delaware Trustee expressly set forth in this Agreement.

(b)     The Delaware Trustee shall serve until such time as the Indemnity Trust Administrator removes the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Indemnity Trust Administrator in accordance with the terms hereof. The Delaware Trustee may resign at any time upon the giving of at least thirty (30) days' advance written notice to the Indemnity Trust Administrator; provided, that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Indemnity Trust Administrator in accordance with the terms hereof. If the Claimant Trustee does not act within such 30-day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(c)     Upon the resignation or removal of the Delaware Trustee, the Indemnity Trust Administrator shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Delaware Statutory Trust Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Indemnity Trust Administrator and any undisputed fees, expenses and indemnity due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations under this Agreement.

(d)     The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement. The Indemnity Trust shall promptly advance and reimburse the Delaware Trustee for all reasonable out-of-pocket costs and expenses (including reasonable legal fees and expenses) incurred by the Delaware Trustee in connection with the performance of its duties hereunder. The terms of this paragraph shall survive termination of this Agreement and/or the earlier resignation or removal of the Delaware Trustee.

## ARTICLE V.
## TRUST INTERESTS

5.1     Interests Beneficial Only. The beneficial interests afforded a Beneficiary hereunder shall not entitle the Beneficiaries to any title in or to the Indemnity Trust Assets (which title shall

017284
HCMLPHMIT00000694

be vested in the Indemnity Trust) or to any right with respect to the administration of the Indemnity Trust except with respect to reporting and the review of books and records as set forth in this Agreement. Further, the Beneficiaries (other than the Indemnity Trustee in such capacity) shall not have any right to direct the actions of the Indemnity Trustee with respect to the Indemnity Trust Assets or the Indemnity Trust Account, or to direct the actions of the Indemnity Trust Administrator.

5.2    Transferability of Trust Interests. No transfer, assignment, pledge, hypothecation, or other disposition of a Beneficiary's interest in the Indemnity Trust may be effected without the consent of the Indemnity Trust Administrator in his sole and absolute discretion, provided that any such transfer, assignment or hypothecation does not confer upon such assignee status as a Beneficiary under the Indemnity Trust. The Indemnity Trust Administrator may impose such conditions and other terms upon any transfer, assignment or hypothecation as he considers appropriate, in his sole and absolute discretion. In the event of an assignment pledge, hypothecation, or other disposition, the foregoing limitations on transferability shall continue to apply in all respects to such beneficial interest and shall be binding on the assignee of such beneficial interest.

5.3    Effect of Death, Incapacity, or Bankruptcy. The death, incapacity, or bankruptcy of any Beneficiary during the term of the Indemnity Trust shall not (i) entitle the representatives or creditors of the deceased Beneficiary to any additional rights under this Agreement, or (ii) otherwise affect the rights and obligations of any of other Beneficiary under this Agreement.

5.4    Change of Address. Any Beneficiary may, after the Effective Date, select an alternative address by providing notice to the Indemnity Trust Administrator and the Indemnity Trustee identifying such alternative address. Such notification shall be effective only upon receipt by the Indemnity Trust Administrator and the Indemnity Trustee. Absent actual receipt of such notice by the Indemnity Trust Administrator and an officer of the Indemnity Trustee responsible for the administration of this Agreement, neither the Indemnity Trust Administrator nor the Indemnity Trustee shall recognize any such change of distribution address.

# ARTICLE VI.
# TAX MATTERS

6.1    Tax Treatment and Tax Returns. It is intended that the Indemnity Trust Assets shall be treated as owned by the Grantor for federal and applicable state and local income tax purposes. The Grantor shall be responsible for causing to be prepared and filed in a timely fashion all tax returns of the Indemnity Trust relating to the transactions contemplated by this Agreement or otherwise contemplated hereby, and it shall send a copy of each such tax return to the Indemnity Trustee. The Indemnity Trustee, acting only upon the written direction of the Indemnity Trust Administrator, shall furnish to the Grantor all such information as it has in its possession and as may be reasonably required in connection with the preparation of such tax returns and shall execute such returns if required to do so by the applicable taxing authority. The Indemnity Trustee shall not be liable for any tax due and payable in connection with this Agreement except for any tax based on or measured by the income of the institution or person acting as the Indemnity Trustee resulting from the amounts paid to the Indemnity Trustee as fees or compensation for acting as the Indemnity Trustee hereunder. Each Party (other than the Indemnity Trustee and the Delaware

017285
HCMLPHMIT00000695

Trustee) shall provide the Indemnity Trustee with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 and such other forms and documents that the Indemnity Trustee may request. Each such Party understands that if such tax reporting documentation is not provided and certified to the Indemnity Trustee, the Indemnity Trustee may be required by the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, to withhold a portion of any interest or other income earned on the investment of the Indemnity Trust Assets.

**ARTICLE VII.**
**STANDARD OF CARE AND INDEMNIFICATION**

7.1 <u>Standard of Care</u>. Neither the Indemnity Trustee acting in its capacity as Indemnity Trustee nor the Indemnity Trust Administrator, acting in his capacity as the Indemnity Trust Administrator, shall be personally liable to the Indemnity Trust or to any person (including any Beneficiary) in connection with the affairs of the Indemnity Trust, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action or cannot exercise jurisdiction over such action, such other court of competent jurisdiction, that the acts or omissions of the Indemnity Trustee or the Indemnity Trust Administrator, as the case may be, constituted fraud, willful misconduct, or gross negligence.

7.2 <u>Indemnification</u>.

(a) At any time prior to the dissolution of the Grantor, the Grantor shall indemnify, defend and hold harmless the Indemnity Trustee, the Delaware Trustee, the Indemnity Trust Administrator, the Advisory Representatives and all current, former and future officers, directors, employees, representatives and/or agents of any of the Indemnity Trust, the Indemnity Trustee, the Delaware Trustee, the Indemnity Trust Administrator or any of their respective subsidiaries (each, an "<u>Indemnified Party</u>"), from and against and reimburse each Indemnified Party for any and all Liabilities of whatever kind or nature regardless of their merit, demanded, asserted or claimed against such Indemnified Party directly or indirectly relating to, or arising from, claims against such Indemnified Party by reason of its participation in the transactions contemplated hereby, including without limitation all reasonable costs associated with claims for damages to persons or property, and reasonable attorneys' and consultants' fees and expenses and court costs except to the extent caused by such Indemnified Party's fraud, willful misconduct, or gross negligence. Promptly after receipt by an Indemnified Party of notification of the commencement of any proceeding, such Indemnified Party will promptly notify the Grantor in writing of such matter; <u>provided</u>, <u>however</u>, that the failure to provide such prompt notice to the Grantor shall not relieve the Grantor of Liability which it may have to such Indemnified Party hereunder.

(b) At any time upon or following (i) the dissolution of Grantor or (ii) the Grantor's failure to satisfy a claim for indemnification of an Indemnified Party pursuant to <u>Section 7.2(a)</u>, the Indemnity Trust shall indemnify, defend and hold harmless the Indemnified Parties, from and against and reimburse each Indemnified Party for any and all Liabilities of whatever kind or nature regardless of their merit, demanded, asserted or claimed against such Indemnified Party directly or indirectly relating to, or arising from, claims against such Indemnified Party by reason of its participation in the transactions contemplated hereby,

017286

HCMLPHMIT00000696

including without limitation all reasonable costs associated with claims for damages to persons or property, and reasonable attorneys' and consultants' fees and expenses and court costs except to the extent caused by such Indemnified Party's fraud, willful misconduct, or gross negligence. Promptly after receipt by an Indemnified Party of notification of the commencement of any proceeding, such Indemnified Party will promptly notify the Indemnity Trust in writing of such matter; provided, however, that the failure to provide such prompt notice to the Indemnity Trust shall not relieve the Indemnity Trust of Liability which it may have to such Indemnified Party hereunder.

(c)     The provisions of this Section 7.2 shall survive the termination of this Agreement or the earlier of the resignation or removal of the Indemnity Trustee or the Indemnity Trust Administrator, as applicable.

7.3     Tax Indemnification.

(a)     To the extent that the Indemnity Trustee becomes liable for the payment of any taxes in respect of income derived from the investment of the Indemnity Trust Assets, the Indemnity Trustee shall satisfy such Liability to the extent possible from the Indemnity Trust Assets.

(b)     At any time prior to the dissolution of the Grantor, the Grantor shall indemnify, defend and hold the Indemnity Trustee harmless from and against any tax, late payment, interest, penalty or other Liability that may be assessed against the Indemnity Trustee on or with respect to the Indemnity Trust Assets and the investment thereof unless such tax, late payment, interest, penalty or other expense was finally adjudicated to have been directly caused by the gross negligence or willful misconduct of the Indemnity Trustee.

(c)     At any time upon or following (i) the dissolution of Grantor or (ii) the Grantor's failure to satisfy a claim for indemnification pursuant to Section 7.3(b), the Indemnity Trust shall indemnify, defend and hold the Indemnity Trustee harmless from and against any tax, late payment, interest, penalty or other Liability that may be assessed against the Indemnity Trustee on or with respect to the Indemnity Trust Assets and the investment thereof unless such tax, late payment, interest, penalty or other expense was finally adjudicated to have been directly caused by the gross negligence or willful misconduct of the Indemnity Trustee.

(d)     The indemnification provided by this Section 7.3 is in addition to the indemnification provided in Section 7.2 and shall survive the resignation or removal of the Indemnity Trustee and the termination of this Agreement.

## ARTICLE VIII.
## TERMINATION

8.1     Term.

(a)     The Indemnity Trust shall be dissolved and its affairs shall be wound up in accordance with this Agreement and Delaware Statutory Trust Act upon the earlier of (i) the later of (x) the resolution by Final Order of all litigation, claims or proceedings in any forum of any kind which could give rise to an Indemnity Obligation and the payment in full of all

017287

HCMLPHMIT00000697

Indemnity Obligations related thereto and (y) the expiration of all applicable statutes of limitations and any applicable tolling of any such statutes of limitations (in either case of (x) or (y), as determined by agreement of (A) the Indemnity Trust Administrator (in his sole, absolute discretion) and (B) a majority of the remaining Advisory Representatives willing to act (in their respective sole absolute discretion)) for any claims that if brought against a Beneficiary would be or would have been subject to indemnification under Section 8.2 of the Claimant Trust Agreement, Section 8.2 of the Litigation Sub-Trust Agreement or Section 10 of the Reorganized Limited Partnership Agreement, as applicable, and (ii) the mutual agreement to dissolve the Indemnity Trust by (A) the Indemnity Trust Administrator and (B) a majority of the remaining Advisory Representatives willing to act, and, if required, entry of an order by the Bankruptcy Court or another court of competent jurisdiction authorizing the termination of the Indemnity Trust.  Notwithstanding the foregoing, if the Indemnity Trust is to be dissolved pursuant to Section 8.1(a)(ii) hereof prior to the expiry of all Indemnification Obligations, (x) if the Grantor is still in existence, then the Grantor, at its expense, shall obtain insurance coverage acceptable to (A) the Indemnity Trust Administrator and (B) a majority of the remaining Advisory Representatives willing to act prior to such dissolution; or (y) if the Grantor is no longer in existence, then the Indemnity Trust Administrator shall, using Indemnity Trust Assets, obtain insurance coverage acceptable to (A) the Indemnity Trust Administrator and (B) a majority of the remaining Advisory Representatives willing to act prior to such dissolution.  For the avoidance of doubt, neither the liquidation, dissolution nor termination and cancellation of the Claimant Trust, the Litigation Sub-Trust or the Reorganized Debtor, as applicable, nor the legal existence of the Grantor or any other party will have any effect on the legal existence of the Indemnity Trust.

(b)     Upon the determination of the Indemnity Trust Administrator that the Claimant Trust has substantially completed its efforts to monetize and distribute its assets or such earlier date that the Indemnity Trust Administrator shall determine in his sole and absolute discretion, the Indemnity Trust Administrator and majority of the remaining Advisory Representatives willing to act shall work in good faith to replace the Indemnity Trust with a suitable third-party insurance policy providing then suitable protections to Beneficiaries, in each case, as determined in the sole, absolute discretion of (i) the Indemnity Trust Administrator and (ii) a majority of the remaining Advisory Representatives willing to act.

(c)     At any time prior to the dissolution of the Indemnity Trust as described in Section 8.1(d), if (i) the Indemnity Trust Administrator (in his sole and absolute discretion) and (ii) a majority of the remaining Advisory Representatives willing to act (in their  respective sole and absolute discretion) determine that the Indemnity Trust Assets are not reasonably necessary to satisfy current or potential Indemnification Obligations to all persons who are or might become Beneficiaries, the Indemnity Trust Administrator may transfer such excess Indemnity Trust Assets (A) at any time prior to the dissolution of the Claimant Trust, to the Claimant Trust for use by the Claimant Trust in accordance with the Claimant Trust Agreement, and (B) at any time upon or following the dissolution of the Claimant Trust, according to the same distribution methodology contemplated in Section 9.2 of the Claimant Trust Agreement in effect as of the effective date of the dissolution of the Claimant Trust; provided, however, that in no event will any such transferee be entitled to the books, records and or privileges of the Indemnity Trust; provided, further, that for the avoidance of doubt, any person or entity's contractual right to receive or recover any such remaining Indemnity Trust Assets as set forth herein does not make

017288

HCMLPHMIT00000698

them or any other person a beneficiary of the Indemnity Trust or this Agreement; and <u>provided</u>, <u>further</u>, that the Indemnity Trust Assets shall at no time be less than $32 million (valued according to their market value at the time of transfer into the Indemnity Trust Account) unless otherwise provided by <u>Section 8.1(a) or (b)</u> of this Agreement.  Any such determination by the (i) the Indemnity Trust Administrator and (ii) a majority of the remaining Advisory Representatives willing to act is final and not subject to review, and in relation to any such determination and transfer, the Indemnity Trust Administrator, the Advisory Representatives, the Oversight Board, the Indemnity Trustee, and the Delaware Trustee will be entitled to the protections of this Agreement, including but not limited to <u>Article VII</u>, <u>Article VIII</u>, and <u>Article IX</u>.

(d)     Upon the dissolution of the Indemnity Trust and in connection with winding up the Indemnity Trust's affairs, any remaining Indemnity Trust Assets (as reduced by payments (actual and reserved) and provisions to pay all claims and obligations of the Indemnity Trust, payments to any Beneficiary or as used to purchase insurance for the benefit of the Beneficiaries to augment or replace the Indemnity Trust or as paid out in accordance with <u>Section 9.12</u> hereof) will be transferred at the written direction of the Indemnity Trust Administrator (i) at any time prior to the dissolution of the Claimant Trust, to the Claimant Trust and (ii) at any time following the dissolution of the Claimant Trust, according to the same distribution methodology contemplated in Section 9.2 of the Claimant Trust Agreement in effect as of the effective date of the dissolution of the Claimant Trust <u>provided</u>, <u>however</u>, that in no event will any such transferee be entitled to the books, records and or privileges of the Indemnity Trust; <u>provided</u>, <u>further</u>, that for the avoidance of doubt, any person or entity's contractual right to receive or recover any such remaining Indemnity Trust Assets as set forth herein does not make them or any other person a beneficiary of the Indemnity Trust or this Agreement.  The Indemnity Trust Administrator shall be solely responsible for the dissolution, liquidation and winding up of the affairs of the Indemnity Trust.  Upon the dissolution of the Indemnity Trust and completion of the winding up of the Assets, Liabilities and affairs of the Indemnity Trust pursuant to the Delaware Statutory Trust Act, the Indemnity Trustee (acting only at the written direction of the Indemnity Trust Administrator) shall prepare, execute and file a certificate of cancellation with the State of Delaware to terminate the Indemnity Trust pursuant to Section 3810 of the Delaware Statutory Trust Act (such date upon which the certificate of cancellation is filed shall be referred to as the "<u>Termination Date</u>").  If the Delaware Trustee's signature is required for purposes of filing such certificate of cancellation, the Indemnity Trust Administrator shall provide the Delaware Trustee with written direction to execute such certificate of cancellation, and the Delaware Trustee shall be entitled to conclusively and exclusively rely upon such written direction without further inquiry.

8.2     <u>Termination of Duties</u>.  Except as otherwise specifically provided herein, upon the Termination Date of the Indemnity Trust, the Indemnity Trustee, the Indemnity Trust Administrator and the Delaware Trustee shall have no further duties or obligations hereunder.

8.3     <u>No Survival</u>.   The rights of Beneficiaries hereunder shall not survive the Termination Date.

017289
HCMLPHMIT00000699

## ARTICLE IX. MISCELLANEOUS

9.1     <u>Trust Irrevocable</u>.  Except as set forth in this Agreement, establishment of the Indemnity Trust by this Agreement shall be irrevocable and shall not be subject to revocation, cancellation or rescission by the Beneficiaries.

9.2     <u>Beneficiaries have No Legal Title to the Indemnity Trust Assets</u>.  No Beneficiary shall have legal title to any part of the Indemnity Trust Assets.

9.3     <u>Agreement for Benefit of Parties Only</u>.  Nothing herein, whether expressed or implied, shall be construed to give any person other than the Parties, the Beneficiaries and the Indemnified Parties any legal or equitable right, remedy or claim under or in respect of this Agreement.  The Indemnity Trust Assets shall be held for the sole and exclusive benefit of the Beneficiaries.  The Beneficiaries and the Indemnified Parties will have the right to enforce the terms of this Agreement in case the Indemnity Trust Administrator fails to perform its obligations hereunder as determined by the Bankruptcy Court or another court of competent jurisdiction.

9.4     <u>Limited Recourse</u>.  Notwithstanding anything herein to the contrary, all obligations of the Indemnity Trust under this Agreement shall be limited recourse obligations of the Indemnity Trust payable solely from the Indemnity Trust Assets.  All obligations of and any claims against the Indemnity Trust hereunder shall be extinguished and not thereafter revive in the event that, at any time, all of the Indemnity Trust Assets are exhausted (including, for the avoidance of doubt, after giving effect to funds subsequently received as payments on the Indemnification Funding Note or otherwise) or distributed pursuant to <u>Section 8.1(d)</u>.  None of the Beneficiaries nor any other person or entity entitled to payments hereunder (including, without limitation pursuant to <u>Sections 7.2, 7.3 and 8.1(c) and (d)</u> hereof) will have recourse to the Indemnity Trust Administrator, the Advisory Representatives, the Oversight Board, Indemnity Trustee or the Delaware Trustee or any of their respective affiliates or their respective officers, directors, employees, representatives or their respective assets.

9.5     <u>Notices</u>.  All notices, directions, instructions, confirmations, consents and requests required or permitted by the terms hereof shall, unless otherwise specifically provided herein, be in writing and shall be sent by first class mail, facsimile, overnight mail or in the case of mailing to a non-United States address, air mail, postage prepaid, addressed to:

(a)     If to the Grantor:

Grantor
c/o Highland Capital Management, L.P.
100 Crescent Court, Suite 1850
Dallas, Texas 75201

With a copy to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA 90067
Attn:   Jeffrey Pomerantz (jpomerantz@pszjlaw.com)

27

017290

HCMLPHMIT00000700

Ira Kharasch (ikharasch@pszjlaw.com)
Gregory Demo (gdemo@pszjlaw.com)

(b)     If to the Indemnity Trust Administrator:

Indemnity Trust Administrator
c/o Highland Capital Management, L.P.
100 Crescent Court, Suite 1850
Dallas, Texas 75201
Attention: James P. Seery, Jr.

With a copy to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA 90067
Attn: Jeffrey Pomerantz (jpomerantz@pszjlaw.com)
Ira Kharasch (ikharasch@pszjlaw.com)
Gregory Demo (gdemo@pszjlaw.com)

(c)     If to the Indemnity Trustee:

Indemnity Trustee
Wilmington Trust, National Association
1100 North Market Street
Wilmington, DE 19890
Attn: Corporate Trust Administration/Neumann Marlett III
Email: nmarlett@wilmingtontrust.com
Phone: (302) 636-6728
Fax: (302) 636-4145

(d)     If to the Delaware Trustee:

Wilmington Trust, National Association
1100 North Market Street
Wilmington, DE 19890
Attn: Corporate Trust Administration/Neumann Marlett III
Email: nmarlett@wilmingtontrust.com
Phone: (302) 636-6728
Fax: (302) 636-4145

Notice mailed shall be effective on the date mailed or sent. Any Party may change the address at which it is to receive notices under this Agreement by furnishing written notice pursuant to the provisions of this Section 9.4 to the other Parties of such change.

9.6    Amendments. Any change or modification to this Agreement will be made by written amendment to this Agreement and signed by the Parties hereto; provided, however, that

28

017291

HCMLPHMIT00000701

any amendment to this Agreement that is materially detrimental to a Beneficiary will not be effective unless consented to in writing by such Beneficiary.

9.7     Severability.  Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in another jurisdiction.

9.8     Counterparts.  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.  This Agreement and the exhibits hereto set forth the entire agreement and understanding of the parties related to this transaction and supersedes all prior agreements and understandings, oral or written.

9.9     Headings; References.   The headings of the various Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

9.10    Governing Law; Waiver of Jury Trial.   This Agreement shall in all respects be governed by, and construed in accordance with the laws of the State of Delaware, including all matters of constructions, validity and performance, but without reference to its conflict of law provisions.  Each Party hereto irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.  Beneficiaries are deemed to have waived any right to a trial by jury.

9.11    Consent to Jurisdiction.  Any action brought by a Beneficiary must be brought in the Bankruptcy Court.  Each of the Parties hereto consents and submits to the exclusive jurisdiction of the Bankruptcy Court for any action or proceeding instituted for the enforcement and construction of any right, remedy, obligation, or Liability arising under or by reason of this Agreement, or any act or omission of the Indemnity Trustee or the Indemnity Trust Administrator. If the Bankruptcy Court either declines to exercise jurisdiction over such action or cannot exercise jurisdiction over such action, such action may be brought in the state or federal courts located in the State of Delaware.

9.12    Okada Settlement.

(a)     On January 21, 2025 and pursuant to the Okada Settlement Agreement, Okada has  transferred, or has cause to be transferred, to the Indemnity Trust, Acis 7 Proceeds, which were transferred and used in accordance with the Okada Settlement Agreement and this Section 9.12.  On January 22, 2025 and in accordance with the Okada Settlement Agreement, the Indemnity Trust Administrator provide written notice to Okada of such receipt by the Indemnity Trust, including the amount of gross proceeds received.  Further, within five (5) Business Days of receipt of any funds on account of Okada's Special Limited Partnership Interest ("SLP") in PetroCap Incentive Partners II, LP (the "PetroCap Proceeds"), Okada will provide written notice to the Indemnity Trust Administrator of such receipt and the amount of gross proceeds received, whereupon a written request from the Indemnity Trust Administrator, Okada

29

017292

HCMLPHMIT00000702

will provide information reasonably related to SLP that Okada is permitted to provide consistent with his confidentiality or other obligations, for the limited purpose of the Indemnity Trust Administrator assessing the value of and funds received on account of the SLP.  If Okada determines that he is unable to provide any such information to the Indemnity Trust Administrator based on confidentiality or other obligations, he will cooperate with the Indemnity Trust Administrator to address those concerns to enable such information to be provided.

(b)     On or after January 1, 2025,  the Indemnity Trust Administrator may in writing demand that Okada provide to the Indemnity Trust the lesser of (i) $1,000,000 and  (ii) 50% of the gross amount of PetroCap Proceeds Okada actually received as of the date of such demand (the "PetroCap Proceeds Demand"); provided that the PetroCap Proceeds Demand include a written representation by the Indemnity Trust Administrator that all Indemnity Trust Assets have been or will imminently be exhausted and that such demand be made no more than once (assuming the timely and full satisfaction of such demand) by the Indemnity Trust Administrator.  If the PetroCap Proceeds Demand is fully satisfied by Okada in a timely manner, Okada's contingent funding obligation under the Okada Settlement Agreement shall be extinguished and no further PetroCap Proceeds Demand may be made by the Indemnity Trust Administrator.

(c)     The Acis 7 Proceeds and any PetroCap Proceeds shall be maintained as part of the Indemnity Trust Account, but accounted for and tracked separately from other Indemnity Trust Assets.  The Acis 7 Proceeds and any PetroCap Proceeds transferred to the Indemnity Trust Account may be used in the same authorized manner as other Indemnity Trust Assets, but used only as "last out" funds after all other cash and other Indemnity Trust Assets are expended or otherwise disbursed in accordance with the terms of this Agreement.  Further, upon written request from Okada to the Indemnity Trust Administrator, the Indemnity Trust Administrator or the Trust Administrator, as applicable, shall provide information as to the remaining amounts of Acis 7 Proceeds and/or PetroCap Proceeds held by the Indemnity Trust.

(d)     On the earlier of (x) the winding-up of the Indemnity Trust and (y) any disbursement of Indemnity Trust Assets to the Claimant Trust (or any other disbursement in accordance with Article VIII), any unused portion of the Acis 7 Proceeds or the PetroCap Proceeds, plus any interest earned on those proceeds, shall be paid to Okada prior to any distributions of other Indemnity Trust Assets in accordance with Section 8.1(d); provided, that Okada shall provide to the Indemnity Trust and the Indemnity Trust Administrator a bring down of the release provided in paragraph 10 of the Okada Settlement Agreement as a condition to the release of such Indemnity Trust Assets to Okada.

(e)     The Parties acknowledge that Okada retains a reversionary interest in the Acis 7 Proceeds and the PetroCap Proceeds (to the extent they actually exist and are deposited into the Indemnity Trust Account), and to the extent they are not expended or disbursed pursuant to the terms of this Agreement, any unused portion of the Acis 7 Proceeds and/or PetroCap Proceeds shall be returned to Okada in accordance with Section 9(d).  For the avoidance of doubt, Okada's right to recover any unused portion of Acis 7 Proceeds and/or PetroCap Proceeds as set forth herein does not make Okada or any of the Okada Parties a beneficiary of the Indemnity Trust or this Agreement.

017293

HCMLPHMIT00000703

[Remainder of Page Intentionally Blank]

SUBJECT TO CONFIDENTIALITY AGREEMENT

017294

HCMLPHMIT00000704

IN WITNESS HEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective officers thereunto duly authorized on the day and year first written above.

Claimant Trust, as Grantor

By: _____
James P. Seery, Jr., not individually but solely in his capacity as the Claimant Trustee

James P. Seery, Jr., as Indemnity Trust Administrator

By: _____
James P. Seery, Jr., not individually but solely in his capacity as the Indemnity Trust Administrator

Wilmington Trust, National Association, as Indemnity Trustee

By: _____

Wilmington Trust, National Association, as Delaware Trustee

By: _____

017295

HCMLPHMIT00000705

<u>EXHIBIT A</u>

Form of Indemnification Funding Note

<u>UNSECURED PROMISSORY NOTE</u>

August [●], 2021

       FOR VALUE RECEIVED, the undersigned, Highland Capital Management L.P., Claimant Trust, and Litigation Sub-Trust, (collectively, "<u>Payors</u>") jointly and severally hereby promise to pay to the Indemnity Trust (the "<u>Payee</u>") the Principal Amount (defined below), as provided in this promissory note (this "<u>Indemnification Funding Note</u>").

<u>Principal Amount</u>

       At all times, the amount owed under this Indemnification Funding Note (the "<u>Principal Amount</u>") shall be equal to TWENTY FIVE MILLION DOLLARS ($25,000,000) **less** the value of any Assets held by the Indemnity Trust.  The Principal Amount shall be determined and documented by the Indemnity Trust Administrator and paid in accordance with the payment terms herein.  Capitalized terms utilized herein, but not defined have the meanings ascribed to them in the Indemnity Trust Agreement, effective as of August 16, 2021 (the "<u>Agreement</u>").

<u>Payment</u>

       Payment of the Principal Amount shall be made, in full or in part, on the earlier of (a) demand for payment from the Indemnity Trust Administrator or (b) the date at which the combined Net Asset Value of Highland Capital Management L.P., the Claimant Trust, and the Litigation Sub-Trust is less than 200% of the Principal Amount.  Subject to the foregoing, the Claimant Trustee will have sole and absolute discretion to determine the timing and amount of payments of the Principal Amount consistent with his view of liquidity needs of the Claimant Trust and related entities and the requirements of any financing agreement binding on the Claimant Trust.  Upon the Claimant Trustee's determination that a payment of the Principal Amount in whole or in part should be made, the amount of the payment shall be due within five (5) days of such a determination.  *Notwithstanding anything in the foregoing*, no payment shall be required to be made at any time if such payment would cause Highland Capital Management L.P., the Claimant Trust, or the Litigation Sub-Trust to be in default under or in violation of that certain *Financing Agreement*, dated as of August 11, 2021, by and among, Highland Capital Management, L.P. and Trussway Industries, LLC, as borrowers, each of the entities listed as guarantors thereon, the lenders from time to time party thereto, and Blue Torch Finance LLC (the "<u>Exit Financing Agreement</u>").

       For the avoidance of doubt, the foregoing payments of Principal Amount will be senior to any distribution to beneficiaries under the Claimant Trust.  In the event that the liquid assets of the Claimant Trust, the Litigation Sub-Trust, and Highland Capital Management L.P. are insufficient to satisfy the foregoing payments, the Claimant Trustee must take all reasonable action, subject in all respects to the terms of the Exit Financing Agreement, to satisfy such obligations under the Indemnification Funding Note, including accessing any available credit lines or third party

017296

HCMLPHMIT00000706

leverage, and no current payments to Claimant Trust beneficiaries will be made until all current amounts of Principal Amount due have been made.

## Interest

The Indemnification Funding Note shall not bear interest, other than that which must be imputed under applicable law.

## Governing Law

This Indemnification Funding Note shall in all respects be governed by, and construed in accordance with the laws of the State of Delaware, including all matters of constructions, validity and performance, but without reference to its conflict of law provisions.

Executed as of August [●], 2021

*Payors*:

**HIGHLAND CLAIMANT TRUST**

By: _____
James P. Seery, Jr., not individually but solely in his capacity as the Claimant Trustee

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____
James P. Seery, Jr., not individually but solely in his capacity as Chief Executive Officer

**HIGHLAND LITIGATION TRUST**

By: _____
Marc Kirschner, not individually but solely in his capacity as the Litigation Trustee

A-2

## EXHIBIT B

### Form of Beneficiary Withdrawal Request

Indemnity Trust Administrator
[insert contact info for Indemnity Trust Administrator]

with a copy to:

[_____]
[insert contact info for the applicable Beneficiary]

[DATE]

Reference is made to the Indemnity Trust Agreement, effective as of _____, 2021 (as amended from time to time, the "Indemnity Trust Agreement"), by and among the Claimant Trust, as grantor (the "Grantor"), the Indemnity Trust Administrator, Wilmington Trust, National Association ("WTNA"), as indemnity trustee (the "Indemnity Trustee"), and WTNA, as the Delaware Trustee. Capitalized terms used herein shall have the meanings assigned thereto in the Indemnity Trust Agreement.

[In accordance with Section 2.4(c) of the Indemnity Trust Agreement, the undersigned hereby certifies that a claim for indemnification was made under [Section 8.2 of the Claimant Trust Agreement][Section 8.2 of the Litigation Sub-Trust Agreement][Section 10 of the Reorganized Limited Partnership Agreement], but that [he][she][entity name] did not receive full payment within fourteen (14) days of submitting such claim for indemnification. A copy of such claim and all underlying documentation is attached hereto as Schedule A.][1]

The undersigned hereby requests the Indemnity Trustee to pay an amount equal to $[_____] out of the funds on deposit in the Indemnity Trust Account. A breakdown of the amounts payable by the Claimant Trust, the Litigation Sub-Trust or the Reorganized Debtor, as applicable, to the undersigned with respect to the Indemnity Obligations is attached hereto as Schedule B.

Wire instructions for the undersigned are attached hereto as Schedule C.

By executing and delivering this Beneficiary Withdrawal Request, the undersigned acknowledges and agrees that any claim for indemnification made hereby is made pursuant to, and is subject in all respects to, the express terms of the [Claimant Trust Agreement] [Litigation Sub-Trust Agreement] [Reorganized Limited Partnership Agreement].

The undersigned irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this request for indemnification and consents and submits to the exclusive jurisdiction of the Bankruptcy Court for any action or proceeding instituted for the enforcement and construction of any right, remedy, obligation, or Liability arising hereunder. If the Bankruptcy Court either declines to exercise

---

[1] To be omitted from any Beneficiary Withdrawal Requests made pursuant to Section 2.4(d).

B-1

017298

HCMLPHMIT00000708

jurisdiction over such action or cannot exercise jurisdiction over such action, such action may be brought in the state or federal courts located in the Northern District of Texas.

[_____], as Beneficiary

By:_____
   Name:
   Title:

B-2

017299

HCMLPHMIT00000709

Schedule A[2]

SUBJECT TO CONFIDENTIALITY AGREEMENT

---

[2] To be omitted from any Beneficiary Withdrawal Requests made pursuant to Section 2.4(d).

017300
HCMLPHMIT00000710

Schedule B

SUBJECT TO CONFIDENTIALITY AGREEMENT

017301

HCMLPHMIT00000711

## EXHIBIT C

## Form of Withdrawal Notice

Indemnity Trustee
[insert contact info for Indemnity Trustee]

with a copy to:

[_____]
[insert contact info for the applicable Beneficiary]


[DATE]

Reference is made to the Indemnity Trust Agreement, effective as of August 16, 2021 (as amended from time to time, the "Indemnity Trust Agreement"), by and among the Claimant Trust, as grantor, the Indemnity Trust Administrator, Wilmington Trust, National Association ("WTNA"), as indemnity trustee (the "Indemnity Trustee"), and WTNA, as the Delaware Trustee, and (ii) the Beneficiary Withdrawal Request from [insert Beneficiary name] dated [insert date].  Capitalized terms used herein shall have the meanings assigned thereto in the Indemnity Trust Agreement.

In accordance with Section 2.4(e) of the Indemnity Trust Agreement, the Indemnity Trust Administrator hereby directs the Indemnity Trustee to pay an amount equal to $[_____] out of the funds on deposit in the Indemnity Trust Account by wire transfer to the following account:

[Insert wire instructions for the applicable Beneficiary]


                                        Indemnity Trust Administrator


                                        By: _____
                                             James P. Seery, Jr., not individually but
                                        solely in his capacity as the Indemnity Trust
                                        Administrator

C-1

017302

HCMLPHMIT00000712

REVISED DRAFT

**PRIVILEGED AND CONFIDENTIAL ATTORNEY CLIENT COMMUNICATON**

**PREPARED AT THE DIRECTION OF COUNSEL IN CONNECTION WITH EXISTING LITIGATION AND IN ANTICIPATION OF FUTURE LITIGATION**

**PROTECTED BY FRE 408 AND SIMILAR STATE LAW PROTECTIONS.  PROVIDED PURSUANT TO NDA**

**April 15, 2025**

DRAFT Potential Settlement Structure with DAF and HMIT

**<u>HMIT</u>**

- **Settlement of remanded motion to sue** – HCMLP, the Claimant Trust, and HMIT settle existing motion to sue and all other claims with prejudice for a cash payment of [$500k]
- **Allowance of claim** - HCMLP to allow HMIT Class 10 interest in the amount of ~$337mm (calculated as ~$395mm Petition Date capital account, less ~$58mm P&I outstanding on HMIT note as of Petition Date), subject to:
  - The HMIT allowed Class 10 interest is not transferable
  - HMIT releases all claims and accepts the "Litigation Protections" – see separate document containing the releases and other required provisions – which eliminate claims and limit the Class 10 allowed interest
  - LT releases HMIT from all other claims in the LT litigation and otherwise
  - LT transfers to holders of allowed Class 10 interests all remaining LT litigation (after HMIT and DAF/CLO Holdco releases) "as-is, where-is" along with all documents produced in the LT case to date
    - Such causes of action are limited to the currently stayed litigation and other causes of action that may exist related to former employees Ellington and Leventon
    - If for any reason the transfer of the LT litigation is nullified, the settlement will not be affected
  - Complete cessation and withdrawal of any other litigation among the parties
  - Class 10 remains senior to Class 11 as required by the Plan
- **Court Approval –** Settlement and allowance of Class 10 Claim subject to approval of the Bankruptcy Court

**<u>DAF</u>**

- **Settlement of DAF Claims** – HCMLP, the Claimant Trust, and DAF/CLO Holdco settle all claims underlying the current Fifth Circuit appeal and all other claims with

017303

HCMLPHMIT00000713

prejudice for a cash payment of $[2mm] within [10] business days of execution of the settlement; the Fifth Circuit appeal will be dismissed with prejudice within [10] business days of execution of the settlement

- o HCMLP will purchase DAF's right to distribution from HCLOF related to Acis 6, as is - where is, without representation except for unencumbered ownership, for $[3mm] cash, to be paid within [10] business days of execution of the settlement; DAF releases HCLOF from any claims related to Acis 6 distributions
- o DAF/CLO Holdco release all claims and accept the "Litigation Protections" – see separate document containing the releases and other required provisions
- o LT releases DAF/CLO Holdco from all other claims in the LT litigation and otherwise
- o Complete cessation and withdrawal of any other litigation among the parties
- o Settlement will be filed with the Bankruptcy Court and "so ordered"

## Distributions

- **Initial Interim Cash Distributions** – Within [91] days of the receipt of a final/non-appealable order not subject to certiorari:
  - o The Indemnity Trust will distribute $[10]mm cash directly to Class 9 Claimant Trust Beneficiaries in accordance with the waterfall and the Indemnity Trust Agreement
  - o [Subject to Class 9 Approval], the Indemnity Trust will distribute $[10]mm cash directly to holders of allowed Class 10 interests
    - ▪ On approval of the settlement by the Bankruptcy Court, the Indemnity Trust will set up a separate $[10]mm reserve for the Initial Interim Cash Distribution which reserve will be held in UST on the same terms as other Indemnity Trust holdings pending distribution to Class 10 interest holders or reversal/remand of the settlement
    - ▪ Any payments on the Dugaboy Note from the date of Bankruptcy Court approval of the settlement to the date of the Initial Interim Cash Distributions will be held by the Indemnity Trust in a separate account and also be paid to holders of allowed Class 10 interests
      - • The actual dollar amount of any such P+I payments paid will reduce the Class 10 interests outstanding

HCMLPHMIT00000714

- **Subsequent Distribution(s)** - Following the Initial Interim Cash Distributions, most, if not all remaining assets will be held by the Indemnity Trust, except for potentially the Disputed Claims Reserve (if the pending claim is not fully resolved) and cash at the Claimant Trust and HCMLP (indirectly owned by the Indemnity Trust) to be used in the wind-down of those entities with any excess amounts contributed/distributed to the Indemnity Trust
  - On April 1, 2028, if no threats, demands, or litigations have been brought against the Indemnity Trust or its beneficiaries:
    - The Indemnity Trust will distribute ~$[11]mm cash directly to Class 9 Claimant Trust Beneficiaries in accordance with the waterfall and the Indemnity Trust Agreement, satisfying the remainder of the Class 9 interests outstanding
    - The Indemnity Trust will distribute $[5]mm cash directly to holders of allowed Class 10 interests
    - Note Cash or In-Kind Distribution – At the election of HMIT, the Indemnity Trust will either (a) sell the currently $[17.6]mm face value (P+I) promissory note receivable from Dugaboy Investment Trust to HCMLP that has been irrevocably participated (and may be assigned if it defaults) to the Indemnity Trust (the "Dugaboy Note") and distribute the net proceeds (plus all P+I payments on the Dugaboy Note from the Interim Cash Distribution Date to April 1, 2028) to holders of allowed Class 10 interests or (b) assign the Dugaboy Note directly to holders of allowed Class 10 interests
      - For purposes of tracking progress toward the ~$337mm Class 10 interest:
        - if the Dugaboy Note is sold, the distribution will be valued at the amount of cash distributed;
        - if the Dugaboy Note is distributed in kind, the distribution will be valued at fair market value as determined by the Indemnity Trust Administrator
      - Assumes the Dugaboy Note continues to perform; if there is a default prior to April 1, 2028, the Indemnity Trust will accelerate the Dugaboy Note and pursue full collection plus cost of collection
        - If distribution of the Dugaboy Note is to be effected on April 1, 2028 and collection litigation has been commenced, at its election, holders of allowed Class 10 interests can receive, the collected balance or the

017305

litigation or elect to have the Indemnity Trust continue the litigation and subsequently pay the proceeds to holders of allowed Class 10 interests

- o As it pertains to the Disputed Claims Reserve, Highland will object to the Daugherty tax POC (final remaining pending claim). Following a final non-appealable order resolving the claim, any remaining funds will be distributed to Class 9 or, if Class 9 has been paid in full, to holders of allowed Class 10 interests

- **"Final Distribution"** - After April 1, 2029, if no threats, demands, or litigations have been brought against beneficiaries of the Indemnity Trust and all statutes of limitation (SOLs) and any potentially applicable tolling thereof have expired, at the Indemnity Trust Administrator's sole discretion, any excess remaining funds in the Indemnity Trust shall be paid out in accordance with the Plan and the Indemnity Trust Agreement (i.e. to holders of allowed Class 10 interests, up to allowed amounts) in conjunction with the dissolution, wind down and cancellation of the Indemnity Trust
  - o The Indemnity Trust Administrator will consult with [Mark Patrick] regarding potentially applicable SOLs and tolling

- **Other**
  - o **Extension of Claimant Trust –** A one-year extension for the Claimant Trust will be sought in the bankruptcy court. During the 1-year extension period, the Claimant Trust will be placed into dissolution and begin its winding up.
    - ▪ The Indemnity Trust will covenant not to transfer any funds to the Claimant Trust following the date of final non-appealable approval of the HMIT settlement
  - o **HCMLP wind down –** the remaining unliquidated assets of the estate, including HCMLP, itself, will be retained within the Indemnity Trust and will be liquidated.
    - ▪ HCMLP personnel will complete the liquidation, dissolution, cancellation, tax compliance, and any other winding up activities for the remaining entities under its purview, including HCMLP.
    - ▪ Any excess amounts remaining at cancellation of HCMLP will be distributed to the Indemnity Trust.

017306

- The Indemnity Trust will covenant not to transfer any funds to HCMLP following the date of final non-appealable approval of the HMIT settlement
    - HCMLP will have a funding agreement with the Claimant Trust to assure that the Claimant Trust has sufficient funds to complete its wind-down
    - Any excess funds in the Claimant Trust at its cancellation will be contributed to the Indemnity Trust; excess funds at HMLP will be distributed to the Indemnity Trust
- **HCMLP and its general partner –** While HCMLP will be placed into dissolution, the entity will continue to survive during its winding up period, during which time it may continue to defend inbound litigation, prosecute outbound litigation, maintain its books and records, and monetize its remaining assets.  HCMLP's general partner will be dissolved, wound-down and cancelled along with HCMLP
- **Claimant Trust Oversight Board –** Subject to the Plan and Claimant Trust agreement, it is anticipated that the members of the Oversight Board will continue in their existing roles until the final/non-appealable order approving the HMIT settlement is received
- **Information rights to HMIT –** After Bankruptcy Court approval of the HMIT settlement, per the Claimant Trust Agreement, except that:
    - HCMLP will review forecasted expenses with [Mark Patrick] at his request, but not more often than quarterly, and will work in good faith to reduce expenses where possible
- **Approval rights –** None, other than as specified elsewhere
- **Duties to HMIT –** None before or after vesting/Bankruptcy Court approval of the HMIT settlement
- **Compensation –** CEO and employee compensation remains governed by existing agreements with the oversight of the Claimant Trust Oversight Board; following the vesting of HMIT's interests, no changes will be permitted to those agreements without HMIT written consent; CEO maintains ability to maintain or reduce headcount in his absolute discretion

DRAFT – SUBJECT TO CONFIDENTIALITY AGREEMENT

HCMLPHMIT00000717

REVISED DRAFT

**PRIVILEGED AND CONFIDENTIAL ATTORNEY CLIENT COMMUNICATON**

**PREPARED AT THE DIRECTION OF COUNSEL IN CONNECTION WITH EXISTING LITIGATION AND IN ANTICIPATION OF FUTURE LITIGATION**

**PROTECTED BY FRE 408 AND SIMILAR STATE LAW PROTECTIONS.  PROVIDED PURSUANT TO NDA**

**April ~~815~~, 2025**

~~DRAFT~~ Potential Settlement Structure with DAF and HMIT

**HMIT**

- **Settlement of remanded motion to sue** – HCMLP, the Claimant Trust, and HMIT settle existing motion to sue and all other claims with prejudice for a cash payment of [$500k]
- **Allowance of claim** - HCMLP to allow HMIT Class 10 interest in the amount of ~$337mm (calculated as ~$395mm Petition Date capital account, less ~$58mm P&I outstanding on HMIT note as of Petition Date), subject to:
  - The HMIT allowed Class 10 interest is not transferable
  - HMIT ~~release~~releases all claims and accepts the "Litigation Protections" – see separate document containing the releases and other required provisions – which eliminate claims and limit the Class 10 allowed interest
  - LT releases HMIT from all other claims in the LT litigation and otherwise
  - LT transfers to ~~HMIT~~holders of allowed Class 10 interests all remaining LT litigation (after HMIT and DAF/CLO Holdco releases) "as-is, where-is" along with all documents produced in the LT case to date
    - Such causes of action are limited to the currently stayed litigation and other causes of action that may exist related to former employees Ellington and Leventon
    - If for any reason the transfer of the LT litigation is nullified, the settlement will not be affected
  - Complete cessation and withdrawal of any other litigation among the parties
  - Class 10 remains senior to Class 11 as required by the Plan
- **Court Approval –** Settlement and allowance of Class 10 Claim subject to approval of the Bankruptcy Court

**DAF**

- **Settlement of DAF Claims** – HCMLP, the Claimant Trust, and DAF/CLO Holdco ~~will~~ settle ~~the~~all claims underlying the current Fifth Circuit appeal and all other claims

017308

with prejudice for a cash payment of [$250k]; $[2mm] within [10] business days of execution of the settlement; the Fifth Circuit appeal will be dismissed with prejudice within [10] business days of execution of the settlement

- o HCMLP will purchase DAF's right to distribution from HCLOF related to Acis 6, as is - where is, without representation except for unencumbered ownership, for [$2.5mm $[3mm] ] cash, to be paid within [10] business days of approval execution of the settlement by the Bankruptcy Court; DAF releases HCLOF from any claims related to Acis 6 distributions
- o DAF/CLO Holdco release all claims and accept the "Litigation Protections" – see separate document containing the releases and other required provisions
- o LT releases DAF/CLO Holdco from all other claims in the LT litigation and otherwise
- o Complete cessation and withdrawal of any other litigation among the parties
- o Settlement will be filed with the Bankruptcy Court and "so ordered"

**Distributions**

- **Initial Interim Cash Distributions** – Within [91] days of the receipt of a final/non-appealable order not subject to certiorari:
  - o The Indemnity Trust will distribute $[10]mm cash directly to Class 9 Claimant Trust Beneficiaries in accordance with the waterfall and the Indemnity Trust Agreement
  - o [Subject to Class 9 Approval], the Indemnity Trust will distribute $[11 10]mm cash directly to HMIT on account holders of its allowed Class 10 interest interests
    - ▪ On approval of the settlement by the Bankruptcy Court, the Indemnity Trust will set up a separate $[11 10]mm reserve for the HMIT Initial Interim Cash Distribution which reserve will be held in UST on the same terms as other Indemnity Trust holdings pending distribution to HMIT Class 10 interest holders or reversal/remand of the settlement
    - ▪ Any payments on the Dugaboy Note from the date of Bankruptcy Court approval of the settlement to the date of the Initial Interim Cash Distributions will be held by the Indemnity Trust in a separate account and also be paid to holders of allowed Class 10 interests
      - • The actual dollar amount of any such P+I payments paid will reduce the Class 10 interests outstanding

017309

REVISED DRAFT

- **Subsequent Distribution(s)** - Following the Initial Interim ~~Cash~~ Distributions, most, if not all remaining assets will be held by the Indemnity Trust, except for ~~potentially~~ the Disputed Claims Reserve (if the pending claim is not fully resolved) and cash at the Claimant Trust and HCMLP (indirectly owned by the Indemnity Trust) to be used in the wind-down of those entities with  any excess amounts contributed/distributed to the Indemnity Trust
  - On ~~January 14~~April 1, 2028~~],.~~, if no threats, demands, or litigations have been brought against the Indemnity Trust or its beneficiaries ~~of the Indemnity Trust~~:
    - The Indemnity Trust will distribute ~$[11]mm cash directly to Class 9 Claimant Trust Beneficiaries in accordance with the waterfall and the Indemnity Trust Agreement, satisfying the remainder of the Class 9 interests outstanding
    - The Indemnity Trust will distribute $[5]mm cash directly to ~~HMIT on account~~holders of ~~its~~allowed Class 10 ~~interest~~interests
    - ~~The indemnity~~Note Cash or In-Kind Distribution – At the election of HMIT, the Indemnity Trust will ~~assign directly to HMIT~~either (a) sell the currently $[17.~~5~~6]mm face value (P+I) promissory note receivable from Dugaboy Investment Trust to HCMLP that has been irrevocably participated ~~to the Indemnity Trust~~(and may be assigned if it defaults) to the Indemnity Trust (the "Dugaboy Note") and distribute the net proceeds (plus all P+I payments on the Dugaboy Note from the Interim Cash Distribution Date to April 1, 2028) to holders of allowed Class 10 interests or (b) assign the Dugaboy Note directly to holders of allowed Class 10 interests
      - ~~Note will be valued at $[4]mm for~~For purposes of tracking progress toward the ~$337mm Class 10 interest:
      - ~~Any payments on~~ if the Dugaboy Note ~~from~~is sold, the ~~date of approval of~~distribution will be valued at the ~~settlement to the date of assignment of the Dugaboy note will also be paid to HMIT on account of its Class 10 interest~~
        - ~~The actual dollar~~amount of ~~any such P+I payments paid to HMIT will reduce the HMIT Class 10 interest.~~ cash distributed;
        - if the Dugaboy Note is distributed in kind, the distribution will be valued at fair market value as determined by the Indemnity Trust Administrator

017310

HCMLPHMIT00000720

- Assumes the Dugaboy Note continues to perform; if there is a default prior to April 1, 2028, the Indemnity Trust will accelerate the Dugaboy Note and pursue full collection plus cost of collection
    - If distribution of the Dugaboy Note is to be effected on April 1, 2028 and collection litigation has been commenced, at its election, holders of allowed Class 10 interests can receive, the collected balance or the litigation or elect to have the Indemnity Trust continue the litigation and subsequently pay the proceeds to holders of allowed Class 10 interests
  - As it pertains to the Disputed Claims Reserve, Highland will object to the Daugherty tax POC (final remaining pending claim).  Following a final non-appealable order resolving the claim, any remaining funds will be distributed to Class 9 or, if Class 9 has been paid in full, to ~~HMIT on account~~holders of ~~its~~allowed Class 10 ~~interest.~~interests

- **"Final Distribution"**  - After ~~January 31~~April 1, 2029, if no threats, demands, or litigations have been brought against beneficiaries of the Indemnity Trust and all statutes of limitation (SOLs) and any potentially applicable tolling thereof have expired, at the Indemnity Trust Administrator's sole discretion, any excess remaining funds in the Indemnity Trust shall be paid out in accordance with the Plan and the Indemnity Trust Agreement (i.e. to ~~HMIT on account~~holders of ~~its~~allowed Class 10 ~~interest~~interests, up to ~~its~~ allowed ~~amount~~amounts) in conjunction with the dissolution, wind down and cancellation of the Indemnity Trust.
    - The Indemnity Trust Administrator will consult with [Mark Patrick] regarding potentially applicable SOLs and tolling

- **Other**
  - **Extension of Claimant Trust –** A one-year extension for the Claimant Trust will be sought in the bankruptcy court.  During the 1-year extension period, the Claimant Trust will be placed into dissolution and begin its winding up.
    - The Indemnity Trust will covenant not to transfer any funds to the Claimant Trust following the date of final non-appealable approval of the HMIT settlement

017311

HCMLPHMIT00000721

- o <u>**HCMLP wind down –**</u> the remaining unliquidated assets of the estate, including HCMLP, itself, will be retained within the Indemnity Trust and will be liquidated.
  - ▪ HCMLP personnel will complete the liquidation, dissolution, cancellation, tax compliance, and any other winding up activities for the remaining entities under its purview, including HCMLP. ~~Any excess amounts remaining at cancellation of HCMLP will be distributed to the Indemnity Trust.~~
  - ▪ <u>Any excess amounts remaining at cancellation of HCMLP will be distributed to the Indemnity Trust.</u>
  - ▪ <u>The Indemnity Trust will covenant not to transfer any funds to HCMLP following the date of final non-appealable approval of the HMIT settlement</u>
    - • <u>HCMLP will have a funding agreement with the Claimant Trust to assure that the Claimant Trust has sufficient funds to complete its wind-down</u>
    - • <u>Any excess funds in the Claimant Trust at its cancellation will be contributed to the Indemnity Trust; excess funds at HMLP will be distributed to the Indemnity Trust</u>
- o **HCMLP and its general partner –** While HCMLP will be placed into dissolution, the entity will continue to survive during its winding up period, during which time it may continue to defend inbound litigation, prosecute outbound litigation, maintain its books and records, and monetize its remaining assets. HCMLP's general partner will be dissolved, wound-down and cancelled along with HCMLP~~.~~
- o **Claimant Trust Oversight Board –** Subject to the Plan and Claimant Trust agreement, it is anticipated that the members of the Oversight Board will continue in their existing roles until the final/non-appealable order approving the <u>HMIT</u> settlement is received~~.~~
- o **Information rights to HMIT –** ~~None prior to vesting; After~~ <u>After</u> ~~vesting~~<u>Bankruptcy Court approval of the HMIT settlement</u>, per the Claimant Trust Agreement<u>, except that:</u>
  - ▪ <u>HCMLP will review forecasted expenses with [Mark Patrick] at his request, but not more often than quarterly, and will work in good faith to reduce expenses where possible</u>
- o **Approval rights –** None, other than as specified elsewhere
- o **Duties to HMIT –** None before or after vesting<u>/Bankruptcy Court approval of the HMIT settlement</u>

017312

HCMLPHMIT00000722

REVISED DRAFT

- o **Compensation –** CEO and employee compensation remains governed by existing agreements with the oversight of the Claimant Trust Oversight Board; following the vesting of HMIT's interests, no changes will be permitted to those agreements without HMIT written consent; CEO maintains ability to maintain or reduce headcount in his absolute discretion.

DRAFT - SUBJECT TO CONFIDENTIALITY AGREEMENT

017313
HCMLPHMIT00000723

PRIVILEGED AND CONFIDENTIAL ATTORNEY CLIENT COMMUNICATON

PREPARED AT THE DIRECTION OF COUNSEL IN CONNECTION WITH EXISTING LITIGATION AND IN ANTICIPATION OF
FUTURE LITIGATION

PROTECTED BY FRE 408 AND SIMILAR STATE LAW PROTECTIONS.  PROVIDED PURSUANT TO NDA

# ILLUSTRATIVE HIGHLAND INDEMNITY TRUST
# PAYOUT SCHEDULE

EXPERIENCED. DISCIPLINED. **BOLD.**



017314

HCMLPHMIT00000724



**HIGHLAND INDEMNITY TRUST**

PRIVILEGED AND CONFIDENTIAL DOCUMENT: THIS DOCUMENT HAS BEEN PREPARED AT THE DIRECTION OF COUNSEL IN CONNECTION WITH PENDING LITIGATION AND IN ANTICIPATION OF FUTURE LITIGATION PROTECTED BY FRE 408 AND SIMILAR STATE LAW PROTECTIONS.  PROVIDED PURSUANT TO NDA

| Total Illustrative Sources and Uses (4/1/26 - 4/1/29) | | | |
|---|---|---|---|
| **Sources** | | **Uses** | |
| Beginning Cash | $  67,850,000 | Cash to repay 9s in Full | $  21,029,073 |
| Interest Received on Cash (4% annual) | $  6,970,471 | Cash distributions to 10s [2] | $  60,439,653 |
| Dugaboy Note P&I Received | $  3,991,523 | | |
| Disputed Claim Reserve [1] | $  2,656,732 | | |
| Total Cash Sources | $  81,468,726 | Total Cash Uses | $  81,468,726 |
| | | | |
| Dugaboy Note (P& Accrued I)  4/1/28 [3] | $  15,137,110 | Dugaboy Note to 10s [3] | $  15,137,110 |
| Total Sources | $  96,605,837 | Total Uses | $  96,605,837 |
| | | | |
| | | Total to 9s | $  21,029,073 |
| | | Total to 10s (incl Dugaboy Note) [3] [4] | $  75,576,763 |

Notes
 [1] HCMLP will object to this claim. If claim is disallowed, following a final non-appealable order, any remaining funds will be distributed to Class 9, or if Class 9 has been paid in full, Class 10.
 [2] Assumes no indemnification costs are expended throughout the period.
 [3] Assumes Dugaboy Note FMV at face with no discounting.
 [4] Excludes any net value ultimately obtained from the Kirschner Litigation

DRAFT - SUBJECT TO CONFIDENTIALITY AGREEMENT

PRIVILEGED AND CONFIDENTIAL

017315

HCMLPHMIT00000725



**HIGHLAND INDEMNITY TRUST**

PRIVILEGED AND CONFIDENTIAL. WORK PRODUCT. PREPARED AT THE DIRECTION OF COUNSEL IN CONNECTION WITH LITIGATION AND IN ANTICIPATION OF FUTURE LITIGATIONPROTECTED BY FRE 408 AND SIMILAR STATE LAW PROTECTIONS. PROVIDED PURSUANT TO NDA

| Interim Cash Distribution Sources and Uses (4/1/26) | | | | | |
|---|---|---|---|---|---|
| **Sources** | | | **Uses** | | |
| Beginning Cash | $ | 67,850,000 | Distribution to 9s - IT | $ | 10,000,000 |
| Interest Received on Cash | $ | 1,360,718 | Distribution to 9s - DCR | $ | 2,656,732 |
| Dugaboy Note P&I Received | $ | 1,354,892 | Distribution to 10s - IT | $ | 10,000,000 |
| Disputed Claim Reserve | $ | 2,656,732 | Distribution to 10s - Dugaboy Note P&I | $ | 1,354,892 |
| | | | Remaining Indemnity Trust Cash | $ | 49,210,718 |
| Total Cash Sources | $ | 73,222,342 | Total Cash Uses | $ | 73,222,342 |

| Subsequent Distribution(s) Sources and Uses (4/1/28) [1] | | | | | |
|---|---|---|---|---|---|
| **Sources** | | | **Uses** | | |
| Beginning Cash | $ | 49,210,718 | Distribution to 9s - IT | $ | 8,372,341 |
| Interest Received on Cash | $ | 4,015,595 | Distribution to 10s - IT | $ | 5,000,000 |
| Dugaboy Note P&I Received | $ | 2,636,631 | Distribution to 10s - Dugaboy Note P&I | $ | 2,636,631 |
| | | | Remaining Indemnity Trust Cash | $ | 39,853,972 |
| Total Cash Sources | $ | 55,862,943 | Total Cash Uses | $ | 55,862,943 |
| | | | | | |
| Dugaboy Note (P&I Accrued )) 4/1/28 | $ | 15,137,110 | Dugaboy Note to 10s | $ | 15,137,110 |
| Total Sources | $ | 71,000,054 | Total Uses | $ | 71,000,054 |

| Final Distribution (4/1/29) [1] [2] | | | | | |
|---|---|---|---|---|---|
| **Sources** | | | **Uses** | | |
| Beginning Cash | $ | 39,853,972 | Distribution to 10s | $ | 41,448,130 |
| Interest Received on Cash | $ | 1,594,159 | | | |
| Total Cash Sources | $ | 41,448,130 | Total Cash Uses | $ | 41,448,130 |

[1] Assumes no threats, demands or litigations.

[2] Assumes all SOL (and any applicable tolling) expired.

PRIVILEGED AND CONFIDENTIAL

2

*DRAFT – SUBJECT TO CONFIDENTIALITY AGREEMENT*

017316

HCMLPHMIT00000726

 **HIGHLAND INDEMNITY TRUST**

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE DIRECTION OF COUNSEL IN CONNECTION WITH LITIGATION AND IN ANTICIPATION OF FUTURE LITIGATIONPROTECTED BY FRE 408 AND SIMILAR STATE LAW PROTECTIONS.  PROVIDED PURSUANT TO NDA

**Illustrative Indemnity Trust Payout - Draft**
**4/15/2025**

| Period Ending | | Start Date 9/30/2025 | | Assumed Final Order Year 1 4/1/2026 | | Year 2 4/1/2027 | | Subsequent Distribution(s) [1] Year 3 4/1/2028 | | Final Distribution [1] [2] Year 4 4/1/2029 | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Indemnity Trust Cash Balance [3] | $ | 67,850,000 | $ | 49,210,718 | $ | 51,179,147 | $ | 39,853,972 | $ | - | | |
| Dugaboy Note Balance (P & and Accrued I) [4] | $ | 17,806,565 | $ | 16,729,382 | $ | 15,932,744 | $ | - | $ | - | | |
| TOTAL INDEMNITY TRUST | $ | 85,656,565 | $ | 65,940,100 | $ | 67,111,891 | $ | 39,853,972 | $ | - | | |
| | | | | | | | | | | | | |
| Disputed Claim Reserve | $ | 2,656,732 | $ | - | $ | - | $ | - | $ | - | | |
| | | | | | | | | | | | | |
| Class 9 Payment of Disputed Claim Reserve [5] | | | $ | (2,656,732) | $ | - | $ | - | $ | - | $ | (2,656,732) |
| Class 9 Payments Indemnity Trust | | | $ | (10,000,000) | $ | - | $ | (8,372,341) | $ | - | $ | (18,372,341) |
| Class 9 Total Payments | | | $ | (12,656,732) | $ | - | $ | (8,372,341) | $ | - | $ | (21,029,073) |
| Class 9 Balance [6] | $ | 21,009,022 | $ | 8,352,290 | | 8,358,972 | $ | - | $ | - | | |
| | | | | | | | | | | | | |
| Class 10 Payments Indemnity Trust | | | $ | (10,000,000) | $ | - | $ | (5,000,000) | $ | (41,448,130) | $ | (56,448,130) |
| Class 10 Payments Dugaboy Note [7] | | | $ | (1,354,892) | $ | - | $ | (17,773,741) | $ | - | $ | (19,128,633) |
| Class 10 Total Payments | | | $ | (11,354,892) | $ | - | $ | (22,773,741) | $ | (41,448,130) | $ | (75,576,763) |
| Class 10 Balance | $ | 336,940,231 | $ | 325,585,339 | $ | 325,585,339 | $ | 302,811,598 | $ | 261,363,467 | | |

Notes
[1] Assumes no threats, demands or litigations.
[2] Assumes all SOL (and any applicatable tolling) expired.
[3] Assumes no threats, demands or litigations. Assumes 4% Interest earned each period.
[4] 3.26% Interest and $790k Amort due 12/31 each year
[5] HCMLP will object to this claim. If claim is disallowed, following a final non-appealable order, any remaining funds will be distributed to Class 9, or if Class 9
 has been paid in full, Class 10.
[6] Interest on balance accrues at 0.08%. Start Date face value of claims outstanding is $20,584,958.56.
[7] Assumes Dugaboy Note FMV at face with no discounting. Payment Year 3 includes P&I received after Initial Interim Cash Distribution.

PRIVILEGED AND CONFIDENTIAL

3

017317
HCMLPHMIT00000727

**EXHIBIT 47**

**PRIVILEGED AND CONFIDENTIAL ATTORNEY CLIENT COMMUNICATON**

**PREPARED AT THE DIRECTION OF COUNSEL IN CONNECTION WITH EXISTING LITIGATION AND IN ANTICIPATION OF FUTURE LITIGATION**

**PROTECTED BY FRE 408 AND SIMILAR STATE LAW PROTECTIONS.  PROVIDED PURSUANT TO NDA**



# ILLUSTRATIVE HIGHLAND INDEMNITY TRUST PAYOUT SCHEDULE

EXPERIENCED. DISCIPLINED. **BOLD.**



017319
HCMLPHMIT00000724



**HIGHLAND INDEMNITY TRUST**

PRIVILEGED AND CONFIDENTIAL.  THIS MATERIAL WAS PREPARED AT THE DIRECTION OF COUNSEL IN CONNECTION WITH ONGOING LITIGATION AND IN ANTICIPATION OF FUTURE LITIGATIONPROTECTED BY FRE 408 AND SIMILAR STATE LAW PROTECTIONS.  PROVIDED PURSUANT TO NDA

| Total Illustrative Sources and Uses (4/1/26 - 4/1/29) | | | |
|---|---|---|---|
| **Sources** | | **Uses** | |
| Beginning Cash | $ 67,850,000 | Cash to repay 9s in Full | $ 21,029,073 |
| Interest Received on Cash (4% annual) | $ 6,970,471 | Cash distributions to 10s [2] | $ 60,439,653 |
| Dugaboy Note P&I Received | $ 3,991,523 | | |
| Disputed Claim Reserve [1] | $ 2,656,732 | | |
| Total Cash Sources | $ 81,468,726 | Total Cash Uses | $ 81,468,726 |
| | | | |
| Dugaboy Note (P& Accrued I) 4/1/28 [3] | $ 15,137,110 | Dugaboy Note to 10s [3] | $ 15,137,110 |
| Total Sources | $ 96,605,837 | Total Uses | $ 96,605,837 |
| | | | |
| | | Total to 9s | $ 21,029,073 |
| | | Total to 10s (incl Dugaboy Note) [3][4] | $ 75,576,763 |

DRAFT - SUBJECT TO CONFIDENTIALITY AGREEMENT

Notes

[1] HCMLP will object to this claim. If claim is disallowed, following a final non-appealable order, any remaining funds will be distributed to Class 9, or if Class 9 has been paid in full, Class 10.

[2] Assumes no indemnification costs are expended throughout the period.

[3] Assumes Dugaboy Note FMV at face with no discounting.

[4] Excludes any net value ultimately obtained from the Kirschner Litigation

017320

HCMLPHMIT00000725

Case 19-34054-sgj11    Doc 4255-47    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Exhibit 47    Page 4 of 5



## HIGHLAND INDEMNITY TRUST

PRIVILEGED AND CONFIDENTIAL  ATTORNEY WORK PRODUCT PREPARED AT THE DIRECTION OF COUNSEL IN CONNECTION WITH PENDING LITIGATION AND IN ANTICIPATION OF FUTURE LITIGATIONPROTECTED BY FRE 408 AND SIMILAR STATE LAW PROTECTIONS.  PROVIDED PURSUANT TO NDA

| Interim Cash Distribution Sources and Uses (4/1/26) | | | |
|---|---|---|---|
| **Sources** | | **Uses** | |
| Beginning Cash | $ 67,850,000 | Distribution to 9s - IT | $ 10,000,000 |
| Interest Received on Cash | $ 1,360,718 | Distribution to 9s - DCR | $ 2,656,732 |
| Dugaboy Note P&I Received | $ 1,354,892 | Distribution to 10s - IT | $ 10,000,000 |
| Disputed Claim Reserve | $ 2,656,732 | Distribution to 10s - Dugaboy Note P&I | $ 1,354,892 |
| | | Remaining Indemnity Trust Cash | $ 49,210,718 |
| Total Cash Sources | $ 73,222,342 | Total Cash Uses | $ 73,222,342 |

| Subsequent Distribution(s) Sources and Uses (4/1/28) [1] | | | |
|---|---|---|---|
| **Sources** | | **Uses** | |
| Beginning Cash | $ 49,210,718 | Distribution to 9s - IT | $ 8,372,341 |
| Interest Received on Cash | $ 4,015,595 | Distribution to 10s - IT | $ 5,000,000 |
| Dugaboy Note P&I Received | $ 2,636,631 | Distribution to 10s - Dugaboy Note P&I | $ 2,636,631 |
| | | Remaining Indemnity Trust Cash | $ 39,853,972 |
| Total Cash Sources | $ 55,862,943 | Total Cash Uses | $ 55,862,943 |
| | | | |
| Dugaboy Note (P&I Accrued I) 4/1/28 | $ 15,137,110 | Dugaboy Note to 10s | $ 15,137,110 |
| Total Sources | $ 71,000,054 | Total Uses | $ 71,000,054 |

| Final Distribution (4/1/29) [1] [2] | | | |
|---|---|---|---|
| **Sources** | | **Uses** | |
| Beginning Cash | $ 39,853,972 | Distribution to 10s | $ 41,448,130 |
| Interest Received on Cash | $ 1,594,159 | | |
| Total Cash Sources | $ 41,448,130 | Total Cash Uses | $ 41,448,130 |

[1] Assumes no threats, demands or litigations.

[2] Assumes all SOL (and any applicable tolling) expired.

*DRAFT – SUBJECT TO CONFIDENTIALITY AGREEMENT*

017321
HCMLPHMIT00000726

Case 19-34054-sgj11    Doc 4255-47    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Exhibit 47    Page 3 of 5


## HIGHLAND INDEMNITY TRUST

PRIVILEGED AND CONFIDENTIAL ALL INFORMATION CONTAINED HEREIN IS PREPARED AT THE DIRECTION OF COUNSEL IN CONNECTION WITH LITIGATION AND IN ANTICIPATION OF FUTURE LITIGATION PROTECTED BY FRE 408 AND SIMILAR STATE LAW PROTECTIONS.  PROVIDED PURSUANT TO NDA

**Illustrative Indemnity Trust Payout - Draft**
**4/15/2025**

| | Start Date | Assumed Final Order | | Subsequent Distribution(s) [1] | Final Distribution [1] [2] | Total |
|---|---|---|---|---|---|---|
| | | Year 1 | Year 2 | Year 3 | Year 4 | |
| Period Ending | 9/30/2025 | 4/1/2026 | 4/1/2027 | 4/1/2028 | 4/1/2029 | |
| | | | | | | |
| Indemnity Trust Cash Balance [3] | $ 67,850,000 | $ 49,210,718 | $ 51,179,147 | $ 39,853,972 | $ - | |
| Dugaboy Note Balance (P & and Accrued I) [4] | $ 17,806,565 | $ 16,729,382 | $ 15,932,744 | $ - | $ - | |
| TOTAL INDEMNITY TRUST | $ 85,656,565 | $ 65,940,100 | $ 67,111,891 | $ 39,853,972 | $ - | |
| | | | | | | |
| Disputed Claim Reserve | $ 2,656,732 | $ - | $ - | $ - | $ - | |
| | | | | | | |
| Class 9 Payment of Disputed Claim Reserve [5] | | $ (2,656,732) | $ - | $ - | $ - | $ (2,656,732) |
| Class 9 Payments Indemnity Trust | | $ (10,000,000) | $ - | $ (8,372,341) | $ - | $ (18,372,341) |
| Class 9 Total Payments | | $ (12,656,732) | $ - | $ (8,372,341) | $ - | $ (21,029,073) |
| Class 9 Balance [6] | $ 21,009,022 | $ 8,352,290 | 8,358,972 | $ - | $ - | |
| | | | | | | |
| Class 10 Payments Indemnity Trust | | $ (10,000,000) | $ - | $ (5,000,000) | $ (41,448,130) | $ (56,448,130) |
| Class 10 Payments Dugaboy Note [7] | | $ (1,354,892) | $ - | $ (17,773,741) | $ - | $ (19,128,633) |
| Class 10 Total Payments | | $ (11,354,892) | $ - | $ (22,773,741) | $ (41,448,130) | $ (75,576,763) |
| Class 10 Balance | $ 336,940,231 | $ 325,585,339 | $ 325,585,339 | $ 302,811,598 | $ 261,363,467 | |

*DRAFT - SUBJECT TO CONFIDENTIALITY AGREEMENT*

Notes
[1] Assumes no threats, demands or litigations.
[2] Assumes all SOL (and any applicatable tolling) expired.
[3] Assumes no threats, demands or litigations. Assumes 4% Interest earned each period.
[4] 3.26% Interest and $790k Amort due 12/31 each year
[5] HCMLP will object to this claim. If claim is disallowed, following a final non-appealable order, any remaining funds will be distributed to Class 9, or if Class 9 has been paid in full, Class 10.
[6] Interest on balance accrues at 0.08%. Start Date face value of claims outstanding is $20,584,958.56.
[7] Assumes Dugaboy Note FMV at face with no discounting. Payment Year 3 includes P&I received after Initial Interim Cash Distribution.

PRIVILEGED AND CONFIDENTIAL                                                                                    3

017322
HCMLPHMIT00000727

**EXHIBIT 48**

017323

**From:** "John A. Morris" <jmorris@pszjlaw.com>
**To:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**Cc:** "Jeff Pomerantz" <jpomerantz@pszjlaw.com>, "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>
**Subject:** Highland/HMIT: Settlement Agreement (HCMLP comments)
**Date:** Thu, 15 May 2025 17:07:04 +0000
**Importance:** Normal
**Attachments:** Highland_HMIT-Rand_Settlement_Agreement.011(Highland_Draft_05.15.25).docx; REDLINE_-_HMIT_Settlement_Agreement.pdf
**Inline-Images:** image001.jpg; image002.png

---

SETTLEMENT COMMUNICATION PURSUANT TO FED. R. EVID. 408
<u>WITHOUT PREJUDICE</u>

Louis:

Thank you for sending the revised version of the draft agreement.

Attached is another black line, this one showing Highland's changes to HMIT's last draft.

Are you and your team available at either **4 or 6 pm Eastern Time today** so we can walk you through this?

Please let me know.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Houston

---

**From:** Tim Cournoyer <TCournoyer@HighlandCapital.com>
**Sent:** Thursday, May 15, 2025 12:45 PM
**To:** Jim Seery <jpseeryjr@gmail.com>; David Klos <DKlos@HighlandCapital.com>; Matthew Gray <MGray@HighlandCapital.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>; John A. Morris <jmorris@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>
**Subject:** RE: PRIVILEGED: RE: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14 against Highland v9.PDF

Revised draft attached incorporating the change to Section 8(a).  Thanks

HCMLPHMIT00000766

**From:** jpseeryjr@gmail.com <jpseeryjr@gmail.com>
**Sent:** Thursday, May 15, 2025 11:42 AM
**To:** David Klos <DKlos@HighlandCapital.com>; Tim Cournoyer <TCournoyer@HighlandCapital.com>; Matthew Gray <MGray@HighlandCapital.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>; John A. Morris <jmorris@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>
**Subject:** Re: PRIVILEGED: RE: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14 against Highland v9.PDF

Makes sense.  New version coming now

Best.  Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

---

**From:** David Klos <DKlos@HighlandCapital.com>
**Date:** Thursday, May 15, 2025 at 12:40 PM
**To:** Tim Cournoyer <TCournoyer@highlandcapital.com>, Jim Seery <jpseeryjr@gmail.com>, Matthew Gray <MGray@highlandcapital.com>, Jeff Pomerantz <jpomerantz@pszjlaw.com>, John A. Morris <jmorris@pszjlaw.com>, Gregory V. Demo <GDemo@pszjlaw.com>
**Subject:** RE: PRIVILEGED: RE: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14 against Highland v9.PDF

The deleted provision in Section 3 is similar to a remaining provision in the lead in to Section 8.  Should that be removed as well?

---

**From:** Tim Cournoyer <TCournoyer@HighlandCapital.com>
**Sent:** Thursday, May 15, 2025 11:35 AM
**To:** Jim Seery <jpseeryjr@gmail.com>; David Klos <DKlos@HighlandCapital.com>; Matthew Gray <MGray@HighlandCapital.com>; 'Jeff Pomerantz' <jpomerantz@pszjlaw.com>; 'John A. Morris' <jmorris@pszjlaw.com>; 'Gregory V. Demo' <GDemo@pszjlaw.com>
**Subject:** RE: PRIVILEGED: RE: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14 against Highland v9.PDF

Jim – As discussed with you and Dave, attached is a revised draft with one change to Section 3 (removing the provision tying the $500k payment to any specific component of the settlement).

@Jeff Pomerantz, @John A. Morris, @Gregory V. Demo – Please let us know if you expect to have any comments and expected timeframe.

We need to circulate drafts to Class 9's, CTOB and HMIT.  We can likely send a draft to Class 9's and CTOB now subject to ongoing review, since I don't believe you will have any changes to the economic proposal we're making, but obviously want everyone signed off asap for purposes of getting a draft back to HMIT.

Thank you.

---

**From:** Tim Cournoyer <TCournoyer@HighlandCapital.com>
**Sent:** Thursday, May 15, 2025 10:40 AM
**To:** Jim Seery <jpseeryjr@gmail.com>; David Klos <DKlos@HighlandCapital.com>; Matthew Gray <MGray@HighlandCapital.com>; 'Jeff Pomerantz' <jpomerantz@pszjlaw.com>; 'John A. Morris'

017325

HCMLPHMIT00000767

**Subject:** RE: PRIVILEGED: RE: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14 against Highland v9.PDF

All,

Attached are revised drafts of the Settlement Agreement and the Class 9 Written Consent, together with redlines in PDF.  Please let me know if you have any comments ASAP.

---

**From:** Tim Cournoyer <TCournoyer@HighlandCapital.com>
**Sent:** Thursday, May 15, 2025 8:23 AM
**To:** Matthew Gray <MGray@HighlandCapital.com>; Jim Seery <jpseeryjr@gmail.com>; 'John A. Morris' <jmorris@pszjlaw.com>
**Cc:** David Klos <DKlos@HighlandCapital.com>; 'Gregory V. Demo' <GDemo@pszjlaw.com>; 'Jeff Pomerantz' <jpomerantz@pszjlaw.com>
**Subject:** PRIVILEGED: RE: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14 against Highland v9.PDF

Below is a quick checklist items to be accomplished.  Please respond if anyone can think of others:

- Settlement Agreement
  - Finalize internal comments among Highland, PSZJ and QE
  - **<u>Need to draft Form of Assignment for Kirschner Claims</u>**
  - Circulate revised draft to:
    - HMIT
    - CTOB
    - Class 9 Holders
- 9019 Motion
  - PSZJ to draft
  - Finalize comments among Highland, QE and PSZJ
  - Circulate final draft to HMIT

- CTOB Resolutions
  - Finalize internal comments among Highland and PSZJ
  - Circulate to:
    - CTOB
    - QE

- Class 9 Consent
  - Finalize internal comments to written consent among Highland and PSZJ
  - Finalize payment schedule to be attached as Exhibit
  - Circulate to:
    - Muck
    - Jessup
    - UBS

- Pay Daugherty Class 9 Claim (can likely happen post-signing)
  - To be completed promptly following receipt of Class 9 Consent

---

**From:** Tim Cournoyer <TCournoyer@HighlandCapital.com>
**Sent:** Wednesday, May 14, 2025 10:19 PM
**To:** Matthew Gray <MGray@HighlandCapital.com>; Jim Seery <jpseeryjr@gmail.com>; 'John A. Morris' <jmorris@pszjlaw.com>
**Cc:** David Klos <DKlos@HighlandCapital.com>; 'Gregory V. Demo' <GDemo@pszjlaw.com>; 'Jeff Pomerantz'

017326

HCMLPHMIT00000768

**Subject:** Re: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14 against Highland v9.PDF

Thanks - I got those on the issues list as well.

TIMOTHY J. COURNOYER
D: 972.628.4153 | M: 305.479.0804

---

**From:** Matthew Gray <MGray@HighlandCapital.com>
**Sent:** Wednesday, May 14, 2025 10:18 PM
**To:** Tim Cournoyer <TCournoyer@HighlandCapital.com>; Jim Seery <jpseeryjr@gmail.com>; 'John A. Morris' <jmorris@pszjlaw.com>
**Cc:** David Klos <DKlos@HighlandCapital.com>; 'Gregory V. Demo' <GDemo@pszjlaw.com>; 'Jeff Pomerantz' <jpomerantz@pszjlaw.com>
**Subject:** RE: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14 against Highland v9.PDF

Two principal comments: 1) we don't own the entire Dugaboy Note as defined in the agreement, so we can't assign the amount of the note owed to Get Good. If language as drafted is fine then no worries, 2) clarifying we pay all P&I received on Dugaboy note between execution date and assignment date.

---

**From:** Tim Cournoyer <TCournoyer@HighlandCapital.com>
**Sent:** Wednesday, May 14, 2025 9:42 PM
**To:** Matthew Gray <MGray@HighlandCapital.com>; Jim Seery <jpseeryjr@gmail.com>; 'John A. Morris' <jmorris@pszjlaw.com>
**Cc:** David Klos <DKlos@HighlandCapital.com>; 'Gregory V. Demo' <GDemo@pszjlaw.com>; 'Jeff Pomerantz' <jpomerantz@pszjlaw.com>
**Subject:** RE: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14 against Highland v9.PDF

Matt – can you send a PDF of your comments? I think the colors of the various comments is dependent on each user's individual Word settings.

---

**From:** Matthew Gray <MGray@HighlandCapital.com>
**Sent:** Wednesday, May 14, 2025 8:59 PM
**To:** Jim Seery <jpseeryjr@gmail.com>; 'John A. Morris' <jmorris@pszjlaw.com>
**Cc:** Tim Cournoyer <TCournoyer@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>; 'Gregory V. Demo' <GDemo@pszjlaw.com>; 'Jeff Pomerantz' <jpomerantz@pszjlaw.com>
**Subject:** RE: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14 against Highland v9.PDF

Apologies, for some reason my red comments did not show up in prior version. Attached has comments in red.

---

**From:** Matthew Gray
**Sent:** Wednesday, May 14, 2025 8:46 PM
**To:** jpseeryjr@gmail.com; John A. Morris <jmorris@pszjlaw.com>
**Cc:** Tim Cournoyer <TCournoyer@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>; 'Gregory V. Demo' <GDemo@pszjlaw.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>
**Subject:** RE: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14 against Highland v9.PDF

I've attached a few comments in red, mostly on the Dugaboy note. Continuing to review.

HCMLPHMIT00000769

**From:** jpseeryjr@gmail.com <jpseeryjr@gmail.com>
**Sent:** Wednesday, May 14, 2025 7:26 PM
**To:** Matthew Gray <MGray@HighlandCapital.com>
**Subject:** FW: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14 against Highland v9.PDF

Best. Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Date:** Wednesday, May 14, 2025 at 7:33 PM
**To:** James Seery <jpseeryjr@gmail.com>, Tim Cournoyer <TCournoyer@highlandcapital.com>, David Klos <DKlos@highlandcapital.com>, Jeff Pomerantz <jpomerantz@pszjlaw.com>, Gregory V. Demo <GDemo@pszjlaw.com>
**Subject:** Fwd: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14 against Highland v9.PDF

Sent from my iPhone

Begin forwarded message:

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**Date:** May 14, 2025 at 7:21:19 PM EDT
**To:** "John A. Morris" <jmorris@pszjlaw.com>, Jeff Pomerantz <jpomerantz@pszjlaw.com>
**Cc:** "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>, Jim Shields <jshields@shieldslegal.com>
**Subject: KH clean of Redline of v9 Settlement Agreement after comments 5.14.DOCX; Redline KH 5.14 against Highland v9.PDF**

John,

Please see the HMIT Entities' responsive version of the settlement agreement along with the redline from your version 9. First, I apologize for the delay, as the last version, sent by Mr. Seery, arrived on the day I landed in Istanbul, and scheduling on my side plus my schedule while overseas made it difficult to get things done. And then I just took longer to get over the lag from traveling back.

We have made some proposed changes. First major change is that we are willing to have the releases made effective as of bankruptcy court approval, and live with that in the event of an appeal. We also think, because the bankruptcy court will have approved the agreement, that the assignment of the Dugaboy Note and the Kirchner litigation should be done within the revised timeline set forth, and that there is no reason for any reservation of HMIT Note Claims by the Litigation Sub Trust (and no reason that we can see for continued day to day activity of the sub-trust, as the litigation would only be returned if an appeal is successful (which none of us think will be the case – at least I think none of us do)). We have added an agreed abatement of everything pending bankruptcy court approval. We have also accelerated funding, though propose an agreement to escrow funds in the event of reversal on appeal. We have reviewed the information provided by Mr. Seery and his group and think our structure and timing of funding leaves plenty of money aside for indemnification. We

HCMLPHMIT00000770

also have tried to identify and make clear what a Threat would be, to get something objective we can rely on and receive notice of.

I am around tomorrow and Friday. I will be working this weekend (without jet lag) and in my New Orleans office Monday preparing for an all day trial on Tuesday. We should be able to corral my side quickly.

There are some other tweaks that are minor we think, with the changes mentioned above being the major changes in structure.

Also, John, while the parties have discussed this matter the attached draft agreement does not contain any reference. That is ok with us, but my clients request from your side an answer to the following question: "Did any of the Highland Entities or their affiliates, for their own account or on behalf of Highland CDO Holding Company, affirmatively give consent to the transfer by Sentinel Reinsurance, Ltd. or its affiliates of that certain promissory note in the original principal amount of app.$32.8M and dated December 13, 2010, and executed by CLO Holdco, Ltd.?"

I really appreciate your patience. Look forward to visiting soon.


**Louis M. Phillips**
*Partner*


KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT: 225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.


PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

017329

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

HCMLPHMIT00000772

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

## SETTLEMENT AGREEMENT & GENERAL RELEASE

THIS SETTLEMENT AGREEMENT & GENERAL RELEASE (this "**Agreement**") is entered into as of May 16, 2025 (the "**Agreement Date**"), by and among Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), the Highland Claimant Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Claimant Trust**"), the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Litigation Sub-Trust**"), and the Highland Indemnity Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Indemnity Trust**", and together with Highland, the Claimant Trust and the Litigation Sub-Trust, the "**Highland Entities**"), on the one hand, and Hunter Mountain Investment Trust, a Delaware statutory trust ("**HMIT**"), Beacon Mountain LLC, a Delaware limited liability company ("**Beacon Mountain**"), Rand Advisors, LLC, a Delaware limited liability company ("**Rand Advisors**"), Rand PE Fund I, LP, a Delaware series limited partnership ("**Rand PE Fund**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**"), Atlas IDF, LP, a Delaware limited partnership ("**Atlas IDF**"), Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP and Atlas IDF, the "**HMIT Entities**"), on the other hand.  The Highland Entities and the HMIT Entities are collectively referred to as the "**Parties**," and each individually, as a "**Party**".

## DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Claimant Trust Agreement or the Plan, as applicable (in each case, as hereinafter defined). For purposes of this Agreement, the following capitalized terms have the following meanings:

"**9019 Motion**" means the motion seeking entry of the Bankruptcy Court Order pursuant to Bankruptcy Rule 9019 and in accordance with Section 18.

"**Action**" means any action, claim, demand, arbitration, hearing, charge, complaint, investigation, examination, indictment, litigation, suit or other civil, criminal, administrative or investigative proceedings, including any petition under Rule 202 of the Texas Rules of Civil Procedure.

"**Affiliate**" means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, a specified Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by contract or otherwise.

"**Amended Complaint**" means the *Amended Complaint and Objection to Claims*, filed as docket number 158 in *Kirschner v. Dondero*, Adv. Pro. No. 21-03076-sgj (Bankr. N.D. Tex. May 19, 2022).

"**Bankruptcy Case**" means *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex.) and its related proceedings.

017331

HCMLPHMIT00000773

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division.

"**Bankruptcy Court Approval Date**" means the date on which the Bankruptcy Court Order is issued.

"**Bankruptcy Court Order**" means an order of the Bankruptcy Court approving the allowance of the HMIT's Class 10 Interest as provided in this Agreement pursuant to the 9019 Motion.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than (i) a Saturday or a Sunday, (ii) a day on which the Federal Reserve Bank of New York or the New York Stock Exchange is closed, or (iii) a day on which banks in the States of Texas are required, or authorized by law, to close.

"**Claimant Trust Agreement**" means that certain Claimant Trust Agreement of the Claimant Trust (as may have been or may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 11, 2021, by and among Highland, as settlor, James P. Seery, Jr., a Claimant Trustee, and Wilmington Trust, National Association, a national banking association, as Delaware trustee.

"**Claims**" means any claims, debts, liabilities, demands, obligations, breaches of contract, breaches of duty or any relationship, misfeasance, malfeasance, promises, acts, omissions, agreements, liens, losses, costs and expenses (including attorney's fees and related costs), damages, injuries, suits, Actions, and causes of action of whatever kind or nature, whenever and however, arising, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise.

"**Class 10**" means the class of Claims or Equity Interests described in Article II. Section H.10. of the Plan.

"**Class 11**" means the class of Claims or Equity Interests described in Article II. Section H.11. of the Plan.

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Case.

"**Confirmation Order**" means that certain *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943], as conformed in accordance with the Fifth Circuit's rulings.

"**Dugaboy Note**" means that certain Promissory Note dated May 31, 2017, in the original face amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

017332

HCMLPHMIT00000774

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

"**Final Court Approval Date**" means the date on which the Bankruptcy Court Order becomes a Final Order.

"**Final Order**" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Highland Entities, as applicable, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

"**Gatekeeper**" means the gatekeeping provision contained in Article IX. F of the Plan as of August 11, 2021.

"**Governmental Authority**" means any federal, provincial, state, local or foreign government or political subdivision thereof, court of competent jurisdiction, administrative agency, judicial or arbitral body, or commission or other governmental or regulatory authority or instrumentality.

"**Highland Released Parties**" means collectively (i) the Highland Entities, (ii) any Affiliate of any Highland Entity and any Person directly or indirectly majority-owned by any Highland Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any Highland Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i)-(iii), collectively, the "**Highland Parties**"), (iv) each of the Highland Parties' current and former trustees and administrators (including the trustees of any of the Claimant Trust, the Litigation Sub-Trust, or the Indemnity Trust), officers, executives, agents, directors, advisors, advisory representatives, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, (v) the current and former members of the Oversight Board of the Claimant Trust in any capacity (including Richard Katz) and their Affiliates, (vi) Farallon Capital Management, LLC, Stonehill Capital Management, LLC, Muck Holdings LLC, and Jessup Holdings LLC, in each case, in any capacity, (vii) the Independent Board and its members John Dubel, James P. Seery, Jr., and Russell Nelms, (viii) James P. Seery, Jr., individually and in all capacities for any Highland Released Party, including as Chief Executive Officer of Highland Capital Management, L.P., Claimant Trustee of the Claimant Trust, and the Indemnity Trust Administrator of the Indemnity Trust, (ix) Marc S. Kirschner, individually and as Trustee of the Litigation Sub-Trust, (x) the Committee and each of its members, (xi) the professionals (and their respective firms) (a) retained by Highland or the Committee during the Bankruptcy Case or which provided services to Highland or the Committee during the Bankruptcy Case or (b) retained by any Highland Released Party on or after August 11, 2021, (xii) any Person indemnified by any

017333

HCMLPHMIT00000775

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Highland Party (the Persons described in clauses (i)-(xii), collectively, the "**Highland Covered Parties**"), and (xii) each Highland Covered Party's current and former officers, executives, agents, attorneys (and their respective firms), directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "Highland Covered Parties;" provided, however, and for the avoidance of doubt, and without in any way limiting the scope of the foregoing, "Highland Covered Parties" shall include Highland CLO Funding, Ltd., Highland HCF Advisor, Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Multi Strategy Credit Fund GP, L.P., Highland Multi Strategy Credit GP, LLC, Highland Multi Strategy Credit Fund, Ltd., Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., Highland Select Equity Fund, L.P., Highland Restoration Capital Partners Master, L.P., Highland Restoration Capital Partners GP, LLC, Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Offshore Director, LLC, Acis CLO Management, LLC, Neutra, Ltd., Pollack, Ltd., Acis CLO Management Holdings, L.P., Acis CLO Management Intermediate Holdings I, LLC, Acis CLO Management Intermediate Holdings II, LLC, Acis CLO Assets Holdings Limited, CHG Houston Holdings, LLC, Penant Management, L.P., Penant Management GP, LLC, Gunwale, LLC, HE Capital, LLC, Gleneagles CLO, Ltd., Aberdeen Loan Funding, Ltd. Highland Argentina Regional Opportunity Fund GP, LLC, Highland Argentina Regional Opportunity Fund, L.P., Highland Argentina Regional Opportunity Fund, Ltd., Highland Argentina Regional Opportunity Master Fund, L.P., Highland Latin America Consulting, Ltd., Highland Capital Management Korea Limited, Highland Capital Management Latin America, L.P., Highland Latin America GP, Ltd., Highland Latin America LP, Ltd., Highland Offshore Partners, L.P. (Diversified), Brentwood CLO, Ltd., Eastland CLO, Ltd., Bristol Bay Funding Ltd., Jasper CLO Ltd., Highland Legacy Limited, Grayson CLO, Ltd., Greenbriar CLO, Ltd., Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Liberty CLO, Ltd., Valhalla CLO, Ltd., Stratford CLO Ltd., Southfork CLO, Ltd., Pam Capital Funding, L.P., Stonebridge-Highland Healthcare Private Equity Fund, Pamco Cayman Ltd., Red River CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO II Ltd., Westchester CLO, Ltd. Longhorn Credit Funding, LLC, PensionDanmark Pensionsforsikringsaktieselskab, Highland Dynamic Income Master Fund L.P., Highland Dynamic Income Fund GP, LLC, Highland Dynamic Income Fund, L.P., Highland Dynamic Income Fund, Ltd., Highland JHT Holdings, LLC, Highland Prometheus Master Fund, L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland Sunbridge GP, LLC, Trussway Holdings, LLC, Trussway Industries, LLC, TW Company, Inc., T-Way Investments, LLC, SSP Holdings, LLC, Highland Flexible Income UCITS Fund, and Acis CLO 2017-7, Ltd. *Notwithstanding the forgoing or anything herein to the contrary*, none of "Highland Released Parties", "Highland Parties", nor "Highland Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner and none of such Persons are released from any Claim by any Person in connection with this Agreement.

"**HMIT Class 10 Interest**" means the unvested, contingent Class 10 interest in the Claimant Trust (a) to be allowed on account of HMIT's pre-petition equity interest in Highland, and (b) subject to the terms and conditions, as applicable, of the Plan, the Plan Documents, the Claimant Trust Agreement, and in accordance with this Agreement, and applicable law.

017334

HCMLPHMIT00000776

"**HMIT Note**" means that certain Secured Promissory Note dated December 21, 2015, in the original face amount of $63,000,000 from HMIT, as maker, and Highland, as payee.

"**HMIT Note Claims**" means any Claim related to, in connection with or arising out of the HMIT Note.

"**HMIT Released Parties**" means collectively (i) the HMIT Entities, (ii) any Affiliate of any HMIT Entity and any Person directly or indirectly majority owned by any HMIT Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any HMIT Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i) – (iii), collectively, the "**HMIT Parties**"), (iv) each of the HMIT Parties' current and former trustees, administrators, officer, executives, agents, directors, advisors, consultants, manager, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns (v) the professionals (and their respective firms (a) retained by any HMIT Party during the Bankruptcy Case or which provided services to any HMIT Party during the Bankruptcy Case or (b) retained by any HMIT Released Party on or after August 11, 2021, (vi) any Person indemnified by any HMIT Party (the Persons described in clauses (i) – (vi), collectively, the "**HMIT Covered Parties**"), and (vii) each HMIT Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "HMIT Covered Parties." *Notwithstanding the forgoing*, none of "HMIT Released Parties", "HMIT Parties", nor "HMIT Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner, and none of such Persons are released from any Claims by any Person in connection with this Agreement.

"**Indemnity Trust Administrator**" has the meaning given to it in the Indemnity Trust Agreement.

"**Indemnity Trust Agreement**" means that certain *Second Amended and Restated Indemnity Trust Agreement of the Indemnity Trust* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of [April 28], 2025, by and among the Claimant Trust, as grantor, James P. Seery, Jr., as indemnity trust administrator, and Wilmington Trust, National Association, a national banking association, as indemnity trustee and Delaware trustee.

"**Indemnity Trust Assets**" has the meaning set forth in the Indemnity Trust Agreement, but excluding Highland, the Claimant Trust, and their respective assets.

"**Independent Board**" means the independent board appointed by the Bankruptcy Court on January 9, 2020, pursuant to that certain *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 339].

017335

HCMLPHMIT00000777

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

"**Kirschner Claims**" means all Claims and causes of action that were asserted or could have been asserted by the Litigation Trustee of the Litigation Sub-Trust, in the Amended Complaint.

"**Liability**" means any liability, debt, obligation, loss, damage, claim, cost or expense (including costs of investigation and defense and attorney's fees, costs and expenses), in each case, whether direct or indirect, whether accrued or contingent, whether or not involving a third-party claim, and including incidental and consequential damages and diminution of value.

"**Litigation Protections**" means, individually and collectively, the rights, duties, and obligations set forth in Sections 1 – 2 and Sections 9 - 16.

"**Litigation Sub-Trust**" means the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act.

"**Litigation Sub-Trust Agreement**" means that certain Litigation Sub-Trust Agreement of the Litigation Sub-Trust (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 16, 2021, by and among James P. Seery, Jr., as Claimant Trustee of the Claimant Trust, Wilmington Trust, National Association, a national banking association, as Delaware Trustee, and the Litigation Trustee.

"**Litigation Trustee**" means Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust.

"**LPA**" means that certain *Sixth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), dated as of October 4, 2021.

"Operating Expenses" means, except for the expenses of the Indemnity Trust (including any payments to Trust Indemnified Parties or Indemnified Parties (in each case, as defined, and pursuant to the terms and conditions set forth, in the Indemnity Trust Agreement)), the expenses of operating and administering the Highland Entities, including legal expenses, employee compensation, Claimant Trustee/CEO and other trust and trustee related compensation, incentive compensation, and customary general and administrative expenses.

"**Original Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* attached as Exhibit A to the *Order (A) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as modified) and (B) Granting Related Relief*, filed at Docket No. 1943 on the Bankruptcy Court's docket.

"**Oversight Board**" means the oversight board of the Highland Claimant Trust.

"**Pending Litigation**" means (i) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including *Hunter Mountain Investment Trust's Emergency Motion for Leave to File Adversary Proceeding* filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating there); (ii) *Dugaboy Investment Trust v. Highland Cap. Mgmt, L.P.*, 3:24-cv-01531-X

017336

HCMLPHMIT00000778

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

(N.D. Tex.) (only as to HMIT), and (iii) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:24-cv-01786-L (N.D. Tex.).

"**Permitted Investments**" has the meaning set forth in the Indemnity Trust Agreement.

"**Person**" means any natural person, partnership, limited liability partnership, corporation, limited liability company, association, joint stock company, trust, estate, joint venture, unincorporated organization or Governmental Authority.

"**Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* as conformed in accordance with the Fifth Circuit's rulings.

"**Plan Documents**" has the meaning given to it in the Plan.

"**Plan Protections**" means, collectively, the provisions of the Plan contained in Article IX thereof.

"**Pro Rata**" means the proportion that (a) the allowed amount of a particular Claim or Equity Interest in Class 10 bears to (b) the aggregate allowed amount of all Claims or Equity Interests in Class 10.

"**Threats**" means any written threats of legal action, legal demands, filed complaints, petitions for pre-suit discovery, suits, litigations, arbitrations, actual or threated restraining orders or injunctions made in writing, or similar written actions of any kind, or sworn statements evidencing the same, in any forum against any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), excluding any such action that would otherwise be a Threat except that any applicable statute of limitations that could be applicable to such action has expired.

"**Threats Notice**" means the written notice of any Threats received by the Indemnity Trust with respect to any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), that is hereby required to be provided by the Indemnity Trust to the HMIT Entities, within five (5) Business Days after receipt of such Threat.

## RECITALS

**WHEREAS**, as of the Petition Date, HMIT held Class B and Class C Limited Partnerships Interests in Highland;

**WHEREAS**, on December 21, 2015, HMIT entered into the HMIT Note with Highland, which had a total outstanding principal balance of Fifty-Seven Million Six Hundred Ninety Thousand Six Hundred Forty and 95/100 Dollars ($57,690,640.95) as of the Petition Date (the "**HMIT Note Balance**");

**WHEREAS**, HMIT's Class B and Class C Limited Partnership Interests in Highland were extinguished on August 11, 2021, in accordance with the Plan;

017337

HCMLPHMIT00000779

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

**WHEREAS**, pursuant to the LPA, HMIT's capital account balance at Highland on account of its Class B and Class C Limited Partnership Interests on the Petition Date was Three Hundred Ninety-Four Million Six Hundred Thirty Thousand Eight Hundred Seventy-One and 53/100 Dollars ($394,630,871.53) (the "**HMIT Capital Account Balance**");

**WHEREAS**, some or all of the HMIT Entities have asserted certain Claims against certain Highland Entities and certain other Highland Covered Parties, including those asserted in the Pending Litigation;

WHEREAS, certain distributions to be made to the holders of allowed Class 10 Claims or Equity Interests pursuant to the terms and subject to the conditions set forth herein are premised on the consent of certain Highland Covered Parties in their capacity as Holders of Class 9 Interests, and such Persons are only willing to provide such consent in exchange for the releases as set forth in this Agreement;

**WHEREAS**, some or all of the Highland Entities have asserted certain Claims against certain HMIT Entities, including the HMIT Note Claims;

**WHEREAS**, the Parties wish to terminate, extinguish, and release any and all rights, duties, obligations and Claims that (a) any of the Highland Released Parties owed or have, or may have owed or have, to or with respect to any of the HMIT Released Parties, and (b) any of the HMIT Released Parties owed or have, or may have owed or have, to or with respect to any of the Highland Released Parties, as provided in this Agreement (collectively, the "**Rights and Obligations**");

**WHEREAS**, the Parties agree that the Litigation Protections are intended to enact a permanent cessation of all litigation concerning or related to the Highland Released Parties through and including the Agreement Date; and

**WHEREAS**, the Parties, individually and collectively, wish to (a) resolve all disputes between and/or among any of the Highland Entities and their respective indemnitees, on the one hand, and any of the HMIT Entities, on the other hand, including those asserted or attempted to be asserted in the Pending Litigation, (b) fix and allow HMIT's Class 10 Interest at the amount and on the terms provided herein; and (c) terminate, extinguish, and release all Rights and Obligations on the terms provided herein.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## <u>AGREEMENT</u>

1.  <u>Stay and Dismissal of Pending Litigation With Prejudice</u>.

    (a)    Within five (5) Business Days after the Agreement Date, the HMIT Entities shall take all steps necessary (at their own cost) to stay the Pending Litigation.

017338
HCMLPHMIT00000780

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

(b)     Within five (5) Business Days after the Bankruptcy Court Approval Date, the HMIT Entities shall take all steps necessary (at their own cost) to dismiss the Pending Litigation with prejudice.

2.     <u>Maintenance of Stay and Dismissal of Certain Defendants from the Amended Complaint</u>.

(a)     The Litigation Trustee shall continue to maintain the stay of Adv. Proc. No. 21-03076-sgj and all related proceedings arising therefrom through the Bankruptcy Court Approval Date. Within five (5) Business Days after the Bankruptcy Court Approval Date, the Litigation Sub-Trust shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand PE from Counts I, II, III, and XXIV of the Amended Complaint.

3.     <u>Cash Payment to HMIT</u>.  Within five (5) Business Days following the Bankruptcy Court Approval Date, Highland shall pay HMIT a one-time, lump sum of Five Hundred Thousand Dollars (US$500,000.00) (the "**Payment**") by wire transfer:

[wire instructions]

4.     <u>HMIT Class 10 Interest</u>.

(a)     Subject to entry of the Bankruptcy Court Order, and the terms of this Agreement, the HMIT Class 10 Interest shall be deemed allowed in the amount of Three Hundred Thirty-Six Million Nine Hundred Forty Thousand Two Hundred Thirty and 58/100 Dollars (US$336,940,230.58), which amount represents the HMIT Capital Account Balance, <u>less</u> the HMIT Note Balance.

(b)     Notwithstanding anything to the contrary in the Plan or the Claimant Trust Agreement, as an integral part of this Agreement to consent to the allowance of the HMIT Class 10 Interest and the other considerations in this Agreement, HMIT shall not be deemed, and no holder of the HMIT Class 10 Interest shall be, a Claimant Trust Beneficiary or a "Beneficiary" under the Claimant Trust Agreement, and the Highland Released Parties, individually and collectively, shall owe no duty to any HMIT Releasor (whether contractual, fiduciary, equitable, statutory or otherwise), including with respect to the HMIT Class 10 Interest, in each case, except as expressly set forth in this Agreement.  Furthermore, without limiting the foregoing and for the avoidance of doubt, the contractual right of the holder of the HMIT Class 10 Interest to receive or recover any payments or Indemnity Trust Assets from the Indemnity Trust as set forth in this Agreement or the Indemnity Trust Agreement does not make any HMIT Releasor or any other Person a beneficiary of the Indemnity Trust or under the Indemnity Trust Agreement.

(c)     Notwithstanding anything to the contrary in the Plan, the Claimant Trust Agreement or the Indemnity Trust Agreement, in no event shall HMIT sell, transfer, assign, pledge, hypothecate, participate or otherwise dispose of or encumber the HMIT Class 10 Interest or any rights (including any right to payment) with respect thereto (collectively, a "**Class 10 Assignment**"), and any attempted Class 10 Assignment shall be null and void.

017339

HCMLPHMIT00000781

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

(d)    For the avoidance of doubt, the HMIT Class 10 Interest is and shall remain senior to the not yet allowed, unvested contingent Class 11 Claims of Equity Interests as provided for in the Plan, the Plan Documents, and the Claimant Trust Agreement.

5.    <u>Initial Interim Distributions on the Allowed Class 10 Interests</u>.

(a)    Within five (5) Business Days after the Bankruptcy Court Approval Date, the Indemnity Trust shall distribute (the date on which such distribution is made, the "**Initial Interim Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Ten Million Dollars (US$10,000,000.00) (the "**Initial Interim Cash Distribution Amount**").

(b)    Within five (5) Business Days after the Bankruptcy Court Approval Date (the "**Note Assignment Date**"), the Highland Entities shall cause the portion of the Dugaboy Note held by the Highland Entities to be distributed to HMIT in-kind and take all actions necessary for HMIT to become the holder of such portion of the Dugaboy Note, and shall in addition pay to HMIT cash in the aggregate amount of all principal and interest payments actually received on the Dugaboy Note by the Highland Entities, including the Indemnity Trust, from the Agreement Date to the Note Assignment Date.  Prior to the Bankruptcy Court Approval Date, HMIT will engage an independent valuation service provider to value the Dugaboy Note for purposes of determining the magnitude of reduction to the outstanding allowed Class 10 Interests on account of such in-kind distribution, which shall not be less than Fifty percent (50%) of the current balance owed under the Dugaboy Note. The HMIT Entities acknowledge and agree that none of the Highland Entities are representing or warranting that the Dugaboy Note can be sold, or the price, if any, that could be received for the Dugaboy Note and further acknowledge and agree that any such purchase price may be de minimis.

6.    <u>Subsequent Distribution(s) on the Allowed Class 10 Interests</u>.

(a)    On December 1, 2027, the Indemnity Trust shall distribute (such distribution, collectively, the "**First Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**First Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests: cash in the aggregate amount of Five Million Dollars (US$5,000,000.00).

(b)    On December 1, 2028, the Indemnity Trust shall distribute (such distribution, collectively, the "**Second Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**Second Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Five Million Dollars (US$5,000,000.00).

(c)    Notwithstanding anything herein to the contrary, the obligations of the Indemnity Trust to make the First Subsequent Distribution or Second Subsequent Distribution is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII, Section 8.1(c) of the Indemnity Trust Agreement that the Indemnity Trust Assets comprising such distributions are not reasonably necessary to satisfy current or potential

017340

HCMLPHMIT00000782

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Indemnification Obligations (as defined in the Indemnity Trust Agreement) to all persons who are or might become Beneficiaries (as defined in the Indemnity Trust Agreement).

      7.    <u>Final Distribution on the Allowed Class 10 Interests</u>.

      (a)    On the later of the Final Court Approval Date and April 1, 2029, the Indemnity Trust will distribute all excess remaining Indemnity Trust Assets in accordance with Article VIII of the Indemnity Trust Agreement; <u>provided</u>, <u>however</u>, that the obligation of the Indemnity Trust to make any such distributions and/or dissolve and wind up the affairs of the Indemnity Trust is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII of the Indemnity Trust Agreement that (1) a Final Order(s) (as defined in the Indemnity Trust Agreement) has been entered resolving all litigation, claims or proceedings in any forum of any kind which could give rise to Indemnity Obligations (as defined in the Indemnity Trust Agreement) and payment in full of all such Indemnity Obligations and (2) all applicable statutes of limitations and any applicable tolling of such statutes of limitation have expired.

      (b)    The Indemnity Trust agrees to not use Indemnity Trust Assets to fund Operating Expenses.

      (c)    Following the Bankruptcy Court Approval Date, at the request of Mark Patrick, solely in his capacity, and to the extent he remains, as administrator of HMIT, but not more often than quarterly, Highland and the Indemnity Trust Administrator agree to review (i) the status of their respective assets, (ii) the balance of cash held, (iii) the status of any claims made for indemnification and any resolutions thereof, (iv) the status of any litigation, and (v) forecasted operating expenses with Mr. Patrick, and will each work in good faith to reduce operating expenses where reasonably practicable; provided, however, that all such reporting shall be subject to Mr. Patrick's agreement to maintain confidentiality with respect to any non-public information.

      8.    <u>Transfer Kirschner Claims; Dismissal of HMIT Note Claims</u>.

      (a)    Within five (5) Business Days after the Bankruptcy Court Approval Date, but after the dismissal provided for in <u>Section 2</u>, the Litigation Sub-Trust shall execute a short-form assignment in in favor of the HMIT Entities transferring all of the Litigation Sub-Trust's right, title, and interest in and to the Kirschner Claims (the "**Kirschner Transfer**"). Such assignment shall be in a form mutually acceptable to the Parties and its substance shall be consistent with the terms, conditions and limitations set forth in this Agreement, including <u>Section 8(b)</u> below. Each HMIT Entity acknowledges and agrees that none of the Highland Entities will have any duty or obligation to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof, except as provided in this Agreement, including the terms of <u>Section 8(c)</u> below.

      (b)    THE HMIT ENTITIES SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THE LITIGATION SUB-TRUST IS TRANSFERRING THE KIRSCHNER CLAIMS ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT THE HMIT ENTITIES ARE NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM THE HIGHLAND ENTITIES OR

017341

HCMLPHMIT00000783

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

THEIR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE KIRSCHNER CLAIMS AND AMENDED COMPLAINT, INCLUDING WITH RESPECT TO THE ENFORCEABILITY, TRANSFERABILITY, VIABILITY, STRENGTH, OR VALUE OF ANY OF THE KIRSCHNER CLAIMS OR THE AMENDED COMPLAINT.  The HMIT Entities hereby specifically acknowledge that they have carefully reviewed this Section and have had the opportunity to discuss its import with legal counsel and that the provisions of this Section are a material part of this Agreement.  Thus, if for any reason HMIT is precluded from or is otherwise unable to prosecute all or any of the Kirschner Claims, (i) the HMIT Releasors shall have no recourse against any Highland Released Parties whatsoever and shall not be entitled to compensation of any kind, it being agreed that the HMIT Entities are otherwise receiving adequate consideration for the duties and obligations they are undertaking pursuant to this Agreement and (ii) there will be no effect whatsoever on the validity and enforceability of this Agreement or any of the other transactions contemplated hereby.

(c)    As promptly as reasonably practicable following the Bankruptcy Court Approval Date, the Highland Entities shall provide to the HMIT Entities electronic copies of written discovery requests and responses thereto, and documents produced in discovery in respect of the Kirschner Claims and the Amended Complaint.  The Highland Entities will not provide any other documents regarding the Kirschner Claims including any attorney-client communications and any documents subject to the attorney work-product doctrine or similar privileges or immunities concerning the Kirschner Claims (collectively, the "**Kirschner Privileges**"), it being understood and agreed that the Highland Entities are retaining, and not transferring or waiving, the Kirschner Privileges.

(d)    Each Party acknowledges and agrees that if the Kirschner Transfer is found or deemed to be impermissible or invalid, for any reason, the Kirschner Claims and Amended Complaint will revert to, and remain an asset of, the Litigation Sub-Trust.

9.    <u>General Release By The HMIT Entities</u>. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the HMIT Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its and their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the HMIT Entities, the "**HMIT Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each Highland Released Party from, and waives and relinquishes, any and all Claims, which the HMIT Releasors, or any Person claiming through, under, or on behalf of any of the HMIT Releasors, ever had, now has, or hereafter can, shall, or may have against any of the Highland Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Agreement Date, including any fact, matter, transaction, or occurrence asserted by any HMIT Entity in the Pending Litigation or in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the Highland Released Parties, or the Highland Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out

017342

HCMLPHMIT00000784

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

of, or otherwise related to, any of the foregoing (collectively, the "**HMIT Entity Released Claims**").

10.     General Release By The Highland Entities. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the Highland Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its or their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners) employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the Highland Entities, the "**Highland Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, any and all Claims which the Highland Releasors, or any Person claiming through, under, or on behalf of any of the Highland Releasors, ever had, now has, or hereafter can, shall, or may have against any of the HMIT Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Bankruptcy Court Approval Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the HMIT Released Parties, or the HMIT Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**Highland Released Claims**").

11.     Further Provisions Concerning The General Releases.

(a)     FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASES ARE INTENDED TO BE GENERAL AND INCLUDE A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE AGREEMENT DATE.

(b)     To the maximum extent permitted by law, each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefit of any statute or other principle of law or equity that limits the applicability of a release with respect to Claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release.

(c)     Without limiting the scope of the foregoing waiver, in connection with the foregoing release, each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefits of Section 1542 of the California Civil Code (to the extent, if any, that Section 1542 might apply to the foregoing release), which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE

017343
HCMLPHMIT00000785

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

**RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees that the provisions of Section 1542 of the Civil Code of the State of California and all similar federal or state law, rights, rules or legal principles, legal or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY EACH OF THE HMIT ENTITIES AND THE HIGHLAND ENTITIES, ON THEIR OWN BEHALF AND ON BEHALF OF THE OTHER HMIT RELEASORS AND HIGHLAND RELEASORS, RESPECTIVELY,** in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

In connection with such waiver and relinquishment, each of the HMIT Entities and Highland Entities acknowledges that it is aware that it may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein. Nevertheless, it is the intent of each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, in executing this Agreement fully, finally, and forever to settle and release all such matters, and all Claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

(d)    As an integral component of this Agreement, and notwithstanding the Parties' intent set forth in the preamble hereto and the general nature of the releases in Sections 9 and 10, should:

(i)    any HMIT Releasor contend or assert that any Claim of any kind whatsoever held by any HMIT Releasor against any Highland Released Party survives this Agreement and is in any way related to or arising from or in connection with any HMIT Entity Released Claim (such claim or cause of action, a "**HMIT Alleged Claim**"), such HMIT Releasor will be deemed to have irrevocably, fully, and finally assigned such HMIT Alleged Claim to the Highland Entities and the Highland Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such HMIT Alleged Claim.

(ii)    any Highland Releasor contend or assert that any Claim of any kind whatsoever held by any Highland Releasor against any HMIT Released Party survives this Agreement and is in any way related to or arising from or in connection with any Highland Entity Released Claim (such claim or cause of action, a "**Highland Alleged Claim**"), such Highland Releasor will be deemed to have irrevocably, fully, and finally assigned such Highland Alleged Claim to the HMIT Entities and the HMIT Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such Highland Alleged Claim.

14

017344
HCMLPHMIT00000786

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

12.    <u>Covenant Not To Sue; Limitation on Standing</u>. Upon the Agreement Date:

(a)    Each of the HMIT Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the Highland Released Parties, to recover, enforce, investigate, or collect any HMIT Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(b)    Each of the Highland Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the HMIT Released Parties, to recover, enforce, investigate, or collect any Highland Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(c)    For the avoidance of doubt, this Agreement shall not operate to give any HMIT Entity standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except for the limited purpose of seeking Court approval of this Agreement (including with respect to any appeal concerning any order entered granting or denying such approval), and except for the limited purpose of enforcing this Agreement, no HMIT Entity shall commence any Action in connection with the HMIT Class 10 Interest.

13.    <u>Representations and Warranties</u>.

(a)    Each of the HMIT Entities hereby represents and warrants that every HMIT Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any HMIT Releasor.

(b)    The HMIT Entities, on their own behalf and on behalf of the other HMIT Releasors, acknowledge and agree that each Plan Provision is lawful, effective, and binding on the HMIT Releasors. The HMIT Entities further agree, on their own behalf and on behalf of the other HMIT Releasors, that the HMIT Releasors will never, in any way, challenge or seek to modify, nullify, vacate, or revoke, or induce, encourage or direct any other Person to do so or act in concert with or assist (financially or otherwise) any other Person in doing so the Confirmation Order, the Plan, the Plan Protections, or any Plan Document, including the Claimant Trust Agreement, the LPA, the Indemnity Trust Agreement or the Litigation Sub-Trust Agreement, in the Bankruptcy Court, in any other state or federal court, in any other forum or tribunal, or otherwise, including administrative or regulatory tribunals and foreign courts.

(c)    Each of the Highland Entities hereby represents and warrants that every Highland Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any Highland Releasor.

(d)    Each Party severally represents and warrants as to itself only that: (i) it has taken all necessary action to authorize and approve the execution, delivery and performance of this Agreement; (ii) such Party has full power and authority to execute and deliver this Agreement; and (iii) this Agreement constitutes a valid, legal and binding obligation of such Party, and is enforceable subject to its terms.  Each individual signatory hereto individually warrants and

017345
HCMLPHMIT00000787

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

represents to all Parties hereto that such individual has full power and authority to act on behalf of and bind the Party for which he or she has executed this Agreement; provided, however that no signatory shall otherwise provide any warranty or representation or otherwise be a party to this Agreement on an individual basis.

14.    <u>No Continuing Rights, Duties or Obligations</u>.  Except for the rights, duties, and obligations expressly set forth in this Agreement, all Rights and Obligations that existed or may have existed shall be deemed terminated, extinguished, and released upon the Agreement Date. For the avoidance of doubt, from and after the Agreement Date, (a) the Highland Released Parties, individually and collectively, shall owe no duty, past or present, including with respect to the Kirchner Claims, to the HMIT Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement, and (b) the HMIT Released Parties, individually and collectively, shall owe no duty to the Highland Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement.

15.    <u>Gatekeeper Standard</u>.

(a)    The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that, notwithstanding the United States Court of Appeals for the Fifth Circuit's decision in *Highland Capital Management Fund Advisors, L.P. v. Highland Capital Management, L.P.*, No. 23-10534 (5th Cir. Mar. 18, 2025), the "Gatekeeper" provisions contained in Highland's Original Plan is forever binding on each of the HMIT Entities and any Persons claiming through, under or on behalf of any of them, and for a claim or cause of action to be  "colorable" for purposes of the Gatekeeper, it must be found by final order of the Bankruptcy Court (the "**Gatekeeper Court**"), which order shall be subject to appeal to a court of competent jurisdiction, to have satisfied the "Gatekeeper Colorability Test" as such term is defined in *In re Highland Capital Management, L.P.*, 2023 Bankr. LEXIS 2104 at *124-36 (Bankr. N.D. Tex. Aug. 24, 2023).

(b)    The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that compliance with the Gatekeeper requires (i) a motion seeking leave to sue an Exculpated Party (as that term is defined in Highland's original Plan) and a finding that the litigant's claims and causes of action are "colorable" attaching a complaint setting forth the basis for such claims or causes of action and (ii), in the Gatekeeper Court's sole discretion, an evidentiary hearing (during which the Gatekeeper Court may, among other things, hear testimony and assess the credibility of any witness(es)) to determine whether a proposed claim or cause of action is "colorable."

(c)    The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, further acknowledge and agree that the moving party under the Gatekeeper has the burden of satisfying the "Gatekeeper Colorability Test," and that the dismissal of the Pending Litigation shall have res judicata effect.

16.    <u>Indemnification</u>.

017346

HCMLPHMIT00000788

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

(a)     Without in any manner limiting the available remedies for any breach of this Agreement, the HMIT Entities, severally but not jointly, agree to indemnify, defend, and hold the Highland Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any HMIT Entity set forth in Section 13 or (y) any Actions brought or prosecuted by or on behalf of, any HMIT Releasor or that are induced, encouraged, assisted  or directed by any HMIT Releasor or brought or prosecuted in concert with any HMIT Releasor against any Highland Released Party with respect to or related to any HMIT Entity Released Claims.  Without limiting the scope of the foregoing in any manner, any HMIT Entity that breaches Section 12 shall be liable to the Highland Released Party against whom the applicable Action has been brought or prosecuted in violation of Section 12 for the reasonable attorneys' fees and costs incurred by such Highland Released Party in defending against or otherwise responding to such Action.  Each HMIT Entity acknowledges and agrees that the HMIT Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

(b)     Without in any manner limiting the available remedies for any breach of this Agreement, the Highland Entities, severally but not jointly, agree to indemnify, defend, and hold the HMIT Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any Highland Entity set forth in Section 13 or (y) any suits, proceedings, or other actions brought or prosecuted by or on behalf of, any Highland Releasor or that are induced, encouraged, assisted  or directed by any Highland Releasor or brought or prosecuted in concert with any Highland Releasor against any HMIT Released Party with respect to or related to any Highland Entity Released Claims.  Without in any manner limiting the scope of the foregoing, any Highland Entity that breaches Section 12 shall be liable to the HMIT Released Party against whom the applicable Action has been brought or prosecuted in violation of Section 12 for the reasonable attorneys' fees and costs incurred by such HMIT Released Party in defending against or otherwise responding to such Action.  Each Highland Entity acknowledges and agrees that the Highland Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

17.     Execution.  This Agreement may be executed by the exchange of signatures by facsimile or by PDF attachment to an email transmittal and in counterparts, and if so executed, shall be fully executed when a counterpart has been executed and delivered by all Parties hereto through counsel.  All counterparts taken together shall constitute one and the same agreement and shall be fully enforceable as such.

18.     Bankruptcy Court Order.  This Agreement and the transactions contemplated hereby is subject to the entry of the Bankruptcy Court Order.  To that end, the Highland Entities shall file the 9019 Motion no later than five (5) Business Days after the Agreement Date.  Each Party shall, and shall cause each of their respective Affiliates to, undertake any and all actions in compliance with applicable law to obtain the Bankruptcy Court Order as promptly as practicable, and without limiting the foregoing, if an Action is threatened or instituted by any Person opposing

017347
HCMLPHMIT00000789

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

the 9019 Motion or otherwise challenging the validity or legality, or seeking to restrain the consummation, of the transactions contemplated by this Agreement or the Bankruptcy Court Order, each Party shall, and shall cause its respective Affiliates to, use their commercially reasonable best efforts to avoid, resist, resolve or, if necessary, and defend to effectuate this Agreement and consummate the transactions hereby. If the 9019 Motion is not approved by entry of the Bankruptcy Court Order or if the Bankruptcy Court Approval is precluded from becoming a Final Order, each Party shall, and shall cause its respective Affiliates to, use their best efforts to seek the entry of a Final Order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby in a substantially similar form and on substantially similar terms as set forth herein to the fullest extent possible so as to give effect to the original intent of the Parties as closely as possible.

19. <u>Fees and Expenses</u>. Whether or not the transactions contemplated hereby are consummated or the Bankruptcy Court Order is obtained, and except as otherwise expressly provided in this Agreement, each Party will bear its respective fees, costs and expenses (including legal, accounting and other professional fees) incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the transactions contemplated hereby, including with respect to each Party's respective obligations pursuant to <u>Section 18</u>. Notwithstanding the foregoing, if any Party hereto brings an Action to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that Action shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

20. <u>Entire Agreement; No Other Representations</u>. **THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF ANY PERSON OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT. THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS (COLLECTIVELY, "<u>REPRESENTATIONS</u>"), EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT; AND THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT RELIED ON ANY REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY ARE ENTERING INTO THIS AGREEMENT RELYING SOLELY ON THEIR OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS BY ANY PARTY, EXCEPT FOR THOSE REPRESENTATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES AGREE THAT REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT SHALL NOT BE USED IN THE INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT, AND NEITHER THE HMIT RELEASED PARTIES NOR THE HIGHLAND RELEASED PARTIES SHALL HAVE ANY LIABILITY FOR ANY CONSEQUENCES ARISING AS A RESULT OF ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT.**

017348
HCMLPHMIT00000790

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

21.    <u>Agreement and Release Knowing and Voluntary</u>.  The Parties acknowledge that they have considered this Agreement with their respective attorneys and have carefully read this Agreement, that it has been fully explained by their attorneys, and that they have had a reasonable opportunity to consider this Agreement.  The Parties further represent that they know and fully understand the contents of this Agreement, that they intend to be legally bound by this Agreement and the releases and covenants contained herein, and that they are signing this Agreement, including the release provisions herein, voluntarily and of their own free will and without coercion, and with the benefit of advice of counsel.

22.    <u>Cooperation</u>.  The Parties agree to perform any services or actions reasonably necessary to carry out the terms and conditions of this Agreement or the transactions contemplated hereby, including the execution and delivery of reasonable additional documents, instruments, conveyances and/or assurances, in good faith, and to reasonably communicate and cooperate with one another in this regard.  For the avoidance of doubt, nothing in this Section shall obligate the Highland Entities to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof.

23.    <u>Governing Law</u>.  This Agreement shall be construed pursuant to and governed by the laws of the State of Delaware (substantive and procedural) without reference to principles of conflicts of law that would result in the application of any other State's laws.

24.    <u>Jurisdiction/Venue</u>.  The Parties hereby irrevocably submit to the jurisdiction and venue of the Bankruptcy Court with respect to any Action arising out of or related to this Agreement or the subject matter hereof; if (and only if) the Bankruptcy Court lacks personal or subject matter jurisdiction to adjudicate an Action arising out of or related to this Agreement or the subject matter hereof, then the Parties irrevocably submit to the jurisdiction and venue of the United States District Court for the Northern District of Texas.

25.    <u>No Admissions</u>.  All Parties acknowledge and agree that the matters set forth in this Agreement constitute the settlement and compromise of disputed Claims and that this Agreement shall not constitute the admission of any fact or liability by any of them regarding any Claim, including the Claims released hereunder, and neither the terms hereof, nor the fact of this Agreement itself, shall be evidence of any kind in any Action, other than an Action to enforce the terms of the Agreement or any instrument executed in connection herewith or any claim for damages or other relief for breach of any representation or warranty contained herein or in any instrument executed in connection herewith.

26.    <u>Other Provisions</u>.

(a)    No representation, inducement, agreement, promise or understandings altering, modifying, amending, taking from or adding to, the terms and conditions hereof shall have any force or effect unless the same is in writing and validly executed by each of the Parties hereto.

(b)    The waiver by any Party of any breach of, or default under, any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or default;

017349
HCMLPHMIT00000791

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

provided, however, that for any such waiver to be enforceable, it shall be in writing and executed by the non-breaching Party.

(c)     The headings contained in this Agreement are for convenience only and shall in no way restrict or otherwise affect the construction of the provisions hereof.

(d)     The Parties shall each execute all documents and perform all acts necessary and proper to effectuate the terms of this Agreement.

27.    <u>Notices</u>.  All notices required or permitted to be provided hereunder shall be afforded to the respective parties to and through their counsel, and shall be transmitted simultaneously by electronic mail (with PDF attachments, as necessary) and by telefax, addressed as follows:

To the Highland Entities:

**PACHULSKI STANG ZIEHL AND JONES LLP**
Jeffrey N. Pomerantz
John A. Morris
10100 Santa Monica Boulevard
Los Angeles, California 90067-4003
310.277.6910
jpomerantz@pszjlaw.com
jmorris@pszjlaw.com

To the HMIT Entities:

**KELLY HART PITRE**
Louis M. Phillips
Amelia Hurt
301 Main Street, Suite 1600
225.381.9643
Louis.Phillips@Kellyhart.com
Amelia.Hurt@Kellyhart.com

28.    <u>Interpretive Provisions</u>. Unless the express context otherwise requires: (a) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) words defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (c) the words "Dollars" and "$" mean U.S. dollars; (d) references herein to a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement; (e) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words ",without limitation,"; (f) references herein to any gender shall include each other gender; (g) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by

20

017350

HCMLPHMIT00000792

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

this Agreement; (h) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (i) the word "or" shall be disjunctive but not exclusive; (j) the headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties; and (k) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

*[Signature page follows]*

017351

HCMLPHMIT00000793

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**HUNTER MOUNTAIN INVESTMENT TRUST**

By   _____
        Name:      Mark Patrick
        Title:       Administrator
        Date:       May __, 2025

**BEACON MOUNTAIN LLC**

By   _____
        Name:
        Title:
        Date:       May __, 2025

**RAND ADVISORS, LLC**

By   _____
        Name:      Mark Patrick
        Title:       President
        Date:       May __, 2025

**RAND PE FUND I, LP**
By: Rand PE Fund Management, LLC, its General Partner

By   _____
        Name:      Mark Patrick
        Title:       President
        Date:       May __, 2025

**RAND PE FUND MANAGEMENT, LLC**

By   _____
        Name:      Mark Patrick
        Title:       President

SIGNATURE PAGE TO SETTLEMENT AGREEMENT & GENERAL RELEASE

017352

HCMLPHMIT00000794

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Date:          May __, 2025

**ATLAS IDF, LP**
By: Atlas IDF GP, LLC, its General Partner

By   _____
     Name:      Mark Patrick
     Title:     President
     Date:      May __, 2025

**ATLAS IDF GP, LLC**

By   _____
     Name:      Mark Patrick
     Title:     President
     Date:      May __, 2025

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By   _____
     Name:      James. P. Seery, Jr.
     Title:     Chief Executive Officer
     Date:      May __, 2025

**HIGHLAND CLAIMANT TRUST**

By   _____
     Name:      James P. Seery, Jr.
     Title:     Claimant Trustee
     Date:      May __, 2025

**HIGHLAND LITIGATION SUB-TRUST**

By   _____
     Name:      Marc S. Kirschner
     Title:     Litigation Trustee

SIGNATURE PAGE TO SETTLEMENT AGREEMENT & GENERAL RELEASE

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Date:     May __, 2025

## HIGHLAND INDEMNITY TRUST

By   _____

     Name:     James P. Seery, Jr.
     Title:     Indemnity Trust Administrator
     Date:     May __, 2025

017354

HCMLPHMIT00000796

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

## SETTLEMENT AGREEMENT & GENERAL RELEASE

THIS SETTLEMENT AGREEMENT & GENERAL RELEASE (this "**Agreement**") is entered into as of May [[.,16,]] 2025 (the "**Agreement Date**"), by and among Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), the Highland Claimant Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Claimant Trust**"), the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Litigation Sub-Trust**"), and the Highland Indemnity Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Indemnity Trust**", and together with Highland, the Claimant Trust and the Litigation Sub-Trust, the "**Highland Entities**"), on the one hand, and Hunter Mountain Investment Trust, a Delaware statutory trust ("**HMIT**"), Beacon Mountain LLC, a Delaware limited liability company ("**Beacon Mountain**"), Rand Advisors, LLC, a Delaware limited liability company ("**Rand Advisors**"), Rand PE Fund I, LP, a Delaware series limited partnership ("**Rand PE Fund**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**"), Atlas IDF, LP, a Delaware limited partnership ("**Atlas IDF**"), Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP and Atlas IDF, the "**HMIT Entities**"), on the other hand.  The Highland Entities and the HMIT Entities are collectively referred to as the "**Parties**," and each individually, as a "**Party**".

## DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Claimant Trust Agreement or the Plan, as applicable (in each case, as hereinafter defined). For purposes of this Agreement, the following capitalized terms have the following meanings:

"**9019 Motion**" means the motion seeking entry of the Bankruptcy Court Order pursuant to Bankruptcy Rule 9019 and in accordance with Section 18.

"**Action**" means any action, claim, demand, arbitration, hearing, charge, complaint, investigation, examination, indictment, litigation, suit or other civil, criminal, administrative or investigative proceedings, including any petition under Rule 202 of the Texas Rules of Civil Procedure.

"**Affiliate**" means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, a specified Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by contract or otherwise.

"**Amended Complaint**" means the *Amended Complaint and Objection to Claims*, filed as docket number 158 in *Kirschner v. Dondero*, Adv. Pro. No. 21-03076-sgj (Bankr. N.D. Tex. May 19, 2022).

"**Bankruptcy Case**" means *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex.) and its related proceedings.

017355

HCMLPHMIT00000797

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division.

"**Bankruptcy Court Approval Date**" means the date on which the Bankruptcy Court Order is issued.

"**Bankruptcy Court Order**" means an order of the Bankruptcy Court approving the allowance of the HMIT's Class 10 Interest as provided in this Agreement pursuant to the 9019 Motion.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than (i) a Saturday or a Sunday, (ii) a day on which the Federal Reserve Bank of New York or the New York Stock Exchange is closed, or (iii) a day on which banks in the States of Texas are required, or authorized by law, to close.

"**Claimant Trust Agreement**" means that certain Claimant Trust Agreement of the Claimant Trust (as may have been or may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 11, 2021, by and among Highland, as settlor, James P. Seery, Jr., a Claimant Trustee, and Wilmington Trust, National Association, a national banking association, as Delaware trustee.

"**Claims**" means any claims, debts, liabilities, demands, obligations, breaches of contract, breaches of duty or any relationship, misfeasance, malfeasance, promises, acts, omissions, agreements, liens, losses, costs and expenses (including attorney's fees and related costs), damages, injuries, suits, ~~actions~~Actions, and causes of action of whatever kind or nature, whenever and however, arising, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise.

"**Class 10**" means the class of Claims or Equity Interests described in Article II. Section H.10. of the Plan.

"**Class 11**" means the class of Claims or Equity Interests described in Article II. Section H.11. of the Plan.

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Case.

"**Confirmation Order**" means that certain *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943], as conformed in accordance with the Fifth Circuit's rulings.

017356

HCMLPHMIT00000798

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

"**Dugaboy Note**" means that certain Promissory Note dated May 31, 2017, in the original face amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

"**Final Court Approval Date**" means the date on which the Bankruptcy Court Order becomes a Final Order.

"**Final Order**" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Highland Entities, as applicable, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

"**Gatekeeper**" means the gatekeeping provision contained in Article IX. F of the Plan as of August 11, 2021.

"**Governmental Authority**" means any federal, provincial, state, local or foreign government or political subdivision thereof, court of competent jurisdiction, administrative agency, judicial or arbitral body, or commission or other governmental or regulatory authority or instrumentality.

"**Highland Released Parties**" means collectively (i) the Highland Entities, (ii) any Affiliate of any Highland Entity and any Person directly or indirectly majority-owned by any Highland Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any Highland Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i)-(iii), collectively, the "**Highland Parties**"), (iv) each of the Highland Parties' current and former trustees and administrators (including the trustees of any of the Claimant Trust, the Litigation Sub-Trust, or the Indemnity Trust), officers, executives, agents, directors, advisors, advisory representatives, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, (v) the current and former members of the Oversight Board of the Claimant Trust in any capacity (including Richard Katz) and their Affiliates, ~~including~~(vi) Farallon Capital Management, LLC, Stonehill Capital Management, LLC, Muck Holdings LLC, and Jessup Holdings LLC, ~~(vi)~~ in each case, in any capacity, (vii) the Independent Board and its members John Dubel, James P. Seery, Jr., and Russell Nelms, (~~vii~~viii) James P. Seery, Jr., individually and in all capacities for any Highland Released Party, including as Chief Executive Officer of Highland Capital Management, L.P., Claimant Trustee of the Claimant Trust, and the Indemnity Trust Administrator of the Indemnity Trust, (~~viii~~ix) Marc S. Kirschner, individually and as Trustee of

017357

HCMLPHMIT00000799

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

the Litigation Sub-Trust, (ix~x~) the Committee and each of its members, (x~xi~) the professionals (and their respective firms) (a) retained by Highland or the Committee during the Bankruptcy Case or which provided services to Highland or the Committee during the Bankruptcy Case or (b) retained by any Highland Released Party on or after August 11, 2021, (xi~xii~) any Person indemnified by any Highland Party (the Persons described in clauses (i)-(xi~xii~), collectively, the "**Highland Covered Parties**"), and (xii) each Highland Covered Party's current and former officers, executives, agents, ~attorneys (and their respective firms),~ directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "Highland Covered Parties;" <u>provided</u>, <u>however</u>, and for the avoidance of doubt, and without in any way limiting the scope of the foregoing, "Highland Covered Parties" shall include Highland CLO Funding, Ltd., Highland HCF Advisor, Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Multi Strategy Credit Fund GP, L.P., Highland Multi Strategy Credit GP, LLC, Highland Multi Strategy Credit Fund, Ltd., Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., Highland Select Equity Fund, L.P., Highland Restoration Capital Partners Master, L.P., Highland Restoration Capital Partners GP, LLC, Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Offshore Director, LLC, Acis CLO Management, LLC, Neutra, Ltd., Pollack, Ltd., Acis CLO Management Holdings, L.P., Acis CLO Management Intermediate Holdings I, LLC, Acis CLO Management Intermediate Holdings II, LLC, Acis CLO Assets Holdings Limited, CHG Houston Holdings, LLC, Penant Management, L.P., Penant Management GP, LLC, Gunwale, LLC, HE Capital, LLC, Gleneagles CLO, Ltd., Aberdeen Loan Funding, Ltd. Highland Argentina Regional Opportunity Fund GP, LLC, Highland Argentina Regional Opportunity Fund, L.P., Highland Argentina Regional Opportunity Fund, Ltd., Highland Argentina Regional Opportunity Master Fund, L.P., Highland Latin America Consulting, Ltd., Highland Capital Management Korea Limited, Highland Capital Management Latin America, L.P., Highland Latin America GP, Ltd., Highland Latin America LP, Ltd., Highland Offshore Partners, L.P. (Diversified), Brentwood CLO, Ltd., Eastland CLO, Ltd., Bristol Bay Funding Ltd., Jasper CLO Ltd., Highland Legacy Limited, Grayson CLO, Ltd., Greenbriar CLO, Ltd., Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Liberty CLO, Ltd., Valhalla CLO, Ltd., Stratford CLO Ltd., Southfork CLO, Ltd., Pam Capital Funding, L.P., Stonebridge-Highland Healthcare Private Equity Fund, Pamco Cayman Ltd., Red River CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Westchester CLO, Ltd. Longhorn Credit Funding, LLC, PensionDanmark Pensionsforsikringsaktieselskab, Highland Dynamic Income Master Fund L.P., Highland Dynamic Income Fund GP, LLC, Highland Dynamic Income Fund, L.P., Highland Dynamic Income Fund, Ltd., Highland JHT Holdings, LLC, Highland Prometheus Master Fund, L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland Sunbridge GP, LLC, Trussway Holdings, LLC, Trussway Industries, LLC, TW Company, Inc., T-Way Investments, LLC, SSP Holdings, LLC, Highland Flexible Income UCITS Fund, and Acis CLO 2017-7, Ltd.  *Notwithstanding the forgoing or anything herein to the contrary*, none of "Highland Released Parties", "Highland Parties", nor "Highland Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, ~or claiming through, under or on behalf of,~ any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner and none of such Persons are released from any Claim by any Person in connection with this Agreement.

017358
HCMLPHMIT00000800

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

"**HMIT Class 10 Interest**" means the unvested, contingent Class 10 interest in the Claimant Trust (a) to be allowed on account of HMIT's pre-petition equity interest in Highland, and (b) subject to the terms and conditions, as applicable, of the Plan, the Plan Documents, the Claimant Trust Agreement, and in accordance with this Agreement, and applicable law.

"**HMIT Note**" means that certain Secured Promissory Note dated December 21, 2015, in the original face amount of $63,000,000 from HMIT, as maker, and Highland, as payee.

"**HMIT Note Claims**" means any Claim related to, in connection with or arising out of the HMIT Note.

"**HMIT Released Parties**" means collectively (i) the HMIT Entities, (ii) any Affiliate of any HMIT Entity and any Person directly or indirectly majority owned by any HMIT Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any HMIT Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i) – (iii), collectively, the "**HMIT Parties**"), (iv) each of the HMIT Parties' current and former trustees, administrators, officer, executives, agents, directors, advisors, consultants, manager, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns (v) the professionals (and their respective firms (a) retained by any HMIT Party during the Bankruptcy Case or which provided services to any HMIT Party during the Bankruptcy Case or (b) retained by any HMIT Released Party on or after August 11, 2021, (vi) any Person indemnified by any HMIT Party (the Persons described in clauses (i) – (vi), collectively, the "**HMIT Covered Parties**"), and (vii) each HMIT Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "HMIT Covered Parties." *Notwithstanding the forgoing*, none of "HMIT Released Parties", "HMIT Parties", nor "HMIT Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner, and none of such Persons are released from any Claims by any Person in connection with this Agreement.

"**Indemnity Trust Administrator**" has the meaning given to it in the Indemnity Trust Agreement.

"**Indemnity Trust Agreement**" means that certain *Second Amended and Restated Indemnity Trust Agreement of the Indemnity Trust* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of [April 28], 2025, by and among the Claimant Trust, as grantor, James P. Seery, Jr., as indemnity trust administrator, and Wilmington Trust, National Association, a national banking association, as indemnity trustee and Delaware trustee.

"**Indemnity Trust Assets**" has the meaning set forth in the Indemnity Trust Agreement, but excluding Highland, the Claimant Trust, and their respective assets.

017359
HCMLPHMIT00000801

"**Independent Board**" means the independent board appointed by the Bankruptcy Court on January 9, 2020, pursuant to that certain *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 339].

"**Kirschner Claims**" means all Claims and causes of action that were asserted or could have been asserted by the Litigation Trustee of the Litigation Sub-Trust, in the Amended Complaint.

"**Liability**" means any liability, debt, obligation, loss, damage, claim, cost or expense (including costs of investigation and defense and attorney's fees, costs and expenses), in each case, whether direct or indirect, whether accrued or contingent, whether or not involving a third-party claim, and including incidental and consequential damages and diminution of value.

"**Litigation Protections**" means, individually and collectively, the rights, duties, and obligations set forth in ~~Section~~Sections 1 – 2 and Sections 9 - 16.

"**Litigation Sub-Trust**" means the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act.

"**Litigation Sub-Trust Agreement**" means that certain Litigation Sub-Trust Agreement of the Litigation Sub-Trust (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 16, 2021, by and among James P. Seery, Jr., as Claimant Trustee of the Claimant Trust, Wilmington Trust, National Association, a national banking association, as Delaware Trustee, and the Litigation Trustee.

"**Litigation Trustee**" means Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust.

"**LPA**" means that certain *Sixth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), dated as of October 4, 2021.

"Operating Expenses" means ~~the expenses of operation and administration of the Highland Entities except for the Indemnity Trust~~, except for the expenses of the Indemnity Trust (including any payments to Trust Indemnified Parties or Indemnified Parties (in each case, as defined, and pursuant to the terms and conditions set forth, in the Indemnity Trust Agreement)), the expenses of operating and administering the Highland Entities, including legal expenses, employee compensation, Claimant Trustee/CEO and other trust and trustee related compensation, incentive compensation, and customary general and administrative expenses.

"**Original Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* attached as Exhibit A to the *Order (A) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as modified) and (B) Granting Related Relief*, filed at Docket No. 1943 on the Bankruptcy Court's docket.

"**Oversight Board**" means the oversight board of the Highland Claimant Trust.

017360

HCMLPHMIT00000802

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

"**Pending Litigation**" means (i) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including *Hunter Mountain Investment Trust's Emergency Motion for Leave to File Adversary Proceeding* filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating there); (ii) *Dugaboy Investment Trust v. Highland Cap. Mgmt, L.P.*, 3:24-cv-01531-X (N.D. Tex.) (only as to HMIT), and (iii) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:24-cv-01786-L (N.D. Tex.).

"**Permitted Investments**" has the meaning set forth in the Indemnity Trust Agreement.

"**Person**" means any natural person, partnership, limited liability partnership, corporation, limited liability company, association, joint stock company, trust, estate, joint venture, unincorporated organization or Governmental Authority.

"**Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* as conformed in accordance with the Fifth Circuit's rulings.

"**Plan Documents**" has the meaning given to it in the Plan.

"**Plan Protections**" means, collectively, the provisions of the Plan contained in Article IX thereof.

"**Pro Rata**" means the proportion that (a) the allowed amount of a particular Claim or Equity Interest in Class 10 bears to (b) the aggregate allowed amount of all Claims or Equity Interests in Class 10.

"**Threats**" means any written threats of legal action, legal demands, filed complaints, petitions for pre-suit discovery, suits, litigations, arbitrations, actual or threatened restraining orders or injunctions made in writing, or similar written actions of any kind, or sworn statements evidencing the same, in any forum against any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), excluding any such action that would otherwise be a Threat except that any applicable ~~Statute~~statute of ~~Limitations~~limitations that could be applicable to such action has expired.

"**Threats Notice**" means the written notice of any Threats ~~made~~received by the Indemnity Trust with respect to any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), that is hereby required to be provided by ~~such Party~~the Indemnity Trust to the HMIT Entities, within ~~Five~~five (5) ~~business days~~Business Days after receipt of such Threat.

## RECITALS

**WHEREAS**, as of the Petition Date, HMIT held Class B and Class C Limited Partnerships Interests in Highland;

**WHEREAS**, on December 21, 2015, HMIT entered into the HMIT Note with Highland, which had a total outstanding principal balance of Fifty-Seven Million Six Hundred Ninety

017361
HCMLPHMIT00000803

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Thousand Six Hundred Forty and 95/100 Dollars ($57,690,640.95) as of the Petition Date (the "**HMIT Note Balance**");

WHEREAS, HMIT's Class B and Class C Limited Partnership Interests in Highland were extinguished on August 11, 2021, in accordance with the Plan;

WHEREAS, pursuant to the LPA, HMIT's capital account balance at Highland on account of its Class B and Class C Limited Partnership Interests on the Petition Date was Three Hundred Ninety-Four Million Six Hundred Thirty Thousand Eight Hundred Seventy-One and 53/100 Dollars ($394,630,871.53) (the "**HMIT Capital Account Balance**");

WHEREAS, some or all of the HMIT Entities have asserted certain Claims against certain Highland Entities and certain other Highland Covered Parties, including those asserted in the Pending Litigation;

WHEREAS, certain distributions to be made to the holders of allowed Class 10 Claims or Equity Interests pursuant to the terms and subject to the conditions set forth herein are premised on the consent of certain Highland Covered Parties in their capacity as Holders of Class 9 Interests, and such Persons are only willing to provide such consent in exchange for the releases as set forth in this Agreement;

WHEREAS, some or all of the Highland Entities have asserted certain Claims against certain HMIT Entities, including the HMIT Note Claims;

WHEREAS, the Parties wish to terminate, extinguish, and release any and all rights, duties, obligations and Claims that (a) any of the Highland Released Parties owed or have, or may have owed or have, to or with respect to any of the HMIT Released Parties, and (b) any of the HMIT Released Parties owed or have, or may have owed or have, to or with respect to any of the Highland Released Parties, as provided in this Agreement (collectively, the "**Rights and Obligations**");

WHEREAS, the Parties agree that the Litigation Protections are intended to enact a permanent cessation of all litigation concerning or related to the Highland Released Parties through and including the Agreement Date; and

WHEREAS, the Parties, individually and collectively, wish to (a) resolve all disputes between and/or among any of the Highland Entities and their respective indemnitees, on the one hand, and any of the HMIT Entities, on the other hand, including those asserted or attempted to be asserted in the Pending Litigation, (b) fix and allow HMIT's Class 10 Interest at the amount and on the terms provided herein; and (c) terminate, extinguish, and release all Rights and Obligations on the terms provided herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

1.     ~~Abatement~~Stay and Dismissal of Pending Litigation With Prejudice.

017362

HCMLPHMIT00000804

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

(a)     Within ~~three (3~~five (5) Business Days after the Agreement Date, the HMIT Entities shall take all steps necessary (at their own cost) to ~~abate~~stay the Pending Litigation.

(b)     Within ~~three (3~~five (5) Business Days after the Bankruptcy Court Approval Date, the HMIT Entities shall take all steps necessary (at their own cost) to dismiss the Pending Litigation with prejudice.

2.      <u>Maintenance of ~~Abatement~~Stay and Dismissal of Certain Defendants from the Amended Complaint</u>.

(a)     The Litigation Trustee shall continue to maintain the ~~abatement~~stay of Adv. Proc. No. 21-03076-sgj and all related proceedings arising therefrom through the Bankruptcy Court Approval Date. Within ~~three (3~~five (5) Business Days after the Bankruptcy Court Approval Date, the Litigation Sub-Trust shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand PE from Counts I, II, III, and XXIV of the Amended Complaint.

3.      <u>Cash Payment to HMIT</u>.  ~~In consideration for the dismissal of the Pending Litigation, within three (3~~Within five (5) Business Days following the Bankruptcy Court Approval Date, Highland shall pay HMIT a one-time, lump sum of Five Hundred Thousand Dollars (US$500,000.00) (the "**Payment**") by wire transfer:

[wire instructions]

4.      <u>HMIT Class 10 Interest</u>.

(a)     Subject to entry of the Bankruptcy Court Order, and the terms of this Agreement, the HMIT Class 10 Interest shall be deemed allowed in the amount of Three Hundred Thirty-Six Million Nine Hundred Forty Thousand Two Hundred Thirty and 58/100 Dollars (US$336,940,230.58), which amount represents the HMIT Capital Account Balance, <u>less</u> the HMIT Note Balance.

(b)     Notwithstanding anything to the contrary in the Plan or the Claimant Trust Agreement, as an integral part of this Agreement to consent to the allowance of the HMIT Class 10 Interest and the other considerations in this Agreement, HMIT shall not be deemed, and no holder of the HMIT Class 10 Interest shall be, a Claimant Trust Beneficiary or a "Beneficiary" under the Claimant Trust Agreement, and the Highland Released Parties, individually and collectively, shall owe no duty to any HMIT Releasor (whether contractual, fiduciary, equitable, statutory or otherwise), including with respect to the HMIT Class 10 Interest, in each case, except as expressly set forth in this Agreement.  Furthermore, without limiting the foregoing and for the avoidance of doubt, the contractual right of the holder of the HMIT Class 10 Interest to receive or recover any payments or Indemnity Trust Assets from the Indemnity Trust as set forth in this Agreement or the Indemnity Trust Agreement does not make any HMIT Releasor or any other Person a beneficiary of the Indemnity Trust or under the Indemnity Trust Agreement.

(c)     Notwithstanding anything to the contrary in the Plan, the Claimant Trust Agreement or the Indemnity Trust Agreement, in no event shall HMIT sell, transfer, assign, pledge, hypothecate, participate or otherwise dispose of <u>or encumber</u> the HMIT Class 10 Interest

017363

HCMLPHMIT00000805

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

or any rights (including any right to payment) with respect thereto (collectively, a "**Class 10 Assignment**"), and any attempted Class 10 Assignment shall be null and void.

(d)     For the avoidance of doubt, the HMIT Class 10 Interest is and shall remain senior to the not yet allowed, unvested contingent Class 11 Claims of Equity Interests as provided for in the Plan, the Plan Documents, and the Claimant Trust Agreement.

5.     <u>Initial Interim Distributions on the Allowed Class 10 Interests.</u>

(a)     Within ten (10five (5) Business Days after the Bankruptcy Court Approval Date, the Indemnity Trust shall distribute (the date on which such distribution is made, the "**Initial Interim Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of TwelveTen Million Dollars (US$1210,000,000.00) (the "**Initial Interim Cash Distribution Amount**").

(b)     HMIT shall deposit and hold Ten Million Dollars (US$10,000,000) of the Initial Interim Cash Distirbution Amount in an interest bearing escrow account (the "**HMIT Escrow Account**") pending the Final Court Approval Date.

(c)(b)     Within ten (10five (5) Business Days after the Bankruptcy Court Approval Date ("(the "**Note Assignment Date**"), the Highland Entities shall cause the portion of the Dugaboy Note held by the Highland Entities to be assigneddistributed to HMIT in-kind and take all actions necessary for HMIT to become the holder of such portion of the Dugaboy Note, and shall in addition pay to HMIT cash in the aggregate amount of all principal and interest payments actually received on the Dugaboy Note by the the Highland Entities, including the Indemnity Trust as of, from the Agreement Date to the Note Assignment Date.  Prior to the Bankruptcy Court Approval Date, HMIT will engage an independent valuation service provider to value the Dugaboy Note for purposes of determining the magnitude of reduction to the outstanding allowed Class 10 Interests on account of such in-kind distribution, which shall not be less than Fifty percent (50%) of the current balance owed under the Dugaboy Note. The HMIT Entities acknowledge and agree that none of the Highland Entities are representing or warranting that the Dugaboy Note can be sold, or the price, if any, that could be received for the Dugaboy Note and further acknowledge and agree that any such purchase price may be de minimis.

6.     <u>Subsequent Distribution(s) on the Allowed Class 10 Interests.</u>

(a)     On December 1, 2027, the Indemnity Trust shall distribute (such distribution, collectively, the "**First Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**First Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests: cash in the aggregate amount of EightFive Million Dollars (US$85,000,000.00).  .  HMIT shall deposit and hold Six Million Dollars (US$6,000,000) of the First Subsequent Distribution in the HMIT Escrow Account pending the Final Court Approval Date.

(b)     On DecemeberDecember 1, 2028, the Indemnity Trust shall distribute (such distribution, collectively, the "**Second Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**Second Subsequent Distribution Date**") Pro Rata to the

017364
HCMLPHMIT00000806

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of ~~Eight~~Five Million Dollars (US$~~8~~5,000,000.00).

~~(c)      HMIT shall deposit and hold Six Million Dollars (US$6,000,000) of the Second Subsequent Distribution in the HMIT Escrow Account pending the Final Court Approval Date.~~

~~(d)~~(c)  Notwithstanding anything herein to the contrary, the obligations of the Indemnity Trust to make the First Subsequent Distribution or Second Subsequent Distribution is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII, Section 8.1(c) of the Indemnity Trust Agreement that the Indemnity Trust Assets comprising such distributions are not reasonably necessary to satisfy current or potential Indemnification Obligations (as defined in the Indemnity Trust Agreement) to all persons who are or might become Beneficiaries (as defined in the Indemnity Trust Agreement).

7.      Final Distribution on the Allowed Class 10 Interests.

(a)      On the later of the Final Court Approval Date and April 1, 2029, the Indemnity Trust will distribute all excess remaining Indemnity Trust Assets in accordance with Article VIII of the Indemnity Trust Agreement; provided, however, that the obligation of the Indemnity Trust to make any such distributions and/or dissolve and wind up the affairs of the Indemnity Trust is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII of the Indemnity Trust Agreement that (1) a Final Order(s) (as defined in the Indemnity Trust Agreement) has been entered resolving all litigation, claims or proceedings in any forum of any kind which could give rise to Indemnity Obligations (as defined in the Indemnity Trust Agreement) and payment in full of all such Indemnity Obligations and (2) all applicable statutes of limitations and any applicable tolling of such statutes of limitation have expired.

(b)      The Indemnity Trust agrees to not use Indemnity Trust Assets to fund Operating Expenses.

(c)      Following the Bankruptcy Court Approval Date, at the request of Mark Patrick, solely in his capacity, and to the extent he remains, as administrator of HMIT, but not more often than quarterly, Highland and the Indemnity Trust Administrator agree to review (i) the status of their respective assets, (ii) the balance of cash held, (iii) the status of any claims made for indemnification and any resolutions thereof, (iv) the status of any litigation, and (v) forecasted operating expenses with Mr. Patrick, and will each work in good faith to reduce operating expenses where reasonably practicable; provided, however, that all such reporting shall be subject to Mr. Patrick's agreement to maintain confidentiality with respect to any non-public information.

8.      Transfer Kirschner Claims; Dismissal of HMIT Note Claims.

(a)      ~~In consideration of the dismissal of the Pending Litigation and the releases provided herein, within ten (10~~Within five (5) Business Days after the Bankruptcy Court Approval Date, but after the dismissal provided for in Section 2, the Litigation Sub-Trust shall execute ~~an~~a short-form assignment in ~~the form attached hereto as Exhibit [_]~~ in favor of the HMIT Entities transferring all of the Litigation Sub-Trust's right, title, and interest in and to the Kirschner Claims

017365

HCMLPHMIT00000807

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

(the "**Kirschner Transfer**"). Such assignment shall be in a form mutually acceptable to the Parties and its substance shall be consistent with the terms, conditions and limitations set forth in this Agreement, including Section 8(b) below. Each HMIT Entity acknowledges and agrees that none of the Highland Entities will have any duty or obligation to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof, except as provided in this Agreement, including without limitation the terms of Section 8(c) below.

(b)     THE HMIT ENTITIES SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THE LITIGATION SUB-TRUST IS TRANSFERRING THE KIRSCHNER CLAIMS ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT THE HMIT ENTITIES ARE NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM THE HIGHLAND ENTITIES OR THEIR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE KIRSCHNER CLAIMS AND AMENDED COMPLAINT, INCLUDING WITH RESPECT TO THE ENFORCEABILITY, TRANSFERABILITY, VIABILITY, STRENGTH, OR VALUE OF ANY OF THE KIRSCHNER CLAIMS OR THE AMENDED COMPLAINT.  The HMIT Entities hereby specifically acknowledge that they have carefully reviewed this Section and have had the opportunity to discuss its import with legal counsel and that the provisions of this Section are a material part of this Agreement.  Thus, if for any reason HMIT is precluded from or is otherwise unable to prosecute all or any of the Kirschner Claims, (i) the HMIT Releasors shall have no recourse against theany Highland Released Parties whatsoever and shall not be entitled to compensation of any kind, it being agreed that the HMIT Entities are otherwise receiving adequate consideration for the duties and obligations they are undertaking pursuant to this Agreement and (ii) there will be no effect whatsoever on the validity and enforceability of this Agreement or any of the other transactions contemplated hereby.

(c)     As promptly as reasonably practicable following the Bankruptcy Court Approval Date, the Highland Entities shall provide to the HMIT Entities electronic copies of written discovery requests and responses thereto, and documents produced in discovery in respect of the Kirschner Claims and the Amended Complaint.  The Highland Entities will not provide any other documents regarding the Kirschner Claims including any attorney-client communications and any documents subject to the attorney work-product doctrine or similar privileges or immunities concerning the Kirschner Claims (collectively, the "**Kirschner Privileges**"), it being understood and agreed that the Highland Entities are retaining, and not transferring or waiving, the Kirschner Privileges.

(d)     Each Party acknowledges and agrees that if (a) the Kirschner Transfer is found or deemed to be impermissible or invalid, for any reason, or (b) the Final Court Approval Date does not occur, the Kirschner Claims and Amended Complaint will revert to, and remain an asset of, the Litigation Sub-Trust.

9.     <u>General Release By The HMIT Entities</u>. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the HMIT Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its and their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other

017366
HCMLPHMIT00000808

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the HMIT Entities, the "**HMIT Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each Highland Released Party from, and waives and relinquishes, any and all Claims, which the HMIT Releasors, or any Person claiming through, under, or on behalf of any of the HMIT Releasors, ever had, now has, or hereafter can, shall, or may have against any of the Highland Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Agreement Date, including any fact, matter, transaction, or occurrence asserted by any HMIT Entity in the Pending Litigation or in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the Highland Released Parties, or the Highland Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**HMIT Entity Released Claims**").

10.    General Release By The Highland Entities. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the Highland Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its or their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise)() and all Persons claiming through, under or on their behalf (collectively with the Highland Entities, the "**Highland Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, any and all Claims which the Highland Releasors, or any Person claiming through, under, or on behalf of any of the Highland Releasors, ever had, now has, or hereafter can, shall, or may have against any of the HMIT Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Bankruptcy Court Approval Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the HMIT Released Parties, or the HMIT Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**Highland Released Claims**").

11.    Further Provisions Concerning The General Releases.

(a)    FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASES ARE INTENDED TO BE GENERAL AND INCLUDE A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE AGREEMENT DATE.

(b)    To the maximum extent permitted by law, each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland

4923-8662-5850.9 36027.003

13

017367

HCMLPHMIT00000809

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Releasors, respectively, waives the benefit of any statute or other principle of law or equity that limits the applicability of a release with respect to Claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release.

(c)    Without limiting the scope of the foregoing waiver, in connection with the foregoing release, each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefits of Section 1542 of the California Civil Code (to the extent, if any, that Section 1542 might apply to the foregoing release), which provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees that the provisions of Section 1542 of the Civil Code of the State of California and all similar federal or state law, rights, rules or legal principles, legal or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY EACH OF THE HMIT ENTITIES AND THE HIGHLAND ENTITIES, ON THEIR OWN BEHALF AND ON BEHALF OF THE OTHER HMIT RELEASORS AND HIGHLAND RELEASORS, RESPECTIVELY,** in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

In connection with such waiver and relinquishment, each of the HMIT Entities and Highland Entities acknowledges that it is aware that it may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein. Nevertheless, it is the intent of each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, in executing this Agreement fully, finally, and forever to settle and release all such matters, and all Claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

(d)    As an integral component of this Agreement, and notwithstanding the Parties' intent set forth in the preamble hereto and the general nature of the releases in Sections 9 and 10, should:

(i)    any HMIT Releasor contend or assert that any Claim of any kind whatsoever held by any HMIT Releasor against any Highland Released Party survives this

017368

HCMLPHMIT00000810

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Agreement and is in any way related to or arising from or in connection with any HMIT Entity Released Claim (such claim or cause of action, a "**HMIT Alleged Claim**"), such HMIT Releasor will be deemed to have irrevocably, fully, and finally assigned such HMIT Alleged Claim to the Highland Entities and the Highland Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such HMIT Alleged Claim.

(ii)    any Highland Releasor contend or assert that any Claim of any kind whatsoever held by any Highland Releasor against any HMIT Released Party survives this Agreement and is in any way related to or arising from or in connection with any Highland Entity Released Claim (such claim or cause of action, a "**Highland Alleged Claim**"), such Highland Releasor will be deemed to have irrevocably, fully, and finally assigned such Highland Alleged Claim to the HMIT Entities and the HMIT Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such Highland Alleged Claim.

12.    <u>Covenant Not To Sue; Limitation on Standing</u>. Upon the Agreement Date:

(a)    Each of the HMIT Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the Highland Released Parties, to recover, enforce, investigate, or collect any HMIT Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(b)    Each of the Highland Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the HMIT Released Parties, to recover, enforce, investigate, or collect any Highland Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(c)    For the avoidance of doubt, this Agreement shall not operate to give any HMIT Entity standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except for the limited purpose of seeking Court approval of this Agreement (including with respect to any appeal concerning any order entered granting or denying such approval), and except for the limited purpose of enforcing this Agreement, no HMIT Entity shall commence any Action in connection with the HMIT Class 10 Interest.

13.    <u>Representations and Warranties</u>.

(a)    Each of the HMIT Entities hereby represents and warrants that every HMIT Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any HMIT Releasor.

(b)    The HMIT Entities, on their own behalf and on behalf of the other HMIT Releasors, acknowledge and agree that each Plan Provision is lawful, effective, and binding on the HMIT Releasors. The HMIT Entities further agree, on their own behalf and on behalf of the other HMIT Releasors, that the HMIT Releasors will never, in any way, challenge or seek to modify, nullify, vacate, or revoke, or induce, encourage or direct any other Person to do so or act in concert with or assist (financially or otherwise) any other Person in doing so the Confirmation Order, the

017369
HCMLPHMIT00000811

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Plan, the Plan Protections, or any Plan Document, including the Claimant Trust Agreement, the LPA, the Indemnity Trust Agreement or the Litigation Sub-Trust Agreement, in the Bankruptcy Court, in any other state or federal court, in any other forum or tribunal, or otherwise, including administrative or regulatory tribunals and foreign courts.

(c)    Each of the Highland Entities hereby represents and warrants that every Highland Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any Highland Releasor.

(d)    Each Party severally represents and warrants as to itself only that: (i) it has taken all necessary action to authorize and approve the execution, delivery and performance of this Agreement; (ii) such Party has full power and authority to execute and deliver this Agreement; and (iii) this Agreement constitutes a valid, legal and binding obligation of such Party, and is enforceable subject to its terms.  Each individual signatory hereto individually warrants and represents to all Parties hereto that such individual has full power and authority to act on behalf of and bind the Party for which he or she has executed this Agreement; provided, however that no signatory shall otherwise provide any warranty or representation or otherwise be a party to this Agreement on an individual basis.

14.    <u>No Continuing Rights, Duties or Obligations</u>.  Except for the rights, duties, and obligations expressly set forth in this Agreement, all Rights and Obligations that existed or may have existed shall be deemed terminated, extinguished, and released upon the Agreement Date. For the avoidance of doubt, from and after the Agreement Date, (a) the Highland Released Parties, individually and collectively, shall owe no duty, past or present, including with respect to the Kirchner Claims, to the HMIT ~~Releasors~~Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement, and (b) the HMIT Released Parties, individually and collectively, shall owe no duty to the Highland ~~Releasors~~Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement.

15.    <u>Gatekeeper Standard</u>.

(a)    The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that, notwithstanding the United States Court of Appeals for the Fifth Circuit's decision in *Highland Capital Management Fund Advisors, L.P. v. Highland Capital Management, L.P.*, No. 23-10~~53~~4 (5th Cir. Mar. 18, 2025), the "Gatekeeper" provisions contained in Highland's Original Plan is forever binding on each of the HMIT Entities <u>and any Persons claiming through, under or on behalf of any of them,</u> and for a claim or cause of action to be  "colorable" for purposes of the Gatekeeper, it must be found by final order of the Bankruptcy Court (the "**Gatekeeper Court**"), which order shall be subject to appeal to a court of competent jurisdiction, to have satisfied the "Gatekeeper Colorability Test" as such term is defined in *In re Highland Capital Management, L.P.*, 2023 Bankr. LEXIS 2104 at *124-36 (Bankr. N.D. Tex. Aug. 24, 2023).

(b)    The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that compliance with the Gatekeeper requires (i) a motion seeking leave to sue an Exculpated Party

017370

HCMLPHMIT00000812

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

(as that term is defined in Highland's original Plan) and a finding that the litigant's claims and causes of action are "colorable" attaching a complaint setting forth the basis for such claims or causes of action and (ii), in the Gatekeeper Court's sole discretion, an evidentiary hearing (during which the Gatekeeper Court may, among other things, hear testimony and assess the credibility of any witness(es)) to determine whether a proposed claim or cause of action is "colorable."

(c)    The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, further acknowledge and agree that the moving party under the Gatekeeper has the burden of satisfying the "Gatekeeper Colorability Test." and that the dismissal of the Pending Litigation shall have res judicata effect.

16.    <u>Indemnification</u>.

(a)    Without in any manner limiting the available remedies for any breach of this Agreement, the HMIT Entities, severally but not jointly, agree to indemnify, defend, and hold the Highland Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any HMIT Entity set forth in <u>Section 13</u> or (y) any Actions brought or prosecuted by or on behalf of, any HMIT Releasor or that are induced, encouraged, assisted  or directed by any HMIT Releasor or brought or prosecuted in concert with any HMIT Releasor against any Highland Released Party with respect to or related to any HMIT Entity Released Claims.  Without limiting the scope of the foregoing in any manner, any HMIT Entity that breaches <u>Section 12</u> shall be liable to the Highland Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such Highland Released Party in defending against or otherwise responding to such Action.  Each HMIT Entity acknowledges and agrees that the HMIT Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

(b)    Without in any manner limiting the available remedies for any breach of this Agreement, the Highland Entities, severally but not jointly, agree to indemnify, defend, and hold the HMIT Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any Highland Entity set forth in <u>Section 13</u> or (y) any suits, proceedings, or other actions brought or prosecuted by or on behalf of, any Highland Releasor or that are induced, encouraged, assisted  or directed by any Highland Releasor or brought or prosecuted in concert with any Highland Releasor against any HMIT Released Party with respect to or related to any Highland Entity Released Claims.  Without in any manner limiting the scope of the foregoing, any Highland Entity that breaches <u>Section 12</u> shall be liable to the HMIT Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such HMIT Released Party in defending against or otherwise responding to such action.  Each Highland Entity acknowledges and agrees that the Highland Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

017371

HCMLPHMIT00000813

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

17. <u>Execution</u>. This Agreement may be executed by the exchange of signatures by facsimile or by PDF attachment to an email transmittal and in counterparts, and if so executed, shall be fully executed when a counterpart has been executed and delivered by all Parties hereto through counsel. All counterparts taken together shall constitute one and the same agreement and shall be fully enforceable as such.

18. <u>Bankruptcy Court Order</u>. The allowance of This Agreement and the allowed HMIT Class 10 Interest pursuant to Section 4 transactions contemplated hereby is subject to the entry of the Bankruptcy Court Order. To that end, the Highland Entities shall file the 9019 Motion no later than five (5) Business Days after the Agreement Date. Each Party shall, and shall cause each of their respective Affiliates to, undertake any and all actions in compliance with applicable law to obtain the Bankruptcy Court Order as promptly as practicable, and without limiting the foregoing, if an Action is threatened or instituted by any Person opposing the 9019 Motion or otherwise challenging the validity or legality, or seeking to restrain the consummation, of the transactions contemplated by this Agreement or the Bankruptcy Court Order, each Party shall, and shall cause its respective Affiliates to, use their commercially reasonable best efforts to avoid, resist, resolve or, if necessary, and defend to effectuate this Agreement and consummate the transactions hereby. If the 9019 Motion is not approved by entry of the Bankruptcy Court Order or if the Bankruptcy Court Approval is precluded from becoming a Final Order, (a) there will be no affect on, adjustment to, or impairment of, in any way, the validity and enforceability of the remainder of this Agreement, and the other transactions contemplated hereby, all of which shall remain in full force and effect and (b) each Party shall, and shall cause its respective Affiliates to, use their best efforts to seek the allowance of the HMIT Class 10 Interest entry of a Final Order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby in a substantially similar amount form and on substantially similar terms as set forth in Section 4 herein to the fullest extent possible so as to give effect to the original intent of the Parties as closely as possible.

19. <u>Fees and Expenses</u>. Whether or not the transactions contemplated hereby are consummated or the Bankruptcy Court Order is obtained, and except as otherwise expressly provided in this Agreement, each Party will bear its respective fees, costs and expenses (including legal, accounting and other professional fees) incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the transactions contemplated hereby, including with respect to each Party's respective obligations pursuant to <u>Section 18</u>. Notwithstanding the foregoing, if any Party hereto brings an Action to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that Action shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

20. <u>Entire Agreement; No Other Representations</u>. **THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF ANY** ~~PARTY~~**PERSON OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT. THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS (COLLECTIVELY, "<u>REPRESENTATIONS</u>"), EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY**

017372
HCMLPHMIT00000814

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

**HAVE NOT BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT; AND THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT RELIED ON ANY REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY ARE ENTERING INTO THIS AGREEMENT RELYING SOLELY ON THEIR OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS BY ANY PARTY, EXCEPT FOR THOSE REPRESENTATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES AGREE THAT REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT SHALL NOT BE USED IN THE INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT, AND NEITHER THE HMIT RELEASED PARTIES NOR THE HIGHLAND RELEASED PARTIES SHALL HAVE ANY LIABILITY FOR ANY CONSEQUENCES ARISING AS A RESULT OF ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT.**

21.     <u>Agreement and Release Knowing and Voluntary</u>.  The Parties acknowledge that they have considered this Agreement with their respective attorneys and have carefully read this Agreement, that it has been fully explained by their attorneys, and that they have had a reasonable opportunity to consider this Agreement.  The Parties further represent that they know and fully understand the contents of this Agreement, that they intend to be legally bound by this Agreement and the releases and covenants contained herein, and that they are signing this Agreement, including the release provisions herein, voluntarily and of their own free will and without coercion, and with the benefit of advice of counsel.

22.     <u>Cooperation</u>.  The Parties agree to perform any services or actions reasonably necessary to carry out the terms and conditions of this Agreement or the transactions contemplated hereby, including the execution and delivery of reasonable additional documents, instruments, conveyances and/or assurances, in good faith, and to reasonably communicate and cooperate with one another in this regard.  For the avoidance of doubt, nothing in this Section shall obligate the Highland Entities to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof.

23.     <u>Governing Law</u>.  This Agreement shall be construed pursuant to and governed by the laws of the State of Delaware (substantive and procedural) without reference to principles of conflicts of law that would result in the application of any other State's laws.

24.     <u>Jurisdiction/Venue</u>.  The Parties hereby irrevocably submit to the jurisdiction and venue of the Bankruptcy Court with respect to any ~~action or proceeding~~Action arising out of or related to this Agreement or the subject matter hereof; if (and only if) the Bankruptcy Court lacks personal or subject matter jurisdiction to adjudicate an ~~action or proceeding~~Action arising out of or related to this Agreement or the subject matter hereof, then the Parties irrevocably submit to the jurisdiction and venue of the United States District Court for the Northern District of Texas.

25.     <u>No Admissions</u>.  All Parties acknowledge and agree that the matters set forth in this Agreement constitute the settlement and compromise of disputed Claims and that this Agreement shall not constitute the admission of any fact or liability by any of them regarding any Claim, including the Claims released hereunder, and neither the terms hereof, nor the fact of this

017373
HCMLPHMIT00000815

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Agreement itself, shall be evidence of any kind in any Action, other than an Action to enforce the terms of the Agreement or any instrument executed in connection herewith or any claim for damages or other relief for breach of any representation or warranty contained herein or in any instrument executed in connection herewith.

26.    <u>Other Provisions</u>.

(a)    ~~This Agreement contains the entire agreement and understanding of the parties and supersedes any and all prior or contemporaneous agreements, arrangements, and understandings relating to the subject matter of this Agreement.~~  No representation, inducement, agreement, promise or understandings altering, modifying, amending, taking from or adding to, the terms and conditions hereof shall have any force or effect unless the same is in writing and validly executed by each of the Parties hereto.

(b)    The waiver by any Party of any breach of, or default under, any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or default; provided, however, that for any such waiver to be enforceable, it shall be in writing and executed by the non-breaching Party.

(c)    The headings contained in this Agreement are for convenience only and shall in no way restrict or otherwise affect the construction of the provisions hereof.

(d)    The Parties shall each execute all documents and perform all acts necessary and proper to effectuate the terms of this Agreement.

27.    <u>Notices</u>.  All notices required or permitted to be provided hereunder shall be afforded to the respective parties to and through their counsel, and shall be transmitted simultaneously by electronic mail (with PDF attachments, as necessary) and by telefax, addressed as follows:

To the Highland Entities:

**PACHULSKI STANG ZIEHL AND JONES LLP**
Jeffrey N. Pomerantz
John A. Morris
10100 Santa Monica Boulevard
Los Angeles, California 90067-4003
310.277.6910
jpomerantz@pszjlaw.com
jmorris@pszjlaw.com

To the HMIT Entities:

**KELLY HART PITRE**
Louis M. Phillips
Amelia Hurt
301 Main Street, Suite 1600
225.381.9643

017374
HCMLPHMIT00000816

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Louis.Phillips@Kellyhart.com
Amelia.Hurt@Kellyhart.com

28.    Severability. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity and enforceability of any other provision of this Agreement.  For the avoidance of doubt, if any provision of this Agreement is overturned on appeal after the Bankruptcy Court Approval Date, any portion that is not overturned on appeal shall remain in full force and effect.

29.28.    Interpretive Provisions. Unless the express context otherwise requires: (a) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) words defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (c) the words "Dollars" and "$" mean U.S. dollars; (d) references herein to a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement; (e) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words ",without limitation,"; (f) references herein to any gender shall include each other gender; (g) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement; (h) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (i) the word "or" shall be disjunctive but not exclusive; (j) the headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties; and (k) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

*[Signature page follows]*

017375

HCMLPHMIT00000817

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**HUNTER MOUNTAIN INVESTMENT TRUST**

By _____
      Name:     Mark Patrick
      Title:      Administrator
      Date:     May __, 2025

**BEACON MOUNTAIN LLC**

By _____
      Name: _____
      Title: _____
      Date:     May __, 2025

**RAND ADVISORS, LLC**

By _____
      Name:     Mark Patrick
      Title:      President
      Date:     May __, 2025

**RAND PE FUND I, LP**
By: Rand PE Fund Management, LLC, its General Partner

By _____
      Name:     Mark Patrick
      Title:      President
      Date:     May __, 2025

**RAND PE FUND MANAGEMENT, LLC**

By _____
      Name:     Mark Patrick
      Title:      President

017376

HCMLPHMIT00000818

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Date:        May __, 2025

**ATLAS IDF, LP**
By: Atlas IDF GP, LLC, its General Partner

By  _____
    Name:        Mark Patrick
    Title:        President
    Date:        May __, 2025

**ATLAS IDF GP, LLC**

By  _____
    Name:        Mark Patrick
    Title:        President
    Date:        May __, 2025

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By  _____
    Name:        James. P. Seery, Jr.
    Title:        Chief Executive Officer
    Date:        May __, 2025

**HIGHLAND CLAIMANT TRUST**

By  _____
    Name:        James P. Seery, Jr.
    Title:        Claimant Trustee
    Date:        May __, 2025

**HIGHLAND LITIGATION SUB-TRUST**

By  _____
    Name:        Marc S. Kirschner
    Title:        Litigation Trustee

017377

HCMLPHMIT00000819

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Date:        May __, 2025

**HIGHLAND INDEMNITY TRUST**

By   _____
      Name:        James P. Seery, Jr.
      Title:        Indemnity Trust Administrator
      Date:        May __, 2025

017378
HCMLPHMIT00000820

**EXHIBIT 49**

017379

**From:** "John A. Morris" <jmorris@pszjlaw.com>

**To:** "Louis M. Phillips" <louis.phillips@kellyhart.com>

**Cc:** "Jeff Pomerantz" <jpomerantz@pszjlaw.com>, "Amelia L. Hurt"
<Amelia.Hurt@kellyhart.com>

**Subject:** Highland/HMIT: Settlement Agreement (HCMLP comments--5/15, 6:52 pm)

**Date:** Thu, 15 May 2025 22:52:44 +0000

**Importance:** Normal

**Attachments:** Highland_HMIT-Rand_Settlement_Agreement.012(Highland_Draft_05.15.25).docx;
CUMULATIVE_REDLINE_-_HMIT_Settlement_Agreement.pdf;
INCREMENTAL_REDLINE_-_HMIT_Settlement_Agreement.pdf

**Inline-Images:** image001.jpg; image002.png

---

Louis,

Attached is a revised agreement and black lines showing cumulative and incremental changes.

We're continuing to review this, and it remains subject to Claimant Oversight Board review and approval in all
respects, but please let us know if you have any questions or comments.

Regards,

John
**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Houston

HCMLPHMIT00000829

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

## SETTLEMENT AGREEMENT & GENERAL RELEASE

THIS SETTLEMENT AGREEMENT & GENERAL RELEASE (this "**Agreement**") is entered into as of May [[.16, 2025 (the "**Agreement Date**"), by and among Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), the Highland Claimant Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Claimant Trust**"), the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Litigation Sub-Trust**"), and the Highland Indemnity Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Indemnity Trust**", and together with Highland, the Claimant Trust and the Litigation Sub-Trust, the "**Highland Entities**"), on the one hand, and Hunter Mountain Investment Trust, a Delaware statutory trust ("**HMIT**"), Beacon Mountain LLC, a Delaware limited liability company ("**Beacon Mountain**"), Rand Advisors, LLC, a Delaware limited liability company ("**Rand Advisors**"), Rand PE Fund I, LP, a Delaware series limited partnership ("**Rand PE Fund**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**"), Atlas IDF, LP, a Delaware limited partnership ("**Atlas IDF**"), Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP and Atlas IDF, the "**HMIT Entities**"), on the other hand. The Highland Entities and the HMIT Entities are collectively referred to as the "**Parties**," and each individually, as a "**Party**".

## DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Claimant Trust Agreement or the Plan, as applicable (in each case, as hereinafter defined). For purposes of this Agreement, the following capitalized terms have the following meanings:

"**9019 Motion**" means the motion seeking entry of the Bankruptcy Court Order pursuant to Bankruptcy Rule 9019 and in accordance with Section 18.

"**Action**" means any action, claim, demand, arbitration, hearing, charge, complaint, investigation, examination, indictment, litigation, suit or other civil, criminal, administrative or investigative proceedings, including any petition under Rule 202 of the Texas Rules of Civil Procedure.

"**Affiliate**" means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, a specified Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by contract or otherwise.

"**Amended Complaint**" means the *Amended Complaint and Objection to Claims*, filed as docket number 158 in *Kirschner v. Dondero*, Adv. Pro. No. 21-03076-sgj (Bankr. N.D. Tex. May 19, 2022).

"**Bankruptcy Case**" means *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex.) and its related proceedings.

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division.

"**Bankruptcy Court Approval Date**" means the date on which the Bankruptcy Court Order is issued.

"**Bankruptcy Court Order**" means an order of the Bankruptcy Court approving the allowance of the HMIT's Class 10 Interest as provided in this Agreement pursuant to the 9019 Motion.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than (i) a Saturday or a Sunday, (ii) a day on which the Federal Reserve Bank of New York or the New York Stock Exchange is closed, or (iii) a day on which banks in the States of Texas are required, or authorized by law, to close.

"**Claimant Trust Agreement**" means that certain Claimant Trust Agreement of the Claimant Trust (as may have been or may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 11, 2021, by and among Highland, as settlor, James P. Seery, Jr., a Claimant Trustee, and Wilmington Trust, National Association, a national banking association, as Delaware trustee.

"**Claims**" means any claims, debts, liabilities, demands, obligations, breaches of contract, breaches of duty or any relationship, misfeasance, malfeasance, promises, acts, omissions, agreements, liens, losses, costs and expenses (including attorney's fees and related costs), damages, injuries, suits, ~~actions~~Actions, and causes of action of whatever kind or nature, whenever and however, arising, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise.

"**Class 10**" means the class of Claims or Equity Interests described in Article II. Section H.10. of the Plan.

"**Class 11**" means the class of Claims or Equity Interests described in Article II. Section H.11. of the Plan.

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Case.

"**Confirmation Order**" means that certain *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943], as conformed in accordance with the Fifth Circuit's rulings.

4923-8662-5850.9 36027.003

017382

HCMLPHMIT00000831

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

"**Dugaboy Note**" means that certain Promissory Note dated May 31, 2017, in the original face amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

"**Final Court Approval Date**" means the date on which the Bankruptcy Court Order becomes a Final Order.

"**Final Order**" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Highland Entities, as applicable, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

"**Gatekeeper**" means the gatekeeping provision contained in Article IX. F of the Plan as of August 11, 2021.

"**Governmental Authority**" means any federal, provincial, state, local or foreign government or political subdivision thereof, court of competent jurisdiction, administrative agency, judicial or arbitral body, or commission or other governmental or regulatory authority or instrumentality.

"**Highland Released Parties**" means collectively (i) the Highland Entities, (ii) any Affiliate of any Highland Entity and any Person directly or indirectly majority-owned by any Highland Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any Highland Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i)-(iii), collectively, the "**Highland Parties**"), (iv) each of the Highland Parties' current and former trustees and administrators (including the trustees of any of the Claimant Trust, the Litigation Sub-Trust, or the Indemnity Trust), officers, executives, agents, directors, advisors, advisory representatives, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, (v) the current and former members of the Oversight Board of the Claimant Trust in any capacity (including Richard Katz) and their Affiliates, ~~including~~(vi) Farallon Capital Management, LLC, Stonehill Capital Management, LLC, Muck Holdings LLC, and Jessup Holdings LLC, ~~(vi)~~ in each case, in any capacity, (vii) the Independent Board and its members John Dubel, James P. Seery, Jr., and Russell Nelms, (~~vii~~viii) James P. Seery, Jr., individually and in all capacities for any Highland Released Party, including as Chief Executive Officer of Highland Capital Management, L.P., Claimant Trustee of the Claimant Trust, and the Indemnity Trust Administrator of the Indemnity Trust, (~~viii~~ix) Marc S. Kirschner, individually and as Trustee of

017383

HCMLPHMIT00000832

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

the Litigation Sub-Trust, (ix̶x̶) the Committee and each of its members, (x̶xi) the professionals (and their respective firms) (a) retained by Highland or the Committee during the Bankruptcy Case or which provided services to Highland or the Committee during the Bankruptcy Case or (b) retained by any Highland Released Party on or after August 11, 2021, (x̶ix̶ii) any Person indemnified by any Highland Party (the Persons described in clauses (i)-(x̶ix̶ii)), collectively, the "**Highland Covered Parties**"), and (xii) each Highland Covered Party's current and former officers, executives, agents, ~~attorneys (and their respective firms),~~ directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "Highland Covered Parties;" provided, however, and for the avoidance of doubt, and without in any way limiting the scope of the foregoing, "Highland Covered Parties" shall include Highland CLO Funding, Ltd., Highland HCF Advisor, Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Multi Strategy Credit Fund GP, L.P., Highland Multi Strategy Credit GP, LLC, Highland Multi Strategy Credit Fund, Ltd., Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., Highland Select Equity Fund, L.P., Highland Restoration Capital Partners Master, L.P., Highland Restoration Capital Partners GP, LLC, Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Offshore Director, LLC, Acis CLO Management, LLC, Neutra, Ltd., Pollack, Ltd., Acis CLO Management Holdings, L.P., Acis CLO Management Intermediate Holdings I, LLC, Acis CLO Management Intermediate Holdings II, LLC, Acis CLO Assets Holdings Limited, CHG Houston Holdings, LLC, Penant Management, L.P., Penant Management GP, LLC, Gunwale, LLC, HE Capital, LLC, Gleneagles CLO, Ltd., Aberdeen Loan Funding, Ltd. Highland Argentina Regional Opportunity Fund GP, LLC, Highland Argentina Regional Opportunity Fund, L.P., Highland Argentina Regional Opportunity Fund, Ltd., Highland Argentina Regional Opportunity Master Fund, L.P., Highland Latin America Consulting, Ltd., Highland Capital Management Korea Limited, Highland Capital Management Latin America, L.P., Highland Latin America GP, Ltd., Highland Latin America LP, Ltd., Highland Offshore Partners, L.P. (Diversified), Brentwood CLO, Ltd., Eastland CLO, Ltd., Bristol Bay Funding Ltd., Jasper CLO Ltd., Highland Legacy Limited, Grayson CLO, Ltd., Greenbriar CLO, Ltd., Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Liberty CLO, Ltd., Valhalla CLO, Ltd., Stratford CLO Ltd., Southfork CLO, Ltd., Pam Capital Funding, L.P., Stonebridge-Highland Healthcare Private Equity Fund, Pamco Cayman Ltd., Red River CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Westchester CLO, Ltd. Longhorn Credit Funding, LLC, PensionDanmark Pensionsforsikringsaktieselskab, Highland Dynamic Income Master Fund L.P., Highland Dynamic Income Fund GP, LLC, Highland Dynamic Income Fund, L.P., Highland Dynamic Income Fund, Ltd., Highland JHT Holdings, LLC, Highland Prometheus Master Fund, L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland Sunbridge GP, LLC, Trussway Holdings, LLC, Trussway Industries, LLC, TW Company, Inc., T-Way Investments, LLC, SSP Holdings, LLC, Highland Flexible Income UCITS Fund, and Acis CLO 2017-7, Ltd.  *Notwithstanding the forgoing or anything herein to the contrary*, none of "Highland Released Parties", "Highland Parties", nor "Highland Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, ~~or claiming through, under or on behalf of,~~ any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner and none of such Persons are released from any Claim by any Person in connection with this Agreement.

017384
HCMLPHMIT00000833

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

"**HMIT Class 10 Interest**" means the unvested, contingent Class 10 interest in the Claimant Trust (a) to be allowed on account of HMIT's pre-petition equity interest in Highland, and (b) subject to the terms and conditions, as applicable, of the Plan, the Plan Documents, the Claimant Trust Agreement, and in accordance with this Agreement, and applicable law.

"**HMIT Note**" means that certain Secured Promissory Note dated December 21, 2015, in the original face amount of $63,000,000 from HMIT, as maker, and Highland, as payee.

"**HMIT Note Claims**" means any Claim related to, in connection with or arising out of the HMIT Note.

"**HMIT Released Parties**" means collectively (i) the HMIT Entities, (ii) any Affiliate of any HMIT Entity and any Person directly or indirectly majority owned by any HMIT Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any HMIT Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i) – (iii), collectively, the "**HMIT Parties**"), (iv) each of the HMIT Parties' current and former trustees, administrators, officer, executives, agents, directors, advisors, consultants, manager, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns (v) the professionals (and their respective firms (a) retained by any HMIT Party during the Bankruptcy Case or which provided services to any HMIT Party during the Bankruptcy Case or (b) retained by any HMIT Released Party on or after August 11, 2021, (vi) any Person indemnified by any HMIT Party (the Persons described in clauses (i) – (vi), collectively, the "**HMIT Covered Parties**"), and (vii) each HMIT Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "HMIT Covered Parties."  *Notwithstanding the forgoing*, none of "HMIT Released Parties", "HMIT Parties", nor "HMIT Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, ~~or claiming through, under or on behalf of,~~ any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner, and none of such Persons are released from any Claims by any Person in connection with this Agreement.

"**Indemnity Trust Administrator**" has the meaning given to it in the Indemnity Trust Agreement.

"**Indemnity Trust Agreement**" means that certain *Second Amended and Restated Indemnity Trust Agreement of the Indemnity Trust* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of [April 28], 2025, by and among the Claimant Trust, as grantor, James P. Seery, Jr., as indemnity trust administrator, and Wilmington Trust, National Association, a national banking association, as indemnity trustee and Delaware trustee.

"**Indemnity Trust Assets**" has the meaning set forth in the Indemnity Trust Agreement~~.~~, but excluding Highland, the Claimant Trust, and their respective assets.

017385

HCMLPHMIT00000834

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

"**Independent Board**" means the independent board appointed by the Bankruptcy Court on January 9, 2020, pursuant to that certain *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 339].

"**Kirschner Claims**" means all Claims and causes of action that were asserted or could have been asserted by the Litigation Trustee of the Litigation Sub-Trust, in the Amended Complaint.

"**Liability**" means any liability, debt, obligation, loss, damage, claim, cost or expense (including costs of investigation and defense and attorney's fees, costs and expenses), in each case, whether direct or indirect, whether accrued or contingent, whether or not involving a third-party claim, and including incidental and consequential damages and diminution of value.

"**Litigation Protections**" means, individually and collectively, the rights, duties, and obligations set forth in ~~Section~~Sections 1 – 2 and Sections 9 - 16.

"**Litigation Sub-Trust**" means the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act.

"**Litigation Sub-Trust Agreement**" means that certain Litigation Sub-Trust Agreement of the Litigation Sub-Trust (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 16, 2021, by and among James P. Seery, Jr., as Claimant Trustee of the Claimant Trust, Wilmington Trust, National Association, a national banking association, as Delaware Trustee, and the Litigation Trustee.

"**Litigation Trustee**" means Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust.

"**LPA**" means that certain *Sixth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), dated as of October 4, 2021.

"Operating Expenses" means ~~the expenses of operation and administration of the Highland Entities except for the Indemnity Trust~~, except for the expenses of the Indemnity Trust (including any payments to Trust Indemnified Parties or Indemnified Parties (in each case, as defined, and pursuant to the terms and conditions set forth, in the Indemnity Trust Agreement)), the expenses of operating and administering the Highland Entities, including legal expenses, employee compensation, Claimant Trustee/CEO and other trust and trustee related compensation, incentive compensation, and customary general and administrative expenses.

"**Original Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* attached as Exhibit A to the *Order (A) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as modified) and (B) Granting Related Relief*, filed at Docket No. 1943 on the Bankruptcy Court's docket.

"**Oversight Board**" means the oversight board of the Highland Claimant Trust.

017386

HCMLPHMIT00000835

"**Pending Litigation**" means (i) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including *Hunter Mountain Investment Trust's Emergency Motion for Leave to File Adversary Proceeding* filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating there); (ii) *Dugaboy Investment Trust v. Highland Cap. Mgmt, L.P.*, 3:24-cv-01531-X (N.D. Tex.) (only as to HMIT), and (iii) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:24-cv-01786-L (N.D. Tex.).

"**Permitted Investments**" has the meaning set forth in the Indemnity Trust Agreement.

"**Person**" means any natural person, partnership, limited liability partnership, corporation, limited liability company, association, joint stock company, trust, estate, joint venture, unincorporated organization or Governmental Authority.

"**Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* as conformed in accordance with the Fifth Circuit's rulings.

"**Plan Documents**" has the meaning given to it in the Plan.

"**Plan Protections**" means, collectively, the provisions of the Plan contained in Article IX thereof.

"**Pro Rata**" means the proportion that (a) the allowed amount of a particular Claim or Equity Interest in Class 10 bears to (b) the aggregate allowed amount of all Claims or Equity Interests in Class 10.

"**Threats**" means any written threats of legal action, legal demands, filed complaints, petitions for pre-suit discovery, suits, litigations, arbitrations, actual or threatened restraining orders or injunctions made in writing, or similar written actions of any kind, or sworn statements evidencing the same, in any forum against any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), excluding any such action that would otherwise be a Threat except that any applicable ~~Statute~~statute of ~~Limitations~~limitations that could be applicable to such action has expired.

"**Threats Notice**" means the written notice of any Threats ~~made~~received by the Indemnity Trust with respect to any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), that is hereby required to be provided by ~~such Party~~the Indemnity Trust to the HMIT Entities, within ~~Five~~five (5) ~~business days~~Business Days after receipt of such Threat.

## RECITALS

**WHEREAS**, as of the Petition Date, HMIT held Class B and Class C Limited Partnerships Interests in Highland;

**WHEREAS**, on December 21, 2015, HMIT entered into the HMIT Note with Highland, which had a total outstanding principal balance of Fifty-Seven Million Six Hundred Ninety

017387
HCMLPHMIT00000836

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Thousand Six Hundred Forty and 95/100 Dollars ($57,690,640.95) as of the Petition Date (the "**HMIT Note Balance**");

**WHEREAS**, HMIT's Class B and Class C Limited Partnership Interests in Highland were extinguished on August 11, 2021, in accordance with the Plan;

**WHEREAS**, pursuant to the LPA, HMIT's capital account balance at Highland on account of its Class B and Class C Limited Partnership Interests on the Petition Date was Three Hundred Ninety-Four Million Six Hundred Thirty Thousand Eight Hundred Seventy-One and 53/100 Dollars ($394,630,871.53) (the "**HMIT Capital Account Balance**");

**WHEREAS**, some or all of the HMIT Entities have asserted certain Claims against certain Highland Entities and certain other Highland Covered Parties, including those asserted in the Pending Litigation;

WHEREAS, certain distributions to be made to the holders of allowed Class 10 Claims or Equity Interests pursuant to the terms and subject to the conditions set forth herein are premised on the consent of certain Highland Covered Parties in their capacity as Holders of Class 9 Interests, and such Persons are only willing to provide such consent in exchange for the releases as set forth in this Agreement;

**WHEREAS**, some or all of the Highland Entities have asserted certain Claims against certain HMIT Entities, including the HMIT Note Claims;

**WHEREAS**, the Parties wish to terminate, extinguish, and release any and all rights, duties, obligations and Claims that (a) any of the Highland Released Parties owed or have, or may have owed or have, to or with respect to any of the HMIT Released Parties, and (b) any of the HMIT Released Parties owed or have, or may have owed or have, to or with respect to any of the Highland Released Parties, as provided in this Agreement (collectively, the "**Rights and Obligations**");

**WHEREAS**, the Parties agree that the Litigation Protections are intended to enact a permanent cessation of all litigation concerning or related to the Highland Released Parties through and including the Agreement Date; and

**WHEREAS**, the Parties, individually and collectively, wish to (a) resolve all disputes between and/or among any of the Highland Entities and their respective indemnitees, on the one hand, and any of the HMIT Entities, on the other hand, including those asserted or attempted to be asserted in the Pending Litigation, (b) fix and allow HMIT's Class 10 Interest at the amount and on the terms provided herein; and (c) terminate, extinguish, and release all Rights and Obligations on the terms provided herein.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## **AGREEMENT**

1.     ~~Abatement~~Stay and Dismissal of Pending Litigation With Prejudice.

017388
HCMLPHMIT00000837

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

(a)     Within ~~three (3~~five (5) Business Days after the Agreement Date, the HMIT Entities shall take all steps necessary (at their own cost) to ~~abate~~stay the Pending Litigation.

(b)     Within ~~three (3~~five (5) Business Days after the Bankruptcy Court Approval Date, the HMIT Entities shall take all steps necessary (at their own cost) to dismiss the Pending Litigation with prejudice.

2.     <u>Maintenance of ~~Abatement~~Stay and Dismissal of Certain Defendants from the Amended Complaint</u>.

(a)     The Litigation Trustee shall continue to maintain the ~~abatement~~stay of Adv. Proc. No. 21-03076-sgj and all related proceedings arising therefrom through the Bankruptcy Court Approval Date. Within ~~three (3~~five (5) Business Days after the Bankruptcy Court Approval Date, the Litigation Sub-Trust shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand PE from Counts I, II, III, and XXIV of the Amended Complaint.

3.     <u>Cash Payment to HMIT</u>.  ~~In consideration for the dismissal of the Pending Litigation, within three (3~~Within five (5) Business Days following the Bankruptcy Court Approval Date, Highland shall pay HMIT a one-time, lump sum of Five Hundred Thousand Dollars (US$500,000.00) (the "**Payment**") by wire transfer:

[wire instructions]

4.     <u>HMIT Class 10 Interest</u>.

(a)     Subject to entry of the Bankruptcy Court Order, and the terms of this Agreement, the HMIT Class 10 Interest shall be deemed allowed in the amount of Three Hundred Thirty-Six Million Nine Hundred Forty Thousand Two Hundred Thirty and 58/100 Dollars (US$336,940,230.58), which amount represents the HMIT Capital Account Balance, <u>less</u> the HMIT Note Balance.

(b)     Notwithstanding anything to the contrary in the Plan or the Claimant Trust Agreement, as an integral part of this Agreement to consent to the allowance of the HMIT Class 10 Interest and the other considerations in this Agreement, HMIT shall not be deemed, and no holder of the HMIT Class 10 Interest shall be, a Claimant Trust Beneficiary or a "Beneficiary" under the Claimant Trust Agreement, and the Highland Released Parties, individually and collectively, shall owe no duty to any HMIT Releasor (whether contractual, fiduciary, equitable, statutory or otherwise), including with respect to the HMIT Class 10 Interest, in each case, except as expressly set forth in this Agreement.  Furthermore, without limiting the foregoing and for the avoidance of doubt, the contractual right of the holder of the HMIT Class 10 Interest to receive or recover any payments or Indemnity Trust Assets from the Indemnity Trust as set forth in this Agreement or the Indemnity Trust Agreement does not make any HMIT Releasor or any other Person a beneficiary of the Indemnity Trust or under the Indemnity Trust Agreement.

(c)     Notwithstanding anything to the contrary in the Plan, the Claimant Trust Agreement or the Indemnity Trust Agreement, in no event shall HMIT sell, transfer, assign, pledge, hypothecate, participate or otherwise dispose of <u>or encumber</u> the HMIT Class 10 Interest

017389

HCMLPHMIT00000838

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

or any rights (including any right to payment) with respect thereto (collectively, a "**Class 10 Assignment**"), and any attempted Class 10 Assignment shall be null and void.

(d)     For the avoidance of doubt, the HMIT Class 10 Interest is and shall remain senior to the not yet allowed, unvested contingent Class 11 Claims of Equity Interests as provided for in the Plan, the Plan Documents, and the Claimant Trust Agreement.

5.     <u>Initial Interim Distributions on the Allowed Class 10 Interests.</u>

(a)     Within ten (10five (5) Business Days after the Bankruptcy Court Approval Date, the Indemnity Trust shall distribute (the date on which such distribution is made, the "**Initial Interim Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of TwelveTen Million Dollars (US$1210,000,000.00) (the "**Initial Interim Cash Distribution Amount**").

(b)     HMIT shall deposit and hold Ten Million Dollars (US$10,000,000) of the Initial Interim Cash Distirbution Amount in an interest bearing escrow account (the "**HMIT Escrow Account**") pending the Final Court Approval Date.

(c)(b)   Within ten (10five (5) Business Days after the Bankruptcy Court Approval Date ("(the "**Note Assignment Date**"), the Highland Entities shall cause the portion of the Dugaboy Note held by the Highland Entities to be assigneddistributed to HMIT in-kind and take all actions necessary for HMIT to become the holder of such portion of the Dugaboy Note, and shall in addition pay to HMIT cash in the aggregate amount of all principal and interest payments actually received on the Dugaboy Note by the the Highland Entities, including the Indemnity Trust as of, from the Agreement Date to the Note Assignment Date. Prior to the Bankruptcy Court Approval Date, HMIT will engage an independent valuation service provider to value the Dugaboy Note for purposes of determining the magnitude of reduction to the outstanding allowed Class 10 Interests on account of such in-kind distribution, which shall not be less than Fifty percent (50%) of the current balance owed under the Dugaboy Note. The HMIT Entities acknowledge and agree that none of the Highland Entities are representing or warranting that the Dugaboy Note can be sold, or the price, if any, that could be received for the Dugaboy Note and further acknowledge and agree that any such purchase price may be de minimis.

6.     <u>Subsequent Distribution(s) on the Allowed Class 10 Interests.</u>

(a)     On December 1, 2027, the Indemnity Trust shall distribute (such distribution, collectively, the "**First Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**First Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests: cash in the aggregate amount of Eight Million Dollars (US$8,000,000.00). . HMIT shall deposit and hold Six Million Dollars (US$6,000,000) of the First Subsequent Distribution in the HMIT Escrow Account pending the Final Court Approval Date.Six Million Five Hundred Thousand Dollars (US$6,500,000.00).

(b)     On DecemeberDecember 1, 2028, the Indemnity Trust shall distribute (such distribution, collectively, the "**Second Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**Second Subsequent Distribution Date**") Pro Rata to the

017390

HCMLPHMIT00000839

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of ~~Eight~~Six Million ~~Five Hundred Thousand~~ Dollars (US$~~8,000~~6,500,000.00).

~~(c)    HMIT shall deposit and hold Six Million Dollars (US$6,000,000) of the Second Subsequent Distribution in the HMIT Escrow Account pending the Final Court Approval Date.~~

~~(d)~~(c)    Notwithstanding anything herein to the contrary, the obligations of the Indemnity Trust to make the First Subsequent Distribution or Second Subsequent Distribution is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII, Section 8.1(c) of the Indemnity Trust Agreement that the Indemnity Trust Assets comprising such distributions are not reasonably necessary to satisfy current or potential Indemnification Obligations (as defined in the Indemnity Trust Agreement) to all persons who are or might become Beneficiaries (as defined in the Indemnity Trust Agreement).

7.    Final Distribution on the Allowed Class 10 Interests.

(a)    On the later of the Final Court Approval Date and April 1, 2029, the Indemnity Trust will distribute all excess remaining Indemnity Trust Assets in accordance with Article VIII of the Indemnity Trust Agreement; provided, however, that the obligation of the Indemnity Trust to make any such distributions and/or dissolve and wind up the affairs of the Indemnity Trust is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII of the Indemnity Trust Agreement that (1) a Final Order(s) (as defined in the Indemnity Trust Agreement) has been entered resolving all litigation, claims or proceedings in any forum of any kind which could give rise to Indemnity Obligations (as defined in the Indemnity Trust Agreement) and payment in full of all such Indemnity Obligations and (2) all applicable statutes of limitations and any applicable tolling of such statutes of limitation have expired.

(b)    The Indemnity Trust agrees to not use Indemnity Trust Assets to fund Operating Expenses.

(c)    Following the Bankruptcy Court Approval Date, at the request of Mark Patrick, solely in his capacity, and to the extent he remains, as administrator of HMIT, but not more often than quarterly, Highland and the Indemnity Trust Administrator agree to review (i) the status of their respective assets, (ii) the balance of cash held, (iii) the status of any claims made for indemnification and any resolutions thereof, (iv) the status of any litigation, and (v) forecasted operating expenses with Mr. Patrick, and will each work in good faith to reduce operating expenses where reasonably practicable; provided, however, that all such reporting shall be subject to Mr. Patrick's agreement to maintain confidentiality with respect to any non-public information.

8.    Transfer Kirschner Claims; Dismissal of HMIT Note Claims.

(a)    ~~In consideration of the dismissal of the Pending Litigation and the releases provided herein, within ten (10~~Within five (5) Business Days after the Bankruptcy Court Approval Date, but after the dismissal provided for in Section 2, the Litigation Sub-Trust shall execute ~~an~~a short-form assignment in ~~the form attached hereto as~~ **Exhibit [_]** in favor of the HMIT Entities transferring all of the Litigation Sub-Trust's right, title, and interest in and to the Kirschner Claims

017391

HCMLPHMIT00000840

(the "**Kirschner Transfer**"). Such assignment shall be in a form mutually acceptable to the Parties and its substance shall be consistent with the terms, conditions and limitations set forth in this Agreement, including Section 8(b) below. Each HMIT Entity acknowledges and agrees that none of the Highland Entities will have any duty or obligation to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof, except as provided in this Agreement, including without limitation the terms of Section 8(c) below.

(b)     THE HMIT ENTITIES SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THE LITIGATION SUB-TRUST IS TRANSFERRING THE KIRSCHNER CLAIMS ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT THE HMIT ENTITIES ARE NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM THE HIGHLAND ENTITIES OR THEIR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE KIRSCHNER CLAIMS AND AMENDED COMPLAINT, INCLUDING WITH RESPECT TO THE ENFORCEABILITY, TRANSFERABILITY, VIABILITY, STRENGTH, OR VALUE OF ANY OF THE KIRSCHNER CLAIMS OR THE AMENDED COMPLAINT.  The HMIT Entities hereby specifically acknowledge that they have carefully reviewed this Section and have had the opportunity to discuss its import with legal counsel and that the provisions of this Section are a material part of this Agreement.  Thus, if for any reason HMIT is precluded from or is otherwise unable to prosecute all or any of the Kirschner Claims, (i) the HMIT Releasors shall have no recourse against theany Highland Released Parties whatsoever and shall not be entitled to compensation of any kind, it being agreed that the HMIT Entities are otherwise receiving adequate consideration for the duties and obligations they are undertaking pursuant to this Agreement and (ii) there will be no effect whatsoever on the validity and enforceability of this Agreement or any of the other transactions contemplated hereby.

(c)     As promptly as reasonably practicable following the Bankruptcy Court Approval Date, the Highland Entities shall provide to the HMIT Entities electronic copies of written discovery requests and responses thereto, and documents produced in discovery in respect of the Kirschner Claims and the Amended Complaint.  The Highland Entities will not provide any other documents regarding the Kirschner Claims including any attorney-client communications and any documents subject to the attorney work-product doctrine or similar privileges or immunities concerning the Kirschner Claims (collectively, the "**Kirschner Privileges**"), it being understood and agreed that the Highland Entities are retaining, and not transferring or waiving, the Kirschner Privileges.

(d)     Each Party acknowledges and agrees that if (ai) the Kirschner Transfer is found or deemed to be impermissible or invalid, for any reason, or (b) the Final Court Approval Date does not occurii) any HMIT Entity materially breaches this Agreement, the Kirschner Claims and Amended Complaint will revert to, and remain an asset of, the Litigation Sub-Trust.

9.     <u>General Release By The HMIT Entities</u>. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the HMIT Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its and their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other

017392

HCMLPHMIT00000841

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the HMIT Entities, the "**HMIT Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each Highland Released Party from, and waives and relinquishes, any and all Claims, which the HMIT Releasors, or any Person claiming through, under, or on behalf of any of the HMIT Releasors, ever had, now has, or hereafter can, shall, or may have against any of the Highland Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Agreement Date, including any fact, matter, transaction, or occurrence asserted by any HMIT Entity in the Pending Litigation or in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the Highland Released Parties, or the Highland Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**HMIT Entity Released Claims**").

10. <u>General Release By The Highland Entities</u>. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the Highland Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its or their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise)() and all Persons claiming through, under or on their behalf (collectively with the Highland Entities, the "**Highland Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, any and all Claims which the Highland Releasors, or any Person claiming through, under, or on behalf of any of the Highland Releasors, ever had, now has, or hereafter can, shall, or may have against any of the HMIT Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Bankruptcy Court Approval Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the HMIT Released Parties, or the HMIT Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**Highland Released Claims**").

11. <u>Further Provisions Concerning The General Releases</u>.

(a) **FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASES ARE INTENDED TO BE GENERAL AND INCLUDE A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE AGREEMENT DATE.**

(b) To the maximum extent permitted by law, each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland

017393
HCMLPHMIT00000842

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Releasors, respectively, waives the benefit of any statute or other principle of law or equity that limits the applicability of a release with respect to Claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release.

(c)      Without limiting the scope of the foregoing waiver, in connection with the foregoing release, each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefits of Section 1542 of the California Civil Code (to the extent, if any, that Section 1542 might apply to the foregoing release), which provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees that the provisions of Section 1542 of the Civil Code of the State of California and all similar federal or state law, rights, rules or legal principles, legal or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY EACH OF THE HMIT ENTITIES AND THE HIGHLAND ENTITIES, ON THEIR OWN BEHALF AND ON BEHALF OF THE OTHER HMIT RELEASORS AND HIGHLAND RELEASORS, RESPECTIVELY,** in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

In connection with such waiver and relinquishment, each of the HMIT Entities and Highland Entities acknowledges that it is aware that it may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein.  Nevertheless, it is the intent of each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, in executing this Agreement fully, finally, and forever to settle and release all such matters, and all Claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

(d)      As an integral component of this Agreement, and notwithstanding the Parties' intent set forth in the preamble hereto and the general nature of the releases in Sections 9 and 10, should:

(i)      any HMIT Releasor contend or assert that any Claim of any kind whatsoever held by any HMIT Releasor against any Highland Released Party survives this

017394
HCMLPHMIT00000843

Agreement and is in any way related to or arising from or in connection with any HMIT Entity Released Claim (such claim or cause of action, a "**HMIT Alleged Claim**"), such HMIT Releasor will be deemed to have irrevocably, fully, and finally assigned such HMIT Alleged Claim to the Highland Entities and the Highland Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such HMIT Alleged Claim.

(ii)     any Highland Releasor contend or assert that any Claim of any kind whatsoever held by any Highland Releasor against any HMIT Released Party survives this Agreement and is in any way related to or arising from or in connection with any Highland Entity Released Claim (such claim or cause of action, a "**Highland Alleged Claim**"), such Highland Releasor will be deemed to have irrevocably, fully, and finally assigned such Highland Alleged Claim to the HMIT Entities and the HMIT Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such Highland Alleged Claim.

12.     <u>Covenant Not To Sue; Limitation on Standing</u>. Upon the Agreement Date:

(a)     Each of the HMIT Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the Highland Released Parties, to recover, enforce, investigate, or collect any HMIT Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(b)     Each of the Highland Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the HMIT Released Parties, to recover, enforce, investigate, or collect any Highland Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(c)     For the avoidance of doubt, this Agreement shall not operate to give any HMIT Entity standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except for the limited purpose of seeking Court approval of this Agreement (including with respect to any appeal concerning any order entered granting or denying such approval), and except for the limited purpose of enforcing this Agreement, no HMIT Entity shall commence any Action in connection with the HMIT Class 10 Interest.

13.     <u>Representations and Warranties</u>.

(a)     Each of the HMIT Entities hereby represents and warrants that every HMIT Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any HMIT Releasor.

(b)     The HMIT Entities, on their own behalf and on behalf of the other HMIT Releasors, acknowledge and agree that each Plan Provision is lawful, effective, and binding on the HMIT Releasors. The HMIT Entities further agree, on their own behalf and on behalf of the other HMIT Releasors, that the HMIT Releasors will never, in any way, challenge or seek to modify, nullify, vacate, or revoke, or induce, encourage or direct any other Person to do so or act in concert with or assist (financially or otherwise) any other Person in doing so the Confirmation Order, the

017395
HCMLPHMIT00000844

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Plan, the Plan Protections, or any Plan Document, including the Claimant Trust Agreement, the LPA, the Indemnity Trust Agreement or the Litigation Sub-Trust Agreement, in the Bankruptcy Court, in any other state or federal court, in any other forum or tribunal, or otherwise, including administrative or regulatory tribunals and foreign courts.

(c)     Each of the Highland Entities hereby represents and warrants that every Highland Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any Highland Releasor.

(d)     Each Party severally represents and warrants as to itself only that: (i) it has taken all necessary action to authorize and approve the execution, delivery and performance of this Agreement; (ii) such Party has full power and authority to execute and deliver this Agreement; and (iii) this Agreement constitutes a valid, legal and binding obligation of such Party, and is enforceable subject to its terms.  Each individual signatory hereto individually warrants and represents to all Parties hereto that such individual has full power and authority to act on behalf of and bind the Party for which he or she has executed this Agreement; provided, however that no signatory shall otherwise provide any warranty or representation or otherwise be a party to this Agreement on an individual basis.

14.     <u>No Continuing Rights, Duties or Obligations</u>.  Except for the rights, duties, and obligations expressly set forth in this Agreement, all Rights and Obligations that existed or may have existed shall be deemed terminated, extinguished, and released upon the Agreement Date. For the avoidance of doubt, from and after the Agreement Date, (a) the Highland Released Parties, individually and collectively, shall owe no duty, past or present, including with respect to the Kirchner Claims, to the HMIT ~~Releasors~~Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement, and (b) the HMIT Released Parties, individually and collectively, shall owe no duty to the Highland ~~Releasors~~Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement.

15.     <u>Gatekeeper Standard</u>.

(a)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that, notwithstanding the United States Court of Appeals for the Fifth Circuit's decision in *Highland Capital Management Fund Advisors, L.P. v. Highland Capital Management, L.P.*, No. 23-10<del>53</del>4 (5th Cir. Mar. 18, 2025), the "Gatekeeper" provisions contained in Highland's Original Plan is forever binding on each of the HMIT Entities <u>and any Persons claiming through, under or on behalf of any of them,</u> and for a claim or cause of action to be  "colorable" for purposes of the Gatekeeper, it must be found by final order of the Bankruptcy Court (the "**Gatekeeper Court**"), which order shall be subject to appeal to a court of competent jurisdiction, to have satisfied the "Gatekeeper Colorability Test" as such term is defined in *In re Highland Capital Management, L.P.*, 2023 Bankr. LEXIS 2104 at *124-36 (Bankr. N.D. Tex. Aug. 24, 2023).

(b)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that compliance with the Gatekeeper requires (i) a motion seeking leave to sue an Exculpated Party

017396

HCMLPHMIT00000845

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

(as that term is defined in Highland's original Plan) and a finding that the litigant's claims and causes of action are "colorable" attaching a complaint setting forth the basis for such claims or causes of action and (ii), in the Gatekeeper Court's sole discretion, an evidentiary hearing (during which the Gatekeeper Court may, among other things, hear testimony and assess the credibility of any witness(es)) to determine whether a proposed claim or cause of action is "colorable."

(c)   The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, further acknowledge and agree that the moving party under the Gatekeeper has the burden of satisfying the "Gatekeeper Colorability Test.", " and that the dismissal of the Pending Litigation shall have res judicata effect.

16.   <u>Indemnification</u>.

(a)   Without in any manner limiting the available remedies for any breach of this Agreement, the HMIT Entities, severally but not jointly, agree to indemnify, defend, and hold the Highland Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any HMIT Entity set forth in <u>Section 13</u> or (y) any Actions brought or prosecuted by or on behalf of, any HMIT Releasor or that are induced, encouraged, assisted  or directed by any HMIT Releasor or brought or prosecuted in concert with any HMIT Releasor against any Highland Released Party with respect to or related to any HMIT Entity Released Claims.  Without limiting the scope of the foregoing in any manner, any HMIT Entity that breaches <u>Section 12</u> shall be liable to the Highland Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such Highland Released Party in defending against or otherwise responding to such Action.  Each HMIT Entity acknowledges and agrees that the HMIT Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

(b)   Without in any manner limiting the available remedies for any breach of this Agreement, the Highland Entities, severally but not jointly, agree to indemnify, defend, and hold the HMIT Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any Highland Entity set forth in <u>Section 13</u> or (y) any suits, proceedings, or other actions brought or prosecuted by or on behalf of, any Highland Releasor or that are induced, encouraged, assisted  or directed by any Highland Releasor or brought or prosecuted in concert with any Highland Releasor against any HMIT Released Party with respect to or related to any Highland Entity Released Claims.  Without in any manner limiting the scope of the foregoing, any Highland Entity that breaches <u>Section 12</u> shall be liable to the HMIT Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such HMIT Released Party in defending against or otherwise responding to such Action.  Each Highland Entity acknowledges and agrees that the Highland Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

017397
HCMLPHMIT00000846

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

17.  <u>Execution</u>.  This Agreement may be executed by the exchange of signatures by facsimile or by PDF attachment to an email transmittal and in counterparts, and if so executed, shall be fully executed when a counterpart has been executed and delivered by all Parties hereto through counsel.  All counterparts taken together shall constitute one and the same agreement and shall be fully enforceable as such.

18.  <u>Bankruptcy Court Order</u>.  The allowance of the allowed HMIT Class 10 Interest pursuant to <u>Section 4</u> is subject to the entry of the Bankruptcy Court Order.  To that end, the Highland Entities shall file the 9019 Motion no later than five (5) Business Days after the Agreement Date.  Each Party shall, and shall cause each of their respective Affiliates to, undertake any and all actions in compliance with applicable law to obtain the Bankruptcy Court Order as promptly as practicable, and without limiting the foregoing, if an Action is threatened or instituted by any Person opposing the 9019 Motion or otherwise challenging the validity or legality, or seeking to restrain the consummation, of the transactions contemplated by this Agreement or the Bankruptcy Court Order, each Party shall, and shall cause its respective Affiliates to, use their commercially reasonable best efforts to avoid, resist, resolve or, if necessary, and defend to effectuate this Agreement and consummate the transactions hereby.  If the 9019 Motion is not approved by entry of the Bankruptcy Court Order or if the Bankruptcy Court Approval is precluded from becoming a Final Order, (a) there will be no affect on, adjustment to, or impairment of, in any way, the validity and enforceability of the remainder of this Agreement, and the other transactions contemplated hereby, all of which shall remain in full force and effect and (b) each Party shall, and shall cause its respective Affiliates to, use their best efforts to seek the allowance of the HMIT Class 10 Interest in a substantially similar amount and on substantially similar terms as set forth in <u>Section 4</u> to the fullest extent possible so as to give effect to the original intent of the Parties as closely as possible.

19.  <u>Fees and Expenses</u>.  Whether or not the transactions contemplated hereby are consummated or the Bankruptcy Court Order is obtained, and except as otherwise expressly provided in this Agreement, each Party will bear its respective fees, costs and expenses (including legal, accounting and other professional fees) incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the transactions contemplated hereby, including with respect to each Party's respective obligations pursuant to <u>Section 18</u>. Notwithstanding the foregoing, if any Party hereto brings an Action to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that Action shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

20.  <u>Entire Agreement; No Other Representations</u>.  **THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF ANY ~~PARTY~~PERSON OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT.  THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS (COLLECTIVELY, "<u>REPRESENTATIONS</u>"), EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT.  THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY ANY**

017398
HCMLPHMIT00000847

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

**REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT; AND THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT RELIED ON ANY REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY ARE ENTERING INTO THIS AGREEMENT RELYING SOLELY ON THEIR OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS BY ANY PARTY, EXCEPT FOR THOSE REPRESENTATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES AGREE THAT REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT SHALL NOT BE USED IN THE INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT, AND NEITHER THE HMIT RELEASED PARTIES NOR THE HIGHLAND RELEASED PARTIES SHALL HAVE ANY LIABILITY FOR ANY CONSEQUENCES ARISING AS A RESULT OF ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT**.

21. <u>Agreement and Release Knowing and Voluntary</u>. The Parties acknowledge that they have considered this Agreement with their respective attorneys and have carefully read this Agreement, that it has been fully explained by their attorneys, and that they have had a reasonable opportunity to consider this Agreement. The Parties further represent that they know and fully understand the contents of this Agreement, that they intend to be legally bound by this Agreement and the releases and covenants contained herein, and that they are signing this Agreement, including the release provisions herein, voluntarily and of their own free will and without coercion, and with the benefit of advice of counsel.

22. <u>Cooperation</u>. The Parties agree to perform any services or actions reasonably necessary to carry out the terms and conditions of this Agreement or the transactions contemplated hereby, including the execution and delivery of reasonable additional documents, instruments, conveyances and/or assurances, in good faith, and to reasonably communicate and cooperate with one another in this regard. For the avoidance of doubt, nothing in this Section shall obligate the Highland Entities to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof.

23. <u>Governing Law</u>. This Agreement shall be construed pursuant to and governed by the laws of the State of Delaware (substantive and procedural) without reference to principles of conflicts of law that would result in the application of any other State's laws.

24. <u>Jurisdiction/Venue</u>. The Parties hereby irrevocably submit to the jurisdiction and venue of the Bankruptcy Court with respect to any ~~action or proceeding~~Action arising out of or related to this Agreement or the subject matter hereof; if (and only if) the Bankruptcy Court lacks personal or subject matter jurisdiction to adjudicate an ~~action or proceeding~~Action arising out of or related to this Agreement or the subject matter hereof, then the Parties irrevocably submit to the jurisdiction and venue of the United States District Court for the Northern District of Texas.

25. <u>No Admissions</u>. All Parties acknowledge and agree that the matters set forth in this Agreement constitute the settlement and compromise of disputed Claims and that this Agreement shall not constitute the admission of any fact or liability by any of them regarding any Claim, including the Claims released hereunder, and neither the terms hereof, nor the fact of this Agreement itself, shall be evidence of any kind in any Action, other than an Action to enforce the

017399
HCMLPHMIT00000848

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

terms of the Agreement or any instrument executed in connection herewith or any claim for damages or other relief for breach of any representation or warranty contained herein or in any instrument executed in connection herewith.

26.    <u>Other Provisions</u>.

(a)    ~~This Agreement contains the entire agreement and understanding of the parties and supersedes any and all prior or contemporaneous agreements, arrangements, and understandings relating to the subject matter of this Agreement.~~ No representation, inducement, agreement, promise or understandings altering, modifying, amending, taking from or adding to, the terms and conditions hereof shall have any force or effect unless the same is in writing and validly executed by each of the Parties hereto.

(b)    The waiver by any Party of any breach of, or default under, any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or default; provided, however, that for any such waiver to be enforceable, it shall be in writing and executed by the non-breaching Party.

(c)    The headings contained in this Agreement are for convenience only and shall in no way restrict or otherwise affect the construction of the provisions hereof.

(d)    The Parties shall each execute all documents and perform all acts necessary and proper to effectuate the terms of this Agreement.

27.    <u>Notices</u>.    All notices required or permitted to be provided hereunder shall be afforded to the respective parties to and through their counsel, and shall be transmitted simultaneously by electronic mail (with PDF attachments, as necessary) and by telefax, addressed as follows:

To the Highland Entities:

**PACHULSKI STANG ZIEHL AND JONES LLP**
Jeffrey N. Pomerantz
John A. Morris
10100 Santa Monica Boulevard
Los Angeles, California 90067-4003
310.277.6910
jpomerantz@pszjlaw.com
jmorris@pszjlaw.com

To the HMIT Entities:

**KELLY HART PITRE**
Louis M. Phillips
Amelia Hurt
301 Main Street, Suite 1600
225.381.9643
Louis.Phillips@Kellyhart.com

017400
HCMLPHMIT00000849

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Amelia.Hurt@Kellyhart.com

28.    <u>Severability</u>. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity and enforceability of any other provision of this Agreement. ~~For the avoidance of doubt, if any provision of this Agreement is overturned on appeal after the Bankruptcy Court Approval Date, any portion that is not overturned on appeal shall remain in full force and effect.~~

29.    <u>Interpretive Provisions</u>. Unless the express context otherwise requires: (a) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) words defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (c) the words "Dollars" and "$" mean U.S. dollars; (d) references herein to a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement; (e) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words ",without limitation,"; (f) references herein to any gender shall include each other gender; (g) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement; (h) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (i) the word "or" shall be disjunctive but not exclusive; (j) the headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties; and (k) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

*[Signature page follows]*

017401
HCMLPHMIT00000850

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**HUNTER MOUNTAIN INVESTMENT TRUST**

By _____
Name:    Mark Patrick
Title:    Administrator
Date:    May __, 2025

**BEACON MOUNTAIN LLC**

By _____
Name: _____
Title: _____
Date:    May __, 2025

**RAND ADVISORS, LLC**

By _____
Name:    Mark Patrick
Title:    President
Date:    May __, 2025

**RAND PE FUND I, LP**
By: Rand PE Fund Management, LLC, its General Partner

By _____
Name:    Mark Patrick
Title:    President
Date:    May __, 2025

**RAND PE FUND MANAGEMENT, LLC**

By _____
Name:    Mark Patrick
Title:    President

017402

HCMLPHMIT00000851

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Date:     May ___, 2025

**ATLAS IDF, LP**
By: Atlas IDF GP, LLC, its General Partner


By   _____
     Name:     Mark Patrick
     Title:     President
     Date:     May ___, 2025

**ATLAS IDF GP, LLC**


By   _____
     Name:     Mark Patrick
     Title:     President
     Date:     May ___, 2025


**HIGHLAND CAPITAL MANAGEMENT, L.P.**


By   _____
     Name:     James. P. Seery, Jr.
     Title:     Chief Executive Officer
     Date:     May ___, 2025


**HIGHLAND CLAIMANT TRUST**


By   _____
     Name:     James P. Seery, Jr.
     Title:     Claimant Trustee
     Date:     May ___, 2025


**HIGHLAND LITIGATION SUB-TRUST**


By   _____
     Name:     Marc S. Kirschner
     Title:     Litigation Trustee

017403

HCMLPHMIT00000852

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Date:        May __, 2025

**HIGHLAND INDEMNITY TRUST**

By  _____
    Name:        James P. Seery, Jr.
    Title:       Indemnity Trust Administrator
    Date:        May __, 2025

017404
HCMLPHMIT00000853

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

## SETTLEMENT AGREEMENT & GENERAL RELEASE

THIS SETTLEMENT AGREEMENT & GENERAL RELEASE (this "**Agreement**") is entered into as of May 16, 2025 (the "**Agreement Date**"), by and among Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), the Highland Claimant Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Claimant Trust**"), the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Litigation Sub-Trust**"), and the Highland Indemnity Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Indemnity Trust**", and together with Highland, the Claimant Trust and the Litigation Sub-Trust, the "**Highland Entities**"), on the one hand, and Hunter Mountain Investment Trust, a Delaware statutory trust ("**HMIT**"), Beacon Mountain LLC, a Delaware limited liability company ("**Beacon Mountain**"), Rand Advisors, LLC, a Delaware limited liability company ("**Rand Advisors**"), Rand PE Fund I, LP, a Delaware series limited partnership ("**Rand PE Fund**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**"), Atlas IDF, LP, a Delaware limited partnership ("**Atlas IDF**"), Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP and Atlas IDF, the  "**HMIT Entities**"), on the other hand.  The Highland Entities and the HMIT Entities are collectively referred to as the "**Parties**," and each individually, as a "**Party**".

## DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Claimant Trust Agreement or the Plan, as applicable (in each case, as hereinafter defined). For purposes of this Agreement, the following capitalized terms have the following meanings:

"**9019 Motion**" means the motion seeking entry of the Bankruptcy Court Order pursuant to Bankruptcy Rule 9019 and in accordance with Section 18.

"**Action**" means any action, claim, demand, arbitration, hearing, charge, complaint, investigation, examination, indictment, litigation, suit or other civil, criminal, administrative or investigative proceedings, including any petition under Rule 202 of the Texas Rules of Civil Procedure.

"**Affiliate**" means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, a specified Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by contract or otherwise.

"**Amended Complaint**" means the *Amended Complaint and Objection to Claims*, filed as docket number 158 in *Kirschner v. Dondero*, Adv. Pro. No. 21-03076-sgj (Bankr. N.D. Tex. May 19, 2022).

"**Bankruptcy Case**" means *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex.) and its related proceedings.

017405
HCMLPHMIT00000854

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division.

"**Bankruptcy Court Approval Date**" means the date on which the Bankruptcy Court Order is issued.

"**Bankruptcy Court Order**" means an order of the Bankruptcy Court approving the allowance of the HMIT's Class 10 Interest as provided in this Agreement pursuant to the 9019 Motion.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than (i) a Saturday or a Sunday, (ii) a day on which the Federal Reserve Bank of New York or the New York Stock Exchange is closed, or (iii) a day on which banks in the States of Texas are required, or authorized by law, to close.

"**Claimant Trust Agreement**" means that certain Claimant Trust Agreement of the Claimant Trust (as may have been or may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 11, 2021, by and among Highland, as settlor, James P. Seery, Jr., a Claimant Trustee, and Wilmington Trust, National Association, a national banking association, as Delaware trustee.

"**Claims**" means any claims, debts, liabilities, demands, obligations, breaches of contract, breaches of duty or any relationship, misfeasance, malfeasance, promises, acts, omissions, agreements, liens, losses, costs and expenses (including attorney's fees and related costs), damages, injuries, suits, Actions, and causes of action of whatever kind or nature, whenever and however, arising, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise.

"**Class 10**" means the class of Claims or Equity Interests described in Article II. Section H.10. of the Plan.

"**Class 11**" means the class of Claims or Equity Interests described in Article II. Section H.11. of the Plan.

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Case.

"**Confirmation Order**" means that certain *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943], as conformed in accordance with the Fifth Circuit's rulings.

"**Dugaboy Note**" means that certain Promissory Note dated May 31, 2017, in the original face amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

2

017406
HCMLPHMIT00000855

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

"**Final Court Approval Date**" means the date on which the Bankruptcy Court Order becomes a Final Order.

"**Final Order**" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Highland Entities, as applicable, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

"**Gatekeeper**" means the gatekeeping provision contained in Article IX. F of the Plan as of August 11, 2021.

"**Governmental Authority**" means any federal, provincial, state, local or foreign government or political subdivision thereof, court of competent jurisdiction, administrative agency, judicial or arbitral body, or commission or other governmental or regulatory authority or instrumentality.

"**Highland Released Parties**" means collectively (i) the Highland Entities, (ii) any Affiliate of any Highland Entity and any Person directly or indirectly majority-owned by any Highland Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any Highland Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i)-(iii), collectively, the "**Highland Parties**"), (iv) each of the Highland Parties' current and former trustees and administrators (including the trustees of any of the Claimant Trust, the Litigation Sub-Trust, or the Indemnity Trust), officers, executives, agents, directors, advisors, advisory representatives, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, (v) the current and former members of the Oversight Board of the Claimant Trust in any capacity (including Richard Katz) and their Affiliates, (vi) Farallon Capital Management, LLC, Stonehill Capital Management, LLC, Muck Holdings LLC, and Jessup Holdings LLC, in each case, in any capacity, (vii) the Independent Board and its members John Dubel, James P. Seery, Jr., and Russell Nelms, (viii) James P. Seery, Jr., individually and in all capacities for any Highland Released Party, including as Chief Executive Officer of Highland Capital Management, L.P., Claimant Trustee of the Claimant Trust, and the Indemnity Trust Administrator of the Indemnity Trust, (ix) Marc S. Kirschner, individually and as Trustee of the Litigation Sub-Trust, (x) the Committee and each of its members, (xi) the professionals (and their respective firms) (a) retained by Highland or the Committee during the Bankruptcy Case or which provided services to Highland or the Committee during the Bankruptcy Case or (b) retained by any Highland Released Party on or after August 11, 2021, (xii) any Person indemnified by any

3

017407

HCMLPHMIT00000856

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Highland Party (the Persons described in clauses (i)-(xii), collectively, the "**Highland Covered Parties**"), and (xii) each Highland Covered Party's current and former officers, executives, agents, attorneys (and their respective firms), directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "Highland Covered Parties;" provided, however, and for the avoidance of doubt, and without in any way limiting the scope of the foregoing, "Highland Covered Parties" shall include Highland CLO Funding, Ltd., Highland HCF Advisor, Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Multi Strategy Credit Fund GP, L.P., Highland Multi Strategy Credit GP, LLC, Highland Multi Strategy Credit Fund, Ltd., Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., Highland Select Equity Fund, L.P., Highland Restoration Capital Partners Master, L.P., Highland Restoration Capital Partners GP, LLC, Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Offshore Director, LLC, Acis CLO Management, LLC, Neutra, Ltd., Pollack, Ltd., Acis CLO Management Holdings, L.P., Acis CLO Management Intermediate Holdings I, LLC, Acis CLO Management Intermediate Holdings II, LLC, Acis CLO Assets Holdings Limited, CHG Houston Holdings, LLC, Penant Management, L.P., Penant Management GP, LLC, Gunwale, LLC, HE Capital, LLC, Gleneagles CLO, Ltd., Aberdeen Loan Funding, Ltd. Highland Argentina Regional Opportunity Fund GP, LLC, Highland Argentina Regional Opportunity Fund, L.P., Highland Argentina Regional Opportunity Fund, Ltd., Highland Argentina Regional Opportunity Master Fund, L.P., Highland Latin America Consulting, Ltd., Highland Capital Management Korea Limited, Highland Capital Management Latin America, L.P., Highland Latin America GP, Ltd., Highland Latin America LP, Ltd., Highland Offshore Partners, L.P. (Diversified), Brentwood CLO, Ltd., Eastland CLO, Ltd., Bristol Bay Funding Ltd., Jasper CLO Ltd., Highland Legacy Limited, Grayson CLO, Ltd., Greenbriar CLO, Ltd., Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Liberty CLO, Ltd., Valhalla CLO, Ltd., Stratford CLO Ltd., Southfork CLO, Ltd., Pam Capital Funding, L.P., Stonebridge-Highland Healthcare Private Equity Fund, Pamco Cayman Ltd., Red River CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Westchester CLO, Ltd. Longhorn Credit Funding, LLC, PensionDanmark Pensionsforsikringsaktieselskab, Highland Dynamic Income Master Fund L.P., Highland Dynamic Income Fund GP, LLC, Highland Dynamic Income Fund, L.P., Highland Dynamic Income Fund, Ltd., Highland JHT Holdings, LLC, Highland Prometheus Master Fund, L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland Sunbridge GP, LLC, Trussway Holdings, LLC, Trussway Industries, LLC, TW Company, Inc., T-Way Investments, LLC, SSP Holdings, LLC, Highland Flexible Income UCITS Fund, and Acis CLO 2017-7, Ltd. *Notwithstanding the forgoing or anything herein to the contrary*, none of "Highland Released Parties", "Highland Parties", nor "Highland Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner and none of such Persons are released from any Claim by any Person in connection with this Agreement.

"**HMIT Class 10 Interest**" means the unvested, contingent Class 10 interest in the Claimant Trust (a) to be allowed on account of HMIT's pre-petition equity interest in Highland, and (b) subject to the terms and conditions, as applicable, of the Plan, the Plan Documents, the Claimant Trust Agreement, and in accordance with this Agreement, and applicable law.

017408
HCMLPHMIT00000857

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

"**HMIT Note**" means that certain Secured Promissory Note dated December 21, 2015, in the original face amount of $63,000,000 from HMIT, as maker, and Highland, as payee.

"**HMIT Note Claims**" means any Claim related to, in connection with or arising out of the HMIT Note.

"**HMIT Released Parties**" means collectively (i) the HMIT Entities, (ii) any Affiliate of any HMIT Entity and any Person directly or indirectly majority owned by any HMIT Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any HMIT Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i) – (iii), collectively, the "**HMIT Parties**"), (iv) each of the HMIT Parties' current and former trustees, administrators, officer, executives, agents, directors, advisors, consultants, manager, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns (v) the professionals (and their respective firms (a) retained by any HMIT Party during the Bankruptcy Case or which provided services to any HMIT Party during the Bankruptcy Case or (b) retained by any HMIT Released Party on or after August 11, 2021, (vi) any Person indemnified by any HMIT Party (the Persons described in clauses (i) – (vi), collectively, the "**HMIT Covered Parties**"), and (vii) each HMIT Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "HMIT Covered Parties." *Notwithstanding the forgoing*, none of "HMIT Released Parties", "HMIT Parties", nor "HMIT Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner, and none of such Persons are released from any Claims by any Person in connection with this Agreement.

"**Indemnity Trust Administrator**" has the meaning given to it in the Indemnity Trust Agreement.

"**Indemnity Trust Agreement**" means that certain *Second Amended and Restated Indemnity Trust Agreement of the Indemnity Trust* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of [April 28], 2025, by and among the Claimant Trust, as grantor, James P. Seery, Jr., as indemnity trust administrator, and Wilmington Trust, National Association, a national banking association, as indemnity trustee and Delaware trustee.

"**Indemnity Trust Assets**" has the meaning set forth in the Indemnity Trust Agreement, but excluding Highland, the Claimant Trust, and their respective assets.

"**Independent Board**" means the independent board appointed by the Bankruptcy Court on January 9, 2020, pursuant to that certain *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 339].

017409

HCMLPHMIT00000858

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

"**Kirschner Claims**" means all Claims and causes of action that were asserted or could have been asserted by the Litigation Trustee of the Litigation Sub-Trust, in the Amended Complaint.

"**Liability**" means any liability, debt, obligation, loss, damage, claim, cost or expense (including costs of investigation and defense and attorney's fees, costs and expenses), in each case, whether direct or indirect, whether accrued or contingent, whether or not involving a third-party claim, and including incidental and consequential damages and diminution of value.

"**Litigation Protections**" means, individually and collectively, the rights, duties, and obligations set forth in Sections 1 – 2 and Sections 9 - 16.

"**Litigation Sub-Trust**" means the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act.

"**Litigation Sub-Trust Agreement**" means that certain Litigation Sub-Trust Agreement of the Litigation Sub-Trust (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 16, 2021, by and among James P. Seery, Jr., as Claimant Trustee of the Claimant Trust, Wilmington Trust, National Association, a national banking association, as Delaware Trustee, and the Litigation Trustee.

"**Litigation Trustee**" means Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust.

"**LPA**" means that certain *Sixth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), dated as of October 4, 2021.

"Operating Expenses" means, except for the expenses of the Indemnity Trust (including any payments to Trust Indemnified Parties or Indemnified Parties (in each case, as defined, and pursuant to the terms and conditions set forth, in the Indemnity Trust Agreement)), the expenses of operating and administering the Highland Entities, including legal expenses, employee compensation, Claimant Trustee/CEO and other trust and trustee related compensation, incentive compensation, and customary general and administrative expenses.

"**Original Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* attached as Exhibit A to the *Order (A) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as modified) and (B) Granting Related Relief*, filed at Docket No. 1943 on the Bankruptcy Court's docket.

"**Oversight Board**" means the oversight board of the Highland Claimant Trust.

"**Pending Litigation**" means (i) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including *Hunter Mountain Investment Trust's Emergency Motion for Leave to File Adversary Proceeding* filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating there); (ii) *Dugaboy Investment Trust v. Highland Cap. Mgmt, L.P.*, 3:24-cv-01531-X

017410
HCMLPHMIT00000859

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

(N.D. Tex.) (only as to HMIT), and (iii) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:24-cv-01786-L (N.D. Tex.).

"**Permitted Investments**" has the meaning set forth in the Indemnity Trust Agreement.

"**Person**" means any natural person, partnership, limited liability partnership, corporation, limited liability company, association, joint stock company, trust, estate, joint venture, unincorporated organization or Governmental Authority.

"**Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* as conformed in accordance with the Fifth Circuit's rulings.

"**Plan Documents**" has the meaning given to it in the Plan.

"**Plan Protections**" means, collectively, the provisions of the Plan contained in Article IX thereof.

"**Pro Rata**" means the proportion that (a) the allowed amount of a particular Claim or Equity Interest in Class 10 bears to (b) the aggregate allowed amount of all Claims or Equity Interests in Class 10.

"**Threats**" means any written threats of legal action, legal demands, filed complaints, petitions for pre-suit discovery, suits, litigations, arbitrations, actual or threated restraining orders or injunctions made in writing, or similar written actions of any kind, or sworn statements evidencing the same, in any forum against any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), excluding any such action that would otherwise be a Threat except that any applicable statute of limitations that could be applicable to such action has expired.

"**Threats Notice**" means the written notice of any Threats received by the Indemnity Trust with respect to any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), that is hereby required to be provided by the Indemnity Trust to the HMIT Entities, within five (5) Business Days after receipt of such Threat.

## RECITALS

**WHEREAS**, as of the Petition Date, HMIT held Class B and Class C Limited Partnerships Interests in Highland;

**WHEREAS**, on December 21, 2015, HMIT entered into the HMIT Note with Highland, which had a total outstanding principal balance of Fifty-Seven Million Six Hundred Ninety Thousand Six Hundred Forty and 95/100 Dollars ($57,690,640.95) as of the Petition Date (the "**HMIT Note Balance**");

**WHEREAS**, HMIT's Class B and Class C Limited Partnership Interests in Highland were extinguished on August 11, 2021, in accordance with the Plan;

017411

HCMLPHMIT00000860

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

**WHEREAS**, pursuant to the LPA, HMIT's capital account balance at Highland on account of its Class B and Class C Limited Partnership Interests on the Petition Date was Three Hundred Ninety-Four Million Six Hundred Thirty Thousand Eight Hundred Seventy-One and 53/100 Dollars ($394,630,871.53) (the "**HMIT Capital Account Balance**");

**WHEREAS**, some or all of the HMIT Entities have asserted certain Claims against certain Highland Entities and certain other Highland Covered Parties, including those asserted in the Pending Litigation;

WHEREAS, certain distributions to be made to the holders of allowed Class 10 Claims or Equity Interests pursuant to the terms and subject to the conditions set forth herein are premised on the consent of certain Highland Covered Parties in their capacity as Holders of Class 9 Interests, and such Persons are only willing to provide such consent in exchange for the releases as set forth in this Agreement;

**WHEREAS**, some or all of the Highland Entities have asserted certain Claims against certain HMIT Entities, including the HMIT Note Claims;

**WHEREAS**, the Parties wish to terminate, extinguish, and release any and all rights, duties, obligations and Claims that (a) any of the Highland Released Parties owed or have, or may have owed or have, to or with respect to any of the HMIT Released Parties, and (b) any of the HMIT Released Parties owed or have, or may have owed or have, to or with respect to any of the Highland Released Parties, as provided in this Agreement (collectively, the "**Rights and Obligations**");

**WHEREAS**, the Parties agree that the Litigation Protections are intended to enact a permanent cessation of all litigation concerning or related to the Highland Released Parties through and including the Agreement Date; and

**WHEREAS**, the Parties, individually and collectively, wish to (a) resolve all disputes between and/or among any of the Highland Entities and their respective indemnitees, on the one hand, and any of the HMIT Entities, on the other hand, including those asserted or attempted to be asserted in the Pending Litigation, (b) fix and allow HMIT's Class 10 Interest at the amount and on the terms provided herein; and (c) terminate, extinguish, and release all Rights and Obligations on the terms provided herein.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

### AGREEMENT

1.    Stay and Dismissal of Pending Litigation With Prejudice.

(a)    Within five (5) Business Days after the Agreement Date, the HMIT Entities shall take all steps necessary (at their own cost) to stay the Pending Litigation.

017412
HCMLPHMIT00000861

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

(b)      Within five (5) Business Days after the Bankruptcy Court Approval Date, the HMIT Entities shall take all steps necessary (at their own cost) to dismiss the Pending Litigation with prejudice.

2.      <u>Maintenance of Stay and Dismissal of Certain Defendants from the Amended Complaint</u>.

(a)      The Litigation Trustee shall continue to maintain the stay of Adv. Proc. No. 21-03076-sgj and all related proceedings arising therefrom through the Bankruptcy Court Approval Date. Within five (5) Business Days after the Bankruptcy Court Approval Date, the Litigation Sub-Trust shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand PE from Counts I, II, III, and XXIV of the Amended Complaint.

3.      <u>Cash Payment to HMIT</u>.  Within five (5) Business Days following the Bankruptcy Court Approval Date, Highland shall pay HMIT a one-time, lump sum of Five Hundred Thousand Dollars (US$500,000.00) (the "**Payment**") by wire transfer:

[wire instructions]

4.      <u>HMIT Class 10 Interest</u>.

(a)      Subject to entry of the Bankruptcy Court Order, and the terms of this Agreement, the HMIT Class 10 Interest shall be deemed allowed in the amount of Three Hundred Thirty-Six Million Nine Hundred Forty Thousand Two Hundred Thirty and 58/100 Dollars (US$336,940,230.58), which amount represents the HMIT Capital Account Balance, <u>less</u> the HMIT Note Balance.

(b)      Notwithstanding anything to the contrary in the Plan or the Claimant Trust Agreement, as an integral part of this Agreement to consent to the allowance of the HMIT Class 10 Interest and the other considerations in this Agreement, HMIT shall not be deemed, and no holder of the HMIT Class 10 Interest shall be, a Claimant Trust Beneficiary or a "Beneficiary" under the Claimant Trust Agreement, and the Highland Released Parties, individually and collectively, shall owe no duty to any HMIT Releasor (whether contractual, fiduciary, equitable, statutory or otherwise), including with respect to the HMIT Class 10 Interest, in each case, except as expressly set forth in this Agreement.  Furthermore, without limiting the foregoing and for the avoidance of doubt, the contractual right of the holder of the HMIT Class 10 Interest to receive or recover any payments or Indemnity Trust Assets from the Indemnity Trust as set forth in this Agreement or the Indemnity Trust Agreement does not make any HMIT Releasor or any other Person a beneficiary of the Indemnity Trust or under the Indemnity Trust Agreement.

(c)      Notwithstanding anything to the contrary in the Plan, the Claimant Trust Agreement or the Indemnity Trust Agreement, in no event shall HMIT sell, transfer, assign, pledge, hypothecate, participate or otherwise dispose of or encumber the HMIT Class 10 Interest or any rights (including any right to payment) with respect thereto (collectively, a "**Class 10 Assignment**"), and any attempted Class 10 Assignment shall be null and void.

017413
HCMLPHMIT00000862

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

(d)     For the avoidance of doubt, the HMIT Class 10 Interest is and shall remain senior to the not yet allowed, unvested contingent Class 11 Claims of Equity Interests as provided for in the Plan, the Plan Documents, and the Claimant Trust Agreement.

5.     <u>Initial Interim Distributions on the Allowed Class 10 Interests</u>.

(a)     Within five (5) Business Days after the Bankruptcy Court Approval Date, the Indemnity Trust shall distribute (the date on which such distribution is made, the "**Initial Interim Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Ten Million Dollars (US$10,000,000.00) (the "**Initial Interim Cash Distribution Amount**").

(b)     Within five (5) Business Days after the Bankruptcy Court Approval Date (the "**Note Assignment Date**"), the Highland Entities shall cause the portion of the Dugaboy Note held by the Highland Entities to be distributed to HMIT in-kind and take all actions necessary for HMIT to become the holder of such portion of the Dugaboy Note, and shall in addition pay to HMIT cash in the aggregate amount of all principal and interest payments actually received on the Dugaboy Note by the Highland Entities, including the Indemnity Trust, from the Agreement Date to the Note Assignment Date.  Prior to the Bankruptcy Court Approval Date, HMIT will engage an independent valuation service provider to value the Dugaboy Note for purposes of determining the magnitude of reduction to the outstanding allowed Class 10 Interests on account of such in-kind distribution, which shall not be less than Fifty percent (50%) of the current balance owed under the Dugaboy Note. The HMIT Entities acknowledge and agree that none of the Highland Entities are representing or warranting that the Dugaboy Note can be sold, or the price, if any, that could be received for the Dugaboy Note and further acknowledge and agree that any such purchase price may be de minimis.

6.     <u>Subsequent Distribution(s) on the Allowed Class 10 Interests.</u>

(a)     On December 1, 2027, the Indemnity Trust shall distribute (such distribution, collectively, the "**First Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**First Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests: cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$6,500,000.00).

(b)     On December 1, 2028, the Indemnity Trust shall distribute (such distribution, collectively, the "**Second Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**Second Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$6,500,000.00).

(c)     Notwithstanding anything herein to the contrary, the obligations of the Indemnity Trust to make the First Subsequent Distribution or Second Subsequent Distribution is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII, Section 8.1(c) of the Indemnity Trust Agreement that the Indemnity Trust Assets comprising such distributions are not reasonably necessary to satisfy current or potential

017414
HCMLPHMIT00000863

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Indemnification Obligations (as defined in the Indemnity Trust Agreement) to all persons who are or might become Beneficiaries (as defined in the Indemnity Trust Agreement).

7.     <u>Final Distribution on the Allowed Class 10 Interests</u>.

(a)     On the later of the Final Court Approval Date and April 1, 2029, the Indemnity Trust will distribute all excess remaining Indemnity Trust Assets in accordance with Article VIII of the Indemnity Trust Agreement; <u>provided</u>, <u>however</u>, that the obligation of the Indemnity Trust to make any such distributions and/or dissolve and wind up the affairs of the Indemnity Trust is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII of the Indemnity Trust Agreement that (1) a Final Order(s) (as defined in the Indemnity Trust Agreement) has been entered resolving all litigation, claims or proceedings in any forum of any kind which could give rise to Indemnity Obligations (as defined in the Indemnity Trust Agreement) and payment in full of all such Indemnity Obligations and (2) all applicable statutes of limitations and any applicable tolling of such statutes of limitation have expired.

(b)     The Indemnity Trust agrees to not use Indemnity Trust Assets to fund Operating Expenses.

(c)     Following the Bankruptcy Court Approval Date, at the request of Mark Patrick, solely in his capacity, and to the extent he remains, as administrator of HMIT, but not more often than quarterly, Highland and the Indemnity Trust Administrator agree to review (i) the status of their respective assets, (ii) the balance of cash held, (iii) the status of any claims made for indemnification and any resolutions thereof, (iv) the status of any litigation, and (v) forecasted operating expenses with Mr. Patrick, and will each work in good faith to reduce operating expenses where reasonably practicable; provided, however, that all such reporting shall be subject to Mr. Patrick's agreement to maintain confidentiality with respect to any non-public information.

8.     <u>Transfer Kirschner Claims; Dismissal of HMIT Note Claims</u>.

(a)     Within five (5) Business Days after the Bankruptcy Court Approval Date, but after the dismissal provided for in <u>Section 2</u>, the Litigation Sub-Trust shall execute a short-form assignment in in favor of the HMIT Entities transferring all of the Litigation Sub-Trust's right, title, and interest in and to the Kirschner Claims (the "**Kirschner Transfer**"). Such assignment shall be in a form mutually acceptable to the Parties and its substance shall be consistent with the terms, conditions and limitations set forth in this Agreement, including <u>Section 8(b)</u> below. Each HMIT Entity acknowledges and agrees that none of the Highland Entities will have any duty or obligation to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof, except as provided in this Agreement, including the terms of <u>Section 8(c)</u> below.

(b)     THE HMIT ENTITIES SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THE LITIGATION SUB-TRUST IS TRANSFERRING THE KIRSCHNER CLAIMS ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT THE HMIT ENTITIES ARE NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM THE HIGHLAND ENTITIES OR

017415
HCMLPHMIT00000864

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

THEIR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE KIRSCHNER CLAIMS AND AMENDED COMPLAINT, INCLUDING WITH RESPECT TO THE ENFORCEABILITY, TRANSFERABILITY, VIABILITY, STRENGTH, OR VALUE OF ANY OF THE KIRSCHNER CLAIMS OR THE AMENDED COMPLAINT. The HMIT Entities hereby specifically acknowledge that they have carefully reviewed this Section and have had the opportunity to discuss its import with legal counsel and that the provisions of this Section are a material part of this Agreement. Thus, if for any reason HMIT is precluded from or is otherwise unable to prosecute all or any of the Kirschner Claims, (i) the HMIT Releasors shall have no recourse against any Highland Released Parties whatsoever and shall not be entitled to compensation of any kind, it being agreed that the HMIT Entities are otherwise receiving adequate consideration for the duties and obligations they are undertaking pursuant to this Agreement and (ii) there will be no effect whatsoever on the validity and enforceability of this Agreement or any of the other transactions contemplated hereby.

(c)     As promptly as reasonably practicable following the Bankruptcy Court Approval Date, the Highland Entities shall provide to the HMIT Entities electronic copies of written discovery requests and responses thereto, and documents produced in discovery in respect of the Kirschner Claims and the Amended Complaint. The Highland Entities will not provide any other documents regarding the Kirschner Claims including any attorney-client communications and any documents subject to the attorney work-product doctrine or similar privileges or immunities concerning the Kirschner Claims (collectively, the "**Kirschner Privileges**"), it being understood and agreed that the Highland Entities are retaining, and not transferring or waiving, the Kirschner Privileges.

(d)     Each Party acknowledges and agrees that if (i) the Kirschner Transfer is found or deemed to be impermissible or invalid, for any reason, or (ii) any HMIT Entity materially breaches this Agreement, the Kirschner Claims and Amended Complaint will revert to, and remain an asset of, the Litigation Sub-Trust.

9.     <u>General Release By The HMIT Entities</u>. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the HMIT Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its and their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the HMIT Entities, the "**HMIT Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each Highland Released Party from and waives and relinquishes, any and all Claims, which the HMIT Releasors, or any Person claiming through, under, or on behalf of any of the HMIT Releasors, ever had, now has, or hereafter can, shall, or may have against any of the Highland Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Agreement Date, including any fact, matter, transaction, or occurrence asserted by any HMIT Entity in the Pending Litigation or in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the Highland Released Parties, or the Highland Released

017416
HCMLPHMIT00000865

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**HMIT Entity Released Claims**").

10. <u>General Release By The Highland Entities</u>. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the Highland Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its or their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the Highland Entities, the "**Highland Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, any and all Claims which the Highland Releasors, or any Person claiming through, under, or on behalf of any of the Highland Releasors, ever had, now has, or hereafter can, shall, or may have against any of the HMIT Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Bankruptcy Court Approval Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the HMIT Released Parties, or the HMIT Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**Highland Released Claims**").

11. <u>Further Provisions Concerning The General Releases</u>.

(a) **FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASES ARE INTENDED TO BE GENERAL AND INCLUDE A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE AGREEMENT DATE.**

(b) To the maximum extent permitted by law, each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefit of any statute or other principle of law or equity that limits the applicability of a release with respect to Claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release.

(c) Without limiting the scope of the foregoing waiver, in connection with the foregoing release, each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefits of Section 1542 of the California Civil Code (to the extent, if any, that Section 1542 might apply to the foregoing release), which provides as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT**

017417
HCMLPHMIT00000866

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

**TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees that the provisions of Section 1542 of the Civil Code of the State of California and all similar federal or state law, rights, rules or legal principles, legal or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY EACH OF THE HMIT ENTITIES AND THE HIGHLAND ENTITIES**, **ON THEIR OWN BEHALF AND ON BEHALF OF THE OTHER HMIT RELEASORS AND HIGHLAND RELEASORS, RESPECTIVELY,** in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

In connection with such waiver and relinquishment, each of the HMIT Entities and Highland Entities acknowledges that it is aware that it may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein. Nevertheless, it is the intent of each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, in executing this Agreement fully, finally, and forever to settle and release all such matters, and all Claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

(d)    As an integral component of this Agreement, and notwithstanding the Parties' intent set forth in the preamble hereto and the general nature of the releases in Sections 9 and 10, should:

(i)    any HMIT Releasor contend or assert that any Claim of any kind whatsoever held by any HMIT Releasor against any Highland Released Party survives this Agreement and is in any way related to or arising from or in connection with any HMIT Entity Released Claim (such claim or cause of action, a "**HMIT Alleged Claim**"), such HMIT Releasor will be deemed to have irrevocably, fully, and finally assigned such HMIT Alleged Claim to the Highland Entities and the Highland Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such HMIT Alleged Claim.

(ii)    any Highland Releasor contend or assert that any Claim of any kind whatsoever held by any Highland Releasor against any HMIT Released Party survives this Agreement and is in any way related to or arising from or in connection with any Highland Entity Released Claim (such claim or cause of action, a "**Highland Alleged Claim**"), such Highland Releasor will be deemed to have irrevocably, fully, and finally assigned such Highland Alleged

017418
HCMLPHMIT00000867

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Claim to the HMIT Entities and the HMIT Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such Highland Alleged Claim.

12.    <u>Covenant Not To Sue; Limitation on Standing</u>. Upon the Agreement Date:

(a)    Each of the HMIT Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the Highland Released Parties, to recover, enforce, investigate, or collect any HMIT Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(b)    Each of the Highland Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the HMIT Released Parties, to recover, enforce, investigate, or collect any Highland Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(c)    For the avoidance of doubt, this Agreement shall not operate to give any HMIT Entity standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except for the limited purpose of seeking Court approval of this Agreement (including with respect to any appeal concerning any order entered granting or denying such approval), and except for the limited purpose of enforcing this Agreement, no HMIT Entity shall commence any Action in connection with the HMIT Class 10 Interest.

13.    <u>Representations and Warranties</u>.

(a)    Each of the HMIT Entities hereby represents and warrants that every HMIT Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any HMIT Releasor.

(b)    The HMIT Entities, on their own behalf and on behalf of the other HMIT Releasors, acknowledge and agree that each Plan Provision is lawful, effective, and binding on the HMIT Releasors. The HMIT Entities further agree, on their own behalf and on behalf of the other HMIT Releasors, that the HMIT Releasors will never, in any way, challenge or seek to modify, nullify, vacate, or revoke, or induce, encourage or direct any other Person to do so or act in concert with or assist (financially or otherwise) any other Person in doing so the Confirmation Order, the Plan, the Plan Protections, or any Plan Document, including the Claimant Trust Agreement, the LPA, the Indemnity Trust Agreement or the Litigation Sub-Trust Agreement, in the Bankruptcy Court, in any other state or federal court, in any other forum or tribunal, or otherwise, including administrative or regulatory tribunals and foreign courts.

(c)    Each of the Highland Entities hereby represents and warrants that every Highland Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any Highland Releasor.

(d)    Each Party severally represents and warrants as to itself only that: (i) it has taken all necessary action to authorize and approve the execution, delivery and performance of this

017419
HCMLPHMIT00000868

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Agreement; (ii) such Party has full power and authority to execute and deliver this Agreement; and (iii) this Agreement constitutes a valid, legal and binding obligation of such Party, and is enforceable subject to its terms. Each individual signatory hereto individually warrants and represents to all Parties hereto that such individual has full power and authority to act on behalf of and bind the Party for which he or she has executed this Agreement; provided, however that no signatory shall otherwise provide any warranty or representation or otherwise be a party to this Agreement on an individual basis.

14.    <u>No Continuing Rights, Duties or Obligations</u>.  Except for the rights, duties, and obligations expressly set forth in this Agreement, all Rights and Obligations that existed or may have existed shall be deemed terminated, extinguished, and released upon the Agreement Date. For the avoidance of doubt, from and after the Agreement Date, (a) the Highland Released Parties, individually and collectively, shall owe no duty, past or present, including with respect to the Kirchner Claims, to the HMIT Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement, and (b) the HMIT Released Parties, individually and collectively, shall owe no duty to the Highland Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement.

15.    <u>Gatekeeper Standard</u>.

(a)    The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that, notwithstanding the United States Court of Appeals for the Fifth Circuit's decision in *Highland Capital Management Fund Advisors, L.P. v. Highland Capital Management, L.P.*, No. 23-10534 (5th Cir. Mar. 18, 2025), the "Gatekeeper" provisions contained in Highland's Original Plan is forever binding on each of the HMIT Entities and any Persons claiming through, under or on behalf of any of them, and for a claim or cause of action to be  "colorable" for purposes of the Gatekeeper, it must be found by final order of the Bankruptcy Court (the "**Gatekeeper Court**"), which order shall be subject to appeal to a court of competent jurisdiction, to have satisfied the "Gatekeeper Colorability Test" as such term is defined in *In re Highland Capital Management, L.P.*, 2023 Bankr. LEXIS 2104 at *124-36 (Bankr. N.D. Tex. Aug. 24, 2023).

(b)    The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that compliance with the Gatekeeper requires (i) a motion seeking leave to sue an Exculpated Party (as that term is defined in Highland's original Plan) and a finding that the litigant's claims and causes of action are "colorable" attaching a complaint setting forth the basis for such claims or causes of action and (ii), in the Gatekeeper Court's sole discretion, an evidentiary hearing (during which the Gatekeeper Court may, among other things, hear testimony and assess the credibility of any witness(es)) to determine whether a proposed claim or cause of action is "colorable."

(c)    The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, further acknowledge and agree that the moving party under the Gatekeeper has the burden of satisfying the "Gatekeeper Colorability Test," and that the dismissal of the Pending Litigation shall have res judicata effect.

017420

HCMLPHMIT00000869

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

16.    <u>Indemnification</u>.

(a)    Without in any manner limiting the available remedies for any breach of this Agreement, the HMIT Entities, severally but not jointly, agree to indemnify, defend, and hold the Highland Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any HMIT Entity set forth in <u>Section 13</u> or (y) any Actions brought or prosecuted by or on behalf of, any HMIT Releasor or that are induced, encouraged, assisted  or directed by any HMIT Releasor or brought or prosecuted in concert with any HMIT Releasor against any Highland Released Party with respect to or related to any HMIT Entity Released Claims.  Without limiting the scope of the foregoing in any manner, any HMIT Entity that breaches <u>Section 12</u> shall be liable to the Highland Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such Highland Released Party in defending against or otherwise responding to such Action.  Each HMIT Entity acknowledges and agrees that the HMIT Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

(b)    Without in any manner limiting the available remedies for any breach of this Agreement, the Highland Entities, severally but not jointly, agree to indemnify, defend, and hold the HMIT Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any Highland Entity set forth in <u>Section 13</u> or (y) any suits, proceedings, or other actions brought or prosecuted by or on behalf of, any Highland Releasor or that are induced, encouraged, assisted  or directed by any Highland Releasor or brought or prosecuted in concert with any Highland Releasor against any HMIT Released Party with respect to or related to any Highland Entity Released Claims.  Without in any manner limiting the scope of the foregoing, any Highland Entity that breaches <u>Section 12</u> shall be liable to the HMIT Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such HMIT Released Party in defending against or otherwise responding to such Action.  Each Highland Entity acknowledges and agrees that the Highland Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

17.    <u>Execution</u>.  This Agreement may be executed by the exchange of signatures by facsimile or by PDF attachment to an email transmittal and in counterparts, and if so executed, shall be fully executed when a counterpart has been executed and delivered by all Parties hereto through counsel.  All counterparts taken together shall constitute one and the same agreement and shall be fully enforceable as such.

18.    <u>Bankruptcy Court Order</u>.  The allowance of the allowed HMIT Class 10 Interest pursuant to <u>Section 4</u> is subject to the entry of the Bankruptcy Court Order.  To that end, the Highland Entities shall file the 9019 Motion no later than five (5) Business Days after the Agreement Date.  Each Party shall, and shall cause each of their respective Affiliates to, undertake

017421

HCMLPHMIT00000870

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

any and all actions in compliance with applicable law to obtain the Bankruptcy Court Order as promptly as practicable, and without limiting the foregoing, if an Action is threatened or instituted by any Person opposing the 9019 Motion or otherwise challenging the validity or legality, or seeking to restrain the consummation, of the transactions contemplated by this Agreement or the Bankruptcy Court Order, each Party shall, and shall cause its respective Affiliates to, use their commercially reasonable best efforts to avoid, resist, resolve or, if necessary, and defend to effectuate this Agreement and consummate the transactions hereby.  If the 9019 Motion is not approved by entry of the Bankruptcy Court Order or if the Bankruptcy Court Approval is precluded from becoming a Final Order, (a) there will be no affect on, adjustment to or impairment of, in any way, the validity and enforceability of the remainder of this Agreement, and the other transactions contemplated hereby, all of which shall remain in full force and effect and (b) each Party shall, and shall cause its respective Affiliates to, use their best efforts to seek the allowance of the HMIT Class 10 Interest in a substantially similar amount and on substantially similar terms as set forth in Section 4 to the fullest extent possible so as to give effect to the original intent of the Parties as closely as possible.

19.   <u>Fees and Expenses</u>.   Whether or not the transactions contemplated hereby are consummated or the Bankruptcy Court Order is obtained, and except as otherwise expressly provided in this Agreement, each Party will bear its respective fees, costs and expenses (including legal, accounting and other professional fees) incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the transactions contemplated hereby, including with respect to each Party's respective obligations pursuant to Section 18. Notwithstanding the foregoing, if any Party hereto brings an Action to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that Action shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

20.   <u>Entire Agreement; No Other Representations</u>.   **THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF ANY PERSON OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT.   THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS (COLLECTIVELY, "<u>REPRESENTATIONS</u>"), EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT.  THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT; AND THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT RELIED ON ANY REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY ARE ENTERING INTO THIS AGREEMENT RELYING SOLELY ON THEIR OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS BY ANY PARTY, EXCEPT FOR THOSE REPRESENTATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT.  THE PARTIES AGREE THAT REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT SHALL NOT BE USED IN THE INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT, AND NEITHER THE HMIT RELEASED PARTIES NOR THE**

017422

HCMLPHMIT00000871

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

**HIGHLAND RELEASED PARTIES SHALL HAVE ANY LIABILITY FOR ANY CONSEQUENCES ARISING AS A RESULT OF ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT**.

21. <u>Agreement and Release Knowing and Voluntary</u>.  The Parties acknowledge that they have considered this Agreement with their respective attorneys and have carefully read this Agreement, that it has been fully explained by their attorneys, and that they have had a reasonable opportunity to consider this Agreement.  The Parties further represent that they know and fully understand the contents of this Agreement, that they intend to be legally bound by this Agreement and the releases and covenants contained herein, and that they are signing this Agreement, including the release provisions herein, voluntarily and of their own free will and without coercion, and with the benefit of advice of counsel.

22. <u>Cooperation</u>.  The Parties agree to perform any services or actions reasonably necessary to carry out the terms and conditions of this Agreement or the transactions contemplated hereby, including the execution and delivery of reasonable additional documents, instruments, conveyances and/or assurances, in good faith, and to reasonably communicate and cooperate with one another in this regard.  For the avoidance of doubt, nothing in this Section shall obligate the Highland Entities to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof.

23. <u>Governing Law</u>.  This Agreement shall be construed pursuant to and governed by the laws of the State of Delaware (substantive and procedural) without reference to principles of conflicts of law that would result in the application of any other State's laws.

24. <u>Jurisdiction/Venue</u>.  The Parties hereby irrevocably submit to the jurisdiction and venue of the Bankruptcy Court with respect to any Action arising out of or related to this Agreement or the subject matter hereof; if (and only if) the Bankruptcy Court lacks personal or subject matter jurisdiction to adjudicate an Action arising out of or related to this Agreement or the subject matter hereof, then the Parties irrevocably submit to the jurisdiction and venue of the United States District Court for the Northern District of Texas.

25. <u>No Admissions</u>.  All Parties acknowledge and agree that the matters set forth in this Agreement constitute the settlement and compromise of disputed Claims and that this Agreement shall not constitute the admission of any fact or liability by any of them regarding any Claim, including the Claims released hereunder, and neither the terms hereof, nor the fact of this Agreement itself, shall be evidence of any kind in any Action, other than an Action to enforce the terms of the Agreement or any instrument executed in connection herewith or any claim for damages or other relief for breach of any representation or warranty contained herein or in any instrument executed in connection herewith.

26. <u>Other Provisions</u>.

(a)  No representation, inducement, agreement, promise or understandings altering, modifying, amending, taking from or adding to, the terms and conditions hereof shall have any force or effect unless the same is in writing and validly executed by each of the Parties hereto.

017423

HCMLPHMIT00000872

(b)     The waiver by any Party of any breach of, or default under, any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or default; provided, however, that for any such waiver to be enforceable, it shall be in writing and executed by the non-breaching Party.

(c)     The headings contained in this Agreement are for convenience only and shall in no way restrict or otherwise affect the construction of the provisions hereof.

(d)     The Parties shall each execute all documents and perform all acts necessary and proper to effectuate the terms of this Agreement.

27.     <u>Notices</u>.  All notices required or permitted to be provided hereunder shall be afforded to the respective parties to and through their counsel, and shall be transmitted simultaneously by electronic mail (with PDF attachments, as necessary) and by telefax, addressed as follows:

To the Highland Entities:

**PACHULSKI STANG ZIEHL AND JONES LLP**
Jeffrey N. Pomerantz
John A. Morris
10100 Santa Monica Boulevard
Los Angeles, California 90067-4003
310.277.6910
jpomerantz@pszjlaw.com
jmorris@pszjlaw.com

To the HMIT Entities:

**KELLY HART PITRE**
Louis M. Phillips
Amelia Hurt
301 Main Street, Suite 1600
225.381.9643
Louis.Phillips@Kellyhart.com
Amelia.Hurt@Kellyhart.com

28.     <u>Severability</u>.  Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity and enforceability of any other provision of this Agreement.

29.     <u>Interpretive Provisions</u>. Unless the express context otherwise requires: (a) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) words defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (c) the words "Dollars" and "$" mean U.S. dollars; (d) references herein to

017424
HCMLPHMIT00000873

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement; (e) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words ",without limitation,"; (f) references herein to any gender shall include each other gender; (g) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement; (h) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (i) the word "or" shall be disjunctive but not exclusive; (j) the headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties; and (k) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

*[Signature page follows]*

017425

HCMLPHMIT00000874

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**HUNTER MOUNTAIN INVESTMENT TRUST**

By _____
       Name:     Mark Patrick
       Title:      Administrator
       Date:     May __, 2025

**BEACON MOUNTAIN LLC**

By _____
       Name:
       Title:
       Date:     May __, 2025

**RAND ADVISORS, LLC**

By _____
       Name:     Mark Patrick
       Title:      President
       Date:     May __, 2025

**RAND PE FUND I, LP**
By: Rand PE Fund Management, LLC, its General Partner

By _____
       Name:     Mark Patrick
       Title:      President
       Date:     May __, 2025

**RAND PE FUND MANAGEMENT, LLC**

By _____
       Name:     Mark Patrick
       Title:      President

017426

HCMLPHMIT00000875

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Date:          May __, 2025

**ATLAS IDF, LP**
By: Atlas IDF GP, LLC, its General Partner

By _____
    Name:          Mark Patrick
    Title:          President
    Date:          May __, 2025

**ATLAS IDF GP, LLC**

By _____
    Name:          Mark Patrick
    Title:          President
    Date:          May __, 2025

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By _____
    Name:          James. P. Seery, Jr.
    Title:          Chief Executive Officer
    Date:          May __, 2025

**HIGHLAND CLAIMANT TRUST**

By _____
    Name:          James P. Seery, Jr.
    Title:          Claimant Trustee
    Date:          May __, 2025

**HIGHLAND LITIGATION SUB-TRUST**

By _____
    Name:          Marc S. Kirschner
    Title:          Litigation Trustee

017427

HCMLPHMIT00000876

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Date:        May ___, 2025

**HIGHLAND INDEMNITY TRUST**

By  _____
    Name:    James P. Seery, Jr.
    Title:    Indemnity Trust Administrator
    Date:    May ___, 2025

017428

HCMLPHMIT00000877

**EXHIBIT 50**

017429

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** David Klos <DKlos@HighlandCapital.com>
**Subject:** Accepted: Confidential discussion - subject to Rule 408 and Confidentiality Agreement
**Date:** Thu, 17 Apr 2025 18:05:44 +0000
**Importance:** Normal
**Attachments:** unnamed

017430

HCMLPHMIT00000947

**EXHIBIT 51**

**From:** David Klos <DKlos@HighlandCapital.com>
**To:** Jim Seery <jpseeryjr@gmail.com>, Tim Cournoyer <TCournoyer@HighlandCapital.com>, Kristin Hendrix <KHendrix@HighlandCapital.com>, "John A. Morris" <jmorris@pszjlaw.com>, Jeff Pomerantz <jpomerantz@pszjlaw.com>, "Gregory V. Demo" <GDemo@pszjlaw.com>, Mark Patrick <mpatrick@dafholdco.com>, Shawn Raver <sraver@dafholdco.com>, "paul@gkmanagement.com.ky" <paul@gkmanagement.com.ky>, "Louis.Phillips@kellyhart.com" <Louis.Phillips@kellyhart.com>, "amelia.hurt@kellyhart.com" <amelia.hurt@kellyhart.com>
**Subject:** Confidential discussion - subject to Rule 408 and Confidentiality Agreement
**Date:** Mon, 7 Apr 2025 19:08:47 +0000
**Importance:** Normal
**Attachments:** unnamed

---

For in-person attendees:

**Location: 100 Crescent Court, Suite 1850, Dallas, TX 75201**

Physical directions for in-person attendees: Take the elevator bank in the "100 building" to Floor 17; then exit and find the small single elevator located around the corner, which will take you to Floor 18; then ring the doorbell at the Highland suite, which can be found around the corner from the elevator.

---

# Microsoft Teams Need help?

## Join the meeting now

Meeting ID: 215 023 216 231

Passcode: Qj7fS3Zb

---

**Dial in by phone**

+1 469-844-8017,,386721907# United States, Dallas

Find a local number

Phone conference ID: 386 721 907#

For organizers: Meeting options | Reset dial-in PIN

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

**EXHIBIT 52**

017433

**Event:** Confidential discussion - subject to Rule 408 and Confidentiality Agreement

**Start Date:** 2025-04-08 15:30:00 +0000

**End Date:** 2025-04-08 17:30:00 +0000

**Organizer:** David Klos <DKlos@HighlandCapital.com>

**Location:** Microsoft Teams Meeting

**Class:** X-PERSONAL

**Date Created:** 2025-06-12 16:05:40 +0000

**Date Modified:** 2025-06-12 16:05:40 +0000

**Priority:** 5

**DTSTAMP:** 2025-04-07 19:08:45 +0000

**Attendee:** Jim Seery <jpseeryjr@gmail.com>; Tim Cournoyer <TCournoyer@HighlandCapital.com>; Kristin Hendrix <KHendrix@HighlandCapital.com>; John A. Morris <jmorris@pszjlaw.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Mark Patrick <mpatrick@dafholdco.com>; Shawn Raver <sraver@dafholdco.com>; paul@gkmanagement.com.ky <paul@gkmanagement.com.ky>; Louis.Phillips@kellyhart.com <Louis.Phillips@kellyhart.com>; amelia.hurt@kellyhart.com <amelia.hurt@kellyhart.com>

**Alarm:** Display the following message 15m before start

| Reminder

For in-person attendees:

**Location: 100 Crescent Court, Suite 1850, Dallas, TX 75201**

Physical directions for in-person attendees: Take the elevator bank in the "100 building" to Floor 17; then exit and find the small single elevator located around the corner, which will take you to Floor 18; then ring the doorbell at the Highland suite, which can be found around the corner from the elevator.

_____

# Microsoft Teams Need help?

017434

HCMLPHMIT00000950

## Join the meeting now

Meeting ID: 215 023 216 231

Passcode: Qj7fS3Zb

___

### Dial in by phone

+1 469-844-8017,,386721907# United States, Dallas

Find a local number

Phone conference ID: 386 721 907#

For organizers: Meeting options | Reset dial-in PIN

___

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

017435

HCMLPHMIT00000951

**EXHIBIT 53**

| | |
|---|---|
| **From:** | David Klos <DKlos@HighlandCapital.com> |
| **To:** | Jim Shields <jshields@shieldslegal.com> |
| **Cc:** | "John A. Morris" <jmorris@pszjlaw.com>, Jim Seery <jpseeryjr@gmail.com>, "Louis.Phillips@kellyhart.com" <Louis.Phillips@kellyhart.com> |
| **Subject:** | Confidential - Subject to Rule 408 and Confidentiality Agreement |
| **Date:** | Tue, 22 Apr 2025 16:20:33 +0000 |
| **Importance:** | Normal |
| **Attachments:** | Privileged_and_confidential_-_DRAFT_4.8.25_discussion_materials.pdf; PRIVILEGED_AND_CONFIDENTIAL_DRAFT_SETTLEMENT_STRUCTURE_CLEAN_4.16.25.pdf; Privileged_and_Confidential_-_Indemnity_Trust_2025-4-16_Draft.pdf |
| **Inline-Images:** | image001.jpg |

---

Jim,

It was nice meeting you virtually this morning.  As a follow-up to our discussion, I understand the attached materials have already been provided to Louis, but I am re-sending this subset to you as well as I understand he's heading out of the country soon.

Attached are:

1. Discussion materials from April 8 meeting (the projected budget build-up can be found on p. 4)
2. Clean draft of settlement structure
3. Illustrative sources and uses of timing/amounts of potential future Indemnity Trust payouts

If you have other follow-ups or clarifications needed, feel free to reach out to John, Jim, or me.

Thank you,

-Dave

**DAVID KLOS**



100 Crescent Court  |  Suite 1850  |  Dallas, Texas 75201
C: 214.674.2926  |  O: 972.419.4478  |  F: 972.628.4147
dklos@highlandcapital.com  |  www.highlandcapital.com

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

HCMLPHMIT00000987

REVISED DRAFT

**PRIVILEGED AND CONFIDENTIAL ATTORNEY CLIENT COMMUNICATON**

**PREPARED AT THE DIRECTION OF COUNSEL IN CONNECTION WITH EXISTING LITIGATION AND IN ANTICIPATION OF FUTURE LITIGATION**

**PROTECTED BY FRE 408 AND SIMILAR STATE LAW PROTECTIONS.  PROVIDED PURSUANT TO NDA**

**April 15, 2025**

DRAFT Potential Settlement Structure with DAF and HMIT

**HMIT**

- **Settlement of remanded motion to sue** – HCMLP, the Claimant Trust, and HMIT settle existing motion to sue and all other claims with prejudice for a cash payment of [$500k]
- **Allowance of claim** - HCMLP to allow HMIT Class 10 interest in the amount of ~$337mm (calculated as ~$395mm Petition Date capital account, less ~$58mm P&I outstanding on HMIT note as of Petition Date) subject to:
  - The HMIT allowed Class 10 interest is not transferable
  - HMIT releases all claims and accepts the "Litigation Protections" – see separate document containing the releases and other required provisions – which eliminate claims and limit the Class 10 allowed interest
  - LT releases HMIT from all other claims in the LT litigation and otherwise
  - LT transfers to holders of allowed Class 10 interests all remaining LT litigation (after HMIT and DAF/CLO Holdco releases) "as-is, where-is" along with all documents produced in the LT case to date
    - Such causes of action are limited to the currently stayed litigation and other causes of action that may exist related to former employees Ellington and Leventon
    - If for any reason the transfer of the LT litigation is nullified, the settlement will not be affected
  - Complete cessation and withdrawal of any other litigation among the parties
  - Class 10 remains senior to Class 11 as required by the Plan
- **Court Approval –** Settlement and allowance of Class 10 Claim subject to approval of the Bankruptcy Court

**DAF**

- **Settlement of DAF Claims** – HCMLP, the Claimant Trust, and DAF/CLO Holdco settle all claims underlying the current Fifth Circuit appeal and all other claims with

017438

prejudice for a cash payment of $[2mm] within [10] business days of execution of the settlement; the Fifth Circuit appeal will be dismissed with prejudice within [10] business days of execution of the settlement

- o HCMLP will purchase DAF's right to distribution from HCLOF related to Acis 6, as is - where is, without representation except for unencumbered ownership, for $[3mm] cash, to be paid within [10] business days of execution of the settlement; DAF releases HCLOF from any claims related to Acis 6 distributions
- o DAF/CLO Holdco release all claims and accept the "Litigation Protections" – see separate document containing the releases and other required provisions
- o LT releases DAF/CLO Holdco from all other claims in the LT litigation and otherwise
- o Complete cessation and withdrawal of any other litigation among the parties
- o Settlement will be filed with the Bankruptcy Court and "so ordered"

## **Distributions**

- **Initial Interim Cash Distributions** – Within [91] days of the receipt of a final/non-appealable order not subject to certiorari:
  - o The Indemnity Trust will distribute $[10]mm cash directly to Class 9 Claimant Trust Beneficiaries in accordance with the waterfall and the Indemnity Trust Agreement
  - o [Subject to Class 9 Approval], the Indemnity Trust will distribute $[10]mm cash directly to holders of allowed Class 10 interests
    - On approval of the settlement by the Bankruptcy Court, the Indemnity Trust will set up a separate $[10]mm reserve for the Initial Interim Cash Distribution which reserve will be held in UST on the same terms as other Indemnity Trust holdings pending distribution to Class 10 interest holders or reversal/remand of the settlement
    - Any payments on the Dugaboy Note from the date of Bankruptcy Court approval of the settlement to the date of the Initial Interim Cash Distributions will be held by the Indemnity Trust in a separate account and also be paid to holders of allowed Class 10 interests
      - The actual dollar amount of any such P+I payments paid will reduce the Class 10 interests outstanding

017439

HCMLPHMIT00000989

- **Subsequent Distribution(s)** - Following the Initial Interim Cash Distributions, most, if not all remaining assets will be held by the Indemnity Trust, except for potentially the Disputed Claims Reserve (if the pending claim is not fully resolved) and cash at the Claimant Trust and HCMLP (indirectly owned by the Indemnity Trust) to be used in the wind-down of those entities with any excess amounts contributed/distributed to the Indemnity Trust
    - On April 1, 2028, if no threats, demands, or litigations have been brought against the Indemnity Trust or its beneficiaries:
        - The Indemnity Trust will distribute ~$[11]mm cash directly to Class 9 Claimant Trust Beneficiaries in accordance with the waterfall and the Indemnity Trust Agreement, satisfying the remainder of the Class 9 interests outstanding
        - The Indemnity Trust will distribute $[5]mm cash directly to holders of allowed Class 10 interests
        - Note Cash or In-Kind Distribution – At the election of HMIT, the Indemnity Trust will either (a) sell the currently $[17.6]mm face value (P+I) promissory note receivable from Dugaboy Investment Trust to HCMLP that has been irrevocably participated (and may be assigned if it defaults) to the Indemnity Trust (the "Dugaboy Note") and distribute the net proceeds (plus all P+I payments on the Dugaboy Note from the Interim Cash Distribution Date to April 1, 2028) to holders of allowed Class 10 interests or (b) assign the Dugaboy Note directly to holders of allowed Class 10 interests
            - For purposes of tracking progress toward the ~$337mm Class 10 interest:
                - if the Dugaboy Note is sold, the distribution will be valued at the amount of cash distributed;
                - if the Dugaboy Note is distributed in kind, the distribution will be valued at fair market value as determined by the Indemnity Trust Administrator
            - Assumes the Dugaboy Note continues to perform; if there is a default prior to April 1, 2028, the Indemnity Trust will accelerate the Dugaboy Note and pursue full collection plus cost of collection
                - If distribution of the Dugaboy Note is to be effected on April 1, 2028 and collection litigation has been commenced, at its election, holders of allowed Class 10 interests can receive, the collected balance or the

017440

HCMLPHMIT00000990

**REVISED DRAFT**

litigation or elect to have the Indemnity Trust continue the litigation and subsequently pay the proceeds to holders of allowed Class 10 interests

o As it pertains to the Disputed Claims Reserve, Highland will object to the Daugherty tax POC (final remaining pending claim).  Following a final non-appealable order resolving the claim, any remaining funds will be distributed to Class 9 or, if Class 9 has been paid in full, to holders of allowed Class 10 interests

- **"Final Distribution"**  - After April 1, 2029, if no threats, demands, or litigations have been brought against beneficiaries of the Indemnity Trust and all statutes of limitation (SOLs) and any potentially applicable tolling thereof have expired, at the Indemnity Trust Administrator's sole discretion, any excess remaining funds in the Indemnity Trust shall be paid out in accordance with the Plan and the Indemnity Trust Agreement (i.e. to holders of allowed Class 10 interests, up to allowed amounts) in conjunction with the dissolution, wind down and cancellation of the Indemnity Trust

  o The Indemnity Trust Administrator will consult with [Mark Patrick] regarding potentially applicable SOLs and tolling

- **Other**
  o **Extension of Claimant Trust –** A one-year extension for the Claimant Trust will be sought in the bankruptcy court.  During the 1-year extension period, the Claimant Trust will be placed into dissolution and begin its winding up.
    ▪ The Indemnity Trust will covenant not to transfer any funds to the Claimant Trust following the date of final non-appealable approval of the HMIT settlement
  o **HCMLP wind down –** the remaining unliquidated assets of the estate, including HCMLP, itself, will be retained within the Indemnity Trust and will be liquidated.
    ▪ HCMLP personnel will complete the liquidation, dissolution, cancellation, tax compliance, and any other winding up activities for the remaining entities under its purview, including HCMLP.
    ▪ Any excess amounts remaining at cancellation of HCMLP will be distributed to the Indemnity Trust.

017441

HCMLPHMIT00000991

**REVISED DRAFT**

- ▪ The Indemnity Trust will covenant not to transfer any funds to HCMLP following the date of final non-appealable approval of the HMIT settlement
  - • HCMLP will have a funding agreement with the Claimant Trust to assure that the Claimant Trust has sufficient funds to complete its wind-down
  - • Any excess funds in the Claimant Trust at its cancellation will be contributed to the Indemnity Trust; excess funds at HMLP will be distributed to the Indemnity Trust
- o **HCMLP and its general partner –** While HCMLP will be placed into dissolution, the entity will continue to survive during its winding up period, during which time it may continue to defend inbound litigation, prosecute outbound litigation, maintain its books and records, and monetize its remaining assets.  HCMLP's general partner will be dissolved, wound-down and cancelled along with HCMLP
- o **Claimant Trust Oversight Board –** Subject to the Plan and Claimant Trust agreement, it is anticipated that the members of the Oversight Board will continue in their existing roles until the final/non-appealable order approving the HMIT settlement is received
- o **Information rights to HMIT –** After Bankruptcy Court approval of the HMIT settlement, per the Claimant Trust Agreement, except that:
  - ▪ HCMLP will review forecasted expenses with [Mark Patrick] at his request, but not more often than quarterly, and will work in good faith to reduce expenses where possible
- o **Approval rights –** None, other than as specified elsewhere
- o **Duties to HMIT –** None before or after vesting/Bankruptcy Court approval of the HMIT settlement
- o **Compensation –** CEO and employee compensation remains governed by existing agreements with the oversight of the Claimant Trust Oversight Board; following the vesting of HMIT's interests, no changes will be permitted to those agreements without HMIT written consent; CEO maintains ability to maintain or reduce headcount in his absolute discretion

017442

HCMLPHMIT00000992

**PRIVILEGED AND CONFIDENTIAL ATTORNEY CLIENT COMMUNICATON**

**PREPARED AT THE DIRECTION OF COUNSEL IN CONNECTION WITH EXISTING LITIGATION AND IN ANTICIPATION OF FUTURE LITIGATION**

**PROTECTED BY FRE 408 AND SIMILAR STATE LAW PROTECTIONS.  PROVIDED PURSUANT TO NDA**

# ILLUSTRATIVE HIGHLAND INDEMNITY TRUST PAYOUT SCHEDULE

EXPERIENCED. DISCIPLINED. **BOLD.**

**HIGHLAND CAPITAL MANAGEMENT**

017443

HCMLPHMIT00000993



**HIGHLAND INDEMNITY TRUST**

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT PREPARED AT THE DIRECTION OF COUNSEL IN CONNECTION WITH LITIGATION AND IN ANTICIPATION OF FUTURE LITIGATIONPROTECTED BY FRE 408 AND SIMILAR STATE LAW PROTECTIONS.  PROVIDED PURSUANT TO NDA

| Total Illustrative Sources and Uses (4/1/26 - 4/1/29) | |
|---|---|

| **Sources** | | **Uses** | |
|---|---|---|---|
| Beginning Cash | $ 67,850,000 | Cash to repay 9s in Full | $ 21,029,073 |
| Interest Received on Cash (4% annual) | $ 6,970,471 | Cash distributions to 10s [2] | $ 60,439,653 |
| Dugaboy Note P&I Received | $ 3,991,523 | | |
| Disputed Claim Reserve [1] | $ 2,656,732 | | |
| Total Cash Sources | $ 81,468,726 | Total Cash Uses | $ 81,468,726 |
| | | | |
| Dugaboy Note (P& Accrued I) 4/1/28 [3] | $ 15,137,110 | Dugaboy Note to 10s [3] | $ 15,137,110 |
| Total Sources | $ 96,605,837 | Total Uses | $ 96,605,837 |
| | | | |
| | | Total to 9s | $ 21,029,073 |
| | | Total to 10s (incl Dugaboy Note) [3][4] | $ 75,576,763 |

Notes

[1] HCMLP will object to this claim. If claim is disallowed, following a final non-appealable order, any remaining funds will be distributed to Class 9, or if Class 9 has been paid in full, Class 10.

[2] Assumes no indemnification costs are expended throughout the period.

[3] Assumes Dugaboy Note FMV at face with no discounting.

[4] Excludes any net value ultimately obtained from the Kirschner Litigation

*DRAFT - SUBJECT TO CONFIDENTIALITY AGREEMENT*

017444
HCMLPHMIT00000994



**HIGHLAND INDEMNITY TRUST**

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT PREPARED AT THE DIRECTION OF COUNSEL IN CONNECTION WITH PENDING LITIGATION AND IN ANTICIPATION OF FUTURE LITIGATION PROTECTED BY FRE 408 AND SIMILAR STATE LAW PROTECTIONS.  PROVIDED PURSUANT TO NDA

### Interim Cash Distribution Sources and Uses (4/1/26)

| Sources | | Uses | |
|---|---|---|---|
| Beginning Cash | $ 67,850,000 | Distribution to 9s - IT | $ 10,000,000 |
| Interest Received on Cash | $ 1,360,718 | Distribution to 9s - DCR | $ 2,656,732 |
| Dugaboy Note P&I Received | $ 1,354,892 | Distribution to 10s - IT | $ 10,000,000 |
| Disputed Claim Reserve | $ 2,656,732 | Distribution to 10s - Dugaboy Note P&I | $ 1,354,892 |
| | | Remaining Indemnity Trust Cash | $ 49,210,718 |
| Total Cash Sources | $ 73,222,342 | Total Cash Uses | $ 73,222,342 |

### Subsequent Distribution(s) Sources and Uses (4/1/28) [1]

| Sources | | Uses | |
|---|---|---|---|
| Beginning Cash | $ 49,210,718 | Distribution to 9s - IT | $ 8,372,341 |
| Interest Received on Cash | $ 4,015,595 | Distribution to 10s - IT | $ 5,000,000 |
| Dugaboy Note P&I Received | $ 2,636,631 | Distribution to 10s - Dugaboy Note P&I | $ 2,636,631 |
| | | Remaining Indemnity Trust Cash | $ 39,853,972 |
| Total Cash Sources | $ 55,862,943 | Total Cash Uses | $ 55,862,943 |
| | | | |
| Dugaboy Note (P&I Accrued I) 4/1/28 | $ 15,137,110 | Dugaboy Note to 10s | $ 15,137,110 |
| Total Sources | $ 71,000,054 | Total Uses | $ 71,000,054 |

### Final Distribution (4/1/29) [1] [2]

| Sources | | Uses | |
|---|---|---|---|
| Beginning Cash | $ 39,853,972 | Distribution to 10s | $ 41,448,130 |
| Interest Received on Cash | $ 1,594,159 | | |
| Total Cash Sources | $ 41,448,130 | Total Cash Uses | $ 41,448,130 |

[1] Assumes no threats, demands or litigations.

[2] Assumes all SOL (and any applicable tolling) expired.

DRAFT - SUBJECT TO CONFIDENTIALITY AGREEMENT

017445
HCMLPHMIT00000995

 **HIGHLAND INDEMNITY TRUST**

PRIVILEGED AND CONFIDENTIAL MATERIAL PREPARED BY COUNSEL OR PREPARED AT THE DIRECTION OF COUNSEL IN CONNECTION WITH LITIGATION AND IN ANTICIPATION OF FUTURE LITIGATION PROTECTED BY FRE 408 AND SIMILAR STATE LAW PROTECTIONS. PROVIDED PURSUANT TO NDA

**Illustrative Indemnity Trust Payout - Draft**
**4/15/2025**

| Period Ending | Start Date 9/30/2025 | Assumed Final Order Year 1 4/1/2026 | Year 2 4/1/2027 | Subsequent Distribution(s)[1] Year 3 4/1/2028 | Final Distribution[1][2] Year 4 4/1/2029 | Total |
|---|---|---|---|---|---|---|
| Indemnity Trust Cash Balance[3] | $ 67,850,000 | $ 49,210,718 | $ 51,179,147 | $ 39,853,972 | $ - | |
| Dugaboy Note Balance (P & and Accrued I)[4] | $ 17,806,565 | $ 16,729,382 | $ 15,932,744 | $ - | $ - | |
| TOTAL INDEMNITY TRUST | $ 85,656,565 | $ 65,940,100 | $ 67,111,891 | $ 39,853,972 | $ - | |
| Disputed Claim Reserve | $ 2,656,732 | $ - | $ - | $ - | $ - | |
| Class 9 Payment of Disputed Claim Reserve[5] | | $ (2,656,732) | $ - | $ - | $ - | $ (2,656,732) |
| Class 9 Payments Indemnity Trust | | $ (10,000,000) | $ - | $ (8,372,341) | $ - | $ (18,372,341) |
| Class 9 Total Payments | | $ (12,656,732) | $ - | $ (8,372,341) | $ - | $ (21,029,073) |
| Class 9 Balance[6] | $ 21,009,022 | $ 8,352,290 | 8,358,972 | $ - | $ - | |
| Class 10 Payments Indemnity Trust | | $ (10,000,000) | $ - | $ (5,000,000) | $ (41,448,130) | $ (56,448,130) |
| Class 10 Payments Dugaboy Note[7] | | $ (1,354,892) | $ - | $ (17,773,741) | $ - | $ (19,128,633) |
| Class 10 Total Payments | | $ (11,354,892) | $ - | $ (22,773,741) | $ (41,448,130) | $ (75,576,763) |
| Class 10 Balance | $ 336,940,231 | $ 325,585,339 | $ 325,585,339 | $ 302,811,598 | $ 261,363,467 | |

Notes
[1] Assumes no threats, demands or litigations.
[2] Assumes all SOL (and any applicatable tolling) expired.
[3] Assumes no threats, demands or litigations. Assumes 4% Interest earned each period.
[4] 3.26% Interest and $790k Amort due 12/31 each year
[5] HCMLP will object to this claim. If claim is disallowed, following a final non-appealable order, any remaining funds will be distributed to Class 9, or if Class 9 has been paid in full, Class 10.
[6] Interest on balance accrues at 0.08%. Start Date face value of claims outstanding is $20,584,958.56.
[7] Assumes Dugaboy Note FMV at face with no discounting. Payment Year 3 includes P&I received after Initial Interim Cash Distribution.

017446
HCMLPHMIT00000996

Case 19-34054-sgj11    Doc 4255-53    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Exhibit 53    Page 12 of 15

Privileged and confidential - provided pursuant to Rule 408 and the binding Confidentiality Agreement executed amongst the Parties

**Current Snapshot - remaining assets [1]**
*in USD millions, except percentages*

| Asset description | Ref | Claimant Trust [2] | Indemnity Trust [3] | Combined |
|---|---|---|---|---|
| Cash/treasuries | [4] | $  20.3 | $  67.9 | $  88.1 |
| Disputed Claims Reserve | [5] | 2.7 | - | 2.7 |
| Dugaboy Note receivable | [6] | - | 17.6 | 17.6 |
| HCM Korea (note and equity) | [7] | 3.0 | - | 3.0 |
| HCLOF shares | [8] | 2.5 | - | 2.5 |
| HCRE bad faith sanction | [9] | 0.9 | - | 0.9 |
| Kirschner Litigation (main adversary) | [10] | *See footnote* | - | - |
| HMIT note | [11] | *See footnote* | - | - |
| **Total assets** | | **$  29.4** | **$  85.5** | **$  114.8** |

[1] As of April 3, 2025. This disclosure is NOT a balance sheet prepared in accordance with US GAAP. In some instances, values are estimated and actual amounts retained may ultimately differ materially. No liabilities are included herein, including existing liabilities, contingent liabilities, indemnification obligations, or considerations for future expenses, including costs of liquidation that have not yet been, but will be incurred.

[2] Claimant Trust, including consolidation of the various "Plan" entities other than the Indemnity Trust (HCMLP GP, LLC, Highland Capital Management, LP, Litigation Sub-Trust), each on a standalone basis, with intercompany balances eliminated.

[3] Stand-alone assets retained by the Indemnity Trust. Other than less than <$1M retained in cash, remainder of cash is invested in US treasuries with maturities less than 1 year. Excludes <$1M of cash/treasuries on account of the Okada settlement. Pursuant to the Okada settlement, these funds are segregated and are to be repaid to Okada as first-out funds to the extent that any excess exists in the Indemnity Trust. Accordingly, in a settlement scenario, these funds would not be available to Class 10 interest holders.

[4] Cash and treasuries includes full face amount of treasuries maturing within 6 months and has also been adjusted up to assume the near-term receipt of approximately $5 million from Highland CLO Funding, Ltd.

[5] Segregated funds invested in US treasuries with near-term maturities. Funds are reserved for the Daugherty tax proof of claim, which remains pending. If Highland successfully objects to the proof of claim, funds would be released from the Disputed Claims Reserve. If the claim is ultimately allowed in full or in part, funds would be paid to Daugherty on account of the allowed claim and any excess remaining would be released from the Disputed Claims Reserve.

[6] Note receivable from The Dugaboy Investment Trust ("Dugaboy"). ~$17.4M principal and ~$0.2M interest currently outstanding, accruing at approximately $1,553/day. Fair value is less than face value as the note is long-dated, accruing interest at 3.26% and makes annual principal and interest payments through 2046, with the last of such payments due December 31, 2046. Dugaboy is current on its payments, including with the most recent payment completed for year-end 2024. Principal payments due are $790,215 yearly, plus accrued interest, which declines each year as principal declines. The next interest payment due December 31, 2025 is $566,677. No assurance that Dugaboy will continue making the annual principal and interest payments when due, although the holder of the note could accelerate and pursue collection in that event.

[7] 100% equity interest in Highland Capital Management Korea Limited ("HCM Korea"), plus $2.5 million note from HCM Korea. Ultimate value dependent on the monetization of the Caris Life Sciences investment through an expected 2025 IPO, which is expected to be in the range of $2 million to $5 million, but could also exceed or fall short of this range.

[8] Shares of Highland CLO Funding, Ltd. ("HCLOF"), a Guernsey company. Value has been adjusted down to assume a near-term cash dividend of approximately $5 million. Remaining value is primarily tied up in the "Acis 6" asset, for which a NexPoint entity has recently initiated an appeal in the 2nd Circuit Court of Appeals. Ultimate value dependent on the Acis 6 litigation and costs of winding down HCLOF and expected to be in the range of $2 million to $4 million, but could also exceed or fall short of this range.

[9] Bad faith sanction against HCRE of $825,940.55, currently on appeal in the District Court. Fully briefed since November 2024. Award was posted in the court registry and is accruing post-judgment interest at a rate of $118.80/day. Approximately $870k is outstanding, including post-judgment interest currently. No assurance that the appeal will resolve favorably and as a result, there is no assurance that any amounts will ultimately be collected.

[10] Litigation brought by Marc Kirschner as Litigation Trustee to the Litigation Sub-Trust. Adversary proceeding is currently stayed. The value of the claims, their collectibility, and the costs of their continued pursuit is ultimately unknown. For purposes of aggregating the current value of assets for this illustrative presentation, no value has been ascribed.

[11] Within the litigation brought by Marc Kirschner as Litigation Trustee to the Litigation Sub-Trust were claims against HMIT relating to the "HMIT note" receivable, which had originally been a portion of the consideration HMIT paid for acquiring limited partnership interests in Highland in 2015. These claims are also stayed as part of the overall stay in the case. The value of the note, its collectibility, and the costs of their continued pursuit is ultimately unknown. For purposes of aggregating the current value of assets for this illustrative presentation, no value has been ascribed.

1

017447
HCMLPHMIT00000997

Case 19-34054-sgj11    Doc 4255-53    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Exhibit 53    Page 13 of 15

Privileged and confidential - provided pursuant to Rule 408 and the binding Confidentiality Agreement executed amongst the Parties

**Uses: how much could be left after satisfying Class 9 claims?**
*in USD millions*

| | | | |
|---|---|---|---|
| **Total combined assets** | $ | **114.8** | *see "current snapshot"* |
| Less: | | | |
| Oustanding Class 9, including interest | | (21.0) | |
| Existing Incentive Compensation triggered through full payment of Class 9 | | (2.5) | |
| Long-dated assets - Dugaboy Note receivable | | (17.6) | [1] |
| Wind down expenses and accrued liabilities | | (20.0) | [2] |
| Pending Class 8 claims (Daugherty tax) | | *See footnote* | [3] |
| Indemnification obligations | | *See footnote* | [4] |
| **Net expected cash prior to any indemnification considerations and necessary reserves** | $ | **53.7** | [5] |
| **Plus: Non-cash assets - Dugaboy Note receivable** | $ | **17.6** | |

[1] Note receivable from The Dugaboy Investment Trust ("Dugaboy"). ~$17.4M principal and ~$0.2M interest currently outstanding, accruing at approximately $1,553/day.  Fair value is less than face value as the note is long-dated, accruing interest at 3.26% and makes annual principal and interest payments through 2046, with the last of such payments due December 31, 2046. Dugaboy is current on its payments, including with the most recent payment completed for year-end 2024. Principal payments due are $790,215 yearly, plus accrued interest, which declines each year as principal declines.  The next interest payment due December 31, 2025 is $566,677.  No assurance that Dugaboy will continue making the annual principal and interest payments when due, although the holder of the note could accelerate and pursue collection in that event.

[2] Amount is ultimately TBD and will ultimately depend on litigation, timing of monetization of remaining assets, and operational needs.  For example, if additional litigation is brought forth, outside counsel will incur additional time and expense and certain employees may need to be retained for a longer period of time.  If actual expenses exceed $20 million, less cash would be potentially available after Class 9; if actual expenses fall short of $20 million, more cash would be potentially available after Class 9.

[3] For illustrative purposes of this presentation, $0 is assumed.  However, if the claim is ultimately allowed in full or in part, funds would be paid to Daugherty on account of the allowed claim, which would reduce cash potentially available after Class 9.  No assurances can be provided that the claim will be completely disallowed.

[4] For illustrative purposes of this presentation, $0 is assumed.  Thus, all funds utilized for purposes of satisfying indemnification obligations will reduce the funds available dollar for dollar.  Under current conditions, it is believed that at least $100 million may be needed for indemnification obligations and as a result, there is not sufficient liquidity at this time to even make any further payments to Class 9 interest holders.  Assuming a final/non-appealable order, providing for among other things, a complete cessation of litigation and comprehensive releases from the HMIT/DAF parties, the need for indemnification reserves could be greatly reduced.

[5] Assumes HCM Korea, HCLOF, and HCRE bad faith sanctions are monetized for the amounts described on the "current snapshot" ($6.4 million in aggregate).  Monetization in excess of these amounts would result in more cash remaining; monetization below those amounts would result in less cash remaining.

DRAFT - SUBJECT TO REVISION/AMENDMENT

017448
HCMLPHMIT00000998

*Privileged and confidential - provided pursuant to Rule 408 and the binding Confidentiality Agreement executed amongst the Parties*
**Information request made April 7, 2025**

**(i) Accrued liabilities**

| | Entity | Amount | |
|---|---|---|---|
| End of case/severance bonuses - remaining employees | HCMLP | $ 1,230,000 | |
| Accounts payable book balance (as of March 31, 2025) | HCMLP | 576,207 | |
| Estimate of other incurred, but not invoiced for work performed | HCMLP | 500,000 | general estimate |
| **Sub-total (i)** | | **$ 2,306,207** | A |

| | Entity | Amount | |
|---|---|---|---|
| **Other liabilities not included in section totals above** | | | |
| Distribution payable | HCT | $ 2,656,732 | previously authorized distributions related to pending Daugherty claim (has offsetting cash reserve; see current snapshot); to be released following resolution of the pending claim |
| Okada settlement payable | Indemnity Trust | 870,000 | first-out dollars in treasuries (amount is face of such treasuries) - for purposes of settlement discussions, the cash reserved related to the Okada settlement and the potential first-out dollars are excluded as irrelevant |

**(ii) Anticipated success or severance (or completion) payments or bonuses**

| | Entity | Amount | Basis for amount |
|---|---|---|---|
| Incentive Compensation Plan | HCMLP/HCT | $ 2,480,088 | assuming full payment of the Class 9's; calc'd as 14.71516% on remaining distributions to Class 9 with a time discount applied to the gross dollars distributed |
| Retention Date payments - employees | HCMLP | 925,000 | Retention Date is 9/30/2025 |
| Nate Burns (employee) incentive comp | HCMLP | — | Nate receives a portion of the performance fees earned related to HCM Korea; assuming zero for presentation purposes as amounts would be a percentage of incremental value received from HCM Korea |
| **Sub-total (ii)** | | **$ 3,405,088** | B |

**(iii) Continuing admin budget for the Claimant Trust, Indemnification sub trust and/or litigation sub trust**

| | | | | |
|---|---|---|---|---|
| See subsequent page; Sub-total (iii) | | $ 16,768,874 | C - *additional detail contained on separate page* | |

| **Sum of A, B, and C** | | **$ 22,480,169** | |
|---|---|---|---|

**(iv) Identity and amount and basis for any holdback(s)**

| | | Amount | Basis for amount |
|---|---|---|---|
| **Identity:** | | | |
| Sum of A, B, and C from above | | $ 22,480,169 | from above; See notes and assumptions related to items A, B, and C |
| Incremental operational reserve | | 5,000,000 | Excess cash to retain to cover potential cost overages - largest risk is incremental litigation and resulting time and expense of PSZJ plus longer retention of employees/CEO to assist with litigation, if applicable |
| Indemnification reserves | | 35,000,000 | Assumes comprehensive releases and settlement amongst the HMIT/DAF Parties; at least $100 million if no settlement |
| Sum of items above | | 62,480,169 | to below |

| | | $ millions | |
|---|---|---|---|
| **Calc of estimated cash available for a prelim distribution to Class 10, assuming settlement** | | | |
| Current cash/treasuries (see previous page) | | 88.1 | Cash and treasuries (including all Plan entities) |
| Assets expected to monetize in next 12 months | | 6.4 | HCM Korea, remainder of HCLOF, bad faith sanction (but excluding near-term Dugaboy Note P&I amortization due December 2025) |
| **Sub-total** | | **94.5** | |
| less: outstanding Class 9, including interest | | (21.0) | current outstanding Class 9 with interest |
| less: holdbacks (from above) | | (62.5) | from above |
| Remaining cash available for initial distribution to Class 10 | | $ 11.1 | [1] |
| **Round to nearest million** | | **$ 11.0** | |

[1] Possibility of incremental amount of up to $2.7 million in the event of a successful opposition to the pending Daugherty tax POC, along with incremental interim cash received from Dugaboy Note P&I amortization.  Amount also does not include non-cash assets (litigation, outstanding Dugaboy Note, etc).

Case 19-34054-sgj11    Doc 4255-53    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Exhibit 53    Page 15 of 15

*Privileged and confidential - provided pursuant to Rule 408 and the binding Confidentiality Agreement executed amongst the Parties*
*Projected Budget Build-Up*

Remaining expected budget assuming a comprehensive settlement with HMIT/DAF Parties (excluding accrued liabilities and contingencies separately discussed)

| Description | Total for budget | Notes and assumptions |
|---|---|---|
| Pachulski Stang and other litigation or BK-related | $    5,000,000 | Primary issues: expected new litigation to defend (actual causes of action unknown) from Dondero parties, incorporation of HMIT/DAF settlement and approval/appeals of same, appeals of "valuation complaint" and "HCRE bad faith", extension of the Trust for 1 yr. and dissolution issues. Ultimate amount required could vary materially higher or lower. |
| HCMLP employees salary and benefits (other than CEO) | 4,084,354 | Assumes declining headcount from 6 to 3, ending August 2026 (monthly trending from approx. $300k/month currently to approx. $200k/month at end) |
| Claimant Trustee/CEO salary | 2,700,000 | Assumes 18 months at $150k/month |
| Litigation Trustee | 360,000 | Assumes 18 months at $20k/month |
| Independent Member | 225,000 | Assumes 18 months at $12.5k/month |
| Litigation trust (other than Trustee) | 250,000 | Assuming minimal time and expense other than in conjunction with transfer of main case |
| Incentive Compensation on distributions to Cl. 10 | TBD | Provide for alignment in regards to quantum and timing of distributions and management of costs |
| *Overhead related* | | |
| Facilities/offsite storage and related | 1,079,121 | Office space through end of 2026 and offsite document retention through 2028 |
| External tax | 1,000,000 | Declining each year with final year for tax year 2027 |
| IT costs | 701,760 | Cloud storage, network infrastructure through 2027, email storage through 2030 |
| Accounting systems and information | 331,045 | General retention and maintenance through 2028 (primarily Oracle maintenance) |
| Other professionals | 200,000 | Misc reserve for other professionals |
| Other misc overhead | 200,000 | Misc reserve for other overhead, T&E, entity wind-up costs, etc |
| Indemnification expenses | 200,000 | Assuming misc. expenses from misc. matters |
| US Trustee | 437,594 | Assuming 0.8% of budget + accruals + distributions (assuming $30M total) |
| **Grand total** | $    16,768,874 | *to previous page* |

DRAFT - SUBJECT TO CONFIDENTIALITY AGREEMENT

017450

HCMLPHMIT00001000

**EXHIBIT 54**

017451

| From: | "jpseeryjr@gmail.com" <jpseeryjr@gmail.com> |
|---|---|
| To: | <mpatrick@dafholdco.com>, Shawn Raver <sraver@dafholdco.com>, "Louis M. Phillips" <Louis.Phillips@kellyhart.com>, <amelia.hurt@kellyhart.com>, <jshields@shieldslegal.com> |
| Cc: | "John A. Morris" <jmorris@pszjlaw.com>, David Klos <DKlos@HighlandCapital.com>, Tim Cournoyer <TCournoyer@HighlandCapital.com>, Jeff Pomerantz <jpomerantz@pszjlaw.com>, "Gregory V. Demo" <GDemo@pszjlaw.com> |
| Subject: | PRIVILEGED AND CONFIDENTIAL |
| Date: | Mon, 28 Apr 2025 19:34:04 -0400 |
| Importance: | Normal |
| Attachments: | 4923-8662-5850.v9_Highland-HMIT-Rand_Settlement_Agreement.doc |

HMIT Team:

Subject to our NDA, and further to our prior discussions, attached please find a draft settlement agreement.

The draft is consistent with the term sheet and the illustrative payment deck we reviewed with you.

However, we changed the timing of certain of the "gives" and "gets" so that the payments, reserves, releases, and litigation assignments, as well as a best-efforts undertaking are exchanged at or around execution.  This is consistent with the DAF agreement, and these exchanges do not require Bankruptcy Court approval.  We believe that an immediate exchange of as much of the material value of the settlement as possible is in the best interests of both sides.

The Class 10 claim allowance and the application of the HMIT Note to fix the amount requires court approval and is set up that way with future Indemnity Trust payments keyed to the Bankruptcy Court order becoming final.  To assure that the order is timely procured and the expectations of the parties protected, we have included the aforementioned best efforts undertaking to reconstruct the essential terms of the deal and deliver it to the parties if for any reason the claim allowance is not approved or is overturned .  We do believe there is much risk to either denial or reversal.

We are at your disposal.  It may make sense for us to walk some or all of you through draft, and we can do that tomorrow.  (We understand that Louis is away and do not presume to intrude on a well-earned holiday.)  Nonetheless, if an overview is appealing, please let me know.

Thank you for your consideration.  Please call me with any questions or issues.  We look forward to working with you to resolve our disputes and reach a mutually satisfactory resolution.

Best.  Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

017452

HCMLPHMIT00001001

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/25/25

## SETTLEMENT AGREEMENT & GENERAL RELEASE

THIS SETTLEMENT AGREEMENT & GENERAL RELEASE (this "**Agreement**") is entered into as of April [__], 2025 (the "**Agreement Date**"), by and among Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), the Highland Claimant Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Claimant Trust**"), the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Litigation Sub-Trust**"), and the Highland Indemnity Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Indemnity Trust**", and together with Highland, the Claimant Trust and the Litigation Sub-Trust, the "**Highland Entities**")), on the one hand, and Hunter Mountain Investment Trust, a Delaware statutory trust ("**HMIT**"), Rand Advisors, LLC, a Delaware limited liability company ("**Rand Advisors**"), Rand PE Fund I, LP, a Delaware series limited partnership ("**Rand PE Fund**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**"), Atlas IDF, LP, a Delaware limited partnership ("**Atlas IDF**"), Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**" and together with HMIT, Rand Advisors, Rand PE Fund, Rand GP and Atlas IDF, the  "**HMIT Entities**"), on the other hand.  The Highland Entities and the HMIT Entities are collectively referred to as the "**Parties**," and each individually, as a "**Party**".

## DEFINITIONS

"**9019 Motion**" means the motion seeking entry of the Bankruptcy Court Order pursuant to Bankruptcy Rule 9019 and in accordance with Section 18.

"**Action**" means any action, claim, demand, arbitration, hearing, charge, complaint, investigation, examination, indictment, litigation, suit or other civil, criminal, administrative or investigative proceedings.

"**Affiliate**" means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, a specified Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by contract or otherwise.

"**Amended Complaint**" means the *Amended Complaint and Objection to Claims*, filed as docket number 158 in *Kirschner v. Dondero*, Adv. Pro. No. 21-03076-sgj (Bankr. N.D. Tex. May 19, 2022).

"**Bankruptcy Case**" means *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex.) and its related proceedings.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended).

017453

HCMLPHMIT00001002

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

"**Bankruptcy Court**" means the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division.

"**Bankruptcy Court Approval Date**" means the date on which the Bankruptcy Court Order is issued.

"**Bankruptcy Court Order**" means an order of the Bankruptcy Court approving the allowance of the HMIT's Class 10 Interest as provided in this Agreement pursuant to the 9019 Motion.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than (i) a Saturday or a Sunday, (ii) a day on which the Federal Reserve Bank of New York or the New York Stock Exchange is closed, or (iii) a day on which banks in the States of Texas are required, or authorized by law, to close.

"**Claimant Trust Agreement**" means that certain Claimant Trust Agreement of the Claimant Trust (as may have been or may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 11, 2021, by and among Highland, as settlor, James P. Seery, Jr., a Claimant Trustee, and Wilmington Trust, National Association, a national banking association, as Delaware trustee.

"**Claims**" means any claims, debts, liabilities, demands, obligations, breaches of contract, breaches of duty or any relationship, misfeasance, malfeasance, promises, acts, omissions, agreements, liens, losses, costs and expenses (including attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whenever and however, arising, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise.

"**Class 10**" means the class of Claims or Equity Interests described in Article II. Section H.10. of the Plan.

"**Class 11**" means the class of Claims or Equity Interests described in Article II. Section H.11. of the Plan.

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Case.

"**Confirmation Order**" means that certain *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943], as conformed in accordance with the Fifth Circuit's rulings.

"**Dugaboy Note**" means that certain Promissory Note dated May 31, 2017, in the original face amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

017454
HCMLPHMIT00001003

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

"**Final Court Approval Date**" means the date on which the Bankruptcy Court Order becomes a Final Order.

"**Final Order**" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Highland Entities, as applicable, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

"**Gatekeeper**" means the gatekeeping provision contained in Article IX. F of the Plan as of August 11, 2021.

"**Governmental Authority**" means any federal, provincial, state, local or foreign government or political subdivision thereof, court of competent jurisdiction, administrative agency, judicial or arbitral body, or commission or other governmental or regulatory authority or instrumentality.

"**Highland Released Parties**" means collectively (i) the Highland Entities, (ii) any Affiliate of any Highland Entity and any Person directly or indirectly majority-owned by any Highland Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any Highland Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i)-(iii), collectively, the "**Highland Parties**"), (iv) each of the Highland Parties' current and former trustees and administrators (including the trustees of any of the Claimant Trust, the Litigation Sub-Trust, or the Indemnity Trust), officers, executives, agents, directors, advisors, advisory representatives, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, (v) the current and former members of the Oversight Board of the Claimant Trust in any capacity (including Richard Katz) and their Affiliates, including Farallon Capital Management, LLC, Stonehill Capital Management, LLC, Muck Holdings LLC, and Jessup Holdings LLC, (vi) the Independent Board and its members John Dubel, James P. Seery, Jr., and Russell Nelms, (vii) James P. Seery, Jr., individually and in all capacities for any Highland Released Party, including as Chief Executive Officer of Highland Capital Management, L.P., Claimant Trustee of the Claimant Trust, and the Indemnity Trust Administrator of the Indemnity Trust, (viii) Marc S. Kirschner, individually and as Trustee of the Litigation Sub-Trust, (ix) the Committee and each of its members, (x) the professionals (and their respective firms) (a) retained by Highland or the Committee during the Bankruptcy Case or

017455

HCMLPHMIT00001004

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

which provided services to Highland or the Committee during the Bankruptcy Case or (b) retained by any Highland Released Party on or after August 11, 2021, (xi) any Person indemnified by any Highland Party (the Persons described in clauses (i)-(xi), collectively, the "**Highland Covered Parties**"), and (xii) each Highland Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "Highland Covered Parties;" provided, however, and for the avoidance of doubt, and without in any way limiting the scope of the foregoing, "Highland Covered Parties" shall include Highland CLO Funding, Ltd., Highland HCF Advisor, Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Multi Strategy Credit Fund GP, L.P., Highland Multi Strategy Credit GP, LLC, Highland Multi Strategy Credit Fund, Ltd., Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., Highland Select Equity Fund, L.P., Highland Restoration Capital Partners Master, L.P., Highland Restoration Capital Partners GP, LLC, Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Offshore Director, LLC, Acis CLO Management, LLC, Neutra, Ltd., Pollack, Ltd., Acis CLO Management Holdings, L.P., Acis CLO Management Intermediate Holdings I, LLC, Acis CLO Management Intermediate Holdings II, LLC, Acis CLO Assets Holdings Limited, CHG Houston Holdings, LLC, Penant Management, L.P., Penant Management GP, LLC, Gunwale, LLC, HE Capital, LLC, Gleneagles CLO, Ltd., Aberdeen Loan Funding, Ltd. Highland Argentina Regional Opportunity Fund GP, LLC, Highland Argentina Regional Opportunity Fund, L.P., Highland Argentina Regional Opportunity Fund, Ltd., Highland Argentina Regional Opportunity Master Fund, L.P., Highland Latin America Consulting, Ltd., Highland Capital Management Korea Limited, Highland Capital Management Latin America, L.P., Highland Latin America GP, Ltd., Highland Latin America LP, Ltd., Highland Offshore Partners, L.P. (Diversified), Brentwood CLO, Ltd., Eastland CLO, Ltd., Bristol Bay Funding Ltd., Jasper CLO Ltd., Highland Legacy Limited, Grayson CLO, Ltd., Greenbriar CLO, Ltd., Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Liberty CLO, Ltd., Valhalla CLO, Ltd., Stratford CLO Ltd., Southfork CLO, Ltd., Pam Capital Funding, L.P., Stonebridge-Highland Healthcare Private Equity Fund, Pamco Cayman Ltd., Red River CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO, Ltd., Westchester CLO, Ltd. Longhorn Credit Funding, LLC, PensionDanmark Pensionsforsikringsaktieselskab, Highland Dynamic Income Master Fund L.P., Highland Dynamic Income Fund GP, LLC, Highland Dynamic Income Fund, L.P., Highland Dynamic Income Fund, Ltd., Highland JHT Holdings, LLC, Highland Prometheus Master Fund, L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland Sunbridge GP, LLC, Trussway Holdings, LLC, Trussway Industries, LLC, TW Company, Inc., T-Way Investments, LLC, SSP Holdings, LLC, Highland Flexible Income UCITS Fund, and Acis CLO 2017-7, Ltd. *Notwithstanding the forgoing or anything herein to the contrary*, none of "Highland Released Parties", "Highland Parties", nor "Highland Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner and none of such Persons are released from any Claim by any Person in connection with this Agreement.

017456

HCMLPHMIT00001005

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

"**HMIT Class 10 Interest**" means the unvested, contingent Class 10 interest in the Claimant Trust (a) to be allowed on account of HMIT's pre-petition equity interest in Highland, and (b) subject to the terms and conditions of the Plan, the Plan Documents, the Claimant Trust Agreement, this Agreement, and applicable law.

"**HMIT Note**" means that certain Secured Promissory Note dated December 21, 2015, in the original face amount of $63,000,000 from HMIT, as maker, and Highland, as payee.

"**HMIT Note Claims**" means any Claim related to, in connection with or arising out of the HMIT Note.

"**HMIT Released Parties**" means collectively (i) the HMIT Entities, (ii) any Affiliate of any HMIT Entity and any Person directly or indirectly majority owned by any HMIT Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any HMIT Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i) – (iii), collectively, the "**HMIT Parties**"), (iv) each of the HMIT Parties' current and former trustees, administrators, officer, executives, agents, directors, advisors, consultants, manager, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns (v) the professionals (and their respective firms (a) retained by any HMIT Party during the Bankruptcy Case or which provided services to any HMIT Party during the Bankruptcy Case or (b) retained by any HMIT Released Party on or after August 11, 2021, (vi) any Person indemnified by any HMIT Party (the Persons described in clauses (i) – (vi), collectively, the "**HMIT Covered Parties**"), and (vii) each HMIT Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "HMIT Covered Parties." *Notwithstanding the forgoing*, none of "HMIT Released Parties", "HMIT Parties", nor "HMIT Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner, and none of such Persons are released from any Claims by any Person in connection with this Agreement.

"**Indemnity Trust Administrator**" has the meaning given to it in the Indemnity Trust Agreement.

"**Indemnity Trust Agreement**" means that certain *Second Amended and Restated Indemnity Trust Agreement of the Indemnity Trust* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of [April 28], 2025, by and among the Claimant Trust, as grantor, James P. Seery, Jr., as indemnity trust administrator, and Wilmington Trust, National Association, a national banking association, as indemnity trustee and Delaware trustee.

"**Indemnity Trust Assets**" has the meaning set forth in the Indemnity Trust Agreement.

017457

HCMLPHMIT00001006

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

"**Independent Board**" means the independent board appointed by the Bankruptcy Court on January 9, 2020, pursuant to that certain *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 339].

"**Kirschner Claims**" means all Claims and causes of action other than the HMIT Note Claims that were asserted or could have been asserted by the Litigation Trustee of the Litigation Sub-Trust, in the Amended Complaint.

"**Liability**" means any liability, debt, obligation, loss, damage, claim, cost or expense (including costs of investigation and defense and attorney's fees, costs and expenses), in each case, whether direct or indirect, whether accrued or contingent, whether or not involving a third-party claim, and including incidental and consequential damages and diminution of value.

"**Litigation Protections**" means, individually and collectively, the rights, duties, and obligations set forth in <u>Section 1</u> and <u>Sections 9 - 16</u>.

"**Litigation Sub-Trust**" means the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act.

"**Litigation Sub-Trust Agreement**" means that certain Litigation Sub-Trust Agreement of the Litigation Sub-Trust (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 16, 2021, by and among James P. Seery, Jr., as Claimant Trustee of the Claimant Trust, Wilmington Trust, National Association, a national banking association, as Delaware Trustee, and the Litigation Trustee.

"**Litigation Trustee**" means Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust.

"**LPA**" means that certain *Sixth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), dated as of October 4, 2021.

"**Original Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* attached as Exhibit A to the *Order (A) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as modified) and (B) Granting Related Relief*, filed at Docket No. 1943 on the Bankruptcy Court's docket.

"**Oversight Board**" means the oversight board of the Highland Claimant Trust.

"**Pending Litigation**" means (i) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including *Hunter Mountain Investment Trust's Emergency Motion for Leave to File Adversary Proceeding* filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating there); (ii) *Dugaboy Investment Trust v. Highland Cap. Mgmt, L.P.*, 3:24-cv-

017458

HCMLPHMIT00001007

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

01531-X (N.D. Tex.) (only as to HMIT), and (iii) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:24-cv-01786-L (N.D. Tex.).

"**Permitted Investments**" has the meaning set forth in the Indemnity Trust Agreement.

"**Person**" means any natural person, partnership, limited liability partnership, corporation, limited liability company, association, joint stock company, trust, estate, joint venture, unincorporated organization or Governmental Authority.

"**Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* as conformed in accordance with the Fifth Circuit's rulings.

"**Plan Documents**" has the meaning given to it in the Plan.

"**Plan Protections**" means, collectively, the provisions of the Plan contained in Article IX thereof.

"**Pro Rata**" means the proportion that (a) the allowed amount of a particular Claim or Equity Interest in Class 10 bears to (b) the aggregate allowed amount of all Claims or Equity Interests in Class 10.

"**Threats**" means any threats, demands, complaints, petitions for pre-suit discovery, suits, litigations, arbitrations, actual or threatened restraining orders or injunctions, or similar actions of any kind in any forum against any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement).

## RECITALS

**WHEREAS**, as of the Petition Date, HMIT held Class B and Class C Limited Partnerships Interests in Highland;

**WHEREAS**, on December 21, 2015, HMIT entered into the HMIT Note with Highland, which had a total outstanding principal balance of Fifty-Seven Million Six Hundred Ninety Thousand Six Hundred Forty and 95/100 Dollars ($57,690,640.95) as of the Petition Date (the "**HMIT Note Balance**");

**WHEREAS**, HMIT's Class B and Class C Limited Partnership Interests in Highland were extinguished on August 11, 2021, in accordance with the Plan;

**WHEREAS**, pursuant to the LPA, HMIT's capital account balance at Highland on account of its Class B and Class C Limited Partnership Interests on the Petition Date was Three Hundred Ninety-Four Million Six Hundred Thirty Thousand Eight Hundred Seventy-One and 53/100 Dollars ($394,630,871.53) (the "**HMIT Capital Account Balance**");

**WHEREAS**, some or all of the HMIT Entities have asserted certain Claims against certain Highland Entities, including those asserted in the Pending Litigation;

017459
HCMLPHMIT00001008

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

**WHEREAS**, some or all of the Highland Entities have asserted certain Claims against certain HMIT Entities, including the HMIT Note Claims;

**WHEREAS**, the Parties wish to terminate, extinguish, and release any and all rights, duties, obligations and Claims that (a) any of the Highland Released Parties owed or have, or may have owed or have, to or with respect to any of the HMIT Released Parties, and (b) any of the HMIT Released Parties owed or have, or may have owed or have, to or with respect to any of the Highland Released Parties (collectively, the "**Rights and Obligations**");

**WHEREAS**, the Parties agree that the Litigation Protections are intended to enact a permanent cessation of all litigation concerning or related to the Highland Released Parties through and including the Agreement Date; and

**WHEREAS**, the Parties, individually and collectively, wish to (a) resolve all disputes between and/or among any of the Highland Entities, on the one hand, the HMIT Entities, on the other hand, including those asserted in the Pending Litigation, (b) fix and allow HMIT's Class 10 Interest at the amount and on the terms provided herein; and (c) terminate, extinguish, and release all Rights and Obligations on the terms provided herein.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

<u>**AGREEMENT**</u>

1.     <u>Dismissal of Pending Litigation With Prejudice</u>.  Within three (3) Business Days after the Agreement Date, the HMIT Entities shall take all steps necessary (at their own cost) to dismiss the Pending Litigation with prejudice.

2.     <u>Dismissal of Certain Defendants from the Amended Complaint</u>.

(a)     Within three (3) Business Days after the Effective Date, the Litigation Trustee shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand PE Fund from Counts I, II, and III of the Amended Complaint.  For the avoidance of doubt, Counts I, II, and III constitute all Kirschner Claims that are not HMIT Note Claims, and such dismissal shall not affect or impair any HMIT Note Claims or any liability or obligation of HMIT with respect to the HMIT Note, if any.

(b)     Within three (3) Business Days after the Final Court Approval Date, the Litigation Sub-Trust shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand PE from Count XXIV of the Amended Complaint, which constitutes all HMIT Note Claims against HMIT and Rand PE.

3.     <u>Cash Payment to HMIT</u>.  In consideration for the dismissal of the Pending Litigation, within three (3) Business Days following the Agreement Date, Highland shall pay HMIT a one-time, lump sum of [Five Hundred Thousand Dollars (US$500,000.00)] (the "**Payment**") by wire transfer:

017460
HCMLPHMIT00001009

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

[wire instructions]

4.    <u>HMIT Class 10 Interest</u>.

(a)    Subject to entry of the Bankruptcy Court Order, and the terms of this Agreement, the HMIT Class 10 Interest shall be deemed allowed in the amount of Three Hundred Thirty-Six Million Nine Hundred Forty Thousand Two Hundred Thirty and 58/100 Dollars (US$336,940,230.58), which amount represents the HMIT Capital Account Balance, <u>less</u> the HMIT Note Balance.

(b)    Notwithstanding anything to the contrary in the Plan or the Claimant Trust Agreement, as an integral part of this Agreement to consent to the allowance of the HMIT Class 10 Interest and the other considerations in this Agreement, HMIT shall not be deemed, and no holder of the HMIT Class 10 Interest shall be, a Claimant Trust Beneficiary or a "Beneficiary" under the Claimant Trust Agreement, and the Highland Released Parties, individually and collectively, shall owe no duty to any HMIT Releasor (whether contractual, fiduciary, equitable, statutory or otherwise), including with respect to the HMIT Class 10 Interest, in each case, except as expressly set forth in this Agreement.  Furthermore, without limiting the foregoing and for the avoidance of doubt, the contractual right of the holder of the HMIT Class 10 Interest to receive or recover any payments or Indemnity Trust Assets from the Indemnity Trust as set forth in this Agreement or the Indemnity Trust Agreement does not make any HMIT Releasor or any other Person a beneficiary of the Indemnity Trust or under the Indemnity Trust Agreement.

(c)    Notwithstanding anything to the contrary in the Plan, the Claimant Trust Agreement or the Indemnity Trust Agreement, in no event shall HMIT sell, transfer, assign, pledge, hypothecate, participate or otherwise dispose of the HMIT Class 10 Interest or any rights (including any right to payment) with respect thereto.

(d)    For the avoidance of doubt, the HMIT Class 10 Interest is and shall remain senior to the not yet allowed, unvested contingent Class 11 Claims of Equity Interests as provided for in the Plan, the Plan Documents, and the Claimant Trust Agreement.

5.    <u>Initial Interim Cash Distributions on the Allowed Class 10 Interests</u>.

(a)    Within ten (10) Business Days of the Final Court Approval Date, the Indemnity Trust shall distribute (the date on which such distribution is made, the "**Initial Interim Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests: (i) cash in the aggregate amount of [Ten Million Dollars (US$10,000,000.00)] (the "**Initial Interim Cash Distribution Amount**"); and (ii) cash in the aggregate amount of all principal and interest payments paid on the Dugaboy Note and actually received by Highland or the Indemnity Trust from and after the Bankruptcy Court Approval Date (the "**Initial Interim Dugaboy Distribution Amount**").

(b)    Upon the Bankruptcy Court Approval Date, the Indemnity Trust shall establish a balance sheet reserve in respect of the Initial Interim Cash Distribution Amount and the Initial Interim Dugaboy Distribution Amount (if and when received), which reserve will be held solely in cash or Permitted Investments and otherwise on the same terms as other Indemnity

017461
HCMLPHMIT00001010

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Trust Assets pursuant to the Indemnity Trust Agreement pending distribution in accordance with <u>Section 5(a)</u>.

6. <u>Subsequent Distribution(s) on the Allowed Class 10 Interests.</u>

(a) On the later of the Final Court Approval Date and April 1, 2028, the Indemnity Trust shall distribute (such distribution, collectively, the "**Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests: (i) cash in the aggregate amount of [Five Million Dollars (US$5,000,000.00)]; and (ii)(x)(1) if HMIT elects in writing that it desires for the Indemnity Trust to sell the Dugaboy Note, the net proceeds, if any, actually received by the Indemnity Trust from such sale, or (2) if HMIT instead elects that it desires to receive the Dugaboy Note in kind, the Dugaboy Note in kind, plus (y) cash in the aggregate amount of all principal and interest payments actually received on the Dugaboy Note by the Indemnity Trust from and after the Initial Interim Distribution Date (the amount pursuant to subclause (y), the "**Subsequent Dugaboy P+I Amount**"). If the Dugaboy Note is distributed in kind, HMIT will engage an independent valuation service provider to value the Dugaboy Note for purposes of determining the magnitude of reduction to the outstanding allowed Class 10 Interests on account of such in-kind distribution. The HMIT Entities acknowledge and agree that none of the Highland Entities are representing or warranting that the Dugaboy Note can or will be sold or the price, if any, received for the Dugaboy Note and further acknowledge and agree that any such purchase price may be de minimis.

(b) Upon the Initial Interim Distribution Date, the Indemnity Trust shall establish a balance sheet reserve in respect of the cash portion of the Subsequent Dugaboy P+I Amount, which will be held solely in cash or Permitted Investments and otherwise on the same terms as other Indemnity Trust Assets pursuant to the Indemnity Trust Agreement pending distribution in accordance with <u>Section 6(a)</u>.

(c) Notwithstanding anything herein to the contrary, the obligations of the Indemnity Trust to make the Subsequent Distribution, including any Cash, the Dugaboy Note, or the Subsequent Dugaboy P+I Amount, is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII, Section 8.1(c) of the Indemnity Trust Agreement that the Indemnity Trust Assets comprising such distributions are not reasonably necessary to satisfy current or potential Indemnification Obligations (as defined in the Indemnity Trust Agreement) to all persons who are or might become Beneficiaries (as defined in the Indemnity Trust Agreement).

7. <u>Final Distribution on the Allowed Class 10 Interests.</u>

(a) On the later of the Final Court Approval Date and April 1, 2029, the Indemnity Trust will distribute all excess remaining Indemnity Trust Assets in accordance with Article VIII of the Indemnity Trust Agreement; <u>provided</u>, <u>however</u>, that the obligation of the Indemnity Trust to make any such distributions and/or dissolve and wind up the affairs of the Indemnity Trust is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII of the Indemnity Trust Agreement that (1) a Final Order(s) (as

017462
HCMLPHMIT00001011

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

defined in the Indemnity Trust Agreement) has been entered resolving all litigation, claims or proceedings in any forum of any kind which could give rise to Indemnity Obligations (as defined in the Indemnity Trust Agreement) and payment in full of all such Indemnity Obligations and (2) all applicable statutes of limitations and any applicable tolling of such statutes of limitation have expired.

(b)     The Indemnity Trust agrees to not use Indemnity Trust Assets to fund the operating expenses of Highland.

(c)     Following the Bankruptcy Court Approval Date, at the request of Mark Patrick, solely in his capacity, and to the extent he remains, as administrator of HMIT, but not more often than quarterly, Highland and the Indemnity Trust Administrator agree to review (i) the status of their respective assets, (ii) the balance of cash held, (iii) the status of any claims made for indemnification and any resolutions thereof, (iv) the status of any litigation, and (v) forecasted operating expenses with Mr. Patrick, and will each work in good faith to reduce operating expenses where reasonably practicable; provided, however, that all such reporting shall be subject to Mr. Patrick's agreement to maintain confidentiality with respect to any non-public information.

8.     <u>Transfer Kirschner Claims; Dismissal of HMIT Note Claims</u>.

(a)     In consideration of the dismissal of the Pending Litigation and the releases provided herein, within ten (10) Business Days of the Agreement Date, but after the dismissal provided for in <u>Section 2</u>, and solely to the extent permitted by the Plan, the Litigation Sub-Trust Agreement and applicable law, the Litigation Sub-Trust shall execute an assignment in the form attached hereto as **Exhibit [_]** in favor of the HMIT Entities transferring all of the Litigation Sub-Trust's right, title, and interest in and to the Kirschner Claims (which, for the avoidance of doubt, shall not include any HMIT Note Claims) (the "**Kirschner Transfer**").[1] Each HMIT Entity acknowledges and agrees that none of the Highland Entities will have any duty or obligation to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof.

(b)     THE HMIT ENTITIES SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THE LITIGATION SUB-TRUST IS TRANSFERRING THE KIRSCHNER CLAIMS ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT THE HMIT ENTITIES ARE NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM THE HIGHLAND ENTITIES OR THEIR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE KIRSCHNER CLAIMS AND AMENDED COMPLAINT, INCLUDING WITH RESPECT TO THE ENFORCEABILITY, TRANSFERABILITY, VIABILITY, STRENGTH, OR VALUE OF ANY OF THE KIRSCHNER CLAIMS OR THE AMENDED COMPLAINT.  The HMIT Entities hereby specifically acknowledge that they have carefully reviewed this Section and have had the opportunity to discuss its import with legal counsel and that the provisions of this Section are a material part of this Agreement.  Thus, if for any reason HMIT is precluded from or is

---

[1] NTD: HMIT Claim to be dismissed without prejudice.

017463
HCMLPHMIT00001012

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

otherwise unable to prosecute all or any of the Kirschner Claims, (i) the HMIT Releasors shall have no recourse against the Highland Released Parties whatsoever and shall not be entitled to compensation of any kind, it being agreed that the HMIT Entities are otherwise receiving adequate consideration for the duties and obligations they are undertaking pursuant to this Agreement and (ii) there will be no effect whatsoever on the validity and enforceability of this Agreement or any of the other transactions contemplated hereby.

(c)     As promptly as reasonably practicable following the Effective Date, the Highland Entities shall provide to the HMIT Entities electronic copies of written discovery requests and responses thereto, and documents produced in discovery in respect of the Kirschner Claims and the Amended Complaint.   The Highland Entities will not provide any other documents regarding the Kirschner Claims including any attorney-client communications and any documents subject to the attorney work-product doctrine or similar privileges or immunities concerning the Kirschner Claims (collectively, the "**Kirschner Privileges**"), it being understood and agreed that the Highland Entities are retaining, and not transferring or waiving, the Kirschner Privileges.

(d)     Each Party acknowledges and agrees that if (a) the Kirschner Transfer is found or deemed to be impermissible or invalid, for any reason, or (b) the Final Court Approval Date does not occur, the Kirschner Claims and Amended Complaint will revert to, and remain an asset of, the Litigation Sub-Trust.

9.     <u>General Release By The HMIT Entities</u>. On the Agreement Date, and to the maximum extent permitted by law, each of the HMIT Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its and their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) (collectively with the HMIT Entities, the "**HMIT Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each Highland Released Party from, and waives and relinquishes, any and all Claims, which the HMIT Releasors, or any Person claiming through, under, or on behalf of any of the HMIT Releasors, ever had, now has, or hereafter can, shall, or may have against any of the Highland Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Agreement Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the Highland Released Parties, or the Highland Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**HMIT Entity Released Claims**").

017464

HCMLPHMIT00001013

10.     Underline{General Release By The Highland Entities}.

(a)     On the Agreement Date, and to the maximum extent permitted by law, each of the Highland Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its or their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise)(collectively with the Highland Entities, the "**Highland Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, any and all Claims, excepting any HMIT Note Claims, which the Highland Releasors, or any Person claiming through, under, or on behalf of any of the Highland Releasors, ever had, now has, or hereafter can, shall, or may have against any of the HMIT Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Agreement Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the HMIT Released Parties, or the HMIT Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**Initial Highland Released Claims**").  For the avoidance of doubt and notwithstanding anything herein to the contrary, the HMIT Note Claims shall not be released until Final Court Approval Date, at which time the HMIT Note will be applied to calculate the allowed HMIT Class 10 Interest set forth in <u>Section 4</u> and the balance of the HMIT Note and any HMIT Note Claims shall be released pursuant to <u>Section 10(b)</u>.

(b)     Upon the Final Court Approval Date, and to the maximum extent permitted by law, each of the Highland Releasors hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, the HMIT Note Claims (the "**Subsequent Highland Released Claims**" and together with the Initial Highland Released Claims, the "**Highland Entity Released Claims**" and together with the HMIT Entity Released Claims, the "**Released Claims**").

11.     <u>Further Provisions Concerning The General Releases</u>.

(a)     **FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASES ARE INTENDED TO BE GENERAL AND INCLUDE A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE AGREEMENT DATE.**

(b)     To the maximum extent permitted by law, each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefit of any statute or other principle of law or

017465
HCMLPHMIT00001014

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

equity that limits the applicability of a release with respect to Claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release.

(c)     Without limiting the scope of the foregoing waiver, in connection with the foregoing release, each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefits of Section 1542 of the California Civil Code (to the extent, if any, that Section 1542 might apply to the foregoing release), which provides as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees that the provisions of Section 1542 of the Civil Code of the State of California and all similar federal or state law, rights, rules or legal principles, legal or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY EACH OF THE HMIT ENTITIES AND THE HIGHLAND ENTITIES, ON THEIR OWN BEHALF AND ON BEHALF OF THE OTHER HMIT RELEASORS AND HIGHLAND RELEASORS, RESPECTIVELY,** in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

In connection with such waiver and relinquishment, each of the HMIT Entities and Highland Entities acknowledges that it is aware that it may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein. Nevertheless, it is the intent of each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, in executing this Agreement fully, finally, and forever to settle and release all such matters, and all Claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

(d)     As an integral component of this Agreement, and notwithstanding the Parties' intent set forth in the preamble hereto and the general nature of the releases in <u>Sections 9 and 10</u>, should:

(i)     any HMIT Releasor contend or assert that any Claim of any kind whatsoever held by any HMIT Releasor against any Highland Released Party survives this

017466

HCMLPHMIT00001015

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Agreement and is in any way related to or arising from or in connection with any HMIT Entity Released Claim (such claim or cause of action, a "**HMIT Alleged Claim**"), such HMIT Releasor will be deemed to have irrevocably, fully, and finally assigned such HMIT Alleged Claim to the Highland Entities and the Highland Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such HMIT Alleged Claim.

(ii)   any Highland Releasor contend or assert that any Claim of any kind whatsoever held by any Highland Releasor against any HMIT Released Party survives this Agreement and is in any way related to or arising from or in connection with any Highland Entity Released Claim (such claim or cause of action, a "**Highland Alleged Claim**"), such Highland Releasor will be deemed to have irrevocably, fully, and finally assigned such Highland Alleged Claim to the HMIT Entities and the HMIT Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such Highland Alleged Claim.

12.   <u>Covenant Not To Sue; Limitation on Standing</u>. Upon the Agreement Date:

(a)   Each of the HMIT Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the Highland Released Parties, to recover, enforce, or collect any HMIT Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(b)   Each of the Highland Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the HMIT Released Parties, to recover, enforce, or collect any Highland Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(c)   For the avoidance of doubt, this Agreement shall not operate to give any HMIT Entity standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except for the limited purpose of seeking Court approval of this Agreement (including with respect to any appeal concerning any order entered granting or denying such approval), and except for the limited purpose of enforcing this Agreement, no HMIT Entity shall commence any Action in connection with the HMIT Class 10 Interest.

13.   <u>Representations and Warranties</u>.

(a)   Each of the HMIT Entities hereby represents and warrants that every HMIT Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any HMIT Releasor.

(b)   The HMIT Entities, on their own behalf and on behalf of the other HMIT Releasors, acknowledge and agree that each Plan Provision is lawful, effective, and binding on the HMIT Releasors.  The HMIT Entities further agree, on their own behalf and on behalf of the other HMIT Releasors, that the HMIT Releasors will never, in any way, challenge or seek to

017467
HCMLPHMIT00001016

modify, nullify, vacate, or revoke, or induce, encourage or direct any other Person to do so or act in concert with or assist (financially or otherwise) any other Person in doing so the Confirmation Order, the Plan, the Plan Protections, or any Plan Document, including the Claimant Trust Agreement, the LPA, the Indemnity Trust Agreement or the Litigation Sub-Trust Agreement, in the Bankruptcy Court, in any other state or federal court, in any other forum or tribunal, or otherwise, including administrative or regulatory tribunals and foreign courts.

(c)     Each of the Highland Entities hereby represents and warrants that every Highland Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any Highland Releasor.

(d)     Each Party severally represents and warrants as to itself only that: (i) it has taken all necessary action to authorize and approve the execution, delivery and performance of this Agreement; (ii) such Party has full power and authority to execute and deliver this Agreement; and (iii) this Agreement constitutes a valid, legal and binding obligation of such Party, and is enforceable subject to its terms. Each individual signatory hereto individually warrants and represents to all Parties hereto that such individual has full power and authority to act on behalf of and bind the Party for which he or she has executed this Agreement; provided, however that no signatory shall otherwise provide any warranty or representation or otherwise be a party to this Agreement on an individual basis.

14.     No Continuing Rights, Duties or Obligations.  Except for the rights, duties, and obligations expressly set forth in this Agreement, all Rights and Obligations that existed or may have existed shall be deemed terminated, extinguished, and released upon the Agreement Date. For the avoidance of doubt, from and after the Agreement Date, (a) the Highland Released Parties, individually and collectively, shall owe no duty, past or present, including with respect to the Kirchner Claims, to the HMIT Releasors, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement, and (b) the HMIT Released Parties, individually and collectively, shall owe no duty to the Highland Releasors, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement.

15.     Gatekeeper Standard.

(a)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that, notwithstanding the United States Court of Appeals for the Fifth Circuit's decision in *Highland Capital Management Fund Advisors, L.P. v. Highland Capital Management, L.P.*, No. 23-10534 (5th Cir. Mar. 18, 2025), the "Gatekeeper" provisions contained in Highland's Original Plan is forever binding on each of the HMIT Entities and for a claim or cause of action to be "colorable" for purposes of the Gatekeeper, it must be found by final order of the Bankruptcy Court (the "**Gatekeeper Court**"), which order shall be subject to appeal to a court of competent jurisdiction, to have satisfied the "Gatekeeper Colorability Test" as such term is defined in *In re Highland Capital Management, L.P.*, 2023 Bankr. LEXIS 2104 at *124-36 (Bankr. N.D. Tex. Aug. 24, 2023).

017468
HCMLPHMIT00001017

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

(b)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that compliance with the Gatekeeper requires (i) a motion seeking leave to sue an Exculpated Party (as that term is defined in Highland's original Plan) and a finding that the litigant's claims and causes of action are "colorable" attaching a complaint setting forth the basis for such claims or causes of action and (ii), in the Gatekeeper Court's sole discretion, an evidentiary hearing (during which the Gatekeeper Court may, among other things, hear testimony and assess the credibility of any witness(es)) to determine whether a proposed claim or cause of action is "colorable."

(c)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, further acknowledge and agree that the moving party under the Gatekeeper has the burden of satisfying the "Gatekeeper Colorability Test."

16.     <u>Indemnification</u>.

(a)     Without in any manner limiting the available remedies for any breach of this Agreement, the HMIT Entities, severally but not jointly, agree to indemnify, defend, and hold the Highland Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any HMIT Entity set forth in <u>Section 13</u> or (y) any Actions brought or prosecuted by or on behalf of, any HMIT Releasor or that are induced, encouraged, assisted or directed by any HMIT Releasor or brought or prosecuted in concert with any HMIT Releasor against any Highland Released Party with respect to or related to any HMIT Entity Released Claims.  Without limiting the scope of the foregoing in any manner, any HMIT Entity that breaches <u>Section 12</u> shall be liable to the Highland Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such Highland Released Party in defending against or otherwise responding to such Action.  Each HMIT Entity acknowledges and agrees that the HMIT Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

(b)     Without in any manner limiting the available remedies for any breach of this Agreement, the Highland Entities, severally but not jointly, agree to indemnify, defend, and hold the HMIT Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any Highland Entity set forth in <u>Section 13</u> or (y) any suits, proceedings, or other actions brought or prosecuted by or on behalf of, any Highland Releasor or that are induced, encouraged, assisted or directed by any Highland Releasor or brought or prosecuted in concert with any Highland Releasor against any HMIT Released Party with respect to or related to any Highland Entity Released Claims.  Without in any manner limiting the scope of the foregoing, any Highland Entity that breaches <u>Section 12</u> shall be liable to the HMIT

017469
HCMLPHMIT00001018

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such HMIT Released Party in defending against or otherwise responding to such Action. Each Highland Entity acknowledges and agrees that the Highland Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

17. <u>Execution</u>. This Agreement may be executed by the exchange of signatures by facsimile or by PDF attachment to an email transmittal and in counterparts, and if so executed, shall be fully executed when a counterpart has been executed and delivered by all Parties hereto through counsel. All counterparts taken together shall constitute one and the same agreement and shall be fully enforceable as such.

18. <u>Bankruptcy Court Order</u>. The allowance of the allowed HMIT Class 10 Interest pursuant to <u>Section 4</u> is subject to the entry of the Bankruptcy Court Order. To that end, the Highland Entities shall file the 9019 Motion no later than five (5) Business Days after the Agreement Date. Each Party shall, and shall cause each of their respective Affiliates to, undertake any and all actions in compliance with applicable law to obtain the Bankruptcy Court Order as promptly as practicable, and without limiting the foregoing, if an Action is threatened or instituted by any Person opposing the 9019 Motion or otherwise challenging the validity or legality, or seeking to restrain the consummation, of the transactions contemplated by this Agreement or the Bankruptcy Court Order, each Party shall, and shall cause its respective Affiliates to, use their commercially reasonable best efforts to avoid, resist, resolve or, if necessary, and defend to effectuate this Agreement and consummate the transactions hereby. If the 9019 Motion is not approved by entry of the Bankruptcy Court Order or if the Bankruptcy Court Approval is precluded from becoming a Final Order, (a) there will be no affect on, adjustment to, or impairment of, in any way, the validity and enforceability of the remainder of this Agreement, and the other transactions contemplated hereby, all of which shall remain in full force and effect and (b) each Party shall, and shall cause its respective Affiliates to, use their best efforts to seek the allowance of the HMIT Class 10 Interest in a substantially similar amount and on substantially similar terms as set forth in Section 4 to the fullest extent possible so as to give effect to the original intent of the Parties as closely as possible.

19. <u>Fees and Expenses</u>. Whether or not the transactions contemplated hereby are consummated or the Bankruptcy Court Order is obtained, and except as otherwise expressly provided in this Agreement, each Party will bear its respective fees, costs and expenses (including legal, accounting and other professional fees) incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the transactions contemplated hereby, including with respect to each Party's respective obligations pursuant to <u>Section 18</u>. Notwithstanding the foregoing, if any Party hereto brings an Action to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that Action shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

017470

HCMLPHMIT00001019

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

20.     Entire Agreement; No Other Representations.     **THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF ANY PARTY OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT. THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS (COLLECTIVELY, "REPRESENTATIONS"), EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT; AND THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT RELIED ON ANY REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY ARE ENTERING INTO THIS AGREEMENT RELYING SOLELY ON THEIR OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS BY ANY PARTY, EXCEPT FOR THOSE REPRESENTATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES AGREE THAT REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT SHALL NOT BE USED IN THE INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT, AND NEITHER THE HMIT RELEASED PARTIES NOR THE HIGHLAND RELEASED PARTIES SHALL HAVE ANY LIABILITY FOR ANY CONSEQUENCES ARISING AS A RESULT OF ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT**.

21.     Agreement and Release Knowing and Voluntary.     The Parties acknowledge that they have considered this Agreement with their respective attorneys and have carefully read this Agreement, that it has been fully explained by their attorneys, and that they have had a reasonable opportunity to consider this Agreement. The Parties further represent that they know and fully understand the contents of this Agreement, that they intend to be legally bound by this Agreement and the releases and covenants contained herein, and that they are signing this Agreement, including the release provisions herein, voluntarily and of their own free will and without coercion, and with the benefit of advice of counsel.

22.     Cooperation.     The Parties agree to perform any services or actions reasonably necessary to carry out the terms and conditions of this Agreement or the transactions contemplated hereby, including the execution and delivery of reasonable additional documents, instruments, conveyances and/or assurances, in good faith, and to reasonably communicate and cooperate with one another in this regard. For the avoidance of doubt, nothing in this Section shall obligate the Highland Entities to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof.

23.     Governing Law.     This Agreement shall be construed pursuant to and governed by the laws of the State of Delaware (substantive and procedural) without reference to principles of conflicts of law that would result in the application of any other State's laws.

24.     Jurisdiction/Venue.     The Parties hereby irrevocably submit to the jurisdiction and venue of the Bankruptcy Court with respect to any action or proceeding arising out of or related

017471
HCMLPHMIT00001020

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

to this Agreement or the subject matter hereof; if (and only if) the Bankruptcy Court lacks personal or subject matter jurisdiction to adjudicate an action or proceeding arising out of or related to this Agreement or the subject matter hereof, then the Parties irrevocably submit to the jurisdiction and venue of the United States District Court for the Northern District of Texas.

25. <u>No Admissions</u>. All Parties acknowledge and agree that the matters set forth in this Agreement constitute the settlement and compromise of disputed Claims and that this Agreement shall not constitute the admission of any fact or liability by any of them regarding any Claim, including the Claims released hereunder, and neither the terms hereof, nor the fact of this Agreement itself, shall be evidence of any kind in any Action, other than an Action to enforce the terms of the Agreement or any instrument executed in connection herewith or any claim for damages or other relief for breach of any representation or warranty contained herein or in any instrument executed in connection herewith.

26. <u>Other Provisions</u>.

(a) This Agreement contains the entire agreement and understanding of the parties and supersedes any and all prior or contemporaneous agreements, arrangements, and understandings relating to the subject matter of this Agreement. No representation, inducement, agreement, promise or understandings altering, modifying, amending, taking from or adding to, the terms and conditions hereof shall have any force or effect unless the same is in writing and validly executed by each of the Parties hereto.

(b) The waiver by any Party of any breach of, or default under, any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or default; provided, however, that for any such waiver to be enforceable, it shall be in writing and executed by the non-breaching Party.

(c) The headings contained in this Agreement are for convenience only and shall in no way restrict or otherwise affect the construction of the provisions hereof.

(d) The Parties shall each execute all documents and perform all acts necessary and proper to effectuate the terms of this Agreement.

27. <u>Notices</u>. All notices required or permitted to be provided hereunder shall be afforded to the respective parties to and through their counsel, and shall be transmitted simultaneously by electronic mail (with PDF attachments, as necessary) and by telefax, addressed as follows:

To the Highland Entities:

**PACHULSKI STANG ZIEHL AND JONES LLP**
Jeffrey N. Pomerantz
John A. Morris
10100 Santa Monica Boulevard
Los Angeles, California 90067-4003
310.277.6910

017472

HCMLPHMIT00001021

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

jpomerantz@pszjlaw.com
jmorris@pszjlaw.com

To the HMIT Entities:

**KELLY HART PITRE**
Louis M. Phillips
Amelia Hurt
301 Main Street, Suite 1600
225.381.9643
Louis.Phillips@Kellyhart.com
Amelia.Hurt@Kellyhart.com

28.    <u>Severability</u>. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity and enforceability of any other provision of this Agreement.

29.    <u>Interpretive Provisions</u>. Unless the express context otherwise requires: (a) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) words defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (c) the words "Dollars" and "$" mean U.S. dollars; (d) references herein to a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement; (e) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words ",without limitation,"; (f) references herein to any gender shall include each other gender; (g) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement; (h) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (i) the word "or" shall be disjunctive but not exclusive; (j) the headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties; and (k) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

*[Signature page follows]*

017473
HCMLPHMIT00001022

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

     IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**HUNTER MOUNTAIN INVESTMENT TRUST**

By    _____

     Name:     Mark Patrick
     Title:     Administrator
     Date:     April __, 2025

**RAND ADVISORS, LLC**

By    _____

     Name:     Mark Patrick
     Title:     President
     Date:     April __, 2025

**RAND PE FUND I, LP**
By: Rand PE Fund Management, LLC, its General Partner

By    _____

     Name:     Mark Patrick
     Title:     President
     Date:     April __, 2025

**RAND PE FUND MANAGEMENT, LLC**

By    _____

     Name:     Mark Patrick
     Title:     President
     Date:     April __, 2025

**ATLAS IDF, LP**
By: Atlas IDF GP, LLC, its General Partner

By    _____

017474

HCMLPHMIT00001023

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Name:    Mark Patrick
Title:    President
Date:    April __, 2025

**ATLAS IDF GP, LLC**

By   _____

Name:    Mark Patrick
Title:    President
Date:    April __, 2025

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By   _____

Name:    James. P. Seery, Jr.
Title:    Chief Executive Officer
Date:    April __, 2025

**HIGHLAND CLAIMANT TRUST**

By   _____

Name:    James P. Seery, Jr.
Title:    Claimant Trustee
Date:    April __, 2025

**HIGHLAND LITIGATION SUB-TRUST**

By   _____

Name:    Marc S. Kirschner
Title:    Litigation Trustee
Date:    April __, 2025

017475

HCMLPHMIT00001024

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

**HIGHLAND INDEMNITY TRUST**

By    _____

      Name:     James P. Seery, Jr.

      Title:       Indemnity Trust Administrator

      Date:      April __, 2025

017476

HCMLPHMIT00001025

**EXHIBIT 55**

017477

**From:** David Klos <DKlos@HighlandCapital.com>
**To:** Jim Seery <jpseeryjr@gmail.com>, Kristin Hendrix <KHendrix@HighlandCapital.com>, "mpatrick@dafholdco.com" <mpatrick@dafholdco.com>, Shawn Raver <sraver@dafholdco.com>, "paul@gkmanagement.com.ky" <paul@gkmanagement.com.ky>
**Subject:** Confidential discussion - Subject to Rule 408 and Confidentiality Agreement
**Date:** Thu, 3 Apr 2025 13:16:34 +0000
**Importance:** Normal
**Attachments:** unnamed

_____

# Microsoft Teams Need help?

## Join the meeting now

Meeting ID: 226 527 188 989

Passcode: tT6tZ9dz

---

## Dial in by phone

+1 469-844-8017,,153081385# United States, Dallas

Find a local number

Phone conference ID: 153 081 385#

For organizers: Meeting options | Reset dial-in PIN

_____

HCMLPHMIT00001037

**EXHIBIT 56**

017479

**From:** David Klos <DKlos@HighlandCapital.com>
**To:** Mark Patrick <MPatrick@CharitableDAF.com>
**Cc:** Kristin Hendrix <KHendrix@HighlandCapital.com>, Jim Seery <jpseeryjr@gmail.com>
**Subject:** Time tomorrow for a Teams
**Date:** Wed, 2 Apr 2025 20:29:42 +0000
**Importance:** Normal

---

Mark,

It's been a long time - I hope this email finds you doing well.

I understand that you have some time tomorrow for a Teams call for an initial discussion around financial information.  Could I propose an hour starting at 11:30 CT?

We plan to have Kristin and Jim on (cc'd), in addition to me.  I don't know that I have a good email for Shawn, so in addition to confirming the time works for you, could you also provide his email or just confirm that you will be able to forward him the invite?  Once I hear from you, I'll circulate a Teams. Thanks and looking forward to speaking with you soon.

-Dave
214-674-2926

017480
HCMLPHMIT00001042

**EXHIBIT 57**

017481

**From:** Jim Seery <jpseeryjr@gmail.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>, Tim Cournoyer
<TCournoyer@HighlandCapital.com>, David Klos <DKlos@HighlandCapital.com>,
Matthew Gray <MGray@HighlandCapital.com>
**Subject:** FW: PRIVILEGED AND CONFIDENTIAL
**Date:** Wed, 11 Jun 2025 17:29:13 +0000
**Importance:** Normal
**Attachments:** Highland_HMIT-Rand_Settlement_Agreement.012(Highland_Draft_05.15.25).docx;
Written_Consent_-_Class_9_Holders_.docx

---

Best.  Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

**From:** jpseeryjr@gmail.com <jpseeryjr@gmail.com>
**Date:** Friday, May 16, 2025 at 9:45 AM
**To:** Nader Attalla <nader.attalla@ubs.com>, Katie.George@lw.com <Katie.George@lw.com>, Gregory V. Demo
<GDemo@pszjlaw.com>
**Cc:** David Klos <DKlos@highlandcapital.com>, Tim Cournoyer <TCournoyer@highlandcapital.com>
**Subject:** Re: PRIVILEGED AND CONFIDENTIAL

Nader and Katie:

Attached is final version of the Class 9 consent with Exhibit B showing the proposed payments to
Class 9 and Class 10.  I have also attached the latest version of the Settlement Agreement which will
be an exhibit to the consent.  Aside from the timing of the Class 10 payments, there are no provisions
in the agreement that affect UBS.

As discussed, assuming final agreement on the settlement and filing of the approval motion this
evening, we anticipate Bankruptcy Court approval in mid-July.  After court approval, the first $10mm
would be paid to Class 9 and Class 10 simultaneously.

Class 9 will also receive the proceeds from the Daugherty Class 8 reserve when that claim is
disallowed.  We filed our objection/complaint last week and expect resolution around September 30.

The balance of Class 9 will be paid off with the First Subsequent Distribution to Class 10 on December
1, 2027.

Please call me if you have any questions.

We appreciate your assistance trying to get the consent approved as soon as possible.

Thank you.

Best.  Jim

017482

Jim Seery
631-804-2049
jpseeryjr@gmail.com

---

**Fr**

HCMLPHMIT00001221

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

## SETTLEMENT AGREEMENT & GENERAL RELEASE

THIS SETTLEMENT AGREEMENT & GENERAL RELEASE (this "**Agreement**") is entered into as of May 12, 9095 (the "**Agreement Date**"), by and among Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), the Highland Claimant Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Claimant Trust**"), the Highland Litigation Sub‐Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Litigation Sub-Trust**"), and the Highland Indemnity Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Indemnity Trust**", and together with Highland, the Claimant Trust and the Litigation Sub‐Trust, the "**Highland Entities**"), on the one hand, and Hunter Mountain Investment Trust, a Delaware statutory trust ("**HMIT**"), Beacon Mountain LLC, a Delaware limited liability company ("**Beacon Mountain**"), Rand Advisors, LLC, a Delaware limited liability company ("**Rand Advisors**"), Rand PE Fund I, LP, a Delaware series limited partnership ("**Rand PE Fund**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**"), Atlas IDF, LP, a Delaware limited partnership ("**Atlas IDF**"), Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP and Atlas IDF, the  "**HMIT Entities**"), on the other hand.  The Highland Entities and the HMIT Entities are collectively referred to as the "**Parties**," and each individually, as a "**Party**".

## DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Claimant Trust Agreement or the Plan, as applicable (in each case, as hereinafter defined). For purposes of this Agreement, the following capitalized terms have the following meanings:

"**9019 Motion**" means the motion seeking entry of the Bankruptcy Court Order pursuant to Bankruptcy Rule 3013 and in accordance with Section 18.

"**Action**" means any action, claim, demand, arbitration, hearing, charge, complaint, investigation, examination, indictment, litigation, suit or other civil, criminal, administrative or investigative proceedings, including any petition under Rule 909 of the Texas Rules of Civil Procedure.

"**Affiliate**" means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, a specified Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by contract or otherwise.

"**Amended Complaint**" means the *Amended Complaint and Objection to Claims*, filed as docket number 158 in *Kirschner v. Dondero*, Adv. Pro. No. 9160‐07265gj (Bankr. N.D. Tex. May 13, 9099).

"**Bankruptcy Case**" means *In re Highland Capital Management, L.P.*, Case No. 136‐405465gj (Bankr. N.D. Tex.) and its related proceedings.

017484

HCMLPHMIT00001222

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 1016l5- 9 (as amended).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division.

"**Bankruptcy Court Approval Date**" means the date on which the Bankruptcy Court Order is issued.

"**Bankruptcy Court Order**" means an order of the Bankruptcy Court approving the allowance of the HMIT's Class 10 Interest as provided in this Agreement pursuant to the 3013 Motion.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than (i) a Saturday or a Sunday, (ii) a day on which the Federal Reserve Bank of New York or the New York Stock Exchange is closed, or (iii) a day on which banks in the States of Texas are required, or authorized by law, to close.

"**Claimant Trust Agreement**" means that certain Claimant Trust Agreement of the Claimant Trust (as may have been or may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 11, 9091, by and among Highland, as settlor, James P. Seery, Jr., a Claimant Trustee, and Wilmington Trust, National Association, a national banking association, as Delaware trustee.

"**Claims**" means any claims, debts, liabilities, demands, obligations, breaches of contract, breaches of duty or any relationship, misfeasance, malfeasance, promises, acts, omissions, agreements, liens, losses, costs and expenses (including attorney's fees and related costs), damages, injuries, suits, Actions, and causes of action of whatever kind or nature, whenever and however, arising, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise.

"**Class 10**" means the class of Claims or Equity Interests described in Article II. Section H.10. of the Plan.

"**Class 11**" means the class of Claims or Equity Interests described in Article II. Section H.11. of the Plan.

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Case.

"**Confirmation Order**" means that certain *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 134- ], as conformed in accordance with the Fifth Circuit's rulings.

"**Dugaboy Note**" means that certain Promissory Note dated May - 1, 9017, in the original face amount of $94,928,291.23, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

017485

HCMLPHMIT00001223

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

"**Final Court Approval Date**" means the date on which the Bankruptcy Court Order becomes a Final Order.

"**Final Order**" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Highland Entities, as applicable, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 20 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

"**Gatekeeper**" means the gatekeeping provision contained in Article IX. F of the Plan as of August 11, 9091.

"**Governmental Authority**" means any federal, provincial, state, local or foreign government or political subdivision thereof, court of competent jurisdiction, administrative agency, judicial or arbitral body, or commission or other governmental or regulatory authority or instrumentality.

"**Highland Released Parties**" means collectively (i) the Highland Entities, (ii) any Affiliate of any Highland Entity and any Person directly or indirectly majority-owned by any Highland Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any Highland Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i)-(iii), collectively, the "**Highland Parties**"), (iv) each of the Highland Parties' current and former trustees and administrators (including the trustees of any of the Claimant Trust, the Litigation Sub-Trust, or the Indemnity Trust), officers, executives, agents, directors, advisors, advisory representatives, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, (v) the current and former members of the Oversight Board of the Claimant Trust in any capacity (including Richard Katz) and their Affiliates, (vi) Farallon Capital Management, LLC, Stonehill Capital Management, LLC, Muck Holdings LLC, and Jessup Holdings LLC, in each case, in any capacity, (vii) the Independent Board and its members John Dubel, James P. Seery, Jr., and Russell Nelms, (viii) James P. Seery, Jr., individually and in all capacities for any Highland Released Party, including as Chief Executive Officer of Highland Capital Management, L.P., Claimant Trustee of the Claimant Trust, and the Indemnity Trust Administrator of the Indemnity Trust, (ix) Marc S. Kirschner, individually and as Trustee of the Litigation Sub-Trust, (x) the Committee and each of its members, (xi) the professionals (and their respective firms) (a) retained by Highland or the Committee during the Bankruptcy Case or which provided services to Highland or the Committee during the Bankruptcy Case or (b) retained by any Highland Released Party on or after August 11, 9091, (xii) any Person indemnified by any

-

017486

HCMLPHMIT00001224

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

Highland Party (the Persons described in clauses (i)-(xii), collectively, the "**Highland Covered Parties**"), and (xii) each Highland Covered Party's current and former officers, executives, agents, attorneys (and their respective firms), directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "Highland Covered Parties;" provided, however, and for the avoidance of doubt, and without in any way limiting the scope of the foregoing, "Highland Covered Parties" shall include Highland CLO Funding, Ltd., Highland HCF Advisor, Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Multi Strategy Credit Fund GP, L.P., Highland Multi Strategy Credit GP, LLC, Highland Multi Strategy Credit Fund, Ltd., Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., Highland Select Equity Fund, L.P., Highland Restoration Capital Partners Master, L.P., Highland Restoration Capital Partners GP, LLC, Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Offshore Director, LLC, Acis CLO Management, LLC, Neutra, Ltd., Pollack, Ltd., Acis CLO Management Holdings, L.P., Acis CLO Management Intermediate Holdings I, LLC, Acis CLO Management Intermediate Holdings II, LLC, Acis CLO Assets Holdings Limited, CHG Houston Holdings, LLC, Penant Management, L.P., Penant Management GP, LLC, Gunwale, LLC, HE Capital, LLC, Gleneagles CLO, Ltd., Aberdeen Loan Funding, Ltd. Highland Argentina Regional Opportunity Fund GP, LLC, Highland Argentina Regional Opportunity Fund, L.P., Highland Argentina Regional Opportunity Fund, Ltd., Highland Argentina Regional Opportunity Master Fund, L.P., Highland Latin America Consulting, Ltd., Highland Capital Management Korea Limited, Highland Capital Management Latin America, L.P., Highland Latin America GP, Ltd., Highland Latin America LP, Ltd., Highland Offshore Partners, L.P. (Diversified), Brentwood CLO, Ltd., Eastland CLO, Ltd., Bristol Bay Funding Ltd., Jasper CLO Ltd., Highland Legacy Limited, Grayson CLO, Ltd., Greenbriar CLO, Ltd., Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Liberty CLO, Ltd., Valhalla CLO, Ltd., Stratford CLO Ltd., Southfork CLO, Ltd., Pam Capital Funding, L.P., Stonebridge-Highland Healthcare Private Equity Fund, Pamco Cayman Ltd., Red River CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO II Ltd., Westchester CLO, Ltd. Longhorn Credit Funding, LLC, PensionDanmark Pensionsforsikringsaktieselskab, Highland Dynamic Income Master Fund L.P., Highland Dynamic Income Fund GP, LLC, Highland Dynamic Income Fund, L.P., Highland Dynamic Income Fund, Ltd., Highland JHT Holdings, LLC, Highland Prometheus Master Fund, L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland Sunbridge GP, LLC, Trussway Holdings, LLC, Trussway Industries, LLC, TW Company, Inc., T6Way Investments, LLC, SSP Holdings, LLC, Highland Flexible Income UCITS Fund, and Acis CLO 90176-7, Ltd. *Notwithstanding the forgoing or anything herein to the contrary*, none of "Highland Released Parties", "Highland Parties", nor "Highland Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner and none of such Persons are released from any Claim by any Person in connection with this Agreement.

"**HMIT Class 10 Interest**" means the unvested, contingent Class 10 interest in the Claimant Trust (a) to be allowed on account of HMIT's pre-petition equity interest in Highland, and (b) subject to the terms and conditions, as applicable, of the Plan, the Plan Documents, the Claimant Trust Agreement, and in accordance with this Agreement, and applicable law.

017487

HCMLPHMIT00001225

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

"**HMIT Note**" means that certain Secured Promissory Note dated December 91, 9015, in the original face amount of $2-,000,000 from HMIT, as maker, and Highland, as payee.

"**HMIT Note Claims**" means any Claim related to, in connection with or arising out of the HMIT Note.

"**HMIT Released Parties**" means collectively (i) the HMIT Entities, (ii) any Affiliate of any HMIT Entity and any Person directly or indirectly majority owned by any HMIT Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any HMIT Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i) – (iii), collectively, the "**HMIT Parties**"), (iv) each of the HMIT Parties' current and former trustees, administrators, officer, executives, agents, directors, advisors, consultants, manager, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns (v) the professionals (and their respective firms (a) retained by any HMIT Party during the Bankruptcy Case or which provided services to any HMIT Party during the Bankruptcy Case or (b) retained by any HMIT Released Party on or after August 11, 9091, (vi) any Person indemnified by any HMIT Party (the Persons described in clauses (i) – (vi), collectively, the "**HMIT Covered Parties**"), and (vii) each HMIT Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "HMIT Covered Parties." *Notwithstanding the forgoing*, none of "HMIT Released Parties", "HMIT Parties", nor "HMIT Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner, and none of such Persons are released from any Claims by any Person in connection with this Agreement.

"**Indemnity Trust Administrator**" has the meaning given to it in the Indemnity Trust Agreement.

"**Indemnity Trust Agreement**" means that certain *Second Amended and Restated Indemnity Trust Agreement of the Indemnity Trust* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of [April 98], 9095, by and among the Claimant Trust, as grantor, James P. Seery, Jr., as indemnity trust administrator, and Wilmington Trust, National Association, a national banking association, as indemnity trustee and Delaware trustee.

"**Indemnity Trust Assets**" has the meaning set forth in the Indemnity Trust Agreement, but excluding Highland, the Claimant Trust, and their respective assets.

"**Independent Board**" means the independent board appointed by the Bankruptcy Court on January 3, 9090, pursuant to that certain *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. - - 3].

017488

HCMLPHMIT00001226

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

"**Kirschner Claims**" means all Claims and causes of action that were asserted or could have been asserted by the Litigation Trustee of the Litigation Sub-Trust, in the Amended Complaint.

"**Liability**" means any liability, debt, obligation, loss, damage, claim, cost or expense (including costs of investigation and defense and attorney's fees, costs and expenses), in each case, whether direct or indirect, whether accrued or contingent, whether or not involving a third-party claim, and including incidental and consequential damages and diminution of value.

"**Litigation Protections**" means, individually and collectively, the rights, duties, and obligations set forth in <u>Sections 1 – 9</u> and <u>Sections 3 6 12</u>.

"**Litigation Sub-Trust**" means the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act.

"**Litigation Sub-Trust Agreement**" means that certain Litigation Sub-Trust Agreement of the Litigation Sub-Trust (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 12, 9091, by and among James P. Seery, Jr., as Claimant Trustee of the Claimant Trust, Wilmington Trust, National Association, a national banking association, as Delaware Trustee, and the Litigation Trustee.

"**Litigation Trustee**" means Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust.

"**LPA**" means that certain *Sixth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), dated as of October 4, 9091.

"Operating Expenses" means, except for the expenses of the Indemnity Trust (including any payments to Trust Indemnified Parties or Indemnified Parties (in each case, as defined, and pursuant to the terms and conditions set forth, in the Indemnity Trust Agreement)), the expenses of operating and administering the Highland Entities, including legal expenses, employee compensation, Claimant Trustee/CEO and other trust and trustee related compensation, incentive compensation, and customary general and administrative expenses.

"**Original Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* attached as Exhibit A to the *Order (A) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as modified) and (B) Granting Related Relief*, filed at Docket No. 134- on the Bankruptcy Court's docket.

"**Oversight Board**" means the oversight board of the Highland Claimant Trust.

"**Pending Litigation**" means (i) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.,* Case No. - :9- 6-cv-09071-E (N.D. Tex.), on remand to the Bankruptcy Court (including *Hunter Mountain Investment Trust's Emergency Motion for Leave to File Adversary Proceeding* filed at Bankruptcy Court Docket No. - 233 and all proceedings, decisions, and orders relating there); (ii) *Dugaboy Investment Trust v. Highland Cap. Mgmt, L.P.,* - :94-6-cv-6015- 16-X

2

017489

HCMLPHMIT00001227

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

(N.D. Tex.) (only as to HMIT), and (iii) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. - :946cv017826L (N.D. Tex.).

"**Permitted Investments**" has the meaning set forth in the Indemnity Trust Agreement.

"**Person**" means any natural person, partnership, limited liability partnership, corporation, limited liability company, association, joint stock company, trust, estate, joint venture, unincorporated organization or Governmental Authority.

"**Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* as conformed in accordance with the Fifth Circuit's rulings.

"**Plan Documents**" has the meaning given to it in the Plan.

"**Plan Protections**" means, collectively, the provisions of the Plan contained in Article IX thereof.

"**Pro Rata**" means the proportion that (a) the allowed amount of a particular Claim or Equity Interest in Class 10 bears to (b) the aggregate allowed amount of all Claims or Equity Interests in Class 10.

"**Threats**" means any written threats of legal action, legal demands, filed complaints, petitions for pre-suit discovery, suits, litigations, arbitrations, actual or threated restraining orders or injunctions made in writing, or similar written actions of any kind, or sworn statements evidencing the same, in any forum against any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), excluding any such action that would otherwise be a Threat except that any applicable statute of limitations that could be applicable to such action has expired.

"**Threats Notice**" means the written notice of any Threats received by the Indemnity Trust with respect to any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), that is hereby required to be provided by the Indemnity Trust to the HMIT Entities, within five (5) Business Days after receipt of such Threat.

## RECITALS

**WHEREAS**, as of the Petition Date, HMIT held Class B and Class C Limited Partnerships Interests in Highland;

**WHEREAS**, on December 91, 9015, HMIT entered into the HMIT Note with Highland, which had a total outstanding principal balance of Fifty-Seven Million Six Hundred Ninety Thousand Six Hundred Forty and 35/100 Dollars ($57,230,240.35) as of the Petition Date (the "**HMIT Note Balance**");

**WHEREAS**, HMIT's Class B and Class C Limited Partnership Interests in Highland were extinguished on August 11, 9091, in accordance with the Plan;

017490

HCMLPHMIT00001228

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

**WHEREAS**, pursuant to the LPA, HMIT's capital account balance at Highland on account of its Class B and Class C Limited Partnership Interests on the Petition Date was Three Hundred Ninety-Four Million Six Hundred Thirty Thousand Eight Hundred Seventy-One and 5-/100 Dollars ($-34,2-0,871.5-) (the "**HMIT Capital Account Balance**");

**WHEREAS**, some or all of the HMIT Entities have asserted certain Claims against certain Highland Entities and certain other Highland Covered Parties, including those asserted in the Pending Litigation;

WHEREAS, certain distributions to be made to the holders of allowed Class 10 Claims or Equity Interests pursuant to the terms and subject to the conditions set forth herein are premised on the consent of certain Highland Covered Parties in their capacity as Holders of Class 3 Interests, and such Persons are only willing to provide such consent in exchange for the releases as set forth in this Agreement;

**WHEREAS**, some or all of the Highland Entities have asserted certain Claims against certain HMIT Entities, including the HMIT Note Claims;

**WHEREAS**, the Parties wish to terminate, extinguish, and release any and all rights, duties, obligations and Claims that (a) any of the Highland Released Parties owed or have, or may have owed or have, to or with respect to any of the HMIT Released Parties, and (b) any of the HMIT Released Parties owed or have, or may have owed or have, to or with respect to any of the Highland Released Parties, as provided in this Agreement (collectively, the "**Rights and Obligations**");

**WHEREAS**, the Parties agree that the Litigation Protections are intended to enact a permanent cessation of all litigation concerning or related to the Highland Released Parties through and including the Agreement Date; and

**WHEREAS**, the Parties, individually and collectively, wish to (a) resolve all disputes between and/or among any of the Highland Entities and their respective indemnitees, on the one hand, and any of the HMIT Entities, on the other hand, including those asserted or attempted to be asserted in the Pending Litigation, (b) fix and allow HMIT's Class 10 Interest at the amount and on the terms provided herein; and (c) terminate, extinguish, and release all Rights and Obligations on the terms provided herein.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

1. <u>Stay and Dismissal of Pending Litigation With Prejudice</u>.

(a)     Within five (5) Business Days after the Agreement Date, the HMIT Entities shall take all steps necessary (at their own cost) to stay the Pending Litigation.

017491

HCMLPHMIT00001229

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

(b)      Within five (5) Business Days after the Bankruptcy Court Approval Date, the HMIT Entities shall take all steps necessary (at their own cost) to dismiss the Pending Litigation with prejudice.

9.      <u>Maintenance of Stay and Dismissal of Certain Defendants from the Amended Complaint</u>.

(a)      The Litigation Trustee shall continue to maintain the stay of Adv. Proc. No. 9160-0726sgj and all related proceedings arising therefrom through the Bankruptcy Court Approval Date. Within five (5) Business Days after the Bankruptcy Court Approval Date, the Litigation Sub-Trust shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand PE from Counts I, II, III, and XXIV of the Amended Complaint.

-.      <u>Cash Payment to HMIT</u>.  Within five (5) Business Days following the Bankruptcy Court Approval Date, Highland shall pay HMIT a one-time, lump sum of Five Hundred Thousand Dollars (US$500,000.00) (the "**Payment**") by wire transfer:

[wire instructions]

4.      <u>HMIT Class 10 Interest</u>.

(a)      Subject to entry of the Bankruptcy Court Order, and the terms of this Agreement, the HMIT Class 10 Interest shall be deemed allowed in the amount of Three Hundred Thirty-Six Million Nine Hundred Forty Thousand Two Hundred Thirty and 58/100 Dollars (US$--2,340,9-0.58), which amount represents the HMIT Capital Account Balance, <u>less</u> the HMIT Note Balance.

(b)      Notwithstanding anything to the contrary in the Plan or the Claimant Trust Agreement, as an integral part of this Agreement to consent to the allowance of the HMIT Class 10 Interest and the other considerations in this Agreement, HMIT shall not be deemed, and no holder of the HMIT Class 10 Interest shall be, a Claimant Trust Beneficiary or a "Beneficiary" under the Claimant Trust Agreement, and the Highland Released Parties, individually and collectively, shall owe no duty to any HMIT Releasor (whether contractual, fiduciary, equitable, statutory or otherwise), including with respect to the HMIT Class 10 Interest, in each case, except as expressly set forth in this Agreement.  Furthermore, without limiting the foregoing and for the avoidance of doubt, the contractual right of the holder of the HMIT Class 10 Interest to receive or recover any payments or Indemnity Trust Assets from the Indemnity Trust as set forth in this Agreement or the Indemnity Trust Agreement does not make any HMIT Releasor or any other Person a beneficiary of the Indemnity Trust or under the Indemnity Trust Agreement.

(c)      Notwithstanding anything to the contrary in the Plan, the Claimant Trust Agreement or the Indemnity Trust Agreement, in no event shall HMIT sell, transfer, assign, pledge, hypothecate, participate or otherwise dispose of or encumber the HMIT Class 10 Interest or any rights (including any right to payment) with respect thereto (collectively, a "**Class 10 Assignment**"), and any attempted Class 10 Assignment shall be null and void.

017492

HCMLPHMIT00001230

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

(d)     For the avoidance of doubt, the HMIT Class 10 Interest is and shall remain senior to the not yet allowed, unvested contingent Class 11 Claims of Equity Interests as provided for in the Plan, the Plan Documents, and the Claimant Trust Agreement.

5.     <u>Initial Interim Distributions on the Allowed Class 10 Interests</u>.

(a)     Within five (5) Business Days after the Bankruptcy Court Approval Date, the Indemnity Trust shall distribute (the date on which such distribution is made, the "**Initial Interim Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Ten Million Dollars (US$10,000,000.00) (the "**Initial Interim Cash Distribution Amount**").

(b)     Within five (5) Business Days after the Bankruptcy Court Approval Date (the "**Note Assignment Date**"), the Highland Entities shall cause the portion of the Dugaboy Note held by the Highland Entities to be distributed to HMIT in-kind and take all actions necessary for HMIT to become the holder of such portion of the Dugaboy Note, and shall in addition pay to HMIT cash in the aggregate amount of all principal and interest payments actually received on the Dugaboy Note by the Highland Entities, including the Indemnity Trust, from the Agreement Date to the Note Assignment Date.  Prior to the Bankruptcy Court Approval Date, HMIT will engage an independent valuation service provider to value the Dugaboy Note for purposes of determining the magnitude of reduction to the outstanding allowed Class 10 Interests on account of such in-kind distribution, which shall not be less than Fifty percent (50%) of the current balance owed under the Dugaboy Note. The HMIT Entities acknowledge and agree that none of the Highland Entities are representing or warranting that the Dugaboy Note can be sold, or the price, if any, that could be received for the Dugaboy Note and further acknowledge and agree that any such purchase price may be de minimis.

2.     <u>Subsequent Distribution(s) on the Allowed Class 10 Interests</u>.

(a)     On December 1, 9097, the Indemnity Trust shall distribute (such distribution, collectively, the "**First Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**First Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests: cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$2,500,000.00).

(b)     On December 1, 9098, the Indemnity Trust shall distribute (such distribution, collectively, the "**Second Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**Second Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$2,500,000.00).

(c)     Notwithstanding anything herein to the contrary, the obligations of the Indemnity Trust to make the First Subsequent Distribution or Second Subsequent Distribution is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII, Section 8.1(c) of the Indemnity Trust Agreement that the Indemnity Trust Assets comprising such distributions are not reasonably necessary to satisfy current or potential

017493
HCMLPHMIT00001231

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

Indemnification Obligations (as defined in the Indemnity Trust Agreement) to all persons who are or might become Beneficiaries (as defined in the Indemnity Trust Agreement).

       7.    <u>Final Distribution on the Allowed Class 10 Interests</u>.

       (a)    On the later of the Final Court Approval Date and April 1, 9093, the Indemnity Trust will distribute all excess remaining Indemnity Trust Assets in accordance with Article VIII of the Indemnity Trust Agreement; <u>provided</u>, <u>however</u>, that the obligation of the Indemnity Trust to make any such distributions and/or dissolve and wind up the affairs of the Indemnity Trust is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII of the Indemnity Trust Agreement that (1) a Final Order(s) (as defined in the Indemnity Trust Agreement) has been entered resolving all litigation, claims or proceedings in any forum of any kind which could give rise to Indemnity Obligations (as defined in the Indemnity Trust Agreement) and payment in full of all such Indemnity Obligations and (9) all applicable statutes of limitations and any applicable tolling of such statutes of limitation have expired.

       (b)    The Indemnity Trust agrees to not use Indemnity Trust Assets to fund Operating Expenses.

       (c)    Following the Bankruptcy Court Approval Date, at the request of Mark Patrick, solely in his capacity, and to the extent he remains, as administrator of HMIT, but not more often than quarterly, Highland and the Indemnity Trust Administrator agree to review (i) the status of their respective assets, (ii) the balance of cash held, (iii) the status of any claims made for indemnification and any resolutions thereof, (iv) the status of any litigation, and (v) forecasted operating expenses with Mr. Patrick, and will each work in good faith to reduce operating expenses where reasonably practicable; provided, however, that all such reporting shall be subject to Mr. Patrick's agreement to maintain confidentiality with respect to any non-public information.

       8.    <u>Transfer Kirschner Claims; Dismissal of HMIT Note Claims</u>.

       (a)    Within five (5) Business Days after the Bankruptcy Court Approval Date, but after the dismissal provided for in <u>Section 9</u>, the Litigation Sub-Trust shall execute a short-form assignment in in favor of the HMIT Entities transferring all of the Litigation Sub-Trust's right, title, and interest in and to the Kirschner Claims (the "**Kirschner Transfer**"). Such assignment shall be in a form mutually acceptable to the Parties and its substance shall be consistent with the terms, conditions and limitations set forth in this Agreement, including <u>Section 8(b)</u> below. Each HMIT Entity acknowledges and agrees that none of the Highland Entities will have any duty or obligation to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof, except as provided in this Agreement, including the terms of <u>Section 8(c)</u> below.

       (b)    THE HMIT ENTITIES SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THE LITIGATION SUB-TRUST IS TRANSFERRING THE KIRSCHNER CLAIMS ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT THE HMIT ENTITIES ARE NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM THE HIGHLAND ENTITIES OR

017494

HCMLPHMIT00001232

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

THEIR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE KIRSCHNER CLAIMS AND AMENDED COMPLAINT, INCLUDING WITH RESPECT TO THE ENFORCEABILITY, TRANSFERABILITY, VIABILITY, STRENGTH, OR VALUE OF ANY OF THE KIRSCHNER CLAIMS OR THE AMENDED COMPLAINT.  The HMIT Entities hereby specifically acknowledge that they have carefully reviewed this Section and have had the opportunity to discuss its import with legal counsel and that the provisions of this Section are a material part of this Agreement.  Thus, if for any reason HMIT is precluded from or is otherwise unable to prosecute all or any of the Kirschner Claims, (i) the HMIT Releasors shall have no recourse against any Highland Released Parties whatsoever and shall not be entitled to compensation of any kind, it being agreed that the HMIT Entities are otherwise receiving adequate consideration for the duties and obligations they are undertaking pursuant to this Agreement and (ii) there will be no effect whatsoever on the validity and enforceability of this Agreement or any of the other transactions contemplated hereby.

(c)    As promptly as reasonably practicable following the Bankruptcy Court Approval Date, the Highland Entities shall provide to the HMIT Entities electronic copies of written discovery requests and responses thereto, and documents produced in discovery in respect of the Kirschner Claims and the Amended Complaint.  The Highland Entities will not provide any other documents regarding the Kirschner Claims including any attorney-client communications and any documents subject to the attorney work-product doctrine or similar privileges or immunities concerning the Kirschner Claims (collectively, the "**Kirschner Privileges**"), it being understood and agreed that the Highland Entities are retaining, and not transferring or waiving, the Kirschner Privileges.

(d)    Each Party acknowledges and agrees that if (i) the Kirschner Transfer is found or deemed to be impermissible or invalid, for any reason, or (ii) any HMIT Entity materially breaches this Agreement, the Kirschner Claims and Amended Complaint will revert to, and remain an asset of, the Litigation Sub-Trust.

3.    <u>General Release By The HMIT Entities</u>. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the HMIT Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its and their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the HMIT Entities, the "**HMIT Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each Highland Released Party from, and waives and relinquishes, any and all Claims, which the HMIT Releasors, or any Person claiming through, under, or on behalf of any of the HMIT Releasors, ever had, now has, or hereafter can, shall, or may have against any of the Highland Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Agreement Date, including any fact, matter, transaction, or occurrence asserted by any HMIT Entity in the Pending Litigation or in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the Highland Released Parties, or the Highland Released

017495

HCMLPHMIT00001233

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**HMIT Entity Released Claims**").

10.    <u>General Release By The Highland Entities</u>. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the Highland Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its or their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the Highland Entities, the "**Highland Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, any and all Claims which the Highland Releasors, or any Person claiming through, under, or on behalf of any of the Highland Releasors, ever had, now has, or hereafter can, shall, or may have against any of the HMIT Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Bankruptcy Court Approval Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the HMIT Released Parties, or the HMIT Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**Highland Released Claims**").

11.    <u>Further Provisions Concerning The General Releases</u>.

(a)    **FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASES ARE INTENDED TO BE GENERAL AND INCLUDE A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE AGREEMENT DATE.**

(b)    To the maximum extent permitted by law, each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefit of any statute or other principle of law or equity that limits the applicability of a release with respect to Claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release.

(c)    Without limiting the scope of the foregoing waiver, in connection with the foregoing release, each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefits of Section 1549 of the California Civil Code (to the extent, if any, that Section 1549 might apply to the foregoing release), which provides as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT**

017496

HCMLPHMIT00001234

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

**TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees that the provisions of Section 1549 of the Civil Code of the State of California and all similar federal or state law, rights, rules or legal principles, legal or equitable, in each case solely to the full extent such provisions apply, **ARE HEREBY KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY EACH OF THE HMIT ENTITIES AND THE HIGHLAND ENTITIES, ON THEIR OWN BEHALF AND ON BEHALF OF THE OTHER HMIT RELEASORS AND HIGHLAND RELEASORS, RESPECTIVELY,** in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

In connection with such waiver and relinquishment, each of the HMIT Entities and Highland Entities acknowledges that it is aware that it may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein. Nevertheless, it is the intent of each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, in executing this Agreement fully, finally, and forever to settle and release all such matters, and all Claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

(d)     As an integral component of this Agreement, and notwithstanding the Parties' intent set forth in the preamble hereto and the general nature of the releases in <u>Sections 3 and 10</u>, should:

(i)     any HMIT Releasor contend or assert that any Claim of any kind whatsoever held by any HMIT Releasor against any Highland Released Party survives this Agreement and is in any way related to or arising from or in connection with any HMIT Entity Released Claim (such claim or cause of action, a "**HMIT Alleged Claim**"), such HMIT Releasor will be deemed to have irrevocably, fully, and finally assigned such HMIT Alleged Claim to the Highland Entities and the Highland Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such HMIT Alleged Claim.

(ii)     any Highland Releasor contend or assert that any Claim of any kind whatsoever held by any Highland Releasor against any HMIT Released Party survives this Agreement and is in any way related to or arising from or in connection with any Highland Entity Released Claim (such claim or cause of action, a "**Highland Alleged Claim**"), such Highland Releasor will be deemed to have irrevocably, fully, and finally assigned such Highland Alleged

017497
HCMLPHMIT00001235

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

Claim to the HMIT Entities and the HMIT Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such Highland Alleged Claim.

19.    Covenant Not To Sue; Limitation on Standing. Upon the Agreement Date:

(a)    Each of the HMIT Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the Highland Released Parties, to recover, enforce, investigate, or collect any HMIT Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(b)    Each of the Highland Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the HMIT Released Parties, to recover, enforce, investigate, or collect any Highland Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(c)    For the avoidance of doubt, this Agreement shall not operate to give any HMIT Entity standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except for the limited purpose of seeking Court approval of this Agreement (including with respect to any appeal concerning any order entered granting or denying such approval), and except for the limited purpose of enforcing this Agreement, no HMIT Entity shall commence any Action in connection with the HMIT Class 10 Interest.

1-.    Representations and Warranties.

(a)    Each of the HMIT Entities hereby represents and warrants that every HMIT Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any HMIT Releasor.

(b)    The HMIT Entities, on their own behalf and on behalf of the other HMIT Releasors, acknowledge and agree that each Plan Provision is lawful, effective, and binding on the HMIT Releasors. The HMIT Entities further agree, on their own behalf and on behalf of the other HMIT Releasors, that the HMIT Releasors will never, in any way, challenge or seek to modify, nullify, vacate, or revoke, or induce, encourage or direct any other Person to do so or act in concert with or assist (financially or otherwise) any other Person in doing so the Confirmation Order, the Plan, the Plan Protections, or any Plan Document, including the Claimant Trust Agreement, the LPA, the Indemnity Trust Agreement or the Litigation Sub-Trust Agreement, in the Bankruptcy Court, in any other state or federal court, in any other forum or tribunal, or otherwise, including administrative or regulatory tribunals and foreign courts.

(c)    Each of the Highland Entities hereby represents and warrants that every Highland Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any Highland Releasor.

(d)    Each Party severally represents and warrants as to itself only that: (i) it has taken all necessary action to authorize and approve the execution, delivery and performance of this

017498
HCMLPHMIT00001236

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

Agreement; (ii) such Party has full power and authority to execute and deliver this Agreement; and (iii) this Agreement constitutes a valid, legal and binding obligation of such Party, and is enforceable subject to its terms.  Each individual signatory hereto individually warrants and represents to all Parties hereto that such individual has full power and authority to act on behalf of and bind the Party for which he or she has executed this Agreement; provided, however that no signatory shall otherwise provide any warranty or representation or otherwise be a party to this Agreement on an individual basis.

14.   <u>No Continuing Rights, Duties or Obligations</u>.  Except for the rights, duties, and obligations expressly set forth in this Agreement, all Rights and Obligations that existed or may have existed shall be deemed terminated, extinguished, and released upon the Agreement Date. For the avoidance of doubt, from and after the Agreement Date, (a) the Highland Released Parties, individually and collectively, shall owe no duty, past or present, including with respect to the Kirchner Claims, to the HMIT Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement, and (b) the HMIT Released Parties, individually and collectively, shall owe no duty to the Highland Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement.

15.   <u>Gatekeeper Standard</u>.

(a)   The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that, notwithstanding the United States Court of Appeals for the Fifth Circuit's decision in *Highland Capital Management Fund Advisors, L.P. v. Highland Capital Management, L.P.*, No. 9-6l0$^{5-}$4 (5th Cir. Mar. 18, 9095), the "Gatekeeper" provisions contained in Highland's Original Plan is forever binding on each of the HMIT Entities and any Persons claiming through, under or on behalf of any of them, and for a claim or cause of action to be  "colorable" for purposes of the Gatekeeper, it must be found by final order of the Bankruptcy Court (the "**Gatekeeper Court**"), which order shall be subject to appeal to a court of competent jurisdiction, to have satisfied the "Gatekeeper Colorability Test" as such term is defined in *In re Highland Capital Management, L.P.*, 909- Bankr. LEXIS 9104 at *1946-2 (Bankr. N.D. Tex. Aug. 94, 909-).

(b)   The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that compliance with the Gatekeeper requires (i) a motion seeking leave to sue an Exculpated Party (as that term is defined in Highland's original Plan) and a finding that the litigant's claims and causes of action are "colorable" attaching a complaint setting forth the basis for such claims or causes of action and (ii), in the Gatekeeper Court's sole discretion, an evidentiary hearing (during which the Gatekeeper Court may, among other things, hear testimony and assess the credibility of any witness(es)) to determine whether a proposed claim or cause of action is "colorable."

(c)   The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, further acknowledge and agree that the moving party under the Gatekeeper has the burden of satisfying the "Gatekeeper Colorability Test," and that the dismissal of the Pending Litigation shall have res judicata effect.

017499

HCMLPHMIT00001237

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

12.   <u>Indemnification</u>.

(a)   Without in any manner limiting the available remedies for any breach of this Agreement, the HMIT Entities, severally but not jointly, agree to indemnify, defend, and hold the Highland Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any HMIT Entity set forth in <u>Section 1-</u> or (y) any Actions brought or prosecuted by or on behalf of, any HMIT Releasor or that are induced, encouraged, assisted  or directed by any HMIT Releasor or brought or prosecuted in concert with any HMIT Releasor against any Highland Released Party with respect to or related to any HMIT Entity Released Claims.  Without limiting the scope of the foregoing in any manner, any HMIT Entity that breaches <u>Section 19</u> shall be liable to the Highland Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 19</u> for the reasonable attorneys' fees and costs incurred by such Highland Released Party in defending against or otherwise responding to such Action.  Each HMIT Entity acknowledges and agrees that the HMIT Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

(b)   Without in any manner limiting the available remedies for any breach of this Agreement, the Highland Entities, severally but not jointly, agree to indemnify, defend, and hold the HMIT Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any Highland Entity set forth in <u>Section 1-</u> or (y) any suits, proceedings, or other actions brought or prosecuted by or on behalf of, any Highland Releasor or that are induced, encouraged, assisted  or directed by any Highland Releasor or brought or prosecuted in concert with any Highland Releasor against any HMIT Released Party with respect to or related to any Highland Entity Released Claims.  Without in any manner limiting the scope of the foregoing, any Highland Entity that breaches <u>Section 19</u> shall be liable to the HMIT Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 19</u> for the reasonable attorneys' fees and costs incurred by such HMIT Released Party in defending against or otherwise responding to such Action.  Each Highland Entity acknowledges and agrees that the Highland Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

17.   <u>Execution</u>.  This Agreement may be executed by the exchange of signatures by facsimile or by PDF attachment to an email transmittal and in counterparts, and if so executed, shall be fully executed when a counterpart has been executed and delivered by all Parties hereto through counsel.  All counterparts taken together shall constitute one and the same agreement and shall be fully enforceable as such.

18.   <u>Bankruptcy Court Order</u>.  The allowance of the allowed HMIT Class 10 Interest pursuant to <u>Section 4</u> is subject to the entry of the Bankruptcy Court Order.  To that end, the Highland Entities shall file the 3013 Motion no later than five (5) Business Days after the Agreement Date.  Each Party shall, and shall cause each of their respective Affiliates to, undertake

017500
HCMLPHMIT00001238

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

any and all actions in compliance with applicable law to obtain the Bankruptcy Court Order as promptly as practicable, and without limiting the foregoing, if an Action is threatened or instituted by any Person opposing the 3013 Motion or otherwise challenging the validity or legality, or seeking to restrain the consummation, of the transactions contemplated by this Agreement or the Bankruptcy Court Order, each Party shall, and shall cause its respective Affiliates to, use their commercially reasonable best efforts to avoid, resist, resolve or, if necessary, and defend to effectuate this Agreement and consummate the transactions hereby. If the 3013 Motion is not approved by entry of the Bankruptcy Court Order or if the Bankruptcy Court Approval is precluded from becoming a Final Order, (a) there will be no affect on, adjustment to, or impairment of, in any way, the validity and enforceability of the remainder of this Agreement, and the other transactions contemplated hereby, all of which shall remain in full force and effect and (b) each Party shall, and shall cause its respective Affiliates to, use their best efforts to seek the allowance of the HMIT Class 10 Interest in a substantially similar amount and on substantially similar terms as set forth in Section 4 to the fullest extent possible so as to give effect to the original intent of the Parties as closely as possible.

13. <u>Fees and Expenses</u>. Whether or not the transactions contemplated hereby are consummated or the Bankruptcy Court Order is obtained, and except as otherwise expressly provided in this Agreement, each Party will bear its respective fees, costs and expenses (including legal, accounting and other professional fees) incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the transactions contemplated hereby, including with respect to each Party's respective obligations pursuant to Section 18. Notwithstanding the foregoing, if any Party hereto brings an Action to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that Action shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

90. <u>Entire Agreement; No Other Representations</u>. **THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF ANY PERSON OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT. THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS (COLLECTIVELY, "<u>REPRESENTATIONS</u>"), EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT; AND THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT RELIED ON ANY REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY ARE ENTERING INTO THIS AGREEMENT RELYING SOLELY ON THEIR OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS BY ANY PARTY, EXCEPT FOR THOSE REPRESENTATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES AGREE THAT REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT SHALL NOT BE USED IN THE INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT, AND NEITHER THE HMIT RELEASED PARTIES NOR THE**

017501

HCMLPHMIT00001239

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

**HIGHLAND RELEASED PARTIES SHALL HAVE ANY LIABILITY FOR ANY CONSEQUENCES ARISING AS A RESULT OF ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT**.

91.    <u>Agreement and Release Knowing and Voluntary</u>.  The Parties acknowledge that they have considered this Agreement with their respective attorneys and have carefully read this Agreement, that it has been fully explained by their attorneys, and that they have had a reasonable opportunity to consider this Agreement.  The Parties further represent that they know and fully understand the contents of this Agreement, that they intend to be legally bound by this Agreement and the releases and covenants contained herein, and that they are signing this Agreement, including the release provisions herein, voluntarily and of their own free will and without coercion, and with the benefit of advice of counsel.

99.    <u>Cooperation</u>.  The Parties agree to perform any services or actions reasonably necessary to carry out the terms and conditions of this Agreement or the transactions contemplated hereby, including the execution and delivery of reasonable additional documents, instruments, conveyances and/or assurances, in good faith, and to reasonably communicate and cooperate with one another in this regard.  For the avoidance of doubt, nothing in this Section shall obligate the Highland Entities to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof.

9-.    <u>Governing Law</u>.  This Agreement shall be construed pursuant to and governed by the laws of the State of Delaware (substantive and procedural) without reference to principles of conflicts of law that would result in the application of any other State's laws.

94.    <u>Jurisdiction/Venue</u>.  The Parties hereby irrevocably submit to the jurisdiction and venue of the Bankruptcy Court with respect to any Action arising out of or related to this Agreement or the subject matter hereof; if (and only if) the Bankruptcy Court lacks personal or subject matter jurisdiction to adjudicate an Action arising out of or related to this Agreement or the subject matter hereof, then the Parties irrevocably submit to the jurisdiction and venue of the United States District Court for the Northern District of Texas.

95.    <u>No Admissions</u>.  All Parties acknowledge and agree that the matters set forth in this Agreement constitute the settlement and compromise of disputed Claims and that this Agreement shall not constitute the admission of any fact or liability by any of them regarding any Claim, including the Claims released hereunder, and neither the terms hereof, nor the fact of this Agreement itself, shall be evidence of any kind in any Action, other than an Action to enforce the terms of the Agreement or any instrument executed in connection herewith or any claim for damages or other relief for breach of any representation or warranty contained herein or in any instrument executed in connection herewith.

92.    <u>Other Provisions</u>.

(a)    No representation, inducement, agreement, promise or understandings altering, modifying, amending, taking from or adding to, the terms and conditions hereof shall have any force or effect unless the same is in writing and validly executed by each of the Parties hereto.

13

HCMLPHMIT00001240

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

(b)     The waiver by any Party of any breach of, or default under, any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or default; provided, however, that for any such waiver to be enforceable, it shall be in writing and executed by the non-breaching Party.

(c)     The headings contained in this Agreement are for convenience only and shall in no way restrict or otherwise affect the construction of the provisions hereof.

(d)     The Parties shall each execute all documents and perform all acts necessary and proper to effectuate the terms of this Agreement.

97.     <u>Notices</u>.  All notices required or permitted to be provided hereunder shall be afforded to the respective parties to and through their counsel, and shall be transmitted simultaneously by electronic mail (with PDF attachments, as necessary) and by telefax, addressed as follows:

To the Highland Entities:

**PACHULSKI STANG ZIEHL AND JONES LLP**
Jeffrey N. Pomerantz
John A. Morris
10100 Santa Monica Boulevard
Los Angeles, California 300276400-
- 10.977.2310
jpomerantz@pszjlaw.com
jmorris@pszjlaw.com

To the HMIT Entities:

**KELLY HART PITRE**
Louis M. Phillips
Amelia Hurt
- 01 Main Street, Suite 1200
995.- 81.324-
Louis.Phillips@Kellyhart.com
Amelia.Hurt@Kellyhart.com

98.     <u>Severability</u>.  Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity and enforceability of any other provision of this Agreement.

93.     <u>Interpretive Provisions</u>.  Unless the express context otherwise requires: (a) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) words defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (c) the words "Dollars" and "$" mean U.S. dollars; (d) references herein to

017503

HCMLPHMIT00001241

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement; (e) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words ",without limitation,"; (f) references herein to any gender shall include each other gender; (g) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement; (h) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (i) the word "or" shall be disjunctive but not exclusive; (j) the headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties; and (k) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

[*Signature page follows*]

017504

HCMLPHMIT00001242

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/98/95

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**HUNTER MOUNTAIN INVESTMENT TRUST**

By    _____
         Name:      Mark Patrick
         Title:       Administrator
         Date:      May __, 9095

**BEACON MOUNTAIN LLC**

By    _____
         Name:
         Title:
         Date:      May __, 9095

**RAND ADVISORS, LLC**

By    _____
         Name:      Mark Patrick
         Title:       President
         Date:      May __, 9095

**RAND PE FUND I, LP**
By: Rand PE Fund Management, LLC, its General Partner

By    _____
         Name:      Mark Patrick
         Title:       President
         Date:      May __, 9095

**RAND PE FUND MANAGEMENT, LLC**

By    _____
         Name:      Mark Patrick
         Title:       President

SIGNATURE PAGE TO SETTLEMENT AGREEMENT & GENERAL RELEASE

017505

HCMLPHMIT00001243

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/98/95

Date: May __, 9095

**ATLAS IDF, LP**
By: Atlas IDF GP, LLC, its General Partner

By _____
   Name:  Mark Patrick
   Title:   President
   Date:  May __, 9095

**ATLAS IDF GP, LLC**

By _____
   Name:  Mark Patrick
   Title:   President
   Date:  May __, 9095

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By _____
   Name:  James. P. Seery, Jr.
   Title:   Chief Executive Officer
   Date:  May __, 9095

**HIGHLAND CLAIMANT TRUST**

By _____
   Name:  James P. Seery, Jr.
   Title:   Claimant Trustee
   Date:  May __, 9095

**HIGHLAND LITIGATION SUB-TRUST**

By _____
   Name:  Marc S. Kirschner
   Title:   Litigation Trustee

017506

HCMLPHMIT00001244

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/98/95

Date:        May __, 9095

## HIGHLAND INDEMNITY TRUST

By  _____

    Name:      James P. Seery, Jr.
    Title:       Indemnity Trust Administrator
    Date:      May __, 9095

SIGNATURE PAGE TO SETTLEMENT AGREEMENT & GENERAL RELEASE

017507

HCMLPHMIT00001245

# EXHIBIT 58

017508

CONFIDENTIAL

Highland Claimant Trust
100 Crescent Court, Suite 1850
Dallas, TX 75201

May 20, 2025

Patrick Daugherty
3621 Cornell Ave, Ste 830
Dallas, TX 75205

Dear Patrick Daugherty:

Highland Claimant Trust is making a distribution (the "**Eighth Distribution**") of cash proceeds to holders of Claimant Trust Interests in accordance with Article VI of the Claimant Trust Agreement.

Your share of the Eighth Distribution is $797,269.56, of which $781,707.29 represents the remaining portion of your previously allowed Class 9 claim and $15,562.27 represents all accrued interest with respect to such claim. No further distributions will be made on account of your allowed Class 9 claim after the Eighth Distribution, provided however that you still have an unresolved and pending claim that is separate from your allowed Class 9 claim, which has neither been allowed nor disallowed as of the date of this notice. The Eighth Distribution will be paid out to you on or about May 20, 2025.

The foregoing is not intended to provide, and should not be relied on for, tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors regarding treatment of the Eighth Distribution. This notice contains confidential information and is intended only for the addressee named herein. If you are not named addressee, you should not disseminate, distribute, or copy this notice. If you have received this notice by mistake, please notify David Klos immediately by e-mail (dklos@highlandcapital.com) and delete it along with any copies in your possession. If you are not the intended recipient, you are notified that disclosing, copying, distributing, or taking any action in reliance on the contents of this information is strictly prohibited.

Sincerely,

James P. Seery, Jr.
Claimant Trustee, Highland Claimant Trust

017509

**EXHIBIT 59**

017510

**WRITTEN CONSENT
OF THE
HOLDERS OF CLASS 9 SUBORINDATED CLAIM TRUST INTERESTS
IN THE
HIGHLAND CLAIMANT TRUST**

May 16, 2025

The undersigned, constituting all of the holders of the Class 9 Subordinated Claim Trust Interests (as defined in the Claimant Trust Agreement (as hereinafter defined)) in the Highland Claimant Trust, a Delaware statutory trust (the "**Claimant Trust**"), except for Mr. Patrick Hagaman Daugherty (such holders, the "**Consenting Holders**"), having waived any requirement for or notice of a meeting, hereby adopt and approve the following written consent:

WHEREAS, on October 16, 2019, Highland Capital Management, L.P. (the "**Debtor**" or "**HCMLP**") filed with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, which case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "**Bankruptcy Court**") and captioned In re Highland Capital Management, L.P., Case No. 19-34054-sgj11 (the "**Chapter 11 Case**");

WHEREAS, on January 22, 2021, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808] (as may be amended, supplemented, or otherwise modified from time to time, the "**Plan**"), which was confirmed by the Bankruptcy Court on February 22, 2021, pursuant to the *Findings of Fact and Order Confirming Plan of Reorganization for the Debtor* [ Docket No. 1943] (the "**Confirmation Order**");

WHEREAS, pursuant to the terms of the Plan, each of the Consenting Holders hold Allowed Class 9 Subordinated Claims entitled to the treatment provided in the Plan or such other less favorable treatment as such Holder and the Claimant Trustee may agree in writing;

WHEREAS, on August 11, 2021, the Effective Date as defined in the Plan occurred, the Debtor emerged from bankruptcy and the Claimant Trust was established pursuant to the Plan and that certain Claimant Trust Agreement, effective as of August 11, 2021 (as may be amended, supplemented, or otherwise modified from time to time, the "**Claimant Trust Agreement**"), by and among the Debtor, as settlor, James P. Seery, Jr. as trustee, and Wilmington Trust, National Association, as Delaware trustee;

WHEREAS, capitalized terms used but not otherwise defined herein or obvious from the context in which they are used have the meanings ascribed to such terms in the Plan and the Claimant Trust Agreement, as applicable.

1

017511

HCMLPHMIT00002677

**Payment in Satisfaction of Mr. Daugherty's Subordinated Claim Trust Interest**

WHEREAS, Mr. Patrick Hagaman Daugherty is the holder of a Class 9 Subordinated Claim Trust Interest in the Claimant Trust in the original amount of Three Million Seven Hundred Fifty Thousand Dollars ($3,750,000) with the current aggregate outstanding amount of Seven Hundred Eighty-One Thousand Seven Hundred Seven and 29/100 DOLLARS ($781,707.29), exclusive of interest (the "**Daugherty Class 9 Interest**");

WHEREAS, interest of Fifteen Thousand Five Hundred Fifty-Three and 71/100 Dollars ($15,553.71) has accrued in respect of the Daugherty Class 9 Interest as of May 15, 2025 and interest continues to accrue at approximately $1.71 per calendar day.

WHEREAS, the Claimant Trust desires to make a non-ratable distribution in respect of the Daugherty Class 9 Interest in order to pay such Daugherty Class 9 Interest in full, along with applicable interest (the "**Final Daugherty Distribution**"); and

WHEREAS, none of the Consenting Holders will receive a distribution at the time the Final Daugherty Distribution is made, but such Consenting Holders will retain all other rights related to their respective Subordinated Claim Trust Interests as set forth in the Plan and the Claimant Trust Agreement.

NOW, THEREFORE, BE IT RESOLVED AND CONSENTED TO that notwithstanding anything in the Plan or the Claimant Trust Agreement to the contrary, the Consenting Holders hereby approve, consent to and waive the Final Daugherty Distribution.

**Payments to Holders of Allowed Class 10 Interests**

WHEREAS, reference is made to the Settlement Agreement & General Release materially in the form attached hereto as Exhibit A (the "**HMIT Settlement Agreement**") to be entered into by and among HCMLP, the Claimant Trust, the Highland Litigation Sub-Trust, a Delaware statutory trust, and the Highland Indemnity Trust, a Delaware statutory trust (the "**Indemnity Trust**"), Hunter Mountain Investment Trust, a Delaware statutory trust ("**HMIT**"), Rand Advisors, LLC, a Delaware limited liability company, Rand PE Fund I, LP, a Delaware series limited partnership, Rand PE Fund Management, LLC, a Delaware limited liability company, Atlas IDF, LP, a Delaware limited partnership, and Atlas IDF GP, LLC, a Delaware limited liability company;

WHEREAS, as of the Petition Date, HMIT held the only Class B and Class C Limited Partnership Interests in HCMLP;

WHEREAS, on December 21, 2015, HMIT entered into the HMIT Note (as defined in the HMIT Settlement Agreement) with HCMLP, which had a total outstanding principal balance of Fifty-Seven Million Six Hundred Ninety Thousand Six Hundred Forty and 95/100 Dollars ($57,690,640.95) as of the Petition Date (the "**HMIT Note Balance**");

WHEREAS, HMIT's Class B and Class C Limited Partnership Interests in HCMLP were extinguished on August 11, 2021, in accordance with the Plan;

017512

HCMLPHMIT00002678

WHEREAS, pursuant to the Limited Partnership Agreement, HMIT's capital account balance at HCMLP on account of its Class B and Class C Limited Partnership Interests on the Petition Date was Three Hundred Ninety-Four Million Six Hundred Thirty Thousand Eight Hundred Seventy-One and 53/100 Dollars ($394,630,871.53) (the "**HMIT Capital Account Balance**");

WHEREAS, pursuant to the terms and subject to the conditions set forth in the HMIT Settlement Agreement, including, without limitation, the entry of the Bankruptcy Court Order (as defined in the HMIT Settlement Agreement), the HMIT Class 10 Interest (as defined in the HMIT Settlement Agreement) will be deemed allowed in the amount of Three Hundred Thirty-Six Million Nine Hundred Forty Thousand Two Hundred Thirty and 58/100 Dollars (US$336,940,230.58), which amount represents the HMIT Capital Account Balance, less the HMIT Note Balance; and

WHEREAS, pursuant to the HMIT Settlement Agreement and subject to the conditions set forth therein, the Indemnity Trust will make certain distributions to the Holders of allowed Class 10 Claims or Equity Interests prior to the Claimant Trust having repaid in full with applicable interest the holders of Class 9 Subordinated Claim Trust Interests (all of whom are Consenting Holders), including, the Initial Interim Cash Distribution Amount, the assignment of the Dugaboy Note in-kind to HMIT and a corresponding pro rata cash distribution to the other Holder of an allowed Class 10 Claim or Equity Interest, the First Subsequent Distribution, and the Second Subsequent Distribution (each as defined in the HMIT Settlement Agreement, and any such payment pursuant to the HMIT Settlement Agreement, a "**Class 10 Distribution**").

NOW, THEREFORE, BE IT RESOLVED AND CONSENTED TO that notwithstanding anything in the Plan or the Claimant Trust Agreement to the contrary, the Consenting Holders hereby approve, consent to all Class 10 Distributions, in each case, in accordance with the terms and conditions set forth in the HMIT Settlement Agreement; provided, that, and such consent by the Consenting Holders being expressly conditioned upon, at the time each Class 10 Distribution is made, if any, the Claimant Trust or the Indemnity Trust, as applicable, shall make the corresponding distribution set forth on Exhibit B on a pro rata basis to the holders of Class 9 Subordinated Claim Trust Interests.

*[Signature Page Follows.]*

017513

HCMLPHMIT00002679

IN WITNESS WHEREOF, the undersigned Consenting Holders have executed this Written Consent to be effective as of the date first written above.

MUCK HOLDINGS, LLC

By: _____
Name: Michael Linn
Title:  Michael Linn

JESSUP HOLDINGS, LLC

By: _____
Name: Paul Malek
Title:  Authorized Signatory

UBS SECURITIES LLC

By: _____
Name: Michael Parniawski
Title: Authorized Signatory

By: _____
Name: Nader Attalla
Title: Authorized Signatory

UBS AG LONDON BRANCH

By: _____
Name: Michael Parniawski
Title: Authorized Signatory

By: _____
Name: Nader Attalla
Title: Authorized Signatory

ACCEPTED AND AGREED:

_____
James P. Seery, Jr., solely in his capacity as
Claimant Trustee of the Highland Claimant
Trust

WRITTEN CONSENT OF THE HOLDERS OF CLASS 9 SUBORDINATED CLAIM TRUST INTERESTS

017514

HCMLPHMIT00002680

# EXHIBIT A

### Form of HMIT Settlement Agreement

[*Attached*.]

017515

HCMLPHMIT00002681

**EXHIBIT B**

**Class 9/10 Distribution Schedule**

| General description | Event | Amount to Class 9 | Amount to Class 10 |
|---|---|---|---|
| Retirement of Daugherty Class 9 | After receipt of written consent | $797,261, plus daily interest if applicable [1] | - |
| Disputed Claims Reserve distribution | Resolution of pending "Daugherty tax claim" | Up to $2,656,732.31 [2] | - |
| Initial Interim Distribution (cash) | Within 5 Business Days after Bankruptcy Court Approval | $10,000,000.00 | $10,000,000.00 |
| Initial Interim Distribution (in-kind) | Within 5 Business Days after Bankruptcy Court Approval | n/a | Assignment of Dugaboy Note [3] |
| First Subsequent Distribution | December 1, 2027, subject to Section 6(c) of settlement agreement | Remaining outstanding w/interest | $6,500,000.00 |
| Second Subsequent Distribution | December 1, 2028, subject to Section 6(c) of settlement agreement | n/a | $6,500,000.00 |
| Final Distribution | April 1, 2029, subject to Section 7(c) of settlement agreement | n/a | Remaining assets |

[1] Payable to Daugherty only in respect of his allowed Class 9 claim, pursuant to the written consent.

[2] Disputed Claims Reserve of up to $2,656,732.31 (representing the reserved Class 8 Daugherty tax claim, including interest) will be released upon resolution of the claim. Payment of the reserve to allowed claimholders will follow the terms of the Plan. For example, if the claim is completely disallowed, the entire reserve will be promptly paid to holders of Class 9 interests up to the holders' remaining unpaid face amount plus interest. Similarly, if the claim is partially allowed, any excess of the reserve over the partially allowed amount will be promptly paid to holders of Class 9 interests up to the holders' remaining unpaid face amount plus interest.

[3] Dugaboy Note to be assigned to HMIT. Cash of up to $550k to be distributed pro rata to other Class 10 holder.

017516

HCMLPHMIT00002682

**EXHIBIT 60**

*EXECUTION VERSION*

## TOLLING AGREEMENT EXTENDING CLAIM
## OBJECTION DEADLINE

This Tolling Agreement (the "<u>Agreement</u>") is made as of July 27, 2022 (the "<u>Effective Date</u>"), by and between Patrick Hagaman Daugherty ("<u>Mr. Daugherty</u>"), on the one hand, and Highland Capital Management, L.P. ("<u>Highland</u>" or the "<u>Debtor</u>," as applicable) and the Highland Claimant Trust (the "<u>Claimant Trust</u>," and together with Highland, the "<u>Highland Parties</u>"), on the other.  Each of Mr. Daugherty, Highland, and the Claimant Trust are individually referred to herein as a "<u>Party</u>" and collectively as the "<u>Parties</u>."

## <u>RECITALS</u>

WHEREAS, Mr. Daugherty is a former employee and limited partner of Highland and served in other positions with affiliates and former affiliates of Highland from time to time;

WHEREAS, on October 16, 2019, Highland filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Case</u>"), which is pending in the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division (the "<u>Bankruptcy Court</u>");

WHEREAS, on April 1, 2020, Mr. Daugherty filed a general, unsecured, non-priority claim against Highland in the amount of at "least $37,483,876.59," and such claim was denoted by Highland's claims agent as Proof of Claim No. 67 ("<u>Claim No. 67</u>");

WHEREAS, on April 6, 2020, Mr. Daugherty filed a general, unsecured, non-priority claim against Highland in the amount of at "least $37,482,876.62" that superseded Claim No. 67 and that was denoted by Highland's claims agent as Proof of Claim No. 77 ("<u>Claim No. 77</u>");

WHEREAS, on August 31, 2020, Highland commenced an adversary proceeding, Adv. Proc. No. 20-03107-sgj (Bankr. N.D. Tex.) (the "<u>Adversary Proceeding</u>"), against Mr. Daugherty by filing a complaint [Adv. Dkt. No. 1][1] (the "<u>Complaint</u>") in which Highland (a) objected to Claim No. 77 on various grounds, and (b) asserted a cause of action for the subordination of part of Mr. Daugherty's claim pursuant to 11 U.S.C. § 510(b);

WHEREAS, on September 29, 2020, Mr. Daugherty filed his answer to the Complaint [Adv. Dkt. No. 8] in the Adversary Proceeding;

WHEREAS, on October 23, 2020, Mr. Daugherty filed a motion seeking leave to amend Claim No. 77 [Bankr. Dkt. No. 1280][2] (the "<u>POC Amendment Motion</u>") and attached an amended proof of claim to the POC Amendment Motion increasing Mr. Daugherty's general, unsecured, non-priority claim against Highland to the amount of at "least $40,410,819.42" and sought to supersede Claim No. 67 and Claim No. 77;

---

[1] Adv. Dkt. No. refers to the docket maintained in the Adversary Proceeding.

[2] Bankr. Dkt. No. refers to the docket maintained in the Bankruptcy Case.

017518

WHEREAS, on December 10, 2020, the Bankruptcy Court entered an order [Bankr. Dkt. No. 1533] granting the POC Amendment Motion, and Mr. Daugherty was permitted to file an amendment to his proof of claim;

WHEREAS, on December 23, 2020, Mr. Daugherty filed an amended proof of claim, designated by Highland's claims agent as Proof of Claim No. 205 ("Claim No. 205," and together with Claim No. 67 Claim No. 77, the "Daugherty Claim");

WHEREAS, Claim No. 205 superseded Claim No. 77 and increased the Daugherty Claim to $40,710,819.42;

WHEREAS, on February 22, 2021, the Bankruptcy Court entered its *Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Bankr. Dkt. No. 1943] (the "Confirmation Order") confirming the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Bankr. Dkt. No. 1808] (as amended, supplemented, or modified, the "Plan");

WHEREAS, on August 11, 2021, the Effective Date (as defined in the Plan) occurred [Bankr. Dkt. No. 2700];

WHEREAS, on or about November 22, 2021, Highland and Mr. Daugherty executed that certain Settlement Agreement (the "Settlement Agreement") attached as Exhibit 1 to the *Declaration of John A. Morris in Support of the Reorganized Debtor's Motion for Entry of an Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and Authorizing Actions Consistent Therewith* [Bankr. Dkt. No. 3089] filed in support of the *Reorganized Debtor's Motion for Entry of an Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and Authorizing Actions Consistent Therewith* [Bankr. Dkt. No. 3088] (the "Settlement Motion");

WHEREAS, following an evidentiary hearing on the Settlement Motion held on March 1, 2022, the Bankruptcy Court entered its order [Bankr. Dkt. No. 3298] (the "Settlement Order") approving the Settlement Motion and the Parties' entry into the Settlement Agreement;

WHEREAS, pursuant to the Settlement Order, the Daugherty Claim, excluding the Reserved Claim,[3] was satisfied in its entirety;

WHEREAS, the Highland Parties dispute the validity and amount of the Reserved Claim and, pursuant to Section 9 of the Settlement Agreement, Mr. Daugherty and Highland reserved all rights with respect to the Reserved Claim; *provided, however*, that any litigation between Highland and Mr. Daugherty concerning the Reserved Claim was stayed until the IRS makes a final determination with respect to the dispute between the Debtor and the IRS (the "IRS Dispute") or the Highland Parties and Mr. Daugherty otherwise agree;

---

[3] "Reserved Claim" means the contingent and unliquidated claim as referenced in Proof of Claim No. 205 that related to an alleged claim for compensation and an audit/dispute between the Debtor and the Internal Revenue Service (the "IRS") in an amount estimated to be $2,650,353.00 as of October 23, 2020.

017519

WHEREAS, pursuant to the Confirmation Order, the deadline to object to claims was 180 days after the Effective Date, *i.e.*, February 7, 2022, unless extended by the Bankruptcy Court (the "Claim Objection Deadline");

WHEREAS, the Claim Objection Deadline was extended by order of the Bankruptcy Court [Bankr. Dkt. No. 3198] to August 8, 2022;

WHEREAS, the Highland Parties were vested with the exclusive authority to compromise, settle, withdrew, or resolve all claims against the Debtor, including the Reserved Claim, without further order of the Bankruptcy Court pursuant to Article VII.B of the Plan;

WHEREAS, on July 6, 2022, the Highland Parties filed the *Reorganized Debtor and Claimant Trustee Joint Motion for Entry of an Order Further Extending the Claim Objection Deadline Pursuant to Confirmed Chapter 11 Plan by which Reorganized Debtor May Object to Certain Claims* [Bankr. Dkt. No. 3387] (the "Second Extension Motion");

WHEREAS, Mr. Daugherty and the Highland Parties continue to consider potential resolutions of the Reserved Claim in the absence of a resolution of the IRS Dispute;

WHEREAS, it is unknown when the IRS Dispute may be resolved; and

WHEREAS, solely to avoid the expense, inconvenience, and uncertainty associated with litigation, and without any Party admitting liability, fault, or wrongdoing, or releasing or waiving any rights or defenses with respect to the Reserved Claim, the Parties desire to enter into this Agreement to extend the Claim Objection Deadline, solely with respect to the Reserved Claim, to January 11, 2023, at 5:00 p.m. (Central Time) (the "Objection Deadline").

NOW, THEREFORE, effective as of the Effective Date, each of the Parties agrees as follows:

1.    Covenant to Reserve.  In consideration of Mr. Daugherty's agreement to extend the Claim Objection Deadline (as set forth in paragraph 2 of this Agreement), the Highland Parties agree not to commence any lawsuit, action or proceeding to further object to the Reserved Claim at any time until the Objection Deadline (notwithstanding Mr. Daugherty's position that the Highland Parties would have no right to do so in any event under the Settlement Agreement until such time that the IRS resolves the IRS Dispute) and further agree to reserve $2,650,353.00 on account of the Reserved Claim in the "Disputed Claim Reserve" as such term is defined in the Plan until the Parties resolve the Reserved Claim pursuant to a signed agreement, or, alternatively, an order of the Bankruptcy Court.

2.    Extension of Claim Objection Deadline.  In consideration of the Highland Parties' "Covenant to Reserve" (as set forth in paragraph 1 of this Agreement), Mr. Daugherty agrees that the Claim Objection Deadline applicable to the Reserved Claim is hereby tolled as of, and extended from, the Effective Date to the Objection Deadline.

3.    Acknowledgement and Waiver.  Mr. Daugherty acknowledges and agrees that:

017520

a.      Regardless of whether the Second Extension Motion is approved by the Bankruptcy Court, Mr. Daugherty waives any right or ability to argue (x) that the terms of this Agreement and the extension of the Claim Objection Deadline required an order of the Bankruptcy Court; or (y) the application of the expiration of the Claims Objection Deadline to the Reserved Claim; and

b.      Mr. Daugherty is estopped from arguing that this Agreement is ineffective to extend the time within which the Highland Parties must object to the Reserved Claim.

4.      <u>Acknowledgement and Waiver</u>.  The Highland Parties acknowledge and agree that regardless of whether the Second Extension Motion is approved by the Bankruptcy Court, the Highland Parties waive any right or ability to argue that the terms of this Agreement and the extension of the Claim Objection Deadline required an order of the Bankruptcy Court.

5.      <u>Representations and Warranties</u>.

a.      Mr. Daugherty represents and warrants that he has not sold, transferred, hypothecated, pledged, or assigned the Reserved Claim to any other person or entity, and that no person or entity other than Mr. Daugherty has been, is, or will be authorized to bring, pursue, or enforce the Reserved Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) Mr. Daugherty.

b.      Each Party represents and warrants to the other Party that such Party is fully authorized to enter into and perform the terms of this Agreement and that, as of the Effective Date, this Agreement will be fully binding upon each Party in accordance with its terms.

6.      <u>Miscellaneous</u>.

a.      <u>Binding Effect; Successors-in-Interest</u>.  Each of the Parties agrees that this Agreement will be binding upon the Parties, and, as applicable, upon their predecessors, successors, subsidiaries, divisions, alter egos, affiliated and related entities, and their past or present officers, directors, partners, employees, attorneys, assigns, agents, representatives, and any or all of them.

b.      <u>No Admission of Liability</u>.  The Parties acknowledge that there is a bona fide dispute with respect to the validity and amount of the Reserved Claim.  Nothing in this Agreement will imply an admission of liability, fault or wrongdoing by the Highland Parties, Mr. Daugherty, or any other person and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Highland Parties, Mr. Daugherty, or any other person.

c.      <u>Notice</u>.  Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

017521

**Mr. Daugherty**

Patrick Hagaman Daugherty
3621 Cornell Avenue, Suite 830
Dallas, TX 75205
Email: pdaugherty@glacierlakecap.com

with a copy (which shall not constitute notice) to:

McCollom D'Emilio Smith Uebler LLC
Attn: Thomas Uebler, Esquire
2751 Centerville Road, Suite 401
Wilmington, DE 19808
E-mail: tuebler@mdsulaw.com

**Highland Parties**

Highland Capital Management, L.P.
100 Crescent Court, Suite 1850
Dallas, Texas 75201
Attention: David Klos
E-mail: dklos@HighlandCapital.com

Highland Claimant Trust
100 Crescent Court, Suite 1850
Dallas, Texas 75201
Attention: David Klos
E-mail: dklos@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Gregory Demo, Esq.
780 Third Avenue, 34th Floor
New York, NY 10017
E-mail: gdemo@pszjlaw.com

d.    Advice of Counsel.  Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, in the negotiation of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without reservation; and (d) had the opportunity to have the terms and conditions of this Agreement explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

017522

   e. <u>Counterparts</u>.  This Agreement may be signed in counterparts and such signatures may be delivered by facsimile or other electronic means.

   f. <u>Entire Agreement</u>.  This Agreement sets forth the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous written and oral agreements and discussions.  This Agreement may only be amended by an agreement in writing signed by the Parties.

   g. <u>No Waiver and Reservation of Rights</u>.  Except as otherwise provided herein, nothing in this Agreement shall be, or deemed to be, a waiver of any rights, remedies or privileges of any of the Parties, and each Party hereby reserves all of such rights, privileges and remedies under applicable law.

   h. <u>No Waiver if Breach</u>.  The Parties agree that no breach of any provision hereof can be waived except in writing.  The waiver of a breach of any provision hereof shall not be deemed a waiver of any other breach of any provision hereof.

   i. <u>Governing Law</u>.  This Agreement will be exclusively governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflicts of law principles, and all claims relating to or arising out of this Agreement, or the breach thereof, whether sounding in contract, tort, or otherwise, will likewise be governed by the laws of the State of Delaware, excluding Delaware's conflicts of law principles.

   j. <u>Jurisdiction</u>.  The Bankruptcy Court will retain exclusive jurisdiction over disputes relating to this Agreement.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

017523

**IT IS HEREBY AGREED.**

PATRICK HAGAMAN DAUGHERTY

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name: _____
Its: _____


HIGHLAND CLAIMANT TRUST

By: _____
Name: _____
Its: _____

017524

**IT IS HEREBY AGREED.**

**PATRICK HAGAMAN DAUGHERTY**

_____

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____
Name: _____
Its: _____

**HIGHLAND CLAIMANT TRUST**

By: _____
Name: _____
Its: _____

017525

**EXHIBIT 61**

017526

## AMENDMENT NO. 1 TO TOLLING AGREEMENT
## <u>EXTENDING CLAIM OBJECTION DEADLINE</u>

This Amendment No. 1 (the "<u>Amendment</u>"), dated as of December 21, 2022, to that certain Tolling Agreement Extending Claim Objection Deadline, dated as of July 27, 2022 (the "<u>Agreement</u>"), is made by and between Patrick Hagaman Daugherty, on the one hand, and Highland Capital Management, L.P. and the Highland Claimant Trust, on the other. Capitalized terms used but not defined herein have the meanings given to them in the Agreement.

## <u>RECITALS</u>

WHEREAS, the Parties entered into the Agreement to extend the Claim Objection Deadline to object to the Reserved Claim to January 11, 2023, at 5:00 p.m. (Central Time) (*i.e.*, the Objection Deadline).

WHEREAS, solely to avoid the expense, inconvenience, and uncertainty associated with litigation, the Parties desire to enter into this Amendment to further extend the Objection Deadline to object to the Reserved Claim.

NOW, THEREFORE, effective as of the date set forth above, each of the Parties agrees as follows:

1.    <u>Extension of Objection Deadline</u>. The term Objection Deadline as used in the Agreement is hereby amended and modified to mean 5:00 p.m. (Central Time) on the earlier of (a) December 31, 2023, (b) the first business day after the date that James P. Seery, Jr., is no longer the sole trustee of the Claimant Trust, or (c) the first business day after the date that the Claimant Trust is no longer (i) Highland's sole limited partner or (ii) the sole owner of, and with the right to direct, Highland's general partner.

2.    <u>Representations and Warranties</u>. Each Party represents and warrants that the representations and warranties set forth in Section 5 of the Agreement are true and accurate as of the date hereof.

3.    <u>Effectiveness of Agreement; No Other Changes</u>. Except as set forth in this Amendment, the Agreement is unaffected and shall continue in full force and effect in accordance with its terms. If there is a conflict between this Amendment and the Agreement, the terms of this Amendment will prevail.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

017527

**IT IS HEREBY AGREED.**

PATRICK HAGAMAN DAUGHERTY

_____

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:     _____
Name:        James P. Seery, Jr.
Its:              CEO

HIGHLAND CLAIMANT TRUST

By:     _____
Name:        James P. Seery, Jr.
Its:            Claimant Trustee

017528

**EXHIBIT 62**

017529

## AMENDMENT NO. 2 TO TOLLING AGREEMENT
## <u>EXTENDING CLAIM OBJECTION DEADLINE</u>

This Amendment No. 2 (the "<u>Amendment</u>"), dated as of November 6, 2023, to that certain Tolling Agreement Extending Claim Objection Deadline, dated as of July 27, 2022 (the "<u>Tolling Agreement</u>"), is made by and between Patrick Hagaman Daugherty, on the one hand, and Highland Capital Management, L.P. and the Highland Claimant Trust, on the other.  Capitalized terms used but not defined herein have the meanings given to them in the Agreement.

## <u>RECITALS</u>

WHEREAS, the Parties entered into the Tolling Agreement to extend the Claim Objection Deadline to object to the Reserved Claim to January 11, 2023, at 5:00 p.m. (Central Time) (*i.e.*, the Objection Deadline).

WHEREAS, the Parties entered into that certain *Amendment No. 1 to Tolling Agreement Extending Claim Objection Deadline* on December 21, 2022, further extending the deadline to object to the Reserved Claim to December 31, 2023 (or earlier if certain conditions were satisfied) (the "<u>First Amendment</u>," and together with the Tolling Agreement, the "<u>Agreement</u>").

WHEREAS, solely to avoid the expense, inconvenience, and uncertainty associated with litigation, the Parties desire to enter into this Amendment to further extend the Objection Deadline to object to the Reserved Claim.

NOW, THEREFORE, effective as of the date set forth above, each of the Parties agrees as follows:

1.      <u>Extension of Objection Deadline</u>.  The term Objection Deadline as used in the Agreement is hereby amended and modified to mean 5:00 p.m. (Central Time) on the earlier of (a) December 31, 2024, (b) the first business day after the date that James P. Seery, Jr., is no longer the sole trustee of the Claimant Trust, or (c) the first business day after the date that the Claimant Trust is no longer (i) Highland's sole limited partner or (ii) the sole owner of, and with the right to direct, Highland's general partner.

2.      <u>Representations and Warranties</u>.  Each Party represents and warrants that the representations and warranties set forth in Section 5 of the Agreement are true and accurate as of the date hereof.

3.      <u>Effectiveness of Agreement; No Other Changes</u>.  Except as set forth in this Amendment, the Agreement is unaffected and shall continue in full force and effect in accordance with its terms.  If there is a conflict between this Amendment and the Agreement, the terms of this Amendment will prevail.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

017530

**IT IS HEREBY AGREED.**

PATRICK HAGAMAN DAUGHERTY

_____

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:     _____
Name:   _____
Its:    _____

**HIGHLAND CLAIMANT TRUST**

By:     _____
Name:   _____
Its:    _____

017531

**IT IS HEREBY AGREED.**

**PATRICK HAGAMAN DAUGHERTY**

_____

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

Name: _____James P. Seery, Jr._____

Its: _____CEO_____

**HIGHLAND CLAIMANT TRUST**

By: _____

Name: _____James P. Seery, Jr._____

Its: _____Claimant Trustee_____

017532

**EXHIBIT 63**

017533

**AMENDMENT NO. 3 TO TOLLING AGREEMENT**
**EXTENDING CLAIM OBJECTION DEADLINE**

This Amendment No. 3 (the "Amendment"), dated as of November 20, 2024, to that certain *Tolling Agreement Extending Claim Objection Deadline*, dated as of July 27, 2022 (the "Tolling Agreement"), is made by and between Patrick Hagaman Daugherty, on the one hand, and Highland Capital Management, L.P. and the Highland Claimant Trust, on the other. Capitalized terms used but not defined herein have the meanings given to them in the Agreement.

**RECITALS**

WHEREAS, the Parties entered into the Tolling Agreement to extend the Claim Objection Deadline to object to the Reserved Claim to January 11, 2023, at 5:00 p.m. (Central Time) (*i.e.*, the Objection Deadline).

WHEREAS, the Parties entered into that certain *Amendment No. 1 to Tolling Agreement Extending Claim Objection Deadline* on December 21, 2022, further extending the deadline to object to the Reserved Claim to December 31, 2023 (or earlier if certain conditions were satisfied) (the "First Amendment").

WHEREAS, the Parties entered into that certain *Amendment No. 2 to Tolling Agreement Extending Claim Objection Deadline* on November 6, 2023, further extending the deadline to object to the Reserved Claim to December 31, 2024 (or earlier if certain conditions were satisfied) (the "Second Amendment," and together with the Tolling Agreement and the First Amendment, the "Agreement").

WHEREAS, solely to avoid the expense, inconvenience, and uncertainty associated with litigation, the Parties desire to enter into this Amendment to further extend the Objection Deadline to object to the Reserved Claim.

NOW, THEREFORE, effective as of the date set forth above, each of the Parties agrees as follows:

1.     Extension of Objection Deadline. The term Objection Deadline as used in the Agreement is hereby amended and modified to mean 5:00 p.m. (Central Time) on the earlier of (a) June 30, 2025, (b) the first business day after the date that James P. Seery, Jr., is no longer the sole trustee of the Claimant Trust, or (c) the first business day after the date that the Claimant Trust is no longer (i) Highland's sole limited partner or (ii) the sole owner of, and with the right to direct, Highland's general partner.

2.     Representations and Warranties. Each Party represents and warrants that the representations and warranties set forth in Section 5 of the Agreement are true and accurate as of the date hereof.

3.     Effectiveness of Agreement; No Other Changes. Except as set forth in this Amendment, the Agreement is unaffected and shall continue in full force and effect in accordance with its terms. If there is a conflict between this Amendment and the Agreement, the terms of this Amendment will prevail.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

017534

**IT IS HEREBY AGREED.**

**PATRICK HAGAMAN DAUGHERTY**

_____

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____
Name:  James P. Seery, Jr.
Its:  Chief Executive Officer

**HIGHLAND CLAIMANT TRUST**

By: _____
Name:  James P. Seery, Jr.
Its:  Claimant Trustee

017535

**EXHIBIT 64**

017536

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>
**Cc:** "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>
**Subject:** RE: John, would you have a couple of minutes to visit with me this morning or sometime today? Thanks.
**Date:** Mon, 6 Jan 2025 17:10:00 +0000
**Importance:** Normal
**Inline-Images:** image004.png; image003.png

---

Happy New Year, John.  Answer, No.  We have a draft ready, but have reviewed the rules and think the deadline is 14 days, and therefore Friday (9023(b) A motion for a new trial or to alter or amend a judgment must be filed within 14 days after the judgment is entered).  We plan to circulate before filing.  Happy to visit.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Monday, January 6, 2025 10:47 AM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Subject:** RE: John, would you have a couple of minutes to visit with me this morning or sometime today? Thanks.

HCMLPHMIT00000008

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**

Good morning and Happy New Year.

Do you anticipate filing anything today?

**From:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Sent:** Monday, December 30, 2024 10:15 AM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Subject:** John, would you have a couple of minutes to visit with me this morning or sometime today? Thanks.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

louis.phillips@kellyhart.com
www.kellyhart.com

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

**EXHIBIT 65**

017539

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>, "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>
**Cc:** "Dan.Elms@gtlaw.com" <Dan.Elms@gtlaw.com>, "Hayley R. Winograd"
<hwinograd@pszjlaw.com>
**Subject:** RE: DRAFT Motion to Reconsider HCLOM Stipulated Order
**Date:** Sat, 11 Jan 2025 03:48:31 +0000
**Importance:** Normal
**Inline-Images:** image005.jpg; image006.png; image002.png

---

John,

We think the ground for the change of lawyers for HCLOM is self-evident.

This is to advise that we will not be filing the motion Amelia sent around earlier (which she sent as a courtesy as I told you we would circulate). Hope to visit soon.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT: 225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Friday, January 10, 2025 3:43 PM

**To:** Amelia Hurt <Amelia.Hurt@kellyhart.com>
**Cc:** Louis M. Phillips <Louis.Phillips@kellyhart.com>; Dan.Elms@gtlaw.com; Hayley R. Winograd
<hwinograd@pszjlaw.com>
**Subject:** RE: DRAFT Motion to Reconsider HCLOM Stipulated Order

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution
when opening attachments, following links or responding to this message.**

Thank you, Amelia.

I honestly don't know what to make of all of this—including Mr. Elms suddenly representing HCLOM rather than Ms.
Deitsch Perez—but please confirm that neither HMIT nor HCLOM is making any request of Highland at this time.

Assuming that to be the case, Highland will wait to see what gets filed, if anything, and otherwise reserves all of its
rights at law and in equity.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Sent:** Friday, January 10, 2025 4:19 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Louis M. Phillips <Louis.Phillips@kellyhart.com>; Dan.Elms@gtlaw.com
**Subject:** DRAFT Motion to Reconsider HCLOM Stipulated Order

Good afternoon,

Per Louis, we said that we would circulate the attached draft before filing.  We think our deadline is today but we are
actively working with Mr. Elms who has been recently retained by HCLOM to resolve without necessity of litigating. But
in case we do not reach a resolution this evening and as we said we would circulate a draft prior to filing, we wanted to
get this draft to you.

thanks,

Amelia

**Amelia L. Hurt**

017541

HCMLPHMIT00000011

*Associate*



**KELLY
HART
PITRE**

ATTORNEYS AT LAW

400 POYDRAS STREET SUITE 1812
NEW ORLEANS, LOUISIANA 70130
T.  504.522.1812
M. 630.292.6652
*amelia.hurt@kellyhart.com*
*www.kellyhart.com*

CONFIDENTIAL NOTICE: This electronic transmission and any documents or other writings sent with it constitute confidential information which is intended only for the named recipient and which may be legally privileged.  If you have received this communication in error, do not read it.  Please reply to the sender at Kelly Hart & Hallman LLP that you have received the message in error.  Then delete it.  Any disclosure, copying, distribution or the taking of any action concerning the contents of ths communication or any attachment(s) by anyone other than the named recipient is strictly prohibited.

017542

HCMLPHMIT00000012

**EXHIBIT 66**

017543

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| _____ | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Reorganized Debtor. | ) | |
| _____ | ) | |

## HIGHLAND CAPITAL MANAGEMENT, L.P.'S MOTION FOR (A) A BAD FAITH FINDING AND (B) AN AWARD OF ATTORNEYS' FEES AGAINST HIGHLAND CLO MANAGEMENT, LTD. AND JAMES DONDERO IN CONNECTION WITH HCLOM CLAIMS 3.65 AND 3.66

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

017544
HCMLPHMIT00000441

## <u>TABLE OF CONTENTS</u>

Page

I.      PRELIMINARY STATEMENT ....................................................................1

II.     RELEVANT BACKGROUND .....................................................................5

        A.      The Bankruptcy Case: The HCLOM Claim, the Objection, and the
                Response........................................................................................................5

        B.      Dondero Terminates Terry and the Parties Execute the Participation
                Agreement......................................................................................................6

        C.      The Note is Assigned to HCLOM Ltd. Under False Pretenses in Exchange
                for HCLOM Ltd. Agreeing to Become the Successor Manager of the CLOs
                ......................................................................................................................10

        D.      The Note and Payment of Acis Participation Interests are Part of One
                Integrated Transaction ................................................................................14

        E.      Undisputed Evidence Proves that HCLOM Ltd. and Acis Breached the
                Transfer Agreement and Acis Breached the Participation Agreement.................16

        F.      The Undisputed Evidence Shows that HCLOM LLC Was To Be the Acis
                Successor Manager .....................................................................................17

        G.      The Parties' Post-Transfer Agreement Conduct Shows that the HCLOM
                Parties Knew Neither Acis Nor HCLOM Ltd. Would Perform under the
                Transfer Agreement or Participation Agreement After Terry Received His
                Arbitration Award .......................................................................................19

        H.      Waterhouse was Unprepared to Testify as HCLOM Ltd.'s Rule 30(b)(6)
                Witness and Otherwise Lacked Personal Knowledge Such that he Cannot
                Testify in Good Faith ..................................................................................21

        I.      Dondero Cannot Testify in Good Faith .................................................22

III.    ARGUMENT ............................................................................................24

        A.      The HCLOM Parties' Prosecution of the HCLOM Claim Constitutes Bad
                Faith and Willful Abuse of the Judicial Process................................................24

                1.      HCLOM Ltd.'s Prosecution of the HCLOM Claim Despite
                        Admitting that it Breached its Obligations Under the Transfer
                        Agreement Constitutes Bad Faith .......................................24

                        a.      The Note is Unenforceable Because HCLOM Ltd. Provided
                                No Consideration ...................................................25

                        b.      The Note is Unenforceable Because HCLOM Ltd.
                                Materially Breached its Obligations under The Transfer
                                Agreement............................................................27

                        c.      Acis Breached its Obligation to Pay the Acis Participation
                                Interest to Highland...............................................29

017545

HCMLPHMIT00000442

2.      HCLOM Ltd.'s Designation of Waterhouse as its Rule 30(b)(6) Witness Constitutes Bad Faith and a Willful Abuse of the Judicial Process ...................................................................................... 30

3.      Dondero's Involvement in the Prosecution of the HCLOM Claim Constitutes Bad Faith and a Willful Abuse of the Judicial Process .......... 30

B.     Highland is Entitled to Attorneys' Fees from the HCLOM Parties for Costs Incurred in Connection with the Bad Faith Prosecution of the HCLOM Claim ........................................................................................................... 31

CONCLUSION ................................................................................................................. 32

017546

HCMLPHMIT00000443

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>CASES</u>

*ASARCO, L.L.C. v. Jordan Hyden Womble Culbreth & Holzer, P.C. (In re ASARCO, L.L.C.),*
  751 F.3d 291 (5th Cir. 2014) ........................................................................ 32

*Baker Botts L.L.P. v. ASARCO LLC,*
  576 U.S. 121 (2015) ........................................................................................ 32

*Barclays Bank Plc v. Kenton Capital*
  [1994-95 CILR 489] ........................................................................................ 25

*Blue v. Ashley*
  [2017] EWHC 1928 (Comm) Leggatt J ........................................................ 25

*Dondero v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt. L.P.),*
  105 F.4th 830 (5th Cir. 2024) ........................................................................ 32

*Folkvang Ltd v. Valorte Capital*
  (unreported, 29 February 2024, FSD 199 of 2023, Parker J) .................... 25

*Golfco Limited v. Borden*
  [2002 CILR 1], Kellock Ag. J ........................................................................ 27

*H.E.B. Enterprises Ltd and Bodden Jr v. Richards*
  [2023] UKPC 7 ................................................................................................ 26

*Heyman v. Darwins Ltd.*
  [1942] AC 356 .................................................................................................. 26

*Hongkong Fir Shipping Co Ltd v. Kawasaki Kisen Kaisha Ltd*
  [1962] 2 W.L.R. 474 ........................................................................................ 27

*In re Brown,*
  444 B.R. 691 (E.D. Tex. 2009) ...................................................................... 31

*In re Cleveland Imaging & Surgical Hosp., L.L.C.,*
  26 F.4th 285 (5th Cir. 2022) .................................................................... 24, 31

*In re Monteagudo,*
  536 F. App'x 456 (5th Cir. 2013) .................................................................. 32

*In re Paige,*
  365 BR 632 (Bankr. N.D. Tex. 2007) ...................................................... 31, 32

*In re Yorkshire, LLC,*
  540 F.3d 328 (5th Cir. 2008) .......................................................................... 31

017547

HCMLPHMIT00000444

*Johnson v. Agnew*
        [1980] A.C. 367 ........................................................................................... 27

*Lopez v. Portfolio Recovery Assocs. (In re Lopez)*,
        576 B.R. 84 (S.D. Tex. 2017) ...................................................................... 32

*McDonald v. Dennys Lascelles Ltd*
        (1933), 48 C.L.R. 457 ................................................................................. 27

*Richards v. H.E.B Enterprises Ltd and Bodden Jr* [2018 (2) CILR 84] ...................... 26

*Schermerhorn v. Kubbernus (In re Skyport Glob. Commc'n, Inc.)*,
        642 F. App'x 301 (5th Cir. 2016) ............................................................... 32

*Tempo Group Ltd and others v. Fortuna Development Corporation*
        (unreported, 31 March 2015, FSD 125 of 2012, Henderson J ........................... 28

017548

HCMLPHMIT00000445

Highland Capital Management, L.P. ("Highland"), the reorganized debtor in the above-captioned bankruptcy case (the "Bankruptcy Case"), by and through its undersigned counsel, hereby files this *Motion for (A) a Bad Faith Finding and (B) an Award of Attorneys' Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with HCLOM Claims 3.65 and 3.66* (the "Motion") against Highland CLO Management, Ltd. ("HCLOM Ltd.") and James Dondero ("Dondero" and together with HCLOM Ltd., the "HCLOM Parties"). In support of its Motion, Highland states as follows:

## I.    PRELIMINARY STATEMENT[1]

1.    The undisputed facts adduced during discovery show that the HCLOM Ltd. Claim is baseless and HCLOM Ltd. lacks a good faith basis to continue prosecuting its claim.

2.    HCLOM Ltd. holds the Note at issue.[2] ***There is no dispute that (a) HCLOM Ltd. never gave anything of value to Highland (or Acis) for the Note, (b) HCLOM Ltd. never performed any of its obligations under the Transfer Agreement or even attempted the necessary steps to enable it to do so, (c) HCLOM Ltd. never paid Highland any Acis Participation Interests, and (d) Acis failed to pay any Acis Participation Interests after the Transfer Agreement was executed***. Despite Highland not receiving the promised Acis Participation Interests and HCLOM Ltd. providing no consideration and breaching the Transfer Agreement, HCLOM Ltd. offers three reasons why it thinks it can nevertheless enforce the Note against Highland; each reason is meritless.

---

[1] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them below.

[2] Incredibly, at the time of his deposition, Dondero claimed he did not know who held the Note or who was responsible for prosecuting this litigation on HCLOM Ltd.'s behalf. (Ex. 62 at 8:7-14; 14:10-14; 19:22-20:15; 110:2-19). At the hearing, Highland respectfully requests that Stinson be directed to disclose the identity of the individual(s) instructing it in this matter on HCLOM Ltd.'s behalf and who is paying its fees.

017549

HCMLPHMIT00000446

3.     ***First***, HCLOM Ltd. contends that the Note is a stand-alone document, enforceable without reference to the Participation Agreement or Transfer Agreement and without regard to whether HCLOM Ltd. provided any consideration or performed its obligations under those agreements.  Response ¶¶ 16-24. This contention lacks any legal basis and is contradicted by the plain and unambiguous terms of (a) the Participation Agreement, pursuant to which Acis agreed to "participate" a portion of its Servicing Fees to Highland in exchange for a downpayment and deferred payments under the Note; (b) the Note which accompanied the Participation Agreement and conditioned its own effectiveness on the effectiveness of the Participation Agreement; and (c) the Transfer Agreement (concocted just days after Terry obtained an $8 million arbitration award against Acis), pursuant to which HCLOM Ltd. was to "step into the shoes of Acis" by becoming Acis' Successor Manager in exchange for the Note.  There can be no credible dispute that these agreements were inextricably intertwined as part of one integrated transaction pursuant to which mutually dependent payments were to be made.  Dondero and Waterhouse confirmed this point during their depositions.  As Dondero testified, "it was essentially a trade of promises, and one side wouldn't have signed if they didn't get the promises of the other side."[3]  HCLOM Ltd.'s contention that the Note is somehow enforceable as a separate, unrelated binding agreement, without regard to the others, is thus unsupported and belied by the documentary and testimonial evidence.[4]

---

[3] Ex. 62 at 50:7-21; *see also id*. at 50:23-51:12.

[4] Notwithstanding HCLOM Ltd.'s new tale, Dondero confirmed these facts under oath in direct examination by his own lawyer in the Acis case in 2018: "Q…it's Mr. Terry's position … that [the Note] does not condition payment by Highland of the promissory note to receipt of service fees from Acis. So what is your response to that contention? A. [Dondero] It was always a – it was always a paired transaction, and the tying of the two together and a recommendation for unwinding or whatever you want to call it, selling the note came to me from counsel and advisors.  I mean does that not answer?"  [Ex. 76 at 151:4-12].

017550

HCMLPHMIT00000447

4.      **Second**, HCLOM Ltd. blames the Acis bankruptcy, this Court's June 2018 injunction, and the subsequent Acis plan injunction for its failure to become Acis' Successor Manager.  Response ¶¶ 25-32. This contention is likewise false.  It is indisputable that a different entity with a strikingly similar name—Highland CLO Management, LLC ("<u>HCLOM LLC</u>")—*was* created by Highland weeks before HCLOM Ltd. and *was* specifically organized, authorized, and equipped to serve as Acis' Successor Manager. But, HCLOM Ltd. and HCLOM LLC were completely separate entities, and HCLOM Ltd. never did, never could, and never would serve in the Acis replacement manager role—a fact Dondero admitted in the Acknowledgement and Waiver Agreement he signed eleven days *before* the Acis bankruptcy petition was even filed.[5]

5.      **Finally**, HCLOM Ltd. contends that the Note is enforceable because Highland included it on its Schedules and Seery supposedly testified during the Acis 9019 hearing that the Note was enforceable.  Response ¶¶ 33-49.  These contentions are equally meritless.  By its terms, the Schedules are subject to an extensive reservation of rights "including, but not limited to, the right to dispute or assert offsets or defenses to any claim reflected on the SoFA and Schedules as to amount, liability, or classification of the claim, or to otherwise subsequently designate any claim as 'disputed,' 'contingent' or 'unliquidated.'"[6]   As HCLOM Ltd. acknowledges, while the

---

[5] Ex. 7.  As shown below, the indisputable evidence proves that HCLOM LLC was created and specifically constructed and enabled to serve as Acis' Successor Manager for the resetting and refinancing of the Acis CLOs. *See infra* ¶¶ 43-51.  Incredibly, despite being designated as HCLOM Ltd.'s Rule 30(b)(6) witness, Waterhouse did not recall that there was an entity named "Highland CLO Management, LLC" and another entity named "Highland CLO Management, Ltd." (Ex. 3 at 6:2-11; 25:21-26:5).  Whether negligently or deceitfully, HCLOM Ltd.'s Response completely and nonsensically confuses HCLOM Ltd. and HCLOM LLC. That confusion or deceit is also reflected in Dondero's recent verified interrogatories in the Acis case where, completely contradicting the terms of the Transfer Agreement and HCLOM Ltd.'s position here, he stated: "Highland CLO Management LLC ("Highland Management") was established to assume management of the Acis CLOs post-reset, including taking on Acis obligation to pay 50% of the Acis CLO fees to Highland Capital as well as becoming payee on Highland Capital's the [*sic*] Promissory Note. In accordance with the above, Acis, on November 7, [*sic*] 2017 agreed to transfer the Promissory Note to Highland Management [LLC] and also agreed to transfer to Highland Management [LLC], when it became manager of the Acis CLO's [*sic*] post-reset, to pay 50% of the CLO management fees to Highland Capital."  Ex. 65 (response to Interrogatory No. 4).

[6] *Notice of Filing of Debtor's Amended Schedules*, Docket No. 1082, Ex. 1 at 2.

017551

HCMLPHMIT00000448

HCLOM Claim may be prima facie valid, Highland's Objection and the evidence adduced herein (and at trial) shifts the burden of proof back to HCLOM Ltd. to establish the validity and amount of its claim.[7] And Seery will testify that his testimony during the Acis 9019 hearing was based on the erroneous notion that Highland owned HCLOM Ltd. at the time, a notion HCLOM Ltd.'s own corporate representative ironically still believes is true.[8]

6.      In addition to pursuing a baseless claim, HCLOM Ltd.'s witnesses—Dondero and Waterhouse, both individually and as HCLOM Ltd.'s Rule 30(b)(6) witness—were so uninformed and unprepared to testify that sanctions are warranted. *See infra* ¶¶ 52-59.  Dondero deserves special focus because while he attempted to distance himself from virtually everything, (a) his family trust, The Dugaboy Investment Trust ("Dugaboy"), was the majority ultimate beneficial owner of Acis and therefore the primary beneficiary of the tax-driven strategy that lead to the Participation Agreement, (b) through Dugaboy, he indirectly owns a majority interest in HCLOM Ltd. and therefore has the largest stake in the outcome of this litigation, and (c) while he claimed to be unaware of it, Dondero was, and apparently remains, the President of HCLOM Ltd.

7.      Discovery is complete.  HCLOM Ltd. knows that there is no genuine dispute that the HCLOM Claim is invalid and will be disallowed; the continued pursuit of the HCLOM Claim is now just another vexatious abuse of the judicial process.  HCLOM Ltd. should immediately consent to the entry of an order disallowing the HCLOM Claim—and all the factual and legal theories upon which it is based—with prejudice.  If it fails to do so, Highland requests that the

---

[7] Ex. 20 ¶¶ 13-15.

[8] Ex. 3 at 36:7-22.

017552

HCMLPHMIT00000449

Court enter a finding of bad faith and an award of attorneys' fees[9] jointly and severally against HCLOM Ltd. and Dondero.[10]

## II.    RELEVANT BACKGROUND

**A.    The Bankruptcy Case: The HCLOM Claim, the Objection, and the Response**

8.    On October 16, 2019 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "<u>Delaware Court</u>").

9.    On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's Bankruptcy Case to this Court [Docket No. 186].[3]

10.    On December 13, 2019, Highland filed its schedule of unsecured claims that identified "Highland CLO Holdco" as a creditor with claims under a note.  Docket No. 247 (Schedule E/F, Part 3.64 and 3.65) (the "<u>Initial HCLOM Claim</u>").

11.    On September 22, 2020, Highland filed a *Notice of Filing of Debtor's Amended Schedules* in which it, among other things, replaced Highland CLO Holdco as the creditor with the Initial HCLOM Claim with HCLOM Ltd., an entity Highland's independent directors then believed was owned directly or indirectly by Highland.  Docket No. 1082 (Schedule E/F, Part 3.65 and 3.66) (the "<u>HCLOM Claim</u>").

---

[9] Highland reserves the right to offer proof of the legal fees it has incurred during the evidentiary hearing currently scheduled for December 18, 2024.

[10] As the Court will recall, Highland moved for similar relief against HCRE but only after the evidentiary hearing was completed and the Court rendered a decision on the merits.  *See* Docket No. 3851. To be more efficient; because the evidence supporting Highland's Objection and this Motion will be the same; and to give HCLOM Ltd. fair notice of the relief requested, Highland files this Motion in advance of the hearing.  While HCLOM Ltd. technically has 21 days to oppose the Motion, Highland has no objection to HCLOM Ltd. filing its response on December 16, 2024, to take into account the Thanksgiving holiday.  Highland reserves the right to offer and rely on such further evidence that is adduced at trial in support of this Motion.

017553

HCMLPHMIT00000450

12.     On February 22, 2021, this Court entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "Confirmation Order"), which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808] (the "Plan"). The Plan became effective on August 11, 2021 (the "Effective Date") [Docket No. 2700].

13.     Following the Effective Date and in furtherance of the Plan, Highland began reviewing the available information to determine the validity, amount, and priority of all unresolved claims. The evidence will show that, as part of the process, Highland discovered, among other things, that (a) it only held a 1% economic interest in HCLOM Ltd.,[11] (b) HCLOM Ltd. provided no consideration for the Note, (c) HCLOM Ltd. never performed its obligations under the Transfer Agreement and could never have done so, and (d) Acis failed to perform its obligations under the Participation Agreement and the Transfer Agreement, all of which vitiated any obligations Highland may have had under the Participation Agreement, the Note, or the Transfer Agreement. Based on these facts, among others, Highland filed its objection to the HCLOM Claim on February 2, 2023 (the "Objection"). Ex. 1.

14.     On April 3, 2023, HCLOM Ltd. filed its response to the Objection (the "Response"). Ex. 20.

**B.      Dondero Terminates Terry and the Parties Execute the Participation Agreement**

15.     This dispute arises from a series of intercompany agreements and machinations orchestrated in the "Highland Complex" while James Dondero ("Dondero") was firmly in control of all sides of the enterprise.

---

[11] It also held 99% of the voting, non-economic interests in HCLOM Ltd.

017554

HCMLPHMIT00000451

16.     Prior to the Petition Date, Acis Capital Management, L.P. ("Acis"), then an affiliate of Highland, provided portfolio management services to the issuers of certain collateralized loan obligations ("CLOs") in exchange for management fees ("Servicer Fees") to be paid under portfolio management agreements (the "PMA's").[12] The PMA's prohibit the portfolio manager from assigning any of its rights or obligations under the PMA's without permission and the satisfaction of certain conditions.[13] At all relevant times, Dondero controlled Acis and Highland.

17.     Since Acis had no employees of its own, Highland provided back- and middle-office services as well as investment advisory services to Acis pursuant to certain Shared Services and Sub-Advisory Agreements (the "SSA" and "SAA", respectively, and together, the "HCMLP Services Agreements," as amended).    The services provided under the HCMLP Services Agreements enabled Acis to perform under the PMA's.    Joshua Terry ("Terry"), a Highland employee, was also an officer and portfolio manager of Acis until 2016.

18.     On June 9, 2016, Dondero, acting through Highland, terminated Terry and as a result, Dondero and Frank Waterhouse ("Waterhouse") remained as the sole officers of Acis' general partner. *See* Ex. 9.

19.     On July 29, 2016, Highland and Acis amended the HCMLP Services Agreements pursuant to which, among other things, Acis agreed to pay Highland a fee at the following rates for each of the Acis CLOs: (a) 20 basis points for sub-advisory services; and (a) 15 basis points for shared services, for a total of 35 basis points, with the rates applied retroactively to January 1, 2016. *See* Ex.10 at HCLOM00535306 (20 bps for sub-advisory services), HCLOM00535321 (15

---

[12] Fees under the PMA's are calculated by multiplying the fee earning assets in a given CLO by the fee rate, expressed in basis points. The CLO issuers were obligated to pay Acis the following under the Acis managed CLOs: Acis CLO 2013-1, Ltd. 50 bps; Acis CLO 2014-3, Ltd. 40 bps; Acis CLO 2014-4, Ltd. 40 bps, Acis CLO 2014-5, Ltd. 40 bps; and Acis CLO 2015-6, Ltd. 40 bps. *See* Ex. 13 (Schedule A under "Total Servicer Fee").

[13] *See* Ex. 32 §14; Ex. 34 §14; Ex. 36 §14; Ex. 38 § 14.

017555

HCMLPHMIT00000452

bps for shared services).[14]  These fee amendments roughly doubled the aggregate annual fees Highland was to receive from Acis and the retroactive nature of the agreements immediately saddled Acis with approximately $3 million in additional payables to Highland.

20.    In or around September 2016, Dondero caused Highland to sue Terry in Texas state court.  Terry moved to compel arbitration, and his motion was granted. *See* Ex. 25.  As discussed below, the arbitration was conducted in September 2017.

21.    On October 7, 2016, Dondero caused Acis and Highland to enter into an *Agreement for Purchase and Sale of CLO Participation Interests* (the "Participation Agreement"). Ex. 13. The Participation Agreement was not an arms' length economic transaction but was adopted for the tax-driven purpose of converting ordinary income into capital gains for the benefit of Acis' ultimate beneficial owners—Dugaboy and Mark Okada—of up to 20%.[15]  As Dondero previously testified: "So immediately upon Josh's [Terry] leaving back in June [2016], the partnership became just Mark and I, 75/25. What this transaction was and was meant to be and never anything more was a tax-planning strategy to reduce taxes. Because Acis was a full taxpaying entity and Highland wasn't. You know, the creation of the note of Highland paying Acis a note, that note—**Highland never got any monies for it. Highland never got any value for it, other than a promise for Acis to pay its management fees over time.**" Ex. 76 at 133:23-134:7 (emphasis added).

22.    In order to try to achieve the desired tax savings under the Participation Agreement, Acis agreed to participate to Highland a portion of the Servicer Fees (the participated portion, the "Acis Participation Interests") for a finite period of time in exchange for Highland's payment to

---

[14] Dondero signed the amendments to the HCMLP Services Agreements on behalf of Acis and Highland.

[15] Dondero admitted that Acis and Highland were "pass through" entities and that the purpose of the Participation Agreement was to defer or recharacterize taxes for the benefit of the ultimate beneficial owners.  (Ex. 62 at 35:10-36:16, 37:4-19; *see also* Ex. 3 at 79:19-80:24, 83:1-6,85:22-86:16 (Waterhouse testified that the Participation Agreement was a "tax-driven strategy" that also provided certain cash management benefits to Highland)).

017556
HCMLPHMIT00000453

Acis of $666,655 in cash (the "Cash Purchase Price") and the payment of deferred annual installments under a note in favor of Acis, in the original principal amount of $12,666,446.00 (the "Note"). *See id.* §§ 1, 1.1; *see also* Ex. 14.[16] While the Note references "advances" by Acis, no money was ever loaned to Highland. The Note simply reflected amounts that would be paid back to Acis by Highland—a "wash" according to Dondero—after Highland received payment of the Acis Participation Interests.[17]

23.    Despite Terry's contentious departure in 2016 and the public litigation Highland launched against him later that year, it was "business as usual" for Acis. (*See* Ex. 3 at 68:7-69:24). For example, Acis continued serving as the portfolio manager for the CLOs, managing billions of dollars of bank loans and paying the Acis Participation Interests to Highland in exchange for the installment payments under the Note, all as required under the Participation Agreement. In March 2017, Dondero caused Highland and Acis to further amend the HCMLP Services Agreements. *See* Ex. 11 (Fourth Amended and Restated Shared Services Agreement, dated March 17, 2017); Ex. 12 (Third Amended and Restated Sub-Advisory Agreement, Dated March 17, 2017). The next month, Acis even completed a new, risk-retention compliant CLO ("Acis 7"), using an indirect

---

[16] The Note called for annual payments to be made on May 31, 2017, 2018, and 2019. Ex. 14. The evidence will show that Acis and Highland performed their respective obligations under the Participation Agreement and the Note until the Transfer Agreement was executed in November 2017. After that, even though Dondero controlled Acis until the appointment of a trustee, Acis stopped remitting the Acis Participation Interests to Highland as required under the Participation Agreement, Highland stopped making payments to Acis under the Note and HCLOM Ltd. did absolutely nothing.

[17] In response to his attorney's questioning in the Acis case, Dondero testified as follows: "Q. "This is not like I – for example, I refinanced my house recently, give a note to the bank, but I get cash money at closing from the bank. Are you saying that did not happen here? A. [Dondero] Correct. In October. Highland got nothing other than a promise for Acis to pay. And all the payment schedule – the amortization on the note was timed exactly to match the expected management fees as Acis got them in." Ex. 76 at 134:13-20. Dondero continued: "**It's essentially a wash. They're – yes, it doesn't matter which pocket it goes into**." *Id.* at 152:23-24 (emphasis added). On cross, Dondero insisted: "A. I'm saying it was paired together, it was a tax transaction, it was supposed to have very little net value, there was supposed to be offsetting flows, and the recommendation on the sale was all guided by counsel, internal and external…." *Id.* at 36:10-14.

017557

HCMLPHMIT00000454

subsidiary, Acis CLO Management, LLC ("ACLOM LLC"), as the portfolio manager. Ex. 15 (Portfolio Management Agreement between Acis CLO 2017-7, Ltd. and ACLOM LLC).[18]

24.     Things went south in 2017 as summer turned to fall. Dondero and his team spent 10 days opposing Terry's arbitration in September. Clearly sensing that the arbitration was not going well for him, Dondero instructed his attorneys to eliminate arbitration clauses in existing and future contracts. Even more tellingly, on October 19, 2017, Highland formed HCLOM LLC as a Delaware LLC to replace ACLOM LLC for future CLO issuances and resets of existing managed CLOs. Ex. 87. The next day, on October 20, 2017, Terry was awarded an $8 million arbitration award against Acis (the "Arbitration Award"). Ex. 26.[19]

## C.    The Note is Assigned to HCLOM Ltd. Under False Pretenses in Exchange for HCLOM Ltd. Agreeing to Become the Successor Manager of the CLOs

25.     Despite having formed HCLOM LLC a week earlier and inserting that entity as successor manager into draft agreements and memoranda, on October 27, 2017, Highland also formed HCLOM Ltd. as a Cayman entity with Summit Management Limited ("Summit") appointed by Highland as HCLOM Ltd.'s initial and sole director. *See* Ex. 5. The creation of this entity in the Cayman Islands was no accident: its sole purpose was to secretly hold the Note and—according to Isaac Leventon, Highland's then-Assistant General Counsel in charge of litigation—cause Terry to spend "multiple years to collect" on his Arbitration Award. Ex. 69; Ex. 83.[20]

---

[18] Dondero stubbornly clings to the notion that all of the asset transfers away from Acis were required because the Acis brand was "toxic." As the Court will recall, during the Acis case, the Highland team under Dondero's leadership attempted to tag HarbourVest with the "toxicity" concept, but that effort failed. During his deposition, he tried to tag Goldman Sachs with the concept despite having no personal knowledge to support it. In fact, the documentary and testimonial evidence is to the contrary.

[19] Even though the Panel found that—under Dondero's watch—Highland concocted pretextual arguments for denying Terry his benefits and interfering with his economic rights, and that Acis breached its contractual and fiduciary duties (Ex. 26 at 21-22), Dondero inexplicably insists that he has never read the Arbitration Award and is unfamiliar with the findings. Ex. 62 at 67:11-22, 70:3-20).

[20] During his deposition, Dondero repeatedly disavowed responsibility for anything related to Terry's termination or arbitration or any of the events that followed; instead, he tried to point the finger at Thomas Surgent and Tim Cournoyer (two current employees of Highland). While the issue is legally irrelevant (it does not matter who caused

017558
HCMLPHMIT00000455

26.     On November 3, 2017, roughly two weeks after the Arbitration Award was rendered, a meeting was held with Dondero in his office to discuss the "Terry Arbitration" and the "Acis Restructuring." *See* Ex. 69 (11/3/17 email among Leventon, Ellington, and Welton detailing "[d]raft bullets for internal management discussion"); Ex. 83 (final version of the bullet points); Ex. 81 (acceptance of meeting invite).

27.     Sometime during or immediately after the November 3, 2017 meeting, Dondero executed the *Assignment and Transfer Agreement* (the "Transfer Agreement" or "Assignment") on behalf of Highland[21] and Acis; Summit (acting at the direction of Dondero-controlled Highland) executed the Transfer Agreement on HCLOM Ltd.'s behalf. *See* Ex. 16.

28.     Pursuant to the Transfer Agreement, which falsely stated that Highland notified Acis that Highland was unwilling to continue providing services to Acis under the HCMLP Services Agreements and, therefore, Acis was unable to fulfill its portfolio management duties to the applicable CLO's,[22] (a) HCLOM Ltd. agreed to become the CLOs' Successor Manager (as defined in the Transfer Agreement); (b) Acis and HCLOM Ltd. agreed to remit the Acis Participation Interests to Highland; and (c) the Note was assigned to HCLOM Ltd. Significantly, the Transfer Agreement Assignment provides: "HCLOM, a qualified Successor Manager, irrevocably commits to be appointed as Successor Manager *in consideration of Acis assigning to it the Note*." Ex. 16 at 1 (emphasis added).

---

HCLOM Ltd. not to provide consideration for the Note or perform under the Transfer Agreement), it weighs on credibility or the lack thereof. The evidence will establish that Scott Ellington—with Dondero's knowledge—dictated that Leventon and an outside attorney, Jamie Welton, were to be solely responsible for working on the Terry case (Ex. 68), and that's exactly what happened (*see, e.g.*, Ex. 69).

[21] Section 5.1 of the Participation Agreement requires Highland's written consent to an assignment by Acis of any of its rights or obligations thereunder.

[22] Written notice of termination was required under the HCMLP Services Agreements, but no such notice was ever given and, in fact, Highland continued to perform the services under the HCMLP Services Agreements until the summer of 2018 when a new service provided took over following the appointment of the Acis trustee.

017559
HCMLPHMIT00000456

29.     According to Waterhouse, the Transfer Agreement was intended to authorize HCLOM Ltd. to take the necessary steps to become Acis' Successor Manager so that it would receive the Servicing Fees and remit them to Highland in exchange for the expected cash streams due under the Note.  Ex. 3 at 135:24-136:24.

30.     The Transfer Agreement also required (a) Acis (again, then under Dondero's control) to "promptly provide the Controlling Class (as defined in the CLO Indentures) with notice requesting the appointment of HCLOM [Ltd.] as Portfolio Manager pursuant to the requirements of the CLO Documents," and (b) each of Acis and HCLOM Ltd. to "promptly pursue Successor Manager appointment of HCLOM [Ltd.] in respect of each CLO." *Id*. §§ 1, 2.  None of this occurred.

31.     Section 3 of the Transfer Agreement provides:

**3.      Assignment and Transfer of the Promissory Note; Stabilization Payments.**

a. Effective immediately upon execution of this Agreement by the Parties, all right, title and interest of Acis under the Note, including the right to any and all Stabilization Payments not yet paid to Acis, are hereby irrevocably assigned and transferred by Acis to HCLOM [Ltd.], it being understood that from the date of such assignment, HCLOM [Ltd.] shall become the "Payee" thereunder.

b. For so long as Acis shall receive Servicer Fees following the date hereof, Acis shall remit to H[ighland] the HCM Stabilization Fees [*i.e.*, the Acis Participation Interests] pursuant to the Note Purchase Agreement [*i.e.*, the Participation Agreement].

c. For so long as HCLOM [Ltd.] receives any Servicer Fees following any Appointment, then HCLOM [Ltd.] shall remit to H[ighland] any portion of such fees that would otherwise have constituted HCM Stabilization Fees pursuant to the Note Purchase Agreement if Acis was the recipient of such fees.

d. HCLOM [Ltd.] shall sign a joinder to Note Purchase Agreement upon HCM's written notice thereof.

Transfer Agreement, § 3 (emphasis added).

017560

HCMLPHMIT00000457

32.     Thus, the Transfer Agreement provided that HCLOM Ltd. would receive Acis's rights under the Note, subject to HCLOM Ltd. becoming the Successor Manager, and Acis and HCLOM Ltd. continuing to remit Acis Participation Interests to Highland.  According to Dondero, from Acis' and Highland's perspective, the purpose of the Transfer Agreement was to replace Acis as Portfolio Manager. Ex. 3 at 83:23-84:11.[23]

33.     Although Dondero signed the Transfer Agreement, he now says he has no knowledge of any facts underlying its execution.  For instance, Dondero says he does not recall (a) the document or reading it before he signed it, (Ex. 62 at 79:4-18; 83:12-19); (b) receiving any advice before signing, (*id.* at 100:4-10); or (c) taking any steps to make sure the Transfer Agreement accurately reflected the facts, (*id.* at 108:16-25).  Dondero also says he does not know who John Cullinane is and never communicated with him, or anyone authorized to act on HCLOM Ltd.'s behalf, before executing the Transfer Agreement, (*id.* at 79:19-81:19; 82:24-83:3).

34.     During his deposition, Dondero (a) could not recall if he expected Highland to receive *any* benefit under the Transfer Agreement, (*id.* at 84:22-25); (b) was unable to identify *anything* of value HCLOM. Ltd. provided to Highland pursuant to the Transfer Agreement, (*id.* at 88:15-89:2); and (c) did not know if HCLOM Ltd. *ever* gave anything of value to Highland for any purpose, (*id.* at 89:20-91:5).  In fact, Dondero (x) was initially unaware that Highland was a party to the Transfer Agreement; (y) could not identify a benefit Highland was to receive even after reviewing the Agreement; and (z) has "no idea" why he signed the Agreement on behalf of Acis and Highland.  *Id.* 85:8-86:15.

---

[23] The Transfer Agreement created a new consolidated defined term—"Note Purchase Agreement"—that provided further evidence that the Note and the Participation Agreement (what was being referred to in the Transfer Agreement as the "Purchase Agreement") are one integrated and mutually dependent agreement.

017561

HCMLPHMIT00000458

**D.**     **The Note and Payment of Acis Participation Interests are Part of One Integrated Transaction**

35.     Contrary to HCLOM Ltd.'s unsupported contentions, the evidence will show that the Note and payment of Acis Participation Interests under the Participation Agreement and Transfer Agreement are inextricably intertwined as one integrated transaction. The Participation Agreement attached a copy of the Note as an exhibit and made repeated references to the Note. *See, e.g.*, Ex. 13 § 1.1 ("In consideration of the sale of the Acis Participation Interests to the Purchase, the Purchaser shall" pay the Cash Purchase Price and deliver the Note); § 1.3 (the Purchase Price "reflects the arm's length value of the Acis Participation Interests as of the date of this Agreement…").  Unlike the many promissory notes that were issued and separately litigated in the Highland bankruptcy, the Note was not tendered in exchange for a cash advance; rather it was tendered solely for the promise of future Acis Participation Interests.[24]

36.     The Note also refers to, and depends on, the Participation Agreement.  By its terms, the Note was to become effective only upon the effectiveness of the Participation Agreement, which was executed contemporaneously by Highland and Acis.[25]  A condition precedent to the effectiveness of the Note provides:

> ***This Note shall not become effective and Payee shall have no obligation to make the advance hereunder until*** Payee has received each of the following in form and substance acceptable to Payee:
>
> ....

---

[24] Dondero under oath at deposition in the Acis case: "A. What did Highland get when the note was put in place? It's a $12 million note.  Did Highland get $12 million? Did Highland get $13 million? Did Highland get an asset? No. Highland got a promise from Asis to pay it management fees that Acis was gonna get over the next three or four years, and the amortization [of the Note] was tied to the fees as they came in, and Highland got them. So when Highland got fees, it paid down – it paid the money to Acis to pay off the note."  Ex. 78 at 12:8-19.

[25] Dondero on direct in the Acis case: "Q. And I think this is obvious, by why are Exhibits 14 [the Participation Agreement] and 15 [the Note] dated October 7, 2016? A, (Dondero) Because they're paired together." Ex. 76 at 141:6-8.

017562

HCMLPHMIT00000459

(b) the Agreement for Purchase and Sale of CLO Participation Interests dated of even date herewith (the "Purchase Agreement"), by and between Maker and Acis Capital Management, LP, a Delaware limited partnership ("Highland") [*sic*], and copies of all agreements, documents and instruments executed or delivered in connection therewith and evidence that ***all conditions to the effectiveness of the Purchase Agreement have been or will be fulfilled contemporaneously with the initial advance under this Note***;

Ex. 14 (Note) at 1 (emphases added).

37.     The Transfer Agreement was ostensibly intended to assign Acis' rights and obligations under the Participation Agreement to HCLOM Ltd.  Pursuant to the Transfer Agreement, HCLOM Ltd. would step into Acis' shoes as Successor Manager.  And, as noted above, the Transfer Agreement combines the Note and the Participation Agreement into one agreement—the "Note Purchase Agreement"—and treats them as the fully integrated transaction they were intended to be.

38.     In addition to the plain and unambiguous terms of the Note, Participation Agreement, and Transfer Agreement, Waterhouse—the former Treasurer of Acis and CFO of Highland—admitted that (a) "Highland is giving the Cash Purchase Price and the Note to Acis *in exchange* for Acis' promise to share the Acis' Participation Interest as defined in th[e] agreement," (Ex. 3 at 104:16-105:24 (emphasis added)), and (b) the Note and Participation Agreement "were part and parcel of the same overall transaction," (*id*. at 111:9-112:1).  Regarding the Transfer Agreement, Waterhouse acknowledged "that the reason Highland agreed to transfer the note to HCLOM [Ltd.] is because HCLOM [Ltd.] was agreeing to become the new portfolio manager for the Acis CLOs and would share the servicing fees after that happened."  (Ex. 3 at 150:13-23).

39.     Dondero also (once again) confirmed that these agreements all constituted one integrated transaction.  According to Dondero, under the Participation Agreement, Acis was to participate a portion of its expected Servicing Fees for cash and a Note for the purpose of reducing the taxes owed by the beneficial owners.  (Ex. 62 at 35:13-41:25; 43:20-25; *see also* Ex. 3 at 79:19-

017563

HCMLPHMIT00000460

80:24, 83:1-6, 85:22-86:16). As Dondero stated: "one side wouldn't have signed if they didn't get

the promises of the other side" (Ex. 62 at 50:7-12; *see also* 50:23-51:12); *see also* (Ex. 28) (opinion

letter from Hunton & Williams that conditions favored tax treatment on the continued exchange

of Acis Participation Interests for payments under the Note).

E.     **Undisputed Evidence Proves that HCLOM Ltd. and Acis Breached the Transfer Agreement and Acis Breached the Participation Agreement**

40.     The overwhelming, undisputed evidence proves that HCLOM Ltd. breached the

Transfer Agreement. HCLOM Ltd. never began, let alone fulfilled, its purported commitment to

serve as the Successor Manager—the only "thing of value" that HCLOM Ltd. contends it "gave"

to Highland in exchange for agreeing to the transfer of the Note. Ex. 21 (Response to Interrogatory

1) (when asked to identify each thing of value HCLOM Ltd. gave to Highland in exchange for the

Note, HCLOM Ltd. stated that it "irrevocably committed in the Assignment to be appointed as

successor manager and then took steps to effectuate the transfer as promised."). Contrary to its

contention, HCLOM Ltd. never took any steps, nor did it ever have the operational capacity, to be

appointed Successor Manager because it:

- had no employees, (Ex. Ex. 3 at 22:1-2);

- was never a registered investment advisor and earned no fees, (Ex. 3 at 26:17-19; Ex. 62 at 91:23-25);

- had no shared services or sub-advisory agreement and therefore could never fulfill its duties as portfolio manager, (Ex. 3 at 22:3-9; Ex. 62 at 93:6-19);

- was not "qualified" pursuant to PMAs and Indentures, (*see* Ex. 62 at 104:24-105:2);

- had no risk retention financing, nor ever tried to obtain any;

- never engaged an investment bank to arrange any reset or refinancing, reissue, refinancing, or new underwriting of any CLO or other vehicle or business;

- was never capitalized and had no bank account or bank relationship, (Ex. 3

017564
HCMLPHMIT00000461

at 26:6-10);

- never maintained financial statements or books and records, (Ex. 3 at 11-16); and

- never sought the consents required to become the Successor Manager.

41.     In fact, ***HCLOM Ltd. admits that it failed to perform any of its obligations under the Transfer Agreement*** because it never (a) became Successor Manager, (b) managed the Acis CLOs, or (c) remitted any Acis Participation Interests to Highland. *See* Ex. 21 (Responses to Interrogatories 4-6 and RFAs 2, 4, and 6); Ex. 3 at 20:25-21:20, 31:14-24, 156:15-157:6; Ex. 62 at 106:14-16; 107:1-10.[26]

42.     Notably, Acis—while under Dondero's control—also breached the Transfer Agreement.  Between November 3, 2017 (when the Transfer Agreement was executed) and April 13, 2018, the time Dondero lost control of Acis with the granting of the order for relief and the appointment of the Acis trustee, Acis continued to receive Servicing Fees in its capacity as the CLO portfolio manager but failed to remit the Acis Participation Interests to Highland as required under both the Participation Agreement and the Transfer Agreement. *See* Ex. 3 at 120:10-18.

**F.     The Undisputed Evidence Shows that HCLOM LLC Was To Be the Acis Successor Manager**

43.     While HCLOM Ltd. was furtively established as a Cayman Islands entity that did nothing except enter into the Transfer Agreement and purportedly take title to the Note, HCLOM LLC (formed prior to HCLOM Ltd.) was busy actually taking the substantial steps required to become Acis' Successor Manager.  As a result, the Note was effectively hidden in the Cayman Islands entity while Highland, under Dondero's control, worked to transfer the business of running the CLOs away from Acis to a separate, same-named, Delaware entity with no obligation to pay

---

[26] Dondero could not recall ever signing a document (other than the Transfer Agreement) that contemplated that HCLOM Ltd. would serve as Acis' Successor Manager. (*See* Ex. 62 at 125:8-12).

017565

HCMLPHMIT00000462

the Acis Participation Interests to Highland. If Highland could transfer the management of the

CLO's to HCLOM LLC and abscond with the Note, Acis would no longer receive any Servicing

Fees, Acis would get no payments under the Note, and Terry would be unable to collect on his

Arbitration Award.

44.     In the weeks after Terry obtained his Arbitration Award:

- On November 15, 2017, HCLOM LLC entered into an agreement with
  Mizuho pursuant to which HCLOM LLC would serve as the manager of the
  Acis CLOs and Mizuho would serve as the placement agent for the resets
  and refinancings of certain of the applicable CLOs, (Ex. 64);[27]

- On December 19, 2017, HCLOM LLC entered into Shared Services and
  Sub-Advisory Agreements with Highland so that it was prepared to fulfill
  its expected duties as the manager of the applicable CLOs, (Ex. 85, Ex. 86);

- On January 19, 2018, HCLOM LLC signed a Custodial Agreement in order
  to be able to hold the securities required of it under the U.S. "risk retention"
  rules then in effect, (Ex. 27); and

- Later in January, HCLOM LLC entered into certain agreements (executed
  by Dondero) to obtain "risk retention" financing that would enable it to reset
  Acis-3, (Exs. 72, 73).

45.     The Acis involuntary petition and the section 303(f) order did undercut the

willingness of bankers to participate in resetting the CLO's away from Acis' control and,

ultimately, the order for relief and the injunction prevented HCLOM LLC from continuing its plan

to replace Acis as Successor Manager but—contrary to the Response (Ex. 20 ¶¶ 27-28)—neither

the involuntary, the 303(f) order, nor the order for relief and the ultimate plan injunction had *any*

impact on HCLOM Ltd.'s failure to perform it obligations under the Transfer Agreement because

---

[27] *See also* Ex. 62 at 119:18-120:4; 122:5-11; 123:19-124:7 (despite signing the Mizuho Agreement, Dondero (a) did
not know where HCLOM LLC obtained authority to enter in that Agreement, (b) acknowledged that HCLOM Ltd. is
not mentioned in the document; and (c) does not know why HCLOM LLC entered into the Agreement rather than
HCLOM Ltd.).

017566

HCMLPHMIT00000463

HCLOM Ltd. was never going to, nor did it take affirmative steps to, serve in that Successor Manager role.

## G. The Parties' Post-Transfer Agreement Conduct Shows that the HCLOM Parties Knew Neither Acis Nor HCLOM Ltd. Would Perform under the Transfer Agreement or Participation Agreement After Terry Received His Arbitration Award

46.    The parties' conduct further demonstrates that, following the issuance of the Arbitration Award, neither HCLOM Ltd. nor Acis would ever satisfy their obligations to Highland under the Participation Agreement or the Transfer Agreement.

47.    For example, on January 19, 2018—before the Acis bankruptcy was commenced—Dondero signed an Acknowledgement and Waiver Agreement in which he (a) acknowledged that HCLOM LLC would succeed Acis rather than HCLOM Ltd., and (b) recognized that HCLOM Ltd.'s failure to serve as Acis' successor constituted a material breach of its obligations under the Transfer Agreement.[28] While purporting to waive HCLOM Ltd.'s breach, Dondero was unaware of anything Highland received in exchange for such waiver (*i.e.*, Highland's waiver of HCLOM Ltd.'s material breach was unsupported by any consideration).[29]

48.    The undisputed evidence will also show that both before and immediately upon the filing of the Acis involuntary petition, while Dondero continued to firmly control both Highland and Acis, Highland eliminated all payments to and from Acis under the Participation Agreement from its internal weekly cash flow forecasts. (*Compare* Ex. 44 at 6 (showing "Stability Transaction" payments during the projection period) *with* Ex. 45 at 3, 6 (showing the removal of the "stability" payments) and Exs. 46-61 (no reference to any stability payments in any forecast

---

[28] Although Dondero signed the Acknowledgement and Waiver Agreement, he does not remember reading it before signing it or discussing it with anyone (Ex. 62 at 129:10-130:7; 134:15-23).

[29] At deposition, Dondero testified that (a) he did not know what Highland received from HCLOM Ltd. in exchange for the waiver; (b) he never asked; and (c) no one ever explained what benefit Highland received for waiving the breaches of the Transfer Agreement (Ex. 62 at 135:18-136:6).

017567
HCMLPHMIT00000464

through May 31, 2018 the date the next amortization payment was due under the Note).  The evidence will also show that Acis removed both the Note (asset) and the Participation Agreement (liability) from its financial statements and both Acis and Highland stopped making any payments related to the transaction.[30]

49.    Further, under Dondero's leadership, Highland filed unsecured, priority, and administrative claims in the Acis bankruptcy case for fees due under the HCMLP Services Agreements, (Exs. 17, 67), yet Highland *never* filed a claim for the Acis Participation Interests due under the Participation Agreement.

50.    Finally, while HCLOM Ltd. now claims it can seek payment under the Note notwithstanding the lack of consideration or performance, it abandoned whatever claims it may have had well before Highland filed its Objection.  In fact, rather than trying to declare a default under the Note or suing to collect, HCLOM Ltd. signed "forbearance" agreements pursuant to which it agreed not to collect under the Note in exchange for Highland's promise not to demand the Acis Participation Interests.  Exs. 18, 19. But this made no sense because Dondero had already acknowledged that HCLOM Ltd. would never succeed Acis and therefore would never receive any Servicing Fees.  If HCLOM Ltd.'s current position had any merit (and it doesn't), HCLOM Ltd. should have been trying to enforce its purported rights under the Note.  Waterhouse testified that the benefit HCLOM Ltd. received from entering into the forbearance was "preserv[ing] that relationship [with Highland]."[31]  The Court can assess the credibility of that testimony.

---

[30] *See, e.g.*, Ex. 76 at 147:6-150:12.  Dondero specifically testified that the Transfer Agreement effectively cancelled the Participation Agreement and the Note: "The unwinding of the note plus the unwinding of the liabilities [the participation] which netted each other . . . were never really of any net value anyway."  *Id.* at 147:6-9.

[31] Because "everyone knew" HCLOM Ltd. would never receive any Servicing Fees, Waterhouse could not identify any benefit it received from the forbearance agreements other than supposedly "preserving the relationship," even though the same people were making the decisions on behalf of both parties and HCLOM Ltd. was an empty box on a piece of paper.  (Ex. 3 at 165:21-168:22, 171:25-172:3, 182:19-184:21).

017568
HCMLPHMIT00000465

51.     Waterhouse admitted that he was unaware "of any discussion or attempt by anybody in the world after January 19, 2018 to install HCLOM Ltd. as the portfolio manager of the CLOs." (Ex. 3 at 172:4-173:11). Thus, whether by neglect or design, HCLOM Ltd.'s contention that the Acis bankruptcy and this Court's injunction prevented HCLOM Ltd. from becoming Acis' Successor Manager so that it could perform under the Transfer Agreement is simply untrue.

## H. Waterhouse was Unprepared to Testify as HCLOM Ltd.'s Rule 30(b)(6) Witness and Otherwise Lacked Personal Knowledge Such that he Cannot Testify in Good Faith

52.     Waterhouse testified as HCLOM Ltd.'s Rule 30(b)(6) witness but was so uninformed and unprepared that he cannot testify at trial in good faith. In fact, even his verification of HCLOM Ltd.'s interrogatory responses was false.[32]

53.     Attached as **Exhibit A** is a demonstrative exhibit that summarizes Waterhouse's deposition testimony (the transcript of which is offered as Ex. 3). As shown therein, Waterhouse testified that the only thing he did to prepare to testify as HCLOM Ltd.'s Rule 30(b)(6) witness was meet with the Stinson lawyers for a few hours and review the primary transaction documents at issue. He (a) did not review a single email or speak with anyone other than counsel, and (b) testified about whole topics with no personal knowledge or preparation. (Ex. 3 at 6:18-8:9, 7:15-16, 9:15-17, 9:21-11:5, 41:9-42:7, 124:24-126:3).[33]

54.     Reflecting his lack of preparation, Waterhouse testified, among other things, that:

•       he did not know that there is an entity called "Highland CLO Management,

---

[32] During his deposition, Waterhouse was forced to admit that (a) his verification falsely stated that it was based on discussions with people with personal knowledge concerning the events at issue and (b) it would be accurate to say that he only spoke with counsel, people he admitted lacked personal knowledge. (*Compare* Ex. 10 (last page) *with* Ex. 3 at 176:4-178:13). Waterhouse also sheepishly admitted he did nothing to verify the accuracy of the interrogatory responses except to take "what counsel provided as correct." As it turns out, certain of the discovery responses were unresponsive or lacked any basis that Waterhouse knew of. (Ex. 3 at 178:21-180:1, 180:14-181:12, 182:3-18).

[33] Waterhouse admitted that he never spoke with Dondero, Cullinane, Sevilla, Ellington or Leventon and read nothing but the primary documents at issue. (Ex. 3 at 9:21-11:5)

017569
HCMLPHMIT00000466

Ltd." and a different entity called "Highland CLO Management, LLC," (*id.* at 6:2-11; 25:21-26:5);

- he did not know if he ever served as an officer of HCLOM Ltd. and did not know if he was an officer of HCLOM Ltd. at the time of the deposition, (*id.* at 14:13-17);[34]

- despite being Acis' Treasurer at the time, and despite causing the Acis bankruptcy and its destructive and continuing aftermath, Waterhouse claimed to have no recollection of Acis transferring its assets to other Highland entities in the fourth quarter of 2017, (*id.* at 131:1-15); and

- he did not know if HCLOM LLC or HCLOM Ltd. was doing the resets and could not competently testify about the meaning, intent or terms of the Acknowledgement and Waiver Agreement, (*id.* at 157:7-163:2).

55.     A fair reading of Waterhouse's deposition transcript shows he lacks a good faith basis to testify in this matter.

## I.     **Dondero Cannot Testify in Good Faith**

56.     Dondero is one of two witnesses HCLOM Ltd. intends to call at the evidentiary hearing in this matter.  Ex. 21 (response to Interrogatory No. 10).  Given that (a) he controlled Highland, Acis, and HCLOM LLC at all relevant times, (b) has served as HCLOM Ltd.'s President beginning on February 7, 2018, (Ex. 6), and (c) executed many of the relevant agreements on those entities' behalf, that is not surprising.  But other than providing certain broad perspectives (all of which undermine HCLOM Ltd.'s contentions), Dondero lacks such basic knowledge, and his testimony will be so disingenuous, that he cannot testify in good faith.

57.     Attached as **Exhibit B** is a demonstrative exhibit that summarizes Dondero's deposition testimony (the transcript of which is offered as Ex. 62).  As shown therein, Dondero testified, among other things, that:

- he did not know who holds the Note that is the subject of this litigation, (Ex.

---

[34] Of course, Waterhouse (a) has served as HCLOM Ltd.'s Treasurer since February 7, 2018 (Ex. 6), and (b) signed an agreement waiving HCLOM Ltd.'s purported right to collect on the Note at issue for a period of time (Ex. 19).

017570

HCMLPHMIT00000467

62 at 8:7-14; 14:10-14);

- he did not know anything about HCLOM Ltd. or HCLOM LLC other than that they were supposed to be involved in the Acis resets and refinancings, (*id*. at 9:24-10:22, 11:19-12:2);

- he did not know whether HCLOM Ltd. and HCLOM LLC are related in any way, (*id*. at 12:13-13:5);

- he could not identify the ultimate beneficial owners of HCLOM Ltd. or who controls it (and never asked) and did not know if he was authorized to act on its behalf, (*id*. at 14:15-16:13), (again, Dondero has been HCLOM Ltd.'s President for nearly seven years (Ex. 6));

- he never saw HCLOM's Response and does not know who is instructing Stinson in this litigation on HCLOM Ltd.'s behalf, (*id*. at 16:14-23, 18:8-19:13, 19:22-20:15, 110:20-111:3);

- he did not recall if he was an officer of Acis or if he controlled that entity, (*id*. at 24:21-25:6);[35]

- he claimed to have never read the Arbitration Award and was unfamiliar with the Panel's findings that the entities he controlled took actions under false pretenses and breached various agreements and fiduciary duties, (*id*. at 67:11-22, 70:3-20);

- he never communicated with Summit or Cullinane, the counterparty to the Transfer Agreement and related documents, (*id*. at 79:19-81:19, 82:24-83:3);

- he did not recall that Highland was a party to the Transfer Agreement, has "no idea" why he signed it, and could not identify any benefit Highland was expected to obtain even after reviewing the document, (*id*. at 84:22-86:14, 88:15-89:2, 89:20-91:5);

- he claimed to have no personal knowledge about the Notification, who gave it, or why Highland was unwilling to support Acis, (*id*. at 94:24-95:18, 98:12-16, 100:11-14);[36]

---

[35] As Waterhouse acknowledged, Dondero controlled Acis at all times from at least June 10, 2016 (the day after Terry's ouster) until the trustee was appointed in the Acis bankruptcy case. (Ex. 3 at 47;16-21; Ex. 9 (Acis consent showing Dondero's appointment as President)).

[36] "Notification" is defined in the Transfer Agreement and refers to the alleged fact that Highland was unwilling to continue providing services to Acis—the whole premise for the Transfer Agreement. Ex. 13 (third "Whereas" clause). Given that Dondero controlled both entities at the time, he either abdicated responsibility or gave false testimony. In fact, Waterhouse testified that Dondero made the decision to give the Notification. (Ex. 3 at 138:3-13). As noted above, there is no evidence that a written Notification was ever given as required by the HCMLP Services Agreements.

017571

HCMLPHMIT00000468

- he took no steps to make sure the assertions set forth in the Transfer Agreement were true and accurate, (*id.* at 108:6-25); and

- he could not identify anything of value Highland received in exchange for its purported waiver of HCLOM Ltd.'s breaches of the Transfer Agreement, (id. at 135:18-136:6).

58. As will be shown at trial, Dondero's deposition testimony in this case directly contradicts his sworn testimony in the Acis bankruptcy case (including in the ongoing adversary proceeding) as well as his sworn responses to interrogatories.

59. This is not just a matter of "credibility." Dondero's testimony is so uninformed and disingenuous that he cannot testify in good faith.

### III.   ARGUMENT

### A.   The HCLOM Parties' Prosecution of the HCLOM Claim Constitutes Bad Faith and Willful Abuse of the Judicial Process

60. Based on clear and convincing evidence, the HCLOM Parties' prosecution of the HCLOM Claim constitutes bad faith and a willful abuse of the judicial process. *See In re Cleveland Imaging & Surgical Hosp., L.L.C.*, 26 F.4th 285, 297 (5th Cir. 2022) (noting that a bankruptcy court may sanction litigants if it finds, "by clear and convincing evidence, that they acted in bad faith or willfully abused the judicial process.").

### 1.   HCLOM Ltd.'s Prosecution of the HCLOM Claim Despite Admitting that it Breached its Obligations Under the Transfer Agreement Constitutes Bad Faith

61. There is no dispute that HCLOM Ltd. failed to perform its obligations under the Transfer Agreement. *See supra* ¶¶ 40-42. Even Dondero and Waterhouse acknowledge that the Note is part of a fully integrated transaction with the Participation Agreement and Transfer Agreement. In fact, the Note represents those deferred payments that Highland was to make in exchange for the deferred Acis Participation Interest payments Acis was able to make under the Participation Agreement. The Note is unenforceable because HCLOM Ltd. (a) provided no

017572

HCMLPHMIT00000469

consideration, (b) both Acis and HCLOM Ltd. materially breached their obligations under the Transfer Agreement, and (c) Acis breached its obligation to pay the Acis Participation Interests to Highland. HCLOM Ltd. knows this because Dondero caused the breaches for each entity which caused a complete failure of consideration to Highland for any purported obligations. Nevertheless, HCLOM Ltd. continues to prosecute the HCLOM Claim without any legal or factual basis.

    a.    **The Note is Unenforceable Because HCLOM Ltd. Provided No Consideration**

62.     The Note is unenforceable because HCLOM Ltd. failed to provide any consideration in exchange for its assignment. Under Cayman Islands law,[37] "[a] compromise like any agreement, must be supported by consideration…" *Folkvang Ltd v Valorte Capital* (unreported, 29 February 2024, FSD 199 of 2023, Parker J. at ¶ 99);[38] *see also Blue v Ashley* [2017] EWHC 1928 (Comm) Leggatt J at ¶ 49 ("The basic requirements of a contract are that: (i) the parties have reached an agreement, which (ii) is intended to be legally binding, (iii) is supported by consideration, and (iv) is sufficiently certain and complete to be enforceable…").[39] Thus, an agreement is unenforceable for lack of consideration where one party's promised performance fails. *See Barclays Bank Plc v. Kenton Capital* [1994-95 CILR 489]: the Grand Court of the Cayman Islands, per Smellie J at page 499 ("... It may also be the case that the depositors would be entitled to recover, as against Kenton in claims at common law, for moneys had and

---

[37] The Transfer Agreement is governed by the laws of the Cayman Islands. *See* Ex. 65, § 6(d).

[38] *See Declaration of Hayley R. Winograd in Support of the Motion for (A) a Bad Faith Finding and (B) an Award of Attorneys' Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with Scheduled Claims 3.65 and 3.66* (the "Winograd Dec.") (being filed concurrently herewith), **Exhibit 1**.

[39] *See* Winograd Dec., **Exhibit 1**. *"Winograd Dec."* refers to the *Declaration of Hayley R. Winograd in Support of the Motion for (A) a Bad Faith Finding and (B) an Award of Attorneys' Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with Scheduled Claims 3.65 and 3.66,* being filed concurrently herewith.

017573
HCMLPHMIT00000470

received on the basis that the consideration on which the agreement is based has failed.");[40] *H.E.B. Enterprises Ltd and Bodden Jr v Richards* [2023] UKPC 7, ¶ 58 ("money had and received to the claimant's use can be recovered where the basis (there referred to as consideration) has wholly failed.");[41] *Richards v H.E.B Enterprises Ltd and Bodden Jr* [2018 (2) CILR 84] ¶¶ 102-4 (finding a total failure of consideration to have occurred in the context of two agreements (namely a sale/purchase agreement and a loan agreement) which, contrary to the defendant's argument, the Court found to constitute one agreement, and holding, "…[a]ccordingly, it is correctly submitted that under the terms of the agreements, there has still been a total failure of consideration on the sale of the parcels.")[42]

63.     Here, in order to transfer any of the rights or obligations under the Participation Agreement, Highland's prior written consent was required.  *See* Ex. 13, § 5.1.  HCLOM Ltd. obtained Highland's agreement to enter into the Transfer Agreement through the commitments of HCLOM Ltd. set out in the agreement.  HCLOM Ltd. admits that it failed to satisfy any of its obligations under the Transfer Agreement, the very document pursuant to which HCLOM Ltd. was assigned the Note.  The ostensible purpose of the Transfer Agreement, *i.e.*, for HCLOM Ltd. to succeed Acis as Successor Manager, was never realized (indeed, *no* steps were ever taken to enable HCLOM Ltd. to become Acis' Successor Manager).  *See supra* ¶¶ 40-51.  HCLOM Ltd. thus failed to perform its promised obligation under the Transfer Agreement, and as a result, the consideration on which the Transfer Agreement is based has failed. *See Richards v H.E.B Enterprises Ltd and Bodden Jr* [2018 (2) CILR 84] per Williams J at ¶ 72, applying *Heyman v Darwins Ltd*. [1942] AC 356, per Lord Porter at page 399 ("Strictly speaking, to say that, upon

---

[40] *See* Winograd Dec., **Exhibit 2**.

[41] *See* Winograd Dec., **Exhibit 3**.

[42] *See* Winograd Dec., **Exhibit 4**.

017574

HCMLPHMIT00000471

acceptance of the renunciation of a contract, the contract is rescinded is incorrect. In such a case the injured party may accept the renunciation as a breach going to the root of the whole of the consideration. By that acceptance he is discharged from further performance and may bring an action for damages, but the contract itself is not rescinded.")[43]   HCLOM Ltd.'s failure of its promised performance under the Transfer Agreement renders the Note unenforceable by HCLOM Ltd.  Based on the evidence adduced in discovery, including HCLOM Ltd.'s extensive admissions, HCLOM Ltd.'s continued prosecution of its HCLOM Claim, with knowledge that it provided no consideration for the Note, constitutes bad faith and a willful abuse of the judicial process.

> **b.** **The Note is Unenforceable Because HCLOM Ltd. Materially Breached its Obligations under The Transfer Agreement**

64.    It is also undisputed that HCLOM Ltd. materially breached its obligations under the Transfer Agreement.  For this additional reason, the Note is unenforceable.  Under Cayman law, a non-breaching party is relieved of performing its obligations where the counterparty materially breaches its obligations. *See Beach Club Enterprises Limited v Horizon Management Limited* [1980-83 CILR 223], Carberry J.A. at page 235 (an innocent party's termination following a breach of a condition excuses future performance) applying *McDonald v Dennys Lascelles Ltd.* (1933), 48 C.L.R. 457 as approved in *Johnson v Agnew* [1980] A.C. 367;[44] *Hongkong Fir Shipping Co Ltd v Kawasaki Kisen Kaisha Ltd* [1962] 2 W.L.R. 474, Lord Diplock, at pages 493-494 (noting that a breach of a condition in a contract provides the innocent party with an immediate, unequivocal right to terminate future performance of the contract);[45] *Golfco Limited v Borden* [2002 CILR 1], Kellock Ag. J at ¶ 25 (finding that the purchaser of an apartment block's

---

[43] *See* Winograd Dec., **Exhibit 5**.

[44] *See* Winograd Dec., **Exhibit 6**.

[45] *See* Winograd Dec., **Exhibit 7**.

017575

HCMLPHMIT00000472

failure: (a) to pay certain instalments to the seller pursuant to the contract for the sale of land; and
(b) to remedy their breach within 28 days of receiving a written notice to do so (in accordance with
clause 11(1) of the contract of sale) from the seller "*would have had to be regarded as a
fundamental breach*");[46] *In the Matter of Re Indies Suites Ltd* [2004-05 CILR 498], Smellie C.J.
at ¶ 22, (accepting that termination excuses future performance, together with a right of the
innocent party to claim damages by way of compensation for the loss sustained in consequence of
the non-performance of the contract in the future, applying the English case of *Photo Production
Ltd. v Securicor Transport Ltd.* [1980] A.C. 827).[47]

65.     A breach is "material" when it goes to the "root" of the contract or forms an
essential condition of performance. *See Tempo Group Ltd and others v. Fortuna Development
Corporation* (unreported, 31 March 2015, FSD 125 of 2012, Henderson J at ¶ 296) ("[a]n act of
repudiation must go to the root of the contract ... The repudiatory breach must deprive the innocent
parties of substantially the whole benefit which they would have obtained from due performance
of the contract…");[48] *Chitty on Contracts*, 35th Ed. Chapter 28-014 (a "condition" of a contract is
that of "an essential stipulation of the contract which one party guarantees is true or promises will
be fulfilled.").[49]

66.     Here, it is undisputed that HCLOM Ltd. materially breached the Transfer
Agreement by failing to (a) "provide the Controlling Class (as defined in each of the CLO
Indentures) with notice requesting the appointment of HCLOM as Portfolio Manager," as required
by Section 1 of the Transfer Agreement; (b) "promptly pursue Successor Manager appointment,"

---

[46] *See* Winograd Dec., **Exhibit 8**.

[47] *See* Winograd Dec., **Exhibits 9 and 10**.

[48] *See* Winograd Dec., **Exhibit 11**.

[49] *See* Winograd Dec., **Exhibit 12**.

017576

HCMLPHMIT00000473

as required by Section 2 of the Assignment; (c) "achiev[e] all conditions precedent required by the CLO Documents," as required by Section 2 of the Transfer Agreement; and (d) execute a joinder to the to the Participation Agreement [referred to as  the "Purchase Agreement" in the Transfer Agreement], as required by Section 3.d of the Transfer Agreement.

67.    If there was any doubt—and there isn't—Dondero agreed on behalf of Highland that HCLOM Ltd. and Acis breached the Transfer Agreement in the Waiver and Acknowledgment Agreement (although he purportedly waived those breaches for no consideration).  Ex. 7.

68.    Based on the documentary evidence adduced during discovery, including the Waiver Agreement, HCLOM Ltd. is prosecuting its HCLOM Claim based on the Participation Agreement, the Note and the Transfer Agreement despite knowing that it materially breached its obligations the Transfer Agreement.  HCLOM Ltd.'s material breaches of the Transfer Agreement excused Highland's obligations under the related Note.  HCLOM Ltd.'s continued prosecution of this claim, despite knowing it materially breached the Transfer Agreement, constitutes bad faith and willful abuse of the judicial process.

### c.    Acis Breached its Obligation to Pay the Acis Participation Interest to Highland

69.    As soon as Terry received the Arbitration Award and the Transfer Agreement was executed, Acis and HCLOM Ltd. breached their obligations under the Participation Agreement and the Transfer Agreement.  In addition to the breaches of the Transfer Agreement by HCLOM Ltd. described above, Dondero-controlled Acis ceased paying any Acis Participation Interests to Highland.  That failure of consideration continued after the Acis order for relief was entered.  The complete failure of Acis and HCLOM Ltd to provide Highland with the consideration it was to receive under Participation Agreement and the Transfer Agreement—the Acis Participation Interests—vitiates any obligation Highland may have had under the Participation Agreement or its

017577

HCMLPHMIT00000474

Note.  As recognized in the Participation Agreement, Highland bore the risk of payment of the Note *other than* in the event that Highland it did not receive the Acis Participation Interests "as a result of the Seller [Acis] breaching its covenants [including to promptly remit the Acis Participation Interests] under this Agreement or as result of the fraud or willful misconduct or the Seller." Ex. 13 §3.6.  Acis' and HCLOM Ltd.'s breach of their obligations under the Participation Agreement and the Transfer Agreement relieved Highland of any duty to make any further payments under the Note.[50]

### 2. HCLOM Ltd.'s Designation of Waterhouse as its Rule 30(b)(6) Witness Constitutes Bad Faith and a Willful Abuse of the Judicial Process

70.    HCLOM Ltd.'s designation of Waterhouse as its Rule 30(b)(6) further demonstrates that HCLOM Ltd. is prosecuting the HCLOM Claim in bad faith.  As discussed above, Waterhouse was wholly unprepared to testify on behalf of HCLOM Ltd.  He lacked knowledge of critical facts underlying the HCLOM Claim, including, for instance, (a) whether he was an officer of HCLOM Ltd. at the time of his deposition; (b) the purpose of the agreements at issue in the HCLOM Claim; and (c) that HLCOM LLC and HCLOM Ltd. were different entities. *See supra* ¶¶ 52-55.  It is untenable for a 30(b)(6) witness to lack such fundamental information about the entity it represents.

### 3. Dondero's Involvement in the Prosecution of the HCLOM Claim Constitutes Bad Faith and a Willful Abuse of the Judicial Process

71.    Dondero's involvement in the prosecution of the HCLOM Claims is likewise in bad faith.  As set forth above, Dondero cannot testify in good faith on behalf of HCLOM Ltd.  He, like HCLOM Ltd.'s 30(b)(6) witness, lacks critical knowledge underlying the facts of this case, including those as fundamental as, among other things, who holds the Note that is the subject of

---

[50] The Participation Agreement and the Note are governed by Texas law.

017578

HCMLPHMIT00000475

this litigation and why he signed the very agreements that are the subject of this litigation. *See supra* ¶¶ 56-59. Dondero's testimony is not credible, is directly contradicted by his sworn testimony and interrogatory responses given in the Acis case, and is otherwise uncorroborated; he simply cannot testify in good faith on behalf of HCLOM Ltd. Dondero's continued involvement in the prosecution of the HCLOM Claim constitutes bad faith and a willful abuse of the judicial process.

**B.** **Highland is Entitled to Attorneys' Fees from the HCLOM Parties for Costs Incurred in Connection with the Bad Faith Prosecution of the HCLOM Claim**

72. The HCLOM Parties should be sanctioned for their bad faith prosecution of the HCLOM Claim by reimbursing Highland for attorneys' fees and expenses incurred in connection with litigating the HCLOM Claim.

73. Bankruptcy courts possess inherent authority under section 105 of the Bankruptcy Code to issue sanctions after making a finding of bad faith. *See In re Yorkshire, LLC*, 540 F.3d 328, 332 (5th Cir. 2008) (affirming bankruptcy court's imposition of sanctions for bad faith filing "following an extensive hearing in which the bankruptcy court heard testimony from the parties and witnesses and made certain credibility determines," and made specific findings that Appellants acted in bad faith."); *In re Brown*, 444 B.R. 691, 695 (E.D. Tex. 2009) (issuing sanctions against party and their counsel, and relying on section 105(a) of the Bankruptcy Code as a basis for awarding attorney's fees against parties for acting "with reckless disregard of their duty to this Court"); *In re Paige*, 365 BR 632, 640 (Bankr. N.D. Tex. 2007) (awarding attorneys' fees against debtor for their "bad faith" conduct during bankruptcy case, noting "[t]he sanction here is derived from the Court's inherent power to sanction" under section 105(a)); *Cleveland Imaging*, 26 F.4th at 297 (noting that a bankruptcy court may sanction litigants "if it finds, by clear and convincing evidence, that they acted in bad faith or willfully abused the judicial process") ; *Schermerhorn v.*

017579

HCMLPHMIT00000476

*Kubbernus (In re Skyport Glob. Commc'n, Inc.)*, 642 F. App'x 301, 304 (5th Cir. 2016) (same);

*(Lopez v. Portfolio Recovery Assocs. (In re Lopez)*, 576 B.R. 84, 93 (S.D. Tex. 2017) (same).

74.    A bankruptcy court has "broad discretion" to determine reasonable attorneys' fees.
*See In re Monteagudo*, 536 F. App'x 456, 459 (5th Cir. 2013) (sanctions orders granted under
bankruptcy court's inherent powers are reviewed for "abuse of discretion"); *ASARCO, L.L.C. v.
Jordan Hyden Womble Culbreth & Holzer, P.C. (In re ASARCO, L.L.C.),* 751 F.3d 291, 294 (5th
Cir. 2014), *aff'd sub nom.*, *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121 (2015) ("A
bankruptcy court has 'broad discretion' to determine reasonable attorneys' fees, as the bankruptcy
court is familiar "with the actual services performed" and is well positioned to determine "what is
just and reasonable") (internal quotations omitted); *In re Paige*, 365 B.R. 632, 637-640 (Bankr.
N.D. Tex. 2007) (awarding attorneys' fees against debtor for their "bad faith" conduct during
bankruptcy case, noting "[t]he sanction here is derived from the Court's inherent power to
sanction" under section 105(a)); *Lopez v. Portfolio Recovery Assocs., LLC (In re Lopez)*, 576 B.R.
84, 93 (S.D. Tex. 2017) (same); *Dondero v. Highland Cap. Mgmt., L.P. (In re Highland Cap.
Mgmt. L.P.)*, 105 F.4th 830, 841 (5th Cir. 2024) ("Undergirding our analysis of the sanctions award
here is a recognition of the goal of such awards everywhere: "to do rough justice.' ... Complete
accuracy is neither required nor expected. The bankruptcy court's judgments in these matters are
entitled to our 'substantial deference.'") (internal quotations omitted).

75.    Here, the Bankruptcy Court should award sanctions against HCLOM Ltd. and
Dondero in the form of attorneys' fees and expenses incurred by Highland in connection with the
bad faith prosecution of the HCLOM Claim, in an amount to be determined at trial.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, Highland respectfully requests that the Court
enter an order, in the form attached hereto as **Exhibit C**, (a) finding that HCLOM Ltd. and Dondero

017580

HCMLPHMIT00000477

prosecuted the HCLOM Claim in bad faith, (b) entering sanctions jointly and severally against

HCLOM Ltd. and Dondero in the form of reimbursement to Highland of Highland's costs and

expenses incurred in objecting to HCLOM Ltd.'s HCLOM Claim in an amount to be determined

at trial; and (c) granting such other and further relief that the Court deems just and proper under

the circumstances.

Dated: November 21, 2024

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

- and -

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

4880-1728-2300.13 36027.003

017581

HCMLPHMIT00000478

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that, on November 19 and 20, 2024, counsel for Highland Capital Management, L.P., John A. Morris, corresponded with counsel for Highland CLO Management, Ltd., Deborah Deitsch-Perez and Michael Aigen, regarding the relief requested in the foregoing Motion. As of the filing of the Motion, it is assumed that Highland CLO Management, Ltd. is **OPPOSED** to the relief requested in the Motion.

*/s/ Zachery Z. Annable*
Zachery Z. Annable

017582

HCMLPHMIT00000479

# EXHIBIT A

017583

HCMLPHMIT00000480

## WATERHOUSE DEPOSITION DIGEST[1]

- **FW does not know that there is an entity called "Highland CLO Management, Ltd." and a different entity called "Highland CLO Management, LLC" (6:2-11; 25:21-26:5)**

## WATERHOUSE DID NOT PROPERLY PREPARE TO TESTIFY

- To prepare, FW met with counsel and reviewed the Note, the Purchase and Sale Agreement, the Transfer Agreement, the Rule 30(b)(6) notice and the pleadings; he also reviewed portions of Dondero's deposition transcript from the Acis case. (6:18-8:9); FW met with counsel a few weeks before for 2-3 hours (41:9-42:7)

- But FW didn't review any emails (7:15-16); was unaware that there is ongoing, current litigation between Acis and Dondero (9:15-17); spoke with nobody other than counsel to prepare, including Dondero, Cullinane, Sevilla, Ellington or Leventon; and read nothing but the primary documents. (9:21-11:5)

- Even though "resets" were a Rule 30(b)(6) topic, FW looked at no documents to prepare, talked to no one other than counsel, and has no personal knowledge on the topic. (124:24-126:3)

- **FW DNR if he ever served as an officer of HCLOM Limited, and did not know if he was an officer of HCLOM Limited at the time of the deposition. (14:13-17)**

- FW DNR seeing HCLOM Limited resolutions; DNK how Summit Management became Limited's director at formation. (15:4-16:20)

- FW DNK who formed HCLOM Limited and DNK of any communications with Summit or Cullinane on the topic. (16:21-17:7)

- FW discussed with Dondero and legal team the need to form HCLOM because Acis could not continue to serve as CLO manager following Terry's arbitration award. (17:11-18:13)

- Needed to create successor manager. (18:14-23)

- **FW claims Acis couldn't continue because Highland wouldn't support it and investors did not want to be associated with it. (18:24-19:13)**

---

[1] "FW" refers to Frank Waterhouse.  "DNR" means "does not recall" or "does not remember."  "DNK" means "does not know." Citations are to the transcript of Waterhouse's deposition marked as Ex. 3.

017584

HCMLPHMIT00000481

- **FW can't identify any specific person who told him investors did not want to be associated with Acis, nor could he identify any particular investors (19:10-20:17)**

- **FW DNR why Highland was unwilling to service Acis. (20:18-20)**

- **HCLOM Limited never served as Successor CLO Services for Acis and DNK if it ever generated a dollar of revenue. (20:25-21:10)**

- Other than formation expenses, FW DNK if HCLOM Limited ever incurred any expenses. (21:11-23)

- **FW DNK if he was HCLOM Limited's Treasurer. (21:24-25)**

- **FW DNR whether HCLOM Limited had any employees or a shared services agreement. (22:1-9)**

- **FW DNR seeing 2/7/18 HCLOM Limited resolutions; they show he is the Treasurer (22:11-23:7). This was a Rule 30(b)(6) topic, yet FW has no knowledge concerning HCLOM Limited's officers. (23:8-24:8)**

- **FW does not know if HCLOM Limited or HCLOM LLC was the entity that tried to take steps to become the Successor Manager. (24:14-25:20)**

- **FW DNR that HCLOM Limited had a bank account; prepared financial statements; maintained books and records; was a registered financial advisor. (26:6-19)**

- **FW never saw a document concerning resets where HCLOM Limited was identified as the proposed portfolio manager rather than LLC. (27:4-7)**

- The Acknowledgement and Waiver Agreement was signed about 10 weeks after the Transfer Agreement by Dondero and Cullinane. (27:14-29:4)

- FW not aware of anything inaccurate or incorrect. (29:5-8)

- **FW has no independent knowledge of the Acknowledgement and Waiver Agreement; it says what it says. (29:9-31:4)**

- **FW admits that the Notices and Appointments required under the Transfer Agreement never occurred. (31:14-24)**

- **Dugaboy and Okada own HCLOM Limited. (34:7-10)**

- **FW has no facts to support speculation that Limited and LLC are affiliates. (33:15-36:1)**

017585

HCMLPHMIT00000482

- **HCMLP had an ownership interest in Limited until 2022. (36:7-22)**

- FW DNK if LLC ever had an ownership interest in Limited. (37:15-19)

- FW's understanding is that Highland owned LLC until 2022. (37:20-38:25)

- **FW was "likely" Treasurer of Acis. (43:14-17)**

- **FW admits that on June 10, 2016, the day after Terry was terminated, he and Dondero were Acis' sole remaining officers. (44:2-45:14)**

- **FW has never discussed Acis with Nancy Dondero even though she is the Dugaboy trustee, which owned Acis, and FW was one of only two officers of Acis. (45:24-46:14)**

- **FW agrees that JD controlled Acis at all times from at least 6/10/16 until Phalen is appointed. (47:16-21)**

- If FW needed approval to do something as Treasurer of Acis, he'd turn to Dondero. (48:12-16)

- **Acis had no employees but did have shared services and sub-advisory agreements with Highland enabled Acis to fulfill its duties as portfolio manager. (48:22-50:1)**

- **Dondero signed amended SSA and Sub-Advisory Agreements the month after Terry is terminated. (50:6-51:10)**

- Despite being Highland's CFO and Acis' Treasurer, FW testified that he wasn't involved in amending the service agreements. (51:11-52:9)

- Dondero would have to approve the 20-BPS formula for Acis and Highland. (59:2-7)

- **FW does not know if Highland ever gave written notice of termination of the SSA pursuant to Section 14(b). (60:2-16)**

- Acis was to pay Highland an aggregate of 35 basis points for shared and sub-advisory services. (64:21-65:4)

- **FW DNR Highland providing written notice of termination of the sub-advisory agreement in accordance with Section 7.02. (65:4-66:7)**

- Shared Services and Sub-Advisory Agreements were amended again in March 2017; Dondero signed the amended agreements so, again, Acis is still paying 35 basis points for services. (66:8-68:6)

017586

HCMLPHMIT00000483

- **So as of March 2017, Acis was still the vehicle through which the Acis CLOs were expected to be managed.  (68:7-69:6)**

- **FW does not recall anyone expressing concerns over Acis until 2018.  (69:7-24)**

- **FW DNR either party ever giving written notice of termination of the service agreements.  (69:25-70:16)**

- FW DNR shared services agreement being amended.  (72:4-22)

- FW DNR Highland assigning or delegating any rights or obligations.  (72:23-75:2)

- **FW DNR sub-advisory agreement being the subject of a written notice of termination.  (75:16-76:21)**

- FW DNR Sub-Advisory Agreement ever being amended.  (76:22-77:10)

- FW DNR Sub-Advisory Agreement ever being assigned.  (77:11-21)


## CLO PARTICIPATION AGREEMENT

- "Highland purchased an … interest in Acis' management fees."  (78:10-22)

- **Whole concept was a "tax-driven strategy" that also gave Highland a cash management benefit because it would receive the Servicing Fees before it paid out on the Note.  (79:19-80:24; 83:1-6)**

- FW discussed tax planning and cash management aspects with tax group and Dondero.  (82:4-25)

- **Because Acis is a pass-through entity, Acis' ultimate beneficial owners were the beneficiaries of the expected tax benefits on the Acis side; same was true on the Highland side.  (85:22-86:16)**

- **Unpredictability and instability of Servicing Fees never caused Acis to default or breach obligations.  (98:14-22)**

- **FW cannot identify any adverse consequence to Acis from the alleged unpredictability and instability of Servicing Fees.  (99:23-25)**

- Terry, Okada, and Dondero were the only people who could make decisions on Acis' behalf because they were the owners; after Terry was terminated, Dondero and Okada remained in control until Phalen was appointed Trustee.  (101:13-102:6)

- **FW DNR the issuers ever breaching their obligation to pay servicing fees to Acis or Acis ever declaring a default.  (102:7-14)**

017587

HCMLPHMIT00000484

- **Schedule A of the Transfer Agreement identifies the CLOs subject to the Agreement. Based on the figures in Schedule A, and the fees due under the Shared and Sub-Advisory Service Agreements, FW agrees that "Acis was obligated to pay to Highland more than it expected to receive in servicing fees." (102:15-104:15)**

- **As Treasurer of Acis and the CFO of Highland, FW admits that "Highland is giving the Cash Purchase Price and the Note to Acis in exchange for Acis' promise to share the Acis Participation Interest as defined in th[e] agreement" (104:16-105:24)**

- FW DNR how the Cash Purchase Price and initial principal balance of the Note were determined; whether they equaled the value of the Participation interests; or whether they were the subject of negotiation. (106:1-16)

### NOTE

- **The Note was executed at the same time as the Participation Agreement, both of which "were part and parcel of the same overall transaction." (111:9-112:1)**

- **The same people made decisions on behalf of Acis and Highland in connection with the Participation Agreement and Note. (112:10-21)**

- Highland did not have a dedicated team looking out for its interests; while H&W was involved, they were engaged solely by Acis. (112:22-113:10)

- HCLOM Limited never paid servicing fees because it never became the collateral manager of the CLOs. (118:7-15)

- FW still insists that HCLOM Ltd. didn't become collateral manager of CLOs because of the Acis bankruptcy. (118:7-18)

- **Highland made the first payment under the Note, but not the second payment due of 5/31/18; HCLOM did not declare a default but entered into the forbearance agreement instead. (118:20-119:12)**

- **Dondero and FW were the sole officers of Acis from at least November 1, 2017 until Phelan was appointed in the Spring or Summer of 2018. (120:3-9)**

- **Acis continued to receive quarterly servicing fees from the CLOs after November 1, 2017. (120:10-15)**

- **FW DNR if Acis remitted servicing fees to Highland after 11/1/17. (120:16-18)**

- **In April 2017, under Dondero's direction, Acis launched a brand-new CLO (Acis-7). (121:11-21)**

017588

HCMLPHMIT00000485

- **FW admits that Dondero would not have launched a brand-new CLO if he didn't believe Acis could not perform. (121:18-25)**

- FW DNR recall (a) anyone expressing any concern about Acis' ability to perform or (b) how Acis funded the risk retention amount (or whether Highland loaned the money). (122:1-23)

- Acis looking to reset Acis-3 in late 2017. (123:13-124:2)

## ASSIGNMENT AND TRANSFER AGREEMENT

- **Despite being the CFO of Acis, FW has no recollection of Acis transferring its assets to other Highland entities in the fourth quarter of 2017. (131:1-15)**

- **FW had no recollection that Highland caused a Delaware entity called "Highland CLO Management, LLC" to be created in October 2007. (131:16-132:7)**

- **FW DNK who authorized the creation of LLC or what its purpose was. (132:4-13)**

- **FW DNK why the Transfer Agreement was entered on 11/3/17 except that (a) Terry got his award and (b) Highland said it wouldn't support Acis; those are the only two reasons why this Agreement was entered. (132:22-134:25)**

- **Dondero made the decision to enter the Transfer Agreement on behalf of Highland and Acis, and Cullinane made the decision on behalf of HCLOM Limited. (135:1-10)**

- **The only purpose of the Transfer Agreement was to transfer the participation interest (i.e., the servicing fees) and the Note. (135:24-136:13)**

- **FW admitted that HCLOM Ltd. had to become the manager of the Acis CLOs "to receive the servicing fees to then in turn remit the participation interest to Highland. That was it." (136:14-24)**

- FW DNK if Transfer Agreement was negotiated or what role, if any, Cullinane played in drafting or negotiating the Agreement and despite being the Rule 30(b)(6) witness, FW made no effort to ascertain Cullinane's thoughts concerning the Agreement. (136:25-138:2)

- **Dondero made the decision on behalf of Highland to stop supporting Acis, as set forth in the third recital. (138:3-13)**

- The team managing the Acis CLOs was the same the day after Terry left as it was on 11/3/17, lead by Dondero (139:23-140:24)

017589

HCMLPHMIT00000486

- **In fact, despite Terry's departure and the public litigation that Highland initiated, Dondero still had enough confidence in the Acis brand that he entered into new service agreements and launched a new CLO with the Acis name. (140:25-142:13)**

- **The award was the sole reason FW could identify for entering into the Assignment and Transfer Agreement. (142:14-21)**

- FW DNK who gave the Notice on behalf of Highland or who received it on behalf of Acis, although Dondero did control both entities at the time. (142:22-143:6)

- FW has no knowledge that Acis ever defaulted under either the SSA or Sub-Advisory Agreement. (143:7-144:8)

- **Dondero made the decision on Highland's behalf not to support Acis, and then made the decision on behalf of Acis that it couldn't continue. (144:9-145:10)**

- **FW cannot identify any "damage to the Acis brand" other than the damage allegedly caused by the Acis arbitration award. (145:11-22)**

- **Acis "simply accepted Highland's notification and said, okay, we're done" without seeking alternatives or declaring a default on Highland's part. (146:13-10)**

- **And despite allegedly giving notice, Highland continued to perform under the service agreements until Phalen was appointed. (147:11-21)**

- **HCLOM was "going to step into Acis' shoes" and would "have the obligation under the CLO participation interest agreement to remit… that 20 bases point over to Highland." (149:18-150:12)**

- **FW agrees that it's fair to say "that the reason Highland agreed to transfer the note to HCLOM is because HCLOM was agreeing to become the new portfolio manager for the Acis CLOs and would share the servicing fees after that happened." (150:13-23)**

- **"The planning contemplated the sale of the CLO participation interest and a note to the CLO manger." (152:1-13)**

- FW has no knowledge concerning the proofs of claim Highland filed in the Acis bankruptcy case. (153:20-155:25)

- **FW admits that the obligations under sections 1 and 2 of the Transfer Agreement were never fulfilled. (156:15-157:6)**

017590

HCMLPHMIT00000487

- **FW has no idea if HCLOM LLC or HCLOM Limited was doing the resets and cannot competently testify about the meaning, intent or terms of the Acknowledgement and Waiver document. (157:7-163:2)**

## FORBEARANCE AGREEMENT

- FW signed – but doesn't know if its electronic signature or a wet signature (163:3-21)

- **FW DNR (a) the circumstances surrounding his execution of the document or (b) why highland did not make the payment due on 5/31/18. (163:22-164:4)**

- **FW DNR HCLOM Limited (a) making a demand under the Note, (b) declaring a default, or (c) exercising any remedies. (164:11-20)**

- FW DNR (a) reviewing before signing, (b) discussing the document with anyone before signing, (c) who asked him to sign it, or (d) where the idea originated. (164:21-165:20)

- **FW admits that "everyone knew" HCLOM Ltd. wasn't receiving fees under the portfolio management agreement and was relieved of the obligation to make payments, so HCLOM received no benefit under the Forbearance Agreement. (165:21-167:11)**

- **The only thing Waterhouse could identify that HCLOM Ltd. received from entering into the Forbearance Agreement was somehow helping Highland preserve its relationships with the investors in the CLOs. (167:12-168:22)**

## AMENDED FORBEARANCE AGREEMENT

- Signed by FW on behalf of both Highland and HCLOM Limited after the Acis plan is confirmed and there is no prospect for Acis reset. (170:5-24)

- **FW admits that by this time, there is no chance HCLOM Limited will ever become the portfolio manager of Acis. (170:25-171:13)**

- **FW DNR HCLOM Limited ever being identified as a portfolio manager in 2019. (171:14-24)**

- **Only alleged benefit to HCLOM Limited from Forbearance Agreement is "reserv[ation] of the relationship. (171:25-172:3)**

- **FW is not aware "of any discussion or attempt by anybody in the world after January 19, 2018 to install HCLOM, Ltd. as the portfolio manager of the CLOs." (172:4-173:11)**

017591

HCMLPHMIT00000488

**RESPONSE**

- FW read it before and is unaware of any mistakes.  (174:13-175:1)

- **FW is not aware of any amendments needed to fully and accurately set forth HCLOM's factual and legal bases for responding to the Objection or of any intended amendments.  (175:2-9)**

**HCLOM'S DISCOVERY RESPONSES**

- Served before FW reviewed and verified.  (176:4-177:1)

- **The verification falsely states that FW spoke with people with "personal knowledge" about the responses.  (177:2-178:13)**

- **FW does not believe the Responses need to be amended or modified to make them more accurate.  (178:14-20)**

- **FW did not verify the accuracy of the Response to Interrogatory No. 2, he just "took what counsel provided as correct."  (178:21-180:1)**

- **FW then admits the response to Interrogatory No. 2 is unresponsive; he doesn't know if the Transfer Agreement was subject to negotiations; and he did nothing to find out.  (180:14-181:2)**

- **FW DNK basis for the denial of the Firs Request to Admit.  (182:3-18)**

- **The "consideration" HCLOM gave was the "preservation of the relationship" even though the same people making the same decisions on behalf of both entities.  (182:19-184:21)**

- Dondero, Ellington & Waterhouse.  (184:22-185:22)

017592

HCMLPHMIT00000489

# **EXHIBIT B**

017593

HCMLPHMIT00000490

## DONDERO DEPOSITION DIGEST[1]

- **JD does not know who holds the Note that is the subject of the litigation. (8:7-14; 14:10-14)**

- JD didn't do anything to prepare other than meet with counsel, an hour the Friday before and 15 minutes today; didn't review documents; didn't speak with anyone other than counsel (including FW).  (8:15-9:23).

- **JD doesn't know anything about HCLOM Limited other than it was one of the entities that was going to be involved in refinancing or resetting of the CLOS.  (9:24-10:22)**

- **JD doesn't know when Limited was formed; formed by "the lawyers." (10:23-11:18)**

- **JD is aware that LLC exists and speculates that it was an onshore entity involved in resets and refinancings.  (11:19-12:2)**

- **JD doesn't know if LLC/Limited have common ownership or had any contractual relationship.  (12:13-13:5)**

- JD never asked why there were entities with similar names because he "wasn't specifically involved in any of the details on a transaction of this size," and DNR anyone ever explaining why.  (13:10-14:1)

- **JD can't identify the ultimate beneficial owners of HCLOM Limited as of today or at the time of formation.  (14:15-15:17)**

- **JD DNK who controls HCLOM Limited: "This is a small transaction.  I wasn't involved in the details," and he never asked anyone.  JD doesn't even know if he's authorized to act on behalf of HCLOM Limited.  (15:18-16:13)**

- **JD never saw HCLOM's Response; DNR seeing before filed.  (16:14-23; 18:8-19:13)**

- **JD doesn't know who, within his organization, is responsible for handling this litigation on behalf of HCLOM Limited; he never designated anyone; no one ever told him who that person was; and he never spoke with anyone internally concerning this litigation.  (19:22-20:15)**

---

[1] "JD" refers to James Dondero.  "DNR" means "does not recall" or "does not remember."  "DNK" means "does not know." Citations are to the transcript of Dondero's deposition in this matter, marked as Ex. 62.

017594

HCMLPHMIT00000491

- Acis: formed in 2011 by Dondero, Terry & Okada to be a RIA and manage and invest in CLOs. (22:4-16)

- Acis obtained role as CLO Manager through management agreements with issuers and would receive fees for services. (22:17-23:13)

- **JD DNR if he was an officer of Acis or controlled that entity. (24:21-25:6)**

- **JD doesn't remember if he fired Josh Terry for cause. (25:7-22)**

- Terry's interests in Acis were allocated between entities owned or controlled by Dondero and Okada, but JD believes the decisions were made by an unnamed in-house lawyer; JD did not delegate to a particular person the responsibility for addressing issues arising from Terry's departure. (26:3-27:13)

- JD DNR delegating or designating anyone to act on behalf of Acis after Terry departs. (29:5-10)

- JD controlled HCMLP at all times until Independent Board appointed in 1/20, and authorized HCMLP to file for bankruptcy. (31:6-17)

- JD acknowledges that Terry left in June 2016, HCMLP sued him based on JD's authority, and Terry moved to compel arbitration on 9/12/16. (31:18-32:23)

- **JD DNR Acis and Highland entering into the Participation Agreement. (31:18-33:3)**

## PARTICIPATION AGREEMENT

- JD signed but did not read before doing so. (35:2-9)

- **Purchase of expected fees for a note in order to recharacterize short-term income as capital gains. Tax advantage. (35:13-36:6)**

- **Acis is a pass-thru entity; not a tax-paying entity; tax liability goes to owners. (36:7-16)**

- **Highland was also pass through entity so neither Acis nor Highland were the tax-paying entities. (37:4-19)**

- When JD signed, he understood that Acis "was agreeing to pay to Highland a portion of the servicing fees that it was going to receive from serving as the portfolio manager of the CLOs." (38:18-23)

017595

HCMLPHMIT00000492

- **Schedule A: "In exchange for the Acis participation interests, as set forth on Schedule A, Highland agreed to give some cash and a note." (38:24-41:14; 41:10-25; 43:20-25)**

- **JD doesn't know the "nuts and bolts" that it takes "to be bona fide for tax purposes" so can't say if you needed cash going both ways. (42:1-13)**

## PROMISSORY NOTE

- JD signed. (42:24-43:9)

- **JD doesn't know how principal amount of the Note was calculated; he "wouldn't have been involved with that." (44:1-6)**

- **JD does not know if there is a relationship between cash flow to/from Highland. (46:4-12)**

- Benefit to Highland was tax deferral and/or recharacterization of income. (46:14-25)

- **JD can't quantify the tax benefit to Highland; he didn't ask anyone what it would be; he doesn't know expected rate of return; he didn't ask; DNR if anyone ever told him IRR. (47:1-17)**

- **Idea originated with tax group, but can't name a person. (49:15-22)**

- **The Note was an integral part of the Participation Agreement:**

  - **Exchange of promises: "one side wouldn't have signed if they didn't get the promises of the other side." (50:7-21)**

  - **Wouldn't have agreed without the promises. (50:23-51:12)**

  - JD DNK if HCMLP made any payments under the amortization schedule; he wasn't involved. (52:5-18)

## SHARED SERVICES AND SUB-ADVISORY AGREEMENTS

- JD signed but DNK why he did so. (55:13-56:8)

- **Goldman says brand toxic; JD has no personal knowledge; can't even remember who told him. (57:11-59:14; 61:18-62:21; 64:3-13)**

017596

HCMLPHMIT00000493

## ARBITRATION AWARD

- **JD has never read it.  (67:11-22)**

- **Not familiar with findings, only that it was against Acis.  (70:3-20)**

- **Recalls that just after Award rendered, he signed the Transfer Agreement. (78:23-79:3)**

## TRANSFER AGREEMENT

- **JD signed.  (79:4-18)**

- **JD DNR Summit or Cullinane.  (79:19-81:2)**

- **JD DNR ever meeting or communicating with Cullinane.  (81:3-19)**

- **JD does not know if agreement was negotiated; "not involved."  (82:16-18)**

- **JD never spoke with anyone authorized to act on HCLOM Limited's behalf before it was executed.  (82:24-83:3)**

- **JD doesn't recall the document; didn't recall if he read it.  (83:12-19)**

- **From Acis and Highland's perspective, JD's understanding is that the purpose of the agreement was to replace Acis as portfolio manager.  (83:23-84:11)**

- JD had no opinion when signing whether Highland would continue to receive serving fees in exchange for payments under the Note.  (84:12-20)

- **JD does not recall if he expected Highland to receive any benefit under this Agreement.  (84:22-25)**

- **JD was unaware that Highland was a party to the Agreement; could not identify a benefit Highland was to receive even after reviewing the document. (85:8-86:4)**

- **JD has "no idea" why he signed the document on behalf of Acis and Highland.  (86:5-14)**

- **Based on his reading of Sections 3(b) and (c), the Agreement is "just trying to make sure the promises and the obligations of Acis transfer to the new entity."  (87:4-24)**

017597

HCMLPHMIT00000494

- Asked to identify anything of value that HCLOM Limited provided to Highland pursuant to this Agreement, JD referred to "shared servicer fees" but didn't know if HCLOM Limited had a shared services agreement. (88:15-89:2)

- JD has no idea if HCLOM Limited ever gave anything of value to Highland for any purpose. (89:20-91:5)

- HCLOM Limited wasn't a registered investment advisor and had no fees. (91:23-25)

- JD DNK if HCLOM Limited ever entered into SSA or sub-advisory agreement with anyone. (93:6-19)

- JD has no personal knowledge about the Notification (as defined in Transfer Agreement.). (94:24-95:6)

- JD DNK who gave the Notification on Highland's behalf or who received it on Acis' behalf. (95:7-12)

- JD DNK why Highland was unwilling to support Acis. (95:13-18)

- JD has no opinion as to whether agreement was "neutral" to Acis. (97:16-24)

- JD DNK who made the decision on Highland's behalf not to service Acis – but it wasn't him. (98:12-16)

- The Terry relationship and litigation was handled by Surgent. (99:4-18)

- JD DNR any advice he received before signing the Agreement. (100:4-10)

- JD DNK who was authorized to give the Notification. (100:11-14)

- JD DNK if HCLOM Limited was a qualified Successor Manager. (104:24-105:2)

- DNK if HCLOM Limited ever appointed Successor Manager. (106:14-16)

- DNK if HCLOM Limited or HCLOM LLC took steps to become Successor Manager. (107:1-10)

- JD wouldn't have signed the Agreement if he thought there were errors in it (and there were: among other things, HCLOM Limited was not "qualified"). (108:6-14)

- Yet, took no steps to make sure the Agreement reflected the facts; just "trusted internal counsel," without asking any questions at all. (108:16-25)

017598

HCMLPHMIT00000495

- **JD's understanding is that the Transfer Agreement "was intended to simply let HCLOM Limited step into the shoes of Acis." (109:22-110:1)**

- **JD DNK who is managing the litigation on behalf of HCLOM Limited and never asked. (110:2-19)**

- **JD DNK who owns HCLOM Limited or who its officers are or who is authorized to act on its behalf. (110:20-111:3)**

- JD not involved in reset/refinance process. (112:13-22)

- One piece of the resets was that Acis would be replaced as portfolio manager and lose the right to receive the serving fees; the fees would go to the Successor Manager. (113:10-25)

- **JD did not authorize or instruct anyone to pursue the resetting of the CLOs. (114:1-115:11).**

- **JD DNK who was authorized to have Acis reset the CLOs in 11/17. (116:12-15)**

## MIZUHO AGREEMENT

- JD signed but DNR ever reading before. (119:18-120:4)

- **JD DNK where HCLOM LLC got the authority to engage Mizuho or why HCLOM Limited was designated as the "Company" for this purpose. (122:5-11)**

- **JD admits that HCLOM Limited is not referred to in the Agreement and he has no knowledge that HCLOM Limited was going to play a role in the transactions subject to the document. (123:19-124:7)**

- **JD DNK why LLC is the signatory and not Limited and never asked. (124:9-14)**

- **JD DNR ever signing a document (other than the Transfer Agreement) that contemplated that Limited would serve as Acis' successor portfolio manager. (125:8-12)**

## CUSTODIAL AGREEMENT

- JD signed but DNR doing so. (126:15-127:3)

017599

HCMLPHMIT00000496

- Every deal needs a custodial bank; it's a different role than placement agent. (127:25-128:14)

## ACKNOWLEDGEMENT AND WAIVER

- **JD signed it but doesn't remember seeing it; reading it before he signed it; or discussing it with anyone. (129:10-130:7; 134:15-23)**

- **JD has no reason to believe paragraph 3 is incorrect in any way. (131:6-13)**

- **JD DNK if Acis ever promptly gave notice to the controlling class of each CLO. (133:9-14)**

- **JD DNK if Acis and HCLOM ever promptly pursued an appointment for each CLO. (133:16-25)**

- **JD did not have a specific awareness that he was waiving breaches of the Transfer Agreement on Highland's behalf. (135:4-11)**

- **JD DNK what Highland received in exchange for the waiver; he never asked; and no one ever explained what benefit Highland would receive by waiving the breaches of the Transfer Agreement. (135:18-136:6)**

017600
HCMLPHMIT00000497

# **EXHIBIT C**

4872-7286-7837.1 36027.003

HCMLPHMIT00000498

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Reorganized Debtor. | ) |  |
|  | ) |  |

### ORDER GRANTING HIGHLAND CAPITAL MANAGEMENT, L.P.'S MOTION FOR (A) A BAD FAITH FINDING AND (B) AN AWARD OF ATTORNEYS' FEES AGAINST HIGHLAND CLO MANAGEMENT, LTD. AND JAMES DONDERO IN CONNECTION WITH HCLOM CLAIMS 3.65 AND 3.66

Before the Court is the *Motion for (A) a Bad Faith Finding and (B) an Award of Attorneys'*

*Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with HCLOM*

*Claims 3.65 and 3.66* [Docket No. __] (the "Motion"),[2] filed by Highland Capital Management,

L.P. ("Highland"), in which Highland requests that this Court enter an order (a) finding that

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] Capitalized terms not defined herein shall take on the meaning ascribed to them in the Motion.

4872-7286-7837.1 36027.003

017602

HCMLPHMIT00000499

HCLOM Ltd. and Dondero prosecuted the HCLOM Claim in bad faith, and (b) entering sanctions against HCLOM Ltd. and Dondero, jointly and severally, in the form of reimbursement to Highland of Highland's costs and expenses incurred in objecting to the HCLOM Claim.  Having considered (a) the Motion, (b) the evidence in support thereof, and (c) all arguments and evidence heard at the hearing on the Motion on December 18, 2024 (the "Hearing"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. § 1409; and this Court having found that Highland's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, and for the reasons set forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

1. The Motion is **GRANTED**.

2. The clear and convincing evidence supports a finding that HCLOM Ltd.'s and Dondero's prosecution of the HCLOM Claim constitutes bad faith and a willful abuse of the judicial process.

3. HCLOM Ltd. and Dondero are hereby ordered, jointly and severally, to reimburse Highland for Highland's costs and expenses incurred in objecting to the HCLOM Claim in the aggregate amount of $[___].

4. The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.

### ###End of Order###

017603
HCMLPHMIT00000500

**EXHIBIT 67**

017604

|   |   |
|---|---|
| 1 | IN THE UNITED STATES BANKRUPTCY COURT |
|   | FOR THE NORTHERN DISTRICT OF TEXAS |
| 2 | DALLAS DIVISION |

```
                              )   Case No. 19-34054-sgj-11
 3   In Re:                   )   Chapter 11
                              )
 4   HIGHLAND CAPITAL         )   Dallas, Texas
     MANAGEMENT, L.P.,        )   December 18, 2024
 5                            )   9:00 a.m. Docket
          Reorganized Debtor. )
 6                            )   - OBJECTION TO SCHEDULED
                              )     CLAIMS [3657]
 7                            )   - MOTION FOR A BAD FAITH
                              )     FINDING [4176]
 8   _____)
```

```
 9                  TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10             UNITED STATES BANKRUPTCY JUDGE.

11   APPEARANCES:

12   For the Reorganized      John A. Morris
     Debtor:                  Hayley R. Winograd
13                            PACHULSKI STANG ZIEHL & JONES, LLP
                              780 Third Avenue, 34th Floor
14                            New York, NY  10017-2024
                              (212) 561-7760
15
     For the Reorganized      Zachery Z. Annable
16   Debtor:                  HAYWARD, PLLC
                              10501 N. Central Expressway,
17                              Suite 106
                              Dallas, TX  75231
18                            (972) 755-7108

19   For the Reorganized      Jeffrey N. Pomerantz
     Debtor:                  PACHULSKI STANG ZIEHL & JONES, LLP
20                            10100 Santa Monica Blvd.,
                                13th Floor
21                            Los Angeles, CA  90067
                              (310) 277-6910
22
     For Highland CLO         Deborah Rose Deitsch-Perez
23   Management, Ltd. and     Michael P. Aigen
     James Dondero:           STINSON, LLP
24                            2200 Ross Avenue, Suite 2900
                              Dallas, TX  75201
25                            (214) 560-2201
```



1934054241219000000000001

017605

HCMLPHMIT00003829

Case 19-34054-sgj11 Doc 2557 Filed 12/09/25 Entered 12/09/25 12:39:29 Desc
Case 3:25-cv-02072-S    Document 8    Filed 06/02/25    Page 757 of 1017    PageID 18639

2

```
 1   Recorded by:                Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
 2                               1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
 3                               (214) 753-2062

 4   Transcribed by:             Kathy Rehling
                                 311 Paradise Cove
 5                               Shady Shores, TX  76208
                                 (972) 786-3063
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25        Proceedings recorded by electronic sound recording;
           transcript produced by transcription service.
```

017606

HCMLPHMIT00003830

Case 19-34054-sgj11 Doc 4255-7 Filed 12/09/25 Entered 12/09/25 12:29:29 Desc
Case 3:25-cv-02072-S    Document 6-14 Page 532 of 33 Page 758 of 1017    PageID 18640

3

|   |   |
|---|---|
| 1 | <u>DALLAS, TEXAS - DECEMBER 18, 2024 - 9:05 A.M.</u> |
| 2 | THE CLERK:  All rise.  The United States Bankruptcy |
| 3 | Court for the Northern District of Texas, Dallas Division, is |
| 4 | now in session, the Honorable Stacey Jernigan presiding. |
| 5 | THE COURT:  Good morning, everyone.  Please be |
| 6 | seated. |
| 7 | All right.  We have a hearing all day today scheduled for |
| 8 | Highland, an objection to the scheduled claim of what I'm |
| 9 | going to call HCLOM.  You all tell me today if you want to |
| 10 | call it something different.  For the record, this is Case No. |
| 11 | 19-34054.  So let's start out by getting appearances from our |
| 12 | lawyers. |
| 13 | MR. MORRIS:  Good morning, Your Honor.  It's been a |
| 14 | while.  Nice to see you.  John Morris from Pachulski Stang |
| 15 | Ziehl & Jones for Highland Capital Management, LP.  I'm joined |
| 16 | here today by my colleagues, Jeffrey Pomerantz, Hayley |
| 17 | Winograd, and Zachery Annable. |
| 18 | THE COURT:  Okay.  Good morning to all. |
| 19 | MS. DEITSCH-PEREZ:  Good morning, Your Honor.  I'm |
| 20 | Deborah Deitsch-Perez from Stinson representing HCLOM, which I |
| 21 | will sometimes refer to as Limited to distinguish it from |
| 22 | HCLOM, LLC.  So I'll call one Limited and the other LLC, |
| 23 | hopefully. |
| 24 | THE COURT:  Okay. |
| 25 | MS. DEITSCH-PEREZ:  I'm here with my colleague Mike |

017607

HCMLPHMIT00003831

Case 19-34054-sgj11 Doc 4255-7 Filed 12/09/25 Entered 12/09/25 12:39:29 Desc
Case 3:25-cv-02072-S    Document 12 filed 06/09/25    Page 759 of 1017    PageID 18641

4

1  Aigen, and Patricia Tomasky, who's a paralegal, and Fred

2  Jones, who are assisting.

3           THE COURT:  Okay.

4           MS. DEITSCH-PEREZ:  Thank you.

5           THE COURT:  Good morning to all.

6      All right.  I presume those are the only appearances, and

7  anyone else on the WebEx is an observer.

8      Do we have a housekeeping matters or shall we go to

9  opening statements?

10          MS. DEITSCH-PEREZ:  I have one housekeeping matter

11  I'd like to raise.  And this is really because Your Honor has

12  on many occasions chided us and said, why are you here, have

13  you done anything to try not to be here?

14      And this is not in the nature of settlement, but certain

15  things happened last week.  Last week, it became clear that

16  $73-odd million is going to come out of the Registry of the

17  Court into the estate, and another several million dollars is

18  going to come out because of the administrative claims,

19  because the Fifth Circuit just ruled, so it's another roughly

20  $80 million in the estate.  And there's already $80 million or

21  so in the estate, and there's $80-ish million left in claims.

22      And so what we had proposed is that, rather than spending

23  time and money fighting about all of this, we would agree to

24  put HCLOM's claim behind Class 8, which I believe has

25  otherwise been fully paid, and Class 9, because otherwise what

017608

HCMLPHMIT00003832

Case 19-34054-sgj11 Doc 4057 Filed 12/09/25 Entered 12/09/25 12:23:59 Desc
Case 3:25-cv-02072-S Document 67 Page 760 of 1017 PageID 18642

5

1   the estate is doing here is bringing in money that's going to

2   be the residual left over for former equity, and we're willing

3   to put HCLOM back there anyway.  And then we wouldn't be

4   spending your time and our time and money to fight this, and

5   particularly with a sanctions motion to try and get fees from

6   Mr. Dondero.

7       I mean, honestly, Your Honor, what is the point, when

8   there's enough money there to pay everyone and basically

9   you're moving it from one pocket to the other, because at the

10  end of the day there's going to be money left over for former

11  equity?

12      And so I would ask that you use your ability to control

13  your docket and send us all home.

14          THE COURT:  Okay.  And by the way, I neglected to

15  ask, does Mr. Dondero have separate counsel today --

16          MS. DEITSCH-PEREZ:  No, I'm here --

17          THE COURT:  -- or you are also his counsel?

18          MS. DEITSCH-PEREZ:  Yes, I'm here for Mr. Dondero

19  also.

20          THE COURT:  All right.  So what I have heard is there

21  is an agreement by your client to essentially have a

22  subordinated claim behind all --

23          MS. DEITSCH-PEREZ:  Yes.

24          THE COURT:  -- Class 8, all Class 9?

25          MS. DEITSCH-PEREZ:  Yep.

017609

HCMLPHMIT00003833

Case 19-34054-sgj11 Doc 4255-7 Filed 06/30/25 Entered 06/30/25 12:23:59 Desc
Case 3:25-cv-02072-S Document 62-4 Page 963 of 33 Page 761 of 1017 PageID 18643

6

1          THE COURT:  It would come above equity.

2          MS. DEITSCH-PEREZ:  Uh-huh.

3          THE COURT:  Strand, I guess, or --

4          MS. DEITSCH-PEREZ:  Yeah, the 10 and 11, --

5          THE COURT:  I think I still remember this --

6          MS. DEITSCH-PEREZ:  Yeah.

7          THE COURT:  -- organizational structure.  And that,

8   of course, eliminates the sanction component of this.

9      What do you have to say, Mr. Morris?

10          MR. MORRIS:  Sure.  I'm just going to come to the

11  podium.  I'm more comfortable there.

12          THE COURT:  Uh-huh.

13          MR. MORRIS:  I'm surprised and disappointed that

14  we're hearing this now.  This is something that could have

15  been raised the day after we filed our objection.  Instead of

16  raising this issue then, they filed a response, and we have

17  spent more than $600,000 litigating this matter.  She's opened

18  the door now.  Before there was a deposition taken, Your

19  Honor, we offered to pay them a half a million dollars for the

20  withdrawal of this claim.  That was not accepted.

21      Here we are now.  When I received this missive on

22  Saturday, saying, gee, it's not -- not complete what's being

23  said here.  She also directed us to pay the Class 8 and Class

24  9 in full, which we're not going to do unless and until the

25  Trustee determines that's in the estate's best interest.  We

017610

HCMLPHMIT00003834

1  responded by saying, if that's what you want to do, then just

2  withdraw your claim with prejudice and we will withdraw our

3  bad faith motion.

4      So, instead of accepting that, they pushed on.  Right?

5  Because it doesn't matter.  If they're going to subordinate

6  that claim to 8 and 9, the claim becomes irrelevant, because

7  if there's ever a distribution to the Class 10, that's the

8  same person.  It's Jim Dondero.  Right?  We don't have to play

9  games here.

10     So I said, withdraw your claim with prejudice, we'll

11  withdraw our bad faith motion with prejudice, and we will have

12  no trial.  Not acceptable.

13     So here we are.  We've now spent the time.  They could

14  have made this proposal two years ago.  They didn't.  They

15  didn't accept the very generous offer that we made before a

16  deposition was taken in this case.  They've got no case here.

17  There's no legal basis for this claim.  There is no factual

18  basis for this claim.  We were prepared to actually write a

19  meaningful check and avoid the whole thing.  Not acceptable.

20  We're forced to go through it.

21     This is like HCRE all over again, where, like, I don't

22  know why we're here.  I really don't know why we're here.

23  It's the same person.  Right?

24     But they pushed me here, and I think we ought to, as long

25  as everybody's here, we ought to just get on with it and be

017611

HCMLPHMIT00003835

Case 19-34054-sgj11   Doc 4557   Filed 12/06/25   Entered 12/06/25 12:23:59   Desc
Case 3:25-cv-02072-S   Document 6-1   Page 833 of 31   Page 763 of 1017   PageID 18645

8

 1   done today.

 2         THE COURT:  Well, I'm trying to figure out if it's

 3   just a mechanical thing at this point.  I mean, I'm hearing

 4   that your proposal is the claim be subordinated.

 5         MS. DEITSCH-PEREZ:  Uh-huh.

 6         THE COURT:  And --

 7         MS. DEITSCH-PEREZ:  And the reason we don't agree

 8   with Mr. Morris, and I'll correct a few of the things he said,

 9   is there are some differences between HCLOM and former equity,

10   and we don't know what kind of tax or other implications there

11   would be from changing it from HCLOM's claim to dumping it

12   into some other category.

13      But as a practical and economic matter for the estate,

14   we're willing to have it at the back.  So it's no difference

15   to the estate.

16      And the reason we didn't make this proposal initially and

17   we made it last week is because of the very material change

18   that the estate suddenly has $80 million more.  And it should

19   be clear to everybody that there's enough money to pay

20   everyone.

21      It is also not true that I said to Mr. Morris that he had

22   to pay everybody this minute to make this claim, because then

23   I would be saying, oh, pay me next week.  That's not what I

24   said.  What I said was we would agree that if it turns out, as

25   we firmly believe and we're putting our money where our mouth

HCMLPHMIT00003836

Case 19-34054-sgj11 Doc 4155-7 Filed 12/06/25 Entered 12/06/25 12:23:59 Desc
Case 3:25-cv-02072-S Document 67 Exhibit 67 Page 32 of 34 Page 764 of 1017 PageID 18646

9

1   is, that there's enough money to pay everyone, then pay HCLOM

2   then.  They've already reserved the money for it.

3       And for them to say this is a ridiculous claim is itself

4   ridiculous.  This is not a proof of claim.  This is a claim

5   that Highland scheduled, not just when Mr. Dondero was at the

6   helm but when Mr. Seery was at the helm.  And then he

7   reaffirmed it for years afterwards.  It's only when they

8   realized that allowing the claim would benefit Mr. Dondero,

9   among others, that they did an about-face and said, oh, no,

10  now we object to the claim.

11          THE COURT:  Okay.  Now we're getting into argument.

12          MS. DEITSCH-PEREZ:  Okay.

13          THE COURT:  And I promise you, I've read every single

14  --

15          MS. DEITSCH-PEREZ:  Okay.

16          THE COURT:  -- sentence of every single pleading.

17          MR. MORRIS:  Yeah.

18          THE COURT:  So I know what the counter-arguments are.

19          MS. DEITSCH-PEREZ:  And --

20          THE COURT:  I'm going to suggest this.  Can we take a

21  15-minute break?  And we are pressed for time today, because I

22  think I told you all, or maybe, I mean, not me, but Traci

23  probably told you all that I have a presentation at 6:00

24  o'clock tonight.  It's five minutes away, but --

25          MR. MORRIS:  I think --

HCMLPHMIT00003837

Case 19-34054-sgj11 Doc 4155-7 Filed 06/09/25 Entered 06/09/25 12:22:59 Desc
Case 3:25-cv-02072-S    Document 53    Document Trial Page 63 of 81    Page 765 of 1017    PageID 18647

10

1          THE COURT:  What I'm really afraid of is you

2    mentioned HCRE.  I remember when we were in the devil-is-in-

3    the-details kind of situation there, where we didn't really

4    have a meeting of the minds on what might happen with a

5    withdrawal of that claim.

6       So might I suggest a 15-minute break, and you can write it

7    down and sign it in blood.  I hate to say it.  But if it's

8    something that you both can get to the same point on.

9          MR. MORRIS:  I'm happy to do it, but I just want to

10   make this really clear on the record.  The reason that we were

11   prepared to agree to withdrawal of our bad faith motion in

12   exchange for disallowance of the scheduled claim is because we

13   would have no theoretical let alone legal duty to HCLOM.  And

14   that's where we need to get to.  That's why we're going

15   forward today.  That's why their settlement proposal was

16   unacceptable.

17      We probably -- I'd have to confer with my client, but we

18   probably would still be willing to withdraw the bad faith

19   motion with the disallowance of the scheduled claims.  But the

20   subordination of it, to leave it hanging out there to create

21   new arguments that we owe some kind of duty is unacceptable.

22          MS. DEITSCH-PEREZ:  And that --

23          THE COURT:  All right.  Wouldn't you know at this

24   point in time if there's a tax consequence or some sort of

25   negative consequence from withdrawal?  Withdrawal seems weird

HCMLPHMIT00003838

Case 19-34054-sgj11 Doc 4355-7 Filed 06/30/25 Entered 06/30/25 12:32:59 Desc
Case 3:25-cv-02072-S Document 53 Document Trial Page 265 of 81 Page 766 of 1017 PageID 18648

11

1   because it's a scheduled claim.

2           MR. MORRIS:  That's why I say disallowance.

3           MS. DEITSCH-PEREZ:  It's --

4           THE COURT:  Disallowance versus subordination?

5           MS. DEITSCH-PEREZ:  We don't know.  And there's

6   really no --

7           THE COURT:  Why wouldn't you, after all of this time?

8           MS. DEITSCH-PEREZ:  Because this only came up last

9   week, and I don't know how many other things one would have to

10  look at to know that, Your Honor.

11      But the bottom line is we don't.  And there's also no

12  reason, because it is economically no different for the Debtor

13  to put us behind 9 than to disallow it, because there's going

14  to be --

15          THE COURT:  Oh, okay.  Well, --

16          MS. DEITSCH-PEREZ:  -- money left over.

17          THE COURT:  -- I still want the 15-minute break, --

18          MR. MORRIS:  Okay.

19          THE COURT:  -- because it seems like there's a

20  mechanic, such as I think the HCRE issue was --

21          MR. MORRIS:  They were saving claims for another day.

22          MS. DEITSCH-PEREZ:  And --

23          MR. MORRIS:  That's what we want to avoid doing here

24  today.

25          THE COURT:  Yes.  That this claim would never be used

017615

HCMLPHMIT00003839

 1  --

 2          MR. MORRIS:  We want to make sure that we have

 3  finality, --

 4          THE COURT:  -- in litigation.

 5          MR. MORRIS:  -- that we're never going to see this

 6  again.

 7          THE COURT:  It would never be used in any future

 8  litigation.

 9          MS. DEITSCH-PEREZ:  Right.  That I could -- as I

10  stand here now, I don't know of any claims that HCLOM has

11  other than this.  And the time to make them is long past.  I

12  mean, the bar date has passed.  The schedules are the

13  schedules.

14          THE COURT:  But that would be against Highland, not

15  against who knows who else.  I mean, I don't know.

16          MS. DEITSCH-PEREZ:  But why does the Debtor -- I

17  mean, why does that matter to the Debtor?

18          THE COURT:  Well, --

19          MS. DEITSCH-PEREZ:  I mean, I also don't know of any

20  claims HCLOM has against anybody else, but why is --

21          THE COURT:  Mr. Seery has been the subject of a lot

22  of claim litigation.  Or trying to assert a claim.

23          MR. MORRIS:  Your Honor?

24          THE COURT:  Fifteen-minute break.

25          MS. DEITSCH-PEREZ:  I'll give you an example.

HCMLPHMIT00003840

```
 1              MR. MORRIS:  Can we take that 15-minute break?

 2              THE COURT:  Yes.  Yes.

 3              MR. MORRIS:  Yes.  Thank you.

 4              THE COURT:  All right.  Thank you.

 5              THE CLERK:  All rise.

 6      (A recess ensued from 9:18 a.m. until 9:47 a.m.)

 7              THE CLERK:  All rise.

 8              THE COURT:  All right.  Please be seated.

 9        All right.  Do we have anything that looks like a

10   compromise and settlement, or no?

11              MS. DEITSCH-PEREZ:  We do.  Can I take your computer?

12              MR. MORRIS:  Sure.

13              MS. DEITSCH-PEREZ:  Or somebody's computer?

14              MR. MORRIS:  It's Hayley's.  But you can read it if

15   you want.

16              MS. DEITSCH-PEREZ:  Okay.

17              MR. MORRIS:  Your Honor, just context, we greatly

18   appreciate the Court's indulgence of time.  It was used

19   constructively.  I believe that we have reached an agreement

20   to resolve today's matter.

21        And with that, I'm going to have Ms. Deitsch-Perez read

22   the written terms that we have right now.  Obviously, it'll be

23   subject to definitive documentation, which we would work on

24   promptly today.

25        But why don't you take it from here?
```

HCMLPHMIT00003841

Case 19-34054-sgj11 Doc 4155-7 Filed 12/09/25 Entered 12/09/25 12:32:59 Desc
Case 3:25-cv-02072-S    Document 53 Document Filed 06/28/32 of 81 Page 769 of 1017    PageID 18651

14

 1              MS. DEITSCH-PEREZ:  Okay.

 2              THE COURT:  Okay.

 3              MS. DEITSCH-PEREZ:  And I'm not going to include your

 4      asterisks.  The --

 5              THE COURT:  And can I ask you to come to the podium

 6      and speak into the mic?  I just want it crystal clear on the

 7      record whatever is said.

 8              MS. DEITSCH-PEREZ:  Okay.  Come.  Yes.  Come.

 9         Okay.  The HCLOM claim would be converted to a Class 10

10      interest in the same amount.

11              THE COURT:  Okay.

12              MS. DEITSCH-PEREZ:  Okay.  HCLOM would release

13      protected parties.

14              MR. MORRIS:  It would be a general release.

15              THE COURT:  Uh-huh.

16              MS. DEITSCH-PEREZ:  But only by HCLOM.

17              MR. MORRIS:  Correct.  Only HCLOM Limited.

18              MS. DEITSCH-PEREZ:  HCLOM would not separately make

19      equity motions, like Hunter Mountain.  However, because of the

20      change in circumstances, I just want this to be clear.  Hunter

21      Mountain or Dugaboy may have -- may want to bring to the

22      Court's attention the change in the finances in the estate.

23              MR. MORRIS:  Your Honor, --

24              MS. DEITSCH-PEREZ:  But it would --

25              MR. MORRIS:  -- I really would prefer that we just

HCMLPHMIT00003842

```
 1    read the terms of the agreement, and then she can put down the
 2    commentary.  I'm going to do this the way we have -- the way
 3    we have it written, and then she can provide whatever
 4    commentary she'd like.
 5         There's five elements to this settlement.
 6              THE COURT:  Okay.
 7              MR. MORRIS:  HCLOM claim will be converted to a Class
 8    10 interest in the amount of the claim.
 9         Number 2, there shall be a general release of all
10    Protected Parties, as that term is defined in the plan.
11         There will be no "equity" type motion by HCLOM Limited.
12    HCLOM Limited shall take no position in connection with this
13    case, including but not limited to in connection with this
14    scheduled claim, as a holder of a Class 10 interest.
15         Number 4, no estate fiduciary, Highland Capital
16    Management, LP, will owe any duty of any kind, whether it's
17    contractual, fiduciary, or otherwise, now or forever.
18         And Number 5, there shall be no reserve established.
19              THE COURT:  Let me -- let me --
20              MS. DEITSCH-PEREZ:  Let --
21              THE COURT:  -- make sure I heard that point.
22              MR. MORRIS:  Uh-huh.
23              THE COURT:  No estate fiduciary or Highland.  What --
24              MS. DEITSCH-PEREZ:  Other than this agreement.  I
25    mean, --
```

HCMLPHMIT00003843

Case 19-34054-sgj11 Doc 4355-7 Filed 06/30/25 Entered 06/30/25 12:32:59 Desc
Case 3:25-cv-02072-S Document 5 Exhibit 7 - Trial Tr. Page 232 of 81 Page 771 of 1017 PageID 18653

16

1          MR. MORRIS:  Sure.

2          THE COURT:  Just, if you could just repeat what you

3    said.

4          MR. MORRIS:  There -- no estate fiduciary or Highland

5    Capital Management or the Trust shall owe any duty of any kind

6    to HCLOM Limited, including but not limited to contractual,

7    fiduciary, or any other duty.

8          MS. DEITSCH-PEREZ:  Except the duties owed as a

9    result of this agreement.  In other words, you're not saying

10   we'll make this agreement but, ha ha, you can't enforce it?

11   That's all.

12         MR. MORRIS:  The only thing that would be enforced is

13   they would have a Class 10 interest.

14         MS. DEITSCH-PEREZ:  Right.

15         MR. MORRIS:  Right?

16         MS. DEITSCH-PEREZ:  It would have its Class 10

17   rights.

18         MR. MORRIS:  Period, full stop.  So that's fine.

19      And then no reserve shall be established.

20      There actually has been a reserve.  That reserve can be

21   released.  There will be no further reserve with respect to

22   this 10 interest.

23      And, you know, we need to make sure, and I don't know that

24   counsel has the authority to do that today, but we need to

25   make sure that neither HMIT nor Dugaboy, the Class 10 and

HCMLPHMIT00003844

Case 19-34054-sgj11 Doc 4257-7 Filed 06/30/25 Entered 06/30/25 12:22:59 Desc
Case 3:25-cv-02072-S   Document 53  Document Page 26 of 81   Page 772 of 1017   PageID 18654

17

1  Class 11 interest holders, have any objection to this.  It's

2  got to be subject to their consent.

3          MS. DEITSCH-PEREZ:  Although I guess I still don't

4  quite understand, because right now HCLOM is ahead of them,

5  but I -- so now they're moving into --

6          MR. MORRIS:  Because if we had the trial today, I'm

7  fairly confident that the claim would be disallowed.

8          MS. DEITSCH-PEREZ:  And I'm equally confident that it

9  would not be --

10          MR. MORRIS:  Okay.  So --

11          MS. DEITSCH-PEREZ:  -- and that it would be ahead.

12          MR. MORRIS:  So we're having a settlement that could

13  impact them.  So --

14      Just to state this really simply, Your Honor, because I

15  want intent to be really clear on the record:  HCLOM Limited

16  is going to walk away with the economic interest of having an

17  allowed Class 10 interest in the amount of the claim and

18  nothing more, as if we actually tried the case today and the

19  scheduled claim was disallowed.  That's the point that we

20  continue to make, that if we had this case, the reason why we

21  really wanted to push forward to this case today and really

22  what we were talking about before we took the break is we

23  didn't want any continuing duty of any kind.

24      So this is why -- this is the compromise here.  Highland

25  gets what it wants, and that is, as a legal matter, the claim

017621

HCMLPHMIT00003845

Case 19-34054-sgj11 Doc 4557 Filed 06/20/25 Entered 06/20/25 12:23:59 Desc
Case 3:25-cv-02072-S Document 5 Document Title Page 26 of 81 Page 773 of 1017 PageID 18655

18

1  has been effectively disallowed.  HCLOM gets what it wants,

2  because, as an economic matter, when and if Class 10 claim --

3  interest holders get paid, they'll get a distribution,

4  presumably prorated with HMIT if HMIT is ultimately found to

5  have, you know, an allowed claim.

6      That's really it.  We want the protection as if the claim

7  had been disallowed in full, no strings attached.  And they're

8  going to get, in exchange for that, they're going to get the

9  economic benefit of holding a Class 10 interest.

10          THE COURT:  Okay.  Let me ask the obvious question.

11  It seemed to the Court that standing was the issue.  When we

12  had this back and forth before the break, Highland wanted

13  disallowance.  Your client wanted subordination.  And we all

14  know that there have been many adversary proceedings and many

15  appeals where the standing of the plaintiff, the standing of

16  the appellant, was challenged.  And some court, maybe this

17  one, maybe an appellate court, said no standing of Mr.

18  Dondero.  Hunter Mountain.  You know.

19          MS. DEITSCH-PEREZ:  These are --

20          THE COURT:  Is this the rub here, or are we in

21  agreement from these five elements that HCLOM will not have

22  standing to bring actions or to pursue appeals that involve --

23          MS. DEITSCH-PEREZ:  We're --

24          THE COURT:  -- somehow Highland?

25          MS. DEITSCH-PEREZ:  We're basically -- and this is

017622

HCMLPHMIT00003846

Case 19-34054-sgj11 Doc 4557 Filed 06/20/25 Entered 06/20/25 12:29:29 Desc
Case 3:25-cv-02072-S    Document 5 Exhibit Exhibit Page 02 Page 774 of 1017    PageID 18656

19

1   why I was trying to give a little color earlier, which is to

2   say circumstances have changed.

3       So former equity, Classes 10 and 11, are in a position to

4   say, Your Honor, look, see how much money there is in the

5   estate.  Now can you agree that we have standing?  But we're

6   not going to rely on the addition of HCLOM to say it's somehow

7   different than if Hunter Mountain had done it or Dugaboy had

8   done it.  Is that -- is that clear?

9           MR. MORRIS:  Let me make sure that I understand.

10  This settlement has no impact on Dugaboy or HMIT.  It doesn't.

11  They've done whatever they wanted.  They'll continue to do

12  whatever they wanted, unfortunately.  But what the third

13  bullet point says is that HCLOM Limited shall take no position

14  in connection with this case.  Period, full stop.

15          MS. DEITSCH-PEREZ:  Other than --

16          MR. MORRIS:  Other than -- other than if, you know,

17  if we gave a distribution to HMIT but didn't give it to HCLOM

18  Limited, they can come in and complain about that.  That's

19  their economic right.

20          MS. DEITSCH-PEREZ:  Right.  We could complain about

21  --

22          MR. MORRIS:  Economic right.

23          MS. DEITSCH-PEREZ:  -- the economic -- about whether

24  we get or don't get what we've just agreed to.  I mean, we

25  have rights arising out of this agreement.

017623

HCMLPHMIT00003847

Case 19-34054-sgj11 Doc 4255-7 Filed 12/09/25 Entered 12/09/25 12:29:29 Desc
Case 3:25-cv-02072-S    Document 52-7 Document Title Page 302 of 81 Page 775 of 1017    PageID 18657

20

1          THE COURT:  Okay.  Would it be -- it might be
2    superfluous, but any problem with either one of you just
3    saying in this agreement, This compromise and settlement
4    agreement does not operate to give HCLOM standing in
5    connection with any adversary, any appeal?
6          MS. DEITSCH-PEREZ:  Not if it related to a violation
7    of the settlement.  So I think it's an unnecessary thing to
8    say.
9          THE COURT:  Except to enforce the settlement
10   agreement?  Could it have that proviso?
11      Because here's where I'm standing.  Standing.  No pun
12   intended, actually.  I mean, you mentioned that I have an
13   obligation or duty to manage my docket.  But I feel like I
14   also have a duty not to clog the court system, including the
15   appellate system, by entering an agreed order that might be
16   construed later, look, --
17          MS. DEITSCH-PEREZ:  Well, --
18          THE COURT:  -- she acknowledged we have a Class 10
19   interest and therefore we have standing.  Okay?
20          MS. DEITSCH-PEREZ:  Your Honor?
21          THE COURT:  Do you see what I'm saying?  I have some
22   duty here, too, to make sure I have not created a standing
23   argument where one --
24          MS. DEITSCH-PEREZ:  There --
25          THE COURT:  -- might not have existed.

017624

HCMLPHMIT00003848

Case 19-34054-sgj11 Doc 4255-57 Filed 06/09/25 Entered 06/09/25 12:39:29 Desc
Case 3:25-cv-02072-S Document 53 Exhibit 57 Page 532 of 81 Page 776 of 1017 PageID 18658

21

1    MS. DEITSCH-PEREZ: There's nothing about this

2 agreement that creates any standing other than with respect to

3 the agreement itself. And I would be loath to say something

4 that might be misconstrued about that. It's simply

5 unnecessary.

6  And it's not, it's not clogging the courts for parties to

7 appeal those decisions with which they disagree. And this

8 settlement is actually efficient, in the sense that surely

9 everybody here is aware that if we went forward on this case,

10 whoever lost would appeal.

11  So this is managing both this docket and lessening the

12 flow of --

13    THE COURT: So, --

14    MS. DEITSCH-PEREZ: -- cases into the future.

15    THE COURT: -- to make me feel like I have done my

16 duty, you all would add a sentence that this order, this

17 agreed order, whatever you're calling the document, does not

18 operate to give standing to HCLOM for any purposes related to

19 the Highland estate except to allow it to enforce this order?

20    MS. DEITSCH-PEREZ: I mean, I'll have to go back and

21 ask, but that sounds -- that sounds okay. You know, as in

22 this case, you're right, the devil is always in the details,

23 but that sounds like what we've been saying.

24    THE COURT: Okay.

25    MR. MORRIS: I just --

HCMLPHMIT00003849

Case 19-34054-sgj11 Doc 4255-7 Filed 12/09/25 Entered 12/09/25 12:32:59 Desc
Case 3:25-cv-02072-S Document 5 Exhibit 7 Page 08 of 31 Page 777 of 1017 PageID 18659

22

```
 1            THE COURT:  You'll have to ask your client?  I think
 2    I saw him here earlier.  Has he left?
 3            MS. DEITSCH-PEREZ:  If he is, I'll go -- I'll go and
 4    call him in the hall.
 5            THE COURT:  Okay.  Okay.
 6            MR. MORRIS:  I just added a sixth clause that says,
 7    This order shall not operate -- does not and shall not operate
 8    -- does not and shall not operate to give standing to HCLOM
 9    Limited for any purpose against Highland -- against the
10    Highland estate except to enforce this order.
11            THE COURT:  Uh-huh.
12            MR. MORRIS:  And I just, I just need to respond to
13    that last comment.  Right?  We know they've appealed your
14    gatekeeper order.  We know that they've, you know, we're in
15    the Fifth Circuit now on recusal.  There's no indication
16    whatsoever that this case is nearing a conclusion.  We have no
17    more contested matters before you, at least as of this moment,
18    Your Honor.  There's no more adversary proceedings that I know
19    of at this moment.  I'm going to cross my fingers and hope
20    that the appellate court upholds the orders of this Court, the
21    orders that have -- from the district court that affirmed your
22    orders.
23        But, clearly, Mr. Dondero still has an appetite for
24    litigation.  He is still pursuing, you know, attacking the
25    gatekeeper.  He's still pursuing your recusal.  So I think --
```

HCMLPHMIT00003850

```
 1   I think the --
 2            THE COURT:  You know, I don't keep --
 3            MR. MORRIS:  Yeah.
 4            THE COURT:  -- as close tabs --
 5            MR. MORRIS:  Yeah.
 6            THE COURT:  -- as lawyers might think I --
 7            MR. MORRIS:  Right.
 8            THE COURT:  -- do on appeals.
 9            MR. MORRIS:  Uh-huh.
10            THE COURT:  But I do think I read where the recusal
11   order was -- was --
12            MS. DEITSCH-PEREZ:  It --
13            THE COURT:  It's a done deal.  They --
14            MS. DEITSCH-PEREZ:  No, Your Honor.
15            MR. MORRIS:  No.  No, they brought in Jonathan
16   Mitchell, the former Solicitor General of the State of Texas,
17   and John Ashcroft, the former Attorney General of the United
18   States.
19            THE COURT:  He's still alive?  I don't mean to be
20   rude, but --
21            MR. MORRIS:  I thought it was his son.
22            MS. DEITSCH-PEREZ:  No, Your Honor.
23            MR. MORRIS:  It's a great question.  With all due
24   respect to Mr. Ashcroft, --
25            THE COURT:  Yes?
```

HCMLPHMIT00003851

Case 19-34054-sgj11 Doc 4557 Filed 12/06/25 Entered 12/06/25 12:23:59 Desc
Case 3:25-cv-02072-S    Document 53 Main Document Page 2832 of 34 Page 779 of 1017    PageID 18661

24

1          MR. MORRIS:  -- I mean no disrespect whatsoever, --

2          THE COURT:  Uh-huh.

3          MR. MORRIS:  -- but when I heard that I thought it

4     was his son, too.  But yes, --

5          MS. DEITSCH-PEREZ:  No.

6          MR. MORRIS:  -- they're on the brief, and they filed

7     a motion for a petition for a rehearing *en banc*.

8          MS. DEITSCH-PEREZ:  And --

9          MR. MORRIS:  And our answer is due on December 26th.

10         MS. DEITSCH-PEREZ:  Yeah.  But --

11         MR. MORRIS:  So we'll see where that goes.  But the

12    point being that it validates Mr. Seery and Highland's

13    concerns that there be no ability to create another vehicle,

14    to create more litigation, and it validates the very concern

15    that Your Honor was addressing earlier on the same topic.

16        I think we're in agreement here, --

17         MS. DEITSCH-PEREZ:  Right.

18         MR. MORRIS:  -- but I want there to be context for

19    why we're so insistent that there be no duty of any kind and

20    no ability of HCLOM all of a sudden to start raising its hand

21    and commencing litigation.

22         MS. DEITSCH-PEREZ:  Okay.  And I do want to thank Mr.

23    Morris for bringing this up and making the recusal status --

24    correcting it.

25        And for all of the complaints and saying these appeals are

HCMLPHMIT00003852

Case 19-34054-sgj11 Doc 4255-7 Filed 06/09/25 Entered 06/09/25 12:23:29 Desc
Case 3:25-cv-02072-S    Document 53    Document Title    Page 262 of 81    Page 780 of 1017    PageID 18662

25

1  not well-founded, it is not often that the Fifth Circuit

2  actually asks a respondent to answer an *en banc* petition, much

3  less require them to do it the day after Christmas, which I am

4  sorry about.  They're an equal opportunity lawyer

5  inconveniencer.

6      So I would just ask that we -- that Highland tone down the

7  attacks on the appeals, because there have been ones that have

8  been upheld.

9              THE COURT:  Okay.  I, you know, --

10             MS. DEITSCH-PEREZ:  That's all.

11             THE COURT:  -- I didn't think Highland's lawyer's

12  tone was at all, you know, angry or elevated or whatever

13  you're thinking.

14             MS. DEITSCH-PEREZ:  I --

15             THE COURT:  Okay?  I have been approached by judge

16  colleagues in the circuit who have told me there have been

17  more appeals out of the Highland bankruptcy than any other

18  bankruptcy in Fifth Circuit history.  Okay?  So to say there

19  have been a whole lot of appeals is just factually correct.  I

20  don't know the number.

21             MR. MORRIS:  It's 15, Your Honor.  And there's more

22  in the pipeline.

23             THE COURT:  There -- what?

24             MR. MORRIS:  There have been 15 so far.  There's more

25  in the pipeline.

HCMLPHMIT00003853

Case 19-34054-sgj11 Doc 4557 Filed 06/20/25 Entered 06/20/25 12:39:59 Desc
Case 3:25-cv-02072-S    Document 53    Main Document    Page 462 of 81    Page 781 of 1017    PageID 18663

26

```
 1                THE COURT:  Wait, wait.  Okay.  You're talking at the
 2     Fifth Circuit?
 3                MR. MORRIS:  Correct.
 4                THE COURT:  But --
 5                MR. MORRIS:  Oh, there has been dozens in the
 6     district.
 7                THE COURT:  I think at one point a year or two ago
 8     you told --
 9                MR. MORRIS:  Yeah.
10                THE COURT:  -- me 50-plus.
11                MR. MORRIS:  Right, right.  I am just -- I am just
12     talking about the Fifth Circuit.  I've never heard of a
13     circuit court in the United States of America that's had 15
14     appeals from any case, let alone a bankruptcy case.
15                MS. DEITSCH-PEREZ:  Hmm.
16                THE COURT:  So, anyway, it is what it is.  But part
17     of the reason I'm engaging in this back and forth is, again,
18     we all have our duties.  You have duties to your clients.  I
19     have duties to the system, okay.  And if I sign anything that
20     all of a sudden is going to create standing where it might not
21     have existed had I allowed this to be litigated today, then I
22     think I've been derelict in my duties.  So it's essential, as
23     far as I'm concerned.
24          So do we need a five-minute break?  I'm telling you, if we
25     have to go forward today, which it's looking like we won't,
```

HCMLPHMIT00003854

Case 19-34054-sgj11 Doc 4155-7 Filed 12/06/25 Entered 12/06/25 12:29:59 Desc
Case 3:25-cv-02072-S    Document 57-7 Trial Transcript Page 782 of 1017    PageID 18664

27

 1   but if we have to, it's going to be compressed, because we've

 2   got to finish --

 3          MR. MORRIS:  Right.

 4          THE COURT:  -- by 5:30.

 5          MR. MORRIS:  I think the only thing I would request

 6   is that Ms. Deitsch-Perez just confirm --

 7          MS. DEITSCH-PEREZ:  Ask about the sixth.

 8          MR. MORRIS:  -- that -- confirm that Number 6 is

 9   acceptable.

10          THE COURT:  Okay.  She suggested she might need to

11   run it by --

12          MR. MORRIS:  Yeah.

13          MS. DEITSCH-PEREZ:  Yeah.

14          THE COURT:  -- the client.

15          MS. DEITSCH-PEREZ:  Let's -- can we take five

16   minutes?

17          THE COURT:  Five minutes.

18          MR. MORRIS:  Thank you, Your Honor.

19          THE COURT:  Okay.  Thank you.

20          THE CLERK:  All rise.

21      (A recess ensued from 10:05 a.m. until 10:12 a.m.)

22          THE CLERK:  All rise.

23          THE COURT:  Okay.  Please be seated.

24      All right.  We're back on the record in Highland.  Have we

25   gotten to closure on all the issues or not?

Case 19-34054-sgj11 Doc 4255-7 Filed 12/06/25 Entered 12/06/25 12:29:29 Desc
Case 3:25-cv-02072-S Document 57 Filed 07/09/25 Page 783 of 1017 PageID 18665

28

1          MS. DEITSCH-PEREZ: We have, Your Honor.

2          THE COURT: Okay.

3          MR. MORRIS: And so what we'd like to do is Highland

4 is going to take the laboring oar of doing an initial draft of

5 a stipulated order. We expect to get that to Stinson today.

6 And we'd like to just put a loose deadline to report to the

7 Court if we're unable to file this document, let's just say by

8 the 24th, next -- I think it's Tuesday.

9     And if we're unable to do it by then, we'll ask for

10 another date for coming back. But I do just want to keep a

11 deadline there just so --

12          MS. DEITSCH-PEREZ: I think it's a week. Okay.

13          MR. MORRIS: A week is -- it's six days instead of

14 five days because I didn't want to take Christmas. That's

15 just me.

16          THE COURT: Okay. Sounds reasonable to me.

17          MR. MORRIS: Yeah.

18          THE COURT: Sounds more than reasonable that you can

19 work this out --

20          MR. MORRIS: Yeah.

21          THE COURT: -- with language within six days.

22          MR. MORRIS: I do appreciate Ms. Deitsch-Perez's

23 listening and getting to yes on this. It's a good result.

24          THE COURT: Okay.

25          MR. MORRIS: Thank you, Your Honor.

017632

HCMLPHMIT00003856

Case 19-34054-sgj11 Doc 2557 Filed 12/09/25 Entered 12/09/25 12:23:59 Desc
Case 3:25-cv-02072-S    Document 5 Main Document Page 784 of 1017    PageID 18666

29

1           MS. DEITSCH-PEREZ:  Thank you, Your Honor.

2           THE COURT:  Anything you want to add, or you're in

3  agreement with everything you just heard, Ms. Deitsch-Perez?

4           MS. DEITSCH-PEREZ:  Yes.

5           THE COURT:  Okay.

6           MR. MORRIS:  Deborah?

7           MS. DEITSCH-PEREZ:  What?

8           MR. MORRIS:  I assume part of this is withdrawing the

9  bad faith motion?

10          MS. DEITSCH-PEREZ:  Oh, yes.

11          MR. MORRIS:  Yes.  I can confirm that that's Element

12 Number 7.  The bad faith motion will be deemed withdrawn.

13          THE COURT:  Okay.  All right.  Well, --

14          MS. DEITSCH-PEREZ:  Well, will be withdrawn.

15          MR. MORRIS:  Yeah.  Thank you.

16          THE COURT:  All right.  I would have been happy to

17 spend a whole day with you all, but we can now go on and take

18 care of other business, I guess.

19    So I thank you all for getting this resolved.  And I'm not

20 going to be a happy camper if I don't see an order.  I mean,

21 the battle of the forms, I really don't think we need to have

22 that here.  Okay?

23          MR. MORRIS:  Yep.

24          THE COURT:  So, --

25          MR. MORRIS:  Thank you, Your Honor.

017633

HCMLPHMIT00003857

1          THE COURT:  All right.  Happy holidays to everyone.

2          MR. MORRIS:  You, too.

3          MS. DEITSCH-PEREZ:  You, too.

4          THE CLERK:  All rise.

5      (Proceedings concluded at 10:15 a.m.)

6                      --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20                    CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                    **12/19/2024**

24   _____    _____
    Kathy Rehling, CETD-444                    Date
25   Certified Electronic Court Transcriber

017634

HCMLPHMIT00003858

31

INDEX

1

PROCEEDINGS                                                    3

2

WITNESSES

3

-none-

4

EXHIBITS

5

-none-

6

RULINGS                                                      29

7

END OF PROCEEDINGS                                           30

8

INDEX                                                        31

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

017635

HCMLPHMIT00003859

**EXHIBIT 68**

017636



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed December 27, 2024

_____
**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |

### STIPULATED AND AGREED ORDER RESOLVING (A) HCLOM, LTD.'S SCHEDULED CLAIMS 3.65 AND 3.66; AND (B) HIGHLAND CAPITAL MANAGEMENT, L.P.'S (1) OBJECTION AND (2) MOTION FOR A BAD FAITH FINDING AND AN AWARD OF ATTORNEYS' FEES AGAINST HCLOM, LTD. AND JAMES DONDERO IN CONNECTION THEREWITH [DOCKET NOS. 3657, 4176]

WHEREAS, on December 13, 2019, Highland Capital Management, L.P. ("Highland"),

the reorganized debtor in the above-captioned Chapter 11 case (the "Bankruptcy Case"), filed its

schedule of unsecured claims that identified "Highland CLO Holdco" as a creditor with claims

arising under a note. Docket No. 247 (Schedule E/F, Part 3.64 and 3.65) (the "Initial HCLOM

Claim");

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

4933-5155-3032.2 36027.003



1934054241227000000000001

# 017637

HCMLPHMIT00003860

WHEREAS, on September 22, 2020, Highland filed a *Notice of Filing of Debtor's Amended Schedules* in which it, among other things, replaced Highland CLO Holdco as the creditor on the Initial HCLOM Claim with Highland CLO Management, Ltd. ("HCLOM Ltd.," and together with Highland, the "Parties"). [Docket No. 1082] (Schedule E/F, Part 3.65 and 3.66, the "HCLOM Claim");

WHEREAS, on February 22, 2021, this Court entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "Confirmation Order"), which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808] (the "Plan"). The Plan became effective on August 11, 2021 (the "Effective Date") [Docket No. 2700];

WHEREAS, as required under the Plan, Highland created a reserve for the HCLOM Claim (the "Reserve");

WHEREAS, on February 2, 2023, Highland filed its objection to the HCLOM Claim [Docket No. 3657] (the "Objection");

WHEREAS, on April 3, 2023, HCLOM Ltd. filed its response to the Objection [Docket No. 3751] (the "Response");

WHEREAS, on November 21, 2024, Highland filed its *Motion for (A) a Bad Faith Finding and (B) an Award of Attorneys' Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with HCLOM Claims 3.65 and 3.66* [Docket No. 4176] (the "Bad Faith Motion," and collectively with the HCLOM Claim and the Objection, the "HCLOM Litigation");

WHEREAS, an evidentiary hearing on the HCLOM Litigation was scheduled for December 18, 2024 (the "Hearing");

017638

HCMLPHMIT00003861

WHEREAS, the Parties desire to settle and resolve the HCLOM Litigation pursuant to the terms of this Stipulated and Agreed Order (the "<u>Agreement</u>");

WHEREAS, the Court finds and concludes that: (a) the Court has jurisdiction to consider the terms contained in this Stipulated and Agreed Order; (b) venue is proper under 28 U.S.C. §1409; (c) the Parties' Stipulated and Agreed Order is binding; and (d) the relief requested in the Stipulated and Agreed Order is appropriate;

**ACCORDINGLY:**

**IT IS HEREBY ORDERED that:**

1.      The HCLOM Claim is hereby converted to a Class 10 interest[2] in the amount of $10,140,633.26.

2.      Upon the Effective Date, and to the maximum extent permitted by law, except for claims arising out of an failure to abide this Order, HCLOM Ltd. hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates the Protected Parties,[3] individually and collectively, from, and waives and relinquishes, any and all Claims, which HCLOM Ltd. ever had, now has, or hereafter can, shall, or may have against any of the Protected Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management of the Highland Entities, or the Highland Entities' property and including any defense, affirmative defenses, and right to setoff

---

[2] "<u>Class 10</u>" shall have the meaning ascribed to that term in Article III.H. ¶ 10 of the Plan.

[3] "<u>Protected Parties</u>" shall have the meaning ascribed to that term in Article I.B ¶ 105 of the Plan.

017639

HCMLPHMIT00003862

arising out of, or otherwise related to, any of the foregoing (collectively, "HCLOM Ltd.'s Released

Claims").

**FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASE IS INTENDED TO BE GENERAL AND INCLUDES, WITHOUT LIMITATION, A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE EFFECTIVE DATE.**

3.      To the maximum extent permitted by law, HCLOM Ltd. waives the benefit of any

statute or other principle of law or equity that limits the applicability of a release with respect to

claims that the releasing party does not know or suspect to exist in his, her or its favor at the time

of executing the release.

4.      Without limiting the scope of the foregoing waiver, in connection with the

foregoing release, HCLOM Ltd. waives the benefits of Section 1542 of the California Civil Code

(to the extent, if any, that Section 1542 might apply to the foregoing release), which provides as

follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

5.      HCLOM Ltd. hereby agrees that the provisions of Section 1542 of the Civil Code

of the State of California and all similar federal or state law, rights, rules or legal principles, legal

or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY**

**KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY HCLOM**

**LTD.** to the full extent that such rights and benefits pertaining to the matters released herein may

017640
HCMLPHMIT00003863

be waived, and HCLOM Ltd., on its own behalf and on behalf of the HCLOM Ltd. Releasors, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

6.      Except for the limited purpose of enforcing this Order, HCLOM, Ltd. shall file no pleading, motion, adversary proceeding, or other paper in this Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), including but not limited to, in connection with the HCLOM Claim as a holder of a Class 10 interest.

7.      The Protected Parties, individually and collectively, shall owe no duty to HCLOM, Ltd. (whether contractual, fiduciary, equitable, statutory or otherwise) except as arising out of this Order.

8.      Highland is authorized to release the Reserve, and no reserve shall be established for HCLOM, Ltd.'s Class 10 interest.

9.      This Stipulated and Agreed Order does not and shall not operate to give HCLOM Ltd. standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except in connection with the enforcement of this Order.

10.     The Bad Faith Motion is deemed withdrawn with prejudice.

**THE PARTIES UNDERSTAND AND AGREE THAT THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF EITHER PARTY OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT. THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS, EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT.**

### ### END OF ORDER ###

4933-5155-3032.2 36027.003

017641

HCMLPHMIT00003864

STIPULATED AND AGREED THIS 23RD DAY OF DECEMBER 2024

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569) 10100
Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
hwinograd@pszjlaw.com

- and -

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Plaintiff Highland Capital
Management, L.P.*

017642

HCMLPHMIT00003865

- and -

**STINSON LLP**
*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas State Bar No. 24036072
Michael P. Aigen
Texas State Bar No. 24012196
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for Highland CLO Management, Ltd. and James Dondero*

- and -

**STINSON LLP**
*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas State Bar No. 24036072
Michael P. Aigen
Texas State Bar No. 24012196
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for Hunter Mountain Investment Trust and Dugaboy Investment Trust (approved as to form and substance)*

017643

HCMLPHMIT00003866

**EXHIBIT 69**

017644

## INTERCREDITOR AND PARTICIPATION AGREEMENT

This Intercreditor and Participation Agreement (the "Agreement") is entered into as of January 10, 2025 (the "Effective Date") by and between Highland CLO Management, Ltd. (together with its successors and assigns in such capacities, "HCLOM Ltd.") and Hunter Mountain Investment Trust (together with its successors and assigns in such capacities, "HMIT"). HCLOM Ltd. and HMIT are each referred to herein individually as a "Party" and jointly as the "Parties."

## RECITALS

WHEREAS, on September 22, 2020, Highland Capital Management, L.P. filed a Notice of Filing of Debtor's Amended Schedules in its pending Chapter 11 Case No. 19-34054-sgj11 (the "Bankruptcy Case") in which it, among other things, scheduled a creditor's claim by HCLOM Ltd. (the "HCLOM Claim"); and

WHEREAS, on December 27, 2024, the Bankruptcy Court entered a Stipulated and Agreed Order Resolving (A) HCLOM, Ltd.'s Scheduled Claims 3.65 and 3.66; and (B) Highland Capital Management, L.P.'s (1) Objection and (2) Motion for a Bad Faith Finding and an Award of Attorneys' Fees Against HCLOM, Ltd. and James Dondero in Connection Therewith [Docket Nos. 3657, 4176] in the Bankruptcy Case (the "Stipulation and Agreed Order"); and

WHEREAS, the Stipulation and Agreed Order converted the HCLOM Claim to a Class 10 interest/claim (as such is defined in Article III.H. ¶ 10 of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) in the Bankruptcy Case) (the "Plan") in the amount of $10,140,633.26; and

WHEREAS, the Parties have agreed to certain rights and priorities solely as between themselves regarding HCLOM Ltd.'s participation in the payment of Class 10 interests/claims;

THEREFORE, for and in consideration of the promises, covenants, conditions, stipulations, benefits, and obligations described and provided herein, the sufficiency and adequacy of which is expressly hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1.      **HMIT Payment Obligation to HCLOM Ltd.** Upon HMIT's receipt of distributions on account of its Class 10 interest/claim (the "Distributions"), HMIT will pay to HCLOM Ltd. an amount equal to five percent (5%) of the funds received by HMIT within two (2) business days after receipt of indefeasible funds by HMIT (the "HMIT Payment Obligation"). HMIT shall be entitled to deduct from the Distributions the fees and expenses billed by Kelly Hart Hallman, LLP which directly relate to the Stipulation and Agreed Order or this Agreement (the "HMIT Expenses") until all HMIT Expenses are paid in full.

2.      **No Additional Duties to HCLOM Ltd.** HMIT shall retain and have the sole discretion to act with respect to its Class 10 interest/claim, and shall owe no additional duties to HCLOM Ltd. or any other person or entity, including without limitation, with respect to (i) the amount of Distributions or recovery by HMIT on account of its Class 10 interests/claims,

ACTIVE 706075387v4

017645

HCMLPHMIT00003868

(ii) the amount of Distributions that could be received by any holder of Class 10 interests/claims, (iii) the rights of any holder of Class 10 interests/claims, or (iv) any pleading or document that could or should be filed in any way related to the Bankruptcy Case, the Plan, or the HMIT Class 10 interests/claims.

3.  **No Liens or Encumbrances**. HMIT will not take any action that could reasonably be expected to encumber HMIT's Class 10 interests/claims, limit or affect HMIT's right or ability to fulfil and perform the HMIT Payment Obligation, or limit or affect HCLOM Ltd.'s right to receive the Distributions.

4.  **This Agreement Supersedes the Effects of the Stipulated and Agreed Order Among the Parties**. HCLOM acknowledges and agrees that, notwithstanding the Stipulated and Agreed Order, the terms of this Agreement amends and supersedes the effect of the Stipulation and Agreed Order as between the Parties and HCLOM's rights to payment under the Plan are limited solely to the HMIT Payment Obligation.

5.  **Non-Interference; No Cause of Action**. Notwithstanding Paragraph 3, HCLOM will not have any rights to object to or otherwise interfere with the rights of HMIT as a holder of Class 10 interest to reach a settlement with Highland Capital Management, LP ("Highland"). HCLOM acknowledges that it shall have no right to notice or approval of such a settlement nor will it have any cause of action against HMIT arising out of any such settlement.

6.  **Remittance Agreement**. The Parties acknowledge that contemporaneously herewith NREA SB II Holdings, LLC (together with its successors and assigns in such capacities, "NexPoint Small Bay."), Charitable DAF Holdings Corp. (together with its successors and assigns in such capacities, "Charitable DAF"), and Liberty CLO Holdco, Ltd. (together with its successors and assigns in such capacities, "Liberty CLO") have entered into that certain Remittance Agreement effective January 10, 2025 (the "Remittance Agreement"). HCLOM agrees that if NexPoint Small Bay fails to make the DAF Bridge Equity Payment (as defined in the Remittance Agreement) pursuant to the terms of the Remittance Agreement, HMIT will have no obligations to make the HMIT Payment Obligation, and HMIT shall not receive any distribution from HMIT or any other party related to any Class 10 interest/claim. Notwithstanding any failure of NexPoint Small Bay to adhere to the terms of the Remittance Agreement, HCLOM acknowledges that by executing this Agreement, it shall have no other recourse or rights to payment under the Plan other than the terms of this Agreement.

7.  **Choice of Law; Jurisdiction; Venue**. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without regard to conflict of law provisions. Each Party to hereby consents and agrees that the courts located in Texas shall have sole and exclusive jurisdiction to hear and determine any claims or disputes between the parties pertaining to this Agreement or to any matter arising out of or relating to this Agreement. Each Party expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and each Party hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue, or *forum non conveniens*.

8.  **Amendments; Waivers**. No amendment, modification, or waiver of any of the provisions of this Agreement shall be deemed to be made unless the same shall be in writing signed on behalf of each Party, and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the Party making such waiver or the obligations of the other Party in any other respect or at any other time.

2

017646

HCMLPHMIT00003869

9.     **Binding Effect**. Except as otherwise expressly provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Parties and their respective successors, assigns, executors, representatives, and administrators.

10.     **Entire Agreement**. The Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into this Agreement.

11.     **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument. Signature by facsimile or other similar electronic transmission shall have the same force and effect as an original signature.

IN WITNESS WHEREOF, the Parties have executed this Intercreditor and Participation Agreement as of the Effective Date set forth above and in the capacities set forth below.

017647

HCMLPHMIT00003870

HIGHLAND CLO MANAGEMENT, LTD.

By: _____

Name: _James Dondero_____

Title: __President_____


HUNTER MOUNTAIN INVESTMENT TRUST

By: _____

Name: ___Mark Patrick_____

Title: ___Administrator_____

017648

HCMLPHMIT00003871

# EXHIBIT 70

017649

# TRUST AGREEMENT

This Trust Agreement is dated as of December 17, 2015 (this "Trust Agreement"), between Beacon Mountain, LLC, a Delaware limited liability company, as sponsor (in such capacity, the "Sponsor"), John Honis as administrator (in such capacity, the "Administrator"), and Wilmington Trust, National Association, a national banking association, as Delaware trustee (the Delaware Trustee").

1.    Definitions. Certain capitalized terms used in this Trust Agreement shall have the respective meaning assigned to them in this Section 1. All references herein to "the Agreement" or "this Agreement" are to this Trust Agreement as it may be amended and supplemented from time to time, and all references herein to Articles, Sections and subsections are to Articles, Sections and subsections of this Trust Agreement unless otherwise specified.

"Account" means the trust account or other account established by the Administrator in the name of the Trust for the benefit of the Sponsor at any financial institution selected from time to time by the Administrator in his sole and absolute discretion.

"Delaware Act" means the Delaware Statutory Trust Act, Chapter 38 of Title 12 of the Delaware Code, 12 Del. C. § 3801 et seq.

"Honis Cause" means conduct by Honis, in any capacity, amounting to (i) Honis's conviction or plea of nolo contendere for any criminal offense; (ii) dishonesty, fraud, willful misconduct, unlawful discrimination, bad faith or theft on the part of Honis that is injurious to any of the Applicable Entities; (iii) Honis's using for his own benefit any confidential or proprietary information of any of the Applicable Entities, or willfully or negligently divulging any such information to third parties without the prior written consent of the Partnership, in each case, other than as provided herein; (iv) a breach or violation of the terms of this Agreement or other agreement to which Honis or any of his Affiliates and any of the Applicable Entities are party in any manner that adversely affects any of the Applicable Entities; or (v) a breach of fiduciary duties. Any determination of whether conduct constitutes Honis Cause pursuant to this Agreement shall be made in the reasonable discretion of the Partnership, shall be made in good faith and shall be binding upon all parties affected thereby.

"Honis Trigger Event" means, with respect to Honis or any of his Affiliates, (i) the Bankruptcy of Honis; (ii) the death of Honis; (iii) the Disability of Honis; (iv) any conduct by Honis amounting to Honis Cause; (v) the termination of Honis's employment with, or the failure of Honis to be actively engaged in the management of, Rand Advisors; (vi) a change in the ownership of Rand Advisors, such that Honis fails to retain, directly or indirectly, majority voting control of Rand Advisors; (vii) a sale of all or substantially all of the assets of Rand Advisors; or (viii) the termination of this Agreement pursuant to Section 16. Honis agrees to give the Partnership ten (10) days' written notice of his Bankruptcy. "Limited Partnership" means Highland Capital Management, L.P., a Delaware limited partnership.

"Limited Partnership Agreement" means the Agreement of Limited Partnership of Highland Capital Management, L.P., as amended from time to time.

017650

HCMLPHMIT00004103

"Limited Partner Interests" means limited partner interests in the Limited Partnership.

"Person" means any individual or any corporation, association, partnership, limited liability company, joint venture, business trust, trust, organization, governmental entity or other entity of any kind.

"Trust" means the Delaware statutory trust established and governed by this Trust Agreement.

"Trust Property" means all Limited Partnership Interests and all amounts in the Account, unless and until any of such Limited Partnership Interests are disposed of in accordance with this Trust Agreement.

2.     Scope.  This Trust Agreement governs the Trust and the disposition of all Trust Property, including amounts in the Account or otherwise held by the Trust now existing or hereafter arising.  Each of the Sponsor, the Administrator and the Delaware Trustee hereby acknowledges that the Trust Property shall be held in trust for Beacon Mountain LLC under Delaware law solely for the use and purposes set forth herein.

3.     Name; Certificate of Trust.  The Trust shall be known as "HUNTER MOUNTAIN INVESTMENT TRUST", in which name the Administrator may conduct the business of the Trust, make and execute contracts and other instruments on behalf of the Trust and sue and be sued on behalf of the Trust, to the extent herein provided.  The Delaware Trustee is authorized and directed to file a Certificate of Trust of the Trust with the Office of the Secretary of State of the State of Delaware in accordance with the applicable provisions of the Delaware Act.  It is the intention of the parties hereto that the Trust created hereby constitute a statutory trust under the Delaware Act and that this Trust Agreement constitute the governing instrument of the Trust.

4.     Account Establishment.  The Administrator shall establish and control the Account.  The Account shall include Trust Property and may include other assets in the sole discretion of the Administrator.

5.     Beneficial Owner; Liability of Beneficial Owner.  The beneficial owner of the trust shall be Beacon Mountain LLC.  Beacon Mountain LLC, as beneficial owner of the Trust, shall be entitled to the same limitation of liability extended to stockholders of private corporations for profit organized under the General Corporation Laws of the State of Delaware.

6.     Title to Trust Property.  Legal title to all Trust Property, including the Account, shall be vested at all times in the Trust as a separate legal entity, except where applicable law in any jurisdiction requires title to any part of the Trust Property or the Account, to be vested in a trustee or trustees, in which case title shall may be vested in a trustee, a co-trustee and/or a separate trustee, as the case may be, as selected by the Administrator.  Title to Trust Property shall not be vested in the name of the Delaware Trustee without the Delaware Trustee's prior written consent.

2

HCMLPHMIT00004104

7.  <u>Purpose and Powers of the Trust; Administrator's Powers</u>. The Trust shall have the power and authority (i) to accept funds and other assets, (ii) to contribute or otherwise transfer funds and other assets to the Account, (iii) to acquire Limited Partnership Interests from (a) the limited partners of the Limited Partnership and (b) the Limited Partnership, in each case, with funds in the Account or other sources of funds, including through the incurrence of debt, and to hold such Limited Partnership Interests in the Account or otherwise and (iv) to dispose of or otherwise allocate such Limited Partnership Interests pursuant to and accordance with the terms and conditions of the Limited Partnership Agreement. The Administrator shall pursuant to Section 3806(b)(7) of the Delaware Act have the power and authority, and shall be duly authorized, from time to time, in his sole discretion to manage the business and affairs of the Trust, and to take the actions described in (i) through (iv) on behalf of the Trust. The Administrator shall have all additional powers and authority necessary or desirable, in the sole discretion of the Sponsor, for prompt and effective administration of the Trust created hereunder, unless the particular power or authority is specifically denied by this Trust Agreement. The Administrator shall also have the power to settle, compromise, submit to arbitration, or submit to any court having jurisdiction in the matter any matters in dispute.

8.  <u>Fiduciary Duties of Administrator</u>. (a) The Administrator is authorized to acquire and retain the Limited Partnership Interests in accordance with the terms of this Trust Agreement without regard to any law limiting the nature of investments of fiduciaries.

(b)   The Administrator agrees to perform his duties under this Trust Agreement in good faith and in the best interests of the Trust, but only upon the express terms of this Trust Agreement. To the fullest extent permitted by law, the Administrator shall have all implied duties (including fiduciary duties) or liabilities existing at law or in equity with respect to the Trust. For the avoidance of doubt, to the fullest extent permitted by law, no Person other than the Administrator (including any such Person that may control or be under common control with the Administrator) shall have any duties (including fiduciary duties) or liabilities at law or in equity to the Trust, any beneficial owner or any other Person.

(c)   To the extent that, at law or in equity, the Administrator has duties (including fiduciary duties) and liabilities relating thereto to the Trust or to any other Person, the Administrator shall not be liable to the Trust or to any other Person for his good faith reliance on the provisions of this Trust Agreement.

(d)   Unless otherwise expressly provided herein:

(i)   whenever a conflict of interest exists or arises between the Administrator or any of its affiliates, on the one hand, and the Trust or the beneficial owner, on the other hand; or

(ii)   whenever this Trust Agreement or any other agreement contemplated herein or therein provides that the Administrator shall act in a manner that is, or provides terms that are, fair and reasonable to the Trust or the beneficial owner,

the Administrator shall resolve such conflict of interest, take such action or provide such terms, considering in each case solely the interests of the Trust and the beneficial owner.

3

017652

HCMLPHMIT00004105

(e)     Notwithstanding any other provision of this Trust Agreement or otherwise applicable law, whenever in this Trust Agreement the Administrator is permitted or required to make a decision:

(i)     in his "discretion" or under a grant of similar authority, the Administrator shall be entitled to consider such interests and factors as it desires, including its own interest, and, to the fullest extent permitted by applicable law, shall have no duty or obligation to give any consideration to any interest of or factors affecting the Trust or any other Person; or

(ii)     in his "good faith" or under another express standard, the Administrator shall act under such express standard and shall not be subject to any other or different standard.  The term "good faith" as used in this Trust Agreement shall mean subjective good faith as such term is understood and interpreted under Delaware law,

(f)     The Administrator and any of his affiliates may engage in or possess an interest in other profit-seeking or business ventures of any nature or description, independently or with others, whether or not such ventures are competitive with the Trust and the doctrine of corporate opportunity, or any analogous doctrine, shall not apply to the Administrator. The Administrator insofar as he acquires knowledge of a potential transaction, agreement, arrangement or other matter that may be an opportunity for the Trust shall not have any duty to communicate or offer such opportunity to the Trust, and the Administrator shall not be liable to the Trust or to the beneficial owners for breach of any fiduciary or other duty by reason of the fact that the Administrator pursues or acquires for, or directs such opportunity to another Person or does not communicate such opportunity or information to the Trust.  Neither the Trust nor any beneficial owner shall have any rights or obligations by virtue of this Trust Agreement or the trust relationship created hereby in or to such independent ventures or the income or profits or losses derived therefrom, and the pursuit of such ventures, even if competitive with the activities of the Trust, shall not be deemed wrongful or improper.   The Administrator may engage or be interested in any financial or other transaction with the Trust or any affiliate of the Trust, or may act as depositary for, trustee or agent for, or act on any committee or body of holders of, securities or other obligations of the Trust or its affiliates.

9.     Recordkeeping and Accounting.  The Administrator shall maintain appropriate records in which he shall record the Trust Property and the acquisition and disposition of Limited Partnership Interests.

10.     Tax Treatment.  The Sponsor and the Administrator acknowledge and agree that for United States Federal Income Tax purposes (i) the Trust shall be disregarded as an entity for federal income tax purposes.  The Administrator shall comply with the information reporting requirements applicable to the Trust under the Internal Revenue Code and prepare and furnish to Beacon Mountain LLC any appropriate Internal Revenue Service forms required to be provided to Beacon Mountain LLC as beneficial owner of the Trust.

4

HCMLPHMIT00004106

11.   <u>No Other Interests</u>

    (a)    The Sponsor acknowledges that it has no rights or claims to specific Trust Property, including funds in the Account, and otherwise has no interest in the Trust Property or the Account other than a beneficial interest in the Trust Property and the Account.

    (b)    The Administrator acknowledges that he has no right, title, or interest in the Trust, the Trust Property, or the Account in his personal capacity and has no beneficial interest in the Trust.

12.   <u>Compensation; Administrator Liability.</u> The Administrator shall not receive any compensation for his role as Administrator. Nothing herein shall be construed to limit the Administrator's ability to receive compensation pursuant to other agreements for services he may provide other than his role as Administrator. The Administrator shall be indemnified, defended and held harmless by the Trust for any liability incurred by him while acting hereunder, and shall not be liable to the Trust or the Sponsor, except for a breach of his fiduciary duties hereunder, his own bad faith, willful misconduct or gross negligence in the performance of his express duties under this Trust Agreement.

13.   <u>Amendment.</u> The Administrator, solely with the consent of the beneficial owner, shall have the right at any time or times to amend or supplement the provisions of this Trust Agreement, in each case by a writing or writings signed by the Administrator; provided that no such amendment shall be permitted if it would subject any amount held hereunder to any right, charge, security interest, lien or claim by, of or for the benefit of any creditor or creditors of the Sponsor or its subsidiaries and affiliates in its corporate or personal capacity. If any such amendment or supplement affects the rights, immunities or obligations of the Delaware Trustee, the Administrator shall be required to obtain the prior written consent of the Delaware Trustee.

14.   <u>Duration.</u> The Trust shall be perpetual unless otherwise dissolved and terminated pursuant to paragraph 15 below.

15.   <u>Termination.</u> The Administrator shall have the power solely upon the prior written consent of the beneficial owner to dissolve the Trust and to distribute all Trust Property held in the Account to, or for the benefit of, such persons (including the Sponsor) as the Administrator shall determine in his sole discretion and after satisfying the claims and obligations of the Trust in accordance with the Delaware Act. Following any such dissolution, the Administrator shall proceed to wind up the affairs of the Trust in an orderly manner and within a reasonable period of time considering relevant circumstances and shall have the powers necessary to wind up the Trust's affairs, including but not limited to the power to fulfill or discharge the contracts of the Trust, collect its assets, sell, convey, exchange or otherwise dispose of all or any part of the remaining property of the Trust to one or more Persons at public or private sale (for consideration which may consist in whole or part of cash, securities or other property of any kind), discharge or pay its liabilities, defend or prosecute suits or administrative proceedings and do all other acts appropriate to the winding up and liquidation of the property and affairs of the Trust. After paying or making reasonable provision for the payment of all claims and obligations of the Trust as required by the Delaware Act, and upon receipt of such releases, indemnities or like documentation as the Administrator may reasonably deem necessary

5

017654
HCMLPHMIT00004107

for the protection of the Administrator, the Administrator shall distribute the remaining property of the Trust as contemplated by this Trust Agreement. Upon the completion of winding up, the Trust shall terminate and the Administrator shall provide written notice directing the Delaware Trustee to file an appropriate form of Certificate of Cancellation to be filed in the Office of the Secretary of State of the State of Delaware by the Delaware Trustee.

16.   Removal of Administrator.   Upon any Honis Trigger Event, the Administrator shall immediately be removed without any action by the Delaware Trustee or any other party.

17.   Successor Administrator.   The Administrator may resign as Administrator hereunder, without leave of court, at any time, and, in such event, the Administrator shall appoint a successor Administrator unless, prior to the effective date of his resignation, the Administrator dissolves the Trust in accordance with paragraph 15 above. Any appointment of a successor Administrator shall be in writing signed by the appointing Administrator, or by a duly authorized officer or officers of the appointing Administrator, if an entity. Whenever this Trust Agreement refers to the Administrator, such reference shall include any successor Administrator appointed under this paragraph. All powers hereby granted to the Administrator shall be exercisable by any successor Administrator, and each successor Administrator shall be deemed to have assumed the duties hereby undertaken by the Administrator.

Upon the termination of the Administrator in accordance with paragraph 16 above, Beacon Mountain, LLC shall appoint a successor Administrator within a reasonable period of time.

The Administrator shall not be required to furnish any bond or surety. No one dealing with the Administrator need inquire concerning the validity of anything the Administrator purports to do or see to the application of any money paid upon the Administrator's order.

18.   Delaware Trustee.

(a)   For purposes of satisfying Sections 3807 of the Delaware Act, during the existence of the Trust, there shall at all times be a "Delaware Trustee" hereunder who shall, in the case of a natural person, be a person who is a resident of the State of Delaware, or, in all other cases, is a trustee with its principal place of business in the State of Delaware. The Delaware Trustee shall not have any duties (including fiduciary duties) or liabilities except to the extent and for the limited purposes described in this paragraph. Accordingly, no reference in this Trust Agreement to the "Administrator" shall include, or be deemed to refer to, the Delaware Trustee. The sole power and duty of the Delaware Trustee shall be to accept service of process in accordance with Section 3804 of the Delaware Act and to execute and deliver for filing all documents required to be filed with the State of Delaware as required by the Delaware Act.

(b)   The Sponsor and the Administrator hereby appoint Wilmington Trust, National Association as the initial Delaware Trustee. The initial Delaware Trustee and any successor Delaware Trustee may resign and may be removed by the Sponsor then serving for any reason, with or without cause. If the Delaware Trustee resigns or is removed, or if there is no Delaware Trustee serving at any time for any other reason, the Administrator shall appoint a successor Delaware Trustee who qualifies under the terms of this paragraph 18. Upon each

6

017655
HCMLPHMIT00004108

appointment of a successor Delaware Trustee, the Administrator shall cause an amendment to the Certificate of Trust of the Trust that reflects such change to be filed with the Secretary of State of the State of Delaware in accordance with the Delaware Act.

      (c)    By its execution hereof, the Delaware Trustee accepts its appointment hereunder.  Except as otherwise expressly required by clause (a) above, the Delaware Trustee shall not have any duty or liability with respect to the administration of the Trust, the investment of the Trust Property or the payment of any distributions of income or principal to the beneficial owners.

      (d)    The Delaware Trustee shall not be liable for the acts or omissions of the Administrator, nor shall the Delaware Trustee be liable for supervising or monitoring the performance of or performing the duties and obligations of the Administrator, the Sponsor or the Trust under this Trust Agreement or any other document.  The Delaware Trustee shall not be personally liable under any circumstances, except for its own willful misconduct, bad faith or gross negligence in the performance of its express duties under this Trust Agreement.  In particular, but not by way of limitation:

      (i)    the Delaware Trustee shall not be personally liable for any error of judgment made in good faith, except to the extent such error of judgment constitutes gross negligence on its part;

      (ii)    no provision of this Trust Agreement shall require the Delaware Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its rights or powers hereunder, if the Delaware Trustee shall have reasonable grounds for believing that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it;

      (iii)    under no circumstances shall the Delaware Trustee be personally liable for any representation, warranty, covenant, agreement, or indebtedness of the Trust;

      (iv)    the Delaware Trustee shall not be personally responsible for or in respect of the validity or sufficiency of this Trust Agreement or for the due execution hereof by the Sponsor or the Administrator;

      (v)    the Delaware Trustee shall incur no liability to anyone in acting upon any signature, instrument, notice, resolution, request, consent, order, certificate, report, opinion, bond or other document or paper reasonably believed by it to be genuine and reasonably believed by it to be signed by the proper party or parties.  The Delaware Trustee may accept a certified copy of a resolution of the board of directors or other governing body of any corporate party as conclusive evidence that such resolution has been duly adopted by such body and that the same is in full force and effect.  As to any fact or matter the manner of ascertainment of which is not specifically prescribed herein, the Delaware Trustee may for all purposes hereof rely on a certificate, signed by the Administrator, as to such fact or matter, and such certificate shall constitute full protection to the Delaware Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon;

7

017656

HCMLPHMIT00004109

(vi)    in the exercise or administration of the Trust hereunder, the Delaware Trustee (a) may act directly or through agents or attorneys pursuant to agreements entered into with any of them, and the Delaware Trustee shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys shall have been selected by the Delaware Trustee in good faith and with due care and (b) may consult with counsel, accountants and other skilled persons to be selected by it in good faith and with due care and employed by it, and it shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons; and

(vii)    except as expressly provided in this Section, in accepting and performing the Trust hereby created the Delaware Trustee acts solely as Delaware Trustee hereunder and not in its individual capacity, and all Persons having any claim against the Delaware Trustee by reason of the transactions contemplated by this Trust Agreement or the Trust Agreement shall look only to the Trust's property for payment or satisfaction thereof.

(e)    The Delaware Trustee (or any successor Delaware Trustee) shall be entitled to receive compensation from the Sponsor or from the Trust for its services in accordance with such fee agreements and schedules as shall have been separately agreed to from time to time by the Delaware Trustee and the Sponsor. The Delaware Trustee may consult with counsel (who may be counsel for the Sponsor or for the Delaware Trustee). The reasonable legal fees incurred in connection with such consultation shall be reimbursed to the Delaware Trustee pursuant to this Section, provided that no such fees shall be payable to the extent that they are incurred as a result of the Delaware Trustee's gross negligence, bad faith or willful misconduct.

(f)    The Delaware Trustee shall serve for the duration of the Trust and until the earlier of (i) the effective date of the Delaware Trustee's resignation, or (ii) the effective date of the removal of the Delaware Trustee. The Delaware Trustee may resign at any time by giving thirty (30) days written notice to the Administrator; provided, however, said resignation shall not be effective until such time as a successor Delaware Trustee has accepted such appointment. The Delaware Trustee may be removed at any time by the Administrator by providing thirty (30) days written notice to the Delaware Trustee; provided, however, such removal shall not be effective until such time as a successor Delaware Trustee has accepted such appointment. Upon the resignation or removal of the Delaware Trustee, the Administrator shall appoint a successor Delaware Trustee. If no successor Delaware Trustee shall have been appointed and shall have accepted such appointment within forty five (45) days after the giving of such notice of resignation or removal, the Delaware Trustee may, at the expense of the Sponsor, petition any court of competent jurisdiction for the appointment of a successor Delaware Trustee. Any successor Delaware Trustee appointed pursuant to this Section shall be eligible to act in such capacity in accordance with this Trust Agreement and, following compliance with this Section, shall become fully vested with the rights, powers, duties and obligations of its predecessor under this Trust Agreement, with like effect as if originally named as Delaware Trustee.

(g)    The Delaware Trustee or any officer, affiliate, director, employee, or agent of the Delaware Trustee (each an "Indemnified Person") shall be entitled to indemnification from the Sponsor, to the fullest extent permitted by law, from and against any and all losses, claims, actions, suits, taxes, damages, reasonable expenses, and liabilities (including liabilities under state or federal securities laws) of any kind and nature whatsoever (collectively, "Expenses"), to

8

HCMLPHMIT00004110

the extent that such Expenses arise out of or are imposed upon or asserted against such Indemnified Persons with respect to the creation, operation or termination of the Trust, the execution, delivery or performance of this Trust Agreement or the transactions contemplated hereby; provided, however, that the Sponsor shall not be required to indemnify any Indemnified Person for any Expenses which are a result of the willful misconduct, bad faith or gross negligence of such Indemnified Person. The obligations of the Sponsor to indemnify the Indemnified Persons as provided herein shall survive the termination of this Trust Agreement and the resignation or removal of the Delaware Trustee.

(h)     The Delaware Trustee shall not be obligated to give any bond or other security for the performance of any of its duties hereunder.

19.     Waiver of Jury Trial.  THE PARTIES HERETO HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO A TRIAL BY JURY IN ANY LITIGATION RELATING TO ANY CLAIM ARISING HEREUNDER OR RELATED HERETO.

20.     Governing Law.  The validity and construction of this Trust Agreement and all amendments hereto shall be governed by the laws of the State of Delaware, and the rights of all parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof; provided, however, that the parties hereto intend that the provisions hereof shall control over any contrary or limiting statutory or common law of the State of Delaware (other than the Delaware Act) and that, to the maximum extent permitted by applicable law, there shall not be applicable to the Trust, the Sponsor, or the Delaware Trustee any provision of the laws (statutory or common) of the State of Delaware (other than the Delaware Act) pertaining to trusts which relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for trustees, officers, agents, or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of real or personal property, (d) fees or other sums payable to trustees, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust assets, (g) the existence of rights or interests (beneficial or otherwise) in trust assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Sponsor or the Delaware Trustee set forth or referenced in this Trust Agreement.  Sections 3540, 3542 and 3561 of Title 12 of the Delaware Code shall not apply to the Trust.

21.     Exclusive Jurisdiction.  Each of the parties hereto, to the fullest extent permitted by law, (i) irrevocably agrees that any claims, suits, actions or proceedings arising out of or relating in any way to this Agreement (including any claims, suits or actions to interpret, apply or enforce (A) the provisions of this Agreement or (B) the duties, obligations or liabilities of the Sponsor, the Administrator and the Delaware Trustee, or (C) the rights or powers of, or

017658

HCMLPHMIT00004111

restrictions on, the Trust, Sponsor, the Delaware Trustee or the Administrator, or (D) any provision of the Delaware Act, or (E) any other instrument, document, agreement or certificate contemplated by any provision of the Delaware Act relating to the Trust (regardless of whether such claims, suits, actions or proceedings (x) sound in contract, tort, fraud or otherwise, (y) are based on common law, statutory, equitable, legal or other grounds, or (z) are derivative or direct claims)), shall be exclusively brought in the Court of Chancery of the State of Delaware or, if such court does not have subject matter jurisdiction thereof, any other court in the State of Delaware with subject matter jurisdiction, (ii) irrevocably submits to the exclusive jurisdiction of such courts in connection with any such claim, suit, action or proceeding, (iii) irrevocably agrees not to, and waives any right to, assert in any such claim, suit, action or proceeding that (A) it is not personally subject to the jurisdiction of such courts or any other court to which proceedings in such courts may be appealed, (B) such claim, suit, action or proceeding is brought in an inconvenient forum, or (C) the venue of such claim, suit, action or proceeding is improper, (iv) expressly waives any requirement for the posting of a bond by a party bringing such claim, suit, action or proceeding, and (v) consents to process being served in any such claim, suit, action or proceeding by mailing, certified mail, return receipt requested, a copy thereof to such party at the address set forth in the books and records of the Trust, and agrees that such service shall constitute good and sufficient service of process and notice thereof; provided, nothing in clause (v) hereof shall affect or limit any right to serve process in any other manner permitted by law.

    22.    <u>Application to Successors</u>.  This Trust Agreement shall extend to and be binding upon the successors, executors, administrators and assigns of each of the Sponsor, the Delaware Trustee and the Administrator.

    23.    <u>Transfer of Beneficial Ownership</u>.    Beacon Mountain LLC shall be the sole beneficial owner of the Trust to the extent provided herein and the interests of Beacon Mountain LLC hereunder shall not be represented by a certificate.  To the fullest extent permitted by law, the beneficial interest of Beacon Mountain LLC in the Trust may not be offered, sold, transferred, pledged, hypothecated or otherwise disposed of.

[SIGNATURE PAGE FOLLOWS]

017659

HCMLPHMIT00004112

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

BEACON MOUNTAIN, LLC, as Sponsor

By: _____
     Name:     John Honis
     Title:     President

JOHN HONIS, as Administrator

1-11-16

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Delaware Trustee

By: _____
     Name:
     Title:

11

017660

HCMLPHMIT00004113

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

BEACON MOUNTAIN, LLC, as Sponsor

By: _____
    Name:    John Honis
    Title:    President

JOHN HONIS, as Administrator

_____

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Delaware Trustee

By: _____
    Name:
    Title:         Jennifer A. Luce
                   Vice President

11

017661

HCMLPHMIT00004114

# EXHIBIT 71

017662

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                      FOR THE NORTHERN DISTRICT OF TEXAS
                               DALLAS DIVISION

                                        )    Case No. 19-34054-sgj-11
In Re:                                  )    Chapter 11
                                        )
HIGHLAND CAPITAL                        )    Dallas, Texas
MANAGEMENT, L.P.,                       )    Tuesday, June 8, 2021
                                        )    9:30 a.m. Docket
            Debtor.                     )
                                        )    - SHOW CAUSE HEARING (2255)
                                        )    - MOTION TO MODIFY ORDER
                                        )      AUTHORIZING RETENTION OF
                                        )      JAMES SEERY (2248)
                                        )    - MOTION FOR ORDER FURTHER
                                        )      EXTENDING THE PERIOD WITHIN
                                        )      WHICH DEBTOR MAY REMOVE
                                        )      ACTIONS (2304)
_____ )

                        TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                   UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Debtor:              Jeffrey Nathan Pomerantz
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             10100 Santa Monica Blvd.,
                               13th Floor
                             Los Angeles, CA  90067-4003
                             (310) 277-6910

For the Debtor:              John A. Morris
                             Gregory V. Demo
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             780 Third Avenue, 34th Floor
                             New York, NY  10017-2024
                             (212) 561-7700

For the Debtor:              Zachery Z. Annable
                             HAYWARD & ASSOCIATES, PLLC
                             10501 N. Central Expressway,
                               Suite 106
                             Dallas, TX  75231
                             (972) 755-7104
```

017663

HCMLPHMIT00002716

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 71 Filed 06/02/2599   Page 815 of 1017   PageID 18697

2

```
 1   APPEARANCES, cont'd.:

 2   For the Charitable DAF,     Mazin A. Sbaiti
     CLO Holdco, Show Cause      Jonathan E. Bridges
 3   Respondents, Movants,       SBAITI & COMPANY, PLLC
     and Sbaiti & Company:       Chase Tower
 4                               2200 Ross Avenue, Suite 4900W
                                 Dallas, TX  75201
 5                               (214) 432-2899

 6   For Mark Patrick:           Louis M. Phillips
                                 KELLY, HART & HALLMAN, LLP
 7                               301 Main Street, Suite 1600
                                 Baton Rouge, LA 70801
 8                               (225) 338-5308

 9   For Mark Patrick:           Michael D. Anderson
                                 KELLY, HART & HALLMAN, LLP
10                               201 Main Street, Suite 2500
                                 Fort Worth, TX  76102
11                               (817) 332-2500

12   For James Dondero:          Clay M. Taylor
                                 Will Howell
13                               BONDS ELLIS EPPICH SCHAFER
                                   JONES, LLP
14                               420 Throckmorton Street,
                                   Suite 1000
15                               Fort Worth, TX  76102
                                 (817) 405-6900
16
     For the Official Committee  Matthew A. Clemente
17   of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                                 One South Dearborn Street
18                               Chicago, IL  60603
                                 (312) 853-7539
19
     For the Official Committee  Paige Holden Montgomery
20   of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                                 2021 McKinney Avenue, Suite 2000
21                               Dallas, TX  75201
                                 (214) 981-3300
22
     Recorded by:                Michael F. Edmond, Sr.
23                               UNITED STATES BANKRUPTCY COURT
                                 1100 Commerce Street, 12th Floor
24                               Dallas, TX  75242
                                 (214) 753-2062
25
```

017664

HCMLPHMIT00002717

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document Exhibit 71 Filed 06/12/299   Page 816 of 1017    PageID 18698

3

1    Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
2                                 Shady Shores, TX  76208
                                  (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24          Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.
25

017665

HCMLPHMIT00002718

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 53-61 Filed 06/02/299   Page 817 of 1017    PageID 18699

4

<u>DALLAS, TEXAS - JUNE 8, 2021 - 9:30 A.M.</u>

1

2          THE COURT:  All right.  We have settings in Highland

3  this morning.  We have three settings.  We have the show cause

4  hearing with regard to a lawsuit filed in the District Court.

5  We have a couple of more, I would say, ministerial matters,

6  although I think we do have objections.  I know we have

7  objections.  We have a motion to extend the removal period in

8  this case as well as a motion to modify the order authorizing

9  Mr. Seery's retention.

10      So let's go ahead and start out by getting appearances

11  from the lawyers who are participating today.  I'll get those

12  now.

13          MR. MORRIS:  Good morning, Your Honor.

14          THE COURT:  Good morning.

15          MR. MORRIS:  John Morris from Pachulski, Stang, Ziehl

16  & Jones for the Debtor.  I'm joined with me this morning by my

17  colleagues, Jeffrey Pomerantz, Greg Demo, and Zachery Annable.

18          THE COURT:  Okay.

19          MR. MORRIS:  We do have a proposal on how to proceed

20  today, a substantial portion of which is in agreement with the

21  Respondents.

22          THE COURT:  Okay.

23          MR. MORRIS:  So, at the appropriate time, I'd be

24  happy to present that to the Court.

25          THE COURT:  All right.  Well, let's get all the

017666

HCMLPHMIT00002719

 1   appearances and then I'll hear from you on that.

 2          MR. SBAITI:  Your Honor, my name is -- would you like

 3   me to approach, Your Honor?

 4          THE COURT:  Yes, please.

 5          MR. SBAITI:  It's my first time appearing in

 6   Bankruptcy Court, Your Honor.  My name is Mazin Sbaiti.  I'm

 7   here on behalf of the charitable DAF Fund, CLO Holdco, and the

 8   Respondents to the show cause hearing.  We are also

 9   representing them as the Movants on the motion to modify the

10   Court's order appointing Mr. Seery.

11          THE COURT:  All right.  Thank you.

12          MR. BRIDGES:  Jonathan Bridges, Your Honor, with Mr.

13   Sbaiti, also representing the Charitable DAF and CLO Holdco,

14   as well as our firm that is named in the show cause order.

15          THE COURT:  Okay.

16          MR. BRIDGES:  Thank you, Your Honor.

17          THE COURT:  Thank you.

18          MR. PHILLIPS:  Good morning, Your Honor.  Louis M.

19   Phillips from Kelly Hart Hallman here on behalf of Mark

20   Patrick in the show cause matter.  I'm joined with my

21   colleague Michael Anderson from the Kelly Hart firm here in

22   Fort Worth.  And that's the matter that we're involved in, the

23   show cause auction.

24          THE COURT:  All right.  Thank you, Mr. Phillips.

25          MR. TAYLOR:  Good morning, Your Honor.  Clay Taylor

HCMLPHMIT00002720

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 33-71   Filed 07/02/25   Page 819 of 1017   PageID 18701

6

1  of Bonds Ellis Eppich Schafer Jones here on behalf of Jim

2  Dondero.  I have Mr. Will Howell here with me from my firm.

3          THE COURT:  All right.  Thank you.

4          MR. CLEMENTE:  Good morning, Your Honor.  Matthew

5  Clemente from Sidley Austin on behalf of the Committee.  I'm

6  here with my partner, Paige Montgomery.

7          THE COURT:  Okay.  Thank you.

8          MR. CLEMENTE:  Good morning.

9          THE COURT:  All right.  Just to remind people, we do

10  have participants on the WebEx, but in setting the hearing I

11  made clear that participants today needed to be here live in

12  the courtroom.  So the WebEx participants are going to be only

13  observers.

14     We have a camera on the screen here that is poised to

15  capture both the lawyer podium as well as the witness box, and

16  then another camera on the bench.

17     So, please be mindful.  We want the lawyers to speak from

18  the podium so that they are captured and heard by the WebEx.

19  And so hopefully we don't have any cords you will trip over.

20  We've worked hard to make it easy to maneuver around the

21  courtroom.

22     All right.  So, Mr. Morris, you had a proposal on how we

23  would approach this today?

24          MR. MORRIS:  I do, Your Honor.  And it's rather

25  brief, but I think it makes a lot of sense.

HCMLPHMIT00002721

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 71 Filed 06/02/99   Page 820 of 1017   PageID 18702

7

1    There are three motions on the calendar for today, --

2         THE COURT:  Uh-huh.

3         MR. MORRIS:  -- only one of which required the

4    personal appearance of certain parties.

5         THE COURT:  Uh-huh.

6         MR. MORRIS:  And for that reason, and because,

7    frankly, it was the first of the three motions filed, we

8    believe that that ought to go first.

9         THE COURT:  Okay.

10         MR. MORRIS:  And then it can be followed by the

11    motion for reconsideration of the July order, assuming time

12    permits, and then the motion to extend the removal deadline.

13    And with respect to the contempt motion, Your Honor, the

14    parties have agreed that each side shall have a maximum of

15    three hours to make opening statements, closing arguments,

16    direct and cross-examination of witnesses.

17    You know, I did point out to them that from time to time

18    Your Honor has used the Court's discretion to adjust the time

19    --

20         THE COURT:  Uh-huh.

21         MR. MORRIS:  -- if the Court is making inquiries, and

22    I guess we'll deal with that matter as it comes.  But as a

23    general matter, that is what we've agreed to.  And I would

24    propose that, unless anybody has any objections, that we just

25    proceed on that basis.

017669

HCMLPHMIT00002722

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 53-71 Filed 06/02/25   Page 821 of 1017   PageID 18703

8

```
 1              THE COURT:  Okay.

 2              MR. MORRIS:  And I could -- I could go right forward.

 3              THE COURT:  So, three hours in the aggregate?

 4              MR. MORRIS:  Uh-huh.

 5              THE COURT:  It doesn't matter how people spend it --

 6   with argument, examination, cross -- three hours in the

 7   aggregate?

 8              MR. MORRIS:  Correct.

 9              THE COURT:  Okay.  So, Nate, you'll be the timer on

10   that.

11              MR. MORRIS:  Yeah.  We thought it was very important

12   to get this done today, with people coming in from out of

13   town.

14              THE COURT:  Okay.  Sounds fine.

15              MR. MORRIS:  So does the Court want to inquire if

16   anybody has any questions or comments?

17              THE COURT:  I do.  Well, I see Mr. Bridges getting

18   up.  You confirm that that's agreeable?

19              MR. BRIDGES:  Thank you, Your Honor.  Yes, that's

20   agreeable.  We have one slight difference in our proposal.  We

21   would suggest to Your Honor that the motion for modification,

22   if Your Honor decides our way, would moot the entire motion

23   for contempt.  And we'd suggest, if that possibility is

24   realistic, that we would go first with that motion, perhaps

25   obviate having to have the evidence presented and the lengthy
```

017670

HCMLPHMIT00002723

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 30-28   Filed 06/06/25   Page 822 of 1017   PageID 18704

9

1  hearing.

2      The motion for modification, Your Honor, asks the Court to

3  reconsider -- to modify that order because of jurisdictional

4  and other shortcomings in it that make the order

5  unenforceable.  And because that's the order that is the

6  subject of the contempt motion, we'd ask Your Honor to

7  consider putting that motion first.

8          THE COURT:  Okay.  Or second?  Ahead of the contempt

9  matter?

10         MR. BRIDGES:  Ahead of the contempt matter, --

11         THE COURT:  Uh-huh.

12         MR. BRIDGES:  -- because it has a possibility --

13         THE COURT:  We have the removal matter, which I think

14  is the shortest.  All right.

15         MR. BRIDGES:  No objection to that, Your Honor.

16  That's correct.

17         THE COURT:  Okay.  So, Mr. Morris, that's fine by

18  you?

19         MR. MORRIS:  Your Honor, that doesn't make a lot of

20  sense to us.  We don't believe there's any basis for the Court

21  to reconsider, modify, or amend in any way the July order.

22  But even if we were wrong about that, that would not

23  retroactively validate conduct which was otherwise wrongful at

24  the time it was committed.

25      The contempt motion needs to go first.  The other motion

017671

HCMLPHMIT00002724

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 71 Filed 06/05/25   Page 823 of 1017   PageID 18705

10

1  will have no impact on whether or not there is a finding of

2  contempt of court.

3          THE COURT:  All right.  And update me on this.  There

4  was something filed yesterday, a notice of a proposed form of

5  order that the Debtor had proposed, that I think was not

6  agreed to, where there would be a change about any action that

7  goes forward, the cause of action would be in the sole

8  jurisdiction of the Court, and you all agreed to change that

9  part of the order, correct?

10         MR. MORRIS:  So, just as a division of labor for Your

11  Honor, I'm doing the contempt motion.

12         THE COURT:  Okay.  That's Mr. Pomerantz's?

13         MR. MORRIS:  Mr. Pomerantz is going to take care of

14  that.

15         MR. POMERANTZ:  Yes, Your Honor.  Good morning.  Good

16  to see you again.

17         THE COURT:  Good to see you.

18         MR. POMERANTZ:  Yes, Your Honor, that's correct.  If

19  Your Honor recalls, there's really three aspects of the

20  January 9th and the July 16th order.  First, requiring people

21  to come to Bankruptcy Court before commencing or pursuing an

22  action.  Second, for the Bankruptcy Court to have the sole and

23  exclusive authority to determine whether the claim is a

24  colorable claim of willful negligence or gross misconduct.

25  And then third, if Your Honor passed the claim through the

HCMLPHMIT00002725

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 71 Filed 06/06/25299 Page 824 of 1017    PageID 18706

11

1    gate, whether you would have jurisdiction.

2        In Your Honor's January 9th and July 16th orders, you said

3    you would have exclusive jurisdiction.  In the motion for

4    reconsideration, and particularly the reply, Movants said, if

5    you just change that and say that if passes through the gate

6    that you'd have jurisdiction only to the extent you would

7    otherwise have it, that would resolve the motion, in the same

8    way that the plan of reorganization was amended.

9        We proposed that.  They rejected it.  We put it before

10   Your Honor.  So we believe that it moots out a good portion --

11   actually, we think it should moot out the entire motion.  They

12   obviously disagree.  But we definitely agree it moots out the

13   most significant portion of their motion, which is that Your

14   Honor would take jurisdiction to adjudicate a matter on an

15   exclusive basis when you might not otherwise have jurisdiction

16   on an exclusive basis.

17           THE COURT:  Okay.  Well, --

18           MR. BRIDGES:  Your Honor, may I respond to that?

19           THE COURT:  You may.  And --

20           MR. BRIDGES:  Thank you, Your Honor.

21           THE COURT:  -- why -- could you clarify why you think

22   it would moot out the entire show cause matter?  I wouldn't be

23   retroactively changing my order.  Is that what you're

24   proposing?

25           MR. BRIDGES:  Your Honor, with all respect, we

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document Exhibit 71 Filed 06/06/25 Page 825 of 1017    PageID 18707

12

1  believe the order is defective and unenforceable and has to be

2  modified in order to fix it.  And because of the defects,

3  we're -- we're actually arguing, Your Honor, that it is

4  unenforceable in a contempt proceeding.  That is exactly what

5  our argument is.

6            THE COURT:  Okay.  I think I'm getting way farther

7  down this road than maybe I want to right now.  But I guess

8  here's the elephant in the room, I feel like:  *Republic Supply*

9  *versus Shoaf*.

10            MR. BRIDGES:  Uh-huh.

11            THE COURT:  The U.S. Supreme Court *Espinosa* case, for

12  that matter.  If I accept your argument that maybe there was a

13  flaw in those orders, that maybe they went too far, don't you

14  have a problem with those two cases?

15            MR. BRIDGES:  Your --

16            THE COURT:  The orders weren't appealed.

17            MR. BRIDGES:  I understand completely, Your Honor.

18            THE COURT:  Uh-huh.

19            MR. BRIDGES:  And I think the answer is no because of

20  the *Applewood* case from the Fifth Circuit.  The *Applewood* case

21  cited in our reply brief explains that in order for an order,

22  a final order of the Bankruptcy Court to have exculpatory

23  effect, in order for it to release claims, for example, that

24  the claims at issue must be enumerated in the order.  It's not

25  enough to have a blanket statement like the order, the July

HCMLPHMIT00002727

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-71   Filed 06/06/25   Page 826 of 1017   PageID 18708

13

1   order has, like the January order has, saying that Mr. Seery's

2   claims -- claims cannot be brought against him for ordinary

3   negligence at all.  The -- Your Honor, we're delving into my

4   argument.

5           THE COURT:  Okay.

6           MR. BRIDGES:  And I was hoping to do this on a

7   preliminary basis.

8           THE COURT:  Right.

9           MR. BRIDGES:  I don't mean to bog you down with that.

10  But Your Honor, no, mandatory authority from the Fifth Circuit

11  after *Shoaf* limits *Shoaf's* application and says that it does

12  not extinguish the claims that are not specifically enumerated

13  in the order.  And the reason for that is because it doesn't

14  give the kind of notice to the parties that they would need to

15  make an appearance and object to those orders at the time.  It

16  actually helps to stem the amount of litigation at the time

17  rather than to encourage it.

18          THE COURT:  All right.  Well, you'll get your

19  opportunity to make your full argument on this.  But I'm not

20  convinced, preliminarily, at least, to affect my decision on

21  the sequence, okay?  So even if it potentially wastes time

22  under your view of the law, I am going to do the removal

23  matter first -- the extension of time request, I should say --

24  and then the show cause and then the motion to modify.  And I

25  realize, those last two matters, everything is kind of

017675

HCMLPHMIT00002728

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-28   71 Filed 06/06/25299   Page 827 of 1017   PageID 18709

14

```
 1    interrelated.  All right?

 2              MR. BRIDGES:  Yes, Your Honor.

 3              THE COURT:  All right.  So, with that decided, is

 4    there a desire on the part of the lawyers to make opening

 5    statements, or shall we just go to the motions?  And, of

 6    course, people can use their three hours for oral argument,

 7    however much they want to use for oral argument.

 8              MR. MORRIS:  Your Honor, the -- to be clear, the six-

 9    hour time limit only applies to the contempt proceeding.

10              THE COURT:  Oh, yes.  Yes.  Uh-huh.

11              MR. MORRIS:  And I do want to make an opening

12    statement.

13              THE COURT:  Okay.

14              MR. MORRIS:  So, as the Movant, I'd like to go first.

15              THE COURT:  You want to make opening statements?

16              MR. BRIDGES:  Yes.  Yes, Your Honor.

17              THE COURT:  Okay.  Okay.

18              MR. BRIDGES:  I believe we've got a PowerPoint

19    prepared that I think can lay out our side of it.

20              THE COURT:  Okay.

21              MR. BRIDGES:  I don't think we're participating in

22    the motion to extend the removal time.

23              THE COURT:  Okay.

24              MR. BRIDGES:  That's going first.

25              THE COURT:  All right.
```

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-71   Filed 06/06/25   Page 828 of 1017   PageID 18710

15

1          MR. BRIDGES:  So we'll wait until that is --

2          THE COURT:  Well, so we don't get confused on the

3    timing, let's just do the motion to extend right now.  And I

4    think we only had one objection.  As Mr. Sbaiti just pointed

5    out, they're not objecting on that one.  We have a Dondero

6    objection.  So let's, without starting the timer, hear that

7    one.  Okay?

8          MR. DEMO:  Good morning, Your Honor.  Greg Demo;

9    Pachulski, Stang, Ziehl & Jones.

10         THE COURT:  Good morning.

11         MR. DEMO:  I'll be arguing the removal motion and

12   then turn it over.

13       It's fairly basic and straightforward, Your Honor.  We're

14   asking for a further extension of the statutory deadline to

15   remove cases until December 14th, 2021.  The deadline is

16   procedural only.  As Your Honor is well aware, there's a lot

17   of moving parts in this case.  You know, we don't know to this

18   date, really, the full universe of what could actually be out

19   there.  So we're just asking for a short extension of the

20   removal period to cover through December.

21       I know that there was an objection from Mr. Dondero.  I

22   know that he argues that 9006 does not allow us to extend that

23   deadline past the effective date of the plan, and he cites one

24   case for that purpose, which is *Health Support*.  I think it's

25   out of Florida.  That case dealt with the extension of the

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28   71 Filed 06/06/25299   Page 829 of 1017   PageID 18711

16

 1  two-year extension of the statute of limitations and was very

 2  clear that you can't use 9 --

 3          THE COURT:  You mean the 546 deadline?

 4          MR. BRIDGES:  Yes.  Yes.

 5          THE COURT:  Okay.

 6          MR. BRIDGES:  That you can't use 9006 to extend non-

 7  bankruptcy deadlines.  That's not what we're doing here, Your

 8  Honor.  We're using 9006 to extend the bankruptcy deadline to

 9  remove the cases.

10          THE COURT:  Uh-huh.

11          MR. DEMO:  And we'd just ask Your Honor for the

12  extension through December.

13          THE COURT:  Okay.  I'll hear Mr. Dondero's counsel.

14          MR. HOWELL:  Good morning, Judge.  Will Howell for

15  Mr. Dondero.

16      So, the argument here is not that the Court can't do this.

17  I was just pointing that there is an outside limit to what

18  we're doing.  And so if you look at the cases that the Debtor

19  cites in support of this motion, the one that is most apt was

20  when Judge Nelms did a fourth extension of time.  But those

21  were all 90-day extensions.  Here, we're in a situation where

22  the Debtor is asking for a fourth 180-day extension of time,

23  and this is really where the, you know, objection came -- or,

24  the response in opposition came from.  They specifically asked

25  that it be without prejudice to further extensions.

HCMLPHMIT00002731

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 71 Filed 06/06/25   Page 830 of 1017   PageID 18712

17

1    And so, at some point, you know, does 9006 have an outside

2    limit?  You know, do we need to see some sort of a light at

3    the end of the tunnel here?

4    So we would ask that the motion, at a minimum, be denied

5    in part with respect to this open-ended request for extension

6    beyond two years for a 90-day period.  The other cases that

7    they cite, they have one extension here, one extension there,

8    120 days here, but not 180 days after 180 days after 180 days,

9    and then asking specifically for without prejudice to further

10   extensions beyond two years.  So that's -- that's where this

11   comes from.

12          THE COURT:  All right.  Do you think it matters that

13   this is a very complex case?

14          MR. BRIDGES:  I --

15          THE COURT:  There's litigation here, there, and

16   everywhere.

17          MR. HOWELL:  I also think, you know, *Mirant* was

18   complex.  I think *Pilgrim's Pride* was complex.  I think, you

19   know, it is not out of bounds for the Court to grant a fourth

20   extension.

21          THE COURT:  Uh-huh.

22          MR. BRIDGES:  But to -- you know, at some point --

23   you know, maybe the Court could grant a 90-day extension and

24   make them come back a little more frequently to kind of corral

25   this thing, rather than just saying "This grant of 180 days,

017679

HCMLPHMIT00002732

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 28-71 Filed 06/06/25   Page 831 of 1017    PageID 18713

18

1  the fourth time, is going to be without prejudice to further

2  extensions."  It just gets kind of large.

3       THE COURT:  Okay.  Mr. Demo, your motion.  You get

4  the last word.

5       MR. DEMO:  Your Honor, I mean, it is without

6  prejudice for further extensions, but that doesn't mean that

7  Your Honor is granting the further extensions now.  It means

8  we'll have to come back.  We'll have to make our case for why

9  an extension is necessary.  And, you know, if Your Honor

10  doesn't want to give us another extension past December 2021,

11  Your Honor doesn't have to.  This is not an order saying that

12  it's a limitless grant.

13      You know, I'd also ask, you know, quite honestly, why Mr.

14  Dondero has such an issue with this.  He hasn't said that any

15  of these cases involve him.  He hasn't given any reasons why

16  this affects him.  He hasn't given any reason why this damages

17  him at all.  So I do, I guess, wonder as an initial matter

18  kind of why we're here, you know, why we're responding to Mr.

19  Dondero's request, when that request really has no impact on

20  him.

21      And then, Your Honor, to the extent that you are inclined

22  to limit this, I would say, you know, we would ask for a

23  reasonable extension of time.  We do think an extension of

24  time, because of the complexity of this case, through December

25  is warranted.  But if Your Honor for some reason does agree

017680

HCMLPHMIT00002733

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 60-28 Filed 06/20/25    Page 832 of 1017    PageID 18714
Exhibit 71   Page 20 of 299

19

1  that a shorter extension is necessary under 9006 -- I don't

2  think it is -- we'd just ask that Your Honor grant us leave to

3  come back for further extensions of time.

4          THE COURT:  Okay.  All right.  I will -- I'll grant a

5  90-day extension, without prejudice for further extensions.

6          MR. DEMO:  Thank you, Your Honor.

7          THE COURT:  Maybe in 90 days we'll be farther down

8  the road and we won't need any more extensions, but you'll

9  have the ability to argue for more if you think it's really

10  necessary.  All right.  So that will bring us to around

11  September 14th, I guess.

12      All right.  Well, let's go ahead and hear opening

13  statements with regard to the show cause matter.  And again,

14  if you want to roll in arguments about the -- well, no, you

15  said the six hours only applies to show cause, so we'll not

16  hear opening statements with regard to the Seery retention

17  modification, just show cause.

18          MR. MORRIS:  All right.  Before I begin, Your Honor,

19  I have a small deck to guide --

20          THE COURT:  Okay.

21          MR. MORRIS:  -- to guide my opening statement.

22          THE COURT:  All right.

23          MR. MORRIS:  Can I approach the bench?

24          THE COURT:  You may.  And is your legal assistant

25  going to share her content --

017681

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 38-71 Filed 06/26/25   Page 833 of 1017   PageID 18715

20

 1                MR. MORRIS:  Yes.

 2                THE COURT:  -- so people on the WebEx will see?

 3   Okay.

 4                MR. MORRIS:  That's the intention, Your Honor.

 5                THE COURT:  Okay.

 6                MR. MORRIS:  All right.  Are you ready for me to

 7   proceed?

 8                THE COURT:  I am.  And obviously, everyone has a

 9   copy?

10                MR. MORRIS:  Yes.

11                THE COURT:  Your opponents have a copy of this?

12                MR. MORRIS:  Yep.

13                THE COURT:  Okay.  Although we hope to see it on the

14   screen.

15                OPENING STATEMENT ON BEHALF OF THE DEBTOR

16                MR. MORRIS:  Good morning, Your Honor.  John Morris;

17   Pachulski, Stang, Ziehl & Jones; for the Debtor.

18       We're here today on the Debtor's motion to hold certain

19   entities and individuals in contempt of court for violating a

20   very clear and specific court order.  I hope to be relatively

21   brief in my opening here, Your Honor, and I'd like to begin

22   where I think we must, and that is, how do we -- how do we

23   prove this and what do we have to prove?

24       The elements of a claim for contempt of court are really

25   rather straightforward.  The Movant must establish by clear

017682

HCMLPHMIT00002735

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 38-28   Filed 06/26/25   Page 834 of 1017   PageID 18716
Exhibit 71   Page 226 of 299

21

 1   and convincing evidence three things.

 2           THE COURT:  Let me stop you and stop the clock.

 3   We're not seeing the shared content.

 4           MR. MORRIS:  Uh-huh.

 5           THE COURT:  Did you want her to go ahead and share

 6   her content?

 7           MR. MORRIS:  I did.

 8           THE COURT:  Okay.

 9           MR. MORRIS:  I was hoping that she'd do that.

10           THE COURT:  All right.  It says it's receiving

11   content.

12           MR. MORRIS:  There we go.  It's on my screen, anyway.

13           THE COURT:  Oh, here it is.  I don't know why it's

14   not on my Polycom.  Can you all see it out there?

15       (Chorus of affirmative replies.)

16           THE COURT:  Okay.  Very good.

17           MR. MORRIS:  Okay.

18           THE COURT:  You may proceed.

19           MR. MORRIS:  Thank you, Your Honor.

20       So, there's three elements to the cause of action for

21   contempt, for civil contempt.  We have to prove by clear and

22   convincing evidence that a court order was in effect; that the

23   order required certain conduct by the Respondents; and that

24   the Respondent failed to comply with the Court's order.

25       We've cited in the footnote the applicable case law from

017683

HCMLPHMIT00002736

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 71 Filed 06/20/25 Page 835 of 1017   PageID 18717

22

 1   the Fifth Circuit, and I don't believe that there's any

 2   dispute that is indeed the legal standard.

 3        The intent of the Respondents as to liability is

 4   completely irrelevant.  It doesn't matter if they thought they

 5   were doing the right thing.  It doesn't matter if they

 6   believed in their heart of hearts that the court order was

 7   invalid.  These are the three elements, and we will be able to

 8   establish these elements not by clear and convincing evidence,

 9   but if we ever had to, beyond reasonable doubt.

10        If we can go to the next slide, please.

11        We begin with the Court's order, the Court's July 9 order.

12   And that order states very clearly what conduct was required.

13   And the conduct that was required was that no entity could

14   commence or pursue -- those are really the magic words --

15   commence or pursue a claim against Mr. Seery without the

16   Bankruptcy Court doing certain things.  And we've referred to

17   this as the gatekeeper.  And the only question I believe the

18   Court has to ask today is whether the Respondents commenced or

19   pursued a claim against Mr. Seery without seeking Bankruptcy

20   Court approval, as set forth in this order.

21        I'll dispute that there's anything ambiguous about this.

22   I'll dispute that it could not be clearer what conduct was

23   prohibited.  It could not be clearer.  The only question is

24   whether the conduct constitutes the pursuit of a claim.

25        Let's see what they did.  If we could go to the next

HCMLPHMIT00002737

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-71 Filed 06/26/25   Page 836 of 1017   PageID 18718

23

1   slide.  There will be no dispute about what they did.  And

2   what they did is, a week after filing a lawsuit against the

3   Debtor and two others arising out of the HarbourVest

4   settlement, a settlement that this Court approved, after

5   notice and a hearing and participation by the Respondents,

6   after they had the opportunity to take discovery, after they

7   had the opportunity to examine Mr. Seery about the value of

8   HarbourVest's interest in HCLOF, after all of that, they

9   brought a lawsuit after Mr. Patrick took control of the DAF

10  and CLO Holdco.  And that lawsuit related to nothing but the

11  HarbourVest suit, and it named in Paragraph 2, right up above,

12  Mr. Seery as a potential party.  And a week later, Your Honor,

13  they filed what we call the Seery Motion, and it was a motion

14  for leave to amend their complaint to add Mr. Seery as a

15  defendant.

16      We believe that that clearly violates the Court's July 7

17  order.  And indeed, again, these are facts.  They're not --

18  they're not in dispute.  Just look at the first sentence of

19  their motion.  The purpose of the motion was to name James

20  Seery as a defendant.  That was the purpose of the motion.

21  And the way that they made the motion, Your Honor -- and these

22  are undisputed facts -- the way they made the motion, Your

23  Honor, shows contemptuous intent.  We don't have to prove

24  intent, but I think it might be relevant when you get to

25  remedies.  Okay?

017685

HCMLPHMIT00002738

Case 19-34054-sgj11 Doc 4255-71 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02072-S Document 28-71 Filed 06/26/25 Page 837 of 1017 PageID 18719

24

1    And so how do I -- why do I say that?  Because they made

2    this motion, Your Honor, and they didn't have to.  Everybody

3    knows that under Rule 15 they could have amended the complaint

4    if they wanted to.  If they wanted to, they didn't need the

5    Court's permission.  What they wanted to do was try to get the

6    District Court to do what they knew they couldn't.  And that's

7    contemptuous.

8    And they did it, Your Honor, without notice to the Debtor.

9    Even after the Debtor had accepted service of the complaint,

10   even after we told them, if you go down this path, we're going

11   to file a motion for contempt, they did it anyway.  They

12   didn't serve the Debtor.  They didn't give the Debtor a

13   courtesy copy.  They didn't notify the Debtor.  The only thing

14   that happened was the next day, when the District Court

15   dismissed it without prejudice, they sent us a copy of that

16   notice.  And within three days, we were here.

17   A court order was in effect.  Mr. Patrick is going to

18   admit to that.  There's not going to be any dispute about

19   that.  The order required that the Respondents come to this

20   Court before they pursue a claim against Mr. Seery, and they

21   failed to comply with that order.  The facts, again -- if we

22   can go to the next slide.  We can look at some of the detail,

23   because the timeline is mindboggling.

24   Mr. Patrick became the Plaintiffs' authorized

25   representative on March 24th.  And folks, when I took their

017686

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-71 Filed 06/26/25   Page 838 of 1017   PageID 18720

25

1   depositions, weren't specific about dates, and that's why some

2   of the entries here refer to sometime after, but there's no

3   question that the order of events is as presented here and as

4   the evidence will show today.

5       The evidence will show that sometime after Patrick became

6   the Plaintiffs' authorized representative, Mr. Dondero

7   informed Mr. Patrick that Highland had usurped an investment

8   opportunity from the Plaintiffs.  Mr. Patrick is going to

9   testify to that.  Mr. Patrick is also going to testify that,

10  without prompting, without making a request, D.C. Sauter, the

11  general counsel of NexPoint Advisors, recommended the Sbaiti

12  firm to Mr. Patrick.  Mr. Patrick considered nobody else.

13      Mr. Patrick retained the Sbaiti firm in April.  In other

14  words, within 12 days of the filing of the complaint.  They're

15  retained and they conduct an investigation.  You're going to

16  hear the assertion of the attorney-client and the common

17  interest privilege every time I ask Mr. Dondero what he and

18  Mr. Sbaiti talked about and whether they talked about naming

19  Jim Seery as a defendant.  But with Patrick's authorization,

20  the Sbaiti firm filed the complaint on April 12th, just days

21  after they were retained.

22      It's like a -- it's an enormous complaint.  I don't know

23  how they did that so quickly.  But in any event, the important

24  point is that they all worked together.  None of this happened

25  until Mr. Patrick became the authorized representative.

HCMLPHMIT00002740

Case 19-34054-sgj11 Doc 4255-71 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02072-S Document 28-71 Filed 06/26/25 Page 839 of 1017 PageID 18721

26

1      Mr. Patrick is going to tell you, Your Honor, he's going

2  to tell you that he had no knowledge of any wrongdoing by Mr.

3  Seery prior to the time he assumed the rein of the DAF and the

4  CLO Holdco.  He had no knowledge, Your Honor, of any claims

5  that the DAF and CLO Holdco had against the Debtor until he

6  became the Plaintiffs' authorized representative and Mr.

7  Dondero spoke to him.

8      If we can flip to the next page.  Mr. Dondero has

9  effective control of the DAF.  He has effective control of CLO

10 Holdco. You're going to be bombarded with corporate documents

11 today, because they're going to show you -- and they want you

12 to respect the corporate form, they really want you to follow

13 the rules and respect the corporate form, because only Mr.

14 Scott was responsible for the DAF and CLO Holdco until he

15 handed the reins on March 24th to Mr. Patrick.  Mr. Dondero

16 has nothing to do with this.  He's going to tell you.  He's

17 going to tell you he had nothing to do with the selection of

18 Mr. Patrick as Mr. Scott's replacement.

19     The facts are going to show otherwise, Your Honor.  The

20 DAF is a $200 million charitable organization that is funded

21 almost exclusively with assets derived from Highland or Mr.

22 Dondero or the Get Good Trust or the Dugaboy Trust.  The

23 evidence is going to show that at all times these entities had

24 shared services agreements and investment advisory agreements

25 with HCMLP.  The evidence will show that HCMLP at all times

017688

HCMLPHMIT00002741

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 38-28   71   Filed 06/26/25   Page 840 of 1017   PageID 18722

27

1   was controlled by Mr. Dondero.

2       And it made sense.  The guy put in an awful lot of money

3   for charitable usage.  Is he really just going to say, I don't

4   really care who runs it?  The evidence is going to show that

5   between October 2020 and January 2021, Grant Scott actually

6   exercised independence.  Grant Scott was Mr. Dondero's

7   childhood friend.  They went to UVA together.  They were

8   roommates.  Mr. Scott was the best man at Mr. Dondero's

9   wedding.  But we were now in bankruptcy court.  We're now in

10  the fishbowl.  And I will -- this may be a little argument,

11  but there's no disputing the facts that Mr. Scott acted

12  independently, and he paid the price for it.  Mr. Scott did it

13  three times.

14      He did it when he amended CLO Holdco's proof of claim to

15  take it down to zero.  He did it again after he withdrew the

16  objection to the HarbourVest settlement motion.  And he did it

17  again when he settled the lawsuit that the Debtors had brought

18  against CLO Holdco.  And that -- and on each of those three

19  occasions, the evidence will show that Mr. Scott did not

20  communicate with Mr. Dondero in advance, that Mr. Dondero

21  found out about these acts of independence after the fact, and

22  that each time he found out about it he had a little

23  conversation with Mr. Scott.

24      Mr. Dondero is going to tell you about it, and he's going

25  to tell you that he told Mr. Scott each act was inappropriate.

HCMLPHMIT00002742

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 71 Filed 06/26/25   Page 841 of 1017   PageID 18723

28

1   You may have heard that word before.  Each act was not in the

2   best interests of the DAF.

3       The last of those conversations happened either on or just

4   after January 26th.  And by January 31st, Mr. Scott gave

5   notice of his resignation.  And you're going to see that

6   notice of resignation.  And he asks for releases.

7       Mr. Patrick becomes, almost two months later, the

8   successor to Mr. Scott.  Mr. Dondero is going to say he has no

9   idea how that happened.  He was just told after the fact that

10  Mr. Patrick and Mr. Scott had an agreement.  He's going to

11  tell you they had an agreement and he just heard about it

12  afterwards.  He didn't really -- for two months, I guess, he

13  sat there after Mr. Scott told him that he wanted out and did

14  nothing to try to find out who's going to take control of my

15  charitable foundation with $200 million.  He wasn't

16  interested.

17      But here's the thing, Your Honor.  If we go to the next

18  slide.  Let's see what Mr. Scott said at his deposition last

19  week.  Question, "Do you know who selected Mark?"  Answer, "I

20  do not."  Question, "Do you know how Mark was selected?"  Mark

21  is a reference to Mark Patrick.  "I do not."  "Did you ever

22  ask Mark how he was selected?"  "I did not."  "Did you ever

23  ask Mark who selected him?"  "I did not."  "Did you ever ask

24  anybody at any time how Mr. Patrick was selected to succeed

25  you?"  "No, I did not."  "Did you ever ask anybody at any time

HCMLPHMIT00002743

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 71 Filed 06/06/25 299 Page 842 of 1017   PageID 18724

29

```
 1    as to who made the decision to select Mr. Patrick to succeed

 2    you?"  "No, I did not."

 3        So I don't know what happened between Mr. Patrick and Mr.

 4    Dondero when Mr. Patrick supposedly told Mr. Dondero that

 5    there was an agreement with Mr. Scott, but that is news to Mr.

 6    Scott.  He had no idea.

 7        Your Honor, we are going to prove by clear and convincing

 8    evidence that each of the Respondents violated a very clear

 9    and specific court order.  And unless the Court has any other

10    questions, I'll stop for now.

11              THE COURT:  No questions.

12              MR. MORRIS:  Thank you, Your Honor.

13              THE COURT:  All right.  Who is making the argument

14    for the Respondents?

15              MR. SBAITI:  Your Honor, I am.  I'm just trying to

16    put the PowerPoint up on the WebEx.

17              THE COURT:  Okay.

18              MR. SBAITI:  Sorry about that.

19              MR. MORRIS:  Your Honor, I'll try not to make this a

20    practice, but can I inquire as to how much time I used?

21              THE COURT:  Oh.  Nate?

22              THE CLERK:  About thirteen minutes.

23              THE COURT:  Thirteen minutes?

24              MR. MORRIS:  Thank you very much.

25              THE COURT:  Okay.  All right.
```

017691

 1           MR. SBAITI:  Your Honor, our PowerPoint is a little

 2   bit longer than that one.  May I approach with a copy?

 3           THE COURT:  You may.  Uh-huh.

 4        (Pause.)

 5           MR. SBAITI:  Your Honor, it does feel good to be back

 6   in the courtroom.

 7           THE COURT:  Okay.

 8           MR. SBAITI:  It's been a long time.

 9           THE COURT:  Yes.  For us, too.

10           MR. SBAITI:  Jut wish it wasn't under a circumstance

11   where someone is trying to sanction me.

12        But we're going to be dividing up this oral argument a

13   little bit.  Also, to just kind of break up a little bit of

14   the monotony, because I think we have a lot to cover at the

15   opening stage of this.  And I'll try to be as expeditious as I

16   can be.

17     OPENING STATEMENT ON BEHALF OF THE SHOW CAUSE RESPONDENTS

18           MR. SBAITI:  Your Honor, the thing we -- the thing we

19   open with is the due process issue that we raised in our

20   brief.  And where this really arises from is the Court's show

21   cause order calls us violators before we've had a chance to

22   respond to the allegations and before we've obviously been

23   able to approach this hearing.  And the word violators means

24   something to us, Your Honor, because I've been a lawyer for a

25   long time, my partner has been a lawyer for a long time, our

017692

HCMLPHMIT00002745

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S     Document Exhibit 71  Filed 06/30/25 299  Page 844 of 1017     PageID 18726

31

```
 1   clients have never been sanctioned, we've never been

 2   sanctioned, and for us to be labeled violators first by

 3   counsel and then in a court order makes us wonder whether or

 4   not this process is already prejudged or predetermined.

 5              THE COURT:  I actually want to address that.  Turn

 6   off the clock.

 7      Just so you know, I looked this up a while back, because

 8   we gave a bankruptcy judges panel at some CLE.  The average

 9   bankruptcy judge in our district, back when I looked, signs

10   over 200 orders a week.

11              MR. SBAITI:  Sure.

12              THE COURT:  Many of those -- in fact, most of them --

13   are submitted by lawyers.  So, you know, a big chunk of my

14   week is signing orders.  And I obviously give more scrutiny to

15   those that are substantive in nature.  Okay?  If someone

16   submits to me a 50-page debtor-in-possession financing order,

17   I will look at that much more carefully than what I consider a

18   mere procedural order setting a hearing.

19      So I regret that that word was used, but I can assure you

20   I fairly quickly set that -- signed that, I should say --

21   regarding it as a merely procedural order setting a hearing.

22   Okay?  So it's as simple as that.  There was no hmm, I like

23   that word, violator.  I had a stack, if you will, an

24   electronic stack of probably 200 orders in front of me the day

25   I signed that.  Okay?
```

017693

HCMLPHMIT00002746

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 63-38    71 Filed 06/06/25299 Page 845 of 1017    PageID 18727

32

1        So, if that makes anyone feel any better, I don't know,

2    but that's the reality.

3        Okay.  You can start the clock again.

4            MR. SBAITI:  And I appreciate Your Honor saying that.

5    It does make us feel better, both about where the -- the

6    genesis of the order and the impact and its reflection on what

7    Your Honor thinks in terms of going into this.

8        The other thing that obviously raised concerns, and I

9    assume this comes from the same place, was four days ahead of

10   that order counsel told us the Court was going to order

11   everyone to be in person, and they had advance notice of that,

12   and we weren't sure how they had advance notice of that.  I

13   guess they assumed --

14           THE COURT:  I can assure you right here on the record

15   I never had ex parte communications with any lawyer in this

16   case, on this matter or any other matter.  Okay?  Again, those

17   are pretty strong words to venture out there with, which your

18   pleading did venture out there with those words.

19       My courtroom deputy, Traci, I think answers her phone 24

20   hours a day.  So I'm quite sure she had communications with

21   the lawyers about this, just like she probably had

22   communications with you and your firm and every other firm in

23   this case.  Okay?

24           MR. SBAITI:  Like I said, Your Honor, we appreciated

25   what Your Honor -- appreciate what Your Honor said, but that

017694

HCMLPHMIT00002747

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-71 Filed 06/26/25   Page 846 of 1017   PageID 18728

33

1    issue obviously stuck out -- stuck out to us, in combination.

2    So I'll move on from that issue.

3        This has to do with the lawsuit that was filed, and the

4    lawsuit, the genesis of the lawsuit, I think it's important to

5    say, because the argument has been raised in the briefing and

6    we wanted to address it upfront, why the lawsuit comes about.

7    And it comes about because of the Advisers Act and the

8    responsibilities that the Debtor has to the assets of the

9    funds that it manages.  And the Advisers Act imposes a duty

10   not only on Highland but obviously on its control people and

11   its supervised people.  And the lawsuit has to do with HCLOF,

12   which is what HarbourVest owned a piece of.  And Highland, as

13   the advisor to HCLOF and the advisor to the DAF, owed

14   fiduciary duties to CLO Holdco, which is the DAF's holding

15   entity of its assets in HCLOF, but Highland Capital was also

16   an advisor, a registered investment advisor to the DAF

17   directly at the time.  And so those federally-imposed

18   fiduciary duties lie at the crux of that lawsuit.

19       Moving on, Mr. Seery testified at the hearing that was in

20   this Court to be -- to get him appointed, and this was Exhibit

21   2 that was presented by the Debtor, and on Page 16 at the

22   bottom he says -- of the transcript, he says, I think, from a

23   high level, the best way to think about the Debtor is that

24   it's a registered investment advisor.  As a registered

25   investment advisor, which is really any advisor of third-party

017695

HCMLPHMIT00002748

1   money over $25 million, it has to register with the SEC, and

2   it manages funds in many different ways.

3       In the middle of the next page he says, In addition, the

4   Debtor manages about $2 billion, $2 billion in total managed

5   assets, around $2 billion in CLO assets, and then other

6   securities, which are hedge funds -- other entities, rather,

7   which are hedge funds or PE style.  Private equity style.

8       On Page 23 towards the bottom he says, As I said, the

9   Investment Advisers Act puts a fiduciary duty on Highland

10  Capital to discharge its duty to the investors.  So while we

11  have duties to the estate, we also have duties, as I mentioned

12  in my last testimony, to each of the investors in the funds.

13  CLO Holdco would be an investor in one of those funds, HCLOF.

14      He goes on to say, Some of them are related parties, and

15  those are a little bit easier.  Some of them are owned by

16  Highland.  HCLOF was not owned by Highland.  But there are

17  third-party investors in these funds who have no relation

18  whatsoever to Highland, and we owe them a fiduciary duty both

19  to manage their assets prudently but also to seek to maximize

20  value.

21      Now, the lawsuit alleges that Seery testified that the

22  HarbourVest portion of Highland CLO Funding was worth $22-1/2

23  million.  Now, Mr. Morris wants the Court to hinge on the fact

24  that, well, no one asked him whether he was lying.  But that's

25  not really the standard, and it certainly isn't the standard

017696

HCMLPHMIT00002749

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 71 Filed 06/30/25299    Page 848 of 1017    PageID 18730

35

 1   when someone's an investment advisor and owes fiduciary

 2   duties, which include fiduciary duties to be transparent with

 3   your investors.

 4        It also includes fiduciary duties not to self-deal.

 5        The lawsuit also alleges that, in reality, those assets

 6   were worth double that -- double that amount at the time.  We

 7   found out just, you know, in late March/early April that a

 8   third -- from a third party who had access to the underlying

 9   valuations at the time that those values were actually double

10   and that there was a misrepresentation, giving rise to the

11   lawsuit.  That change in circumstance is the key issue behind

12   the lawsuit.

13        We allege that Mr. Seery and the Debtor, as RIAs, had a

14   duty to not self-deal and be fully transparent with that

15   information, and we think both of those things were violated

16   under the Advisers Act.

17        We don't allege that the HarbourVest settlement should be

18   undone or unwound.  We can't unscramble that egg.  We do seek

19   damages, as I believe is our right, arising out of the

20   wrongdoing and the process of pushing forth the settlement.

21        I think one of the allegations in the actual motion for

22   the show cause order was that this was going to undo all of

23   the hard work that Court had done and basically unwind and try

24   to re-piece Humpty Dumpty back together again.  But that's

25   simply not the case.  Nowhere in our allegations or in the

HCMLPHMIT00002750

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 28-1 Filed 06/30/25   Page 849 of 1017   PageID 18731
Exhibit 71 Page 36 of 299

36

 1  relief that we request are we trying to undo the HarbourVest

 2  settlement as such.

 3      Now, whether the lawsuit should be dismissed under the

 4  affirmative defenses that they bring up -- res judicata,

 5  waiver, release -- all of those are questionable under the

 6  Advisers Act, given the change of circumstance, and therefore

 7  are also questions on the merits.  They don't go to the

 8  colorability of the underlying claims in and of themselves,

 9  which I think is important.

10      So we asked for leave to amend from the Court.  And what

11  they want us to do, Your Honor, is they want to sanction us

12  for asking.  They're saying asking for leave to amend is the

13  same thing as pursuing a claim.  And I'll get to the specifics

14  on that in a little bit.  But that's the frame.  Can we be

15  sanctioned for asking a court, any court, even if it's the

16  wrong court, for permission to bring the lawsuit?  They don't

17  cite a single case that says that that, in and of itself, is

18  sanctionable conduct, us asking.

19      So I'd like to introduce some of the Respondents.

20      Your Honor, may I have one of these waters?

21          THE COURT:  Certainly.

22          MR. SBAITI:  Thank you.

23          THE COURT:  That's why they're there, by the way.

24          MR. SBAITI:  I didn't know if they belonged to

25  somebody else.

 1          THE COURT:  We've scattered water bottles around for

 2    people.

 3          MR. SBAITI:  I appreciate it.  Thank you, Your Honor.

 4          THE COURT:  So if you see these little ones, that's

 5    for anyone.

 6          MR. SBAITI:  So, this is an org chart, and you'll see

 7    it as -- the exhibits that the Debtor's going to bring up.

 8    And when we talk about the DAF, Your Honor -- I don't know if

 9    that's visible to you.  We're on Slide 19, if you're looking

10    at it on paper.  There's a little number at the lower right-

11    hand corner.  The charitable DAF GP, LLP and then the

12    Charitable DAF Holdco, Ltd. together are the principles of the

13    Charitable DAF Fund, LP.  And so when we refer to the DAF or

14    the Charitable DAF, that's really the entity structure that

15    we're referring to.  And then the GP and Holdco Ltd. have a

16    managing member.  It used to be Grant Scott at the time this

17    was done.  Today, it's Mr. Mark Patrick, who's in the room,

18    sitting next to Mr. Bridges.

19       The DAF is a charitable fund.  It's funded over $32

20    million, as the evidence will show, including Dallas-Fort

21    Worth organizations, The Family Place, Dallas Children's

22    Advocacy, Center for Brain Health, the Crystal Ray Initiative,

23    Friends of the Dallas Police, Snowball Express, various

24    community and education initiatives, Dallas Arts, museums, the

25    Perot Museum, Dallas Zoo.  That evidence is undisputed, Your

017699

HCMLPHMIT00002752

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 68-8   Filed 08/06/25   Page 851 of 1017   PageID 18733

38

1    Honor.  The DAF is a real fund.  It is a real charitable fund.

2    It does real good in the community.

3         Now, Respondents -- Holdco, which you will see at the

4    bottom of that chart, is essentially the investment arm.

5    There are assets that the DAF owns in various pots, and Holdco

6    is the actual business engine that generates the money from

7    those assets that then -- that then gets passed up to the

8    charitable -- the four charitable foundations at the top.

9         I'll go back to Slide 21.  And if you look at the top,

10   Your Honor, the Dallas Foundation, Greater Kansas City

11   Community, Santa Barbara Foundation, The Community Foundation

12   of North Texas:  Those are the charities that then themselves

13   bestow the funds onto the actual recipients.  So the money

14   flows up as dividends or distributions, and then gets

15   contributed.

16        CLO Holdco invests those assets, and it's an important

17   part of the business model, so that you're not sending out

18   principal.  It's the money that CLO makes, the profits, if you

19   will, that it is able to generate that gets donated and makes

20   its way into the community.

21        So there's an important feature to the structure in that

22   it has to be able to generate money.  It's not just money that

23   sits there and waits to be distributed.  There's active

24   investing going on.

25        Mr. Mark Patrick owns the control shares of the entities

017700

HCMLPHMIT00002753

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 71-20 Filed 06/06/25    Page 852 of 1017    PageID 18734

39

1  comprising the DAF and CLO Holdco, as I showed you, and the

2  beneficiary charitable foundations hold what we call

3  beneficial interests, where they just get money.  They don't

4  have a vote.

5      Mr. Patrick cares about the public service the DAF engages

6  in.  He's been an advisor to the DAF, CLO Holdco, and its

7  predecessor, Mr. Scott, since its inception.  He receives no

8  compensation for the job he's doing today.  And you'll hear

9  how he became -- how he inured to the control position of the

10  DAF and CLO Holdco from him, but it doesn't involve Mr.

11  Dondero, and the absence of someone saying that it did, I

12  think, is going to be striking by the end of the presentation

13  of evidence.

14      Their only argument against you, Your Honor, is going to

15  be you just can't believe them.  But not believing witnesses

16  is not a substitute for the lack of affirmative evidence.

17      Mr. Patrick has said all along he authorized the filing of

18  the motion for leave to add Mr. Seery to the lawsuit in

19  District Court.  He doesn't believe the motion to amend

20  violated this Court's orders, for the reasons stated in our

21  responsive filings to the motions for contempt and show cause

22  order.  That's why he authorized it.

23      My firm, Sbaiti & Company, we're a small Dallas litigation

24  boutique retained by the DAF and CLO Holdco to file the

25  lawsuit.  We did an investigation.  I'm tickled to death that

HCMLPHMIT00002754

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-71 Filed 06/06/25   Page 853 of 1017   PageID 18735

40

1    Mr. Morris loved our complaint so much and gave us the

2    compliment that we got it done in a short amount of time, but

3    we did get it done in a short amount of time, because, in the

4    end, it's a rather simple issue, as I was able to lay it out

5    in about three or four bullet points in a previous slide.

6        The written aspect of that doesn't take that long, as Your

7    Honor knows, but the idea that there's a suspicion that we

8    didn't write it or someone else wrote it and ghost-wrote it

9    and gave it to us, which I think is the insinuation he was

10   making, is completely unfounded.  There's no evidence of that.

11       We carefully read Your Honor's orders.  We developed a

12   good-faith basis, as required by Rule 11, that the lawsuit and

13   the motion to add Mr. Seery were not filed in bad faith or for

14   an improper purpose.  We don't think they're frivolous.  We

15   don't think they're in violation of Your Honor's orders, given

16   the current state of the law.

17       Mr. Dondero is one of the settlors of the CRT, of the

18   Charitable Remainder Trust that ultimately provided assets to

19   CLO Holdco and the DAF.  He does care about the DAF's mission.

20   I think Mr. Morris hit the nail on the head.  Of course Mr.

21   Dondero cares about what happens to it.  He's one of the

22   settlors, and it was his funds that initially were put into

23   it, so he's allowed to care.  And I don't think him caring is

24   insidious, and him caring doesn't mean he has control and

25   doesn't mean he's the driving force behind some insidious

017702

HCMLPHMIT00002755

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 33-71 Filed 06/26/25   Page 854 of 1017   PageID 18736

41

1    conspiracy that they're trying to insinuate exists.

2        He is an advisor to the DAF and CLO Holdco.  It is a lot

3    of money and it needs advice, and he's an advisor to Mr.

4    Patrick.  We don't run away from any of those facts, Your

5    Honor.

6        We also don't run away from the fact that he was the

7    source of some of the information that came in to that

8    complaint and that he relayed some of that information.  The

9    content, we do claim work product privilege and attorney-

10   client privilege, because he's an agent of our client, and as

11   lawyers doing an investigation, the content of our

12   communications is protected under the attorney-client and work

13   product privileges, as well as the joint interest privilege.

14   But the fact that we admit that those communications happened,

15   we're not running away from that fact.

16       So, what does he have to do with this?  It's interesting

17   that that opening argument you just heard spent about three

18   minutes on contempt and the other fourteen or fifteen minutes

19   or so on Mr. Dondero.  And only on Mr. Dondero.  There's a

20   negative halo effect, I believe, that they're trying to get

21   this Court to abide by.  They want to inflame Your Honor and

22   hopefully capture -- cultivate and then capitalize on whatever

23   antipathy you might have for Mr. Dondero, and then sweep us

24   all in under that umbrella and sanction everybody just because

25   he had some involvement.

HCMLPHMIT00002756

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-71 Filed 06/06/25   Page 855 of 1017   PageID 18737

42

1     But whatever involvement he has, which we admit he had

2  some involvement in helping us marshal the facts, that's not a

3  basis for us to be sanctioned if there isn't an actual

4  sanctionable conduct that -- as we say there isn't.

5     We think there's an ulterior motive.  That's why Mr.

6  Morris just announced to Your Honor, Mr. Dondero controls it

7  all.  The ulterior motive, I believe, is, down the line, when

8  they want to argue some kind of alter ego theory, they want to

9  lay that foundation here.  I don't think this is the

10  appropriate time for that foundation, and I don't think any of

11  the information and the evidence they're trying to marshal in

12  front of you is really going to be relevant to the very

13  specific question that's before Your Honor:  Does our motion

14  asking the District Court to add Mr. Seery violate your order,

15  or violate it in a way that can be -- that we can be

16  sanctioned for?  We don't believe it violates it.

17     So, the three core standards that have to be met.  First

18  of all, civil contempt requires a valid, enforceable order.

19  It's not debatable and it's not -- I don't think that's a

20  shocking statement.  Then they have to have clear and

21  convincing evidence of a violation of a specific unambiguous

22  term therein.  Mr. Morris wants his version of the word pursue

23  to be unambiguous, and I think the word pursue is unambiguous.

24  But the way he wants you to construe it makes it completely

25  ambiguous, and we'll -- I'll get to that in a moment.

HCMLPHMIT00002757

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 71 Filed 06/46/05299    Page 856 of 1017    PageID 18738

43

```
 1        Now, for sanctioning counsel, the Fifth Circuit has held
 2   you have to find bad faith.  We're adjudged under a slightly
 3   separate standard under the Fifth Circuit law.  So the
 4   contempt motion, though, to the extent it seeks to impose
 5   double and treble attorney's fees, those are in punitive
 6   fines.  They are not compensatory.  So criminal contempt
 7   standards are raised, and so they have to show a violation in
 8   bad faith.  In other words, our arguments that we're making
 9   have to be bad faith, not simply that we're wrong, and they
10   have to show beyond a reasonable doubt, usually in front of a
11   jury.  The U.S. Supreme Court explained the difference and the
12   different procedural protections that have to be involved if
13   they're really going to seek double and treble compensatory
14   damages.
15        Now, he's right.  Saying we intended -- saying that we
16   didn't mean to violate it isn't necessarily a defense.  But
17   what you're actually going to hear from him is the opposite
18   argument, that even though we didn't violate it, we wanted to.
19   That's what he says.  That's why he quoted you the opening
20   section of our motion asking for permission to sue Mr. Seery,
21   because that's a statement of purpose.  And he says you should
22   sanction them right there.  That's literally what he said.
23   It's right there, their purpose.  If intent is irrelevant to
24   them, it's irrelevant as to us.  The fact that we wanted to
25   sue Seery is fully admitted.  We don't deny the fact that we
```

017705

HCMLPHMIT00002758

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 20-3   Filed 08/05/25   Page 857 of 1017   PageID 18739

44

1  believe Mr. Seery should be a defendant in this lawsuit.  But

2  the fact that we didn't sue him is why we didn't violate the

3  order.  And they can't say that the fact that we eventually

4  wanted to sue him means we did violate the order.  That door

5  swings both ways, Your Honor.

6      We don't think any element is met.  The order, while writ

7  large, prohibits suing Mr. Seery without permission, and we

8  did not sue James Seery, pure and simple.  The July 12 --

9  14th, 2020 order purports to reserve exclusively to this Court

10  that which, according to the statutes and the case law, we

11  believe the Court can't exclusively reserve to itself.  And

12  Your Honor, the order prohibits commencing and pursuing a

13  claim against Jim Seery without coming here first to decide

14  the colorability of such a claim.

15      They, I believe, admit that we didn't commence a claim

16  against Jim Seery.  I think they've admitted that now.  So now

17  we're talking about what does pursue mean?  We didn't pursue a

18  claim against Jim Seery.  Is asking for leave to bring suit

19  the same thing as pursuing a claim?  That's the question

20  that's really before Your Honor.  Lawyers never talk of

21  pursuing a claim that hasn't been filed.  We don't say, I'm

22  pursuing a claim and I'm going to file it next week or next

23  year.  Usually, that type of language is in an order, because

24  when the order happens, there may already be claims against

25  Mr. Seery.  And so the pursuit of claim is supposed to attack

HCMLPHMIT00002759

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-71 Filed 06/06/25   Page 858 of 1017   PageID 18740
Exhibit 71 Page 46 of 299

45

1   those cases, to come here and show colorability, presumably,

2   before they continue on with those lawsuits.  It doesn't mean

3   asking for permission.

4      If it did mean asking for permission, then complying with

5   Your Honor's order would be a violation.  If the motion for

6   leave is a violation because it is pursuing a claim, if I had

7   filed that motion in this Court, it would still be pursuing a

8   claim without Your Honor's permission.  I'd have to get

9   permission just to ask for permission.  It puts us in this

10  endless loop of, well, if asking for permission is pursuing a

11  claim, and pursuing a claim is without permission violates the

12  Court's order, we'd always be in violation of the Court's

13  order just for asking, just for following Your Honor's edict.

14          THE COURT:  I'm just, I'm going to interject.  You

15  were supposed to, under the order, file a motion in this

16  Court.

17          MR. SBAITI:  I understand that, Your Honor, and I

18  think that we can get to the specifics on why we disagree with

19  how the motion went, Your Honor.  We hadn't sued Mr. Seery.

20  So as long as we dealt with the order, which is what our

21  position is, then we don't believe we violated the order.

22          THE COURT:  You think the order was ambiguous,

23  requiring a motion to be filed in the Bankruptcy Court?

24          MR. SBAITI:  Your Honor, what we believe is that the

25  order was ambiguous in terms of whether us asking for

HCMLPHMIT00002760

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 71 Filed 06/06/25   Page 859 of 1017   PageID 18741
Page 46 of 299

46

1   permission in the District Court was in and of itself a

2   violation of the order.  We don't think it was.  Actually, we

3   don't think the order's ambiguous to that extent.  The second

4   we file a suit against Mr. Seery and we don't have some

5   resolution of the issue, then I think the question of

6   sanctionability comes in.  But we never filed suit, Your

7   Honor.

8       The Court doesn't say I can't seek permission in the

9   District Court or that we can't go to the District Court with

10   -- which has general jurisdiction over this case, and has

11   jurisdiction, we believe, over the actual case and controversy

12   that's being raised.  But the idea of pursuit being a

13   violation of the order, of the letter of that order, is

14   nonsensical under that, it leads to an absurd result, and it's

15   plainly vague and ambiguous, Your Honor.

16       Asking Judge Boyle or asking a District Court for

17   permission is not a violation of this Court's order, not the

18   way it was written and not -- and I don't even believe it was

19   a violation necessarily of the Court's -- of the language that

20   the Court has.  We -- it doesn't unambiguously prevent us from

21   asking the District Court for leave.

22       The Court's order yesterday, Your Honor, applied this very

23   rule.  The TRO -- you said the TRO did not specifically state,

24   Turn your cell phone over.  And you denied motion for

25   sanctions on that.  That's basically the argument we're making

017708

HCMLPHMIT00002761

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 71 Filed 06/26/25 299   Page 860 of 1017   PageID 18742

47

 1    here, Your Honor.  We think that was the correct ruling, and

 2    we think the same type of ruling applies here.

 3       Your order yesterday also determined that the Court

 4    ultimately believes that hiring lawyers to file motions should

 5    not be viewed as having crossed the line into contemptuous

 6    behavior.  That's essentially the argument they want you to

 7    buy, that there's somehow a vindictiveness behind this and an

 8    insidious plan to violate court orders, Your Honor.  We don't

 9    have any evidence of that.

10            THE COURT:  Okay.  Take the words vindictiveness and

11    insidious out of the equation.  That's making things personal,

12    and I don't like that.  The key is the literal wording of the

13    order, is it not?

14            MR. SBAITI:  Your Honor, the key, I believe, is the

15    --

16            THE COURT:  No entity may commence or pursue a cause

17    of action of any kind against Mr. Seery relating in any way to

18    his role as the chief executive officer and chief

19    restructuring officer of the Debtor without the Bankruptcy

20    Court first determining, after notice, that such claim or

21    cause of action represents a colorable claim of willful

22    misconduct or gross negligence against Mr. Seery and

23    specifically authorizing such entity to bring such a claim.

24    So I'm trying to understand why you argue that filing a motion

25    asking the District Court for permission is not inconsistent

HCMLPHMIT00002762

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-71 Filed 06/05/25   Page 861 of 1017   PageID 18743

48

1  with this order.

2          MR. SBAITI:  Because it's not commencing a claim,

3  Your Honor.  It's not commencing a claim against him.

4          THE COURT:  Okay.  So is your argument that if Judge

5  Boyle authorizes amendment of the pleading to add Mr. Seery

6  and then you do it, at that point they may have grounds for a

7  motion for contempt, but not yet, because she has not actually

8  granted your motion?

9          MR. SBAITI:  Correct, Your Honor.  I mean, in a

10  nutshell.  In fact, that's one of -- I think that's probably

11  our next argument.  We think, in a sense, this argument is

12  incredibly premature.  There is three ways that this -- well,

13  I'd like to address this, so I've got -- I've got a diagram

14  that I think will actually help elucidate what our thought

15  process was.

16      There's three things she could have done.  She could have

17  referred -- referred it to Your Honor, which is what we

18  expected was likely to happen.

19          THE COURT:  But you didn't file a motion for referral

20  of the motion before her.

21          MR. SBAITI:  Well, no, I don't mean in respect of

22  enforcing the reference.  The referral we thought was most

23  likely going to happen because it's an associated case, and we

24  actually put those orders in front of her, so we expected that

25  those orders would end up -- that the question would

017710

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 23-8   Filed 06/06/25   Page 862 of 1017   PageID 18744

49

1    ultimately end up in front of Your Honor on that basis.

2        She could have denied our motion outright, in which case

3    we haven't filed a claim, we haven't violated it, or she could

4    have granted our motion and done one of two things.  She could

5    have granted it to the extent that she thought leave would be

6    proper but then referred it down, or she could have decided --

7    taken the decision as the court with general jurisdiction and

8    simply decided it all on her own.  She had all of those

9    options, Your Honor, and none of them results in a claim being

10   commenced or pursued without the leave of this Court, if leave

11   is absolutely necessary, Your Honor.  And that's the point

12   that we were trying to make.

13       Your Honor, the -- there's -- you know, there's no

14   evidence that, absent an order from a court with jurisdiction,

15   that we were going to file a claim against Mr. Seery, that we

16   were going to commence or pursue a claim against Mr. Seery.

17   We were cognizant of Your Honor's order.  We considered that.

18   And the reason we filed them the way we did is because,

19   according to the statutes and the case law, this is the type

20   of case that would be subject to a mandatory withdrawal of the

21   reference.

22       And so there's this paradox that arises, Your Honor.  And

23   the paradox that arises is that we show up and immediately go,

24   well, we need to be back in the District Court.  So we filed

25   our motion there, and I don't think that was contemptuous, it

017711

HCMLPHMIT00002764

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 20-71 Filed 07/05/25   Page 863 of 1017   PageID 18745

50

1   wasn't intended to be contemptuous of the Court, but we showed

2   the orders to the Court, made the same arguments that we have

3   been making here, that we believe that there's problems with

4   the order, we believe the order oversteps its jurisdiction and

5   maybe is unenforceable, and it's up to that District Court, as

6   it has been in almost all of these other gatekeeper order

7   cases that get filed.  None of them result in sanctions, Your

8   Honor.  What they result in is a District Court deciding,

9   well, either they refer it or they decide I don't need to

10  refer it.  But I don't think that that is the same thing as

11  commencing or pursuing a claim in the end, Your Honor, because

12  all we did was ask for permission, and permission could have

13  been denied or granted or granted in part.

14      Your Honor, they haven't cited an injury.  You've heard

15  the testimony, Your Honor, that they -- the first time they

16  knew we had filed a motion -- which I don't understand why

17  that's the first time they knew we had filed a motion; we told

18  them we were going to file the motion -- was when I forwarded

19  an email saying that it's been denied without prejudice, Your

20  Honor.  Well, that means they didn't have to do any work to

21  respond to the motion.  They didn't have to do any work to do

22  any of the other things.

23      And one hundred percent of the damages that they're going

24  to say they incurred is the litigation of this contempt

25  hearing or this sanction motion, as opposed to some other

017712
HCMLPHMIT00002765

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 20-71 Filed 06/26/25   Page 864 of 1017   PageID 18746

51

1    simpler remedy, like going in to Judge Boyle and saying, Your

2    Honor, all that needs to go, which is what they eventually

3    did.  But they would have had to incur those costs anyway

4    because they're now moving to enforce the reference.  They

5    filed a 12(b)(6).  That briefing would have existed regardless

6    of whether or not we had filed our motion, regardless of

7    whether the sanctions hearing had commenced.

8        Your Honor, I'm going to let my partner, Mr. Bridges,

9    address this part of it, if I could.  I think that gets into

10   more of the questions that you asked, and I think he can

11   answer them a lot better than I can.

12              THE COURT:  Okay.

13              MR. SBAITI:  Thank you.

14              THE COURT:  That's fine.

15              MR. BRIDGES:  Thank you, Your Honor.  And I do want

16   to address pointedly the questions that you're asking.  First,

17   though, I was hoping to back up to some preliminary remarks

18   that you made and say that I find the 200 orders a week just

19   mindboggling.  It amazes me, and puts the entire hearing in a

20   different perspective for me.  I'm grateful that you shared

21   that with us.

22       Your expression of regret about naming us violators was

23   very meaningful to me.  It causes me -- well, the strong words

24   in our brief were mine.  I wrote them.  And your expression of

25   regret causes me to regret some of those words.  I'm hopeful

HCMLPHMIT00002766

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document Exhibit 71 Filed 06/05/25299   Page 865 of 1017    PageID 18747

52

1    that you can understand, at least in part, our reaction out of

2    concern.

3        And Your Honor, it's awkward for me to talk about problems

4    with your order, and that's the task that's come to me, to

5    list and talk through four of them and why we think they put

6    us in a really awkward position in deciding what to do in this

7    case, in the filing of it, in where we filed it, and in how we

8    sought leave to go forward against Mr. Seery.  That was

9    awkward and difficult for us, and I'm hopeful that I can

10   explain that and that you'll understand, if I'm blunt about

11   problems with the order, that I mean it very respectfully.

12   Two hundred orders a week is still very difficult for me to

13   get my mind around.

14       The four issues in the order start with the gatekeeping.

15   Then, secondly, in the preliminary remarks, I made mention of

16   the *Applewood* case and the notice that the order releases some

17   claims.  Its effect of --

18           THE COURT:  And by the way, I mean, you might

19   elaborate on the facts and holding of *Applewood*, because I

20   came into this thinking *Republic Supply v. Shoaf*, and for that

21   matter, as I said, *Espinosa*, were much more germane.  And so,

22   you know, you'll have to elaborate on *Applewood*.  I remember

23   that case, but it's just not one people cite as frequently as

24   those two.

25           MR. BRIDGES:  Yes, Your Honor.  And our reply brief

017714

HCMLPHMIT00002767

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 71 Filed 06/06/25    Page 866 of 1017    PageID 18748

53

 1  devotes a page to the case, and I'm hopeful that I can

 2  remember it well enough to give you what you're looking for

 3  about it, but I would point you to our reply brief on that

 4  topic as well.

 5       The *Shoaf* case that *Applewood* quotes from and

 6  distinguishes and expressly limits, the *Shoaf* case actually

 7  has been cautioned and limited and distinguished numerous

 8  times, if you Shepardize it, and the *Applewood* case is the

 9  leading case, and it also is from the Fifth Circuit, that

10  describes and cabins the effects of *Shoaf*.  And in *Applewood*,

11  what happened is a bankruptcy confirmation order became final

12  with releases in it, and the court held that exculpatory

13  orders in a final order from the Bankruptcy Court do not have

14  res judicata effect and do not release claims unless those

15  claims are enumerated in the exculpatory order.  And --

16            THE COURT:  Okay.  So it was about specificity more

17  than anything else, right?

18            MR. BRIDGES:  Yes, Your Honor. It was a --

19            THE COURT:  Okay.

20            MR. BRIDGES:  -- a blanket release, a blanket --

21            THE COURT:  Okay.

22            MR. BRIDGES:  -- exculpatory order that didn't

23  specify what claims were released by what parties, and

24  therefore the parties didn't have the requisite notice.

25       In my mind, Your Honor, it's comparable to the Texas

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 36-28   71 Filed 09/05/25   Page 55 of 299   Page 867 of 1017   PageID 18749

54

1   Supreme Court's holdings on what's required in a settlement

2   release in terms of a disclaimer of reliance, --

3          THE COURT:  Okay.  But, again, --

4          MR. BRIDGES:  -- that if you aren't --

5          THE COURT:  -- it's about specificity --

6          MR. BRIDGES:  Yes, Your Honor.

7          THE COURT:  -- more than anything else?  And then

8   we've got the U.S. Supreme Court *Espinosa* case subsequent.

9          MR. BRIDGES:  Okay.  Your Honor, I'm not sure what

10  *Espinosa* you're referring to.  Can you tell me why that

11  applies?

12         THE COURT:  Well, it was a confirmation order.  It

13  was in a Chapter 13 context.  And there were provisions that

14  operated to discharge student loan debt, --

15         MR. BRIDGES:  Uh-huh.

16         THE COURT:  -- which, of course, cannot be discharged

17  without a 523 action, a separate adversary proceeding.

18  Nevertheless, the confirmation order operated to do what 523

19  suggests you cannot do, discharge student loan debt through a

20  plan confirmation order.

21     The U.S. Supreme Court says, well, that's unfortunate that

22  the confirmation order did something which it doesn't look

23  like you can do, but no one ever objected or appealed.  That's

24  my recollection of *Espinosa*.  So it seems to be the same

25  holding as *Republic Supply v. Shoaf*.  And what I -- why I

017716

HCMLPHMIT00002769

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 71 Filed 06/06/25299  Page 868 of 1017    PageID 18750

55

1  asked you to elaborate on *Applewood* is because it does seem to

2  deal with the specificity of the order versus the

3  enforceability, no?

4          MR. BRIDGES:  Your Honor, if it's not obvious

5  already, I'm not prepared to argue *Espinosa*.  And your

6  explanation of it is very helpful to me.  I think you're right

7  that the specificity issue from *Applewood* is what we're

8  relying on.  And it sounds like --

9          THE COURT:  Okay.  So, that being the case, how was

10  this order not specific?  Okay?

11          MR. BRIDGES:  That's easy, Your Honor, because it

12  doesn't say which parties are releasing which claims.  And

13  what we're talking specifically about there -- as we go

14  through the order, I can show you the language -- but what

15  we're talking about specifically are the ordinary negligence

16  and breach of fiduciary duty claims that your order doesn't

17  provide for at all.  Rather, it says colorability of gross

18  negligence or willful wrongdoing, if I remember the words

19  precisely, that's what must be shown to pursue a case -- a

20  cause of action against Mr. Seery, thereby -- thereby

21  indicating that claims for mere negligence, not gross

22  negligence, or breach of fiduciary duty, which is an even

23  lesser standard, that those claims are prohibited entirely.

24      And by having that kind of general all-encompassing

25  release or exculpation for potential liability involving

HCMLPHMIT00002770

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-1 Filed 06/06/25   Exhibit 71   Page 9 of 299   Page 869 of 1017   PageID 18751

56

 1 ‖ negligence, and most importantly, fiduciary duty breach under

 2 ‖ the Advisers Act, that that kind of exculpation under

 3 ‖ *Applewood* is not enforceable and has no res judicata effect

 4 ‖ because it wasn't -- those claims weren't enumerated in the

 5 ‖ order.

 6 ‖     That for it to have the intended exculpatory effect, if

 7 ‖ that was what was intended, that the fiduciary duty claims and

 8 ‖ the parties who those claims may belong to would have to have

 9 ‖ been enumerated.

10 ‖     And indeed, that kind of specificity, what was required in

11 ‖ *Applewood*, isn't even possible for a claim that hasn't yet

12 ‖ occurred for future conduct.  It's not possible to enumerate

13 ‖ the details, any details, of a future claim, because the

14 ‖ underlying act -- if the underlying basis, facts for that

15 ‖ claim, haven't yet happened.  It's something to happen in the

16 ‖ future.

17 ‖     And here, that's what we're dealing with.  We're dealing

18 ‖ with conduct that took place well after the January and July

19 ‖ 2020 orders that had that exculpatory effect.  Is -- is that

20 ‖ clear?

21 ‖           THE COURT:  Understood.

22 ‖           MR. BRIDGES:  Thank you, Your Honor.  So, the four

23 ‖ areas of the order, the four functions that the order does

24 ‖ that are problematic to us that led us to do what we have done

25 ‖ are the gatekeeping function; the release; the fact that by

017718

HCMLPHMIT00002771

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 28-1 Filed 06/06/25    Page 870 of 1017    PageID 18752

57

1  stating sole jurisdiction, that it had a jurisdiction-

2  stripping effect; and then, finally, jurisdiction asserting,

3  where, respectfully, Your Honor, we think to some extent the

4  order goes beyond what this Court's jurisdiction is.  And so

5  that not only claiming exclusive jurisdiction, but claiming

6  jurisdiction over all actions against Mr. Seery, as described

7  in the order, is going too far.

8       And those are the four issues I want to talk about one at

9  a time, and here -- I went two screens instead of one.  There

10  we go.  And here's the order.  I have numbered the highlights

11  here out of sequence because this is the sequence that I wish

12  to talk about them and that I think their significance to our

13  decision applies.

14       Before we get into the words of this July 16, 2020 order,

15  I want to mention the January order as well.  Although the

16  motion for contempt recites both orders, we don't actually

17  think the January order applies to us, because our lawsuit

18  against Mr. Seery is not about his role as a director at

19  Strand in any way.  We didn't make an issue of that, other

20  than in a footnote in our brief, because we don't think that

21  distinction matters much since the orders essentially say the

22  same things.

23       I'm not sure that it matters whether we have potentially

24  violated one order or two.  If Your Honor finds we've violated

25  one, I think we're on the hook regardless.  If Your Honor

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-71 Filed 06/06/25   Page 871 of 1017   PageID 18753

58

1    finds that we didn't violate the July order, I don't think you

2    will find that we violated the January order, either.  So my

3    focus is on the July order.

4        The gatekeeping function comes from the preliminary

5    language about commencing or pursuing a claim or cause of

6    action against Mr. Seery.  And it says what you want us to do

7    first before bringing such a claim.

8        The second issue of the release comes a little bit later.

9    It's the colorable claim of willful misconduct or gross

10   negligence language.  In other words, because only claims of

11   willful misconduct or gross negligence can pass the bar, can

12   pass muster under this order, that lesser claims -- ordinary

13   negligence and breach of fiduciary duty -- that those claims

14   are released by this order.  That's the second argument.

15       Third is your reference to sole jurisdiction and the

16   effect that that has of attempting to say that other courts,

17   courts of original jurisdiction, do not have jurisdiction

18   because it solely resides here.  That's the third thing I want

19   to address.

20       And then the fourth is the notion that we have to come to

21   this Court first for any action that fits the description of

22   an action against Mr. Seery, when some actions are, through

23   acts of Congress, removed from what this Court has the power

24   to address.  Under 157(d) of Title 28, Your Honor, there are

25   some kinds of actions which withdrawal of the reference is

017720

HCMLPHMIT00002773

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 71 Filed 06/06/25   Page 872 of 1017   PageID 18754

59

1    mandatory, and therefore this court lacks jurisdiction to

2    address those.

3        And so those are the four issues I want to tackle,

4    starting with the first, the gatekeeping.  Your Honor, Section

5    28 -- Section 959 of Title 28 appears to be precisely on

6    point.  It calls -- it is called by some courts an exception

7    to the Barton Doctrine, which we believe is the only basis,

8    the Barton Doctrine, for this Court to claim that it has

9    jurisdiction or sole jurisdiction and can require us to come

10   here first.  We think the Barton Doctrine is the only basis

11   for that.  We haven't seen anything in the briefing from

12   opposing counsel indicating there was another basis for it.

13   We think we're talking about the Barton Doctrine here as the

14   basis for that.

15       959 is exception to the Barton Doctrine, and we think it

16   explicitly authorizes what we have done.

17       Secondly, Your Honor, the order, the gatekeeping functions

18   of the order are too broad because of its incorporation of the

19   jurisdictional problems and the release problem that we'll

20   talk about later.  But for problem number one, the key issue

21   that we're talking about is 959 as an exception to the Barton

22   Doctrine.  And I went the wrong way.

23           THE COURT:  So, we could go down a lot of rabbit

24   trails today, and I'm going to try not to do that, but are you

25   saying the very common practice of having gatekeeping

017721

HCMLPHMIT00002774

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 20-18   Exhibit 71   Filed 06/05/25   Page 873 of 1017   PageID 18755

60

```
 1    provisions in Chapter 11 cases is just defective law under 28

 2    U.S.C. § 959(a)?

 3              MR. BRIDGES:  Can I say yes and no?

 4              THE COURT:  Okay.

 5              MR. BRIDGES:  Yes, to some extent, for some claims.

 6    No as to other claims to another extent.  We are not saying

 7    gatekeeping orders are altogether wrong, --

 8              THE COURT:  Okay.

 9              MR. BRIDGES:  -- no.

10              THE COURT:  Okay.

11              MR. BRIDGES:  There are problems with gatekeeping

12    orders that do more than what the law, Section 959 in

13    particular, allows them to do.

14              THE COURT:  Okay.  Be more explicit.  I'm not -- I

15    think you're saying, no, except when certain situations exist,

16    but I don't know what the certain situations are.

17              MR. BRIDGES:  And Your Honor, you're exactly right.

18    It's complicated, and it takes a long explanation.  Let me

19    start --

20              THE COURT:  Okay.  I really want to know, --

21              MR. BRIDGES:  Yeah, me, too.

22              THE COURT:  -- since I do these all the time, and

23    most of my colleagues do.

24              MR. BRIDGES:  Thank you, Your Honor.  And 959 is on

25    the screen.  Managers of any property --
```

HCMLPHMIT00002775

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 38-20   Filed 06/25/25   Page 874 of 1017   PageID 18756

61

1          THE COURT:  Uh-huh.

2          MR. BRIDGES:  -- is what we're talking about,

3   including debtors in possession.  Now, it starts off by saying

4   trustees, receivers.  I mean, this is exactly what the Barton

5   Doctrine is about, right?  We're talking about trustees and

6   receivers, but not just them.  We're also talking about

7   managers of any property, including debtors in possession, --

8          THE COURT:  Uh-huh.

9          MR. BRIDGES:  -- may be sued without leave of the

10  court appointing that.  That's contrary to the Barton Doctrine

11  so far.

12     With respect to what I've numbered five here -- these

13  numbers are mine -- the quote is directly verbatim out of the

14  U.S. Code, but the numbering one through five is mine.  With

15  respect to what acts or transactions in carrying on business

16  connected with such property.

17     And so, Your Honor, what we're talking about isn't Barton

18  Doctrine is inapplicable, or you can't have a gatekeeping

19  order for any claims, but it's about managers of property.

20  And one of the hornbook examples of this is the grocery store

21  that files for bankruptcy and then, when --

22          THE COURT:  Slip-and-fall.

23          MR. BRIDGES:  You've got it, Your Honor.

24          THE COURT:  Uh-huh.

25          MR. BRIDGES:  And because they're managing property,

017723

HCMLPHMIT00002776

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-20   Filed 06/06/25   Page 875 of 1017   PageID 18757

62

1 | --

2 | THE COURT:  So your cause of action, if it went

3 | forward, is the equivalent of a slip-and-fall --

4 | MR. BRIDGES:  Yes, Your Honor.

5 | THE COURT:  -- in a grocery store?

6 | MR. BRIDGES:  Yes, Your Honor.

7 | THE COURT:  Okay.  Let me skip ahead.  What about the

8 | last sentence of 959(a)?

9 | MR. BRIDGES:  959(b)?  Or 959(a)?

10 | THE COURT:  No, of 959(a).

11 | MR. BRIDGES:  What we're looking at here?

12 | THE COURT:  That's the sentence that I have always

13 | thought was one justification for a gatekeeper provision.  And

14 | I know, you know, a lot of others feel the same.

15 | MR. BRIDGES:  Are we talking about what I have listed

16 | in number five here?

17 | THE COURT:  No.  I'm talking about the last sentence

18 | of 959(a).  Such actions, okay, shall be subject to the

19 | general equity power of such court, you know, meaning the

20 | Bankruptcy Court, so far as the same may be necessary to the

21 | ends of justice, but this shall not deprive a litigant of his

22 | right to a trial by jury.

23 | Isn't that one of the provisions that lawyers sometimes

24 | rely on in arguing a gatekeeper provision is appropriate?

25 | MR. BRIDGES:  Certain --

HCMLPHMIT00002777

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-71   Filed 06/06/25   Page 876 of 1017   PageID 18758

63

1          THE COURT:  You, Bankruptcy Judge, have the power,

2     the general equity power, so far as the same may be necessary

3     to the ends of justice?

4          MR. BRIDGES:  Your Honor, you bet.  Absolutely, there

5     is equitable power to do more.  There's no doubt that there

6     are reliance -- there is reliance on that in many instances.

7     So I'm not sure -- I'm not sure I'm responding to your point.

8          THE COURT:  Well, again, I think this is the third or

9     fourth argument down the line that really you start with in

10    the analytical framework here, but I guess I'm just saying I

11    always thought a gatekeeping provision was consistent,

12    entirely consistent with 28 U.S.C. § 959(a), the last

13    sentence.

14         MR. BRIDGES:  When you're dealing --

15         THE COURT:  You disagree with that?

16         MR. BRIDGES:  I do, Your Honor.

17         THE COURT:  Okay.

18         MR. BRIDGES:  And it's not that the Court lacks

19    equitable powers to do more.  It's that those equitable powers

20    are affected by when management of other parties, third

21    parties' property is at issue.

22       What we're talking about is similar to yesterday's

23    contempt order.  When you set the basis of describing what it

24    is that Highland's business is, that they're a registered

25    investment advisor in the business of buying, selling, and

HCMLPHMIT00002778

Case 19-34054-sgj11 Doc 4255-71 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02072-S Document 28-71 Filed 06/05/25 Page 877 of 1017 PageID 18759

64

1  managing assets -- assets, of course, are property, and that

2  property is not just Highland's, but it's third-party

3  property, as if a railroad loses luggage belonging to its

4  customers. Rather than the railroad with a trustee appointed

5  having mismanaged railroad property, we're talking about

6  third-party property here, third-party property that belongs

7  to the CLOs, about a billion dollars of assets in these CLO

8  SPEs that Highland manages.

9      And again, the slide that Mr. Sbaiti showed you showing

10  Highland, yes, they manage their own assets, the assets of the

11  Debtor, but also of the third parties, including the

12  Charitable DAF and CLO Holdco, and that the Advisers Act

13  imposes fiduciary duties on them that are unwaivable when

14  they're doing that.

15      In *Anderson*, the Fifth Circuit called 959 an exception to

16  the rule requiring court's permission for leave to sue. In

17  *Hoffman v. City of San Diego* much more recently, relying on

18  this statute again, the court rejected a *Barton* challenge and

19  called it a statutory exception. And in *Barton* itself, from a

20  century ago, the U.S. Supreme Court even acknowledged there

21  that where a receiver misappropriated the property of another

22  -- not the debtor's property, the property of another -- that

23  the receiver could still be sued personally, without leave of

24  court.

25      Absent *Barton*, absent applicability of the Barton

017726

HCMLPHMIT00002779

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 71 Filed 06/06/25 299  Page 878 of 1017    PageID 18760

65

1    Doctrine, Your Honor, the gatekeeper order is problematic.

2         *Barton* applies where a court has appointed a trustee, and

3    I don't think, Your Honor, under the circumstances in this

4    case, that it is fair to say Mr. Seery was appointed, as

5    opposed to approved by this Court.  And it involves a

6    trustee's actions under the powers conferred on him.  The

7    Barton Doctrine is not about a broader exculpation of the

8    trustee.

9         Here, what the Debtor asked for in its motion for

10   approval, approval of hiring Mr. Seery, what it asked for

11   specifically in the motion was that the Court not interfere

12   with corporate decisions absent a showing of bad faith, self-

13   interest, or gross negligence, and asking the Court to uphold

14   the board's decision to appoint Mr. Seery as the CEO as long

15   as they are attributable to any rationale business purpose.

16        At the hearing, Your Honor, at the hearing, we've quoted

17   your comments saying that the evidence amply shows a sound

18   business justification and reasonable business judgment on the

19   part of the Debtor in proposing that Mr. Seery be CEO and CRO.

20   Your Honor, respectfully, those words don't sound like the

21   judge using its discretion to choose -- appoint a trustee.

22   They sound like the Court exercising deference to the business

23   judgment of a business.  And appropriately so.  We don't have

24   trouble with application of the business judgment rule.  Our

25   problem is with application of it and the Barton Doctrine.

HCMLPHMIT00002780

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 38-29   Filed 06/06/25   Page 879 of 1017   PageID 18761

66

 1   Those two do not go together.  A trustee has protection

 2   because it's acting under color of the court that appointed

 3   it.  A court that merely deferred to someone else's

 4   appointment, that's not what the Barton Doctrine is about.

 5   The Barton Doctrine is about the court's function that the

 6   trustee takes on, not deference to the business judgment of

 7   the debtor in possession or the other fiduciary appointed by

 8   the court.

 9       Problem one was the gatekeeping.  Problem two is about the

10   release and the *Applewood* case.  Your Honor, again, ordinary

11   negligence and ordinary fiduciary duty breaches do not rise to

12   the level of gross negligence and willful misconduct.  And

13   because of that, the language of this order appears to be

14   barring them entirely.  No entity may bring a lawsuit against

15   Mr. Seery in certain circumstances without the Bankruptcy

16   Court doing what?  Determining that the cause of action

17   represents a colorable claim of willful misconduct or gross

18   negligence against Mr. Seery.

19       A breach of fiduciary duty under the Advisers Act can be

20   unintentional, it can fall short of gross negligence by miles,

21   and to exculpate Mr. Seery from those kinds of claims entirely

22   is to make him no longer a fiduciary.  A fiduciary duty that

23   is unenforceable makes someone not a fiduciary.  That's

24   plainly not what Mr. Seery thinks his role is.  It's

25   inconsistent with the Advisers Act.  And Your Honor, the

HCMLPHMIT00002781

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 88-71 Filed 06/06/25   Page 880 of 1017   PageID 18762

67

 1   notion that he would not owe his clients fiduciary duties as

 2   he manages their assets would require disclosures under the

 3   SEC regulations.  It creates all kinds of problems to state

 4   that a fiduciary under the Advisers Act does not have

 5   enforceable fiduciary duties.  The order appears to be

 6   releasing all of those.  But for *Applewood's* specificity

 7   requirement, it would be doing that.

 8        As an asset manager under the Advisers Act, Mr. Seery is

 9   managing assets belonging to CLO Holdco and The Charitable

10   DAF.  That's precisely what the District Court action is

11   about, those fiduciary duties.  And Mr. Seery, in describing

12   these recently in testimony here -- forgive me for reading

13   through this, Your Honor, but it is pretty short -- Mr. Seery

14   testifies, I think, from a high level, the best way to think

15   about the Debtor is that it's a registered investment advisor.

16   As a registered investment advisor, which is really any

17   advisor of third-party money over $25 million, it has to

18   register with the SEC and it manages funds in many different

19   ways.  The Debtor manages approximately $200 million current

20   values -- it was more than that of the start of the case -- of

21   its own assets.

22        I'm pausing there, Your Honor.  $200 million of its own

23   assets, but we're about to talk about third-party assets.

24        It doesn't have to be a registered investment advisor for

25   those assets, but it does manage its own assets, which include

017729

HCMLPHMIT00002782

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 71 Filed 06/06/25299    Page 881 of 1017    PageID 18763

68

 1   directly-owned securities, loans, from mostly related entities

 2   but not all, and investments in certain funds, which it also

 3   manages.

 4       And then here it comes:  In addition, the manager -- the

 5   Debtor manages about roughly $2 billion, $2 billion in total

 6   managed assets, around $2 billion in CLO assets, and then

 7   other entities, which are hedge funds or PE style.

 8       We also had to get a very good understanding of each of

 9   the funds that we manage.  And as I said, the Investment

10   Advisers Act puts a fiduciary duty on Highland Capital to

11   discharge its duty to the investors.  So while we have duties

12   to the estate, we also have duties, as I mentioned in my last

13   testimony, to each of the investors in the funds.

14       Now, some of them are related parties, and those are a

15   little bit easier.  Some of them are owned by Highland.  But

16   there are third-party investors in these funds who have no

17   relation whatsoever to Highland, and we owe them a fiduciary

18   duty both to manage their assets prudently but also to seek to

19   manage -- maximize value.

20       Those duties do not require -- requires the opposite of

21   what I mean.  They don't merely require avoiding gross

22   negligence or willful wrongdoing.  When you're managing assets

23   of others, the fiduciary duties that you owe are far stricter

24   than that.  The highest duty known to law is a fiduciary duty.

25       The order is inconsistent with that testimony,

017730

HCMLPHMIT00002783

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document Exhibit 71 Filed 06/06/25299   Page 882 of 1017   PageID 18764

69

1    acknowledging the fiduciary duties owed to The Charitable DAF

2    and to CLO Holdco.  It appears to release the Debtor -- maybe

3    not the Debtor.  My slide may be wrong about that.  It appears

4    to release Seery from having to uphold these duties.

5         In addition to problems with the gatekeeping under the

6    Barton Doctrine, in addition to the release problem and

7    *Applewood* and the unwaivable fiduciary duties under the

8    Advisers Act, there's also a problem with telling other courts

9    that they lack jurisdiction.  Your Honor knows bankruptcy

10   court law -- bankruptcy -- and the Bankruptcy Code far better

11   than I do, I'm certain.  But a first principle, I believe, of

12   bankruptcy law is that this Court's jurisdiction is derivative

13   of the District Court's.  And the only doctrine I've heard of

14   that can allow this Court to exercise exclusive jurisdiction

15   of the District Court that it sits in is the Barton Doctrine,

16   which, again, is very problematic to apply in this case, for

17   the reasons we've discussed already.

18        By claiming to have -- by stating in the order that this

19   Court has sole jurisdiction, it appears to either be inclusive

20   of the District Court, which I understand Your Honor doesn't

21   think her order can be read that way, but if it's not read

22   that way, then it results in telling the District Court that

23   it doesn't have the original jurisdiction that Congress has

24   given it.  And that's problematic in the order as well.

25             THE COURT:  Let me ask you.  If you think the word

HCMLPHMIT00002784

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 20-71 Filed 06/05/25   Page 883 of 1017   PageID 18765

70

1  "power" had been used, or "authority," versus "jurisdiction,"

2  that would have cured it?

3       MR. BRIDGES:  I think there would still have been

4  other problems.  Would it have cured this?  I don't think so,

5  Your Honor, because, again, I think the only basis for that

6  power is the Barton Doctrine.

7       THE COURT:  Okay.

8       MR. BRIDGES:  To listen to opposing counsel, you'd

9  think that our jurisdictional argument was entirely about the

10 jurisdiction stripping.  It's not.  Frankly, Your Honor,

11 that's maybe even a lesser point.  A key problem here to is

12 the assertion of jurisdiction, not over any of the claims, but

13 over all of the claims, because of 157(d), Your Honor, because

14 some claims, some causes of action, have been put outside the

15 reach of bankruptcy, the Bankruptcy Court, and those actions

16 may in some instances fit within your description of the cases

17 that are precluded here.

18     That's a problem jurisdictionally with this Court's

19 ability to say it retains jurisdiction or that it has, that it

20 asserts jurisdiction.  Over what?  Any kind of claim or cause

21 of action against Mr. Seery relating in any way to his role as

22 the chief executive officer and chief restructuring officer of

23 the Debtor.

24     Some claims that fit into that bucket also fit into the

25 description in 157(d) of cases that require both consideration

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 71 Filed 06/06/2999   Page 884 of 1017   PageID 18766

71

1  of bankruptcy law and federal laws affecting interstate

2  commerce or regulating it.  Right?  Some cases must fall into

3  -- under 157(d), despite having something to do with Mr.

4  Seery's role as a chief executive officer.  And Your Honor,

5  the Advisers Act fiduciary duty claims asserted by Respondents

6  in the District Court are such claims.  They cannot be decided

7  without considering the Advisers Act.

8       There are also RICO claims that, of course, require

9  consideration of the RICO statute.  But the Advisers Act

10  claims absolutely require consideration of both bankruptcy law

11  and this Court's order exonerating -- exculpating Mr. Seery

12  from some liability, in addition to the unwaivable fiduciary

13  duties imposed by the Advisers Act.

14       The assertion of jurisdiction here blanketed, in a blanket

15  manner, over all claims against Mr. Seery in any way related

16  to his CEO role is a 157(d) problem that the order has no --

17  has no solution for and we see no way around.  157(d) requires

18  withdrawal of the reference, makes it mandatory, when a case

19  requires considerations of federal law implicating interstate

20  commerce.

21       Your Honor, we think we had to do it the way we did,

22  filing in the District Court instead of filing here, in order

23  to preserve our jurisdictional arguments.  To come to this

24  Court with a motion and then what?  Immediately file a motion

25  to withdraw the reference on our own motion here?  To come

HCMLPHMIT00002786

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 38-23    Filed 06/06/25    Page 885 of 1017    PageID 18767

72

1  here and ask for a decision on colorability, when first

2  colorability would exclude the claims that we're trying to

3  bring, at least some of them, the mere negligence, mere

4  fiduciary duty breaches, because they don't rise to the level

5  necessarily of gross negligence or willful wrongdoing.

6     Your Honor, coming here and asking this Court to rule on

7  that may well have waived our jurisdictional objections.

8  Coming here to this Court and doing that and immediately

9  filing a motion --

10        THE COURT:  I don't get it.

11        MR. BRIDGES:  The ordinary --

12        THE COURT:  Subject matter jurisdiction, if it's a

13  problem, it's not waivable.

14        MR. BRIDGES:  The ordinary issue -- the ordinary

15  waiver rule, Your Honor, is that when you come and ask for a

16  court to rule on something, that you waive your right to -- to

17  later -- you're estopped judicially from taking the contrary

18  position.

19        THE COURT:  Okay.  Well, again, I don't get it.  If

20  you filed your motion and I ruled in a way you didn't like,

21  you would appeal to the District Court.

22        MR. BRIDGES:  Yes, Your Honor.  An appeal to the

23  District Court, we would be entitled to do.  I understand, no

24  matter what happens here, we can appeal to the District Court.

25  That's different from whether or not, by coming here first,

017734

HCMLPHMIT00002787

```
 1   have we waived or have we created an estoppel situation, in

 2   terms of arguing jurisdiction.

 3            THE COURT:  Okay.

 4            MR. BRIDGES:  Because of the problems with the order,

 5   we thought we were in a situation where coming here would

 6   waive rights that we could avoid waiving by asking in the

 7   District Court.

 8        In other words, there was a jurisdictional paradox:  How

 9   does a party ask a court to do something it believes the court

10   lacks the power to do?  That's the spot we found ourselves in.

11   What were we supposed to do?

12        Your Honor, it is definitely a complex case.  And coming

13   into this matter with over 2,000 filings on the docket before

14   I had ever heard of Highland was a very daunting thing, coming

15   into this case.  And whether or not there's something that we

16   missed is certainly possible, but these orders that are the

17   subject of the contempt motion, these orders are not things

18   that we overlooked.  These are things that we studied

19   carefully, that we did not ignore or have disdain for, but

20   that affected and changed our actions.

21        And in the Slide #3 from Mr. Morris's -- from Mr. Morris's

22   presentation, in his third slide, he quotes from the first

23   page of our motion for leave, the motion that he says exhibits

24   our contemptuous behavior.

25        The second paragraph is kind of tiny print there, Your
```

HCMLPHMIT00002788

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-71 Filed 06/05/25 Page 887 of 1017   PageID 18769

74

1   Honor, and it's not highlighted, but I'd like to read it.

2   Seery is not named in the original complaint, but this is only

3   out of an abundance of caution due to the Bankruptcy Court in

4   HCM's pending Chapter 11 proceeding having issued an order

5   prohibiting the filing of any causes of action against Seery

6   in any way related to his role at HCM, subject to certain

7   prerequisites.  In that order, the Bankruptcy Court also

8   asserts sole jurisdiction over all such causes of action.

9       Your Honor, our intent was not to violate the order.  Our

10  intent was to be cautious about how we proceeded, to fully

11  disclose what we were doing, and to do it in a District Court

12  that absolutely could refer the matter here to this Court for

13  a decision, but to do it in a way that didn't waive our

14  jurisdictional arguments, that didn't waive our arguments

15  regarding the release of the very claims we were trying to

16  bring, by first having to prove that they were colorful claims

17  of willful misconduct or gross negligence, when we were trying

18  to assert claims that weren't willful negligence or gross --

19  gross negligence or willful misconduct.  That was what I was

20  trying to say.

21      Your Honor, this was not disregard of your order.  If

22  we're wrong on the law, we're wrong on the law, but it's not

23  that we disregarded your order or lacked respect for it.  We

24  disclosed it.

25      Mr. Morris has argued in the briefs that we attempted to

017736

HCMLPHMIT00002789

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document Exhibit 71 Filed 06/06/25299   Page 888 of 1017    PageID 18770

75

1    do this on an ex parte basis.  Your Honor, we did not attempt

2    to do this on an ex parte basis.  And if there are errors,

3    they probably are mine.  I know one error is mine.  On the

4    civil cover sheet in the filing in the District Court, I noted

5    and passed on that we should check the box for related case

6    and list this case on there.  I did not follow up to make sure

7    that it happened, and administratively, it didn't happen.  We

8    did not check the box on the civil cover sheet.  Mr. Morris is

9    correct that we failed to do that.  He's incorrect that that

10   was sneaky or intentional.  It was my error, having noticed it

11   but not followed up.

12       Your Honor, similarly, the argument that we didn't serve

13   them with the motion I think is disingenuous.  What happened,

14   Your Honor, is that counsel for the Debtor had agreed to

15   accept service of the complaint itself against the Debtor

16   before the motion for leave, and after accepting service, I

17   was under the impression that they'd be monitoring the docket,

18   especially when I emailed them, informed them that we were

19   filing the motion for leave to amend, because I was required

20   to submit a certificate of conference on that motion.  I

21   informed them in a polite email.  The polite email is not

22   quoted in their brief.  It is included in the record, and it's

23   quoted in full in our brief.

24       The email exchange indicates to them, Thank you for

25   pointing out the Court's orders.  We've carefully studied them

HCMLPHMIT00002790

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-22   Filed 06/06/25   Page 889 of 1017   PageID 18771
Exhibit 71 Page 76 of 299

76

1  and we don't think what we're doing is a violation of those

2  orders.

3       That we didn't serve them is because we thought they

4  already knew that the motion was coming and would be

5  monitoring the docket, and we didn't know which lawyers they

6  were going to have make an appearance in that case, so we

7  wouldn't have known who to serve.  But if not serving them --

8  first, the Rules do not require that service.  But if not

9  serving them out of politeness --

10          THE COURT:  Mr. Morris is standing up.  Did --

11          MR. MORRIS:  I move to strike all of this, Your

12  Honor.  If Counsel wants to take the stand and raise his hand,

13  he should testify under oath.  I'm just going to leave it at

14  that.  He's not on their witness list.

15          THE COURT:  All right.  I overrule.  You can

16  continue.

17          MR. BRIDGES:  Thank you, Your Honor.

18       If failure to serve them was an error, it was mine.  I

19  know of no rule that requires it.

20          THE COURT:  Can I ask you, you were talking about the

21  cover sheet mistake in not checking the box.  What about your

22  jurisdictional statement in the actual complaint not

23  mentioning 28 U.S.C. § 1334 as a possible basis for subject

24  matter jurisdiction?  Do you think that was a mistake as well,

25  or was that purposeful, not necessary?

HCMLPHMIT00002791

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 33-28   71   Filed 06/06/25   Page 890 of 1017   PageID 18772

77

 1              MR. BRIDGES:  Candidly, Your Honor, standing here

 2      right now, I have no recollection whatsoever of it.

 3              THE COURT:  You mention 28 U.S.C. § 1331, and then

 4      1367 supplemental jurisdiction, but you don't mention 1334.

 5              MR. BRIDGES:  I suspect it's true, but Mr. Sbaiti

 6      would have written that.

 7              THE COURT:  Okay.

 8              MR. BRIDGES:  I have no recollection of --

 9              THE COURT:  Okay.

10              MR. BRIDGES:  -- making any decision at all --

11              THE COURT:  All right.

12              MR. BRIDGES:  -- with regards to that.

13              THE COURT:  Okay.

14              MR. BRIDGES:  Your Honor, you've been very patient

15      with a very long opening argument, and I'm very grateful for

16      that.  Please know that we take this Court's order seriously.

17      We voluntarily appeared here before the Court ordered us to do

18      so by filing our motion asking for a modification of the order

19      we're accused now of having been in violation of.

20          And the last thing I'd like to say, Your Honor, Mr.

21      Morris's brief claims that the first he knew of the motion,

22      the motion seeking leave to add Mr. Seery to the District

23      Court claim, the first he knew of that was when Mr. Sbaiti

24      forwarded him the District Court's order dismissing that

25      motion, denying that motion without prejudice.

HCMLPHMIT00002792

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-1 Filed 06/06/25 299 Page 891 of 1017   PageID 18773

78

1    Your Honor, in a civil contempt proceeding, where the

2    issue is compensating, not punishing, if the aggrieved party

3    didn't even know about the action until it had been denied by

4    the District Court, we submit that there can be no harm from

5    that having taken place.

6        That's all I have for opening.  Thank you, Your Honor.

7            THE COURT:  All right.  Thank you.

8        Before we give you a time check, do we have other opening

9    statements?

10           MR. ANDERSON:  Yes.  Yes, Your Honor.  Michael

11   Anderson on behalf of Mr. Patrick.  If we need to take a

12   break, that's fine, too.

13           THE COURT:  Well, how long do you plan to use?

14           MR. ANDERSON:  No more than ten minutes, for sure.

15           THE COURT:  Let's go ahead and do that, and then

16   we'll take a break.

17           MR. POMERANTZ:  Your Honor, after, I would ask the

18   opportunity to respond to Mr. Bridges' argument.  Probably

19   another ten minutes.

20           THE COURT:  All right.  Let's go ahead and take a

21   ten-minute break.  And Mr. Taylor, you're going to have

22   something, because you --

23           MR. TAYLOR:  Five.

24           THE COURT:  Okay.  We'll take a ten-minute break.

25   And Nate, can you give them a time?

HCMLPHMIT00002793

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S     Document 8-20 71  Filed 06/06/25299  Page 892 of 1017    PageID 18774

79

```
 1            THE CLERK:  I'm showing it was about 59-1/2 minutes.
 2            THE COURT:  Fifty-nine and a half?  And is that
 3    subtracting some for my questioning?
 4            THE CLERK:  I stopped whenever you talked, maybe a
 5    little over --
 6            THE COURT:   Okay.  So he stopped it whenever I asked
 7    questions and you answered, so 59 minutes has been used by the
 8    Respondents.
 9        All right.  We'll take a ten-minute break.  We'll come
10    back at 11:35.
11            THE CLERK:  All rise.
12        (A recess ensued from 11:25 a.m. to 11:37 a.m.)
13            THE COURT:  All right.  We're going back on the
14    record in the Highland matter.  We have further opening
15    statements.  Counsel, you may proceed.
16      OPENING STATEMENT ON BEHALF OF MARK PATRICK, RESPONDENT
17            MR. ANDERSON:  Thank you.  May it please the Court,
18    Counsel.  Michael Anderson on behalf of Respondent, Mark
19    Patrick.
20        Your Honor, after listening to this and looking at the
21    filings in this case, this issue of whether there's contempt
22    -- and I would argue there's not -- is ripe for decision.  We
23    have no real undisputed facts for purposes of the contempt
24    issue.  We have your Court's July order, the subject of Mr.
25    Bridge's arguments.  We have the Plaintiffs in the underlying
```

HCMLPHMIT00002794

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 71 Filed 06/30/25299 Page 893 of 1017    PageID 18775

80

 1  lawsuit at issue.  They commenced the lawsuit in April of this

 2  year.  There's absolutely nothing improper about that filing.

 3  It's not subject to the contempt.  A week later, there is a

 4  motion for leave to add Mr. Seery.  That's the issue.  There's

 5  no dispute over that.  There's no dispute that Mr. Patrick

 6  authorized the filing of the motion for leave.

 7      And so then the question becomes we look at the Court's

 8  July order, did a motion for leave, did that violate the terms

 9  of the order?  The motion for leave is not commencing a

10  lawsuit.  It's also not pursuing a claim, because whether or

11  not the Court grants the motion, denies the motion, or

12  whatever the Court does, nothing happened, because the day

13  after the motion for leave was filed it was dismissed *sua*

14  *sponte* without prejudice because not all parties had been

15  served in the case.

16      It was permission asked one day.  The matter was mooted

17  the following day by the District Court.  And so that is

18  completely undisputed.

19      And so the question is, is asking permission, is that

20  commence?  I think everybody says there's no way that's

21  commencing a lawsuit because you have asked permission.  The

22  question, then, is it pursuing a claim?  And the argument,

23  well, no, that's not pursuing a claim; it's asking permission.

24      And I think it's also important to note that when the

25  motion for leave was filed, there were no secrets there.  I

017742

HCMLPHMIT00002795

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 24-8   Filed 06/05/25   Page 894 of 1017   PageID 18776
Exhibit 71 Page 85 of 299

81

1    mean, I'm coming in this after the fact, representing Mr.

2    Patrick.  You look at a motion for leave, and right there on

3    Page 1 it talks about Your Honor's order.  Page 2, it quotes

4    the order and it gives the reasons, there's arguments being

5    made as to why that order doesn't bar adding Mr. Seery as a

6    defendant in the lawsuit, many of the arguments that Mr.

7    Bridges made.

8        So that's where we are.  And so when I hear, hey, we've

9    got six hours, three hours and three hours, and we're going to

10   split this up, you know, maybe too simplistic from Fort Worth,

11   but I'm like, wait a second, this is all undisputed.  It's

12   totally undisputed.  The -- whether or not the prior order is

13   enforceable or not enforceable, those are all legal arguments.

14   You know, no witnesses are necessary for that.  And as I

15   understood, right before we broke, counsel stood up and he's

16   going to do what generally doesn't happen in opening

17   statements, which is respond to opening statements, which

18   shows that that's a legal issue.

19       And so it really does come down to undisputed facts.

20   There's no testimony.  No -- nothing is necessary.  And a lot

21   of what this comes down to is the old statement, you know, is

22   it better to ask forgiveness or permission?  And usually that

23   statement comes up when somebody has already done something:

24   Hey, I'm going to go do it anyway and I'll ask for forgiveness

25   later.  Well, what the Plaintiffs in the underlying case did

HCMLPHMIT00002796

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 11-28 71  Filed 06/06/25  299   Page 895 of 1017    PageID 18777

82

1   was ask permission.  Motion for leave.  That is not

2   contemptuous.  And there's literally no damages.  As was

3   pointed out, by the time counsel found out, it had already

4   been dismissed.

5         The last thing I want to point out, Your Honor, is that

6   the argument from opposing counsel was, well, under Rule 15 of

7   the Federal Rules of Civil Procedure, since parties hadn't

8   answered yet, the Plaintiffs in the underlying case could have

9   just simply added Mr. Seery as a defendant and moved on that

10  way, but then that would be another ball of wax and then we

11  would be addressing issues as far as whether or not there is a

12  violation of the Court's order, notwithstanding Mr. Bridge's

13  arguments.  But then we would have those issues.  But that's

14  not what happened.  Everybody knows that's not what happened.

15  It was a motion for leave that was resolved the following day.

16        And so, Your Honor, for those reasons, and those

17  undisputed reasons, we would request that the Court at the end

18  of this hearing deny the request for sanctions and a contempt

19  finding against our client, Mr. Patrick.

20        Mr. Phillips is going to address one brief issue

21  bankruptcy-wise I believe that was raised earlier.

22            THE COURT:  Okay.  Mr. Phillips?

23            MR. PHILLIPS:  Your Honor, thank you very much.

24  Louis M. Phillips on behalf of Mark Patrick.

25        The only thing that I would point out, Your Honor, and I'm

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 28-71  Filed 06/06/25   Page 896 of 1017   PageID 18778

83

1   going to do -- try to simplistically, because that's about the

2   level at which I operate, boil down the questions about the

3   order.

4        This order was an employment order.  The problem that Mr.

5   Bridges has elucidated to Your Honor is that the precise

6   effect, one of the precise effects of that order is to bar the

7   claims of third parties that arise into the future on the

8   basis of the employment of Mr. Seery, because the order

9   required that all claims asserting gross negligence or willful

10  misconduct need to be brought before you to determine that

11  they're colorable.

12       One question I have is, does it apply to the lawsuit that

13  was filed?  Doesn't apply unless the effect of the order was

14  to release those claims and preclude any party from bringing

15  those claims at all.  And while you can say correctly that

16  this Court issues gatekeeper orders all of the time, one thing

17  I cannot imagine that you would say is that in employment

18  orders you release claims of third parties existing and as may

19  arise in the future that could be brought against the party

20  employed to be a CRO of a debtor, who, by his own testimony,

21  says we do all kinds of stuff in the billions of dollars for

22  third parties that we owe fiduciary duties to.

23       There's no way, Your Honor, that you were considering your

24  July order to bar third-party claims arising from breach of

25  fiduciary duties by Mr. Seery to third parties who held third-

017745

HCMLPHMIT00002798

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 30-1   Filed 06/05/25   Page 897 of 1017   PageID 18779

84

1   party claims that did not involve some assertion that, in his

2   capacity as CRO, he was in some way acting within the scope of

3   his authority as CRO for the Debtor and yet committed

4   negligence against the Debtor.

5        Now, if the order was asserting that you know what a lot

6   of people in this courtroom know, that the standard of

7   liability for a CRO doing work for a debtor, just like the

8   standard of liability for the president of a corporation or an

9   officer of the corporation, is as long as you're within the

10  course and scope of your employment, your actions for the

11  corporation have -- can -- the corporation takes care of you

12  because there's no personal claim unless you're outside the

13  scope, and you're outside the scope if you commit gross

14  negligence or willful misconduct.

15       That, if you're restating the standard of care and

16  standard of liability for a CRO, we have no problem with that,

17  because Mr. Patrick did not authorize a cause of action

18  arising against Mr. Seery against the Debtors for damage to

19  the Debtors.  He authorized the filing of a complaint in the

20  District Court with jurisdiction for a third-party claim for

21  breach of a fiduciary duty to a third party that Mr. Seery

22  admits he owes, and then sought leave because they didn't

23  understand the order that Your Honor issued.  It couldn't have

24  been to release the breach of fiduciary duty claims that

25  wouldn't rise to gross negligence or willful misconduct, it

017746

HCMLPHMIT00002799

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document Exhibit 71 Filed 06/06/25 299  Page 898 of 1017    PageID 18780

85

1   couldn't be that, but it might be.  But if it did, under an

2   employment order?  That's very different from *Espinosa*, that's

3   very different from *Shoaf*, when you're at the end of a case in

4   a confirmation of a plan and you're talking about matters

5   arising in the past.

6        This order, if it has the effect it could be read to have,

7   precludes any third party from asserting a breach of fiduciary

8   duty against Seery for actions that violate the duty to that

9   third party, when Seery's biggest job, it looks to us like, is

10  running third-party money.  That could not have been what Your

11  Honor was thinking.

12       And so all I'm pointing out is I'm trying to distill down.

13  The lawsuit doesn't involve gross negligence or willful

14  misconduct allegations.  It involves breach of fiduciary duty,

15  breach of the Advisers Act, et cetera, et cetera.  Mr. Patrick

16  authorized that lawsuit.

17       Now, what we're here for today is to determine whether the

18  complaint, which was not against the Debtor -- which was not

19  against Seery, the motion for leave, which did not -- all they

20  did was ask for permission, not forgiveness.  And we can't

21  understand how the Debtor should be saying, all they had to do

22  was amend.  Well, if they amended, would we be in hotter water

23  than we are today for asking for permission to sue?  I think

24  we would have been, that should have been the prescribed

25  course, when we are more concerned and we are more risk-averse

HCMLPHMIT00002800

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 71 Filed 06/06/25299   Page 899 of 1017   PageID 18781

86

1  by asking for leave rather than just amending by right.

2  Absolutely, that makes no sense.  We can't be held to be more

3  contemptuous because we asked for permission, when we could

4  have just sued him, because they're saying asking for

5  permission was wrong.  Certainly, suing him would have been

6  wrong.  That would have been easier.

7          THE COURT:  But Mr. Phillips, the issue is you all

8  didn't come to the Bankruptcy Court and ask permission.

9          MR. PHILLIPS:  Look at your order, Your Honor.

10          THE COURT:  It's right in front of me.

11          MR. PHILLIPS:  Right.  That order either doesn't

12  apply to the claims that were brought or it released the

13  claims that were brought.  That's our point.  It couldn't have

14  released them.  Does it apply to them?  Thank you.

15          THE COURT:  Okay.  Mr. Taylor?

16          MR. TAYLOR:  Good morning.

17          THE COURT:  Good morning.

18          OPENING STATEMENT ON BEHALF OF JAMES DONDERO

19          MR. TAYLOR:  Your Honor, Clay Taylor on behalf of Jim

20  Dondero.  I'll be very brief because I know we've already

21  spent a lot of time on opening argument.  But I do think it is

22  appropriate to, one, first look at who brought the lawsuit,

23  CLO Holdco & DAF.  That was authorized -- it's undisputed it

24  was authorized by Mr. Patrick.  There is no dispute about

25  that.  There's no dispute who the Plaintiffs are.  But yet my

1    client is up here as an alleged violator.

2        I think it's very clear, as all the parties have said,

3    there's no dispute as to there's an order, there was a

4    complaint, and there was a motion for leave.

5        It seems to me that the rest of the evidentiary hearing

6    that you may be about to go through is going to be about pin

7    the blame on Mr. Dondero.  It is undisputed that he is not a

8    control person for the DAF or CLO Holdco.  The only type of

9    evidence you will hear is going to be insinuation that he

10   somehow controls Mr. Patrick and used to control Mr. Scott.

11   There will be no direct evidence that he authorized this or

12   that he's the control person and the proper corporate

13   authorized representative that signed off on the --

14       It seems to me, Your Honor, first of all, that's a

15   discrete issue that should be able to be decided separately

16   from this, and the first gating issue is, was there indeed a

17   violation of this Court's order?  It would seem to me that

18   there is no disputes about those facts and that we should

19   bifurcate that, and if you then find that there is a violation

20   and find that there is any even need to move into who the

21   alleged violators are, that then we could have that

22   evidentiary portion.  But there is no reason to do that now

23   before there's even been found to be a violation.

24           THE COURT:  All right.  Thank you.

25       All right.  Well, someone made the point rebuttals in

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 30-23 Filed 08/06/25 Page 901 of 1017    PageID 18783

88

1 | opening statements are not very common, --

2 | MR. POMERANTZ:  Your -- Your --

3 | THE COURT:  -- but you can use your three hours

4 | however you want.

5 | OPENING STATEMENT ON BEHALF OF THE DEBTOR

6 | MR. POMERANTZ:  Your Honor, I didn't intend to stand

7 | up.

8 | THE COURT:  Okay.

9 | MR. POMERANTZ:  I also didn't intend to have the

10 | motion to modify the sealing order presented to Your Honor,

11 | which it was in the course of that opening argument.  And

12 | despite your comments at the beginning of the hearing, the

13 | Movants have taken Your Honor down a series of rabbit holes

14 | that have really no relevance to the contempt motion.  And

15 | notwithstanding, as I said, your ruling that basically the

16 | contempt would go first and the modification would go second,

17 | there they were, persistent in making all the arguments why

18 | this Court should modify the order.

19 | They're just really trying to obfuscate the simple issue

20 | that Mr. Morris presented and raised at the beginning of the

21 | hearing:  Did they violate the order by pursuing a claim?  We

22 | think the answer is undoubtedly yes.

23 | I'm not going to try to address each of the issues they

24 | raised in connection with the modification motion in detail.

25 | I have a lengthy presentation.  I'll do it at the appropriate

HCMLPHMIT00002803

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 23-71   Filed 06/06/25   Page 902 of 1017   PageID 18784

89

1   time.  But there are a few issues I want to address.  I want

2   to address one of the last points Mr. Bridges raised first.

3   If they thought that the order was a problem, they could have

4   filed their motion to modify that order before Your Honor.

5   They could have had that heard first.  There was no statute of

6   limitations issue in connection with the HarbourVest matter.

7   They could have come to Your Honor to do that.  But no, they

8   didn't.  They went to the District Court first, and it was

9   only after we filed our contempt motion that they came back

10  and said, well, Your Honor, you should modify the order.

11  Their argument that if they did that there would have been

12  waiver and estoppel is just an after-the-fact justification

13  for what they did and what they tried to do, which was

14  unsuccessful.  They tried to have the District Court make the

15  decision.

16      And why?  Your Honor, they've filed motions to recuse

17  before Your Honor.  They -- they -- it's no secret the disdain

18  they have for Your Honor's rulings as it relates to them.

19  They wanted to be out of this courtroom and in another

20  courtroom.

21      And their belated argument, Mr. Bridges falling on the

22  sword, that they failed to check the box, inadvertent, it's on

23  me, it's very curious.  Because if they had done so and had

24  referred to the correct 1334 jurisdictional predicate, as Your

25  Honor had mentioned, the complaint would have been referred to

HCMLPHMIT00002804

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 71 Filed 06/05/25299 Page 903 of 1017    PageID 18785

90

 1   this Court and the entire trajectory of the proceedings would

 2   have been different.  They would have had the opportunity to

 3   take their shot to go to District Court and argue that your

 4   order didn't apply.

 5       Your Honor, they say the January 9th order is not

 6   relevant.  It is entirely relevant.  It covered the

 7   independent directors and their agents.  Yes, Mr. Seery is an

 8   independent director, but he was also an agent of the

 9   independent directors and carried out the duties.  You heard

10   argument at the July 16th hearing that Mr. Seery had been

11   acting as the chief executive officer for several months.  And

12   why is it important?  Mr. Bridges said, well, if we violated

13   one order, we violated the other.  It's important because,

14   Your Honor, number one, Mr. Dondero supported that order.  We

15   would never have had an independent board in this case if Mr.

16   Dondero, the decision-making -- of the Debtor at that time,

17   supported that order and supported the exculpations that are

18   now claimed to have been invalid.

19       And also Your Honor heard testimony at the confirmation

20   hearing that the independent directors would never have taken

21   this job, would never have taken this job because of the

22   potential for litigation, litigation that we've now had to

23   endure for several months.  So to come back 16 months later

24   and say, well, you know, you couldn't really exculpate them,

25   it's really an employment order:  It was an employment order.

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 28-71 Filed 06/20/25   Page 904 of 1017   PageID 18786

91

1    They know it.  We know it.  Your Honor knows it.  It was a

2    resolution of corporate governance issues that changed the

3    whole trajectory of the case, and luckily it -- luckily, Your

4    Honor approved it.

5        The question just is whether they violated the order,

6    period.  And I'll have a lot to say about res judicata, but I

7    won't go in too much in detail, but I will just briefly

8    address their arguments.  They're correct and the Court is

9    correct that there's a difference between *Applewood* and *Shoaf*.

10   And Your Honor got the exact difference.  In one case, a

11   release was not specific, *Applewood*.  In one case it was.

12   *Shoaf* hasn't been discredited by *Applewood*.  It was different

13   facts.  In fact, *Shoaf* relied on two Supreme Court cases, the

14   *Stoll* case and the *Chicot* case, both for the propositions that

15   a court that enters an order, a clear order, even if it didn't

16   have jurisdiction, that cannot be attacked in res judicata.

17   So here what we have is clear, unambiguous, you come to this

18   Court before commencing or pursuing a claim.  That's the

19   clarity.  The focus on the releases, that's not what we're

20   here for today, that's not what we're here for on a contempt

21   motion, on whether the release covered them or it didn't cover

22   them.  We're here on the clear issue of did they violate the

23   language, and we submit that they did.

24       And similarly, *Espinosa* applies.  Your Honor, just to

25   quote some language, "Appellees could have moved to remand the

017753

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 28-71 Filed 06/06/25    Page 905 of 1017    PageID 18787
Exhibit 71 Page 96 of 299

92

1   action to state court after it improperly -- after its

2   improper removal to the federal court or challenge the

3   district court's exercise in jurisdiction on direct appeal.

4   Because they did neither, they are now barred by principles of

5   res judicata."

6       Res judicata actually does apply, and I will speak about

7   it in much more detail in the modification motion.

8       With respect to *Barton*, Your Honor, we disagree with their

9   argument that Mr. Seery is not a court-appointed agent.  We've

10  briefed it extensively in our motion to modify.  *Barton*

11  applies to debtors in possession.  *Barton* applies to general

12  partners of the debtor.  *Barton* applies to chief restructuring

13  orders -- officers who are approved by the debtor.  And it

14  applies to general counsel who are appointed by the chief

15  restructuring order.  Officer.

16      So the argument that *Barton* is somehow inapplicable is

17  just wrong.  Your Honor knows that.  Your Honor has written

18  extensively on *Barton* in connection with your *Ondova* opinion.

19      Some of the argument about 959 is all wrong, as well.

20  Your Honor got it right that 959 applies to slip-and-fall

21  cases or torts, injuries to parties that are strangers to this

22  process.  There is a legion of cases that I will cite to Your

23  Honor in connection with argument.  959 does not apply here.

24  There's nothing more core to this case than the transactions

25  surrounding the resolution of the HarbourVest claims.

017754

HCMLPHMIT00002807

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 71   Filed 06/05/299   Page 906 of 1017   PageID 18788

93

1    We also disagree, Your Honor, that the complaint is

2    subject to mandatory withdrawal of the reference.  We've --

3    one of our exhibits in the motion to modify is our motion to

4    enforce the reference.  We think Movants have it completely

5    wrong.  This is not the type of case that will be subject to

6    withdrawal -- mandatory withdrawal of the reference, and in

7    any event, for this contempt motion, it's irrelevant.

8    And they argue -- one of the other points Mr. Bridges

9    raises is that, because this Court would not have had

10   jurisdiction under 157 because of the mandatory withdrawal,

11   then Your Honor could not legally act as a gatekeeper.  But

12   they haven't addressed *Villegas v. Schmidt*.  We've raised it

13   throughout this case.  And again, in these series of

14   pleadings, they don't even address it.  And *Villegas v.*

15   *Schmidt* was a *Barton* case.  It was a *Barton* case where the --

16   where the argument was that *Barton* does not apply because it's

17   a *Stern* claim and the Bankruptcy Court would not have

18   jurisdiction.  And *Villegas* said no, it does apply.  And Your

19   Honor even cited that in your *Ondova* case.  And why does it

20   apply?  Because there's nothing inconsistent with a Bankruptcy

21   Court having exclusive decision to make a *Barton*

22   determination.

23   In fact, in that case *Villegas* said, you can't go to the

24   District Court for that decision, it is the Bankruptcy Court's

25   decision.

017755

HCMLPHMIT00002808

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document Exhibit 71 Filed 06/05/299   Page 907 of 1017    PageID 18789

94

1    So, again, it's a red herring, Your Honor.  Your Honor had

2    the ability to act as an exclusive gatekeeper for these types

3    of actions.

4    With that, Your Honor, I'll leave the rest of my argument

5    for the next motion.

6         THE COURT:  All right.  Thanks.

7    All right.  Nate, let's give everyone their time.

8         THE CLERK:  That was just about eight and a half

9    additional from the Debtor, and then altogether the other ones

10   were just shy of fourteen minutes.  Thirteen minutes and fifty

11   seconds for the other three combined.  Do you want me to --

12        THE COURT:  Yes, I meant for Debtor combined versus

13   --

14        THE CLERK:  Oh.  Oh.

15        THE COURT:  Respondents combined.

16        THE CLERK:  So that would be twenty one and a half

17   the Debtor.  Let me do the math on the other one.  Be an hour

18   twelve minutes and fifty seconds for --

19        THE COURT:  Okay.  All right.  Got that?  Debtors

20   used a total of twenty one and a half minutes; Responders have

21   used an hour twelve minutes and fifty seconds.

22   All right.  Mr. Morris, you may call your first witness.

23        MR. MORRIS:  Thank you very much, Your Honor.  The

24   Debtor calls Mark Patrick.

25        THE COURT:  All right.  Mr. Patrick?  Please approach

017756

HCMLPHMIT00002809

Patrick - Direct                          95

 1  our witness stand and I'll swear you in.  Please raise your

 2  right hand.

 3       (The witness is sworn.)

 4            THE COURT:  All right.  Please take a seat.

 5            MARK PATRICK, DEBTOR'S WITNESS, SWORN

 6                    DIRECT EXAMINATION

 7  BY MR. MORRIS:

 8  Q    Good afternoon, Mr. Patrick.

 9  A    Good afternoon.

10  Q    Can you hear me okay?

11  A    Yes, I can.

12  Q    Okay.  You have before you several sets of binders.

13  They're rather large.  But when I deposed you on Friday, we

14  did that virtually.  Now, I may direct you specifically to one

15  of the binders or one of the documents from time to time, so I

16  just wanted you to know that those were in front of you and

17  that I may be doing that.

18       Mr. Patrick, since March 1st, 2001 [sic], you've been

19  employed by Highland Consultants, right?

20  A    I believe the name is Highgate Consultants doing business

21  as Skyview Group.

22  Q    Okay.  And that's an entity that was created by certain

23  former Highland employees, correct?

24  A    That is my understanding, correct.

25  Q    And your understanding is that Mr. Dondero doesn't have an

HCMLPHMIT00002810

Patrick - Direct                                    96

1   ownership interest in that entity, correct?

2   A    That he does not.  That is correct.

3   Q    And your understanding is that he's not an employee of

4   that -- of Skyview, correct?

5   A    That is correct.

6   Q    Prior to joining Skyview on March 1st, you had worked at

7   Highland Capital Management, LP for about 13 years, correct?

8   A    Correct.

9   Q    Joining in, I believe, early 2008?

10  A    Correct.

11  Q    Okay.  I'm going to refer to Highland Capital Management,

12  LP from time to time as HCMLP.  Is that okay?

13  A    Yes.

14  Q    While at HCMLP, you served as a tax counselor, correct?

15  A    No, I would like to distinguish that.  I did have the

16  title tax counsel.  However, essentially all my activities

17  were in a non-lawyer capacity, being the client

18  representative.  I would engage other outside law firms to

19  provide legal advice.

20  Q    Okay.  So you are an attorney, correct?

21  A    Yes, I am.

22  Q    But essentially everything you did at Highland during your

23  13 years was in a non-lawyer capacity, correct?

24  A    Correct.

25  Q    In fact, you didn't even work in the legal department; is

017758

HCMLPHMIT00002811

1   that right?

2   A    That is correct.  I worked for the tax department.

3   Q    Okay.  Let's talk about how you became the authorized

4   representative of the Plaintiffs.  You are, in fact,

5   authorized representative today of CLO Holdco, Ltd. and

6   Charitable DAF, LP, correct?

7   A    Charitable DAF Fund, LP.  Correct.

8   Q    And those are the two entities that filed the complaint in

9   the United States District Court against the Debtor and two

10  other entities, correct?

11  A    Correct.

12  Q    And may I refer to those two entities going forward as the

13  Plaintiffs?

14  A    Yes.

15  Q    You became the authorized representative of the Plaintiffs

16  on March 24th, 2021, the day you and Mr. Scott executed

17  certain transfer documents, correct?

18  A    Correct.

19  Q    And you had no authority to act on behalf of either of the

20  Plaintiffs before March 24th, correct?

21  A    Correct.

22  Q    The DAF controls about $200 million in assets, correct?

23  A    The Plaintiffs, you mean?  CLO Holdco and Charitable DAF

24  Fund, LP.

25  Q    Yes.

HCMLPHMIT00002812

1  A    Around there.

2  Q    Okay.  Let me try and just ask that again, and thank you

3  for correcting me.  To the best of your knowledge, the

4  Plaintiffs control about $200 million in assets, correct?

5  A    Net assets, correct.

6  Q    Okay.  And that asset base is derived largely from HCMLP,

7  Mr. Dondero, or Mr. Dondero's trusts, correct?

8  A    Can you restate that question again, Mr. Morris?

9  Q    Sure.  The asset base that you just referred to is derived

10 largely from HCMLP, Mr. Dondero, or donor trusts?

11 A    The way I would characterize it -- you're using the word

12 derived.  I would characterize it with respect to certain

13 charitable donations --

14 Q    Uh-huh.

15 A    -- that were -- that were made at certain time periods,

16 where the donors gave up complete dominion and control over

17 the respective assets and at that time claimed a federal

18 income tax deduction for that.

19      I do -- I do believe that, as far as the donor group, as

20 you specified, Highland Capital Management, I recall, provided

21 a donation to a Charitable Remainder Trust that eventually had

22 expired and that eventually such assets went into the

23 supporting organizations.  And then I do believe Mr. Dondero

24 also contributed to the Charitable Remainder Trust No. 2,

25 which seeded substantial amounts of the original assets that

**017760**

HCMLPHMIT00002813

Patrick - Direct                                    99

1    were eventually composed of the $200 million.  And then from

2    time to time I do believe that Mr. Dondero's trusts made

3    charitable donations to their respective supporting

4    organizations.

5    Q    Okay.  Thank you.

6    A    Is that responsive?

7    Q    It is.  It's very responsive.  Thank you very much.  So,

8    to the best of your knowledge, the charitable donations that

9    were made that form the bases of the assets came from those

10   three -- primarily from those three sources, correct?

11   A    Well, you know, there's two different trusts.  There's the

12   Dugaboy Trust and the Get Good Trust.

13   Q    Okay.

14   A    Then you have Mr. Dondero and Highland Capital Management.

15   So I would say four sources.

16   Q    Okay.  All right.  Thank you.  Prior to assuming your role

17   as the authorized representative of the Plaintiff, you had

18   never had meaningful responsibility for making investment

19   decisions, correct?

20   A    I'm sorry.  You kind of talk a little bit fast.  Please

21   slow it down --

22   Q    That's okay.

23   A    -- and restate it.  Thank you.

24   Q    And I appreciate that.  And any time you don't understand

25   what I'm saying or I speak too fast, please do exactly what

017761

HCMLPHMIT00002814

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-71   Filed 06/06/25   Page 913 of 1017   PageID 18795
Exhibit 71   Page 100 of 299

Patrick - Direct                               100

1    you're doing.  You're doing fine.

2        Prior to assuming your role as the authorized

3    representative of the Plaintiffs, you never had any meaningful

4    responsibility making investment decisions.  Is that correct?

5    A    To whom?

6    Q    For anybody.

7    A    Well, during my deposition, I believe I testified that I

8    make investment decisions with respect to my family.  Family

9    and friends come to me and they ask me for investment

10   decisions.  I was -- in my deposition, I indicated to you that

11   I was a board member of a nonprofit called the 500, Inc.  They

12   had received a donation of stock in Yahoo!, and the members

13   there looked to me for financial guidance.  As an undergrad at

14   the University of Miami, I was a -- I was a finance major, and

15   so I do have a variety of background with respect to

16   investments.

17   Q    Okay.  So you told me that from time to time friends and

18   family members come to you for investing advice.  Is that

19   right?

20   A    That is correct.

21   Q    And when you were a young lawyer you were on the board of

22   a nonprofit that received a donation of Yahoo! stock and the

23   board looked to you for guidance.  Is that correct?

24            THE COURT:  Just a moment.  I think there's an

25   objection.

HCMLPHMIT00002815

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 28-71   Filed 07/02/25   Page 914 of 1017   PageID 18796
Exhibit 71   Page 102 of 299

Patrick - Direct                    101

1          MR. MORRIS:  Uh-huh.

2          THE COURT:  Go ahead.

3          MR. ANDERSON:  So far -- relevance, Your Honor.  This

4   is way out of the bounds of the contempt proceeding.  You

5   know, what he did as a young person with Yahoo! stock.  We're

6   here to -- he authorized the lawsuit.  They filed the lawsuit.

7   That's it.  Getting into all this peripheral stuff is

8   completely irrelevant.

9          THE COURT:  Your response?

10         MR. MORRIS:  My response, Your Honor, is very simple.

11  Mr. Patrick assumed responsibility, and you're going to be

12  told that he exercised full and complete authority over a $200

13  million fund that was created by Mr. Dondero, --

14         THE COURT:  Okay.

15         MR. MORRIS:  -- that funds -- that is funded

16  virtually by Mr. Dondero, and for which -- Mr. Patrick is a

17  lovely man, and I don't mean to disparage him at all -- but he

18  has no meaningful experience in investing at all.

19         THE COURT:  All right.  Counsel, I overrule.  I think

20  there's potential relevance.

21      And may I remind people that when you're back at counsel

22  table, please make sure you speak your objections into the

23  microphone.  Thank you.

24  BY MR. MORRIS:

25  Q   When you were a young lawyer, sir, you were on the board

HCMLPHMIT00002816

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 71    Filed 01/03/25    Page 915 of 1017    PageID 18797

Patrick - Direct                      102

1   of a nonprofit that received a donation of Yahoo! stock and

2   the board looked to you for guidance, correct?

3   A    Yes, correct.

4   Q    And -- but during your 13 years at Highland, you never had

5   formal responsibility for making investment decisions,

6   correct?

7   A    That is correct.

8   Q    Yeah.  In fact, other than investment opportunities that

9   you personally presented where you served as a co-decider, you

10  never had any responsibility or authority to make investment

11  decisions on behalf of HCMLP or any of its affiliated

12  entities, correct?

13  A    That is correct.

14  Q    And at least during your deposition, you couldn't identify

15  a single opportunity where you actually had the authority and

16  did authorize the execution of a transaction on behalf of

17  HCMLP or any of its affiliates, correct?

18  A    Correct.

19  Q    And yet today you are now solely responsible for making

20  all investment decisions with respect to a $200 million

21  charitable fund, correct?

22  A    Yes, but I get some help.  I've engaged an outside third

23  party called ValueScope, and they have been as -- effectively

24  working as a "gatekeeper" for me, and I look to them for

25  investment guidance and advice, and I informally look to Mr.

017764

1   Dondero since the time period of when I took control on March

2   24th for any questions I may have with respect to the

3   portfolio.  So I don't feel like I'm all by myself in making

4   decisions.

5   Q    Okay.  I didn't mean to suggest that you were, sir, and I

6   apologize if you took it that way.  I was just asking the

7   question, you are the person now solely responsible for making

8   the investment decisions, correct?

9   A    Yes.

10  Q    Okay.  Let's talk about the circumstances that led to the

11  filing of the complaint for a bit.  On April 12, 2021, you

12  caused the Plaintiffs to commence an action against HCMLP and

13  two other entities, correct?

14  A    Correct.

15  Q    Okay.  One of the binders -- you've got a couple of

16  binders in front of you.  If you look at the bottom, one of

17  them says Volume 1 of 2, Exhibits 1 through 18.  And if you

18  could grab that one and turn to Exhibit 12.  Do you have that,

19  sir?

20  A    It says -- it says the original complaint.  Is that the

21  right one?

22  Q    That is the right one.  And just as I said when we were

23  doing this virtually last Friday, if I ask you a question

24  about a particular document, you should always feel free to

25  review as much of the document as you think you need to

017765

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 28-71 Filed 05/05/25    Page 917 of 1017    PageID 18799

Patrick - Direct                                        104

1  competently and fully answer the question.  Okay?

2  A    Okay.  Thank you.

3  Q    All right.  You instructed the Sbaiti firm to file that

4  complaint on behalf of the Plaintiffs, correct?

5  A    Correct.

6  Q    And to the best of your recollection, the Plaintiffs

7  returned -- retained the Sbaiti firm in April, correct?

8  A    Correct.

9  Q    So the Sbaiti firm was retained no more than twelve days

10  before the complaint was filed, correct?

11  A    Correct.

12  Q    You personally retained the Sbaiti firm, correct?

13  A    Correct.

14  Q    And the idea of filing this complaint originated with the

15  Sbaiti firm, correct?

16  A    Correct.

17  Q    Before filing -- withdrawn.  Before becoming the

18  Plaintiffs' authorized representative, you hadn't had any

19  communications with anyone about potential claims that might

20  be brought against the Debtor arising out of the HarbourVest

21  settlement, correct?

22  A    That is correct.

23  Q    Now, after you became the Plaintiffs' authorized

24  representative, Mr. Dondero communicated with the Sbaiti firm

25  about the complaint that's marked as Exhibit 12, correct?

017766

HCMLPHMIT00002819

1  A   Yes.  After he brought certain information to myself and

2  then that I engaged the Sbaiti firm to launch an

3  investigation, I also wanted Mr. Dondero to work with the

4  Sbaiti firm with respect to their investigation of the

5  underlying facts.

6  Q   Okay.  Mr. Dondero did not discuss the complaint with you,

7  but he did communicate with the Sbaiti firm about the

8  complaint, correct?

9  A   I believe -- yeah.  I heard you slip in at the end "the

10  complaint."  I know he communicated with the Sbaiti firm.  I

11  can't -- I can't say what he said or didn't say with respect

12  to the -- the actual complaint.

13  Q   Okay.  But Mr. Dondero got involved in the process

14  initially when he brought some information to your attention

15  concerning the HarbourVest transaction, correct?

16  A   Correct.

17  Q   And he came to you with the HarbourVest information after

18  you assumed your role as the authorized representative of the

19  Plaintiffs on March 24th, correct?

20  A   That is correct.

21  Q   At the time he came to you, you did not have any specific

22  knowledge about the HarbourVest transaction, correct?

23  A   I did not have specific knowledge with respect to the

24  allegations that were laid out and the facts with respect to

25  the original complaint.  I think I had just had a general

HCMLPHMIT00002820

1  awareness that there was a HarbourVest something or other, but

2  the specific aspects of it, I was unaware.

3  Q    Okay.  And you had no reason to believe that Mr. Seery had

4  done anything wrong with respect to the HarbourVest

5  transaction at the time you became the Plaintiffs' authorized

6  representative, correct?

7  A    That is correct.

8  Q    But you recall very specifically that some time after

9  March 24th Mr. Dondero told you that an investment opportunity

10  was essentially usurped or taken away, to the Plaintiffs' harm

11  and for the benefit of HCMLP, correct?

12  A    That is correct.

13  Q    And after Mr. Dondero brought this information to your

14  attention, you hired the Sbaiti firm to launch an

15  investigation into the facts, correct?

16  A    Correct.

17  Q    You had never worked with the Sbaiti firm before, correct?

18  A    That is correct.

19  Q    And you had hired many firms as a tax counselor at HCMLP,

20  but not the Sbaiti firm until now.  Correct?

21  A    That is correct.

22  Q    You got to the Sbaiti firm through a recommendation from

23  D.C. Sauter, correct?

24  A    Correct.

25  Q    Mr. Sauter is the in-house counsel, the in-house general

017768

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 28-71   Filed 07/08/25   Page 920 of 1017    PageID 18802
Exhibit 71 Page 108 of 299

Patrick - Direct                    107

1   counsel at NexPoint Advisors, correct?

2   A    Correct.

3   Q    You didn't ask Mr. Sauter for a recommendation for a

4   lawyer; he just volunteered that you should use the Sbaiti

5   firm.  Correct?

6   A    That is correct.

7   Q    And you never used -- considered using another firm, did

8   you?

9   A    When they were presented to me, they appeared to have all

10  the sufficient skills necessary to undertake this action, and

11  so I don't recall interviewing any other firms.

12  Q    Okay.  Now, after bringing the matter to your action, Mr.

13  Dondero communicated directly with the Sbaiti firm in relation

14  to the investigation that was being undertaken.  Correct?

15  A    That is correct.

16  Q    But you weren't privy to the communications between Mr.

17  Dondero and the Sbaiti firm, correct?

18  A    I did not participate in those conversations as the --

19  what I, again, considered Mr. Dondero as the investment

20  advisor to the portfolio, and he was very versant in the

21  assets.  I wanted him to participate in the investigation that

22  the Sbaiti firm was undertaking prior to the filing of this

23  complaint.

24  Q    Let's talk for a minute about the notion of Mr. Dondero

25  being the investment advisor.  Until recently, the entity

017769

HCMLPHMIT00002822

 1  known as the DAF had an investment advisory committee with HC

 2  -- an investment advisory agreement with HCMLP.  Correct?

 3  A    It's my understanding that the investment advisory

 4  agreement existed with the Plaintiffs, CLO Holdco, as well as

 5  Charitable DAF Fund, LP, up and to the end of February,

 6  throughout the HarbourVest transaction.

 7  Q    Okay.  And since February, the Plaintiffs do not have an

 8  investment advisory agreement with anybody, correct?

 9  A    That is correct.

10  Q    Okay.  So Mr. Dondero, if he serves as an investment

11  advisor, it's on an informal basis.  Is that fair?

12  A    After I took control, he serves as an informal investment

13  advisor.

14  Q    Okay.  So there's no contract that you're aware of between

15  either of the Plaintiffs and Mr. Dondero pursuant to which he

16  is authorized to act as the investment advisor for the

17  Plaintiffs, correct?

18  A    That is correct.

19  Q    Okay.  When you communicated with Grant Scott --

20  withdrawn.  You know who Grant Scott is, right?

21  A    Yes, I do.

22  Q    He's the gentleman who preceded you as the authorized

23  representative of the Plaintiffs, correct?

24  A    Yes.

25  Q    Okay.  You communicated with Mr. Scott from time to time

017770

HCMLPHMIT00002823

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 35-71 Filed 06/06/25   Page 922 of 1017   PageID 18804

Exhibit 71   Page 110 of 299

1    during February and March 2021, correct?

2    A    February and March are the dates?  Yes.

3    Q    Yeah.  And from February 1st until March 21st -- well,

4    withdrawn.  Prior to March 24th, 2021, Mr. Scott was the

5    Plaintiffs' authorized representative, correct?

6    A    Correct.

7    Q    And you have no recollection of discussing with Mr. Scott

8    at any time prior to March 24th any aspect of the HarbourVest

9    settlement with Mr. Scott.  Correct?

10   A    Correct.

11   Q    And you have no recollection of discussing whether the

12   Plaintiffs had potential claims that might be brought against

13   the Debtor.  Correct?  Withdrawn.  Let me ask a better

14   question.

15        You have no recollection of discussing with Mr. Scott at

16   any time prior to March 24th whether the Plaintiffs had

17   potential claims against the Debtor.  Correct?

18   A    That is correct.

19   Q    You and Mr. Scott never discussed whether either of --

20   either of the Plaintiffs had potential claims against Mr.

21   Seery.  Correct?

22   A    Correct.

23   Q    Okay.  At the time that you became their authorized

24   representative, you had no knowledge that the Plaintiffs would

25   be filing a complaint against the Debtors relating to the

HCMLPHMIT00002824

1   HarbourVest settlement less than three weeks later, correct?

2   A    That is correct.

3   Q    Okay.  Now, if you look at Page 2 of the complaint, you'll

4   see at the top it refers to Mr. Seery as a potential party.

5   Do you see that?

6   A    Yes, I do.

7   Q    Okay.  You don't know why Mr. Seery was named --

8   withdrawn.  You don't know why Mr. Seery was not named as a

9   defendant in the complaint, correct?

10  A    No, I -- that's correct.  I do not know why he was not

11  named.  That's in the purview of the Sbaiti firm.

12  Q    Okay.  And the Sbaiti firm also made the decision to name

13  Mr. Seery on Page 2 there as a potential party when drafting

14  the complaint, correct?

15  A    That's what the document says.

16  Q    And you weren't involved in the decision to identify Mr.

17  Seery as a potential party, correct?

18  A    That is correct.  Again, I rely on the law firm to decide

19  what parties to bring a suit to -- against.

20  Q    Okay.  Okay.  Do you recall the other day we talked about

21  a document called the July order?

22  A    Yes.

23  Q    Okay.  That's in -- that's in Tab 16 in your binder, if

24  you can turn to that.  And take a moment to look at it, if

25  you'd like.  And my first question is simply whether this is

HCMLPHMIT00002825

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 71 Filed 07/02/25   Page 924 of 1017   PageID 18806
Page 112 of 299

Patrick - Direct                             111

 1   the July order, as you understand it.

 2       (Pause.)

 3   A   Yes, it is.  I was just looking for the gatekeeper

 4   provision.  It looks like it's Paragraph 5.  So, --

 5   Q   Okay.  Thank you for that.  About a week after the

 6   complaint was filed, you authorized the Plaintiffs to file a

 7   motion in the District Court for leave to amend the

 8   Plaintiffs' complaint to add Mr. Seery as a defendant.

 9   Correct?

10   A   I authorized the filing of a motion in Federal District

11   Court that would ask the Federal District Court whether or not

12   Jim Seery could be named in the original complaint with

13   respect to the gatekeeper provision cited in that motion and

14   with respect to the arguments that were made in that motion.

15   Q   Okay.  Just to be clear, if you turn to Exhibit 17, the

16   next tab, --

17   A   I'm here.

18   Q   -- do you see that document is called Plaintiffs' Motion

19   for Leave to File First Amended Complaint?

20   A   Yes.

21   Q   And that's the document that you authorized the Plaintiffs

22   to file on or about April 19th, correct?

23   A   Correct.

24   Q   Okay.  And can we refer to that document as the motion to

25   amend?

017773

HCMLPHMIT00002826

1   A    Yes.

2   Q    Okay.  You were aware of the July order at Tab 16 before

3   you authorized the filing of the motion to amend.  Correct?

4   A    Yes, because it's cited in the motion itself.

5   Q    Okay.  And at the time that you authorized the filing of

6   the motion to amend, you understood that the July order was

7   still in effect.  Correct?

8   A    Yes, because it was referenced in the motion, so my

9   assumption would be it would still be in effect.

10  Q    Okay.  Before the motion to amend was filed, you're -- you

11  are aware that my firm and the Sbaiti firm communicated by

12  email about the propriety of filing the motion to amend?

13  A    Before it was filed?  Communications between your firm and

14  the Sbaiti firm?  I would have to have my recollection

15  refreshed.

16  Q    I'll just ask the question a different way.  Did you know

17  before you authorized the filing of the motion to amend that

18  my firm and the Sbaiti firm had engaged in an email exchange

19  about the propriety of filing the motion to amend in the

20  District Court?

21  A    It's my recollection -- and again, I could be wrong here

22  -- but I thought the email exchange occurred after the fact,

23  not before.  But again, I -- I just --

24  Q    Okay.  In any event, on April 19th, the motion to amend

25  was filed.  Correct?

017774

HCMLPHMIT00002827

```
 1   A    Correct.

 2   Q    That's the document that is Exhibit 17.  And you

 3   personally authorized the Sbaiti firm to file the motion to

 4   amend on behalf of the Plaintiffs, correct?

 5   A    Correct.

 6   Q    And you authorized the filing of the motion to amend with

 7   knowledge -- withdrawn.

 8        Can you read the first sentence of the motion to amend out

 9   loud, please?

10   A    Yeah.  (reading)  Plaintiffs submit this motion under Rule

11   15 of the Federal Rules of Civil Procedure for one purpose:

12   to name as defendant one James P. Seery, Jr., the CEO of

13   defendant Highland Capital Management, LP (HCM) and the chief

14   perpetrator of the wrongdoing that forms the basis of the

15   Plaintiffs' causes of action.

16   Q    And does that fairly state the purpose of the motion?

17        MR. SBAITI:  Objection, Your Honor.  Asks him to make

18   a legal conclusion about the purpose of the legal motion filed

19   in court that he didn't draft.

20        THE COURT:  Okay.  I overrule.  You can answer if you

21   have an answer.

22        THE WITNESS:  It's always been my general

23   understanding that the purpose of filing this motion was to go

24   to the Federal District Court and ask that Court of reference

25   to this Court whether or not Mr. Seery could be named with
```

017775

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-71 Filed 06/06/25   Page 927 of 1017   PageID 18809
Exhibit 71   Page 105 of 299

Patrick - Direct                                  114

1   respect to the original complaint, citing again the gatekeeper

2   provisions and citing the various arguments that we've heard

3   much earlier.

4   BY MR. MORRIS:

5   Q    Okay.  You personally didn't learn anything between April

6   9th, when the complaint was filed, and April 19th, when the

7   motion to amend was filed, that caused you to authorize the

8   filing of the motion to amend, correct?

9   A    That is correct.

10  Q    In fact, you relied on the Sbaiti firm with respect to

11  decisions concerning the timing of the motion to amend.

12  Correct?

13  A    Correct.

14  Q    And you had no knowledge of whether anyone acting on

15  behalf of the Plaintiffs ever served the Debtor with a copy of

16  the motion to amend.  Correct?

17  A    Yes.  I have no knowledge.

18  Q    Okay.  And you have no knowledge that the Sbaiti firm ever

19  provided my firm with a copy of the motion to amend.  Correct?

20  A    I cannot recall one way or another.

21  Q    Okay.  You never instructed anyone on behalf -- acting on

22  behalf of the Plaintiffs to inform the Debtor that the motion

23  to amend had been filed, correct?

24  A    That is correct.

25  Q    And that's because you relied on the Sbaiti firm on

017776

HCMLPHMIT00002829

Patrick - Direct                    115

 1  procedural issues, correct?

 2  A    That is correct.

 3  Q    You didn't consider waiting until the Debtor --

 4       (Interruption.)

 5  Q    -- had appeared in the action before authorizing the

 6  filing of the motion --

 7  A    Yeah, --

 8            THE COURT:  Yes.  Y'all are being a little bit loud.

 9  Okay.

10            A VOICE:  Sorry.

11            MR. MORRIS:  No problem.

12            MR. PHILLIPS:  I've heard that before, Your Honor,

13  and I apologize.

14            THE COURT:  I bet you have.  Thank you.

15            MR. MORRIS:  Admonish Mr. Phillips, please.

16            THE COURT:  Okay.

17            MR. MORRIS:  He's always the wild card.

18            MR. PHILLIPS:  I admonish --

19            MR. MORRIS:  He's always the wild card.

20            MR. PHILLIPS:  I admonish myself.

21            THE COURT:  All right.  I think he got the message.

22  Continue.

23  BY MR. MORRIS:

24  Q    You didn't consider waiting until the Debtor had appeared

25  in the action before filing the motion to amend, correct?

017777

HCMLPHMIT00002830

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 71   Filed 01/07/25 299   Page 929 of 1017   PageID 18811

Patrick - Direct                    116

1    A    Again, I am the client and I rely upon the law firm that's

2    engaged with respect to making legal decisions as to the

3    timing and notice and appearance and what have you.  I'm a tax

4    lawyer.

5    Q    Okay.  You wanted the District Court to grant the relief

6    that the Plaintiffs were seeking.  Correct?

7    A    I wanted the District Court to consider, under the

8    gatekeeper provisions of this Court, whether or not Mr. Seery

9    could be named in the original complaint.  That's -- that,

10   from my perspective, is what was desired.

11   Q    All right.  You wanted the District Court to grant the

12   relief that the Plaintiffs were seeking, correct?

13          MR. SBAITI:  Objection, Your Honor.  Asked and

14   answered.

15          THE COURT:  Overruled.

16          THE WITNESS:  Again, I would characterize this motion

17   as not necessarily asking for specific relief, but asking the

18   Federal District Court whether or not, under the gatekeeper

19   provision, that Mr. Seery could be named on there.  What

20   happens after that would be a second step.  So I kind of -- I

21   dispute that characterization.

22   BY MR. MORRIS:

23   Q    All right.  I'm going to cross my fingers and hope that

24   Ms. Canty is on the line, and I would ask her to put up Page

25   57 from Mr. Patrick's deposition transcript.

017778

Patrick - Direct                    117

```
 1              THE COURT:  There it is.

 2              MR. MORRIS:  There it is.  It's like magic.  Can we

 3   go down to Lines 18 through 20?

 4   BY MR. MORRIS:

 5   Q   Mr. Patrick, during the deposition on Friday, did I ask

 6   you this question and did you give me this answer?  Question,

 7   "Did you want the Court to grant the relief you were seeking?"

 8   Answer, "Yes."

 9   A   I -- and it was qualified with respect to Lines 12 through

10   17.  In my view, when I answered yes, I was simply restating

11   what I stated in Line 12.  I wanted the District Court to

12   consider this motion as to whether or not Mr. Seery could be

13   named in the original complaint or the amended complaint

14   pursuant to the existing gatekeeper rules and the arguments

15   that were made in that motion.  That's -- that's what I

16   wanted.  And so then when I was asked, did you want the Court

17   to grant the relief that you were seeking, when I answered

18   yes, it was from that perspective.

19   Q   Okay.  Thank you very much.  If the District Court had

20   granted the relief that you were seeking, you would have

21   authorized the Sbaiti firm to file the amended complaint

22   naming Mr. Seery as a defendant if the Sbaiti firm recommended

23   that you do so.  Correct?

24   A   If the Sbaiti firm recommended that I do so.  That is

25   correct.
```

017779

HCMLPHMIT00002832

Patrick - Direct                                  118

1   Q    Okay.  Let's talk for a little bit about the line of

2   succession for the DAF and CLO Holdco.  Can we please go to

3   Exhibit 25, which is in the other binder?  It's in the other

4   binder, sir.

5        (Pause.)

6   Q    I guess you could look on the screen or you can look in

7   the binder, whatever's easier for you.

8   A    Yeah.  I prefer the screen.  I prefer the screen.

9   Q    Okay.

10  A    It's much easier.

11  Q    All right.  We've got it in both spots.  But do you have

12  Exhibit 25 in front of you, sir?

13  A    Yes, I do.

14  Q    All right.  Do you know what it is?

15  A    This is the organizational chart depicting a variety of

16  charitable entities as well as entities that are commonly

17  referred to the DAF.  However, when I look at this chart, I do

18  not look at and see just boxes, what I see is the humanitarian

19  effort that these boxes represent.

20           MR. MORRIS:  Your Honor, may I interrupt?

21           THE COURT:  You may.

22           MR. MORRIS:  Okay.

23  BY MR. MORRIS:

24  Q    I appreciate that, and when your lawyers get up to ask you

25  questions, I bet they'll want to know just what you were about

017780

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 35-71   Filed 01/20/25   Page 932 of 1017   PageID 18814
Exhibit 71   Page 120 of 299

Patrick - Direct                                    119

 1   to tell me.  But I just want to understand what this chart is.

 2   This chart is the DAF, CLO Holdco, structure chart.  Correct?

 3   A    Correct.

 4   Q    Okay.  And you were personally involved in creating this

 5   organizational structure, correct?

 6   A    I -- yes.

 7   Q    Okay.  And from time to time, the Charitable DAF Holdco

 8   Limited distributes cash to the foundations that are above it.

 9   Correct?

10   A    Correct.

11   Q    All right.  I want to talk a little bit more specifically

12   about how this happens.  The source of the cash distributed by

13   Charitable DAF Holdco Limited is CLO Holdco, Ltd., that

14   entity, the Cayman Islands entity near the bottom.  Correct?

15           MR. ANDERSON:  Your Honor, I have an objection.

16   Completely irrelevant.  I'm objecting on relevance grounds.

17   This has nothing to do with the contempt proceeding.  We've

18   already gone over that he authorized the filing of the

19   complaint, that he authorized the filing of the motion to

20   amend.  It's all in the record.  This is completely irrelevant

21   at this point.

22           THE COURT:  Okay.  Relevance objection.  Your

23   response?

24           MR. MORRIS:  I believe that it's relevant to the

25   Debtor's motion to hold Mr. Dondero in contempt for pursuing

HCMLPHMIT00002834

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 26-871 Filed 06/20/25   Page 933 of 1017   PageID 18815
Exhibit 71   Page 120 of 299

Patrick - Direct                                      120

1   claims against Mr. Seery, in violation of the July 7 order.  I

2   think an understanding of what the Plaintiffs are, how they're

3   funded, and Mr. Dondero's interest in pursuing claims on

4   behalf of those entities is relevant to the -- to the -- just

5   -- it's just against him.  It's not against their clients,

6   frankly.  It's just against Mr. Dondero.

7           THE COURT:  I overrule.

8           MR. MORRIS:  I'll try and -- I'll try and make this

9   quick, though.

10  BY MR. MORRIS:

11  Q   CLO Holdco had two primary sources of capital.  Is that

12  right?

13  A   Two primary sources of capital?

14  Q   Let me ask it differently.  There was a Charitable

15  Remainder Trust that was going to expire in 2011, correct?

16  A   That is correct.

17  Q   And that Charitable Remainder Trust had certain CLO equity

18  assets, correct?

19  A   Correct.

20  Q   And the donor to that Charitable Remainder Trust was

21  Highland Capital Management, LP.  Correct?

22  A   Not correct.  After my deposition, I refreshed my memory.

23  There were two Charitable Remainder Trusts that existed, which

24  I think in my mind caused a little bit of confusion.  The

25  Charitable Remainder Trust No. 2, which is the one that

017782

HCMLPHMIT00002835

1  expired in 2011, was originally funded by Mr. Dondero.

2  Q   Okay.  So, so the Charitable Remainder Trust that we were

3  talking about on Friday wasn't seeded with capital from

4  Highland Capital Management, it came from Mr. Dondero

5  personally?

6  A   That is correct.

7  Q   Okay.  Thank you.  And the other primary source of capital

8  was the Dallas Foundation, the entity that's in the upper

9  left-hand corner of the chart.  Is that correct?

10 A   No.

11 Q   The -- you didn't tell me that the other day?

12 A   You said -- you're pointing to the Dallas Foundation.

13 That's a 501(c)(3) organization.

14 Q   I apologize.  Did you tell me the other day that the

15 Dallas Foundation was the second source of capital for HCLO

16 Hold Company?

17 A   No, I did not.  You --

18     (Pause.)

19 Q   Maybe I know the source of the confusion.  Is the Highland

20 Dallas Foundation something different?

21 A   Yes.  On this organizational chart, you'll see that it has

22 an indication, it's a supporting organization.

23 Q   Ah, okay.  So, so let me restate the question, then.  The

24 second primary source of capital for CLO Holdco, Ltd. is the

25 Highland Dallas Foundation.  Do I have that right?

HCMLPHMIT00002836

1   A     Yes.

2   Q     Okay.  And the sources of that entity's capital were

3   grantor trusts and possibly Mr. Dondero personally.  Correct?

4   A     In addition -- per my refreshing my recollection from our

5   deposition, the other Charitable Remainder Trust, I believe

6   Charitable Remainder Trust No. 1, which expired later, also

7   sent a donation, if you will, or assets to -- and I cannot

8   recall specifically whether it was just the Highland Dallas

9   Foundation or the other supporting organizations that you see

10  on this chart.

11  Q     But the source of that -- the source of the assets that

12  became the second Charitable Remainder Trust was Highland

13  Capital Management, LP.  Is that right?

14  A     I think that is accurate from my recollection.  And again,

15  I'm talking about Charitable Remainder Trust No. 1.

16  Q     Okay.  So is it fair to say -- I'm just going to try and

17  summarize, if I can.  Is it fair to say that CLO Holdco, Ltd.

18  is the investment arm of the organizational structure on this

19  page?

20  A     Yes.

21  Q     And is it fair to say that nearly all of the assets that

22  are in there derived from either Mr. Dondero, one of his

23  trusts, or Highland Capital Management, LP?

24  A     Yes.  It's like the Bill Gates Foundation or the

25  Rockefeller Foundation.  These come from the folks that make

017784

Patrick - Direct                    123

1  their donations and put their name on it.

2  Q    Okay.

3            MR. MORRIS:  Now, now, Your Honor, I'm going to go

4  back just for a few minutes to how Mr. Scott got appointed,

5  because I think that lays kind of the groundwork for his

6  replacement.  It won't take long.

7            THE COURT:  Okay.  I have a question either --

8            MR. MORRIS:  Sure.

9            THE COURT:  -- for you or the witness.  I'm sorry,

10  but --

11            MR. MORRIS:  Sure.  Yeah.

12            THE COURT:  -- the organizational chart, it's not

13  meant to show everything that might be connected to this

14  substructure, right?  Because doesn't CLO Holdco, Ltd. own

15  49.02 percent of HCLOF, --

16            MR. MORRIS:  That --

17            THE COURT:  -- which gets us into the whole

18  HarbourVest transaction issue?

19            MR. MORRIS:  You're exactly right, Your Honor.

20            THE COURT:  Okay.

21            MR. MORRIS:  But that's just an investment that HCLO

22  Holdco made.

23            THE COURT:  Right.

24            MR. MORRIS:  Right?  And so I -- let me ask the

25  witness, actually.

017785

HCMLPHMIT00002838

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-71   Filed 01/25/25   Page 937 of 1017   PageID 18819

Patrick - Direct                                      124

```
 1              THE COURT:  Okay.  Thank you.  Thank you.

 2              MR. MORRIS:  Let me ask the witness.  Yeah.

 3              THE COURT:  I just want my brain --

 4              MR. MORRIS:  Right.

 5              THE COURT:  -- to be complete on this chart.

 6   BY MR. MORRIS:

 7   Q    Mr. Patrick, there are three entities under CLO Holdco,

 8   Ltd.  Do you see that?

 9   A    Yes.

10   Q    And does CLO Holdco, Ltd. own one hundred percent of the

11   interests in each of those three entities?

12   A    Yes.

13   Q    Do you know why those three entities are depicted on this

14   particular chart?  Is it because they're wholly-owned

15   subsidiaries?

16   A    Correct.

17   Q    Okay.  And CLO Holdco, Ltd. has interests in other

18   companies.  Isn't that right?

19   A    It has other investments.  That is correct.

20   Q    And the reason that they're not depicted on here is

21   because they're not wholly-owned subsidiaries, they're just

22   investments; is that fair?

23   A    That is fair.

24              MR. MORRIS:  Does that--?

25              THE COURT:  Yes.
```

017786

HCMLPHMIT00002839

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S     Document 28-71   Filed 01/26/25   Page 938 of 1017     PageID 18820
Exhibit 71    Page 126 of 299

Patrick - Direct                                125

1          MR. MORRIS:  Okay.

2          THE COURT:  Uh-huh.

3    BY MR. MORRIS:

4    Q   So, so let's go back to Mr. Grant for a moment.  Mr.

5    Scott, rather.  Mr. Dondero was actually the original general

6    partner.  If you look at this chart, while it's still up here,

7    you see on the left there's Charitable DAF GP, LLC?

8    A   Yes.

9    Q   And the Charitable DAF GP, LLC is the general partner of

10   the Charitable DAF Fund, LP.  Correct?

11   A    Correct.

12   Q   And on this chart, Grant Scott was the managing member of

13   Charitable DAF GP, LLC.  Right?

14   A    Correct.

15   Q   Okay.  But Mr. Dondero was the original general partner of

16   that entity, correct?

17   A    That is correct.  But I do want to point out, I just note

18   that the GP interest is indicating a one percent interest and

19   the 99 interest to Charitable DAF Holdco.  I believe that's

20   incorrect.  It's a hundred percent by Charitable DAF Holdco,

21   Ltd., and the Charitable DAF GP interest is a noneconomic

22   interest.  So that should actually reflect a zero percent to

23   the extent it may indicate some sort of profits or otherwise.

24   Q   Okay.  Thank you for the clarification.  Can you turn to

25   Exhibit 26, please, in your binder?  And is it your

017787

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 25-871 Filed 01/27/25   Page 939 of 1017   PageID 18821

Patrick - Direct                    126

1  understanding that that is the amended and restated LLC

2  agreement for the DAF GP, LLC?

3  A    Yes.

4  Q    Okay.  And this was amended and restated effective as of

5  January 1st, 2012, correct?

6  A    Yes.

7  Q    And if you go to the last page, you'll see there are

8  signatures for Mr. Scott and Mr. Dondero, correct?

9  A    Yes.

10  Q    And Mr. Dondero is identified as the forming -- former

11  managing member and Mr. Scott is identified as the new

12  managing member.   Correct?

13  A    Correct.  That's what the document says.

14  Q    And it's your understanding that Mr. Dondero had the

15  authority to select his successor.  Correct?

16  A    Correct.

17  Q    In fact, it's based on your understanding of documents and

18  your recollection that Mr. Dondero personally selected Mr.

19  Scott as the person he was going to transfer control to,

20  correct?

21  A    Upon advice of Highland Capital Management's tax

22  compliance officer, Mr. Tom Surgent.

23  Q    What advice did Mr. Surgent give?

24  A    He gave advice that, because Mr. Dondero -- and this is

25  what I came to an understanding after the fact of this

HCMLPHMIT00002841

Patrick - Direct                127

1   transaction, because I was not a part of it -- that by Mr.

2   Dondero holding that GP interest, that it would be -- the

3   Plaintiffs, if you will, would be an affiliate entity for

4   regulatory purposes, and so he advised that if he -- if Mr.

5   Dondero transferred his GP interest to Mr. Scott, it would no

6   longer be an affiliate, is my recollection.

7   Q    Okay.  You didn't appoint Mr. Scott, did you?

8   A    No.

9   Q    That was Mr. Dondero.  Is that right?

10  A    Yes.

11  Q    Okay.  Let's go to 2021.  Let's come back to the current

12  time.  Sometime in February, Mr. Scott called you to ask about

13  the mechanics of how he could resign.  Correct?

14  A    That is correct.

15  Q    But the decision to have you replace Mr. Scott was not

16  made until March 24th, the day you sent an email to Mr. Scott

17  with the transfer documents.  Correct?

18  A    That is correct.

19  Q    And it's your understanding that he could have transferred

20  the management shares and control of the DAF to anyone in the

21  world.  Correct?

22  A    Correct.

23  Q    That's what the docu... that he had the authority under

24  the documentation, as you understood it, to freely trade or

25  transfer the management shares.  Correct?

017789

HCMLPHMIT00002842

 1  A    Wait.  Now, let's be precise here.

 2  Q    Okay.

 3  A    Are you talking about the GP interests or the management

 4  shares held by Charitable DAF Holdco, Ltd.?

 5  Q    Let's start with the management shares.  Can you explain

 6  to the Court what the management shares are?

 7            MR. ANDERSON:  Your Honor?  Hang on one second.  Your

 8  Honor, I want to object again on relevance.  We're going way

 9  beyond the scope of the contempt issue, whether or not --

10            MR. MORRIS:  This is about control.

11            MR. ANDERSON:  -- the motion to amend somehow

12  violated the prior order of this Court.  Getting into the

13  management structure, transfer of shares, that's way outside

14  the bounds.  I object on relevance.

15            THE COURT:  Okay.  Relevance objection?

16            MR. MORRIS:  Your Honor, they have probably 30

17  documents, maybe 20 documents, on their exhibit list that

18  relate to management and control.  I'm asking questions about

19  management and control.  Okay?  This is important, again, to

20  (a) establish his authority, but (b) the circumstances under

21  which he came to be the purported control person.

22            THE COURT:  Okay.  Overruled.  Go ahead.

23            THE WITNESS:  It might be helpful to look at the

24  organizational chart, but if not -- but I'll describe it to

25  you again.  With respect to the entity called --

017790

HCMLPHMIT00002843

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 15-31   Filed 06/30/25   Page 942 of 1017   PageID 18824
Exhibit 71   Page 130 of 299

Patrick - Direct                    129

1          MR. MORRIS:  Hold on one second.  Can we put up the

2    organizational chart again, Ms. Canty, if you can?  There you

3    go.

4          THE WITNESS:  Okay.  So with respect to the

5    Charitable DAF Holdco, Ltd., it is my understanding that Mr.

6    Scott, he organized that entity when he was the independent

7    director of the Charitable Remainder Trust, and he caused the

8    issuance of the management shares to be issued to himself.

9    And then those are, again, noneconomic shares, but they are

10   control shares over that entity.

11        And I think, to answer your question, is -- it -- he alone

12   decides who he can transfer those shares to.

13   BY MR. MORRIS:

14   Q    Do I have this right, that whoever holds the noneconomic

15   management shares has the sole authority to appoint the

16   representatives for each of the Charitable DAF entities and

17   CLO Holdco?  It's kind of a magic ticket, if you will?

18   A    It -- I think there's a -- the answer really is no from a

19   legal standpoint, because Charitable DAF Holdco is a limited

20   partner in Charitable DAF Fund, LP, so it does not have

21   authority -- authority under all -- the respective entities

22   underneath that.  It could cause a redemption, if you will, of

23   Charitable DAF Fund.  And so, really, the authority -- the

24   trickle-down authority that you're referencing is with respect

25   to his holding of the Charitable DAF GP, LLC interest.  It's a

017791

HCMLPHMIT00002844

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-71 Filed 08/06/25   Page 943 of 1017   PageID 18825
Exhibit 71   Page 133 of 299

Patrick - Direct                        130

1   member-managed Delaware limited liability company.  And from

2   that, he -- that authority kind of trickles down to where he

3   can appoint directorships.

4   Q    All right.  I think I want to just follow up on that a

5   bit.  Which entity is the issuer of the manager shares, the

6   management shares?

7   A    Yeah, the -- per the organizational chart, it is accurate,

8   it's the Charitable DAF Holdco, Ltd. which issued the

9   management shares to Mr. Scott.

10  Q    Okay.  And that's why you have the arrow from Mr. Scott

11  into that entity?

12  A    Correct.

13  Q    And do those -- does the holder of the management shares

14  have the authority to control the Charitable DAF Holdco, Ltd.?

15  A    Yes.

16  Q    Okay.  And as the control person for the Charitable DAF

17  Holdco, Ltd., they own a hundred -- withdrawn.  Charitable DAF

18  Holdco Limited owns a hundred percent of the limited

19  partnership interests of the Charitable DAF Fund, LP.

20  Correct?

21  A    Correct.

22  Q    And so does the holder of that hundred percent limited

23  partnership interest have the authority to decide who acts on

24  behalf of the Charitable DAF Fund, LP?

25  A    I would say no.  I mean, you know, just -- I would love to

HCMLPHMIT00002845

Patrick - Direct                 131

1  read the partnership agreement again.  But I, conceptually,

2  what I know with partnerships, I would say the limited partner

3  would not.  It would be through the Charitable DAF GP, LLC

4  interest.

5  Q    The one on the left, the general partner?

6  A    The general partner.

7  Q    I see.  So when Mr. Scott transferred to you the one

8  hundred percent of the management shares as well as the title

9  of the managing member of the Charitable DAF GP, LLC, did

10 those two events give you the authority to control the

11 entities below it?

12 A    Yes.

13 Q    Thank you.  And so prior to the time that he transferred

14 those interests to you, is it your understanding that Mr.

15 Scott had the unilateral right to transfer those interests to

16 anybody in the world?

17 A    Yes.

18 Q    Okay.  And you have that right today, don't you?

19 A    Yes, I do.

20 Q    If you wanted, you could transfer it to me, right?

21 A    Yes, I could.

22 Q    Okay.  But of all the people in the world, Mr. Scott

23 decided to transfer the management shares and the managing

24 member title of the DAF GP to you, correct?

25 A    Restate that question again?

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 28-71  Filed 03/06/25  Page 945 of 1017    PageID 18827
Exhibit 71 Page 133 of 299

Patrick - Direct                    132

1   Q   Of all the people in the world, Mr. Scott decided to

2   transfer it to you, correct?

3   A   Yeah.  Mr. Scott transferred those interests to me.

4   Q   Okay.  And you accepted them, right?

5   A   Yes.

6   Q   You're not getting paid anything for taking on this

7   responsibility, correct?

8   A   I am not paid by any of the entities depicted on this

9   chart.

10  Q   And Mr. Scott used to get $5,000 a month, didn't he?

11  A   I believe that's what he testified to.

12  Q   Yeah.  But you don't get anything, right?

13  A   Correct.

14  Q   In fact, you get the exact same salary and compensation

15  from Skyview that you had before you became the authorized

16  representative of the DAF entities and CLO Holdco.  Correct?

17  A   Correct.

18        MR. MORRIS:  Okay.  Your Honor, if I may just take a

19  moment, I may be done.

20        THE COURT:  Okay.

21     (Pause.)

22        MR. MORRIS:  Your Honor, I have no further questions.

23        THE COURT:  All right.  Pass the witness.  Any

24  examination of the witness?

25                      CROSS-EXAMINATION

017794

HCMLPHMIT00002847

Patrick - Cross                    133

```
 1   BY MR. ANDERSON:

 2   Q   Mr. Patrick, I just had a few follow-up questions.  When

 3   you authorized the filing of the lawsuit against Highland

 4   Capital Management, LP, Highland HCF Advisor Limited, and

 5   Highland CLO Funding, Limited, when that lawsuit was filed in

 6   April of this year, was Mr. Seery included as a defendant?

 7   A   No.

 8   Q   Have the two Plaintiffs in that lawsuit, have they

 9   commenced any lawsuit against Mr. Seery?

10   A   No.

11   Q   Have they pursued any lawsuit against Mr. Seery?

12   A   No.

13   Q   Have they pursued a claim or cause of action against Mr.

14   Seery?

15   A   No.

16   Q   At most, did the Plaintiffs file a motion for leave to add

17   Mr. Seery as a defendant?

18          MR. MORRIS:  Objection, Your Honor.  To the extent

19   that any of these questions are legal conclusions, I object.

20   He's using the word pursue.  If he's trying -- if he's then

21   going to argue that, But the witness testified that he didn't

22   pursue and that's somehow a finding of fact, I object.

23          THE COURT:  Okay.  I understand.

24          MR. MORRIS:  Yeah.

25          THE COURT:  But I overrule.  He can answer.
```

017795

HCMLPHMIT00002848

1          MR. MORRIS:  That's fine.

2          THE WITNESS:  Can you restate the question again?

3   BY MR. ANDERSON:

4   Q    Sure.  On behalf of the Plaintiffs -- well, strike that.

5   Did the Plaintiffs pursue a claim or cause of action against

6   Mr. Seery?

7   A    No.

8   Q    At most, did the Plaintiffs file a motion for leave to

9   file an amended complaint regarding Mr. Seery?

10  A    Yes.  But, again, I viewed the motion as simply asking the

11  Federal District Court whether Mr. Seery could or could not be

12  named in a complaint, and then the next step might be how the

13  Federal District Court might rule with respect to that.

14  Q    And we have -- it's Tab 17 in the binders in front of you.

15  That is Plaintiffs' motion for leave.  If you could turn to

16  that, please.

17  A    Yes.  I've got it open.

18  Q    Is the Court's July order, the Bankruptcy Court's July

19  order, is it mentioned on the first page and then throughout

20  the motion for leave to amend?

21  A    Yes, it is.  I see it quoted verbatim on Page 2 under

22  Background.

23  Q    Was the Court's order hidden at all from the District

24  Court?

25  A    The document speaks for itself.  It's very transparent.

017796

Patrick - Cross                    135

1    Q    Was there any effort whatsoever to hide the prior order of

2    the Bankruptcy Court?

3    A    No.

4              MR. ANDERSON:  Pass the witness.

5              THE COURT:  Okay.  Other examination?

6              MR. SBAITI:  Yes, Your Honor.  Just a couple of

7    questions.

8                        CROSS-EXAMINATION

9    BY MR. SBAITI:

10   Q    Do you mind flipping to Exhibit 25, which I believe is the

11   org chart, the one that you were looking at before?

12   A    Okay.

13   Q    It'll still be in --

14   A    Okay.  Yeah.

15   Q    -- the defense binder.  No reason to swap out right now.

16   A    I've got the right binders.  Some of them are repeatable

17   exhibits, so --

18   Q    Yeah.

19   A    -- I have to grab the right binder.  Yes.

20   Q    As this org chart would sit today, is the only difference

21   that Grant Scott's name would instead be Mark Patrick?

22   A    Yes.

23   Q    Was there ever a period of time where Jim Dondero's name

24   would sit instead of Grant Scott's name prior?

25   A    Yes, originally, when this -- yes.

017797

HCMLPHMIT00002850

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 25-38 71   Filed 07/07/25   Page 949 of 1017   PageID 18831

Patrick - Cross                              136

1    Q   So did Mr. Dondero both have the control shares of the GP,

2    LLC and DAF Holdco Limited?

3    A   No, I believe not.  I believe he only held the Charitable

4    DAF GP interest and that Mr. Scott at all times held the

5    Charitable DAF Holdco, LTD interest, until he decided to

6    transfer it to me.

7    Q   Can you just tell us how Mr. Scott came to hold the

8    control shares of the Charitable DAF Holdco, LTD?

9    A   When he was the independent trustee of the Charitable

10   Remainder Trust, he caused that -- the creation of that

11   entity, and that's how he became in receipt of those

12   management shares.

13   Q   And does the Charitable DAF GP, LLC have any control over

14   Charitable DAF Fund, LP's actions or activities?

15   A   Yes, it does.

16   Q   What kind of control is that?

17   A   I would describe complete control.  It's the managing

18   member of that entity and can -- and effectively owns, you

19   know, the hundred percent interest in the respective

20   subsidiaries, and so the control follows down.

21   Q   And when did Mr. Scott replace Mr. Dondero as the GP --

22   managing member of the GP?

23   A   Well, I think as the -- and Mr. Morris had shown me with

24   respect to that transfer occurring on March 2012.

25   Q   So nine years ago?

017798

HCMLPHMIT00002851

Patrick - Cross                137

1  A    Yes.

2  Q    Does Mr. Dondero today exercise any control over the

3  activities of the DAF Charitable -- the Charitable DAF, GP or

4  the Charitable DAF Holdco, LTD?

5  A    No.

6  Q    Is he a board member of sorts for either of those

7  entities?

8  A    No.

9  Q    Is he a board members of CLO Holdco?

10  A    No.

11  Q    Does he have any decision-making authority at CLO Holdco?

12  A    None.

13  Q    The decision to authorize the lawsuit and the decision to

14  authorize the motion that you've been asked about, who made

15  that authorization?

16  A    I did.

17  Q    Did you have to ask for anyone's permission?

18  A    No.

19        MR. SBAITI:  No more questions, Your Honor.

20        THE COURT:  Okay.  Any -- I guess Mr. Taylor, no.

21    All right.  Any redirect?

22                    REDIRECT EXAMINATION

23  BY MR. MORRIS:

24  Q    Since becoming the authorized representative of the

25  Plaintiffs, have you ever made a decision on behalf of those

HCMLPHMIT00002852

1  entities that Mr. Dondero disagreed with?

2  A    I have made decisions that were adverse to Mr. Dondero's

3  financial -- financial decision.  I mean, financial interests.

4  Whether he disagreed with them or not, I don't -- he has not

5  communicated them to me.  But they have been adverse, at least

6  two very strong instances.

7  Q    Have you ever -- have you ever talked to him about making

8  a decision that would be adverse to his interests?  Did he

9  tell -- did --

10  A    I didn't -- I don't -- I did not discuss with him prior to

11  making the decisions that I made that were adverse to his

12  economic interests.

13          MR. MORRIS:  Okay.  No further questions, Your Honor.

14          THE COURT:  Any further examination?  Recross on that

15  redirect?

16          MR. ANDERSON:  No further questions.

17          MR. SBAITI:  No further questions, Your Honor.

18          MR. ANDERSON:  Sorry.

19          THE COURT:  Nothing?

20          MR. ANDERSON:  I think we're good.

21          THE COURT:  Okay.  I have one question, Mr. Patrick.

22  My brain sometimes goes in weird directions.

23                  EXAMINATION BY THE COURT

24          THE COURT:  I'm just curious.  What are these Cayman

25  Island entities, charitable organizations formed in the Cayman

017800

HCMLPHMIT00002853

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-71   Filed 04/06/25   Page 952 of 1017   PageID 18834

Patrick - Examination by the Court                     139

1   Islands?

2           THE WITNESS:  Yeah.  I'll keep it as simple as I can,

3   even though I'm a tax lawyer, so I won't get into the tax

4   rules, but the Cayman structure is modeled after what you

5   typically see in the investment management industry, and so I

6   -- and I won't reference specific entities here with respect

7   to the Highland case, but I think you'll note some

8   similarities, if you think about it.  They're -- it's

9   described as an offshore master fund structure where you have

10  a -- and that would be the Charitable DAF Fund that's

11  organized offshore, usually in the Cayman or Bermuda Islands,

12  where the general partner, typically, in the industry, holds

13  the management --

14          THE COURT:  Yeah.  Let --

15          THE WITNESS:  Okay.

16          THE COURT:  -- me just stop you.  I've seen this

17  enough --

18          THE WITNESS:  Yeah, it's

19          THE COURT:  -- to know that it happens in the

20  investment world.  But in --

21          THE WITNESS:  Yeah.

22          THE COURT:  You know, usually, I see 501(c)(3), you

23  know, domestically-created entities for charitable purposes,

24  so I'm just curious.

25          THE WITNESS:  Yes.

017801

HCMLPHMIT00002854

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-71   Filed 04/14/25   Page 953 of 1017   PageID 18835
Exhibit 71   Page 140 of 299

Patrick - Examination by the Court            140

1          THE COURT:  Uh-huh.

2          THE WITNESS:  The offshore master fund structure

3    typically will have two different types of -- they call it

4    foreign feeder funds.  One foreign feeder fund is meant to

5    accommodate foreign investors; the other foreign feeder fund

6    is meant to accommodate U.S. tax-exempt investors.

7          Why, why is it structured that way?  In order to avoid

8    something called -- I was trying not to be wonkish -- UBTI.

9    That's, let's see, Un -- Unrelated Trader Business Income.  I

10   probably have that slightly wrong.  But it's essentially,

11   it's a means to avoid active business income, which includes

12   debt finance income, which is what these CLOs tend to be, that

13   would throw off income that would be taxable normally if the

14   exempts did not go through this foreign blocker, and it

15   converts that UBTI income -- it's called (inaudible) income --

16   into passive income that flows -- that flows up to the

17   charities.

18         And so it's very typical that you'll have a U.S. tax-

19   exempt investor, when they make an investment in a fund,

20   prefer to go through an offshore feeder fund, which is

21   actually Charitable DAF Holdco, LTD.  That's essentially what,

22   from a tax perspective, represents as a UBTI blocker entity.

23   And then you have the offshore investments being held offshore

24   because there's a variety of safe harbors where the receipt of

25   interest, the portfolio interest exception, is not taxable.

017802

HCMLPHMIT00002855

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 28-71    Filed 04/02/25    Page 954 of 1017    PageID 18836
Patrick - Examination by the Court                    141

```
 1   The creation of capital gains or losses under the -- they call
 2   it the trading, 864(b) trading safe harbor, is not taxable.
 3   So that's why you'll find these structures operating offshore
 4   to rely on those safe harbor provisions as well as -- as well
 5   as what I indicated with respect to the two type blocker
 6   entities.  It's very typical and industry practice to organize
 7   these way.  And so when this was set --
 8          THE COURT:  It's very typical in the charitable world
 9   to --
10          THE WITNESS:  In the investment management --
11          THE COURT:  -- form this way?
12          THE WITNESS:  In the investment management world,
13   when you have charitable entities that are taking some
14   exposure to assets that are levered, to set this structure up
15   in this way.  It was modeled after -- they just call them
16   offshore master fund structures.  They're known as Mickey
17   Mouse structures, where you'll have U.S. investors --
18          THE COURT:  Yes.  I -- yes, I --
19          THE WITNESS:  -- enter through a U.S. partnership,
20   and the foreign investors enter through a blocker.
21          THE COURT:  It was really just the charitable aspect
22   of this that I was --
23          THE WITNESS:  Yeah.  Yeah.
24          THE COURT:  -- getting at.
25          THE WITNESS:  Yeah.  No, but I'm just trying to
```

017803

HCMLPHMIT00002856

 1  emphasize if --

 2          THE COURT:  All right.  It's --

 3          THE WITNESS:  Yeah.

 4          THE COURT:  -- neither here nor there.  All right.

 5          MR. SBAITI:  Your Honor, may I ask a slightly

 6  clarifying leading question on that, because I think I

 7  understand what he was trying to say, just for the record?

 8          THE COURT:  Well, --

 9          MR. MORRIS:  I object.

10          THE COURT:  -- I tell you what.  Anyone who wants to

11  ask one follow-up question on the judge's question can do so.

12  Okay?  You can go first.

13          MR. SBAITI:  I'll approach, Your Honor.

14          THE COURT:  Okay.

15                      RECROSS-EXAMINATION

16  BY MR. SBAITI:

17  Q   Would it be a fair summary of what you were saying a

18  minute ago that the reason the bottom end of that structure is

19  offshore is so that it doesn't get taxed before the money

20  reaches the charities on the U.S. side?

21  A   Tax -- it converts the nature of the income that is being

22  thrown off by the investments so that it becomes a tax

23  friendly income to the tax-exempt entity.  Passive income.

24  That's --

25  Q   So, essentially, --

HCMLPHMIT00002857

Patrick - Recross                    143

```
 1              THE COURT:  Okay.  Okay.

 2              MR. SBAITI:  -- so it doesn't get taxed before it

 3    hits the --

 4              THE COURT:  I said one question.

 5              MR. SBAITI:  Sorry, Your Honor.

 6              THE COURT:  Okay.  He answered it.

 7              MR. PHILLIPS:  And I have one question, Your Honor

 8              THE COURT:  Okay.

 9              MR. PHILLIPS:  I don't know if I need to ask this

10    question, but I'd rather not ask you if I need to ask it.

11              THE COURT:  Go ahead.

12              MR. PHILLIPS:  But if I do, you know, I could --

13              THE COURT:  Go ahead.

14              MR. PHILLIPS:  Well, okay.

15                         RECROSS-EXAMINATION

16    BY MR. PHILLIPS:

17    Q   We've talked about the offshore structure.  Are the

18    foundations in the top two tiers of the organizational chart

19    offshore entities?

20    A   No.

21    Q   They're --

22    A   They're onshore entities.  They're tax-exempt entities.

23    Q   Thank you.

24    A   The investments are offshore.

25    Q   Thank you.
```

017805

HCMLPHMIT00002858

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 38-71 Filed 04/45/25299 Page 957 of 1017   PageID 18839
Exhibit 71   Page 0145/25

Patrick - Further Redirect                    144

 1          THE COURT:  Mr. Morris?  One question.

 2                    FURTHER REDIRECT EXAMINATION

 3   BY MR. MORRIS:

 4   Q    Do you hold yourself out as an expert on the

 5   organizational structures in the Caribbean for charitable

 6   organizations?

 7   A    I hold myself out as a tax professional versant on setting

 8   up offshore master fund structures.  It's sort of a bread-and-

 9   butter thing.  But there are plenty of people that can testify

10   that this is very typical.

11   Q    Uh-huh.  Okay.

12          THE COURT:  Okay.  Thank you.

13      All right.  You are excused, Mr. Patrick.  I suppose

14   you'll want to stay around.  I don't know if you'll

15   potentially be recalled today.

16      (The witness steps down.)

17          THE COURT:  All right.  We should take a lunch break.

18   I'm going to put this out for a democratic vote.  Forty-five

19   minutes?  Is that good with everyone?

20          MR. SBAITI:  Do we have to leave the building to eat,

21   Your Honor, or is there food in the building?

22          THE COURT:  I think --

23          MR. SBAITI:  I'm sorry to ask that question, but --

24          THE COURT:  Yes.  You know what, there used to be a

25   very bad cafeteria, but I think it closed.  Right, Mike?  So,

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S     Document 28-71   Filed 04/06/25   Page 958 of 1017     PageID 18840

145

 1   you know, --

 2           MR. SBAITI:  Sorry I asked that.

 3           A VOICE:  Hate to miss that one.

 4           THE COURT:  Is 45 minutes not enough since you have

 5   to go off campus?  I'll give you an hour.  It just means we

 6   stay later tonight.

 7           A VOICE:  Can we just say 2:00 o'clock?

 8           MR. SBAITI:  That's fine with us, Your Honor.

 9           THE COURT:  2:00 o'clock.  That's 50 minutes.  See

10   you then.

11           MR. SBAITI:  Thank you.

12           A VOICE:  Your Honor, can we just get a time check?

13           THE COURT:  Okay.

14           THE CLERK:  Yeah.  The Debtors are at an hour and

15   eleven minutes.  Respondents at an hour nineteen.

16           THE COURT:  And hour and eleven and an hour and

17   nineteen.

18           A VOICE:  Wait, that's not right.

19           A VOICE:  That can't be right.

20           A VOICE:  Two hours?  We started at --

21           THE COURT:  Okay.  So, again, their side, the

22   collective Respondents?

23           THE CLERK:  An hour and eleven, responding to your

24   questions, --

25           A VOICE:  Yeah, he's not recording --

HCMLPHMIT00002860

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-71   Filed 04/07/25   Page 959 of 1017   PageID 18841

146

```
 1              THE CLERK:  So an hour and eleven and an hour and
 2   nineteen.
 3              THE COURT:  But they were already over an hour --
 4              A VOICE:  Yeah.  It's been over three hours.
 5              THE COURT:  -- with opening statements.
 6              THE CLERK:  An hour and twelve.  Yes.  They were very
 7   short with the questioning.  It was only like --
 8              THE COURT:  Okay.  We'll double-check that over the
 9   break with the court reporter.
10              A VOICE:  All right.  Thank you, Your Honor.
11              THE COURT:  We'll double-check and let you know.
12              THE COURT:  All rise.
13         (A luncheon recess ensued from 1:09 p.m. until 2:03 p.m.)
14              THE COURT:  All right.  Please be seated.  We're
15   going back on the record in Highland after our lunch break.
16   I'm going to confirm time.  We've had the Debtor an aggregate
17   of an hour and eleven minutes.  The Respondents, an aggregate
18   of an hour and twenty minutes.  Okay?  So we've gone two hours
19   and thirty-one minutes.
20         If it seems like we've been going longer, it's because we
21   did not do the clock on the opening matters regarding removal,
22   extension of time.  And then when I interjected with
23   questions, we stopped the clock.  All right?  So let's go.
24         You may call your next witness, Mr. Morris.
25              MR. MORRIS:  Thank you, Your Honor.  The Debtor calls
```

 1  James Dondero.

 2             THE COURT:   All right.

 3             A VOICE:   He had to step down the hall.  We had a

 4  little trouble getting through security.  Let me --

 5             THE COURT:   All right.  Mr. Dondero, you've been

 6  called as the next witness.  So if you'll approach our witness

 7  stand, please.  All right.  Please raise your right hand.

 8        (The witness is sworn.)

 9             THE COURT:   All right.  Please be seated.

10             JAMES D. DONDERO, DEBTOR'S WITNESS, SWORN

11                     DIRECT EXAMINATION

12  BY MR. MORRIS:

13  Q    Good afternoon, Mr. Dondero.

14  A    Good afternoon.

15  Q    Can you hear me?

16  A    Yes.

17  Q    Okay.  So, you were here this morning, correct?

18  A    Yes.

19  Q    All right.  So, we're going to put up -- we'll put it up

20  on the screen, but if you'd prefer to look at a hard copy in

21  the binder that's marked Volume 1 of -- 2 of 2, I'd ask you to

22  turn to Exhibit 25.  Or you could just follow on the screen.

23  And this is a one-page document, so maybe that's easier.

24  A    Sure.

25  Q    Do you have it?  All right.

017809

HCMLPHMIT00002862

1   A    Yes.

2   Q    This is the organizational chart for what's known as the

3   DAF, correct?

4   A    Yes.

5   Q    And Mark Patrick set up this structure, correct?

6   A    I believe he coordinated.  I believe it was set up by

7   third-party law firms.  I believe it was Hutton or a firm like

8   that.

9   Q    Mr. Patrick participated in the creation of this structure

10   because you gave him the task of setting up a charitable

11   entity for Highland at that time, correct?

12   A    Yes.

13   Q    And you approved of this organizational structure,

14   correct?

15   A    Yes.

16   Q    And Grant Scott was the Trustee of the DAF for a number of

17   years, correct?

18   A    I often use that word, trustee, but technically I think

19   it's managing member.

20   Q    That's right.  I appreciate that.  I was using your word

21   from the deposition.  But is it fair to say that, to the best

22   of your knowledge, Grant Scott was the sole authorized

23   representative of the entity known as the DAF from 2011 until

24   just recently?

25   A    Sole -- I would describe it more he was in a trustee

HCMLPHMIT00002863

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-71   Filed 05/06/25   Page 962 of 1017   PageID 18844

Dondero - Direct                                    149

1   function.

2   Q     Uh-huh.

3   A     Advice was being provided by Highland on the investment

4   side.  He wasn't expected to be a financial or an investment

5   expert.  And then accounting, tax, portfolio, tracking, you

6   know, compliance with all the offshore formation documents,

7   that was all done by Highland as part of a shared services

8   agreement.

9   Q     Okay.  I appreciate that, but listen carefully to my

10  question.  All I asked you was whether he was the authorized

11  representative, the sole authorized representative for the

12  ten-year period from 2011 until recently.

13  A     Yes.

14  Q     Okay.

15  A     I believe so.

16  Q     Thank you.  You served as the managing member of the DAF

17  GP, LLC before Mr. Scott, correct?

18  A     Yes.

19  Q     Okay.  And if you turn to Exhibit 26 in your binder,

20  that's the amended and restated limited liability company

21  agreement for the DAF GP, LLC, correct?

22  A     Yes.

23  Q     And on the last page, that's your signature line, right?

24  A     Yes.

25  Q     And you stepped down as the managing member on March 12,

017811

HCMLPHMIT00002864

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-71   Filed 05/30/25   Page 963 of 1017   PageID 18845

Dondero - Direct                    150

 1  2012, and were replaced by Mr. Scott, correct?

 2  A    Yes.

 3  Q    And as you recall it, Mr. Scott came to be appointed the

 4  trustee of the DAF based on your recommendation, right?

 5  A    Based on my recommendation?  Yes, I would say that's fair.

 6  Q    And you made that recommendation to Mr. Patrick, right?

 7  A    I -- I don't remember who I made the recommendation to.

 8  But I would echo the testimony of Mark Patrick earlier that

 9  the purpose of stepping down was to make the DAF unaffiliated

10  or independent versus being in any way affiliated.

11          MR. MORRIS:  I move to strike.

12  BY MR. MORRIS:

13  Q    And I'd ask you to listen carefully to my question.

14          THE COURT:  Sustained.

15  BY MR. MORRIS:

16  Q    You made the recommendation to Mr. Patrick, correct?

17  A    I would give the same answer again.

18  Q    Okay.

19          MR. MORRIS:  Can we please put up Mr. Dondero's

20  deposition transcript from last Friday at Page 297?

21      I believe, Your Honor, that the court reporter thought

22  that this was a continuation of a prior deposition, and that's

23  why the pages begin in the, you know, high in the 200s and not

24  at Page 1.  Just to avoid any confusion.

25  BY MR. MORRIS:

HCMLPHMIT00002865

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-71 Filed 05/02/25   Page 964 of 1017   PageID 18846
Exhibit 71 Page 152 of 299

Dondero - Direct                    151

1  Q    Mr. Dondero, do you see the transcript in front of you?

2  A    Yes.

3  Q    Okay.  Were you asked this question and did you give this

4  answer?  "Who did you make the" -- question, "Who did you make

5  the recommendation to?"  Answer, "It would have been Mark

6  Patrick."

7  A    I don't recall right now as I sit here, and it seems like

8  I was speculating when I answered, but it -- it probably would

9  have been Mark Patrick.  I just don't have a specific

10  recollection.

11  Q    You made the recommendation to Mr. Patrick because he was

12  responsible for setting up the overall structure, correct?

13  A    I -- I can't testify to why I did something I don't

14  remember.  I think that would be --

15  Q    Can we --

16  A    -- speculative.

17  Q    Are you finished, sir?

18  A    Yeah.

19  Q    Okay.

20        MR. MORRIS:  Can we go to Page 299, please?

21  BY MR. MORRIS:

22  Q    Lines 6 through 10.  Did I ask this question and did you

23  give me this answer?  Question, "But why did you select Mr.

24  Patrick as the person to whom to make your recommendation?"

25  Answer, "Because he was responsible for setting up the overall

017813

Dondero - Direct                    152

1   structure."

2       Were you asked that question and did you give that answer

3   last Friday?

4   A    Yes.

5   Q    Thank you.  But it's your testimony that you don't really

6   know what process led to Mr. Scott's appointment, correct?

7   A    No, I -- I said I was refreshed by Mark Patrick's

8   testimony earlier.

9   Q    Yeah.  Were you refreshed that, in fact, you specifically

10  had the authority to and did appoint Grant Scott as the

11  managing member of the DAF GP, LLC?

12  A    I -- I don't know.

13  Q    Well, you're referring to Mr. Patrick's testimony and I'm

14  asking you a very specific question.  Did you agree -- is your

15  memory refreshed now that you're the person who put Grant

16  Scott in the position in the DAF?

17  A    I -- I don't know if I owned those secret shares that --

18  well, they're not secret, but shares that could appoint

19  anybody on the planet.  I guess if I was in that box at that

20  time before Grant, then I would have had that ability.  I'm

21  not denying at all that I recommended Grant.  I'm just saying

22  I don't -- I don't remember if I went specifically to him or

23  if it was Thomas Surgent that was orchestrating it at the

24  time.  I don't remember.

25  Q    Do you deny that you had the authority to and that you did

017814

HCMLPHMIT00002867

Dondero - Direct                              153

1    appoint Grant Scott as your successor?

2            MR. TAYLOR:  Your Honor, objection to the extent it

3    calls for a legal conclusion.  I can't get close to a mic, so

4    --

5            THE COURT:  I overrule the objection.

6            THE WITNESS:  Can you repeat the question for me?

7    BY MR. MORRIS:

8    Q    Do you deny that you had the authority to and that you

9    did, in fact, appoint Grant Scott as your successor?

10   A    It'd be better to say I don't -- I don't -- no, I don't

11   remember or I didn't know the details at the time.  But,

12   again, I -- I assume I owned those shares.  And, again, I do

13   remember recommending Grant and -- but exactly how it

14   happened, I don't remember.

15   Q    Did you hear Mark Patrick say just an hour ago that you

16   appointed Grant Scott as your successor?

17           MR. SBAITI:  Objection, Your Honor.  Misstates

18   testimony.  The witness testified he transferred shares.

19   That's different than an appointment power.

20           THE COURT:  Response?  I can't remember the exact way

21   you worded it, to be honest.

22           MR. MORRIS:  Neither can I, but I'll even take it

23   that way.

24           THE COURT:  Okay.

25           MR. MORRIS:  I think he's wrong, but I'll even take

017815

HCMLPHMIT00002868

Dondero - Direct                    154

```
 1   it that way.
 2            THE COURT:  Okay.
 3   BY MR. MORRIS:
 4   Q    Mr. Dondero, did you listen to Mark Patrick say that you
 5   are the person who made the decision to transfer the shares to
 6   Mr. Scott in 2012?
 7   A    Yes, I heard him say that.
 8   Q    Okay.  So, do you -- do you dispute that testimony?
 9   A    I -- I don't have any better knowledge to dispute or
10   confirm.
11   Q    You and Mr. Scott have known each other since high school,
12   correct?
13   A    Yes.
14   Q    You spent a couple of years at UVA together, correct?
15   A    Yes.
16   Q    You were housemates together, correct?
17   A    Yes.
18   Q    He was the best man at your wedding, correct?
19   A    Yes.
20   Q    He's a patent lawyer, correct?
21   A    Yes.
22   Q    He had no expertise in finance when -- when he was
23   appointed as your successor to the DAF, correct?
24   A    Correct.
25   Q    To the best of your knowledge, at the time Mr. Scott
```

017816

HCMLPHMIT00002869

Dondero - Direct                                    155

1   assumed his position, he had never made any decisions

2   concerning collateralized loan obligations, correct?

3   A    Correct, but he wasn't hired for that.  That wasn't his

4   position.

5   Q    Was he the person who was going to make the decisions with

6   respect to the DAF's investments?

7   A    My understanding on how it was structured was the DAF was

8   paying a significant investment advisory fee to Highland.

9   Highland was doing portfolio construction and the investment

10  selection of -- or the investment recommendations for the

11  portfolio.  There is an independent trustee protocol that I

12  believe was adhered to, but it was never my direct

13  involvement.  It was always the portfolio managers or the

14  traders.

15       You have to provide three similar or at least two other

16  alternatives, and then with a rationale for each of them, but

17  a rationale for why you think one in particular is better.

18  And the trustee looks at the three, evaluates them.  And the

19  way I understand it always worked, that it works at pretty

20  much every charitable trust or trust that I'm aware of, they

21  generally, if not always, pick alongside the -- or, pick the

22  recommendation of their highly-paid investment advisory firm.

23  Q    And are you the highly-paid investment advisory firm?

24  A    Highland was at the time, yes.

25  Q    And you controlled Highland, right?

017817

HCMLPHMIT00002870

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 38-71   Filed 05/07/25   Page 969 of 1017   PageID 18851
Exhibit 71   Page 157 of 299

Dondero - Direct                    156

1   A    Yes.

2   Q    Okay.  But at the end of the day, is it your understanding

3   that Mr. Scott had the exclusive responsibility for making

4   actual decisions on behalf of the charitable trust that you

5   had created?

6   A    Yeah, I mean, subject to the protocol I just described.

7   Q    Yeah, okay, so let's keep going.  Mr. Scott had no

8   experience or expertise running charitable organizations at

9   the time you decided to transfer the shares to him, correct?

10  A    Yes, I believe that's correct.

11  Q    Okay.  You didn't recommend Mr. Scott to serve as the

12  DAF's investment advisor, did you?

13  A    No.

14  Q    And until early 2021, as you testified, I believe,

15  already, HCMLP served as the DAF's investment advisor,

16  correct?

17  A    Yes.

18  Q    And until early 2021, all of the DAF's day-to-day

19  operations were conducted by HCMLP pursuant to a shared

20  services agreement, correct?

21  A    Yes.

22  Q    And from the time the DAF was formed until January 9,

23  2020, you controlled HCMLP, correct?

24  A    Yes.

25  Q    You can't think of one investment decision that HCMLP

017818

HCMLPHMIT00002871

Dondero - Direct                 157

1  recommended that Mr. Scott ever rejected in the ten-year

2  period, correct?

3          MR. SBAITI:  Objection, Your Honor.  Lacks

4  foundation.

5          THE COURT:  Response?

6          MR. MORRIS:  I'm not quite sure what to say, Your

7  Honor.  The witness has already testified that HCMLP was the

8  investment advisor, made recommendations to Mr. Scott, and

9  that Mr. Scott was the one who had to make the investment

10 decisions at the end of the day.

11         MR. SBAITI:  He's not here as a witness for HCMLP.

12 He's here in his personal capacity.  There's no foundation

13 he'd have personal knowledge of which specific investments

14 were proposed, which ones were rejected or accepted.  He said

15 it was done by the portfolio manager.

16         THE COURT:  Okay.  I overrule.  He can answer if he

17 has an answer.

18 BY MR. MORRIS:

19 Q   Sir, you can't think of one investment decision that HCMLP

20 ever recommended to Mr. Scott that he rejected, correct?

21 A   I can't think of one, but I would caveat with I wouldn't

22 have expected there to be any.

23 Q   So you expected him to just do exactly what HCMLP

24 recommended, correct?

25 A   No.  I would expect him to sort through the various

017819

HCMLPHMIT00002872

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 31-871   Filed 05/30/25   Page 971 of 1017   PageID 18853
Exhibit 71   Page 159 of 299

Dondero - Direct                          158

1    investments when he was given three or four to choose from and

2    be able to discern that, just as we had with our expertise,

3    which was much greater than his, discern which one was the

4    best and most suitable investment, the best risk-adjusted

5    investment, that he would come to the same conclusion.

6    Q    Okay.  You can't think of an investment that Mr. Scott

7    ever made on behalf of the DAF that didn't originate with

8    HCMLP, correct?

9    A    Again, no, but I wouldn't expect there to be.

10    Q    Okay.  And that's because you expected all of the

11    investments to originate with the company that you were

12    controlling, correct?

13    A    We were the hired investment advisor with fiduciary

14    responsibility --

15    Q    Uh-huh.

16    A    -- and with a vested interest in making sure the DAF

17    performance was the best it could be.

18    Q    Okay.  Let --

19    A    He was, as you said, a patent attorney.  It would have

20    been unusual for him to second-guess.  I'm sure, in any

21    private investment or any investment that was one off or

22    didn't have comps, you know, he probably sought third-party

23    valuations.  But you would have to talk to him about that, or

24    the people at Highland that did that.

25             MR. MORRIS:  I move to strike.  It's a very simple

HCMLPHMIT00002873

Dondero - Direct                    159

1  question.

2          THE COURT:  Sustained.

3  BY MR. MORRIS:

4  Q   Sir, you can't think of one investment that Mr. Scott made

5  on behalf of the DAF that did not originate with HCMLP,

6  correct?

7  A   I'm going to give the same answer.

8  Q   Okay.  Let's go to Page 371 of the transcript, please.

9  Lines 7 through 11.

10     Oh, I apologize.  I think I might -- I think I meant 317.

11  I think I got that inverted.  Yeah.

12     Did I ask this question and did you give this answer:

13  "Can you think of any investment that Mr. Scott made on behalf

14  of the DAF that didn't original with HCMLP?"  Answer, "He

15  wasn't the investment advisor, but no, I don't -- I don't

16  recall."

17     Is that the answer you gave on Friday?

18  A   Yes.

19  Q   Thank you.  Let's --

20          MR. SBAITI:  Just for clarification, Your Honor, --

21          THE COURT:   Pardon?

22          MR. SBAITI:  -- the deposition was last Tuesday, not

23  on Friday.

24          MR. MORRIS:  I stand corrected, Your Honor.

25          THE COURT:  Okay.

017821

HCMLPHMIT00002874

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 58-71  Filed 06/06/25  Page 973 of 1017   PageID 18855
Exhibit 71  Page 160 of 299

Dondero - Direct                 160

1          MR. MORRIS:  I apologize.

2          THE COURT:  Okay.

3          MR. MORRIS:  I apologize if the Court thinks I misled

4  it.

5  BY MR. MORRIS:

6  Q    Let's talk about Mr. Scott's decision during the

7  bankruptcy case that preceded his resignation.  After HCMLP

8  filed for bankruptcy, CLO Holdco, Ltd. filed a proof of claim,

9  correct?

10          MR. ANDERSON:  Your Honor, I haven't objected yet,

11  but we literally haven't covered anything that deals with

12  commencing or pursuing a claim or cause of action.  I'm going

13  to object.  This is way outside, again, the bounds of the

14  contempt hearing.  It's -- otherwise, it's other discovery for

15  something else.  It literally has nothing to do with pursue a

16  claim or cause of action.

17          THE COURT:  We have another relevance objection.

18  Your response?

19          MR. MORRIS:  Your Honor, the evidence is going to

20  show that Mr. Dondero told Mr. Scott on three separate

21  occasions that his conduct, which were acts of independence,

22  were inappropriate and were not in the best interests of the

23  DAF.  Within days of the third strike, he resigned.  Okay?

24      I think it's relevant to Mr. Dondero's control of the DAF.

25  I think that the moment that Mr. -- this is the argument I'm

017822

```
 1    going to make.  I'll make it right now.  You want me to make
 2    it now, I'll make it now.  The moment that Mr. Scott exercised
 3    independence, Mr. Dondero was all over him, and Mr. Scott
 4    left.  That's what happened.  The evidence is going to be
 5    crystal clear.
 6        And I think that that control of the DAF is exactly what
 7    led to this lawsuit.  And what led -- and I'm allowed to make
 8    my argument.  So that's why it's relevant, Your Honor, because
 9    I think it shows that Mr. Scott -- Mr. Scott, after exercising
10    independence, was forced out.
11            MR. ANDERSON:  That doesn't move the needle one bit
12    as to whether a lawsuit was commenced or a claim or cause of
13    action was pursued, which is the subject of the contempt
14    motion.  It doesn't move the needle one bit as to those two
15    issues, as to whether that has any bearing on was it commenced
16    or was it pursued.
17            MR. MORRIS:  Your Honor, I appreciate the very narrow
18    focus that counsel for a different party is trying to put on
19    this, but it is absolutely relevant to the question of whether
20    Mr. Dondero was involved in the pursuit of these claims.  All
21    right?  That's what the order says.  Pursue.
22            THE COURT:  All right.  Overruled.
23    BY MR. MORRIS:
24    Q    After HCMLP filed for bankruptcy, CLO Holdco filed a proof
25    of claim, correct?
```

017823

HCMLPHMIT00002876

Dondero - Direct                              162

1    A    I believe so.

2    Q    And in the fall of 2020, Mr. Scott amended the proof of

3    claim to effectively reduce it to zero, correct?

4    A    I -- I guess.

5    Q    And Mr. Scott made that decision without discussing it

6    with you in advance, correct?

7    A    Yes.

8    Q    But you did discuss it with him after you learned of that

9    decision, correct?

10   A    I don't -- I don't recall.  I'm willing to be refreshed,

11   but I don't remember.

12   Q    Well, you told him specifically that he had given up bona

13   fide claims against the Debtor, correct?

14   A    Let me state or clarify my testimony this way.  Um, --

15        MR. MORRIS:  Your Honor, it's really just a yes or no

16   question.  His counsel can ask him if he wants to clarify, but

17   it's really just a yes or no question.

18   BY MR. MORRIS:

19   Q    You told Mr. Scott that he gave up bona fide claims

20   against the Debtor, correct?

21        THE COURT:  Okay.

22        THE WITNESS:  I don't know if I told him then with

23   regard to those claims.

24   BY MR. MORRIS:

25   Q    Okay.  Can we go to Page 321 of the transcript?  At the

017824

HCMLPHMIT00002877

 1  bottom, Line 21?  22, I apologize.

 2      Did I ask this question and did you give this answer?

 3  "And what do you" -- Question, "And what do you recall about

 4  your discussion with Mr. Scott afterwards?"  Answer, "That he

 5  had given up bona fide claims against the Debtor and I didn't

 6  understand why."

 7      Did I ask that question and did you give that answer last

 8  Tuesday?

 9  A   Yes.

10  Q   Okay.  A short time later, in December, the Debtor filed

11  notice of their intention to enter into a settlement with

12  HarbourVest, correct?

13  A   Yes.

14  Q   And CLO Holdco, under Mr. Scott's direction, filed an

15  objection to that settlement, correct?

16  A   Yes.

17  Q   And that settlement, the substance of that settlement was

18  that the Debtor did not have the right to receive

19  HarbourVest's interests in HCLOF at the time, correct?

20  A   I don't remember the exact substance of it.

21  Q   Okay.  But you do remember that you learned that Mr. Scott

22  caused CLO Holdco to withdraw the objection, correct?

23  A   Yes, ultimately.

24  Q   Okay.  And again, Mr. Scott did not give you advance

25  notice that he was going to withdraw the HarbourVest

017825

Dondero - Direct                        164

1  objection, correct?

2  A    No, he -- he did it an hour before the hearing.  He didn't

3  give anybody notice.

4  Q    You learned that Mr. Scott caused CLO Holdco to withdraw

5  its objection to the HarbourVest settlement at the hearing,

6  correct?

7  A    Yes.

8  Q    And you were surprised by that, weren't you?

9  A    I believe everybody was.

10  Q    You were sur... you were surprised by that, weren't you,

11  sir?

12  A    Yes.

13  Q    And you were surprised by that because you believed Mr.

14  Scott's decision was inappropriate, right?

15  A    Partly inappropriate, and partly because 8:00 o'clock the

16  night before he confirmed that he was going forward with the

17  objection.  And I think the DAF's objection was scheduled to

18  be first, I think.

19  Q    After you learned that Mr. Scott instructed his attorneys

20  to withdraw the CLO Holdco objection to the HarbourVest

21  settlement, you again spoke with Mr. Scott, correct?

22  A    Yes.

23  Q    And that conversation took place the day of the hearing or

24  shortly thereafter, correct?

25  A    Yes.

017826

HCMLPHMIT00002879

1   Q   And during that conversation, you told Mr. Scott that it

2   was inappropriate to withdraw the objection, correct?

3   A   Yes.

4   Q   And in response, Mr. Scott told you that he followed the

5   advice of his lawyers, correct?

6   A   Yes.

7   Q   But that didn't -- that explanation didn't make sense to

8   you, right?

9   A   Yes.

10  Q   In fact, you believed that Mr. Scott failed to act in the

11  best interests of the DAF and CLO Holdco by withdrawing its

12  objection to the HarbourVest settlement, correct?

13  A   Yes.

14  Q   And while you didn't specifically use the words fiduciary

15  duty, you reminded Mr. Scott in your communications with him

16  that he needed to do what was in the best interests of the

17  DAF, correct?

18  A   Yes.

19  Q   You're the founder of the DAF, correct?

20  A   I put it -- I put it in motion.  Yeah.  I tasked Mark

21  Patrick and third-party law firms to do it, but if that boils

22  down to founder, I guess yes.

23  Q   Uh-huh.  And you're the primary donor to the DAF, correct?

24  A   Yes.

25  Q   You're the investment advisor to the DAF, or at least you

017827

1  were at that time?

2  A   Yes.

3  Q   And because you served in these roles, you expected Mr.

4  Scott to discuss his decision to withdraw the HarbourVest

5  objection in advance, correct?

6  A   Yes, I -- I think it was even broader than that.  I mean,

7  he was having health and anxiety issues, and to the extent he

8  felt overwhelmed, I -- you know, yeah, you should do what's in

9  the best interests at all times, but -- but yes, I thought it

10 would be helpful if he conferred with me or Mark Patrick or

11 whoever he was comfortable with.

12 Q   Mr. Dondero, you specifically believed that Mr. Scott's

13 failure to tell you that he was going to withdraw the

14 HarbourVest objection in advance was inappropriate, right?

15 A   Yes.

16 Q   Even though he was the sole authorized representative, you

17 believed that, because you were the founder of the DAF, the

18 primary donor of the DAF, and the investment advisor to the

19 DAF, he should have discussed that before he actually made the

20 decision, correct?

21 A   No.  What I'm saying is at 8:00 o'clock at night, when he

22 confirms to numerous people he's ready to go first thing with

23 his objection, and then he or counsel or some combination of

24 them change their mind and don't tell anybody before the

25 hearing, that's odd and inappropriate behavior.

017828

HCMLPHMIT00002881

Dondero - Direct                  167

 1            MR. MORRIS:  Can we go to Page 330 of the transcript,

 2    please?

 3       And Your Honor, before I read the testimony, there is an

 4    objection there.  So I'd like you to rule --

 5            THE COURT:  Okay.

 6            MR. MORRIS:  -- before I do that.  It can be found at

 7    -- on Page 330 at Line 21.

 8       (Pause.)

 9            MR. MORRIS:  Here we go.  Page 30, beginning at Line

10    19.  330, rather.

11            THE COURT:  Okay.

12       (Pause.)

13            THE COURT:  Okay.  I overrule that objection.

14    BY MR. MORRIS:

15    Q   Mr. Dondero, were you asked this question and did you give

16    this answer last Tuesday?  Question, "Do you believe that he

17    had an obligation to inform you in advance?"  Answer, "I don't

18    know if I would use the word obligation, but, again, as the

19    founder or the primary donor and continued donor to the DAF,

20    and as the investment advisor fighting for above-average

21    returns on a daily basis for the fund, significant decisions

22    that affect the finances of the fund would be something I

23    would expect typically a trustee to discuss with the primary

24    donor."

25       Did you give that answer the other day, sir?

017829

HCMLPHMIT00002882

Dondero - Direct                    168

1   A    Yes.

2   Q    If Mr. Patrick decides tomorrow to withdraw the lawsuit

3   that's in District Court, does he have an the obligation to

4   tell you in advance?

5   A    Again, I wouldn't use the word obligation.  But something

6   that I think ultimately is going to be a $20 or $30 million,

7   if not more, benefit to the DAF, to the detriment of Highland,

8   if you were to give that up, I would expect him to have a

9   rationale and I would expect him to get other people's

10  thoughts and opinions before he did that.

11  Q    Okay.  But does he have to get your opinion before he

12  acts?

13  A    No, he does not.

14  Q    Okay.  So he -- Mr. Patrick could do that tomorrow, he

15  could settle the case, and if he doesn't come to you to

16  discuss it in advance, you won't be critical of him, right?

17  A    He doesn't have the obligation, but there's -- there's a

18  reasonableness in alignment of interests.  I -- a growing

19  entrepreneur sets up a trust, a lot of times they'll put their

20  wife in charge of it, and she hires investment advisers and

21  whatever, but they've got the best interests at mind for the

22  charity or the children or whatever.

23       You know, people who go rogue and move in their own self-

24  interest or panic, that stuff can happen all the time.  It

25  doesn't make it appropriate, though.

017830

HCMLPHMIT00002883

Dondero - Direct                                     169

1   Q    A couple of weeks after Mr. Scott withdraw the objection

2   to the HarbourVest settlement, he entered into a settlement

3   agreement with the Debtor pursuant to which he settled the

4   dispute between the Debtor and CLO Holdco, correct?

5   A    Yes.

6   Q    Okay.  You didn't get advance notice of that third

7   decision, correct?

8   A    No.

9   Q    Can we go to Page -- Exhibit 32 in your binder?  And this

10  is the settlement agreement between CLO Holdco and the Debtor,

11  correct?  Attached as the exhibit.  I apologize.

12  A    Yes.

13  Q    And do you understand that that's Mr. Scott's signature on

14  the last page?

15  A    Yep.

16  Q    And you learned about this settlement only after it had

17  been reached, correct?

18  A    Yep.

19  Q    And you believed Mr. Scott's decision not to pursue

20  certain claims against the Debtor or to remove HCMLP as the

21  manager of the CLOs was not in the best interests of the DAF,

22  correct?

23  A    Correct.

24  Q    And you let Mr. Scott know that, correct?

25  A    Yes.

017831

HCMLPHMIT00002884

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 38-71 Filed 07/03/25   Page 983 of 1017   PageID 18865

Dondero - Direct                    170

1   Q    After learning about the settlement agreement on January

2   26th, you had one or two conversations with Mr. Scott on this

3   topic, correct?

4   A    Yes.

5   Q    And your message to Mr. Scott was that the compromise or

6   settlement wasn't in the DAF's best interest, correct?

7   A    It was horrible for the DAF.

8   Q    Uh-huh.  And you told him that, right?

9   A    Yes.

10  Q    Okay.  From your perspective, any time a trustee doesn't

11  do what you believe is in the trust's best interest, you leave

12  yourself open to getting sued, correct?

13  A    Who is "you" in that question?

14  Q    You.  Mr. Dondero.

15  A    Can you repeat the question, then, please?

16  Q    Sure.  From your perspective, any time you're a trustee

17  and you don't believe that the trustee is doing what's in the

18  best interests of the fund, the trustee leaves himself open to

19  getting sued, correct?

20  A    I don't know who the trustee leaves himself open to, but

21  as soon as you go down a path of self-interest or panic, you

22  -- you potentially create a bad situation.  But I don't know

23  who holds who liable.

24  Q    Did you believe that Mr. Scott was acting out of self-

25  interest or panic when he decided to settle the dispute with

017832

HCMLPHMIT00002885

Dondero - Direct                         171

1  | the Debtor on behalf of CLO Holdco?

2  | A    Yes.

3  | Q    Did you tell him that?

4  | A    He told me that.

5  | Q    He told you that he was acting out of panic or

6  | desperation?  With self-int... withdrawn.  Withdrawn.  Did he

7  | tell you that he was acting out of self-interest?

8  | A    He was having health problems, anxiety problems, and he

9  | didn't want to deal with the conflict.  He didn't want to

10 | testify.  He didn't want to come to court.  He didn't want to

11 | do those things.  And I told him I didn't think the settlement

12 | was going to get him out of that stuff.  I think, you know, it

13 | got him out of some issues, but I think you guys are going to

14 | go after him for other stuff.  But he -- he panicked.

15 |          MR. MORRIS:  I move to strike the latter remark.

16 |          THE COURT:   Sustained.

17 | BY MR. MORRIS:

18 | Q    Shortly after you had the conversation with Mr. Scott, he

19 | sent you notice of his intent to resign from his positions at

20 | the DAF and CLO Holdco, correct?

21 | A    Yes.

22 | Q    Okay.  Let's take a look at that, please.  Exhibit 29.

23 | This is Mr. Scott's notice of resignation, correct?

24 | A    Yes.

25 | Q    He sent it only to you, correct?

017833

HCMLPHMIT00002886

Dondero - Direct                                    172

1    A    Yes.

2    Q    A couple of days before he sent this, he told you he was

3    considering resigning; isn't that right?

4    A    Yes.

5    Q    Okay.  And he told you he was considering resigning

6    because he was suffering from health and anxiety issues

7    regarding the confrontation and the challenges of

8    administering the DAF given the bankruptcy, correct?

9    A    Yes.

10   Q    He didn't tell you that he made the decision -- withdrawn.

11   Did you tell him in this same conversation -- withdrawn.  Is

12   this the same conversation where you conveyed the message that

13   the compromise or settlement wasn't in the best interests of

14   the DAF?

15   A    You mean the conversation -- or the resignation? Is that

16   -- can you rephrase the question, please?

17   Q    Yeah, I apologize.  It's my fault, sir.  You testified

18   that after the January 26th hearing you had a conversation

19   with Mr. Scott where you told him that the compromise or

20   settlement was not in the best interests of the DAF, correct?

21   A    Yes.

22   Q    Okay.  Did Mr. Scott share with you his concerns about

23   anxiety and health issues in that same conversation, or was it

24   in a subsequent conversation?

25   A    It was at or around that time.  I -- I don't remember

017834

HCMLPHMIT00002887

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 35-871   Filed 07/04/25   Page 986 of 1017   PageID 18868

Dondero - Direct                          173

1  which conversation.

2  Q    Okay.

3  A    But it was right at or around that time.

4  Q    All right.  You never asked Mr. Scott to reconsider, did

5  you?

6  A    No.

7  Q    You don't recall sending this notice of resignation to

8  anyone, do you?

9  A    No.

10 Q    You don't remember notifying anyone that you'd received

11 notice of Mr. Scott's intent to resign from the DAF, do you?

12 A    It was -- yeah, no, I -- I don't remember.  It was a busy

13 time around that time and this was a secondary issue.

14 Q    Okay.  So the fact that the person who has been running

15 the DAF for a decade gives you and only you notice of his

16 intent to resign was a secondary issue in your mind?

17 A    Yes, because when I talked to him at about that time, I

18 said, okay, well, it's going to take a while.  I don't even

19 know how the mechanism works.  But don't do anything adverse

20 to the DAF, don't do anything else until, you know, you've

21 figured out transition.

22 Q    Uh-huh.

23 A    And so once he had confirmed he wouldn't do anything

24 outside normal course until he transitioned, I didn't worry

25 about this.  I had bigger issues to worry about at the time.

HCMLPHMIT00002888

1   Q    In the third paragraph of his email to you, he wrote that

2   his resignation will not be effective until he approves of the

3   indemnification provisions and obtains any and all necessary

4   releases.  Do you see that?

5   A    Yes.

6   Q    And that was the condition that on January 31st Mr. Scott

7   placed on the effectiveness of his resignation, correct?

8   A    Condition?  Yeah, I -- I think he's trying to state the

9   timing will happen after that.

10  Q    After he gets the release, right?

11  A    Yes.

12  Q    And he wanted the release because you'd told him three

13  different times that he wasn't acting in the best of the DAF,

14  correct?

15        MR. TAYLOR:  Objection, Your Honor.

16        MR. SBAITI:  Objection.  Calls for --

17        MR. TAYLOR:  Objection.  Calls for speculation.

18        THE WITNESS:  Yeah, I --

19        THE COURT:  Sustained.

20        THE WITNESS:  I can't take that jump.  Yeah.

21  BY MR. MORRIS:

22   Q    In response to this email from your lifelong friend, you

23  responded, if we could scroll up, about whether divest was a

24  synonym -- if we can look at the first one -- whether divest

25  is a synonym for resigned.  Do I have that right?

HCMLPHMIT00002889

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 28-71   Filed 07/06/25   Page 988 of 1017   PageID 18870

Dondero - Direct                    175

1   A    (no immediate response)

2   Q    If you will look at your response on Monday morning at

3   9:50.

4   A    Yes.

5   Q    Okay.  And then after Mr. Scott responds, you respond

6   further, if we can scroll up, and you specifically told him,

7   "You need to tell me ASAP that you have no intent to divest

8   assets."  Correct?

9   A    Yes.

10  Q    And you wrote that because you believed some of his

11  behavior was unpredictable, right?

12  A    I think I wrote that because the term divest in investment

13  terms means sale or liquidate, but I guess it had a different

14  legal term in the way he was looking at it.  I wasn't aware at

15  that time of the shares that could be bequeathed to anybody,

16  and I think the divest refers to that, but I wasn't aware that

17  that's how the structure worked at that time, and I was

18  worried that divest could be the investment term and I -- it

19  wouldn't have been appropriate for him to liquidate the

20  portfolio.

21  Q    So, and you wanted to make sure he wasn't liquidating or

22  intending to liquidate any of the CLOs, correct?

23  A    Correct.

24  Q    Okay.  So he's still the authorized, the sole authorized

25  representative, but you wanted to make sure that he didn't do

017837

HCMLPHMIT00002890

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 71    Filed 07/07/25    Page 989 of 1017    PageID 18871

Dondero - Direct                        176

 1  anything that you thought was inappropriate.  Fair?

 2  A    It's because I had talked to him before this and he said

 3  he wasn't going to do anything outside normal course, and then

 4  the word divest scared me, but I didn't realize it was a legal

 5  term in this parlance here.

 6  Q    And so after he explained, you still wanted to make sure

 7  that he wasn't divesting any assets, correct?

 8  A    Yes.

 9  Q    Okay.  Since February 1st, you've exchanged exactly one

10  text messages with Mr. Scott; is that right?

11  A    I think there've been several, several text messages.  But

12  one on his birthday.

13  Q    Yeah.  And you haven't spoken to him in months, correct?

14  A    In a couple months, yes.

15  Q    All right.  Let's talk about the replacement of Mr. Scott.

16  With -- with Mr. Scott's notice, someone needed to find a

17  replacement, correct?

18  A    Yes.

19  Q    And the replacement was going to be responsible for

20  managing a charitable organization with approximately $200

21  million of assets, most of which was seeded directly or

22  indirectly through you, correct?

23  A    Yes.

24  Q    And the replacement was going to get his and her -- his or

25  her investment advice from you and NexPoint Advisors; do I

HCMLPHMIT00002891

1    have that right?

2    A    That was the plan.

3    Q    Okay.  Ultimately, Mr. Patrick replaced Mr. Scott,

4    correct?

5    A    Yes.

6    Q    But it's your testimony that you had no knowledge that Mr.

7    Patrick was going to replace Mr. Scott until after it happened

8    on March 24, 2021.  Correct?

9    A    That's correct.  I believe it happened suddenly.

10   Q    So, for nearly two months after you had received notice of

11   Mr. Scott's intent to resign, you were uninvolved in the

12   process of selecting his replacement, correct?

13   A    I was uninvolved.  I'd say the process was dormant for an

14   extended period of time until Mark Patrick came on board, and

15   then Mark Patrick ran the process of interviewing multiple

16   potential candidates.

17   Q    Mark Patrick didn't have any authority prior to March

18   24th, correct?

19   A    Is March 24th the date that he transitioned the shares to

20   himself from Grant Scott?

21   Q    Yep.

22   A    That's when he then became the trustee of the DAF, yes.

23   Q    Do you know -- do you know who was instructing Mr. Patrick

24   on who to interview or how to carry the process out?

25   A    He was doing that on his own with, I think,

017839

HCMLPHMIT00002892

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 58-71 Filed 07/09/25    Page 991 of 1017    PageID 18873

Dondero - Direct                          178

 1   recommendations from third-party tax firms.

 2   Q    So Mr. Patrick was trying to find a successor to Mr.

 3   Scott, even though he had no authority to do that, and you

 4   were completely uninvolved in the whole process?  Do I have

 5   that right?

 6   A    I was uninvolved, yes.  He was trying to facilitate it for

 7   the benefit of his friendship with Grant Scott and knowing

 8   that it -- it -- with his resignation, it had to transition to

 9   somebody.  And he enjoys working on the DAF, he enjoys the

10   charitable stuff in the community, and he was the most

11   appropriate person to work on helping Grant transition.

12           MR. MORRIS:  All right.  I move to strike, Your

13   Honor.  It's hearsay.

14           THE COURT:  Sustained.

15   BY MR. MORRIS:

16   Q    You're aware that Mr. Seery was appointed the Debtor's CEO

17   and CRO last summer, correct?

18   A    Yes.

19   Q    And you're aware that Mr. Seery's appointment was approved

20   by the Bankruptcy Court, correct?

21   A    Yes.

22   Q    And you were aware of that at the time it happened,

23   correct?

24   A    Yes.

25   Q    And even before that, in January of 2020, you consented to

HCMLPHMIT00002893

Case 19-34054-sgj11 Doc 4255-71 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02072-S Document 38-71 Filed 06/30/25 Page 992 of 1017 PageID 18874
Exhibit 71 Page 180 of 299

Dondero - Direct                                           179

1  a settlement where you gave up control of the Debtor.

2  Correct?

3  A    To the independent board for a consensual Chapter 11

4  restructuring that would leave Highland intact.

5  Q    And do you understand that the gatekeeper provision in the

6  July order is exactly like the one that you agreed to in

7  January except that it applies to Mr. Seery instead of the

8  independent directors?

9  A    I -- I learned a lot about that today, but I don't think

10  it's appropriate to move what applied to the board to the CEO

11  of a registered investment advisor.

12  Q    Okay.  I'm just asking you, sir.  Listen carefully to my

13  question.  Were you aware in January 2020 that you agreed to a

14  gatekeeper provision on behalf of the independent board?

15  A    Generally, but not specifically.

16  Q    Okay.

17  A    Not -- not like what we've been going over today.

18  Q    Okay.  And you knew that Mr. Seery had applied to be

19  appointed CEO subject to the Court's approval, correct?

20  A    Wasn't it backdated to March?  I -- I think the hearing

21  was in June, but it was backdated for -- for money and other

22  purposes, right?  I -- that's my recollection.  I don't

23  remember otherwise.

24  Q    You do remember that Mr. Seery got -- he got -- his

25  appointment got approved by the Court, right?

017841

HCMLPHMIT00002894

Dondero - Direct                    180

1    A    Yes.  But, as far as the dates are concerned, I thought it

2    was either in March or retroactive to March.  Maybe it was

3    June or July.

4    Q    And you --

5    A    But I don't remember.

6    Q    Did you have your lawyers review the motion that was filed

7    on behalf of the Debtor?

8    A    I'm -- I assume they do their job.  I -- if they didn't, I

9    don't know.

10   Q    Okay.  That's what you hired them to do; is that fair?

11   A    Yes.

12   Q    Okay.  Can we go to Exhibit 12, please?  I think it's in

13   Binder 1.  You've seen this document before, correct?

14   A    Yes.

15   Q    In fact, you saw versions of this complaint before it was

16   filed, correct?

17   A    Yes, I saw one or two versions towards the end.  I don't

18   know if I saw the final version, but --

19   Q    Sir, you participated in discussions with Mr. Sbaiti

20   concerning the substance of this complaint before it was

21   filed, correct?

22   A    Some.  I would just use the word some.

23   Q    Okay.  Can you describe for me all of your conversations

24   with Mr. Sbaiti concerning the substance of this complaint?

25              MR. SBAITI:  Your Honor, I would object on the basis

HCMLPHMIT00002895

Dondero - Direct                    181

1    of work product privilege and attorney-client communications.

2    He was an agent for my client, the DAF, at the time he was

3    having these discussions with us, and our discussions with him

4    were work product.  So to the extent he can reveal the

5    conversations without discussing the actual content, we would

6    raise privilege objection, Your Honor.

7              THE COURT:  Mr. Morris?

8              MR. MORRIS:  Your Honor, there is no privilege here.

9    That's exactly why I asked Mr. Patrick the questions earlier

10   today.  Mr. Dondero is not party to any agreement with the DAF

11   today.  It's an informal agreement, perhaps, but there is no

12   contractual relationship, there is no privity any longer

13   between Mr. Dondero or any entity that owns and controls in

14   the DAF, as far as I know.  If they have evidence of it, I'm

15   happy to listen, but that -- that's exactly why I asked those

16   questions of Mr. Patrick earlier today.

17             THE COURT:  All right.

18             MR. SBAITI:  Your --

19             THE COURT:  That was the testimony.  There's an

20   informal arrangement, at best.

21             MR. SBAITI:  Well, Your Honor, I would suggest that

22   that doesn't necessarily mean that he isn't an agent of the

23   DAF.  It doesn't have to be a formal agreement for him to be

24   an agent of the DAF.

25      Everyone's agreed he was an advisor.  Everyone's agreed he

017843

HCMLPHMIT00002896

Dondero - Direct                                         182

1    was helping out.  That is an agency relationship.  It doesn't

2    have to be written down.  It doesn't have to be a formal

3    investment advisory relationship.  He's still an agent of the

4    DAF.  He was requested to do something and agreed to do it

5    under the expectation that all of us had that those would be

6    privileged, Your Honor.  That is -- that is sufficient -- that

7    is sufficient, I would argue, to get us where we need to be.

8    The privilege should apply, Your Honor, and they don't have a

9    basis for, I would say, invading the privilege, Your Honor.

10          THE COURT:  Well, do you have any authority?  Because

11   it just sounds wrong.  He's not an employee of your client.

12   He doesn't have any contractual arrangement with your client.

13          MR. SBAITI:  Your Honor, I would dispute the idea

14   that he has no contractual arrangement with my client.  The

15   question was asked, do you have a -- do you have a written

16   agreement, and then the question was, so you don't have a

17   contract, and the answer was no, I don't have a contract,

18   building upon that first -- that first question.  But the

19   testimony as he just recounted is that there is an agreement

20   that he would advise Mr. Patrick and he would advise the DAF.

21          THE COURT:  Okay.

22          MR. SBAITI:  That's -- that's a contract.

23          THE COURT:  Okay.  My question was, do you have any

24   legal authority?  That's what I meant when I said authority.

25   Any legal authority to support the privilege applying in this

017844

HCMLPHMIT00002897

Dondero - Direct                    183

 1  kind of --

 2          MR. SBAITI:  In an informal arrangement, Your Honor?

 3  I don't have one at my fingertips at the moment, Your Honor,

 4  but I don't know that that should be a reason to invade the

 5  privilege.

 6      And I would just add, Your Honor, I would just add, we've

 7  already -- because of the purpose of these questions, you've

 8  heard Mr. Morris state several times that the purpose is to

 9  show that Mr. -- that Mr. Dondero had some role in advising

10  and participating in the creation of this complaint.  That's

11  been conceded by myself.  I believe it was conceded by Mr.

12  Dondero.

13      The actual specific facts, the actual specific

14  conversations, Your Honor, shouldn't be relevant at this point

15  and they shouldn't be admissible, given -- given the

16  relevancy, given the perspective of the privilege.

17          THE COURT:  Okay.

18          MR. MORRIS:  If I might --

19          THE COURT:  I overrule your objection.  I don't think

20  a privilege has been shown here --

21          MR. SBAITI:  And Your Honor, --

22          THE COURT:  -- and I think it's relevant.

23          MR. SBAITI:  -- I would ask if we could *voir dire* the

24  witness on the basis of the privilege, if that's --

25          THE COURT:  All right.  You may do so.

HCMLPHMIT00002898

```
 1                    VOIR DIRE EXAMINATION
 2   BY MR. SBAITI:
 3   Q    Mr. Dondero, do you have a relationship with the DAF?
 4   A    Yes.
 5   Q    How would you describe that relationship?
 6   A    I view myself and my firm as the investment advisor.  I
 7   was actually surprised by the testimony today that there
 8   wasn't a contract in place, but there should be one.  There
 9   should be one soon, in my opinion.
10   Q    Have you -- did you hear Mr. Patrick testify earlier that
11   he comes to you for advice?
12   A    Yes.
13   Q    Is that --
14   A    As he should.  Yeah.
15   Q    Is that true?
16   A    Yes.
17   Q    When you render that advice, do you render that advice
18   with some expectation about him following or listening to that
19   advice?
20   A    Okay, I think there's only been one investment or one
21   change in the DAF portfolio since Mark Patrick's been
22   involved, only one, and it was a real estate investment that I
23   wasn't directly involved in.  And so the people who put that
24   investment forward worked with Mark without my involvement,
25   and then I think Mark got third-party appraisal firms and
```

017846

HCMLPHMIT00002899

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 28-71  Filed 08/06/25  Page 998 of 1017    PageID 18880
Exhibit 71   Page 186 of 299

Dondero - Voir Dire                               185

1  third-party valuation firms involved to make sure he was

2  comfortable, which was a good process.

3  Q   When you supplied information to Mr. Patrick, do you do so

4  under the belief that there is a contractual, informal or

5  formal, relationship?

6            MR. MORRIS:  Objection to the form of the question.

7            THE COURT:  Overruled.

8            MR. SBAITI:  What specific form?

9            THE COURT:  Overruled.

10            MR. SBAITI:  Thank you.

11            THE WITNESS:  Yes.  I believe it -- it's a

12  relationship that can and should be papered as -- soon.

13  That's my -- I mean, unless I get some reason from counsel not

14  to, I think it's something that should be memorialized.

15  BY MR. SBAITI:

16  Q   And when you have that -- in that relationship, when you

17  communicate with Mr. Patrick about matters, investment or

18  otherwise, is there an expectation of privacy?

19  A   Yes.

20  Q   When Mr. Patrick -- did Mr. Patrick request that you

21  interface with my firm and myself, as he testified earlier?

22  A   Yes.

23  Q   And when he did so, did he ask you to do so in an

24  investigatory manner?

25            MR. MORRIS:  Objection to the form of the question.

017847

HCMLPHMIT00002900

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 53-71   Filed 07/25 299   Page 999 of 1017   PageID 18881

Dondero - Voir Dire                              186

1          THE COURT:  Sustained.  Rephrase.

2   BY MR. SBAITI:

3   Q    Did he tell you why he wanted you to talk to us?

4   A    Yeah.  At that point, he had started an investigation into

5   the HarbourVest transaction.

6   Q    And -- and when he -- when you were providing information

7   to us, did he tell you whether he wanted you to help the

8   Sbaiti firm conduct the investigation?

9   A    The -- overall, the financial numbers and tables in there

10  were prepared by not myself, but I -- I did -- I did help on

11  -- on the -- some of the registered investment advisor issues

12  as I understood them.

13  Q    Okay.  And the communications that you had with us, was

14  that part of our investigation?

15          MR. MORRIS:  Objection to the form of the question.

16          THE COURT:  Overruled.

17          THE WITNESS:  Yes.

18  BY MR. SBAITI:

19  Q    And did you understand that we had been retained by Mr.

20  Patrick on behalf of the DAF and CLO Holdco?

21  A    Yes.

22  Q    And did you appreciate or have any understanding of

23  whether or not you were helping the law firm perform its legal

24  function on behalf of the DAF and CLO Holdco?

25  A    Perform its legal function?  I was just helping with

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 71 Filed 06/08/25   Page 1000 of 1017   PageID 18882

Dondero - Voir Dire                                187

1  regard to the registered investment advisor aspects of the

2  overall, you know, like that.

3  Q    Let me ask a more simple question.  Did you -- did you

4  appreciate that you were assisting a law firm in its

5  representation of the DAF?

6  A    Yes.

7  Q    And you were helping the law -- and were you helping the

8  law firm develop the facts for a complaint?

9  A    Yes.  I would almost say, more importantly, I wanted to

10 make sure that there weren't errors in terms of understanding

11 either how CLOs worked or how the Investment Advisers Act

12 worked.  So I was -- it was almost more of a proofing.

13        MR. SBAITI:  Your Honor, based upon that, I mean,

14 he's helping a law firm perform its function for the client.

15 That's an agency relationship that gets cloaked.  You can call

16 him a consulting expert.  You can call him, to a certain

17 extent, a fact witness, Your Honor.  If we want to take a

18 break, I'm sure we could find authority on that basis for a

19 work product privilege pretty easily.

20        But he's an agent of the DAF.  Even if it's an informal

21 agency relationship, that's still agency.  He's in some

22 respects, I guess, an agent of the law firm, to the extent

23 he's helping us perform our legal work.  And it seems like

24 invading that privilege at this juncture is (a) unnecessary,

25 because we've already conceded that there's been

017849

HCMLPHMIT00002902

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 71   Filed 08/25   Page 1001 of 1017   PageID 18883

Dondero - Voir Dire                              188

```
 1    conversations, which I think is the relationship they wanted
 2    to establish.  And it's not unusual for a law firm to use
 3    someone with specialized knowledge to understand some of the
 4    intricacies of the actual issues that they're -- that they're
 5    getting ready to litigate.
 6              THE COURT:  Okay.  I find no privilege.  All right.
 7    That's the ruling.
 8              MR. BRIDGES:  Your Honor, may I add one thing to the
 9    objection for the record?
10              THE COURT:  Okay, we have a rule, one lawyer per
11    witness.  Okay?  So, thank you.  A District Court rule, by the
12    way, not mine.
13              MR. SBAITI:  Your Honor, may we take a short recess,
14    given the Court's ruling?
15              THE COURT:  Well, I'd really like to finish this
16    witness.  How much longer do you have?
17              MR. MORRIS:  About eight more questions.
18              THE COURT:  All right.  We'll take a break after the
19    direct, okay?
20              MR. SBAITI:  Your Honor, I would ask that we -- if
21    he's going to ask him more questions about the content of the
22    communications, I ask respectfully for a recess so we can
23    figure out what to do about that.  Because, right now, there's
24    a ruling that he's going to have to reveal privileged
25    information, and we don't have a way to go around and figure
```

017850

1   out how to resolve that issue if we needed to.

2           THE COURT:  Okay.  I've ruled it's not privilege.

3   Okay?

4           MR. SBAITI:  I understand that, Your Honor, but --

5           THE COURT:  Your client is CLO Holdco and the DAF.

6           MR. SBAITI:  Yes, Your Honor.

7           THE COURT:  Representative, Mark Patrick.  No

8   contract with Mr. Dondero.  The fact that he may be very

9   involved I don't think gives rise to a privilege.  That's my

10  ruling.

11          MR. SBAITI:  I understand, Your Honor.  I understand,

12  Your Honor, but I'm asking for a recess so that we can at

13  least undertake to provide Your Honor with some case law on a

14  reconsideration before we go there, because that bell can't be

15  unrung.

16          MR. MORRIS:  Your Honor, if I may?

17          MR. SBAITI:  And it's --

18          THE COURT:  Uh-huh.

19          MR. MORRIS:  I'm happy to give them ten minutes, Your

20  Honor, as long as they don't talk to the witness.

21          THE COURT:  Okay.

22          MR. MORRIS:  I want to give them the opportunity.  Go

23  right ahead.

24          THE COURT:  All right.  We'll take a ten-minute

25  break.

017851

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 71    Filed 08/08/25    Page 1003 of 1017    PageID 18885
Page 299

Dondero - Voir Dire                              190

1           MR. SBAITI:  Thank you.

2           THE COURT:  It's 3:05.

3           THE CLERK:  All rise.

4      (A recess ensued from 3:03 p.m. until 3:17 p.m.)

5           THE CLERK:  All rise.

6           THE COURT:  Okay.  Please be seated.  Going back on

7   the record in Highland.  Mr. Sbaiti?

8           MR. SBAITI:  Yes, Your Honor.  May I approach?

9           THE COURT:  You may.

10           MR. SBAITI:  Your Honor, we have some authority to

11   support the position we'd taken.  We'd ask the Court to

12   reconsider your ruling on the privilege.

13       The first bit of authority is Section 70 of the

14   Restatement (Third) of Law Governing Lawyers.  Privileged

15   persons within the meaning of Section 68, which governs the

16   privilege, says that those persons include either agents of

17   either the lawyer or the client who facilitate communications

18   between the two in order for the lawyers to perform their

19   function.

20       Another case that we found is 232 F.R.D. 103 from the

21   Southern District of New York, 2005.  It's *Express Imperial*

22   *Bank of U.S. v. Asia Pulp Company*.  And in that case, Your

23   Honor, the consultant was a -- had a close working

24   relationship with the company and performed a similar role to

25   that of the employee and was assisting the law firm in

017852

HCMLPHMIT00002905

Dondero - Voir Dire                    191

```
 1    performing their functions, and the court there found that the

 2    work product privilege -- actually, the attorney-client

 3    privilege -- attached in what they called a Functional

 4    Equivalents Doctrine, Your Honor.

 5         And here we have pretty much the same set of facts that's

 6    pretty much undisputed.  The fact that there -- and the fact

 7    that there isn't a written agreement doesn't mean there isn't

 8    a contractual arrangement for him to have rendered services

 9    and advice.  And the fact that he's, you know, recruited by us

10    to help us perform our functions puts him in the realm, as I

11    said, of something of a consulting expert.

12         Either way, the work product privilege, Your Honor, should

13    apply, and we'd ask Your Honor not to invade that privilege at

14    this point, Your Honor.  And I'll ask you to reconsider your

15    prior ruling.

16         Furthermore, I believe Mr. Morris, you know, in making his

17    argument, is trying to create separation.  The fact that he

18    has no relationship, that the privilege can be invaded, seems

19    to defeat the whole premise of his whole line of questioning.

20         So, once again, Your Honor, I just -- it's a tit for a tat

21    there, and it seems to kind of eat itself.  Either he is

22    working with us, which we've admitted he is working with us,

23    us being the law firm, and helping us do our jobs, or he's

24    not.  And if he's not, then this should be done.

25              THE COURT:  Okay.
```

017853

HCMLPHMIT00002906

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 38-08   71   Filed 06/13/25   Page 1005 of 1017   PageID 18887
Exhibit 71  Page 193 of 299

Dondero - Voir Dire                    192

 1          MR. MORRIS:  Your Honor, briefly?

 2          THE COURT:  Well, among other things, what do you

 3  want me to do?  Take a break and read your one sentence from

 4  the Restatements and your one case?  And could you not have

 5  anticipated this beforehand?

 6          MR. SBAITI:  Your Honor, --

 7          THE COURT:  This is not the way we work in the

 8  bankruptcy courts, okay?  We're business courts.  We have

 9  thousands of cases.  We expect briefing ahead of time.

10          MR. SBAITI:  Your Honor, this has been a rather

11  rushed process anyway.  And to be honest, --

12          THE COURT:  When was the motion filed?

13          MR. SBAITI:  Your Honor, --

14          THE COURT:  More than a month ago.

15          MR. SBAITI:  -- his deposition was a week ago.

16          THE COURT:  Well, okay.  So you could not have

17  anticipated this issue until his deposition one week ago?

18          MR. SBAITI:  Your Honor, this issue arose at the

19  deposition, obviously, because that's what he's quoting from.

20  However, at least to us, this is such a well-settled area, and

21  to be honest, --

22          THE COURT:  Such a well-settled area that you have

23  one sentence from the Restatement and one case from the

24  Southern District of New York?

25          MR. SBAITI:  No, Your Honor.  I think the work

017854

HCMLPHMIT00002907

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 71 Filed 08/425 of 299    Page 1006 of 1017    PageID 18888

Dondero - Voir Dire                    193

1   product privilege lexicon -- we had ten minutes to try to find

2   something more on point than the general case law that applies

3   the work product privilege to people that work with lawyers,

4   consultants who work with lawyers, employees who work with

5   lawyers, even low-down employees who normally wouldn't enjoy

6   the privileges that attach to the corporation, when they work

7   with the company for -- when they work with the company

8   lawyers, it typically attaches.

9            THE COURT:  You know, obviously, I know a few things

10  about work product privilege, but he doesn't check any of the

11  boxes you just listed out.

12           MR. SBAITI:  I disagree, Your Honor.

13           THE COURT:  He's not an employee.  He's not a low-

14  level employee.

15           MR. SBAITI:  He's a consultant.

16           THE COURT:  With no agreement.

17           MR. SBAITI:  With a verbal agreement.  He's an

18  advisor.  And he was recruited by us, and at the request of

19  the DAF, of the head of the DAF, Mr. Patrick, to help us do

20  our job for the DAF.  I don't --

21           THE COURT:  Okay.  Mr. Morris, what do you want to

22  say?

23           MR. MORRIS:  Just briefly, Your Honor.  This issue

24  has been ripe since last Tuesday.  They directed him not to

25  answer a whole host of questions about his involvement at the

HCMLPHMIT00002908

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 71   Filed 06/25/25   Page 1007 of 1017   PageID 18889
Page 1005 of 299   PageID 18889

Dondero - Voir Dire                              194

1   deposition last Tuesday, so they've actually had six days to

2   deal with this.  That's number one.

3       Number two, there's absolutely nothing inconsistent with

4   the Debtor's position that Mr. Dondero is participating in the

5   pursuit of claims and at the same time saying that his

6   communications with the Sbaiti firm are not privileged.

7   There's nothing inconsistent about that.

8       So the argument that he just made, that somehow because

9   we're trying to create separation, that that's inconsistent

10  with our overall arching theme that Mr. Dondero is precisely

11  engaged in the pursuit of claims against Mr. Seery, I think

12  that takes care of that argument.

13      Finally, your Honor, with respect to this consultancy

14  arrangement, not only isn't there anything in writing, but

15  either you or Mr. Sbaiti or I, I think, should ask Mr. Dondero

16  the terms of the agreement.  Is he getting paid?  Is he doing

17  it for free?  Who retained him?  Was it Mr. -- because the --

18  there's no such thing.  There's no such thing.

19      The fact of the matter is what happened is akin to I have

20  a slip-and-fall case and I go to a personal injury lawyer and

21  I bring my brother with me because I trust my brother with

22  everything.  It's not privileged.  Any time you bring in

23  somebody who is not the attorney or the client, the privilege

24  is broken.  It's really quite simple.  Unless there's a common

25  interest.  They can't assert that here.  There is no common

HCMLPHMIT00002909

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 71   Filed 09/08/25   Page 1008 of 1017   PageID 18890
Page 1008 of 299

Dondero - Voir Dire                    195

 1   interest.  So --

 2           THE COURT:  Okay.  Mr. Sbaiti, I'll give you up to

 3   three more minutes to *voir dire* Mr. Dondero to try to

 4   establish some sort of agency relationship or other evidence

 5   that you think might be relevant.

 6                        VOIR DIRE, RESUMED

 7   BY MR. SBAITI:

 8   Q   Mr. Dondero, when you provided information to the law

 9   firm, were you doing so under an agency relationship?  Do you

10   know what an agency relationship is?

11   A   Generally.  When you're working on the -- or why don't you

12   tell me?

13   Q   Tell me your understanding, so we can use --

14   A   That you're working for the benefit or as a proxy for the

15   other entity or the other firm or the other person.

16   Q   Right.  So you're working for the DAF?

17   A   Yes.

18   Q   Do you do work for the DAF?

19   A   Yes.  As I stated, I'm surprised there isn't -- when we

20   reconstituted after leaving Highland, we put in shared

21   services agreements in place and asset management agreements

22   in place and tasked people with doing that for most of the

23   entities.  There might be still a few contracts that are being

24   negotiated, but I thought most of them were in place.

25           So I would imagine that there'll be an asset management

HCMLPHMIT00002910

 1  agreement with the DAF back to NexPoint sometime soon, so it

 2  -- it's --

 3  Q    Let me ask you this question.  When you were providing

 4  information to us and having conversations with us, were you

 5  doing that as an agent of the DAF, the way you described it,

 6  --

 7  A    Yes.

 8  Q    -- on their behalf?

 9  A    Yes.

10  Q    Were you also doing it to help us do our jobs for the DAF?

11  A    Yes.

12  Q    Did you respond to requests for information from myself?

13  A    Yes.

14  Q    Did you help coordinate other -- finding other witnesses

15  or sources of information at my request?

16  A    Yes.

17  Q    Did you do so based upon any understanding that I was

18  working on behalf of the DAF for that?

19  A    Yes.  I knew -- I knew you were working for the DAF.  No

20  one else, yeah.

21  Q    And so -- and so did you provide any expertise or any in-

22  depth understanding to myself in helping me prepare that

23  complaint?

24  A    I think so, but I give a lot of credit to your firm for

25  researching things that I -- I knew reasonably well but then

017858

HCMLPHMIT00002911

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document Exhibit 71 Filed 08/25 of 299 Page 1010 of 1017    PageID 18892

Dondero - Voir Dire                    197

1   you guys researched in even more depth.

2            MR. MORRIS:  I'd move to strike the answer as

3   nonresponsive.

4            THE COURT:  Sustained.

5   BY MR. SBAITI:

6   Q    Let me ask the question again.  When you were providing us

7   information and expertise, were you doing so knowing you were

8   working -- helping us work for the DAF?

9   A    Yes.

10  Q    Now, did you demand any compensation for that?

11  A    No.

12  Q    Do you require compensation necessarily to help the DAF?

13  A    No.

14  Q    Do you do other things for the DAF sometimes without

15  compensation?

16  A    Right.  We do the right thing, whether we get paid for it

17  or not.  Yes.

18  Q    Had you known that our communications were not necessarily

19  part of an agency relationship with the DAF, as you understood

20  it, that you were just some guy out on the street, would you

21  have had the same conversations with us?

22  A    (sighs)

23  Q    Let me ask a better question.  If I had come to you

24  working for someone that wasn't the DAF, you didn't already

25  have a relationship with, would you have given us the same

017859

HCMLPHMIT00002912

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 71 Filed 09/09/25    Page 1011 of 1017    PageID 18893

Dondero - Voir Dire                          198

```
 1   help?

 2   A    I wouldn't have been involved if it was somebody else.

 3   Q    Is the reason you got involved because we were the lawyers

 4   for the DAF?

 5   A    Correct.

 6            MR. MORRIS:  Objection.  It's just leading.  This is

 7   all leading.

 8            THE WITNESS:  Correct.

 9            THE COURT:  Sustained.

10            MR. SBAITI:  Can --

11            THE WITNESS:  Yeah.  Sorry.

12   BY MR. SBAITI:

13   Q    Do you get -- do -- did you -- did you do work for the --

14   did you provide the help for the DAF laboring under the

15   understanding that there was an agreement?

16            MR. MORRIS:  Objection; leading.

17            THE COURT:  Sustained.

18   BY MR. SBAITI:

19   Q    Earlier you testified you believed there was an agreement?

20   A    I thought that was an agreement, and I thought there will

21   be one shortly if there isn't one, yes.

22   Q    Okay.

23   A    And so we -- I've been operating in a bona fide way in the

24   best interests of the DAF throughout -- assuming there was an

25   agreement, but even if there wasn't a formal one, I would
```

017860

HCMLPHMIT00002913

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 71 Filed 06/20/25    Page 1012 of 1017    PageID 18894

Dondero - Voir Dire                    199

1   still be moving in the best interests of the DAF and helping

2   your firm out or --

3   Q   And you did that because you believed there was an

4   agreement or soon would be?

5   A   Yes.

6          MR. SBAITI:  Your Honor, I mean, I believe we've

7   established a dual role here, both as an agent of the DAF and

8   as an agent of the law firm, Your Honor.

9          THE COURT:  Okay.  Just a minute.  I'm looking at

10  Texas authority on common interest privilege to see if there's

11  anything that --

12      (Pause.)

13         THE COURT:  All right.  Again, it would have been

14  very nice to get briefing ahead of time.  I think this

15  absolutely could have been anticipated.

16     I do not find the evidence supports any sort of protection

17  of this testimony under work product privilege, common

18  interest privilege.  I just haven't been given authority or

19  evidence that supports that conclusion.  So the objections are

20  overruled.

21     Mr. Morris, go ahead.

22                  DIRECT EXAMINATION, RESUMED

23  BY MR. MORRIS:

24  Q   Can you describe for the Court the substance of your

25  communications with Mr. Sbaiti concerning the complaint?

017861

HCMLPHMIT00002914

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 71   Filed 06/20/25   Page 1013 of 1017   PageID 18895

Dondero - Direct                    200

1    A    As I've stated, directing him toward the Advisers Act and

2    then largely in a proofing function regarding CLO nomenclature

3    and some of the other fund nomenclature that sometimes gets

4    chaotic in legal briefs.

5    Q    Did you communicate in writing at any time with anybody at

6    the Sbaiti firm regarding any of the matters that are the

7    subject of the complaint?

8    A    I can't remember anything in writing.  Almost everything

9    was verbal, on the phone.

10   Q    You don't tend to write much, right?

11   A    Periodically.

12   Q    Did you communicate with Mr. Patrick?  Did you communicate

13   with anybody in the world in writing regarding the substance

14   of anything having to do with the complaint?

15              MR. SBAITI:  Objection, Your Honor.  Argumentative.

16              THE COURT:  Overruled.

17              THE WITNESS:  I --

18              MR. SBAITI:  Your Honor, may I just -- one

19   housekeeping.  Rather than raise the same objection, may we

20   have a standing objection, just so we're not disruptive, as to

21   the privilege, just for preservation purposes, on the content

22   of these communications?  Otherwise, I'll just make the same

23   objections and we can go through it.

24              THE COURT:  Well, disruptive as it may be, I think

25   you need to object to every --

HCMLPHMIT00002915

1          MR. SBAITI:  Okay.

2          THE COURT:  -- question you think the privilege

3    applies to.

4          MR. SBAITI:  I will do so.  Thank you, Your Honor.

5    Uh-huh.

6    BY MR. MORRIS:

7    Q   Mr. Dondero, the question was whether you've ever

8    communicated with anybody in the world in writing concerning

9    anything having to do with the complaint?

10   A   Not that I remember.

11   Q   Okay.

12         MR. MORRIS:  I will point out, Your Honor, that last

13   week, when the privilege was asserted, I had requested the

14   production of a privilege log.  I was told -- I forget exactly

15   what I was told, but we never received one.  I'll just point

16   that out as well.

17         THE COURT:  Okay.

18   BY MR. MORRIS:

19   Q   You provided comments to the drafts of the complaint

20   before it was filed, correct?

21   A   Yes, a few.

22   Q   Can you describe for the Court all of the comments that

23   you provided to earlier drafts of the complaint?

24         MR. SBAITI:  Your Honor, we object on the basis of

25   privilege and work product and joint -- joint interest

HCMLPHMIT00002916

 1   privilege.

 2            THE COURT:  Overruled.

 3            THE WITNESS:  It's along the lines of things I've

 4   said in this court several times.  The obligations under the

 5   Advisers Act cannot be negotiated away and they cannot be

 6   waived by the people involved, full stop.  I remember giving

 7   the -- Mazin the example of the only reason why we're in a

 8   bankruptcy is from an arbitration award that, even though we

 9   did what was in the best interests of the investors, we got

10   the investors out more than whole over an extended period of

11   time, they got an arbitration award that said when we

12   purchased some of the secondary interests we should have

13   offered them up to the other 800 members in the committee

14   besides the -- the 800 investors in the fund besides the eight

15   people on the committee who had approved it and that the

16   committee couldn't approve a settlement that went against the

17   Advisers Act and the Advisers Act stipulates specifically that

18   you have to offer it up to other investors before you take an

19   opportunity for yourself.  And someday, hell or high water, in

20   this court or some other, we will get justice on that.  And

21   that was the primary point that I reminded Mazin about.

22   BY MR. MORRIS:

23   Q   And that's exactly the conversation you had with Mark

24   Patrick that started this whole thing, correct?

25   A   No.

017864

HCMLPHMIT00002917

Dondero - Direct                                    203

1   Q    You told Mark Patrick that you believe the Debtor had

2   usurped a corporate opportunity that should have gone to the

3   DAF, didn't you?

4   A    That was not our conversation.

5   Q    So when Mr. Patrick testified to that earlier today, he

6   just got it wrong, right?

7   A    Well, maybe later on, but it wasn't that in the beginning.

8   The beginning, any conversation I had with Mark Patrick in the

9   beginning was smelling a rat in the way that the Debtor had

10  priced the portfolio for HarbourVest.

11  Q    Hmm.  So you're the one, again, who started that piece of

12  the discussion as well, correct?

13  A    Started the -- I -- I guess I smelled a rat, but I put the

14  person who could do all the numbers in touch with the Sbaiti

15  firm.

16  Q    And was the rat Mr. Seery?

17  A    Was the rat Mr. Seery?  Or the independent board.  Or a

18  combination thereof.  I believe the independent board knew

19  exactly what Seery was doing with --

20  Q    Do you have any idea --

21  A    -- HarbourVest.

22  Q    Do you have any idea why, why the Sbaiti firm didn't name

23  the whole independent board in the -- in the motion for leave

24  to amend?

25  A    I don't know.  Maybe they will at some point.

017865

HCMLPHMIT00002918

1   Q    Yeah.

2   A    I don't know.

3   Q    But did you tell the Sbaiti firm that you thought the

4   whole independent board was acting in bad faith and was a rat?

5          MR. SBAITI:  Your Honor, I object on the basis of

6   privilege.

7          THE COURT:  Overruled.

8          MR. SBAITI:  All three.

9          THE WITNESS:  I knew Jim Seery was and I knew Jim

10  Seery had weekly meetings with the other independent board

11  members, so the HarbourVest settlement was significant enough

12  that it would have been approved, but I don't have direct

13  knowledge of their involvement.

14  BY MR. MORRIS:

15  Q    And so you -- but you believed Jim Seery was certainly a

16  rat, right?

17  A    Oh, I -- there was a defrauding of third-party investors

18  to the tune of not insignificant 30, 40, 50 million bucks, and

19  it was obfuscated, it was -- it was highly obfuscated in the

20  9019.

21  Q    Did you think Mr. Seery was a rat, sir?  Yes or no?

22  A    I believe he had monthly financials.  He knew that the

23  numbers presented in the 9019 were wrong.  And if that makes

24  him a rat, that makes him a rat.  Or maybe he's just being

25  aggressive for the benefit of his incentive or for the estate.

HCMLPHMIT00002919