**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re: Highland Capital Management, L.P.**

|  | § |  |
|---|---|---|
|  | § | Case No. **19-34054-sgj11** |
| **The Dugaboy Investment Trust et al- Appellant** |  |  |
|  | § |  |
| vs. | § |  |
|  |  |  |
| **Highland Capital Management, L.P.** |  |  |
| **Et al-** Appellee |  |  |
|  | § | **3:25-cv-02072-S** |
|  | § |  |

   **[4333]  Memorandum of Opinion and Order Regarding Stay Requests (Addressing DE #4326 and 4308) entered on 7/21/25**

# Volume 24

# APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | |

*INDEX*

## APPELLANT THE DUGABOY INVESTMENT TRUST'S STATEMENT OF ISSUES TO BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL FROM THE BANKRUPTCY COURT'S ORDER REGARDING STAY REQUESTS [ADDRESSING DE ## 4326 & 4308]

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4353] on August 4, 2025 in the above-captioned case from the Bankruptcy Court's July 21, 2025 *Memorandum Order and Opinion Regarding Stay Requests [Addressing DE ## 4326 & 4308]*[Docket No. 4333], hereby submits this *Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the items listed herein to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1. **Did the Bankruptcy Court err in faulting Dugaboy's Stay Request because Dugaboy did not make a "standard" request for a stay pending appeal pursuant to Federal Bankruptcy Rule 8007?**

2. **Did the Bankruptcy Court err in determining that the Bankruptcy Rule 9019 settlement proceeding was not "a proceeding involving a charitable trust"?**

3. **Did the Bankruptcy Court err in concluding there was insufficient evidence connecting Mark Patrick's involvement in this Court's Rule 9019 settlement proceedings to the allegations of wrongdoing against Patrick in the Cayman Islands proceeding?**

4. **Did the Bankruptcy Court err in failing to recognize that the new evidence of Mark Patrick's misconduct exposed in the Cayman Islands proceeding fatally undermines the 9019 settlement by establishing that Patrick lacked authority to enter into the settlement?**

5. **Did the Bankruptcy Court err in concluding that a stay was unnecessary because Dugaboy could still pursue remedies against Mark Patrick in the Cayman Islands proceeding?**

6. **Did the Bankruptcy Court err in failing to recuse itself under 28 U.S.C. § 455 due to the appearance of partiality created by the presiding judge's authorship of novels that bear striking factual and thematic similarities to the Highland Capital Management bankruptcy proceedings and portray hedge fund principals in an overtly negative**

---

[1] Because of its voluminous nature, Docket #4255 will be delivered to the Clerk on a flash drive which will arrive tomorrow.

light, thereby depriving Dugaboy of an impartial judge with respect to the stay motion?

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

*Vol. I*

*000001*

1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4353] filed by Appellant;

*000023*

2. Bankruptcy Court's *Memorandum Opinion and Order Regarding Stay Requests [Addressing DE ## 4236 & 4308* [Docket No. 4333];

*000039*

3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings: Transcript of hearing held June 25, 2025 before Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297]; and

5. Each of the additional documents and items designated below:

*Vol. 2*

*000569*

*000730*

*000734*

*Vol. 3*

*000771*
*Thru vol. 5*

*Vol 5*
*003493*

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s)1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 3/18/2021 | 2060 | Motion to recuse Judge Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| 3/18/2021 | 2061 | Brief in support filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/18/2021 | 2062 | Support/supplemental document Appendix to Motion to Recuse filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/23/2021 | 2083 | Order denying motion to recuse (related document #2060) Entered on 3/23/2021. (Okafor, M.) |

2

| | 4/6/2021 | 2169 | Amended notice of appeal filed by Interested Party James Dondero (RE: related document(s)2149 Notice of appeal). (Lang, Michael) |
|---|---|---|---|
| | 4/15/2022 | 2205 | Statement of issues on appeal, filed by Interested Party James Dondero (RE: related document(s)2083 Order on motion to recuse Judge). (Lang, Michael) |
| | 4/15/2021 | 2206 | Appellant designation of contents for inclusion in record on appeal filed by Interested Party James Dondero (RE: related document(s)2169 Amended notice of appeal). Appellee designation due by 04/29/2021. (Lang, Michael) |
| | 2/9/2022 | 3264 | DISTRICT COURT MEMORANDUM OPINION AND ORDER - The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292 (a) and the Court is without jurisdiction over this appeal of the Bankruptcy Court's Recusal Order. The Court further denies Appellants leave to appeal the Recusal Order under § 1292 (b), denies Appellants' request to withdraw the reference of their motion to recuse, and denies Appellants' request to construe their appeal as a petition for writ of mandamus. Accordingly, the Court dismisses this appeal for lack of jurisdiction. (Ordered by Judge Ed Kinkeade on 2/9/2022). Civil Action number:3:21-cv-00879-K, DISMISSED for lack of jurisdiction (RE: related document(s)2083 Order on motion to recuse Judge). Entered on 2/9/2022 (Whitaker, Sheniqua) Modified on 2/25/2022 (Whitaker, Sheniqua). (Entered: 02/25/2022) |
| | 7/20/2022 | 3406 | Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: #1 Appendix Appendix (Lang, Michael) Modified text on 7/21/2022 (Ecker, C.). |
| | 8/1/2022 | 3422 | Notice of hearing on Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.).). Hearing to be held on 8/31/2022   at   09:30   AM   at   https://us-courts.webex.com/meet/jerniga for 3406, (Lang, Michael) |

Handwritten annotations in left margin: Vol. 5, 00 3504, 00 3519, 00 3521, 00 3530, Vol 6, 00 3544, 00 3909

| | | | |
|---|---|---|---|
| *Vol 6*<br><br>*003912* | 8/15/2022 | 3444 | Response opposed to (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Attachments: #1 Exhibit   A (Annable, Zachery) |
| *Vol. 7*<br><br>*003936*<br>*Thru End of Vol 14* | 8/15/2022 | 3445 | Exhibit List (Appendix in Support of Highland Capital Management, L.P.'s Objection to Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 USC 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3444 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Index 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 (Annable, Zachery) |
| *Vol 15*<br><br>*011840* | 8/15/2022 | 3446 | Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

| | | | |
|---|---|---|---|
| | | | Depositions) Filed by Debtor Highland Capital Management, L.P. (Annable, Zachery) |
| | 8/15/2022 | 3447 | Declaration re: (Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi). (Annable, Zachery) |
| | 8/17/2022 | 3456 | Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.)). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3446 and for 3449, (Annable, Zachery) |
| | 8/22/2022 | 3463 | Reply to (related document(s): 3444 Response filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. (Lang, Michael) |
| | 8/24/2022 | 3466 | Amended Notice of hearing filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.)., 3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

vol. 15

011855

011864

011869

011874

*Vol 15*

| | | | |
|---|---|---|---|
| | | | Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.), 3462 Order converting the August 31, 2022 at 9:30 AM Hearing on (A) The motion for final appealable order and supplement to motion to recuse and (B) related motions to strike and compel to a preliminary status/scheduling conference (RE: related document(s)3406 Motion for leave filed by Interested Party James Dondero, 3446 Motion to strike document filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel filed by Debtor Highland Capital Management, L.P.). Entered on 8/19/2022 (Ecker, C.)). Status Conference to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga. (Lang, Michael) |
| *011877* | 8/26/2022 | 3470 | Amended motion for final appealable order and proposed supplement to the record filed by Interested Party James Dondero (RE: related document(s)3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support). (Attachments: #1 Appendix (Lang, Michael) MODIFIED text to match PDF on 9/1/2022 (Ecker, C.). |
| *012039* | 8/26/2022 | 3471 | Stipulation by James Dondero and Highland Capital Management, L.P.. filed by Interested Party James Dondero (RE: related document(s)3406 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi, 3449 Motion to compel Lawyers' Depositions.). (Lang, Michael) |
| *No PDF Available* | 8/31/2022 | 3478 *N/A* | 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.) (Edmond, Michael) |
| *012047* | 9/1/2022 | 3479 | Order denying amended motion of James Dondero, Highland Capital Management Fund Advisors, L.P., Nexpoint Advisors, |

| | | | |
|---|---|---|---|
| | | | L.P. The Dugaboy Investment Trust Get Good Trust and, Nexpoint Real Estate Partners, LLC, F/K/A HCRE Partners, A Delaware Limited Liability Company for final appealable order and supplement to motion to recuse pursuant to 28 U.S.C. Section 455 (RE: related document(s)3470 Brief filed by Interested Party James Dondero). Entered on 9/1/2022 (Okafor, Marcey) |
| | 9/1/2022 | 3480 | Transcript regarding Hearing Held 08/31/2022 (27 pages) RE: Status Conference Re: Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 (#3406). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 11/30/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.)). Transcript to be made available to the public on 11/30/2022. (Rehling, Kathy) |
| | 9/27/2022 | 3541 | Motion to recuse Judge Stacey G. C. Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| | 9/72/2022 | 3542 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3541 Motion to recuse Judge Stacey G. C. Jernigan). (Attachments: #1 Appendix (Lang, Michael) |
| | 10/14/2022 | 3567 | Agreed Scheduling Order on renewed motion to recuse (related document #3541) Entered on 10/14/2022. (Okafor, Marcey) |

| | | | |
|---|---|---|---|
| *Vol. 16*<br>*012361* | 10/17/2022 | 3570 | Motion to recuse Judge Stacey G. C. Jernigan - AMENDED Filed by Interested Party James Dondero (Lang, Michael) |
| *Vol. 17*<br>*012363* | 10/17/2022 | 3571 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Attachments: #1 Appendix (Lang, Michael) |
| *012641* | 10/31/2022 | 3595 | Response opposed to (related document(s): 3541 Motion to recuse Judge Stacey G. C. Jernigan filed by Interested Party James Dondero, 3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| *Vol. 18*<br>*012697*<br>*Thru End of Vol. 21* | 10/31/2022 | 3596 | Support/supplemental document (Appendix in Support of Highland's Objection to Renewed Motion to Recuse Pursuant to 28 U.S.C. 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3595 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 (Annable, Zachery) |
| *Vol. 22*<br>*016732* | 3/3/2023 | 3673 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Lang, Michael) |
| *016737* | 3/6/2023 | 3675 | Memorandum of Opinion and Order Denying Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. Section 455 (RE: related document(s)3570 Motion to recuse Judge filed by Interested Party James Dondero). Entered on 3/6/2023 (Okafor, Marcey) |
| *016773* | 3/6/2023 | 3676 | Order Denying Amended Renewed Motion to Recuse Pursuant to U.S.C. Section 455 (related document #3570) Entered on 3/6/2023. (Okafor, Marcey) |
| *016809* | 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland |

*Vol. 22*

| | | | Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
|---|---|---|---|
| | 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery) |
| | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| | 6/20/2025 | 4255 *(to be submitted to Clerk on flash drive)* | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 |

016827

016830

016855

016863

016865

*Vol. 23*

016867

*Thru end of Vol. 25*

9

| | | | |
|---|---|---|---|
| | | | Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| | 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |
| | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent |

*Handwritten left margin: Vol. 26    019524    019527*

|  |  |  | Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart, #3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
| *Vol. 27* | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| *019847* | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4257 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8 ,8, Exhibit 9 (Curry, David) |
| *019871* | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| *019998* |  |  |  |
| *Vol. 28* | 6/23/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4255 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |
| *020013* | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 Deitsch-Perez, Deborah) |
| *020230* |  |  |  |
| *020241* | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)). (Attachments:      #1 Exhibit 126 (Annable, Zachery) |

| | | | |
|---|---|---|---|
| *Vol. 28*<br><br>*020266* | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| *Vol. 29*<br><br>*020267* | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4223 Objection). (Annable, Zachery) |
| *020271* | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust. Entered on 6/27/2025 (Okafor, M.) |
| *020282* | 7/1/2025 | 4299 | Motion to withdraw document Consent Motion to Dismiss HMIT Remand Proceedings with Prejudice (related document(s) 3699 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| *020289* | 7/1/2025 | 4300 | Motion to withdraw document Consent Motion to Dismiss Delaware Action Proceedings with Prejudice (related document(s) 4000 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |

| | | | |
|---|---|---|---|
| Vol. 29 | 7/7/2025 | 4304 | Order withdrawing Emergency Motion for Leave to File Adversary Proceeding [Dkt. 3699] with prejudice (RE: related document(s)4299 Motion to withdraw document filed by Interested Party Hunter Mountain Trust, Creditor Hunter Mountain Investment Trust). IT IS THEREFORE ORDERED that the proceedings defined in the Dismissal Motion as: Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P., Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including Hunter Mountain Investment Trusts Emergency Motion for Leave to File Adversary Proceeding filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating thereto), are dismissed with prejudice. Entered on 7/7/2025 (Okafor, M.) |
| 020296 | | | |
| 020298 | 7/10/2025 | 4308 | Notice Letter from the Office of the Texas Attorney General Requesting a Stay filed by Interested Party State of Texas. (Stone, Johnathan) |
| 020300 | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| 020309 | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| 020311 | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
| Vol. 30 020407 | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related |

VOL. 31

020686

020696

020808

020830

020837

| | | | |
|---|---|---|---|
| | | | document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| 7/21/2025 | 4333 | | Memorandum of opinion (RE: related document(s)4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| 7/21/2025 | 4334 | | Order denying stay requests (related document 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order and 4308 Notice). Entered on 7/21/2025. (Okafor, M.) Additional attachment(s) added on 7/21/2025 (Okafor, M.) |
| 8/4/2025 | 4353 | | Notice of appeal. Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: #1 Exhibit A) (Harper, Geoffrey) |
| 8/5/2025 | 4359 | | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-02072-S. (RE: related document(s)4353 Notice of appeal filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). (Almaraz, Jeanette) |
| 8/15/2025 | 4372 | | Motion to recuse Judge Filed by Interested Parties James Dondero, NexPoint Advisors, L.P., NexPoint Asset Management, L.P., NexPoint Real Estate Advisors, L.P., The Dugaboy Investment Trust, The Get Good Non Exempt Trust No 2 (Attachments: #1 Proposed Order (Harper, Geoffrey) |

Dated: August 18, 2025      Respectfully submitted,

WINSTON & STRAWN LLP

By: /s/ Geoffrey S. Harper

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

14

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
**CRAWFORD, WISHNEW & LANG PLLC**
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

***Counsel for Appellant The Dugaboy Investment Trust***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 18, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-471   Filed 06/06/25   Page 18 of 1017   PageID 18917

Dondero - Direct                    205

1  But I -- I believe those things wholeheartedly.

2  Q   Did you tell the Sbaiti firm you thought Jim Seery was a

3  rat?

4          MR. SBAITI:  Objection, Your Honor.  Privilege.

5          THE COURT:  Overruled.

6          THE WITNESS:  I -- I don't remember using those

7  words.

8  BY MR. MORRIS:

9  Q   Did you tell the Sbaiti Firm that you thought Jim Seery

10  had engaged in wrongful conduct?

11          MR. SBAITI:  Your Honor, objection.  Privilege.

12          THE COURT:  Overruled.

13          THE WITNESS:  I believe he violated the Advisers Act,

14  and I was clear on that throughout.

15  BY MR. MORRIS:

16  Q   Listen carefully to my question.  Did you tell the Sbaiti

17  firm that you believed that Jim Seery engaged in wrongful

18  conduct?

19          MR. SBAITI:  Objection, Your Honor.  Calls for

20  privileged communications.

21          THE COURT:  Overruled.

22          THE WITNESS:  I think I gave the answer.  I'll give

23  the same answer.  I believe he violated the Advisers Act.

24  BY MR. MORRIS:

25  Q   What other wrongful conduct did you tell the Sbaiti firm

HCMLPHMIT00002920

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-471   Filed 06/06/25   Page 19 of 1017   PageID 18918

Dondero - Direct                    206

1  you thought Mr. Seery had engaged in?

2          MR. SBAITI:  Same objection, Your Honor.

3          THE COURT:  Overruled.

4          MR. SBAITI:  Calls for privileged communications.

5          THE COURT:  Overruled.

6          THE WITNESS:  I -- I just remember the obfuscating

7  and mispricing portfolio violations of the Advisers Act was

8  all I discussed with the Sbaiti firm regarding Seery's

9  behavior.

10 BY MR. MORRIS:

11 Q   Did you talk to them about coming to this Court under the

12 gatekeeper order to see if you could get permission to sue Mr.

13 Seery?

14 A   I --

15         MR. SBAITI:  Objection, Your Honor.  Calls for

16 privileged communication.

17         THE COURT:  Overruled.

18         THE WITNESS:  I wasn't involved in any of the --

19 BY MR. MORRIS:

20 Q   Did you --

21 A   -- tactical stuff on who to sell or -- who to sue or when

22 or whatever.

23 Q   Did you tell the Sbaiti firm that you thought they should

24 sue Mr. Seery?

25         MR. SBAITI:  Objection, Your Honor.  Calls for

HCMLPHMIT00002921

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 18-71    Filed 08/06/25    Page 20 of 1017    PageID 18919

Dondero - Direct                    207

1   privileged communication.

2           THE COURT:  Overruled.

3           MR. SBAITI:  I'll also say, Your Honor, the question

4   is getting a little argumentative.

5           THE WITNESS:  I didn't get directly --

6           THE COURT:  Overruled.

7           THE WITNESS:  I didn't get directly involved in who

8   was -- who was specifically liable.

9   BY MR. MORRIS:

10  Q    How many times did you speak with the Sbaiti firm

11  concerning the complaint?

12  A    Half a dozen times, maybe.

13  Q    Did you ever meet with them in person?

14  A    I've only met with them in person a couple, three times.

15  And I don't think any of them -- no, it was, excuse me, it was

16  on deposition or other stuff.  It wasn't regarding this.

17  Q    Did you send them any information that was related to the

18  complaint?

19  A    I did not.

20  Q    Did you ask anybody to send the Sbaiti firm information

21  that related to the complaint?

22  A    I did not.  I -- I was aware that Hunter Covitz was

23  providing the historic detailed knowledge to the firm, but it

24  -- it wasn't -- I don't believe it was me who orchestrated

25  that.

017869

HCMLPHMIT00002922

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 18-71    Filed 02/06/25    Page 21 of 1017    PageID 18920

Dondero - Direct                         208

 1   Q    Did you talk to anybody at Skyview about the allegations

 2   that are contained in the complaint before it was filed?

 3   A    I don't -- I don't remember.

 4   Q    Have you ever talked to Isaac Leventon or Scott Ellington

 5   about the allegations in the complaint?

 6   A    No.  They weren't involved.

 7   Q    How about -- how about D.C. Sauter?  You ever speak to him

 8   about it?

 9   A    I don't --

10             MR. TAYLOR:  Objection, Your Honor.

11             THE WITNESS:  I don't remember.

12             MR. TAYLOR:  At this point, D.C. Sauter is indeed an

13   employee of Skybridge and is a general counsel for some of the

14   entities which he worked for.  And to the extent he's trying

15   to ask for those communications, that would be invasion of the

16   privilege.

17             MR. MORRIS:  I'll withdraw it, Your Honor.  That's

18   fair.

19             THE COURT:  Okay

20             MR. MORRIS:  That's fair.

21             THE COURT:  Question withdrawn.

22             THE WITNESS:  I thought you only had eight more

23   questions.

24             MR. MORRIS:  Opened the door.

25   BY MR. MORRIS:

017870

HCMLPHMIT00002923

1    Q    Can you describe the general fact -- withdrawn.  You

2    provided facts and ideas to the Sbaiti firm in connection with

3    your review of the draft complaint, correct?

4    A    Ideas and proofreading.

5    Q    Anything beyond what you haven't described already?

6    A    Nope.

7    Q    Okay.  Who is your primary contact at the Sbaiti firm, if

8    you had one?

9    A    Mazin.

10   Q    Okay.  Did you suggest to Mr. Sbaiti that Mr. Seery should

11   be named as a defendant in the lawsuit before it was filed?

12            MR. SBAITI:  Your Honor, calls for privileged

13   communication.  We object --

14            THE COURT:  Overruled.

15            MR. SBAITI:  -- to that answer.

16            MR. SBAITI:  Okay.

17            THE WITNESS:  Again, no.  I wasn't involved with the

18   tactics on who would be defendants and when or if other people

19   would be added.

20   BY MR. MORRIS:

21   Q    Did you -- are familiar with the motion to amend that was

22   filed by the Sbaiti firm?

23   A    I'm more familiar with it after today --

24   Q    Right.

25   A    -- than I was before.

HCMLPHMIT00002924

Dondero - Direct                    210

1   Q    And were you aware that that motion was going to be filed

2   prior to the time that it actually was filed?

3   A    I -- I don't remember.  Probably.

4   Q    And who would have been the source of that information?

5   Would that have been Mr. Sbaiti?

6   A    Yes.

7   Q    Okay.  And did you express any support for the decision to

8   file the motion for leave to amend in the District Court?

9   A    I -- I wasn't involved.  It was very complicated legal

10  preservation conver... -- I wasn't involved.  I knew the

11  conversations were going on between different lawyers, but I

12  wasn't involved in the ultimate decision.  I didn't encourage,

13  applaud, or even know exactly what court it was going to be

14  filed in.

15          MR. MORRIS:  All right.  I have no further questions,

16  Your Honor.

17          THE COURT:  All right.  Pass the witness.

18          MR.

19  ANDERSON:  We have no questions, Your Honor.

20          THE COURT:  Okay.  Any questions from Respondents?

21          MR. SBAITI:  No questions.

22          THE COURT:  Okay.  Mr. Taylor?

23                      CROSS-EXAMINATION

24  BY MR. TAYLOR:

25  Q    Mr. Dondero, --

HCMLPHMIT00002925

Dondero - Cross                    211

1   A   Yes, sir.

2   Q   -- you are not the authorized representative of CLO

3   Holdco, are you?

4   A   No.

5   Q   You're not the authorized representative for the DAF, are

6   you?

7   A   No.

8   Q   Do you know who that person is as we sit here today?

9   A   Yes.

10  Q   Who is that?

11  A   Mark Patrick.

12  Q   Thank you.

13        MR. TAYLOR:  No further questions.

14        THE COURT:  Any redirect on that cross?

15        MR. MORRIS:  I do not, Your Honor.  I would just like

16  to finish up the Debtor's case in chief by moving my exhibits

17  into evidence.

18        THE COURT:  Okay.  Mr. Dondero, you're excused.

19     (The witness steps down.)

20        THE COURT:  All right.  So you have no more

21  witnesses; you're just going to offer exhibits?

22        MR. MORRIS:  Yes, Your Honor.

23        THE COURT:  Okay.

24        MR. MORRIS:  So, at Docket #2410, --

25        THE COURT:  Uh-huh.

HCMLPHMIT00002926

Case 19-34054-sgj11 Doc 4255-71 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02072-S Document 18-71 Filed 07/08/25 Page 25 of 1017 PageID 18924

212

1          MR. MORRIS:  -- the Court will find Exhibits 1

2     through 53.

3          THE COURT:  Uh-huh.

4          MR. MORRIS:  In advance, Your Honor, I've conferred

5     with the Respondents' counsel.  They had previously objected

6     to Exhibits 15 and 16, which I believe were the Grant Scott

7     deposition transcripts.  They objected to them on the grounds

8     of lack of completeness because I had taken the time to make

9     deposition designations, but I'm happy to put the entirety of

10    both transcripts into evidence, and I hope that that will

11    remove the objections to Exhibits 15 and 16.

12         THE COURT:  All right.  Before we confirm, let's just

13    make sure we have the right one.

14         MR. MORRIS:  Oh, I apologize.

15         THE COURT:  I have 16 as the July order.

16         MR. MORRIS:  I apologize.  You're absolutely right,

17    Your Honor.  What I was referring to was -- oh, goodness.  One

18    second.  (Pause.)  I was referring to Exhibits 23 and 24.

19    Those are Mr. Scott's deposition designations.  They had

20    lodged an informal objection with me on grounds of

21    completeness.  And in order to resolve that objection, we're

22    happy to put the entirety of both transcripts in.

23         THE COURT:  All right.  So if our Respondents could

24    confirm with the agreement to put in the entire depos at 23

25    and 24, you stipulate to 1 through 53?

017874

HCMLPHMIT00002927

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 18-71    Filed 02/06/25    Page 26 of 1017    PageID 18925

213

```
 1              MR. PHILLIPS:  We also -- Your Honor, --

 2              MR. MORRIS:  Yeah, I was going to take them one at a

 3    time.  Just take those two.

 4              MR. PHILLIPS:  Yeah, can we just take those two?

 5    Confirmed?

 6              MR. MORRIS:  Okay.

 7              THE COURT:  Oh, okay.

 8              MR. PHILLIPS:  Because there are other -- there are

 9    other -- we exchanged objections to each other's witness and

10    exhibit lists.  And so I think you can handle the rest of them

11    kind of in a bunch, right?

12              MR. MORRIS:  Yeah.  Yeah, there's two bunches,

13    actually.

14              MR. PHILLIPS:  Yeah.

15              THE COURT:  Okay.  So you have just now stipulated to

16    23 and 24 being admitted --

17              MR. MORRIS:  Correct.

18              THE COURT:  -- with the full depos?  Okay.

19              MR. PHILLIPS:  Yes, ma'am.  Thank you.

20              THE COURT:  All right.

21         (Debtor's Exhibits 23 and 24 are received into evidence.)

22              MR. MORRIS:  And then the next two that they objected

23    to are Exhibits 15 and 16.  15 is the January order and 16 is

24    the July order.  They objected on relevance grounds.  I think

25    16 -- these are the two orders that the Debtors contend the
```

017875

HCMLPHMIT00002928

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 18-471    Filed 07/15/25    Page 27 of 1017    PageID 18926

214

1  Respondents have violated, so I don't understand the relevance

2  objection, but that's what it was and that's my response.

3          MR. PHILLIPS:  Resolved, Your Honor.

4          THE COURT:  Okay.  15 and 16 are admitted.

5      (Debtor's Exhibits 15 and 16 are received into evidence.)

6          MR. MORRIS:  Okay.  And then the last objection

7  relates to a group of exhibits.  They're Exhibits 1 through

8  11.  Those exhibits I think either come in together or stay

9  out together.  They are exhibits that relate to the

10  HarbourVest proceedings, including deposition notices,

11  including I think the transcript from the hearing, the Court's

12  order, the motion that was filed.

13      The Debtor believes that those documents are relevant

14  because they go right to the issue of the gatekeeper order and

15  had they filed, had the Respondents followed the gatekeeper

16  order, this is -- this is why they didn't do it.  You know

17  what I mean?  That's the argument, is that the Respondents,

18  one of the reasons the Respondents -- argument -- one of the

19  reasons the Respondents didn't come to this Court is because

20  they knew this Court had that kind of record before it.  And I

21  think that's very relevant.

22          THE COURT:  All right.  Response?

23          MR. PHILLIPS:  Your Honor, we think that these

24  exhibits are not relevant.  We have a very focused, we think,

25  -- we have the Court's order.  Those objections are withdrawn.

HCMLPHMIT00002929

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 18-71    Filed 07/06/25    Page 28 of 1017    PageID 18927

215

1    We have the complaint.  We have the motion to amend.  And the

2    issue is whether the motion to amend, which was dismissed one

3    day, or the next day after it was filed, constitutes criminal

4    -- constitutes contempt.

5        So we think the prior proceedings go to their underlying

6    argument, which is the lawsuit or the complaint is no good,

7    and that has nothing to do with -- there's been no foundation

8    laid and it's not relevant what happened in connection with

9    the HarbourVest settlement.  It is what it is, and there's no

10   dispute that it is what it is, but it's not relevant to

11   establish any type of -- they've even said intent is not even

12   relevant here.  So we -- that's -- we think all of that goes

13   out and simplifies the record, because it has nothing to do

14   with whether or not there was a contempt.

15           THE COURT:  Response?

16           MR. MORRIS:  We withdraw the exhibits, Your Honor.

17   I'm just going to make it simple for the Court.

18           THE COURT:  Okay.

19           MR. MORRIS:  I'm just going to make it simple for the

20   Court.

21           THE COURT:  1 through 11 are withdrawn.

22       (Debtor's Exhibits 1 through 11 are withdrawn.)

23           MR. MORRIS:  So, the balance, there was no objection.

24   So all of the Debtor's exhibits on Docket #2410 -- let me

25   restate that.  Exhibits 12 through 53 no longer have an

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-471   Filed 07/05/299   Page 29 of 1017   PageID 18928

216

 1  objection.  Is that correct?

 2           MR. PHILLIPS:  Yes.

 3           MR. MORRIS:  Okay.  And then --

 4           MR. PHILLIPS:  Confirmed.

 5           THE COURT:  Okay.

 6      (Debtor's Exhibits 12 through 53 are received into

 7  evidence.)

 8           MR. MORRIS:  Okay.  Thank you.  And then we filed an

 9  amended list, I believe, yesterday --

10           THE COURT:  Uh-huh.

11           MR. MORRIS:  -- to add Exhibits 40 -- 54 and 55.

12           THE COURT:  Uh-huh.

13           MR. MORRIS:  And those exhibits are simply my firm's

14  billing records.

15           THE COURT:  Okay.

16           MR. MORRIS:  You know, we added Mr. Demo to the

17  witness list in case there was a need to establish a

18  foundation.  That's the only thing he would testify to.  I

19  don't know if there's an objection to those two exhibits,

20  because we hadn't had an opportunity to confer.

21           THE COURT:  Any objection?

22           MR. PHILLIPS:  Your Honor, we're not going to require

23  authenticity and foundation for -- we have the right, we

24  think, to say that they're not a ground -- we're not going to

25  challenge that they are the bills, and the bills say what they

017878

HCMLPHMIT00002931

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-471   Filed 08/06/25   Page 30 of 1017   PageID 18929

217

1    say.  We don't need Mr. -- we don't need a witness to

2    authenticate those exhibits.  But we reserve all substantive

3    rights with respect to the effect of those exhibits.

4         THE COURT:  All right.  54 and 55 are admitted.

5       (Debtor's Exhibits 54 and 55 are received into evidence.)

6         MR. MORRIS:  And with that, Your Honor, the Debtor

7    rests.

8         THE COURT:  Okay.  All right.  Respondents?

9       (Counsel confer.)

10        MR. PHILLIPS:  If I could have a second?

11        THE COURT:  Okay.

12        A VOICE:  Sorry, Your Honor.

13      (Pause.)

14        MR. PHILLIPS:  Your Honor, we have filed in our

15   witness and exhibit list, and I have to say I don't have the

16   number, but we'll get the docket entry number, but we have 44

17   exhibits.  There's an objection to Exhibit #2, which is --

18   thank you -- it's Document 2411, Your Honor.  Thank you.

19        THE COURT:  Uh-huh.

20        MR. PHILLIPS:  There is a pending objection to

21   Exhibit #2 which we have not resolved.  There's no objection

22   to any other exhibit.  But in reviewing our exhibit list, I

23   found that we had some -- some mistakes and duplications.

24      So, with respect to 2411, we would withdraw Exhibit 13,

25   14, and 29, and we would offer Exhibit 1, and then 30 through

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 18-471    Filed 02/06/299    Page 31 of 1017    PageID 18930

218

```
 1   44, with 13, 14, and 29 deleted.

 2              THE COURT:  Okay.  So 1, 3 through 12, --

 3              MR. PHILLIPS:  Yes.

 4              THE COURT:  -- 15 through 28, and then 30 --

 5              MR. PHILLIPS:  And then 30 through 44.

 6              THE COURT: -- through 44?  Do you confirm, Mr.

 7   Morris?

 8              MR. MORRIS:  Yes, Your Honor.  The only objection we

 9   have is to Exhibit #2.

10              THE COURT:  And that's -- he's not offering that?

11              MR. MORRIS:  Yeah.

12              MR. PHILLIPS:  Not at this time, Your Honor.

13              THE COURT:  Okay.

14              MR. PHILLIPS:  We would have to have testimony about

15   that.

16              THE COURT:  Okay.  All right.  So those are admitted.

17              MR. PHILLIPS:  Okay.

18         (Mark Patrick's Exhibits 1, 3 through 12, 15 through 28,

19   and 30 through 44 are received into evidence.)

20              THE COURT:  By the way, it looks like Exhibit 44 is

21   at a different docket number, Docket 2420.  Correct?  You have

22   --

23              MR. SBAITI:  Your Honor, I believe Exhibit 44 is the

24   hearing transcript from the July approval hearing.  At least

25   that's what it's supposed to be.
```

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-471   Filed 02/20/25299 Page 32 of 1017   PageID 18931

219

```
 1              THE COURT:  Okay.

 2              MR. SBAITI:  It was Exhibit 2 on the Debtor's list,

 3   and then I think they took it off, so we had to add it.

 4              MR. PHILLIPS:  Oh, okay.  I was looking -- oh, that's

 5   right.  They -- that's correct, Your Honor.

 6              THE COURT:  Okay.

 7              MR. PHILLIPS:  Exhibit 44 was added --

 8              THE COURT:  Okay.

 9              MR. PHILLIPS:  -- because the Debtor's withdrew it,

10   and so it was added in the second -- in the supplemental and

11   amended list.  The -- the one that I was talking about was the

12   prior list.

13              THE COURT:  Okay.  So that's at Docket 2420?

14              MR. PHILLIPS:  Yes.

15              THE COURT:  You're not offering 45 or 46?

16              MR. PHILLIPS:  No, I think we'd offer 45 and 46 as

17   well.  I'm sorry.

18              THE COURT:  Okay.  Any objections, Mr. Morris?

19              MR. MORRIS:  No, Your Honor.

20              THE COURT:  Okay.  So 45 and 46 are admitted as well.

21   They're at Docket Entry 2420.

22         (Mark Patrick's Exhibits 45 and 46 are received into

23   evidence.)

24              THE COURT:  All right.  Your witnesses?

25              MR. PHILLIPS:  Your Honor, could we have five minutes
```

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 18-471   Filed 02/16/25   Page 33 of 1017    PageID 18932
Exhibit 71    Page 226 of 299

220

 1   to just see what we're -- our plan is, and then we'll be back

 2   at 4:00?

 3            THE COURT:  Okay.  We'll be back at 4:00.

 4            MR. PHILLIPS:  Thank you.

 5            THE CLERK:  All rise.

 6       (A recess ensued from 3:55 p.m. until 4:04 p.m.)

 7            THE CLERK:  All rise.

 8            THE COURT:  Please be seated.  All right.  Back on

 9   the record in Highland.  Mr. Phillips?

10            MR. PHILLIPS:  Your Honor, with the introduction of

11   the Respondents -- CLO Holdco, DAF Fund, LP, and Mark Patrick,

12   those Respondents, and we consider Mark Patrick a Respondent

13   although not formally named as a Respondent because he is the

14   party who authorized the filing of the Seery motion -- we

15   rest.

16            THE COURT:  You rest?  Okay.  Well, Mr. Morris,

17   closing arguments?

18            MR. MORRIS:  How much time do I have?

19            THE COURT:  You've got a lot more time than you

20   probably thought you were going to.  You're under an hour.

21            MR. MORRIS:  42 minutes?

22            THE COURT:  How much?

23            THE CLERK:  42 minutes.

24            THE COURT:  42 minutes?  Feel free not to use it all.

25            MR. SBAITI:  Out of curiosity, how long do we have?

HCMLPHMIT00002935

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-471   Filed 02/26/25299   Page 34 of 1017   PageID 18933

221

1            THE COURT:  You have a lot of time, which I hope you

2   won't use.

3            THE CLERK:  Hour and twenty-five minutes or so.

4            MR. SBAITI:  I was afraid it was going to be an hour

5   and twenty, so --

6            MR. PHILLIPS:  No, not either.

7            MR. MORRIS:  I don't suspect I'll use all the time.

8            THE COURT:  Okay.  Thank you.

9            MR. MORRIS:  May I proceed?

10           THE COURT:  You may.

11             CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

12           MR. MORRIS:  Good afternoon, Your Honor.  John

13  Morris; Pachulski Stang Ziehl & Jones; for the Debtor.  I'd

14  like to just make some closing remarks after the evidence has

15  closed.

16      This is a very, very important motion, Your Honor.  I take

17  this stuff seriously.  It's only the second contempt motion

18  I've ever brought in my life.  I've never gone after another

19  law firm.  But these facts and circumstances require it,

20  because my client is under attack, and these orders were

21  entered to prevent that.

22      It is serious stuff.  There's no question in my mind,

23  there's no question the evidence showed, clear and

24  convincingly, beyond reasonable doubt, that they violated this

25  Court's order.

HCMLPHMIT00002936

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-71   Filed 02/26/25   Page 35 of 1017   PageID 18934

222

```
1      I started off with three very simple prongs.  So simple

2   you'd think I'd remember them.  Number one, was a court order

3   in effect?  There is no dispute.  The court order was in

4   effect.

5      Number two, did the order require certain conduct by the

6   Respondent?  We believe it did.  We heard an hour-long

7   argument styled as an opening statement, but it was really

8   argument and not an opening statement, about all the defects

9   in the order.  But the one thing that is crystal clear in the

10  order are the words commence or pursue.  You've been told many

11  times by the Respondent that nobody has commenced an action

12  against Mr. Seery.  That is true.  We all know what the word

13  commence means.  We all know what the word pursue means.

14     I heard argument this morning that pursue means after a

15  claim is filed you pursue a case.  That's the way lawyers talk

16  about it.  But that doesn't make any sense, Your Honor,

17  because once you've commenced the action you've violated the

18  order.  It's commence or pursue, it's in the disjunctive, and

19  you can't read out of the order the concept of pursuit by

20  making it an event that happens after the commencement,

21  because that's exactly what they're trying to do.  They're

22  trying to read out of the order the word pursuit.

23     And I ask you to use very simple common sense.  If filing

24  a motion for leave to amend a complaint to add Mr. Seery as a

25  defendant is not pursuit, what is?  What is?  There's nothing
```

017884

HCMLPHMIT00002937

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-471   Filed 02/26/25299   Page 36 of 1017   PageID 18935

223

1   left.  You commence an action or you do something less than

2   commencing an action when you're going after the man.  That's

3   what pursuit means.  They're going after the man.  And they

4   asked the District Court to do what they knew they couldn't.

5       Mr. Phillips is exactly right.  I made the point about

6   Rule 15 because they knew they couldn't do it.  I'm not

7   suggesting that they should have.  I'm suggesting that the

8   reason that they didn't is because they knew they were -- they

9   were in a bad place.  Because if they really just wanted to

10  name Mr. Seery as a defendant, they wouldn't have done it.

11  They knew commence was crystal clear.

12      What they're trying to do is claim that somehow there's an

13  ambiguity around the word pursuit.  Does that make any sense

14  at all?  Filing a motion for leave to amend the complaint.

15  And Mr. Patrick, to his credit, candidly admitted that if the

16  motion was granted, they were suing, yeah, as long -- as long

17  as the Sbaiti firm, you know, recommended it.  That's what

18  would have happened.

19      Those orders that you signed, nothing, absolutely

20  meaningless from their point of view.  They believed they were

21  wrong.  They believed that they were overbroad.  They believed

22  they were too narrow.  They believed they were vague.  They

23  believed they were without authority.  They don't get to be

24  the gatekeeper.  They want to be the gate -- that's this

25  Court's decision.  That's why we went through all of the

HCMLPHMIT00002938

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 18-471   Filed 02/26/25   Page 37 of 1017    PageID 18936
Exhibit 71   Page 225 of 299

224

1    processes that we did.  And they just flagrantly said, I don't

2    agree.  I don't agree because it's wrong this way and it's

3    wrong that way and it's wrong the other way, and therefore let

4    me go find a higher authority to validate my thinking.  That's

5    not the way this process is supposed to work.

6        The independent directors and Mr. Seery relied on the

7    gatekeeper in accepting their positions.  It was a quid pro

8    quo.  Mr. Dondero agreed to the exact same provision, the

9    exact same gatekeeper provision in the January order that he

10   now complains about today, that the DAF complains about today.

11   Where were these people?

12       As the Court knows, nobody appealed either order.  The

13   Debtor, the independent board, Mr. Seery expected that the

14   plain and unambiguous words would be honored and enforced.  I

15   think that's fair.  I think that's the way the process is

16   supposed to work.

17       Instead, we have games.  We have these linguistic

18   gymnastics.  We have statements that are too cute by half.

19   Mr. Dondero won't even admit that he appointed Mr. Scott back

20   in 2012.  I couldn't even get him to do that, really, even

21   though the documents say it, even though Mr. Patrick says it.

22       I'll take the Respondents one at a time in a moment, but I

23   just want to deal with some of the more interesting arguments

24   they make.  The order was vague because it didn't say you

25   can't seek leave from the District Court to amend your

HCMLPHMIT00002939

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S     Document 18-71   Filed 02/26/25   Page 38 of 1017     PageID 18937
Exhibit 71   Page 226 of 299

225

1   complaint to add Mr. Seery.  They said that that's what makes

2   the order vague.

3       Your Honor, if you had thought to put that language in,

4   you know what they would have done?  They would have sued Mr.

5   Seery in New York State Supreme Court, where he lives, and

6   said, the order didn't say I couldn't do that.  Where does it

7   end?

8       There's a reason why the order was crafted broadly to say

9   no commencement or pursuit without Bankruptcy Court  approval.

10  You have to bring a colorable claim.

11      We heard an argument this morning that they couldn't

12  possibly have brought that motion for reconsideration first.

13  You know, the one they filed about eight hours after we filed

14  the contempt motion.  They couldn't possibly have brought that

15  motion before the motion for leave to amend because somehow

16  they would have been estopped or they would have been found to

17  have waived some right.

18      How could it be that anybody reasonably believes that

19  complying with a court order results in a waiver of some

20  right?  It just -- these are games.  These are not good

21  arguments.  And they certainly don't carry the day on a

22  contempt motion.

23      We've heard repeatedly, the District Court denied the

24  motion without prejudice, how have you been harmed?  They

25  shouldn't be able to rely on the District Court's prudence to

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S     Document 18-471   Filed 02/26/25   Page 39 of 1017     PageID 18938
Exhibit 71   Page 226 of 299

226

```
 1    protect themselves.  The question shouldn't be, have you been
 2    harmed since the District Court didn't grant the motion?  No.
 3    The question should be, were we harmed by the attempt to name
 4    Mr. Seery a defendant, in violation of court orders, without
 5    notice?  Without notice.
 6        I'm told they assumed that I'd be checking the dockets.  I
 7    wasn't checking the docket, Your Honor.  I hadn't filed an
 8    appearance in the case.  And, in fact, if you look at the
 9    exhibits, because I could pull it out, but we put in the
10    communications between the lawyers.  The last communication
11    was from Mr. Pomerantz, and the last communication from Mr.
12    Pomerantz said, Don't do it or we're going to file a motion
13    for contempt.  That's now in the evidence.
14        So, having sent that message, I wasn't going to check the
15    docket to see if they really were going to go ahead and do it.
16    I didn't think they would.  And if they did, I certainly
17    thought I'd get notice of it.  Nothing.
18        And, again, I don't really need to establish intent at all
19    in order to meet my burden of clear and convincing evidence of
20    a contempt of court, but I think it is relevant when the Court
21    hopefully finds liability and is considering damages, because
22    that's really the most important point I have to make right
23    now, is the Court needs to enforce its own orders, because if
24    the Court doesn't, or doesn't impose a penalty that's
25    meaningful, this is just going to continue.  And Your Honor,
```

017888

HCMLPHMIT00002941

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 18-71    Filed 02/26/25299    Page 40 of 1017    PageID 18939

227

1    it's all in the record.  Your Honor knows this.  Mr. Daugherty

2    has gone through it.  Right?  Mr. Terry went through it.  UBS

3    went through it.  You've seen litigation now for a year and a

4    half.  It's happening in New York, right, the Sbaiti firm is

5    reopening the Acis case.  we've got this other lawsuit that's

6    filed by an entity with like a five-tenths of one percent

7    interest who's complaining about the SSP transaction that Mr.

8    -- that the Debtor engaged in.  There's no end here.

9        We need the Court to pump the brakes.  We need the Court

10   to exercise its authority.  We need the Court to protect the

11   estate fiduciary that it approved.

12       It is true, Mr. Seery is not a trustee.  But it is also

13   true that he is a third-party outsider who came into this case

14   with the expectation and the promise in an order that he

15   wouldn't be subjected to frivolous litigation, that this Court

16   would be the arbiter of whether claims could be pursued

17   against him.  That was the code of conduct.  That was the quid

18   pro quo.  That was the deal that Mr. Seery made.  It's the

19   deal that the board members made.

20       What gives these people the right to just say, your order

21   is wrong, and because I think your order is wrong I'm going to

22   go to the District Court, and if the District Court agrees,

23   too bad, and if the District Court doesn't agree, we'll be

24   back before Your Honor, and no harm, no foul?  No.  It can't

25   be.  It can't be that that's the way this process works.  It

HCMLPHMIT00002942

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-71   Filed 02/26/299   Page 41 of 1017   PageID 18940

228

1   just can't.

2       So, Your Honor, let me take the Defendants one at a time,

3   the Respondents one at a time.  CLO Holdco and the DAF are

4   corporate entities.  They've done what they've done.  Mr.

5   Patrick, bless him, I think he's a lovely man.  I don't think

6   he quite bargained for what he's getting right now, but

7   nevertheless he is where he is and he's willing to stand up

8   and be counted, and for that, at least, I admire his courage.

9   He's willing to say, I authorized those.  But you know what?

10  It's a violation of the law, it's a violation of this Court's

11  order to file that motion, and so he has -- and he was very

12  candid today.  He knew of the order.  Right?  He knew it was

13  in effect.  He pointed out that it was in their papers.

14  Right?

15      They're trying to be cute, they're trying to thread this

16  needle, but it has no hole in it.  They keep -- they keep

17  doing this.  Well, maybe if we do it this way, maybe if we do

18  it -- no.  The order was crystal clear.

19      The Sbaiti firm.  They're probably fathers and husbands

20  and good people and I wish them no ill will, but this is

21  wrong.  This is wrong.  To come into a court you've never been

22  in before and in less than twelve days to jump the shark like

23  this in twelve -- in less than twelve days, because Mr.

24  Patrick said they weren't hired until April, and the complaint

25  was filed on the 12th.

HCMLPHMIT00002943

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 18-41   Filed 06/20/25   Page 42 of 1017    PageID 18941
Exhibit 71   Page 230 of 299

229

1      We're told that they understood this was an overwhelming

2    case with two -- why don't you take your time?  What was the

3    rush?  Why not wait until the Defendant -- the Debtor appeared

4    in the action before rushing to do this?

5      It's bad conduct, Your Honor, and that's really a very

6    important point that I have to make, is that there's lots of

7    lawyers who are engaging in highly-questionable conduct here

8    that, from my perspective, goes well beyond the bounds of

9    zealous advocacy.

10      It's not aggressive lawyering.  I love aggressive

11    lawyering.  I really do.  Respectful, honest -- and I don't,

12    you know, I don't want to say that they're dishonest people.

13    I don't mean to do that.  But I think, I think they made a

14    gross error in judgment, and there's no question that they

15    violated this Court's order.

16      And then that leaves Mr. Dondero.  I don't even know what

17    to say about his testimony, Your Honor.  He pursued claims

18    against Mr. Seery.  He thinks he's a rat.  He's the one who

19    started the whole process.  He's the one who put the bug in

20    Mark Patrick's ear.  All of this is uncontested.  Right?

21    Uncontested.

22      I don't have to go back in time.  We can talk about what

23    happened to Grant Scott.  It's a very sad story.  Mr. Scott, I

24    think, did his honest best to do what he believed, on the

25    advice of counsel, was in the best interest of the DAF.  And

017891

HCMLPHMIT00002944

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-71   Filed 08/06/25   Page 43 of 1017   PageID 18942

230

1   Mr. Dondero, as you hear time and time again when he speaks

2   about Mr. Seery, it was inappropriate.  He's the arbiter of

3   what's in the best interest of entities that other people

4   control.  And they pay a price.  And they pay a price.  And so

5   Mr. Dondero felt it was his job, even though he tries to

6   distance himself from the DAF -- I have no responsibility, I

7   don't -- I'm not involved -- until, until somebody wants to

8   sue Seery and the Debtor.  Then he'll go all in on that, no

9   matter how specious the claim may be.

10      The Debtor's not going to fold its tent because a motion

11  for leave to amend was denied without prejudice.  That's not

12  the point.  The point is that people need to respect this

13  Court, people need to respect the Court's orders, and those

14  that aid and abet or otherwise support the violation of court

15  orders ought to be held to account, Your Honor.

16      I have nothing further.

17          THE COURT:  All right.  Thank you.  Respondents?

18          CLOSING ARGUMENT ON BEHALF OF THE RESPONDENTS

19          MR. SBAITI:  Your Honor, the fact that we're here on

20  a motion for leave, and the motion for leave is what they're

21  saying is pursuing a claim under the Court's order, and then

22  you hear that the mere act of investigating a claim against

23  Mr. Seery is also pursuing a claim, this goes to the infinite

24  regression problem with this word pursue the way they want to

25  construe it, Your Honor.  Asking for permission is not

017892

HCMLPHMIT00002945

1   pursuing a claim and can't be the definition of pursuing a

2   claim because it's not doing anything other than asking for

3   permission.

4       We didn't file a suit.  We didn't commence a suit.  I

5   think that's established.  We did not pursue a claim.  Mr.

6   Morris ignores, I think, the very commonsensical aspect that

7   we put out in the opening, which is that the reason pursue --

8   and sometimes the language in these types of orders is,

9   instead of pursue, it's maintain -- but the reason that word

10  is there is because sometimes the case has already been

11  started when the order is entered.  And so to pursue a claim,

12  *i.e.*, one that's already been filed as of the date of the

13  order, that would be lost if the commencement of that claim

14  hadn't happened until after the -- until the -- if the

15  commencement happened before the order was filed.  That's the

16  --

17          THE COURT:  Okay.  So are you saying it's a

18  sequential thing?

19          MR. SBAITI:  I'm not sure I understood your question,

20  Your Honor.  I'm sorry.

21          THE COURT:  Well, I'm trying to understand what it is

22  you're saying about how pursue should be interpreted.

23          MR. SBAITI:  Sure.

24          THE COURT:  I think you're saying you have to -- you

25  can either have -- well, we've got a prohibition on commencing

HCMLPHMIT00002946

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-11   Filed 08/06/25   Page 45 of 1017   PageID 18944

232

1  an action.

2          MR. SBAITI:  Yes.

3          THE COURT:  And then the separate word pursue, I

4  think you're saying that must refer to you already have an

5  action that's been commenced and you're continuing on with it.

6  Is that what you're saying?

7          MR. SBAITI:  Yes, Your Honor.

8          THE COURT:  Then why not use the word continue?

9          MR. SBAITI:  Well, Your Honor, the choice of --

10         THE COURT:  Kind of like 362(a) of the Bankruptcy

11  Code, you know, is worded.

12         MR. SBAITI:  Well, Your Honor, the choice of the

13  wording of pursue at that point, Your Honor, I believe ends up

14  being ambiguous, because by filing the motion here that would

15  be pursuing a claim under that definition.  So before I got

16  permission to pursue a claim, I've got to pursue a claim.

17  That's the problem that they have with the words that they're

18  trying to get you to adopt, or the meaning of the words

19  they're trying to get you to adopt.

20     If I came to this Court and said, Judge, I need

21  permission, I need leave to file suit against Mr. Seery, and

22  then the question is, well, you're not allowed to seek leave

23  because that's pursuing the claim, it's infinitely regressive.

24  And in fact, his closing argument just proved how it's

25  infinitely regressive.

017894

HCMLPHMIT00002947

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-41   Filed 08/06/25   Page 46 of 1017   PageID 18945

233

1          THE COURT:  Okay.  Let me -- I'm not following this

2     infinitely regressive or whatever the term was.

3          MR. SBAITI:  Yes.

4          THE COURT:  Just answer this very direct question.

5     Why did you not file a motion for leave in the Bankruptcy

6     Court?  That would have clearly, clearly complied with the

7     July order.

8          MR. SBAITI:  Your Honor, I believe we explained this

9     in the opening.  I took a stab at it.  Mr. Bridges took a stab

10    at it.  We did not believe coming here and asking for leave

11    and asking for -- for Your Honor to do what we don't believe

12    Your Honor can do, would effectuate an estoppel or a waiver,

13    which we didn't think was in the best interest of our client

14    to have.  Your Honor, this happens -- I don't believe this is

15    the --

16         THE COURT:  Okay.  Connect the dots.  Make that clear

17    as clear can be for me.  You file a motion for leave --

18         MR. SBAITI:  Yes.

19         THE COURT:  -- to file this District Court action

20    against the Debtor and Seery, and if I say yes, everything is

21    fine and dandy from your perspective.  If I say no, tell me

22    again what your estoppel argument is.

23         MR. SBAITI:  Your Honor, the key question is whether

24    us putting the Court's ability to decide colorability and the

25    Court's gatekeeper functions, for us to invoke those functions

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-71   Filed 08/05/25   Page 47 of 1017   PageID 18946

234

```
1   concerned us because there's case law that says that that

2   effectuates an estoppel.  And so we don't get our chance in

3   front of an Article III judge to make that in the first

4   instance.

5           THE COURT:  Okay.  Tell me what cases you're talking

6   about and the exact context of those cases.

7           MR. SBAITI:  Your Honor, I would have to defer to my

8   partner on this one, Your Honor.

9           THE COURT:  Okay.

10          MR. SBAITI:  So, --

11          THE COURT:  Because I'm just letting you know --

12          MR. SBAITI:  Yes.

13          THE COURT:  -- I am at a complete loss.  I'm at a

14  complete loss understanding what you're saying.  I am.

15          MR. SBAITI:  Well, Your Honor, the --

16          THE COURT:  I don't understand.  If you have followed

17  the order to the letter and I tell you no, --

18          MR. SBAITI:  Then --

19          THE COURT:  -- what, you're saying you were worried

20  you'd be estopped from appealing my order to the District

21  Court and saying abuse of discretion or invalid order in the

22  first place?  You'd be estopped from taking an appeal?

23          MR. SBAITI:  No, Your Honor.  We wouldn't be estopped

24  from taking an appeal.

25          THE COURT:  Then why didn't you follow the letter of
```

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-471   Filed 07/06/299 Page 48 of 1017   PageID 18947

235

1   the order?

2           MR. SBAITI:  For one thing, Your Honor, asking the

3   District Court made sense to us, given the order and given our

4   understanding of the law.  Certainly, we had other options, as

5   Your Honor is pointing out.  We could have come here.  Our

6   read of the law, our understanding of what we were doing, made

7   it -- put us in, like I said, put us in the sort of

8   jurisdictional and paradoxical position.

9           THE COURT:  This is your chance to tell me exactly

10  which law you think applies here.  What case?  What statute?

11          MR. SBAITI:  Your Honor, like I said, I don't have

12  those at the moment.

13          THE COURT:  Why not?  Your whole argument rides on

14  this, apparently.

15          MR. SBAITI:  Well, Your Honor, I don't know that our

16  whole argument rides on that.

17          THE COURT:  Okay.

18          MR. SBAITI:  I mean, our argument rides on we don't

19  think we violated the letter of the order.  I think that's

20  really what I'm -- what we're here to say, is that we didn't

21  commence a lawsuit and we didn't pursue a claim by filing for

22  leave in the District Court, just like filing for leave in

23  this Court would not be pursuing a claim.  It would be filing

24  for leave.

25          THE COURT:  I agree.  Filing a motion for leave in

HCMLPHMIT00002950

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 18-71    Filed 08/05/25    Page 49 of 1017    PageID 18948

236

1    this Court would be exactly what the order contemplated.

2            MR. SBAITI:  I understand, Your Honor.

3            THE COURT:  What you did is not exactly what the

4    order contemplated.

5            MR. SBAITI:  Your Honor, but we're -- we're moving

6    back and forth between two concepts.  One, your question is

7    why didn't we file for leave?

8            THE COURT:  Uh-huh.

9            MR. SBAITI:  And the answer to that, I've tried to

10    explain.  And if we -- if you'd like us to bring up the case

11    law or to give you a better articulation of our concern, I'm

12    happy to defer to my partner.

13        What I'm really here to say, Your Honor, is a very simple

14    point, though.  Just because we didn't file for leave here and

15    we filed for leave in the District Court doesn't mean we

16    violated your order, and that's the point I'm trying to make,

17    Your Honor.  And I think that's the simplest point I can make.

18    Asking the Article III judge for leave to amend, for leave to

19    amend to add Mr. Seery, doesn't violate, facially, at least as

20    we read it, Your Honor's order.  It's not commencing a suit

21    and it's not -- it's not pursuing a claim against him.  It's

22    all preliminary to pursuing a claim against him, because a

23    claim hasn't even been filed.

24        The judge could have -- the judge could have -- the

25    District Court could have denied it, the District Court could

017898

HCMLPHMIT00002951

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-1   Filed 06/20/25   Page 50 of 1017   PageID 18949

237

1  have referred it down here, the District Court could have

2  decided part of it and then asked Your Honor to rule on some

3  portion of it.  There are innumerable ways that could have

4  gone.  That fork -- those forks in the road is precisely why

5  we say this is not pursuing the claim.  Otherwise, where does

6  it stop?

7      Does pursuing a claim happen just when we file the motion

8  for leave?  Why didn't it happen when we started the

9  investigation?  If pursuing a claim means having the intent

10 and taking steps towards eventually filing a lawsuit, that's

11 the point that I'm making that it is infinitely regressive,

12 and that's exactly what Mr. Morris argued to you.

13     He said Mr. Dondero, by merely speaking to me, is pursuing

14 a claim and that violates your order.  Speaking to me.  Even

15 if we had never filed it.  Speaking is pursuing a claim.

16          THE COURT:  I don't agree with that, for what it's

17 worth.

18          MR. SBAITI:  Okay.  But that was his argument.  I'm

19 just responding to it.

20          THE COURT:  Okay.

21          MR. SBAITI:  And if that's not pursuing a claim,

22 filing a motion for leave likewise wouldn't be pursuing a

23 claim.  I understand it's an official act in a court, but we

24 did it in a Court that is an adjutant to this Court.  This

25 Court is an adjutant to that Court.  It's the Court with

HCMLPHMIT00002952

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-71   Filed 08/08/25   Page 51 of 1017   PageID 18950

238

1   original jurisdiction over the matter.  So we didn't go to New

2   York.  We didn't go to the state court in New York where I

3   learned Mr. Seery lives.  We came to the Northern District of

4   Texas, understanding that this Court and this Court's orders

5   had to be -- had to be addressed.  And that's the very first

6   thing we did.  We asked the Court to address it.

7       That judge could either decide to send it down here, which

8   is normally what I think -- what we understood would happen.

9   So it's not like we were avoiding it.  But we wanted to invoke

10  the jurisdiction which we, as the Plaintiff, we believe we had

11  the right to invoke.  We're allowed to choose our forum.  So

12  that's the forum we chose for the primary case, which there's

13  not a problem, no one's raised an issue with us filing the

14  underlying lawsuit.

15      Adding Mr. Seery to that lawsuit and filing a motion for

16  leave in the same court where we actually had the lawsuit,

17  knowing that it might get -- that might get decided or

18  referred in some way, doesn't strike me as being anything

19  improper, because he didn't get sued and we don't know what

20  Judge Boyle would have said had the motion gone forward.  And

21  for them to speculate and to say that, well, this is exactly

22  the type of thing you have to protect against, I completely

23  disagree.

24      The case law that they cited for you on these -- on most

25  of these orders really do discuss the fact that you have

HCMLPHMIT00002953

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 18-471    Filed 04/06/299    Page 52 of 1017    PageID 18951

239

1    somebody who is actually protecting the underlying property of

2    the Debtor.  This claim comes from a complete third party that

3    Mr. Seery himself has admitted under oath he owes a fiduciary

4    duty to.  Two third parties.  One is an investor of a fund

5    that he manages, and one to a fund that the Debtor, with Mr.

6    Seery as the head of it, was an advisor for up until recently.

7        Those fiduciary duties exist.  We felt like there was a

8    valid claim to be brought against Mr. Seery.  And the only

9    reason -- and he says this like it's a negative; I view it as

10   a positive -- the reason he wasn't named is because of Your

11   Honor's orders.  And so we asked a Court, the Court with

12   general jurisdiction, to address it for us or to tell us what

13   to do.  And I don't see how that is a violation of this

14   Court's order, nor is it contemptuous of this Court's order.

15       If every time one of these issues came up it was a

16   contempt of the court that appointed a trustee, we'd see a lot

17   more contempt orders.

18       Interestingly, the cases that were thrown out to you in

19   the opening argument by the other side, for example, *Villages*

20   [sic] *v. Schmidt*, was a trustee case, but not one that

21   involved a sanction.  And the trustee case specifically in

22   that case held that the Barton Doctrine didn't have an

23   exception for *Stern* cases, whereas the cases we cited to you,

24   *Anderson*, for example, in the Fifth Circuit, which is 520 F.2d

25   1027, expressly held that Section 959 is an exception to the

017901

HCMLPHMIT00002954

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-71   Filed 04/05/299   Page 53 of 1017   PageID 18952

240

1  Barton Doctrine.

2      And my partner, Mr. Bridges, can walk through the issues

3  that we had on the enforceability of the order, but all -- to

4  me, all of that is sort of a secondary issue because, *prima*

5  *facie*, we didn't violate this order.  I understand it may

6  irritate the Debtor and may raise questions about why the

7  motion wasn't filed here versus the District Court.  But it

8  was a motion for leave.  In order to sanction us, Your Honor

9  would have to find that asking for permission is sanctionable

10  conduct in the gatekeeper order.  Even if we ask the wrong

11  court.  Simply asking the wrong court is sanctionable, not

12  knowing what that court would have done, not knowing what that

13  court's mindset was, not even having the benefit of the

14  argument.  And that's, I guess, where this bottom -- the

15  bottom line is for me.

16      The evidence that they put on for you, Your Honor.

17  Everything you heard was evidence in the negative.  You know,

18  they talk about the transition from Mr. Dondero to Mr. Scott

19  and Mr. Scott to Mr. Patrick, but if you actually look at the

20  evidence he wants you to see and he wants you to rule on, it's

21  the evidence that wasn't there.  It's the evidence that Mr.

22  Dondero had no control.  In fact, I believe that was the basis

23  he argued for why there should be no privilege.  And all he

24  said is that he was promoting it.

25      But the fact of the matter is, like I said, all of that is

017902

HCMLPHMIT00002955

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-71   Filed 24/06/25299   Page 54 of 1017   PageID 18953

241

1   secondary to the core issue that we didn't violate the order.

2   We didn't take steps to violate the order.  We took steps to

3   try to not violate the order.  And they want you to punish us

4   to send a message.  Even used words like the Court needs to

5   enforce its own orders.  And he did that as a transition away

6   from the idea that there were no damages, Your Honor, and I

7   think that has implications.

8       And then he said you have to enforce a meaningful penalty.

9   Well, Your Honor, I don't think that is the purpose of these

10  sanctions.  These sanctions are supposed to be remedial,

11  according to the case law, according to the case law that they

12  cite.  So a meaningful --

13          THE COURT:  Coercive or remedial.

14          MR. SBAITI:  Sorry?

15          THE COURT:  Coercive or remedial.  Civil contempt.

16          MR. SBAITI:  Sure, Your Honor.  But usually coercive

17  sanctions require someone to do something or they are

18  sanctioned until they do it.

19          THE COURT:  Coerced compliance.  Coerced compliance

20  --

21          MR. SBAITI:  Yes.

22          THE COURT:  -- with an existing order.

23          MR. SBAITI:  Yes.

24          THE COURT:  Uh-huh.

25          MR. SBAITI:  The last thing, he says you have to

017903

HCMLPHMIT00002956

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 18-71   Exhibit 71   Filed 04/06/25   Page 55 of 1017   PageID 18954

242

1   protect the estate of the fiduciary and his expectation -- I

2   believe he's talking about Mr. Seery -- his expectation that

3   the Court would be the gatekeeper.  And Your Honor, that

4   argument rings a little bit hollow here, given that what

5   they're really saying is that we should have come here first

6   and asked for permission.  But that insinuates that, by coming

7   here, the case is dead on arrival, which I don't think is the

8   right argument.

9       I think the issue for us has been, who do we have to ask

10  and who can we ask to deal with the Court's gatekeeper order?

11  I believe we chose a court, a proper court, a court with

12  jurisdiction, to hear the issue and decide the issue.  Your

13  Court's -- Your Honor's indication of the jurisdiction of this

14  Court we believed invoked the District Court's jurisdiction at

15  the same time.

16      And so the last thing is he said -- the last thing, and

17  getting back to the core issue, is Mr. Morris wants you to

18  believe that we intended to violate the order, and now, as an

19  afterthought, we're using linguistic gymnastics to get around

20  all of that.  But it's not linguistic gymnastics.  Linguistic

21  gymnastics is saying that pursue means doing anything in

22  pursuit of a claim.  That's a little -- I believe that's

23  almost a direct quote.  They're chasing the man.  Well, that's

24  the infinite regression that I talked about, Your Honor, that

25  it's going to be impossible in any principled way to reconcile

HCMLPHMIT00002957

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-71   Filed 04/46/25299   Page 56 of 1017   PageID 18955

243

1   Mr. Morris's or the Debtor's definition of pursue with any

2   logical, reasonable limitation that is readable into the

3   order, Your Honor.

4       And I'm going to defer to my partner, Mr. Bridges -- oh,

5   go ahead.

6           THE COURT:  I'm going to stop you.  I mean, we have

7   the linguistic argument.  But how do you respond to this?

8           MR. SBAITI:  Sure.

9           THE COURT:  What if I tell you, in my gut, this

10  appears to be an end run?  An end run.  I mean, I'm stating

11  something that should be obvious, right?  An end run around

12  this Court.  This Court spent hours, probably, reading a

13  motion to compromise issues with HarbourVest, issues between

14  the Debtor and HarbourVest.  I had objections.  An objection

15  from CLO Holdco that was very document-oriented, as I recall.

16  Right of first refusal.  HarbourVest can't transfer its 49.98

17  percent interest in HCLOF, right?  Talk about alphabet soup.

18  We definitely have it.

19          MR. SBAITI:  Yes.

20          THE COURT:  Without giving CLO Holdco the first right

21  to buy those assets.  Read pleadings.  Law clerk and I stay up

22  late.  And then, you know, we get to the hearing and there's

23  the withdrawal -- we heard a little bit about that today --

24  withdrawal of the objection.  We kind of confirmed that two or

25  three different ways on the record.  And then I remember going

017905

HCMLPHMIT00002958

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 18-471    Filed 08/05/25    Page 57 of 1017    PageID 18956

244

1    to Mr. Draper, who represents the Dugaboy and Get Good Trusts.

2    You know, are you challenging the legal propriety of doing

3    this?  And he backed off any objection.

4        So the Court ended up having a hearing where we went

5    through what I would call the standard 9019 prove-up, where we

6    looked at was it in the best interest, was it fair and

7    equitable given all the risks, rewards, dah, dah, dah, dah.

8    You know, HarbourVest had initially, you know, started at a

9    $300 million proof of claim, eye-popping, but this all put to

10   bed a very complicated claim.

11           MR. SBAITI:  Yeah.

12           THE COURT:  Tell me something that would make me feel

13   better about what is, in my core, in my gut, that this is just

14   a big, giant end run around the Bankruptcy Court approval of

15   the HarbourVest settlement, which is not on appeal, right?

16   There are a gazillion appeals in this case, but I don't think

17   the HarbourVest --

18           A VOICE:  It is on -- it is on appeal, Your Honor.

19           THE COURT:  Is it?  Oh, it is on appeal?  Okay.  So I

20   may be told --

21           MR. SBAITI:  I didn't know.

22           THE COURT:  I may be told, gosh, you got it wrong,

23   Judge.  You know, that happens sometimes.

24       So, this feels like an end run.  You know, the appeal is

25   either going to prevail or not.  If it's successful, then, you

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-71   Filed 06/06/25   Page 58 of 1017   PageID 18957

245

1    know, do you really need this lawsuit?  You know, I don't --

2    okay.  Your chance.

3              MR. SBAITI:  Thank you, Your Honor.

4              THE COURT:  Uh-huh.

5              MS. SBAITI:  Your Honor, this wouldn't be the first

6    case where finality or where there was a settlement -- I'm not

7    familiar as well with bankruptcy, but certainly in litigation

8    -- where the settlement then reveals -- well, after a

9    settlement is done, after everyone thinks it's done, some new

10   facts come to light that change people's views about what

11   happened before the settlement or before the resolution.  And

12   that's what happened here, Your Honor.  This is what we've

13   pled.  And this is what we understand.

14        There were the instances of Mr. Seery's testimony where he

15   testified to the value of the HarbourVest assets.  I believe,

16   as I recall, he testified in I believe it's the approval

17   hearing that Your Honor is talking about that the settlement

18   gave HarbourVest a certain amount of claims of I think it's,

19   Series 8 and then Series 9 claims, and that those were

20   discounted to a certain dollar value that he quantified as

21   about $30, $31 million.  And the way he ratified and justified

22   the actual settlement value, the actual money or value he was

23   conferring on HarbourVest, given the critique of HarbourVest

24   claims that he was settling, is he explained it this way.  He

25   said $22-1/2 million of this whole pot that I'm giving them

017907

HCMLPHMIT00002960

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-471   Filed 04/05/25   Page 59 of 1017   PageID 18958

246

1   pays for the HarbourVest -- HarbourVest's interests in HCLOF

2   -- it's alphabet soup again -- and Highland CLO Funding,

3   Limited.  And so it's the other $9 million that's really

4   settling their claims.  And given the amount of expense it's

5   going to take, so on and so forth, $9 million seems like a

6   reasonable amount to settle them with, especially since we're

7   just giving them claims.

8        So that $22-1/2 million everyone apparently took to the

9   bank as being the value, including CLO Holdco at the time,

10  because they didn't have the underlying valuations.  Highland

11  was supposed to give the updated valuations.

12       So, fast-forward a couple of months -- and this is what

13  we've played in our lawsuit, Your Honor; this is why I don't

14  think it's an end run -- we pled in our lawsuit just a couple

15  months later Highland -- I believe some of the people that

16  worked at Highland started leaving, according to some

17  mechanisms that I saw where Highland didn't want to keep all

18  the staff and so the staff was migrated to other places.  And

19  one of those gentlemen, I believe Mr. Dondero referred to him

20  as a gentleman named Hunter Covitz, and Hunter Covitz, who's

21  also an investor in HCLOF, he owns a small piece of HCLOF, he

22  had the data, he had some of the information that showed that,

23  actually, in January, when Mr. Seery said that the HarbourVest

24  settlement was worth 22 -- excuse me, the HarbourVest

25  interests in HCLOF were worth $22-1/2 million, that they're

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 18-41    Filed 08/08/25    Page 60 of 1017    PageID 18959

247

1    actually worth upwards of $45 million.

2        And so that information, Your Honor, we believe gives us a

3    different -- a different take on what happened and what was

4    supposed to happen.  This is strictly about the lack of

5    transparency.

6            THE COURT:  Okay.  Assuming --

7            MR. SBAITI:  Yeah.

8            THE COURT:  -- I buy into your argument that this is

9    newly-discovered evidence --

10            MR. SBAITI:  Yes.

11            THE COURT:  -- CLO Holdco would not have had reason

12    to know -- I guess that's what you're saying, right?

13            MR. SBAITI:  I'm saying they -- they didn't know.

14            THE COURT:  That they didn't know.

15            MR. SBAITI:  Uh-huh.

16            THE COURT:  And didn't have reason to know.  I'm

17    trying to figure out who's damaged here.

18            MR. SBAITI:  Well, CLO Holdco, my client, is damaged,

19    Your Honor.

20            THE COURT:  How?

21            MR. SBAITI:  Because one of the aspects of the -- of

22    Highland, one of the issues under, excuse me, of Highland's

23    advisory, is that it has a fiduciary duty.  And that fiduciary

24    duty, at least here, entails two, if not, three prongs.  The

25    first prong is they have to be transparent.  You can't say --

HCMLPHMIT00002962

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-71   Filed 04/30/25   Page 61 of 1017   PageID 18960

248

```
 1              THE COURT:  How is -- you know, I know a lot about
 2   fiduciary duties, believe it or not.  How is CLO Holdco harmed
 3   and the DAF harmed?
 4              MR. SBAITI:  Because, Your Honor, they lost out on an
 5   investment opportunity to buy the piece of -- the HarbourVest
 6   piece.  They would have been able to go out and raise the
 7   money.  They had the opportunity --
 8              THE COURT:  Okay.
 9              MR. SBAITI:  They would have had the opportunity to
10   make a different argument.
11              THE COURT:  What you're saying, you're saying, if
12   they had known what they didn't have reason to know, that it
13   was worth, let's say, $45 million, that they would have gone
14   out and raised money and said, oh, we do want to exercise this
15   right of first refusal that we decided we didn't have and gave
16   in on, we're going to press the issue and then outbid the $22
17   million, because we know it's worth more?  Is that where
18   you're going? I'm trying to figure out where the heck you're
19   going, to be honest.
20              MR. SBAITI:  That's -- Your Honor, I'd push back on a
21   little of the phrasing, only because the way these duties --
22   the way we understand the SEC's duties work when you're an
23   investment advisor is you have a transparency obligation and
24   an obligation --
25              THE COURT:  Yes.  Yes.
```

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 18-71    Filed 06/20/25    Page 62 of 1017    PageID 18961

249

1            MR. SBAITI:  -- not to divert these.  So, yes, CLO

2     Holdco would have at least had the opportunity and been

3     offered the opportunity, which it could have taken advantage

4     of, to, if the assets were really on the block for $22-1/2

5     million, they should have been able to buy their percentage

6     pro rata share of that $22-1/2 million deal.  I mean, in a

7     nutshell, that's -- that's where we believe we've been harmed.

8     And we believe that the obfuscation of those values and, to a

9     certain extent, the misrepresentation of those values in the

10    settlement is not cleansable by the argument, well, you should

11    have asked.

12         Well, you should have asked is fine in normal litigation,

13    but when the person you should have asked actually owes you a

14    positive duty to inform, we believe that the should-have-asked

15    piece doesn't really apply and there's -- and that's, that's

16    the basis of our case.

17         So it's not an end run around the settlement, Your Honor.

18    I think I opened with we're not trying to undo the settlement.

19    We're not saying HarbourVest has to take its interest back.

20    We're not saying the settlement has to go on.  We're not even

21    saying any of the things that happened in Bankruptcy Court

22    need to change.  But Section 959 is pretty clear that this is

23    management of third-party property --

24            THE COURT:  I guess -- okay.  Again, rabbit trail,

25    maybe.  But CLO Holdco still owns its same 49.02 percent

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-471   Filed 06/16/25   Page 63 of 1017   PageID 18962

250

1    interest that it did before this transaction.  So if there's

2    value galore in HCLOF, it still has its 49.02 percent

3    interest.  What am I missing?

4            MR. SBAITI:  Oh, I think Your Honor's assuming that

5    HCLOF bought the piece back from HarbourVest.  It didn't.

6            THE COURT:  No, I'm not.

7            MR. SBAITI:  Oh.

8            THE COURT:  I'm not assuming that.

9            MR. SBAITI:  Well, --

10           THE COURT:  I know that now the Debtor has, what,

11   fifty point, you know, five percent of HCLOF, whereas it only

12   had, you know, a fraction.

13           MR. SBAITI:  Point six-ish.  Yeah.

14           THE COURT:  Point six-ish, and HarbourVest had 49.98.

15           MR. SBAITI:  Right.

16           THE COURT:  So, again, please educate me.  I'm really

17   trying to figure out how this lawsuit isn't just some crazy

18   end run around a settlement I approved.  And moreover, what's

19   the damages?

20           MR. SBAITI:  Well, Your Honor, --

21           THE COURT:  What's the damages?  CLO Holdco still has

22   its 49.02 percent interest in HCLOF.

23           MR. SBAITI:  Your Honor, again, --

24           THE COURT:  What am I missing?  I must be missing

25   something.

017912

HCMLPHMIT00002965

```
 1              MR. SBAITI:  I think so, Your Honor.
 2              THE COURT:  What?
 3              MR. SBAITI:  The damages is the lost opportunity, the
 4    lost opportunity to own more of HCLOF.
 5              THE COURT:  Oh, it could have owned the whole darn
 6    thing?
 7              MR. SBAITI:  I could have owned 90 -- whatever 49
 8    plus 49.98, 98.98 percent.
 9              THE COURT:  But --
10              MS. SBAITI:  Or some pro rata portion.
11              THE COURT:  But Mr. Seery had some information that
12    you think he was holding back from CLO Holdco that CLO Holdco
13    had no reason to know?
14              MR. SBAITI:  Yes, Your Honor.  The -- the -- what he
15    testified to that the value of those assets, excuse me, the
16    value of the HarbourVest interests in HCLOF or its share of
17    the underlying assets being $22-1/2 million was either, one,
18    intentionally obfuscated, or, two, and I don't think this
19    excuses it at all, he simply used ancient data and simply
20    never updated himself, not for the Court and not for any
21    representations to the investors, who he himself testified
22    under oath in this Court that he has a fiduciary duty to under
23    the Investment Advisers Act.
24              THE COURT:  This could get very --
25              MR. SBAITI:  So that's injury to my client, Your
```

HCMLPHMIT00002966

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-71   Filed 07/08/25   Page 65 of 1017   PageID 18964

252

```
 1    Honor.
 2               THE COURT:  This could get really dangerous.  Maybe
 3    --
 4               MR. SBAITI:  I'm sorry.
 5               THE COURT:  This could get really dangerous.  Maybe I
 6    should cut off where I'm going on this.
 7               MR. SBAITI:  Okay.
 8               THE COURT:  Of course, someone dangled it out there
 9    in a pleading.  You know where I'm going, right?
10               MR. SBAITI:  I'm not sure I do, Your Honor.
11               THE COURT:  Hmm.  I do read the newspaper, but
12    someone put it in a pleading.  HCLOF owns MGM stock, right?
13    Is that what this is all about?  Is that what this is all
14    about?  Or shall we not do this on the record?
15               MR. SBAITI:  Well, Your Honor, this has nothing -- I
16    don't -- I don't think this has anything to do with the MGM
17    stock one way or the other.
18               THE COURT:  You don't?  OH?
19               MR. SBAITI:  Your Honor, my charge as a counsel for
20    the DAF is pretty straightforward.  We looked at the claims.
21    We looked at the newly-discovered information.  We talked to
22    the people who had it, Your Honor.  That was our
23    investigation.  We put together a complaint.  We believed that
24    we had a good basis to file suit, despite Your Honor's -- the
25    settlement approval.  We expressly, because we understand how
```

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-71   Filed 07/06/25   Page 66 of 1017   PageID 18965

253

1    finality is so critical in a bankruptcy context, we expressly

2    didn't ask for rescission.  We expressly didn't ask for

3    anything that would undo the settlement.

4        Asking for damages because of how the settlement happened,

5    through no fault of the Court's, of course, but asking for

6    damages is not, at least not as I see it, an end run around

7    the Court's settlement, and it's a legitimate claim.  And I

8    don't think this is far from the first time that new evidence

9    has come up that's allowed someone to question how something

10   was done that actually -- that actually damaged them.

11           THE COURT:  Usually, they come in for a motion to

12   reopen evidence to the court who issued the order approving

13   the settlement.

14           MR. SBAITI:  Well, Your Honor, I mean, that's --

15           THE COURT:  Newly-discovered evidence.

16           MR. SBAITI:  That would be the case in a final

17   judgment, Your Honor.  But, you know, our understanding of the

18   way the settlement worked was that that was not necessarily

19   going to be -- not the direction anybody wanted to go, but

20   seeking damages on a straight claim for damages, which we're

21   allowed to seek, which I think is our prerogative to seek, we

22   went that direction.

23           THE COURT:  Okay.  Okay.

24           MR. SBAITI:  But this --

25           THE COURT:  My last question.

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-71   Filed 2/55/299   Page 67 of 1017   PageID 18966

254

1          MR. SBAITI:  Yes, Your Honor.

2          THE COURT:  Again, I have to know.  You have filed

3   some sort of pleading to reopen litigation against Acis in New

4   York?  I'm only asking this because it's part of what's going

5   on here.  What is going on here?

6          MR. SBAITI:  Your Honor, that's a -- that's a

7   separate lawsuit, and it's not to reopen litigation against

8   Acis.  It deals with post-plan confirmation mismanagement by

9   Acis.

10          THE COURT:  Oh, okay.  Okay.

11          MR. SBAITI:  Yeah.

12          THE COURT:  All right.

13          MR. SBAITI:  But I believe there's a motion in front

14   of Your Honor, just to -- that gave notice that the suit was

15   filed, but I believe Mr. -- well, a bankruptcy lawyer filed

16   it.  I don't know.

17          THE COURT:  A motion or a notice?  I don't know.

18          MR. SBAITI:  I don't know, Your Honor.  That's above

19   my paygrade.

20          THE COURT:  I have not seen it.  Okay?

21          MR. SBAITI:  Okay.

22          THE COURT:  Maybe it's there, but no one has called

23   it to my attention.

24          MR. SBAITI:  With the Court's permission, I'm going

25   to yield time to Mr. Bridges.

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-71   Filed 06/26/25   Page 68 of 1017   PageID 18967
Exhibit 71   Page 256 of 299

255

```
 1              THE COURT:  Okay.  Mr. Bridges?

 2              CLOSING ARGUMENT ON BEHALF OF THE RESPONDENTS

 3              MR. BRIDGES:  Thank you, Your Honor.  I'm grateful

 4    that you asked most of those questions to Mr. Sbaiti.  I would

 5    not have been able to answer them.  The one I can answer is

 6    the one about judicial estoppel.  Apparently, I did a pretty

 7    lousy job earlier.  I think I'm prepared to do a better job

 8    now.

 9        The case law I'd like to refer you to is the Texas Supreme

10    Court's 2009 decision in Ferguson v. Building Materials, 295

11    S.W.3d 642.  And this was my concern and my issue, perhaps

12    because I used to teach it and so it was at the front of my

13    mind.  But contrary to what you would think and what you said

14    earlier, it's not your ruling against us that would create a

15    judicial estoppel problem.  It's if you ruled in our favor.

16    And I know that seems weird.  Let me explain.

17        The two things that have to take place for there to be

18    judicial estoppel are, first, successfully maintaining a

19    position in one proceeding, and then taking an inconsistent

20    position in another.  And Your Honor, what we talked about

21    earlier is the notion that your July order forecloses the key

22    claim that Mr. Sbaiti was just describing, that Mr. Seery

23    should have known.  Not that he was grossly negligent or did

24    intentional wrong, but that he breached fiduciary duties

25    because he should have known and should have disclosed.
```

017917

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 18-471    Filed 05/06/25    Page 69 of 1017    PageID 18968

256

1          And if your order forecloses that and we come and convince

2     you that we nonetheless have colorable claims, colorable

3     claims of gross negligence or willful wrongdoing, that we

4     ultimately are unable to prove, our lawsuit could fail, even

5     though we had proved -- in the lawsuit we had proved he should

6     have known and that he breached fiduciary duties, but we would

7     be estopped, having succeeded from coming here and asking in

8     compliance with the order and its colorability rule, that we

9     would be estopped from then saying that this Court lacked the

10    authority to have issued that order in the first place, to

11    have released the claim on the mere breach of fiduciary duty

12    or ordinary negligence.  That's the inconsistency that I was

13    concerned about.

14         By coming here rather than trying to make our objection

15    and our position known without submitting to the foreclosure

16    of that claim that is, in many ways, the most important, the

17    headliner from our District Court complaint, is the concern,

18    Your Honor.  And frankly, if Your Honor's order does foreclose

19    that, then we're in serious trouble.  That's the claim that

20    we're trying to preserve.

21         But Your Honor, I don't think it was in anyone's

22    contemplation in July of 2000 that what that order would do is

23    terminate -- 2020; sorry, Your Honor -- in July of 2020, that

24    that order would terminate future claims that might arise

25    based on future conduct that had not yet happened in Mr.

017918

HCMLPHMIT00002971

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-471   Filed 06/06/25   Page 70 of 1017   PageID 18969

257

```
 1   Seery's role.  Not in his role as a manager of the Debtor's

 2   property, but in his role as a registered investment advisor

 3   on behalf of his clients and their property.  And that is the

 4   concern that the judicial estoppel argument is about.

 5           THE COURT:  I still don't understand.  I'm very well

 6   aware of judicial estoppel, the old expression, you can't play

 7   fast and loose with the court.  Take one position in one

 8   court, you're successful, and then take another position in

 9   another court.  That's the concept.

10           MR. BRIDGES:  Coming here --

11           THE COURT:  How is this judicial estoppel if you had

12   done what I think the order required and asked this Court for

13   leave?  What -- and I said fine, you have leave.  Where's the

14   judicial estoppel problem?

15           MR. BRIDGES:  If you say fine, you have leave, but

16   that leave is only, as the order states, because we have

17   colorable claims of gross negligence, colorable claims of

18   intentional wrongdoing, what happens to our mere negligence

19   and mere breach of fiduciary duty claims?  Are they

20   foreclosed?  The order on its face --

21           THE COURT:  Well, I would interpret the order to be

22   yes, and then you could appeal me, and the Court would either

23   say it's too late to appeal that because you didn't appeal it

24   in July 2020, or fine, I'll hear your appeal.  Where's the

25   estoppel?
```

HCMLPHMIT00002972

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-71   Filed 06/20/25 Page 71 of 1017   PageID 18970

258

1          MR. BRIDGES:  Your Honor, our claims that this Court

2     lacks the authority either to have made that order in the

3     first place or the jurisdiction to rule on colorability now

4     because of Section -- the mandatory abstention provision,

5     whose section number I've now lost.  That if we come to you

6     and ask you to rule on those things, have we not thereby

7     waived on appeal our claim that you couldn't rule in the first

8     place on those things?

9          That is what our motion for leave in the District Court

10    argues, is that there's -- there are jurisdictional

11    shortcomings with your ability to decide what we're asking

12    that Court to decide.  And Your Honor, by coming here first

13    and then appealing, that's what we fear we would have lost.

14    And instead of coming here and appealing, what we -- what we

15    would have done, in the alternative, I guess, would be to come

16    here and ask you not to rule but move to withdraw the

17    reference of our own motion.

18         That two-step, filing here and filing a motion to withdraw

19    the reference on the thing we filed here, we didn't think was

20    required, nor could we find any case law or rule saying that

21    that was appropriate.

22         THE COURT:  Okay.

23         MR. BRIDGES:  These are not games, Your Honor.  We

24    were not trying to play games.  We aren't bankruptcy court

25    lawyers.  We're not regularly in front of the Bankruptcy

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-471  Filed 060625/299 Page 72 of 1017   PageID 18971
Exhibit 71  Page 260 of 299

259

```
 1   Court.  So the notion why didn't we come here first isn't
 2   exactly at the top of our mind.  The question for trial
 3   lawyers typically is, where can we file this, what are the
 4   permissible venues, not why don't we come to Bankruptcy Court?
 5   Especially when your order appears to say that causes of
 6   action that don't rise to the level of gross negligence or
 7   intentional wrongdoing are already foreclosed.
 8       Your Honor, the January order, I think I have to just
 9   briefly address again, even though I don't understand why it
10   makes a difference.  Apparently, counsel thinks it makes a
11   difference because Mr. Dondero apparently supported it in some
12   way.  Our position is, for whatever difference it makes, the
13   January versus the July, we don't believe there's anything in
14   the District Court complaint putting at issue Mr. Seery's role
15   as a director, so we don't understand how that order is
16   implicated.
17       Again, I'm not sure that matters at all.  I'm not raising
18   it as a defense.  I'm just telling Your Honor this is all
19   about the July order, from our perspective.  Certainly, the
20   July order puts his role as a CEO -- certainly, the District
21   Court case puts his role as a CEO at issue, and that's what
22   the July order is about.
23       Your Honor, the Applewood case requires specifics in order
24   to terminate our rights to sue and to bring certain causes of
25   action, and without that kind of specificity, Your Honor, we
```

HCMLPHMIT00002974

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-471   Filed 06/26/25299   Page 73 of 1017   PageID 18972

260

1  believe that that order fails to preclude, fails to have

2  preclusive effect as to these later-arising claims.  And we

3  would submit not only that it was not contemplated, but that

4  it was not intended to have that effect, and that even Mr.

5  Seery's testimony suggests that that's not how he understood

6  that order to be effective.

7      Counsel argued that the Barton Doctrine does apply here

8  and rattled off the names of cases that don't -- to my

9  knowledge, no case, no case that I can find deals with this

10  type of deferential order where someone is asked -- where a

11  court is asked to defer to the business judgment of an entity

12  in approving an appointment, and nonetheless deciding that the

13  Barton Doctrine applies.  That's not what *Villegas* holds.

14  That's not what *Espinosa* holds.  I don't think *Barton* is

15  applicable in a situation like that.  Certainly, it's outside

16  of the context of what *Barton* anticipated itself over a

17  century ago when it was decided.

18      Your Honor, if we're wrong, please know we're wrong in

19  earnest.  These are not games.  These are not sneakiness.  No

20  such motivation is at issue here.  I was hopeful that that

21  would be plain from the text of the motion for leave itself.

22  If it's not, I'd offer this in addition.  The docket at the

23  District Court shows that immediately upon filing the motion

24  for leave, a proposed order was filed with it asking to have

25  the proposed complaint deemed filed, which as soon as I saw I

017922

HCMLPHMIT00002975

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 18-471    Filed 06/20/25299    Page 74 of 1017    PageID 18973

261

1    asked us to immediately retract it and to substitute a new

2    proposed order that does not ask for the amended complaint to

3    be deemed filed.  That is not what we wanted.

4        And the fear was what if our motion is granted because the

5    District Court says you have the right, you don't even need

6    leave, but as to the Bankruptcy Court, you're on your own,

7    this is at your own risk, I'm not going to rule on any of the

8    jurisdictional questions that you attempt to raise?  We did

9    not want our complaint deemed filed for that reason.  What we

10    did want was for a court where we did not risk judicial

11    estoppel to decide whether or not our key claim under the

12    Advisers Act had been foreclosed by your July order, and that

13    was the key and motivating factor.

14        On top of that, Your Honor, instead of arguing the meaning

15    of the word pursue, let me just say this.  We understood

16    pursue in that context to refer to claims or causes of action,

17    not potential, unfiled, unasserted, contemplated claims or

18    causes of action.  That until a claim or cause of action is

19    actually asserted in some way, that it can't be pursued, and

20    that the reference here was to two kinds of action, those that

21    had not yet been commenced -- and your order foreclosed the

22    commencing of them without permission -- and those that had

23    been commenced.  And your order couldn't foreclose the

24    commencing of them because they hadn't been commenced yet, but

25    your order did foreclose pursuing them.

017923

HCMLPHMIT00002976

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-471   Filed 06/06/25   Page 75 of 1017   PageID 18974

262

1    And that was my reading of what that order said.  And it

2  fits with this notion that a claim or cause of action isn't

3  something you're considering or even researching.  It didn't

4  dawn on us that researching or talking to a client about a

5  potential claim could violate the order because in some

6  respect that conversation could be in pursuit of the claim.

7    By the same notion, we didn't think asking a court with

8  original jurisdiction according to Congress, asking a court to

9  decide whether or not we were foreclosed from bringing our

10  claims in a motion for leave was violating your order.

11    We don't have much else, Your Honor.  In terms of the need

12  to enforce compliance with your orders, if we understand them,

13  we sure as heck are going to follow them.  And if we've

14  misconstrued the term pursue, I'm certainly very sorry about

15  that.

16    I appreciate counsel saying he thinks we're probably good

17  people.  I did not think what we did was any kind of gross

18  error in judgment.  I thought that what we were doing was

19  preserving our clients' rights, going to a court of competent

20  jurisdiction, and asking the question, can we do what we think

21  we ought to be able to do, but is -- frankly, Your Honor,

22  we're a bit confused about because of the order that seems on

23  its face to foreclose the very lawsuit that we think we should

24  be bringing on behalf on this charitable organization that

25  foreclosed it months before the conduct at issue that gave

HCMLPHMIT00002977

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-41   Filed 06/06/25299   Page 76 of 1017   PageID 18975

263

1    rise to the complaint.  And with that conundrum, knowing what

2    to do was not obvious or easy for the lawyers or for the

3    client who was dependent on his lawyers to give him good,

4    sound advice.

5        I'm very grateful for you giving us the time and for your

6    very pointed questions.  Thank you, Your Honor.

7                THE COURT:  Thank you.  All right.  Who's next?

8                CLOSING ARGUMENT ON BEHALF OF MARK PATRICK

9                MR. ANDERSON:  May it please the Court, Michael

10   Anderson on behalf of Mr. Patrick, Mark Patrick.

11       You know, this is a contempt proceeding.  It's very

12   serious.  And, you know, my stomach aches for the people here.

13               THE COURT:  Mine does, too, by the way.

14               MR. ANDERSON:  It truly aches.

15               THE COURT:  Uh-huh.

16               MR. ANDERSON:  And I mean what I said when I did

17   opening, when I said we don't need a hearing, an evidentiary

18   hearing.  And I still don't believe we did, because it comes

19   down to what does the word pursue mean, because there's

20   already been an acknowledgement --

21               THE COURT:  Do you all want to withdraw all your

22   exhibits?  I've got a lot of exhibits that I now need to go

23   through.  If I admit them into evidence, I'm going to read

24   them.

25               MR. ANDERSON:  No, I understand.

HCMLPHMIT00002978

Case 19-34054-sgj11  Doc 4255-71  Filed 06/20/25  Entered 06/20/25 21:39:29  Desc
Case 3:25-cv-02072-S  Document 18-471  Filed 06/05/25  Page 77 of 1017  PageID 18976

264

1              THE COURT:  Uh-huh.

2              MR. ANDERSON:  But it does come down to the word

3    pursue.  Counsel has already said commence doesn't do it, and

4    so then it's pursue.

5          And I could ask Your Honor, what did you mean when you

6    said pursue in the July order, but I'm not going to say that.

7    And I asked my client on the stand, you know, did you pursue a

8    claim or cause of action?  And then it was very telling.  What

9    happened with counsel?  He stood up and objected to me even

10   asking if it was pursued.  And it dawned on me, if he's going

11   to object, does pursue have some sort of legal -- that was his

12   objection.  It was he objected on legal grounds.  Does that

13   have some sort of legal meaning?

14         This is contempt.  You can't be held in contempt unless it

15   is bright-line clear that you have deviated from a standard of

16   conduct and there's no ambiguity.  Well, clearly, there is

17   ambiguity, because over on this side of the room we say filing

18   a motion for leave can't be pursue.  We can look at the order

19   and we know it doesn't mean pursue because I just heard Your

20   Honor say you should have filed a motion for leave in this

21   Court before doing anything.  All right?  So if that -- if

22   that is what without the Bankruptcy Court first determining,

23   if that's what the motion for leave is, well, then if we go up

24   to the first sentence, No entity may commence or pursue a

25   claim or cause of action, then it has this, without the

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-471   Filed 06/06/25   Page 78 of 1017   PageID 18977

265

 1  Bankruptcy Court first determining, that means -- if pursue

 2  means a motion for leave, if that's what that means, then that

 3  order says you can't commence or file a motion for leave

 4  before you file a motion for leave.  Because that's what it

 5  means.  If pursue means motion for leave and you've said you

 6  should have come here and filed a motion for leave because it

 7  says, Debtor, without the Bankruptcy Court first determining

 8  that notice that such claim or cause of action represents a

 9  colorable claim, and specifically authorizing.  The vehicle to

10  do that would be a motion for leave, right?  And you can't

11  pursue anything until a motion for leave has been filed.

12       Now, where was the motion for leave?  And I understand,

13  Your Honor, you know, no expert at reading the room,

14  obviously, you're frustrated that the motion for leave was

15  filed in the District Court and not in this Court.  But it

16  doesn't change the fact, and neither did any of the evidence,

17  change anything, is what does pursue mean?

18       And if someone says, well, it's obviously clear it means

19  $x$, well, is it really obviously clear it means filing a motion

20  for leave?  Because nobody on my side, when you read it, when

21  you say pursue, can read it that way.  And if we're going to

22  have contempt sanctions being posed, and there has to be clear

23  and convincing evidence or beyond reasonable doubt, depending

24  upon, you know, I don't think you have to get to that part,

25  but clear --

HCMLPHMIT00002980

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-47   Filed 06/06/25   Page 79 of 1017   PageID 18978

266

1            THE COURT:  This is not criminal contempt.

2            MR. ANDERSON:  Clear and convincing is the civil

3    standard for contempt.

4            THE COURT:  Right.

5            MR. ANDERSON:  And if pursue is open to that much

6    interpretation, it's not the kind of thing that can be held in

7    contempt on.  And I understand the frustration.  I hear the

8    frustration.  I hear counsel talk about that was not their

9    intent when they filed it.  You know, I heard Mr. Patrick get

10   up there.  I heard counsel say, hey, Mr. Patrick's doing his

11   job, he's a good guy, seems like a good guy.  Well, Mr.

12   Patrick's up there.  Look, they filed the underlying lawsuit.

13   Nobody -- there's no motion for that in this Court about the

14   underlying lawsuit.  It's only about the motion for leave.

15   That's all we're here about.

16       And so you go to that, and we've heard all these arguments

17   about it, and we've been here almost as long as the motion for

18   leave was actually on file before it was sua sponte dismissed

19   without prejudice.

20       And so I go back to that and I say that, if pursue means

21   filing a motion for leave, then that order would require an

22   order for anyone to violate -- it would be violated upon the

23   filing of a motion for leave, because you can't pursue

24   something until the Bankruptcy Court has already first

25   determined, after notice, that such claim or cause of action

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 18-471   Filed 08/08/25   Page 80 of 1017    PageID 18979
Exhibit 71    Page 268 of 299

267

1   represents a colorable claim and specifically authorizing the

2   entity to bring such a claim.  Because that -- we already know

3   that's a motion for leave in and of itself.  Therefore,

4   pursue, just simply filing a motion for leave will put you in

5   that.

6       But that gets into all these -- we don't need to be having

7   this discussion about, you know, is a motion for leave pursue?

8   Is pursue a motion for leave?  I've heard both arguments here.

9   It doesn't justify contempt.  And I know -- and so certainly

10   with respect to my side, I, you know -- given that, I would

11   request that the Court deny the request for contempt.

12       And again, I want to say, too, look, we hear you.

13   Absolutely hear you.  Understand the frustration.  Totally

14   hear you on that.

15       I'm going to turn over the balance of my time to Mr.

16   Phillips, --

17             THE COURT:  Okay.

18             MR. ANDERSON:  -- unless you have any questions, Your

19   Honor.  I appreciate it.

20             THE COURT:  Okay.  I do not.

21              CLOSING ARGUMENT ON BEHALF OF MARK PATRICK

22             MR. PHILLIPS:  Your Honor, Louis M. Phillips, and

23   I'll be brief.  I'm going to try to bring it down to -- I was

24   not involved.  We are -- we are here because of the

25   indemnification provisions of CLO Holdco representing Mr.

017929

Case 19-34054-sgj11 Doc 4255-71 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02072-S Document 18-71 Filed 08/08/25 Page 81 of 1017 PageID 18980

268

1    Patrick individually.  My firm was not involved in the

2    litigation.  We were hired to represent CLO Holdco and some of

3    the defendants in the UCC litigation, and our role has

4    expanded to do some other stuff, particularly represent Mr.

5    Patrick because of the indemnification provisions of the

6    Holdco entity documents.  He's entitled to indemnification and

7    we're providing a defense for him.  That's why we're here.

8        So I come way after the order.  We have not been involved

9    in anything.  But I think I'm just going to try to distill

10   everything about the order and about the concern and about the

11   litigation, because the Court is asking about is this an end

12   run on the settlement?  The Court is also saying, all you had

13   to do was come here first.

14       But let's look.  We're here about one thing, the motion

15   for leave.  And as Mr. Anderson pointed out, the commence or

16   pursue a claim, according to the order, commence or pursue can

17   only occur after the Court has authorized the litigation.

18   Okay.  So that's what the order says.  You can't commence or

19   pursue.

20       Counsel for the Debtors says, well, it can't be after

21   commencement because you've already commenced the action.  So

22   pursue has to mean something before the commencement of the

23   action.  It would mean something before the commencement of

24   the action under this order.

25       But it doesn't mean something before the Court approves

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-71   Filed 07/08/25   Page 82 of 1017   PageID 18981

269

1   the commencement of the action, because commence or pursue

2   under this order does not occur before the Court has acted.

3   That's the language of the order.  It only occurs after the

4   Court has authorized it.  That's the context in which commence

5   or pursue exists, after this Court has authorized.

6       Okay.  So it can't be pursuit before the Court has

7   authorized without commencement because it only is triggered

8   by the Court's authorization of the action, which means,

9   before you commence it, actions in time take time, before you

10  commence the action, you have to pursue the action to commence

11  it.  But you can't do that until you've approved it.  All

12  right?

13      That's the temporal concern and why we say the motion for

14  leave can't be pursuit of an action under this order.  It

15  might be pursuit under another definition or another order.

16  In other words, maybe an order could be issued saying, you

17  can't file a motion for leave in any other court but this one.

18  I don't know whether it'd be a good order, but the order could

19  say that.  But when you say all you had to do was file a

20  motion for leave in this Court and everything would be okay,

21  no.  The motion for leave is not, under this order, pursuit.

22  Pursuit only occurs under this order after you've done

23  something, after Your Honor has done something.

24      So if a motion for leave is violative at the District

25  Court, the motion for leave would be violative here, because

017931

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-71   Filed 07/05/25   Page 83 of 1017   PageID 18982

270

1   it occurs before Your Honor has taken action.

2       Now, clearly, you want people to ask, but just as clearly,

3   and this was the point of my remarks earlier at the tail-end

4   of opening, just as clearly, I have a question, because

5   frankly, I understand what these guys are saying.  These guys

6   haven't really said it.  They're a little shame-faced at what

7   these guys are asking.  Because what these guys are asking is

8   whether or not an employee Seery, as the CRO -- and we heard,

9   oh, he bargained for it, he wouldn't have done it without

10  getting the order and the protections because -- did he

11  bargain for not having to comply with the Investor Advisory

12  Act?  Did he bargain for not having a fiduciary duty to third

13  parties?  Because the one thing that Mr. Bridges has been

14  trying to tell you is that, under this order, if it's

15  interpreted one way, you would never authorize a violation of

16  the Investment Advisory Act because it wouldn't necessarily be

17  gross negligence or willful misconduct.

18      In other words, in employing Seery, did the Debtor go out

19  in this disclosure statement and say, we are advisor to $1.2

20  billion of third-party money, and guess what, our CRO has no

21  fiduciary duty to you?  We have forestalled any claim under

22  the Investment Advisory Act in our employment order.  Did that

23  happen?

24      Because if that happened, I don't know if the Court was

25  really thinking that way, because that -- that can't happen in

HCMLPHMIT00002985

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-471   Filed 07/06/25   Page 84 of 1017   PageID 18983

271

1   a confirmation order before, under the Fifth Circuit

2   authority, after disclosure statement, plan, et cetera, et

3   cetera, because that's a third party release of claims that

4   may -- that haven't occurred yet.  You would be releasing

5   because you would be saying you have no right.  You have no

6   right.  This is not temporal.  This is saying you have no

7   right, if it's saying that, to bring an Investment Advisory --

8   Investment Advisory Act or a Breach of Fiduciary Duty Act

9   that's not gross negligence or willful misconduct forever upon

10   an employment order.

11       Now, if that's not what it means, then we have another

12   conundrum.  The other conundrum -- and I'm new to this, maybe

13   this has been thought out by everybody, but I don't think so.

14   The other conundrum is this order doesn't apply to actions

15   that don't involve willful -- gross negligence or willful

16   misconduct.  It only applies to those types of actions.  So,

17   frankly, I don't know what the order does.

18       I think the problem -- I probably shouldn't be the

19   purviewer of who ought to know because my standard's probably

20   really low, given my capacity here.  But I'm a guy off the

21   street.  Seery gets hired to run the Debtor.  Seery testifies

22   and he admits, we've got Investment Advisory  Act all over the

23   place.  We're making lots of fees out of administering all

24   this third-party money.  Do they know?  Do they know he's

25   immune?  Do the third parties know?

017933

HCMLPHMIT00002986

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 18-71    Filed 07/06/25    Page 85 of 1017    PageID 18984

272

1          Now, a standard about managing the Debtor?  Absolutely.

2     That's just pure D Chapter 11, pure D corporate, pure D

3     standard liability if you're operating an entity.  You're not

4     liable for gross negligence or willful misconduct.  You're

5     not.  And so any claim for damage to the Debtor or to the

6     estate by actions taken in the CRO capacity, absolutely.

7     Absolutely.  You don't want a bunch of yoyos suing, you did

8     something against the Debtor and the Debtor is now worth $147

9     less than it was because you did something, you were negligent

10    and you forgot to put the dog out.  No.  It's got to be gross

11    negligence or willful misconduct if you are talking about

12    running the Debtor and running the estate.

13          But that's not what we have here.  And you can ask all the

14    questions you want about whether the lawsuit's any good, but

15    that's not what's up before the Court.  What's up before the

16    Court is whether filing a motion for leave is contempt.  And

17    under this order, you're saying, all you had to do is come

18    here.  Well, in one reading of it, you'd have never got relief

19    because you can't bring the kind of action.  I foreclosed it

20    by employing Seery.  He no longer has a fiduciary duty and is

21    no longer bound by the Investment Advisory Act.  Case closed.

22    Get out of here.  Unless you can formulate something around so

23    that you can establish gross negligence or willful misconduct,

24    I've done away with all those causes of action.

25          I don't think that's what happened.  And if that's not

017934

HCMLPHMIT00002987

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-471   Filed 2/06/25299   Page 86 of 1017   PageID 18985

273

1    what happened, this doesn't apply because it shouldn't apply

2    to third-party actions.  It should apply to actions for damage

3    to the estate by creditors of the estate for whom Seery is

4    acting as CRO of the Debtor, who is the -- in possession of

5    the estate.  That makes perfect sense.  Perfect sense.  And

6    nobody would say that you shouldn't have sole authority to

7    determine whether a CRO who's acting for the estate and

8    damages the estate -- because that'd be a claim against the

9    estate.  That would be an administrative claim against the

10   estate.  That is just hornbook law.

11        That's the way I see this order.  And I admit I didn't

12   write it.  I admit I didn't submit it.  I admit I didn't

13   litigate it.  I admit I'm coming in late.  But sometimes maybe

14   a fresh pair of elderly, trifocal-assisted eyes doesn't hurt.

15   Because I will tell you, Judge, on one read this Court says

16   don't bother coming here because you don't have the kind of

17   claim that can be brought, even if you're a third party.  And

18   the only way that happens is if Seery's released from any

19   obligation under the Investment Advisory Act, and I think

20   everybody would like to know that.  And he can't be sued for

21   breach of fiduciary duty to third parties that he admits he

22   owes.  I think people would like to know that.

23        And if it doesn't, then this is not -- this order is not

24   about that.  But the fact -- I've been at this 40 years, and I

25   usually don't want to talk about myself.  There's really not a

017935

HCMLPHMIT00002988

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 18-71    Filed 08/05/25    Page 87 of 1017    PageID 18986

274

1   lot to talk about.  But I hear Mr. Morris how he's never done

2   this, he's never done that.  I hear this, I'm a good -- you

3   know, whatever.  I'm confused.  I've been doing this 41 years.

4   Bankruptcy, 39.7.  I must be crazy, but that's what I've been

5   doing.  And I'm confused because I don't even know if they

6   needed to come here.  I don't even know if, had they come

7   here, if they could have even presented an action for gross --

8   for negligence or breach of fiduciary duty, could have --

9   gross negligence or willful misconduct?  I don't know whether

10  this order just applies to Seery's duties as CRO vis-a-vis

11  creditors of the estate and property of the estate and damage

12  to the estate.  Because that's not what we're dealing with

13  here.

14      The point is, Judge, this is contempt.  And I understand

15  Your Honor knows all about contempt.  Your Honor knows about

16  *Matter of Hipp*.  Your Honor knows about civil contempt

17  authorization for bankruptcy courts.  Your Honor knows that

18  you can't operate without the right to impose civil contempt

19  sanctions.  And Your Honor knows, and I agree with Your Honor,

20  that civil contempt is both remedial and coercive.

21      But how do you coerce around my questions?  Maybe I am all

22  wet, but if I am, I don't think I am, and I don't understand

23  that I am, and that's why I'm concerned about going off into

24  this contempt wilderness and millions in fees, when the motion

25  for leave was dismissed and when the lawsuit doesn't ask for

017936

HCMLPHMIT00002989

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-471   Filed 07/06/25   Page 88 of 1017   PageID 18987

275

1  or includes most of its claims.  I don't even -- I have not

2  studied the lawsuit.  I wasn't involved in it.  But if it's a

3  breach of fiduciary duty and Advisory Act and it says what

4  you've been told it says, that he should have pulled up

5  different stuff, that the valuation metrics were different,

6  that he shouldn't have used it, I don't know that they're

7  saying fraud.  I don't know that they're saying he knew he was

8  doing -- I think they're saying he breached the Investment

9  Advisory Act.  And that's not gross negligence or willful

10  misconduct.  Then does this order apply or this order -- does

11  this order foreclose that?

12     The fact is, I think we could have decided this on the

13  pleadings and on the order.  We didn't.  The fact that Mr.

14  Dondero did A, B, C.  And I will tell you this.  Mr. Patrick

15  has stood up.  He's going to get a harpoon, he's going to get

16  a harpoon, subject to his right to appeal.  But he has told

17  this Court.  We represent him.  We're not trying to get him

18  out of having authorized the order.  It's very important for

19  this Court to understand.  Mr. Patrick is one of these

20  entities.  Mr. Dondero can holler and scream all he wants to.

21  Mr. -- and look, did he terminate Grant Scott?  If I'm Grant

22  Scott, and this is my best friend and I was in his wedding and

23  I was his roommate and I was his best friend and I'm doing

24  this stuff for $5,000 and I do something and $5,000 a month

25  and I do something and I get hollered at and I've got a full a

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-71   Filed 07/06/25   Page 89 of 1017   PageID 18988
Exhibit 71   Page 276 of 299

276

1 │ law practice, I'm an IP lawyer, why don't I just tell him to

2 │ go jump in a lake, which is the other way you could look at

3 │ Grant Scott leaving.  I want you to jump in a lake.  I'm out

4 │ of here.  I don't need this.

5 │     Thank you.

6 │             THE COURT:  All right.  Thank you.

7 │             MR. DEMO:  Your Honor, how much time do they have

8 │ left, --

9 │             THE COURT:  Um, --

10 │            MR. DEMO:  -- to be honest?

11 │            THE COURT:  Nate, are you -- 26 minutes?  All right.

12 │            MR. TAYLOR:  I'll go way under, Your Honor.

13 │            THE COURT:  Okay.

14 │             CLOSING ARGUMENT ON BEHALF OF JAMES DONDERO

15 │            MR. TAYLOR:  Your Honor, Clay Taylor.  I'm here on

16 │ behalf of Mr. Dondero.  He was named as an individual alleged

17 │ violator within the order.

18 │            THE COURT:  Okay.  I'm getting lawyers mixed up.  Mr.

19 │ Anderson, who did you represent?

20 │            MR. ANDERSON:  Mr. Patrick.  Mr. Phillips and I

21 │ represent --

22 │            THE COURT:  You're Mr. Patrick?

23 │            MR. PHILLIPS:  We're Mr. Patrick.

24 │            THE COURT:  You're both --

25 │            MR. PHILLIPS:  Mr. Patrick.

HCMLPHMIT00002991

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 18-471    Filed 02/06/25    Page 90 of 1017    PageID 18989

277

```
 1              THE COURT:  Okay.  I'm sorry.  I'm getting my Fort
 2   Worth law firms mixed up.  Okay.
 3              MR. TAYLOR:  That's quite all right.  Clay Taylor
 4   from Bonds Ellis here on behalf of Mr. Dondero.  And we're
 5   here because he was named in the alleged violator motion
 6   within the order as an alleged violator.  We don't think that
 7   he is, for the reasons that we're about to explain, but we
 8   were ordered to appear --
 9              A VOICE:  No.
10              MR. TAYLOR:  -- and so therefore we are appearing and
11   telling you why we're not an alleged violator.
12         First of all, for all the reasons that Mr. Sbaiti and Mr.
13   Bridges and Mr. Phillips and Mr. Anderson said, the court
14   order was in effect.  We agree with that.  It required certain
15   conduct to be done.  Yes, it did.  It said you couldn't
16   commence something.  It said you couldn't pursue it.  I think
17   we have gone through what the pursuit and commence.  Nobody is
18   arguing that anything was commenced.  It comes down to
19   pursuit.
20         But let's talk about what the evidence shows about Mr.
21   Dondero.  It shows that Mr. Dondero believes that there have
22   been breaches of fiduciary duty.  He thinks that there has
23   been negligence committed.  He believes that actions should be
24   taken.  We don't run away from that.  He, frankly, told you
25   that.
```

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-471   Filed 08/08/25   Page 91 of 1017   PageID 18990

278

 1      But here, he didn't take any action to pursue it.  The DAF

 2  did.  CLO Holdco did.  It's undisputed that he's not an

 3  officer, director, or control person for either of those

 4  entities.  The act we're here on is a motion for leave to file

 5  an amended complaint to include Mr. Seery.  That's -- Mr.

 6  Dondero didn't take any of those acts.  He believes it should

 7  have been done, but he's not the authorizing person.

 8      He might have -- let's just pretend that he thought he was

 9  authorizing something.  It doesn't matter that he thought he

10  could authorize something or that he was trying to push for

11  it.  The fact remains he can't authorize it.  You know, he can

12  say, I declare war on Afghanistan.  Well, he can't.  Congress

13  can't.  He can write a letter to his Congressman.  He already

14  wrote a letter to his Congressman.  He talked.  He talked with

15  the head of the acting CLO -- CLO Holdco and he said, I think

16  there's something wrong here.  I think you should be looking

17  into it.  You know what, he goes, you might be right.  Go talk

18  with Mazin about it.  Give him some data.  Conduct an

19  investigation.  They did.  And then they went to the

20  authorizing person and they filed a motion for leave to

21  include Mr. Seery.  Mr. Dondero did nothing wrong in that.

22      Now, there is some personal animosity.  I think that Your

23  Honor has probably seen there seems to be some personal

24  animosity between Mr. Seery and Mr. Dondero, and that's

25  unfortunate.  But just because there's some personal animosity

HCMLPHMIT00002993

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-471   Filed 08/06/25   Page 92 of 1017   PageID 18991

279

1  doesn't mean that maybe something wasn't done wrong.  Maybe

2  that Mr. Dondero -- he's certainly allowed to at least tell

3  people, well, I think there was something done wrong.  And if

4  there is an action to be had, then those appropriate entities

5  can take it.  But he didn't do those things.

6      And so even if he says, just like Michael Scott, "I

7  declare bankruptcy," it doesn't matter.  You have to take the

8  certain actions.

9          THE COURT:  I got it.  I don't know if everyone did.

10          MR. TAYLOR:  Yes, well, yeah, you have to be a *The*

11  *Office* fan.

12      But so that's where we stand.  And for all the reasons the

13  prior people have discussed, I don't think that there was any

14  violation of this Court's order.  But even if there was, Mr.

15  Dondero in this situation was not the one.  We're going to

16  have to deal with the other order that came out yesterday in

17  due course, but for this discrete issue that is before this

18  Court today, Mr. Dondero didn't violate anything.

19      Thank you.

20          THE COURT:  All right.  Mr. Morris, you get the last

21  word.

22      REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23          MR. MORRIS:  Thank you, Your Honor.  These are going

24  to be discrete points because it's truly rebuttal.  I'm going

25  to try to respond to certain points.

017941

HCMLPHMIT00002994

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-471   Filed 06/05/25   Page 93 of 1017   PageID 18992

280

1       Mr. Bridges and Mr. Phillips made extensive arguments

2   about why they believe the order is wrong, why it's

3   overreaching.  They tried to get into your head to think about

4   what you intended or what you thought.  The fact of the matter

5   is, the answer to all of those questions -- first of all, none

6   of it's relevant to this motion because we've got the order --

7   but the answer is very simple.  Forget about coming here to

8   seek leave to amend to add Mr. Seery.  We can avoid Mr.

9   Sbaiti's concerns about judicial estoppel or something.  Why

10  didn't they just file the motion for reconsideration?  They

11  filed that after they filed the motion for leave to amend,

12  after we filed the motion for contempt.  Only then did they

13  file the motion for reconsideration.

14      Now, we think it's ill-thought-out.  We think it's

15  problematic.  Probably not today, is my guess, we'll argue to

16  you as to why we think that motion ought to be denied.  But if

17  they truly believed that the order was infirm in any way,

18  wouldn't the proper thing to have been to come here and tell

19  you that?  Wouldn't the proper thing to be to come to the

20  court that issued the order that you have a problem with and

21  ask the court to review it again?  And if Your Honor overruled

22  the motion, to appeal it.

23      Why are we even doing this?  Why did they do it?  It's not

24  we.  Why did they do it?  Right?  And that solves almost

25  everything they've said.  That's point one.

HCMLPHMIT00002995

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-471   Filed 06/26/25   Page 94 of 1017   PageID 18993

281

1       Point two, the January order.  The January order is very

2   important.  It's important not just because it applies to

3   directors, but it's important because Mr. Dondero agreed to

4   it, and it also applies -- I want to get it -- Paragraph 10.

5   It's Exhibit 15.  It applies to the independent directors and

6   the independents directors' agents.  If a CEO is not an agent

7   of an independent director, I'm not sure what is.  The

8   independent directors are the body that appointed the CEO.

9   The CEO, Mr. Seery, is acting on behalf of the board.  This is

10  the order that Mr. Dondero agreed to.  It's the order -- take

11  out the word independent director; put in Mr. Seery -- it's

12  the order everybody's complaining about.  But even the January

13  order certainly applied to Mr. Seery.  That's point two.

14      Point three.  I've heard a lot of concerns about the

15  slippery slope and what does pursuit mean and does talking to

16  a lawyer mean pursuit and doing an investigation being

17  pursuit.  I don't know, Your Honor, and I don't care, because

18  that's not what we're here to talk about.  We're here to talk

19  about a specific act -- not a hypothetical, not a slippery

20  slope.  We're talking about the filing of a motion for leave

21  to amend a complaint to add Mr. Seery as a defendant.  That's

22  all we're talking about.  So, you know, the rest of it, it's

23  just noise.  And the only question is whether, and I think

24  it's pretty clear, that means pursuit.

25      Another version on the theme of was there any alternative

017943

HCMLPHMIT00002996

Case 19-34054-sgj11  Doc 4255-71  Filed 06/20/25  Entered 06/20/25 21:39:29  Desc
Case 3:25-cv-02072-S  Document 18-471  Filed 08/08/25  Page 95 of 1017  PageID 18994

282

1    to filing the motion in the District Court, I think there was.

2    The Sbaiti firm did file that suit against Acis in New York.

3    And if Your Honor checks the docket in the Acis bankruptcy, I

4    think you'll find that there's a motion from Mr. Rukavina, for

5    a comfort order, basically, saying that -- asking the court to

6    declare that the filing of the complaint in New York against

7    Acis didn't violate the plan injunction.  I think I have that

8    right.

9         But I point that out, Your Honor -- it's not evidence in

10   the record, but the Court can certainly take judicial notice

11   of what's on its docket -- I point that out because there's

12   another example of a lawyer who is very active in this case

13   who actually -- now, he already commenced the suit, so he did

14   -- they did both simultaneously, so I don't want to suggest

15   that that's the perfect thing to have done, but at least he's

16   here asking for -- he's bringing it to your attention, he's

17   telling you it's happened, he's asking for a comfort order,

18   and someday Your Honor may rule on it.  I don't know.

19        Number six, what's with the pursuit of Mr. Seery?  What is

20   with the pursuit of Mr. Seery?  Is there any doubt in

21   anybody's mind that the Debtor is going to have to indemnify

22   Mr. Seery and will bring in another law firm?  And while I

23   don't think it will ever happen in a hundred billion years, if

24   there is a judgment against Mr. Seery, isn't that going to be

25   the Debtor's responsibility?  Why are they even bothering to

HCMLPHMIT00002997

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-71   Filed 08/06/25   Page 96 of 1017   PageID 18995

283

1   do this?  I think it's a fair question for the Court to ask.

2       I think Mr. Taylor came up and talked about animosity.

3   How do you explain going after Jim Seery?  How do you do it?

4   He's going to be indemnified.  It's in -- it's in like three

5   different orders.  It's in the confirmation order.  It's in

6   the CEO order.  It's -- it's probably as a matter of law.

7   It's in the Strand partnership agreement.  It's -- he's been

8   indemnified like 12 different times.  What is the purpose,

9   other than to make Mr. Seery's life miserable?  There is none.

10  You'll never hear a rational explanation for why they're doing

11  this.

12          THE COURT:  Just so you know, I've not looked at any

13  of the pleadings in the District Court --

14          MR. MORRIS:  And I'm not asking you to.

15          THE COURT:  -- other than what has been presented to

16  me today.

17          MR. MORRIS:  Yeah.  That's fine, Your Honor.

18          THE COURT:  But I'm very flipped out about the causes

19  of action against the Debtor, --

20          MR. MORRIS:  Yeah.

21          THE COURT:   -- who hasn't reached an effective date.

22          MR. MORRIS:  Well, --

23          THE COURT:  And I'm most interested to know what the

24  defenses, motions --

25          MR. MORRIS:  We'll get to that.

017945

HCMLPHMIT00002998

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S     Document 18-471   Filed 08/26/25   Page 97 of 1017     PageID 18996
Exhibit 71   Page 285 of 299

284

1             THE COURT:  -- are going to be raised in that regard.

2             MR. MORRIS:  We will get to that in due course.

3        I do want to point out, just to be clear, because we keep

4    hearing that they learned about, you know, all of these

5    horrible things after the fact.  In the complaint, which I

6    think is Exhibit 12, --

7             THE COURT:  I'm there.

8             MR. MORRIS:  -- at Paragraph 127, the Plaintiffs

9    allege, "Mr. Seery was informed in late December 2020 at an

10   in-person meeting in Dallas, to which Mr. Seery had to fly,

11   that HCO" -- excuse me "HCLF and HCM had to suspend trading in

12   MGM Studios' securities because Seery had learned from James

13   Dondero, who was on the board, of a potential purchase of the

14   company.  The news of the MGM purchase should have caused

15   Seery to revalue."

16       I cannot begin to tell you the problems with that

17   paragraph.  We're not going to discuss them today.  I made a

18   promise to these folks that we wouldn't get into the merits of

19   the complaint.  But Your Honor was onto something before, and

20   those issues, you know, may see the light of day one day.  And

21   if they do, folks are going to have to deal with it.  But I

22   will point out that at the time the communication was made,

23   the other TRO was in effect.  We didn't bring that one to the

24   Court's attention.  But the important point there, Your Honor,

25   is December 2020.  It is December 2020.  That is the

1   allegation that's being made against Mr. Seery.  And the fact

2   of the matter is, because I've done the research myself, the

3   Court will find that on December 23rd, the day the HarbourVest

4   settlement motion was filed, it was fully public knowledge

5   that Amazon and Apple, I think, had shut down negotiations

6   with MGM at that time.  Right?  So the big secret information,

7   it was in the public domain on December 23rd.

8        There will also never be any evidence ever that Mr. Seery

9   got on a plane and flew to Dallas in December 2020, but that's

10   a minor point.

11        I'd like to just conclude, Your Honor, by saying I've

12   heard pleas that they understand.  They understand, Your

13   Honor, now they understand.  It would be good if they promised

14   the Court that they won't seek to assert claims against Mr.

15   Seery anywhere but in this Court and comply with the order as

16   it's written.  That, that, that would be taking a little bit

17   of responsibility.

18        I have nothing further, Your Honor.

19             THE COURT:  Okay.  Thank you.

20        All right.  Let me give you some clue of when I'm going to

21   be able to rule.  I've been glancing at my email in hopes that

22   something set tomorrow would go away, but that's not

23   happening.  I've got a hearing that I've been told will take

24   all day tomorrow on a case involving a half-built hotel,

25   luxury hotel in Palm Springs, California.  So I have to spend

HCMLPHMIT00003000

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 18-71   Filed 08/06/25   Page 99 of 1017   PageID 18998

286

1    the next I don't know how long getting ready for that hearing

2    tomorrow, and then I have what looks like a full day of

3    hearings Thursday, including you people coming back on

4    something.

5              MR. POMERANTZ:  Your Honor, I was going to address

6    that.  We have Dugaboy's motion to enforce compliance on the

7    2015(3) reports.

8              THE COURT:  That's what it was.

9              MR. POMERANTZ:  Since we haven't gotten to the motion

10   to modify the Seery order, my suggestion would be we use that

11   time -- of course, Dugaboy, I'm not sure if they're on the

12   phone.  They're not here.  I'm not sure that's time sensitive.

13   But if Your Honor wanted to have a hearing on that motion,

14   which was contemplated to take place today, the Debtor would

15   be okay having that motion heard on Thursday, perhaps by

16   WebEx, unless Your Honor wants us to stay here, which we would

17   if you do, and then reschedule the 2015(3) motion.

18        But again, that wasn't my motion.  It's Dugaboy's.  I'm

19   not sure Mr. Draper is on.  But we obviously have some

20   calendar issues.

21             MR. MORRIS:  And Your Honor, just to complete it, I

22   think also on Thursday the Court is supposed to hear HCRE and

23   Highland Capital Management Services motions for leave to

24   amend their complaint in the promissory note litigation

25   against each of them.  I think that's also on the calendar for

017948

HCMLPHMIT00003001

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 51-4 1   Filed 08/08/25   Page 100 of 1017    PageID 18999

287

 1   Thursday.  I don't expect that -- I hope that doesn't take

 2   very long, but that's also, I believe, on the calendar.

 3           THE COURT:  Okay.  Mr. Draper, are you out there?

 4           MR. PHILLIPS:  I didn't see him on the list, Your

 5   Honor.  I was just looking.  But --

 6           THE COURT:  Okay.  All right.  Well, --

 7           MR. PHILLIPS:  What is the question?  I can send him

 8   a text real quick.

 9           THE COURT:  Well, just have -- if you all could

10   follow up with Traci Ellison, my courtroom deputy, tomorrow, I

11   am perfectly happy to continue the motion to modify the Seery

12   order to Thursday morning at 9:30 if Draper is willing to

13   continue the 2015 motion.

14           MR. POMERANTZ:  I know, if I was him, my first

15   question would be is what times does the Court have available?

16   We could work that through Ms. Ellison.

17           THE COURT:  Yes.  And I'm just letting you know --

18   talk to her.  Okay.  Number one, I'll do these by video, okay?

19   WebEx.  But I know I don't have any time Wednesday, and

20   Thursday's a busy day.

21       We have court Friday morning at 9:30 in--?

22           THE CLERK:  Cici's Pizza.

23           THE COURT:  Cici's Pizza?  That's not going to take

24   very long, right?

25           THE CLERK:  I don't think so.

|    |                                                              |
|----|--------------------------------------------------------------|
|  1 | THE COURT:  I can potentially do something, you know,        |
|  2 | 10:00 o'clock Friday morning.  Other than that, then you've  |
|  3 | got to wait a while, because I have a seven-day trial, live  |
|  4 | human beings in the courtroom starting next Monday.  And so my |
|  5 | point is mainly to tell you, as much as I would like to rule |
|  6 | very, very fast, it's going to be, it looks like, a couple of |
|  7 | weeks or so before I can give you a ruling on this.          |
|  8 | MR. BRIDGES:  Your Honor?                                     |
|  9 | THE COURT:  Yes?                                              |
| 10 | MR. BRIDGES:  May I?  It's our motion.  I would              |
| 11 | propose, if counsel would agree, that we just submit it on the |
| 12 | papers.                                                       |
| 13 | THE COURT:  Everybody good with that?  I'm certainly        |
| 14 | good with that.                                               |
| 15 | MR. POMERANTZ:  Your Honor, I'd like there to be            |
| 16 | argument.  I have a lengthy argument.  I think I'd like to    |
| 17 | address a number of the things that -- Mr. Bridges made his  |
| 18 | argument today.  Okay?                                        |
| 19 | THE COURT:  Okay.                                             |
| 20 | MR. POMERANTZ:  His deck, it was entitled, Motion to        |
| 21 | Modify.                                                       |
| 22 | THE COURT:  Okay.                                             |
| 23 | MR. POMERANTZ:  So that's very nice of him, but I           |
| 24 | would like to make my argument.                               |
| 25 | THE COURT:  Okay.  Let's try to nail this down right        |

HCMLPHMIT00003003

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24-71   Filed 09/06/25   Page 102 of 1017   PageID 19001

289

1    now.  Friday at 10:00 o'clock, can we do the oral argument

2    WebEx?

3              MR. POMERANTZ:  On that one, yes, Your Honor.

4              THE COURT:  On that one?  Everybody good?  Okay.  So

5    we'll come back Friday, 10:00 o'clock, WebEx, for that motion.

6        You know, I'm going to say a couple of things where --

7    I've leaned toward thinking this is a pretty simple motion

8    before me, the motion for contempt, but when people offer into

9    evidence documents, I read your documents.  Okay?  That's my

10   duty.  And so I have however many exhibits I admitted today

11   that I am going to look at and see how they sway me one way or

12   another on this issue.  But I will tell you that my gut is

13   there has been contempt of court.  Okay?  I don't see anything

14   ambiguous at all about Paragraph 5 of my July 16th, 2020

15   order.  Somebody may think I overreached, but if that was the

16   case, someone should have argued at the time I was

17   overreaching.  Someone should have appealed the order.  And I

18   think it's a *Shoaf*/*Espinosa* problem at this point for anyone

19   to argue about the enforceability of that order.

20       I think there's nothing ambiguous in the wording.  Pursue

21   is not ambiguous.  There's nothing confusing about the

22   requirement that any entity who wanted to sue or pursue a

23   claim, you know, commence claim, pursue a claim against Mr.

24   Seery, had to come to the Bankruptcy Court.  Standard-fare

25   gatekeeping order.

017951

HCMLPHMIT00003004

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 54-71 Filed 06/26/25    Page 103 of 1017    PageID 19002

290

1    So what I'm going to be looking at is, do these documents

2    I admitted into evidence change my view on that, and then the

3    harder question is who of the alleged contemnors am I going to

4    think it's clear and convincing committed contempt and -- who

5    are the contemnors, and then, of course, what are the damages?

6    Coercive or compensatory damages?

7    So, again, you know how I feel, to the extent that's

8    helpful in your planning purposes.  I'm pretty convinced

9    contempt of court has occurred.  It's just a matter of who's a

10    contemnor and what are the damages.

11    I'll say a couple of remaining things.  I continue to be

12    frustrated, I think was the word people used, about

13    unproductive ways we all spend our time.  I am going to spend

14    I don't know how many more hours drafting another ruling on a

15    contempt motion, and attorneys' fees are through the roof.

16    And, you know, I dangled out there a question I couldn't

17    resist about MGM.

18    And I will tell you, I mean, someone mentioned about their

19    stomach aching.  Personal story, I could hardly sleep the

20    night it became public about the Amazon purchase, because,

21    silly me, maybe, I'm thinking game-changer.  This is such

22    potentially a windfall, an economic windfall.  Maybe this

23    could be the impetus to make everyone get in a room and say

24    look, we've got this wonderful windfall of money.  I don't

25    know how much is owned directly or indirectly by the Debtor of

017952

HCMLPHMIT00003005

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 34-71 Filed 09/02/25    Page 104 of 1017    PageID 19003

291

1   MGM stock.  I don't know how much the Debtor  manages.  I

2   don't know how much, you know, some other entity.  I know it's

3   probably spread out in many different entities.  But I know, I

4   know because I listen, that one or more of the Highland-

5   managed CLOs has some of this, and I think I read -- remember

6   that HCLOF, which now Highland owns more than 50 percent of,

7   has some of this stock.  Right?

8          MR. DONDERO:  Do you want to know what happened?

9          THE COURT:  Oh.

10          A VOICE:  No.

11          THE COURT:  Well, okay.  So, you know, I can

12   understand I'm getting into maybe uncomfortable territory in a

13   public proceeding, so I'll stop.

14     But, you know, do we need to set up a status conference?

15   Do you all need to like talk about this?  Am I just being

16   naïve?  Couldn't this be a game-changer, where maybe it would

17   give new incentive to --

18          MR. POMERANTZ:  Your Honor, I would -- he's been

19   pretty quiet through the whole hearing, Mr. Clemente.  He has

20   the Committee, that a couple of people you've heard have sold

21   claims.  They're now held by other parties.

22     You know, the door is always open.  I don't think this is

23   going to be game-changer, unfortunately.  We would like

24   nothing more, as Debtor's counsel.  We don't enjoy coming to

25   Your Honor for contempt hearings.

017953

HCMLPHMIT00003006

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 34-71    Filed 09/03/25    Page 105 of 1017    PageID 19004

292

1        Mr. Clemente said that it was productive.  We would sure

2   participate.  But right now, we have creditors who are very

3   angry that millions and millions of dollars have been spent on

4   really a waste of time and a waste of the Court's time and a

5   waste of everyone's time and eating into the creditors' money.

6   So I would ask Mr. Clemente to address that.

7           MR. CLEMENTE:  I'm here.

8           THE COURT:  Yes, he's way in the back, hoping to be

9   ignored.

10          MR. CLEMENTE:  It's too cold, Your Honor, where I was

11  sitting.  For the record, Your Honor, --

12          THE COURT:  I noticed some entity called Muck

13  Holdings bought HarbourVest, according to the docket.

14          MR. CLEMENTE:  That's correct.  Muck Holdings bought

15  HarbourVest, and I believe also the Acis claim, and then

16  there's a different entity that bought the Redeemer claim.

17          THE COURT:  Uh-huh.

18          MR. CLEMENTE:  So, as we mentioned in our -- one of

19  our pleadings, I think it was the retention pleading for

20  Teneo, the Committee consists of two members currently, Meta-e

21  and UBS.

22          THE COURT:  Uh-huh.

23          MR. CLEMENTE:  Obviously, Your Honor just approved

24  the UBS settlement recently.  The U.S. Trustee is aware of the

25  make-up of the Committee, and is currently comfortable with

HCMLPHMIT00003007

Case 19-34054-sgj11 Doc 4255-71 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02072-S Document 24-71 Filed 09/04/25 Page 106 of 1017 PageID 19005

293

1    the Committee maintaining a two-person membership at this

2    point.

3        In terms of whether the MGM transaction is a game-changer,

4    we've not yet seen, to Your Honor's point, how all of that

5    rolls up through the various interests that the Debtor may or

6    -- you know, may have --

7             THE COURT:  Okay.

8             MR. CLEMENTE:  -- that would be implicated by the MGM

9    transaction.  If ultimately the MGM transaction has to

10   actually occur, right?  I mean, so, you know, just based on

11   what I read in the public documents, we're not sure when that

12   transaction may actually happen.  But obviously it's a good

13   thing for the Debtor's estate because it's going to recognize

14   value for the estate.

15       In terms of whether it ultimately changes how Mr. Dondero,

16   you know, wishes to proceed, that's entirely up to him, Your

17   Honor.  But we don't see it as something at this point that

18   would suggest that there's an overall back to let's talk about

19   a pot plan because of where the MGM transaction might

20   ultimately come out.

21       So I don't know if that's helpful to Your Honor, but those

22   are -- that's my perspective.

23            THE COURT:  Well, and I'm not trying to, you know,

24   push a pot plan on anyone.

25            MR. CLEMENTE:  No, I understand.

017955

HCMLPHMIT00003008

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 24-71 Filed 09/05/25 Page 107 of 1017   PageID 19006
Exhibit 71 Page 295 of 299

294

```
 1              THE COURT:  I'm just saying it looked like an
 2    economic windfall.  I just -- I don't know how much is
 3    Highland versus other entities in the so-called byzantine
 4    complex, but, gosh, I just hoped that there might be something
 5    there to change the dynamic of, you know, lawsuit, lawsuit,
 6    lawsuit, lawsuit, motion for contempt, motion for contempt.
 7              MR. CLEMENTE:  Agreed, Your Honor.
 8              THE COURT:  Uh-huh.
 9              MR. CLEMENTE:  And like I said, it was a very
10    positive development obviously for the creditors for the
11    Debtor.  But whether it's the game-changer that Your Honor
12    would envision, I'm not sure that I can suggest at this point
13    that it is.
14        I think that, you know, obviously, we don't like to see
15    these lawsuits continue to be filed.  That's the whole point
16    of the gatekeeper order, Your Honor.
17              THE COURT:  Uh-huh.
18              MR. CLEMENTE:  I didn't say anything during the
19    hearing, but obviously the January 9th order, as Your Honor
20    has said many times, was in the context of a trustee being
21    appointed.
22              THE COURT:  Right.  Right.
23              MR. CLEMENTE:  Right?  So, and the July 16th order,
24    very similar vein, it's an outshoot of that.  In fact, it was
25    contemplated in the January 9th settlement that a CEO could be
```

017956

HCMLPHMIT00003009

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 55-1   Filed 06/26/25   Page 108 of 1017    PageID 19007
Exhibit 71   Page 296 of 299

295

1    appointed.

2        So I think, again, it's just -- it's important, the

3    context in which that January 9th order came into play, for

4    this very reason, so we could avoid this type of litigation,

5    Your Honor.

6            THE COURT:  Uh-huh.

7            MR. CLEMENTE:  And so again, I didn't -- I obviously

8    didn't rise to mention that during the hearing, but Your Honor

9    is already aware of that.  I didn't need to remind Your Honor

10   of that.

11           THE COURT:  Uh-huh.  Okay.

12           MR. CLEMENTE:  Anything else for me, Your Honor?

13           THE COURT:  No.  Thank you.

14           MR. CLEMENTE:  Okay, then, Your Honor.

15           THE COURT:  Sorry I picked on you.  But, all right.

16   Well, again, I hope the message has landed in the way I hope

17   will matter, and that is I'm going to look at your documents

18   but I feel very strongly that, unless there's something in

19   there that, whoa, is somehow eye-opening, I'm going to find

20   contempt of court.  It's just a matter of who and what the

21   damages are.  There's just not a thing in the world ambiguous

22   about Paragraph 5 of the July 9th, 2020 order.  So I'll get to

23   it as soon as we humanly can get to it.

24       Mr. Morris, anything else?

25           MR. MORRIS:  Nothing.  No, thank you.

017957

HCMLPHMIT00003010

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 34-71 Filed 06/20/25   Page 109 of 1017   PageID 19008
Exhibit 71   Page 297 of 299

296

1          THE COURT:  I guess I'll see you Thursday on the

2     WebEx.  Thank you.

3          THE CLERK:  All rise.

4       (Proceedings concluded at 6:00 p.m.)

5                          --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                       CERTIFICATE

21     I certify that the foregoing is a correct transcript from
      the electronic sound recording of the proceedings in the
22    above-entitled matter.

23     **/s/ Kathy Rehling**                      **06/09/2021**

24    _____     _____

      Kathy Rehling, CETD-444                     Date
25    Certified Electronic Court Transcriber

017958

HCMLPHMIT00003011

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24-71 Filed 08/28/25   Page 110 of 1017   PageID 19009

297

INDEX

PROCEEDINGS                                                     4

OPENING STATEMENTS (Show Cause)
- Mr. Morris                                                    21
- Mr. Sbaiti                                                    31
- Mr. Bridges                                                   52
- Mr. Anderson                                                  80
- Mr. Phillips                                                  83
- By Mr. Taylor                                                 87
- By Mr. Pomerantz                                              88

WITNESSES

Debtor's Witnesses

Mark Patrick
- Direct Examination by Mr. Morris                             95
- Cross-Examination by Mr. Anderson                           132
- Cross-Examination by Mr. Sbaiti                             135
- Redirect Examination by Mr. Morris                          137
- Examination by the Court                                    138
- Recross-Examination by Mr. Sbaiti                           142
- Recross-Examination by Mr. Phillips                         143
- Further Redirect Examination by Mr. Morris                  144

James D. Dondero
- Direct Examination by Mr. Morris                            147
- Voir Dire Examination by Mr. Sbaiti                         184
- Direct Examination (Resumed) by Mr. Morris                  199
- Cross-Examination by Mr. Taylor                             210

EXHIBITS

Debtor's Exhibits 1 through 11                Withdrawn 215
Debtor's Exhibits 12 through 53               Received 216
Debtor's Exhibits 15 and 16                   Received 214
Debtor's Exhibits 23 and 24                   Received 213
Debtor's Exhibits 54 and 55                   Received 217

Mark Patrick's Exhibits 1, 3 through 12,       Received 218
15 through 28, and 30 through 44

Mark Patrick's Exhibits 45 and 46              Received 219

017959

298

INDEX
Page 2

CLOSING ARGUMENTS

- Mr. Morris                                              221
- Mr. Sbaiti                                              230
- Mr. Bridges                                             255
- Mr. Anderson                                            263
- Mr. Phillips                                            267
- Mr. Taylor                                              276
- Mr. Morris                                              279

RULINGS

Motion for Entry of an Order Further Extending the Period   19
Within Which It May Remove Actions Pursuant to 28 U.S.C.
§ 1452 and Rule 9027 of the Federal Rules of Bankruptcy
Procedure filed by Debtor (2304)

Show Cause Hearing (2255) - *Taken Under Advisement*      285

Motion to Modify Order Authorizing Retention of James    285
Seery filed by Plaintiffs CLO Holdco, Ltd., The
Charitable DAF Fund, L.P. (2248) - *Taken Under Advisement*

END OF PROCEEDINGS                                       296

INDEX                                                297-298

017960

**EXHIBIT 72**

017961

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                 FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                              )    Case No. 19-34054-sgj-11
 3   In Re:                   )    Chapter 11
                              )
 4   HIGHLAND CAPITAL         )    Dallas, Texas
     MANAGEMENT, L.P.,        )    June 8, 2023
 5                            )    9:30 a.m. Docket
                              )
 6        Reorganized Debtor. )
                              )    HMIT'S MOTION FOR LEAVE TO
 7                            )    FILE VERIFIED ADVERSARY
                              )    PROCEEDING (3699)
 8   ─────────────────────────)
                    TRANSCRIPT OF PROCEEDINGS
 9         BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                 UNITED STATES BANKRUPTCY JUDGE.
10
     APPEARANCES:
11
     For the Reorganized      John A. Morris
12   Debtor:                  Gregory V. Demo
                              Hayley R. Winograd
13                            PACHULSKI STANG ZIEHL & JONES, LLP
                              780 Third Avenue, 34th Floor
14                            New York, NY  10017-2024
                              (212) 561-7700
15
     For the Reorganized      Jeffrey Nathan Pomerantz
16   Debtor:                  PACHULSKI STANG ZIEHL & JONES, LLP
                              10100 Santa Monica Blvd., 13th
17                             Floor
                              Los Angeles, CA  90067
18                            (310) 277-6910

19   For Hunter Mountain      Sawnie A. McEntire
     Investment Trust:        Timothy J. Miller
20                            PARSONS MCENTIRE MCCLEARY, PLLC
                              1700 Pacific Avenue, Suite 4400
21                            Dallas, TX  75201
                              (214) 237-4303
22
     For Hunter Mountain      Roger L. McCleary
23   Investment Trust:        PARSONS MCENTIRE MCCLEARY, PLLC
                              One Riverway, Suite 1800
24                            Houston, TX  77056
                              (713) 960-7305
25
```

017962

HCMLPHMIT00003014

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 53-1   Filed 06/30/25   Page 114 of 1017   PageID 19013
Exhibit 72 Page 302 of 590

2

APPEARANCES, cont'd.:

For Hunter Mountain        Deborah Deitsch-Perez
Investment Trust:          STINSON
                           2200 Ross Avenue, Suite 2900
                           Dallas, TX  75201
                           (214) 560-2218

For Muck Holdings, et al.: Brent Ryan McIlwain
                           HOLLAND & KNIGHT, LLP
                           300 Crescent Court, Suite 1100
                           Dallas, TX  75201
                           (214) 964-9481

For James P. Seery, Jr.:   Mark Stancil
                           Joshua Seth Levy
                           WILLKIE FARR & GALLAGHER, LLP
                           1875 K Street, NW
                           Washington, DC  20006
                           (202) 303-1133

Recorded by:               Michael F. Edmond, Sr.
                           UNITED STATES BANKRUPTCY COURT
                           1100 Commerce Street, 12th Floor
                           Dallas, TX  75242
                           (214) 753-2062

Transcribed by:            Kathy Rehling
                           311 Paradise Cove
                           Shady Shores, TX  76208
                           (972) 786-3063

            Proceedings recorded by electronic sound recording;
               transcript produced by transcription service.

HCMLPHMIT00003015

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document Exhibit 72 Filed 06/05/25   Page 115 of 1017    PageID 19014

3

| | |
|---|---|
| 1 | DALLAS, TEXAS - JUNE 8, 2023 - 9:42 A.M. |
| 2 | THE CLERK:  All rise.  United States Bankruptcy Court |
| 3 | for the Northern District of Texas, Dallas Division, is now in |
| 4 | session, The Honorable Stacey Jernigan presiding. |
| 5 | THE COURT:  Good morning.  Please be seated.  All |
| 6 | right.  We are here this morning for a setting in Highland. |
| 7 | This is on a motion of Hunter Mountain for leave to file an |
| 8 | adversary proceeding.  I will start out by getting appearances |
| 9 | from lawyers in the courtroom. |
| 10 | MR. MCENTIRE:  Yes, Your Honor.  Sawnie McEntire |
| 11 | along with my partner Roger McCleary and Tim Miller on behalf |
| 12 | of Hunter Mountain Investment Trust, Ltd. |
| 13 | THE COURT:  Thank you. |
| 14 | MR. MORRIS:  Good morning, Your Honor.  John Morris, |
| 15 | Pachulski Stang Ziehl & Jones, for the Reorganized Highland, |
| 16 | for the Highland Claimant Trust.  I'm joined by Mr. Pomerantz, |
| 17 | Mr. Demo, and Ms. Winograd. |
| 18 | THE COURT:  Good morning. |
| 19 | MR. STANCIL:  Good morning, Your Honor.  Mark Stancil |
| 20 | from Willkie Farr & Gallagher for Mr. Seery.  I'm joined by my |
| 21 | colleague Josh Levy. |
| 22 | THE COURT:  Good morning. |
| 23 | MR. MCILWAIN:  Good morning, Your Honor.  Brent |
| 24 | McIlwain from Holland & Knight here for Muck Holding, LLC, |
| 25 | Jessup Holdings, LLC, Farallon Capital Management, LLC, and |

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 72   Filed 06/02590   Page 116 of 1017   PageID 19015

4

1  Stonehill Capital Management, LLC.

2          THE COURT:  Thank you.  All right.  Is that all of

3  our lawyer appearances?  I know we have observers on the

4  WebEx, but I assume you are just observers.  We scheduled this

5  to be a live hearing for participants.

6      All right.  Well, we had some ground rules for how this

7  would go forward today.  We, of course, have had two -- I call

8  them hearings on what kind of hearing we're going to have.

9  We've had two status conferences.  And so our ground rules

10  were set.  Three hours of total presentation time for each the

11  Movant and the aggregate Respondents.  We also had an order

12  regarding what discovery would or would not be allowed.

13      And to my surprise, there were a flurry of pleadings.

14  We're a few minutes late getting out here because we were

15  trying to digest what was filed late yesterday and into the

16  night.

17      So I understand we have a controversy about a couple of

18  expert witnesses who were listed on Monday on the Movants'

19  exhibit and witness list.  And I've seen a motion to exclude

20  the expert witnesses' testimony.  And I think we need to

21  address that right off the bat.  I don't want to take too much

22  time on this, because, again, we're going to finish today, and

23  I won't let this housekeeping matter eat into our three hours,

24  but I want to get going.  So I'll hear from Movant, Mr.

25  McEntire.

017965

HCMLPHMIT00003017

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document Exhibit 72    Filed 06/06/25    Page 117 of 1017    PageID 19016

5

 1          MR. STANCIL:  Your Honor, may --

 2          THE COURT:  Go ahead.

 3          MR. STANCIL:  We moved to exclude, so I would propose

 4   that my colleague, Mr. Levy, address this motion very briefly

 5   if --

 6          THE COURT:  Well, I guess --

 7          MR. STANCIL:  Or I will do as --

 8          THE COURT:  -- that actually makes sense.

 9          MR. STANCIL:  Okay.

10          THE COURT:  I was thinking Mr. McEntire teed up the

11   issue, but I suppose you did with the motion to exclude.  So,

12   Counsel?

13          MR. LEVY:  Thank you, Your Honor.  Josh Levy on

14   behalf of Mr. Seery.

15      So, we think our papers largely speak for themselves, but

16   two additional points we'd like to raise.  In the response

17   filed by Hunter Mountain this morning, and this is Docket

18   Entry 3828, in Paragraph 11, they argue that this is a bench

19   hearing on colorability, not a trial where junk science is a

20   concern.  But junk science is precisely what they're trying to

21   introduce here.  They have raised two expert witnesses, one

22   who purports to be an expert in compensation but has no

23   experience whatsoever in evaluating compensation, and they

24   provide no methodology for their conclusion.

25      For example, they claim to have identified red flags.

HCMLPHMIT00003018

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 72 Filed 07/02/25    Page 118 of 1017    PageID 19017

6

1    They never explain what those red flags are, why they are red

2    flags, or how they determined they were red flags.  This is

3    junk science, precisely what the Federal Rules are designed to

4    exclude.

5        But that shouldn't detract from the broader procedural

6    point that this is the first time we're hearing about expert

7    witnesses, at 10:00 p.m. three days before the hearing.  This

8    is a trial by ambush.  This motion was filed in March, we've

9    been litigating this motion for over two months now, and this

10    is the first time we're hearing about any expert witnesses.

11        As Your Honor noted, we've had multiple conferences.

12    We've had rules setting the ground rules for this hearing.

13    We've had orders setting the scope of discovery.  But now

14    Hunter Mountain is trying to pull a bait-and-switch.  After

15    never mentioning any experts, after obtaining orders limiting

16    the scope of discovery, they then wait until right before the

17    hearing to disclose their experts, ensuring that these experts

18    are insulated from any kind of discovery and can ambush us at

19    the hearing.

20        I'm happy to answer any other questions, but we believe

21    they should be excluded and the accompanying exhibits should

22    also be excluded.

23            THE COURT:  All right.  Thank you.  And the

24    accompanying exhibits, I don't review exhibits before a trial

25    or a hearing because I don't know what's going to be objected

017967

HCMLPHMIT00003019

1  to and admitted.  So do you want to point out, were there

2  expert reports in the proposed exhibits?

3       MR. LEVY:  These were charts and analyses prepared by

4  their experts, not actual expert reports.

5       THE COURT:  Okay.

6       MR. LEVY:  In their witness and exhibit list, Hunter

7  Mountain included several paragraphs that I guess serves as

8  what would be their expert reports.  And then it would be

9  Exhibits 39 through 52, which consist of CVs, materials

10  reviewed, and then what they term "data charts" prepared by

11  their experts.

12       THE COURT:  39 through 52?  Oh, I'm looking at the

13  wrong exhibit notebook.  Oh.

14     (Pause.)

15       THE COURT:  Okay.  Here we go.  All right.  No

16  questions at this time.

17     Mr. McEntire?

18       MR. MCENTIRE:  Yes, Your Honor.  May I proceed?

19       THE COURT:  You may.

20       MR. MCENTIRE:  Again, my presentation and response is

21  subject to our objection concerning that any evidence is being

22  admitted for any purpose, other than what we believe is the

23  proper standard of review.  So my response and our offer of

24  these experts is subject to that objection.

25     With that said, Mr. Levy's argument he just presented to

HCMLPHMIT00003020

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 72   Filed 06/23/390   Page 120 of 1017   PageID 19019

8

1   the Court presupposes that my client has a duty under 9014 to

2   provide a report, which we do not; to provide detailed

3   disclosures, which we do not, because 9014 is specifically

4   exempted from the scope of Rule 26.  What we did, we didn't

5   have to do.  What we did, and I made the decision to provide

6   them some disclosure and identification of who they were,

7   their backgrounds, and --

8           THE COURT:  Well, let me stop you.

9           MR. MCENTIRE:  Certainly.

10          THE COURT:  "What we did, we didn't have to do."  The

11  Local Rules, first of all, do require an exhibit and witness

12  list.  And --

13          MR. MCENTIRE:  We've provided that.

14          THE COURT:  I know.  I know.  But you -- I thought I

15  heard you --

16          MR. MCENTIRE:  No, no.

17          THE COURT:  -- saying you didn't have to do that.

18  You do have to do that.

19          MR. MCENTIRE:  No, no, no.

20          THE COURT:  But I guess what you're saying is --

21          MR. MCENTIRE:  What we provided was more than what

22  the Local Rules require.

23          THE COURT:  How so?

24          MR. MCENTIRE:  We provided CVs.  We provided their

25  backgrounds.  We disclosed in the actual witness description

HCMLPHMIT00003021

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24-72   Filed 06/06/25   Page 121 of 1017   PageID 19020

9

1   who they were and the key components of their opinions.  And

2   we refer to their data charts.  That is not something that the

3   Local Rule requires.

4           THE COURT:  Okay.  Well, let me back up.  We have our

5   Local Rules, but then we had our two status conferences --

6           MR. MCENTIRE:  Yes.

7           THE COURT:  -- on what the format of the hearing --

8           MR. MCENTIRE:  Yes.

9           THE COURT:  -- would be.

10          MR. MCENTIRE:  Yes.

11          THE COURT:  And, of course, there was extensive

12  discussion, evidence or no evidence?  What did the legal

13  standard, colorability, require?

14          MR. MCENTIRE:  Yes.

15          THE COURT:  And I came out in the end and said, if

16  people want to put on witnesses, they're entitled to put on

17  witnesses.  I think there may be a mixture of a fact question

18  and law question on colorability.  So, and then I set a three-

19  hour time limit and I said, if someone wants to depose Mr.

20  Seery and Mr. Dondero, they can, but no more discovery other

21  than that.  Okay?

22          MR. MCENTIRE:  I understand.

23          THE COURT:  Why then did you not say, well, wait,

24  Judge, if it's going to be evidence, we're just letting you

25  know, in full disclosure, we might call a couple of experts,

017970

HCMLPHMIT00003022

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24-72   Filed 06/06/25   Page 122 of 1017   PageID 19021

10

1   and this may impact your decision on what kind of discovery

2   can happen.  And this may impact your decision on whether

3   three hours each side is enough.

4          MR. MCENTIRE:  Well, Your Honor, in fairness, I don't

5   think we had made a final decision to actually designate any

6   experts.  And at the time, the focus was on other witnesses.

7   But there was no exclusion, there was no limitation at all on

8   my right to bring an expert.  And the Rules are very clear.

9   And the Court's --

10          THE COURT:  But I specifically limited discovery, and

11   it was on your motion.  It was on your motion we set the

12   hearing on --

13          MR. MCENTIRE:  Actually, --

14          THE COURT:  You know, did you need a continuance,

15   because if we were going to have evidence, maybe you needed a

16   continuance.  And then there was a discovery issue raised.

17          MR. MCENTIRE:  To be clear, Your Honor, I'm looking

18   at your orders.

19          THE COURT:  Got them in front of me.

20          MR. MCENTIRE:  Your order of May 26, 2023.  You said,

21   You can put on your witnesses and the Court is going to rule.

22   You made no limitations as to who the witnesses would be.

23   Your order did not limit the scope of witnesses to simply Mr.

24   Seery or Mr. Dondero.  In fact, any suggestion that you did

25   limit the witnesses is contrary --

017971

HCMLPHMIT00003023

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document Exhibit 72Filed 06/05/5390 Page 123 of 1017   PageID 19022

11

1            THE COURT:  Now, which order are you looking at?

2            MR. MCENTIRE:  I'm looking at the May 26, 2023 order,

3     Page 51, Lines 3 through 14.

4            THE COURT:  Okay.

5            MR. MCENTIRE:  You also stated --

6            THE COURT:  I have -- have I entered three orders on

7     this?  I've got a May 10th order.  I've got a May 22nd order.

8            MR. MCENTIRE:  And I would also point out, Your

9     Honor, --

10           THE COURT:  Could you answer my question?  I want to

11    look at what you're looking at.

12           MR. MCENTIRE:  Certainly.

13           THE COURT:  Here we -- this is the one.  Okay.  Aha.

14    Okay.  May 26.

15           MR. MCENTIRE:  Page 51, Lines 3 through 14.

16           THE COURT:  I've entered three orders on what kind of

17    hearing we're going to have.  Okay.  So you're looking where?

18           MR. MCENTIRE:  Page 51, Lines 3 through 14.  "You can

19    put on your witnesses."

20           THE COURT:  Page 51?

21           MR. MCENTIRE:  Yes, ma'am.

22           THE COURT:  Oh.  You're looking at a transcript, not

23    the order.

24           MR. MCENTIRE:  That's right.  I apologize.

25           THE COURT:  Okay.

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 24-72    Filed 06/06/25    Page 124 of 1017    PageID 19023

12

1            MR. MCENTIRE:  Yeah, I'm looking at the transcript

2     from the hearing.

3            THE COURT:  Okay.  Well, I'm looking at my order.

4            MR. MCENTIRE:  And the order, the order also

5     specifies no limitation at all in connection with the -- the

6     --

7            THE COURT:  But my order was based on what was

8     discussed that day.

9            MR. MCENTIRE:  And what was --

10           THE COURT:  If you had said, hmm, Judge, if you're

11    going to allow evidence, we may call a couple of experts, then

12    there would have been a whole discussion about that and did I

13    need to limit the discovery, as I did.  And there would have

14    been a whole discussion of, well, three hours, three hours

15    each side, is that going to be enough if we have experts?

16           MR. MCENTIRE:  The discovery ruling that you made was

17    on my motion, and at the time I was not seeking to take any

18    expert depositions.  And you denied my request to take ample

19    discovery.  You limited my right to take only one deposition,

20    without documents.

21       The issue of taking expert discovery was not even on the

22    table.  However, you made it very --

23           THE COURT:  Well, that's my point precisely.  The

24    whole purpose of the hearing was, what kind of hearing are we

25    going to have on June 8th?

017973

HCMLPHMIT00003025

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 34   72   Filed 06/06/25390   Page 125 of 1017   PageID 19024

13

1          MR. MCENTIRE:  I understand.  And our position --

2          THE COURT:  We had already had one status conference

3     on argument only versus evidence.  And I allowed you all to

4     file some briefing, which you did.  And then I issued an order

5     after the briefing, saying, I think I should allow evidence on

6     the colorability question.  I'm not forcing anyone to put on

7     evidence, but if you want to put on evidence, you can.

8       And then you filed your motions and we had the next status

9     conference on what kind of hearing we're going to have.  And

10    there was more argument:  We don't think the evidence is

11    appropriate, but if evidence is appropriate, we want you to

12    continue the hearing to allow all kinds of discovery.  I don't

13    know what.  And it was right before Memorial Day, and I hated

14    the fact that a bunch of subpoenas were going to go out and

15    ruin people's holidays.  But there was no discussion then of,

16    okay, but just so you know, since you have made the ruling

17    that evidence can come in, we're going to have a couple of

18    experts.

19         MR. MCENTIRE:  As I've already mentioned, Your Honor,

20    we had not made a decision to call experts at that time.  We

21    made a decision to call the experts shortly before we filed

22    our designations.

23      The point here is this.  The Rules do not require me to

24    provide any more disclosure than I have.  I have gone over and

25    above the Local Rules.

017974

HCMLPHMIT00003026

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 72 Filed 06/06/25 390    Page 126 of 1017    PageID 19025

14

1        If the Court believes that it would have allowed more time

2   for this hearing, I would advise the Court that opposing

3   counsel vehemently opposed any type of postponement or

4   continuance.  The discovery that I was requesting was

5   discovery from fact witnesses.  Experts were not at issue at

6   that time.  Experts are --

7                THE COURT:  Because --

8                MR. MCENTIRE:  -- at issue now.

9                THE COURT:  -- nobody knew that experts might be

10  called.

11               MR. MCENTIRE:  I have a right to call experts, Your

12  --

13               THE COURT:  It changes the whole complexion.

14               MR. MCENTIRE:  But I have a right to call experts,

15  under the Rules.  I have a right, a fundamental due process --

16  let me -- may I finish, Your Honor?  A fundamental due process

17  right to call experts.  Their attempt to charge some type of

18  *Daubert* challenge is nothing but a shotgun blast on the wall,

19  having no meaning at all.  At a minimum, I have a right to put

20  the witnesses on the stand and we'll have a *Daubert* hearing.

21       If they want more time, they need to ask for it.  They

22  didn't ask for it.  Their solution is to strike my experts,

23  which is improper.  It would be improper for this Court to

24  strike my experts when they have been properly tendered under

25  the Local Rules.  They have not cited an alternative remedy.

017975

HCMLPHMIT00003027

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24   Filed 06/06/25   Page 127 of 1017   PageID 19026
Exhibit 72   Page 126 of 390

15

1    If they want the alternative remedy, they need to ask the

2    Court.

3              THE COURT:  My next question is:  How do you propose

4    to get this all done in only three hours?

5              MR. MCENTIRE:  We intend to move quickly.

6              THE COURT:  But, see, now they, I'm guessing,

7    prepared their case assuming there weren't going to be

8    experts.  And they, if they're good lawyers, which I know you

9    all are, they have their script of the kind of things they

10   were going to ask the witnesses.

11             MR. MCENTIRE:  Well, did they have a --

12             THE COURT:  And now they've got to carve out time for

13   two last-minute experts?

14             MR. MCENTIRE:  They had an option.  And one of the

15   options was they could have called me up on Tuesday and asked

16   for their depositions and I probably would have agreed.

17             THE COURT:  I already said no depositions except

18   Seery and Dondero.

19             MR. MCENTIRE:  Then they could have come and filed a

20   different kind of motion with the Court.

21        Their only remedy that they're seeking is a draconian one.

22   There are other options that are more consistent with the

23   implementation of due process here, Your Honor, not striking

24   my experts, which were properly identified under the Local

25   Rules.

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 24    Exhibit 72    Filed 06/06/25    Page 128 of 1017    PageID 19027

16

 1      If the Court is going to strike my experts, note our

 2   objection.  We are tendering our experts.  We will put -- like

 3   to put a proffer on for the Fifth Circuit or for the appellate

 4   process.  But if the Court is going to strike our experts,

 5   then it needs to do so.  We object because we have done

 6   everything correctly.

 7           THE COURT:  Okay.  Here's another problem.  I have

 8   not had time to process their motion to exclude.  Beyond the

 9   procedural issues, they are saying junk science, that there's

10   inadequate expertise on the part of I guess at least one of

11   them regarding executive compensation.  I haven't had -- they

12   filed their motion to exclude at 4:00-something yesterday.

13   Okay?

14           MR. MCENTIRE:  I understand.

15           THE COURT:  Now, yeah, I could have stayed up all

16   night.  I stayed up pretty late anyway, by the way.  But --

17           MR. MCENTIRE:  Well, first of all, --

18           THE COURT:  -- I haven't even had the time to process

19   and intelligently rule on their motion --

20           MR. MCENTIRE:  I appreciate that, and I'll respect --

21           THE COURT:  -- as far as the --

22           MR. MCENTIRE:  I'll respect the Court's statement.

23           THE COURT:  -- junk science argument.

24           MR. MCENTIRE:  I'll respect the Court's statement.

25   Their process and the procedure they've adopted is improper,

HCMLPHMIT00003029

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24-72   Filed 08/06/25390   Page 129 of 1017   PageID 19028

17

1   because if you're going to have a *Daubert* hearing, that's a

2   live hearing.  Or they're going to have to have evidence to

3   support their challenge.  This is simply a conclusory shotgun

4   blast on the wall, Your Honor.

5       If you even want to consider a *Daubert* challenge, the

6   proper procedure is to put the witnesses on the stand and have

7   an opportunity to have a proffer of evidence and a cross-

8   examination.  That's the proper procedure.  Throwing something

9   and innuendo and rhetoric and conclusions is not a proper

10  *Daubert* motion at all.  The Court could deny their *Daubert*

11  motion just on those grounds.

12          THE COURT:  I'm not going to rule on a motion that

13  I've barely had a chance to read, not to mention your response

14  that was filed at 8:00-something this morning.

15          MR. MORRIS:  It was.

16          MR. MCENTIRE:  It was.  Well, then the option is you

17  need to continue the proceeding to allow the experts to take

18  the stand.

19          THE COURT:  Well, I know you have thought on that,

20  but here is something I'm contemplating doing.  We'll go

21  forward with the hearing in the manner my order said we would

22  go forward with it.  My, I guess, Order #3 of my three orders.

23  And at the end of the evidence, you can argue in closing, each

24  of you, why we should keep the evidence open to come back

25  another day on only the experts.  But time matters.  If you've

017978

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 34-24  Filed 08/08/25  Page 130 of 1017    PageID 19029

18

1   all already used your three hours on each side, then are we

2   going to come back for five minutes on each of them?  I mean,

3   I don't know.

4        And then, of course, I would have to, if I ruled in that

5   way, I believe I would have to give them a chance to depose

6   these people.

7              MR. MCENTIRE:  I think that would be reasonable.

8              THE COURT:  Okay.  But you think you can get all of

9   your evidence in, other than your experts, and your opening

10  statement, if any, your closing argument, if any, in three

11  hours?

12             MR. MCENTIRE:  I'll do my best.

13             THE COURT:  Well, if you -- it's not a matter of --

14  I'm just saying this may all be an academic argument, because

15  I'm not increasing this to more than three hours each.  We've

16  fully vetted that.

17             MR. MCENTIRE:  Well, what the Court is then doing by

18  virtue of your ruling is that you're making me actually

19  present my evidence in a shortened form today, two hours, two

20  and a half hours, not knowing how -- whether or not you are

21  actually going to allow experts.

22       So, without the certainty, I will have to abbreviate my

23  entire presentation, giving them the advantage of putting more

24  evidence on than I, in an effort to anticipate a positive

25  ruling, which you're not prepared to provide yet.  And so I'm

017979

HCMLPHMIT00003031

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document Exhibit 72 Filed 06/20/25390 Page 131 of 1017    PageID 19030

19

1   actually being penalized.

2          THE COURT:  Counsel, we had two status conferences on

3   what kind of hearing we were going to have.

4          MR. MCENTIRE:  I understand.

5          THE COURT:  Now, the fact that you had not decided

6   your strategy for this hearing, that's not my fault.  Again,

7   we had two hearings on what kind of hearing we were going to

8   have today.  We could have fully vetted this.  I could have

9   heard about the experts, I could have decided if we were going

10  to continue the hearing past June 8th, could have decided if

11  we were going to allow more depositions.

12         MR. MCENTIRE:  Your Honor, --

13         THE COURT:  I could have fully studied the merits of

14  the motion to exclude and decided if this is junk science or

15  not.

16         MR. MCENTIRE:  I would request a ruling at this time,

17  Your Honor, on the experts.  If you are not inclined to

18  provide a ruling to me on the experts at this time, I would

19  effectively be penalized on my time limits.  I will have to

20  set aside enough time to put the experts on, not knowing, not

21  knowing whether you're going to give me the opportunity to do

22  so until the end of the day.  And that would be -- that would

23  be punishment.

24         THE COURT:  Isn't this going to be just preparing

25  your case you would have -- I mean, going forward with your

017980

HCMLPHMIT00003032

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 72 Filed 06/25/25390 Page 132 of 1017    PageID 19031

20

1  case the way you would have?

2          MR. MCENTIRE:  No, I don't -- really don't think so.

3  I think there's --

4          THE COURT:  I mean, --

5          MR. MCENTIRE:  There's a difference.

6          THE COURT:  -- you did not prepare your witnesses and

7  your possible cross-examination with the expectation of I'll

8  get my two experts in?

9          MR. MCENTIRE:  My -- of course.  But the point is,

10  then I'm going to have to set aside a half an hour or maybe

11  even longer from my other witness preparations, not knowing

12  whether you'll even give me that time.

13          THE COURT:  Isn't the other side going to have to do

14  the very same thing?

15          MR. MCENTIRE:  No.

16          THE COURT:  Why not?  They don't know how I'm going

17  to rule.  I don't know how I'm going to rule.  I have not

18  studied the motion to exclude the way I should.

19          MR. MCENTIRE:  Okay.  Well, Your Honor, we request a

20  ruling now.  But if the Court is not inclined to do so, please

21  note our objection.

22          THE COURT:  All right.  I'll give the Movants the

23  last word.  And I say "Movants" plural.  I'm trying to

24  remember where I saw a joinder and when I did not.  Did I see

25  a joinder?  I can't remember.

017981

HCMLPHMIT00003033

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 72    Filed 06/26/25390    Page 133 of 1017    PageID 19032

21

 1              MR. MORRIS:  Can we just have a moment, Your Honor?

 2              THE COURT:  Okay.  Okay.

 3              MR. MCILWAIN:  Your Honor, my clients did file a

 4      joinder, but --

 5              THE COURT:  Okay.

 6              MR. MCILWAIN:  -- I'm going to let them handle this.

 7              THE COURT:  Okay.

 8          (Pause.)

 9              THE COURT:  Counsel?

10              MR. LEVY:  Thank you, Your Honor.  Two brief points

11      we'd like to make.  The first is on the Rules.  So, Hunter

12      Mountain is focused on Rule 26(a) regarding reports.  However,

13      Rule 26(b) applies to contested matters under Rule 9014.  And

14      as we explain in Paragraph -- we explain in our brief, that --

15      or, in Paragraph 19 of our brief, that under Rule 26(b) we're

16      entitled to depose the experts.

17          And so we agree with Your Honor's suggestion that if

18      there's going to be any sort of experts, then we need the

19      opportunity to depose them.  This is Rule 26(b)(4)(A), which

20      expressly does apply to contested matters under Bankruptcy

21      Rule 9014(b).

22          The second point is we agree with the approach Your Honor

23      has proposed.  We think, for today, both sides can put on

24      their full cases without expert witnesses.  Both sides can

25      have the full three hours, which should address Hunter

017982

HCMLPHMIT00003034

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document Exhibit 72 Filed 06/26/05390   Page 134 of 1017    PageID 19033

22

1   Mountain's concern.  And if Your Honor decides at the

2   conclusion of the hearing that expert testimony would be

3   helpful, then we could take the opportunity to depose their

4   experts and then come back for an additional half-hour for

5   each side to address any expert testimony that Your Honor

6   believes would be helpful.

7           THE COURT:  Okay.  Is your proposal that you each

8   today would be limited to two and a half/two and a half?  Or

9   three/three, and then another hour, 30 minutes/30 minutes, if

10  I --

11          MR. LEVY:  Three/three.

12          THE COURT:  -- decide to allow any experts?

13          MR. LEVY:  Yeah.  Three.  Three and three for each

14  side, the hearing contemplated by Your Honor's orders, today.

15  And if Your Honor decides that expert testimony would be

16  helpful, we could come back for an hour, for half an hour on

17  each side, regarding experts.

18          THE COURT:  All right.  Mr. McEntire, what about

19  that?

20      Oh, I'm sorry, did you --

21          MR. STANCIL:  Oh, I'm sorry.  Just one additional

22  point, Your Honor.  We would ask that Your Honor's ruling on

23  the ultimate admissibility of this be limited to what they've

24  actually put in front of us.  The day for the hearing is

25  today, so I think I'd like -- I'd suspect Your Honor would

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 72 Filed 06/26/25390   Page 135 of 1017   PageID 19034

23

1   like to avoid another raft of submissions.  So we would just

2   ask that they live or die with what they've said in the way of

3   methodology, disclosures, and the like.

4           THE COURT:  Okay.  Mr. McEntire, this seems like the

5   best of all worlds, maybe.

6           MR. MCENTIRE:  Well, it may be the best of the worlds

7   in which we're operating.

8       My first position is that the experts are admissible,

9   period.  And the Rules do not require anything more than what

10  we've already done.  In fact, we've done more than we were

11  supposed to.

12          THE COURT:  What is your argument about 26(b)(4),

13  which --

14          MR. MCCLEARY:  If they want to take a deposition,

15  they could have called me up and asked for it.

16          MR. STANCIL:  Your Honor, I was --

17          THE COURT:  Wait a second.  They were under a court

18  order.  Okay?

19          MR. MCENTIRE:  They could have -- they could have

20  sought --

21          THE COURT:  They were under my order.  Okay?  They

22  would have been violating my order if they had done it.

23          MR. STANCIL:  I was also, Your Honor, I was in a --

24          THE COURT:  Not to mention that it was --

25          MR. STANCIL:  I was in an airplane from 9:00 a.m.

017984

HCMLPHMIT00003036

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 24   72 Filed 06/26/25   Page 136 of 1017    PageID 19035

24

1   Tuesday until 9:00 p.m. Tuesday.

2           THE COURT:  I'm surprised a lot of you got here, with

3   the Martian atmosphere that I saw pictures of.

4       Yes.  That's not realistic, to think that you disclose an

5   expert on Monday for a Thursday hearing and they can call you

6   up and --

7           MR. MCENTIRE:  The other --

8           THE COURT:  -- quickly put together a deposition.

9   So, --

10          MR. MCENTIRE:  Sure.  The other option, --

11          THE COURT:  Uh-huh.

12          MR. MCENTIRE:  -- of course, Your Honor, as I

13   mentioned before, and I'm not going to repeat myself, is they

14   -- there's other forms of relief they could seek.  But under

15   the circumstances, and in light of your apparent leaning on

16   the issue, then this is the best under the circumstances that

17   they've suggested.  We'd like an hour each.

18      I would also point out that -- well, anyway, that's it,

19   Your Honor.  Thank you.

20          THE COURT:  All right.  So we are going to go forward

21   as planned, three hours/three hours.  No experts today.  In

22   making your closings -- well, this is kind of awkward.  I'm

23   trying to think if we really have closing arguments, when you

24   don't know if it's -- it doesn't seem to make sense.  Like, I

25   guess we could have closing arguments if you want, subject to

017985

HCMLPHMIT00003037

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 34-24   Filed 06/26/25   Page 137 of 1017   PageID 19036

25

1   supplementing your closing arguments if we come back a second

2   day with the experts.  Okay?

3       And I'm not making a ruling today on the motion to

4   exclude.  I'm going to hear what I hear.  And maybe what we'll

5   do is I'll give you a placeholder hearing if we're going to

6   come back on the experts.  Then I'll go back and read the

7   motion, the response, and make my ruling on are we coming back

8   for another day of experts.  Okay?  Got it?

9       And with regard to the comment about not adding to, I

10  think that's a fair point.  You can't add new exhibits that

11  the expert might talk about or that you might want me to

12  consider between now and whenever the tentative day two is.

13           MR. MCENTIRE:  Understand.  We agree with that.

14           THE COURT:  Okay.

15           MR. MCCLEARY:  Your Honor, there is one -- one

16  exhibit that has a small typo transcription of a number on it.

17  So we would like to substitute for that.  It's a minor detail.

18  But I'll provide opposing counsel with that.  But it's very

19  minor.

20           THE COURT:  You have it today, I presume?

21           MR. MCCLEARY:  Yes, we have it.

22           THE COURT:  Okay.  So as long as you hand it to them

23  today.

24           MR. STANCIL:  No objection, Your Honor.  We do -- I

25  think someone is back at the office working on a short reply

017986

HCMLPHMIT00003038

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 72 Filed 06/26/25390    Page 138 of 1017    PageID 19037

26

1    on our motion, which I assume we could file in support of -- I

2    mean, we filed our motion.  They filed an opposition.  I

3    assume we would be entitled under the Rules to file a short

4    reply on the actual exclusion issue.

5             THE COURT:  That is fair, but let's talk about

6    timing.  You said someone is back at the office working on it.

7    Could you get it on file by Monday?

8             MR. STANCIL:  Yes, ma'am.

9             THE COURT:  Okay.  Then that'll be allowed if it's

10   filed by the end of the day Monday.

11            MR. MCCLEARY:  Your Honor, I'm providing a copy of

12   Exhibit 43 to opposing counsel, which is the substitute

13   exhibit.

14       And obviously, we'd like to have an opportunity to respond

15   to what their filing is on Monday.

16            THE COURT:  No.  I mean, motion, response, reply.

17   That's all our Rules permit.  Okay?  Motion, response, reply.

18   Okay.

19            MR. MCCLEARY:  Yes, Your Honor.

20            THE COURT:  All right.  Well, with that, do the

21   parties want to make opening statements?  If so, Mr. McEntire,

22   you go first.

23            MR. MCENTIRE:  Yes, Your Honor.  We have a PowerPoint

24   I would like to utilize, if I could.

25            THE COURT:  You may.

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 34-72   Filed 06/26/25  Page 139 of 1017    PageID 19038
Exhibit 72  Page 26 of 390

27

1            MR. MORRIS:  Your Honor, before we get to that, the

2    Plaintiff has objected to virtually every single exhibit that

3    we have.  Should we deal with the evidence first, because I

4    don't want to refer to documents or evidence in my opening

5    that they're objecting to.  They've literally objected to

6    every single exhibit except one, although I think they're

7    withdrawing certain of those objections.

8        I don't -- I don't know if the Court has had an

9    opportunity to see the objection that was filed to the

10   exhibits.

11           THE COURT:  That was what was filed like at 11:00

12   last night or so?

13           MR. MORRIS:  That's right.

14           THE COURT:  Okay.

15           MR. MORRIS:  And so at 2:00, 3:00, 4:00, 5:00 o'clock

16   this morning, I actually typed out a response that I'd like to

17   hand up to the Court.  But we've got to resolve the

18   evidentiary issues before we get to this.

19           THE COURT:  Okay.  Well, --

20           MR. MORRIS:  And I don't know what their position is

21   going to be --

22           THE COURT:  -- as a housekeeping matter, let's do

23   that first.  And let's start with the Movants' exhibits.  Do

24   we have any stipulations on admissibility of Movants'

25   exhibits?

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 24    Exhibit 72    Filed 06/26/25390    Page 140 of 1017    PageID 19039

28

```
 1              MR. MORRIS:  So, if I understand correctly, Your

 2    Honor, you'd like to know if we object to any of their

 3    exhibits first?

 4              THE COURT:  Yes.  And --

 5              MR. MORRIS:  Okay.

 6              THE COURT:  -- we'll hold --

 7              MR. MORRIS:  Because we have very limited objections.

 8              THE COURT:  Yes.  We're going to keep on hold for now

 9    your exhibits to the expert-related, --

10              MR. MORRIS:  Yes.

11              THE COURT:  -- your objections to the expert-related

12    ones.

13              MR. MORRIS:  Right.  I think -- I think --

14              THE COURT:  So let's not talk about, for this moment,

15    --

16              MR. MORRIS:  39 --

17              THE COURT:  -- 39 through 52.

18              MR. MORRIS:  Okay.

19              THE COURT:  But as for 1 through 38 or 53 through 80,

20    do the Respondents have objections?

21              MR. LEVY:  Yes, Your Honor.  We have very limited

22    objections.

23              THE COURT:  Okay.

24              MR. LEVY:  So, the three to which we object in their

25    entirety are Exhibits 24, 25, and 76, all of which we object
```

HCMLPHMIT00003041

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 34-24    Exhibit 72    Filed 06/06/25    Page 141 of 1017    PageID 19040

29

1    to on relevance grounds.

2        Exhibits 24 and 25 are email correspondence between

3    counsel in an unrelated state court matter where Mr. Seery is

4    responding to a third-party subpoena regarding the

5    preservation of his text messages on his iPhone.  This has

6    absolutely nothing to do with whether or not the Movants have

7    stated a colorable claim for breach of fiduciary duties.

8        What this appears to be is related to an entirely separate

9    motion raised by Dugaboy regarding the preservation of Mr.

10   Seery's iPhone.  So we object to Exhibits 24 and 25 because

11   they have simply nothing to do with the issues in this

12   hearing.

13       We also object to Exhibit 76, which is a filing from two

14   years ago in a different bankruptcy matter, from *Acis*,

15   regarding an injunction in place in that -- in that plan about

16   issues that -- that occurred before the bankruptcy was in

17   place.  So this is just an entirely different case from issues

18   that arose many, many years ago that, again, has nothing to do

19   with this case.

20            THE COURT:  This was whether the *Acis* plan injunction

21   barred some lawsuit?

22            MR. LEVY:  Exactly.

23            THE COURT:  Okay.  Okay.  Is that all?

24            MR. LEVY:  We also have limited objections to certain

25   exhibits that we think are admissible for the -- for the fact

017990

HCMLPHMIT00003042

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24-72  Filed 08/05/25390  Page 142 of 1017   PageID 19041

30

1    they're said, but not the truth of the matter asserted.

2        For example, Exhibits 1 and 2 are complaints filed in

3    those actions.  We have no objection to those coming in, but

4    not for the truth of the matter asserted.  These are advocacy

5    pieces and pleadings.  They're not actually substantive

6    evidence.

7        And we would have similar -- similar objections to

8    Exhibits 4, 6, 11, --

9            THE COURT:  Wait.  4 is James Dondero Handwritten

10   Notes, May 2021.

11           MR. LEVY:  Yes.

12           THE COURT:  Okay.

13           MR. LEVY:  So, we have no objection to that coming

14   into evidence.

15           THE COURT:  Uh-huh.

16           MR. LEVY:  But there are -- those are hearsay.

17   They're not admissible standing by themselves for the truth of

18   the matter asserted.

19           THE COURT:  Okay.

20           MR. LEVY:  And Exhibit 6 are news articles.

21   Similarly, they're hearsay, but we have no objection to them

22   coming in.  They're admissible for the fact that they're

23   published, but not the truth of the matter asserted.

24           THE COURT:  Okay.

25           MR. LEVY:  Exhibit 11, which is a motion filed by the

HCMLPHMIT00003043

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 34-24    Filed 08/06/25    Page 143 of 1017    PageID 19042

31

1  Debtor.  Similarly, it's for -- we have no objection to

2  anything on the docket coming in, but anything that's an

3  advocacy piece, like a motion as opposed to an order, we think

4  is not admissible for the truth of the matter asserted.

5      And that would be a similar objection, then, for Exhibit

6  58, which is a complaint.

7      Exhibits 59, 60, and 61 are -- are letters by counsel for

8  Mr. Dondero to the U.S. Trustee's Office.  We similarly have

9  no objection to that coming in, but not for the truth of the

10 matter asserted.

11     And Exhibits 62 and 63, Exhibit 62 is an attorney

12 declaration attaching, similarly, documents that are -- that

13 are advocacy pieces.

14     And Exhibit 63 appears to be an asset chart prepared by

15 counsel.  So it would be a similar objection.

16     And Exhibit 66 also is a declaration attaching documents.

17     No objections to those coming in, but not for the truth of

18 the matter asserted.

19     Exhibits 72, 73, and 74 are all -- well, 72 are press

20 articles.  73 and 74 are briefs.  We don't object to that

21 coming in, but we object to it being admitted for the truth of

22 the matter asserted.

23     And similarly, Exhibit 80 is a pleading in an SDNY

24 bankruptcy.  We have no objection to that coming in, but not

25 for the truth of the matter asserted.

017992

HCMLPHMIT00003044

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 72 Filed 06/05/390   Page 144 of 1017   PageID 19043

32

```
 1        And finally, Exhibits 81, 82, 83 don't specify particular

 2   documents.  They appear to largely be reservations of rights.

 3   And so we would likewise reserve our right to object once we

 4   see any specific documents --

 5             THE COURT:  Okay.

 6             MR. LEVY:  -- admitted under these exhibits.

 7             THE COURT:  Okay.  Mr. --

 8             MR. LEVY:  And I understand my colleague has an

 9   objection to Exhibit 5.

10             MR. MORRIS:  Exhibit 5, which is the subject, I

11   believe, of an unopposed sealing motion.  That document has to

12   do with purported restrictions on certain securities.  Since

13   it's subject to a sealing motion, I don't want to say too much

14   more than that, other than that -- we don't think it should be

15   admitted, because you can just see from the information on the

16   document that it was created after the termination of a shared

17   services agreement.

18        However, I'm hopeful that we can resolve the issue by

19   simply stipulating that in December 2020 MGM was on a

20   restricted list.  What that means, what the consequences of

21   it, the rest of it can be the subject of discussion.  But if

22   they're trying to get that document in for that particular

23   fact, we would stipulate to it in order to resolve that

24   dispute.

25             THE COURT:  All right.  Well, that's lots to respond
```

017993

HCMLPHMIT00003045

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 24    Exhibit 72 Filed 06/26/25390    Page 145 of 1017    PageID 19044

33

1  to, Mr. McCleary.  Why don't we start with the outright

2  objections:  24, 25.  It's apparently text messages related to

3  Mr. Seery's iPhone.  I know we've got another motion pending

4  out there that's not set today regarding Mr. Seery's iPhone.

5          MR. MCCLEARY:  Yes, Your Honor.  Well, as the Court

6  is aware, we've attempted to get discovery from Mr. Seery in

7  relation to the allegations in this lawsuit.  And by the way,

8  all of our exhibits that we're tendering are subject to our

9  objections that this should not be an evidentiary hearing.  I

10 just want to make that clear.

11         THE COURT:  Understood.

12         MR. MCCLEARY:  Okay.  Thank you.  So, we're not

13 waiving that.

14    The Exhibits 24 and 25 are relevant to the fact that he's

15 -- he's not preserving information that is relevant to the

16 claims in this lawsuit.  And that also is something that is a

17 factor in the colorability of our claims in this case.

18         THE COURT:  How?

19         MR. MCCLEARY:  Well, there is an effort, we believe,

20 underway to not have information available for us to discover.

21 And it reflects that they have been involved in providing --

22 we think supports -- providing material nonpublic information

23 to other people that would be in his phone.  And we want him

24 to preserve it.  And we think the fact that he is not is

25 evidence that supports the colorability of our claims.

HCMLPHMIT00003046

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S     Document 32-24   Filed 08/05/390   Page 146 of 1017     PageID 19045

34

1          THE COURT:  So, --

2          MR. MCENTIRE:  Your Honor, this --

3          THE COURT:  No.  No.  I'm processing that.  You're

4    wanting the Court to receive into evidence a text that may say

5    something like, I delete messages periodically on my phone, to

6    support your claim that you have a colorable claim that some

7    sort of improper insider disclosure of information and insider

8    trading is going on?  He said he had an automatic delete

9    feature on his phone; therefore, he -- that must be evidence

10   of a colorable claim for insider trading.  That's the

11   argument?

12         MR. MCENTIRE:  May I add to it, supplement, Your

13   Honor?  Mr. Seery, in his deposition, indicated that he did

14   receive a text message that he had recently reviewed from

15   Stonehill in February of 2021.  To the extent, however, that

16   is inconsistent with the fact that he has an automatic delete

17   button, suggesting to me that certain text messages have been

18   selectively saved and some other messages have been not

19   selectively saved.

20         THE COURT:  We don't have that motion set today.

21         MR. MCENTIRE:  This is not -- that has nothing to do

22   with the motion.  It has to do with the fact that what is

23   being presented to the Court in response, the Respondents'

24   argument, is a selected window, a selected picture, that is --

25   distorts the reality of what we think has been destroyed

HCMLPHMIT00003047

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 72 Filed 06/05/390 Page 147 of 1017    PageID 19046

35

1   evidence.

2       Mr. Seery can't save one message that may be helpful to

3   them and not save others that may not be.  And it is

4   inconsistent with the notion that this automatic delete button

5   was already in effect, so why does he have one favorable

6   message?  That's why it's relevant.

7           THE COURT:  Maybe he stopped using the automatic

8   delete after --

9           MR. MCENTIRE:  No, he didn't at this time, Your

10  Honor.

11          THE COURT:  Well, --

12          MR. MCENTIRE:  That's the relevance.

13          THE COURT:  So, --

14          MR. MCCLEARY:  And he should never have used it, Your

15  Honor, given his role and responsibilities.

16          THE COURT:  We don't have that motion set today.

17  What is the content of these emails?  February 16th, March

18  10th, 2023?  What is the content, for me to really zero in --

19          MR. LEVY:  I have --

20          THE COURT:  -- on relevance or not.

21          MR. LEVY:  -- copies of the emails, if that would be

22  helpful --

23          THE COURT:  Okay.

24          MR. LEVY:  -- to Your Honor.

25          THE COURT:  Well, you know, now I'm seeing them, so I

HCMLPHMIT00003048

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 72 Filed 06/36/05390   Page 148 of 1017   PageID 19047

36

1    don't know what the big deal is if --

2                MR. LEVY:  As Your Honor can see, these are emails

3    between counsel regarding preservation, which has nothing to

4    do with whether there are colorable claims for fiduciary

5    duties.

6        I'll add that -- and to show that this has nothing to do

7    with this case and it is an attempt to generate a fishing

8    expedition for documents in an entirely unrelated motion, we

9    had a meet-and-confer where we represented to the counsel

10   bringing that motion that we have been able to recover the

11   text messages from the iCloud.

12       And so this is really just a sideshow.  It has nothing to

13   do with the issues of the colorability of claims for breach of

14   fiduciary duties.  It should not be introduced into evidence

15   in this hearing.

16               THE COURT:  All right.  I'm going to sustain the

17   objection, but this is without prejudice to you re-urging

18   admission of these messages at the hearing on the motion

19   regarding Mr. Seery's phone.  Okay?  Now, --

20               MR. MCCLEARY:  That's as to 24 and 25, Your Honor?

21               THE COURT:  Correct.  And let's go now to the other

22   one, the Exhibit 76, the *Acis*-related document, the relevance

23   of that.  Statement of Interested Party in Response to Motion

24   of NexPoint to Confirm Discharge or Plan Injunction Does Not

25   Bar Suit, or Alternatively, for Relief from All Applicable

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document Exhibit 72 Filed 06/86/5390 Page 149 of 1017    PageID 19048

37

1  Injunctions.

2      What is the relevance for today's matter?

3          MR. MCCLEARY:  Your Honor, this is background of

4  pleadings and just background information generally to support

5  the allegations made in the case and the background.

6          THE COURT:  What do you mean, background?

7          MR. MCCLEARY:  Kind of the history relative to the

8  claims trading and relative to the claims of the use of

9  insider information.

10         THE COURT:  Okay.  Be more specific, because I

11 certainly have a background education on *Acis* litigation.

12     (Pause.)

13         MR. MCCLEARY:  Yeah.  Your Honor, this is a data

14 point that is referred to in one of our experts' data charts,

15 I believe, so --

16         THE COURT:  All right.  So let's just carry that to

17 --

18         MR. MCCLEARY:  Yes.

19         THE COURT:  I'm just going to mark it as carried

20 along with 39 through 62, related to the experts.

21     (HMIT's Exhibits 39 through 62 and Exhibit 76 carried.)

22         THE COURT:  Okay.  What about all of these objections

23 that we don't object *per se* but we want it clear that the

24 documents are not being offered for the truth of the matter

25 asserted because there's hearsay?

017998

HCMLPHMIT00003050

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 72 Filed 08/05/390 Page 150 of 1017   PageID 19049

38

1          MR. MCENTIRE:  Your Honor, I'll let Mr. McCleary

2     address all of those.

3        I want to point out one exception, and that is Exhibit #4,

4     which are handwritten notes from Mr. Jim Dondero.  Those are

5     not -- they are being offered for the truth of the matter

6     asserted because it's an admission of a party opponent in

7     these proceedings, and that's Farallon.  They reflect

8     significant statements and admissions by Farallon, which are

9     not hearsay.  It's an exception to the hearsay rule.  And

10    they're being offered for more -- they are being offered for

11    the truth of the matter asserted, because -- and it's

12    admissible in that format.

13         THE COURT:  But are you referring to hearsay within

14    hearsay?  Because there would be, I guess -- I guess the

15    handwritten notes of Mr. Dondero are his hearsay, and then

16    you're saying there's --

17         MR. MCENTIRE:  So, this is reflecting statements made

18    to Mr. Dondero that are admissions of a party opponent.

19         MR. LEVY:  None of that has been established.  These

20    are not notes from anybody at Farallon or Stonehill which

21    could potentially be a party admission.  These are notes by

22    Mr. Dondero about what was purportedly said by somebody else,

23    and there's no evidence that these were kept in the regular

24    course of business.

25        This is hearsay and hearsay within hearsay.  And this

**017999**

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 72 Filed 06/06/25390 Page 151 of 1017   PageID 19050

39

1    could be established in testimony, but it can't be admitted --

2    the document can't be admitted to speak on behalf of a third

3    person who's not here.

4         MR. MCENTIRE:  Well, first of all, I agree, we'd need

5    to lay a foundation.  But that's not the purpose of this

6    discussion right now.  I am simply advising the Court that

7    once I lay a foundation, it comes in for all purposes.  It

8    comes in as an admission of a party opponent.

9         MR. LEVY:  It is not an admission of a party

10   opponent.  It is not notes or statements by any actual

11   defendant.  These are notes by Mr. Dondero being introduced

12   for his own benefit.  It is not a party admission.

13        THE COURT:  Okay.  I'm going to carry that one.  If

14   one of the witnesses that's on the witness stand -- well,

15   presumably Mr. Dondero will be called -- we can get context at

16   that time and decide if it's appropriate to let it in and let

17   you cross-examine him on them if that's going to come in.  All

18   right?  So we'll carry this one.

19        Anything else, though, unique, or can we consider as a

20   batch all these other objections to -- most of them being

21   pleadings, not all of them but a lot of them -- that the

22   Respondents just want it clear that they're not being offered

23   for the truth of the matter asserted?  Your response?

24        MR. MCCLEARY:  They're, again, largely data points

25   relied on by experts in the course of coming up with their

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 34-24   Filed 04/16/25   Page 152 of 1017    PageID 19051
                                        Exhibit 72   Page 45 of 390

40

 1  opinions and just setting the background and history of the

 2  claims trading.

 3          THE COURT:  Well, then which ones are data points?

 4  Because I just need to carry those, right?  If they're not

 5  being offered for any other reason.

 6          MR. MCCLEARY:  Well, I would have to -- we would have

 7  to refer to the charts of the experts, Your Honor, to

 8  determine that on all of them.

 9          MR. MCENTIRE:  In order to facilitate this, may I

10  make a suggestion, Your Honor?  We'll agree that if we're

11  going to offer anything that he's identified other than for

12  the purposes indicated, we will advise the Court.  Otherwise,

13  we'll accept the limitations imposed.  And as we go through,

14  if we offer an exhibit that is more than the truth -- if we

15  are offering it for the truth of the matter asserted, we will

16  advise the Court, and then we could take it up then.  I'm just

17  trying to get the ball rolling.

18          THE COURT:  Okay.  Well, that's still going to be a

19  time-consuming thing, maybe.  But, okay.  Just, when we start

20  the clock here -- very shortly, I hope -- I want people clear

21  that when you make objections, that counts against your three

22  hours.  Okay?  All right?

23          MR. LEVY:  Okay.  Understood, Your Honor.

24          MR. MCCLEARY:  Your Honor, we have certainly made

25  objection to some of their exhibits.

HCMLPHMIT00003053

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 24  72  Filed 04/25/25  Page 153 of 1017    PageID 19052

41

```
 1                 THE COURT:  All right.  Well, shall we turn to those
 2    now?
 3                 MR. MCCLEARY:  Yes, Your Honor.
 4                 MR. MORRIS:  Your Honor, they objected to every
 5    single exhibit except one, so let's be clear.
 6                 THE COURT:  Okay.
 7                 MR. MORRIS:  If they're withdrawing them, that's
 8    fine.
 9                 MR. MCCLEARY:  Well, --
10                 MR. MORRIS:  But let's be clear.
11                 MR. MCCLEARY:  -- we are not withdrawing our general
12    objection to all the evidence, of course.  Just --
13                 THE COURT:  Okay.  Let me just say for the record
14    right now, I understand and you are preserving for all
15    purposes your ability to argue on appeal that it was error for
16    the Court to consider any evidence.  Okay?  You have not
17    waived that argument by --
18                 MR. MCCLEARY:  Thank you.
19                 THE COURT:  -- now --
20                 MR. MCCLEARY:  Thank you.  We can have --
21                 THE COURT:  -- agreeing to the admission of anybody's
22    exhibit or offering your own exhibits.
23                 MR. MCCLEARY:  And we could have a running objection
24    on that basis, on relevance to all the witnesses and the
25    evidence that they offer on that basis.  I would request that.
```

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 34-24  Filed 06/06/25    Page 154 of 1017    PageID 19053
Exhibit 72 Page 46 of 390

42

```
 1                THE COURT:  Well, okay, let me be clear.  Relevance.

 2     Your argument is that no evidence is relevant because the

 3     Court doesn't need to consider any evidence --

 4                MR. MCCLEARY:  Yes, Your Honor.

 5                THE COURT:  -- on the colorability issue.  You've got

 6     a running objection.  It's not destroyed for appeal purposes.

 7     Okay?

 8                MR. MCCLEARY:  Thank you, Your Honor.  Then, subject

 9     to that, in terms --

10                MR. MORRIS:  I'm sorry to interrupt, but --

11                MR. MCCLEARY:  Sure.

12                MR. MORRIS:  -- would it be helpful if I gave the

13     Court my list so she can see --

14                MR. MCCLEARY:  Sure.

15                MR. MORRIS:  -- what the --

16                MR. MCCLEARY:  Sure.

17                MR. MORRIS:  Okay.  May I approach, Your Honor?

18                THE COURT:  You may.  I'm not sure, if everything has

19     been objected to, I'm not sure how --

20                MR. MORRIS:  Because I've tried -- I've tried to

21     organize it in a way that would be helpful.

22                THE COURT:  Okay.

23         (Pause.)

24                MR. MCCLEARY:  Okay.  Your --

25                THE COURT:  I'm ready.
```

018003

HCMLPHMIT00003055

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24-72 Filed 06/06/25390 Page 155 of 1017   PageID 19054

43

```
 1              MR. MCCLEARY:  -- Honor, yes.

 2              THE COURT:  Uh-huh.

 3              MR. MCCLEARY:  So, we are withdrawing our objections,

 4    other than the general objections to relevance based on the

 5    evidentiary nature of the proceeding, to Exhibits 1 and 2.

 6        With respect to 3, this is a verified petition to take

 7    deposition for suit and seek documents filed on July 22, 2021.

 8    We object on the grounds of relevance and hearsay to that.  Is

 9    that --

10              THE COURT:  Well, --

11              MR. MORRIS:  I don't -- I don't understand this one.

12              THE COURT:  This --

13              MR. MCCLEARY:  Is that, I'm sorry, is that your #11?

14              MR. MORRIS:  Yeah.

15              MR. MCCLEARY:  All right.  We withdraw our objection

16    to #3, subject to our general objection.

17        On Exhibit 4, we object to relevance and hearsay on a

18    verified amended petition to take deposition before suit and

19    seek documents.

20              THE COURT:  Okay.  This is my time to hear your

21    argument.  And we're going to be here --

22              MR. MORRIS:  Can I -- can I do this here?  It's going

23    to be much quicker.

24              THE COURT:  What do you mean?  Do what here?

25              MR. MORRIS:  So, if you just follow the chart that I
```

018004

HCMLPHMIT00003056

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 24-72    Filed 06/26/25    Page 156 of 1017    PageID 19055

44

1   gave the Court, --

2            THE COURT:  Uh-huh.

3            MR. MORRIS:  -- Section A is a list of exhibits that

4   they've objected to.  Those exhibits are in the right-hand

5   column.

6       At the same time, they are offering the exact same

7   exhibits into evidence on their exhibit list.  I don't

8   understand how they can offer their exhibits and object to

9   ours.

10           MR. MCCLEARY:  Counsel.  I'm sorry.  We've already

11  told them that, subject to our general objection, we'll

12  withdraw the objections to those exhibits.

13           MR. MORRIS:  Right.  So can we agree that all

14  objections to Section A are withdrawn?

15           MR. MCCLEARY:  Subject to the general objection, yes.

16           MR. MORRIS:  Thank you.

17           THE COURT:  Okay.  So, --

18           MR. MORRIS:  That's going to be much quicker.

19           THE COURT:  -- 11, 34, 2, 46, 42, 38, 41, 39, 40,

20  and various attachments to Highland Exhibits 5 are withdrawn.

21  So, admitted by stipulation.

22       (Debtors' Exhibits 2, 11, 34, 38, 39, 40, 41, 42, 46 are

23  received into evidence.  Certain attachments to Debtors'

24  Exhibit 5 are received into evidence.)

25           MR. MORRIS:  And to make this easy, Your Honor, at

HCMLPHMIT00003057

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 72  Filed 06/06/25  Page 46 of 390   Page 157 of 1017   PageID 19056

45

1   some point I hope later today, but perhaps tomorrow, we'll

2   slap a caption on this, we'll file it on the docket, so that,

3   you know, an appellate court, if necessary, can follow along.

4   But I think that we've just stipulated that all of the

5   exhibits identified in Section A of this document are -- the

6   objections have been withdrawn.

7            THE COURT:  Okay.

8            MR. MCCLEARY:  Subject to the general objections.

9            MR. MORRIS:  Right.  That gets us -- I'm going to

10   jump to Section C, because I think the same is true.  Section

11   C identifies all exhibits that each party has taken from the

12   docket.  And you can see from Footnote 4, the Court can take

13   judicial notice under Federal Rule of Evidence 201, we've just

14   had the discussion about whether or not any of them would be

15   limited for purposes of the truth of the matter asserted, but

16   all of the exhibits identified in Section C I think the Court

17   can take judicial notice of because they're on a docket.

18            THE COURT:  Response?

19            MR. MORRIS:  And so I would respectfully request that

20   they withdraw their objections to anything in Section C.

21            THE COURT:  Response, Mr. McCleary?

22            MR. MCCLEARY:  I understand the Court can take

23   judicial notice of those, Your Honor, but they do contain

24   irrelevant and hearsay information also.

25            MR. MORRIS:  The hearsay, I think that we just had

018006

HCMLPHMIT00003058

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 24-72    Filed 06/06/25    Page 158 of 1017    PageID 19057
Exhibit 72    Page 46 of 390

46

```
 1   the discussion.  I mean, if there's something that he wants to
 2   really point out at this point that I can respond to.  But we
 3   would agree that advocacy pieces shouldn't be offered for the
 4   truth of the matter asserted.  Court orders, on the other
 5   hand, are law of the case.
 6        THE COURT:  So, I mean, it's the very same situation
 7   we just addressed with your own exhibits.  You have a lot of
 8   court filings.  And they didn't have a problem with it, as
 9   long as everyone knew advocacy was not being accepted for the
10   truth of the matter asserted.
11        MR. MCCLEARY:  Well, --
12        THE COURT:  Isn't this the same thing?
13        MR. MCCLEARY:  -- they're not offering it for the
14   truth of the matter asserted.  That's one thing.  And
15   certainly the Court can take judicial notice.  We do object to
16   the extent they're offering Exhibits 6 through 10 for the
17   truth of the matter asserted.
18        MR. MORRIS:  Well, let me check those.
19        THE COURT:  Well, --
20        MR. MCCLEARY:  I'm sorry.  6, 7, uh -- (pause).
21        THE COURT:  Those are orders of --
22        MR. MORRIS:  Yeah.
23        THE COURT:  -- courts.
24        MR. MORRIS:  Yeah.  They're orders of the Court.
25        MR. MCCLEARY:  The orders are not relevant, Your
```

018007

HCMLPHMIT00003059

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 72    Filed 06/06/25390    Page 159 of 1017    PageID 19058

47

 1  Honor.

 2           THE COURT:  Explain.

 3           MR. MCCLEARY:  Well, they have not demonstrated that

 4  the orders that they seek to introduce are relevant.  They

 5  have orders regarding, for example, the contempt proceedings

 6  that are irrelevant to these proceedings.  And prejudicial

 7  under 403.

 8           THE COURT:  All right.  Shall I take a five- or ten-

 9  minute break?  Let me -- I think I've been very generous by

10  not starting the clock yet on the three hours/three hours.

11           MR. MCCLEARY:  Appreciate that.

12           THE COURT:  But here's how we do things in bankruptcy

13  court.  And I don't mean to talk down to anyone.  I don't

14  know, you may appear in bankruptcy court every day of your

15  life.  But we expect counsel to get together ahead of time and

16  stipulate to the admissibility of as many exhibits as you can.

17  If there's a preservation of rights here and there, fine.  But

18  we --

19           MR. MCCLEARY:  Maybe if we take --

20           THE COURT:  You know, --

21           MR. MCCLEARY:  We can try to --

22           THE COURT:  -- helping everyone to understand, --

23           MR. MCCLEARY:  Sure.

24           THE COURT:  -- we have thousands of cases in our

25  court.

018008

HCMLPHMIT00003060

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 24-72   Filed 06/06/25390   Page 160 of 1017    PageID 19059

48

```
1              MR. MCCLEARY:  Sure.

2              THE COURT:  And this is just something we have to do

3    to give all parties their day in court when they need time.

4    And so --

5              MR. MCCLEARY:  If you'd like us to take ten minutes

6    and try to narrow this, we certainly --

7              THE COURT:  Okay.  With everybody understanding you

8    should have taken the ten minutes before we got here.  But,

9    again, when I say three hours, --

10             MR. MORRIS:  Yeah.

11             THE COURT:  -- that's what I meant.  Okay?

12             MR. MCCLEARY:  Yes, Your Honor.

13             THE COURT:  So we'll take a ten-minute break.

14             THE CLERK:  All rise.

15       (A recess ensued from 10:42 a.m. until 10:54 a.m.)

16             THE CLERK:  All rise.

17             THE COURT:  All right.  Please be seated.  Have we

18   reached agreements on some of these exhibits?

19             MR. MCCLEARY:  Your Honor, we have agreed on the ones

20   that we can agree on, and we announced that to the Court with

21   respect to the Paragraph A items that the Court's already

22   ruled on.

23       I would like to point out to the Court that we just got

24   their objections handed to us right before the hearing.  We

25   filed ours last night.  So we didn't --
```

HCMLPHMIT00003061

Case 19-34054-sgj11 Doc 4255-72 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02072-S Document 24 72 Filed 06/06/25 390 Page 161 of 1017 PageID 19060

49

1          THE COURT:  At 11:00-something, right?

2          MR. MCCLEARY:  Yes, Your Honor, but we did --

3          THE COURT:  Okay.  Well, okay.  So I guess your point

4     is you want to make sure I'm annoyed with everyone, not just

5     selective of you.

6          MR. MCCLEARY:  Well, --

7          THE COURT:  I mean, exhibit lists were filed Monday.

8     So I don't know why on Tuesday people were not on the phone

9     saying, you know, or Wednesday morning at the latest.

10         MR. MCCLEARY:  Sure.  And we haven't had much of an

11    opportunity, in fairness, to consider their objections and

12    respond because we just received them right at the time of the

13    hearing, just before the hearing started.

14       Your Honor, we would urge our objections to Exhibit #4.

15    We've objected to this petition to take deposition before suit

16    and seek documents on the basis of relevance and hearsay.

17    They have a number of pleadings in other matters that have

18    nothing to do with, frankly, the colorability standard in this

19    case.  And this is an example.

20         THE COURT:  Okay.  This is the time for me to hear

21    specific objections and what the basis is, and not just --

22         MR. MORRIS:  Can we go back --

23         THE COURT:  -- a category.

24         MR. MCCLEARY:  Yeah.

25         MR. MORRIS:  Can we go back to my way?  Because it's

018010

HCMLPHMIT00003062

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 34-24   Filed 05/05/25   Page 162 of 1017    PageID 19061

50

1  just going to be much faster.  It really will be.  Right?  We

2  -- Category 1, A and C, we dealt with.  Category B, --

3           THE COURT:  Well, we dealt with A.

4           MR. MORRIS:  Right.  And --

5           THE COURT:  All of those are withdrawn, and they are

6  admitted by stipulation.

7           MR. MORRIS:  Right.

8           MR. MCCLEARY:  Subject to --

9           THE COURT:  Category C, --

10          MR. MCCLEARY:  -- the general objections.

11          THE COURT:  -- I'm not sure we're to closure on.

12          MR. MORRIS:  Um, --

13          THE COURT:  Are we to closure on C?  Are you

14 stipulating?

15          MR. MCCLEARY:  No.  We are not stipulating on C.

16          MR. MORRIS:  Let's do them one at a time.

17          MR. MCCLEARY:  I have not had an opportunity to -- to

18 --

19          MR. MORRIS:  Let's do them one at a time.

20          MR. MCCLEARY:  Have not had an opportunity to look at

21 each and every one of these, Your Honor.  Because we did just

22 get these.

23          THE COURT:  Okay.

24          MR. MCCLEARY:  But generally --

25          THE COURT:  If we have not wrapped this up in 15

018011

HCMLPHMIT00003063

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24-72 Filed 06/26/25 Page 163 of 1017   PageID 19062

51

1   minutes, we're just going to start, and you can object the

2   old-fashioned way.  But I'm telling all lawyers here,

3   objections count against your time.  Okay?

4          MR. MORRIS:  And I'd move for the admission of all of

5   our exhibits right now, then.

6          THE COURT:  Okay.

7          MR. MORRIS:  So let him -- let -- put him on the

8   clock and let's go.

9          THE COURT:  Okay.  So, 15 minutes.  Let start going

10  through everything except Category A.

11         MR. MORRIS:  Number 4?

12         MR. MCCLEARY:  Number 4, Your Honor, we object on the

13  basis of relevance and hearsay.

14         MR. MORRIS:  Okay.  My response to that, Your Honor,

15  and this will be my response -- this is in Section B of my

16  outline --

17         THE COURT:  Uh-huh.

18         MR. MORRIS:  Okay?  They object to Exhibits 3, 4, 5,

19  and 9.  These are Mr. Dondero's prior sworn statements.  You

20  just heard his lawyer stand here and tell the Court that

21  somehow his handwritten notes should be admissible as an

22  admission.  You know what he did?  He testified four different

23  times under oath.  That's Exhibits 3, 4, 5, and 9.  Sworn

24  statements.

25    They come into evidence not as hearsay but under Federal

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exh 24 72 Filed 06/06/25390 Page 164 of 1017   PageID 19063

52

1  Rule of Evidence 801(d)(1).  It's beyond -- the notion that

2  they can prove a colorable claim and that it's not relevant

3  that he's got diametrically different -- he's got four

4  different statements, now five with his notes, he's got five

5  different statements.  Doesn't that go to the colorability of

6  these claims?

7      We believe it does.  That's the basis for the introduction

8  of these documents into evidence.

9          THE COURT:  Okay.  Mr. McCleary, your response?

10         MR. MCCLEARY:  Well, it's a verified amended

11  petition, Your Honor, in another matter, to -- before suit to

12  seek documents.  Has nothing to do with the merits of this

13  case and our motion for leave.  So we object on the grounds of

14  relevance and hearsay.

15         THE COURT:  Well, since they're prior sworn

16  statements of Mr. Dondero, --

17         MR. MCCLEARY:  Well, then they might -- if they want

18  to use it later to impeach, they can try to do that, but they

19  have to lay the foundation.

20         THE COURT:  What about 801(d)(1)?

21         MR. MCCLEARY:  Again, relevance, Your Honor.

22         THE COURT:  Okay.  I overrule.  Those are --

23         MR. MCCLEARY:  And Mr. --

24         MR. MORRIS:  Okay.

25         THE COURT:  Those are going to be admitted.

HCMLPHMIT00003065

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 34-24   Filed 06/06/25   Page 165 of 1017   PageID 19064

53

 1            MR. MCCLEARY:  By the way, on hearsay, Mr. Dondero is

 2   not Hunter Mountain.  So when he argues that these are

 3   admissions, they're not admissions by Hunter Mountain.

 4            MR. MORRIS:  Your Honor, the only piece of evidence,

 5   literally the only piece of evidence they have are the words

 6   out of Mr. Dondero's mouth.  There is no evidence, there will

 7   be no evidence of a *quid*, a *pro*, or a *quo*.  There will be no

 8   evidence other than what Mr. Dondero testifies to --

 9            MR. MCCLEARY:  Well, --

10            MR. MORRIS:  -- about what he was told.  There will

11   be no evidence that there was a meaningful relationship

12   between Mr. Seery and Ms. -- and Farallon and Stonehill.

13   There will be no evidence, none, that Farallon and Stonehill

14   rubber-stamped Mr. Seery's compensation package.  Nothing.

15   The only thing we have are going to be the words out of Mr.

16   Dondero's mouth and these notes that just showed up.  And

17   these statements --

18            MR. MCCLEARY:  Your Honor?

19            THE COURT:  Okay.  Counsel, I mean, it just feels

20   like --

21            MR. MORRIS:  It's --

22            THE COURT:  -- if notes get in, then sworn statements

23   of Mr. Dondero should get in.  Right?

24            MR. MCCLEARY:  Your Honor, he's making arguments,

25   closing arguments, opening arguments, trying to run out the

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 24-72  Filed 06/25/25  Page 166 of 1017    PageID 19065
Exhibit 24   Page 55 of 390

54

 1   clock.  We objected to relevance, and we stand on our

 2   objection.

 3           THE COURT:  Okay.

 4           MR. MCCLEARY:  And on hearsay.

 5           THE COURT:  I'll admit 3, 4, 5, and 9.

 6       (Debtors' Exhibits 3, 4, 5, and 9 are received into

 7   evidence.)

 8           MR. MORRIS:  Section E.

 9           MR. MCCLEARY:  I'm sorry.  So our objections are

10   overruled?

11           THE COURT:  They are overruled.

12           MR. MCCLEARY:  On 3, 4, 5?

13           THE COURT:  And 9.

14           MR. MORRIS:  Section E of my outline.

15           MR. MCCLEARY:  What about 6?

16           THE COURT:  That's not --

17           MR. MORRIS:  Well, --

18           THE COURT:  Well, I don't --

19           MR. MORRIS:  -- it would -- it would --

20           THE COURT:  Let's go back to C.  I'm not clear if

21   we're to closure on Section C.

22           MR. MORRIS:  I'll let Counsel go through --

23           THE COURT:  And 6 is within Section C.

24           MR. MORRIS:  I'll let Counsel go through each one,

25   one at a time.

HCMLPHMIT00003067

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24   Filed 06/26/25   Page 167 of 1017   PageID 19066
Exhibit 72   Page 56 of 390

55

1          MR. MCCLEARY:  No.  That's all right.  If you want to

2    go through, you have them lumped in.  Yeah, I think it'd

3    probably be quickest if, frankly, we just go down the list,

4    Your Honor.  Frankly.

5          THE COURT:  Well, you've got ten minutes left.

6          MR. MCCLEARY:  Okay.  We object to #6, memorandum and

7    opinion order granting Dondero's motion to remand, on the

8    basis of relevance and hearsay.

9          THE COURT:  Overruled.  I can take judicial notice

10   under 201 of that.  So 6 is admitted.

11     (Debtors' Exhibit 6 is received into evidence.)

12         MR. MCCLEARY:   We object to Exhibits 7 and 8 on the

13   grounds of relevance.  7 on relevance and hearsay, and 8 on

14   relevance.

15         MR. MORRIS:  I'll take 7 first, Your Honor.

16         THE COURT:  Okay.

17         MR. MORRIS:  It's an order dismissing Mr. Dondero's

18   202 petition.  That 202 petition sought discovery on the basis

19   of the exact same so-called insider trading claims that Hunter

20   Mountain is asserting today.

21     I think it's not only relevant, it's almost dispositive

22   that a Texas state court heard the exact same -- or, actually,

23   not the exact same, because Mr. Dondero changed his story so

24   many times -- but heard a version, I think Versions 1, 2, and

25   3, of this insider trading and would not even give them

HCMLPHMIT00003068

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24   Exhibit 72   Filed 06/05/390   Page 168 of 1017   PageID 19067

56

1  discovery.

2      So when the Court considers whether or not there's a

3  colorable claim here, I think it ought to think about what a

4  Texas state court decided on not whether or not they have

5  colorable claims, whether or not they're even entitled to

6  discovery.  I think it's very relevant.  Move for its

7  admission right now.

8          MR. MCCLEARY:  Your Honor, it's ironic, because at

9  that hearing counsel for the Respondents was arguing that it

10  ought to be this Court that considers what discovery is

11  appropriate.

12          THE COURT:  Okay.  Well, obviously, you can argue

13  about that, but, again, I think I can take judicial notice of

14  this.  Right?

15          MR. MCCLEARY:  Well, we argue that it's not relevant,

16  Your Honor, and it is the --

17          THE COURT:  Okay.

18          MR. MCCLEARY:  7 is not relevant and is hearsay.

19          THE COURT:  Okay.

20          MR. MORRIS:  Number 8, --

21          THE COURT:  Objection is overruled.

22          MR. MCCLEARY:  Overruled?

23          THE COURT:  And so 7 is admitted.

24      (Debtors' Exhibit 7 is received into evidence.)

25          MR. MCCLEARY:  8 is our verified petition.  And we

018017

HCMLPHMIT00003069

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 72 Filed 06/06/25390 Page 169 of 1017   PageID 19068

57

1  object on the grounds of relevance.

2         MR. MORRIS:  You know, Your Honor, if I really had

3  the time and the patience to do this, I think I'd find this

4  document attached to Mr. McEntire's affidavit that's on their

5  exhibit list.

6      But to speed this up just a little bit, how could their

7  202 petition that sought discovery on the basis of the very

8  same insider trading allegation not be relevant?  It's a

9  judicial order.  You can take notice of it.  And it's

10  incredibly relevant that a second Texas state court heard the

11  same allegations that they're presenting to you as colorable

12  and said no, you're not getting discovery.

13         MR. MCCLEARY:  We don't know why they made that

14  order, Your Honor.  They could have simply accepted the

15  opposition's arguments that this Court had jurisdiction and

16  should consider what discovery ought to be done.

17         THE COURT:  Overruled.

18         MR. MCCLEARY:  It's not relevant to our --

19         THE COURT:  I admit 8.

20         MR. MORRIS:  Next?

21         MR. MCCLEARY:  Overruled?

22         THE COURT:  Yes.

23      (Debtors' Exhibit 8 is received into evidence.)

24         MR. MCCLEARY:  The declaration of James Dondero.  I

25  think we withdrew the Dondero --

018018

HCMLPHMIT00003070

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 72 Filed 06/06/25390 Page 170 of 1017   PageID 19069

58

```
 1            THE COURT:  Right.

 2            MR. MCCLEARY:  -- declarations.  If it --

 3            THE COURT:  It's --

 4            MR. MCCLEARY:  Numbered -- I'm sorry, #9.

 5            THE COURT:  9.  I've already checked it as admitted.

 6            MR. MCCLEARY:  If you want to -- if you want to offer

 7   #9, they can offer it.

 8            THE COURT:  It's admitted.  I've already --

 9            MR. MCCLEARY:  Okay.

10            THE COURT:  -- said.

11            MR. MCCLEARY:  Number 10.  It's an order denying our

12   second Rule 202 petition.  And we object to it on relevance,

13   Your Honor.

14            THE COURT:  Same objection.  It's overruled.  It's

15   admitted.

16        (Debtors' Exhibit 10 is received into evidence.)

17            MR. MCCLEARY:  Number 12, 13, and -- 12 and 13 are

18   correspondence regarding resignation letters.  We object on

19   grounds of relevance.

20            THE COURT:  Wait.  Did we skip 11 for a reason?

21            MR. MCCLEARY:  Pardon me?

22            THE COURT:  Did we skip 11 for a reason?

23            MR. MCCLEARY:  We only have it --

24            THE COURT:  Oh, wait.  It's already admitted by

25   stipulation.
```

018019

HCMLPHMIT00003071

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 64 72 Filed 06/06/25390   Page 171 of 1017    PageID 19070

59

1          MR. MCCLEARY:  Yeah, and we have --

2          MR. MORRIS:  That's the one --

3          MR. MCCLEARY:  We have our general objection.

4          MR. MORRIS:  That's the one exhibit that they didn't

5    object to.

6          THE COURT:  Okay.

7          MR. MCCLEARY:  We only had our general objection with

8    respect to that.

9          THE COURT:  Okay.  Thank you.  Thank you.

10          MR. MCCLEARY:  On 12 --

11          THE COURT:  Uh-huh.

12          MR. MCCLEARY:  -- and 13, those are correspondence

13    regarding resignations.  We object on the grounds of

14    relevance.

15          MR. MORRIS:  So, the relevance of that, Your Honor,

16    is to show that when Mr. Dondero sent this email to Mr. Seery

17    in December 2020, he had absolutely no relationship to

18    Highland, had absolutely no duty to Highland, had absolutely

19    no reason to send this email to Highland.  He wasn't in

20    control of Highland.  He wasn't --

21      If they'll stipulate to this, that's fine.  He wasn't in

22    control.  He had no authority to do anything.  He couldn't

23    effectuate trades.  He wasn't there.  And that's what these

24    documents are intended to prove.

25          THE COURT:  Okay.  Why are we -- this is --

HCMLPHMIT00003072

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document Exhibit 72 Filed 06/05/25390 Page 172 of 1017    PageID 19071

60

```
 1              MR. MCCLEARY:  Because there are --

 2              THE COURT:  Some of this stuff, I mean, --

 3              MR. MCCLEARY:  There are other agreements.

 4              THE COURT:  -- is no big deal.  Right?

 5              MR. MCCLEARY:  Sub-advisory agreements, other

 6    agreements that he had under which he had a responsibility to

 7    make the communications regarding material nonpublic

 8    information that he made.  So this is simply irrelevant, Your

 9    Honor.

10              THE COURT:  I overrule.  I mean, again, I don't --

11              MR. MCCLEARY:  Okay.

12        (Debtors' Exhibits 12 and 13 are received into evidence.)

13              MR. MCCLEARY:   Number 14, --

14              THE COURT:  You're both giving me just a lot of

15    background that I already have, but of course a Court of

16    Appeals --

17              MR. MORRIS:  That's why we --

18              THE COURT:  -- isn't going to have it.

19              MR. MORRIS:  Yep.

20              MR. MCCLEARY:  Well, #14, Exhibit 14, we object on

21    the grounds of relevance and hearsay.

22              THE COURT:  Okay.  Wait a minute.  We skipped 13

23    because -- why?  Oh, wait, that was, I'm sorry, 12 and 13 --

24              MR. MORRIS:  Yes.

25              THE COURT:  -- where I've overruled the objection and
```

018021

HCMLPHMIT00003073

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 14-24   Filed 06/25/25   Page 173 of 1017   PageID 19072

61

1   admitted.

2       Okay.  Go ahead.

3           MR. MCCLEARY:  14, we object on the grounds of

4   relevance and hearsay, Your Honor.

5           MR. MORRIS:  I'm just going to make this real quick,

6   Your Honor.  Here's the thing.  This Court knows it.  It's

7   actually facts that cannot be disputed because they're subject

8   of court orders.

9       As the Court will recall, beginning in late November 2020

10  continuing through late December 2020, Mr. Dondero was engaged

11  in a continuous pattern of interference with Highland's

12  business and trading.  It was the subject of the TRO, which is

13  why the TRO is relevant.

14      Your Honor will recall that at the end of November Mr.

15  Dondero attempted to stop Mr. Seery from trading in Avaya

16  stock.  On December 3rd is when he sent this threatening

17  email, text message, to Mr. Dondero [sic].  It caused us to

18  get the TRO.

19      Your Honor will recall on December 16, 2020, that's when

20  we had the hearing on Mr. Dondero's motion to try to stop Mr.

21  Seery from trading in the CLOs that the Court dismissed as

22  frivolous and granted the directed verdict of Highland.

23      So, that's December 16.  He sends this email about MGM on

24  December 17th.  And what happens on December 18th?  More

25  interference with Highland's business.  It's a matter of --

018022

HCMLPHMIT00003074

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 24-72    Filed 06/06/25    Page 174 of 1017    PageID 19073

62

1  beyond dispute.  It's law of the case at this point because

2  that's the subject of the contempt order.  And the Court found

3  that, after -- after hours, on December 18th, Hunter Covitz

4  told Mr. Dondero that Mr. Seery was again trying to trade in

5  Avaya stock, and within a day or two Mr. Dondero was again

6  interfering it, and that's what led to the second -- to the

7  first contempt order.

8       So all of these documents are relevant to show motive and

9  what was happening.  This email was not sent for any

10 legitimate purpose.  The evidence is just overwhelming.  And

11 it's not -- it's not like, oh, that's an argument we're

12 making.  Between the TRO and the contempt order, it's law of

13 the case.  He was interfering with Highland's business nonstop

14 for thirty days, including the day before he sent this email

15 and the day after he sent the email.

16           THE COURT:  Okay.

17           MR. MCCLEARY:  Your Honor, this is a lawsuit or an

18 effort to file a lawsuit on behalf of Hunter Mountain

19 Investment Trust, not James Dondero.  And as much as Counsel

20 wants to make this about Jim Dondero and attack him, this is a

21 different case.  So this exhibit has nothing to do with the

22 claims in this lawsuit.  It's not relevant.  And hearsay.

23           MR. MORRIS:  The only evidence is Mr. Dondero.  It's

24 -- could not be more relevant.

25           THE COURT:  Okay.  I overrule.  I'm admitting this.

018023

HCMLPHMIT00003075

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 24-72 Filed 06/06/25    Page 175 of 1017    PageID 19074

63

```
 1   And so we're --

 2           MR. MCCLEARY:  Uh, --

 3           THE COURT:  It's 14.  It's -- how far?

 4           MR. MCCLEARY:  14.  Exhibit 15 is where we are, Your

 5   Honor.

 6           THE COURT:  Okay.

 7       (Debtors' Exhibit 14 is received into evidence.)

 8           THE COURT:  15.

 9           MR. MORRIS:  Oh, that's -- that's the contempt order.

10   And so these contain the judicial findings that are now beyond

11   dispute that Mr. Dondero was engaged in interfering with

12   Highland's business after the TRO was entered on December

13   10th.

14           THE COURT:  Okay.  Again, my own orders, --

15           MR. MCCLEARY:  Your Honor, it's not --

16           THE COURT:  -- I can take judicial notice of --

17           MR. MCCLEARY:  It's --

18           THE COURT:  -- under the Federal Rules of Evidence.

19           MR. MCCLEARY:  It's --

20           THE COURT:  201.

21           MR. MCCLEARY:  We simply object as not relevant.  We

22   object based on Federal Rule of Evidence 403.  Any possible

23   relevance is outweighed by the prejudice.  And we object on

24   the grounds of hearsay, Your Honor.

25           THE COURT:  Prejudice?  Prejudice?  They're orders I
```

018024

HCMLPHMIT00003076

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 34-72  Filed 06/05/390   Page 176 of 1017    PageID 19075
Exhibit 72   Page 65 of 390

64

1   issued.  I'm going to be prejudiced by my own orders?

2           MR. MCCLEARY:  Uh, well, --

3           THE COURT:  I don't --

4           MR. MCCLEARY:  -- Hunter Mountain will be.

5           THE COURT:  Okay.  I'll overrule.

6       (Debtors' Exhibit 15 is received into evidence.)

7           THE COURT:  I'll tell you what.  We're out of our --

8   well, we've get probably 30 seconds left.  Anything that we

9   can maybe knock out to not have eat into your three hours?

10  Both of you?

11          MR. MCCLEARY:  Your Honor, we filed written

12  objections to all of these exhibits.  We urge those

13  objections.  16.

14          THE COURT:  I know, but this is your chance to argue

15  why your objections have merit.  I can -- we can just --

16          MR. MCCLEARY:  Because, well, obviously, we're

17  talking about pleadings and filings in other matters.  The

18  evidence that they're trying to use to impugn Jim Dondero,

19  which has nothing to do with the merits of HMIT's claims and

20  allegations of insider trades.

21          THE COURT:  Okay.  A lot of this is articles.

22  Articles, articles, articles about MGM.

23          MR. MCCLEARY:  On the articles, Your Honor, subject

24  to our general objection, we'll withdraw the objections to the

25  articles if they'll agree to the articles that we've offered.

018025

HCMLPHMIT00003077

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24   Exhibit 72   Filed 06/06/25390   Page 177 of 1017   PageID 19076

65

1          MR. MORRIS:  Your Honor, we didn't lodge an objection

2   to their articles.

3          MR. MCCLEARY:  Okay.

4          MR. MORRIS:  And just so, if anybody is keeping track

5   at home, this is Item B on the list that I created earlier

6   this morning.

7          THE COURT:  Okay.  So, 25 through 30 are articles.

8   Those are admitted by stipulation.  Nothing is about the truth

9   of the matter asserted.  They're just articles that were out

10   there for --

11          MR. MORRIS:  Right.  I would just --

12          MR. MCCLEARY:  Yes.

13          THE COURT:  -- the world.

14          MR. MORRIS:  Just so we're clear, it's Exhibits 25, 6

15   -- 25, 26, 27, 28, 29, and 30.

16          THE COURT:  Right.

17     (Debtors' Exhibits 25 through 30 are received into

18   evidence.)

19          MR. MORRIS:  And so, yes, those are all articles.

20   They have their articles.  Exhibit 72.

21          THE COURT:  Oh, and 34 is another one.  So that's

22   admitted as well.

23          MR. MORRIS:  Yes.

24          MR. MCCLEARY:  Yes, Your Honor.

25     (Debtors' Exhibit 34 is received into evidence.)

018026

HCMLPHMIT00003078

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document Exhibit 72 Filed 06/06/25390   Page 178 of 1017    PageID 19077

66

```
 1                  THE COURT:  Okay.  Well, we're out of time, so as for

 2      the others, they can offer them the old-fashioned way if they

 3      want to, you can object the old-fashioned way, and it eats

 4      into both of your three hours.

 5                  MR. MCCLEARY:  Yes, Your Honor.

 6                  THE COURT:  Okay.  Let's hear opening statements.

 7          And by the way, before we wrap up today, I'm going to say

 8      out loud everything I've admitted so we're all crystal clear

 9      on what's in the record.  This has been a bit chaotic.

10                  MR. MCCLEARY:  Okay.  Understood.

11                  THE COURT:  So, Caroline is going to be the keeper of

12      our time over here.  And if the judge ever interrupts you,

13      she's going to stop the timer.  Okay?

14                  MR. MCENTIRE:  Thank you.

15                  THE COURT:  I hope I won't any more, but you may

16      proceed.

17                  MR. MCENTIRE:  No, I appreciate it.  Thank you.  Can

18      you see it, Your Honor?

19                  THE COURT:  I can, yes.  Thanks.

20                  MR. MCENTIRE:  Can opposing counsel see it?

21                  MR. MORRIS:  Yes, sir.

22                  MR. MCENTIRE:  All right.

23                  THE COURT:  And I'm just going to ask everyone who

24      has a PowerPoint today, can I get a hard copy --

25                  MR. MCENTIRE:  Certainly.
```

HCMLPHMIT00003079

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 34-1   Filed 08/08/25   Page 179 of 1017   PageID 19078
Exhibit 72   Page 66 of 390

67

```
1              THE COURT:  -- before we close?

2              MR. MCENTIRE:  Certainly.

3              THE COURT:  Okay.  Thank you.

4      OPENING STATEMENT ON BEHALF OF HUNTER MOUNTAIN INVESTMENT

5                              TRUST

6              MR. MCENTIRE:  May it please the Court, Your Honor,

7      at this time I'll be providing the opening statement on behalf

8      of Hunter Mountain Investment Trust.  It is a Delaware trust.

9      Mark Patrick, who's in the courtroom, is the Administrator.

10     He will be one of the witnesses that you'll hear today.

11          Hunter Mountain Investment Trust is the former 99.5

12     percent equity holder, currently classified as a Class 10

13     contingent beneficiary under the Claimant Trust Agreement.  It

14     is active in supporting various entities that in turn support

15     charities throughout North Texas.

16          Your Honor, this is not an ordinary claims-trading case.

17     I know the Court made those references in one of the hearings,

18     and I wanted to more clearly respond.  This has different

19     indicia.  An ordinary claims-trading case is normally outside

20     the purview of the bankruptcy court.  What makes this

21     different is that we're involving, we believe and allege,

22     breaches of fiduciary duty of the Debtor-in-Possession's CEO

23     and the Trustee.

24          It involves also aiding and abetting by the entities that

25     actually acquired the claims.  And that falls into the
```

018028

HCMLPHMIT00003080

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24-72   Filed 08/08/25   Page 180 of 1017   PageID 19079

Exhibit 72   Page 69 of 390

68

1   category of willful misconduct.

2        It also involves injury to the Reorganized Debtor and to

3   the Claimant Trust.  Ordinarily, a claims trade would not

4   involve injury to the estate or the reorganized debtor.  Here,

5   we have alleged that it has.  And the injury takes the form of

6   unearned excessive fees that Mr. Seery has garnered as a

7   result of his relationship and arrangements, as we have

8   alleged, with the Claims Purchasers.

9        During the course of my presentation today, I'll be

10   referring to the Claims Purchasers as the collective of

11   Farallon, Stonehill, Muck, and Jessup.

12        I would like to briefly discuss some of the issues that

13   have already been presented to the Court, just to make sure

14   that this record is clear.

15        Can you please continue?

16        We don't believe the *Barton* Doctrine is applicable.  I

17   believe that precedent is very clear that the *Barton* Doctrine

18   deals with proceedings in other courts, and the various

19   standards and requirements of *Barton* do not apply if in fact

20   we're coming to the Court and filing the proceeding in the

21   court where the Trustee was actually appointed.

22        And so I think that the law is clear.  And this is Judge

23   Houser here in the Northern District of Texas in the case *In*

24   *re Provider Meds*.  And she makes very clear that the standard

25   for granting leave to sue here is actually less stringent than

018029

HCMLPHMIT00003081

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 24-72 Filed 06/06/25    Page 181 of 1017    PageID 19080

69

1    a 12(b)(6) plausibility standard.  So if there is any issue as

2    to what standard this Court should be applying to the -- to

3    this process, we believe it's a 12(b)(6) standard, confined to

4    the four corners of the document.

5        If the Court wishes to consult the documents that are

6    referred to in the four corners of the petition or complaint,

7    it may do so.

8        But the standard here is even more flexible than a

9    standard plausibility.  Our evidence, though, achieves the

10   standard of plausibility as well.

11       The *In re Deepwater Horizon* case is another important

12   case.  That's a Fifth Circuit case.  A plaintiff's claim is

13   colorable if it can allege standing and the elements necessary

14   to state a claim on which relief could be granted.  Defining a

15   colorable claim as one with some possible validity.  I don't

16   have to prove my case today.  I didn't have to prove my case

17   in the prior hearings.  I have to prove sufficient

18   allegations, not evidence, but sufficient allegations to show

19   that it has some possible basis of validity.

20       Possible basis of validity.  We're not here talking about

21   likelihoods.  We're not here talking about *prima facie*

22   evidence.  We're not here talking about probabilities.  We're

23   talking about something less than plausibility.  But, again,

24   we achieve plausibility.

25       A colorable claim is defined as one which is plausible or

HCMLPHMIT00003082

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 24-72    Filed 06/06/25    Page 182 of 1017    PageID 19081

70

1  not without merit.  These are various cases from around the

2  country.  The colorable claim requirement is met if a

3  committee has asserted claims for relief that, on appropriate

4  proof, would allow recovery.  On appropriate proof.  We're not

5  required to put on that proof today, Your Honor.

6      Courts have determined that a court need not conduct an

7  evidentiary hearing, but must ensure that the claims do not

8  lack any merit whatsoever.  We submit that our claims have

9  substantial merit and deserve the opportunity to initiate our

10  proceedings, have an opportunity to conduct discovery.  And if

11  they want to file a 12(b)(6) motion before this judge, before

12  you, they can do so.  If they want to file a motion for

13  summary judgment, they can do so.  But at this juncture, they

14  cannot, and at this juncture this Court should not consider

15  evidence in making its determination.

16      Standing under Delaware law.  The Funds have collectively

17  really hit the standing issue hard.  I think it's easily

18  resolved.  First of all, it's clear that a beneficial owner

19  has standing to bring a derivative action.  Under Delaware

20  law, a beneficial owner has a right to bring a derivative

21  action on behalf of the -- against the trustee.

22      So the issue is, am I a beneficial owner?  As a contingent

23  beneficiary in Class 10, and that's the Court's inquiry here,

24  do I qualify as a beneficial owner?  And I think that Delaware

25  law is clear that, by not limiting it to only vested

018031

HCMLPHMIT00003083

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24   Filed 07/05/25   Page 183 of 1017   PageID 19082
Exhibit 72   Page 76 of 390

71

1   interests, by not limiting it only to immediate beneficiaries,

2   they are not -- they are not extending the scope of the

3   statute to contingent beneficiaries.  And this is consistent

4   with the laws around the country, because even Texas

5   recognizes that an unvested contingent beneficiary has a

6   property right to protect.

7        Even Mr. Seery admitted in his deposition that a unvested

8   contingent interest is in the nature of a property right.  If

9   you have a property right, that property right can be abused.

10  If you have a property right, that property right, whether

11  it's inchoate or not, it can be abused, it can be

12  misappropriated, and you could become aggrieved.  And that is

13  the constitutional standard for standing:  Is Hunter Mountain

14  Investment Trust aggrieved?  And the answer is yes.

15       Contingent beneficiaries from around the country, in

16  addition to Mr. Seery's admission that we have a property

17  interest, contingent beneficiary has standing.  This is the

18  *Smith v. Clearwater* case on Slide 11.  Very clearly, they say

19  that even if it's subject to a future event.  Their argument

20  is that Mr. Seery has not certified Hunter Mountain as in the

21  money.  We believe we are in the money.  That's a different

22  issue.  We believe he should certify, in the discharge of his

23  duties.  That's a different issue.

24       But even assuming his case -- his argument for a moment,

25  their argument is that since he's not done that act, which we

018032

HCMLPHMIT00003084

1  also challenge and criticize that he's not done that act, that

2  we can't qualify to bring this case.  Well, that's not what

3  the law is, that even an unvested interest, a contingent

4  interest, has a right.

5      Slide 12.  This is the State of Illinois.  Despite the

6  fact that interest is contingent and may not vest in

7  possession, you still have a right to protect what you have.

8  And you have standing to bring a cause of action.

9      The Claimant Trust Agreement, by the way, suggests that we

10  have no vested interest, and they'll likely argue that point.

11  But the point there is the law says that's irrelevant.  If

12  it's an inchoate interest, if it's potentially vested in the

13  future, that's what imbues you with standing.

14      And in any event, the Claimant Trust Agreement is subject

15  to Delaware trust law, and they can't get around that.  They

16  can say whatever they want to say in the agreement to try to

17  block us from participation, but it's still subject to

18  Delaware trust law, and Delaware trust law does not draw a

19  distinction between vested or unvested.

20      The State of Missouri:  There is no dispute in this case

21  that the future -- that future beneficiaries have standing to

22  bring an accounting action, whether they're vested or

23  contingent.  The *Bucksbaum* case.  Article III standing exists,

24  constitutional standing, including discretionary

25  beneficiaries, have long been permitted to bring suits to

HCMLPHMIT00003085

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 24-72Exhibit 72FilePage 06/05390 Page 185 of 1017    PageID 19084

73

1    redress trustees' breaches of trust.  This applies not only to

2    our standing as an individual plaintiff, which we've brought,

3    but also in our standing -- in our capacity seeking to bring a

4    derivative action to benefit the Claimant Trust of the

5    Reorganized Debtor.  Both are permitted under this law under

6    these cases.

7        An interest -- in the *Mayfield* case, an interest is any

8    interest, whether legal or equitable or both, vested,

9    contingent, defeasible, or indefeasible.  So the unilateral

10   self-serving wording of the Claimant Trust does not abrogate

11   our right to bring the claim.

12       I'd like to talk briefly about fiduciary duties.  We know

13   that Mr. Seery has fiduciary duties to the estate when he was

14   the CEO prior to the effective date.  We allege that he

15   breached those fiduciary duties, and that gives us standing to

16   bring the claim that we have brought for breaching fiduciary

17   duties, causing damages that are accruing post-effective date.

18       In the *Xtreme Power* case, again, the directors can either

19   appear on both sides of the transaction or expect to derive

20   any personal financial benefit.  We are alleging that Mr.

21   Seery engaged in self-dealing.  We allege that he engaged in

22   self-dealing by arriving at an understanding where he could

23   put business allies -- whether you call them friends, business

24   allies, close acquaintances -- on the committee, the Oversight

25   Board that would ultimately oversee his compensation, which,

018034

HCMLPHMIT00003086

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 72 Filed 06/05/390 Page 186 of 1017    PageID 19085

74

1  in the context of this case, makes no sense and it is

2  excessive.

3      Muck is a specially -- special-purpose entity of Farallon.

4  Farallon acquired the claims, created Muck to do the job.

5  Muck is now on the Oversight Board.

6      Jessup.  Jessup is a special-purpose entity, a shell

7  created by Stonehill.  Stonehill bought the claims, funneled

8  the money through Jessup.  Jessup is now on the Oversight

9  Board.  Jessup and Muck -- and by the way, the principals in

10  Farallon are actually the representatives from Muck on the

11  Oversight Board.  So there's no suggestion that there's really

12  a distinct corporate relationship here.

13      Michael Linn, who is a principal at Farallon.  You'll hear

14  his name today, throughout today.  He actually is a

15  representative of the Oversight Board, dealing with Mr. Seery

16  and negotiating Mr. -- I put negotiation in quotes --

17  negotiating Mr. Seery's compensation.

18      I'd like to talk very briefly about background.  We took

19  Mr. Seery's deposition.  I was unaware of this.  I now know

20  it.  Perhaps the Court was already aware of it.  This is Mr.

21  Seery's first job as a CEO of any debtor.  This is the first

22  time Mr. Seery has ever been a chief restructuring officer.

23  This is the first time Mr. Seery has ever been the CEO of a

24  reorganized debtor.  This is the first time that he's served

25  as a trustee post-effective date.  However, his compensation

018035

HCMLPHMIT00003087

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24-72Exhibit 72Filed 06/06/25390   Page 187 of 1017   PageID 19086

75

1   is excessive and not market-driven, and there's a reason for

2   that.  We believe and we allege that it's a *quid pro quo*

3   because of prior relationships with Farallon and Stonehill.

4       Farallon and Stonehill are hedge funds, Your Honor.  They

5   created their special-purpose entities on the eve of this

6   transaction simply to take the title to the claims, but the

7   money is going upstream.

8       Seery has a relationship with Farallon.  Do we know the

9   full extent of that relationship?  No.  We have been deprived

10  of discovery.  We attempted to get the discovery in the state

11  court 202 process.  We were denied for reasons not articulated

12  in the court's order.

13      We attempted to get the discovery here that the Court

14  refused under the last hearing about these relationships.

15      So what we do have begins to put the pieces of the puzzle

16  together.  And sufficient is more than plausible.  It is more

17  than colorable.

18      We know that Mr. Seery went on a meet-and-greet trip to

19  Farallon's offices in 2017.  Didn't have to.  He was trying to

20  cultivate a business relationship.  Farallon was important to

21  him.

22      We know that in 2019 he was no longer with Guggenheim

23  Securities.  He goes out to Farallon's offices for another

24  meet-and-greet and he specifically meets with the two

25  principals who are reflected in Mr. Dondero's notes, Raj Patel

018036

HCMLPHMIT00003088

1   and Michael Linn.

2        We know that in June 2020 Farallon emailed Seery.  This is

3   after Mr. Seery becomes the CEO.  He says, "Congratulations.

4   We're monitoring what you're doing."

5        Seery's relationship with Stonehill.  These are all --

6   this is all before what we believe to be the events that are

7   at issue in this case.  We believe that -- represented

8   Stonehill in the *Blockbuster* bankruptcy proceeding.  There was

9   an objection to a document.  Mr. Seery was involved in the

10  *Blockbuster* proceedings.  Stonehill was one of his many

11  clients on the committee that he represented.

12       We know that Stonehill is actively involved in one of Mr.

13  Seery's charities in New York.  We know that he sent text

14  messages to Mr. Seery in February of 2021, wanting to know how

15  to get involved in this bankruptcy.

16       Farallon and Stonehill were strangers to this bankruptcy.

17  They weren't creditors.  They were encouraged and they came

18  into this process.

19       Farallon and Stonehill have not denied any of our

20  allegations.  They are not putting any evidence on today.  We

21  allege that these relationships was based and founded upon a

22  *quid pro quo*.  I'll scratch your back; you scratch mine.  You

23  give me some information; I want to evaluate these claims.

24  And, by the way, we're going to be on the Oversight Board, or

25  you're going to put us on the Oversight Board, or by default

018037

HCMLPHMIT00003089

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 34-24 72 Filed 06/06/25390   Page 189 of 1017   PageID 19088

77

1    we'll be on the Oversight Board, and we'll work out your

2    compensation agreement.

3        Mr. Seery also has an established relationship with

4    Stonehill.

5        I like to have a timeline of certain events.  This is not

6    all of the relevant events, but this can give you a quick

7    picture.  We know that Mr. Dondero sent an email to Mr. Seery

8    in December of 2020 relating to MGM.  It is undisputed that

9    Mr. -- that Farallon emailed Seery, Mr. Seery, in January of

10   2021 if there was a path to get information regarding the

11   claims for sales.  Mr. Seery says he never responded to it,

12   but we know that this entity, Farallon, got deeply involved in

13   buying these claims shortly after this email.

14       We have the Claimant Trust Agreement suddenly being

15   amended to not have a base fee, but now we're going to

16   incorporate a success participation fee.  As part of a plan,

17   we're not criticizing that, but suddenly the vehicle for post-

18   effective date bonuses is being created.

19       The Debtors' analysis comes out in association with the

20   plan confirmation.  It projects a 71.32 percent recovery for

21   Class 8 and Class 9, and those are the principal classes we're

22   talking about.  95 percent -- 98 percent of all of the claims

23   here are in Class 8 and Class 9, until you get to us, Class

24   10.

25       71.32 percent of Class 8 means that Farallon and Stonehill

018038

HCMLPHMIT00003090

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 4   Exhibit 72   Filed 06/06/25390   Page 190 of 1017   PageID 19089

78

1   will get less than about a six percent internal rate return on

2   their $163 million investment, which they have never denied.

3   That is not a hedge fund investment goal.  Investment -- hedge

4   funds like these companies, they go for 38, 40, 50 percent of

5   returns.  Who would ever invest $163 million on a distressed

6   asset that's not collateralized with only an expectation of an

7   internal rate of turn of six percent?  But that's going to be

8   the evidence before the Court.  That does not make any

9   financial, rational wisdom at all.

10       The plan is confirmed.  It's undisputed that Stonehill

11  contacts Seery after the plan is confirmed to want to know how

12  to get involved.  They have phone calls after this text

13  message.  Muck is created on March 9.  We know from Mr.

14  Seery's deposition that Farallon told Seery that six days

15  later they bought the claims.  All the claims, by the way,

16  when I say bought the claims, it's everything except UBS.  To

17  our knowledge.  They may have negotiated the paperwork back

18  then, but the claims transfers did not occur until the summer.

19  All the other claims involved, the claims transfers were filed

20  with this Court in mid-April and at the end of April.

21       Tim Cournoyer removes MGM from the restricted list.  Tim

22  Cournoyer is an employee of Highland.  Well, it tells us that

23  MGM was on the restricted list and there should be no

24  discussion about MGM, but there was.  There was discussions

25  about MGM, and Mr. Dondero is going to testify to that.

018039

HCMLPHMIT00003091

Case 19-34054-sgj11 Doc 4255-72 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02072-S Document 24-72 Filed 08/06/25 Page 191 of 1017 PageID 19090

79

1    And we also know that the HarbourVest settlement was

2   consummated during this period of time.  If it had been on the

3   restricted list, as it was, that transaction should never have

4   occurred.  But it did occur.  This Court ordered it.  It

5   approved it.  And I'm not challenging -- we're not challenging

6   that settlement.  It is done.  That is done.  What we are

7   challenging is the fact that Mr. Seery is actively involved in

8   using inside material nonpublic information.

9        Jessup Holdings is created shortly thereafter, on April

10  8th.  We have claims settling on April 30th.  The Acis claim

11  is transferred to Muck -- that's Farallon -- on April 16.  The

12  Redeemer and Crusader are all transferred on April 30th.

13       Stonehill and Farallon never deny that they did no due --

14  that they failed to do due diligence.  We allege that there

15  was no due diligence.  And that relies in significant part

16  upon Mr. Dondero.  But now, because we have Mr. Seery's

17  deposition, it also relies upon Mr. Seery's admissions in

18  deposition, because he says he never opened up a data room, he

19  doesn't know what due diligence they did.  Farallon says the

20  only due diligence they did is they talked to Jim Seery.  And

21  how do you invest $163 million, or $10 million or $50 million,

22  whatever the part is, with an internal rate of return six

23  percent, only on the advice of Mr. Seery, who's never been a

24  trustee or a CEO before, unless there's something going on?

25       Your Honor, public announcement of MGM on May 26th.  On

HCMLPHMIT00003092

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 34-24    Filed 08/05/25    Page 192 of 1017    PageID 19091

80

1    May 28th, two days later, Mr. Dondero calls Farallon.  It took

2    Mr. Dondero or his group a few days, a week or so, to even

3    understand who -- that Farallon was involved, because the

4    registrations for Muck and Jessup did not disclose their

5    principals, did not even disclose addresses.  They were shell

6    -- they were companies that came in in the last minute to buy

7    these claims incognito, frankly.

8        They found out that Farallon was involved.  They had a

9    call initially with Raj Patel, who is the principal of

10   Farallon.  He has three conversations total:  One with Mr.

11   Patel and two with Michael Linn.  Michael Linn was the one

12   responsible for these claim purchases.  Patel admitted that

13   Farallon relied exclusively on Seery and did no due diligence.

14   Linn rejected the premium to sell.  The evidence you'll hear

15   today, that Mr. Linn rejected a premium up to 40 percent to

16   sell the claims.  He actually said he would not sell at all

17   because he was told by Mr. Seery that the claims were too

18   valuable.

19       That is evidence of insider trading.  Specifically, they

20   said they were very optimistic about MGM and they were

21   unwilling to sell because Seery said too valuable.

22       We have -- these are the purchases.  This is where the

23   Class 9 claims fall.  And keep in mind -- Tim, go back -- that

24   $95 million of this upside potential is being told, at least

25   to the publicly available information, that you're never going

HCMLPHMIT00003093

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24-72   Filed 08/25/25   Page 193 of 1017   PageID 19092

81

1   to get there.  Yet 95 -- $95 million is allocated to this

2   category.  So Class 8 is $275 million.  Class 9 is 29 -- $95

3   million.

4        Next.

5        So we have the evidence that you'll hear today.  Farallon

6   admitted the timing.  No due diligence, never denied by the

7   Claim Purchasers.  Based upon material nonpublic information.

8   That's our allegation.  Purchased over $160 million.  This is

9   never denied by the Claims Purchasers.  They purchased claims

10  when the return on investment was highly doubtful.  Maximum

11  expected annual rate of return, assuming publicly-available

12  information, was approximately six percent, and that is

13  totally atypical of what a hedge fund would seek.

14       Insider information.  We're not talking about just MGM.

15  The Respondents want to narrow the Court's inquiry.  This is

16  much larger than MGM.  MGM is a part of it, it's a big part of

17  it, but it's not the only part of it.  It's other assets.

18  Portfolio companies.  Other invested assets.  There's a lot of

19  money out there, and it was never disclosed during the

20  ordinary course of the bankruptcy, for reasons that the Court

21  already knows, in terms of asset values.  How does someone

22  come in and purchase distressed assets, claims, without any

23  understanding of what assets are backing those claims, when

24  there's no publicly-available information there to do it and

25  there's no evidence, no indication, no statement that actually

018042

HCMLPHMIT00003094

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24-72   Filed 06/06/25390 Page 194 of 1017   PageID 19093

82

1   due diligence was done?

2       That right there, without anything else, makes our claims

3   plausible.  You don't have to prove insider trading by direct

4   evidence.  Nobody's going to admit that they did something

5   wrong.  You prove it circumstantially, and we've cited cases

6   and we'll give you cases to that effect.

7       Next.

8       We have material nonpublic information.  It is very clear

9   that Mr. Dondero on December 17th sent this email, not just to

10  Mr. Seery but to several other individuals, including lawyers.

11  It states that he'd just gotten off a board call.  A pre-board

12  call.  The update, he provides the update.  Active

13  diligencing.  It's probably a first-quarter event.  We can

14  scour all of the other media documents that are in evidence,

15  both from us and them, and you're not going to find any

16  indication anywhere that a board member has said, guys, gals,

17  it's going to be a probable first-quarter event.  That's

18  material nonpublic information.

19          THE COURT:  By the way, you all objected to this

20  exhibit.

21          MR. MCENTIRE:  No, this is my exhibit.

22          THE COURT:  We spent --

23          MR. MCENTIRE:  I did not.  They objected to this.

24          MR. MORRIS:  Your Honor, we didn't object to it, and

25  that is the one exhibit that they did not object to.

018043

HCMLPHMIT00003095

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 72    Filed 06/06/25390    Page 195 of 1017    PageID 19094

83

```
 1                THE COURT:  Oh, it is?

 2                MR. MORRIS:  Nobody objected to this exhibit.

 3                MR. MCENTIRE:  I'm not going to object to this

 4     exhibit, Your Honor.

 5                THE COURT:  Okay.  It's a different version.

 6                MR. MCENTIRE:  Fair enough.

 7                THE COURT:  Okay.  It was a different email around

 8     that same time frame.

 9                MR. MCENTIRE:  So just --

10                THE COURT:  Apologies.  We stopped the clock.

11                MR. MCENTIRE:  This -- my next exhibit is simply a

12     demonstrative, but I just want the Court to understand that

13     MGM is no small matter here and Mr. Seery did testify in

14     deposition that it probably made up $450 million.  He was

15     pretty close.

16                MR. MORRIS:  Your Honor, I object to this

17     demonstrative.  There is no evidence in the record.  It's not

18     cited to anything.  We're not just going to start putting up

19     stuff on the screen that we like.

20                MR. MCENTIRE:  Excuse me.  I'm not offering this

21     document into evidence.

22                MR. MORRIS:  I don't care.  The Court shouldn't be

23     seeing a demonstrative exhibit that contains matters that are

24     never going to be in the record.

25                THE COURT:  Okay.
```

018044

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 34-24 72 Filed 06/25/25390  Page 196 of 1017    PageID 19095

84

1          MR. MCENTIRE:  I disagree.  I can put the data in the

2     record.

3        May I proceed?

4          MR. MORRIS:  But you didn't.

5          THE COURT:  Okay.  I'm not considering the truth of

6     this until and unless I get evidence of this.

7          MR. MCENTIRE:  Fair enough.  But the point is this,

8     Mr. Seery has conceded in deposition that between the

9     institutional funds and the CLOs, there's a lot of MGM

10    securities and stock.  We're talking a lot of money.  We're

11    not talking about just Highland Capital's investment.

12       You can skip the next slide.  Skip.

13       So, rumors versus material nonpublic information.  They

14    can talk all day long, and if they want to use their time

15    doing this, they can.  There's a difference between rumor and

16    actual material nonpublic information.  Rumor from

17    undocumented sources, lack of clarity, lack of timing.  There

18    is no -- there's no debate that a lot of people knew that

19    maybe MGM might be for sale.  Maybe they wouldn't.  Sometimes

20    it falls apart, you know.  But the point is a board member is

21    telling someone that there's a probable event in the first

22    quarter of 2021.  That is definite, specific, and it comes

23    from the highest authority.  That is -- if that's not material

24    and public information, I don't know what could be.

25       Classic indications of insider trading.  You have to have

HCMLPHMIT00003097

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 72 Filed 06/06/25390 Page 197 of 1017    PageID 19096

85

```
 1    a tipper with access to MNPI.  Here, we know that Mr. Seery,

 2    if he's the tipper, we allege he's the tipper -- and these are

 3    words of art out of case law, by the way -- he has access to

 4    information about MGM.  He has access about asset values,

 5    projected values.  He has a relationship.  We believe he has a

 6    very strong relationship.  It's more than just social

 7    acquaintances.  He's giving congratulatory emails.  He's

 8    getting solicitations.  He's solicited.  Benefits received.

 9    We know what the benefits are.  They get the opportunity to

10    invest money with huge upside.

11        There was a point mentioned some time ago that, well, only

12    -- only the sellers really have the grievance.  Well, Your

13    Honor, we have a right to start our lawsuit and do some

14    discovery, because, frankly, a lot of sellers have big-boy

15    agreements.  They say, you don't sue me if I have MNPI.  I

16    don't sue you if you have MNPI.  We have mutual releases.

17    Let's go by our way.  Everybody's happy.  We're not going to

18    come back and see each other ever again.

19        That's one of the things we're being deprived of here.

20    But otherwise, what we have here is a colorable plan.  We've

21    asked for the communications with the sellers.  We can't get

22    it.  We have here an email.

23        Next.

24        We have here an email.  This actually -- you'll hear Mr.

25    Dondero say this actually reflects three communications.  Raj
```

HCMLPHMIT00003098

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 72 Filed 06/06/390 Page 198 of 1017    PageID 19097

86

1   Patel, Farallon, bought it because of Seery.  Mr. Dondero

2   contacted Mr. Patel and says, Raj Patel bought it because of

3   Seery.  50 to 70 percent's not compelling.  Class 8.  50

4   percent, 70 percent.  Give you a 30 percent to 40 percent

5   premium.  Not compelling.  I ain't going to sell.  Ask what

6   would be compelling.  Nothing.  No offer.  Bought in February/

7   March.  We now know the time frame.  We know that Stonehill is

8   communicating with them and we know that Farallon has been

9   just communicating with Mr. Seery.  Bought assets with claims.

10  It's not just the MGM.  It's not just the portfolio companies

11  and other assets.  It's also the claims.

12      Well, what are the claims?  It's the claims against Mr.

13  Dondero.  Well, how would they know about all this if there's

14  no due diligence and there's no evidence of any due diligence

15  before you?  130 percent of costs, not compelling, no counter.

16  Mr. Dondero's angry.  Discovery is coming.

17      Atypical behaviors are also circumstantial evidence of

18  insider trading.  We have strange behaviors here, Judge.  We

19  have a vast majority of the claim value is acquired by only

20  two entities post-confirmation.  Most significant claims are

21  only owned by two entities who were strangers to the whole

22  process.

23      The removal of -- and Mr. Morris offered to stipulate.

24  The sudden removal of MGM from the compliance list in April of

25  2021 -- by the way, the removal doesn't cleanse the MNPI.  If

HCMLPHMIT00003099

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 34-24   72 Filed 06/08/25   Page 199 of 1017   PageID 19098

87

1   you have material nonpublic information because you received

2   it from Mr. Dondero, the fact that Mr. Dondero's no longer

3   employed by Highland Capital or no longer directly or formally

4   affiliated doesn't cleanse the MNPI.

5       We have no due diligence, regardless of the significant

6   nine-digit numbers, and we have no rational explanation of why

7   this kind of money would be invested when they're projecting

8   an actual loss, if -- a modest return at best for Class 8 and

9   a loss for Class 9.

10      Insider trading can be proved by circumstantial evidence,

11  Your Honor.  No fraudster, no person who's done wrong is going

12  to admit to it, so you look for the classic -- you look for

13  the classic elements.  And that's what we had here.  And we

14  have alleged all of this in our pleadings.  Not in extraneous

15  evidence.  Within the four corners of our pleadings.  And

16  that's why we have a plausible claim.

17      You know, I believe it's Rule 8, Rule 9 of the Federal --

18  you have to require specificity in a fraud claim.  Well, this

19  is not a fraud claim.  This is a different claim.  But we have

20  provided specificity that passes the smell test of

21  colorability.  We have provided specificity that would satisfy

22  even more stringent requirements under 12(b)(6).

23      The plan analysis.  This is a, I think, a document

24  admitted by everyone.  Mr. Seery has testified that this

25  projection of 71.32 percent for Class 8 came out in February

HCMLPHMIT00003100

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24-72   Filed 08/06/25   Page 200 of 1017   PageID 19099

88

1    of 2021 and never changed, all the way up to the effective

2    date.

3        So this is what the public believed.  This is what the

4    public knew.  And if this was all that Farallon and if is all

5    that Stonehill had access to, that means that they were going

6    to lose their entire investment on Class 9.  They bought UBS

7    at a loss to begin with.  And on the other three investments,

8    they were going to get a very, very modest, minor return, six

9    percent over three years, or even less.  That is not what

10   hedge funds do.

11       Seery's excessive post-effective date compensation.  We

12   have obtained no discovery from Farallon or Stonehill in this

13   regard, but we know that he had no prior experience.  We know

14   that the award that was given him was not market-based, even

15   though the self-serving documents that have been produced and

16   that are attached to their exhibit list suggests a robust

17   negotiation.  Well, they were robust without any kind of

18   reality check in the real world about whether it was market-

19   supported.  None.  Mr. Seery has admitted to that.

20       It was not lowered.  He's making $1.8 million a year right

21   now, with most -- a lot of the assets already sold, the

22   reorganization done.  All they're doing now is monetizing

23   assets.  He's getting $1.8 million.  He's got 11 people

24   working for him.  And then he has a bonus, a bonus that is --

25   increases significantly with his ability to recover for Muck,

018049

HCMLPHMIT00003101

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 34-72   Filed 06/06/25   Page 201 of 1017   PageID 19100

89

1   Jessup, Farallon, and Stonehill.

2       And in the absence of -- if we were really dealing with

3   uncertainty and risk, then that may be another issue, but here

4   we're dealing with entities that already know that they're

5   going to get a payday and they already have.  They've already

6   made about a $170 million return -- 170 percent return, excuse

7   me -- over and above the original investment, when they were

8   projected to actually lose money.

9       Just so you know, we have over $534 million of cash that

10  has been basically monetized, and out of that, $203 million in

11  total expenses -- $277 million to Class 8 and -- and -- 1

12  through 7, and Class 8 distributors.  Excuse me, creditors.

13  Even if you take -- if you take out the alleged obligations of

14  Mr. Dondero on the promissory note cases, that still leaves

15  over $100 million available, which puts us in the money.  Puts

16  us in the money.  And the fact that you have $203 million of

17  expenses in a case of this nature is part of our claim, is

18  that we have delay actions.  We have a situation where Mr.

19  Seery is continuing to receive $1.8 million a year on a slow

20  pace to monetize, paying other professionals, when this could

21  have been over a long time ago.  That's part of our

22  allegations.  It's not part of any valuation motion.  It's

23  actually in our allegations.

24      I'm going to reserve the rest.  I think that's my opening

25  statement, Your Honor.  I'm going to reserve the rest for my

HCMLPHMIT00003102

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exh. 24 72 Filed 06/05/25390   Page 202 of 1017   PageID 19101

90

```
 1   closing.  And let me see.  Yes, that's right.  And thank you

 2   for your time.

 3          THE COURT:  All right.  Caroline, how much time was

 4   that?

 5          THE CLERK:  Thirty-four minutes and 27 seconds.

 6          THE COURT:  Thirty-four minutes and 37 seconds.

 7   Okay.

 8          THE CLERK:  Twenty-seven.

 9          THE COURT:  Oh, 27.  Okay.

10          MR. MCENTIRE:  Thirty-four minutes?

11          MR. MCCLEARY:  Thirty-four minutes.

12          MR. MORRIS:  Your Honor, I do have hard copies of my

13   short slide presentation.

14          THE COURT:  All right.  You may approach.

15       And Mr. McEntire, are you going to give me your PowerPoint

16   later, hard copies later?

17          MR. MCENTIRE:  Yes, Your Honor.  I found one typo and

18   I'd like to fix one typo and then we'll give it to you.

19          THE COURT:  Okay.

20           OPENING STATEMENT ON BEHALF OF THE DEBTORS

21          MR. MORRIS:  Good morning, Your Honor.  John Morris,

22   Pachulski Stang Ziehl & Jones, for Highland Capital Management

23   and the Claimant Trust.

24       I want to be fairly brief because I really want to focus

25   on the evidence.  I look forward to Your Honor hearing from
```

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24-72   Filed 06/26/25   Page 203 of 1017   PageID 19102

91

 1   Mr. Seery so that he could clear up a lot of the misleading

 2   statements that were just made.

 3        The Court is here today on a gatekeeper function, and

 4   we're delighted that the gatekeeper exists.  We're delighted

 5   that the Court will have an opportunity, after considering

 6   evidence, to determine whether or not these claims are

 7   actually colorable.

 8        There's -- there were a lot of conclusory statements I

 9   just heard.  There were a lot of assumptions that were made.

10   There were a lot of misleading statements that were made.  At

11   the end of the day, what the Court is going to be asked to do

12   is to decide whether, in light of the evidence, do these

13   claims stand up on their own?  And they do not.

14        And let me begin by saying that I made a mistake a couple

15   of weeks ago.  If we can go to Slide 1.  I told Your Honor

16   that you were the sixth body to consider these insider trading

17   claims.  Based on Hunter Mountain's exhibit list, there is

18   actually one more, and I'll get to that in a moment.  So

19   you're actually -- this is the seventh attempt to peddle these

20   claims to one body or another.

21        The first was Mr. Dondero's 202 petition.

22        Everything I have here, Your Honor, is footnoted to

23   evidence.  Okay?

24        So, Footnote 1, you can look in the paragraphs of Mr.

25   Dondero's petition, his amended petition, his declaration,

Case 19-34054-sgj11 Doc 4255-72 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02072-S Document 24 72 Filed 06/06/25 Page 204 of 1017 PageID 19103

92

1  where he makes the same allegations. Again, I misspeak. Not

2  the same allegations. Different versions of the allegations

3  that are being presented today concerning insider trading.

4       He did it three times. The Texas state court said no

5  discovery. In October of 2021, Douglas Draper wrote an

6  extensive letter to the U.S. Trustee, setting forth the same

7  allegations. You can find them at our Exhibit 5. It's

8  attachment Exhibit A, Pages 6 through 11. Compare them to the

9  allegations that are being made by Hunter Mountain today. The

10  U.S. Trustee's Office took no action.

11      Mr. Rukavina followed up with the same thing to the same

12  body in November of 2021. You can see where his allegations

13  of insider trading are made and *quid pro quo* and all the rest

14  of it. Again, they took no action.

15      The one that I don't have on this chart because I didn't

16  -- I made the chart last week and then was unavailable. Mr.

17  Rukavina sent a second letter. And you can find that at

18  Plaintiffs' Exhibit 61. And in Plaintiffs' Exhibit 61, you'll

19  see that Mr. Rukavina sent yet another letter to the U.S.

20  Trustee's Office on May 11, 2022.

21      And these are all really important, right? The U.S.

22  Trustee's Office has oversight responsibility for matters

23  including claims trading. That's their job. They took three

24  different swings at this. And these are pages of allegations.

25  6 to 11. 9 to 13. We think it's very important that the

HCMLPHMIT00003105

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 24-72   Filed 06/06/25   Page 205 of 1017    PageID 19104
Exhibit 72 Page 96 of 390

93

1   Court look at what was told to the U.S. Trustee's Office.  And

2   you're going to hear Mr. Seery testify that Highland has never

3   heard from the U.S. Trustee's Office concerning any of these

4   allegations or any of the other allegations that are set forth

5   in Mr. Rukavina and Mr. Draper's letter.  Never.  Declined to

6   even initiate an investigation.

7        Hunter Mountain filed its own 202 petition.  It boggles my

8   mind that they try to create distance with Mr. Dondero,

9   because the whole petition, like this whole complaint, is

10  based on Mr. Dondero.  He submitted a declaration alleging the

11  same insider trading case, and a second Texas state court said

12  I'm not even giving you discovery.  We know that's the result.

13       But the best is the Texas State Securities Board.  I think

14  we're going to hear testimony that Mr. Dondero or somebody

15  under his control is the one who filed the complaint with the

16  Texas State Securities Board.  Who would be the better body to

17  assess whether or not there's insider trading than a

18  securities board?  I can't imagine there's a better body.

19  They did an investigation.  Mr. Dondero could have told them

20  anything he wanted.  I'm sure he did.  And they wrote in their

21  motion in Paragraph 37 one of the reasons they have colorable

22  claims is the investigation is ongoing.

23       Much to their dismay, I'm sure, two days before our

24  opposition was due, the Texas State Securities Board said,

25  we've looked at the complaint, we've done our investigation,

HCMLPHMIT00003106

1   and we're not taking any action.  You can find that, Your

2   Honor, Footnoted 5 at Exhibit 33.

3       You are now the seventh body who's being asked -- and

4   you're being asked to do substantially more than any of the

5   other prior bodies were.  The Texas state courts were being

6   asked, just let them have discovery.  They said no.  The U.S.

7   Trustee's Office, charged with the responsibility of looking

8   at claims trading, said, I'm not going to investigate.  I know

9   what you've told me.  No.  The Texas State Securities Board.

10  Insider trading, insider trading.  I'm not doing an

11  investigation.  I'm not doing anything.  And now they want to

12  come here and engage in, you know, in expensive, long

13  litigation over the same claims nobody else would touch.

14      Can we go to the next slide?

15      Mr. Dondero's email.  Good golly.  "Amazon and Apple are

16  in the data room."  There's a hundred articles out there that

17  they're putting into evidence that say that.  "Both continue

18  to express material interest."  There's a hundred articles out

19  there that say that.  "Probably a first-quarter event.  Will

20  update as facts change."

21      There will not be any evidence that he ever updated

22  anybody, because that wasn't the purpose of this, as Your

23  Honor will recall.  He had an axe to grind.

24      And I direct your -- I don't direct the Court to do

25  anything -- I ask the Court to take a look at our opposition

018055

HCMLPHMIT00003107

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24   Filed 06/06/25   Page 207 of 1017   PageID 19106

95

1  to the motion, in Paragraphs 23 to 25, where we cite to

2  extensive evidence, all of which is now part of the record,

3  showing just what was happening, from the moment he got fired

4  on October 10th until the end of the year, with the

5  interference, with the interference, with the threats, with

6  the TRO.  It was nonstop.

7      Was this email sent in good faith by somebody who owed no

8  duty to anybody?  Or was it really just another attempt -- and

9  this is why the gatekeeper is so important, because I think

10  that's exactly what this Court is supposed to do:  Is this a

11  good-faith claim?  Is this a claim that's made in good faith?

12  It can't be.  And you know why?  You know what's -- you know

13  what's -- I'll just say it now.  I won't even save it for

14  cross.

15      Remember the HarbourVest settlement that they're making so

16  much, you know, about?  Mr. Dondero is the tipper.  According

17  to him, he gave Mr. Seery inside information.  According to

18  him, Mr. Seery abused it by engaging in the HarbourVest

19  transaction.  But Mr. Dondero filed an extensive objection to

20  the HarbourVest settlement and never said a word about this,

21  because that wasn't on his mind at the time.  The email was

22  sent in order to interfere.  And when that failed, he's trying

23  to play gotcha now.  It's ridiculous.

24      He owed no duty to Highland.  It would have been a breach

25  of his own duty to MGM to share that information at that

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 34 72 Filed 06/06/25   Page 208 of 1017   PageID 19107

96

1    period of time.

2        The shared services agreement.  They don't help him.  Mr.

3    Dondero has nothing to do with that.  Highland is providing

4    services.  He's not providing services to Highland.  Highland

5    was providing.  We had already given notice of termination.

6    We had already had our plan and disclosure -- we had already

7    had our disclosure statement approved.  We were weeks away

8    from confirmation.  Please.

9        And the *Wall Street Journal* article on December 21st at

10   Exhibit 27, that's not your garden-variety *Wall Street Journal*

11   article, because it specifically says that investment bankers

12   were engaged to start a formal process.  The investment

13   bankers are identified by name.  Something has changed.

14   Anybody could see that.

15       Yes, there were rumors for a long time.  Nobody had ever

16   said there was a formal process.  Nobody had ever said

17   investment bankers had ever been hired.  Nobody had ever

18   identified those investment bankers.  Right?  I mean, just the

19   world changed.

20       If you can go to the next slide.

21       You know, before I get to the next slide in too much

22   detail, *quid pro quo*.  We look at it as *quid*.  Did he -- is

23   there any evidence that he actually gave anybody material

24   nonpublic inside information?  The answer is going to be no.

25   The *quo* is the relationship.  And I'm not going to spend too

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 4 72Filed 06/96/05390 Page 209 of 1017   PageID 19108

97

1   much time on that now.  But wait until you hear Mr. Seery

2   testify as to the actual facts about his relationship.

3   Because some of what we just heard is mind-boggling, that

4   little -- that little page from the *Blockbuster* case, like, 14

5   years ago, where Farallon was one of a group of people who Jim

6   Seery never met.  Like, the stretch, what they're trying to do

7   is beyond the pale.  But I'm delighted to have Mr. Seery sit

8   in the box and answer all the questions they want to ask him

9   about his relationship with Farallon and Stonehill.

10          But getting to the point, the *quid pro quo*.  The *quo* is

11   they fixed his compensation?  Are you kidding me?  They

12   rubber-stamped his compensation?  Highland and Mr. Seery and

13   the board are alleged to have negotiated?  There's nothing

14   alleged.  There are facts.  There is evidence.  It is beyond

15   dispute.  If you look, just for example, right, they take

16   issue with his salary?  The salary was fixed by this Court in

17   2020.  Without objection.  He's getting the exact same salary

18   that he ever got.

19      You'll hear that it's a full-time job.  Your Honor knows

20   better than anybody in this courtroom, other than me, perhaps,

21   the litigation burden that's been placed on this man.  He has

22   no other income.  He doesn't do anything else.  This is a

23   full-time job.  It's the exact same job that he had when Your

24   Honor approved his compensation package three years ago,

25   without a raise.  They didn't give him a nickel more.  Not one

018058

HCMLPHMIT00003110

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24-72 Filed 09/05/25   Page 210 of 1017   PageID 19109

98

1    nickel.  It's outrageous.

2        The balance of his compensation, of which he has not yet

3    received a nickel, is exactly what this Court would want

4    somebody in Mr. Seery's position to do.  It aligns his

5    interests with his constituency.  Not with Stonehill.  Not

6    with Farallon.  With all creditors.  The greater the recovery,

7    the greater the bonus.  Outrageous, right?  Remarkable, isn't

8    it?  Only in their world.

9        If Your Honor can go back to Mr. Rukavina's letter,

10   because this is where it all -- that's where it all starts

11   from.  Like, excessive compensation.  Mr. Rukavina, I don't

12   know how he did this, why he did it, what it was based on.  He

13   actually told the U.S. Trustee's Office that they thought Mr.

14   Seery made $50 million.  It's in the letter.  $50 million,

15   they told the U.S. Trustee's Office he made.  It's footnoted,

16   so you can go find it.  It's right there, at Page 14.  Quote,

17   Seery's success fee could approximate $50 million.

18       $8.8 million is what he's making.  They think that's

19   excessive?  What do they think he should make?  Three?  Five?

20   We're not going to hear that.  But that's what this case is

21   about.  You just heard counsel in his opening statement.  He

22   literally said the only thing at issue is his compensation.

23   And that has to be the case, because if there was -- if there

24   was no claims trading, UBS and HarbourVest and Acis, right,

25   the Redeemer Committee, they would all still be holding these

018059

HCMLPHMIT00003111

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 72    Filed 06/00/25390    Page 211 of 1017    PageID 19110

99

1    claims today.

2        When Stonehill and Farallon acquired the claims, they were

3    all allowed.  There was no debate about what the claims were.

4    If they held the claims today, they would be worth the exact

5    same amount of money, only a different person would be

6    benefitting from it.

7        So the case actually is only about Mr. Seery's

8    compensation.  And they've moved the goalposts, as often

9    happens in this courtroom, from rubber-stamping -- I'll give

10   you what you want.  When I hear rubber-stamp, I hear, you make

11   a demand and I'll give it to you.  And now they realize, when

12   they see the negotiation -- because it's in evidence, it's

13   just the documents, you can see the board minutes -- what do

14   we, doctor the board minutes and they should get discovery

15   because we doctored the board minutes?  The board minutes show

16   a four-month negotiation with an Independent Board member

17   fully involved.  It's mind-boggling.  It's actually -- well,

18   I'll just leave it at that.

19       Next slide.  Last slide.  Let me finish up.  Three of the

20   four sellers were former Committee members.  Mr. Dondero

21   agreed that Committee members would have access to special

22   nonpublic inside information as part of the protocols, as part

23   of the corporate governance settlement.  He agreed to that.

24   These are the people who got abused?  These are the people who

25   didn't know what was happening?  Committee members and

018060

HCMLPHMIT00003112

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 51-24 Filed 01/06/25 Page 212 of 1017   PageID 19111
Exhibit 72   Page 100 of 390

100

1   HarbourVest, probably one of the biggest and most

2   sophisticated funds in the world, didn't know what was

3   happening?  They got abused?  Stonehill and Farallon took

4   advantage of them?

5        If you read their pleadings closely, they actually allege,

6   and I don't -- I don't know if there'll ever be any evidence

7   of this -- but they actually allege that -- I forget which --

8   oh, somebody is an investor in Stonehill and Farallon, and so

9   the theory is one of the sellers is an investor in Farallon.

10  So not only did they abuse, they abused one of their own

11  investors.  Like, this is not a colorable claim.  This is

12  ridiculous.

13       None of the claims sellers are here.  Sophisticated people

14  who -- who -- right?  Mr. Dondero could pick up the phone and

15  say, hey, guys, you got ripped off.  You sold your claims when

16  you shouldn't have.  They had an unfair advantage.

17       Nobody's here.  Where is anybody complaining?  They're not

18  going to because they cut a deal that they thought was good

19  for them at the time.  In hindsight, maybe they have regrets.

20  Right?  We all have regrets sometimes in hindsight.  But that

21  doesn't create a claim.

22       We've heard so much about what hedge funds would get and

23  how much and is this rational?  The fact of the matter is, at

24  the time Mr. Dondero had his phone call on May 28th, UBS had

25  not been purchased, although MGM had already been announced.

HCMLPHMIT00003113

Case 19-34054-sgj11 Doc 4255-72 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02072-S Document 34-72 Filed 07/02/25 Page 213 of 1017 PageID 19112

Exhibit 72 Page 102 of 390

101

1  So when they talk about MGM, maybe it's the fact -- and this

2  is in evidence -- maybe it's the fact that, two days before,

3  the MGM-Amazon deal actually was publicly announced.  It

4  actually was.  So maybe when they say, hey, yeah, we like MGM,

5  because, you know, that just -- that just got announced.

6  Maybe that happened.

7      But at the end of the day, the claims that they bought, if

8  you just look at the claims that were purchased at the time he

9  had the conversation, all Mr. Seery had to do was meet

10  projections and they were going to get $33 million in two

11  years.  A 30 percent return in two years.  I don't know.  That

12  doesn't -- that doesn't sound crazy to me.  Doesn't sound

13  crazy to me.  It certainly doesn't create a colorable claim,

14  just because they think that Farallon or Stonehill -- there's

15  not going to be any evidence of Farallon or Stonehill's risk

16  profile.  There's not going to be any evidence of Farallon or

17  Stonehill's, you know, expected returns.  There's not going to

18  be any evidence at all about what due diligence they did or

19  didn't do, other than what comes out of Mr. Dondero's mouth,

20  as usual.

21      Mr. Dondero -- and let's look at what's going to come out

22  of Mr. Dondero's mouth.  He has multiple sworn statements.

23  I'm going to take his notes and they're going to become mine.

24  I'll put him on notice right now.  Because those notes bear no

25  relationship to the evolution of his sworn statements over

HCMLPHMIT00003114

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 54-72   Filed 06/03/25   Page 214 of 1017   PageID 19113

102

1   time.

2       The first time he mentions MGM in a sworn statement is two

3   years after the fact in Version #5.  That's a colorable claim?

4   You want -- you want to oversee a litigation, or maybe it gets

5   removed to the district court, maybe I get lucky to be in

6   front of a jury, and I'll have Mr. Dondero explain how it took

7   him five tries before he could write down the letters MGM.

8   Not a colorable claim.  No evidence against Stonehill

9   whatsoever.  Zero.  Zero.  Never spoke to them.  There's no

10  colorable claim here, Your Honor.

11      I'm going to turn the podium over to Mr. Stancil to talk

12  about the law.

13             THE COURT:  Okay.

14       OPENING STATEMENT ON BEHALF OF JAMES P. SEERY, JR.

15             MR. STANCIL:  Thank you, Your Honor.  Mark Stancil,

16  counsel for Mr. Seery.  But I'm going to just very briefly

17  address a few legal points.  And I actually mean briefly.

18             THE COURT:  Okay.

19             MR. STANCIL:  I'll come back to a good bit of this in

20  closing as time permits.

21      I heard Mr. McEntire say *Barton* doesn't apply.  I would

22  encourage him to start with what the gatekeeping order

23  actually says.  Here it is.  This is in -- it's in the plan.

24  Your Honor has confirmed it.  The question we have in terms of

25  what standard applies is, what does this order mean?  Well, we

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 10-4  Filed 04/24/25  Page 215 of 1017    PageID 19114
Exhibit 72   Page 104 of 390

103

1    think that's going to be clear.  It's not what they think the

2    word "colorable" would mean in other contexts.  It's not what

3    they think they should have to satisfy now that they have a

4    theory.  It's, what does this mean?

5        And we'll get into some of the additional evidence from

6    Your Honor's order at the time, later in closing.

7        Next slide, please.

8        But let me just start to say I'm awfully surprised to hear

9    him say that he doesn't believe *Barton* applies, because the

10   order says that it does.  This is Paragraph 80 of the

11   confirmation order.  It says that the Court has statutory

12   authority to approve the gatekeeper provision under these

13   sections of the Bankruptcy Code.  The gatekeeper provision is

14   also within the spirit of the Supreme Court's *Barton* Doctrine.

15   The gatekeeper provision is also consistent with the notion of

16   a pre-filing injunction to deter vexatious litigants that has

17   been approved by the Fifth Circuit in such cases as *Baum v.*

18   *Blue Moon Ventures*.

19       So I think it is impossible, and respectfully, Your Honor,

20   it's law of the case.  This is what the order is based on.

21   The day for objecting to what's in the confirmation order is

22   long gone.

23       So let me come back, then -- first slide, please -- and

24   I'll just very briefly give you a little legal framework for

25   what we're going to be arguing to you later in closing.

018064

HCMLPHMIT00003116

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24-72   Filed 07/05/25   Page 216 of 1017   PageID 19115

104

1        So, *Barton* does require a *prima facie* showing.  That is

2    *Vistacare* and plenty of other cases.  That is more than a

3    12(b)(6) standard, Your Honor.  Numerous courts agree.  And in

4    fact, as you'll hear us discuss later, Judge Houser's opinion

5    is not to the contrary, because she said explicitly, I'm not

6    applying *Barton*.  So anything that they're relying on for what

7    *Barton* requires from that opinion is *dicta*.  But we can show

8    you case after case after case, and we will, to show that

9    *Barton* requires evidentiary hearings.

10       Here's a point, this third bullet here is something I have

11   not heard a single word in all of the briefing and ink that

12   has been spilled and in as long as we've been here this

13   morning, is what is a gatekeeping order doing if all it does

14   is reproduce a 12(b)(6) standard?  That's what they say.  In

15   fact, they're actually saying it's even lower.  Now I think I

16   heard them say it's even lower than a 12(b)(6) standard.

17       That makes no sense whatsoever.  We've just shown you that

18   this gatekeeping order was imposed consistent with *Barton* and

19   vexatious litigant principles.  Later I will walk Your Honor

20   through factual findings that you made detailing the vexatious

21   litigation, detailing the abuses.  The notion that the gate is

22   the same gate that every other litigant who hasn't

23   demonstrated that record of bad faith is absurd, and it serves

24   no purpose.

25       And as Mr. Morris described, Hunter Mountain woefully,

018065

HCMLPHMIT00003117

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 5-24   Filed 06/06/25   Page 217 of 1017   PageID 19116

105

1    woefully violates any *prima facie* showing.  And we'll get into

2    a little bit more exactly how that works.

3        We are going to ask this Court, in addition to ruling that

4    *Barton* applies and that they've failed it, we're going to ask

5    this Court, respectfully, to please consider ruling on

6    multiple independent grounds as well.  We know there's a

7    penchant for appeals and appeals upon appeals.  So we will

8    argue to Your Honor, although we will largely spare you

9    another rehash of our briefs, but we will explain to Your

10   Honor why they do lack standing to bring this claim as a

11   matter of Delaware law.  And there was a lot of fuzzing up

12   about constitutional standing and Delaware law.  Not

13   necessary.

14       If -- we will be happy to rely on our pleadings here, but

15   on Page 27 of the Claimant Trust Agreement, that's what

16   defines their rights under Delaware law, and they were talking

17   about how beneficial owners under Delaware law have standing.

18   Well, are they beneficial owners?  They are not.  Equity

19   holders -- this is in Paragraph C, Page 27 of the Claimant

20   Trust Agreement -- Equity holders will only be deemed

21   beneficiaries under this agreement upon the filing of a

22   payment certification with the bankruptcy court, at which time

23   the contingent trust interests will vest and be deemed equity

24   trust interests.

25       They are not beneficial owners of squat.  That has not

018066

HCMLPHMIT00003118

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 72    Filed 07/06/25    Page 218 of 1017    PageID 19117

106

1    happened.

2       And last, Your Honor, we will -- and I will organize this

3    for Your Honor in closing as well -- we would ask you to rule

4    on a straight-up 12(b)(6) standard as an alternative, because

5    we know what's coming on appeal and we think their complaint

6    collapses under its own weight.  You heard Mr. Morris

7    detailing their own math shows significant returns.  You'll

8    also hear us describe how they have nothing but mere

9    conclusions and naked assertions upon information and belief

10   but unsupported.

11      *Iqbal* and *Twombly* would still apply under their 12(b)(6)

12   standard, especially, and perhaps even more with a heightened

13   standard under Rule 9(b), because they're essentially alleging

14   some version of fraud, it sounds like.

15      They're never going to get there, Your Honor.  All we

16   would ask is for a full record to take inevitably,

17   unfortunately, to the Court of Appeals.

18      And I think Mr. -- I'm not sure which of my colleagues

19   will be speaking briefly for Holland & Knight, but I'll just

20   turn it over to them.

21         THE COURT:  All right.  Mr. McIlwain?

22      OPENING STATEMENT ON BEHALF OF THE CLAIM PURCHASERS

23         MR. MCILWAIN:  Thank you, Your Honor.  I'll be even

24   briefer.  Brent McIlwain here for the Claim Purchasers.

25      Your Honor, Mr. McEntire stated to this Court that my

018067

HCMLPHMIT00003119

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 34-72 Filed 06/08/25   Page 219 of 1017   PageID 19118

107

1   clients have never denied any of this.  In fact, in his reply,

2   he says, The Claim Purchasers do not deny that they invested

3   over $163 million.  We do not deny that we did not due

4   diligence, we do not deny that we refused to sell our claims

5   at any price, and we do not deny that we invested the claims

6   at what is, at best, a low ROI.

7       We had no duty to answer to HMIT or Mr. McEntire.  We had

8   no duty when we bought these claims to -- we had no duties to

9   any creditor.  We had -- it was a bilateral agreement with a

10  third party.  And frankly, Your Honor, it's not Mr. Dondero's

11  or HMIT's business what due diligence we did and what

12  information that we obtained.

13      But I will tell you right now, Your Honor, we were very

14  careful in our pleadings to not bring issues of fact, because

15  this -- HMIT has been chasing my clients, obviously, based on

16  the notes that were presented in the initial PowerPoint, it

17  was a -- it's retribution.  It's retribution for not agreeing

18  to sell the claims to Mr. Dondero when he offered to purchase

19  at a 40 percent premium.

20      And Your Honor, when I look at that note, it's

21  interesting, because I hadn't seen the note, obviously, until

22  it showed up on the exhibit list.  When you look at that note,

23  I think it's -- I think it's very interesting.  To the extent

24  it was contemporaneous, I don't know.  But what it shows, it

25  shows that if you're a hammer, everything's a nail.  And Mr.

018068

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 34-72    Filed 06/09/25    Page 220 of 1017    PageID 19119
Exhibit 72    Page 109 of 390

108

1    Dondero is a vexatious litigator.  And what did he write down?

2    Discovery to follow.

3         But my question is this.  Who was trying to trade on

4    inside information?  Mr. Dondero was offering a 40 percent

5    premium, allegedly, on the cost.  What information did he

6    have?  Certainly, he had inside information.

7         My client owed no duty to Mr. Dondero.  My client owed no

8    duty to anybody in this estate at the time of these claims

9    purchase.

10        And Your Honor, we talk a lot about -- or, it's been

11   talked a lot of insider trading.  These are claims trades.  I

12   think the Court honed in on this from the very get-go.  The

13   Court does not have a role in claims trades.  There's a 3001

14   notice that's filed post-claims trade, but there's no

15   requirement that there's Court approval.

16        And these aren't securities.  It's not as if we're trading

17   claims and it could benefit or hurt you based on some equity

18   position that you're going to obtain.  We obtained claims that

19   had been settled, they were litigated heavily, and the most

20   that we can obtain is the amount of the claim.  And that is,

21   as Mr. Morris stated, all that changed was the name of the

22   claimant.  That's all.  Because the claims didn't increase in

23   value based on the trade.

24        Your Honor, our pleadings, I think, speak for themselves

25   in terms of you really -- you really don't have to consider

HCMLPHMIT00003121

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 55-24   Filed 07/06/25   Page 221 of 1017    PageID 19120
Exhibit 72  Page 110 of 390

109

1  evidence, from our perspective, to determine that this

2  proposed complaint has no merit and is not plausible and

3  presents no colorable claims.

4      The gatekeeper provision, and we're going to talk a lot

5  about that today, obviously, right, requires that Mr. Dondero

6  establish a *prima facie* case that the claims have some

7  plausibility.  If you can simply write down allegations, file

8  a motion for leave and attach those allegations and say, Your

9  Honor, you have to take all these as true, the gatekeeper has

10  no meaning.  There's no point in having a gatekeeper

11  provision.

12      And in summary, Your Honor, what -- and I think Mr. Morris

13  honed in on this specifically -- this really comes down to

14  compensation.  Right?  Because this -- the allegation is that

15  my clients purchased claims, presumably at a discount, right,

16  based on some inside information, which we obviously deny, but

17  we don't have to put that at issue today.  For what purpose?

18  For what purpose?  So we got inside information from Mr. Seery

19  so that we could then scratch his back on compensation on the

20  back-end?

21      Your Honor, there is no reason that my clients need to be

22  involved in this litigation.  If HMIT thinks that this -- that

23  they have a claim against Mr. Seery for excessive

24  compensation, they can -- they could have brought such a

25  gatekeeper motion, or a motion for leave under the gatekeeper

018070

HCMLPHMIT00003122

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 36-72   Filed 06/06/25   Page 222 of 1017    PageID 19121

110

 1    provision, without including my clients.  Why did they include

 2    my clients?  They included my clients because my clients did

 3    not sell to Mr. Dondero when he called, unsolicited, to try to

 4    get information.  It's retribution.  And that's what a

 5    vexatious litigator does, and that's why the gatekeeper

 6    provision is in place.

 7        I'll reserve the rest for closing, Your Honor.

 8            THE COURT:  All right.  Caroline, what was the

 9    collective time of the Respondents?

10            THE CLERK:  Twenty-eight minutes and 37 seconds.

11            THE COURT:  Twenty-eight minutes, 37 seconds.

12        All right.  Well, let's talk about should we take a lunch

13    break now?  I'm thinking we should, because any witness is

14    going to be, I'm sure, more than an hour.  So can you all get

15    by with 30 minutes, or do you need 45 minutes?  I'll go with

16    the majority vote on this.

17        (Counsel confer.)

18            MR. MCENTIRE:  1:00 o'clock.  45 minutes.

19            MR. MORRIS:  40 minutes, whatever.  1:00 o'clock?

20            THE COURT:  We'll come back at 1:00 o'clock.

21            MR. MORRIS:  Thank you, Your Honor.

22            THE COURT:  Okay.  Thank you.

23            THE CLERK:  All rise.

24        (A luncheon recess ensued from 12:19 p.m. until 1:05 p.m.)

25            THE CLERK:  All rise.

HCMLPHMIT00003123

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 54-72   Filed 07/02/25   Page 223 of 1017   PageID 19122

111

```
 1              THE COURT:  All right.  Please be seated.  We're
 2    going back on the record in the Highland matter, the Hunter
 3    Mountain motion for leave to file lawsuit.
 4        I'll just let you know that at 1:30 we're going to take
 5    probably what will be a five-minute break, maybe ten minutes
 6    at the most, because I have a 1:30 motion to lift stay docket.
 7    Just looking at the pleadings, I really think maybe one is
 8    going to be resolved and it won't be more than five or ten
 9    minutes.  So whoever is on witness stand can either just stay
10    there, because I think we won't be finished, or you can take a
11    bathroom break or whatever.  All right?  So, it's video, the
12    1:30 docket.
13        All right.  So, Mr. McEntire, are you ready to call your
14    first witness?
15              MR. MCENTIRE:  I am, Your Honor.
16              THE COURT:  Okay.
17              MR. MCENTIRE:  May I proceed?
18              THE COURT:  You may.
19              MR. MCENTIRE:  At this time, Hunter Mountain calls
20    Mr. James Dondero.
21              THE COURT:  All right.  Mr. Dondero, welcome.  If you
22    could find your way to the witness box, I will swear you in
23    once you're there.  It looks like you've got lots of notebooks
24    there.  Please raise your right hand.
25        (The witness is sworn.)
```

018072

HCMLPHMIT00003124

Dondero - Direct                    112

```
 1              THE COURT:  All right.  Thank you.  You may be

 2    seated.

 3              MR. MCENTIRE:  I'm not familiar with your procedure.

 4    Should I approach the -- here to --

 5              THE COURT:  If you would, unless you're having --

 6              MR. MCENTIRE:  That's fine.

 7              THE COURT:  -- any kind of --

 8              MR. MCENTIRE:  That's fine.  I'm not.

 9              THE COURT:  -- knee issues or, you know, sometimes

10    people want to stay seated for that reason.

11              MR. MCENTIRE:  Your Honor, again, my tender of Mr.

12    Dondero as a witness is subject to our running objection on

13    the evidentiary format.

14              THE COURT:  Understood.

15        JAMES DAVID DONDERO, HUNTER MOUNTAIN INVESTMENT TRUST'S

16                         WITNESS, SWORN

17                       DIRECT EXAMINATION

18    BY MR. MCENTIRE:

19    Q   Mr. Dondero, would you state your full name for the

20    record, please?

21    A   James David Dondero.

22    Q   With whom are you currently -- what company are you

23    currently affiliated with?

24    A   Founder and president of NexPoint.

25    Q   All right.  And I think the Court is well aware, but would
```

018073

HCMLPHMIT00003125

```
 1   you just briefly describe your prior affiliation with -- was

 2   it Highland Capital?

 3   A    Yes.

 4   Q    What was that affiliation?

 5   A    President and founder for 30 years, and then to facilitate

 6   an expeditious resolution of the estate I handed the reins to

 7   three Independent Board members and I became a portfolio

 8   manager until October of -- I was an unpaid portfolio manager

 9   until October of '20.

10   Q    Thank you, sir.  Do you have any current official position

11   with Hunter Mountain Investment Trust?

12   A    No.

13   Q    Can you describe for us, sir, any actual or control you

14   attempt to exercise on the business affairs of Hunter Mountain

15   Investment Trust?

16   A    None.

17   Q    Are you -- do you have any official legal relationship

18   with Hunter Mountain Investment Trust where you can attempt to

19   exercise either direct or indirect control over Hunter

20   Mountain Investment Trust?

21   A    I do not.

22   Q    Did you participate -- personally participate in the

23   decision of whether or not to file the proceedings that are

24   currently pending before Judge Jernigan?

25   A    I did not.
```

018074

HCMLPHMIT00003126

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 45-72    Filed 06/05/25    Page 226 of 1017    PageID 19125

Exhibit 72    Page 115 of 390

Dondero - Direct                    114

1    Q    As the former CEO of Highland Capital, are you familiar

2    with the types of assets that Highland Capital owned?  On the

3    petition date?

4    A    Yes.

5    Q    And have you been monitoring these proceedings and the

6    disclosures in these proceedings since the petition date?

7    A    Yes.

8    Q    Okay.  Can you describe generally for me the types of

9    assets on the petition date that Highland Capital owned?  The

10   types of assets?  Describe the types of assets -- companies,

11   stocks, securities, whatever, whatever you -- however you

12   would describe it.

13   A    There were some securities, but it was primarily

14   investments in private equity companies and interests in

15   funds.

16   Q    Okay.  I've heard the term portfolio company.  What is a

17   portfolio company?

18   A    A portfolio company would be a private equity company that

19   we controlled a majority of the equity and appointed and held

20   accountable the management teams.

21   Q    Would there be separate management, separate boards, for

22   those portfolio companies?

23   A    Yes.

24   Q    All right.  How many portfolio companies were there on the

25   petition date, if you're aware?  If you recall?

018075

HCMLPHMIT00003127

Dondero - Direct                    115

1   A    Half a dozen, of different sizes.

2   Q    Can you identify the names, if you recall?

3   A    Yes.

4   Q    What are those names?

5   A    Trussway, Cornerstone, some small -- Carey International,

6   CFA, SSP Holdings.  Yeah, to a lesser extent, OmniCare.

7   Q    All right.

8   A    Or, um, --

9   Q    In addition to the portfolio --

10  A    Sorry.

11  Q    -- of companies in which Highland Capital would own

12  interests, did Highland also have interests in various funds?

13  A    Yes.  I said OmniCare.  I meant OmniMax, I think was the

14  name.

15  Q    What type of funds?

16  A    I'm sorry.  The funds were usually funds that we were

17  invested in or seeded or managed.  So they're things like

18  Multistrat, Restoration, a Korea fund, PetroCap.

19  Q    Are these managed funds by Highland Capital?  Or were

20  they?

21  A    Yes.  Pretty much, with the exception of PetroCap.  We

22  were a minority -- a minority -- a large -- a large minority

23  investor with a sub-advisor.

24  Q    Did Highland Capital Management on the petition date own

25  an interest, a direct security interest in MGM?

018076

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document Exhibit 72 Filed 07/07/25 390   Page 228 of 1017    PageID 19127

Dondero - Direct                        116

 1   A    Yes.  And I -- yes.

 2   Q    Did the various portfolio companies that you've

 3   identified, did one or more of those portfolio companies also

 4   own MGM stock?

 5   A    Yes.

 6   Q    Did the various funds that you've identified, did one or

 7   more of those funds also own MGM stock?

 8   A    Yes.  Between -- yes.  Between the CLOs, the funds,

 9   Highland directly, it was about $500 million that eventually

10   got taken out for about a billion dollars.

11   Q    Okay.  $500 million is what you said?

12   A    Approximately.  Depending on what mark, what time frame.

13   But ultimately they got taken out for about a billion dollars.

14   Q    Okay.  And as a consequence of these investments,

15   significant investment -- first of all, how would you describe

16   that magnitude of investments?  Is that a significant

17   investment from the perspective of MGM?

18   A    Yes.

19   Q    As a consequence, what role, if any, did you play in terms

20   of MGM's governance?  Were you -- did you become a member of

21   the board of directors?

22   A    Yes.  I was a board member for approximately ten years,

23   and myself and the president of Anchorage, between our two

24   entities, we had a majority of the equity in MGM.

25   Q    Okay.  If there was a third party, not familiar with the

HCMLPHMIT00003129

Dondero - Direct                    117

 1  management of Highland Capital, who had been monitoring these

 2  bankruptcy proceedings as you have, was there any way that a

 3  third-party stranger to this bankruptcy proceeding could, from

 4  your perspective, actually appreciate or identify the -- all

 5  the details of the investments that Highland Capital had?

 6         MR. MORRIS:  Objection to the form of the question.

 7  It calls for speculation.  He's not here as an expert today.

 8  He shouldn't be allowed to testify what a third party would or

 9  wouldn't have thought or known.

10         MR. MCENTIRE:  Well, I'll --

11         THE COURT:  I'll overrule.

12  BY MR. MCENTIRE:

13  Q    Mr. Dondero?

14  A    The disclosures in the Highland bankruptcy were scant.  I

15  think there was six or eight line items listed, the

16  descriptions of which were limited.  But it didn't include --

17  it didn't include a broad listing of all the funds, and it

18  didn't include subsidiaries or any net value or any offsetting

19  liabilities or risks of any of the underlying companies or

20  investments, either.

21         MR. MCENTIRE:  Would you put up Exhibit 3, please?

22  BY MR. MCENTIRE:

23  Q    Mr. Dondero, we're going to -- do you have a screen in

24  front of you as well?

25  A    Yes.

HCMLPHMIT00003130

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S     Document 15-472   Filed 07/09/25   Page 230 of 1017     PageID 19129

Dondero - Direct                           118

1    Q    We're going to put up Exhibit 3, and I'm going to ask you

2    some questions about it.  First of all, would you identify

3    Exhibit 3?

4    A    It didn't come up on my screen yet.

5    Q    Still not up there?

6    A    Yes.  Now it is.

7    Q    Can you identify Exhibit 3, please?

8         (Discussion.)

9    Q    There we go.  Mr. Dondero, would you identify Exhibit 3,

10   please?

11   A    This was an email I sent to Compliance and relevant people

12   to put -- to put MGM on the restricted list.

13   Q    It indicates it was on December 17, 2020.  Did you

14   personally author this email?

15   A    Yes.

16   Q    You sent it to multiple individuals, including Mr.

17   Surgent.  Was Mr. Surgent an attorney at Highland Capital at

18   the time?

19   A    He was head of compliance for both organizations.

20   Q    Scott Ellington?  Is he an attorney?  Was he an attorney

21   at the time?

22   A    He's the general counsel of Highland.

23   Q    You also sent it to someone at NexPoint Advisors, Jason

24   Post.  Who is Mr. Post?

25   A    Mr. Post was head of compliance at NexPoint Advisors and a

018079

HCMLPHMIT00003131

1  subordinate of Thomas Surgent's.

2  Q    Jim Seery.  Mr. Seery, of course.  You also addressed it

3  to Mr. Seery?

4  A    Yes.

5  Q    It says, Trading Restrictions Re: MGM Material Nonpublic

6  Information.  What did you mean by the term "material

7  nonpublic information"?

8  A    Material nonpublic information is when you have material

9  nonpublic information that the public does not have, and it

10  essentially makes you an insider and restricts you from

11  trading.

12  Q    All right.  It says, Just got off a pre-board call.

13      First of all, you generated this in the ordinary course of

14  your business, did you not?

15  A    Um, --

16  Q    This email.

17  A    Yes.

18  Q    Okay.

19  A    Yes.

20  Q    And --

21  A    Any restricted list.  Restricted list items happen all the

22  time in the normal course of business.

23  Q    And you've maintained a copy of this email as well, have

24  you not?

25  A    I'm sure we have one.  I don't have it personally.

018080

HCMLPHMIT00003132

Dondero - Direct                    120

1    Q    Fair enough.  But you're -- you have -- you have access

2    and custody over emails, correct?

3    A    Not any of my Highland emails.

4    Q    But those were left.  Right?

5    A    Yes.  Yes.

6              MR. MORRIS:  Your Honor, I mean, he's leading the

7    witness at this point, so I'm just --

8              MR. MCENTIRE:  That's fine.

9              MR. MORRIS:  I'm just --

10             THE COURT:  Okay.  Sustained.

11             MR. MORRIS:  -- going to be sensitive to it.

12             THE COURT:  Sustained.

13   BY MR. MCENTIRE:

14   Q    Mr. -- this is a true and accurate copy of the email that

15   you sent, is it not?

16   A    It appears to be.

17             MR. MCENTIRE:  At this time, I would offer Exhibit 3

18   into evidence, Your Honor.

19             THE COURT:  Okay.  I'm looking through what we

20   admitted earlier.  Did we not --

21             MR. MCENTIRE:  This already may be in evidence.

22             THE COURT:  Yes.  I'm --

23             MR. MCENTIRE:  I don't --

24             THE COURT:  Was there any objection?

25             MR. MORRIS:  There wasn't.  I mean, --

018081

HCMLPHMIT00003133

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 36-72    Filed 07/22/25    Page 233 of 1017    PageID 19132

Dondero - Direct                            121

```
 1              THE COURT:  I think there was an objection that I
 2    overruled.
 3              MR. MORRIS:  No.  There wasn't.  I mean,
 4    unfortunately, we've gotten the short end of the stick here,
 5    because all of their documents are in evidence, and I got
 6    caught short because I'm going to have to do it the old-
 7    fashioned way.  But yes, this is in evidence.
 8              MR. MCENTIRE:  Okay.  Fair enough.
 9              MR. MORRIS:  Because -- actually got through all of
10    their documents.
11              MR. MCENTIRE:  Fair enough.
12              THE COURT:  Okay.  All right.
13    BY MR. MCENTIRE:
14    Q   So, Mr. --
15              THE COURT:  So it's in evidence.
16    BY MR. MCENTIRE:
17    Q   -- Dondero, going back to Exhibit 3, it says, Just got off
18    a pre-board call.
19        Is that the MGM board, a pre-board call?
20    A   Yes.
21    Q   What is a pre-board call?
22    A   It's a pre-board call that usually sets the agenda.  And,
23    again, myself and the Anchorage guys, we would move in
24    locksteps, in a coordinated fashion, generally, in terms of
25    agenda and company policy.
```

018082

HCMLPHMIT00003134

Dondero - Direct                    122

1    Q    It says, Update is as follows.  Amazon and Apple actively

2    diligencing in the data room.

3        What was your understanding of -- of -- what was your

4    intent in conveying that information to the recipients?

5    A    The intent was really in the last sentence, or second-to-

6    last sentence, that the transaction was likely to close.

7    Amazon had come back.  We had turned Amazon away earlier in

8    the year at $120 a share, and they said they wouldn't be

9    willing to pay more.  And --

10            THE COURT:  Is there an objection?

11            MR. MORRIS:  There is an objection.  None of this was

12   shared with Mr. Seery, all of this background that we're --

13   that we're doing.  He -- I would request that we stick with

14   the -- only the information that was given to Mr. Seery, like

15   -- like he's talking about his intent.  Like, who cares at

16   this point?

17            MR. MCENTIRE:  Well, --

18            MR. MORRIS:  This is what Mr. Seery got.

19            THE COURT:  Okay.  What is your response to that?

20            MR. MCENTIRE:  I have a response to -- well, they've

21   -- they've questioned his intent in sending this in his

22   opening statement.

23            MR. MORRIS:  Ah.

24            MR. MCENTIRE:  And I'm trying to make it clear what

25   his intent was.

018083

HCMLPHMIT00003135

Case 19-34054-sgj11 Doc 4255-72 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02072-S Document 26-34 Filed 06/24/25 Page 235 of 1017 PageID 19134
Exhibit 72 Page 124 of 390

Dondero - Direct                    123

1          MR. MORRIS:  So, you know what, Your Honor?  *Quid pro*

2     *quo*.  Now we're going to do a real *quid pro quo*.  He can ask

3     him about his intent, and then he can't object to all of the

4     other documents and exhibits that I say prove that this was

5     here only to interfere with Mr. Seery's trading activity.

6     I'll do that *quid pro quo*.

7          MR. MCENTIRE:  May I proceed, Your Honor?

8          THE COURT:  You may.  Objection is overruled.

9     BY MR. MCENTIRE:

10    Q    Mr. Dondero, what was your intent in communicating --

11    A    Okay.

12    Q    -- that probably a first-quarter event?  What was your

13    understanding?

14    A    After 30 years of compliance education:  Taint one, taint

15    all.  We were all sitting together.  I -- the trading desk was

16    right outside my desk.  All the employees of Highland that

17    would eventually move to NexPoint, all the ones that would

18    eventually move to Skyview, all the ones that eventually moved

19    to Jim Seery, were all within 30 feet of my desk.

20    Q    What do you mean by "Taint one, taint all"?

21    A    That's a compliance concept that, as a professional, you

22    have a responsibility, when you are in possession of material

23    nonpublic information, to put something on the restricted list

24    so that it's not traded.  Okay?  And you can't -- one person

25    can't sit in their cube and say they know something and not

Dondero - Direct                    124

1    tell anybody else, such that the rest of the organization

2    trades.  That's not the way compliance works.

3    Q    It says also no -- also, any sales are subject to a

4    shareholder agreement.

5         What was the meaning of that or the intent of that?

6    A    There was a stringent shareholder agreement, particularly

7    among the board members, that no shares could be bought or

8    sold without approval of the company.

9    Q    The company here being MGM?

10   A    MGM, yes.

11   Q    What is a restricted list?

12   A    A restricted list is when you believe as an investment

13   professional that you have material nonpublic information, you

14   notify Compliance, and then Compliance notifies the entire

15   organization and prevents any trading in that security.

16   Q    You mentioned the doctrine taint one, taint all.  If an

17   individual or -- if an individual within a company setting is

18   found to have traded on material nonpublic information, what

19   is the potential consequence or sanction?

20           MR. MORRIS:  Objection, Your Honor.  This is like a

21   legal conclusion.  He's not a law enforcement officer.  He's

22   not a securities officer.  What are we doing?

23           MR. MCENTIRE:  I can rephrase.

24           THE COURT:  Okay.  He's going to rephrase.

25   BY MR. MCENTIRE:

018085

HCMLPHMIT00003137

Dondero - Direct                              125

1   Q    Based upon your years -- based upon your years of

2   experience as a board member of MGM, based upon your years of

3   experience as a CEO of Highland Capital and an executive that

4   trades in securities and has sold securities, what is your

5   understanding, from a non-legal perspective, of what the risks

6   are associated with trading on material nonpublic information?

7   A    You could be -- you would be fired from the organization

8   if you did.  You could be banned from the securities industry.

9   The industry can shut down the -- or, the SEC can shut down

10  the advisor or they can fine the advisor.

11  Q    Do you know what a compliance log is?

12  A    Yes.

13  Q    Should MGM have been placed on a compliance log at

14  NexPoint?

15  A    Throughout the organization -- throughout the

16  organization, it should -- it should and it was on all -- at

17  all organizations, yes.

18  Q    Should it have been placed on a -- on a compliance log to

19  Highland Capital, from your perspective?

20  A    Yes.

21  Q    Can you give us any explanation of why, to your knowledge,

22  why MGM would be taken off the restricted list in April of

23  2021 at Highland Capital?

24  A    When an investment professional puts something on the

25  restricted list, in order for it to come off the restricted

018086

HCMLPHMIT00003138

1   list, the material nonpublic information has to be public.  So

2   there has to be a cleansing that occurs by the company.

3   Q    To the extent that you were no longer affiliated with

4   Highland Capital in the early portion, the first quarter of

5   2021, does that somehow cleanse the material nonpublic

6   information that you identified?

7   A    It does not.

8   Q    Why not?

9   A    Because the -- it -- the company hasn't -- the company

10  didn't come out and make public the information that we knew

11  from a private perspective that the transaction was about to

12  go through.

13  Q    You sat here during opening statements when Mr. Morris

14  referred to the various news coverage and media coverage

15  concerning MGM and the fact that people had expressed interest

16  in buying in the past?

17  A    Yes.  And at the board level, we had entertained numerous

18  ones.  There were rumors that had no basis in fact, and there

19  were negotiations we had with people that were never in the

20  news.  But none of them got to this degree of certainty where

21  it was going to close within a couple months.

22  Q    From your perspective as an investment professional, with

23  the years of experience that you described for the Court, what

24  is the difference between receiving an email from a board

25  member such as yourself and rumors or suggestions of possible

018087

HCMLPHMIT00003139

1  sale in the media?

2  A    I knew with certainty from the board level that Amazon had

3  hit our price, agreed to hit our price, and it was going to

4  close in the next couple months.

5  Q    That's not rumor or innuendo; that's hard information from

6  a member of the MGM board?

7  A    Correct.

8          MR. MCENTIRE:  All right.  You can take that down,

9  please, Tim.

10  BY MR. MCENTIRE:

11  Q    I want to talk a little bit about due diligence.  When you

12  were the chief executive officer of Highland Capital, --

13  A    Yes.

14  Q    -- can you tell us whether Highland Capital ever involved

15  itself in the acquisition of distressed assets?

16  A    Yes.  We did a fair amount of investing in distressed

17  assets.

18  Q    What is a distressed asset?

19  A    It's something that trades at a discount, where the

20  certainty and the timing of realizations or contractual

21  obligations is uncertain.

22  Q    Is a -- well, let me back up.  Has Highland -- did

23  Highland Capital ever invest in unsecured claims in connection

24  with bankruptcy proceedings?

25  A    Yes.

018088

HCMLPHMIT00003140

1  Q   And in terms of the -- on the spectrum of risk, where does

2  an unsecured creditor claim in a bankruptcy proceeding kind of

3  rank in terms of the uncertainties or risk, from your

4  perspective?

5  A   It's high risk.  It's a -- yeah, it would be highly-

6  distressed, generally.

7  Q   Explain to us -- I know the Court is very familiar with

8  claims trading.  Explain to us from your perspective as an

9  investment -- a seasoned investment expert or executive what

10 those risks are.  What types of risk are associated with such

11 an investment?

12 A   You have to evaluate the assets tied to the claim

13 specifically.  Or if it's an unsecured in general, the assets

14 in general in the estate.

15     You have to handicap the realization that a distressed

16 seller might not get full value for something.  You have to

17 handicap the likelihood around that.  And then you have to

18 handicap the timing, and then you have to handicap the

19 expenses and the other obligations of the estate, and then

20 handicap risk items that aren't known or that are difficult if

21 not impossible to underwrite, like unknown litigation or last-

22 minute litigation or claims or something.

23 Q   And all these handicapping, this handicapping process, how

24 does that impact the price or the investment that you're

25 willing to make?  Generally?

HCMLPHMIT00003141

1    A    Generally, you put a much higher discount rate.  You know,

2    like if you would do debt at 10 percent and a normal public

3    equity at a 15 percent return, you would do distressed or

4    private equity investing at a 20, 25 percent return

5    expectation to offset the risk and the unknowns.

6    Q    In order to handicap an investment in an unsecured

7    creditor's claim appropriately to reach an informed decision,

8    what type of data would you need to have access to?

9          MR. MORRIS:  Objection to the form of the question.

10   He's not here as an expert.  He's here as a fact witness.  He

11   should -- he should limit himself to that instead of talking

12   about what investors should be doing.

13         MR. MCENTIRE:  Well, Your Honor, with all due

14   respect, he's here as the former CEO of Highland Capital.  He

15   has experience, firsthand knowledge experience, and he also

16   has expertise because of his education, his career, and

17   training.

18      And again, there's no limitation here under the Rules

19   about what type of information I can elicit from him in this

20   proceeding.  This is, whether you call it expert testimony, I

21   call it personal knowledge, but it has some expert aspects to

22   it, but I think that's fair and appropriate.

23         THE COURT:  Well, I think you can ask what kind of

24   data would you rely on, would Highland Capital or entities

25   he's been in charge of rely on, --

018090

HCMLPHMIT00003142

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 25-34 72   Filed 06/36/25   Page 242 of 1017    PageID 19141

Dondero - Direct                    130

 1          MR. MCENTIRE:  I understand.

 2          THE COURT:  -- but not what would people rely on.  So

 3   I sustain the objection partially.

 4          MR. MCENTIRE:  All right.

 5   BY MR. MCENTIRE:

 6   Q   Mr. Dondero, I'll rephrase the question.  When you were

 7   the chief executive officer of Highland Capital before Mr.

 8   Seery took the reins, and you, your company, Highland Capital,

 9   was investing in an unsecured creditor's claims, what due

10   diligence, what type of information would you expect your team

11   to explore and investigate?

12   A   Sure.  Distressed investment in a trade claim would be

13   among our thickest folders, it would be among our most

14   diligenced items, because you have those three buckets, the

15   value of the assets, again, and the ability and timing of

16   monetization of those as a not strong -- as a weak seller, and

17   then you would have the litigation or claims against those,

18   and then you would have to also have a third section of

19   analysis for the litigation risk of the estate overall.

20   Q   What type of legal analysis or legal due diligence would

21   you have required as the CEO of Highland Capital?

22   A   At Highland, we would have had third-party law firms, in

23   addition to our own legal staff, in addition to our own

24   business professionals, reviewing all the analysis and the

25   assumptions.

018091

HCMLPHMIT00003143

1    Q   With regard to a financial analysis, what types of

2    financial due diligence would you have required?

3    A   It would have been a detailed -- a detailed analysis of

4    all the cash flows on the particular underlying investments,

5    and an evaluation and valuation of what those companies or

6    investments were worth.

7    Q   Why is it important to look at the underlying value of the

8    asset?

9    A   Because that -- those are what will be monetized in order

10   to give you a return on the claims or securities that you buy

11   in a distressed situation.

12          MR. MCENTIRE:  Tim, would you please put up Exhibit

13   4?

14          MR. MORRIS:  Your Honor, I don't mean to be

15   monitoring your time, but we're at the 1:30 --

16          THE COURT:  I was just checking the clock here.

17   Let's do take a break.  So, --

18          MR. MCENTIRE:  All right.

19          MR. MORRIS:  Your Honor, can we have an instruction

20   to the witness not to --

21          THE COURT:  Yes.

22          MR. MORRIS:  -- look at his phone and not to confer

23   with anybody?  Because we had that incident once before.

24          THE COURT:  Okay.  Well, I don't --

25          THE WITNESS:  I don't have my phone.

HCMLPHMIT00003144

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 4-72   Filed 08/33/25   Page 244 of 1017   PageID 19143

Dondero - Direct                          132

```
 1              THE COURT:  Okay.

 2              THE WITNESS:  My phone's at the front desk.

 3              THE COURT:  So, no discussions with your lawyers or

 4   -- I guess he doesn't have his phone -- during this break.

 5              MR. MORRIS:  Thank you, Your Honor.

 6              THE COURT:  All right.  So, I really think this will

 7   take five minutes, so don't go far.

 8         (Off the record, 1:33 p.m. to 1:47 p.m.)

 9              THE COURT:  Okay.  We will go back on the record,

10   then, in the Highland matter.

11              MR. MCENTIRE:  I'm just going to grab him right now.

12              THE COURT:  Okay.  We are, for the record, waiting on

13   Mr. Dondero to take his place again on the witness stand.

14         (Pause.)

15              THE COURT:  All right, Mr. Dondero.  We're ready for

16   you to resume your testimony.

17         All right.  Mr. McEntire, you may proceed.

18              MR. MCENTIRE:  Thank you, Your Honor.

19                      DIRECT EXAMINATION, RESUMED

20   BY MR. MCENTIRE:

21   Q   Mr. Dondero, when we left off, I was just putting up what

22   I requested as Exhibit 4.

23              MR. MCENTIRE:  And Tim, if you can put that back up,

24   please.

25   BY MR. MCENTIRE:
```

018093

HCMLPHMIT00003145

Dondero - Direct                     133

1   Q   Mr. Dondero, can you identify Exhibit #4, please?

2   A   Yes.  These are notes I took contemporaneous with three

3   conversations with guys at Farallon.

4   Q   I didn't quite hear you.  Did you say contemporaneous?

5   A   Yes.

6   Q   So, you say with three conversations.  Who were the

7   conversations with?

8   A   One was with Raj Patel that was fairly short, and he

9   deflected me to Mike Linn, who was the portfolio manager in

10  charge and had done the transactions.

11  Q   Which transactions?

12  A   The buying of the claim, the Highland claims.

13  Q   All right.  And what was your purpose in making these

14  notes?

15  A   We'd been trying nonstop to settle the case for two-plus

16  years.  We'd been counseled that it was a Kabuki dance that

17  would just, you know, all settle at the end, and it never

18  quite happened that way.  And when we heard the claims traded,

19  we realized there were new parties to potentially negotiate to

20  resolve the case.

21       The ownership was initially hidden, but we were able to

22  find out pretty quickly that Farallon was Muck.  So I reached

23  out the Farallon guys.

24  Q   All right.  And were you ever able at that time to

25  determine who was affiliated with Jessup, the other special-

018094

HCMLPHMIT00003146

 1  purpose entity?

 2  A   We -- initially, we thought Farallon was all of the

 3  entities.  We didn't find out about Stonehill -- it was more

 4  difficult and they had taken more efforts to hide the

 5  ownership in Stonehill.  We didn't find out for two more

 6  months.

 7  Q   So your first conversation was with Mr. Patel?

 8  A   Yes.

 9  Q   And did you call him?

10  A   Yes.

11  Q   Your first entry, there's a 28 on the left-hand side.

12  What does that 28 refer to, if you recall?

13  A   That was the date, I believe.

14  Q   Do you believe it was May 28th?

15  A   Yes.

16  Q   What makes you believe that?

17  A   That's what it says.

18  Q   Okay.  Raj Patel --

19          THE COURT:  Is there a way you can show the words

20  that are cut off?

21          MR. MCENTIRE:  On this particular one, I can't, Your

22  Honor.  We tried, but we can't.  No.

23          THE COURT:  If I look in the notebook, can I see it?

24          MR. MCENTIRE:  I don't think so.  I think this is --

25  what you see is exactly what's in the notebook.  It's the same

018095

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 53-472  Filed 06/30/25   Page 247 of 1017    PageID 19146
Exhibit 72   Page 136 of 390

Dondero - Direct                          135

1   document.  This is how -- how we -- this is how we have it.

2   BY MR. MCENTIRE:

3   Q    Mr. Patel.  Who is Mr. Patel?

4   A    He's Mike Linn's boss.  He's head of -- I believe head of

5   credit at Farallon.

6   Q    Okay.  And Farallon is based where, if you know?

7   A    San Francisco.

8   Q    And what kind of company is Farallon, if you know?

9   A    They -- they look a lot like Highland.  Well, they do real

10  estate.  They do hedge funds.  They do -- they don't do as

11  many 40 Act or retail funds, but they're -- they're an

12  investor.

13  Q    Mr. Patel.  What did he tell you during this phone call?

14  A    That he bought it because Seery told him to buy it and

15  they had made money with Seery before.

16  Q    All right.  And how long did the call last?

17  A    Not long.

18  Q    Okay.  You said he referred you to Mr. -- who was the

19  person?

20  A    To Mike Linn.

21  Q    Who is Mike Linn?

22  A    Mike Linn is a portfolio manager that works for Mr. Patel.

23  Q    And did you call Mr. Linn?

24  A    Yes.

25  Q    All right.  The notes here, do these reflect several

018096

HCMLPHMIT00003148

Dondero - Direct                              136

1   conversations?

2   A    The first one reflects a conversation with Raj Patel, and

3   then the rest of it reflects two conversations with Mike Linn.

4   Q    All right.  Where does the first conversation with Mike

5   Linn start and where does it end?

6   A    It ends -- it begins at the 50, 70 cents.  We knew that

7   they had -- that the claims had traded around 50 cents.  And I

8   said we'd be willing to pay 70 cents.  We'd like to prevent

9   the $5 million-a-month burn.  We'd like to buy your claims.

10  Q    Why 70 cents?  What was -- what was that all about?

11  A    I was trying to give them a compelling premium that was

12  still less than I had offered the UCC three months earlier.

13  Q    And so you have:  Not compelling, Class 8.  What does that

14  mean?

15  A    He said that was -- he just said 70 cents wasn't

16  compelling.

17  Q    There's a reference to:  Asked what would be compelling.

18  Was that a question you asked him?

19  A    Yes.

20  Q    And what was his response?

21  A    He said he had no offer.  And he -- we had heard he paid

22  50 cents and I offered him 70 cents and then -- but he was

23  clear to me that he wouldn't tell me what he paid.  And so the

24  next time I called him I -- I -- instead of just making it

25  cents on the dollar, I said I'd pay 130 percent of whatever he

018097

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 35-24   Filed 07/08/25   Page 249 of 1017   PageID 19148
Exhibit 72   Page 138 of 390

Dondero - Direct                    137

1    did pay.  You don't have to tell me what you paid, but I'll

2    pay you 30 percent more than you paid, you know, a couple

3    months ago.  And -- or we thought they notified the Court when

4    they just bought it, but they had actually negotiated buying

5    it back in February.  January or February.  So --

6    Q    Who told you that they bought it in February or March time

7    frame?

8    A    He did.

9    Q    Okay.  Was this during the first or the second phone --

10             MR. MORRIS:  I apologize for interrupting.  Who's the

11   "he"?

12             MR. MCENTIRE:  Mike Linn.

13             THE WITNESS:  Mike Linn.

14             MR. MORRIS:  Thank you so much.

15             MR. MCENTIRE:  I'll make sure the record --

16   BY MR. MCENTIRE:

17   Q    Mike Linn --

18   A    Yes.

19   Q    -- told you that Farallon had bought their interest in the

20   claims back in the February or March time frame?

21   A    Yes.

22   Q    All right.  Bought assets with claims.  What does that

23   refer to?

24   A    He said it wasn't compelling because he said Seery told

25   him it would be worth a lot more.  He -- he confirmed what Raj

018098

HCMLPHMIT00003150

 1   said, that -- I said, do you realize the estate is spending $5

 2   million a month on legal fees?  That, you know, you should

 3   want to sell this thing.  And he said Seery told him it was

 4   worth a lot more and there were claims and litigation beyond

 5   the asset value.

 6   Q    You offered him 40 to 50 percent premium.  What is that?

 7   A    That's what the 70 cents on the 50 cents represents.  And

 8   then I changed the dialogue to I'll pay you 130 percent of

 9   whatever your cost was.  And he said, not compelling.  And

10   then I, both -- both calls, I pressed him, what price would he

11   offer at?  And he said he had no offer, he wasn't willing to

12   sell.

13   Q    The 130 percent of cost, not compelling, was that in the

14   second or the third call with Mr. Linn?

15   A    It was at my third and final call with Farallon.  My

16   second call with Mike Linn was the 130 percent of cost.

17   Q    And he said not compelling?  You put it in quotation

18   marks?

19   A    Yep.

20   Q    And then you said, no counter.  What does that mean?

21   A    He wouldn't -- he wouldn't give an offer, he wouldn't give

22   a price at which he would sell.

23   Q    What did Mike Linn tell you, in effect, with regard to his

24   due diligence that Farallon had undertaken?

25   A    When I -- when I told him about the risks and the

018099

HCMLPHMIT00003151

Dondero - Direct                         139

```
 1   litigation and the burn, he said he wasn't following the case,

 2   he wasn't aware of it, he was depending on Jim Seery.

 3   Q    What, if anything, did Michael Linn tell you about MGM?

 4   A    That was more the initial Raj Patel call, where he said we

 5   bought it because he was very optimistic regarding MGM.

 6   Q    Okay.  Did you have any understanding when he first got

 7   his optimism about MGM?

 8   A    No.  He just said that's why they had bought it initially,

 9   they were very optimistic about MGM.

10   Q    That's why they had bought it initially?

11   A    Yes.

12   Q    And they had bought it initially in the February-March

13   time frame?

14   A    Yes.

15   Q    And that -- would you -- does that predate the public

16   disclosure of the MGM sale to Amazon?

17   A    Yes.

18   Q    Substantially by a couple of months?

19   A    Yes.

20   Q    I'd like to turn your attention now to a different topic.

21            MR. MCENTIRE:  And Tim, if you could pull up Exhibit

22   8, please.

23        I believe this document is already in evidence, Your

24   Honor.

25            THE COURT:  8 is?
```

018100

HCMLPHMIT00003152

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 25-72   Filed 04/46/25   Page 252 of 1017    PageID 19151

Dondero - Direct                          140

```
 1              MR. MCENTIRE:  Oh, by the way, I offer Exhibit 4 into

 2   evidence.

 3   BY MR. MCENTIRE:

 4   Q    Let me ask you a couple quick questions.

 5              THE COURT:  Is there an objection?

 6              MR. MORRIS:  Nope.

 7              THE COURT:  Okay.  4 is admitted.

 8        (Hunter Mountain Investment Trust's Exhibit 4 is received

 9   into evidence.)

10   BY MR. MCENTIRE:

11   Q    Exhibit 8.

12              MR. MORRIS:  I apologize, Your Honor.  Just one

13   caveat.  It's not for the truth of the matter asserted; it's

14   for what his impressions were at the time.

15              MR. MCENTIRE:  Well, --

16              MR. MORRIS:  This is what he wrote down.  I don't --

17              MR. MCENTIRE:  I'm offering it for the truth of the

18   matter asserted.

19              MR. MORRIS:  Okay.  And I object to that extent.

20   This --

21              MR. MCENTIRE:  Let me --

22              MR. MORRIS:  Can I *voir dire*?  Can I *voir dire*?  May

23   I do --

24              MR. MCENTIRE:  May I finish my statement that I was

25   --
```

HCMLPHMIT00003153

Dondero - Direct                    141

```
 1            THE COURT:  Let him finish, and then --

 2            MR. MCENTIRE:  Thank you.

 3            THE COURT:  -- you can.

 4            MR. MCENTIRE:  I am offering it for the truth of the

 5   matter asserted because these are documents that were prepared

 6   contemporaneously, it's an exception to the hearsay rule and

 7   reflects admissions of a -- of an adverse party.  Admissions

 8   that are adverse to their interests.  Declarations of interest

 9   adverse to their interest and admissions of an adverse party

10   contemporaneously recorded.  And so that's why I'm offering

11   it.

12            MR. MORRIS:  For all purposes?

13            THE COURT:  Okay.  Let me have you point me to the

14   exact hearsay exception.  I understand this hearsay exception

15   you're arguing for the hearsay within the hearsay, the party

16   opponent exception.  But it's technically hearsay of Mr.

17   Dondero, even though he's here on the stand.

18            MR. MCENTIRE:  Well, I could lay a foundation, then.

19   BY MR. MCENTIRE:

20   Q   Mr. Dondero, --

21            THE COURT:  Well, no.  I'm asking for what your --

22            MR. MCENTIRE:  It's --

23            THE COURT:  -- rule reference is.

24            MR. MCENTIRE:  I don't have the Rules with me right

25   this second.  It's 803(1) --
```

018102

HCMLPHMIT00003154

Dondero - Direct                    142

1          (Discussion.)

2               MR. MCENTIRE:  All right.  Well, it's -- it's

3     admissible under several categories.  It's not hearsay because

4     it's an admission of a party opponent.  It's also an admission

5     under 803(1), present sense impression.  It's also admissible

6     --

7               THE COURT:  So you say it's Mr. Dondero's statement

8     describing or explaining an event --

9               MR. MCENTIRE:  Yes.

10              THE COURT:  -- or admission made while or immediately

11    after the declarant perceived it?

12              MR. MCENTIRE:  Yes.  It's also a record of a

13    regularly-conducted activity, which is 803(6).  And I think

14    it's also not technically hearsay because it's also an

15    admission of a party.  So, this --

16              THE COURT:  Well, that's the hearsay within the

17    hearsay.

18              MR. MORRIS:  Yeah.

19              THE COURT:  But I'm -- I'm --

20              MR. MORRIS:  That can't possibly be right.  I can't

21    go back to my hotel right now and write down that he told me

22    that he did a bad thing and come in here tomorrow and say he

23    admitted he did a bad thing because it's in my notes.

24              MR. MCENTIRE:  Well, --

25              MR. MORRIS:  That's can't possibly be the law.

018103

HCMLPHMIT00003155

1          MR. MCENTIRE:  Well, --

2          MR. MORRIS:  That's not the law.

3          MR. MCENTIRE:  There are two hearsay issues here.

4    One is whether this is a business record or otherwise

5    qualifies as an exception to the hearsay rule, and then

6    there's an internal hearsay issue of whether or not what Mr.

7    Patel and Mr. --

8          THE COURT:  You haven't established the business

9    record exception.  Okay?

10          MR. MCENTIRE:  I'm prepared to lay the foundation

11   right this second.  At this moment.

12          THE COURT:  You may proceed.

13   BY MR. MCENTIRE:

14   Q   Mr. Dondero, is this a document that was generated by you

15   in the ordinary course of your business?

16   A   Yes.

17   Q   Did you have personal knowledge when you recorded this

18   document?

19   A   Yes.

20   Q   You personally recorded this document, correct?

21   A   Yes.

22   Q   And you have had custody of this document.  Correct?

23   A   Yes.

24   Q   And this is --

25          MR. MCENTIRE:  That's a -- that's a business record,

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 151-24 Filed 07/45/25390  Page 256 of 1017    PageID 19155

Dondero - Voir Dire                                    144

1  Your Honor.

2              MR. MORRIS:  May I, Your Honor?

3              THE COURT:  You may.

4              MR. MORRIS:  Okay.

5                        VOIR DIRE EXAMINATION

6  BY MR. MORRIS:

7  Q    Where's the document now?  How come it's -- how come it's

8  cut off?

9  A    I don't know.

10 Q    Do you have the document today?  How come we're looking at

11 a document that's cut off?

12 A    I'm sure we have it somewhere.  I don't have it.

13              MR. MORRIS:  So, number one, Your Honor, we don't

14 have the actual document.  We have a partial document.

15      Number two, let's talk about it for a second.

16 BY MR. MORRIS:

17 Q    You say that you do this in the ordinary course of

18 business.  What's the purpose of taking these notes?

19 A    When I'm starting negotiation with somebody new on

20 something complicated and I don't know what their concerns or

21 rationale is going to be, I take little notes like this.

22 Q    And is it -- is it the purpose of it to capture the

23 important things that are going on in the conversation?

24 A    So I know next time how to address it differently, you

25 know.

HCMLPHMIT00003157

1  Q    That's not my question.  My question is, is the purpose of

2  taking notes so that you have a written record of the

3  important points that you discussed?

4  A    Yes, so I know how to address it the next time.

5  Q    Okay.  And among the important points that you never put

6  down on these notes was the letters MGM.  Is that correct?

7  A    Correct.

8  Q    Okay.  And you never put down here that Michael Linn told

9  you he wasn't following the case, correct?

10  A    No, I did not.

11  Q    Okay.

12  A    But it was --

13  Q    And --

14  A    Yeah.  But I --

15  Q    That --

16        MR. MORRIS:  Your Honor, if this is --

17        MR. MCENTIRE:  (faintly)  This is *voir dire* of the

18  witness for a business record exception.

19        MR. MORRIS:  No, because --

20        THE COURT:  Overruled.

21        MR. MORRIS:  Thank you.

22  BY MR. MORRIS:

23  Q    Mr. Patel wouldn't tell you how much he paid and that's

24  why you didn't write it down, right?

25  A    Mr. Patel told me he bought it because of Seery.  My

HCMLPHMIT00003158

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 72   Filed 04/07/25   Page 258 of 1017   PageID 19157
Page 147 of 390

Dondero - Voir Dire                        146

 1   conversation was very short with him.  That was one of the few

 2   things he said.  Linn said he wouldn't sell it because he

 3   didn't find it compelling.

 4   Q    Okay.

 5   A    And Linn was the one who wouldn't tell me --

 6   Q    Okay.

 7   A    -- the price.

 8   Q    But -- but even though you took these notes to write down

 9   things that you thought were important, you didn't write down

10   MGM.  Correct?

11   A    Yes.

12   Q    And you didn't write down that anybody was very optimistic

13   about MGM.  Correct?

14   A    No, I did not.

15   Q    And you didn't write down that Mr. Linn told you he wasn't

16   following the case.  Correct?

17   A    Well, he said the same thing Patel said about he bought it

18   because of Seery.  He did confirm that.  I didn't see any

19   reason to write that again.

20   Q    You didn't -- you never wrote it down.  Not once.  Not --

21   there's nothing about again, right.  You never wrote down that

22   --

23   A    No, I did write --

24   Q    -- anybody ever told you they weren't following the case.

25   Correct?

018107

HCMLPHMIT00003159

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 15-24 72 Filed 07/08/25 390 Page 259 of 1017   PageID 19158

Dondero - Voir Dire                    147

1   A    Correct.

2   Q    Okay.

3   A    But I wrote down that he bought it because of Seery.

4   Q    Okay.

5          MR. MORRIS:  Your Honor, no objection.  It can go in.

6          MR. MCENTIRE:  Okay.

7          THE COURT:  Wait.  Did you just say no objections?

8          MR. MORRIS:  Except -- except for the hearsay on

9   hearsay.  It can't possibly be an admission.  It's his -- it's

10  his notes.  This is what he wrote.  It can come in for that

11  purpose.  It's -- it's a -- that's what he's testified to, and

12  I can't object to that.  But it can't possibly come in as an

13  admission against Farallon.

14         MR. MCENTIRE:  Well, I disagree.

15         MR. MORRIS:  That's the point.

16         MR. MCENTIRE:  Well, first of all, I disagree.  This

17  is otherwise admissible, and it can come.  I think that's

18  really, Your Honor, that's really the weight it's going to be

19  given.  It comes in.  He's not making an objection to its

20  admissibility.  And if he wants to argue the weight of the

21  document, that's a different issue.

22         MR. STANCIL:  Your Honor, if I may.

23         THE COURT:  You may.

24         MR. STANCIL:  The second layer of hearsay goes to

25  whether this is a statement by Farallon.  It is a statement by

018108

HCMLPHMIT00003160

Dondero - Direct                          148

1   Mr. Dondero of what he heard, what he says he heard Farallon

2   say.  801(d) refers to, when they're talking about an opposing

3   party statement, made by the party, not made by a listener who

4   says he heard the party.  This is classic hearsay within

5   hearsay.  It's not admissible for that purpose.

6        THE COURT:  Okay.  I sustain the objection, and --

7   but I'm still struggling to understand what the Respondents

8   have agreed to.  Because --

9        MR. MORRIS:  That -- that this is what he claims to

10  have written down.  I mean, right?  So, so --

11       THE COURT:  Okay.

12       MR. MORRIS:  -- a present sense impression.

13       THE COURT:  So, it is admitted as Mr. Dondero's

14  present sense impression, but it's not admitted as to the

15  truth of anything that Claims Purchasers may have said.

16       MR. MORRIS:  And -- and the --

17       THE COURT:  That's what you're saying?

18       MR. MORRIS:  Yes.  And the most important thing is

19  that he's testified that the purpose of the notes was to

20  capture the things that were important that he was told.  And

21  we've established what he wasn't told.

22       MR. MCENTIRE:  Okay.  I believe the document is in

23  evidence, Your Honor.

24       THE COURT:  Exhibit 4 is in evidence.  But, again,

25  there's no admission in here as to what Claims Purchasers

018109

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 56-24   Filed 06/20/25   Page 261 of 1017   PageID 19160
Exhibit 72   Page 150 of 390

Dondero - Direct                    149

```
 1   testified as to.

 2           MR. MCENTIRE:  Well, they haven't testified yet

 3   because --

 4           THE COURT:  This is what he --

 5           THE DEFENDANT:  I understand.  I understand.

 6           THE COURT:  -- he says he remembers.

 7           MR. MCENTIRE:  Okay.  So, --

 8           THE COURT:  It's sort of an --

 9           MR. STANCIL:  Your Honor, just so we're clear for our

10   record, this is not admitted for the truth of what Farallon is

11   purported to have said.

12           MR. MCENTIRE:  Correct.

13           THE COURT:  Correct.

14           MR. MCENTIRE:  This --

15           MR. STANCIL:  Thank you.

16           MR. MCENTIRE:  This is offered for the truth of what

17   Mr. -- Mr. Dondero recalls them saying.

18           THE COURT:  Okay.

19           MR. MCENTIRE:  In part.

20           THE COURT:  I think -- I think we're on the same page

21   now.  I think.  I think.

22       (Hunter Mountain Investment Trust's Exhibit 4 is received

23   into evidence.)

24           MR. MCENTIRE:  All right.  May I proceed, Your Honor?

25           THE COURT:  You may.
```

018110

HCMLPHMIT00003162

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S     Document 34-72 Filed 06/24/25390Page 262 of 1017     PageID 19161

Dondero - Direct                    150

 1           MR. MCENTIRE:  Can you please put up Exhibit 8,

 2    please?  And I believe this document has been put into

 3    evidence --

 4           THE COURT:  It is.

 5           MR. MCENTIRE:  Thank you.

 6    BY MR. MCENTIRE:

 7    Q    Mr. Dondero, this document is a -- part of a -- the

 8    Court's docket.  It was filed on February 1, 2021, if you

 9    could go to the top upper banner.  It's Debtors' Notice of

10    Filing of Plan Supplement of the Fifth Amended Plan of

11    Reorganization of Highland Capital Management, as Modified.

12         Do you see that?

13    A    Yes.

14    Q    I'll direct your attention, --

15           MR. MCENTIRE:  If you could go to Page 4, please, for

16    me, Tim.

17    BY MR. MCENTIRE:

18    Q    Page 4 has a schedule, a plan analysis and a liquidation

19    analysis.  Do you see that?

20    A    Yes.

21    Q    All right.  For Class 8, what does it identify that is

22    being projected for distributions to the general unsecured

23    claims for Class 8?

24    A    71.3 percent.

25    Q    What percentage is being identified that will be

018111

HCMLPHMIT00003163

Dondero - Direct                                    151

1  distributed to Class 9?

2  A    9, no distribution.

3  Q    No distribution?  All right.  Mr. Dondero, in Paragraph --

4  I'm going to give you a piece of paper.

5          MR. MCENTIRE:  Can you just give me a piece of paper

6  real quick?

7  BY MR. MCENTIRE:

8  Q    I'm handing you a piece of paper and I'm --

9  A    Okay.  Thank you.

10  Q    Mr. Dondero, in our complaint in this case, the proposed

11  complaint in this case, we allege that Class 8 had a total of

12  $270 million, the claims that were purchased by Farallon and

13  Stonehill had a face value in Class 8 of $270 million.  Would

14  you write that number down?

15      And assuming that this was public information that was

16  available in February of 2021 at 71.32 percent, --

17          MR. MORRIS:  Objection, Your Honor.  That's an

18  assumption not in evidence.  He hasn't laid a foundation for

19  what was available in February in 2021.

20  BY MR. MCENTIRE:

21  Q    Mr. Dondero, according to --

22          THE COURT:  Wait.  Are you going to respond, or are

23  you just going to --

24          MR. MCENTIRE:  I'll rephrase the question.

25          THE COURT:  -- rephrase?  Okay.

018112

HCMLPHMIT00003164

Dondero - Direct                    152

1   BY MR. MCENTIRE:

2   Q    According to the document that is identified as Exhibit #8

3   that says that 71.32 percent is the anticipated projected

4   payout on Class 8 claims, what is 71.32 percent of the face

5   value of the claims that were purchased?

6   A    About $192 million.

7   Q    $192 million?  And assuming for a moment that, as alleged

8   by Hunter Mountain in this case, that $163 million was

9   actually used to purchase the Class 8 claims, what is the

10  difference?

11  A    About $30 million.

12  Q    A little less than that, isn't it?  Or is the number --

13  A    Yeah.  $28 million or whatever.

14  Q    $28 million?  And based upon your years of experience in

15  running Highland Capital, being involved in the purchase of

16  unsecured claims, being involved in investigating and

17  acquiring distressed assets, that return over a two-year

18  period, is that the kind of return that a hedge fund would

19  typically -- you would expect to receive?

20       MR. MORRIS:  I just want to make sure that -- because

21  the question changed a little bit in the middle.  If he wants

22  to ask him if he would have made the investment, that's fine.

23  But he should not be permitted to testify as to what any other

24  investor, including the ones who purchased these claims, would

25  have done.  Every -- there's different risk profiles.  He can

018113

HCMLPHMIT00003165

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 15-14   Exhibit 72   Filed 05/04/25   Page 265 of 1017   PageID 19164

Dondero - Direct                    153

 1 | testify to whatever he wants about himself.

 2 |         THE COURT:  Sustained.

 3 | BY MR. MCENTIRE:

 4 | Q   Go ahead.  Based upon your experience at Highland Capital,

 5 | would Highland Capital have ever acquired those claims based

 6 | upon that kind of return over two years?  For a distressed

 7 | asset such as this?

 8 | A   No.

 9 | Q   Why not?

10 | A   It's below a debt level return that you could get on high-

11 | rated assets with certainty.  It's --

12 | Q   What do you mean by it's below -- below a debt return that

13 | you could get on collateralized assets?  What do you mean by

14 | that?

15 | A   I think in this case the debt that the Debtor put in place

16 | paid 12, 13 percent and was triple secured or whatever.  So no

17 | one would buy the residual claims for an 8 percent compounded,

18 | whatever that $28 million works out to.

19 |         MR. MORRIS:  I move to strike, Your Honor.  He

20 | shouldn't be talking about or testifying to what other people

21 | might do.

22 |         THE WITNESS:  Well, we --

23 |         THE COURT:  This is --

24 |         THE WITNESS:  We would never have done that.

25 |         THE COURT:  This is --

018114

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document Exhibit 472 Filed 05/15/25   Page 266 of 1017    PageID 19165

Dondero - Direct                      154

1          MR. MCENTIRE:  He would not have.

2          THE COURT:  -- Highland, not nobody.  Okay.

3    BY MR. MCENTIRE:

4    Q   Mr. Dondero, and what is it about the fact that these

5    claims are not collateralized that impacts the decision-

6    makers, from your perspective?

7    A   You have all the risk that the $205 million of expenses

8    this estate has currently paid grows to $300 or $400 million.

9    You know, you have the risk that other litigation regarding

10   Seery violating the Advisers Act --

11          MR. MORRIS:  I move to strike, Your Honor.

12          THE WITNESS:  -- results in --

13          THE COURT:  Sustained.

14          THE WITNESS:  -- expenses.

15   BY MR. MCENTIRE:

16   Q   Just respond to my question, sir.  What does the fact

17   about not being collateralized, how does that impact the

18   decision-maker's --

19   A   Well, I was trying to answer it.  You just have all kinds

20   of residual risk of bad acts that have happened at the estate

21   or expenses increasing or whatever.

22          MR. MORRIS:  I move to strike the phrase "bad acts,"

23   Your Honor.

24          THE COURT:  Overruled.

25   BY MR. MCENTIRE:

018115

HCMLPHMIT00003167

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S      Document 45-72    Filed 06/26/25    Page 267 of 1017    PageID 19166
Exhibit 72   Page 156 of 390

Dondero - Direct                    155

1  Q    What did you mean by that?  What did you mean by "bad

2  acts"?

3  A    We've highlighted it in a lot of complaints.  There's been

4  several violations of the Advisers Act.

5          MR. MORRIS:  Move to strike, Your Honor.  It's a

6  legal conclusion.

7          THE COURT:  Sustained.

8  BY MR. MCENTIRE:

9  Q    Mr. Dondero, are you familiar with an entity known as NHF?

10  A    Yes.

11  Q    What is NHF?

12  A    A NexPoint hedge fund.  It was a closed-in fund that we

13  manage still to this day at NexPoint.  The name has changed to

14  NXDT.

15  Q    Was NHF publicly traded?

16  A    It -- yeah, it's a publicly-traded equity.  It's a closed-

17  in fund, technically, but it's a publicly-traded security.

18  Q    What -- what is your affiliation with NHF?

19  A    I'm the portfolio manager.

20  Q    And, again, what are your responsibilities as the

21  portfolio manager?

22  A    To optimize the portfolio and hopefully exceed investor

23  expectations.

24  Q    Have you become aware that Stonehill was purchasing MGM

25  stock in the first quarter of 2021?  And NHF?

018116

Dondero - Direct                          156

1   A    Yes.  We believe -- we're able to demonstrate from

2   Bloomberg records, on the Bloomberg terminal, they show up as

3   holders and purchasers in the -- in the first few months of

4   2021.

5   Q    What magnitude?

6   A    I think it was one of their top equity positions.  It was

7   about six million bucks.

8            MR. MCENTIRE:  Can you put up the chart?  This is for

9   demonstrative purposes only.

10       I'm not offering this chart into evidence, Your Honor.

11   It's simply a demonstration.  Or a demonstrative.

12            MR. MORRIS:  Your Honor, there's no such thing.

13            MR. MCENTIRE:  There is.

14            MR. MORRIS:  A demonstrative has to be based on

15   evidence.  A demonstrative is supposed to summarize evidence.

16   You don't put up a demonstrative until --

17            THE COURT:  All right.  What's your response to that?

18            MR. MCENTIRE:  That I'm about to walk through some

19   points where he can establish as a point of evidence, and then

20   we can talk about it.  Demonstratives, demonstratives are used

21   all the time, Your Honor.

22            MR. MORRIS:  It's to --

23            THE COURT:  Well, they summarize evidence.

24            MR. MORRIS:  It's to summarize evidence.

25            THE COURT:  Yes.  So, --

018117

HCMLPHMIT00003169

1          MR. MCENTIRE:  Well, this is --

2          THE COURT:  -- you can elicit the evidence, and then

3    if this chart seems to summarize whatever he testifies as to,

4    then --

5          MR. MCENTIRE:  All right.

6          THE COURT:  -- then I think maybe you can put it up.

7          MR. MCENTIRE:  Mr. -- you can take it down, Tim.

8    BY MR. MCENTIRE:

9    Q   Mr. Dondero, do you have an understanding of how much

10   total distributions have been paid to date in the Highland

11   bankruptcy?

12   A   I believe the Class 8 -- the 1 through 7 was only about

13   $10 million.  I believe Class 8 got $260 or $270 million so

14   far.

15   Q   All right.  And do you have an understanding of what the

16   total amount of expenses are?

17   A   Total expenses paid to date was $203 million.  $205

18   million.

19   Q   So the -- the -- there's a rough approximation between the

20   professional expenses and the actual all proofs of claim; is

21   that correct?

22   A   There is, yeah, a ratio, and -- yes.

23   Q   The total cash flow, if you add those two together, what

24   are they?  What are they approximately?

25   A   $470 million.

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 25-72 Filed 05/30/25   Page 270 of 1017    PageID 19169

Dondero - Direct                    158

1   Q   $470 million?  And do you understand that the -- that the

2   Reorganized Debtor and the Claimant Trust would have more than

3   sufficient assets to reach Class 10 where Hunter Mountain is

4   currently located, even setting aside the claims against you?

5   A   Correct.  There's $57 million of cash on the balance

6   sheet, net of a couple million today, I guess.  And then

7   there's $100 million of other assets.

8           MR. MCENTIRE:  Reserve the rest of my questions.

9   Reserve the rest of my questions, Your Honor.

10          THE COURT:  Okay.  Pass the witness.

11          MR. MCENTIRE:  Could I have my time estimate?

12          THE COURT:  Yes.  Caroline?

13          THE CLERK:  (faintly)  As of right now, we are at 81

14  minutes, so --

15          MR. MCENTIRE:  Thank you.

16          THE COURT:  That was 81 minutes total?

17          THE CLERK:  Yes.

18          THE COURT:  Okay.

19          MR. MORRIS:  May I proceed, Your Honor?

20          THE COURT:  You may.

21                        CROSS-EXAMINATION

22  BY MR. MORRIS:

23  Q   Good afternoon, Mr. Dondero.

24  A   Good to see you.

25  Q   My pleasure.  Do you know an attorney named Ronak

HCMLPHMIT00003171

1   (phonetic) Patel?

2   A    Is that Rakhee that they call --

3   Q    Could be.  Do you know an attorney named Rakhee Patel?

4   A    There was a Rakhee Patel, I believe, early in the *Acis*

5   case.

6   Q    Let me try --

7   A    I'm not -- I've never met her.

8   Q    Let me try this differently.

9   A    Okay.

10  Q    Did you ever meet with the Texas State Securities Board?

11  A    No.

12  Q    Did anybody acting on your behalf ever file a complaint

13  with the Texas State Securities Board?

14  A    No.

15  Q    Do you know if anybody's filed a complaint with the Texas

16  State Securities Board?  About Highland?

17  A    I believe you covered it earlier.  Mark Patrick.

18  Q    Mark Patrick what?

19  A    I guess he did, or Hunter Mountain did, or the DAF did.  I

20  don't -- I don't know.

21  Q    Did you ever speak with Mark Patrick about a TSSB

22  investigation of Highland?

23  A    No.

24  Q    Okay.  Why do you think Mark Patrick knows about the TSSB

25  investigation of Highland?

1            MR. MCENTIRE:  Objection to form.  Calls for

2    speculation.  He's just established that he's never --

3            THE WITNESS:  I don't know.

4            MR. MCENTIRE:  -- talked to Mark Patrick.

5            MR. MORRIS:  Okay.

6            THE COURT:  Okay.  Sustained.

7            MR. MORRIS:  Okay.

8    BY MR. MORRIS:

9    Q    Have you ever seen the draft Hunter Mountain complaint in

10   this case?

11   A    No.

12   Q    Okay.  I think you testified a moment ago that Amazon had

13   hit MGM's price by December 17th.  Do I have that right?

14   A    Yes.

15   Q    Okay.  Then how come you didn't say that in your email to

16   Mr. Seery?

17   A    Your best practices and typical practices, when you put it

18   on the restricted list, is to just give as little information

19   as possible so that the inside information isn't promulgated

20   specifically throughout the organization and leaked --

21   Q    So, --

22   A    -- throughout the organization.

23   Q    So, even though your intent was to convey information to

24   Mr. Seery, you didn't actually tell him the truth, right?  You

25   didn't tell him that Amazon had actually hit the stock price.

018121

HCMLPHMIT00003173

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 25-72 Filed 06/20/25 Page 273 of 1017    PageID 19172

Dondero - Cross                                   161

1   Right?

2   A    I wouldn't characterize it that way.

3   Q    Okay.  In fact, all you told him was that they were

4   interested.  Isn't that right?

5   A    I wasn't telling him anything.  I was telling Compliance,

6   as an investment professional, that it needed to be on the

7   restricted list because we were in possession of material

8   nonpublic information regarding a merger that was going to go

9   through shortly.  Or in the next few months.

10  Q    Is it your testimony that, as of December 17th, Amazon had

11  made an offer that was acceptable to MGM?

12  A    Yeah, we were going into -- that's what the board meeting

13  was.  We were going into exclusive negotiations to culminate

14  the merger with them.

15  Q    Okay.  I think you have a binder there of our exhibits.

16  If you can go to #11.

17  A    Which one?

18         MR. MORRIS:  May I approach?

19         THE WITNESS:  Sure.

20      (Pause.)

21  BY MR. MORRIS:

22  Q    That's your email, sir, right?

23  A    Yes.

24  Q    Okay.  It doesn't say anything about Amazon hitting the

25  price, right?

018122

HCMLPHMIT00003174

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 34-72   Filed 06/23/25   Page 274 of 1017   PageID 19173

Dondero - Cross                              162

 1  A    It doesn't need to.

 2  Q    In fact, it still mentions Apple, doesn't it?  Why did you

 3  feel the need to mention Apple if Amazon had already hit the

 4  price?

 5  A    The only way you generally get something done at

 6  attractive levels in business is if two people are interested.

 7  Q    But why weren't you -- why were you creating a story for

 8  the Compliance Department when the whole idea was to be

 9  transparent so they would understand what was happening?  Why

10  would you create a story that differed from the facts?

11  A    It didn't differ from the facts, and it's not a story.

12  It's a, we have material nonpublic information.  Please put

13  this on the restricted list.  And --

14  Q    But that -- but you said Amazon and Apple are actively

15  diligencing and they're in the data room.  Do you see that?

16  A    That's true.

17  Q    So, even though -- you know what, I'll move on.  But this

18  -- this doesn't say what you testified to earlier, that Apple

19  hit the -- that Amazon hit the price.  Right?  Can we just

20  agree on that?

21  A    Well, agree that it doesn't have to and it's not supposed

22  to.

23          MR. MORRIS:  I move to strike.  I just want --

24          THE COURT:  Sustained.

25  BY MR. MORRIS:

018123

HCMLPHMIT00003175

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 35-72   Filed 06/04/25   Page 275 of 1017    PageID 19174
Exhibit 72   Page 164 of 390

Dondero - Cross                          163

1    Q    -- you to -- I want you to just work with me here.  You

2    did not tell the Compliance Department that Apple -- that

3    Amazon had hit the strike price.  Right?  Isn't that correct?

4    That's not what this email says?

5    A    The -- you can pull up a hundred of these type emails.

6    They're not specific.

7              MR. MORRIS:  I'm going to move to strike and I'm just

8    going to ask you, --

9              THE COURT:  Sustained.

10   BY MR. MORRIS:

11   Q    -- because you testified to one thing, and I just want to

12   make clear that you told the Compliance Department something

13   different.  Can we just agree on that?

14             MR. MCENTIRE:  Well, Your Honor, may I respond to his

15   motions to strike?  I think he's becoming argumentative.

16             THE COURT:  Could you speak into the mic, --

17             MR. MCENTIRE:  I can.

18             THE COURT:  -- please.

19             THE COURT:  He's becoming argumentative.  And I think

20   it's very clear that, if he asks a question, the witness has a

21   right to respond.  I think his answers are totally responsive.

22   And I don't think anything should be struck.

23             THE COURT:  Okay.  Your question was you didn't put

24   in there anything about it hit the strike price --

25             MR. MORRIS:  He didn't --

018124

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 34-72   Filed 01/05/25   Page 276 of 1017    PageID 19175
Exhibit 72 Page 165 of 390

Dondero - Cross                     164

1          THE COURT:  -- or whatever?

2          MR. MORRIS:  He didn't -- he didn't tell the

3    Compliance Department what he just testified to.  In fact, he

4    told the Compliance Department something very different.

5    That's all I'm asking.

6          THE COURT:  And I think that's just a yes or no.

7          MR. MORRIS:  Okay.

8    BY MR. MORRIS:

9    Q    Yes or no?  You told the Compliance Department something

10   different than what was actually happening?

11   A    That's not true.

12   Q    Oh.

13   A    Exactly what was here, what was happening.  I didn't give

14   more detail, which is more hearsay.

15   Q    Okay.  If somebody was filing -- following the Highland

16   bankruptcy, they would have known that MGM was very important,

17   right?

18   A    You'd have to show me where.  I don't -- I don't see it in

19   any of the bankruptcy --

20   Q    You don't think that that's true?

21   A    I didn't see it in any of the public filings.

22   Q    Do you remember we were here two years ago on this very

23   day, June 8, 2021, for the second contempt hearing?  You sat

24   in that very witness box during the second contempt hearing?

25   Remember that?  That was two years ago.

HCMLPHMIT00003177

Dondero - Cross                                    165

1   A    I remember sitting in the box.  What are you asking?

2   Q    And do you remember that that was just a few days after

3   MGM had announced its deal with Amazon?

4   A    I -- I don't remember -- I -- was that the day the judge

5   was hopeful that would lead to a resolution of the case?

6   Q    Exactly.  So, --

7   A    Okay.

8   Q    -- Judge Jernigan certainly knew that MGM was important.

9   Right?

10  A    Yes.

11  Q    And she's a bankruptcy judge, right?

12  A    Yes.

13  Q    And she was overseeing the bankruptcy case, right?

14  Correct?

15  A    Yes.

16  Q    And the very first thing when she walked in the door two

17  years ago on this day was, oh my goodness, MGM, they have a

18  deal, maybe we can finally get to a settlement.  Right?

19  A    And I wish she had pushed on that.

20  Q    Do you --

21  A    And I remember you guys dismissing it.

22  Q    Do you think she had material nonpublic inside

23  information?

24  A    No, I don't think so.

25  Q    She probably learned it in the bankruptcy case, right?

018126

HCMLPHMIT00003178

Dondero - Cross                          166

1   A    Yeah.

2   Q    Okay.  Do you believe Mr. Seery sold any MGM securities

3   between the day you sent your email and the day the Amazon

4   deal was announced on May 26th?

5   A    I don't know.

6   Q    Do you -- so you have no knowledge?  Let's do this a

7   different way.  You have no basis to say that Mr. Seery sold

8   any MGM securities between the moment you sent this email on

9   December 17th and the day the Amazon deal was announced on May

10  26th.  Correct?

11  A    I'm sorry.  Just to clarify, you're saying sold, not

12  bought, right?  You're not asking me if --

13  Q    I'll do either way.

14  A    Okay.

15  Q    Fair point.

16  A    Sure.

17  Q    Very fair point.

18  A    Okay.

19  Q    Do you believe that Mr. Seery engaged in any transactions

20  of MGM securities between those two relevant data points?

21  A    Yes.

22  Q    Okay.  What do you think he did?

23  A    The HarbourVest transaction.

24  Q    Okay.  So, you learned about the HarbourVest transaction

25  when?

018127

HCMLPHMIT00003179

Dondero - Cross                              167

1   A    When it was filed.

2   Q    And that was on December 23rd.  Do you remember that?

3   A    Yes.

4   Q    It was just less than a week after you sent your email,

5   right?

6   A    Yes.

7   Q    And do you remember that you filed an objection to the

8   HarbourVest settlement?

9   A    Yes.

10  Q    And you're the one who gave Mr. Seery this material

11  nonpublic inside information, right?

12  A    Yes.

13  Q    Did you object to the HarbourVest settlement on the basis

14  that Mr. Seery was engaging in insider trading?

15  A    Not then, I don't think.  I believe --

16  Q    You didn't, right?  Even though it was happening at the

17  exact same moment, the very -- within a week of you giving him

18  this information.  He's announcing that he's doing this

19  settlement and you don't say a word.  Isn't that right?

20  A    Because I delegated the responsibility to Compliance by

21  notifying them of material nonpublic information, and

22  Compliance should hold the organization accountable.

23  Compliance is separate and discrete from management.

24  Compliance reports to the SEC.

25  Q    You filed a 15-page objection to the settlement, didn't

HCMLPHMIT00003180

Case 19-34054-sgj11 Doc 4255-72 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02072-S Document 51-34 72 Filed 06/09/25390 Page 280 of 1017 PageID 19179

Dondero - Cross                                          168

1    you?

2    A    I don't -- I don't know.

3    Q    Did you tell Judge Jernigan that Mr. Seery was doing bad?

4    A    Not then.  I think a month later, two months later.

5    Q    Even though you knew what was happening, you didn't say

6    anything, right?

7    A    I -- I'm not responsible for all the filings.  I --

8    Q    Even though it's under your name?

9    A    Correct.

10   Q    How about -- how about CLO Holdco?  Did CLO Holdco file an

11   objection to the HarbourVest settlement?

12   A    I -- I don't know which entities did, but it -- whatever

13   entities that were in control that could did, eventually, when

14   they found out, you know, and -- but did -- did they, within a

15   week or contemporaneously?  No.  It was right around the

16   holidays.  A lot of people weren't paying attention.  You guys

17   were trying to rush the HarbourVest thing through.

18   Q    Sir, CLO Holdco filed an objection, claiming that it was

19   entitled to purchase the HarbourVest interests in HCLOF

20   because it had a right of first refusal, right?  Isn't that

21   right?

22   A    Okay.  I -- what ultimately governs the --

23   Q    Isn't that right?

24   A    I don't -- okay.

25   Q    It's really just yes or no.

018129

HCMLPHMIT00003181

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 26-4  Filed 07/06/25  Page 281 of 1017   PageID 19180
Exhibit 72   Page 170 of 390

Dondero - Cross                    169

1  A    I don't know.

2  Q    If you don't remember, that's fine.

3  A    I don't remember, yeah.

4          MR. MCENTIRE:  Your Honor, would he please give the

5  witness an opportunity to answer?  He's interrupted three

6  times in less than five seconds.  Give the witness an

7  opportunity to respond.

8          MR. MORRIS:  This is real easy stuff.

9          THE COURT:  Okay.

10          MR. MORRIS:  I'm trying to cross him here.

11          MR. MCENTIRE:  Your Honor, with all due respect, he's

12  making it very difficult because he's being very aggressive --

13          MR. MORRIS:  Nah.

14          MR. MCENTIRE:  -- and he's interrupting the witness.

15          MR. MORRIS:  I would never.

16          THE COURT:  Okay.  I don't feel the need to do that

17  right now, but I will -- I will consider your request.

18          THE WITNESS:  Can I give a complete answer to his

19  last question, or one that I'd like to be my answer on the

20  record?

21          THE COURT:  Go ahead.

22          THE WITNESS:  The governing responsibility as a

23  registered investment advisor is you're not allowed to buy

24  back from investors fund interests or investments unless you

25  offer it to everybody else, in writing, in that fund first.

018130

HCMLPHMIT00003182

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 51-4 72  Filed 07/03/25  Page 282 of 1017    PageID 19181

Dondero - Cross                    170

1  That's the Investment Advisers Act as I understand it, and

2  that is what was improper in the HarbourVest transaction.  I

3  mean, besides the fact that the pricing was wrong, they misled

4  HarbourVest.  And I know HarbourVest hasn't complained, but

5  just because your investors don't complain doesn't mean you

6  can rip them off.

7           MR. MORRIS:  I'd really move to strike the entirety

8  of the answer, Your Honor.

9           THE COURT:  Granted.

10  BY MR. MORRIS:

11  Q    Mr. Dondero, HC --

12  A    I'm not going to -- I'm not answering any more questions

13  unless I can answer that question with that answer, --

14  Q    Mr. Dondero, do you --

15  A    -- because I believe it's responsive.

16  Q    Do you remember that CLO Holdco withdrew their objection?

17  A    I --

18  Q    To the HarbourVest settlement?

19  A    I don't remember.

20  Q    Do you remember that's really when Grant Scott left the

21  scene?

22  A    I don't --

23  Q    He thought it was inappropriate for them to withdraw,

24  right?

25  A    I don't remember all the details.  I know they made some

018131

HCMLPHMIT00003183

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 55-24 72   Filed 07/02/25390   Page 283 of 1017   PageID 19182

Dondero - Cross                    171

  1  mistakes, and there's a tolling agreement against Kane's

  2  (phonetic) firm for making mistakes, and, you know, whatever.

  3  But I -- I don't remember all the details.

  4  Q   And a couple of months later, you conspired with Mr.

  5  Patrick to try to sue Mr. Seery in order to try to get that

  6  very same interest in HCLOF, right?

  7            MR. MCENTIRE:  Your Honor, I have to object.  There's

  8  no foundation and it's also highly argumentative and I move to

  9  object.  That's a -- that's a question asked in bad faith.

 10            THE WITNESS:  I deny any conspiring.

 11            MR. MORRIS:  Okay.

 12            THE COURT:  Sustained.

 13  BY MR. MORRIS:

 14  Q   In April, Mr. Patrick filed a lawsuit on behalf of CLO

 15  Holdco a couple of weeks after getting appointed as the head

 16  of CLO Holdco and the DAF about the HarbourVest settlement.

 17  Isn't that right?

 18  A   I believe so.

 19  Q   Okay.  And you worked with him on that, right?

 20  A   I -- I did not work with him on that.  I was very just

 21  tangentially aware.

 22  Q   Okay.

 23            MR. MORRIS:  I'm just going to refer the Court -- I'm

 24  going to move for the admission into evidence of the second

 25  contempt order.

018132

HCMLPHMIT00003184

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 24-72    Filed 07/03/25   Page 284 of 1017    PageID 19183
Exhibit 72   Page 173 of 390

Dondero - Cross                    172

```
 1            THE COURT:  Exhibit what?

 2            MR. MORRIS:  Just one moment, Your Honor.

 3       (Pause.)

 4            MR. MORRIS:  You know what, I don't know that I have

 5  it on the list.  I'm just going to ask the Court to take

 6  judicial notice.  We had a hearing two years ago to this day,

 7  and the Court found in the order that it entered at the

 8  conclusion of that hearing that Mr. Patrick had abdicated his

 9  responsibility to Mr. Seery.  It's one of the reasons why Mr.

10  Seery wasn't held in contempt of Court.  And I'd like -- I'd

11  like Counsel to address it now.

12            MR. MCENTIRE:  Yeah, I'll -- you said Seery, didn't

13  you?

14            MR. MORRIS:  Oh, sorry.  I said Seery.  I meant

15  Dondero.

16            MR. MCENTIRE:  (faintly)  Also, I believe it's

17  entirely irrelevant.  Judicial -- taking judicial --

18            THE COURT:  Would you speak in the microphone,

19  please?

20            MR. MCENTIRE:  I'm sorry.  Taking judicial notice of

21  something that is utterly irrelevant is not necessary, not

22  appropriate.  What this Court did two years ago roughly to the

23  day -- and I assume he's correct -- has no bearing on anything

24  before the Court today.  Nothing.  This has zero connection,

25  nexus, under any analysis, any fair scrutiny, dealing with the
```

018133

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 34-72   Filed 07/04/25   Page 285 of 1017   PageID 19184
Exhibit 72   Page 174 of 390

Dondero - Cross                                173

1   colorability of the claim that Hunter Mountain, who was not

2   involved in those proceedings, is trying to advance here.  And

3   it would be -- it would be improper for this Court to even

4   take it under judicial notice.

5            THE COURT:  Okay.  Response?

6            MR. MORRIS:  Can I respond?

7            THE COURT:  Uh-huh.

8            MR. MORRIS:  Okay.  So, Your Honor, I'm going to move

9   for the introduction into evidence of Exhibit 45.  It is the

10  Charitable DAF complaint that was filed in the federal

11  district court on April 12, 2021, under the direction of Mark

12  Patrick, who today stands here as the representative of Hunter

13  Mountain.

14      This was the complaint, if Your Honor will recall, that

15  they tried to amend and we had a hearing here about the

16  circumstances, because that amendment was going to name Mr.

17  Seery personally, in violation of the gatekeeper order.

18  Right?

19            THE COURT:  Uh-huh.

20            MR. MORRIS:  And so it is all tied together.  If you

21  go to Paragraph 77 of this exhibit, it says, HCLOF holds

22  equity in MGM Studio.  This is the exact same transaction,

23  right?  So, so Mr. Dondero says, I gave Mr. Seery inside

24  information, he violated all of these things in the

25  HarbourVest transaction, even though he didn't say a word

```
 1   then, and here, while it's still on the restricted list,
 2   before the Amazon deal is announced, they're actually in court
 3   saying that they should be entitled to acquire that same asset
 4   that Mr. Seery supposedly acquired improperly.  He wants it
 5   for himself.
 6       I mean, are you kidding me?  It's not relevant?
 7            THE COURT:  I overrule the relevance objection.  It's
 8   admitted.
 9            MR. MORRIS:  Thank you.  And 45 is admitted, Your
10   Honor?
11            THE COURT:  45 is admitted.
12            MR. MORRIS:  Okay.
13       (Debtors' Exhibit 45 is received into evidence.)
14            MR. MCENTIRE:  Just, Your Honor, I was identifying my
15   objection in connection with his original request that you
16   take something under --
17            THE COURT:  Would you speak in the microphone?
18   Again, we --
19            MR. MCENTIRE:  Yes.  My original objection was
20   addressing his request of you, Your Honor, to take something
21   under judicial notice.  I want to make sure my objection is
22   also lodged with regard to Exhibit 45, which I understand
23   you've overruled.
24            THE COURT:  Correct.
25            MR. MCENTIRE:  Okay.
```

HCMLPHMIT00003187

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 26-72   Filed 07/06/25   Page 287 of 1017   PageID 19186

Dondero - Cross                    175

1              THE COURT:  It is so noted.

2              MR. MORRIS:  Okay.

3              THE COURT:  You've objected and I've admitted it.

4              MR. MORRIS:  And I think I've said this already, but

5    the reason that we're requesting the Court take judicial

6    notice of its order on the second contempt proceeding is

7    because it shows that Mr. Dondero and Mr. Patrick worked

8    together, in violation of the gatekeeper, to try to suit Mr.

9    Seery to obtain the interest in HCLOF that he is sitting here

10   today saying somehow that Mr. Seery wrongfully acquired, even

11   though he didn't say a word at the time.

12             THE COURT:  Okay.  So now we're talking about not

13   Exhibit 45 --

14             MR. MORRIS:  Yes.

15             THE COURT:  -- but the order that was entered --

16             MR. MORRIS:  Correct.

17             THE COURT:  -- regarding the filing of Exhibit 45?

18             MR. MORRIS:  Exactly.

19             THE COURT:  Someone is going to need to give me a

20   docket entry number before we're done here.

21             MR. MORRIS:  Okay.

22             THE COURT:  I can and will take judicial notice of

23   that, but I need to have it --

24             MR. MCENTIRE:  So I assume, for the record, my

25   objection is overruled?

018136

HCMLPHMIT00003188

Dondero - Cross                          176

```
 1              THE COURT:  Your objection is overruled.

 2              MR. MCENTIRE:  Thank you.

 3              MR. MORRIS:  All right.

 4   BY MR. MORRIS:

 5   Q    You mentioned something about, I think, was it NXDT or

 6   NHF?

 7   A    Yes.

 8   Q    And just let me see if I can do it this way.  Right?  So

 9   there used to be a fund known as the NexPoint Strategic

10   Opportunities Fund, right?

11   A    Yes.

12   Q    Okay.  And in 2020 that was a closed-in fund.  Correct?

13   A    Yes.

14   Q    And it traded under the ticker symbol NHF, correct?

15   A    Yes.

16   Q    And then late in 2021 the name of the fund was changed to

17   NexPoint Diversified Real Estate Trust, correct?

18   A    Yes.

19   Q    And the ticker symbol changed from NHF to NXDT, correct?

20   A    Yes.

21   Q    And then it became a REIT the following year, right?

22   A    Yes.

23   Q    And I'm just going to refer to these letters as the Fund;

24   is that fair?

25   A    That's fine.
```

018137

HCMLPHMIT00003189

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document Exhibit 72   Filed 07/18/25   Page 289 of 1017    PageID 19188

Dondero - Cross                         177

1   Q    For purposes of these questions.  And you were the Fund's

2   portfolio manager, the president, the principal executive

3   officer, correct?

4   A    Yes.

5   Q    And another entity that you controlled, NexPoint Advisors,

6   provided advisory services to the Fund, correct?

7   A    Yes.

8   Q    And you controlled NexPoint Advisors at all times,

9   correct?

10  A    Yes.

11  Q    Okay.  And the Fund was publicly traded, right?

12  A    Yes.

13  Q    And the Fund owned shares of MGM at the end of 19 -- at

14  the end of 2020, correct?

15  A    Yes.

16  Q    In fact, as of December 2020, MGM was one of the Fund's

17  ten largest holdings, with -- valued at over $25 million.

18  Isn't that right?

19  A    Yes.

20  Q    And by the end of 2021, MGM was the Fund's fifth largest

21  holding, with assets -- with a value of over $40 million.

22  Correct?

23  A    Yes.

24  Q    And the Fund also held MGM common stock indirectly; isn't

25  that right?

018138

HCMLPHMIT00003190

Dondero - Cross                    178

1   A    Yes.

2   Q    In fact, when the Amazon deal closed at the -- in March of

3   2022, the Fund issued a press release disclosing that it stood

4   to receive over $125 million on the MGM shares that it held

5   directly and indirectly.  Correct?

6   A    We issued several press releases.  I don't remember --

7   Q    Okay.  Do you remember that, that as a result of the MGM

8   sale, the Fund was expected to receive approximately $126

9   million?

10  A    Yes.

11  Q    Okay.

12  A    Roughly.

13  Q    All right.  In October 2020, just a few weeks before you

14  sent your email, the Fund announced the commencement of a

15  tender offer to acquire outstanding shares at a certain price.

16  Correct?

17  A    Yeah, I believe so.

18  Q    And you authorized that, right?

19  A    Yes.

20  Q    And when a fund acquires shares and then retires them, the

21  shareholders who did not tender consequently own a larger

22  percentage of the fund than they did before the tender,

23  correct?

24  A    Yes.

25  Q    Okay.  And the tender was completed in January, in the

018139

HCMLPHMIT00003191

```
 1  first week of January 2001 [sic], correct?

 2  A   I don't remember when it was complete.

 3  Q   It started at the end of October 2020, and it ended

 4  sometime in January '21.  Is that fair?

 5  A   Okay.  I don't remember.  Okay.

 6  Q   Do you want me to refresh your recollection?

 7  A   I'm just saying I don't remember.

 8  Q   Yeah, okay.

 9  A   I'm not dis...

10  Q   Okay.

11  A   -- denying it.  I just don't remember the exact dates.

12      (Discussion.)

13          MR. MORRIS:  Your Honor, can I mark for

14  identification purposes Plaintiffs' Exhibit -- I'm just going

15  to call it 100, to see if it refreshes the witness's

16  recollection?

17          THE COURT:  You may mark it.

18          MR. MORRIS:  Okay.

19          THE COURT:  We'll see where it goes from there.

20      (Debtors' Exhibit 100 is marked for identification.)

21  BY MR. MORRIS:

22  Q   So, I've put --

23          MR. MCENTIRE:  Hold it.  Your Honor, I think we're

24  now marking exhibits that we haven't put on an exhibit list.

25          MR. MORRIS:  I'm trying to refresh his recollection.
```

018140

HCMLPHMIT00003192

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 15-24   Filed 08/04/25   Page 292 of 1017    PageID 19191
Exhibit 72   Page 181 of 390

Dondero - Cross                          180

```
1              MR. MCENTIRE:  Okay.

2              MR. MORRIS:  Yeah.

3              MR. MCENTIRE:  Well, --

4              THE COURT:  Yes.

5              MR. MORRIS:  Okay?  I haven't offered it in -- I

6    haven't offered it --

7              THE COURT:  I've not admitted -- I don't know what it

8    is.  I haven't admitted it yet.  I'm waiting.

9              MR. MORRIS:  I haven't offered it into evidence.  He

10   said he doesn't remember, --

11             THE COURT:  Okay.

12             MR. MORRIS:  -- I've got an SEC document here, and

13   I'm going to try and refresh his recollection.

14             THE COURT:  Okay.

15   BY MR. MORRIS:

16   Q    You're familiar with these forms, right?

17   A    Generally.

18   Q    In fact, in fact, you sign them in your capacity as the

19   fund portfolio manager, right?  Your signature is put on it,

20   anyway?

21   A    Generally.

22   Q    Yeah.  And do you see that this is the Form N-CSR that was

23   filed with the SEC at the end of 2001 [sic] on behalf of

24   NexPoint Diversified Real Estate Trust?

25   A    Yes.
```

018141

HCMLPHMIT00003193

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 24-72 Filed 08/02/25   Page 293 of 1017    PageID 19192
Exhibit 72   Page 182 of 390

Dondero - Cross                    181

1    Q    Okay.  So if you just turn to Page 16.  And the numbers

2    are kind of at the bottom in the middle of the page.  You'll

3    see the notes to the consolidated financial statements.

4    A    Yes.

5    Q    Okay.  And Note 1 discusses the organization.  Do you see

6    that?

7    A    Yes.

8    Q    And at the bottom of the left-hand column, it says, On

9    January 8, 2021, the company announced the final result of its

10   exchange offer pursuant to which the company purchased the

11   company's outstanding -- the company's common shares in

12   exchange for certain consideration.

13        Do you see that?

14   A    Yes.

15   Q    That's a reference to the tender offer that you authorized

16   at the end of October, correct?

17   A    Yes.

18   Q    And then at the bottom it says, The company share --

19   company -- excuse me.  I strike that.  It says, quote, The

20   common shares at a price of $12 per common share, for an

21   aggregate purchase price of approximately $125 -- $105

22   million.  Upon retirement of the repurchased shares, the net

23   asset value was $152 million, or $17.41 million.

24        Do you see that?

25   A    Yes.

HCMLPHMIT00003194

Dondero - Cross                          182

1    Q    Does that refresh your recollection that the tender offer

2    was completed at the beginning of January?

3    A    Yes.

4    Q    And that's with all of the MGM stock that the Fund still

5    owned at that time, right?

6    A    Yeah.  We -- we didn't -- we didn't violate --

7    Q    You didn't --

8    A    We didn't -- we didn't violate like Seery did.  We didn't

9    sell any shares or buy shares.

10   Q    Okay.

11            MR. MORRIS:  I'm going to move to strike that, Your

12   Honor.

13            THE COURT:  So granted.

14            MR. MCENTIRE:  Well, Your Honor, I've actually got a

15   response to his motion to strike.  This entire inquiry is

16   irrelevant.

17            MR. MORRIS:  Not --

18            MR. MCENTIRE:  This has no relevance at all in

19   connection with the allegations that we're making in this

20   case.

21            THE COURT:  Your response?

22            MR. MORRIS:  My response, Your Honor, if you ask me

23   -- let me just get a few more questions.  He personally owned

24   shares in the Fund.  The Fund owned shares in MGM.  And

25   notwithstanding the restricted material, this is the insider,

HCMLPHMIT00003195

Dondero - Cross                    183

1    and he is benefiting from himself through the Fund's

2    repurchase of these shares in the tender offer, and he went

3    and he had substantial holdings.  I'll get to that in a

4    minute.

5        So he is actually doing something worse than what Mr.

6    Seery -- what he accuses Mr. Seery of, because he's buying

7    shares for his own personal benefit.  Right?  He's the

8    insider.  Right?  And the Fund owns the shares directly.

9    There's never going to be an allegation that HCLOF ever owned

10   any MGM stock.  Never.

11           THE COURT:  Okay.  I'm going to allow this.

12   Obviously, on redirect, you can further question on this --

13           MR. MCENTIRE:  Well, --

14           THE COURT:  -- to --

15           MR. MCENTIRE:  Well, first of all, his suggestions

16   and his accusations are purely argumentative.

17           THE COURT:  Would you please speak in the microphone?

18   We --

19           MR. MCENTIRE:  Well, he's standing in the way, Your

20   Honor.

21           THE COURT:  Well, --

22           MR. MCENTIRE:  It's irrelevant.

23           THE COURT:  There are two.  There's room for both of

24   you.

25        Continue.  Go ahead.

HCMLPHMIT00003196

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 51-24 Filed 08/05/25   Page 296 of 1017    PageID 19195
Exhibit 72 Page 185 of 390

Dondero - Cross                      184

1          MR. MCENTIRE:  It's entirely irrelevant, and it's

2    argumentative.

3          THE COURT:  Okay.  Overruled.  You can continue.

4    BY MR. MORRIS:

5    Q    You did own an awful lot of the Fund's shares, didn't you?

6    A    I owned some.

7    Q    You owned some?  You owned millions, right?

8    A    Yes.

9    Q    Okay.  And as a result of the tender, you owned a greater

10   interest of the Fund, right?

11   A    Yes.

12   Q    And therefore you owned a greater number -- a greater

13   portion of the MGM stock, the $125 million of MGM stock that

14   was owned directly and indirectly by the Fund, correct?

15   A    You do know insiders weren't permitted to participate in

16   the tender, which would have kept my percentage the same.

17   Q    Sir, you benefitted -- you didn't stop the tender, right?

18   You didn't say, now I know what's going to happen, I should

19   stop it?  You benefitted from the tender.  Can we just agree

20   on that?

21   A    I did everything I was supposed to do, notifying

22   Compliance.  If they thought it was material, they would have

23   -- it was in their hands once I notified Compliance of the

24   material --

25   Q    Okay.

018145

HCMLPHMIT00003197

Dondero - Cross                      185

1    A    -- nonpublic information.

2    Q    I appreciate that.  I just want --

3    A    It wasn't my responsibility to do Compliance's job to call

4    you or call --

5    Q    Okay.

6    A    -- the SEC or call anybody else.

7    Q    But you will agree that, even though you had material

8    nonpublic inside information, you didn't take any steps to

9    stop the tender, correct?

10   A    The tender was for a relatively small amount of the stock.

11   But I did -- I would -- it would not be my responsibility to

12   change or adjust the tender --

13   Q    Okay.

14   A    -- or what was happening.

15   Q    Okay.  And then the last question is, you benefitted from

16   the tender because the Fund repurchased shares, which

17   increased your percentage ownership of the Fund, and therefore

18   your percentage ownership of the MGM shares that were held

19   directly and indirectly.  Is that fair?

20   A    Marginally, I guess.  Yes.

21   Q    Okay.  From the -- from the millions of shares, you would

22   describe it as marginal?  Okay.

23        Let me move on.  You've testified now that you spoke with

24   representatives of Farallon in the late spring, I guess

25   beginning on May 28th.  Right?

018146

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 34-72    Filed 07/07/25    Page 298 of 1017    PageID 19197
                                    Exhibit 72    Page 187 of 390

                           Dondero - Cross                      186

1   A   Yes.

2   Q   And that was two days after the MGM deal was publicly

3   announced, correct?

4   A   Yes.

5   Q   Okay.  And had you ever communicated with Mr. Patel before

6   that phone call?

7   A   I don't believe so.

8   Q   And then you spoke with Mr. Linn shortly after?

9   A   Yes.

10  Q   Had you ever spoken with Mr. Linn before that phone call

11  with Mr. Linn?

12  A   I don't believe so.

13  Q   So these phone calls were the very first time that you

14  ever spoke to either one of these gentlemen.  Is that right?

15  A   That I can remember.

16  Q   Okay.

17  A   If I ran into them at --

18  Q   Uh-huh.

19  A   -- a conference a decade ago, I don't know, but --

20  Q   And they told you that they bought the shares in the

21  February-March time frame, right?

22  A   Yes.

23  Q   And you have no reason to dispute that, correct?

24  A   Correct.

25  Q   Okay.  And you didn't know how much they had paid for the

HCMLPHMIT00003199

1    claims as a result of these conversations, correct?

2    A    They did not admit a price.

3    Q    Okay.  And it's your testimony that there wasn't

4    sufficient information in the public for them to buy -- this

5    is your view -- that there wasn't sufficient information in

6    the public to justify their purchases.  Is that your view?

7    A    Correct.

8    Q    And even though you didn't think there was sufficient

9    information in the public, you were prepared to pay 30 percent

10   more than they did, right?

11   A    Yes.

12   Q    And is that because you were 30 percent more irrational

13   than them or because you had material nonpublic inside

14   information?

15           MR. MCENTIRE:  Objection.  Argumentative, Your Honor.

16           THE COURT:  Overruled.

17           THE WITNESS:  Even at a 30 percent premium, it was

18   less than I offered the UCC several months earlier, number

19   one.

20       Number two, I was still under the illusion there was a

21   desire to resolve the place, not burn it down.  You know,

22   there was -- all the original members were happy to sell at

23   $150 million.  It was a $500 or $600 million estate.  There

24   should be $400 or $500 million of residual value.  It

25   shouldn't all be going out the door to lawyers and others.

018148

HCMLPHMIT00003200

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 72   Filed 08/05/25 390   Page 300 of 1017   PageID 19199

Dondero - Cross                                  188

 1  BY MR. MORRIS:

 2  Q    You were willing to pay 30 percent more for an unknown

 3  purchase price, 30 percent more of an unknown purchase price,

 4  at a moment that you didn't believe there was sufficient

 5  information to buy the claims, correct?

 6  A    You have a couple misstatements in there.  The Grosvenor

 7  piece was public.  The Grosvenor piece traded at $67 million.

 8  So we knew that piece trade at around 50 cents.  We knew from

 9  people in the marketplace the other pieces were trading right

10  around that level.

11      So I wasn't just offering 30 percent on any willy-nilly

12  number, 130 percent of any willy-nilly number.  I knew they

13  had paid around 50, 60 cents.  And so I was offering 30

14  percent more than that.  Thirty percent more than $150

15  million, call it $200 million.  I had offered $230 or $240

16  million to resolve the whole estate before the plan went

17  effective, and I got no response from the original UCC

18  members.

19  Q    So why didn't you just try to settle the case with them?

20  Why did you try to buy the claim?  Why, if you had these new

21  people, and your good intentions were to finally get to a

22  settlement of the case, why didn't you say, hey, guys, how do

23  we resolve the case?  Why did you want to buy the claims at a

24  30 percent premium over what they paid with no knowledge and

25  no diligence, according to you?  Can you explain that to Judge

HCMLPHMIT00003201

Dondero - Cross                    189

1   Jernigan?

2   A    Because Seery told them to hold on, don't worry, they were

3   going to make $270 million.

4   Q    That doesn't answer my question.  Why didn't you try --

5   you had new owners.  Why didn't you try to settle with them?

6   A    When someone owns an asset, buying their asset is settling

7   with them.  What claim does Farallon have against us?  At that

8   point, they had no claims against us.

9   Q    It doesn't settle the case, does it?

10  A    But if we owned all the claims, it would settle the case.

11  Just like if Seery had objected to the claims trading that

12  they were supposed to give written notice to the Court, he had

13  enough cash on the balance sheet to buy and retire all the

14  claims.

15  Q    All right.  Let's go back, I apologize, to that Exhibit

16  11.  No, it's not Exhibit 11.  I think it's their Exhibit 4,

17  your notes.

18          MR. MORRIS:  Your Honor, may I have -- just have one

19  moment?

20          THE COURT:  You may.

21          MR. MORRIS:  Can you tell me how long I've been

22  going?  That's really my question.

23          THE CLERK:  So, on cross, --

24          MR. MORRIS:  Yeah.

25          THE CLERK:  -- you've been going for 32 minutes.

018150

HCMLPHMIT00003202

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S     Document 35-72   Filed 09/04/25   Page 302 of 1017     PageID 19201
Exhibit 72   Page 190 of 390

Dondero - Cross                           190

1        MR. MORRIS:  Okay.  Trying to speed this up.

2   BY MR. MORRIS:

3   Q   All right.  So, do we have your handwritten notes, which

4   are Exhibit 4, in this binder?  Oh.

5        THE COURT:  Do you want to put it up again on the

6   screen?

7        MR. MORRIS:  Ms. Canty, if you're listening and you

8   can do that, that would be great.  If not, --

9       (Discussion.)

10       MS. CANTY:  One second, John.

11       MR. MORRIS:  All right.  He -- he's got it.

12       THE COURT:  Okay.

13  BY MR. MORRIS:

14  Q   Okay.  So, I just -- I just want to make -- you know,

15  follow up on a few questions I asked you earlier on *voir dire*.

16  So, these are your notes, right, and you said you write down

17  the important stuff.  Correct?

18  A   I write down, yeah, the stuff I thought I would need for

19  the next call.

20  Q   Okay.  And, you know, again, just so we have it all in one

21  spot, it doesn't say anything about MGM.  Correct?

22  A   It does not.

23  Q   It doesn't say anything about a *quid pro quo*, correct?

24  A   *Quid pro*?  Uh, no, it does not.

25  Q   It doesn't say anything at all about Mr. Seery's

HCMLPHMIT00003203

1   compensation, correct?

2   A    It does not.

3   Q    It doesn't say anything about the sharing of material

4   nonpublic inside information, correct?

5   A    When I told them discovery was coming, that was my

6   response to I knew they had traded on material nonpublic

7   information.

8   Q    Okay.  That -- you told them that?

9   A    Yes.

10   Q    Is that what you're saying now?

11   A    Yes.

12   Q    Oh, so that's what you told them?  They didn't tell you

13   that; that's what you told them?

14   A    Yes.

15   Q    And that's why you wanted discovery, right?

16   A    I thought it would be a lot easier to get discovery on a

17   situation like this than it has been for the last two years,

18   yes.

19   Q    Okay.  Um, --

20   A    In fact, I told them that it would be coming in the next

21   few weeks.  And this has been a couple years.

22   Q    And that's exactly what you did, right?

23   A    Well, we've been trying for two years to get --

24   Q    Right.

25   A    -- discovery in this.

HCMLPHMIT00003204

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 25-72   Filed 06/03/25   Page 304 of 1017   PageID 19203
Exhibit 72   Page 193 of 390

Dondero - Cross                    192

1   Q   Okay.  So you filed your Texas 202, right?

2   A   I don't know who filed what.

3   Q   That was the one by Mr. Sbaiti that was filed under your

4   name?  Do you remember that?

5   A   Generally.

6   Q   Okay.  Let's take a quick look at that document.  It's #3

7   in our binder.

8   A   Binder #3?

9       (Discussion.)

10          MR. MORRIS:  Okay.  I think #3 is in evidence, Your

11   Honor.

12          THE WITNESS:  Number 3 is in evidence.

13          THE COURT:  Yes.

14          MR. MORRIS:  Okay.

15          THE COURT:  It is.

16   BY MR. MORRIS:

17   Q   And if you can turn to the last page, Mr. Dondero.  Page

18   8.

19   A   Yes.

20   Q   Okay.  And that's your signature, right?

21   A   Yes.

22   Q   And you verified that this document was true and correct

23   within the best of your personal knowledge, correct?

24   A   Yes.

25   Q   Did you read it before you signed it?

018153

HCMLPHMIT00003205

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 15-472  Filed 09/04/25  Page 305 of 1017    PageID 19204

Dondero - Cross                    193

1   A    Probably.

2   Q    You don't recall doing that?

3   A    Not at this moment.

4   Q    And you may not have.  Is that fair?

5   A    No, I probably did.  Do you have a question?

6   Q    I'm just wondering if you signed it or not.

7   A    I did sign it.

8   Q    Okay.  Good.  So, can you go to Paragraph 21?  Well, let's

9   start at Paragraph 20.  It says that Mr. Seery, quote, has an

10  age-old connection to Farallon, and upon information and

11  belief, advised Farallon to purchase the claims.

12       Do you see that?

13  A    Yes.

14  Q    And then the next paragraph you refer to the telephone

15  call that you had with Michael Linn, right?

16  A    Yes.

17  Q    It doesn't refer to any phone call with Mr. Patel,

18  correct?

19  A    It does not.

20  Q    And the only reason that you swore under oath you were

21  told that Farallon purchased the claims was because of

22  Farallon's, quote, prior dealings with Mr. Seery.  Correct?

23  In Paragraph 21, it says, Relying entirely on Mr. Seery's

24  advice solely because of their prior dealings?

25  A    Yes.

018154

1  Q   Okay.  You didn't -- you didn't swear under oath at that

2  time that you were told that they bought the claims because of

3  MGM.  Right?

4  A   If you're asking if this is -- it seems like it's not

5  complete, if that's what you're asking me.

6  Q   I'm not asking you that.  I'm asking you what -- I'm

7  asking you to confirm that you swore under oath to the Texas

8  state court, just weeks after you had these conversations,

9  about what you were told concerning Farallon's purchase of the

10 claims.

11     I'm focused on Paragraph 21.  The only reason that you

12 gave, that you told the Texas state court under oath, was that

13 Farallon told you they bought their claims because of their

14 prior dealings with Seery.  Right?

15 A   Yeah.  And that's true.  And that's consistent with what

16 I've said.

17 Q   Okay.  You didn't say anything about MGM, correct?

18 A   Correct.

19 Q   You didn't say anything about a *quid pro quo*, correct?

20 A   Correct.

21 Q   You didn't say anything about Mr. Seery's compensation.

22 Correct?

23 A   I did not.

24 Q   You didn't say anything about the sharing of material

25 nonpublic inside information, correct?

018155

HCMLPHMIT00003207

1   A    Different document, different purposes.

2   Q    Well, but that's now two documents.  You have your notes

3   and you had this document, neither one of which say any of

4   those things.  Fair?

5   A    Different documents, different purposes.  I don't know if

6   that's --

7   Q    Is it fair that neither one of those documents say any of

8   those things?

9   A    It's fair that they don't all match.

10  Q    Okay.  Okay.  Well, that's a fair statement.  Let's go to

11  the next one.  Do you remember the next year you filed an

12  amended petition?

13  A    What tab?

14  Q    That's -- I appreciate that.  It's Tab 4.  Do you see at

15  the last page you've again signed a verification?

16  A    Yep.

17  Q    And do you see this one's filed with the Texas state court

18  on May 2, 2022?

19  A    Yes.

20  Q    And you swore under oath that this statement was complete,

21  true, and accurate to the best of your knowledge, correct?

22  A    Yes.

23  Q    Okay.  Can you go to Page 5, please?

24  A    Yes.

25  Q    Directing your attention to Paragraph 23, do you see where

HCMLPHMIT00003208

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 72 Filed 09/06/25 Page 308 of 1017    PageID 19207

Dondero - Cross                          196

1    you say now that Farallon was relying, quote, on Mr. Seery's

2    say-so because they had made so much money in the past when

3    Mr. Seery told them to purchase claims.

4         Do you see that?

5    A    Yes.

6    Q    Again, you don't say anything about MGM, correct?

7    A    Correct.

8    Q    Again, you don't say anything about material nonpublic

9    inside information, correct?

10   A    Well, on 24 it does.  Right?  Mr. Seery had inside

11   information on the price and value of claims.  So, you've got

12   to look at all of the bullet points.

13   Q    But that's not the paragraph where you're talking --

14   that's -- it says, in other words.  That's not the paragraph

15   where you're describing your conversation with Farallon.

16   That's your interpretation of it, correct, just as you just

17   said?

18   A    (no immediate response)

19   Q    You told -- I'm sorry.  I should let you finish the

20   answer.  That's your interpretation of it, correct?

21   A    Well, I'm reading all the bullets in aggregate, and it's

22   -- it's a picture of material information shared by Seery, not

23   just MGM or one particular investment, but on all the other

24   assets that aren't detailed in any of the public filings,

25   also.

018157

1   Q    The only -- the only point I want to make, I think we can

2   agree on this --

3   A    Okay.

4   Q    -- is that you believed that Mr. Seery gave them material

5   nonpublic inside information.  Farallon never told you that.

6   Isn't that true?  That's why you wanted discovery?

7   A    They said they relied on him and did no diligence of their

8   own.  They were very express -- explicit about that.

9   Q    Okay.  Can you answer my question now?

10  A    Which -- I thought -- that does, --

11  Q    You concluded --

12  A    -- yes.

13  Q    -- that Mr. Seery gave them material nonpublic inside

14  information.  They never told you that.  Fair?

15  A    They said they relied on -- solely on Seery, didn't buy it

16  for any other reason, and they did no due diligence of their

17  own.

18  Q    Okay.  Let's go to the next one.  Now, the no-due-

19  diligence part, that's not in any version we've seen, right?

20  That's something that you just --

21  A    No, no, --

22  Q    -- that you're just testifying to now?  That's not in your

23  notes, it's not in Version 1, and it's not in this version,

24  correct?

25  A    Well, let's go back to the Linn one, because when I was

HCMLPHMIT00003210

Dondero - Cross                    198

1   going back and forth and he wouldn't give a price, he kept

2   saying, Seery told us it's worth a lot more.  And I kept

3   saying, you've got to look at the burn, you've got to look at

4   the professionals.  And --

5   Q    Okay.

6   A    -- that's --

7   Q    Shortly after this, you filed yet another declaration,

8   right?

9   A    Yes.

10   Q    Uh-huh.  Can you turn to #5?  And this is another version

11   of your recollection of what you were told, correct?  In

12   Paragraph 2?

13   A    These are all -- I don't know why you're saying they're

14   different.  They're all the same.  They're just slightly

15   different verbiage.  What's the major difference between any

16   of them?

17   Q    I'll ask, I'll ask you the question.  The question is, you

18   had never written in any of the prior versions that they

19   didn't do any due diligence; isn't that right?  You never --

20   you never talked about their due diligence in any prior

21   version, correct?

22   A    It's all -- it's all the same version.  I don't -- some

23   versions --

24   Q    Can you answer my question?

25   A    I don't know.  I don't know --

018159

HCMLPHMIT00003211

```
 1   Q   Which --

 2   A   -- which ones included which -- I don't --

 3   Q   We've just looked at them.  Do you want to look at them

 4   again?

 5   A   I just looked at one page in the other one and it was five

 6   pages.  I just looked at the one page and I found two or three

 7   things --

 8   Q   Your notes --

 9   A   -- it didn't include, but --

10        MR. MORRIS:  You know what.  I don't want to argue.

11   They say what they say, Your Honor, and I would ask the Court

12   to look carefully at our objection to the motion because we

13   lay all of this out.

14       Your Honor can -- here's the point, because I do want to

15   finish up right now.  There are five different versions of

16   this conversation.  They're laid out in the brief.  And the

17   question that you have to ask yourself, Your Honor, is, if you

18   allow this case to go forward, how do they make a colorable

19   claim when the story keeps changing?

20       And I'll just leave it at that, because, you know, the

21   last version says MGM for the first time.  Like, it comes out

22   of nowhere.  This -- his notes don't say it, he hasn't

23   testified that that's what he was told, but somehow that's in

24   his sworn statement.

25       So I'm just going to rest on the papers, because this is
```

HCMLPHMIT00003212

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 25-34   Filed 06/06/25   Page 312 of 1017   PageID 19211
Exhibit 72   Page 200 of 390

Dondero - Cross                    200

 1  -- I don't want to be argumentative.

 2          THE COURT:  Okay.

 3          MR. MCENTIRE:  Well, I'll object to the argument of

 4  counsel.  He's just doing another opening statement here, and

 5  it's inappropriate and not proper.

 6          THE COURT:  Okay.  I agree.  This is Q and A.

 7          MR. MORRIS:  Okay.

 8          THE COURT:  So, --

 9  BY MR. MORRIS:

10  Q   Do you know -- do you have any knowledge or information as

11  to how Mr. Seery's compensation was established?

12  A   Uh, --

13  Q   Withdrawn.  I'm talking now not in his capacity as an

14  independent director or the CEO of the Debtor.  I'm only

15  talking about in his capacity as the CEO of the Reorganized

16  Debtor and the Claimant Trustee.  Do you have any personal

17  knowledge as to how his compensation was established?

18  A   The knowledge I have is that the Claimant Trust gives full

19  latitude to change it at almost any time they want.  Add more

20  to it, add more than that we've seen, double it in the future

21  if reserves are reversed.  It can do anything it wants.  And I

22  guess we've seen some redacted partial statements of his

23  compensation, but that's all I know.

24  Q   Okay.  You have no knowledge about how Mr. Seery's

25  compensation package was determined, correct?

018161

HCMLPHMIT00003213

Dondero - Redirect                      201

1  A   I was not involved.

2  Q   Okay.  You've never -- I'll just leave it at that.

3          MR. MORRIS:  I have nothing further, Your Honor.

4          THE COURT:  Okay.  Pass the witness.  I'm sorry, I

5  guess I should ask, do any of the other responding parties

6  have examination?

7          MR. STANCIL:  No, Your Honor.

8          THE COURT:  No?  Okay.  Redirect?

9          MR. MCENTIRE:  Just very briefly, Your Honor.

10          THE COURT:  Okay.

11          MR. MCENTIRE:  Thank you, Your Honor.

12                    REDIRECT EXAMINATION

13  BY MR. MCENTIRE:

14  Q   Mr. Dondero, you remember the questions about Judge

15  Jernigan walking into the courtroom on June 8 two years ago

16  saying, MGM is sold, maybe we can settle this case?  Do you

17  recall those questions?

18  A   Yes.

19  Q   And do you remember Mr. Morris's dramatic suggestion that,

20  well, how did Judge Jernigan know, or to that effect?

21  A   Yes.

22  Q   Well, that had already been announced, had it not,

23  publicly?

24  A   Yes.

25  Q   Several weeks before?

HCMLPHMIT00003214

Dondero - Redirect                202

1   A    Yes.

2   Q    I'd like to direct your attention -- do you still have

3   Exhibit 4 that he handed you?  Do you have Exhibit 4 there?

4   A    Uh, --

5   Q    His exhibit?

6   A    Is that the notes?

7   Q    No, it's -- Exhibit 4 is the verified amended petition to

8   take deposition before suit -- take -- in the state court.  To

9   -- deposition.

10  A    You've got to give me more of a clue.  I'm sorry.  There's

11  like six binders.

12         MR. MCENTIRE:  Mr. Morris, can you show us where the

13  exhibit --

14         MR. MORRIS:  Sure.  Which one is it?

15         MR. MCENTIRE:  It's Exhibit 4.  I'm going to talk to

16  him about Exhibit 4 (inaudible) that you've have used with

17  this witness.

18  BY MR. MCENTIRE:

19  Q    I assume -- Mr. Dondero, were you assuming from the tone

20  and the substantive content of his questions that Mr. Morris

21  is suggesting that your notes are not reliable?

22  A    He was trying to make it seem like the versions were

23  different.  They were all 90 percent the same.  Different --

24  it seemed like different emphasis for different purposes.  And

25  then you have to remember we learned more about Farallon and

HCMLPHMIT00003215

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 15-24-72 Filed 06/20/25   Page 315 of 1017   PageID 19214

Dondero - Redirect                                  203

1  Stonehill over time.  Like, in the beginning, when I had --

2  when I -- we didn't even know Stonehill was involved when I --

3  Q    Sure.

4  A    -- first talked to -- when --

5  Q    Well, he made the big suggestion about you never talked

6  about due diligence before.  Turn to Exhibit 4, Paragraph 23,

7  which he did not address with you.  Can you turn to Paragraph

8  23 of Exhibit 4?  Mr. Morris omitted to refer you to this

9  particular paragraph.

10 A    23?  Go ahead.

11 Q    Would you read it into the record?

12 A    (reading)  On a telephone call between Petitioner and

13 Michael Linn, a representative of Farallon, Michael Linn

14 informed the Petitioner Farallon had purchased the claim

15 sight-unseen and with no due diligence, a hundred percent

16 relying on Mr. Seery's say-so, because they had made so much

17 in the past with Mr. -- when Mr. Seery had (overspoken).

18 Q    Now, since you've an opportunity to see other paragraphs

19 and other -- that he was otherwise not selecting, you did

20 refer to the -- to what Mr. Linn had told you about in May of

21 2021?

22 A    Yes.  I've been very consistent.  Listen, I believe

23 Farallon tapes all their conversations.  So, eventually, as

24 this goes further, I purposefully --

25 Q    Well, let's --

018164

HCMLPHMIT00003216

Dondero - Redirect                                204

1           MR. MORRIS:  I move to strike, Your Honor.

2           THE WITNESS:  Okay.

3           THE COURT:  Sustained.

4    BY MR. MCENTIRE:

5    Q    He also did not direct your attention or the Court's

6    attention to Paragraph 27 of Exhibit 4, selecting --

7    presumably strategically selecting not to refer to that

8    paragraph.  Do you see Paragraph 27?

9    A    Yes.

10   Q    Could you read that into the record, please?

11   A    (reading)  However, Mr. Seery is privy to material

12   nonpublic information, inside information of many of the

13   securities that Highland deals in, as well as the funds that

14   Mr. Seery manages through Highland.  One of these assets was a

15   publicly-traded security that Highland was an insider of, and

16   therefore should not have traded, whether directly or

17   indirectly, given its possession of insider information.

18   Q    Isn't that paragraph just basically addressing MGM?

19   A    Yeah, that's the only major position we had that that

20   would apply to.

21   Q    So the suggestion that you're just making this MGM stuff

22   up is not true.  It's consistent with what you've (inaudible)

23   in other courts as well, correct?

24   A    Yes.  I believe it's disingenuous to say that there's

25   different versions of my story.

018165

HCMLPHMIT00003217

Exhibit 72   Page 206 of 390

Dondero - Redirect                    205

1  Q   Well, let's continue with Mr. Morris's strategy.  Go to

2  Exhibit 3, please.  Mr. Morris suggested that there's no

3  reference at all in any of these prior pleadings about Mr.

4  Seery's excess conversation.  Do you recall that series of

5  questions?

6  A   Yes.  Or his statements, yes.

7  Q   Yes.  And he did not direct your --

8        MR. MORRIS:  I move to strike.  I asked him if he had

9  any knowledge of the man's compensation package.  That's what

10  I asked him.

11       MR. MCENTIRE:  No, sir.  Your Honor, that's not what

12  he asked him.  That was one of the questions he asked.  The

13  other question was, there's nothing in here about

14  compensation.  That's what I'd like to address now.

15       MR. MORRIS:  Oh, go right ahead.

16       THE COURT:  Okay.

17  BY MR. MCENTIRE:

18  Q   Directing your attention --

19       THE COURT:  You can ask.  I'd have to go back and

20  check the record whether you had that second question you

21  mentioned.  I remember questions about does he have knowledge

22  of Seery's compensation.  I just can't remember if he asked,

23  --

24       MR. MCENTIRE:  Fair enough.

25       THE COURT:  -- were there references to it in the --

HCMLPHMIT00003218

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S     Document 55-4 72   Filed 07/02/25390   Page 318 of 1017     PageID 19217

Dondero - Redirect                           206

```
 1              MR. MCENTIRE:  Well, --

 2              THE COURT:  -- prior pleadings.

 3              MR. MCENTIRE:  -- for the record, we'll make it clear

 4    that there is a reference.

 5    BY MR. MCENTIRE:

 6    Q   If I could direct your attention to Paragraph 23, Exhibit

 7    -- as to --

 8              MR. MORRIS:  What exhibit is it?

 9              MR. MCENTIRE:  It's Exhibit 3.

10              MR. MORRIS:  Hold on one second.

11              MS. MUSGRAVE:  Your exhibit.

12              THE COURT:  Highland's Exhibit 3.

13              MR. MORRIS:  Give me a moment.

14              THE COURT:  Page what?

15              MR. MCENTIRE:  It's Paragraph 22 on Page 5.

16              THE WITNESS:  I'm sorry.  My Exhibit 3?

17    BY MR. MCENTIRE:

18    Q   Could you read for me, please, Mr. --

19              MR. MORRIS:  Hold on one second.  It's my Exhibit 3

20    or your exhibit?

21              MR. MCENTIRE:  It's your exhibit.  This is Hunter

22    Mountain's binder.

23              MR. MORRIS:  Ah, I apologize.

24              MR. MCENTIRE:  You were just using it.

25              MR. MORRIS:  Okay.  All right.  Go ahead.  What
```

018167

HCMLPHMIT00003219

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 54-72 Filed 08/06/25   Page 319 of 1017   PageID 19218
Exhibit 72 Page 208 of 390

Dondero - Redirect                    207

1  paragraph were you?

2  BY MR. MCENTIRE:

3  Q    I'd direct your attention, Mr. Dondero, to Paragraph 22.

4         MR. MORRIS:  Yeah.

5  BY MR. MCENTIRE:

6  Q    Would you read -- would you read Paragraph 22 into the

7  record, please?

8  A    (reading)  Mr. Seery had much to gain by brokering a sale

9  of the claim suggested to Muck, mainly his knowledge that

10  Farallon as a friendly investor would allow him to remain as

11  Highland's CEO with virtually unfettered discretion to

12  administer Highland.  In addition, Mr. Seery's written

13  compensation package incentivized him to continue the

14  bankruptcy for as long as possible.

15  Q    There was also a series of questions to you about a

16  transaction involving NexPoint -- NexPoint Diversified Real

17  Estate Trust.  Do you recall those questions?

18  A    Yeah.  Let's talk about that.

19  Q    All right.  Tell me what the transaction was.

20  A    I'm sorry.  The tender that he was asking about or --

21  Q    Yes, the tender.

22  A    There was -- investors wanted some shares retired, and we

23  didn't have enough cash on the balance sheets.  So we tendered

24  in the form of giving them Preferred, which was like equity

25  but a better dividend or a more secured dividend, and 20

HCMLPHMIT00003220

Dondero - Redirect                          208

1   percent cash.  And then insiders weren't allowed to

2   participate.  But the whole tender was only for eight or ten

3   percent of the nominal amount outstanding.  And again, you've

4   got a package of securities, so you didn't get any -- you

5   didn't cash.  And although it reduced the share count, it also

6   increased the Preferred or the claims against the company.  So

7   it was marginally accretive, I guess.

8   Q    All right.

9   A    But, again, as far as inside information is concerned,

10  Compliance is a separate party organization that reports up to

11  the SEC.  Has a dotted line to me.  Reports to the SEC.  They

12  make sure everything we do is compliant.

13  Q    Mr. Dondero, --

14  A    Yeah.  Can --

15  Q    -- you didn't participate in the transaction, did you?

16  A    No.  Insiders weren't allowed to participate in the

17  transaction.

18          MR. MCENTIRE:  Reserve the rest of my questions, Your

19  Honor.

20          THE COURT:  Any recross?

21                    RECROSS-EXAMINATION

22  BY MR. MORRIS:

23  Q    The reference to the compensation that we just looked at,

24  that was your own personal view, not something that anybody

25  from Farallon ever told you, correct?  You can go back and

018169

HCMLPHMIT00003221

Dondero - Recross                           209

1   look.

2   A    Yeah, that --

3   Q    I mean, it's not a trick question.

4   A    Yeah, that was my pleading.

5   Q    Okay.  And that was your own speculation, if you will?  It

6   had nothing to do with anything Farallon ever told you,

7   correct?

8   A    I never discussed Seery's compensation with Farallon.

9   Q    Okay.  Thank you, sir, very much.  Just one last question.

10  The price of the tender --

11  A    Yes.

12  Q    -- was based in part on the value of the MGM stock,

13  correct?

14  A    The tender was based on market price --

15  Q    And --

16  A    -- of where the closed-in fund was trading.  It was

17  trading at a discount.  And the discount to NAV, the NAV

18  included MGM accurately marked at whatever time.

19  Q    I appreciate that.

20         MR. MORRIS:  No further questions, Your Honor.

21         THE COURT:  All right.  Mr. Dondero, that concludes

22  your testimony.

23         THE WITNESS:  Thank you.

24         THE COURT:  You are excused from the witness box.

25      (The witness steps down.)

018170

HCMLPHMIT00003222

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S     Document 53-24   Filed 06/23/25 390   Page 322 of 1017   PageID 19221

210

1          THE COURT:  We probably should take a break, right?

2          MR. MORRIS:  Okay.

3          THE COURT:  Caroline, do you want to give them the

4   aggregate time used?

5          THE CLERK:  Yes.  The Defendants used 91 minutes

6   right now.  And the Respondents together, 86 minutes.

7          THE COURT:  Okay.  I thought it was going to be

8   higher than that.

9       (Laughter.)

10         MR. MCENTIRE:  That's what it feels like.

11         MR. MORRIS:  You were wishing.

12         THE COURT:  I was wishing.  Okay.  A ten-minute

13  break.

14         THE CLERK:  All rise.

15      (A recess ensued from 3:17 p.m. until 3:28 p.m.)

16         THE CLERK:  All rise.

17         THE COURT:  All right.  Please be seated.  We're back

18  on the record in the Highland matter.  Mr. McEntire, you may

19  call your next witness.

20         MR. MCENTIRE:  Your Honor, Hunter Mountain would call

21  Mr. Seery adversely.

22         MR. STANCIL:  Your Honor, we're waiting for Mr.

23  Morris for just 60 more seconds.  I think he's on his way back

24  to the courtroom.

25         THE COURT:  Okay.  I just noticed.

018171

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S      Document 25-34  Filed 06/02/25   Page 323 of 1017   PageID 19222
Exhibit 72   Page 212 of 390

Seery - Direct                              211

  1         Did I hear you say you're going to call him virtually?

  2              MR. MCENTIRE:  Adversely.

  3              THE COURT:  Oh, adversely?  Okay.  I'm so used to

  4    hearing the word "virtually" the past few years.

  5         Oh, and there he is.  Okay.

  6              MR. SEERY:  I'm sorry, Your Honor.

  7              THE COURT:  Mr. Seery, welcome.

  8              MR. SEERY:  Good afternoon, Your Honor.

  9              THE COURT:  Please raise your right hand.

 10         (The witness is sworn.)

 11              THE WITNESS:  I do.

 12              THE COURT:  All right.  You may be seated.

 13        JAMES P. SEERY, JR., HUNTER MOUNTAIN INVESTMENT TRUST'S

 14                      ADVERSE WITNESS, SWORN

 15                        DIRECT EXAMINATION

 16    BY MR. MCENTIRE:

 17    Q    Mr. Seery, would you please state your full name for the

 18    record?

 19    A    James P. Seery, Jr.

 20    Q    And you and I met for the first time I believe it was last

 21    Friday in your deposition; is that correct?

 22    A    You were by video.

 23    Q    I mean, --

 24    A    We didn't actually meet.

 25    Q    Correct.  You are currently the CEO of the Reorganized

HCMLPHMIT00003224

Seery - Direct                          212

1  Debtor?

2  A    That's correct.

3  Q    Prior to your appointment as the CEO of the Reorganized

4  Debtor, you've never served as a CEO of a reorganized debtor

5  in the past, have you?

6  A    I have not.

7  Q    You previously served as the chief executive officer of

8  Highland Capital as a Debtor-In-Possession.  Is that correct?

9  A    That's correct.

10  Q    And that was the first time you'd ever served in a

11  position such as that; is that correct?

12  A    As the CEO of a debtor, yes.

13  Q    Right.  You also now currently serve as a Trustee for the

14  Highland Claimant Trust, which was put into effect after the

15  effective date of the plan, correct?

16  A    Yes, I'm the Claimant Trustee.

17  Q    All right.  That's the first time --

18        THE COURT:  Mr. McEntire, we usually require standing

19  at the podium.  I mean, do you need --

20        MR. MCENTIRE:  That's fine.  I'm totally fine.

21        THE COURT:  Okay.  That's --

22        MR. MCENTIRE:  I forgot.

23        THE COURT:  Okay.  Thank you.

24  BY MR. MCENTIRE:

25  Q    That was -- and your capacity as the Trustee for the

HCMLPHMIT00003225

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S     Document 14-72  Filed 04/06/25  Page 325 of 1017     PageID 19224
Exhibit 72   Page 214 of 390

Seery - Direct                              213

1  Claimant Trust, that's a first experience as well, correct?

2  A    As the Claimant Trustee, yes.

3  Q    All right.  And in these various capacities as a CEO of

4  the Reorganized Debtor, do you consider yourself to be subject

5  to the Investment Advisers Act?

6  A    No, I don't I'm subject to the Investment Advisers Act.  I

7  think Highland in certain capacities could be.

8  Q    All right.  But do you have any duties that -- that you

9  are required to fulfill under the Investment Advisers Act

10  accordingly?

11  A    Do I?

12  Q    Yes.

13  A    I believe Highland does.  I don't know that I have any

14  personal duties.

15  Q    All right, sir.  Let me now talk a little bit about your

16  duties that you did have at Highland.  You agree that when you

17  were at Highland you had fiduciary duties that you owed to the

18  estate?

19  A    Yes.

20  Q    What were those duties?

21  A    To generally treat the estate on an honest and fair

22  matter.

23  Q    Avoid conflicts of interest?

24  A    Yes.

25  Q    Not self-deal?

HCMLPHMIT00003226

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 5-14   Filed 06/05/25   Page 326 of 1017   PageID 19225
Exhibit 72   Page 215 of 390

Seery - Direct                                214

1   A    Yes.

2   Q    Do you agree with me that you would have a duty not to

3   trade on material inside -- material nonpublic information?

4   A    Generally, I would have a duty to not trade on material

5   nonpublic information, yes.

6   Q    Can you think of an exception?

7   A    There may be.  I just don't think of any one off the top

8   of my head.

9   Q    So, today, you would agree, for purposes of these

10  proceedings, that you would have an obligation as the CEO of

11  the Debtor-In-Possession not to participate in a transaction

12  involving material nonpublic information?  Agreed?

13  A    It would depend.  So, for example, if I was trading with

14  someone else who had material nonpublic information, that

15  might be a permissible transaction.

16  Q    The HarbourVest transaction, you were involved in

17  negotiating the HarbourVest settlement?

18  A    Yes, I was.

19  Q    Did that involve any component related to MGM stock?

20  A    No, it did not.

21  Q    There was no involvement at all concerning the transfer of

22  MGM stock to any entity as a result of that transaction?

23  A    None whatsoever.

24  Q    Okay.  And does HCLOF not have a participation at this

25  time in MGM stock?

018175

HCMLPHMIT00003227

Seery - Direct                                    215

1    A    We call it H-C-L-O-F.

2    Q    Yes.

3    A    It does not own MGM stock, and as I far as I know, never

4    owned MGM stock.

5    Q    Okay.  You agree you received an email from Mr. Dondero in

6    December of 2020.  We've had it here before.  You've seen it

7    in the courtroom, correct?

8    A    Yes.

9    Q    Okay.  Did you ever send -- forward that email to anyone

10   else?

11   A    I'm sorry.  Could you repeat that?

12   Q    Did you forward that email on to anyone else?

13   A    I believe I did, yes.

14   Q    To whom?

15   A    I certainly discussed it with counsel.  I believe I

16   forwarded it to counsel, both the Pachulski firm and the

17   WilmerHale firm.  Thomas Surgent had gotten it.  He was on the

18   email.  And I also forwarded it, I believe -- certainly,

19   discussed it -- with the other independent directors.

20   Q    Okay.  I'm not going to talk about your conversations with

21   other lawyers in-house, okay, or your outside counsel.  Did

22   you take any steps yourself personally to make sure that MGM

23   stock was placed on a restricted list at Highland Capital

24   after you received that email?

25   A    No.  MGM was already on the restricted list at Highland

018176

HCMLPHMIT00003228

1   Capital.

2   Q   Okay.  And is that because of Mr. Dondero's position on

3   the board of MGM?

4   A   It -- I believe that's the reason.  It was on before I got

5   to Highland.

6   Q   Okay.  And you agree, do you not, sir, that the email that

7   you received from Mr. Dondero also contained material

8   nonpublic information?

9   A   I don't think so, no.

10        MR. MCENTIRE:  Would you put up Exhibit -- our

11  Exhibit 4, please?

12        MR. MORRIS:  4?

13        MR. MCENTIRE:  4.

14  BY MR. MCENTIRE:

15  Q   Did H-C-L-O-F -- I'll refer to it as HCLOF, you refer to

16  it as H-C-L-O-F -- did that -- did HCLOF own any funds that

17  owned MGM stock?

18  A   HCLOF had interest in certain Highland-managed CLOs that

19  did own some.

20  Q   As a result of the Highland settlement -- excuse me, the

21  HarbourVest settlement, was there any impact on who owned some

22  of those CLO funds?

23  A   No.

24  Q   Okay.  How was the CLOs, the funds, handled, if at all, in

25  the -- in the HarbourVest settlement?

HCMLPHMIT00003229

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 51-72 Filed 06/20/25   Page 329 of 1017   PageID 19228
Exhibit 72   Page 218 of 390

Seery - Direct                                    217

1    A    They didn't have any impact whatsoever on the HarbourVest

2    settlement.

3    Q    Looking at Exhibit 4 for a moment, please, did the

4    interests, did the interests in -- HarbourVest's interests in

5    any of those CLOs transfer?

6    A    No, they did not.

7    Q    Okay.  And did HCLOF acquire any interest in any of those

8    CLO's as a consequence of the HarbourVest settlement?

9    A    No, it did not.

10   Q    Looking at Exhibit 4.  Excuse me, Exhibit 3 is what I

11   meant to say.  Exhibit 3.

12              THE COURT:  Hunter Mountain Exhibit 3?

13              MR. MCENTIRE:  Yes, ma'am.

14              THE COURT:  Okay.

15              MR. MCENTIRE:  Yes, Your Honor.  Excuse me.

16   BY MR. MCENTIRE:

17   Q    This is the email that we were just referring to that you

18   received, correct?

19   A    Yes.

20   Q    And you don't think -- you knew that Mr. Dondero was on

21   the board of directors of MGM?

22   A    Yes.

23   Q    And he -- as a member of the board of directors, when you

24   received this, you see where he indicated that it was probably

25   a first-quarter event?  Do you see that?

HCMLPHMIT00003230

1   A    I see what it says, yes.

2   Q    Okay.  And you did not think that that was material

3   nonpublic information?

4   A    No, I did not.

5   Q    When he indicated that Amazon and Apple were actively

6   diligencing -- are diligencing in the data room, both continue

7   to express material interest, coming from a member of the

8   board of directors of MGM, you did not think that was material

9   nonpublic information?

10  A    I did not, no.

11  Q    You know the difference between a newspaper article or a

12  media article that discusses rumors of a possible sale and the

13  difference between that and a member of the board of directors

14  saying that a sale is going to occur?  You understand the

15  difference between the two?

16  A    Between the two things you just outlined?

17  Q    Yes.

18  A    Yes.  One you said a sale is going to occur, and the other

19  you said a media report.  But it would depend on what's in the

20  media report.  Some media reports are pure speculation.

21  Others have a lot of detail, and they clearly came from an

22  inside source, and that's why the market moves on them.

23  Q    Okay.  So what you're suggesting to me, that there was

24  some indication in the media press before you received this

25  email suggesting that there was actually going to be a sale in

018179

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 54-72   Filed 06/20/25   Page 331 of 1017    PageID 19230
Exhibit 72    Page 220 of 390

Seery - Direct                                                                    219

1   the first quarter of 2021?

2   A    I don't know if it had a first-quarter event in it, but

3   certainly it was clear from the media reports and the actual

4   quotes from Kevin Ulrich of Anchorage, who was the chairman at

5   MGM, that a transaction had to take place very quickly.  And

6   in fact, the transaction did not take place in the first

7   quarter.

8   Q    Okay.  So you -- when you received this particular email,

9   you did not think that it was requiring any additional

10  protection at -- in any way?  Is that what you're suggesting

11  to this Court?

12  A    That the email required additional protection?

13  Q    That you didn't take additional steps to make sure that it

14  was maintained on the restricted list.

15  A    It was already on the restricted list, so there was no

16  change.

17  Q    Was it --

18  A    I --

19         MR. MORRIS:  Hold on.  Let him finish.

20  BY MR. MCENTIRE:

21  A    I was suspicious when I got the email, but I didn't think

22  I had to do anything else than the steps I told you I just

23  took.

24  Q    Yeah, I'm not asking whether you were suspicious or not.

25  My question's a little bit different.  You understand that MGM

018180

HCMLPHMIT00003232

1    was taken off your restricted list in April of 2021?

2    A    I understand that that's what you've recently shown me.  I

3    wasn't aware of that fact or I didn't have a recollection of

4    that fact, but certainly April of 2021 would be beyond the

5    first quarter.  Mr. Dondero was not an employee, an affiliate,

6    subject to a contractual relationship.  He had no duty to

7    Highland and Highland had no duty to him.  And in fact, it was

8    quite antagonistic by that time.  So it would be appropriate

9    to take MGM off the restricted list at the end of that time.

10   Q    Well, hopefully you won't take this as argumentative, but

11   I object as nonresponsive.  That really wasn't my question.

12   Okay?  My question --

13               THE COURT:  Sustained.

14   BY MR. MCENTIRE:

15   Q    -- is a little bit different.  As far as you were

16   concerned, MGM was on the restricted list and stayed on the

17   restricted list all the way until the public announcement in

18   May of 2021?

19   A    That's not true.

20   Q    When did you first become aware it was taken off the

21   restricted list?

22   A    I didn't -- I wasn't aware that it had come off the

23   restricted list.  I would have assumed it would have been off

24   the restricted list once Mr. Dondero had been severed from

25   Highland.

018181

HCMLPHMIT00003233

Seery - Direct                             221

1    Q    I see.  Now, Mr. Dondero has relayed a conversation that

2    he had with Mr. Patel and Mr. Linn, suggesting that they were

3    particularly optimistic about MGM based upon what you told

4    them.

5    A    I --

6    Q    Let me finish.  If that occurred, are you suggesting that

7    that is a lie?

8    A    Two things.  One is I don't think he actually testified to

9    that.  I think he said he had a conversation with Mr. Patel.

10   Then he had a different conversation with Mr. Linn, and a

11   subsequent conversation with Mr. Linn.  So the way he laid it

12   out were multiple conversations.

13   Q    Agreed.

14   A    I don't -- I don't know which one you're talking about.

15   Q    Mr. Dondero testified that Mr. Patel was particularly

16   optimistic about the investment because of what he had learned

17   from Mr. -- from you about MGM.

18         MR. MORRIS:  I dispute that characterization.  Why

19   can't he just ask the question?

20         MR. MCENTIRE:  That is my question.  If that --

21         THE COURT:  What is the question?  I'm not sure I

22   hear the question.

23         MR. MCENTIRE:  I'm getting lost because I'm getting

24   interrupted.  I'll try to rephrase it again.

25         MR. MORRIS:  It's my first objection.

018182

HCMLPHMIT00003234

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 15-34 72   Filed 06/23/25   Page 334 of 1017    PageID 19233
Exhibit 72   Page 223 of 390

Seery - Direct                                    222

1          MR. MCENTIRE:  And I --

2          THE COURT:  Go ahead.

3          MR. MCENTIRE:  I'm just going to rephrase, Your

4    Honor.

5          THE COURT:  Just rephrase your question.

6          MR. MCENTIRE:  Thank you.

7    BY MR. MCENTIRE:

8    Q    Mr. Dondero has testified that Farallon advised him in May

9    of 2021 that they were optimistic about MGM based upon what

10   you told them.  Assuming that to be the case, do you deny that

11   happened?

12   A    I do deny that happened.  Because I can't -- I don't know

13   what Farallon told him, but I never told Farallon anything.

14   And a conversation on May 28th, after the May 26th

15   announcement that MGM was going through, might make people

16   optimistic that it could go through, but there was a very

17   difficult FTC process that MGM would have to go through.

18   Q    And I'm referring to that.  If Farallon stated that they

19   were optimistic about MGM based upon what you had told them,

20   --

21   A    That would not be true.

22   Q    -- that would be false?

23   A    That would not be true.

24   Q    And is Mr. Dondero says that's what Farallon told them,

25   that would also be false?

018183

HCMLPHMIT00003235

1  A   That's correct.

2  Q   So we have your statement, we have what may be Farallon's

3  statement, and we have what Mr. Dondero believes may have been

4  Farallon's statement, and you're saying the latter two are

5  just not true?

6  A   I didn't have a conversation with Farallon about MGM that

7  -- that I recall --

8  Q   Well, you're on the witness stand.

9  A   -- virtually at any time.

10  Q   You're on the witness stand.

11  A   Oh, I'm aware of where I am sitting.

12  Q   Yeah.  Good.  We've got that cleared up.  Now, are you

13  suggesting that -- that you may not specifically recall this

14  conversation?

15  A   No, I am not saying that at all.  After May 26th, when the

16  MGM announcement was made and it was public, I may have had

17  conversations with a number of people about MGM.

18  Q   Well, let's make sure the record is clear.  Did you call

19  Farallon on May 26th and say, hey, did you know that MGM just

20  sold?

21  A   No, I don't recall any such conversation, and I wouldn't

22  have had to, since it was in the paper.

23  Q   I'm not talking about what's in the paper.  I'm talking

24  about conversations between you and Farallon.

25  A   Yeah.  I don't recall having a conversation with Farallon

HCMLPHMIT00003236

Seery - Direct                            224

1    on May 26th.

2    Q    How about May 27th?

3    A    Not that I recall, no.

4    Q    How about May 28th?

5    A    Not that I recall off the top of my head.

6    Q    And we understand that that's the day that Mr. Dondero

7    actually had his conversation that he's reported, at least,

8    with Farallon.  Do you recall that?

9    A    That's what he claims, yes.

10   Q    You were with a company called River -- you're a lawyer,

11   correct?

12   A    I am.  I'm in retired status.

13   Q    Okay.  I wish I was.

14   A    It's simply retiring your license and not having to take

15   the CLE.

16   Q    Understood.  Now, you were with a company called River

17   Birch?

18   A    Yes.

19   Q    And from River Birch, you went to Guggenheim Securities?

20   A    That's correct.

21   Q    At Guggenheim Securities, did you go to Farallon and meet

22   with Mr. Patel in their offices in San Francisco?

23   A    I believe we did, yes.

24   Q    You call it a meet-and-greet?

25   A    I do, yes.

018185

HCMLPHMIT00003237

Seery - Direct                          225

1    Q    That was in 2017?

2    A    2017, 2018.  I'm not exactly sure when it was.

3    Q    And one of the purposes of meet-and-greet is to solicit

4    business or to see if a business opportunity -- see if it

5    exists?

6    A    That's not correct, no.

7    Q    What is a meet-and-greet for, then?

8    A    It's to meet the people at the fund and to greet the

9    people at the fund.  Introduce them to other people in your

10   firm.

11   Q    Just because it's going to be fun, or does it have a

12   business angle to it?

13   A    Oh, it hopefully will be fun, yes, but it's done in order

14   to build a relationship over time.  You're not in there

15   soliciting business.  If you do that, you won't do very well.

16   Q    Okay.  Fair enough.  So you're there trying to develop a

17   relationship with Farallon?

18   A    Guggenheim was, yes.

19   Q    And you were part of it?

20   A    That's correct.

21   Q    And what was your job at Guggenheim?

22   A    I was co-head of credit.

23   Q    Is that a fairly significant position at Guggenheim?

24   A    Not really, no.

25   Q    It's not significant at all?

018186

HCMLPHMIT00003238

Seery - Direct                                226

```
 1   A    No.

 2   Q    All right.

 3   A    Which is why --

 4   Q    Well, you left --

 5   A    Which is why they don't have that business.

 6   Q    Okay.  So is that why you left Guggenheim?

 7   A    It -- I did, yeah.  It wasn't a good fit for either

 8   Guggenheim or for me, because it really wasn't something --

 9   Q    When did you --

10   A    -- that they were set up to do.

11   Q    -- leave Guggenheim?

12   A    In 2019.

13   Q    And then you went back to Farallon to meet with them

14   again, did you not?

15   A    I met with Farallon while I was in San Francisco with my

16   wife.

17   Q    Okay.  Did you call ahead to arrange the meeting, or was

18   it just a --

19   A    I --

20   Q    -- a blind call?

21   A    I did call ahead, yes.

22   Q    A cold call, I guess, is the word -- the phrase that they

23   use.  Okay.  So -- and was that a meet-and-greet?

24   A    That was again, yes.

25   Q    Again, what were you trying to do?  Develop a relationship
```

018187

HCMLPHMIT00003239

1   with Farallon?

2   A    I was trying to catch up with them after having met them

3   previously.  And that was just Raj Patel.  And this one I also

4   met Michael Linn.

5   Q    Okay.  What kind of business were you in when you met with

6   them the second time?

7   A    I wasn't doing anything.

8   Q    What were you hoping to do?

9   A    I was hoping to get back into the investing side of the

10  business, from running a credit-type lending business at

11  Guggenheim, which is what they tried to do and it didn't work

12  out.  And I wanted to get back to what I was doing more at

13  River Birch, but I was looking at other opportunities,

14  whatever came along.

15  Q    Well, what were the different options that you were

16  looking at?

17  A    I was looking at potentially getting back into investing,

18  joining potentially a restructuring firm, any options like

19  that.  I was not looking to become a lawyer again.

20  Q    And why would meeting and greeting with Farallon fit in

21  within that scenario, the strategic scenarios that you've just

22  discussed?

23  A    They're a giant hedge fund.

24  Q    A giant hedge fund?

25  A    Yes.

018188

HCMLPHMIT00003240

Seery - Direct                            228

1  Q   And so it would be good to have a relationship with a

2  giant hedge fund, wouldn't it?

3  A   And to know what their thinking of the markets, where the

4  opportunity set might be, who they are dealing with and

5  interacting with.  Those are -- those are valuable things to

6  know over time.

7  Q   And --

8  A   And you need to maintain those relationships in order to

9  be --

10  Q   Sure.

11  A   -- part of any business.

12  Q   Sure.  These meet-and-greets can actually evolve and

13  provide relationship benefits, correct?

14  A   I don't -- I'm not sure what you mean by relationship

15  benefits.

16  Q   Sloppy words for -- on my part.  They can evolve into

17  something that is a meaningful relationship?

18  A   They could over time, yes.

19  Q   And we know that after you became the CEO of Highland

20  Capital that you received a call from, was it Farallon, to

21  congratulate you on your appointment?

22  A   It was an email.

23  Q   And that was in the summer of 2020, shortly after your

24  meet-and-greet out in San Francisco?

25  A   Your calendar's a bit off, but it was in June of 2020, so

018189

HCMLPHMIT00003241

1    that would have been more than shortly after, but yes.

2    Q    Okay.  And who contacted you to congratulate you on your

3    appointment?

4    A    This was my appointment as an independent director.  I had

5    not yet been appointed as CEO or CRO.  This was in June of

6    2020, and it was Michael Linn.

7    Q    Michael Linn?  Was it a telephone call?

8    A    I think 30 seconds ago I said it was an email.

9    Q    Fair enough.  Do you still have that email?

10   A    I do, yes.

11   Q    Okay.  He contacted you again, "he" being Michael Linn, he

12   contacted you again in January of 2021, did he not?

13   A    That's correct, yes.

14   Q    He wanted to see if he could get involved somehow in the

15   Highland bankruptcy?

16   A    Well, he congratulated -- he didn't congratulate -- he

17   wished me a happy new year, and he basically said it looks

18   like you're -- again, he's following the case -- it looks like

19   you're doing good work.  Is there any way for us to get

20   involved?  We're interested in claims or buying assets.

21   Q    Okay.  And Stonehill.  Now, you know the founder of

22   Stonehill, do you not?

23   A    No, I don't know him.  I've met him several times.

24   Q    Doesn't he come by and stop in and talk with you when

25   you're in Stonehill's offices?  And that's happened recently?

HCMLPHMIT00003242

Seery - Direct                              230

1    A    Your use of the plural is incorrect, and you know that

2    from the deposition.  I was in Stonehill's office one time,

3    and I was in a meeting with Mr. Stern.  We ended up having a

4    board meeting from Stonehill's office with the other

5    participants on video, and Mr. Motulsky came in and said

6    hello.

7    Q    All right.  And who's Mr. Motulsky?

8    A    He's the founder of Stonehill.

9    Q    I see.  And did you know Mr. Motulsky before that?

10   A    I'd interacted with Mr. Motulsky over the years at --

11   mostly at industry-type functions.

12   Q    Okay.  Now, Stonehill is also a hedge fund?

13   A    Yes.

14   Q    Are they different than Farallon in that regard, or

15   similar?

16   A    I don't know as much about what their business is.  They

17   certainly do a direct lending component, so I know that they

18   -- they will do some direct lending, which I don't think is

19   something Farallon really does.  Farallon is much bigger, as I

20   understand it, but I don't really know the size of Stonehill.

21   Q    Okay.

22   A    I know they're not a $50 billion fund like Farallon.

23   Q    And do you know Mr. Stern at Farallon?

24   A    I now know him, yes, because he was -- he's really the

25   representative on the -- no, he's not the representative on

018191

HCMLPHMIT00003243

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 26-4   Filed 06/20/25   Page 343 of 1017    PageID 19242
Exhibit 72   Page 232 of 390

Seery - Direct                          231

1   the board, but he is the one who manages the Stonehill and

2   Jessup positions for Stonehill.

3   Q    Well, we know that after you were CEO of Highland, you

4   also got a text message, correct, a text message from someone

5   at Stonehill, correct?

6   A    Mr. Stern sent me a text message reintroducing himself --

7   I don't know if it was re- or just introducing -- and sent me

8   his email and asked me to contact him about the case.  This

9   was at the end of February/beginning of March 2021, after the

10  confirmation order.

11  Q    Okay.  After the -- after the confirmation order?

12  A    Yes.

13  Q    I believe the confirmation order -- I may be wrong -- I

14  thought it was like the 21st, 22nd, somewhere in there.  Does

15  that sound right to you?

16  A    Yes.

17  Q    Okay.  So, shortly after confirmation, then, Farallon

18  calls you to congratulate you and wants to see how they can

19  get involved?

20  A    No.  There was no congratulations there.  Shortly after

21  the confirmation order, which I believe was at least a week to

22  ten days after confirmation, I got the communication from Mr.

23  Stern to try to connect about the case.

24  Q    All right.

25  A    He's at Stonehill, not Farallon.

018192

HCMLPHMIT00003244

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 34-72   Filed 03/03/25   Page 344 of 1017   PageID 19243
Exhibit 72   Page 233 of 390

Seery - Direct                          232

1   Q    Correct.  Now, --

2   A    You said Farallon.

3   Q    I misspoke, then.  Thank you for correcting me.  Let's

4   talk about -- you live in New York?

5   A    I do.

6   Q    You're involved with a charity called Team Rubicon?

7   A    Yes.

8   Q    And Team Rubicon is a -- is that a veterans-type charity?

9   A    Yeah.  It's a veteran-led organization, and what it does

10  is connects veterans to disasters.  And mostly in the U.S.,

11  but also all over.  So if there's a flood, if there's a

12  hurricane, if there's an earthquake, veterans who have been

13  trained in -- by the military in ready response and really

14  being able to handle themselves when things are bad are

15  deployed to help the communities that are hit.  So I think

16  that Team Rubicon likes to think, you know, on your worst day

17  they're your best friend.

18  Q    So you're -- are you on the board?

19  A    No, I'm not.

20  Q    You're on the Host Committee?

21  A    I was on the Host Committee last year, and I'll be on the

22  Host Committee this year.

23  Q    Okay.  And you have charity events?

24  A    We have a charity event, yes.

25  Q    Okay.  And the purpose of the charity event is to raise a

018193

HCMLPHMIT00003245

1   bunch of money?

2   A    That's correct.

3   Q    Okay.  Have you been successful in the past?

4   A    I do my best.  Team Rubicon is a big organization.  It's

5   done very well raising money.  It doesn't have an endowment.

6   The founder's theory was that if people give us money, we're

7   supposed to spend it on helping other people.  And so each

8   year it has to raise more money.

9   Q    And Stonehill has been -- has contributed to your charity?

10  A    I believe Stonehill, one or two years, and I should know

11  this, and I didn't look it up after our deposition, gave

12  $10,000.

13  Q    Okay.  Maybe once, maybe twice?

14  A    Maybe twice.

15  Q    Okay.

16  A    I hope more.

17  Q    Okay.  And they also attend your -- your actual charity

18  events, do they not?

19  A    No.

20  Q    All right.  They just give money?

21  A    That's right.  And the Mike Stern who's on the board of

22  Team Rubicon is not the Mike Stern who is at Stonehill.  It's

23  an older gentleman who's in Texas who just happens to give a

24  lot of money to --

25  Q    All right.

HCMLPHMIT00003246

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 24-72   Filed 06/05/25   Page 346 of 1017    PageID 19245

Seery - Direct                                    234

1   A    -- Team Rubicon.

2   Q    You also represented Blockbuster.  Take that back.  Were

3   you the lawyer or the attorney representing the Creditors

4   Committee, the UCC, in the *Blockbuster* bankruptcy?

5   A    No, I was not.

6   Q    Tell me what your capacity was.

7   A    I represented a group of bondholders, secured bondholders.

8   So I represented the group.

9   Q    And was Stonehill a member of that group?

10  A    Not that I recall, but your pleadings seem to indicate

11  that they were.  So if they were, they were a small

12  participant.  The largest participant was Carl Icahn, who

13  owned about 30 percent of it.  Then the others who were big

14  were DK, Davidson Kempner, Monarch, Owl Creek.  Those were the

15  big players.

16  Q    Well, --

17  A    When Carl Icahn is in your group, you remember that.

18  Q    Yeah, well, Carl Icahn is not here.  We're talking about

19  Stonehill right now.

20  A    And I said I don't remember them actually being a part of

21  it.  If they were, --

22  Q    Okay.  Well, let me -- let me give you what I'm going to

23  mark as Exhibit 80.  That's your name at the top, right?

24       (Hunter Mountain Investment Trust's Exhibit 80 is marked

25  for identification.)

018195

HCMLPHMIT00003247

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 5-14   Filed 06/06/25   Page 347 of 1017   PageID 19246
Exhibit 72   Page 236 of 390

Seery - Direct                                        235

1   A    That's correct, yes.

2   Q    You were at the time with Sidley & Austin?

3   A    That's correct, yes.

4   Q    This is *In re Blockbuster.*

5        MR. MCENTIRE:  Scroll down, please.

6   BY MR. MCENTIRE:

7   Q    And steering group of senior -- involves -- well, let's

8   count them.  Let's see.  One, two, three, four, five.  Five

9   entities comprising the backstop lenders.  Is that correct?

10  A    I think that's the steering group.  So, in order to

11  represent the group, you need to try to assemble a large-

12  enough group that it's material to the company.  And then the

13  company, if you're -- particularly if you're over 50 percent,

14  will pay the fees of the group.  And you don't represent any

15  individual member of the group.  I've never represented Carl

16  Icahn.  I represent the group.  And if folks want to stay in

17  the group, they can stay.  If they want to trade out of the

18  group, they do.  And the company will generally continue to

19  pay the fees, and you represent the group so long as you have

20  a controlling interest in the -- whatever the issue is.

21  Q    Well, that's interesting, because now what you're telling

22  me is that this group right here, this is kind of like the

23  executive committee of the group.

24  A    No, it's called the steering group, and it doesn't

25  necessarily --

018196

Seery - Direct                                                 236

1    Q    That's fine.

2    A    Well, it's not an executive committee.  It doesn't

3    necessarily include just the largest.  Some large holders

4    won't be on it.  The largest holders here by a long shot were

5    Icahn, who --

6    Q    I'm not talking about --

7    A    -- unloaded, as I say, over 30 percent.  Monarch, Owl

8    Creek, and I just don't recall Stonehill being a part of it.

9    Q    I'm not really interested in Carl Icahn.  I just want to

10   establish this is a steering group in which you were the lead

11   counsel and Blockbuster was on it.  Is that correct?

12   A    Yes.

13   Q    Excuse me.  Not Blockbuster.

14   A    I'm sorry.

15   Q    Stonehill.

16   A    No, it's the Blockbuster case in 2010, and Stonehill was

17   apparently on it, but I just don't have a recollection of

18   their involvement.

19   Q    All right.  So when Mr. -- who sent you the text message

20   in February of 2021 from Stonehill?

21   A    Michael Stern.

22   Q    And had you actually met him before?

23   A    I think I had, but we didn't know each --

24   Q    All right.

25   A    You know, we certainly didn't know each other, we'd never

018197

HCMLPHMIT00003249

1   worked on anything together, but I --

2   Q    Do you have all your text messages from that period of

3   time, that first quarter of 2021?

4   A    I believe I do, yes.

5   Q    They're saved?

6   A    Yes.

7   Q    Okay.  When did the automatic delete button on your cell

8   phone start?

9          MR. STANCIL:  Your Honor, objection.  We've covered

10   this this morning.  I believe this is a motion coming down the

11   pike, and I thought we had -- thought we had had tabled this

12   preservation issue.

13          MR. MCENTIRE:  This has a direct bearing on his

14   communications with Farallon and Stonehill in this period of

15   time, Your Honor.  We have one text message that he's

16   identified, and I have a right to examine whether there are

17   others.  Or if not, why not.

18          MR. STANCIL:  Your Honor, he's --

19          MR. MCENTIRE:  That's a legitimate -- I'm not

20   finished.  That's a legitimate area of inquiry in this

21   examination.

22          MR. STANCIL:  He's testified he has them all.  Your

23   Honor did not order document discovery.  I think that's it for

24   purposes of today's hearing, Your Honor.

25          THE COURT:  Okay.  I sustain the objection.

018198

HCMLPHMIT00003250

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 72   Filed 06/20/25   Page 350 of 1017   PageID 19249

Seery - Direct                                    238

```
 1   BY MR. MCENTIRE:

 2   Q    After this text message that you received from Stonehill

 3   in February 2021, did you have any follow-up?

 4   A    Well, his text message, I don't recall what it said other

 5   than I was -- I do recall that he gave me his email address,

 6   because I didn't have it.  And we just didn't know each other

 7   well enough.  But we definitely had follow -up.  He wanted to

 8   talk to me, and at some point we talked.

 9   Q    And when did you talk?

10   A    I'm sorry?

11   Q    When did you talk?

12   A    When?  I -- it was at the, initially, end of February,

13   beginning of March.  So it would have been somewhere in that

14   -- in that time period.

15   Q    End of February, beginning of March?  And we also know

16   that you next talked to Farallon, according to your testimony,

17   and they advised you they had already purchased all their

18   claims as of March 15, correct?

19   A    On March 15th, they sent me an email that said they had

20   purchased an interest in claims, and --

21   Q    So -- go ahead.

22   A    I'm not finished.  And then at some point after that, we

23   arranged a quick discussion, because that was a curious --

24   Q    I want to assure you I will always let you finish.

25   A    Thank you very much.
```

018199

HCMLPHMIT00003251

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S     Document 51-34   Filed 06/20/25   Page 351 of 1017     PageID 19250
Exhibit 72     Page 240 of 390

Seery - Direct                          239

1   Q    Unlike others.  So, with that said, Mr. Seery, can you

2   identify -- let me back up.  Was there a data room set up at

3   Highland Capital for claims investors to come in and look at

4   data?

5   A    No, there was not.

6   Q    Are you aware, sitting here today, that Farallon did any

7   due diligence in connection with its investment in the claims

8   it purchased that are at issue in this proceeding?

9   A    I have indication that they did some, yes.  I don't know

10  how much they did.

11  Q    What is the indication?

12  A    In the email in June of 2020, Mr. Linn said that he and

13  his associate were following the case, thought it was --

14  that's the one that congratulated me on being an independent

15  director, and that they were paying attention to the case.

16  And it -- I don't recall the exact other items in there, but

17  it was clear that they were following the Highland matter.

18  And then in the email in January 2021, he also indicated that

19  they'd been following the case further, and said, Looks like

20  you have things well in hand, or something to that effect.  So

21  --

22  Q    Do you have that email, too?  Have you saved that email?

23  A    They're all saved, yeah.

24  Q    Okay.  So let's talk about that.  But you had no data room

25  that would allow them to come in and actually investigate the

018200

HCMLPHMIT00003252

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document Exhibit 72   Filed 04/16/25 390   Page 352 of 1017    PageID 19251

Seery - Direct                            240

1    underlying assets.  Is that correct?

2    A    Not in respect of anybody trying to buy claims.  We did

3    have a data room with respect to financing.

4    Q    Please listen to my question.  I'll get to it.  Data room

5    for claims investors.  There was no data room set up on or

6    before March 15 to allow Farallon to come in and investigate

7    its investment in this claim?

8    A    That's correct.

9    Q    There was no data room set up prior to March 15 to allow

10   Stonehill to come in and investigate its investment in the

11   claims it purchased.  Is that correct?

12   A    That's correct.

13   Q    Can you identify any due diligence, sitting here today --

14   let me back up.  You heard Mr. Dondero's testimony about

15   portfolio companies, correct?

16   A    Yes.

17   Q    Portfolio companies are companies in which Highland

18   Capital has an interest that actually have separate and

19   distinct management.  Is that correct?

20   A    Generally.  And it -- I disagree with some of his

21   testimony, but generally that's correct, yes.

22   Q    Well, okay.  Let's just take on the part that you agree

23   with.  With regard to those portfolio companies, was there

24   anything that was disclosed in the Highland publicly-available

25   financials that would allowed a detailed analysis of

Seery - Direct                          241

1    Highland's investments in each of those portfolio companies?

2    A    I don't know.  Certainly, in the four or five sets of

3    projections that were filed, there were financial projections.

4    I'm not sure exactly what was included in each one or in the

5    disclosure statement.

6    Q    Fair enough.  Well, I'll represent to you I don't think

7    there's detailed information on each individual portfolio

8    company.

9            MR. MORRIS:  Your Honor, he's not here to testify.  I

10   move to strike.

11           MR. MCENTIRE:  Okay.

12           THE COURT:  Sustained.

13   BY MR. MCENTIRE:

14   Q    In that regard, Mr. Seery, can you identify what Farallon

15   did to investigate the underlying asset value of any of these

16   portfolio companies?

17   A    I don't have any knowledge as to what Farallon did before

18   it bought claims.

19   Q    Can you identify what due diligence Stonehill did to

20   investigate the underlying asset value in any of these

21   portfolio companies?

22   A    I don't -- I mean, in connection with claims purchasing, I

23   have no idea what Stonehill did.

24   Q    Now, I understand that you solicited -- perhaps I don't

25   recall correctly.  Did you solicit both Farallon and Stonehill

018202

HCMLPHMIT00003254

Seery - Direct                                    242

1   to participate in a bid to provide exit financing?

2   A    I don't think that's fair.  I solicited Farallon because I

3   knew they already owned claims.  Stonehill reached out to me,

4   and that was one of the things they were interested in doing,

5   if there was financing needs.

6   Q    Okay.

7   A    And at the time they reached out, which was right after

8   confirmation -- right after confirmation and the confirmation

9   order, we didn't know what our needs would be.  We didn't

10  really, at the early stage, think we needed exit financing.

11  When we looked at some of the difficulty we were going to have

12  -- for example, collecting notes and realizing on assets -- we

13  realized that we were going to need some exit financing in

14  order to have enough money to support the enterprise to

15  monetize the assets.

16  Q    And I think you used the -- I think the phrase you used,

17  you are the straw man or a straw man bid?  Is that what you

18  called it the other day?

19  A    We did.  You set up a very typical competitive process to

20  do exit financing.

21  Q    And what was the --

22  A    And what -- well, I --

23  Q    -- suggest --

24  A    I was going to get to your straw man.  And one of the

25  things you do is you assess what the market's going to look

018203

HCMLPHMIT00003255

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 25-72 Filed 09/04/25   Page 355 of 1017    PageID 19254

Seery - Direct                    243

 1  like, what you think the market looks like, what you think a

 2  financing would be good for the enterprise, the flexibility

 3  you need, how you'd structure it.  And then you put that out

 4  to prospective lenders and say, Here's our straw man.  This is

 5  what we'd like you to consider in terms of financing.  And

 6  then they do their work and come back.  And they can either

 7  say, that looks great, or we have a totally different idea of

 8  what the financing might be, or some other combination of

 9  those things.

10  Q   Mr. Seery, thank you for that answer, but I need to ask

11  you to do me a favor.  I'm on the clock, and so I'd just like

12  to get my questions out, if you'd try to respond.  Okay?

13  A   Uh-huh.

14  Q   Because your answers, as long as they may be, are

15  impacting me a little bit.

16      So let me ask this question.  In the straw man proposal

17  that you put out for bid, what was the suggested interest

18  rate?

19  A   You know, you asked me that the other day, and I think I

20  was slightly off.  So it -- and I -- but I did tell you that

21  it depended.  There was -- I don't recall what the rate was,

22  but it starts -- if everybody wants to put out money -- and I

23  apologize for the length of the answer -- they look and they

24  say, well, what if I get paid back in six months?  Nobody

25  wants to do that.  So, duration makes a difference.  So

HCMLPHMIT00003256

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 64-72   Filed 06/20/25   Page 356 of 1017   PageID 19255

Seery - Direct                          244

1   there's an interest rate.  There's upfront fees.  There's

2   often exit fees.  And sometimes there's other amounts.  So,

3   our -- my recollection is that our straw man was somewhere in

4   the low teens on the high end, and then closer to high single-

5   digits on the low end.  Something in that range.

6   Q   And Farallon indicated to you they were not interested,

7   correct?

8   A   No, not exactly.  What Farallon said was they didn't --

9   they signed an NDA because we invited them in.  We invited in

10  six folks.   Five signed NDAs.  Two of the -- I invited in

11  Farallon.  I invited in Stonehill.  Well, Stonehill called me.

12  I invited in Contrarian because they had bought claims.  And

13  then two lenders that I knew.  And Farallon did the work and

14  came back and said, this isn't really what we do.  And the

15  other guys, you're telling me, which I was, that other people

16  are more competitive.  And so it's not really what we do, we

17  don't think the returns are good enough, but if you need us,

18  because now they're already invested in the claims, call us.

19  Q   Okay.

20       MR. MCENTIRE:  And again, I'll object as

21  nonresponsive.  Your Honor, that was a very long answer

22  talking about a lot of other entities.  My only question was

23  what the interest rate was.

24       MR. MORRIS:  Your Honor, we oppose the motion to

25  strike.  I think it's --

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 25-72 Filed 06/26/25   Page 357 of 1017   PageID 19256
Exhibit 72   Page 246 of 390

Seery - Direct                          245

 1            MR. MCENTIRE:  No, I didn't strike it.  I said -- my

 2    objection was nonresponsive.  I will now follow it up with a

 3    motion to strike his answer.

 4            THE COURT:  Overruled.  Okay.

 5    BY MR. MCENTIRE:

 6    Q    Mr. Seery, you just told us that the interest rate was in

 7    the high single digits to in the 12 and 13 percent range.

 8    A    No, I was giving you the all-in return for the lender.

 9    That's a very different --

10    Q    All-in return?

11    A    -- thing for the -- than an interest rate.

12    Q    That's even better.

13    A    And it depended on the time.

14    Q    Fair enough.

15    Q    So if -- the shorter the duration, the higher the

16    effective return, because he's not getting the return for as

17    long a period of time.  If I have $100 million and I get 10

18    percent, I get just $10 million.  But if I have that out for

19    $3 million, I've earned $30 million.  So maybe that gets

20    squeezed in the longer it's out.

21    Q    And Farallon said that the interest rate or the return

22    rate was not what they were looking for?

23    A    They indicated two things.  I believe I've said this

24    several times.  One is they said, this isn't really what we

25    do, a $50-ish million dollar loan to do an exit.  But we're in

018206

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 34-72 Filed 04/05/25   Page 358 of 1017   PageID 19257
Exhibit 72 Page 247/26

Seery - Direct                                              246

 1   the case.  If you need us, call us.  Included in that was, it

 2   doesn't look attractive enough to us because you're telling me

 3   other guys are more competitive.

 4   Q    Okay.  And do you know what kind of rate of return they

 5   were going to get on the investment of the -- on the claims at

 6   a 71 percent projected return rate?

 7   A    If we only hit the plan, Farallon's two purchases, based

 8   on the numbers you get -- you gave, over a two-year period,

 9   would be 38.9 percent.

10   Q    Okay, but we're going to talk about that in a second.

11   Okay.  How much -- how much did Farallon actually invest?

12   A    I'd have to look back at your numbers.  They're in your

13   pleading.  I don't know what they actually paid.  I just have

14   it from your pleading.

15   Q    Okay.  And do you have paperwork that -- can you

16   (inaudible) calculation here?

17   A    I have a calculator that, when I looked at your numbers, I

18   ran that, and I --

19   Q    I see.  All right.

20   A    I'm able to remember certain things.

21   Q    So, so if it's projected that the internal rate of return

22   is only six percent, do you disagree with that?

23   A    A hundred percent disagree.  There's -- that's virtually

24   impossible.

25   Q    Okay.

018207

HCMLPHMIT00003259

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 54-72   Filed 06/06/25   Page 359 of 1017   PageID 19258
Exhibit 72   Page 248 of 390

Seery - Direct                               247

1   A    And that's, by the way, for hitting the plan.

2   Q    I'm sorry?

3   A    That's for hitting the 70 -- the 71-and-change percent.

4   Q    I want to ask you a question about that.  The 71-percent-

5   and-change --

6   A    Uh-huh.

7   Q    -- that came out of the plan for Class 8, --

8   A    Yes.

9   Q    -- that was for Class 8, correct?

10  A    Correct.

11  Q    There was zero expected return to Class 9, correct?

12  A    That's correct.  They would only get upside, and I think

13  it says in the projections, based upon our view at the time,

14  litigation that could ensue, and that was part of the plan.

15  Q    And as I understand it, that 71-and-some-change --

16  A    Uh-huh.

17  Q    -- projected return rate never changed from the date of

18  confirmation all the way up to the effective date.  Am I

19  correct?

20  A    The -- we didn't change the projections that we'd filed

21  with the plan because the plan was confirmed.  We didn't need

22  to change the projections that were filed with the plan.

23  Q    The NDAs, as you understand it, can you tell me

24  specifically when the NDAs were signed?

25  A    I know it's the first week of April to the second week of

018208

HCMLPHMIT00003260

1   April.  Blue Torch may have signed -- who actually ended up

2   doing the financing -- they may have signed it a week or so

3   before.  They'd been around offering financing a number of

4   times in the past.

5   Q    Fair enough.  But we know that you understood as of March

6   15th that Farallon had already made their investments?  I

7   mean, claims?

8   A    That's what they told me in that email, yes.

9   Q    Okay.  When did Stonehill sign the NDA?

10  A    In and around the same time.

11  Q    But you don't know when Stonehill actually purchased their

12  claims?

13  A    I don't know exactly when.  I know generally that by the

14  end of April, early May, they were -- they were the holder of

15  the Redeemer claim.  And --

16       (Interruption.)

17  A    -- I can't remember whether it was from them or whether it

18  was from --

19  Q    Did you ever communicate with Stonehill during the time

20  that they were doing their due diligence on the exit

21  financing?

22  A    Yes.

23  Q    Okay.  Did they come to your offices?

24  A    I don't know if we were back yet.  I think we were back,

25  but I don't recall them coming to our offices.  I think it was

HCMLPHMIT00003261

1   all virtual.  It's early '21, so there would have been

2   vaccines.  It would have been very -- very -- I don't recall

3   them coming to the offices at that time.

4   Q    But just to be clear, you don't know, you can't give the

5   Court a date when Stonehill actually completed their

6   investments in either Redeemer or HarbourVest?

7   A    No, I don't.  I don't know.  Did -- just --

8   Q    That was my question.

9   A    When you say Redeemer or HarbourVest, they never bought

10  HarbourVest.

11  Q    It was just Redeemer?

12  A    Correct.

13  Q    All right.  You understand that Muck is an entity, a

14  special-purpose entity created by Farallon?

15  A    That's my understanding, yes.

16  Q    And you understand Jessup is a special-purpose entity

17  created by Stonehill?

18  A    That's my understanding, yes.

19  Q    Muck and Jessup are both on the Oversight Committee?

20  A    They are.  They -- those entities are the --

21  Q    Is it the Oversight Committee or the Oversight Board?

22  A    Same thing.

23  Q    Fair enough.

24  A    I'll consider them the same.

25  Q    And there's a third member, too, correct?

018210

HCMLPHMIT00003262

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 15-24 72 Filed 06/30/25   Page 362 of 1017   PageID 19261

Seery - Direct                                          250

1    A    That's correct.

2    Q    Okay.

3    A    Independent member.

4    Q    Okay.  So you have a three-person board; is that right?

5    A    That's correct.

6    Q    And one of their jobs is to make decisions concerning your

7    compensation?

8    A    The structure of the Claimant Trust Agreement provides

9    that I'm to negotiate with the -- either the Committee or the

10   Oversight Board.  And the compensation in the Claimant Trust

11   Agreement is a base salary of $150,000, which is -- a month,

12   which is the same as the one in the case, plus severance, plus

13   a success fee.  And it's very specific that that will be

14   negotiated by the -- either the Committee or then the

15   Oversight Board.

16   Q    And Michael Linn, who Mr. Dondero has referred to, he's

17   actually on the Oversight Board, is he not?

18   A    He's the Muck representative on the Oversight Board.

19   Q    All right.

20   A    Yes.

21   Q    If I understand it correctly, you are currently receiving,

22   as the Trustee, $150,000 a month.  Is that correct?

23   A    That's incorrect.

24   Q    What are you receiving?

25   A    I receive $150,000 a month as the Trustee and the CEO of

018211

HCMLPHMIT00003263

Seery - Direct                    251

1  Highland Capital.

2  Q   Well, --

3  A   So I have --

4  Q   -- fair enough.

5  A   I have both roles.  The Trustee, for example, doesn't

6  manage the team, they actually work for Highland Capital, and

7  I'm the CEO of Highland Capital.

8  Q   There was some suggestion that the $150,000 was something

9  that the Court had passed upon prior to the effective date or

10 part of the plan.  This is a separate negotiated item that you

11 -- that you allegedly negotiated that was awarded to you post-

12 effective date, correct?

13 A   That's false.

14 Q   Okay.  So the $150,000 had a discount that was supposed to

15 drop down to $75,000 after a period of time.  That never

16 happened, did it?

17 A   The -- you seem to be mixing concepts.  But the $150,000 a

18 month was set by the plan and the -- and the Claimant Trust

19 Agreement as the "base salary."  That wasn't going to move.

20 When we -- it never was supposed to move.

21     When I began negotiating with the Oversight Board for the

22 success fee, they pushed back and said, we would like that to

23 step down.  So in our -- I did not say, oh, that's a great

24 idea.  We ended up negotiating, and they included a provision

25 that we would renegotiate depending on the level of work.

018212

HCMLPHMIT00003264

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 05/30/25   Page 364 of 1017   PageID 19263
Exhibit 72   Page 253 of 390

Seery - Direct                              252

1    That's one of the provisions.

2    Q    Okay.  But renegotiate down to $75,000 after a period of

3    time, but that never happened?

4    A    Initially, I believe it was supposed to step down to

5    $75,000 automatic, subject to renegotiation that it go back

6    up, not a structure that I particularly liked.  And since

7    then, we've negotiated on that point.

8    Q    So you currently are making $150,000 a month?

9    A    That's correct.

10   Q    How often do you come to Dallas?

11   A    Usually I'm here at least once a month.  Usually it's

12   between two and four days.

13   Q    Okay.  And you have a staff here in Dallas at Highland

14   Capital, correct?

15   A    Yes.

16   Q    How many people?

17   A    Eleven.

18   Q    Eleven people?

19   A    Uh-huh.

20   Q    Working full-time?

21   A    Yes.

22   Q    And you're still making $1.8 million a year?

23   A    Yes.

24   Q    You also have a bonus structure, correct?

25   A    That's correct.

018213

HCMLPHMIT00003265

Seery - Direct                                    253

1   Q    And that's performance-based?

2   A    That's correct.

3          MR. MCENTIRE:  Can you pull up the agreement please?

4   Okay.

5        (Pause.)

6   BY MR. MCENTIRE:

7   Q    All right.  Do you see --

8          MR. MCENTIRE:  We're having technical difficulty

9   here.

10  BY MR. MCENTIRE:

11  Q    All right.  Can you identify this document?

12         MR. MCENTIRE:  What exhibit number is this?

13         MR. MILLER:  28.

14  BY MR. MCENTIRE:

15  Q    Exhibit 28.

16         MR. MCENTIRE:  I believe this is already in evidence.

17         THE COURT:  Hunter Mountain Exhibit 28?

18         MR. MCENTIRE:  Yes, Your Honor.

19         THE COURT:  Okay.

20  BY MR. MCENTIRE:

21  Q    This is the memorandum of agreement.  Do you see that?

22  A    Yes.

23  Q    On the third line, it says -- and your name is identified

24  here.  You're the Claimant Trustee, correct?

25  A    Claimant Trustee/CEO.

018214

HCMLPHMIT00003266

1   Q   Engaged in robust, arm's length, and good-faith

2   negotiations regarding the incentive compensation program.

3       As part of this robust, arm's length, and good-faith

4   negotiation, did you personally conduct any independent search

5   in the marketplace?

6   A   I did -- what do you mean by search in the marketplace?

7   Q   Well, did you try to do a market study?  I asked that

8   question in your deposition.

9   A   I didn't know if you were asking a different question.

10  Q   Same question.

11  A   You mean market study on compensation?

12  Q   Yes.

13  A   No, I did not.

14  Q   Are you aware of whether or not any member of the

15  Oversight Board or Oversight Committee did a market study?

16  A   On compensation?

17  Q   On compensation.

18  A   I'm not aware that they did one, no.

19  Q   So this robust, arm's length, and good-faith negotiation,

20  as far as you know, is divorced from any market study database

21  or -- or methods.  Is that correct?

22  A   I don't believe that's correct, no.

23  Q   I see.  So did -- was any third-party consultant hired?

24  A   Not by me or Highland or the Trust, no.

25  Q   All right.

018215

HCMLPHMIT00003267

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 35-472   Filed 06/06/25   Page 367 of 1017    PageID 19266

Seery - Direct                              255

 1              MR. MCENTIRE:  Can you scroll down a little bit,

 2    please?

 3    BY MR. MCENTIRE:

 4    Q    You signed this agreement, correct?

 5    A    Yes.

 6    Q    And we have Michael Linn signing on behalf of Muck, who

 7    also is with Farallon, correct?

 8    A    That's correct.

 9              MR. MCENTIRE:  Scroll down.

10    BY MR. MCENTIRE:

11    Q    And by the way, this is a heavily-redacted document.  The

12    redactions deal with what?

13    A    The redactions deal with the portion that would go to the

14    team as opposed to going to me.

15    Q    Are we talking about the 11-member team?

16    A    Correct.

17              MR. MCENTIRE:  Can you scroll down?  Stop.  Go back.

18    BY MR. MCENTIRE:

19    Q    So we have the assumed allowed claim amounts under Section

20    D.  Do you see that?

21    A    Yes.

22    Q    Class 9, $98 million and some change.  Class 8, $295

23    million and some change.  Then we go into the incentive

24    payment tiers.  Do you see that?

25    A    Yes.

HCMLPHMIT00003268

Seery - Direct                                256

1   Q    What's the purpose of the tiers?

2   A    The purpose of the tiers was to set additional

3   compensation so that, the more recovery, the higher the

4   compensation.  So, below Tier 1, there was really effectively

5   no bonus, is my recollection.  And then in each tier there

6   would be a percentage.

7        So the first tier is $10 million.  There would be a

8   percentage of that $10 million that could be allocated for

9   bonus.  Then in the next tier it would be $56 million.  A

10  portion of that would be allocated for bonus.  And it's

11  weighted more heavily to the higher-recovery tiers, meaning it

12  incentivizes both me and the team to try to reach deeper into

13  Class 8 and Class 9 and get higher recoveries.

14  Q    Okay.  So the idea is, the more difficult it is to get the

15  recoveries, the higher percentage you should get, because if

16  you're successful then you should be rewarded accordingly?  Is

17  that kind of how it works?

18  A    I'm not sure if difficult is the term, but it's a

19  combination of both expertise, difficulty, and time.

20            MR. MCENTIRE:  All right.  Can you scroll down,

21  please?  Next page.

22  BY MR. MCENTIRE:

23  Q    And here are your actual tier participations.  They go --

24  you said basically nothing Tier 1, up through 6 percent.  So

25  Tier 1 is the 71 percent, right?

018217

HCMLPHMIT00003269

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 35-24   Filed 06/26/25   Page 369 of 1017    PageID 19268
Exhibit 72   Page 258 of 390

Seery - Direct                                 257

1   A    It's .72 percent, and it's of the -- that's the first

2   piece.  You have to get to Tier 1.  So if we had not -- I

3   believe it's structured is if we don't get to Tier 1, for

4   example, we don't hit the plan, right around the plan number

5   of 71-and-change cents, then there wouldn't -- there wouldn't

6   be upside.

7        So it was very much structured in a way that you had to

8   perform.  And then the better the performance, the bigger the

9   percentages of the tier.

10  Q    So, in theory, Mr. Seery, by the time you get down to Tier

11  4 and Tier 5, it's a little bit less certain that you're ever

12  going to get there.  Is that right?

13  A    Well, out of the gate, going deeper was uncertain.  It's a

14  question of being able to execute well on the assets and being

15  able to control the costs and being able to make

16  distributions.  It wasn't based on what we just got for the

17  assets.  It's actually based on actual distributions --

18  Q    I understand that.

19  A     -- to Class 8 and 9 claimants.

20  Q    I understand that.  And the idea is, is that it take a lot

21  more effort -- the theory was it might take a lot more effort

22  to get all the way to the bottom of Tier 5 to pay all the

23  Class 9 claims, right?

24  A    And maybe a little luck.

25  Q    Yeah.  And Class 10 is not even factored into this, is it?

018218

HCMLPHMIT00003270

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S     Document Exhibit 72   Filed 05/30/25   Page 370 of 1017     PageID 19269

Seery - Direct                    258

1   A    No, it is not.

2   Q    And so you didn't consider Class 10.  You stopped at Tier

3   5?

4   A    That's correct.

5   Q    So your entitlement to a 6 percent return, or a 6 percent

6   bonus on the recoveries, you say it's there to incentivize

7   you.  You didn't expect that to actually happen, did you, when

8   you signed this?  Is that your testimony?

9        MR. STANCIL:  I object to the form of the question.

10  It mischaracterizes the agreement.

11  BY MR. MCENTIRE:

12  Q    You didn't expect it to happen, did you, sir?

13       THE WITNESS:  Well, the six --

14       THE COURT:  Wait.  I'm sorry.  Could you rephrase the

15  question?

16       MR. MCENTIRE:  Sure.

17  BY MR. MCENTIRE:

18  Q    Are you telling the judge that you really didn't expect

19  that to happen and that's why you were entitled to a higher

20  percentage?

21  A    No.  We didn't expect to reach Class 9 and go deep into

22  Class 9, but we certainly held out the possibility that we

23  could.  And it's not six percent.  It's six percent of the

24  increment.  These are cumulative.  So you get .72 of Tier 1.

25  You get 1.17 of Tier 2.  And you can add those, and you earn

018219

HCMLPHMIT00003271

1   them when you've actually made the distribution, but you don't

2   get paid until you get all your distribution or we're

3   relatively done or there's a renegotiation.  Because the

4   Committee wanted to make sure that I didn't say, hey, I hit

5   Tier 3, time to go, I got a better job.

6   Q   So, Mr. Seery, if Farallon told Mr. Dondero that they

7   wouldn't sell basically at any price because you said it was

8   too valuable, and they rejected a 40 or 50 percent premium, if

9   they said that, is that -- is that a lie?

10  A   That I -- rephrase that, please.  I don't -- didn't quite

11  understand your question.

12  Q   Yeah.  You've heard the testimony that Farallon, Michael

13  Linn, told Mr. Dondero that they were not going to sell their

14  claim at any amount because you had told them it was too

15  valuable.  Is that a lie?

16  A   I think that's -- yeah, I don't think that's true.

17  Q   Okay.  And obviously, if they're not going to be willing

18  to sell at any amount, they must be pretty certain they're

19  going to hit Tier 5.  Would that just be a lie?

20  A   That -- that conversation was before this negotiation.

21  That -- there's no -- they could not have had any expectation,

22  either when they had that conversation in May or when we had

23  this discussion that I was going to hit Tier 5 and I hadn't

24  hit Tier 5.  And the idea that they wouldn't sell at any price

25  is complete utter nonsense, because they're capped on what

018220

1   they can get.

2   Q    So if -- sure.  Okay.  So, but if Farallon told --

3   A    But that's what you said.

4   Q    If Farallon told Mr. Dondero that they wouldn't even sell

5   at 130 percent of the purchase price because you told them it

6   would be too valuable, is that a lie?

7   A    I never told them it would be too valuable.  I don't -- I

8   don't know any of the other parts that you're saying, the 130

9   percent of an unknown number, some guess number that Mr.

10  Dondero had.  I never told them it would be too valuable.

11  That would be their own assessment of where we were at the end

12  of May 2021.

13  Q    If they said that you told them not to sell, that it was

14  too valuable, is that a lie?

15  A    That's untrue, yes.

16  Q    If they told him -- if they told him that he told you --

17  that you told them it was too valuable because of MGM, is that

18  a lie?

19  A    Yes.

20  Q    How many shares of stock did Highland Capital own?

21       MR. MCENTIRE:  Well, one second.  What is my time?

22  How much time do I have?

23       THE CLERK:  Right now you're at --

24       MR. MCENTIRE:  So I'm almost two and a half hours in?

25       THE CLERK:  Just about.  A little under.

HCMLPHMIT00003273

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 15-24   Filed 06/20/25   Page 373 of 1017   PageID 19272
Exhibit 72   Page 262 of 390

Seery - Direct                    261

1   BY MR. MCENTIRE:

2   Q    I'm going to have to speed up here, Mr. Seery.

3           THE COURT:  A little under two and a half, you said.

4   BY MR. MCENTIRE:

5   Q    Mr. Seery, I want to make sure.  Highland Capital owns

6   interests in the CLOs.  What is the CLOs' stake in the MGM

7   stock, or what was it?

8   A    Highland Capital does not own any interest in any of the

9   CLOs it manages.  It has a fee stream, and it can have certain

10  deferred fees that it can get, but it didn't own any interest

11  in any of the CLOs that it managed.

12  Q    Fair enough.  How about the portfolio companies?

13  A    Did Highland Capital own interests in the portfolio

14  companies?

15  Q    Yes.

16  A    Some of the ones Mr. Dondero listed, but they weren't

17  portfolio companies.  So he said OmniMax, but we didn't have

18  any management of OmniMax.  We just had debt that converted to

19  equity, but we didn't control the -- the thing.  That was

20  during the case, the company.

21  Q    Did Multistrat have an interest in MGM?

22  A    Multistrat owned MGM, yes.

23  Q    Okay.  And did your company, Highland Capital -- your

24  company -- Highland Capital have an interest in Multistrat?

25  A    Highland Capital owns 57 percent of Multistrat, yes.

HCMLPHMIT00003274

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 35-72  Filed 08/08/25   Page 374 of 1017    PageID 19273
Exhibit 72   Page 263 of 390

Seery - Direct                                          262

1   Q    And did Highland Capital have an interest in any other

2   portfolio companies that have an interest in -- had a stake in

3   MGM?

4   A    RCP.  Restoration Capital Partners.

5   Q    And do you recall what the value of that was?

6   A    It shifted over time.  I don't -- I don't know what time

7   you're talking about.

8   Q    And isn't it true that 90 percent of all the securities

9   that Highland Capital owned at the time that the sale went

10  public was roughly 90 percent of all of Highland Capital's

11  securities?

12        MR. STANCIL:  Objection, Your Honor.  I don't know

13  what that question is asking.

14        THE COURT:  I don't understand it, either.

15     Could you rephrase?

16        MR. MCENTIRE:  I'll try to.

17  BY MR. MCENTIRE:

18  Q    At the time that the announcement was made about Amazon

19  buying MGM in May of 2021, what percentage of all the

20  securities did MGM comprise of the securities that were owned

21  by Highland Capital?

22  A    Of the securities that were directly owned by Highland

23  Capital, it may have been -- I'm thinking of public or semi-

24  public securities, the 150,000 or 170,000 that we had that

25  were subject to the Frontier lien.  Might have been almost all

018223

HCMLPHMIT00003275

Seery - Direct                                                    263

```
 1   of the securities that we owned.  It wasn't -- it was a good
 2   position, but it wasn't a huge driver for the directly-owned
 3   shares.  There was more value in the Multistrat and the RCP.
 4   Q   What percent of shares of all --
 5            MR. STANCIL:  Your Honor, I'm sorry, I'm having
 6   trouble hearing the end of Mr. Seery's answers.  So I know
 7   it's not his --
 8            THE WITNESS:  I'm sorry.
 9            THE COURT:  Okay.  If you could make sure you speak
10   into the mic.
11            THE WITNESS:  Yeah.  I'm sorry.
12            MR. STANCIL:  I'm having trouble with Mr. McEntire
13   talking over the end of Mr. Seery's answers.
14            THE COURT:  Ah.
15            MR. STANCIL:  I'm having trouble following.
16            THE COURT:  Okay.
17            MR. STANCIL:  I apologize.
18            THE COURT:  Okay.  Could you --
19            MR. MCENTIRE:  I didn't know I was doing that.
20            THE COURT:  Well, --
21            MR. MCENTIRE:  I'll try to do better.
22   BY MR. MCENTIRE:
23   Q   Mr. Seery, of all the stock that Highland Capital owned in
24   May of 2021, what percentage of that was (inaudible) stock?
25   A   Hopefully this is clear.  Highland Capital did not own a
```

018224

HCMLPHMIT00003276

Seery - Direct                          264

1    lot of stock.  Highland Capital did have a direct ownership

2    interest in MGM, so that might have been the vast majority of

3    the stock that Highland Capital owned.  It did own interest in

4    other entities, like its investment in RCP or its investment

5    in Multistrat.  But of the stock that it owned directly, that

6    was probably it, and that's the one that was liened up to

7    Frontier.

8    Q    Mr. Seery, did Highland Capital own approximately 170,000

9    shares of MGM stock in May of 2021?

10   A    Yes.  You -- I'm sorry.  You asked me what percentage, and

11   I think I said roughly that amount of stock liened up to

12   Frontier, and that that might have been almost all of the

13   stock we owned.

14   Q    Does Highland Capital own a direct interest in HCLOF?

15   A    In HC --

16   Q    HCLOF?

17   A    HCLOF?  Yes.  Highland Capital owns a small direct

18   interest, and a large indirect interest which we got through

19   the settlement with HarbourVest.

20   Q    And the entity in which you acquired the indirect

21   interest, what's the name of that entity?

22   A    I don't recall.  It's a -- it's a single-shell special-

23   purpose entity that we own all of it and it has no other

24   assets.

25   Q    And just to make sure that the record is clear, you deny

018225

HCMLPHMIT00003277

Seery - Direct                                        265

1  under oath that HCLOF has any interest -- or had any interest

2  in MGM stock?

3  A   HCLOF has never owned MGM stock and still doesn't own MGM

4  stock.  It's never owned it.

5  Q   Um, --

6  A   At least -- at least, as long as I've been in this case.

7          MR. MCENTIRE:  One second, Your Honor, please.

8      (Pause.)

9          MR. MCENTIRE:  I'm going to have to pass the witness

10  because of time sensitivities, Your Honor, so I'll pass the

11  witness at this time.

12          THE COURT:  Okay.  Cross?

13                  CROSS-EXAMINATION

14  BY MR. MORRIS:

15  Q   Mr. Seery?

16  A   Yes, sir.

17  Q   You just covered a lot of what we would have covered, so I

18  want to be really, really quick here.  Okay?  We're not

19  covering old ground.  Let's just start with the HarbourVest

20  settlement.  Do you recall that Mr. Dondero sent the email to

21  you on December 17th?

22  A   Yes.

23  Q   Okay.  When did you reach the agreement with HarbourVest

24  on the settlement?

25  A   December 10th.

018226

HCMLPHMIT00003278

Seery - Cross                          266

1    Q   Okay.

2             MR. MCENTIRE:  Your Honor, I'd like to move into

3    evidence Exhibit 31.  Actually, let me lay a foundation first.

4         Can you give the witness --

5             MR. MCENTIRE:  Is this a new exhibit?

6             MR. MORRIS:  No.  It's Exhibit 31.

7             MR. MCENTIRE:  Can I see it, Tim, please?

8             MR. MORRIS:  It's in your box.

9             MR. MCENTIRE:  Give me a minute.

10            MR. MORRIS:  Uh-huh.

11            THE COURT:  Okay.  We're about to focus on Highland

12   Exhibit what?

13            MR. MORRIS:  31.

14            THE COURT:  Okay.

15            MR. MORRIS:  Do you have it, Your Honor?

16            THE COURT:  I do.

17   BY MR. MORRIS:

18   Q   Do you have it, Mr. Seery?

19   A   I do, yes.

20            MR. MORRIS:  Do you have it, sir?

21            MR. MCENTIRE:  I do.  Thank you.

22            MR. MORRIS:  Okay.

23   BY MR. MORRIS:

24   Q   Can you just tell the Court what this is?

25   A   This is an email chain.  It starts from me to the other

018227

HCMLPHMIT00003279

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 54-72   Filed 06/08/25   Page 379 of 1017   PageID 19278
Exhibit 72   Page 268 of 390

Seery - Cross                                    267

1   independent directors, copying counsel, to outline the terms

2   of the HarbourVest settlement that I had just made the offer

3   to HarbourVest to settle on these terms on December 8th.  And

4   this was the product of a number of negotiations that had

5   taken place over the prior weeks, and this was the final offer

6   that I was making to them to settle.

7   Q    Directing your attention to the bottom of the first page,

8   the first email dated December 8, 2020 at 6:46 p.m., can you

9   just read the first sentence out loud.

10  A    I lost -- you lost me.

11  Q    That begins, "As discussed yesterday."

12  A    Oh.  "As discussed yesterday, after consultation with John

13  Morris" -- that would be you -- "regarding litigation risks,

14  this evening I made an offer" -- it says "and," but it should

15  have said "an" -- "offer to HarbourVest to settle their

16  claims.  The following are the proposed terms."

17  Q    Okay.  Just stop right there.  And you were -- this is the

18  report that you gave to the independent directors?

19  A    The other independent directors.

20  Q    Right.

21  A    I was also one.

22  Q    Right.  And did Mr. Dubel respond?

23  A    He did, yes.

24  Q    And can you just describe briefly what your understanding

25  was of his response?

018228

HCMLPHMIT00003280

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 72   Filed 06/20/25   Page 380 of 1017   PageID 19279

Seery - Cross                                    268

1   A     Dubel responds a couple hours after I sent the original

2   email:  "Jim, this basically looks like a $10 million -- net

3   $10 million payment to HV." That's HarbourVest.  "Is that

4   correct?  Does the 72-cent recovery include the $22-1/2

5   million that we get from the transfer of HCLOF interests?

6   Remind me again, post-effective date, who is managing HCLOF?"

7         So I think my understanding was Mr. Dubel was querying me

8   on some of the terms that I had set forth here, including that

9   the value of the claim in our estimation was going to be about

10  $9.9 million, meaning they would have a $45 million senior

11  claim, a $35 million junior claim, and we thought, based on

12  the values we had then, it was going to pay out about $9.9

13  million.

14  Q     Okay.  And was this offer accepted?

15  A     Yes, it was.

16  Q     When was it accepted?

17  A     I think I just said.  On -- on December 10th.

18  Q     Okay.  And did the terms that you described for the other

19  independent directors on December 8th, did they change in any

20  way at all from that reflected in this email until the time we

21  got to the 9019 hearing?

22  A     Not at all, no.

23  Q     Okay.  I see that you mention in here that you -- it says,

24  quote, "The interests have a marked value of $22-1/2 million,

25  according to Hunter Covitz."  Do you see that?

018229

HCMLPHMIT00003281

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 24-72   Filed 07/06/25   Page 381 of 1017    PageID 19280
Exhibit 72   Page 270 of 390

Seery - Cross                           269

 1  A     That's correct, yes.

 2  Q     Who's Hunter Covitz?

 3  A     Hunter Covitz was a Highland employee.  He ran the

 4  structured products business.  So he was responsible for

 5  making sure that the CLO we managed, which was AC7, was

 6  compliant and was -- with the indentures.  He also was

 7  responsible for monitoring the -- what we call the 1.0 CLOs,

 8  even though they weren't really CLOs, they were more like

 9  closed-in funds.  And he also kept track of the Acis -- CLOs

10  that HCLOF had an interest in that were managed by Acis.

11  Q     Okay.  And do you recall how he conveyed to you the NAV?

12  A     Well, I talked to him numerous times, so this wasn't our

13  -- I didn't just call him up at the end and say, what's the

14  NAV?  I had had discussions with him while I was negotiating

15  with HarbourVest.  And at some point, he or someone -- he told

16  me the amount, and at some point he gave me a NAV statement

17  that actually showed the NAV of HCLOF, which at 11/30 was

18  roughly $45 million.

19  Q     Okay.  Can you turn to Exhibit 31-A, the next document in

20  the binder?

21  A     Mine's completely blacked out.

22          THE COURT:  I'm sorry, what number?

23          MR. MORRIS:  31-A.

24          THE COURT:  Oh.

25          MR. MORRIS:  And the first two pages are redacted

018230

HCMLPHMIT00003282

Seery - Cross                          270

1   just because they're not relevant and they're business

2   information.

3   BY MR. MORRIS:

4   Q    But can you turn to the last page, sir?

5   A    Yes.

6   Q    Can you tell the judge what this is?

7   A    So this is a net asset value statement from HCLOF.  That's

8   Highland CLO Funding, Limited.  That's the Guernsey entity

9   that -- that held these interests.  And this is a net asset

10  amount, and it shows what the net -- what the net asset value

11  is as of this time on a carryforward basis of $45.191 million.

12  Q    Okay.  And where did you get this document?

13  A    I believe I got it from Covitz.  It's generated by an

14  entity called Elysium, which is the fund administrator for

15  HCLOF, and I believe they're out of Guernsey.

16  Q    And did you rely on this document in setting the proposal

17  to HarbourVest?

18  A    Well, both the conversations with Covitz and the document.

19  And frankly, HarbourVest got the same documents because they

20  were -- they held a membership interest in HCLOF.  So he --

21  Michael Pugatch knew what the NAV was.

22  Q    And would Mr. Dondero or entities controlled by him who

23  also have interests in HCLOF, is it your understanding that

24  they would have also had this document available?

25  A    All members would --

018231

HCMLPHMIT00003283

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 72    Filed 07/02/25 390   Page 383 of 1017    PageID 19282

Seery - Cross                                 271

```
 1              MR. MCENTIRE:  Excuse me.  Excuse me.  I object to
 2    that question, the question being "and the entities controlled
 3    by Mr. Dondero."  There's no foundation for this witness to
 4    answer a question like that.
 5    BY MR. MORRIS:
 6    Q    Who else owned --
 7              THE COURT:  Sustained.
 8    BY MR. MORRIS:
 9    Q    -- an interest in HCLOF?
10              THE COURT:  Go ahead.
11              THE WITNESS:  It would have been DAF.
12    BY MR. MORRIS:
13    Q    The DAF?
14    A    Yeah.
15    Q    Okay.  Let's just ask this question.  Is it your
16    understanding that these NAV valuation reports were made to
17    all holders of interests in HCLOF?
18    A    Yes.  And that would include the DAF.  And I did leave off
19    that there were three former Highland employees long gone, or
20    at least not around at this point, who also owned very small
21    interests, and they would have gotten those statements as
22    well.
23    Q    And does HCLOF also produce audited financial statements?
24    A    It does, yes.
25    Q    Can you go to Exhibit 60, please?
```

018232

```
 1   A    Six zero?

 2   Q    Yes, sir.  A couple of questions here.  Is this a document

 3   that Highland would have received in the ordinary course of

 4   business?

 5   A    Yes, it is.

 6   Q    Okay.  And what is the NAV depicted on this page as of the

 7   end of the year 2020?

 8   A    Well, you have to look through it, because this document

 9   is actually dated 4/21/21, --

10   Q    Okay.

11   A    -- which you can see on Page 10 where it's signed.  And

12   that shows a net asset value of $50.4 million as of 12/31/21.

13   12/20.  I'm sorry.  And -- but it wasn't prepared until -- the

14   audits aren't done and we don't get this document until after

15   the directors sign off in April.

16   Q    Okay.

17        MR. MORRIS:  And Your Honor, I move for the admission

18   into evidence of these three HarbourVest-related documents,

19   30, 31-A, and 60.

20        MR. MCENTIRE:  No objection.

21        THE COURT:  They're admitted.

22        MR. MORRIS:  Okay.

23     (Debtors' Exhibits 30, 31-A, and 60 are received into

24   evidence.)

25   BY MR. MORRIS:
```

018233

HCMLPHMIT00003285

Seery - Cross                               273

1   Q    Okay.  Let me move on.  We've seen Mr. Dondero's email

2   today.  You've seen that before, correct?

3   A    Yes.

4   Q    Okay.  What was your reaction when you got it?

5   A    I was highly suspicious.

6   Q    Why is that?

7   A    Well, not to replow too much old ground, but this came

8   after he threatened me.  He threatened me in writing.  I'd

9   never been threatened in my career.  I've never heard of

10  anyone else in this business who's been threatened in their

11  career.  So anything I would get from him, I was going to be

12  highly suspicious.

13       It also followed the imposition of a TRO for interfering

14  with the business.  He knew what was in the TRO and he knew

15  what it applied to, and it restricted him from communicating

16  with me or any of the other independent directors without

17  Pachulski being on it.

18       Furthermore, Pachulski had advised Mr. Dondero's counsel

19  that not only could they not communicate with us, if they

20  wanted to communicate they had to prescreen the topics.

21       And how do we know that?  Because Dondero filed a motion

22  to modify the TRO.  And that was all before this email.

23       In addition, that followed the termination of the shared

24  service arrangements, the approval of the disclosure

25  statement, and the demand to collect on the demand notes that

018234

HCMLPHMIT00003286

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 34-72  Filed 07/15/25  Page 386 of 1017   PageID 19285
Exhibit 72   Page 275 of 390

Seery - Cross                                    274

1   Mr. Dondero and his entities were liable for.

2        So at that point, he'd been interfering with the business,

3   he had threatened me, he was subject to a TRO, and I got this

4   email and I was highly suspicious.

5   Q    Did you ever share this email with anybody at Farallon?

6   A    No.

7   Q    Did you ever share this email with anybody at Stonehill?

8   A    No.  And just to be clear, not just the email, the

9   contents.  Never discussed it with them.

10  Q    That was going to be my next question.  Did you ever share

11  any information about MGM with anybody?

12             MR. MCENTIRE:  Objection.  Leading.

13             MR. MORRIS:  I'm asking the question.

14             MR. MCENTIRE:  No, you're leading.

15             MR. MORRIS:  This is the whole --

16             MR. MCENTIRE:  You're leading the witness.

17             THE COURT:  Overruled.  Finish the question.

18  BY MR. MORRIS:

19  Q    Did you ever share any information concerning with MGM

20  with anybody at Stonehill before you learned that they had

21  purchased claims?

22             MR. MCENTIRE:  Objection.  Leading.

23             THE COURT:  Overruled.

24             THE WITNESS:  No.  No, I did not.

25  BY MR. MORRIS:

018235

HCMLPHMIT00003287

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 51-24   Filed 02/06/25   Page 387 of 1017   PageID 19286
Exhibit 72   Page 276 of 390

Seery - Cross                                275

1  Q   Did you ever share any information with anybody at

2  Farallon concerning MGM before you learned that they purchased

3  their claims?

4          MR. MCENTIRE:  Objection.  Leading.

5          THE WITNESS:  No, I did not.

6          THE COURT:  Overruled.

7          THE WITNESS:  I'm sorry.

8       (Pause.)

9          THE WITNESS:  You know, you just asked me something

10  about Stonehill.

11          THE COURT:  No.

12          THE WITNESS:  I'm sorry.

13  BY MR. MORRIS:

14  Q   Yeah.  No question.

15  A   I wanted to clarify one.

16  Q   What did you want to clarify, sir?

17  A   Certainly didn't share anything about this email, any of

18  the contents of it.  I don't know if I ever -- I don't know

19  exactly when Stonehill bought their claims, and they were

20  subject to the NDA to do the financing process.  So I know

21  when Farallon told me they had bought their claims and I know

22  we never had any discussions at all before they acquired their

23  claims, and I don't know when Stonehill got those -- their

24  claims, so I don't know when -- what was in the data room or

25  what -- what might have been discussed about MGM while they

018236

Seery - Cross                                    276

1   were under an NDA.

2   Q    Okay.

3   A    But certainly nothing -- I never shared the contents of

4   this email, the substance of this email, the email at all.

5   That's what I wanted to clarify.

6   Q    What data room are you talking about, sir?

7   A    This was the data room related to the exit financing where

8   we sought exit financing and ultimately got exit financing

9   from Blue Torch Capital.

10  Q    And who put together the data room?

11  A    DSI, which was our financial consultants, and our finance

12  team.

13  Q    And why did you -- did you delegate responsibility for

14  creating the data room to DSI and the members of your team you

15  just identified?

16  A    Yeah, of course.

17  Q    How come?

18  A    I don't really know how to put together a data room.

19  Q    Did you -- did you direct them to put anything in the data

20  room?

21  A    Not specifically.  We had a deck that we -- that certainly

22  I worked on and commented on, which would have been a general

23  overview of the -- of the post-reorganized Highland and the --

24  and the -- and the Claimant Trust.  So I certainly commented

25  on that.  But the specific information in the data room, I

018237

HCMLPHMIT00003289

1  don't -- I never looked at it.  I don't know what it is.

2  Q   How many -- how many entities who were participating in

3  the exit facility process wound up making bids or offers?

4  A   There were five that signed NDAs.  Three provided

5  substantive proposals.  One was verbal.  That was Bardin Hill,

6  who'd been contacting me throughout the case, and they do this

7  kind of financing, and they submitted a competitive bid.

8  Stonehill in writing, and then amended, a more aggressive one,

9  in writing.  And Blue Torch probably three, and the most

10 aggressive.

11 Q   And did you give the -- did you give the opportunity to

12 your age-old friends at Stonehill?

13 A   They're not my age-old friends.  And no, they lost.  They

14 were second, they were close, it was a good real proposal, but

15 they didn't win.

16 Q   So, --

17 A   Blue Torch won.

18 Q   So is it fair to say that you -- did you pick the best

19 proposal that you thought provided the best value for the

20 company that you were managing?

21        MR. MCENTIRE:  Your Honor, again, for the last ten

22 minutes, we've had nothing but leading questions.  And it just

23 is --

24        MR. MORRIS:  Fine.  Happy to --

25        THE COURT:  Sustained.  Rephrase.

018238

HCMLPHMIT00003290

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 472 Filed 07/09/25 Page 390 of 1017    PageID 19289

Seery - Cross                                    278

1   BY MR. MORRIS:

2   Q    Why did you pick Stone -- why did you pick Blue -- Blue-?

3   A    Blue Torch.

4   Q    Blue Torch, over the other bids?

5   A    It was the best bid.  So, structurally, it was the least

6   expensive, although they were extremely close.  I had a lot of

7   confidence in Blue Torch because this type of financing is

8   what they do.  And while you can never have a hundred percent

9   confidence that if somebody goes through the -- this is an

10  LOI, right, so this is a letter of intent.  When they go

11  further, they may -- they may not complete it.  But I had a

12  high degree of confidence that they would get there, because,

13  again, that's what they do.  And they were the -- they were

14  just the better bid.

15  Q    Okay.  Do you recall that in Mr. Dondero's notes he wrote

16  down that he was told that Farallon had purchased their claims

17  in February or March?

18  A    I saw that on what he claimed, yes.

19  Q    And is that consistent with what you were told by Farallon

20  in March?

21  A    They told me they acquired the claims -- they had acquired

22  the claims on March 15th, by email.  I don't know if they

23  acquired them in February or March.  Or even January.  I know

24  they said they had them on March 15.

25  Q    Did you ever speak with Farallon about anything having to

018239

HCMLPHMIT00003291

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S     Document 25-4   Filed 06/06/25   Page 391 of 1017     PageID 19290
Exhibit 72   Page 280 of 390

Seery - Cross                                279

1    do with the purchase of their claims?

2             MR. MCENTIRE:  Objection.  Leading.

3             THE COURT:  Overruled.

4             THE WITNESS:  Not -- not before they sent me that

5    email.

6             MR. MORRIS:  I apologize.  Withdrawn.

7    BY MR. MORRIS:

8    Q    Before -- before learning of their purchase, had you had

9    any discussions with them about potential claim purchases?

10            MR. MCENTIRE:  Objection.

11            THE WITNESS:  No.

12            MR. MCENTIRE:   Leading.

13            THE WITNESS:  I'm sorry.

14            THE COURT:  Overruled.

15            THE WITNESS:  No, I didn't.

16   BY MR. MORRIS:

17   Q    Okay.  Before you learned that Stonehill had purchased

18   claims in the Highland bankruptcy, had you ever had any

19   conversation with them about the potential purchase of claims?

20            MR. MCENTIRE:  Objection.  Leading.

21            THE WITNESS:  No, I don't -- I don't --

22            THE COURT:  Overruled.

23            THE WITNESS:  I'm sorry.  I don't -- I don't believe

24   so, no.

25   BY MR. MORRIS:

018240

HCMLPHMIT00003292

Seery - Cross                                    280

1   Q    Do you have any knowledge at all as to how the sellers

2   went about selling their claims?

3   A    I have some knowledge now, post-effective date, that I

4   believe I have some understanding, but not a great one.

5   Q    Did you ever communicate with any of the sellers about the

6   potential sale of their claims prior to the time their claims

7   were sold?

8          MR. MCENTIRE:  Objection.  Leading.

9          THE COURT:  Overruled.

10         THE WITNESS:  I did have a conversation with Eric

11  Felton who was the Redeemer representative on the Creditors'

12  Committee.  And it came out of one of the emails I got.  I

13  think it indicated that --

14         MR. MCENTIRE:  Objection, hearsay, Your Honor.  I

15  mean, hearsay, Your Honor.

16         THE COURT:  Okay.

17         MR. MCENTIRE:  It's hearsay.

18         THE COURT:  Okay.  He's about to say something that's

19  hearsay is the objection.  Any response?

20         MR. MORRIS:  I'm not offering it for the truth of the

21  matter asserted.  I'm offering it for Mr. Seery's state of

22  mind and the extent of his communications.  How about that?

23         MR. MCENTIRE:  I don't see how you could offer it for

24  anything other than for the truth of the matter asserted.

25  It's coming from a third party, so I object to hearsay.

018241

HCMLPHMIT00003293

Seery - Cross                                    281

1              MR. MORRIS:  Okay.  You know what?  We --

2    BY MR. MORRIS:

3    Q    Other than the one conversation --

4              THE COURT:  Are you withdrawing the question or do I

5    need --

6              MR. MORRIS:  Yeah.  This is just --

7              THE COURT:  Okay.  You're withdrawing the question.

8              MR. MORRIS:  I'll withdraw the question.

9              THE COURT:  Okay.

10   BY MR. MORRIS:

11   Q    Other than the one conversation with Mr. Felton, did you

12   ever have a conversation with any seller prior to the time you

13   learned that Farallon or Stonehill --

14             MR. MCENTIRE:  Objection.  Leading.

15   BY MR. MORRIS:

16   Q    -- purchased the claims?

17             THE COURT:  Overruled.

18             THE WITNESS:  No.

19   BY MR. MORRIS:

20   Q    Did you play any role in facilitating or recommending to

21   Farallon or Muck that it purchase claims?

22             MR. MCENTIRE:  Objection.  Leading.

23             THE COURT:  Overruled.

24             THE WITNESS:  No.  None whatsoever.

25   BY MR. MORRIS:

018242

HCMLPHMIT00003294

Seery - Cross                         282

1   Q    Did you play any role in facilitating or recommending that

2   Stonehill or Jessup purchase claims?

3   A    No.

4            MR. MCENTIRE:  Objection.  Leading.

5            THE COURT:  Overruled.

6            THE WITNESS:  I'm sorry.

7   BY MR. MORRIS:

8   Q    All right.  Let's just finish up with compensation.  Can

9   you go to Exhibit 41, please?  Can you just identify that

10  document for the Court?

11  A    This is the -- it's a memorandum agreement that sits on

12  top of an outline.  It is the December 2 incentive

13  compensation agreed terms for Highland Capital --

14  Q    Okay.

15  A     -- and the Trust.

16  Q    And when was this signed?

17  A    It would have been -- the date is December 6th.

18  Q    And --

19  A    2021.  I'm sorry.

20  Q    Okay.  And when did you and the Committee members begin

21  discussing your compensation package?

22  A    Shortly after the effective date, which was August 11,

23  2021.

24  Q    And were there any negotiations during that intervening

25  three- or four-month period?

018243

HCMLPHMIT00003295

Seery - Cross                                    283

1   A    Considerable negotiations during that period, yes.

2   Q    Can you go to the last page of Exhibit 41?  Can you

3   describe that for the Court?  I know it's hard to read, but --

4   A    I --

5   Q    -- the numbers don't matter so much as the infor... you

6   know, just, can you just describe --

7   A    Yeah.

8   Q     -- what's being conveyed?

9   A    So it's very hard to read, but it says -- because it's

10  small -- Seery Proposal 1, Oversight Counter 1, Seery Proposal

11  2, Oversight Counter 2, and then it continues down.  My

12  recollection is that we had four or five rounds of back-and-

13  forth that were meaningful.  But it -- but it even took a

14  detour in the middle, because it started with my proposal,

15  which was pretty robust, and their response to me that they

16  didn't like the structure or the amount, and so then we

17  started talking about that.  And then they -- after we were

18  kind of hitting numbers and structure at the same time, they

19  came back to me and said, stop, we've got to agree on the

20  structure before we agree on the amounts.

21          MR. MCENTIRE:  Your Honor, I'm going to object as

22  it's hearsay and move to strike.  This is -- he's not talking

23  about the document.  He's talking about something outside of

24  the four corners of the document.  I object to hearsay.

25          MR. MORRIS:  Hearsay?  There's no statement.

018244

HCMLPHMIT00003296

```
1              THE COURT:  There was --

2              MR. MORRIS:  It's a description of what happened.

3              MR. MCENTIRE:  But he's actually referring to

4     statements in his substantive comments.

5              THE COURT:  Overruled.  Okay.

6              MR. MORRIS:  I move for the admission into evidence

7     of Exhibit 41.

8              THE COURT:  Any objection?

9              MR. MCENTIRE:  That's the memorandum agreement, Mr.

10    Morris?  Is that it?

11             MR. MORRIS:  Yes, sir.

12             MR. MCENTIRE:  No objection.

13             THE COURT:  Admitted.

14        (Debtors' Exhibit 41 is received into evidence.)

15    BY MR. MORRIS:

16    Q   Can we go backwards to Exhibit 39, please?  Can you

17    describe for the Court what that is?

18    A   This is a redacted copy of minutes of the board meeting on

19    August 21 -- 26, 2021.

20    Q   And there's a lot of stuff redacted there.  Do you have an

21    understanding as to why there is redactions?

22    A   It would have nothing to do with these issues that we're

23    discussing or the alleged quid pro quo.

24    Q   Okay.  Can you just read out loud the last portion that's

25    unredacted on the second page, beginning with "Mr. Seery
```

HCMLPHMIT00003297

Seery - Cross                                    285

1  reviewed"?

2  A    It actually says, "Mr. Seery also presented the board with

3  an overview of his incentive compensation program proposal,

4  which would include not only Mr. Seery but the current HCMLP

5  team.  The terms and structure of the proposal had been

6  previewed with the board in prior operating models presented

7  by Mr. Seery.  Mr. Seery reviewed the proposal and stated his

8  view that the proposal was market-based and was designed to

9  align incentive between himself and the HCMLP team on the one

10  hand and the Claimant Trust beneficiaries on the other.  The

11  board asked questions regarding the proposal and determined

12  that it would consider the proposal and revert to Mr. Seery

13  with a counterproposal."

14  Q    All right.  When you were -- when you were shown one of

15  these documents before, you were asked to identify Mr. Linn,

16  but you weren't asked about the others.  Do you see Richard

17  Katz there?

18  A    Yes.

19  Q    Who's that?

20  A    He's the independent member.

21  Q    Did he play any role in the negotiation of your

22  compensation package?

23  A    Yes.  He was actively involved.

24  Q    Okay.  And how about Mr. Provost?  Who's he?

25  A    He is the Jessup person.  Jessup is the board member.

018246

HCMLPHMIT00003298

1   He's their representative on the board.

2   Q    Okay.

3           MR. MORRIS:  And I move for admission into evidence

4   of Exhibit 39.

5           MR. MCENTIRE:  No objection, Your Honor.

6           THE COURT:  Admitted.

7       (Debtors' Exhibit 39 is received into evidence.)

8   BY MR. MORRIS:

9   Q    Let's go to Exhibit 40, please.  Can you just describe for

10  the Court what that is?

11  A    This is a subsequent board meeting minutes, August 30,

12  2021.

13  Q    And can you just read into the record -- why are there

14  redactions?

15  A    Again, they would -- if there are redactions, it would

16  have nothing to do with the issues that are being brought up

17  in this motion.

18  Q    And can you just read into the record the paragraph

19  beginning, "Mr. Katz"?

20  A    "Mr. Katz began the meeting by walking the Oversight Board

21  and Mr. Seery through the Oversight Board's counterproposal to

22  the HCMLP incentive compensation proposal, including the

23  review of the spreadsheet and summary of the counterproposal.

24  Discussion was joined by Mr. Linn and Mr. Stern.  Mr. Seery

25  asked numerous questions and received detailed responses from

018247

Seery - Cross                                           287

1   the Oversight Board.  Mr. Seery and the Oversight Board agreed

2   to continue the discussion and negotiations regarding the

3   proposed incentive compensation plan for the Claimant Trustee

4   and the -- and the HCMLP."

5   Q   So they didn't accept your original proposal that you made

6   in the earlier document?

7   A   They did not.

8   Q   Okay.  And did negotiations continue?

9   A   They did, yes.

10         MR. MORRIS:  Before we go on, I move for admission

11   into evidence Exhibit 40.

12         THE COURT:  Any --

13         MR. MCENTIRE:  No objection.

14         THE COURT:  It's admitted.

15      (Debtors' Exhibit 40 is received into evidence.)

16   BY MR. MORRIS:

17   Q   Can you go to Exhibit 59, please?  Can you describe for

18   the Court what this is?

19   A   This is an email string between me and the Oversight Board

20   regarding the compensation proposal.

21   Q   Okay.  And directing your attention to the bottom, I

22   guess, of the second page, there is an email from Mr. Katz

23   dated October 26.  Do you see that?

24   A   At the bottom of the second -- oh, yes, yes.

25   Q   Okay.  Can you just read the sentence at the bottom of the

018248

Seery - Cross                                    288

1   page beginning "We propose"?

2           MR. MCENTIRE:  Well, Your Honor, I would, first of

3   all, object to him just reading from the document until it's

4   been put into evidence.

5           THE COURT:  I'm sorry, say again?

6           MR. MCENTIRE:  I would object to Exhibit --

7           THE COURT:  We can't pick things up on the record

8   when you don't speak in a mic.

9           MR. MCENTIRE:  I object to him simply reading from

10  the document before the document is offered into evidence.

11          MR. MORRIS:  Okay.

12          MR. MCENTIRE:  Accepted into evidence.

13          MR. MORRIS:  Sure.  I'd move it into evidence.

14          MR. MCENTIRE:  I object as hearsay.

15          MR. MORRIS:  This is a present sense recollection --

16  recorded.  It's a clear business record.  It's a negotiation

17  that's happening over time.  Mr. Seery is here to answer any

18  questions about authenticity.

19          MR. MCENTIRE:  Well, first of all, it's an email

20  string involving communications with third parties.  That's

21  hearsay in and of itself.  And it's not been established that

22  this is a business record.  And Mr. Morris's statements to

23  that effect, frankly, don't carry his burden.  There's

24  internal hearsay contained throughout the document, Your

25  Honor, even if it is a business record.

018249

HCMLPHMIT00003301

```
 1          MR. MORRIS:  Your Honor, just to be clear, let me

 2   respond.

 3          THE COURT:  Uh-huh.

 4          MR. MORRIS:  Exceptions to hearsay rule.  803(1)

 5   present sense impression; (2) -- (3) existing mental

 6   impression, state of mind about motive, (5) recorded

 7   recollection, (6) records of regularly-conducted activity, or

 8   Federal Rule of Evidence 807, residual exception for

 9   trustworthy and probative evidence.  I'll take any of them.

10          MR. MCENTIRE:  None of them apply.

11          MR. MORRIS:  Okay.

12          THE COURT:  Okay.  Overruled.

13          MR. MORRIS:  Thank you.

14          THE COURT:  I admit it.  59's admitted.

15      (Debtors' Exhibit 59 is received into evidence.)

16   BY MR. MORRIS:

17   Q   Can you just read that last sentence at the bottom of that

18   page?

19   A   This is from Rich Katz to me.

20   Q   Uh-huh.

21   A   (reading)  We propose doing this in two stages.  First,

22   we'd like to come to agreement on structural, underscored,

23   elements of the ICP.

24      ICP means incentive compensation program or plan.

25      Only after we'd done that, when the board had greater
```

018250

HCMLPHMIT00003302

1   understanding of what plan they were pricing, would we haggle

2   out the specific numbers, underscore, tier attachment points,

3   and percentage participation in each tier.

4   Q    Okay.  And going to the right-hand part of that, do you

5   see where it says, Salary J.S. Only?

6   A    Yes.

7   Q    Can you just, you know, generally describe for the Court

8   what the debate is or the negotiation that's happening on that

9   particular point?

10  A    Well, this was brought up earlier.  The salary was

11  $150,000 a month.  That was the same salary that I'd had

12  during the case that was approved by the Court.  It had been

13  approved by the Committee, approved by the other independent

14  members.  That was continuing.  It was also contained as an

15  actual base salary in the plan and the Claimant Trust

16  Agreement, and they were never amended.

17      The Committee came back to me and said, we'd like that to

18  step down.  And they'd like it to step down on a definitive

19  specific schedule, because they had a view that that would

20  incentivize me to work faster to make distributions before the

21  stepdown and that I wouldn't linger in the role.  And the

22  yellow --

23  Q    Can you just read the yellow out loud?

24  A    That's --

25  Q    Read the whole thing.

018251

HCMLPHMIT00003303

Seery - Cross                                         291

1    A    That's my response.

2    Q    Read the whole thing.

3    A    (reading)  Based on the required expertise, volume, and

4    personal risk of the work today, I do not think that any

5    formulaic reduction in base comp is appropriate.  With the

6    complexity and amount of issues that I have to manage on a

7    daily basis, I currently do not have capacity to take on

8    significant outside work.  Of course, things can change.  If

9    they do, I am open to discussing reduction in the base.  I

10   have no interest in sitting around doing nothing, having no

11   risk, and collecting the full base compensation.  We can

12   include prefatory language and an agreement to revisit our

13   terms, but I do not see an avenue to set parameters to lock in

14   an agreement for the future at this time.

15       And then there's another paragraph on severance.

16   Q    You can stop there.

17            MR. MORRIS:  I have no further questions.

18            THE COURT:  All right.  Pass the witness.

19            MR. MCENTIRE:  Do you have any questions?

20            A VOICE:  No.

21            MR. MCENTIRE:  Okay.  How much time do I have,

22   please?

23            THE CLERK:  So, the limit is at two hours and 32

24   minutes.

25            MR. MCENTIRE:  All right.

018252

HCMLPHMIT00003304

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 35-1472   Filed 03/03/25   Page 404 of 1017   PageID 19303

Seery - Redirect                                          292

 1                    REDIRECT EXAMINATION

 2   BY MR. MCENTIRE:

 3   Q    Just a couple questions very quickly, Mr. Seery.  Highland

 4   Capital Management paid HarbourVest cash as part of the

 5   settlement, correct?

 6   A    That's incorrect.

 7   Q    There was no cash component at all?

 8   A    There was not.

 9   Q    And in connection with the HarbourVest settlement,

10   HarbourVest transferred an interest in HCLOF to Highland

11   Capital or an entity affiliated with Highland Capital; is that

12   not correct?

13   A    That's correct.

14   Q    And that -- that entity -- and HCLOF, and HCLOF had an

15   interest in various CLOs, correct?

16        MR. MORRIS:  Your Honor, I object.  This is beyond

17   the scope of my cross, or redirect, however you prefer.

18        MR. MCENTIRE:  Well, you spent a lot of time on

19   HarbourVest.  I'm just trying to clear it up.

20        MR. MORRIS:  I didn't say the word CLO.  I did not

21   say the word CLO.

22        THE COURT:  Overruled.  He can go there.

23        If you'd please move the mic towards your voice.

24   BY MR. MCENTIRE:

25   Q    And HCLOF had an interest in various CLOs, correct?

018253

HCMLPHMIT00003305

Seery - Redirect                                    293

1  A    I believe it had an interest in five CLOs.  Oh, that's not

2  true.  It had an interest in five of the 1.0 CLOs.  It also

3  owned one hundred -- basically, somewhere between 87 and a

4  hundred percent of Acis 3, 4, 5, 6, and 7, which is about a

5  billion dollars of CLOs to 10 (inaudible) leveraged vehicles,

6  and they owned basically all the equity, so that was the

7  driver of the value.

8  Q    And various entities that were -- I mean, some of these

9  various CLOs had an interest in MGM stock, correct?

10 A    The 1. -- the Highland 1.0s did.  The value drivers I just

11 described -- Acis 3, 4, 5, 6, and 7 -- had no interest in MGM.

12 Q    But one of them did have an interest in MGM?

13 A    That's not correct.

14 Q    What did you just say?

15 A    3, 4, 5, 6, and 7 did not have any interest in MGM.

16 Q    Were there any CLOs that had an interest in MGM?

17 A    Some of the 1.0 CLOs did, --

18 Q    I see.

19 A    -- yes.

20         MR. MCENTIRE:  Pass the witness.

21         MR. MORRIS:  No further questions.

22         THE COURT:  Mr. Seery, I want to ask you one thing.

23         THE WITNESS:  Yes, Your Honor.

24                 EXAMINATION BY THE COURT

25         THE COURT:  We dance around it a lot.  The Highland

018254

HCMLPHMIT00003306

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 34-72   Filed 06/25/25   Page 406 of 1017    PageID 19305

Seery - Examination by the Court                     294

1   ownership of MGM stock.  If think -- if you could confirm I've

2   heard this correct -- you said Highland itself owned 170,000

3   shares that were subject to a Frontier Bank lien?

4            THE WITNESS:  Yes, Your Honor.  I believe that's the

5   right amount.  So, Highland directly owned about 170,000

6   shares.  Those were liened up to Frontier.  They were -- they

7   were never transferred.  Highland never sold any MGM stock.

8            THE COURT:  Okay.  So Frontier still holds it or

9   what?

10           THE WITNESS:  No.  In fact, post-effective -- I

11   believe it was post-effective date, and with cash generated,

12   we -- we paid off the Frontier loan, --

13           THE COURT:  Uh-huh.

14           THE WITNESS:  -- released that lien, and then we held

15   those shares in MGM until the merger was consummated.

16           THE COURT:  Okay.

17           THE WITNESS:  So we tendered our shares into the --

18   into the merger and got the merger consideration, which was

19   cash.

20           THE COURT:  Okay.  And so there was that.  But other

21   than that, you said Highland owned 50 percent of Multistrat,

22   which owned some MGM stock?

23           THE WITNESS:  Multistrat had a -- I don't recall the

24   amount, but a material amount of MGM stock.  That also -- so,

25   Highland owned 57 percent of Multistrat.  Is also the manager

1  of Multistrat.

2           THE COURT:  Uh-huh.

3           THE WITNESS:  Multistrat did not sell any MGM stock.

4  It also tendered them into the merger as well.

5           THE COURT:  Okay.  And then you said Highland owned

6  some percentage of Restoration --

7           THE WITNESS:  Restorations Capital Partners.

8           THE COURT:   -- Capital Partners, which owned some

9  MGM stock?

10          THE WITNESS:  Similarly, Highland is the manager of

11 what we call RCP.  RCP owned a material amount of MGM stock.

12 RCP did not sell any MGM stock.  However, in 2019, you'll

13 recall that Mr. Dondero sold $125 million of stock

14 postpetition out of RCP.  It was MGM stock.  He sold it back

15 to MGM.  We had a -- we had a hearing on it, because

16 subsequently the Independent Board learned about it, the

17 Committee learned about it, they had not -- it had not been

18 disclosed, but there was a -- what we thought was a binding

19 agreement with MGM, and MGM indicated that they were going to

20 hold us to it, and so we had a hearing about approving that

21 transaction.  The Committee was not happy.

22          THE COURT:  Okay.  I'm fuzzy on when that was.  You

23 said?

24          THE WITNESS:  That would have been in early 2020,

25 probably April-ish timeframe.

HCMLPHMIT00003308

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 31-24   Filed 08/06/25   Page 408 of 1017   PageID 19307

Seery - Examination by the Court                          296

 1              THE COURT:  Okay.

 2              MR. MORRIS:  Your Honor?

 3              THE WITNESS:  The transaction was in November, I

 4    believe.

 5              MR. MORRIS:  If it's helpful, Your Honor, you can

 6    find it at Docket 487.

 7              THE COURT:  Okay.

 8              MR. MORRIS:  I think that's the objection from the

 9    Committee where the issue was -- comes up at least at one

10    time.

11              THE COURT:  Okay.  And then I think this is the last

12    category I heard, that HCM and its specially-created sub owned

13    just over 50 percent of HCLOF, and it in turn owns interest in

14    a lot of CLOs, and a few of those, what you call the 1.0 CLOs,

15    did own some MGM stock?

16              THE WITNESS:  That's correct.  So if you look on the

17    audited financials that we had introduced into evidence,

18    you'll see actually every asset that HCLOF owns.  There's no

19    MGM in there.  It does own interest.  There were minority

20    interests in five or six of the 1.0 CLOs.  Grayson,

21    Greenbrier, Gleneagles, Brentwood, Liberty, and one other.

22    And it had interest in those, but it never owned any MGM stock

23    and it never traded any MGM stock.  It didn't own any.

24              THE COURT:  All right.  Did I cover the universe of

25    what MGM stock was owned by Highland or something Highland had

HCMLPHMIT00003309

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 1-34   Filed 08/08/25   Page 409 of 1017   PageID 19308
Exhibit 72   Page 298 of 390

Seery - Examination by the Court          297

1   an interest in?

2          THE WITNESS:  Yeah.  So, the ones that HCLOF had an

3   interest in that I just listed, those -- Jasper was the other

4   one.  I apologize.  The -- they owned -- they owned MGM stock

5   among their other -- they had a lot of other assets.   The

6   other CLOs, the 1.0 CLOs that Highland had, every one of them

7   owned MGM stock.  None of them sold or bought any stock.

8   Those all tendered into the merger as well.  Highland did not

9   own any interest in any of those entities.

10          THE COURT:  Uh-huh.

11          THE WITNESS:  It just managed them.

12          THE COURT:  Okay.  And this is my last question.

13   Someone brought up or it came up today that exactly two years

14   ago today -- I didn't remember we were on an anniversary of

15   that -- but was when we had a hearing, and I think it was a

16   contempt hearing, but I had, I guess, read in the media, like

17   many other human beings, an article about the MGM-Amazon

18   transaction, and I had said I had hope in my heart and brain

19   that this could be an impetus or a triggering event for maybe

20   a settlement.  And that was kind of quickly pooh-poohed, if

21   you will.

22      Remind me why I was quickly persuaded, oh well, I guess

23   that's not going to happen.  I just can't remember what I

24   heard that day.

25          THE WITNESS:  Well, it was widely known that

HCMLPHMIT00003310

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 34-72   Filed 09/09/25   Page 410 of 1017    PageID 19309
Exhibit 72    Page 299 of 390

Seery - Examination by the Court          298

1    Highland, meaning not the 171,000 --

2              THE COURT:  Uh-huh.

3              THE WITNESS:  -- but the entities that Highland or

4    related entities, including DAF, the other Dondero entities,

5    controlled a lot of Highland stock, as even Mr. Dondero said

6    between Anchorage --

7              THE COURT:  You mean MGM?

8              THE WITNESS:  MGM, I'm sorry.  Between -- there were

9    only five major holders.  There was the two we just mentioned

10   and Davidson Kempner and Monarch and Owl Creek, and just a few

11   other big holders.

12        And so Your Honor would have learned it from the case, but

13   you also would have learned it from the paper, that any time a

14   holder is mentioned, it's first Anchorage, because they owned

15   the biggest piece, and Kevin Ulrich, who was the chairman of

16   Anchorage, was also the chairman of MGM.  And then Highland

17   was always mentioned.

18        The reason that it didn't have some great amount of

19   capital that went on to Highland, although there was money

20   from RCP and there was money from MGM, is Highland doesn't own

21   the stock that's -- or interests in the 1.0 CLOs that owned

22   all of it.  We just manage it.

23             THE COURT:  Uh-huh.

24             THE WITNESS:  And that goes to various other

25   entities, including, in large part, to Dondero entities.  So

018259

HCMLPHMIT00003311

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24-72   Filed 08/06/25   Page 411 of 1017   PageID 19310
Exhibit 72   Page 300 of 390

Seery - Examination by the Court                299

1    there wasn't a big windfall to Highland from that.

2        The possibility of some upside from HCLOF, because it

3    owned small interests in those five, there was some value in

4    that, but a lot of it got tied up in the litigation that other

5    entities, Dondero entities, are bringing against U.S. Bank and

6    Acis, which has tied up everything in that -- those

7    distributions.

8            THE COURT:  Okay.  All right.  Thank you.  You are

9    excused from the stand.

10           THE WITNESS:  Thank you, Your Honor.

11           MR. STANCIL:  I owe you a docket number, Your Honor.

12   You said don't let us leave before we give you a docket number

13   for that second contempt order.  We promised to come back.  It

14   was #2660.

15           THE COURT:  Okay.  Got it.

16           MR. STANCIL:  Which -- did we move that into

17   evidence?

18           MR. MORRIS:  No.  We asked the Court to take judicial

19   notice.

20           THE COURT:  I will take judicial notice of 2660, --

21           MR. STANCIL:  Thank you, Your Honor.

22           THE COURT:   -- I already said.  Thank you.

23           THE WITNESS:  Thank you, Your Honor.

24           THE COURT:  You're excused.

25       (The witness steps down.)

018260

HCMLPHMIT00003312

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 3472   Filed 06/30/25   Page 412 of 1017   PageID 19311

300

1          THE COURT:  All right.  Are you going to have any

2     other evidence, Mr. McEntire?

3          MR. MCENTIRE:  Your Honor, as I respond to your

4     question, I think we have 30 -- approximately 30 minutes left.

5          THE CLERK:  Twenty-six, yes.

6          MR. MCENTIRE:  Twenty-six.  We do have another

7     witness.  We also have a closing final argument.  And we also

8     have an opportunity -- we want to reserve an opportunity for

9     our experts that is still under advisement.

10         So my first action would be to ask for an extension of

11    time, or we would like to add to our time limit.  Instead of

12    just three hours, we'd like to increase the time so we can

13    accomplish all these things.

14         I mean, if the Court is unwilling to give us additional

15    time, then I will be forced not to call another witness.  I

16    will move to a very short final argument.  I need to preserve

17    some time for my experts, should you allow them to testify.

18         THE COURT:  Well, --

19         MR. MORRIS:  May I respond?

20         THE COURT:   -- you don't have to preserve time.  I'm

21    either going to allow you to put on your experts, and we said

22    30 minutes/30 minutes, --

23         MR. MORRIS:  That was what I was going to say, Your

24    Honor.

25         THE COURT:  Okay.

018261

HCMLPHMIT00003313

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 26-34 Filed 08/02/25   Page 413 of 1017   PageID 19312
Exhibit 72 Page 302 of 390

301

```
 1              MR. MORRIS:  There's no prejudice here.  Nobody's

 2    being harmed.  There's no appellate issue.  I thought we were

 3    really clear.  Everybody gets their three hours today.  We

 4    will file our reply brief on Monday.  The Court will determine

 5    both whether it needs to hear expert testimony and whether or

 6    not our motion should be sustained.  If the Court denies the

 7    motion, we'll take a couple of depositions and each side will

 8    get whatever period of time the Court orders.

 9         But, you know, the attempts to create an appellate record

10    are just -- you know, that's not -- there's no issue here.  He

11    can -- he's got 26 minutes.  He can put on his witness, he can

12    make his closing in the 26 minutes that they've always had.

13              THE COURT:  All right.  Well, we have --

14              MR. MCENTIRE:  May I caucus?  May I caucus very

15    quickly, Your Honor?

16              THE COURT:  Okay.  Uh-huh.  And while you're

17    caucusing, we have our game plan on the experts.  We know how

18    that's going to happen.  And I'm not extending the three

19    hours.

20              MR. MORRIS:  (sotto voce)  We have 62 minutes?

21         (Pause.)

22              MR. MCENTIRE:  Your Honor, accordingly, I'll just --

23    we'll move into a final argument at this time.

24              THE COURT:  Okay.  So you rest?

25              MR. MCENTIRE:  I rest.
```

018262

HCMLPHMIT00003314

Patrick - Direct                              302

1              THE COURT:  All right.

2              MR. MORRIS:  We call Mark Patrick.

3              THE COURT:  All right.  Mr. Patrick, you've been

4    called to the witness stand.

5              MR. MORRIS:  I just need to find my examination

6    notes.  Just give me one moment, please.

7              THE COURT:  All right.  Please raise your right hand.

8    Could you remain standing, please.

9         (The witness is sworn.)

10             THE COURT:  All right.  You may be seated.

11             MARK PATRICK, DEBTORS' WITNESS, SWORN

12                      DIRECT EXAMINATION

13   BY MR. MORRIS:

14   Q    Hi, Mr. Patrick.

15   A    Hello.

16   Q    Did you ever meet with anybody at the Texas State

17   Securities Board?

18   A    No.

19   Q    Do you know if -- do you know anybody who ever met with

20   anybody at the Texas State Securities Board concerning

21   Highland?

22   A    Yes.

23   Q    And who met with the Texas State Securities Board

24   concerning Highland?

25   A    Ronnie (phonetic) Patel.

HCMLPHMIT00003315

Patrick - Direct                                    303

1   Q    And is that a lawyer?

2   A    Yes.

3   Q    Do you know who retained Mr. -- that lawyer?

4   A    Yes.

5   Q    Who retained that lawyer?

6   A    The DAF, the Charitable DAF Fund.  Or one of its entities.

7   Q    Okay.  And is it your understanding that the DAF Fund or

8   one of its charitable entities filed a complaint with the

9   Texas State Securities Board?

10  A    Yes.

11  Q    Okay.  Thank you very much.  Does Hunter Mountain owe any

12  money to Mr. Dondero?

13  A    No.

14  Q    Is there a promissory note that's outstanding that Mr.

15  Dondero has pursuant to which Hunter Mountain owes him $60-

16  plus million?

17  A    No.

18  Q    Who created Hunter Mountain?

19  A    Well, I don't recall specifically.  I just recall the

20  facts that, when Hunter Mountain was created, Thomas Surgent,

21  the chief compliance officer of Highland Capital Management,

22  who was representing the Dugaboy Investment Trust as well as

23  Highland Capital legally with respect to that transaction,

24  requested to Rand that the Hunter Mountain Investment Trust be

25  created for purposes of Highland filing its ADV with the SEC.

018264

Patrick - Direct                                        304

 1  It was my understanding that when the ADV would be filed, sort

 2  of the ownership change would -- chain would stop at Hunter

 3  Mountain.

 4  Q   Okay.  Dugaboy is Mr. Dondero's family trust, correct?

 5  A   No.  But I'll help you along.  Just please use the full

 6  name of the trust.

 7  Q   If I refer to the Trust, will you know that that's -- is

 8  that for the Hunter Mountain Investment Trust, or do you want

 9  me to use trust --

10  A   There's no entity called Dugaboy.  Just Dugaboy.  There's

11  not.

12  Q   Okay.

13  A   It's a shorthand.  I'm --

14  Q   Okay.  I'll refer to Dugaboy then, okay?

15  A   What are we referring to?

16  Q   The trust known as Dugaboy.

17  A   Okay.  Fair enough.  Go ahead.

18  Q   Okay.  Did Dugaboy contribute a portion of its ownership

19  interest in Highland to the Highland -- to the Hunter Mountain

20  Investment Trust?

21  A   Contribute?  No.

22  Q   Did it transfer?

23  A   Yes.

24  Q   And did it receive in exchange a promissory note from

25  Hunter Mountain?

018265

HCMLPHMIT00003317

Patrick - Direct                    305

1  A    Yes, it did.

2  Q    Okay.  And Mr. Dondero is the lifetime beneficiary of

3  Dugaboy, correct?

4  A    Yes and no.  It's a placeholder -- a placeholder provision

5  that's never been used.

6        MR. MCCLEARY:  Your Honor, pardon me.  Pardon me.

7  Objection, relevance, Your Honor.

8        THE COURT:  Relevance?

9        MR. MORRIS:  This is -- we've been told so many times

10 that Mr. Dondero has no interest in this case, he has nothing

11 to do with Hunter Mountain.  He's the lifetime beneficiary of

12 Dugaboy.  And if I --

13       THE WITNESS:  That provision has never been invoked.

14 He's received no money through that provision.

15       THE COURT:  Okay.  Just wait.  We're resolving --

16       MR. MORRIS:  Right.

17       THE COURT:   -- an objection at the moment.

18 BY MR. MORRIS:

19 Q    Can we turn to Exhibit 51?

20       THE COURT:  I'm still working on the objection.

21       MR. MORRIS:  I'm going to try and lay a foundation.

22 Okay?

23       THE COURT:  Okay.  So he's withdrawing the question.

24       MR. MCCLEARY:  He's withdrawing the question?  Okay.

25       THE COURT:  Okay.

018266

HCMLPHMIT00003318

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 25-72   Filed 03/07/25   Page 418 of 1017    PageID 19317

Patrick - Direct                          306

```
 1    BY MR. MORRIS:

 2    Q   You have a binder in front of you, sir.  Can you go to

 3    Exhibit 51?

 4              THE COURT:  And this is Highland's Exhibit 51?

 5              MR. MORRIS:  Yeah.

 6              THE COURT:  Okay.

 7    BY MR. MORRIS:

 8    Q   And is that a promissory note that was made --

 9    A   Yes, it is.

10    Q    -- that was made by Hunter Mountain in favor of Dugaboy

11    back in 2015?

12              MR. MCCLEARY:  Objection, relevance, Your Honor.

13              MR. MORRIS:  I'm trying to connect Mr. Dondero to

14    Hunter Mountain.

15              THE COURT:  Okay.  Overruled.

16              THE WITNESS:  Yeah.  It's a secured promissory note

17    with the amount of approximately $62.6 million signed by

18    Beacon Mountain, LLC, --

19              MR. MORRIS:  Uh-huh.

20              THE WITNESS:  -- as administrator for Hunter Mountain

21    Investment Trust.

22    BY MR. MORRIS:

23    Q   Okay.  And as the -- what's your role with Hunter Mountain

24    today?

25    A   And it's in favor, just to answer your question, it's in
```

018267

HCMLPHMIT00003319

Patrick - Direct                                        307

 1  favor of the Dugaboy Investment Trust.  That's where I was

 2  just being a little stickler --

 3  Q   I appreciate that.

 4  A    -- previously.  Sorry.

 5  Q   I do.

 6  A   Okay.  What is your question?

 7  Q   What's your role with Hunter Mountain today?

 8  A   I am the administrator.

 9  Q   When did you become the administrator?

10  A   On or about August of 2022.

11  Q   Okay.  How did you become the administrator?

12  A   Through the acquisition of Rand Advisors.

13  Q   And does Hunter Mountain have any employees?

14  A   No.

15  Q   Does it have any operations?

16  A   No.

17  Q   Does it generate any revenue?

18  A   Not -- not currently.

19  Q   Okay.  Did it generate any revenue in 2022?

20  A   No.

21  Q   Does it own any assets?

22  A   Yes.

23  Q   What does it own?

24  A   It has -- it's my understanding it has a contingent

25  beneficiary interest in the Claimants Trust.

018268

HCMLPHMIT00003320

Patrick - Direct                                308

1   Q    And that's the only asset it has, right?

2   A    Correct.

3   Q    So that if it -- if that interest has no value, then

4   Hunter Mountain has no ability to pay the Dugaboy note.  Fair?

5   A    (sotto voce) If that interest has no value?

6        That is correct.

7   Q    Okay.

8            MR. MORRIS:  I move Exhibit 51 into evidence.

9            MR. MCCLEARY:  Your Honor, relevance.  Objection.

10           THE COURT:  Your response?

11           MR. MORRIS:  Mr. Dondero desperately needs Hunter

12  Mountain to win in this lawsuit because otherwise his family

13  trust will get nothing on this $63 million note.

14           THE COURT:  Okay.  Overrule the objection.  It's

15  admitted.

16       (Debtors' Exhibit 51 is received into evidence.)

17  BY MR. MORRIS:

18  Q    Neither you or any representative of Hunter Mountain has

19  ever spoken with any representative of Farallon, correct?

20  A    Correct.

21  Q    Neither you nor any representative of Hunter Mountain has

22  ever spoken with anybody at Stonehill, correct?

23  A    Correct.

24  Q    You have -- neither you nor Hunter Mountain have any

25  personal knowledge about a *quid pro quo*, correct?

018269

HCMLPHMIT00003321

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 25-172   Filed 07/10/25   Page 421 of 1017   PageID 19320

Patrick - Direct                                    309

1    A    (sotto voce)  Nor Hunter Mountain have any personal

2    knowledge about a *quid pro quo*.

3         Correct.

4    Q    Neither you nor anybody at Hunter Mountain have any

5    personal knowledge about how Mr. Seery's compensation package

6    was determined, correct?

7    A    Correct.

8    Q    Neither you nor anybody at Hunter Mountain had any

9    knowledge about the terms of Mr. Seery's compensation package

10   until the Highland parties voluntarily disclosed that in

11   opposition to the Hunter Mountain motion, correct?

12   A    No.  I --

13            MR. STANCIL:  Objection, relevance, Your Honor.

14            THE COURT:  Overruled.

15            THE WITNESS:  No.  I seem to -- I seem to have an

16   awareness that the performance fee was amended at a certain

17   time post-confirmation, or, you know, around the confirmation

18   time period.  And so that's with respect to the compensation.

19   I -- just myself.

20   BY MR. MORRIS:

21   Q    Can you tell Judge Jernigan everything you know or

22   everything you knew before receiving Highland's opposition to

23   this motion about Mr. Seery's compensation as the CEO of the

24   Reorganized Debtor at the Claimant Trustee?

25            MR. MCCLEARY:  Objection, Your Honor.  That's

018270

HCMLPHMIT00003322

Patrick - Direct                                       310

 1   overboard and an unclear question.

 2            THE COURT:  Overruled.  He's gone through some

 3   specific things now.  I guess he's just trying to encompass

 4   anything we haven't covered.

 5            THE WITNESS:  Yeah.  I had a -- I personally had a

 6   general understanding that Mr. Seery's compensation changed

 7   after the claims trading to put in a performance-based-type

 8   measure.  But I do recall that it was always very -- it was

 9   unclear exactly the terms.

10   BY MR. MORRIS:

11   Q   Okay.  Did you learn anything else?

12   A   Such as?

13   Q   Just, did you ever learn anything else about Mr. Seery's

14   compensation package that you haven't testified to yet?

15            MR. STANCIL:  Your Honor, objection.  Vague.

16            THE COURT:  Overruled.

17            THE WITNESS:  No.

18   BY MR. MORRIS:

19   Q   Okay.  Neither you nor Hunter Mountain has any personal

20   knowledge whatsoever about any due diligence that Stonehill

21   did in connection with the purchase of claims, correct?

22            MR. MCCLEARY:  Your Honor, he's getting into

23   allegations in the complaint which involve attorney work

24   product, so we object on the basis of invading the attorney

25   work product.

018271

HCMLPHMIT00003323

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  Can you restate the question again?

 3   BY MR. MORRIS:

 4   Q   Yes, sir.  Neither you nor Hunter Mountain have any

 5   personal knowledge as to what due diligence Stonehill did

 6   before purchasing its claims in this case, correct?

 7              MR. MCCLEARY:  Objection.  Attorney work product.

 8   Invasion of that.  Could I --

 9              THE COURT:  I just ruled.

10              MR. MCCLEARY:  I understand.

11              THE COURT:  I just --

12              MR. MCCLEARY:  Could I have a running objection to

13   this line of questioning on that basis, Your Honor, invasion

14   of attorney work product?

15              THE COURT:  Why don't you explain why it's attorney

16   work product.  I'm missing --

17              MR. MCCLEARY:  Because they might -- he would have

18   knowledge from the efforts and investigation through attorneys

19   in the case.  I assume he's not asking -- you can't separate

20   that, potentially.  So he's getting into attorney work

21   product.

22              MR. MORRIS:  I'm asking for facts.

23              THE COURT:  He's asking for facts.  I overrule.

24   BY MR. MORRIS:

25   Q   Can you answer the question, sir?
```

018272

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 15-24 Filed 06/13/25   Page 424 of 1017    PageID 19323
Exhibit 72   Page 313 of 390

Patrick - Direct                    312

1   A    Yeah.  I'm not aware -- I'm not personally aware of how

2   much work Farallon did, or Stonehill.

3   Q    You have no knowledge whatsoever about the diligence

4   Stonehill did before purchasing its claims, correct?

5   A    Well, I would generalize now is that they did nothing.

6   Q    And that's on the basis of Mr. Dondero's testimony,

7   correct?

8   A    I would just call it on a basis of our general inquiry,

9   which would be including, in part, Mr. Dondero's testimony.

10  Q    What else are you relying upon for your conclusion that

11  you just described other than Mr. Dondero's?  What other

12  facts?

13  A    Yeah, we -- yeah, we have not uncovered any facts that

14  indicated that they did conduct any due diligence of any sort.

15  Q    Okay.  And are you -- do you have any personal knowledge

16  as to what Farallon did in connection with its due diligence

17  prior to buying its claim?

18  A    Yeah.  We have not been able to find any facts that would

19  suggest that Farallon conducted any due diligence of any kind.

20  Q    Okay.

21          MR. MORRIS:  One second, Your Honor.

22      (Pause.)

23  BY MR. MORRIS:

24  Q    Who's paying Hunter Mountain's legal fees?

25  A    Hunter Mountain is paying -- is legally obligated and

018273

HCMLPHMIT00003325

Patrick - Direct                          313

1    paying its own legal fees.

2    Q    If it generates no income and its only assets is the

3    interest in Highland, where is it getting the funds to pay

4    legal fees?

5         MR. MCCLEARY:  Objection, Your Honor.  This is

6    irrelevant and invades the attorney-client privilege.

7         MR. STANCIL:  Your Honor, I'm happy to read a Fifth

8    Circuit case that says the identity of a third-party payer of

9    attorneys' fees is not privileged.  I would refer them to *In*

10   *re Grand Jury Subpoena*, 913 F.2d 1118, a 1990 Fifth Circuit

11   case.  I can read from Judge Jones' opinion, but you tell me

12   how much you want to hear on this.

13        THE COURT:  Okay.  I overrule your objection.  He can

14   answer.

15        THE WITNESS:  There is a settlement agreement by

16   Hunter Mountain Investment Trust as well as the Dugaboy

17   Investment Trust that provides for the payment of attorney

18   fees.

19        MR. MORRIS:  No further questions, Your Honor.

20        THE COURT:  Okay.  Cross?

21        MR. MCCLEARY:  Yes, Your Honor, briefly.

22                    CROSS-EXAMINATION

23   BY MR. MCCLEARY:

24   Q    Mr. Patrick, how would you describe Mr. Dondero's

25   relationship with Hunter Mountain Investment Trust today?

018274

HCMLPHMIT00003326

Patrick - Cross                        314

```
 1   A    None.
 2   Q    You were asked some -- let me ask you about litigation,
 3   and litigation involving the sub-trust.  Has Hunter Mountain
 4   been involved in litigation with Mr. Kirschner?
 5   A    Yes.
 6   Q    Okay.  And what is your understanding of Mr. Kirschner's
 7   role?
 8         MR. MORRIS:  Your Honor, while I would love for them
 9   to continue --
10         MR. MCCLEARY:  He's the --
11         MR. MORRIS:   -- to use their time, I object that
12   it's beyond the scope of my examination.  They passed on the
13   witness.  They rested their case.  He should be limited to the
14   scope of my inquiry.
15         THE COURT:  Okay.  How does this tie to direct?
16         MR. MCCLEARY:  Your Honor, it -- just very generally.
17   This is --
18         THE COURT:  Okay.  I need to know how it ties to the
19   direct.
20         MR. MCCLEARY:  This doesn't tie directly to the
21   direct, Your Honor.
22         THE COURT:  Then it's beyond the scope, you
23   acknowledge?
24         MR. MCCLEARY:  Yes, Your Honor.
25         THE COURT:  Okay.  Sustained, then.
```

018275

HCMLPHMIT00003327

Patrick - Cross                    315

```
 1              MR. MCCLEARY:  Okay.
 2    BY MR. MCCLEARY:
 3    Q    Mr. Patrick, has Hunter Mountain Investment filed any
 4    litigation as a plaintiff other than its efforts to be a
 5    plaintiff in this lawsuit and its action as a petitioner in
 6    the Rule 201 matter earlier this year in Dallas state court?
 7    A    The 202.
 8    Q    202, yes.
 9    A    No, it has not.
10    Q    All right.  And then it's -- has it been a party, then, to
11    any other litigation other than the efforts to file this
12    action, the Rule 202 action, and has it been a defendant in
13    any lawsuits?
14    A    To my understanding, no.
15    Q    Is it involved as a defendant in the Kirschner litigation?
16    A    Yes.
17    Q    Mr. Kirschner is suing Hunter Mountain; is that correct?
18    A    That is correct.
19    Q    Okay.  So, is Hunter Mountain a vexatious litigant?
20              MR. MORRIS:  Objection, Your Honor.  This is now
21    really beyond the scope.  We're not doing -- this is -- we're
22    not doing it.  I'm not letting -- because there's a vexatious
23    litigant motion pending now in the district court right now
24    before Judge Starr.  This has nothing to do with anything I
25    asked.
```

018276

HCMLPHMIT00003328

Patrick - Cross                          316

1              THE COURT:  Okay.

2              MR. MCCLEARY:  They're trying to draw --

3              THE COURT:  You've already asked him is it a party in

4    any other litigation besides the 202 and this attempted one,

5    so where are we going with this?

6              MR. MCCLEARY:  Well, they're just trying to draw Mr.

7    Dondero into this and -- this vexatious litigant argument, and

8    we're just developing the fact that obviously Hunter Mountain

9    has only filed -- attempting to file this action and a Rule

10   202 proceeding.  So they're not involved in a lot of

11   litigation and they're not a vexatious litigant.

12             THE COURT:  Okay.  I think I'll sustain that and we

13   can just move on.

14             MR. MCCLEARY:  Okay.  Then I'll pass the witness.

15   Thank you, Your Honor.

16             THE COURT:  Okay.  Any redirect?

17             MR. MORRIS:  No, thank you, Your Honor.

18             THE COURT:  All right.  You are excused, Mr. Patrick.

19        (The witness steps down.)

20             THE COURT:  Anything else?

21             MR. MORRIS:  Just a time check for both sides and

22   let's get to closings.

23             THE COURT:  Okay.  Caroline?

24             THE CLERK:  Movant has 23 minutes left and the

25   Respondents have 47.

018277

HCMLPHMIT00003329

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 34-72   Filed 08/18/25   Page 429 of 1017   PageID 19328

317

```
 1              THE COURT:  23 and 47.  Any other evidence from the
 2   Respondents?
 3              MR. MORRIS:  That is a fair question.
 4        (Discussion.)
 5              MR. MCCLEARY:  Your Honor, I just want to confirm
 6   that all the exhibits that they did not object to have been
 7   admitted into evidence.
 8              THE COURT:  All right.  Well, let me --
 9              MR. MCCLEARY:  We do offer them.
10              MR. MORRIS:  Oh.
11              THE COURT:  Hang on.
12              MR. MORRIS:  Did I get Exhibit 45, Your Honor?
13              THE COURT:  Just a moment.  I'm doing two things at
14   once here.  45 is in.
15              MR. MORRIS:  Okay.
16              THE COURT:  All right.  On HMIT's exhibits, okay,
17   first, as we all know, 29 through 52 are carried until -- if
18   we have another hearing with the experts.
19        (HMIT's Exhibits 29 through 52 carried.)
20              THE COURT:  I'm showing we have -- and speak up if
21   anyone questions this -- I show that we have Hunter Mountain
22   Exhibits 3 and 4, and then 7 through 10, 12 through 23, and 26
23   through 38, and 53 through 57, 64, 65, and then 67 through
24   seventy --
25        (HMIT's Exhibits 3, 4, 7-10, 12-23, 26-38, 53-57, 64, 65,
```

018278

HCMLPHMIT00003330

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24-72   Filed 09/19/25   Page 430 of 1017   PageID 19329

318

1  67-70 are received into evidence.)

2          MR. MCCLEARY:  Your Honor, I apologize.  From 36 --

3  26 to 32 are in?

4          THE COURT:  I believe that was part of the

5  stipulation, Mr. Morris, right?

6          MR. MCCLEARY:  Yes.

7          MR. MORRIS:  I think that's right.

8          THE COURT:  Okay.

9          MR. MORRIS:  We really didn't object to very many.

10          THE COURT:  Yes.

11          MR. MCCLEARY:  That would be 25, too.  That would

12  include 25?

13          MR. STANCIL:  No.  Objection.  25 is not --

14          THE COURT:  It's not admitted.

15          MR. STANCIL:  It's not in evidence.

16          THE COURT:  25 and 24 were not admitted.

17          MR. MORRIS:  Correct.  Those are my emails.

18          THE COURT:  Okay.  So --

19          MR. MCCLEARY:  25 is an article.

20          THE COURT:  Your 25 was John Morris Email Re: Text

21  Messages dated March 10, 2023.

22          MR. MCCLEARY:  Okay.

23          THE COURT:  Okay.  I can't remember where I left off.

24  I think I left off -- I'll just repeat after the expert

25  exhibits that are carried.  I've admitted 53 through 57.  I

HCMLPHMIT00003331

Case 19-34054-sgj11 Doc 4255-72 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02072-S Document 51-24 Filed 08/20/25 Page 431 of 1017 PageID 19330

319

1  have admitted 64, 65, 67 through 71.

2      (HMIT's Exhibit 71 is received into evidence.)

3      Now, I'm not sure if I ended up admitting 72.  That was

4  the articles.  I can't remember if you stipulated on that

5  finally.

6          MR. MORRIS:  I said they --

7          MR. MCCLEARY:  They had no objection.

8          MR. MORRIS:  -- they come in --

9          THE COURT:  Not for the truth of the matter asserted.

10         MR. MORRIS:  -- self -- exactly.

11         THE COURT:  Okay.

12         MR. MORRIS:  Self-authenticating.

13         THE COURT:  So 72 is in.

14         MR. MCCLEARY:  Okay.

15     (HMIT's Exhibit 72 is received into evidence.)

16         THE COURT:  Then we had some pleadings.  I think 73,

17  74, 75 are in, but again, not for the truth of the matter

18  asserted in any advocacy on 73 and 74.  And then 77, 78, 79

19  are in.  And that's it.

20     (HMIT's Exhibits 73, 74, 75, 77, 78, and 79 are received

21  into evidence.)

22         MS. DEITSCH-PEREZ:  Your Honor, I didn't make an

23  appearance, but I was taking notes (inaudible).

24         MR. MCCLEARY:  Your Honor, I believe 80 should be in.

25         MR. MORRIS:  No objection to 80.  It's on our -- it's

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 51-24   Filed 03/26/25   Page 432 of 1017   PageID 19331
Exhibit 72   Page 321 of 390

320

1   part of our Exhibit 5.

2          THE COURT:  Okay.  80 is in.  Admitted.

3      (HMIT's exhibit 80 is received into evidence.)

4          MR. MORRIS:  Yeah.  That's really Section A of that

5   thing that I gave you this morning.

6          THE COURT:  If Ms. Deitsch-Perez wants to consult

7   with the Hunter Mountain lawyers, she can.  I don't know --

8          MR. MORRIS:  Can I go through quickly mine, Your

9   Honor?  Because we actually never had the opportunity to put

10  our exhibits in.

11         THE COURT:  Okay.  Let's make sure we're to --

12         MR. MORRIS:  Okay.  I'm sorry.  I'm sorry.

13         THE COURT:  -- closure on the Hunter Mountain

14  exhibits.

15         MR. MORRIS:  I'm sorry.

16         THE COURT:  Anything I said that you disagree with?

17  I don't think --

18     (Pause.)

19         THE COURT:  Okay.  Let's hurry up.  What is the

20  controversy?

21         A VOICE:  Roger?  The Court's addressing you.

22         MR. MCCLEARY:  Oh.  Excuse me, Your Honor.  So, just

23  a little unclear of whether you have Exhibits 21 through 25

24  admitted.

25         THE COURT:  I have 21, 22, and 23.  Not 24.  Not 25.

018281

HCMLPHMIT00003333

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 34-72   Filed 03/22/25   Page 433 of 1017    PageID 19332

321

1    Okay.  Anything else?

2              MR. MCCLEARY:  Okay.  Then we do offer 24 and 25.

3              THE COURT:  You offered them.  I did not admit them.

4              MR. MCCLEARY:  Okay.  76.  I believe -- was that --

5    you're carrying?

6              MS. DEITSCH-PEREZ:  Carried.

7              MR. MCCLEARY:  You're carrying that?

8              THE COURT:  Okay.  I carried that and --

9              MR. MCCLEARY:  It's part of the expert issue.

10             THE COURT:  Okay.  Yes, part of the expert.  So it's

11   carried.

12        (HMIT's Exhibit 76 is carried.)

13        (Pause.)

14             MR. MCCLEARY:  I understand you've admitted 53

15   through 83, although some of them have now not been approved.

16             THE COURT:  All right.  Well, we need to clarify.  58

17   through 63, you think you offered them and I admitted them,

18   but not for the truth?  I remember that being discussed for 58

19   through 63.  Are you actually offering them?

20             MR. MCCLEARY:  Yes.  58 through 63.

21             THE COURT:  All right.  And Mr. Morris, you

22   ultimately agreed that yes, but not for the truth of the

23   matter asserted?

24             MR. MORRIS:  That's right, Your Honor.

25             THE COURT:  Okay.  So they are admitted.  Okay.

018282

HCMLPHMIT00003334

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 24-72   Filed 08/28/25   Page 434 of 1017   PageID 19333
Exhibit 72   Page 323 of 390

322

1      (HMIT's Exhibits 58 through 63 are received into

2   evidence.)

3          THE COURT:  And then there was an objection to the

4   Mark Patrick declaration for the same thing, not for the truth

5   of the matter asserted.

6          MR. MORRIS:  Exactly.

7          THE COURT:  But you agree as long as it's --

8          MR. MORRIS:  Correct.

9          THE COURT:  Okay.  So what that means is, to recap,

10  53 through 75 are admitted, although some of those are only --

11  they're not for the truth of the matter asserted.  And then 77

12  through 80 are admitted.  Okay?

13         MR. MCCLEARY:  And 76?  We offered 76.

14         THE COURT:  That's -- we carried it.  We carried it.

15  It relates to the expert.

16         MR. MCCLEARY:  Carried it.

17                         (Pause.)

18         MR. MCCLEARY:  Thank you, Your Honor.

19         THE COURT:  Okay.  Now let's straighten out

20  Highland's exhibits.  So, I'm showing 1 through 16 have been

21  admitted, and then 25 through 31-A?

22         MR. MORRIS:  25 through 31-A?

23         THE COURT:  I'm sorry.  Yes.  25 through 31-A.

24         MR. MORRIS:  Okay.

25         THE COURT:  And then 34.  And then 39, 40, 41, and

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 34-72   Filed 06/24/25   Page 435 of 1017   PageID 19334
Exhibit 72   Page 324 of 390

323

 1  then 45.  51, 59, and 60.

 2         MR. MORRIS:  Okay.  So I'm going to do my best not to

 3  burden the Court.  I'm trying to focus.  We move for the

 4  admission into evidence of Exhibit 32, which is Mr. Dondero's

 5  objection to the HarbourVest settlement.  And the reason that

 6  we're offering it is because he made no mention of any concern

 7  at all that the settlement implicated material nonpublic

 8  inside information.

 9         THE COURT:  All right.  Any objection?

10         MR. MCCLEARY:  32?

11         THE COURT:  Uh-huh.

12         MR. MCCLEARY:  Yes, Your Honor.  Relevance and

13  hearsay.

14         THE COURT:  Overruled.  And I can take judicial

15  notice of it in any event.

16     (Debtors' Exhibit 32 is received into evidence.)

17         MR. MORRIS:  We move for the admission into evidence

18  of Exhibit 33, which is the recent letter from the Texas State

19  Securities Board declining to take any action after conducting

20  an investigation of the Dugaboy complaint.

21         THE COURT:  Okay.  Any objection?

22         MR. MCCLEARY:  We object on the grounds of relevance,

23  403, hearsay, and authenticity, Your Honor.

24     And I also, I think it's important that the decision by a

25  regulatory body has no bearing on this cause of action or the

HCMLPHMIT00003336

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 25-24 Filed 08/25/25   Page 436 of 1017   PageID 19335
Exhibit 72   Page 325 of 390

324

```
 1   colorability of this claim, and the Texas State Securities

 2   Board will tell you that.  This is completely and utterly

 3   irrelevant to your inquiry, Your Honor.

 4           THE COURT:  Okay.  I overrule the relevance

 5   objection.  Certainly, it goes to colorability.  It's some

 6   evidence.  It's some evidence.  A regulatory body did not

 7   choose to go forward --

 8           MR. MCCLEARY:  But that could be for --

 9           THE COURT:   -- on the complaint.

10           MR. MCCLEARY:  That could be for reasons entirely

11   unrelated.

12           THE COURT:  True, true.  It's some evidence.

13           MR. MORRIS:  That's speculation.

14           MR. MCCLEARY:  Not for this.

15           THE COURT:  But what is the authenticity objection?

16           MR. MCCLEARY:  Well, there's no demonstration.  I

17   don't believe they sponsored that with anyone.

18           THE COURT:  Pardon?  Say again?

19           MR. MCCLEARY:  They didn't sponsor that with anyone.

20           MR. MORRIS:  Your Honor, I actually -- if they really

21   put me to it, because I was reading the Rules of Evidence in

22   the wee hours of the morning, I am certain that there's an

23   exception for government documents and government statements

24   and government decisions.

25           MR. STANCIL:  Your Honor, as to its authenticity, I
```

HCMLPHMIT00003337

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 5-54    Exhibit 72    Filed 08/26/25    Page 437 of 1017    PageID 19336

325

```
 1   could produce a witness from Highland who said they got it, if

 2   that's really what we're doing.  That it's the letter, they

 3   got it from the TSSB, if we're really doing authenticity.

 4          MR. MCENTIRE:  Well, first of all, it's hearsay and

 5   there is no authenticity issue and it's irrelevant.  I

 6   understand --

 7          MR. STANCIL:  What is the authenticity issue, Mr.

 8   McEntire?

 9          THE COURT:  I'm trying to understand the authenticity

10   issue.  You think this is a --

11          MR. STANCIL:  Do you think it's a real letter or a

12   fake letter?

13          MR. MCENTIRE:  Well, first of all, I'm going to

14   address the Court and not you, okay?

15      Your Honor, --

16          THE COURT:  Well, address by speaking in a --

17          MR. MCENTIRE:  Yeah.  Thank you.

18          THE COURT:  Okay.  I'm just saving the court reporter

19   from grief, okay?

20          MR. MCENTIRE:  It is hearsay, and it is hearsay that

21   is calculated to be misrepresented or mischaracterized because

22   it's utter speculation as to the basis for their decision.

23   And if it's -- utter speculation is the basis of your

24   decision, it has no reason to come in.  There's no --

25          THE COURT:  What you're telling me, it goes to the
```

018286

HCMLPHMIT00003338

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 15-34   Filed 08/27/25   Page 438 of 1017   PageID 19337
Exhibit 72   Page 327 of 390

326

1  weight of the evidence.  Okay?

2         MR. MCENTIRE:  Your Honor, --

3         THE COURT:  Okay.  You're not telling me it's

4  inadmissible hearsay.

5         MR. MCENTIRE:  Well, it is inadmissible hearsay.

6         MR. MORRIS:  Can I just, for one second?

7         THE COURT:  Please.

8         MR. MORRIS:  Paragraph 34 of their motion, Your

9  Honor.  Quote, "The Court also should be aware that the Texas

10  State Securities Board opened an investigation into the

11  subject matter of the insider tradings at issue, and this

12  investigation has not been closed.  The continuing nature of

13  this investigation underscores HMIT's position that the claims

14  described in the attached adversary proceeding are plausible

15  and certainly far more than merely colorable."

16     They used the investigation to try to convince you that

17  their claims are colorable, and now we have a letter saying

18  there's nothing.

19         THE COURT:  Okay.  You want to explain that to me?

20         MR. MCENTIRE:  Well, we put no evidence in, in this

21  proceeding --

22         THE COURT:  You put what?

23         MR. MCENTIRE:  We have put no evidence in, in this

24  proceeding, --

25         THE COURT:  You filed a pleading under Rule 11

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 84-72   Filed 06/26/25   Page 439 of 1017    PageID 19338

327

1  suggesting this was highly relevant, right?

2          MR. MCENTIRE:  We filed a motion.  Yes, we did.

3          THE COURT:  Under Rule 11.

4          MR. MCENTIRE:  Yes.  Of course we did.

5          THE COURT:  Okay.

6          MR. MCENTIRE:  Of course we did.

7          THE COURT:  Suggesting this Texas State Securities

8  Board complaint and investigation was highly relevant.

9          MR. MCENTIRE:  The fact that it had opened an

10 investigation and was conducting an investigation is

11 irrelevant.  Its decision to stop the investigation without

12 further elaboration or clarification, this is why it calls for

13 utter speculation.

14         MR. MORRIS:  Your --

15         THE COURT:  Okay.  Do you have the hearsay exception

16 that applies?  I'm looking at my evidence rules right now for

17 the government record or public record.  Is it 803(8) that we

18 need to have addressed here?

19         MR. STANCIL:  803(8), Your Honor.

20         A VOICE:  Yeah, public records.

21         THE COURT:  Okay.

22         MR. STANCIL:  Public record.  Sets out --

23         THE COURT:  Public records, 803(8), hearsay

24 exception.  Moreover, you pled allegations suggesting this

25 investigation was really relevant.  So I overrule your

018288

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 34-72   Filed 06/20/25   Page 440 of 1017    PageID 19339
Exhibit 72   Page 329 of 390

328

```
 1    objection, and so that means 33 is admitted.

 2         (Debtors' Exhibit 33 is received into evidence.)

 3            MR. MORRIS:  Thank you, Your Honor.  I continue.

 4    Exhibit 36 --

 5            MR. MCENTIRE:  Which one was that?

 6            MR. MORRIS:  That was 33.

 7       So now we're up to 36, Your Honor.  I'm going to skip some

 8    of these.

 9            THE COURT:  Okay.

10            MR. MORRIS:  But this is just the Court's order

11    approving Mr. Seery's original --

12            THE COURT:  I'm waiting for any objection for the

13    record.  Do we have an objection, Mr. McCleary?

14            MR. MCCLEARY:  36, relevance, Your Honor.

15            MR. MORRIS:  The relevance is that this Court

16    approved without objection Mr. Seery's compensation package in

17    an amount that included a base salary of $150,000, which the

18    Claimant Purchasers and the independent director saw fit to

19    continue.

20            THE COURT:  Objection overruled.  It's admitted.

21         (Debtors' Exhibit 36 is received into evidence.)

22            MR. MORRIS:  I think 38 may be on their list.  Yeah,

23    38 is in as their 26, right?  So that should be admitted.

24            THE COURT:  Admitted.

25         (Debtors' Exhibit 38 is received into evidence.)
```

HCMLPHMIT00003341

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 51-24   Filed 06/30/25   Page 441 of 1017    PageID 19340
Exhibit 72   Page 330 of 390

329

```
 1              MR. MCCLEARY:  If it's on our list, we agree.

 2              THE COURT:  Okay.  It's admitted.

 3              MR. MORRIS:  That's it, Your Honor.

 4              THE COURT:  Okay.  Do you all need a five-minute

 5    break before we do closing arguments?

 6              MR. MORRIS:  I'd be grateful.

 7              THE COURT:  Okay.

 8              MR. MCCLEARY:  Yes, Your Honor.  Thank you.

 9              THE COURT:  Will do.

10              THE CLERK:  All rise

11       (A recess ensued from 5:49 p.m. to 5:57 p.m.)

12              THE CLERK:  All rise.

13              THE COURT:  All right.  Please be seated.

14       We're back on the record in the Highland matter.  Closing

15    arguments.  Just for everyone's benefit, time -- you said 47

16    minutes and 23 minutes back several minutes ago, and then we

17    had all the housekeeping stuff.  So I'm not sure if that's

18    where we are right now or if --

19              MR. MCENTIRE:  I'm waiting for my monitor guy to be

20    here.

21              THE COURT:  Okay.  Okay.

22       So Caroline, is it still 47 and 23?

23              THE CLERK:  Yes.

24              THE COURT:  That's when we started the housekeeping

25    stuff.
```

018290

HCMLPHMIT00003342

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 11-34   Filed 03/26/25   Page 442 of 1017   PageID 19341
Exhibit 72   Page 330 of 390

330

```
 1              MR. MCENTIRE:  So 27 minutes?

 2              THE COURT:  Twenty-three.

 3              THE CLERK:  Twenty-three.

 4              MR. MCENTIRE:  Twenty-three?  Can I get a five-minute

 5   warning, please?  Would you pull up the PowerPoint?  And let's

 6   go to Slide 39.

 7        May I proceed, Your Honor?

 8              THE COURT:  You may.

 9   CLOSING ARGUMENT ON BEHALF OF HUNTER MOUNTAIN INVESTMENT TRUST

10              MR. MCENTIRE:  So, before I go to the PowerPoint, I'd

11   like to kind of give a high-altitude overview of the situation

12   as I see it from the evidence perspective.  We don't believe

13   this should have been an evidentiary hearing.  Evidence has

14   been allowed.

15        We had a situation where, if you believe Mr. Dondero's

16   testimony as contrasted with Mr. Seery's testimony, you have a

17   credibility issue.  So the Court is now conducting an inquiry

18   presumably on the basis in part on the credibility of

19   witnesses.  And if you engage -- and if you want to indulge

20   that type of inquiry, the credibility of witnesses, without

21   allowing the Plaintiff in this case or the Movant in this case

22   to conduct some level of meaningful discovery, I would suggest

23   we have been deprived of due process, because without

24   documents to test Mr. Seery's statements, we are being

25   deprived of something that's basically very fundamental in our
```

018291

HCMLPHMIT00003343

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 15-34 Filed 06/20/25   Page 443 of 1017   PageID 19342

331

1   judicial process.

2       And therefore, it underscores our argument and our

3   rationale why this shouldn't be an evidentiary hearing,

4   because I don't believe the Court can consider credibility

5   issues.

6       We have, on the one hand, unequivocal notes from Mr.

7   Dondero prepared contemporaneously that would suggest that

8   someone admitted to him and stated to him that they did in

9   fact obtain material nonpublic information.  Mr. Seery says

10  that didn't happen.  I specifically said, is that a lie?  Yes,

11  it's not true.  Well, that's a real problem, because that's

12  not the criteria that this Court should use for determining

13  whether we have a colorable claim.  A colorable claim is

14  whether there is some possibility.  It's something less, even

15  less stringent than a 12(b)(6) standard, plausibility.  We

16  have that.

17      If you look at our pleadings, we have set forth all of the

18  facts we need, all the elements we need to establish a trade

19  on material inside information, nonpublic information.  We

20  have evidence -- we have allegations that there was no due

21  diligence.  And Farallon's lawyer stood up here -- well, I'm

22  not going to really address that today.  But if there was any

23  day to address it, it was today.  We have no evidence to

24  suggest they did do due diligence.  Even Mr. Seery said, I

25  don't know what due diligence they did.  We have evidence to

018292

HCMLPHMIT00003344

Case 19-34054-sgj11 Doc 4255-72 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02072-S Document 14-72 Filed 08/08/25 Page 444 of 1017 PageID 19343
Exhibit 72 Page 333 of 390

332

1    suggest that the only due diligence they did was to talk to

2    Mr. Seery, who has told -- who told them that this is very

3    valuable, don't -- this is a really good -- a good investment

4    here, it's a lot better than the 71 percent that's on our

5    disclosures.

6        And Judge, that evidence supports the colorability of the

7    claim.  And if you go down the pathway of saying, well, I'm

8    not sure about Mr. Dondero because he had been held in

9    contempt two years ago, that's a real problem.  That's a

10   problem for this Court.  And I'm going to suggest that's why

11   this should have been a four-corners deliberation.  Even

12   Farallon and Stonehill suggest this should be a four-corners

13   deliberation.

14       We have evidence now of no due diligence.  We have

15   evidence before you that suggests that they did learn about

16   MGM before the announcement date.  We have evidence that Mr.

17   Seery did trade on -- did -- was aware and received

18   information of material nonpublic information.  And for him, a

19   CEO of his reputed stature, to sit here and say that was not

20   material and that was nonpublic defies common sense.  It

21   defies reasonableness.  That goes to credibility.

22       Mr. Dondero's notes speak volumes.  The trades themselves

23   speak volumes.  Mr. Dondero established that the interest --

24   return of interest here is to be less than one -- it's in the

25   one digits, and hedge funds trade in the 30, 40, 50 percent

HCMLPHMIT00003345

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 15-24 Filed 06/24/25 Page 445 of 1017    PageID 19344

333

1  range.  Well, if that's the case, we have Farallon walking

2  away from a return on the exit financing of 13 percent, and

3  that wasn't good enough for him.  How could six percent be

4  good enough for him?  There's something missing here.  There's

5  something not right.

6      And we're entitled to get our lawsuit on file and do some

7  discovery.  And if they want to do a 12(b)(6), they do a

8  12(b)(6).  If they want to do a Rule 56 after discovery, they

9  could do a Rule 56, all in this Court.  But to address this

10  threshold issue now based upon this, what happened here today,

11  is a fundamental denial of due process.

12      I'd like to go to my pleadings.

13      Can you go to Slide 39, please?

14      First of all, let there be no doubt -- 39.  Slide 39.  38.

15  38, please.

16      We can plead on information and belief.  We have a right

17  to plead on information and belief.  And the Fifth Circuit --

18  that is an acknowledged procedural practice in the Fifth

19  Circuit.  And if some of our allegations are based upon

20  information and belief, so be it.  The test here is not at

21  this stage.  The test here is whether I have sufficient

22  factual allegations, whether on information and belief or

23  otherwise, to satisfy at most a plausibility standard.  That's

24  it.

25      And if they want to challenge us at a later date, they

HCMLPHMIT00003346

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 5-34    Filed 06/35/25390 Page 446 of 1017    PageID 19345

334

```
 1   can.  Rule 56.  12(b)(6).  Or standing.  But we have standing.

 2   We have standing.  We have standing under Delaware law.  We're

 3   a contingent beneficial interest that has standing under

 4   Delaware law and all other law.  All -- even Texas agrees that

 5   a contingent interest has standing, an inchoate interest as

 6   Mr. Seery described.  A property interest.  You have property

 7   interest, you have standing.

 8            THE COURT:  Let me ask you.

 9        And Caroline, turn the clock off when the Court

10   interrupts.

11        Just so you know, I mean, my analysis here is standing

12   first.  Does your client have standing?  Because we all know

13   that's a subject matter jurisdiction inquiry and I have to

14   explore that first.  And then I've said many times the legal

15   standard question for colorability.  That's kind of the second

16   place I go --

17            MR. MCENTIRE:  Sure.

18            THE COURT:  -- if I find there's standing.  But can

19   you tell me, have there been appellate decisions that are

20   relevant today on standing?  Contrary to what people may

21   expect, I don't follow every appellate decision from every

22   appeal in the Highland case.  Okay?  I wait until I get a

23   mandate --

24            MR. MCENTIRE:  Sure.

25            THE COURT:  -- to where I have to act on something.
```

HCMLPHMIT00003347

1              MR. MCENTIRE:  Sure.

2              THE COURT:  So I feel like I've learned at some point

3     that some either district judge or Fifth Circuit said some

4     party didn't have standing.  And I don't know if it was Hunter

5     Mountain or some other trust.

6              MR. MCENTIRE:  Not --

7              THE COURT:  And is there anything they said that, if

8     it wasn't Hunter Mountain, could be relevant here?

9              MR. MCENTIRE:  I hope somebody kicks me if I'm wrong,

10    what I'm about to say.  I'm not aware of any such issue --

11             THE COURT:  Okay.

12             MR. MCENTIRE:  -- dealing with Hunter Mountain

13    Investment Trust.  I am not.

14             THE COURT:  But any other party that might somehow

15    bear on this case?

16             MR. MORRIS:  I apologize, Your Honor, I was

17    distracted.  For which issue?

18             THE COURT:  Standing.  Because I was saying my first

19    thing I've got to tackle in ruling on this is standing of

20    Hunter Mountain.  And I seem to remember learning that either

21    the district court on an appeal or the Fifth Circuit on some

22    appeal from Highland --

23             MR. MORRIS:  Correct.

24             THE COURT:   -- said some party didn't have standing.

25             MR. MORRIS:  Correct.

018296

HCMLPHMIT00003348

336

```
 1              THE COURT:  And I don't know if it was --

 2              MR. MORRIS:  Dugaboy on the 2015.3, for sure, was a

 3   Fifth Circuit standing decision.

 4              THE COURT:  Okay.

 5              MR. MORRIS:  I think there was a district court order

 6   that preceded that.

 7              THE COURT:  Okay.

 8              MR. MORRIS:  That was the subject of the appeal.

 9              THE COURT:  The Dugaboy --

10              MR. MORRIS:  2015.3.

11              THE COURT:  -- motion to require those --

12              MR. MORRIS:  Yeah.

13              THE COURT:  -- 2015.3 statements.  Okay.

14              MR. MCENTIRE:  So what we have here -- we can go back

15   on the clock if you'd like.

16              THE COURT:  Yes, please.

17              MR. MCENTIRE:  How much time do I have?

18              THE CLERK:  You have just under 16 minutes.

19              MR. MCENTIRE:  Sixteen?  Okay.  Give me a two-minute

20   warning.  Sorry.

21          Your Honor, what we have here --

22              THE COURT:  I don't think the U.S. Supreme Court

23   justices will give you a two-minute warning, but maybe I'm

24   wrong.

25              MR. MCENTIRE:  Would you give me a two-minute
```

018297

HCMLPHMIT00003349

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 61-24   Filed 06/20/25   Page 449 of 1017   PageID 19348

337

1   warning, please?

2           THE COURT:  And I'm sure not a Supreme Court justice.

3           MR. MCENTIRE:  What we have here is we have a 99.5

4   percent equity interest that has now been relegated to a

5   category of contingent interest, which we don't believe we

6   should be, and that's part of our declaratory judgment relief

7   we're asking for, which we have standing to do that at a

8   minimum because we want to be treated like a Class 9.

9       If they want to treat us like a Class 10, I have an

10  argument for that, and it's more than colorable.  It's

11  persuasive.  It's -- it is a winning argument.  And that is we

12  do have standing in our individual capacity, and we have given

13  you a whole bunch of cases in our PowerPoint, or we will give

14  you a whole bunch of cases in our PowerPoint and in our

15  briefing to support that.

16      We also have given you Delaware case law that says we have

17  standing under Delaware trust law to bring a derivative action

18  against the Trustee.  We have done everything appropriate

19  here.

20      We have the -- a demand upon Seery obviously would be

21  futile to prosecute the claim.  A demand upon the Oversight

22  Board would be futile to make a demand on Muck and Jessup,

23  because they're Defendants and they're SPEs of Farallon and

24  Stonehill.  And a demand upon Mr. Kirschner would be futile.

25  They suggest that there's an assignment of some sort, but that

018298

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 72 Filed 06/30/25 390 Page 450 of 1017    PageID 19349

338

 1  would be a modification -- of the claims over to the

 2  Litigation Trust, but that would be a modification of the

 3  plan.

 4       There's been no assignment of this claim, or these claims,

 5  to the Litigation Trust Trustee.  But even if there had been,

 6  we pled that in the alternative as well.  And it would be

 7  futile to make a demand on Mr. Kirschner because he's suing

 8  Hunter Mountain.

 9       So we are an appropriate party.  The only, then, issue

10  becomes whether or not we have standing under Delaware law to

11  bring a derivative action.  And we have briefed that and we --

12  and that's included in our PowerPoint.  The answer is yes.

13       I'd like to go briefly to Page -- next slide.

14       In our factual section, we set forth why this investment

15  would defy any kind of rational economic sense in the absence

16  of material nonpublic information as a factual allegation

17  supported by data, supported by dates, supported by time.

18       Based upon that, we also have allegations that are framed

19  around the admissions that Mr. Michael Linn provided.  We have

20  allegations that he turned down a 30 or 40 percent premium in

21  our petition.  We have allegations that they admitted that

22  they did no due diligence.  We have allegations that they

23  admitted that they got material -- basically information about

24  MGM.

25       And again, it's not all about MGM.  It's about the values

HCMLPHMIT00003351

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 35-4   Filed 03/20/25   Page 451 of 1017   PageID 19350
Exhibit 72   Page 340 of 390

339

1   of all the portfolio companies.  They want to make it about

2   MGM.  If they do, we win.  But it's much broader than that.

3        And we have standing to bring this claim because if we're

4   right Mr. Seery will have to return excess compensation and

5   the Claims Purchasers will have to disgorge.  And that's going

6   to help not just Hunter Mountain.  That's going to help other

7   creditors who haven't been paid yet.

8        So this is not exclusively -- Hunter Mountain would

9   substantially benefit.  I'm not suggesting otherwise.  But it

10  also benefits innocent stakeholders other than Hunter

11  Mountain.  And that's why we are an appropriate party.  We

12  don't have a conflict of interest to bring this.  Everybody on

13  their side of the table does.  There's no one else who could

14  bring this.

15       Your Honor, it's very clear when the trades took place.

16  We give dates and times.  It's very clear that -- next slide,

17  40.  It's very clear that their investment was over $160

18  million.  If it isn't, I don't see any denials.  All we got

19  today was a lame statement from the lawyer saying we're not

20  here today to deny this.

21            MR. MORRIS:  I'm offended.

22            THE COURT:  He's offended by being called lame.

23            MR. MCENTIRE:  Not you lame personally.

24            MR. MORRIS:  Oh, thanks for the clarification.

25            THE COURT:  Okay.

018300

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 26-1   Filed 04/26/25   Page 452 of 1017    PageID 19351
Exhibit 72    Page 341 of 390

340

 1              MR. MCENTIRE:  A lame statement by you.  In fact, it

 2     wasn't even you, so --

 3         In any event, Your Honor, --

 4              MR. MORRIS:  I've been called worse.

 5              MR. MCENTIRE:  -- the point being is that there was

 6     no -- there's not -- never been an attempt to deny the factual

 7     allegations in our pleadings dealing with Farallon and

 8     Stonehill.  None at all.

 9         And so -- not that that's ultimately relevant, because

10     that's an evidentiary issue outside of the four corners of our

11     pleading, but it does -- it just stands out and screams.  It

12     screams.  And it screams volumes.

13         So right, now based upon our pleadings -- we even plead in

14     Paragraph 42, Paragraph 42, exactly what they invested.  This

15     is what you have before you.  No one has disputed it.  It's in

16     the four corners of our pleading.  We've got dates, times,

17     amounts.  We have admissions to Mr. -- well, we have

18     admissions from Michael Linn, Paragraph 47.  We have -- we do

19     plead upon information and belief the *quid pro quo* on

20     compensation.  And frankly, the evidence here today is that

21     the compensation is excessive.  And the experts will further

22     confirm that it is excessive.  $1.8 million with a bonus

23     program in place to pay him another $8, $9, $10 million, when

24     in fact the risks don't exist and there's no uncertainty and

25     therefore the percentages make no sense.  That's --

HCMLPHMIT00003353

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 30-24 Filed 06/28/25   Page 453 of 1017   PageID 19352
Exhibit 72   Page 342 of 390

341

```
 1              THE COURT:  What do you mean, the risks don't exist

 2     and there is no uncertainty?

 3              MR. MCENTIRE:  If Mr. Seery is telling Farallon and

 4     Stonehill don't sell, this could be really valuable, it's

 5     inconsistent with the notion that the schedule and the

 6     performance -- performance schedule in the compensation

 7     agreement is rationally justified.  Because if it's really

 8     certain or it's likely you're going to make a lot of money,

 9     there's no reason to give him six percent to incentivize him

10     because it's already a done deal.

11         And the whole point here is that I scratch your back, you

12     scratch mine.  They make a lot of money on their deal and he

13     gets a lot of money on the backside post-effective date.

14     Post-effective date.

15         Next slide, 49.

16         It would have been impossible, based upon the publicly-

17     available information in Paragraph 49, impossible for

18     Stonehill and Farallon, in the absence of inside information,

19     to forecast any significant profit when they made their

20     investments.  It's not possible.  Because given the amount of

21     the Claim 8 and Claim 9 claims -- they actually invested in

22     Claim 9 with a zero return.  It's projected to be a negative

23     result.  On Claim 8, even if you allocate their entire

24     purchase price to Claim 8, they're going to get something less

25     than a 10 percent return paid out over a couple years.  Nobody
```

HCMLPHMIT00003354

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 14472   Filed 08/43/25   Page 454 of 1017   PageID 19353

342

1    invests that kind of money in an unsecured creditor asset that

2    hasn't been collateralized.  There's something wrong here.

3        And we have a right to have our day in court to show that.

4    We have our right to take a true deposition of Mr. Seery with

5    documents.  We have a right to take Farallon and Stonehill's

6    deposition with documents.  And we have tried to get

7    information and we have been turned down at every turn.  We

8    have a right to have our day in court, Your Honor.

9        We have allegations of excessive compensation.  I know Mr.

10   Morris suggested the other day that we didn't have any such

11   allegations.  They're here.  The whole idea here is that Mr.

12   Seery would really profit on the backside.  And, you know, he

13   actually testified, I believe -- I won't do that because

14   that's outside the four corners of our pleading.  But the --

15   there is a *quid pro quo*.  We allege there's a *quid pro quo*

16   upon information and belief.  And we also allege willfully and

17   knowingly, we allege conduct that falls clearly within the

18   exceptions.

19       None of this -- none of these claims were released.  Mr.

20   Seery's not an exculpated party in the context of how we --

21   proposing to sue him here.  None of the protected parties, to

22   the extent that Muck and Jessup claim to be protected parties,

23   they're not protected here, because all of the claims we're

24   making are on the basis of willful misconduct and bad faith,

25   which are the standards that they used and incorporated in the

HCMLPHMIT00003355

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 24-72    Filed 04/25/25    Page 455 of 1017    PageID 19354
Exhibit 72    Page 344 of 390

343

1    plan and in the gatekeeper provisions.

2        How much time do I have?

3            THE CLERK:  Right now you have --

4            MR. MCENTIRE:  Thirty seconds?

5            THE CLERK:  -- seven minutes left.

6            MR. MCENTIRE:  Okay.  Next slide, please.

7        Mr. Seery has admitted that he has a duty to avoid self-

8    dealing.  We allege that he did self-deal.  There is clearly a

9    relationship.  We have a right to explore the depths of that

10   relationship.  Well, already we know there is a relationship.

11   We have investments in charities, contributions to charities,

12   meet-and-greets, congratulatory emails.  It's not as if

13   Farallon and Stonehill are strangers, or Mr. Seery's a

14   stranger to them.  It's not like that at all.  They contacted

15   him to get involved.

16       And by placing -- by acquiring these claims -- and by the

17   way, this is the most significant trading activity in your

18   bankruptcy, in this bankruptcy proceeding.  Post-confirmation.

19   Post-confirmation.  By acquiring these claims, they were

20   guaranteed to be put onto the Oversight Board.  By acquiring

21   these claims, they were guaranteed to be put in a position --

22   into a position where they would adjust, monitor, compensate

23   Mr. Seery.  That's the terms of the Claimant Trust.  Those are

24   the terms.

25       And it's interesting, because one of the amendments that's

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 35-42 Filed 06/05/25    Page 456 of 1017    PageID 19355
Exhibit 72    Page 345 of 390

344

 1   in evidence to the plan, I think it's either the third or the

 2   fourth amendment, that came out of nowhere right before

 3   confirmation, they changed the structure of the Claimant Trust

 4   to go off a standard base pay and added in a bonus structure

 5   at the last minute.  That's evidence.

 6        Mr. Seery has acknowledged, we have alleged he had duties

 7   to avoid self-dealing, to always look out for the best

 8   interests of the estate, to avoid conflicts of interest.

 9   Well, here, to the extent that there is a *quid pro quo*, he is

10   self-dealing and he has injured the Reorganized Debtor and

11   he's injured the Claimant Trust, because that's just less

12   money.

13        And we also allege, Your Honor, it's also an allegation

14   that --

15             THE COURT:  And let me ask, the sole injury here is

16   compensation was more than it would have been if not for the

17   sale of the claims to Farallon and Stonehill --

18             MR. MCENTIRE:  That's one of the injuries.

19             THE COURT:  -- and therefore less money at the end of

20   the day for creditors and ultimately Hunter Mountain?

21             MR. MCENTIRE:  Yes.  And we also allege that, as part

22   of this arrangement, conspiracy, as we allege conspiracy, we

23   have seen over $200 million flow out of the coffers of this

24   estate in the form of --

25             THE COURT:  What do you mean, as a result of the

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 24-72  Filed 03/06/25   Page 457 of 1017    PageID 19356
Exhibit 72   Page 346 of 390

345

1  alleged conspiracy?  What do you mean?

2          MR. MCENTIRE:  A delay, a postponement, making long-

3  term payouts, keeping the litigation alive.  They actually

4  suggested to Mr. Linn, don't settle these claims, don't sell

5  out, because this is asset-backed, and we also have claims.

6  And so --

7          THE COURT:  Wait, what?  Say again?

8          MR. MCENTIRE:  One of the things that Mr. Linn told

9  Mr. Dondero, according to Mr. Dondero's notes, is we have --

10  this is very valuable, we're buying assets and we're buying

11  into claims, the litigation claims that are being asserted in

12  this bankruptcy proceeding.

13          THE COURT:  Yes.  Got it.

14          MR. MCENTIRE:  Yeah.  And so the whole idea here is,

15  is that people are funneling money in and taking money out of

16  the coffers of this estate to fuel future litigation in order

17  to have a bigger payday at the end for Class 8 and Class 9.

18  That's exactly what those notes suggest.

19          THE COURT:  I don't understand the correlation.  What

20  correlation are you making?  Because of the claims being

21  purchased, what?

22          MR. MCENTIRE:  The claims being purchased allow Muck

23  and Jessup to be in a position to award compensation.  We've

24  talked about that.

25          THE COURT:  I got that.

HCMLPHMIT00003358

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 31-72   Filed 07/25/25   Page 458 of 1017   PageID 19357
Exhibit 72 Page 347 of 390

346

1          MR. MCENTIRE:  That's one type of injury.  The other

2     injury is, and we have alleged it, is the fact that these

3     claims become very valuable not only because they're asset-

4     backed but because also the litigation claims that Mr.

5     Kirschner is prosecuting.

6          THE COURT:  But how does the purchase of the claims

7     impact that?  They were allowed claims at certain amounts

8     before, and after the purchase they're still allowed claims.

9          MR. MCENTIRE:  Mr. Seery is telling them that,

10     basically, this is our plan, this is what we're doing, this is

11     --

12          THE COURT:  That was the plan of reorganization that

13     was confirmed by the Court.  I don't get how something

14     changed.  I'm trying to get to what are the injuries that your

15     client has suffered.  And I get the compensation argument

16     you're making, but I don't get the rest of it.

17          MR. MCENTIRE:  If Mr. Dondero had been in a position,

18     or one of his entities had been in a position, or even Hunter

19     Mountain, and I'm not sure why Hunter Mountain -- be in a

20     position to have acquired the claims, then we would -- this

21     bankruptcy wouldn't even be in existence anymore.  It'd be

22     over.  All creditors would be paid.  It would be done.  Be

23     over.  And that is an allegation we have made --

24          THE COURT:  How do I know that?

25          MR. MCENTIRE:  Because all the creditors would have

018307

HCMLPHMIT00003359

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 21-34 Filed 06/20/25   Page 459 of 1017   PageID 19358
Exhibit 72   Page 048 of 390

347

1  been paid off.

2          THE COURT:  How do I know, if he would have purchased

3  the claims, that's what would have happened?

4          MR. MCENTIRE:  Well, that's what he testified to

5  today here.  I don't want to get off on a rabbit trail.

6          THE COURT:  I'm trying to understand the injury, --

7          MR. MCENTIRE:  Sure.  I understand.

8          THE COURT:  -- because that's part of my analysis

9  here.

10          MR. MCENTIRE:  The focus, the focus is on the

11  compensation.  And once they aid and abet, once they aid and

12  abet a breach of fiduciary duties, they are subject to

13  disgorgement, and disgorgement of all of their ill-gotten

14  gains.  And the ill-gotten gains are now well over --

15  approaching over $100,000 million.

16          THE COURT:  How do you get to that number?

17          MR. MCENTIRE:  Easily.  We know how much they

18  purchased, which has never been denied.  We know how much has

19  been distributed to Class 8.  And we know what percentage of

20  Class 8 they own.  They own about 95 percent of all Class 8

21  claims.  So if $270,000 million has been distributed to Class

22  8, they got 90 percent of that, 95 percent of it has already

23  gone to them, Farallon and Stonehill.

24          THE COURT:  But it would have gone to the sellers of

25  the claims as well.  I'm trying to make the connection.

HCMLPHMIT00003360

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document Exhibit 72    Filed 03/06/25    Page 460 of 1017    PageID 19359

348

 1              MR. MCENTIRE:  That's not the injury.  The injury is

 2      what -- that is a consequence of their conduct.  The injury is

 3      the compensation.  All right?  That's a distinct injury.  They

 4      are subject to disgorgement as a consequence because they have

 5      done wrong, and the law should not tolerate -- should not

 6      tolerate and allow wrongdoers to get away.  And that's where

 7      the unjust enrichment and disgorge --

 8              THE COURT:  And what are your best cases for that,

 9      that they would have to disgorge --

10              MR. MCENTIRE:  We have cited --

11              THE COURT:   -- the Purchasers would have to disgorge

12      --

13              MR. MCENTIRE:  We have cited cases in our brief.

14              THE COURT:  I'm asking you now to --

15              MR. MCENTIRE:  I don't have them in front of me right

16      this second.  But an aider and abettor --

17              THE COURT:  The *CVC* case, is that your best case?

18              MR. MCENTIRE:  I don't have the cases in front of me.

19      I can say this, that the case law is robust, and I can supply

20      you --

21              THE COURT:  It is not robust.  That's why I'm asking

22      you to zero in.  I read your *CVC* case from the Third Circuit,

23      and I'm wondering, is that your strongest case?

24              MR. MCENTIRE:  No.  I think we -- I think we have a

25      lot of strong cases.  I'm not sure that it is the strongest.

HCMLPHMIT00003361

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S     Document 24-72   Filed 06/26/25   Page 461 of 1017     PageID 19360

349

1          THE COURT:  Tell me which ones, so I --

2          MR. MCENTIRE:  Ma'am, I just said I don't have it in

3    front of me.  If you'll look --

4          THE COURT:  Okay.  Well, this is closing argument

5    where you present law in support of your position.

6          MR. MCENTIRE:  Well, actually, I'm arguing facts

7    right now.  But Your Honor, what I want to tell you is if

8    you'd like me to submit a letter brief on that, I will.

9          THE COURT:  No.

10         MR. MCENTIRE:  Okay.  Then I won't.  It's in my

11   brief.  All of our authorities are in the brief.

12       In conclusion, --

13         THE COURT:  Okay.  So that was the *CVC* case from the

14   Third Circuit which dealt with an insider who purchased

15   claims, statutory insider, a board member, a 28-percent equity

16   owner, who purchased claims during the case to be in a

17   position to file a competing plan and didn't disclose to the

18   board or file a 3001(e) notice.  Okay.  There was -- claims

19   shouldn't be allowed at more than what the purchaser paid for

20   it.

21         MR. MCENTIRE:  Okay.

22         THE COURT:  Okay.  I'm asking you, is that your best

23   case?  Because you also cited *Adelphia*, which seemed kind of

24   factually off the mark.  And so I really --

25         MR. MCENTIRE:  I -- I'm sorry, --

HCMLPHMIT00003362

Case 19-34054-sgj11 Doc 4255-72 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02072-S Document 26-14 72 Filed 06/30/25 390 Page 462 of 1017 PageID 19361

350

```
 1              THE COURT:  I need to know, because I've made clear

 2     from the beginning, --

 3              MR. MCENTIRE:  Yes.

 4              THE COURT:  -- I'm struggling with how is there a

 5     cause of action related to claims trading.

 6              MR. MCENTIRE:  (chuckles)

 7              THE COURT:  I don't know why you're giggling.  This

 8     is --

 9              MR. MCENTIRE:  No, I'm not.  But --

10              THE COURT:  -- serious stuff.  Okay?

11              MR. MCENTIRE:  Agreed.  Agreed.

12              THE COURT:  A bankruptcy estate is being charged ka-

13     ching, ka-ching -- not bankruptcy estate -- the post-

14     confirmation trust.  Ka-ching, ka-ching, ka-ching.  So this is

15     serious stuff.

16              MR. MCENTIRE:  Agreed.

17              THE COURT:  I need to, you know, colorable claim.

18              MR. MCENTIRE:  Agreed.

19              THE COURT:  Colorable claim.

20              MR. MCENTIRE:  Agreed.

21              THE COURT:  Even if plausibility is the standard,

22     which I've expressed my doubt about that, how do you have a

23     plausible claim?  What is your best case?

24              MR. MCENTIRE:  Okay.  This --

25              THE COURT:  Just to recap what I'm focused on,
```

HCMLPHMIT00003363

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 72   Filed 03/26/25390   Page 463 of 1017   PageID 19362

351

1   purchaser and seller, okay?  I can see where breach of

2   contract, maybe some sort of torts between those two.  Okay.

3   I can see where the U.S. Trustee, the SEC, I don't know, the

4   Texas State Securities Board, they might get concerned about

5   allegations of insider trading and there might be a regulatory

6   action.  But the estate?  Again, the post-confirmation trust

7   --

8           MR. MCENTIRE:  Okay.

9           THE COURT:  -- and a contingent beneficiary.  I'm

10  trying to understand what is the best legal authority that

11  might support a colorable claim.  And we talked about the *CVC*

12  case and *Adelphia*.  I'm trying to figure out what are other

13  cases you think I should really hone in on to understand this.

14          MR. MCENTIRE:  All right.  At the very beginning this

15  morning, during my opening statement, I had said this is not

16  your typical claims-handling case, because I recall from our

17  last conference you asked that question a couple of times.

18  This is not your typical claims-handling case.  And it's not a

19  typical claims-handling case because we have a fiduciary that

20  we claim breached his duties that were owed to the estate.

21  And he self-dealt.  And he -- this has nothing to do with the

22  plan.  This has something to do with what Mr. Seery did

23  outside the corners of the plan.  Perhaps he used the plan

24  expediently.  He self-dealt.

25      That's why this is not just between a seller and a buyer

HCMLPHMIT00003364

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S     Document 24-72   Filed 05/30/25   Page 464 of 1017     PageID 19363
Exhibit 72   Page 353 of 390

352

1    of a claim.  That's number one.

2        We have been denied an opportunity to discover the

3    communications between the sellers and the buyers, and my

4    guess is we have big boy agreements that prevent the sellers

5    from ever coming back at anybody for fraud.  My expectation,

6    that's the case.  We should have a right to go explore that.

7    So that's why they're not here.

8            THE COURT:  Why?  I mean, what would that tell you?

9    What would that tell you?

10           MR. MCENTIRE:  That --

11           THE COURT:  If there's a big boy agreement, if

12   there's not, what --

13           MR. MCENTIRE:  It would tell us --

14           THE COURT:   -- consequence would that have for this

15   --

16           MR. MCENTIRE:  It would tell us --

17           THE COURT:   -- proposed lawsuit?

18           MR. MCENTIRE:  It would answer Mr. Morris's question

19   that he's raised several times, this is the seller's issue,

20   this is not -- this is not the Hunter Mountain's issue.  It is

21   Hunter Mountain's issue.  Hunter Mountain as an equity

22   interest-holder should be in a position to be certified as a

23   Class 9 beneficiary now pursuant to our declaratory judgment

24   action.  That's number one.

25       Number two.  As a contingent beneficiary, it is entitled

018313

HCMLPHMIT00003365

1    to protect its interests and bring suits if it sees that

2    something has happened that is incorrect and is a tort

3    involving the Reorganized Debtor and the Claimant Trust.  That

4    is the nature and the essence of our claim.

5         And as a consequence, the aiders and abettors should not

6    be allowed to walk away unharmed.  They should be required to

7    disgorge their ill-gotten profits.  And that calculation is

8    easily done, as I've just demonstrated.

9         Your Honor, that's all I have.  Thank you very much.

10             THE COURT:  Thank you.

11             MR. MCENTIRE:  And we talked -- we'd need an

12    opportunity to argue on the issue of experts, because --

13    whether you're just going to take it under advisement, I'm not

14    sure how you're going to handle that.

15             THE COURT:  I'm going to read the pleadings and then

16    I'm going to let you all know are we coming back for another

17    day.

18             MR. MCENTIRE:  Thank you.

19             THE COURT:  All right.  Who is making the closing

20    argument -- do we have three closing arguments?

21             MR. STANCIL:  Yes.

22             MR. MCILWAIN:  We're going to do it in reverse order.

23             MR. MORRIS:  Reverse order in.

24             THE COURT:  Okay.  Reverse order of --

25             MR. STANCIL:  Keep it interesting.

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 24-72  Filed 08/06/25 Page 466 of 1017    PageID 19365
Exhibit 72   Page 355 of 390

354

1          MR. MORRIS:  I think I was last on the opening.

2          THE COURT:   -- importance?

3      (Laughter.)

4          THE COURT:  No.  Just kidding.  Just kidding.

5          MR. MORRIS:  We're assuming you remember what the

6  original order was.

7          MR. STANCIL:  Yeah, right, right.

8          MR. MORRIS:  It was so many hours ago.

9          THE COURT:  Okay.  Oh, so many hours ago.

10          MR. MCILWAIN:  I think I was referred to earlier as

11  the lame lawyer.

12          THE COURT:  Oh, you were.  I think --

13          MR. MCILWAIN:  So I'll start.  I think --

14          THE COURT:  I think you --

15          MR. MCILWAIN:  Or maybe it was the lame argument,

16  whatever.  Whatever.

17          THE COURT:  I think you were the lame one.

18      CLOSING ARGUMENT ON BEHALF OF THE CLAIM PURCHASERS

19          MR. MCILWAIN:  Your Honor, Brent McIlwain here for

20  the Claim Purchasers.

21      Let me start, I guess, by saying I understand now why

22  Hunter Mountain did not want to put on evidence, because the

23  evidence that they put on, frankly, made their case much

24  worse.

25      As we argued or we stated in the opening statement, our

1    position is that you can look within the four corners of this

2    document and determine that there is no plausible or colorable

3    claim.  What the evidence showed is that Mr. Dondero allegedly

4    had a call with one -- with Farallon, not with Stonehill, with

5    Farallon, Farallon wouldn't tell him what they paid, Farallon

6    did not accept an offer of 130 or 140 percent of whatever they

7    paid for the claim, and he thinks they did no due diligence,

8    right?  He had nothing in his notes about MGM.  So he can say

9    that he thought that they were positive because of MGM, but

10   it's certainly not -- I don't think the Court should take that

11   evidence with any credibility.

12       But interestingly, what Mr. Dondero says is, well, how do

13   you know how much they paid for these claims?  He goes, well,

14   there was a market for the claims, right?  They were all

15   trading at 50 or 60 cents.  But yet no one would ever buy

16   these claims without any due diligence because the projections

17   in the plan indicate that they wouldn't -- they wouldn't get a

18   return.

19       Well, if there's a market for the claims and he's willing

20   to pay 30 or 40 percent more than whatever someone purchased,

21   certainly there is a market for the claims.  And he is the

22   only one, frankly, that had inside information.  That's why he

23   was willing to maybe pay more.

24       Or, alternatively, the case that you were describing

25   before, Mr. Dondero maybe wanted to buy the claims so he could

HCMLPHMIT00003368

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 11-24   Filed 03/07/25   Page 468 of 1017   PageID 19367

356

1   control the case, right, so he could dismiss any litigation

2   that was pending against himself so he could avoid the ire of

3   the estate that is aimed at him.

4       It also -- the Court's inquiry as to what the injury is I

5   think is precisely on point.  The only injury offered at this

6   point really is that somehow my client's agreed-to higher

7   compensation that is reasonable or appropriate in return for

8   some inside information on claims that were allegedly trading

9   at 50 or 60 cents in any instance.  And what the evidence

10  showed is that, one, Mr. Dondero never had any information

11  about that, about the compensation that Seery is receiving

12  when this complaint was filed, when this motion for leave was

13  filed.

14      And so if you judge the complaint within the four corners,

15  there is no -- there is no *quid pro quo*, right?  Because he

16  says, well, there's obviously something up here because they

17  wouldn't have bought these claims without due diligence, and

18  they must have agreed to higher compensation, and that's why

19  it all happened.  And if we throw all this out here, then

20  we'll get to do the discovery that we wanted to do.

21      Importantly, if you look at his notes, right, the first

22  thing that's written down is discovery to follow, because

23  that's how he operates.  That's how a serial litigator

24  operates.  Discovery to follow so that I can pay you back for

25  not selling your claim to me.  Right?  So I can't control the

HCMLPHMIT00003369

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 34-72 Filed 08/05/25   Page 469 of 1017   PageID 19368

357

1    world, so I can't control this case, you're going to pay.  And

2    we're all paying.  Every one of us here.  Right?  There's 15

3    lawyers in the courtroom and probably 10 on the phone, right?

4    We're all paying.

5         And so when Mr. McEntire says I'm not getting my day in

6    court, we've had an entire day in court.  We've had three

7    hearings to decide what this hearing is going to be.  And he's

8    gotten more than his day in court for, frankly, what is word

9    salad.  This complaint doesn't pass any test, whether it's

10   12(b)(6) or under the *Barton* Doctrine.  It's simply

11   allegations that are thrown out there, and they're saying, so

12   that we can do more discovery to determine if we actually have

13   allegations.  Because they want to continue to harass people,

14   they want to continue to be a thorn in everyone's side, so

15   that perhaps they can avoid further litigation against Mr.

16   Dondero or they can convince somebody to settle with Mr.

17   Dondero.

18        It doesn't make any sense, Your Honor, and this is exactly

19   why there is a gatekeeper provision, right.  That's why the

20   Court imposed this.

21        And you ask yourself, why would someone sell these claims?

22   Obviously, the sellers of the claims have not shown up.

23   Whether they're big boy, it doesn't matter, because the Court

24   and this estate had nothing to do with those sales.  But they

25   haven't shown back up.  I can -- I can venture a guess why, if

018318

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 21-24    Filed 05/09/25   Page 470 of 1017    PageID 19369
Exhibit 72   Page 359 of 390

358

1    I was involved with Mr. Dondero, I would sell my claim, right?

2    Because I wouldn't have to be here.  And that's exactly why

3    the Court should not authorize this complaint to be filed and

4    the gatekeeper provision of the order should prevent it.  And

5    frankly, this should be shut down and we should not have to

6    have continued litigation over experts, or anything else, for

7    that matter.  And frankly, we should just be able to go on and

8    let Mr. Seery do his job.

9        Because I think the evidence was pretty clear that his

10   compensation is reasonable and it was in line, frankly, with

11   what he was making before.  And candidly -- and maybe it's

12   because Mr. McEntire is not involved in bankruptcy cases, but

13   this is similar compensation that I see in numerous cases, and

14   it's tiered to incentivize Mr. Seery to do his job, and he's

15   doing his job.

16       So, with that, Your Honor, I'll cede the rest of the time

17   to the other parties.

18           THE COURT:  Okay.  Thank you.

19       CLOSING ARGUMENT ON BEHALF OF JAMES P. SEERY, JR.

20           MR. STANCIL:  Thank you, Your Honor.  I'm going to

21   focus -- and I'm going to put my little clock up so Mr. Morris

22   doesn't, you know, give me the hook here.

23           THE COURT:  Okay.

24           MR. STANCIL:  But first --

25           THE COURT:  Next time we're all here, maybe I'll have

018319

HCMLPHMIT00003371

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S     Document 51-24   Filed 06/20/25   Page 471 of 1017     PageID 19370
Exhibit 72   Page 360 of 390

359

1 │ one of those red, what do you call them, the buzzer.

2 │          MR. STANCIL:  Oh, the big light?

3 │          THE COURT:  The red light.

4 │          MR. STANCIL:  We used to joke that the judge I

5 │ clerked for wished he had a trapdoor and he could just pull

6 │ the lever when it was done.

7 │          THE COURT:  Okay.

8 │     (Laughter.)

9 │          MR. STANCIL:  Maybe I shouldn't have put that in your

10 │ head.

11 │          THE COURT:  Who was that?  Are we going to say who

12 │ that was?

13 │          MR. STANCIL:  So Your Honor, I'm going to try to set

14 │ the legal framework.  I'm going to ask you -- and I think we

15 │ have our -- we have the deck.  It's the little -- if we could

16 │ put that up and start on Slide 2.

17 │     I'd like to address what standard applies, and then I'd

18 │ like to spend a few minutes asking Your Honor again not only

19 │ to rule on multiple alternative grounds, but also I'd like to

20 │ walk through what if you did this on a pure 12(b)(6), because

21 │ it's going to collapse.

22 │     So, well, we'll just jump in.  I said at the beginning

23 │ that we know that the question here is not what does the word

24 │ colorable mean in isolation.  We wouldn't do that in any

25 │ context.  We would always look and see what the operative

018320

HCMLPHMIT00003372

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 72   Filed 06/06/25   Page 472 of 1017   PageID 19371

360

1   language here is in the Court's confirmation order.  So the

2   question is, what did the Court mean, it must represent a

3   colorable claim?

4       So we mentioned before Paragraph 80 of the confirmation

5   order.  That cites *Barton*.  It cites the vexatious litigant

6   cases.  I've not heard one word from Mr. McEntire answering

7   how it can be that we're here on a sub-12(b)(6) standard he

8   now says when the Court articulated this legal authority and

9   this legal basis in the confirmation order.  If he believed

10  that, the time to make that argument was on the confirmation

11  appeal, and that's over.

12      But let me then say, how did we get, how did the Court get

13  to Paragraph 80?  Well, that came after a series of factual

14  findings in the confirmation order -- in fact, actually, Josh,

15  do you have the hard copy of this?

16          MR. LEVY:  Yeah.

17          MR. STANCIL:  If I could hand that to the Court.

18      May I approach, Your Honor?

19          THE COURT:  You may.  Thanks.

20          MR. STANCIL:  And I don't propose to go through every

21  slide, Your Honor.

22          THE COURT:  Okay.

23          MR. STANCIL:  But if you could turn to Slide #5.

24  This is Paragraph 77 of the Court's confirmation order.

25  Factual support for gatekeeper provision.

018321

HCMLPHMIT00003373

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 55-34   Filed 06/26/25   Page 473 of 1017    PageID 19372
Exhibit 472   Page 362 of 390

361

 1              MR. MCENTIRE:  Excuse me.  May I have a copy?  I

 2    can't see it.

 3              THE COURT:  Oh.

 4              MR. LEVY:  Oh, yeah, sure, sure.

 5              MR. STANCIL:  And can we get a copy of yours as well,

 6    --

 7              MR. MCENTIRE:  Sure.

 8              MR. STANCIL:  -- while we're at it?  Thanks.

 9         The facts supporting the need for the gatekeeper provision

10    are as follows.  I will not read them all, but if you scroll

11    about eight lines down, it says, During the last several

12    months, Mr. Dondero and the Dondero-related entities have

13    harassed the Debtor, which has resulted in further

14    substantial, costly, and time-consuming litigation for the

15    Debtor.  And then there are six separate enumerated examples

16    of that.

17         Paragraph 78 on the next slide.  Findings regarding

18    Dondero postpetition litigation.  The Bankruptcy Court finds

19    that the Dondero postpetition litigation was a result of Mr.

20    Dondero failing to obtain creditor support for his plan

21    proposal and consistent with his comments, as set forth in Mr.

22    Seery's credible testimony, that if Mr. Dondero's plan

23    proposal was not accepted he would, quote, burn down the

24    place.

25         Next slide.  This is Paragraph 79.  Necessity of the

HCMLPHMIT00003374

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 15-24   Filed 06/03/25   Page 474 of 1017   PageID 19373

362

1    gatekeeper provision.  If you would just skim to the bottom of

2    that first column, it says, Approval of the gatekeeper

3    provision will prevent baseless litigation designed merely to

4    harass the post-confirmation entities charged with monetizing

5    the Debtors' assets for the benefit of its economic

6    constituents, will avoid abuse of the court system and preempt

7    the use of judicial time that properly could be used to

8    consider the meritorious claims of other litigants.

9         And then came Paragraph 80, which we've just discussed.

10   With respect, Your Honor, the question is, what is the meaning

11   of Paragraph 80?  And in context, following those paragraphs

12   regarding vexatious litigation and abuse of litigation, it is

13   simply implausible to suggest that colorability is a sub-

14   12(b)(6) standard.

15        And that is Mr. McEntire's contention today, that the

16   gatekeeping order is actually lower than the threshold that

17   every other litigant faces.  Everyone else has to file a

18   claim, pass a 12(b)(6), and on they go to get to discovery.

19   Mr. McEntire believes that the gatekeeping order imposes less

20   than that on him, and then he's treated just like everybody

21   else.  It makes no sense whatsoever.

22        So I'll skip Slides 8 and 9, Your Honor, but that's where

23   the Fifth Circuit described the gatekeeping orders, affirmed

24   them in relevant part, citing *Barton*.  There is no mystery

25   here.

HCMLPHMIT00003375

1       If you could flip, Your Honor, to Slide 10 very briefly.

2    We've talked about this case a little bit in one of our status

3    hearings, *In re Vistacare Group*.  This is the leading case

4    that describes what it is that one does under a *Barton*

5    analysis, and it says that the trustee must make a -- pardon

6    me -- a party seeking leave to sue a trustee must make a *prima*

7    *facie* case against the trustee, showing that its claim is not

8    without foundation.  A *prima facie* case is more than a

9    12(b)(6).

10      And I would direct Your Honor to the language in the third

11   bullet.  It involves a greater degree of flexibility than a

12   Rule 12(b)(6) motion to dismiss because the bankruptcy court,

13   which, given its familiarity with the underlying facts and the

14   parties, is uniquely situated to determine whether a claim

15   against the trustee has merit.  Boy howdy, are we -- I'm

16   sorry.  My kids are going to tease me for that.

17      But this -- no case has ever proved the wisdom of that

18   statement, Your Honor.  We are here, and the Court is all too

19   familiar with the facts and the parties of this case.  And

20   we're not here on an adversary proceeding.  We're here on a

21   contested matter.  And Your Honor has the authority on any

22   contested matter to take evidence, and a broad, broad

23   discretion as to what evidence is appropriate to meet that

24   standard.

25      So we have laid out briefly in Slide 11 what -- why we

HCMLPHMIT00003376

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 34-72   Filed 06/05/25   Page 476 of 1017   PageID 19375

364

1   believe that -- or how we believe that the *prima facie* showing

2   would work.  And in short -- and maybe this will help us going

3   forward -- we believe that if they make -- if a party seeking

4   relief under the gatekeeping order says things, we have the

5   right to rebut them, like in a burden-shifting or a burden of

6   production -- pardon me -- analysis.  So you can say that the

7   sun rises in the west, but we can bring in evidence to say it

8   doesn't, it rises in the east.  And that's the plausibility

9   threshold.

10      And here, and if Your Honor would flip to the next slide,

11   I'm not sure it's entirely fair to say, even after they have

12   purported to withdraw their evidence, that they've really done

13   so.  And we disagreed with Mr. McEntire, and advised him of

14   such leading up to this hearing, that we do not agree that his

15   redactions fully excise all of the evidentiary assertions from

16   his motion.

17      And I'll just pick one example here on Slide 12.  On the

18   left is Paragraph 32 of the motion for leave prior to the

19   purported withdrawal.  On the right is Paragraph 32 after the

20   withdrawal.  Your Honor will see all they've withdrawn are the

21   citations.  It's verbatim.  It's the same allegations.  And

22   they have argued various facts and put them in evidence.  So

23   even if it were true, and it's not, but even if it were true

24   that all you get here is a 12(b)(6) ruling in the ordinary

25   case if you put no evidence in dispute, they forfeited that

018325

HCMLPHMIT00003377

 1   right by putting these facts and evidence in dispute in their

 2   motion.

 3        The fact that they have withdrawn evidentiary support for

 4   their evidentiary assertions does not relieve them of the

 5   reality that they have made all sorts of factual arguments in

 6   their motion for leave, and as a contested matter we have the

 7   right to address it.

 8        I'm proposing, Your Honor, unless you have questions on

 9   the cases on 13, 14, those are the cases where we have

10   described the hearings that have been held under *Vistacare* and

11   *Foster*, and I know more about the down-in-the-weeds of *Foster*

12   than I ever cared to, but I don't want to repeat what's in our

13   briefs.

14        If Your Honor is willing to flip to Page 15, this is an

15   argument I've alluded to briefly, but boy, we don't hear -- we

16   have not heard a single thing as to what function the

17   gatekeeper serves, particularly in context of Your Honor's

18   factual findings in the confirmation order, if all it means is

19   12(b)(6) or lower.  It just, it's an unanswerable point that

20   they just persist in ignoring.

21        But I'd like to address very briefly that third bullet,

22   because at various times and in their brief they have cited,

23   Hunter Mountain has cited, down here we call it *Louisiana*

24   *World*, I think in the Second Circuit we call it *STN*, but this

25   UCC derivative standing.  There are, in fact, two elements one

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 5-34   Filed 06/30/25   Page 478 of 1017   PageID 19377
Exhibit 72   Page 367 of 390

366

1   has to pass for that, and that's a different context.  The

2   first is colorability as it's used in that context, and that

3   is often a 12(b)(6) standard in that context.  But still to

4   have standing, to bring that claim on behalf of the estate,

5   you have to show a cost-benefit analysis.  As we've heard

6   today, we've probably spent more in legal fees today, or over

7   the last three months, than the purportedly excessive

8   compensation to Mr. Seery.  And so I would respectfully

9   submit, if we were here on a *Louisiana World* or *STN* hearing,

10  this would be an open-and-shut case just as well.

11       So if I could, Your Honor, if you are willing to jump

12  ahead to Slide 17, I'd like to ask you -- and I do want to

13  address the standing jurisdictional question a little bit.

14            THE COURT:  Okay.

15            MR. STANCIL:  Not to get into the weeds of standing,

16  because I think we have briefed that out the wazoo in our

17  papers, and I read this morning -- I think it was this morning

18  -- from the Claimant Trust Agreement, which says they're not a

19  beneficial interest.

20       But my understanding is that Article III standing, whether

21  there is a theoretical injury in any way, that is -- that goes

22  to Your Honor's subject matter jurisdiction under Article III,

23  but that is not true of statutory standing under Delaware law

24  or prudential standing.  Those are -- those go to basically

25  whether they state a claim.

HCMLPHMIT00003379

1       So, Your Honor, I believe, can -- and I've confessed to my

2   colleague that the only way I remember this is I screwed it up

3   really, really badly when I was clerking years ago -- but I

4   believe Your Honor can, and in this case should, rule on the

5   standing ground in the alternative.  Not on the Article III.

6   Article III is binary.  They either have it or they don't.

7   But on the statutory standing, you can say -- I think you can

8   hold that they do not have standing under Delaware law to

9   pursue the claim, but even if they do have standing, and then

10  reach the remainder.

11      And we know we're headed for appeal.  We've heard --

12  pretty much two-thirds of the time this morning has been

13  laying the groundwork for an appeal.  And we would only like

14  -- we would like to make sure that we give the Fifth Circuit a

15  fulsome record.

16      So I would like to ask Your Honor to flip to Page 19.  And

17  this is really the end of, I think, what we need to do.  So,

18  Your Honor, what if we were here just on 12(b)(6)?  So we've

19  got a *quid*, we've got a *pro*, we've got a *quo*.  They fail at

20  each turn.  Let me spend most of my time on the *quid*.  I'll

21  let the documents of which the Court can take judicial notice

22  speak for themselves.  I will let the bare-bones nature of the

23  assertion -- and it's okay to put in a complaint something on

24  information and belief, but you still have to pass *Iqbal* and

25  *Twombly*.  I can't say upon information and belief that I was

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document 5-54  Filed 08/09/25  Page 480 of 1017    PageID 19379
Exhibit 72    Page 369 of 390

368

1    denied a starting position on the Knicks, right?  I would like

2    to believe that's the case, but it still has to be a plausible

3    allegation.

4        Let's look at this chart.  And this chart is taken right

5    out of our brief.  These are their numbers.  This is at the

6    bottom.  And I want to -- I would like to take head-on this

7    proposition that this is not a rational investment on their

8    numbers.

9        So let's take the Stonehill purchase of Redeemer.  They

10   paid $78 million to earn a projected profit, according to the

11   November 30 disclosure statement, of $19.71 million.  By my

12   arithmetic, that is a return of 25.27 percent.  Even by Mr.

13   Dondero's lights, that's a pretty good return.

14       I'm going to come back to why that's not the end of the

15   return, but let's look at the Farallon purchase of Acis.

16   Spent $8 million.  Projected profit, $8.4 million.  I'll take

17   105 percent return any day.

18       Let's look at the Farallon purchase of HarbourVest.

19   Purchase price, $27 million.  Projected profit, $5.09 million.

20   That is -- oh, I can't read my own writing anymore -- I think

21   that is 18.85 percent.  I would again gladly take that every

22   day of the week, whether it's a distressed asset or otherwise.

23       But let me make one really important point that Mr.

24   Dondero obfuscated, Mr. McEntire does not acknowledge, and it

25   is just a fact.  These are projected profits if all Mr. Seery

HCMLPHMIT00003381

1    does is hit the plan.  November 30, 2021.  If he does no

2    better than what he thought these assets were worth then, this

3    is the expected return.  So for those trades that we've talked

4    about, that's a slam dunk even on that.

5        But let's look about -- we'll talk about upside.  Because,

6    as Your Honor knows from doing bankruptcy cases, upside, it's

7    all about upside for people who are purchasing claims.  So it

8    isn't just that their returns were capped at these already-

9    ample percentages.  If Class 8, for example, of Redeemer paid

10   out in full, they would be making not -- oh, gosh, I'm not

11   sure I should do this on the fly -- but they'd be recovering

12   $137 million on the Class 8 claim, not the $97.71 million.  So

13   there's another $40 million of upside.

14       Even if it's a low-probability event, that's a -- hedge

15   funds do that all day every day.

16       Same here with Acis.  Paid $8 million, expected $16.4

17   million, but they could get up to $23 million.

18       Now, we've heard so much about how Class 9 was worthless,

19   worthless, worthless.  No, it's not.  There's always the

20   potential for upside.  Paid $27 million.  Could recover $45

21   million just on Class 8.  Could recover another $35 million on

22   Class 9.  They could recover $80 million on a $27 million

23   purchase.  Now, the probability of that is complicated, but

24   it's not zero.  We know that it's not zero.  All we've heard

25   from them today is that Mr. Seery is -- could pay off 8 and 9

018330

HCMLPHMIT00003382

1    in full.  So I don't think that is even remotely plausible.

2         Let's talk briefly about UBS.  They like to talk about UBS

3    for the projected profit of $3.61 million in loss.  But that

4    was -- that's in August, and that claim trades.

5         So a couple of things that happened between the November

6    30 disclosure statement setting that projected value and the

7    purchase of the UBS claim in August.  Number one is we are

8    nine, ten months past the worst of COVID.  And Your Honor

9    could take judicial notice of massive market movements just if

10   you do nothing.

11        We don't need to get to that, because we talked all

12   morning about MGM.  May 26th, it's announced publicly.  May

13   26, 2021.

14        So the notion that a purchaser of a UBS claim in the

15   summer of 2021, after this MGM transaction is announced, would

16   think, you know what, I think these claims are only worth what

17   they were worth back in November, is not plausible.

18        And so this is why the comparisons to the debt, the exit

19   financing, well, 12 percent.  That's a 12 percent capped

20   return.  We're talking here about returns of 25 percent, 105

21   percent, 18.85 percent, just based on projections at the --

22   sort of in the darkest days post-COVID.

23        So it's not plausible.  If a court were looking at this

24   just under the 12(b)(6) standard, we would be -- we'd be

25   dismissing this claim as well.  And we really -- respectfully,

018331

HCMLPHMIT00003383

1    Your Honor, we need that ruling.  We think we need that ruling

2    so that whatever the -- whatever they may say the standard is

3    in the Fifth Circuit, we only have to go one time.  And we

4    really believe that we're entitled to that.

5        I'll let Your Honor -- I will just stand on the deck and

6    our briefs on the *pro* and the *quo*.  But meet-and-greets, these

7    are just conclusory allegations in the complaint.  He says

8    they worked -- that he worked for them 10 or 15 years ago,

9    which some of that's not even true, but even if it were all

10   true, if I were beholden to every client I've met at a

11   schmooze fest or everybody I worked for in a group 20 years

12   ago or 15 years ago, you know, I would be incapable of

13   operating without a conflict of interest.  And it's just not

14   plausible.  This is something that needs to go.

15       Unless the Court has questions, I will cede the remainder

16   of our time to Mr. Morris.

17            THE COURT:  No questions.  Thank you.

18      CLOSING ARGUMENT ON BEHALF OF THE REORGANIZED DEBTOR

19            MR. MORRIS:  Thank you so much, Your Honor, for your

20   patience.  It's been a very long day.  I am very grateful that

21   we're going to finish today.

22       As I said at the beginning, I believe this exercise, as

23   difficult as it may have been, is so important and so vital,

24   preserving this estate and what's left of it.

25       The gatekeeper exists for very important reasons.  Your

HCMLPHMIT00003384

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 34-72   Filed 07/03/25   Page 484 of 1017   PageID 19383
Exhibit 72   Page 373 of 390

372

1   Honor made those findings in her order that has been upheld on

2   appeal.  And we're here to make sure that frivolous litigation

3   is not commenced against my clients, or, frankly, against

4   Stonehill and Farallon, given their capacity as Claimant

5   Oversight Board members.

6       Hunter Mountain confuses argument with facts.  There's no

7   facts here to support anything, and that's what the gatekeeper

8   is about.  The gatekeeper is making sure that there's a good-

9   faith basis to pursue claims.  And as Mr. Stancil points out,

10  it is certainly acceptable to state things upon information

11  and belief.  But the point of the gatekeeper is if somebody

12  says -- not somebody says -- somebody offers proof that those

13  beliefs are wrong, you no longer have a plausible claim.  And

14  that's why we thought it was so important to go through this

15  exercise today.  Because the facts show that their beliefs are

16  simply wrong, and the entire complaint is based on their

17  beliefs.

18      There is zero evidence concerning the compensation other

19  than their belief that the compensation is excessive.  The

20  case is over.  Like, you could stop there.  I'm going to go

21  through a bunch of things that -- you could stop there.

22      I want to actually begin backwards, though, in time, with

23  the HarbourVest settlement.  Right?  After two years of

24  litigation and re-litigation and re-litigation of the

25  HarbourVest settlement, the claims of insider trading, finally

018333

HCMLPHMIT00003385

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 34-72 Filed 07/04/25   Page 485 of 1017   PageID 19384

373

1   the Court has before it admissible indisputable evidence that

2   Mr. Seery negotiated the terms of the HarbourVest settlement

3   before he ever got this notorious email from Mr. Dondero.

4   That should be a finding of fact in Your Honor's order and it

5   should never be -- nobody should ever make that allegation

6   again.  It's over.  You have the documents.  You have the

7   email from Mr. Seery to the board, here are the terms, and

8   those are the terms Your Honor approved.

9        And there's more.  Because this is so important for us,

10  because we're tired of being accused of wrongdoing.  We're

11  tired of being falsely accused of wrongdoing.

12       $22-1/2 million.  That's the valuation Mr. Seery put on

13  it.  You can see that he's doing it to his Independent Board

14  colleagues, copying his lawyers.  He's telling them where he

15  got it, from Hunter Covitz.  The evidence is now in the

16  record.  It came from a regularly-published NAV report from

17  November 30th.  It was seven days old.  It can never be

18  disputed again that $22.5 million was a fair value, not based

19  on some subjective view of Mr. Seery but based on the person

20  who gave him the report that everybody relies upon that Mr.

21  Dondero got.

22       And it was ratified yet again in the audited financial

23  statements that came out, and it shows for the period ending

24  -- this is Exhibit 60, I believe -- for the period ending

25  December 31, 2020, $50 million.  Okay, so it went up a few

HCMLPHMIT00003386

Case 19-34054-sgj11 Doc 4255-72 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02072-S Document 31-72 Filed 03/05/25 Page 486 of 1017 PageID 19385

374

1  million dollars in December.

2      This is their case?  This is the case?  Your Honor I know

3  is still working on the motion to dismiss.  That's Mark

4  Patrick, right?  That's the complaint that he brought.  That's

5  what this is about.  I don't mean to confuse the issue, but

6  it's time to put this stuff to rest, because it's wrong.  Mr.

7  Dondero has lost and he's got to get over it at some point.

8      But here's the best piece of evidence about this whole

9  shenanigans about MGM being inside information.  Mr. Dondero

10  filed a 15-page objection to the HarbourVest settlement and

11  didn't say a word about it.  How is that possible?  Six days

12  before the settlement, he sends this email.  Two weeks later,

13  in January, he files a 15-page objection and doesn't mention

14  anything about insider trading, MGM, or any wrongdoing by Mr.

15  Seery.  In fact, he argues the exact opposite, that Mr. Seery

16  cut a bad deal.  How is that possible?  This is a plausible

17  claim?

18      It gets better, or worse, depending on your point of view.

19  CLO Holdco filed an objection and they said they're entitled

20  to buy the asset.  This is Mr. Dondero's, you know, operating

21  arm of the DAF.  They lost -- they actually had an honorable

22  person who concluded, I don't really have that right.  But

23  these are the claims that Mr. Patrick is asserting, and he

24  asserted them on April -- in April, before the MGM deal was

25  announced.  Right?  And Your Honor found, and that's why it

HCMLPHMIT00003387

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 72   Filed 07/06/25   Page 487 of 1017   PageID 19386

375

1   was so important for the Court to take judicial notice of the

2   second contempt order, because Mr. Dondero was intimately

3   involved in bringing those claims and in bringing those claims

4   against -- or trying to bring those claims against Mr. Seery,

5   in violating of the gatekeeper.  This is all tied together.

6        I have to tell you, I don't know why we're not doing Rule

7   11.  Forget about colorable claims.  This is a fraud on the

8   Court.  It really is.  And I don't know when it's going to

9   stop.  I'd love to move on with my life, to be honest with

10  you.

11       The tender offer.  He's out there doing a tender offer

12  benefitting as the fund that he manages acquires more shares

13  and his interest goes up and the value goes up with all these

14  MGM holdings.  Really?  And he's going to accuse Mr. Seery of

15  wrongdoing?

16       There was one point of Mr. Dondero's testimony that made

17  my heart skip a beat.  It's when he referred to the need to

18  get discovery.  And why did it skip a beat?  Because he

19  actually had a moment of candor where he admitted that the

20  notion that Mr. Seery gave them material nonpublic inside

21  information was his thought.  It's not anything that Farallon

22  ever told him.  And then it spins and it spins and it spins,

23  and finally when he gets to the fifth version of his sworn

24  statement MGM suddenly appears.  It's not right.  Colorable

25  claims?  Fraudulent claims.

HCMLPHMIT00003388

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S    Document Exhibit 72  Filed 06/20/25  Page 488 of 1017    PageID 19387

376

1   What's the undisputed evidence right now?  I'll take Mr.

2   Dondero at his word that Mr. Patel told him that Farallon

3   bought the claims in February or March.  How did they

4   reconcile that with the undisputed testimony that Mr. Seery

5   thereafter invited Farallon to participate in the exit

6   financing?  And they signed an NDA in early April.  Why would

7   you sign an NDA if you already got inside information?  Who

8   would do that?  What would be the purpose of that?

9       How do you reconcile the fact that, according to Mr.

10  Dondero, the claims were already in Farallon's pocket when

11  they signed an NDA to get information for an exit facility.

12  Is that plausible?

13      We've heard Mr. McEntire say a bunch of times it's much

14  broader than MGM.  Not only not a scintilla of evidence, but

15  no substantive allegation.  Again, confusing argument with

16  facts.  Because he had -- yes, Mr. Seery had access to inside

17  information relative to Highland.  He's the CEO.  But where is

18  the evidence that he shared anything with anybody?  There is

19  nothing.

20      Mr. Dondero admitted in his motion -- in a moment of

21  candor, he said that's what he concluded based on the fact

22  that Mr. Patel supposedly told him, I bought because Seery

23  told me to.  He made the inference.  No evidence.  Nothing.

24      They're bringing this case for the benefit of innocent

25  parties?  These people have told you time and again that

HCMLPHMIT00003389

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document Exhibit 72   Filed 06/20/25   Page 489 of 1017   PageID 19388

377

1   assets exceed liabilities.  What innocent parties?  Where are

2   they and how come they're not -- let's get to that point, too.

3   Because they're saying, oh, Mr. Seery is, like, just not

4   declaring the end of this.  Seriously?  How much do they think

5   Mr. Seery should reserve for indemnification claims as we do

6   trials like this with a mountain of lawyers billing $800,

7   $1,500 an hour?  Seriously?  Mr. Seery is somehow acting in

8   bad faith by not declaring the end of this case?  How much is

9   he supposed to reserve?  They keep skipping over that.  We'll

10  talk about that in the mediation motion.  We'll talk about

11  that in the Hunter Mountain motion in July.  Who's prosecuting

12  that?  Mr. Dondero's lawyer.  I know there's a really big

13  separation between Hunter Mountain and Mr. Dondero, but

14  Stinson is prosecuting that claim on behalf of Hunter Mountain

15  when they're seeking information.

16      And they complain about the legal fees?  We've put our

17  pens down.  Kirschner put his pens down.  We put down the

18  claim objection.  What we're doing is defense at this point.

19      We're awaiting the ruling on the notes litigation, and we

20  will very much prosecute the vexatious litigant motion if

21  Judge Starr grants the pending motion to exceed the page limit

22  that's been out there for months.  I'm not sure what's

23  happening there.  We'll do that for sure.  But otherwise,

24  we're just playing defense.

25      We're here today because they've made a motion, a motion

018338

HCMLPHMIT00003390

Case 19-34054-sgj11 Doc 4255-72 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02072-S Document 34-72 Filed 03/09/25 Page 490 of 1017 PageID 19389
Exhibit 72 Page 379 of 390

378

1    that lacks any good-faith basis whatsoever. And that's why

2    today was so important, so the Court could hear the witnesses.

3    They could -- the Court -- I mean, think about it. Texas

4    State Securities Board. The audacity of saying that somehow a

5    letter from the Texas State Securities Board saying they're

6    taking no action after conducting an investigation of

7    Dugaboy's claim of insider trading is irrelevant? Like, what?

8        I've told you before, all we do is play Whack-A-Mole.

9    Whack-A-Mole. They make an argument, we prove it's frivolous,

10   so they just make a new argument. Their pleading says their

11   claims are colorable because there's an open investigation.

12   Now there's no investigation and they say that's irrelevant.

13   How can they say that with a straight face? I couldn't.

14       I want to talk about Mr. Seery. I want to finish with my

15   Mr. Seery. I may not use all my time. We can go home early.

16       (Laughter.)

17       THE COURT: It's past early.

18       MR. MORRIS: But this guy has worked doggedly, Your

19   Honor, and I will defend him until the end of time. He's a

20   man who has so far exceeded expectations. And they're saying

21   he's not -- he's overpaid? The guy is overpaid? When he's

22   into Class 9? When he's being pursued with these frivolous

23   claims? Every day he's being attacked. How much do they

24   think he should be paid? I would have loved to -- I hope --

25   no, I don't hope. I don't think there's any reason to hear

018339

HCMLPHMIT00003391

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S     Document 24-72   Filed 08/06/25   Page 491 of 1017     PageID 19390
Exhibit 72   Page 380 of 526   PageID 19390

379

1    expert testimony.  I think Your Honor should exercise -- the

2    Court should exercise its discretion and say there's no need,

3    the Court doesn't need to hear expert testimony.

4        But if we do, I'll be delighted to hear their expert's

5    view on what Mr. Seery -- if it's not $8.8 million for all

6    these years, what should it be, after he takes an estate from

7    71 percent on the 8s to, according to them, assets exceed

8    liabilities, 9s are paid in full?

9        You know what?  If they put their pens down, maybe there

10   would be a conversation.  But as long as we keep doing this

11   ridiculous, baseless, frivolous litigation, Mr. Seery is going

12   to conserve resources, because he's got to pay people like me

13   to defend him and to defend the estate.  This is a preview of

14   what we'll talk about at the mediation motion.  He's doing a

15   great job.  He's devoting his life to it.  He has no other

16   income.  He's got no other job.  It's wrong.

17       The claims are not only not colorable, they are frivolous.

18   I ask the Court to stop this in its tracks right now.

19       Thank you very much.

20          THE COURT:  Thank you.

21       All right.  Is there any time for the Movant to have the

22   last word, which we usually give the Movant the last word.

23          THE CLERK:  The Movant, I think, has a little under

24   -- maybe about a minute left.

25          THE COURT:  Anything you want to say in a minute?

018340

HCMLPHMIT00003392

Case 19-34054-sgj11  Doc 4255-72  Filed 06/20/25  Entered 06/20/25 21:39:29  Desc
Case 3:25-cv-02072-S    Document Exhibit 72 Filed 06/04/25390Page 492 of 1017    PageID 19391

380

|   |   |
|---|---|
| 1 | MR. MCENTIRE:  Yes, just I'll take 30 seconds.  How |
| 2 | is that? |
| 3 | THE COURT:  Okay. |
| 4 | REBUTTAL CLOSING ARGUMENT ON BEHALF OF HUNTER MOUNTAIN |
| 5 | MR. MCENTIRE:  I just want to direct your attention |
| 6 | to our reply brief, specific paragraphs that address your |
| 7 | question about authorities.  We do cite several cases on Page |
| 8 | 41, 40 and 41, dealing with the issue of unjust enrichment. |
| 9 | That's it. |
| 10 | Thank you, Your Honor, very much. |
| 11 | THE COURT:  Okay.  Thank you.  Unjust enrichment? |
| 12 | MR. MCENTIRE:  Disgorgement. |
| 13 | THE COURT:  Okay.  But I was really, you know, claims |
| 14 | trading in the bankruptcy context, just your best -- |
| 15 | MR. MCENTIRE:  Well, I think the cases that you |
| 16 | identified were our best cases.  The -- |
| 17 | THE COURT:  Okay. |
| 18 | MR. MCENTIRE:  -- *Adelphia* and the other cases. |
| 19 | THE COURT:  All right.  Well, -- |
| 20 | MR. MCENTIRE:  There are other cases, Your Honor, in |
| 21 | different contexts.  There's also the *Washington Mutual* case |
| 22 | dealing with equitable disallowance.  There's also the *Mobile* |
| 23 | *Steel* case, a Fifth Circuit -- |
| 24 | THE COURT:  *Mobile Steel*?  Oh, my goodness.  Okay. |
| 25 | MR. MCENTIRE:  Okay.  All right. |

HCMLPHMIT00003393

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 24-72   Filed 06/20/25   Page 493 of 1017   PageID 19392
Exhibit 72   Page 382 of 390

381

```
 1              THE COURT:  1968?  Or no.  That doesn't mean it isn't

 2     still quoted often, but --

 3              MR. MCENTIRE:  Those would also be relevant.

 4              THE COURT:  Equitable subordination --

 5              MR. MCENTIRE:  Yes, ma'am.

 6              THE COURT:   -- when there's bad acts.

 7              MR. MCENTIRE:  And Footnote #10 in the Mobile Steel

 8     case.  That is relevant, too.  Just, --

 9              THE COURT:  Okay.

10              MR. MCENTIRE:  Thank you.

11              THE COURT:  All right.  So I gave a deadline of

12     Monday, right, --

13              MR. STANCIL:  Yes.

14              THE COURT:   -- to reply to the response to the

15     motion in limine?

16              MR. STANCIL:  Yes, Your Honor.  Do you want time

17     before you leave for the day?  I mean, it's not going to be

18     that long, so 4:00 o'clock Monday?  Does that work for you?

19              THE COURT:  I don't care.  I probably won't start

20     looking at it until the next day.

21              MR. STANCIL:  But I will -- I'll just reserve and so

22     I don't have my associates --

23              THE COURT:  Yes.  I think these days midnight, 11:59

24     p.m., is what lawyers tend to want.

25              MR. STANCIL:  Oh, not this lawyer.
```

018342

HCMLPHMIT00003394

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 54-24    Filed 08/03/25    Page 494 of 1017    PageID 19393
Exhibit 72    Page 383 of 390

382

```
 1              THE COURT:  Oh, well, okay.  Okay.  So I'll just have
 2   to look at this, and probably by Friday of next week I will
 3   reach out through Traci and let you know what my decision is
 4   on whether we're going to have another day of just 30 minutes,
 5   30 minutes of experts.
 6              MR. MCENTIRE:  Your Honor, another housekeeping
 7   matter.  You'd wanted a copy of our PowerPoint, --
 8              THE COURT:  Yes.
 9              MR. MCENTIRE:  -- which I'm pleased to give you.  We
10   found a typo that we can correct electronically on the version
11   I showed.
12              THE COURT:  Uh-huh.
13              MR. MCENTIRE:  I likely will send that to you and I
14   can copy opposing counsel.  Is that --
15              THE COURT:  Okay.  Send it to Traci Ellison, my
16   courtroom deputy.
17              MR. MCENTIRE:  All right.
18              THE COURT:  And she'll --
19              MR. MCENTIRE:  We'll do that first thing in the
20   morning.
21              THE COURT:  Okay.
22              MR. MCENTIRE:  So you'll have a copy --
23              MR. STANCIL:  Can we get the hard copy that -- from
24   today, though?
25              MR. MCENTIRE:  No, that had a typo on it.  I really
```

018343

HCMLPHMIT00003395

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 16-4   Filed 08/04/25   Page 495 of 1017   PageID 19394
Exhibit 72   Page 384 of 390

383

```
 1  don't want to share it.  We fixed it.

 2          THE COURT:  What?  I'm sorry, what?

 3          MR. MORRIS:  That's fine.

 4          MR. STANCIL:  Never mind.

 5          THE COURT:  Do I not need to know?

 6          MR. STANCIL:  Let's all go home.

 7          THE COURT:  Okay.  And then my last question is --

 8  and there was a mention of the CLO Holdco lawsuit, where

 9  there's a pending motion to dismiss.  There's an opinion I'm

10  writing well underway.  I just keep getting sidetracked by

11  other things.  Imagine that.  So I know that people are

12  wanting to get an answer to that.  So, trust me, it's going to

13  get done here pretty soon.

14      You mentioned Brantley Starr.  I mean, it is not my role

15  to pick up the phone and call him and say hey, --

16          MR. MCENTIRE:  No, I wasn't suggesting that.

17          THE COURT:   -- District Judge, get busy on that.

18          MR. MCENTIRE:  Yeah.

19          THE COURT:  But I'll at least tell you, I know the

20  man seems to have more jury trials than any judge I've seen in

21  this building, so I suspect he's working late hours trying to

22  get things done.

23          MR. MCENTIRE:  Yeah.

24          THE COURT:  What do we have upcoming?  We have what

25  you called the mediation motion.  When is that set?
```

HCMLPHMIT00003396

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02072-S   Document 25-72   Filed 08/05/25   Page 496 of 1017   PageID 19395

384

```
 1              MR. MORRIS:  June 26.

 2              THE COURT:  June 26th.  Be here before we know it.

 3              MR. MORRIS:  Yeah.  And just to keep the Court

 4    informed, the Movant's reply was due today.  We gave them a

 5    week extension.  They asked earlier today.  I saw in my email

 6    we gave them.  So I think you should expect the reply on the

 7    15th.  The hearing is the 26th, and that's not in person.

 8              THE COURT:  Okay.  Well, I'm very interested to dive

 9    into those pleadings.  I knew the motion was coming because

10    one of the lawyers said at a prior hearing it would be coming.

11    So I haven't read any of those pleadings, but, well, I'm just

12    very interested to hear how this plays out.  I mean, I've said

13    it before.

14              MR. MORRIS:  Uh-huh.

15              THE COURT:  We had global mediation in summer of

16    2020.  We had two very fine mediators.  We had a heck of a lot

17    settled, to my amazement.  But we're now way down the road and

18    whole lot of money has been eaten up fighting lots of stuff.

19    I mean, it would have to be pens down.  There's an enormous

20    amount out there that would have to be part of it, and I just

21    don't know if everyone is fully appreciating that.  I hope

22    they are.  Anyone listening.  We're really, really far down

23    the road now, and there's just how many appeals?  Someone at

24    one time told me there were 26.  I bet it's more than that by

25    now.
```

018345

HCMLPHMIT00003397

Case 19-34054-sgj11 Doc 4255-72 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02072-S Document 4-72 Filed 08/06/25 Page 497 of 1017 PageID 19396

385

1    MR. MORRIS: I think that's right. I think we argued

2  on Monday, what is it, the sixth of nine appeals in the Fifth

3  Circuit. And we've got, you know, a cert petition that we're

4  waiting to hear from on the Supreme Court. And yeah, there's

5  still a couple dozen matters in the district court.

6         THE COURT: Okay.

7    MR. MORRIS: Not one of them, not one of them we're

8  prosecuting, with the exception of waiting on the Court to

9  rule on the Report and Recommendation on the notes litigation

10  and vexatious litigant. We are not the plaintiff, movant, in

11  anything.

12         THE COURT: We've got adversaries. The Reports and

13  Recommendations. That's just made everything go a lot slower.

14  But all right. So we have that. And anything else coming up?

15    MR. MORRIS: I think on July 11th maybe there is a

16  hearing scheduled on Hunter Mountain. If you recall, Hunter

17  Mountain had that valuation motion last year that you denied

18  on the grounds that they didn't have a legal right to

19  valuation information. They made a motion earlier this year

20  for leave to file an adversary proceeding to assert an

21  equitable claim and some other declaratory relief, is my

22  recollection.

23    While we filed an opposition, we didn't oppose the relief

24  requested, so that motion got resolved. They have filed an

25  adversary proceeding. And I think, if I remember correctly,

HCMLPHMIT00003398

Case 19-34054-sgj11 Doc 4255-72 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02072-S Document 54-72 Filed 06/20/25 Page 498 of 1017 PageID 19397

386

1   our response to the complaint, maybe that's what due.  Oh, the

2   11th is a status conference.  It could be a status conference,

3   maybe to set a scheduling order.

4           THE COURT:  Okay.

5           MR. MORRIS:  But that's it.  I think that's the only

6   thing on the calendar.

7           THE COURT:  That's a lot.

8           MR. MCENTIRE:  Thank you.

9           THE COURT:  Anything else?  Okay.

10          MR. STANCIL:  Thank you, Your Honor.

11          MR. MORRIS:  Thank you, Your Honor.

12          THE CLERK:  All rise.

13      (Proceedings concluded at 7:18 p.m.)

14                          --oOo--

15

16

17

18

19                      CERTIFICATE

20      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
21  above-entitled matter.

22   /s/ Kathy Rehling                    06/12/2023

23  _____    _____
    Kathy Rehling, CETD-444                     Date
24  Certified Electronic Court Transcriber

25

018347

387

INDEX

PROCEEDINGS                                                    3

OPENING STATEMENTS

- By Mr. McEntire                                            67
- By Mr. Morris                                              90
- By Mr. Stancil                                            102
- By Mr. McIlwain                                           106

WITNESSES

Hunter Mountain Investment Trust's Witnesses

James David Dondero
- Direct Examination by Mr. McEntire                        112
  *Voir Dire* Examination by Mr. Morris                     144
- Cross-Examination by Mr. Morris                           158
- Redirect Examination by Mr. McEntire                      201
- Recross-Examination by Mr. Morris                         208

James P. Seery
- Direct Examination by Mr. McEntire                        211
- Cross-Examination by Mr. Morris                           265
- Redirect Examination by Mr. McEntire                      292
- Examination by the Court                                  293

Debtors' Witnesses

Mark Patrick
- Direct Examination by Mr. Morris                          302
- Cross-Examination by Mr. McCleary                         313

EXHIBITS

HMIT's Exhibits

Certain Exhibits                                Received 33-40

HMIT's Exhibit 3                                  Received 317
HMIT's Exhibit 4                                  Received 317
HMIT's Exhibit 4                              Received 140/149
HMIT's Exhibits 7-10                              Received 317
HMIT's Exhibits 12-23                             Received 317
HMIT's Exhibits 26-38                             Received 317
HMIT's Exhibits 29-52                              Carried 317

018348

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02072-S    Document 14-72    Filed 08/29/25    Page 500 of 1017    PageID 19399

388

1                                    INDEX
                                    Page 2
2

3    HMIT'S Exhibits, cont'd.

4    HMIT's Exhibits 39-62                              Carried 37
     HMIT's Exhibits 53-57                             Received 317
5    HMIT's Exhibits 58-63                             Received 321
     HMIT's Exhibit 64                                 Received 317
6    HMIT's Exhibit 65                                 Received 317
     HMIT's Exhibits 67-70                             Received 317
7    HMIT's Exhibit 71                                 Received 318
     HMIT's Exhibit 72                                 Received 319
8    HMIT's Exhibit 73                                 Received 319
     HMIT's Exhibit 74                                 Received 319
9    HMIT's Exhibit 75                                 Received 319
     HMIT's Exhibit 76                              Carried 37/321
10   HMIT's Exhibit 77                                 Received 319
     HMIT's Exhibit 78                                 Received 319
11   HMIT's Exhibit 79                                 Received 319
     HMIT's Exhibit 80                        Marked 234 Received 320
12

13   Debtors' Exhibits

14   Debtors' Exhibit 2                                Received  44
     Debtors' Exhibit 3                                Received  54
15   Debtors' Exhibit 4                                Received  54
     Debtors' Exhibit 5                                Received  54
16   Debtors' Exhibit 6                                Received  55
     Debtors' Exhibit 7                                Received  56
17   Debtors' Exhibit 8                                Received  57
     Debtors' Exhibit 9                                Received  54
18   Debtors' Exhibit 10                               Received  58
     Debtors' Exhibit 11                               Received  44
19   Debtors' Exhibit 12                               Received  60
     Debtors' Exhibit 13                               Received  60
20   Debtors' Exhibit 14                               Received  63
     Debtors' Exhibit 15                               Received  64
21   Debtors' Exhibits 25-30                           Received  65
22   Debtors' Exhibit 30                               Received 272
     Debtors' Exhibit 31-A                             Received 272
23   Debtors' Exhibit 32                               Received 323
     Debtors' Exhibit 33                               Received 327
24   Debtors' Exhibit 34                            Received 44/65
     Debtors' Exhibit 36                               Received 328
25

018349

HCMLPHMIT00003401

389

INDEX
Page 3

Debtors' Exhibits, cont'd.

Debtors' Exhibit 38                           Received  44/328
Debtors' Exhibit 39                           Received  44/286
Debtors' Exhibit 40                           Received  44/287
Debtors' Exhibit 41                           Received  44/284
Debtors' Exhibit 42                             Received  44
Debtors' Exhibit 45                            Received 174
Debtors' Exhibit 46                             Received  44
Debtors' Exhibit 51                            Received 308
Debtors' Exhibit 59                            Received 289
Debtors' Exhibit 60                            Received 272
Debtors' Exhibit 100                             Marked 179

Judicial Notice to be Taken                              175

CLOSING ARGUMENTS

- By Mr. McEntire                                        329
- By Mr. McIlwain                                        354
- By Mr. Stancil                                         358
- By Mr. Morris                                          371
- By Mr. McEntire                                        379

RULINGS

HMIT's Motion for Leave to File Verified Adversary       382
Proceeding (3699) - *Taken Under Advisement*

END OF PROCEEDINGS                                       386

INDEX                                               387-389

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

018350
HCMLPHMIT00003402

**EXHIBIT 73**

018351

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## ATLAS IDF GP, LLC

This Limited Liability Company Agreement (this "**Agreement**") of Atlas IDF GP, LLC (the "**Company**") is entered into as of October 29, 2015 by and between the Company and John Honis (the "**Managing Member**", and collectively with any individuals and/or entities who subsequently become members of the Company in the future in accordance with the terms hereof, "**Members**"), pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del.C. § 18-101, et seq.), as amended from time to time (the "**Act**").

        **Section 1**      **Name**.  The name of the limited liability company governed hereby is Atlas IDF GP, LLC.

        **Section 2**      **Certificates**.  The Managing Member, as an authorized person within the meaning of the Act, has executed, delivered and filed the certificate of formation of the Company (the "**Certificate of Formation**") with the Secretary of State of the State of Delaware on October 29, 2015. Upon the execution of this Agreement, the Managing Member shall thereafter be designated as an authorized person within the meaning of the Act.  Hereafter, the Managing Member shall have the power to execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

        **Section 3**      **Purpose**.  The Company was formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in all lawful activities for which limited liability companies may be formed under the Act, including, without limitation of the foregoing, serving as the general partner of Atlas IDF, LP, a Delaware limited partnership.

        **Section 4**      **Powers**.  The Company shall have the power to do any and all acts reasonably necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purpose and business described herein and for the protection and benefit of the Company, and shall have, without limitation, any and all of the powers that may be exercised on behalf of the Company by the Managing Member pursuant to this Agreement.

        **Section 5**      **Principal Business Office**.  The principal place of business and office of the Company shall be located at, and the Company's business shall be conducted from 87 Railroad Place, Suite 403, Saratoga Springs, NY 12866, or elsewhere as the Managing Member may from time to time determine.

        **Section 6**      **Registered Office**.  The address of the registered office of the Company in the State of Delaware is:  c/o Stellar Corporate Services LLC, 3500 South DuPont Highway, County of Kent, Dover, Delaware 19901.

        **Section 7**      **Registered Agent**.  The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is:  c/o Stellar Corporate Services LLC, 3500 South DuPont Highway, County of Kent, Dover, Delaware 19901.

        **Section 8**      **Members**. The names, the nature of the interests held, the mailing addresses, the initial capital contributions and the Percentage Interests (as defined below) of the Members are as set

HCMLPHMIT00003511

forth in **Schedule A** attached hereto.

**Section 9**     **Term**.  The term of the Company commenced on the date of filing of the Certificate of Formation in accordance with the Act and shall continue until dissolution of the Company in accordance with **Section 23** of this Agreement.

**Section 10**     **Limited Liability**.  Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and none of the Members, any Officer (as hereinafter defined), employee or agent of the Company (including a person having more than one such capacity) shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of acting in such capacity.

**Section 11**     **Initial Capital Contributions**.  Each Member is deemed admitted as a Member of the Company upon his, her or its execution and delivery of this Agreement.  The initial capital contributions of the Members are set forth on **Schedule A** attached hereto.

**Section 12**     **Additional Capital Contributions**.  The Members are not required to make any capital contributions to the Company beyond their initial capital contributions, unless otherwise determined by the Managing Member.

**Section 13**     **Capital Accounts**.  Separate capital accounts shall be maintained for each Member on the books of the Company, which accounts shall set forth the capital of such Member in the Company.  Each capital account shall be adjusted to reflect such Member's share of allocations and distributions as provided in **Sections 14 and 15** of this Agreement, and any additional capital contributions to the Company or withdrawals of capital from the Company.  Such capital accounts shall further be adjusted to conform to the Treasury Regs. under Section 704(b) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**"), as interpreted in good faith by the Managing Member.

**Section 14**     **Allocations of Profit and Loss**.  All items of income, gain, loss, deduction and credit shall be allocated among the Members in accordance with their percentage interests as set forth on **Schedule A** attached hereto ("**Percentage Interests**").

**Section 15**     **Distributions**.  Distributions shall be made to the Members at such times and in such amounts as may be determined in the sole discretion of the Managing Member.  Distributions shall be allocated among the Members in accordance with their Percentage Interests.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to the Members on account of their interest in the Company if such distribution would violate Section 18-607 of the Act or other applicable law.

**Section 16**     **Management**.

(a)     The business and affairs of the Company shall be managed by the Managing Member. Subject to the express limitations contained in any provision of this Agreement, the Managing Member shall have complete and absolute control of the affairs and business of the Company, and the Managing Member shall possess all powers necessary, convenient or appropriate to carrying out the purposes and business of the Company, including, without limitation, doing all things and taking all actions necessary to carrying out the terms and provisions of this Agreement.

(b)     Subject to the rights and powers of the Managing Member and the limitations thereon contained herein, the Managing Member may delegate to any person any or all of his powers,

018353

HCMLPHMIT00003512

rights and obligations under this Agreement, and the Managing Member may appoint, contract or otherwise deal with any person to perform any acts or services for the Company as the Managing Member may reasonably determine.

(c)     No Member (other than the Managing Member) shall participate in the management or control of the business of, or shall have any rights or powers with respect to, the Company except those expressly granted to it by, or pursuant to the terms of, this Agreement, or those conferred on it by law.

(d)     The Managing Member shall hold office until the earliest to occur of his death, disability or other inability to act in such capacity, at which time a successor Managing Member may be appointed by Members owning at least a majority of the Percentage Interests.

**Section 17    Officers**.  The Managing Member may, from time to time as he deems advisable, appoint officers of the Company (the "**Officers**") and assign in writing titles (including, without limitation, President, Vice President, Secretary and Treasurer) to any such person.  Unless the Managing Member decides otherwise, if the title is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office.  Any delegation pursuant to this **Section 17** may be revoked at any time by the Managing Member.

**Section 18    Other Business**.  The Members (including, for the avoidance of doubt, the Managing Member) may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others.  Neither the Company nor any other Member shall have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

**Section 19    Exculpation and Indemnification**.  The Managing Member shall not be liable to the Company or to the other Members for any action taken or omitted to be taken in connection with the business or affairs of the Company, so long as he acted in good faith and is not found to be guilty of gross negligence or willful misconduct with respect thereto, as determined by a final non-appealable decision of a court of competent jurisdiction.  To the fullest extent permitted by law, the Company agrees to indemnify and hold harmless:  (i) the Managing Member, and (ii) in the discretion of the Managing Member, the Company's managers, shareholders, partners, officers, employees, agents and affiliates and/or the other Members (each, an "**Indemnified Party**") from and against any and all claims, actions, demands, losses, costs, expenses (including attorneys' fees and other expenses of litigation), damages, penalties or interest, as a result of any claim or legal proceeding related to any action taken or omitted to be taken by any of them in connection with the business and affairs of the Company (including the settlement of any such claim or legal proceeding); *provided, however*, that the party against whom the claim is made or legal proceeding is directed is not guilty of gross negligence or willful misconduct, as determined by a final non-appealable decision of a court of competent jurisdiction.  Any indemnity under this **Section 19** shall be provided out of and to the extent of Company assets only, and no Member (including the Managing Member) shall have personal liability on account thereof.

**Section 20    Admission of Additional Members**.  Additional Members may be admitted to the Company only with the written consent of the Managing Member.  The capital contribution required of, and the Percentage Interests assigned to, such newly-admitted Member shall be determined by the Managing Member.

**Section 21    Effect of Bankruptcy, Dissolution, Death or Incompetence of a Member**.  The bankruptcy, dissolution, death or disability of a Member, or an adjudication that such Member is

3

018354

HCMLPHMIT00003513

incompetent (a Member experiencing any such event, a "**Disabled Member**"), shall not cause the termination or dissolution of the Company, and the business of the Company shall continue. If a Member is dissolved or becomes bankrupt, the trustee or receiver of such Disabled Member's estate or, if a Member dies, such Disabled Member's executor, administrator or trustee, or, if such Member is adjudicated incompetent, such Disabled Member's committee, guardian or conservator, or the personal representative of such Disabled Member, as applicable, shall have the rights of such Disabled Member for the purposes of settling or managing such Disabled Member's estate or property and such power as the Disabled Member possessed to dispose of all or any part of such Member's interest in the Company, and to join with any assignee in satisfying conditions precedent to the admission of the assignee as a substitute Member.

Section 22   **Assignments**.  A Member may not transfer, assign, pledge or hypothecate, in whole or in part, his, her or its limited liability company interest without the prior written consent of the Managing Member.

Section 23   **Dissolution**.

(a)   The Company shall dissolve, and its affairs shall be wound-up upon the first to occur of the following: (i) the written consent of the Managing Member; (ii) the death, disability, bankruptcy or withdrawal of the Managing Member, in the event no successor managing member is appointed pursuant to **Section 16(d)**; and (iii) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

(b)   In the event of dissolution, the Company shall conduct only such activities as are necessary to wind-up its affairs (including the sale of the assets of the Company in an orderly manner).

Section 24   **Tax Matters Partner**.  John Honis shall be the tax matters partner within the meaning of Section 6231(a)(7) of the Code.  All expenses incurred by the tax matters partner in connection with his duties as tax matters partner shall be expenses of the Company.

Section 25   **Elections**.  The Managing Member shall determine the accounting methods and conventions under the tax laws of any and all applicable jurisdictions as to the treatment of income, gain, loss, deduction and credit of the Company or any other method or procedure related to the preparation of such tax returns.  The Managing Member may cause the Company to make or refrain from making any and all elections permitted by such tax laws, and the Managing Member shall not be liable for any consequences to any previously admitted or subsequently admitted Members resulting from making or failing to make any such elections.

Section 26   **Separability of Provisions**.  Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

Section 27   **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement.

Section 28   **Entire Agreement**.  This Agreement constitutes the entire agreement of the Members with respect to the subject matter hereof and shall supersede all prior and contemporaneous agreements, understandings and discussions with respect thereto.

018355

HCMLPHMIT00003514

Section 29     <u>Governing Law, Personal Jurisdiction and Venue</u>. The parties acknowledge and agree that any claim, controversy, dispute or action relating in any way to this Agreement or the subject matter of this Agreement shall be governed solely by the laws of the State of Delaware, without regard to any conflict of laws doctrines. The parties irrevocably consent to and submit to being served with legal process issued from the state and federal courts located in the State of New York and irrevocably consent to the exclusive personal jurisdiction of the federal and state courts situated in the State of New York. The parties irrevocably waive any objections to the personal jurisdiction of these courts. The federal and state courts of the State of New York in New York County shall have sole and exclusive jurisdiction over any and all claims, controversies, disputes and actions which in any way relate to this Agreement or the subject matter of this Agreement. Any such claim, controversy, dispute or action must first be brought in the federal court of the State of New York in New York County, unless the federal courts do not have subject matter jurisdiction as a matter of law, in which case it must first be brought in the Commercial Division of the New York State Supreme Court in New York County (and can only proceed in New York County outside the Commercial Division if the Commercial Division rejects it). The parties also irrevocably waive any objections that these courts constitute an oppressive, unfair, or inconvenient forum and agree not to seek to change venue on these grounds or any other grounds.

Section 30     <u>Amendments</u>. This Agreement may be modified, altered, supplemented or amended in the sole discretion of the Managing Member.

*[remainder of page intentionally left blank]*

018356
HCMLPHMIT00003515

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Agreement as of the date first written above.

THE COMPANY:

ATLAS IDF GP, LLC

By: _____
Name: John Honis
Title: Managing Member


MANAGING MEMBER:

_____
Name: John Honis

6

018357
HCMLPHMIT00003516

**Schedule A**

**Members of Atlas IDF GP, LLC**

**As of October 29, 2015**

| NAME | NATURE OF INTEREST | MAILING ADDRESS | INITIAL CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|------|--------------------|-----------------|------------------------------|---------------------|
| John Honis | Managing Member | 87 Railroad Place, Suite 403<br><br>Saratoga Springs, NY 12866 | $100 | 100% |

7

018358

HCMLPHMIT00003517

**EXHIBIT 74**

018359

**KELLY HART PITRE**
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500
Telecopier: (817) 878-9280

COUNSEL FOR CLO HOLDCO, LTD., CHARITABLE DAF FUND, LP AND
HIGHLAND DALLAS FOUNDATION, INC.

<div align="center">

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

</div>

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054-sgj11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor | § | **Relates to Dkt. No. 2460** |

RESPONSE AND DISCLOSURES RELATED TO THE COURT'S ORDER REQUIRING DISCLOSURES



1934054210709000000000015

018360

HCMLPHMIT00003523

CLO HoldCo, Ltd. ("CLO HoldCo"), Charitable DAF Fund, LP ("DAF Fund"), Highland

Dallas Foundation, Inc., ("Highland Dallas Foundation," collectively, the "Charitable

Respondents"), [1] file this *Response* ("Response") and submit these *Disclosures* ("Disclosures") to

comply with the Court's *sua sponte Order Requiring Disclosures* (Dkt. No. 2460) (the

"Disclosures Order").

---

[1] CLO Holdco and Highland Dallas Foundation have filed a *Motion to Withdraw the Reference* in Adversary Case No. 20-03195 (the "Adversary Proceeding"), at Dkt. No. 24 (in the Adversary Proceeding), and neither the fact nor content of this Response is intended to be nor shall be deemed a waiver of their right to a trial by jury on all claims asserted in the Adversary Proceeding nor consent to the entry of final orders in the Adversary Proceeding by the Bankruptcy Court. DAF Fund is also a defendant in the Adversary Proceeding but has not been served. Neither the fact nor content of this Response by DAF Fund is intended to be nor shall be deemed: a waiver of service requirements in the Adversary Proceeding; acceptance of service of citation or summons in the Adversary Proceeding; waiver of its right to a trial by jury on all claims in the Adversary Proceeding (if ever served), nor consent to the entry of final orders in the Adversary Proceeding by the Bankruptcy Court (again, if ever served). The Charitable Respondents submit this Response in the Bankruptcy Case solely because the Court has ordered them to do so, and because they have appeared before this Court previously.

018361

HCMLPHMIT00003524

TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... I

TABLE OF AUTHORITIES ............................................................................................. II

PRELIMINARY STATEMENT ......................................................................................... 1

PROCEDURAL HISTORY ................................................................................................ 4

RESPONSE ......................................................................................................................... 7

    I.        The Charitable Respondents are independently owned and controlled charitable organizations. ..................................................................................... 7

        a)    CLO HoldCo .............................................................................................. 9

        b)    DAF Fund ................................................................................................. 9

        c)    DAF Holdco ........................................................................................... 10

        d)    DAF GP .................................................................................................. 11

        e)    The Supporting Organizations ................................................................ 11

        f)    Mr. Patrick's role .................................................................................... 15

    II.       The Charitable Respondents have donated tens of millions of dollars to charitable causes ....................................................................................... 16

    III.      CLO HoldCo and DAF Fund may be creditors of the Debtor .............................. 18

    IV.      The Disclosures Order is procedurally improper and the Court has no power to institute *sua sponte* investigations into hypothetical standing. ............................. 20

        a)    The Court does not have the power to require non-parties to provide it with disclosures ............................................................................................. 20

        b)    The Court's *sua sponte* investigation into hypothetical standing is improper. .......... 22

        c)    The Disclosures Order is not just improper, it is prejudicial. ..................................... 26

CONCLUSION ................................................................................................................. 28

i

HCMLPHMIT00003525

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Baum v. Blue Moon Ventures, LLC*,
    513 F.3d 181 (5th Cir. 2008) ................................................26

*Berry v. CIGNA/RSI-CIGNA*,
    975 F.2d 1188 (5th Cir. 1992) ..............................................21

*Brackeen v. Haaland*,
    994 F.3d 249 (5th Cir. 2021) ................................................24

*Castro v. United States*,
    540 U.S. 375, 124 S.Ct. 786, 157 L.Ed.2d 778 (2003) ...........................23

*In re Delta Underground Storage Co., Inc.*,
    165 B.R. 596 (Bankr. S.D. Miss. 1994) ....................................25

*Franklin v. Laughlin*,
    No. SA-10-CV-1027 XR, 2011 WL 598489 (W.D. Tex. Jan. 13, 2011) ...............26

*In re Friede Goldman Halter Inc.*,
    600 B.R. 526 (Bankr. S.D. Miss. 2019) ....................................25

*Greenlaw v. United States*,
    554 U.S. 237 (2008) ........................................................23

*NASCO, Inc. v. Calcasieu Television & Radio, Inc.*,
    894 F.2d 696 (5th Cir.1990) ..............................................22

*Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*,
    2 F.3d 1397 (5th Cir. 1993) ............................................21, 22

*Navtech US Surveyors USSA Inc. v. Boat/Us Inc.*,
    No. 219CV184FTM99MRM, 2019 WL 3219667 (M.D. Fla. July 17, 2019) ...........24

*In re Saldana*,
    531 B.R. 141 (Bankr. N.D. Tex.), *aff'd in part, remanded in part*, 534 B.R.
    678 (N.D. Tex. 2015) ......................................................22

*Sanchez-Llamas v. Oregon*,
    548 U.S. 331 (2006) ........................................................23

*Simon v. Taylor*,
    794 F. App'x 703 (10th Cir. 2019) ........................................23

018363

HCMLPHMIT00003526

*Thompson v. Gonzales*,
  No. 1:15-CV-301-LJO-EPG, 2016 WL 5404436 (E.D. Cal. Sept. 27, 2016) .........................22

*Uberoi v. Labarga*,
  769 F. App'x 692 (11th Cir. 2019) ...............................................................24

*United States v. Sineneng-Smith*,
  140 S. Ct. 1575 (2020)...............................................................................23

*Matter of Ward*,
  978 F.3d 298 (5th Cir. 2020) ......................................................................21

*Wood v. Milyard*,
  566 U.S. 463 (2012)...................................................................................23

**Statutes**

11 U.S.C. § 101(10) ...........................................................................................20

11 U.S.C. § 105...........................................................................................5, 20, 21, 24

**Other Authorities**

Adam Milani & Michael Smith, *Playing God: A Critical Look at Sua Sponte
  Decisions by Appellate Courts*, 69 TENN. L. REV. 245 (2002) ................................23

Ralph Brubaker, *On the Nature of Federal Bankruptcy Jurisdiction: A General
  Statutory and Constitutional Theory*, 41 WM. & MARY L. REV. 743, 832
  (2000)...........................................................................................................24

Ralph Brubaker, *Of State Sovereign Immunity and Prospective Remedies: The
  Bankruptcy Discharge As Statutory Ex Parte Young Relief*, 76 AM. BANKR.
  L.J. 461, 563 (2002).......................................................................................24

018364

HCMLPHMIT00003527

## PRELIMINARY STATEMENT

1.      CLO HoldCo, DAF Fund, and Highland Dallas Foundation have each previously filed pleadings in this Court and are, at least arguably, parties to the Bankruptcy Case. As set forth herein, several targets of the Court's Disclosures Order have never made an appearance before this Court including Charitable DAF Holdco, Ltd.[2] ("DAF Holdco"), Highland Santa Barbara Foundation, Inc. ("Highland Santa Barbara Foundation"), and Highland Kansas City Foundation, Inc. ("Highland Kansas City Foundation," collectively with DAF Holdco and Highland Santa Barbara Foundation, the "Non-Party Targets").[3] The Court does not have the power to order a non-party to produce documents nor undertake *sua sponte* investigations, particularly into non-parties. The fact that these entities are non-parties and at the same time targets, is telling. Further the Non-Party Targets have not been served with the Disclosures Order.

2.      Neither the Charitable Respondents nor undersigned counsel are authorized to make appearances for the Non-Party Targets, and the Non-Party Targets are not by this Response submitting themselves to this Court's jurisdiction. The Charitable Respondents file this Response and submit these Disclosures solely on their own behalf and neither they nor undersigned counsel are appearing for or on behalf of the Non-Party Targets. Nonetheless, much of the Disclosures provided by the Charitable Respondents on their own behalf will be informative regarding the Non-Party Targets. Further, the Non-Party Targets have provided limited authorization for the

---

[2]      Undersigned counsel has been retained to represent DAF Holdco; however, DAF Holdco has never made an appearance in this bankruptcy case and has not been served in the Adversary Proceeding. Nor has DAF Holdco been served with this Disclosures Order. DAF Holdco has not authorized undersigned counsel to accept service nor to make an appearance for it in this Bankruptcy Case.

[3]      The Highland Dallas Foundation, the Highland Santa Barbara Foundation, and the Highland Kansas City Foundation are sometimes also referred to as "Supporting Organizations."

018365

HCMLPHMIT00003528

Charitable Respondents, through Mr. Mark Patrick ("Patrick"), to provide the information to the Court that is submitted by the Charitable Respondents in this Response.

3. Further, the Disclosures Order does not mention the third-party foundation level entities included in the Structure Chart (*infra*) ("Foundations"); however, these Foundations have provided the Charitable Respondents with documents and important information regarding their charitable giving structures and the supporting organizations include the Highland Dallas Foundation and the supporting organizations that are Non-Party Targets. The fact and content of this Response is not intended to be nor shall be deemed to be an appearance by these Foundations in this Bankruptcy Case, nor submission by them to this Court's jurisdiction. The Charitable Respondents file this Response and submit these Disclosures solely on their own behalf and neither they nor undersigned counsel are appearing for or on behalf of the Foundations.

4. Patrick has provided a declaration regarding the information provided by and/or about the Foundations and the Supporting Organizations, and as provided herein within the Disclosures. As well, he has reviewed the Response and Disclosures. *See* **Exhibit 1** [Mark Patrick Declaration]

5. As set forth herein, contrary to the Court's unsupported and highly prejudicial *sua sponte* assertions that the Charitable Respondents and Non-Party Targets "appear to be under the *de facto* control of Mr. Dondero," the Charitable Respondents and Non-Party Targets (along with the Foundations) make up a legal and viable charitable giving structure, established through a non-byzantine set of entities that has committed over $42 million in grants, and funded $32.5 million, to nonprofits across a wide-range of issues including education, support of military, veterans, and first-responders, and victims of family violence and child abuse. With respect to Mr. Dondero, of course he is involved, personally in the capacity as the Donor personality. In addition, as disclosed

2

018366

HCMLPHMIT00003529

within the Disclosures, he holds positions within the Supporting Organizations, which are subject to the authority of the Foundations they support. As well, and as established by Mr. Patrick's uncontroverted testimony before this Court, Mr. Dondero currently acts as an unpaid investment advisor to CLO HoldCo and DAF Fund. However, as will be shown Mr. Dondero is not in "de facto" or legal control of the Charitable Respondents nor the Non-Party Targets (nor the Foundations).

6. The Charitable Respondents take the time to refute the Court's assertions in the Disclosures Order because not only are they factually inaccurate—which will be shown herein and through the submitted Disclosures—but worse, these *sua sponte* findings bear directly upon the causes of action asserted by Official Committee of Unsecured Creditors (the "Committee") against CLO HoldCo, DAF Holdco, DAF Fund, and Highland Dallas Foundation (the "Charitable Defendants") in Adversary Proceeding No. 20-03195 (the "Adversary Proceeding"). While there are several motions to withdraw the reference pending in the Adversary Proceeding, this Court should, at an absolute minimum, refrain from espousing, *sua sponte*, any "findings" or "conclusions" that in fact are indistinguishable from allegations made in conclusory fashion (much like the Court's expositions) by a plaintiff party in litigation currently pending in this Court. Such an "approach" to exercise of the judicial function (under the notion of maintaining the Court's docket) is, frankly, not recognizable as a constitutional approach to exercise of judicial power. This Court, it appears has become litigant, investigator and decider, far outside the scope of case or controversy. Through its assertions the Court appears to have decided integral issues in the Adversary Proceeding *sua sponte* without considering any evidence nor offering the Charitable Defendants any opportunity to present their case, and all this notwithstanding pending motions to

018367

HCMLPHMIT00003530

withdraw reference (that the Court has previously stayed over the objection of the Charitable Defendant movers).

<div align="center">

**PROCEDURAL HISTORY**

</div>

7.      As the Court is aware, there was a show cause hearing on June 8, 2021 (the "Show Cause Hearing") related to the lawsuit filed by CLO HoldCo and DAF Fund against the Debtor captioned *Charitable DAF Fund, L.P. et al. v. Highland Capital Management, L.P. et al.*, case no. 21-cv-00842, pending in the United States District Court for the Northern District of Texas (the "District Court Suit").  In the District Court Suit, the plaintiffs filed a motion to amend their complaint (the "Seery Motion"), and thereafter, the Court issued what it titled: *Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* [Dkt. No. 2255] (the "Show Cause Order") to determine if the "Violators" should be held in contempt of court for filing the Seery Motion.  The Court ordered the "Violators," as defined by the Court, including CLO HoldCo and DAF Fund, those persons who authorized the filing of the Seery Motion and the District Court Suit (and the law firm representing the plaintiffs), along with Mr. Dondero, to appear at the Show Cause Hearing.

8.      Patrick identified himself as the person who authorized the filing of the Seery Motion and the District Court Suit and identified that he was vested with such authority by virtue of his position as the director CLO HoldCo and control person of DAF Fund.  *See* Response, Dkt. No. 2309.  The Debtor undertook extensive discovery related to the Show Cause Hearing with the express purpose of attempting to prove that despite Mr. Patrick authorizing the filings and being the control person of the plaintiffs, Mr. Dondero should nonetheless be held in contempt.

018368

HCMLPHMIT00003531

9.     Therefore, at the Show Cause Hearing, the respondents, including Patrick, introduced evidence reflecting the structure of the Charitable Respondents,[4] the ownership of the Charitable Respondents,[5] and the controlling entities/persons of the Charitable Respondents.[6]  At the Show Cause Hearing, Patrick further provided extensive testimony regarding the creation, structure, organization, purpose, and control of the Charitable Respondents. *See* **Exhibit 2** [Transcript, June 8, 2021 Hearing, Excerpts].

10.     On June 17, 2021, the Court issued its Disclosures Order *sua sponte* pursuant to Section 105 of the Bankruptcy Code and its "inherent ability to efficiently monitor its docket and evaluate standing of parties who ask for relief in the [Bankruptcy Case]."  Disclosures Order, p. 1.

11.     Importantly, the Disclosures Order does not relate to and was not issued in connection with any contested matter or adversary proceeding before the Bankruptcy Court. Instead, the Court states that the Disclosures Order is "in furtherance of [its] desire to be more clear about the standing of various of these entities, and to assess whether their interests may be sufficiently aligned, in some circumstances, so as to require joint pleadings."  Disclosures Order, p. 12.  As such, the Court appears to be attempting to ascertain some sort of generalized standing where there is no proceeding before it and contemplating the issuance of  pre-filing injunctions against the Charitable Respondents and Non-Party Targets.

12.     Based on the forgoing, the Disclosures Order requires numerous parties (whether before the Court or not), including the Charitable Respondents and Non-Party Targets, to file a notice in the Bankruptcy Case disclosing: (a) who owns the entity (showing percentages); (b)

---

[4] Exhibit and Witness List, Dkt. No. 2411 (Exhibit 1)

[5] Exhibit and Witness List, Dkt. No. 2411 (Exhibit 9, 10, 11, 12, 15, 16, 17, 18, 19, 20)

[6] Exhibit and Witness List, Dkt. No. 2411 (Exhibit 3, 4, ,5, 6, 7, 8, 29)

018369

HCMLPHMIT00003532

whether Mr. Dondero or his family trusts have either a direct or indirect ownership interest in the entity and, if so, what percentage of ultimate ownership; (c) who are the officers, directors, managers and/or trustees of the Non-Debtor Dondero-Related Entity (this itself looks to be a determination by this Court of "relationship" with damaging consequences); and (d) whether the entity is a creditor of the Debtor (explaining in reasonable detail the amount and substance of its claims).

13.     The Disclosures Order does not even pretend to be concerned with such mundane matters as proper service, or the right of parties not before the Court, even if creditors, to remain outside the Court.  Certainly the Court does not exhibit a glimpse of concern about possible limitations upon the judicial power to compel parties to appear before it.  Because of its assertions concerning Mr. Dondero's "de facto control" of third party entities (again, outside of any pending case or controversy and in fact contrary to evidence put before the Court), the Court has (i) dispensed with case or controversy boundaries, and (ii) sent its Disclosures Order into the universe as an all-powerful compulsion imposed upon entities that have never made appearance before the Court - all without service.  All because this Court has concluded that these third parties are controlled by Mr. Dondero, and because this Court has power over Mr. Dondero, it need not think twice about its power over any entity it has determined (without ground) to be controlled by Mr. Dondero because such party may have some relation to Mr. Dondero.

14.     As mentioned above, the Charitable Respondents are responding.  But the entities outside the scope of the Court's authority are not appearing in Response.  As set forth below, the Charitable Respondents believe this Response and the Disclosures provided herein are sufficient and compliant.  The Charitable Respondents reserve all rights.

018370

HCMLPHMIT00003533

<div align="center">**RESPONSE**</div>

15.     The Charitable Respondents file their Response to the Disclosures Order to comply with it, but with full reservations concerning the propriety of such a *sua sponte* investigation into standing where there is no proceeding before the Court and the prospective issuance of pre-filing injunctions against parties who have never participated in the Bankruptcy Case (i.e. the Non-Party Targets), or have only do so on a limited basis or were compelled to by order of the Court (i.e. the Charitable Respondents).

16.     The Charitable Respondents have already provided the Debtor and the Court with much of the information ordered by the Court, and do so again and more robustly herein, to show to the Court that the Charitable Respondents are not "under the *de facto* control of Mr. Dondero" and its directors do not act "at Mr. Dondero's direction." *See* Disclosures Order, pp. 5, 11.

17.     The Charitable Respondents, however, take this opportunity to correct any misunderstanding regarding their structure and control, while noting and reserving all rights regarding the impropriety of such prejudicial *sua sponte* assertions.

    **I.**     **The Charitable Respondents are independently owned and controlled charitable organizations.**

18.     The best starting point to understand the structure of the Charitable Respondents is the Structure Chart attached hereto as **<u>Exhibit 3</u>** ["Structure Chart"]. For ease of reference, the Structure Chart is reproduced as follows:

<div align="center">7</div>

<div align="right">018371</div>

HCMLPHMIT00003534



19.     Second, the Charitable Respondents provide the Court with a legal memorandum of Kenneth K. Bezozo, a partner with Haynes and Boone, LLP, determined by the Charitable Respondents to be a legal expert in the field of taxation and organizational structures. *See* **Exhibit 4** [Kenneth K. Bezozo Memorandum].  As the Bezozo Memorandum explains, the Structure Chart and the entity structure of which the Charitable Respondents are a part (along with the Supporting Organizations and the Foundations) is a structure including offshore entities that is a typical industry standard investment structure to facilitate tax-exempt ownership and charitable giving.  Given that the structure employed is in fact, within the tax-exempt, charitable entity structures neither unusual nor exotic, the Charitable Respondents submit that contrary to the jargon appropriated by the Court from the Committee and the Debtor and its counsel, this structure is not at all "Byzantine."

018372

HCMLPHMIT00003535

**The Entities**

**a) CLO HoldCo**

20.      As the Structure Chart reflects, CLO HoldCo is a company limited by shares incorporated in the Cayman Islands.  *See* **Exhibit 5** [Certificate of Incorporation - CLO HoldCo, Ltd.].  CLO HoldCo was incorporated in 2010.  *See* **Exhibit 6** [Memorandum of Association of CLO HoldCo, Ltd.].  CLO HoldCo is managed and controlled by directors who are appointed by resolution of shareholders of CLO HoldCo.  *See* Memorandum of Association of CLO HoldCo, Ltd., p. 11-12 ("Directors").  The Directors are currently Mr. Patrick and Mr. Paul Murphy.  *See* **Exhibit 36** [CLO HoldCo - Register of Directors].

21.      CLO HoldCo is owned by the holder of its sole share.  The sole shareholder of CLO HoldCo was previously DAF Holdco who contributed the share on November 7, 2011 to DAF Fund.  *See* **Exhibit 7** [Ordinary Share Registry - CLO HoldCo].  Therefore, CLO HoldCo is wholly owned by DAF Fund.[7]

**b) DAF Fund**

22.      DAF Fund is a limited partnership organized under the laws of the Cayman Islands.  *See* **Exhibit 8** [Certificate of Registration of Exempted Limited Partnership - DAF Fund].  Pursuant to the *Amended and Restated Exempted Limited Partnership Agreement dated November 7, 2011* (the "DAF Fund LP Agreement"), DAF Holdco is the limited partner of the DAF Fund and the Charitable DAF GP, LLC ("DAF GP") is the general partner.  *See* **Exhibit 9** [DAF Fund

---

[7]      While not appearing on the Structure Chart, nor made subject of the Disclosures Order, there are subsidiaries of CLO HoldCo as well, and these are named, with corresponding ownership and director exhibits identified as follows:  (i) Liberty CLO Holdco, Ltd. (*see* **Exhibits 38 and 39** [Register of Directors and Share Register]); (ii) MGM Studios HoldCo, Ltd. (*see* **Exhibits 40 and 41** [Register of Directors and Share Register]); (iii) HCT HoldCo 2, Ltd. (*see* **Exhibits 42 and 43** [Register of Directors and Share Register]).  Note, Dondero holds no directorship or ownership.

018373

HCMLPHMIT00003536

LP Agreement]. Pursuant to the terms of the DAF Fund LP Agreement, DAF Holdco contributed its equity interest in CLO HoldCo to DAF Fund pursuant to a Contribution and Transfer Agreement dated November 7, 2011. Ordinary Share Class Transfers - CLO HoldCo; DAF Fund LP Agreement, ¶3.1.

23.     The express purpose of DAF Fund is and always was to invest and trade in securities of all type and other investment vehicles for the purpose of befitting, direct and indirectly, the indirect equity owners of DAF Holdco, which were required to be Section 501(c)(3) of the IRS Code entities or organizations or have sole beneficiaries which are entities or organizations exempt from taxation under Section 501(c)(3) of the IRS Code. *See* DAF Fund LP Agreement, ¶1.3.

24.     Because DAF Fund is a limited partnership, the DAF GP has the exclusive and complete discretion in the management and control of the DAF Fund. DAF Fund LP Agreement, ¶1.6, **Exhibit 10** [DAF Fund General Partner Register].

### c)  DAF Holdco

25.     DAF Holdco is a company limited by shares incorporated under the laws of the Cayman Islands. See **Exhibit 11** [Amended and Restated Memorandum of Association of DAF Holdco]. DAF Holdco's equity ownership consists of holders of Management and Participating Shares. *Id.* The Management Shares confer no right to participate in profits but rather to manage DAF Holdco, whereas Participating Shares confer the right to participate in profits or assets but not management rights. *Id.*

26.     The Management Shares of DAF Holdco were allotted to Grant Scott ("Scott") in 2011 but as will be discussed herein, were transferred to Patrick in 2021. *See* **Exhibit 12** [Register of Management Shares DAF Holdco]. The Directors are currently Mr. Patrick and Mr. Paul Murphy. *See* **Exhibit 37** [DAF Holdco - Register of Directors]. The Participating Shares of DAF

018374

HCMLPHMIT00003537

Holdco are held by the "Supporting Organizations," which are Highland Kanas City Foundation [32.78%], Highland Dallas Foundation [32.78%], Highland Santa Barbara Foundation [32.78%], and Highland Community Foundation of North Texas [1.63%].[8]  *See* **Exhibit 13** [Register of Participating Shares DAF Holdco].

27.    As set forth in the DAF Fund LP Agreement, DAF Fund's investments are for the benefit of the equity owners of  DAF Holdco which were required to be non-profit organizations. The Supporting Organizations are those non-profit organizations.

**d)  DAF GP**

28.    DAF GP is a limited liability company organized under the laws of Delaware. *See* **Exhibit 14** [Certificate of Formation of DAF GP].  Again, DAF GP is the general partner of DAF Fund who manages and controls DAF Fund.  Prior to March 2021, 100% of the limited liability company interests in the DAF GP (the "DAF GP Membership Interests") were held by Mr. Scott. Mr. Scott transferred all of the DAF GP Membership Interests to Mr. Patrick.  **Exhibit 15** [Assignment and Assumption of Membership Interests Agreement Dated March 24, 2021].

29.    As shown by the Exhibits hereto, Dondero holds no ownership, officer, or director status in any of:  CLO HoldCo; DAF Fund; DAF HoldCo; or DAF GP.

**e)  The Supporting Organizations**

30.    As mentioned, the Supporting Organizations are Highland Dallas Foundation, Highland Kansas City Foundation, Highland Santa Barbara Foundation, and Highland Community Foundation of North Texas.  These Supporting Organizations were established by the Foundations.

---

[8]    The Court has not included Highland Community Foundation of North Texas in its Disclosures Order.

018375
HCMLPHMIT00003538

- **Highland Dallas Foundation**

31.     Highland Dallas Foundation is a corporation incorporated in 2011 under the laws of Delaware.  **Exhibit 16** [HDF Certificate of Incorporation].  The Highland Dallas Foundation was and is organized and operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the IRS Code.  **Exhibit 17** [IRS Determination - HDF].

32.     The Highland Dallas Foundation supports and benefits the Dallas Foundation.  *See* HDF Certificate of Incorporation, **Exhibit 18** [Narrative Description of Activities].  The Dallas Foundation is a third-party and is the oldest community foundation in Texas.

33.     As set forth in the attached letter from the President and Chief Executive Officer of the Dallas Foundation, the Dallas Foundation is a Texas nonprofit corporation, and is the successor in interest to Dallas Community Trust, a charitable trust which was formed in 1929.  **Exhibit 19** [reserved for supplementation].  The Dallas Foundation has hundreds of donors with whom it works regularly to make charitable grants supporting numerous worthy causes and regularly utilizes donor-advised funds and supporting organizations to carry out its charitable mission.  *Id.*

34.     The Highland Dallas Foundation is a membership corporation, and its members have the ultimate authority to elect its Board of Directors.  *Id.*  **Exhibit 20** [HDF Bylaws].  The Highland Dallas Foundation has two (2) classes of members, an "Institutional Member" (the TDF), and an "Individual Member" (Mr. Dondero).  *Id.*

35.     The Institutional Member has two (2) votes and the Individual Member has only one (1) vote on any matter submitted to the members.  *Id.*  Further, the Institutional Member elects two (2) of Highland Dallas Foundation's three (3) directors, and the Individual Member elects one (1) director.  *Id.*  The Board of Directors of Highland Dallas Foundation consists of Mr. Dondero, Julie Diaz (Chief Philanthropic Partnerships Officer of TDF) and Matthew Randazzo (President

018376

HCMLPHMIT00003539

& Chief Executive Officer of Dallas Foundation).  Mr. Dondero serves as President, Mr. Randazzo

serves as Vice President and Ms. Diaz serves as Secretary and Treasurer.

36.     So while Mr. Dondero is a member with some level of influence within the

Highland Dallas Foundation, he has 1/3 of the voting power, where TDF employees have 2/3 of

voting power.

37.     The Highland Dallas Foundation is an independent supporting organization of the

Dallas Foundation.  While Mr. Dondero is on the Board of Directors and is President of the

Highland Dallas Foundation, it cannot be said to be "under the control" (de facto or otherwise) of

Mr. Dondero, because of the control of the Board of Directors held by the Dallas Foundation.

- **Highland Santa Barbara Foundation**

38.     The Highland Santa Barbara Foundation was formed in November 2011 as a

Delaware nonprofit nonstock corporate to operate exclusively for the benefit of, to perform the

functions of, or carry out the purposes of Santa Barbara Foundation.  See **Exhibit 21** [HSBF

Certificate of Incorporation]; **Exhibit 22** [IRS Determination - HSBF].

39.     The Santa Barbara Foundation is a third-party community foundation incorporated

in 1928 as a nonprofit corporation to enrich the lives of the people of Santa Barbara County through

philanthropy.  **Exhibit 23** [SBF Letter Overview].  The Santa Barbara Foundation funds a wide

range of initiatives, projects, and organizations and has supported nearly every Santa Barbara

County nonprofit organization and essential community sproject during its 93-year history.  *Id.*

40.     Similarly to the Dallas Foundation, the Santa Barbara Foundation works with

entities organized under Section 509(a)(3) of IRS Code as supporting organizations to Santa

Barbara Foundation for the specific and primary purpose of benefiting, performing functions of,

018377

HCMLPHMIT00003540

and engaging in activities consistent with Santa Barbara Foundation's charitable purposes. *Id.* Highland Santa Barbara Foundation is one such supporting organization. *Id.*

41.     Again as is common amongst supporting organizations, Highland Santa Barbara Foundation has two classes of members, institutional and individual, and one member in each class. *Id.*, *see also* Bylaws HSBF. Santa Barbara Foundation is the institutional member and Mr. Dondero is the individual member. Highland Santa Barbara Foundation has three directors, two elected by SBF and one elected by Mr. Dondero. The president, secretary, and any other officers of HSBF are elected by the three directors. *Id.* The directors are Mr. Dondero, Jacqueline M. Carrera (President & CEO of SBF), and Arnold Brier (Santa Barbara County community volunteer). Currently, Mr. Dondero serves as President, Jacqueline M. Carrera as Vice President, and the Secretary position is vacant pending board of directors election.

42.     Again, while Mr. Dondero positions in the Highland Santa Barbara Foundation, it is certainly not under his "de facto" control, nor do the other directors and officers act under Mr. Dondero's direction. The Highland Santa Barbara Foundation is an independent supporting organization of the Santa Barbara Foundation, and is controlled by the Santa Barbara Foundation. Imputing a lack of independence based on what is a typical structure for supporting organization management sets a unwarrantable precedent for charitable organizations.

- **Highland Kansas City Foundation**

43.     Highland Kansas City Foundation was and is organized and operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the IRS Code, and to support and benefit the Greater Kansas City Community Foundation ("GKCCF"). *See* **Exhibit 24** [GKCCF Certificate of Formation].

018378
HCMLPHMIT00003541

44.    The Greater Kansas City Community Foundation was created in 1978 and manages over $4 billion in assets, and again uses donor-advised funds and supporting organizations. *See* **Exhibit 25** [GKCCF Letter].  As explained by the President & CEO of Greater Kansas City Community Foundation, Highland Kansas City Foundation is one of 18 supporting organizations that Greater Kansas City Community Foundation works with. *Id*.

45.    Highland Kansas City Foundation has two classes of members, institutional and individual, and one member in each class. *See* **Exhibit 26** [Bylaws HKCF].  Greater Kansas City Community Foundation is the institutional member and Mr. Dondero is the individual member.

46.    The Directors of Highland Kansas City Foundation are: Brenda Chumley (Senior Vice President of Greater Kansas City Community Foundation), Mr. Dondero, and Deborah Wilkerson (the President & CEO of Greater Kansas City Community Foundation).  The Highland Kansas City Foundation has not named officers. All three directors approve grants by unanimous consent.

**f)  Mr. Patrick's role**

47.    Prior to March 24, 2021, Mr. Scott was the holder of Management Shares in the DAF Holdco.  On March 24, 2021, Mr. Scott executed the *Share Transfer Form*, in which he transferred the management shares in DAF Holdco to Mr. Patrick.  **Exhibit 27** [Share Transfer Form].  Further on March 24, 2021, Mr. Scott and Mr. Patrick entered into that certain *Assignment and Assumption of Membership Interest* whereby Mr. Scott assigned and Mr. Patrick assumed one hundred percent of the limited liability company interest in the DAF GP.  *See* Assignment and Assumption Agreement.

48.    As the holder of the management shares in DAF Holdco, Mr. Patrick executed a resolution removing Mr. Scott as Director and appointing Mr. Patrick as Director.  **Exhibit 28** [March 25 Resolution - DAF Holdco].

15

HCMLPHMIT00003542

49.     On April 2, 2021, Mr. Patrick, as holder of one hundred percent of the interest in DAF GP, executed the shareholder resolution removing Mr. Scott as Director of CLO HoldCo and appointing Mr. Patrick as director.  **Exhibit 29** [April 2 Resolution - CLO HoldCo].

50.     While on paper the switch from Mr. Scott to Mr. Patrick was completed, it became obvious that this switch would be practically more complicated.  Therefore, there was a transitional period wherein Mr. Scott had to continue to authorize certain actions with Mr. Patrick assisting him.  As of the date of filing, Mr. Scott no longer has authority/ control over the Charitable Respondents.

51.     After Mr. Patrick's appointment, he determined that given the breadth of issues facing the Charitable Respondents, including but not limited to the Adversary Proceeding, it would be in the best interest of DAF Holdco, CLO HoldCo and others for another director to be appointed. As such, on April 22, 2021, Paul Murphy was appointed a director of DAF Holdco and CLO HoldCo.  **Exhibit 30** [Written Resolution - Murphy].

## II.     The Charitable Respondents have donated tens of millions of dollars to charitable causes

52.     The Court included the Charitable Respondents and Non-Party Targets as part of what it terms — borrowing from the Committee's verbiage in the Adversary Proceeding — Mr. Dondero's "byzantine" empire and made *sua sponte* assertions regarding their lack of independence and Mr. Dondero's "de facto" control.  Again, as will be set forth herein, these findings are procedurally improper and highly prejudicial to the Charitable Defendants.  But most importantly, they are wrong.

53.     The Charitable Respondents are part of a charitable structure that donates tens of millions of dollars to charitable causes focusing on education; support for military, veterans, and

018380

HCMLPHMIT00003543

first responders; health and medical research; economic and community development initiatives; and youth and family. *See* **Exhibit 31** [Charitable Giving Overview, Grant Summary: 2012-2020].

54.     Since 2012, the Supporting Organizations have committed over $42 million to nonprofit organizations, and have funded $32 million of the total commitments (with the remaining commitments being comprised of future scheduled installments). *Id*.

55.     The Supporting Organizations' charitable giving has made a tangible impact on some of the most vulnerable including grants to the Dallas Children's Advocacy Center which serves over 8,000 abused children a year and The Family Place which serves more than 11,000 victims of family violence. *Id*. The CEO of The Family Place has submitted a letter in support which is attached hereto as **Exhibit 32** [The Family Place Letter]. The Family Place empowers victims of family violence by providing safe housing and counseling, and identifies its partnership with the Highland Dallas Foundation as "instrumental" in providing community exposure and awareness of domestic violence as well as providing essential services to family violence victims. *Id*. As stated by the CEO, The Family Violence Place would not be able to successfully serve its domestic violence clients without this support.

56.     Cristo Rey Dallas also submitted a letter in support of the Highland Dallas Foundation which is submitted herewith as **Exhibit 33** [Cristo Rey Letter]. Cristo Rey Dallas provides college preparatory high school curriculum accessible to those of limited financial resources. Highland Dallas Foundation provided impactful donations which allow Crito Rey Dallas to provide services to its 465 students, including funding work study programs and remote work places during COVID-19 pandemic. *Id*.

57.     Dallas Children's Advocacy Center submitted a letter in support of the Highland Dallas Foundation which is submitted herewith as **Exhibit 34** [DCAC Letter]. Dallas Children's

018381

HCMLPHMIT00003544

Advocacy Center's mission is to improve the lives of abused children in Dallas County and to provide national leadership on child abuse issues. *Id*. Highland Dallas Foundation has robustly supported this mission since 2016, including providing funding that has been critical to the sustainability of its programs. *Id*.

58.     The Supporting Organizations' grants to the Center for BrainHealth helped provide and training other programming to members of the military, veterans, and local law enforcements to improve their congestive health. *See* Charitable Giving Overview.

59.     The Friends of the Dallas Police grants show appreciation to men and women who risk their lives every day to make Dallas a safer city and the Supporting Organizations have funded awards programs and educational sponsorships for children of police officers. *Id*.

60.     The Charitable Respondents invite the Court, and others who have characterized the Supporting Organizations as mere "puppets" of Mr. Dondero, to review the Charitable Giving Overview provided herewith as well as the letters in support from The Family Place, Cristo Rey Dallas, Dallas Children's Advocacy Center,  the Santa Barbara Foundation, and the Highland Kansas City Foundation.  The Charitable Respondents have and will continue to make meaningful impacts on the communities they serve through the tens of millions of dollars of philanthropic giving they facilitate.

**III.    CLO HoldCo and DAF Fund may be creditors of the Debtor**

61.     In the Disclosures Order, the Court requires all entities to state whether the entity is a creditor of the Debtor and explain in reasonable detail the amount and substance of its claims. Disclosures Order, p. 13.

62.     All claims bar dates have long since passed [*see* General Claims Bar Date Order [Dkt. No. 498].

018382

HCMLPHMIT00003545

63.     The Court states that CLO HoldCo filed two proofs of claim.  Disclosures Order, p. 11.  This is not correct.  CLO HoldCo filed a proof of claim on April 8, 2020 [Proof of Claim No. 133] and on October 21, 2021, CLO HoldCo amended that same proof of claim [Proof of Claim No. 198] (the "Amended Proof of Claim").  In the Amended Proof of Claim, CLO HoldCo explained that as a result of certain proceedings that effectuated a termination of the Debtor's participation interests in the funds referred to in the CLO HoldCo proof of claim, such termination served to cancel the CLO HoldCo interests, as well, as the CLO HoldCo interests were in effect derivative of the Debtor's interests.  Accordingly, the Amended Proof of Claim reflected that the CLO HoldCo claim was reduced to $0.00, and therefore resolved.

64.     The Court stated in the Disclosures Order that it was unaware of whether DAF Holdco, DAF Fund, Highland Dallas Foundation, Highland Santa Barbara Foundation, or Highland Kansas City Foundation filed proofs of claims (notwithstanding this "uncertainty" the Court deemed it appropriate nevertheless to try to compel appearance).  Disclosures Order, p. 11.  A review of the Court's Claims Register and that of the Debtor's claims and noticing agent reflects that none of these entities filed proofs of claim against the Debtor.

65.     Therefore, none of the Charitable Respondents are pre-petition creditors of the Debtor, as the claims bar date has long since passed and no claims were filed which have not been fully resolved.

66.     It is unclear from the Disclosures Order whether the Court is referring to the term "creditor" as defined in section 101(10) of the Bankruptcy Code or using creditor as a lay term.  If it is the former, the Charitable Respondents are not creditors of the Debtor.  *See* 11 U.S.C. § 101(10) (defining a "creditor" an entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor).

018383

HCMLPHMIT00003546

67. As the Court is aware from the Show Cause Hearing, CLO HoldCo and DAF Fund filed the District Court Suit against the Debtor. The causes of action asserted by CLO HoldCo and DAF Fund arose after the order for relief. **Exhibit 35** [Complaint]. The substance of these claims is set forth in the Complaint.

## IV. The Disclosures Order is procedurally improper and the Court has no power to institute *sua sponte* investigations into hypothetical standing.

68. The Charitable Defendants have fully complied with the Court's Disclosures Order and provided the Court with complete information regarding: (a) who owns each entity, (b) whether Mr. Donerdo or his family trusts have direct or indirect ownership, (c) who the officers, directors, and managers are, and (d) whether the entity is a creditor of the Debtor. The Charitable Defendants have done so because they were expressly ordered by the Court do; however, the Disclosures Order is procedurally improper and highly prejudicial.

### a) The Court does not have the power to require non-parties to provide it with disclosures.

69. The Charitable Defendants are those named entities who have made appearances before this Court. The Court does not have the power to order production or disclosures from non-parties including the Non-Party Targets.

70. In the Disclosures Order, the Court states that the order is issued "*sua sponte* pursuant to Section 105 of the Bankruptcy Code and the court's inherent ability to efficiently monitor its docket and evaluate the standing of parties who ask for relief in the above-referenced case." Disclosures Order, p. 1. But yet, the Disclosures Order goes on to target entities who have never asked for the relief in the Bankruptcy Case.

71. Of course, it is undisputed that the Court has the inherent power to manage its own docket "to ensure the orderly and expeditious disposition of cases." *Berry v. CIGNA/RSI-CIGNA*, 975 F.2d 1188, 1191 (5th Cir. 1992) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31

018384

HCMLPHMIT00003547

(1962)).  But this inherent authority is limited, as is the Court's authority pursuant to section 105 of the Bankruptcy Code.  *Matter of Ward*, 978 F.3d 298, 303 (5th Cir. 2020) (noting that "the powers afforded to bankruptcy courts pursuant to § 105, however, are not unlimited").

72.    In *Energy Gathering*, the Fifth Circuit considered whether the district court could *sua sponte* order a party's attorney, a non-party to the case, to produce documents.  *See Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1412 (5th Cir. 1993).  In that case, the district court found that the attorney had purposefully withheld documents from the court, and "ordered [him] to produce every document in his possession relating to [his client] or business he had done with [his client]."  *Id*. at 1404. The district court did not explain the source of its perceived authority to do so.  *See id*. at 1405.

73.    On appeal by the attorney, the plaintiffs asserted that the district court had the inherent authority to order him to produce documents. *Id*. at 1406.  The Fifth Circuit disagreed with the plaintiffs.  *See id*. at 1408-09. Specifically addressing whether the district court had the inherent authority to issue its order, the Fifth Circuit acknowledged that the district court had certain limited power "to conduct discovery not recognized by rule or statute," observing that federal courts "possess[ ] all of the common law equity tools of a Chancery Court (subject, of course, to congressional limitation) to process litigation to a just and equitable conclusion." *Id*. at 1409.  The Fifth Circuit suggested that the district court had the inherent authority to order the attorney to produce documents—if at all—under its power to issue a "bill of discovery," a common law "chancery tool" that the Supreme Court has described as "the forerunner of all modern discovery procedures." *Id*. at 1409.  But recognizing that bills of discovery "could not be used to obtain documents (or other discovery) from someone who was not a party," the Fifth Circuit

018385

HCMLPHMIT00003548

therefore concluded that district courts do not have the inherent authority to order non-parties to produce discovery. *Id.*

74.     Important here, the Fifth Circuit noted the impropriety of the *sua sponte* investigation by the district court. *Id.* at 1411 (noting "factors [that] contribute to the order's unreasonableness" as being the *sua sponte* nature of the order and that the "court engaged in a fishing expedition"). Expressly relying upon the *Energy Gathering* opinion, the court in *Thompson v. Gonzales* determined that the court lacked inherent authority to order disclosures from non-parties. *Thompson v. Gonzales*, No. 1:15-CV-301-LJO-EPG, 2016 WL 5404436, at *8 (E.D. Cal. Sept. 27, 2016).

**b) The Court's *sua sponte* investigation into hypothetical standing is improper.**

75.     As the Fifth Circuit noted in *Energy Gatherings* and this Court and others numerous have many times since, inherent authority "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 702 (5th Cir.1990); *In re Saldana*, 531 B.R. 141, 166 (Bankr. N.D. Tex.), *aff'd in part, remanded in part*, 534 B.R. 678 (N.D. Tex. 2015).

76.     Here, the Court has launched a *sua sponte* investigation into parties under the stated purpose of evaluating their hypothetical standing.

77.     The American adversarial system differs from its European (and other) inquisitorial counterparts in that its central features are "party presentation of evidence and arguments" for resolution before a "neutral and passive decision maker[]." Adam Milani & Michael Smith, *Playing God: A Critical Look at Sua Sponte Decisions by Appellate Courts*, 69 TENN. L. REV. 245, 272 & n.143 (2002); *see also United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020); *Greenlaw v. United States*, 554 U.S. 237, 243 (2008); *Wood v. Milyard*, 566 U.S. 463, 472 (2012).

018386

HCMLPHMIT00003549

78.    The judge "does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties."    *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 356 (2006) (quotation omitted). Thus, "[i]t is normally incumbent on each party to prove its claims," and a *sua sponte* investigation upsets the normal burden of persuasion between the parties."  Domitille Baizeau and Tessa Hayes, *The Arbitral Tribunal's Duty and Power to Address Corruption Sua Sponte*, in Andrea Menaker (ed), International Arbitration and the Rule of Law: Contribution and Conformity, ICCA Congress Series, Volume 19, pp. 225 -265.

79.    Thus, federal courts have been instructed to restrain from conducting such an inquest which is antithetical to the American adversarial system. *Simon v. Taylor*, 794 F. App'x 703, 718 (10th Cir. 2019) (noting that scientific evidence involving environmental contamination from the district court's own *sua sponte* investigation cannot be considered); *Wood*, 566 U.S. at 472 ("federal court does not have carte blanche to depart from the principle of party presentation basic to our adversary system"); *Castro v. United States*, 540 U.S. 375, 381–383, 124 S.Ct. 786, 157 L.Ed.2d 778 (2003).

80.    The Court asserts that it launched its investigation because standing is an issue of subject matter jurisdiction and that it must gain "clarity" with regard to standing. Disclosures Order, p. 2.  But what the Court proposes to do is render an impermissible advisory opinion on the hypothetical standing of the various entities, including some of have never filed a pleading in the Bankruptcy Case.  How can this Court have blanket power to compel investigation of entities that have never made appearances before the Court, or that have only been made parties because they have been sued, on the purported ground it needs to investigate standing?  As shown here, it cannot.

018387

HCMLPHMIT00003550

81.     A bankruptcy case itself is not a justiciable controversy; rather, it is the individual proceedings (contested matters or adversary proceedings) which create a justiciable case or controversy.[9]  Here, there is no proceeding, and instead, the Court expressly stated that it will determine standing *sua sponte* pursuant to section 105 of the Bankruptcy Code.  While this general rule of justiciablity standing alone would prohibit such a determination, evaluating a party's hypothetical standing absent a justiciable controversy is acutely problematic. *See Uberoi v. Labarga*, 769 F. App'x 692, 697 (11th Cir. 2019) ("The Court should not speculate concerning the existence of standing."); *Navtech US Surveyors USSA Inc. v. Boat/Us Inc.*, No. 219CV184FTM99MRM, 2019 WL 3219667, at *2 (M.D. Fla. July 17, 2019) (noting that advisory opinions on standing are improper).

82.     This is because "standing is not dispensed in gross," rather, standing must be established for each claim a party seeks to press and for each form of relief that is sought. *Brackeen v. Haaland*, 994 F.3d 249, 291 (5th Cir. 2021) (quoting *Town of Chester v. Laroe Estates, Inc.*, –— U.S. ——, 137 S. Ct. 1645, 1650, 198 L.Ed.2d 64 (2017) and *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008)).

83.     This is rule is no less applicable in a bankruptcy case.  The Bankruptcy Code does not define "party in interest," offering instead a non-exclusive list of who "may raise and may appear and be heard on any issue" in cases under chapter 11.  *In re Friede Goldman Halter Inc.*,

---

[9]     Ralph Brubaker, *On the Nature of Federal Bankruptcy Jurisdiction: A General Statutory and Constitutional Theory*, 41 WM. & MARY L. REV. 743, 832 (2000); Ralph Brubaker, *Of State Sovereign Immunity and Prospective Remedies: The Bankruptcy Discharge As Statutory Ex Parte Young Relief*, 76 AM. BANKR. L.J. 461, 563 (2002) (explaining that: "the appropriate constitutional explanation for the entirety of federal bankruptcy jurisdiction materializes only when one recognizes that the fundamental jurisdictional unit in bankruptcy is an individual bankruptcy 'proceeding' raising a justiciable controversy between adverse parties.").

018388

HCMLPHMIT00003551

600 B.R. 526, 530–31 (Bankr. S.D. Miss. 2019).  "The lack of definition was intentional." *In re Delta Underground Storage Co., Inc.*, 165 B.R. 596, 598 (Bankr. S.D. Miss. 1994).

84.    Congress' failure to define a party in interest specifically was discussed by both Senator DeConcini and Representative Edwards during the proceedings preceding the enactment of the Code.  Senator DeConcini stated:

> Rules of bankruptcy procedure or court decisions will determine who is a party in interest **for the particular purposes of the provision in question.**' 124 Cong.Rec. § 12407 (daily ed. Oct. 6, 1978).... Party in interest is an expandable concept **depending on the particular factual context in which it is applied**.

*Id. (*citing *In re North American Oil & Gas, Inc.*, 130 B.R. 473, 479 (Bankr.W.D.Tex.1990)) (emphasis added).  Congress has thus expressly directed that standing in a bankruptcy case must be determined in the particular proceeding before the bankruptcy court.

85.    But here, there is no "particular purpose" or "particular factual context" in which this Court can properly evaluate party in interest standing.  Instead, it appears that the Court proposes to render an advisory opinion on the named entities' standing to file pleadings without any requisite justiciable controversy before it.  But none of this makes sense, with respect to entities not before the Court or only before the Court in capacity as defendants.  In fact the Disclosures Order appears to be more of an investigation to find evidence that the Court could point to as supporting its assertions about Dondero's *de facto* control.

86.    Additionally, the Court further states that beyond determining the hypothetical standing of such parties, it also must "ascertain whether their interests are sufficiently aligned such that the parties might be required to file joint pleadings hence forth, rather than each file pleadings that are similar in content."  Disclosures Order, p. 1.  What the Court is describing are pre-filing injunctions, which "are an extreme remedy" that courts should not issue "with undue haste because such sanctions can tread on a litigant's due process right of access to the courts."  *Franklin v.*

018389

HCMLPHMIT00003552

*Laughlin,* No. SA-10-CV-1027 XR, 2011 WL 598489, at *7 (W.D. Tex. Jan. 13, 2011), *report*

*and recommendation adopted,* No. SA-10-CV-1027-XR, 2011 WL 672328 (W.D. Tex. Feb. 15,

2011).

87.     Specifically, the Fifth Circuit has explained that:

"In determining whether it should impose a pre-filing injunction or should modify
an existing injunction to deter vexatious filings, a court must weigh all the relevant
circumstances.  Four factors must be specifically considered: (1) the party's history
of litigation, in particular whether he has filed vexatious, harassing, or duplicative
lawsuits; (2) whether the party had a good faith basis for pursuing the litigation, or
simply intended to harass; (3) the extent of the burden on the courts and other
parties resulting from the party's filings; and (4) the adequacy of alternative
sanctions.

*Baum v. Blue Moon Ventures, LLC,* 513 F.3d 181, 189 (5th Cir. 2008).

88.     What is more, this purported reason makes no sense, as multiple entities the Court

seeks to compel have never made an appearance and the Court has no basis to even suspect that

they might make an appearance.  With respect to parties who have filed pleadings, for example the

Charitable Defendants, the Court already knows that Highland Dallas Foundation and CLO

HoldCo have filed joint pleadings within the Adversary Proceeding (a single motion to dismiss for

failure to state claims and a single motion to withdraw reference). The Non-Party Targets are

nowhere to be found within the Bankruptcy Case or any proceedings before the Court; yet the

Court must conduct an investigation into these entities to see whether to compel the filing of joint

pleadings?  Cannot be.

### c)  The Disclosures Order is not just improper, it is prejudicial.

89.     As this Court is aware, the Charitable Defendants are defendants in the Adversary

Proceeding instituted by the Committee (DAF Fund and DAF Holdco are also defendants, though

yet unserved—despite the Adversary Proceeding being pending for over 6 months).  Central to the

Committee's claims against the Charitable Defendants are the conclusions posing as allegation(s)

018390

HCMLPHMIT00003553

that the Charitable Defendants are part of civil conspiracy to fraudulently transaction assets out of the estate orchestrated by Mr. Dondero whom the Committee characterized as: standing on top of byzantine empire, moving assets and funds from one entity to another to meet various needs. *See* Adversary Proceeding, Dkt. No. 6, ¶2. (Sounds familiar).

90.     In the Disclosures Order, the Court, seemingly already deciding this highly disputed issue in the Adversary Proceeding (which is not even a dispute—CLO HoldCo and Highland Dallas Foundation have filed a (joint) motion to dismiss under Rule 7012 for failure to state a claim), as it borrows the Committee's "byzantine" characterization and states that the targets of its Disclosures Order "appear to be under the *de facto* control of Mr. Dondero" and that the DAF Fund's decisions are "presumably at Mr. Dondero's direction." (the word "byzantine" is a much overworked word within this Bankruptcy Case, and its proceedings, pleadings, and orders of this Court.  Disclosures Order, pp. 5, 11.  This constitutes direct, specific, and express pre-judgment by this Court, and, of course, has tainted the Adversary Proceeding.

91.     First and foremost, as shown herein, these assertions/findings are wrong.  The Charitable Respondents and Non-Party Targets comprise an independent charitable giving structure that has facilitated the donation of tens of millions of dollars to important philanthropic causes.  They are not under the *de facto* control of Mr. Dondero nor does Mr. Dondero direct their decisions—though like any donor would expect, Mr. Dondero has some say in the causes which the Supporting Organizations donate to.

92.     But the fact that the Court has made these assertions/findings *sua sponte* outside of the Adversary Proceeding (or any case or controversy), when it has no authority to adjudicate the Adversary Proceeding (that is the subject of a motion to withdraw reference), is highly prejudicial to the Charitable Defendants. This Court, in its assumed posture as investigative body as well as

27

018391

HCMLPHMIT00003554

prosecutor and decider, has given cover to the utterly conclusory assertions of the Committee, and has, practically, joined the Committee as a plaintiff.

93.     At an absolute minimum, the Court should refrain from deciding or even commenting upon contested issues of law and fact *sua sponte* outside of the Adversary Proceeding, and should retract its supposed findings (issued under the transparently incorrect suggestion of its power to manage its own docket [by pre-screening parties for standing????? - again, the case law cited above shows this is not proper]).  The Charitable Respondents urge the Court, particularly after reviewing the information and documents provided in this Response and Disclosures, to reconsider such findings, and respectfully request that this Court retract its Disclosure Order or at least the problematic content therein.

<div align="center">

CONCLUSION

</div>

By this Response and the Disclosures, the Charitable Respondents have fully complied with this Court's Disclosures Order, but have done so with the express reservations concerning the impropriety of the Disclosures Order and the non-appearance or submission by the Non-Party Targets.  But most important to the Charitable Respondents is that the Court closely review this Response and Disclosures and reconsider its assumptions/assertions/findings/conclusion that the Charitable Respondents are under the *de facto* control of or act at the direction of Mr. Dondero. The Charitable Respondents are real, independent charitable giving vehicles that have affected, very positively, the lives of countless people through the tens of millions of dollars donated to important philanthropic causes.

<div align="center">

[*signature block on following page*]

</div>

018392

HCMLPHMIT00003555

Respectfully submitted:

**KELLY HART PITRE**

*/s/ Louis M. Phillips*
**Louis M. Phillips (#10505)**
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9072
Email: louis.phillips@kellyhart.com

Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

and

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500

## <u>CERTIFICATE OF SERVICE</u>

I, undersigned counsel, hereby certify that a true and correct copy of the above and foregoing document and all attachments thereto were sent via electronic mail via the Court's ECF system to all parties authorized to receive electronic notice in this case on this July 9, 2021.

*/s/ Louis M. Phillips*
Louis M. Phillips

018393
HCMLPHMIT00003556

# EXHIBIT 1

018394

HCMLPHMIT00003557

Case 19-34054-sgj11 Doc 2545 Filed 07/09/21 Entered 07/09/21 16:29:39 Page 2 of 4
Case 3:25-cv-02072-S    Document 74    Filed 06/06/25    Page 546 of 1017    PageID 19445
Exhibit 24    Page 86 of 307

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-sgj11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | Chapter 11 |
| | § | |
| Debtor | § | Relates to Dkt. No. 2460 |

### Declaration of Mark Patrick

I, Mark Patrick, hereby declare as follows:

1.    My name is Mark Patrick, and I am over the age of 21.  I have personal knowledge of the facts set forth herein, and make this declaration pursuant to 28 U.S.C. § 1746.

2.    I am a Director of Charitable DAF Holdco, Ltd. and the managing member of the sole general partner of Charitable DAF Fund, L.P. (Charitable DAF Holdco, Ltd. and Charitable DAF Fund, L.P., and their direct and indirect subsidiaries will be referred to herein as the "DAF"). A more robust discussion of these entities and their interrelation is set forth in the Response and Disclosures (defined herein).

3.    I appreciate the opportunity to describe the important charitable work the DAF is doing through its charitable beneficiaries.

4.    Since its inception in 2012, the DAF has had a significant impact in the communities where the supporting organizations that are the DAF's beneficiaries deploy their capital. In fact, such supporting organizations have funded more than $32 million in charitable contributions to numerous non-profit organizations. The DAF's charitable commitments are in excess of $42 million. The non-profit organizations that have received support from the DAF include The Family Place, which provides emergency shelter to those in need, and the Dallas Children's Advocacy Center, which serves the needs of abused and neglected children. A more

1

018395

HCMLPHMIT00003558

detailed summary of the DAF's charitable impact is an exhibit filed with the Response and Disclosures referenced herein.

5.    I ultimately agreed to take on the roles I currently hold with the DAF because I believe in the causes the DAF is supporting. In college, I was a guardian ad litem for abused and neglected children. I have seen firsthand how the DAF is helping people every day who are struggling with abuse or difficult life situations. I have visited the Cristo Rey Dallas school campus, where low income and disadvantaged children are receiving a high-quality education that they otherwise would likely not receive.

6.    The actions taken by me on behalf of the DAF in connection with the bankruptcy case of Highland Capital Management, L.P., and the lawsuit I authorized to be filed on behalf of CLO Holdco, Ltd. and DAF Fund against Highland Capital Management, L.P., were done so the DAF can continue to support these worthy causes. I am only trying to protect the DAF's investments, which are the source of the millions in charitable contributions the DAF has made over the past decade.

7.    My actions aren't taken under the direction of James Dondero, or to somehow protect a direct or indirect economic benefit Mr. Dondero receives from the DAF.  As the Response and Disclosures set forth  in  greater detail, Mr. Dondero has no direct or indirect economic ownership in the DAF.

8.    My concern in vigorously pursuing claims for the DAF, or defending claims against the DAF, is to protect the DAF's investments from being taken by creditors who have no credible basis to obtain such investments.

9.    I have been provided with and reviewed this Court's Order Requiring Disclosures (the "Disclosures Order").

018396

HCMLPHMIT00003559

10.     In my capacity with the DAF, I assisted counsel in preparing the Response and Disclosures related to the Disclosures Order on behalf of CLO Holdco, Ltd., Charitable DAF Fund, L.P., and Highland Dallas Foundation, Inc. (the "Response and Disclosures," and capitalized terms used herein which are not otherwise defined are as defined in the Response and Disclosures).

11.     With respect to the documents and Exhibits provided by the Foundations about the Supporting Organizations and Non-Party Targets I or those acting under my direction dealt with the Foundations to obtain such information.  Multiple Exhibits have already been provided as evidence to the Bankruptcy Court at the Show Cause Hearing.  I have reviewed the exhibits to the Response and Disclosures and affirm that the Exhibits provided about the Charitable Respondents are true and correct copies of what each document is identified as in the Response and Disclosures.  With respect to the documents and Exhibits provided by the Foundations, I affirm, upon information and belief that these Exhibits are true and correct copies of what each document is identified as in the Response and Disclosures. As I am not a person with authority over the Supporting Organizations I cannot identify such documents and Exhibits of my own personal knowledge, but am satisfied that I can upon information and belief.

12.     I have reviewed the Response and Disclosures and certify that the factual recitations therein are accurate.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.**

Executed on July 9, 2021

_Mark Patrick (signature)_
_____
**Mark Patrick**

3

018397
HCMLPHMIT00003560

# EXHIBIT 2

018398

HCMLPHMIT00003561

```
                     IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                                    )    Case No. 19-34054-sgj-11
 3   In Re:                         )    Chapter 11
                                    )
 4   HIGHLAND CAPITAL               )    Dallas, Texas
     MANAGEMENT, L.P.,              )    Tuesday, June 8, 2021
 5                                  )    9:30 a.m. Docket
              Debtor.              )
 6                                  )    - SHOW CAUSE HEARING (2255)
                                    )    - MOTION TO MODIFY ORDER
 7                                  )      AUTHORIZING RETENTION OF
                                    )      JAMES SEERY (2248)
 8                                  )    - MOTION FOR ORDER FURTHER
                                    )      EXTENDING THE PERIOD WITHIN
 9                                  )      WHICH DEBTOR MAY REMOVE
                                    )      ACTIONS (2304)
10   _____)

11                        TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
12                   UNITED STATES BANKRUPTCY JUDGE.

13   APPEARANCES:

14   For the Debtor:              Jeffrey Nathan Pomerantz
                                  PACHULSKI STANG ZIEHL & JONES, LLP
15                                10100 Santa Monica Blvd.,
                                    13th Floor
16                                Los Angeles, CA  90067-4003
                                  (310) 277-6910
17
     For the Debtor:              John A. Morris
18                                Gregory V. Demo
                                  PACHULSKI STANG ZIEHL & JONES, LLP
19                                780 Third Avenue, 34th Floor
                                  New York, NY  10017-2024
20                                (212) 561-7700

21   For the Debtor:              Zachery Z. Annable
                                  HAYWARD & ASSOCIATES, PLLC
22                                10501 N. Central Expressway,
                                    Suite 106
23                                Dallas, TX  75231
                                  (972) 755-7104
24

25
```

018399

HCMLPHMIT00003562

Case 19-34054-sgj11 Doc 2544-24 Filed 07/08/21 Entered 07/08/21 06:29:39 Page 3 of 12
Case 3:25-cv-02072-S Document 74 Filed 04/25/25 Page 551 of 1017 PageID 19450

2

```
 1   APPEARANCES, cont'd.:

 2   For the Charitable DAF,      Mazin A. Sbaiti
     CLO Holdco, Show Cause       Jonathan E. Bridges
 3   Respondents, Movants,        SBAITI & COMPANY, PLLC
     and Sbaiti & Company:        Chase Tower
 4                                2200 Ross Avenue, Suite 4900W
                                  Dallas, TX  75201
 5                                (214) 432-2899

 6   For Mark Patrick:            Louis M. Phillips
                                  KELLY, HART & HALLMAN, LLP
 7                                301 Main Street, Suite 1600
                                  Baton Rouge, LA 70801
 8                                (225) 338-5308

 9   For Mark Patrick:            Michael D. Anderson
                                  KELLY, HART & HALLMAN, LLP
10                                201 Main Street, Suite 2500
                                  Fort Worth, TX  76102
11                                (817) 332-2500

12   For James Dondero:           Clay M. Taylor
                                  Will Howell
13                                BONDS ELLIS EPPICH SCHAFER
                                    JONES, LLP
14                                420 Throckmorton Street,
                                    Suite 1000
15                                Fort Worth, TX  76102
                                  (817) 405-6900
16
     For the Official Committee   Matthew A. Clemente
17   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  One South Dearborn Street
18                                Chicago, IL  60603
                                  (312) 853-7539
19
     For the Official Committee   Paige Holden Montgomery
20   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  2021 McKinney Avenue, Suite 2000
21                                Dallas, TX  75201
                                  (214) 981-3300
22
     Recorded by:                 Michael F. Edmond, Sr.
23                                UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
24                                Dallas, TX  75242
                                  (214) 753-2062
25
```

018400

HCMLPHMIT00003563

Case 19-34054-sgj11 Doc 2547-24 Filed 07/08/20 Entered 07/08/20 06:29:39 Page 4 of 12
Case 3:25-cv-02072-S Document 74 Filed 04/06/07 Page 552 of 1017 PageID 19451

3

1   Transcribed by:              Kathy Rehling
                                 311 Paradise Cove
2                                Shady Shores, TX   76208
                                 (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
            Proceedings recorded by electronic sound recording;
24              transcript produced by transcription service.

25

HCMLPHMIT00003564

Patrick - Cross                   135

1    Q    Was there any effort whatsoever to hide the prior order of

2    the Bankruptcy Court?

3    A    No.

4              MR. ANDERSON:  Pass the witness.

5              THE COURT:  Okay.  Other examination?

6              MR. SBAITI:  Yes, Your Honor.  Just a couple of

7    questions.

8                        CROSS-EXAMINATION

9    BY MR. SBAITI:

10   Q    Do you mind flipping to Exhibit 25, which I believe is the

11   org chart, the one that you were looking at before?

12   A    Okay.

13   Q    It'll still be in --

14   A    Okay.  Yeah.

15   Q    -- the defense binder.  No reason to swap out right now.

16   A    I've got the right binders.  Some of them are repeatable

17   exhibits, so --

18   Q    Yeah.

19   A    -- I have to grab the right binder.  Yes.

20   Q    As this org chart would sit today, is the only difference

21   that Grant Scott's name would instead be Mark Patrick?

22   A    Yes.

23   Q    Was there ever a period of time where Jim Dondero's name

24   would sit instead of Grant Scott's name prior?

25   A    Yes, originally, when this -- yes.

018402

HCMLPHMIT00003565

Patrick - Cross                                    136

1   Q    So did Mr. Dondero both have the control shares of the GP,

2   LLC and DAF Holdco Limited?

3   A    No, I believe not.  I believe he only held the Charitable

4   DAF GP interest and that Mr. Scott at all times held the

5   Charitable DAF Holdco, LTD interest, until he decided to

6   transfer it to me.

7   Q    Can you just tell us how Mr. Scott came to hold the

8   control shares of the Charitable DAF Holdco, LTD?

9   A    When he was the independent trustee of the Charitable

10  Remainder Trust, he caused that -- the creation of that

11  entity, and that's how he became in receipt of those

12  management shares.

13  Q    And does the Charitable DAF GP, LLC have any control over

14  Charitable DAF Fund, LP's actions or activities?

15  A    Yes, it does.

16  Q    What kind of control is that?

17  A    I would describe complete control.  It's the managing

18  member of that entity and can -- and effectively owns, you

19  know, the hundred percent interest in the respective

20  subsidiaries, and so the control follows down.

21  Q    And when did Mr. Scott replace Mr. Dondero as the GP --

22  managing member of the GP?

23  A    Well, I think as the -- and Mr. Morris had shown me with

24  respect to that transfer occurring on March 2012.

25  Q    So nine years ago?

018403

HCMLPHMIT00003566

Patrick - Cross                137

```
 1   A    Yes.

 2   Q    Does Mr. Dondero today exercise any control over the

 3   activities of the DAF Charitable -- the Charitable DAF, GP or

 4   the Charitable DAF Holdco, LTD?

 5   A    No.

 6   Q    Is he a board member of sorts for either of those

 7   entities?

 8   A    No.

 9   Q    Is he a board members of CLO Holdco?

10   A    No.

11   Q    Does he have any decision-making authority at CLO Holdco?

12   A    None.

13   Q    The decision to authorize the lawsuit and the decision to

14   authorize the motion that you've been asked about, who made

15   that authorization?

16   A    I did.

17   Q    Did you have to ask for anyone's permission?

18   A    No.

19        MR. SBAITI:  No more questions, Your Honor.

20        THE COURT:  Okay.  Any -- I guess Mr. Taylor, no.

21   All right.  Any redirect?

22                 REDIRECT EXAMINATION

23   BY MR. MORRIS:

24   Q    Since becoming the authorized representative of the

25   Plaintiffs, have you ever made a decision on behalf of those
```

018404

HCMLPHMIT00003567

Case 19-34054-sgj11 Doc 254-5 Filed 07/08/20 Entered 07/08/20 06:29:39 Page 8 of 12
Case 3:25-cv-02072-S Document 74 Filed 06/06/25 Page 556 of 1017 PageID 19455

Patrick - Cross                                    138

1   entities that Mr. Dondero disagreed with?

2   A    I have made decisions that were adverse to Mr. Dondero's

3   financial -- financial decision.  I mean, financial interests.

4   Whether he disagreed with them or not, I don't -- he has not

5   communicated them to me.  But they have been adverse, at least

6   two very strong instances.

7   Q    Have you ever -- have you ever talked to him about making

8   a decision that would be adverse to his interests?  Did he

9   tell -- did --

10  A    I didn't -- I don't -- I did not discuss with him prior to

11  making the decisions that I made that were adverse to his

12  economic interests.

13          MR. MORRIS:  Okay.  No further questions, Your Honor.

14          THE COURT:  Any further examination?  Recross on that

15  redirect?

16          MR. ANDERSON:  No further questions.

17          MR. SBAITI:  No further questions, Your Honor.

18          MR. ANDERSON:  Sorry.

19          THE COURT:  Nothing?

20          MR. ANDERSON:  I think we're good.

21          THE COURT:  Okay.  I have one question, Mr. Patrick.

22  My brain sometimes goes in weird directions.

23                  EXAMINATION BY THE COURT

24          THE COURT:  I'm just curious.  What are these Cayman

25  Island entities, charitable organizations formed in the Cayman

HCMLPHMIT00003568

Case 1:23-cv-11195-SHS Document 254-28 Filed 07/08/25 Page 9 of 12
Case 3:25-cv-02072-S    Document 74    Filed 04/46/25    Page 557 of 1017    PageID 19456
Patrick - Examination by the Court          140

1    THE COURT:  Uh-huh.

2    THE WITNESS:  The offshore master fund structure

3    typically will have two different types of -- they call it

4    foreign feeder funds.  One foreign feeder fund is meant to

5    accommodate foreign investors; the other foreign feeder fund

6    is meant to accommodate U.S. tax-exempt investors.

7    Why, why is it structured that way?  In order to avoid

8    something called -- I was trying not to be wonkish -- UBTI.

9    That's, let's see, Un -- Unrelated Trader Business Income.  I

10   probably have that slightly wrong.  But it's essentially,

11   it's a means to avoid active business income, which includes

12   debt finance income, which is what these CLOs tend to be, that

13   would throw off income that would be taxable normally if the

14   exempts did not go through this foreign blocker, and it

15   converts that UBTI income -- it's called (inaudible) income --

16   into passive income that flows -- that flows up to the

17   charities.

18   And so it's very typical that you'll have a U.S. tax-

19   exempt investor, when they make an investment in a fund,

20   prefer to go through an offshore feeder fund, which is

21   actually Charitable DAF Holdco, LTD.  That's essentially what,

22   from a tax perspective, represents as a UBTI blocker entity.

23   And then you have the offshore investments being held offshore

24   because there's a variety of safe harbors where the receipt of

25   interest, the portfolio interest exception, is not taxable.

018406

HCMLPHMIT00003569

Patrick - Examination by the Court          141

1   The creation of capital gains or losses under the -- they call

2   it the trading, 864(b) trading safe harbor, is not taxable.

3   So that's why you'll find these structures operating offshore

4   to rely on those safe harbor provisions as well as -- as well

5   as what I indicated with respect to the two type blocker

6   entities.  It's very typical and industry practice to organize

7   these way.  And so when this was set --

8              THE COURT:  It's very typical in the charitable world

9   to --

10             THE WITNESS:  In the investment management --

11             THE COURT:  -- form this way?

12             THE WITNESS:  In the investment management world,

13  when you have charitable entities that are taking some

14  exposure to assets that are levered, to set this structure up

15  in this way.  It was modeled after -- they just call them

16  offshore master fund structures.  They're known as Mickey

17  Mouse structures, where you'll have U.S. investors --

18             THE COURT:  Yes.  I -- yes, I --

19             THE WITNESS:  -- enter through a U.S. partnership,

20  and the foreign investors enter through a blocker.

21             THE COURT:  It was really just the charitable aspect

22  of this that I was --

23             THE WITNESS:  Yeah.  Yeah.

24             THE COURT:  -- getting at.

25             THE WITNESS:  Yeah.  No, but I'm just trying to

018407

HCMLPHMIT00003570

Patrick - Recross                         142

 1  emphasize if --

 2          THE COURT:  All right.  It's --

 3          THE WITNESS:  Yeah.

 4          THE COURT:  -- neither here nor there.  All right.

 5          MR. SBAITI:  Your Honor, may I ask a slightly

 6  clarifying leading question on that, because I think I

 7  understand what he was trying to say, just for the record?

 8          THE COURT:  Well, --

 9          MR. MORRIS:  I object.

10          THE COURT:  -- I tell you what.  Anyone who wants to

11  ask one follow-up question on the judge's question can do so.

12  Okay?  You can go first.

13          MR. SBAITI:  I'll approach, Your Honor.

14          THE COURT:  Okay.

15                      RECROSS-EXAMINATION

16  BY MR. SBAITI:

17  Q   Would it be a fair summary of what you were saying a

18  minute ago that the reason the bottom end of that structure is

19  offshore is so that it doesn't get taxed before the money

20  reaches the charities on the U.S. side?

21  A   Tax -- it converts the nature of the income that is being

22  thrown off by the investments so that it becomes a tax

23  friendly income to the tax-exempt entity.  Passive income.

24  That's --

25  Q   So, essentially, --

018408

HCMLPHMIT00003571

```
 1              THE COURT:  Okay.  Okay.

 2              MR. SBAITI:  -- so it doesn't get taxed before it

 3    hits the --

 4              THE COURT:  I said one question.

 5              MR. SBAITI:  Sorry, Your Honor.

 6              THE COURT:  Okay.  He answered it.

 7              MR. PHILLIPS:  And I have one question, Your Honor

 8              THE COURT:  Okay.

 9              MR. PHILLIPS:  I don't know if I need to ask this

10    question, but I'd rather not ask you if I need to ask it.

11              THE COURT:  Go ahead.

12              MR. PHILLIPS:  But if I do, you know, I could --

13              THE COURT:  Go ahead.

14              MR. PHILLIPS:  Well, okay.

15                        RECROSS-EXAMINATION

16    BY MR. PHILLIPS:

17    Q   We've talked about the offshore structure.  Are the

18    foundations in the top two tiers of the organizational chart

19    offshore entities?

20    A   No.

21    Q   They're --

22    A   They're onshore entities.  They're tax-exempt entities.

23    Q   Thank you.

24    A   The investments are offshore.

25    Q   Thank you.
```

018409

HCMLPHMIT00003572

# EXHIBIT 3

018410

HCMLPHMIT00003573

# Charitable DAF/CLO HoldCo
## Structure Chart



018411

HCMLPHMIT00003574

# EXHIBIT 4

018412
HCMLPHMIT00003575

# MEMORANDUM

**Date: July 9, 2021**

**To: Mark Patrick**

**Company: Charitable DAF Holdco, Ltd. and CLO Holdco, Ltd.**

**From: Haynes and Boone, LLP, by Kenneth Bezozo**

**Subject:  Donor Advised Funds ("*DAFs*"), Sponsoring Organizations and Supporting Organizations -- The Reasons for Making Investments in Offshore Jurisdictions**

---

1.  ***What are Donor Advised Funds, Sponsoring Organizations and Supporting Organizations?***

A donor advised fund, or DAF, is a separately managed charitable investment account established by a donor within a public charity (a section 501(c)(3) organization), which is generally referred to as a sponsor.  Sponsors may include a community foundation, university, religious organization, or financial institution.  The donor (or the donor's designee) typically maintains certain advisory privileges over the DAF funds or account – specifically with respect to charities that should receive donations, although the DAF account is fully and completely owned and controlled by the sponsor.

In some cases, a sponsor can create as a subsidiary a "supporting organization" which also is a Section 501(c)(3) public charity.  A supporting organization is a separate entity controlled by the sponsor through its ability to elect a majority of the supporting organization's governing board.  Because of this control, a supporting organization is treated financially as part of a consolidated unit with the sponsor.

Here, for example, The Dallas Foundation formed, and owns and controls, a supporting organization named Highland Dallas Foundation, Inc. ("***Highland Dallas Foundation***") to assist The Dallas Foundation in carrying out its charitable mission in helping support a wide variety of community affairs.  Donations were made to the Highland Dallas Foundation as both the sponsor and the supporting organization.  The Highland Dallas Foundation from time to time makes distributions of funds to The Dallas Foundation which in turn makes further distributions to local public charities.  ***Exhibit 1*** attached shows these above-described entities, as well as other entities referenced herein that are pertinent to this donor advised fund.

2.  ***How Does a Donor Establish a DAF Account?***

To establish a DAF fund or account, a donor must make an irrevocable contribution of assets, such as cash, stock or securities or other business or financial assets, to a sponsoring public charity. The donor's contribution is recorded and recognized as a donation to the sponsoring

4822-2891-9537 v.7

018413

HCMLPHMIT00003576

public charity of the DAF. A donor can make additional contributions to the sponsoring organization whenever they choose.

Because a contribution to a sponsoring organization is, for tax purposes, the equivalent of a contribution to a public charity and because the donor gets an immediate tax benefit for the contribution, the contribution, when made, is permanent and irrevocable. This is true even though the donor contribution to the sponsoring organization is in an account that grows tax-free and the donor has advisory rights as to where to invest the assets and donations made from these assets.

Here, the Highland Dallas Foundation is the sponsor of the DAF account which it fully owns and controls. Although the donor has advisory rights regarding investments and donations to charities (by way of a board seat he fills in the supporting organization), the Highland Dallas Foundation has full authority and control over all such decision-making.

3. *What Type of Investments Can be Made by a Sponsor/Supporting Organization?*

A sponsor and its supporting organization, such as The Dallas Foundation and Highland Dallas Foundation, are able to invest in a wide variety of assets including, but not limited to, marketable securities, financial assets, businesses, real estate, private equity and hedge funds. But because the sponsor and supporting organization are both public charities that are tax-exempt organizations, their investments must take into account all laws that could possibly effect their tax-exempt status.

a. *Can a Sponsor and its Supporting Organization Invest in a Hedge Fund, Private Equity Fund or Similar Investment Vehicle?*

The short answer is yes, but as stated above, a sponsor and its supporting organization, such as The Dallas Foundation and Highland Dallas Foundation, are both public charities that are tax-exempt organizations. As a strong general rule, a tax-exempt organization will avoid any investments that will subject it to federal or state taxes. A tax-exempt organization is generally exempt from all federal and state taxes except to the extent it receives income classified as unrelated business taxable income (UBTI), which would be taxed at a 21% rate. The term "unrelated business taxable income" generally means the income derived from an unrelated trade or business regularly conducted by the tax-exempt organization. UBTI also can arise from the receipt of income from debt-financed investments, which is why hedge and private equity funds generally utilize a special investment structure to ensure tax-exempt investors do not have UBTI.

To prevent UBTI from flowing through to a tax-exempt organization, a corporation can be utilized to "block" this income at the corporate level, which is accomplished by having a corporation interposed between the tax-exempt organization and the hedge fund, such as The Charitable DAF Holdco, Ltd. (a corporate blocker) from the Charitable DAF Fund, L.P. Using a structure in this manner is often described as using a "blocker" because the UBTI is blocked out and does not flow through to the tax-exempt investor. Instead, the UBTI is included in the income of, and subject to tax in, the blocker corporation. The blocker corporation thereafter distributes the income to the tax-exempt

018414

HCMLPHMIT00003577

investor through the payment of dividends which are not UBTI and therefore not taxable to a tax-exempt organization.

Although using a domestic corporate blocker can avoid the problem of having UBTI passed through to a tax-exempt sponsor or its supporting organization, a U.S.-based blocker corporation will be required to pay corporate and state-level income tax on the income they receive from an investment fund.

### b. *Are There Particular Jurisdictions in Which Hedge and Private Equity Funds form Investment Partnerships and Blocker Corporations for their tax-exempt investors?*

It is common for hedge and private equity funds that have tax-exempt investors such as The Dallas Foundation and Highland Dallas Foundation to utilize an offshore structure to form its investment partnership. In addition, these funds may form offshore blocker corporations as well as for other reasons including the ability to make non-U.S. investments or U.S. investments that do not give rise to U.S. tax for foreign investors (i.e., U.S. investments that do not cause the investor to be "engaged in a U.S. trade or business.") Jurisdictions such as Bermuda and the Cayman Islands are typically used because those countries do not have an income tax regime.

By utilizing an offshore structure with corporate blockers, hedge and private equity funds can ensure their tax-exempt investors will not receive any UBTI from investments held by The Dallas Foundation or Highland Dallas Foundation. In addition, to the extent the sole source of UBTI is through debt financing (which is often the case in a hedge fund), then using an offshore corporate blocker can eliminate this type of UBTI (because the debt financing will not flow through the corporate blocker to taint the income received by the tax-exempt investor). This allows the sponsor (i.e., Highland Dallas Foundation), as well as any other charities that receive distributions from Highland Dallas Foundation or The Dallas Foundation, to receive the largest possible distributions.

Utilizing an offshore structure for hedge and private equity funds in the manner described above for tax-exempt investors is a best practice used by many U.S. law firms representing U.S. hedge and private equity funds. In fact, if a U.S. law firm didn't use offshore blockers in the manner described above, it could be considered a poor practice.

In summary, using an offshore blocker corporation, such as Charitable DAF Holdco, Ltd. and CLO Holdco, Ltd., for many hedge funds minimizes taxes and increases the net after-tax cash flow to the tax-exempt investors because investments grow tax-free, giving a sponsor, such as Highland Dallas Foundation, the potential to create even more capital for philanthropic giving.

### 4. *Who Has Control and Authority over the Assets Held by the Sponsor?*

Because a DAF is an account within a sponsor organization, the sponsoring organization has full, complete and final control over the funds in the DAF, which is the case here with the sponsor, the Highland Dallas Foundation. Although the supporting organization permits the donor or the donor's designee to recommend how funds should be invested and how funds should be

018415

HCMLPHMIT00003578

distributed to other public charities, Highland Dallas Foundation must approve any investments and all distributions to charities.

In this case, the donor of the charitable DAF, or his designee, is able to appoint a representative to the board of the Highland Dallas Foundation, which allows the donor to recommend investments or distributions to charitable organizations, i.e., organizations that are tax-exempt under Internal Revenue Code section 501(c)(3) and classified as public charities under Internal Revenue Code section 509(a).  But the donor (or the donor's designee) only has advisory privileges over making investments and the distribution of funds.

5. ***What Are the Benefits to a Donor of a Contribution to a DAF account?***

A DAF account allows a donor who makes an irrevocable charitable contribution to the DAF account to receive an immediate tax deduction, and with the ability to recommend distributions be made by the sponsor to specific charities either presently or in the future.  Also, if the donor contributes certain appreciated assets to the DAF account, such as stock or securities, the donor avoids the recognition of any gain in these appreciated assets.  This is a significant additional benefit to donors made available in the Internal Revenue Code.

The DAF assets that are not immediately distributed to charities are then invested and depending on the type of investments and the jurisdiction in what the investments are made, the assets may grow tax-free.

4822-2891-9537 v.7

4

018416

HCMLPHMIT00003579

**Exhibit 1**

**Charitable DAF/CLO Holdco
Structure Chart**



018417

HCMLPHMIT00003580

# EXHIBIT 5

018418

HCMLPHMIT00003581

*WK–249232*

## Certificate Of Incorporation

*I, V. DAPHENE WHITELOCKE* Assistant Registrar of Companies of the Cayman Islands
*DO HEREBY CERTIFY, pursuant to the Companies Law  CAP. 22,  that all requirements of the said*
*Law in respect of registration were complied with by*

### CLO HoldCo, Ltd.

*an Exempted Company incorporated in the Cayman Islands with Limited Liability with effect*
*from the 13th day of December Two Thousand Ten*

*Given under my hand and Seal at George Town in the*
*Island of Grand Cayman this 13th day of December*
*Two Thousand Ten*



**Assistant Registrar of Companies,**
**Cayman Islands.**

PATRICK_000039

018419

HCMLPHMIT00003582

# EXHIBIT 6

HCMLPHMIT00003583

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

MEMORANDUM AND ARTICLES OF ASSOCIATION

OF

# CLO HOLDCO, LTD.



Walker House, 87 Mary Street, George Town
Grand Cayman KY1-9001, Cayman Islands
**T** 345 949 0100  **F** 345 949 7886  www.walkersglobal.com

**REF: VC/CM/99957**

PATRICK_000062

018421

HCMLPHMIT00003584

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

MEMORANDUM OF ASSOCIATION

OF

# CLO HOLDCO, LTD.

1.  The name of the company is CLO HoldCo, Ltd. (the "**Company**").

2.  The registered office of the Company will be situated at the offices of **Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands** or at such other location as the Directors may from time to time determine.

3.  The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law (as amended) of the Cayman Islands (the "**Law**").

4.  The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Law.

5.  The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6.  The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7.  The capital of the Company is **US$50,000.00** divided into **50,000** shares of a nominal or par value of **US$1.00 each** provided always that subject to the Law and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8.  The Company may exercise the power contained in Section 206 of the Law to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.

REGISTERED AND FILED
AS NO. 247232 THIS 13th DAY
OF December, 2010

Asst. Registrar of Companies
Cayman Islands



1

PATRICK_000063

018422

HCMLPHMIT00003585

The undersigned, whose name, address and description are set out below, wishes the Company to be incorporated as a company in the Cayman Islands in accordance with this Memorandum of Association, and agrees to take the number of shares in the capital of the Company as set out opposite the undersigned's name.

| NAME, ADDRESS AND DESCRIPTION OF SUBSCRIBER | NUMBER OF SHARES TAKEN BY SUBSCRIBER |
|---|---|
| Walkers Nominees Limited, 87 Mary Street, George Town, Grand Cayman KY1-9001, Cayman Islands | ONE SHARE |

(Sgd) Virginia Czarnocki

Virginia Czarnocki
as Authorised Signatory of Walkers Nominees Limited

Dated:     13 December 2010

(Sgd) Carol MacDonald
Signature of Witness

Name:        Carol MacDonald

Address:     87 Mary Street, George Town, Grand Cayman KY1-9001, Cayman Islands

Occupation:  Secretary

CERTIFIED TO BE A TRUE AND CORRECT COPY

SIG.

V. Daphene Whitelocke
Assistant Registrar

Date. 13th December, 2010



2

3760538_1

PATRICK_000064

018423

HCMLPHMIT00003586

## TABLE OF CONTENTS

| CLAUSE | PAGE |
|---|---|
| TABLE A | 1 |
| INTERPRETATION | 1 |
| PRELIMINARY | 3 |
| SHARES | 3 |
| MODIFICATION OF RIGHTS | 4 |
| CERTIFICATES | 4 |
| FRACTIONAL SHARES | 4 |
| LIEN | 5 |
| CALLS ON SHARES | 5 |
| FORFEITURE OF SHARES | 6 |
| TRANSFER OF SHARES | 7 |
| TRANSMISSION OF SHARES | 7 |
| ALTERATION OF SHARE CAPITAL | 7 |
| REDEMPTION AND PURCHASE OF SHARES | 8 |
| GENERAL MEETINGS | 8 |
| NOTICE OF GENERAL MEETINGS | 9 |
| PROCEEDINGS AT GENERAL MEETINGS | 9 |
| VOTES OF SHAREHOLDERS | 10 |
| CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS | 11 |
| DIRECTORS | 11 |
| ALTERNATE DIRECTOR OR PROXY | 12 |
| POWERS AND DUTIES OF DIRECTORS | 12 |
| BORROWING POWERS OF DIRECTORS | 13 |
| THE SEAL | 14 |
| DISQUALIFICATION OF DIRECTORS | 14 |

PATRICK_000065

018424

HCMLPHMIT00003587

PROCEEDINGS OF DIRECTORS ................................................................................................ 14

DIVIDENDS ................................................................................................................................. 16

ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION .................................... 17

CAPITALISATION OF RESERVES ........................................................................................... 17

SHARE PREMIUM ACCOUNT ................................................................................................. 18

NOTICES ................................................................................................................................... 18

INDEMNITY ............................................................................................................................... 19

NON-RECOGNITION OF TRUSTS .......................................................................................... 20

WINDING UP ............................................................................................................................. 20

AMENDMENT OF ARTICLES OF ASSOCIATION .................................................................. 21

CLOSING OF REGISTER OR FIXING RECORD DATE .......................................................... 21

REGISTRATION BY WAY OF CONTINUATION ...................................................................... 21

DISCLOSURE ........................................................................................................................... 21

PATRICK_000066

018425

HCMLPHMIT00003588



**COMPANIES LAW (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**ARTICLES OF ASSOCIATION**

**OF**

# CLO HOLDCO, LTD.

REGISTERED AND FILED,
AS NO: 249282 THIS 13th DAY
OF December, 2010

Asst. Registrar of Companies
Cayman Islands

**TABLE A**

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Law shall not apply to CLO HoldCo, Ltd. (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

**INTERPRETATION**

1.    In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time;

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company;

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof;

"**Law**" means the Companies Law (as amended) of the Cayman Islands;

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time;

"**Office**" means the registered office of the Company as required by the Law;

"**Ordinary Resolution**" means a resolution:

(a)    passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and

1

PATRICK_000067

018426

HCMLPHMIT00003589

where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed;

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up;

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires;

"**Register**" means the register of Members of the Company required to be kept pursuant to the Law;

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof;

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company;

"**Share**" means a share in the capital of the Company. All references to "Shares" herein shall be deemed to be Shares of any or all Classes as the context may require. For the avoidance of doubt in these Articles the expression "Share" shall include a fraction of a Share;

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber;

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Law;

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means; and

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Law, being a resolution:

(a) passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

2. In these Articles, save where the context requires otherwise:

(a) words importing the singular number shall include the plural number and vice versa;

2

PATRICK_000068

018427

HCMLPHMIT00003590

(b)    words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

(c)    the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d)    reference to a dollar or dollars (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e)    reference to a statutory enactment shall include reference to any amendment or re-enactment thereof for the time being in force;

(f)    reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case; and

(g)    reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another.

3.    Subject to the last two preceding Articles, any words defined in the Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

**PRELIMINARY**

4.    The business of the Company may be commenced at any time after incorporation.

5.    The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

6.    The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

7.    The Directors shall keep, or cause to be kept, the Register at such place as the Directors may from time to time determine and, in the absence of any such determination, the Register shall be kept at the Office.

**SHARES**

8.    Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

(a)    issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine; and

(b)    grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

3

PATRICK_000069

018428

HCMLPHMIT00003591

Case 19-34054-sgj11 Doc 4255-74 Filed 06/20/25 Entered 06/20/25 20:39:29 Desc of
Case 3:25-cv-02072-S Document 74 Filed 06/05/25 Page 580 of 1017 PageID 19479
Exhibit 74 Page 05 of 307

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

9.  The Directors may authorise the division of Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors.

10. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

11. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

## MODIFICATION OF RIGHTS

12. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Shares of the relevant Class, or with the sanction of a resolution passed at a separate meeting of the holders of the Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that all such Classes would be affected in the same way by the proposals under consideration, but in any other case shall treat them as separate Classes.

13. The rights conferred upon the holders of the Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Shares of any Class by the Company.

## CERTIFICATES

14. No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

15. The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or

PATRICK_000070

018429

HCMLPHMIT00003592

par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

## LIEN

16.    The Company has a first and paramount lien on every Share (whether or not fully paid) for all amounts (whether presently payable or not) payable at a fixed time or called in respect of that Share. The Company also has a first and paramount lien on every Share registered in the name of a Person indebted or under liability to the Company (whether he is the sole registered holder of a Share or one of two or more joint holders) for all amounts owing by him or his estate to the Company (whether or not presently payable). The Directors may at any time declare a Share to be wholly or in part exempt from the provisions of this Article. The Company's lien on a Share extends to any amount payable in respect of it.

17.    The Company may sell, in such manner as the Directors in their absolute discretion think fit, any Share on which the Company has a lien, but no sale shall be made unless an amount in respect of which the lien exists is presently payable nor until the expiration of fourteen days after a notice in writing, demanding payment of such part of the amount in respect of which the lien exists as is presently payable, has been given to the registered holder for the time being of the Share, or the Persons entitled thereto by reason of his death or bankruptcy.

18.    For giving effect to any such sale the Directors may authorise some Person to transfer the Shares sold to the purchaser thereof. The purchaser shall be registered as the holder of the Shares comprised in any such transfer and he shall not be bound to see to the application of the purchase money, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the sale.

19.    The proceeds of the sale after deduction of expenses, fees and commission incurred by the Company shall be received by the Company and applied in payment of such part of the amount in respect of which the lien exists as is presently payable, and the residue shall (subject to a like lien for sums not presently payable as existed upon the Shares prior to the sale) be paid to the Person entitled to the Shares immediately prior to the sale.

## CALLS ON SHARES

20.    The Directors may from time to time make calls upon the Shareholders in respect of any moneys unpaid on their Shares, and each Shareholder shall (subject to receiving at least fourteen days' notice specifying the time or times of payment) pay to the Company at the time or times so specified the amount called on such Shares.

21.    The joint holders of a Share shall be jointly and severally liable to pay calls in respect thereof.

22.    If a sum called in respect of a Share is not paid before or on the day appointed for payment thereof, the Person from whom the sum is due shall pay interest upon the sum at the rate of eight percent per annum from the day appointed for the payment thereof to the time of the actual payment, but the Directors shall be at liberty to waive payment of that interest wholly or in part.

23.    The provisions of these Articles as to the liability of joint holders and as to payment of interest shall apply in the case of non-payment of any sum which, by the terms of issue of a Share,

5

PATRICK_000071

018430

HCMLPHMIT00003593

becomes payable at a fixed time, whether on account of the amount of the Share, or by way of premium, as if the same had become payable by virtue of a call duly made and notified.

24. The Directors may make arrangements on the issue of partly paid Shares for a difference between the Shareholders, or the particular Shares, in the amount of calls to be paid and in the times of payment.

25. The Directors may, if they think fit, receive from any Shareholder willing to advance the same all or any part of the moneys uncalled and unpaid upon any partly paid Shares held by him, and upon all or any of the moneys so advanced may (until the same would, but for such advance, become presently payable) pay interest at such rate (not exceeding without the sanction of an Ordinary Resolution, eight percent per annum) as may be agreed upon between the Shareholder paying the sum in advance and the Directors.

## FORFEITURE OF SHARES

26. If a Shareholder fails to pay any call or instalment of a call in respect of partly paid Shares on the day appointed for payment, the Directors may, at any time thereafter during such time as any part of such call or instalment remains unpaid, serve a notice on him requiring payment of so much of the call or instalment as is unpaid, together with any interest which may have accrued.

27. The notice shall name a further day (not earlier than the expiration of fourteen days from the date of the notice) on or before which the payment required by the notice is to be made, and shall state that in the event of non-payment at or before the time appointed the Shares in respect of which the call was made will be liable to be forfeited.

28. If the requirements of any such notice as aforesaid are not complied with, any Share in respect of which the notice has been given may at any time thereafter, before the payment required by notice has been made, be forfeited by a resolution of the Directors to that effect.

29. A forfeited Share may be sold or otherwise disposed of on such terms and in such manner as the Directors think fit, and at any time before a sale or disposition the forfeiture may be cancelled on such terms as the Directors think fit.

30. A Person whose Shares have been forfeited shall cease to be a Shareholder in respect of the forfeited Shares, but shall, notwithstanding, remain liable to pay to the Company all moneys which at the date of forfeiture were payable by him to the Company in respect of the Shares forfeited, but his liability shall cease if and when the Company receives payment in full of the amount unpaid on the Shares forfeited.

31. A statutory declaration in writing that the declarant is a Director, and that a Share has been duly forfeited on a date stated in the declaration, shall be conclusive evidence of the facts in the declaration as against all Persons claiming to be entitled to the Share.

32. The Company may receive the consideration, if any, given for a Share on any sale or disposition thereof pursuant to the provisions of these Articles as to forfeiture and may execute a transfer of the Share in favour of the Person to whom the Share is sold or disposed of and that Person shall be registered as the holder of the Share, and shall not be bound to see to the application of the purchase money, if any, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the disposition or sale.

33. The provisions of these Articles as to forfeiture shall apply in the case of non-payment of any sum which by the terms of issue of a Share becomes due and payable, whether on account of the

6

PATRICK_000072

018431

HCMLPHMIT00003594

amount of the Share, or by way of premium, as if the same had been payable by virtue of a call duly made and notified.

### TRANSFER OF SHARES

34. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

35. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor.

36. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

37. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

### TRANSMISSION OF SHARES

38. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased survivor, shall be the only Person recognised by the Company as having any title to the Share.

39. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

40. A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

### ALTERATION OF SHARE CAPITAL

41. The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

42. The Company may by Ordinary Resolution:

7

PATRICK_000073

018432

HCMLPHMIT00003595

    (a)      consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

    (b)      convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

    (c)      subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

    (d)      cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

43.    The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

## REDEMPTION AND PURCHASE OF SHARES

44.    Subject to the Law, the Company may:

    (a)      issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may, before the issue of such Shares, determine;

    (b)      purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder; and

    (c)      make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Law, including out of its capital, profits or the proceeds of a fresh issue of Shares.

45.    Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

46.    The redemption or purchase of any Share shall not be deemed to give rise to the redemption or purchase of any other Share.

47.    The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

## GENERAL MEETINGS

48.    The Directors may, whenever they think fit, convene a general meeting of the Company.

49.    General meetings shall also be convened on the requisition in writing of any Shareholder or Shareholders entitled to attend and vote at general meetings of the Company holding at least ten percent of the paid up voting share capital of the Company deposited at the Office specifying the objects of the meeting for a date no later than 21 days from the date of deposit of the requisition signed by the requisitionists, and if the Directors do not convene such meeting for a date not later

PATRICK_000074

018433

HCMLPHMIT00003596

than 45 days after the date of such deposit, the requisitionists themselves may convene the general meeting in the same manner, as nearly as possible, as that in which general meetings may be convened by the Directors, and all reasonable expenses incurred by the requisitionists as a result of the failure of the Directors to convene the general meeting shall be reimbursed to them by the Company.

50.     If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

## NOTICE OF GENERAL MEETINGS

51.     At least seven days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

52.     The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

## PROCEEDINGS AT GENERAL MEETINGS

53.     All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, the appointment and removal of Directors and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

54.     No business shall be transacted at any general meeting unless a quorum of Shareholders is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles, one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

55.     If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

56.     If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

9

PATRICK_000075

018434

HCMLPHMIT00003597

57. The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

58. If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

59. The chairman may with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting) adjourn a meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given as in the case of an original meeting. Save as aforesaid it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

60. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, except for general meetings requisitioned by the Shareholders in accordance with these Articles, for any reason or for no reason, upon notice in writing to Shareholders. A postponement may be for a stated period of any length or indefinitely as the Directors may determine.

61. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

62. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

63. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

64. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

## VOTES OF SHAREHOLDERS

65. Subject to any rights and restrictions for the time being attached to any Share, on a show of hands every Shareholder present in person and every Person representing a Shareholder by proxy shall, at a general meeting of the Company, each have one vote and on a poll every Shareholder and every Person representing a Shareholder by proxy shall have one vote for each Share of which he or the Person represented by proxy is the holder.

66. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

10

PATRICK_000076

018435

HCMLPHMIT00003598

67. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

68. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

69. On a poll votes may be given either personally or by proxy.

70. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.

71. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

72. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

73. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

74. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at general meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

### CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

75. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

### DIRECTORS

76. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

77. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

78. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

11

PATRICK_000077

018436

HCMLPHMIT00003599

79. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

80. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

81. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.

82. The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

## ALTERNATE DIRECTOR OR PROXY

83. Any Director may in writing appoint another Person to be his alternate and, save to the extent provided otherwise in the form of appointment, such alternate shall have authority to sign written resolutions on behalf of the appointing Director, but shall not be required to sign such written resolutions where they have been signed by the appointing Director, and to act in such Director's place at any meeting of the Directors at which he is unable to be present. Every such alternate shall be entitled to attend and vote at meetings of the Directors as a Director when the Director appointing him is not personally present and where he is a Director to have a separate vote on behalf of the Director he is representing in addition to his own vote. A Director may at any time in writing revoke the appointment of an alternate appointed by him. Such alternate shall not be an officer of the Company. The remuneration of such alternate shall be payable out of the remuneration of the Director appointing him and the proportion thereof shall be agreed between them.

84. Any Director may appoint any Person , whether or not a Director, to be the proxy of that Director to attend and vote on his behalf, in accordance with instructions given by that Director, or in the absence of such instructions at the discretion of the proxy, at a meeting or meetings of the Directors which that Director is unable to attend personally. The instrument appointing the proxy shall be in writing under the hand of the appointing Director and shall be in any usual or common form or such other form as the Directors may approve, and must be lodged with the chairman of the meeting of the Directors at which such proxy is to be used, or first used, prior to the commencement of the meeting.

## POWERS AND DUTIES OF DIRECTORS

85. Subject to the Law, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

86. The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution. The Directors may also appoint one or more of their

12

PATRICK_000078

018437

HCMLPHMIT00003600

number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

87. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

88. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

89. The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an **"Attorney"** or **"Authorised Signatory"**, respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

90. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article .

91. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

92. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

93. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

## BORROWING POWERS OF DIRECTORS

94. The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

13

PATRICK_000079

018438

HCMLPHMIT00003601

## THE SEAL

95.    The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

96.    The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal.  The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

97.    Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

## DISQUALIFICATION OF DIRECTORS

98.    The office of Director shall be vacated, if the Director:

    (a)    becomes bankrupt or makes any arrangement or composition with his creditors;

    (b)    dies or is found to be or becomes of unsound mind;

    (c)    resigns his office by notice in writing to the Company;

    (d)    is removed from office by Ordinary Resolution;

    (e)    is removed from office by notice addressed to him at his last known address and signed by all of his co-Directors (not being less than two in number); or

    (f)    is removed from office pursuant to any other provision of these Articles.

## PROCEEDINGS OF DIRECTORS

99.    The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit . Questions arising at any meeting shall be decided by a majority of votes.  In case of an equality of votes the chairman shall have a second or casting vote.  A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

100.    A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication

14

PATRICK_000080

018439

HCMLPHMIT00003602

equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

101. The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two, and if there be one Director the quorum shall be one. A Director represented by proxy or by an alternate Director at any meeting shall be deemed to be present for the purposes of determining whether or not a quorum is present.

102. A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

103. A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

104. Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

105. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

   (a)   all appointments of officers made by the Directors;

   (b)   the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

   (c)   all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

106. When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

15

PATRICK_000081

018440

HCMLPHMIT00003603

107.   A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be (an alternate Director, subject as provided otherwise in the terms of appointment of the alternate Director, being entitled to sign such a resolution on behalf of his appointer), shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be.  When signed a resolution may consist of several documents each signed by one or more of the Directors or his duly appointed alternate.

108.   The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.

109.   The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

110.   Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings.  If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

111.   A committee appointed by the Directors may meet and adjourn as it thinks proper.  Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

112.   All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.

## DIVIDENDS

113.   Subject to any rights and restrictions for the time being attached to any Shares, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

114.   Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

115.   The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

16

PATRICK_000082

018441

HCMLPHMIT00003604

116.  Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

117.  The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

118.  Subject to any rights and restrictions for the time being attached to any Shares, all dividends shall be declared and paid according to the amounts paid up on the Shares, but if and for so long as nothing is paid up on any of the Shares dividends may be declared and paid according to the par value of the Shares.

119.  If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

120.  No dividend shall bear interest against the Company.

## ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

121.  The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

122.  The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

123.  The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

124.  The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

125.  The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Law and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

## CAPITALISATION OF RESERVES

126.  Subject to the Law, the Directors may, with the authority of an Ordinary Resolution:

(a)  resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

17

PATRICK_000083

018442

HCMLPHMIT00003605

(b)    appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

    (i)    paying up the amounts (if any) for the time being unpaid on Shares held by them respectively, or

    (ii)    paying up in full unissued Shares or debentures of a nominal amount equal to that sum,

and allot the Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Shares to be allotted to Shareholders credited as fully paid;

(c)    make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Shares or debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d)    authorise a Person to enter (on behalf of all the Shareholders concerned) into an agreement with the Company providing for either:

    (i)    the allotment to the Shareholders respectively, credited as fully paid, of Shares or debentures to which they may be entitled on the capitalisation, or

    (ii)    the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Shares,

and any such agreement made under this authority being effective and binding on all those Shareholders; and

(e)    generally do all acts and things required to give effect to the resolution.

## SHARE PREMIUM ACCOUNT

127.    The Directors shall in accordance with the Law establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share .

128.    There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Law, out of capital.

## NOTICES

129.    Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the

PATRICK_000084

018443

HCMLPHMIT00003606

purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

130.    Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

131.    Any notice or other document, if served by:

(a)    post, shall be deemed to have been served five days after the time when the letter containing the same is posted;

(b)    facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c)    recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d)    electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

132.    Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

133.    Notice of every general meeting of the Company shall be given to:

(a)    all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b)    every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

**INDEMNITY**

134.    Every Director (including for the purposes of this Article any alternate Director appointed pursuant to the provisions of these Articles), Secretary, assistant Secretary, or other officer for the time being and from time to time of the Company (but not including the Company's auditors) and the personal representatives of the same (each an **"Indemnified Person"**) shall be indemnified and

19

PATRICK_000085

018444

HCMLPHMIT00003607

secured harmless against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by such Indemnified Person, other than by reason of such Indemnified Person's own dishonesty, wilful default or fraud, in or about the conduct of the Company's business or affairs (including as a result of any mistake of judgment) or in the execution or discharge of his duties, powers, authorities or discretions, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by such Indemnified Person in defending (whether successfully or otherwise) any civil proceedings concerning the Company or its affairs in any court whether in the Cayman Islands or elsewhere.

135.   No Indemnified Person shall be liable:

   (a)   for the acts, receipts, neglects, defaults or omissions of any other Director or officer or agent of the Company; or

   (b)   for any loss on account of defect of title to any property of the Company; or

   (c)   on account of the insufficiency of any security in or upon which any money of the Company shall be invested; or

   (d)   for any loss incurred through any bank, broker or other similar Person; or

   (e)   for any loss occasioned by any negligence, default, breach of duty, breach of trust, error of judgement or oversight on such Indemnified Person's part; or

   (f)   for any loss, damage or misfortune whatsoever which may happen in or arise from the execution or discharge of the duties, powers, authorities, or discretions of such Indemnified Person's office or in relation thereto;

unless the same shall happen through such Indemnified Person's own dishonesty, wilful default or fraud.

## NON-RECOGNITION OF TRUSTS

136.   Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any Share or (except only as otherwise provided by these Articles or as the Law requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

## WINDING UP

137.   If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

138.   If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Shareholders or different Classes.  The liquidator may, with the like sanction, vest the whole or any part of such assets in

20

PATRICK_000086

018445

HCMLPHMIT00003608

trustees upon such trusts for the benefit of the Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

## AMENDMENT OF ARTICLES OF ASSOCIATION

139.     Subject to the Law and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

## CLOSING OF REGISTER OR FIXING RECORD DATE

140.     For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

141.     In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

142.     If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## REGISTRATION BY WAY OF CONTINUATION

143.     The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

## DISCLOSURE

144.     The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial

21

PATRICK_000087

018446

HCMLPHMIT00003609

authority, or to any stock exchange on which the Shares may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.

PATRICK_000088

018447

HCMLPHMIT00003610

**NAME, ADDRESS AND DESCRIPTION
OF SUBSCRIBER**

Walkers Nominees Limited, 87 Mary
Street, George Town, Grand Cayman
KY1-9001, Cayman Islands

(Sgd) Virginia Czarnocki

Virginia Czarnocki
as Authorised Signatory for and on behalf of Walkers
Nominees Limited

Dated:    13 December 2010

(Sgd) Carol MacDonald

Signature of Witness

Name:         Carol MacDonald

Address       87 Mary Street, George
              Town, Grand Cayman KY1-
              9001, Cayman Islands

Occupation:   Secretary

CERTIFIED TO BE A TRUE AND CORRECT COPY

SIG.

V. Daphene Whitelocke
Assistant Registrar

Date. 13ᵗʰ December, 2010

23

PATRICK_000089

018448

HCMLPHMIT00003611

# EXHIBIT 5

018449
HCMLPHMIT00003612



intertrust
GROUP

Registration No.: **249232**

Date of Incorporation: **13 December 2010**

Client No.: **KY057017**

REGISTER OF MEMBERS
FOR:
**CLO HOLDCO, LTD.**

| | |
|---|---|
| Share Class: | **Ordinary** |
| Nominal Value: | **USD 1.00** |
| Voting Rights: | Yes |
| Conditional: | No |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **WNL Limited** Walkers Corporate Services Limited Walker House 87 Mary Street George Town Grand Cayman KY1-9005 Cayman Islands | 13 Dec 2010 | Allotment | 1.00 | 13 Dec 2010 : Subscriber's share issued by operation of law on registration | No Cert | | | |
| | | Transfer | (1.00) | 17 Dec 2010 : Transfer of 1.0 Ordinary share(s) from WNL Limited to Highland Capital Management Partners, Charitable Trust #2 pursuant to resolutions dated 17 Dec 2010 | | | | |
| | | | | | | Nil | Nil | 17 Dec 2010 |
| **Highland Capital Management Partners, Charitable Trust #2** 13455 Noel Road Suite 800 Dallas TX 75240 USA | 17 Dec 2010 | Transfer | 1.00 | 17 Dec 2010 : Transfer of 1.0 Ordinary share(s) from WNL Limited to Highland Capital Management Partners, Charitable Trust #2 pursuant to resolutions dated 17 Dec 2010 | No Cert | | | |
| | | Transfer | (1.00) | 7 Nov 2011 : Transfer of 1.0 Ordinary share(s) from Highland Capital Management Partners, Charitable Trust #2 to CHARITABLE DAF HOLDCO, LTD | | | | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 3]

PATRICK_000022

018450



HCMLPHMIT00003613


GROUP

Registration No.: **249232**

Date of Incorporation: **13 December 2010**

Client No.: **KY057017**

REGISTER OF MEMBERS
FOR:
**CLO HOLDCO, LTD.**

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| | | | | pursuant to Contribution and Tranfser Agreement dated 7 Nov 2011 | | | | |
| | | | | | | **Nil** | **Nil** | 7 Nov 2011 |
| **CHARITABLE DAF FUND, LP**<br>Intertrust Corporate Services (Cayman) Limited<br>One Nexus Way<br>Camana Bay<br>Grand Cayman KY1-9005<br>Cayman Islands | 7 Nov 2011 | Transfer | 1.00 | 7 Nov 2011 : Transfer of 1.0 Ordinary share(s) from CHARITABLE DAF HOLDCO, LTD to CHARITABLE DAF FUND, LP pursuant to Contribution and Transfer Agreement dated 7 Nov 2011 | No Cert | | | |
| | | | | | | **100** | **1.00** | |
| **CHARITABLE DAF HOLDCO, LTD**<br>Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005<br>Cayman Islands | 7 Nov 2011 | Transfer | 1.00 | 7 Nov 2011 : Transfer of 1.0 Ordinary share(s) from Highland Capital Management Partners, Charitable Trust #2 to CHARITABLE DAF HOLDCO, LTD pursuant to Contribution and Tranfser Agreement dated 7 Nov 2011 | No Cert | | | |
| | | Transfer | (1.00) | 7 Nov 2011 : Transfer of 1.0 Ordinary share(s) from CHARITABLE DAF HOLDCO, LTD to CHARITABLE DAF FUND, LP pursuant to Contribution and Transfer Agreement dated 7 Nov 2011 | | | | |
| | | | | | | **Nil** | **Nil** | 7 Nov 2011 |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[2 / 3]

PATRICK_000023

018451


HCMLPHMIT00003614



Registration No.: **249232**

Date of Incorporation: **13 December 2010**

Client No.: **KY057017**

REGISTER OF MEMBERS
FOR:
**CLO HOLDCO, LTD.**

Notes:

|  |
|--|
|  |

PATRICK_000024

018452



# EXHIBIT 8

018453

HCMLPHMIT00003616



WK–53083

# Certificate of Registration of Exempted Limited Partnership

*I, **JOY A. RANKINE** Assistant Registrar of Exempted Limited Partnership  in the Cayman Islands DO HEREBY CERTIFY, pursuant to the Exempted Limited Partnership Law, 1991 that all the requisitions of the said Law in respect of registration were complied with by*

### Charitable DAF Fund, LP

*an Exempted Limited Partnership registered  in the Cayman Islands on the 28th day of October Two Thousand Eleven*

*Given under my hand and Seal at George Town in the Island of Grand Cayman this 28th day of October Two Thousand Eleven*

**Assistant Registrar of Exempted Limited Partnership
Cayman Islands.**

PATRICK_000040

018454
HCMLPHMIT00003617

# EXHIBIT 9

018455

HCMLPHMIT00003618

DATED NOVEMBER 7, 2011

AMENDED AND RESTATED

EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF

CHARITABLE DAF FUND, LP

---

WARNING

THE TAKING OR SENDING BY ANY PERSON OF AN ORIGINAL OF THIS
DOCUMENT INTO THE CAYMAN ISLANDS MAY GIVE RISE TO THE
IMPOSITION OF CAYMAN ISLANDS STAMP DUTY

# TABLE OF CONTENTS

<div align="right">

**PAGE**

</div>

| | | |
|---|---|---|
| ARTICLE I | GENERAL PROVISIONS; COMPENSATION AND EXPENSES | 2 |
| 1.1 | Continuation | 2 |
| 1.2 | Name | 2 |
| 1.3 | Purpose and Powers | 2 |
| 1.4 | Registered Office | 2 |
| 1.5 | Partners | 2 |
| 1.6 | Powers. | 2 |
| 1.7 | Term | 3 |
| 1.8 | Admission of New Partners | 3 |
| 1.9 | Taxable Year | 3 |
| 1.10 | Liability of Partners | 3 |
| 1.11 | Limitation on Assignability of Partners' Interests. | 3 |
| 1.12 | Definitions. | 4 |
| 1.13 | Service Providers | 4 |
| 1.14 | Partnership Expenses | 4 |
| 1.15 | Withdrawal of Initial Limited Partner | 5 |
| ARTICLE II | POWERS | 5 |
| 2.1 | Partnership Powers | 5 |
| 2.2 | Rights, Powers, Limitations on Liability and Indemnification of General Partner. | 6 |
| ARTICLE III | CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES | 9 |
| 3.1 | Capital Contributions. | 9 |
| 3.2 | Capital Account; Allocation of Profits and Losses. | 9 |
| ARTICLE IV | LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL WITHDRAWALS FROM CAPITAL ACCOUNT | 9 |
| 4.1 | Legal Interest. | 9 |
| 4.2 | Distributions. | 10 |
| 4.3 | Withdrawal | 10 |
| ARTICLE V | DURATION OF PARTNERSHIP | 10 |
| 5.1 | Termination | 10 |
| 5.2 | Winding Up | 11 |
| ARTICLE VI | MISCELLANEOUS | 11 |
| 6.1 | Tax Matters Partner | 11 |
| 6.2 | Right to Hire. | 11 |
| 6.3 | Applicable Law, etc | 12 |
| 6.4 | Power of Attorney | 12 |
| 6.5 | Tax Elections Under the Internal Revenue Code | 12 |
| 6.6 | Amendments to Partnership Agreement | 12 |

<div align="center">

i

</div>

PATRICK_000063

018457

HCMLPHMIT00003620

| 6.7 | Investment Representation | 13 |
| 6.8 | Notices | 13 |
| 6.9 | General Partner Determinations | 14 |
| 6.10 | Dispute Resolution | 14 |
| 6.11 | Successors and Assigns | 16 |
| 6.12 | Severability | 16 |
| 6.13 | No Third Party Rights | 16 |
| 6.14 | No Right to Partition | 16 |

PATRICK_000064

018458

HCMLPHMIT00003621

## AMENDED AND RESTATED
## EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF
## CHARITABLE DAF FUND, LP

**THIS AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT** (the "**Agreement**") is made on November 7, 2011

**BETWEEN**

(1)    Charitable DAF GP, LLC, a Delaware limited liability company registered as a foreign company in the Cayman Islands and having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands as general partner (the "**General Partner**"); and

(2)    Charitable DAF HoldCo, Ltd, a Cayman Islands exempted Company having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands as limited partner (the "**Limited Partner**"); and

(3)    Each individual, partnership, corporation, limited liability company, trust or other entity (each, a "**Person**") admitted as a limited partner or general partner (collectively, the "**Partners**") of the Partnership (as defined below) in accordance with this Agreement, including any Persons hereafter admitted as Partners in accordance with this Agreement and excluding any Persons who cease to be Partners in accordance with this Agreement; and

(4)    Walkers Nominees Limited having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman, KY1-9005, Cayman Islands as the initial limited partner (the "**Initial Limited Partner**") solely for the purposes of withdrawing as such.

**WHEREAS**, Charitable DAF Fund, LP (the "**Partnership**") was formed and registered as an exempted limited partnership pursuant to and in accordance with the Exempted Limited Partnership Law (as amended) of the Cayman Islands (the "**Law**"), and since its formation has been governed by the Initial Limited Partnership Agreement of the Partnership, dated October 25, 2011 (the "**Initial Agreement**"); and

**WHEREAS**, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**") and the parties hereto desire for the Partnership to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein; and

**WHEREAS**, the parties hereto wish to amend and restate the Initial Agreement in its entirety and enter into this Agreement.

PATRICK_000066

018459

HCMLPHMIT00003622

**NOW THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby adopt this Agreement to be their Limited Partnership Agreement, as follows:

**IT IS AGREED:**

## ARTICLE I
## GENERAL PROVISIONS; COMPENSATION AND EXPENSES

1.1 <u>Continuation</u>.  The parties hereto continue the Partnership as an exempted limited partnership formed on October 25, 2011 pursuant to the Law.

1.2 <u>Name</u>.  The business of the Partnership shall be carried on under the name of Charitable DAF Fund, LP.

1.3 <u>Purpose and Powers</u>.  The purpose of the Partnership shall be to invest and trade, directly or indirectly, in securities of all types and other investment vehicles and instruments.  At least initially, a majority of the Partnership's assets shall be invested in shares of CLO HoldCo, Ltd., a Cayman Islands exempted company ("**CLO HoldCo**"), but the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners.

1.4 <u>Registered Office</u>.  The registered office of the Partnership is c/o Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands.

1.5 <u>Partners</u>.  The name and addresses of the Partners are as follows:

| Name | Address |
|------|---------|
| Charitable DAF GP, LLC | c/o Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005, Cayman Islands |
| Charitable DAF HoldCo Ltd<br>(Limited Partner) | c/o Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005, Cayman Islands |

1.6 <u>Powers</u>.

(a) Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and

2

PATRICK_000065

018460

HCMLPHMIT00003623

obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.

(b)    Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.

1.7    <u>Term</u>.  The Partnership was established on October 25, 2011 and shall continue until terminated in accordance with this Agreement or any amendment or modification thereof.

1.8    <u>Admission of New Partners</u>.  The General Partner may at any time admit one or more new Partners on such terms as it may determine in its sole discretion; provided that any such new Limited Partner shall have as its equity owners solely Indirect Charitable Owners.

1.9    <u>Taxable Year</u>.  The Taxable Year of the Partnership shall be a calendar fiscal year, or such other fiscal year as the General Partner shall determine in their sole discretion from time to time.

1.10    <u>Liability of Partners</u>.

(a)    The General Partner shall be liable for all of the debts, liabilities and obligations of the Partnership.

(b)    Except to the extent otherwise required by law or this Agreement, a Limited Partner shall not be personally liable for any obligations of the Partnership to third parties nor for the return of any distributions from the Partnership to the Limited Partner.  A Limited Partner may be liable for the tax audit and related expenses referred to in Section 6.1.

1.11    <u>Limitation on Assignability of Partners' Interests</u>.

(a)    A Limited Partner may not assign his interest in whole or in part to any person, without the prior written consent of the General Partner, except by operation of law, nor shall he be entitled to substitute for himself as a Limited Partner any other person, without the prior written consent of the General Partner, which in either case may be given or withheld in the sole discretion of the General Partner. Any attempted assignment or substitution not made in accordance with this section shall be void *ab initio*.

3

PATRICK_000067

018461

HCMLPHMIT00003624

(b)    The General Partner may not assign their interests in the Partnership to any entity that is not under common control with the General Partner without the consent of a majority-in-interest of the Limited Partners.  Notwithstanding the foregoing, the General Partner may freely assign their economic interest in the Partnership in whole or in part.

1.12  <u>Definitions</u>.  For the purpose of this Agreement, unless the context otherwise requires:

(a)    <u>General Partner</u>.  The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement.  The General Partner shall give each Limited Partner notice of any change in control of the General Partner.  The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

(b)    <u>Indirect Charitable Owners</u>.  The term "**Indirect Charitable Owner**" shall refer to the indirect equity owners of the Limited Partners, which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.

(c)    <u>Limited Partner</u>.  The term "**Limited Partner**" shall refer to Charitable DAF HoldCo Ltd (and each person subsequently admitted as a limited partner by the General Partner pursuant to the terms of this Agreement).

(d)    <u>Partner</u>.  The term "**Partner**" shall refer to the General Partner or the Limited Partner.

1.13  <u>Service Providers</u>.  The General Partner may engage one or more Persons to act, or remove any one or more Persons from so acting, as service providers to the Company (including, without limitation, as manager, administrator, custodian, registrar and transfer agent, investment manager, investment adviser, sponsor and/or prime broker, auditors and legal counsel to the Partnership) in its sole discretion; provided, that any compensation paid to any such service provider that is affiliated with the General Partner shall be in an amount customary for services of a similar nature.

1.14  <u>Partnership Expenses</u>.  The Partnership will bear its own operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees (if any), taxes, research costs, legal and accounting expenses and other operating expenses.  In addition, the Partnership will bear its pro rata share of CLO HoldCo's operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees, taxes, research costs, legal and accounting expenses and other operating expenses.  The Partnership will also bear (or reimburse the General Partner for) its organizational fees and expenses. To the extent the Partnership shares trading expenses with other accounts that may be managed by the General Partner or any affiliates, it will bear a proportionate share of the associated costs. In no event shall the General Partner receive any compensation from the Partnership.

<div align="center">4</div>

PATRICK_000068

018462

HCMLPHMIT00003625

1.15    <u>Withdrawal of Initial Limited Partner</u>.  The Initial Limited Partner hereby withdraws as a limited partner immediately following the admission of the Limited Partners and thereafter shall have no further rights, liabilities or obligations under or in respect of this Agreement in its capacity as Initial Limited Partner.

<div align="center">

**ARTICLE II**
**POWERS**

</div>

2.1    <u>Partnership Powers</u>.  The Partnership shall have the following powers:

(a)    To purchase, sell, invest and trade, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non-U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, syndicated debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; statutory claims; royalty claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (all such items being called herein a "**Financial Instruments**"), and to sell Financial Instruments short and cover such sales;

<div align="center">

5

</div>

PATRICK_000069

018463

HCMLPHMIT00003626

(b)      To possess, transfer, mortgage, pledge or otherwise deal in, and to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, Financial Interests held or owned by the Partnership with the ultimate objective of the preservation, protection, improvement and enhancement in value thereof and to hold such Financial Interests in the name of the Partnership, in the name of any securities broker or firm, in the name of any nominee of such firm, or in the name of any other nominee or any other street name, or any combination thereof;

(c)      To lend, either with or without security, any Financial Instruments, funds or other properties of the Partnership, including by entering into reverse repurchase agreements, and, from time to time, undertake leverage on behalf of the Partnership;

(d)      To borrow or raise moneys and, from time to time, without limit as to amount, to issue, accept, endorse and execute promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of any of the foregoing instruments and of the interest thereon by mortgage upon or pledge, conveyance or assignment in trust of the whole or any part of the property of the Partnership, whether at the time owned or thereafter acquired, and to sell, pledge or otherwise dispose of such bonds or other obligations of the Partnership for its purposes;

(e)      To have and maintain one or more offices within or without the Cayman Islands and in connection therewith to rent or acquire office space, engage personnel and do such other acts and things as may be necessary or advisable in connection with the maintenance of such office or offices;

(f)      To open, maintain and close bank accounts and brokerage accounts, including the power to draw checks or other orders for the payment of monies; and

(g)      To enter into, make and perform all contracts, agreements and other undertakings as may be necessary or advisable or incidental to the carrying out of the foregoing objects and purposes.

2.2     <u>Rights, Powers, Limitations on Liability and Indemnification of General Partner</u>.

(a)      Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the General Partner, its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including members of any committee and parties acting as agents for the execution of transactions) (each, a "**Covered Person**" and collectively, "**Covered Persons**") shall be subject to the provisions of this Section.

(b)      To the fullest extent permitted by law, no Covered Person shall be liable to the Partnership or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the

<div align="center">6</div>

PATRICK_000061

018464

HCMLPHMIT00003627

business of the Partnership, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Partnership, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Partnership whom such Covered Person believes is authorized to make such suggestions on behalf of the Partnership, (iii) any act or omission by the Partnership, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Partnership selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or gross negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

(c)     Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Partnership or in furtherance of the business of the Partnership in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d)     To the fullest extent permitted by law, the Partnership shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Partnership, any investment made under or in connection with this Agreement, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Partnership, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or gross negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or gross negligence.

(e)     Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Partnership prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.

(f)     The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may

PATRICK_000050

018465

HCMLPHMIT00003628

otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

(g) The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h) **Notwithstanding anything in this Agreement to the contrary, the aggregate maximum amount that a Covered Person may be liable to the Partnership and/or any of the Partners pursuant to this Agreement shall, to the extent not prohibited by law, never exceed the amount of management and incentive fees received by such Covered Person from the Partnership under this Agreement prior to the date that the acts or omissions giving rise to a claim for indemnification or liability shall have occurred. In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits. No Covered Person shall incur any liability for interest on any monies at any time received by such Covered Person or any investment loss or other charge resulting therefrom with respect to amounts invested hereunder.**

(i) **WAIVER OF CONSUMER RIGHTS: The Partnership and each of the Limited Partners waive all of their respective rights, if any, under the Deceptive Trade Practices-Consumer Protection Act, Section 17.41 et seq., Texas Business & Commerce Code ("DTPA"), a law that gives consumers special rights and protections. After consultation with an attorney of Partnership's own selection, Partnership voluntarily consents to this waiver. This waiver includes any right to recover attorneys' fees under the DTPA. Further, Partnership waives all of its rights to any and all protections afforded by any other state or federal Consumer Protection Acts, including the recovery of attorneys' fees.**

(j) No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

Pursuant to the foregoing indemnification and exculpation provisions applicable to each Covered Person, the Partnership (and not the applicable Covered Person) shall be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence or reckless or intentional misconduct of any Covered Person. Given the volume of transactions executed on behalf of the Partnership, Limited Partners acknowledge that trading errors (and similar errors) will occur and that the Partnership shall be responsible for any resulting losses, even if such losses result from the negligence (but not gross negligence) of any Covered Person.

(k) This Section 2.2 shall survive a Limited Partner's withdrawal as a limited partner of the Partnership and any termination of this Agreement.

8

PATRICK_000052

018466

HCMLPHMIT00003629

## ARTICLE III
## CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES

3.1    Capital Contributions.

   (a)    Each Partner has made the capital contributions to the Partnership in the amount set forth in the records of the Partnership. The Limited Partner has contributed to the Partnership all of the outstanding equity interests of CLO HoldCo.

3.2    Capital Account; Allocation of Profits and Losses.

   (a)    There shall be established for each Partner on the books of the Partnership as of the first day of the fiscal period during which such Partner was admitted to the Partnership a capital account for such Partner in an amount equal to his capital contribution to the Partnership.

   (b)    Since the General Partner's capital account and contributions shall be the minimum required by Law, all income, deductions, gains, losses and credits of the Partnership shall be allocated shall be for the benefit of the Limited Partner, except as may otherwise be required by law. In the event any valuation of assets is necessary or appropriate, the General Partner shall determine such value in any reasonable manner determined by the General Partner in its sole discretion consistent with relevant accounting principles and applicable law.

   (c)    For purposes of determining the share of any items allocated to any period during the relevant Taxable Year of the Partnership, such shares shall be determined by the General Partner using any method permitted by the Code and the regulations thereunder. All allocations to be made by the General Partner may be overridden if necessary to comply with the Code, the regulations thereunder or other applicable law.

   (d)    To the extent that the Partnership pays withholding taxes as to a Partner, such amounts shall be charged to the applicable Partner's capital account; provided, however, that any such amounts may be treated as an advance to the Partner with interest to be charged to that Partner's capital account at a rate determined by the General Partner.

   (e)    Each Partner agrees not to treat, on any tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with treatment of such item by the Partnership.

## ARTICLE IV
## LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL
## WITHDRAWALS FROM CAPITAL ACCOUNT

4.1    Legal Interest. Each Partner shall have and own during any Taxable Year an undivided interest in the Partnership equal to his opening capital account for such period.

9

PATRICK_000053

018467

HCMLPHMIT00003630

4.2   <u>Distributions</u>.

    (a)     Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses. In determining the amount of cash or securities available for distribution, the General Partner may retain reasonable reserves in such amounts as it determines may be necessary to cover expenses, contingencies and losses. Notwithstanding the foregoing, distributions made in connection with a sale of all or substantially all of the Partnership's assets or a liquidation of the Partnership shall be made in accordance with the capital account balances of the Partners within the time period set forth in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(3).

    (b)     The General Partner may withhold and pay over to the U.S. Internal Revenue Service (or any other relevant taxing authority) such amounts as the Partnership is required to withhold or pay over, pursuant to the Code or any other applicable law, on account of a Partner's distributive share of the Partnership's items of gross income, income or gain.

        For purposes of this Agreement, any taxes so withheld or paid over by the Partnership with respect to a Partner's distributive share of the Partnership's gross income, income or gain shall be deemed to be a distribution or payment to such Partner, reducing the amount otherwise distributable to such Partner pursuant to this Agreement and reducing the capital account of such Partner. If the amount of such taxes is greater than any such distributable amounts, then such Partner and any successor to such Partner's interest shall pay the amount of such excess to the Partnership, as a contribution to the capital of the Partnership.

4.3   <u>Withdrawal</u>. Without the consent of the General Partner, no Partner may withdraw as a Partner or make withdrawals from such Partner's capital account. In the event the General Partner permits any such withdrawal, the withdrawal shall be on such terms and conditions as the General Partner shall determine in its sole discretion. The General Partner may terminate all or any part of the interest of any Limited Partner at any time for any reason or no reason by written notice; provided that any new or additional Limited Partner shall be directly or indirectly an entity or organization exempt from taxation under Section 501(c)(3) of the Code.

## ARTICLE V
## DURATION OF PARTNERSHIP

5.1   <u>Termination</u>. The Partnership shall be required to be wound up and dissolved upon:

    (a)     the service of a notice by the General Partner on the other Partners requiring that the Partnership be wound up and dissolved; or

PATRICK_000054

018468

HCMLPHMIT00003631

(b)      the withdrawal by or resignation of the General Partner as general partner of the Partnership; or

(c)      the withdrawal of all Limited Partners.

Upon the occurrence of any such event, the Partnership's affairs shall be wound up by the General Partner or such other Person as the General Partner shall appoint.

5.2      <u>Winding Up</u>.  Upon the Partnership being required to be wound up and dissolved, the General Partner shall proceed with the liquidation and distribution of the assets of the Partnership, and upon completion of the winding up of the Partnership, shall have the authority to and shall execute and file a dissolution notice and such other documents required to effect the dissolution and termination of the Partnership in accordance with the Law.  Before the distribution of all the assets of the Partnership, the business of the Partnership and the affairs of the Partners, as such, shall continue to be governed by this Agreement.  The winding up of the Partnership and payment of creditors shall be effected in accordance with the Law.

## ARTICLE VI
## MISCELLANEOUS

6.1      <u>Tax Matters Partner</u>.  The General Partner shall at all times constitute, and have full powers and responsibilities, as the Tax Matters Partner of the Partnership.  In the event the Partnership shall be the subject of an income tax audit by any Federal, state or local authority, to the extent the Partnership is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Tax Matters Partner shall be authorized to act for, and his decision shall be final and binding upon, the Partnership and each Partner thereof, and the Tax Matters Partner shall be indemnified and held harmless by the Partnership and each Partner for any action so taken by him in good faith.  All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Partnership to the extent of available Partnership funds, and any excess shall be paid by the Partners individually in proportion to their percentage interests in the Partnership.

6.2      <u>Right to Hire</u>.

(a)      Nothing herein shall preclude the General Partner from engaging on behalf of the Partnership the services of any person or firm, whether or not affiliated with the General Partner, including the General Partner, to render for compensation such services to the Partnership as may be necessary to implement the business purposes of the Partnership.

(b)      Each of the Partners consents that the General Partner, the Investment Manager or any Limited Partner or any affiliate (as defined in the Securities Act of 1933, as amended, and the regulations thereunder) of any of them, including without limitation the investment manager of the CLO HoldCo, may engage in or possess an interest in directly or indirectly, any other present or future business venture of any nature or description for his own account, independently or with others,

11

PATRICK_000056

018469

HCMLPHMIT00003632

including but not limited to, any aspect of the securities business or any other business engaged in by the Partnership, and may become the general partner in other partnerships; and neither the Partnership nor any Partner shall have any rights in or to such independent venture or the income or profits derived therefrom.

(c) The General Partner, the Investment Manager and any affiliate or employee of such General Partner or Investment Manager, may hereafter render investment advisory services to other investors with respect to, and/or may own, purchase or sell, securities or other interests in property the same as or similar to those which the General Partner may purchase, hold or sell on behalf of the Partnership.

6.3 <u>Applicable Law, etc.</u>  This Limited Partnership Agreement:  (i) shall be binding on the executors, administrators, estates, heirs and legal successors of the Partners; (ii) shall be governed by, and construed in accordance with, the laws of the Cayman Islands; and (iii) may be executed in more than one counterpart with the same effect as if the parties executing the several counterparts had all executed one counterpart as of the day and year first above written; provided, however, that in the aggregate, they shall have been signed by all of the Partners.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural as the identity of the person may require.  The term "gross negligence" and its cognates shall be interpreted in accordance with the laws of the State of Delaware.

6.4 <u>Power of Attorney</u>.  Each of the undersigned does hereby constitute and appoint the General Partner, with full power of substitution, his true and lawful representative and attorney in-fact, in his name, place and stead to make, execute, sign and file this Agreement and any amendment to this Agreement authorized by the terms of this Agreement, and all such other instruments, documents and certificates (and any amendments thereto) which may from time to time be required by the laws of the Cayman Islands, the United States of America, or any state in which the Partnership shall determine to do business, or any political subdivision or agency thereof, to effectuate, implement and continue the valid and subsisting existence of the Partnership and to take any further action that the General Partner considers advisable in its sole discretion in connection with the exercise of its authority pursuant to this Agreement.  This power of attorney is intended to secure an interest in property and, in addition, the obligations of each relevant Limited Partner under this Agreement and shall be irrevocable.

6.5 <u>Tax Elections Under the Internal Revenue Code</u>.  The General Partner shall have the authority to make all tax elections and determinations on behalf of the Partnership under the Internal Revenue Code, the regulations promulgated thereunder or other applicable law to effect any elections, determinations or capital allocations.

6.6 <u>Amendments to Partnership Agreement</u>.  The terms and provisions of this Agreement may be modified or amended at any time and from time to time with the consent of the General Partner together with the consent of a majority in interest of the Limited Partners, insofar as is consistent with the laws governing this Agreement. Notwithstanding the foregoing, the General Partner shall have the right to effect

12

PATRICK_000055

018470

HCMLPHMIT00003633

amendments to this Agreement without the consent of any Limited Partner, including without limitation, to reflect: a change in the location of the Partnership's principal place of business; a change in the registered office or registered agent; a change in the name of the Partnership; admission of Partners in accordance with this Agreement; a change that is necessary to qualify the Partnership as a limited partnership under the laws of any state or that is necessary or advisable in the opinion of the Tax Matters Partner to ensure that the Partnership will not be treated as an association taxable as a corporation for Federal income tax purposes; a change of the provisions relating to the management fee or other compensation to the Investment Manager or the General Partner so that such provisions conform to any applicable requirements of the U.S. Securities and Exchange Commission and other regulatory authorities; a change (i) that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any Federal or state agency or contained in any Federal or state statute, compliance with any of which the General Partner deems to be in the best interests of the Partnership and the Limited Partners, (ii) that is required or contemplated by this Agreement, or (iii) that is necessary or desirable to implement new regulations published by the Internal Revenue Service with respect to partnership allocations of income, gain, loss, deduction and credit; a change to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein, or to make any other provision with respect to the matters or questions arising under this Agreement which will not be inconsistent with the provisions hereof; or a change that does not adversely affect the Limited Partners in any material respect; *provided, that* in no event shall the General Partner effect any amendment to this Agreement that has the effect of giving the General Partner any economic benefits in the assets of the Partnership; *provided further, that* the General Partner shall give notice to the Limited Partners of any such amendment.

6.7     <u>Investment Representation</u>.  Each Partner hereby acknowledges and represents that it acquired its interest in the Partnership for investment purposes only and not with a view to its resale or distribution.

6.8     <u>Notices</u>.  All notices, requests or approvals that any party hereto is required or desires to give to any Partner or to the Partnership shall be in writing signed by or on behalf of the party giving the same and delivered personally or sent overnight express mail by a reputable private carrier or by prepaid registered or certified mail, return receipt requested, addressed (i) to the Limited Partner at the addresses set forth beneath his signature to this Agreement; (ii) to the Partnership at the principal place of business of the Partnership with a copy of each such notice sent simultaneously to the General Partner and the Investment Manager at Nextbank Tower, 13455 Noel Road, 8th Floor, Dallas, Texas 75240; or (iii) to the respective party at such other address or addresses as the party may specify from time to time in a writing given to the Partnership in the manner provided in this Section 6.8 of ARTICLE VI.  Notice shall be deemed to have been duly given and received (i) on the date of delivery, if personally delivered, (ii) on the next business day subsequent to sending by overnight express mail as aforesaid, or (iii) on the third day subsequent to mailing if mailed as aforesaid; provided that any withdrawal notices shall not be deemed to have been given until actually received by the Partnership.

<div align="center">13</div>

PATRICK_000057

018471

HCMLPHMIT00003634

6.9   <u>General Partner Determinations</u>.   Any determinations or calculations made by the General Partner shall, if made in good faith and in the absence of manifest error, be binding upon the Partnership and its Limited Partners.

6.10   <u>Dispute Resolution</u>.  The following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with the Agreement or otherwise involving the Partnership, its Partners and/or any Covered Person.  If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

    (a)    <u>Mediation</u>.

        (1)    Any Dispute shall be submitted to mediation by written notice to the other party or parties.  In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations.  The mediator will be selected by agreement of the parties.  If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect.

        (2)    The mediation will be conducted as specified by the mediator and agreed upon by the parties.  The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

        (3)    The mediation will be treated as a settlement discussion and therefore will be confidential.  The mediator may not testify for either party in any later proceeding relating to the dispute.  No recording or transcript shall be made of the mediation proceedings.

        (4)    Each party will bear its own costs in the mediation.  The fees and expenses of the mediator will be shared equally by the parties.

    (b)    <u>Arbitration</u>.  If a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration.  A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed.  Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein.  The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in this document and the commercial dispute arbitration rules then in effect ("**Arbitration Rules**").  In the event of a conflict, the provisions of this document will control.

        (1)    The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the

PATRICK_000058

018472

HCMLPHMIT00003635

Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, *provided, however*, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a state arbitration act preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

(2)   The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.

(3)   The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive.

(4)   No discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The

15

PATRICK_000059

018473

HCMLPHMIT00003636

total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.

(5)     All aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term.

(6)     The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

6.11    <u>Successors and Assigns</u>.    Subject to the limitations set forth in <u>Section 1.11</u>, this Agreement shall inure to the benefit of and be binding upon the parties and to their respective heirs, executors, administrators, successors and permitted assigns. For the avoidance of doubt, any Limited Partner who becomes a former Limited Partner shall remain bound to all terms and conditions of this Agreement.

6.12    <u>Severability</u>.    Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity shall not affect the validity of the remainder of the Agreement.

6.13    <u>No Third Party Rights</u>.    Except for rights expressly granted hereunder to the Covered Persons, this Agreement is intended solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any Person other than the parties hereto.

6.14    <u>No Right to Partition</u>.    Each of the Partners, on behalf of themselves and their shareholders, partners, principals, members, successors and assigns, if any and as permitted hereunder, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek, bring or maintain any action in any court of law or equity for partition of the Partnership or any asset of the Partnership, or any interest which is considered to be Partnership property, regardless of the manner in which title to such property may be held.

PATRICK_000051

018474

HCMLPHMIT00003637

Case 19-34054-sgj11 Doc 254-55 Filed 07/09/21 Entered 07/09/21 07:56:39 Page 24 of
Case 3:25-cv-02072-S Document 51-24 Filed 01/06/25 Page 626 of 1017 PageID 19525
Exhibit 74 Filed 01/06/25307

**SIGNATURE PAGE FOR AMENDED AND RESTATED
EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF
CHARITABLE DAF FUND, LP**

**IN WITNESS WHEREOF,** the undersigned have executed this Amended and Restated
Exempted Limited Partnership Agreement as a Deed effective as amongst the parties as of the
day and year first above written.

GENERAL PARTNER:

CHARITABLE DAF GP, LLC

By: _____
     James D. Dondero
     Managing Member

Witnessed By: _____

LIMITED PARTNER:

CHARITABLE DAF HOLDCO, LTD:


By: _____
     Name: Grant Scott
     Title: Director


Witnessed By: _____

INITIAL LIMITED PARTNER:

WALKERS NOMINEES LIMITED:


By: _____
     Name:
     Title:


Witnessed by: _____

PATRICK_000060

018475

HCMLPHMIT00003638

SIGNATURE PAGE FOR AMENDED AND RESTATED
EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF
CHARITABLE DAF FUND, LP

**IN WITNESS WHEREOF,** the undersigned have executed this Amended and Restated
Exempted Limited Partnership Agreement as a Deed effective as amongst the parties as of the
day and year first above written.

GENERAL PARTNER:

CHARITABLE DAF GP, LLC

By: _____
    James D. Dondero
    Managing Member


Witnessed By: _____

LIMITED PARTNER:

CHARITABLE DAF HOLDCO, LTD:

By: _____
    Name: Grant Scott
    Title: Director

Witnessed By: _Candi L. Rizzo_
    Candi L. Rizzo

INITIAL LIMITED PARTNER:

WALKERS NOMINEES LIMITED:

By: _____
    Name: ROD PALMER
    Title:

Witnessed by: _Graeme S Clay_

PATRICK_000061

018476

HCMLPHMIT00003639

# EXHIBIT 10

018477
HCMLPHMIT00003640



Registration No.: **53083**

Date of Incorporation: **28 October 2011**

Client No.: **KY059900**

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF FUND, LP**

| | |
|---|---|
| Share Class: | **General Partner** |
| Nominal Value: | **USD 0.00** |
| Voting Rights: | Yes |
| Conditional: | NO |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **CHARITABLE DAF GP, LLC** The Corporation Trust Company Corporation Trust Center 1209 Orange St New Castle 19801 Wilmington DE USA | 25 Oct 2011 | New Partner | 1.00 | 25 Oct 2011 : Initial Exempted Limited Partnership Agreement dated 25 Oct 2011 | No Cert | | | |
| | | | | | | **Nil** | **1.00** | |

Notes:

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

PATRICK_000061

018478



# EXHIBIT 11

018479

HCMLPHMIT00003642

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

MEMORANDUM AND ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

(ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)



**|||** WALKERS

190 Elgin Avenue, George Town
Grand Cayman KY1-9001, Cayman Islands
T +1 345 949 0100   F +1 345 949 7886   www.walkersglobal.com

**REF: SSJ/VT/H0851-120776**



AMER_Docs   11255406.3 H0851.120776

*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

PATRICK_000060

**018480**

HCMLPHMIT00003643

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

MEMORANDUM OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

### (ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)

1. The name of the company is Charitable DAF HoldCo, Ltd (the "**Company**").

2. The registered office of the Company will be situated at the offices of Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law (as amended) of the Cayman Islands (the "**Law**").

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Law.

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each and 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Law and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Law to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000062

018481

HCMLPHMIT00003644

## TABLE OF CONTENTS

| CLAUSE | PAGE |
|---|---|
| TABLE A | 1 |
| INTERPRETATION | 1 |
| PRELIMINARY | 4 |
| SHARES | 4 |
| MANAGEMENT SHARES | 5 |
| PARTICIPATING SHARES | 6 |
| MODIFICATION OF RIGHTS | 6 |
| CERTIFICATES | 7 |
| FRACTIONAL SHARES | 7 |
| TRANSFER OF SHARES | 7 |
| TRANSMISSION OF SHARES | 7 |
| ALTERATION OF SHARE CAPITAL | 8 |
| REDEMPTION, PURCHASE AND SURRENDER OF SHARES | 8 |
| TREASURY SHARES | 9 |
| GENERAL MEETINGS | 9 |
| NOTICE OF GENERAL MEETINGS | 10 |
| PROCEEDINGS AT GENERAL MEETINGS | 10 |
| VOTES OF SHAREHOLDERS | 11 |
| CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS | 12 |
| DIRECTORS | 12 |
| ALTERNATE DIRECTOR | 13 |
| POWERS AND DUTIES OF DIRECTORS | 13 |
| BORROWING POWERS OF DIRECTORS | 15 |



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000063

018482

HCMLPHMIT00003645

THE SEAL ........................................................................................................15

DISQUALIFICATION OF DIRECTORS ...........................................................15

PROCEEDINGS OF DIRECTORS ...................................................................16

DIVIDENDS ......................................................................................................18

ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION ............18

CAPITALISATION OF RESERVES .................................................................19

SHARE PREMIUM ACCOUNT ........................................................................20

NOTICES ..........................................................................................................20

NON-RECOGNITION OF TRUSTS .................................................................21

WINDING UP ....................................................................................................21

AMENDMENT OF ARTICLES OF ASSOCIATION .........................................22

CLOSING OF REGISTER OR FIXING RECORD DATE .................................22

REGISTRATION BY WAY OF CONTINUATION .............................................22

MERGERS AND CONSOLIDATION ................................................................22

DISCLOSURE ...................................................................................................23

INDEMNITY ......................................................................................................23

DISPUTE RESOLUTION ..................................................................................24

AMER_Docs  11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000064

018483

HCMLPHMIT00003646

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

## (ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)

TABLE A

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Law shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

## INTERPRETATION

1.    In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Gross Negligence**" has the meaning ascribed under the laws of the State of Delaware in the United States.

"**Law**" means the Companies Law (as amended) of the Cayman Islands.

"**Management Share**" means a voting non-participating share in the capital of the Company of $0.01 nominal or par value, that shall be non-redeemable at the option of the holder but redeemable by the Company in accordance with these Articles, and issued subject to and in accordance with the provisions of the Law and these Articles and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Shares.

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.



1

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000065

018484

HCMLPHMIT00003647

"**Office**" means the registered office of the Company as required by the Law.

"**Ordinary Resolution**" means a resolution:

(a)   passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)   approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Participating Share**" means a non-voting, participating, non-redeemable share in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Law and these Articles, and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Share. All references to "**Participating Shares**" herein shall be deemed to be Participating Shares of any or all Classes or Series as the context may require. For the avoidance of doubt, in these Articles the expression "Participating Share" shall include a fraction of a Participating Share.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Law and these Articles, means the Register maintained by the Company pursuant to the Law and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Law and includes any Branch Register(s) established by the Company in accordance with the Law.

"**Restricted Person**" means any Person holding Participating Shares:

(a)   in breach of the law or requirements of any country or governmental authority;

(b)   that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the US Internal Revenue Code of 1986, as amended (the "**Code**") or an entity or organisation all of whose beneficiaries are exempt under Section 501(c)(3) of the Code; or

(c)   in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered.

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000067

018485

HCMLPHMIT00003648

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a Management Share or Participating Share or both as the context so requires.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Law.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Law, being a resolution:

(a)    passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)    approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

"**United States**" means the United States of America (including the District of Columbia), its states, territories and possessions.

In these Articles, save where the context requires otherwise:

(a)    words importing the singular number shall include the plural number and vice versa;

(b)    words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

(c)    the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d)    reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e)    reference to a statutory enactment shall include reference to any amendment or re-enactment thereof for the time being in force;



AMER_Docs    11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000068

018486

HCMLPHMIT00003649

(f)     reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case; and

(g)     reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another.

2.     Subject to the preceding Articles, any words defined in the Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

**PRELIMINARY**

3.     The business of the Company may be commenced at any time after incorporation.

4.     The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

5.     The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Participating Shares shall be paid by the Company.  Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

6.     The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Law and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office.   The Directors may keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Law, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Law.

**SHARES**

7.     Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

(a)     issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine; and

(b)     grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

8.     The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions,

AMER_Docs  11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000069

018487

HCMLPHMIT00003650

preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

9.    The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

10.   The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

## MANAGEMENT SHARES

11.   The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.

12.   Any Management Shares held by Grant Scott will be automatically redeemed by the Company upon his death or upon the Company receiving written notice from two board certified physicians confirming that he is of unsound mind or otherwise incapacitated ("**Automatic Redemption**").

13.   If at the time of an Automatic Redemption, Grant Scott is the sole Director of the Company, such office will be automatically vacated by Grant Scott.

14.   Upon an Automatic Redemption, the Company shall issue 100 Management Shares to a successor management shareholder ("**Successor Management Shareholder**") designated by James Dondero ("**Designator**"), or, if he is unable or declines to act, by an individual or individuals designated by James Dondero ("**Successor Designator**"), in either case within 15 days of the Automatic Redemption. If the Designator is:

(a)   deceased and has not named a Successor Designator, or if each named Successor Designator is unable or declines to act, the designation of the Successor Management Shareholder shall be made in accordance with the provisions of the Designator's will, or if his will contains no such provisions, by the qualified personal representative of his estate (the "**Designator's Personal Representative**"); or

(b)   otherwise incapacitated and has not previously designated a Successor Designator, or if each named Successor Designator is unable or declines to act, the designation of the Successor Management Shareholder shall be made by the Designator's attorney-in-fact appointed for such purpose, under a valid, effective power of attorney instrument (the "**Designator's Attorney**").

15.   Any designation of a Successor Management Shareholder must be notified to the Company in writing and signed by either the Designator, the Successor Designator, the Designator's Personal Representative, or the Designator's Attorney, as appropriate, and accompanied by a consent to become a Shareholder signed by the Successor Management Shareholder ("**Issue Notice**"). The issue of the 100 Management Shares to the Successor Management Shareholder shall take effect upon receipt by the Company of the Issue Notice and the Register will be updated accordingly.



AMER_Docs  11255406.3 H0851.120776

*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

PATRICK_000061

# 018488

HCMLPHMIT00003651

16.     The Designator may name a Successor Designator (including an individual, or a series of individuals) at any time pursuant to a written notice delivered to the Company during his lifetime or by a provision in his will.   Each Successor Designator upon succeeding and replacing the Designator or a prior Successor Designator, may in the same manner as set out above, designate an individual, or a series of individuals, to succeed him as Successor Designator.   In the event of a conflict between such instruments, the one bearing the latest date shall control.   A Successor Designator will assume such office upon consenting to so act.

17.     The Successor Management Shareholder may not be a "disqualified person" (as that term is defined in Section 4946 of the United States Internal Revenue Code of 1986, as amended), other than a foundation manager, with respect to Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., or Highland Kansas City Foundation, Inc.

18.     In connection with the appointment of the Successor Management Shareholder, the Company and its registered office service provider will be entitled to rely on the advice of counsel confirming that the designation of the Successor Management Shareholder has been made in accordance with the procedures set out in these Articles.

### PARTICIPATING SHARES

19.     Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

### MODIFICATION OF RIGHTS

20.     Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him.   For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes.

21.     The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company.



6

*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

PATRICK_000066

018489

HCMLPHMIT00003652

## CERTIFICATES

22.  No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

23.  The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

## TRANSFER OF SHARES

24.  The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

25.  The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws.

26.  The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

27.  All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

28.  If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles.

## TRANSMISSION OF SHARES

29.  The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share.  In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

30.  Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000200

018490

HCMLPHMIT00003653

could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

31.    A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

## ALTERATION OF SHARE CAPITAL

32.    The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

33.    The Company may by Ordinary Resolution:

(a)    consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b)    convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c)    subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d)    cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

34.    The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

## REDEMPTION, PURCHASE AND SURRENDER OF SHARES

35.    Subject to the Law, the Company may:

(a)    issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;

(b)    purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

(c)    make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Law; and

(d)    accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.



AMER_Docs   11255406.3 H0851.120776

*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

PATRICK_000202

018491

HCMLPHMIT00003654

36.    Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

37.    The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

38.    The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

### TREASURY SHARES

39.    Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Law. In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

40.    No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

41.    The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

    (a)    the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

    (b)    a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Law, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.

42.    Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

### GENERAL MEETINGS

43.    The Directors may, whenever they think fit, convene a general meeting of the Company.

44.    The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, except for general meetings requisitioned by the Shareholders in accordance with these Articles, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting. The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

45.    General meetings shall also be convened on the requisition in writing of any Shareholder or Shareholders entitled to attend and vote at general meetings of the Company holding at least ten percent of the paid up voting share capital of the Company deposited at the Office specifying the

AMER_Docs   11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000203

018492

HCMLPHMIT00003655

objects of the meeting for a date no later than 21 days from the date of deposit of the requisition signed by the requisitionists, and if the Directors do not convene such meeting for a date not later than 45 days after the date of such deposit, the requisitionists themselves may convene the general meeting in the same manner, as nearly as possible, as that in which general meetings may be convened by the Directors, and all reasonable expenses incurred by the requisitionists as a result of the failure of the Directors to convene the general meeting shall be reimbursed to them by the Company.

46.    If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

## NOTICE OF GENERAL MEETINGS

47.    At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

48.    The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

## PROCEEDINGS AT GENERAL MEETINGS

49.    All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors.  No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

50.    No business shall be transacted at any general meeting unless a quorum of Shareholders is present at the time when the meeting proceeds to business.  Save as otherwise provided by these Articles, one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

51.    If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved.  In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

52.    If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.



*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

AMER_Docs  11255406.3 H0851.120776

PATRICK_000204

018493

HCMLPHMIT00003656

53.     The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

54.     If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

55.     The chairman may adjourn a meeting from time to time and from place to place either:

    (a)     with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting); or

    (b)     without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

        (i)     secure the orderly conduct or proceedings of the meeting; or

        (ii)    give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.  When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting.  Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

56.     At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

57.     If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

58.     In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

59.     A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith.  A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

### VOTES OF SHAREHOLDERS

60.     On a show of hands every holder of Management Shares present in person and every Person representing such a Shareholder by proxy shall have one vote, and on a poll every holder of

AMER_Docs   11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000205

018494

HCMLPHMIT00003657

Management Shares present in person and every Person representing such Shareholder by proxy shall be entitled to one vote in respect of each of the Management Shares held by him.

61. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

62. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

63. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

64. On a poll votes may be given either personally or by proxy.

65. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.

66. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

67. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

68. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

69. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at general meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

### CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

70. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

### DIRECTORS

71. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

AMER_Docs   11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000207

018495

HCMLPHMIT00003658

72.  The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

73.  Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

74.  The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

75.  The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

76.  There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.

77.  The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

## ALTERNATE DIRECTOR

78.  Any Director may in writing appoint another Person to be his alternate and, save to the extent provided otherwise in the form of appointment, such alternate shall have authority to sign written resolutions on behalf of the appointing Director, but shall not be required to sign written resolutions where they have been signed by the appointing Director, and to act in such Director's place at any meeting of the Directors at which he is unable to be present.  Every such alternate shall be entitled to attend and vote at meetings of the Directors as a Director when the Director appointing him is not personally present and where he is a Director to have a separate vote on behalf of the Director he is representing in addition to his own vote.  A Director may at any time in writing revoke the appointment of an alternate appointed by him.  Such alternate shall not be deemed to be an officer of the Company solely as a result of his appointment as an alternate.  The remuneration of such alternate shall be payable out of the remuneration of the Director appointing him and the proportion thereof shall be agreed between them.

79.  Any Director may appoint any Person , whether or not a Director, to be the proxy of that Director to attend and vote on his behalf, in accordance with instructions given by that Director, or in the absence of such instructions at the discretion of the proxy, at a meeting or meetings of the Directors which that Director is unable to attend personally.  The instrument appointing the proxy shall be in writing under the hand of the appointing Director and shall be in any usual or common form or such other form as the Directors may approve, and must be lodged with the chairman of the meeting of the Directors at which such proxy is to be used, or first used, prior to the commencement of the meeting.

## POWERS AND DUTIES OF DIRECTORS

80.  Subject to the Law, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company.  No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

AMER_Docs   11255406.3 H0851.120776



*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

PATRICK_000208

018496

HCMLPHMIT00003659

81.   The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit.  Any natural person or corporation so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.  The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

82.   The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit.  Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

83.   The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

84.   The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

85.   The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

86.   The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

87.   The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000209

018497

HCMLPHMIT00003660

88.     Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

### BORROWING POWERS OF DIRECTORS

89.     The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

### THE SEAL

90.     The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

91.     The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal.  The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

92.     Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

### DISQUALIFICATION OF DIRECTORS

93.     The office of Director shall be vacated, if the Director:

        (a)     becomes bankrupt or makes any arrangement or composition with his creditors;

        (b)     dies or is found to be or becomes of unsound mind;

        (c)     resigns his office by notice in writing to the Company;

        (d)     is removed from office by Ordinary Resolution;

        (e)     is removed from office by notice addressed to him at his last known address and signed by all of his co-Directors (not being less than two in number); or

AMER_Docs   11255406.3 H0851.120776



*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

PATRICK_000201

018498

HCMLPHMIT00003661

(f)   is removed from office pursuant to any other provision of these Articles, including without limitation, in the circumstance set out in Article 13.

**PROCEEDINGS OF DIRECTORS**

94.   The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

95.   A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

96.   The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two, and if there be one Director the quorum shall be one. A Director represented by proxy or by an alternate Director at any meeting shall be deemed to be present for the purposes of determining whether or not a quorum is present.

97.   A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

98.   A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

99.   Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.



AMER_Docs   11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000206

018499

HCMLPHMIT00003662

100. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

   (a)   all appointments of officers made by the Directors;

   (b)   the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

   (c)   all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

101. When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

102. A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be (an alternate Director, subject as provided otherwise in the terms of appointment of the alternate Director, being entitled to sign such a resolution on behalf of his appointer), shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors or his duly appointed alternate.

103. The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.

104. The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

105. Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

106. A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

107. All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.

AMER_Docs   11255406.3 H0851.120776



Uploaded: 27-Jun-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000220

018500

HCMLPHMIT00003663

## DIVIDENDS

108.   Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Law and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

109.   Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

110.   The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

111.   Any dividend may be paid in any manner as the Directors may determine.  If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.  Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

112.   The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

113.   Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.

114.   If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

115.   No dividend shall bear interest against the Company.

### ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

116.   The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

117.   The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

118.   The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not

AMER_Docs   11255406.3 H0851.120776



*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

PATRICK_000222

018501                    HCMLPHMIT00003664

being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

119.  The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

120.  The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Law and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

## CAPITALISATION OF RESERVES

121.  Subject to the Law and these Articles, the Directors may:

(a)  resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b)  appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Participating Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i)  paying up the amounts (if any) for the time being unpaid on Participating Shares held by them respectively; or

(ii)  paying up in full unissued Participating Shares or debentures of a nominal amount equal to that sum,

and allot the Participating Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Participating Shares to be allotted to Shareholders credited as fully paid;

(c)  make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Participating Shares or debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d)  authorise a Person to enter (on behalf of all the Shareholders concerned) into an agreement with the Company providing for either:

(i)  the allotment to the Shareholders respectively, credited as fully paid, of Participating Shares or debentures to which they may be entitled on the capitalisation, or

(ii)  the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Participating Shares,

AMER_Docs  11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000223

018502

HCMLPHMIT00003665

and any such agreement made under this authority being effective and binding on all those Shareholders; and

(e)    generally do all acts and things required to give effect to any of the actions contemplated by this Article.

## SHARE PREMIUM ACCOUNT

122.    The Directors shall in accordance with the Law establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

123.    There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Law, out of capital.

## NOTICES

124.    Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

125.    Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

126.    Any notice or other document, if served by:

(a)    post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

(b)    facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c)    recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d)    electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

AMER_Docs  11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000224

018503

HCMLPHMIT00003666

127.  Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

128.  Notice of every general meeting of the Company shall be given to:

(a)   all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b)   every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

## NON-RECOGNITION OF TRUSTS

129.  Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any Share or (except only as otherwise provided by these Articles or as the Law requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

## WINDING UP

130.  If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

131.  Subject to any rights and restrictions for the time being attributed to any Class or Series, the assets available for distribution among the Shareholders shall then be applied in the following priority:

(a)   first, in the payment to the holders of Participating Shares and Management Shares, *pari passu*, of a sum equal to the par value of the Participating Shares or Management Shares held by them; and

(b)   second, in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the number Participating Shares of the relevant Class and Series held.

132.  If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Participating Shareholders or different Classes.  The liquidator may, with the like sanction, vest the whole or any part of such

AMER_Docs  11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000225

018504                                      HCMLPHMIT00003667

assets in trustees upon such trusts for the benefit of the Participating Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

## AMENDMENT OF ARTICLES OF ASSOCIATION

133.   Subject to the Law and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

## CLOSING OF REGISTER OR FIXING RECORD DATE

134.   For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days.   If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

135.   In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

136.   If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## REGISTRATION BY WAY OF CONTINUATION

137.   The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

## MERGERS AND CONSOLIDATION

138.   The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Law.

AMER_Docs   11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000227

018505

HCMLPHMIT00003668

## DISCLOSURE

139.    The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares or any Class or Series may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.

## INDEMNITY

140.    To the fullest extent permitted by law, no Director, Secretary, Assistant Secretary, committee member or other officer for the time being and from time to time of the Company (each, a "**Covered Person**" and collectively, "**Covered Persons**") shall be liable to the Company or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Company, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Company, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Company whom such Covered Person believes is authorized to make such suggestions on behalf of the Company, (iii) any act or omission by the Company, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Company selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or Gross Negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

141.    Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Company or in furtherance of the business of the Company in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

142.    To the fullest extent permitted by law, the Company shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Company, any investment made, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Company, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or Gross Negligence (as determined by a non-appealable judgment of a court of competent jurisdiction).   The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or Gross Negligence.

143.    Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.



AMER_Docs   11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000228

018506

HCMLPHMIT00003669

144.    The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

### DISPUTE RESOLUTION

145.    The following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with these Articles or otherwise involving the Company, its Shareholders and/or any Covered Person.    If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a)    Mediation:

(i)    any Dispute shall be submitted to mediation by written notice to the other party or parties.  In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations.  The mediator will be selected by agreement of the parties.  If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect;

(ii)    the mediation will be conducted as specified by the mediator and agreed upon by the parties.  The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute;

(iii)    the mediation will be treated as a settlement discussion and therefore will be confidential.  The mediator may not testify for either party in any later proceeding relating to the dispute.  No recording or transcript shall be made of the mediation proceedings; and

(iv)    each party will bear its own costs in the mediation.  The fees and expenses of the mediator will be shared equally by the parties,

(b)    Arbitration:

if a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration.  A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed.  Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein.  The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in these Articles and the commercial dispute arbitration rules then in effect ("**Arbitration Rules**").  In the event of a conflict, the provisions of these Articles will control:

(i)    the arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules.  Any

AMER_Docs  11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000229

018507

HCMLPHMIT00003670

issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the United States Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, *provided, however*, that the Company or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a State arbitration act of the United States preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement.  No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures;

(ii)    the arbitrators may not award non-monetary or equitable relief of any sort.  They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum.  In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered.  Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law;

(iii)   the party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees.  All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site.  Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive;

(iv)    no discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it.  In any event, there shall be no more than (i) two party depositions of six hours each.  Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production.  In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents.  The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted;

(v)     all aspects of the arbitration shall be treated as confidential, including its institution and/or settlement.  Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements.  Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a

AMER_Docs  11255406.3 H0851.120776



*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

PATRICK_000221

018508

HCMLPHMIT00003671

reasonable opportunity to protect their interests.  In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered.  The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term; and

(vi)     the result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

AMER_Docs   11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000226

018509

HCMLPHMIT00003672

# EXHIBIT 12

018510

HCMLPHMIT00003673



Registration No.: **263805**

Date of Incorporation: **27 October 2011**

Client No.: **KY059904**

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| | | |
|---|---|---|
| Share Class: | **Management** | |
| Nominal Value: | USD 0.01 | |
| Voting Rights: | Yes | |
| Conditional: | NO | |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **Grant Scott** Highland Capital Managment, L.P. 13455 Noel Road, Suite 800 Dallas Texas 75240 USA | 7 Nov 2011 | Allotment | 100.00 | 7 Nov 2011 : Allotment of 100.0 Management share(s) for USD0.01 / share to Mr. Grant Scott pursuant to minutes/resolutions dated 07 Nov 2011 | No Cert | | | |
| | | Transfer | (100.00) | 25 Mar 2021 : Transfer of 100.0 Management share(s) from Mr. Grant Scott to Mark E. Patrick pursuant to resolutions dated 25 Mar 2021 | | | | |
| | | | | | | Nil | Nil | 25 Mar 2021 |
| **WNL Limited** Walkers Corporate Services Limited Walker House 87 Mary Street George Town Grand Cayman KY1-9005 Cayman Islands | 7 Nov 2011 | Allotment | 1.00 | 7 Nov 2011 : Allotment of 1.0 Management share(s) for USD0.01 / share to WNL Limited pursuant to minutes/resolutions dated 07 Nov 2011 | No Cert | | | |
| | | Repurchase | (1.00) | 7 Nov 2011 : Repurchase of 1.0 Management share(s) from WNL Limited pursuant to resolutions | No Cert | | | |

Date printed: 19 May, 2021

[1 / 2]

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

PATRICK_000017

018511

HCMLPHMIT00003674



Registration No.: **263805**

Date of Incorporation: **27 October 2011**

Client No.: **KY059904**

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

PATRICK_000018

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | dated 07 Nov 2011. | | | | |
| | | | | | | **Nil** | **Nil** | 7 Nov 2011 |
| **Mark E. Patrick** | 25 Mar 2021 | Transfer | 100.00 | 25 Mar 2021 : Transfer of 100.0 Management share(s) from Mr. Grant Scott to Mark E. Patrick pursuant to resolutions dated 25 Mar 2021 | No Cert | | | |
| | | | | | | **100** | **100.00** | |

Notes:

Date printed: 19 May, 2021                INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[2 / 2]

018512

HCMLPHMIT00003675

# EXHIBIT 13

HCMLPHMIT00003676



PATRICK_000019

Registration No.: **263805**
Date of Incorporation: **27 October 2011**
Client No.: **KY059904**

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| | |
|---|---|
| Share Class: | **Participating** |
| Nominal Value: | **USD 0.01** |
| Voting Rights: | Yes |
| Conditional: | NO |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **The Highland Capital Management Partners Charitable Trust #2** Highland Capital Management, L.P. 13455 Noel Rd, Suite 800 Dallas TX 75240 USA | 7 Nov 2011 | Allotment | 300.00 | 7 Nov 2011 : Allotment of 300.0 Participating share(s) for USD0.01 / share to The Highland Capital Management Partners Charitable Trust #2 pursuant to minutes/resolutions dated 07 Nov 2011 | No Cert | | | |
| | | Transfer | (100.00) | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Kansas City Foundation, Inc pursuant to resolutions dated 30 Nov 2011 | | | | |
| | | New Certificate | 200.00 | 30 Nov 2011 : New certificate No. 0 issued for remaining balance of 200.0 Participating share(s) | No Cert | | | |
| | | Transfer | (100.00) | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Dallas Foundation, Inc | | | | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 3]

018514
HCMLPHMIT00003677



| | Registration No.: **263805** |
|---|---|
| | Date of Incorporation: **27 October 2011** |
| | Client No.: **KY059904** |

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | New Certificate | 100.00 | pursuant to resolutions dated 30 Nov 2011 | | | | |
| | | | | 30 Nov 2011 : New certificate No. 0 issued for remaining balance of 100.0 Participating share(s) | No Cert | | | |
| | | Transfer | (100.00) | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Santa Barbara Foundation, Inc pursuant to resolutions dated 30 Nov 2011 | | | | |
| | | | | | | Nil | Nil | 30 Nov 2011 |
| **Highland Kansas City Foundation, Inc** | 30 Nov 2011 | Transfer | 100.00 | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Kansas City Foundation, Inc pursuant to resolutions dated 30 Nov 2011 | No Cert | | | |
| | | | | | | 100 | 100.00 | |
| **Highland Dallas Foundation, Inc** | 30 Nov 2011 | Transfer | 100.00 | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Dallas Foundation, Inc pursuant to resolutions dated 30 Nov 2011 | No Cert | | | |
| | | | | | | 100 | 100.00 | |
| **Highland Santa Barbara Foundation, Inc** | 30 Nov 2011 | Transfer | 100.00 | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management | No Cert | | | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[2 / 3]

PATRICK_000020

018515

HCMLPHMIT00003678



intertrust
GROUP

Registration No.: **263805**

Date of Incorporation: **27 October 2011**

Client No.: **KY059904**

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Partners Charitable Trust #2 to Highland Santa Barbara Foundation, Inc pursuant to resolutions dated 30 Nov 2011 | | | | |
| | | | | | | 100 | 100.00 | |
| **Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT** 306 W. 7th St., Suite 1045 Fort Worth TX 76102 USA | 13 Aug 2015 | Allotment | 5.00 | 13 Aug 2015 : Allotment of 5.0 Participating share(s) for USD0.01 / share to Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT pursuant to minutes/resolutions dated 12 Aug 2015 | No Cert | | | |
| | | | | | | 100 | 5.00 | |

Notes:

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[3 / 3]

PATRICK_000021

018516

HCMLPHMIT00003679

# EXHIBIT 14

018517
HCMLPHMIT00003680

Case 19-34054-sgj11   Doc 4255-74   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc 3
Case 19-34054-sgj11 Doc 2547-13 Filed 07/09/21 Entered 07/09/21 17:06:29 Page 2 of 3
Case 3:25-cv-02072-S    Document 104-74    Filed 06/06/25    Page 669 of 1017    PageID 19568

# Delaware

PAGE  1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF FORMATION OF "CHARITABLE DAF GP,
LLC", FILED IN THIS OFFICE ON THE TWENTY-FIFTH DAY OF OCTOBER,
A.D. 2011, AT 11:23 O'CLOCK A.M.

5056341  8100

111131792

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 9113377

DATE: 10-25-11

PATRICK_000036

018518

HCMLPHMIT00003681

Case 19-34054-sgj11 Doc 4255-74 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc 3
Case 19-34054-sgj11 Doc 2547-13 Filed 07/09/21 Entered 07/09/21 17:06:29 Page 3 of 3
Case 3:25-cv-02072-S Document 164-74 Filed 06/06/25 Page 670 of 1017 PageID 19569

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 11:26 AM 10/25/2011*
*FILED 11:23 AM 10/25/2011*
*SRV 111131792 - 5056341 FILE*

**CERTIFICATE OF FORMATION**

**OF**

**CHARITABLE DAF GP, LLC**

The undersigned hereby executes this Certificate of Formation of Charitable DAF, LLC (the "**Company**"), for the purpose of forming a limited liability company pursuant to the Delaware Limited Liability Company Act.

1.   The name of the Company is **Charitable DAF GP, LLC.**

2.   The address of the registered office of the Company in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, County of New Castle, State of Delaware 19901. Its registered agent at such address is The Corporation Trust Company.

IN WITNESS WHEREOF, the undersigned, an authorized person of the Company, has caused this Certificate of Formation to be duly executed as of the *24th* day of October, 2011.

By: _____

James S. Seevers, Jr.
Authorized Person

78673.000002 EMF_US 37662262v2

PATRICK_000037

018519

HCMLPHMIT00003682

# EXHIBIT 15

HCMLPHMIT00003683

### ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST AGREEMENT (this "Agreement") is made and entered into as of the 24 day of March, 2021, by and between Grant J. Scott (the "Assignor") and Mark E. Patrick.

WHEREAS, Assignor is the legal and beneficial owner of one hundred percent (100%) of the limited liability company interest (the "Membership Interest") in Charitable DAF GP, LLC, a Delaware limited liability company (the "Company"), and Assignor desires to assign the Membership Interest to Assignee, upon the terms and conditions set forth herein; and

WHEREAS, Assignee desires to accept an assignment of the Membership Interest (such right, title and interest in and to the Membership Interest, together with, if any: (i) Assignor's capital account, (ii) the Assignor's rights in and to specific Company property, (iii) Assignor's rights to participate in the management of the Company, (iv) Assignor's rights to distributions, reimbursements or other payments (including any distributions of cash flow which have not been distributed), (v) rights to profits, losses and other allocations, and (vi) all other rights and benefits of Assignor in the Company with respect to the Membership Interest assigned hereby to Assignee being herein sometimes collectively referred to as the "Assigned Interest").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby agree as follows:

1.      Assignment and Assumption of Assigned Interest. Assignor does hereby unconditionally and irrevocably assign, transfer, set over and deliver unto the Assignee, its successors and assigns, the Assigned Interest, including, but not limited to the profits, losses, capital and cash flow, if any, allocable to the Assigned Interest, free and clear of any and all liens, security interests, encumbrances, claims, rights of another, rights of first refusal, covenants, conditions, reservations and any and all other restrictions. Assignee does hereby accept the Assigned Interest and agrees to be bound by and assume all obligations under the limited liability company agreement of the Company.

2.      Substitute Member. Assignor hereby acknowledges that Assignee is hereby admitted as a substitute member of the Company with respect to the Membership Interest from and after the date hereof as a result of this Agreement.

3.      Effective Date. This Agreement is effective as of the date first above mentioned.

4.      Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document. All counterparts shall be construed together and shall constitute one Agreement. This Agreement and any signed agreement or instrument entered into in connection with this Agreement or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine, PDF or other electronic means, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

PATRICK_000006

018521

HCMLPHMIT00003684

ASSIGNOR:

Name:  Grant J. Scott

ASSIGNEE:

Name:  Mark E. Patrick

[Signature Page for Assignment of Membership Interest Agreement]

078673.0000002 EMF_US 84142968v2

PATRICK_000007

018522

HCMLPHMIT00003685

# EXHIBIT 16

018523
HCMLPHMIT00003686

Form 1023                     Highland Dallas Foundation, Inc.               TIN: 45-3961755

## Attachment 2

***Part II, Line 1***          Certificate of Incorporation

018524

HCMLPHMIT00003687

# Delaware

PAGE 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND DALLAS FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF NOVEMBER, A.D. 2011, AT 7:34 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

5069985   8100

111224468

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 9177054

DATE: 11-23-11

You may verify this certificate online at corp.delaware.gov/authver.shtml

018525

HCMLPHMIT00003688

State of Delaware
Secretary of State
Division of Corporations
Delivered 09:17 PM 11/22/2011
FILED 07:34 PM 11/22/2011
SRV 111224468 - 5069985 FILE

# CERTIFICATE OF INCORPORATION

## OF

## HIGHLAND DALLAS FOUNDATION, INC.

FIRST: The name of the corporation is Highland Dallas Foundation. Inc. (sometimes hereinafter referred to as the "corporation").

SECOND: The corporation is organized and shall be operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit The Dallas Foundation, a Texas nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by The Dallas Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD: The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH: The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws; provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation exempt from federal income tax under section 501(c)(3) of the Code. (ii) a corporation contributions

HCMLPHMIT00003689

to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH: The corporation shall have perpetual existence.

SEVENTH: To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH: Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to The Dallas Foundation. If The Dallas Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH: In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH: The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this day of November, 2011.

_____
James Dondero

018527

HCMLPHMIT00003690

# EXHIBIT 15

018528

HCMLPHMIT00003691

INTERNAL REVENUE SERVICE
P. O. BOX 2508
CINCINNATI, OH  45201

Date:  **JAN 19 2013**

HIGHLAND DALLAS FOUNDATION INC
C/O HUNTON & WILLIAMS LLP
MARGARET S ALFORD
1445 ROSS AVE STE 3700
DALLAS, TX  75202

Employer Identification Number:
   █████1755
DLN:
   ████████8022
Contact Person:
   SHEILA M ROBINSON       ID# █1220
Contact Telephone Number:
   (877) 829-5500
Accounting Period Ending:
   December 31
Public Charity Status:
   509(a)(3)
Form 990 Required:
   Yes
Effective Date of Exemption:
   November 22, 2011
Contribution Deductibility:
   Yes
Addendum Applies:
   No

Dear Applicant:

We are pleased to inform you that upon review of your application for tax
exempt status we have determined that you are exempt from Federal income tax
under section 501(c)(3) of the Internal Revenue Code.  Contributions to you are
deductible under section 170 of the Code.  You are also qualified to receive
tax deductible bequests, devises, transfers or gifts under section 2055, 2106
or 2522 of the Code.  Because this letter could help resolve any questions
regarding your exempt status, you should keep it in your permanent records.

Organizations exempt under section 501(c)(3) of the Code are further classified
as either public charities or private foundations.  We determined that you are
a public charity under the Code section(s) listed in the heading of this
letter.

Specifically, we have determined that you are a Type I supporting organization
under section 509(a)(3).  A Type I supporting organization is operated,
supervised, or controlled by one or more publicly supported organizations.

Please see enclosed Publication 4221-PC, Compliance Guide for 501(c)(3) Public
Charities, for some helpful information about your responsibilities as an
exempt organization.

Letter  947 (DO/CG)

018529

HCMLPHMIT00003692

HIGHLAND DALLAS FOUNDATION INC

Sincerely,

Holly O. Paz
Director, Exempt Organizations
Rulings and Agreements

Enclosure:  Publication 4221-PC

Letter  947 (DO/CG)

018530

HCMLPHMIT00003693

# EXHIBIT 18

018531

HCMLPHMIT00003694

Form 1023           Highland Dallas Foundation, Inc.        TIN: 45-3961755

## Attachment 4

***Part IV***       <u>Narrative Description of Activities</u>

The Applicant is organized and will be operated exclusively as a supporting organization within the meaning of section 509(a)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), to support and benefit The Dallas Foundation ("TDF"), a Texas nonprofit corporation. TDF is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code and a public charity described in section 509(a)(1) of the Code.

The Applicant received its funding as one of three charitable remainder beneficiaries of a charitable remainder trust created by James Dondero, which terminated on November 30, 2011. As the attached Schedule D reflects, the Applicant qualifies as a Type I supporting organization within the meaning of section 509(a)(3)(B)(i) because a majority of its board is elected by TDF.

The Applicant's supported organization, TDF, is the oldest community foundation in Texas and serves donors and nonprofit agencies throughout North Texas. As a community foundation, TDF offers a range of ways for local philanthropists to assist the community, including donor advised funds, designated and agency endowment funds, field of interest funds, scholarship funds, and unrestricted funds. TDF focuses on challenges facing North Texas and searches for nonprofit agencies that address these issues most efficiently and effectively, and it assists in connecting donors to causes they care about. In 2010, TDF paid out $31,408,988 in grants to charitable organizations in North Texas. The Applicant will support and benefit TDF by making grants directly to TDF in support of its charitable purposes. In addition, upon the direction and on behalf of TDF, the Applicant may make grants to such other public charities that TDF wishes to benefit in furtherance of TDF's exempt purposes. The total annual grants from the Applicant to or on behalf of TDF are expected to average approximately $1,000,000 per year.

018532

HCMLPHMIT00003695

# EXHIBIT 19

Reserved for Possible Supplementation

018533

HCMLPHMIT00003696

# EXHIBIT 20

018534

HCMLPHMIT00003697

Case 19-34054-sgj11 Doc 2547-2 Filed 07/06/21 Entered 07/06/21 23:29:29 Page 2 of
Case 3:25-cv-02072-S    Document 514-74   Filed 01/07/25   Page 686 of 1017    PageID 19585
Form 1023                          Highland Dallas Foundation, Inc.                TIN: 45-3961755

## Attachment 3

***Part II, Line 5***        Bylaws

018535

HCMLPHMIT00003698

**BYLAWS**
**OF**

**HIGHLAND DALLAS FOUNDATION, INC.**

018536

HCMLPHMIT00003699

# TABLE OF CONTENTS

<div align="right">Page</div>

ARTICLE I OFFICES ...............................................................................................1

    Section 1.1    Registered Office ...................................................................1
    Section 1.2    Other Offices .........................................................................1

ARTICLE II MEMBERSHIP ......................................................................................1

    Section 2.1    Classes and Number...............................................................1
    Section 2.2    Voting ...................................................................................1
    Section 2.3    Transfer of Membership ........................................................1
    Section 2.4    Resignation of Member..........................................................2
    Section 2.5    Place of Meetings..................................................................2
    Section 2.6    Annual Meetings...................................................................2
    Section 2.7    Special Meetings...................................................................2
    Section 2.8    Notice of Meetings of Members.............................................2
    Section 2.9    Quorum ................................................................................3
    Section 2.10    Voting ...................................................................................3
    Section 2.11    Proxies..................................................................................3
    Section 2.12    Action by Written Consent ....................................................3

ARTICLE III DIRECTORS .........................................................................................4

    Section 3.1    General Powers .....................................................................4
    Section 3.2    Number of Directors .............................................................4
    Section 3.3    Vacancies.............................................................................4
    Section 3.4    Place of Meetings..................................................................4
    Section 3.5    Committees of Directors ........................................................4
    Section 3.6    Compensation of Directors ....................................................4
    Section 3.7    Annual Meeting ....................................................................4
    Section 3.8    Additional Regular Meetings .................................................5
    Section 3.9    Special Meetings...................................................................5
    Section 3.10    Method and Timing of Notice ................................................5
    Section 3.11    Purpose not Required in Notice .............................................5
    Section 3.12    Waiver of Notice ..................................................................5
    Section 3.13    Action by Written Consent.....................................................6
    Section 3.14    Validation of Action by Consent ...........................................6
    Section 3.15    Quorum and Manner of Acting ..............................................6
    Section 3.16    Resignation and Removal of Directors ...................................6

ARTICLE IV OFFICERS.............................................................................................6

    Section 4.1    Officers ................................................................................6
    Section 4.2    Election, Term of Office and Eligibility .................................7

-i-

018537

HCMLPHMIT00003700

Section 4.3        Subordinate Officers ...........................................................7
Section 4.4        Removal .................................................................................7
Section 4.5        The President .........................................................................7
Section 4.6        The Secretary ........................................................................7
Section 4.7        The Assistant Secretaries ......................................................7
Section 4.8        Chairman ...............................................................................8
Section 4.9        The Chief Financial Officer ...................................................8
Section 4.10       The Assistant Chief Financial Officers ...................................8
Section 4.11       Delegation of Duties ..............................................................8

ARTICLE V BOOKS AND RECORDS ..................................................................8

Section 5.1        Location ..................................................................................8
Section 5.2        Inspection ...............................................................................9

ARTICLE VI MISCELLANEOUS PROVISIONS ....................................................9

Section 6.1        Fiscal Year ..............................................................................9
Section 6.2        Depositories ...........................................................................9
Section 6.3        Checks, Drafts and Notes ........................................................9
Section 6.4        Contracts and Other Instruments ............................................9
Section 6.5        Conflicts of Interest ...............................................................9
Section 6.6        Waivers of Notice ..................................................................10
Section 6.7        Ownership Interests in Other Entities ....................................10
Section 6.8        Indemnification .....................................................................10
Section 6.9        Amendment of Bylaws ..........................................................11

018538

HCMLPHMIT00003701

BYLAWS

OF

HIGHLAND DALLAS FOUNDATION, INC.

## ARTICLE I

## OFFICES

Section 1.1    Registered Office.  The registered office of Highland Dallas Foundation, Inc. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2    Other Offices.  The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE II

## MEMBERSHIP

Section 2.1    Classes and Number.  The Corporation shall have two classes of members and one member in each such class:  the Institutional Member, which shall be The Dallas Foundation, and the Individual Member, which shall be James Dondero or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2    Voting.  Except as otherwise provided in these Bylaws, the Institutional Member shall be entitled to two (2) votes upon each matter submitted to a vote of the members, and the Individual Member shall be entitled to one (1) vote upon each matter submitted to a vote of the members.  In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3    Transfer of Membership.  Institutional Membership in the Corporation is not transferable or assignable.  The Individual Membership is transferable or assignable as provided herein only upon the approval of the Institutional Member, with such approval not to be unreasonably withheld by the Institutional Member.  Subject to the approval of the Institutional Member, Mr. Dondero, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document, transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member.  Each successor Individual Member shall succeed to the rights of the initial Individual Member.  Subject to the approval of the Institutional Member, each successor Individual Member may in the same manner transfer his Individual Member

-1-

018539

HCMLPHMIT00003702

interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. In the event of a conflict between such transfer documents, the one bearing the latest date shall control. Each Individual Member may at any time revoke his transfer document that is to be effective in the future, in whole or in part, by written notice delivered to the Institutional Member. If at any time an Individual Member shall be disabled and no transfer of such member's interest is to occur as a result of such disability in accordance with the foregoing provisions of this Section, then such member's attorney-in-fact under a valid, effective power of attorney instrument may act for such member hereunder. In the event of the death of an Individual Member, such member's personal representative of his estate, or trustee of a trust to which the Individual Member transferred his interest, may, if necessary, act as the Individual Member hereunder until such time as the Individual Member interest is transferred from the estate or trust.

Section 2.4    Resignation of Member. A member may resign at any time upon written notice to the Secretary.

Section 2.5    Place of Meetings. All meetings of the members be held shall by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6    Annual Meetings. Except as otherwise provided by these Bylaws, annual meeting of the members, commencing with the year 2012, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.7    Special Meetings. Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall be called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting.  The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.8    Notice of Meetings of Members. When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting (at least three (3) days in the case of a special meeting). Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the

018540

HCMLPHMIT00003703

facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.9    Quorum.  Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business, except as otherwise required by Law, the Certificate of Incorporation or these Bylaws.  If, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall be present or represented by proxy.  At the adjourned meeting at which a quorum shall be present or represented by proxy, the Corporation may transact any business which might have been transacted at the original meeting.  If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.10    Voting.  When a quorum is present at any meeting, the vote of a majority of the number of votes held by the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.11    Proxies.  At any meeting of the members, any member entitled to vote, consent or approve any action or matter may do so in person or by proxy authorized by an instrument in writing or by a transmission permitted by law.  Any member represented by proxy shall be counted as present at such meeting for all purposes.  Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to these Bylaws may be substituted or used in lieu of the original writing or transmission that could be used, provided that the copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 2.12    Action by Written Consent.  Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by the member(s) holding the number of votes necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted.  A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.12.  Prompt notice of the taking of an action by the members without a meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action.  Each such consent must state the date of each member's signature.  Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting.

018541
HCMLPHMIT00003704

# ARTICLE III

# DIRECTORS

Section 3.1    General Powers. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2    Number of Directors. The number of Directors that shall constitute the Board of Directors shall be three (3). Two (2) Directors (the "Institutional Directors") shall be elected annually by the Institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member. Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3    Vacancies. If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy. If at any time there is no Individual Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director. Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4    Place of Meetings. The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5    Committees of Directors. The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6    Compensation of Directors. Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7    Annual Meeting. The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors. If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of

-4-

018542

HCMLPHMIT00003705

Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8    Additional Regular Meetings. The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9    Special Meetings. Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors upon not less than three (3) days notice to each director. The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10    Method and Timing of Notice. Unless otherwise provided herein, when notice is required to be given for a meeting of the Board of Directors, such notice shall be given to each Director at least ten (10) days prior to the meeting. Any notice given herein shall specify the date, time, and location of the meeting. Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a Director's residence or place of business.

Section 3.11    Purpose not Required in Notice. Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12    Waiver of Notice. Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall be deemed the equivalent of the Director having received notice. A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

018543

HCMLPHMIT00003706

Section 3.13  <u>Action by Written Consent</u>.  Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, are signed by all of the then-serving Directors.  A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13.  Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14  <u>Validation of Action by Consent</u>.  All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held.  At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice.  If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15  <u>Quorum and Manner of Acting</u>.  A quorum for the transaction of business at any meeting of the Board of Directors shall consist of a majority of the then serving Directors.  Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall be the act of the Board of Directors.  Any Director may participate in a meeting of the Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such participation shall constitute presence in person at the meeting.  In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present.  Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16  <u>Resignation and Removal of Directors</u>.  Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation.  A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. A resignation that is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable.  The Institutional Member may remove an Institutional Director at any time, with or without cause.  The Individual Member may remove an Individual Director at any time, with or without cause.

## **ARTICLE IV**

## **OFFICERS**

Section 4.1  <u>Officers</u>.  The officers of the Corporation shall include a President and a Secretary, and may include a Chairman and a Chief Financial Officer.  A person may hold multiple offices.

018544

HCMLPHMIT00003707

Section 4.2    Election, Term of Office and Eligibility. The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof. Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal. None of the officers other than the Chairman need be members of the Board of Directors.

Section 4.3    Subordinate Officers. The Board of Directors may appoint such Vice Presidents, Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine. The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4    Removal. The President, the Secretary, the Chairman and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause. Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

Section 4.5    The President. The President shall be the chief executive officer of the Corporation. He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the Corporation. In general the President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors.

Section 4.6    The Secretary. The Secretary shall:

(a)    keep the minutes of the meetings of the members and of the Board of Directors;

(b)    see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c)    be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized; and

(d)    in general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7    The Assistant Secretaries. If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant

-7-

018545

HCMLPHMIT00003708

Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8    Chairman.  The Chairman, if any, shall preside when present at meetings of the Board of Directors; advise and counsel the other officers of the Corporation; and shall perform such other duties as may be prescribed by the Board of Directors from time to time.

Section 4.9    The Chief Financial Officer.  The Chief Financial Officer, if any, shall:

(a)    receive and be responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things:  keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b)    render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation; and

(c)    in general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

Section 4.10    The Assistant Chief Financial Officers.  If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief Financial Officer.

Section 4.11    Delegation of Duties.  In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

## ARTICLE V

## BOOKS AND RECORDS

Section 5.1    Location.  The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

018546

HCMLPHMIT00003709

Section 5.2    Inspection.  The books, accounts, and records of the Corporation shall be open to inspection at all times by any member and by any member of the Board of Directors.

# ARTICLE VI

## MISCELLANEOUS PROVISIONS

Section 6.1    Fiscal Year.  The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2    Depositories.  The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 6.3    Checks, Drafts and Notes.  All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4    Contracts and Other Instruments.  The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances.

Section 6.5    Conflicts of Interest.  No contract or agreement may be entered into by and between the corporation and any of the following: (a) a Director, officer, or employee of the corporation (hereinafter an "Insider"); or (b) any corporation, partnership, trust, sole proprietorship or any other entity (hereinafter an "Entity") in which an interest is owned or held, directly or indirectly, by or for the benefit of an Insider, unless (i) the transaction is approved in accordance with Section 144 of the Delaware General Corporation Law to the extent such provision is applicable to the transaction; and (ii) if one or more of the parties to the contract or transaction is a "disqualified person" with respect to the corporation within the meaning of Section 4958 of the Code, either (x) such transaction is reviewed and approved in accordance with the "rebuttable presumption safe harbor" provisions set forth in the regulations promulgated under Section 4958 of the Code or (y) the Board of Directors determines that such procedures are not necessary for the transaction involved and records its specific findings for making such determination; provided, however, that the following contracts and agreements shall not be subject to the foregoing prohibition: a gratuitous transfer of assets or promise to transfer assets to the corporation of any kind, including but not limited to, (i) a gift annuity, charitable remainder trust, charitable lead trust or similar split-interest arrangement which benefits both the Insider and the corporation; or (ii) a loan, lease, agreement of sale or purchase, pledge, guarantee, assumption of liability, bailment, or consignment.  All Insiders shall, as a condition of qualifying and continuing to qualify as a Director, officer, and/or employee of the corporation, abide by such conflict of interest policies as the Board of Directors may adopt from time to time.

-9-

018547

HCMLPHMIT00003710

Section 6.6    Waivers of Notice.  Whenever any notice is required to be given under the provisions of the Law or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members, Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.7    Ownership Interests in Other Entities.  Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.8    Indemnification.

(a)    Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators.  The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition upon receipt by the Corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise.  The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b)    If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the

-10-

018548

HCMLPHMIT00003711

unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct.

(c)     The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d)     The Corporation may maintain insurance, at its expense, to protect itself and any Director, member, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e)     To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

(f)     Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g)     The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.9     <u>Amendment of Bylaws</u>.  Only the members, by the affirmative unanimous vote of the members entitled to vote, may adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the

018549

HCMLPHMIT00003712

Board of Directors to the extent such alteration or amendment expressly states that it can only be altered or amended by the members.

018550

HCMLPHMIT00003713

# EXHIBIT 12

HCMLPHMIT00003714

# Delaware

PAGE  1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND SANTA BARBARA FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF NOVEMBER, A.D. 2011, AT 7:36 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 9177064

DATE: 11-23-11

5069989  8100

111224480

You may verify this certificate online
at corp.delaware.gov/authver.shtml

018552

HCMLPHMIT00003715

State of Delaware
Secretary of State
Division of Corporations
Delivered 09:17 PM 11/22/2011
FILED 07:36 PM 11/22/2011
SRV 111224480 - 5069989 FILE

# CERTIFICATE OF INCORPORATION

## OF

## HIGHLAND SANTA BARBARA FOUNDATION, INC.

FIRST:  The name of the corporation is Highland Santa Barbara Foundation, Inc. (sometimes hereinafter referred to as the "corporation").

SECOND:  The corporation is organized and shall be operated, exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code").  Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit Santa Barbara Foundation, a California nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code of 1986 as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code.  In furtherance of these purposes, the corporation shall be controlled by Santa Barbara Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation.  Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD:  The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801.  The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH:  The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock.  The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws; provided, however, that the number of directors shall not be fewer than three (3).  Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH:  No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code.  No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation.  The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office.  Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation exempt from federal income tax under section 501(c)(3) of the Code, (ii) a corporation contributions

018553

HCMLPHMIT00003716

to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH:  The corporation shall have perpetual existence.

SEVENTH:  To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit.  If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended.  To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH:  Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to Santa Barbara Foundation.  If Santa Barbara Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH:  In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH:  The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this 22 day of November, 2011.

_____
James Dondero

018554

HCMLPHMIT00003717

# EXHIBIT 22

018555

HCMLPHMIT00003718

IRS DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
CINCINNATI OH   45999-0023

Date of this notice:  12-02-2011

Employer Identification Number:
████2008

Form:  SS-4

Number of this notice:  CP 575 E

HIGHLAND SANTA BARBARA FOUNDATION
INC
13455 NOEL RD STE 800
DALLAS, TX  75240

For assistance you may call us at:
1-800-829-4933

IF YOU WRITE, ATTACH THE
STUB AT THE END OF THIS NOTICE.


              WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER

     Thank you for applying for an Employer Identification Number (EIN).  We assigned you
EIN ████2008.  This EIN will identify you, your business accounts, tax returns, and
documents, even if you have no employees.  Please keep this notice in your permanent
records.

     When filing tax documents, payments, and related correspondence, it is very important
that you use your EIN and complete name and address exactly as shown above.  Any variation
may cause a delay in processing, result in incorrect information in your account, or even
cause you to be assigned more than one EIN.  If the information is not correct as shown
above, please make the correction using the attached tear off stub and return it to us.

     Assigning an EIN does not grant tax-exempt status to non-profit organizations.
Publication 557, *Tax Exempt Status for Your Organization*, has details on the
application process, as well as information on returns you may need to file.  To apply
for formal recognition of tax-exempt status, most organizations will need to complete
either Form 1023, *Application for Recognition of Exemption Under Section 501(c)(3) of
the Internal Revenue Code*, or Form 1024, *Application for Recognition of Exemption
Under Section 501(a)*.  Submit the completed form, all applicable attachments, and the
required user fee to:

Internal Revenue Service
PO Box 12192
Covington, KY  41012-0192

     The Pension Protection Act of 2006 contains numerous changes to the tax law
provisions affecting tax-exempt organizations, including an annual electronic
notification requirement (Form 990-N) for organizations not required to file an annual
information return (Form 990 or Form 990-EZ).  Additionally, if you are required to
file an annual information return, you may be required to file it electronically.
Please refer to the Charities & Non-Profits page at www.irs.gov for the most current
information on your filing requirements and on provisions of the Pension Protection
Act of 2006 that may affect you.

     To obtain tax forms and publications, including those referenced in this notice,
visit our Web site at www.irs.gov.  If you do not have access to the Internet, call
1-800-829-3676 (TTY/TDD 1-800-829-4059) or visit your local IRS office.


018556

HCMLPHMIT00003719

Case 1:23-cv-11195-SHS-OTW Document 547-33 Filed 07/09/24 Page 708 of 1017 Page 3 of 3
Case 3:25-cv-02072-S    Document 56-14    Filed 09/25    Page 708 of 1017    PageID 19607
(IRS USE ONLY)    575E    12-02-2011  HIGH  O  9999999999  SS-4

**IMPORTANT REMINDERS:**

    *  Keep a copy of this notice in your permanent records. **This notice is issued only
       one time and the IRS will not be able to generate a duplicate copy for you.**

    *  Use this EIN and your name exactly as they appear at the top of this notice on all
       your federal tax forms.

    *  Refer to this EIN on your tax-related correspondence and documents.

    *  Provide future officers of your organization with a copy of this notice.

    If you have questions about your EIN, you can call us at the phone number or write to
us at the address shown at the top of this notice.  If you write, please tear off the stub
at the bottom of this notice and send it along with your letter.  If you do not need to
write us, do not complete and return the stub.  Thank you for your cooperation.


                    Keep this part for your records.        CP 575 E (Rev. 7-2007)

--------------------------------------------------------------------------------------------

    Return this part with any correspondence
    so we may identify your account.  Please                        CP 575 E
    correct any errors in your name or address.
                                                                9999999999


    Your Telephone Number  Best Time to Call  DATE OF THIS NOTICE:  12-02-2011
    (     )     -                             EMPLOYER IDENTIFICATION NUMBER: ████2008
    _____  _____   FORM:  SS-4              NOBOD


    INTERNAL REVENUE SERVICE                  HIGHLAND SANTA BARBARA FOUNDATION
    CINCINNATI  OH   45999-0023               INC
    IılıIıIıIıIıIıIıIılıIılııIılıIıılıIıl      13455 NOEL RD STE 800
                                              DALLAS, TX  75240


                                                              018557

HCMLPHMIT00003720

# EXHIBIT 23

018558

HCMLPHMIT00003721



SANTA BARBARA
FOUNDATION

July 9, 2021

Honorable Stacy G. C. Jernigan
United States Bankruptcy Judge
Northern District of Texas

Re:     Highland Dallas Foundation, Inc.

Dear Judge Jernigan:

The Santa Barbara Foundation ("SBF") is a community foundation incorporated in 1928 under the laws of the state of California as a nonprofit corporation to enrich the lives of the people of Santa Barbara County through philanthropy. The mission of SBF is to mobilize collective wisdom and philanthropic capital to build empathetic, inclusive, and resilient communities. Working in partnership with individuals, families, community organizations, nonprofits, businesses, and government, SBF funds a wide range of initiatives, projects, and organizations. SBF has supported nearly every Santa Barbara County nonprofit organization and essential community project during its 93-year history and continues to serve as one of the largest private funding sources for area nonprofits, agencies, and college-bound students.

In 2020, SBF awarded $31 million in grants, received $36 million in contributions, and had $514 million in assets. Nonprofit support included annual grant programs (behavioral health, health care, food, shelter & safety, and child care), laying the groundwork for workforce development strategies, and creating the Collaboration for Social Impact to help nonprofits with capacity building and leadership development. Additionally, SBF co-organized and co-led the countywide COVID-19 Joint Response Effort, broadened its grantmaking to include small businesses through the Santa Barbara Better Together Fund, co-led the 2020 census efforts with the County of Santa Barbara, sponsored and produced educational events to promote diversity, equity, inclusion and access, and continued its annual funding of the Scholarship Foundation of Santa Barbara. Grants are made through SBF from various types of funds, including donor advised, donor designated, and field of interest. Discretionary grants, totaling over $7 million in 2020, are also supported by SBF's unrestricted contributions and investment income.

<u>Supporting Organizations</u>

SBF works with entities organized under Section 509(a)(3) of the Internal Revenue Code as supporting organizations to SBF for the specific and primary purpose of benefiting, performing functions of, and engaging in activities consistent with SBF's charitable purposes. SBF appoints a majority of the members of the governing boards of the supporting organizations. Each governing board may create its own investment policy and grant guidelines. Each organization is a separate legal entity required to file

BOARD OF TRUSTEES

Pamela Gann
**Chair**

Stephen Hicks
**Vice Chair**

Susan T. Richards
**Treasurer**

Nicolasa Sandoval, Ph.D.
**Secretary**

Diane Adam
Phil Alvarado
Randall Day
Donna France
Angel Iscovich, M.D.
Danna McGrew
Robert C. Nakasone
Ernesto Paredes
Cathy Pepe
James Rogers
Matt Rowe
Ginger Salazar
Tracy Stouffer
Michael D. Young, Ph.D.

**President & CEO**
Jacqueline M. Carrera

**South County Headquarters**
1111 Chapala Street, Suite 200
Santa Barbara, CA 93101-3100
Phone: (805) 963-1873
Fax: (805) 966-2345

**North County Headquarters**
2625 S. Miller Street, Suite 101
Santa Maria, CA 93455-1777
Phone: (805) 346-6123
Fax: (805) 346-6125

SBFoundation.org

 @sbfoundation
 @sbfoundation
 /santa-barbara-foundation
 @santabarbarafoundation

018559

its own IRS Form 990, "Return of Organization Exempt from Income Tax". SBF and its supporting organizations are considered under SBF's control and thus consolidated in SBF's audited financial statements.

<u>Overview of Highland Santa Barbara Foundation, Inc.</u>

Highland Santa Barbara Foundation, Inc. (HSBF) was formed in November 2011 as a Delaware nonprofit nonstock corporation to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of SBF. HSBF is a Type I supporting organization under Section 509(a)(3) of the Internal Revenue Code. SBF is a supported organization under Section 509(a)(1) of the Internal Revenue Code.

The Bylaws of HSBF describe the governance of HSBF by its members, directors, and officers. HSBF has two classes of members, institutional and individual, and one member in each class. SBF is the institutional member. James Dondero is the individual member. HSBF has three directors, two elected by SBF and one elected by James Dondero. The president, secretary, and any other officers of HSBF are elected by the three directors.

SBF and HSBF have an operating agreement whereby SBF provides grant administration and other services to HSBF and HSBF pays support fees to SBF. The fees are calculated using a tiered schedule based on the fair market value of 100 participation shares of Charitable DAF HoldCo, Ltd., which is the primary asset of HSBF. The fair market value is determined by an independent valuation firm at least annually.

<u>Relationship and Mission Advancement</u>

SBF meets annually with HSBF to discuss SBF activities, alignment of SBF priorities and focus areas with HSBF philanthropic objectives, and proposed HSBF funding for the upcoming year. Since its inception, HSBF has funded over $5 million of the grants awarded by SBF, including nearly $3 million in Santa Barbara County. See HSBF, Inc. History, attached.

HSBF has augmented SBF's discretionary grants in the areas of: early childhood, youth, and workforce development and education; scholarships; veterans and military education and job training; Community Caregiving Initiative; and Food Action Plan. HSBF has also funded grants to specific organizations, including: $400,000 to Children's Museum of Santa Barbara d.b.a. MOXI - The Wolf Museum of Exploration and Innovation; $90,000 to Reasoning Mind, Inc. for identified local schools to participate in a math literacy program; and $30,000 to Boy Scouts of America - Los Padres Council for rebuilding of Camp Rancho Alegre following the Whittier Fire.

Thank you.

Sincerely,

Jacqueline M. Carrera
President & Chief Executive Officer

018560

# EXHIBIT 24

018561

HCMLPHMIT00003724

Case 19-34054-sgj11    Doc 4255-74    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc 4
Case 19-34054-sgj11 Doc 2547-23 Filed 07/09/21 Entered 07/09/21 17:06:29 Page 2 of 4
Case 3:25-cv-02072-S    Document 104-74    Filed 04/03/25    Page 713 of 1017    PageID 19612

# Delaware

PAGE 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND KANSAS CITY FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-THIRD DAY OF NOVEMBER, A.D. 2011, AT 4:23 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

5070449  8100

111227849

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 9179752

DATE: 11-28-11

018562

HCMLPHMIT00003725

Case 19-34054-sgj11  Doc 4255-74  Filed 06/20/25  Entered 06/20/25 21:39:29  Desc 4
Case 19-34054-sgj11  Doc 2547-23  Filed 07/09/21  Entered 07/09/21 17:06:29  Page 3 of 4
Case 3:25-cv-02072-S  Document 64-74  Filed 06/06/25  Page 714 of 1017  PageID 19613
Exhibit 74

State of Delaware
Secretary of State
Division of Corporations
Delivered 05:03 PM 11/23/2011
FILED 04:23 PM 11/23/2011
SRV 111227849 - 5070449 FILE

# CERTIFICATE OF INCORPORATION

## OF

## HIGHLAND KANSAS CITY FOUNDATION, INC.

FIRST: The name of the corporation is Highland Kansas City Foundation, Inc. (sometimes hereinafter referred to as the "corporation").

SECOND: The corporation is organized and shall be operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit the Greater Kansas City Community Foundation, a Missouri nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by the Greater Kansas City Community Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD: The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH: The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws; provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation

018563

HCMLPHMIT00003726

exempt from federal income tax under section 501(c)(3) of the Code, (ii) a corporation contributions to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH: The corporation shall have perpetual existence.

SEVENTH: To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH: Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to the Greater Kansas City Community Foundation. If the Greater Kansas City Community Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH: In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH: The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this 22 day of November, 2011.

James Dondero

78673.000002 EMF_US 37829386v4

018564

HCMLPHMIT00003727

# EXHIBIT 25

HCMLPHMIT00003728



July 7, 2021

To Whom It May Concern:

Thank you for this opportunity to share our experience working with the Highland Kansas City Foundation, Inc.

I represent the Greater Kansas City Community Foundation, which exists to serve philanthropic donors by providing vehicles for their charitable giving. The Community Foundation was founded in 1978, and now has an asset base of more than $4 billion, housing thousands of donor-advised funds, scholarship funds, supporting organizations and other charitable funds and accounts established by individuals, families and businesses. In 2020, the Community Foundation's donors used their charitable dollars to grant over $550 million to their favorite causes across the country.

The Community Foundation currently works with 18 supporting organizations, one of which is the Highland Kansas City Foundation, established in 2011. Supporting organizations operate under their own legal entities but require the Community Foundation's active oversight and involvement. The Community Foundation's Board of Directors controls the Board of the Highland Kansas City Foundation. The Community Foundation oversees all of the Highland Kansas City Foundation's grants, ensuring every dollar is distributed for charitable purposes.

Since 2011, the Highland Kansas City Foundation has granted more than $9 million to support education and college preparation, historical preservation, medical research, veterans, the arts, the environment and more.

The Community Foundation's mission is to increase philanthropy and connect donors to the causes they care about, and we are honored to further the Highland Kansas City Foundation's generosity through significant annual distributions to important causes in our country.

Sincerely,

Deborah L. Wilkerson
President & CEO

018566

HCMLPHMIT00003729

# EXHIBIT 26

018567

HCMLPHMIT00003730

# BYLAWS

## OF

## HIGHLAND KANSAS CITY FOUNDATION, INC.

018568

HCMLPHMIT00003731

# TABLE OF CONTENTS

<div align="right">Page</div>

ARTICLE I    OFFICES...................................................................................1

    Section 1.1    Registered Office ............................................................1
    Section 1.2    Other Offices...................................................................1

ARTICLE II    MEMBERSHIP...........................................................................1

    Section 2.1    Classes.............................................................................1
    Section 2.2    Voting ..............................................................................1
    Section 2.3    Transfer of Membership ..................................................1
    Section 2.4    Resignation of Member....................................................2
    Section 2.5    Place of Meetings............................................................2
    Section 2.6    Annual Meetings .............................................................2
    Section 2.7    Special Meetings .............................................................2
    Section 2.8    Members' List..................................................................2
    Section 2.9    Notice of Meetings of Members ......................................2
    Section 2.10    Quorum ...........................................................................3
    Section 2.11    Voting ..............................................................................3
    Section 2.12    Proxies.............................................................................3
    Section 2.13    Action by Written Consent ..............................................3

ARTICLE III    DIRECTORS...............................................................................4

    Section 3.1    General Powers.................................................................4
    Section 3.2    Number of Directors ........................................................4
    Section 3.3    Vacancies.........................................................................4
    Section 3.4    Place of Meetings............................................................4
    Section 3.5    Committees of Directors ..................................................4
    Section 3.6    Compensation of Directors ..............................................4
    Section 3.7    Annual Meeting ...............................................................5
    Section 3.8    Additional Regular Meetings...........................................5
    Section 3.9    Special Meetings .............................................................5
    Section 3.10    Method and Timing of Notice..........................................5
    Section 3.11    Purpose not Required in Notice .......................................6
    Section 3.12    Waiver of Notice..............................................................6
    Section 3.13    Action by Written Consent ..............................................6
    Section 3.14    Validation of Action by Consent .....................................6
    Section 3.15    Quorum and Manner of Acting........................................6
    Section 3.16    Resignation and Removal of Directors ............................7
    Section 3.17    Chairman Presiding..........................................................7

ARTICLE IV    OFFICERS ..................................................................................7

    Section 4.1    Officers ............................................................................7

018569

HCMLPHMIT00003732

Section 4.2        Election, Term of Office and Eligibility ...............................................7
Section 4.3        Subordinate Officers ...............................................................................7
Section 4.4        Removal ....................................................................................................7
Section 4.5        The President ...........................................................................................8
Section 4.6        The Secretary ...........................................................................................8
Section 4.7        The Assistant Secretaries ........................................................................8
Section 4.8        The Chief Financial Officer .....................................................................8
Section 4.9        The Assistant Chief Financial Officers ...................................................9
Section 4.10       Delegation of Duties ...............................................................................9

ARTICLE V        BOOKS AND RECORDS .........................................................................9

Section 5.1        Location ....................................................................................................9
Section 5.2        Inspection .................................................................................................9

ARTICLE VI        MISCELLANEOUS PROVISIONS ..........................................................9

Section 6.1        Fiscal Year ...............................................................................................9
Section 6.2        Depositories .............................................................................................9
Section 6.3        Checks, Drafts and Notes .........................................................................9
Section 6.4        Contracts and Other Instruments ...........................................................10
Section 6.5        Waivers of Notice ..................................................................................10
Section 6.6        Ownership Interests in Other Entities ...................................................10
Section 6.7        Indemnification. .....................................................................................10
Section 6.8        Amendment of Bylaws. .........................................................................12

018570

HCMLPHMIT00003733

# BYLAWS

## OF

## HIGHLAND KANSAS CITY FOUNDATION, INC.

## **ARTICLE I**

## **OFFICES**

Section 1.1    <u>Registered Office</u>.  The registered office of Highland Kansas City Foundation, Inc. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2    <u>Other Offices</u>.  The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

## **ARTICLE II**

## **MEMBERSHIP**

Section 2.1    <u>Classes</u>.  The Corporation shall have two classes of members, the Institutional Member, which shall be the Greater Kansas City Community Foundation, and the Individual Member, which shall be James Dondero or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2    <u>Voting</u>.  Except as otherwise provided in these Bylaws, each member shall be entitled to one vote upon each matter submitted to a vote of the members.  In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3    <u>Transfer of Membership</u>.  Institutional Membership in the Corporation is not transferable or assignable.  Mr. Dondero, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document designate an individual, or series of individuals, to serve as a successor Individual Member, and such designation may be a current appointment or an appointment to take effect upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member.  Each successor Individual Member shall succeed to the rights of the initial Individual Member.  Each successor Individual Member may in the same manner designate an individual, or

-1-

018571

HCMLPHMIT00003734

series of individuals, to serve as successor Individual Member, and such designation may be a current appointment or an appointment to take effect upon the occurrence of a future contingency such as the death or failure to act of a current or future Individual Member. In the event of a conflict between such appointments, the one bearing the earliest date shall control. Each Individual Member may at any time revoke his or her appointment notice or other document in whole or in part by written notice delivered to the Institutional Member. If at any time there is no Individual Member and no individual has been designated in accordance with the foregoing provisions of this Section to act as such, then the Individual Member shall be the individual designated by a majority of the eldest generation of then living descendants of James Dondero that has at least one descendant then living.

Section 2.4    Resignation of Member. A member may resign at any time upon written notice to the Secretary.

Section 2.5    Place of Meetings. All meetings of the members shall by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6    Annual Meetings. An annual meeting of the members, commencing with the year 2012, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.9 below.

Section 2.7    Special Meetings. Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall be called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting.   The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.9 below.

Section 2.8    Members' List. At least ten days before every meeting of members, a complete list of the members entitled to vote at said meeting, arranged in alphabetical order, shall be prepared by the Secretary. Such list shall be open to the examination of any member, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten days prior to the meeting at the place where the meeting is to be held. The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any member who is present.

Section 2.9    Notice of Meetings of Members. When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting. Notice shall be given (a) by written notice delivered personally,

018572

HCMLPHMIT00003735

(b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.10    Quorum. Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business except as otherwise provided by Law, the Certificate of Incorporation or these Bylaws. If, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall again be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.11    Voting. When a quorum is present at any meeting, the vote of a majority of the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.12    Proxies. At any meeting of the members, a member is entitled to be counted as present and to vote by written proxy executed by that member or his or her duly authorized attorney-in-fact. No proxy shall be valid after three (3) months from the date of its execution.

Section 2.13    Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by that number of members necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.13. Prompt notice of the taking of an action by the members without a

018573

HCMLPHMIT00003736

meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action. Each such consent must state the date of each member's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting.

## ARTICLE III

## DIRECTORS

Section 3.1 <u>General Powers</u>. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2 <u>Number of Directors</u>. The number of Directors that shall constitute the Board of Directors shall be three (3). Two (2) Directors (the "Institutional Directors") shall be elected annually by the Institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member. Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3 <u>Vacancies</u>. If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy. If at any time there is no Individual Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director. Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4 <u>Place of Meetings</u>. The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5 <u>Committees of Directors</u>. The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6 <u>Compensation of Directors</u>. Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and

018574

HCMLPHMIT00003737

expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7    Annual Meeting.  The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors.  If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of Directors, no further notice of such annual meeting shall be required.  If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8    Additional Regular Meetings.  The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors.  If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required.  If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9    Special Meetings.  Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors.  The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10    Method and Timing of Notice.  When notice is required to be given for a meeting of the Board of Directors, such notice shall specify the date, time, and location of the meeting and shall be given to each Director at least ten (10) days prior to the meeting.  Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone.  If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid.  If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address.  If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number.  If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a Director's residence or place of business.

018575

HCMLPHMIT00003738

Section 3.11   Purpose not Required in Notice.  Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12   Waiver of Notice.  Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall be deemed the equivalent of the Director having received notice.  A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

Section 3.13   Action by Written Consent.  Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by that number of Directors necessary to authorize or take such action at a meeting at which all Directors entitled to vote thereon were present and voted.  A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13.  Prompt notice of the taking of an action by the Board of Directors without a meeting by less than unanimous written consent shall be given to each Director who did not consent in writing to the action.  Each such consent must state the date of each Director's signature.  Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14   Validation of Action by Consent.  All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held.  At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice.  If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15   Quorum and Manner of Acting.  Except as otherwise provided in these Bylaws, a quorum for the transaction of business at any meeting of the Board of Directors shall consist of all three of the then serving Directors.  Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall be the act of the Board of Directors.  A Director shall be considered present at any meeting of the Board of Directors if the Director participates in person or by proxy or if during the meeting he or she can communicate with all other persons

-6-

018576

HCMLPHMIT00003739

participating in the meeting by using conference telephone or another suitable electronic communications system. In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present. Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16   Resignation and Removal of Directors. Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation. The Institutional Member may remove an Institutional Director at any time, with or without cause. The Individual Member may remove an Individual Director at any time, with or without cause.

Section 3.17   Chairman Presiding. If a Chairman is appointed by the Board of Directors, the Chairman shall preside at all meetings of the Board of Directors and in general shall perform all duties incident to a nonexecutive chairman of a board of directors.

## ARTICLE IV

## OFFICERS

Section 4.1   Officers. The officers of the Corporation shall be a President, a Secretary and a Chief Financial Officer. One person may hold any number of said offices.

Section 4.2   Election, Term of Office and Eligibility. The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof. Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal. None of the officers need be members of the Board of Directors.

Section 4.3   Subordinate Officers. The Board of Directors may appoint such Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine. The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4   Removal. The President, the Secretary and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause. Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

018577

HCMLPHMIT00003740

Section 4.5    The President.  The President shall be the chief executive officer of the Corporation.  He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the Corporation.  In general the President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors.

Section 4.6    The Secretary.  The Secretary shall:

(a)    Keep the minutes of the meetings of the members and of the Board of Directors;

(b)    See that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c)    Be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized;

(d)    In general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7    The Assistant Secretaries.  If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8    The Chief Financial Officer.  The Chief Financial Officer shall:

(a)    Receive and be responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things:  keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b)    Render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation;

-8-

018578

HCMLPHMIT00003741

(c)    In general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

Section 4.9    The Assistant Chief Financial Officers.  If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief Financial Officer.

Section 4.10    Delegation of Duties.  In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

## ARTICLE V

## BOOKS AND RECORDS

Section 5.1    Location.  The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

Section 5.2    Inspection.  The books, accounts, and records of the Corporation shall be open to inspection by any member of the Board of Directors at all times; and open to inspection by the members at such times, and subject to such regulations as the Board of Directors may prescribe, except as otherwise provided by statute.

## ARTICLE VI

## MISCELLANEOUS PROVISIONS

Section 6.1    Fiscal Year.  The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2    Depositories.  The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 6.3    Checks, Drafts and Notes.  All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or

-9-

018579

HCMLPHMIT00003742

agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4    Contracts and Other Instruments.  The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances.

Section 6.5    Waivers of Notice.  Whenever any notice is required to be given under the provisions of the statutes or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members, Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.6    Ownership Interests in Other Entities.  Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.7    Indemnification.

(a)    Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators.  The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any

018580

HCMLPHMIT00003743

such proceeding in advance of its final disposition upon receipt by the corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise. The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b)    If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct.

(c)    The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d)    The Corporation may maintain insurance, at its expense, to protect itself and any Director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e)    To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

018581

HCMLPHMIT00003744

(f)     Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g)     The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.8     Amendment of Bylaws.

(a)     The members, by the affirmative unanimous vote of the members entitled to vote, may, at any annual or special meeting if notice of such alteration or amendment of the Bylaws is contained in the notice of such meeting, adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the Board of Directors.

(b)     The Board of Directors, by unanimous vote, may adopt, amend, or repeal these Bylaws at any meeting, except as provided in Section 6.8(a), above.  Any alterations or amendments to these Bylaws made by the Board of Directors may be altered or repealed by the members.

99900.13475 EMF_US 37828905v4

018582

HCMLPHMIT00003745



HUNTON & WILLIAMS LLP
FOUNTAIN PLACE
1445 ROSS AVENUE
SUITE 3700
DALLAS, TEXAS 75202-2799

TEL   214 • 979 • 3000
FAX   214 • 880 • 0011

ANDREW W. LAWRENCE
DIRECT DIAL: 214 • 979 • 3052
EMAIL: alawrence@hunton.com

FILE NO: 78673.000002

November 9, 2011

Deborah L. Wilkerson                              *Via E-Mail*
General Counsel
Greater Kansas City Community Foundation
9001 W. 110th Street, Suite 220
Overland Park, KS  66210

Re:    Highland Capital Management Partners Charitable Trust #2

Dear Debbie:

In accordance with your request during our telephone conversation last week, the paragraphs below describe briefly the proposed distribution of assets from Highland Capital Management Partners Charitable Trust #2 (the "Trust") to a to-be-formed supporting organization (i.e., Highland Kansas City Foundation, Inc.) with respect to which the Greater Kansas City Community Foundation ("GKCCF") is the supported organization.

1.    The Trust.  As you know, James Dondero, as the Settlor, and Grant Scott, as the Trustee, established the Trust by a trust agreement dated December 1, 2006 (the "Trust Agreement").  Under the terms of the Trust Agreement, Mr. Dondero, as Settlor, is entitled to name remainder beneficiaries and substitute new remainder beneficiaries from time to time until the remainder interest is ultimately distributed.

2.    Assets of the Trust/Cayman Islands Company.  The remainder interest will be comprised solely of one hundred percent (100%) of the non-voting shares (the "Shares") of Charitable DAF HoldCo, Ltd., a Cayman Islands corporation ("HoldCo").  Highland Kansas City Foundation, Inc. will receive one-third (1/3) of the Shares.  HoldCo will own one hundred percent (100%) of the limited partner interests in Charitable DAF Fund, LP, a Cayman Island limited partnership, which, in turn, will own one hundred percent (100%) of the shares of CLO Holdco, Ltd., a Cayman Islands exempted company, which, in turn, owns minority equity interests in Cayman Islands investment companies that own portfolios of debt instruments issued by various public companies.

018583

HCMLPHMIT00003746



November 9, 2011
Page 2

    3.    <u>The Supporting Organizations</u>. Mr. Dondero intends to name as the remainder beneficiaries of the Trust three supporting organizations (each an "SO", collectively, the "SOs"), each of which will support one of three separate community foundations. Each SO will receive an equal number of HoldCo Shares. Highland Capital Management, L.P. currently receives management fees from the companies that own the corporate debt portfolios and will continue to receive those fees under existing agreements with those companies after the Holdco Shares are transferred to the SOs.

    4.    <u>Use of Multiple Supporting Organizations</u>. Rather than the remainder interest being distributed in its entirety to just one or two SOs, the remainder interest is being distributed in equal shares to the three SOs out of an abundance of caution in light of the excess benefit transaction rules under Section 4958(c)(3) of the Code, such that no SO will own more than fifty percent (50%) of the stock of HoldCo.

    Please let me know if you have additional questions regarding this matter.

Very truly yours,

Andrew W. Lawrence

AWL/bt

cc:    Alexander G. McGeoch, Esq.
       Douglas M. Mancino, Esq.

018584

HCMLPHMIT00003747

# EXHIBIT 25

HCMLPHMIT00003748

**CHARITABLE DAF HOLDCO, LTD**

(the "Company")

**SHARE TRANSFER FORM**

Dated 24 March 2021

I, **Grant James Scott** (the "**Transferor**"), for good and valuable consideration received by me from **Mark E. Patrick** (the "**Transferee**"), do hereby:

1.  transfer to the Transferee 100 Management Shares (the "**Shares**") for the par value of $0.01 each standing in my name in the register of members of the Company to hold unto the Transferee, his executors, administrators and assigns, subject to the several conditions on which I held the same at the time of execution of this Share Transfer Form; and

2.  consent that my name remains on the register of the Company until such time as the Company enters the Transferee's name in the register of the Company.

SIGNED by **TRANSFEROR**:                  )
                                           ) _____
                                             Name: Grant J. Scott

And the Transferee does hereby agree to take the Shares subject to the same conditions.

SIGNED by **TRANSFEREE**:                  )
                                           ) _____
                                             Name:  Mark E. Patrick

1

078673.0000002 EMF_US 84436263v1

PATRICK_000005

018586

HCMLPHMIT00003749

# EXHIBIT 28

018587

HCMLPHMIT00003750

**CHARITABLE DAF HOLDCO, LTD**
**(THE "COMPANY")**

---

**WRITTEN RESOLUTIONS OF THE SOLE DIRECTOR**
**OF THE COMPANY DATED** March 25 **2021**

---

**1.     SHARE TRANSFER**

1.1     **IT IS NOTED** that the Director has received a duly executed share transfer form relating to the transfer by Grant James Scott of 100 Management Shares to Mark E. Patrick.

1.2     **IT IS RESOLVED** that:

(a)     the following share transfer (the "**Transfer**") be and is hereby ratified, confirmed and approved:

| TRANSFEROR | TRANSFEREE | NO OF SHARES | DATE OF TRANSFER |
|---|---|---|---|
| Grant James Scott | Mark E. Patrick | 100 Management Shares | 24 March 2021 |

(b)     the Company's registered office provider be instructed to update the Register of Members of the Company to reflect the Transfer.

**2.     GENERAL AUTHORISATION**

2.1     **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, the Director, officer or (if applicable) any attorney or duly authorised signatory of the Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively) be, and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of the Company, to do such further acts and things as the Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

**3.     RATIFICATION OF PRIOR ACTIONS**

3.1     **IT IS RESOLVED** that any and all actions of the Company, or of the Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, the Director prior to such action being taken.

1

PATRICK_000003

018588

HCMLPHMIT00003751

These written resolutions are signed by the sole Director of the Company.


**Mark E. Patrick**

PATRICK_000004

018589

HCMLPHMIT00003752

# EXHIBIT 29

018590

HCMLPHMIT00003753

CLO HOLDCO, LTD.
(THE "COMPANY")

---

## WRITTEN SHAREHOLDER RESOLUTIONS OF THE SOLE SHAREHOLDER OF THE COMPANY
## MADE ON _April 2_ 2021

---

The undersigned, being the sole holder of Shares of the Company having the right to receive notice of, attend and vote at general meetings hereby resolves the following shareholder resolutions.

**1.** **REMOVAL OF DIRECTOR AND APPOINTMENT OF NEW DIRECTOR**

1.1 **IT IS RESOLVED** by ordinary resolutions that:

    (a)    Grant James Scott be and is hereby removed as a Director of the Company with effect from the date of these resolutions;

    (b)    Mark E. Patrick be and is hereby appointed as a Director of the Company with effect from the date of these resolutions until such time as such Director resigns or is removed or otherwise disqualified in accordance with the Articles of Association of the Company;

    (c)    the Register of Directors of the Company be amended to note the removal of the Director and the appointment of the new Director, all as set out in these resolutions; and

    (d)    the Company's registered office be and is hereby instructed to notify the Registrar of Companies in the Cayman Islands of the removal of Mark E. Patrick as a Director of the Company and the appointment of Grant James Scott as a Director of the Company.

BY _Mark Patrick_

Mark E. Patrick for and on behalf of

Charitable DAF GP, LLC, the general partner of Charitable DAF Fund, L.P.

1

PATRICK_000002

018591

HCMLPHMIT00003754

# EXHIBIT 30

HCMLPHMIT00003755

**THE COMPANIES LISTED IN THE ATTACHED SCHEDULE**
**(EACH A "COMPANY" AND TOGETHER THE "COMPANIES")**

---

**WRITTEN RESOLUTIONS OF THE SOLE DIRECTOR**
**OF EACH COMPANY DATED** ___April 22,___ **2021**

---

## 1.   APPOINTMENT OF DIRECTOR

1.1   **IT IS NOTED** that the Directors wish to appoint Paul Murphy as a Director of each Company with effect from the date of these resolutions and that such proposed Director has indicated a willingness to hold such office and has executed a letter of consent and/or a services agreement in relation thereto (such appointment, the "**Director's Appointment**").

1.2   **IT IS RESOLVED** that:

   (a)   the Director's Appointment be and is hereby approved with effect from the date of these resolutions until such time as the Director resigns or is removed from office in accordance with the Articles of Association of each Company; and

   (b)   the registered office service provider be and is hereby instructed to update the Register of Directors of each Company and to make the necessary filings with the Registrar of Companies to reflect the Director's Appointment.

## 2.   GENERAL AUTHORISATION

2.1   **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, the Director or any officer or (if applicable) any attorney or duly authorised signatory of each Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively) be, and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of each Company, to do such further acts and things as the Director or any officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of each Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

## 3.   RATIFICATION OF PRIOR ACTIONS

3.1   **IT IS RESOLVED** that any and all actions of each Company, or of the Director or any officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, the Director prior to such action being taken.

*[Remainder of page left blank intentionally]*

1

018593

HCMLPHMIT00003756

These written resolutions are signed by the sole Director of the Company.

**Mark E. Patrick**

Error! Unknown document property name.

018594

HCMLPHMIT00003757

**Schedule**
(*List of Companies*)

**Charitable DAF HoldCo, Ltd.**

**CLO HoldCo, Ltd.**

**Liberty CLO Holdco, Ltd.**

**Liberty Sub, Ltd.**

**HCT Holdco 2, Ltd.**

**MGM Studios Holdco, Ltd.**

3

018595
HCMLPHMIT00003758

# EXHIBIT 31

018596

HCMLPHMIT00003759

# Charitable Giving Overview

## GRANT SUMMARY : 2012-2020

018597

HCMLPHMIT00003760

# Highlights

The following provides an overview of philanthropic activities across the group of charitable entities that operate as supporting organizations to community foundation: the Highland Dallas Foundation, Inc., the Highland Santa Barbara Foundation, Inc., and the Highland Kansas City Foundation, Inc. (together the "Supporting Organizations" or "we").

Each of the entities within the Supporting Organizations has its own independent board, which provides oversight for the organization's grantmaking activity.

Data represents activity between January 1, 2012, and December 31, 2020 unless otherwise noted.

**$42M+** — Since 2012, the Supporting Organizations have committed over $42 million to nonprofit organizations operating across a range of issue areas.

**$32M+** — We have funded over $32 million of our total commitments; remaining commitments are comprised of future scheduled installments of multiyear grants.

**$3.7M** — Average annual grant payments total $3.7 million.

**275+** — The Supporting Organizations have made donations to more than 275 individual organizations.

**2029** — Through our multiyear grants we have over $10 million in funds committed through 2029.

018598

HCMLPHMIT00003761

G R A N T S   O V E R V I E W

# Total committed: $42.7 million[1]

The Supporting Organizations have committed **$42,688,403** in grants to nonprofits across a range of issue areas, with a focus on:

- civic and cultural institutions in the Dallas-Ft. Worth area;
- education;
- support for military, veterans, and first responders;
- health and medical research;
- economic and community development initiatives; and
- youth and family.

GRANT COMMITMENTS BY ISSUE AREA[2]



- Civic & Cultural Institutions
- Education & Research
- Military, Veterans & First Responders
- Health
- Economic & Community Development
- Youth & Family
- Other

1. As of 12/31/2020.  Figures rounded to the nearest hundred thousand.  2. Represents amount committed in grants since 2012 (inclusive of funded and unfunded commitments).  Unfunded commitments represent installment payments for multiyear grants to be paid at future dates following a schedule included in the grant agreement. Issue areas defined by HCP.  Grants categorized by purpose and/or use of funds.  "Other" category inclusive of grants related to the following issue areas: Animals & Environments; Arts, Culture & Humanities; Faith-Based Causes; and Global Affairs.

018599
HCMLPHMIT00003762

GRANTS OVERVIEW

# Total funded: $32.5 million[1]

The Supporting Organizations have funded **$32,548,403** in grants, representing payments made directly to nonprofit organizations that are improving lives and addressing pressing issues in our local community—and beyond.

GRANTS FUNDED BY ISSUE AREA[2]



- ■ Civic & Cultural Institutions
- ■ Education & Research
- ■ Military, Veterans & First Responders
- ■ Health
- ■ Economic & Community Development
- ■ Youth & Family
- ■ Other

1. As of 12/31/2020. Figures rounded to the nearest hundred thousand. 2. Represents amount committed in grants since 2012 (inclusive of funded and unfunded commitments). Unfunded commitments represent installment payments for multiyear grants to be paid at future dates following a schedule included in the grant agreement. Issue areas defined by HCP. Grants categorized by purpose and/or use of funds. "Other" category inclusive of grants related to the following issue areas: Animals & Environments; Arts, Culture & Humanities; Faith-Based Causes; and Global Affairs.

018600
HCMLPHMIT00003763

G R A N T S   O V E R V I E W

# Average annual funding: $3.7 million[1]

TOTAL GRANT PAYMENTS ($M)[2]



1. As of 12/31/2020.  Figures rounded to the nearest hundred thousand.  2. Represents amount paid in grants and/or grant installments during each calendar year. Not inclusive of grants committed but not funded.



018601

HCMLPHMIT00003764

G R A N T S  O V E R V I E W

# Highlights of grants' impact

Supporting **4,000** military and law enforcement members

Grants to the Center for BrainHealth helped provide training and other programming to members of the military, veterans, and local law enforcement that aims to improve the cognitive health—all at no cost.

Enabling **1.2M** visitors to make memorable experiences with wildlife

Grants funding the construction of the new hippo exhibit and providing support for the organization's membership program helped the Dallas Zoo draw a record-breaking 1.2 million visitors in 2017.

Providing a path to safety for **11,000** victims of family violence

Grants to The Family Place helped the organization serve more than 11,000 clients in 2019, including providing more than 62,000 days of Emergency Shelter.

Supporting and defending **8,000** abused children

Grants to the Dallas Children's Advocacy Center helped the organization serve over 8,000 children who have been abused each year,

Providing educational opportunities for **600** low-income students in southeast Dallas

Grants to expand the Cristo Rey Dallas campus in Pleasant Grove enable the school to accommodate up to 600 students. 95% of CRD students are the first in their families to attend college, and with a 100% college acceptance rate, the expansion will help create an estimated 570 first-generation college students every four years.

018602

HCMLPHMIT00003765

GRANT HIGHLIGHT

# Dallas Zoo

### About the Dallas Zoo

The Dallas Zoological Society (the "Zoo"), the largest zoological park in Texas, has become a staple in the Dallas community over its 130-year history. Home to over 430 different species, the Dallas Zoo engages and educates visitors, while seeking to create a better world for animals.

### Promoting Visitor Engagement: Grant to Support Zoo Membership

The Supporting Organizations have supported the Zoo's membership program since 2014 through a series of multiyear grants that help the Dallas Zoo continue to reach new audiences. In the first full year of the grant, the Zoo welcomed a record 600,000 guests, and that number has steadily increased since. With our support, the Zoo continues to find new ways to deliver unforgettable experiences. As a result, it regularly ranks in the top-10 zoos in the U.S. by USA Today.

### Increasing Community Access: Grant to Support Discounted Admission

The Supporting Organizations pursue grant opportunities that increase community access to local civic and cultural institutions. With this goal, we expanded our support of the Zoo in 2017 to include the annual sponsorship of the "Penguin Days" program. The grant enables the Zoo to reduce the price of general admission to $7 on select days from December-February, making the Zoo more accessible to the North Texas Community and allowing families who might not otherwise visit the Zoo to do so in an affordable way.

### Opening a New Exhibit: Grant to Support Construction of an Educational/Event Space at the Hippo Exhibit

The Zoo announced in early 2016 that it was planning to break ground on a new exhibit that would bring hippos to the Zoo for the first time in 16 years. The project also marked the first major exhibit opening at the Zoo since 2010. The Supporting Organizations contributed to this project through a grant that helped establish a 4,485-square-foot indoor/outdoor multipurpose event space, which engages visitors in interactive activities that further the Zoo's animal education mission. Currently, the space is a walkthrough exhibit highlighting conservation efforts of hippo habitats around the world. This exhibit helped increase attendance to a record-breaking 1.2 million visitors in 2017.

Issue Area: **Civic & Cultural Institutions**



018603

HCMLPHMIT00003766

GRANT HIGHLIGHT

# George W. Bush Presidential Center

## About the George W. Bush Presidential Center

The George W. Bush Presidential Center (the "Bush Center") is comprised of the George W. Bush Presidential Library and Museum, which houses the official records of the presidency of George W. Bush, and the George W. Bush Institute, an action-oriented, nonpartisan policy organization. Through these dual operations, the Bush Center works to both preserve history and shape the future. The Bush Center is uniquely equipped to promote leadership development, advance policy initiatives, and inspire action on a local, national, and global scale. Its work covers three major Impact Centers: Domestic Excellence; Global Leadership; and Engagement. Through these Impact Centers, the Bush Center is dedicated to solving some of today's most pressing challenges.

### Driving a Local Institution's Ambitious Global Agenda: Grant Supporting the Construction of the Bush Center in Dallas

In 2008, the Bush Center officially selected Dallas as its permanent home, announcing plans to construct its building on the campus of SMU. The Supporting Organizations helped make the vision of the Bush Center's Dallas home a reality, making a grant to help complete construction and design for the building. On May 1, 2013, the Bush Center opened its doors to the public. In its first five years after opening, the Bush Center welcomed over $1.6 million visitors.

### Securing a Legacy and Driving Engagement: Grant Supporting the Center's Long-term Operations and Engagement Agenda

In 2018, the Bush Center launched an important fundraising initiative to ensure its mission endures for generations to come. With its "A Charge to Keep" capital campaign, the Bush Center aimed to raise funds that would sustain its operations beyond the lifetimes of President and Mrs. Bush.

The Supporting Organizations made a grant to help ensure the Bush Center can continue its important work well into the future. The grant specifically focused on the public speaker series, Engage at the Bush Center. The series brings newsmakers, thought leaders, and authors to the Bush Center for thought-provoking panel discussions and keynote conversations that allow guests to connect with the Bush Center in a meaningful way and dive deeper into many of today's most pressing policy areas and issues.

Issue Area: **Civic & Cultural Institutions**



018604

HCMLPHMIT00003767

GRANT HIGHLIGHT

# Perot Museum

### About the Perot Museum

The Perot Museum of Nature and Science (the "Perot") promotes science and education in the North Texas community through hands-on exhibits, educator resources, unique films, and other special programming that engages audiences of all ages.

### Helping Establish a World Class Museum in Downtown Dallas: Grant to Support Construction of the New Perot Museum:

With support from Dallas' philanthropic community, the Perot Museum opened a new building in December 2012. With its bold architectural design, it quickly became a fixture in its new location in Dallas' Victory Park. The project also sparked a renewed commitment to inspire minds and improve community achievement, giving rise to new initiatives that promote science learning.

The Supporting Organizations contributed to the project by issuing a challenge grant, which matched donations, inciting additional giving and helping complete the project's capital campaign. Since then, we have contributed additional funding to support ongoing educational programming, special exhibitions, and community engagement initiatives.

### Increasing Community Access: Grant to Support the Perot's Traveling Exhibition Programs

In 2014, the Supporting Organizations began issuing a series of grants to support the traveling exhibitions program. The initial exhibition, the "The World's Largest Dinosaurs" exhibition, educated audiences on the gigantic sauropods that once roamed the earth, drawing nearly 200,000 visitors to the museum. Since then, our grants have made possible the many captivating exhibitions that have been hosted by the Perot, covering a range of subject areas. With two special exhibitions held each year, the grants enable the museum to deliver new experiences that give visitors a reason to keep coming back and serve as a complement to the museum's 11 permanent exhibit halls. The program draws exhibitions from around the globe to the Perot, providing the North Texas community with access to world-class educational experiences. All the special exhibition grants include funding that allows the Perot to make all traveling exhibitions bilingual (with programming in both English and Spanish). These exhibits have helped increase community access to the North Texas Hispanic population.

Issue Area: **Civic & Cultural Institutions**



018605

HCMLPHMIT00003768

GRANT HIGHLIGHT

# Cristo Rey Dallas

### About Cristo Rey Dallas

Cristo Rey Dallas College Prep ("CRD") is a private, independent Catholic high school located in the Pleasant Grove area of Southeast Dallas. The Cristo Rey Network's formula for success is a proven, revolutionary model of college preparatory high school curriculum accessible to those of limited financial resources. It integrates rigorous college preparatory academics with professional work experience through the Corporate Work Study Program—a key component of the fiscal sustainability of the Cristo Rey model. Through the Work Study Program, students work in a professional setting five days per month to earn the majority of their tuition. The 144 job partners include some of Dallas's most prominent companies.

**Building Space for Innovation: Grant to Support CRD Campus Expansion and Renovations**

The 30th school in the nationwide Cristo Rey network, CRD opened in August 2015, operating out of an old elementary school and aging gymnasium. They quickly outgrew the space and had to begin turning away prospective students. In 2019, CRD launched a $15 million capital campaign to expand the campus, adding new academic and athletic buildings and conducting much needed renovations on the existing buildings.

The Supporting Organizations issued the campaign's lead grant, helping build a new 37,000 sq. ft. Innovation Center, which boasts spaces for fine arts and counseling. The campaign also created a new cafeteria and gymnasium, as well as a new soccer field – something the school never had before. The new buildings opened in time for the 2020 school year.

The Supporting Organizations also helped provide space for CRD students off campus in a centrally located office building near Downtown Dallas. The space gave students a place to study and complete work study programs that were moved to Work From Home due to the pandemic.



*The Cristo Rey model is proven, with 100% of graduates gaining acceptance to a two- or four-year college and 90% matriculating. For students in Pleasant Grove—where only 4% of the population graduated from college—CRD offers access and opportunity that can change their trajectory.*

Issue Area: **Education & Research**



018606

HCMLPHMIT00003769

GRANT HIGHLIGHT

# Education Is Freedom

### About Education Is Freedom

Education Is Freedom ("EIF") is committed to transforming students' lives through education. With a focus on college planning, the organization provides underserved students in the North Texas community with a range of resources to ensure every student has the opportunity to pursue a college education.

EIF's higher education advisors work onsite at public high schools across the region, helping students and their families navigate the college process. In 20XX, EIF helped high school seniors complete 21,000 college applications and receive over $132 million in scholarships.

In addition to their college planning initiatives, EIF operates a number of supplementary programs to enhance access to postsecondary education and promote workforce readiness.

**Developing a Skilled and Educated Workforce: Grant Supporting the Mayor's Intern Fellows Program**

In 2008, EIF worked with the Mayor's Office to create the Mayor's Intern Fellows Program ("MIFP"), an initiative to provide workforce readiness. The program provides Dallas high school students with internship opportunities at local companies, nonprofits, and government entities. Through the eight-week, paid internship, students gain real-world experience and insight into the professional opportunities available to them. Not only does the program prepare students for future careers, but it also connects local businesses with the future workforce, promoting collaboration to strengthen the pipeline of talent.

The Supporting Organizations have issued grants to EIF to support the MIFP. The grants have helped EIF put on the program's annual Job Fair. Held in the spring, the Job Fair provides an opportunity for students to interview with prospective employers in the hopes of securing an internship for the summer. Education Is Freedom conducts extensive training with the students throughout the program, offering workshops and coaching on everything from interview preparation to professional etiquette.

In 2018, over 2,400 students from 52 high schools applied for the program. Of those applicants, 1,050 were selected to attend the Job Fair. At the 2018 Job Fair, over 200 employers from across the Dallas-Fort Worth region interviewed internship candidates, ultimately offering positions to 395 students for the summer. In addition to the Job Fair, our grants have funded internships at various nonprofit partners, covering the cost for organizations that might not otherwise be able to hire paid interns.

Issue Area: **Education & Research**



018607

HCMLPHMIT00003770

GRANT HIGHLIGHT

# SMU Tower Center

### About the SMU Tower Scholars Program

The Southern Methodist University ("SMU") Tower Scholars Program provides top undergraduate students with an opportunity to integrate public policy and international affairs into their studies through a dedicated curriculum of academic coursework and real-world experiences. Students in the program receive a minor in public policy and international affairs, offered through SMU's John Goodwin Tower Center for Political Studies (the "Tower Center").

*"The Tower Scholar Program's resources and curriculum allow me to not only learn public policy principles through lectures, but also gain tactile experience with practicums and classes taught by policy practitioners. Without this program, I would have been unable to experience and explore my interest in public policy."*

*– Tower Scholar, Class of 2020*

**Investing in the Next Generation of Policymakers: Grant to Endow the Tower Scholars Undergraduate Program at SMU**

In 2014, the Supporting Organizations worked with the Tower Center to create a dedicated undergraduate program that carries out the center's mission of bridging the gap between the scholarship and practice of politics and striving to inspire ethical public service. The grant established an endowment that provides long-term funding for the Tower Scholars Program.

A hallmark of the program is its interdisciplinary focus. Over 75% of the Tower Scholars either earned or are pursuing more than one major—and that is in addition to the minor they earn in the program. Outside the classroom, each student is involved in multiple on-campus organizations, many in leadership positions.

The Supporting Organizations' grant makes possible the unique academic experiences—from meeting with global leaders, to working on real policy issues for major corporations—offered to the Tower Scholars. The program accepts 10 students each year, and recently welcomed its eighth cohort.

Issue Area: **Education & Research**



018608

HCMLPHMIT00003771

GRANT HIGHLIGHT

# Center for BrainHealth

## About the Center for BrainHealth

The Center for BrainHealth ("CBH"), part of The University of Texas at Dallas, is a research institute committed to enhancing, protecting and restoring brain health across the lifespan. CBH is composed of independent labs that are responsible for more than 60 fully funded research projects that investigate brain health, injury, and disease. Many of the center's programs use functional and structural neuroimaging techniques to better understand the neurobiology supporting cognition and emotion in health and disease. Areas of research include addiction, aging, Alzheimer's disease, autism, multiple sclerosis, social cognition, and traumatic brain injuries.

**Applying Innovative Research to Improve the Lives of Post-9/11 Veterans and First Responders: Grant Supporting the Warriors Program Through the Brain Performance Institute**

In 2015, CBH broke ground on new building dedicated to translating leading-edge science to scalable solutions for the public at large. Through construction of the Brain Performance Institute, CBH sought to extend the reach and applications of its research, providing solutions to the public to maximize brain performance in health, injury, and disease.

The Supporting Organizations made a grant to help fund the construction of the Brain Performance Institute and expand CBH's Warrior Initiative, which that focused on translating research into cognitive therapies for former military personnel. The Warrior Initiative was established to provide high performance brain training to current and former military service men and women and their families.

The goal of the Warrior Initiative program is to arm veteran and active-duty service members with the necessary tools to achieve successful, enriching, and fulfilling lives by proactively optimizing brain performance, building resilience in cognitive brain function, and reversing losses in cognitive capacity. The program was expanded in 2016 to support first responders, specifically focusing on local law enforcement.

The grant help create a space in the Brain Performance Institute building specifically for veterans, first responders, and their families, where these groups are able to come together in a safe, relaxing environment and get to know other members of service before and after training sessions.

_Issue Area:_ **Military, Veterans & First Responders**



018609

HCMLPHMIT00003772

Case 19-34054-sgj11     Doc 4255-74     Filed 06/20/25     Entered 06/20/25 21:39:29     Desc
Exhibit 74     Page 252 of 307
Case 19-34054-sgj11 Doc 2547-31 Filed 07/09/21     Entered 07/09/21 17:06:29     Page 15 o8
1f

G R A N T  H I G H L I G H T

# Friends of the Dallas Police

### About  Friends of the Dallas Police

The Friends of Dallas Police was founded in 1982 to recognize the commitment that the employees of the Dallas Police Department make to better the city and its residents' quality of life. The organization's mission is to raise and provide funds to be used to host a major awards banquet each year honoring Dallas Police Department personnel for outstanding performance in the line of duty. Over the years, approximately 4,400 awards have been presented to officers and civilian staff, and more than $43,000 in educational scholarships have been awarded to their children.

### Helping Show Appreciation and Recognition to Local Law Enforcement: Grant Supporting the Annual Awards Program

The Supporting Organizations have provided grants to help the Friends of the Dallas Police show appreciation to the men and women of the Dallas Police Department who risk their lives every day to make Dallas a safer city. Our grants have helped fund the annual awards event hosted by the Friends of the Dallas Police, which honors and recognizes outstanding employees throughout the Dallas Police Department.

Through our grants, the Supporting Organizations have facilitated the production of the annual awards program, enabled sworn and non-sworn employees and their spouses to attend the event, and provided educational sponsorships for children of police officers.

The Supporting Organizations have also drawn on its philanthropic network to provide gifts to award recipients and their families, including tickets to visit organizations like the Dallas Zoo, George W. Bush Presidential Center, and Perot Museum.

Issue Area: **Military, Veterans & First Responders**



018610

HCMLPHMIT00003773

GRANT HIGHLIGHT

# Snowball Express

## About Snowball Express

Snowball Express (now part of the Gary Sinise Foundation) serves the children of fallen military heroes. By providing events and other experiences in a stress-free environment, the organization is creating a community to learn, grow, and make lasting memories with new friends.

The organization hosts an annual five-day experience for 1,750+ children of the fallen and their surviving parent or guardian. As a therapeutic retreat with a blend of fun and inspiring programs, these families can lean on their peers for support. The organization also hosts community-driven events for these families all year long. From baseball games, to arts and educational opportunities, to camping trips, the events strengthen the local networks of Gold Star families, helping children and surviving spouses to build bonds with the only people who can truly understand their loss: each other.

## Supporting Families of Fallen Service Members: Grant to Support Programming for Gold Star Children

In 2014, Myles Eckert, the nine-year-old son of U.S. Army Sergeant was killed in Iraq on active duty, gave a $20 bill that he found to a veteran in a pay-it-forward act of kindness towards our military. Myles's story was shared widely online, and the gift quickly received national attention.

In honor of Myles Eckert's gift, the Supporting Organizations issued a challenge grant to Snowball Express to support the organization's programming for children that have lost one or both parents during active service.

The grant inspired significant giving from individuals and organizations around the world, enabling Snowball Express to expand its services for Gold Star children and their families.

Snowball Express used the proceeds from the challenge grant to provide services to over 8,000 Gold Star children in 2014—almost 6,000 more than the year before and a new record for the organization.

Issue Area: **Military, Veterans & First Responders**



018611

HCMLPHMIT00003774

GRANT HIGHLIGHT

# Dallas Children's Advocacy Center

### About Dallas Children's Advocacy Center

Dallas Children's Advocacy Center ("DCAC") is the only agency of its kind in Dallas County, working in agreement with public and private agencies to investigate, prosecute, and provide healing services for child abuse cases in Dallas County. DCAC reduces the re-victimization of the child, removes barriers to investigation and treatment, and enhances criminal prosecution with its distinctive multidisciplinary approach to these complex and severe cases.

**Fostering Crucial Collaboration: Grant to Support DCAC's Operations and Strengthen Collaboration Among Agencies Involved in Child Abuse Cases**

The Supporting Organizations have been a longtime partner of the Dallas Children's Advocacy Center ("DCAC"), issuing annual grants that provide funding for a range of operating costs. The grants help DCAC serve over 8,000 children (and their non-offending family members) each year who were sexually abused, severely physically abused, or who had witnessed a violent crime. DCAC's average client is a 9-year-old girl, sexually abused by someone she knows and trusts.

The grants also support DCAC in its efforts to foster crucial collaboration across government agencies and other organizations involved in child abuse cases. The DCAC building houses the Child Abuse Unit of the Dallas Police Department, six units of CPS, and a Dallas County Assistant District Attorney. Having all of these professionals under one roof drives collaboration and communication in the very sensitive cases that DCAC coordinates.

Not only have the Supporting Organizations been a long-time financial supporter of DCAC, we have also provided support in other ways, leveraging connections with our network of nonprofit partners. Most recently, we worked with the Dallas Zoo to provide animal encounter demonstrations during DCAC's summer camps, which serve as a way to deliver ongoing support to—and help build a community for—children who have experienced trauma.

Issue Area: **Youth & Family**



018612

HCMLPHMIT00003775

GRANT HIGHLIGHT

# The Family Place

### About The Family Place

The Family Place was founded in 1978 and has grown to become the largest family violence prevention agency in North Texas, providing shelter and assistance to victims across the region along with counseling and education. Since its founding, the organization has served over 839,000 clients through counseling, shelter, and hotline responses.

In 2019, The Family Place served nearly 12,000 clients, providing over 62,000 days of emergency shelter, over 36,000 days of transitional housing, and over 18,000 hours of counseling to nonresidential clients, and over 8,000 hours of counseling to batterers. All services are in Spanish and in English.

### Providing Support for Victims of Family Violence Across North Texas

The Family Place empowers victims of family violence by providing safe housing, counseling, and skills that create independence while building community engagement and advocating for social change to stop family violence.

While The Family Place supports clients in several different ways, its Residential Services, which provide safe shelter for families affected by violence, are one of crucial components of its work. These services include the Emergency Shelter Services, which provide immediate shelter for families escaping abuse, and the Supportive Living Program, which provides long-term housing for families as they rebuild their lives. Not only does the organization provide necessities like food, clothing, and transportation, but it also offers childcare, legal services, counseling, and case management.

As The Family Place expanded, its Residential Services were constrained by the capacity of its emergency shelters, and at many times the organization had to house clients in hotels and other temporary housing in order to meet demand.

In 2016, the Supporting Organizations issued a challenge grant to help The Family Place build a new shelter facility to expand its Residential Services. The new facility provides space and support services for over 2,000 victims per year. It also includes onsite Medical and Dental Clinics and even an Animal Kennel so families can bring their beloved pets with them to safety. The shelter has been operating at full capacity since October 2017. With the new facility, The Family Place now has three emergency shelters, providing 177 shelter beds each night, and three counseling centers.

Issue Area: **Youth & Family**

018613
HCMLPHMIT00003776

# EXHIBIT 32

018614

HCMLPHMIT00003777



**the family place**
*Where family violence stops*

July 7, 2021

To Whom It May Concern:

I am pleased to write this letter outlining the relationship between The Family Place and the Highland Dallas Foundation. The Family Place empowers victims of family violence by providing safe housing, counseling and skills that create independence while building community engagement and advocating for social change to stop family violence. Our agency provides emergency shelter, individual and group counseling, case management, transitional housing as well as other essential services to help those seeking refuge from family violence. The Family Place provides free, comprehensive services in both Spanish and English that prevent violence and fully support women, children, and men on their path from fear to safety.

In 2020, The Family Place successfully navigated through COVID-19 and the barriers it presented, serving 11,933 unduplicated clients across our programs. Our emergency shelters served 678 women, 886 children and 58 men for 62,118 shelter nights. 98% of our shelter clients did not return to their abuser after exiting one of our shelters. In our counseling programs, we served 2,258 clients, an 11.5% increase over 2019. 98% of our counseling clients reported feeling safer after attending counseling at The Family Place. At our on-site medical and dental clinics, we treated 778 clients and referred 571 clients to more intensive medical and dental services.

The Highland Dallas Foundation has been a long-standing partner with The Family Place in providing services to domestic violence clients. In 2016, The Family Place launched a 5-year, $16.5 million dollar capital campaign to build a new facility specifically designed to provide all necessary services for victims seeking shelter and counseling. The Family Place successfully reached our capital campaign goal due in large part to the commitment of a $1 million matching grant by the Highland Dallas Foundation. In December 2016, the Highland Dallas Foundation donated $13,950 for Christmas gifts for our clients. In 2017, when the Highland Hippo Hut was opened at the Dallas Zoo, the Highland Dallas Foundation generously invited our shelter clients to a special Mother's Day luncheon.

The collaboration between the Highland Dallas Foundation and The Family Place has been instrumental in providing community exposure and awareness of domestic violence in our community as well as providing essential services to family violence victims. With our new facility, completed in 2017, The Family Place has been able to expand programs and execute on the long-range plans developed for these programs. For victims of family violence, The Family Place is the Dallas area's leading organization delivering proven programs that address emotional and physical abuse and incest. Without the ongoing support of the Highland Dallas Foundation, The Family Place would not be able to successfully serve our domestic violence clients who are in desperate need of support.

Sincerely,

Paige Flink

Paige Flink
CEO, The Family Place

*P.O Box 7999*
*Dallas, Texas 75209*
*214 559 2170*
*fax 214 443 7797*
*www.familyplace.org*

BOARD OF DIRECTORS
*PRESIDENT*
Harold Ginsburg
*TREASURER*
Wes McCown
*SECRETARY*
Thomas McCollum
*V.P. COMMUNITY ENGAGEMENT*
Clarisa Lindenmeyer
*V.P. DEVELOPMENT*
Lindsay Jacaman
*V.P. FACILITIES*
Jim Buddrus
*V.P. HUMAN CAPITAL*
David Oliver
*V.P. LONG RANGE PLANNING*
Radhika Zaveri
*V.P. NOMINATIONS*
Belinda Griffin
*V.P. PUBLIC AFFAIRS*
Delia Jasso
*GENERAL COUNSEL*
Kristin Bauer
Eric White

Sandra Aguirre
Lisa Armstrong
Mandy Austin
Steven Bauer
Melinda Bell
Laurie Berger
Nancy Bierman
Julie Bosché
Eric Chandler
Kerry Cole
Nicole Collins
Barbara Durham
Monika Flood
Theresa Flores
Beth Garvey
Lauran Goldberg
Carlos Gonzalez-Jaime
Michelle Goolsby
Rhonda Green
Tasha Grinnell
Johnese Howard
Stacee Johnson-Williams
Linda Knox
Holly Krug
Emily Maduro
Margo McClinton Stoglin
Mary McNulty
Sam Megally
Aaliyah Miranda
Mike Montgomery
Tiffany Moon
Elizabeth Saab
Nathaniel St. Clair
Kristen Sanger
Ryan Scripps
Carol Seay
Lisa Singleton
Ghousuddin Syed
Jill Tananbaum
Samantha Wortley
Ana Yoder

*Chief Executive Officer*
Paige Flink



018615

HCMLPHMIT00003778

# EXHIBIT 33

018616

HCMLPHMIT00003779

## Cristo Rey Dallas Update

Cristo Rey Dallas (CRD) is incredibly grateful for the gifts from Highland Dallas Foundation, Inc. CRD is excited to have the Highland Capital Academic Center and the NexBank Gymnasium in the Innovation Center on our campus. These naming rights were given as the result of a donation that Highland Dallas Foundation, Inc.made to our Innovation Center Capital Campaign. These facilities truly impact our students and allow us to provide our services to our population of 465 students.

CRD also receives support from Highland Dallas Foundation, Inc. through the Corporate Work Study Program (CWSP). Cornerstone Healthcare and NexBank both currently have one job team (a team of 4 students) that work in their offices. In the upcoming year, NexBank will host two teams of students. One team is funded through the gift from Highland Dallas Foundation, Inc. and the other is supported by NexBank. The work study program allows students to earn about 60% percent of their tuition to CRD, and the involvement in the work study program makes such a difference in the lives of the 8 students that work in those businesses.

Finally, CRD is incredibly thankful for the remote workspace at Cityplace Tower. CWSP has been greatly affected by COVID-19. This year, many partners were unable to host students in their offices. The space at Cityplace Tower allows 30 students to work remotely for their job partners each day which means that about 120 students benefit from the offices each week. Without this space, CRD would not have the capacity to allow these students to work remotely.

The support of Highland Dallas Foundation, Inc. has meant so much to us at CRD. We are so appreciative, and we look forward to continuing our partnership for many years.

018617

HCMLPHMIT00003780

# EXHIBIT 34

018618
HCMLPHMIT00003781



**Dallas Children's Advocacy Center (DCAC)**
**Partnership with Highland Dallas Foundation, Inc.**

**Organization Mission and History**
The mission of DCAC is *to improve the lives of abused children in Dallas County and to provide national leadership on child abuse issues*. Since opening its doors in 1991, DCAC has served more than 60,000 of the most severely abused children and their non-offending family members in Dallas County. In FY2021, DCAC will serve 8,400 children and their non-offending family members.

DCAC was created to coordinate the investigation of child abuse cases that rise to the criminal level in a seamless, collaborative process. We facilitate a coordinated approach to child abuse cases that results in more successful investigation and prosecution outcomes and provides a less traumatic response to child victims and families. DCAC partners with 39 organizations to form a Multidisciplinary Team (MDT) that includes medical, legal, and law enforcement and is designed to ensure child clients receive the appropriate services for healing and safety.

In 2015 DCAC's Partner Relations Team began reading all reports of abuse and neglect made to DFPS in Dallas County as part of a state-wide effort to ensure every child who needs services from a children's advocacy center (CAC) gets them. In FY2019 we read 28,131 reports of child abuse for Dallas County. At the beginning of March 2020 before COVID-19 safety measures were implemented, we had experienced a 15% increase in the number of cases read. While case reports went down during quarantine, we have projected and experienced a dramatic increase in cases; at the end of February 2021, we had experienced a 35% increase in cases read year-over-year.

In addition to supportive services provided by the MDT, DCAC also provides the following Core Programs at no cost to our clients. Please note, for the second half of FY2020, DCAC provided therapy and family advocacy services via a HIPPA-approved telehealth platform, Doxy.me. Forensic interviews were always conducted on-site during quarantine.  Below you will find details and outcomes for FY 2020.

***Forensic Interview Program***
Trained DCAC forensic interviewers conduct interviews of children, both as a first step in the child's healing process and as a vital component of the investigation and prosecution of alleged perpetrators. The result is a legally defensible investigative interview of each alleged child victim. During FY2020, DCAC conducted 1,921 forensic interviews.

***Family Advocacy Program***
The Family Advocacy Team is committed to helping each family navigate the complex process of investigation, prosecution and healing after a child makes an outcry of abuse. The team helps the family learn about their rights and resources available to them during crisis as well as provides tangible, critical needs items like clothing, toiletries, and financial assistance on an as-needed basis. During FY 2020, the Family Advocacy Program supported 7,431 children and their non-offending family members.

***Evidence-Based Therapy Program***

018619

HCMLPHMIT00003782



The Evidence-Based Therapy Program provides clients and their non-offending caregivers with cutting-edge, no-cost therapeutic services. Treatment is informed by an initial assessment to enhance engagement between families and therapists toward the recovery of children. When clients are assessed at the end of treatment, over 70% report a reduction in trauma symptoms. During FY 2020, the DCAC Therapy Program provided services to 2,498 clients.

### Education Program

DCAC has pioneered a comprehensive, multi-part training curriculum that provides holistic responses to Texas child abuse reporting laws. In the past year, 100,405 people were educated in our curriculum by means of in-person instruction or online learning. In addition to our cutting-edge curriculum, we also host a Lecture Series at the Center. Lecture Series topics are designed to provide continuing education for medical, legal, clinical, law enforcement and other children's advocacy professionals. Since the start of the pandemic, we moved all lecture series' online; we continue to provide this education virtually and as such have discovered we can reach even more professional.

### Partnership with Highland Dallas Foundation, Inc.

Since 2016, Highland Dallas Foundation, Inc. has supported DCAC through yearly, general operating investments towards our mission. We have received over $85,000 over the past five years through sponsorship of our Art for Advocacy event as well as from a golf tournament where DCAC was the dedicated beneficiary. This funding has been critical to the sustainability of our programs and each dollar allows us to serve our clients with transformative services at no cost to them. Alongside the financial commitment, Highland Dallas Foundation, Inc. has gone above and beyond in introducing us to additional community advocates who individually support our efforts as well. The ripple effect of our partnership with Highland Dallas Foundation, Inc. is invaluable and for that we are so grateful.

HCMLPHMIT00003783

# EXHIBIT 35

018621

HCMLPHMIT00003784

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **Cause No. _____** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P. , HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

---

## ORIGINAL COMPLAINT

---

### I.

### <u>INTRODUCTION</u>

This action arises out of the acts and omissions of Defendant Highland Capital Management, L.P. ("HCM"), which is the general manager of Highland HCF Advisor, Ltd. ("HCFA"), both of which are registered investment advisers under the Investment Advisers Act of 1940 (the "Advisers Act"),[1] and nominal Defendant Highland CLO Funding, Ltd. ("HCLOF") (HCM and HCFA each a "Defendant," or together, "Defendants"). The acts and omissions which have recently come to light reveal breaches of fiduciary duty, a pattern of violations of the Advisers Act's anti-fraud provisions, and concealed breaches of the HCLOF Company Agreement, among others, which have caused and/or likely will cause Plaintiffs damages.

---

[1] https://adviserinfo.sec.gov/firm/summary/110126

018622

HCMLPHMIT00003785

At all relevant times, HCM was headed by CEO and potential party James P. Seery ("Seery"). Seery negotiated a settlement with the several Habourvest[2] entities who owned 49.98% of HCLOF. The deal had HCM (or its designee) purchasing the Harbourvest membership interests in HCLOF for $22.5 million. Recent revelations, however, show that the sale was predicated upon a sales price that was vastly below the Net Asset Value ("NAV") of those interests. Upon information and belief, the NAV of HCLOF's assets had risen precipitously, but was not disclosed to Harbourvest nor to Plaintiffs.

Under the Advisers Act, Defendants have a non-waivable duty of loyalty and candor, which includes its duty not to inside trade with its own investors, *i.e.*, not to trade with an investor to which HCM and Seery had access to superior non-public information. Upon information and belief, HCM's internal compliance policies required by the Advisers Act would not generally have allowed a trade of this nature to go forward—meaning, the trade either was approved in spite of compliance rules preventing it, or the compliance protocols themselves were disabled or amended to a level that leaves Defendants HCM and HCLOF exposed to liability. Thus, Defendants have created an unacceptable perpetuation of exposure to liability.

Additionally, Defendants are liable for a pattern of conduct that gives rise to liability for their conduct of the enterprise consisting of HCM in relation to HCFA and HCLOF, through a pattern of concealment, misrepresentation, and violations of the securities rules. In the alternative, HCFA and HCM, are guilty of self-dealing, violations of the Advisers Act, and tortious interference by (a) not disclosing that Harbourvest had agreed to sell at a price well below the current NAV, and (b) diverting the Harbourvest opportunity to themselves.

---

[2] "Habourvest" refers to the collective of Harbourvest Dover Street IX Investment, L.P., Harbourvest 2017 Global AIF, L.P., Harbourvest 2017 lobal Fund, L.P., HV International VIII Secondary, L.P., and Harbourvest Skew Base AIF, L.P. Each was a member of Defendant Highland CLO Funding, Ltd.

018623

HCMLPHMIT00003786

For these reasons, judgment should be issued in Plaintiffs' favor.

## II.

## PARTIES

1.     Plaintiff CLO Holdco, Ltd. is a limited company incorporated under the laws of the Cayman Islands.

2.     Plaintiff Charitable DAF Fund, L.P., ("DAF") is a limited partnership formed under the laws of the Cayman Islands.

3.     Defendant Highland Capital Management, L.P. is a limited partnership with its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. It may be served at its principal place of business or through its principal officer, James P. Seery, Jr., or through the Texas Secretary of State, or through any other means authorized by federal or state law.

4.     Defendant Highland HCF Advisor, Ltd.  is a limited company incorporated under the laws of the Cayman Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201. It is a registered investment adviser ("RIA") subject to the laws and regulations of the Investment Advisers Act of 1940 (the "Adviser's Act"). It is a wholly-owned subsidiary of Highland Capital Management, L.P.

5.     Nominal Defendant Highland CLO Funding, Ltd. is a limited company incorporated under the laws of the Island of Guernsey. Its registered office is at First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey GY1 6HJ, Channel Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201.

6.     Potential party James P. Seery, Jr. ("Seery") is an officer and/or director and/or control person of Defendants Highland Capital Management, L.P., Highland CLO Funding, Ltd., and Highland HCF Advisor, Ltd., and is a citizen of and domiciled in Floral Park, New York.

018624

HCMLPHMIT00003787

## III.

## JURISDICTION AND VENUE

**7.** This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 as one or more rights and/or causes of action arise under the laws of the United States. This Court has supplemental subject matter jurisdiction over all other claims under 28 U.S.C. § 1367.

**8.** Personal jurisdiction is proper over the Defendants because they reside and/or have continual contacts with the state of Texas, having regularly submitted to jurisdiction here. Jurisdiction is also proper under 18 U.S.C. § 1965(d).

**9.** Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because one or more Defendants reside in this district and/or a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated in this district. Venue in this district is further provided under 18 U.S.C. § 1965(d).

## IV.

## RELEVANT BACKGROUND

### *HCLOF IS FORMED*

**10.** Plaintiff DAF is a charitable fund that helps several causes throughout the country, including providing funding for humanitarian issues (such as veteran's welfare associations and women's shelters), public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Its mission is critical.

**11.** Since 2012, DAF was advised by its registered investment adviser, Highland Capital Management, L.P., and its various subsidiaries, about where to invest. This relationship was governed by an Investment advisory Agreement.

---

018625

HCMLPHMIT00003788

12.     At one point in 2017, HCM advised DAF to acquire 143,454,001 shares of HCLOF, with HCFA (a subsidiary of HCM) serving as the portfolio manager. DAF did so via a holding entity, Plaintiff CLO Holdco, Ltd.

13.     On November 15, 2017, through a Subscription and Transfer Agreement, the DAF entered into an agreement with others to sell and transfer shares in HCLOF, wherein the DAF retained 49.02% in CLO Holdco.

14.     Pursuant to that agreement, Harbourvest acquired the following interests in the following entities:

Harbourvest Dover Street IX Investment, L.P., acquired 35.49%;

Harbourvest 2017 Global AIF, L.P., acquired 2.42%;

Harbourvest 2017 lobal Fund, L.P., acquired 4.85%;

HV International VIII Secondary, L.P., acquired 6.5%; and

Harbourvest Skew Base AIF, L.P., acquired 0.72%;

for a total of 49.98% (altogether, the "Harbourvest interests").

15.     On or about October 16, 2019, Highland Capital Management filed for Chapter 11 bankruptcy in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, in the case styled *In Re: Highland Capital Management, L.P., Debtor*, Cause No. 19-34054, (the "HCM Bankruptcy" and the Court is the "Bankruptcy Court").

<center>

**The Harbourvest Settlement with
Highland Capital Management in Bankruptcy**

</center>

16.     On April 8, 2020, Harbourvest submitted its proofs of claim in the HCM bankruptcy proceeding. Annexed to its proofs of claims was an explanation of the Proof of Claim and the basis therefor setting out various pre-petition allegations of wrongdoing by HCM. *See, e.g.,* Case No. 19-bk-34054, Doc. 1631-5.

018626

HCMLPHMIT00003789

17.    The debtor, HCM, made an omnibus response to the proofs of claims, stating they were duplicative of each other, overstated, late, and otherwise meritless.

18.    Harbourvest responded to the omnibus objections on September 11, 2020. *See* Cause No. 19-bk-34054, Doc. 1057.

19.    Harbourvest represented that it had invested in HCLOF, purchasing 49.98% of HCLOF's outstanding shares.

20.    Plaintiff CLO Holdco was and is also a 49.02% holder of HCLOF's member interests.

21.    In its Omnibus Response, Harbourvest explained that its claims included unliquidated legal claims for fraud, fraud in the inducement, RICO violations under 18 U.S.C. 1964, among others (the "Harbourvest Claims"). *See* Cause No. 19-bk-34054, Doc. 1057.

22.    The Harbourvest Claims centered on allegations that when Harbourvest was intending to invest in a pool of Collateralized Loan Obligations, or CLOs, that were then-managed by Acis Capital Management ("Acis"), a subsidiary of HCM, HCM failed to disclose key facts about ongoing litigation with a former employee, Josh Terry.

23.    Harbourvest contended that HCM never sufficiently disclosed the underlying facts about the litigation with Terry, and HCM's then-intended strategy to fight Terry caused HCLOF to incur around $15 million in legal fees and costs. It contended that had it known the nature of the lawsuit and how it would eventually turn out, Harbourvest never would have invested in HCLOF. *See* Cause No. 19-bk-34054, Doc. 1057.

24.    HCLOF's portfolio manager is HCFA. HCM is the parent of HCFA and is managed by its General Partner, Strand Management, who employs Seery and acts on behalf of HCM.

---

018627

HCMLPHMIT00003790

25.     Before acceding to the Harbourvest interests, HCM was a 0.6% holder of HCLOF interests.

26.     While even assuming Harbourvest's underlying claims were valid as far as the lost $15 million went, the true damage of the legal fees to Harbourvest would have been 49.98% of the HCLOF losses (i.e., less than $7.5 million). Harbourvest claimed that it had lost over $100 million in the HCLOF transaction due to fraud, which, after trebling under the racketeering statute, it claimed it was entitled to over $300 million in damages.

27.     In truth, as of September 2020, Harbourvest had indeed lost some $52 million due to the alleged diminishing value of the HCLOF assets (largely due to the underperformance of the Acis entities[3])—and the values were starting to recover.

28.     HCM denied the allegations in the Bankruptcy Court. Other than the claim for waste of corporate assets of $15 million, HCM at all times viewed the Harbourvest legal claims as being worth near zero and having no merit.

29.     On December 23, 2020, HCM moved the Court to approve a settlement between itself and Harbourvest. No discovery had taken place between the parties, and Plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (or even during its pendency) in order to investigate its rights.

30.     HCM set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal.

31.     On January 14, 2021, the Bankruptcy Court held an evidentiary hearing and approved the settlement in a bench ruling, overruling the objections to the settlement.

---

[3] Acis was being managed by Joshua Terry. JP Morgan had listed the four ACIS entities under his management as the four worst performers of the 1200 CLOs it evaluated.

---

Original Complaint                                                                    Page 7

018628

HCMLPHMIT00003791

32.    An integral part of the settlement was allowing $45 million in unsecured claims that, at the time of the agreement, were expected to net Harbourvest around 70 cents on the dollar. In other words, Harbourvest was expected to recover around $31,500,000 from the allowed claims.

33.    As part of the consideration for the $45 million in allowed claims, Harbourvest agreed to transfer all of its interests in HCLOF to HCM or its designee.

34.    HCM and Seery rationalized the settlement value by allocating $22.5 million of the net value of the $45 million in unsecured claims as consideration to purchase Harbourvest's interests in HCLOF, meaning, if 70% of the unsecured claims—i.e., $31.5 million—was realized, because $22.5 million of that would be allocated to the purchase price of the Harbourvest interests in HCLOF, the true "settlement" for Harbourvest's legal claims was closer to $9 million.

35.    Plaintiffs here are taking no position at this time about the propriety of settling the Harbourvest legal claims for $9 million. That is for another day.

36.    At the core of this lawsuit is the fact that HCM purchased the Harbourvest interests in HCLOF for $22.5 million knowing that they were worth far more than that.

37.    It has recently come to light that, upon information and belief, the Harbourvest interests, as of December 31, 2020, were worth in excess of $41,750,000, and they have continued to go up in value.

38.    On November 30, 2020, which was less than a month prior to the filing of the Motion to Approve the Settlement, the net asset value of those interests was over $34.5 million. Plaintiffs were never made aware of that.

39.    The change is due to how the net asset value, or NAV, was calculated. The means and methods for calculating the "net asset value" of the assets of HCLOF are subject to and

018629

HCMLPHMIT00003792

governed by the regulations passed by the SEC pursuant to the Adviser's Act, and by HCM's internal policies and procedures.

40.    Typically, the value of the securities reflected by a market price quote.

41.    However, the underlying securities in HCLOF are not liquid and had not been traded in a long while.

42.    There not having been any contemporaneous market quotations that could be used in good faith to set the marks[4] meant that other prescribed methods of assessing the value of the interests, such as the NAV, would have been the proper substitutes.

43.    Seery testified that the fair market value of the Harbourvest HCLOF interests was $22.5 million. Even allowing some leeway there, it was off the mark by a mile.

44.    Given the artifice described herein, Seery and the entity Defendants had to know that the representation of the fair market value was false. But it does not appear that they disclosed it to Harbourvest to whom they owed fiduciary duties as the RIA in charge of HCLOF, and they certainly did not disclose the truth to the Plaintiff.

45.    It is either the case that (i) Defendants conducted the proper analysis to obtain a current value of the assets but decided to use a far lower valuation in order to whitewash the settlement or enrich the bankruptcy estate; *or* (ii) Defendants never conducted the proper current valuation, and therefore baselessly represented what the current value of the assets was, despite knowingly having no reasonable basis for making such a claim.

46.    For years HCM had such internal procedures and compliance protocols. HCM was not allowed by its own compliance officers to trade with an investor where HCM had superior knowledge about the value of the assets, for example. While Plaintiff has no reason to believe that

---

[4] The term "mark" is shorthand for an estimated or calculated value for a non-publicly traded instrument.

018630

HCMLPHMIT00003793

those procedures were scrapped in recent months, it can only assume that they were either overridden improperly or circumvented wholesale.

47.     Upon finalizing the Harbourvest Settlement Agreement and making representations to the Bankruptcy Court to the Plaintiffs about the value of the Harbourvest Interests, Seery and HCM had a duty to use current values and not rely on old valuations of the assets or the HCLOF interests.

48.     Given Defendants' actual or constructive knowledge that they were purchasing Harbourvest's Interests in HCLOF for a less than 50% of what those interests were worth— Defendants owed Plaintiff a fiduciary duty not to purchase them for themselves.

49.     Defendants should have either had HCLOF repurchase the interests with cash, or offer those interests to Plaintiff and the other members *pro rata*, before HCM agreed to purchase them all lock, stock and barrel, for no up-front cash.

50.     Indeed, had Plaintiff been offered those interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the Harbourvest Settlement.

51.     That Defendants (and to perhaps a lesser extent, the Unsecured Creditors Committee (the "UCC")) agreed to pay $22.5 million for the HCLOF assets, where they had previously not consented to any such expenditure by the estate on behalf of HCLOF, strongly indicates their awareness that they were purchasing assets for far below market value.

52.     The above is the most reasonable and plausible explanation for why Defendants and the UCC forwent raising as much as $22.5 million in cash now in favor of hanging on to the HCLOF assets.

018631

HCMLPHMIT00003794

53.     Indeed, in January 2021 Seery threatened Ethen Powell that "[Judge Jernigan] is laughing at you" and "we are coming after you" in response to the latter's attempt to exercise his right as beneficial holder of the CLO, and pointing out a conflict of interest in Seery's plan to liquidate the funds.

54.     HCM's threat, made by Seery, is tantamount to not only a declaration that he intends to liquidate the funds regardless of whether the investors want to do so, and whether it is in their best interests, but also that HCM intends to leverage what it views as the Bankruptcy Court's sympathy to evade accountability.

## V.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### *Breaches of Fiduciary Duty*

55.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

56.     HCM is a registered investment advisor and acts on behalf of HCFA. Both are fiduciaries to Plaintiffs.

57.     The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers.[5]

---

[5] *See e.g, SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers."); *Santa Fe Indus, v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC v. Capital Gains*, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).

018632

HCMLPHMIT00003795

**58.** HCM and the DAF entered into an Amended and Restated Investment Advisory Agreement, executed between them on July 1, 2014 (the "RIA Agreement"). It renews annually and continued until the end of January 2021.

**59.** In addition to being the RIA to the DAF, HCM was appointed the DAF's attorney-in-fact for certain actions, such as "to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner." RIA Agreement ¶ 4.

**60.** The RIA Agreement further commits HCM to value financial assets "in accordance with the then current valuation policy of the Investment Advisor [HCM], a copy of which will provided to the General Partner upon request." RIA Agreement ¶ 5.

**61.** While HCM contracted for the recognition that it would be acting on behalf of others and could be in conflict with advice given the DAF, (RIA Agreement ¶ 12), nowhere did it purport to waive the fiduciary duties owed to the DAF not to trade as a principal in a manner that harmed the DAF.

**62.** HCFA owed a fiduciary duty to Holdco as an investor in HCLOF and to which HCFA was the portfolio manager. HCM owed a fiduciary duty to the DAF (and to Holdco as its subsidiary) pursuant to a written Advisory Agreement HCM and the DAF had where HCM agreed to provide sound investment advice and management functions.

**63.** As a registered investment adviser, HCM's fiduciary duty is broad and applies to the entire advisor-client relationship.

**64.** The core of the fiduciary duty is to act in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party.

018633
HCMLPHMIT00003796

65.     This is manifested in a duty of loyalty and a duty of utmost care. It also means that the RIA has to follow the terms of the company agreements and the regulations that apply to the investment vehicle.

66.     The fiduciary duty that HCM and Seery owed to Plaintiff is predicated on trust and confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the RIA from trading on material, non-public information. *See* 17 C.F.R. § 275.206(4)-7. That means that Plaintiff should be able to take Defendants at their word and not have to second guess or dig behind representations made by them.

67.     The simple thesis of this claim is that Defendants HCFA and HCM breached their fiduciary duties by (i) insider trading with Harbourvest and concealing the rising NAV of the underlying assets—i.e., trading with Harbourvest on superior, non-public information that was neither revealed to Harbourvest nor to Plaintiff; (ii) concealing the value of the Harbourvest Interests; and (iii) diverting the investment opportunity in the Harbourvest entities to HCM (or its designee) without offering it to or making it available to Plaintiff or the DAF.

68.     HCM, as part of its contractual advisory function with Plaintiffs, had expressly recommended the HCLOF investment to the DAF. Thus, diverting the opportunity for returns on its investment was an additional breach of fiduciary duty.

69.     This violated a multitude of regulations under 27 C.F.R. part 275, in addition to Rules 10b-5 and 10b5-1. 17 CFR 240.10b5-1 ("Rule 10b5-1") explains that one who trades while possessing non-public information is liable for insider trading, and they do not necessarily have to have *used* the specific inside information.

70.     It also violated HCM's own internal policies and procedures.

018634

HCMLPHMIT00003797

71.     Also, the regulations impose obligations on Defendants to calculate a *current*
valuation when communicating with an investor, such as what may or may not be taken into
account, and what cannot pass muster as a current valuation. Upon information and belief, these
regulations were not followed by the Defendants.

72.     HCM's internal policies and procedures, which it promised to abide by both in the
RIA Agreement and in its Form ADV SEC filing, provided for the means of properly calculating
the value of the assets.

73.     HCM either did not follow these policies, changed them to be out of compliance
both with the Adviser Act regulations and its Form ADV representations, and/or simply
misrepresented or concealed their results.

74.     In so doing, because the fiduciary duty owed to Plaintiff is a broad one, and because
Defendants' malfeasance directly implicates its relationship with Plaintiff, Defendants have
breached the Advisers Act's fiduciary duties owed to Plaintiff as part of their fiduciary
relationship.[6]

75.     At no time between agreeing with Harbourvest to the purchase of its interests and
the court approval did Defendants disclose to either Harbourvest or to Plaintiff (and the
Bankruptcy Court for that matter) that the purchase was at below 50% the current net asset value
as well, and when they failed to offer Plaintiff (and the other members of HCLOF) their right to
purchase the interests pro rata at such advantageous valuations. Plaintiff's lost opportunity to

---

[6] *See* Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) ("[O]nce an investment
Advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary
relationship by defrauding his client in any investment transaction connected to the Advisory
relationship."); *see also SEC v. Lauer*, No. 03-80612-CIV, 2008 U.S. Dist. LEXIS 73026, at 90 (S.D. Fla.
Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206
of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection
with the purchase or sale of any security.'").

018635
HCMLPHMIT00003798

purchase has harmed Plaintiff. Plaintiff had been led to believe by the Defendants that the value of what was being purchased in the Harbourvest settlement by HCM (or its designee) was at fair market value. This representation, repeated again in the Bankruptcy Court during the Harbourvest confirmation, implicitly suggested that a proper current valuation had been performed.

76.      Defendant's principal, Seery, testified in January 2021 that the then-current fair market value of Habourvests's 49.98% interest in HCLOF was worth around $22.5 million. But by then, it was worth almost double that amount and has continued to appreciate. Seery knew or should have known that fact because the value of some of the HCLOF assets had increased, and he had a duty to know the current value. His lack of actual knowledge, while potentially not overtly fraudulent, would nonetheless amount to a breach of fiduciary duty for acting without proper diligence and information that was plainly available.

77.      Furthermore, HCLOF holds equity in MGM Studios and debt in CCS Medical via various CLO positions. But Seery, in his role as CEO of HCM, was made aware during an advisors meeting in December 2020 that Highland would have to restrict its trading in MGM because of its insider status due to activities that were likely to apply upward pressure on MGM's share price.

78.      Furthermore, Seery controlled the Board of CCS Medical. And in or around October 2020, Seery was advocating an equatization that would have increased the value of the CCS securities by 25%, which was not reflected in the HCM report of the NAV of HCLOF's holdings.

79.      Seery's knowledge is imputed to HCM.

80.      Moreover, it is a breach of fiduciary duty to commit corporate waste, which is effectively what disposing of the HCLOF assets would constitute in a rising market, where there

---

018636

HCMLPHMIT00003799

is no demand for disposition by the investors (save for HCM, whose proper 0.6% interest could easily be sold to the DAF at fair value).

81. As holder of 0.6% of the HCLOF interests, and now assignee of the 49.98% Harbourvest Interests), HCM has essentially committed self-dealing by threatening to liquidate HCLOF now that it may be compelled to do so under its proposed liquidation plan, which perhaps inures to the short term goals of HCM but to the pecuniary detriment of the other holders of HCLOF whose upside will be prematurely truncated.

82. Seery and HCM should not be allowed to benefit from the breach of their fiduciary duties because doing so would also cause Plaintiffs irreparable harm. The means and methods of disposal would likely render the full scope of damages to the DAF not susceptible to specific calculation—particularly as they would relate to calculating the lost opportunity cost. Seery and HCM likely do not have the assets to pay a judgment to Plaintiffs that would be rendered, simply taking the lost appreciation of the HCLOF assets.

83. Defendants are thus liable for diverting a corporate opportunity or asset that would or should have been offered to Plaintiff and the other investors. Because federal law makes the duties invoked herein unwaivable, it is preposterous that HCM, as a 0.6% holder of HCLOF, deemed itself entitled to the all of the value and optionality of the below-market Harbourvest purchase.

84. Defendants cannot rely on any contractual provision that purports to waive this violation. Nothing in any agreement purports to permit, authorize or otherwise sanitize Defendants' self-dealing. All such provisions are void.

85. In the fourth quarter of 2020, Seery and HCM notified staff that they would be terminated on December 31, 2020. That termination was postponed to February 28, 2021.

018637

HCMLPHMIT00003800

Purchasing the Harbourvest assets without staffing necessary to be a functioning Registered Investment Advisor was a strategic reversal from prior filings that outlined canceling the CLO management contracts and allowing investors to replace Highland as manager.

86. Seery's compensation agreement with the UCC incentivizes him to expedite recoveries and to prevent transparency regarding the Harbourvest settlement.

87. What is more, Seery had previously testified that the management contracts for the funds—HCLOF included—were unprofitable, and that he intended to transfer them. But he later rejected offers to purchase those management contracts for fair value and instead decided to continue to manage the funds—which is what apparently gave rise to the Harbourvest Settlement, among others. He simultaneously rejected an offer for the Harbourvest assets of $24 million, stating that they were worth much more than that.

88. Because of Defendants' malfeasance, Plaintiffs have lost over $25 million in damages—a number that continues to rise—and the Defendants should not be able to obtain a windfall.

89. For the same reason, Defendants' malfeasance has also exposed HCLOF to a massive liability from Harbourvest since the assignment of those interests is now one that is likely unenforceable under the Advisers Act, Section 47(b), if there was unequal information.

90. HCM and HCFA are liable as principals for breach of fiduciary duty, as are the principals and compliance staff of each entity.

91. Plaintiffs seek disgorgement, damages, exemplary damages, attorneys' fees and costs. To the extent the Court determines that this claim had to have been brought derivatively on behalf of HCLOF, then Plaintiffs represent that any pre-suit demand would have been futile since asking HCM to bring suit against its principal, Seery, would have been futile.

018638

HCMLPHMIT00003801

**SECOND CAUSE OF ACTION**
*Breach of HCLOF Company Agreement*
**(By Holdco against HCLOF, HCM and HCFA)**

92.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

93.     On November 15, 2017, the members of HCLOF, along with HCLOF and HCFA, executed the *Members Agreement Relating to the Company* (the "Company Agreement").

94.     The Company Agreement governs the rights and duties of the members of HCLOF.

95.     Section 6.2 of HCLOF Company Agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not to an affiliate of the selling member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

96.     Here, despite the fact that Harbourvest agreed to sell its interests in HCLOF for $22.5 million when they were worth more than double that, Defendants did not offer Plaintiff the chance to buy its pro rata share of those interests at the same agreed price of $22.5 million (adjusted pro rata).

97.     The transfer and sale of the interests to HCM were accomplished as part of the Harbourvest Settlement which was approved by the Bankruptcy Court.

98.     Plaintiff was not informed of the fact that Harbourvest had offered its shares to Defendant HCM for $22.5 million—which was under 50% of their true value.

99.     Plaintiff was not offered the right to purchase its pro rata share of the Harbourvest interests prior to the agreement being struck or prior to court approval being sought.

---

018639

HCMLPHMIT00003802

100.    Had Plaintiff been allowed to do so, it would have obtained the interests with a net

equity value over their purchase price worth in excess of $20 million.

101.    No discovery or opportunity to investigate was afforded Plaintiff prior to lodging

an objection in the Bankruptcy Court.

102.    Plaintiff is entitled to specific performance or, alternatively, disgorgement,

constructive trust, damages, attorneys' fees and costs.

<div align="center">

**THIRD CAUSE OF ACTION**
*Negligence*
**(By the DAF and CLO Holdco against HCM and HCFA)**

</div>

103.    Plaintiffs respectfully incorporate the foregoing factual averments as if fully set

forth herein, and further alleges the following:

104.    Plaintiffs incorporate the foregoing causes of action and note that all the foregoing

violations were breaches of the common law duty of care imposed by law on each of Seery, HCFA

and HCM.

105.    Each of these Defendants should have known that their actions were violations of

the Advisers Act, HCM's internal policies and procedures, the Company Agreement, or all three.

106.    Seery and HCM owed duties of care to Plaintiffs to follow HCM's internal policies

and procedures regarding both the propriety and means of trading with a customer [Harbourvest],

the propriety and means of trading as a principal in an account but in a manner adverse to another

customer [the DAF and Holdco], and the proper means of valuing the CLOs and other assets held

by HCLOF.

107.    It would be foreseeable that failing to disclose the current value of the assets in the

HCLOF would impact Plaintiffs negatively in a variety of ways.

---

018640

HCMLPHMIT00003803

108.    It would be reasonably foreseeable that failing to correctly and accurately calculate the current net asset value of the market value of the interests would cause Plaintiffs to value the Harbourvest Interests differently.

109.    It would be reasonably foreseeable that referring to old and antiquated market quotations and/or valuations of the HCLOF assets or interests would result in a mis-valuation of HCLOF and, therefore, a mis-valuation of the Harbourvest Interests.

110.    Likewise, it would have been foreseeable that Plaintiff's failure to give Plaintiff the opportunity to purchase the Harbourvest shares at a $22.5 million valuation would cause Plaintiff damages. Defendants knew that the value of those assets was rising. They further knew or should have known that whereas those assets were sold to HCM for an allowance of claims to be funded in the future, selling them to Plaintiff would have provided the estate with cash funds.

111.    Defendants' negligence foreseeably and directly caused Plaintiff harm.

112.    Plaintiff is thus entitled to damages.

### FOURTH CAUSE OF ACTION
### *Racketeering Influenced Corrupt Organizations Act*
### (CLO Holdco and DAF against HCM)

113.    Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

114.    Defendants are liable for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, for the conduct of an enterprise through a pattern of racketeering activity.

115.    HCLOF constitutes an enterprise under the RICO Act. Additionally, or in the alternative, HCM, HCLA, and HCLOF constituted an association-in-fact enterprise. The purpose of the association-in-fact was the perpetuation of Seery's position at HCM and using the

---

018641
HCMLPHMIT00003804

Harbourvest settlement as a vehicle to enrich persons other than the HCLOF investors, including Holdco and the DAF, and the perpetuation of HCM's holdings in collateralized loan obligations owned by HCLOF, while attempting to deny Plaintiffs the benefit of its rights of ownership.

116.     The association-in-fact was bound by informal and formal connections for years prior to the elicit purpose, and then changed when HCM joined it in order to achieve the association's illicit purpose. For example, HCM is the parent and control person over HCFA, which is the portfolio manager of HCLOF pursuant to a contractual agreement—both are registered investment advisors and provide advisory and management services to HCLOF.

117.     Defendants injured Plaintiffs through their continuous course of conduct of the HCM-HCLA-HCLOF association-in-fact enterprise. HCM's actions (performed through Seery and others) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D).

118.     HCM operated in such a way as to violate insider trading rules and regulations when it traded with Harbourvest while it had material, non-public information that it had not supplied to Harbourvest or to Plaintiffs.

119.     In or about November 2020, HCM and Harbourvest entered into discussions about settling the Harbourvest Claims. Seery's conduct of HCLOF and HCLA on behalf of HCM through the interstate mails and/or wires caused HCM to agree to the purchase of Harbourvest's interests in HCLOF.

120.     On or about each of September 30, 2020, through December 31, 2020, Seery, through his conduct of the enterprise, utilized the interstate wires and/or mails to obtain or arrive at valuations of the HCLOF interests. Seery's conduct of the enterprise caused them to cease

018642

HCMLPHMIT00003805

sending the valuation reports to Plaintiffs, which eventually allowed Plaintiffs to be misled into believing that Seery had properly valued the interests.

    **121.**    On or about September 30, 2020, Seery transmitted or caused to be transmitted though the interstate wires information to HCLOF investors from HCM (via HCFA), including Harbourvest, regarding the value of HCLOF interests and underlying assets.

    **122.**    Additionally, Seery operated HCM in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations on or about December 23, 2020, and then further transmitted verbal representations of the current market value (the vastly understated one) on January 14, 2021, during live testimony.

    **123.**    However, Harbourvest was denied the full picture and the true value of the underlying portfolio. At the end of October and November of 2020, HCM had updated the net asset values of the HCLOF portfolio. According to sources at HCM at the time, the HCLOF assets were worth north of $72,969,492 as of November 30, 2020. Harbourvest's share of that would have been $36,484,746.

    **124.**    The HCLOF net asset value had reached $86,440,024 as of December 31, 2021, which means that by the time Seery was testifying in the Bankruptcy Court on January 14, 2021, the fair market value of the Harbourvest Assets was $22.5 million, when it was actually closer to $43,202,724. Seery, speaking on behalf of HCM, knew of the distinction in value.

    **125.**    On January 14, 2021, Seery also testified that he (implying HCM, HCLA and HCLOF) had valued the Harbourvest Assets at their current valuation and at fair market value. This was not true because the valuation that was used and testified to was ancient. The ostensible purpose of this concealment was to induce Plaintiff and other interest holdings to take no action.

---

018643

HCMLPHMIT00003806

126. In supporting HCM's motion to the Bankruptcy Court to approve the Harbourvest Settlement, Seery omitted the fact that HCM was purchasing the interests at a massive discount, which would violate the letter and spirit of the Adviser's Act.

127. Seery was informed in late December 2020 at an in-person meeting in Dallas to which Seery had to fly that HCLOF and HCM had to suspend trading in MGM Studios' securities because Seery had learned from James Dondero, who was on the Board of MGM, of a potential purchase of the company. The news of the MGM purchase should have caused Seery to revalue the HCLOF investment in MGM.

128. In or around October 2020, Seery (who controls the Board of CSS Medical) was pursuing "equalization" of CSS Medical's debt, which would have increased the value of certain securities by 25%. In several communications through the U.S. interstate wires and/or mails, and with Plaintiffs, and the several communications with Harbourvest during the negotiations of the settlement, Seery failed to disclose these changes which were responsible in part for the ever-growing value of the HCLOF CLO portfolio.

129. Seery was at all relevant times operating as an agent of HCM.

130. This series of related violations of the wire fraud, mail fraud, and securities fraud laws, in connection with the HCM bankruptcy, constitute a continuing pattern and practice of racketeering for the purpose of winning a windfall for HCM and himself--a nearly $30,000,000 payday under the confirmation agreement.

131. The federal RICO statute makes it actionable for one's conduct of an enterprise to include "fraud in connection with a [bankruptcy case]". The Advisers' Act antifraud provisions require full transparency and accountability to an advisers' investors and clients and does not require a showing of reliance or materiality. The wire fraud provision likewise is violated when,

---

018644
HCMLPHMIT00003807

as here, the interstate wires are used as part of a "scheme or artifice … for obtaining money or property by means of false … pretenses, [or] representations[.]"

132.     Accordingly, because Defendants' conduct violated the wire fraud and mail fraud laws, and the Advisers' Act antifraud provisions, and their acts and omissions were in connection with the HCM Bankruptcy proceedings under Title 11, they are sufficient to bring such conduct within the purview of the RICO civil action provisions, 18 U.S.C. § 1964.

133.     Plaintiffs are thus entitled to damages, treble damages, attorneys' fees and costs of suit, in addition to all other injunctive or equitable relief to which they are justly entitled.

<div align="center">

**FIFTH CAUSE OF ACTION**
***Tortious Interference***
**(CLO Holdco against HCM)**

</div>

134.     Plaintiff respectfully incorporates the foregoing factual averments as if fully set forth herein and further alleges the following:

135.     At all relevant times, HCM owned a 0.6% interest in HCLOF.

136.     At all relevant times, Seery and HCM knew that Plaintiff had specific rights in HCLOF under the Company Agreement, § 6.2.

137.     Section 6.2 of HCLOF Company agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not an affiliate of the member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

138.     HCM, through Seery, tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, diverting the Harbourvest Interests in HCLOF to HCM without giving HCLOF or Plaintiff the option to purchase those assets at the same favorable price that HCM obtained them.

---

018645
HCMLPHMIT00003808

139.     HCM and Seery tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, misrepresenting the fair market value as $22.5 million and concealing the current value of those interests.

140.     But for HCM and Seery's tortious interference, Plaintiff would have been able to acquire the Harbourvest Interests at a highly favorable price. HCM and Seery's knowledge of the rights and intentional interference with these rights has caused damage to Plaintiff CLO Holdco.

141.     Plaintiff is therefore entitled to damages from HCM and Seery, as well as exemplary damages.

## VI.

## **JURY DEMAND**

142.     Plaintiff demands trial by jury on all claims so triable.

## VII.

## **PRAYER FOR RELIEF**

143.     Wherefore, for the foregoing reasons, Plaintiffs respectfully pray that the Court enter judgment in its favor and against Defendants, jointly and severally, for:

    a.  Actual damages;

    b.  Disgorgement;

    c.  Treble damages;

    d.  Exemplary and punitive damages;

    e.  Attorneys' fees and costs as allowed by common law, statute or contract;

    f.  A constructive trust to avoid dissipation of assets;

    g.  All such other relief to which Plaintiff is justly entitled.

018646

HCMLPHMIT00003809

Dated:  April 12, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

_/s/  Mazin A. Sbaiti_

**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
    jeb@sbaitilaw.com

**Counsel for Plaintiffs**

018647

HCMLPHMIT00003810

# EXHIBIT 36

018648

HCMLPHMIT00003811



Registration No.: **249232**

Client No.: **KY057017**

REGISTER OF DIRECTORS
FOR:
**CLO HOLDCO, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited** <br> Walkers Corporate Services Limited; Walker House; 87 Mary Street; George Town; Grand Cayman KY1-9005; Cayman Islands. | Director | 17 Dec 2010 | 17 Dec 2010 |
| **Grant James Scott** <br> Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 17 Dec 2010 | 24 Mar 2021 |
| **Mark E. Patrick** <br> . | Director | 24 Mar 2021 | 31 Mar 2021 |
| **Grant James Scott** <br> Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 31 Mar 2021 | 02 Apr 2021 |
| **Mark E. Patrick** <br> . | Director | 02 Apr 2021 | |
| **Paul Murphy** <br> Coutil Jacques; Les Gravees, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

018649

HCMLPHMIT00003812

# EXHIBIT 37

018650

HCMLPHMIT00003813



Registration No.: **263805**

Client No.: **KY059904**

REGISTER OF DIRECTORS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited** <br> Walkers Corporate Services Limited; Walker House; 87 Mary Street; George Town; Grand Cayman KY1-9005; Cayman Islands. | Director | 04 Nov 2011 | 04 Nov 2011 |
| **Grant James Scott** <br> Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 04 Nov 2011 | 25 Mar 2021 |
| **Patrick Mark** <br> Highland Capital Management, L.P.; 13455 Noel Rd, Suite 800; Dallas; TX 75240; USA. | Director | 25 Mar 2021 | |
| **Paul Murphy** <br> Coutil Jacques; Les Graves, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |
| | | | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

018651

HCMLPHMIT00003814

# EXHIBIT 38

018652

HCMLPHMIT00003815

Case 1:23-cv-05455-gjj-11 Doc 2654255-74d / FRBO9B120/25 re:Ent079B0B120726F2939:8ageDec:3
Exhibit 74    Page 295 of 307

 **intertrust** GROUP

Registration No.: **269389**
Date of Incorporation: **6 June 2012**
Client No.: **KY061847**

REGISTER OF MEMBERS
FOR:
**LIBERTY CLO HOLDCO, LTD.**

| | |
|---|---|
| Share Class: | **Ordinary** |
| Nominal Value: | **USD 0.01** |
| Voting Rights: | Yes |
| Conditional: | No |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **WNL Limited** Walkers Corporate Services Limited Walker House 87 Mary Street George Town Grand Cayman KY1-9005 Cayman Islands | 6 Jun 2012 | Allotment | 1.00 | 6 Jun 2012 : Subscriber's share issued by operation of law on registration | No Cert | | | |
| | | Transfer | (1.00) | 26 Jun 2012 : Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 26 Jun 2012 | | | | |
| | | | | | | **Nil** | **Nil** | 26 Jun 2012 |
| **CLO HOLDCO, LTD.** Intertrust Corporate Services (Cayman) Limited One Nexus Way Camana Bay Grand Cayman KY1-9005 Cayman Islands | 26 Jun 2012 | Transfer | 1.00 | 26 Jun 2012 : Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 26 Jun 2012 | No Cert | | | |
| | | | | | | **100** | **1.00** | |

Notes:

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 2]

018653
 HCMLPHMIT00003816



Registration No.: **269389**

Date of Incorporation: **6 June 2012**

Client No.: **KY061847**

REGISTER OF MEMBERS
FOR:
**LIBERTY CLO HOLDCO, LTD.**

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[2 / 2]

018654

HCMLPHMIT00003817

# EXHIBIT 39

018655
HCMLPHMIT00003818

Case 19-34054-sgj11 Doc 2654-259 Filed 07/08/21 Entered 07/08/21 20:26:29 Page 2 of 2
Exhibit 74   Page 298 of 307



Registration No.: **269389**

Client No.: **KY061847**

REGISTER OF DIRECTORS
FOR:
**LIBERTY CLO HOLDCO, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited**<br>Walkers Corporate Services Limited; Walker House; 87 Mary Street; George Town; Grand Cayman KY1-9005; Cayman Islands. | Director | 26 Jun 2012 | 26 Jun 2012 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 26 Jun 2012 | 24 Mar 2021 |
| **Mark E. Patrick**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 24 Mar 2021 | |
| **Paul Murphy**<br>Coutil Jacques; Les Gravees, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |
| | | | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

018656

HCMLPHMIT00003819

# EXHIBIT 40

HCMLPHMIT00003820



Registration No.: **293607**

Client No.: **KY073541**

REGISTER OF DIRECTORS
FOR:
**MGM STUDIOS HOLDCO, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited** <br> 190 Elgin Avenue; George Town; Grand Cayman KY1-9001; Cayman Islands. | Director | 12 Nov 2014 | 12 Nov 2014 |
| **Grant James Scott** <br> Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 12 Nov 2014 | 24 Mar 2021 |
| **Mark E. Patrick** <br> . | Director | 24 Mar 2021 | |
| **Paul Murphy** <br> Coutil Jacques; Les Gravees, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |
| | | | |

Date printed: 21 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

018658

HCMLPHMIT00003821

# EXHIBIT 41

HCMLPHMIT00003822



Registration No.: **293607**

Date of Incorporation: **12 November 2014**

Client No.: **KY073541**

REGISTER OF MEMBERS
FOR:
**MGM STUDIOS HOLDCO, LTD.**

| | |
|---|---|
| Share Class: | **Ordinary** |
| Nominal Value: | **USD 0.01** |
| Voting Rights: | Yes |
| Conditional: | No |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **WNL Limited** 190 Elgin Avenue George Town Grand Cayman KY1-9001 Cayman Islands | 12 Nov 2014 | Allotment | 1.00 | 12 Nov 2014: Subscriber's share issued by operation of law on registration | No Cert | | | |
| | | Transfer | (1.00) | 12 Nov 2014: Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 12 Nov 2014 | | | | |
| | | | | | | **Nil** | **Nil** | 12 Nov 2014 |
| **CLO HOLDCO, LTD.** Intertrust Corporate Services (Cayman) Limited One Nexus Way Camana Bay Grand Cayman KY1-9005 Cayman Islands | 12 Nov 2014 | Transfer | 1.00 | 12 Nov 2014: Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 12 Nov 2014 | No Cert | | | |
| | | | | | | **100** | **1.00** | |

Notes:

Date printed: 21 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

018660
HCMLPHMIT00003823


# EXHIBIT 42

018661
HCMLPHMIT00003824


GROUP

egi straorsn RNn.: **R249848**

Clsg rRNn.: **RKY058111**

eEGISTEeRFOFRDIeECTOeSRR
FOe:R
**HCT HOLDCO 2, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited**<br>] olWgatRCnapnaorgRSgaksvgtRjsc srgdnRj olWgaR nHtgmRu8RMoayRSraggmR Ggnai gRTn7 mRGao dRCoyc o Rv(9K-225mRCoyc o Rltlo dt.R | DsagvmaRR | h2RDgvR1292R | h2RDgvR1292R |
| **Grant James Scott**<br>; si 3lo dRCoprsolRMo oic g r,Rj.U.mR0h455RNnglRenod,RSHsrgRu22mRDollotnR Tgxot R85142mR0SP.R | DsagvmaRR | h2RDgvR1292R | 14RMoaR1219R |
| **Mark E. Patrick**<br>.R | DsagvmaRR | 14RMoaR1219R | |
| **Paul Murphy**<br>CnHrsRRovqHgtmR)gtRGaokggt,RSrRUgrgaRUnamRGHga tgymRGHga tgy,RC.I.R G(9F0e).R | DsagvmaRR | 11RPpaR1219R | |
| | | | |

DorgRpas rgd:R19RMoy,R1219

L9R[9/

INTEeTe0STRCOeUOePTERSEeAICESRCP(MPNY)IMITED

018662
HCMLPHMIT00003825

# EXHIBIT 43

018663

HCMLPHMIT00003826



Registration No.: **249848**

Date of Incorporation: **29 December 2010**

Client No.: **KY058111**

REGISTER OF MEMBERS
FOR:
**HCT HOLDCO 2, LTD.**

| | |
|---|---|
| Share Class: | **Ordinary** |
| Nominal Value: | **USD 1.00** |
| Voting Rights: | Yes |
| Conditional: | No |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **WNL Limited** Walkers Corporate Services Limited Walker House 87 Mary Street George Town Grand Cayman KY1-9005 Cayman Islands | 29 Dec 2010 | Allotment | 1.00 | 29 Dec 2010: Subscriber's share issued by operation of law on registration | No Cert | | | |
| | | Transfer | (1.00) | 30 Dec 2010: Transfer of 1.0 Ordinary share(s) from WNL Limited to Highland Capital Management Partners, Charitable Trust #2 pursuant to resolutions dated 30 Dec 2010 | | | | |
| | | | | | | **Nil** | **Nil** | 30 Dec 2010 |
| **Highland Capital Management Partners, Charitable Trust #2** 13455 Noel Road Suite 800 Dallas TX 75240 USA | 30 Dec 2010 | Transfer | 1.00 | 30 Dec 2010: Transfer of 1.0 Ordinary share(s) from WNL Limited to Highland Capital Management Partners, Charitable Trust #2 pursuant to resolutions dated 30 Dec 2010 | No Cert | | | |
| | | Transfer | (1.00) | 24 Oct 2011: Transfer of 1.0 Ordinary share(s) from Highland Capital Management Partners, Charitable Trust #2 to CLO HOLDCO, LTD. pursuant to resolutions dated Contribution | | | | |

Date printed: 21 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 2]

018664
HCMLPHMIT00003827



 **intertrust** GROUP

Registration No.: **249848**

Date of Incorporation: **29 December 2010**

Client No.: **KY058111**

REGISTER OF MEMBERS
FOR:
**HCT HOLDCO 2, LTD.**

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| | | | | Agreement | | | | |
| | | | | | | Nil | Nil | 24 Oct 2011 |
| **CLO HOLDCO, LTD.** Intertrust Corporate Services (Cayman) Limited One Nexus Way Camana Bay Grand Cayman KY1-9005 Cayman Islands | 24 Oct 2011 | Transfer | 1.00 | 24 Oct 2011: Transfer of 1.0 Ordinary share(s) from Highland Capital Management Partners, Charitable Trust #2 to CLO HOLDCO, LTD. pursuant to resolutions dated Contribution Agreement | No Cert | | | |
| | | | | | | 100 | 1.00 | |

Notes:

Date printed: 21 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[2 / 2]

018665

 HCMLPHMIT00003828

**EXHIBIT 75**

018666

HUNTER MOUNTAIN INVESTMENT TRUST

APPOINTMENT OF SUCCESSOR ADMINISTRATOR

August 12, 2022


Reference is made to that certain Trust Agreement of Hunter Mountain Investment Trust dated December 17, 2015 (the "Trust Agreement").  Capitalized terms not otherwise defined shall have the meaning given them in the Trust Agreement.  Pursuant to section 16 of the Trust Agreement, upon the occurrence of a Honis Trigger Event, the current Administrator is immediately removed.  Pursuant to that certain Membership Interest Purchase Agreement dated August 1, 2022 ("MIPA"), by and among John Honis (as "Seller"), Rand Advisors Holding Corp., a Delaware corporation (as "Buyer"), and CLO Holdco, Ltd., a Cayman limited company (as "Guarantor"), the Buyer acquired all the membership interests in, and therefore voting control of, Rand Advisors, LLC ("Rand").  A Honis Trigger Event under the Trust Agreement includes a change in ownership of Rand, such that John Honis fails to retain majority voting control.

Pursuant to section 17 of the Trust Agreement, upon the occurrence of a Honis Trigger Event and the immediate removal of John Honis as Administrator, Beacon Mountain, LLC ("Beacon") shall appoint a successor Administrator.  Accordingly, Beacon hereby appoints Mark E. Patrick as Administrator of Hunter Mountain Investment Trust, effective as of the date first written above.


BEACON MOUNTAIN, LLC, a Delaware limited liability company
By: Rand PE Fund I, L.P., its sole member
By: Rand PE Fund Management, LLC, its general partner
By: Rand Advisors Holding Corp., its sole member


By:_____
Name: Mark Patrick
Title: President

018667

HCMLPHMIT00003872

**EXHIBIT 76**

018668

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## RAND PE FUND MANAGEMENT, LLC

This Limited Liability Company Agreement (this "**Agreement**") of Rand PE Fund Management, LLC (the "**Company**") is entered into as of October 29, 2015 by and between the Company and John Honis (the "**Managing Member**", and collectively with any individuals and/or entities who subsequently become members of the Company in the future in accordance with the terms hereof, "**Members**"), pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del.C. § 18-101, et seq.), as amended from time to time (the "**Act**").

Section 1      **Name**.  The name of the limited liability company governed hereby is Rand PE Fund Management, LLC.

Section 2      **Certificates**.   The Managing Member, as an authorized person within the meaning of the Act, has executed, delivered and filed the certificate of formation of the Company (the "**Certificate of Formation**") with the Secretary of State of the State of Delaware on September 18, 2015. Upon the execution of this Agreement, the Managing Member shall thereafter be designated as an authorized person within the meaning of the Act.  Hereafter, the Managing Member shall have the power to execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

Section 3      **Purpose**.  The Company was formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in all lawful activities for which limited liability companies may be formed under the Act, including, without limitation of the foregoing, serving as the general partner of Rand PE Fund I, L.P., a Delaware limited partnership.

Section 4      **Powers**.  The Company shall have the power to do any and all acts reasonably necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purpose and business described herein and for the protection and benefit of the Company, and shall have, without limitation, any and all of the powers that may be exercised on behalf of the Company by the Managing Member pursuant to this Agreement.

Section 5      **Principal Business Office**.  The principal place of business and office of the Company shall be located at, and the Company's business shall be conducted from 87 Railroad Place, Suite 403, Saratoga Springs, NY 12866, or elsewhere as the Managing Member may from time to time determine.

Section 6      **Registered Office**.  As of the date hereof, the address of the registered office of the Company in the State of Delaware is:  c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware 19801.

Section 7      **Registered Agent**.  As of the date hereof, the name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is:  The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware 19801.

Section 8      **Members**.  The names, the nature of the interests held, the mailing addresses, the

018669

HCMLPHMIT00003873

initial capital contributions and the Percentage Interests (as defined below) of the Members are as set forth in **Schedule A** attached hereto.

Section 9 **Term**. The term of the Company commenced on the date of filing of the Certificate of Formation in accordance with the Act and shall continue until dissolution of the Company in accordance with **Section 23** of this Agreement.

Section 10 **Limited Liability**. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and none of the Members, any Officer (as hereinafter defined), employee or agent of the Company (including a person having more than one such capacity) shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of acting in such capacity.

Section 11 **Initial Capital Contributions**. Each Member is deemed admitted as a Member of the Company upon his, her or its execution and delivery of this Agreement. The initial capital contributions of the Members are set forth on **Schedule A** attached hereto.

Section 12 **Additional Capital Contributions**. The Members are not required to make any capital contributions to the Company beyond their initial capital contributions, unless otherwise determined by the Managing Member.

Section 13 **Capital Accounts**. Separate capital accounts shall be maintained for each Member on the books of the Company, which accounts shall set forth the capital of such Member in the Company. Each capital account shall be adjusted to reflect such Member's share of allocations and distributions as provided in **Sections 14 and 15** of this Agreement, and any additional capital contributions to the Company or withdrawals of capital from the Company. Such capital accounts shall further be adjusted to conform to the Treasury Regs. under Section 704(b) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**"), as interpreted in good faith by the Managing Member.

Section 14 **Allocations of Profit and Loss**. All items of income, gain, loss, deduction and credit shall be allocated among the Members in accordance with their percentage interests as set forth on **Schedule A** attached hereto ("**Percentage Interests**").

Section 15 **Distributions**. Distributions shall be made to the Members at such times and in such amounts as may be determined in the sole discretion of the Managing Member. Distributions shall be allocated among the Members in accordance with their Percentage Interests. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to the Members on account of their interest in the Company if such distribution would violate Section 18-607 of the Act or other applicable law.

Section 16 **Management**.

(a) The business and affairs of the Company shall be managed by the Managing Member. Subject to the express limitations contained in any provision of this Agreement, the Managing Member shall have complete and absolute control of the affairs and business of the Company, and the Managing Member shall possess all powers necessary, convenient or appropriate to carrying out the purposes and business of the Company, including, without limitation, doing all things and taking all actions necessary to carrying out the terms and provisions of this Agreement.

(b) Subject to the rights and powers of the Managing Member and the limitations

2

018670

HCMLPHMIT00003874

thereon contained herein, the Managing Member may delegate to any person any or all of his powers, rights and obligations under this Agreement, and the Managing Member may appoint, contract or otherwise deal with any person to perform any acts or services for the Company as the Managing Member may reasonably determine.

(c)     No Member (other than the Managing Member) shall participate in the management or control of the business of, or shall have any rights or powers with respect to, the Company except those expressly granted to it by, or pursuant to the terms of, this Agreement, or those conferred on it by law.

(d)     The Managing Member shall hold office until the earliest to occur of his death, disability or other inability to act in such capacity, at which time a successor Managing Member may be appointed by Members owning at least a majority of the Percentage Interests.

Section 17      **Officers**.  The Managing Member may, from time to time as he deems advisable, appoint officers of the Company (the "**Officers**") and assign in writing titles (including, without limitation, President, Vice President, Secretary and Treasurer) to any such person.  Unless the Managing Member decides otherwise, if the title is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office.  Any delegation pursuant to this **Section 17** may be revoked at any time by the Managing Member.

Section 18      **Other Business**.  The Members (including, for the avoidance of doubt, the Managing Member) may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others.  Neither the Company nor any other Member shall have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

Section 19      **Exculpation and Indemnification**.  The Managing Member shall not be liable to the Company or to the other Members for any action taken or omitted to be taken in connection with the business or affairs of the Company, so long as he acted in good faith and is not found to be guilty of gross negligence or willful misconduct with respect thereto, as determined by a final non-appealable decision of a court of competent jurisdiction.  To the fullest extent permitted by law, the Company agrees to indemnify and hold harmless:  (i) the Managing Member, and (ii) in the discretion of the Managing Member, the Company's managers, shareholders, partners, officers, employees, agents and affiliates and/or the other Members (each, an "**Indemnified Party**") from and against any and all claims, actions, demands, losses, costs, expenses (including attorneys' fees and other expenses of litigation), damages, penalties or interest, as a result of any claim or legal proceeding related to any action taken or omitted to be taken by any of them in connection with the business and affairs of the Company (including the settlement of any such claim or legal proceeding); *provided, however*, that the party against whom the claim is made or legal proceeding is directed is not guilty of gross negligence or willful misconduct, as determined by a final non-appealable decision of a court of competent jurisdiction.  Any indemnity under this **Section 19** shall be provided out of and to the extent of Company assets only, and no Member (including the Managing Member) shall have personal liability on account thereof.

Section 20      **Admission of Additional Members**.  Additional Members may be admitted to the Company only with the written consent of the Managing Member.  The capital contribution required of, and the Percentage Interests assigned to, such newly-admitted Member shall be determined by the Managing Member.

Section 21      **Effect of Bankruptcy, Dissolution, Death or Incompetence of a Member**.

018671

HCMLPHMIT00003875

The bankruptcy, dissolution, death or disability of a Member, or an adjudication that such Member is incompetent (a Member experiencing any such event, a "**Disabled Member**"), shall not cause the termination or dissolution of the Company, and the business of the Company shall continue.  If a Member is dissolved or becomes bankrupt, the trustee or receiver of such Disabled Member's estate or, if a Member dies, such Disabled Member's executor, administrator or trustee, or, if such Member is adjudicated incompetent, such Disabled Member's committee, guardian or conservator, or the personal representative of such Disabled Member, as applicable, shall have the rights of such Disabled Member for the purposes of settling or managing such Disabled Member's estate or property and such power as the Disabled Member possessed to dispose of all or any part of such Member's interest in the Company, and to join with any assignee in satisfying conditions precedent to the admission of the assignee as a substitute Member.

Section 22      **Assignments**.  A Member may not transfer, assign, pledge or hypothecate, in whole or in part, his, her or its limited liability company interest without the prior written consent of the Managing Member.

Section 23      **Dissolution**.

(a)      The Company shall dissolve, and its affairs shall be wound-up upon the first to occur of the following: (i) the written consent of the Managing Member; (ii) the death, disability, bankruptcy or withdrawal of the Managing Member, in the event no successor managing member is appointed pursuant to **Section 16(d)**; and (iii) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

(b)      In the event of dissolution, the Company shall conduct only such activities as are necessary to wind-up its affairs (including the sale of the assets of the Company in an orderly manner).

Section 24      **Tax Matters Partner**.  John Honis shall be the tax matters partner within the meaning of Section 6231(a)(7) of the Code.  All expenses incurred by the tax matters partner in connection with his duties as tax matters partner shall be expenses of the Company.

Section 25      **Elections**.  The Managing Member shall determine the accounting methods and conventions under the tax laws of any and all applicable jurisdictions as to the treatment of income, gain, loss, deduction and credit of the Company or any other method or procedure related to the preparation of such tax returns.  The Managing Member may cause the Company to make or refrain from making any and all elections permitted by such tax laws, and the Managing Member shall not be liable for any consequences to any previously admitted or subsequently admitted Members resulting from making or failing to make any such elections.

Section 26      **Separability of Provisions**.  Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

Section 27      **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement.

Section 28      **Entire Agreement**.  This Agreement constitutes the entire agreement of the Members with respect to the subject matter hereof and shall supersede all prior and contemporaneous agreements, understandings and discussions with respect thereto.

4

018672

HCMLPHMIT00003876

Section 29 **Governing Law, Personal Jurisdiction and Venue**.  The parties acknowledge and agree that any claim, controversy, dispute or action relating in any way to this Agreement or the subject matter of this Agreement shall be governed solely by the laws of the State of Delaware, without regard to any conflict of laws doctrines.  The parties irrevocably consent to and submit to being served with legal process issued from the state and federal courts located in the State of New York and irrevocably consent to the exclusive personal jurisdiction of the federal and state courts situated in the State of New York.  The parties irrevocably waive any objections to the personal jurisdiction of these courts.  The federal and state courts of the State of New York in New York County shall have sole and exclusive jurisdiction over any and all claims, controversies, disputes and actions which in any way relate to this Agreement or the subject matter of this Agreement.  Any such claim, controversy, dispute or action must first be brought in the federal court of the State of New York in New York County, unless the federal courts do not have subject matter jurisdiction as a matter of law, in which case it must first be brought in the Commercial Division of the New York State Supreme Court in New York County (and can only proceed in New York County outside the Commercial Division if the Commercial Division rejects it).  The parties also irrevocably waive any objections that these courts constitute an oppressive, unfair, or inconvenient forum and agree not to seek to change venue on these grounds or any other grounds.

Section 30 **Amendments**.  This Agreement may be modified, altered, supplemented or amended in the sole discretion of the Managing Member.

*[remainder of page intentionally left blank]*

018673

HCMLPHMIT00003877

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Agreement as of the date first written above.

THE COMPANY:

RAND PE FUND MANAGEMENT, LLC

By:
Name: John Honis
Title: Managing Member

MANAGING MEMBER:

Name: John Honis

6

018674

HCMLPHMIT00003878

**Schedule A**

**Members of Rand PE Fund Management, LLC**

**As of October 29, 2015**

| NAME | NATURE OF INTEREST | MAILING ADDRESS | INITIAL CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|---|---|---|---|---|
| John Honis | Managing Member | 87 Railroad Place, Suite 403 Saratoga Springs, NY 12866 | $100 | 100% |

7

018675

HCMLPHMIT00003879

**EXHIBIT 77**

018676

# LIMITED LIABILITY COMPANY AGREEMENT
## OF
## RAND ADVISORS, LLC

This LIMITED LIABILITY COMPANY AGREEMENT (this "*Agreement*") is entered into as of the 28th day of August, 2013 by John Honis, an individual (the "*Member*"), as the sole member of Rand Advisors, LLC, a limited liability company formed pursuant to the Delaware Limited Liability Company Act (the "*Act*"). The Member desires to form a limited liability company pursuant to the Act upon the following terms and conditions:

## ARTICLE 1
## NAME, REGISTERED AGENT AND OFFICES

The name of the Company is Rand Advisors, LLC (the "*Company*"). Its registered office in the State of Delaware is 1209 Orange Street, Wilmington, Delaware 19801, in the County of New Castle. The name of its registered agent at such address is The Corporation Trust Company. The principal office of the Company shall be located at such place within or without the State of Delaware, and the Company shall maintain such records as the Member shall determine from time to time. The Company may have such other offices as the Member may designate from time to time.

## ARTICLE 2
## BUSINESS, PURPOSE, AND TERM OF COMPANY

Section 2.1    Purposes.  The purpose of the Company shall be to do all such things for which limited liability companies may be formed under the Act.

Section 2.2    Term.  The term of the Company shall commence on the date the Certificate of Formation is filed with the Delaware Secretary of State in accordance with the provisions *of* the Act and shall continue on a perpetual basis unless dissolved pursuant to ARTICLE 6 of this Agreement. Matt McGraner is hereby designed as an "Authorized Person" for the purpose of executing the Certificate of Formation and arranging for its filing.

Section 2.3    Powers.  In addition to the purpose set forth in Section 2.1 above, the Company shall have the power:

(a)    to conduct its business, carry on its operations and have and exercise the powers granted to a limited liability company by the Act in any state, territory, district or possession of the United States, or in any foreign country that may be necessary, convenient or incidental to the accomplishment of the purpose of the Company;

(b)    to acquire, by purchase, mortgage, lease, contribution of property or otherwise, and to own, hold, operate, maintain, finance, improve, lease, sell, convey, mortgage, transfer or dispose of any real or personal property that may be necessary, convenient or incidental to the accomplishment of the purpose of the Company;

018677

HCMLPHMIT00003880

(c) to enter into, perform and carry out contracts of any kind, including, without limitation, contracts with the Member or any person or other entity that directly or indirectly controls, is controlled by, or is under common control with the Member, or any agent of the Company necessary to, in connection with, convenient to, or incidental to, the accomplishment of the purpose of the Company;

(d) to lend or borrow money and to invest its funds;

(e) to sue and be sued;

(f) to appoint employees and fix their compensation;

(g) to indemnify any person; and

(h) to guarantee obligations of an affiliate or subsidiary.

## ARTICLE 3
## CAPITAL CONTRIBUTIONS

Section 3.1 <u>Capital Contribution by Members</u>.  Upon the formation of the Company, the Member shall not be required to make a Capital Contribution.  Capital Contributions shall be made from time to time as the Member shall determine.

Section 3.2 <u>Capital Accounts</u>.  A Capital Account shall be maintained for the Member to which shall be credited (i) the Member's Capital Contributions, if any and (ii) all Company revenues.  The Capital Account shall be debited with (i) all costs, expenses, and losses of the Company and (ii) the amount of any distributions (including return of capital) made to the Member.  No interest shall be paid on the Member's Capital Account.

## ARTICLE 4
## ALLOCATIONS OF PROFITS AND DISTRIBUTIONS

Section 4.1 <u>Allocation of Profits and Losses</u>.  All profits and losses of the Company shall be allocated to the Member.

Section 4.2 <u>Allocation of Distributions</u>.  All distributions of cash or other assets of the Company shall be made to the Member when and as determined by the Member.

## ARTICLE 5
## MANAGEMENT OF THE COMPANY

Section 5.1 <u>General</u>.  The Member shall be the Managing Member and shall be responsible for the management of the Company.  The Managing Member shall have the right, power and authority to manage, direct and control all of the business and affairs of the Company, to transact business on behalf of the Company, to sign for the Company or on behalf of the Company or otherwise to bind the Company.

2

018678
HCMLPHMIT00003881

Section 5.2    <u>Delegation of Powers of Managing Member</u>.   The Managing Member shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to delegate the management, control, administration, and operation of the business and affairs of the Company or the custody of the Company's assets for all purposes stated in this Agreement.   Such delegation shall be as provided in such documentation as the Managing Member shall determine. Any such delegation shall not cause the Managing Member to cease to be the Managing Member.

Section 5.3    <u>Officers</u>.  The Managing Member may appoint individuals with or without such titles as it may elect, including the titles of President, Vice President, Treasurer, and Secretary, to act on behalf of the Company with such power and authority as the Managing Member may delegate in writing to any such persons.

Section 5.4    <u>Powers of Managing Member</u>.   The Managing Member shall have the right, power and authority, in the management of the business and affairs of the Company, to do or cause to be done any and all acts deemed by the Managing Member to be necessary or appropriate to effectuate the business, purposes and objectives of the Company at the expense of the Company, including but not limited to the execution of all documents or instruments in all matters necessary, desirable, convenient or incidental to the purpose of the Company or the making of investments of Company funds.

Section 5.5    <u>Reliance by Third Parties</u>.   Any person or entity dealing with the Company may rely on a certificate signed by the Managing Member as to:

(a)    the identity of the Managing Member;

(b)    the existence or non-existence of any fact or facts which constitute a condition precedent to acts by the Managing Member or are in any matter germane to the affairs of the Company;

(c)    the persons who or entities which are authorized to execute and deliver any instrument or document of or on behalf of the Company; or

(d)    any act or failure to act by the Company or as to any other matter whatsoever involving the Company.

Section 5.6    Actions Requiring Member Approval.   Notwithstanding any other provision of this Agreement, the written consent of the Member shall be required to approve the following matters:

(a)    the dissolution or winding up of the Company;

(b)    the merger or consolidation of the Company;

(c)    the sale, transfer, contribution, exchange, mortgage, pledge, encumbrance, lease or other disposition or transfer of all or substantially all of the assets of the Company;

3

018679

HCMLPHMIT00003882

(d)      the declaration of any distributions by the Company; and

(e)      amendments to this Agreement.

## ARTICLE 6
## DISSOLUTION

The Company shall be dissolved, and shall terminate and wind up its affairs, upon the first to occur of the following:

(a)      the determination by the Member to dissolve the Company; or

(b)      the entry of a decree of judicial dissolution pursuant to Section 18.802 of the Act.

## ARTICLE 7
## GOVERNING LAW AND JURISDICTION

This Agreement, including its existence, validity, construction and operating effect, and the rights of each of the parties hereto, shall be governed by and construed in accordance with the laws of the State of Delaware (without regard to principles of conflicts of laws).

## ARTICLE 8
## INDEMNIFICATION

Section 8.1      Indemnification and Liability.

(a)      To the maximum extent permitted by applicable law, the Managing Member shall not be liable to the Company or any other third party (i) for mistakes of judgment, (ii) for any act or omission suffered or taken by it, or (iii) for losses due to any such mistakes, action or inaction.

(b)      Except as may be restricted by applicable law, the Managing Member shall not be liable for and the Company shall indemnify the Managing Member against, and agrees to hold the Managing Member harmless from, all liabilities and claims (including reasonable attorney's fees and expenses in defending against such liabilities and claims) against the Managing Member, arising from the Managing Member's performance of its duties in conformance with the terms of this Agreement.

(c)      The Managing Member may consult with legal counsel or accountants selected by the Managing Member and, to the maximum extent permitted by applicable law, any action or omission suffered or taken in good faith in reliance and in accordance with the written opinion or advice of any such counsel or accountants (provided such counsel or accountants have been selected with reasonable care) shall be fully protected and justified with respect to the action or omission so suffered or taken.

(d)      The Company shall also have the power to indemnify the Trustee to the extent, and under the conditions and terms, as may be provided in the Trust Agreement.

4

018680

HCMLPHMIT00003883

## ARTICLE 9
### ASSIGNMENT OF INTERESTS

The Member may Transfer all or part of its Membership Interest in the Company.

## ARTICLE 10
### WINDING UP AND DISTRIBUTION OF ASSETS

Section 10.1    Winding Up.  If the Company is dissolved, the Member shall wind up the affairs of the Company.

Section 10.2    Distribution of Assets.  Upon the winding up of the Company, subject to the provisions of the Act, the Member shall pay or make reasonable provision to pay all claims and obligations of the Company, including all costs and expenses of the liquidation and all contingent, conditional or unmatured claims and obligations that are known to the Member but for which the identity of the claimant is unknown.  If there are sufficient assets, such claims and obligations shall be paid in full and any such provision shall be made in full.  If there are insufficient assets, such claims and obligations shall be paid or provided for according to their priority and, among claims and obligations of equal priority, ratably to the extent of assets available therefore.  Any remaining assets shall be distributed to the Member.

## ARTICLE 11
### DEFINITIONS

As used herein, the following terms shall have the indicated definitions.

"***Act***" means the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq., as may be amended from time to time.

"***Agreement***" means this Limited Liability Company Agreement, as may be amended from time to time.

"***Capital Account***" means a separate accounting maintained with respect to the Member pursuant to section 3.2 of this Agreement.

"***Capital Contribution***" means the contribution by the Member to capital of the Company.

"***Certificate of Formation***" means the Certificate of Formation of the Company as filed with the Delaware Secretary of State on August 27, 2013, as the same may be amended from time to time.

"***Company***" means Rand Advisors, LLC, a Delaware limited liability company.

"***Managing Member***" means the Member.

"***Member***" means John Honis, an individual.

5

018681

HCMLPHMIT00003884

"***Membership Interest***" means the ownership interest of the Member in the Company, including any and all rights, powers, benefits, duties or obligations conferred or imposed on the Member under the Act or this Agreement.

"***Transfer***" means a transfer, assignment, pledge or encumbrance relative to any Membership Interest in the Company.

**[SIGNATURE PAGE FOLLOWS]**

018682

HCMLPHMIT00003885

IN WITNESS WHEREOF, the Member has executed and delivered this Agreement the day and year first above written.

SOLE MEMBER

JOHN HONIS

018683

HCMLPHMIT00003886

**EXHIBIT 78**

018684

# AGREEMENT OF LIMITED PARTNERSHIP

## OF

## RAND PE FUND I, L.P.

This Agreement of Limited Partnership (this "**Agreement**") of Rand PE Fund I, L.P., is entered into as of October 29, 2015 by and among:  (i) Rand PE Fund Management, LLC, a Delaware limited liability company (the "**General Partner**"), and (ii) John Honis (collectively with any individuals who may become limited partners of the Partnership in the future, the "**Limited Partners**"; and, collectively with the General Partner, the "**Partners**") pursuant to and in accordance with the Delaware Revised Uniform Limited Partnership Act (6 Del.C. § 17-101, et seq.), as amended from time to time (the "**Act**").

1.    **Name**.  The name of the partnership governed hereby is Rand PE Fund I, L.P. (the "**Partnership**").

2.    **Certificate of Limited Partnership**.  The General Partner filed a Certificate of Limited Partnership for the Partnership with the Secretary of State of the State of Delaware on September 18, 2015, and the Partners shall take such further actions as shall be appropriate to comply with all requirements of law for the formation and operation of a limited partnership in the State of Delaware, and all other counties and states where the Partnership may elect to do business.

3.    **Purpose**.  The Partnership is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Partnership is, engaging in all lawful activities for which partnerships may be formed under the Act, including, without limitation of the foregoing, serving as a private insurance-dedicated investment fund.

4.    **Powers**.  The Partnership shall have the power to do any and all acts reasonably necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purpose and business described herein and for the protection and benefit of the Partnership and shall have, without limitation, any and all of the powers that may be exercised on behalf of the Partnership by the General Partner pursuant to this Agreement.

5.    **Principal Business Office**.  The principal place of business and office of the Partnership shall be located at, and the Partnership's business shall be conducted from, such place or places as may hereafter be determined by the General Partner.

6.    **Registered Office**.  The address of the registered office of the Partnership in the State of Delaware is:  c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware 19801.

7.    **Registered Agent**.  The name and address of the registered agent of the Partnership for service of process on the Partnership in the State of Delaware is:  The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware 19801.

8.    **Term**.  The term of the Partnership commenced on the date of filing of the Certificate of Limited Partnership of the Partnership in accordance with the Act and shall continue until dissolution of the Partnership in accordance with **Section 21** of this Agreement.

9.    **Limitation on Liabilities of Limited Partners**.  Notwithstanding any provision

HCMLPHMIT00003887

of this Agreement, the Limited Partners shall not be liable for any of the losses, debts or liabilities of the Partnership in excess of their respective capital contributions.

10.     **Capital Contributions**.   Each Partner is deemed admitted as a Partner of the Partnership upon his, her or its execution and delivery of this Agreement.  The initial capital contributions of the Partners consist of the assets set forth on Schedule A attached hereto.

11.     **Additional Contributions**.   The Partners are not required to make additional capital contributions to the Partnership, beyond their initial contributions.

12.     **Capital Accounts**.   Separate capital accounts shall be maintained for each Partner on the books of the Partnership.  Each capital account shall be adjusted to reflect such Partner's shares of allocations and distributions as provided in **Section 13** of this Agreement, and any additional capital contributions to the Partnership or withdrawals of capital from the Partnership.  Such capital accounts shall further be adjusted to conform to the Treasury Regulations under Section 704(b) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**"), as interpreted in good faith by the General Partner.

13.     **Allocations and Distributions**.

(i)     *Allocations of Profit and Loss*.  All items of income, gain, loss, deduction and credit shall be allocated among the Partners in accordance with their Percentage Interests (as indicated on Schedule A attached hereto).

(ii)     *Distributions*.  Distributions shall be made to the Partners at such times and in such amounts as may be determined in the sole discretion of the General Partner.  Distributions shall be shared among the Partners in accordance with their Percentage Interests.  Notwithstanding any provision to the contrary contained in this Agreement, the Partnership shall not make a distribution to the Partners on account of their interest in the Partnership if such distribution would violate Section 17-607 of the Act or other applicable law.

14.     **Management**.

(i)     The business and affairs of the Partnership shall be managed by the General Partner.  Subject to the express limitations contained in any provision of this Agreement, the General Partner shall have complete and absolute control of the affairs and business of the Partnership, and shall possess all powers necessary, convenient or appropriate to carrying out the purposes and business of the Partnership, including, without limitation, doing all things and taking all actions necessary to carrying out the terms and provisions of this Agreement.  The General Partner has the authority to bind the Partnership.

(ii)     Subject to the rights and powers of the General Partner and the limitations thereon contained herein, the General Partner may delegate to any person any or all of its powers, rights and obligations under this Agreement and may appoint, contract or otherwise deal with any person to perform any acts or services for the Partnership as the General Partner may reasonably determine.

(iii)     No Partner (other than the General Partner) shall participate in the management or control of the business of, or shall have any rights or powers with respect to, the Partnership except those expressly granted to it by the terms of this Agreement, or those conferred on it by law.

018686

HCMLPHMIT00003888

(iv)    The General Partner shall remain general partner of the Partnership until the earliest to occur of its termination, dissolution or other inability to act in such capacity, at which time a majority in Percentage Interests of the Limited Partners shall appoint a successor general partner. Upon the termination, dissolution or other inability of such successor General Partner to act in such capacity, a successor general partner will be appointed by the designee of the General Partner.

15.    **Officers**. The General Partner may, from time to time as it deems advisable, appoint officers of the Partnership (the "**Officers**") and assign in writing titles (including, without limitation, President, Vice President, Secretary and Treasurer) to any such person. Unless the General Partner decides otherwise, if the title is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office. Any delegation pursuant to this **Section 15** may be revoked at any time by the General Partner.

16.    **Other Business**. The Partners may engage in or possess an interest in other business ventures (unconnected with the Partnership) of every kind and description, independently or with others. The Partnership shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

17.    **Liability of General Partner**.

(i)    None of the General Partner or the Officers shall be liable, responsible or accountable in damages to the Limited Partner or the Partnership for: (x) any act or omission on behalf of the Partnership performed or omitted to be taken by it in good faith and in a manner reasonably believed by it to be within the scope of the authority granted to it by this Agreement and in, or not opposed to, the best interests of the Partnership; *provided* that the General Partner is not guilty of gross negligence or willful misconduct, (y) any action or omission taken or suffered by any other Partner, or (z) any mistake, negligence, dishonesty or bad faith of any broker or other agent of the Partnership selected by the General Partner with reasonable care. To the extent that, at law or in equity, the General Partner has duties (including fiduciary duties) and liabilities relating thereto to the Partnership or to another Partner, the General Partner acting under this Agreement shall not be liable to the Partnership or such other Partner for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they expand or restrict the duties and liabilities of the General Partner otherwise existing at law or in equity, are agreed by the Partners to modify to that extent such other duties and liabilities of the General Partner. To the fullest extent permitted by law, the Partnership shall indemnify the General Partner against any loss, damage or expense (including amounts paid in satisfaction of judgments, in settlements, as fines and penalties and legal and other costs and expenses of investigation or defense) incurred by it by reason of any act or omission so performed or omitted by it (and not involving gross negligence or willful misconduct) and any such amount shall be paid by the Partnership to the extent assets are available, but the Limited Partner shall not have any personal liability to the General Partner or the Partnership on account of such loss, damage or expense.

(ii)    The General Partner may consult with legal counsel, accountants and other professional experts selected by it and any act or omission suffered or taken by it on behalf of the Partnership or in furtherance of the interests of the Partnership in good faith in reliance upon and in accordance with the advice of such counsel, accountants or other professional experts shall be full justification for any such act or omission, and the General Partner shall be fully protected in so acting or omitting to act; *provided* that such counsel, accountants or other professional experts were selected with reasonable care.

(iii)    To the fullest extent permitted by law, expenses incurred by the General Partner

018687
HCMLPHMIT00003889

in defense or settlement of any claim that may, at the determination of the General Partner, be subject to a right of indemnification hereunder may be paid by the Partnership in advance of the final disposition thereof upon receipt of an undertaking by or on behalf of the General Partner to repay such amount to the Partnership if it shall be determined, by a court of competent jurisdiction pursuant to a final non-appealable judgment, order or decree, that the General Partner is not entitled to be indemnified hereunder.

18.   **Admission of Additional Partners**.   One (1) or more additional persons may be admitted to the Partnership as Partners with the written consent of the General Partner.

19.   **Dissolution of Partners**.   Subject to **Section 21**, the termination, dissolution, death, bankruptcy or adjudicated incompetency of a Partner shall not cause a dissolution of the Partnership, but the rights of such Partner to share in the allocations and distributions pursuant to the terms hereof and to assign his, her or its interest in the Partnership pursuant to the terms hereof shall, on the happening of such an event, devolve on his, her or its legal representative for the purpose of settling his estate or administering its property.

20.   **Assignments**.   A Partner may not transfer, assign, pledge or hypothecate, in whole or in part, his, her or its limited partnership interest without the prior written consent of the General Partner.

21.   **Dissolution**.

(i)   The Partnership shall dissolve, and its affairs shall be wound-up upon the first to occur of the following:   (A) the written consent of the General Partner, (B) the death, disability, termination, dissolution, bankruptcy or withdrawal of the last remaining General Partner (subject to **Section 14(iv)**), and (C) the entry of a decree of judicial dissolution under Section 17-802 of the Act.

(ii)   In the event of dissolution, the Partnership shall conduct only such activities as are necessary to wind-up its affairs (including the sale of the assets of the Partnership in an orderly manner).

22.   **Tax Matters Partner**.   The General Partner shall be the tax matters partner within the meaning of Section 6231(a)(7) of the Code.  All expenses incurred by the tax matters partner in connection with its duties as tax matters partner shall be expenses of the Partnership.

23.   **Elections**.   The General Partner shall determine the accounting methods and conventions under the tax laws of any and all applicable jurisdictions as to the treatment of income, gain, loss, deduction and credit of the Partnership or any other method or procedure related to the preparation of such tax returns.  The General Partner may cause the Partnership to make or refrain from making any and all elections permitted by such tax laws, and the General Partner shall not be liable for any consequences to any previously admitted or subsequently admitted Partners resulting from their making or failing to make any such elections.

24.   **Separability of Provisions**.   Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

25.   **Counterparts**.   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement.

018688

HCMLPHMIT00003890

26.    **Entire Agreement**.  This Agreement constitutes the entire agreement of the Partners with respect to the subject matter hereof and shall supersede all prior and contemporaneous agreements, understandings and discussions with respect thereto.

27.    **Governing Law, Personal Jurisdiction and Venue**.  The parties acknowledge and agree that any claim, controversy, dispute or action relating in any way to this Agreement or the subject matter of this Agreement shall be governed solely by the laws of the State of Delaware, without regard to any conflict of laws doctrines.  The parties irrevocably consent to and submit to being served with legal process issued from the state and federal courts located in the State of New York and irrevocably consent to the exclusive personal jurisdiction of the federal and state courts situated in the State of New York.  The parties irrevocably waive any objections to the personal jurisdiction of these courts.  The federal and state courts of the State of New York in New York County shall have sole and exclusive jurisdiction over any and all claims, controversies, disputes and actions which in any way relate to this Agreement or the subject matter of this Agreement.  Any such claim, controversy, dispute or action must first be brought in the federal court of the State of New York in New York County, unless the federal courts do not have subject matter jurisdiction as a matter of law, in which case it must first be brought in the Commercial Division of the New York State Supreme Court in New York County (and can only proceed in New York County outside the Commercial Division if the Commercial Division rejects it).  The parties also irrevocably waive any objections that these courts constitute an oppressive, unfair, or inconvenient forum and agree not to seek to change venue on these grounds or any other grounds.

28.    **Amendments**.  This Agreement may not be modified, altered, supplemented or amended except pursuant to a written agreement executed and delivered by the Partners.

*[remainder of page intentionally left blank]*

018689

HCMLPHMIT00003891

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Agreement of Limited Partnership as of the date first written above.

GENERAL PARTNER:

Rand PE Fund Management, LLC

By: _____
Name:  John Honis
Title:  Managing Member

LIMITED PARTNER:

_____
Name:  John Honis

018690
HCMLPHMIT00003892

**Schedule A**

**As of October 29, 2015**

| NAME | MAILING ADDRESS | INITIAL CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|---|---|---|---|
| John Honis | 87 Railroad Place, Suite 403 Saratoga Springs, NY 12866 | $99 | 99% |
| Rand PE Fund Management, LLC | 87 Railroad Place, Suite 403 Saratoga Springs, NY 12866 | $1 | 1% |

018691

HCMLPHMIT00003893

**EXHIBIT 79**

018692

SadisGoldberg LLP

# Amended and Restated Limited Partnership Agreement of Atlas IDF, LP

A DELAWARE "SERIES" LIMITED PARTNERSHIP

As of November 30, 2015

# Exhibit A

Neither Atlas IDF, LP nor the limited partner interests therein ("**Interests**") have been or will be registered under the Securities Act of 1933, as amended ("**Securities Act**"), the Investment Company Act of 1940, as amended, or the securities laws of any of the States of the United States. The offering of the Interests is being made in reliance upon an exemption from the registration requirements of the Securities Act for offers and sales of securities which do not involve any public offering, and analogous exemptions under state securities laws.

These securities are subject to restrictions on transferability and resale, may not be transferred or resold, except: (i) as permitted under the Securities Act and applicable state securities laws pursuant to registration or exemption therefrom, and (ii) in accordance with the requirements and conditions set forth in this Amended and Restated Limited Partnership Agreement.

018693

This Amended and Restated Limited Partnership Agreement of Atlas IDF, LP, a Delaware "series" limited partnership ("**Partnership**"), is entered into as of November 30, 2015 ("**Agreement**") by and among: (i) Atlas IDF GP, LLC, a Delaware limited liability company ("**General Partner**"), with an address at 87 Railroad Place, Suite 403, Saratoga Springs, New York, 12866; (ii) such persons and entities who are or may become limited partners in accordance with the terms hereof ("**Limited Partners**"; and, together with the General Partner, shall collectively be referred to as the "**Partners**"); (iii) John Honis, as the initial Limited Partner ("**Initial Limited Partner**"); and (iv) such other persons who may become parties to this Agreement from time to time.

**WITNESSETH:**

**WHEREAS**, the General Partner and the Initial Limited Partner entered into a Limited Partnership Agreement, dated and effective as of October 29, 2015 ("**Current Agreement**"); and

**WHEREAS**, the General Partner desires to amend and restate the Current Agreement in its entirety pursuant to, and in accordance with the terms of, **Section 28** thereof, including to reflect the conversion of the Partnership into a "series" limited partnership.

**NOW THEREFORE**, in consideration of the mutual promises of the parties hereinafter set forth and of other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned parties agree to amend and restate the Current Agreement in its entirety with the following terms and conditions:

## ARTICLE I
### GENERAL PROVISIONS

**Section 1.01**  **Formation of Partnership**. The Partnership was formed as a limited partnership under the Delaware Revised Uniform Limited Partnership Act (as in effect on the date hereof and as amended from time to time, the "**Act**") by the filing of its Certificate of Limited Partnership (the "**Certificate**") with the Secretary of State of the State of Delaware (the "**Delaware Secretary**") on October 29, 2015. On November 19, 2015, an amended Certificate was filed with the Delaware Secretary to convert the Partnership into a "series" limited partnership under Section 17-218 of the Act. The General Partner, for itself and as agent for the Limited Partners, shall accomplish all filing, recording, publishing and other acts necessary or appropriate for compliance with all the requirements for the formation and operation of the Partnership as a limited partnership under this Agreement and the Act and under all other laws of the State of Delaware and such other jurisdictions in which the General Partner determines that the Partnership may conduct business. Each Limited Partner admitted to the Partnership by the General Partner shall promptly execute all relevant certificates and other documents, as the General Partner shall request.

**Section 1.02**  **Partnership Name**. The name of the Partnership is Atlas IDF, LP.

**Section 1.03**  **Purpose**. The Partnership was organized for the purpose of investing and trading in a wide variety of securities and financial instruments, domestic and foreign, of all kinds and descriptions, whether publicly traded or privately placed, including but not limited to, common and preferred stocks, bonds and other debt securities, convertible securities, limited partner interests, mutual fund shares, options, warrants, commodities, futures, derivatives (including swaps, forward contracts and structured instruments), currencies, monetary instruments, and cash and cash equivalents. In furtherance of the foregoing, the Partnership may engage in any lawful act or activity for which limited partnerships may be formed under the Act, and any and all activities necessary or incidental thereto, including any other business activities described in the Partnership's confidential private placement memorandum (as amended and supplemented from time to time, the "**Memorandum**"). In addition to investing in individual traded assets, the Partnership may invest a significant portion of its assets in other investment vehicles, including, without limitation, hedge funds, managed accounts and other private investment funds (collectively, the "**Portfolio Funds**"), including those managed by, or otherwise affiliated or related to, the Investment Manager (as defined in **Section 3.01**). Portfolio Funds may allocate their assets to Illiquid Investments (as defined in **Section 9.07(a)**).

**Section 1.04**  **Place of Business**. The Partnership shall have offices located at 87 Railroad Place, Suite

018694

HCMLPHMIT00003895

403, Saratoga Springs, New York, 12866, or elsewhere as the General Partner may from time to time determine.  The Partnership may have more than one (1) office as may from time to time be determined by the General Partner.

**Section 1.05**   **Fiscal Year**.  The fiscal year of the Partnership (the "**Fiscal Year**") shall end on December 31 of each year, except that it may be changed at any time by the General Partner in its sole discretion.  In the event that the General Partner changes the Partnership's Fiscal Year, the dates and time periods referred to in this Agreement shall be appropriately adjusted.

**Section 1.06**   **Term of Partnership**.  The term of the Partnership commenced upon filing of the Partnership's Certificate with the Delaware Secretary and shall continue indefinitely; *provided, however*, that the Partnership shall be dissolved forthwith upon the occurrence of any one of the events set forth in **Section 13.01**.

## ARTICLE II
### COMPOSITION; ADMISSIONS

**Section 2.01**   **Names of the Partners**.  Atlas IDF GP, LLC, a Delaware limited liability company, is the sole general partner of the Partnership as of the date hereof.  The names and addresses of the General Partner and of each of the Limited Partners shall be set forth in the records of the Partnership to be kept on file at all times at the principal place of business of the Partnership.

**Section 2.02**   **Admission of Partners**.  Additional Limited Partners (as defined in **Section 8.01**) may be admitted to the Partnership at such times as provided in **Article VIII**.  In connection with the admission of a Limited Partner to the Partnership, such Limited Partner shall, in advance of such admission and as a condition thereto, sign a copy of this Agreement or an agreement to become bound by the provisions of this Agreement and such other subscription materials as shall be determined by the General Partner.  Upon the admission of a Limited Partner, the Initial Limited Partner listed on the signature page hereof shall automatically be deemed to have withdrawn from the Partnership. For the avoidance of doubt, the General Partner shall be permitted to make an investment in the Partnership and be issued Partnership Interests hereunder, and such Interests of the General Partner shall be treated as a Limited Partner's Partnership Interests hereunder.  A substitute general partner and additional general partners may be admitted to the Partnership as provided in **Article IV**.

**Section 2.03**   **Partnership Interests**.

(a)   For purposes of this Agreement, the term "**Partnership Interest**" shall mean the quotient resulting from dividing (i) the amount in a Partner's Capital Account (as defined in **Section 9.01**), including the fair value of such Partner's interests in any Side Pocket Accounts (as defined in **Section 9.07**) or New Issues Accounts (as defined in **Section 9.08(a)**) and other memorandum accounts, by (ii) the aggregate amount in the Capital Accounts of all Partners, including the fair value of any Side Pocket Accounts, New Issues Accounts and other memorandum accounts.  "**Partnership Interests**" shall mean the sum of all amounts in the Capital Accounts of all Partners (including all Side Pocket Accounts, New Issues Accounts and other memorandum accounts).

(b)   The Partnership is an "insurance-dedicated" fund.  The Partnership Interests are being offered only to Limited Partners that are:  (x) insurance company investors, on behalf of certain of their segregated separate accounts ("**Separate Accounts**"), that fund certain variable life insurance and variable annuity contracts (collectively, the "**Policies**") to be issued to policy owners (each, a "**Policy Owner**") by the Limited Partners, or (y) state or local government pension plans, qualified tuition plans ("**§529 plans**"), and private sector qualified pension or retirement plans, as generally described in Treasury Regulation 1.817-5(f)(3).  In addition, if an investor is an insurance company, such investor must require its Policy Owners to meet certain suitability standards, as further set forth in the Memorandum.  While an insurance company, not a Policy Owner, will become a Limited Partner in the Partnership, it is expected that Policy Owners will be able to allocate a portion of their investment held in the Separate Account to the Partnership as one of the investment options of the Policies.

018695

HCMLPHMIT00003896

Each life insurance company Limited Partner will be deemed to hold a Partnership Interest in respect of the account of each Policy Owner and will be treated as a separate Limited Partner with respect to each such Partnership Interest.

**Section 2.04**      **Issuance of Interests in Series**.

(a)   Pursuant to Section 17-218 of the Act, the Partnership Interests will be offered in separate series ("**Series**").  The Partnership is currently offering one Series of Partnership Interests: "**Series 1 Partnership Interests**".  Each Series of Partnership Interests will have separate rights and obligations.

(b)   In addition, each Series of Partnership Interests may correspond to a separate portfolio of assets, which may have different investment objectives and strategies.  The Partnership may issue additional Series of Partnership Interests in the future, which may have rights and obligations that differ from those of the Series 1 Partnership Interests with respect to any matters, including without limitation, fees, withdrawal rights, participation in Side Pocket Accounts (as defined) and other rights and terms. The terms of such additional Series shall be determined by the General Partner, in its sole discretion.

(c)   Each Series shall have separate rights, powers and duties with respect to its investment portfolio and other property and obligations and the profits and losses associated with such portfolio, property and obligations.  The Partnership shall maintain separate and distinct records for each Series and shall hold and account for the assets and liabilities of such Series separately from other Series.  The Partnership shall not accept additional Limited Partners into any existing Series if such Series has existing Side Pocket Accounts at the time of such admission.

(d)   Pursuant to Section 17-218 of the Act, (i) the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to a particular Series shall be enforceable against the assets of such Series only, and not against the assets of any other Series, and (ii) none of the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to the Partnership generally or any other Series shall be enforceable against the assets of such Series.

(e)   As of the date hereof, the Investment Manager intends to allocate approximately 45% of the Series 1 investment portfolio to traded investments and approximately (but not more than) 55% of the Series 1 investment portfolio to the first series of limited partnership interests to be issued by the PE Portfolio Fund (as defined in **Section 2.04(f)**).  However, the Investment Manager reserves the right to change such allocation in the future, subject to compliance with all applicable laws, including the diversification requirements applicable to insurance-dedicated investment funds, as further set forth in the Memorandum.

(f)   As of the date hereof, (i) the Investment Manager acts as the investment manager to Rand PE Fund I, L.P., a Delaware "series" limited partnership ("**PE Portfolio Fund**") that: (x) is expected to initially invest in the Highland Transaction (as defined in the Memorandum), if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction; (ii) Rand PE Fund Management, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the PE Portfolio Fund; (iii) the Principal (as defined in the Memorandum) is the managing member and controlling person of Rand PE Fund Management, LLC; and (iv) the Investment Manager acts as the investment subadvisor to a series of SALI Multi-Series Fund, L.P., a Delaware "series" limited partnership, and provides certain discretionary investment advisory or consulting services to such series, as further set forth in the Memorandum.

(g)   Unless the context otherwise requires, Series 1 Partnership Interests and any other Series of Partnership Interests shall be collectively referred to throughout this Agreement as the "**Partnership Interests**."  As the context may require, the holders of Series 1 Partnership Interests may be referred to herein as "**Series 1 Limited Partners**".  Series 1 Limited Partners and, to the extent applicable, all the Limited Partners of other Series shall be collectively referred to throughout this Agreement the "**Limited Partners**".

018696

HCMLPHMIT00003897

(h)  References herein to the Partnership shall include, where appropriate, each Series of the Partnership.  The terms of the other Series may be set forth in an amended version of this Agreement and/or in a separate supplement thereto.

## ARTICLE III
### MANAGEMENT

**Section 3.01**   **Management of Partnership**

(a)   The business and affairs of the Partnership shall be managed exclusively by the General Partner.  The Limited Partners shall take no part in the management or control of the Partnership's business and shall have no authority to act for or bind the Partnership.  The General Partner shall have sole discretion and authority to select investments, shall invest the funds of the Partnership from time to time as the General Partner deems appropriate in accordance with the purposes set forth in **Section 1.03**, and shall have (without limitation) the powers set forth in **Section 3.02**.  The General Partner may select an investment manager ("**Investment Manager**") to provide all or any portion of the portfolio management services required by the Partnership, including the valuation of assets of the Partnership.  The Investment Manager may be changed from time to time by the General Partner in its sole and absolute discretion.  The initial Investment Manager shall be Rand Advisors, LLC, a Delaware limited liability company and an affiliate of the General Partner.  If at any time there is no Investment Manager, then the General Partner shall provide such portfolio management services, and be subject to the provisions of this Agreement applicable to the Investment Manager.

(b)   Each of the General Partner and the Investment Manager shall not be required to devote its full time to the business of the Partnership, but shall devote so much of its time and efforts to the affairs of the Partnership as may in its judgment be necessary to accomplish the purposes of the Partnership.  Nothing herein contained shall prevent the General Partner or the Investment Manager from conducting any other business, including any business with respect to securities (and/or other investments), whether or not such business ventures are in direct or indirect competition with the Partnership.  Each of the General Partner and the Investment Manager is not prohibited from buying or selling securities for its own account, including the same securities (and/or other investments) as are purchased, sold or held by the Partnership, but none of the General Partner, the Investment Manager or any of their respective affiliates (which shall not include, for purposes of this paragraph, advisory clients or managed funds) shall buy securities (and/or other investments) from or sell securities (and/or other investments) to the Partnership without the written consent of either all Limited Partners or a committee of independent Limited Partners.

**Section 3.02**   **Powers of the General Partner**.  Without in any way intending to limit the powers of the General Partner, the General Partner shall have the right, power and authority on behalf of the Partnership (or to delegate any portion of such rights, power and authority):

(a)   As provided in **Section 3.01**, to allocate all of the assets of the Partnership among securities (and/or other investments) to be selected by the General Partner in its sole and absolute discretion, including, but not limited to the right to:

(i)   purchase, hold and sell securities (and/or other investments) and rights therein of any kind or nature;

(ii)   allocate any and all of the assets of the Partnership among a number of Portfolio Funds;

(iii)   purchase, hold, sell and otherwise deal in put and call options, monetary instruments and any combinations thereof and any other financial instruments or contracts of any nature or kind;

018697

HCMLPHMIT00003898

(iv)    maintain margin accounts with brokers, pledge securities for loans and, in connection with any such pledge, effect borrowings from brokers or banks in such amounts as may be determined from time to time; and

(v)    transact business through brokers and dealers and other persons selected by the General Partner in its sole discretion, and in selecting such brokers, dealers and other persons, and determining the compensation payable to such persons, it shall seek to obtain the best execution for the Partnership taking into account the value of any research and brokerage services or products provided by such persons to the General Partner or the Partnership even though other persons may be able to provide transactional services (without any accompanying research or brokerage services or products) at lower rates of compensation;

(b)    To acquire and enter into any contract of insurance that the General Partner deems necessary or appropriate for the protection of the Partnership and the General Partner or for any purpose convenient or beneficial to the Partnership;

(c)    To engage in any transaction with affiliates of the General Partner, including entering into and amending and restating an investment management agreement with the Investment Manager (any such agreement, in effect from time to time, "**Investment Management Agreement**"), subject to the restrictions in **Section 3.01(b)**;

(d)    To employ persons, whether full-time or part-time, in the operation and management of the business of the Partnership, on such terms and for such compensation as the General Partner shall determine, regardless of whether or not such persons also may be employed by the General Partner or its affiliates;

(e)    To file, conduct and defend legal proceedings of any form, including proceedings against Partners, and to compromise and settle any such proceedings or any claims, including claims against Partners, on whatever terms deemed appropriate by the General Partner;

(f)    To open brokerage, bank and other accounts and, to the extent that funds are not invested, to deposit and maintain such funds in the name of the Partnership in such accounts and to temporarily invest such funds in short term United States and/or foreign government securities, money market accounts and/or other short term interest-bearing instruments; *provided, however*, that the Partnership's funds shall not be commingled with the funds of any other person or entity;

(g)    To cause the Partnership to make or revoke any of the elections referred to in Section 754 of the Internal Revenue Code of 1986, as amended ("**Code**"), or any similar provision enacted in lieu thereof;

(h)    To act as the "tax matters partner" of the Partnership within the meaning of Section 6231(a)(7) of the Code;

(i)    To select as its accounting year the annual period ending December 31 or any other Fiscal Year as is permitted by the Internal Revenue Service ("**IRS**");

(j)    To engage independent accountants, attorneys, investment managers, sub-advisers, broker-dealers, administrators, custodians, consultants and such other persons as the General Partner may deem necessary or advisable;

(k)    To establish and maintain for the conduct of Partnership affairs one or more offices and in connection therewith rent or acquire office space, engage personnel, whether part time or full time, and do such other acts and incur such expenses as the General Partner may deem necessary or advisable in connection with the maintenance or administration of such office;

(l)    To require a provision in any Partnership contract that the General Partner shall not have any personal liability therefor, but that the person or entity contracting with the

018698

HCMLPHMIT00003899

Partnership is to look solely to the Partnership and its assets for satisfaction;

(m)   To purchase and sell Partnership assets at such price or amount for cash, securities or other property and upon such terms as are deemed in the General Partner's absolute discretion to be in the best interests of the Partnership;

(n)   To prepare (or cause to be prepared), execute, acknowledge and/or deliver any and all instruments to effectuate the business of the Partnership, including, but not limited to, annual and/or interim reports, a copy of which shall be delivered to each Partner, as provided in **Sections 3.06(b) and 13.05**;

(o)   To effect on behalf of the Partnership any "agency cross transaction" (as contemplated in Rule 206(3)-2 under the U.S. Investment Advisers Act of 1940, as amended ("**Advisers Act**")) through the General Partner or any of its affiliates that is registered as a broker or dealer; *provided* that the authority granted in this subsection may be revoked at any time by the General Partner or by vote or consent of Limited Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners;

(p)   To "cross" any transaction for the purchase or sale of securities between two or more advisory clients or managed funds, including the Partnership (as contemplated in Rule 206(3) under the Advisers Act and interpretations thereunder) ("**Cross Trading**"); *provided* that the General Partner receives no additional compensation in connection with such Cross Trading activities, and subject to the restrictions in **Section 3.01(b)**;

(q)   To waive or reduce, in whole or in part, any notice period, minimum amount requirement, or other limitation or restriction imposed on Capital Contributions (as defined in **Section 8.01**), withdrawals of capital, any fee, any payment to the General Partner and/or any requirement imposed on a Limited Partner by this Agreement, regardless of whether such notice period, minimum amount, limitation, restriction, withdrawal provision, fee, payment or other requirement of this Agreement, or the waiver or reduction thereof, operates for the benefit of the Partnership, the General Partner or fewer than all the Limited Partners;

(r)   To establish such reserves for the Partnership as the General Partner shall, in its sole but reasonable discretion, deem appropriate to pay current and future, definite, contingent and possible obligations of the Partnership or a Series (even if such reserves are not in accordance with U.S. generally accepted accounting principles ("**GAAP**"));

(s)   To value the assets and liabilities of the Partnership;

(t)   To create special purpose vehicles to make or pursue investments either alone or as a joint-venture with other persons or entities;

(u)   To establish and offer multiple Series of Partnership Interests with such rights and privileges as the General Partner shall determine, and to amend this Agreement in connection therewith to reflect such multi-Series structure;

(v)   To convert the Partnership from a stand-alone fund into a "feeder fund" as part of a master-feeder structure, and to amend this Agreement pursuant thereto to reflect such master-feeder structure;

(w)   To create a liquidating fund entity (e.g., a liquidating trust or similar vehicle), and to transfer all or a portion of the Partnership's assets to such entity for any reason, including an orderly liquidation of any illiquid Partnership assets; and

(x)   To do any act, engage in any activity or execute any agreement of any nature, necessary or incidental to the accomplishment of the purposes of the Partnership in accordance with the provisions of this Agreement, the Memorandum and all applicable federal, state and local laws and regulations.

018699
HCMLPHMIT00003900

Section 3.03    **Actions of General Partner**. The General Partner is authorized, directed and empowered to act individually on behalf of the Partnership, and in accordance therewith, to execute all documents and instruments on behalf of the Partnership. Third parties may rely on the execution of any documents on behalf of the Partnership by the General Partner.

Section 3.04    **Liability and Indemnification**

(a)    None of the General Partner, the Investment Manager or any of the Investment Manager Affiliates (as defined in **Section 6.02(a)**) shall be liable to the Partnership or the Limited Partners for any action or inaction in connection with the business and affairs of the Partnership unless such action or inaction is determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct. It shall be conclusively presumed and established that the General Partner, the Investment Manager and such persons acted in good faith if any action is taken, or not taken, by any of them on the advice of legal counsel or other independent outside consultants; *provided* that the General Partner, the Investment Manager and such persons did not act with gross negligence or willful misconduct in the selection of such counsel or consultants. Any exculpation under this **Section 3.04(a)** shall apply only to the extent that such exculpation does not violate applicable federal and state laws.

(b)    The Partnership shall indemnify and hold harmless the General Partner, the Investment Manager and the Investment Manager Affiliates (which, for purposes of this **Section 3.04(b)**, shall include fund counsel (except for legal malpractice)) from and against any and all claims, liabilities, obligations, judgments, suits, proceedings, actions, demands, losses, costs, expenses (including attorneys' fees and other expenses of litigation), damages, penalties or interest, as a result of any claim or legal proceeding (made or threatened) related to any action or inaction by any of them in connection with the business and affairs of the Partnership (including the settlement or appeal of any such claim or legal proceeding); *provided, however*, that the party against whom the claim is made or legal proceeding is directed is not guilty of gross negligence or willful misconduct, as determined by a final, non-appealable decision of a court of competent jurisdiction. Any indemnity under this **Section 3.04(b)** shall be paid from and to the extent of Partnership assets only, and shall apply only to the extent that such indemnity does not violate applicable federal and state laws. The Partnership shall, in the sole discretion of the General Partner, advance amounts and/or pay expenses as incurred in connection with the indemnification obligation herein. In the event this indemnification obligation shall be deemed unenforceable, whether in whole or in part, such unenforceable portion shall be stricken or modified so as to give effect to this paragraph to the fullest extent permitted by law. For the avoidance of doubt, the foregoing indemnification provisions shall apply on a Series-by-Series basis.

(c)    If, to the extent, and at such times as, any assets of the Partnership are deemed to be "plan assets" within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), of any Limited Partner that is an employee benefit plan governed by ERISA, the General Partner shall be, and hereby acknowledges that it shall be considered to be, a fiduciary within the meaning of Section 3(21) of ERISA as to that Limited Partner. In such an event, or if any manager, member, officer, employee, agent or affiliate of the General Partner, is ever held to be a fiduciary of any Limited Partner, then, in accordance with Sections 405(b)(1), 405(c)(2) and 405(d) of ERISA, the fiduciary responsibilities of that person shall be limited to the person's duties in administering the business of the Partnership, and the person shall not be responsible for any other duties to such Limited Partner, specifically including evaluating the initial or continued appropriateness of this investment in the Partnership under Section 404(a)(1) of ERISA.

Section 3.05    **No Prohibition Against Other Business Ventures**. Each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may engage and hold interests in other business ventures of every kind and description for its own account, including, without limitation, other investment entities similar to the Partnership, whether or not such

018700

HCMLPHMIT00003901

business ventures are in direct or indirect competition with the Partnership, and whether or not the Partnership or any of the Partners also has an interest therein, without having to account to the Partnership or any Partner for any profits or other benefits derived therefrom and without incurring any obligation to offer any interest in any such activity to the Partnership or any Partner.

**Section 3.06**       **Duty to Keep Books, Financial and Tax Reports**

(a)       At all times during the existence of the Partnership, the General Partner shall keep true and complete records and books of account, in which each transaction of the Partnership shall be entered fully and accurately.   The General Partner has the power, in its sole and absolute discretion, to delegate some or all of the administrative bookkeeping functions relating to the Partnership to an administrator or other agent, which may be the Partnership's accountants.

(b)       The General Partner shall cause to be prepared and distributed to each Partner as soon as practicable following each Fiscal Year the Partnership's annual financial statements prepared in accordance with GAAP (except to the extent that the Memorandum or this Agreement states or contemplates that such statements may be inconsistent with GAAP) and audited by an independent certified public accounting firm.   The General Partner shall also have prepared and filed all federal, state and local income, franchise, gross receipts, payroll and other tax returns that the Partnership is obligated to file.   Subject to the limitations set forth in **Section 5.04**, copies of all Partnership tax returns, information returns or reports shall be available to all Partners as soon as possible after the close of the Partnership's Fiscal Year at the principal office of the Partnership.   Copies of each Partner's Schedule K-1 of the Partnership's Tax Return (Form 1065) shall be distributed to such Partner as soon as practicable after the close of the Partnership's Fiscal Year.   The General Partner may agree to provide certain Limited Partners with additional information on the underlying investments of the Partnership, as well as heightened access to the General Partner, the Investment Manager and their respective employees for relevant information.   For the avoidance of doubt, the foregoing reporting provisions shall apply on a Series-by-Series basis.

(c)       The General Partner may at any time choose to change the Partnership's accounting guidelines from GAAP to the International Financial Reporting Standard ("**IFRS**").   In such event, the financial performance of the Partnership, as determined under IFRS, may vary from those determined under GAAP.

## ARTICLE IV
### GENERAL PARTNER RESIGNATION; TRANSFER OF GENERAL PARTNER INTEREST; CONTINUATION OF PARTNERSHIP; SUBSTITUTION OF GENERAL PARTNER

**Section 4.01**       **General Partner Resignation and Involuntary Withdrawal; Admission of Additional General Partners and Transfer by General Partner**

(a)       The General Partner shall not be permitted to voluntarily withdraw or resign as the general partner of the Partnership, except upon no less than thirty (30) days' prior written notice to all Limited Partners.   In the event of dissolution of the General Partner, or if a voluntary or involuntary petition for bankruptcy shall be filed by or against the General Partner, or the General Partner shall make any assignment for the benefit of its creditors (any of the foregoing, an "**Involuntary Withdrawal**"), the General Partner or the General Partner's trustee, receiver or assignee shall have none of the rights and powers of a general partner hereunder, and shall have no authority to act on behalf of the Partnership or have any voice in the management and operation of the Partnership, except as provided in **Section 13.02**.

(b)       The General Partner may admit additional general partners to the Partnership at such times as the General Partner shall determine, without the consent of the Limited Partners.   Notwithstanding anything herein to the contrary, the General Partner shall have the right to transfer its interest, as the general partner of the Partnership, to any affiliate of the General Partner, including any person or entity controlled by the

018701

HCMLPHMIT00003902

General Partner, controlling the General Partner or under common control with the General Partner, without the consent of the Limited Partners.  In the event of such transfer by the General Partner to an affiliate, the General Partner shall not be deemed to have resigned or withdrawn from the Partnership for purposes of **Section 13.01(a)**.  Any affiliate transferee of the General Partner under this **Section 4.01(b)** shall assume the status of and shall have all of the rights, powers and obligations that the General Partner possessed prior to such transfer.  The General Partner shall not assign, transfer, sell, mortgage or otherwise encumber or transfer its interest as the general partner of the Partnership, except as set forth herein.  Any additional general partner or transferee of the General Partner shall execute and acknowledge any and all instruments that are necessary or appropriate to effect the admission of any such person or entity as a general partner, including, without limitation, the written acceptance and adoption by such person of the provisions of this Agreement and, if required by the Act, an amendment of the Certificate.  For the avoidance of doubt, should the General Partner transfer its interest, as the general partner of the Partnership, to any non-affiliate of the General Partner, the Limited Partners shall have the right to revoke such appointment within ninety (90) days after such event, by affirmative vote of Limited Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners.

Section 4.02       **Continuation of Partnership; Appointment of Substitute General Partner by Limited Partners**.  If an event as set forth in **Section 13.01(a)** occurs, the Limited Partners shall have the right, within ninety (90) days after such event, by affirmative vote of Limited Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners, to appoint a substitute general partner, in which event the Partnership shall not dissolve and shall continue its existence.

Section 4.03       **Substitute General Partner Requirements**.  Any substitute general partner shall execute and acknowledge any and all instruments that are necessary or appropriate to effect the admission of any such person or entity as a substitute general partner, including, without limitation, the written acceptance and adoption by such person of the provisions of this Agreement and, if required by the Act, an amendment of the Certificate.  Any successor to such office of general partner shall assume the status of and shall have all of the rights, powers and obligations that the General Partner possessed prior to its withdrawal, resignation or Involuntary Withdrawal from the Partnership.

## ARTICLE V
### STATUS, RIGHTS, POWERS AND VOTING RIGHTS OF LIMITED PARTNERS

Section 5.01       **Limited Liability**.  No Limited Partner, Substitute Limited Partner (as defined in **Section 10.02**) or Additional Limited Partner shall be personally liable or bound for the expenses, liabilities or obligations of the Partnership or the relevant Series beyond the amount in such Partner's Capital Account in the relevant Series, from time to time, including any amounts thereof attributable to Capital Contributions, except that such Partner may be obligated to return all or a portion of any distributions (including withdrawal proceeds) received from the Partnership (x) in an amount up to its aggregate Capital Contributions in the relevant Series (including any income or gains thereon) to the Partnership in order to pay such Partner's *pro rata* share of any Partnership liabilities that arose while such Partner held Partnership Interests, and (y) as required under **Section 5.02(b)**.

Section 5.02       **Capital Contributions**

(a)       No Limited Partner shall be entitled to a return of such Limited Partner's Capital Contribution or any portion thereof, except as set forth in **Section 7.01**, and no time has been agreed upon for the return of any Partner's Capital Contribution, except as herein provided.

(b)       Each Limited Partner, if such Limited Partner receives a return of all or any part of such Limited Partner's Capital Contribution, may, to the extent provided for in the Act, be liable to the Partnership or the relevant Series for an amount equal to such distribution, if at the time of such distribution, the Limited Partner knew the

018702

HCMLPHMIT00003903

Partnership or the relevant Series was prohibited from making such distribution under the Act.

**Section 5.03**    **Liability of Limited Partner for Additional Contributions and Loans**.  No Limited Partner shall be obligated to provide any contributions to the Partnership, other than the Original Capital Contribution (as defined in **Section 9.02**) of such Limited Partner.  No Limited Partner shall be obligated to make any loan to the Partnership.

**Section 5.04**    **Rights of Limited Partners to Inspect Books, Records, and Partnership Documents**.  Upon reasonable advance written notice and during reasonable business hours, a Limited Partner may inspect and copy, at the Limited Partner's expense and solely for a purpose reasonably related to the Limited Partner's interest as a Partner, the records of the Partnership required to be maintained pursuant to Section 17-305 of the Act and any financial statements maintained by the Partnership.  Any such inspection must be in good faith without any intent to damage the Partnership or any of its Partners in any manner.  Notwithstanding the foregoing, the General Partner in its discretion may limit the information that a Limited Partner may obtain pursuant to this **Section 5.04** to the extent that such information shall allow a Limited Partner to identify any other Limited Partner.  As a result, each Limited Partner agrees and acknowledges that any books and records of the Partnership made available to a Limited Partner for inspection may be redacted to exclude any information concerning the identity of the other Limited Partners, and, to the extent such books and records cannot be so redacted, such books and records may be withheld for inspection to such requesting Limited Partner.  Copies of this Agreement and all amendments hereto shall be furnished to each Limited Partner upon request.  For the avoidance of doubt, the foregoing reporting provisions shall apply on a Series-by-Series basis.

**Section 5.05**    **No Restriction on Other Activities**.  Limited Partners may engage and hold interests in business ventures of every kind and description for their own accounts, including, without limitation, business ventures which are, directly or indirectly, in competition with the Partnership and whether or not the Partnership or any of the Partners also has an interest therein.  Neither the Partnership nor any of the Partners shall have any rights in such independent business ventures by virtue of this Agreement.

**Section 5.06**    **Voting Rights**.  In addition to the rights to vote conferred upon the Limited Partners in **Sections 3.01(b), 3.02, 4.02 and 13.02** or otherwise specifically set forth herein, Limited Partners shall have the right to vote on amendments to this Agreement to the extent provided in **Section 14.08**.

**Section 5.07**    **Constructive Consent by Limited Partners**.  In the event that the General Partner requires the consent of the Limited Partners in order to take action (including approving amendments to this Agreement), and written notice of such action is sent to any such Limited Partners by (i) certified mail, return receipt requested, (ii) electronic mail, or (iii) overnight delivery by a reputable private carrier or by the postal service, those Limited Partners not affirmatively objecting in writing within thirty (30) days after such notice is deemed to have been mailed or sent (under **Section 14.01**) be deemed to have consented to the proposed action set forth in the General Partner's notice.

**Section 5.08**    **Rights as to Dissolution**.  The Limited Partners shall have no right or power to cause the dissolution and winding up of the Partnership by court decree or otherwise or to withdraw or reduce their Capital Contributions, except as set forth in the Certificate and this Agreement.  No Limited Partner shall have the right to bring an action for partition against the Partnership, and each Partner hereby waives any right to partition of the Partnership's property.

**Section 5.09**    **Consent by Partners in Lieu of Meeting**.  Any action required by this Agreement or the Act to be taken at any regular or special meeting of the Partners, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Partners (or shall be deemed signed by the Partners pursuant to **Section 5.07**) having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Partners entitled to vote thereon were present and voted.

**Section 5.10**    **Non-Voting Interests of BHC Limited Partners; Other Non-Voting Interests**

018703

HCMLPHMIT00003904

(a)      The portion of any Partnership Interest held for its own account by a BHC Limited Partner (as defined in this **Section 5.10(a)**) whose interests in the Partnership are determined, at any time, to be in excess of 4.99% (or such greater or lesser percentage as may be permitted or required from time to time under under 4(c)(6) of the Bank Holding Company Act of 1956, as amended ("**BHCA**")) of the aggregate outstanding Partnership Interests of all Limited Partners, excluding any other Partnership Interests that are non-voting Partnership Interests pursuant to this **Section 5.10**, shall be deemed to be non-voting Partnership Interests to the extent of such excess above 4.99% (whether or not subsequently transferred, in whole or in part, to any other person or entity) (collectively, "**Non-Voting Interests**"); *provided* that such Non-Voting Interests shall be permitted to participate in any vote by the Limited Partners on (i) any proposal to dissolve or continue the business of the Partnership under this Agreement, (ii) any vote pursuant to **Section 4.02**, and (iii) matters with respect to which voting rights are not considered to be "voting securities" under 12 C.F.R. § 225.2(q)(2), including such matters which may "significantly and adversely" affect a BHC Limited Partner (such as amendments to this Agreement or modifications of the terms of its Partnership Interest). Except as provided in **Section 13.01(a)**, a BHC Limited Partner shall not be permitted to vote on the selection of any successor general partner of the Partnership, and each BHC Limited Partner irrevocably waives its right to vote its Non-Voting Interest on the selection of a successor general partner of the Partnership under Section 17-801 of the Act, which waiver shall be binding upon such BHC Limited Partner or any person or entity that succeeds to its Partnership Interest. A "**BHC Limited Partner**" shall mean any Limited Partner that is, or is an affiliate of, a bank holding company (as defined in Section 2(a) of the BHCA) that is subject to the provisions of Regulation Y issued by the Board of Governors of the Federal Reserve System.

(b)      To the extent permitted by the BHCA, and except as otherwise provided in this **Section 5.10**, Non-Voting Interests shall not be counted as Partnership Interests held by any Limited Partner for purposes of determining whether any vote or consent required by this Agreement has been approved or given by the requisite percentage of the Limited Partners.

(c)      Notwithstanding the foregoing, any BHC Limited Partner may elect to no longer be treated as a BHC Limited Partner for the purposes of this Agreement by delivering written notice of such election to the General Partner. Any such election made by a BHC Limited Partner may be rescinded at any time by providing written notice thereof to the General Partner.

(d)      The General Partner may, for legal, regulatory or other reasons, designate any other Partnership Interests as non-voting, in whole or in part. Except as provided in this **Section 5.10**, a Partnership Interest held by a Limited Partner as a non-voting Partnership Interest shall be identical in all regards to all other Partnership Interests held by Limited Partners.

(e)      For the avoidance of doubt, the provisions of this **Section 5.10** shall apply on a Series-by-Series basis.

---

## ARTICLE VI
### FEES AND EXPENSES; BROKERAGE PRACTICES

**Section 6.01**    **Management Fee**.

(a)      In consideration for services provided pursuant to the Investment Management Agreement, the Investment Manager shall receive a quarterly management fee ("**Management Fee**") equal to a percentage of each Limited Partner's share of the Partnership's Net Asset Value (as defined in **Section 9.04**), and based on the Partnership's total Net Asset Value, as follows:

| Partnership's Total Net Asset Value | Management Fee (per annum) |
| --- | --- |

018704
HCMLPHMIT00003905

| $0 - $99,999,999 | 0.5500% |
| $100,000,000 - $199,999,999 | 0.5000% |
| $200,000,000 - $249,999,999 | 0.4500% |
| $250,000,000 - $499,999,999 | 0.3500% |
| > $500,000,000 | 0.3400% |

For the avoidance of doubt, the Management Fee calculated based on the foregoing schedule will be calculated on a "progressive" basis. For example, if the Partnership's Net Asset Value reaches $150,000,000, the initial $99,999,999 will always be charged a Management Fee of 0.55000% annually. The benefit of the declining Management Fee schedule above is intended to benefit all Limited Partners as each Capital Account will be charged a blended Management Fee based on the above schedule.

The Management Fee shall be calculated and payable to the Investment Manager quarterly, in advance, as of the first day of each calendar quarter. A *pro rata* Management Fee shall be charged to Limited Partners on any amounts accepted by the General Partner during a calendar quarter. No part of the Management Fee shall be refunded in the event that a Limited Partner withdraws, whether voluntarily or involuntarily, all or any of the value in such Limited Partner's Capital Account during any calendar quarter. Management Fees shall be payable with respect to the Partnership Interests of a Limited Partner in any Side Pocket Account.

(b)     For purposes of calculating the Management Fee with respect to Side Pocket Accounts, Illiquid Investments (each as defined in **Section 9.07**) shall be carried at their fair value (which may be at, above or below cost) as determined by the Investment Manager.

(c)     With respect to any Limited Partner who has requested to withdraw all of its Partnership Interests from the Partnership, with the exception of any Partnership Interests maintained in a Side Pocket Account, the Partnership may reserve an amount from the withdrawing Limited Partner's withdrawal proceeds in order to cover the estimated accrued Management Fees and expenses attributable to the Limited Partner's Partnership Interests in the Side Pocket Account based on the Investment Manager's estimate of the time period that the Illiquid Investments held in the Side Pocket Account shall remain in such Side Pocket Account (collectively, the "**Management Fee Reserve**"). The Management Fee Reserve shall be treated as a liability of the Partnership, and the balance of the Management Fee Reserve, if any, shall be paid to the withdrawing Limited Partner, without interest, upon such Limited Partner's complete withdrawal from the Side Pocket Account.

(d)     The Partnership will also bear its *pro rata* share of the management fees charged by the managers of the Portfolio Funds. Notwithstanding the foregoing, the Investment Manager intends to waive any management fees due to the Investment Manager with respect to any investment of the Partnership in any Affiliated Funds (as defined in the Memorandum), including the PE Portfolio Fund (as defined in the Memorandum). Accordingly, to the extent that the Partnership invests in any Affiliated Funds, including the PE Portfolio Fund, the Partnership will not be subject to a layering of fees.

**Section 6.02**     **Expenses**

(a)     **Organizational and Initial Offering Expenses**. The Partnership shall pay or reimburse the General Partner, the Investment Manager and/or their respective managers, members, shareholders, directors, officers, partners, employees, agents and/or affiliates (collectively, "**Investment Manager Affiliates**") for all organizational

018705

HCMLPHMIT00003906

and initial offering expenses of the Partnership, including, but not limited to, legal and accounting fees, printing and mailing expenses and government filing fees (including blue sky filing fees). The Partnership's organizational and initial offering expenses may be, for accounting purposes, capitalized and amortized by the Partnership for up to sixty (60) months from the date the Partnership commences operations. Amortization of such expenses is a divergence from GAAP. In certain circumstances, this divergence may result in a qualification of the Partnership's annual audited financial statements. In such instances, the Partnership may elect to: (i) avoid the qualification by recognizing the unamortized expenses or (ii) make GAAP-conforming changes for financial reporting purposes, but capitalize and amortize expenses for purposes of calculating the Partnership's Net Asset Value (resulting in a divergence in Fiscal Year-end Net Asset Values reported in the Partnership's financial statements, and as otherwise applicable under the provisions of this Agreement). If the Partnership capitalizes and amortizes such expenses and is then terminated within sixty (60) months of its commencement, any unamortized expenses shall be recognized. If a Limited Partner makes a withdrawal prior to the end of the period during which the Partnership is capitalizing and amortizing expenses, the Partnership may, but is not required to, accelerate a proportionate share of the unamortized expenses based upon the amount being withdrawn and reduce withdrawal proceeds accordingly.

(b)     **Operating Expenses**.  The Partnership shall pay or reimburse the General Partner, the Investment Manager and/or the Investment Manager Affiliates for: (i) all expenses incurred in connection with the ongoing offer and sale of Partnership Interests, including, but not limited to, printing of the Memorandum and exhibits, marketing expenses and documentation of performance and the admission of Limited Partners, (ii) all operating expenses of the Partnership, such as tax preparation fees, governmental fees and taxes, fees to the Partnership's administrator ("**Administrator**"), costs of communications with Limited Partners, and ongoing legal, accounting, auditing, bookkeeping, consulting and other professional fees and expenses, (iii) all Partnership research, trading and investment-related costs and expenses (e.g., brokerage commissions, research fees, margin interest, expenses related to short sales, custodial fees, bank service fees, and clearing and settlement charges), (iv) technology-related costs and expenses, including, but not limited to, software licenses, data feeds and colocation expenses, (v) all expenses related to attending any conference or seminar related to alternative investments (e.g., registration, transportation, accommodation or meal expenses), (vi) regulatory and other filing fees and expenses, (vii) travel expenses related to meeting with management teams, or related to any of the other categories of expenses set forth herein, (viii) any costs and expenses incurred by the Partnership in connection with converting from a stand-alone fund into a "feeder fund" as part of a master-feeder structure, (ix) director and officer liability insurance or other insurance premiums for any principal or employee of the Partnership, the General Partner, the Investment Manager or any of the Investment Manager Affiliates, (x) all fees and other expenses incurred in connection with the investigation, prosecution or defense of any claims, assertion of rights or pursuit of remedies, by or against the Partnership, including, without limitation, professional and other advisory and consulting expenses, and (xi) any and all costs and expenses incurred in connection with the dissolution, winding up, or termination of the Partnership. Each of the General Partner, the Investment Manager or any of the Investment Manager Affiliates, in its sole discretion, may from time to time pay for any of the foregoing Partnership expenses. Any such person may elect to be reimbursed for such expenses, or to waive its right to reimbursement for any such expenses, as well as terminate any such voluntary payment or waiver of reimbursement.

The Partnership will also bear its *pro rata* share of the expenses of each Portfolio Fund.

(c)     **Allocation of Expenses Among Series**.  The General Partner and/or the Investment Manager will allocate all expenses attributable to the Partnership among the Series on a *pro rata* basis or otherwise in their reasonable discretion.

018706

HCMLPHMIT00003907

(d)    **General Partner and Investment Manager Expenses**.  The General Partner and the Investment Manager shall pay for their own general operating and overhead expenses associated with providing the management and investment management services required under this Agreement and the Investment Management Agreement, respectively.  These expenses include all expenses incurred by the General Partner and the Investment Manager in providing for their normal operating overhead, including, but not limited to, the cost of providing relevant support and administrative services (e.g., employee compensation and benefits, rent, office equipment, computer systems, insurance (other than as expressly set forth above), utilities, telephone, secretarial and bookkeeping services, etc.), but not including any Partnership operating expenses described above. The General Partner and the Investment Manager may use "soft dollar" commissions or rebates by brokerage firms of commissions generated by the Partnership's brokerage transactions executed through those firms to pay for certain brokerage and research products and services that fall within the safe harbor under Section 28(e) of the Securities Exchange Act of 1934, as amended, as set forth in the Memorandum.

**Section 6.03**    **Marketing Fees and Sales Charges**.  The General Partner and/or the Investment Manager may sell Partnership Interests through broker-dealers and pay a marketing fee or commission in connection with such activities, including ongoing payments, at the General Partner's or the Investment Manager's own expense.  The General Partner and/or the Investment Manager may also deduct a percentage of the amount invested by a Limited Partner in the Partnership to pay sales fees or charges, on a fully disclosed basis, to a broker-dealer based upon the Capital Contribution of such Limited Partner introduced to the Partnership by such broker-dealer.  Any such sales fees or charges would be assessed against the referred Limited Partner and would reduce the amount actually invested by such Limited Partner in the Partnership.  If a Limited Partner is introduced to the Partnership through a broker-dealer that is not affiliated with the General Partner and/or the Investment Manager, the arrangement, if any, with such broker-dealer shall be disclosed to, and acknowledged by, such Limited Partner.

**Section 6.04**    **Directed Brokerage**.  The Investment Manager is authorized to direct Partnership brokerage transactions to brokers or other persons who refer prospective Limited Partners to the Partnership.  The Investment Manager is authorized to pay finders' fees or other compensation at its own expense to such persons.

**Section 6.05**    **Allocation of Investment Opportunities**.  The Investment Manager may at times determine that certain investments shall be suitable for acquisition by the Partnership and by other accounts managed by the Investment Manager, the Investment Manager's own accounts or accounts of an affiliate.  If that occurs, and the Investment Manager is not able to acquire the desired aggregate amount of such investments on terms and conditions which the Investment Manager deems advisable, the Investment Manager shall endeavor to allocate in good faith the limited amount of such investments acquired among the various accounts for which the Investment Manager considers them to be suitable.  The Investment Manager may make such allocations among the accounts in any manner which it considers to be fair under the circumstances, including, but not limited to, allocations based on relative account sizes, the degree of risk involved in the investments acquired, and the extent to which such investments are consistent with the investment policies and strategies of the various accounts involved.

**Section 6.06**    **Aggregation of Orders**.  The Investment Manager may aggregate purchase and sale orders of investments held by the Partnership with similar orders being made simultaneously for other accounts or entities if, in the Investment Manager's reasonable judgment, such aggregation is reasonably likely to result in an overall economic benefit to the Partnership based on an evaluation that the Partnership shall be benefited by relatively better purchase or sale prices, lower commission expenses or beneficial timing of transactions, or a combination of these and other factors.  In some instances, the purchase or sale of investments for the Partnership may be effected simultaneously with the purchase or sale of like investments for other accounts or entities.  Such transactions may be made at slightly different prices, due to the volume of investments purchased or sold.  In such event, the average price of all investments purchased or sold in such transactions may be determined, at the Investment Manager's sole discretion, and the Partnership may be charged or credited, as the case may be, with the average transaction price.

018707

HCMLPHMIT00003908

## ARTICLE VII
### WITHDRAWALS FROM CAPITAL ACCOUNT; DISTRIBUTIONS

**Section 7.01**   **Permissible Withdrawals**.  A Limited Partner may withdraw all or any of the value in such Limited Partner's Capital Account in any Series in the manner and to the extent provided in **Section 7.02**.  Each of the General Partner and its principals and affiliates may withdraw all or any of the value in its respective Capital Account at any time, from time to time, without the consent of the Limited Partners and without notice to any of the Limited Partners.

**Section 7.02**   **Withdrawal Procedures**

(a)   Subject to the Lock-Up Period (as defined in **Section 7.02(b)**) and certain other restrictions described herein, each Limited Partner may withdraw a minimum of $100,000 as of the last day of each calendar quarter and at such other times as the General Partner may determine in its sole discretion (each such date shall be referred to herein as a "**Withdrawal Date**"), upon at least ninety-one (91) days' prior written notice to the Administrator, with a copy to the General Partner.  Unless the General Partner consents, partial withdrawals may not be made if they would reduce a Limited Partner's Capital Account balance below $500,000.  All withdrawals shall be deemed made prior to the commencement of the following calendar quarter (or other relevant period).

(b)   Each Capital Contribution by a Limited Partner to the Partnership will be subject to a twelve (12)-month lock-up period ("**Lock-Up Period**") during which such capital may not be withdrawn from the Partnership, unless the Lock-Up Period is waived or reduced by the General Partner.  If a Limited Partner purchases Partnership Interests on multiple dates, each tranche of Partnership Interests will be tracked separately for purposes of the Lock-Up Period, and withdrawals will be deemed made from Partnership Interests purchased on the earliest date (as adjusted for changes in the Net Asset Value).  For the avoidance of doubt, the foregoing Lock-Up provisions shall apply on a Series-by-Series basis.

(c)   The General Partner believes (but cannot guarantee) that the assets of the Partnership will be invested in a manner which would allow the General Partner to satisfy withdrawal requests.  The General Partner may, in its sole discretion:  (i) defer withdrawal requests until the Partnership's assets mature or are liquidated in due course, (ii) elect to purchase with its own funds the Partnership Interests of the withdrawing Partner, or (iii) borrow from a third party or draw from a line of credit, subject to availability and other factors, in order to fund any withdrawal.   In addition, notwithstanding anything to the contrary herein, the General Partner may limit and/or suspend withdrawals in order to ensure that the Partnership, at all times, meets the diversification requirements applicable to insurance-dedicated investment funds, as further set forth in the Memorandum.

(d)   A Limited Partner may not withdraw any of the amounts in its Capital Account that are attributable to the value of an Illiquid Investment held in a Side Pocket Account until such time that such Illiquid Investment (or the sales proceeds thereof) is reallocated to such Limited Partner's Capital Account.  At the sole discretion of the Investment Manager, an Illiquid Investment may be held in a Side Pocket Account until the occurrence of a Realization Event (as defined in **Section 9.07**).  **For the avoidance of doubt, any investment made by Series 1 into the series of the PE Portfolio Fund that corresponds to the latter fund's investment made in the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**

(e)   The following provision shall apply to withdrawals, on a Series-by-Series basis:

(i)   A Limited Partner who requests any withdrawal of capital that constitutes, together with prior withdrawals within any Fiscal Year, less than ninety percent (90%) of the value of such Limited Partner's Capital Account (excluding any amounts held in any Side Pocket Accounts) shall be paid

018708

HCMLPHMIT00003909

within ninety (90) days after the applicable Withdrawal Date.

(ii)    In the event that a Limited Partner requests a withdrawal of capital that constitutes, together with prior withdrawals within any Fiscal Year, ninety percent (90%) or more of the value of such Limited Partner's Capital Account (excluding any amounts held in any Side Pocket Accounts), the General Partner may reduce the amounts paid after any Withdrawal Date so that they constitute, in the aggregate during such Fiscal Year ninety percent (90%) of an amount estimated by the General Partner to be the amount to which the withdrawing Limited Partner is entitled in the aggregate (calculated on the basis of unaudited data); such amount will be paid within ninety (90) days after the applicable Withdrawal Date.  The balance of the amount payable upon such withdrawal shall be paid, without interest, within ninety (90) days after completion of the audited financial statements for the Fiscal Year in which the withdrawal occurs. Notwithstanding the foregoing, the General Partner may, in its sole discretion, agree to pay up to the full Capital Account balance (calculated on the basis of unaudited data) to a withdrawing Limited Partner within ninety (90) days after the applicable Withdrawal Date, subject to adjustment based on audited financial statements. To the extent that the sum previously paid to a withdrawing Limited Partner is calculated to have exceeded the amount to which it is entitled, that Limited Partner shall be required to repay to the Partnership the balance.

(f)    The General Partner may, in its sole discretion, require a Limited Partner to withdraw any or all of the value of such Limited Partner's Capital Accounts on at least five (5) days' notice for any reason or no reason; *provided, however*, that the General Partner may require such a withdrawal on less (or no) notice in order to comply with any laws and regulations applicable to the Partnership and/or its affiliates.

(g)    The Partnership or the relevant Series has the right to pay cash or in-kind, or a combination of both, to a Limited Partner that makes a withdrawal from such Limited Partner's Capital Account under this **Article VII**.

(h)    All withdrawals shall be subject to the General Partner's power to establish such reserves for the Partnership or a Series as the General Partner shall, in its sole but reasonable discretion, deem appropriate to pay current and future, definite, contingent and possible obligations of the Partnership or a Series (even if such reserves are not in accordance with GAAP), including estimated expenses in connection therewith, which could reduce the amount of a distribution upon withdrawal.

(i)    All notices of withdrawal must specify the dollar amount or percentage of value of a Limited Partner's Capital Account to be withdrawn.  The General Partner, in its sole discretion, may waive or modify any of the terms relating to withdrawals, including, without limitation, minimum amounts, notice periods and the Lock-UP Period, for all or any of the Limited Partners in its discretion without notice to the other Limited Partners.

(j)    If the General Partner, in its sole discretion, permits a Limited Partner to withdraw capital other than on a regularly scheduled Withdrawal Date, the General Partner may impose an administrative fee to cover the actual legal, accounting, administrative, brokerage, and any other costs and expenses associated with such withdrawal.  Such fee shall be payable to the relevant Series of the Partnership and shall be deducted from the withdrawal proceeds of the withdrawing Limited Partner as of such Withdrawal Date.

(k)    Upon withdrawal of all of the capital in its Capital Account (excluding for purposes hereof, any remaining investments held in a Side Pocket Account), a Limited Partner shall be deemed to have withdrawn from the Partnership or the relevant Series and, upon notice of such withdrawal, a Limited Partner shall not be entitled to exercise any voting rights afforded to Limited Partners under this Agreement.

018709
HCMLPHMIT00003910

(l)      In addition to the above limitations on withdrawals, all withdrawals by Limited Partners will be subject to any limitations on withdrawals imposed by the Portfolio Funds, as applicable. For example, the ability of the Partnership to provide withdrawal proceeds to a Limited Partner may be subject to, among other things, various notice period requirements of the Portfolio Funds.

**Section 7.03**      **Limitations on Withdrawals**

(a)      The Partnership or a Series may suspend (or postpone) withdrawals, subscriptions, calculations of Net Asset Value and/or payments upon any withdrawals (in whole or in part) from Capital Accounts:

(i)      during the existence of any state of affairs which, in the opinion of the General Partner, makes the disposition of the Partnership's investments impractical or prejudicial to the Partners, or where such state of affairs, in the opinion of the General Partner, makes the determination of the price or value of the Partnership's investments impractical or prejudicial to the Partners;

(ii)      where any such withdrawals, subscriptions, calculations and/or payments, in the opinion of the General Partner, would result in the violation of any applicable law or regulation, including any diversification requirements applicable to insurance-dedicated investment funds;

(iii)      if the General Partner determines, in its sole discretion, that such suspension or postponement is prudent in order to prevent the Partnership from being subject to adverse tax or regulatory implications;

(iv)      a Portfolio Fund suspends the right to, or the payment of proceeds due upon, withdrawal and/or a Portfolio Fund allocates assets to its side pocket account;

(v)      a Portfolio Fund satisfies a withdrawal request by making an in-kind distribution; or

(vi)      for such other reasons or for such other periods as the General Partner may in good faith determine.

(b)      All Limited Partners shall be notified in writing of any such suspension or postponement and the termination thereof. Following any suspension or postponement of withdrawals, a withdrawal request made by a Limited Partner prior to such suspension or postponement shall be effected as of the first Withdrawal Date following the recommencement of withdrawals.

(c) For the avoidance of doubt, the following "gate" provisions shall apply on a Series-by-Series basis. In the event that Limited Partners, in the aggregate, request, as of any Withdrawal Date, withdrawals of more than twenty-five percent (25%) of the aggregate balances of the Partnership's Capital Accounts (excluding any Side Pocket Accounts), the requested amounts may, in the General Partner's sole discretion, be reduced to an amount equal to twenty-five percent (25%) of the aggregate Capital Account balances of the Partnership (excluding any Side Pocket Accounts) as of such date, and satisfied on a *pro rata* basis, based on the respective amounts of requested withdrawals of capital by each withdrawing Limited Partner. Capital withdrawal requests that are deferred due to such limitation may be revoked by the withdrawing Limited Partner, and if not revoked, will be aggregated with other withdrawal requests received for subsequent Withdrawal Dates. In the interim, all of the remaining capital in such Limited Partner's Capital Account (including the capital subject to such deferred withdrawal request) shall remain subject to the performance of the Partnership.

**Section 7.04**      **Distributions**

018710

HCMLPHMIT00003911

(a)     The Partnership (or any Series) is not required, and generally does not intend, to make any distributions of cash or other property.  However, the Partnership (or any Series) may make such distributions at such times and in such amounts as the General Partner shall determine in its sole discretion.

(b)     All distributions hereunder (other than those made related to withdrawals from Capital Accounts) shall be made *pro rata* to all Partners in accordance with their relative Capital Accounts (or Side Pocket Accounts, New Issues Accounts or other memorandum accounts, as applicable) at the time of any such distribution.  The General Partner may set up such reserves as it shall determine shall be appropriate or necessary to accomplish the purposes of the Partnership (even if such reserves are not in accordance with GAAP).  If the Partnership (or a Series) shall distribute property other than cash pursuant to this **Section 7.04**, the Capital Accounts of the Partners shall be adjusted as if such property were sold at the value of such property as determined under **Section 9.04**, and the cash proceeds of such sale were distributed.

(c)     Notwithstanding anything to the contrary herein, to the extent that the Partnership makes any distributions, the General Partner may limit such distributions, in its sole discretion, in order to ensure that the Partnership, at all times, meets the diversification requirements applicable to insurance-dedicated investment funds.

## ARTICLE VIII
### ADDITIONAL LIMITED PARTNERS

**Section 8.01**   **Future Issuance of Partnership Interests**.  The General Partner may admit as of the first day of each month (each such date, a "**Contribution Date**"), or at any other time that the General Partner determines in its sole and absolute discretion, as additional Limited Partners ("**Additional Limited Partners**"), persons who contribute cash or, in the General Partner's sole discretion, persons who contribute securities (and/or other investments), for Partnership Interests ("**Capital Contributions**").  If the General Partner consents to a Limited Partner's contribution of securities (and/or other investments) to the Partnership, the Partnership may, in the General Partner's discretion, assess a special charge against such Limited Partner equal to the actual costs incurred by the Partnership in connection with accepting such contributed securities (and/or other investments), including, but not limited to, the costs of liquidating, or otherwise adjusting the Partnership's portfolio to accommodate, such securities (and/or other investments), and legal, accounting and administration costs.  Such special charge shall be assessed as of such dates deemed appropriate by the General Partner.  Any securities (and/or other investments) accepted as a Capital Contribution shall be valued by the General Partner, in its sole discretion, using the valuation criteria set forth in **Section 9.04**.

## ARTICLE IX
### CAPITAL ACCOUNTS; CAPITAL CONTRIBUTIONS; NET ASSET VALUE ADJUSTMENTS; TAXABLE INCOME AND LOSS AND DISTRIBUTIONS

**Section 9.01**   **Capital Accounts**.  A Partner's "**Capital Account**" as of a particular date shall consist of the following:

(a)   an amount equal to the Partner's Original Capital Contribution;

(b)   the increases, if any, to such account by reason of Additional Capital Contributions (as defined in **Section 9.03(a)**);

(c)   the decreases, if any, to such account by reason of withdrawals (and distributions) from such Capital Account; and

(d)   the increases or decreases, if any, to such Capital Account in accordance with the provisions of this **Article IX**.

Capital Accounts shall be maintained in accordance with the provisions of Treasury

018711

HCMLPHMIT00003912

Regulations Section 1.704-1(b)(2), or any successor provisions thereto.

**Section 9.02**    **Original Capital Contributions**.  A Partner's "**Original Capital Contribution**" shall be the amount of the cash, or in the sole discretion of the General Partner, securities (and/or other investments), contributed by such party upon such Partner's admission as a Partner.  The General Partner may establish such minimum Original Capital Contribution as the General Partner deems appropriate and that minimum may thereafter be waived or changed by the General Partner.  In the event an Original Capital Contribution is accepted as of any day other than a Contribution Date, the General Partner shall cause appropriate adjustments to be made for purposes of applying the accounting and allocation provisions of this Agreement.  At any time that a Partner is admitted, the General Partner shall end the prior accounting period on the day prior to the date of the acceptance of the Original Capital Contribution, and commence a new accounting period on the date of such admission, and upon such admission, the Partnership Interests shall be adjusted and reallocated based upon the Capital Accounts of the respective Partners.

**Section 9.03**    **Additional Capital Contributions**

(a)    A Partner shall be permitted, with the consent of the General Partner, to make additional Capital Contributions in an amount deemed appropriate by the General Partner in cash or, in the sole discretion of the General Partner, securities (and/or other investments) ("**Additional Capital Contributions**") to the capital of the Partnership as of any Contribution Date, or at any other time that the General Partner determines in its sole and absolute discretion. In the event an Additional Capital Contribution is accepted as of any day other than a Contribution Date, the General Partner shall cause appropriate adjustments to be made for purposes of applying the accounting and allocation provisions of this Agreement.  At any time that Additional Capital Contributions are accepted pursuant to this **Section 9.03**, the General Partner shall end the prior accounting period on the day prior to the date of the acceptance of the Additional Capital Contributions, and commence a new accounting period on the date of such acceptance, and upon such acceptance, the Partnership Interests shall be adjusted and reallocated based upon the Capital Accounts of the respective Partners.  Any securities accepted as an Additional Capital Contribution shall be valued by the General Partner, in its sole discretion, using the valuation criteria set forth in **Section 9.04**.

(b)    In connection with an Additional Capital Contribution by an existing Limited Partner, the General Partner shall (i) treat such Additional Capital Contribution as a Capital Contribution with respect to one of such Limited Partner's existing Capital Accounts or (ii) establish a new Capital Account to which such Capital Contribution shall be credited and which shall be maintained for the benefit of such Limited Partner separately from any existing Capital Account of such Limited Partner.  Such separate Capital Account may be maintained for any purpose, in the discretion of the General Partner, including the calculation of the Incentive Fee, the Loss Carryforward (each as defined in **Section 9.05**) and/or the Lock-Up Period.  If a Limited Partner has more than one Capital Account, any withdrawals by or distributions to such Limited Partner shall be applied to such Capital Accounts in such manner and proportion as the General Partner shall determine in its sole discretion.

**Section 9.04**    **Determination of Net Asset Value**

(a)    The net asset value ("**Net Asset Value**") of the Partnership, on a Series-by-Series basis, shall be determined on an accrual basis of accounting, as of the end of each calendar month (or other period, as the case may be), in accordance with GAAP, consistently applied (except that: (x) organizational and initial offering expenses of the Partnership may be capitalized and amortized over a period of up to sixty (60) months from the date the Partnership commences operations and (y) reserves may be taken that are inconsistent with GAAP), the Memorandum and the following:

(1)    No value shall be assigned to goodwill;

(2)    All accrued debts and liabilities shall be treated as liabilities, including, but

018712

HCMLPHMIT00003913

not limited to, all compensation payable to the Investment Manager that has been earned but not yet paid (e.g., Management Fees and Incentive Fees), any allowance for the Partnership's estimated annual audit and legal fees and other operating expenses and any contingencies for which reserves are required;

(3)     Securities, commodities and other financial instruments (other than options) that are listed on a national securities, commodities or other exchange, or over-the-counter instruments listed on NASDAQ, shall be valued at their last sales prices on such date or, if no sales occurred on such date, at the midpoint between the last "bid" and "ask" prices for such securities, commodities or financial instruments on such date;

(4)     Options that are listed on a securities or commodities exchange shall be valued at their last sales prices on the date of determination on the largest securities or commodities exchange (by trading volume) on which such options shall have traded on such date; provided that, if the last sales prices of such options do not fall between the last "bid" and "ask" prices for such options on such date, then such options shall be valued at the midpoint between the last "bid" and "ask" prices for such options on such date;

(5)     Securities, commodities, options and other financial instruments that are not listed on an exchange or quoted on an over-the-counter market, but for which there are available quotations, shall be valued based upon quotations obtained from market makers, dealers or pricing services;

(6)     Securities (and/or other investments) contributed to the Partnership as subscription proceeds shall be treated as if purchased by the Partnership at market value on the date of contribution, and securities (and/or other investments) distributed from the Partnership as withdrawal proceeds shall be treated as if sold by the Partnership at market value on the date of distribution;

(7)     Net profits and net losses from New Issues (as defined in **Section 9.08(a)**) shall only be credited or debited to the Net Asset Value of the New Issues Accounts, except to the extent permitted by the applicable rules of the FINRA (as defined in **Section 9.08(a)**), in which case a portion of the net profits and net losses from New Issues may be credited or debited to the Net Asset Value of the Capital Accounts of Limited Partners who are Restricted Persons (as defined in **Section 9.08(a)**) up to an amount permitted by applicable FINRA rules;

(8)     Any securities, commodities, options and other financial instruments that have no public market, investments in other asset classes (including those in Side Pocket Accounts), and all other assets of the Partnership for which a valuation methodology is not specified, shall be valued by the Investment Manager in a manner determined in good faith to reflect their fair market value; and

(9)     In the case of investments in Portfolio Funds, which investments are expected to constitute most of the Partnership's assets, the net asset value calculation provided by the relevant managers (or any affiliates or service providers thereof) of those Portfolio Funds will generally be used in determining the Partnership's Net Asset Value.  The Investment Manager intends to engage an independent third-party valuation agent (in addition to the Administrator) to appraise the Partnership's interests in Illiquid Investments, including, without limitation, the PE Portfolio Fund; *provided* that, if the PE Portfolio Fund engages its own independent third-party valuation agent, the Partnership may rely on such valuation of any investment in the PE Portfolio Fund.  None of the General Partner, the Investment Manager or any of their respective affiliates will be responsible for calculating the net asset value of the Portfolio Funds or for verifying the

018713

HCMLPHMIT00003914

accuracy and completeness of any such values received.

(b)    If the Investment Manager determines, in its sole discretion, that the valuation of any security, commodity, option or other financial instrument does not fairly represent its market value, the Investment Manager shall value such security, commodity, option or other financial instrument as it reasonably determines.

(c)    In connection with the determination of the Net Asset Value of the Partnership, the Investment Manager may consult with and is entitled to rely upon the advice of the Partnership's brokers and any other third parties deemed appropriate by the Investment Manager.  In no event and under no circumstances shall the Investment Manager, the Partnership's brokers or such other third parties incur any individual liability or responsibility for any determination made or other action taken or omitted by them in good faith.

(d)    Absent bad faith or manifest error, all Net Asset Value determinations pursuant to this Agreement are conclusive and binding as to all Partners.

(e)    After the foregoing determinations have been made, a further calculation shall be made to determine the increase or decrease in Net Asset Value of the Partnership during the month (or other time period, as the case may be) just ended.  The term "**increase in Net Asset Value**" shall be the excess of Net Asset Value at the end of any month (or other time period, as the case may be) over that of the Net Asset Value of the Partnership as of the end of the preceding period, after adjusting for Capital Contributions, distributions and withdrawals.  The term "**decrease in Net Asset Value**" shall be the amount by which the Net Asset Value at the end of the month (or other time period, as the case may be) is less than the Net Asset Value of the Partnership as of the end of the preceding period, after making the adjustments specified above.

**Section 9.05     Allocation of Increases and Decreases in Net Asset Value; Incentive Fee**

(a)    Any net increase or decrease in Net Asset Value during any month (or such other period, as the case may be) shall be allocated as of the end of such month (or such other period, as the case may be) to the Capital Account of each Partner in the proportion which such Partner's Capital Account bore to the sum of the Capital Accounts of all the Partners as of the beginning of such month (or such other period, as the case may be); *provided* that net increases or decreases in Side Pocket Accounts, New Issues Accounts and other memorandum accounts shall be allocated as provided in **Sections 9.07 and 9.08**, respectively.

(b)    In consideration for the management services provided pursuant to this Agreement, the General Partner shall receive an incentive fee ("**Incentive Fee**") at the close of each Fiscal Year (or such other applicable period that this payment is made in accordance with this Agreement, as the case may be) equal to five percent (5%) of the net increase in Net Asset Value (including realized and unrealized gains and losses and net of the Management Fee) attributable to each Limited Partner's Capital Account for such Fiscal Year (or other applicable period), as determined on the accrual basis of accounting; *provided*, *however*, that the Incentive Fee shall be subject to a Loss Carryforward (as described below in **Section 9.05(g)**).

(c)    The Incentive Fee shall not include any change in the value of an Illiquid Investment held in a Side Pocket Account until such Illiquid Investment (or the sales proceeds thereof) has been reallocated from such Side Pocket Account to the Capital Accounts of participating Partners.  Notwithstanding the foregoing, any income generated from an Illiquid Investment shall be transferred to and included in the Capital Accounts of participating Partners for purposes of calculating the Incentive Fee.

(d)    The Partnership will also bear its *pro rata* share of the incentive-based fees/allocations charged by the managers of the Portfolio Funds.  Notwithstanding the foregoing, (x) the General Partner intends to waive any incentive-based fees/allocations due to the General Partner and/or any affiliate thereof with respect to

018714

HCMLPHMIT00003915

any investment of the Partnership in any Affiliated Funds, including the PE Portfolio Fund, such that, to the extent that the Partnership invests in any Affiliated Funds, including the PE Portfolio Fund, the Partnership will not be subject to a layering of fees; and (y) to the extent that the Partnership is subject to a waiver or reduction of incentive-based fees/allocations, or any other special arrangement, with respect to its investment in the PE Portfolio Fund, the General Partner shall nevertheless not charge any such fees or allocations (or otherwise change such arrangement) at the level of the Partnership.

(e)     The General Partner shall also receive the Incentive Fee with respect to any amounts withdrawn by a Limited Partner, whether voluntary or involuntary, and upon dissolution of the Partnership under **Article XIII**.  The Incentive Fee shall be paid to the General Partner in addition to, and separately from, the allocations of net increases or decreases in Net Asset Value to its Capital Account pursuant to **Section 9.05(a)**.

(f)     In the event of a net decrease in the Net Asset Value of the Capital Account of any Limited Partner in any Fiscal Year (or other relevant Incentive Fee period), the amount of such net decrease shall be recorded and carried forward as a "**Loss Carryforward**".  Any net increase in the Net Asset Value of the Capital Account of such Limited Partner in a subsequent Fiscal Year (or other period) shall be applied to reduce (but not below zero) such Loss Carryforward balance (and, conversely, any net decrease in Net Asset Value shall be applied to increase such Loss Carryforward balance).  No Incentive Fee shall be paid in any subsequent Fiscal Year (or other period) in respect of such Capital Account until the Loss Carryforward has been fully recovered as described above, and in such Fiscal Year (or other period) of such recovery, the Incentive Fee shall be calculated based on the excess net increase in Net Asset Value of such Capital Account (i.e., after being applied to reduce the Loss Carryforward to zero).  However, in the event that a Limited Partner withdraws funds at a time in which such Limited Partner's Capital Account has a Loss Carryforward, the amount of such Loss Carryforward at such Withdrawal Date applicable to such Limited Partner's Capital Account shall be reduced by a percentage equal to one hundred percent (100%) multiplied by a fraction, the numerator of which is the amount to be withdrawn from the Limited Partner's Capital Account, and the denominator of which is the amount in such Capital Account immediately prior to the withdrawal.

(g)     Notwithstanding the provisions set forth above, if the Partnership has a material item of income or loss in any fiscal period which relates to a matter or transaction occurring during a prior fiscal period (e.g., if the Partnership wins a cash settlement in a case it began in a prior period) the item of income or loss may, at the sole discretion of the General Partner, be shared among the Partners (including persons who ceased to be Partners) in accordance with each such Partner's Partnership Interest in the Partnership during the prior period.

**Section 9.06     Allocations for Tax Purposes; General Partner Discretion on Allocations; Withholding**

(a)     Ordinary income, gains, losses and deductions of the Partnership for each Fiscal Year shall accrue to, and be borne by, the Partners in proportion to their sharing of net increases or decreases in Net Asset Value, the allocations of various types of taxable income and losses likewise being as nearly as possible proportionate.

(b)     All allocations under this **Section 9.06** shall be made pursuant to the principles of Section 704 of the Code and in conformity with Treasury regulations promulgated thereunder ("**Regulations**"), or the successor provisions to such Code Section and Regulations.

(c)     All matters concerning the allocation of profits, gains and losses among the parties (including the taxes thereon) and accounting procedures not expressly provided for by the terms of this Agreement shall be determined by the General Partner in its sole discretion, and the General Partner is expressly permitted to use the aggregate method of apportioning taxable gain and loss under Treasury Regulation Section

018715

HCMLPHMIT00003916

704(b). The General Partner is expressly authorized to make special allocations to the Partners of such gains or income as shall be necessary to satisfy the "qualified income offset" requirements of Treasury Regulations Section 1.704-1(b)(2)(ii)(d). The General Partner's determination of the foregoing matters shall be final and conclusive as to all parties.

(d) Notwithstanding anything to the contrary contained in this Agreement, in the event a Partner withdraws all of the capital in its Capital Account from the Partnership (excluding any amounts held in Side Pocket Accounts), the General Partner shall have the discretion to specially allocate an amount of the Partnership's taxable gains or losses to the withdrawing Partner to the extent that the Partner's Capital Account exceeds, or is less than, its federal income tax basis in its Partnership Interest.

(e) Any taxes, fees or other charges that the Partnership is required to withhold under applicable law with respect to any Partner shall be withheld by the Partnership (and paid to the appropriate government authority) and shall be deducted from the Capital Account of such Partner as of the last day of the Fiscal Year (or earlier if the Partner withdraws) with respect to which amounts are required to be withheld.

(f) For the avoidance of doubt, the provisions of this **Section 9.06** shall apply on a Series-by-Series basis.

| Section 9.07 | **Side Pocket Accounts** |

(a) The Investment Manager may designate that certain investments held by a Series of the Partnership and/or its Portfolio Fund(s) be carried in one or more separate memorandum accounts (each, a "**Side Pocket Account**") for such period of time as the Investment Manager determines. Such investments may include: (i) privately placed, unregistered securities, commodities, options and other financial instruments, or those investments that, in the opinion of the Investment Manager, do not have a readily ascertainable market value; (ii) other illiquid securities that may be valued but are not freely transferable; (iii) an investment into a Portfolio Fund with an extended lock-up period and/or that invests in illiquid assets; (iv) that portion of an investment in a Portfolio Fund that is attributable to side pocket accounts designated by the manager of such Portfolio Fund (which may be designated with respect to assets that are subject to legal or contractual restrictions on transferability, or that the Investment Manager believes either lack a readily assessable market value (without impairing the value of such investments) or should be held until the resolution of a special event or circumstance; and (v) investments in other asset classes (such as real estate) and other property that are not traded on public exchanges (each, as designated by the Investment Manager, along with follow-on investments, if any, an "**Illiquid Investment**"). **For the avoidance of doubt, (i) there will be no limitation on the percentage of the Partnership's portfolio that may be carried in a Side Pocket Account, and (ii) any investment made by Series 1 into the series of the PE Portfolio Fund that corresponds to the latter fund's investment made in the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.** Illiquid Investments held in a Side Pocket Account shall be carried at their fair value (which may be at, above or below cost) as determined by the Investment Manager. For the avoidance of doubt, each Policy Owner investing through the relevant Limited Partner will indirectly participate in the economics from a *pro rata* portion of a Side Pocket Account and the corresponding Illiquid Investment.

(b) At the sole discretion of the Investment Manager, an Illiquid Investment may be held in a Side Pocket Account until the occurrence of a Realization Event. Upon a Realization Event, such Illiquid Investment (or the sales proceeds thereof) shall be reallocated, *pro rata*, from the Side Pocket Account to the Capital Accounts of participating Partners in accordance with their respective interests in such Side Pocket Account. Until such reallocation, a Limited Partner may not withdraw any of the amounts in its Capital Account that are attributable to the value of Illiquid Investments held in a Side Pocket Account. Upon such reallocation, a Limited Partner that has withdrawn all of its capital from the Partnership other than the capital attributable to such Side Pocket Account shall receive an amount equal to its interest

018716

HCMLPHMIT00003917

in such Side Pocket Account (net of: (i) any accrued Management Fees and accrued expenses (to the extent not covered by the Partnership's reserves, including the Management Fee Reserve), and (ii) any accrued Incentive Fee, with respect thereto) within ninety (90) days after such reallocation.  A "**Realization Event**" occurs: (1) when an Illiquid Investment becomes liquid, as determined in the reasonable discretion of the Investment Manager; (2) when an Illiquid Investment is sold or otherwise disposed of by the Partnership; (3) when circumstances otherwise exist that, in the reasonable judgment of the Investment Manager, conclusively establish a value for an Illiquid Investment, as determined in the reasonable discretion of the Investment Manager (including, without limitation, when additional securities substantially similar to the Illiquid Investment have been issued by the issuer of the Illiquid Investment); or (4) as otherwise determined in the sole discretion of the Investment Manager.

(c)     Newly-admitted Limited Partners may not participate in Illiquid Investments that were placed in a Side Pocket Account prior to their admission.  **For the avoidance of doubt, the Partnership shall not accept additional Limited Partners into any existing Series if such Series has existing Side Pocket Accounts at the time of such admission.**  Notwithstanding any provisions of this Agreement to the contrary, any expenses relating specifically to a Side Pocket Account shall be charged to the Partners participating in such account in proportion to their respective interests therein, as of the commencement of such Side Pocket Account.

(d)     If the Investment Manager in its discretion designates any investment as a follow-on investment to an existing Illiquid Investment (each, a "**Follow-On Investment**"), only the Partners participating in such original investment shall participate in such Follow-On Investment in proportion to their interest in the related Side Pocket Account; *provided, however,* that if a Partner shall have withdrawn from the Partnership, the General Partner shall equitably adjust the interests of the remaining participating Partners to reflect such withdrawn Partner's non-participation in the Follow-On Investment.  In its discretion, the Investment Manager need not designate as a "Follow-On Investment" an additional investment in the same or similar opportunity as the investment for which a Side Pocket Account has been established, but instead may designate such investment as a new investment with a separate Side Pocket Account.  Additionally, the Investment Manager, in its sole and absolute discretion, may determine that, for various reasons, an asset that initially was not an Illiquid Investment should be categorized as an Illiquid Investment.

Section 9.08     **New Issues; Other Memorandum Accounts for Restricted Transactions**.

(a)     From time to time, the Partnership may invest in initial public offerings of equity securities ("**New Issues**").  Under rules adopted by the Financial Industry Regulatory Authority ("**FINRA**"), (i) certain persons engaged in the securities, banking or financial services industries (and members of their immediate families) and (ii) certain persons who are affiliated with companies that are current, former or prospective investment banking clients of the Partnership's broker(s) (collectively, "**Restricted Persons**") are restricted from participating in New Issues, each subject to a de minimis exemption ("**De Minimis Limit**").  To the extent necessary to comply with FINRA rules, in addition to the Partnership's regular Capital Accounts and any Side Pocket Accounts, the General Partner may establish one or more memorandum accounts that are authorized to participate in New Issues (each, a "**New Issues Account**"). Participation in New Issues Accounts shall be limited to (i) those Limited Partners who are not Restricted Persons, and (ii) those Limited Partners who are Restricted Persons, but only to the extent that such participation by Restricted Persons does not exceed the De Minimis Limit. To the extent not prohibited by applicable FINRA rules, the General Partner shall be entitled to receive the Incentive Fee with respect to any profits arising from New Issues trades.

(b)     In the event a New Issues Account is established, to effect a transaction in New Issues, the requisite funds shall be transferred from the Partnership to the New Issues Account.  Securities held in the New Issues Account shall be held there until they are eventually sold or transferred.  Upon the sale or other disposition of New

018717

HCMLPHMIT00003918

Issues (including any transfer of the underlying securities in the New Issues Account to the Capital Accounts of all of the Partners after such securities no longer constitute New Issues), any profits or losses resulting from securities transactions in the New Issues Account in any fiscal period shall be credited or debited to the Capital Accounts of Limited Partners participating in the New Issues Account in accordance with their interests therein.  In the event that the Partnership establishes one or more New Issues Accounts, the General Partner shall be authorized to make an equitable adjustment to account for the fact that Limited Partners that are not Restricted Persons were receiving profits based in part on the capital of Limited Partners that are Restricted Persons.  Such adjustment may, in the sole and absolute discretion of the General Partner, and to the extent not prohibited by rules of FINRA, consist of: (i) assessing an interest charge to the Capital Accounts of Limited Partners that are not Restricted Persons, in favor of the Partnership, in an amount deemed appropriate to compensate the Partnership for the use of capital by Limited Partners that are not Restricted Persons in connection with New Issue trades; or (ii) such other adjustment as the General Partner considers equitable and is not inconsistent with the rules of FINRA.

(c)     In addition to the foregoing provisions with respect to New Issues Accounts and Side Pocket Accounts, to the extent that certain Limited Partners are restricted from participating in any transactions of the Partnership by applicable laws or regulations, or for any other reason determined by the General Partner in good faith, the General Partner may, in its discretion, establish one or more separate memorandum accounts to hold such investments and isolate ownership away from such non-participating Limited Partners.  Only those Limited Partners who the General Partner determines are eligible shall participate in such accounts.  In the event that the Partnership establishes one or more memorandum accounts, the General Partner shall be authorized to make an equitable adjustment to account for the fact that participating Limited Partners were receiving profits based in part on the capital of non-participating Limited Partners.  Such adjustment may, in the sole and absolute discretion of the General Partner, consist of: (i) assessing an interest charge to the Capital Accounts of participating Limited Partners, in favor of the Partnership, in an amount deemed appropriate to compensate the Partnership for the use of capital by participating Limited Partners in connection with such trades; or (ii) such other adjustment as the General Partner considers equitable.

## ARTICLE X
### RESTRICTIONS ON TRANSFERS OF PARTNERSHIP INTERESTS OF LIMITED PARTNERS; ADMISSION OF SUBSTITUTE LIMITED PARTNERS; OTHER MATTERS AFFECTING PARTNERSHIP INTERESTS

**Section 10.01    Restrictions on Transfer of Partnership Interests of Limited Partners**

(a)     Except for transfers by will or intestate succession or by operation of law, no Limited Partner may offer, sell, transfer, assign, exchange, hypothecate or pledge, or otherwise dispose of or encumber (hereinafter collectively, "**Transfer**" or "**Transferred**"), in whole or in part, such Limited Partner's Partnership Interest without the consent of the General Partner, which may be given or withheld in the sole and absolute discretion of the General Partner.

(b)     No Limited Partner may Transfer, in whole or in part, such Limited Partner's Partnership Interest if, in the General Partner's discretion, such Transfer could result in the termination of the Partnership for federal income tax purposes, and any purported Transfer that could result in the termination of the Partnership for federal income tax purposes shall be void *ab initio*.  In its sole and absolute discretion, the General Partner may request a written opinion of counsel acceptable to the General Partner (the expenses of which may be allocated to the relevant Limited Partner) as to whether any contemplated Transfer could result in the termination of the Partnership for federal income tax purposes, and the General Partner shall be entitled to rely conclusively upon such opinion in determining whether such Transfer could result in the termination of the Partnership and whether consent to such disposition should be given.

018718
HCMLPHMIT00003919

(c)     The Partnership Interests may not be transferred without documentation acceptable to the General Partner, which may include a written opinion of counsel acceptable to the General Partner (the expenses of which may be allocated to the relevant Limited Partner) that such proposed Transfer may be effected without:

(i)     registration of the Partnership Interest being made under the Securities Act of 1933, as amended;

(ii)    violating any applicable state securities or "blue sky" law (including investment suitability standards) or the laws of any other jurisdiction;

(iii)   the Partnership becoming subject to the Investment Company Act of 1940, as amended ("**1940 Act**"); or

(iv)    violating the Act.

(d)     In no event shall the Partnership Interest of a Limited Partner or any portion thereof be Transferred to a minor or incompetent, unless by will or intestate succession.

**Section 10.02    Admission of Substitute Limited Partner**

(a)     Subject to the provisions of this **Article X**, an assignee of the Partnership Interest of a Limited Partner (which shall include any purchaser, transferee, donee or other recipient of any disposition of such Partnership Interest) shall be deemed admitted to the Partnership as a Limited Partner (a "**Substitute Limited Partner**") only upon the satisfactory completion of the following:

(i)     consent of the General Partner shall have been given, which may be given or withheld in the sole and absolute discretion of the General Partner and which shall be evidenced by a written document executed by the General Partner;

(ii)    the assignee shall have accepted and agreed to be bound by the terms and provisions of this Agreement (as it may be amended from time to time) by executing a counterpart hereof and such assignee shall have expressly assumed all of the rights and obligations of the assignor Limited Partner hereunder, and shall have executed such other documents or instruments as the General Partner may require in its sole and absolute discretion in order to effect the admission of such person as a Limited Partner;

(iii)   an amendment to the Certificate, if required by the Act (in the opinion of the General Partner), evidencing the admission of such person as a Limited Partner shall have been filed;

(iv)    the assignee shall have delivered a letter containing a representation that the assignee's acquisition of the Partnership Interest is made as a principal, for the assignee's own account, for investment purposes only and not with a view to the resale or distribution of such Partnership Interest, and that the assignee will not Transfer such Partnership Interest or any fraction thereof to anyone in violation of this Agreement;

(v)     if the assignee is a corporation, partnership, limited liability company, trust or other entity, the assignee shall have provided to the General Partner evidence satisfactory to the General Partner of its authority to become a Limited Partner under the terms and provisions of this Agreement;

(vi)    the assignee shall have complied with all applicable governmental rules and regulations, if any;

(vii)   the assignee meets the suitability requirements for investing in the Partnership and the assignee completes the subscription documents

018719
HCMLPHMIT00003920

("**Subscription Documents**") provided by the General Partner; and

(viii)    all costs and expenses incurred by the Partnership and the General Partner in connection with this **Section 10.02** shall be paid by the person or entity seeking to become a Substitute Limited Partner (or the transferor Limited Partner).

**Section 10.03**    **Rights of Assignee of Partnership Interest**

(a)    Subject to **Section 10.01(b)**, if a Limited Partner Transfers all or a portion of such Limited Partner's Partnership Interest, involuntarily, by operation of law or voluntarily, without the consent required by this **Article X**, the transferee or assignee shall: (i) be entitled only to receive that proportion of profit and loss, and any distribution of Partnership assets, attributable to the Partnership Interest acquired by reason of such disposition from and after the effective date of such disposition, and only upon written notification of same to the General Partner consistent with **Section 10.03(b)**; and (ii) have no other rights as a Limited Partner unless admitted as a Substitute Limited Partner in accordance with the terms of this Agreement.

(b)    Subject to the provisions of **Section 10.01**, and except as required by operation of law, the Partnership shall not be obligated for any purposes whatsoever to recognize the assignment by any Limited Partner of such Limited Partner's Partnership Interest until the General Partner has received notice thereof.

(c)    Any person or entity who is the assignee of all or any portion of the Partnership Interest of a Limited Partner, but who has not become a Substitute Limited Partner, and desires to make a further disposition of such Partnership Interest, shall be subject to all the provisions of this **Article X** to the same extent and in the same manner as any Limited Partner desiring to make a disposition of such Limited Partner's Partnership Interest.

**Section 10.04**    **Effect of Bankruptcy, Death or Incompetence of a Limited Partner**.  The bankruptcy, dissolution or winding up of a Limited Partner, the death of a Limited Partner or an adjudication that a Limited Partner is incompetent (which term shall include, but not be limited to, insanity), shall not cause the termination, wind-down or dissolution of the Partnership and the business of the Partnership shall continue.  If a Limited Partner becomes bankrupt, dissolved or wound up, the trustee or receiver of such Limited Partner's estate or, if a Limited Partner dies, such Limited Partner's executor, administrator or trustee, or, if such Limited Partner is adjudicated incompetent, such Limited Partner's committee, guardian or conservator, shall have the rights of such Limited Partner for the purposes of settling or managing such Limited Partner's estate or property and such power as the bankrupt, deceased or incompetent Limited Partner possessed to dispose of all or any part of such Limited Partner's Interest and to join with any assignee in satisfying conditions precedent to the admission of the assignee as a Substitute Limited Partner.

**Section 10.05**    **Attachment by Creditors**.  If a Partnership Interest is subjected to attachment by a creditor, or is assigned for the benefit of any creditor, the Partnership Interest obtained by such creditor shall be only that of an assignee, and in no event shall such creditor have the rights of a Substitute Limited Partner or an Additional Limited Partner.

---

**ARTICLE XI**
**REPRESENTATIONS, WARRANTIES AND COVENANTS**

---

**Section 11.01**    **Limited Partners**.  Each Limited Partner represents, warrants and covenants to the Partnership and to every other Partner as follows:

(a)    Such Limited Partner shall provide promptly, upon request by the General Partner, all financial data, documents, reports, certifications or other information necessary or appropriate to enable the Partnership to apply for and obtain an exemption from the registration provisions of applicable law and any other information required by governmental agencies having jurisdiction over the Partnership.

018720

HCMLPHMIT00003921

(b)     There is no misrepresentation contained in the Subscription Documents and the forms attached thereto completed by such Limited Partner.

(c)     If such Limited Partner is a corporation, partnership, limited liability company, trust or other entity, that the officer (or other signatory) signing on its behalf has been duly authorized to execute and deliver this Agreement and, to the extent requested by the General Partner, the Certificate.

(d)     Such Limited Partner that is an entity that would be an "investment company" under the 1940 Act, but for an exclusion under either Section 3(c)(1) or Section 3(c)(7) thereof, has advised the General Partner of the number of persons that constitute "beneficial owners of such Limited Partner's outstanding securities (other than short-term paper)" within the meaning of Section 3(c)(1)(A) of the 1940 Act, and shall advise the General Partner promptly upon any change in that number.

## ARTICLE XII
## SPECIAL POWER OF ATTORNEY

**Section 12.01**    **Execution and Consent**.  Each Limited Partner hereby irrevocably constitutes and appoints the General Partner and its respective successors (hereinafter referred to as "**Special Attorney**") as the attorney-in-fact for such Limited Partner with power and authority to act in the Limited Partner's name and on the Limited Partner's behalf to execute, acknowledge, swear to and file documents and instruments necessary or appropriate to the conduct of the Partnership's business, which shall include, but not be limited to, the following:

(a)     the Certificate and this Agreement, as well as amendments thereto as required by the laws of any state, or any other jurisdiction, or as otherwise permitted under the terms of this Agreement;

(b)     any other certificates, instruments and documents, including fictitious name certificates, as may be required by, or may be appropriate under, the laws of any state;

(c)     the amendment and/or restatement of this Agreement in accordance with **Section 14.08**; and

(d)     any documents that may be required to effect the continuation of the Partnership, the admission of an Additional Limited Partner or a Substitute Limited Partner, the withdrawal of a Limited Partner, or the dissolution and termination of the Partnership, *provided* that such continuation, admission, withdrawal or dissolution and termination are in accordance with the terms of the Certificate and this Agreement.

**Section 12.02**    **Procedural Aspects**.  The power of attorney granted by each Limited Partner to the Special Attorney:

(a)     is a special power of attorney, coupled with an interest, and is accordingly irrevocable;

(b)     may be exercised by the Special Attorney for each Limited Partner either by signing separately as attorney-in-fact for each Limited Partner or, by executing any instrument with the single signature of such Special Attorney acting as attorney-in-fact for all of the Limited Partners; and

(c)     shall survive the assignment by a Limited Partner of the whole or any portion of such Limited Partner's Partnership Interest; *provided* that where the assignee has been approved in accordance with the provisions of this Agreement for admission to the Partnership as a Substitute Limited Partner, the Power of Attorney shall survive such assignment for the sole purpose of enabling the Special Attorney to execute, acknowledge and file any instrument necessary to effect such substitution.

018721

HCMLPHMIT00003922

| | ARTICLE XIII |
|---|---|
| | **DISSOLUTION AND LIQUIDATION** |

**Section 13.01**   **Dissolution**.  The Partnership shall be dissolved upon the earliest to occur of:

    (a)    the withdrawal, resignation or Involuntary Withdrawal of the General Partner, or any other event that results in such entity ceasing to be a general partner, unless the remaining Limited Partners agree, within ninety (90) days after such event, to continue the Partnership with a new and qualified substitute general partner pursuant to and in accordance with the terms and conditions set forth in **Article IV**;

    (b)    an election to dissolve the Partnership made by the General Partner, in its discretion, upon thirty (30) days' prior written notice to the Limited Partners; or

    (c)    the happening of any other event, including the entry of a decree of judicial dissolution under Section 17-802 of the Act, that under the law of the State of Delaware, mandatorily requires the dissolution of the Partnership.

For the avoidance of doubt, the termination of the Partnership shall constitute the termination of all Series.  For the avoidance of doubt, the termination of an individual Series, however, shall not constitute the termination of the Partnership.

**Section 13.02**   **Liquidation**.  Upon the dissolution of the Partnership, the "**Liquidators**", namely:  (i) the General Partner or, if there is no general partner at the time, or if the principal(s) of the General Partner are unable to act on its behalf, (ii) (A) the person or persons previously designated in writing by the General Partner and notified to the Partnership's auditors, or (B) if the General Partner has not made such a designation, the person or persons designated by Limited Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners, shall cause the cancellation of the Certificate, liquidate (or distribute) the assets of the Partnership, and apply and distribute the balance of the proceeds of such liquidation in accordance with the following order of priority: (1) pay off known liabilities; (2) establish reserves for contingent liabilities and expenses of liquidation (even if such reserves are not in accordance with GAAP); and (3) distribute the remainder to the Partners in proportion to the Capital Account balances maintained in accordance with the provisions of **Section 9.01** and the Act.  The Liquidators shall take all other steps necessary to wind up the affairs of the Partnership as promptly as practicable.  To the extent reasonable, the business of the Partnership may continue to be conducted until liquidation is complete.  For purposes hereof, the term "Liquidators" shall also include the trustees, receivers or other persons required by law to wind up the affairs of the Partnership.

**Section 13.03**   **Notice of Dissolution**

    (a)    Upon the dissolution of the Partnership or the relevant Series, the Liquidators shall promptly notify the Partners of such dissolution as well as known creditors and claimants whose addresses appear on the Partnership's or the relevant Series' records.

    (b)    The General Partner shall give at least fifteen (15) days' prior written notice to each Limited Partner that is a BHC Limited Partner (as defined in **Section 5.10**) of any proposal to distribute property in-kind to such Limited Partner and the proposed date of such distribution, and shall not make any such distribution in-kind to the extent that such Limited Partner advises the General Partner at least five (5) days prior to the date set forth in such notice for such distribution that such distribution in-kind could reasonably be expected to cause it to violate the BHCA. In the event that a BHC Limited Partner notifies the General Partner to such effect, the General Partner shall be authorized to make such arrangements for the property that it would have otherwise distributed in-kind as the General Partner shall determine in its reasonable discretion.

**Section 13.04**   **Deferred Liquidation; Distribution In-Kind of Joint Interests in Property**.   For the avoidance of doubt, the following provisions of this **Section 13.04** shall apply on a Series-by-

018722

HCMLPHMIT00003923

Series basis.  Notwithstanding the provisions of **Section 13.02**, if on dissolution of the Partnership the Liquidators shall determine that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners, the Liquidators may, in their absolute discretion, either defer for a reasonable time the liquidation of any assets, except those necessary to satisfy liabilities of the Partnership (other than those to Partners), or distribute to the Partners, in lieu of cash, as tenants in common and in proportion to their respective interests in the Partnership, undivided interests in such Partnership assets as the Liquidators deem not suitable for liquidation.  To the extent that the General Partner exercises its right, power and authority under **Section 3.02(w)**, this Section shall be construed by the Liquidators in their reasonable discretion to give effect thereto.

Section 13.05    **Final Statement**.  As soon as practicable after the dissolution of the Partnership or the relevant Series, a final statement of its assets and liabilities shall be prepared by the General Partner and/or the internal accountants for the Partnership or the relevant Series and furnished to the Partners.

## ARTICLE XIV
### GENERAL PROVISIONS

Section 14.01    **Address and Notices**.  The address of each Partner (other than the General Partner) for all purposes shall be the address set forth on the signature page to this Agreement or such other address of which the General Partner has received written notice in accordance with this **Section 14.01**.  The address of the General Partner for all purposes shall be the address set forth in **Section 1.04** or such other address of which the General Partner has provided written notice to the Partners in accordance with this **Section 14.01**.  Any notice, demand or request required or permitted to be given or made hereunder shall be in writing and shall be deemed given or made (i) when delivered in person, (ii) when sent to such Partner at such address by registered or certified mail, return receipt requested, or by electronic mail, or (iii) when delivered by overnight delivery by a reputable private carrier or by the postal service.

Section 14.02    **Titles and Captions**.  All Article and Section titles and captions in this Agreement are for convenience only.  They shall not be deemed part of this Agreement and in no way define, limit, extend or describe the scope or intent of any provisions hereof.

Section 14.03    **Pronouns and Plurals**.  Whenever the context may require, any pronoun used herein shall include the corresponding masculine, feminine or neuter forms.  The singular form of nouns, pronouns and verbs shall include the plural and vice versa.

Section 14.04    **Further Action**.  The Limited Partners shall execute and deliver all documents, provide all information and take or forbear from taking all such action as may be necessary or appropriate, in the discretion of the General Partner, to achieve the purposes set forth in this Agreement.

Section 14.05    **Governing Law, Personal Jurisdiction and Venue**.  **EACH LIMITED PARTNER ACKNOWLEDGES AND AGREES THAT ANY CLAIM, CONTROVERSY, DISPUTE OR ACTION RELATING IN ANY WAY TO THIS AGREEMENT, THE SUBSCRIPTION AGREEMENT OR SUCH LIMITED PARTNER'S INVESTMENT IN THE PARTNERSHIP SHALL BE GOVERNED SOLELY AND EXCLUSIVELY BY THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ANY CONFLICT OF LAWS DOCTRINES. EACH LIMITED PARTNER UNDERSTANDS AND AGREES THAT IT IS WAIVING THE PROTECTION OF STATUTES IN ITS STATE OF RESIDENCE THAT PROVIDE IT WITH CERTAIN RIGHTS, REMEDIES AND PROTECTIONS IN THE CASE OF FRAUD OR MISREPRESENTATION AND AGREES TO RELY SOLELY UPON THE LAWS OF THE STATE OF DELAWARE AND ANY APPLICABLE FEDERAL LAWS. EACH LIMITED PARTNER MAKES THIS WAIVER KNOWINGLY AND REPRESENTS THAT IT HAS CONSULTED INDEPENDENT COUNSEL, OR THAT IT HAS HAD THE OPPORTUNITY TO CONSULT WITH SUCH INDEPENDENT COUNSEL BUT HAS ELECTED NOT TO DO SO, AND AGREES THAT THE ONLY STATE LAWS THAT WILL APPLY TO THIS AGREEMENT, THE SUBSCRIPTION AGREEMENT AND ITS INVESTMENT IN THE PARTNERSHIP ARE THE LAWS OF THE STATE OF DELAWARE.**

018723

HCMLPHMIT00003924

**EACH OF THE LIMITED PARTNERS, FUND COUNSEL AND ANY OTHER PARTY TO THIS AGREEMENT, THE SUBSCRIPTION AGREEMENT OR ANY OTHER AGREEMENT REGARDING SUCH LIMITED PARTNER'S INVESTMENT IN THE PARTNERSHIP (COLLECTIVELY, FOR PURPOSES OF THIS CLAUSE, THE "PARTIES") IRREVOCABLY CONSENTS TO BEING SERVED WITH LEGAL PROCESS ISSUED FROM THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF NEW YORK AND IRREVOCABLY CONSENTS TO THE EXCLUSIVE PERSONAL JURISDICTION OF THE FEDERAL AND STATE COURTS SITUATED IN THE STATE OF NEW YORK. THE PARTIES IRREVOCABLY WAIVE ANY OBJECTIONS TO THE PERSONAL JURISDICTION OF THESE COURTS. SAID COURTS SHALL HAVE SOLE AND EXCLUSIVE JURISDICTION OVER ANY AND ALL CLAIMS, CONTROVERSIES, DISPUTES AND ACTIONS, OF ANY KIND OR MANNER, WHICH IN ANY WAY RELATE TO THIS AGREEMENT, THE SUBSCRIPTION AGREEMENT, OR SUCH LIMITED PARTNER'S INVESTMENT IN THE PARTNERSHIP. THE PARTIES ALSO IRREVOCABLY WAIVE ANY OBJECTIONS THAT THESE COURTS CONSTITUTE AN OPPRESSIVE, UNFAIR, OR INCONVENIENT FORUM AND AGREE NOT TO SEEK TO CHANGE VENUE ON THESE GROUNDS OR ANY OTHER GROUNDS. THE PARTIES FURTHER AGREE THAT THEY WILL NOT FILE SUIT IN A JURISDICTION OTHER THAN NEW YORK AND THAT, SHOULD THEY DO SO, THEY SHALL BE LIABLE FOR ALL DAMAGES AS A RESULT OF MAKING SUCH A FILING AND SHALL PAY ALL ATTORNEYS' FEES INCURRED BY ANY PARTY IN CONNECTION WITH MOVING TO DISMISS THE SUIT FOR FAILURE TO COMPLY WITH THIS PROVISION.**

In the event that (i) any current or prior Limited Partner ("**Claiming Party**") initiates or asserts any litigation, arbitration or similar claim or counterclaim, or joins, offers substantial assistance to or has a direct financial interest in any claim ("**Claim**") against the Partnership, the General Partner, the Investment Manager or any Investment Manager Affiliates, including any Claim purportedly filed on behalf of the Partnership or any Limited Partner, and (ii) the Claiming Party (or the third party that received substantial assistance from the Claiming Party or in whose Claim the Claiming Party had a direct financial interest) does not obtain a judgment on the merits that substantially achieves, in substance and amount, the full remedy sought, then each Claiming Party shall be obligated jointly and severally to reimburse the Partnership and/or the General Partner, the Investment Manager or any such Investment Manager Affiliate for all fees, costs and expenses of every kind and description (including, but not limited to, all reasonable attorneys' fees and other litigation expenses) that the parties may incur in connection with such Claim.

Section 14.06    **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the parties and their heirs, executors, administrators, successors, legal representatives and permitted assigns; *provided*, however, that fund counsel shall be a party to this Agreement solely with respect to **Sections 3.04(b) and 14.05** hereof in order to benefit from and enforce such Sections, and a conformed signature page for fund counsel is included as a counterpart to this Agreement.

Section 14.07    **Entire Agreement**. This Agreement, together with the related Subscription Documents and any other written agreement between the General Partner, on behalf of the Partnership (acting severally in the name of and for the account of any individual Series), and any Limited Partner of that Series, shall constitute the entire agreement and understanding among all the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter, including, without limitation, the Current Agreement. The parties hereto acknowledge that, notwithstanding any other provision of this Agreement or the Subscription Documents, the General Partner, on its own behalf or on behalf of the Partnership, without any act, consent or approval of any other Partner, may enter into side letters or other writings to or with one or more Limited Partners that have the effect of establishing rights under, or altering or supplementing the terms of, this Agreement or the Subscription Documents ("**Side Letters**"). The parties agree that any rights established, or any terms of this Agreement or the Subscription Documents altered or supplemented, in a Side Letter to or with one or more Limited Partners shall govern with respect to such Limited Partner(s) notwithstanding any other provision of this Agreement or the Subscription Documents. No covenant, representation or condition not expressed in this Agreement or such Subscription Documents (and, if applicable, any Side Letter) shall affect or be deemed to interpret, change or restrict the express provisions hereof and thereof.

018724

HCMLPHMIT00003925

**Section 14.08**  **Amendment**.  This Agreement may be modified or amended only by the affirmative vote of the General Partner and Limited Partners owning more than fifty percent (50%) of all of the outstanding Partnership Interests of each Series; *provided* that the General Partner may amend this Agreement from time to time (x) only with the affirmative vote of the General Partner and Limited Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners of a specific Series of Partnership Interests, if such amendment, in the opinion of the General Partner, only has a material effect on such Series of Partnership Interests, and (y) without the consent, approval or other authorization of, or notice to, any of the Limited Partners (including pursuant to **Sections 3.02(u)** and **(v)**) if, in the opinion of the General Partner, the amendment does not have a material adverse effect on any Limited Partner.  Notwithstanding the foregoing, no amendment may:  (i) convert a Limited Partner's interest to that of a general partner or, modify the limited liability of any Limited Partner, without the consent of each affected Partner or (ii) amend any provision hereof which requires the consent or approval of a specified percentage in interest of the Limited Partners without the consent of such specified percentage in interest of the Limited Partners.

**Section 14.09**  **Creditors**.  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership or the relevant Series.

**Section 14.10**  **Waiver by Partner**

(a)    Any Partner by notice to the General Partner may, but shall be under no obligation to, waive any of its rights or any conditions to its obligations hereunder, or any duty, obligation or covenant of any other Partner to such first mentioned Partner.

(b)    No such waiver shall affect or alter the remainder of this Agreement, but each and every covenant, agreement, term and condition hereof shall continue in full force and effect with respect to any other existing or subsequent breach.

**Section 14.11**  **Rights and Remedies**

(a)    The rights and remedies of any of the Partners hereunder shall not be mutually exclusive, and the implementation of one or more of the provisions of this Agreement shall not preclude the implementation of any other provision.

(b)    Each of the Partners confirms that damages at law may be an inadequate remedy for a breach or threatened breach of any provision hereof.  The respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy but nothing herein contained is intended to or shall limit or affect any rights at law or by statute or otherwise of any Partner aggrieved as against the other Partners for a breach or threatened breach of any provision hereof, it being the intention of this paragraph to make clear that the respective rights and obligations of the Partners hereunder shall be enforceable in equity as well as at law or otherwise, except as provided in **Section 5.08**.

**Section 14.12**  **Counterparts**.  This Agreement may be executed in counterparts, all of which taken together shall constitute one agreement binding on all parties, notwithstanding that all the parties are not signatories to the original or the same counterpart.  Each party shall become bound by this Agreement immediately upon affixing his, her or its signature hereto, independently of the signature of any other party.

**Section 14.13**  **Certain Tax Matters**

(a)    *Tax Matters Partner*

(i)    The Tax Matters Partner (as such term is defined in Section 6231(a)(7) of the Code) of the Partnership shall be the General Partner.  The General Partner shall have all powers necessary to perform fully in its capacity as Tax Matters Partner and, in such capacity, the General Partner shall use its reasonable efforts to comply with the responsibilities outlined in Sections 6221 through 6233 of the Code (including the Regulations) and

018725

HCMLPHMIT00003926

shall have any powers necessary to perform fully in such capacity.

(ii)     In furtherance of the foregoing, the General Partner is authorized to represent the Partnership before taxing authorities and courts in tax matters affecting the Partnership and the Partners in their capacity as such and shall keep the Partners informed of any such administrative and judicial proceedings. The General Partner shall be entitled to be reimbursed by the Partnership for all costs and expenses incurred by it in connection with any administrative or judicial proceeding affecting tax matters of the Partnership and the Partners in their capacity as such and to be indemnified by the Partnership (solely out of Partnership assets) with respect to any action brought against it in connection with any judgment in or settlement of any such proceeding, except in the case of the General Partner's own fraud, gross negligence, willful misconduct or conduct that is the subject of a criminal proceeding (where the General Partner has a reasonable cause to believe that such conduct was unlawful).

(iii)     Any Partner that is in dispute with any tax authority in relation to any Partnership matter shall notify the General Partner within thirty (30) calendar days, and if the General Partner reasonably determines that the matter is of material relevance to the tax position of the Partnership, such Partner shall consult with the General Partner (or any advisor appointed by the General Partner for the purpose) as to how that dispute shall be handled. Any Partner who enters into a settlement agreement with respect to any Partnership item shall notify the Tax Matters Partner of such settlement agreement and its terms within thirty (30) calendar days after the date of settlement.

(iv)     The provisions of this **Section 14.13(a)** shall survive any termination of this Agreement.

(b)     *Tax Elections*. Each Partner agrees to provide the Partnership with such information which may be necessary or desirable in order for the General Partner to carry out its powers under this **Section 14.13** and **Section 3.02(g)**, including, without limitation, to facilitate compliance with Section 743 of the Code and elections permitted thereunder.

(c)     *Classification as a Partnership*. The parties hereto intend that the Partnership be classified as a partnership for federal income tax purposes. The General Partner shall not elect to have the Partnership classified as an association taxable as a corporation for federal income tax purposes pursuant to Regulation Section 301.7701–3. The General Partner shall, for and on behalf of the Partnership, take all steps as it may deem reasonably necessary to maintain the Partnership's classification as a partnership for federal income tax purposes.

(d)     *Tax Audits*. Each Limited Partner shall reasonably cooperate with the General Partner in connection with any tax audit of the Partnership or any existing or former investment.

*[remainder of page intentionally left blank]*

018726

HCMLPHMIT00003927

**IN WITNESS WHEREOF**, this Amended and Restated Limited Partnership Agreement has been duly executed as of the day and year first above written.

> **Atlas IDF GP, LLC**, as General Partner
> (acting severally in the name of and for the account of each individual Series)
>
> By: _____
> Name: John Honis
> Title: Managing Member

INITIAL LIMITED PARTNER:

/s/ John Honis
John Honis

[SIGNATURES OF ADDITIONAL LIMITED PARTNERS AND OTHER PARTIES ARE
SET FORTH ON SEPARATE SIGNATURE PAGES]

018727

HCMLPHMIT00003928

**EXHIBIT 80**

018728

SadisGoldberg LLP

| FOR THE EXCLUSIVE USE OF: | | COPY NO. | |
|---|---|---|---|

## Atlas IDF, LP

**A DELAWARE "SERIES" LIMITED PARTNERSHIP**

**GENERAL PARTNER:**
ATLAS IDF GP, LLC

**INVESTMENT MANAGER:**
RAND ADVISORS, LLC

**OFFERING OF SERIES 1 LIMITED PARTNERSHIP INTERESTS**

**November 30, 2015**

**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**

THIS IS NOT AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY THE INTERESTS DESCRIBED HEREIN IN ANY JURISDICTION TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SALE.

018729

HCMLPHMIT00003929

## DIRECTORY

| INVESTMENT MANAGER | GENERAL PARTNER |
|---|---|
| RAND ADVISORS, LLC | ATLAS IDF GP, LLC |
| 87 RAILROAD PLACE, SUITE 403 | 87 RAILROAD PLACE, SUITE 403 |
| SARATOGA SPRINGS, NY 12866 | SARATOGA SPRINGS, NY 12866 |
| ATTENTION: JOHN HONIS | ATTENTION: JOHN HONIS |
| TELEPHONE: (214) 335-7969 | TELEPHONE: (214) 335-7969 |
| EMAIL: JHONIS@RANDADVISORS.COM | EMAIL: JHONIS@RANDADVISORS.COM |

LEGAL COUNSEL
SADIS & GOLDBERG LLP
551 FIFTH AVENUE, 21ST FLOOR
NEW YORK, NEW YORK 10176
ATTENTION: STEVEN HUTTLER, ESQ.
TELEPHONE: (212) 573-8424
FACSIMILE: (212) 573-8151
EMAIL: SHUTTLER@SGLAWYERS.COM

018730

HCMLPHMIT00003930

## TABLE OF CONTENTS

| CAPTION | PAGE |
|---|---|
| OVERVIEW | 1 |
| IMPORTANT GENERAL CONSIDERATIONS | 4 |
| SUMMARY OF OFFERING AND PARTNERSHIP TERMS | 7 |
| MANAGEMENT | 24 |
| SERVICE PROVIDERS | 26 |
| INVESTMENT PROGRAM | 29 |
| BROKERAGE PRACTICES | 38 |
| RISK FACTORS AND CONFLICTS OF INTEREST | 41 |
| ERISA CONSIDERATIONS | 79 |
| TAXATION | 81 |

EXHIBITS

| | |
|---|---|
| AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT | EXHIBIT A |
| SUBSCRIPTION DOCUMENTS | EXHIBIT B |
| PART 2 OF RAND ADVISORS, LLC's FORM ADV | EXHIBIT C |

HCMLPHMIT00003931

<div style="text-align: right;">OVERVIEW</div>

## DESCRIPTION OF INTERESTS AND STRUCTURE

Atlas IDF, LP ("**Partnership**"), a "series" limited partnership organized under the Delaware Revised Uniform Limited Partnership Act, is offering limited partner interests in the Partnership ("**Interests**") in a private placement pursuant to Section 4(a)(2) of the Securities Act of 1933, as amended ("**Securities Act**"), and Regulation D promulgated thereunder. The Partnership may offer Interests in separate Series (as defined and described herein). Only Series 1 Interests (as defined herein) are offered at this time pursuant to this Memorandum.

Only persons that are Accredited Investors (as defined in Rule 501 of Regulation D promulgated under the Securities Act), Qualified Clients (as defined in Rule 205-3 promulgated under the Investment Advisers Act of 1940, as amended ("**Advisers Act**")), and Qualified Purchasers (as defined under Section 2(a)(51) of the Investment Company Act of 1940, as amended ("**Investment Company Act**")) may purchase Interests. The Subscription Documents (as defined below) set forth in detail the definitions of Accredited Investor, Qualified Client and Qualified Purchaser. If an investor is an insurance company, such investor must require its Policy Owners (as defined herein) to meet the same suitability standards.

The Partnership was formed to pool investment funds of its investors (each, a "**Limited Partner**" and, collectively, "**Limited Partners**"; and, together with the General Partner (as defined below), "**Partners**") for the purpose of investing and trading in a wide variety of securities, financial instruments and other assets and investments, including other investment vehicles, as more fully described herein.

In addition to noting the investor qualifications listed above, Limited Partners should note that the Partnership is an insurance-dedicated investment fund. As such, the Interests are being offered only to Limited Partners that are: (x) insurance company investors, on behalf of certain of their segregated separate accounts ("**Separate Accounts**"), that fund certain variable life insurance and variable annuity contracts (collectively, the "**Policies**") to be issued to policy owners (each, a "**Policy Owner**") by the Limited Partners, or (y) state and local governmental pension plans, qualified tuition plans ("**§529 plans**"), and private sector qualified pension or retirement plans, as generally described in Treasury Regulation 1.817-5(f)(3). In addition, if an investor is an insurance company, such investor must require its Policy Owners to meet the same suitability standards described herein. While an insurance company, not a Policy Owner, will become a Limited Partner in the Partnership, it is expected that Policy Owners will be able to allocate a portion of their investment held in the Separate Account to the Partnership as one of the investment options of the Policies. See "SUMMARY OF OFFERING AND PARTNERSHIP TERMS—Investor Control" herein.

Atlas IDF GP, LLC, a Delaware limited liability company ("**General Partner**"), is the general partner of the Partnership and is responsible for the management of the Partnership's affairs.

Rand Advisors, LLC, a Delaware limited liability company ("**Investment Manager**"), is the investment manager of the Partnership and has discretionary investment authority over the Partnership's assets. The Investment Manager is registered as an investment adviser with the U.S. Securities and Exchange Commission ("**SEC**"). A copy of Part 2 of the Investment Manager's Form ADV is attached hereto as Exhibit C.

As the managing member and controlling person of the General Partner and the Investment Manager, John Honis controls all of the Partnership's operations and activities.

The minimum initial capital contribution that will be accepted from a new Limited Partner is $500,000. The minimum additional capital contribution that will be accepted from an existing Limited Partner is $500,000. In each case, the General Partner has discretion to accept lesser amounts. Generally, new Limited Partners will be admitted on the first day

<div style="text-align: right;">018732</div>

HCMLPHMIT00003932

of each month, and withdrawals may be made on the last day of each calendar quarter upon 91 days' prior written notice, subject to certain restrictions as described herein (unless, in each case, the General Partner, in its sole discretion, permits subscriptions or withdrawals at another time).



## Investment Objective and Strategy

The Partnership's primary objective is to seek consistent above-average returns primarily through capital appreciation. The Investment Manager intends to use a disciplined investment philosophy by combining thorough fundamental research and in-depth analysis of investment opportunities. **No assurance can be given, however, that the Investment Manager will achieve the Partnership's investment objective, and investment results may vary substantially over time and from period to period.** See "INVESTMENT PROGRAM" herein for further details.

As of the date hereof, the Investment Manager intends to allocate approximately 45% of the Series 1 investment portfolio to traded investments and approximately (but not more than) 55% of the Series 1 investment portfolio to the first series of limited partnership interests to be issued by the PE Portfolio Fund (as defined herein) that: (x) is expected to initially invest in the Highland Transaction (as defined herein), if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction. However, the Investment Manager reserves the right to change such allocation in the future, subject to compliance with all applicable laws, including the diversification requirements applicable to insurance-dedicated investment funds, as further set forth herein. **Further, the Partnership shall not accept additional Limited Partners into any existing Series if such Series has existing Side Pocket Accounts (as defined herein) at the time of such admission.**

018733

HCMLPHMIT00003933

## RISK FACTORS, CONFLICTS OF INTERESTS AND OTHER CONSIDERATIONS

Before purchasing an Interest in the Partnership, you should carefully consider various risk factors and conflicts of interest, as well as suitability requirements, restrictions on transfers and withdrawals of Interests and various legal, tax and other considerations, all of which are discussed elsewhere in this Confidential Private Placement Memorandum (this "**Memorandum**").

018734

HCMLPHMIT00003934

## IMPORTANT GENERAL CONSIDERATIONS

You should not construe the contents of this Memorandum as legal, tax or investment advice and, if you acquire an Interest, you will be required to make a representation to that effect. You should review the proposed investment and the legal, tax and other consequences thereof with your own professional advisors. The purchase of an Interest involves certain risks and conflicts of interest among the General Partner, the Investment Manager and the Partnership. See "RISK FACTORS AND CONFLICTS OF INTEREST". The General Partner reserves the right to refuse any subscription for any reason.

In making an investment decision, you must rely on your own examination of the Partnership and the terms of the offering of Interests, including the merits and risks involved. You and your representative(s), if any, are invited to ask questions and obtain additional information from the General Partner concerning the terms and conditions of the offering, the Partnership, and any other relevant matters to the extent that the General Partner possesses such information or can acquire it without unreasonable effort or expense.

Neither the SEC nor any state securities commission has passed upon the merits of participating in the Partnership, nor has the SEC or any state securities commission passed upon the adequacy or accuracy of this Memorandum. Any representation to the contrary is a criminal offense. The General Partner anticipates that: (i) the offer and sale of the Interests will be exempt from registration under the Securities Act and the various state securities laws; (ii) the Partnership will not be registered as an investment company under the Investment Company Act, pursuant to an exemption provided by Section 3(c)(7) thereunder; and (iii) neither the General Partner nor the Investment Manager will be registered as a commodity pool operator under the Commodity Exchange Act, as amended ("CEA"), based upon an exemption available under Rule 4.13(a)(3) thereunder. Consequently, you will not be entitled to certain protections afforded by those statutes.

The Investment Manager is registered as an investment adviser with the SEC. A copy of Part 2 of the Investment Manager's Form ADV is attached hereto as Exhibit C.

Pursuant to Rule 4.13(a)(3) of the CEA, each of the General Partner and the Investment Manager is exempt from registration with the Commodity Futures Trading Commission ("CFTC") as a commodity pool operator and therefore, unlike a registered commodity pool operator, it is not required to deliver a Disclosure Document (as such term is defined under CFTC rules) and a certified annual report to participants in the pool. The foregoing registration exemption is based on the Partnership's limited commodity trading activity and its undertaking that at all times either: (a) the aggregate initial margin and premiums required to establish commodity interest positions, determined at the time the most recent position was established, will not exceed 5% of the liquidation value of the Partnership's portfolio, after taking into account unrealized profits and losses on any such positions; or (b) the aggregate net notional value of the Partnership's commodity interest positions, determined at the time the most recent position was established, will not exceed 100% of the liquidation value of the Partnership's portfolio, after taking into account unrealized profits and losses on any such positions. Similar limitations will apply with respect to investments in Portfolio Funds. Certain types of swaps are included in the definition of "commodity interests". These swaps include interest rate swaps, currency swaps, energy and metal swaps, agricultural swaps, swaps on broad-based indices, swaps on government securities and certain mixed swaps.

As a Limited Partner, you may withdraw from the Partnership and receive payment for your Interests, subject to certain restrictions, as specified in the Amended and Restated Limited Partnership Agreement of the Partnership (as the same may be

018735

HCMLPHMIT00003935

amended and/or restated from time to time, the "Partnership Agreement"), a copy of which is attached hereto as Exhibit A.

The offering of Interests is made only by delivery of a copy of this Memorandum to the person whose name appears hereon. The offering is made only to potential investors who are Accredited Investors, Qualified Clients and Qualified Purchasers. If an investor is an insurance company, such investor must require its Policy Owners to meet the same suitability standards. By accepting delivery of this Memorandum, you agree not to reproduce or divulge its contents, in whole or in part, and, if you do not purchase any Interests, to return this Memorandum and the exhibits attached hereto to the General Partner or the Partnership's administrator, a provider of administrative services ("Administrator"), as further set forth herein under "SERVICE PROVIDERS—Administrator".

Notwithstanding any provision in this Memorandum to the contrary, prospective Limited Partners (and their employees, representatives, and other agents) may disclose to any and all persons the U.S. federal income tax treatment and tax structure of the Interests offered hereby. For this purpose, "tax structure" is limited to facts relevant to the U.S. federal income tax treatment of the Interests, and does not include information relating to the identity of the issuer, its affiliates, agents or advisors.

There is no public market for the Interests nor is any expected to develop. Even if such a market develops, no distribution, resale or transfer of an Interest will be permitted, except in accordance with the provisions of the Securities Act, the rules and regulations promulgated thereunder, any applicable state securities laws and the terms and conditions of the Partnership Agreement. Any transfer of an Interest by a Limited Partner, public or private, will require the consent of the General Partner. Accordingly, if you purchase an Interest, you will be required to represent and warrant that you have read this Memorandum and are aware of and can afford the risks of an investment in the Partnership for an indefinite period of time. You will also be required to represent that you are acquiring the Interest for your own account, for investment purposes only, and not with any intention to resell or transfer all or any part of the Interest. This investment is suitable for you only if you have adequate means of providing for your current and future needs, have no need for liquidity in this investment and can afford to lose the entire amount of your investment.

Although this Memorandum contains summaries of certain terms of certain documents pertaining to the Partnership, you should refer to the actual documents (copies of which are attached hereto or are available from the General Partner or the Administrator) for complete information concerning the rights and obligations of the parties thereto. All such summaries are qualified in their entirety by the terms of the actual documents. No person has been authorized to make any representations or furnish any information with respect to the Partnership or the Interests, other than the representations and information set forth in this Memorandum or other documents or information furnished by the General Partner upon request, as described above.

Certain information contained in this Memorandum constitutes "forward-looking statements", which can be identified by the use of forward-looking terminology, such as "may", "will", "seek", "should", "expect", "anticipate", "project", "estimate", "intend", "continue" or "believe" or the negatives thereof or other variations thereon or comparable terminology. Due to various risks and uncertainties, including those set forth under "RISK FACTORS AND CONFLICTS OF INTEREST", actual events or results or the actual performance of the Partnership may differ materially from those reflected or contemplated in such forward-looking statements.

No rulings have been sought from the Internal Revenue Service ("IRS") with respect to any tax matters discussed in this Memorandum. You are cautioned that the views contained herein are subject to material qualifications and subject to

018736

HCMLPHMIT00003936

possible changes in regulations by the IRS or by the U.S. Congress in existing tax statutes or in the interpretation of existing statutes and regulations.

**NOTICE TO BERMUDA RESIDENTS**

THE INTERESTS MAY BE OFFERED OR SOLD IN OR FROM BERMUDA ONLY IN COMPLIANCE WITH THE PROVISIONS OF THE INVESTMENT BUSINESS ACT 2003 OF BERMUDA (THE "BERMUDA ACT") AND THE REQUIREMENTS OF THE RELATED REGULATIONS OF BERMUDA WHICH REGULATE THE SALE OF SECURITIES IN OR FROM BERMUDA. TO THE EXTENT THAT THE INTERESTS ARE OFFERED OR SOLD IN OR FROM BERMUDA, SUCH OFFER OR SALE WILL BE MADE IN ACCORDANCE WITH THE BERMUDA ACT.

THE BERMUDA MONETARY AUTHORITY, THE BERMUDA REGISTRAR OF COMPANIES AND THE BERMUDA MINISTER OF ECONOMIC DEVELOPMENT ACCEPT NO RESPONSIBILITY FOR THE FINANCIAL SOUNDNESS OF ANY PROPOSAL OR FOR THE CORRECTNESS OF ANY OF THE STATEMENTS MADE OR OPINIONS EXPRESSED HEREIN.

NO INVITATION, WHETHER DIRECTLY OR INDIRECTLY, MAY BE MADE TO THE PUBLIC IN OR FROM BERMUDA TO SUBSCRIBE FOR THE INTERESTS.

The information contained herein is current only as of the date hereof and you should not, under any circumstances, assume that there has not been any change in the matters discussed herein since the date hereof.

018737

HCMLPHMIT00003937

## SUMMARY OF OFFERING AND PARTNERSHIP TERMS

The following summary is qualified in its entirety by other information contained elsewhere in this Confidential Private Placement Memorandum (this "**Memorandum**") and by Amended and Restated the Limited Partnership Agreement of the Partnership (as defined below) (as the same may be amended and/or restated from time to time, the "**Partnership Agreement**"), a copy of which is attached to this Memorandum as Exhibit A.  You should read this entire Memorandum and the Partnership Agreement, carefully before making any investment decision regarding the Partnership and should pay particular attention to the information under the heading "RISK FACTORS AND CONFLICTS OF INTEREST".  To the extent relevant, you should also read the offering and governing documents of the PE Portfolio Funds (as defined herein) in which the Partnership intends to initially invest on behalf of the initial Limited Partners (as defined herein), which are available from the Partnership upon request.  In addition, you should consult your own advisors in order to understand fully the consequences of an investment in the Partnership.

**The Partnership**    Atlas IDF, LP, a Delaware "series" limited partnership ("**Partnership**"), was formed to pool investment funds of its investors (each, a "**Limited Partner**" and, collectively, "**Limited Partners**"; and, together with the General Partner (as defined below), "**Partners**") for the purpose of investing and trading in a wide variety of securities, financial instruments and other assets and investments, including other investment vehicles, as more fully described herein.  See "INVESTMENT PROGRAM" and "—Portfolio Funds" below.

The Partnership may offer Interests in separate Series (as defined and described herein).  Only Series 1 Interests (as defined herein) are offered at this time pursuant to this Memorandum.

**Management**    Atlas IDF GP, LLC, a Delaware limited liability company ("**General Partner**"), is the general partner of the Partnership and is responsible for the management of the Partnership's affairs.

Rand Advisors, LLC, a Delaware limited liability company ("**Investment Manager**"), is the investment manager of the Partnership and has discretionary investment authority over the Partnership's assets.  The Investment Manager is registered as an investment adviser with the U.S. Securities and Exchange Commission ("**SEC**").  A copy of Part 2 of the Investment Manager's Form ADV is attached hereto as Exhibit C.

As the managing member and controlling person of the General Partner and the Investment Manager, John Honis ("**Principal**") controls all of the Partnership's operations and activities.  See "MANAGEMENT" for additional information.

**Issuance of Interests in Multiple Series**    The Interests will be offered in separate series ("**Series**").  The Partnership is currently offering one Series of Interests: "**Series 1 Interests**".  Each Series of Interests will have separate rights and obligations.  In addition, each Series of Interests may correspond to a separate portfolio of assets, which may have different investment objectives and strategies.  The Partnership may issue additional Series of Interests in the future, which may have rights and obligations that differ from those of the Series 1 Interests with respect to any matters, including without limitation, fees, withdrawal rights, participation in Side Pocket Accounts (as defined herein) and other rights and terms. The terms of such additional Series will be determined by the General Partner, in its sole discretion.

Each Series shall have separate rights, powers and duties with respect to its investment portfolio and other property and obligations and the profits and losses associated with such portfolio, property and obligations.  The Partnership will maintain separate and distinct records for each Series and shall hold and account for the assets and liabilities of such Series separately from other Series.  **The Partnership shall not accept additional Limited Partners into any existing Series if such Series has existing Side Pocket Accounts at the time of such admission.**

Under Delaware law, (i) the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to a particular Series shall be enforceable against the

018738

HCMLPHMIT00003938

assets of such Series only, and not against the assets of any other Series, and (ii) none of the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to the Partnership generally or any other Series shall be enforceable against the assets of such Series.

Unless the context otherwise requires, Series 1 Interests and any other Series of Interests shall be collectively referred to throughout this Memorandum as the "**Interests**." As the context may require, the holders of Series 1 Interests may be referred to herein as "**Series 1 Limited Partners**". Series 1 Limited Partners and, to the extent applicable, all the Limited Partners of other Series shall be collectively referred to throughout this Memorandum as the "**Limited Partners**".

References herein to the Partnership shall include, where appropriate, each Series of the Partnership. The terms of the other Series may be set forth in an amended version of this Memorandum and/or in a separate supplement hereto.

**Portfolio Funds**   In addition to investing in individual traded assets, the Partnership may invest a significant portion of its assets in other investment vehicles, including, without limitation, hedge funds, managed accounts and other private investment funds (collectively, the "**Portfolio Funds**"), including those managed by, or otherwise affiliated or related to, the Investment Manager. Portfolio Funds may allocate their assets to Illiquid Investments (as defined herein). As of the date hereof, the Investment Manager intends to allocate approximately 45% of the Series 1 investment portfolio to traded investments and approximately (but not more than) 55% of the Series 1 investment portfolio to the first series of limited partnership interests to be issued by the PE Portfolio Fund (as defined herein). However, the Investment Manager reserves the right to change such allocation in the future, subject to compliance with all applicable laws, including the diversification requirements applicable to insurance-dedicated investment funds, as further set forth herein.

As of the date hereof, (i) the Investment Manager acts as the investment manager to Rand PE Fund I, L.P., a Delaware "series" limited partnership ("**PE Portfolio Fund**") that: (x) is expected to initially invest in the Highland Transaction (as defined herein), if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction; (ii) Rand PE Fund Management, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the PE Portfolio Fund; and (iii) the Principal is the managing member and controlling person of Rand PE Fund Management, LLC, as further set forth herein.

The Portfolio Funds will bear their own operating and investment related expenses, which will be shared by the partners in such Portfolio Funds, including the Partnership. These fees and expenses may result in greater expenses than if Limited Partners invested directly in the Portfolio Funds or the relevant underlying investments. Limited Partners should take into account that the return on their investment will be reduced to the extent of both levels of fees and expenses.

**The Offering**   The Partnership is offering limited partner interests in the Partnership ("**Interests**") to persons who are Accredited Investors (as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended ("**Securities Act**")), Qualified Clients (as defined in Rule 205-3 promulgated under the Investment Advisers Act of 1940, as amended ("**Advisers Act**")), and Qualified Purchasers (as defined under Section 2(a)(51) of the Investment Company Act of 1940, as amended ("**Investment Company Act**")). Interests represent a percentage interest in the Partnership proportionate to the capital accounts of all Partners.

In addition to noting the investor qualifications listed above, Limited Partners should note that the Partnership is an insurance-dedicated investment fund. As such, the Interests are being offered only to Limited Partners that are: (x) insurance company investors, on behalf of certain of their segregated separate accounts ("**Separate Accounts**"), that fund certain variable life insurance and variable annuity contracts (collectively, the "**Policies**") to be issued to policy owners (each, a "**Policy Owner**") by the Limited Partners, or (y) state and local governmental pension plans, qualified tuition plans ("**§529 plans**"), and

018739

HCMLPHMIT00003939

private sector qualified pension or retirement plans, as generally described in Treasury Regulation 1.817-5(f)(3). In addition, if an investor is an insurance company, such investor must require its Policy Owners to meet the same suitability standards described in the previous paragraph. While an insurance company, not a Policy Owner, will become a Limited Partner in the Partnership, it is expected that Policy Owners will be able to allocate a portion of their investment held in the Separate Account to the Partnership as one of the investment options of the Policies. See "SUMMARY OF OFFERING AND PARTNERSHIP TERMS—Investor Control" herein.

Each life insurance company Limited Partner ("**Insurance Company Limited Partner**") will be deemed to hold an Interest in respect of the account of each Policy Owner and will be treated as a separate Limited Partner with respect to each such Interest.

<u>**Marketing Fees and Sales Charges**</u>.  The General Partner and/or the Investment Manager may sell Interests through broker-dealers and pay a marketing fee or commission in connection with such activities, including ongoing payments, at the General Partner's or the Investment Manager's own expense. The General Partner and/or the Investment Manager may also deduct a percentage of the amount invested by a Limited Partner in the Partnership to pay sales fees or charges, on a fully disclosed basis, to a broker-dealer based upon the capital contribution of such Limited Partner introduced to the Partnership by such broker-dealer. Any such sales fees or charges would be assessed against the referred Limited Partner and would reduce the amount actually invested by such Limited Partner in the Partnership. If a Limited Partner is introduced to the Partnership through a broker-dealer that is not affiliated with the General Partner and/or the Investment Manager, the arrangement, if any, with such broker-dealer will be disclosed to, and acknowledged by, such Limited Partner. See "BROKERAGE PRACTICES—Referral of Investors and Sales Charges".

|  |  |
|---|---|
| **How to Subscribe** | Attached as Exhibit B to this Memorandum are the subscription documents and instructions for subscribing ("**Subscription Documents**"). In order to subscribe for Interests, you must complete the Subscription Documents and return them to the Partnership's administrator, a provider of administrative services ("**Administrator**"), as further set forth herein under "SERVICE PROVIDERS—Administrator". You must pay 100% of your investment at the time you subscribe. Payment must be made by wire transfer of immediately available funds to the Partnership. To ensure compliance with applicable laws, regulations and other requirements relating to money laundering, the General Partner and/or the Administrator may require additional information to verify the identity of any person who subscribes for an Interest in the Partnership. |
|  | If the General Partner consents to a Limited Partner's contribution of securities (and/or other investments) to the Partnership, the Partnership may, in the General Partner's discretion, assess a special charge against such Limited Partner equal to the actual costs incurred by the Partnership in connection with accepting such contributed securities (and/or other investments), including the costs of liquidating, or otherwise adjusting the Partnership's portfolio to accommodate, such securities (and/or other investments). Such special charge will be assessed as of such dates deemed appropriate by the General Partner. Any investor who contributes securities (and/or other investments) in lieu of cash to the Partnership should consult with such person's counsel or advisors as to the tax effect of such contribution. |
| **Eligible Investors and Suitability** | In order to invest in the Partnership, you must meet certain minimum suitability requirements, including qualifying as an Accredited Investor under the Securities Act, a Qualified Client under the Advisers Act and a Qualified Purchaser under the Investment Company Act. The Subscription Documents set forth in detail the definitions of Accredited Investor, Qualified Client and Qualified Purchaser. You must check the appropriate places in the Subscription Documents to represent to the Partnership that you are an Accredited Investor, a Qualified Client and a Qualified Purchaser in order to be able to purchase Interests. In addition, you must check the appropriate places in the Subscription Documents and/or make the appropriate representations that you are an insurance company investor. If an investor is an insurance company, such investor must require its Policy Owners to meet the same suitability standards. The General Partner, in its sole discretion, can accept or reject any initial subscriptions from prospective Limited Partners |

018740

HCMLPHMIT00003940

and any additional capital contributions from existing Limited Partners for any reason or for no reason.

Qualified pension or retirement plans subject to the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), and other tax-exempt entities described in Treasury Regulation 1.817-5(f)(3) may purchase Interests.  However, investment in the Partnership by such entities requires special consideration.  Trustees or administrators of such entities should consult their own legal and tax advisors.  The General Partner intends to use reasonable efforts to limit the aggregate equity participation by "benefit plan investors" in the Partnership to less than 25% of the value of any class of Interests in the Partnership. See "ERISA CONSIDERATIONS" and "TAXATION—Tax-Exempt Investors".

**Minimum Investment**

The minimum initial capital contribution that will be accepted from a new Limited Partner is $500,000.  The minimum additional capital contribution that will be accepted from an existing Limited Partner is $500,000.  In each case, the General Partner has discretion to accept lesser amounts.  Limited Partners are not required to make any additional capital contributions to the Partnership.  There is no minimum or maximum aggregate amount of funds that must or may be contributed by all Partners to the Partnership.

**Admission of Limited Partners**

Capital contributions generally will be accepted as of the first day of each month, although the General Partner, in its sole discretion, has the right to admit new Limited Partners and to accept additional funds from existing Limited Partners at any time.  Upon such admission or receipt of additional capital contributions, the Interests of the Partners will be readjusted in accordance with their capital accounts.

In connection with an additional capital contribution by an existing Limited Partner, the General Partner will:  (i) treat such additional capital contribution as a capital contribution with respect to one of such Limited Partner's existing capital accounts, or (ii) establish a new capital account to which such capital contribution will be credited and which will be maintained for the benefit of such Limited Partner separately from any existing capital account of such Limited Partner.  Such separate capital accounts may be maintained for any purpose, in the discretion of the General Partner.

**Management Fee**

The Partnership has entered into an investment management agreement (as the same may be amended and/or restated from time to time, the "**Investment Management Agreement**") by and among the Partnership and the Investment Manager. In consideration for services provided pursuant to the Investment Management Agreement, the Investment Manager will receive a quarterly management fee ("**Management Fee**"), equal to a percentage of each Limited Partner's share of the Partnership's Net Asset Value (as defined herein), and based on the Partnership's total Net Asset Value, as follows:

| Partnership's Total Net Asset Value | Management Fee (per annum) |
| --- | --- |
| $0 - $99,999,999 | 0.5500% |
| $100,000,000 - $199,999,999 | 0.5000% |
| $200,000,000 - $249,999,999 | 0.4500% |
| $250,000,000 - $499,999,999 | 0.3500% |
| > $500,000,000 | 0.3400% |

For the avoidance of doubt, the Management Fee calculated based on the foregoing schedule will be calculated on a "progressive" basis.  For example, if the Partnership's Net Asset Value reaches $150,000,000, the initial $99,999,999 will always be charged a Management Fee of 0.55000% annually.  The benefit of the declining Management Fee schedule above is intended to benefit all Limited Partners as each capital account will be charged a blended Management Fee based on the above schedule.

018741

HCMLPHMIT00003941

The Management Fee will be calculated and payable to the Investment Manager quarterly, in advance, as of the first day of each calendar quarter.  A *pro rata* Management Fee will be charged to Limited Partners on any amounts accepted by the General Partner during a calendar quarter.  No part of the Management Fee will be refunded in the event that a Limited Partner withdraws, whether voluntarily or involuntarily, all or any of the value in such Limited Partner's capital account during any calendar quarter.  Management Fees will be payable with respect to the Interests of a Limited Partner in any Side Pocket Account (as defined below). For purposes of calculating the Management Fee with respect to Side Pocket Accounts, Illiquid Investments will be carried at their fair value (which may be at, above or below cost) as determined by the Investment Manager.

With respect to any Limited Partner who has requested to withdraw all of its Interests from the Partnership, with the exception of any Interests maintained in a Side Pocket Account, the Partnership may reserve an amount from the withdrawing Limited Partner's withdrawal proceeds in order to cover the estimated accrued Management Fees and expenses attributable to the Limited Partner's Interests in the Side Pocket Account based on the Investment Manager's estimate of the time period that the Illiquid Investments held in the Side Pocket Account will remain in such Side Pocket Account (collectively, the "**Management Fee Reserve**").  The Management Fee Reserve will be treated as a liability of the Partnership, and the balance of the Management Fee Reserve, if any, will be paid to the withdrawing Limited Partner, without interest, upon such Limited Partner's complete withdrawal from the Side Pocket Account.

The Partnership will also bear its *pro rata* share of the management fees charged by the managers of the Portfolio Funds.  Notwithstanding the foregoing, the Investment Manager intends to waive any management fees due to the Investment Manager with respect to any investment of the Partnership in any Affiliated Funds (as defined herein), including the PE Portfolio Fund.  Accordingly, to the extent that the Partnership invests in any Affiliated Funds, including the PE Portfolio Fund, the Partnership will not be subject to a layering of fees.

| | |
|---|---|
| Expenses | **Organizational and Initial Offering Expenses**.  The Partnership will pay or reimburse the General Partner, the Investment Manager and/or the Investment Manager Affiliates (as defined herein) for all organizational and initial offering expenses of the Partnership, including, but not limited to, legal and accounting fees, printing and mailing expenses and government filing fees (including "blue sky" filing fees).  The Partnership's organizational and initial offering expenses may be, for accounting purposes, capitalized and amortized by the Partnership for up to 60 months from the date the Partnership commences operations.  Amortization of such expenses is a divergence from U.S. generally accepted accounting principles ("**GAAP**").  In certain circumstances, this divergence may result in a qualification of the Partnership's annual audited financial statements.  In such instances, the Partnership may elect to:  (i) avoid the qualification by recognizing the unamortized expenses, or (ii) make GAAP-conforming changes for financial reporting purposes, but capitalize and amortize expenses for purposes of calculating the Partnership's Net Asset Value (resulting in a divergence in fiscal year-end Net Asset Values reported in the Partnership's financial statements, and as otherwise applicable under the provisions of the Partnership Agreement).  If the Partnership capitalizes and amortizes such expenses and is then terminated within 60 months of its commencement, any unamortized expenses will be recognized.  If a Limited Partner makes a withdrawal prior to the end of the period during which the Partnership is capitalizing and amortizing expenses, the Partnership may, but is not required to, accelerate a proportionate share of the unamortized expenses based upon the amount being withdrawn and reduce withdrawal proceeds accordingly.

**Operating Expenses**.  The Partnership will pay or reimburse the General Partner, the Investment Manager and/or the Investment Manager Affiliates for: (i) all expenses incurred in connection with the ongoing offer and sale of Interests, including, but not limited to, printing of this Memorandum and exhibits, marketing expenses and documentation of performance and the admission of Limited Partners, (ii) all operating expenses of the Partnership, such as tax preparation fees, governmental fees and taxes, fees to the Administrator, costs of communications with Limited Partners, and ongoing |

018742

HCMLPHMIT00003942

legal, accounting, auditing, bookkeeping, consulting and other professional fees and expenses, (iii) all Partnership research, trading and investment-related costs and expenses (e.g., brokerage commissions, research fees, margin interest, expenses related to short sales, custodial fees, bank service fees, and clearing and settlement charges), (iv) technology-related costs and expenses, including, but not limited to, software licenses, data feeds and colocation expenses, (v) all expenses related to attending any conference or seminar related to alternative investments (e.g., registration, transportation, accommodation or meal expenses), (vi) regulatory and other filing fees and expenses, (vii) travel expenses related to meeting with management teams, or related to any of the other categories of expenses set forth herein, (viii) any costs and expenses incurred by the Partnership in connection with converting from a stand-alone fund into a "feeder fund" as part of a master-feeder structure, (ix) director and officer liability insurance or other insurance premiums for any principal or employee of the Partnership, the General Partner, the Investment Manager or any of the Investment Manager Affiliates, (x) all fees and other expenses incurred in connection with the investigation, prosecution or defense of any claims, assertion of rights or pursuit of remedies, by or against the Partnership, including, without limitation, professional and other advisory and consulting expenses, and (xi) any and all costs and expenses incurred in connection with the dissolution, winding up, or termination of the Partnership.

Each of the General Partner, the Investment Manager or any of the Investment Manager Affiliates, in its sole discretion, may from time to time pay for any of the foregoing Partnership expenses.  Any such person may elect to be reimbursed for such expenses, or to waive its right to reimbursement for any such expenses, as well as terminate any such voluntary payment or waiver of reimbursement.

The Partnership will also bear its *pro rata* share of the expenses of each Portfolio Fund.

**Allocation of Expenses Among Series**.  The General Partner and/or the Investment Manager will allocate all expenses attributable to the Partnership among the Series on a *pro rata* basis or otherwise in their reasonable discretion.

**General Partner's and Investment Manager's Expenses**.  The General Partner and the Investment Manager will pay their own general operating and overhead expenses associated with providing the management and investment management services required under the Partnership Agreement and the Investment Management Agreement, respectively.  These expenses include all expenses incurred by the General Partner and the Investment Manager in providing for their normal operating overhead, including, but not limited to, the cost of providing relevant support and administrative services (e.g., employee compensation and benefits, rent, office equipment, computer systems, insurance (other than as expressly set forth above), utilities, telephone, secretarial and bookkeeping services, etc.), but not including any Partnership operating expenses described above.

The General Partner and the Investment Manager may use "soft dollar" commissions or rebates by brokerage firms of commissions generated by the Partnership's brokerage transactions executed through those firms to pay for certain brokerage and research products and services that fall within the safe harbor under Section 28(e) of the Securities Exchange Act of 1934, as amended ("**Exchange Act**"), as further described herein.  See "BROKERAGE PRACTICES—Soft Dollar Arrangements".

| | |
|---|---|
| Withdrawals | **Limited Partner Withdrawals Generally**.  Subject to certain restrictions described herein, each Limited Partner may withdraw a minimum of $100,000 as of the last day of each calendar quarter and at such other times as the General Partner may determine in its sole discretion (each such date, a "**Withdrawal Date**"), upon at least 91 days' prior written notice to the Administrator, with a copy to the General Partner.  Unless the General Partner consents, partial withdrawals may not be made if they would reduce a Limited Partner's capital account balance below $500,000.  All withdrawals will be deemed made prior to the commencement of the following calendar quarter (or other relevant period). |

If the General Partner, in its sole discretion, permits a Limited Partner to withdraw capital

018743

HCMLPHMIT00003943

other than on a regularly scheduled Withdrawal Date, the General Partner may impose an administrative fee to cover the actual legal, accounting, administrative, brokerage, and any other costs and expenses associated with such withdrawal. Such fee will be payable to the relevant Series of the Partnership and will be deducted from the withdrawal proceeds of the withdrawing Limited Partner as of such Withdrawal Date.

**Ability to Withdraw Is Not Guaranteed**. The General Partner believes (but cannot guarantee) that the assets of the Partnership will be invested in a manner which would allow the General Partner to satisfy withdrawal requests. The General Partner may, in its sole discretion: (i) defer withdrawal requests until the Partnership's assets mature or are liquidated in due course, (ii) elect to purchase with its own funds the Interests of the withdrawing Partner, or (iii) borrow from a third party or draw from a line of credit, subject to availability and other factors, in order to fund any withdrawal.

In addition, notwithstanding anything to the contrary herein, the General Partner may limit and/or suspend withdrawals in order to ensure that the Partnership, at all times, meets the diversification requirements applicable to insurance-dedicated investment funds, as further set forth herein.

**Payments with Respect to Withdrawals; Applicable on a Series-by-Series Basis**. A Limited Partner who requests any withdrawal of capital that constitutes, together with prior withdrawals within any fiscal year, less than 90% of the value of such Limited Partner's capital account (excluding any amounts held in any Side Pocket Accounts) will be paid within 90 days after the applicable Withdrawal Date. In the event that a Limited Partner requests a withdrawal of capital that constitutes, together with prior withdrawals within any fiscal year, 90% or more of the value of such Limited Partner's capital account (excluding any amounts held in any Side Pocket Accounts), the General Partner may reduce the amounts paid after any Withdrawal Date so that they constitute, in the aggregate during such fiscal year, 90% of an amount estimated by the General Partner to be the amount to which the withdrawing Limited Partner is entitled in the aggregate (calculated on the basis of unaudited data); such amount will be paid within 90 days after the applicable Withdrawal Date. The balance of the amount payable upon such withdrawal will be paid, without interest, within 90 days after completion of the audited financial statements for the fiscal year in which the withdrawal occurs. Notwithstanding the foregoing, the General Partner may, in its sole discretion, agree to pay up to the full capital account balance (calculated on the basis of unaudited data) to a withdrawing Limited Partner within 90 days after the applicable Withdrawal Date, subject to adjustment based on audited financial statements. To the extent that the sum previously paid to a withdrawing Limited Partner is calculated to have exceeded the amount to which it is entitled, that Limited Partner shall be required to repay to the Partnership the balance.

Upon withdrawal of all of the capital in its capital account (excluding for purposes hereof, any remaining investments held in a Side Pocket Account), a Limited Partner will be deemed to have withdrawn from the Partnership or the relevant Series, and upon notice of such withdrawal, a Limited Partner will not be entitled to exercise any voting rights afforded to Limited Partners under the Partnership Agreement.

The Partnership or the relevant Series has the right to pay cash or in-kind, or a combination of both, to a Limited Partner that makes a withdrawal from such Limited Partner's capital account.

**Limitations on Withdrawals**. The Partnership or a Series may suspend (or postpone) withdrawals, subscriptions, calculations of Net Asset Value and/or payments upon any withdrawals (in whole or in part) from capital accounts: (i) during the existence of any state of affairs which, in the opinion of the General Partner, makes the disposition of the Partnership's investments impractical or prejudicial to the Partners, or where such state of affairs, in the opinion of the General Partner, makes the determination of the price or value of the Partnership's investments impractical or prejudicial to the Partners; (ii) where any such withdrawals, subscriptions, calculations and/or payments, in the opinion of the General Partner, would result in the violation of any applicable law or regulation, including any diversification requirements applicable to insurance-dedicated investment funds; (iii) if the General Partner determines, in its sole discretion, that such suspension or

018744

HCMLPHMIT00003944

postponement is prudent in order to prevent the Partnership from being subject to adverse tax or regulatory implications; (iv) a Portfolio Fund suspends the right to, or the payment of proceeds due upon, withdrawal and/or a Portfolio Fund allocates assets to its side pocket account; (v) a Portfolio Fund satisfies a withdrawal request by making an in-kind distribution; or (vi) for such other reasons or for such other periods as the General Partner may prudently and in good faith determine.

All Limited Partners will be notified in writing of any such suspension or postponement and the termination thereof.  Following any suspension or postponement of withdrawals, a withdrawal request made by a Limited Partner prior to such suspension or postponement will be effected as of the first Withdrawal Date following the recommencement of withdrawals.

<u>Required Withdrawals</u>.  The General Partner may, in its sole discretion, require a Limited Partner to withdraw any or all of the value of such Limited Partner's capital accounts on at least five days' notice for any reason or no reason; *provided, however*, that the General Partner may require such a withdrawal on less (or no) notice in order to comply with any laws and regulations applicable to the Partnership and/or its affiliates.

<u>Side Pocket Accounts</u>.  A Limited Partner may not withdraw any of the amounts in its capital account that are attributable to the value of an Illiquid Investment held in a Side Pocket Account until such time that such Illiquid Investment (or the sales proceeds thereof) is reallocated to such Limited Partner's capital account.  At the sole discretion of the Investment Manager, an Illiquid Investment may be held in a Side Pocket Account until the occurrence of a Realization Event (as defined below).  **For the avoidance of doubt, any investment made by Series 1 into the series of the PE Portfolio Fund that corresponds to the latter fund's investment made in the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**

<u>Reserves</u>.  All withdrawals shall be subject to the General Partner's power to establish such reserves for the Partnership or a Series as the General Partner shall, in its sole but reasonable discretion, deem appropriate to pay current and future, definite, contingent and possible obligations of the Partnership or a Series (even if such reserves are not in accordance with GAAP), including estimated expenses in connection therewith, which could reduce the amount of a distribution upon withdrawal.  See "—Management Fee" for more information on the Management Fee Reserve.

<u>Other Limitations on Withdrawals</u>.  In addition to the above limitations on withdrawals, all withdrawals by Limited Partners will be subject to any limitations on withdrawals imposed by the Portfolio Funds, as applicable.  For example, the ability of the Partnership to provide withdrawal proceeds to a Limited Partner may be subject to, among other things, various notice period requirements of the Portfolio Funds.

<u>Waiver</u>.  The General Partner, in its sole discretion, may waive or modify any of the terms relating to withdrawals, including, without limitation, minimum amounts and notice periods, for all or any of the Limited Partners in its discretion without notice to the other Limited Partners.

**Withdrawals, Resignation and Transfers by General Partner and its Affiliates**

Each of the General Partner, the Investment Manager and/or any Investment Manager Affiliate may withdraw all or any of the value in its respective capital account at any time, from time to time, without the consent of the Limited Partners and without notice to any of the Limited Partners.  The General Partner may resign as the general partner of the Partnership upon 30 days' prior written notice to the Limited Partners.  Upon such resignation of the General Partner, or upon its bankruptcy or dissolution, the remaining Limited Partners have the right to appoint a substitute general partner; otherwise, the Partnership will be dissolved pursuant to the procedures set forth in the Partnership Agreement.  The Partnership Agreement permits the General Partner to appoint additional general partners and to transfer its general partner interest to an affiliate of the General Partner without the consent of Limited Partners.

**Leverage**

The Investment Manager may cause the Partnership to undertake leverage.  Leverage may take a variety of forms, including, but not limited to, the following: long-term loans,

018745

HCMLPHMIT00003945

convertible notes and repurchase arrangements. Leverage arrangements used by the Partnership when financing is contingent on the market value of the financed assets may include those which may be subject to mark-to-market collateral or margin calls. See "INVESTMENT PROGRAM" and "RISK FACTORS AND CONFLICTS OF INTEREST" herein.

**Determination of Net Asset Value**

The net asset value ("**Net Asset Value**") of the Partnership, on a Series-by-Series basis, is determined in accordance with the Partnership Agreement and is generally equal to the amount by which the value of the Partnership's assets exceeds the amount of its liabilities. Net Asset Value calculations will be made by the Administrator (based on the information provided by the Investment Manager) on an accrual basis of accounting, as of the end of each calendar month (or other period, as the case may be), in accordance with GAAP, consistently applied (except that: (x) organizational and initial offering expenses of the Partnership may be capitalized and amortized over a period of up to 60 months from the date the Partnership commences operations, and (y) reserves may be taken that are inconsistent with GAAP), this Memorandum and the Partnership Agreement.

In making such determinations, securities, commodities and other financial instruments (other than options) that are listed on a national securities, commodities or other exchange, or over-the-counter instruments listed on NASDAQ, will be valued at their last sales prices on such date or, if no sales occurred on such date, at the midpoint between the last "bid" and "ask" prices for such securities, commodities or financial instruments on such date. Options that are listed on a securities or commodities exchange will be valued at their last sales prices on the date of determination on the largest securities or commodities exchange (by trading volume) on which such options shall have traded on such date; *provided* that, if the last sales prices of such options do not fall between the last "bid" and "ask" prices for such options on such date, then such options will be valued at the midpoint between the last "bid" and "ask" prices for such options on such date. Securities, commodities, options and other financial instruments that are not listed on an exchange or quoted on an over-the-counter market, but for which there are available quotations, will be valued based upon quotations obtained from market makers, dealers or pricing services.

In the case of investments in Portfolio Funds, which investments are expected to constitute most of the Partnership's assets, the net asset value calculation provided by the relevant managers (or any affiliates or service providers thereof) of those Portfolio Funds will generally be used in determining the Partnership's Net Asset Value. The Investment Manager intends to engage an independent third-party valuation agent (in addition to the Administrator) to appraise the Partnership's interests in Illiquid Investments, including, without limitation, the PE Portfolio Fund; *provided* that, if the PE Portfolio Fund engages its own independent third-party valuation agent, the Partnership may rely on such valuation of any investment in the PE Portfolio Fund. None of the General Partner, the Investment Manager or any of their respective affiliates will be responsible for calculating the net asset value of the Portfolio Funds or for verifying the accuracy and completeness of any such values received.

If the Investment Manager, in its sole discretion, determines that the valuation of any security, commodity, option or other financial instrument pursuant to the foregoing does not fairly represent its market value, the Investment Manager will value such security, commodity, option or other financial instrument as it reasonably determines. Any securities, commodities, options and other financial instruments that have no public market, investments in other asset classes (including those in Side Pocket Accounts), and all other assets of the Partnership for which a valuation methodology is not specified, will be valued by the Investment Manager in a manner determined in good faith to reflect their fair market value. Absent bad faith or manifest error, all Net Asset Value determinations pursuant to the Partnership Agreement are conclusive and binding as to all Partners.

**Allocation of Profit and Loss**

To determine how the economic gains and losses of the Partnership will be shared, the Partnership Agreement allocates net income or loss (increases and decreases in Net Asset Value) to each Partner's capital account. Net income or loss includes all portfolio gains and losses, whether realized or unrealized, plus all other Partnership items of income (such as interest) and less all Partnership expenses. Generally, net income and

018746

HCMLPHMIT00003946

net loss for each month (or other period, as the case may be) will be allocated to the Partners in proportion to their capital account balances as of the start of such month (or such other period). Net income and net losses in any Side Pocket or other memorandum accounts will be allocated to those Partners participating in such accounts in proportion to their capital account balances in such accounts. All matters concerning the allocation of profits, gains and losses among the parties (including the taxes thereon) and accounting procedures not expressly provided for by the terms of the Partnership Agreement will be determined by the General Partner in its sole discretion. Capital account balances will reflect capital contributions, previous allocations of increases and decreases in Net Asset Value, withdrawals, distributions (if any), and expenses. For the avoidance of doubt, the foregoing provisions will apply on a Series-by-Series basis.

|  |  |
|---|---|
| **Allocation of Taxable Income and Loss** | For income tax purposes, all items of taxable income, gain, loss, deduction and credit will be allocated among the Partners at the end of each fiscal year in a manner consistent with their economic interests in the Partnership. In light of the fact that the Partnership does not intend to make distributions, to the extent that the Partnership's investment activities are successful, Limited Partners should expect to receive allocations of income and loss, and may incur tax liabilities from an investment in the Partnership without receiving cash distributions from the Partnership with which to pay those liabilities. To obtain cash from the Partnership to pay taxes, if any, Limited Partners may be required to make withdrawals, subject to the limitations in the Partnership Agreement. For the avoidance of doubt, the foregoing provisions will apply on a Series-by-Series basis. |
| **Side Pocket Accounts** | The Investment Manager may designate that certain investments held by a Series of the Partnership and/or by the Portfolio Fund(s) be carried in one or more separate memorandum accounts (each, a "**Side Pocket Account**") for such period of time as the Investment Manager determines. Such investments may include: (i) privately placed, unregistered securities, commodities, options and other financial instruments, or those investments that, in the opinion of the Investment Manager, do not have a readily ascertainable market value; (ii) other illiquid securities that may be valued but are not freely transferable; (iii) an investment into a Portfolio Fund that invests in illiquid assets; (iv) that portion of an investment in a Portfolio Fund that is attributable to side pocket accounts designated by the manager of such Portfolio Fund (which may be designated with respect to assets that are subject to legal or contractual restrictions on transferability, or that the Investment Manager believes either lack a readily assessable market value (without impairing the value of such investments) or should be held until the resolution of a special event or circumstance; and (v) investments in other asset classes (such as real estate) and other property that are not traded on public exchanges (each, as designated by the Investment Manager, along with follow-on investments, if any, an "**Illiquid Investment**"). Additionally, the Investment Manager, in its sole and absolute discretion, may determine that, for various reasons, an asset that initially was not an Illiquid Investment should be categorized as an Illiquid Investment, or that a follow-on investment should be categorized as a new Illiquid Investment. **For the avoidance of doubt, (i) there will be no limitation on the percentage of the Partnership's portfolio that may be carried in Side Pocket Accounts; and (ii) any investment made by Series 1 into the series of the PE Portfolio Fund that corresponds to the latter fund's investment made in the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.** Illiquid Investments held in a Side Pocket Account will be carried at their fair value (which may be at, above or below cost) as determined by the Investment Manager. For the avoidance of doubt, each Policy Owner investing through the relevant Limited Partner will indirectly participate in the economics from a *pro rata* portion of a Side Pocket Account and the corresponding Illiquid Investment. |

At the sole discretion of the Investment Manager, an Illiquid Investment may be held in a Side Pocket Account until the occurrence of a Realization Event. Upon a Realization Event, such Illiquid Investment (or the sales proceeds thereof) will be reallocated, *pro rata*, from the Side Pocket Account to the capital accounts of participating Partners in accordance with their respective interests in such Side Pocket Account. Until such reallocation, a Limited Partner may not withdraw any of the amounts in its capital account that are attributable to the value of Illiquid Investments held in a Side Pocket Account. Upon such reallocation, a Limited Partner that has withdrawn all of its capital from the Partnership other than the capital attributable to such Side Pocket Account will receive an

018747

HCMLPHMIT00003947

amount equal to its interest in such Side Pocket Account (net of any accrued Management Fee and accrued expenses (to the extent not covered by the Partnership's reserves, including the Management Fee Reserve) with respect thereto), within 90 days after such reallocation. **For the avoidance of doubt, any investment made by Series 1 into the series of the PE Portfolio Fund that corresponds to the latter fund's investment made in the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**

A "**Realization Event**" occurs: (1) when an Illiquid Investment becomes liquid, as determined in the reasonable discretion of the Investment Manager; (2) when an Illiquid Investment is sold or otherwise disposed of by the Partnership; (3) when circumstances otherwise exist that, in the reasonable judgment of the Investment Manager, conclusively establish a value for an Illiquid Investment, as determined in the reasonable discretion of the Investment Manager (including, without limitation, when additional securities substantially similar to the Illiquid Investment have been issued by the issuer of the Illiquid Investment); or (4) as otherwise determined in the sole discretion of the Investment Manager.

Newly-admitted Limited Partners may not participate in Illiquid Investments that were placed in a Side Pocket Account prior to their admission. **For the avoidance of doubt, the Partnership shall not accept additional Limited Partners into any existing Series if such Series has existing Side Pocket Accounts at the time of such admission.** Any expenses relating specifically to a Side Pocket Account will be charged to the Partners participating in such account. If the Investment Manager in its discretion designates any investment as a follow-on investment to an existing Illiquid Investment, only the Partners participating in such original investment will participate in such follow-on investment in proportion to their interest in the related Side Pocket Account; *provided, however*, that, if a Partner shall have withdrawn from the Partnership, the General Partner will equitably adjust the interests of the remaining participating Partners to reflect such withdrawn Partner's non-participation in the follow-on investment.

Also see "RISK FACTORS AND CONFLICTS OF INTEREST—Conflicts of Interest" herein.

|  |  |
|---|---|
| **New Issues Accounts; Other Memorandum Accounts** | From time to time, the Partnership may purchase securities that are part of a public distribution.  Under rules adopted by the Financial Industry Regulatory Authority ("**FINRA**"), (i) certain persons engaged in the securities, banking or financial services industries (and members of their immediate families) and (ii) certain persons who are affiliated with companies that are current, former or prospective investment banking clients of the Partnership's broker(s) (collectively, "**Restricted Persons**") are restricted from participating in initial public offerings of equity securities ("**New Issues**"), each subject to a *de minimis* exemption.  To the extent necessary to comply with FINRA rules, in addition to the Partnership's regular accounts and any Side Pocket Accounts, the General Partner may establish one or more memorandum accounts that are authorized to participate in New Issues (each, a "**New Issues Account**").  Participation in New Issues Accounts will be limited to (i) those Limited Partners who are not Restricted Persons, and (ii) those Limited Partners who are Restricted Persons, but only to the extent that such participation by Restricted Persons does not exceed levels permitted under applicable FINRA rules. |

In addition, as a matter of fairness to Partners that do not participate in New Issues, a use-of-funds charge may be debited to the capital accounts of those Partners that do participate in New Issues and credited to the capital accounts of all the Partners. The General Partner may calculate such charge, in its discretion, in any manner consistent with applicable FINRA rules, including, debiting amounts equal to interest, (i) on the funds used to purchase the New Issues at the annual rate being paid by the Partnership, or (ii) that would be paid by the Partnership on borrowed funds during the applicable period.

Upon the sale or other disposition of New Issues (including any transfer of the underlying securities in the New Issues Account to the capital accounts of all of the Partners, after such securities no longer constitute New Issues), any profits or losses resulting from securities transactions in the New Issues Account in any fiscal period will be credited or

018748

HCMLPHMIT00003948

debited to the capital accounts of Limited Partners participating in the New Issues Account in accordance with their interests therein. Accordingly, the returns to Limited Partners on their investments in the Partnership may differ depending upon whether or not they are a Restricted Person.

In addition to the foregoing with respect to Side Pocket Accounts and New Issues Accounts, to the extent that certain Limited Partners are restricted from participating in any other transactions of the Partnership by applicable laws or regulations, or for any other reason determined by the General Partner in good faith, the General Partner may, in its discretion, establish one or more separate memorandum accounts to hold such investments and isolate ownership away from such restricted Limited Partners. Only those Limited Partners who the General Partner determines are eligible will participate in such accounts.

**Side Letters**    The Partnership, the General Partner and/or the Investment Manager may from time to time enter into side letters or other similar agreements (collectively, "**Side Letters**") with one or more Limited Partners that provide such Limited Partner(s) with additional and/or different rights (including, without limitation, with respect to access to information, minimum investment amounts and liquidity terms) than such Limited Partner(s) have pursuant to this Memorandum and the Partnership Agreement. Neither the General Partner nor the Investment Manager will be required to notify any or all of the other Limited Partners of any such Side Letters or any of the rights and/or terms or provisions thereof, nor will the General Partner or the Investment Manager be required to offer such additional and/or different rights and/or terms to any or all of the other Limited Partners. Specifically, certain Insurance Company Limited Partners may have additional withdrawal rights not offered to other Limited Partners. See "RISK FACTORS AND CONFLICTS OF INTEREST—Partnership Risks—Impact of Side Letters" herein.

**Reports to Limited Partners**    Each Limited Partner will receive the following, with respect to the relevant Series: (i) annual financial statements of the Partnership audited by an independent certified public accounting firm; (ii) quarterly unaudited performance information; (iii) copies of such Limited Partner's Schedule K-1 to the Partnership's tax returns; and (iv) other periodic reports or letters as determined by the General Partner in its sole discretion. The financial statements of the Partnership will be prepared in accordance with GAAP (except to the extent that this Memorandum or the Partnership Agreement states or contemplates that such statements may be inconsistent with GAAP).

The General Partner may at any time choose to change the Partnership's accounting guidelines from GAAP to the International Financial Reporting Standard ("**IFRS**"). In such event, the financial performance of the Partnership, as determined under IFRS, may vary from those determined under GAAP.

The Partnership will bear all fees incurred in providing such tax returns and reports.

The General Partner may agree to provide certain Limited Partners with additional information on the underlying investments of the Partnership, which may affect investment and withdrawal decisions, as well as heightened access to the General Partner, the Investment Manager and their respective employees for relevant information.

**Transferability of Interests**    As a Limited Partner, you may not assign or transfer your Interest (except by operation of law) without the consent of the General Partner, which consent may be given or withheld in its sole discretion. No transfer of an Interest by a Limited Partner will be permitted if it would result in the termination of the Partnership for federal income tax purposes. Transfers of Interests are subject to other restrictions set forth in the Partnership Agreement, including compliance with ERISA and federal and state securities laws.

Due to these limitations on transferability, Limited Partners may be required to hold their Interests indefinitely, unless they withdraw from the Partnership in accordance with the provisions set forth in the Partnership Agreement.

**Distributions; Distributions**    The Partnership does not expect to make any distributions to Limited Partners from profits or capital, except pursuant to requests for withdrawals and upon termination of the

018749

HCMLPHMIT00003949

| | |
|---|---|
| **Upon Termination of the Partnership** | Partnership or the relevant Series. Upon the termination of the Partnership (as further described in the Partnership Agreement), the assets of the Partnership or the relevant Series will be liquidated (or distributed) and the proceeds of liquidation will be used to pay off known liabilities, establish reserves for contingent liabilities and expenses of liquidation (even if such reserves are not in accordance with GAAP), and any remaining balance will be applied and distributed in proportion to the respective capital accounts of the Partners. The Partnership or the relevant Series may satisfy any distributions to Limited Partners in cash, in-kind or any combination thereof.   Additionally, the General Partner may create a liquidating fund entity (e.g., a liquidating trust or similar vehicle) and may transfer all or a portion of the Partnership's assets to such entity for any reason, including an orderly liquidation of any illiquid Partnership or Series assets, including, but not limited to Side Pocket Accounts, and may distribute ownership interests in such entity to Limited Partners.

Notwithstanding anything to the contrary herein, to the extent that the Partnership makes any distributions, the General Partner may limit such distributions, in its sole discretion, in order to ensure that the Partnership, at all times, meets the diversification requirements applicable to insurance-dedicated investment funds.

The termination of the Partnership shall constitute the termination of all Series.  For the avoidance of doubt, the termination of an individual Series, however, shall not constitute the termination of the Partnership. |
| **Bank Holding Companies** | Limited Partners that are Bank Holding Companies ("**BHC Limited Partners**") (as defined by Section 2(a) of the Bank Holding Company Act of 1956, as amended ("**BHCA**")) are limited to 4.99% of the voting Interest in the Partnership under Section 4(c)(6) of the BHCA.  The portion of the Interest in the Partnership held by a BHC Limited Partner in excess of 4.99% of the aggregate outstanding voting Interests of all Limited Partners will be deemed non-voting Interests in the Partnership.  BHC Limited Partners holding non-voting Interests in the Partnership are permitted to vote such Interests (i) on any proposal to dissolve or continue the business of the Partnership under the Partnership Agreement and (ii) on matters with respect to which voting rights are not considered to be "voting securities" under 12 C.F.R. § 225.2(q)(2), including such matters which may "significantly and adversely" affect a BHC Limited Partner (such as amendments to the Partnership Agreement or modifications of the terms of its Interest).  For the avoidance of doubt, the foregoing provisions shall apply on a Series-by-Series basis.  Except with regard to restrictions on voting, non-voting Interests are identical to all other Interests held by Limited Partners. |
| **Voting Rights and Amendments** | The voting rights of Limited Partners are very limited.  Other than as explicitly set forth in the Partnership Agreement, Limited Partners have no voting rights as to the Partnership or its management.  Generally, the Partnership Agreement may be amended only with the consent of the General Partner and Limited Partners owning more than 50% of all of the outstanding Interests of each Series; *provided* that:  (x) for matters only relating to one Series, only the Limited Partners of that Series will vote on such matters, and (y) that the General Partner may amend the Partnership Agreement without the consent of or notice to any of the Limited Partners if, in the opinion of the General Partner, the amendment does not materially adversely affect any Limited Partner. |
| **Liability of Limited Partners** | No Limited Partner shall be personally liable or bound for the expenses, liabilities or obligations of the Partnership or the relevant Series beyond the amount in such Limited Partner's capital account in the relevant Series, from time to time, including any amounts thereof attributable to capital contributions, except that such Limited Partner may be obligated to return all or a portion of any distributions (including withdrawal proceeds) received from the Partnership or the relevant Series in an amount up to its aggregate capital contributions (including any income or gains thereon) to the Partnership or the relevant Series in order to pay such Limited Partner's *pro rata* share of any Partnership or Series liabilities that arose while such Limited Partner held Interests.  Subject to the foregoing, no Limited Partner shall be obligated to provide any contributions to the Partnership or the relevant Series, other than its initial capital contribution. No Limited Partner shall be obligated to make any loan to the Partnership or a Series. |

HCMLPHMIT00003950

Under the Delaware Revised Uniform Limited Partnership Act ("**Delaware Act**"), when a Limited Partner receives a return of all or any part of such Limited Partner's capital contribution, the Limited Partner may be liable to the Partnership or a Series for any sum, not in excess of such return of capital (together with interest), if at the time of such distribution the Limited Partner knew that the Partnership or the relevant Series was prohibited from making such distribution pursuant to the Delaware Act.

**Brokerage Practices**

Portfolio transactions for the Partnership will be allocated by the Investment Manager to brokers on the basis of best execution and in consideration of, among other factors, such brokers' ability to effect transactions, operational efficiency, reputation and financial strength. See "BROKERAGE PRACTICES".

**Other Activities of the General Partner, the Investment Manager, the Principal and Affiliates**

None of the General Partner, the Investment Manager, the Principal or any of their respective partners, managers, members, directors, officers, employees, agents and affiliates (collectively, "**Investment Manager Affiliates**") is required to manage the Partnership as its sole and exclusive function. In addition to managing the Partnership and its investments, each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may provide investment management and other services to other parties and may manage other accounts and/or establish other private investment funds in the future (both domestic and offshore) (such accounts and funds, collectively, "**Affiliated Funds**"), including those that may employ an investment program and strategy similar to that of the Partnership.

Specifically, as of the date hereof: (i) the Investment Manager acts as the investment manager to Rand PE Fund I, L.P., a Delaware "series" limited partnership ("**PE Portfolio Fund**") that: (x) is expected to initially invest in the Highland Transaction, if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction; (ii) Rand PE Fund Management, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the PE Portfolio Fund; (iii) the Principal is the managing member and controlling person of Rand PE Fund Management, LLC; and (iv) the Investment Manager acts as the investment subadvisor to a series of SALI Multi-Series Fund, L.P., a Delaware "series" limited partnership, and provides certain discretionary investment advisory or consulting services to such series.

See "MANAGEMENT" and "RISK FACTORS AND CONFLICTS OF INTEREST" herein.

**Exculpation and Indemnification**

The Partnership Agreement provides that none of the General Partner, the Investment Manager or any of the Investment Manager Affiliates will be liable to the Partnership or the Limited Partners for any action or inaction in connection with the business and affairs of the Partnership unless such action or inaction is determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct. The Partnership (but not the Limited Partners individually) is obligated to indemnify the General Partner, the Investment Manager and the Investment Manager Affiliates (which, for purposes of this indemnity, shall include fund counsel (except for legal malpractice)) from and against any and all claims, liabilities, obligations, judgments, suits, proceedings, actions, demands, losses, costs, expenses (including attorneys' fees and other expenses of litigation), damages, penalties or interest, as a result of any claim or legal proceeding (made or threatened) related to any action or inaction by any of them in connection with the business and affairs of the Partnership (including the settlement or appeal of any such claim or legal proceeding); *provided* that such indemnity will not extend to conduct determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct. For the avoidance of doubt, the foregoing indemnification provisions shall apply on a Series-by-Series basis. The Investment Management Agreement also provides similar protections to the Investment Manager.

**Investor Control**

The Partnership is an insurance-dedicated investment fund. In certain circumstances, the owner of a variable life insurance or annuity contract invested in a Separate Account may, for federal income tax purposes, be considered the owner of the assets of the Separate Account that funds the variable contract under an "investor control" theory. Each Policy Owner should consult his or her own tax advisors regarding the "investor control" theory

018751

HCMLPHMIT00003951

and the particular tax risks, if any, posed by the Policy Owner's selection of the Partnership as its investment option under a related Policy.

Policy Owners have no right to communicate with or direct the investment policies or decisions of the Partnership and/or the Investment Manager Affiliates relating in any way to the Partnership.  For purposes of this Memorandum, the term Policy Owner includes: (i) any trustees of a Policy Owner; (ii) any Policy beneficiaries; (iii) any affiliated person (as this term is defined in Section 2(a)(3) of the Investment Company Act) of the foregoing persons; or (iv) any person that represents the Policy Owner.

There is not, nor shall there be, a pre-arranged binding agreement between the General Partner, the Administrator and the Investment Manager, on the one hand, and any Policy Owner, on the other hand, relating to the investments of the Partnership.  Furthermore, Limited Partners have no right or power to take part in the management of the Partnership.

None of the Partnership, the General Partner, the Investment Manager or any of the Investment Manager Affiliates will be held responsible to any Limited Partner or Policy Owner for any loss, damage, liability or expense resulting from a violation of the "investor control" theory to the extent such violation is attributable to conduct of a Policy Owner.

Notwithstanding the foregoing, the Partnership's investment program permits investments in Portfolio Funds, Illiquid Investments and other investments that are managed by, or otherwise affiliated with or related to the Investment Manager.  None of such investments, if made, will be deemed to be directed by the Policy Owner or be part of a pre-arranged binding agreement as a result of such affiliation or relation.

A substantial portion of the Partnership is expected to be invested in illiquid Portfolio Funds and/or Illiquid Investments.  Such investments are often structured as "pass-through" entities for tax purposes and therefore may generate significant taxable income to the Limited Partners without any corresponding liquidity from such investments.  As a result, an investment in the Partnership may be unsuitable for those investors that do not receive a corresponding deduction for such allocated income.

**Tax Considerations**   The Partnership intends to invest its assets in compliance with the diversification requirements imposed by Section 817(h) of the U.S. Internal Revenue Code of 1986, as amended ("**Code**"), and regulations promulgated thereunder and expects to be treated as a partnership and not as an association or a publicly traded partnership taxable as a corporation for federal tax purposes. Accordingly, the Partnership should not be subject to federal income tax, and each Limited Partner will be required to report on its own annual tax return such Limited Partner's distributive share of the Partnership's taxable income or loss. Prospective purchasers are responsible for determining the tax considerations of an investment in the Partnership and should consult their own tax advisors with specific reference to their own situations as they relate to an investment in the Partnership.

The Investment Manager will be required to endeavor to invest the assets of the Partnership in compliance with the diversification requirements imposed by Section 817(h) of the Code, and regulations promulgated thereunder.  The Investment Manager will be required to notify the Limited Partners within a commercially reasonable time upon having a reasonable basis for believing that the Partnership has ceased to meet the standards set forth in Section 817(h) of the Code and to take all commercially reasonable steps to comply with the diversification requirements within the grace period afforded under Treasury Regulation Section 1.817-5. None of the Partnership, the General Partner, the Investment Manager or any of their respective affiliates has any obligation to:   (i) determine if any state's diversification requirements or other regulatory requirements applicable to insurance companies or variable contract separate accounts are applicable to the Partnership or to any Limited Partner, or (ii) take any steps to facilitate compliance with any such requirements.

The Investment Manager will not accept investment recommendations, or make any investment decisions regarding the direct or indirect investment of the Partnership's assets based, in whole or in part, on information regarding any investment or group of

018752

HCMLPHMIT00003952

investments received from any Limited Partner or Policy Owner. No Limited Partner or Policy Owners will have the right or be permitted to select or recommend any particular investment or group of investments to be made directly or indirectly with the assets of the Partnership, and there is not, nor will there be, any direct or indirect pre-arrangements or agreement between any Limited Partner or its Policy Owners and the Investment Manager regarding the investments to be made directly or indirectly by the Partnership. See "TAXATION" herein.

|  |  |
|---|---|
| **Term** | The term of the Partnership will continue indefinitely until terminated in accordance with the Partnership Agreement. Under the Partnership Agreement, the Partnership may be terminated at the election of the General Partner. |
| **Fiscal Year** | The fiscal year of the Partnership will end on December 31 of each year. However, the fiscal year may be changed at any time by the General Partner, in its sole and absolute discretion. |
| **Auditor** | The Partnership intends to engage a nationally recognized public accounting firm to act as the Partnership's auditor. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details. |
| **Administrator** | The Partnership intends to engage a provider of administrative services to acts as the Partnership's Administrator, as further set forth herein. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details. See "SERVICE PROVIDERS—Administrator" herein. |
| **Shared Services Arrangement** | In addition, the Investment Manager has entered into a shared services agreement ("**Shared Services Agreement**") with Highland Capital Management, L.P., a Delaware limited partnership (in its capacity with respect to the Shared Services Agreement, the "**Shared Services Provider**"), pursuant to which the Shared Services Provider will provide certain administrative, accounting, tax, back-office and other services to the Investment Manager. The Partnership will not incur any additional fees as a result of the arrangements with the Shared Services Provider. See "RISK FACTORS AND CONFLICTS OF INTEREST" herein. Also see "SERVICE PROVIDERS—Administrator" herein. |
| **Introducing Broker** | The Partnership intends to engage a nationally recognized introducing broker to act as the introducing broker for the Partnership ("**Introducing Broker**"). Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details. |
| **Clearing Broker and Custodian** | The Partnership intends to engage a nationally recognized clearing broker and custodian to act as the clearing broker and custodian for the Partnership ("**Custodian**"). Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details. |
| **Regulatory Compliance Provider** | The Investment Manager intends to engage a reputable regulatory compliance provider for the Investment Manager, the General Partner and certain of their respective affiliates. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details. |
| **Legal Counsel** | Sadis & Goldberg LLP acts as legal counsel to the General Partner, the Investment Manager, the Partnership and certain of their respective affiliates in connection with the offering of Interests and other ongoing matters. Sadis & Goldberg LLP has been retained to prepare offering documentation in connection with the offering but not to conduct any due diligence on the Principal, the General Partner, the Investment Manager or any of the information in this Memorandum. Sadis & Goldberg LLP does not represent the Limited Partners, and each Limited Partner is urged to consult with its own counsel.<br><br>There may exist other matters that could have a bearing on the Partnership as to which Sadis & Goldberg LLP has not been consulted. In addition, Sadis & Goldberg LLP does not undertake to monitor compliance by the Investment Manager, the General Partner, the |

018753

HCMLPHMIT00003953

Principal and their respective affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Sadis & Goldberg LLP monitor ongoing compliance with applicable laws. In connection with the preparation of this Memorandum, Sadis & Goldberg's responsibility is limited to matters of U.S. securities and federal tax law and it does not accept responsibility in relation to any other matters referred to or disclosed in this Memorandum. In the course of advising the Partnership, there are times when the interests of Limited Partners may differ from those of the Partnership. Sadis & Goldberg LLP does not represent the Limited Partners' interests in resolving these issues. Sadis & Goldberg LLP is a party to certain offering related documents to the limited extent that it can benefit from and enforce certain provisions thereof. In preparing this Memorandum, Sadis & Goldberg LLP has relied upon information furnished to it by the General Partner, the Investment Manager and their respective affiliates and is not obligated to investigate or verify the accuracy and completeness of information set forth herein concerning the Partnership.

Furthermore, if a conflict of interest or dispute arises between the General Partner and/or the Investment Manager, on the one hand, and the Partnership or any Limited Partner, on the other hand, by investing in the Partnership, the Limited Partners acknowledge that Sadis & Goldberg LLP may act as counsel to the General Partner and/or the Investment Manager and not counsel to the Partnership or the Limited Partners, notwithstanding the fact that, in certain cases, the fees paid to Sadis & Goldberg LLP are paid through or by the Partnership.

In addition, Sadis & Goldberg LLP has represented Highland and affiliates at different times over a period lasting over a decade. It is currently expected that Sadis & Goldberg LLP will represent the General Partner, the Investment Manager, the Principal and certain of their respective affiliates in connection with the establishment of the Partnership and the PE Portfolio Fund, the possible consummation of the Highland Transaction, and certain related matters. The Principal and his affiliates are aware of the representation by Sadis & Goldberg LLP of Highland and affiliates.

Also see "RISK FACTORS AND CONFLICTS OF INTEREST—Conflicts of Interest—Lack of Separate Representation; Potential Conflicts of Counsel" herein.

**Address for Inquiries**

You are invited to, and it is highly recommended that you do, meet with the General Partner and/or the Administrator (to the extent applicable) for a further explanation of the terms and conditions of this offering of Interests and to obtain any additional information necessary to verify the information contained in this Memorandum, to the extent that the General Partner and/or the Administrator (to the extent applicable) possesses such information or can acquire it without unreasonable effort or expense. Requests for such information should be directed to:

Atlas IDF GP, LLC
87 Railroad Place, Suite 403
Saratoga Springs, NY 12866
Attention: John Honis
Telephone: (214) 335-7969
Email: Jhonis@RandAdvisors.com

018754

HCMLPHMIT00003954

<div style="text-align: right">**MANAGEMENT**</div>

### BACKGROUND OF THE GENERAL PARTNER AND THE INVESTMENT MANAGER

The General Partner of the Partnership is Atlas IDF GP, LLC, a Delaware limited liability company.  The General Partner is responsible for the management of the Partnership's affairs.

The Investment Manager of the Partnership is Rand Advisors, LLC, a Delaware limited liability company.  The Investment Manager has discretionary investment authority over the Partnership's assets.  The Investment Manager is registered as an investment adviser with the SEC.  A copy of Part 2 of the Investment Manager's Form ADV is attached hereto as Exhibit C.

As the managing member and controlling person of the General Partner and the Investment Manager, John Honis controls all of the Partnership's operations and activities.

Limited Partners do not have any right to participate in the management of the Partnership and have very limited voting rights.

<div style="text-align: right">### BACKGROUND OF THE PRINCIPAL</div>

***John Honis, Principal***

Mr. Honis has more than 25 years of investment management and business experience.  He has a background in the credit markets and private equity.  Throughout his career in the investment management industry, Mr. Honis has guided many portfolio companies across several continents.  Mr. Honis' business experience includes roles as CEO, CRO and board-level advisory positions to both high-growth and distressed companies, in a wide range of manufacturing and service industries.

Mr. Honis founded Barrier Advisors, a recognized provider of strategic, operational and financial advice to private equity, venture capital and money management institutions.  He led many turnarounds and strategic growth initiatives and has attracted many of the nation's reputable turnaround practitioners to the Barrier team.

Previously, Mr. Honis was a high-tech executive, having served as President, CEO or Chief Restructuring Officer of five telecommunications firms.  His experiences in all aspects of growth management, strategic/operational turnarounds, financial restructuring, mergers and acquisitions and capital markets were the foundational elements of Barrier Advisors' charter.  Mr. Honis was previously a Partner and Co-Head of Private Equity at Highland Capital Management, L.P. ("**Highland**") (which now serves as the Shared Services Provider to the Investment Manager).

Mr. Honis' early career started at J.P. Morgan in New York where he was worked in the firm's global consulting practice.  At J.P. Morgan, he specialized in the design and implementation of worldwide corporate finance processes and systems.  Mr. Honis received a BA Degree in Economics from Syracuse University.

Mr. Honis currently serves on the Board of Trustees for each of Highland's affiliated registered investment companies and on the Board of Directors for American HomePatient, Inc. and Turtle Bay Resort, LLC, which are portfolio companies of investment funds operated by Highland.

See "RISK FACTORS AND CONFLICTS OF INTEREST" herein.

***Additional Personnel***

The General Partner and the Investment Manager may employ additional personnel in the future.

---

ATLAS IDF, LP

<div style="text-align: center">24</div>

<div style="text-align: right">018755</div>

HCMLPHMIT00003955

## OTHER ACTIVITIES OF THE GENERAL PARTNER, THE INVESTMENT MANAGER, THE PRINCIPAL AND AFFILIATES

None of the General Partner, the Investment Manager, the Principal or any of the Investment Manager Affiliates is required to manage the Partnership as its sole and exclusive function. Each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may engage in other business activities, including competing ventures and/or other unrelated employment, and is only required to devote such time to the Partnership as the General Partner deems necessary to accomplish the purposes of the Partnership.

In addition to managing the Partnership and its investments, each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may provide investment management and other services to other parties and may manage and/or establish Affiliated Funds in the future, including those that may employ an investment program and strategy similar to that of the Partnership.

Specifically, as of the date hereof:  (i) the Investment Manager acts as the investment manager to the PE Portfolio Fund that:  (x) is expected to initially invest in the Highland Transaction, if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction; (ii) Rand PE Fund Management, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the PE Portfolio Fund; (iii) the Principal is the managing member and controlling person of Rand PE Fund Management, LLC; and (iv) the Investment Manager acts as the investment subadvisor to a series of SALI Multi-Series Fund, L.P., a Delaware "series" limited partnership, and provides certain discretionary investment advisory or consulting services to such series. See "RISK FACTORS AND CONFLICTS OF INTEREST" herein.

## INVESTMENTS BY THE GENERAL PARTNER, THE INVESTMENT MANAGER, THE PRINCIPAL AND AFFILIATES

Capital contributions by the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates will generally be on the same basis as capital contributions made by other investors, except that, in the discretion of the Investment Manager, no Management Fee may be assessed to such persons.   Neither the Partnership Agreement nor the Investment Management Agreement requires the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates to maintain any minimum capital account balance.

018756

HCMLPHMIT00003956

<div align="right">

**SERVICE PROVIDERS**

</div>

<div align="right">

**ADMINISTRATOR**

</div>

The Partnership intends to engage an Administrator and enter into an Administration Agreement with the Administrator ("**Administration Agreement**"). The Administrator may be: (x) a nationally recognized provider of administrative services or (y) Highland (i.e., the Shared Services Provider); *provided* that, for the avoidance of doubt, any Administration Agreement with Highland, to the extent applicable, will be in addition to the Shared Services Agreement.  Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

The Administration Agreement will include industry-standard provisions relating to scope of services, fees, termination and indemnification.

The Administrator will be a service provider to the Partnership and will not be responsible for the preparation of this Memorandum or the activities of the Partnership, and therefore accepts no responsibility for any information contained in this Memorandum.  The Administrator will not participate in the Partnership's investment decision-making process.

<div align="right">

**AUDITOR**

</div>

The Partnership intends to engage a nationally recognized public accounting firm to act as the auditor for the Partnership.  Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

<div align="right">

**INTRODUCING BROKER**

</div>

The Partnership intends to engage a nationally recognized Introducing Broker to act as the Partnership's introducing broker. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

The Introducing Broker will act as the executing broker to the Partnership, and will clear the Partnership's transactions through the Custodian.  Accordingly, the Introducing Broker may receive a substantial amount of brokerage commissions related to the securities transactions of the Partnership.  The Partnership will not be committed to continuing its introducing brokerage relationship with the Introducing Broker for any minimum period, and may enter into introducing brokerage relationships with other introducing brokers.

The Introducing Broker will not participate in the investment decision-making process of the Partnership and will have no obligation to review, monitor or otherwise ensure compliance by the Partnership with the investment policies, restrictions or guidelines applicable to it or any other term or condition of this Memorandum.  The Introducing Broker will be a service provider to the Partnership and will not be responsible for the preparation of this Memorandum or the activities of the Partnership and therefore will accept no responsibility for any information contained in this Memorandum.

<div align="right">

**CLEARING BROKER AND CUSTODIAN**

</div>

The Partnership intends to engage a nationally recognized Custodian to act as the Partnership's clearing broker and custodian. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

The Custodian will act as the clearing broker and custodian for the Partnership, and will generally clear (on the basis of payment against delivery) the securities transactions of the Partnership which are effected through other brokerage firms, specifically including the

018757

HCMLPHMIT00003957

Introducing Broker. The Partnership may also utilize the Custodian, its affiliates and other brokers and dealers for the purpose of executing transactions for the Partnership. Accordingly, the Custodian may receive a substantial amount of brokerage commissions and/or margin interest related to the securities transactions of the Partnership. The Partnership will not be committed to continuing its clearing brokerage and custodial relationship with the Custodian for any minimum period, and may enter into clearing brokerage and custodial relationships with other clearing brokers and custodians.

The Custodian will not participate in the investment decision-making process of the Partnership and will have no obligation to review, monitor or otherwise ensure compliance by the Partnership with the investment policies, restrictions or guidelines applicable to it or any other term or condition of this Memorandum. The Custodian will be a service provider to the Partnership and will not be responsible for the preparation of this Memorandum or the activities of the Partnership and therefore will accept no responsibility for any information contained in this Memorandum.

## REGULATORY COMPLIANCE PROVIDER

The Investment Manager intends to engage a reputable regulatory compliance provider for the Investment Manager, the General Partner and certain of their respective affiliates. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

## LEGAL COUNSEL

Sadis & Goldberg LLP acts as legal counsel to the General Partner, the Investment Manager, the Partnership and certain of their respective affiliates in connection with the offering of Interests and other ongoing matters. Sadis & Goldberg LLP has been retained to prepare offering documentation in connection with the offering but not to conduct any due diligence on the Principal, the General Partner, the Investment Manager or any of the information in this Memorandum. Sadis & Goldberg LLP does not represent the Limited Partners, and each Limited Partner is urged to consult with its own counsel.

There may exist other matters that could have a bearing on the Partnership as to which Sadis & Goldberg LLP has not been consulted. In addition, Sadis & Goldberg LLP does not undertake to monitor compliance by the Investment Manager, the General Partner, the Principal and their respective affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Sadis & Goldberg LLP monitor ongoing compliance with applicable laws. In connection with the preparation of this Memorandum, Sadis & Goldberg's responsibility is limited to matters of U.S. securities and federal tax law and it does not accept responsibility in relation to any other matters referred to or disclosed in this Memorandum. In the course of advising the Partnership, there are times when the interests of Limited Partners may differ from those of the Partnership. Sadis & Goldberg LLP does not represent the Limited Partners' interests in resolving these issues. Sadis & Goldberg LLP is a party to certain offering related documents to the limited extent that it can benefit from and enforce certain provisions thereof. In preparing this Memorandum, Sadis & Goldberg LLP has relied upon information furnished to it by the General Partner, the Investment Manager and their respective affiliates and is not obligated to investigate or verify the accuracy and completeness of information set forth herein concerning the Partnership.

Furthermore, if a conflict of interest or dispute arises between the General Partner and/or the Investment Manager, on the one hand, and the Partnership or any Limited Partner, on the other hand, by investing in the Partnership, the Limited Partners acknowledge that Sadis & Goldberg LLP may act as counsel to the General Partner and/or the Investment Manager and not counsel to the Partnership or the Limited Partners, notwithstanding the fact that, in certain cases, the fees paid to Sadis & Goldberg LLP are paid through or by the Partnership.

In addition, Sadis & Goldberg LLP has represented Highland and affiliates at different times over a period lasting over a decade. It is currently expected that Sadis & Goldberg LLP will represent the General Partner, the Investment Manager, the Principal and certain

018758

HCMLPHMIT00003958

of their respective affiliates in connection with the establishment of the Partnership and the PE Portfolio Fund, the possible consummation of the Highland Transaction, and certain related matters.  The Principal and his affiliates are aware of the representation by Sadis & Goldberg LLP of Highland and affiliates.

018759

HCMLPHMIT00003959

## INVESTMENT PROGRAM

### INTRODUCTION

The Partnership was organized for the purpose of investing and trading in a wide variety of investments, domestic and foreign, of all kinds and descriptions, whether publicly traded or privately placed, including, but not limited to, the following: common and preferred stocks, bonds and other debt securities, convertible securities, limited partnership interests, other investment funds (including the Portfolio Funds), CLO securities, mutual fund shares, options, warrants, futures, derivatives (including swaps, forward contracts and structured instruments), monetary instruments, other financial instruments, cash and cash equivalents. The Investment Manager is eligible to trade a limited amount of commodities or financial futures on behalf of the Partnership under a provision in the Commodity Exchange Act, as amended ("**CEA**"), that provides an exemption from registration as a commodity pool operator.

References herein to the Partnership shall include, where appropriate: (i) each Series of the Partnership; (ii) the instances whereby the Investment Manager directly invests the Partnership's assets, and (iii) the Partnership's investments through Portfolio Funds.

The following is a general description of the principal types of investments which the Investment Manager currently contemplates making for the Partnership, certain trading techniques that it may employ, the investment criteria that it plans to apply, and the guidelines that it has established with respect to the composition of its investment portfolio. The following description is merely a summary, and a Limited Partner should not assume that any descriptions of the specific activities in which the Partnership may engage are intended in any way to limit the types of investment activities which the Partnership may undertake or the allocation of Partnership capital among such investments.

### INVESTMENT OBJECTIVE

The Partnership's primary objective is to seek consistent above-average returns primarily through capital appreciation. **No assurance can be given, however, that the Investment Manager will achieve the Partnership's investment objective, and investment results may vary substantially over time and from period to period.**

As of the date hereof, the Investment Manager intends to allocate approximately 45% of the Series 1 investment portfolio to traded investments and approximately (but not more than) 55% of the Series 1 investment portfolio to the first series of limited partnership interests to be issued by the PE Portfolio Fund that: (x) is expected to initially invest in the Highland Transaction, if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction. However, the Investment Manager reserves the right to change such allocation in the future, subject to compliance with all applicable laws, including the diversification requirements applicable to insurance-dedicated investment funds, as further set forth herein. **Further, the Partnership shall not accept additional Limited Partners into any existing Series if such Series has existing Side Pocket Accounts at the time of such admission.**

### INVESTMENT STRATEGY

#### Philosophy

The Investment Manager intends to use a disciplined investment philosophy by combining thorough fundamental research and in-depth analysis of investment opportunities. The following principles generally guide the Investment Manager's portfolio management strategy and allocation of capital:

- invest with a long-term perspective, minimize turnover and avoid market-timing;
- hold a concentrated investment portfolio; and

018760

HCMLPHMIT00003960

- view each investment relative to other investment opportunities.

*Long-Term Perspective*. The Investment Manager intends to invest with a long-term perspective, typically holding an ownership position in a company until it reaches its intrinsic value. In general, when the Investment Manager will be looking to invest in a company, it intends to avoid trying to time the market, but rather intends to focus on the intrinsic value of the company and then find the right entry or purchase point.

*Concentration*. The Investment Manager intends to have a concentrated portfolio of investments. The Investment Manager believes that this may provide the Partnership with a competitive advantage over most other private investment vehicles in that: (i) the Investment Manager's best ideas would be rarely and/or marginally diluted by its lesser ideas; (ii) the extra time saved by not trading may allow the Investment Manager to concentrate on finding other investment ideas; and (iii) careful analysis may allow the Investment Manager to make intelligent and deliberated decisions.

*Relative Analysis*. The Investment Manager intends to evaluate potential investments in companies of varying market capitalization in an attempt to isolate those securities with the greatest potential for capital appreciation. As part of its strategy, the Investment Manager intends to invest in those industries, sectors and securities which may provide value on a relative basis. The Investment Manager intends to seek to understand a company and its industry before investing.

**Strategies**

The following is a general description of the principal types of securities in which the Partnership may invest, certain trading techniques that it may employ, the investment criteria that it plans to apply, and the guidelines that it has established with respect to the composition of its investment portfolio. The following description is merely a summary, and the Investment Manager has discretion to cause the Partnership to invest in other types of securities and to follow other investment criteria and guidelines.

*Long Equity*. The Investment Manager expects that a portion of the Partnership's investments will generally be in equities. In connection with the foregoing, the Partnership's focus will be on companies of varying size that have a reasonable expectation of producing above-average returns. The Investment Manager intends to favor private companies that are not actively traded in the U.S. but may be willing to invest in companies without respect to market capitalization, geographic location or market sector.

Before investing in a company, the Investment Manager intends to analyze certain financial measures, such as the company's historical and expected cash flows, its projected earnings growth, its valuation relative to its growth and to that of its industry, the historical trading patterns of the company's securities, and forecasts and projections for the relevant industry group. The Investment Manager will at times gather information about a company from consultants, analysts, competitors, suppliers and customers that may help the effectiveness of the analysis performed.

*Short Selling*. The Investment Manager may sell short individual stocks as a means of attempting to reduce risk and increase performance. Stocks are generally sold short for a variety of reasons, including, without limitation, the following: (i) temporary overvaluation due to short-term market euphoria for a sector; (ii) faulty business model; (iii) poor earnings; (iv) questionable accounting practices; (v) deteriorating fundamentals; (vi) negative tangible book value; and (vii) weak management unable to adapt to changes in technology, regulation or the competitive environment. The Investment Manager believes that, by focusing on specific companies that are experiencing any one or more of these elements, the Investment Manager may be able to identify profitable short sale candidates in most stock market environments. In addition, technical analysis may also be used to help in the decision-making process.

*Event-Driven Investments*. When the opportunity arises, in the opinion of the Investment Manager, the Partnership may invest in companies based upon certain situations or

018761

HCMLPHMIT00003961

events, such as launching of a new product, changes in management, a corporate restructuring, a merger or an acquisition. These situations or events may also include investments that are based on market-timing and impact analysis.

Occasionally, the Partnership may engage in arbitrage transactions that the Investment Manager believes may represent an exceptional risk/reward opportunity. Risk arbitrage opportunities generally arise during corporate mergers, leveraged buyouts or takeovers. Frequently, the stock of the company being acquired will trade at a significant discount to the announced deal price. This discount compensates investors for the time value of money and the risk that the transaction may be canceled. If the discount is significantly greater than the Investment Manager's assessment of the underlying risk, the strategy will be implemented. The Investment Manager intends to use event-driven investments as a tactical, opportunistic strategy and not as part of the Partnership's normal operations.

### Bank Loans

In general, a portion of the Partnership's net assets will be invested and traded in senior secured floating rate bank loans ("**Bank Loans**") denominated in U.S. dollars. Bank Loans represent amounts borrowed by corporate entities from banks and other lenders. In many cases, they are issued in connection with re-capitalizations, acquisitions, leveraged buyouts and re-financings. Most, if not all, of the Bank Loans in which the Partnership intends to invest will have a below investment-grade credit rating or will not be rated by a major credit rating agency. The Bank Loans in which the Partnership intends to invest are often referred to as "leveraged loans" because the borrowing companies have significantly more debt than equity.

Bank Loans have the highest seniority within a borrower's capital structure. Therefore, in the event of a bankruptcy, holders of Bank Loans are typically paid (to the extent assets are available) before certain other creditors, such as bondholders. Bank Loan maturities typically range from 5 to 8 years, although loan prepayments and re-financings generally result in effective average lives of approximately 3 years depending on market conditions.

Bank Loans generally pay interest at rates that are determined periodically by reference to a base lending rate plus a premium. These rates often are re-determined daily, monthly, quarterly or semi-annually. As a result, the Investment Manager believes that the Partnership may experience less sensitivity to changes in market interest rates and lower volatility than if the Partnership invested exclusively in fixed rate obligations.

The Bank Loan market has grown significantly in recent years, as investors have been drawn into the market by the advantageous characteristics of Bank Loans, which include floating interest rates, senior secured status, lower volatility, growing liquidity, greater control over an issuer in times of stress, and lower correlation with other asset classes.

### Other Securities

When, in the opinion of the Investment Manager, appropriate investments cannot be found or when market conditions dictate a more conservative stance, the Partnership may maintain significant cash positions or invest in money market instruments (e.g., money market funds or U.S. Treasury securities).

### Fixed Income Securities

The Investment Manager may invest in fixed income securities (bonds) as part of the strategic operations of the Partnership. The Investment Manager may take advantage of special investment opportunities in the high yield and convertible segments of the fixed income market. The Investment Manager considers these investments to be equity substitutes, with the expectation of providing both current income and capital appreciation. The Investment Manager may also seek opportunities in government-issued fixed income securities, as deemed appropriate.

### High Yield Bonds

018762

HCMLPHMIT00003962

The price and yield of lower-quality (i.e., high yield, high risk) bonds, commonly referred to as "junk bonds," can be expected to fluctuate more than the price and yield of higher-quality bonds.  Because these bonds are rated below BBB or are in default, they are regarded as predominantly speculative with respect to the issuer's continuing ability to meet principal and interest payments. Successful investment in lower-medium- and low-quality bonds involves greater investment risk and is highly dependent on credit analysis. A real or perceived economic downturn or higher interest rates could cause a decline in high yield bond prices by lessening the ability of issuers to make principal and interest payments.  These bonds can be more difficult to sell and value accurately than high-quality bonds.  Because objective pricing data may be less available, judgment may play a greater role in the valuation process.  In addition, the entire high yield bond market can experience sudden and sharp price swings due to a variety of factors, including changes in economic forecasts, stock market activity, large or sustained sales by major investors, a high-profile default, or just a change in the market's psychology.  This type of volatility is usually associated more with stocks than bonds, but junk bond investors should be prepared for it.

### Derivative Transactions

The Partnership may enter into derivative transactions, including credit default swaps to hedge the market risk of its Bank Loan portfolio.  The Investment Manager may purchase and write put and call options that are traded on national securities exchanges or over-the-counter markets, as well as on electronic communications networks.  Options can be used in many ways, such as to increase market exposure (i.e., leverage), to reduce overall market exposure (i.e., hedge), to increase the portfolio's current income, or to reduce the cost basis of a new position.  The Partnership may also utilize certain options, such as various types of index or "market-basket" options, in an effort to hedge against certain market-related risks, as the Investment Manager deems appropriate.  The Investment Manager believes that the use of options and other derivatives may help reduce risk and enhance investment performance of the Partnership's portfolio.

### Foreign Investments

Although the Investment Manager intends to focus primarily on the U.S. marketplace, it may invest in U.S. dollar-denominated securities of foreign issuers or loans of foreign borrowers traded in the U.S.

### Special Situations

The Partnership may invest in companies involved in (or the target of) acquisition attempts or tender offers or in companies involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies and similar transactions.

### Money Market Instruments

From time to time, the Investment Manager may also invest some of the Partnership's assets in short-term U.S. government obligations, certificates of deposit, commercial paper and other money market instruments.  A greater percentage of Partnership assets may be invested in such obligations if the Investment Manager believes that a defensive position is appropriate because of expected economic or business conditions or the outlook for security prices.  From time to time, in the sole discretion of the Investment Manager, cash balances in the Partnership's brokerage account may be placed in a money-market fund or other cash equivalents.

### CLO Securities Generally

A portion of the Partnership's assets will also be invested in: (i) rated and unrated, debt relating to collateralized loan obligations ("**CLOs**" or "**CLO Securities**") in the primary and secondary markets, and (ii) collateralized debt obligations that also have leveraged loans as part of their underlying investments.

### Currency Hedging Transactions

018763

HCMLPHMIT00003963

The Investment Manager may, but is not required, to engage in currency hedging transactions to protect against adverse changes in currency and interest rates. Currency hedging instruments may include, without limitation, forward contracts, futures contracts, options contracts, cross-currency swaps, exchange-traded funds ("**ETFs**"), treasury locks, shorting non-U.S. debt and any other instrument deemed reasonable in the Investment Manager's discretion to hedge the non-U.S. currency exposure of the Partnership.

**Description of CLO Investments**

An investment in CLO tranches represents varying levels of exposure primarily to credit performance of the underlying assets and is characterized by a combination of expected significant current cash flow, as well as the opportunity for positive returns through long-term gains on the underlying portfolios. CLO investments often have a relatively short expected duration (usually less than 10 years), as a typical CLO distributes excess cash flows quarterly or semi-annually concurrent with the payment of interest on its liabilities, subject to compliance with overall collateral quality tests and other performance criteria. The Investment Manager believes that CLO debt securities may offer significant relative value in the current market. The Investment Manager believes the attractive spreads currently offered by investments in CLOs have been created by technical factors, mainly rating agency driven, rather than fundamentals of the underlying collateral.

A cash flow CLO is generally analogous to a special purpose finance company. The CLO owns a portfolio consisting of corporate loans and other investments from which it typically receives interest income, together with capital gains and losses. The CLO is often financed with equity, which may be in the form of preference shares or income notes and several levels of long-term debt. CLO debt is typically rated by the rating agencies based on the deal structure as well as outstanding principal amount of portfolio securities and, in most cases, is not contingent on the market value of the underlying portfolio. CLO equity is almost always unrated.

In addition to the opportunities in the secondary market, the Investment Manager believes that it may be able to source attractive opportunities from the growing issuance of CLOs in the primary market as well. The CLO market generally is characterized by a lack of liquidity, transparency and the absence of uniform standards. The Investment Manager believes that market participants often tend to lack the expertise and analytic tools to systematically and comprehensively analyze either primary or secondary market CLO tranches. The market for CLO tranches is also highly fragmented and, to date, many investors have had limited leverage in negotiating CLO terms, such as structure and fees. The Investment Manager believes that the Partnership may benefit from the Investment Manager's ability to use its CLO management expertise, proprietary analytics and direct market access to assess value opportunities and effectively execute transactions. In the primary market, the Investment Manager will seek situations where it can influence structures, fees and timing of CLO transactions to achieve favorable terms not directly available to other investors.

The Investment Manager generally intends to invest the Partnership's gross assets in CLO debt that is diversified across maturities, underlying assets and managers. In addition to implementing its rigorous investment process and utilizing proprietary analytical tools to evaluate and select investments for the Partnership, the Investment Manager intends to use its market knowledge and industry position to seek to add value by addressing what it believes may be material inefficiencies of the existing CLO execution process. For example, within the primary new issuance market, the Investment Manager will look to invest in CLOs where it can leverage its expertise and market relationships to achieve the timing, structural and financial terms especially advantageous to the Partnership's investments. In addition, the Investment Manager will look to assess value dislocations of CLOs and other structured investments within the secondary market, as the Investment Manager believes structured products markets may have inherent inefficiencies that often cause significant differentials between intrinsic value and market value.

The Investment Manager will seek to achieve the following specific objectives:

018764

HCMLPHMIT00003964

- seek consistent above-average returns while minimizing volatility;
- access and initiate deal flow directly and through arrangements with underwriters and broker-dealers;
- take advantage of value dislocations in the secondary market;
- reduce risk through efficient, cost-effective transaction execution;
- add value through optimization of terms and structures;
- and leverage expertise in CLO investments and management to create a well-balanced, broadly diversified portfolio.

**Structural Optimization and Transaction Terms with Respect to CLOs**

Typically, CLO securities are offered to investors after the structure has been developed and agreed to by the collateral manager, underwriter and rating agencies. Investors have limited ability to effect significant changes to the structure and/or the key terms. Also, very few investors have the expertise or the tools to model and analyze proposed CLO investments; most are believed to rely on the underwriters to provide analytical support. Proactive, early involvement with select managers and underwriters, and significant investment participation, are expected to enable the Investment Manager to use its structuring capability and proprietary analytics to identify and achieve desirable structural features and transaction terms.

**CLO Investment Process**

*General*. The investment process used by the Investment Manager to evaluate potential CLO tranches will generally employ a combination of rigorous qualitative (manager, portfolio and legal considerations) and quantitative (structural, cash-flow, collateral valuation and pricing/relative value) analysis. Among other resources, the Investment Manager intends to use its proprietary quantitative analytical tool, Rand CLO Insight, as well as INTEX data service, Wall Street Analytics, Moody's Investor Services and Wall Street Office in connection with gathering information with respect to CLO investments by the Partnership.

*Asset/Portfolio Assessment*. The Investment Manager believes the most critical component of investing in CLO securities is the ability to quickly and effectively understand the characteristics of the CLO's underlying collateral, primarily consisting of corporate Bank Loans. The Investment Manager believes that its capability to develop accurate, up-to-date portfolio quality indicators may be critical to the foregoing task because these indicators are key inputs for the subsequent quantitative component of the investment analysis.

Further assessment by the Investment Manager will generally include additional portfolio-level analysis. The Investment Manager intends to consider, among other factors, the following key parameters of a CLO:

- historical par loss due to defaults and distressed sales as a key indicator of prior portfolio performance;
- defaulted securities currently held in the portfolio and prospective recovery levels for such securities;
- aggregate ratings of the performing securities (statistically, lower ratings generally indicate higher probability of default);
- liquidity as measured by the average facility size and percent of the portfolio with private credit ratings, among other metrics;
- projected future portfolio par loss, based on the security-level analysis and the resulting ratings adjustments;
- portfolio market value and portfolio segment trading at distressed prices as another indicator of future portfolio performance; and
- degree of industry and issuer diversification/concentration.

*Manager Evaluation*. The underlying CLO manager is responsible for selecting the assets and for managing them within the ratings-constrained environment according to the specified procedures and limitations that exist in each CLO's indenture. The review of the

018765

HCMLPHMIT00003965

CLO manager will generally encompass historical performance, investment management and structured finance expertise, quality and size of the investment team, co-investment history, investment philosophy and credit process, platform scalability, systems and back office operations. The review process will generally focus on evaluating the manager's performance and capabilities in the following areas:

- Past CLO performance, including par erosion through defaults, recoveries and trading history (gains/losses) of current and prior CLO managed;
- proficiency in the underlying asset classes, integrity of the investment process, investment criteria, decision-making and monitoring processes;
- consistency of historic performance, with an emphasis on performance during a credit down cycle;
- knowledge of CLO structures and the ability to manage the assets within the limitations imposed by indenture constraints;
- upgrade and downgrade history of its prior transactions;
- key personnel, retention arrangements and succession plan, and experience and depth of the entire investment team; and
- technical self-reliance, such as degree of independence from trustee/underwriter to assess impact of potential trades, indenture interpretation, etc.; and
- sophistication of systems, compliance procedures and reporting capabilities.

*Structural Considerations*. A review of the CLO structure will generally focus on the indenture (the governing document of the transaction) provisions that determine which assets may be purchased by the vehicle, as well as the mechanics behind the cash-flow "waterfall" (i.e., priority of payments). The cash-flow "waterfall" determines the order in which cash disbursements are made on each payment date according to the performance of the transaction. In the event of performance deterioration, cash flow may be diverted from lower tranches of the capital structure to prepay the senior or mezzanine tranches, reduce the leverage, and, if possible, restore compliance with the appropriate tests.

Further structural analysis by the Investment Manager includes a thorough review of indenture provisions which generally include:

- asset eligibility – the types and required features of the assets permitted to be purchased for the CLO (e.g., loans, rating requirements, maturity restrictions, interest payment frequency, etc.);

- "basket" limitations – percentage limits on securities bearing certain ratings, maximum permitted percentages for certain asset types (e.g., synthetic instruments, structured notes, zero-coupon bonds, etc.);

- trading restrictions – the level of discretionary trading allowed, rules for trading and how they may change in the event that the liabilities are downgraded;

- reinvestment criteria – the rules that govern reinvestment of principal proceeds generated from sales, maturities, calls and tenders during and after the reinvestment period;

- priority of payments – structure of the CLO's cash-flow waterfall and cash-flow diversion mechanisms (the over-collateralization and interest coverage tests); if earlier cash-flow diversion results in deferral of interest payments to certain tranches, these rules determine how deferred interest gets paid when the funds are available and what the protections or risks are for each investor in the CLO;

- management fee structure – senior, subordinate, incentive, contingent fees; generally, proper fee structure is key in aligning the manager's interest with various note holders; and an equity investor would favor a structure that compensates the manager for managing the transaction while providing an incentive to maintain equity distributions without sacrificing the future health of the transaction;

- collateral quality tests haircuts – if a certain "basket" is larger than its limitation, overcollateralization tests may be reduced by the amount above the limitation;

018766

HCMLPHMIT00003966

- analysis of the hedging strategy and of the hedge structure is important in evaluating implications of any mismatch between fixed rate assets and floating rate liabilities; the hedge instrument is valued and the effectiveness of the strategy is evaluated based on various criteria, such as where the termination payments are positioned in the waterfall, whether payments are made upfront or over time and how the notional amount changes over time; improper hedging can prove very costly to investors at all levels of the capital structure;

- governance provisions and voting rights – the rights of investors in different tranches of the capital structure to effect changes (e.g., manager removal, collateral disposition, note redemption, etc.);

- events of default – definitions and implications for each tranche holder; and

- reporting – the frequency and detail provided to the investors updating the portfolio and liability performance and composition.

*Legal/Other Issue Analysis*.   Legal review will generally be an integral part of the Investment Manager's overall investment process with the goal of understanding and interpreting the numerous documents that govern a typical CLO.   Reviewed documents and legal issues may include the following:

- the indenture – the CLO's governing document that acts as a "roadmap" for the entire transaction;

- legal opinions – these provide guidance as to tax treatment and other legal areas that may impact the management of the transaction;

- the management/advisory agreements – these dictate the role, rights and responsibilities of the manager;

- legal structure of equity securities – the structure of the preference shares or income notes may have an impact on the tax treatment;

- financial guaranty agreements – a financial guarantor is typically a monoline insurance company which in the past may have given its rating, usually Aaa/AAA to the senior class of notes to guarantee payments of principal and interest in exchange for a fee and additional rights within the CLO; such rights are important to evaluate as they may have an impact on the rights of the equity investors;

- ratings – agency, analyst, location, timing and basic assumptions used to arrive at the ratings; and

- offering memoranda, deal pitch books and other marketing materials.

*Detailed Quantitative Analysis Using Proprietary Analytics*.   A detailed cash flow analysis is crucial in determining the return characteristics and profile of the tranche under consideration.   The cash flows will generally be stress-tested using multiple economic scenarios and assumptions to assess the risk and return profile of the proposed CLO investment.   Among other items, the quantitative analysis will also include the following:

- a review of the portfolio market value, the resulting market value coverage of the proposed CLO investment, and its change over time;

- the likelihood of future cash flows being diverted or interrupted, as well as the potential severity in the event that it happens;

- analysis of par value and interest coverage cushions.   Cushions in the overcollateralization and the interest coverage tests may indicate the level of losses that can be sustained before a potential cash flow diversion; and

018767

HCMLPHMIT00003967

- analysis of sector and issuer concentrations, largest exposures and level of diversification.

*Final Screen/ Pricing*.  The Investment Manager's investment decision will generally be based on the qualitative and quantitative analysis of each investment and on the correlation between the proposed investment and the existing holdings in an effort to ensure an appropriate level of diversification.  The Investment Manager will generally compare the risk and return characteristics of the proposed CLO investment against similar CLO bond trade prices in its proprietary pricing database.  The combined assessment of the underlying portfolio characteristics, structural considerations, legal and cash flow scenario analyses will generally be compared with the relative value analysis to determine the value of the proposed CLO investment.

**Leverage**

The Investment Manager may cause the Partnership to undertake leverage.  Leverage may take a variety of forms, including, but not limited to, the following: long-term loans, convertible notes and repurchase arrangements.  Entering into short sales and certain types of derivative instruments may also increase the Partnership's use of leverage.  Leverage arrangements used by the Partnership when financing is contingent on the market value of the financed assets may include those which may be subject to mark-to-market collateral or margin calls.

**Important Notice**

The foregoing description of the Partnership's investment program does not purport to be a complete explanation of all the asset classes or securities in which the Partnership may invest.  In general, the Investment Manager intends to follow a flexible approach in order to place the Partnership in the best position to capitalize on opportunities in the financial markets.  Accordingly, the Investment Manager may employ other strategies and may take advantage of opportunities in diverse asset classes if they meet the Investment Manager's standards of investment merit.

### DEVELOPMENT AND RISKS OF INVESTMENT MANAGER'S INVESTMENT STRATEGY

The development of an investment strategy is a continuous process, and the Partnership's investment strategy and methods may therefore be modified from time to time.  The Partnership's investment methods are confidential, and the descriptions of them in this Memorandum are not exhaustive.  The Partnership's investment strategies may differ from those used by the Investment Manager and its affiliates with respect to other accounts they manage.  Investment decisions require the exercise of judgment by the Investment Manager.  The Investment Manager may, at times, decide not to make certain investments, thereby foregoing participation in price movements, which would have yielded profits or avoided losses.  Limited Partners cannot be assured that the strategies or methods utilized by the Investment Manager will result in profitable investing for the Partnership.

**The Partnership's investment program entails substantial risks, and there can be no assurance that its investment objectives will be achieved.  The practices of options trading, short selling, the use of leverage and other investment techniques employed by the Partnership can, in certain circumstances, maximize the adverse impact to which the Partnership's investment portfolio may be subject.  See "RISK FACTORS AND CONFLICTS OF INTEREST—Market Risks".**

018768

HCMLPHMIT00003968

## BROKERAGE PRACTICES

References herein to the Partnership shall be deemed to apply with respect to the Partnership's traded investments.

### BROKERAGE ARRANGEMENTS

The Investment Manager is responsible for the placement of the portfolio transactions of the Partnership and the negotiation of any commissions paid on such transactions. Portfolio securities normally are purchased through brokers on securities exchanges or directly from the issuer or from an underwriter or market maker for the securities. Purchases of portfolio instruments through brokers involve a commission to the broker. Purchases of portfolio securities from dealers serving as market makers include the spread between the "bid" and the "ask" price. The Investment Manager will not commit to provide any level of brokerage business to any broker. The Investment Manager may utilize the services of one or more introducing brokers who will execute the Partnership's brokerage transactions through a broker or custodian who will clear the Partnership's transactions.

Securities transactions for the Partnership are executed through brokers selected by the Investment Manager in its sole discretion and without the consent of the Partnership. In placing portfolio transactions, the Investment Manager will seek to obtain the best execution for the Partnership, taking into account the following factors: the ability to effect prompt and reliable executions at favorable prices (including the applicable dealer spread or commission, if any); the operational efficiency with which transactions are effected and the efficiency of error resolution, taking into account the size of order and difficulty of execution; the financial strength, integrity and stability of the broker; special execution capabilities; reputation; clearance, settlement, on-line pricing, block trading and block positioning capabilities; willingness to execute related or unrelated difficult transactions in the future; order of call; online access to computerized data regarding clients' accounts; performance measurement data; the quality, comprehensiveness and frequency of available brokerage and research products and services considered to be of value; the availability of stocks to borrow for short trades; and the competitiveness of commission rates in comparison with other brokers satisfying the Investment Manager's other selection criteria.

### SOFT DOLLAR ARRANGEMENTS

The term "soft dollars" refers to commissions accumulated by brokers based on an investment manager's transactions, on behalf of its clients, which may be used by the investment manager to acquire various products or services. The use of client commissions, known as soft dollars, to pay for these products and services, including research and brokerage products and services, presents investment managers with potential conflicts of interest and may give incentives for investment managers to use certain brokers without regard to their obligations to their clients.

The Investment Manager may use soft dollars generated by the Partnership's brokerage transactions to pay for brokerage and research products and services that fall within the safe harbor afforded by Section 28(e) of the Exchange Act ("**Section 28(e)**"). Section 28(e) provides a "safe harbor" to investment managers who use soft dollars to obtain investment research and brokerage products and services. In order to qualify for the safe harbor, the products or services must provide assistance to the investment manager in the performance of its investment decision-making responsibilities, or must relate to the execution, clearance or settlement of a trade.

### REFERRAL OF INVESTORS AND SALES CHARGES

The Investment Manager may direct some Partnership brokerage business to brokers who refer prospective investors to the Partnership. Because such referrals, if any, are likely to benefit the Investment Manager and its affiliates but will provide an insignificant (if any)

018769
HCMLPHMIT00003969

benefit to Limited Partners, the Investment Manager will have a conflict of interest with the Partnership when allocating Partnership brokerage business to a broker who has referred investors to the Partnership.  To prevent Partnership brokerage commissions from being used to pay investor referral fees, the Investment Manager will not allocate Partnership brokerage business to a referring broker unless the Investment Manager determines in good faith that the commissions payable to such broker are reasonable in relation to those available from non-referring brokers offering services of substantially equal value to the Partnership.

The General Partner and/or the Investment Manager may sell Interests through broker-dealers and pay a marketing fee or commission in connection with such activities, including ongoing payments, at the General Partner's or the Investment Manager's own expense.  The General Partner and/or the Investment Manager may also deduct a percentage of the amount invested by a Limited Partner in the Partnership to pay sales fees or charges, on a fully disclosed basis, to a broker-dealer based upon the capital contribution of such Limited Partner introduced to the Partnership by such broker-dealer.  Any such sales fees or charges would be assessed against the referred Limited Partner and would reduce the amount actually invested by such Limited Partner in the Partnership.  If a Limited Partner is introduced to the Partnership through a broker-dealer that is not affiliated with the Investment Manager and/or the General Partner, the arrangement, if any, with such broker-dealer will be disclosed to, and acknowledged by, such Limited Partner.

## ALLOCATION OF INVESTMENT OPPORTUNITIES

The Investment Manager may at times determine that certain investments will be suitable for acquisition by the Partnership and by other accounts managed by the Investment Manager, including Affiliated Funds, the Investment Manager's own accounts or accounts of an affiliate.  If that occurs, and the Investment Manager is not able to acquire the desired aggregate amount of such investments on terms and conditions which the Investment Manager deems advisable, the Investment Manager will endeavor to allocate in good faith the limited amount of such investments acquired among the various accounts for which the Investment Manager considers them to be suitable.  The Investment Manager may make such allocations among the accounts in any manner which it considers to be fair under the circumstances, including, but not limited to, allocations based on relative account sizes, the degree of risk involved in the investments acquired, and the extent to which such investments are consistent with the investment policies and strategies of the various accounts involved.

## AGGREGATION OF ORDERS

The Investment Manager may aggregate purchase and sale orders of investments held by the Partnership with similar orders being made simultaneously for other accounts or entities if, in the Investment Manager's reasonable judgment, such aggregation is reasonably likely to result in an overall economic benefit to the Partnership based on an evaluation that the Partnership will be benefited by relatively better purchase or sale prices, lower commission expenses or beneficial timing of transactions, or a combination of these and other factors.

In some instances, the purchase or sale of investments for the Partnership may be effected simultaneously with the purchase or sale of like investments for other accounts or entities.  Such transactions may be made at slightly different prices, due to the volume of investments purchased or sold.  In such event, the average price of all investments purchased or sold in such transactions may be determined, at the Investment Manager's sole discretion, and the Partnership may be charged or credited, as the case may be, with the average transaction price.

## TRADE ERROR POLICY

The Investment Manager has internal controls in place to prevent trade errors from occurring.  On those occasions when such an error nonetheless occurs, the Investment

018770

HCMLPHMIT00003970

Manager will use reasonable efforts to correct the error. If the error cannot be corrected, the Investment Manager does not intend to make any adjustment, regardless of whether the error works to the benefit or detriment of the Partnership. The Investment Manager will endeavor to maintain a record of each trade error, including information about the trade and how such error was corrected or attempted to be corrected. The Partnership (and not the General Partner, the Investment Manager or any of the Investment Manager Affiliates) will be responsible for any losses resulting from trading errors and similar human errors, unless such errors are due to gross negligence or willful misconduct, as determined by a final, non-appealable decision of a court of competent jurisdiction.

018771

HCMLPHMIT00003971

## RISK FACTORS AND CONFLICTS OF INTEREST

An investment in the Partnership (and any Series thereof) involves significant risks not associated with other investment vehicles and is suitable only for persons of adequate financial means who have no need for liquidity in this investment. There can be no assurances or guarantees that: (i) the Partnership's (or any Series') investment strategy will prove successful, or (ii) investors will not lose all or a portion of their investment in the Partnership (or any particular Series).

References herein to the Partnership shall include, where appropriate: (i) each Series of the Partnership; (ii) the instances whereby the Investment Manager directly invests the Partnership's assets, and (iii) the Partnership's investments through Portfolio Funds.

In addition, to the extent relevant, you should also read the offering and governing documents of the PE Portfolio Fund in which the Partnership intends to initially invest on behalf of the initial Limited Partners, which are available from the Partnership upon request.

You should consider the Partnership as a supplement to an overall investment program and should only invest if you are willing to undertake the risks involved. In addition, investors who are subject to income tax should be aware that an investment in the Partnership (or any Series thereof) is likely (if the Partnership (or such Series) is successful) to create taxable income or tax liabilities in excess of cash distributions to pay such liabilities. You should therefore bear in mind the following risk factors and conflicts of interest before purchasing an Interest:

### PARTNERSHIP RISKS

**Dependence Upon the General Partner, the Investment Manager and the Principal; No Participation in Management.** The Partnership's success will depend on the management of the General Partner and the Investment Manager and on the skill and acumen of the Principal. If the Principal should cease to participate in the Partnership's business, the Partnership's ability to select attractive investments and manage its portfolio could be severely impaired.

As a Limited Partner, you should be aware that you will have no right to participate in the management of the Partnership, and you will have no opportunity to select or evaluate any of the Partnership's investments or strategies. Accordingly, you should not invest in the Partnership unless you are willing to entrust all aspects of the management of the Partnership and its investments to the discretion of the General Partner and the Investment Manager.

**Limited or Lack of Operating History.** Each of the Partnership, the Investment Manager and the General Partner are recently-formed entities that have no operating history upon which prospective investors may evaluate the Partnership's future performance. Although the Principal has experience with investments of the type the Partnership intends to make, any prior performance of the Principal (or the Investment Manager Affiliates) is not necessarily indicative of results that he may achieve with respect to the Partnership. As such, there can be no assurances that the Partnership will be able to implement its investment strategy or achieve its investment objective. In addition, any prior performance of the Principal or the Investment Manager Affiliates is not indicative of the results each may achieve for the Partnership in the future.

**Reliance on the Shared Services Provider.** The Investment Manager relies on the Shared Services Provider to provide certain administrative and other services. In the event that the Shared Services Agreement is terminated for any reason, the Investment Manager may not be able to engage another third party to provide such services and may not have the resources to continue advising the Partnership without the provision of such services by the Shared Services Provider. In addition, the Shared Services Provider may be (but, as of the date hereof, is not) engaged by the Partnership to act as the Partnership's Administrator, pursuant to a separate Administration Agreement.

018772

HCMLPHMIT00003972

<u>Limited Liquidity of Interests</u>.  An investment in the Partnership involves substantial restrictions on liquidity, and its Interests are not freely transferable.  There is no market for the Interests in the Partnership, and no market is expected to develop.  Additionally, transfers are subject to the consent of the General Partner, which consent may be granted or withheld in the General Partner's sole discretion.  Consequently, Limited Partners will be unable to liquidate their Interests except by withdrawing from the Partnership in accordance with the Partnership Agreement.  Limited Partners may be unable to liquidate their investment promptly in the event of an emergency or for any other reason.  Although a Limited Partner may attempt to increase its liquidity by borrowing from a bank or other institution, Interests may not readily be accepted as collateral for a loan.  In addition, the transfer of an Interest as collateral or otherwise to achieve liquidity may result in adverse tax consequences to the transferor.

A portion of the Partnership's assets may be invested in securities and other financial instruments or obligations for which no market exists and/or which are restricted as to their transferability under federal or state securities laws.  Such investments may be segregated from other Partnership assets and carried in Side Pocket Accounts, which are subject to restrictions on withdrawals.  Because of the absence of any trading market for these investments, the Partnership may take longer to liquidate these positions than would be the case for publicly traded securities.  Although these securities may be resold in privately negotiated transactions, the prices realized on these sales could be less than those originally paid by the Partnership.  Further, companies whose securities are not publicly traded may not be subject to public disclosure and other investor protection requirements applicable to publicly traded securities.

<u>Lack of Registration</u>.  The Interests have neither been registered under the Securities Act nor under the securities laws of any state and, therefore, are subject to transfer restrictions.  In connection with your purchase of an Interest, you must represent that you are purchasing the Interest for investment purposes only and not with a view toward resale or distribution.  Neither the Partnership nor the General Partner has any plans or assumed any obligation to register the Interests.  Accordingly, the Interests may not be transferred without documentation acceptable to the General Partner, which may include an opinion of counsel to the Partnership that the transfer will not involve a violation of the registration requirements of the Securities Act or require registration by the Partnership under the Investment Company Act.  These restrictions on transfer are in addition to those found in the Partnership Agreement.  Ordinarily, this means that transfers will be restricted to instances of death, gift or passage by operation of law.

<u>Withdrawal of Capital</u>.  A Limited Partner's ability to withdraw funds from the Partnership is restricted in accordance with the withdrawal provisions contained in this Memorandum under "SUMMARY OF OFFERING AND PARTNERSHIP TERMS—Withdrawals" and the withdrawal provisions contained in the Partnership Agreement.  In addition, substantial withdrawals by investors within a short period of time could require the Partnership to liquidate securities positions and other investments more rapidly than would otherwise be desirable, possibly reducing the value of the Partnership's assets and/or disrupting the Partnership's investment strategy.  Reduction in the size of the Partnership could make it more difficult to generate a positive return or to recoup losses due to, among other things, reductions in the Partnership's ability to take advantage of particular investment opportunities or decreases in the ratio of its income to its expenses.

In addition to the above limitations on withdrawals, all withdrawals by Limited Partners will be subject to any limitations on withdrawals imposed by the Portfolio Funds.

**For the avoidance of doubt, (i) there will be no limitation on the percentage of the Partnership's portfolio that may be carried in Side Pocket Accounts; and (ii) any investment made by Series 1 into the series of the PE Portfolio Fund that corresponds to the latter fund's investment made in the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**  In addition, because of the absence of any trading market Illiquid Investments, the Partnership may take longer to liquidate these positions than would be the case for publicly traded securities.  Each of the foregoing may impact a Limited Partner's ability to withdraw.

018773

HCMLPHMIT00003973

**Concentration of Investments**.  The Investment Manager implements its investment program in a manner which, in light of investment considerations, market risks and other factors, it believes will provide the best opportunity for attractive risk-adjusted returns in the value of the Partnership's assets. The Partnership Agreement does not formally limit the amount of the Partnership's assets that may be invested in a single company, security, country, industry, sector or asset class.  In addition, the Partnership Agreement does not limit the amount of the Partnership's assets that may be invested in a single Portfolio Fund.  The concentration of the Partnership's portfolio in any manner described above would subject the Partnership to a greater degree of risk with respect to the failure of one or a few investments, or with respect to economic downturns in relation to an individual industry or sector, or single company, security, country, industry, sector or asset class. See "—Regulatory and Tax Risks—Diversification" herein.

**Operating Deficits**.    The expenses of operating the Partnership (including the Management Fee) may exceed its income, thereby requiring that the difference be paid out of the Partnership's capital, reducing the Partnership's investments and potential for profitability.  In addition to the Partnership's own operating expenses, the Partnership will also bear its *pro rata* share of the operating expenses of the relevant Portfolio Fund.  As such, the Partnership is subject to layering of operating expenses due to the expenses charged by the managers and the Portfolio Funds.

**No Distributions**. The General Partner does not intend to make distributions to the Limited Partners, but intends instead to reinvest substantially all Partnership income and gain, if any.  Cash that might otherwise be available for distribution will also be reduced by payment of Partnership obligations, payment of Partnership expenses (including fees payable and expense reimbursements to the General Partner) and establishment of appropriate reserves.  As a result, if the Partnership is profitable, Limited Partners in all likelihood will be credited with Partnership net income, and will incur the consequent income tax liability (to the extent that they are subject to income tax), even though Limited Partners receive little or no Partnership distributions.  In addition, notwithstanding anything to the contrary herein, the General Partner may limit withdrawals in order to ensure that the Partnership meets the diversification requirements applicable to insurance-dedicated investment funds.

**Investment Expenses**.    The investment expenses (e.g., expenses related to the investment and custody of the Partnership's assets, such as brokerage commissions, custodial fees and other trading and investment charges and fees) as well as other Partnership fees may, in the aggregate, constitute a high percentage relative to other investment entities.  The Partnership will bear these costs regardless of its profitability.

**Cross-Series Liability**.    Section 17-218 of the Delaware Act provides that limited partnerships can be established in separate series in a manner that the liabilities and obligations incurred with respect to any series are only enforceable against the assets of such series, and not against the assets of the limited partnership generally or any other series.  The relevant provisions of the Delaware Act provide the legal requirements for how limited partnerships can be established and operated to maintain this segregation.  The statute includes such requirements as the maintenance of separate books and records for each series, and separation of the assets of each series from other series.  Despite these statutory provisions, there may be instances where the assets of a particular Series may be exposed to the liabilities of one or more other Series.  For example, there may be certain counterparties which resist entering into a contract with a particular Series and insist that one or more other Series, or the Partnership itself acting on behalf of the Series together, enter into such contract.

**Supervision of Trading Operations**.  The Investment Manager, with assistance from its brokerage and clearing firms, intends to supervise and monitor trading activity in the Partnership's account to ensure compliance with the Partnership's objectives. Despite the Investment Manager's efforts, however, there is a risk that unauthorized or otherwise inappropriate trading activity may occur in the Partnership account.

**Impact of Side Letters**.  The Partnership, the General Partner and/or the Investment

018774

HCMLPHMIT00003974

Manager may from time to time enter into Side Letters with one or more Limited Partners that provide such Limited Partner(s) with additional and/or different rights (including, without limitation, with respect to access to information, minimum investment amounts and liquidity terms) than such Limited Partner(s) have pursuant to this Memorandum and the Partnership Agreement.  Neither the General Partner nor the Investment Manager will be required to notify any or all of the other Limited Partners of any such written agreements or any of the rights and/or terms or provisions thereof, nor will the General Partner or the Investment Manager be required to offer such additional and/or different rights and/or terms to any or all of the other Limited Partners.  Specifically, certain Insurance Company Limited Partners may have additional withdrawal rights not offered to other Limited Partners.  The other Limited Partners will have no recourse against the Partnership, the General Partner, the Investment Manager and/or any of their respective affiliates in the event that certain Limited Partners receive additional and/or different rights and/or terms as a result of such Side Letters.

**Broad Discretionary Power to Choose Investments and Strategies**.  The Investment Management Agreement gives the Investment Manager broad discretionary power to decide what investments the Partnership will make and what strategies it will use.  While the Investment Manager currently intends to use the strategies described in "INVESTMENT PROGRAM", it is not obligated to do so, and it may choose any other investments and strategies that it believes are advisable.

**Limitation of Liability and Indemnification of the General Partner, the Investment Manager and Affiliates**.  The Partnership Agreement provides that none of the General Partner, the Investment Manager, the Principal or any of the Investment Manager Affiliates will be liable to the Partnership or the Limited Partners for any action or inaction in connection with the business and affairs of the Partnership unless such action or inaction is determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct.  The Partnership (but not the Limited Partners individually) is obligated to indemnify the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates (which, for purposes of this indemnity, shall include fund counsel (except for legal malpractice)) from and against any and all claims, liabilities, obligations, judgments, suits, proceedings, actions, demands, losses, costs, expenses (including attorneys' fees and other expenses of litigation), damages, penalties or interest, as a result of any claim or legal proceeding (made or threatened) related to any action or inaction by any of them in connection with the business and affairs of the Partnership (including the settlement or appeal of any such claim or legal proceeding); *provided* that such indemnity will not extend to conduct determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct. The Investment Management Agreement also provides similar protections to the Investment Manager.  Therefore, a Limited Partner may have a more limited right of action against the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates than a Limited Partner would have had absent these provisions in the Partnership Agreement and the Investment Management Agreement. **It is the policy of the SEC that indemnification for violations of securities laws is against public policy and therefore unenforceable.**

**No Minimum Size of Partnership**.  The Partnership may begin or continue operations without attaining or maintaining any particular level of capitalization.  At low asset levels, the Partnership may be unable to make its investments as fully as would otherwise be desirable or to take advantage of potential economies of scale, including the ability to obtain the most timely and valuable research and trading information from securities brokers.  It is possible that even if the Partnership operates for a period with substantial capital, investors' withdrawals could diminish the Partnership assets to a level that does not permit the most efficient and effective implementation of the Partnership's investment program.  As a result of losses or withdrawals, the Partnership may not have sufficient capital to diversify its investments to the extent desired or currently contemplated by the Investment Manager.

**Portfolio Valuation**.  Valuation of the Partnership's portfolio, which will affect the amount of the Management Fee, involves uncertainties and determinations based on judgments.

018775

HCMLPHMIT00003975

Third-party pricing information may, at times, not be available regarding certain of the Partnership's investments. A disruption in the secondary markets for the Partnership's investments may limit the ability of the Partnership to obtain accurate market quotations for purposes of valuing its investments. In addition, material events occurring after the close of a principal market upon which a portion of the investments of the Partnership are traded may require it to make a determination of the effect of a material event on the value of the investments traded on the market for purposes of determining the value of the Partnership's investments on a valuation date. Further, because of the overall size and concentrations in particular markets and maturities of positions that may be held by the Partnership from time to time, the liquidation values of the Partnership's securities and other investments may differ significantly from the interim valuations of these investments derived from the valuation methods described herein. Moreover, because of the inherent uncertainty of valuing an illiquid security, the quoted valuation may be higher than the actual final liquidation value, and these differences could be material. If the Partnership's valuation should prove to be incorrect, the value of the Partnership's investments could be adversely affected.

<u>Liability of a Limited Partner for the Return of Capital Contributions</u>. If the Partnership should become insolvent, Limited Partner may be obligated to return all or a portion of any distributions (including withdrawal proceeds) received from the Partnership in an amount up to its aggregate capital contributions (including any income or gains thereon) to the Partnership in order to pay such Limited Partner's *pro rata* share of any Partnership liabilities that arose while such Limited Partner held Interests.

Under the Delaware Act, when a Limited Partner receives a return of all or any part of such Limited Partner's capital contribution, the Limited Partner may be liable to the Partnership for any sum, not in excess of such return of capital (together with interest), if at the time of such distribution the Limited Partner knew that the Partnership was prohibited from making such distribution pursuant to the Delaware Act.

<u>Delayed Schedule K-1s</u>. The General Partner will endeavor to provide a Schedule K-1 to each Limited Partner for any given calendar year prior to April 15 of the following year. In addition, the Partnership will first have to receive a Schedule K-1 from each Portfolio Fund. In the event that the Schedule K-1 is not available by such date, a Limited Partner may have to request an extension of time to file or may have to pay taxes based on an estimated amount.

<u>Lack of Insurance</u>. The assets of the Partnership are not insured by any government or private insurer, except to the extent portions may be deposited in bank accounts insured by the United States Federal Deposit Insurance Corporation or with brokers insured by the Securities Investor Protection Corporation and such deposits and securities are subject to such insurance coverage (which, in any event, is limited in amount). Therefore, in the event of the insolvency of a depository or custodian, the Partnership may be unable to recover all of its funds or the value of its securities so deposited.

<u>Forward-Looking Statements; Opinions</u>. Statements contained in this Memorandum that are not historical facts are based on current expectations, estimates, projections, opinions and/or beliefs of the Partnership. Such statements involve known and unknown risks, uncertainties and other factors, and undue reliance should not be placed thereon. Moreover, certain information contained in this Memorandum constitutes "forward-looking" statements, which can be identified by the use of forward-looking terminology, such as "may", "will", "seek", "should", "expect", "anticipate", "project", "estimate", "intend", "continue" or "believe" or the negatives thereof or other variations thereon or comparable terminology. Due to various risks and uncertainties, including those set forth herein, actual events or results or the actual performance of the Partnership may differ materially from those reflected or contemplated in such forward-looking statements.

<div align="right">

### MARKET RISKS

</div>

<u>General</u>

<u>Competition Generally</u>. The securities industry and the varied strategies and techniques

018776

HCMLPHMIT00003976

to be engaged in by the Investment Manager are extremely competitive and each involves a degree of risk. The Partnership will compete with firms, including many of the larger securities and investment banking firms, which have substantially greater financial resources and research staffs. Further, lower fees for comparable services may be available from these or other firms.

**Market Volatility**. The profitability of the Partnership substantially depends upon the Investment Manager correctly assessing the future price movements of bonds, stocks, options on stocks, and other financial instruments, and the movements of interest rates. The Partnership cannot guarantee that the Investment Manager will be successful in accurately predicting those prices and interest rate movements.

**Partnership's Investment Activities**. The Partnership's investment activities involve a significant degree of risk. The performance of any investment is subject to numerous factors which are neither within the control of nor predictable by the Investment Manager. Such factors include a wide range of economic, political, competitive, technological and other conditions (including natural disasters, acts of terrorism and war) that may affect investments in general or specific industries or companies. The securities markets may be volatile, which may adversely affect the ability of the Partnership to realize profits. As a result of the nature of the Partnership's investing activities, it is possible that the Partnership's financial performance may fluctuate substantially over time and from period to period.

**Terrorist Actions**. There is a risk of terrorist attacks on the United States and elsewhere causing significant loss of life and property damage and disruptions in the global market. Economic and diplomatic sanctions may be in place or imposed on certain states and military action may be commenced. The impact of such events is unclear, but could have a material effect on general economic conditions and market liquidity.

**Unforeseen Events**. The Partnership may be adversely affected by unforeseen events involving such matters as changes in interest rates or the credit status of an issuer, forced withdrawals of securities or acquisition proposals, break-up of planned mergers, unexpected changes in relative value, short squeezes, inability to short stock or changes in tax treatment.

**Potential Cybersecurity Breaches and Identity Theft**. The Investment Manager relies, to a certain extent, on the use of information technology. The Investment Manager's information and technology systems may be vulnerable to damage and/or interruption from computer viruses, network failures, computer and telecommunication failures, infiltration by unauthorized persons and security breaches, usage errors by its professionals, power outages, and/or catastrophic events such as fires, tornadoes, floods, hurricanes and earthquakes. Although the Investment Manager has implemented various measures to manage risks relating to these types of events, if these systems are compromised, become inoperable for extended periods of time and/or cease to function properly, the Investment Manager and/or the Partnership may have to make a significant investment to fix or replace them. The failure of these systems and/or of disaster recovery plans for any reason could cause significant interruptions in the Investment Manager's and/or the Partnership's operations and may result in a failure to maintain the security, confidentiality or privacy of sensitive data, including personal information relating to investors (and the beneficial owners of investors). Such a failure could harm the Investment Manager's and/or the Partnership's reputation, subject any such entity and their respective affiliates to legal claims and/or otherwise affect their business and financial performance.

**Long-Biased Investment Program**. The Investment Manager expects that its strategy with respect to the Partnership will have a long bias. Therefore, any decline in the overall market may result in a decline in the value of the Partnership's assets.

**Market Liquidity and Leverage**. The Partnership may be adversely affected by a decrease in market liquidity for the instruments in which it invests which may impair the Partnership's ability to adjust its positions. The size of the Partnership's positions may magnify the effect of a decrease in market liquidity for such instruments. Changes in

018777

HCMLPHMIT00003977

overall market leverage, deleveraging as a consequence of a decision by the brokers and/or custodians, or other counterparties with which the Partnership enters into repurchase/reverse repurchase agreements or derivative transactions, to reduce the level of leverage available, or the liquidation by other market participants of the same or similar positions, may also adversely affect the Partnership's portfolio.

**Material Non-Public Information**.  By reason of their responsibilities in connection with other activities of the Investment Manager and/or its affiliates, the Principal or employees of the Investment Manager and/or its affiliates may acquire confidential or material non-public information or be restricted from initiating transactions in certain securities.  The Partnership will not be free to act upon any such information.  Due to these restrictions, the Partnership may not be able to initiate a transaction that it otherwise might have initiated and may not be able to sell an investment that it otherwise might have sold.

**Accuracy of Public Information**.  The Investment Manager may select investments for the Partnership, in part, on the basis of information and data filed by issuers with various government regulators or made directly available to the Investment Manager by the issuers or through sources other than the issuers.  Although the Investment Manager evaluates certain such information and data and sometimes seeks independent corroboration when the Investment Manager considers it is appropriate and when it is reasonably available, the Investment Manager is not in a position to confirm the completeness, genuineness or accuracy of such information and data, and in some cases, complete and accurate information is not available.  Investments may not perform as expected if information is inaccurate.

**Directorships on Boards of Portfolio Companies**.  The principals and other members and employees of the Investment Manager or its designees may serve as directors of companies the securities of which are purchased or sold on behalf of the Partnership and may be compensated for such service.  In the event that material non-public information obtained with respect to such companies becomes subject to trading restrictions pursuant to the internal trading policies of such companies or as a result of applicable law or regulations, the Partnership may be prohibited for a period of time from purchasing or selling the securities of such companies, which prohibition may have an adverse effect on the Partnership.

**Short-Swing Liability and Other Limitations**.  From time to time, the Partnership, acting alone or as part of a group, may acquire beneficial ownership of more than 10% of a certain class of securities of a public company, or may place a director on the board of directors of such a company.  As a result, under Section 16 of the Exchange Act, the Partnership may be subject to certain additional reporting requirements and may be required to disgorge certain short-swing profits arising from purchases and sales of such securities.  In addition, in such circumstances the Partnership will be prohibited from entering into a short position in such issuer's securities, and therefore limited in its ability to hedge such investments.

**Disruptions or Inability to Trade Due to a Failure to Receive Timely and Accurate Market Data from Third-Party Vendors**.  The Investment Manager's strategy may depend on the receipt of timely and accurate market data from third-party vendors. Any failure to receive such data in a timely manner or the receipt of inaccurate data for any reason could disrupt and adversely affect the Partnership's trading until such failure or inaccuracy is corrected.

**Use of Automated Order Routing and Execution Systems Generally**.  The Investment Manager may use automated order routing and execution systems in its trading.  Such systems are typically provided on an "as is" basis.  Such systems may experience technical difficulties which may render them temporarily unavailable.  In addition, such systems may fail to properly perform.  Such failures may result in losses to the Partnership, for which losses the providers of such services have disclaimed all liability.  In an effort to mitigate such risks, the Investment Manager intends to closely monitor trades executed through automated order routing and execution systems and the operation of the systems themselves.

HCMLPHMIT00003978

**Electronic Trading Facilities**. The Partnership may make use of electronic trading facilities (including ECNs), which are generally supported by computer-based component systems for the order-routing, execution, matching, registration or clearing of trades. As with all facilities and systems, they are vulnerable to temporary disruption or failure. Trading on an electronic trading system (including an ECN) may differ not only from trading in an open-outcry market or telephonic market but also from trading on other electronic trading systems. The Partnership, in undertaking transactions on an electronic trading system, will be exposed to risk associated with the system including the failure of hardware and software. The result of any system failure may be that the Partnership's order is either not executed according to its instructions or is not executed at all. The Partnership's ability to limit or recover certain losses may be subject to limits on liability imposed by, without limitation, foreign or domestic law or regulation, the Partnership's own or its broker's internet service provider, other systems providers, market factors, foreign or domestic banking or other market regulations and/or telephonic or other communications providers, foreign or domestic.

**Technology Risk**. The Investment Manager's investment strategy may rely on the use of proprietary and non-proprietary software, data and intellectual property. Any such reliance on this technology and data is subject to a number of important risks. First, the Partnership may be severely and adversely affected by the malfunction of the technology and/or data feed. For example, an unforeseeable software or hardware malfunction could occur, as a result of a virus or other outside force, or as result of a design flaw in the Partnership's system or in its continued implementation. In the past, occurrences of this nature to other funds have sometimes resulted in dramatically negative consequences for the portfolio of the related fund. In addition, changes in the market for publicly available data or in regulatory reporting requirements could cause a severe diminution in the data available for the technology to operate as designed. Such events can also have dramatically negative consequences for the Partnership. Furthermore, if any of the Partnership's software, hardware, data and/or other intellectual property is found to infringe on the rights of any third party, the Partnership could be severely and adversely affected.

**Trading Errors**. The Investment Manager's computerized trading systems rely on the ability of the Investment Manager's personnel to accurately process such systems' outputs and to use the proper trading orders, including stop-loss or limit orders, to execute the transactions called for by the systems. In addition, the Investment Manager relies on its staff to properly operate and maintain the computer and communication systems upon which the trading systems rely. The Investment Manager's systems are accordingly subject to human errors, including the failure to implement, or the inaccurate implementation of any of the Investment Manager's systems, in addition to errors in properly executing transactions. This could cause substantial losses on transactions, and any such losses could substantially and adversely affect the performance of the Partnership. See "BROKERAGE PRACTICES—Trade Error Policy" herein.

**Co-Investments with Third Parties**. The Partnership may co-invest with third parties through joint ventures or other entities. Such investments may involve risks in connection with such third- party involvement, including the possibility that a third-party co-venturer may have financial difficulties resulting in a negative impact on such investment, economic or business interests or goals that are inconsistent with those of the Partnership or be in a position to take (or block) action in a manner contrary to the Partnership's investment objectives. In those circumstances where such third parties involve a management group, such third parties may enter into compensation arrangements relating to such investments, including incentive compensation arrangements. Such compensation arrangements will reduce the returns to participants in the investments.

**Other Investment Vehicles; Limited Recourse**. The Investment Manager may allocate a portion of the Partnership's assets to pooled investment vehicles that may be managed by the Investment Manager or its affiliates or unaffiliated managers. Such investment vehicles may trade wholly-independently of one another and may at times hold economically offsetting positions. To the extent that such investment vehicles do, in fact, hold such positions, the Partnership, considered as a whole, may not achieve any gain or loss despite incurring expenses. Additionally, a creditor having a claim that relates to a

018779

HCMLPHMIT00003979

particular investment held by any such investment vehicle may be able to satisfy such claim against all assets of such investment vehicle, without regard to the participation rights of the Partnership and other investors of such investment vehicle in the assets of such investment vehicle.

Since the Partnership may not have full transparency with respect to the trading activities of such investment vehicles, it may be limited in its ability to hedge its exposure or to prevent concentration of its assets within the same issuer, asset or asset class, industry, section, strategy, currency, country or geographic region.  Further, the Investment Manager may be limited with respect to its ability to monitor unaffiliated managers, including their adherence to their respective trading and risk guidelines (if such guidelines exist).  Even in the event that such information may be available to the Partnership, the Partnership's investment in such investment vehicles may be "locked up" and subject to limitations on withdrawals, and in light of the broad exculpation and indemnification provisions typically contained in the governing documents of such investment vehicles, may have limited recourse against the managers of such investment vehicles.

**Risks Associated with ETFs**.  The Partnership may invest in ETFs.  ETFs represent an interest in a passively managed portfolio of securities and financial instruments selected to replicate a securities or financial instruments index.  Unlike open-end mutual funds, the shares of ETFs are not purchased and redeemed by investors directly with the ETF, but instead are purchased and sold through broker-dealers in transactions on an exchange.  Because ETF shares are traded on an exchange, they may trade at a discount from or a premium to the net asset value per share of the underlying portfolio of securities or financial instruments.  In addition to bearing the risks related to investments in securities or financial instruments, investors in ETFs intended to replicate an index bear the risk that the ETFs performance may not correctly replicate the performance of the index.  Investors in ETFs, closed-end funds and other investment companies bear a proportionate share of the expenses of those funds, including management fees, custodial and accounting costs, and other expenses.  As such, the Partnership is subject to layering of such fees.  Trading in ETF and closed-end fund shares also entails payment of brokerage commissions and other transaction costs.

**Illiquid Securities**.  From time to time, the Partnership may invest in financial instruments that are not publicly traded.  The Partnership may also invest in securities and other financial instruments that trade regularly but may be only thinly traded, either periodically or on an on-going basis.  The Partnership may not be able to readily dispose of such financial instruments and, in some cases, may be contractually prohibited from disposing of such financial instruments for a specified period of time.  Accordingly, the Partnership may be forced to sell its more liquid positions at a disadvantageous time, resulting in a greater percentage of the portfolio consisting of illiquid securities.  In addition, the market prices, if any, for such financial instruments tend to be volatile, and the Partnership may not be able to sell them when it desires to do so or to realize what it perceives to be their fair value in the event of a sale.  The sale of illiquid securities also often requires more time and results in higher brokerage charges or dealer discounts and other selling expenses than does the sale of securities eligible for trading on national securities exchanges or in the over-the-counter markets.  Furthermore, there may be limited information available about the assets of such issuers of the financial instruments which may make valuation of such financial instruments difficult or uncertain.  It also should be noted that, even those markets which the Investment Manager expects to be liquid can experience periods, possibly extended periods, of illiquidity.

**Investments in Securities and Other Assets Believed to Be Undervalued**.  The Investment Manager's investment program contemplates that a portion of the Partnership's portfolio may be invested in securities and other assets that the Investment Manager believes to be undervalued.  The identification of such investment opportunities is a difficult task, and there are no assurances that such opportunities will be successfully recognized or acquired.  While such investments offer the opportunities for above-average capital appreciation, they also involve a high degree of financial risk and can result in substantial losses.  Returns generated from the Partnership's investments may not adequately compensate for the business and financial risks assumed.  The current economic conditions and any future major economic recession can severely disrupt the

018780

HCMLPHMIT00003980

markets for such investments and significantly impact their value. In addition, any such economic downturn can adversely affect the ability of the issuers of such obligations to repay principal and pay interest thereon and increase the incidence of default for such securities. Additionally, there can be no assurance that other investors will ever come to realize the value of some of these investments, and that they will ever increase in price. Furthermore, the Partnership may be forced to hold such investments for a substantial period of time before realizing their anticipated value. During this period, a portion of the Partnership's funds would be committed to the investments made, thus possibly preventing the Partnership from investing in other opportunities.

<u>Short Sales</u>. The Investment Manager's investment program contemplates that a portion of the Partnership's portfolio may be invested in selling securities short. Although the Investment Manager may sell short a variety of assets, it expects most short trades to be in equity securities. Short selling involves the sale of a security that the Partnership does not own and must borrow in order to make delivery in the hope of purchasing the same security at a later date at a lower price. In order to make delivery to the purchaser, the Partnership must borrow securities from a third-party lender. The Partnership subsequently returns the borrowed securities to the lender by delivering to the lender the securities it receives in the transaction or by purchasing securities in the open market. The Partnership must generally pledge cash with the lender equal to the market price of the borrowed securities. This deposit may be increased or decreased in accordance with changes in the market price of the borrowed securities. During the period in which the securities are borrowed, the lender typically retains its right to receive interest and dividends accruing to the securities. In exchange, in addition to lending the securities, the lender generally pays the Partnership a fee for the use of the Partnership's cash. This fee is based on prevailing interest rates, the availability of the particular security for borrowing and other market factors.

Theoretically, securities sold short are subject to unlimited risk of loss because there is no limit on the price that a security may appreciate before the short position is closed. In addition, the supply of securities that can be borrowed fluctuates from time to time. The Partnership may be subject to substantial losses if a security lender demands return of the lent securities and an alternative lending source cannot be found.

<u>Small Companies</u>. The Investment Manager may invest a portion of the Partnership's assets in small and/or unseasoned companies with small market capitalizations. While smaller companies generally have potential for rapid growth, they often involve higher risks because they may lack the management experience, financial resources, product diversification and competitive strength of larger companies. In addition, in many instances, the frequency and volume of their trading may be substantially less than is typical of larger companies. As a result, the securities of smaller companies may be subject to wider price fluctuations. When making large sales, the Partnership may have to sell portfolio holdings at discounts from quoted prices or may have to make a series of small sales over an extended period of time due to the lower trading volume of smaller company securities.

<u>Leverage</u>. When deemed appropriate by the Investment Manager and subject to applicable regulations, the Partnership will incur leverage in its investment program, whether directly through the use of borrowed funds, or indirectly through investment in certain types of financial instruments with inherent leverage, such as puts, calls and warrants, which may be purchased for a fraction of the price of the underlying securities while giving the purchaser the full benefit of movement in the market price of those underlying securities. While such strategies and techniques increase the opportunity to achieve higher returns on the amounts invested, they also increase the risk of loss. To the extent that the Partnership purchases securities with borrowed funds, its net assets will tend to increase or decrease at a greater rate than if borrowed funds are not used. The level of interest rates generally, and the rates at which such funds may be borrowed in particular, could affect the operating results of the Partnership. If the interest expense on this leverage were to exceed the net return on the investments made with borrowed funds, the Partnership's use of leverage would result in a lower rate of return than if the Partnership were not leveraged.

018781
HCMLPHMIT00003981

If the amount of leverage which the Partnership may have outstanding at any one time is large in relation to its capital, fluctuations in the market value of the Partnership's portfolio will have disproportionately large effects in relation to the Partnership's capital and the possibilities for profit and the risk of loss will therefore be increased. Any investment gains made with the additional leverage will generally cause the Net Asset Value of the Partnership to rise more rapidly than would otherwise be the case. Conversely, if the investment performance of the leveraged capital fails to cover its cost to the Partnership, the Net Asset Value of the Partnership will generally decline faster than would otherwise be the case.

Certain of the Partnership's trading and investment activities in securities and other financial instruments may be subject to Federal Reserve Board margin requirements, which are computed each day. When the market value of a particular open position changes to a point where the margin on deposit does not satisfy maintenance margin requirements, a "margin call" on the customer is made. If the customer does not deposit additional funds with the broker to meet the margin call within a reasonable time, the customer's position may be closed out. In the event of a precipitous drop in the value of the assets managed by the Partnership, the Partnership might not be able to liquidate assets quickly enough to pay off the margin debt and might suffer mandatory liquidation of positions in a declining market at relatively low prices, incurring substantial losses. With respect to the Partnership's trading activities, the Partnership, and not the Limited Partners personally, will be subject to margin calls.

Overall, the use of leverage, while providing the opportunity for a higher return on investments, also increases the volatility of such investments and the risk of loss.

**Options and Other Derivative Instruments**. The Investment Manager may invest, from time to time, a portion of the Partnership's assets in options and derivative instruments, including buying and writing puts and calls on some of the securities held by the Partnership. The prices of many derivative instruments, including many options and swaps, are highly volatile. The value of options and swap agreements depend primarily upon the price of the securities, indexes, currencies or other instruments underlying them. Price movements of options contracts and payments pursuant to swap agreements are also influenced by, among other things, interest rates, changing supply and demand relationships, trade, fiscal, monetary and exchange control programs and policies of governments, and national and international political and economic events and policies. The Partnership is also subject to the risk of the failure of any of the exchanges on which its positions trade or of their clearinghouses or of counterparties. The cost of options is related, in part, to the degree of volatility of the underlying securities, currencies or other assets. Accordingly, options on highly volatile securities, currencies or other assets may be more expensive than options on other investments.

Put options and call options typically have similar structural characteristics and operational mechanics regardless of the underlying instrument or asset on which they are purchased or sold. A put option gives the purchaser of the option, upon payment of a premium, the right to sell, and the writer the obligation to buy, the underlying security, index, currency or other instrument or asset at the exercise price. A call option, upon payment of a premium, gives the purchaser of the option the right to buy, and the seller the obligation to sell, the underlying instrument or asset at the exercise price.

If a put or call option purchased by the Partnership were permitted to expire without being sold or exercised, the Partnership would lose the entire premium it paid for the option. The risk involved in writing a put option is that there could be a decrease in the market value of the underlying instrument or asset caused by rising interest rates or other factors. If this occurred, the option could be exercised and the underlying instrument or asset would then be sold to the Partnership at a higher price than its current market value. The risk involved in writing a call option is that there could be an increase in the market value of the underlying instrument or asset caused by declining interest rates or other factors. If this occurred, the option could be exercised and the underlying instrument or asset would then be sold by the Partnership at a lower price than its current market value.

Purchasing and writing put and call options and, in particular, writing "uncovered" options

018782

HCMLPHMIT00003982

are highly specialized activities and entail greater than ordinary investment risks. In particular, the writer of an uncovered call option assumes the risk of a theoretically unlimited increase in the market price of the underlying instrument or asset above the exercise price of the option. This risk is enhanced if the instrument or asset being sold short is highly volatile and there is a significant outstanding short interest. These conditions exist in the stocks of many companies. The instrument or asset necessary to satisfy the exercise of the call option may be unavailable for purchase except at much higher prices. Purchasing instruments or assets to satisfy the exercise of the call option can itself cause the price of the instruments or assets to rise further, sometimes by a significant amount, thereby exacerbating the loss. Accordingly, the sale of an uncovered call option could result in a loss by the Partnership of all or a substantial portion of its assets.

Swaps and certain options and other custom instruments are subject to the risk of non-performance by the counterparty, including risks relating to the financial soundness and creditworthiness of the counterparty.

**Hedging Transactions.** Investments in financial instruments such as options and interest rate swaps, caps and floors, and other derivatives are commonly utilized by investment funds to hedge against fluctuations in the relative values of its portfolio positions as a result of changes in currency exchange rates, interest rates and/or the equity markets or sectors thereof. Any hedging against a decline in the value of portfolio positions does not eliminate fluctuations in the values of portfolio positions or prevent losses if the values of such positions decline, but establishes other positions designed to gain from those same developments, thus moderating the decline in the portfolio positions' value. Such hedging transactions also limit the opportunity for gain if the value of the portfolio positions should increase. Moreover, it may not be possible for the Partnership to hedge against a fluctuation at a price sufficient to protect the Partnership's assets from the decline in value of the portfolio positions anticipated as a result of such fluctuations. For example, the cost of options is related, in part, to the degree of volatility of the underlying instruments or assets. Accordingly, options on highly volatile instruments or assets may be more expensive than options on other instruments or assets and of limited utility in hedging against fluctuations in their prices.

The Investment Manager is not obligated to establish hedges for portfolio positions and may not do so. To the extent that hedges are implemented, their success is dependent on the Investment Manager's ability to correctly predict movements in the direction of currency and interest rates and the equity markets or sectors thereof.

**Market or Interest Rate Risk.** The Partnership may, from time to time, invest in fixed income securities and instruments. The price of most fixed income securities move in the opposite direction of the change in interest rates. For example, as interest rates rise, the prices of fixed income securities fall. If the Partnership holds a fixed income security to maturity, the change in its price before maturity may have little impact on the Partnership's performance. However, if the Partnership has to sell the fixed income security before the maturity date, an increase in interest rates could result in a loss to the Partnership.

**Callable Securities.** Many bonds, including agency, corporate and municipal bonds, and mortgage-backed securities, sometimes contain a provision that allows the issuer to "call" (i.e., redeem) all or part of the issue before the bond's maturity date. The issuer usually retains this right to refinance the bond in the future if market interest rates decline below the coupon rate on the outstanding debt security. From the investor's perspective, there are three disadvantages to the call provision. First, the cash flow pattern of a callable bond is not known with certainty. Second, because the issuer will call the bonds when interest rates have dropped, the Partnership is exposed to reinvestment rate risk – the Partnership will have to reinvest the proceeds received when the bond is called at lower interest rates. Finally, the capital appreciation potential of a bond will be reduced because the price of a callable bond may not rise much above the price at which the issuer may call the bond.

**Maturity Risk.** In certain situations, the Partnership may purchase a bond of a given maturity as an alternative to another bond of a different maturity. Ordinarily, under these

018783

HCMLPHMIT00003983

circumstances, the Partnership will make an adjustment to account for the interest rate risk differential in the two bonds. This adjustment, however, makes an assumption about how the interest rates at different maturities will move. To the extent that the yield movements deviate from this assumption, there is a yield-curve or maturity risk. Another situation where yield-curve risk should be considered is in the analysis of bond swap transactions where the potential incremental returns are dependent entirely on the parallel shift assumption for the yield curve.

**Inflation Risk**. Inflation risk results from the variation in the value of cash flows from a fixed income security or instrument due to inflation, as measured in terms of purchasing power. For example, if the Partnership purchases a 5-year bond with a coupon rate of 5%, but the rate of inflation is 6%, then the purchasing power of the cash flow has declined. For all but inflation-linked bonds, adjustable bonds or floating rate bonds, the Partnership is exposed to inflation risk because the interest rate the issuer promises to make is fixed for the life of the security. To the extent that interest rates reflect the expected inflation rate, floating rate bonds have a lower level of inflation risk.

**Downgrades in Fixed Income Debt Securities**. Unless required by applicable law, the Partnership is not required to sell or dispose of any debt security that either loses its rating or has its rating reduced after the Partnership purchases such security.

**Investments in Non-U.S. Investments**. From time to time, the Investment Manager may invest and trade a portion of the Partnership's assets in non-U.S. securities and other assets (through ADRs and otherwise), which will give rise to risks relating to political, social and economic developments abroad, as well as risks resulting from the differences between the regulations to which U.S. and non-U.S. issuers and markets are subject. Such risks may include:

- Political or social instability, the seizure by foreign governments of company assets, acts of war or terrorism, withholding taxes on dividends and interest, high or confiscatory tax levels, and limitations on the use or transfer of portfolio assets.

- Enforcing legal rights in some foreign countries is difficult, costly and slow, and there are sometimes special problems enforcing claims against foreign governments.

- Non-U.S. securities and other assets often trade in currencies other than the U.S. dollar, and the Partnership may directly hold foreign currencies and purchase and sell foreign currencies through forward exchange contracts. Changes in currency exchange rates will affect the Partnership's Net Asset Value, the value of dividends and interest earned, and gains and losses realized on the sale of investments. An increase in the strength of the U.S. dollar relative to these other currencies may cause the value of the Partnership's investments to decline. Some foreign currencies are particularly volatile. Foreign governments may intervene in the currency markets, causing a decline in value or liquidity of the Partnership's foreign currency holdings. If the Partnership enters into forward foreign currency exchange contracts for hedging purposes, it may lose the benefits of advantageous changes in exchange rates. On the other hand, if the Partnership enters forward contracts for the purpose of increasing return, it may sustain losses.

- Non-U.S. securities and other markets may be less liquid, more volatile and less closely supervised by the government than in the United States. Foreign countries often lack uniform accounting, auditing and financial reporting standards, and there may be less public information about the operations of issuers in such markets.

**Risks Associated with ADRs**. The Partnership may purchase ADRs, which are certificates evidencing ownership of shares of a non-U.S. issuer, acting as alternatives to directly purchasing the underlying non-U.S. securities in their national markets and currencies. Such investments are subject to many of the risks associated with investing directly in non-U.S. securities. These risks include the political and economic risks of the underlying issuer's country, as well as, in the case of depositary receipts traded on non-U.S. securities, foreign exchange risk. ADRs may be sponsored or unsponsored. Unsponsored ADRs are established without the participation of the issuer. In addition, unsponsored ADRs may involve higher expenses, may not carry pass-through voting or

018784

HCMLPHMIT00003984

other shareholder rights, and may be less liquid. The performance of ADRs may be different from the performance of the ordinary shares of the non-U.S. issuers to which they relate.

**Emerging Markets**. The Partnership may invest a portion of its assets in investments related to emerging market countries. The securities markets of emerging market countries as a whole have been volatile and the loans and securities of issuers in emerging markets tend to be subject to abrupt or erratic price movements. Investing a significant portion of the Partnership's assets in issuers in emerging markets will make the Partnership susceptible to a greater degree than otherwise would be the case to factors affecting emerging markets in general and issuers in emerging markets included in the Partnership's portfolio in particular, and may increase the volatility of the value of the Partnership's portfolio investments. The economies of these markets may differ significantly from the economies of certain developed countries in such respects as gross domestic product or gross national product, rate of inflation, currency depreciation, capital reinvestment, resource self-sufficiency, structural unemployment and balance of payments position. In particular, these economies frequently experience high levels of inflation. In addition, such countries may have: (1) restrictive national policies that limit the Partnership's investment opportunities; (2) limited information about their issuers; (3) a general lack of uniform accounting, auditing and financial reporting standards, auditing practices and requirements compared to the standards of developed countries; (4) less governmental supervision and regulation of business and industry practices, securities exchanges, brokers and listed companies; (5) economic developments that may be slowed or reversed by unanticipated political or social events in such countries; and (6) a lack of capital market structure or market-oriented economy.

Systemic and market factors may affect the acquisition, payment for or ownership of investments including: (a) the prevalence of crime and corruption; (b) the inaccuracy or unreliability of business and financial information; (c) the instability or volatility of: (i) banking and financial systems, or the absence or inadequacy of an infrastructure to support such systems, (ii) custody and settlement infrastructure of the market in which such investments are traded and held, and (iii) the acts, omissions and operation of any securities depository; (d) the risk of the bankruptcy or insolvency of banking agents, counterparties to cash and securities transactions, registrars or transfer agents; and (e) the existence of market conditions that prevent the orderly execution or settlement of transactions or that affect the value of assets. Different clearance and settlement procedures may prevent the Partnership from making intended security purchases causing the Partnership to miss attractive investment opportunities, possibly resulting in either losses to or contract claims against the Partnership. The investment markets of many of the countries in which the Partnership may invest may also be smaller, less liquid, and subject to greater price volatility than developed markets. The Partnership's assets may be denominated in a variety of currencies subject to changes in currency exchange rates and in exchange control regulations.

**Volatility of Currency Prices**. In general, price movements of currencies are difficult to predict accurately because they are influenced by, among other things, changing supply and demand relationships; governmental, trade, fiscal, monetary and exchange control programs and policies; national and international political and economic events; and changes in interest rates. Governments from time to time intervene in certain markets in order to influence prices directly.

**Currency Control**. It is sometimes the case that governments alter the exchange rate policy of a currency without advance notice, and it may not always be possible to foresee a change in policy.

**Exchange Rate Fluctuations**. Investments that are denominated in a foreign currency are subject to the risk that the value of a particular currency will change in relation to one or more other currencies. The Partnership intends to value its holdings and to make distributions in U.S. dollars. Thus, changes in currency exchange rates adverse to the U.S. dollar may affect adversely the value of such holdings. Among the factors that may affect currency values are trade balances, the appropriateness of interest rates, the shape of the yield curve, the degree of central bank independence and credibility, differences in relative values of similar assets in different currencies, long-term opportunities for

018785

HCMLPHMIT00003985

investment and capital appreciation and political developments.

**Risks of Trading Futures**.  The Investment Manager is eligible to trade a limited amount of commodities or financial futures on behalf of the Partnership under a provision in the CEA that provides an exemption from registration as a commodity pool operator.  Trading futures is a highly risky strategy.  Whenever the Partnership purchases a particular future, there is a possibility that the Partnership may sustain a total loss of its purchase price.  The equity values of leveraged positions using futures are, in general, much more volatile than the prices of securities, such as stocks and bonds.  As a result, the risk of loss in trading futures is substantially greater than in trading those securities.  The prices of futures react strongly to the prices of the underlying commodities.  The prices of these underlying products, in turn, rise and fall based on changes in interest rates, international balances of trade, changes in governments, wars, weather events and a host of other factors that are entirely beyond the Investment Manager's control and very difficult (and perhaps impossible) to predict.

**Forward Trading**.  Forward contracts and options thereon, unlike futures contracts, are not traded on exchanges and are not standardized; rather, banks and dealers act as principals in these markets, negotiating each transaction on an individual basis.  Forward and "cash" trading is substantially unregulated; there is no limitation on daily price movements and speculative position limits are not applicable.  The principals who deal in the forward markets are not required to continue to make markets in the currencies or commodities they trade and these markets can experience periods of illiquidity, sometimes of significant duration.  There have been periods during which certain participants in these markets have refused to quote prices for certain currencies or commodities or have quoted prices with an unusually wide spread between the price at which they were prepared to buy and that at which they were prepared to sell.  Disruptions can occur in any market traded by the Partnership due to unusual trading volume, political intervention or other factors.  The imposition of controls by governmental authorities might also limit such forward trading to less than that which the Investment Manager would otherwise recommend, to the possible detriment of the Partnership. Market illiquidity or disruption could result in major losses to the Partnership.

**Over-the-Counter-Trading**.  Financial instruments that may be purchased or sold by the Partnership may include instruments not traded on an exchange.  The risk of nonperformance by the obligor on such an instrument may be greater and the ease with which the Partnership can dispose of or enter into closing transactions with respect to such an instrument may be less than in the case of an exchange-traded instrument.  In addition, significant disparities may exist between "bid" and "asked" prices for financial instruments that are not traded on an exchange.  Financial instruments not traded on exchanges are also not subject to the same type of government regulation as exchange traded instruments, and many of the protections afforded to participants in a regulated environment may not be available in connection with such transactions.

To the extent that the Partnership engages in these transactions, the Partnership must rely on the creditworthiness of its counterparty.  In certain instances, counterparty or credit risk is affected by the lack of a central clearinghouse for foreign exchange trades.  To reduce their credit risk exposure, the Partnership may trade in the forward foreign currency market through money center banks and leading brokerage firms.

**Position Limits**.  Position limits imposed by various regulators or regulations may also limit the Partnership's ability to affect desired trades.  Position limits are the maximum amounts of gross, net long or net short positions that any one person or entity may own or control in a particular financial instrument.  All positions owned or controlled by the same person or entity, even if in different accounts, may be aggregated for purposes of determining whether the applicable position limits have been exceeded.  Thus, even if the Partnership does not intend to exceed applicable position limits, it is possible that different accounts managed by the Investment Manager or its affiliates may be aggregated.  If at any time positions managed by the Investment Manager were to exceed applicable position limits, the Investment Manager would be required to liquidate positions, which might include positions of the Partnership, to the extent necessary to come within those limits.  Further, to avoid exceeding the position limits, the Partnership might have to forego

018786

HCMLPHMIT00003986

or modify certain of its contemplated trades.

**Risk of Default or Bankruptcy of Third Parties**.  The Partnership may engage in transactions in securities and other financial instruments and assets that involve counterparties.  Under certain conditions, the Partnership could suffer losses if a counterparty to a transaction were to default or if the market for certain securities or other financial instruments or assets were to become illiquid.  In addition, the Partnership could suffer losses if there were a default or bankruptcy by certain other third parties, including brokerage firms and banks with which the Partnership does business, or to which securities or other financial instruments or assets have been entrusted for custodial purposes.

**Custody and Brokerage Risk**.  There are risks involved in dealing with the custodians or other brokers who settle Partnership trades. The Partnership maintains custody accounts with the Custodian.  Although the Investment Manager generally monitors both the Introducing Broker and the Custodian and believes they are appropriate service providers, there is no guarantee that such service providers, or any other introducing broker and/or clearing broker and custodian that the Partnership may use from time to time, will not become bankrupt or insolvent.  While both the U.S. Bankruptcy Code, as amended, and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a bankruptcy, insolvency, failure, or liquidation of a broker-dealer, there is no certainty that, in the event of a failure of a broker-dealer that has custody of Partnership assets, the Partnership would not incur losses due to its assets being unavailable for a period of time, the ultimate receipt of less than full recovery of its assets, or both.

The Partnership and/or the Custodian may appoint sub-custodians in certain non-U.S. jurisdictions to hold the assets of the Partnership. The Custodian may not be responsible for cash or assets which are held by sub-custodians in certain non-U.S. jurisdictions, nor for any losses suffered by the Partnership as a result of the bankruptcy or insolvency of any such sub-custodian.  The Partnership may therefore have a potential exposure on the default of any sub-custodian and, as a result, many of the protections that would normally be provided to a fund by a custodian may not be available to the Partnership.  Under certain circumstances, including certain transactions where the Partnership's assets are pledged as collateral for leverage from a non-broker-dealer custodian or a non-broker-dealer affiliate of the Custodian, or where the Partnership's assets are held at a non-U.S. custodian, the securities and other assets deposited with the custodian or broker may not be clearly identified as being assets of the Partnership and hence the Partnership could be exposed to a credit risk with regard to such parties.  Custody services in certain non-U.S. jurisdictions remain undeveloped and, accordingly, there is a transaction and custody risk of dealing in certain non-U.S. jurisdictions.  Given the undeveloped state of regulations on custodial activities and bankruptcy, insolvency, or mismanagement in certain non-U.S. jurisdictions, the ability of the Partnership to recover assets held by a sub-custodian in the event of the sub-custodian's bankruptcy or insolvency could be in doubt, as the Partnership may be subject to significantly less favorable laws than many of the protections that would be available under U.S. laws.  In addition, there may be practical or time problems associated with enforcing the Partnership's rights to its assets in the case of a bankruptcy or insolvency of any such party.

**Temporary Defensive Investments**.  If warranted under certain economic or market conditions or for other reasons, the Investment Manager may temporarily invest up to 100% of the Partnership's assets outside the scope of its principal investment focus in U.S. government securities, such as Treasury bills, notes and bonds, cash, money-market funds, certificates of deposit, time deposits, bankers' acceptances and other short-term debt instruments bearing a reasonable rate of interest.  In such circumstances, the Partnership may not achieve its investment objectives.

**Other Instruments**.  The Partnership may take advantage of opportunities with respect to certain other instruments that are not presently contemplated for use or that are currently not available, but that may be developed, to the extent such opportunities are both consistent with the investment objective of the Partnership and legally permissible.  Special risks may apply to instruments that are invested in by the Partnership in the future that cannot be determined at this time or until such instruments are developed or invested

018787

HCMLPHMIT00003987

in by the Partnership.

**Specific Risks Associated with Investing in Bank Loans**

You should note that certain of the following risk factors specifically applicable with respect to Bank Loans have been discussed under "—Market Risks—General" above and are included in this sub-section for ease of reference.

**Senior Loans Risk**.  Senior loans are usually rated below investment grade or may also be unrated.  As a result, the risks associated with senior loans are similar to the risks of below investment grade fixed income instruments, although senior loans are senior and secured in contrast to other below investment grade fixed income instruments, which are often subordinated or unsecured.  Investment in senior loans rated below investment grade is considered speculative because of the credit risk of their issuers.  Such companies are more likely than investment grade issuers to default on their payments of interest and principal owed to the Partnership, and such defaults could have a materially adverse effect on the Partnership's performance.  An economic downturn would generally lead to a higher non-payment rate, and a senior loan may lose significant market value before a default occurs.  Moreover, any specific collateral used to secure a senior loan may decline in value or become illiquid, which would adversely affect the senior loan's value.  Senior loans are subject to a number of risks described elsewhere in this Memorandum, including liquidity risk and the risk of investing in below investment grade fixed income instruments.

There may be less readily available and reliable information about most senior loans than is the case for many other types of securities, including securities issued in transactions registered under the Securities Act or registered under the Exchange Act.  As a result, the Investment Manager will rely primarily on its own evaluation of a borrower's credit quality rather than on any available independent sources.  Therefore, the Partnership will be particularly dependent on the analytical abilities of the Investment Manager.

In general, the secondary trading market for senior loans is not well developed.  No active trading market may exist for certain senior loans, which may make it difficult to value them.  Illiquidity and adverse market conditions may mean that the Partnership may not be able to sell senior loans quickly or at a fair price.  To the extent that a secondary market does exist for certain senior loans the market for them may be subject to irregular trading activity, wide bid/ask spreads and extended trade settlement periods.

**Variable Interest Rate Risk**.  Because senior loans with floating or variable rates reset their interest rates periodically, changes in prevailing interest rates can be expected to cause some fluctuations in the value of the Partnership's investments.  Similarly, a sudden and significant increase in market interest rates may cause a decline in the value of the Partnership's investments.  In addition, senior loans or similar securities may allow the borrower or issuer to opt between LIBOR-based interest rates and interest rates based on bank prime rates, which may have an impact on value of the Partnership's investments.

**Bank Loans**.  The Partnership's investment program will include investments in significant amounts of Bank Loans and participations.  These obligations are subject to unique risks, including:  (i) the possible invalidation of an investment transaction as a fraudulent conveyance under relevant creditors' rights laws; (ii) so-called lender-liability claims by the issuer of the obligations; (iii) environmental liabilities that may arise with respect to collateral securing the obligations; and (iv) limitations on the ability of the Partnership to directly enforce its rights with respect to participations.  In analyzing each Bank Loan or participation, the Investment Manager compares the relative significance of the risks against the expected benefits of the investment.  Successful claims by third parties arising from these and other risks will be borne by the Partnership.

**DIP Loans**.  From time to time, the Partnership may invest in loans to companies that have filed for protection under Chapter 11 of the U.S. Bankruptcy Code, as amended.  DIP loans are typically asset-based, revolving working-capital facilities put into place at the outset of a Chapter 11 bankruptcy to provide both immediate cash as well as ongoing

018788

HCMLPHMIT00003988

working capital during the reorganization process.  Such loans are risky and present significant exposure for default risk to the Partnership.

**Adjustments to Terms of Investments**.  The terms and conditions of loan agreements and related assignments may be amended, modified or waived only by the agreement of the lenders.  Generally, any such agreement must include a majority or a super majority (measured by outstanding loans or commitments) or, in certain circumstances, a unanimous vote of the lenders.  Consequently, the terms and conditions of the payment obligation arising from loan agreements could be modified, amended or waived in a manner contrary to the preferences of the Partnership if a sufficient number of the other lenders concurred with such modification, amendment or waiver.  There can be no assurance that any obligations arising from a loan agreement will maintain the terms and conditions to which the Partnership originally agreed.

The exercise of remedies may also be subject to the vote of a specified percentage of the lenders thereunder.  The Investment Manager will have the authority to cause the Partnership to consent to certain amendments, waivers or modifications to the Partnership's investments requested by obligors or the lead agents for loan syndication agreements.  The Investment Manager may, in accordance with its investment management standards, cause the Partnership to extend or defer the maturity, adjust the outstanding balance of any investment, reduce or forgive interest or fees, release material collateral or guarantees, or otherwise amend, modify or waive the terms of any related loan agreement, including the payment terms thereunder.  The Investment Manager will make such determinations in accordance with its investment management standards.  Any amendment, waiver or modification of the terms of an investment could adversely impact the Partnership's investment returns.

**Prepayments**.  Certain of the Partnership's investments may be prepaid more quickly than expected.  Prepayment rates are influenced by changes in interest rates and a variety of economic, geographic and other factors beyond the Partnership's control and consequently cannot be predicted with certainty.  Early prepayments give rise to increased re-investment risk, as the Partnership might realize excess cash earlier than it expected.  If the Partnership is unable to reinvest the principle portion of a prepayment in a new investment with an expected rate of return at least equal to that of the investment repaid, this may reduce the Partnership's net investment income and, consequently, could have an adverse impact on the Partnership's ability to make distributions.

**Investments in Loans Secured by Real Estate**.  While direct real estate investment is not intended to be the focus of the Partnership, it is possible that, from time to time, the Partnership may, as a result of default, foreclosure or otherwise, hold real estate assets.  Special risks associated with such investments include changes in the general economic climate or local conditions (such as an oversupply of space or a reduction in demand for space), competition based on rental rates, attractiveness and location of the properties, changes in the financial condition of tenants, and changes in operating costs.  Real estate values are also affected by such factors as government regulations (including those governing usage, improvements, zoning and taxes), interest rate levels, the availability of financing, and potential liability under changing environmental and other laws.  Of particular concern may be those mortgaged properties which are, or have been, the site of manufacturing, industrial or disposal activity.  Such environmental risks may give rise to a diminution in the value of property (including real property securing any portfolio investment) or liability for cleanup costs or other remedial actions, which liability could exceed the value of such property or the principal balance of the related portfolio investment.  In certain circumstances, a lender may choose not to foreclose on contaminated property rather than risk incurring liability for remedial actions.

**Environmental Hazards**.  Under environmental laws enacted by the United States and the various states, owners of property may be liable for the cleanup and removal of hazardous substances even where the owner was not responsible for placing the hazardous substances on the property or where the property was contaminated prior to the time the owner took title.  The kinds of hazardous substances for which liability may be incurred include, among other things, chemicals and other materials commonly used by

018789

HCMLPHMIT00003989

small businesses and manufacturing operations. The costs of removal and clean-up of hazardous substances and wastes can be extremely expensive and, in some cases, can exceed the value of a property. If any property acquired by the Partnership through foreclosure or otherwise subsequently were found to have an environmental problem, such acquiring entity could incur substantial costs and suffer a complete loss of its investment in such property as well as of other assets. Similarly, real estate is subject to loss due to so-called "special hazards" (e.g., floods, earthquakes and hurricanes). It may be impractical or impossible to fully insure against such events and, should such an event occur, the Partnership could incur substantial costs and suffer a loss of its investment in such property.

**Fraud**. Of paramount concern in lending is the possibility of material misrepresentation or omission on the part of the borrower. Such inaccuracy or incompleteness may adversely affect the valuation of the collateral underlying the loans or may adversely affect the ability of the Partnership to perfect or effectuate a lien on the collateral securing the loan. The Partnership will rely upon the accuracy and completeness of representations made by borrowers to the extent reasonable, but cannot guarantee such accuracy or completeness. Under certain circumstances, payments to the Partnership may be reclaimed if any such payment or distribution is later determined to have been a fraudulent conveyance or a preferential payment.

**Debt Securities**. The Partnership intends to invest in bonds or other fixed income securities, including, without limitation, commercial paper and "higher yielding" (and, therefore, higher risk) debt securities. It is likely that a major economic recession could disrupt severely the market for such securities and may have an adverse impact on the value of such securities. In addition, it is likely that any such economic downturn could adversely affect the ability of the issuers of such securities to repay principal and pay interest thereon and increase the incidence of default for such securities.

**Investing in High Yield Securities**. The Partnership intends to invest in high-yield securities. Such securities are generally not exchange traded and, as a result, these instruments trade in the over-the-counter marketplace, which is less transparent than the exchange-traded marketplace. In addition, the Partnership will invest in bonds of issuers that do not have publicly traded equity securities, making it more difficult to hedge the risks associated with such investments. High-yield securities face ongoing uncertainties and exposure to adverse business, financial or economic conditions which could lead to the issuer's inability to meet timely interest and principal payments. The market values of certain of these lower- rated and unrated debt securities tend to reflect individual corporate developments to a greater extent than do higher-rated securities which react primarily to fluctuations in the general level of interest rates, and tend to be more sensitive to economic conditions than are higher-rated securities. Companies that issue such securities are often highly leveraged and may not have available to them more traditional methods of financing. It is possible that a major economic recession could disrupt severely the market for such securities and may have an adverse impact on the value of such securities. In addition, it is possible that any such economic downturn could adversely affect the ability of the issuers of such securities to repay principal and pay interest thereon and increase the incidence of default of such securities.

**Timing Risk**. Many agency, corporate and municipal bonds, and all mortgage-backed securities, contain a provision that allows the issuer to "call" all or part of the issue before the bond's maturity date. The issuer usually retains the right to refinance the bond in the future if market interest rates decline below the coupon rate. There are three disadvantages to the call provision. First, the cash flow pattern of a callable bond is not known with certainty. Second, because the issuer will call the bonds when interest rates have dropped, the Partnership is exposed to reinvestment rate risk, i.e., the Partnership will have to reinvest the proceeds received when the bond is called at lower interest rates. Finally, the capital appreciation potential of a bond will be reduced because the price of a callable bond may not rise much above the price at which the issuer may call the bond.

**Maturity Risk**. In certain situations, the Partnership may purchase a bond of a given maturity as an alternative to another bond of a different maturity. Ordinarily, under these

018790

HCMLPHMIT00003990

circumstances, the Partnership will make an adjustment to account for the differential interest rate risks in the two bonds. This adjustment, however, makes an assumption about how the interest rates at different maturities will move. To the extent that the yield movements deviate from this assumption, there is a yield-curve or maturity risk. Another situation where yield-curve risk should be considered is in the analysis of bond swap transactions where the potential incremental returns are dependent entirely on the parallel shift assumption for the yield curve.

**Revolving Credit Facilities**. From time to time the Partnership may incur contingent liabilities in connection with an investment. For example, the Partnership may purchase from a lender a revolving credit facility that has not yet been fully drawn. If the borrower subsequently draws down on the facility, the Partnership would be obligated to fund the amounts due.

**Investments in Stressed Debt**. The Partnership is authorized to invest in securities and other obligations of stressed issuers. Stressed issuers are issuers that are not yet deemed distressed or bankrupt and whose debt securities are trading at a discount to par, but not yet at distressed levels. An example would be an issuer that is in technical default of its credit agreement, or undergoing strategic or operational changes, which results in market pricing uncertainty.

**Investments in Distressed Securities**. The Partnership may invest in securities and obligations of issuers in weak financial condition, experiencing poor operating results, having substantial capital needs or negative net worth, facing special competitive or product obsolescence problems, including companies involved in bankruptcy or other reorganization and liquidation proceedings. These securities are likely to be particularly risky investments although they also may offer the potential for correspondingly high returns. Among the risks inherent in investments in troubled entities is the fact that it frequently may be difficult to obtain information as to the true condition of such issuers. Such investments may also be adversely affected by laws relating to, among other things, fraudulent transfers and other voidable transfers or payments, lender liability and the bankruptcy court's power to disallow, reduce, subordinate or disenfranchise particular claims. Such companies' securities may be considered speculative, and the ability of such companies to pay their debts on schedule could be affected by adverse interest rate movements, changes in the general economic climate, economic factors affecting a particular industry or specific developments within such companies. In addition, there is no minimum credit standard that is a prerequisite to the Partnership's investment in any instrument, and a significant portion of the obligations and securities in which the Partnership invests may be less than investment grade. The level of analytical sophistication, both financial and legal, necessary for successful investment in companies experiencing significant business and financial difficulties is unusually high. There is no assurance that the Investment Manager will correctly evaluate the value of the assets collateralizing the Partnership's loans or the prospects for a successful reorganization or similar action. In any reorganization or liquidation proceeding relating to a company in which the Partnership invests, the Partnership may lose its entire investment, may be required to accept cash or securities with a value less than the Partnership's original investment and/or may be required to accept payment over an extended period of time. Under such circumstances, the returns generated from the Partnership's investments may not compensate the Limited Partners adequately for the risks assumed. In liquidation (both in and out of bankruptcy) and other forms of corporate reorganization, there exists the risk that the reorganization either will be unsuccessful (due to, for example, failure to obtain requisite approvals), will be delayed (for example, until various liabilities, actual or contingent, have been satisfied) or will result in a distribution of cash or a new security the value of which will be less than the purchase price to the Partnership of the security in respect to which such distribution was made.

**Troubled Origination**. The investments chosen by the Investment Manager may have been originated by financial institutions or other entities that are, or may in the future be, insolvent, in serious financial difficulty, or no longer in existence. As a result, the standards by which such investments were originated, the recourse to the selling institution, or the standards by which such investments are being serviced or operated

018791

HCMLPHMIT00003991

may be adversely affected.

**Issuer Default Risk; Negative Loan Performance**.  There are varying sources of statistical default and recovery rate data for commercial loans and numerous methods for measuring default and recovery rates.  The levels of defaults and delinquencies with respect to loans have been increasing, and slowing economic activity continues to contribute to a decline in overall credit quality.  The historical performance of the loan market is not necessarily indicative of its future performance, and there is no way to determine whether such trends in the credit markets will improve or worsen in the future.

A substantial portion of the Partnership's income is expected to be derived, directly or indirectly, from repayments of principal and interest received in respect of debt securities. A wide range of factors may adversely affect an obligor's ability to make repayments, including: adverse changes in the financial condition of such obligor or the industries or regions in which it operates; the obligor's exposure to counterparty risk; systemic risk in the financial system and settlement; changes in law or taxation; changes in governmental regulations or other policies; natural disasters; terrorism; social unrest, civil disturbances; or general economic conditions.  Default rates tend to accelerate during economic downturns. A continuing decreased ability of borrowers to obtain refinancing may result in a further economic decline that could delay an economic recovery and cause a further deterioration in loan performance generally.

To the extent that the Partnership invests in debt securities secured by collateral, there can be no assurance that the liquidation of any collateral securing any of the Partnership's investments would satisfy the borrower's obligation in the event of non-payment of scheduled interest or principal payments, or that the collateral could be readily liquidated. In the event of bankruptcy or insolvency of a borrower, the Partnership could experience delays or limitations with respect to its ability to realize the benefits of the collateral securing such investment.  The collateral securing an investment may lose all or substantially all of its value in the event of the bankruptcy or insolvency of a borrower.

Any defaults will have a negative impact on the value of the Partnership's investments and may reduce the return that such Partnership receives from its investments in certain circumstances.  While some amount of defaults is expected to occur in the Partnership's portfolio, in the event that the Partnership elects to apply leverage to an investment, defaults in or declines in the value of  the portfolio investments in excess of these expected amounts may result in breaches of covenants under applicable financing arrangements, triggering credit enhancement requirements or accelerated repayment provisions and, if not cured within the relevant grace periods, permitting the finance provider to enforce its security over all the assets of the Partnership.

In the case of debt ranking equally with the loans or debt securities in which the Partnership invests, the Partnership would have to share on an equal basis any distributions with other creditors holding such debt in the event of an insolvency, liquidation, dissolution, reorganization or bankruptcy of the relevant company's debt securities. Each jurisdiction in which the Partnership invests has its own insolvency laws. As a result, investments in similarly situated companies in different jurisdictions may confer different rights in the event of insolvency.

**Nature of Reorganization Proceedings**.  The Partnership will hold debt of companies and may, under certain circumstances, hold equity of companies as a result of the recapitalization or restructuring of debt obligations.  Investments in the debt or equity of companies involved in reorganization proceedings typically entail a number of risks that do not normally apply to investments in financially sound companies.  For example, if the Investment Manager's evaluation of the anticipated outcome of a reorganization or the timing of such outcome should prove incorrect, the Partnership could experience losses. A wide variety of considerations make any evaluation of the outcome of an investment in such a company uncertain.  Such considerations include, for example, the possibility of litigation between the participants in a reorganization or liquidation proceeding or a requirement to obtain mandatory or discretionary consents from various governmental authorities or others.  The uncertainties inherent in evaluating such investments may be

018792

HCMLPHMIT00003992

increased by legal and practical considerations which limit the access of the Investment Manager to reliable and timely information concerning material developments affecting a company, or which cause lengthy delays in the completion of a reorganization or liquidation proceeding. Competition from other investors may also render it difficult or impossible for the Partnership to achieve intended results or promptly effect transactions.

**Insolvency and Enforceability of Security**. The Partnership's investments may be secured by mortgages, charges, pledges, liens or other security interests. Depending on the jurisdiction in which such security interests are created, enforcement of such security interests may be a complicated and difficult process. For example, enforcement of security interests in certain jurisdictions may require a court order and a sale of the secured property through public bidding or auction. In addition, some jurisdictions grant courts the power to declare security interest arrangements to be void if they deem the security interest to be excessive.

**Risks Associated with Bankruptcy Cases**. Many of the events within a bankruptcy case are adversarial and often beyond the control of the creditors. While creditors generally are afforded an opportunity to object to significant actions, there can be no assurance that a bankruptcy court would not approve actions which may be contrary to the interests of the Partnership. Furthermore, there are instances where creditors and equity holders lose their ranking and priority as such if they are considered to have taken over management and functional operating control of a debtor.

Generally, the duration of a bankruptcy case can only be roughly estimated. The reorganization of a company usually involves the development and negotiation of a plan of reorganization, plan approval by creditors and confirmation by the bankruptcy court. This process can involve substantial legal, professional and administrative costs to the company and the Partnership; it is subject to unpredictable and lengthy delays; and during the process the company's competitive position may erode, key management may depart and the company may not be able to invest adequately. In some cases, the company may not be able to reorganize and may be required to liquidate assets. Although the Partnership intends to invest primarily in debt, the debt of companies in financial reorganization will, in most cases, not pay current interest, may not accrue interest during reorganization and may be adversely affected by an erosion of the issuer's fundamental value. Such investments can result in a total loss of principal.

U.S. bankruptcy law permits the classification of "substantially similar" claims in determining the classification of claims in a reorganization for purpose of voting on a plan of reorganization. Because the standard for classification is vague, there exists a significant risk that the Partnership's influence with respect to a class of securities can be lost by the inflation of the number and the amount of claims in, or other gerrymandering of, the class. In addition, certain administrative costs and claims that have priority by law over the claims of certain creditors (for example, claims for taxes) may be quite high.

Furthermore, there are instances where creditors and equity holders lose their ranking and priority as such when they take over management and functional operating control of a debtor. In those cases where the Partnership, by virtue of such action, is found to exercise "domination and control" of a debtor, the Partnership may lose its priority if the debtor can demonstrate that its business was adversely impacted or other creditors and equity holders were harmed by the Partnership.

The Partnership may invest in companies based outside the United States. Investment in the debt of financially distressed companies domiciled outside the United States involves additional risks. Bankruptcy law and process may differ substantially from that in the United States, resulting in greater uncertainty as to the rights of creditors, the enforceability of such rights, reorganization timing and the classification, seniority and treatment of claims. In certain developing countries, although bankruptcy laws have been enacted, the process for reorganization remains highly uncertain.

The Investment Manager, on behalf of the Partnership, may elect to serve on creditors' committees, equity holders' committees or other groups to ensure preservation or

018793

HCMLPHMIT00003993

enhancement of the Partnership position as a creditor or equity holder. A member of any such committee or group may owe certain obligations generally to all parties similarly situated that the committee represents. If the Investment Manager concludes that its obligations owed to the other parties as a committee or group member conflict with its duties owed to the Partnership, it will resign from that committee or group, and the Partnership may not realize the benefits, if any, of participation on the committee or group. In addition, and also as discussed above, if the Partnership is represented on a committee or group, it may be restricted or prohibited under applicable law from disposing of or increasing its investments in such company while it continues to be represented on such committee or group.

The Partnership may purchase creditor claims subsequent to the commencement of a bankruptcy case. Under judicial decisions, it is possible that such purchase may be disallowed by the bankruptcy court if the court determines that the purchaser has taken unfair advantage of an unsophisticated seller, which may result in the rescission of the transaction (presumably at the original purchase price) or forfeiture by the purchaser.

**Equitable Subordination**. Under common law principles that in some cases form the basis for lender liability claims, if a lender (a) intentionally takes an action that results in the undercapitalization of a borrower or issuer to the detriment of other creditors of such borrower or issuer, (b) engages in other inequitable conduct to the detriment of such other creditors, (c) engages in fraud with respect to, or makes misrepresentations to, such other creditors or (d) uses its influence as a stockholder to dominate or control a borrower or issuer to the detriment of other creditors of such borrower or issuer, a court may elect to subordinate the claim of the offending lender or bondholder to the claims of the disadvantaged creditor or creditors (a remedy called "equitable subordination"). The Partnership does not intend to engage in conduct that would form the basis for a successful cause of action based upon the equitable subordination doctrine; however, because of the nature of the debt obligations, the Partnership may be subject to claims from creditors of an obligor that debt obligations of such obligor which are held by the issuer should be equitably subordinated.

**Liability Following the Disposal of Investments**. While the Partnership may hold certain of its investments to maturity, the Partnership may dispose of investments in some circumstances prior to termination and, in connection therewith, may be required to pay damages to the extent that any representations or warranties given in connection with such investments turn out to be inaccurate. The Partnership may become involved in disputes or litigation concerning such representations and warranties and may be required to make payments to third parties as a result of such disputes or litigation. In the event that the Partnership does not have cash available to conduct such litigation or make such payments, it may be forced to sell investments to obtain funds. Such sales may be effected on unsatisfactory terms.

**Potential Involvement in Litigation**. In the event that the Partnership holds investments in distressed investments, there is a possibility that the Investment Manager may participate in restructuring activities, it is possible that the Partnership may become involved in litigation respecting creditor disputes and similar issues among classes of claimants. Litigation entails expense and the possibility of counterclaims against the Partnership and the Investment Manager and ultimately judgments may be rendered against the Partnership for which the Partnership does not carry insurance.

**Specific Risks Associated with Investing in CLOs**

You should note that certain of the following risk factors specifically applicable with respect to CLOs have been discussed under "—Market Risks—General" above and are included in this sub-section for ease of reference.

**Dependence Upon Other Unrelated Managers**. The success of a CLO may depend on the management talents and efforts of one person or a small group of persons whose management could adversely affect the CLO and, accordingly, the Partnership as an

018794

HCMLPHMIT00003994

investor in such CLO. Given that the Investment Manager will not have an active role in the management of these CLOs, the return on the Partnership's investments in such CLOs will depend on the performance of unrelated managers.

**Multiple Levels of Fees**. The Partnership and the CLOs are expected to impose management fees, administrative fees, and/or transaction-based fees. This may result in greater expense than if Limited Partners were able to invest directly in the CLOs or underlying investments. Limited Partners should take into account that the return on their investment will be reduced to the extent of both levels of fees. The general partner or manager of a CLO may receive the economic benefit of certain fees from its portfolio companies for services and in connection with unconsummated transactions (*e.g.*, break-up, placement, monitoring, directors', organizational and set-up fees and financial advisory fees). Additionally, some of the CLOs may invest themselves in underlying hedge funds or CLOs. In such case, additional management costs and other administrative expenses may be incurred.

**Limited Diversification**. CLOs may invest in concentrated portfolios of assets. The concentration of an underlying portfolio in any one obligor would subject the related CLO Securities to a greater degree of risk with respect to defaults by such obligor and the concentration of a portfolio in any one industry would subject the related CLOs to a greater degree of risk with respect to economic downturns relating to such industry. The Partnership may have a concentrated exposure to CLOs of a particular type of CLO.

**CLO Embedded Leverage Risk**. The Partnership's participation in CLOs involves varying amounts of leverage. Leverage is embedded in all classes of a CLO other than the most senior tranche. If the Partnership retains either the most or one of the most subordinate tranches of the CLO's securities, it will hold the most leveraged investment in the CLO. While leverage presents opportunities for increasing the Partnership's total return, it has the effect of potentially increasing losses as well. Accordingly, any event which adversely affects the value of an investment in a CLO would be magnified to the extent such CLO is leveraged. The cumulative effect of the use of leverage by a CLO in a market that moves adversely to the CLO's investments could result in a substantial loss to the CLO which would be greater than if the CLO were not leveraged. The borrowing arrangements of CLOs will contain events of default that, under certain circumstances, could result in early amortization or in the acceleration of the maturities of these obligations. In the event of acceleration of the borrowing arrangements of a CLO, in whole or in part, it may be required to dispose of all or a significant portion of its investments. Such a forced disposal of securities could result in realization of value of such investments significantly below the anticipated market values for such securities. When the Partnership invests in derivative transactions, it may also gain leverage through such derivative transactions, which will expose the Partnership to a greater risk of loss.

**Risks of Investment Focus**. The Partnership's portfolio may consist of CLO Securities. CLO Securities are subject to, among other risks, credit, liquidity and interest rate risks.

The value of the CLO Securities that the Partnership may own generally will fluctuate with, among other things, the financial condition of the obligors or issuers of the CLO Securities' underlying portfolio of assets ("**CLO Collateral**"), general economic conditions, the condition of certain financial markets, political events, developments or trends in any particular industry and changes in prevailing interest rates. CLO Securities are issued on a non-recourse basis and holders of CLO Securities must rely solely on distributions on the CLO Collateral or proceeds thereof for payment in respect thereof. If distributions on the CLO Collateral are insufficient to make payments on the CLO Securities, no other assets will be available for payment of the deficiency and following realization of the CLO Securities, the obligations of such issuer to pay such deficiency generally will be extinguished.

Issuers of CLO Securities may acquire interests in loans and other debt obligations by way of sale, assignment or participation. The purchaser of an assignment typically succeeds to all the rights and obligations of the assigning institution and becomes a lender under the credit agreement with respect to the loan or debt obligation; however, its rights can be more restricted than those of the assigning institution. CLO Collateral may consist

018795

HCMLPHMIT00003995

of corporate loans, leveraged loans and other instruments, which often are rated below investment grade (or of equivalent credit quality). Loans may be unsecured and may be subordinated to certain other obligations of the issuer thereof. The lower ratings of below investment grade loans reflect a greater possibility that adverse changes in the financial condition of an issuer or in general economic conditions or both may impair the ability of the related issuer or obligor to make payments of principal or interest. Such investments may be speculative.

**Interest Rate Mismatch**. CLOs may be subject to interest rate risk. The CLO Collateral of an issuer of a CLO may bear interest at a fixed or floating rate, while the CLO Debt may bear interest at a floating or fixed rate. As a result, there could be a floating/fixed rate or basis mismatch between such CLO Debt and the CLO Collateral which bears interest at a fixed rate ("**Fixed Rate Assets**"), and there may be a timing mismatch between such CLO Debt and the assets that are not Fixed Rate Assets ("**Floating Rate Assets**"). In addition, the interest rate on Floating Rate Assets may adjust more frequently or less frequently, on different dates and based on different indices than the interest rates on the CLO Debt. As a result of such mismatches, an increase or decrease in the level of the floating rate indices could adversely impact the ability to make payments on such CLO Debt or Equity. Although many CLOs attempt to hedge this interest rate risk, the hedges may not eliminate this risk and payments by the CLO under the hedges may significantly reduce the distributions on the CLO securities. In addition, these hedges may have additional risks, such as counterparty risk, that are not present without these hedges.

**Lower Credit Quality Securities**. There are no restrictions on the credit quality of the investments of the Partnership. CLO Securities in which the Partnership will invest may have no ratings or may be deemed by rating agencies to have substantial vulnerability to default in payment of interest and/or principal and have the lowest quality ratings. The Partnership may purchase CLO Securities which have ratings that have been downgraded or placed on "credit watch" for future downgrading. Lower rated and unrated securities in which the Partnership may invest have large uncertainties or major risk exposures to adverse conditions and are considered to be predominantly speculative and may become a defaulted asset for a variety of reasons. Generally, such securities offer a higher return potential than higher rated securities, but involve greater volatility of price and greater risk of loss of income and principal.

The market values of certain of these securities (such as subordinated securities) also tend to be more sensitive to changes in economic conditions than higher rated securities. The value of leveraged loans and other assets underlying a CLO may also be affected by changes in the market's perception of the entity issuing or guaranteeing them, or by changes in government regulations and tax policies. Additionally, loans and interests in loans have significant liquidity and market value risks since they are not generally traded in organized exchange markets but are traded by banks and other institutional investors engaged in loan syndications. Because loans are privately syndicated and loan agreements are privately negotiated and customized, loans are not purchased or sold as easily as publicly traded securities. In addition, historically the trading volume in the loan market has been small relative to the high-yield debt securities market, and such illiquidity has been exacerbated during the current liquidity crisis.

Leveraged loans have historically experienced greater default rates than has been the case for investment grade securities. There can be no assurance as to the levels of defaults and/or recoveries that may be experienced on the assets underlying CLO Securities.

In general, the ratings of nationally recognized rating organizations represent the opinions of such agencies as to the quality of securities that they rate. Such ratings may be used by the Investment Manager as an initial basis for the selection of portfolio securities. Such ratings, however, are relative and subjective; they are not absolute standards of quality and do not evaluate the market value risk of the securities. Such ratings also do not reflect macroeconomic or systematic risk, including the risk of increased illiquidity in the credit markets. It is also possible that a rating agency might not change its rating of a particular issue on a timely basis to reflect subsequent events.

018796

HCMLPHMIT00003996

**Defaulted Assets Underlying CLO Securities**.  If the assets underlying a CLO Security become defaulted assets, such defaulted assets may become subject to either substantial workout negotiations or restructuring, which may entail, among other things, a substantial reduction in the interest rate, a substantial write-down of principal, and a substantial change in the terms, conditions and covenants with respect to such defaulted asset.  In addition, such negotiations or restructuring may be quite extensive and protracted over time, and therefore may result in substantial uncertainty with respect to the ultimate recovery on such defaulted asset.  The liquidity for defaulted assets may be limited, and to the extent that defaulted assets are sold, it is highly unlikely that the proceeds from such sale will be equal to the amount of unpaid principal and interest thereon.  Furthermore, there can be no assurance that the ultimate recovery on any defaulted assets will be at least equal to either the minimum recovery rate assumed by any rating agency that rates the notes of the CLO security.  Therefore, if any CLO security has defaulted assets which correspond to the exposure of the Partnership's interest in the CLO security, the Partnership may be adversely affected.

There exist significant additional risks for CLO Securities and investors in such securities in the event of a liquidity crisis.  Those risks include, among others, (i) the likelihood that the issuer of the CLO Security will find it harder to sell any of its assets in the secondary market, thus rendering it more difficult to dispose of assets which it has the discretion to manage, including credit risk obligations, credit improved obligations or defaulted obligations, (ii) the possibility that the price at which assets can be sold by the issuer of the CLO Security will have deteriorated from their effective purchase price and (iii) the increased illiquidity of the notes issued by the CLO Security.  These additional risks may affect the returns on the investments in the Partnership's portfolio.

**Subordination of CLO Debt**.  The Partnership's portfolio may subordinate CLO Debt. Subordinate CLO Debt generally is fully subordinated to the related CLO senior tranches. Thus, some of the investments of the Partnership in a CLO may rank behind other creditors of the CLO.  To the extent that any losses are incurred by a CLO in respect of its related CLO Collateral, such losses are likely to be borne first by the holders of the related CLO Equity, next by the holders of any related subordinated CLO debt and finally by the holders of the related CLO senior tranches.  In addition, if an event of default occurs under the governing instrument or underlying investment, as long as any CLO senior tranches are outstanding, the holders thereof generally are likely to be entitled to determine the remedies to be exercised under the instrument governing the CLO.  Remedies pursued by such holders could be adverse to the interests of the holders of any related subordinated CLO Debt.  Investments of the Partnership may be the first to absorb any losses by the CLO on its underlying portfolio.  This may result in losses on the invested proceeds of the Partnership and could result in the complete loss of invested proceeds.

**Mandatory Redemption of CLO Senior Tranches and CLO Debt**.  Under certain circumstances, cash flows from CLO Collateral that otherwise would have been paid to the holders of any related CLO Debt will be used to redeem the related CLO senior tranches.  This could result in an elimination, deferral or reduction in the interest payments, principal repayments or other payments made to the holders of such CLO Debt, which could adversely impact the returns to the holders of such CLO Debt.

**Optional Redemption of CLO Senior Tranches and CLO Debt**.  An optional redemption by a CLO of its securities and, in particular, the exercise of rights by the holders of one or more classes of its securities (or the requisite percentages thereof) so as to effect any such optional redemption, could require the collateral or portfolio manager of the related CLO to liquidate positions more rapidly than would otherwise be desirable, which is likely to materially and adversely affect the realized value of the items of CLO Collateral sold (and which in turn is likely to materially and adversely impact the holders of any related CLO securities, including the Partnership).  As a result of any such rapid liquidation of a CLO, a holder of the related CLO securities (including the Partnership) could lose all or a substantial portion of its investment in such CLO securities.

**Insolvency Risks**.  Various laws enacted for the protection of creditors may apply to the issuers of the CLO Collateral (solely for purposes of this risk factor, an "**Insolvent Company**").  The information in this paragraph and the following paragraph is applicable

018797

HCMLPHMIT00003997

with respect to U.S. issuers of CLO Collateral. Insolvency considerations may differ with respect to non-U.S. issuers of CLO Collateral. If a court in a lawsuit brought by an unpaid creditor or representative of creditors of an Insolvent Company, such as a trustee in bankruptcy, were to find that the issuer did not receive fair consideration or reasonably equivalent value for incurring the indebtedness constituting the CLO or CLO Collateral (as applicable) and, after giving effect to such indebtedness, the Insolvent Company (i) was insolvent, (ii) was engaged in a business for which the remaining assets of the Insolvent Company constituted unreasonably small capital or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature, such court could determine to invalidate, in whole or in part, such indebtedness as a fraudulent conveyance, to subordinate such indebtedness to existing or future creditors of the Insolvent Company or to recover amounts previously paid by such issuer in satisfaction of such indebtedness. The measure of insolvency for purposes of the foregoing will vary. Generally, an Insolvent Company would be considered insolvent at a particular time if the sum of its debts were then greater than all of its property at a fair valuation or if the present fair saleable value of its assets were then less than the amount that would be required to pay its probable liabilities on its existing debts as they became absolute and matured. There can be no assurance as to what standard a court would apply in order to determine whether the Insolvent Company was "insolvent" after giving effect to the incurrence of the indebtedness constituting the CLO or CLO Collateral (as applicable) or that, regardless of the method of valuation, a court would not determine that the Insolvent Company was "insolvent" upon giving effect to such incurrence. In addition, in the event of the insolvency of an Insolvent Company, payments made on such CLO or CLO Collateral (as applicable) could be subject to avoidance as a "preference" if made within a certain period of time (which may be as long as one year) before insolvency.

In general, if payments on a CLO or CLO Collateral (as applicable) are avoidable, whether as fraudulent conveyances or preferences, such payments can be recaptured either from the initial recipient (such as the Partnership) or from subsequent transferees of such payments (such as the Limited Partners). However, a court in a bankruptcy or insolvency proceeding would be able to direct the recapture of any such payment from a Limited Partner only to the extent that such court has jurisdiction over such holder or its assets. Moreover, it is likely that avoidable payments could not be recaptured directly from a holder that has given value in exchange for its interest, in good faith and without knowledge that the payments were avoidable. Nevertheless, there can be no assurance that a Limited Partner will be able to avoid recapture on this or any other basis.

The preceding discussion is based upon principles of United States federal and state laws. Insofar as the Partnership's portfolio consists of the obligations of non-United States obligors, the laws of certain foreign jurisdictions may provide for avoidance remedies under factual circumstances similar to those described above or under different circumstances, with consequences that may or may not be analogous to those described above under United States Federal and state laws.

**"Widening" Risk**.  For reasons not necessarily attributable to any of the risks set forth herein (for example, supply/demand imbalances or other market forces), the prices of the CLO Securities in which the Partnership invests may decline substantially. In particular, purchasing assets at what may appear to be "undervalued" levels is no guarantee that these assets will not be trading at even lower levels at a time of valuation or at the time of sale. It may not be possible to predict, or to hedge against, such "spread widening" risk.

**There Is Limited Disclosure about the CLO Securities and the Underlying CLO Collateral in this Memorandum**.  The Investment Manager will not be required to provide the investors in the Partnership with financial or other information (which may include material non-public information) it receives related to the CLO Securities. The Investment Manager also may not disclose to investors notices the Investment Manager receives and it will not have any obligation to keep investors informed as to defaults in the CLO Securities, failure by the Partnership to receive any payment of principal, interest, or other amounts or to disclose the portfolio or the decisions of which CLO Securities were not purchased in general to any investor. In addition, the investors will not have any right to inspect any records relating to the CLO Securities, and the Investment Manager will not be obligated to disclose any further information or evidence regarding the existence or

018798

HCMLPHMIT00003998

terms of, or the identity of any obligor on, any CLO Securities.

**Impact of the Volcker Rule on the Liquidity of the Notes.** Section 619 of the Dodd-Frank Act added a provision, commonly referred to (together with the final regulations with respect thereto adopted on December 10, 2013) as the Volcker Rule, to federal banking laws to generally prohibit various covered banking entities from engaging in proprietary trading or acquiring or retaining an ownership interest in "covered funds" which generally include, sponsoring or having certain relationships with a hedge fund or private equity fund (defined in final regulations adopted on December 10, 2013 as any entity relying on Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act to be exempt from registration under the Investment Company Act), subject to certain exemptions. The Volcker Rule also provides for certain supervised nonbank financial companies that engage in such activities or have such interests or relationships to be subject to additional capital requirements, quantitative limits or other restrictions. The conformance period for the Volcker Rule has been extended to July 21, 2015, and to July 21, 2017 for CLOs. Certain CLOs may be considered "covered funds" under the Volcker rule and therefore the most senior tranche of the CLO may be a restricted security for various banking and nonbanking entities. This may restrict the liquidity of certain non-Volcker compliant CLOs in the future and may affect the Partnership's ability to liquidate these positions on a timely basis.

**Specific Risks Associated with Investing in Portfolio Funds and Illiquid Investments**

You should note that certain of the following risk factors specifically applicable with respect to Portfolio Funds and Illiquid Investments have been discussed under "—Market Risks—General" above and are included in this sub-section for ease of reference.

**Special Situations.** The Portfolio Funds may invest in companies involved in (or the target of) acquisition attempts or tender offers or in companies involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies and similar transactions. In any investment opportunity involving any such type of special situation, there exists the risk that the contemplated transaction either will be unsuccessful, take considerable time or result in a distribution of cash or a new security the value of which will be less than the purchase price to the Portfolio Funds of the security or other financial instrument in respect of which such distribution is received. Similarly, if an anticipated transaction does not in fact occur, the Partnership may be required to sell its investment at a loss. In connection with such transaction (or otherwise), the Portfolio Funds may purchase securities on a when-issued basis, which means that delivery and payment take place sometime after the date of the commitment to purchase and are often conditioned upon the occurrence of a subsequent event, such as approval and consummation of a merger, reorganization or debt restructuring. The purchase price and/or interest create receivable with respect to a when-issue security are fixed when the Partnership enters into the commitment. Such securities are subject to changes in market value prior to their delivery. Because there is substantial uncertainty concerning the outcome of transactions involving companies in which the Portfolio Funds may invest, there is a potential risk of loss by a Portfolio Fund of its entire investment in such companies.

**Alternative Investments.** In the alternative asset class, the Investment Manager may invest assets of the Partnership in other pooled investment vehicles managed by the Investment Manager. The pooled investment vehicles managed by the Investment Manager may follow a variety of investment strategies including investments in commodities, managed futures, inflation-adjusted bonds, global real estate, "hedge fund strategies", which may be broadly characterized as "hedge funds", and mezzanine debt or Illiquid Investments.

**Withdrawal Considerations.** The Partnership may be subject to withdrawal restrictions of the individual Portfolio Fund(s) in which it will invest. In addition, the Partnership is permitted to invest in Illiquid Investments. There is no market for the Interests, and no market is expected to develop. Therefore, in certain circumstances, the Partnership may not be able to withdraw invested assets from a particular Portfolio Fund or with respect to Illiquid Investments at a time that would be most advantageous to the Partnership or at a time that would allow the Partnership to comply with its withdrawal obligations to its

018799
HCMLPHMIT00003999

Limited Partners.  In this regard, the General Partner has the right to suspend in whole or in part certain withdrawal rights of the Limited Partners to the extent that the Partnership is unable to obtain liquidity from its investments in one or more of the Portfolio Funds.  The illiquidity of Illiquid Investments and restrictions on withdrawals at the level of the individual Portfolio Funds could have a material adverse effect on the Partnership, as well as the ability of the Limited Partners to liquidate their investments in the Partnership during permitted withdrawal periods. Consequently, Limited Partners may be unable to liquidate their Interests except by withdrawing from the Partnership in accordance with the terms of this Memorandum, and, even in such event, payment of withdrawal proceeds may be delayed for a significant period of time.  One or more affiliates of the Investment Manager may serve as general partner or manager of such Portfolio Funds, and will not be required to liquidate Portfolio Fund investments other than when they determine such liquidation is advisable or appropriate in their sole discretion, without regard to withdrawal provisions applicable to the Partnership.   Limited Partners may be unable to liquidate their investment promptly in the event of an emergency or for any other reason.

**High Growth Industry Related Risks.**  Portfolio Funds may have significant investments in the securities of high growth companies (e.g., technology, communications and healthcare).  It is noted that these securities may be very volatile.  In addition, these companies may face undeveloped or limited markets, have limited products, have no proven profit-making history, may operate at a loss or with substantial variations in operating results from period to period, have limited access to capital and/or be in the developmental stages of their businesses, have limited ability to protect their rights to certain patents, copyrights, trademarks and other trade secrets, or be otherwise adversely affected by the extremely competitive markets in which many of their competitors operate.

**Risk of Illiquid Investments.**  Illiquid Investments involve a high degree of financial risk.  There can be no assurance that Illiquid Investments will be profitable or that substantial losses will not occur.  The companies in which the Illiquid Investments will invest are often dependent on the skills of a small number of executives and are vulnerable to changes in technology, fluctuations in demand for their products, changing interest rates and other factors.  There can also be no assurance that the Illiquid Investments will be repaid, be able to sell or otherwise liquidate their investments at the optimal time or price.  Therefore, there can be no assurance that the rate of return objectives of the Illiquid Investments will be realized or that there will be any return of capital to the Limited Partners.

**Illiquid and Long-Term Investments.**  It is anticipated that there will be a significant period of time before certain Illiquid Investments will have completed their investments.  Such investments may take several years from the date of initial investment to reach a state of maturity when realization of the investment can be achieved.   Although investments by Illiquid Investments occasionally may generate some current income, private investment transaction structures typically will not provide for liquidity of the Illiquid Investment's investment prior to that time.   The return of capital and the realization of gains, if any, from such investment will generally occur only upon the partial or complete disposition or refinancing of the investment.  In light of the foregoing, it is likely that no significant return from the disposition of Illiquid Investment's underlying investments will occur for a substantial period of time from the commencement of the Illiquid Investment's operations.  It is unlikely that there will be a public market for the securities held by the Illiquid Investment and/or its portfolio companies at the time of their acquisition.  The Illiquid Investment generally will not be able to sell its securities publicly unless the issuer has consummated a public offering of its securities and such offered securities are registered under applicable securities laws, unless an exemption from such registration requirements is available.  In addition, in some cases, the Partnership may be prohibited by contract from selling certain securities for a period of time and, as a result, may not be permitted to sell an underlying investment at a time it might otherwise desire to do so.  Further, disposition of such investments may require a lengthy time period or may result in distributions in kind to investors.

**Investments in Less Established Companies.**  The Partnership may invest a portion of its assets in the securities of less established companies, or early stage companies.  Investments in such early stage companies may involve greater risks than those generally associated with investments in more established companies.  For instance, less

018800

HCMLPHMIT00004000

established companies tend to have smaller capitalizations and fewer resources and, therefore, are often more vulnerable to financial failure. Such companies also may have shorter operating histories on which to judge future performance and in many cases, if operating, will have negative cash flow. In the case of start-up enterprises, such companies may not have significant or any operating revenues. In addition, less mature companies could be more susceptible to irregular accounting or other fraudulent practices. Furthermore, to the extent there is any public market for the securities held by the Illiquid Investment, securities of less established companies may be subject to more abrupt and erratic market price movements than those of larger, more established companies.

Some of the investments expected to be made by an Illiquid Investment would be considered highly speculative and may result in the loss of the Special Situation Investment's entire investment therein. There can be no assurance that any such losses will be offset by gains (if any) realized on the Illiquid Investment's other investments.

**Investments in Restructurings or Underperforming Companies.** The Partnership may make investments in companies that are experiencing or are expected to experience financial difficulties, which such companies may never overcome. Such investments could, in certain circumstances, subject the Partnership to additional potential liabilities, which may exceed the value of the Partnership's original investment therein. Such investments of the Partnership could also be subject to federal bankruptcy law and state fraudulent transfer laws, which may vary from state to state, if the securities relating to such investments were issued with the intent of hindering, delaying or defrauding creditors or, in certain circumstances, if the issuer receives less than reasonably equivalent value or fair consideration in return for issuing such securities. If such investments constitute debt and such debt is used for a buyout of shareholders, this risk is greater than if the debt proceeds are used for day-to-day operations or organic growth. If a court were to find that the issuance of the securities was a fraudulent transfer or conveyance, the court could void the payment obligations under the securities, further subordinate the securities to other existing and future indebtedness of the issuer or require the Partnership to repay any amounts received by it with respect to the securities. In the event of a finding that a fraudulent transfer or conveyance occurred, the Partnership may not receive any repayment on the securities.

Under the Bankruptcy Code, a lender that has inappropriately exercised control of the management and policies of a company may have its claims against the company subordinated or disallowed, or may be found liable for damages suffered by parties as a result of such actions. In addition, under certain circumstances, payments to the Partnership and distributions by the Partnership ion Investment to its limited partners may be reclaimed if any such payment or distribution is later determined to have been a fraudulent conveyance or a preferential payment. Such debt may also be disallowed or subordinated to the claims of other creditors if the Partnership is found to have engaged in other inequitable conduct resulting in harm to other parties. The Partnership's underlying investment may be treated as equity if it is deemed to be a contribution to capital, or if the Partnership attempts to control the outcome of the business affairs of a company prior to its filing under the Bankruptcy Code. While the Partnership will attempt to avoid taking the types of action that would lead to such liability, there can be no assurance that such claims will not be asserted or that the Partnership will be able successfully to defend against them.

## REGULATORY AND TAX RISKS

**General Regulatory Risks.** Statutes, regulations and policies are continually under review by the U.S. Congress and state legislatures and federal and state regulatory agencies. The introduction of new legislation or amendments to existing legislation and regulations (including changes in how they are interpreted or implemented) by governments, the decisions of courts and tribunals and the rulings and decisions of regulatory authorities, can adversely impact the Partnership's returns. The regulatory environment for private investment funds is evolving, and changes in the regulation of these funds may adversely affect the value of investments held by the Partnership, the cost of compliance with applicable regulations, and the ability of the Partnership to obtain the leverage it might otherwise obtain or to pursue its trading strategies.

018801

HCMLPHMIT00004001

**Regulatory Risks Related to the Highland Transaction**.  In connection with the Highland Transaction (if consummated), there can be no assurance that such transaction (if consummated) will not result in adverse regulatory consequences (including, without limitation, being characterized as a "change of control" under applicable laws), even though the Highland Transaction only contemplates the acquisition of non-voting limited partnership interests in Highland.

**Strategy Restrictions**.  Certain institutions may be restricted from directly utilizing investment strategies of the type in which the Partnership may engage.  Such institutions, including entities subject to ERISA, should consult their own advisors, counsel and accountants to determine what restrictions may apply and whether an investment in the Partnership is appropriate.

**Trading Limitations**.  For all securities, instruments and/or assets listed on an exchange, including options listed on a public exchange, the exchange generally has the right to suspend or limit trading under certain circumstances.  Such suspensions or limits could render certain strategies difficult to complete or continue and subject the Partnership to loss.  Also, such a suspension could render it impossible for the Investment Manager to liquidate positions and thereby expose the Partnership to potential losses relating thereto.

**Limited Regulatory Oversight**.  The Partnership's investments are not supervised or monitored by any regulatory authority.  The Partnership is not registered as an "investment company" under the Investment Company Act.  Although the Investment Manager is registered as an investment adviser with the SEC, neither the General Partner nor the Investment Manager is registered as a commodity pool operator, pursuant to an exemption provided under Rule 4.13(a)(3) of the CEA.  Consequently, Limited Partners will not benefit from some of the protections afforded by these statutes, including oversight by the Commodity Futures Trading Commission.

**Prevention of Money Laundering and Terrorism**.  The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended (the "**USA PATRIOT Act**"), signed into law and effective as of October 26, 2001, requires that financial institutions, a term that includes banks, broker-dealers and investment companies, establish and maintain compliance programs to guard against money laundering activities.  The USA PATRIOT Act requires the Secretary of the U.S. Treasury ("**Treasury**") to prescribe regulations in connection with anti- money laundering policies of financial institutions.  The U.S. Federal Reserve Board, the Treasury and the SEC are currently studying what types of investment vehicles should be required to adopt anti-money laundering procedures, and it is unclear at this time whether such procedures will apply to pooled investment vehicles such as the Partnership.  Future rules and regulations regarding money laundering or proceeds of crime could regulate the Partnership.  In addition, in April 2000, the Treasury Department published proposed regulations that would require certain investment advisors to establish an anti-money laundering program.  It is possible that there could be promulgated legislation or regulations that would require the Partnership or its affiliates, in connection with the establishment of anti-money laundering procedures, to share information with governmental authorities with respect to investors in the Interests.  Such legislation and/or regulations could require the Partnership to implement additional restrictions on the transfer of the Interests.  The Partnership reserves the right to request such information as is necessary to verify the identity of investors in the Interests, and the source of the payment of subscription monies, or as is necessary to comply with any customer identification programs required by Financial Crimes Enforcement Network and/or the SEC or such information as may be required in order for the Partnership to discharge its obligations under the laws of the Cayman Islands (including pursuant to the Proceeds of Criminal Conduct Law (2005 Revision)).  In the event of delay or failure by the applicant to produce any information required for verification purposes, an application for or transfer of the Interests and the subscription monies relating thereto may be refused.

**Recent Developments in the Financial Services Industry**.  Recent developments in the U.S. financial markets have heightened the risks associated with the investment activities and operations of hedge funds, including without limitation, those resulting from a

018802

HCMLPHMIT00004002

substantial reduction in the availability of credit and the increased cost of short-term credit, a decrease in market liquidity and an increased risk of insolvency of brokers and other counterparties.  In addition, in July of 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act ("**Dodd-Frank**") was passed which imposes many new requirements and restrictions on the financial services industry that may likely affect the business, operations and performance of hedge funds, such as increased reporting requirements, limitations on certain trading activity and regulatory oversight by different agencies, such as the newly created Financial Stability Oversight Counsel.  Even with the passage of Dodd-Frank, the implications of its passage for the hedge fund industry as a whole still remain somewhat unclear.  The hedge fund industry may continue to be adversely affected by the recent developments in the financial markets in the U.S. and abroad, and any future legal, regulatory, or governmental action and developments in such financial markets and the broader U.S. economy could have an adverse effect on the Partnership or the Partnership's business, operations and performance.

**Enhanced Regulation of Swaps**.  The Wall Street Transparency and Accountability Act of 2010 (the "**WSTAA**") will, subject to exceptions for certain hedgers, (1) require swaps accepted for clearing by a derivatives clearing organization (a "**DCO**") or for trading through a designated contract market or swaps-execution facility to be so cleared and traded, (2) require margin for almost all swap transactions, (3) subject traders with a "substantial position" in swaps to registration and regulation requirements as a "major swap participant" or "swap dealer", and (4) impose position limits on swaps either individually or in the aggregate with respect to positions in commodity-futures contracts.  Due to the new requirements imposed by the WSTAA, the Partnership may experience increased transaction costs to pay for the clearing, execution and segregation obligations.  In addition, margin requirements may increase once margin is set by DCOs with input from the CFTC, which may limit the Partnership's ability to engage in leverage and limit the Partnership's return.  The application of position limits to swap contracts may also limit the Partnership's ability to concentrate in any particular contract or exposure to an underlying commodity and may negatively impact the Partnership's ability to take advantage of current market trends or conditions.  Any tightening in the market for swaps may significantly impact the Partnership and its returns.  In addition, if the Partnership were deemed to be a swap dealer or a major swap participant under WSTAA, the Partnership may be required to register with the CFTC and would be subject to a number of regulatory requirements that would significantly impact the Partnership's legal obligations and its returns.

**Tax Risk**.  The tax aspects of an investment in the Partnership are complicated and each investor should have them reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and private investment vehicles.  The Partnership is not intended and should not be expected to provide any tax shelter, but is organized as a limited partnership to avoid corporate taxation and to permit any distributions it might make to be made without being taxed as dividends.  No assurance can be given that legislative, administrative or judicial changes will not occur which will alter, either prospectively or retroactively, the tax considerations or risk factors discussed in this Memorandum.

The tax consequences to a Limited Partner of an investment in the Partnership are uncertain.  A significant portion of the Partnership is expected to be invested in illiquid Portfolio Funds and/or Illiquid Investments.  Such investments are often structured as "pass through" entities for tax purposes and therefore may generate significant taxable income to the Limited Partners without any corresponding liquidity from such investments.  As a result, an investment in the Partnership may be unsuitable for those investors that do not receive a corresponding deduction for such allocated income.

Neither the General Partner nor the Investment Manager makes any representations or warranties regarding any tax matters.  Prospective investors are strongly urged to consult their own tax advisors regarding the U.S. federal, state and local and non-U.S. tax consequences to them arising from an investment in the Partnership, and should rely on the advice of their own tax advisors with respect to the possible impact on its investment in the Partnership of any future legislation or administrative or judicial action.  You should review the section entitled "TAXATION" for a more complete discussion of certain of the

018803

HCMLPHMIT00004003

tax risks inherent in the acquisition of Interests.

**Tax-Exempt Entities**. Certain prospective Limited Partners may be subject to federal and state laws, rules and regulations that may regulate their participation in the Partnership, or their engaging, directly or indirectly through an investment in the Partnership, in investment strategies of the types that the Partnership utilizes from time to time. Tax-exempt entities should consider the applicability to them of the provisions relating to UBTI (as defined below). Investments in the Partnership by entities subject to ERISA and other tax-exempt entities require special consideration. See "ERISA CONSIDERATIONS" and "TAXATION—Tax-Exempt Investors".

**Diversification**. The tax benefits of the Policies may not be available in the event that the methodology used by the Partnership does not satisfy the diversification rules as described under "TAXATION" herein, including the risk that, if the Partnership fails to meet such diversification rules, owners of Policies funded by a Separate Account that is treated as holding interests in the Partnership would be subject to current taxation on the annual earnings of the Separate Account.

**Diversification of Contracts**. Interests in the Partnership will be held only by variable contract separate asset accounts of Insurance Companies and state and local governmental pension plans, §529 plans, and private sector qualified pension or retirement plans, as generally described in Treasury Regulation 1.817-5(f)(3). Variable contract separate asset accounts are subject to certain investment diversification requirements (the "**Diversification Rules**") of Section 817(h) of the Code and the Regulations with respect to assets held in such separate accounts. These rules apply to the investments made by separate accounts (such separate accounts are referred to as "segregated asset accounts") that are used to fund benefits under Policies that are "variable contracts" within the meaning of Section 817(d) of the Code, other than "pension plan contracts."

For purposes of satisfying the Diversification Rules, the assets of the Partnership must be invested in securities such that no more than 55% of total assets of the Partnership may be invested in the securities of any one (1) issuer, no more than 70% of total assets of the Partnership may be invested in the securities of any two (2) issuers, no more than 80% of total assets of the Partnership may be invested in the securities of any three (3) issuers, and no more than 90% of total assets of the Partnership may be invested in the securities of any four (4) issuers. For purposes of these Diversification Rules, all securities of the same issuer are treated as a single investment and in the case of government securities, each government agency or instrumentality is treated as a separate issuer. Thus, all securities issued by the Treasury would be considered a single investment, but securities issued by the Federal Home Loan Banks would be considered a separate investment from Treasury securities. The assets of the Partnership will be invested in compliance with these rules.

Under a "look-through" rule established by the IRS, if: (i) all Interests of the Partnership are held by one or more segregated asset accounts of Insurance Companies (other than Interests held by persons listed in §1.817-5(f)(3) of the Regulations) and (ii) public access to the Partnership is available exclusively through the purchase of a variable contract as defined in Section 817(d) of the Code, then the test for diversification is made by looking to the assets held by the Partnership. So long as the Partnership is subject to the "look-through" rule, Interests in the Partnership will not constitute a single investment for purposes of the Diversification Rules. For purposes of applying such Diversification Rules, the Partnership's investment on behalf of Series 1 in the PE Portfolio Fund will be treated as a single asset, since the "look-through" rule will not apply to the PE Portfolio Fund.

In the event that the Partnership fails to satisfy the look-through requirements of the Diversification Rules, any Policy based on a segregated asset account that has invested in the Partnership may not be treated as a life insurance or annuity contract for federal income tax purposes. For this purpose, a Policy is based on a segregated asset account if amounts received under such Policy, or earnings thereon, are allocated to such segregated asset account. If a Policy is no longer treated as a life insurance or annuity

018804

HCMLPHMIT00004004

contract, then the owner of the Policy would be subject to current taxation on the income on the Policy for taxable years in which such failure occurs, and thereafter. If the Policy is a life insurance or annuity contract under local law, however, then certain amounts paid as death benefits will be treated as amounts paid under a life insurance or annuity contract for federal income tax purposes. If the failure to meet the Diversification Rules is shown to be inadvertent, the Insurance Company that issued the Policy is permitted to bring the segregated asset account into compliance with those rules. In such cases, the Diversification Rules contemplate adjustments or the payment of a "toll charge" for the period during which the account failed to meet the Diversification Rules. Accordingly, compliance with the Diversification Rules, as they may be modified from time to time, is important and will be carefully monitored by the Investment Manager. Compliance with the Diversification Rules may have the effect of reducing the return of the Partnership, as the investments and strategies utilized by the Investment Manager may be different from what the Investment Manager might otherwise believe to be desirable.

**Investor Control**.  The Partnership is an insurance-dedicated investment fund.  In certain circumstances, the owner of a variable life insurance or annuity contract invested in a Separate Account may, for federal income tax purposes, be considered the owner of the assets of the Separate Account that funds the variable contract under an "investor control" theory.  Each Policy Owner should consult his or her own tax advisors regarding the "investor control" theory and the particular tax risks, if any, posed by the Policy Owner's selection of the Partnership as his or her investment option under a related Policy.

Policy Owners have no right to communicate with or direct the investment policies or decisions of the General Partner, any administrator, Investment Manager, or Investment Manager relating in any way to the Partnership.  For purposes of this Memorandum, the term Policy Owner includes: (i) any trustees of a Policy Owner; (ii) any Policy beneficiaries; (iii) any affiliated person (as this term is defined in Section 2(a)(3) of the Investment Company Act) of the foregoing persons; or (iv) any person that represents the Policy Owner.

There is not, nor shall there be, a pre-arranged binding agreement between the General Partner, the Administrator and the Investment Manager, on the one hand, and any Policy Owner, on the other hand, relating to the investments of the Partnership.  Furthermore, Limited Partners have no right or power to take part in the management of the Partnership.

None of the Partnership, the General Partner, the Investment Manager or any of the Investment Manager Affiliates will be held responsible to any Limited Partner or Policy Owner for any loss, damage, liability or expense resulting from a violation of the "investor control" theory to the extent such violation is attributable to conduct of a Policy Owner.

Policy Owners should consult their own tax advisors regarding the "investor control" theory.

**This Memorandum Intended for Limited Partners**.  This Memorandum does not address the tax treatment afforded by Policy Owners.  Policy Owners should refer to their insurance contract and related explanatory materials for such a discussion.  The Limited Partners are the owners of Interests in the Interests.  Policy Owners are not Limited Partners of the Partnership and do not have rights as such.

**Accounting Rules**.  The Partnership's assets and liabilities are valued in accordance with the Partnership Agreement.  However, for purposes of preparing the Partnership's annual audited financial statements, which are prepared in accordance with GAAP, certain of the Partnership's assets and liabilities may be valued in a manner that, while consistent with GAAP, may be different from the manner in which such assets are valued in accordance with the valuation policies set forth in the Partnership Agreement.

The General Partner may at any time choose to change the Partnership's accounting guidelines from GAAP to the IFRS.  In such event, the financial performance of the Partnership, as determined under IFRS, may vary from those determined under GAAP.

018805

HCMLPHMIT00004005

The Investment Manager undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Limited Partners.

**No Obligation of Full-Time Service**.  None of the General Partner, the Investment Manager, the Principal or any of the Investment Manager Affiliates has any obligation to devote its full time to the business of the Partnership.  Each is only required to devote such time to the Partnership as the General Partner deems necessary to accomplish the purposes of the Partnership, and each may engage in other business activities, including competing ventures and/or unrelated employment, which may result in various conflicts of interest between such persons and the Partnership.

**Services to Affiliated Funds**.  In addition to managing the Partnership and its investments, each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may provide investment management and other services to other parties and may manage and/or establish Affiliated Funds in the future, including those that may employ an investment program and strategy similar to that of the Partnership.  Specifically, as of the date hereof:  (i) the Investment Manager acts as the investment manager to the PE Portfolio Fund that:  (x) is expected to initially invest in the Highland Transaction, if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction; (ii) Rand PE Fund Management, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the PE Portfolio Fund; (iii) the Principal is the managing member and controlling person of Rand PE Fund Management, LLC.  As such, the Investment Manager and the Principal owe fiduciary duties to different investment vehicles, which may conflict with each other; and (iv) the Investment Manager acts as the investment subadvisor to a series of SALI Multi-Series Fund, L.P., a Delaware "series" limited partnership, and provides certain discretionary investment advisory or consulting services to such series.

The investments made by Affiliated Funds that may be managed by the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates in the future may compete with investments for the Partnership's account, and the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates may decide to invest the funds of these Affiliated Funds rather than the assets of the Partnership in a particular security or strategy.  In addition, the Investment Manager and/or such other persons will determine the allocation of funds by and among the Partnership and the Affiliated Funds to investment strategies and techniques on whatever basis they decide is appropriate or desirable in their sole and absolute discretion.  The records of these Affiliated Funds will not be made available to Limited Partners.  Nonetheless, in the event that certain securities, instruments and other assets are suitable for acquisition by the Partnership and by other accounts managed by the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates, and the Investment Manager or such other persons are not able to acquire the desired aggregate amount of such securities, instruments and other assets on terms and conditions which they deem advisable, the Investment Manager and such persons will endeavor in good faith to allocate the limited amount of such investment opportunities among the various accounts for which they consider to be suitable.

**Certain Potential Conflicts Between the Principal and Highland Related to the Series 1 Interests**.  The Principal was previously a Partner and Co-Head of Private Equity at Highland, an investment manager with significant assets under management located in Dallas, Texas.  Although Mr. Honis has retired from that position, he still currently serves on:  (x) the Board of Trustees for each of Highland's affiliated registered investment companies, and receives compensation in connection with each of the foregoing, and (y) the Board of Directors for American HomePatient, Inc. and Turtle Bay Resort, LLC, which are portfolio companies of investment funds operated by Highland, and receives compensation in connection with each of the foregoing.  Additionally, as part of his retirement, Mr. Honis has received or is in the process of receiving payments in the total

018806

HCMLPHMIT00004006

amount of approximately $3 million from certain affiliates of Highland.

In addition, pursuant to the Shared Services Agreement, Highland serves as the Shared Services Provider, which provides the Investment Manager and the Partnership with certain administrative, information technology, accounting, tax, back-office and other services. In addition, the Shared Services Provider may be (but, as of the date hereof, is not) engaged by the Partnership to act as the Partnership's Administrator, pursuant to a separate Administration Agreement.

Further, the Investment Manager and Highland have had preliminary discussions concerning the potential acquisition of all or substantially all of the non-voting limited partnership interests in Highland for the first series of the PE Portfolio Fund (such purchases or other acquisitions, if any, collectively, the "**Highland Transaction**"). Although, as of the date hereof, the PE Portfolio Fund and Highland have not actively negotiated documentation for the legal and economic terms of the Highland Transaction (and there can be no assurances that such transaction will be consummated), it is nonetheless the intention of such parties that the transaction should come about.

In light of the foregoing, the Principal, and indirectly the Investment Manager, are in a position of conflict with respect to the ultimate decision by the Partnership regarding whether it pursues the Highland Transaction, and under what terms (if any) it agrees to participate in any such transaction.

Also see "—Potential Directorship Positions; Other Roles" herein.

**Highland Transaction; Limited Control**. If the Highland Transaction is consummated, it is currently contemplated that the PE Portfolio Fund would acquire only limited partnership interests in Highland. As with investments in non-controlling interests in other partnerships, the Highland Transaction may involve special risks associated with the possibility that the controlling principals of Highland may: (i) have economic or business interests or goals that are inconsistent with those of the PE Portfolio Fund and therefore the Partnership, (ii) take actions contrary to the instructions or requests of the PE Portfolio Fund or contrary to the PE Portfolio Fund's policies or objectives, (iii) be unable or unwilling to fulfill its obligations under the organizational/governing documents, and/or (iv) experience financial difficulties. The occurrence of such problems could have a material adverse effect on the business and prospects of the PE Portfolio Fund's investment in the Highland Transaction and may affect management decisions and exit strategies in a manner adverse to the PE Portfolio Fund's and the Partnership's interests.

**Conflicts Related to Shared Services Provider**. The Investment Manager has certain affiliated entities that may provide services with respect to the Partnership, the Portfolio Funds (generally and the PE Portfolio Fund specifically) and certain investments held by the Partnership. The Shared Services Provider may provide services for the benefit of the Partnership under the Shared Services Agreement and/or may incur reimbursable expenses on behalf of the Partnership and/or the Investment Manager. In addition, the Shared Services Provider may be (but, as of the date hereof, is not) engaged by the Partnership to act as the Partnership's Administrator, pursuant to a separate Administration Agreement. The Principal is a former Partner and former Co-Head of Private Equity of the Shared Services Provider.

**Potential Directorship Positions; Other Roles**. The Investment Manager Affiliates may, subject to applicable law, serve as directors (whether supervisory or managing), officers, personnel, employees, partners, agents, nominees or signatories, and receive arm's length fees in connection with such service, for the Partnership or other entities that operate in the same or a related line of business as the Partnership, for other clients managed by the Investment Manager or any of the Investment Manager Affiliates, or for any Portfolio Fund or portfolio company of the Partnership, and the Partnership shall have no right to any such fees. In serving in these multiple capacities, they may have obligations to such other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Partnership. Also see "—Certain Potential Conflicts Between the Principal and Highland Related to the Series 1 Interests" herein.

018807

HCMLPHMIT00004007

The Investment Manager and/or the Investment Manager Affiliates may act as an underwriter, arranger or placement agent, or otherwise participate in the origination, structuring, negotiation, syndication or offering of investments purchased by the Partnership. Such transactions are on an arm's-length basis and may be subject to arm's-length fees. There is no expectation for preferential access to transactions involving investments that are underwritten, originated, arranged or placed by the Investment Manager and/or the Investment Manager Affiliates and the Partnership shall not have any right to any such fees.

**Potential Cross-Trades**. The Investment Manager may effect client cross-transactions where the Investment Manager causes a transaction to be effected between the Partnership and another client advised by it or any of its affiliates. The Investment Manager may engage in a client cross-transaction involving the Partnership any time that the Investment Manager believes such transaction to be fair to the Partnership and such other client. By purchasing an Interest in the Partnership, a Limited Partner is deemed to have consented to such client cross-transactions between the Partnership and another client of the Investment Manager or one of its affiliates.

**Diverse Limited Partners**. The Limited Partners may include taxable and tax-exempt entities and persons or entities resident of or organized in various jurisdictions. As a result, conflicts of interest may arise in connection with decisions made by the General Partner that may be more beneficial for one type of Limited Partner than for another. In making such decisions, the General Partner intends to consider the investment objectives of the Partnership as a whole, not the investment objectives of any Limited Partner individually.

**Soft Dollars**. The General Partner and the Investment Manager may be offered soft dollars in the form of research and brokerage and other products or services, which may be utilized by the General Partner, the Investment Manager and their respective affiliates in connection with the services they offer to clients other than the Partnership. The use of soft dollars presents the Investment Manager with potential conflicts of interest and may provide the Investment Manager with incentives to: (i) use certain brokers who may provide certain soft dollar benefits that other brokers may not, without regard to its obligations to the Partnership (including, without limitation, its best execution obligations); or (ii) trade more actively in order to generate more soft dollars and thereby reduce its expenses.

**Referral of Investors**. The General Partner and/or the Investment Manager may sell Interests through broker-dealers and pay a marketing fee or commission in connection with such activities, including ongoing payments, at the General Partner's or the Investment Manager's own expense. The General Partner and/or the Investment Manager may also deduct a percentage of the amount invested by a Limited Partner in the Partnership to pay sales fees or charges, on a fully disclosed basis, to a broker-dealer based upon the capital contribution of such Limited Partner introduced to the Partnership by such broker-dealer. Any such sales fees or charges would be assessed against the referred Limited Partner and would reduce the amount actually invested by such Limited Partner in the Partnership. Such broker-dealers may have a conflict of interest in advising prospective investors to purchase Interests, as the broker-dealers are often only compensated upon the investment of the prospective investors.

**Lack of Separate Representation; Potential Conflicts of Counsel**. Neither the Partnership Agreement nor any of the agreements, contracts and arrangements between the Partnership, on the one hand, and the General Partner or the Investment Manager, on the other hand, were or will be the result of arm's-length negotiations. The attorneys, accountants and others who have performed services for the Partnership in connection with this offering, and who will perform services for the Partnership in the future, have been and will be selected by the General Partner. No independent counsel has been retained to represent the interests of prospective investors or Limited Partners. You are therefore urged to consult your own counsel as to the terms and provisions of the Partnership Agreement and all subscription and other related documents.

In addition, Sadis & Goldberg LLP has represented Highland and affiliates at different

018808
HCMLPHMIT00004008

times over a period lasting over a decade.  It is currently expected that Sadis & Goldberg LLP will represent the General Partner, the Investment Manager, the Principal and certain of their respective affiliates in connection with the establishment of the Partnership and the PE Portfolio Fund, the possible consummation of the Highland Transaction, and certain related matters.  The Principal and his affiliates are aware of the representation by Sadis & Goldberg LLP of Highland and affiliates.

<u>Valuation of Assets</u>.  The Administrator will calculate the net asset value of the Partnership (based upon information provided by the Investment Manager). In the case of investments in Portfolio Funds that are not readily marketable, the net asset value calculation provided by the relevant managers (or any affiliates or service providers thereof) of those Portfolio Funds will generally be used in determining the Partnership's Net Asset Value.  Such calculations could be incorrect, delayed or subject to significant adjustments, any of which events could adversely affect the valuation of the Partnership's investments.  The Investment Manager intends to engage an independent third-party valuation agent (in addition to the Administrator) to appraise the Partnership's interests in Illiquid Investments, including, without limitation, the PE Portfolio Fund; *provided* that, if the PE Portfolio Fund engages its own independent third-party valuation agent, the Partnership may rely on such valuation of any investment in the PE Portfolio Fund.  If the Investment Manager determines, in its sole discretion, that the valuation of any security, commodity, option or other financial instrument pursuant to the valuation methodologies described herein does not fairly represent its market value, the Investment Manager will value such security, option or other financial instrument as it reasonably determines.  Likewise, any securities, commodities, options and other financial instruments that have no public market, investments in other asset classes (including those in Side Pocket Accounts), and all other assets of the Partnership for which a valuation methodology is not specified, will be valued by the Investment Manager in a manner determined in good faith to reflect their fair market value.  The Investment Manager has a conflict of interest in that it will receive a higher Management Fee if the Partnership's assets are given a favorable valuation.   See "SUMMARY OF OFFERING AND PARTNERSHIP TERMS— Determination of Net Asset Value".

**The foregoing list of risk factors and conflicts of interest does not purport to be a complete enumeration or explanation of the risks and conflicts of interest involved in an investment in the Partnership.  Offerees should read this entire Memorandum and the Partnership Agreement and consult with their own advisors before deciding to purchase Interests.**

018809

HCMLPHMIT00004009

<div align="right">**ERISA CONSIDERATIONS**</div>

An investment of benefit plan assets in the Partnership may raise issues under ERISA and the Code. ERISA and the Code impose certain duties on persons who are fiduciaries of a Plan (as defined below) and prohibit certain transactions involving the assets of a Plan and its fiduciaries or other interested parties. Under ERISA and the Code, any person who exercises any discretionary authority or control over the administration of a Plan or the management or disposition of the assets of a Plan, or who renders investment advice for a fee or other compensation to a Plan, is generally considered to be a fiduciary of the Plan.

In considering an investment in the Partnership of a portion of the assets of any employee benefit plan (including a "**Keogh**" plan) subject to the fiduciary and prohibited transaction provisions of ERISA or the Code or similar provisions under applicable state law (collectively, a "**Plan**"), a Plan fiduciary should determine, in light of the risks and limited liquidity inherent in an investment in the Partnership, whether the investment is in accordance with the documents and instruments governing the Plan and the applicable provisions of ERISA or similar law relating to a fiduciary's duties to the Plan. Furthermore, absent an exemption, the fiduciaries of a Plan should not purchase Interests with the assets of any Plan if the Investment Manager or any affiliate thereof is a fiduciary or other "party in interest" or "disqualified person" (collectively, a "**party in interest**") with respect to such Plan.

<div align="right">**PLAN ASSETS**</div>

Regulations promulgated under ERISA by the U.S. Department of Labor ("**Plan Asset Regulations**") generally provide that when a Plan subject to Title I of ERISA or Section 4975 of the Code acquires an equity interest in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act, the Plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established either that equity participation in the entity by "benefit plan investors" is not "significant" or that the entity is an "operating company", in each case as defined in the Plan Asset Regulations. The Interests will not constitute "publicly offered" securities or securities issued by an investment company registered under the Investment Company Act, and it is not expected that the Partnership will qualify as an "operating company" under the Plan Asset Regulations. For purposes of the Plan Asset Regulations, equity participation in an entity by benefit plan investors will not be "significant" so long as they own, in the aggregate less than 25%, directly or indirectly, of the value of each class of such entity's equity. For purposes of such calculation, equity interests held by persons (other than a benefit plan investor) with discretionary authority or control over the assets of the entity or who provide investment advice for a fee (direct or indirect) with respect to such assets, and any affiliates thereof, are disregarded. For purposes of this 25% test ("**Benefit Plan Investor Test**"), "benefit plan investors" include: employee benefit plans subject to the provisions of Part 4 of Title I of ERISA and plans subject to Section 4975 of the Code, including "Keogh" plans and individual retirement accounts ("**IRAs**"). The following are not included in the definition of benefit plan investor: employee benefit plans maintained outside the U.S. by foreign companies that cover non-U.S. persons, governmental plans, and certain church plans. Thus, absent satisfaction of another exception under the Plan Asset Regulations, if 25% or more of the value of any class of Interests in the Partnership were owned by benefit plan investors, an undivided interest in each of the underlying assets of the Partnership would be deemed to be "plan assets" of any Plan subject to Title I of ERISA or Section 4975 of the Code that invested in the Partnership.

Consequently, the General Partner intends to use reasonable efforts either (i) to prohibit plans subject to Title I of ERISA or Section 4975 of the Code from investing in the Partnership or (ii) to provide that investment by "benefit plan investors" in the Partnership will not be "significant" for purposes of the Plan Asset Regulations by limiting equity participation by benefit plan investors in the Partnership to less than 25% of the value of each class of Interests in the Partnership as described above. However, each Plan fiduciary should be aware that even if the Partnership were to avoid plan asset status

018810

HCMLPHMIT00004010

under the Benefit Plan Investor Test at the time a Plan acquires Interests in the Partnership, the exemption could become unavailable at a later date as a result, for example, of subsequent transfers or withdrawals of Interests in the Partnership, and that Interests held by benefit plan investors may be subject to mandatory withdrawal in such event in order for the Partnership to continue to avoid plan asset status under the Benefit Plan Investor Test.

Furthermore, there can be no assurance that notwithstanding the reasonable efforts of the Partnership, the Partnership will satisfy the Benefit Plan Investor Test, that the structure of particular investments of the Partnership will otherwise satisfy the Plan Asset Regulations or that the underlying assets of the Partnership will not otherwise be deemed to include ERISA plan assets.

## PLAN ASSET CONSEQUENCES

If the assets of the Partnership were deemed to be "plan assets" under ERISA, (i) the prudence and other fiduciary responsibility standards of ERISA would extend to investments made by the Partnership and (ii) certain transactions in which the Partnership might seek to engage could constitute "prohibited transactions" under ERISA and the Code.  If a prohibited transaction occurs for which no exemption is available, the Investment Manager and any other fiduciary that has engaged in the prohibited transaction could be required (x) to restore to the Plan any profit realized on the transaction and (y) to reimburse the Plan for any losses suffered by the Plan as a result of the investment.  In addition, each party in interest involved could be subject to an excise tax equal to 15% of the amount involved in the prohibited transaction for each year the transaction continues and, unless the transaction is corrected within statutorily required periods, to an additional tax of 100%.  Plan fiduciaries that decide to invest in the Partnership could, under certain circumstances, be liable for prohibited transactions or other violations as a result of their investment in the Partnership or as co-fiduciaries for actions taken by or on behalf of the Partnership or the Investment Manager.  With respect to an IRA that invests in the Partnership, the occurrence of a prohibited transaction involving the individual who established the IRA, or his or her beneficiaries, could cause the IRA to lose its tax-exempt status.

Under the Partnership Agreement, the General Partner has the power to take certain actions to avoid having the assets of the Partnership characterized as plan assets, including, without limitation, the right to refuse a subscription, exclude a Limited Partner from an investment or to compulsorily redeem a Limited Partner's Interests in the Partnership.  While the General Partner does not expect that it will need to exercise such power, it cannot give any assurance that such power will not be exercised.

**Each Plan fiduciary should consult its own legal advisor concerning the considerations discussed above before making an investment in the Partnership.**

018811

HCMLPHMIT00004011

<div align="right">

**TAXATION**

</div>

**Prospective investors are advised that: (i) any U.S. federal tax advice contained herein, including any opinion of counsel referred to herein, is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding U.S. federal tax penalties that may be imposed on the taxpayer; (ii) any such advice is written to support the promotion or marketing of the transactions described herein (or in any such opinion of counsel); and (iii) each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.**

<div align="right">

### INTRODUCTION

</div>

The following is a summary of certain aspects of the taxation of the Partnership and its Partners, which should be considered by a potential purchaser of an Interest in the Partnership. A complete discussion of all tax aspects of an investment in the Partnership is beyond the scope of this Memorandum. The following summary is only intended to identify and discuss certain salient issues.

This summary of certain tax considerations applicable to the Partnership is considered to be a correct interpretation of existing laws and regulations in force on the date of this Memorandum. No assurance can be given that changes in existing laws or regulations or their interpretation will not occur after the date of this Memorandum or that any such future guidance or interpretation will not be applied retroactively.

**The following summary is not intended as a substitute for careful tax planning. The tax matters relating to the Partnership are complex and are subject to varying interpretations. Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on Partners will vary with the particular circumstances of each Partner. Accordingly, each prospective investor must consult with and rely solely on his or its professional tax advisors with respect to the tax results of the investor's investment in the Partnership. In no event will the General Partner, its affiliates, counsel or other professional advisors be liable to any Limited Partner for any federal, state, local or other tax consequences of an investment in the Partnership, whether or not such consequences are as described below.**

<div align="right">

### CLASSIFICATION OF THE PARTNERSHIP

</div>

Under the provisions of the Code and the Treasury Regulations promulgated thereunder ("**Regulations**"), as in effect on the date of this Memorandum, so long as the Partnership complies with the Partnership Agreement, the Partnership should be classified for U.S. federal income tax purposes as a partnership and not as an association taxable as a corporation.

The Partnership has been formed under the Delaware Act as a series limited partnership and may offering its Interests in multiple separate Series. Under the provisions of the Code and the Regulations, as in effect on the date of this Memorandum, so long as the Partnership complies with the Partnership Agreement and the Delaware Act, each Series of Interests in the Partnership should be classified for U.S. federal income tax purposes as equity interests in a separate partnership and not as equity interests in an association taxable as a corporation.

The Partnership has not sought and will not seek a ruling from the Internal Revenue Service ("**IRS**") with respect to its status as a partnership. If a Series of Interests in the Partnership should be classified as an association taxable as a corporation (e.g., as a result of a change in law or a material change in facts), the taxable income of the Partnership allocable to such Series would be subject to corporate income taxation; and distributions from the Partnership to the Limited Partners owning Interests in such Series would be treated as dividend income when received by such Limited Partners to the extent of the current or accumulated earnings and profits of the Partnership allocable to

018812

HCMLPHMIT00004012

such Series. Furthermore, the Insurance Company Limited Partners would lose their look-through treatment for the purposes of complying with the diversification requirements imposed by Section 817(h) of the Code.

Certain partnerships may be taxable as corporations for U.S. federal income tax purposes under the publicly traded partnership rules set forth in the Code and the Regulations, and a Series of the Partnership may not qualify for one of the safe harbors under the Regulations if such Series has more than 100 Partners. The Partnership expects that, under the facts and circumstances test set forth in the Regulations, the Interests will not be readily tradable on a secondary market (or the substantial equivalent thereof) and therefore, the Series partnerships will not be treated as publicly traded partnerships under the Regulations. It is assumed in the following discussion of tax considerations that each Series of the Partnership will be treated as a partnership for U.S. federal income tax purposes.

Unless otherwise indicated, references in the discussion below to the tax consequences of the "Partnership's" investments, activities, income and expenses refer to the investments, activities, income and expenses attributable to each Series that is treated as a separate tax partnership. Prospective investors should note that each Series will issue its annual Schedule K-1 tax reporting form to its Partners. Therefore, investors that own Interests in more than one Series will receive separate Schedule K-1 reporting forms for each Series in which the investor is treated as owning an equity interest.

### TAXATION OF PARTNERSHIP OPERATIONS

As a partnership, the Partnership is not itself subject to U.S. federal income tax but will file an annual partnership information return with the IRS. Each Limited Partner, in computing his own federal income tax liability for a taxable year, is required to take into account such Partner's distributive share of the Partnership's net long-term capital gain or loss, net short-term capital gain or loss, net ordinary income or loss and any separately stated income items, deductions and credits for the taxable year of the Partnership that ends with or within such Partner's taxable year. The Partnership may utilize a variety of investment and trading strategies, which produce both short-term and long-term capital gain (or loss), as well as ordinary income (or loss). The Partnership will send annually to each Limited Partner a Schedule K-1 form reporting such Partner's distributive share of the Partnership items of income, gain, loss, deduction and credit. The Partnership intends to use the calendar year as its taxable year unless a different fiscal year is required under the Code.

Each Limited Partner will be subject to tax, and liable for such tax, on such Partner's distributive share of the Partnership's taxable income regardless of whether the Limited Partner has received or will receive any distribution of cash from the Partnership. Thus, in any particular year, a Limited Partner's distributive share of taxable income from the Partnership (and, generally, the taxes imposed on that income) could exceed the amount of cash, if any, such Limited Partner received or is entitled to withdraw from the Partnership.

Under Section 704 of the Code, a Limited Partner's distributive share of any Partnership item of income, gain, loss, deduction or credit is governed by the Partnership Agreement unless the allocation provided by the Partnership Agreement does not have "substantial economic effect". The Regulations promulgated under Section 704(b) of the Code provide certain "safe harbors" with respect to allocations, which, under the Regulations, will be deemed to have substantial economic effect. The validity of an allocation which does not satisfy any of the "safe harbors" of these Regulations is determined by taking into account all facts and circumstances relating to the economic arrangements among the Partners. While no assurance can be given, the allocations provided by the Partnership Agreement should have substantial economic effect and should be sustained under the facts and circumstances test. However, if it were determined by the IRS or otherwise that the allocations provided in the Partnership Agreement with respect to a particular item do not have substantial economic effect, each Limited Partner's distributive share of that item would be determined for tax purposes in accordance with that Limited Partner's interest in the Partnership, taking into account all facts and circumstances.

018813

HCMLPHMIT00004013

Cash distributions and withdrawals, to the extent they do not exceed a Limited Partner's tax basis in such Partner's interest in the Partnership, should not result in taxable gain to that Limited Partner, but reduce the tax basis in the Interest by the amount distributed or withdrawn. Cash distributed to a Limited Partner in excess of the tax basis of his or its Interest is generally taxable either as capital gain or ordinary income, depending on the circumstances. A distribution of property other than cash generally will not result in taxable income or loss to the Limited Partner to whom it is distributed until such time that the property is sold.

For financial statement presentation and capital account maintenance purposes, all securities held by the Partnership will be marked-to-market at the end of each relevant accounting period and the net gain or loss from marking to market will be reported as income or loss. This treatment differs from the general tax rule applicable to many securities transactions that a transaction does not result in gain or loss until it is closed by an actual sale or other disposition. The divergence between such accounting and tax treatments frequently may result in substantial variation between financial statement income (or loss) and taxable income (or loss) reported by the Partnership.

The income tax treatment of the Partnership will depend upon the tax treatment of the Portfolio Funds in which the Partnership invests.

The Partnership expects to be treated as engaged in a trade or business by reason of its anticipated investment, on behalf of Series 1, in the PE Portfolio Fund, which will own equity interests in one or more business partnerships. The Partnership may also engage in other trade or business activities, either directly or through investments in portfolio partnerships. Prospective investors that are U.S. tax-exempt entities should consider the impact of UBTI on an investment in the Partnership. See "—Tax-Exempt Investors" below.

The Partnership will also engage in investing and trading securities for its own account. Accordingly, a portion of the Partnership's direct and indirect expenses are expected to be deductible as trade or business expenses under Section 162 of the Code. Certain other expenses may be classified as Section 212 investment expenses, which, for certain types of Limited Partners, including trusts, would be classified as miscellaneous itemized deductions. Prospective investors that are classified as trusts for U.S. federal income tax purposes should consult their tax advisors concerning the limitations in the Code on deductions for miscellaneous itemized deductions.

## LIMITATIONS ON LOSSES AND DEDUCTIONS

**In General.** A Limited Partner is not permitted to deduct Partnership losses that exceed the Partner's adjusted tax basis in its Interest at the end of the year in which such loss is incurred. A Limited Partner's basis for its Interest is generally equal the amount of such Partner's cash contributions made to the Partnership, increased by (i) the Partner's allocable share of Partnership taxable income, (ii) the Partner's allocable share of Partnership tax-exempt income, and (iii) the Partner's allocable share of nonrecourse liabilities of the Partnership (if any); and decreased by (w) the Limited Partner's allocable share of Partnership taxable losses and non-deductible expenses, (x) any distributions of cash received by the Limited Partner from the Partnership, (y) the tax basis of any property distributed by the Partnership to such Partner and (z) any decrease in the Partner's share of Partnership nonrecourse liabilities (if any). There are several other Code provisions that may limit the ability of a Limited Partner to claim deductions attributable to an investment in the Partnership. The most significant of these limitations are discussed below.

**At Risk Limitations**. Section 465 of the Code limits certain taxpayers' losses from certain activities to the amount they are "at risk" in the activities. Taxpayers subject to the "at risk" rules are non-corporate taxpayers, including trusts, and certain closely-held corporations. The activities subject to the "at risk" limitations include all activities in which the Partnership expects to engage. A Partner subject to the "at risk" rules will not be permitted to deduct in any year losses arising from its interest in the Partnership to the extent that the losses exceed the amount it is considered to have "at risk" in the

018814

HCMLPHMIT00004014

Partnership at the close of that year.

A taxpayer is considered to be "at risk" in any activity to the extent of his cash contribution to the activity, his basis in other property contributed to the activity and his personal liability for repayments of amounts borrowed for use in the activity. With respect to amounts borrowed for use in the activity, the taxpayer is not considered to be "at risk" even if he is personally liable for repayment if the borrowing was from a person who has an "interest" in the activity other than an interest as a creditor. Even if a taxpayer is personally liable for repayment of amounts borrowed for use in the activity, and even if the amount borrowed is borrowed from a person whose only interest in the activity is an interest as a creditor, a taxpayer will not be considered "at risk" in the activity to the extent his investment in the activity is protected against loss through guarantees, stop loss agreements, or other similar arrangements.

Each Limited Partner will be at risk initially for the amount of his capital contribution. A Partner's amount "at risk" will be increased by his distributive share of income from the Partnership and will be decreased by his distributive share of losses from the Partnership and distributions to him. If a Partner's amount "at risk" decreases to zero, he can take no further losses until he has an "at risk" amount to cover the losses. A Partner is subject to a recapture of losses previously allowed to the extent that his amount "at risk" is reduced below zero (limited to loss amounts previously allowed to the Partner over any amounts previously recaptured).

<u>Investment Interest Limitations</u>. To the extent that the Partnership incurs interest expense or short sale expenses, a non-corporate Limited Partner, including a trust, will likely be subject to the "investment interest expense" limitations of Section 163(d) of the Code. Investment interest expense includes (i) interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment and (ii) any amounts deductible in connection with a short sale. The deduction for investment interest expense is limited to the taxpayer's net investment income for the taxable year; i.e., the excess of investment income over investment expenses. Excess investment interest expense that is disallowed is not lost permanently but may be carried forward to succeeding years subject to the Section 163(d) limitation. Net capital gain (i.e., net long-term capital gain over net short-term capital loss) on property held for investment and qualified dividends are only included in investment income to the extent that the taxpayer elects to subject some or all of such gain or dividend income to taxation at ordinary income tax rates. The Section 163(d) limitations will apply at the Partner level with regard to the Partner's distributive share of the Partnership's interest expense.

To the extent that the Partnership is treated as engaged in a trade or business by reason of being deemed a trader, a non-corporate Limited Partner's share of the Partnership's interest expense from such trading activity would retain its character as investment interest subject to the Section 163(d) investment income limitation, but the allowable investment interest deduction would be deducted "above the line" in determining adjusted gross income and therefore fully deductible, rather than being treated as an itemized deduction.

Section 265(a)(2) of the Code disallows any deduction for interest paid by a taxpayer on indebtedness incurred or continued for the purpose of purchasing or carrying tax-exempt obligations. The IRS has announced that such purpose will be deemed to exist with respect to indebtedness incurred to finance a "portfolio investment", and that a limited partnership interest will be regarded as a "portfolio investment". Therefore, if the Partnership holds tax-exempt obligations, the IRS might take the position that all or part of the interest expense incurred by a Limited Partner in connection with the purchase of such Partner's Interest should be viewed as incurred to enable such Limited Partner to continue carrying tax-exempt obligations, and that such Limited Partner should not be allowed to deduct all or a portion of such interest.

<u>Itemized Deduction Limitations</u>. Under Section 67 of the Code, for non-corporate taxpayers, including trusts, certain miscellaneous itemized deductions are allowable only to the extent they exceed a "floor" amount equal to 2% of the taxpayer's adjusted gross income ("<u>**2% Floor**</u>"). To the extent that the Partnership's operations do not constitute a

018815

HCMLPHMIT00004015

trade or business within the meaning of Section 162 and other provisions of the Code, a non-corporate Limited Partner's distributive share of the Partnership's investment expenses, other than investment interest expense, would be deductible only as miscellaneous itemized deductions, subject to the 2% Floor. Moreover, a non-corporate taxpayer's investment expenses that are miscellaneous itemized deductions are also not deductible in calculating the taxpayer's alternative minimum tax liability.

Capital losses generally may be deducted only to the extent of capital gains, except for non-corporate taxpayers who are allowed to deduct $3,000 of excess capital losses per year against ordinary income. Corporate taxpayers may carry back unused capital losses for three years and may carry forward such losses for five years; non-corporate taxpayers may not carry back unused capital losses but may carry forward unused capital losses indefinitely.

### ADDITIONAL TAX ISSUES

Gain or loss from a short sale of property is generally considered as capital gain or loss to the extent that the property used to close the short sale constitutes a capital asset in the Partnership's hands.

The "wash sale" rules of Section 1091 of the Code disallow any deduction for losses arising from the sale or other disposition of "stock or securities", where, within a period beginning 30 days before such sale or disposition and ending 30 days afterwards, the taxpayer acquires "substantially identical" stocks of securities by purchase or by an exchange on which the entire amount of gain or loss is recognized. This disallowance rule also applies where, within such 61-day period, the taxpayer enters into a contract or option to acquire substantially identical stock or securities. Thus, if the Partnership were to engage in such a "wash sale" transaction, the Partners would not be able to recognize their distributive share of any loss realized in connection with such sale in the current year.

**Currency Fluctuations - "Section 988" Gains and Losses.** To the extent that the Partnership's investments are made in securities denominated in a foreign currency, gain or loss realized by the Partnership frequently will be affected by the fluctuation in the value of such foreign currencies relative to the value of the U.S. dollar. Generally, gains or losses with respect to the Partnership's investments in common stock of foreign issuers will be taxed as capital gains or losses at the time of the Partnership's sale of such stock. However, under Section 988 of the Code, gains or losses of the Partnership on the acquisition or disposition of foreign currency (i.e., the purchase of foreign currency and subsequent use of such currency to acquire stock) will be treated as ordinary income or loss. Moreover, under Section 988, gains and losses from disposition of debt securities denominated in a foreign currency that are attributable to the fluctuations in such currency between the date of acquisition of the debt security and the date of its disposition will be treated as ordinary income or loss. Since the Code provides limitations on the ability of taxpayers to deduct capital losses against ordinary income, a Partner's share of capital losses realized by the Partnership on sale of foreign securities would not be available to offset the Partner's share of ordinary income realized by the Partnership on its currency hedging transactions.

The Partnership may acquire foreign currency forward contracts, enter into foreign currency futures contracts and acquire put and call options on foreign currencies. Generally, foreign currency regulated futures contracts and option contracts that qualify as "Section 1256 contracts" will not be subject to ordinary income and loss treatment under Section 988. However, if the Partnership acquires currency futures contracts or options contracts that are not Section 1256 contracts, or any currency forward contracts, any gain or loss realized by the Partnership with respect to such instruments will be ordinary income or loss, unless (i) the contract is a capital asset in the hands of the Partnership and is not part of a straddle transaction and (ii) the Partnership makes an election (by the close of the day the transaction is entered into) to treat the gain or loss attributable to such contract as capital gain or loss.

The taxation of debt obligations under the Code is complex; the following discussion is intended to provide only a general description of these rules. Generally, interest income and income items similar to stated interest, such as original issue discount (in general, the

018816

HCMLPHMIT00004016

annual portion of the discount on original issuance of debt obligations issued for less than their stated principal amount) and market discount (the amount by which debt obligations are acquired in the secondary market for less than their principal) are treated as items of ordinary income.  Generally, debt obligations that are disposed of in a taxable transaction for an amount greater than their adjusted cost basis give rise to capital gain, which will be long-term if the debt obligation is held for longer than one year, and short-term, if held for a period of one year or less.  Generally, debt obligations that are disposed of in a taxable transaction for an amount less than their adjusted cost basis give rise to capital loss, which will be long-term if the debt obligation is held for longer than one year, and short-term if held for a period of one year or less.  In the event that any such debt obligations are not held as capital assets, such dispositions will generally give rise to ordinary gain or loss, as the case may be.

Section 1259 of the Code requires that the Partnership recognize gain on the constructive sale of any appreciated financial position in stock, a partnership interest, or certain debt instruments.  A constructive sale of an appreciated financial position occurs if, among other things, the Partnership enters into (1) a short sale of the same or substantially identical property (a transaction commonly known as a "short sale against the box"), (2) an offsetting notional principal contract with respect to the same or substantially identical property, or (3) a futures or forward contract to deliver the same or substantially identical property.  Exceptions to the foregoing apply to certain transactions closed within 30 days after the close of the taxable year if the underlying appreciated financial position remains "unhedged" for at least 60 days thereafter, and to transactions involving certain contracts to sell stock, debt instruments, or partnership interests if the contract settles within one year.

The IRS may treat certain positions in securities held (directly or indirectly) by a Partner and its indirect interest in similar securities held by the Partnership as "straddles" for federal income tax purposes.  The application of the "straddle" rules in such a case could affect a Partner's holding period for the securities involved and may defer the recognition of losses with respect to such securities.  In addition, if either of the Partner's positions in such a transaction is an "appreciated financial position", application of the "straddle" rules may trigger a constructive sale of that position under the rules described above.

Section 1258 of the Code recharacterizes capital gain from a "conversion transaction" as ordinary income, with certain limitations.  Conversion transactions are defined as transactions in which substantially all the expected return is attributable to the time value of money and either: (a) the transaction consists of the acquisition of property by the taxpayer and a substantially contemporaneous agreement to sell the same or substantially identical property in the future; (b) the transaction qualifies as a "straddle" (within the meaning of Section 1092(c) of the Code); (c) the transaction is one that was marketed or sold to the taxpayer on the basis that it would have the economic characteristics of a loan but the interest-like return would be taxed as capital gain; or (d) the transaction is described as a conversion transaction in the Regulations.  The amount of gain so recharacterized will not exceed the amount of interest that would have accrued on the taxpayers' net investment for the relevant period at a yield equal to 120% of the "applicable rate".

### INVESTMENTS IN NON-U.S. CORPORATIONS

The Partnership may invest in certain foreign corporations that will be classified as "passive foreign investment companies" ("**PFICs**") for U.S. tax purposes.  Under the PFIC rules, unless the Partnership makes one of the elections described below, any gain realized by the Partnership on the sale or disposition of stock in a PFIC that is allocable to Partners that are U.S. Persons (as defined in the Code) will be treated as ordinary income and will be subject to U.S. federal income tax as if (i) the gain had been realized ratably over the Partnership's holding period and (ii) the amount deemed realized had been subject to tax in each year of that holding period at the highest applicable federal income tax rate; in addition, an interest charge at the rate generally applicable to underpayments of federal income tax will be imposed on the amount.  Further, any "excess distributions" from a PFIC (as defined in the Regulations) are treated as ordinary income (regardless of their original character) and subject to this deferred tax and interest charge.

018817

HCMLPHMIT00004017

Provided the PFIC complies with certain reporting requirements, the Partnership may elect to have the PFIC treated as a "qualified electing fund", in which case the Partnership would include annually in its gross income its *pro rata* share of the PFIC's net ordinary income and net realized capital gains, whether or not such amounts are actually distributed to the Partnership. Generally, any net operating losses or net capital losses of the PFIC will not pass through to the Partnership and will not offset any ordinary income or capital gains of the PFIC reportable to the Partnership in subsequent years. Alternatively, the Partnership could elect to "mark-to-market" stock in certain PFICs if such stock is considered "marketable stock" under the Code, and thereby avoid being subject to the deferred tax and interest charge discussed above. However, there can be no assurance that the Partnership will be able to make either of these elections with respect to any PFICs in which it invests. Further, Limited Partners may be subject to IRS reporting requirements with respect to the Partnership's investments in PFICs.

The Partnership may also invest in certain foreign corporations that will be considered "controlled foreign corporations" ("**CFCs**") for U.S. tax purposes. A CFC is a non-U.S. corporation in which certain U.S. shareholders own, directly or indirectly, more than 50% of either the total voting power of all classes of stock entitled to vote or the total value of all classes of stock. Under the CFC rules, certain U.S. shareholders are subject to U.S. federal income tax on certain types of income (generally passive income) realized by the CFC regardless of whether any amounts are distributed from the CFC to such U.S. shareholder. Further, such U.S. shareholders may be subject to IRS reporting requirements with respect to investments in CFCs.

In addition, if the Partnership invests in stock of foreign corporations that become PFICs or CFCs after the Partnership has made such investment, this may also result in adverse tax consequences for the Limited Partners that are U.S. Persons and may subject them to IRS reporting requirements with respect to such investments.

### TAX-EXEMPT INVESTORS

If the Partnership derives income which would be considered "unrelated business taxable income" (as defined in Section 512 of the Code) ("**UBTI**"), if derived directly by a Limited Partner that is a qualified retirement plan or other organization exempt from tax under Sections 401 or 501(a) of the Code or an individual retirement account ("**IRA**") exempt under Section 408(e) of the Code (each, a "**Tax-Exempt Entity**"), such Limited Partner's allocable share of such Partnership income would be subject to tax. A Tax-Exempt Entity which is subject to tax on its allocable share of the Partnership's UBTI, including an IRA, may also be subject to the alternative minimum tax with respect to items of tax preference which enter into the computation of UBTI.

UBTI is generally the excess of gross income from any unrelated trade or business conducted by a Tax-Exempt Entity (or by a partnership of which the Tax-Exempt Entity is a member) over the deductions attributable to such trade or business. UBTI generally does not include certain passive income, including dividends, interest, annuities, royalties and gain or loss from the disposition of property held for investment, unless such income items are debt-financed income (as discussed below).

While UBTI itself is taxable, the receipt of UBTI by a Tax-Exempt Entity generally has no effect upon that entity's tax-exempt status or upon the exemption from tax of its other income. However, for certain types of Tax-Exempt Entities, the receipt of any UBTI may have extremely adverse consequences. In particular, for charitable remainder trusts (as defined under Section 664 of the Code), the receipt of any taxable income from UBTI during a taxable year will result in the imposition of an excise tax equal to the amount of such UBTI.

A Tax-Exempt Entity also includes in its UBTI its "unrelated debt-financed income" (and its allocable share of the "unrelated debt-financed income" of any partnership in which it invests) pursuant to Section 514 of the Code. In general, unrelated debt-financed income consists of: (i) income derived by a Tax-Exempt Entity (directly or through a partnership) from income producing property with respect to which there is "acquisition indebtedness"

018818

HCMLPHMIT00004018

at any time during the taxable year; and (ii) gains derived by a Tax-Exempt Entity (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness". Acquisition indebtedness is generally defined as debt incurred to purchase or carry an investment. Such income and gains derived by a Tax-Exempt Entity from the ownership and sale of debt-financed property are taxable in the proportion to which such property is financed by acquisition indebtedness during the relevant period of time.

**Income From the Partnership's Private Equity Investments**. The Investment Manager will invest a substantial portion of the Partnership's Series 1 assets in the PE Portfolio Fund, and such partnership expects to invest in equity interests of other partnerships which will be engaged in business activities. It is anticipated that such portfolio companies may also use borrowed funds to acquire property. Accordingly, Limited Partners that are Tax-Exempt Entities should anticipate that a substantial portion, and possibly all, of their distributive share of the Partnership's net income realized from ownership of equity interests in such portfolio companies, including gain realized upon sales of such equity investments, will be subject to federal income tax as UBTI.

**Income From the Partnership's Other Activities**. The Investment Manager expects that the Partnership will incur indebtedness in connection with its operations from time to time. The law is not entirely clear regarding the appropriate method to be used to determine what portion of a tax-exempt Limited Partner's share of the Partnership's income is attributable to debt financing and therefore constitutes "debt-financed income". Accordingly while the Partnership will compute each tax-exempt Limited Partner's share of "debt-financed income" from the Partnership in a manner which the Partnership considers to be reasonable, there can be no assurance that the IRS will accept the method of computation used by the Partnership.

Tax-exempt Limited Partners will also realize UBTI if the Partnership acquires equity interests of publicly traded partnerships or private partnerships that are engaged in trade or business activities or the Partnership directly carries on other trade or business activities (other than as a securities trader).

## OTHER TAXES

Partners may be subject to other taxes, such as the alternative minimum tax, state and local income taxes, and estate, inheritance or intangible property taxes that may be imposed by various jurisdictions. Each prospective investor should consider the potential consequences of such taxes due to an investment in the Partnership. It is the responsibility of each prospective investor to become satisfied as to the legal and tax consequences of an investment in the Partnership under state law, including the laws of the state(s) of its, his or her domicile and residence, by obtaining advice from such investor's own tax advisors, and to file all appropriate tax returns that may be required.

Income received by the Partnership from sources within non-U.S. countries may be subject to withholding and other taxes imposed by such countries. Each Partner may be entitled either to deduct (as an itemized deduction) such Partner's proportionate share of the non-U.S. taxes of the Partnership in computing such Partner's taxable income or to use the amount as a foreign tax credit against his or its U.S. federal income tax liability, subject to limitations. Generally, a credit for non-U.S. taxes is subject to the limitation that it may not exceed the taxpayer's U.S. tax attributable to his or its non-U.S. source taxable income. With respect to Partners that are U.S. Persons: (i) certain currency fluctuation gains, including fluctuation gains from non-U.S.-Dollar-denominated debt securities, receivables and payables, will be treated as ordinary income derived from U.S. sources; and (ii) Partnership gains from the sale of securities also will be treated as derived from U.S. sources. The limitation on the foreign tax credit is applied separately to non-U.S. source passive income (as defined for purposes of the foreign tax credit), including the non-U.S. source passive income realized by the Partnership. The foreign tax credit limitation rules do not apply to certain electing individual taxpayers who have limited creditable non-U.S. taxes and no non-U.S. source income other than passive investment-type income. The foreign tax credit generally is eliminated with respect to non-U.S. taxes withheld on income and gain if the Partnership fails to satisfy minimum holding period

018819

HCMLPHMIT00004019

requirements with respect to the property giving rise to the income and gain.

## TAX ELECTIONS; RETURNS; TAX AUDITS

If the General Partner determines that the Partnership is treated as a securities trader for federal income tax purposes, the General Partner may cause the Partnership to elect to "mark-to-market" its securities at the end of each taxable year, in which case such securities would be treated for federal income tax purposes as though sold for fair market value on the last business day of such taxable year. Such an election under Code Section 475(f) would apply to the taxable year for which made and all subsequent taxable years unless revoked with the consent of the IRS. If the Partnership were to make such an election, all or a portion of the Partnership's gains and losses would be considered ordinary income or loss, rather than capital gain or loss. Since for federal income tax purposes capital losses generally may be deducted only against capital gains, a Limited Partner may be unable to deduct capital losses realized from other investments and transactions in a taxable year against his share of the Partnership's income.

The Code provides for optional adjustments to the basis of partnership property upon distributions of partnership property to a partner and transfers of partnership interests (including by reason of death); provided that a partnership election has been made pursuant to Section 754 of the Code. Under the Partnership Agreement, the General Partner, in its sole discretion, may cause the Partnership to make such an election. Any such election, once made, cannot be revoked without the IRS's consent. The General Partner also has the authority and sole discretion to make or refrain from making other tax elections that are available to the Partnership.

Additionally, even if a partnership has not made a Section 754 election, Section 743 of the Code provides for a mandatory basis adjustment to partnership property on certain transfers of partnership interests (including transfers by reason of death), if the partnership has a "substantial built-in loss" immediately after such transfer. A partnership is treated as having a "substantial built-in loss" if the partnership's adjusted basis in partnership property exceeds the property's fair market value by more than $250,000. Section 734 of the Code also provides for mandatory basis adjustments in the case of certain property distributions to partners. Such Code provisions could cause the Partnership to decrease the basis of its remaining assets in such circumstances.

The General Partner will decide how to report partnership items on the Partnership's tax returns and all Limited Partners are required to treat such tax items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. Since the Partnership may engage in transactions whose treatment for tax purposes is not clear, there is a risk that a claim of tax liability could be asserted against the Partnership or its Partners. In the event that the income tax returns of the Partnership are audited by the IRS, the tax treatment of Partnership income and deductions generally is determined at the partnership level in a single proceeding rather than by individual audits of the Partners. As the "Tax Matters Partner", the General Partner has considerable authority to make decisions affecting the tax treatment and procedural rights of all Partners. In addition, the Tax Matters Partner has the authority to bind certain Partners to settlement agreements and the right on behalf of all Partners to extend the statute of limitations relating to the Partners' tax liabilities with respect to partnership items. The General Partner may, in its sole discretion, consult with, and rely upon, the Partnership's auditors and their determinations or advice as to tax and/or accounting matters.

It is possible that the Partnership and or certain transactions executed by the Partnership would be subject to tax shelter disclosure registration and listing requirements under applicable U.S. tax laws and regulations.

**PFIC Reporting.** The Code provides that each U.S. Person (as defined herein) that is a direct or indirect shareholder of a PFIC (generally, an investment corporation organized under the laws of a foreign jurisdiction) is required to file an annual information return containing such information as the IRS may require. Limited Partners would be indirect shareholders of stock in any PFICs owned by the Partnership, and would satisfy such filing requirement (if applicable to such Partner) by completing a copy of IRS Form 8621

018820

HCMLPHMIT00004020

for the reportable PFIC investment and submitting such forms to the IRS with the Partner's federal income tax return.

**FATCA Withholding and Compliance**. The provisions of the Code known as the Foreign Account Tax Compliance Act ("**FATCA**") provide that a 30% withholding tax will be imposed on payments of U.S.-source dividends and interest (and certain other items of U.S.-source income) to certain foreign financial entities, and beginning on January 1, 2017 with regard to other withholdable payments (including gross proceeds from the sale of property that give rise to U.S.-source, interest or dividends), unless the foreign financial entity has registered with the IRS and agreed to provide specified U.S. tax information concerning "specified U.S. persons" that own interests in the foreign entity. The Partnership is a withholding agent with respect to such withholding taxes that may be imposed on any of its Partners. U.S. and non-U.S. Partners will be required to furnish appropriate documentation certifying as to their U.S. or non-U.S. tax status, together with such other additional tax information as the Partnership may from time to time request. Limited Partners that are "non-financial foreign entities" (as defined in Code Section 1472) are required to certify whether they have any "substantial United States owners" and, if so, to disclose the identity and tax identification numbers of such persons to the Partnership. Failure to provide such information may subject a Limited Partner to withholding taxes or mandatory withdrawal of its entire interest in the Partnership. Limited Partners are encouraged to consult with their own tax advisors regarding the possible impact of the FATCA legislation on their investment in the Partnership.

## OTHER MATTERS

The Partnership may incur certain expenses in connection with its organization and the marketing of the Interests. Amounts paid or incurred to organize the Partnership are being amortized, for tax purposes, over a period of 180 months from the date the Partnership commenced operations. Amounts paid or incurred to market interests in a partnership (marketing and syndication expenses) are not deductible or amortizable.

018821

HCMLPHMIT00004021

### SPECIAL CONSIDERATIONS FOR PARTNERS THAT ARE NOT U.S. PERSONS

A "**U.S. Person**" is (a) a citizen or resident of the United States, (b) a corporation, partnership, or other entity organized under the laws of the United States, any state, or the District of Columbia, other than a partnership that is not treated as a U.S. Person under the Regulations, (c) an estate whose income is subject to United States income tax, regardless of its source, or (d) a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. Persons have the authority to control all substantial decisions of the trust. In addition, to the extent provided in the Regulations, "U.S. Person" includes certain trusts in existence on August 20, 1996, and treated as U.S. Persons prior to such date, that have elected to be treated as U.S. Persons.  Partners that are not U.S. Persons are referred to below as "non-U.S. Partners".

**Taxation of Effectively Connected Income**.  The Partnership expects to be treated for U.S. tax purposes as being engaged in the conduct of a U.S. trade or business.   As a result, non-U.S. Limited Partners that acquire interests in the Partnership will generally be treated as being engaged in the conduct of a U.S. trade or business.  Thus, each non-U.S. Limited Partner will be subject to U.S. federal income taxation, at graduated rates, on its distributive share of the Partnership's income, gain or loss (whether ordinary or capital) that is effectively connected with the conduct of the Partnership's U.S. trade or business ("**ECI**").  Such Limited Partners will be required to file annual U.S. federal income tax returns with respect to such ECI, and the Partnership will be required to withhold and remit to the U.S. Treasury a portion of the non-U.S. Limited Partner's distributive share of such ECI.  The Limited Partner would be entitled to claim a credit on his U.S. federal income tax return for the amount withheld by the Partnership with respect to such ECI.  Non-U.S. Limited Partners may also be required to file applicable state and local tax returns in jurisdictions in which the Partnership is engaged in business or in which its real property interests are located.

**U.S. Branch Profits Tax**.  In the case of a Limited Partner that is a non-U.S. corporation, in addition to the regular corporate income tax that must be paid on its ECI, the Code provides for an additional 30% "branch profits" tax.  The branch profits tax is 30% (or lower rate permitted by tax treaty) of the foreign corporation's "dividend equivalent amount".  This is the amount of the foreign corporation's effectively connected after-tax earnings that are not reinvested in a U.S. trade or business by the end of the tax year or disinvested in a later tax year.  Certain income tax treaties may reduce or eliminate the branch profits tax; however, under certain circumstances, the branch profits tax may override income tax treaty benefits.

**FIRPTA**.   The Foreign Investment in Real Property Tax Act of 1980, as amended ("**FIRPTA**"), imposes a  tax on gain realized on disposition by a foreign person of a "U.S. real property interest" ("**USRPI**") by treating such gain as ECI, generally giving rise to the tax consequences described above.  A USRPI  includes a direct investment in U.S. real estate and buildings and also investments in stock and certain types of debt interests of a U.S. corporation that is classified as a "U.S. real property holding corporation" (as defined in the Code).  A USRPI held by a partnership is deemed to be held proportionately by its partners.

**Taxation of Non-ECI**.  The Partnership also expects to realize certain types of periodic income from U.S. sources (e.g., dividends and certain types of interest) which are not classified as ECI.  Each non-U.S. Limited Partner will be subject to a flat 30% withholding tax on its allocable share of the gross amount of such income.  Such withholding tax is sometimes reduced or eliminated by an applicable income tax treaty, provided that the proper certification is provided by the non-U.S. Limited Partner when necessary.  The applicable IRS form or forms (W-8 series) should be submitted to the Partnership by each non-U.S. Limited Partner at the time such Limited Partner acquires an Interest in the Partnership, and should be resubmitted every three years thereafter (or earlier, if the information on such form changes before such date).

**Disposition of Partnership Interests**.  A non-U.S. Limited Partner that disposes of its Interest in the Partnership, by sale or otherwise, may be subject to U.S. federal income

018822

HCMLPHMIT00004022

taxation on such disposition. A transferee of an Interest in the Partnership may be required to deduct and withhold a tax equal to 10% of the gross amount realized on such disposition. Any amount so withheld can be applied as a credit against the U.S. federal income tax liability of the non-U.S. Limited Partner and can be recovered as a refund in the event of overpayment.

**U.S. Estate and Gift Taxation of Interests**. Non-U.S. Limited Partners that are individuals should also be aware that Interests in the Partnership will be treated as U.S. situs property by reason of the Partnership's ownership of U.S. real property interests, and thus subject to U.S. estate taxation upon the death on a non-U.S. individual owner, or U.S. gift taxation upon a donative transfer of such Interest.

## STATE TAXATION

In addition to the federal income tax consequences described above, prospective investors should consider potential state tax consequences of an investment in the Partnership. No attempt is made herein to provide a discussion of such state tax consequences. State laws often differ from federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit. A Partner's distributive share of the taxable income or loss of the Partnership generally will be required to be included in determining the Partner's reportable income for state tax purposes in the jurisdiction in which such Partner a resident. Each prospective investor must consult such investor's own tax advisors regarding such state tax consequences.

## FUTURE TAX LEGISLATION

Future amendments to the Code, other legislation, new or amended Regulations, administrative rulings or guidance by the IRS, or judicial decisions may adversely affect the federal income tax aspects of an investment in the Partnership, with or without advance notice, and retroactively or prospectively.

018823

HCMLPHMIT00004023

# EXHIBIT 81

018824

Sadis Goldberg LLP

| FOR THE EXCLUSIVE USE OF: | | COPY NO. | |
|---|---|---|---|

## Rand PE Fund I, L.P.

### A DELAWARE "SERIES" LIMITED PARTNERSHIP

**GENERAL PARTNER:**
RAND PE FUND MANAGEMENT, LLC

**INVESTMENT MANAGER:**
RAND ADVISORS, LLC

**OFFERING OF SERIES 1 LIMITED PARTNERSHIP INTERESTS**

**November 30, 2015**

### CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

THIS IS NOT AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY THE INTERESTS DESCRIBED HEREIN IN ANY JURISDICTION TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SALE.

018825

HCMLPHMIT00004024

## DIRECTORY

| INVESTMENT MANAGER | GENERAL PARTNER |
|---|---|
| RAND ADVISORS, LLC | RAND PE FUND MANAGEMENT, LLC |
| 87 RAILROAD PLACE, SUITE 403 | 87 RAILROAD PLACE, SUITE 403 |
| SARATOGA SPRINGS, NY 12866 | SARATOGA SPRINGS, NY 12866 |
| ATTENTION: JOHN HONIS | ATTENTION: JOHN HONIS |
| TELEPHONE: (214) 335-7969 | TELEPHONE: (214) 335-7969 |
| EMAIL: JHONIS@RANDADVISORS.COM | EMAIL: JHONIS@RANDADVISORS.COM |

LEGAL COUNSEL
SADIS & GOLDBERG LLP
551 FIFTH AVENUE, 21ST FLOOR
NEW YORK, NEW YORK 10176
ATTENTION: STEVEN HUTTLER, ESQ.
TELEPHONE: (212) 573-8424
FACSIMILE: (212) 573-8151
EMAIL: SHUTTLER@SGLAWYERS.COM

018826

HCMLPHMIT00004025

## TABLE OF CONTENTS

CAPTION                                                                                          PAGE

OVERVIEW ..................................................................................................... 1

IMPORTANT GENERAL CONSIDERATIONS................................................................ 3

SUMMARY OF OFFERING AND PARTNERSHIP TERMS.................................................. 6

MANAGEMENT ............................................................................................... 20

SERVICE PROVIDERS ........................................................................................ 22

INVESTMENT PROGRAM .................................................................................... 24

BROKERAGE PRACTICES ................................................................................... 27

RISK FACTORS AND CONFLICTS OF INTEREST........................................................ 30

ERISA CONSIDERATIONS ................................................................................. 55

TAXATION .................................................................................................... 57


EXHIBITS

AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT ....................................... EXHIBIT A

SUBSCRIPTION DOCUMENTS ............................................................................. EXHIBIT B

PART 2 OF RAND ADVISORS, LLC'S FORM ADV......................................................... EXHIBIT C

018827

HCMLPHMIT00004026

### DESCRIPTION OF INTERESTS AND STRUCTURE

Rand PE Fund I, L.P. ("**Partnership**"), a "series" limited partnership organized under the Delaware Revised Uniform Limited Partnership Act, is offering limited partner interests in the Partnership ("**Interests**") in a private placement pursuant to Section 4(a)(2) of the Securities Act of 1933, as amended ("**Securities Act**"), and Regulation D promulgated thereunder.  The Partnership may offer Interests in separate Series (as defined and described herein).  Only Series 1 Interests (as defined herein) are offered at this time pursuant to this Memorandum.

Only persons that are Accredited Investors (as defined in Rule 501 of Regulation D promulgated under the Securities Act), Qualified Clients (as defined in Rule 205-3 promulgated under the Investment Advisers Act of 1940, as amended ("**Advisers Act**")), and Qualified Purchasers (as defined under Section 2(a)(51) of the Investment Company Act of 1940, as amended ("**Investment Company Act**")) may purchase Interests.  The Subscription Documents (as defined below) set forth in detail the definitions of Accredited Investor, Qualified Client and Qualified Purchaser.

The Partnership was formed to pool investment funds of its investors (each, a "**Limited Partner**" and, collectively, "**Limited Partners**"; and, together with the General Partner (as defined below), "**Partners**") for the purpose of investing and trading in a wide variety of securities, financial instruments and other assets and investments, including other investment vehicles, as more fully described herein.

Rand PE Fund Management, LLC, a Delaware limited liability company ("**General Partner**"), is the general partner of the Partnership and is responsible for the management of the Partnership's affairs.

Rand Advisors, LLC, a Delaware limited liability company ("**Investment Manager**"), is the investment manager of the Partnership and has discretionary investment authority over the Partnership's assets.  The Investment Manager is registered as an investment adviser with the U.S. Securities and Exchange Commission ("**SEC**").  A copy of Part 2 of the Investment Manager's Form ADV is attached hereto as Exhibit C.

As the managing member and controlling person of the General Partner and the Investment Manager, John Honis controls all of the Partnership's operations and activities.

The minimum initial capital contribution that will be accepted from a new Limited Partner is $500,000.  The minimum additional capital contribution that will be accepted from an existing Limited Partner is $500,000.  In each case, the General Partner has discretion to accept lesser amounts.  Generally, new Limited Partners will be admitted on the first day of each month, and withdrawals may be made on the last day of each calendar quarter upon 91 days' prior written notice, subject to certain restrictions as described herein (unless, in each case, the General Partner, in its sole discretion, permits subscriptions or withdrawals at another time).

*[remainder of this page intentionally left blank]*

018828

HCMLPHMIT00004027



## INVESTMENT OBJECTIVE AND STRATEGY

The Partnership's primary objective is to seek consistent above-average returns primarily through capital appreciation.  The Investment Manager intends to invest the Partnership's portfolio in small- to medium-sized companies (i.e., generally with market capitalization of under $1 billion) that are involved in (or are the target of) acquisition attempts or tender offers, and/or in companies involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies or similar transactions.  The Investment Manager intends to use a disciplined investment philosophy by combining thorough fundamental research and in-depth analysis of investment opportunities.   The Partnership (x) is expected to initially invest all or substantially all of the assets attributable to Series 1 in the Highland Transaction (as defined herein), if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction.  **No assurance can be given, however, that the Investment Manager will achieve the Partnership's investment objective, and investment results may vary substantially over time and from period to period.**  See "INVESTMENT PROGRAM" herein for further details.

## RISK FACTORS, CONFLICTS OF INTERESTS AND OTHER CONSIDERATIONS

Before purchasing an Interest in the Partnership, you should carefully consider various risk factors and conflicts of interest, as well as suitability requirements, restrictions on transfers and withdrawals of Interests and various legal, tax and other considerations, all of which are discussed elsewhere in this Confidential Private Placement Memorandum (this "**Memorandum**").

018829

HCMLPHMIT00004028

### IMPORTANT GENERAL CONSIDERATIONS

You should not construe the contents of this Memorandum as legal, tax or investment advice and, if you acquire an Interest, you will be required to make a representation to that effect. You should review the proposed investment and the legal, tax and other consequences thereof with your own professional advisors. The purchase of an Interest involves certain risks and conflicts of interest among the General Partner, the Investment Manager and the Partnership. See "RISK FACTORS AND CONFLICTS OF INTEREST". The General Partner reserves the right to refuse any subscription for any reason.

In making an investment decision, you must rely on your own examination of the Partnership and the terms of the offering of Interests, including the merits and risks involved. You and your representative(s), if any, are invited to ask questions and obtain additional information from the General Partner concerning the terms and conditions of the offering, the Partnership, and any other relevant matters to the extent that the General Partner possesses such information or can acquire it without unreasonable effort or expense.

Neither the SEC nor any state securities commission has passed upon the merits of participating in the Partnership, nor has the SEC or any state securities commission passed upon the adequacy or accuracy of this Memorandum. Any representation to the contrary is a criminal offense. The General Partner anticipates that: (i) the offer and sale of the Interests will be exempt from registration under the Securities Act and the various state securities laws; (ii) the Partnership will not be registered as an investment company under the Investment Company Act, pursuant to an exemption provided by Section 3(c)(7) thereunder; and (iii) neither the General Partner nor the Investment Manager will be registered as a commodity pool operator under the Commodity Exchange Act, as amended ("CEA"), based upon an exemption available under Rule 4.13(a)(3) thereunder. Consequently, you will not be entitled to certain protections afforded by those statutes.

The Investment Manager is registered as an investment adviser with the SEC. A copy of Part 2 of the Investment Manager's Form ADV is attached hereto as Exhibit C.

Pursuant to Rule 4.13(a)(3) of the CEA, each of the General Partner and the Investment Manager is exempt from registration with the Commodity Futures Trading Commission ("CFTC") as a commodity pool operator and therefore, unlike a registered commodity pool operator, it is not required to deliver a Disclosure Document (as such term is defined under CFTC rules) and a certified annual report to participants in the pool. The foregoing registration exemption is based on the Partnership's limited commodity trading activity and its undertaking that at all times either: (a) the aggregate initial margin and premiums required to establish commodity interest positions, determined at the time the most recent position was established, will not exceed 5% of the liquidation value of the Partnership's portfolio, after taking into account unrealized profits and losses on any such positions; or (b) the aggregate net notional value of the Partnership's commodity interest positions, determined at the time the most recent position was established, will not exceed 100% of the liquidation value of the Partnership's portfolio, after taking into account unrealized profits and losses on any such positions. Certain types of swaps are included in the definition of "commodity interests". These swaps include interest rate swaps, currency swaps, energy and metal swaps, agricultural swaps, swaps on broad-based indices, swaps on government securities and certain mixed swaps.

As a Limited Partner, you may withdraw from the Partnership and receive payment for your Interests, subject to certain restrictions, as specified in the Amended and Restated Limited Partnership Agreement of the Partnership (as the same may be amended and/or restated from time to time, the "Partnership Agreement"), a copy of

018830

HCMLPHMIT00004029

which is attached hereto as Exhibit A.

The offering of Interests is made only by delivery of a copy of this Memorandum to the person whose name appears hereon. The offering is made only to potential investors who are Accredited Investors, Qualified Clients and Qualified Purchasers. By accepting delivery of this Memorandum, you agree not to reproduce or divulge its contents, in whole or in part, and, if you do not purchase any Interests, to return this Memorandum and the exhibits attached hereto to the General Partner or the Partnership's administrator, a provider of administrative services ("Administrator"), as further set forth herein under "SERVICE PROVIDERS—Administrator".

Notwithstanding any provision in this Memorandum to the contrary, prospective Limited Partners (and their employees, representatives, and other agents) may disclose to any and all persons the U.S. federal income tax treatment and tax structure of the Interests offered hereby. For this purpose, "tax structure" is limited to facts relevant to the U.S. federal income tax treatment of the Interests, and does not include information relating to the identity of the issuer, its affiliates, agents or advisors.

There is no public market for the Interests nor is any expected to develop. Even if such a market develops, no distribution, resale or transfer of an Interest will be permitted, except in accordance with the provisions of the Securities Act, the rules and regulations promulgated thereunder, any applicable state securities laws and the terms and conditions of the Partnership Agreement. Any transfer of an Interest by a Limited Partner, public or private, will require the consent of the General Partner. Accordingly, if you purchase an Interest, you will be required to represent and warrant that you have read this Memorandum and are aware of and can afford the risks of an investment in the Partnership for an indefinite period of time. You will also be required to represent that you are acquiring the Interest for your own account, for investment purposes only, and not with any intention to resell or transfer all or any part of the Interest. This investment is suitable for you only if you have adequate means of providing for your current and future needs, have no need for liquidity in this investment and can afford to lose the entire amount of your investment.

Although this Memorandum contains summaries of certain terms of certain documents pertaining to the Partnership, you should refer to the actual documents (copies of which are attached hereto or are available from the General Partner or the Administrator) for complete information concerning the rights and obligations of the parties thereto. All such summaries are qualified in their entirety by the terms of the actual documents. No person has been authorized to make any representations or furnish any information with respect to the Partnership or the Interests, other than the representations and information set forth in this Memorandum or other documents or information furnished by the General Partner upon request, as described above.

Certain information contained in this Memorandum constitutes "forward-looking statements", which can be identified by the use of forward-looking terminology, such as "may", "will", "seek", "should", "expect", "anticipate", "project", "estimate", "intend", "continue" or "believe" or the negatives thereof or other variations thereon or comparable terminology. Due to various risks and uncertainties, including those set forth under "RISK FACTORS AND CONFLICTS OF INTEREST", actual events or results or the actual performance of the Partnership may differ materially from those reflected or contemplated in such forward-looking statements.

No rulings have been sought from the Internal Revenue Service ("IRS") with respect to any tax matters discussed in this Memorandum. You are cautioned that the views contained herein are subject to material qualifications and subject to possible changes in regulations by the IRS or by the U.S. Congress in existing tax statutes or in the interpretation of existing statutes and regulations.

018831

HCMLPHMIT00004030

**The information contained herein is current only as of the date hereof and you should not, under any circumstances, assume that there has not been any change in the matters discussed herein since the date hereof.**

018832

HCMLPHMIT00004031

## SUMMARY OF OFFERING AND PARTNERSHIP TERMS

The following summary is qualified in its entirety by other information contained elsewhere in this Confidential Private Placement Memorandum (this "**Memorandum**") and by Amended and Restated the Limited Partnership Agreement of the Partnership (as defined below) (as the same may be amended and/or restated from time to time, the "**Partnership Agreement**"), a copy of which is attached to this Memorandum as Exhibit A. You should read this entire Memorandum and the Partnership Agreement, carefully before making any investment decision regarding the Partnership and should pay particular attention to the information under the heading "RISK FACTORS AND CONFLICTS OF INTEREST". In addition, you should consult your own advisors in order to understand fully the consequences of an investment in the Partnership.

**The Partnership**

Rand PE Fund I, L.P., a Delaware "series" limited partnership ("**Partnership**"), was formed to pool investment funds of its investors (each, a "**Limited Partner**" and, collectively, "**Limited Partners**"; and, together with the General Partner (as defined below), "**Partners**") for the purpose of investing and trading in a wide variety of securities, financial instruments and other assets and investments, including other investment vehicles, as more fully described herein.

The Partnership (x) is expected to initially invest all or substantially all of the assets attributable to Series 1 in all or substantially all of the non-voting limited partnership interests in Highland Capital Management, L.P. which the Partnership currently expects to acquire after the launch of its operations (such purchase or other acquisition, if any, collectively, the "**Highland Transaction**"), and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction.

See "INVESTMENT PROGRAM" and "RISK FACTORS AND CONFLICTS OF INTEREST—Conflicts of Interest—Certain Potential Conflicts Between the Principal and Highland Related to the Series 1 Interests" herein.

The Partnership may offer Interests in separate Series (as defined and described herein). Only Series 1 Interests (as defined herein) are offered at this time pursuant to this Memorandum.

**Management**

Rand PE Fund Management, LLC, a Delaware limited liability company ("**General Partner**"), is the general partner of the Partnership and is responsible for the management of the Partnership's affairs.

Rand Advisors, LLC, a Delaware limited liability company ("**Investment Manager**"), is the investment manager of the Partnership and has discretionary investment authority over the Partnership's assets. The Investment Manager is registered as an investment adviser with the U.S. Securities and Exchange Commission ("**SEC**"). A copy of Part 2 of the Investment Manager's Form ADV is attached hereto as Exhibit C.

As the managing member and controlling person of the General Partner and the Investment Manager, John Honis ("**Principal**") controls all of the Partnership's operations and activities. See "MANAGEMENT" for additional information.

**Issuance of Interests in Multiple Series**

The Interests will be offered in separate series ("**Series**"). The Partnership is currently offering one Series of Interests: "**Series 1 Interests**". Each Series of Interests will have separate rights and obligations. In addition, each Series of Interests may correspond to a separate portfolio of assets, which may have different investment objectives and strategies. The Partnership may issue additional Series of Interests in the future, which may have rights and obligations that differ from those of the Series 1 Interests with respect to any matters, including without limitation, fees, withdrawal rights, participation in Side Pocket Accounts (as defined herein) and other rights and terms. The terms of such additional Series will be determined by the General Partner, in its sole discretion.

Each Series shall have separate rights, powers and duties with respect to its investment portfolio and other property and obligations and the profits and losses associated with

018833

HCMLPHMIT00004032

such portfolio, property and obligations.  The Partnership will maintain separate and distinct records for each Series and shall hold and account for the assets and liabilities of such Series separately from other Series.

Under Delaware law, (i) the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to a particular Series shall be enforceable against the assets of such Series only, and not against the assets of any other Series, and (ii) none of the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to the Partnership generally or any other Series shall be enforceable against the assets of such Series.

Unless the context otherwise requires, Series 1 Interests and any other Series of Interests shall be collectively referred to throughout this Memorandum as the "**Interests**."  As the context may require, the holders of Series 1 Interests may be referred to herein as "**Series 1 Limited Partners**".  Series 1 Limited Partners and, to the extent applicable, all the Limited Partners of other Series shall be collectively referred to throughout this Memorandum as the "**Limited Partners**".

References herein to the Partnership shall include, where appropriate, each Series of the Partnership.  The terms of the other Series may be set forth in an amended version of this Memorandum and/or in a separate supplement hereto.

**The Offering**

The Partnership is offering limited partner interests in the Partnership ("**Interests**") to persons who are Accredited Investors (as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended ("**Securities Act**")), Qualified Clients (as defined in Rule 205-3 promulgated under the Investment Advisers Act of 1940, as amended ("**Advisers Act**")), and Qualified Purchasers (as defined under Section 2(a)(51) of the Investment Company Act of 1940, as amended ("**Investment Company Act**")).  Interests represent a percentage interest in the Partnership proportionate to the capital accounts of all Partners.

**Marketing Fees and Sales Charges**.  The General Partner and/or the Investment Manager may sell Interests through broker-dealers and pay a marketing fee or commission in connection with such activities, including ongoing payments, at the General Partner's or the Investment Manager's own expense.  The General Partner and/or the Investment Manager may also deduct a percentage of the amount invested by a Limited Partner in the Partnership to pay sales fees or charges, on a fully disclosed basis, to a broker-dealer based upon the capital contribution of such Limited Partner introduced to the Partnership by such broker-dealer.  Any such sales fees or charges would be assessed against the referred Limited Partner and would reduce the amount actually invested by such Limited Partner in the Partnership.  If a Limited Partner is introduced to the Partnership through a broker-dealer that is not affiliated with the General Partner and/or the Investment Manager, the arrangement, if any, with such broker-dealer will be disclosed to, and acknowledged by, such Limited Partner.  See "BROKERAGE PRACTICES—Referral of Investors and Sales Charges".

**How to Subscribe**

Attached as Exhibit B to this Memorandum are the subscription documents and instructions for subscribing ("**Subscription Documents**").  In order to subscribe for Interests, you must complete the Subscription Documents and return them to the Partnership's administrator, a provider of administrative services ("**Administrator**"), as further set forth herein under "SERVICE PROVIDERS—Administrator".  You must pay 100% of your investment at the time you subscribe.  Payment must be made by wire transfer of immediately available funds to the Partnership.  To ensure compliance with applicable laws, regulations and other requirements relating to money laundering, the General Partner and/or the Administrator may require additional information to verify the identity of any person who subscribes for an Interest in the Partnership.

If the General Partner consents to a Limited Partner's contribution of securities (and/or other investments) to the Partnership, the Partnership may, in the General Partner's discretion, assess a special charge against such Limited Partner equal to the actual costs incurred by the Partnership in connection with accepting such contributed securities (and/or other investments), including the costs of liquidating, or otherwise adjusting the

018834

HCMLPHMIT00004033

Partnership's portfolio to accommodate, such securities (and/or other investments). Such special charge will be assessed as of such dates deemed appropriate by the General Partner. Any investor who contributes securities (and/or other investments) in lieu of cash to the Partnership should consult with such person's counsel or advisors as to the tax effect of such contribution.

| | |
|---|---|
| **Eligible Investors and Suitability** | In order to invest in the Partnership, you must meet certain minimum suitability requirements, including qualifying as an Accredited Investor under the Securities Act, a Qualified Client under the Advisers Act and a Qualified Purchaser under the Investment Company Act. The Subscription Documents set forth in detail the definitions of Accredited Investor, Qualified Client and Qualified Purchaser. You must check the appropriate places in the Subscription Documents to represent to the Partnership that you are an Accredited Investor, a Qualified Client and a Qualified Purchaser in order to be able to purchase Interests. The General Partner, in its sole discretion, can accept or reject any initial subscriptions from prospective Limited Partners and any additional capital contributions from existing Limited Partners for any reason or for no reason. |
| | Entities subject to the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), and other tax-exempt entities may purchase Interests. However, investment in the Partnership by such entities requires special consideration. Trustees or administrators of such entities should consult their own legal and tax advisors. The General Partner intends to use reasonable efforts to limit equity participation by "benefit plan investors" in the Partnership to less than 25% of the value of any class of Interests in the Partnership. See "ERISA CONSIDERATIONS" and "TAXATION—Tax-Exempt Investors". |
| **Minimum Investment** | The minimum initial capital contribution that will be accepted from a new Limited Partner is $500,000. The minimum additional capital contribution that will be accepted from an existing Limited Partner is $500,000. In each case, the General Partner has discretion to accept lesser amounts. Limited Partners are not required to make any additional capital contributions to the Partnership. There is no minimum or maximum aggregate amount of funds that must or may be contributed by all Partners to the Partnership. |
| **Admission of Limited Partners** | Capital contributions generally will be accepted as of the first day of each month, although the General Partner, in its sole discretion, has the right to admit new Limited Partners and to accept additional funds from existing Limited Partners at any time. Upon such admission or receipt of additional capital contributions, the Interests of the Partners will be readjusted in accordance with their capital accounts. |
| | In connection with an additional capital contribution by an existing Limited Partner, the General Partner will: (i) treat such additional capital contribution as a capital contribution with respect to one of such Limited Partner's existing capital accounts, or (ii) establish a new capital account to which such capital contribution will be credited and which will be maintained for the benefit of such Limited Partner separately from any existing capital account of such Limited Partner. Such separate capital accounts may be maintained for any purpose, in the discretion of the General Partner. |
| **Management Fee** | The Partnership has entered into an investment management agreement (as the same may be amended and/or restated from time to time, the "**Investment Management Agreement**") by and among the Partnership and the Investment Manager. In consideration for services provided pursuant to the Investment Management Agreement, the Investment Manager will receive a quarterly management fee ("**Management Fee**"), equal to a percentage of each Limited Partner's share of the Partnership's Net Asset Value (as defined herein), and based on the Partnership's total Net Asset Value, as follows: |

| Partnership's Total Net Asset Value | Management Fee (per annum) |
|---|---|
| $0 - $99,999,999 | 0.5500% |
| $100,000,000 - $199,999,999 | 0.5000% |

018835

HCMLPHMIT00004034

| $200,000,000 - $249,999,999 | 0.4500% |
| $250,000,000 - $499,999,999 | 0.3500% |
| > $500,000,000 | 0.3400% |

For the avoidance of doubt, the Management Fee calculated based on the foregoing schedule will be calculated on a "progressive" basis. For example, if the Partnership's Net Asset Value reaches $150,000,000, the initial $99,999,999 will always be charged a Management Fee of 0.55000% annually. The benefit of the declining Management Fee schedule above is intended to benefit all Limited Partners as each capital account will be charged a blended Management Fee based on the above schedule.

The Management Fee will be calculated and payable to the Investment Manager quarterly, in advance, as of the first day of each calendar quarter. A *pro rata* Management Fee will be charged to Limited Partners on any amounts accepted by the General Partner during a calendar quarter. No part of the Management Fee will be refunded in the event that a Limited Partner withdraws, whether voluntarily or involuntarily, all or any of the value in such Limited Partner's capital account during any calendar quarter. Management Fees will be payable with respect to the Interests of a Limited Partner in any Side Pocket Account (as defined below). For purposes of calculating the Management Fee with respect to Side Pocket Accounts, Illiquid Investments (as defined herein) will be carried at their fair value (which may be at, above or below cost) as determined by the Investment Manager.

With respect to any Limited Partner who has requested to withdraw all of its Interests from the Partnership, with the exception of any Interests maintained in a Side Pocket Account, the Partnership may reserve an amount from the withdrawing Limited Partner's withdrawal proceeds in order to cover the estimated accrued Management Fees and expenses attributable to the Limited Partner's Interests in the Side Pocket Account based on the Investment Manager's estimate of the time period that the Illiquid Investments held in the Side Pocket Account will remain in such Side Pocket Account (collectively, the "**Management Fee Reserve**"). The Management Fee Reserve will be treated as a liability of the Partnership, and the balance of the Management Fee Reserve, if any, will be paid to the withdrawing Limited Partner, without interest, upon such Limited Partner's complete withdrawal from the Side Pocket Account.

| | |
|---|---|
| Expenses | **Organizational and Initial Offering Expenses.** The Partnership will pay or reimburse the General Partner, the Investment Manager and/or the Investment Manager Affiliates (as defined herein) for all organizational and initial offering expenses of the Partnership, including, but not limited to, legal and accounting fees, printing and mailing expenses and government filing fees (including "blue sky" filing fees). The Partnership's organizational and initial offering expenses may be, for accounting purposes, capitalized and amortized by the Partnership for up to 60 months from the date the Partnership commences operations. Amortization of such expenses is a divergence from U.S. generally accepted accounting principles ("**GAAP**"). In certain circumstances, this divergence may result in a qualification of the Partnership's annual audited financial statements. In such instances, the Partnership may elect to: (i) avoid the qualification by recognizing the unamortized expenses, or (ii) make GAAP-conforming changes for financial reporting purposes, but capitalize and amortize expenses for purposes of calculating the Partnership's Net Asset Value (resulting in a divergence in fiscal year-end Net Asset Values reported in the Partnership's financial statements, and as otherwise applicable under the provisions of the Partnership Agreement). If the Partnership capitalizes and amortizes such expenses and is then terminated within 60 months of its commencement, any unamortized expenses will be recognized. If a Limited Partner makes a withdrawal prior to the end of the period during which the Partnership is capitalizing and amortizing expenses, the Partnership may, but is not required to, accelerate a proportionate share of the unamortized expenses based upon the amount being withdrawn and reduce withdrawal proceeds accordingly. |

**Operating Expenses.** The Partnership will pay or reimburse the General Partner, the

018836

HCMLPHMIT00004035

Investment Manager and/or the Investment Manager Affiliates for: (i) all expenses incurred in connection with the ongoing offer and sale of Interests, including, but not limited to, printing of this Memorandum and exhibits, marketing expenses and documentation of performance and the admission of Limited Partners, (ii) all operating expenses of the Partnership, such as tax preparation fees, governmental fees and taxes, fees to the Administrator, costs of communications with Limited Partners, and ongoing legal, accounting, auditing, bookkeeping, consulting and other professional fees and expenses, (iii) all Partnership research, trading and investment-related costs and expenses (e.g., brokerage commissions, research fees, margin interest, expenses related to short sales, custodial fees, bank service fees, and clearing and settlement charges), (iv) technology-related costs and expenses, including, but not limited to, software licenses, data feeds and colocation expenses, (v) all expenses related to attending any conference or seminar related to alternative investments (e.g., registration, transportation, accommodation or meal expenses), (vi) regulatory and other filing fees and expenses, (vii) travel expenses related to meeting with management teams, or related to any of the other categories of expenses set forth herein, (viii) any costs and expenses incurred by the Partnership in connection with converting from a stand-alone fund into a "feeder fund" as part of a master-feeder structure, (ix) director and officer liability insurance or other insurance premiums for any principal or employee of the Partnership, the General Partner, the Investment Manager or any of the Investment Manager Affiliates, (x) all fees and other expenses incurred in connection with the investigation, prosecution or defense of any claims, assertion of rights or pursuit of remedies, by or against the Partnership, including, without limitation, professional and other advisory and consulting expenses, and (xi) any and all costs and expenses incurred in connection with the dissolution, winding up, or termination of the Partnership.

Each of the General Partner, the Investment Manager or any of the Investment Manager Affiliates, in its sole discretion, may from time to time pay for any of the foregoing Partnership expenses. Any such person may elect to be reimbursed for such expenses, or to waive its right to reimbursement for any such expenses, as well as terminate any such voluntary payment or waiver of reimbursement.

**Allocation of Expenses Among Series**. The General Partner and/or the Investment Manager will allocate all expenses attributable to the Partnership among the Series on a *pro rata* basis or otherwise in their reasonable discretion.

**General Partner's and Investment Manager's Expenses**. The General Partner and the Investment Manager will pay their own general operating and overhead expenses associated with providing the management and investment management services required under the Partnership Agreement and the Investment Management Agreement, respectively. These expenses include all expenses incurred by the General Partner and the Investment Manager in providing for their normal operating overhead, including, but not limited to, the cost of providing relevant support and administrative services (e.g., employee compensation and benefits, rent, office equipment, computer systems, insurance (other than as expressly set forth above), utilities, telephone, secretarial and bookkeeping services, etc.), but not including any Partnership operating expenses described above.

The General Partner and the Investment Manager may use "soft dollar" commissions or rebates by brokerage firms of commissions generated by the Partnership's brokerage transactions executed through those firms to pay for certain brokerage and research products and services that fall within the safe harbor under Section 28(e) of the Securities Exchange Act of 1934, as amended ("**Exchange Act**"), as further described herein. See "BROKERAGE PRACTICES—Soft Dollar Arrangements."

**Withdrawals**

**Limited Partner Withdrawals Generally**. Subject to certain restrictions described herein, each Limited Partner may withdraw a minimum of $100,000 as of the last day of each calendar quarter and at such other times as the General Partner may determine in its sole discretion (each such date, a "**Withdrawal Date**"), upon at least 91 days' prior written notice to the Administrator, with a copy to the General Partner. Unless the General Partner consents, partial withdrawals may not be made if they would reduce a Limited Partner's capital account balance below $500,000. All withdrawals will be

018837

HCMLPHMIT00004036

deemed made prior to the commencement of the following calendar quarter (or other relevant period).

If the General Partner, in its sole discretion, permits a Limited Partner to withdraw capital other than on a regularly scheduled Withdrawal Date, the General Partner may impose an administrative fee to cover the actual legal, accounting, administrative, brokerage, and any other costs and expenses associated with such withdrawal.  Such fee will be payable to the relevant Series of the Partnership and will be deducted from the withdrawal proceeds of the withdrawing Limited Partner as of such Withdrawal Date.

**Ability to Withdraw Is Not Guaranteed**.  Notwithstanding the foregoing, the General Partner cannot guarantee that the assets of the Partnership will be invested in a manner which would allow the General Partner to satisfy withdrawal requests.  The General Partner may, in its sole discretion:  (i) defer withdrawal requests until the Partnership's assets mature or are liquidated in due course, (ii) elect to purchase with its own funds the Interests of the withdrawing Partner, or (iii) borrow from a third party or draw from a line of credit, subject to availability and other factors, in order to fund any withdrawal.

**Payments with Respect to Withdrawals; Applicable on a Series-by-Series Basis**.  A Limited Partner who requests any withdrawal of capital that constitutes, together with prior withdrawals within any fiscal year, less than 90% of the value of such Limited Partner's capital account (excluding any amounts held in any Side Pocket Accounts) will be paid within 90 days after the applicable Withdrawal Date.  In the event that a Limited Partner requests a withdrawal of capital that constitutes, together with prior withdrawals within any fiscal year, 90% or more of the value of such Limited Partner's capital account (excluding any amounts held in any Side Pocket Accounts), the General Partner may reduce the amounts paid after any Withdrawal Date so that they constitute,  in the aggregate during such fiscal year, 90% of an amount estimated by the General Partner to be the amount to which the withdrawing Limited Partner is entitled in the aggregate (calculated on the basis of unaudited data); such amount will be paid within 90 days after the applicable Withdrawal Date.  The balance of the amount payable upon such withdrawal will be paid, without interest, within 90 days after completion of the audited financial statements for the fiscal year in which the withdrawal occurs.  Notwithstanding the foregoing, the General Partner may, in its sole discretion, agree to pay up to the full capital account balance (calculated on the basis of unaudited data) to a withdrawing Limited Partner within 90 days after the applicable Withdrawal Date, subject to adjustment based on audited financial statements. To the extent that the sum previously paid to a withdrawing Limited Partner is calculated to have exceeded the amount to which it is entitled, that Limited Partner shall be required to repay to the Partnership the balance.

Upon withdrawal of all of the capital in its capital account (excluding for purposes hereof, any remaining investments held in a Side Pocket Account), a Limited Partner will be deemed to have withdrawn from the Partnership or the relevant Series, and upon notice of such withdrawal, a Limited Partner will not be entitled to exercise any voting rights afforded to Limited Partners under the Partnership Agreement.

The Partnership or the relevant Series has the right to pay cash or in-kind, or a combination of both, to a Limited Partner that makes a withdrawal from such Limited Partner's capital account.

**Limitations on Withdrawals**.  The Partnership or a Series may suspend (or postpone) withdrawals, subscriptions, calculations of Net Asset Value and/or payments upon any withdrawals (in whole or in part) from capital accounts:  (i) during the existence of any state of affairs which, in the opinion of the General Partner, makes the disposition of the Partnership's investments impractical or prejudicial to the Partners, or where such state of affairs, in the opinion of the General Partner, makes the determination of the price or value of the Partnership's investments impractical or prejudicial to the Partners; (ii) where any such withdrawals, subscriptions, calculations and/or payments, in the opinion of the General Partner, would result in the violation of any applicable law or regulation; (iii) if the General Partner determines, in its sole discretion, that such suspension or postponement is prudent in order to prevent the Partnership from being subject to adverse tax or regulatory implications; or (iv) for such other reasons or for such other periods as the

018838

HCMLPHMIT00004037

General Partner may prudently and in good faith determine.

All Limited Partners will be notified in writing of any such suspension or postponement and the termination thereof. Following any suspension or postponement of withdrawals, a withdrawal request made by a Limited Partner prior to such suspension or postponement will be effected as of the first Withdrawal Date following the recommencement of withdrawals.

<u>Required Withdrawals</u>.  The General Partner may, in its sole discretion, require a Limited Partner to withdraw any or all of the value of such Limited Partner's capital accounts on at least five days' notice for any reason or no reason; *provided, however*, that the General Partner may require such a withdrawal on less (or no) notice in order to comply with any laws and regulations applicable to the Partnership and/or its affiliates.

<u>Side Pocket Accounts</u>.  A Limited Partner may not withdraw any of the amounts in its capital account that are attributable to the value of an Illiquid Investment held in a Side Pocket Account until such time that such Illiquid Investment (or the sales proceeds thereof) is reallocated to such Limited Partner's capital account.  At the sole discretion of the Investment Manager, an Illiquid Investment may be held in a Side Pocket Account until the occurrence of a Realization Event (as defined below).  **For the avoidance of doubt, any investment made by Series 1 into the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**

<u>Reserves</u>.  All withdrawals shall be subject to the General Partner's power to establish such reserves for the Partnership or a Series as the General Partner shall, in its sole but reasonable discretion, deem appropriate to pay current and future, definite, contingent and possible obligations of the Partnership or a Series (even if such reserves are not in accordance with GAAP), including estimated expenses in connection therewith, which could reduce the amount of a distribution upon withdrawal.  See "—Management Fee" for more information on the Management Fee Reserve.

<u>Waiver</u>.  The General Partner, in its sole discretion, may waive or modify any of the terms relating to withdrawals, including, without limitation, minimum amounts and notice periods, for all or any of the Limited Partners in its discretion without notice to the other Limited Partners.

|  |  |
|---|---|
| **Withdrawals, Resignation and Transfers by General Partner and its Affiliates** | Each of the General Partner, the Investment Manager and/or any Investment Manager Affiliate may withdraw all or any of the value in its respective capital account at any time, from time to time, without the consent of the Limited Partners and without notice to any of the Limited Partners.  The General Partner may resign as the general partner of the Partnership upon 30 days' prior written notice to the Limited Partners.  Upon such resignation of the General Partner, or upon its bankruptcy or dissolution, the remaining Limited Partners have the right to appoint a substitute general partner; otherwise, the Partnership will be dissolved pursuant to the procedures set forth in the Partnership Agreement.  The Partnership Agreement permits the General Partner to appoint additional general partners and to transfer its general partner interest to an affiliate of the General Partner without the consent of Limited Partners. |
| **Leverage** | The Investment Manager may cause the Partnership to undertake leverage.  Leverage may take a variety of forms, including, but not limited to, the following: long-term loans, convertible notes and repurchase arrangements.  Leverage arrangements used by the Partnership when financing is contingent on the market value of the financed assets may include those which may be subject to mark-to-market collateral or margin calls.  See "INVESTMENT PROGRAM" and "RISK FACTORS AND CONFLICTS OF INTEREST" herein. |
| **Determination of Net Asset Value** | The net asset value ("**Net Asset Value**") of the Partnership, on a Series-by-Series basis, is determined in accordance with the Partnership Agreement and is generally equal to the amount by which the value of the Partnership's assets exceeds the amount of its liabilities.  Net Asset Value calculations will be made by the Administrator (based on the information provided by the Investment Manager) on an accrual basis of accounting, as of the end of each calendar month (or other period, as the case may be), in accordance with |

018839

HCMLPHMIT00004038

GAAP, consistently applied (except that: (x) organizational and initial offering expenses of the Partnership may be capitalized and amortized over a period of up to 60 months from the date the Partnership commences operations, and (y) reserves may be taken that are inconsistent with GAAP), this Memorandum and the Partnership Agreement.

In making such determinations, securities, commodities and other financial instruments (other than options) that are listed on a national securities, commodities or other exchange, or over-the-counter instruments listed on NASDAQ, will be valued at their last sales prices on such date or, if no sales occurred on such date, at the midpoint between the last "bid" and "ask" prices for such securities, commodities or financial instruments on such date. Options that are listed on a securities or commodities exchange will be valued at their last sales prices on the date of determination on the largest securities or commodities exchange (by trading volume) on which such options shall have traded on such date; *provided* that, if the last sales prices of such options do not fall between the last "bid" and "ask" prices for such options on such date, then such options will be valued at the midpoint between the last "bid" and "ask" prices for such options on such date. Securities, commodities, options and other financial instruments that are not listed on an exchange or quoted on an over-the-counter market, but for which there are available quotations, will be valued based upon quotations obtained from market makers, dealers or pricing services.

The Investment Manager intends to engage an independent third-party valuation agent (in addition to the Administrator) to appraise the Partnership's interests in Illiquid Investments.

If the Investment Manager, in its sole discretion, determines that the valuation of any security, commodity, option or other financial instrument pursuant to the foregoing does not fairly represent its market value, the Investment Manager will value such security, commodity, option or other financial instrument as it reasonably determines. Any securities, commodities, options and other financial instruments that have no public market, investments in other asset classes (including those in Side Pocket Accounts), and all other assets of the Partnership for which a valuation methodology is not specified, will be valued by the Investment Manager in a manner determined in good faith to reflect their fair market value. Absent bad faith or manifest error, all Net Asset Value determinations pursuant to the Partnership Agreement are conclusive and binding as to all Partners.

**Allocation of Profit and Loss**

To determine how the economic gains and losses of the Partnership will be shared, the Partnership Agreement allocates net income or loss (increases and decreases in Net Asset Value) to each Partner's capital account. Net income or loss includes all portfolio gains and losses, whether realized or unrealized, plus all other Partnership items of income (such as interest) and less all Partnership expenses. Generally, net income and net loss for each month (or other period, as the case may be) will be allocated to the Partners in proportion to their capital account balances as of the start of such month (or such other period). Net income and net losses in any Side Pocket Accounts or other memorandum accounts will be allocated to those Partners participating in such accounts in proportion to their capital account balances in such accounts. All matters concerning the allocation of profits, gains and losses among the parties (including the taxes thereon) and accounting procedures not expressly provided for by the terms of the Partnership Agreement will be determined by the General Partner in its sole discretion. Capital account balances will reflect capital contributions, previous allocations of increases and decreases in Net Asset Value, withdrawals, distributions (if any), and expenses. For the avoidance of doubt, the foregoing provisions will apply on a Series-by-Series basis.

**Allocation of Taxable Income and Loss**

For income tax purposes, all items of taxable income, gain, loss, deduction and credit will be allocated among the Partners at the end of each fiscal year in a manner consistent with their economic interests in the Partnership. In light of the fact that the Partnership does not intend to make distributions, to the extent that the Partnership's investment activities are successful, Limited Partners should expect to receive allocations of income and loss, and may incur tax liabilities from an investment in the Partnership without receiving cash distributions from the Partnership with which to pay those liabilities. To obtain cash from the Partnership to pay taxes, if any, Limited Partners may be required to make withdrawals, subject to the limitations in the Partnership Agreement. For the

018840

HCMLPHMIT00004039

avoidance of doubt, the foregoing provisions will apply on a Series-by-Series basis.

**Side Pocket Accounts**    The Investment Manager may designate that certain investments held by a Series of the Partnership be carried in one or more separate memorandum accounts (each, a "**Side Pocket Account**") for such period of time as the Investment Manager determines.  Such investments may include:  (i) privately placed, unregistered securities, commodities, options and other financial instruments, or those investments that, in the opinion of the Investment Manager, do not have a readily ascertainable market value; (ii) other illiquid securities that may be valued but are not freely transferable; and (iii) investments in other asset classes (such as real estate) and other property that are not traded on public exchanges (each, as designated by the Investment Manager, along with follow-on investments, if any, an "**Illiquid Investment**").  Additionally, the Investment Manager, in its sole and absolute discretion, may determine that, for various reasons, an asset that initially was not an Illiquid Investment should be categorized as an Illiquid Investment, or that a follow-on investment should be categorized as a new Illiquid Investment.  **For the avoidance of doubt, (i) there will be no limitation on the percentage of the Partnership's portfolio that may be carried in Side Pocket Accounts; and (ii) any investment made by Series 1 into the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**  Illiquid Investments held in a Side Pocket Account will be carried at their fair value (which may be at, above or below cost) as determined by the Investment Manager.

At the sole discretion of the Investment Manager, an Illiquid Investment may be held in a Side Pocket Account until the occurrence of a Realization Event.  Upon a Realization Event, such Illiquid Investment (or the sales proceeds thereof) will be reallocated, *pro rata*, from the Side Pocket Account to the capital accounts of participating Partners in accordance with their respective interests in such Side Pocket Account.  Until such reallocation, a Limited Partner may not withdraw any of the amounts in its capital account that are attributable to the value of Illiquid Investments held in a Side Pocket Account.  Upon such reallocation, a Limited Partner that has withdrawn all of its capital from the Partnership other than the capital attributable to such Side Pocket Account will receive an amount equal to its interest in such Side Pocket Account (net of any accrued Management Fee and accrued expenses (to the extent not covered by the Partnership's reserves, including the Management Fee Reserve) with respect thereto), within 90 days after such reallocation.  **For the avoidance of doubt, any investment made by Series 1 into the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**

A "**Realization Event**" occurs: (1) when an Illiquid Investment becomes liquid, as determined in the reasonable discretion of the Investment Manager; (2) when an Illiquid Investment is sold or otherwise disposed of by the Partnership; (3) when circumstances otherwise exist that, in the reasonable judgment of the Investment Manager, conclusively establish a value for an Illiquid Investment, as determined in the reasonable discretion of the Investment Manager (including, without limitation, when additional securities substantially similar to the Illiquid Investment have been issued by the issuer of the Illiquid Investment); or (4) as otherwise determined in the sole discretion of the Investment Manager.

Newly-admitted Limited Partners may not participate in Illiquid Investments that were placed in a Side Pocket Account prior to their admission.  Any expenses relating specifically to a Side Pocket Account will be charged to the Partners participating in such account.  If the Investment Manager in its discretion designates any investment as a follow-on investment to an existing Illiquid Investment, only the Partners participating in such original investment will participate in such follow-on investment in proportion to their interest in the related Side Pocket Account; *provided, however*, that, if a Partner shall have withdrawn from the Partnership, the General Partner will equitably adjust the interests of the remaining participating Partners to reflect such withdrawn Partner's non-participation in the follow-on investment.

Also see "RISK FACTORS AND CONFLICTS OF INTEREST—Conflicts of Interest" herein.

018841

HCMLPHMIT00004040

| | |
|---|---|
| **New Issues Accounts; Other Memorandum Accounts** | From time to time, the Partnership may purchase securities that are part of a public distribution.  Under rules adopted by the Financial Industry Regulatory Authority ("**FINRA**"), (i) certain persons engaged in the securities, banking or financial services industries (and members of their immediate families) and (ii) certain persons who are affiliated with companies that are current, former or prospective investment banking clients of the Partnership's broker(s) (collectively, "**Restricted Persons**") are restricted from participating in initial public offerings of equity securities ("**New Issues**"), each subject to a *de minimis* exemption.  To the extent necessary to comply with FINRA rules, in addition to the Partnership's regular accounts and any Side Pocket Accounts, the General Partner may establish one or more memorandum accounts that are authorized to participate in New Issues (each, a "**New Issues Account**").  Participation in New Issues Accounts will be limited to (i) those Limited Partners who are not Restricted Persons, and (ii) those Limited Partners who are Restricted Persons, but only to the extent that such participation by Restricted Persons does not exceed levels permitted under applicable FINRA rules. |

In addition, as a matter of fairness to Partners that do not participate in New Issues, a use-of-funds charge may be debited to the capital accounts of those Partners that do participate in New Issues and credited to the capital accounts of all the Partners.  The General Partner may calculate such charge, in its discretion, in any manner consistent with applicable FINRA rules, including, debiting amounts equal to interest, (i) on the funds used to purchase the New Issues at the annual rate being paid by the Partnership, or (ii) that would be paid by the Partnership on borrowed funds during the applicable period.

Upon the sale or other disposition of New Issues (including any transfer of the underlying securities in the New Issues Account to the capital accounts of all of the Partners, after such securities no longer constitute New Issues), any profits or losses resulting from securities transactions in the New Issues Account in any fiscal period will be credited or debited to the capital accounts of Limited Partners participating in the New Issues Account in accordance with their interests therein.  Accordingly, the returns to Limited Partners on their investments in the Partnership may differ depending upon whether or not they are a Restricted Person.

In addition to the foregoing with respect to Side Pocket Accounts and New Issues Accounts, to the extent that certain Limited Partners are restricted from participating in any other transactions of the Partnership by applicable laws or regulations, or for any other reason determined by the General Partner in good faith, the General Partner may, in its discretion, establish one or more separate memorandum accounts to hold such investments and isolate ownership away from such restricted Limited Partners.  Only those Limited Partners who the General Partner determines are eligible will participate in such accounts.

| | |
|---|---|
| **Side Letters** | The Partnership, the General Partner and/or the Investment Manager may from time to time enter into side letters or other similar agreements (collectively, "**Side Letters**") with one or more Limited Partners that provide such Limited Partner(s) with additional and/or different rights (including, without limitation, with respect to access to information, minimum investment amounts and liquidity terms) than such Limited Partner(s) have pursuant to this Memorandum and the Partnership Agreement.  Neither the General Partner nor the Investment Manager will be required to notify any or all of the other Limited Partners of any such Side Letters or any of the rights and/or terms or provisions thereof, nor will the General Partner or the Investment Manager be required to offer such additional and/or different rights and/or terms to any or all of the other Limited Partners. |
| **Reports to Limited Partners** | Each Limited Partner will receive the following, with respect to the relevant Series: (i) annual financial statements of the Partnership audited by an independent certified public accounting firm; (ii) quarterly unaudited performance information; (iii) copies of such Limited Partner's Schedule K-1 to the Partnership's tax returns; and (iv) other periodic reports or letters as determined by the General Partner in its sole discretion.  The financial statements of the Partnership will be prepared in accordance with GAAP (except to the extent that this Memorandum or the Partnership Agreement states or contemplates that such statements may be inconsistent with GAAP). |

018842

HCMLPHMIT00004041

The General Partner may at any time choose to change the Partnership's accounting guidelines from GAAP to the International Financial Reporting Standard ("**IFRS**").  In such event, the financial performance of the Partnership, as determined under IFRS, may vary from those determined under GAAP.

The Partnership will bear all fees incurred in providing such tax returns and reports.

The General Partner may agree to provide certain Limited Partners with additional information on the underlying investments of the Partnership, which may affect investment and withdrawal decisions, as well as heightened access to the General Partner, the Investment Manager and their respective employees for relevant information.

|  |  |
|---|---|
| **Transferability of Interests** | As a Limited Partner, you may not assign or transfer your Interest (except by operation of law) without the consent of the General Partner, which consent may be given or withheld in its sole discretion.  No transfer of an Interest by a Limited Partner will be permitted if it would result in the termination of the Partnership for federal income tax purposes.  Transfers of Interests are subject to other restrictions set forth in the Partnership Agreement, including compliance with ERISA and federal and state securities laws. |

Due to these limitations on transferability, Limited Partners may be required to hold their Interests indefinitely, unless they withdraw from the Partnership in accordance with the provisions set forth in the Partnership Agreement.

|  |  |
|---|---|
| **Distributions; Distributions Upon Termination of the Partnership** | The Partnership does not expect to make any distributions to Limited Partners from profits or capital, except pursuant to requests for withdrawals and upon termination of the Partnership or the relevant Series.  Upon the termination of the Partnership (as further described in the Partnership Agreement), the assets of the Partnership or the relevant Series will be liquidated (or distributed) and the proceeds of liquidation will be used to pay off known liabilities, establish reserves for contingent liabilities and expenses of liquidation (even if such reserves are not in accordance with GAAP), and any remaining balance will be applied and distributed in proportion to the respective capital accounts of the Partners.  The Partnership or the relevant Series may satisfy any distributions to Limited Partners in cash, in-kind or any combination thereof.   Additionally, the General Partner may create a liquidating fund entity (e.g., a liquidating trust or similar vehicle) and may transfer all or a portion of the Partnership's assets to such entity for any reason, including an orderly liquidation of any illiquid Partnership or Series assets, including, but not limited to Side Pocket Accounts, and may distribute ownership interests in such entity to Limited Partners. |

The termination of the Partnership shall constitute the termination of all Series.  For the avoidance of doubt, the termination of an individual Series, however, shall not constitute the termination of the Partnership.

|  |  |
|---|---|
| **Bank Holding Companies** | Limited Partners that are Bank Holding Companies ("**BHC Limited Partners**") (as defined by Section 2(a) of the Bank Holding Company Act of 1956, as amended ("**BHCA**")) are limited to 4.99% of the voting Interest in the Partnership under Section 4(c)(6) of the BHCA.  The portion of the Interest in the Partnership held by a BHC Limited Partner in excess of 4.99% of the aggregate outstanding voting Interests of all Limited Partners will be deemed non-voting Interests in the Partnership.  BHC Limited Partners holding non-voting Interests in the Partnership are permitted to vote such Interests (i) on any proposal to dissolve or continue the business of the Partnership under the Partnership Agreement and (ii) on matters with respect to which voting rights are not considered to be "voting securities" under 12 C.F.R. § 225.2(q)(2), including such matters which may "significantly and adversely" affect a BHC Limited Partner (such as amendments to the Partnership Agreement or modifications of the terms of its Interest).  For the avoidance of doubt, the foregoing provisions shall apply on a Series-by-Series basis.   Except with regard to restrictions on voting, non-voting Interests are identical to all other Interests held by Limited Partners. |
| **Voting Rights and Amendments** | The voting rights of Limited Partners are very limited.  Other than as explicitly set forth in the Partnership Agreement, Limited Partners have no voting rights as to the Partnership or its management.  Generally, the Partnership Agreement may be amended only with the |

018843

HCMLPHMIT00004042

consent of the General Partner and Limited Partners owning more than 50% of all of the outstanding Interests of each Series; *provided* that: (x) for matters only relating to one Series, only the Limited Partners of that Series will vote on such matters, and (y) that the General Partner may amend the Partnership Agreement without the consent of or notice to any of the Limited Partners if, in the opinion of the General Partner, the amendment does not materially adversely affect any Limited Partner.

| **Liability of Limited Partners** | No Limited Partner shall be personally liable or bound for the expenses, liabilities or obligations of the Partnership or the relevant Series beyond the amount in such Limited Partner's capital account in the relevant Series, from time to time, including any amounts thereof attributable to capital contributions, except that such Limited Partner may be obligated to return all or a portion of any distributions (including withdrawal proceeds) received from the Partnership or the relevant Series in an amount up to its aggregate capital contributions (including any income or gains thereon) to the Partnership or the relevant Series in order to pay such Limited Partner's *pro rata* share of any Partnership or Series liabilities that arose while such Limited Partner held Interests. Subject to the foregoing, no Limited Partner shall be obligated to provide any contributions to the Partnership or the relevant Series, other than its initial capital contribution. No Limited Partner shall be obligated to make any loan to the Partnership or a Series. |

Under the Delaware Revised Uniform Limited Partnership Act ("**Delaware Act**"), when a Limited Partner receives a return of all or any part of such Limited Partner's capital contribution, the Limited Partner may be liable to the Partnership or a Series for any sum, not in excess of such return of capital (together with interest), if at the time of such distribution the Limited Partner knew that the Partnership or the relevant Series was prohibited from making such distribution pursuant to the Delaware Act.

| **Brokerage Practices** | Portfolio transactions for the Partnership will be allocated by the Investment Manager to brokers on the basis of best execution and in consideration of, among other factors, such brokers' ability to effect transactions, operational efficiency, reputation and financial strength. See "BROKERAGE PRACTICES". |

| **Other Activities of the General Partner, the Investment Manager, the Principal and Affiliates** | None of the General Partner, the Investment Manager, the Principal or any of their respective partners, managers, members, directors, officers, employees, agents and affiliates (collectively, "**Investment Manager Affiliates**") is required to manage the Partnership as its sole and exclusive function. In addition to managing the Partnership and its investments, each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may provide investment management and other services to other parties and may manage other accounts and/or establish other private investment funds in the future (both domestic and offshore) (such accounts and funds, collectively, "**Affiliated Funds**"), including those that may employ an investment program and strategy similar to that of the Partnership. |

Specifically, as of the date hereof: (i) the Investment Manager acts as the investment manager to Atlas IDF, LP, a Delaware "series" limited partnership ("**IDF Fund**") that is structured as an insurance-dedicated fund and is expected to invest a portion of its assets in the Partnership; (ii) Atlas IDF GP, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the IDF Fund; (iii) the Principal is the managing member and controlling person of Atlas IDF GP, LLC; and (iv) the Investment Manager acts as the investment subadvisor to a series of SALI Multi-Series Fund, L.P., a Delaware "series" limited partnership, and provides certain discretionary investment advisory or consulting services to such series.

See "MANAGEMENT" and "RISK FACTORS AND CONFLICTS OF INTEREST" herein.

| **Exculpation and Indemnification** | The Partnership Agreement provides that none of the General Partner, the Investment Manager or any of the Investment Manager Affiliates will be liable to the Partnership or the Limited Partners for any action or inaction in connection with the business and affairs of the Partnership unless such action or inaction is determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct. The Partnership (but not the Limited Partners individually) is obligated to indemnify the General Partner, the Investment Manager and the Investment Manager |

---

018844

HCMLPHMIT00004043

Affiliates (which, for purposes of this indemnity, shall include fund counsel (except for legal malpractice)) from and against any and all claims, liabilities, obligations, judgments, suits, proceedings, actions, demands, losses, costs, expenses (including attorneys' fees and other expenses of litigation), damages, penalties or interest, as a result of any claim or legal proceeding (made or threatened) related to any action or inaction by any of them in connection with the business and affairs of the Partnership (including the settlement or appeal of any such claim or legal proceeding); *provided* that such indemnity will not extend to conduct determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct. For the avoidance of doubt, the foregoing indemnification provisions shall apply on a Series-by-Series basis. The Investment Management Agreement also provides similar protections to the Investment Manager.

|  |  |
|---|---|
| **Term** | The term of the Partnership will continue indefinitely until terminated in accordance with the Partnership Agreement.  Under the Partnership Agreement, the Partnership may be terminated at the election of the General Partner. |
| **Fiscal Year** | The fiscal year of the Partnership will end on December 31 of each year.  However, the fiscal year may be changed at any time by the General Partner, in its sole and absolute discretion. |
| **Auditor** | The Partnership intends to engage a nationally recognized public accounting firm to act as the Partnership's auditor.  Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details. |
| **Administrator** | The Partnership intends to engage a provider of administrative services to acts as the Partnership's Administrator, as further set forth herein.  Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.  See "SERVICE PROVIDERS—Administrator" herein. |
| **Shared Services Arrangement** | In addition, the Investment Manager has entered into a shared services agreement ("**Shared Services Agreement**") with Highland Capital Management, L.P., a Delaware limited partnership (in its capacity with respect to the Shared Services Agreement, the "**Shared Services Provider**"), pursuant to which the Shared Services Provider will provide certain administrative, information technology, accounting, tax, back-office and other services to the Investment Manager.  The Partnership will not incur any additional fees as a result of the arrangements with the Shared Services Provider.  See "RISK FACTORS AND CONFLICTS OF INTEREST" herein. Also see "SERVICE PROVIDERS—Administrator" herein. |
| **Regulatory Compliance Provider** | The Investment Manager intends to engage a reputable regulatory compliance provider for the Investment Manager, the General Partner and certain of their respective affiliates.  Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details. |
| **Legal Counsel** | Sadis & Goldberg LLP acts as legal counsel to the General Partner, the Investment Manager, the Partnership and certain of their respective affiliates in connection with the offering of Interests and other ongoing matters.  Sadis & Goldberg LLP has been retained to prepare offering documentation in connection with the offering but not to conduct any due diligence on the Principal, the General Partner, the Investment Manager or any of the information in this Memorandum.  Sadis & Goldberg LLP does not represent the Limited Partners, and each Limited Partner is urged to consult with its own counsel. |

There may exist other matters that could have a bearing on the Partnership as to which Sadis & Goldberg LLP has not been consulted.  In addition, Sadis & Goldberg LLP does not undertake to monitor compliance by the Investment Manager, the General Partner, the Principal and their respective affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Sadis & Goldberg LLP monitor ongoing compliance with applicable laws.  In connection with the preparation of this Memorandum, Sadis & Goldberg's responsibility is limited to matters of U.S. securities and federal tax law and it does not accept responsibility in relation to any other matters referred to or

018845

HCMLPHMIT00004044

disclosed in this Memorandum. In the course of advising the Partnership, there are times when the interests of Limited Partners may differ from those of the Partnership. Sadis & Goldberg LLP does not represent the Limited Partners' interests in resolving these issues. Sadis & Goldberg LLP is a party to certain offering related documents to the limited extent that it can benefit from and enforce certain provisions thereof. In preparing this Memorandum, Sadis & Goldberg LLP has relied upon information furnished to it by the General Partner, the Investment Manager and their respective affiliates and is not obligated to investigate or verify the accuracy and completeness of information set forth herein concerning the Partnership.

Furthermore, if a conflict of interest or dispute arises between the General Partner and/or the Investment Manager, on the one hand, and the Partnership or any Limited Partner, on the other hand, by investing in the Partnership, the Limited Partners acknowledge that Sadis & Goldberg LLP may act as counsel to the General Partner and/or the Investment Manager and not counsel to the Partnership or the Limited Partners, notwithstanding the fact that, in certain cases, the fees paid to Sadis & Goldberg LLP are paid through or by the Partnership.

In addition, Sadis & Goldberg LLP has represented Highland and affiliates at different times over a period lasting over a decade. It is currently expected that Sadis & Goldberg LLP will represent the General Partner, the Investment Manager, the Principal and certain of their respective affiliates in connection with the establishment of the Partnership and the IDF Fund, the possible consummation of the Highland Transaction, and certain related matters. The Principal and his affiliates are aware of the representation by Sadis & Goldberg LLP of Highland and affiliates.

Also see "RISK FACTORS AND CONFLICTS OF INTEREST—Conflicts of Interest—Lack of Separate Representation; Potential Conflicts of Counsel" herein.

**Address for Inquiries**

You are invited to, and it is highly recommended that you do, meet with the General Partner and/or the Administrator (to the extent applicable) for a further explanation of the terms and conditions of this offering of Interests and to obtain any additional information necessary to verify the information contained in this Memorandum, to the extent that the General Partner and/or the Administrator (to the extent applicable) possesses such information or can acquire it without unreasonable effort or expense. Requests for such information should be directed to:

Rand PE Fund Management, LLC
87 Railroad Place, Suite 403
Saratoga Springs, NY 12866
Attention: John Honis
Telephone: (214) 335-7969
Email: Jhonis@RandAdvisors.com

018846

HCMLPHMIT00004045

<div align="right">**MANAGEMENT**</div>

### BACKGROUND OF THE GENERAL PARTNER AND THE INVESTMENT MANAGER

The General Partner of the Partnership is Rand PE Fund Management, LLC, a Delaware limited liability company.  The General Partner is responsible for the management of the Partnership's affairs.

The Investment Manager of the Partnership is Rand Advisors, LLC, a Delaware limited liability company.  The Investment Manager has discretionary investment authority over the Partnership's assets.  The Investment Manager is registered as an investment adviser with the SEC.  A copy of Part 2 of the Investment Manager's Form ADV is attached hereto as Exhibit C.

As the managing member and controlling person of the General Partner and the Investment Manager, John Honis controls all of the Partnership's operations and activities.

Limited Partners do not have any right to participate in the management of the Partnership and have very limited voting rights.

<div align="right">### BACKGROUND OF THE PRINCIPAL</div>

***John Honis, Principal***

Mr. Honis has more than 25 years of investment management and business experience.  He has a background in the credit markets and private equity.  Throughout his career in the investment management industry, Mr. Honis has guided many portfolio companies across several continents.  Mr. Honis' business experience includes roles as CEO, CRO and board-level advisory positions to both high-growth and distressed companies, in a wide range of manufacturing and service industries.

Mr. Honis founded Barrier Advisors, a recognized provider of strategic, operational and financial advice to private equity, venture capital and money management institutions.  He led many turnarounds and strategic growth initiatives and has attracted many of the nation's reputable turnaround practitioners to the Barrier team.

Previously, Mr. Honis was a high-tech executive, having served as President, CEO or Chief Restructuring Officer of five telecommunications firms.  His experiences in all aspects of growth management, strategic/operational turnarounds, financial restructuring, mergers and acquisitions and capital markets were the foundational elements of Barrier Advisors' charter.  Mr. Honis was previously a Partner and Co-Head of Private Equity at Highland Capital Management, L.P. ("**Highland**") (which now serves as the Shared Services Provider to the Investment Manager).

Mr. Honis' early career started at J.P. Morgan in New York where he was worked in the firm's global consulting practice. At J.P. Morgan, he specialized in the design and implementation of worldwide corporate finance processes and systems. Mr. Honis received a BA Degree in Economics from Syracuse University.

Mr. Honis currently serves on the Board of Trustees for each of Highland's affiliated registered investment companies and on the Board of Directors for American HomePatient, Inc. and Turtle Bay Resort, LLC, which are portfolio companies of investment funds operated by Highland.

***Additional Personnel***

The General Partner and the Investment Manager may employ additional personnel in the future.

018847

HCMLPHMIT00004046

### OTHER ACTIVITIES OF THE GENERAL PARTNER, THE INVESTMENT MANAGER, THE PRINCIPAL AND AFFILIATES

None of the General Partner, the Investment Manager, the Principal or any of the Investment Manager Affiliates is required to manage the Partnership as its sole and exclusive function. Each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may engage in other business activities, including competing ventures and/or other unrelated employment, and is only required to devote such time to the Partnership as the General Partner deems necessary to accomplish the purposes of the Partnership.

In addition to managing the Partnership and its investments, each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may provide investment management and other services to other parties and may manage and/or establish Affiliated Funds in the future, including those that may employ an investment program and strategy similar to that of the Partnership.

Specifically, as of the date hereof: (i) the Investment Manager acts as the investment manager to the IDF Fund that is structured as an insurance-dedicated fund and is expected to invest a portion of its assets in the Partnership; (ii) Atlas IDF GP, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the IDF Fund; (iii) the Principal is the managing member and controlling person of Atlas IDF GP, LLC; and (iv) the Investment Manager acts as the investment subadvisor to a series of SALI Multi-Series Fund, L.P., a Delaware "series" limited partnership, and provides certain discretionary investment advisory or consulting services to such series. See "RISK FACTORS AND CONFLICTS OF INTEREST" herein.

### INVESTMENTS BY THE GENERAL PARTNER, THE INVESTMENT MANAGER, THE PRINCIPAL AND AFFILIATES

Capital contributions by the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates will generally be on the same basis as capital contributions made by other investors, except that, in the discretion of the Investment Manager, no Management Fee may be assessed to such persons. Neither the Partnership Agreement nor the Investment Management Agreement requires the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates to maintain any minimum capital account balance.

018848

HCMLPHMIT00004047

## SERVICE PROVIDERS

### ADMINISTRATOR

The Partnership intends to engage an Administrator and enter into an Administration Agreement with the Administrator ("**Administration Agreement**"). The Administrator may be: (x) a nationally recognized provider of administrative services or (y) Highland (i.e., the Shared Services Provider); provided that, for the avoidance of doubt, any Administration Agreement with Highland, to the extent applicable, will be in addition to the Shared Services Agreement. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

The Administration Agreement will include industry-standard provisions relating to scope of services, fees, termination and indemnification.

The Administrator will be a service provider to the Partnership and will not be responsible for the preparation of this Memorandum or the activities of the Partnership, and therefore accepts no responsibility for any information contained in this Memorandum. The Administrator will not participate in the Partnership's investment decision-making process.

### AUDITOR

The Partnership intends to engage a nationally recognized public accounting firm to act as the auditor for the Partnership. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

### REGULATORY COMPLIANCE PROVIDER

The Investment Manager intends to engage a reputable regulatory compliance provider for the Investment Manager, the General Partner and certain of their respective affiliates. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

### LEGAL COUNSEL

Sadis & Goldberg LLP acts as legal counsel to the General Partner, the Investment Manager, the Partnership and certain of their respective affiliates in connection with the offering of Interests and other ongoing matters. Sadis & Goldberg LLP has been retained to prepare offering documentation in connection with the offering but not to conduct any due diligence on the Principal, the General Partner, the Investment Manager or any of the information in this Memorandum. Sadis & Goldberg LLP does not represent the Limited Partners, and each Limited Partner is urged to consult with its own counsel.

There may exist other matters that could have a bearing on the Partnership as to which Sadis & Goldberg LLP has not been consulted. In addition, Sadis & Goldberg LLP does not undertake to monitor compliance by the Investment Manager, the General Partner, the Principal and their respective affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Sadis & Goldberg LLP monitor ongoing compliance with applicable laws. In connection with the preparation of this Memorandum, Sadis & Goldberg's responsibility is limited to matters of U.S. securities and federal tax law and it does not accept responsibility in relation to any other matters referred to or disclosed in this Memorandum. In the course of advising the Partnership, there are times when the interests of Limited Partners may differ from those of the Partnership. Sadis & Goldberg LLP does not represent the Limited Partners' interests in resolving these issues. Sadis & Goldberg LLP is a party to certain offering related documents to the limited extent that it can benefit from and enforce certain provisions thereof. In preparing this Memorandum, Sadis & Goldberg LLP has relied upon information furnished to it by the General Partner, the Investment Manager and their respective affiliates and is not obligated to investigate or verify the accuracy and completeness of information set forth

018849

HCMLPHMIT00004048

herein concerning the Partnership.

Furthermore, if a conflict of interest or dispute arises between the General Partner and/or the Investment Manager, on the one hand, and the Partnership or any Limited Partner, on the other hand, by investing in the Partnership, the Limited Partners acknowledge that Sadis & Goldberg LLP may act as counsel to the General Partner and/or the Investment Manager and not counsel to the Partnership or the Limited Partners, notwithstanding the fact that, in certain cases, the fees paid to Sadis & Goldberg LLP are paid through or by the Partnership.

In addition, Sadis & Goldberg LLP has represented Highland and affiliates at different times over a period lasting over a decade.  It is currently expected that Sadis & Goldberg LLP will represent the General Partner, the Investment Manager, the Principal and certain of their respective affiliates in connection with the establishment of the Partnership and the IDF Fund, the possible consummation of the Highland Transaction, and certain related matters.  The Principal and his affiliates are aware of the representation by Sadis & Goldberg LLP of Highland and affiliates.

018850

HCMLPHMIT00004049

<div style="background:black; color:white; text-align:right">**INVESTMENT PROGRAM**</div>

## INTRODUCTION

The Partnership was organized for the purpose of investing and trading in a wide variety of investments, domestic and foreign, of all kinds and descriptions, whether publicly traded or privately placed, including, but not limited to, the following: common and preferred stocks, bonds and other debt securities, convertible securities, limited partnership interests, other investment funds, CLO securities, mutual fund shares, options, warrants, futures, derivatives (including swaps, forward contracts and structured instruments), monetary instruments, other financial instruments, cash and cash equivalents. The Investment Manager is eligible to trade a limited amount of commodities or financial futures on behalf of the Partnership under a provision in the Commodity Exchange Act, as amended ("**CEA**"), that provides an exemption from registration as a commodity pool operator.

References herein to the Partnership shall include, where appropriate, each Series of the Partnership.

The following is a general description of the principal types of investments which the Investment Manager currently contemplates making for the Partnership, certain trading techniques that it may employ, the investment criteria that it plans to apply, and the guidelines that it has established with respect to the composition of its investment portfolio. The following description is merely a summary, and a Limited Partner should not assume that any descriptions of the specific activities in which the Partnership may engage are intended in any way to limit the types of investment activities which the Partnership may undertake or the allocation of Partnership capital among such investments.

## INVESTMENT OBJECTIVE

The Partnership's primary objective is to seek consistent above-average returns primarily through capital appreciation. **No assurance can be given, however, that the Investment Manager will achieve the Partnership's investment objective, and investment results may vary substantially over time and from period to period.**

## INVESTMENT STRATEGY

**General**

The Investment Manager intends to invest the Partnership's portfolio in small- to medium-sized companies (i.e., generally with market capitalization of under $1 billion) that are involved in (or are the target of) acquisition attempts or tender offers, and/or in companies involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies or similar transactions. The Investment Manager intends to use a disciplined investment philosophy by combining thorough fundamental research and in-depth analysis of investment opportunities. The Partnership (x) is expected to initially invest all or substantially all of the assets attributable to Series 1 in the Highland Transaction, if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction.

**Philosophy**

The Investment Manager intends to use a disciplined investment philosophy by combining thorough fundamental research and in-depth analysis of investment opportunities. The following principles generally guide the Investment Manager's portfolio management strategy and allocation of capital:

- invest with a long-term perspective, minimize turnover and avoid market-timing;
- hold a concentrated investment portfolio; and

018851

HCMLPHMIT00004050

- view each investment relative to other investment opportunities.

*Long-Term Perspective*. The Investment Manager intends to invest with a long-term perspective, typically holding an ownership position in a company until it reaches its intrinsic value. In general, when the Investment Manager will be looking to invest in a company, it intends to avoid trying to time the market, but rather intends to focus on the intrinsic value of the company and then find the right entry or purchase point.

*Concentration*. The Investment Manager intends to have a concentrated portfolio of investments. The Investment Manager believes that this may provide the Partnership with a competitive advantage over most other private investment vehicles in that: (i) the Investment Manager's best ideas would be rarely and/or marginally diluted by its lesser ideas; (ii) the extra time saved by not trading may allow the Investment Manager to concentrate on finding other investment ideas; and (iii) careful analysis may allow the Investment Manager to make intelligent and deliberated decisions. **For the avoidance of doubt, (i) there will be no limitation on the percentage of the Partnership's portfolio that may be carried in Side Pocket Accounts; and (ii) any investment made by Series 1 into the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**

*Relative Analysis*. The Investment Manager intends to evaluate potential investments in companies of varying market capitalization in an attempt to isolate those securities with the greatest potential for capital appreciation. As part of its strategy, the Investment Manager intends to invest in those industries, sectors and securities which may provide value on a relative basis. The Investment Manager intends to seek to understand a company and its industry before investing.

## Leverage

The Investment Manager may cause the Partnership to undertake leverage. Leverage may take a variety of forms, including, but not limited to, the following: long-term loans, convertible notes and repurchase arrangements. To the extent applicable, entering into short sales and certain types of derivative instruments may also increase the Partnership's use of leverage. Leverage arrangements used by the Partnership when financing is contingent on the market value of the financed assets may include those which may be subject to mark-to-market collateral or margin calls.

## Important Notice

The foregoing description of the Partnership's investment program does not purport to be a complete explanation of all the asset classes or securities in which the Partnership may invest. In general, the Investment Manager intends to follow a flexible approach in order to place the Partnership in the best position to capitalize on opportunities in the financial markets. Accordingly, the Investment Manager may employ other strategies and may take advantage of opportunities in diverse asset classes if they meet the Investment Manager's standards of investment merit.

### DEVELOPMENT AND RISKS OF INVESTMENT MANAGER'S INVESTMENT STRATEGY

The development of an investment strategy is a continuous process, and the Partnership's investment strategy and methods may therefore be modified from time to time. The Partnership's investment methods are confidential, and the descriptions of them in this Memorandum are not exhaustive. The Partnership's investment strategies may differ from those used by the Investment Manager and its affiliates with respect to other accounts they manage. Investment decisions require the exercise of judgment by the Investment Manager. The Investment Manager may, at times, decide not to make certain investments, thereby foregoing participation in price movements, which would have yielded profits or avoided losses. Limited Partners cannot be assured that the strategies or methods utilized by the Investment Manager will result in profitable investing for the Partnership.

018852

HCMLPHMIT00004051

The Partnership's investment program entails substantial risks, and there can be no assurance that its investment objectives will be achieved.  The practices of options trading, short selling, the use of leverage and other investment techniques that may be employed by the Partnership can, in certain circumstances, maximize the adverse impact to which the Partnership's investment portfolio may be subject. See "RISK FACTORS AND CONFLICTS OF INTEREST—Market Risks".

018853
HCMLPHMIT00004052

### BROKERAGE PRACTICES

References herein to the Partnership shall be deemed to apply with respect to the Partnership's traded investments.

## BROKERAGE ARRANGEMENTS

The Investment Manager is responsible for the placement of the portfolio transactions of the Partnership and the negotiation of any commissions paid on such transactions. Portfolio securities normally are purchased through brokers on securities exchanges or directly from the issuer or from an underwriter or market maker for the securities. Purchases of portfolio instruments through brokers involve a commission to the broker. Purchases of portfolio securities from dealers serving as market makers include the spread between the "bid" and the "ask" price. The Investment Manager will not commit to provide any level of brokerage business to any broker. The Investment Manager may utilize the services of one or more introducing brokers who will execute the Partnership's brokerage transactions through a broker or custodian who will clear the Partnership's transactions.

Securities transactions for the Partnership are executed through brokers selected by the Investment Manager in its sole discretion and without the consent of the Partnership. In placing portfolio transactions, the Investment Manager will seek to obtain the best execution for the Partnership, taking into account the following factors: the ability to effect prompt and reliable executions at favorable prices (including the applicable dealer spread or commission, if any); the operational efficiency with which transactions are effected and the efficiency of error resolution, taking into account the size of order and difficulty of execution; the financial strength, integrity and stability of the broker; special execution capabilities; reputation; clearance, settlement, on-line pricing, block trading and block positioning capabilities; willingness to execute related or unrelated difficult transactions in the future; order of call; online access to computerized data regarding clients' accounts; performance measurement data; the quality, comprehensiveness and frequency of available brokerage and research products and services considered to be of value; the availability of stocks to borrow for short trades; and the competitiveness of commission rates in comparison with other brokers satisfying the Investment Manager's other selection criteria.

## SOFT DOLLAR ARRANGEMENTS

The term "soft dollars" refers to commissions accumulated by brokers based on an investment manager's transactions, on behalf of its clients, which may be used by the investment manager to acquire various products or services. The use of client commissions, known as soft dollars, to pay for these products and services, including research and brokerage products and services, presents investment managers with potential conflicts of interest and may give incentives for investment managers to use certain brokers without regard to their obligations to their clients.

The Investment Manager may use soft dollars generated by the Partnership's brokerage transactions to pay for brokerage and research products and services that fall within the safe harbor afforded by Section 28(e) of the Exchange Act ("**Section 28(e)**"). Section 28(e) provides a "safe harbor" to investment managers who use soft dollars to obtain investment research and brokerage products and services. In order to qualify for the safe harbor, the products or services must provide assistance to the investment manager in the performance of its investment decision-making responsibilities, or must relate to the execution, clearance or settlement of a trade.

## REFERRAL OF INVESTORS AND SALES CHARGES

The Investment Manager may direct some Partnership brokerage business to brokers who refer prospective investors to the Partnership. Because such referrals, if any, are likely to benefit the Investment Manager and its affiliates but will provide an insignificant (if any)

018854

HCMLPHMIT00004053

benefit to Limited Partners, the Investment Manager will have a conflict of interest with the Partnership when allocating Partnership brokerage business to a broker who has referred investors to the Partnership.  To prevent Partnership brokerage commissions from being used to pay investor referral fees, the Investment Manager will not allocate Partnership brokerage business to a referring broker unless the Investment Manager determines in good faith that the commissions payable to such broker are reasonable in relation to those available from non-referring brokers offering services of substantially equal value to the Partnership.

The General Partner and/or the Investment Manager may sell Interests through broker-dealers and pay a marketing fee or commission in connection with such activities, including ongoing payments, at the General Partner's or the Investment Manager's own expense.  The General Partner and/or the Investment Manager may also deduct a percentage of the amount invested by a Limited Partner in the Partnership to pay sales fees or charges, on a fully disclosed basis, to a broker-dealer based upon the capital contribution of such Limited Partner introduced to the Partnership by such broker-dealer. Any such sales fees or charges would be assessed against the referred Limited Partner and would reduce the amount actually invested by such Limited Partner in the Partnership.  If a Limited Partner is introduced to the Partnership through a broker-dealer that is not affiliated with the Investment Manager and/or the General Partner, the arrangement, if any, with such broker-dealer will be disclosed to, and acknowledged by, such Limited Partner.

## ALLOCATION OF INVESTMENT OPPORTUNITIES

The Investment Manager may at times determine that certain investments will be suitable for acquisition by the Partnership and by other accounts managed by the Investment Manager, including Affiliated Funds, the Investment Manager's own accounts or accounts of an affiliate.  If that occurs, and the Investment Manager is not able to acquire the desired aggregate amount of such investments on terms and conditions which the Investment Manager deems advisable, the Investment Manager will endeavor to allocate in good faith the limited amount of such investments acquired among the various accounts for which the Investment Manager considers them to be suitable.  The Investment Manager may make such allocations among the accounts in any manner which it considers to be fair under the circumstances, including, but not limited to, allocations based on relative account sizes, the degree of risk involved in the investments acquired, and the extent to which such investments are consistent with the investment policies and strategies of the various accounts involved.

## AGGREGATION OF ORDERS

The Investment Manager may aggregate purchase and sale orders of investments held by the Partnership with similar orders being made simultaneously for other accounts or entities if, in the Investment Manager's reasonable judgment, such aggregation is reasonably likely to result in an overall economic benefit to the Partnership based on an evaluation that the Partnership will be benefited by relatively better purchase or sale prices, lower commission expenses or beneficial timing of transactions, or a combination of these and other factors.

In some instances, the purchase or sale of investments for the Partnership may be effected simultaneously with the purchase or sale of like investments for other accounts or entities.  Such transactions may be made at slightly different prices, due to the volume of investments purchased or sold.  In such event, the average price of all investments purchased or sold in such transactions may be determined, at the Investment Manager's sole discretion, and the Partnership may be charged or credited, as the case may be, with the average transaction price.

## TRADE ERROR POLICY

The Investment Manager has internal controls in place to prevent trade errors from occurring.  On those occasions when such an error nonetheless occurs, the Investment

018855

HCMLPHMIT00004054

Manager will use reasonable efforts to correct the error.  If the error cannot be corrected, the Investment Manager does not intend to make any adjustment, regardless of whether the error works to the benefit or detriment of the Partnership.  The Investment Manager will endeavor to maintain a record of each trade error, including information about the trade and how such error was corrected or attempted to be corrected.  The Partnership (and not the General Partner, the Investment Manager or any of the Investment Manager Affiliates) will be responsible for any losses resulting from trading errors and similar human errors, unless such errors are due to gross negligence or willful misconduct, as determined by a final, non-appealable decision of a court of competent jurisdiction.

018856

HCMLPHMIT00004055

## RISK FACTORS AND CONFLICTS OF INTEREST

An investment in the Partnership (and any Series thereof) involves significant risks not associated with other investment vehicles and is suitable only for persons of adequate financial means who have no need for liquidity in this investment.  There can be no assurances or guarantees that:  (i) the Partnership's (or any Series') investment strategy will prove successful, or (ii) investors will not lose all or a portion of their investment in the Partnership (or any particular Series).

References herein to the Partnership shall include, where appropriate, each Series of the Partnership.

You should consider the Partnership as a supplement to an overall investment program and should only invest if you are willing to undertake the risks involved.  In addition, investors who are subject to income tax should be aware that an investment in the Partnership (or any Series thereof) is likely (if the Partnership (or such Series) is successful) to create taxable income or tax liabilities in excess of cash distributions to pay such liabilities.  You should therefore bear in mind the following risk factors and conflicts of interest before purchasing an Interest:

### PARTNERSHIP RISKS

**Dependence Upon the General Partner, the Investment Manager and the Principal; No Participation in Management**.  The Partnership's success will depend on the management of the General Partner and the Investment Manager and on the skill and acumen of the Principal.  If the Principal should cease to participate in the Partnership's business, the Partnership's ability to select attractive investments and manage its portfolio could be severely impaired.

As a Limited Partner, you should be aware that you will have no right to participate in the management of the Partnership, and you will have no opportunity to select or evaluate any of the Partnership's investments or strategies.  Accordingly, you should not invest in the Partnership unless you are willing to entrust all aspects of the management of the Partnership and its investments to the discretion of the General Partner and the Investment Manager.

**Limited or Lack of Operating History**.  Each of the Partnership, the Investment Manager and the General Partner are recently-formed entities that have no operating history upon which prospective investors may evaluate the Partnership's future performance.  Although the Principal has experience with investments of the type the Partnership intends to make, any prior performance of the Principal (or the Investment Manager Affiliates) is not necessarily indicative of results that he may achieve with respect to the Partnership.  As such, there can be no assurances that the Partnership will be able to implement its investment strategy or achieve its investment objective.  In addition, any prior performance of the Principal or the Investment Manager Affiliates is not indicative of the results each may achieve for the Partnership in the future.

**Reliance on the Shared Services Provider**.  The Investment Manager relies on the Shared Services Provider to provide certain administrative and other services.  In the event that the Shared Services Agreement is terminated for any reason, the Investment Manager may not be able to engage another third party to provide such services and may not have the resources to continue advising the Partnership without the provision of such services by the Shared Services Provider.  In addition, the Shared Services Provider may be (but, as of the date hereof, is not) engaged by the Partnership to act as the Partnership's Administrator, pursuant to a separate Administration Agreement.

**Limited Liquidity of Interests**.  An investment in the Partnership involves substantial restrictions on liquidity, and its Interests are not freely transferable.  There is no market for the Interests in the Partnership, and no market is expected to develop.  Additionally, transfers are subject to the consent of the General Partner, which consent may be granted or withheld in the General Partner's sole discretion.  Consequently, Limited Partners will

018857

HCMLPHMIT00004056

be unable to liquidate their Interests except by withdrawing from the Partnership in accordance with the Partnership Agreement.  Limited Partners may be unable to liquidate their investment promptly in the event of an emergency or for any other reason.  Although a Limited Partner may attempt to increase its liquidity by borrowing from a bank or other institution, Interests may not readily be accepted as collateral for a loan.  In addition, the transfer of an Interest as collateral or otherwise to achieve liquidity may result in adverse tax consequences to the transferor.

A portion of the Partnership's assets may be invested in securities and other financial instruments or obligations for which no market exists and/or which are restricted as to their transferability under federal or state securities laws.   Such investments may be segregated from other Partnership assets and carried in Side Pocket Accounts, which are subject to restrictions on withdrawals.  Because of the absence of any trading market for these investments, the Partnership may take longer to liquidate these positions than would be the case for publicly traded securities.  Although these securities may be resold in privately negotiated transactions, the prices realized on these sales could be less than those originally paid by the Partnership.  Further, companies whose securities are not publicly traded may not be subject to public disclosure and other investor protection requirements applicable to publicly traded securities.

<u>Lack of Registration</u>.  The Interests have neither been registered under the Securities Act nor under the securities laws of any state and, therefore, are subject to transfer restrictions.  In connection with your purchase of an Interest, you must represent that you are purchasing the Interest for investment purposes only and not with a view toward resale or distribution.  Neither the Partnership nor the General Partner has any plans or assumed any obligation to register the Interests.  Accordingly, the Interests may not be transferred without documentation acceptable to the General Partner, which may include an opinion of counsel to the Partnership that the transfer will not involve a violation of the registration requirements of the Securities Act or require registration by the Partnership under the Investment Company Act.  These restrictions on transfer are in addition to those found in the Partnership Agreement.  Ordinarily, this means that transfers will be restricted to instances of death, gift or passage by operation of law.

<u>Withdrawal of Capital</u>.  A Limited Partner's ability to withdraw funds from the Partnership is restricted in accordance with the withdrawal provisions contained in this Memorandum under "SUMMARY OF OFFERING AND PARTNERSHIP TERMS—Withdrawals" and the withdrawal provisions contained in the Partnership Agreement.  In addition, substantial withdrawals by investors within a short period of time could require the Partnership to liquidate securities positions and other investments more rapidly than would otherwise be desirable, possibly reducing the value of the Partnership's assets and/or disrupting the Partnership's investment strategy.  Reduction in the size of the Partnership could make it more difficult to generate a positive return or to recoup losses due to, among other things, reductions in the Partnership's ability to take advantage of particular investment opportunities or decreases in the ratio of its income to its expenses.

**For the avoidance of doubt, (i) there will be no limitation on the percentage of the Partnership's portfolio that may be carried in Side Pocket Accounts; and (ii) any investment made by Series 1 into the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**  In addition, because of the absence of any trading market Illiquid Investments, the Partnership may take longer to liquidate these positions than would be the case for publicly traded securities.  Each of the foregoing may impact a Limited Partner's ability to withdraw.

<u>Concentration of Investments</u>.  The Investment Manager implements its investment program in a manner which, in light of investment considerations, market risks and other factors, it believes will provide the best opportunity for attractive risk-adjusted returns in the value of the Partnership's assets. The Partnership Agreement does not formally limit the amount of the Partnership's assets that may be invested in a single company, security, country, industry, sector or asset class.  **For the avoidance of doubt, (i) there will be no limitation on the percentage of the Partnership's portfolio that may be carried in Side Pocket Accounts; and (ii) any investment made by Series 1 into the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**  The

018858

HCMLPHMIT00004057

concentration of the Partnership's portfolio in any manner described above would subject the Partnership to a greater degree of risk with respect to the failure of one or a few investments, or with respect to economic downturns in relation to an individual industry or sector, or single company, security, country, industry, sector or asset class.

**Operating Deficits**.    The expenses of operating the Partnership (including the Management Fee) may exceed its income, thereby requiring that the difference be paid out of the Partnership's capital, reducing the Partnership's investments and potential for profitability.

**No Distributions**. The General Partner does not intend to make distributions to the Limited Partners, but intends instead to reinvest substantially all Partnership income and gain, if any.  Cash that might otherwise be available for distribution will also be reduced by payment of Partnership obligations, payment of Partnership expenses (including fees payable and expense reimbursements to the General Partner) and establishment of appropriate reserves.  As a result, if the Partnership is profitable, Limited Partners in all likelihood will be credited with Partnership net income, and will incur the consequent income tax liability (to the extent that they are subject to income tax), even though Limited Partners receive little or no Partnership distributions.

**Investment Expenses**.    The investment expenses (e.g., expenses related to the investment and custody of the Partnership's assets, such as brokerage commissions, custodial fees and other trading and investment charges and fees) as well as other Partnership fees may, in the aggregate, constitute a high percentage relative to other investment entities.  The Partnership will bear these costs regardless of its profitability.

**Cross-Series Liability**.    Section 17-218 of the Delaware Act provides that limited partnerships can be established in separate series in a manner that the liabilities and obligations incurred with respect to any series are only enforceable against the assets of such series, and not against the assets of the limited partnership generally or any other series.  The relevant provisions of the Delaware Act provide the legal requirements for how limited partnerships can be established and operated to maintain this segregation.  The statute includes such requirements as the maintenance of separate books and records for each series, and separation of the assets of each series from other series.  Despite these statutory provisions, there may be instances where the assets of a particular Series may be exposed to the liabilities of one or more other Series.  For example, there may be certain counterparties which resist entering into a contract with a particular Series and insist that one or more other Series, or the Partnership itself acting on behalf of the Series together, enter into such contract.

**Supervision of Trading Operations**.  The Investment Manager, with assistance from its brokerage and clearing firms, intends to supervise and monitor trading activity in the Partnership's account to ensure compliance with the Partnership's objectives.  Despite the Investment Manager's efforts, however, there is a risk that unauthorized or otherwise inappropriate trading activity may occur in the Partnership account.

**Impact of Side Letters**.  The Partnership, the General Partner and/or the Investment Manager may from time to time enter into Side Letters with one or more Limited Partners that provide such Limited Partner(s) with additional and/or different rights (including, without limitation, with respect to access to information, minimum investment amounts and liquidity terms) than such Limited Partner(s) have pursuant to this Memorandum and the Partnership Agreement.  Neither the General Partner nor the Investment Manager will be required to notify any or all of the other Limited Partners of any such written agreements or any of the rights and/or terms or provisions thereof, nor will the General Partner or the Investment Manager be required to offer such additional and/or different rights and/or terms to any or all of the other Limited Partners.  The other Limited Partners will have no recourse against the Partnership, the General Partner, the Investment Manager and/or any of their respective affiliates in the event that certain Limited Partners receive additional and/or different rights and/or terms as a result of such Side Letters.

**Broad Discretionary Power to Choose Investments and Strategies**.  The Investment Management Agreement gives the Investment Manager broad discretionary power to

018859

HCMLPHMIT00004058

decide what investments the Partnership will make and what strategies it will use. While the Investment Manager currently intends to use the strategies described in "INVESTMENT PROGRAM", it is not obligated to do so, and it may choose any other investments and strategies that it believes are advisable.

<u>**Limitation of Liability and Indemnification of the General Partner, the Investment Manager and Affiliates**</u>. The Partnership Agreement provides that none of the General Partner, the Investment Manager, the Principal or any of the Investment Manager Affiliates will be liable to the Partnership or the Limited Partners for any action or inaction in connection with the business and affairs of the Partnership unless such action or inaction is determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct. The Partnership (but not the Limited Partners individually) is obligated to indemnify the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates (which, for purposes of this indemnity, shall include fund counsel (except for legal malpractice)) from and against any and all claims, liabilities, obligations, judgments, suits, proceedings, actions, demands, losses, costs, expenses (including attorneys' fees and other expenses of litigation), damages, penalties or interest, as a result of any claim or legal proceeding (made or threatened) related to any action or inaction by any of them in connection with the business and affairs of the Partnership (including the settlement or appeal of any such claim or legal proceeding); *provided* that such indemnity will not extend to conduct determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct. The Investment Management Agreement also provides similar protections to the Investment Manager. Therefore, a Limited Partner may have a more limited right of action against the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates than a Limited Partner would have had absent these provisions in the Partnership Agreement and the Investment Management Agreement. **It is the policy of the SEC that indemnification for violations of securities laws is against public policy and therefore unenforceable.**

<u>**No Minimum Size of Partnership**</u>. The Partnership may begin or continue operations without attaining or maintaining any particular level of capitalization. At low asset levels, the Partnership may be unable to make its investments as fully as would otherwise be desirable or to take advantage of potential economies of scale, including the ability to obtain the most timely and valuable research and trading information from securities brokers. It is possible that even if the Partnership operates for a period with substantial capital, investors' withdrawals could diminish the Partnership assets to a level that does not permit the most efficient and effective implementation of the Partnership's investment program. As a result of losses or withdrawals, the Partnership may not have sufficient capital to diversify its investments to the extent desired or currently contemplated by the Investment Manager.

<u>**Portfolio Valuation**</u>. Valuation of the Partnership's portfolio, which will affect the amount of the Management Fee, involves uncertainties and determinations based on judgments. Third-party pricing information may, at times, not be available regarding certain of the Partnership's investments. A disruption in the secondary markets for the Partnership's investments may limit the ability of the Partnership to obtain accurate market quotations for purposes of valuing its investments. In addition, material events occurring after the close of a principal market upon which a portion of the investments of the Partnership are traded may require it to make a determination of the effect of a material event on the value of the investments traded on the market for purposes of determining the value of the Partnership's investments on a valuation date. Further, because of the overall size and concentrations in particular markets and maturities of positions that may be held by the Partnership from time to time, the liquidation values of the Partnership's securities and other investments may differ significantly from the interim valuations of these investments derived from the valuation methods described herein. Moreover, because of the inherent uncertainty of valuing an illiquid security, the quoted valuation may be higher than the actual final liquidation value, and these differences could be material. If the Partnership's valuation should prove to be incorrect, the value of the Partnership's investments could be adversely affected.

018860

HCMLPHMIT00004059

**Liability of a Limited Partner for the Return of Capital Contributions**.  If the Partnership should become insolvent, Limited Partner may be obligated to return all or a portion of any distributions (including withdrawal proceeds) received from the Partnership in an amount up to its aggregate capital contributions (including any income or gains thereon) to the Partnership in order to pay such Limited Partner's *pro rata* share of any Partnership liabilities that arose while such Limited Partner held Interests.

Under the Delaware Act, when a Limited Partner receives a return of all or any part of such Limited Partner's capital contribution, the Limited Partner may be liable to the Partnership for any sum, not in excess of such return of capital (together with interest), if at the time of such distribution the Limited Partner knew that the Partnership was prohibited from making such distribution pursuant to the Delaware Act.

**Delayed Schedule K-1s**.  The General Partner will endeavor to provide a Schedule K-1 to each Limited Partner for any given calendar year prior to April 15 of the following year.  In the event that the Schedule K-1 is not available by such date, a Limited Partner may have to request an extension of time to file or may have to pay taxes based on an estimated amount.

**Lack of Insurance**.  The assets of the Partnership are not insured by any government or private insurer, except to the extent portions may be deposited in bank accounts insured by the United States Federal Deposit Insurance Corporation or with brokers insured by the Securities Investor Protection Corporation and such deposits and securities are subject to such insurance coverage (which, in any event, is limited in amount).  Therefore, in the event of the insolvency of a depository or custodian, the Partnership may be unable to recover all of its funds or the value of its securities so deposited.

**Forward-Looking Statements; Opinions**.  Statements contained in this Memorandum that are not historical facts are based on current expectations, estimates, projections, opinions and/or beliefs of the Partnership.  Such statements involve known and unknown risks, uncertainties and other factors, and undue reliance should not be placed thereon. Moreover, certain information contained in this Memorandum constitutes "forward-looking" statements, which can be identified by the use of forward-looking terminology, such as "may", "will", "seek", "should", "expect", "anticipate", "project", "estimate", "intend", "continue" or "believe" or the negatives thereof or other variations thereon or comparable terminology.  Due to various risks and uncertainties, including those set forth herein, actual events or results or the actual performance of the Partnership may differ materially from those reflected or contemplated in such forward-looking statements.

<div align="right">

MARKET RISKS

</div>

**General**

**Competition Generally**.  The securities industry and the varied strategies and techniques to be engaged in by the Investment Manager are extremely competitive and each involves a degree of risk.  The Partnership will compete with firms, including many of the larger securities and investment banking firms, which have substantially greater financial resources and research staffs.  Further, lower fees for comparable services may be available from these or other firms.

**Market Volatility**.  The profitability of the Partnership substantially depends upon the Investment Manager correctly assessing the future price movements of bonds, stocks, options on stocks, and other financial instruments, and the movements of interest rates. The Partnership cannot guarantee that the Investment Manager will be successful in accurately predicting those prices and interest rate movements.

**Partnership's Investment Activities**.  The Partnership's investment activities involve a significant degree of risk.  The performance of any investment is subject to numerous factors which are neither within the control of nor predictable by the Investment Manager. Such factors include a wide range of economic, political, competitive, technological and other conditions (including natural disasters, acts of terrorism and war) that may affect investments in general or specific industries or companies.  The securities markets may

018861
HCMLPHMIT00004060

be volatile, which may adversely affect the ability of the Partnership to realize profits.  As a result of the nature of the Partnership's investing activities, it is possible that the Partnership's financial performance may fluctuate substantially over time and from period to period.

**Terrorist Actions**.  There is a risk of terrorist attacks on the United States and elsewhere causing significant loss of life and property damage and disruptions in the global market.  Economic and diplomatic sanctions may be in place or imposed on certain states and military action may be commenced.  The impact of such events is unclear, but could have a material effect on general economic conditions and market liquidity.

**Unforeseen Events**.  The Partnership may be adversely affected by unforeseen events involving such matters as changes in interest rates or the credit status of an issuer, forced withdrawals of securities or acquisition proposals, break-up of planned mergers, unexpected changes in relative value, short squeezes, inability to short stock or changes in tax treatment.

**Potential Cybersecurity Breaches and Identity Theft**.  The Investment Manager relies, to a certain extent, on the use of information technology.  The Investment Manager's information and technology systems may be vulnerable to damage and/or interruption from computer viruses, network failures, computer and telecommunication failures, infiltration by unauthorized persons and security breaches, usage errors by its professionals, power outages, and/or catastrophic events such as fires, tornadoes, floods, hurricanes and earthquakes.  Although the Investment Manager has implemented various measures to manage risks relating to these types of events, if these systems are compromised, become inoperable for extended periods of time and/or cease to function properly, the Investment Manager and/or the Partnership may have to make a significant investment to fix or replace them.  The failure of these systems and/or disaster recovery plans for any reason could cause significant interruptions in the Investment Manager's and/or the Partnership's operations and may result in a failure to maintain the security, confidentiality or privacy of sensitive data, including personal information relating to investors (and the beneficial owners of investors).  Such a failure could harm the Investment Manager's and/or the Partnership's reputation, subject any such entity and their respective affiliates to legal claims and/or otherwise affect their business and financial performance.

**Long-Biased Investment Program**.  The Investment Manager expects that its strategy with respect to the Partnership will have a long bias.  Therefore, any decline in the overall market may result in a decline in the value of the Partnership's assets.

**Market Liquidity and Leverage**.  The Partnership may be adversely affected by a decrease in market liquidity for the instruments in which it invests which may impair the Partnership's ability to adjust its positions.  The size of the Partnership's positions may magnify the effect of a decrease in market liquidity for such instruments.  Changes in overall market leverage, deleveraging as a consequence of a decision by any brokers and custodians, or other counterparties with which the Partnership enters into repurchase/reverse repurchase agreements or derivative transactions, to reduce the level of leverage available, or the liquidation by other market participants of the same or similar positions, may also adversely affect the Partnership's portfolio.

**Material Non-Public Information**.  By reason of their responsibilities in connection with other activities of the Investment Manager and/or its affiliates, the Principal or employees of the Investment Manager and/or its affiliates may acquire confidential or material non-public information or be restricted from initiating transactions in certain securities.  The Partnership will not be free to act upon any such information.  Due to these restrictions, the Partnership may not be able to initiate a transaction that it otherwise might have initiated and may not be able to sell an investment that it otherwise might have sold.

**Accuracy of Public Information**.  The Investment Manager may select investments for the Partnership, in part, on the basis of information and data filed by issuers with various government regulators or made directly available to the Investment Manager by the issuers or through sources other than the issuers.  Although the Investment Manager

018862

HCMLPHMIT00004061

evaluates certain such information and data and sometimes seeks independent corroboration when the Investment Manager considers it is appropriate and when it is reasonably available, the Investment Manager is not in a position to confirm the completeness, genuineness or accuracy of such information and data, and in some cases, complete and accurate information is not available.  Investments may not perform as expected if information is inaccurate.

**Directorships on Boards of Portfolio Companies**.  The principals and other members and employees of the Investment Manager or its designees may serve as directors of companies the securities of which are purchased or sold on behalf of the Partnership and may be compensated for such service.  In the event that material non-public information obtained with respect to such companies becomes subject to trading restrictions pursuant to the internal trading policies of such companies or as a result of applicable law or regulations, the Partnership may be prohibited for a period of time from purchasing or selling the securities of such companies, which prohibition may have an adverse effect on the Partnership.

**Short-Swing Liability and Other Limitations**.  From time to time, the Partnership, acting alone or as part of a group, may acquire beneficial ownership of more than 10% of a certain class of securities of a public company, or may place a director on the board of directors of such a company.  As a result, under Section 16 of the Exchange Act, the Partnership may be subject to certain additional reporting requirements and may be required to disgorge certain short-swing profits arising from purchases and sales of such securities.  In addition, in such circumstances the Partnership will be prohibited from entering into a short position in such issuer's securities, and therefore limited in its ability to hedge such investments.

**Disruptions or Inability to Trade Due to a Failure to Receive Timely and Accurate Market Data from Third-Party Vendors**.  The Investment Manager's strategy may depend on the receipt of timely and accurate market data from third-party vendors. Any failure to receive such data in a timely manner or the receipt of inaccurate data for any reason could disrupt and adversely affect the Partnership's trading until such failure or inaccuracy is corrected.

**Use of Automated Order Routing and Execution Systems Generally**.  The Investment Manager may use automated order routing and execution systems in its trading.  Such systems are typically provided on an "as is" basis.  Such systems may experience technical difficulties which may render them temporarily unavailable. In addition, such systems may fail to properly perform.  Such failures may result in losses to the Partnership, for which losses the providers of such services have disclaimed all liability.  In an effort to mitigate such risks, the Investment Manager intends to closely monitor trades executed through automated order routing and execution systems and the operation of the systems themselves.

**Electronic Trading Facilities**.  The Partnership may make use of electronic trading facilities (including ECNs), which are generally supported by computer-based component systems for the order-routing, execution, matching, registration or clearing of trades.  As with all facilities and systems, they are vulnerable to temporary disruption or failure.  Trading on an electronic trading system (including an ECN) may differ not only from trading in an open-outcry market or telephonic market but also from trading on other electronic trading systems. The Partnership, in undertaking transactions on an electronic trading system, will be exposed to risk associated with the system including the failure of hardware and software. The result of any system failure may be that the Partnership's order is either not executed according to its instructions or is not executed at all.  The Partnership's ability to limit or recover certain losses may be subject to limits on liability imposed by, without limitation, foreign or domestic law or regulation, the Partnership's own or its broker's internet service provider, other systems providers, market factors, foreign or domestic banking or other market regulations and/or telephonic or other communications providers, foreign or domestic.

**Technology Risk**.  The Investment Manager's investment strategy may rely on the use of proprietary and non-proprietary software, data and intellectual property.  Any such reliance

018863

HCMLPHMIT00004062

on this technology and data is subject to a number of important risks. First, the Partnership may be severely and adversely affected by the malfunction of the technology and/or data feed. For example, an unforeseeable software or hardware malfunction could occur, as a result of a virus or other outside force, or as result of a design flaw in the Partnership's system or in its continued implementation. In the past, occurrences of this nature to other funds have sometimes resulted in dramatically negative consequences for the portfolio of the related fund. In addition, changes in the market for publicly available data or in regulatory reporting requirements could cause a severe diminution in the data available for the technology to operate as designed. Such events can also have dramatically negative consequences for the Partnership. Furthermore, if any of the Partnership's software, hardware, data and/or other intellectual property is found to infringe on the rights of any third party, the Partnership could be severely and adversely affected.

<u>Trading Errors</u>. The Investment Manager's computerized trading systems rely on the ability of the Investment Manager's personnel to accurately process such systems' outputs and to use the proper trading orders, including stop-loss or limit orders, to execute the transactions called for by the systems. In addition, the Investment Manager relies on its staff to properly operate and maintain the computer and communication systems upon which the trading systems rely. The Investment Manager's systems are accordingly subject to human errors, including the failure to implement, or the inaccurate implementation of any of the Investment Manager's systems, in addition to errors in properly executing transactions. This could cause substantial losses on transactions, and any such losses could substantially and adversely affect the performance of the Partnership. See "BROKERAGE PRACTICES–Trade Error Policy" herein.

<u>Co-Investments with Third Parties</u>. The Partnership may co-invest with third parties through joint ventures or other entities. Such investments may involve risks in connection with such third- party involvement, including the possibility that a third-party co-venturer may have financial difficulties resulting in a negative impact on such investment, economic or business interests or goals that are inconsistent with those of the Partnership or be in a position to take (or block) action in a manner contrary to the Partnership's investment objectives. In those circumstances where such third parties involve a management group, such third parties may enter into compensation arrangements relating to such investments, including incentive compensation arrangements. Such compensation arrangements will reduce the returns to participants in the investments.

<u>Other Investment Vehicles; Limited Recourse</u>. The Investment Manager may allocate a portion of the Partnership's assets to pooled investment vehicles that may be managed by the Investment Manager or its affiliates or unaffiliated managers. Such investment vehicles may trade wholly-independently of one another and may at times hold economically offsetting positions. To the extent that such investment vehicles do, in fact, hold such positions, the Partnership, considered as a whole, may not achieve any gain or loss despite incurring expenses. Additionally, a creditor having a claim that relates to a particular investment held by any such investment vehicle may be able to satisfy such claim against all assets of such investment vehicle, without regard to the participation rights of the Partnership and other investors of such investment vehicle in the assets of such investment vehicle.

Since the Partnership may not have full transparency with respect to the trading activities of such investment vehicles, it may be limited in its ability to hedge its exposure or to prevent concentration of its assets within the same issuer, asset or asset class, industry, section, strategy, currency, country or geographic region. Further, the Investment Manager may be limited with respect to its ability to monitor unaffiliated managers, including their adherence to their respective trading and risk guidelines (if such guidelines exist). Even in the event that such information may be available to the Partnership, the Partnership's investment in such investment vehicles may be "locked up" and subject to limitations on withdrawals, and in light of the broad exculpation and indemnification provisions typically contained in the governing documents of such investment vehicles, may have limited recourse against the managers of such investment vehicles.

<u>Risks Associated with ETFs</u>. The Partnership may invest in ETFs. ETFs represent an

018864

HCMLPHMIT00004063

interest in a passively managed portfolio of securities and financial instruments selected to replicate a securities or financial instruments index. Unlike open-end mutual funds, the shares of ETFs are not purchased and redeemed by investors directly with the ETF, but instead are purchased and sold through broker-dealers in transactions on an exchange. Because ETF shares are traded on an exchange, they may trade at a discount from or a premium to the net asset value per share of the underlying portfolio of securities or financial instruments. In addition to bearing the risks related to investments in securities or financial instruments, investors in ETFs intended to replicate an index bear the risk that the ETFs performance may not correctly replicate the performance of the index. Investors in ETFs, closed-end funds and other investment companies bear a proportionate share of the expenses of those funds, including management fees, custodial and accounting costs, and other expenses. As such, the Partnership is subject to layering of such fees. Trading in ETF and closed-end fund shares also entails payment of brokerage commissions and other transaction costs.

**Illiquid Securities**. From time to time, the Partnership may invest in financial instruments that are not publicly traded. The Partnership may also invest in securities and other financial instruments that trade regularly but may be only thinly traded, either periodically or on an on-going basis. The Partnership may not be able to readily dispose of such financial instruments and, in some cases, may be contractually prohibited from disposing of such financial instruments for a specified period of time. Accordingly, the Partnership may be forced to sell its more liquid positions at a disadvantageous time, resulting in a greater percentage of the portfolio consisting of illiquid securities. In addition, the market prices, if any, for such financial instruments tend to be volatile, and the Partnership may not be able to sell them when it desires to do so or to realize what it perceives to be their fair value in the event of a sale. The sale of illiquid securities also often requires more time and results in higher brokerage charges or dealer discounts and other selling expenses than does the sale of securities eligible for trading on national securities exchanges or in the over-the-counter markets. Furthermore, there may be limited information available about the assets of such issuers of the financial instruments which may make valuation of such financial instruments difficult or uncertain. It also should be noted that, even those markets which the Investment Manager expects to be liquid can experience periods, possibly extended periods, of illiquidity.

**Investments in Securities and Other Assets Believed to Be Undervalued**. The Investment Manager's investment program contemplates that a portion of the Partnership's portfolio may be invested in securities and other assets that the Investment Manager believes to be undervalued. The identification of such investment opportunities is a difficult task, and there are no assurances that such opportunities will be successfully recognized or acquired. While such investments offer the opportunities for above-average capital appreciation, they also involve a high degree of financial risk and can result in substantial losses. Returns generated from the Partnership's investments may not adequately compensate for the business and financial risks assumed. The current economic conditions and any future major economic recession can severely disrupt the markets for such investments and significantly impact their value. In addition, any such economic downturn can adversely affect the ability of the issuers of such obligations to repay principal and pay interest thereon and increase the incidence of default for such securities. Additionally, there can be no assurance that other investors will ever come to realize the value of some of these investments, and that they will ever increase in price. Furthermore, the Partnership may be forced to hold such investments for a substantial period of time before realizing their anticipated value. During this period, a portion of the Partnership's funds would be committed to the investments made, thus possibly preventing the Partnership from investing in other opportunities.

**Short Sales**. The Investment Manager's investment program contemplates that a portion of the Partnership's portfolio may be invested in selling securities short. Although the Investment Manager may sell short a variety of assets, it expects most short trades to be in equity securities. Short selling involves the sale of a security that the Partnership does not own and must borrow in order to make delivery in the hope of purchasing the same security at a later date at a lower price. In order to make delivery to the purchaser, the Partnership must borrow securities from a third-party lender. The Partnership subsequently returns the borrowed securities to the lender by delivering to the lender the

018865

HCMLPHMIT00004064

securities it receives in the transaction or by purchasing securities in the open market. The Partnership must generally pledge cash with the lender equal to the market price of the borrowed securities. This deposit may be increased or decreased in accordance with changes in the market price of the borrowed securities. During the period in which the securities are borrowed, the lender typically retains its right to receive interest and dividends accruing to the securities. In exchange, in addition to lending the securities, the lender generally pays the Partnership a fee for the use of the Partnership's cash. This fee is based on prevailing interest rates, the availability of the particular security for borrowing and other market factors.

Theoretically, securities sold short are subject to unlimited risk of loss because there is no limit on the price that a security may appreciate before the short position is closed. In addition, the supply of securities that can be borrowed fluctuates from time to time. The Partnership may be subject to substantial losses if a security lender demands return of the lent securities and an alternative lending source cannot be found.

**Small Companies**.  The Investment Manager may invest a portion of the Partnership's assets in small and/or unseasoned companies with small market capitalizations. While smaller companies generally have potential for rapid growth, they often involve higher risks because they may lack the management experience, financial resources, product diversification and competitive strength of larger companies. In addition, in many instances, the frequency and volume of their trading may be substantially less than is typical of larger companies. As a result, the securities of smaller companies may be subject to wider price fluctuations. When making large sales, the Partnership may have to sell portfolio holdings at discounts from quoted prices or may have to make a series of small sales over an extended period of time due to the lower trading volume of smaller company securities.

**Leverage**.  When deemed appropriate by the Investment Manager and subject to applicable regulations, the Partnership will incur leverage in its investment program, whether directly through the use of borrowed funds, or indirectly through investment in certain types of financial instruments with inherent leverage, such as puts, calls and warrants, which may be purchased for a fraction of the price of the underlying securities while giving the purchaser the full benefit of movement in the market price of those underlying securities. While such strategies and techniques increase the opportunity to achieve higher returns on the amounts invested, they also increase the risk of loss. To the extent that the Partnership purchases securities with borrowed funds, its net assets will tend to increase or decrease at a greater rate than if borrowed funds are not used. The level of interest rates generally, and the rates at which such funds may be borrowed in particular, could affect the operating results of the Partnership. If the interest expense on this leverage were to exceed the net return on the investments made with borrowed funds, the Partnership's use of leverage would result in a lower rate of return than if the Partnership were not leveraged.

If the amount of leverage which the Partnership may have outstanding at any one time is large in relation to its capital, fluctuations in the market value of the Partnership's portfolio will have disproportionately large effects in relation to the Partnership's capital and the possibilities for profit and the risk of loss will therefore be increased. Any investment gains made with the additional leverage will generally cause the Net Asset Value of the Partnership to rise more rapidly than would otherwise be the case. Conversely, if the investment performance of the leveraged capital fails to cover its cost to the Partnership, the Net Asset Value of the Partnership will generally decline faster than would otherwise be the case.

Certain of the Partnership's trading and investment activities in securities and other financial instruments may be subject to Federal Reserve Board margin requirements, which are computed each day. When the market value of a particular open position changes to a point where the margin on deposit does not satisfy maintenance margin requirements, a "margin call" on the customer is made. If the customer does not deposit additional funds with the broker to meet the margin call within a reasonable time, the customer's position may be closed out. In the event of a precipitous drop in the value of the assets managed by the Partnership, the Partnership might not be able to liquidate

018866

HCMLPHMIT00004065