**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re: Highland Capital Management, L.P.**

|  |  |
|---|---|
| § | |
| § | Case No. **19-34054-sgj11** |

**The Dugaboy Investment Trust et al- Appellant**

|  |
|---|
| § |

vs.                                                  §

**Highland Capital Management, L.P.**
**Et al- Appellee**

|  |  |
|---|---|
| § | **3:25-cv-02072-S** |
| § | |

   **[4333]  Memorandum of Opinion and Order Regarding Stay Requests (Addressing DE #4326 and 4308) entered on 7/21/25**


# Volume 25

# APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | |

*INDEX*

### APPELLANT THE DUGABOY INVESTMENT TRUST'S STATEMENT OF ISSUES TO BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL FROM THE BANKRUPTCY COURT'S ORDER REGARDING STAY REQUESTS [ADDRESSING DE ## 4326 & 4308]

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4353] on August 4, 2025 in the above-captioned case from the Bankruptcy Court's July 21, 2025 *Memorandum Order and Opinion Regarding Stay Requests [Addressing DE ## 4326 & 4308]*[Docket No. 4333], hereby submits this *Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the items listed herein to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1. **Did the Bankruptcy Court err in faulting Dugaboy's Stay Request because Dugaboy did not make a "standard" request for a stay pending appeal pursuant to Federal Bankruptcy Rule 8007?**

2. **Did the Bankruptcy Court err in determining that the Bankruptcy Rule 9019 settlement proceeding was not "a proceeding involving a charitable trust"?**

3. **Did the Bankruptcy Court err in concluding there was insufficient evidence connecting Mark Patrick's involvement in this Court's Rule 9019 settlement proceedings to the allegations of wrongdoing against Patrick in the Cayman Islands proceeding?**

4. **Did the Bankruptcy Court err in failing to recognize that the new evidence of Mark Patrick's misconduct exposed in the Cayman Islands proceeding fatally undermines the 9019 settlement by establishing that Patrick lacked authority to enter into the settlement?**

5. **Did the Bankruptcy Court err in concluding that a stay was unnecessary because Dugaboy could still pursue remedies against Mark Patrick in the Cayman Islands proceeding?**

6. **Did the Bankruptcy Court err in failing to recuse itself under 28 U.S.C. § 455 due to the appearance of partiality created by the presiding judge's authorship of novels that bear striking factual and thematic similarities to the Highland Capital Management bankruptcy proceedings and portray hedge fund principals in an overtly negative**

---

[1] Because of its voluminous nature, Docket #4255 will be delivered to the Clerk on a flash drive which will arrive tomorrow.

1

light, thereby depriving Dugaboy of an impartial judge with respect to the stay motion?

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

*Vol. 1*

*000001*

1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4353] filed by Appellant;

*000023*

2. Bankruptcy Court's *Memorandum Opinion and Order Regarding Stay Requests [Addressing DE ## 4236 & 4308* [Docket No. 4333];

*000039*

3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings: Transcript of hearing held June 25, 2025 before Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297]; and

5. Each of the additional documents and items designated below:

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| *Vol. 2* *000569* | 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s)1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| *000730* | 3/18/2021 | 2060 | Motion to recuse Judge Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| *000734* | 3/18/2021 | 2061 | Brief in support filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| *Vol. 3* *000771 Thru vol. 5* | 3/18/2021 | 2062 | Support/supplemental document Appendix to Motion to Recuse filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| *Vol. 5* *003493* | 3/23/2021 | 2083 | Order denying motion to recuse (related document #2060) Entered on 3/23/2021. (Okafor, M.) |

2

| | | | |
|---|---|---|---|
| *Vol. 5*<br>003504 | 4/6/2021 | 2169 | Amended notice of appeal filed by Interested Party James Dondero (RE: related document(s)2149 Notice of appeal). (Lang, Michael) |
| 003519 | 4/15/2022 | 2205 | Statement of issues on appeal, filed by Interested Party James Dondero (RE: related document(s)2083 Order on motion to recuse Judge). (Lang, Michael) |
| 003521 | 4/15/2021 | 2206 | Appellant designation of contents for inclusion in record on appeal filed by Interested Party James Dondero (RE: related document(s)2169 Amended notice of appeal). Appellee designation due by 04/29/2021. (Lang, Michael) |
| 003530 | 2/9/2022 | 3264 | DISTRICT COURT MEMORANDUM OPINION AND ORDER - The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292 (a) and the Court is without jurisdiction over this appeal of the Bankruptcy Court's Recusal Order. The Court further denies Appellants leave to appeal the Recusal Order under § 1292 (b), denies Appellants' request to withdraw the reference of their motion to recuse, and denies Appellants' request to construe their appeal as a petition for writ of mandamus. Accordingly, the Court dismisses this appeal for lack of jurisdiction. (Ordered by Judge Ed Kinkeade on 2/9/2022). Civil Action number:3:21-cv-00879-K, DISMISSED for lack of jurisdiction (RE: related document(s)2083 Order on motion to recuse Judge). Entered on 2/9/2022 (Whitaker, Sheniqua) Modified on 2/25/2022 (Whitaker, Sheniqua). (Entered: 02/25/2022) |
| *Vol 6*<br>003544 | 7/20/2022 | 3406 | Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: #1 Appendix Appendix (Lang, Michael) Modified text on 7/21/2022 (Ecker, C.). |
| 003909 | 8/1/2022 | 3422 | Notice of hearing on Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.).). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3406, (Lang, Michael) |

| | | | |
|---|---|---|---|
| Vol 6<br><br>003912 | 8/15/2022 | 3444 | Response opposed to (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Attachments: #1 Exhibit A (Annable, Zachery) |
| Vol. 7<br><br>003936<br>Thru END of Vol 14 | 8/15/2022 | 3445 | Exhibit List (Appendix in Support of Highland Capital Management, L.P.'s Objection to Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 USC 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3444 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Index 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 (Annable, Zachery) |
| Vol 15<br><br>011840 | 8/15/2022 | 3446 | Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

| | | | |
|---|---|---|---|
| *Vol. 15* | | | Depositions) Filed by Debtor Highland Capital Management, L.P. (Annable, Zachery) |
| *011855* | 8/15/2022 | 3447 | Declaration re: (Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi). (Annable, Zachery) |
| *011864* | 8/17/2022 | 3456 | Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.)). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3446 and for 3449, (Annable, Zachery) |
| *011869* | 8/22/2022 | 3463 | Reply to (related document(s): 3444 Response filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. (Lang, Michael) |
| *011874* | 8/24/2022 | 3466 | Amended Notice of hearing filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.)., 3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

| | | | |
|---|---|---|---|
| *Vol 15* | | | Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.), 3462 Order converting the August 31, 2022 at 9:30 AM Hearing on (A) The motion for final appealable order and supplement to motion to recuse and (B) related motions to strike and compel to a preliminary status/scheduling conference (RE: related document(s)3406 Motion for leave filed by Interested Party James Dondero, 3446 Motion to strike document filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel filed by Debtor Highland Capital Management, L.P.). Entered on 8/19/2022 (Ecker, C.)). Status Conference to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga. (Lang, Michael) |
| *011877* | 8/26/2022 | 3470 | Amended motion for final appealable order and proposed supplement to the record filed by Interested Party James Dondero (RE: related document(s)3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support). (Attachments: #1 Appendix (Lang, Michael) MODIFIED text to match PDF on 9/1/2022 (Ecker, C.). |
| *012039* | 8/26/2022 | 3471 | Stipulation by James Dondero and Highland Capital Management, L.P.. filed by Interested Party James Dondero (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi, 3449 Motion to compel Lawyers' Depositions.). (Lang, Michael) |
| *012047* | 8/31/2022 *N/A* *NO PDF AVAilAble* | 3478 | 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.) (Edmond, Michael) |
| *012047* | 9/1/2022 | 3479 | Order denying amended motion of James Dondero, Highland Capital Management Fund Advisors, L.P., Nexpoint Advisors, |

*Vol. 15*

*012050*

*012077*
*Vol. 16*
*012079*

*012357*

| | | | |
|---|---|---|---|
| | | | L.P. The Dugaboy Investment Trust Get Good Trust and, Nexpoint Real Estate Partners, LLC, F/K/A HCRE Partners, A Delaware Limited Liability Company for final appealable order and supplement to motion to recuse pursuant to 28 U.S.C. Section 455 (RE: related document(s)3470 Brief filed by Interested Party James Dondero). Entered on 9/1/2022 (Okafor, Marcey) |
| | 9/1/2022 | 3480 | Transcript regarding Hearing Held 08/31/2022 (27 pages) RE: Status Conference Re: Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 (#3406). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 11/30/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.)). Transcript to be made available to the public on 11/30/2022. (Rehling, Kathy) |
| | 9/27/2022 | 3541 | Motion to recuse Judge Stacey G. C. Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| | 9/72/2022 | 3542 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3541 Motion to recuse Judge Stacey G. C. Jernigan). (Attachments: #1 Appendix (Lang, Michael) |
| | 10/14/2022 | 3567 | Agreed Scheduling Order on renewed motion to recuse (related document #3541) Entered on 10/14/2022. (Okafor, Marcey) |

7

*Vol. 16*
*012361*

*Vol. 17*

*012363*

*012641*

*Vol. 18*

*012697*
*Thru End of Vol. 21*

*Vol. 22*
*016732*

*016737*

*016773*

*016809*

| | | | |
|---|---|---|---|
| 10/17/2022 | 3570 | Motion to recuse Judge Stacey G. C. Jernigan - AMENDED Filed by Interested Party James Dondero (Lang, Michael) |
| 10/17/2022 | 3571 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Attachments: #1 Appendix (Lang, Michael) |
| 10/31/2022 | 3595 | Response opposed to (related document(s): 3541 Motion to recuse Judge Stacey G. C. Jernigan filed by Interested Party James Dondero, 3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 10/31/2022 | 3596 | Support/supplemental document (Appendix in Support of Highland's Objection to Renewed Motion to Recuse Pursuant to 28 U.S.C. 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3595 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 (Annable, Zachery) |
| 3/3/2023 | 3673 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Lang, Michael) |
| 3/6/2023 | 3675 | Memorandum of Opinion and Order Denying Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. Section 455 (RE: related document(s)3570 Motion to recuse Judge filed by Interested Party James Dondero). Entered on 3/6/2023 (Okafor, Marcey) |
| 3/6/2023 | 3676 | Order Denying Amended Renewed Motion to Recuse Pursuant to U.S.C. Section 455 (related document #3570) Entered on 3/6/2023. (Okafor, Marcey) |
| 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland |

*Vol. 22*

| | | | |
|---|---|---|---|
| | | | Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| | 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery) |
| | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| | 6/20/2025 | 4255  *(to be submitted to Clerk on flash drive)* | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 |

*016827*

*016830*

*016855*

*016863*

*016865*

*Vol. 23*

*016867*

*Thru end of Vol. 25*

| | | | |
|---|---|---|---|
| | | | Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| 6/20/2025 | 4256 | | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |
| 6/20/2025 | 4257 | | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent |

*Vol. 26*

*019524*

*019527*

| | | | |
|---|---|---|---|
| | | | Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart, #3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
| *Vol. 27*<br>*019847* | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Professional Highland Claimant Trust (RE: related document(s)4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| *019871* | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4257 List (witness/exhibit/generic). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8 ,8, Exhibit 9 (Curry, David) |
| *019998* | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| *Vol. 28*<br>*020013* | 6/23/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4255 List (witness/exhibit/generic). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |
| *020230* | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 Deitsch-Perez, Deborah) |
| *020241* | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic). (Attachments: #1 Exhibit 126 (Annable, Zachery) |

| | | | |
|---|---|---|---|
| *VOL. 28*<br><br>*020266* | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| *VOL. 29*<br><br>*020267* | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4223 Objection). (Annable, Zachery) |
| *020271* | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust. Entered on 6/27/2025 (Okafor, M.) |
| *020282* | 7/1/2025 | 4299 | Motion to withdraw document Consent Motion to Dismiss HMIT Remand Proceedings with Prejudice (related document(s) 3699 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| *020289* | 7/1/2025 | 4300 | Motion to withdraw document Consent Motion to Dismiss Delaware Action Proceedings with Prejudice (related document(s) 4000 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |

| | | | |
|---|---|---|---|
| *Vol. 29* | 7/7/2025 | 4304 | Order withdrawing Emergency Motion for Leave to File Adversary Proceeding [Dkt. 3699] with prejudice (RE: related document(s)4299 Motion to withdraw document filed by Interested Party Hunter Mountain Trust, Creditor Hunter Mountain Investment Trust). IT IS THEREFORE ORDERED that the proceedings defined in the Dismissal Motion as: Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P., Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including Hunter Mountain Investment Trusts Emergency Motion for Leave to File Adversary Proceeding filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating thereto), are dismissed with prejudice. Entered on 7/7/2025 (Okafor, M.) |
| *020296* | | | |
| *020298* | 7/10/2025 | 4308 | Notice Letter from the Office of the Texas Attorney General Requesting a Stay filed by Interested Party State of Texas. (Stone, Johnathan) |
| *020300* | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| *020309* | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *020311* | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
| *Vol. 30*<br>*020407* | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related |

| | | | |
|---|---|---|---|
| *Vol. 31* 020680 | | | document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| | 7/21/2025 | 4333 | Memorandum of opinion (RE: related document(s)4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| 020696 | 7/21/2025 | 4334 | Order denying stay requests (related document 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order and 4308 Notice). Entered on 7/21/2025. (Okafor, M.) Additional attachment(s) added on 7/21/2025 (Okafor, M.) |
| 020808 | 8/4/2025 | 4353 | Notice of appeal. Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: #1 Exhibit A) (Harper, Geoffrey) |
| 020830 | 8/5/2025 | 4359 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-02072-S. (RE: related document(s)4353 Notice of appeal filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). (Almaraz, Jeanette) |
| 020837 | 8/15/2025 | 4372 | Motion to recuse Judge Filed by Interested Parties James Dondero, NexPoint Advisors, L.P., NexPoint Asset Management, L.P., NexPoint Real Estate Advisors, L.P., The Dugaboy Investment Trust, The Get Good Non Exempt Trust No 2 (Attachments: #1 Proposed Order (Harper, Geoffrey) |

Dated: August 18, 2025

Respectfully submitted,

**WINSTON & STRAWN LLP**

By: */s/ Geoffrey S. Harper*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
**CRAWFORD, WISHNEW & LANG PLLC**
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

***Counsel for Appellant The Dugaboy Investment Trust***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 18, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

assets quickly enough to pay off the margin debt and might suffer mandatory liquidation of positions in a declining market at relatively low prices, incurring substantial losses. With respect to the Partnership's trading activities, the Partnership, and not the Limited Partners personally, will be subject to margin calls.

Overall, the use of leverage, while providing the opportunity for a higher return on investments, also increases the volatility of such investments and the risk of loss.

**Options and Other Derivative Instruments.** The Investment Manager may invest, from time to time, a portion of the Partnership's assets in options and derivative instruments, including buying and writing puts and calls on some of the securities held by the Partnership. The prices of many derivative instruments, including many options and swaps, are highly volatile. The value of options and swap agreements depend primarily upon the price of the securities, indexes, currencies or other instruments underlying them. Price movements of options contracts and payments pursuant to swap agreements are also influenced by, among other things, interest rates, changing supply and demand relationships, trade, fiscal, monetary and exchange control programs and policies of governments, and national and international political and economic events and policies. The Partnership is also subject to the risk of the failure of any of the exchanges on which its positions trade or of their clearinghouses or of counterparties. The cost of options is related, in part, to the degree of volatility of the underlying securities, currencies or other assets. Accordingly, options on highly volatile securities, currencies or other assets may be more expensive than options on other investments.

Put options and call options typically have similar structural characteristics and operational mechanics regardless of the underlying instrument or asset on which they are purchased or sold. A put option gives the purchaser of the option, upon payment of a premium, the right to sell, and the writer the obligation to buy, the underlying security, index, currency or other instrument or asset at the exercise price. A call option, upon payment of a premium, gives the purchaser of the option the right to buy, and the seller the obligation to sell, the underlying instrument or asset at the exercise price.

If a put or call option purchased by the Partnership were permitted to expire without being sold or exercised, the Partnership would lose the entire premium it paid for the option. The risk involved in writing a put option is that there could be a decrease in the market value of the underlying instrument or asset caused by rising interest rates or other factors. If this occurred, the option could be exercised and the underlying instrument or asset would then be sold to the Partnership at a higher price than its current market value. The risk involved in writing a call option is that there could be an increase in the market value of the underlying instrument or asset caused by declining interest rates or other factors. If this occurred, the option could be exercised and the underlying instrument or asset would then be sold by the Partnership at a lower price than its current market value.

Purchasing and writing put and call options and, in particular, writing "uncovered" options are highly specialized activities and entail greater than ordinary investment risks. In particular, the writer of an uncovered call option assumes the risk of a theoretically unlimited increase in the market price of the underlying instrument or asset above the exercise price of the option. This risk is enhanced if the instrument or asset being sold short is highly volatile and there is a significant outstanding short interest. These conditions exist in the stocks of many companies. The instrument or asset necessary to satisfy the exercise of the call option may be unavailable for purchase except at much higher prices. Purchasing instruments or assets to satisfy the exercise of the call option can itself cause the price of the instruments or assets to rise further, sometimes by a significant amount, thereby exacerbating the loss. Accordingly, the sale of an uncovered call option could result in a loss by the Partnership of all or a substantial portion of its assets.

Swaps and certain options and other custom instruments are subject to the risk of non-performance by the counterparty, including risks relating to the financial soundness and creditworthiness of the counterparty.

**Hedging Transactions.** Investments in financial instruments such as options and interest

018867

HCMLPHMIT00004066

rate swaps, caps and floors, and other derivatives are commonly utilized by investment funds to hedge against fluctuations in the relative values of its portfolio positions as a result of changes in currency exchange rates, interest rates and/or the equity markets or sectors thereof. Any hedging against a decline in the value of portfolio positions does not eliminate fluctuations in the values of portfolio positions or prevent losses if the values of such positions decline, but establishes other positions designed to gain from those same developments, thus moderating the decline in the portfolio positions' value. Such hedging transactions also limit the opportunity for gain if the value of the portfolio positions should increase. Moreover, it may not be possible for the Partnership to hedge against a fluctuation at a price sufficient to protect the Partnership's assets from the decline in value of the portfolio positions anticipated as a result of such fluctuations. For example, the cost of options is related, in part, to the degree of volatility of the underlying instruments or assets. Accordingly, options on highly volatile instruments or assets may be more expensive than options on other instruments or assets and of limited utility in hedging against fluctuations in their prices.

The Investment Manager is not obligated to establish hedges for portfolio positions and may not do so. To the extent that hedges are implemented, their success is dependent on the Investment Manager's ability to correctly predict movements in the direction of currency and interest rates and the equity markets or sectors thereof.

**Market or Interest Rate Risk**. The Partnership may, from time to time, invest in fixed income securities and instruments. The price of most fixed income securities move in the opposite direction of the change in interest rates. For example, as interest rates rise, the prices of fixed income securities fall. If the Partnership holds a fixed income security to maturity, the change in its price before maturity may have little impact on the Partnership's performance. However, if the Partnership has to sell the fixed income security before the maturity date, an increase in interest rates could result in a loss to the Partnership.

**Callable Securities**. Many bonds, including agency, corporate and municipal bonds, and mortgage-backed securities, sometimes contain a provision that allows the issuer to "call" (i.e., redeem) all or part of the issue before the bond's maturity date. The issuer usually retains this right to refinance the bond in the future if market interest rates decline below the coupon rate on the outstanding debt security. From the investor's perspective, there are three disadvantages to the call provision. First, the cash flow pattern of a callable bond is not known with certainty. Second, because the issuer will call the bonds when interest rates have dropped, the Partnership is exposed to reinvestment rate risk – the Partnership will have to reinvest the proceeds received when the bond is called at lower interest rates. Finally, the capital appreciation potential of a bond will be reduced because the price of a callable bond may not rise much above the price at which the issuer may call the bond.

**Maturity Risk**. In certain situations, the Partnership may purchase a bond of a given maturity as an alternative to another bond of a different maturity. Ordinarily, under these circumstances, the Partnership will make an adjustment to account for the interest rate risk differential in the two bonds. This adjustment, however, makes an assumption about how the interest rates at different maturities will move. To the extent that the yield movements deviate from this assumption, there is a yield-curve or maturity risk. Another situation where yield-curve risk should be considered is in the analysis of bond swap transactions where the potential incremental returns are dependent entirely on the parallel shift assumption for the yield curve.

**Inflation Risk**. Inflation risk results from the variation in the value of cash flows from a fixed income security or instrument due to inflation, as measured in terms of purchasing power. For example, if the Partnership purchases a 5-year bond with a coupon rate of 5%, but the rate of inflation is 6%, then the purchasing power of the cash flow has declined. For all but inflation-linked bonds, adjustable bonds or floating rate bonds, the Partnership is exposed to inflation risk because the interest rate the issuer promises to make is fixed for the life of the security. To the extent that interest rates reflect the expected inflation rate, floating rate bonds have a lower level of inflation risk.

**Downgrades in Fixed Income Debt Securities**. Unless required by applicable law, the

018868

HCMLPHMIT00004067

Partnership is not required to sell or dispose of any debt security that either loses its rating or has its rating reduced after the Partnership purchases such security.

**Investments in Non-U.S. Investments**.  From time to time, the Investment Manager may invest and trade a portion of the Partnership's assets in non-U.S. securities and other assets (through ADRs and otherwise), which will give rise to risks relating to political, social and economic developments abroad, as well as risks resulting from the differences between the regulations to which U.S. and non-U.S. issuers and markets are subject. Such risks may include:

- Political or social instability, the seizure by foreign governments of company assets, acts of war or terrorism, withholding taxes on dividends and interest, high or confiscatory tax levels, and limitations on the use or transfer of portfolio assets.

- Enforcing legal rights in some foreign countries is difficult, costly and slow, and there are sometimes special problems enforcing claims against foreign governments.

- Non-U.S. securities and other assets often trade in currencies other than the U.S. dollar, and the Partnership may directly hold foreign currencies and purchase and sell foreign currencies through forward exchange contracts.  Changes in currency exchange rates will affect the Partnership's Net Asset Value, the value of dividends and interest earned, and gains and losses realized on the sale of investments.  An increase in the strength of the U.S. dollar relative to these other currencies may cause the value of the Partnership's investments to decline.  Some foreign currencies are particularly volatile.  Foreign governments may intervene in the currency markets, causing a decline in value or liquidity of the Partnership's foreign currency holdings.  If the Partnership enters into forward foreign currency exchange contracts for hedging purposes, it may lose the benefits of advantageous changes in exchange rates.  On the other hand, if the Partnership enters forward contracts for the purpose of increasing return, it may sustain losses.

- Non-U.S. securities and other markets may be less liquid, more volatile and less closely supervised by the government than in the United States.  Foreign countries often lack uniform accounting, auditing and financial reporting standards, and there may be less public information about the operations of issuers in such markets.

**Risks Associated with ADRs**.  The Partnership may purchase ADRs, which are certificates evidencing ownership of shares of a non-U.S. issuer, acting as alternatives to directly purchasing the underlying non-U.S. securities in their national markets and currencies.  Such investments are subject to many of the risks associated with investing directly in non-U.S. securities.  These risks include the political and economic risks of the underlying issuer's country, as well as, in the case of depositary receipts traded on non-U.S. markets, foreign exchange risk.  ADRs may be sponsored or unsponsored. Unsponsored ADRs are established without the participation of the issuer.  In addition, unsponsored ADRs may involve higher expenses, may not carry pass-through voting or other shareholder rights, and may be less liquid.  The performance of ADRs may be different from the performance of the ordinary shares of the non-U.S. issuers to which they relate.

**Emerging Markets**.  The Partnership may invest a portion of its assets in investments related to emerging market countries.  The securities markets of emerging market countries as a whole have been volatile and the loans and securities of issuers in emerging markets tend to be subject to abrupt or erratic price movements.  Investing a portion of the Partnership's assets in issuers in emerging markets will make the Partnership susceptible to a greater degree than otherwise would be the case to factors affecting emerging markets in general and issuers in emerging markets included in the Partnership's portfolio in particular, and may increase the volatility of the value of the Partnership's portfolio investments.  The economies of these markets may differ significantly from the economies of certain developed countries in such respects as gross domestic product or gross national product, rate of inflation, currency depreciation, capital reinvestment, resource self-sufficiency, structural unemployment and balance of payments position.  In particular, these economies frequently experience high levels of inflation.  In addition, such countries may have:   (1) restrictive national policies that limit the Partnership's investment opportunities; (2) limited information about their issuers; (3) a

018869

HCMLPHMIT00004068

general lack of uniform accounting, auditing and financial reporting standards, auditing practices and requirements compared to the standards of developed countries; (4) less governmental supervision and regulation of business and industry practices, securities exchanges, brokers and listed companies; (5) economic developments that may be slowed or reversed by unanticipated political or social events in such countries; and (6) a lack of capital market structure or market-oriented economy.

Systemic and market factors may affect the acquisition, payment for or ownership of investments including:  (a) the prevalence of crime and corruption; (b) the inaccuracy or unreliability of business and financial information; (c) the instability or volatility of:  (i) banking and financial systems, or the absence or inadequacy of an infrastructure to support such systems, (ii) custody and settlement infrastructure of the market in which such investments are traded and held, and (iii) the acts, omissions and operation of any securities depository; (d) the risk of the bankruptcy or insolvency of banking agents, counterparties to cash and securities transactions, registrars or transfer agents; and (e) the existence of market conditions that prevent the orderly execution or settlement of transactions or that affect the value of assets.  Different clearance and settlement procedures may prevent the Partnership from making intended security purchases causing the Partnership to miss attractive investment opportunities, possibly resulting in either losses to or contract claims against the Partnership.  The investment markets of many of the countries in which the Partnership may invest may also be smaller, less liquid, and subject to greater price volatility than developed markets.  The Partnership's assets may be denominated in a variety of currencies subject to changes in currency exchange rates and in exchange control regulations.

**Volatility of Currency Prices**.  In general, price movements of currencies are difficult to predict accurately because they are influenced by, among other things, changing supply and demand relationships; governmental, trade, fiscal, monetary and exchange control programs and policies; national and international political and economic events; and changes in interest rates.  Governments from time to time intervene in certain markets in order to influence prices directly.

**Currency Control**.  It is sometimes the case that governments alter the exchange rate policy of a currency without advance notice, and it may not always be possible to foresee a change in policy.

**Exchange Rate Fluctuations**.  Investments that are denominated in a foreign currency are subject to the risk that the value of a particular currency will change in relation to one or more other currencies.  The Partnership intends to value its holdings and to make distributions in U.S. dollars.  Thus, changes in currency exchange rates adverse to the U.S. dollar may affect adversely the value of such holdings.  Among the factors that may affect currency values are trade balances, the appropriateness of interest rates, the shape of the yield curve, the degree of central bank independence and credibility, differences in relative values of similar assets in different currencies, long-term opportunities for investment and capital appreciation and political developments.

**Risks of Trading Futures**.  The Investment Manager is eligible to trade a limited amount of commodities or financial futures on behalf of the Partnership under a provision in the CEA that provides an exemption from registration as a commodity pool operator.  Trading futures is a highly risky strategy.  Whenever the Partnership purchases a particular future, there is a possibility that the Partnership may sustain a total loss of its purchase price.  The equity values of leveraged positions using futures are, in general, much more volatile than the prices of securities, such as stocks and bonds.  As a result, the risk of loss in trading futures is substantially greater than in trading those securities.  The prices of futures react strongly to the prices of the underlying commodities.  The prices of these underlying products, in turn, rise and fall based on changes in interest rates, international balances of trade, changes in governments, wars, weather events and a host of other factors that are entirely beyond the Investment Manager's control and very difficult (and perhaps impossible) to predict.

**Forward Trading**.  Forward contracts and options thereon, unlike futures contracts, are not traded on exchanges and are not standardized; rather, banks and dealers act as principals in these markets, negotiating each transaction on an individual basis.  Forward

018870

HCMLPHMIT00004069

and "cash" trading is substantially unregulated; there is no limitation on daily price movements and speculative position limits are not applicable.  The principals who deal in the forward markets are not required to continue to make markets in the currencies or commodities they trade and these markets can experience periods of illiquidity, sometimes of significant duration.  There have been periods during which certain participants in these markets have refused to quote prices for certain currencies or commodities or have quoted prices with an unusually wide spread between the price at which they were prepared to buy and that at which they were prepared to sell.  Disruptions can occur in any market traded by the Partnership due to unusual trading volume, political intervention or other factors.  The imposition of controls by governmental authorities might also limit such forward trading to less than that which the Investment Manager would otherwise recommend, to the possible detriment of the Partnership. Market illiquidity or disruption could result in major losses to the Partnership.

<u>Over-the-Counter-Trading</u>.  Financial instruments that may be purchased or sold by the Partnership may include instruments not traded on an exchange.  The risk of nonperformance by the obligor on such an instrument may be greater and the ease with which the Partnership can dispose of or enter into closing transactions with respect to such an instrument may be less than in the case of an exchange-traded instrument.  In addition, significant disparities may exist between "bid" and "asked" prices for financial instruments that are not traded on an exchange.  Financial instruments not traded on exchanges are also not subject to the same type of government regulation as exchange traded instruments, and many of the protections afforded to participants in a regulated environment may not be available in connection with such transactions.

To the extent that the Partnership engages in these transactions, the Partnership must rely on the creditworthiness of its counterparty.  In certain instances, counterparty or credit risk is affected by the lack of a central clearinghouse for foreign exchange trades.  To reduce their credit risk exposure, the Partnership may trade in the forward foreign currency market through money center banks and leading brokerage firms.

<u>Position Limits</u>.  Position limits imposed by various regulators or regulations may also limit the Partnership's ability to affect desired trades.  Position limits are the maximum amounts of gross, net long or net short positions that any one person or entity may own or control in a particular financial instrument.  All positions owned or controlled by the same person or entity, even if in different accounts, may be aggregated for purposes of determining whether the applicable position limits have been exceeded.  Thus, even if the Partnership does not intend to exceed applicable position limits, it is possible that different accounts managed by the Investment Manager or its affiliates may be aggregated.  If at any time positions managed by the Investment Manager were to exceed applicable position limits, the Investment Manager would be required to liquidate positions, which might include positions of the Partnership, to the extent necessary to come within those limits.  Further, to avoid exceeding the position limits, the Partnership might have to forego or modify certain of its contemplated trades.

<u>Risk of Default or Bankruptcy of Third Parties</u>.  The Partnership may engage in transactions in securities and other financial instruments and assets that involve counterparties.  Under certain conditions, the Partnership could suffer losses if a counterparty to a transaction were to default or if the market for certain securities or other financial instruments or assets were to become illiquid.  In addition, the Partnership could suffer losses if there were a default or bankruptcy by certain other third parties, including brokerage firms and banks with which the Partnership does business, or to which securities or other financial instruments or assets have been entrusted for custodial purposes.

<u>Potential Custody and Brokerage Risk</u>.  The Partnership may rely on its relationship(s) with brokers and/or custodians.  There are risks involved in dealing with the custodians or brokers who may settle Partnership trades. The Partnership may maintain custody accounts with a broker.  Although the Investment Manager intends to monitor the Partnership's broker(s) and/or custodian(s), if any, there is no guarantee that such broker(s) and/or custodian(s) that the Partnership may use from time to time, will not become bankrupt or insolvent.  While both the U.S. Bankruptcy Code, as amended, and

018871

HCMLPHMIT00004070

the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a bankruptcy, insolvency, failure, or liquidation of a broker-dealer, there is no certainty that, in the event of a failure of a broker-dealer that has custody of Partnership assets, the Partnership would not incur losses due to its assets being unavailable for a period of time, the ultimate receipt of less than full recovery of its assets, or both.

The Partnership and/or its broker or custodian, if any, may appoint sub-custodians in certain non-U.S. jurisdictions to hold the assets of the Partnership. The appointing broker and/or custodian may not be responsible for cash or assets which are held by sub-custodians in certain non-U.S. jurisdictions, nor for any losses suffered by the Partnership as a result of the bankruptcy or insolvency of any such sub-custodian. The Partnership may therefore have a potential exposure on the default of any sub-custodian and, as a result, many of the protections that would normally be provided to a fund by a custodian may not be available to the Partnership. Under certain circumstances, including certain transactions where the Partnership's assets are pledged as collateral for leverage from a non-broker-dealer custodian or a non-broker-dealer affiliate of the broke and/or custodian, or where the Partnership's assets are held at a non-U.S. custodian, the securities and other assets deposited with the custodian or broker may not be clearly identified as being assets of the Partnership and hence the Partnership could be exposed to a credit risk with regard to such parties. Custody services in certain non-U.S. jurisdictions remain undeveloped and, accordingly, there is a transaction and custody risk of dealing in certain non-U.S. jurisdictions. Given the undeveloped state of regulations on custodial activities and bankruptcy, insolvency, or mismanagement in certain non-U.S. jurisdictions, the ability of the Partnership to recover assets held by a sub-custodian in the event of the sub-custodian's bankruptcy or insolvency could be in doubt, as the Partnership may be subject to significantly less favorable laws than many of the protections that would be available under U.S. laws. In addition, there may be practical or time problems associated with enforcing the Partnership's rights to its assets in the case of a bankruptcy or insolvency of any such party.

__Temporary Defensive Investments__. If warranted under certain economic or market conditions or for other reasons, the Investment Manager may temporarily invest up to 100% of the Partnership's assets outside the scope of its principal investment focus in U.S. government securities, such as Treasury bills, notes and bonds, cash, money-market funds, certificates of deposit, time deposits, bankers' acceptances and other short-term debt instruments bearing a reasonable rate of interest. In such circumstances, the Partnership may not achieve its investment objectives.

__Other Instruments__. The Partnership may take advantage of opportunities with respect to certain other instruments that are not presently contemplated for use or that are currently not available, but that may be developed, to the extent such opportunities are both consistent with the investment objective of the Partnership and legally permissible. Special risks may apply to instruments that are invested in by the Partnership in the future that cannot be determined at this time or until such instruments are developed or invested in by the Partnership.

__Specific Risks Associated with Investing in Illiquid Investments__

You should note that certain of the following risk factors specifically applicable with respect to Illiquid Investments have been discussed under "—Market Risks—General" above and are included in this sub-section for ease of reference.

__Special Situations__. The Partnership will invest in companies involved in (or the target of) acquisition attempts or tender offers or in companies involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies and similar transactions. In any investment opportunity involving any such type of special situation, there exists the risk that the contemplated transaction either will be unsuccessful, take considerable time or result in a distribution of cash or a new security the value of which will be less than the purchase price to the Partnership of the security or other financial instrument in respect of which such distribution is received. Similarly, if an anticipated transaction does not in fact occur, the Partnership may be required to sell its investment at a loss. In connection with such transaction (or otherwise), the Partnership may purchase securities on a when-issued

018872

HCMLPHMIT00004071

basis, which means that delivery and payment take place sometime after the date of the commitment to purchase and are often conditioned upon the occurrence of a subsequent event, such as approval and consummation of a merger, reorganization or debt restructuring.  The purchase price and/or interest create receivable with respect to a when-issue security are fixed when the Partnership enters into the commitment.  Such securities are subject to changes in market value prior to their delivery.  Because there is substantial uncertainty concerning the outcome of transactions involving companies in which the Partnership may invest, there is a potential risk of loss by the Partnership of its entire investment in such companies.

**Alternative Investments.**  In the alternative asset class, the Investment Manager may invest assets of the Partnership in other pooled investment vehicles managed by the Investment Manager.  The pooled investment vehicles managed by the Investment Manager may follow a variety of investment strategies including investments in commodities, managed futures, inflation-adjusted bonds, global real estate, "hedge fund strategies", which may be broadly characterized as "hedge funds", and mezzanine debt or Illiquid Investments.

**Withdrawal Considerations.**  The Partnership is permitted to invest in Illiquid Investments.  There is no market for the Interests, and no market is expected to develop.  Therefore, in certain circumstances, the Partnership may not be able to withdraw invested assets with respect to Illiquid Investments at a time that would be most advantageous to the Partnership or at a time that would allow the Partnership to comply with its withdrawal obligations to its Limited Partners.  In this regard, the General Partner has the right to suspend in whole or in part certain withdrawal rights of the Limited Partners to the extent that the Partnership is unable to obtain liquidity from its investments in one or more of the Illiquid Investments.  The illiquidity of Illiquid Investments could have a material adverse effect on the Partnership, as well as the ability of the Limited Partners to liquidate their investments in the Partnership during permitted withdrawal periods. Consequently, Limited Partners may be unable to liquidate their Interests except by withdrawing from the Partnership in accordance with the terms of this Memorandum, and, even in such event, payment of withdrawal proceeds may be delayed for a significant period of time.  Limited Partners may be unable to liquidate their investment promptly in the event of an emergency or for any other reason.  **For the avoidance of doubt, (i) there will be no limitation on the percentage of the Partnership's portfolio that may be carried in Side Pocket Accounts; and (ii) any investment made by Series 1 into the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**

**High Growth Industry Related Risks.**  The Partnership may have significant investments in the securities of high growth companies (e.g., technology, communications and healthcare).  It is noted that these securities may be very volatile.  In addition, these companies may face undeveloped or limited markets, have limited products, have no proven profit-making history, may operate at a loss or with substantial variations in operating results from period to period, have limited access to capital and/or be in the developmental stages of their businesses, have limited ability to protect their rights to certain patents, copyrights, trademarks and other trade secrets, or be otherwise adversely affected by the extremely competitive markets in which many of their competitors operate.

**Risk of Illiquid Investments.**  Illiquid Investments involve a high degree of financial risk.  There can be no assurance that Illiquid Investments will be profitable or that substantial losses will not occur.  The companies in which the Illiquid Investments will invest are often dependent on the skills of a small number of executives and are vulnerable to changes in technology, fluctuations in demand for their products, changing interest rates and other factors.  There can also be no assurance that the Illiquid Investments will be repaid, be able to sell or otherwise liquidate their investments at the optimal time or price.  Therefore, there can be no assurance that the rate of return objectives of the Illiquid Investments will be realized or that there will be any return of capital to the Limited Partners.

**Illiquid and Long-Term Investments.**  It is anticipated that there will be a significant period of time before certain Illiquid Investments will have completed their investments.  Such investments may take several years from the date of initial investment to reach a state of maturity when realization of the investment can be achieved.  Although

018873

HCMLPHMIT00004072

investments by Illiquid Investments occasionally may generate some current income, private investment transaction structures typically will not provide for liquidity of the Illiquid Investment's investment prior to that time. The return of capital and the realization of gains, if any, from such investment will generally occur only upon the partial or complete disposition or refinancing of the investment. In light of the foregoing, it is likely that no significant return from the disposition of Illiquid Investment's underlying investments will occur for a substantial period of time from the commencement of the Illiquid Investment's operations. It is unlikely that there will be a public market for the securities held by the Illiquid Investment and/or its portfolio companies at the time of their acquisition. The Illiquid Investment generally will not be able to sell its securities publicly unless the issuer has consummated a public offering of its securities and such offered securities are registered under applicable securities laws, unless an exemption from such registration requirements is available. In addition, in some cases, the Partnership may be prohibited by contract from selling certain securities for a period of time and, as a result, may not be permitted to sell an underlying investment at a time it might otherwise desire to do so. Further, disposition of such investments may require a lengthy time period or may result in distributions in kind to investors.

**Investments in Less Established Companies.** The Partnership may invest a portion of its assets in the securities of less established companies, or early stage companies. Investments in such early stage companies may involve greater risks than those generally associated with investments in more established companies. For instance, less established companies tend to have smaller capitalizations and fewer resources and, therefore, are often more vulnerable to financial failure. Such companies also may have shorter operating histories on which to judge future performance and in many cases, if operating, will have negative cash flow. In the case of start-up enterprises, such companies may not have significant or any operating revenues. In addition, less mature companies could be more susceptible to irregular accounting or other fraudulent practices. Furthermore, to the extent there is any public market for the securities held by the Illiquid Investment, securities of less established companies may be subject to more abrupt and erratic market price movements than those of larger, more established companies.

Some of the investments expected to be made by an Illiquid Investment would be considered highly speculative and may result in the loss of the Special Situation Investment's entire investment therein. There can be no assurance that any such losses will be offset by gains (if any) realized on the Illiquid Investment's other investments.

**Investments in Restructurings or Underperforming Companies.** The Partnership may make investments in companies that are experiencing or are expected to experience financial difficulties, which such companies may never overcome. Such investments could, in certain circumstances, subject the Partnership to additional potential liabilities, which may exceed the value of the Partnership's original investment therein. Such investments of the Partnership could also be subject to federal bankruptcy law and state fraudulent transfer laws, which may vary from state to state, if the securities relating to such investments were issued with the intent of hindering, delaying or defrauding creditors or, in certain circumstances, if the issuer receives less than reasonably equivalent value or fair consideration in return for issuing such securities. If such investments constitute debt and such debt is used for a buyout of shareholders, this risk is greater than if the debt proceeds are used for day-to-day operations or organic growth. If a court were to find that the issuance of the securities was a fraudulent transfer or conveyance, the court could void the payment obligations under the securities, further subordinate the securities to other existing and future indebtedness of the issuer or require the Partnership to repay any amounts received by it with respect to the securities. In the event of a finding that a fraudulent transfer or conveyance occurred, the Partnership may not receive any repayment on the securities.

Under the Bankruptcy Code, a lender that has inappropriately exercised control of the management and policies of a company may have its claims against the company subordinated or disallowed, or may be found liable for damages suffered by parties as a result of such actions. In addition, under certain circumstances, payments to the Partnership and distributions by the Partnership ion Investment to its limited partners may be reclaimed if any such payment or distribution is later determined to have been a

018874

HCMLPHMIT00004073

fraudulent conveyance or a preferential payment. Such debt may also be disallowed or subordinated to the claims of other creditors if the Partnership is found to have engaged in other inequitable conduct resulting in harm to other parties. The Partnership's underlying investment may be treated as equity if it is deemed to be a contribution to capital, or if the Partnership attempts to control the outcome of the business affairs of a company prior to its filing under the Bankruptcy Code. While the Partnership will attempt to avoid taking the types of action that would lead to such liability, there can be no assurance that such claims will not be asserted or that the Partnership will be able successfully to defend against them.

## REGULATORY AND TAX RISKS

**General Regulatory Risks**. Statutes, regulations and policies are continually under review by the U.S. Congress and state legislatures and federal and state regulatory agencies. The introduction of new legislation or amendments to existing legislation and regulations (including changes in how they are interpreted or implemented) by governments, the decisions of courts and tribunals and the rulings and decisions of regulatory authorities, can adversely impact the Partnership's returns. The regulatory environment for private investment funds is evolving, and changes in the regulation of these funds may adversely affect the value of investments held by the Partnership, the cost of compliance with applicable regulations, and the ability of the Partnership to obtain the leverage it might otherwise obtain or to pursue its trading strategies.

**Regulatory Risks Related to the Highland Transaction**. In connection with the Highland Transaction (if consummated), there can be no assurance that such transaction (if consummated) will not result in adverse regulatory consequences (including, without limitation, being characterized as a "change of control" under applicable laws), even though the Highland Transaction only contemplates the acquisition of non-voting limited partnership interests in Highland.

**Strategy Restrictions**. Certain institutions may be restricted from directly utilizing investment strategies of the type in which the Partnership may engage. Such institutions, including entities subject to ERISA, should consult their own advisors, counsel and accountants to determine what restrictions may apply and whether an investment in the Partnership is appropriate.

**Trading Limitations**. For all securities, instruments and/or assets listed on an exchange, including options listed on a public exchange, the exchange generally has the right to suspend or limit trading under certain circumstances. Such suspensions or limits could render certain strategies difficult to complete or continue and subject the Partnership to loss. Also, such a suspension could render it impossible for the Investment Manager to liquidate positions and thereby expose the Partnership to potential losses relating thereto.

**Limited Regulatory Oversight**. The Partnership's investments are not supervised or monitored by any regulatory authority. The Partnership is not registered as an "investment company" under the Investment Company Act. Although the Investment Manager is registered as an investment adviser with the SEC, neither the General Partner nor the Investment Manager is registered as a commodity pool operator, pursuant to an exemption provided under Rule 4.13(a)(3) of the CEA. Consequently, Limited Partners will not benefit from some of the protections afforded by these statutes, including oversight by the Commodity Futures Trading Commission.

**Prevention of Money Laundering and Terrorism**. The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended (the "**USA PATRIOT Act**"), signed into law and effective as of October 26, 2001, requires that financial institutions, a term that includes banks, broker-dealers and investment companies, establish and maintain compliance programs to guard against money laundering activities. The USA PATRIOT Act requires the Secretary of the U.S. Treasury ("**Treasury**") to prescribe regulations in connection with anti- money laundering policies of financial institutions. The U.S. Federal Reserve Board, the Treasury and the SEC are currently studying what types of investment vehicles should be required to adopt anti-money laundering procedures, and it is unclear at this time whether such

018875

HCMLPHMIT00004074

procedures will apply to pooled investment vehicles such as the Partnership. Future rules and regulations regarding money laundering or proceeds of crime could regulate the Partnership. In addition, in April 2000, the Treasury Department published proposed regulations that would require certain investment advisors to establish an anti-money laundering program. It is possible that there could be promulgated legislation or regulations that would require the Partnership or its affiliates, in connection with the establishment of anti-money laundering procedures, to share information with governmental authorities with respect to investors in the Interests. Such legislation and/or regulations could require the Partnership to implement additional restrictions on the transfer of the Interests. The Partnership reserves the right to request such information as is necessary to verify the identity of investors in the Interests, and the source of the payment of subscription monies, or as is necessary to comply with any customer identification programs required by Financial Crimes Enforcement Network and/or the SEC or such information as may be required in order for the Partnership to discharge its obligations under the laws of the Cayman Islands (including pursuant to the Proceeds of Criminal Conduct Law (2005 Revision)). In the event of delay or failure by the applicant to produce any information required for verification purposes, an application for or transfer of the Interests and the subscription monies relating thereto may be refused.

**Recent Developments in the Financial Services Industry.** Recent developments in the U.S. financial markets have heightened the risks associated with the investment activities and operations of hedge funds, including without limitation, those resulting from a substantial reduction in the availability of credit and the increased cost of short-term credit, a decrease in market liquidity and an increased risk of insolvency of brokers, custodians and other counterparties. In addition, in July of 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act ("**Dodd-Frank**") was passed which imposes many new requirements and restrictions on the financial services industry that may likely affect the business, operations and performance of hedge funds, such as increased reporting requirements, limitations on certain trading activity and regulatory oversight by different agencies, such as the newly created Financial Stability Oversight Counsel. Even with the passage of Dodd-Frank, the implications of its passage for the hedge fund industry as a whole still remain somewhat unclear. The hedge fund industry may continue to be adversely affected by the recent developments in the financial markets in the U.S. and abroad, and any future legal, regulatory, or governmental action and developments in such financial markets and the broader U.S. economy could have an adverse effect on the Partnership or the Partnership's business, operations and performance.

**Enhanced Regulation of Swaps.** The Wall Street Transparency and Accountability Act of 2010 (the "**WSTAA**") will, subject to exceptions for certain hedgers, (1) require swaps accepted for clearing by a derivatives clearing organization (a "**DCO**") or for trading through a designated contract market or swaps-execution facility to be so cleared and traded, (2) require margin for almost all swap transactions, (3) subject traders with a "substantial position" in swaps to registration and regulation requirements as a "major swap participant" or "swap dealer", and (4) impose position limits on swaps either individually or in the aggregate with respect to positions in commodity-futures contracts. Due to the new requirements imposed by the WSTAA, the Partnership may experience increased transaction costs to pay for the clearing, execution and segregation obligations. In addition, margin requirements may increase once margin is set by DCOs with input from the CFTC, which may limit the Partnership's ability to engage in leverage and limit the Partnership's return. The application of position limits to swap contracts may also limit the Partnership's ability to concentrate in any particular contract or exposure to an underlying commodity and may negatively impact the Partnership's ability to take advantage of current market trends or conditions. Any tightening in the market for swaps may significantly impact the Partnership and its returns. In addition, if the Partnership were deemed to be a swap dealer or a major swap participant under WSTAA, the Partnership may be required to register with the CFTC and would be subject to a number of regulatory requirements that would significantly impact the Partnership's legal obligations and its returns.

**Tax Risk.** The tax aspects of an investment in the Partnership are complicated and each investor should have them reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and

018876

HCMLPHMIT00004075

private investment vehicles.  The Partnership is not intended and should not be expected to provide any tax shelter, but is organized as a limited partnership to avoid corporate taxation and to permit any distributions it might make to be made without being taxed as dividends.  No assurance can be given that legislative, administrative or judicial changes will not occur which will alter, either prospectively or retroactively, the tax considerations or risk factors discussed in this Memorandum.

The tax consequences to a Limited Partner of an investment in the Partnership are uncertain.  All or substantially all of the assets of the Partnership are expected to be invested in Illiquid Investments.  Such investments are often structured as "pass through" entities for tax purposes and therefore may generate significant taxable income to the Limited Partners without any corresponding liquidity from such investments.  As a result, an investment in the Partnership may be unsuitable for those investors that do not receive a corresponding deduction for such allocated income.

Neither the General Partner nor the Investment Manager makes any representations or warranties regarding any tax matters.  Prospective investors are strongly urged to consult their own tax advisors regarding the U.S. federal, state and local and non-U.S. tax consequences to them arising from an investment in the Partnership, and should rely on the advice of their own tax advisors with respect to the possible impact on its investment in the Partnership of any future legislation or administrative or judicial action.  You should review the section entitled "TAXATION" for a more complete discussion of certain of the tax risks inherent in the acquisition of Interests.

**Tax-Exempt Entities**.  Certain prospective Limited Partners may be subject to federal and state laws, rules and regulations that may regulate their participation in the Partnership, or their engaging, directly or indirectly through an investment in the Partnership, in investment strategies of the types that the Partnership utilizes from time to time.  Tax-exempt entities should consider the applicability to them of the provisions relating to UBTI (as defined below).  Investments in the Partnership by entities subject to ERISA and other tax-exempt entities require special consideration.  See "ERISA CONSIDERATIONS" and "TAXATION—Tax-Exempt Investors".

**Accounting Rules**.  The Partnership's assets and liabilities are valued in accordance with the Partnership Agreement.  However, for purposes of preparing the Partnership's annual audited financial statements, which are prepared in accordance with GAAP, certain of the Partnership's assets and liabilities may be valued in a manner that, while consistent with GAAP, may be different from the manner in which such assets are valued in accordance with the valuation policies set forth in the Partnership Agreement.

The General Partner may at any time choose to change the Partnership's accounting guidelines from GAAP to the IFRS.  In such event, the financial performance of the Partnership, as determined under IFRS, may vary from those determined under GAAP.

## CONFLICTS OF INTEREST

The Investment Manager undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Limited Partners.

**No Obligation of Full-Time Service**.  None of the General Partner, the Investment Manager, the Principal or any of the Investment Manager Affiliates has any obligation to devote its full time to the business of the Partnership.  Each is only required to devote such time to the Partnership as the General Partner deems necessary to accomplish the purposes of the Partnership, and each may engage in other business activities, including competing ventures and/or unrelated employment, which may result in various conflicts of interest between such persons and the Partnership.

**Services to Affiliated Funds**.  In addition to managing the Partnership and its investments, each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may provide investment management and other services to other parties and may manage and/or establish Affiliated Funds in the future, including

018877

HCMLPHMIT00004076

those that may employ an investment program and strategy similar to that of the Partnership. Specifically, as of the date hereof: (i) the Investment Manager acts as the investment manager to the IDF Fund that is structured as an insurance-dedicated fund and is expected to invest a portion of its assets in the Partnership; (ii) Atlas IDF GP, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the IDF Fund; (iii) the Principal is the managing member and controlling person of Atlas IDF GP, LLC; and (iv) the Investment Manager acts as the investment subadvisor to a series of SALI Multi-Series Fund, L.P., a Delaware "series" limited partnership, and provides certain discretionary investment advisory or consulting services to such series.

The investments made by Affiliated Funds that may be managed by the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates in the future may compete with investments for the Partnership's account, and the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates may decide to invest the funds of these Affiliated Funds rather than the assets of the Partnership in a particular security or strategy. In addition, the Investment Manager and/or such other persons will determine the allocation of funds by and among the Partnership and the Affiliated Funds to investment strategies and techniques on whatever basis they decide is appropriate or desirable in their sole and absolute discretion. The records of these Affiliated Funds will not be made available to Limited Partners. Nonetheless, in the event that certain securities, instruments and other assets are suitable for acquisition by the Partnership and by other accounts managed by the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates, and the Investment Manager or such other persons are not able to acquire the desired aggregate amount of such securities, instruments and other assets on terms and conditions which they deem advisable, the Investment Manager and such persons will endeavor in good faith to allocate the limited amount of such investment opportunities among the various accounts for which they consider to be suitable.

**<u>Certain Potential Conflicts Between the Principal and Highland Related to the Series 1 Interests</u>**. The Principal was previously a Partner and Co-Head of Private Equity at Highland, an investment manager with significant assets under management located in Dallas, Texas. Although Mr. Honis has retired from that position, he still currently serves on: (x) the Board of Trustees for each of Highland's affiliated registered investment companies, and receives compensation in connection with each of the foregoing, and (y) the Board of Directors for American HomePatient, Inc. and Turtle Bay Resort, LLC, which are portfolio companies of investment funds operated by Highland, and receives compensation in connection with each of the foregoing. Additionally, as part of his retirement, Mr. Honis has received or is in the process of receiving payments in the total amount of approximately $3 million from certain affiliates of Highland.

In addition, pursuant to the Shared Services Agreement, Highland serves as the Shared Services Provider, which provides the Investment Manager and the Partnership with certain administrative, information technology, accounting, tax, back-office and other services. In addition, the Shared Services Provider may be (but, as of the date hereof, is not) engaged by the Partnership to act as the Partnership's Administrator, pursuant to a separate Administration Agreement.

Further, the Investment Manager and Highland have had preliminary discussions concerning the potential Highland Transaction. Although, as of the date hereof, the Partnership and Highland have not actively negotiated documentation for the legal and economic terms of the Highland Transaction (and there can be no assurances that such transaction will be consummated), it is nonetheless the intention of such parties that the transaction should come about.

In light of the foregoing, the Principal, and indirectly the Investment Manager, are in a position of conflict with respect to the ultimate decision by the Partnership regarding whether it pursues the Highland Transaction, and under what terms (if any) it agrees to participate in any such transaction.

Also see "—Potential Directorship Positions; Other Roles" herein.

018878

HCMLPHMIT00004077

**Highland Transaction; Limited Control**.  If the Highland Transaction is consummated, it is currently contemplated that the Partnership would acquire only limited partnership interests in Highland.  As with investments in non-controlling interests in other partnerships, the Highland Transaction may involve special risks associated with the possibility that the controlling principals of Highland may:  (i) have economic or business interests or goals that are inconsistent with those of the Partnership, (ii) take actions contrary to the instructions or requests of the Partnership or contrary to the Partnership's policies or objectives, (iii) be unable or unwilling to fulfill its obligations under the organizational/governing documents, and/or (iv) experience financial difficulties.  The occurrence of such problems could have a material adverse effect on the business and prospects of the Partnership's investment in the Highland Transaction and may affect management decisions and exit strategies in a manner adverse to the Partnership's interests.

**Conflicts Related to Shared Services Provider**.  The Investment Manager has certain affiliated entities that may provide services with respect to the IDF Fund, as well as the Partnership and certain investments held by the Partnership.  The Shared Services Provider may provide services for the benefit of the Partnership under the Shared Services Agreement and/or may incur reimbursable expenses on behalf of the Partnership and/or the Investment Manager.   In addition, the Shared Services Provider may be (but, as of the date hereof, is not) engaged by the Partnership to act as the Partnership's Administrator, pursuant to a separate Administration Agreement.  The Principal is a former Partner and former Co-Head of Private Equity of the Shared Services Provider.

**Potential Directorship Positions; Other Roles**.  The Investment Manager Affiliates may, subject to applicable law, serve as directors (whether supervisory or managing), officers, personnel, employees, partners, agents, nominees or signatories, and receive arm's length fees in connection with such service, for the Partnership or other entities that operate in the same or a related line of business as the Partnership, for other clients managed by the Investment Manager or any of the Investment Manager Affiliates, or for any portfolio company of the Partnership, and the Partnership shall have no right to any such fees.  In serving in these multiple capacities, they may have obligations to such other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Partnership.  Also see "—Certain Potential Conflicts Between the Principal and Highland Related to the Series 1 Interests" herein.

The Investment Manager and/or the Investment Manager Affiliates may act as an underwriter, arranger or placement agent, or otherwise participate in the origination, structuring, negotiation, syndication or offering of investments purchased by the Partnership.  Such transactions are on an arm's-length basis and may be subject to arm's-length fees.  There is no expectation for preferential access to transactions involving investments that are underwritten, originated, arranged or placed by the Investment Manager and/or the Investment Manager Affiliates and the Partnership shall not have any right to any such fees.

**Potential Cross-Trades**.  The Investment Manager may effect client cross-transactions where the Investment Manager causes a transaction to be effected between the Partnership and another client advised by it or any of its affiliates.  The Investment Manager may engage in a client cross-transaction involving the Partnership any time that the Investment Manager believes such transaction to be fair to the Partnership and such other client.  By purchasing an Interest in the Partnership, a Limited Partner is deemed to have consented to such client cross-transactions between the Partnership and another client of the Investment Manager or one of its affiliates.

**Diverse Limited Partners**.  The Limited Partners may include taxable and tax-exempt entities and persons or entities resident of or organized in various jurisdictions.  As a result, conflicts of interest may arise in connection with decisions made by the General Partner that may be more beneficial for one type of Limited Partner than for another.  In making such decisions, the General Partner intends to consider the investment objectives of the Partnership as a whole, not the investment objectives of any Limited Partner individually.

018879

HCMLPHMIT00004078

**Soft Dollars**.  The General Partner and the Investment Manager may be offered soft dollars in the form of research and other products or services, which may be utilized by the General Partner, the Investment Manager and their respective affiliates in connection with the services they offer to clients other than the Partnership.  The use of soft dollars presents the Investment Manager with potential conflicts of interest and may provide the Investment Manager with incentives to: (i) use certain brokers who may provide certain soft dollar benefits that other brokers may not, without regard to its obligations to the Partnership (including, without limitation, its best execution obligations); or (ii) trade more actively in order to generate more soft dollars and thereby reduce its expenses.

**Referral of Investors**.  The General Partner and/or the Investment Manager may sell Interests through broker-dealers and pay a marketing fee or commission in connection with such activities, including ongoing payments, at the General Partner's or the Investment Manager's own expense.  The General Partner and/or the Investment Manager may also deduct a percentage of the amount invested by a Limited Partner in the Partnership to pay sales fees or charges, on a fully disclosed basis, to a broker-dealer based upon the capital contribution of such Limited Partner introduced to the Partnership by such broker-dealer.  Any such sales fees or charges would be assessed against the referred Limited Partner and would reduce the amount actually invested by such Limited Partner in the Partnership.  Such broker-dealers may have a conflict of interest in advising prospective investors to purchase Interests, as the broker-dealers are often only compensated upon the investment of the prospective investors.

**Lack of Separate Representation; Potential Conflicts of Counsel**.  Neither the Partnership Agreement nor any of the agreements, contracts and arrangements between the Partnership, on the one hand, and the General Partner or the Investment Manager, on the other hand, were or will be the result of arm's-length negotiations.  The attorneys, accountants and others who have performed services for the Partnership in connection with this offering, and who will perform services for the Partnership in the future, have been and will be selected by the General Partner.  No independent counsel has been retained to represent the interests of prospective investors or Limited Partners.  You are therefore urged to consult your own counsel as to the terms and provisions of the Partnership Agreement and all subscription and other related documents.

In addition, Sadis & Goldberg LLP has represented Highland and affiliates at different times over a period lasting over a decade.  It is currently expected that Sadis & Goldberg LLP will represent the General Partner, the Investment Manager, the Principal and certain of their respective affiliates in connection with the establishment of the Partnership and the IDF Fund, the possible consummation of the Highland Transaction, and certain related matters.  The Principal and his affiliates are aware of the representation by Sadis & Goldberg LLP of Highland and affiliates.

**Valuation of Assets**.  The Administrator will calculate the net asset value of the Partnership (based upon information provided by the Investment Manager).  Such calculations could be incorrect, delayed or subject to significant adjustments, any of which events could adversely affect the valuation of the Partnership's investments.  The Investment Manager intends to engage an independent third-party valuation agent (in addition to the Administrator) to appraise the Partnership's interests in Illiquid Investments. Partnership If the Investment Manager determines, in its sole discretion, that the valuation of any security, commodity, option or other financial instrument pursuant to the valuation methodologies described herein does not fairly represent its market value, the Investment Manager will value such security, option or other financial instrument as it reasonably determines.  Likewise, any securities, commodities, options and other financial instruments that have no public market, investments in other asset classes (including those in Side Pocket Accounts), and all other assets of the Partnership for which a valuation methodology is not specified, will be valued by the Investment Manager in a manner determined in good faith to reflect their fair market value.  The Investment Manager has a conflict of interest in that it will receive a higher Management Fee if the Partnership's assets are given a favorable valuation.  See "SUMMARY OF OFFERING AND PARTNERSHIP TERMS—Determination of Net Asset Value".

018880

HCMLPHMIT00004079

The foregoing list of risk factors and conflicts of interest does not purport to be a complete enumeration or explanation of the risks and conflicts of interest involved in an investment in the Partnership. Offerees should read this entire Memorandum and the Partnership Agreement and consult with their own advisors before deciding to purchase Interests.

018881

HCMLPHMIT00004080

## ERISA CONSIDERATIONS

An investment of benefit plan assets in the Partnership may raise issues under ERISA and the U.S. Internal Revenue Code of 1986, as amended ("**Code**"). ERISA and the Code impose certain duties on persons who are fiduciaries of a Plan (as defined below) and prohibit certain transactions involving the assets of a Plan and its fiduciaries or other interested parties. Under ERISA and the Code, any person who exercises any discretionary authority or control over the administration of a Plan or the management or disposition of the assets of a Plan, or who renders investment advice for a fee or other compensation to a Plan, is generally considered to be a fiduciary of the Plan.

In considering an investment in the Partnership of a portion of the assets of any employee benefit plan (including a "**Keogh**" plan) subject to the fiduciary and prohibited transaction provisions of ERISA or the Code or similar provisions under applicable state law (collectively, a "**Plan**"), a Plan fiduciary should determine, in light of the risks and limited liquidity inherent in an investment in the Partnership, whether the investment is in accordance with the documents and instruments governing the Plan and the applicable provisions of ERISA or similar law relating to a fiduciary's duties to the Plan. Furthermore, absent an exemption, the fiduciaries of a Plan should not purchase Interests with the assets of any Plan if the Investment Manager or any affiliate thereof is a fiduciary or other "party in interest" or "disqualified person" (collectively, a "**party in interest**") with respect to such Plan.

### PLAN ASSETS

Regulations promulgated under ERISA by the U.S. Department of Labor ("**Plan Asset Regulations**") generally provide that when a Plan subject to Title I of ERISA or Section 4975 of the Code acquires an equity interest in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act, the Plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established either that equity participation in the entity by "benefit plan investors" is not "significant" or that the entity is an "operating company", in each case as defined in the Plan Asset Regulations. The Interests will not constitute "publicly offered" securities or securities issued by an investment company registered under the Investment Company Act, and it is not expected that the Partnership will qualify as an "operating company" under the Plan Asset Regulations. For purposes of the Plan Asset Regulations, equity participation in an entity by benefit plan investors will not be "significant" so long as they own, in the aggregate less than 25%, directly or indirectly, of the value of each class of such entity's equity. For purposes of such calculation, equity interests held by persons (other than a benefit plan investor) with discretionary authority or control over the assets of the entity or who provide investment advice for a fee (direct or indirect) with respect to such assets, and any affiliates thereof, are disregarded. For purposes of this 25% test ("**Benefit Plan Investor Test**"), "benefit plan investors" include: employee benefit plans subject to the provisions of Part 4 of Title I of ERISA and plans subject to Section 4975 of the Code, including "Keogh" plans and individual retirement accounts ("**IRAs**"). The following are not included in the definition of benefit plan investor: employee benefit plans maintained outside the U.S. by foreign companies that cover non-U.S. persons, governmental plans, and certain church plans. Thus, absent satisfaction of another exception under the Plan Asset Regulations, if 25% or more of the value of any class of Interests in the Partnership were owned by benefit plan investors, an undivided interest in each of the underlying assets of the Partnership would be deemed to be "plan assets" of any Plan subject to Title I of ERISA or Section 4975 of the Code that invested in the Partnership.

Consequently, the General Partner intends to use reasonable efforts either (i) to prohibit plans subject to Title I of ERISA or Section 4975 of the Code from investing in the Partnership or (ii) to provide that investment by "benefit plan investors" in the Partnership will not be "significant" for purposes of the Plan Asset Regulations by limiting equity participation by benefit plan investors in the Partnership to less than 25% of the value of each class of Interests in the Partnership as described above. However, each Plan fiduciary should be aware that even if the Partnership were to avoid plan asset status

018882

HCMLPHMIT00004081

under the Benefit Plan Investor Test at the time a Plan acquires Interests in the Partnership, the exemption could become unavailable at a later date as a result, for example, of subsequent transfers or withdrawals of Interests in the Partnership, and that Interests held by benefit plan investors may be subject to mandatory withdrawal in such event in order for the Partnership to continue to avoid plan asset status under the Benefit Plan Investor Test.

Furthermore, there can be no assurance that notwithstanding the reasonable efforts of the Partnership, the Partnership will satisfy the Benefit Plan Investor Test, that the structure of particular investments of the Partnership will otherwise satisfy the Plan Asset Regulations or that the underlying assets of the Partnership will not otherwise be deemed to include ERISA plan assets.

### PLAN ASSET CONSEQUENCES

If the assets of the Partnership were deemed to be "plan assets" under ERISA, (i) the prudence and other fiduciary responsibility standards of ERISA would extend to investments made by the Partnership and (ii) certain transactions in which the Partnership might seek to engage could constitute "prohibited transactions" under ERISA and the Code.  If a prohibited transaction occurs for which no exemption is available, the Investment Manager and any other fiduciary that has engaged in the prohibited transaction could be required (x) to restore to the Plan any profit realized on the transaction and (y) to reimburse the Plan for any losses suffered by the Plan as a result of the investment.  In addition, each party in interest involved could be subject to an excise tax equal to 15% of the amount involved in the prohibited transaction for each year the transaction continues and, unless the transaction is corrected within statutorily required periods, to an additional tax of 100%.  Plan fiduciaries that decide to invest in the Partnership could, under certain circumstances, be liable for prohibited transactions or other violations as a result of their investment in the Partnership or as co-fiduciaries for actions taken by or on behalf of the Partnership or the Investment Manager.  With respect to an IRA that invests in the Partnership, the occurrence of a prohibited transaction involving the individual who established the IRA, or his or her beneficiaries, could cause the IRA to lose its tax-exempt status.

Under the Partnership Agreement, the General Partner has the power to take certain actions to avoid having the assets of the Partnership characterized as plan assets, including, without limitation, the right to refuse a subscription, exclude a Limited Partner from an investment or to compulsorily redeem a Limited Partner's Interests in the Partnership.  While the General Partner does not expect that it will need to exercise such power, it cannot give any assurance that such power will not be exercised.

**Each Plan fiduciary should consult its own legal advisor concerning the considerations discussed above before making an investment in the Partnership.**

018883

HCMLPHMIT00004082

**TAXATION**

**Prospective investors are advised that: (i) any U.S. federal tax advice contained herein, including any opinion of counsel referred to herein, is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding U.S. federal tax penalties that may be imposed on the taxpayer; (ii) any such advice is written to support the promotion or marketing of the transactions described herein (or in any such opinion of counsel); and (iii) each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.**

### INTRODUCTION

The following is a summary of certain aspects of the taxation of the Partnership and its Partners, which should be considered by a potential purchaser of an Interest in the Partnership. A complete discussion of all tax aspects of an investment in the Partnership is beyond the scope of this Memorandum. The following summary is only intended to identify and discuss certain salient issues.

This summary of certain tax considerations applicable to the Partnership is considered to be a correct interpretation of existing laws and regulations in force on the date of this Memorandum. No assurance can be given that changes in existing laws or regulations or their interpretation will not occur after the date of this Memorandum or that any such future guidance or interpretation will not be applied retroactively.

**The following summary is not intended as a substitute for careful tax planning. The tax matters relating to the Partnership are complex and are subject to varying interpretations. Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on Partners will vary with the particular circumstances of each Partner. Accordingly, each prospective investor must consult with and rely solely on his or her professional tax advisors with respect to the tax results of his or her investment in the Partnership. In no event will the General Partner, its affiliates, counsel or other professional advisors be liable to any Limited Partner for any federal, state, local or other tax consequences of an investment in the Partnership, whether or not such consequences are as described below.**

### CLASSIFICATION OF THE PARTNERSHIP

Under the provisions of the Code and the Treasury Regulations promulgated thereunder ("**Regulations**"), as in effect on the date of this Memorandum, so long as the Partnership complies with the Partnership Agreement, the Partnership should be classified for U.S. federal income tax purposes as a partnership and not as an association taxable as a corporation.

The Partnership has been formed under the Delaware Act as a series limited partnership and may offering its Interests in multiple separate Series. Under the provisions of the Code and the Regulations, as in effect on the date of this Memorandum, so long as the Partnership complies with the Partnership Agreement and the Delaware Act, each Series of Interests in the Partnership should be classified for U.S. federal income tax purposes as equity interests in a separate partnership and not as equity interests in an association taxable as a corporation.

The Partnership has not sought and will not seek a ruling from the Internal Revenue Service ("**IRS**") with respect to its status as a partnership. If a Series of Interests in the Partnership should be classified as an association taxable as a corporation (e.g., as a result of a change in law or a material change in facts), the taxable income of the Partnership allocable to such Series would be subject to corporate income taxation; and distributions from the Partnership to the Limited Partners owning Interests in such Series would be treated as dividend income when received by such Limited Partners to the extent of the current or accumulated earnings and profits of the Partnership allocable to

018884
HCMLPHMIT00004083

such Series.

Certain partnerships may be taxable as corporations for U.S. federal income tax purposes under the publicly traded partnership rules set forth in the Code and the Regulations, and a Series of the Partnership may not qualify for one of the safe harbors under the Regulations if such Series has more than 100 Partners.  The Partnership expects that, under the facts and circumstances test set forth in the Regulations, the Interests will not be readily tradable on a secondary market (or the substantial equivalent thereof) and therefore, the Series partnerships will not be treated as publicly traded partnerships under the Regulations.  It is assumed in the following discussion of tax considerations that each Series of the Partnership will be treated as a partnership for U.S. federal income tax purposes.

Unless otherwise indicated, references in the discussion below to the tax consequences of the "Partnership's" investments, activities, income and expenses refer to the investments, activities, income and expenses attributable to each Series that is treated as a separate tax partnership.  Prospective investors should note that each Series will issue its annual Schedule K-1 tax reporting form to its Partners.  Therefore, investors that own Interests in more than one Series will receive separate Schedule K-1 reporting forms for each Series in which the investor is treated as owning an equity interest.

## TAXATION OF PARTNERSHIP OPERATIONS

As a partnership, the Partnership is not itself subject to U.S. federal income tax but will file an annual partnership information return with the IRS.  Each Limited Partner, in computing his own federal income tax liability for a taxable year, is required to take into account such Partner's distributive share of the Partnership's net long-term capital gain or loss, net short-term capital gain or loss, net ordinary income or loss and any separately stated income items, deductions and credits for the taxable year of the Partnership that ends with or within such Partner's taxable year. The Partnership may utilize a variety of investment and trading strategies, which produce both short-term and long-term capital gain (or loss), as well as ordinary income (or loss).  The Partnership will send annually to each Limited Partner a Schedule K-1 form reporting such Partner's distributive share of the Partnership items of income, gain, loss, deduction and credit. The Partnership intends to use the calendar year as its taxable year unless a different fiscal year is required under the Code.

Each Limited Partner will be subject to tax, and liable for such tax, on such Partner's distributive share of the Partnership's taxable income regardless of whether the Limited Partner has received or will receive any distribution of cash from the Partnership.  Thus, in any particular year, a Limited Partner's distributive share of taxable income from the Partnership (and, generally, the taxes imposed on that income) could exceed the amount of cash, if any, such Limited Partner received or is entitled to withdraw from the Partnership.

Under Section 704 of the Code, a Limited Partner's distributive share of any Partnership item of income, gain, loss, deduction or credit is governed by the Partnership Agreement unless the allocation provided by the Partnership Agreement does not have "substantial economic effect".  The Regulations promulgated under Section 704(b) of the Code provide certain "safe harbors" with respect to allocations, which, under the Regulations, will be deemed to have substantial economic effect.  The validity of an allocation which does not satisfy any of the "safe harbors" of these Regulations is determined by taking into account all facts and circumstances relating to the economic arrangements among the Partners. While no assurance can be given, the allocations provided by the Partnership Agreement should have substantial economic effect and should be sustained under the facts and circumstances test.  However, if it were determined by the IRS or otherwise that the allocations provided in the Partnership Agreement with respect to a particular item do not have substantial economic effect, each Limited Partner's distributive share of that item would be determined for tax purposes in accordance with that Limited Partner's interest in the Partnership, taking into account all facts and circumstances.

Cash distributions and withdrawals, to the extent they do not exceed a Limited Partner's tax basis in such Partner's interest in the Partnership, should not result in taxable gain to

018885

HCMLPHMIT00004084

that Limited Partner, but reduce the tax basis in the Interest by the amount distributed or withdrawn. Cash distributed to a Limited Partner in excess of the tax basis of his or its Interest is generally taxable either as capital gain or ordinary income, depending on the circumstances. A distribution of property other than cash generally will not result in taxable income or loss to the Limited Partner to whom it is distributed until such time that the property is sold.

In the event a Limited Partner withdraws all of the capital in such Partner's capital account, the General Partner will have the discretion to specially allocate an amount of the Partnership's taxable gains or losses to the withdrawing Partner to the extent that the Partner's capital account exceeds, or is less than, its federal income tax basis in its Partnership Interest. However, there can be no assurances that the IRS will accept such a special allocation. If the special allocation were to be successfully challenged by the IRS, the Partnership's taxable gains or losses allocable to the remaining Partners would be increased.

For financial statement presentation and capital account maintenance purposes, all securities held by the Partnership will be marked-to-market at the end of each relevant accounting period and the net gain or loss from marking to market will be reported as income or loss. This treatment differs from the general tax rule applicable to many securities transactions that a transaction does not result in gain or loss until it is closed by an actual sale or other disposition. The divergence between such accounting and tax treatments frequently may result in substantial variation between financial statement income (or loss) and taxable income (or loss) reported by the Partnership.

The Partnership may be required to determine (on an annual basis) whether it will take the position for U.S. federal income tax purposes that it is (i) carrying on a trade or business as a trader in securities, or (ii) an investor in securities. This determination will be made each year based primarily on the frequency, extent and regularity of the Partnership's trading activity during the particular year. The Partnership expects to be treated as engaged in a trade or business by reason of its anticipated investment in the Highland Transaction. The Partnership may also engage in other trade or business activities, either directly or through investments in portfolio partnerships. Prospective investors that are U.S. tax-exempt entities should consider the impact of UBTI on an investment in the Partnership. See "—Tax-Exempt Investors" below. The Partnership's status as a trader or investor may vary from year to year.

If the Partnership is a trader, each Limited Partner who is an individual may deduct his share of the Partnership's expenses (other than interest expense) under Code section 162 as a business expense. Alternatively, if the Partnership is characterized as an investor, an individual Limited Partner's share of the Partnership's expenses (other than interest expense) would pass through to the Partner as separately stated investment expenses deductible under Code section 212 as "miscellaneous itemized deductions". An individual taxpayer's itemized deductions of this type are subject to deduction limitations and phase-out rules that are discussed below in "Limitations on Losses and Deductions—Itemized Deduction Limitations". The limitations on deductions for "investment interest" are discussed below in "Limitations on Losses and Deductions—Investment Interest Limitations".

A Limited Partner may, with the consent of the General Partner, contribute securities to the capital of the Partnership. However, a Limited Partner's contribution of appreciated securities may be a taxable exchange under Section 721(b) of the Code.

The Partnership will also engage in investing and trading securities for its own account. Accordingly, a portion of the Partnership's direct and indirect expenses are expected to be deductible as trade or business expenses under Section 162 of the Code. Certain other expenses may be classified as Section 212 investment expenses, which, for certain types of Limited Partners, including trusts, would be classified as miscellaneous itemized deductions. Prospective investors that are classified as trusts for U.S. federal income tax purposes should consult their tax advisors concerning the limitations in the Code on deductions for miscellaneous itemized deductions.

018886

HCMLPHMIT00004085

## LIMITATIONS ON LOSSES AND DEDUCTIONS

**In General.** A Limited Partner is not permitted to deduct Partnership losses that exceed the Partner's adjusted basis in its Interest at the end of the year in which such loss is incurred. A Limited Partner's basis for its Interest is generally equal the amount of such Partner's cash contributions made to the Partnership, increased by (i) the Partner's allocable share of Partnership taxable income, (ii) the Partner's allocable share of Partnership tax-exempt income, and (iii) the Partner's allocable share of nonrecourse liabilities of the Partnership (if any); and decreased by (w) the Limited Partner's allocable share of Partnership taxable losses and non-deductible expenses, (x) any distributions of cash received by the Limited Partner from the Partnership, (y) the basis of any property distributed by the Partnership to such Partner and (z) any decrease in the Partner's share of Partnership nonrecourse liabilities (if any). There are several other Code provisions that may limit the ability of a Limited Partner to claim deductions attributable to an investment in the Partnership. The most significant of these limitations are discussed below.

**At Risk Limitations.** Section 465 of the Code limits certain taxpayers' losses from certain activities to the amount they are "at risk" in the activities. Taxpayers subject to the "at risk" rules are non-corporate taxpayers, including trusts, and certain closely-held corporations. The activities subject to the "at risk" limitations include all activities in which the Partnership expects to engage. A Partner subject to the "at risk" rules will not be permitted to deduct in any year losses arising from its interest in the Partnership to the extent that the losses exceed the amount it is considered to have "at risk" in the Partnership at the close of that year.

A taxpayer is considered to be "at risk" in any activity to the extent of his cash contribution to the activity, his basis in other property contributed to the activity and his personal liability for repayments of amounts borrowed for use in the activity. With respect to amounts borrowed for use in the activity, the taxpayer is not considered to be "at risk" even if he is personally liable for repayment if the borrowing was from a person who has an "interest" in the activity other than an interest as a creditor. Even if a taxpayer is personally liable for repayment of amounts borrowed for use in the activity, and even if the amount borrowed is borrowed from a person whose only interest in the activity is an interest as a creditor, a taxpayer will not be considered "at risk" in the activity to the extent his investment in the activity is protected against loss through guarantees, stop loss agreements, or other similar arrangements.

Each Limited Partner will be at risk initially for the amount of his capital contribution. A Partner's amount "at risk" will be increased by his distributive share of income from the Partnership and will be decreased by his distributive share of losses from the Partnership and distributions to him. If a Partner's amount "at risk" decreases to zero, he can take no further losses until he has an "at risk" amount to cover the losses. A Partner is subject to a recapture of losses previously allowed to the extent that his amount "at risk" is reduced below zero (limited to loss amounts previously allowed to the Partner over any amounts previously recaptured).

**Investment Interest Limitations.** To the extent that the Partnership incurs interest expense or short sale expenses, a non-corporate Limited Partner, including a trust, will likely be subject to the "investment interest expense" limitations of Section 163(d) of the Code. Investment interest expense includes (i) interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment and (ii) any amounts deductible in connection with a short sale. The deduction for investment interest expense is limited to the taxpayer's net investment income for the taxable year; i.e., the excess of investment income over investment expenses. Excess investment interest expense that is disallowed is not lost permanently but may be carried forward to succeeding years subject to the Section 163(d) limitation. Net capital gain (i.e., net long-term capital gain over net short-term capital loss) on property held for investment and qualified dividends are only included in investment income to the extent that the taxpayer elects to subject some or all of such gain or dividend income to taxation at ordinary income tax rates. The Section 163(d) limitations will apply at the Partner level with regard to the Partner's distributive share of the Partnership's interest expense.

018887

HCMLPHMIT00004086

To the extent that the Partnership is treated as engaged in a trade or business by reason of being deemed a trader, a non-corporate Limited Partner's share of the Partnership's interest expense from such trading activity would retain its character as investment interest subject to the Section 163(d) investment income limitation, but the allowable investment interest deduction would be deducted "above the line" in determining adjusted gross income and therefore fully deductible, rather than being treated as an itemized deduction.

Section 265(a)(2) of the Code disallows any deduction for interest paid by a taxpayer on indebtedness incurred or continued for the purpose of purchasing or carrying tax-exempt obligations. The IRS has announced that such purpose will be deemed to exist with respect to indebtedness incurred to finance a "portfolio investment", and that a limited partnership interest will be regarded as a "portfolio investment". Therefore, if the Partnership holds tax-exempt obligations, the IRS might take the position that all or part of the interest expense incurred by a Limited Partner in connection with the purchase of such Partner's Interest should be viewed as incurred to enable such Limited Partner to continue carrying tax-exempt obligations, and that such Limited Partner should not be allowed to deduct all or a portion of such interest.

**Itemized Deduction Limitations**. Under Section 67 of the Code, for non-corporate taxpayers, including trusts, certain miscellaneous itemized deductions are allowable only to the extent they exceed a "floor" amount equal to 2% of the taxpayer's adjusted gross income ("**2% Floor**"). To the extent that the Partnership's operations do not constitute a trade or business within the meaning of Section 162 and other provisions of the Code, a non-corporate Limited Partner's distributive share of the Partnership's investment expenses, other than investment interest expense, would be deductible only as miscellaneous itemized deductions, subject to the 2% Floor. In addition, Section 68 of the Code further restricts the ability of high income individuals with adjusted gross incomes in excess of specified threshold amounts to deduct certain itemized deductions. Under this limitation (the "3% Phase-Out Rule"), miscellaneous itemized deductions in excess of the 2% Floor described above, along with certain other itemized deductions (not including investment interest expense), are reduced by 3% of the amount by which the taxpayer's adjusted gross income exceeds the applicable threshold, which, for 2015, is $309,900 for joint return filers and $258,250 for single taxpayers. However, the amount of otherwise deductible itemized deductions is not reduced by more than 80% under the 3% Phase-Out Rule. Moreover, a non-corporate taxpayer's investment expenses that are miscellaneous itemized deductions are also not deductible in calculating the taxpayer's alternative minimum tax liability.

Capital losses generally may be deducted only to the extent of capital gains, except for non-corporate taxpayers who are allowed to deduct $3,000 of excess capital losses per year against ordinary income. Corporate taxpayers may carry back unused capital losses for three years and may carry forward such losses for five years; non-corporate taxpayers may not carry back unused capital losses but may carry forward unused capital losses indefinitely.

### ADDITIONAL TAX ISSUES

Gain or loss from a short sale of property is generally considered as capital gain or loss to the extent that the property used to close the short sale constitutes a capital asset in the Partnership's hands.

The "wash sale" rules of Section 1091 of the Code disallow any deduction for losses arising from the sale or other disposition of "stock or securities", where, within a period beginning 30 days before such sale or disposition and ending 30 days afterwards, the taxpayer acquires "substantially identical" stocks or securities by purchase or by an exchange on which the entire amount of gain or loss is recognized. This disallowance rule also applies where, within such 61-day period, the taxpayer enters into a contract or option to acquire substantially identical stock or securities. Thus, if the Partnership were to engage in such a "wash sale" transaction, the Partners would not be able to recognize their distributive share of any loss realized in connection with such sale in the current year.

018888

HCMLPHMIT00004087

**Currency Fluctuations - "Section 988" Gains and Losses.**   To the extent that the Partnership's investments are made in securities denominated in a foreign currency, gain or loss realized by the Partnership frequently will be affected by the fluctuation in the value of such foreign currencies relative to the value of the U.S. dollar.  Generally, gains or losses with respect to the Partnership's investments in common stock of foreign issuers will be taxed as capital gains or losses at the time of the Partnership's sale of such stock. However, under Section 988 of the Code, gains or losses of the Partnership on the acquisition or disposition of foreign currency (i.e., the purchase of foreign currency and subsequent use of such currency to acquire stock) will be treated as ordinary income or loss.  Moreover, under Section 988, gains and losses from disposition of debt securities denominated in a foreign currency  that are attributable to the fluctuations in such currency between the date of acquisition of the debt security and the date of its disposition will be treated as ordinary income or loss.  Since the Code provides limitations on the ability of taxpayers to deduct capital losses against ordinary income, a Partner's share of capital losses realized by the Partnership on sale of foreign securities would not be available to offset the Partner's share of ordinary income realized by the Partnership on its currency hedging transactions.

The Partnership may acquire foreign currency forward contracts, enter into foreign currency futures contracts and acquire put and call options on foreign currencies. Generally, foreign currency regulated futures contracts and option contracts that qualify as "Section 1256 contracts" will not be subject to ordinary income and loss treatment under Section 988.  However, if the Partnership acquires currency futures contracts or options contracts that are not Section 1256 contracts, or any currency forward contracts, any gain or loss realized by the Partnership with respect to such instruments will be ordinary income or loss, unless (i) the contract is a capital asset in the hands of the Partnership and is not part of a straddle transaction and (ii) the Partnership makes an election (by the close of the day the transaction is entered into) to treat the gain or loss attributable to such contract as capital gain or loss.

The taxation of debt obligations under the Code is complex; the following discussion is intended to provide only a general description of these rules.  Generally, interest income and income items similar to stated interest, such as original issue discount (in general, the annual portion of the discount on original issuance of debt obligations issued for less than their stated principal amount) and market discount (the amount by which debt obligations are acquired in the secondary market for less than their principal) are treated as items of ordinary income.  Generally, debt obligations that are disposed of in a taxable transaction for an amount greater than their adjusted cost basis give rise to capital gain, which will be long-term if the debt obligation is held for longer than one year, and short-term, if held for a period of one year or less.  Generally, debt obligations that are disposed of in a taxable transaction for an amount less than their adjusted cost basis give rise to capital loss, which will be long-term if the debt obligation is held for longer than one year, and short-term if held for a period of one year or less.  In the event that any such debt obligations are not held as capital assets, such dispositions will generally give rise to ordinary gain or loss, as the case may be.

Section 1259 of the Code requires that the Partnership recognize gain on the constructive sale of any appreciated financial position in stock, a partnership interest, or certain debt instruments.  A constructive sale of an appreciated financial position occurs if, among other things, the Partnership enters into (1) a short sale of the same or substantially identical property (a transaction commonly known as a "short sale against the box"), (2) an offsetting notional principal contract with respect to the same or substantially identical property, or (3) a futures or forward contract to deliver the same or substantially identical property.  Exceptions to the foregoing apply to certain transactions closed within 30 days after the close of the taxable year if the underlying appreciated financial position remains "unhedged" for at least 60 days thereafter, and to transactions involving certain contracts to sell stock, debt instruments, or partnership interests if the contract settles within one year.

The IRS may treat certain positions in securities held (directly or indirectly) by a Partner and its indirect interest in similar securities held by the Partnership as "straddles" for federal income tax purposes.  The application of the "straddle" rules in such a case could

018889

HCMLPHMIT00004088

affect a Partner's holding period for the securities involved and may defer the recognition of losses with respect to such securities. In addition, if either of the Partner's positions in such a transaction is an "appreciated financial position", application of the "straddle" rules may trigger a constructive sale of that position under the rules described above.

Section 1258 of the Code recharacterizes capital gain from a "conversion transaction" as ordinary income, with certain limitations. Conversion transactions are defined as transactions in which substantially all the expected return is attributable to the time value of money and either: (a) the transaction consists of the acquisition of property by the taxpayer and a substantially contemporaneous agreement to sell the same or substantially identical property in the future; (b) the transaction qualifies as a "straddle" (within the meaning of Section 1092(c) of the Code); (c) the transaction is one that was marketed or sold to the taxpayer on the basis that it would have the economic characteristics of a loan but the interest-like return would be taxed as capital gain; or (d) the transaction is described as a conversion transaction in the Regulations. The amount of gain so recharacterized will not exceed the amount of interest that would have accrued on the taxpayers' net investment for the relevant period at a yield equal to 120% of the "applicable rate".

## INVESTMENTS IN NON-U.S. CORPORATIONS

The Partnership may invest in certain foreign corporations that will be classified as "passive foreign investment companies" ("**PFICs**") for U.S. tax purposes. Under the PFIC rules, unless the Partnership makes one of the elections described below, any gain realized by the Partnership on the sale or disposition of stock in a PFIC that is allocable to Partners that are U.S. Persons (as defined in the Code) will be treated as ordinary income and will be subject to U.S. federal income tax as if (i) the gain had been realized ratably over the Partnership's holding period and (ii) the amount deemed realized had been subject to tax in each year of that holding period at the highest applicable federal income tax rate; in addition, an interest charge at the rate generally applicable to underpayments of federal income tax will be imposed on the amount. Further, any "excess distributions" from a PFIC (as defined in the Regulations) are treated as ordinary income (regardless of their original character) and subject to this deferred tax and interest charge.

Provided the PFIC complies with certain reporting requirements, the Partnership may elect to have the PFIC treated as a "qualified electing fund", in which case the Partnership would include annually in its gross income its *pro rata* share of the PFIC's net ordinary income and net realized capital gains, whether or not such amounts are actually distributed to the Partnership. Generally, any net operating losses or net capital losses of the PFIC will not pass through to the Partnership and will not offset any ordinary income or capital gains of the PFIC reportable to the Partnership in subsequent years. Alternatively, the Partnership could elect to "mark-to-market" stock in certain PFICs if such stock is considered "marketable stock" under the Code, and thereby avoid being subject to the deferred tax and interest charge discussed above. However, there can be no assurance that the Partnership will be able to make either of these elections with respect to any PFICs in which it invests. Further, Limited Partners may be subject to IRS reporting requirements with respect to the Partnership's investments in PFICs.

The Partnership may also invest in certain foreign corporations that will be considered "controlled foreign corporations" ("**CFCs**") for U.S. tax purposes. A CFC is a non-U.S. corporation in which certain U.S. shareholders own, directly or indirectly, more than 50% of either the total voting power of all classes of stock entitled to vote or the total value of all classes of stock. Under the CFC rules, certain U.S. shareholders are subject to U.S. federal income tax on certain types of income (generally passive income) realized by the CFC regardless of whether any amounts are distributed from the CFC to such U.S. shareholder. Further, such U.S. shareholders may be subject to IRS reporting requirements with respect to investments in CFCs.

In addition, if the Partnership invests in stock of foreign corporations that become PFICs or CFCs after the Partnership has made such investment, this may also result in adverse tax consequences for the Limited Partners that are U.S. Persons and may subject them to IRS reporting requirements with respect to such investments.

018890

HCMLPHMIT00004089

### 3.8 % MEDICARE SURTAX ON NET INVESTMENT INCOME

High income U.S. individuals are subject to an annual 3.8% Medicare contribution tax on their "net investment income" (the "**NII Tax**"). The NII Tax is an "add on" federal surtax which must be paid in addition to the regular federal income tax on such income. The NII Tax applies to single taxpayers with "modified" adjusted gross income ("**MAGI**") in excess of $200,000 and married persons filing jointly with MAGI in excess of $250,000. THE NII Tax also applies, in modified form, to the undistributed net investment income of certain trusts and estates.

For purposes of the NII Tax, "investment income" is defined to include (1) interest, dividends, annuities, royalties and rents (subject to certain exceptions); (2) income from a trade or business that consists of trading financial instruments or commodities (i.e., income from trader funds); (3) income from a trade or business that is a passive activity for the individual (i.e., income from an equity interest in a partnership engaged in a trade or business in which the partner does not actively participate); and (4) net gain attributable to disposition of capital assets and certain other property.

It is anticipated that a U.S. individual Limited Partner's distributive share of taxable income from the Partnership will be classified as investment income of the type subject to the NII Tax. To the extent the Partnership generates income from activities that constitute a trade or business (e.g., originating loans), such trade or business income would still be classified as investment income under the NII Tax because the Limited Partner will not be considered an active participant in the Partnership's business.

Net investment income for purposes of calculating the NII Tax is (i) investment income (as defined above) reduced by (ii) any deductions allowed under the regular rules applicable for federal income tax purposes that are properly allocable to such gross income or net gain. If the Partnership is not engaged in a trade or business, an individual Limited Partner's distributive share of investment-related expenses (other than investment interest) would pass through to such Partners as Code Section 212 expenses which are deductible for regular tax purposes and the NII Tax only as itemized deductions and are subject to the Section 67 (2% Floor) and Section 68 (3% Phase-Out Rule) limitations previously discussed.

### TAX-EXEMPT INVESTORS

If the Partnership derives income which would be considered "unrelated business taxable income" (as defined in Section 512 of the Code) ("**UBTI**"), if derived directly by a Limited Partner that is a qualified retirement plan or other organization exempt from tax under Sections 401 or 501(a) of the Code or an individual retirement account ("**IRA**") exempt under Section 408(e) of the Code (each, a "**Tax-Exempt Entity**"), such Limited Partner's allocable share of such Partnership income would be subject to tax. A Tax-Exempt Entity which is subject to tax on its allocable share of the Partnership's UBTI, including an IRA, may also be subject to the alternative minimum tax with respect to items of tax preference which enter into the computation of UBTI.

UBTI is generally the excess of gross income from any unrelated trade or business conducted by a Tax-Exempt Entity (or by a partnership of which the Tax-Exempt Entity is a member) over the deductions attributable to such trade or business. UBTI generally does not include certain passive income, including dividends, interest, annuities, royalties and gain or loss from the disposition of property held for investment, unless such income items are debt-financed income (as discussed below).

While UBTI itself is taxable, the receipt of UBTI by a Tax-Exempt Entity generally has no effect upon that entity's tax-exempt status or upon the exemption from tax of its other income. However, for certain types of Tax-Exempt Entities, the receipt of any UBTI may have extremely adverse consequences. In particular, for charitable remainder trusts (as defined under Section 664 of the Code), the receipt of any taxable income from UBTI during a taxable year will result in the imposition of an excise tax equal to the amount of such UBTI.

018891

HCMLPHMIT00004090

A Tax-Exempt Entity also includes in its UBTI its "unrelated debt-financed income" (and its allocable share of the "unrelated debt-financed income" of any partnership in which it invests) pursuant to Section 514 of the Code. In general, unrelated debt-financed income consists of: (i) income derived by a Tax-Exempt Entity (directly or through a partnership) from income producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year; and (ii) gains derived by a Tax-Exempt Entity (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness". Acquisition indebtedness is generally defined as debt incurred to purchase or carry an investment. Such income and gains derived by a Tax-Exempt Entity from the ownership and sale of debt-financed property are taxable in the proportion to which such property is financed by acquisition indebtedness during the relevant period of time.

<u>Income From the Partnership's Private Equity Investments</u>. The Investment Manager expects to invest a substantial portion of the Partnership's Series 1 assets in the Highland Transaction. The Partnership expects to incur acquisition indebtedness with respect to the Highland Transaction (if it occurs) and may use borrowed funds to acquire other property. Accordingly, Limited Partners that are Tax-Exempt Entities should anticipate that a substantial portion, and possibly all, of their distributive share of the Partnership's net income realized from ownership of equity interests in Highland and other portfolio companies that are business partnerships, including gain realized upon sales of such equity investments, will be subject to federal income tax as UBTI.

<u>Income From the Partnership's Other Activities</u>. The Investment Manager expects that the Partnership will incur indebtedness in connection with its operations from time to time. The law is not entirely clear regarding the appropriate method to be used to determine what portion of a tax-exempt Limited Partner's share of the Partnership's income is attributable to debt financing and therefore constitutes "debt-financed income". Accordingly while the Partnership will compute each tax-exempt Limited Partner's share of "debt-financed income" from the Partnership in a manner which the Partnership considers to be reasonable, there can be no assurance that the IRS will accept the method of computation used by the Partnership.

Tax-exempt Limited Partners will also realize UBTI if the Partnership acquires equity interests of publicly traded partnerships or private partnerships that are engaged in trade or business activities or the Partnership directly carries on other trade or business activities (other than as a securities trader).

OTHER TAXES

Partners may be subject to other taxes, such as the alternative minimum tax, state and local income taxes, and estate, inheritance or intangible property taxes that may be imposed by various jurisdictions. Each prospective investor should consider the potential consequences of such taxes due to an investment in the Partnership. It is the responsibility of each prospective investor to become satisfied as to the legal and tax consequences of an investment in the Partnership under state law, including the laws of the state(s) of its, his or her domicile and residence, by obtaining advice from such investor's own tax advisors, and to file all appropriate tax returns that may be required.

Income received by the Partnership from sources within non-U.S. countries may be subject to withholding and other taxes imposed by such countries. Each Partner may be entitled either to deduct (as an itemized deduction) such Partner's proportionate share of the non-U.S. taxes of the Partnership in computing such Partner's taxable income or to use the amount as a foreign tax credit against his or its U.S. federal income tax liability, subject to limitations. Generally, a credit for non-U.S. taxes is subject to the limitation that it may not exceed the taxpayer's U.S. tax attributable to his or its non-U.S. source taxable income. With respect to Partners that are U.S. Persons: (i) certain currency fluctuation gains, including fluctuation gains from non-U.S.-Dollar-denominated debt securities, receivables and payables, will be treated as ordinary income derived from U.S. sources; and (ii) Partnership gains from the sale of securities also will be treated as derived from U.S. sources. The limitation on the foreign tax credit is applied separately to non-U.S.

018892

HCMLPHMIT00004091

source passive income (as defined for purposes of the foreign tax credit), including the non-U.S. source passive income realized by the Partnership.  The foreign tax credit limitation rules do not apply to certain electing individual taxpayers who have limited creditable non-U.S. taxes and no non-U.S. source income other than passive investment-type income.  The foreign tax credit generally is eliminated with respect to non-U.S. taxes withheld on income and gain if the Partnership fails to satisfy minimum holding period requirements with respect to the property giving rise to the income and gain.

## TAX ELECTIONS; RETURNS; TAX AUDITS

If the General Partner determines that the Partnership is treated as a securities trader for federal income tax purposes, the General Partner may cause the Partnership to elect to "mark-to-market" its securities at the end of each taxable year, in which case such securities would be treated for federal income tax purposes as though sold for fair market value on the last business day of such taxable year.  Such an election under Code Section 475(f) would apply to the taxable year for which made and all subsequent taxable years unless revoked with the consent of the IRS.  If the Partnership were to make such an election, all or a portion of the Partnership's gains and losses would be considered ordinary income or loss, rather than capital gain or loss.  Since for federal income tax purposes capital losses generally may be deducted only against capital gains, a Limited Partner may be unable to deduct capital losses realized from other investments and transactions in a taxable year against his share of the Partnership's income.

The Code provides for optional adjustments to the basis of partnership property upon distributions of partnership property to a partner and transfers of partnership interests (including by reason of death); provided that a partnership election has been made pursuant to Section 754 of the Code.  Under the Partnership Agreement, the General Partner, in its sole discretion, may cause the Partnership to make such an election.  Any such election, once made, cannot be revoked without the IRS's consent. The General Partner also has the authority and sole discretion to make or refrain from making other tax elections that are available to the Partnership.

Additionally, even if a partnership has not made a Section 754 election, Section 743 of the Code provides for a mandatory basis adjustment to partnership property on certain transfers of partnership interests (including transfers by reason of death), if partnership has a "substantial built-in loss" immediately after such transfer.  A partnership is treated as having a "substantial built-in loss" if the partnership's adjusted basis in partnership property exceeds the property's fair market value by more than $250,000.  Section 734 of the Code also provides for mandatory basis adjustments in the case of certain property distributions to partners.  Such Code provisions could cause the Partnership to decrease the basis of its remaining assets in such circumstances.

The General Partner will decide how to report partnership items on the Partnership's tax returns and all Limited Partners are required to treat such tax items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency.  Since the Partnership may engage in transactions whose treatment for tax purposes is not clear, there is a risk that a claim of tax liability could be asserted against the Partnership or its Partners.  In the event that the income tax returns of the Partnership are audited by the IRS, the tax treatment of Partnership income and deductions generally is determined at the partnership level in a single proceeding rather than by individual audits of the Partners.  As the "Tax Matters Partner", the General Partner has considerable authority to make decisions affecting the tax treatment and procedural rights of all Partners.  In addition, the Tax Matters Partner has the authority to bind certain Partners to settlement agreements and the right on behalf of all Partners to extend the statute of limitations relating to the Partners' tax liabilities with respect to Partnership items. The General Partner may, in its sole discretion, consult with, and rely upon, the Partnership's auditors and their determinations or advice as to tax and/or accounting matters.

It is possible that the Partnership and or certain transactions executed by the Partnership would be subject to tax shelter disclosure registration and listing requirements under applicable U.S. tax laws and regulations.

---

RAND PE FUND I, L.P.

018893

HCMLPHMIT00004092

**PFIC Reporting**. The Code provides that each U.S. Person (as defined herein) that is a direct or indirect shareholder of a PFIC (generally, an investment corporation organized under the laws of a foreign jurisdiction) is required to file an annual information return containing such information as the IRS may require.  Limited Partners would be indirect shareholders of stock in any PFICs owned by the Partnership, and would satisfy such filing requirement (if applicable to such Partner) by completing a copy of IRS Form 8621 for the reportable PFIC investment and submitting such forms to the IRS with the Partner's federal income tax return.

**FATCA Withholding and Compliance**. The provisions of the Code known as the Foreign Account Tax Compliance Act ("**FATCA**") provide that a 30% withholding tax will be imposed on payments of U.S.-source dividends and interest (and certain other items of U.S.-source income) to certain foreign financial entities, and beginning on January 1, 2017 with regard to other withholdable payments (including gross proceeds from the sale of property that give rise to U.S.-source, interest or dividends), unless the foreign financial entity has registered with the IRS and agreed to provide specified U.S. tax information concerning "specified U.S. persons" that own interests in the foreign entity. The Partnership is a withholding agent with respect to such withholding taxes that may be imposed on any of its Partners.  U.S. and non-U.S. Partners will be required to furnish appropriate documentation certifying as to their U.S. or non-U.S. tax status, together with such other additional tax information as the Partnership may from time to time request. Limited Partners that are "non-financial foreign entities" (as defined in Code Section 1472) are required to certify whether they have any "substantial United States owners" and, if so, to disclose the identity and tax identification numbers of such persons to the Partnership. Failure to provide such information may subject a Limited Partner to withholding taxes or mandatory withdrawal of its entire interest in the Partnership.  Limited Partners are encouraged to consult with their own tax advisors regarding the possible impact of the FATCA legislation on their investment in the Partnership.

## OTHER MATTERS

The Partnership may incur certain expenses in connection with its organization and the marketing of the Interests.  Amounts paid or incurred to organize the Partnership are being amortized, for tax purposes, over a period of 180 months from the date the Partnership commenced operations.  Amounts paid or incurred to market interests in a partnership (marketing and syndication expenses) are not deductible or amortizable.

018894

HCMLPHMIT00004093

## SPECIAL CONSIDERATIONS FOR PARTNERS WHO ARE NOT U.S. PERSONS

A "**U.S. Person**" is (a) a citizen or resident of the United States, (b) a corporation, partnership, or other entity organized under the laws of the United States, any state, or the District of Columbia, other than a partnership that is not treated as a U.S. Person under the Regulations, (c) an estate whose income is subject to United States income tax, regardless of its source, or (d) a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. Persons have the authority to control all substantial decisions of the trust. In addition, to the extent provided in the Regulations, "U.S. Person" includes certain trusts in existence on August 20, 1996, and treated as U.S. Persons prior to such date, that have elected to be treated as U.S. Persons.  Partners that are not U.S. Persons are referred to below as "non-U.S. Partners".

**Taxation of Effectively Connected Income**.  The Partnership expects to be treated for U.S. tax purposes as being engaged in the conduct of a U.S. trade or business.   As a result, non-U.S. Limited Partners that acquire interests in the Partnership will generally be treated as being engaged in the conduct of a U.S. trade or business.  Thus, each non-U.S. Limited Partner will be subject to U.S. federal income taxation, at graduated rates, on its distributive share of the Partnership's income, gain or loss (whether ordinary or capital) that is effectively connected with the conduct of the Partnership's U.S. trade or business ("**ECI**").  Such Limited Partners will be required to file annual U.S. federal income tax returns with respect to such ECI, and the Partnership will be required to withhold and remit to the U.S. Treasury a portion of each non-U.S. Limited Partner's distributive share of such ECI.  The Limited Partner would be entitled to claim a credit on his U.S. federal income tax return for the amount withheld by the Partnership with respect to such ECI.  Non-U.S. Limited Partners may also be required to file applicable state and local tax returns in jurisdictions in which the Partnership is engaged in business or in which its real property interests are located.

**U.S. Branch Profits Tax**.  In the case of a Limited Partner that is a non-U.S. corporation, in addition to the regular corporate income tax that must be paid on its ECI, the Code provides for an additional 30% "branch profits" tax.  The branch profits tax is 30% (or lower rate permitted by tax treaty) of the foreign corporation's "dividend equivalent amount".  This is the amount of the foreign corporation's effectively connected after-tax earnings that are not reinvested in a U.S. trade or business by the end of the tax year or disinvested in a later tax year.  Certain income tax treaties may reduce or eliminate the branch profits tax; however, under certain circumstances, the branch profits tax may override income tax treaty benefits.

**FIRPTA**.    The Foreign Investment in Real Property Tax Act of 1980, as amended ("**FIRPTA**"), imposes a  tax on gain realized on disposition by a foreign person of a "U.S. real property interest" ("**USRPI**") by treating such gain as ECI, generally giving rise to the tax consequences described above.  A USRPI  includes a direct investment in U.S. real estate and buildings and also investments in stock and certain types of debt interests of a U.S. corporation that is classified as a "U.S. real property holding corporation" (as defined in the Code).  A USRPI held by a partnership is deemed to be held proportionately by its partners.

**Taxation of Non-ECI**.  The Partnership also expects to realize certain types of periodic income from U.S. sources (e.g., dividends and certain types of interest) which are not classified as ECI.  Each non-U.S. Limited Partner will be subject to a flat 30% withholding tax on its allocable share of the gross amount of such income.  Such withholding tax is sometimes reduced or eliminated by an applicable income tax treaty, provided that the proper certification is provided by the non-U.S. Limited Partner when necessary.  The applicable IRS form or forms (W-8 series) should be submitted to the Partnership by each non-U.S. Limited Partner at the time such Limited Partner acquires an Interest in the Partnership, and should be resubmitted every three years thereafter (or earlier, if the information on such form changes before such date).

**Disposition of Partnership Interests**.  A non-U.S. Limited Partner that disposes of its Interest in the Partnership, by sale or otherwise, may be subject to U.S. federal income

018895

HCMLPHMIT00004094

taxation on such disposition.   A transferee of an Interest in the Partnership may be required to deduct and withhold a tax equal to 10% of the gross amount realized on such disposition.  Any amount so withheld can be applied as a credit against the U.S. federal income tax liability of the non-U.S. Limited Partner and can be recovered as a refund in the event of overpayment.

**U.S. Estate and Gift Taxation of Interests**.  Non-U.S. Limited Partners that are individuals should also be aware that Interests in the Partnership will be treated as U.S. situs property by reason of the Partnership's ownership of U.S. real property interests, and thus subject to U.S. estate taxation upon the death on a non-U.S. individual owner, or U.S. gift taxation upon a donative transfer of such Interest.

## STATE TAXATION

In addition to the federal income tax consequences described above, prospective investors should consider potential state tax consequences of an investment in the Partnership.   No attempt is made herein to provide a discussion of such state tax consequences.  State laws often differ from federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit.  A Partner's distributive share of the taxable income or loss of the Partnership generally will be required to be included in determining the Partner's reportable income for state tax purposes in the jurisdiction in which he or she is a resident.  Each prospective investor must consult such investor's own tax advisors regarding such state tax consequences.

## FUTURE TAX LEGISLATION

Future amendments to the Code, other legislation, new or amended Regulations, administrative rulings or guidance by the IRS, or judicial decisions may adversely affect the federal income tax aspects of an investment in the Partnership, with or without advance notice, and retroactively or prospectively.

018896

HCMLPHMIT00004095

**EXHIBIT 82**

018897

MEMBER AND MANAGER CONSENT
OF
ATLAS IDF GP, LLC

October 13, 2022

THE UNDERSIGNED sole member (the "**Member**") and sole manager (the "**Manager**") of ATLAS IDF GP, LLC, a Delaware limited liability company (the "**General Partner**"), the general partner of ATLAS IDF, LP, a Delaware limited partnership (the "**Partnership**"), acting pursuant to the Delaware Limited Liability Company Act and the Amended and Restated Company Agreement of the General Partner, do hereby consent and agree, to take the following actions and adopt the following resolutions:

RESOLVED, that pursuant to that certain Membership Interest Purchase Agreement dated as August 1, 2022 (the "Purchase Agreement"), by and among JOHN HONIS (as "Seller"), the Sole Member (as "Buyer"), and CLO HOLDCO, LTD. a Cayman limited company (as "Guarantor"), the Sole Member purchased from Seller all of the issued and outstanding membership interests in the General Partner;

RESOLVED, that the following individual be, and hereby is, duly appointed and qualified to hold the office(s) set forth next to his name, and shall serve in such capacity until such person's successor(s) shall have been duly appointed and qualified, or until his earlier resignation or removal (each, an "**Officer**"):

| Name | Office |
|------|--------|
| Mark Patrick | Sole Manager, President, Secretary and Treasurer |

RESOLVED, that the certificate of formation of the Company and other Company documents/agreements on file and/or executed by the Member may reflect management by members, and not management by managers.  As a result, if such is the case and the certificate is not amended to reflect management by managers, the Company and all governing documents shall be interpreted in such a manner that all references therein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President;

RESOLVED FURTHER, that any individual previously appointed as a manager and/or as an officer of the General Partner but not named above is hereby removed from the office of the General Partner;

RESOLVED FURTHER, that each Officer and manager is hereby, authorized, empowered and directed, in the name and on behalf of the General Partner and the Partnership, to do and perform all acts and deeds, to execute and deliver all documents, instruments and other agreements, to waive any and all conditions and do all things necessary or helpful to carry out and comply with the terms and provisions of the foregoing resolutions;

RESOLVED FURTHER, that that all authorized acts and deeds of the Officers, managers and agents on behalf of the General Partner and/or the Partnership prior to the date

018898

HCMLPHMIT00004124

hereof shall be, and they hereby are, in all respects, ratified, approved, confirmed and adopted as the acts and deeds of the General Partner and/or the Partnership; and

RESOLVED FURTHER, that the foregoing authorization shall remain in effect until further written notice from the General Partner.

*[Signature Page to Follow]*

2

018899

HCMLPHMIT00004125

IN WITNESS WHEREOF, the undersigned Sole Member and Sole Manager have executed this Consent to be effective as of the date first set forth above.

MEMBER

RAND ADVISORS HOLDING CORP.,
a Delaware corporation

By: _____
           Mark Patrick, Sole Director

SOLE MANAGER

_____
Mark Patrick

*Signature Page*

**018900**

HCMLPHMIT00004126

# EXHIBIT 83

AMENDED AND RESTATED COMPANY AGREEMENT

*of*

ATLAS IDF GP, LLC

A Delaware Limited Liability Company

018902

HCMLPHMIT00004127

**AMENDED AND RESTATED COMPANY AGREEMENT**

*of*

**ATLAS IDF GP, LLC**

**A Delaware Limited Liability Company**

This AMENDED AND RESTATED COMPANY AGREEMENT (collectively, the "Agreement," which shall include all amendments and exhibits hereto) dated effective as of the 1st day of August, 2022 (the "Effective Date"), are entered into by and among those Persons executing the signature page hereto as the Members of ATLAS IDF GP, LLC, a Delaware limited liability company (the "Company"). All capitalized terms not defined in the instance of first usage shall have the respective meanings associated with such terms in Section 1.04 below.

## ARTICLE I

### INTRODUCTION

1.01    <u>Formation of Limited Liability Company</u>    The Company was formed by the filing of the Certificate of Formation (the "Certificate") with the Secretary of State of Delaware on the October 29, 2015. The Company's business shall be conducted under the name "ATLAS IDF GP, LLC" until such time as the Members shall hereafter designate otherwise and file amendments to the Certificate in accordance with applicable law. This Agreement amends and replaces, in its entirety, all prior governing agreements for the Company, including any and all amendments thereto.

This Agreement is subject to, and governed by, the Delaware laws governing limited liability companies (the "DELAWARE LAWS") and the Certificate. In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the DELAWARE LAWS or the provisions of the Certificate, such provisions of the DELAWARE LAWS or the Certificate, as the case may be, will be controlling.

1.02    <u>Registered Office and Agent</u>    The registered office and registered agent of the Company initially shall be as set forth in the Certificate and may be changed from time to time by the appropriate filing by the Company in the office of the Secretary of State of Delaware.

1.03    <u>Other Offices</u>    The Company may also have offices at such other places, both within and without the State of Delaware, as the Board of Managers may from time to time determine or the business of the Company may require.

1.04    <u>Defined Terms</u>    The terms used in this Agreement with their initial letter capitalized shall, unless the context requires otherwise, have the meanings specified in this Section 1.04. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, as the context requires. When used in this Agreement, the following terms shall have the meanings set forth below:

(a)    "DELAWARE LAWS" shall mean the Delaware laws governing limited liability companies, as the same may be amended from time to time.

(b)    "Affiliate" shall mean, as to any Person, any Person controlled by, controlling, or under common control with such Person, and, in the case of a Person who is an individual, a member of the family of such individual consisting of a spouse, sibling, in-law, lineal descendant, or ancestor (including by adoption). For purposes of this definition, "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person means the possession, directly or indirectly, alone or in concert with others, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, by contract or otherwise, and no Person shall be deemed in control of another solely by virtue of being a director, officer or holder of voting securities of any entity. A Person shall be presumed to control any partnership of which such Person is a general partner.

2

018903

HCMLPHMIT00004128

(c)    "Bankruptcy" shall mean, and a Member shall be deemed a "Bankrupt Member," upon (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any Debtor Relief Laws; (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator, or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; (iii) the ordering of the winding up or liquidation of the Member's affairs; (iv) the filing of a petition in any involuntary bankruptcy case, which petition remains undismissed for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect; (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator, or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(d)    "Book Depreciation" for any asset shall mean for any Fiscal Year or other period an amount that bears the same ratio to the Book Value of that asset at the beginning of such Fiscal Year or other period as the federal income tax depreciation, amortization, or other cost recovery deduction allowable for that asset for such year or other period bears to the adjusted tax basis of that asset at the beginning of such year or other period. If the federal income tax depreciation, amortization, or other cost recovery deduction allowable for any asset for such year or other period is zero, then Book Depreciation for that asset shall be determined with reference to such beginning Book Value using any reasonable method selected by the Board of Managers.

(e)    "Book Value" shall mean for any asset the asset's adjusted tax basis, except as follows:

(i)    the initial Book Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Board of Managers;

(ii)    the Book Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board of Managers, as of one of the following times: (1) on the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution if the Board of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; (2) on the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an Interest in the Company if the Board of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; and (3) on the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations;

(iii)    the Book Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution;

(iv)    the Book Values of Company assets shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Treasury Regulations and Section 8.02(d) hereof; provided, however, that Book Values shall not be adjusted pursuant to this Section 1.04(e)(iv) to the extent the Board of Managers determines that an adjustment pursuant to Section 1.04(e)(ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 1.04(e)(iv); and

(v)    if the Book Value of an asset has been determined or adjusted pursuant to Section 1.04(e)(i),1.04(e)(ii), or 1.04(e)(iv) hereof, such Book Value shall thereafter be adjusted by the Book Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

(f)    "Capital Contribution" shall mean the total value of cash and Book Value (except as otherwise herein provided) of property contributed and agreed to be contributed to the Company by each Member, as shown in Exhibit A, attached hereto and incorporated herein for all purposes, as the same may be amended from time to time. Any reference in this Agreement to the Capital Contribution of a then Member shall include a Capital Contribution previously made by any

3

018904
HCMLPHMIT00004129

prior Member for the interest of such then Member, reduced by any distribution to such Member in return of its capital as contemplated herein.

(g)     "Class A Interest" shall refer to the Interest of a Class A Member in the Profits, Losses, Distributable Cash, and assets upon liquidation of the Company as described in this Agreement.

(h)     "Class A Members" shall mean those Persons listed on Exhibit A and designated as "Class A Members." The Class A Members shall have such additional rights as a Member as are specifically described and granted in Exhibit A, as amended from time to time.

(i)     Intentionally Blank.

(j)     Intentionally Blank.

(k)     "Code" shall mean the Internal Revenue Code of 1986, as amended.  All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

(l)     "Company" shall refer to the limited liability company created by virtue of the Certificate and this Agreement and any successor in interest.

(m)     "Debtor Relief Laws" shall mean any federal or state bankruptcy, insolvency, or similar laws generally affecting the rights of creditors and the relief of debtors now or hereafter in effect.

(n)     Intentionally Blank.

(o)     "Distributable Cash" of the Company shall mean all cash funds of the Company on hand from time to time (other than cash funds obtained as Capital Contributions by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time; (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time; and (iii) provision for a working cash reserve in accordance with Section 8.07 below.

(p)     "Fiscal Year" shall mean the calendar year.

(q)     "Former Member" shall mean a member that causes a Dissolution Event.

(r)     "Interest" in the Company shall mean the entire ownership interest of a Member in the Company at any particular time, including such Member's Capital Account, allocable share of Profits, Losses, and Distributable Cash, and the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement, together with the obligations of such Member to comply with all of the terms and provisions of this Agreement.

(s)     Intentionally Blank

(t)     "Manager" shall mean an individual elected to the Board of Managers of the Company pursuant to Sections 3.02 and 3.04 below.

(u)     "Member(s)" shall mean all Members admitted to the Company hereafter as Members who shall consent to the terms hereof and shall be admitted pursuant to the provisions hereof.  The names, business or residence addresses, Capital Contributions, Percentage Interest, and class of Interest of the Members shall be set forth on Exhibit B, attached hereto and incorporated herein by reference.  Reference to a "Member" shall be to any one of the Members.

(v)     "Percentage Interest" of a Member shall mean the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit B, as such percentage may be adjusted from time to time pursuant to the terms hereof.

(w)     "Person" shall mean any individual, corporation, partnership, limited liability company or partnership, association, organization, trust, estate, or other entity.

4

018905

HCMLPHMIT00004130

(x)    "Pro Rata Part" shall mean the percentage expression of a fraction the numerator of which is a Member's respective Percentage Interest and the denominator of which is the aggregate Percentage Interests of all Members involved in the respective transaction or having a respective right or option.

(y)    "Profits" and "Losses" shall mean, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)    income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this Section 1.04(y) shall be added to such taxable income or loss;

(ii)    any expenditures of the Company described in Code Section 705(a)(2)(B), or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations, and not otherwise taken into account in computing Profits and Losses pursuant to this Section 1.04(y), shall be subtracted from such taxable income or loss;

(iii)    if the Book Value of any Company asset is adjusted pursuant to Section 1.04(e)(ii) or Section 1.04(e)(iii), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits and Losses;

(iv)    gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(v)    in lieu of the deduction for depreciation, cost recovery, or amortization taken into account in computing such taxable income or loss, there shall be taken into account Book Depreciation; and

(vi)    notwithstanding any other provision of this Section 1.04(y), any items that are specially allocated pursuant to Section 8.02 or Section 8.03 shall not be taken into account in computing Profits and Losses.

(z)    "Regulatory Allocations" shall mean the special allocations of items of income, gain, loss, and deduction, if any, set forth in Section 8.02 hereof.

(aa)    "Transfer" or "Transferred" shall mean the sale, assignment, conveyance, gift, bequest, devise, transfer under the rules of intestate succession, pledge, mortgage, or other encumbrance. In addition, the term "Transfer" or "Transferred" shall mean an "ownership change" of a Member as defined in Section 382(g) of the Code in effect as of the Effective Date, except that the term "Member" shall be substituted for "shareholder" wherever it appears.

(bb)    "Treasury Regulations" shall mean regulations issued by the Department of the Treasury interpreting the Code.

(cc)    "Unanimous Consent" shall mean the written consent of all of the then Members of the Company.

## ARTICLE II

## MEMBERS AND MEMBERSHIP INTERESTS

2.01    <u>Members</u>. The Members of the Company shall be those Persons listed on <u>Exhibit B</u>. Except as otherwise may be provided in <u>Exhibit A</u> or <u>Exhibit B</u>, and except as provided in Section 7.05 below, a Person may be admitted as a Member to the Company only upon the affirmative vote of the Managers, plus one or more Members whose Percentage Interests total more than fifty percent (50%); provided, however, that no Person will be recognized as a Member of the

018906

HCMLPHMIT00004131

Company until he/she shall have executed this Agreement, or a counterpart hereto, and agrees to be bound by all of the terms and conditions hereof.

2.02    Annual Meetings    An annual meeting of the Members of the Company shall be held during each calendar year on such date and at such time as shall be designated from time to time by the Board of Managers and stated in the notice of the meeting, and if a legal holiday, then on the next business day following, at the time specified in the notice of the meeting.  At such meeting, the Members shall elect Managers and transact such other business as may properly be brought before the meeting.

2.03    Special Meetings    A special meeting of the Members may be called at any time by the President, the Board of Managers, or one or more Members whose Percentage Interests total at least 10%.  Only such business shall be transacted at a special meeting as may be stated or indicated in the notice of such meeting.

2.04    Place of Meetings    The annual meeting of Members may be held at any place within or without the State of Delaware as may be designated by the Board of Managers.  Special meetings of Members may be held at any place within or without the State of Delaware as may be designated by the person or persons calling such special meeting as provided in Section 2.03.  If no place for a meeting is designated, it shall be held at the registered office of the Company.

2.05    Notice.  Written or printed notice stating the place, day, and hour of each meeting of Members and, in case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than 10 days or more than 50 days before the date of the meeting, either personally or by mail, by or at the direction of the President, the Secretary, or the person calling the meeting, to each Member of record entitled to vote at such meeting.

2.06    Voting List    At least 10 days before each meeting of Members, the Secretary shall prepare a complete list of Members entitled to vote at such meeting, arranged in alphabetical order, including the address of each Member and the number of voting Interests held by each Member.  For a period of 10 days prior to such meeting, such list shall be kept on file at the registered office of the Company and shall be subject to inspection by any Member during usual business hours.  Such list shall be produced at such meeting, and at all times during such meeting shall be subject to inspection by any Member.  The membership interest transfer books shall be prima facie evidence as to who are the Members entitled to examine such list or membership interest transfer books.

2.07    Voting of Interests.  Interests held by the Company in treasury, Interests owned by a Person the majority of the voting interests of which are owned or controlled by the Company, and Interests held by the Company in a fiduciary capacity shall not be Interests entitled to vote or to be counted in determining the total number of outstanding Interests of the Company.  Interests held by an administrator, executor, guardian, or conservator may be voted by him or her, either in person or by proxy, without transfer of such Interests into his or her name so long as such Interests form a part of the estate and are in the possession of the estate being served by him or her.  Interests standing in the name of a trustee may be voted by him or her, either in person or by proxy, only after the Interests have been transferred into his or her name as trustee.  Interests standing in the name of a receiver may be voted by such receiver, and Interests held by or under the control of a receiver may be voted by such receiver without transfer of such Interests into his or her name if authority to do so is contained in the court order by which such receiver was appointed.  Interests standing in the name of another domestic or foreign corporation of any type or kind may be voted by such officer, agent, or proxy as the bylaws of such corporation may provide or, in the absence of such provision, as the board of directors of such corporation may by resolution determine.  A Member whose Interests are pledged shall be entitled to vote such Interests until they have been transferred into the name of the pledgee, and thereafter the pledgee shall be entitled to vote such Interests.

2.08    Quorum.  The presence in person or by proxy of one or more Members whose Percentage Interests total more than fifty percent (50%) shall constitute a quorum at any meeting of Members, except as otherwise provided by law, the Certificate, or this Agreement.  At any reconvening of an adjourned meeting at which a quorum shall be present or represented, any business may be transacted that could have been transacted at the original meeting if a quorum had been present or represented.

2.09    Vote; Withdrawal of Quorum.  If a quorum is present in person or represented by proxy at any meeting, except as otherwise may be provided in Exhibit A or Exhibit B, the vote of one or more Members whose Percentage Interests total more than fifty percent (50%) of all Members, whether or not they are present in person or represented by proxy, shall decide any question brought before such meeting, unless the question is one on which, by express provision of law, the

6

HCMLPHMIT00004132

Certificate, or this Agreement a different vote is required, in which event such express provision shall govern and control the decision of such question. The Members present at a duly convened meeting may continue to transact business until adjournment, notwithstanding any withdrawal of Members that may leave less than a quorum remaining.

2.10    Method of Voting; Proxies. Except as otherwise may be provided in Exhibit A or Exhibit B, each Member shall be entitled to that number of votes on each matter submitted to the Members for their vote equal to such Member's Percentage Interest multiplied by 100. At any meeting of Members, every Member having the right to vote may vote either in person or by a proxy executed in writing by the Member or by his duly authorized attorney-in-fact. Each such proxy shall be filed with the Secretary of the Company before or at the time of the meeting. No proxy shall be valid after 11 months from the date of its execution, unless otherwise provided in the proxy. If no date is stated on a proxy, such proxy shall be presumed to have been executed on the date of the meeting at which it is to be voted. Each proxy shall be revocable unless expressly provided therein to be irrevocable or unless otherwise made irrevocable by law.

2.11    Closing of Transfer Books; Record Date . For the purpose of determining Members entitled to notice of, or to vote at, any meeting of Members or any reconvening thereof, or entitled to receive payment of any distribution, or in order to make a determination of Members for any other proper purpose, the Board of Managers may provide that the membership interest transfer books of the Company shall be closed for a stated period but not to exceed in any event 50 days. If the membership interest transfer books are closed for the purpose of determining Members entitled to notice of, or to vote at, a meeting of Members, such books shall be closed for at least 10 days immediately preceding such meeting. In lieu of closing the membership interest transfer books, the Board of Managers may fix in advance a date as the record date for any such determination of Members, such date in any case to be not more than 50 days and not less than 10 days prior to the date on which the particular action requiring such determination of Members is to be taken. If the membership interest transfer books are not closed and if no record date is fixed for the determination of Members entitled to notice of, or to vote at, a meeting of Members or entitled to receive payment of a distribution, the date on which the notice of the meeting is to be mailed or the date on which the resolution of the Board of Managers declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members.

2.12    Presiding Officials at Meetings  The President shall preside at, and the Secretary shall prepare minutes of, each meeting of Members, and in the absence of either such officer, his other duties shall be performed by some person appointed at the meeting.

## ARTICLE III

## MANAGERS

3.01    Management. The business and affairs of the Company shall be managed EXCLUSIVELY by the Board of Managers. Subject to the restrictions imposed by law, the Certificate, or this Agreement, the Board of Managers may exercise all the powers of the Company.

3.02    Number; Election; Term; Qualification. The first Board of Managers shall consist of the number of Managers named in the Certificate and or otherwise in the Company documents. Thereafter, except as otherwise may be restricted by this Agreement, the number of Managers that shall constitute the entire Board of Managers shall be determined by resolution of the Board of Managers at any meeting thereof or by the Members at any meeting thereof, but shall never be less than one (1). At each annual meeting of Members, Managers shall be elected to hold office until the next annual meeting of Members and until their successors are elected and qualified. No Manager need be a Member, a resident of the State of Delaware, or a citizen of the United States.

3.03    Removal Except as otherwise may be provided by the Members, at any meeting of Members called expressly for that purpose, any Manager or the entire Board of Managers may be removed, with or without cause, by a vote of one or more Members whose Percentage Interests total more than fifty percent (50%).

3.04    Change in Number; Vacancies. No decrease in the number of Managers constituting the entire Board of Managers shall have the effect of shortening the term of any incumbent Manager. In the case of any increase in the number of Managers, or in the case of the death, retirement, resignation, or removal of a Manager, the vacancies to be filled by such increase or death, retirement, resignation, or removal may be filled by (a) the Board of Managers for a term of office

018908

HCMLPHMIT00004133

continuing only until the next election of one or more Managers by the Members; or (b) the Members at any annual or special meeting of the Members. A Manager elected to fill a vacancy shall be elected to serve for the unexpired term of his predecessor in office.

3.05     Place of Meetings .  The Board of Managers may hold its meetings in such place or places, including by telephonic or other electronic method of communication, within or without the State of Delaware as the Board of Managers may from time to time determine.

3.06     First Meeting .  Each newly elected Board of Managers may hold its first meeting, if a quorum is present, for the purpose of organization and the transaction of business immediately after and at the same place as the annual meeting of Members, and no notice of such meeting shall be necessary.

3.07     Regular Meetings .  Regular meetings of the Board of Managers may be held without notice at such times and places, including by telephonic or other electronic method of communication, as may be designated from time to time by resolution of the Board of Managers and communicated to all Managers. Regular meetings of the Board of Managers may be held when and if needed, and no more than one regular meeting of the Board of Managers shall be required in any calendar year.

3.08     Special Meetings .  A special meeting of the Board of Managers shall be held whenever called by any Manager at such time and place, including by telephonic or other electronic method of communication, as such Manager shall designate in the notice of such special meeting. The Manager calling any special meeting shall cause notice of such special meeting to be given to each Manager at least 24 hours before such special meeting. Neither the business to be transacted at, nor the purpose of, any special meeting of the Board of Managers need be specified in the notice or waiver of notice of any special meeting.

3.09     Quorum; Vote .  At all meetings of the Board of Managers, a majority of the Managers fixed in the manner provided in this Agreement shall constitute a quorum for the transaction of business. If a quorum is not present at a meeting, a majority of the Managers present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present. The vote of a majority of the Managers present at a meeting at which a quorum is in attendance shall be the act of the Board of Managers, unless the vote of a different number is required by law, the Certificate, or this Agreement.

3.10     Procedure; Minutes .  At meetings of the Board of Managers, business shall be transacted in such order as the Board of Managers may determine from time to time. The Board of Managers shall appoint at each meeting a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the meeting that shall be delivered to the Secretary of the Company for placement in the minute book of the Company.

3.11     Presumption of Assent .  A Manager of the Company who is present at any meeting of the Board of Managers at which action on any matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof, or shall forward any dissent by certified or registered mail to the Secretary of the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action.

3.12     Compensation .  Except as otherwise may be restricted in this Agreement, Managers, in their capacity as Managers, may receive, by resolution of the Board of Managers, a stated salary or a fixed sum and expenses of attendance, if any, for attending meetings of the Board of Managers. No Manager shall be precluded from serving the Company in any other capacity or receiving compensation therefor.

## ARTICLE IV

## COMMITTEES

4.01     Designation .  The Board of Managers may, by a resolution adopted by a majority of the entire Board of Managers, designate executive and other committees.

018909

HCMLPHMIT00004134

4.02   <u>Number; Qualification; Term</u> .   Each committee shall consist of one or more Managers appointed by resolution adopted by a majority of the entire Board of Managers.  The number of committee members may be increased or decreased from time to time by resolution adopted by a majority of the entire Board of Managers.  Each committee member shall serve as such until the expiration of his term as a Manager or his earlier resignation, unless sooner removed as a committee member or as a Manager.

4.03   <u>Authority</u> .   The executive committee, to the extent provided in the resolution establishing such committee, shall have and may exercise all of the authority of the Board of Managers in the management of the business and affairs of the Company.  Each other committee, to the extent expressly provided for in the resolution establishing such committee, shall have and may exercise all of the authority of the Board of Managers in such other matters and affairs concerning the Company.  However, no committee shall have the authority of the Board of Managers in reference to any of the following:

(a)   amending the Certificate;

(b)   approving a plan of merger or consolidation;

(c)   recommending to the Members the sale, lease, or exchange of all or substantially all of the property and assets of the Company other than in the usual and regular course of its business;

(d)   recommending to the Members a voluntary dissolution of the Company or a liquidation thereof;

(e)   filling vacancies in, or removing members of, the Board of Managers or of any committee thereof;

(f)   filling any vacancy to be filled by reason of an increase in the number of Managers;

(g)   electing or removing officers or committee members;

(h)   fixing the compensation of any committee member; or

(i)   altering or repealing any resolution of the Board of Managers that, by its term, provides that it shall not be amendable or repealable.

4.04   <u>Committee Changes</u> .   The Board of Managers shall have the power at any time to fill vacancies in, to change the Membership of, and to discharge any committee.  However, a committee member may be removed by the Board of Managers only if, in the judgment of the Board of Managers, the best interests of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

4.05   <u>Regular Meetings</u> .   Regular meetings of any committee may be held without notice at such times and places, including by telephonic or other electronic methods of communication, as may be designated from time to time by resolution of the committee and communicated to all committee members.

4.06   <u>Special Meetings</u> .   A special meeting of any committee may be held whenever called by any committee member at such time and place, including by telephonic or other electronic methods of communication, as such committee member shall designate in the notice of such special meeting.  The committee member calling any special meeting shall cause notice of such special meeting to be given to each committee member at least 24 hours before such special meeting.  Neither the business to be transacted at, nor the purpose of, any special meeting of any committee need be specified in the notice or waiver of notice of any special meeting.

4.07   <u>Quorum; Majority Vote</u> .   At all meetings of any committee, a majority of the number of committee members designated by the Board of Managers shall constitute a quorum for the transaction of business.  If a quorum is not present at a meeting of any committee, a majority of the committee members present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present.  The vote of a majority of the committee members present at any meeting at which a quorum is in attendance shall be the act of a committee, unless the vote of a different number is required by law, the Certificate, or this Agreement.

9

018910

HCMLPHMIT00004135

4.08   <u>Minutes</u> .  Each committee shall cause minutes of its proceedings to be prepared and shall report the same to the Board of Managers.  The minutes of the proceedings of each committee shall be delivered to the Secretary of the Company for placement in the minute books of the Company.

4.09   <u>Compensation</u> .  Except as otherwise may be restricted in this Agreement, committee members may, by resolution of the Board of Managers, be allowed a stated salary or a fixed sum and expenses of attendance, if any, for attending any committee meetings.

4.10   <u>Responsibility</u> .  The designation of any committee and the delegation of authority to it shall not operate to relieve the Board of Managers or any Manager of any responsibility imposed upon it or such Manager by law.

## ARTICLE V

## GENERAL PROVISIONS RELATING TO MEETINGS

5.01   <u>Notice</u>  Whenever by law, the Certificate, or this Agreement notice is required to be given to any Member, Manager, or committee member and no provision is made as to how such notice shall be given, it shall be construed to mean that notice may be given either (a) in person; (b) in writing, by mail; (c) by telegram, telex, cable, telecopy or facsimile transmission, or similar means; or (d) by any other method permitted by law.  Any notice required or permitted to be given hereunder (other than personal notice) shall be addressed to such Member, Manager, or committee member at his address as it appears on the books on the Company or, in the case of a Member, on the membership interest transfer records of the Company or at such other place as such Member, Manager, or committee member is known to be at the time notice is mailed or transmitted.  Any notice required or permitted to be given by mail shall be deemed to be delivered and given at the time when such notice is deposited in the United States mail, postage prepaid.  Any notice required or permitted to be given by telegram, telex, cable, telecopy or facsimile transmission, or similar means shall be deemed to be delivered and given at the time transmitted.

5.02   <u>Waiver of Notice</u> .  Whenever by law, the Certificate, or this Agreement any notice is required to be given to any Member, Manager, or committee member of the Company, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time notice should have been given, shall be equivalent to the giving of such notice.  Attendance of a Manager or Member at a meeting shall constitute a waiver of notice of such meeting, except where a Manager or Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

5.03   <u>Telephone and Similar Meetings</u>  Members, Managers, or committee members may participate in and hold a meeting by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other.  Participation in such a meeting shall constitute presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

5.04   <u>Action Without Meeting</u> .  Any action that may be taken, or is required by law, the Certificate, or this Agreement to be taken at a meeting of the Members, the Board of Managers, or a committee thereof may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by the Members owning the required Percentage Interests of all Members (as set forth herein for the respective action or decision), a majority of the  Managers or committee members, as the case may be, entitled to vote with respect to the subject matter thereof, and such consent shall have the same force and effect as a vote of such Members, Managers, or committee members, as the case may be, and may be stated as such in any document filed with the Secretary of State of Delaware or in any certificate or other document delivered to any person.  The consent may be in one or more counterparts so long as each Member, Manager, or committee member signs one of the counterparts.  The signed consent shall be placed in the minute books of the Company.

## ARTICLE VI

## OFFICERS AND OTHER AGENTS

018911

HCMLPHMIT00004136

6.01    Number; Titles; Election; Term    The Company shall have a president, one or more vice presidents (and, in the case of each vice president, with such descriptive title, if any, as the Board of Managers shall determine), a secretary, a treasurer, and such officers and agents as the Board of Managers may deem desirable.  The Board of Managers shall elect a president, vice president, treasurer, and secretary at its first meeting at which a quorum shall be present after the annual meeting of Members or whenever a vacancy exists.  The Board of Managers then, or from time to time, may also elect or appoint one or more other officers or agents as it shall deem advisable.  Except as otherwise may be provided by separate agreement, each officer and agent shall hold office for the term for which he is elected or appointed and until his successor has been elected or appointed and qualified.  Unless otherwise provided in the resolution of the Board of Managers electing or appointing an officer or agent, his term of office shall extend to and expire at the meeting of the Board of Managers following the next annual meeting of Members or, if earlier, at his death, resignation, or removal.  Any two or more offices may be held by the same person.  No officer or agent need be a Member, a Manager, a resident of the State of Delaware, or a citizen of the United States.

6.02    Removal .  Any officer or agent elected or appointed by the Board of Managers may be removed by a majority of the Board of Managers only if, in the judgment of a majority of the Board of Managers, the best interests of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.  Election or appointment of an officer or agent shall not of itself create contract rights.

6.03    Vacancies .  Any vacancy occurring in any office of the Company may be filled by the Board of Managers.

6.04    Authority .  Officers shall have such authority and perform such duties in the management of the Company as are provided in this Agreement or as may be determined by resolution of the Board of Managers not inconsistent with this Agreement.

6.05    Compensation .  Except as otherwise may be provided by separate agreement, the compensation, if any, of officers  or any salaried employee shall be fixed, increased, or decreased from time to time by the Board of Managers, provided, however, that the Board of Managers may by resolution delegate to any one or more officers of the Company the authority to fix such compensation.

6.06    Chairman of the Board .  The Chairman of the Board, if any, shall be an officer of the Company and, subject to the direction of the Board of Managers, shall perform such executive, supervisory, and management functions and duties as may be assigned to him from time to time by the Board of Managers.

6.07    President, CEO and COO .  The Board of Managers may designate and appoint a President, CEO and/or COO, with rights, duties and responsibilities established by the Board of Managers.

6.08    Vice Presidents .  Each Vice President shall have such powers and duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President and (in the order as designated by the Board of Managers, or in the absence of such designation, as determined by the length of time each has held the office of Vice President continuously) shall exercise the powers of the President during that officer's absence or inability to act.

6.09    Treasurer .  The Treasurer shall have custody of the Company's funds and securities, shall keep full and accurate accounts of receipts and disbursements, and shall deposit all moneys and valuable effects in the name and to the credit of the Company in such depository or depositories as may be designated by the Board of Managers.  The Treasurer shall audit all payrolls and vouchers of the Company; shall receive, audit, and consolidate all operating and financial statements of the Company and its various departments; shall supervise the accounting and auditing practices of the Company; and shall have charge of matters relating to taxation.  Additionally, the Treasurer shall have the power to endorse for deposit, collection, or otherwise all checks, drafts, notes, bills of exchange, and other commercial paper payable to the Company and to give proper receipts and discharges for all payments to the Company.  The Treasurer shall perform such other duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.

6.10    Assistant Treasurers .  Each Assistant Treasurer shall perform such duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.  The Assistant Treasurers (in the order as designated by the Board of Managers or, in the absence of such designation, as determined by the length of time each has held the office of Assistant Treasurer continuously) shall exercise the powers of the Treasurer.

018912

HCMLPHMIT00004137

6.11 <u>Secretary</u> .  The Secretary shall maintain minutes of all meetings of the Board of Managers, of any committee, and of the Members, or consents in lieu of such minutes, in the Company's minute books, and shall cause notice of such meetings to be given when requested by any person authorized to call such meetings.  The Secretary may sign with the President, in the name of the Company, all contracts of the Company and affix the seal of the Company thereto.  The Secretary shall have charge of the certificate books, membership interest transfer books, and other documents as the Board of Managers may direct, all of which shall at all reasonable times be open to inspection by any Manager at the office of the Company during normal business hours.  The Secretary shall perform such other duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.

6.12 <u>Assistant Secretaries</u> .  Each Assistant Secretary shall perform such duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.  The Assistant Secretaries (in the order designated by the Board of Managers or, in the absence of such designation, as determined by the length of time each has held the office of Assistant Secretary continuously) shall exercise the powers of the Secretary during that officer's absence or inability to act.

## <u>ARTICLE VII</u>

### <u>CAPITALIZATION AND CAPITAL ACCOUNTS</u>

7.01 <u>Capital Contributions</u> .  The Capital Contributions of the Members, as set forth in the books and records of the Company, shall be paid or transferred to the Company in cash and/or property on the terms and in the manner specified by the Board of Managers.  No Member shall be entitled to make any additional Capital Contributions except as provided in Section 7.02 and 7.03 below.

7.02 <u>Additional Capital Contributions</u> .  If the Board of Managers determine that additional capital is required for the purposes of the Company, as set forth herein, the Board of Managers may notify the Members of the need for such additional capital and shall state the specific purposes for which the call for such additional capital is being made.  Thereupon, all Members shall have the right (but not the obligation) to make additional Capital Contributions in cash and/or property to the Company aggregating the amount of additional capital needed by the Company in the proportion of their respective Percentage Interests in the Company at the time notice is given.  The Board of Managers shall use the additional capital so contributed solely for the purposes stated in the notice to the Members.

7.03 <u>Failure to Make Additional Capital Contributions</u> .  If any Member chooses not to contribute its share of the additional capital needed by the Company within 14 days after notice is given to the Members of the need for such additional capital (a "Non-Contributing Member"), then the other Members shall be entitled (but not obligated) to contribute the share of such Non-Contributing Member (such Members being referred to as "Contributing Members") of the additional capital needed pro rata according to such Contributing Members' Percentage Interests at such time or such other share as otherwise agreed upon by the Contributing Members.

7.04 <u>Effect of Failure to Make Additional Capital Contributions</u> .  In the event of a Non-Contributing Member, the Percentage Interests of all of the Members shall be recomputed on the following basis:  Each Member's Percentage Interest immediately following the computation shall equal the percentage expression of a fraction, the numerator of which is the total Capital Contributions of such Member plus the additional Capital Contribution, if any, made by such Member pursuant to Sections 7.02 and 7.03 above, and the denominator of which is the total Capital Contributions of all of the Members plus the additional Capital Contributions made by all of the Members pursuant to Sections 7.02 and 7.03 above.

7.05 <u>Recapitalization by Admission of Additional Members</u> .  If additional capital is required for the purposes of the Company as set forth herein and the Board of Managers is unable to finance such capital needs by borrowing the required amounts or through notice to the existing Members of the necessity for additional Capital Contributions as provided in Section 7.02 and 7.03 above, the Board of Managers shall have the right to admit additional Members to the Company, upon receiving the other approvals required herein.  Following the admission of one or more new Members, the Percentage Interest of each Member, including the newly admitted Member(s), shall be computed as follows:  Each Member's Percentage Interest immediately following the computation shall equal the percentage expression of a fraction, the numerator of which is the total Capital Contributions of such Member and the denominator of which is the total Capital Contributions of all of the Members, including the newly admitted Members.

12

018913

HCMLPHMIT00004138

7.06    <u>Maintenance of Capital Accounts</u> .  The Company shall maintain for each Member a separate Capital Account in accordance with this Section 7.06, which shall control the allocation of Profits and Losses and the division of assets upon liquidation of the Company as provided in Section 12.01.  Each Capital Account shall be maintained in accordance with the following provisions:

(a)    a Member's Capital Account shall initially be zero and shall be increased by the cash amount or Book Value of any property contributed by such Member to the Company pursuant to this Agreement, such Member's allocable share of Profits and any items in the nature of income or gains that are specially allocated to such Member pursuant to Section 8.02 and Section 8.03 hereof, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member;

(b)    such Capital Account shall be decreased by the cash amount or Book Value of any property distributed to such Member pursuant to this Agreement, such Member's allocable share of Losses and any items in the nature of deductions or losses that are specially allocated to such Member pursuant to Section 8.02 and Section 8.03 hereof, and the amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by such Member to the Company; and

(c)    if all or a portion of an Interest in the Company is Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest, provided, however, that if the Transfer causes a termination of the Company under Code Section 708(b)(1)(B), the assets of the Company shall be deemed to have been distributed to the Members (including the transferee of the Interest) in liquidation of the Company and recontributed by such Members and transferees in reconstitution of the Company.  Such deemed liquidation and reconstitution shall not cause the Company to be dissolved and/or reconstituted for purposes other than maintenance of the Capital Accounts and federal income tax.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Treasury Regulations and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  If the Board of Managers determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Board of Managers may authorize such modifications, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Sections 8.06 and 12.01 hereof.

7.07    <u>Negative Capital Accounts</u> .  If any Member has a deficit balance in its Capital Account, such Member shall have no obligation to restore such negative balance or to make any Capital Contribution to the Company by reason thereof, and such negative balance shall not be considered an asset of the Company or of any Member.

7.08    <u>Interest</u> .  No interest shall be paid by the Company on Capital Contributions or on balances in Capital Accounts.

7.09    <u>No Withdrawal</u> .  No Member shall be entitled to withdraw any part of his Capital Contribution or his Capital Account or to receive any distribution from the Company, except as provided in Sections 11.02 and 12.01 of this Agreement.

7.10    <u>Loans From Members</u> .  Loans by a Member to the Company shall not be considered Capital Contributions.

**ARTICLE VIII**

**ALLOCATIONS AND DISTRIBUTIONS**

8.01    <u>Allocation of Profits and Losses</u>.

(a)    <u>Allocation of Profits</u>.  Except as provided on any Exhibit hereto, after giving effect to the allocations set forth in Section 8.02 and Section 8.03, and after giving effect to all distributions of cash or property (other than cash or

13

property to be distributed pursuant to Section 12.01), Profits for any Fiscal Year shall be allocated to the Members in the following manner:

(i)    first, to each Member with a negative balance in its Capital Account, pro rata in accordance with such negative Capital Account balances, until such negative Capital Account balances have been eliminated;

(ii)    next, to all of the Members in accordance with their respective Percentage Interests.

(b)    <u>Allocation of Losses</u>.  Except as provided in any Exhibit hereto, after giving effect to the allocations set forth in Section 8.02 and Section 8.03, Losses for any Fiscal Year shall be allocated to the Members in the following manner:

(i)    to all of the Members in accordance with their respective Percentage Interests.

8.02    <u>Special Allocations of Profits and Losses</u> .

(a)    <u>Minimum Gain Chargeback–Company Nonrecourse Liabilities</u>.  If there is a net decrease in Company minimum gain during any Fiscal Year, certain items of income and gain shall be allocated (on a gross basis) to the Members in the amounts and manner described in Treasury Regulations Section 1.704-2(f) and (j)(2)(i) and (ii), subject to the exemptions set forth in Treasury Regulations Section 1.704-2(f)(2), (3), (4) and (5).  This Section 8.02(a) is intended to comply with the minimum gain chargeback requirement set forth in Treasury Regulations Section 1.704-2(f) relating to Company nonrecourse liabilities, as defined in Treasury Regulations Section 1.704-2(b)(3) and shall be so interpreted.

(b)    <u>Minimum Gain Chargeback–Member Nonrecourse Debt</u>.  If there is a net decrease in Member minimum gain during any Fiscal Year, certain items of income and gain shall be allocated (on a gross basis) as quickly as possible to those Members who had a share of the Member minimum gain determined pursuant to Treasury Regulations Section 1.704-2(i)(5) in the amounts and manner described in Treasury Regulations Sections 1.704-2(i)(4), (j)(2)(ii), and (j)(2)(iii).  This Section 8.02(b) is intended to comply with the minimum gain chargeback requirement set forth in Treasury Regulations Section 1.704-2(i)(4) relating to Member nonrecourse debt, as defined in Treasury Regulations Section 1.704-2(b)(4) and shall be so interpreted.

(c)    <u>Qualified Income Offset</u>.  If, after applying Section 8.02(a) and Section 8.02(b), any Member has an adjusted Capital Account deficit, items of Company income and gain shall be specially allocated (on a gross basis) to each such Member in an amount and manner sufficient to eliminate the adjusted Capital Account deficit of such Member as quickly as possible.  This Section 8.02(c) is intended to comply with the "qualified income offset" requirement set for the in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be so interpreted.

(d)    <u>Optional Basis Adjustments</u>.  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken in to account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

(f)    <u>Partner Nonrecourse Deductions</u>.  Partner Nonrecourse Deductions shall be allocated pursuant to Treasury Regulations Section 1.704-2(b)(4) and (i)(1) to the Member who bears the economic risk of loss with respect to such deductions.

8.03    <u>Curative Allocations</u> .  The Regulatory Allocations are intended to comply with certain requirements of the Treasury Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 8.03.  Therefore, notwithstanding any other provisions of this Article VIII, the Board of Managers shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 8.01(a) and Section 8.01(b) hereof.

14

HCMLPHMIT00004140

8.04    Tax Allocations: Code Section 704(c) .

(a)    In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Book Value.

(b)    If the Book Value of any Company asset is adjusted pursuant to Section 1.04(e)(ii) hereof, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder.

(c)    Any elections or other decisions relating to such allocation shall be made by the Board of Managers. Allocations pursuant to this Section 8.04 are solely for purposes of federal, state, and local taxes and shall not affect or in any way be taken into account in computing any Member's Capital Account, or share of Profits, Losses, and other items or distribution pursuant to any provision of this Agreement.

8.05    Other Allocation Rules .

(a)    For purposes of determining the Profits, Losses, or any other item allocable to any period, Profits, Losses, and any such other item shall be determined on a daily, monthly, or other   basis, as determined by the Board of Managers using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

(b)    For federal income tax purposes, every item of income, gain, loss, and deduction shall be allocated among the Members in accordance with the allocations under Sections 8.01, 8.02, 8.03, and 8.04.

(c)    The Members are aware of the income tax consequences of the allocations made by this Article VIII and hereby agree to be bound by the provisions of this Article VIII in reporting their shares of Company income and loss for income tax purposes.

(d)    It is intended that the allocations in Sections 8.01, 8.02, 8.03, and 8.04 hereof effect an allocation for federal income tax purposes consistent with Section 704 of the Code and comply with any limitations or restrictions therein.

8.06    Distributions of Distributable Cash .  Except as otherwise may be provided in this Agreement, the Board of Managers shall cause the Company to make distributions of Distributable Cash at such intervals and in such amounts as the Board of Managers in its sole discretion shall determine by majority vote.   Distributions of Distributable Cash shall be made to all of the Members in accordance with their respective Percentage Interests.

8.07    Working Cash Reserve .  The Board of Managers may from time to time establish a working cash reserve for capital expenditures, unforeseen contingencies, projected operating deficits, and other corporate purposes and may increase or decrease the amount in such reserve in its business judgment.

## ARTICLE IX

## CERTIFICATES

9.01    Certificated and Uncertificated Interests.   The membership interests of the Company may be either certificated interests or uncertificated interests.  As used herein, the term "certificated interests" means Interests represented by instruments in bearer or registered form, and the term "uncertificated interests" means Interests not represented by such instruments and the transfers of which are registered upon books maintained for that purpose by or on behalf of the Company.

9.02    Certificates for Certificated Interests .  The certificates for certificated interests shall be in such form as shall be approved by the Board of Managers in conformity with law.  The certificates shall be consecutively numbered, shall be entered as they are issued in the books of the Company or in the records of the Company's designated transfer agent, if any, and shall state the Member's name, the class of Interests, the Percentage Interest that such Interest represents, and such

018916

HCMLPHMIT00004141

other matters as may be required by law. The certificates shall be signed by the President or any Vice President and also by the Secretary, an Assistant Secretary, or any other officer, and may be sealed with the seal of the Company or a facsimile thereof. If any certificate is countersigned by a transfer agent or registered by a registrar, either of which is other than the Company itself or an employee of the Company, the signatures of the foregoing officers may be a facsimile.

9.03 Lost, Stolen, or Destroyed Certificates. The Company shall issue a new certificate in place of any certificate for Interests previously issued if the registered owner of the certificate satisfies the following requirements:

(a) the registered owner makes proof in affidavit form that a previously issued certificate for Interests has been lost, destroyed, or stolen;

(b) the registered owner requests the issuance of a new certificate before the Company has notice that the certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

(c) the registered owner gives a bond in such form, and with such surety or sureties, with fixed or open penalty, as the Board of Managers may direct, in its discretion, to indemnify the Company (and its transfer agent and registrar, if any) against any claim that may be made on account of the alleged loss, destruction, or theft of the certificate; and

(d) the registered owner satisfies any other reasonable requirements imposed by the Board of Managers.

When a certificate has been lost, destroyed, or stolen and the Member of record fails to notify the Company within a reasonable time after he has notice of it, if the Company registers a transfer of the Interests represented by the certificate before receiving such notification, the Member of record is precluded from making any claim against the Company for the transfer or for a new certificate.

9.04 Transfer of Interests. Interests of the Company shall be transferable only on the books of the Company by the Members thereof in person or by their duly authorized attorneys or legal representatives, but only as authorized in this COMPANY AGREEMENT. With respect to certificated interests, upon surrender to the Company or the transfer agent of the Company of a certificate representing Interests duly endorsed or accompanied by proper evidence of succession, assignment, or authority to transfer, the Company or its agent shall issue a new certificate to the person entitled thereto, cancel the old certificate, and record the transaction upon its books. With respect to uncertificated interests, upon delivery to the Company of proper evidence of succession, assignment, or authority to transfer, the Company or its agent shall record the transaction upon its books.

9.05 Registered Members. The Company shall be entitled to treat the Member of record as the Member in fact of any Interests and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Interests on the part of any other Person, whether or not it shall have actual or other notice thereof, except as otherwise provided by law.

9.06 Legends. If the Company is authorized to issue Interests of more than one class, each certificate representing Interests issued by the Company (a) shall conspicuously set forth on the face or back of the certificate a full statement of all of the designations, preferences, limitations, and relative rights of the Interests of each class authorized to be issued; or (b) shall conspicuously state on the face or back of the certificate that (i) such a statement is set forth in the Certificate on file in the office of the Secretary of State or in this Agreement; and (ii) the Company will furnish a copy of such statements to the record holder of the certificate without charge on written request to the Company at its principal place of business or registered office.

If the Company issues any Interests that are not registered under the Securities Act of 1933, the transfer of any such interests shall be restricted in accordance with an appropriate legend.

In the event any restriction on the transfer, or registration of the transfer, of Interests shall be imposed or agreed to by the Company, each certificate representing Interests so restricted (a) shall conspicuously set forth a full or summary statement of the restriction on the face of the certificate; (b) shall set forth such statement on the back of the certificate and conspicuously refer to the same on the face of the certificate; or (c) shall conspicuously state on the face or back of the certificate that such a restriction exists pursuant to a specified document and (i) that the Company will furnish to the record holder of the certificate without charge upon written request to the Company at its principal place of business or registered

16

HCMLPHMIT00004142

office a copy of the specified document; or (ii) if such document is one required or permitted by law to be and has been filed, that such specified document is on file in the office of the Secretary of State and contains a full statement of such restriction.

## ARTICLE X

### ACCOUNTING AND RECORDS

10.01    <u>Records and Accounting</u> .  The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal income tax purposes.  The books and records of the Company shall reflect all Company transactions and shall be appropriate and adequate for the Company's business.

10.02    <u>Access to Accounting Records</u> .  All books and records of the Company shall be maintained at any office of the Company or at the Company's principal place of business, and each Member owning a Percentage Interest of at least ten percent (10%), and his duly authorized representative, shall have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

10.03    <u>Annual and Tax Information</u> .  The Company shall deliver to each Member within 90 days after the end of each Fiscal Year all information necessary for the preparation of such Member's federal income tax return.  The Company shall prepare, within 120 days after the end of each Fiscal Year, a financial report of the Company for such Fiscal Year, containing a statement of the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

10.04    <u>Accounting Decisions</u> .  All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Board of Managers.  The Members may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

10.05    <u>Federal Income Tax Elections</u> .  The Company may make all elections for federal income tax purposes, including, but not limited to, the following:

(a)    to the extent permitted by applicable law and regulations, the election to use an accelerated depreciation method on any depreciable unit of the assets of the Company; and

(b)    in case of a transfer of all or part of the Interest of any Member, the election pursuant to Section 734, 743, and 754 of the Code, as amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company.

## ARTICLE XI

### CHANGES IN MEMBERS

The provisions of this Article XI are subject to, and may be superceded by, one or more separate agreements entered into by and among one or more Members.  The provisions of this Article XI shall continue to control with respect to matters not covered by, or Members not parties to, such agreement(s).

11.01    <u>Intentionally Blank</u> .

11.02    <u>Transfer and Assignment of Members' Interest</u> .  Except as approved by the Manager, plus a Member or Members owning a Percentage Interest greater than fifty percent (50%), no Member shall be entitled to Transfer any part of its Interest in the Company.  The Company and, if applicable, the remaining Members shall be entitled to match the terms of the proposed Transfer, with consideration being only set forth in traditional monetary terms.  If the Company and the remaining Members fail to match the proposed Transfer with regard to the purchase of the entire Interest, or portion thereof, the Member proposing to make the Transfer may move forward with the proposed Transfer.  Transfers in violation of this Section 11.02 shall be effective only to the extent set forth in Section 11.05(b) hereof.

018918

HCMLPHMIT00004143

11.03   <u>Further Restrictions on Transfer</u>.  No Member shall Transfer any part of his Interest in the Company:  (i) without registration under applicable federal and state securities laws, or unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not required; or (ii) if the Interest to be sold or exchanged, when added to the total of all other Interests to be sold or exchanged in the preceding 12 consecutive months prior thereto, would result in the termination of the Company under Code Section 708.

11.04   <u>Substitute Members</u>.  A transferee shall have the right to become a substitute Member if (a) the requirements of Section 11.02 and 11.03 hereof are met; (b) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of this Agreement; and (c) such person pays any reasonable expenses in connection with his or her admission as a Member.

11.05   <u>Effect of Transfer</u>.

(a)   Any permitted Transfer of all or any portion of a Member's Interest in the Company will take effect on the first day of the month following receipt by the Members of written notice of Transfer.  Any transferee of an Interest in the Company shall take subject to the restrictions on Transfer imposed by this Agreement.

(b)   Upon any Transfer of a Member's Interest in the Company in violation of this Agreement, and if such Member's Interest is not purchased pursuant to Section 11.01, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member, but such transferee shall be entitled to receive only the allocable share of Profits, Losses, Distributive Cash, and other items to which the transferor of such Interest in the Company would otherwise be entitled.

11.06   <u>No Dissolution or Withdrawal: Advanced Consent</u>.  Upon the occurrence of a Dissolution Event with regard to a respective Member, all remaining Members shall be deemed to automatically consent to the continuation of the business of the Company.  By executing this Agreement, however, all Members hereby consent that they shall not voluntarily cause a Dissolution Event or demand the return of Member's capital.  If any Member shall breach the agreement represented by this Section 11.06, the agreement of such breaching Member shall not be specifically performable, but shall be actionable for damages, and shall be deemed an offer of the Interest of such breaching Member for sale pursuant hereto.  The parties agree that a reasonable approximation of the damage that the Company shall experience due to breach hereof is 20% of the value of the breaching Member's Interest, or as otherwise set forth herein (whichever is greater), which shall be deducted from any payments to such Member upon dissolution or purchase of such Member's Interest hereunder.  The value of the breaching Member's Interest shall be determined pursuant to Section 11.01, to which value the said discount may then be applied in determining payments due to the breaching Member pursuant to the deemed offer of sale occurring under this Section 11.06.

**ARTICLE XII**

**TERMINATION**

12.01   <u>Termination of the Company</u>.

(a)   The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following events:

(i)   a determination by the Managers, plus the Unanimous Consent of the Members that the Company should be dissolved;

(ii)   a sale of all or substantially all of the assets of the Company;

(iii)   the expiration of the Company's term as stated in its Certificate; or

(iv)   at such earlier time as provided by applicable law.

18

HCMLPHMIT00004144

(b)      In settling accounts of the Company after dissolution, the liabilities of the Company shall be entitled to payment and the assets of the Company remaining thereafter shall be distributed to the Members in the following order, all as required by the DELAWARE LAWS:

(i)      those to creditors, in the order of priority as provided by law, except those to Members of the Company on account of their Capital Contributions;

(ii)      to the Members, pro rata, in accordance with the positive balances, if any, in their Capital Accounts; and

(iii)      to the Members in proportion to their relative Percentage Interests.

## ARTICLE XIII

## INDEMNIFICATION

13.01    <u>Indemnification of Members, Managers, and Other Persons</u> .

(a)      To the greatest extent not inconsistent with the laws and public policies of Delaware, the Company shall indemnify any Member, Manager, or officer of the Company made a party to any proceeding because such individual is or was a Member, Manager, or officer of the Company (an "Indemnitee"), as a matter of right, against all liability incurred by such individual in connection with any proceeding; provided that it shall be determined in the specific case in accordance with subsection (d) of this Section 13.01 that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section 13.01.  The Company shall advance, pay for, or reimburse the reasonable expenses incurred by an Indemnitee in connection with any such proceeding in advance of final disposition thereof if (i) the Indemnitee furnishes the Company a written affirmation of the Indemnitee's good faith belief that he or she has met the standard of conduct for indemnification described in subsection (c) of this Section 13.01; (ii) the Indemnitee furnishes the Company a written undertaking, executed personally or on such Indemnitee's behalf, to repay the advance if it is ultimately determined that such individual did not meet such standard of conduct; and (iii) a determination is made in accordance with subsection (d) that based upon facts then known to those making the determination, indemnification would not be precluded under this Section 13.01.  The undertaking described in subsection (a)(ii) above must be a general obligation of the Indemnitee, subject to such reasonable limitations as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment.  The Company shall indemnify an Indemnitee who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the individual in connection with the proceeding without the requirement of a determination as set forth in subsection (c) of this Section 13.01.  Upon demand by an Indemnitee for indemnification or advancement of expenses, as the case may be, the Company shall expeditiously determine whether the Indemnitee is entitled thereto in accordance with this Section 13.01.  The indemnification and advancement of expenses provided for under this Section 13.01 shall be applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section 13.01.

(b)      The Company shall have the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a Member, Manager, or officer of the Company.

(c)      Indemnification is permissible under this Section 13.01 only if (i) the Indemnitee conducted himself in good faith; (ii) he or she reasonably believed that his conduct was in, or at least not opposed to, the Company's best interest; (iii) in the case of any criminal proceeding, he or she had no reasonable cause to believe his conduct was unlawful; and (iv) such Indemnitee is not adjudged in any such proceeding to be liable for gross negligence or willful misconduct in the performance of duty.  The termination of a proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent is not, of itself, determinative that the Indemnitee did not meet the standard of conduct described in this subsection (c).

(d)      A determination as to whether indemnification or advancement of expenses is permissible shall be made by any one of the following procedures:

018920

HCMLPHMIT00004145

(i)      by the Board of Managers or by a majority vote consisting of Members not at the time parties to the proceeding; or

(ii)      by special legal counsel selected by the Members in the manner prescribed in subsection (d)(i) above.

(e)      An Indemnitee of the Company who is a party to a proceeding may apply for indemnification from the Company to the court, if any, conducting the proceeding or to another court of competent jurisdiction.  On receipt of an application, the court, after giving notice the court considers necessary, may order indemnification if it determines:

(i)      in a proceeding in which the Indemnitee is wholly successful, on the merits or otherwise, the Indemnitee is entitled to indemnification under this Section 13.01, in which case the court shall order the Company to pay the Indemnitee his or her reasonable expenses incurred to obtain such court ordered indemnification; or

(ii)      the Indemnitee is fairly and reasonably entitled to indemnification in view of all the relevant circumstances, whether or not the Indemnitee met the standard of conduct set forth in subsection (c) of this Section 13.01.

(f)      Indemnification shall also be provided for an Indemnitee's conduct with respect to an employee benefit plan if the individual reasonably believed his or her conduct to be in the interests of the participants in and beneficiaries of plan.

(g)      Nothing contained in this Section 13.01 shall limit or preclude the exercise or be deemed exclusive of any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual who is or was a Member, Manager, or officer of the Company or is or was serving at the Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise, whether for profit or not.  Nothing contained in this Section 13.01 shall limit the ability of the Company to otherwise indemnify or advance expenses to any individual.  It is the intent of this Section 13.01 to provide indemnification to Indemnitees to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section 13.01.  Indemnification shall be provided in accordance with this Section 13.01 irrespective of the nature of the legal or equitable theory upon which a claim is made, including, without limitation, negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

(h)      For purposes of this Section 13.01:

(i)      The term "expenses" includes all direct and indirect costs (including, without limitation, counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement, or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section 13.01, applicable law, or otherwise.

(ii)      The term "liability" means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(iii)      The term "party" includes an individual who was, is, or is threatened to be made a named defendant or respondent in a proceeding.

(iv)      The term "proceeding" means any threatened, pending, or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative and whether formal or informal.

(v)      The Company may purchase and maintain insurance for its benefit, the benefit of any individual who is entitled to indemnification under this Section 13.01, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the Company, whether or not the Company would have the power to indemnify such individual against such liability.

018921

HCMLPHMIT00004146

## ARTICLE XIV

### MISCELLANEOUS

14.01    <u>Complete Agreement</u> .  This Agreement, the Certificate, and all other organizational documents signed by all of the Members constitute the complete and exclusive statement of agreement among the Members with respect to the matters herein.  This Agreement and the Certificate replace and supersede all prior agreements by and among the Members or any of them, and no representation, statement, or condition or warranty not contained in this Agreement or the Certificate will be binding on the Members or have any force or effect whatsoever.

14.02    <u>Governing Law</u> .  This Agreement and the rights of the parties hereunder will be governed by, interpreted, and enforced in accordance with the laws of the State of Delaware.

14.03    <u>Binding Effect</u> .  Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective distributes, successors, and assigns.

14.04    <u>Terms</u> .  Common nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require.  Any reference to the DELAWARE LAWS, the Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

14.05    <u>Headings</u> .  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

14.06    <u>Severability</u> .  If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of this Agreement, such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement.  Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there will be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

14.07    <u>Multiple Counterparts</u> .  This Agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same instrument.  However, in making proof hereof it will be necessary to produce only one copy hereof signed by the party to be charged.

14.08    <u>Additional Documents and Acts</u> .  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out, and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

14.09    <u>No Third-Party Beneficiary</u> .  This Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

14.10    <u>References to this Agreement</u> .  Numbered or lettered articles, sections, and subsections herein contained refer to articles, sections, and subsections of this Agreement unless otherwise expressly stated.

14.11    <u>Notices</u> .  Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice.  Such notices will be given to a Member at the address specified in <u>Exhibit B</u> hereto.  Any Member or the Company may, at any time by giving five days' prior written notice to the other Members and the Company, designate any other address in substitution of the foregoing address to which such notice will be given.

018922

HCMLPHMIT00004147

14.12    <u>Amendments</u> .  Except as otherwise may be provided in this Agreement, all amendments to this Agreement must be approved by the Managers, plus one or more Members whose aggregate Percentage Interests total more than fifty percent (50%).

14.13    <u>Title to Company Property</u> .  Legal title to all property of the Company will be held and conveyed in the name of the Company.

14.14    <u>Reliance on Authority of Person Signing Agreement</u> .  In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual; or (b) be required to see to the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

14.15    <u>S-Corp Election</u> .  In the event the Company elects to be treated as a S-Corporation for federal tax purposes, the provisions in this Company Agreement addressing tax treatment shall be automatically amended and modified as required in order to pertain to a S-corporation.

14.16    <u>Company Indemnification</u> .  In the event any Member is personally liable for any debt or obligations associated with a Company asset, then the Company agrees to indemnify such Member for any such debt or obligation in excess of his or her proportionate amount of such debt or obligation that he/she is required to pay or perform, as measured by the Percentage Interest of the Members, except as otherwise agreed by the Members.

*14.17    <u>**Management by Members**</u>.  **The Certificate of the Company and other Company documents/agreements on file and/or executed by the Member may reflect management by members, and not management by managers.  As a result, if such is the case and the Certificate is not amended to reflect management by managers, this Agreement shall be interpreted in such a manner that all references herein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President.***

018923

HCMLPHMIT00004148

IN WITNESS WHEREOF, the Members have executed this Agreement to be effective as of the date first written above.

**THE MEMBER (OR MANAGING MEMBER)**

RAND ADVISORS HOLDING CORP.,
a Delaware corporation

By: _____

       Mark Patrick, Director and President

018924
HCMLPHMIT00004149

## EXHIBIT A

THE CLASS A MEMBERS AND INTERESTS

The sole Class A Member shall be RAND ADVISORS HOLDING CORP., a Delaware corporation, and it shall own the Percentage Interest set forth on Exhibit "B" hereto.  In addition to such other rights as a Member described in this Agreement, the holders of record of the Class A Interests shall have no additional rights.

018925

HCMLPHMIT00004150

## EXHIBIT B

The Members

| Members and Addresses | Date Admitted | Class A Interest | Percentage Interest |
|---|---|---|---|
| RAND ADVISORS HOLDING CORP. 2101 Cedar Springs Road Suite 1200, Dallas, TX 75201 Attn: Mark Patrick | 8/1/2022 | 100% | 100% |

25

HCMLPHMIT00004151

**EXHIBIT 84**

018927

AMENDED AND RESTATED COMPANY AGREEMENT

*of*

RAND ADLISORSF, , C

A Delaware , imited , iability Company

018928

HCMLPHMIT00004152

## AMENDED AND RESTATED COMPANY AGREEMENT

*of*

### RAND ADLISORSF, , C

### A Delaware , imited , iability Company

This AMENDED AND RESTATED COMPANY AGREEMENT (collectivelyF the "AgreementF" which shall include all amendments and exhibits hereto) dated effective as of the 1ˢᵗ day of AugustF 2022 (the "Effective Date")F are entered into by and among those Persons executing the signature page hereto as the Members of RAND ADLISORSF, , CFa Delaware limited liability company (the "Company"). All capitalized terms not defined in the instance of first usage shall have the respective meanings associated with such terms in Section 1.04 below.

### ARTIC‚ E I

### INTRODUCTION

1.01   9ormation of , imited , iability Company   The Company was formed by the filing of the Certificate of 9ormation (the "Certificate") with the Secretary of State of Delaware on the August 25F201' . The Companyʲs business shall be conducted under the name "RAND ADLISORSF, , C" until such time as the Members shall hereafter designate otherwise and file amendments to the Certificate in accordance with applicable law. This Agreement amends and replacesF in its entiretyFall prior governing agreements for the CompanyFincluding but not limited to that certain Amended and Restated , imited , iability Company Agreement dated March 1F201Wand any and all amendments thereto.

This Agreement is sub3ect toF and governed byF the Delaware laws governing limited liability companies (the "DE, AB ARE , AB S") and the Certificate. In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the DE, AB ARE , AB S or the provisions of the CertificateF such provisions of the DE, AB ARE , AB S or the CertificateFas the case may beFwill be controlling.

1.02   Registered Office and Agent   The registered office and registered agent of the Company initially shall be as set forth in the Certificate and may be changed from time to time by the appropriate filing by the Company in the office of the Secretary of State of Delaware.

1.0'   Other Offices   The Company may also have offices at such other placesFboth within and without the State of DelawareFas the q oard of Managers may from time to time determine or the business of the Company may re: uire.

1.04   Defined Terms   The terms used in this Agreement with their initial letter capitalized shallF unless the context re: uires otherwiseFhave the meanings specified in this Section 1.04. The singular shall include the plural and the masculine gender shall include the feminine and neuterF and vice versaF as the context re: uires. B hen used in this AgreementFthe following terms shall have the meanings set forth below"

(a)   -DE, AB ARE , AB S- shall mean the Delaware laws governing limited liability companiesFas the same may be amended from time to time.

(b)   "Affiliate" shall meanFas to any PersonFany Person controlled byFcontrollingFor under common control with such PersonFandFin the case of a Person who is an individualFa member of the family of such individual consisting of a spouseF siblingFinlawF lineal descendantF or ancestor (including by adoption). 9or purposes of this definitionF "control" (including the terms "controlling"F"controlled by" and "under common control with") of a Person means the possessionF directly or indirectlyFalone or in concert with othersFof the power to direct or cause the direction of the management and policies of such PersonFwhether through the ownership of securitiesFby contract or otherwiseFand no Person shall be deemed in control of another solely by virtue of being a directorFofficer or holder of voting securities of any entity. A Person shall be presumed to control any partnership of which such Person is a general partner.

2

018929

HCMLPHMIT00004153

(c)      -Bankruptcy- shall mean and a Member shall be deemed a -Bankrupt Member- upon (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any Debtor Relief Laws' (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property' (iii) the ordering of the winding up or liquidation of the Member's affairs' (iv) the filing of a petition in any involuntary bankruptcy case, which petition remains undismissed for a period of 1U0 days or which is not dismissed or suspended pursuant to Section '0V of the 9ederal Bankruptcy Code (or any corresponding provision of any future 7nited States bankruptcy law)' (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law, now or hereafter in effect' (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property' or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(d)      "Bankruptcy; Depreciation" for any asset shall mean for any 9iscal Year or other period an amount that bears the same ratio to the Boo; Lalue of that asset at the beginning of such 9iscal Year or other period as the federal income tax depreciation, amortization, or other cost recovery deduction allowable for that asset for such year or other period bears to the adjusted tax basis of that asset at the beginning of such year or other period.  If the federal income tax depreciation, amortization, or other cost recovery deduction allowable for any asset for such year or other period is zero, then Boo; Depreciation for that asset shall be determined with reference to such beginning Boo; Lalue using any reasonable method selected by the Board of Managers.

(e)      "Boo; Lalue" shall mean for any asset the asset's adjusted tax basis, except as follows"

(i)      the initial Boo; Lalue of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Board of Managers'

(ii)      the Boo; Lalues of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board of Managers, as of one of the following times" (1) on the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution if the Board of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company' (2) on the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an Interest in the Company if the Board of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company' and (') on the liquidation of the Company within the meaning of Section 1.504kl(b)(2)(ii)(g) of the Treasury Regulations'

(iii)      the Boo; Lalue of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution'

(iv)      the Boo; Lalues of Company assets shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Code Section 5'4(b) or Code Section 54'(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.504kl(b)(2)(iv)(m) of the Treasury Regulations and Section U02(d) hereof' provided, however, that Boo; Lalues shall not be adjusted pursuant to this Section 1.04(e)(iv) to the extent the Board of Managers determines that an adjustment pursuant to Section 1.04(e)(ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 1.04(e)(iv)' and

(v)      if the Boo; Lalue of an asset has been determined or adjusted pursuant to Section 1.04(e)(i), 1.04(e)(ii), or 1.04(e)(iv) hereof, such Boo; Lalue shall thereafter be adjusted by the Boo; Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

(f)      -Capital Contribution- shall mean the total value of cash and Boo; Lalue (except as otherwise herein provided) of property contributed and agreed to be contributed to the Company by each Member, as shown in <u>Exhibit A</u>, attached hereto and incorporated herein for all purposes, as the same may be amended from time to time.  Any reference in this Agreement to the Capital Contribution of a then Member shall include a Capital Contribution previously made by any

'

HCMLPHMIT00004154

prior Member for the interest of such then Member reduced by any distribution to such Member in return of its capital as contemplated herein.

(g)    "Class A Interest" shall refer to the Interest of a Class A Member in the Profits, osses, Distributable Cash, and assets upon li: uidation of the Company as described in this Agreement.

(h)    "Class A Members" shall mean those Persons listed on Exhibit A and designated as "Class A Members." The Class A Members shall have such additional rights as a Member as are specifically described and granted in Exhibit A, as amended from time to time.

(i)    Intentionally q lan; .

(3)    Intentionally q lan; .

(; )    -Code- shall mean the Internal Revenue Code of 16UW, as amended.  All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

(l)    -Company- shall refer to the limited liability company created by virtue of the Certificate and this Agreement and any successor in interest.

(m)    "Debtor Relief , aws" shall mean any federal or state ban; ruptcy, insolvency, or similar laws generally affecting the rights of creditors and the relief of debtors now or hereafter in effect.

(n)    Intentionally q lan; .

(o)    -Distributable Cash- of the Company shall mean all cash funds of the Company on hand from time to time (other than cash funds obtained as Capital Contributions by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time' (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time' and (iii) provision for a wor; ing cash reserve in accordance with Section U05 below.

(p)    "9iscal Year" shall mean the calendar year.

(: )    "9ormer Member" shall mean a member that causes a Dissolution Event.

(r)    -Interest- in the Company shall mean the entire ownership interest of a Member in the Company at any particular time, including such Member's Capital Account, allocable share of Profits, osses, and Distributable Cash, and the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement, together with the obligations of such Member to comply with all of the terms and provisions of this Agreement.

(s)    Intentionally q lan;

(t)    -Manager- shall mean an individual elected to the q oard of Managers of the Company pursuant to Sections ' .02 and ' .04 below.

(u)    -Member(s)- shall mean all Members admitted to the Company hereafter as Members who shall consent to the terms hereof and shall be admitted pursuant to the provisions hereof.  The names, business or residence addresses, Capital Contributions, Percentage Interest, and class of Interest of the Members shall be set forth on Exhibit q attached hereto and incorporated herein by reference.  Reference to a -Member- shall be to any one of the Members.

(v)    -Percentage Interest- of a Member shall mean the percentage of such Member set forth opposite the name of such Member under the column -Percentage Interest- in Exhibit q, as such percentage may be ad3usted from time to time pursuant to the terms hereof.

(w)    "Person" shall mean any individual, corporation, partnership, limited liability company or partnership, association, organization, trust, estate, or other entity.

4

018931

HCMLPHMIT00004155

(x) -Pro Rata Part- shall mean the percentage expression of a fraction the numerator of which is a Member's respective Percentage Interest and the denominator of which is the aggregate Percentage Interests of all Members involved in the respective transaction or having a respective right or option.

(y) "Profits" and ", osses" shall mean Ffor each 9iscal Year or other period Fan amount e: ual to the Company's taxable income or loss for such year or period Fdetermined in accordance with Code Section 50' (a) (for this purpose Fall items of income Fgain Floss For deduction re: uired to be stated separately pursuant to Code Section 50' (a)(1) shall be included in taxable income or loss) Fwith the following ad3ustments"

(i) income of the Company that is exempt from federal income tax and not otherwise ta; en into account in computing Profits and , osses pursuant to this Section 1.04(y) shall be added to such taxable income or loss'

(ii) any expenditures of the Company described in Code Section 50V(a)(2)(q) For treated as Code Section 50V(a)(2)(q) expenditures pursuant to Section 1.504kl(b)(2)(iv)(i) of the Treasury Regulations F and not otherwise ta; en into account in computing Profits and , osses pursuant to this Section 1.04(y) Fshall be subtracted from such taxable income or loss'

(iii) if the q oo;  Lalue of any Company asset is ad3usted pursuant to Section 1.04(e)(ii) or Section 1.04(e)(iii) Fthe amount of such ad3ustment shall be ta; en into account as gain or loss from the disposition of such asset for purposes of computing Profits and , osses'

(iv) gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the q oo;  Lalue of the property disposed of Fnotwithstanding that the ad3usted tax basis of such property differs from its q oo;  Lalue'

(v) in lieu of the deduction for depreciation F cost recovery For amortization ta; en into account in computing such taxable income or loss Fthere shall be ta; en into account q oo;  Depreciation' and

(vi) notwithstanding any other provision of this Section 1.04(y) Fany items that are specially allocated pursuant to Section U02 or Section U0'  shall not be ta; en into account in computing Profits and , osses.

(z) "Regulatory Allocations" shall mean the special allocations of items of income Fgain Floss Fand deduction Fif any Fset forth in Section U02 hereof.

(aa) -Transfer- or -Transferred- shall mean the sale F assignment F conveyance F gift F be: uest F devise F transfer under the rules of intestate succession F pledge F mortgage For other encumbrance.  In addition F the term -Transfer- or -Transferred- shall mean an -ownership change- of a Member as defined in Section ' U2(g) of the Code in effect as of the Effective Date Fexcept that the term -Member- shall be substituted for -shareholder- wherever it appears.

(bb) -Treasury Regulations- shall mean regulations issued by the Department of the Treasury interpreting the Code.

(cc) "7 nanimous Consent" shall mean the written consent of all of the then Members of the Company.

## ARTIC, E II

### MEMBERS AND MEMBERSHIP INTERESTS

2.01   Members.  The Members of the Company shall be those Persons listed on Exhibit q . Except as otherwise may be provided in Exhibit A or Exhibit q Fand except as provided in Section 5.0V below Fa Person may be admitted as a Member to the Company only upon the affirmative vote of the Managers Fplus one or more Members whose Percentage Interests total more than fifty percent (V0%)' provided Fhowever Fthat no Person will be recognized as a Member of the

V

Company until he/she shall have executed this AgreementFor a counterpart heretoFand agrees to be bound by all of the terms and conditions hereof.

2.02   Annual Meetings   An annual meeting of the Members of the Company shall be held during each calendar year on such date and at such time as shall be designated from time to time by the q oard of Managers and stated in the notice of the meetingFand if a legal holidayFthen on the next business day followingFat the time specified in the notice of the meeting.   At such meetingFthe Members shall elect Managers and transact such other business as may properly be brought before the meeting.

2.0'   Special Meetings   A special meeting of the Members may be called at any time by the PresidentFthe q oard of ManagersFor one or more Members whose Percentage Interests total at least 10%.   Only such business shall be transacted at a special meeting as may be stated or indicated in the notice of such meeting.

2.04   Place of Meetings   The annual meeting of Members may be held at any place within or without the State of Delaware as may be designated by the q oard of Managers.   Special meetings of Members may be held at any place within or without the State of Delaware as may be designated by the person or persons calling such special meeting as provided in Section 2.0' .   If no place for a meeting is designatedFit shall be held at the registered office of the Company.

2.0V   Notice.   B ritten or printed notice stating the placeFdayFand hour of each meeting of Members andFin case of a special meetingFthe purpose or purposes for which the meeting is calledFshall be delivered not less than 10 days or more than V0 days before the date of the meetingFeither personally or by mailFby or at the direction of the PresidentFthe SecretaryF or the person calling the meetingFto each Member of record entitled to vote at such meeting.

2.0W   Loting . ist   At least 10 days before each meeting of MembersFthe Secretary shall prepare a complete list of Members entitled to vote at such meetingFarranged in alphabetical orderFincluding the address of each Member and the number of voting Interests held by each Member.   9or a period of 10 days prior to such meetingFsuch list shall be ; ept on file at the registered office of the Company and shall be sub3ect to inspection by any Member during usual business hours.   Such list shall be produced at such meetingFand at all times during such meeting shall be sub3ect to inspection by any Member.   The membership interest transfer boo; s shall be prima facie evidence as to who are the Members entitled to examine such list or membership interest transfer boo; s.

2.05   Loting of Interests.   Interests held by the Company in treasuryFInterests owned by a Person the ma3ority of the voting interests of which are owned or controlled by the CompanyFand Interests held by the Company in a fiduciary capacity shall not be Interests entitled to vote or to be counted in determining the total number of outstanding Interests of the Company.   Interests held by an administratorFexecutorFguardianFor conservator may be voted by him or herFeither in person or by proxyFwithout transfer of such Interests into his or her name so long as such Interests form a part of the estate and are in the possession of the estate being served by him or her.   Interests standing in the name of a trustee may be voted by him or herFeither in person or by proxyFonly after the Interests have been transferred into his or her name as trustee.   Interests standing in the name of a receiver may be voted by such receiverFand Interests held by or under the control of a receiver may be voted by such receiver without transfer of such Interests into his or her name if authority to do so is contained in the court order by which such receiver was appointed.   Interests standing in the name of another domestic or foreign corporation of any type or ; ind may be voted by such officerFagentFor proxy as the bylaws of such corporation may provide orFin the absence of such provisionFas the board of directors of such corporation may by resolution determine.   A Member whose Interests are pledged shall be entitled to vote such Interests until they have been transferred into the name of the pledgeeFand thereafter the pledgee shall be entitled to vote such Interests.

2.0U   Quorum.   The presence in person or by proxy of one or more Members whose Percentage Interests total more than fifty percent (V0%) shall constitute a : uorum at any meeting of MembersFexcept as otherwise provided by lawFthe CertificateFor this Agreement.   At any reconvening of an ad3ourned meeting at which a : uorum shall be present or representedFany business may be transacted that could have been transacted at the original meeting if a : uorum had been present or represented.

2.06   Lote' B ithdrawal of Quorum.   If a : uorum is present in person or represented by proxy at any meetingF except as otherwise may be provided in Exhibit A or Exhibit qFthe vote of one or more Members whose Percentage Interests total more than fifty percent (V0%) of all MembersFwhether or not they are present in person or represented by proxyFshall decide any : uestion brought before such meetingFunless the : uestion is one on whichFby express provision of lawFthe

W

018933
HCMLPHMIT00004157

CertificateFor this Agreement a different vote is re: uiredFin which event such express provision shall govern and control the decision of such : uestion.  The Members present at a duly convened meeting may continue to transact business until ad3ournmentFnotwithstanding any withdrawal of Members that may leave less than a : uorum remaining.

2.10    Method of Loting' Proxies.  Except as otherwise may be provided in Exhibit A or Exhibit qFeach Member shall be entitled to that number of votes on each matter submitted to the Members for their vote e: ual to such Member's Percentage Interest multiplied by 100.   At any meeting of MembersFevery Member having the right to vote may vote either in person or by a proxy executed in writing by the Member or by his duly authorized attorneykinkfact.  Each such proxy shall be filed with the Secretary of the Company before or at the time of the meeting.  No proxy shall be valid after 11 months from the date of its executionFunless otherwise provided in the proxy.  If no date is stated on a proxyFsuch proxy shall be presumed to have been executed on the date of the meeting at which it is to be voted.  Each proxy shall be revocable unless expressly provided therein to be irrevocable or unless otherwise made irrevocable by law.

2.11    Closing of Transfer q oo; s' Record Date .  9or the purpose of determining Members entitled to notice ofFor to vote atFany meeting of Members or any reconvening thereofFor entitled to receive payment of any distributionFor in order to ma; e a determination of Members for any other proper purposeFthe q oard of Managers may provide that the membership interest transfer boo; s of the Company shall be closed for a stated period but not to exceed in any event V0 days.  If the membership interest transfer boo; s are closed for the purpose of determining Members entitled to notice ofFor to vote atFa meeting of MembersFsuch boo; s shall be closed for at least 10 days immediately preceding such meeting.  In lieu of closing the membership interest transfer boo; sFthe q oard of Managers may fix in advance a date as the record date for any such determination of MembersFsuch date in any case to be not more than V0 days and not less than 10 days prior to the date on which the particular action re: uiring such determination of Members is to be ta; en.  If the membership interest transfer boo; s are not closed and if no record date is fixed for the determination of Members entitled to notice ofFor to vote atFa meeting of Members or entitled to receive payment of a distributionFthe date on which the notice of the meeting is to be mailed or the date on which the resolution of the q oard of Managers declaring such distribution is adoptedFas the case may beFshall be the record date for such determination of Members.

2.12    Presiding Officials at Meetings .  The President shall preside atFand the Secretary shall prepare minutes ofF each meeting of MembersFand in the absence of either such officerFhis other duties shall be performed by some person appointed at the meeting.

### ARTIC, E III

### MANAGERS

' .01    Management.  The business and affairs of the Company shall be managed EXC, 7 SIL E, Y by the q oard of Managers.  Sub3ect to the restrictions imposed by lawF the CertificateF or this AgreementF the q oard of Managers may exercise all the powers of the Company.

' .02    Number' Election' Term' Qualification.   The first q oard of Managers shall consist of the number of Managers named in the Certificate and or otherwise in the Company documents.  ThereafterFexcept as otherwise may be restricted by this AgreementFthe number of Managers that shall constitute the entire q oard of Managers shall be determined by resolution of the q oard of Managers at any meeting thereof or by the Members at any meeting thereofFbut shall never be less than one (1).  At each annual meeting of MembersFManagers shall be elected to hold office until the next annual meeting of Members and until their successors are elected and : ualified.  No Manager need be a MemberFa resident of the State of DelawareFor a citizen of the 7 nited States.

' .0'    Removal .  Except as otherwise may be provided by the MembersF at any meeting of Members called expressly for that purposeFany Manager or the entire q oard of Managers may be removedFwith or without causeFby a vote of one or more Members whose Percentage Interests total more than fifty percent (V0%).

' .04    Change in Number' Lacancies .  No decrease in the number of Managers constituting the entire q oard of Managers shall have the effect of shortening the term of any incumbent Manager.  In the case of any increase in the number of ManagersFor in the case of the deathFretirementFresignationFor removal of a ManagerFthe vacancies to be filled by such increase or deathF retirementF resignationF or removal may be filled by (a) the q oard of Managers for a term of office

5

continuing only until the next election of one or more Managers by the Members' or (b) the Members at any annual or special meeting of the Members.  A Manager elected to fill a vacancy shall be elected to serve for the unexpired term of his predecessor in office.

' .0V    Place of Meetings .  The q oard of Managers may hold its meetings in such place or placesFincluding by telephonic or other electronic method of communicationFwithin or without the State of Delaware as the q oard of Managers may from time to time determine.

' .0W    9irst Meeting .  Each newly elected q oard of Managers may hold its first meetingFif a : uorum is presentF for the purpose of organization and the transaction of business immediately after and at the same place as the annual meeting of MembersFand no notice of such meeting shall be necessary.

' .05    Regular Meetings .  Regular meetings of the q oard of Managers may be held without notice at such times and placesFincluding by telephonic or other electronic method of communicationFas may be designated from time to time by resolution of the q oard of Managers and communicated to all Managers.  Regular meetings of the q oard of Managers may be held when and if neededFand no more than one regular meeting of the q oard of Managers shall be re: uired in any calendar year.

' .0U    Special Meetings .  A special meeting of the q oard of Managers shall be held whenever called by any Manager at such time and placeFincluding by telephonic or other electronic method of communicationFas such Manager shall designate in the notice of such special meeting.  The Manager calling any special meeting shall cause notice of such special meeting to be given to each Manager at least 24 hours before such special meeting.  Neither the business to be transacted atF nor the purpose ofFany special meeting of the q oard of Managers need be specified in the notice or waiver of notice of any special meeting.

' .06    Quorum' Lote .  At all meetings of the q oard of ManagersFa ma3ority of the Managers fixed in the manner provided in this Agreement shall constitute a : uorum for the transaction of business.  If a : uorum is not present at a meetingF a ma3ority of the Managers present may ad3ourn the meeting from time to timeFwithout notice other than an announcement at the meetingFuntil a : uorum is present.  The vote of a ma3ority of the Managers present at a meeting at which a : uorum is in attendance shall be the act of the q oard of ManagersFunless the vote of a different number is re: uired by lawFthe CertificateF or this Agreement.

' .10    Procedure' Minutes .  At meetings of the q oard of ManagersFbusiness shall be transacted in such order as the q oard of Managers may determine from time to time.  The q oard of Managers shall appoint at each meeting a person to preside at the meeting and a person to act as secretary of the meeting.  The secretary of the meeting shall prepare minutes of the meeting that shall be delivered to the Secretary of the Company for placement in the minute boo; of the Company.

' .11    Presumption of Assent .  A Manager of the Company who is present at any meeting of the q oard of Managers at which action on any matter is ta; en shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the ad3ournment thereofFor shall forward any dissent by certified or registered mail to the Secretary of the Company immediately after the ad3ournment of the meeting.  Such right to dissent shall not apply to a Manager who voted in favor of such action.

' .12    Compensation .  Except as otherwise may be restricted in this AgreementFManagersFin their capacity as ManagersFmay receiveFby resolution of the q oard of ManagersFa stated salary or a fixed sum and expenses of attendanceFif anyFfor attending meetings of the q oard of Managers.  No Manager shall be precluded from serving the Company in any other capacity or receiving compensation therefor.

## ARTIC, E IL

## COMMITTEES

4.01    Designation .  The q oard of Managers mayFby a resolution adopted by a ma3ority of the entire q oard of ManagersFdesignate executive and other committees.

U

4.02   <u>Number, Qualification, Term</u>.  Each committee shall consist of one or more Managers appointed by resolution adopted by a majority of the entire board of Managers.  The number of committee members may be increased or decreased from time to time by resolution adopted by a majority of the entire board of Managers.  Each committee member shall serve as such until the expiration of his term as a Manager or his earlier resignation, unless sooner removed as a committee member or as a Manager.

4.03   <u>Authority</u>.  The executive committee, to the extent provided in the resolution establishing such committee, shall have and may exercise all of the authority of the board of Managers in the management of the business and affairs of the Company.  Each other committee, to the extent expressly provided for in the resolution establishing such committee, shall have and may exercise all of the authority of the board of Managers in such other matters and affairs concerning the Company.  However, no committee shall have the authority of the board of Managers in reference to any of the following:

(a)   amending the Certificate;

(b)   approving a plan of merger or consolidation;

(c)   recommending to the Members the sale, lease, or exchange of all or substantially all of the property and assets of the Company other than in the usual and regular course of its business;

(d)   recommending to the Members a voluntary dissolution of the Company or a liquidation thereof;

(e)   filling vacancies in, or removing members of, the board of Managers or of any committee thereof;

(f)   filling any vacancy to be filled by reason of an increase in the number of Managers;

(g)   electing or removing officers or committee members;

(h)   fixing the compensation of any committee member; or

(i)   altering or repealing any resolution of the board of Managers that, by its term, provides that it shall not be amendable or repealable.

4.04   <u>Committee Changes</u>.  The board of Managers shall have the power at any time to fill vacancies in, to change the Membership of, and to discharge any committee.  However, a committee member may be removed by the board of Managers only if, in the judgment of the board of Managers, the best interests of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

4.05   <u>Regular Meetings</u>.  Regular meetings of any committee may be held without notice at such times and places, including by telephonic or other electronic methods of communication, as may be designated from time to time by resolution of the committee and communicated to all committee members.

4.06   <u>Special Meetings</u>.  A special meeting of any committee may be held whenever called by any committee member at such time and place, including by telephonic or other electronic methods of communication, as such committee member shall designate in the notice of such special meeting.  The committee member calling any special meeting shall cause notice of such special meeting to be given to each committee member at least 24 hours before such special meeting.  Neither the business to be transacted at, nor the purpose of, any special meeting of any committee need be specified in the notice or waiver of notice of any special meeting.

4.05   <u>Quorum, Majority Vote</u>.  At all meetings of any committee, a majority of the number of committee members designated by the board of Managers shall constitute a quorum for the transaction of business.  If a quorum is not present at a meeting of any committee, a majority of the committee members present may adjourn the meeting from time to time without notice other than an announcement at the meeting, until a quorum is present.  The vote of a majority of the committee members present at any meeting at which a quorum is in attendance shall be the act of a committee, unless the vote of a different number is required by law, the Certificate, or this Agreement.

018936

HCMLPHMIT00004160

4.0U   <u>Minutes</u> .  Each committee shall cause minutes of its proceedings to be prepared and shall report the same to the q oard of Managers.  The minutes of the proceedings of each committee shall be delivered to the Secretary of the Company for placement in the minute boo; s of the Company.

4.06   <u>Compensation</u> .  Except as otherwise may be restricted in this AgreementFcommittee members mayFby resolution of the q oard of ManagersFbe allowed a stated salary or a fixed sum and expenses of attendanceF if anyF for attending any committee meetings.

4.10   <u>Responsibility</u> .  The designation of any committee and the delegation of authority to it shall not operate to relieve the q oard of Managers or any Manager of any responsibility imposed upon it or such Manager by law.

## ARTIC, E L

### GENERA, PROLISIONS RE, ATING TO MEETINGS

V.01   <u>Notice</u>  B henever by lawFthe CertificateFor this Agreement notice is re: uired to be given to any MemberF ManagerFor committee member and no provision is made as to how such notice shall be givenFit shall be construed to mean that notice may be given either (a) in person' (b) in writingFby mail' (c) by telegramFtelexFcableFtelecopy or facsimile transmissionFor similar means' or (d) by any other method permitted by law.  Any notice re: uired or permitted to be given hereunder (other than personal notice) shall be addressed to such MemberFManagerFor committee member at his address as it appears on the boo; s on the Company orFin the case of a MemberFon the membership interest transfer records of the Company or at such other place as such MemberFManagerFor committee member is ; nown to be at the time notice is mailed or transmitted.  Any notice re: uired or permitted to be given by mail shall be deemed to be delivered and given at the time when such notice is deposited in the 7 nited States mailFpostage prepaid.  Any notice re: uired or permitted to be given by telegramFtelexFcableFtelecopy or facsimile transmissionFor similar means shall be deemed to be delivered and given at the time transmitted.

V.02   <u>B aiver of Notice</u> .  B henever by lawFthe CertificateFor this Agreement any notice is re: uired to be given to any MemberFManagerFor committee member of the CompanyFa waiver thereof in writing signed by the person or persons entitled to such noticeFwhether before or after the time notice should have been givenFshall be e: uivalent to the giving of such notice.  Attendance of a Manager or Member at a meeting shall constitute a waiver of notice of such meetingFexcept where a Manager or Member attends a meeting for the express purpose of ob3ecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

V.0'   <u>Telephone and Similar Meetings</u>  MembersFManagersFor committee members may participate in and hold a meeting by means of a conference telephone or similar communications e: uipment by means of which all persons participating in the meeting can hear each other.  Participation in such a meeting shall constitute presence in person at such meetingFexcept where a person participates in the meeting for the express purpose of ob3ecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

V.04   <u>Action B ithout Meeting</u> .  Any action that may be ta; enFor is re: uired by lawFthe CertificateFor this Agreement to be ta; en at a meeting of the MembersFthe q oard of ManagersFor a committee thereof may be ta; en without a meeting if a consent in writingFsetting forth the action so ta; enFshall be signed by the Members owning the re: uired Percentage Interests of all Members (as set forth herein for the respective action or decision)Fa ma3ority of the  Managers or committee membersFas the case may beFentitled to vote with respect to the sub3ect matter thereofFand such consent shall have the same force and effect as a vote of such MembersFManagersFor committee membersFas the case may beFand may be stated as such in any document filed with the Secretary of State of Delaware or in any certificate or other document delivered to any person.  The consent may be in one or more counterparts so long as each MemberFManagerFor committee member signs one of the counterparts.  The signed consent shall be placed in the minute boo; s of the Company.

## ARTIC, E LI

### OVVICERS AND OTHER AGENTS

018937

HCMLPHMIT00004161

9.01   <u>Number' Titles' Election' Term</u>   The Company shall have a president'one or more vice presidents (and'in the case of each vice president'with such descriptive title'if any'as the 9oard of Managers shall determine)'a secretary'a treasurer'and such officers and agents as the 9oard of Managers may deem desirable.  The 9oard of Managers shall elect a president' vice president' treasurer'and secretary at its first meeting at which a : uorum shall be present after the annual meeting of Members or whenever a vacancy exists.  The 9oard of Managers then'or from time to time'may also elect or appoint one or more other officers or agents as it shall deem advisable.  Except as otherwise may be provided by separate agreement'each officer and agent shall hold office for the term for which he is elected or appointed and until his successor has been elected or appointed and : ualified.  9 nless otherwise provided in the resolution of the 9oard of Managers electing or appointing an officer or agent'his term of office shall extend to and expire at the meeting of the 9oard of Managers following the next annual meeting of Members or'if earlier'at his death'resignation'or removal.  Any two or more offices may be held by the same person.  No officer or agent need be a Member'a Manager'a resident of the State of Delaware'or a citizen of the 9 nited States.

9.02   <u>Removal</u> .  Any officer or agent elected or appointed by the 9oard of Managers may be removed by a ma3ority of the 9oard of Managers only if'in the 3udgment of a ma3ority of the 9oard of Managers'the best interests of the Company will be served thereby'but such removal shall be without pre3udice to the contract rights'if any'of the person so removed.  Election or appointment of an officer or agent shall not of itself create contract rights.

9.0'   <u>Lacancies</u> .  Any vacancy occurring in any office of the Company may be filled by the 9oard of Managers.

9.04   <u>Authority</u> .  Officers shall have such authority and perform such duties in the management of the Company as are provided in this Agreement or as may be determined by resolution of the 9oard of Managers not inconsistent with this Agreement.

9.0V   <u>Compensation</u> .  Except as otherwise may be provided by separate agreement'the compensation'if any'of officers  or any salaried employee shall be fixed'increased'or decreased from time to time by the 9oard of Managers' provided'however'that the 9oard of Managers may by resolution delegate to any one or more officers of the Company the authority to fix such compensation.

9.0W   <u>Chairman of the 9oard</u> .  The Chairman of the 9oard'if any'shall be an officer of the Company and' sub3ect to the direction of the 9oard of Managers'shall perform such executive'supervisory'and management functions and duties as may be assigned to him from time to time by the 9oard of Managers.

9.05   <u>President'CEO and COO</u> .  The 9oard of Managers may designate and appoint a President'CEO and/or COO'with rights'duties and responsibilities established by the 9oard of Managers.

9.0U   <u>Lice Presidents</u> .  Each Lice President shall have such powers and duties as may be prescribed from time to time by the 9oard of Managers or as may be delegated from time to time by the President and (in the order as designated by the 9oard of Managers'or in the absence of such designation'as determined by the length of time each has held the office of Lice President continuously) shall exercise the powers of the President during that officer3s absence or inability to act.

9.06   <u>Treasurer</u> .  The Treasurer shall have custody of the Company3s funds and securities'shall ; eep full and accurate accounts of receipts and disbursements'and shall deposit all moneys and valuable effects in the name and to the credit of the Company in such depository or depositories as may be designated by the 9oard of Managers.  The Treasurer shall audit all payrolls and vouchers of the Company' shall receive' audit' and consolidate all operating and financial statements of the Company and its various departments' shall supervise the accounting and auditing practices of the Company' and shall have charge of matters relating to taxation.  Additionally'the Treasurer shall have the power to endorse for deposit'collection'or otherwise all chec; s'drafts'notes'bills of exchange'and other commercial paper payable to the Company and to give proper receipts and discharges for all payments to the Company.  The Treasurer shall perform such other duties as may be prescribed from time to time by the 9oard of Managers or as may be delegated from time to time by the President.

9.10   <u>Assistant Treasurers</u> .  Each Assistant Treasurer shall perform such duties as may be prescribed from time to time by the 9oard of Managers or as may be delegated from time to time by the President.  The Assistant Treasurers (in the order as designated by the 9oard of Managers or'in the absence of such designation'as determined by the length of time each has held the office of Assistant Treasurer continuously) shall exercise the powers of the Treasurer.

018938

HCMLPHMIT00004162

4.11   <u>Secretary</u>.  The Secretary shall maintain minutes of all meetings of the Board of Managers, of any committee, and of the Members, or consents in lieu of such minutes, in the Company's minute books, and shall cause notice of such meetings to be given when required by any person authorized to call such meetings.  The Secretary may sign with the President, in the name of the Company, all contracts of the Company and affix the seal of the Company thereto.  The Secretary shall have charge of the certificate books, membership interest transfer books, and other documents as the Board of Managers may direct, all of which shall at all reasonable times be open to inspection by any Manager at the office of the Company during normal business hours.  The Secretary shall perform such other duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.

4.12   <u>Assistant Secretaries</u>.  Each Assistant Secretary shall perform such duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.  The Assistant Secretaries (in the order designated by the Board of Managers or, in the absence of such designation, as determined by the length of time each has held the office of Assistant Secretary continuously) shall exercise the powers of the Secretary during that officer's absence or inability to act.

## ARTICLE V

### CAPITALIZATION AND CAPITAL ACCOUNTS

5.01   <u>Capital Contributions</u>.  The Capital Contributions of the Members, as set forth in the books and records of the Company, shall be paid or transferred to the Company in cash and/or property on the terms and in the manner specified by the Board of Managers.  No Member shall be entitled to make any additional Capital Contributions except as provided in Section 5.02 and 5.03 below.

5.02   <u>Additional Capital Contributions</u>.  If the Board of Managers determine that additional capital is required for the purposes of the Company, as set forth herein, the Board of Managers may notify the Members of the need for such additional capital and shall state the specific purposes for which the call for such additional capital is being made.  Thereupon, all Members shall have the right (but not the obligation) to make additional Capital Contributions in cash and/or property to the Company aggregating the amount of additional capital needed by the Company in the proportion of their respective Percentage Interests in the Company at the time notice is given.  The Board of Managers shall use the additional capital so contributed solely for the purposes stated in the notice to the Members.

5.03   <u>Failure to Make Additional Capital Contributions</u>.  If any Member chooses not to contribute its share of the additional capital needed by the Company within 14 days after notice is given to the Members of the need for such additional capital (a "Non-Contributing Member"), then the other Members shall be entitled (but not obligated) to contribute the share of such Non-Contributing Member (such Members being referred to as "Contributing Members") of the additional capital needed pro rata according to such Contributing Members' Percentage Interests at such time or such other share as otherwise agreed upon by the Contributing Members.

5.04   <u>Effect of Failure to Make Additional Capital Contributions</u>.  In the event of a Non-Contributing Member, the Percentage Interests of all of the Members shall be recomputed on the following basis:  Each Member's Percentage Interest immediately following the computation shall equal the percentage expression of a fraction, the numerator of which is the total Capital Contributions of such Member plus the additional Capital Contribution, if any, made by such Member pursuant to Sections 5.02 and 5.03 above, and the denominator of which is the total Capital Contributions of all of the Members plus the additional Capital Contributions made by all of the Members pursuant to Sections 5.02 and 5.03 above.

5.05   <u>Recapitalization by Admission of Additional Members</u>.  If additional capital is required for the purposes of the Company as set forth herein and the Board of Managers is unable to finance such capital needs by borrowing the required amounts or through notice to the existing Members of the necessity for additional Capital Contributions as provided in Section 5.02 and 5.03 above, the Board of Managers shall have the right to admit additional Members to the Company, upon receiving the other approvals required herein.  Following the admission of one or more new Members, the Percentage Interest of each Member, including the newly admitted Member(s), shall be computed as follows:  Each Member's Percentage Interest immediately following the computation shall equal the percentage expression of a fraction, the numerator of which is the total Capital Contributions of such Member and the denominator of which is the total Capital Contributions of all of the Members, including the newly admitted Members.

018939

HCMLPHMIT00004163

5.0W    Maintenance of Capital Accounts .   The Company shall maintain for each Member a separate Capital Account in accordance with this Section 5.0W which shall control the allocation of Profits and , osses and the division of assets upon li: uidation of the Company as provided in Section 12.01.   Each Capital Account shall be maintained in accordance with the following provisions"

(a)    a Member% Capital Account shall initially be zero and shall be increased by the cash amount or q oo; L alue of any property contributed by such Member to the Company pursuant to this Agreement Fsuch Member% allocable share of Profits and any items in the nature of income or gains that are specially allocated to such Member pursuant to Section U02 and Section U0' hereofF and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member'

(b)    such Capital Account shall be decreased by the cash amount or q oo; L alue of any property distributed to such Member pursuant to this Agreement Fsuch Member% allocable share of , osses and any items in the nature of deductions or losses that are specially allocated to such Member pursuant to Section U02 and Section U0' hereofF and the amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by such Member to the Company' and

(c)    if all or a portion of an Interest in the Company is Transferred in accordance with the terms of this Agreement F the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred InterestF providedF however F that if the Transfer causes a termination of the Company under Code Section 50U(b)(1)(q )F the assets of the Company shall be deemed to have been distributed to the Members (including the transferee of the Interest) in li: uidation of the Company and recontributed by such Members and transferees in reconstitution of the Company.  Such deemed li: uidation and reconstitution shall not cause the Company to be dissolved and/or reconstituted for purposes other than maintenance of the Capital Accounts and federal income tax.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.504kl(b) of the Treasury Regulations and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  If the q oard of Managers determines that it is prudent to modify the manner in which the Capital Accounts F or any increases or decreases to the Capital Accounts F are computed in order to comply with such Treasury RegulationsF the q oard of Managers may authorize such modificationsF provided that it is not li: ely to have a material effect on the amounts distributable to any Member pursuant to Sections U0W and 12.01 hereof.

5.05    Negative Capital Accounts .   If any Member has a deficit balance in its Capital AccountF such Member shall have no obligation to restore such negative balance or to ma; e any Capital Contribution to the Company by reason thereofF and such negative balance shall not be considered an asset of the Company or of any Member.

5.0U    Interest .   No interest shall be paid by the Company on Capital Contributions or on balances in Capital Accounts.

5.06    No B ithdrawal .   No Member shall be entitled to withdraw any part of his Capital Contribution or his Capital Account or to receive any distribution from the CompanyF except as provided in Sections 11.02 and 12.01 of this Agreement.

5.10    , oans 9rom Members .   , oans by a Member to the Company shall not be considered Capital Contributions.

## ARTIC, E LIII

## A, , OCATIONS AND DISTRIBUTIONS

U01    Allocation of Profits and , osses.

(a)    Allocation of Profits.   Except as provided on any Exhibit heretoF after giving effect to the allocations set forth in Section U02 and Section U0' F and after giving effect to all distributions of cash or property (other than cash or

018940
HCMLPHMIT00004164

property to be distributed pursuant to Section 12.01)FProfits for any 9iscal Year shall be allocated to the Members in the following manner"

       (i)     firstFto each Member with a negative balance in its Capital AccountFpro rata in accordance with such negative Capital Account balancesFuntil such negative Capital Account balances have been eliminated'

       (ii)    nextFto all of the Members in accordance with their respective Percentage Interests.

    (b)    <u>Allocation of , osses</u>.  Except as provided in any Exhibit heretoFAfter giving effect to the allocations set forth in Section U02 and Section U0' F, osses for any 9iscal Year shall be allocated to the Members in the following manner"

       (i)    to all of the Members in accordance with their respective Percentage Interests.

    U02    <u>Special Allocations of Profits and , osses</u> .

    (a)    <u>Minimum Gain Chargebac; –Company Nonrecourse , iabilities</u>.  If there is a net decrease in Company minimum gain during any 9iscal YearFcertain items of income and gain shall be allocated (on a gross basis) to the Members in the amounts and manner described in Treasury Regulations Section 1.504k2(f) and (3)(2)(i) and (ii)F sub3ect to the exemptions set forth in Treasury Regulations Section 1.504k2(f)(2)F(' )F(4) and (V).  This Section U02(a) is intended to comply with the minimum gain chargebac; re: uirement set forth in Treasury Regulations Section 1.504k2(f) relating to Company nonrecourse liabilitiesFas defined in Treasury Regulations Section 1.504k2(b)(' ) and shall be so interpreted.

    (b)    <u>Minimum Gain Chargebac; –Member Nonrecourse Debt</u>.  If there is a net decrease in Member minimum gain during any 9iscal YearFcertain items of income and gain shall be allocated (on a gross basis) as : uic; ly as possible to those Members who had a share of the Member minimum gain determined pursuant to Treasury Regulations Section 1.504k 2(i)(V) in the amounts and manner described in Treasury Regulations Sections 1.504k2(i)(4)F3(2)(ii)Fand (3)(2)(iii).  This Section U02(b) is intended to comply with the minimum gain chargebac; re: uirement set forth in Treasury Regulations Section 1.504k2(i)(4) relating to Member nonrecourse debtFas defined in Treasury Regulations Section 1.504k2(b)(4) and shall be so interpreted.

    (c)    <u>Qualified Income Offset</u>.  IfF after applying Section U02(a) and Section U02(b)F any Member has an ad3usted Capital Account deficitFitems of Company income and gain shall be specially allocated (on a gross basis) to each such Member in an amount and manner sufficient to eliminate the ad3usted Capital Account deficit of such Member as : uic; ly as possible.  This Section U02(c) is intended to comply with the ": ualified income offset" re: uirement set for the in Treasury Regulations Section 1.504kl(b)(2)(ii)(d) and shall be so interpreted.

    (d)    <u>Optional q asis Ad3ustments</u>.  To the extent an ad3ustment to the ad3usted tax basis of any Company asset pursuant to Code Sections 5' 4(b) or 54' (b) is re: uiredFpursuant to Treasury Regulations Section 1.504kl(b)(2)(iv)(m)Fto be ta; en in to account in determining Capital AccountsFthe amount of such ad3ustment to the Capital Accounts shall be treated as an item of gain (if the ad3ustment increases the basis of the asset) or loss (if the ad3ustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are re: uired to be ad3usted pursuant to such Section of the Treasury Regulations.

    (f)    <u>Partner Nonrecourse Deductions</u>.  Partner Nonrecourse Deductions shall be allocated pursuant to Treasury Regulations Section 1.504k2(b)(4) and (i)(1) to the Member who bears the economic ris; of loss with respect to such deductions.

    U0'    <u>Curative Allocations</u> .  The Regulatory Allocations are intended to comply with certain re: uirements of the Treasury Regulations.  It is the intent of the Members thatFto the extent possibleFall Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company incomeF gainF lossF or deduction pursuant to this Section U0' .  ThereforeFnotwithstanding any other provisions of this Article L IIIFthe q oard of Managers shall ma; e such offsetting special allocations of Company incomeFgainFlossFor deduction in whatever manner it determines appropriate so thatFafter such offsetting allocations are madeFeach Member% Capital Account balance isFto the extent possibleFe: ual to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section U01(a) and Section U01(b) hereof.

14

U04    Tax Allocations" Code Section 504(c) .

(a)    In accordance with Code Section 504(c) and the Treasury Regulations thereunderFincomeFgainFlossFand deduction with respect to any property contributed to the capital of the Company shallF solely for federal income tax purposesFbe allocated among the Members so as to ta; e account of any variation between the ad3usted basis of such property to the Company for federal income tax purposes and its initial q oo;  Lalue.

(b)    If the q oo;  Lalue of any Company asset is ad3usted pursuant to Section 1.04(e)(ii) hereofF subse: uent allocations of incomeFgainFlossFand deduction with respect to such asset shall ta; e account of any variation between the ad3usted basis of such asset for federal income tax purposes and its q oo;  Lalue in the same manner as under Code Section 504(c) and the Treasury Regulations thereunder.

(c)    Any elections or other decisions relating to such allocation shall be made by the q oard of Managers. Allocations pursuant to this Section U04 are solely for purposes of federalFstateFand local taxes and shall not affect or in any way be ta; en into account in computing any Member's Capital AccountFor share of ProfitsF, ossesFand other items or distribution pursuant to any provision of this Agreement.

U0V    Other Allocation Rules .

(a)    9or purposes of determining the ProfitsF, ossesFor any other item allocable to any periodFProfitsF, ossesF and any such other item shall be determined on a dailyFmonthlyFor other   basisFas determined by the q oard of Managers using any permissible method under Code Section 50WFand the Treasury Regulations thereunder.

(b)    9or federal income tax purposesFevery item of incomeFgainFlossFand deduction shall be allocated among the Members in accordance with the allocations under Sections U01FU02FU0' Fand U04.

(c)    The Members are aware of the income tax conse: uences of the allocations made by this Article LIII and hereby agree to be bound by the provisions of this Article LIII in reporting their shares of Company income and loss for income tax purposes.

(d)    It is intended that the allocations in Sections U01FU02FU0' Fand U04 hereof effect an allocation for federal income tax purposes consistent with Section 504 of the Code and comply with any limitations or restrictions therein.

U0W    Distributions of Distributable Cash .   Except as otherwise may be provided in this AgreementFthe q oard of Managers shall cause the Company to ma; e distributions of Distributable Cash at such intervals and in such amounts as the q oard of Managers in its sole discretion shall determine by ma3ority vote.   Distributions of Distributable Cash shall be made to all of the Members in accordance with their respective Percentage Interests.

U05    B or; ing Cash Reserve .   The q oard of Managers may from time to time establish a wor; ing cash reserve for capital expendituresF unforeseen contingenciesF pro3ected operating deficitsF and other corporate purposes and may increase or decrease the amount in such reserve in its business 3udgment.

## ARTIC, E IX

## CERTIVICATES

6.01    Certificated and 7 ncertificated Interests.   The membership interests of the Company may be either certificated interests or uncertificated interests.  As used hereinFthe term -certificated interests- means Interests represented by instruments in bearer or registered formFand the term -uncertificated interests- means Interests not represented by such instruments and the transfers of which are registered upon boo; s maintained for that purpose by or on behalf of the Company.

6.02    Certificates for Certificated Interests .   The certificates for certificated interests shall be in such form as shall be approved by the q oard of Managers in conformity with law.  The certificates shall be consecutively numberedFshall be entered as they are issued in the boo; s of the Company or in the records of the Company's designated transfer agentFif anyFand shall state the Member's nameFthe class of InterestsFthe Percentage Interest that such Interest representsFand such

1V

018942

HCMLPHMIT00004166

other matters as may be re: uired by law.  The certificates shall be signed by the President or any Lice President and also by the SecretaryFan Assistant SecretaryFor any other officerFand may be sealed with the seal of the Company or a facsimile thereof.  If any certificate is countersigned by a transfer agent or registered by a registrarFeither of which is other than the Company itself or an employee of the CompanyFthe signatures of the foregoing officers may be a facsimile.

6.0'    . ostF StolenF or  Destroyed Certificates .  The Company shall issue a new certificate in place of any certificate for Interests previously issued if the registered owner of the certificate satisfies the following re: uirements"

(a)       the registered owner ma; es proof in affidavit form that a previously issued certificate for Interests has been lostFdestroyedFor stolen'

(b)        the registered owner re: uests the issuance of a new certificate before the Company has notice that the certificate has been ac: uired by a purchaser for value in good faith and without notice of an adverse claim'

(c)       the registered owner gives a bond in such formF and with such surety or suretiesF with fixed or open penaltyF as the q oard of Managers may directF in its discretionF to indemnify the Company (and its transfer agent and registrarFif any) against any claim that may be made on account of the alleged lossFdestructionFor theft of the certificate' and

(d)       the registered owner satisfies any other reasonable re: uirements imposed by the q oard of Managers.

B hen a certificate has been lostFdestroyedFor stolen and the Member of record fails to notify the Company within a reasonable time after he has notice of itFif the Company registers a transfer of the Interests represented by the certificate before receiving such notificationFthe Member of record is precluded from ma; ing any claim against the Company for the transfer or for a new certificate.

6.04    Transfer of Interests .  Interests of the Company shall be transferable only on the boo; s of the Company by the Members thereof in person or by their duly authorized attorneys or legal representativesFbut only as authorized in this COMPANY AGREEMENT.  B ith respect to certificated interestsFupon surrender to the Company or the transfer agent of the Company of a certificate representing Interests duly endorsed or accompanied by proper evidence of successionF assignmentF or authority to transferF the Company or its agent shall issue a new certificate to the person entitled theretoF cancel the old certificateFand record the transaction upon its boo; s.  B ith respect to uncertificated interestsFupon delivery to the Company of proper evidence of successionFassignmentFor authority to transferFthe Company or its agent shall record the transaction upon its boo; s.

6.0V    Registered Members .  The Company shall be entitled to treat the Member of record as the Member in fact of any Interests andFaccordinglyFshall not be bound to recognize any e: uitable or other claim to or interest in such Interests on the part of any other PersonFwhether or not it shall have actual or other notice thereofFexcept as otherwise provided by law.

6.0W    . egends .  If the Company is authorized to issue Interests of more than one classF each certificate representing Interests issued by the Company (a) shall conspicuously set forth on the face or bac; of the certificate a full statement of all of the designationsFpreferencesFlimitationsFand relative rights of the Interests of each class authorized to be issued' or (b) shall conspicuously state on the face or bac; of the certificate that (i) such a statement is set forth in the Certificate on file in the office of the Secretary of State or in this Agreement' and (ii) the Company will furnish a copy of such statements to the record holder of the certificate without charge on written re: uest to the Company at its principal place of business or registered office.

If the Company issues any Interests that are not registered under the Securities Act of 16' ' Fthe transfer of any such interests shall be restricted in accordance with an appropriate legend.

In the event any restriction on the transferFor registration of the transferFof Interests shall be imposed or agreed to by the CompanyFeach certificate representing Interests so restricted (a) shall conspicuously set forth a full or summary statement of the restriction on the face of the certificate' (b) shall set forth such statement on the bac; of the certificate and conspicuously refer to the same on the face of the certificate' or (c) shall conspicuously state on the face or bac; of the certificate that such a restriction exists pursuant to a specified document and (i) that the Company will furnish to the record holder of the certificate without charge upon written re: uest to the Company at its principal place of business or registered

1W

018943

HCMLPHMIT00004167

office a copy of the specified document' or (ii) if such document is one re: uired or permitted by law to be and has been filedF that such specified document is on file in the office of the Secretary of State and contains a full statement of such restriction.

## ARTIC, E X

## ACCOUNTING AND RECORDS

10.01   <u>Records and Accounting</u> .  The boo; s and records of the Company shall be ; eptFand the financial position and the results of its operations recordedFin accordance with the accounting methods elected to be followed by the Company for federal income tax purposes.  The boo; s and records of the Company shall reflect all Company transactions and shall be appropriate and ade: uate for the Companyjs business.

10.02   <u>Access to Accounting Records</u> .  All boo; s and records of the Company shall be maintained at any office of the Company or at the Companyjs principal place of businessFand each Member owning a Percentage Interest of at least ten percent (10%)Fand his duly authorized representativeFshall have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

10.0'   <u>Annual and Tax Information</u> .  The Company shall deliver to each Member within 60 days after the end of each 9iscal Year all information necessary for the preparation of such Memberjs federal income tax return.  The Company shall prepareFwithin 120 days after the end of each 9iscal YearFa financial report of the Company for such 9iscal YearF containing a statement of the year then endedF a statement of sources and applications of fundsF and a statement of reconciliation of the Capital Accounts of the Members.

10.04   <u>Accounting Decisions</u> .  All decisions as to accounting mattersFexcept as otherwise specifically set forth hereinFshall be made by the q oard of Managers.  The Members may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

10.0V   <u>9ederal Income Tax Elections</u> .  The Company may ma; e all elections for federal income tax purposesF includingFbut not limited toFthe following"

(a)   to the extent permitted by applicable law and regulationsFthe election to use an accelerated depreciation method on any depreciable unit of the assets of the Company' and

(b)   in case of a transfer of all or part of the Interest of any MemberFthe election pursuant to Section 5' 4F54' F and 5\4 of the CodeFas amended (or corresponding provisions of future law) to ad3ust the basis of the assets of the Company.

## ARTIC, E XI

## CHANGES IN MEMBERS

The provisions of this Article XI are sub3ect toFand may be superceded byFone or more separate agreements entered into by and among one or more Members.  The provisions of this Article XI shall continue to control with respect to matters not covered byFor Members not parties toFsuch agreement(s).

11.01   <u>Intentionally q lan; </u> .

11.02   <u>Transfer and Assignment of Membersj Interest</u> .  Except as approved by the ManagerFplus a Member or Members owning a Percentage Interest greater than fifty percent (\0%)Fno Member shall be entitled to Transfer any part of its Interest in the Company.  The Company andFif applicableFthe remaining Members shall be entitled to match the terms of the proposed TransferFwith consideration being only set forth in traditional monetary terms.  If the Company and the remaining Members fail to match the proposed Transfer with regard to the purchase of the entire InterestFor portion thereofF the Member proposing to ma; e the Transfer may move forward with the proposed Transfer.  Transfers in violation of this Section 11.02 shall be effective only to the extent set forth in Section 11.0V(b) hereof.

018944


HCMLPHMIT00004168

11.0'    9urther Restrictions on Transfer .  No Member shall Transfer any part of his Interest in the Company" (i) without registration under applicable federal and state securities lawsFor unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not re: uired' or (ii) if the Interest to be sold or exchangedFwhen added to the total of all other Interests to be sold or exchanged in the preceding 12 consecutive months prior theretoFwould result in the termination of the Company under Code Section 50U

11.04    Substitute Members .  A transferee shall have the right to become a substitute Member if (a) the re: uirements of Section 11.02 and 11.0' hereof are met' (b) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of this Agreement' and (c) such person pays any reasonable expenses in connection with his or her admission as a Member.

11.0V    Effect of Transfer .

(a)    Any permitted Transfer of all or any portion of a Member's Interest in the Company will ta; e effect on the first day of the month following receipt by the Members of written notice of Transfer.  Any transferee of an Interest in the Company shall ta; e sub3ect to the restrictions on Transfer imposed by this Agreement.

(b)    7 pon any Transfer of a Member's Interest in the Company in violation of this AgreementFand if such Member's Interest is not purchased pursuant to Section 11.01Fthe transferee shall have no right to participate in the management of the business and affairs of the Company or to become a MemberFbut such transferee shall be entitled to receive only the allocable share of ProfitsF, ossesFDistributive CashFand other items to which the transferor of such Interest in the Company would otherwise be entitled.

11.0W    No Dissolution or B ithdrawal" Advanced Consent .  7 pon the occurrence of a Dissolution Event with regard to a respective MemberFall remaining Members shall be deemed to automatically consent to the continuation of the business of the Company.  q y executing this AgreementFhoweverFall Members hereby consent that they shall not voluntarily cause a Dissolution Event or demand the return of Member's capital.  If any Member shall breach the agreement represented by this Section 11.0Wthe agreement of such breaching Member shall not be specifically performableFbut shall be actionable for damagesFand shall be deemed an offer of the Interest of such breaching Member for sale pursuant hereto.  The parties agree that a reasonable approximation of the damage that the Company shall experience due to breach hereof is 20% of the value of the breaching Member's InterestFor as otherwise set forth herein (whichever is greater)Fwhich shall be deducted from any payments to such Member upon dissolution or purchase of such Member's Interest hereunder.  The value of the breaching Member's Interest shall be determined pursuant to Section 11.01Fto which value the said discount may then be applied in determining payments due to the breaching Member pursuant to the deemed offer of sale occurring under this Section 11.0W

## ARTIC, E XII

## TERMINATION

12.01    Termination of the Company .

(a)    The Company shall be dissolvedFits assets shall be disposed ofFand its affairs wound up on the first to occur of the following events"

(i)    a determination by the ManagersFplus the 7 nanimous Consent of the Members that the Company should be dissolved'

(ii)    a sale of all or substantially all of the assets of the Company'

(iii)    the expiration of the Company's term as stated in its Certificate' or

(iv)    at such earlier time as provided by applicable law.

018945

HCMLPHMIT00004169

(b)    In settling accounts of the Company after dissolutionFthe liabilities of the Company shall be entitled to payment and the assets of the Company remaining thereafter shall be distributed to the Members in the following orderFall as re: uired by the DE, AB ARE , AB S"

(i)    those to creditorsFin the order of priority as provided by lawFexcept those to Members of the Company on account of their Capital Contributions'

(ii)    to the MembersFpro rataFin accordance with the positive balancesFif anyFin their Capital Accounts' and

(iii)    to the Members in proportion to their relative Percentage Interests.

## ARTIC, E XIII

### INDEMNIVICATION

1' .01    Indemnification of MembersFManagersFand Other Persons .

(a)    To the greatest extent not inconsistent with the laws and public policies of DelawareFthe Company shall indemnify any MemberFManagerFor officer of the Company made a party to any proceeding because such individual is or was a MemberFManagerFor officer of the Company (an "Indemnitee")Fas a matter of rightFagainst all liability incurred by such individual in connection with any proceeding' provided that it shall be determined in the specific case in accordance with subsection (d) of this Section 1' .01 that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section 1' .01.  The Company shall advanceFpay forFor reimburse the reasonable expenses incurred by an Indemnitee in connection with any such proceeding in advance of final disposition thereof if (i) the Indemnitee furnishes the Company a written affirmation of the Indemnitee¡s good faith belief that he or she has met the standard of conduct for indemnification described in subsection (c) of this Section 1' .01' (ii) the Indemnitee furnishes the Company a written underta; ingFexecuted personally or on such Indemnitee¡s behalfFto repay the advance if it is ultimately determined that such individual did not meet such standard of conduct' and (iii) a determination is made in accordance with subsection (d) that based upon facts then ; nown to those ma; ing the determinationFindemnification would not be precluded under this Section 1' .01.  The underta; ing described in subsection (a)(ii) above must be a general obligation of the IndemniteeFsub¡ect to such reasonable limitations as the Company may permitFbut need not be secured and may be accepted without reference to financial ability to ma; e repayment.  The Company shall indemnify an Indemnitee who is wholly successfulFon the merits or otherwiseFin the defense of any such proceedingFas a matter of rightFagainst reasonable expenses incurred by the individual in connection with the proceeding without the re: uirement of a determination as set forth in subsection (c) of this Section 1' .01.  7 pon demand by an Indemnitee for indemnification or advancement of expensesFas the case may beFthe Company shall expeditiously determine whether the Indemnitee is entitled thereto in accordance with this Section 1' .01.  The indemnification and advancement of expenses provided for under this Section 1' .01 shall be applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section 1' .01.

(b)    The Company shall have the powerFbut not the obligationFto indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a MemberFManagerFor officer of the Company.

(c)    Indemnification is permissible under this Section 1' .01 only if (i) the Indemnitee conducted himself in good faith' (ii) he or she reasonably believed that his conduct was inFor at least not opposed toFthe Company¡s best interest' (iii) in the case of any criminal proceedingFhe or she had no reasonable cause to believe his conduct was unlawful' and (iv) such Indemnitee is not ad¡udged in any such proceeding to be liable for gross negligence or willful misconduct in the performance of duty.  The termination of a proceeding by ¡udgmentForderFsettlementFconviction For upon a plea of nolo contendere or its e: uivalent is notFof itselfFdeterminative that the Indemnitee did not meet the standard of conduct described in this subsection (c).

(d)    A determination as to whether indemnification or advancement of expenses is permissible shall be made by any one of the following procedures"

16

018946

HCMLPHMIT00004170

(i)      by the q oard of Managers or by a ma3ority vote consisting of Members not at the time parties to the proceeding' or

(ii)      by special legal counsel selected by the Members in the manner prescribed in subsection (d)(i) above.

(e)      An Indemnitee of the Company who is a party to a proceeding may apply for indemnification from the Company to the courtFif anyFconducting the proceeding or to another court of competent 3urisdiction.  On receipt of an applicationFthe courtFafter giving notice the court considers necessaryFmay order indemnification if it determines"

(i)      in a proceeding in which the Indemnitee is wholly successfulFon the merits or otherwiseFthe Indemnitee is entitled to indemnification under this Section 1' .01Fin which case the court shall order the Company to pay the Indemnitee his or her reasonable expenses incurred to obtain such court ordered indemnification' or

(ii)      the Indemnitee is fairly and reasonably entitled to indemnification in view of all the relevant circumstancesFwhether or not the Indemnitee met the standard of conduct set forth in subsection (c) of this Section 1' .01.

(f)      Indemnification shall also be provided for an Indemnitees conduct with respect to an employee benefit plan if the individual reasonably believed his or her conduct to be in the interests of the participants in and beneficiaries of plan.

(g)      Nothing contained in this Section 1' .01 shall limit or preclude the exercise or be deemed exclusive of any right under the lawFby contract or otherwiseFrelating to indemnification of or advancement of expenses to any individual who is or was a MemberFManagerFor officer of the Company or is or was serving at the Companys re: uest as a directorF officerFpartnerFmanagerFtrusteeFemployeeFor agent of another foreign or domestic companyFpartnershipFassociationF limited liability companyFcorporationF3oint ventureFtrustFemployee benefit planFor other enterpriseFwhether for profit or not.  Nothing contained in this Section 1' .01 shall limit the ability of the Company to otherwise indemnify or advance expenses to any individual.  It is the intent of this Section 1' .01 to provide indemnification to Indemnitees to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section 1' .01.  Indemnification shall be provided in accordance with this Section 1' .01 irrespective of the nature of the legal or e: uitable theory upon which a claim is madeFincludingFwithout limitationFnegligenceFbreach of dutyFmismanagementFwasteFbreach of contractFbreach of warrantyFstrict liabilityFviolation of federal or state securities lawFviolation of the Employee Retirement Income Security Act of 1654Fas amendedFor violation of any other state or federal law.

(h)      9or purposes of this Section 1' .01"

(i)      The term -expenses- includes all direct and indirect costs (includingFwithout limitationFcounsel feesFretainersFcourt costsFtranscriptsFfees of expertsFwitness feesFtravel expensesFduplicating costsFprinting and binding costsFtelephone chargesFpostageFdelivery service feesFand all other disbursements or out of poc: et expenses) actually incurred in connection with the investigationFdefenseFsettlementFor appeal of a proceeding or establishing or enforcing a right to indemnification under this Section 1' .01Fapplicable lawFor otherwise.

(ii)      The term -liability- means the obligation to pay a 3udgmentFsettlementFpenaltyFfineFexcise tax (including an excise tax assessed with respect to an employee benefit plan)For reasonable expenses incurred with respect to a proceeding.

(iii)      The term -party- includes an individual who wasFisFor is threatened to be made a named defendant or respondent in a proceeding.

(iv)      The term -proceeding- means any threatenedFpendingFor completed actionFsuit or proceedingF whether civilFcriminalFadministrativeFor investigative and whether formal or informal.

(v)      The Company may purchase and maintain insurance for its benefitFthe benefit of any individual who is entitled to indemnification under this Section 1' .01For bothFagainst any liability asserted against or incurred by such individual in any capacity or arising out of such individuals service with the CompanyFwhether or not the Company would have the power to indemnify such individual against such liability.

018947

HCMLPHMIT00004171

**ARTIC, E XIL**

**MISCE, , ANEOUS**

14.01    <u>Complete Agreement</u> .  This AgreementFthe CertificateFand all other organizational documents signed by all of the Members constitute the complete and exclusive statement of agreement among the Members with respect to the matters herein.  This Agreement and the Certificate replace and supersede all prior agreements by and among the Members or any of themFand no representationFstatementFor condition or warranty not contained in this Agreement or the Certificate will be binding on the Members or have any force or effect whatsoever.

14.02    <u>Governing , aw</u> .  This Agreement and the rights of the parties hereunder will be governed byFinterpretedF and enforced in accordance with the laws of the State of Delaware.

14.0'    <u>q inding Effect</u> .  Sub3ect to the provisions of this Agreement relating to transferabilityFthis Agreement will be binding upon and inure to the benefit of the MembersFand their respective distributesFsuccessorsFand assigns.

14.04    <u>Terms</u> .  Common nouns and pronouns will be deemed to refer to the masculineFfeminineFneuterFsingular and pluralFas the identity of the Person may in the context re: uire.  Any reference to the DE, AB ARE , AB SFthe Code or other statutes or laws will include all amendmentsFmodificationsFor replacements of the specific sections and provisions concerned.

14.0V    <u>Headings</u> .  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

14.0W    <u>Severability</u> .  If any provision of this Agreement is held to be illegalFinvalidFor unenforceable under the present or future laws effective during the term of this AgreementFsuch provision will be fully severable' this Agreement will be construed and enforced as if such illegalFinvalidFor unenforceable provision had never comprised a part of this Agreement' and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegalFinvalidFor unenforceable provision or by its severance from this Agreement.  9urthermoreFin lieu of such illegalF invalidFor unenforceable provisionFthere will be added automatically as a part of this Agreement a provision as similar in terms to such illegalFinvalidFor unenforceable provision as may be possible and be legalFvalidFand enforceable.

14.05    <u>Multiple Counterparts</u> .  This Agreement may be executed in several counterpartsFeach of which will be deemed an original but all of which will constitute one and the same instrument.  HoweverFin ma; ing proof hereof it will be necessary to produce only one copy hereof signed by the party to be charged.

14.0U    <u>Additional Documents and Acts</u> .  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuateFcarry outFand perform all of the termsFprovisionsFand conditions of this Agreement and the transactions contemplated hereby.

14.06    <u>No ThirdkParty q eneficiary</u> .  This Agreement is made solely and specifically among and for the benefit of the parties heretoFand their respective successors and assigns sub3ect to the express provisions hereof relating to successors and assignsFand no other person will have any rightsFinterestFor claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

14.10    <u>References to this Agreement</u> .  Numbered or lettered articlesFsectionsFand subsections herein contained refer to articlesFsectionsFand subsections of this Agreement unless otherwise expressly stated.

14.11    <u>Notices</u> .  Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice.  Such notices will be given to a Member at the address specified in <u>Exhibit q</u> hereto.  Any Member or the Company mayFat any time by giving five daysj prior written notice to the other Members and the CompanyFdesignate any other address in substitution of the foregoing address to which such notice will be given.

018948

HCMLPHMIT00004172

14.12    <u>Amendments</u>.  Except as otherwise may be provided in this AgreementFall amendments to this Agreement must be approved by the ManagersFplus one or more Members whose aggregate Percentage Interests total more than fifty percent (V0%).

14.1'    <u>Title to Company Property</u> .  , egal title to all property of the Company will be held and conveyed in the name of the Company.

14.14    <u>Reliance on Authority of Person Signing Agreement</u> .  In the event that a Member is not a natural personF neither the Company nor any Member will (a) be re: uired to determine the authority of the individual signing this Agreement to ma; e any commitment or underta; ing on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual' or (b) be re: uired to see to the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

14.1V    <u>SkCorp Election</u>.  In the event the Company elects to be treated as a SkCorporation for federal tax purposesFthe provisions in this Company Agreement addressing tax treatment shall be automatically amended and modified as re: uired in order to pertain to a Skcorporation.

14.1W    <u>Company Indemnification</u>.   In the event any Member is personally liable for any debt or obligations associated with a Company assetFthen the Company agrees to indemnify such Member for any such debt or obligation in excess of his or her proportionate amount of such debt or obligation that he/she is re: uired to pay or performFas measured by the Percentage Interest of the MembersFexcept as otherwise agreed by the Members.

*14.17    <u>**Management by Members**</u>.  **The Certificate of the Company and other Company documents/agreements on file and/or executed by the Member may reflect management by members, and not management by managers.  As a result, if such is the case and the Certificate is not amended to reflect management by managers, this Agreement shall be interpreted in such a manner that all references herein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President.***

22

018949

HCMLPHMIT00004173

IN B ITNESS B HEREO9Fthe Members have executed this Agreement to be effective as of the date first written above.

**THE MEMBER (OR MANAGING MEMBER)**

RAND ADL ISORS HO, DING CORP.F
a Delaware corporation

qy" _____
Mar;  Patric; FDirector and President

2'

018950

HCMLPHMIT00004174

**EXHIBIT A**

THE C, ASS A MEMq ERS AND INTERESTS

The sole Class A Member shall be RAND ADL ISORS HO, DING CORP. Fa Delaware corporationFand it shall own the Percentage Interest set forth on <u>Exhibit "q"</u> hereto.  In addition to such other rights as a Member described in this AgreementFthe holders of record of the Class A Interests shall have no additional rights.

018951

HCMLPHMIT00004175

**EXHIBIT B**

The Members

| Members and Addresses | Date Admitted | Class A Interest | Percentage Interest |
|---|---|---|---|
| RAND ADL ISORS HO, DING CORP. 2101 Cedar Springs Road Suite 1200FDallasFTX 5V201 Attn" Mar; Patric; | U1/2022 | 100% | 100% |

2\

018952

HCMLPHMIT00004176

**EXHIBIT 85**

018953

AMENDED AND RESTATED COMPANY AGREEMENT


*of*

RAND PE LI ND MANAGEMENTF, , C

A Delaware , imited , iability Company

018954

HCMLPHMIT00004177

# AMENDED AND RESTATED COMPANY AGREEMENT

### *of*

### RAND PE LI ND MANAGEMENTF, , C

### A Delaware , imited , iability Company

This AMENDED AND RESTATED COMPANY AGREEMENT (collectivelyF the "AgreementF" which shall include all amendments and exhibits hereto) dated effective as of the 1ˢᵗ day of AugustF 2022 (the "Effective Date")F are entered into by and among those Persons executing the signature page hereto as the Members of RAND PE LI ND MANAGEMENTF, , CFa Delaware limited liability company (the "Company"). All capitalized terms not defined in the instance of first usage shall have the respective meanings associated with such terms in Section 1.04 below.

### ARTIC, E U

### UNTRODI CTION

1.01    Lormation of , imited , iability Company  The Company was formed by the filing of the Certificate of Lormation (the "Certificate") with the Secretary of State of Delaware on the September 19F2015. The Company's business shall be conducted under the name "RAND PE LI ND MANAGEMENTF , , C" until such time as the Members shall hereafter designate otherwise and file amendments to the Certificate in accordance with applicable law. This Agreement amends and replacesF in its entiretyF all prior governing agreements for the CompanyF including any and all amendments thereto.

This Agreement is subject toF and governed byF the Delaware laws governing limited liability companies (the "DE, AWARE , AWS") and the Certificate. Un the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the DE, AWARE , AWS or the provisions of the CertificateF such provisions of the DE, AWARE , AWS or the CertificateF as the case may beF will be controlling.

1.02    Registered Office and Agent  The registered office and registered agent of the Company initially shall be as set forth in the Certificate and may be changed from time to time by the appropriate filing by the Company in the office of the Secretary of State of Delaware.

1.0B    Other Offices  The Company may also have offices at such other placesF both within and without the State of DelawareF as the q oard of Managers may from time to time determine or the business of the Company may re: uire.

1.04    Defined Terms  The terms used in this Agreement with their initial letter capitalized shallF unless the context re: uires otherwiseF have the meanings specified in this Section 1.04. The singular shall include the plural and the masculine gender shall include the feminine and neuterF and vice versaF as the context re: uires. When used in this AgreementF the following terms shall have the meanings set forth below"

(a)    -DE, AWARE , AWS- shall mean the Delaware laws governing limited liability companiesF as the same may be amended from time to time.

(b)    "Affiliate" shall meanF as to any PersonF any Person controlled byF controllingF or under common control with such PersonF andF in the case of a Person who is an individualF a member of the family of such individual consisting of a spouseF siblingF inklawF lineal descendantF or ancestor (including by adoption). Lor purposes of this definitionF "control" (including the terms "controlling"F "controlled by" and "under common control with") of a Person means the possessionF directly or indirectlyF alone or in concert with othersF of the power to direct or cause the direction of the management and policies of such PersonF whether through the ownership of securitiesF by contract or otherwiseF and no Person shall be deemed in control of another solely by virtue of being a directorF officer or holder of voting securities of any entity. A Person shall be presumed to control any partnership of which such Person is a general partner.

2

018955

HCMLPHMIT00004178

(c)    -q;an;ruptcy- shall meanFand a Member shall be deemed a -q;an;rupt MemberF upon (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any Debtor Relief , aws' (ii) the appointment of a receiverF li:uidatorF assigneeF custodianF trusteeF se:uestratorFor other similar agent under applicable Debtor Relief , aws for the Member or for any substantial part of its assets or property' (iii) the ordering of the winding up or li:uidation of the Member's affairs' (iv) the filing of a petition in any involuntary ban;ruptcy caseFwhich petition remains undismissed for a period of 190 days or which is not dismissed or suspended pursuant to Section B05 of the Lederal q;an;ruptcy Code (or any corresponding provision of any future Inited States ban;ruptcy law)' (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief , aw now or hereafter in effect' (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the ta;ing of possession by a receiverF li:uidatorF assigneeF trusteeF custodianF se:uestratorFor other similar agent under any applicable Debtor Relief , aws for the Member or for any substantial part of its assets or property' or (vii) the ma;ing by a Member of any general assignment for the benefit of its creditors.

(d)    "q;oo; Depreciation" for any asset shall mean for any Liscal Year or other period an amount that bears the same ratio to the q;oo; Ualue of that asset at the beginning of such Liscal Year or other period as the federal income tax depreciationFamortizationFor other cost recovery deduction allowable for that asset for such year or other period bears to the adjusted tax basis of that asset at the beginning of such year or other period.  3f the federal income tax depreciationF amortizationFor other cost recovery deduction allowable for any asset for such year or other period is zeroFthen q;oo; Depreciation for that asset shall be determined with reference to such beginning q;oo; Ualue using any reasonable method selected by the q;oard of Managers.

(e)    "q;oo; Ualue" shall mean for any asset the asset's adjusted tax basisFexcept as follows"

(i)    the initial q;oo; Ualue of any asset contributed by a Member to the Company shall be the gross fair mar;et value of such assetFas determined by the q;oard of Managers'

(ii)    the q;oo; Ualues of all Company assets shall be adjusted to e:ual their respective gross fair mar;et valuesFas determined by the q;oard of ManagersFas of one of the following times" (1) on the ac:uisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution if the q;oard of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company' (2) on the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an 3nterest in the Company if the q;oard of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company' and (B) on the li:uidation of the Company within the meaning of Section 1.V04;l(b)(2)(ii)(g) of the Treasury Regulations'

(iii)    the q;oo; Ualue of any Company asset distributed to any Member shall be the gross fair mar;et value of such asset on the date of distribution'

(iv)    the q;oo; Ualues of Company assets shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Section VB4(b) or Code Section V4B(b)Fbut only to the extent that such adjustments are ta;en into account in determining Capital Accounts pursuant to Section 1.V04;l(b)(2)(iv)(m) of the Treasury Regulations and Section 9.02(d) hereof'  providedFhoweverFthat q;oo; Ualues shall not be adjusted pursuant to this Section 1.04(e)(iv) to the extent the q;oard of Managers determines that an adjustment pursuant to Section 1.04(e)(ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 1.04(e)(iv)' and

(v)    if the q;oo; Ualue of an asset has been determined or adjusted pursuant to Section 1.04(e)(i)H.04(e)(ii)For 1.04(e)(iv) hereofFsuch q;oo; Ualue shall thereafter be adjusted by the q;oo; Depreciation ta;en into account with respect to such asset for purposes of computing Profits and , osses.

(f)    -Capital Contribution- shall mean the total value of cash and q;oo; Ualue (except as otherwise herein provided) of property contributed and agreed to be contributed to the Company by each MemberFas shown in <u>Exhibit A</u>F attached hereto and incorporated herein for all purposesFas the same may be amended from time to time.  Any reference in this Agreement to the Capital Contribution of a then Member shall include a Capital Contribution previously made by any

B

HCMLPHMIT00004179

prior Member for the interest of such then MemberFreduced by any distribution to such Member in return of its capital as contemplated herein.

(g)      "Class A 3nterest" shall refer to the 3nterest of a Class A Member in the ProfitsF, ossesFDistributable CashF and assets upon li: uidation of the Company as described in this Agreement.

(h)      "Class A Members" shall mean those Persons listed on Exhibit A and designated as "Class A Members." The Class A Members shall have such additional rights as a Member as are specifically described and granted in Exhibit AF as amended from time to time.

(i)      3ntentionally q lan; .

(j)      3ntentionally q lan; .

(; )      -Code- shall mean the 3nternal Revenue Code of 1796Fas amended.  All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

(l)      -Company- shall refer to the limited liability company created by virtue of the Certificate and this Agreement and any successor in interest.

(m)      "Debtor Relief , aws" shall mean any federal or state ban;ruptcyFinsolvencyF or similar laws generally affecting the rights of creditors and the relief of debtors now or hereafter in effect.

(n)      3ntentionally q lan; .

(o)      -Distributable Cash- of the Company shall mean all cash funds of the Company on hand from time to time (other than cash funds obtained as Capital Contributions by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time' (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time' and (iii) provision for a wor; ing cash reserve in accordance with Section 9.0Vbelow.

(p)      "Liscal Year" shall mean the calendar year.

(: )      "Lormer Member" shall mean a member that causes a Dissolution Event.

(r)      -3nterest- in the Company shall mean the entire ownership interest of a Member in the Company at any particular timeFincluding such Member's Capital AccountFallocable share of ProfitsF, ossesFand Distributable CashFand the right of such Member to any and all benefits to which a Member may be entitled as provided in this AgreementFtogether with the obligations of such Member to comply with all of the terms and provisions of this Agreement.

(s)      3ntentionally q lan;

(t)      -Manager- shall mean an individual elected to the q oard of Managers of the Company pursuant to Sections B.02 and B.04 below.

(u)      -Member(s)- shall mean all Members admitted to the Company hereafter as Members who shall consent to the terms hereof and shall be admitted pursuant to the provisions hereof.  The namesFbusiness or residence addressesFCapital ContributionsFPercentage 3nterestFand class of 3nterest of the Members shall be set forth on Exhibit q Fattached hereto and incorporated herein by reference.  Reference to a -Member- shall be to any one of the Members.

(v)      -Percentage 3nterest- of a Member shall mean the percentage of such Member set forth opposite the name of such Member under the column -Percentage 3nterest- in Exhibit q Fas such percentage may be adjusted from time to time pursuant to the terms hereof.

(w)      "Person" shall mean any individualF corporationF partnershipF limited liability company or partnershipF associationForganizationFtrustFestateFor other entity.

4

018957

HCMLPHMIT00004180

(x)     -Pro Rata Part- shall mean the percentage expression of a fraction the numerator of which is a Member's respective Percentage Interest and the denominator of which is the aggregate Percentage Interests of all Members involved in the respective transaction or having a respective right or option.

(y)     "Profits" and ", osses" shall mean For each Fiscal Year or other period Fan amount e; ual to the Company's taxable income or loss for such year or period Fdetermined in accordance with Code Section 703(a) (for this purpose Fall items of income Fgain Floss For deduction re: uired to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss) Fwith the following adjustments"

(i)     income of the Company that is exempt from federal income tax and not otherwise ta; en into account in computing Profits and , osses pursuant to this Section 1.04(y) shall be added to such taxable income or loss'

(ii)     any expenditures of the Company described in Code Section 705(a)(2)(q) For treated as Code Section 705(a)(2)(q) expenditures pursuant to Section 1.V04kl(b)(2)(iv)(i) of the Treasury Regulations Fand not otherwise ta; en into account in computing Profits and , osses pursuant to this Section 1.04(y) Fshall be subtracted from such taxable income or loss'

(iii)     if the q oo; Value of any Company asset is adjusted pursuant to Section 1.04(e)(ii) or Section 1.04(e)(iii) Fthe amount of such adjustment shall be ta; en into account as gain or loss from the disposition of such asset for purposes of computing Profits and , osses'

(iv)     gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the q oo; Value of the property disposed of Fnotwithstanding that the adjusted tax basis of such property differs from its q oo; Value'

(v)     in lieu of the deduction for depreciation F cost recovery For amortization ta; en into account in computing such taxable income or loss Fthere shall be ta; en into account q oo; Depreciation' and

(vi)     notwithstanding any other provision of this Section 1.04(y) Fany items that are specially allocated pursuant to Section 9.02 or Section 9.03 shall not be ta; en into account in computing Profits and , osses.

(z)     "Regulatory Allocations" shall mean the special allocations of items of income Fgain Floss Fand deduction Fif any Fset forth in Section 9.02 hereof.

(aa)     -Transfer- or -Transferred- shall mean the sale F assignment F conveyance F gift F be: uest F devise F transfer under the rules of intestate succession F pledge F mortgage For other encumbrance. In addition Fthe term -Transfer- or -Transferred- shall mean an -ownership change- of a Member as defined in Section 392(g) of the Code in effect as of the Effective Date Fexcept that the term -Member- shall be substituted for -shareholder- wherever it appears.

(bb)     -Treasury Regulations- shall mean regulations issued by the Department of the Treasury interpreting the Code.

(cc)     "I nanimous Consent" shall mean the written consent of all of the then Members of the Company.

## ARTIC, E II

## MEMBERS AND MEMBERSHIP INTERESTS

2.01     <u>Members</u>. The Members of the Company shall be those Persons listed on <u>Exhibit q</u>. Except as otherwise may be provided in <u>Exhibit A</u> or <u>Exhibit q</u> Fand except as provided in Section V.05 below Fa Person may be admitted as a Member to the Company only upon the affirmative vote of the Managers Fplus one or more Members whose Percentage Interests total more than fifty percent (50%)' provided Fhowever Fthat no Person will be recognized as a Member of the

018958

HCMLPHMIT00004181

Company until he/she shall have executed this AgreementFor a counterpart heretoFand agrees to be bound by all of the terms and conditions hereof.

2.02    <u>Annual Meetings</u>   An annual meeting of the Members of the Company shall be held during each calendar year on such date and at such time as shall be designated from time to time by the q oard of Managers and stated in the notice of the meetingFand if a legal holidayFthen on the next business day followingFat the time specified in the notice of the meeting.   At such meetingFthe Members shall elect Managers and transact such other business as may properly be brought before the meeting.

2.0B    <u>Special Meetings</u>   A special meeting of the Members may be called at any time by the PresidentFthe q oard of ManagersFor one or more Members whose Percentage 3nterests total at least 10%.   Only such business shall be transacted at a special meeting as may be stated or indicated in the notice of such meeting.

2.04    <u>Place of Meetings</u>   The annual meeting of Members may be held at any place within or without the State of Delaware as may be designated by the q oard of Managers.   Special meetings of Members may be held at any place within or without the State of Delaware as may be designated by the person or persons calling such special meeting as provided in Section 2.0B.   3f no place for a meeting is designatedFit shall be held at the registered office of the Company.

2.05    <u>Notice</u>.   Written or printed notice stating the placeFdayFand hour of each meeting of Members andFin case of a special meetingFthe purpose or purposes for which the meeting is calledFshall be delivered not less than 10 days or more than 50 days before the date of the meetingFeither personally or by mailFby or at the direction of the PresidentFthe SecretaryF or the person calling the meetingFto each Member of record entitled to vote at such meeting.

2.06    <u>Uoting , ist</u>   At least 10 days before each meeting of MembersFthe Secretary shall prepare a complete list of Members entitled to vote at such meetingFarranged in alphabetical orderFincluding the address of each Member and the number of voting 3nterests held by each Member.   Lor a period of 10 days prior to such meetingFsuch list shall be ; ept on file at the registered office of the Company and shall be subject to inspection by any Member during usual business hours.   Such list shall be produced at such meetingFand at all times during such meeting shall be subject to inspection by any Member.   The membership interest transfer boo; s shall be prima facie evidence as to who are the Members entitled to examine such list or membership interest transfer boo; s.

2.0V    <u>Uoting of 3nterests</u>.   3nterests held by the Company in treasuryF3nterests owned by a Person the majority of the voting interests of which are owned or controlled by the CompanyFand 3nterests held by the Company in a fiduciary capacity shall not be 3nterests entitled to vote or to be counted in determining the total number of outstanding 3nterests of the Company.   3nterests held by an administratorFexecutorFguardianFor conservator may be voted by him or herFeither in person or by proxyFwithout transfer of such 3nterests into his or her name so long as such 3nterests form a part of the estate and are in the possession of the estate being served by him or her.   3nterests standing in the name of a trustee may be voted by him or herFeither in person or by proxyFonly after the 3nterests have been transferred into his or her name as trustee.   3nterests standing in the name of a receiver may be voted by such receiverFand 3nterests held by or under the control of a receiver may be voted by such receiver without transfer of such 3nterests into his or her name if authority to do so is contained in the court order by which such receiver was appointed.   3nterests standing in the name of another domestic or foreign corporation of any type or ; ind may be voted by such officerFagentFor proxy as the bylaws of such corporation may provide orFin the absence of such provisionFas the board of directors of such corporation may by resolution determine.   A Member whose 3nterests are pledged shall be entitled to vote such 3nterests until they have been transferred into the name of the pledgeeFand thereafter the pledgee shall be entitled to vote such 3nterests.

2.09    <u>Quorum</u>.   The presence in person or by proxy of one or more Members whose Percentage 3nterests total more than fifty percent (50%) shall constitute a : uorum at any meeting of MembersFexcept as otherwise provided by lawFthe CertificateF or this Agreement.   At any reconvening of an adjourned meeting at which a : uorum shall be present or representedFany business may be transacted that could have been transacted at the original meeting if a : uorum had been present or represented.

2.07    <u>Uote' Withdrawal of Quorum</u>.   3f a : uorum is present in person or represented by proxy at any meetingF except as otherwise may be provided in <u>Exhibit A</u> or <u>Exhibit q</u>Fthe vote of one or more Members whose Percentage 3nterests total more than fifty percent (50%) of <u>all</u> MembersFwhether or not they are present in person or represented by proxyFshall decide any : uestion brought before such meetingFunless the : uestion is one on whichFby express provision of lawFthe

6

018959

HCMLPHMIT00004182

CertificateFor this Agreement a different vote is re: uiredFin which event such express provision shall govern and control the decision of such : uestion.  The Members present at a duly convened meeting may continue to transact business until adjournmentFnotwithstanding any withdrawal of Members that may leave less than a : uorum remaining.

    2.10    Method of Uoting' Proxies.  Except as otherwise may be provided in Exhibit A or Exhibit qFeach Member shall be entitled to that number of votes on each matter submitted to the Members for their vote e: ual to such Member's Percentage 3nterest multiplied by 100.  At any meeting of MembersFevery Member having the right to vote may vote either in person or by a proxy executed in writing by the Member or by his duly authorized attorneykinkfact.  Each such proxy shall be filed with the Secretary of the Company before or at the time of the meeting.  No proxy shall be valid after 11 months from the date of its executionFunless otherwise provided in the proxy.  3f no date is stated on a proxyFsuch proxy shall be presumed to have been executed on the date of the meeting at which it is to be voted.  Each proxy shall be revocable unless expressly provided therein to be irrevocable or unless otherwise made irrevocable by law.

    2.11    Closing of Transfer q oo; s' Record Date .  Lor the purpose of determining Members entitled to notice ofFor to vote atFany meeting of Members or any reconvening thereofFor entitled to receive payment of any distributionFor in order to ma; e a determination of Members for any other proper purposeFthe q oard of Managers may provide that the membership interest transfer boo; s of the Company shall be closed for a stated period but not to exceed in any event 50 days.  3f the membership interest transfer boo; s are closed for the purpose of determining Members entitled to notice ofFor to vote atFa meeting of MembersFsuch boo; s shall be closed for at least 10 days immediately preceding such meeting.  3n lieu of closing the membership interest transfer boo; sFthe q oard of Managers may fix in advance a date as the record date for any such determination of MembersFsuch date in any case to be not more than 50 days and not less than 10 days prior to the date on which the particular action re: uiring such determination of Members is to be ta; en.  3f the membership interest transfer boo; s are not closed and if no record date is fixed for the determination of Members entitled to notice ofFor to vote atFa meeting of Members or entitled to receive payment of a distributionFthe date on which the notice of the meeting is to be mailed or the date on which the resolution of the q oard of Managers declaring such distribution is adoptedFas the case may beFshall be the record date for such determination of Members.

    2.12    Presiding Officials at Meetings  The President shall preside atFand the Secretary shall prepare minutes ofF each meeting of MembersFand in the absence of either such officerFhis other duties shall be performed by some person appointed at the meeting.

## ARTlC‚ E lll

### MANAGERS

    B01    Management.  The business and affairs of the Company shall be managed EXC‚ I S3UE‚ Y by the q oard of Managers.  Subject to the restrictions imposed by lawF the CertificateF or this AgreementF the q oard of Managers may exercise all the powers of the Company.

    B02    Number' Election' Term' Qualification.  The first q oard of Managers shall consist of the number of Managers named in the Certificate and or otherwise in the Company documents.  ThereafterFexcept as otherwise may be restricted by this AgreementFthe number of Managers that shall constitute the entire q oard of Managers shall be determined by resolution of the q oard of Managers at any meeting thereof or by the Members at any meeting thereofFbut shall never be less than one (1).  At each annual meeting of MembersFManagers shall be elected to hold office until the next annual meeting of Members and until their successors are elected and : ualified.  No Manager need be a MemberFa resident of the State of DelawareFor a citizen of the I nited States.

    B0B    Removal  Except as otherwise may be provided by the MembersF at any meeting of Members called expressly for that purposeFany Manager or the entire q oard of Managers may be removedFwith or without causeFby a vote of one or more Members whose Percentage 3nterests total more than fifty percent (50%).

    B04    Change in Number' Uacancies.  No decrease in the number of Managers constituting the entire q oard of Managers shall have the effect of shortening the term of any incumbent Manager.  3n the case of any increase in the number of ManagersFor in the case of the deathFretirementFresignationFor removal of a ManagerFthe vacancies to be filled by such increase or deathF retirementF resignationF or removal may be filled by (a) the q oard of Managers for a term of office

018960

HCMLPHMIT00004183

continuing only until the next election of one or more Managers by the Members' or (b) the Members at any annual or special meeting of the Members.  A Manager elected to fill a vacancy shall be elected to serve for the unexpired term of his predecessor in office.

B05   <u>Place of Meetings</u> .  The q oard of Managers may hold its meetings in such place or placesFincluding by telephonic or other electronic method of communicationFwithin or without the State of Delaware as the q oard of Managers may from time to time determine.

B06   <u>Lirst Meeting</u> .  Each newly elected q oard of Managers may hold its first meetingFif a : uorum is presentF for the purpose of organization and the transaction of business immediately after and at the same place as the annual meeting of MembersFand no notice of such meeting shall be necessary.

B0V   <u>Regular Meetings</u> .  Regular meetings of the q oard of Managers may be held without notice at such times and placesFincluding by telephonic or other electronic method of communicationFas may be designated from time to time by resolution of the q oard of Managers and communicated to all Managers.  Regular meetings of the q oard of Managers may be held when and if neededFand no more than one regular meeting of the q oard of Managers shall be re: uired in any calendar year.

B09   <u>Special Meetings</u> .  A special meeting of the q oard of Managers shall be held whenever called by any Manager at such time and placeFincluding by telephonic or other electronic method of communicationFas such Manager shall designate in the notice of such special meeting.  The Manager calling any special meeting shall cause notice of such special meeting to be given to each Manager at least 24 hours before such special meeting.  Neither the business to be transacted atF nor the purpose ofFany special meeting of the q oard of Managers need be specified in the notice or waiver of notice of any special meeting.

B07   <u>Quorum' Uote</u> .  At all meetings of the q oard of ManagersFa majority of the Managers fixed in the manner provided in this Agreement shall constitute a : uorum for the transaction of business.  3f a : uorum is not present at a meetingF a majority of the Managers present may adjourn the meeting from time to timeFwithout notice other than an announcement at the meetingFuntil a : uorum is present.  The vote of a majority of the Managers present at a meeting at which a : uorum is in attendance shall be the act of the q oard of ManagersFunless the vote of a different number is re: uired by lawFthe CertificateF or this Agreement.

B10   <u>Procedure' Minutes</u> .  At meetings of the q oard of ManagersFbusiness shall be transacted in such order as the q oard of Managers may determine from time to time.  The q oard of Managers shall appoint at each meeting a person to preside at the meeting and a person to act as secretary of the meeting.  The secretary of the meeting shall prepare minutes of the meeting that shall be delivered to the Secretary of the Company for placement in the minute boo; of the Company.

B11   <u>Presumption of Assent</u> .  A Manager of the Company who is present at any meeting of the q oard of Managers at which action on any matter is ta; en shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereofFor shall forward any dissent by certified or registered mail to the Secretary of the Company immediately after the adjournment of the meeting.  Such right to dissent shall not apply to a Manager who voted in favor of such action.

B12   <u>Compensation</u> .  Except as otherwise may be restricted in this AgreementFManagersFin their capacity as ManagersFmay receiveFby resolution of the q oard of ManagersFa stated salary or a fixed sum and expenses of attendanceFif anyFfor attending meetings of the q oard of Managers.  No Manager shall be precluded from serving the Company in any other capacity or receiving compensation therefor.

<u>**ARTIC, E IV**</u>

**COMMITTEES**

4.01   <u>Designation</u> .  The q oard of Managers mayFby a resolution adopted by a majority of the entire q oard of ManagersFdesignate executive and other committees.

9

018961

4.02    <u>Number' Qualification' Term</u> .  Each committee shall consist of one or more Managers appointed by resolution adopted by a majority of the entire qoard of Managers.  The number of committee members may be increased or decreased from time to time by resolution adopted by a majority of the entire qoard of Managers.  Each committee member shall serve as such until the expiration of his term as a Manager or his earlier resignationFunless sooner removed as a committee member or as a Manager.

4.0B    <u>Authority</u> .  The executive committeeFto the extent provided in the resolution establishing such committeeF shall have and may exercise all of the authority of the qoard of Managers in the management of the business and affairs of the Company.  Each other committeeFto the extent expressly provided for in the resolution establishing such committeeFshall have and may exercise all of the authority of the qoard of Managers in such other matters and affairs concerning the Company.  HoweverFno committee shall have the authority of the qoard of Managers in reference to any of the following"

(a)    amending the Certificate'

(b)    approving a plan of merger or consolidation'

(c)    recommending to the Members the saleFleaseFor exchange of all or substantially all of the property and assets of the Company other than in the usual and regular course of its business'

(d)    recommending to the Members a voluntary dissolution of the Company or a li: uidation thereof'

(e)    filling vacancies inFor removing members ofFthe qoard of Managers or of any committee thereof'

(f)    filling any vacancy to be filled by reason of an increase in the number of Managers'

(g)    electing or removing officers or committee members'

(h)    fixing the compensation of any committee member' or

(i)    altering or repealing any resolution of the qoard of Managers thatFby its termFprovides that it shall not be amendable or repealable.

4.04    <u>Committee Changes</u> .  The qoard of Managers shall have the power at any time to fill vacancies inFto change the Membership ofFand to discharge any committee.  HoweverFa committee member may be removed by the qoard of Managers only ifFin the judgment of the qoard of ManagersFthe best interests of the Company will be served therebyFbut such removal shall be without prejudice to the contract rightsFif anyFof the person so removed.

4.05    <u>Regular Meetings</u> .  Regular meetings of any committee may be held without notice at such times and placesFincluding by telephonic or other electronic methods of communicationFas may be designated from time to time by resolution of the committee and communicated to all committee members.

4.06    <u>Special Meetings</u> .  A special meeting of any committee may be held whenever called by any committee member at such time and placeFincluding by telephonic or other electronic methods of communicationFas such committee member shall designate in the notice of such special meeting.  The committee member calling any special meeting shall cause notice of such special meeting to be given to each committee member at least 24 hours before such special meeting.  Neither the business to be transacted atFnor the purpose ofFany special meeting of any committee need be specified in the notice or waiver of notice of any special meeting.

4.0V    <u>Quorum' Majority Uote</u> .  At all meetings of any committeeFa majority of the number of committee members designated by the qoard of Managers shall constitute a : uorum for the transaction of business.  3f a : uorum is not present at a meeting of any committeeFa majority of the committee members present may adjourn the meeting from time to timeFwithout notice other than an announcement at the meetingFuntil a : uorum is present.  The vote of a majority of the committee members present at any meeting at which a : uorum is in attendance shall be the act of a committeeFunless the vote of a different number is re: uired by lawFthe CertificateFor this Agreement.

7

018962

HCMLPHMIT00004185

4.09 <u>Minutes</u> . Each committee shall cause minutes of its proceedings to be prepared and shall report the same to the q oard of Managers. The minutes of the proceedings of each committee shall be delivered to the Secretary of the Company for placement in the minute boo; s of the Company.

4.07 <u>Compensation</u> . Except as otherwise may be restricted in this AgreementFcommittee members mayFby resolution of the q oard of ManagersFbe allowed a stated salary or a fixed sum and expenses of attendanceFif anyFfor attending any committee meetings.

4.10 <u>Responsibility</u> . The designation of any committee and the delegation of authority to it shall not operate to relieve the q oard of Managers or any Manager of any responsibility imposed upon it or such Manager by law.

## ARTIC, E V

## GENERA, PROVISIONS RE, ATING TO MEETINGS

5.01 <u>Notice</u> Whenever by lawFthe CertificateFor this Agreement notice is re: uired to be given to any MemberF ManagerFor committee member and no provision is made as to how such notice shall be givenFit shall be construed to mean that notice may be given either (a) in person' (b) in writingFby mail' (c) by telegramFtelexFcableFtelecopy or facsimile transmissionFor similar means' or (d) by any other method permitted by law. Any notice re: uired or permitted to be given hereunder (other than personal notice) shall be addressed to such MemberFManagerFor committee member at his address as it appears on the boo; s on the Company orFin the case of a MemberFon the membership interest transfer records of the Company or at such other place as such MemberFManagerFor committee member is ; nown to be at the time notice is mailed or transmitted. Any notice re: uired or permitted to be given by mail shall be deemed to be delivered and given at the time when such notice is deposited in the I nited States mailFpostage prepaid. Any notice re: uired or permitted to be given by telegramFtelexFcableFtelecopy or facsimile transmissionFor similar means shall be deemed to be delivered and given at the time transmitted.

5.02 <u>Waiver of Notice</u> . Whenever by lawFthe CertificateFor this Agreement any notice is re: uired to be given to any MemberFManagerFor committee member of the CompanyFa waiver thereof in writing signed by the person or persons entitled to such noticeFwhether before or after the time notice should have been givenFshall be e: uivalent to the giving of such notice. Attendance of a Manager or Member at a meeting shall constitute a waiver of notice of such meetingFexcept where a Manager or Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

5.0B <u>Telephone and Similar Meetings</u> MembersFManagersFor committee members may participate in and hold a meeting by means of a conference telephone or similar communications e: uipment by means of which all persons participating in the meeting can hear each other. Participation in such a meeting shall constitute presence in person at such meetingFexcept where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

5.04 <u>Action Without Meeting</u> . Any action that may be ta; enFor is re: uired by lawFthe CertificateFor this Agreement to be ta; en at a meeting of the MembersFthe q oard of ManagersFor a committee thereof may be ta; en without a meeting if a consent in writingFsetting forth the action so ta; enFshall be signed by the Members owning the re: uired Percentage 3nterests of all Members (as set forth herein for the respective action or decision)Fa majority of the Managers or committee membersFas the case may beFentitled to vote with respect to the subject matter thereofFand such consent shall have the same force and effect as a vote of such MembersFManagersFor committee membersFas the case may beFand may be stated as such in any document filed with the Secretary of State of Delaware or in any certificate or other document delivered to any person. The consent may be in one or more counterparts so long as each MemberFManagerFor committee member signs one of the counterparts. The signed consent shall be placed in the minute boo; s of the Company.

## ARTIC, E VI

## OLLICERS AND OTHER AGENTS

018963

HCMLPHMIT00004186

6.01    <u>Number' Titles' Election' Term</u>  The Company shall have a presidentFone or more vice presidents (andFin the case of each vice presidentFwith such descriptive titleFif anyFas the q oard of Managers shall determine)Fa secretaryFa treasurerFand such officers and agents as the q oard of Managers may deem desirable.  The q oard of Managers shall elect a presidentF vice presidentF treasurerF and secretary at its first meeting at which a : uorum shall be present after the annual meeting of Members or whenever a vacancy exists.  The q oard of Managers thenFor from time to timeFmay also elect or appoint one or more other officers or agents as it shall deem advisable.  Except as otherwise may be provided by separate agreementFeach officer and agent shall hold office for the term for which he is elected or appointed and until his successor has been elected or appointed and : ualified.  I nless otherwise provided in the resolution of the q oard of Managers electing or appointing an officer or agentFhis term of office shall extend to and expire at the meeting of the q oard of Managers following the next annual meeting of Members orFif earlierFat his deathFresignationFor removal.  Any two or more offices may be held by the same person.  No officer or agent need be a MemberFa ManagerFa resident of the State of DelawareFor a citizen of the I nited States.

6.02    <u>Removal</u> .  Any officer or agent elected or appointed by the q oard of Managers may be removed by a majority of the q oard of Managers only ifFin the judgment of a majority of the q oard of ManagersFthe best interests of the Company will be served therebyFbut such removal shall be without prejudice to the contract rightsFif anyFof the person so removed. Election or appointment of an officer or agent shall not of itself create contract rights.

6.0B    <u>Uacancies</u> .  Any vacancy occurring in any office of the Company may be filled by the q oard of Managers.

6.04    <u>Authority</u> .  Officers shall have such authority and perform such duties in the management of the Company as are provided in this Agreement or as may be determined by resolution of the q oard of Managers not inconsistent with this Agreement.

6.05    <u>Compensation</u> .  Except as otherwise may be provided by separate agreementFthe compensationFif anyFof officers  or any salaried employee shall be fixedF increasedF or decreased from time to time by the q oard of ManagersF providedFhoweverFthat the q oard of Managers may by resolution delegate to any one or more officers of the Company the authority to fix such compensation.

6.06    <u>Chairman of the q oard</u> .  The Chairman of the q oardFif anyFshall be an officer of the Company andF subject to the direction of the q oard of ManagersFshall perform such executiveFsupervisoryFand management functions and duties as may be assigned to him from time to time by the q oard of Managers.

6.0V    <u>PresidentFCEO and COO</u> .  The q oard of Managers may designate and appoint a PresidentFCEO and/or COOFwith rightsFduties and responsibilities established by the q oard of Managers.

6.09    <u>Uice Presidents</u> .  Each Uice President shall have such powers and duties as may be prescribed from time to time by the q oard of Managers or as may be delegated from time to time by the President and (in the order as designated by the q oard of ManagersFor in the absence of such designationFas determined by the length of time each has held the office of Uice President continuously) shall exercise the powers of the President during that officer's absence or inability to act.

6.07    <u>Treasurer</u> .  The Treasurer shall have custody of the Company's funds and securitiesFshall ; eep full and accurate accounts of receipts and disbursementsFand shall deposit all moneys and valuable effects in the name and to the credit of the Company in such depository or depositories as may be designated by the q oard of Managers.  The Treasurer shall audit all payrolls and vouchers of the Company' shall receiveF auditF and consolidate all operating and financial statements of the Company and its various departments' shall supervise the accounting and auditing practices of the Company' and shall have charge of matters relating to taxation.  AdditionallyFthe Treasurer shall have the power to endorse for depositFcollectionForF otherwise all chec; sFdraftsFnotesFbills of exchangeFand other commercial paper payable to the Company and to give proper receipts and discharges for all payments to the Company.  The Treasurer shall perform such other duties as may be prescribed from time to time by the q oard of Managers or as may be delegated from time to time by the President.

6.10    <u>Assistant Treasurers</u> .  Each Assistant Treasurer shall perform such duties as may be prescribed from time to time by the q oard of Managers or as may be delegated from time to time by the President.  The Assistant Treasurers (in the order as designated by the q oard of Managers orFin the absence of such designationFas determined by the length of time each has held the office of Assistant Treasurer continuously) shall exercise the powers of the Treasurer.

11

018964

HCMLPHMIT00004187

6.11   <u>Secretary</u> .   The Secretary shall maintain minutes of all meetings of the q oard of Managers F of any committee F and of the Members F or consents in lieu of such minutes F in the Company's minute boo; s F and shall cause notice of such meetings to be given when re: uested by any person authorized to call such meetings.  The Secretary may sign with the President F in the name of the Company F all contracts of the Company and affix the seal of the Company thereto.  The Secretary shall have charge of the certificate boo; s F membership interest transfer boo; s F and other documents as the q oard of Managers may direct F all of which shall at all reasonable times be open to inspection by any Manager at the office of the Company during normal business hours.  The Secretary shall perform such other duties as may be prescribed from time to time by the q oard of Managers or as may be delegated from time to time by the President.

6.12   <u>Assistant Secretaries</u> .   Each Assistant Secretary shall perform such duties as may be prescribed from time to time by the q oard of Managers or as may be delegated from time to time by the President.  The Assistant Secretaries (in the order designated by the q oard of Managers or F in the absence of such designation F as determined by the length of time each has held the office of Assistant Secretary continuously) shall exercise the powers of the Secretary during that officer's absence or inability to act.

**ARTIC, E VII**

**CAPITA, IZATION AND CAPITA,  ACCOI NTS**

V.01   <u>Capital Contributions</u> .   The Capital Contributions of the Members F as set forth in the boo; s and records of the Company F shall be paid or transferred to the Company in cash and/or property on the terms and in the manner specified by the q oard of Managers.  No Member shall be entitled to ma; e any additional Capital Contributions except as provided in Section V.02 and V.0B below.

V.02   <u>Additional Capital Contributions</u> .   3f the q oard of Managers determine that additional capital is re: uired for the purposes of the Company F as set forth herein F the q oard of Managers may notify the Members of the need for such additional capital and shall state the specific purposes for which the call for such additional capital is being made.  Thereupon F all Members shall have the right (but not the obligation) to ma; e additional Capital Contributions in cash and/or property to the Company aggregating the amount of additional capital needed by the Company in the proportion of their respective Percentage 3nterests in the Company at the time notice is given.  The q oard of Managers shall use the additional capital so contributed solely for the purposes stated in the notice to the Members.

V.0B   <u>Lailure to Ma; e Additional Capital Contributions</u> .   3f any Member chooses not to contribute its share of the additional capital needed by the Company within 14 days after notice is given to the Members of the need for such additional capital (a "Non-Contributing Member") F then the other Members shall be entitled (but not obligated) to contribute the share of such Non-Contributing Member (such Members being referred to as "Contributing Members") of the additional capital needed pro rata according to such Contributing Members' Percentage 3nterests at such time or such other share as otherwise agreed upon by the Contributing Members.

V.04   <u>Effect of Lailure to Ma; e Additional Capital Contributions</u> .   3n the event of a Non-Contributing Member F the Percentage 3nterests of all of the Members shall be recomputed on the following basis"  Each Member's Percentage 3nterest immediately following the computation shall e: ual the percentage expression of a fraction F the numerator of which is the total Capital Contributions of such Member plus the additional Capital Contribution F if any F made by such Member pursuant to Sections V.02 and V.0B above F and the denominator of which is the total Capital Contributions of all of the Members plus the additional Capital Contributions made by all of the Members pursuant to Sections V.02 and V.0B above.

V.05   <u>Recapitalization by Admission of Additional Members</u> .   3f additional capital is re: uired for the purposes of the Company as set forth herein and the q oard of Managers is unable to finance such capital needs by borrowing the re: uired amounts or through notice to the existing Members of the necessity for additional Capital Contributions as provided in Section V.02 and V.0B above F the q oard of Managers shall have the right to admit additional Members to the Company F upon receiving the other approvals re: uired herein.  Lollowing the admission of one or more new Members F the Percentage 3nterest of each Member F including the newly admitted Member(s) F shall be computed as follows"  Each Member's Percentage 3nterest immediately following the computation shall e: ual the percentage expression of a fraction F the numerator of which is the total Capital Contributions of such Member and the denominator of which is the total Capital Contributions of all of the Members F including the newly admitted Members.

12

018965

HCMLPHMIT00004188

V.06    <u>Maintenance of Capital Accounts</u> .  The Company shall maintain for each Member a separate Capital Account in accordance with this Section V.06F which shall control the allocation of Profits and , osses and the division of assets upon li: uidation of the Company as provided in Section 12.01.  Each Capital Account shall be maintained in accordance with the following provisions"

(a)    a Member⅛ Capital Account shall initially be zero and shall be increased by the cash amount or q oo; Ualue of any property contributed by such Member to the Company pursuant to this AgreementF such Member⅛ allocable share of Profits and any items in the nature of income or gains that are specially allocated to such Member pursuant to Section 9.02 and Section 9.0B hereofF and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member'

(b)    such Capital Account shall be decreased by the cash amount or q oo; Ualue of any property distributed to such Member pursuant to this AgreementF such Member⅛ allocable share of , osses and any items in the nature of deductions or losses that are specially allocated to such Member pursuant to Section 9.02 and Section 9.0B hereofF and the amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by such Member to the Company' and

(c)    if all or a portion of an 3nterest in the Company is Transferred in accordance with the terms of this AgreementF the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred 3nterestF providedF howeverF that if the Transfer causes a termination of the Company under Code Section V09(b)(1)(q )F the assets of the Company shall be deemed to have been distributed to the Members (including the transferee of the 3nterest) in li: uidation of the Company and recontributed by such Members and transferees in reconstitution of the Company.  Such deemed li: uidation and reconstitution shall not cause the Company to be dissolved and/or reconstituted for purposes other than maintenance of the Capital Accounts and federal income tax.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.V04kl(b) of the Treasury Regulations and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  3f the q oard of Managers determines that it is prudent to modify the manner in which the Capital AccountsF or any increases or decreases to the Capital AccountsF are computed in order to comply with such Treasury RegulationsF the q oard of Managers may authorize such modificationsF provided that it is not li; ely to have a material effect on the amounts distributable to any Member pursuant to Sections 9.06 and 12.01 hereof.

V.0V    <u>Negative Capital Accounts</u> .  3f any Member has a deficit balance in its Capital AccountF such Member shall have no obligation to restore such negative balance or to ma; e any Capital Contribution to the Company by reason thereofF and such negative balance shall not be considered an asset of the Company or of any Member.

V.09    <u>3nterest</u> .  No interest shall be paid by the Company on Capital Contributions or on balances in Capital Accounts.

V.07    <u>No Withdrawal</u> .  No Member shall be entitled to withdraw any part of his Capital Contribution or his Capital Account or to receive any distribution from the CompanyF except as provided in Sections 11.02 and 12.01 of this Agreement.

V.10    <u>, oans Lrom Members</u> .  , oans by a Member to the Company shall not be considered Capital Contributions.

## ARTIC, E VWU

## A, , OCATIONS AND DISTRIBU TIONS

9.01    <u>Allocation of Profits and , osses</u>.

(a)    <u>Allocation of Profits</u>.  Except as provided on any Exhibit heretoF after giving effect to the allocations set forth in Section 9.02 and Section 9.0BF and after giving effect to all distributions of cash or property (other than cash or

1B

018966

HCMLPHMIT00004189

property to be distributed pursuant to Section 12.01)FProfits for any Liscal Year shall be allocated to the Members in the following manner"

> (i)    firstFto each Member with a negative balance in its Capital AccountFpro rata in accordance with such negative Capital Account balancesFuntil such negative Capital Account balances have been eliminated'

> (ii)    nextFto all of the Members in accordance with their respective Percentage 3nterests.

(b)    Allocation of , osses.  Except as provided in any Exhibit heretoFAfter giving effect to the allocations set forth in Section 9.02 and Section 9.0BF, osses for any Liscal Year shall be allocated to the Members in the following manner"

> (i)    to all of the Members in accordance with their respective Percentage 3nterests.

9.02    Special Allocations of Profits and , osses .

(a)    Minimum Gain Chargebac; –Company Nonrecourse , iabilities .  3f there is a net decrease in Company minimum gain during any Liscal YearFcertain items of income and gain shall be allocated (on a gross basis) to the Members in the amounts and manner described in Treasury Regulations Section 1.V04k2(f) and (j)(2)(i) and (ii)F subject to the exemptions set forth in Treasury Regulations Section 1.V04k2(f)(2)F(B)F(4) and (5).  This Section 9.02(a) is intended to comply with the minimum gain chargebac; re: uirement set forth in Treasury Regulations Section 1.V04k2(f) relating to Company nonrecourse liabilitiesFas defined in Treasury Regulations Section 1.V04k2(b)(B) and shall be so interpreted.

(b)    Minimum Gain Chargebac; –Member Nonrecourse Debt .  3f there is a net decrease in Member minimum gain during any Liscal YearFcertain items of income and gain shall be allocated (on a gross basis) as : uic; ly as possible to those Members who had a share of the Member minimum gain determined pursuant to Treasury Regulations Section 1.V04k 2(i)(5) in the amounts and manner described in Treasury Regulations Sections 1.V04k2(i)(4)F(j)(2)(ii)Fand (j)(2)(iii).  This Section 9.02(b) is intended to comply with the minimum gain chargebac; re: uirement set forth in Treasury Regulations Section 1.V04k2(i)(4) relating to Member nonrecourse debtFas defined in Treasury Regulations Section 1.V04k2(b)(4) and shall be so interpreted.

(c)    Qualified 3ncome Offset .  3fF after applying Section 9.02(a) and Section 9.02(b)F any Member has an adjusted Capital Account deficitFitems of Company income and gain shall be specially allocated (on a gross basis) to each such Member in an amount and manner sufficient to eliminate the adjusted Capital Account deficit of such Member as : uic; ly as possible.  This Section 9.02(c) is intended to comply with the ": ualified income offset" re: uirement set for the in Treasury Regulations Section 1.V04kl(b)(2)(ii)(d) and shall be so interpreted.

(d)    Optional q asis Adjustments .  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections VB4(b) or V4B(b) is re: uiredFpursuant to Treasury Regulations Section 1.V04kl(b)(2)(iv)(m)Fto be ta; en in to account in determining Capital AccountsFthe amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are re: uired to be adjusted pursuant to such Section of the Treasury Regulations.

(f)    Partner Nonrecourse Deductions .  Partner Nonrecourse Deductions shall be allocated pursuant to Treasury Regulations Section 1.V04k2(b)(4) and (i)(1) to the Member who bears the economic ris; of loss with respect to such deductions.

9.0B    Curative Allocations .  The Regulatory Allocations are intended to comply with certain re: uirements of the Treasury Regulations.  3t is the intent of the Members thatFto the extent possibleFall Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company incomeF gainF lossF or deduction pursuant to this Section 9.0B.  ThereforeFnotwithstanding any other provisions of this Article U333Fthe q oard of Managers shall ma; e such offsetting special allocations of Company incomeFgainFlossFor deduction in whatever manner it determines appropriate so thatFafter such offsetting allocations are madeFeach Member8s Capital Account balance isFto the extent possibleFe: ual to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 9.01(a) and Section 9.01(b) hereof.

14

HCMLPHMIT00004190

9.04    <u>Tax Allocations" Code Section V04(c)</u> .

(a)    In accordance with Code Section V04(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial q oo; value.

(b)    If the q oo; value of any Company asset is adjusted pursuant to Section 1.04(e)(ii) hereof, subse: uent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its q oo; value in the same manner as under Code Section V04(c) and the Treasury Regulations thereunder.

(c)    Any elections or other decisions relating to such allocation shall be made by the q oard of Managers. Allocations pursuant to this Section 9.04 are solely for purposes of federal, state, and local taxes and shall not affect or in any way be ta; en into account in computing any Member's Capital Account, or share of Profits, losses, and other items or distribution pursuant to any provision of this Agreement.

9.05    <u>Other Allocation Rules</u> .

(a)    For purposes of determining the Profits, losses, or any other item allocable to any period, Profits, losses, and any such other item shall be determined on a daily, monthly, or other   basis, as determined by the q oard of Managers using any permissible method under Code Section V06 and the Treasury Regulations thereunder.

(b)    For federal income tax purposes, every item of income, gain, loss, and deduction shall be allocated among the Members in accordance with the allocations under Sections 9.01, 9.02, 9.0B, and 9.04.

(c)    The Members are aware of the income tax conse: uences of the allocations made by this Article U333 and hereby agree to be bound by the provisions of this Article U333 in reporting their shares of Company income and loss for income tax purposes.

(d)    It is intended that the allocations in Sections 9.01, 9.02, 9.0B, and 9.04 hereof effect an allocation for federal income tax purposes consistent with Section V04 of the Code and comply with any limitations or restrictions therein.

9.06    <u>Distributions of Distributable Cash</u> .   Except as otherwise may be provided in this Agreement, the q oard of Managers shall cause the Company to ma; e distributions of Distributable Cash at such intervals and in such amounts as the q oard of Managers in its sole discretion shall determine by majority vote.   Distributions of Distributable Cash shall be made to all of the Members in accordance with their respective Percentage Interests.

9.0V    <u>Wor; ing Cash Reserve</u> .   The q oard of Managers may from time to time establish a wor; ing cash reserve for capital expenditures, unforeseen contingencies, projected operating deficits, and other corporate purposes and may increase or decrease the amount in such reserve in its business judgment.

<b>ARTIC E IX</b>

<b>CERTIFICATES</b>

7.01    <u>Certificated and I ncertificated Interests</u>.   The membership interests of the Company may be either certificated interests or uncertificated interests.  As used herein, the term -certificated interests- means Interests represented by instruments in bearer or registered form, and the term -uncertificated interests- means Interests not represented by such instruments and the transfers of which are registered upon boo; s maintained for that purpose by or on behalf of the Company.

7.02    <u>Certificates for Certificated Interests</u>.   The certificates for certificated interests shall be in such form as shall be approved by the q oard of Managers in conformity with law.  The certificates shall be consecutively numbered, shall be entered as they are issued in the boo; s of the Company or in the records of the Company's designated transfer agent, if any, and shall state the Member's name, the class of Interests, the Percentage Interest that such Interest represents, and such

15

018968

HCMLPHMIT00004191

other matters as may be re: uired by law.  The certificates shall be signed by the President or any Uice President and also by the SecretaryFan Assistant SecretaryFor any other officerFand may be sealed with the seal of the Company or a facsimile thereof.  3f any certificate is countersigned by a transfer agent or registered by a registrarFeither of which is other than the Company itself or an employee of the CompanyFthe signatures of the foregoing officers may be a facsimile.

7.0B   . ostF StolenF or  Destroyed Certificates .  The Company shall issue a new certificate in place of any certificate for 3nterests previously issued if the registered owner of the certificate satisfies the following re: uirements"

(a)       the registered owner ma; es proof in affidavit form that a previously issued certificate for 3nterests has been lostFdestroyedFor stolen'

(b)        the registered owner re: uests the issuance of a new certificate before the Company has notice that the certificate has been ac: uired by a purchaser for value in good faith and without notice of an adverse claim'

(c)       the registered owner gives a bond in such formF and with such surety or suretiesF with fixed or open penaltyF as the q oard of Managers may directF in its discretionF to indemnify the Company (and its transfer agent and registrarFif any) against any claim that may be made on account of the alleged lossFdestructionFor theft of the certificate' and

(d)       the registered owner satisfies any other reasonable re: uirements imposed by the q oard of Managers.

When a certificate has been lostFdestroyedFor stolen and the Member of record fails to notify the Company within a reasonable time after he has notice of itFif the Company registers a transfer of the 3nterests represented by the certificate before receiving such notificationFthe Member of record is precluded from ma; ing any claim against the Company for the transfer or for a new certificate.

7.04   Transfer of 3nterests .  3nterests of the Company shall be transferable only on the boo; s of the Company by the Members thereof in person or by their duly authorized attorneys or legal representativesFbut only as authorized in this COMPANY AGREEMENT.  With respect to certificated interestsFupon surrender to the Company or the transfer agent of the Company of a certificate representing 3nterests duly endorsed or accompanied by proper evidence of successionF assignmentF or authority to transferF the Company or its agent shall issue a new certificate to the person entitled theretoF cancel the old certificateFand record the transaction upon its boo; s.  With respect to uncertificated interestsFupon delivery to the Company of proper evidence of successionFassignmentFor authority to transferFthe Company or its agent shall record the transaction upon its boo; s.

7.05   Registered Members .  The Company shall be entitled to treat the Member of record as the Member in fact of any 3nterests andFaccordinglyFshall not be bound to recognize any e: uitable or other claim to or interest in such 3nterests on the part of any other PersonFwhether or not it shall have actual or other notice thereofFexcept as otherwise provided by law.

7.06   . egends .  3f the Company is authorized to issue 3nterests of more than one classF each certificate representing 3nterests issued by the Company (a) shall conspicuously set forth on the face or bac; of the certificate a full statement of all of the designationsFpreferencesFlimitationsFand relative rights of the 3nterests of each class authorized to be issued' or (b) shall conspicuously state on the face or bac; of the certificate that (i) such a statement is set forth in the Certificate on file in the office of the Secretary of State or in this Agreement' and (ii) the Company will furnish a copy of such statements to the record holder of the certificate without charge on written re: uest to the Company at its principal place of business or registered office.

3f the Company issues any 3nterests that are not registered under the Securities Act of 17BBFthe transfer of any such interests shall be restricted in accordance with an appropriate legend.

3n the event any restriction on the transferFor registration of the transferFof 3nterests shall be imposed or agreed to by the CompanyFeach certificate representing 3nterests so restricted (a) shall conspicuously set forth a full or summary statement of the restriction on the face of the certificate' (b) shall set forth such statement on the bac; of the certificate and conspicuously refer to the same on the face of the certificate' or (c) shall conspicuously state on the face or bac; of the certificate that such a restriction exists pursuant to a specified document and (i) that the Company will furnish to the record holder of the certificate without charge upon written re: uest to the Company at its principal place of business or registered

16

018969

HCMLPHMIT00004192

office a copy of the specified document' or (ii) if such document is one re: uired or permitted by law to be and has been filedF that such specified document is on file in the office of the Secretary of State and contains a full statement of such restriction.

## ARTlC, E X

## ACCOI NTING AND RECORDS

10.01    Records and Accounting .  The boo; s and records of the Company shall be ; eptFand the financial position and the results of its operations recordedFin accordance with the accounting methods elected to be followed by the Company for federal income tax purposes.  The boo; s and records of the Company shall reflect all Company transactions and shall be appropriate and ade: uate for the Company's business.

10.02    Access to Accounting Records .  All boo; s and records of the Company shall be maintained at any office of the Company or at the Company's principal place of businessFand each Member owning a Percentage 3nterest of at least ten percent (10%)Fand his duly authorized representativeFshall have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

10.0B    Annual and Tax 3nformation .  The Company shall deliver to each Member within 70 days after the end of each Liscal Year all information necessary for the preparation of such Member's federal income tax return.  The Company shall prepareFwithin 120 days after the end of each Liscal YearFa financial report of the Company for such Liscal YearF containing a statement of the year then endedF a statement of sources and applications of fundsF and a statement of reconciliation of the Capital Accounts of the Members.

10.04    Accounting Decisions .  All decisions as to accounting mattersFexcept as otherwise specifically set forth hereinFshall be made by the q oard of Managers.  The Members may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

10.05    Lederal 3ncome Tax Elections .  The Company may ma; e all elections for federal income tax purposesF includingFbut not limited toFthe following"

(a)    to the extent permitted by applicable law and regulationsFthe election to use an accelerated depreciation method on any depreciable unit of the assets of the Company' and

(b)    in case of a transfer of all or part of the 3nterest of any MemberFthe election pursuant to Section VB4FV4BF and V54 of the CodeFas amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company.

## ARTlC, E XU

## CHANGES IN MEMBERS

The provisions of this Article X3 are subject toFand may be superceded byFone or more separate agreements entered into by and among one or more Members.  The provisions of this Article X3 shall continue to control with respect to matters not covered byFor Members not parties toFsuch agreement(s).

11.01    3ntentionally q lan; .

11.02    Transfer and Assignment of Members' 3nterest .  Except as approved by the ManagerFplus a Member or Members owning a Percentage 3nterest greater than fifty percent (50%)Fno Member shall be entitled to Transfer any part of its 3nterest in the Company.  The Company andFif applicableFthe remaining Members shall be entitled to match the terms of the proposed TransferFwith consideration being only set forth in traditional monetary terms.  3f the Company and the remaining Members fail to match the proposed Transfer with regard to the purchase of the entire 3nterestFor portion thereofF the Member proposing to ma; e the Transfer may move forward with the proposed Transfer.  Transfers in violation of this Section 11.02 shall be effective only to the extent set forth in Section 11.05(b) hereof.

018970

HCMLPHMIT00004193

11.0B    <u>Lurther Restrictions on Transfer</u> .  No Member shall Transfer any part of his Interest in the Company" (i) without registration under applicable federal and state securities lawsFor unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not re: uired' or (ii) if the Interest to be sold or exchangedFwhen added to the total of all other Interests to be sold or exchanged in the preceding 12 consecutive months prior theretoFwould result in the termination of the Company under Code Section V09.

11.04    <u>Substitute Members</u> .  A transferee shall have the right to become a substitute Member if (a) the re: uirements of Section 11.02 and 11.0Bhereof are met' (b) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of this Agreement' and (c) such person pays any reasonable expenses in connection with his or her admission as a Member.

11.05    <u>Effect of Transfer</u> .

(a)    Any permitted Transfer of all or any portion of a Member's Interest in the Company will ta; e effect on the first day of the month following receipt by the Members of written notice of Transfer.  Any transferee of an Interest in the Company shall ta; e subject to the restrictions on Transfer imposed by this Agreement.

(b)    Ipon any Transfer of a Member's Interest in the Company in violation of this AgreementFand if such Member's Interest is not purchased pursuant to Section 11.01Fthe transferee shall have no right to participate in the management of the business and affairs of the Company or to become a MemberFbut such transferee shall be entitled to receive only the allocable share of ProfitsF, ossesFDistributive CashFand other items to which the transferor of such Interest in the Company would otherwise be entitled.

11.06    <u>No Dissolution or Withdrawal" Advanced Consent</u> .  Ipon the occurrence of a Dissolution Event with regard to a respective MemberFall remaining Members shall be deemed to automatically consent to the continuation of the business of the Company.  q y executing this AgreementFhoweverFall Members hereby consent that they shall not voluntarily cause a Dissolution Event or demand the return of Member's capital.  If any Member shall breach the agreement represented by this Section 11.06Fthe agreement of such breaching Member shall not be specifically performableFbut shall be actionable for damagesFand shall be deemed an offer of the Interest of such breaching Member for sale pursuant hereto.  The parties agree that a reasonable approximation of the damage that the Company shall experience due to breach hereof is 20% of the value of the breaching Member's InterestFor as otherwise set forth herein (whichever is greater)Fwhich shall be deducted from any payments to such Member upon dissolution or purchase of such Member's Interest hereunder.  The value of the breaching Member's Interest shall be determined pursuant to Section 11.01Fto which value the said discount may then be applied in determining payments due to the breaching Member pursuant to the deemed offer of sale occurring under this Section 11.06.

## ARTIC, E XIU

### TERMINATION

12.01    <u>Termination of the Company</u> .

(a)    The Company shall be dissolvedFits assets shall be disposed ofFand its affairs wound up on the first to occur of the following events"

(i)    a determination by the ManagersFplus the Inanimous Consent of the Members that the Company should be dissolved'

(ii)    a sale of all or substantially all of the assets of the Company'

(iii)    the expiration of the Company's term as stated in its Certificate' or

(iv)    at such earlier time as provided by applicable law.

19

018971

HCMLPHMIT00004194

(b)    3n settling accounts of the Company after dissolutionFthe liabilities of the Company shall be entitled to payment and the assets of the Company remaining thereafter shall be distributed to the Members in the following orderFall as re: uired by the DE, AWARE , AWS"

(i)    those to creditorsFin the order of priority as provided by lawFexcept those to Members of the Company on account of their Capital Contributions'

(ii)    to the MembersFpro rataFin accordance with the positive balancesFif anyFin their Capital Accounts' and

(iii)    to the Members in proportion to their relative Percentage 3nterests.

## ARTIC, E XlIU

## INDEMNLICATION

1B.01    3ndemnification of MembersFManagersFand Other Persons .

(a)    To the greatest extent not inconsistent with the laws and public policies of DelawareFthe Company shall indemnify any MemberFManagerFor officer of the Company made a party to any proceeding because such individual is or was a MemberFManagerFor officer of the Company (an "3ndemnitee")Fas a matter of rightFagainst all liability incurred by such individual in connection with any proceeding' provided that it shall be determined in the specific case in accordance with subsection (d) of this Section 1B.01 that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section 1B.01.  The Company shall advanceFpay forFor reimburse the reasonable expenses incurred by an 3ndemnitee in connection with any such proceeding in advance of final disposition thereof if (i) the 3ndemnitee furnishes the Company a written affirmation of the 3ndemnitee's good faith belief that he or she has met the standard of conduct for indemnification described in subsection (c) of this Section 1B.01' (ii) the 3ndemnitee furnishes the Company a written underta; ingFexecuted personally or on such 3ndemnitee's behalfFto repay the advance if it is ultimately determined that such individual did not meet such standard of conduct' and (iii) a determination is made in accordance with subsection (d) that based upon facts then ; nown to those ma; ing the determinationFindemnification would not be precluded under this Section 1B.01.  The underta; ing described in subsection (a)(ii) above must be a general obligation of the 3ndemniteeFsubject to such reasonable limitations as the Company may permitFbut need not be secured and may be accepted without reference to financial ability to ma; e repayment.  The Company shall indemnify an 3ndemnitee who is wholly successfulFon the merits or otherwiseFin the defense of any such proceedingFas a matter of rightFagainst reasonable expenses incurred by the individual in connection with the proceeding without the re: uirement of a determination as set forth in subsection (c) of this Section 1B.01.  I pon demand by an 3ndemnitee for indemnification or advancement of expensesFas the case may beFthe Company shall expeditiously determine whether the 3ndemnitee is entitled thereto in accordance with this Section 1B.01.  The indemnification and advancement of expenses provided for under this Section 1B.01 shall be applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section 1B.01.

(b)    The Company shall have the powerFbut not the obligationFto indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a MemberFManagerFor officer of the Company.

(c)    3ndemnification is permissible under this Section 1B.01 only if (i) the 3ndemnitee conducted himself in good faith' (ii) he or she reasonably believed that his conduct was inFor at least not opposed toFthe Company's best interest' (iii) in the case of any criminal proceedingFhe or she had no reasonable cause to believe his conduct was unlawful' and (iv) such 3ndemnitee is not adjudged in any such proceeding to be liable for gross negligence or willful misconduct in the performance of duty.  The termination of a proceeding by judgmentForderFsettlementFconvictionFor upon a plea of nolo contendere or its e: uivalent is notFof itselfFdeterminative that the 3ndemnitee did not meet the standard of conduct described in this subsection (c).

(d)    A determination as to whether indemnification or advancement of expenses is permissible shall be made by any one of the following procedures"

17

018972

HCMLPHMIT00004195

(i)      by the qoard of Managers or by a majority vote consisting of Members not at the time parties to the proceeding' or

(ii)      by special legal counsel selected by the Members in the manner prescribed in subsection (d)(i) above.

(e)      An 3ndemnitee of the Company who is a party to a proceeding may apply for indemnification from the Company to the courtFif anyFconducting the proceeding or to another court of competent jurisdiction.  On receipt of an applicationFthe courtFafter giving notice the court considers necessaryFmay order indemnification if it determines"

(i)      in a proceeding in which the 3ndemnitee is wholly successfulFon the merits or otherwiseFthe 3ndemnitee is entitled to indemnification under this Section 1B.01Fin which case the court shall order the Company to pay the 3ndemnitee his or her reasonable expenses incurred to obtain such court ordered indemnification' or

(ii)      the 3ndemnitee is fairly and reasonably entitled to indemnification in view of all the relevant circumstancesFwhether or not the 3ndemnitee met the standard of conduct set forth in subsection (c) of this Section 1B.01.

(f)      3ndemnification shall also be provided for an 3ndemnitee's conduct with respect to an employee benefit plan if the individual reasonably believed his or her conduct to be in the interests of the participants in and beneficiaries of plan.

(g)      Nothing contained in this Section 1B.01 shall limit or preclude the exercise or be deemed exclusive of any right under the lawFby contract or otherwiseFrelating to indemnification of or advancement of expenses to any individual who is or was a MemberFManagerForF officer of the Company or is or was serving at the Company's re: uest as a directorF officerFpartnerFmanagerFtrusteeFemployeeFor agent of another foreign or domestic companyFpartnershipFassociationF limited liability companyFcorporationFjoint ventureFtrustFemployee benefit planFor other enterpriseFwhether for profit or not.  Nothing contained in this Section 1B.01 shall limit the ability of the Company to otherwise indemnify or advance expenses to any individual.  3t is the intent of this Section 1B.01 to provide indemnification to 3ndemnitees to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section 1B.01.  3ndemnification shall be provided in accordance with this Section 1B.01 irrespective of the nature of the legal or e: uitable theory upon which a claim is madeFincludingFwithout limitationFnegligenceFbreach of dutyFmismanagementFwasteFbreach of contractFbreach of warrantyFstrict liabilityFviolation of federal or state securities lawFviolation of the Employee Retirement 3ncome Security Act of 17V4Fas amendedFor violation of any other state or federal law.

(h)      Lor purposes of this Section 1B.01"

(i)      The term -expenses- includes all direct and indirect costs (includingFwithout limitationFcounsel feesFretainersFcourt costsFtranscriptsFfees of expertsFwitness feesFtravel expensesFduplicating costsFprinting and binding costsFtelephone chargesFpostageFdelivery service feesFand all other disbursements or outFofFpoc: et expenses) actually incurred in connection with the investigationFdefenseFsettlementFor appeal of a proceeding or establishing or enforcing a right to indemnification under this Section 1B.01Fapplicable lawForF otherwise.

(ii)      The term -liability- means the obligation to pay a judgmentFsettlementFpenaltyFfineFexcise tax (including an excise tax assessed with respect to an employee benefit plan)For reasonable expenses incurred with respect to a proceeding.

(iii)      The term -party- includes an individual who wasFisFor is threatened to be made a named defendant or respondent in a proceeding.

(iv)      The term -proceeding- means any threatenedFpendingFor completed actionFsuit or proceedingF whether civilFcriminalFadministrativeForF investigative and whether formal or informal.

(v)      The Company may purchase and maintain insurance for its benefitFthe benefit of any individual who is entitled to indemnification under this Section 1B.01For bothFagainst any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the CompanyFwhether or not the Company would have the power to indemnify such individual against such liability.

20

018973

**ARTICLE XIV**

**MISCELLANEOUS**

14.01    <u>Complete Agreement</u> .  This Agreement, the Certificate, and all other organizational documents signed by all of the Members constitute the complete and exclusive statement of agreement among the Members with respect to the matters herein.  This Agreement and the Certificate replace and supersede all prior agreements by and among the Members or any of them, and no representation, statement, condition or warranty not contained in this Agreement or the Certificate will be binding on the Members or have any force or effect whatsoever.

14.02    <u>Governing Law</u> .  This Agreement and the rights of the parties hereunder will be governed by, interpreted, and enforced in accordance with the laws of the State of Delaware.

14.03    <u>Binding Effect</u> .  Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective distributes, successors, and assigns.

14.04    <u>Terms</u> .  Common nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require.  Any reference to the DELAWARE ACT, the Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

14.05    <u>Headings</u> .  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

14.06    <u>Severability</u> .  If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of this Agreement, such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement.  Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there will be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

14.07    <u>Multiple Counterparts</u> .  This Agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same instrument.  However, in making proof hereof it will be necessary to produce only one copy hereof signed by the party to be charged.

14.09    <u>Additional Documents and Acts</u> .  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out, and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

14.07    <u>No Third-Party Beneficiary</u> .  This Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

14.10    <u>References to this Agreement</u> .  Numbered or lettered articles, sections, and subsections herein contained refer to articles, sections, and subsections of this Agreement unless otherwise expressly stated.

14.11    <u>Notices</u> .  Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice.  Such notices will be given to a Member at the address specified in <u>Exhibit B</u> hereto.  Any Member or the Company may, at any time by giving five days' prior written notice to the other Members and the Company, designate any other address in substitution of the foregoing address to which such notice will be given.

21

018974

HCMLPHMIT00004197

14.12    <u>Amendments</u> .  Except as otherwise may be provided in this AgreementFall amendments to this Agreement must be approved by the ManagersFplus one or more Members whose aggregate Percentage 3nterests total more than fifty percent (50%).

14.1B    <u>Title to Company Property</u> .  , egal title to all property of the Company will be held and conveyed in the name of the Company.

14.14    <u>Reliance on Authority of Person Signing Agreement</u> .  3n the event that a Member is not a natural personF neither the Company nor any Member will (a) be re: uired to determine the authority of the individual signing this Agreement to ma; e any commitment or underta; ing on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual' or (b) be re: uired to see to the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

14.15    <u>SkCorp Election</u> .  3n the event the Company elects to be treated as a SkCorporation for federal tax purposesFthe provisions in this Company Agreement addressing tax treatment shall be automatically amended and modified as re: uired in order to pertain to a Skcorporation.

14.16    <u>Company 3ndemnification</u> .  3n the event any Member is personally liable for any debt or obligations associated with a Company assetFthen the Company agrees to indemnify such Member for any such debt or obligation in excess of his or her proportionate amount of such debt or obligation that he/she is re: uired to pay or performFas measured by the Percentage 3nterest of the MembersFexcept as otherwise agreed by the Members.

*14.17    <u>Management by Members</u>.  The Certificate of the Company and other Company documents/agreements on file and/or executed by the Member may reflect management by members, and not management by managers.  As a result, if such is the case and the Certificate is not amended to reflect management by managers, this Agreement shall be interpreted in such a manner that all references herein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President.*

018975

HCMLPHMIT00004198

3N W3TNESS WHEREOLFthe Members have executed this Agreement to be effective as of the date first written above.

**THE MEMBER (OR MANAGING MEMBER)**

RAND ADU3SORS HO, D3NG CORP.F
a Delaware corporation

qy" _____
    Mar; Patric; ꜰDirector and President

2E

018976

HCMLPHMIT00004199

**EXHIBIT A**

THE C, ASS A MEMq ERS AND 3NTERESTS

The sole Class A Member shall be RAND ADU3SORS HO, D3NG CORP.Fa Delaware corporationFand it shall own the Percentage 3nterest set forth on <u>Exhibit "q"</u> hereto.  3n addition to such other rights as a Member described in this AgreementFthe holders of record of the Class A 3nterests shall have no additional rights.

24

018977

HCMLPHMIT00004200

## EXHIBIT B

The Members

| Members and Addresses | Date Admitted | Class A Interest | Percentage Interest |
|---|---|---|---|
| RAND ADVISORS HO, DING CORP. 2101 Cedar Springs Road Suite 1200 Dallas TX 75201 Attn" Mar; Patric; | 9/1/2022 | 100% | 100% |

25

018978

HCMLPHMIT00004201

**EXHIBIT 86**

018979

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "**Agreement**"), dated as August 1, 2022, is entered into by and among JOHN HONIS ("**Seller**"), RAND ADVISORS HOLDING CORP., a Delaware corporation ("**Buyer**"), and CLO HOLDCO, LTD. a Cayman limited company (the "**Guarantor**").

## RECITALS

WHEREAS, Seller owns one hundred (100%) percent of the issued and outstanding membership interests, (the "**Interests**") of each of Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**") and Rand Advisors, LLC, a Delaware limited liability company ("**Advisor**", and together with Atlas GP and Rand GP, each a "**Company**" and collectively, the "**Companies**");

WHEREAS, the Companies collectively manage certain private investment funds, including two (2) insurance-dedicated funds ("**IDFs**") and one (1) one private equity fund that one of the IDFs invests in (collectively, the "**Client Funds**");

WHEREAS, in addition to the foregoing with respect to the Client Funds, Advisor acts as the investment sub-advisor to Rand Advisors Series I Insurance Fund of SALI Multi-Series Fund, L.P., a Delaware series limited partnership (such, product, the "**SALI Fund**");

WHEREAS, Rand GP as the general partner of Rand PE Fund I, LP, ("**Rand LP**") manages: a) Rand LP; b) Rand LP's wholly owned subsidiary Beacon Mountain, LLC ("**Beacon**"); and c) Beacon's sponsorship and administration of the Hunter Mountain Investment Trust ("**HMIT**", and together with Rand LP and Beacon, the "**Managed Companies**"); and

WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, the Interests, subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01  Purchase and Sale.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell to Buyer, and Buyer shall purchase from Seller, the Interests, free and clear of any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment or other similar encumbrance. In connection with such sale of the Interests, Seller acknowledges that he retains no rights to any commissions or other compensation or consideration from (a) any Company, (b) any of the Client Funds, (c) the SALI Fund, (d) any of the Managed Funds, and/or (e) any person or entity affiliated with any of the foregoing, that has not been paid as of the Closing.

018980
HCMLPHMIT00004202

**Section 1.02   Purchase Price.** The purchase price payable by Buyer for the Interests shall be equal to One Million One Hundred Twenty Thousand ($1,120,000.00) Dollars (the "**Purchase Price**").  The Purchase Price shall be due and payable in sixteen (16) equal quarterly installments of Seventy Thousand ($70,000.00) Dollars (each, an "**Installment Payment**") with the first Installment Payment payable on the Closing Date and subsequent Installment Payments made quarterly thereafter on March 31, June 30, September 30 and December 31 of each calendar year until the Purchase Price has been paid in full; *provided, however*, that if any Installment Payment is due and owing on a day that is not a Business Bay, such Installment Payment shall be paid on the next Business Day.  For purposes of this Agreement, the term "Business Day" means any day except a Saturday, a Sunday or any other day on which commercial banks are required or authorized to close in New York, New York. Each Installment Payment shall be paid to Seller pursuant to the wiring instructions provided in writing at least two (2) days prior to Closing; *provided* that Seller may provide alternative wiring instructions in writing at least two (2) days prior to any Installment Payment.

## ARTICLE II
## CLOSING

**Section 2.01   Closing.** The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place electronically as of the Effective Date, with the parties executing and exchanging all material closing documents by counterpart, as applicable, on the date that all deliverables pursuant to <u>Sections 2.02</u> and <u>2.03</u> have been delivered, or at such other time, date or place as Seller and Buyer may mutually agree upon in writing.  The date on which the Closing is to occur is herein referred to as the "**Closing Date**".

**Section 2.02   Seller Closing Deliverables.** At the Closing, Seller shall deliver to Buyer the following:

    **(a)**    The resignation letter, resigning in all capacities from each of the Companies.

    **(b)**    The independent contractor agreement, by and between Seller and Buyer, dated as of the date hereof (the "**Independent Contractor Agreement**"), countersigned by Seller.

    **(c)**    The books and records of the Companies.

**Section 2.03   Buyer's Deliveries.** At the Closing, Buyer shall deliver the following to Seller:

    **(a)**    The Purchase Price.

    **(b)**    The Independent Contractor Agreement, countersigned by Buyer.

2

018981

HCMLPHMIT00004203

     **(c)**     Evidence of compliance with <u>Section 5.01(b)</u>.

# ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that the statements contained in this ARTICLE III are true and correct as of the date hereof.

**Section 3.01   Organization and Authority of Seller.** Seller is a natural person and resident of the State of New York. Seller has all necessary authority to enter into this Agreement, to carry out his obligations hereunder and to consummate the transactions contemplated hereby. This Agreement constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 3.02   Organization, Authority, Qualification and Ownership of the Companies.** Each Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all necessary corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as it is currently conducted. Each Company is duly licensed or qualified to do business and is in good standing in each jurisdiction where the operation of its business as currently conducted makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not have a material adverse effect. Seller is the sole owner and member of each Company.

**Section 3.03   Employment Matters.** Seller is the only employee of each of the Companies.

**Section 3.04   Title to Interests.** Seller has exclusive and valid title to all of the Interests, with the absolute right to sell, assign and transfer the same to Buyer free and clear of all liens, pledges, security interests and encumbrances. Seller has not assigned, transferred or sold any rights, options or other benefits associated with the Interests. Further, Seller represents and warrants that the assets of the Companies are free and clear of any and all liens, pledges, security interests and other encumbrances.

**Section 3.05   No Restrictions Against Sale.** Seller has full right, power and authority to sell the Interests to Buyer as provided in this Agreement without obtaining the consent or approval of any creditor, third party or governmental body.

**Section 3.06   Intentionally Blank**

3

018982
HCMLPHMIT00004204

**Section 3.07  No Other Representations and Warranties.** Except for the representations and warranties contained in this ARTICLE III, none of Seller, the Companies or any other person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller or any Company, including any representation or warranty as to the accuracy or completeness of any information regarding the Companies furnished or made available to Buyer as to the future revenue, profitability or success of each Company, or any representation or warranty arising from statute or otherwise in law.

# ARTICLE IV
# REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this Article IV are true and correct as of the date hereof.

**Section 4.01  Organization and Authority of Buyer.** Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has all necessary corporate power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by Buyer of this Agreement, the performance by Buyer of its obligations hereunder, and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 4.02  No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with any provision of the certificate of incorporation or by-laws of Buyer; (b) violate or conflict with any provision of any law or governmental order applicable to Buyer; (c) require the consent, notice or other action by any person under, violate or conflict with, or result in the acceleration of any agreement to which Buyer is a party; or (d) require any consent, permit, governmental order, filing or notice from, with or to any governmental authority; except, in the cases of clauses (b) and (c), where the violation, conflict, acceleration or failure to obtain consent or give notice would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby and, in the case of clause (d), where such consent, permit, governmental order, filing or notice which, in the aggregate, would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

**Section 4.03  Legal Proceedings.** There are no actions pending or, to Buyer's knowledge, threatened against or by Buyer or any of its affiliates that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

018983
HCMLPHMIT00004205

**Section 4.04    Buyer Acknowledgement of SALI Agreement and CG Agreement.**
Buyer acknowledges the obligations of (i) the Advisor pursuant to the Subadvisor Agreement
dated September 25, 2013 between the Advisor and SALI Fund Management, LLC (the **"SALI
Agreement"**) and (ii) Atlas IDF, LP and the Advisor pursuant to the Participation Agreement
dated as of November 30, 2015 among Crown Global Life Insurance Ltd., Atlas IDF, LP and the
Advisor (the **"CG Agreement"**).    The purchase and sale of the Interests pursuant to this
Agreement will not cause a violation of either Exhibit C to the SALI Agreement or Schedule D
to the CG Agreement (**"Schedule D"**).

**Section 4.05    Independent Investigation.** Buyer has conducted its own independent
investigation, review and analysis of Seller, the Companies, the Managed Companies, the Client
Funds and the SALI Fund, and acknowledges that it has been provided adequate access to the
personnel, properties, assets, premises, books and records and other documents and data of
Seller, the Companies, the Managed Companies, the Client Funds and the SALI Fund for such
purpose.    Buyer represents and warrants that it is aware that the Companies are involved in
multiple litigations, the ultimate liability under such litigations may not be quantified and accepts
any risk related thereto.    Buyer acknowledges and agrees that: (a) in making its decision to enter
into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied
solely upon its own investigation and the express representations and warranties of Seller set
forth in ARTICLE III of this Agreement; and (b) none of Seller, any Company or any other
person has made any representation or warranty as to Seller, any Company, any Managed
Company, any Client Funds, the SALI Fund or this Agreement, except as expressly set forth in
ARTICLE III of this Agreement.

**ARTICLE V
COVENANTS**

**Section 5.01    Director, Manager and Officer Indemnification Liability.**

(a)    Buyer agrees that all rights to indemnification, advancement of expenses
and exculpation by each Company now existing in favor of each person who is now, or
has been at any time prior to the date hereof, an officer, manager, member or director of
such Company, in each case as in effect on the date of this Agreement, or pursuant to any
other agreements in effect on the date hereof, shall survive the Closing Date and shall
*continue in full force and effect in accordance with their respective terms.*

(b)    Each Company shall, and Buyer shall cause each Company to (i) maintain
in effect for a period of six (6) years after the Closing Date the current policies of
Investment Adviser and Fund Professional and Directors and Officers Liability Insurance
(or similar policy) maintained by each Company immediately prior to the Closing Date
(provided that each Company may substitute policies, of at least the same coverage and
amounts and containing terms and conditions that are not less advantageous to the
directors, members, managers and officers of such Company when compared to the
insurance maintained by such Company as of the date hereof), or (ii) obtain as of the
Closing Date "tail" insurance policies with a claims period of six (6) years from the

018984

HCMLPHMIT00004206

Closing Date with at least the same coverage and amounts, and containing terms and conditions that are not less advantageous to the mangers and officers of such Company, in each case with respect to claims arising out of or relating to events which occurred on or prior to the Closing Date (including in connection with the transactions contemplated by this Agreement).  The parties acknowledge and agree that the coverages required by this Section 5.01(b) shall not be required to cover the Excluded Claims referenced in Section 5.04 hereinafter.

(c)    The obligations of Buyer and each Company under this Section 5.01 shall not be terminated or modified in such a manner as to adversely affect Seller.

(d)    In the event that Buyer, any Company or any of their respective successors or assigns (i) consolidates with or merges into any other person and shall not be the continuing or surviving corporation or entity in such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any person, then, and in either such case, proper provision shall be made so that the successors and assigns of Buyer or such Company, as the case may be, shall assume all of the obligations set forth in this Section 5.01.

**Section 5.02    Further Assurances.**  Following the Closing:

(a)    each of the parties hereto shall, and shall cause their respective affiliates to, execute and deliver such additional documents and instruments and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

(b)    The parties agree that certain matters in which any of the Affected Parties will be involved may necessitate Seller's cooperation in the future. Accordingly, for any reason, to the extent requested by any of the Affected Parties or their representatives and/or agents, Seller shall reasonably cooperate with the Affected Parties in connection with any matters in which any of the Affected Parties asserts that Seller's assistance is necessary, including, but not limited to, the Kirschner Litigation, the HCMLP Bankruptcy, and any other disputes; provided that, any of the Affected Parties shall make reasonable efforts to minimize disruption of Seller's other activities. The respective Affected Parties shall reimburse Seller for reasonable expenses incurred in connection with such reasonable cooperation and, to the extent that Seller is required to spend substantial time on such matters, the respective Affected Parties shall compensate Seller at an hourly rate of $350.00 per hour.  Such reasonable cooperation shall include, but is not limited to, providing interviews, truthful testimony, documents, assistance, information, and executing and returning documents related to any litigation or disputes in which any of the Affected Parties is involved, including, but not limited to, the Kirschner Litigation and/or the HCMLP Bankruptcy and any disputes related thereto. "Affected Parties" shall collectively mean Buyer, Companies, Client Funds, SALI Fund and Managed Companies.

018985

HCMLPHMIT00004207

(c)     Additionally, Seller agrees that he will not voluntarily provide reasonable assistance to or cooperate with any party that has any adverse interests to any of the Affected Parties without prior written consent from the respective Affected Parties, and Seller will notify the Affected Parties if any third-party seeks such reasonable assistance or cooperation from Seller.  Any failure to comply with this clause by Seller shall constitute a material breach of this Agreement.  Seller shall not, except as required by law, disclose to any third party this Agreement, its terms and particularly this cooperation clause.  If, at any time, Seller is ordered or subpoenaed by any court, regulator, agency, or legislative body to disclose, or is served with a subpoena or discovery request seeking or requiring disclosure of, this Agreement or any of its terms, Seller shall so notify the Affected Parties at least two (2) business days in advance of the time for compliance with the order, subpoena or discovery request.

**Section 5.03   Transfer Taxes.** All transfer, documentary, sales, use, stamp, registration, value added and other such taxes and fees (including any penalties and interest) incurred in connection with this Agreement shall be borne and paid by Buyer when due. Buyer shall, at its own expense, timely file any tax return or other document with respect to such taxes or fees (and Seller shall cooperate with respect thereto as necessary).

**Section 5.04   Release.** Effective as of the Closing, (i) Buyer shall, (ii) Buyer shall cause the Companies, (iii) Buyer shall cause the Companies to cause the Client Funds, and (iv) Buyer shall cause the Companies to cause the Managed Companies (together, the "**Buyer Releasors**") generally, irrevocably, unconditionally and completely to release and forever discharge Seller and his partners, affiliates, employees, consultants, counsel and agents, and the counsel, consultants and agents of the Companies, the Managed Companies, and the Client Funds (each, a "**Seller Releasee**" and collectively, the "**Seller Releasees**") from, and irrevocably, unconditionally and completely to waive and relinquish each and all past, present and future disputes, claims, controversies, demands, rights, obligations, liabilities, actions and causes of action of every kind and nature, including any unknown, unsuspected or undisclosed claim (collectively "**Claims**"), that the Buyer Releasors may have had in the past, may now have or may have in the future against any of the Seller Releasees and has arisen or arises directly or indirectly out of, or relates directly or indirectly to, this Agreement and the transactions contemplated hereby, or the operation of the Companies, the Managed Companies, the SALI Fund or the Client Funds, other than any claim that Buyer may have against any of the Seller Releasees that arises under this Agreement.  Buyer Releasors, acknowledges that the laws of many states provide substantially the following: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."  The Buyer Releasors acknowledge that such provisions are designed to protect a party from waiving claims which it does not know exist or may exist. Nonetheless, the Buyer Releasors, agree that, effective as of the Closing, the Companies, the Client Funds and the Managed Companies shall be deemed to waive any such provision. Buyer shall not permit any Company, Client Fund or Managed Company to institute, solicit or encourage, or participate, assist or cooperate in, any legal proceeding based upon, arising out of, or relating to any of the disputes, claims, controversies, demands, rights,

7

018986
HCMLPHMIT00004208

obligations, liabilities, actions and causes of action waived under this Section 5.04. Notwithstanding the foregoing, the parties acknowledge and agrees that the Claims released by this Section 5.04 shall not include any and all Claims that are found by a court of competent jurisdiction to be a result of a Seller Releasees fraud, gross negligence or willful misconduct (each an "**Excluded Claim**" and/or collectively, the "**Excluded Claims**").

### Section 5.05   Guaranty.

(a)     The Guarantor hereby irrevocably and unconditionally guarantees to Seller full and punctual performance of and compliance with all of Buyer's obligations pursuant to this Agreement. The guaranty set forth in this Section 5.05(a) is an absolute, present, primary and continuing guaranty of performance, payment and compliance.   The Guarantor acknowledges and agrees that upon any default by Buyer, Seller shall not be obligated to first attempt enforcement against Buyer.  The Guarantor hereby waives any and all defenses to enforcement of the guaranty set forth in this Section 5.05(a), now existing or hereafter arising, which may be available to guarantors, sureties and other secondary parties at law or in equity.  The Guarantor further agrees to pay all reasonable costs and expenses, including reasonable attorney fees and related costs, incurred by any Seller Releasee in enforcing the guaranty set forth in this Section 5.05(a).

(b)     The Guarantor represents and warrants to Seller that (i) the execution and delivery of this Agreement, and the Guarantor's performance under this Agreement, including the Guarantor's performance under this Section 5.05, does not violate any law, decree or contractual restriction binding on the Guarantor, (ii) this Agreement has been duly executed and delivered by the Guarantor and constitutes the valid and legally binding obligation of the Guarantor, enforceable against the Guarantor in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditor's rights generally and general principles of equity and (iii) the Guarantor has the financial capacity necessary to perform its obligations under the guaranty set forth in Section 5.05(a).

**Section 5.06   Ownership of Work Product of the Companies**.  Seller hereby agrees that all work product, designs, graphics, processes, trade secrets, proprietary information and confidential investor information of the Companies, that is not (i) generally available to the public other than by virtue of a disclosure by Seller after the Closing Date and in violation of this Agreement or (ii) independently developed by Seller from sources not known by Seller to be bound by an obligation of confidentiality to the Companies (collectively, "**Confidential Information**") and shall remain the property of the applicable Company without any further act on Seller's or any Company's part, and that Seller shall not have any past, current or future copyright, trademark right, intellectual property right, property interest and/or any other right, title or interest in such Confidential Information.  Seller acknowledges and agrees that all right, title and interest in such Confidential Information, including, without limitation, all conceivable intellectual property rights, including, without limitation, all copyrights, trademarks, service marks, patents, and discoveries shall remain the property of the applicable Company on and after the Closing Date.  Notwithstanding anything in this Section 5.06 or otherwise in this Agreement

8

HCMLPHMIT00004209

to the contrary, Seller may retain the phone that he used in the management and ownership of the Companies as his own personal property, and all "personal" information/data on such phone shall not constitute Confidential Information.

**Section 5.07   Client Information**.   Seller hereby covenants and agrees at all times following the execution hereof to hold in strictest confidence, and not to use (for himself or for any other person), or to disclose to any person, firm or entity, any such Confidential Information. The provisions of this <u>Section 5.07</u> shall survive the execution hereof.

**Section 5.08   Buyer Obligations Pursuant to CG Agreement**.   Buyer covenants and agrees to ensure that after the Closing, either (x) Buyer and each person that would be an "Adviser Party" within the meaning of Schedule D immediately after the Closing is not affiliated with any "Policy Party" within the meaning of Schedule D or (y) each such person that would be such an Adviser Party immediately after the closing and that is affiliated with any such Policy Party has established or will establish procedures pursuant to a legally binding written agreement to prevent any communication prohibited by Schedule D.

**Section 5.09   Managed Companies Counsel**.   Buyer expressly acknowledges that counsel who have appeared for or represented the Managed Companies prior to the execution of this Agreement shall withdraw as counsel from any existing litigation and shall be replaced by counsel of Buyer's choice or designation.   The Managed Companies existing counsel shall cooperate with Buyer's designated replacement counsel in all respects, including filing any necessary pleadings or motions with the applicable court and turning over all documents, correspondence or other work product heretofore generated in connection with any such existing litigation to Buyer's designated replacement counsel; *provided* that Buyer acknowledges existing counsel may retain one copy of each such document, correspondence or work product for record keeping purposes.

**ARTICLE VI**
**INDEMNIFICATION AND OTHER REMEDIES**

**Section 6.01   Indemnification by Buyer.** Buyer shall defend and indemnify each Seller Releasee against, and hold each Seller Releasee harmless from, all Claims (other than Excluded Claims), including those related to Seller's ownership of the Interests or any actions or inaction by any Company, any Managed Company, any Client Fund or the SALI Fund.

**Section 6.02   Indemnification by Seller.** Seller shall have no obligations of indemnification with respect to any Claims (other than Excluded Claims), including those related to this Agreement or the transactions contemplated hereby.

**Section 6.03**   Intentionally Blank

**Section 6.04   Exclusive Remedies.** The parties acknowledge and agree that their sole and exclusive remedy with respect to any and all Claims for any breach of any representation,

9

018988
HCMLPHMIT00004210

warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement shall be pursuant to the indemnification provisions set forth in this ARTICLE VI. In furtherance of the foregoing, each party hereby waives, to the fullest extent permitted under law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their affiliates arising under or based upon any law, except pursuant to the indemnification and other provisions set forth in this ARTICLE VI.  Nothing in this Section 6.04 shall limit any person's right to seek and obtain any equitable relief to which such person shall be entitled or to seek any remedy on account of any fraud by any party hereto. The provisions of this Articles VI shall survive the execution hereof.

## ARTICLE VII
## MISCELLANEOUS

**Section 7.01    Expenses.**  All costs and expenses incurred in connection with the preparation and negotiation of this Agreement and the transactions contemplated hereby shall be paid by Buyer at Closing.

**Section 7.02    Notices.**  All notices, claims, demands and other communications *hereunder shall be in writing and shall be deemed to have been given:* (a) *when delivered by* hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the second day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid, if sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 7.02):

**If to Seller:**

John Honis
42 Regatta View Drive
Saratoga Springs, NY 12866
Email:  jwhonis@icloud.com

with a copy (which shall not constitute notice) to:

Sadis & Goldberg LLP
551 Fifth Avenue, 21st Floor
New York, NY 10176
Attn:  Steven Huttler
Email: SHuttler@sadis.com

**If to Buyer:**

Rand Advisors Holding Corp.
6716 Glenhurst Dr.
Dallas, TX 75254

10

018989
HCMLPHMIT00004211

Email: mpatricktax1040@gmail.com
Attention: Mark Patrick

with a copy (which shall not
constitute notice) to:

Leggett Clemons Crandall, PLLC
5700 Granite Parkway, Ste. 950
Plano, TX 75024
Email: sclemons@lcclawfirm.com
Attention: Steve H. Clemons

**Section 7.03   Interpretation; Headings.** This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 7.04   Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement.

**Section 7.05   Entire Agreement.** This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter.

**Section 7.06   Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. No party may assign its rights or obligations hereunder without the prior written consent of the other parties. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 7.07   Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise or delay in exercising, any right or remedy arising from this Agreement shall operate or be construed as a waiver thereof. No single or partial exercise of any right or remedy hereunder shall preclude any other or further exercise thereof or the exercise of any other right or remedy.

**Section 7.08   Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

**(a)**      This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware any other jurisdiction).

11

018990

HCMLPHMIT00004212

(b)     ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF DELAWARE, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.08(c).

Section 7.09   Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.10   AS-IS, WHERE-IS.  Except as expressly set forth in this Agreement to the contrary, Buyer is expressly purchasing the Interests "AS-IS, WHERE-IS, AND WITH ALL FAULTS" with respect to all facts, circumstances, conditions, and defects, and Seller has no obligation to determine or correct any such facts, circumstances, conditions, or defects or to compensate Buyer for same. Except as expressly set forth in this Agreement, Seller has specifically bargained for the assumption by Buyer of all responsibility to investigate Seller, the Companies, the Client Funds, the SALI Fund, the Managed Companies and the Interests, and of all risk of adverse conditions and has structured the Purchase Price and other terms of this Agreement in consideration thereof.  Except for the representations set forth in ARTICLE III, Buyer is and will be relying strictly and solely on its own inspections and examinations and the advice and counsel of its own consultants, agents, legal counsel, and officers.  Except as set forth

12

018991
HCMLPHMIT00004213

in ARTICLE III and otherwise in this Agreement, Buyer assumes the full risk of any loss or damage occasioned by any fact, circumstance, condition, or defect pertaining to Seller, any Company, any Client Fund, the SALI Fund, any Managed Company or the Interests.   The provisions of this Section 7.10 shall survive the Closing and shall not be deemed to have merged into any of the documents executed or delivered at the Closing.

Section 7.11    **Specific Performance**.  The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

Section 7.12    **Privileges; Conflicts**.  It is acknowledged by each of the parties hereto that the Seller has retained Sadis & Goldberg LLP ("**Sadis**") to act as their counsel in connection with the transactions contemplated hereby and that Sadis has not acted as counsel for Buyer, any Company, any Client Fund, SALI Fund, any Managed Company or any of their respective affiliates in connection with the transactions contemplated hereby and that no other party has the status of a client of Sadis for conflict of interest or any other purposes as a result thereof.  Buyer hereby agrees that, in the event that a dispute arises between Buyer or any of its affiliates (including, after the Closing, the Companies) and the Seller or any of his affiliates, Sadis may represent the Seller or any such affiliate in such dispute even though the interests of the Seller or such affiliate may be directly adverse to Buyer or any of its affiliates (including, after the Closing, the Companies), and even though Sadis may have represented such Company in a matter substantially related to such dispute, or may be handling ongoing matters for the Companies, and Buyer and the Companies hereby waive, on behalf of themselves and each of their affiliates, any claim they have or may have that Sadis has a conflict of interest in connection with, or is otherwise prohibited from engaging in, such representation.  Buyer further agrees that, as to all communications among Sadis, Seller, any Company, or their respective affiliates that relate in any way to the transactions contemplated by this Agreement, the attorney-client privilege, the expectation of client confidence and all other rights to any evidentiary privilege belong to Seller and may be controlled by Seller and shall not pass to or be claimed by Buyer, any Company or their affiliates.  Buyer agrees to take, and to cause its affiliates to take, all reasonable steps necessary to implement the intent of this Section 7.12.  Buyer and Seller further agree that Sadis and its partners and employees are third-party beneficiaries of this Section 7.12.

[SIGNATURE PAGE FOLLOWS]

018992

HCMLPHMIT00004214

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above.

**SELLER**:

JOHN HONIS

**BUYER**:

RAND ADVISORS HOLDING CORP

By

Name: Mark Patrick
Title: Director

**GUARANTOR**:

CLO HOLDCO, LTD.,
a Cayman limited company

By

Name: Mark Patrick
Title: Director

14

018993
HCMLPHMIT00004215

**EXHIBIT 87**

018994

MEMBER AND MANAGER CONSENT
OF
RAND ADVISORS, LLC

October 13, 2022

THE UNDERSIGNED sole member (the "**Member**") and sole manager (the "**Manager**") of RAND ADVISORS, LLC, a Delaware limited liability company (the "**C mpan** "), acting pursuant to the Delaware Limited Liability Company Act, do hereby consent and agree, to take the following actions and adopt the following resolutions:

RESOLVED, that pursuant to that certain Membership Interest Purchase Agreement dated as August 1, 2022 (the "Purchase Agreement"), by and among JOHN HONIS (as "Seller"), the Sole Member (as "Buyer"), and CLO HOLDCO, LTD. a Cayman limited company (as "Guarantor"), the Sole Member purchased from Seller all of the issued and outstanding membership interests in the Company;

RESOLVED, that the following individual be, and hereby is, duly appointed and qualified to hold the office(s) set forth next to his name, and shall serve in such capacity until such person's successor(s) shall have been duly appointed and qualified, or until his earlier resignation or removal (each, an "**Officer**"):

| Name | Office |
|------|--------|
| Mark Patrick | Sole Manager, President, Secretary and Treasurer |

RESOLVED, that the certificate of formation of the Company and other Company documents/agreements on file and/or executed by the Member may reflect management by members, and not management by managers.  As a result, if such is the case and the certificate is not amended to reflect management by managers, the Company and all governing documents shall be interpreted in such a manner that all references therein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President;

RESOLVED FURTHER, that any individual previously appointed as a manager and/or as an officer of the Company but not named above is hereby removed from the office of the Company;

RESOLVED FURTHER, that each Officer and manager is hereby, authorized, empowered and directed, in the name and on behalf of the Company, to do and perform all acts and deeds, to execute and deliver all documents, instruments and other agreements, to waive any and all conditions and do all things necessary or helpful to carry out and comply with the terms and provisions of the foregoing resolutions;

RESOLVED FURTHER, that that all authorized acts and deeds of the Officers, managers and agents on behalf of the Company prior to the date hereof shall be, and they hereby are, in all respects, ratified, approved, confirmed and adopted as the acts and deeds of the Company; and

HCMLPHMIT00004216

RESOLVED FURTHER, that the foregoing authorization shall remain in effect until further written notice from the Company.

*[Signature Page to Follow]*

018996
HCMLPHMIT00004217

IN WITNESS WHEREOF, the undersigned Sole Member and Sole Manager have executed this Consent to be effective as of the date first set forth above.

SOLE MEMBER

RAND ADVISORS HOLDING CORP.,
a Delaware corporation

By: _____
        Mark Patrick, Sole Director

SOLE MANAGER

_____
Mark Patrick

*Signature Page*

018997

HCMLPHMIT00004218

**EXHIBIT 88**

018998

MEMBER AND MANAGER CONSENT
OF
RAND PE FUND MANAGEMENT, LLC

October 13, 2022

THE UNDERSIGNED sole member (the "**Member**") and sole manager (the "**Manager**") of RAND PE FUND MANAGEMENT, LLC, a Delaware limited liability company (the "**General Partner**"), the general partner of RAND PE FUND I, L.P., a Delaware limited partnership (the "**Partnership**"), acting pursuant to the Delaware Limited Liability Company Act and the Amended and Restated Company Agreement of the General Partner, do hereby consent and agree, to take the following actions and adopt the following resolutions:

RESOLVED, that pursuant to that certain Membership Interest Purchase Agreement dated as August 1, 2022 (the "Purchase Agreement"), by and among JOHN HONIS (as "Seller"), the Sole Member (as "Buyer"), and CLO HOLDCO, LTD. a Cayman limited company (as "Guarantor"), the Sole Member purchased from Seller all of the issued and outstanding membership interests in the General Partner;

RESOLVED, that the following individual be, and hereby is, duly appointed and qualified to hold the office(s) set forth next to his name, and shall serve in such capacity until such person's successor(s) shall have been duly appointed and qualified, or until his earlier resignation or removal (each, an "**Officer**"):

| **Name** | **Office** |
|---|---|
| Mark Patrick | Sole Manager, President, Secretary and Treasurer |

RESOLVED, that the certificate of formation of the Company and other Company documents/agreements on file and/or executed by the Member may reflect management by members, and not management by managers.  As a result, if such is the case and the certificate is not amended to reflect management by managers, the Company and all governing documents shall be interpreted in such a manner that all references therein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President;

RESOLVED FURTHER, that any individual previously appointed as a manager and/or as an officer of the General Partner but not named above is hereby removed from the office of the General Partner;

RESOLVED FURTHER, that each Officer and manager is hereby, authorized, empowered and directed, in the name and on behalf of the General Partner and the Partnership, to do and perform all acts and deeds, to execute and deliver all documents, instruments and other agreements, to waive any and all conditions and do all things necessary or helpful to carry out and comply with the terms and provisions of the foregoing resolutions;

RESOLVED FURTHER, that that all authorized acts and deeds of the Officers, managers and agents on behalf of the General Partner and/or the Partnership prior to the date

018999

HCMLPHMIT00004219

hereof shall be, and they hereby are, in all respects, ratified, approved, confirmed and adopted as the acts and deeds of the General Partner and/or the Partnership; and

RESOLVED FURTHER, that the foregoing authorization shall remain in effect until further written notice from the General Partner.

*[Signature Page to Follow]*

2

019000

HCMLPHMIT00004220

IN WITNESS WHEREOF, the undersigned Sole Member and Sole Manager have executed this Consent to be effective as of the date first set forth above.

MEMBER

RAND ADVISORS HOLDING CORP.,
a Delaware corporation

By: _____
          Mark Patrick, Sole Director

SOLE MANAGER

_____
Mark Patrick

019001

HCMLPHMIT00004221

**EXHIBIT 89**

019002

**FORM ADV**

# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION AND REPORT BY EXEMPT REPORTING ADVISERS

| | |
|---|---|
| **Primary Business Name: RAND ADVISORS, LLC** | **CRD Number: 172839** |
| **Annual Amendment - All Sections** | **Rev. 10/2021** |
| **3/17/2025 8:51:05 AM** | |

**WARNING:** Complete this form truthfully. False statements or omissions may result in denial of your application, revocation of your registration, or criminal prosecution. You must keep this form updated by filing periodic amendments. See Form ADV General Instruction 4.

**Item 1 Identifying Information**

Responses to this Item tell us who you are, where you are doing business, and how we can contact you. If you are filing an *umbrella registration*, the information in Item 1 should be provided for the *filing adviser* only. General Instruction 5 provides information to assist you with filing an *umbrella registration*.

A.  Your full legal name (if you are a sole proprietor, your last, first, and middle names):
   **RAND ADVISORS, LLC**

B.  (1) Name under which you primarily conduct your advisory business, if different from Item 1.A.
   **RAND ADVISORS, LLC**

   *List on Section 1.B. of Schedule D any additional names under which you conduct your advisory business.*

   (2) If you are using this Form ADV to register more than one investment adviser under an *umbrella registration*, check this box ☐

   *If you check this box, complete a Schedule R for each relying adviser.*

C.  If this filing is reporting a change in your legal name (Item 1.A.) or primary business name (Item 1.B.(1)), enter the new name and specify whether the name change is of
   ☐ your legal name or ☐ your primary business name:

D.  (1) If you are registered with the SEC as an investment adviser, your SEC file number: **801-80265**
   (2) If you report to the SEC as an *exempt reporting adviser*, your SEC file number:
   (3) If you have one or more Central Index Key numbers assigned by the SEC ("CIK Numbers"), all of your CIK numbers:

| CIK Number |
|---|
| 1660386 |
| 1660401 |

E.  (1) If you have a number ("*CRD* Number") assigned by the *FINRA's CRD* system or by the IARD system, your *CRD* number: **172839**

   *If your firm does not have a CRD number, skip this Item 1.E. Do not provide the CRD number of one of your officers, employees, or affiliates.*

   (2) If you have additional *CRD* Numbers, your additional *CRD* numbers:
                              No Information Filed

F.  *Principal Office and Place of Business*
   (1) Address (do not use a P.O. Box):
   Number and Street 1:                         Number and Street 2:
   2101 CEDAR SPRINGS ROAD                       SUITE 1200
   City:                State:          Country:              ZIP+4/Postal Code:
   DALLAS               Texas           United States         75201

   If this address is a private residence, check this box: ☐

   *List on Section 1.F. of Schedule D any office, other than your principal office and place of business, at which you conduct investment advisory business. If you are applying for registration, or are registered, with one or more state securities authorities, you must list all of your offices in the state or states to which you are applying for registration or with whom you are registered. If you are applying for SEC registration, if you are registered only with the SEC, or if you are reporting to the SEC as an exempt reporting adviser, list the largest twenty-five offices in terms of numbers of employees as of the end of your most recently completed fiscal year.*

   (2) Days of week that you normally conduct business at your *principal office and place of business*:
   ◉ Monday - Friday ○ Other:

   Normal business hours at this location:
   9AM-5PM
   (3) Telephone number at this location:
   214-908-8130
   (4) Facsimile number at this location, if any:

HCMLPHMIT00003465

Case 19-34054-sgj11 Doc 4255-89 Filed 06/20/25 Entered 06/20/25 21:38:29 Desc
(5) What is the total number of offices, other than your principal office and place of business, at which you conduct investment advisory business as of the end of your most recently completed fiscal year?
Exhibit 89 Page 3 of 30

Case 3:25-cv-02072-S    Document 15-25    Filed 10/06/25    Page 155 of 674    PageID 20071

214-550-4459

G. Mailing address, if different from your *principal office and place of business* address:

Number and Street 1:                    Number and Street 2:
City:              State:               Country:          ZIP+4/Postal Code:

If this address is a private residence, check this box: ☐

H. If you are a sole proprietor, state your full residence address, if different from your *principal office and place of business* address in Item 1.F.:

Number and Street 1:                    Number and Street 2:
City:              State:               Country:          ZIP+4/Postal Code:

|  |  | Yes | No |
|---|---|---|---|

I. Do you have one or more websites or accounts on publicly available social media platforms (including, but not limited to, Twitter, Facebook and LinkedIn)?     ◉  ○

If "yes," list all firm website addresses and the address for each of the firm's accounts on publicly available social media platforms on *Section 1.I. of Schedule D*. *If a website address serves as a portal through which to access other information you have published on the web, you may list the portal without listing addresses for all of the other information. You may need to list more than one portal address. Do not provide the addresses of websites or accounts on publicly available social media platforms where you do not control the content. Do not provide the individual electronic mail (e-mail) addresses of employees or the addresses of employee accounts on publicly available social media platforms.*

J. Chief Compliance Officer

(1) Provide the name and contact information of your Chief Compliance Officer. If you are an *exempt reporting adviser*, you must provide the contact information for your Chief Compliance Officer, if you have one. If not, you must complete Item 1.K. below.

Name:                          Other titles, if any:
Telephone number:              Facsimile number, if any:
Number and Street 1:           Number and Street 2:
City:              State:      Country:          ZIP+4/Postal Code:

Electronic mail (e-mail) address, if Chief Compliance Officer has one:

(2) If your Chief Compliance Officer is compensated or employed by any *person* other than you, a *related person* or an investment company registered under the Investment Company Act of 1940 that you advise for providing chief compliance officer services to you, provide the *person's* name and IRS Employer Identification Number (if any):

Name:
IRS Employer Identification Number:

K. Additional Regulatory Contact Person: If a person other than the Chief Compliance Officer is authorized to receive information and respond to questions about this Form ADV, you may provide that information here.

Name:                          Titles:
Telephone number:              Facsimile number, if any:
Number and Street 1:           Number and Street 2:
City:              State:      Country:          ZIP+4/Postal Code:

Electronic mail (e-mail) address, if contact person has one:

|  |  | Yes | No |
|---|---|---|---|

L. Do you maintain some or all of the books and records you are required to keep under Section 204 of the Advisers Act, or similar state law, somewhere other than your *principal office and place of business*?     ◉  ○

If "yes," complete *Section 1.L. of Schedule D*.

|  |  | Yes | No |
|---|---|---|---|

M. Are you registered with a *foreign financial regulatory authority*?     ○  ◉

Answer "no" if you are not registered with a foreign financial regulatory authority, even if you have an affiliate that is registered with a foreign financial regulatory authority. If "yes," complete *Section 1.M. of Schedule D*.

|  |  | Yes | No |
|---|---|---|---|

N. Are you a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934?     ○  ○

|  |  | Yes | No |
|---|---|---|---|

O. Did you have $1 billion or more in assets on the last day of your most recent fiscal year?     ○  ○
If yes, what is the approximate amount of your assets:

- $1 billion to less than $10 billion
- $10 billion to less than $50 billion
- $50 billion or more

*For purposes of Item 1.O. only, "assets" refers to your total assets, rather than the assets you manage on behalf of clients. Determine your total assets using the total assets shown on the balance sheet for your most recent fiscal year end.*

P.   Provide your *Legal Entity Identifier* if you have one:

A *legal entity identifier* is a unique number that companies use to identify each other in the financial marketplace. You may not have a *legal entity identifier*.

---

**SECTION 1.B. Other Business Names**

No Information Filed

---

**SECTION 1.F. Other Offices**

No Information Filed

---

**SECTION 1.I. Website Addresses**

List your website addresses, including addresses for accounts on publicly available social media platforms where you control the content (including, but not limited to, Twitter, Facebook and/or LinkedIn). You must complete a separate Schedule D Section 1.I. for each website or account on a publicly available social media platform.

Address of Website/Account on Publicly Available Social Media Platform:   HTTP://WWW.RANDADVISORS.COM/

---

**SECTION 1.L. Location of Books and Records**

Complete the following information for each location at which you keep your books and records, other than your *principal office and place of business*. You must complete a separate Schedule D, Section 1.L. for each location.

Name of entity where books and records are kept:
HIGHGATE CONSULTING GROUP INC

Number and Street 1:                                  Number and Street 2:
2101 CEDAR SPRINGS RD                                 SUITE 1200

City:                        State:        Country:                ZIP+4/Postal Code:
DALLAS                       Texas         United States           75201

If this address is a private residence, check this box: ☐

Telephone Number:                          Facsimile number, if any:
214-550-4459

This is (check one):
- one of your branch offices or affiliates.
- ⦿ a third-party unaffiliated recordkeeper.
- other.

Briefly describe the books and records kept at this location.
ALL BOOKS AND RECORDS OF THE ADVISER

---

**SECTION 1.M. Registration with Foreign Financial Regulatory Authorities**

**Item 2 SEC Registration/Reporting**

Responses to this Item help us (and you) determine whether you are eligible to register with the SEC. Complete this Item 2.A. only if you are applying for SEC registration or submitting an *annual updating amendment* to your SEC registration. If you are filing an *umbrella registration*, the information in Item 2 should be provided for the *filing adviser* only.

A.   To register (or remain registered) with the SEC, you must check **at least one** of the Items 2.A.(1) through 2.A.(12), below. If you are submitting an *annual updating amendment* to your SEC registration and you are no longer eligible to register with the SEC, check Item 2.A.(13). *Part 1A Instruction 2* provides information to help you determine whether you may affirmatively respond to each of these items.

   You (the adviser):

   ☑   (1)   are a **large advisory firm** that either:

        (a) has regulatory assets under management of $100 million (in U.S. dollars) or more; or

        (b) has regulatory assets under management of $90 million (in U.S. dollars) or more at the time of filing its most recent *annual updating amendment* and is registered with the SEC;

   ☐   (2)   are a **mid-sized advisory firm** that has regulatory assets under management of $25 million (in U.S. dollars) or more but less than $100 million (in U.S. dollars) and you are either:

        (a) not required to be registered as an adviser with the *state securities authority* of the state where you maintain your *principal office and place of business;* or

        (b) not subject to examination by the *state securities authority* of the state where you maintain your *principal office and place of business;*

           Click *HERE* for a list of states in which an investment adviser, if registered, would not be subject to examination by the state securities authority.

        (3)   Reserved

   ☐   (4)   have your *principal office and place of business* **outside the United States**;

   ☐   (5)   are **an investment adviser (or subadviser) to an investment company** registered under the Investment Company Act of 1940;

   ☐   (6)   are **an investment adviser to a company which has elected to be a business development company** pursuant to section 54 of the Investment Company Act of 1940 and has not withdrawn the election, and you have at least $25 million of regulatory assets under management;

   ☐   (7)   are a **pension consultant** with respect to assets of plans having an aggregate value of at least $200,000,000 that qualifies for the exemption in rule 203A-2(a);

   ☐   (8)   are a **related adviser** under rule 203A-2(b) that *controls,* is *controlled* by, or is under common *control* with, an investment adviser that is registered with the SEC, and your *principal office and place of business* is the same as the registered adviser;

           *If you check this box, complete* Section 2.A.(8) of Schedule D.

   ☐   (9)   are an **adviser** relying on rule 203A-2(c) because you **expect to be eligible for SEC registration within 120 days;**

           *If you check this box, complete* Section 2.A.(9) of Schedule D.

   ☐   (10)  are a **multi-state adviser** that is required to register in 15 or more states and is relying on rule 203A-2(d);

           *If you check this box, complete* Section 2.A.(10) of Schedule D.

   ☐   (11)  are an **Internet adviser** relying on rule 203A-2(e);

           *If you check this box, complete* Section 2.A.(11) of Schedule D.

   ☐   (12)  have **received an SEC order** exempting you from the prohibition against registration with the SEC;

           *If you check this box, complete* Section 2.A.(12) of Schedule D.

   ☐   (13)  are **no longer eligible** to remain registered with the SEC.

---

***State Securities Authority Notice Filings** and State Reporting by **Exempt Reporting Advisers***

C.   Under state laws, SEC-registered advisers may be required to provide to *state securities authorities* a copy of the Form ADV and any amendments they file with the SEC. These are called *notice filings*. In addition, *exempt reporting advisers* may be required to provide *state securities authorities* with a copy of reports and any amendments they file with the SEC. If this is an initial application or report, check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to direct your *notice filings* or reports to additional state(s), check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to your registration to stop your *notice filings* or reports from going to state(s) that currently receive them, uncheck the box(es) next to those state(s).

Jurisdictions

| | | | |
|---|---|---|---|
| ☐ AL | ☐ IL | ☐ NE | ☐ SC |
| ☐ AK | ☐ IN | ☐ NV | ☐ SD |
| ☐ AZ | ☐ IA | ☐ NH | ☐ TN |
| ☐ AR | ☐ KS | ☐ NJ | ☑ TX |

HCMLPHMIT00003468

| | | | |
|---|---|---|---|
| ☐ CA | ☐ KY | ☐ NM | ☐ UT |
| ☐ CO | | | |
| ☐ DE | ☐ MD | ☐ ND | ☐ VA |
| ☐ DC | ☐ MA | ☐ OH | ☐ WA |
| ☐ FL | ☐ MI | ☐ OK | ☐ WV |
| ☐ GA | ☐ MN | ☐ OR | ☐ WI |
| ☐ GU | ☐ MS | ☐ PA | ☐ WY |
| ☐ HI | ☐ MO | ☐ PR | |
| ☐ ID | ☐ MT | ☐ RI | |

*If you are amending your registration to stop your notice filings or reports from going to a state that currently receives them and you do not want to pay that state's notice filing or report filing fee for the coming year, your amendment must be filed before the end of the year (December 31).*

## SECTION 2.A.(8) Related Adviser

If you are relying on the exemption in rule 203A-2(b) from the prohibition on registration because you *control*, are *controlled* by, or are under common *control* with an investment adviser that is registered with the SEC and your *principal office and place of business* is the same as that of the registered adviser, provide the following information:

Name of Registered Investment Adviser

*CRD* Number of Registered Investment Adviser

SEC Number of Registered Investment Adviser
-

## SECTION 2.A.(9) Investment Adviser Expecting to be Eligible for Commission Registration within 120 Days

If you are relying on rule 203A-2(c), the exemption from the prohibition on registration available to an adviser that expects to be eligible for SEC registration within 120 days, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations. You must make both of these representations:

☐ I am not registered or required to be registered with the SEC or a *state securities authority* and I have a reasonable expectation that I will be eligible to register with the SEC within 120 days after the date my registration with the SEC becomes effective.

☐ I undertake to withdraw from SEC registration if, on the 120th day after my registration with the SEC becomes effective, I would be prohibited by Section 203A(a) of the Advisers Act from registering with the SEC.

## SECTION 2.A.(10) Multi-State Adviser

If you are relying on rule 203A-2(d), the multi-state adviser exemption from the prohibition on registration, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations.

If you are applying for registration as an investment adviser with the SEC, you must make both of these representations:

☐ I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of 15 or more states to register as an investment adviser with the *state securities authorities* in those states.

☐ I undertake to withdraw from SEC registration if I file an amendment to this registration indicating that I would be required by the laws of fewer than 15 states to register as an investment adviser with the *state securities authorities* of those states.

If you are submitting your *annual updating amendment*, you must make this representation:

☐ Within 90 days prior to the date of filing this amendment, I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of at least 15 states to register as an investment adviser with the *state securities authorities* in those states.

## SECTION 2.A.(11) Internet Adviser

If you are relying on rule 203A-2(e), the Internet adviser exemption from the prohibition on registration, you are required to make a representation about your eligibility for SEC registration. By checking the appropriate box, you will be deemed to have made the required representation.

If you are applying for registration as an investment adviser with the SEC or changing your existing Item 2 response regarding your eligibility for SEC registration, you must make this representation:

☐ I will provide investment advice on an ongoing basis to more than one client exclusively through an *operational interactive website*.

If you are filing an annual updating amendment to your existing registration and are continuing to rely on the Internet adviser exemption for SEC registration, you must make this representation:

☐ I have provided and will continue to provide investment advice on an ongoing basis to more than one client exclusively through an *operational interactive website*.

019007

HCMLPHMIT00003469

Case 8:25-cv-02072-sgj11   Doc 4255-89   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Exhibit 89   Page 7 of 30
Case 1:25-cv-02072-S   Document 15-25   Filed 10/06/25   Page 159 of 674   PageID 20075

**SECTION 2.A.(12) SEC Exemptive Order**

If you are relying upon an SEC exemptive order or no-action letter permitting omission or redaction of certain portions of this Item:

Application Number:

803-

Date of *order*:

---

| **Item 3 Form of Organization** |
|---|

If you are filing an *umbrella registration*, the information in Item 3 should be provided for the *filing adviser* only.

  A.  How are you organized?

     ○ Corporation

     ○ Sole Proprietorship

     ○ Limited Liability Partnership (LLP)

     ○ Partnership

     ● Limited Liability Company (LLC)

     ○ Limited Partnership (LP)

     ○ Other (specify):

     *If you are changing your response to this Item, see Part 1A Instruction 4.*

  B.  In what month does your fiscal year end each year?
     DECEMBER

  C.  Under the laws of what state or country are you organized?

     State     Country

     Delaware  United States

     *If you are a partnership, provide the name of the state or country under whose laws your partnership was formed. If you are a sole proprietor, provide the name of the state or country where you reside.*

     *If you are changing your response to this Item, see Part 1A Instruction 4.*

---

| **Item 4 Successions** | | | **Yes** | **No** |
|---|---|---|---|---|

  A.  Are you, at the time of this filing, succeeding to the business of a registered investment adviser, including, for example, a change of your structure or legal status (e.g., form of organization or state of incorporation)?    ○  ●

     *If "yes", complete Item 4.B. and Section 4 of Schedule D.*

  B.  Date of Succession: (MM/DD/YYYY)

     *If you have already reported this succession on a previous Form ADV filing, do not report the succession again. Instead, check "No." See Part 1A Instruction 4.*

---

| **SECTION 4 Successions** |
|---|

No Information Filed

---

| **Item 5 Information About Your Advisory Business - Employees, Clients, and Compensation** |
|---|

Responses to this Item help us understand your business, assist us in preparing for on-site examinations, and provide us with data we use when making regulatory policy. *Part 1A Instruction 5.a.* provides additional guidance to newly formed advisers for completing this Item 5.

| ***Employees*** |
|---|

*If you are organized as a sole proprietorship, include yourself as an employee in your responses to Item 5.A. and Items 5.B.(1), (2), (3), (4), and (5). If an employee performs more than one function, you should count that employee in each of your responses to Items 5.B.(1), (2), (3), (4), and (5).*

HCMLPHMIT00003470

A. Approximately how many *employees* do you have? Include full- and part-time *employees* but do not include any clerical workers.

1

Exhibit 89   Page 8 of 30

B. (1) Approximately how many of the *employees* reported in 5.A. perform investment advisory functions (including research)?

1

(2) Approximately how many of the *employees* reported in 5.A. are registered representatives of a broker-dealer?

0

(3) Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser representatives*?

0

(4) Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser representatives* for an investment adviser other than you?

0

(5) Approximately how many of the *employees* reported in 5.A. are licensed agents of an insurance company or agency?

0

(6) Approximately how many firms or other *persons* solicit advisory *clients* on your behalf?

0

*In your response to Item 5.B.(6), do not count any of your employees and count a firm only once – do not count each of the firm's employees that solicit on your behalf.*

## Clients

*In your responses to Items 5.C. and 5.D. do not include as "clients" the investors in a private fund you advise, unless you have a separate advisory relationship with those investors.*

C. (1) To approximately how many *clients* for whom you do not have regulatory assets under management did you provide investment advisory services during your most recently completed fiscal year?

0

(2) Approximately what percentage of your *clients* are non-*United States persons*?

0%

D. *For purposes of this Item 5.D., the category "individuals" includes trusts, estates, and 401(k) plans and IRAs of individuals and their family members, but does not include businesses organized as sole proprietorships.*
*The category "business development companies" consists of companies that have made an election pursuant to section 54 of the Investment Company Act of 1940. Unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, do not answer (1)(d) or (3)(d) below.*

Indicate the approximate number of your *clients* and amount of your total regulatory assets under management (reported in Item 5.F. below) attributable to each of the following type of *client*. If you have fewer than 5 *clients* in a particular category (other than (d), (e), and (f)) you may check Item 5.D.(2) rather than respond to Item 5.D.(1).

The aggregate amount of regulatory assets under management reported in Item 5.D.(3) should equal the total amount of regulatory assets under management reported in Item 5.F.(2)(c) below.

If a *client* fits into more than one category, select one category that most accurately represents the *client* to avoid double counting *clients* and assets. If you advise a registered investment company, business development company, or pooled investment vehicle, report those assets in categories (d), (e), and (f) as applicable.

| Type of *Client* | (1) Number of *Client(s)* | (2) Fewer than 5 *Clients* | (3) Amount of Regulatory Assets under Management |
|---|---|---|---|
| (a) Individuals (other than *high net worth individuals*) | 0 | ☐ | $ 0 |
| (b) *High net worth individuals* | 0 | ☐ | $ 0 |
| (c) Banking or thrift institutions | 0 | ☐ | $ 0 |
| (d) Investment companies | 0 | | $ 0 |
| (e) Business development companies | 0 | | $ 0 |
| (f) Pooled investment vehicles (other than investment companies and business development companies) | 3 | | $ 153,660,847 |
| (g) Pension and profit sharing plans (but not the plan participants or government pension plans) | 0 | ☐ | $ 0 |
| (h) Charitable organizations | 0 | ☐ | $ 0 |
| (i) State or municipal *government entities* (including government pension plans) | 0 | ☐ | $ 0 |
| (j) Other investment advisers | 0 | ☐ | $ 0 |

019009

HCMLPHMIT00003471

| | | | | |
|---|---|---|---|---|
| (k) Insurance companies | 0 | ☐ | $ 0 | |
| (l) Sovereign wealth funds and foreign official institutions | 0 | ☐ | $ 0 | |
| (m) Corporations or other businesses not listed above | 0 | ☐ | $ 0 | |
| (n) Other: | 0 | ☐ | $ 0 | |

Case 19-34054-sgj11 Doc 4255-89 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Exhibit 89 Page 9 of 30

## Compensation Arrangements

E.  You are compensated for your investment advisory services by (check all that apply):

- ☑ (1) A percentage of assets under your management
- ☐ (2) Hourly charges
- ☐ (3) Subscription fees (for a newsletter or periodical)
- ☐ (4) Fixed fees (other than subscription fees)
- ☐ (5) Commissions
- ☐ (6) *Performance-based fees*
- ☐ (7) Other (specify):

## Item 5 Information About Your Advisory Business - Regulatory Assets Under Management

### Regulatory Assets Under Management

| | | Yes | No |
|---|---|---|---|
| F. (1) Do you provide continuous and regular supervisory or management services to securities portfolios? | | ● | ○ |

(2) If yes, what is the amount of your regulatory assets under management and total number of accounts?

| | U.S. Dollar Amount | | Total Number of Accounts |
|---|---|---|---|
| Discretionary: | (a) $ 153,660,847 | (d) | 80 |
| Non-Discretionary: | (b) $ 0 | (e) | 0 |
| Total: | (c) $ 153,660,847 | (f) | 80 |

*Part 1A Instruction 5.b. explains how to calculate your regulatory assets under management. You must follow these instructions carefully when completing this Item.*

(3) What is the approximate amount of your total regulatory assets under management (reported in Item 5.F.(2)(c) above) attributable to *clients* who are non-*United States persons*?

$ 0

## Item 5 Information About Your Advisory Business - Advisory Activities

### Advisory Activities

G.  What type(s) of advisory services do you provide? Check all that apply.

- ☐ (1) Financial planning services
- ☐ (2) Portfolio management for individuals and/or small businesses
- ☐ (3) Portfolio management for investment companies (as well as "business development companies" that have made an election pursuant to section 54 of the Investment Company Act of 1940)
- ☑ (4) Portfolio management for pooled investment vehicles (other than investment companies)
- ☐ (5) Portfolio management for businesses (other than small businesses) or institutional *clients* (other than registered investment companies and other pooled investment vehicles)
- ☐ (6) Pension consulting services
- ☐ (7) Selection of other advisers (including *private fund* managers)
- ☐ (8) Publication of periodicals or newsletters
- ☐ (9) Security ratings or pricing services
- ☐ (10) Market timing services
- ☐ (11) Educational seminars/workshops
- ☐ (12) Other(specify):

*Do not check Item 5.G.(3) unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, including as a subadviser. If you check Item 5.G.(3), report the 811 or 814 number of the investment company or investment companies to which you provide advice in Section 5.G.(3) of Schedule D.*

H.  If you provide financial planning services, to how many *clients* did you provide these services during your last fiscal year?

- ○ 0
- ○ 1 - 10
- ○ 11 - 25
- ○ 26 - 50
- ○ 51 - 100
- ○ 101 - 250
- ○ 251 - 500
- ○ More than 500

If more than 500, how many?
(round to the nearest 500)

019010

HCMLPHMIT00003472

*In your response to this Item 5.I.(1), do not include as "wrap fee program" arrangements under which you advise ultimate clients to have a separate advisory relationship with those investors.*

|  |  | Yes | No |
|---|---|---|---|
| I. | (1) Do you participate in a *wrap fee program*? | ○ | ⦿ |

(2) If you participate in a *wrap fee program*, what is the amount of your regulatory assets under management attributable to acting as:

(a) *sponsor* to a *wrap fee program*
$

(b) portfolio manager for a *wrap fee program*?
$

(c) *sponsor* to and portfolio manager for the same *wrap fee program*?
$

If you report an amount in Item 5.I.(2)(c), do not report that amount in Item 5.I.(2)(a) or Item 5.I.(2)(b).

If you are a portfolio manager for a wrap fee program, list the names of the programs, their sponsors and related information in *Section 5.I.(2) of Schedule D*.

If your involvement in a wrap fee program is limited to recommending wrap fee programs to your clients, or you advise a mutual fund that is offered through a wrap fee program, do not check Item 5.I.(1) or enter any amounts in response to Item 5.I.(2).

|  |  | Yes | No |
|---|---|---|---|
| J. | (1) In response to Item 4.B. of Part 2A of Form ADV, do you indicate that you provide investment advice only with respect to limited types of investments? | ○ | ⦿ |
|  | (2) Do you report *client* assets in Item 4.E. of Part 2A that are computed using a different method than the method used to compute your regulatory assets under management? | ○ | ⦿ |

K. Separately Managed Account *Clients*

|  |  | Yes | No |
|---|---|---|---|
|  | (1) Do you have regulatory assets under management attributable to *clients* other than those listed in Item 5.D.(3)(d)-(f) (separately managed account *clients*)? | ○ | ⦿ |

If yes, complete *Section 5.K.(1) of Schedule D*.

|  |  | Yes | No |
|---|---|---|---|
|  | (2) Do you engage in borrowing transactions on behalf of any of the separately managed account *clients* that you advise? | ○ | ⦿ |

If yes, complete *Section 5.K.(2) of Schedule D*.

|  |  | Yes | No |
|---|---|---|---|
|  | (3) Do you engage in derivative transactions on behalf of any of the separately managed account *clients* that you advise? | ○ | ⦿ |

If yes, complete *Section 5.K.(2) of Schedule D*.

|  |  | Yes | No |
|---|---|---|---|
|  | (4) After subtracting the amounts in Item 5.D.(3)(d)-(f) above from your total regulatory assets under management, does any custodian hold ten percent or more of this remaining amount of regulatory assets under management? | ○ | ⦿ |

If yes, complete *Section 5.K.(3) of Schedule D* for each custodian.

L. Marketing Activities

|  |  | Yes | No |
|---|---|---|---|
|  | (1) Do any of your *advertisements* include: |  |  |
|  | (a) Performance results? | ○ | ⦿ |
|  | (b) A reference to specific investment advice provided by you (as that phrase is used in rule 206(4)-1(a)(5))? | ○ | ⦿ |
|  | (c) *Testimonials* (other than those that satisfy rule 206(4)-1(b)(4)(ii))? | ○ | ⦿ |
|  | (d) *Endorsements* (other than those that satisfy rule 206(4)-1(b)(4)(ii))? | ○ | ⦿ |
|  | (e) *Third-party ratings*? | ○ | ⦿ |
|  | (2) If you answer "yes" to L(1)(c), (d), or (e) above, do you pay or otherwise provide cash or non-cash compensation, directly or indirectly, in connection with the use of *testimonials*, *endorsements*, or *third-party ratings*? | ○ | ○ |
|  | (3) Do any of your *advertisements* include *hypothetical performance* ? | ○ | ⦿ |

HCMLPHMIT00003473

**SECTION 5.G.(3) Advisers to Registered Investment Companies and Business Development Companies**

No Information Filed

**SECTION 5.I.(2) *Wrap Fee Programs***

No Information Filed

**SECTION 5.K.(1) Separately Managed Accounts**

After subtracting the amounts reported in Item 5.D.(3)(d)-(f) from your total regulatory assets under management, indicate the approximate percentage of this remaining amount attributable to each of the following categories of assets. If the remaining amount is at least $10 billion in regulatory assets under management, complete Question (a). If the remaining amount is less than $10 billion in regulatory assets under management, complete Question (b).

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise.

End of year refers to the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment* . Mid-year is the date six months before the end of year date. Each column should add up to 100% and numbers should be rounded to the nearest percent.

Investments in derivatives, registered investment companies, business development companies, and pooled investment vehicles should be reported in those categories. Do not report those investments based on related or underlying portfolio assets. Cash equivalents include bank deposits, certificates of deposit, bankers' acceptances and similar bank instruments.

Some assets could be classified into more than one category or require discretion about which category applies. You may use your own internal methodologies and the conventions of your service providers in determining how to categorize assets, so long as the methodologies or conventions are consistently applied and consistent with information you report internally and to current and prospective clients. However, you should not double count assets, and your responses must be consistent with any instructions or other guidance relating to this Section.

(a)

| Asset Type | | Mid-year | End of year |
|---|---|---|---|
| (i) | Exchange-Traded Equity Securities | % | % |
| (ii) | Non Exchange-Traded Equity Securities | % | % |
| (iii) | U.S. Government/Agency Bonds | % | % |
| (iv) | U.S. State and Local Bonds | % | % |
| (v) | *Sovereign Bonds* | % | % |
| (vi) | Investment Grade Corporate Bonds | % | % |
| (vii) | Non-Investment Grade Corporate Bonds | % | % |
| (viii) | Derivatives | % | % |
| (ix) | Securities Issued by Registered Investment Companies or Business Development Companies | % | % |
| (x) | Securities Issued by Pooled Investment Vehicles (other than Registered Investment Companies or Business Development Companies) | % | % |
| (xi) | Cash and Cash Equivalents | % | % |
| (xii) | Other | % | % |

Generally describe any assets included in "Other"

(b)

| Asset Type | | End of year |
|---|---|---|
| (i) | Exchange-Traded Equity Securities | % |
| (ii) | Non Exchange-Traded Equity Securities | % |
| (iii) | U.S. Government/Agency Bonds | % |
| (iv) | U.S. State and Local Bonds | % |
| (v) | *Sovereign Bonds* | % |
| (vi) | Investment Grade Corporate Bonds | % |
| (vii) | Non-Investment Grade Corporate Bonds | % |
| (viii) | Derivatives | % |
| (ix) | Securities Issued by Registered Investment Companies or Business Development Companies | % |
| (x) | Securities Issued by Pooled Investment Vehicles (other than Registered Investment Companies or Business Development | % |

019012

| | Companies) | | | | | | |
| (xi) | Cash and Cash Equivalents | Case 19-34054-sgj11 | Doc 4255-89 | Filed 06/20/25 | Entered 06/20/25 21:39:29 | Desc | % |
| | | Exhibit 89   Page 12 of 30 | | | | | |
| (xii) | Case 3:25-cv-02072-S | Document 15-25 | Filed 10/06/25 | Page 164 of 674 | PageID 20080 | | |

Generally describe any assets included in "Other"

## SECTION 5.K.(2) Separately Managed Accounts - Use of *Borrowings* and Derivatives

☑ **No information is required to be reported in this Section 5.K.(2) per the instructions of this Section 5.K.(2)**

If your regulatory assets under management attributable to separately managed accounts are at least $10 billion, you should complete Question (a). If your regulatory assets under management attributable to separately managed accounts are at least $500 million but less than $10 billion, you should complete Question (b).

(a)  In the table below, provide the following information regarding the separately managed accounts you advise. If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise. End of year refers to the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment*. Mid-year is the date six months before the end of year date.

In column 1, indicate the regulatory assets under management attributable to separately managed accounts associated with each level of gross notional exposure. For purposes of this table, the gross notional exposure of an account is the percentage obtained by dividing (i) the sum of (a) the dollar amount of any *borrowings* and (b) the *gross notional value* of all derivatives, by (ii) the regulatory assets under management of the account.

In column 2, provide the dollar amount of *borrowings* for the accounts included in column 1.

In column 3, provide aggregate *gross notional value* of derivatives divided by the aggregate regulatory assets under management of the accounts included in column 1 with respect to each category of derivatives specified in 3(a) through (f).

You may, but are not required to, complete the table with respect to any separately managed account with regulatory assets under management of less than $10,000,000.

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

(i) Mid-Year

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* | (3) Derivative Exposures | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | (a) *Interest Rate Derivative* | (b) *Foreign Exchange Derivative* | (c) *Credit Derivative* | (d) *Equity Derivative* | (e) *Commodity Derivative* | (f) *Other Derivative* |
| **Less than 10%** | $ | $ | % | % | % | % | % | % |
| **10-149%** | $ | $ | % | % | % | % | % | % |
| **150% or more** | $ | $ | % | % | % | % | % | % |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

(ii) End of Year

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* | (3) Derivative Exposures | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | (a) *Interest Rate Derivative* | (b) *Foreign Exchange Derivative* | (c) *Credit Derivative* | (d) *Equity Derivative* | (e) *Commodity Derivative* | (f) *Other Derivative* |
| **Less than 10%** | $ | $ | % | % | % | % | % | % |
| **10-149%** | $ | $ | % | % | % | % | % | % |
| **150% or more** | $ | $ | % | % | % | % | % | % |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

(b)  In the table below, provide the following information regarding the separately managed accounts you advise as of the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment*. If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise.

In column 1, indicate the regulatory assets under management attributable to separately managed accounts associated with each level of gross notional exposure. For purposes of this table, the gross notional exposure of an account is the percentage obtained by dividing (i) the sum of (a) the dollar amount of any borrowings and (b) the gross notional value of all derivatives, by (ii) the regulatory assets under management of the account.

In column 2, provide the dollar amount of *borrowings* for the accounts included in column 1.

You may, but are not required to, complete the table with respect to any separately managed accounts with regulatory assets under management of less than $10,000,000.

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* |
|---|---|---|
| **Less than 10%** | $ | $ |
| **10-149%** | $ | $ |
| **150% or more** | $ | $ |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

---

**SECTION 5.K.(3) Custodians for Separately Managed Accounts**

No Information Filed

---

## Item 6 Other Business Activities

In this Item, we request information about your firm's other business activities.

A.   You are actively engaged in business as a (check all that apply):
- ☐ (1)   broker-dealer (registered or unregistered)
- ☐ (2)   registered representative of a broker-dealer
- ☐ (3)   commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
- ☐ (4)   futures commission merchant
- ☐ (5)   real estate broker, dealer, or agent
- ☐ (6)   insurance broker or agent
- ☐ (7)   bank (including a separately identifiable department or division of a bank)
- ☐ (8)   trust company
- ☐ (9)   registered municipal advisor
- ☐ (10)  registered security-based swap dealer
- ☐ (11)  major security-based swap participant
- ☐ (12)  accountant or accounting firm
- ☐ (13)  lawyer or law firm
- ☐ (14)  other financial product salesperson (specify):

*If you engage in other business using a name that is different from the names reported in Items 1.A. or 1.B.(1), complete Section 6.A. of Schedule D.*

|  |  | Yes | No |
|---|---|---|---|
| B. (1) | Are you actively engaged in any other business not listed in Item 6.A. (other than giving investment advice)? | ○ | ● |
| (2) | If yes, is this other business your primary business? | ○ | ○ |

*If "yes," describe this other business on Section 6.B.(2) of Schedule D, and if you engage in this business under a different name, provide that name.*

|  |  | Yes | No |
|---|---|---|---|
| (3) | Do you sell products or provide services other than investment advice to your advisory *clients*? | ○ | ● |

*If "yes," describe this other business on Section 6.B.(3) of Schedule D, and if you engage in this business under a different name, provide that name.*

---

**SECTION 6.A. Names of Your Other Businesses**

No Information Filed

---

**SECTION 6.B.(2) Description of Primary Business**

Describe your primary business (not your investment advisory business):

If you engage in that business under a different name, provide that name:

HCMLPHMIT00003476

**SECTION 6.B.(3) Description of Other Products and Services**

Describe other products or services you sell to your client. You may omit products and services that you listed in Section 6.B.(2) above.

If you engage in that business under a different name, provide that name:

---

## Item 7 Financial Industry Affiliations

In this Item, we request information about your financial industry affiliations and activities. This information identifies areas in which conflicts of interest may occur between you and your *clients*.

A.  This part of Item 7 requires you to provide information about you and your *related persons*, including foreign affiliates. Your *related persons* are all of your *advisory affiliates* and any *person* that is under common *control* with you.

You have a *related person* that is a (check all that apply):

☐  (1)   broker-dealer, municipal securities dealer, or government securities broker or dealer (registered or unregistered)
☐  (2)   other investment adviser (including financial planners)
☐  (3)   registered municipal advisor
☐  (4)   registered security-based swap dealer
☐  (5)   major security-based swap participant
☐  (6)   commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
☐  (7)   futures commission merchant
☐  (8)   banking or thrift institution
☐  (9)   trust company
☐  (10)  accountant or accounting firm
☐  (11)  lawyer or law firm
☐  (12)  insurance company or agency
☐  (13)  pension consultant
☐  (14)  real estate broker or dealer
☐  (15)  sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
☐  (16)  sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

*Note that Item 7.A. should not be used to disclose that some of your employees perform investment advisory functions or are registered representatives of a broker-dealer. The number of your firm's employees who perform investment advisory functions should be disclosed under Item 5.B.(1). The number of your firm's employees who are registered representatives of a broker-dealer should be disclosed under Item 5.B.(2).*

*Note that if you are filing an umbrella registration, you should not check Item 7.A.(2) with respect to your relying advisers, and you do not have to complete Section 7.A. in Schedule D for your relying advisers. You should complete a Schedule R for each relying adviser.*

*For each related person, including foreign affiliates that may not be registered or required to be registered in the United States, complete Section 7.A. of Schedule D.*

*You do not need to complete Section 7.A. of Schedule D for any related person if: (1) you have no business dealings with the related person in connection with advisory services you provide to your clients; (2) you do not conduct shared operations with the related person; (3) you do not refer clients or business to the related person, and the related person does not refer prospective clients or business to you; (4) you do not share supervised persons or premises with the related person; and (5) you have no reason to believe that your relationship with the related person otherwise creates a conflict of interest with your clients.*

*You must complete Section 7.A. of Schedule D for each related person acting as qualified custodian in connection with advisory services you provide to your clients (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)), regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

---

## SECTION 7.A. Financial Industry Affiliations

No Information Filed

---

## Item 7 *Private Fund* Reporting

                                                                                                    Yes   No

B.  Are you an adviser to any *private fund*?                                                          ◉     ○

*If "yes," then for each private fund that you advise, you must complete a Section 7.B.(1) of Schedule D, except in certain circumstances described in the next sentence and in Instruction 6 of the Instructions to Part 1A. If you are registered or applying for registration with the SEC or reporting as an SEC exempt reporting adviser, and another SEC-registered adviser or SEC exempt reporting adviser reports this information with respect to any such private fund in Section 7.B.(1) of Schedule D of its Form ADV (e.g., if you are a subadviser), do not complete Section 7.B.(1) of Schedule D with respect to that private fund. You must, instead, complete Section 7.B.(2) of Schedule D.*

*In either case, if you seek to preserve the anonymity of a private fund client by maintaining its identity in your books and records in numerical or alphabetical code, or similar designation, pursuant to rule 204-2(d), you may identify the private fund in Section 7.B.(1) or 7.B.(2) of Schedule D using the same code or designation in place of the fund's name.*

HCMLPHMIT00003477

Funds per Page: | 15 | Total Funds: 2

**A. PRIVATE FUND**

**Information About the *Private Fund***

1.  (a)  Name of the *private fund*:

     ATLAS IDF, LP

    (b)  *Private fund* identification number:
         (include the "805-" prefix also)

     805-9274628204

2.  Under the laws of what state or country is the *private fund* organized:

     State:                                    Country:
     Delaware                                  United States

3.  (a)  Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
| --- |
| ATLAS IDF GP, LLC |

    (b)  If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

| No Information Filed |
| --- |

4.  The *private fund* (check all that apply; you must check at least one):

     ☐  (1)  qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940
     ☑  (2)  qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5.  List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

| No Information Filed |
| --- |

                                                                                                              **Yes  No**
6.  (a)  Is this a "master fund" in a master-feeder arrangement?                                               ○    ◉

    (b)  If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| No Information Filed |
| --- |

                                                                                                              **Yes  No**
    (c)  Is this a "feeder fund" in a master-feeder arrangement?                                               ○    ◉

    (d)  If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

         Name of *private fund*:

         *Private fund* identification number:
         (include the "805-" prefix also)

     NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7.  If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

| No Information Filed |
| --- |

     NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

8.  (a)  Is this *private fund* a "fund of funds"?  **Yes** ○  **No** ○

NOTE: For purposes of this question only, count as "*private funds*" any funds of funds in which the *private fund* invests but not the underlying funds in which those funds of funds invest. Also, count private fund assets of *private funds* that invest in other *private funds*, as well as registered investment companies and other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

(b)  If yes, does the *private fund* invest in funds managed by you or by a *related person*?  **Yes** ○  **No** ○

9.  During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)?  **Yes** ○  **No** ●

10.  What type of fund is the *private fund*?

○ hedge fund  ○ liquidity fund  ● private equity fund  ○ real estate fund  ○ securitized asset fund  ○ venture capital fund  ○ Other *private fund*:

NOTE: For definitions of these fund types, please see *Instruction 6 of the Instructions to Part 1A*.

11.  Current gross asset value of the *private fund*:

$ 29,902,788

**Ownership**

12.  Minimum investment commitment required of an investor in the *private fund*:

$ 500,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13.  Approximate number of the *private fund's* beneficial owners:

2

14.  What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

0%

15.  (a)  What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

0%

(b)  If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*?  **Yes** ○  **No** ○

16.  What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

100%

**Your Advisory Services**

17.  (a)  Are you a subadviser to this *private fund*?  **Yes** ○  **No** ●

(b)  If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
| --- |

18.  (a)  Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*?  **Yes** ○  **No** ●

(b)  If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
| --- |

19.  Are your *clients* solicited to invest in the *private fund*?  **Yes** ○  **No** ○

*NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20.  Approximately what percentage of your *clients* has invested in the *private fund*?

0%

**Private Offering**

**Yes**  **No**

21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933?

Case 19-34054-sgj11    Doc 4255-89    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Exhibit 89 - Page 17 of 30

22. I Case 3:25-cv-02072-S  Document 15-5  Filed 10/06/25    Page 169 of 674    PageID 20085

| | | Yes | No |

No Information Filed

B. SERVICE PROVIDERS

<u>Auditors</u>

|  |  | **Yes** | **No** |

23. (a) (1) Are the *private fund's* financial statements subject to an annual audit?

(2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

---

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b) Name of the auditing firm:

COHEN & CO.

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
| AKRON | Ohio | United States |

|  |  | **Yes** | **No** |

(d) Is the auditing firm an *independent public accountant*?

(e) Is the auditing firm registered with the Public Company Accounting Oversight Board?

If yes, Public Company Accounting Oversight Board-Assigned Number:

925

(f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?

---

|  |  | **Yes** | **No** |

(g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors?

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

○ Yes   ○ No   ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

<u>Prime Broker</u>

|  |  | **Yes** | **No** |

24. (a) Does the *private fund* use one or more prime brokers?

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

---

No Information Filed

---

<u>Custodian</u>

|  |  | **Yes** | **No** |

25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

---

**Additional Custodian Information : 1 Record(s) Filed.**

019018

HCMLPHMIT00003480

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
US BANK

(c) Primary business name of custodian:
US BANK

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|-------|--------|----------|
| DALLAS | Texas | United States |

|  | Yes | No |
|--|-----|----|
| (e) Is the custodian a *related person* of your firm? | ○ | ⦿ |

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
-
CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

## Administrator

|  | Yes | No |
|--|-----|----|
| 26. (a) Does the *private fund* use an administrator other than your firm? | ⦿ | ○ |

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

**Additional Administrator Information : 1 Record(s) Filed.**

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

(b) Name of administrator:
HIGHGATE CONSULTING GROUP INC

(c) Location of administrator (city, state and country):

| City: | State: | Country: |
|-------|--------|----------|
| DALLAS | Texas | United States |

|  | Yes | No |
|--|-----|----|
| (d) Is the administrator a *related person* of your firm? | ○ | ⦿ |

(e) Does the administrator prepare and send investor account statements to the *private fund's* investors?
⦿ Yes (provided to all investors)   ○ Some (provided to some but not all investors)   ○ No (provided to no investors)

(f) If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund's* investors? If investor account statements are not sent to the (rest of the) *private fund's* investors, respond "not applicable."

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?
100%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

## Marketers

|  | Yes | No |
|--|-----|----|
| 28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes? | ○ | ○ |

019019

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund*.

Case 19-34054-sgj11   Doc 4255-89   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Exhibit 82 -   Page 169 of 306

Case 3:25-cv-02072-S   Document 15-25   Filed 10/06/25   Page 171 of 674   PageID 20087

| No Information Filed |
| --- |

## A. PRIVATE FUND

**Information About the *Private Fund***

1.  (a)  Name of the *private fund*:
        RAND PE FUND I, L.P.

    (b)  *Private fund* identification number:
        (include the "805-" prefix also)
        805-7357834832

2.  Under the laws of what state or country is the *private fund* organized:
    State:                                          Country:
    Delaware                                        United States

3.  (a)  Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
| --- |
| RAND PE FUND MANAGEMENT, LLC |

    (b)  If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

| No Information Filed |
| --- |

4.  The *private fund* (check all that apply; you must check at least one):
    ☑  (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940
    ☑  (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5.  List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

| No Information Filed |
| --- |

                                                                                                        **Yes  No**
6.  (a)  Is this a "master fund" in a master-feeder arrangement?                                          ○    ●

    (b)  If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| No Information Filed |
| --- |

                                                                                                        **Yes  No**
    (c)  Is this a "feeder fund" in a master-feeder arrangement?                                          ○    ●

    (d)  If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?
        Name of *private fund*:

        *Private fund* identification number:
        (include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7.  If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

| No Information Filed |
| --- |

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their

assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares and invests the assets representing some, but not all, of the classes in a master fund.

Case 3:25-cv-02072-S    Document 15-25    Filed 10/06/25    Page 172 of 674    PageID 20088

Case 3:19-cv-04054-sgl-jlt    Doc 4255-89    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Exhibit 89    Page 20 of 30

8. (a) Is this *private fund* a "fund of funds"?    Yes ○  No ○

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

(b) If yes, does the *private fund* invest in funds managed by you or by a *related person*?    Yes ○  No ○

                                                                          Yes  No

9. During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)?    Yes ○  No ●

10. What type of fund is the *private fund*?

   ○ hedge fund   ○ liquidity fund   ● private equity fund   ○ real estate fund   ○ securitized asset fund   ○ venture capital fund   ○ Other *private fund*:

NOTE: For definitions of these fund types, please see *Instruction 6 of the Instructions to Part 1A*.

11. Current gross asset value of the *private fund*:

$ 0

## Ownership

12. Minimum investment commitment required of an investor in the *private fund*:

$ 500,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

3

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

0%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

0%

                                                                      Yes  No

(b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*?    Yes ●  No ○

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

100%

## Your Advisory Services

                                                                      Yes  No

17. (a) Are you a subadviser to this *private fund*?    Yes ○  No ●

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

                                                                       Yes  No

18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*?    Yes ○  No ●

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
|---|

                                                                        Yes  No

19. Are your *clients* solicited to invest in the *private fund*?    Yes ○  No ●

*NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?

0%

019021

HCMLPHMIT00003483

Private Offering

|  |  | Yes | No |
|---|---|---|---|
| 21. | Have you provided investors in the *private fund* with the information in the exemption of Rule 506 of the Securities Act (Regulation D)? | | ○ |

22. If yes, provide the *private fund's* Form D file number (if any):

| No Information Filed |
|---|

## B. SERVICE PROVIDERS

Auditors

|  |  | Yes | No |
|---|---|---|---|
| 23. (a) | (1) Are the *private fund's* financial statements subject to an annual audit? | ◉ | ○ |
|  | (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP? | ◉ | ○ |

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b)  Name of the auditing firm:
COHEN & CO

(c)  The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
|---|---|---|
| AKRON | Ohio | United States |

|  |  | Yes | No |
|---|---|---|---|
| (d) | Is the auditing firm an *independent public accountant*? | ◉ | ○ |
| (e) | Is the auditing firm registered with the Public Company Accounting Oversight Board? | ◉ | ○ |

If yes, Public Company Accounting Oversight Board-Assigned Number:
925

|  |  | Yes | No |
|---|---|---|---|
| (f) | If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules? | ◉ | ○ |

|  |  | Yes | No |
|---|---|---|---|
| (g) | Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors? | ◉ | ○ |

(h)  Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

◉ Yes   ○ No   ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

Prime Broker

|  |  | Yes | No |
|---|---|---|---|
| 24. (a) | Does the *private fund* use one or more prime brokers? | ○ | ◉ |

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

| No Information Filed |
|---|

Custodian

|  |  | Yes | No |
|---|---|---|---|
| 25. (a) | Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets? | ◉ | ○ |

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b)   Legal name of custodian:
STATE STREET GLOBAL MARKETS, LLC

(c)   Primary business name of custodian:
STATE STREET GLOBAL MARKETS, LLC

(d)   The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | | Country: |
|---|---|---|---|
| BOSTON | Massachusetts | | United States |

|  | Yes | No |
|---|---|---|
| (e)   Is the custodian a *related person* of your firm? | ○ | ◉ |

(f)   If the custodian is a broker-dealer, provide its SEC registration number (if any):
8 - 69862
CRD Number (if any):
285852

(g)   If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

## Administrator

|  | Yes | No |
|---|---|---|
| 26.   (a)   Does the *private fund* use an administrator other than your firm? | ◉ | ○ |

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

**Additional Administrator Information : 1 Record(s) Filed.**

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

(b)   Name of administrator:

HIGHGATE CONSULTING GROUP INC

(c)   Location of administrator (city, state and country):

| City: | State: | Country: |
|---|---|---|
| DALLAS | Texas | United States |

|  | Yes | No |
|---|---|---|
| (d)   Is the administrator a *related person* of your firm? | ○ | ◉ |

(e)   Does the administrator prepare and send investor account statements to the *private fund's* investors?
◉ Yes (provided to all investors)   ○ Some (provided to some but not all investors)   ○ No (provided to no investors)

(f)   If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund's* investors? If investor account statements are not sent to the (rest of the) *private fund's* investors, respond "not applicable."

---

27.   During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

100%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

## Marketers

HCMLPHMIT00003485

28. (a)  Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes?    ○ Yes  ● No

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

| No Information Filed |
|---|

Funds per Page:  15 ▾    Total Funds: 2

---

**SECTION 7.B.(2)** *Private Fund* **Reporting**

1.  Name of the *private fund*:

    RAND ADVISORS SERIES I INSURANCE FUND SERIES INTERESTS OF THE SALI MULTISERIES

2.  *Private fund* identification number:
    (include the "805-" prefix also)

    805-9425927696

3.  Name and SEC File number of adviser that provides information about this *private fund* in Section 7.B.(1) of Schedule D of its Form ADV filing
    Name:

    SALI FUND SERVICES

    SEC File Number:

    801 - 61702

4.  Are your *clients* solicited to invest in this *private fund*?    ○ Yes  ● No

    In answering this question, disregard feeder funds' investment in a master fund. For purposes of this question, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

---

**Item 8 Participation or Interest in *Client* Transactions**

In this Item, we request information about your participation and interest in your *clients*' transactions. This information identifies additional areas in which conflicts of interest may occur between you and your *clients*. Newly-formed advisers should base responses to these questions on the types of participation and interest that you expect to engage in during the next year.

Like Item 7, Item 8 requires you to provide information about you and your *related persons*, including foreign affiliates.

**Proprietary Interest in *Client* Transactions**

|  |  | Yes | No |
|---|---|---|---|
| A. | Do you or any *related person*: | | |
| | (1) buy securities for yourself from advisory *clients*, or sell securities you own to advisory *clients* (principal transactions)? | ○ | ● |
| | (2) buy or sell for yourself securities (other than shares of mutual funds) that you also recommend to advisory *clients*? | ● | ○ |
| | (3) recommend securities (or other investment products) to advisory *clients* in which you or any *related person* has some other proprietary (ownership) interest (other than those mentioned in Items 8.A.(1) or (2))? | ● | ○ |

**Sales Interest in *Client* Transactions**

|  |  | Yes | No |
|---|---|---|---|
| B. | Do you or any *related person*: | | |
| | (1) as a broker-dealer or registered representative of a broker-dealer, execute securities trades for brokerage customers in which advisory *client* securities are sold to or bought from the brokerage customer (agency cross transactions)? | ○ | ● |
| | (2) recommend to advisory *clients*, or act as a purchaser representative for advisory *clients* with respect to, the purchase of securities for which you or any *related person* serves as underwriter or general or managing partner? | ● | ○ |
| | (3) recommend purchase or sale of securities to advisory *clients* for which you or any *related person* has any other sales interest (other than the receipt of sales commissions as a broker or registered representative of a broker-dealer)? | ○ | ● |

**Investment or Brokerage Discretion**

|  |  | Yes | No |
|---|---|---|---|
| C. | Do you or any *related person* have *discretionary authority* to determine the: | | |
| | (1) securities to be bought or sold for a *client's* account? | ● | ○ |

HCMLPHMIT00003486

(2)   amount of securities to be bought or sold for a *client's* account?

(3)   broker or dealer to be used for a purchase or sale of securities for a *client's* account?

(4)   commission rates to be paid to a broker or dealer for a *client's* securities transactions?

D.   If you answer "yes" to C.(3) above, are any of the brokers or dealers *related persons*?

E.   Do you or any *related person* recommend brokers or dealers to *clients*?

F.   If you answer "yes" to E. above, are any of the brokers or dealers *related persons*?

G.   (1)   Do you or any *related person* receive research or other products or services other than execution from a broker-dealer or a third party ("soft dollar benefits") in connection with *client* securities transactions?

(2)   If "yes" to G.(1) above, are all the "soft dollar benefits" you or any *related persons* receive eligible "research or brokerage services" under section 28(e) of the Securities Exchange Act of 1934?

H.   (1)   Do you or any *related person*, directly or indirectly, compensate any *person* that is not an *employee* for *client* referrals?

(2)   Do you or any *related person*, directly or indirectly, provide any *employee* compensation that is specifically related to obtaining *clients* for the firm (cash or non-cash compensation in addition to the *employee's* regular salary)?

I.   Do you or any *related person*, including any *employee*, directly or indirectly, receive compensation from any *person* (other than you or any *related person*) for *client* referrals?

   *In your response to Item 8.I., do not include the regular salary you pay to an employee.*

   *In responding to Items 8.H. and 8.I., consider all cash and non-cash compensation that you or a related person gave to (in answering Item 8.H.) or received from (in answering Item 8.I.) any person in exchange for client referrals, including any bonus that is based, at least in part, on the number or amount of client referrals.*

---

## Item 9 Custody

In this Item, we ask you whether you or a *related person* has *custody* of *client* (other than *clients* that are investment companies registered under the Investment Company Act of 1940) assets and about your custodial practices.

| | | Yes | No |
|---|---|---|---|

A.   (1)   Do you have *custody* of any advisory *clients'*:

   (a)  cash or bank accounts?

   (b)  securities?

*If you are registering or registered with the SEC, answer "No" to Item 9.A.(1)(a) and (b) if you have custody solely because (i) you deduct your advisory fees directly from your clients' accounts, or (ii) a related person has custody of client assets in connection with advisory services you provide to clients, but you have overcome the presumption that you are not operationally independent (pursuant to Advisers Act rule 206(4)-2(d)(5)) from the related person.*

(2)   If you checked "yes" to Item 9.A.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* for which you have *custody*:

   U.S. Dollar Amount                Total Number of *Clients*
   (a) $ 153,649,022               (b) 3

*If you are registering or registered with the SEC and you have custody solely because you deduct your advisory fees directly from your clients' accounts, do not include the amount of those assets and the number of those clients in your response to Item 9.A.(2). If your related person has custody of client assets in connection with advisory services you provide to clients, do not include the amount of those assets and number of those clients in your response to 9.A.(2). Instead, include that information in your response to Item 9.B.(2).*

| | | Yes | No |
|---|---|---|---|

B.   (1)   In connection with advisory services you provide to *clients*, do any of your *related persons* have *custody* of any of your advisory *clients'*:

   (a)  cash or bank accounts?

   (b)  securities?

*You are required to answer this item regardless of how you answered Item 9.A.(1)(a) or (b).*

(2)   If you checked "yes" to Item 9.B.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* for which your *related persons* have *custody*:

   U.S. Dollar Amount                Total Number of *Clients*
   (a) $                           (b)

C.   If you or your *related persons* have *custody* of *client* funds or securities in connection with advisory services you provide to *clients*, check all the following that apply:

   (1)   A qualified custodian(s) sends account statements at least quarterly to the investors in the pooled investment vehicle(s) you manage.   ☐

   (2)   An *independent public accountant* audits annually the pooled investment vehicle(s) that you manage and the audited financial statements   ☑

(3) An *independent public accountant* conducts an annual surprise examination of *client* funds and securities.

(4) *related person(s)* that, as a "qualified custodian," maintain *advisory client* funds or securities in connection with advisory services you provide to *clients* are qualified custodians for *client* funds and securities.

*If you checked Item 9.C.(2), C.(3) or C.(4), list in Section 9.C. of Schedule D the accountants that are engaged to perform the audit or examination or prepare an internal control report. (If you checked Item 9.C.(2), you do not have to list auditor information in Section 9.C. of Schedule D if you already provided this information with respect to the private funds you advise in Section 7.B.(1) of Schedule D).*

D.  Do you or your *related person(s)* act as qualified custodians for your *clients* in connection with advisory services you provide to *clients*?   **Yes  No**

(1)  you act as a qualified custodian    ○  ●

(2)  your *related person(s)* act as qualified custodian(s)    ○  ●

*If you checked "yes" to Item 9.D.(2), all related persons that act as qualified custodians (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)) must be identified in Section 7.A. of Schedule D, regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

E.  If you are filing your *annual updating amendment* and you were subject to a surprise examination by an *independent public accountant* during your last fiscal year, provide the date (MM/YYYY) the examination commenced:

F.  If you or your *related persons* have *custody* of *client* funds or securities, how many *persons*, including, but not limited to, you and your *related persons*, act as qualified custodians for your *clients* in connection with advisory services you provide to *clients*?
2

---

**SECTION 9.C. *Independent Public Accountant***

No Information Filed

---

**Item 10 Control Persons**

In this Item, we ask you to identify every *person* that, directly or indirectly, *controls* you. If you are filing an *umbrella registration*, the information in Item 10 should be provided for the *filing adviser* only.

If you are submitting an initial application or report, you must complete Schedule A and Schedule B. Schedule A asks for information about your direct owners and executive officers. Schedule B asks for information about your indirect owners. If this is an amendment and you are updating information you reported on either Schedule A or Schedule B (or both) that you filed with your initial application or report, you must complete Schedule C.

**Yes  No**

A.  Does any *person* not named in Item 1.A. or Schedules A, B, or C, directly or indirectly, *control* your management or policies?    ○  ●

*If yes, complete Section 10.A. of Schedule D.*

B.  If any *person* named in Schedules A, B, or C or in Section 10.A. of Schedule D is a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934, please complete *Section 10.B. of Schedule D.*

---

**SECTION 10.A. *Control Persons***

No Information Filed

---

**SECTION 10.B. *Control Person* Public Reporting Companies**

No Information Filed

---

**Item 11 Disclosure Information**

In this Item, we ask for information about your disciplinary history and the disciplinary history of all your *advisory affiliates*. We use this information to determine whether to grant your application for registration, to decide whether to revoke your registration or to place limitations on your activities as an investment adviser, and to identify potential problem areas to focus on during our on-site examinations. One event may result in "yes" answers to more than one of the questions below. In accordance with General Instruction 5 to Form ADV, "you" and "your" include the *filing adviser* and all *relying advisers* under an *umbrella registration*.

Your *advisory affiliates* are: (1) all of your current *employees* (other than *employees* performing only clerical, administrative, support or similar functions); (2) all of your officers, partners, or directors (or any *person* performing similar functions); and (3) all *persons* directly or indirectly *controlling* you or *controlled* by you.

If you are registered or registering with the SEC or if you are an exempt reporting adviser, you may limit your disclosure of any event listed in Item 11 to ten years following the date of the event. If you are registered or registering with a state, you must respond to the questions as posed; you may, therefore, limit your disclosure to ten years following the date of an event only in responding to Items 11.A.(1), 11.A.(2), 11.B.(1), 11.B.(2), 11.D.(4), and 11.H.(1)(a). For purposes of calculating this ten-year period, the date of an event is the date the final order, judgment, or decree was entered, or the date any rights of appeal from preliminary orders, judgments, or decrees lapsed.

You must complete the appropriate Disclosure Reporting Page ("DRP") for "yes" answers to the questions in this Item 11.

| | Yes | No |
|---|---|---|
| Do any of the events below involve you or any of your *supervised persons*? | ○ | ⊙ |

**For "yes" answers to the following questions, complete a Criminal Action DRP:**

| | | Yes | No |
|---|---|---|---|
| A. | In the past ten years, have you or any *advisory affiliate*: | | |
| | (1) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to any *felony*? | ○ | ⊙ |
| | (2) been *charged* with any *felony*? | ○ | ⊙ |

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.A.(2) to charges that are currently pending.*

| | | Yes | No |
|---|---|---|---|
| B. | In the past ten years, have you or any *advisory affiliate*: | | |
| | (1) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to a *misdemeanor* involving: investments or an *investment-related* business, or any fraud, false statements, or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses? | ○ | ⊙ |
| | (2) been *charged* with a *misdemeanor* listed in Item 11.B.(1)? | ○ | ⊙ |

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.B.(2) to charges that are currently pending.*

**For "yes" answers to the following questions, complete a Regulatory Action DRP:**

| | | Yes | No |
|---|---|---|---|
| C. | Has the SEC or the Commodity Futures Trading Commission (CFTC) ever: | | |
| | (1) *found* you or any *advisory affiliate* to have made a false statement or omission? | ○ | ⊙ |
| | (2) *found* you or any *advisory affiliate* to have been *involved* in a violation of SEC or CFTC regulations or statutes? | ○ | ⊙ |
| | (3) *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ⊙ |
| | (4) entered an *order* against you or any *advisory affiliate* in connection with *investment-related* activity? | ○ | ⊙ |
| | (5) imposed a civil money penalty on you or any *advisory affiliate*, or *ordered* you or any *advisory affiliate* to cease and desist from any activity? | ○ | ⊙ |
| D. | Has any other federal regulatory agency, any state regulatory agency, or any *foreign financial regulatory authority*: | | |
| | (1) ever *found* you or any *advisory affiliate* to have made a false statement or omission, or been dishonest, unfair, or unethical? | ○ | ⊙ |
| | (2) ever *found* you or any *advisory affiliate* to have been *involved* in a violation of *investment-related* regulations or statutes? | ○ | ⊙ |
| | (3) ever *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ⊙ |
| | (4) in the past ten years, entered an *order* against you or any *advisory affiliate* in connection with an *investment-related* activity? | ○ | ⊙ |
| | (5) ever denied, suspended, or revoked your or any *advisory affiliate's* registration or license, or otherwise prevented you or any *advisory affiliate*, by *order*, from associating with an *investment-related* business or restricted your or any *advisory affiliate's* activity? | ○ | ⊙ |
| E. | Has any *self-regulatory organization* or commodities exchange ever: | | |
| | (1) *found* you or any *advisory affiliate* to have made a false statement or omission? | ○ | ⊙ |
| | (2) *found* you or any *advisory affiliate* to have been *involved* in a violation of its rules (other than a violation designated as a "*minor rule violation*" under a plan approved by the SEC)? | ○ | ⊙ |
| | (3) *found* you or any *advisory affiliate* to have been the cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ⊙ |
| | (4) disciplined you or any *advisory affiliate* by expelling or suspending you or the *advisory affiliate* from membership, barring or suspending you or the *advisory affiliate* from association with other members, or otherwise restricting your or the *advisory affiliate's* activities? | ○ | ⊙ |
| F. | Has an authorization to act as an attorney, accountant, or federal contractor granted to you or any *advisory affiliate* ever been revoked or suspended? | ○ | ⊙ |
| G. | Are you or any *advisory affiliate* now the subject of any regulatory *proceeding* that could result in a "yes" answer to any part of Item 11.C., 11.D., or 11.E.? | ○ | ⊙ |

**For "yes" answers to the following questions, complete a Civil Judicial Action DRP:**

| | | Yes | No |
|---|---|---|---|
| H. | (1) Has any domestic or foreign court: | | |

(a)  in the past ten years, *enjoined* from any *advisory affiliate* in connection with any *investment-related* activity?

(b)  ever *found* that you or any *advisory affiliate* were *involved* in a violation of *investment-related* statutes or regulations?

(c)  ... a state or *foreign financial regulatory authority*?

(2)  Are you or any *advisory affiliate* now the subject of any civil *proceeding* that could result in a "yes" answer to any part of Item 11.H.(1)?

---

**Item 12 Small Businesses**

The SEC is required by the Regulatory Flexibility Act to consider the effect of its regulations on small entities. In order to do this, we need to determine whether you meet the definition of "small business" or "small organization" under rule 0-7.

Answer this Item 12 only if you are registered or registering with the SEC **and** you indicated in response to Item 5.F.(2)(c) that you have regulatory assets under management of less than $25 million. You are not required to answer this Item 12 if you are filing for initial registration as a state adviser, amending a current state registration, or switching from SEC to state registration.

For purposes of this Item 12 only:

- Total Assets refers to the total assets of a firm, rather than the assets managed on behalf of *clients*. In determining your or another *person's* total assets, you may use the total assets shown on a current balance sheet (but use total assets reported on a consolidated balance sheet with subsidiaries included, if that amount is larger).
- *Control* means the power to direct or cause the direction of the management or policies of a *person*, whether through ownership of securities, by contract, or otherwise. Any *person* that directly or indirectly has the right to vote 25 percent or more of the voting securities, or is entitled to 25 percent or more of the profits, of another *person* is presumed to *control* the other *person*.

|  | Yes | No |
|---|---|---|
| A.   Did you have total assets of $5 million or more on the last day of your most recent fiscal year? | ○ | ○ |
| *If "yes," you do not need to answer Items 12.B. and 12.C.* | | |
| B.   Do you: | | |
| (1)   *control* another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| (2)   *control* another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| C.   Are you: | | |
| (1)   *controlled* by or under common *control* with another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| (2)   *controlled* by or under common *control* with another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? | ○ | ○ |

---

**Schedule A**

**Direct Owners and Executive Officers**

1.  Complete Schedule A only if you are submitting an initial application or report. Schedule A asks for information about your direct owners and executive officers. Use Schedule C to amend this information.
2.  Direct Owners and Executive Officers. List below the names of:
   (a)  each Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Chief Legal Officer, Chief Compliance Officer(Chief Compliance Officer is required if you are registered or applying for registration and cannot be more than one individual), director, and any other individuals with similar status or functions;
   (b)  if you are organized as a corporation, each shareholder that is a direct owner of 5% or more of a class of your voting securities, unless you are a public reporting company (a company subject to Section 12 or 15(d) of the Exchange Act);
   Direct owners include any *person* that owns, beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 5% or more of a class of your voting securities. For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.
   (c)  if you are organized as a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 5% or more of your capital;
   (d)  in the case of a trust that directly owns 5% or more of a class of your voting securities, or that has the right to receive upon dissolution, or has contributed, 5% or more of your capital, the trust and each trustee; and
   (e)  if you are organized as a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 5% or more of your capital, and (ii) if managed by elected managers, all elected managers.
3.  Do you have any indirect owners to be reported on Schedule B?  ● Yes   ○ No
4.  In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner or executive officer is an individual.
5.  Complete the Title or Status column by entering board/management titles; status as partner, trustee, sole proprietor, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).
6.  Ownership codes are:     NA - less than 5%         B - 10% but less than 25%     D - 50% but less than 75%
                                          A - 5% but less than 10%     C - 25% but less than 50%     E - 75% or more
7.  (a)  In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does

not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are
*control persons*.

(b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

(c) Complete each column.

Case 19-34054-sgj11   Doc 4255-89   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Exhibit 89   Page 28 of 30

Case 3:25-cv-02072-S   Document 15-25   Filed 10/06/25   Page 180 of 674   PageID 20096

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Title or Status | Date Title or Status Acquired MM/YYYY | Ownership Code | *Control Person* | PR | *CRD* No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|
| CHARITABLE DAF HOLDINGS CORP. | DE | OWNER | 08/2022 | E | Y | N | |
| Patrick, Mark | I | CCO | 08/2022 | NA | Y | N | 7626259 |

## Schedule B

### Indirect Owners

1. Complete Schedule B only if you are submitting an initial application or report. Schedule B asks for information about your indirect owners; you must first complete Schedule A, which asks for information about your direct owners. Use Schedule C to amend this information.

2. Indirect Owners. With respect to each owner listed on Schedule A (except individual owners), list below:

    (a) in the case of an owner that is a corporation, each of its shareholders that beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 25% or more of a class of a voting security of that corporation;

    For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

    (b) in the case of an owner that is a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 25% or more of the partnership's capital;

    (c) in the case of an owner that is a trust, the trust and each trustee; and

    (d) in the case of an owner that is a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 25% or more of the LLC's capital, and (ii) if managed by elected managers, all elected managers.

3. Continue up the chain of ownership listing all 25% owners at each level. Once a public reporting company (a company subject to Sections 12 or 15(d) of the Exchange Act) is reached, no further ownership information need be given.

4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner is an individual.

5. Complete the Status column by entering the owner's status as partner, trustee, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

6. Ownership codes are:   C - 25% but less than 50%   E - 75% or more
    D - 50% but less than 75%   F - Other (general partner, trustee, or elected manager)

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

    (b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

    (c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Entity in Which Interest is Owned | Status | Date Status Acquired MM/YYYY | Ownership Code | *Control Person* | PR | *CRD* No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|---|
| LIBERTY CLO HOLDCO, LTD. | FE | CHARITABLE DAF HOLDINGS CORP. | OWNER OF CHARITABLE DAF HOLDINGS CORP. | 04/2023 | E | Y | N | |
| CHARITABLE DAF HOLDCO LTD. | FE | LIBERTY CLO HOLDCO, LTD. | OWNER OF CHARITABLE DAF FUND, L.P. | 11/2011 | E | Y | N | |
| CDH GP, LTD | DE | LIBERTY CLO HOLDCO, LTD. | GNEREAL PARTNER OF CHARITABLE DAF FUND, L.P | 03/2024 | F | Y | N | |
| Patrick, Mark | I | CDH GP, LTD | SOLE OWNER AND SOLE DIRECTOR OF CDH GP, LTD. | 03/2024 | E | Y | N | 7626259 |

## Schedule D - Miscellaneous

You may use the space below to explain a response to an Item or to provide any other information.

## Schedule R

No Information Filed

## DRP Pages

**CRIMINAL DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

---

**REGULATORY ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

---

**CIVIL JUDICIAL ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

---

## Part 2

**Exemption from brochure delivery requirements for SEC-registered advisers**

SEC rules exempt SEC-registered advisers from delivering a firm brochure to some kinds of clients.  If these exemptions excuse you from delivering a brochure to *all* of your advisory clients, you do not have to prepare a brochure.

Are you exempt from delivering a brochure to all of your clients under these rules?                    Yes  No
                                                                                                       ○    ◉

*If no, complete the ADV Part 2 filing below.*

Amend, retire or file new brochures:

| Brochure ID | Brochure Name | Brochure Type(s) |
|---|---|---|
| 400181 | ADV PART 2A | Private funds or pools |
| 409351 | ADV PART 2 | Private funds or pools |

---

## Part 3

| CRS | Type(s) | Affiliate Info | Retire |
|---|---|---|---|

There are no CRS filings to display.

---

## Execution Pages

**DOMESTIC INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

### Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the Secretary of State or other legally designated officer, of the state in which you maintain your *principal office and place of business* and any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such *persons* may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding*, or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of the state in which you maintain your *principal office and place of business* or of any state in which you are submitting a *notice filing*.

### Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

| | |
|---|---|
| Signature: | Date: MM/DD/YYYY |
| SHAWN RAVER | 03/17/2025 |
| Printed Name: | Title: |
| SHAWN RAVER | OPERATIONS |

019030

HCMLPHMIT00003492

**NON-RESIDENT INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

## 1. Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint each of the Secretary of the SEC, and the Secretary of State or other legally designated officer, of any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such persons may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding* or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of any state in which you are submitting a *notice filing*.

## 2. Appointment and Consent: Effect on Partnerships

If you are organized as a partnership, this irrevocable power of attorney and consent to service of process will continue in effect if any partner withdraws from or is admitted to the partnership, provided that the admission or withdrawal does not create a new partnership. If the partnership dissolves, this irrevocable power of attorney and consent shall be in effect for any action brought against you or any of your former partners.

## 3. *Non-Resident* Investment Adviser Undertaking Regarding Books and Records

By signing this Form ADV, you also agree to provide, at your own expense, to the U.S. Securities and Exchange Commission at its principal office in Washington D.C., at any Regional or District Office of the Commission, or at any one of its offices in the United States, as specified by the Commission, correct, current, and complete copies of any or all records that you are required to maintain under Rule 204-2 under the Investment Advisers Act of 1940. This undertaking shall be binding upon you, your heirs, successors and assigns, and any *person* subject to your written irrevocable consents or powers of attorney or any of your general partners and *managing agents*.

## Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the *non-resident* investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

Signature:                                    Date: MM/DD/YYYY
Printed Name:                                 Title:
Adviser *CRD* Number:
172839

HCMLPHMIT00003493

**EXHIBIT 90**

019032

**SIGNATURE PAGE**

This page constitutes the signature page for the Subscription Agreement, the Prospective Investor Questionnaire and the Partnership Agreement, and execution of this signature page constitutes execution of each.

IN WITNESS WHEREOF, the Subscriber has executed this Subscription Agreement, the Prospective Investor Questionnaire and the Partnership Agreement this _21_ day of _December_, 20_15_.

$ _7,000,000_
Capital Contribution

Series _1_

**For Individuals:**

_____
Name of Prospective Investor (print or type)

_____
(Signature)

_____
Name of Joint Prospective Investor (print or type)
(if applicable)

_____
(Joint Signature, if applicable)

**For Entities:**

_Atlas IDF LP_
Name of Prospective Investor (print or type)

By: _____
    (Signature)

Name: _Don Honis_

Title: _Managing Member of GP_

_____
(Name and Initials of IRA custodian, if applicable)

$ _7,000,000_
Capital Contribution Accepted
Series _2_

Accepted and Agreed, as of _Dec 21_, 20_15_:

**RAND PE FUND I, L.P.**
By: Rand PE Fund Management, LLC, as its general partner
(acting severally in the name of and for the account of each individual Series)

By: _____
Name: John Honis
Title: Managing Member

019033

Form **W-9**
(Rev. December 2014)
Department of the Treasury
Internal Revenue Service

## Request for Taxpayer
## Identification Number and Certification

Give Form to the requester. Do not send to the IRS.

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

**2** Business name/disregarded entity name, if different from above

*Atlas IDF LP*

**3** Check appropriate box for federal tax classification; check only **one** of the following seven boxes:

☐ Individual/sole proprietor or single-member LLC ☐ C Corporation ☐ S Corporation ☒ Partnership ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

**Note.** For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

(Applies to accounts maintained outside the U.S.)

**5** Address (number, street, and apt. or suite no.)

*87 Railroad Place - Suite 403*

**6** City, state, and ZIP code

*Saratoga Springs, NY 12866*

Requester's name and address (optional)

**7** List account number(s) here (optional)

*Print or type — See Specific Instructions on page 2.*

## Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

Social security number

| | | | – | | | – | | | | |

**or**

Employer identification number

| 4 | 7 | – | 5 | 4 | 5 | 5 | 3 | 4 | 3 |

## Part II    Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here**

Signature of U.S. person ▶

Date ▶ *12/21/15*

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at *www.irs.gov/fw9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding.* See *What is backup withholding?* on page 2.

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting?* on page 2 for further information.

Cat. No. 10231X

Form **W-9** (Rev. 12-2014)

019034

**PART I – SUBSCRIBER INFORMATION PAGE**

Subscriber Name: _____   Joint Subscriber Name (if necessary): _____

-or-

Entity Name: _Atlas IDF, LP_

Subscriber Social Security/Tax ID No.:   Joint Subscriber Social Security/Tax ID No. (if necessary):
_42-3455343_   _____

Subscriber Date of Birth/Date of Incorporation or Formation:   Joint Subscriber Date of Birth/Date of Incorporation or Formation (if necessary): _____
_Oct 2015_

State, or if not in the U.S., Country in which the Subscription
Agreement was signed: _New York_

Residence (for individuals) or Principal Place of Business (for
entities) (May not be a P.O. Box):

Address: _87 Railroad Place_   Telephone: _714-335-7969_
_Suite 403_   Facsimile: _____
City: _Saratoga_   State: _NY_   Zip: _12866_   Email: _JHanie @RandAdvisers.com_
Country: _U.S._

**Mailing Address (if other than above)**

Address: _____   Telephone: _____
_____   Facsimile: _____
City: _____   State: _____   Zip: _____   Email: _____
Country: _____

**Subscriber Type:**

☐ Individual   ☐ Joint Tenants with Right of   ☐ Trust   ☒ Partnership   ☐ Corporation   ☐ LLC
Survivorship

☐ IRA (Self-directed)   ☐ IRA (Custodian)   ☐ Tenants in Common   ☐ Other: _____

If through a custodian, please
provide details:

_____

☐ Community Property (Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington or Wisconsin).
**PLEASE NOTE: if you are married and live in a community property state, both you and your spouse must sign the
Signature Page to the Subscription Agreement.**

**Series of Interests:**
Please indicate which Series of Interests you are subscribing for:

☒ Series 1 Interests

*Prior to selecting a Series of Interests, Subscribers are advised to review the detailed descriptions of the rights and
obligations applicable to such Series of Interests, which are set forth in the Memorandum (and/or a supplement to any such
document), the Partnership Agreement and/or this Agreement.*

**Form PF Investor Type:**

019035

Under the reporting requirements on Form PF (Reporting Form for Investment Advisers to Private Funds and Certain Commodity Pool Operators and Commodity Trading Advisors), a reporting entity must organize its investors by certain specified investor groups set forth in Form PF. Accordingly, please check below the investor type that best describes the Subscriber. (*If the Subscriber is acting as trustee, agent, representative or nominee for a beneficial owner, please check the item that best describes the beneficial owner.*)

***Please check one:***

- ☐ Individual that is a United States person[4] (or a trust of such a person)
- ☐ Individual that is not a United States person (or a trust of such a person)
- ☐ Broker-dealer
- ☐ Insurance company
- ☐ Investment company registered with the SEC
- ☒ Private fund[5]
- ☐ Non-profit
- ☐ Pension plan (other than a governmental pension plan)
- ☐ Banking or thrift institution (proprietary)
- ☐ State or municipal government entity (other than a governmental pension plan)
- ☐ State or municipal government pension plan
- ☐ Sovereign wealth fund or foreign official institution
- ☐ Investor that is not a United States person and about which the foregoing beneficial ownership information is not known and cannot reasonably be obtained because the beneficial interest is held through a chain involving one or more third-party intermediaries
- ☐ Other (*please specify*): _____

**Payment Information:**

Please insert your payment information. Please note **you must wire the payment from an account in your name**.

Bank Name: *BBVA Compas*  Swift Code*: _____

Bank ABA#: *062001186*  For Further Credit to: _____

City/State/Country: *Dallas, TX*  Account Name: _____

Account Name: *Atlas IDF, LP*  Account #: _____

Account #: *6733738776*

\*  Required for U.S. dollar wire transfer to non-U.S. banks. Please contact your bank for more information.

**Was the Subscriber referred to the Partnership by a placement agent?**

☐ Yes  ☒ No

If yes, please provide the name of placement agent: _____

**COMMUNICATIONS TO SUBSCRIBER:**

**Please send all communications to (please check one):**

☒  Residence or Principal Place of Business

_____

[4] For purposes of Form PF, the term "United States person" has the meaning provided in Rule 203(m)-1 under the Advisers Act, which includes any natural person that is resident in the United States.
[5] For purposes of Form PF, the term "private fund" means any issuer that would be an investment company as defined in Section 3 of the Investment Company Act, but for Section 3(c)(1) or 3(c)(7) thereof.

☒    Mailing Address

**Duplicate communications should be sent to an authorized representative as follows (complete if desired; otherwise, leave blank):**

Name: _____

Address: _____

_____

_____

Facsimile: _____

Email: _____

**Preferred Methods of Communication**: Choose *one* for the Subscriber and *one* for the authorized representative whose address appears immediately above, if any; *Note*: each of the Partnership, the Administrator, the Investment Manager, and the General Partner is permitted to send notices and other information relating to the Subscriber's investment in the Partnership in any manner it chooses but will send notices and other information by the method selected below if possible and may charge a related fee to the Subscriber in connection therewith.

| | Mail | Facsimile | Email/Web-based Delivery |
|---|---|---|---|
| Subscriber | ☐ | ☐ | ☒ |
| Authorized Representative | ☐ | ☐ | ☐ |

**Electronic Delivery of Reports and Other Communications:**

If you elected "Email/Web-based Delivery" above, at their discretion, the Partnership, the Administrator, the Investment Manager and/or the General Partner may provide to you (or your authorized representative) statements, reports and other communications relating to the Partnership and/or your investment in the Partnership in electronic form, such as email.

Do you consent to the sending of such statements, reports and other communications regarding the Partnership and your investment in the Partnership (including Net Asset Value information, subscription and withdrawal activity, and annual and other updates of the Partnership's consumer privacy policies and procedures) exclusively in electronic form without separate mailing of paper copies?

☒ Yes      ☐ No

By consenting you also acknowledge that emails from the Partnership, the Administrator, the Investment Manager and/or the General Partner may be accessed by recipients other than you and may be interfered with, may contain computer viruses or other defects and may not be successfully replicated on other systems. The Partnership, the Administrator, the Investment Manager and the General Partner give no warranties in relation to these matters. If you have any doubts about the authenticity of an email purportedly sent by the Partnership, the Administrator, the Investment Manager and/or the General Partner, please contact the purported sender immediately.

**Schedule K-1s:**

The annual Schedule K-1 statement will be sent to the Subscriber in physical form unless the Subscriber consents below to receive it electronically. Does the Subscriber grant permission for the annual Schedule K-1 to be sent electronically?

☒ Yes      ☐ No

Please note that this choice will apply until the Subscriber informs the Administrator that it is electing to alter such permission, which the Subscriber is able to do at any time by contacting the Administrator and in such contact specifying the effective date of the new election. The Administrator will confirm the receipt of the Subscriber's

019037

change in election and will specify the date on which such change will take effect. If the Subscriber has chosen to receive the Schedule K-1 electronically, a paper copy can be obtained by contacting the Administrator, and such a request will NOT alter the election noted above. The Schedule K-1s will only be sent for those periods for which the Subscriber was an investor in the Partnership. Subscribers should note that the electronic versions of the Schedule K-1 will be sent as Microsoft Word documents or .pdf files and that the Schedule K-1 may be required to be printed by the Subscriber for the purpose of attaching it to the Subscriber's federal, state and/or local income tax returns, if required by applicable law.

**Compliance with the PATRIOT Act:**

To comply with applicable anti-money laundering/OFAC rules and regulations, you and/or the institution remitting payment are required to provide the following payment information:

1.    Name of the bank from which your payment to the Partnership is being wired (the "**Wiring Bank**")?

_BBVA CompASS_

2.    Is the Wiring Bank located in the United States or another "**FATF Member**"[6]?

☒ Yes        ☐ No

If **yes**, please answer question 3 below.

If **no**, please provide the information described in Footnote 7 below and contact the Administrator.[7]

3.    Are you a customer of the Wiring Bank?

_YES_

[6] As of November 1, 2015, members of the Financial Action Task Force on Money Laundering (each, an "**FATF Member**") include: Argentina; Australia; Austria; Belgium; Brazil; Canada; China; Denmark; the European Commission; Finland; France; Germany; Greece; the Gulf Co-operation Council; Hong Kong, China; Iceland; India; Ireland; Italy; Japan; the Kingdom of the Netherlands (including the Netherlands, Aruba, Curaçao and Saint Maarten); Luxembourg; Mexico; New Zealand; Norway; Portugal; the Republic of Korea; the Russian Federation; Singapore; South Africa; Spain; Sweden; Switzerland; Turkey; the United Kingdom; and the United States. This list may be expanded, from time to time, to include future FATF Members and FATF-compliant countries, as appropriate.

[7] Subscribers who responded "no" to question 2 or 3 of "Compliance with the PATRIOT Act" above must provide the following additional information and materials to the Administrator, and contact the Administrator to obtain further anti-money laundering schedules:

For Individual Investors: (i) a government-issued form of picture identification (e.g., passport or driver's license); and (ii) proof of the individual's current address (e.g., current utility bill), if not included in the form of picture identification.

For Funds-of-Funds or Entities that Invest on Behalf of Third Parties Not Located in the United States or Other FATF Members: (i) a certificate of due formation and organization and continued authorization to conduct business in the jurisdiction of its organization (e.g., certificate of good standing); (ii) an incumbency certificate attesting to the title of the individual executing the Subscription Agreement on behalf of the prospective Subscriber; (iii) a completed form certifying that the entity has adequate anti-money laundering policies and procedures in place that are consistent with the PATRIOT Act, OFAC and other relevant federal, state or foreign anti-money laundering laws and regulations; and (iv) a letter of reference from a local office of a reputable bank or brokerage firm which is incorporated, or has its principal place of business located, in the United States or other FATF Member certifying that the prospective Subscriber (i.e., the fund-of-funds or the entity investing on behalf of third parties) has maintained an account at such bank/brokerage firm for a length of time and containing a statement affirming the prospective Subscriber's integrity.

For All Other Entity Subscribers: (i) a certificate of due formation and organization and continued authorization to conduct business in the jurisdiction of its organization (e.g., certificate of good standing); (ii) an incumbency certificate attesting to the title of the individual executing the Subscription Agreement on behalf of the prospective Subscriber; (iii) a letter of reference from a local office of a reputable bank or brokerage firm which is incorporated, or has its principal place of business located, in the United States or other FATF Member certifying that the prospective Subscriber has maintained an account at such bank/brokerage firm for a length of time and containing a statement affirming the prospective Subscriber's integrity; (iv) if the prospective Subscriber is a privately-held entity, a completed form listing the name of each person who directly, or indirectly through intermediaries, is the beneficial owner of 25% or more of any voting or non-voting class of equity interests of the prospective Subscriber; and (v) if the prospective Subscriber is a trust, a list of current beneficiaries of the trust that have, directly or indirectly, 25% or more of any interest in the trust, the settlors or grantors of the trust, and the trustees.

019038

☒ Yes        ☐ No

If **yes**, the information described in Footnote 7 below is not required.

If **no**, please provide the information described in Footnote 7 below and contact the Administrator.

019039

**PART III – TO BE COMPLETED BY IRAs (OTHER THAN SELF-DIRECTED IRAs), KEOGHS, CORPORATIONS, LIMITED LIABILITY COMPANIES, PARTNERSHIPS, TRUSTS AND OTHER ENTITIES**

A.    *General Information*

6.    Is the Subscriber subscribing for an Interest as agent, nominee, trustee or otherwise on behalf of, for the account of or jointly with any other person or entity?

☐ Yes    ☒ No

7.    Will any other person or persons have a beneficial interest in the Interest acquired (other than as a shareholder, partner, member, trust beneficiary or other beneficial owner of equity interests in the Subscriber)?

☐ Yes    ☒ No

8.    Does the Subscriber control, or is the Subscriber controlled by or under common control with, any other existing or prospective investor in the Partnership?

☐ Yes    ☒ No

*PLEASE NOTE: If any of the above questions were answered "Yes", please provide identifying information or contact the Administrator.*

9.    Legal form of the Subscriber:    _____ LP _____

10.   U.S. state or foreign jurisdiction in which the Subscriber was incorporated or formed:
      _____ Delaware _____

11.   Date of incorporation or formation of the Subscriber:    _____ Oct 2015 _____

12.   Is the Subscriber in any way affiliated with the General Partner or the Partnership?

☒ Yes    ☐ No

If yes, please describe the relationship below.

_____ Fund managed by the same General _____
_____ Partner as the Partnership _____

13.   Is the Subscriber in any way affiliated with a senior foreign government, political or military official, or an immediate family member or close associate of such person (a *politically exposed person*)?

☐ Yes    ☒ No

If yes,   (a)  which government? _____

          (b)  what position in the government? _____

          (c)  if an immediate family member or close associate of a politically exposed person, what relationship to the politically exposed person? _____

14.   Authorized individual who is executing the Subscription Agreement on behalf of the investing entity is:

Name:    _____ John Howin _____
Current position or title:    _____ Managing member of the General Partner - Partnership _____
Telephone number:    _____ 214-335-7969 _____

019040

Facsimile number: _____

Email: _JHONIO @RANDAdvisors.com_

**B.**   **Subscriber Qualification**

1.   **Accredited Investor.** Interests will be sold only to investors who are "*accredited investors*" (as defined in Rule 501 of Regulation D promulgated under the Securities Act). Please indicate the basis of "*accredited investor*" status of the Subscriber by checking the applicable statement or statements.

☒   The Subscriber has total assets in excess of $5,000,000, was not formed for the purpose of investing in the Partnership and is one of the following:
  - a corporation
  - a partnership
  - a limited liability company
  - a business trust
  - a tax-exempt organization described in Section 501(c)(3) of the Code.

☐   The Subscriber is a personal (non-business) trust, other than an employee benefit trust, with total assets in excess of $5,000,000 which was not formed for the purpose of investing in the Partnership and whose decision to invest in the Partnership has been directed by a person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of the investment.

☐   The Subscriber is licensed, or subject to supervision, by U.S. federal or state examining authorities as a "*bank*", "*savings and loan association*", "*insurance company*", or "*small business investment company*" (as such terms are used and defined in 17 CFR §230.501(a)) or is an account for which a bank or savings and loan association is subscribing in a fiduciary capacity.

☐   The Subscriber is registered with the SEC as a broker or dealer or an investment company, or has elected to be treated or qualifies as a "*business development company*" (within the meaning of Section 2(a)(48) of the Investment Company Act or Section 202(a)(22) of the Advisers Act).

☐   The Subscriber is an employee benefit plan within the meaning of ERISA (including an IRA), which satisfies at least one of the following conditions:

&#95;&#95;   it has total assets in excess of $5,000,000; or

&#95;&#95;   the investment decision is being made by a plan fiduciary which is a bank, savings and loan association, insurance company or registered investment adviser; or

&#95;&#95;   it is a self-directed plan (i.e., a tax-qualified defined contribution plan in which a participant may exercise control over the investment of assets credited to the participant's account) and the decision to invest is made by those participants investing, and each such participant qualifies as an accredited investor.

☐   The Subscriber is an employee benefit plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions, which has total assets in excess of $5,000,000.

☐   The Subscriber is an entity in which all of the equity owners are at least one of the following:  (a) natural persons who are "accredited investors", (b) grantor trusts where the individual grantors are "accredited investors" or (c) non-natural persons described above.

If the Subscriber does <u>not</u> qualify in any accredited investor category above (and is not a natural person or grantor trust), please indicate this in the space provided below.

☐   The Subscriber does not qualify in any of the above accredited investor categories.

2. **Qualified Client.** Interests will be sold only to investors who are "*qualified clients*" (as defined in Rule 205-3 promulgated under the Advisers Act).  Please indicate the basis of "*qualified client*" status of the Subscriber by checking the applicable statement or statements.

    (a)    Is the Subscriber an entity with net assets at the time of entering into the Subscription Agreement exceeding $2,000,000?

        ☐ Yes        ☐ No

    (b)    Is the Subscriber an entity that has at least $1,000,000 under the management of the Investment Manager immediately after entering into the Subscription Agreement?

        ☐ Yes        ☐ No

    (c)    Is the Subscriber a "*qualified purchaser*" as defined in Section 2(a)(51)(A) of the Investment Company Act at the time of entering into the Subscription Agreement?

        ☒ Yes        ☐ No

If the Subscriber does <u>not</u> qualify in any qualified client category above (and is not a natural person or grantor trust), please indicate this in the space provided below.

    ☐ The Subscriber does not qualify in any of the above qualified client categories.

3. **Qualified Purchaser.** The Partnership intends to claim exemption from registration under the Investment Company Act in reliance on Section 3(c)(7) thereof, and accordingly Interests will be sold only to investors who are "*qualified purchasers*" (as defined in Section 2(a)(51) of the Investment Company Act).  Please indicate the basis of "*qualified purchaser*" status of the Subscriber by checking the applicable statement or statements. In connection therewith, **the Subscriber must read Annexes B and C to these Subscription Documents** for the definition of "*investments*" and for information regarding the valuation of "*investments*," respectively.

    ☐ (a)    A company, partnership or trust that owns not less than $5,000,000 in "*investments*" and that is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouse (including former spouses), or direct lineal descendants by birth or adoption, spouses of such persons, the estates of such persons, or foundations, charitable organizations or trusts established by or for the benefit of such persons.

    ☐ (b)    A trust that is not covered by (a) above as to which the trustee or other person authorized to make decisions with respect to the trust, and each settlor or other person who has contributed assets to the trust, is a person described in clause (a), (c), (d) or (e) hereof (or under Part II, Section (B)(3) above).

    ☐ (c)    An entity, acting for its own account or the accounts of other qualified purchasers, which, in the aggregate, owns and invests on a discretionary basis not less than $25,000,000 in "*investments.*"

    ☐ (d)    A qualified institutional buyer as defined in paragraph (a) of Rule 144A under the Securities Act, acting for its own account, the account of another qualified institutional buyer, or the account of a qualified purchaser; *provided* that:  (i) a dealer described in paragraph (a)(1)(ii) of Rule 144A shall own and invest on a discretionary basis at least $25,000,000 in securities of issuers that are not affiliated persons of the dealer and (ii) a plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan, will not be deemed to be acting for its own account if investment decisions with respect to the plan are made by the beneficiaries of the plan, except with respect to investment decisions made solely by the fiduciary, trustee or sponsor of such plan.

(e)   An entity, each beneficial owner of which is a qualified purchaser.  **_PLEASE NOTE_**:  **_This
certification does not apply to beneficiaries of an irrevocable trust._**

If the Subscriber does <u>not</u> qualify in a qualified purchaser category above (and is not a natural person or
grantor trust), please indicate this in the space provided below.

☐        The Subscriber does not qualify in any of the above qualified purchaser categories.

**4.        Supplemental Data**

(a)   Was the Subscriber organized or reorganized for the specific purpose of acquiring Interests
in the Partnership?

☐   Yes        ☒   No

*PLEASE NOTE: If the answer to question 4(a) is "Yes", each person who is an equity owner
of the Subscriber must complete a copy of the Prospective Investor Questionnaire as if such
person were directly purchasing an Interest.*

(b)   With respect to its acquisition of the Interests, is the Subscriber a participant-directed
defined contribution plan (such as a 401(k) plan), or a partnership or other investment
vehicle (1) in which its partners or participants have or will have any discretion as to their
level of investment in the Subscriber or in investments made by the Subscriber (including
the Subscriber's investment in an Interest), or (2) that is otherwise an entity managed to
facilitate the individual decisions of its beneficial owners to invest in the Partnership?

☐   Yes        ☒   No

(c)   Will the Subscriber, at any time, invest more than 40% of the Subscriber's assets in the
Partnership?

☒   Yes        ☐   No

**5.        ERISA and Tax-Exempt Information**

(a)   Is the Subscriber a pension, profit-sharing, annuity or employee benefit plan (a "**Plan**")
described in ERISA, whether or not subject to ERISA, or a "*plan*" (as defined in Section
4975(e)(i) of the Code), or is the Subscriber an entity whose underlying assets include Plan
assets by reason of a Plan's investment in the Subscriber?

☐   Yes        ☒   No

If the answer to question 5(a) is "No", please skip to question 4(b) below.

If the answer to question 5(a) is "*Yes*", is the Subscriber subject to ERISA?

☐   Yes        ☐   No

If the answer to question 5(a) is "*Yes*", is the Subscriber a "*governmental plan*" (as
defined in Section 3(32) of ERISA) or a "*church plan*" (as defined in Section 3(33) of
ERISA)?

☐   Yes        ☐   No

(b)   Is the Subscriber a partnership, a limited liability company, an S Corporation, trust or other
pass-through entity?

☒   Yes        ☐   No

019043

If the answer to question 5(b) is "*Yes*", please supply the approximate percentage of ERISA plan assets to be invested in the Partnership by the Subscriber as compared to the total assets of such Subscriber?

_____ 0 _____ %     _John Homer_

Please identify a contact for confirmation

If the answer to question 5(b) is "*Yes*", please provide the approximate percentage of ERISA plan assets to be invested in the Partnership as compared with the total assets of the ERISA plan sponsor _____ 0 _____ %

If the answer to question 5(b) is "*Yes*", please provide the percentage of assets of such entity that constitute "plan assets" as defined in DOL Reg. Sec. 2510.3-101.

_____ 0 _____ %

(c)     If the Subscriber is subscribing as a trustee or custodian for an IRA, is the Subscriber a qualified IRA custodian or trustee?

☐ Yes     ☒ No     ☐ N/A

(d)     If applicable, if the Subscriber is an IRA, the IRA beneficiary must complete the Subscription Agreement.  The IRA custodian must approve the Subscription Agreement and retain legal title of the Interest for the benefit of the IRA beneficiary.  By initialing on the line below, the Subscriber represents that the IRA custodian has approved the Subscription Agreement and will retain legal title of the Interest for the benefit of the IRA beneficiary.

_____          _____
Initial                              Name of IRA Custodian (Note: cannot be an individual)

6.     **Bank Holding Company Act Information**

Does the Subscriber wish to be treated as if it were subject to the Bank Holding Company Act of 1956, as amended from time to time ("**BHCA**")?

☐ Yes     ☒ No

By checking "*Yes*", the Subscriber acknowledges and agrees that the Partnership shall not be deemed to be providing any legal advice to Limited Partners that are subject to the BHCA and that all such Limited Partners should consult their own counsel regarding an investment in the Partnership.

7.     **Tax Information**

(a)     Is the Subscriber a "*United States person*" as defined in Section 7701(a)(30) of the Code and the regulations promulgated thereunder?[10]

☒ Yes     ☐ No

If the answer to question 7(a) is "*Yes*", has the Subscriber included a fully executed Form W-9 with this Prospective Investor Questionnaire?

_____

[10] As per Section 7701(a)(30) of the Code and the regulations promulgated thereunder, "United States person" means (i) a citizen or resident of the United States, (ii) a U.S. partnership, (iii) a U.S. corporation, (iv) any estate (other than a non-United States estate, within the meaning of Section 7701(a)(31) of the Code), (v) any trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust, or (vi) any trust which has elected to be taxed as a trust described in (v).

☒ Yes          ☐ No

If the answer to question 7(a) is "No", has the Subscriber included a fully executed
Form W-8BEN, Form W-8BEN-E, Form W-8ECI, Form W-8IMY or Form W-8EXP,
as applicable, with this Prospective Investor Questionnaire?

☐ Yes          ☐ No

(b)     Please provide the Subscriber's U.S. state or foreign country of residence for tax purposes:

_____*Delaware*_____

(c)     The Subscriber reports income for federal income tax purposes on the following basis:

☒ calendar year taxable year;

☐ other taxable year (please specify):_____; or

☐ N/A

(d)     Is the Subscriber exempt from U.S. federal income tax (e.g., a qualified employee benefit
plan or trust, retirement account, charitable remainder trust, or a charitable foundation or
other tax-exempt organization described in Section 501(c)(3) of the Code)?

☐ Yes          ☐ No          ☐N/A

(e)     Is the Subscriber treated as a "disregarded entity" for U.S. federal income tax purposes?

☐ Yes          ☐ No

If the answer to question 7(e) is "No", pleas skip to question 7(f) below.

If the answer to question 7(e) is "*Yes*", is the owner of the Subscriber a "*United
States person*"?

☐ Yes          ☐ No

If the answer to the previous question is "*Yes*", please provide a fully executed Form
W-9.

If the answer to the previous question is "No", please provide a fully executed Form
W-8BEN, Form W-8BEN-E, Form W-8ECI, Form W-8IMY or Form W-8EXP, as
applicable.

(f)     Is the Subscriber a "*simple trust*" or a "*grantor trust*" for U.S. federal income tax purposes?

☐ Yes          ☐ No

If the answer to question 7(f) is "Yes", please provide a fully executed Form W-9 or
Form W-8BEN, Form W-8BEN-E, Form W-8ECI, Form W-8IMY or Form W-8EXP,
as applicable, with respect to the persons who are subject to U.S. federal income
tax on the trust's income.

(g)     Is the Subscriber a "*grantor trust*", "*S Corporation*" or an entity treated as a partnership for
U.S. federal income tax purposes?

☐ Yes          ☐ No

*[remainder of page intentionally left blank]*

019045

**PART IV—NEW ISSUES CERTIFICATION TO BE COMPLETED BY ALL SUBSCRIBERS**

The Subscriber must complete this Certification in order for the Partnership to be able to determine the extent to which the Subscriber may participate in "new issue" securities in accordance with Rule 5130 (the "**New Issues Rule**") of the Securities Offering and Trading Standards and Practices of FINRA.  If the Subscriber is a corporation, partnership, limited liability company, trust or any other entity or a nominee for another person, the person completing this Certification with respect to the Subscriber *must* be a person authorized to represent the beneficial owner(s) of the Subscriber, or a bank, foreign bank, broker-dealer, investment adviser or other conduit acting on behalf of the beneficial owner(s) of the Subscriber.

INSTRUCTIONS: Each Subscriber must complete this Certification by checking the box next to all applicable categories under Section A below to determine whether the Subscriber is a restricted person under the New Issues Rule (a "**Restricted Person**") or indicating that none of the Restricted Person categories apply to it and the Subscriber is eligible to participate in new issues.  A Subscriber that is an entity and that is also a Restricted Person under Section A may still be able to participate fully in new issue investments if it indicates in Section B that it is also an exempted entity (an "**Exempted Entity**").  Accordingly, each such Subscriber should check the box next to any applicable categories under Section B to determine whether or not the Subscriber is an Exempted Entity.

If the Subscriber is a corporation, partnership, limited liability company, trust or any other entity (including a hedge fund, fund-of-funds, investment partnership or any other collective investment vehicle, or a broker-dealer organized as an investment fund) (any of the foregoing, an "**Entity Investor**"), such Entity Investor must complete the certification of beneficial ownership in Section C.  Based on such information and the size of the investment by such Entity Investor in the Partnership, such Entity Investor may be deemed to be a Restricted Person with respect to the entirety of its investment in the Partnership or any portion thereof (such determination of Restricted Person status by the Partnership shall be final and conclusive).

[X] *The Subscriber does not wish to participate in new issues and will be deemed a Restricted Person.*  If this box is checked, no further responses to Section A, B or C are necessary.

**A.  Determination of Restricted Person Status.** Please check all appropriate boxes.

The Subscriber is:

☐      (i) a broker-dealer;

☐      (ii) an officer, director, general partner, associated person[11] or employee of a broker-dealer (other than a limited business broker-dealer)[12];

☐      (iii) an agent of a broker-dealer (other than a limited business broker-dealer) that is engaged in the investment banking or securities business;

☐      (iv) an immediate family member[13] of a person described in (ii) or (iii) above.  Under certain circumstances, a Subscriber who checks this box may be able to participate in new issue investments.  The Partnership may request additional information in order to determine the eligibility of a Subscriber under this Restricted Person category;

---

[11] A person "associated with" a broker-dealer includes any natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a broker-dealer, or any partner, director, officer or sole proprietor of a broker-dealer.

[12] A "limited business broker-dealer" is any broker-dealer whose authorization to engage in the securities business is limited solely to the purchase and sale of investment company/variable contracts securities and direct participation program securities.

[13] The term "immediate family" includes the Subscriber's: (i) parents, (ii) mother-in-law or father-in-law, (iii) husband or wife, (iv) brother or sister, (v) brother-in-law or sister-in-law, (vi) son-in-law or daughter-in-law, (vii) children, and (viii) any other person who is supported, directly or indirectly, to a material extent by an officer, director, general partner, employee, agent of a broker-dealer or person associated with a broker-dealer.

☐ (v) a finder or any person acting in a fiduciary capacity to a managing underwriter, including, but not limited to, attorneys, accountants and financial consultants. Notwithstanding the foregoing, a Subscriber who is a finder or fiduciary but who is not acting in such capacity with respect to the security being offered, may be able to participate in new issue investments, and, accordingly, the Partnership may request additional information from a Subscriber who checks this box in order to determine the Subscriber's eligibility under this Restricted Person category;

☐ (vi) a person who has authority to buy or sell securities for a bank, savings and loan institution, insurance company, investment company, investment advisor or collective investment account[14] (including a private investment vehicle such as a hedge fund);

☐ (vii) an immediate family member of a person described in (v) or (vi) above who materially supports[15], or receives material support from, the Subscriber;

☐ (viii) a person listed or required to be listed in Schedule A, B or C of a Form BD (other than with respect to a limited business broker-dealer), except persons whose listing on Schedule A, B or C is related to a person identified by an ownership code of less than 10% on Schedule A;

☐ (ix) a person that (A) directly or indirectly owns 10% or more of a public reporting company listed, or required to be listed, in Schedule A of a Form BD, or (B) directly or indirectly owns 25% or more of a public reporting company listed, or required to be listed in Schedule B of a Form BD, in each case (A) or (B), other than a reporting company that is listed on a national securities exchange, or other than with respect to a limited business broker-dealer;

☐ (x) an immediate family member of a person described in (viii) or (ix) above. Under certain circumstances, a Subscriber who checks this box may be able to participate in new issue investments. The Partnership may request additional information in order to determine the eligibility of a Subscriber under this Restricted Person category; or

☐ (xi) any entity (including a corporation, partnership, limited liability company, trust or other entity) in which any person or persons listed in (i)-(x) above has a beneficial interest[16].

☐ None of the above categories apply and the Subscriber is eligible to participate in new issue securities.

---

[14] A "collective investment account" is any hedge fund, investment corporation, or any other collective investment vehicle that is engaged primarily in the purchase and/or sale of securities. Investment clubs (groups of individuals who pool their money to invest in stock or other securities and who are collectively responsible for making investment decisions) and family investment vehicles (legal entities that are beneficially owned solely by immediate family members (as defined above)) are not considered collective investment accounts.

[15] The term "material support" means directly or indirectly providing more than 25% of a person's income in the prior calendar year. Members of the immediate family living in the same household are deemed to materially support each other.

[16] The term "beneficial interest" means any economic interest such as the right to share in gains or losses. The initial receipt of a management or performance-based fee for operating a collective investment account, or other fee for acting in a fiduciary capacity, is not considered a beneficial interest in the account; however, if such payments are accumulated and subsequently invested into the account (as a deferred fee arrangement or otherwise), they would constitute a beneficial interest in that account.

019047

**B.** **Determination of Exempted Entity Status.** A Subscriber that is an entity and that is also a Restricted Person under Section A may still be able to participate fully in new issue investments, whether directly or through an account in which such Subscriber has a beneficial interest, if it indicates below that it is also an Exempted Entity. Please check all appropriate boxes.

The Subscriber is:

☐ (i) a publicly-traded entity (other than a broker-dealer or an affiliate of a broker-dealer, where such broker-dealer is authorized to engage in the public offering of new issues either as a selling group member or underwriter) that is listed on a national securities exchange, or is a foreign issuer whose securities meet the quantitative designation criteria for listing on a national securities exchange;

☐ (ii) an investment company registered under the Investment Company Act;

☐ (iii) an investment company organized under the laws of a foreign jurisdiction and:

    (a) the investment company is listed on a foreign exchange or authorized for sale to the public by a foreign regulatory authority; and

    (b) no person owning more than 5% of the shares of the investment company is a Restricted Person;

☐ (iv) (A) an employee benefit plan under ERISA that is qualified under Section 401(a) of the Code and that is not sponsored solely by a broker-dealer, (B) a state or municipal government benefits plan that is subject to state and/or municipal regulation or (C) a church plan under Section 414(e) of the Code;

☐ (v) a tax-exempt charitable organization under Section 501(c)(3) of the Code;

☐ (vi) a common trust fund or similar fund as described in Section 3(a)(12)(A)(iii) of the Exchange Act, and the fund

    (a) has investments from 1,000 or more accounts, and

    (b) does not limit beneficial interests in the fund principally to trust accounts of Restricted Persons;

☐ (vii) an insurance company general, separate or investment account, and

    (a) the account is funded by premiums from 1,000 or more policyholders, or, if a general account, the insurance company has 1,000 or more policyholders, and

    (b) the insurance company does not limit the policyholders whose premiums are used to fund the account principally to Restricted Persons, or, if a general account, the insurance company does not limit its policyholders principally to Restricted Persons; or

☐ (viii) an entity (including a private investment vehicle, such as a hedge fund or fund of hedge funds) (a) in which the beneficial interests of Restricted Persons do not exceed in the aggregate 10% of such entity, or (b) that limits participation in New Issue profits by Restricted Persons to not more than 10% of the profits from New Issues.

019048

**C.    Determination of Beneficial Ownership.**

If the box for (viii) in Section B above is checked, please specify the current percentage of the net profits from New Issues allocable to beneficial owners of such entity who are Restricted Persons:

_____%

*[remainder of page intentionally left blank]*

019049

**PART V—SPINNING PROHIBITION CERTIFICATION TO BE COMPLETED BY ALL SUBSCRIBERS**

The Subscriber must complete this Certification in order for the Partnership to be able to determine the extent to which the Subscriber may participate in "new issue" securities in accordance with FINRA Rule 5131(b) (the "**Spinning Prohibition Rule**"), which prohibits a FINRA member who provides investment banking services from allocating new issues to accounts in which officers and directors of certain current, former or prospective investment banking clients have an interest.  To enable the Partnership to purchase new issues, the Partnership must determine whether the Subscriber is an executive officer or director or person materially supported by an executive officer or director of a public company or a "covered non-public company" under the Spinning Prohibition Rule. Please note that the Spinning Prohibition Rule (FINRA Rule 5131(b)) is in addition to, not a replacement of, the New Issues Rule (FINRA Rule 5130) covered in Part IV of this Questionnaire.

If the Subscriber is a corporation, partnership, limited liability company, trust or any other entity or a nominee for another person, the person completing this Certification with respect to the Subscriber *must* be a person authorized to represent the beneficial owner(s) of the Subscriber, or a bank, foreign bank, broker-dealer, investment adviser or other conduit acting on behalf of the beneficial owner(s) of the Subscriber.

INSTRUCTIONS: Each Subscriber must complete this Certification by checking the box next to all applicable categories under Section A below to determine whether the Subscriber is a restricted investor under the Spinning Prohibition Rule (a "**Restricted Investor**"), or indicating that none of the Restricted Investor categories apply to it and that the Subscriber is eligible to participate in new issues.  A Subscriber that is an entity which is deemed a Restricted Investor under Section A may still be able to participate in new issues if it indicates in Section B below that it is an unrestricted investor under the Spinning Prohibition Rule (an "**Unrestricted Investor**").

 *The Subscriber does not wish to participate in new issues and will be deemed a Restricted Investor.  If this box is checked, no further responses to Section A or B are necessary.*

**A.    Determination of Restricted Investor Status.**  Please check all appropriate boxes.

The Subscriber is:

☐    (i) an executive officer or director of a public company[17] or a covered non-public company[18].

If this box is checked, please provide the name and ticker symbol (where applicable) of each such company (include additional sheets if necessary):

_____

_____

_____

☐    (ii) a person who receives material support[19] from an executive officer or director of a public company or a covered non-public company.

If this box is checked, please provide the name and ticker symbol (where applicable) of each such company (include additional sheets if necessary):

_____

---

[17] A "public company" is any company that is registered under Section 12 of the Exchange Act, or files periodic reports pursuant to Section 15(d) of the Exchange Act.

[18] A "covered non-public company" is any non-public company satisfying the following criteria: (i) income of at least $1 million in the last fiscal year or in two of the last three fiscal years and shareholders' equity of at least $15 million; (ii) shareholders' equity of at least $30 million and a two-year operating history; or (iii) total assets and total revenue of at least $75 million in the latest fiscal year or in two of the last three fiscal years.

[19] The term "material support" means directly or indirectly providing more than 25% of a person's income in the prior calendar year. Persons living in the same household are deemed to be providing each other with material support.

019050

_____

_____

☐    (iii) an entity (including a corporation, partnership, limited liability company, trust or other entity) in which a person or persons listed in (i) and (ii) above has a beneficial interest[20] (each such person, a "**Restricted Participant**").

If this box is checked, please indicate the company or companies (and ticker symbol(s) where applicable) on whose behalf such executive officers or directors serve and the percentage share of profits or losses attributable to new issues to be received by all Restricted Participants related to each company (include additional sheets if necessary):

Name and ticker symbol of each such company:      Share of profits:

_____       _____

_____       _____

_____       _____

☐    (iv) None of the above categories apply and the Subscriber is not a Restricted Investor and is eligible to participate in new issues. The Subscriber does not need to complete Section B below.

**B.**    **Determination of Unrestricted Investor Status.**  A Subscriber that is an entity which is deemed a Restricted Investor under Section A may still be able to participate in new issues if it indicates below that it is also an Unrestricted Investor.  Please check all appropriate boxes.

The Subscriber is:

☐    (i) an entity (including a corporation, partnership, limited liability company, trust or other entity) in which a Restricted Participant(s) has/have a beneficial interest, but the Subscriber hereby represents and warrants that such Restricted Participant(s) affiliated with the same public company or covered non-public company in aggregate (as to each such public company or covered non-public company) is/are allocated no more than 25% of any profits or losses attributable to new issues received by the Subscriber.

If this box is checked, please indicate the company or companies (and ticker symbol(s) where applicable) on whose behalf such executive officers or directors serve and the percentage share of profits or losses attributable to new issues to be received by all Restricted Participants related to each company (include additional sheets if necessary):

Name and ticker symbol of each such company:      Share of profits:

_____       _____

_____       _____

_____       _____

☐    (ii) a publicly-traded entity (other than a broker-dealer or an affiliate of a broker-dealer, where such broker-dealer is authorized to engage in the public offering of new issues either as a selling group member or underwriter) that is listed on a national securities exchange, or is a foreign issuer whose securities meet the quantitative designation criteria for listing on a national securities exchange;

_____

[20] The term "beneficial interest" means any economic interest such as the right to share in gains or losses.  The initial receipt of a management or performance-based fee for operating a collective investment account, or other fee for acting in a fiduciary capacity, is not considered a beneficial interest in the account; however, if such payments are accumulated and subsequently invested into the account (as a deferred fee arrangement or otherwise), they would constitute a beneficial interest in that account.

019051

☐    (iii) an investment company registered under the Investment Company Act;

☐    (iv) an investment company organized under the laws of a foreign jurisdiction and:

        (a)    the investment company is listed on a foreign exchange or authorized for sale to the public by a foreign regulatory authority; and

        (b)    no person owning more than 5% of the shares of the investment company is a Restricted Person;

☐    (v) (A) an employee benefit plan under ERISA that is qualified under Section 401(a) of the Code and that is not sponsored solely by a broker-dealer, (B) a state or municipal government benefits plan that is subject to state and/or municipal regulation or (C) a church plan under Section 414(e) of the Code;

☐    (vi) a tax-exempt charitable organization under Section 501(c)(3) of the Code;

☐    (vii) a common trust fund or similar fund as described in Section 3(a)(12)(A)(iii) of the Exchange Act, and the fund

        (a)    has investments from 1,000 or more accounts, and

        (b)    does not limit beneficial interests in the fund principally to trust accounts of Restricted Persons; or

☐    (viii) an insurance company general, separate or investment account, and

        (a)    the account is funded by premiums from 1,000 or more policyholders, or, if a general account, the insurance company has 1,000 or more policyholders, and

        (b)    the insurance company does not limit the policyholders whose premiums are used to fund the account principally to Restricted Persons, or, if a general account, the insurance company does not limit its policyholders principally to Restricted Persons.

*[remainder of page intentionally left blank]*

019052

**EXHIBIT 91**

019053

ADDITIONAL CONTRIBUTION FORM

Rand PE Fund I, L.P.
c/o Administrator
[address to be provided upon request]

Dear Sir or Madam:

The undersigned hereby wishes to make an additional capital contribution ("**Additional Capital Contribution**") to Rand PE Fund I, L.P., a Delaware limited partnership (the "**Partnership**").    Subject to the discretion of the Partnership's general partner, Rand PE Fund Management, LLC, a Delaware limited liability company (the "**General Partner**"), to accept a lower amount, the minimum Additional Capital Contribution is $500,000.  The amount of the undersigned's Additional Capital Contribution to Series ___1___ is: $ _9,253,000_.

The undersigned acknowledges and agrees that:  (i) the undersigned is making the Additional Capital Contribution on the terms and conditions contained in the Subscription Agreement, dated _12/21/15_, previously executed by the undersigned and accepted by the General Partner (the "**Subscription Agreement**"); (ii) the representations of the undersigned contained in the Subscription Agreement are true and correct in all material respects as of the date set forth below; (iii) the undersigned has complied in all material respects through the date set forth below with all covenants contained in the Subscription Agreement; and (iv) the information provided by the undersigned in the Prospective Investor Questionnaire submitted with the Subscription Agreement is true and correct as of the date set forth below.  **THE UNDERSIGNED AGREES TO NOTIFY THE PARTNERSHIP PROMPTLY SHOULD THERE BE ANY CHANGE IN ANY OF THE FOREGOING INFORMATION.**

Dated: _Dec 23, 2015_

**For Individuals:**

_____
Name of Investor (print or type)

_____
(Signature)

_____
Name of Joint Investor (print or type) (if applicable)

_____
(Joint Signature, if applicable)

**For Entities:**

_Atlas IDF, LP_
Name of Investor (print or type)

By: _____
(Signature)

Name: _John Honis_

Title: _Managing Member_

_of the General Partner_
(Name and Initials of IRA custodian, if applicable)

**FOR INTERNAL USE ONLY:**

$ _9,253,000.00_
Additional Capital Contribution Accepted

Accepted and Agreed, as of _Dec 23_, 20_15_.

**RAND PE FUND I, L.P.**
By:  Rand PE Fund Management, LLC, as its general partner
(acting severally in the name of and for the account of each individual Series)

By: _____
Name: John Honis
Title: Managing Member

019054

# EXHIBIT 92

019055

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

### UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
### FORM D

### Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

---

## 1. Issuer's Identity

CIK (Filer ID Number)

**Previous Names** [X] None

**Entity Type**

0001660386

Name of Issuer
Atlas IDF, LP

Jurisdiction of Incorporation/Organization
DELAWARE

Year of Incorporation/Organization

[X] Over Five Years Ago

[ ] Within Last Five Years (Specify Year)

[ ] Yet to Be Formed

[ ] Corporation

[X] Limited Partnership

[ ] Limited Liability Company

[ ] General Partnership

[ ] Business Trust

[ ] Other (Specify)

---

## 2. Principal Place of Business and Contact Information

Name of Issuer
Atlas IDF, LP

| Street Address 1 | Street Address 2 |
|---|---|
| C/O ATLAS IDF GP, LLC | 2101 CEDAR SPRINGS ROAD, SUITE 1200 |

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
|---|---|---|---|
| DALLAS | TEXAS | 75201 | (214) 288-9555 |

---

## 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Atlas IDF GP, LLC | N/A | |

| Street Address 1 | Street Address 2 | |
|---|---|---|
| 2101 Cedar Springs Road | Suite 1200 | |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Dallas | TEXAS | 75201 |

Relationship: [ ] Executive Officer [ ] Director [X] Promoter

Clarification of Response (if Necessary):

The Issuer's General Partner

| Last Name | First Name | Middle Name |
|---|---|---|

019056

HCMLPHMIT00003518

Patrick Mark

| Street Address 1 | Street Address 2 |
|---|---|
| c/o Atlas IDF GP, LLC | 2101 Cedar Springs Road, Suite 1200 |
| City | State/Province/Country | ZIP/PostalCode |
| Dallas | TEXAS | 75201 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

Controlling Person

---

## 4. Industry Group

[ ] Agriculture

Banking & Financial Services
- [ ] Commercial Banking
- [ ] Insurance
- [ ] Investing
- [ ] Investment Banking
- [X] Pooled Investment Fund
  - [X] Hedge Fund
  - [ ] Private Equity Fund
  - [ ] Venture Capital Fund
  - [ ] Other Investment Fund

Is the issuer registered as an investment company under the Investment Company Act of 1940?
- [ ] Yes    [X] No
- [ ] Other Banking & Financial Services

[ ] Business Services

Energy
- [ ] Coal Mining
- [ ] Electric Utilities
- [ ] Energy Conservation
- [ ] Environmental Services
- [ ] Oil & Gas
- [ ] Other Energy

Health Care
- [ ] Biotechnology
- [ ] Health Insurance
- [ ] Hospitals & Physicians
- [ ] Pharmaceuticals
- [ ] Other Health Care

[ ] Manufacturing

Real Estate
- [ ] Commercial
- [ ] Construction
- [ ] REITS & Finance
- [ ] Residential
- [ ] Other Real Estate

[ ] Retailing

[ ] Restaurants

Technology
- [ ] Computers
- [ ] Telecommunications
- [ ] Other Technology

Travel
- [ ] Airlines & Airports
- [ ] Lodging & Conventions
- [ ] Tourism & Travel Services
- [ ] Other Travel

[ ] Other

---

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| [ ] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |

019057

HCMLPHMIT00003519

☐ $1,000,001 - $5,000,000  ☐ $5,000,001 - $25,000,000

☐ $5,000,001 - $25,000,000  ☐ $25,000,001 - $50,000,000

☐ $25,000,001 - $100,000,000  ☐ $50,000,001 - $100,000,000

☐ Over $100,000,000  ☐ Over $100,000,000

☐ Decline to Disclose  ☒ Decline to Disclose

☐ Not Applicable  ☐ Not Applicable

---

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

☒ Investment Company Act Section 3(c)

☐ Rule 504(b)(1) (not i, (ii) or (iii))  ☐ Section 3(c)(1)  ☐ Section 3(c)(9)

☐ Rule 504 (b)(1)(i)  ☐ Section 3(c)(2)  ☐ Section 3(c)(10)

☐ Rule 504 (b)(1)(ii)  ☐ Section 3(c)(3)  ☐ Section 3(c)(11)

☐ Rule 504 (b)(1)(iii)  ☐ Section 3(c)(4)  ☐ Section 3(c)(12)

☒ Rule 506(b)  ☐ Section 3(c)(5)  ☐ Section 3(c)(13)

☐ Rule 506(c)  ☐ Section 3(c)(6)  ☐ Section 3(c)(14)

☐ Securities Act Section 4(a)(5)  ☒ Section 3(c)(7)

---

## 7. Type of Filing

☐ New Notice   Date of First Sale 2015-12-15  ☐ First Sale Yet to Occur
☒ Amendment

---

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year?  ☒ Yes ☐ No

---

## 9. Type(s) of Securities Offered (select all that apply)

☐ Equity  ☒ Pooled Investment Fund Interests

☐ Debt  ☐ Tenant-in-Common Securities

☐ Option, Warrant or Other Right to Acquire Another Security  ☐ Mineral Property Securities

☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security  ☐ Other (describe)

---

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer?  ☐ Yes ☒ No

Clarification of Response (if Necessary):

---

## 11. Minimum Investment

Minimum investment accepted from any outside investor $500,000 USD

019058

HCMLPHMIT00003520

## 12. Sales Compensation

| | |
|---|---|
| Recipient | Recipient CRD Number [X] None |
| (Associated) Broker or Dealer [X] None | (Associated) Broker or Dealer CRD Number [X] None |
| Street Address 1 | Street Address 2 |
| City | State/Province/Country | ZIP/Postal Code |

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States

[ ] All States

[ ] Foreign/non-US

## 13. Offering and Sales Amounts

| | | |
|---|---|---|
| Total Offering Amount | USD or [X] Indefinite |
| Total Amount Sold | $37,975,518 USD |
| Total Remaining to be Sold | USD or [X] Indefinite |

Clarification of Response (if Necessary):

## 14. Investors

[ ] Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering:    | 3 |

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD [X] Estimate

Finders' Fees $0 USD [X] Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD [X] Estimate

Clarification of Response (if Necessary):

Atlas IDF GP, LLC and/or its affiliates receive customary management fees, as described in the Issuer's Confidential Private Placement Memorandum.

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

019059

HCMLPHMIT00003521

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| Atlas IDF, LP | /s/ Mark Patrick | Mark Patrick | Controlling Person | 2025-02-24 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

019060
HCMLPHMIT00003522

**EXHIBIT 93**

019061

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

### UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
## FORM D

### Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

---

## 1. Issuer's Identity

CIK (Filer ID Number)

0001660401

Previous Names [X] None

Entity Type

[ ] Corporation
[X] Limited Partnership
[ ] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

Name of Issuer
Rand PE Fund I, L.P.

Jurisdiction of Incorporation/Organization
DELAWARE

Year of Incorporation/Organization
[X] Over Five Years Ago
[ ] Within Last Five Years (Specify Year)
[ ] Yet to Be Formed

---

## 2. Principal Place of Business and Contact Information

Name of Issuer
Rand PE Fund I, L.P.

| Street Address 1 | Street Address 2 |
|---|---|
| C/O RAND PE FUND MANAGEMENT, LLC | 2101 CEDAR SPRINGS ROAD, SUITE 1200 |

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
|---|---|---|---|
| DALLAS | TEXAS | 75201 | (214) 288-9555 |

---

## 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Rand PE Fund Management, LLC | N/A | |

| Street Address 1 | Street Address 2 |
|---|---|
| 2101 Cedar Springs Road | Suite 1200 |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Dallas | TEXAS | 75201 |

Relationship: [ ] Executive Officer [ ] Director [X] Promoter

Clarification of Response (if Necessary):

The Issuer's General Partner

---

| Last Name | First Name | Middle Name |
|---|---|---|

019062

HCMLPHMIT00004096

Mark

| Street Address 1 | Street Address 2 |
|---|---|
| c/o Rand PE Fund Management, LLC | 2101 Cedar Springs Road, Suite 1200 |
| City | State/Province/Country | ZIP/PostalCode |
| Dallas | TEXAS | 75201 |

Relationship: [X] Executive Officer  [ ] Director  [ ] Promoter

Clarification of Response (if Necessary):

Controlling Person

---

## 4. Industry Group

[ ] Agriculture

Banking & Financial Services

    [ ] Commercial Banking

    [ ] Insurance

    [ ] Investing

    [ ] Investment Banking

    [X] Pooled Investment Fund

        [X] Hedge Fund

        [ ] Private Equity Fund

        [ ] Venture Capital Fund

        [ ] Other Investment Fund

        Is the issuer registered as an investment company under the Investment Company Act of 1940?

        [ ] Yes      [X] No

    [ ] Other Banking & Financial Services

[ ] Business Services

Energy

    [ ] Coal Mining

    [ ] Electric Utilities

    [ ] Energy Conservation

    [ ] Environmental Services

    [ ] Oil & Gas

    [ ] Other Energy

Health Care

    [ ] Biotechnology

    [ ] Health Insurance

    [ ] Hospitals & Physicians

    [ ] Pharmaceuticals

    [ ] Other Health Care

[ ] Manufacturing

Real Estate

    [ ] Commercial

    [ ] Construction

    [ ] REITS & Finance

    [ ] Residential

    [ ] Other Real Estate

[ ] Retailing

[ ] Restaurants

Technology

    [ ] Computers

    [ ] Telecommunications

    [ ] Other Technology

Travel

    [ ] Airlines & Airports

    [ ] Lodging & Conventions

    [ ] Tourism & Travel Services

    [ ] Other Travel

[ ] Other

---

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| [ ] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |

019063

HCMLPHMIT00004097

☐ $1,000,001 - $5,000,000
☐ $5,000,001 - $25,000,000
☐ $25,000,001 - $100,000,000
☐ Over $100,000,000
☐ Decline to Disclose
☐ Not Applicable

☐ $5,000,001 - $25,000,000
☐ $25,000,001 - $50,000,000
☐ $50,000,001 - $100,000,000
☐ Over $100,000,000
☒ Decline to Disclose
☐ Not Applicable

---

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

☒ Investment Company Act Section 3(c)

☐ Rule 504(b)(1) (not i, (ii) or (iii))
☐ Rule 504 (b)(1)(i)
☐ Rule 504 (b)(1)(ii)
☐ Rule 504 (b)(1)(iii)
☒ Rule 506(b)
☐ Rule 506(c)
☐ Securities Act Section 4(a)(5)

☐ Section 3(c)(1)
☐ Section 3(c)(2)
☐ Section 3(c)(3)
☐ Section 3(c)(4)
☐ Section 3(c)(5)
☐ Section 3(c)(6)
☒ Section 3(c)(7)

☐ Section 3(c)(9)
☐ Section 3(c)(10)
☐ Section 3(c)(11)
☐ Section 3(c)(12)
☐ Section 3(c)(13)
☐ Section 3(c)(14)

---

## 7. Type of Filing

☐ New Notice   Date of First Sale 2015-12-17   ☐ First Sale Yet to Occur
☒ Amendment

---

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year?   ☒ Yes ☐ No

---

## 9. Type(s) of Securities Offered (select all that apply)

☐ Equity
☐ Debt
☐ Option, Warrant or Other Right to Acquire Another Security
☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security

☒ Pooled Investment Fund Interests
☐ Tenant-in-Common Securities
☐ Mineral Property Securities
☐ Other (describe)

---

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer?   ☐ Yes ☒ No

Clarification of Response (if Necessary):

---

## 11. Minimum Investment

Minimum investment accepted from any outside investor $500,000 USD

---

019064

HCMLPHMIT00004098

## 12. Sales Compensation

Recipient                                          Recipient CRD Number [X] None

(Associated) Broker or Dealer [X] None            (Associated) Broker or Dealer CRD Number    [X] None

Street Address 1                                   Street Address 2

City                                               State/Province/Country          ZIP/Postal Code

State(s) of Solicitation (select all that apply)     [ ] All States      [ ] Foreign/non-US
Check "All States" or check individual States

## 13. Offering and Sales Amounts

Total Offering Amount                USD or [X] Indefinite
Total Amount Sold        $16,417,187 USD
Total Remaining to be Sold           USD or [X] Indefinite

Clarification of Response (if Necessary):

## 14. Investors

[ ] Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering:        | 3 |

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD [X] Estimate

Finders' Fees $0 USD [X] Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD [X] Estimate

Clarification of Response (if Necessary):

Rand PE Fund Management, LLC and/or its affiliates receive customary management fees, as described in the Issuer's Confidential Private Placement Memorandum.

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

019065

HCMLPHMIT00004099

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of:  (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|--------|-----------|----------------|-------|------|
| Rand PE Fund I, L.P. | /s/ Mark Patrick | Mark Patrick | Controlling Person | 2025-02-24 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

019066

HCMLPHMIT00004100

**EXHIBIT 94**

019067

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
OF
BEACON MOUNTAIN LLC

This Amended and Restated Limited Liability Company Agreement (this "Agreement"), dated as of the 24th day of September, 2015, has been entered into by Rand PE Fund I, L.P. – Series 1 (the "Member"). The Member's LLC Interest (as hereinafter defined) is as set forth on Schedule A hereto.

WHEREAS, the initial Limited Liability Company Agreement, also dated as of the 24th day of September, 2015 ("Initial Agreement"), contained a scrivener's error with respect to the name of the single member of the Company (as defined below).

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Initial Agreement is hereby amended and restated in its entirety to read as follows:

    1.    Name, Business, Address and Registered Agent.

    (a)    The Member hereby acknowledges that a limited liability company under the name of "Beacon Mountain LLC" (the "Company") was formed under the Delaware Limited Liability Company Act (the "Act") for the purpose of engaging in any business of any kind necessary to, in connection with, related to or incidental to such purposes as the Member shall from time to time deem desirable.

    (b)    The principal office of the Company shall be at such place as the Member may from time to time designate.

    (c)    The initial registered office of the Company for purposes of the Act shall be at 1675 South State Street, Suite B, in the City of Dover, County of Kent, Delaware 19901. The initial registered agent of the Company for purposes of the Act shall be Capitol Services, Inc., whose business office is identical to the Company's registered office.

    2.    Member. The sole responsibility for managing the business and affairs of the Company, except as otherwise provided herein or in the Act, shall be vested in the Member. Except as expressly provided herein, voting power shall be vested solely in the Member, and all matters requiring a vote pursuant to this Agreement or the Act shall be determined by the vote of the Member and the Member may act by written consent.

    3.    Officers.

    (a)    Election of Officers: Term. Officers, including assistant and subordinate officers, may from time to time be appointed by the Member. All officers shall hold office until their successors are appointed by the Member. Any two or more offices may be combined in the same person as the Member may determine. No officer may act in more than one capacity where the action of two or more officers is required.

019068

HCMLPHMIT00004115

(b)   <u>Removal of Officers: Vacancies</u>.  Any officer of the Company may be removed summarily with or without cause, at any time, by the Member.  Vacancies may be filled by the Member.

(c)   <u>Duties</u>.  The officers of the Company shall have only such powers and duties as are from time to time conferred by the Member in writing or as are set forth in writing and executed by either of the President or the Secretary.  The Member shall determine the compensation of all officers of the Company.

4.   <u>Term</u>.  The term of the Company shall be perpetual, except that the Company shall be dissolved upon the first to occur of any of the following events:

(a)   The election of the Member to dissolve and terminate the Company;

(b)   At any time there are no remaining members, except as may be avoided pursuant to §18-801(a)(4) of the Act;

(c)   The entry of a decree of judicial dissolution under §18-802 of the Act; or

(d)   Automatic cancellation of the Company's certificate of formation pursuant to §18-1108 of the Act.

5.   <u>Capital</u>.  The Member may contribute such capital, in cash or other property, as it so chooses in its sole discretion.  No capital contributions shall be required unless the Member consents thereto in writing, in its sole and absolute discretion.

6.   <u>Bank Accounts</u>.  The President and the Secretary and any other officer, including any assistant or subordinate officer, as may be authorized to do so in writing by either of the President or the Secretary, are authorized to open commercial banking accounts for and in the name of the Company throughout the United States, at any time and from time to time, and to deposit to the credit of the Company in such banking accounts any monies, checks, drafts, orders or other commercial paper payable to the Company, and from time to time to withdraw all or any part of the funds on deposit in the name of the Company by check drawn in the name of the Company and signed by such officer.

7.   <u>Voting of Shares</u>.  Unless otherwise provided by written resolution of the Member, either of the President or the Secretary may from time to time appoint an attorney or attorneys or agent or agents of the Company, in the name and on behalf of the Company, to cast the vote which the Company may be entitled to cast as a stockholder or otherwise in any corporation, partnership, limited liability company, joint venture or any other entity, any of whose securities may be held by the Company, at meetings of the holders of the shares or other securities of such entity or to consent in writing to any action by any such entity.  Such officer shall instruct the person or persons so appointed as to the manner of casting such votes or giving such consent and may execute or cause to be executed on behalf of the Company such written proxies, consents, waivers or other instruments as may be necessary or proper in the premises.  In lieu of such appointment, either of the President or the Secretary may himself attend any meetings of the holders of the shares or other securities of any such entity and there vote or

019069

HCMLPHMIT00004116

exercise any or all power of the Company as the holder of such shares or other securities of such entity or consent in writing to any action by any such entity.

8.    Distributions.  Any cash or other property of the Company not required for the operation of the Company shall be distributable to the Member at such times and in such amounts as determined by the Member.

9.    Certificates; "Opt-In" to Article 8; Transferability of Interests.

(a)    The Company may issue one or more certificates evidencing the limited liability company interests in the Company ("LLC Interest") in the form attached hereto as Exhibit A.  Certificates shall be executed on behalf of the Company by one of its executive officers.  The Member hereby agrees that the LLC Interest held by such Member shall be treated as a "security" for purposes of and shall be governed by Article 8 of the Delaware Uniform Commercial Code--Investment Securities, as amended from time to time.

(b)    The Member may transfer, sell, assign, mortgage, grant a lien on, give or otherwise dispose of, whether voluntarily or by operation of law, at judicial sale or otherwise, all or any part of its LLC Interest in the Company; provided, however, that there shall not at any time be more than one member until this Agreement is amended to provide generally (in addition to Section 12 hereof) for having more than one member.  If, in connection with any such transfer, less than 100% of the LLC Interest of the transferor member is transferred, then this Agreement shall be amended to include appropriate provisions, including those relating to partnership accounting and tax issues, necessary to address the fact that the Company has more than one member.

10.    Liquidation.  Any net proceeds from the sale, exchange or other disposition (including a disposition pursuant to foreclosure or deed in lieu of foreclosure) of the assets of the Company following the dissolution of the Company shall be distributed to the Member.

11.    Other Activities.  The Member may engage in or possess any interest in another venture or business of any nature or description, independently or with others.

12.    Tax Classification.  The Member intends that the Company be disregarded for U.S. federal income tax purposes as long as there is only one member, and that if there is ever more than one member or more than one owner of the Company as determined for U.S. federal income tax purposes, that the Company be classified as a partnership for U.S. federal income tax purposes and this Agreement shall be interpreted accordingly.

13.    Limited Liability.  The Member shall not have any personal obligation for any debts, obligations or liabilities of the Company, whether arising in contract, tort or otherwise, solely by reason of being a Member, except as provided under the Act.

14.    Exculpation; Indemnification.

(a)    Except as otherwise provided by any written employment, consulting or similar agreement, if applicable, or unless otherwise expressly required by law, no officer or member of the Company (including any former executive officer or member) (each such person

019070

HCMLPHMIT00004117

referred to herein as a "Covered Person") shall have any liability to the Company or to any member for any loss suffered by the Company or any member which arises out of any act or omission or alleged act or omission of the Covered Person in the Covered Person's capacity as a Covered Person to the extent the Covered Person acted in good faith and to the extent such course of conduct did not constitute willful misconduct or gross negligence of the Covered Person. Each Covered Person shall be indemnified by the Company against any losses, judgments, liabilities, claims, damages, costs, expenses (including reasonable legal fees and other expenses actually incurred in investigating or defending against any such losses, judgments, liabilities or claims and expenses actually incurred enforcing this Agreement) and amounts paid in settlement of any claim (approved in advance and in good faith by the Member) sustained by any of them by reason of any act or omission or alleged act or omission in connection with the activities of the Company (including any subsidiaries thereof) unless there is a final judicial determination by a court of competent jurisdiction to which all rights of appeal have been exhausted or expired that the same were the result of bad faith, willful misconduct or gross negligence of the Covered Person. The Covered Person may rely in good faith upon the advice of legal counsel.

(b)    To the extent available on commercially reasonable terms, the Company may purchase, at the Company's expense, insurance (including without limitation, liability insurance policies and errors and omissions policies) to cover any liabilities covered by this Section 14 in such amount and with such deductibles as the Company may determine; provided, however, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person. Any such insurance may extend beyond the termination of the Company for a commercially reasonable period. The Company shall be subrogated to the Covered Person's rights under such indemnification or insurance. If any Covered Person recovers any amounts in respect of any such liabilities from insurance coverage or any third party source, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to it by the Company in respect of such liabilities. The Company shall not incur the cost of that portion of any insurance, other than public liability insurance, which insures any party against any liability the indemnification of which is herein prohibited.

(c)    The Company may, as determined in good faith by the Member, pay the legal fees and other expenses reasonably incurred by any Covered Person hereunder in connection with any proceeding in advance of the final disposition of such proceeding, so long as the Company receives a written undertaking, in form and content approved by the Company's counsel, by such Covered Person to repay the full amount advanced if there is a final judicial determination by a court of competent jurisdiction, as to which all rights of appeal have been exhausted or expired, that such Covered Person did not satisfy the standards which entitle it to indemnification pursuant to the terms of this Section 14.

(d)    The right of indemnification hereby provided shall not be exclusive of, and shall not affect, any other rights to which any Covered Person may be entitled. Nothing contained in this Section 14 shall limit any lawful rights to indemnification existing independently of this Section 14.

019071

HCMLPHMIT00004118

(e)    The indemnification rights provided by this <u>Section 14</u> shall not be construed to increase the liability of the Member.

(f)    The indemnification rights provided by this <u>Section 14</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

(g)    The provisions of this <u>Section 14</u> shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this <u>Section 14</u> and regardless of any subsequent amendment to this Agreement; <u>provided</u>, <u>however</u>, that no such amendment shall reduce or restrict the extent to which the indemnification provisions of this <u>Section 14</u> apply to actions taken or omissions made or alleged actions taken or omissions made prior to the date of such amendment.

(h)    If deemed appropriate or necessary by the Member, the Company may establish reserves, escrow accounts or similar accounts to fund its obligations under this <u>Section 14</u>.

(i)    The provisions of this <u>Section 14</u> shall survive the termination or dissolution of the Company.

15.    <u>No Third Party Beneficiary</u>.  No creditor or other third party having dealings with the Company shall have the right to enforce the right or obligation of the Member to make capital contributions or loans or to pursue any other right or remedy hereunder or at law or in equity, it being understood and agreed that the provisions of this Agreement shall be solely for the benefit of, and may be enforced solely by, the Member, the Covered Persons (to the extent granted herein) and the Company and their respective successors and permitted assigns.

[Signature Page Follows]

019072

HCMLPHMIT00004119

IN WITNESS WHEREOF, the undersigned member has executed this Amended and Restated Limited Liability Company Agreement as of the date first set forth above.

RAND PE FUND I, L.P. – Series 1

By: RAND PE FUND MANAGEMENT, LLC
Its:   General Partner

By:
Its:   *MANAGING MEMBER*

Page 6

*Signature Page to Beacon Mountain LLC*
*Company Agreement*

019073

HCMLPHMIT00004120

## SCHEDULE A

## MEMBER

| Member | LLC Interest |
|---|---|
| Rand PE Fund I, L.P. – Series 1 | 100% |

019074

HCMLPHMIT00004121

## EXHIBIT A

## <u>CERTIFICATE NO.</u>__

### CERTIFICATE OF LLC INTEREST

of

### BEACON MOUNTAIN LLC

### A Delaware Limited Liability Company

This Certificate of LLC Interest (this "<u>Certificate</u>") is issued and shall be held subject to the provisions of the Certificate of Formation of Beacon Mountain, LLC, a limited liability company organized under the laws of the State of Delaware (the "<u>Company</u>"), filed on September ___, 2015 with the Secretary of State of the State of Delaware, and the Limited Liability Company Agreement of the Company, dated as of September ___, 2015, as each may be amended from time to time.

This Certificate of LLC Interest certifies that _____, a Member of the Company, is the registered holder of ___% of the "<u>LLC Interest</u>" (as such term is defined in the above-referenced Limited Liability Company Agreement) of the Company, which LLC Interest shall be transferable only on the books of the Company by the holder hereof in person or by a duly authorized attorney upon surrender of this Certificate with a proper endorsement.

### *SEE RESTRICTIONS ON REVERSE SIDE.*

IN WITNESS WHEREOF, the Company has caused this Certificate to be signed by its duly authorized officer as of the _____ day of _____, 2 ___.

BEACON MOUNTAIN LLC

By: _____
Name: _____
Title: _____

Page 8

019075

HCMLPHMIT00004122

## [REVERSE SIDE OF CERTIFICATE]

### BEACON MOUNTAIN LLC

For value received, the undersigned hereby sells, assigns, and transfers to

_____ and its successors and assigns, ____% of the LLC Interest of

Beacon Mountain LLC standing in the name of _____, on the books of said

limited liability company represented by certificate No. _____ and does hereby irrevocably

constitute and appoint _____, and its successors and assigns, attorney

to transfer said interests on the books of the limited liability company with full power of

substitution.

Dated: _____

_____

By: _____
Name: _____
Title: _____

THE LLC INTEREST REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY STATE SECURITIES ACT OR OTHER SIMILAR STATUTE IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS. WITHOUT SUCH REGISTRATION, THE SALE, PLEDGE OR OTHER TRANSFER OF THIS LLC INTEREST IS RESTRICTED, EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL, SATISFACTORY TO THE COMPANY AND ITS COUNSEL, THAT REGISTRATION IS NOT REQUIRED FOR THE TRANSFER, OR SUCH OTHER EVIDENCE SATISFACTORY TO THE COMPANY THAT THE TRANSFER IS NOT IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAW.  THE SALE, PLEDGE OR OTHER TRANSFER OF THIS LLC INTEREST IS ALSO SUBJECT TO THE RESTRICTIONS SET FORTH IN THE LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, WHICH MAY BE AMENDED FROM TIME TO TIME.

019076

HCMLPHMIT00004123

# EXHIBIT 95

019077





019079



019080





d r     d     r          d          d
d d  d       d      d                 r          d   r      r
                                                        r

r        d

M r      r
M        r

019083

**SCHEDULE A**

**MEMBER**

| Member | LLC Interest |
|--------|--------------|
| d      |              |

019084

**EXHIBIT A**

**CERTIFICATE NO.** _____

**CERTIFICATE OF LLC INTEREST**

**of**

**BEACON MOUNTAIN LLC**

**A Delaware Limited Liability Company**



*SEE RESTRICTIONS ON REVERSE SIDE.*



**[REVERSE SIDE OF CERTIFICATE]**

**BEACON MOUNTAIN LLC**

019086

**EXHIBIT 96**

019087

**BYLAWS**

**OF**

**THE OKADA FAMILY FOUNDATION, INC.**

019088

# TABLE OF CONTENTS

**Page**

ARTICLE I.   OFFICES..................................................................................................1

    Section 1.1  Registered Office ..............................................................................1
    Section 1.2  Other Offices ....................................................................................1

ARTICLE II.   MEMBERSHIP......................................................................................1

    Section 2.1  Classes and Number .........................................................................1
    Section 2.2  Voting ...............................................................................................1
    Section 2.3  Transfer of Membership ...................................................................1
    Section 2.4  Resignation of Member .....................................................................2
    Section 2.5  Place of Meetings .............................................................................2
    Section 2.6  Annual Meetings ...............................................................................2
    Section 2.7  Special Meetings ...............................................................................2
    Section 2.8  Notice of Meetings of Members .......................................................2
    Section 2.9  Quorum .............................................................................................3
    Section 2.10  Voting .............................................................................................3
    Section 2.11  Proxies............................................................................................3
    Section 2.12  Action by Written Consent .............................................................3
    Section 2.13  Control of Investments ...................................................................3

ARTICLE III. DIRECTORS ..........................................................................................4

    Section 3.1  General Powers .................................................................................4
    Section 3.2  Number of Directors .........................................................................4
    Section 3.3  Vacancies .........................................................................................4
    Section 3.4  Place of Meetings .............................................................................5
    Section 3.5  Committees of Directors ...................................................................5
    Section 3.6  Compensation of Directors ...............................................................5
    Section 3.7  Annual Meeting ................................................................................5
    Section 3.8  Additional Regular Meetings ............................................................5
    Section 3.9  Special Meetings ...............................................................................5
    Section 3.10  Method and Timing of Notice.........................................................5
    Section 3.11  Purpose not Required in Notice ......................................................6
    Section 3.12  Waiver of Notice ............................................................................6
    Section 3.13  Action by Written Consent .............................................................6
    Section 3.14  Validation of Action by Consent ....................................................6
    Section 3.15  Quorum and Manner of Acting .......................................................6
    Section 3.16  Resignation and Removal of Directors ...........................................7

ARTICLE IV. OFFICERS ..............................................................................................7

    Section 4.1  Officers .............................................................................................7
    Section 4.2  Election, Term of Office and Eligibility ..........................................7
    Section 4.3  Subordinate Officers ........................................................................7

6646907.1/SP/12409/0104/030915

019089

Section 4.4  Removal ............................................................................................7
Section 4.5  The President and Co-President ...........................................................7
Section 4.6  The Secretary ....................................................................................8
Section 4.7  The Assistant Secretaries ....................................................................8
Section 4.8  Chairman and Co-Chairs .....................................................................8
Section 4.9  The Chief Financial Officer .................................................................8
Section 4.10  The Assistant Chief Financial Officers ................................................9
Section 4.11  Delegation of Duties .........................................................................9

ARTICLE V.  BOOKS AND RECORDS ................................................................9

Section 5.1  Location ...........................................................................................9
Section 5.2  Inspection .........................................................................................9

ARTICLE VI. MISCELLANEOUS PROVISIONS .....................................................9

Section 6.1  Fiscal Year .......................................................................................9
Section 6.2  Depositories ......................................................................................9
Section 6.3  Checks, Drafts and Notes ..................................................................10
Section 6.4  Contracts and Other Instruments ........................................................10
Section 6.5  Conflicts of Interest .........................................................................10
Section 6.6  Waivers of Notice ............................................................................10
Section 6.7  Ownership Interests in Other Entities .................................................10
Section 6.8  Indemnification ...............................................................................11
Section 6.9  Amendment of Bylaws ......................................................................12

6646907.1/SP/12409/0104/030915

019090

BYLAWS

OF

THE OKADA FAMILY FOUNDATION, INC.

## ARTICLE I.

### OFFICES

Section 1.1    Registered Office.   The registered office of THE OKADA FAMILY FOUNDATION, INC. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2    Other Offices.   The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE II.

### MEMBERSHIP

Section 2.1    Classes and Number.   The Corporation shall have two classes of members and one member in each such class: the Institutional Member, which shall be The Dallas Foundation, and the Individual Member, which shall be Mark Okada or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2    Voting.   Except as otherwise provided in these Bylaws, the Institutional Member shall be entitled to two (2) votes upon each matter submitted to a vote of the members, and the Individual Member shall be entitled to one (1) vote upon each matter submitted to a vote of the members, In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3    Transfer of Membership.   Institutional Membership in the Corporation is not transferable or assignable. The Individual Membership is transferable or assignable as provided herein only upon the approval of the Institutional Member, with such approval not to be unreasonably withheld by the Institutional Member. Subject to the approval of the Institutional Member, Mr. Okada, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document, transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. Each successor Individual Member shall succeed to the rights of the initial Individual Member. Subject to the approval of the Institutional Member, each successor Individual Member may in the same manner transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the

6646907.1/SP/12409/0104/030915

019091

death or failure to act of a current or future Individual Member. In the event of a conflict between such transfer documents, the one bearing the latest date shall control. Each Individual Member may at any time revoke his transfer document that is to be effective in the future, in whole or in part, by written notice delivered to the Institutional Member. If at any time an Individual Member shall be disabled and no transfer of such member's interest is to occur as a result of such disability in accordance with the foregoing provisions of this Section, then such member's attorney-in-fact under a valid, effective power of attorney instrument may act for such member hereunder. In the event of the death of an Individual Member, such member's personal representative of his estate, or trustee of a trust to which the Individual Member transferred his interest, may, if necessary, act as the Individual Member hereunder until such time as the Individual Member interest is transferred from the estate or trust.

Section 2.4    Resignation of Member.  A member may resign at any time upon written notice to the Secretary.

Section 2.5    Place of Meetings.  All meetings of the members be held shall by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6    Annual Meetings.  Except as otherwise provided by these Bylaws, annual meeting of the members, commencing with the year 2015, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.7    Special Meetings.  Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall he called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.8    Notice of Meetings of Members.  When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting (at least three (3) days in the case of a special meeting). Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the

6646907.1/SP/12409/0104/030915

telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.9    <u>Quorum</u>.  Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business, except as otherwise required by Law, the Certificate of Incorporation or these Bylaws. lf, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the Corporation may transact any business which might have been transacted at the original meeting, if the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.10    <u>Voting</u>.  When a quorum is present at any meeting, the vote of a majority of the number of votes held by the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.11    <u>Proxies.</u>    At any meeting of the members, any member entitled to vote, consent or approve any action or matter may do so in person or by proxy authorized by an instrument in writing or by a transmission permitted by law. Any member represented by proxy shall be counted as present at such meeting for all purposes. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to these Bylaws may be substituted or used in lieu of the original writing or transmission that could be used, provided that the copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 2.12    <u>Action by Written Consent</u>.  Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by the member(s) holding the number of votes necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.12. Prompt notice of the taking of an action by the members without a meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action. Each such consent must state the date of each member's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting,

Section 2.13    <u>Control of Investments</u>. Notwithstanding any other provision contained in these Bylaws to the contrary, the Institutional Member shall have the sole and exclusive power and authority to direct the management and investment of the assets of the Corporation. Such power and authority shall be exercised by the Institutional Member in its sole discretion and shall be separate and independent of any power and authority of the Board of Directors and officers of

6646907.1/SP/12409/0104/030915

the Corporation which have no power or authority with respect to the matters delegated hereby to the Institutional Member with respect to investments. Such power and authority of the Institutional Member shall include, but not be limited to: [a] the power to purchase, sell and retain assets of the Corporation; [b] the power to exercise voting, subscription, conversion, redemption, withdrawal, cancellation, option and similar rights with respect to such assets; [c] the power to participate in and consent to any voting trust, reorganization, merger, dissolution or other action affecting any such property; [d] the power to acquire life insurance policies, annuities, and/or other insurance or similar products (including the exercise or non-exercise or any rights, or the prosecution or defense of any disputes with the issuer or other parties regarding legal, regulatory, contractual, or other matters, arising under or relating to such products) and [e] the power to direct, and delegate to, the officers of the Corporation the taking of such acts and the execution of such documents as may be necessary to effectuate the decisions of the Institutional Member with respect to investments.  The Corporation shall furnish the Institutional Member with such information as is necessary or desirable for it to fulfill its responsibilities. The Corporation shall furnish the Institutional Member with such clerical and other assistance as the Institutional Member may need to carry out its powers and authority. The Institutional Member shall advise the Board of Directors periodically of the investments of the assets of the Corporation and changes thereto.  The Institutional Member shall have the sole power to retain investment advisors and custodians to assist it in carrying out its powers and authority under this Section 2.13 and it may delegate to any such investment advisors and custodians any and all such powers and authority subject to limitations on such delegation provided under the law, if any. The Corporation shall be responsible for all costs and expenses incurred by the Institutional Member in carrying out its powers and authority under this Section 2.13.

## ARTICLE III.

## DIRECTORS

Section 3.1    General Powers.    The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2    Number of Directors.    The number of Directors that shall constitute the Board of Directors shall be three (3). Two (2) Directors (the "Institutional Directors") shall be elected annually by the institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member. Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3    Vacancies.    If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy. If at any time there is no Individual

019094

Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director. Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4    Place of Meetings.  The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5    Committees of Directors.  The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6    Compensation of Directors.  Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7    Annual Meeting.  The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors. If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8    Additional Regular Meetings.  The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9    Special Meetings.  Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors upon not less than three (3) days' notice to each director. The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10    Method and Timing of Notice.  Unless otherwise provided herein, when notice is required to be given for a meeting of the Board of Directors, such notice shall be given to each Director at least ten (10) days prior to the meeting. Any notice given herein shall specify the date, time, and location of the meeting. Notice shall be given (a) by written notice delivered

019095

personally, or (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation. If mailed, such notice shall he deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number.

Section 3.11   <u>Purpose not Required in Notice</u>.  Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12   <u>Waiver of Notice</u>.  Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall he deemed the equivalent of the Director having received notice. A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

Section 3.13   <u>Action by Written Consent</u>.  Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, are signed by all of the then-serving Directors. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14   <u>Validation of Action by Consent</u>.  All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held. At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice. If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15   <u>Quorum and Manner of Acting</u>.  A quorum for the transaction of business at any meeting of the Board of Directors shall consist of a majority of the then serving Directors. Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall he the act of the Board of Directors. Any Director may participate in a meeting of the Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such

019096

participation shall constitute presence in person at the meeting. In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present. Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16   <u>Resignation and Removal of Directors</u>.  Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. A resignation that is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable. The Institutional Member may remove an Institutional Director at any time, with or without cause. The Individual Member may remove an Individual Director at any time, with or without cause.

## ARTICLE IV.

## OFFICERS

Section 4.1   <u>Officers</u>.  The officers of the Corporation shall include a President  and a Secretary, and may include a Chairman and a Chief Financial Officer. A person may hold multiple offices.

Section 4.2   <u>Election, Term of Office and Eligibility</u>.  The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal. None of the officers other than the Chairman need be members of the Board of Directors.

Section 4.3   <u>Subordinate Officers</u>.  The Board of Directors may appoint such Vice Presidents, Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine. The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4   <u>Removal</u>.  The President, the Secretary, the Chairman and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause. Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

Section 4.5   <u>The President and The Co-Presidents</u>.  The President shall be the chief executive officer of the Corporation. He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the

6646907.1/SP/12409/0104/030915

019097

Corporation. In general the President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors. A second person may be appointed by the Board of Directors having the same duties and powers as provided for under this Section 4.5, and in the case of such an appointment, each person serving pursuant to this Section 4.5 shall be referred to as Co-President. When Co-Presidents are serving either Co-President may act alone without the concurrence of the other Co-President. Should the Co-Presidents disagree as to the taking or not taking of an action provided for by this Section 4.5, then the Members shall decide whether to take or not take such action.

Section 4.6    The Secretary.  The Secretary shall:

(a)    keep the minutes of the meetings of the members and of the Board of Directors;

(b)    see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c)    be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized; and

(d)    in general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7    The Assistant Secretaries.  If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4,3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8    Chairman and Co-Chairs.  The Chairman, if any, shall preside when present at meetings of the Board of Directors; advise and counsel the other officers of the Corporation; and shall perform such other duties as may be prescribed by the Board of Directors from time to time. A second person may be appointed by the Board of Directors having the same duties and powers as provided for under this Section 4.8, and in the case of such an appointment, each person serving pursuant to this Section 4.8 shall be referred to as a Co-Chair. When Co-Chairs are serving either Co-Chair may act alone without the concurrence of the other Co-Chair.

Section 4.9    The Chief Financial Officer.  The Chief Financial Officer, if any, shall:

(a)    receive and he responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things: keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the

-8-

019098

Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b)    render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation; and

(c)    in general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

Section 4.10    The Assistant Chief Financial Officers.  If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief Financial Officer.

Section 4.11    Delegation of Duties.  In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

## ARTICLE V.

## BOOKS AND RECORDS

Section 5.1    Location.  The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

Section 5.2    Inspection.  The books, accounts, and records of the Corporation shall be open to inspection at all times by any member and by any member of the Board of Directors.

## ARTICLE VI.

## MISCELLANEOUS PROVISIONS

Section 6.1    Fiscal Year.  The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2    Depositories.  The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 6.3   <u>Checks, Drafts and Notes</u>.   All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4   <u>Contracts and Other Instruments</u>.   The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances,

Section 6.5   <u>Conflicts of Interest</u>.   No contract or agreement may be entered into by and between the corporation and any of the following: (a) a Director, officer, or employee of the corporation (hereinafter an "Insider"); or (b) any corporation, partnership, trust, sole proprietorship or any other entity (hereinafter an "Entity") in which an interest is owned or held, directly or indirectly, by or for the benefit of an Insider, unless (i) the transaction is approved in accordance with Section 144 of the Delaware General Corporation Law to the extent such provision is applicable to the transaction; and (ii) if one or more of the parties to the contract or transaction is a "disqualified person" with respect to the corporation within the meaning of Section 4958 of the Code, either (x) such transaction is reviewed and approved in accordance with the "rebuttable presumption safe harbor" provisions set forth in the regulations promulgated under Section 4958 of the Code or (y) the Board of Directors determines that such procedures are not necessary for the transaction involved and records its specific findings for making such determination; provided, however, that the following contracts and agreements shall not be subject to the foregoing prohibition: a gratuitous transfer of assets or promise to transfer assets to the corporation of any kind, including but not limited to, (i) a gift annuity, charitable remainder trust, charitable lead trust or similar split-interest arrangement which benefits both the Insider and the corporation; or (ii) a loan, lease, agreement of sale or purchase, pledge, guarantee, assumption of liability, bailment, or consignment. All Insiders shall, as a condition of qualifying and continuing to qualify as a Director, officer, and/or employee of the corporation, abide by such conflict of interest policies as the Board of Directors may adopt from time to time.

Section 6.6   <u>Waivers of Notice</u>.   Whenever any notice is required to be given under the provisions of the Law or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members. Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.7   <u>Ownership Interests in Other Entities</u>.   Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or

6646907.1/SP/12409/0104/030915

019100

by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.8    Indemnification.

(a)    Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all, costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators. The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition upon receipt by the Corporation of an undertaking. by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise. The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b)    If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea

-11-

of nolo contendere or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct,

(c)     The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d)     The Corporation may maintain insurance, at its expense, to protect itself and any Director, member, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e)     To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

(f)     Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g)     The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.9     <u>Amendment of Bylaws</u>.  Only the members, by the affirmative unanimous vote of the members entitled to vote, may adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the Board of Directors to the extent such alteration or amendment expressly states that it can only be altered or amended by the members.

\*   \*   \*   \*   \*

The undersigned, being the duly elected and qualifying Secretary of the Corporation, hereby certifies that the foregoing initial Bylaws of the Corporation were duly adopted by the Board of Directors of the Corporation by unanimous written consent on __March 9__, 2015.

Digitally signed by Gary Garcia
DN: cn=Gary Garcia, o=The Dallas Foundation, ou,
email=gwgarcia@dallasfoundation.org, c=US
Date: 2015.03.09 16:09:08 -05'00'

_____
Gary W. Garcia, Secretary

6646907.1/SP/12409/0104/030915

019102

6646907.1/SP/12409/0104/030915

019103

**EXHIBIT 97**

019104

**BYLAWS**

**OF**

**EMPOWER DALLAS FOUNDATION, INC.**

010036 000016 14282559.2

019105

# TABLE OF CONTENTS

**Page**

ARTICLE I.   OFFICES .............................................................................................................1

    Section 1.1  Registered Office ............................................................................1
    Section 1.2  Other Offices ...................................................................................1

ARTICLE II.  MEMBERSHIP ....................................................................................................1

    Section 2.1  Classes and Number .......................................................................1
    Section 2.2  Voting .............................................................................................1
    Section 2.3  Transfer of Membership .................................................................1
    Section 2.4  Resignation of Member ..................................................................2
    Section 2.5  Place of Meetings ...........................................................................2
    Section 2.6  Annual Meetings ............................................................................2
    Section 2.7  Special Meetings ............................................................................2
    Section 2.8  Notice of Meetings of Members ....................................................2
    Section 2.9  Quorum ...........................................................................................3
    Section 2.10  Voting ...........................................................................................3
    Section 2.11  Proxies ..........................................................................................3
    Section 2.12  Action by Written Consent ...........................................................3
    Section 2.13  Control of Investments .................................................................3

ARTICLE III. DIRECTORS .......................................................................................................4

    Section 3.1  General Powers ...............................................................................4
    Section 3.2  Number of Directors ......................................................................4
    Section 3.3  Vacancies .......................................................................................4
    Section 3.4  Place of Meetings ...........................................................................5
    Section 3.5  Committees of Directors .................................................................5
    Section 3.6  Compensation of Directors .............................................................5
    Section 3.7  Annual Meeting ..............................................................................5
    Section 3.8  Additional Regular Meetings ..........................................................5
    Section 3.9  Special Meetings ............................................................................5
    Section 3.10  Method and Timing of Notice ......................................................5
    Section 3.11  Purpose not Required in Notice ....................................................6
    Section 3.12  Waiver of Notice ..........................................................................6
    Section 3.13  Action by Written Consent ...........................................................6
    Section 3.14  Validation of Action by Consent ..................................................6
    Section 3.15  Quorum and Manner of Acting .....................................................6
    Section 3.16  Resignation and Removal of Directors .........................................7

ARTICLE IV. OFFICERS ..........................................................................................................7

    Section 4.1  Officers ...........................................................................................7
    Section 4.2  Election, Term of Office and Eligibility .........................................7
    Section 4.3  Subordinate Officers ......................................................................7

019106

Section 4.4  Removal ........................................................................................................7

Section 4.5  The President ...............................................................................................7

Section 4.6  The Secretary ...............................................................................................8

Section 4.7  The Assistant Secretaries ............................................................................8

Section 4.8  Chairman ......................................................................................................8

Section 4.9  The Chief Financial Officer ........................................................................8

Section 4.10  The Assistant Chief Financial Officers .....................................................9

Section 4.11  Delegation of Duties ..................................................................................9

ARTICLE V.  BOOKS AND RECORDS .....................................................................................9

Section 5.1  Location ........................................................................................................9

Section 5.2  Inspection .....................................................................................................9

ARTICLE VI. MISCELLANEOUS PROVISIONS .......................................................................9

Section 6.1  Fiscal Year ...................................................................................................9

Section 6.2  Depositories ..................................................................................................9

Section 6.3  Checks, Drafts and Notes .............................................................................9

Section 6.4  Contracts and Other Instruments .................................................................9

Section 6.5  Conflicts of Interest ...................................................................................10

Section 6.6  Waivers of Notice ......................................................................................10

Section 6.7  Ownership Interests in Other Entities .......................................................10

Section 6.8  Indemnification ..........................................................................................10

Section 6.9  Amendment of Bylaws ...............................................................................12

010036 000016 14282559.2

019107

# BYLAWS

## OF

## EMPOWER DALLAS FOUNDATION, INC.

## ARTICLE I.

### OFFICES

Section 1.1    Registered Office.    The registered office of EMPOWER DALLAS FOUNDATION, INC. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2    Other Offices.    The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE II.

## MEMBERSHIP

Section 2.1    Classes and Number.    The Corporation shall have two classes of members and one member in each such class: the Institutional Member, which shall be The Dallas Foundation, and the Individual Member, which shall be Grant Scott or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2    Voting.    Except as otherwise provided in these Bylaws, the Institutional Member shall be entitled to two (2) votes upon each matter submitted to a vote of the members, and the Individual Member shall be entitled to one (1) vote upon each matter submitted to a vote of the members, In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3    Transfer of Membership.    Institutional Membership in the Corporation is not transferable or assignable. The Individual Membership is transferable or assignable as provided herein only upon the approval of the Institutional Member, with such approval not to be unreasonably withheld by the Institutional Member. Subject to the approval of the Institutional Member, Mr. Scott, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document, transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. Each successor Individual Member shall succeed to the rights of the initial Individual Member. Subject to the approval of the Institutional Member, each successor Individual Member may in the same manner transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the

-1-

019108

death or failure to act of a current or future Individual Member. In the event of a conflict between such transfer documents, the one bearing the latest date shall control. Each Individual Member may at any time revoke his transfer document that is to be effective in the future, in whole or in part, by written notice delivered to the Institutional Member. If at any time an Individual Member shall be disabled and no transfer of such member's interest is to occur as a result of such disability in accordance with the foregoing provisions of this Section, then such member's attorney-in-fact under a valid, effective power of attorney instrument may act for such member hereunder. In the event of the death of an Individual Member, such member's personal representative of his estate, or trustee of a trust to which the Individual Member transferred his interest, may, if necessary, act as the Individual Member hereunder until such time as the Individual Member interest is transferred from the estate or trust.

Section 2.4    Resignation of Member.  A member may resign at any time upon written notice to the Secretary.

Section 2.5    Place of Meetings.  All meetings of the members be held shall by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6    Annual Meetings.  Except as otherwise provided by these Bylaws, annual meeting of the members, commencing with the year 2015, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.7    Special Meetings.  Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall he called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.8    Notice of Meetings of Members.  When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting (at least three (3) days in the case of a special meeting). Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the

-2-

019109

telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.9    Quorum.  Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business, except as otherwise required by Law, the Certificate of Incorporation or these Bylaws. lf, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the Corporation may transact any business which might have been transacted at the original meeting, if the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.10    Voting.  When a quorum is present at any meeting, the vote of a majority of the number of votes held by the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.11    Proxies.  At any meeting of the members, any member entitled to vote, consent or approve any action or matter may do so in person or by proxy authorized by an instrument in writing or by a transmission permitted by law. Any member represented by proxy shall be counted as present at such meeting for all purposes. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to these Bylaws may be substituted or used in lieu of the original writing or transmission that could be used, provided that the copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 2.12    Action by Written Consent.  Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by the member(s) holding the number of votes necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.12. Prompt notice of the taking of an action by the members without a meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action. Each such consent must state the date of each member's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting,

Section 2.13    Control of Investments. Notwithstanding any other provision contained in these Bylaws to the contrary, the Institutional Member shall have the sole and exclusive power and authority to direct the management and investment of the assets of the Corporation. Such power and authority shall be exercised by the Institutional Member in its sole discretion and shall be separate and independent of any power and authority of the Board of Directors and officers of

010036 000016 14282559.2

the Corporation which have no power or authority with respect to the matters delegated hereby to the Institutional Member with respect to investments. Such power and authority of the Institutional Member shall include, but not be limited to: [a] the power to purchase, sell and retain assets of the Corporation; [b] the power to exercise voting, subscription, conversion, redemption, withdrawal, cancellation, option and similar rights with respect to such assets; [c] the power to participate in and consent to any voting trust, reorganization, merger, dissolution or other action affecting any such property; [d] the power to acquire life insurance policies, annuities, and/or other insurance or similar products (including the exercise or non-exercise or any rights, or the prosecution or defense of any disputes with the issuer or other parties regarding legal, regulatory, contractual, or other matters, arising under or relating to such products) and [e] the power to direct, and delegate to, the officers of the Corporation the taking of such acts and the execution of such documents as may be necessary to effectuate the decisions of the Institutional Member with respect to investments.  The Corporation shall furnish the Institutional Member with such information as is necessary or desirable for it to fulfill its responsibilities.  The Corporation shall furnish the Institutional Member with such clerical and other assistance as the Institutional Member may need to carry out its powers and authority. The Institutional Member shall advise the Board of Directors periodically of the investments of the assets of the Corporation and changes thereto.  The Institutional Member shall have the sole power to retain investment advisors and custodians to assist it in carrying out its powers and authority under this Section 2.13 and it may delegate to any such investment advisors and custodians any and all such powers and authority subject to limitations on such delegation provided under the law, if any.  The Corporation shall be responsible for all costs and expenses incurred by the Institutional Member in carrying out its powers and authority under this Section 2.13.

## ARTICLE III.

## DIRECTORS

Section 3.1    General Powers.  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2    Number of Directors.  The number of Directors that shall constitute the Board of Directors shall be three (3). Two (2) Directors (the "Institutional Directors") shall be elected annually by the institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member. Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3    Vacancies.  If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy. If at any time there is no Individual

Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director. Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4    Place of Meetings.  The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5    Committees of Directors.  The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6    Compensation of Directors.  Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7    Annual Meeting.  The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors. If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8    Additional Regular Meetings.  The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9    Special Meetings.  Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors upon not less than three (3) days' notice to each director. The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10   Method and Timing of Notice.  Unless otherwise provided herein, when notice is required to be given for a meeting of the Board of Directors, such notice shall be given to each Director at least ten (10) days prior to the meeting. Any notice given herein shall specify the date, time, and location of the meeting. Notice shall be given (a) by written notice delivered

personally, or (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation. If mailed, such notice shall he deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number.

Section 3.11    Purpose not Required in Notice.  Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12    Waiver of Notice.  Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall he deemed the equivalent of the Director having received notice. A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

Section 3.13    Action by Written Consent.  Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, are signed by all of the then-serving Directors. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14    Validation of Action by Consent.  All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held. At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice. If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15    Quorum and Manner of Acting.  A quorum for the transaction of business at any meeting of the Board of Directors shall consist of a majority of the then serving Directors. Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall he the act of the Board of Directors. Any Director may participate in a meeting of the Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such

-6-

participation shall constitute presence in person at the meeting. In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present. Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16    <u>Resignation and Removal of Directors</u>.  Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. A resignation that is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable. The Institutional Member may remove an Institutional Director at any time, with or without cause. The Individual Member may remove an Individual Director at any time, with or without cause.

## <u>ARTICLE IV.</u>

## <u>OFFICERS</u>

Section 4.1    <u>Officers</u>.  The officers of the Corporation shall include a President  and a Secretary, and may include a Chairman and a Chief Financial Officer. A person may hold multiple offices.

Section 4.2    <u>Election, Term of Office and Eligibility</u>.  The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal. None of the officers other than the Chairman need be members of the Board of Directors.

Section 4.3    <u>Subordinate Officers</u>.  The Board of Directors may appoint such Vice Presidents, Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine. The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4    <u>Removal</u>.  The President, the Secretary, the Chairman and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause. Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

Section 4.5    <u>The President</u>.  The President shall be the chief executive officer of the Corporation. He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the Corporation. In general the

010036 000016 14282559.2

019114

President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors.

Section 4.6    The Secretary.  The Secretary shall:

(a)    keep the minutes of the meetings of the members and of the Board of Directors;

(b)    see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c)    be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized; and

(d)    in general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7    The Assistant Secretaries.  If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4,3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8    Chairman.  The Chairman, if any, shall preside when present at meetings of the Board of Directors; advise and counsel the other officers of the Corporation; and shall perform such other duties as may be prescribed by the Board of Directors from time to time.

Section 4.9    The Chief Financial Officer.  The Chief Financial Officer, if any, shall:

(a)    receive and he responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things: keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b)    render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation; and

(c)    in general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

010036 000016 14282559.2

019115

Section 4.10    The Assistant Chief Financial Officers.  If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief Financial Officer.

Section 4.11    Delegation of Duties.  In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

## ARTICLE V.

## BOOKS AND RECORDS

Section 5.1    Location.  The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

Section 5.2    Inspection.  The books, accounts, and records of the Corporation shall be open to inspection at all times by any member and by any member of the Board of Directors.

## ARTICLE VI.

## MISCELLANEOUS PROVISIONS

Section 6.1    Fiscal Year.  The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2    Depositories.  The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 6.3    Checks, Drafts and Notes.  All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4    Contracts and Other Instruments.  The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances,

010036 000016 14282559.2

019116

Section 6.5    Conflicts of Interest.   No contract or agreement may be entered into by and between the corporation and any of the following: (a) a Director, officer, or employee of the corporation (hereinafter an "Insider"); or (b) any corporation, partnership, trust, sole proprietorship or any other entity (hereinafter an "Entity") in which an interest is owned or held, directly or indirectly, by or for the benefit of an Insider, unless (i) the transaction is approved in accordance with Section 144 of the Delaware General Corporation Law to the extent such provision is applicable to the transaction; and (ii) if one or more of the parties to the contract or transaction is a "disqualified person" with respect to the corporation within the meaning of Section 4958 of the Code, either (x) such transaction is reviewed and approved in accordance with the "rebuttable presumption safe harbor" provisions set forth in the regulations promulgated under Section 4958 of the Code or (y) the Board of Directors determines that such procedures are not necessary for the transaction involved and records its specific findings for making such determination; provided, however, that the following contracts and agreements shall not be subject to the foregoing prohibition: a gratuitous transfer of assets or promise to transfer assets to the corporation of any kind, including but not limited to, (i) a gift annuity, charitable remainder trust, charitable lead trust or similar split-interest arrangement which benefits both the Insider and the corporation; or (ii) a loan, lease, agreement of sale or purchase, pledge, guarantee, assumption of liability, bailment, or consignment. All Insiders shall, as a condition of qualifying and continuing to qualify as a Director, officer, and/or employee of the corporation, abide by such conflict of interest policies as the Board of Directors may adopt from time to time.

Section 6.6    Waivers of Notice.   Whenever any notice is required to be given under the provisions of the Law or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members. Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.7    Ownership Interests in Other Entities.   Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.8    Indemnification.

(a)    Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held

-10-

harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all, costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators. The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition upon receipt by the Corporation of an undertaking. by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise. The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b)     If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct,

(c)     The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d)     The Corporation may maintain insurance, at its expense, to protect itself and any Director, member, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense,

019118

liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e)     To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

(f)     Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g)     The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.9     <u>Amendment of Bylaws</u>.  Only the members, by the affirmative unanimous vote of the members entitled to vote, may adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the Board of Directors to the extent such alteration or amendment expressly states that it can only be altered or amended by the members.

\* \* \* \* \*

The undersigned, being the duly elected and qualifying Secretary of the Corporation, hereby certifies that the foregoing initial Bylaws of the Corporation were duly adopted by the Board of Directors of the Corporation by unanimous written consent on ___March 9___, 2015.

Digitally signed by Gary Garcia
DN: cn=Gary Garcia, o=The Dallas Foundation, ou, email=gwgarcia@dallasfoundation.org, c=US
Date: 2015.03.09 15:47:15 -05'00'

Gary W. Garcia, Secretary

019119

# EXHIBIT 98

019120



**Deferred Variable Annuity Policy**

**This Policy is a Deferred Variable Annuity (DVA) Policy. This Policy is Non-Participating.** Crown Global Life Insurance Ltd., a Bermuda Class C insurance company, will pay, subject to the provisions of this Policy, the Annuity Payments to the Beneficiaries as provided by this Policy, provided that the Policy is In Force.

Signed for the Insurer at its Home Office located at Hamilton, Bermuda on the Issue Date.

12/15/15 Ken Goertzen,

12/16/15 Janita Burkey

**THIS IS A LEGAL CONTRACT.**

**PLEASE READ IT CAREFULLY.**

THE INSURER IS INCORPORATED IN BERMUDA AND IS REGISTERED AS A CLASS C INSURER IN BERMUDA PERMITTING IT TO WRITE DEFERRED VARIABLE ANNUITY POLICIES AND CONDUCT OTHER LONG-TERM INSURANCE BUSINESS. THE INSURER IS NOT AUTHORIZED IN ANY JURISDICTION OTHER THAN BERMUDA TO CARRY ON ANY INSURANCE BUSINESS. POLICY ACCOUNT VALUES UNDER THIS POLICY ARE BASED ON THE INVESTMENT EXPERIENCE OF A SEPARATE ACCOUNT ESTABLISHED UNDER THIS POLICY AND THE PRIVATE ACT. THE POLICY ACCOUNT VALUES UNDER THIS POLICY MAY INCREASE OR DECREASE IN AMOUNT. INVESTMENTS OF FUNDS HELD IN THE SEPARATE ACCOUNT MAY BE MADE IN NON-U.S. INVESTMENTS AS WELL AS U.S. INVESTMENTS. THE ASSETS IN THE SEPARATE ACCOUNT MAY BE ADVERSELY AFFECTED BY CHANGES IN FOREIGN GOVERNMENTS, AND OTHER ECONOMIC AND POLITICAL EVENTS, WHICH MIGHT NOT AFFECT U.S. INVESTMENTS OR ENTITIES, AND BY FLUCTUATIONS IN THE ENTITIES, AND BY FLUCTUATIONS IN THE VALUE OF FOREIGN CURRENCY.

*continued on next page*

**Crown Global Life Insurance Ltd.**

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com



**Deferred Variable Annuity Policy**

Crown Global Life Insurance Ltd.

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com

THIS POLICY CANNOT BE TRANSFERRED, ASSIGNED, HYPOTHECATED, OR PLEDGED, WITHOUT THE INSURER'S PRIOR WRITTEN CONSENT, WHICH THE INSURER MAY WITHHOLD IN ITS SOLE AND ABSOLUTE DISCRETION. THIS POLICY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER U.S. FEDERAL OR STATE SECURITIES LAWS OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND, THEREFORE, CANNOT BE TRANSFERRED UNLESS SO REGISTERED OR UNLESS SUCH REGISTRATION IS NOT REQUIRED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE. THIS POLICY IS AN APPROPRIATE INVESTMENT ONLY FOR PURCHASERS WHO ARE QUALIFIED PURCHASERS WITHIN THE MEANING OF THE U.S. INVESTMENT COMPANY ACT OF 1940 AND ACCREDITED INVESTORS WITHIN THE MEANING OF RULE 501(a) OF REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933. THIS POLICY IS ALSO APPROPRIATE ONLY FOR SOPHISTICATED PURCHASERS WHO, AMONG OTHER THINGS, HAVE NO NEED FOR ACCESS TO AMOUNTS DESCRIBED IN THE POLICY. ADDITIONAL INFORMATION ON THE RISKS OF PURCHASING A POLICY APPEARS IN THE CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM, AS AMENDED THROUGH THE DATE HEREOF, DESCRIBING THE POLICY.

THE INSURER MAKES NO REPRESENTATION AS TO THE TAX TREATMENT OF THIS POLICY FOR U.S. FEDERAL INCOME TAX PURPOSES OR FOR THE PURPOSES OF THE TAX LAWS OF ANY OTHER JURISDICTION. NO REPRESENTATION IS MADE THAT A PROPOSED POLICYHOLDER WOULD NOT BE SUBJECT TO AUDIT OR EXAMINATION BY THE TAX AUTHORITIES OF ANY JURISDICTION AS A RESULT OF PURCHASING A POLICY.

NO REPRESENTATION IS MADE REGARDING THE LIKELIHOOD THAT THE CURRENT U.S. FEDERAL INCOME TAX LAWS, REGULATIONS AND OFFICIAL INTERPRETATIONS OF THE LAW MAY BE CHANGED IN THE FUTURE. IT IS POSSIBLE THAT SUCH CHANGES COULD OCCUR, AND THAT SUCH CHANGES COULD APPLY TO THE POLICY, AND COULD APPLY RETROACTIVELY. THE INSURER HAS RESERVED THE RIGHT IN ITS SOLE AND ABSOLUTE DISCRETION TO MAKE CHANGES TO THE POLICY THAT IT DEEMS NECESSARY TO PRESERVE THE EXPECTED TAX CONSEQUENCES OF THE OWNERSHIP OF THE POLICY AS A RESULT OF CHANGES IN THE LAWS OF THE U.S. OR ANY OTHER JURISDICTION.



## Policy Data Page

### General Policy Data

All amounts expressed in "$" or "dollars" are in United States dollars

Proposed Policyholder:

Empower Dallas Foundation, Inc

Proposed Annuitant:

Grant Scott

Proposed Annuitant's Date of Birth:

29 May, 1962

Gender:

Male

Policy Effective Date: 10 Dec, 2015

Issue Date: 10 Dec, 2015

Annuity Starting Date: Deferred

until Annuitant's 85th birthday

at the latest

| Beneficiary: | Beneficiary Interest | Revocable/Irrevocable? |
| --- | --- | --- |
| Empower Dallas Foundation, Inc | 100% | Irrevocable |

Separate Account number : 30218
### Premium Amounts

Initial Premium:

$ 15,903,108.54

Premium Limit:

n/a

Premium Deposit:

n/a

Net Premiums will be deposited to the Separate Account established by the Insurer with respect to the Policy.

019123



---

## Policy Data Page

**Initial Allocation of Payments to Investment Options**

| Investment Options | Initial Allocation |
| --- | --- |
| 1. IDF: Atlas IDF, LP/ Rand Advisors LLC | 100% |

Custodian Bank:      n/a

Investment Manager:   n/a

019124



## Policy Data Page

**Policy Fees and Charges**

| Charge | Due Date | Amount of Charge |
|---|---|---|
| Policy Administration Fee | In equal installments in advance on each Liquidity Date | $2,900 per annum |
| Agreed Upon Procedures Fee | Annually | As charged by the outside auditors, currently $1,975. |
| DAC Charges | Each date the Insurer receives a Premium | 0.25% of the amount of Premium payment. *See* Section 9.2 of the Policy. |
| Management & Expense Fee | In advance on each Liquidity Date | The following annual rates expressed as a percentage of the Policy Account Value: <br><br> 0.45% p.a  $10mm of  Premium <br><br> 0.35% p.a. $11-20mm of Premium <br><br> 0.25% p.a. $21mm+of Premium, provided that if the Policy Account Value exceeds $50mm, the annual rate shall be 0.1% p.a. on the portion of Policy Account Value in excess of $50mm <br><br> (adjusted for additional premium payments and withdrawals, as applicable) <br><br> *See* Section 9.3 of the Policy. |
| Policy Set-Up Deposit | Upon submission of the completed Annuity Application Form. | N/A |
| Acceptance Fee | Each date the Insurer receives a Premium payment | Zero |
| Taxes | When paid by the Insurer or its affiliate | *See* Section 9.7 of the Policy. |

**CROWN GLOBAL**
INSURANCE

## Table of Contents

General Policy Data ............................................................................................ 3

Initial Allocation of Payments to Investment Options ............................... 4

Policy Fees and Charges .................................................................................. 5

**Article I     General Provisions............................................................15**

Section 1.1     Consideration ............................................................... 15

Section 1.2     Entire Policy................................................................... 15

Section 1.3     Survival of Representations, Warrants, Covenants....... 15

Section 1.4     Amendment or Modification ........................................ 15

Section 1.5     Misstatement of Age .................................................... 15

Section 1.6     Non-Participating Policy .............................................. 16

Section 1.7     Ownership of Assets ..................................................... 16

Section 1.8     Rule of Construction ..................................................... 16

Section 1.9     Governing Law .............................................................. 16

Section 1.10   Effective Date of Coverage.......................................... 16

**Article II    Premium Provisions..........................................................17**

Section 2.1     Premiums ....................................................................... 17

Section 2.2     Insurer's Right to Refuse Premiums ............................. 17

Section 2.3     Nonpayment of Premium .............................................. 18

**Article III   Termination Provisions.....................................................19**

Section 3.1     Insurer's Cancellation Rights ........................................ 19

Section 3.2     Reinstatement ............................................................... 20

**Article IV   Premium Investment; Policy Account Values ...................21**

Section 4.1     The Separate Account .................................................. 21

Section 4.2     Premiums ....................................................................... 21

Section 4.3     Allocations to Investment Options ............................... 21

Section 4.4     Compliance with Investor Control Rules....................... 22

Section 4.5     Changes in Allocations to Investment Options ............ 23

Section 4.6     Responsibility for Selecting Investment Options .......... 23

Section 4.7     Appointment of Investment Manager and Custodian Bank .......... 24

Section 4.8     Timing of Allocations .................................................... 24

Section 4.9     Investment of Separate Account Assets........................ 24

Section 4.10   Request for Extension of Investment Rights  With Respect
                       to Adequate Diversification ......................................... 26

Section 4.11   Changes in Investment Options ................................... 26

**CROWNGLOBAL**
I N S U R A N C E

Section 4.12   Policy Account Value .................................................................. 27

**Article V    Transfers Among Investment Options ...............................................28**
Section 5.1   General ...................................................................................... 28
Section 5.2   Conditions on Transfer ............................................................... 28
Section 5.3   Liability ...................................................................................... 29
Section 5.4   Limits on Right of Transfer ......................................................... 29

**Article VI   Annuity Provisions ...........................................................................30**
Section 6.1   Annuity Payments ...................................................................... 30
Section 6.2   Annuity Percentage .................................................................... 30
Section 6.3   No Guaranteed Payments .......................................................... 30
Section 6.4   Annuity Starting Date ................................................................. 31
Section 6.5   Change of Annuity Starting Date ................................................ 31
Section 6.6   Annuity Income Options ............................................................. 31
Section 6.7   Maturity Payment ...................................................................... 32

**Article VII  Loan Provisions ...............................................................................33**
Section 7.1   Policy Loans .............................................................................. 33

**Article VIII Surrender Provisions .......................................................................34**
Section 8.1   General ...................................................................................... 34
Section 8.2   Full Surrender ............................................................................ 34
Section 8.3   Partial Surrender ........................................................................ 34

**Article IX   Policy Fees and Charges ..................................................................36**
Section 9.1   Policy Administration Fee .......................................................... 36
Section 9.2   DAC Charges ............................................................................. 36
Section 9.3   Management & Expense Fee ...................................................... 36
Section 9.4   Policy Set-Up Deposit ................................................................ 36
Section 9.5   Acceptance Fee ......................................................................... 36
Section 9.6   Surrender Charge ....................................................................... 37
Section 9.7   Taxes ........................................................................................ 37
Section 9.8   Agreed Upon Procedures Fee .................................................... 37
Section 9.9   Deductions for Fees and Charges ............................................... 37
Section 9.10  Custodian Bank and Investment Manager Fees ........................... 37

**Article X    Death Benefit Provisions ..................................................................39**
Section 10.1  Death Benefit ............................................................................ 39
Section 10.2  Due Proof of Death .................................................................... 40



**Article XI  Owner, Beneficiary, Assignment** ......................................................**41**

    Section 11.1   Proposed Policyholder ........................................ 41

    Section 11.2   Change of Proposed Policyholder ....................... 41

    Section 11.3   Proposed Annuitant ............................................ 41

    Section 11.4   Change of Proposed Annuitant .......................... 41

    Section 11.5   Beneficiary ......................................................... 42

    Section 11.6   Change of Beneficiary ........................................ 42

    Section 11.7   Assignment ........................................................ 42

**Article XII Other General Provisions** ................................................................**44**

    Section 12.1   Periodic Reports ................................................ 44

    Section 12.2   Currency and Place of Payment ......................... 44

    Section 12.3   Notices, Requests and Elections ........................ 44

    Section 12.4   Policy Settlement ............................................... 45

    Section 12.5   Deferment ......................................................... 45

    Section 12.6   Incontestability .................................................. 45

    Section 12.7   Policyholder Information ..................................... 46

    Section 12.8   Tax Matters ....................................................... 46

    Section 12.9   Limitation on Liability of Insurer ......................... 47

**019128**



## Definitions

**Acceptance Fee** – The fee deducted by the Insurer as stated in the Policy Data Page and described in Section 9.5.

**Accredited Investor** – An "accredited investor" as defined in Rule 501(a) under Regulation D of the Securities Act.

**Age** –  A Proposed Annuitant or Proposed Joint Annuitant's age on their last birthday.

**Agreed Upon Procedures ("AUP") Fee** – The fee deducted by the Insurer as stated on the Policy Data Page and described in Section 9.8.

**Annuity Application Form** – The annuity application provided by the Insurer as completed and signed by the Proposed Policyholder.

**Annuity Payments** – The benefits payable to the Beneficiary under Section 6.1 of this Policy (each an "Annuity Payment").

**Annuity Starting Date** – The date on which Annuity Payments under Section 6.4 of this Policy commence.

**Beneficiary** – The persons or entities designated as such on the Annuity Application Form, as amended from time to time, by the Proposed Policyholder, who is entitled to receive Annuity Payments under the Policy, and distributions following the death of the Proposed Policyholder as applicable, in accordance with the terms of the Policy.

**Business Day** – Any day on which banks in the U.S. and Bermuda are open for business.

**Claim Date** – The date on which the Insurer receives written notice and due proof of death of the Proposed Annuitant (or the survivor of the Proposed Joint Annuitants) in accordance with Section 10.2 at the Insurer's Home Office.

**Code** – The U.S. Internal Revenue Code of 1986, as amended.

**Confidential Private Placement Memorandum** – The confidential private placement memorandum describing the Policy including all schedules, appendices, attachments,



exhibits, amendments and supplements thereto, as amended and restated from time to time.

**Contestable Period** – The period of time described in Section 12.6 which extends for two (2) years from the Issue Date during the lifetime of the Proposed Annuitant.

**DAC Charges** – The amount deducted by the Insurer as set forth in the Policy Data Page and described in Section 9.2.

**Death Benefit** – The death benefit calculated and payable under the provisions of Article X of this Policy.

**Fees and Charges** – Any applicable fees and charges due under the Policy including, without limitation, the Policy Administration Fee, the DAC Charges, the Management & Expense Fee, the Acceptance Fee, Taxes, and the Agreed Upon Procedures Fee.

**FINMA** – The Swiss Financial Market Supervisory Authority.

**Full Surrender** – A Surrender pursuant to Section 8.2.

**Grace Period** – A period of thirty days following the date on which the Insurer makes available to the Proposed Policyholder information indicating that (i) the Policy Account Value is less than $250,000, or (ii) the Policy Account Value is insufficient to pay the Fees and Charges due under the Policy without the Policy Account Value becoming less than $250,000 following payment of such Fees and Charges.

**Home Office** – The Insurer's office in Hamilton, Bermuda. The Insurer's mailing address is Crown Global Life Insurance Ltd., Canon's Court, 22 Victoria Street, Hamilton HM 12, Bermuda,  email: info@crownglobalinsurance.com,  facsimile: +1-345-945-6121.

**IDF** – An insurance dedicated fund.

**In Force** – A condition that the Policy has not terminated.

**Initial Premium** – The first Premium payment by the Proposed Policyholder as shown on the Policy Data Page.

**Insurance Dedicated Fund** – An Investment Option involving investment in an investment fund generally formed as a limited partnership or limited liability company



(i) which is intended to operate as an insurance dedicated fund (an "IDF") and (ii) investment in which is available only to a U.S. or non-U.S. insurance company that regularly engages in the sale of life insurance policies and annuity policies in the ordinary course of its business and is acquiring interests in the IDF to hold in a Separate Account established in connection with a Policy and not as part of the general assets of the insurance company.

**Insurer** – Crown Global Life Insurance Ltd. The Insurer has elected under Code section 953(d) to be treated as a U.S. domestic corporation for U.S. federal income tax purposes.

**Investment Adviser Act** – The U.S. Investment Adviser Act of 1940, as amended.

**Investment Company Act** – The U.S. Investment Company Act of 1940, as amended.

**Investment Option** – A separate investment option consisting of all or a portion of the assets held in a Separate Account and managed by the investment manager identified therein directly or through an IDF.

**IRS** – The U.S. Internal Revenue Service.

**Issue Date** – The issue date of the Policy as stated on the Policy Data Page.

**Joint Life Annuity** – An annuity issued on the life of two Proposed Annuitants and under which payments continue as long as either Proposed Annuitant is alive.

**Liquid Asset Subaccount** – A Subaccount of the Separate Account, the funds in which are primarily invested in interest-bearing commercial bank accounts.

**Liquidity Date** – The last Business Day of each calendar quarter.

**Managed Subaccount** – An Investment Option where assets held in a Subaccount are managed by an investment manager unrelated to the Insurer.  For the avoidance of doubt, a Managed Subaccount does not include an IDF.

**Management & Expense Fee** – The Management & Expense Fee as stated on the Policy Data Page and described in Section 9.3.



**Minimum Liquid Asset Allocation** – An amount not in excess of the expected annual Fees and Charges related to the Policy that the Insurer may place in the Liquid Asset Subaccount.

**Net Premium** – A Premium payment less applicable Fees and Charges, including, without limitation, the Acceptance Fee set forth on the Policy Data Page and described in Section 9.5.

**Next Available Liquidity Date** – For any specified day, the Liquidity Date on or next following the 100th calendar day following the specified day.

**Partial Surrender** – A Surrender pursuant to Section 8.3.

**Policy** – This Deferred Variable Annuity (DVA) Policy offered by the Insurer.

**Policy Account Value** – The net fair market value of all assets in the Separate Account backing the Policy, less any accrued but unpaid Fees or Charges.

**Policy Administration Fee** – The fee deducted by the Insurer as stated on the Policy Data Page and described in Section 9.1.

**Policy Anniversary** – The anniversary of the Policy Effective Date.

**Policy Data Page** – The pages of this Policy titled "Policy Data Page."  The Insurer will reissue these pages by means of an endorsement whenever the information on the Policy Data Page is amended, in accordance with the Policy.

**Policy Effective Date** – The "Policy Effective Date" of this Policy as stated on the Policy Data Page.

**Policy Set-Up Deposit** – A non-refundable screening deposit due upon submission of the completed Annuity Application Form as stated on the Policy Data Page and described in Section 9.4.

**Policy Year** – Any one year period beginning on the Policy Effective Date or a Policy Anniversary and ending on the day before the next Policy Anniversary.

**Premiums** – The Initial Premium and any subsequent Premiums paid to the Insurer under this Policy.



**Private Act** – The private act entitled "The Scottish Annuity & Life International Insurance Company (Bermuda) Ltd. Consolidation and Amendment Act 2001," as amended and consolidated from time to time.

**Proposed Annuitant** – The individual whose life is used to determine the duration of the period during which the Annuity Payments will be paid by the Insurer.

**Proposed Joint Annuitants** – Each Proposed Annuitant (each being a "Proposed Joint Annuitant") when a second Proposed Annuitant is designated under the Policy and a Joint Life Annuity is selected. Each Proposed Annuitant, including the second Proposed Annuitant, is to generally be designated by the Proposed Policyholder in the Annuity Application Form but may be designated by the Proposed Policyholder after the Issue Date with the consent of the Insurer. The second named Proposed Annuitant shall be designated as the Proposed Joint Annuitant by the Proposed Policyholder in the Annuity Application Form and reflected as such on the Policy Data Page.

**Proposed Policyholder** – Proposed Policyholder means the individual or entity that proposes or is considering the purchase of a Policy pursuant to the Confidential Private Placement Memorandum. This term shall include a person who has become an actual policyholder through the purchase of a Policy or pursuant to a change made pursuant to Section 11.2.

**Qualified Purchaser** – A Qualified Purchaser within the meaning of Section 2(a)(51) of the Investment Company Act.

**SEC** – The U.S. Securities and Exchange Commission.

**Securities Act** – The U.S. Securities Act of 1933, as amended.

**Separate Account** – A separate investment account established by the Insurer for this Policy pursuant to the terms hereof, and Bermuda law (including the Private Act), the assets of which can be used for the sole purpose of paying claims under this Policy. A Separate Account is not a legal entity under Bermuda law and any references to the Separate Account performing any tasks means the Insurer in respect of the Separate Account.

**Single Life Annuity** – An annuity measured by the life of a single Proposed Annuitant.

019133



**Subaccount** – A subaccount established by the Insurer as a bookkeeping entry within the Separate Account.

**Surrender** – A surrender under Article VIII including a Full Surrender under Section 8.2 and a Partial Surrender under Section 8.3.

**Taxes** – The taxes defined in Section 9.7 of this Policy.

**Unscheduled Premium** – Any Premium payment other than the Initial Premium or a Premium scheduled on the Policy Data Page or as set forth in an endorsement or attachment to the Policy.

**U.S. Treasury Regulations** – The U.S. Treasury regulations promulgated under the Code, as amended.



## Article I  General Provisions

### Section 1.1  Consideration

This Policy is issued in consideration of the payment of the Initial Premium.

### Section 1.2  Entire Policy

This Policy, any endorsements or riders, and the Annuity Application Form constitute the entire contract between the Proposed Policyholder and the Insurer. The Proposed Policyholder, on behalf of the Proposed Policyholder, the Proposed Annuitant, and the Beneficiaries represents, acknowledges, and agrees that the Insurer has relied, and is entitled to rely, upon the accuracy of the information and statements made in the Annuity Application Form in deciding to issue this Policy.

### Section 1.3  Survival of Representations, Warrants, Covenants

The representations, warrants, covenants, and other statements made in the Annuity Application Form are incorporated herein by reference and shall survive the execution of this Policy.

### Section 1.4  Amendment or Modification

The Insurer cannot modify the Policy without the Proposed Policyholder's consent, provided that, the Insurer may take any action it deems necessary in order to preserve the U.S. tax treatment of the Policy without the Proposed Policyholder's consent, so long as the Insurer provides 90 days prior notice of any such proposed action to the Proposed Policyholder and discusses with the Proposed Policyholder the legal basis for such change.

### Section 1.5  Misstatement of Age

If the Age of any Proposed Annuitant or Proposed Joint Annuitant is misstated on the Annuity Application Form, the Insurer will adjust the Annuity Payments to reflect the correct Age. Any amount that the Insurer has overpaid as a result of any such misstatement shall be deducted from future Annuity Payments made under the Policy. The Insurer will require due proof of the Age or survival of any person on



whose continued life any payment or benefit under the Policy is dependent. It is the Proposed Policyholder's obligation to provide proof that is satisfactory to the Insurer.

### Section 1.6    Non-Participating Policy

This Policy is non-participating, which means that the Proposed Policyholder will not share in the Insurer's profits or surplus earnings and that the Insurer will not pay dividends on this Policy.

### Section 1.7    Ownership of Assets

Assets held in the Separate Account are the sole property of the Insurer. The Proposed Policyholder will have no direct proprietary interest in the assets held in any separate account, including, without limitation, the Separate Account with respect to this Policy.

### Section 1.8    Rule of Construction

For purposes of this Policy, the period denoted by the phrase "prior to a Liquidity Date" shall include the Liquidity Date.

### Section 1.9    Governing Law

The Policy will be governed by the laws of Bermuda without regard to its conflict of laws principles, including without limitation, the Private Act and the Life Insurance Act, 1978 as may be amended from time to time.

### Section 1.10    Effective Date of Coverage

Coverage of the Proposed Annuitants under this Policy will begin on the Policy Effective Date.



## Article II    Premium Provisions

### Section 2.1    Premiums

The minimum Initial Premium payable under the Policy is $2 million. Such minimum may be met by aggregating Policies having initial Premiums of $1 million each and purchased by the same Proposed Policyholder. The Insurer has not placed a limitation on the maximum amount of Premiums that may be contributed by a Proposed Policyholder. Subject to Section 2.2, additional Premium Payments may be made at any time and from time to time as the Proposed Policyholder's financial situation permits, provided that the minimum additional Premium Payment may not be less than the minimum Unscheduled Premium.

The Initial Premium is due on the Issue Date. Premiums must be paid or mailed from outside the U.S. to the Insurer at its Home Office. Upon request, a receipt will be provided at the Insurer's Home Office (or other non-U.S. jurisdiction designated by the Insurer from time to time).

No Initial Premium or additional Premium payments may be made from the U.S. by any Proposed Policyholder (nor will the same be accepted by the Insurer) if said Proposed Policyholder is in the U.S. at the time the decision to make said Premium payment occurs. Further, the Proposed Policyholder may not direct that a Premium payment be made while the Proposed Policyholder is in the U.S. even if the Premium payment is made from outside the U.S.

Premium payments are generally to be made in U.S. Dollars. The Insurer may, in its sole and absolute discretion, accept certain in-kind asset contributions as Premium payments. The Insurer may reject in-kind asset contributions in its sole and absolute discretion.

### Section 2.2    Insurer's Right to Refuse Premiums

The Insurer reserves the right to refuse Premiums and to return Premiums with interest if such Premiums would adversely affect the U.S. tax consequences the Policy is intended to provide or the tax consequences under the laws of any other applicable jurisdiction.



The Insurer reserves the right not to accept any Premium payments from a Proposed Policyholder who ceases to be a Qualified Purchaser or an Accredited Investor. The Insurer may require any Proposed Policyholder to provide confirmation of the Proposed Policyholder's status as a Qualified Purchaser or an Accredited Investor before accepting any additional Premium payments. However, subject to any other limitation set forth in this Section 2.2, Premium payments during a Policy Year that do not exceed the sum of expected Fees and Charges under the Policy for the Policy Year will be accepted.

**Section 2.3      Nonpayment of Premium**

If no Premiums are paid after the Initial Premium, the Policy will continue In Force as long as the Policy Account Value is sufficient to pay any applicable Fees and Charges and, following the payment of such Fees and Charges, the Policy Account Value is $500,000 or more.



## Article III    Termination Provisions

### Section 3.1    Insurer's Cancellation Rights

The Insurer may, in its sole and absolute discretion, cancel the Policy and distribute the Policy Account Value to the Proposed Policyholder if:

1. The Policy Account Value is less than $250,000 at the end of any calendar quarter prior to the Annuity Starting Date but following the Insurer's acceptance of the Initial Premium payment, notwithstanding any potential negative tax consequences to the Proposed Policyholder or any other person or entity; or

2. The continuing existence of the Policy would require the Insurer, the Policy or the Separate Account backing the Policy to register, or make information filings, with the SEC under the Securities Act, the U.S. Investment Company Act, the U.S. Investment Adviser Act, each as amended from time to time, or the securities laws of any jurisdiction in which the Insurer, the Policy or the Separate Account is not currently registered or required to make information filings; or

3. The Proposed Policyholder or the Proposed Annuitant (or any Proposed Joint Annuitant) changes his or her country of residence for tax, securities regulation, or other purposes; or

4. Subject to the provisions of section 12.6 of the Policy, any declaration in the Annuity Application Form is not exact, truthful, and complete in all material respects; or

5. If the Proposed Policyholder fails to comply with the terms of any of the covenants or declarations made in the Annuity Application Form.

Prior to the Policy termination, the Insurer will provide 90 day notice of such termination to the Proposed Policyholder, which notice shall include the reason for such termination.  The Insurer will pay to the Proposed Policyholder the amount, if any, of the Policy Account Value determined as of the Next Available Liquidity Date. Surrender charges will not apply.



**Section 3.2      Reinstatement**

If the Policy terminates as the result of the expiration of a Grace Period, it may not be
reinstated unless reinstatement is required by Bermuda law.

019140



## Article IV    Premium Investment; Policy Account Values

**Section 4.1    The Separate Account**

The Insurer will establish a Separate Account pursuant to the terms of the Private Act to hold assets that fund obligations arising under each Policy issued by it together with any supplementary contracts hereunder and certain other funds. Income, gains, or losses of each Separate Account are credited to or charged against the assets held in such Separate Account, without regard to other income, gains, or losses of any other Separate Account or business of the Insurer. Under the terms of this Policy and the laws of Bermuda, assets allocated or credited to each Separate Account are the property of the Insurer and the Proposed Policyholder has no direct proprietary interest in such assets.

**Section 4.2    Premiums**

Net Premiums received by the Insurer with respect to the Policy will be credited to the related Separate Account. To the extent that Premiums are insufficient to pay all Fees and Charges due to the Insurer under the Policy, the Insurer will deduct Fees and Charges from the Separate Account.

Amounts payable to the Proposed Policyholder or any Beneficiary under the Policy will be made by the Insurer from the related Separate Account to the Proposed Policyholder or Beneficiary in accordance with the terms of this Policy. The Insurer will establish Subaccounts within the Separate Account for each Investment Option selected by the Proposed Policyholder. Each Subaccount will correspond to an Investment Option. The Insurer may from time to time change the Investment Options and investment managers available to Proposed Policyholders, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer's investment management or similar agreement with such investment manager).

**Section 4.3    Allocations to Investment Options**

On the Annuity Application Form, the Proposed Policyholder will designate the initial allocation of Net Premiums among the available Investment Options and on each Liquidity Date a Proposed Policyholder's Net Premiums will be allocated among the



Investment Options according to the allocation percentages selected. Allocation percentages must be zero or a whole number not less than ten nor greater than 100. The sum of the allocation percentages must equal 100. The Insurer will document the initial allocation on the Policy Data Page. The Insurer has reserved the right to require allocation of an amount equal to the expected aggregate quarterly Fees and Charges related to the Policy to the Liquid Asset Subaccount before application of the allocation percentages designated by the Proposed Policyholder. In addition, the Insurer may transfer amounts from other Investment Options and Subaccounts to the Liquid Asset Subaccount equal to the expected quarterly Fees and Charges.

The specific Investment Options can generally be divided into two categories:  IDFs and Managed Subaccounts. The Insurer is not obligated to offer both IDFs and Managed Subaccounts as Investment Options at any time. Accordingly, at any given time only one of these types of Investment Options may be available.

The Insurer and its affiliates make no recommendations, and provide no investment advice, as to the selection of, and allocations to, Investment Options. The Insurer has not evaluated any of the investment manager's investment performance and makes no recommendation regarding the selection of any investment manager or any IDF. The Insurer does not act as a custodian of cash or investments held in the Separate Account.

**Section 4.4      Compliance with Investor Control Rules**

The Proposed Policyholder agrees that, except for the selection of the allocation of Separate Account assets among Investment Options as contemplated in Section 4.3, and changes to such allocations as contemplated in Section 4.5, it will not select, identify or recommend, nor will it contact any investment manager for the purpose of influencing, any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount, including, without limitation, an investment manager with respect to an IDF in which funds held in a particular Subaccount are invested.

A Proposed Policyholder may not have direct contact or communicate with the investment manager of either an IDF or a Managed Subaccount and may not directly participate in the management of the Separate Account or any IDF or Managed Subaccount.



### Section 4.5      Changes in Allocations to Investment Options

The Proposed Policyholder may, at quarterly intervals, reallocate funds among then available Investment Options but may do so no more than twice per calendar year. If a change in allocation percentages requires a transfer of funds between Investment Options, there may be a delay after the Separate Account receives the proceeds from one Investment Option until the next date on which it is possible to reinvest the funds in a different Investment Option. During this delay period (which may be up to one calendar quarter), funds will be invested in the Liquid Asset Subaccount. The Proposed Policyholder acknowledges that this delay may result in the funds having a lower return for this period.

In the event of such a delay, the funds from the liquidated investments will be invested in the Liquid Asset Subaccount until the next Liquidity Date at which time the funds will be re-allocated (together with any related earnings) to the applicable Subaccount originally designated by the Proposed Policyholder for the transfer.

Unless and until the Proposed Policyholder notifies the Insurer in writing of a new Net Premium allocation, the Net Premium allocations as specified in "Initial Allocation of Payment to Investment Options" on the Policy Data Page will continue to apply to any additional Premium payments.

### Section 4.6      Responsibility for Selecting Investment Options

The Insurer does not and will not make any recommendation as to the Proposed Policyholder's selection or retention of investment managers, allocation of assets among Subaccounts, Investment Options, or investments in particular securities or categories of securities, nor will it evaluate the investment performance of any investment manager. Inclusion of an Investment Option shall not be deemed to be a recommendation of that investment or as an indication that such an investment is suitable for the Proposed Policyholder.

Each Proposed Policyholder acknowledges, represents, warrants, and covenants that it is solely responsible for determining for themselves whether a particular Investment Option is suitable in light of their individual situations. The Insurer and its affiliates make no recommendations, and provide no advice, as to the selection of Investment Options and provide no warranty, representation, or indemnity with respect to the



performance of any Investment Option. Each Proposed Policyholder should consult his or her personal financial advisor concerning Premium allocations.

### Section 4.7    Appointment of Investment Manager and Custodian Bank

The Insurer shall have the right, exercisable in its sole and absolute discretion, to appoint, change, or remove the investment manager and custodian bank with respect to each Investment Option or Separate Account, provided that an investment manager shall only be removed for cause (as described in the Insurer's investment management or similar agreement with such investment manager).  A Proposed Policyholder may recommend to the Insurer one or more investment managers or custodian banks who meet the Insurer's general requirements after the initial policy date, but the Insurer may accept or reject such recommendation in its sole and absolute discretion.

### Section 4.8    Timing of Allocations

The Insurer will allocate the Proposed Policyholder's Net Premiums among one or more Investment Options in the percentages specified on the Policy Data Page, as amended from time to time at the written request of the Proposed Policyholder, within two business days  following the date the Insurer receives the Net Premiums. Net Premiums received and which are to be allocated to an Investment Option will be initially invested in the Liquid Asset Subaccount and subsequently allocated (together with any related earnings) within two business days to the applicable Investment Option (subject to deferral due to liquidity constraints imposed by the applicable investment manager or IDF and subject to such provisions as to valuation and unit calculation as may be specified by the applicable investment manager).

### Section 4.9    Investment of Separate Account Assets

The Insurer will require each investment manager with respect to a portfolio of an IDF or Managed Account held in the Separate Account and the investment manager of each investment fund or other investment fund in which the assets of the Separate Account are invested, to comply with the following:

1.    Investment of assets held in each Subaccount will be sufficiently diversified to comply with the requirements of U.S. Treasury Regulation section 1.817-5(b). Assets of any investment fund relying upon a "look-through" basis for purposes



of meeting such diversification requirements will themselves be sufficiently diversified so as to allow the Subaccount to comply with such requirements.

2.      The investment manager and its employees who are responsible for investment decisions will not accept investment recommendations or make any investment decisions regarding the direct or indirect investment of Separate Account assets based, in whole or in part, on information regarding any investment or group of investments received from any Proposed Policyholder or any representative or adviser of a Proposed Policyholder.

3.      No Proposed Policyholder (or any representative or adviser of a Proposed Policyholder) will have the right or be permitted to select or identify any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount.

4.      The investment manager will not commit to invest assets of any Subaccount (or of any underlying investment fund or Managed Account in which a Subaccount has invested directly or indirectly) in mutual funds or other collective investment funds or publicly available investment products (including, without limitation, market-linked deposits and flexible deposits) managed, advised and/or distributed by the investment manager or its affiliates and will only do so if (a) in the investment manager's sole judgment at the time the investment is made, such fund or product is appropriate within the investment objectives and policies of the Subaccount fund or Managed Account and (b) no more than 55% of the assets on an initial purchase basis (excluding market value increases) of the Subaccount fund or Managed Account are invested in such funds or products at any time. Subject to the foregoing, for the avoidance of doubt, assets may be invested in an IDF.

5.      In accordance with Section 4.4, except for general descriptions of the investment policies of the Investment Options, there will not be any direct or indirect prearrangement, plan or agreement between any Proposed Policyholder (or any Proposed Policyholder's advisers or representatives) and the investment manager (or any of its employees) regarding the investments to be made directly or indirectly by any Subaccount.



**Section 4.10     Request for Extension of Investment Rights With Respect to Adequate Diversification**

A Proposed Policyholder may make a request for an extension of the Proposed Policyholder's investment rights described in Section 4.4 and partial or complete release of the investment manager's obligations in Section 4.9 to adequately diversify the assets held in the Separate Account by delivering a written request to the Insurer's Home Office expressing a specific desire for the same. The Insurer may grant or deny such requests in its sole and absolute discretion, for any reason or for no reason whatsoever. Any such request must be approved by the Insurer in writing (and, in the case of an IDF, may also require the consent of the IDF). Absent written approval of the request, the request shall be deemed to have been denied.

The Insurer expresses no opinion and makes no representations or warranties regarding the tax consequences under the laws of the U.S. or any other jurisdiction of the Insurer's decision to grant such requests. By making such a request, a Proposed Policyholder waives any claim against the Insurer, its shareholders, directors, officers, employees, agents or affiliates on behalf of the Proposed Policyholder, any Beneficiaries or any other person for any loss from the Insurer's decision to grant or deny the Proposed Policyholder's request and agrees to hold harmless hereunder the Insurer and its shareholders, directors, officers, employees, agents or affiliates for any such loss.

**Section 4.11     Changes in Investment Options**

The Insurer at any time may add additional Investment Options, remove or restrict existing Investment Options, or add or eliminate an investment manager subject to any required regulatory approval, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer's investment management or similar agreement with such investment manager). If an Investment Option is removed or restricted or an investment manager is terminated, the Insurer may eliminate the Investment Option as an option for future Premium payments or transfers and may also transfer funds from the Subaccount in which assets invested in the terminated Investment Option were held, to the Liquid Asset Subaccount. An affected Proposed Policyholder may submit instructions to adjust the allocation of Net Premiums among the remaining Investment Options, without charge, for a period of 60 days following receipt of the Insurer's notice of any

019146



such termination. The Insurer will implement those instructions on the Next Available Liquidity Date after receipt.

**Section 4.12    Policy Account Value**

The Policy Account Value is equal to the net fair market value of all assets in the Separate Account backing the Policy, less any accrued but unpaid fees or expenses. The Insurer will determine the Policy Account Value on each Liquidity Date. The Separate Account value will increase or decrease, depending upon the investment experience of the related Subaccounts.

Assets allocated or credited to a Separate Account may be commingled with assets allocated or credited to another Separate Account for purposes of investment. In such circumstances, the Insurer may determine the Policy Account Value of each such Separate Account by the use of accumulation units, which are calculated separately with respect to each commingled investment. The accumulation unit value for each commingled investment will vary to reflect the investment experience of the assets invested therein.

The value of an accumulation unit will be determined on each Liquidity Date. When a commingled investment is made, the Insurer will credit the Separate Account with a number of accumulation units determined by dividing the amount of the investment by the value of the accumulation unit. When assets allocated or credited to a Separate Account are withdrawn from an investment, the accumulation units are reduced.



## Article V    Transfers Among Investment Options

**Section 5.1    General**

The Proposed Policyholder may request one transfer among Investment Options per calendar quarter, but no more than twice per calendar year.

**Section 5.2    Conditions on Transfer**

To effect any transfer, the Proposed Policyholder must submit a transfer request to the Insurer. All transfers are subject to the following conditions:

1.    Any applicable Fees and Charges will be deducted from the Subaccount or from the amount which is transferred.

2.    Transfers will be effected within 60 days following receipt by the Insurer of a transfer request. Actual settlement of a disposition or redemption from the relevant Subaccount, and reinvestment of the proceeds may be delayed as described below.

3.    Any transfer request must clearly specify: (a) the amount which is to be transferred; and (b) the Subaccounts which are to be affected.

4.    Payments to effect a transfer are subject to the disbursement rules and restrictions of the Subaccount(s).

5.    The minimum amount that may be transferred in a single transfer will be the lesser of $250,000 or the entire interest in a Subaccount.

6.    No transfer may be made from the Liquid Asset Subaccount if the amount remaining therein would not equal or exceed the Minimum Liquid Asset Allocation.

7.    In the case of an IDF, any additional conditions set forth in the governing documents in the IDF must be satisfied.



### Section 5.3      Liability

Neither the Insurer nor any of the Insurer's affiliates will be liable for any losses incurred as a result of transfers made in accordance with a Proposed Policyholder's transfer request including lower returns which may result.

### Section 5.4      Limits on Right of Transfer

The Insurer may in its sole and absolute discretion defer the right of transfer for any period when it reasonably determines that additional time is necessary to obtain sufficient cash to make the transfer payments. Additional limitations on transfer may be imposed under the terms of any IDF in which assets held in a Separate Account are invested.  For the avoidance of doubt, a transfer described in this Section 5.4 is a situation where a change from one Investment Option to another Investment Option occurs.



## Article VI    Annuity Provisions

### Section 6.1    Annuity Payments

The Insurer will make periodic payments to the Beneficiaries beginning on the Annuity Starting Date and continuing thereafter on each Policy Anniversary to an account located outside the U.S. The amount of each Annuity Payment will equal the product of the applicable Annuity Percentage and the Policy Account Value (determined as of the end of the calendar quarter immediately preceding each Annuity Payment) and will vary depending upon the investment experience of the Investment Options in which the Separate Account assets are invested and the age of the Proposed Annuitant.

### Section 6.2    Annuity Percentage

The Annuity Percentages are listed in the Appendix I to this Policy. The applicable Annuity Percentage will, depend upon the benefit option selected by the Policyholder. In the case of a Single Life Annuity, the Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants. The Annuity Percentage is adjusted for each Annuity Payment.

### Section 6.3    No Guaranteed Payments

The Policy Account Value, and thus, the Annuity Payments may increase or decrease depending upon the investment experience of the Investment Options selected by the Proposed Policyholder. The sole source for the payment of the Annuity Payments are the assets held in the Separate Account backing the Policy. The Policy does not provide for guaranteed annuity or death benefits. All payments, including upon the death of the Proposed Policyholder or Proposed Annuitant (or Proposed Joint Annuitants) are strictly limited to the assets held in the Separate Account backing the Policy and no Annuity Payments or any other payments under the Policy are payable from any other source.



### Section 6.4    Annuity Starting Date

The Annuity Starting Date must be on the first day of a calendar quarter and may not be later than the first day of the calendar quarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant's or surviving Proposed Joint Annuitant's) eighty-fifth (85th) birthday. If the Proposed Policyholder has not chosen an Annuity Starting Date, then the first day of the calendar quarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant's or surviving Proposed Joint Annuitant's) eighty- fifth (85th) birthday shall be the Annuity Starting Date.

### Section 6.5    Change of Annuity Starting Date

The Proposed Policyholder may change the Annuity Starting Date prior to the then current Annuity Starting Date by delivering a written notice to the Insurer. The new Annuity Starting Date may not be before the Next Available Liquidity Date for any Investment Option under the Policy as of the date the Insurer receives the notice from the Proposed Policyholder, and may not be later than the first day of the calendar month following the Proposed Annuitant's 85th birthday. Distributions must commence after the Annuity Starting Date in accordance with requirements under the Code.

### Section 6.6    Annuity Income Options

Two (2) basic benefit options are offered under the Policy: (i) a Single Life Annuity, and (ii) a Joint Life Annuity. The benefit option may be changed by the Proposed Policyholder; however, no such change may be made at any time on or after the Annuity Starting Date. A Policyholder may change the selection of any benefit option by giving the Insurer at least thirty (30) calendar days' written notice prior to the Annuity Starting Date from outside the U.S.

In the case of a Single Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants.

Under both basic benefit options, the amount of each annual Annuity Payment made on or after the Annuity Starting Date will vary in accordance with the age of the Proposed Annuitant (or Proposed Joint Annuitant(s)) and the investment performance of the assets held in the Separate Account and shall be computed by the Insurer's



actuary each year (and recomputed on the annual anniversary date each year thereafter) by multiplying the applicable Annuity Percentage in the Annuity Percentage Table attached as Appendix I to this Policy by the then current Policy Account Value as of the Annuity Starting Date and predetermined on the annual anniversary date each year thereafter. If the Policy Account Value is zero, then all payments will cease.  All Annuity Payments shall be made to an account outside the U.S. The Insurer may consider the adoption of additional benefit options at the request of a Proposed Policyholder.

**Section 6.7      Maturity Payment**

Upon the death of the Proposed Annuitant (or survivor of the Proposed Joint Annuitants), the Insurer will pay to the Beneficiaries, or their successors as Beneficiaries, as the case may be, the balance of the Policy Account Value.

019152



## Article VII    Loan Provisions

**Section 7.1    Policy Loans**

The Proposed Policyholder shall have no guaranteed rights or privileges with respect to loans under a Policy. The Insurer may, in its sole and absolute discretion consider whether to facilitate a Proposed Policyholder's request to pledge a Policy as collateral security for a loan to be made by the Insurer or institutional or other third party lenders. A pledge of a Policy as collateral security for a loan may be effected only with the prior written consent of the Insurer, which may be granted or denied in the Insurer's sole and absolute discretion.



# Article VIII    Surrender Provisions

### Section 8.1    General

At any time after the Issue Date and prior to the Annuity Starting Date, the Proposed Policyholder may request one or more withdrawals under the Policy from the Separate Account in the form of a Partial Surrender. Withdrawals are possible up to 100% of the Policy Account Value. Should the Policy Account Value be equal to or less than $250,000, the Policy will lapse. The rights of a Proposed Policyholder to make a Surrender under the Policy shall be subject to the consent of all Beneficiaries who have been irrevocably designated by the Proposed Policyholder under the Policy. Subject to this Article VIII, the Proposed Policyholder may Surrender the Policy, in whole or in part, by filing a written request with the Insurer at the Insurer's Home Office at any time during the lifetime of the Proposed Annuitant. The Policy Account Value which is the subject of the Surrender will be determined as of the Next Available Liquidity Date occurring after the Insurer receives the request to Surrender.

Although the amount of the Surrender proceeds will be determined as of the Next Available Liquidity Date after receipt of the Surrender request, the Insurer will use reasonable efforts to pay Surrender proceeds as soon as practicable whether on a Liquidity Date or another date (subject to such liquidity constraints and provisions as to valuation and unit calculation as may be specified by the investment manager of the applicable Investment Option).

### Section 8.2    Full Surrender

If the Proposed Policyholder requests a Full Surrender of the Policy Account Value of the Policy, the Policy will terminate on the date the Proposed Policyholder submits its Surrender request in accordance with Section 12.3.

### Section 8.3    Partial Surrender

The Proposed Policyholder may request a Partial Surrender of the Policy for up to and including 90% of the Policy Account Value of the Policy. No more than one Partial Surrender may be requested by the Proposed Policyholder during each quarter of a Policy Year. As provided in Section 3.1, any Partial Surrender that causes the Policy Account Value to be reduced to an amount that is less than



$250,000 may be deemed by the Insurer to be a request for Full Surrender and if so deemed will cause the Policy to be terminated, notwithstanding any potential negative tax consequences to the Proposed Policyholder or any other person or entity. If the Policy Account Value is reduced to an amount that is less than $250,000, then the Insurer shall have the right, exercisable in its sole and absolute discretion, to treat a Partial Surrender request as a Full Surrender request.

Each Partial Surrender will reduce the Policy Account Value and the amount of any Annuity Payment to be paid after the Annuity Starting Date. An amendment to the Policy will be sent to the Proposed Policyholder outside the U.S. for countersignature upon any request for a Partial Surrender under the Policy. Said amendment shall become a part of the Policy.



# Article IX    Policy Fees and Charges

### Section 9.1    Policy Administration Fee

The Insurer will deduct the Policy Administration Fee from the Separate Account as set forth in the Policy Data Page for general administrative expenses.

### Section 9.2    DAC Charges

The amount deducted by the Insurer as set forth on the Policy Data Page to pay for the costs imposed by virtue of the treatment of certain deferred acquisition costs for U.S. federal income tax purposes under section 848 of the Code. The amount of the DAC Charge as set forth on the Policy Data Page shall be adjusted to reflect any change in the applicable U.S. federal income tax rate.  The Insurer shall provide the Proposed Policyholder notice of any change in the DAC Charge.

### Section 9.3    Management & Expense Fee

The Insurer will deduct the Management & Expense Fee from the Separate Account. The Management & Expense Fee is an on-going insurance administration fee described on the Policy Data Page.

### Section 9.4    Policy Set-Up Deposit

The Policy Set-Up Deposit is due to the Insurer as set forth on the Policy Data Page upon submission of the completed Annuity Application Form by the Proposed Policyholder. The Policy Set-Up Deposit will be paid into the General Account of the Insurer.  Upon issuing the Policy, an amount equal to the Policy Set-Up Deposit will be used to offset the Acceptance Fee.  If for any reason, a Policy is not issued, the Insurer will retain the Policy Set-Up Deposit to cover medical, underwriting, administration and any other costs incurred by the Insurer in the processing of the application.

### Section 9.5    Acceptance Fee

The Insurer will deduct the Acceptance Fee set forth in the Policy Data Page on each date the Insurer receives a Premium payment.

019156



### Section 9.6    Surrender Charge

Surrender charges will not apply to this Policy.

### Section 9.7    Taxes

The Insurer will deduct only those Taxes (as defined below) paid by the Insurer or its affiliates to any governmental entity that relate to the Policy or the related Separate Account.  These taxes (the "Taxes") exclusively include withholding taxes, excise taxes, sales taxes, stamp taxes, value added taxes, state taxes imposed on the Insurer or its affiliates, and taxes imposed on Subpart F income of a Separate Account attributable to its investment in a controlled foreign corporation, as well as the deferred tax amount and any interest charge or other taxes imposed on the investments of a Separate Account in a passive foreign investment company, or under the corresponding tax laws of other jurisdictions.

The Insurer may, in its sole and absolute discretion, pay Taxes when due and deduct such amounts from the Separate Account at a later date. The Insurer will, in its absolute discretion, determine when Taxes have resulted from the investment experience of any Subaccount or receipt by the Insurer of Premiums.

### Section 9.8    Agreed Upon Procedures Fee

The Insurer will deduct the Agreed Upon Procedures Fee from the Separate Account if the Proposed Policyholder instructs the Insurer to engage a third party audit firm to review charges and provide an Agreed Upon Procedures (AUP) report.

### Section 9.9    Deductions for Fees and Charges

The Fees and Charges are paid to the Insurer under the Policy initially by making deductions from Premiums and then by making deductions from the Separate Account. To the extent that the Insurer deducts Fees and Charges from the Separate Account, amounts will be deducted first from the Liquid Asset Subaccount and then from the Subaccounts pursuant to the terms of the Policy.

### Section 9.10    Custodian Bank and Investment Manager Fees

Each custodian bank and investment manager will separately deduct any applicable fees charged by it from any Separate Account or Investment Option for which it is acting as custodian or investment manager, as the case may be. The fees of the



custodian bank and investment manager are calculated on an individual basis and may vary depending upon the investment manager and Investment Option(s) selected by the Proposed Policyholder. The list of investment managers and custodians retained by the Insurer is available from the Insurer upon request.



# Article X    Death Benefit Provisions

**Section 10.1    Death Benefit**

If all Beneficiaries and any alternative Beneficiaries predecease the Proposed Policyholder and Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected), then the benefits payable under the Policy to the Beneficiaries or alternative Beneficiaries shall be paid to the Proposed Policyholder until the first to die of the Proposed Policyholder or Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected).

If none of the Beneficiaries or alternative Beneficiaries survives the Proposed Annuitant(s), then the Policy Account Value shall be paid to the Proposed Policyholder upon the Proposed Annuitant's death (or survivor of the Proposed Joint Annuitants' death, in the case where a Joint Life Annuity benefit option is selected).

If the Proposed Policyholder is not living at the time any benefit under the Policy is payable to the Proposed Policyholder, then such benefit shall be paid to the Proposed Policyholder's estate, if then open, or if not then to his heirs *per stirpes*, in accordance with the laws of succession in the jurisdiction of the Proposed Policyholder's last known domicile on the date of the Proposed Policyholder's death.

If the Proposed Policyholder is not an individual, then the Proposed Annuitant (or the younger of the Proposed Joint Annuitants or the survivor of the Proposed Joint Annuitants) shall be recognized as the "primary Proposed Annuitant" and treated as the Proposed Policyholder of the Policy. Any change in the designation of such Proposed Annuitant (or Proposed Joint Annuitant) following the Issue Date (in the case where the Proposed Policyholder is not an individual) shall be treated as the death of the Proposed Policyholder.

If the Proposed Policyholder dies prior to the "annuity starting date" (defined under Code Section 72(c)(4) as the first day of the first period for which an amount is received as an annuity under the contract; such definition possibly differing from the Annuity Starting Date designated under the Policy), then the Proposed Policyholder's entire interest in the Policy shall be distributed to the Beneficiaries within five (5) years from the date of the Proposed Policyholder's death, unless the Beneficiaries

019159



elect to receive such interest in distributions made over their life or lives (or over a period not extending beyond their respective life expectancies), and such distributions begin within one (1) year from the date of the Proposed Policyholder's death. Any such election must be made in writing and received by the Insurer at the Insurer's Home Office within 180 calendar days from the date of the Proposed Policyholder's death.

If the Proposed Policyholder dies on or after the "annuity starting date" (as defined under Code Section 72(c)(4)) and before the entire interest in the Policy has been distributed, the remaining portion of the Policy Account Value shall be distributed to the Beneficiaries at least as rapidly as under the method of distributions being used as of the date of the Proposed Policyholder's death.

Notwithstanding any provision of the Policy, all Death Benefits must be distributed in compliance with the provision of section 72(s) of the Code. Death Benefits payable hereunder will be includible in the gross income of the Beneficiary.

### Section 10.2    Due Proof of Death

Due proof of death is one of the following received at the Insurer's Home Office in a form satisfactory to the Insurer in its absolute discretion:

1.    A certified copy of a death certificate;

2.    A certified copy of a decree of a court of competent jurisdiction as to the finding of death; or

3.    Any other proof of death satisfactory to the Insurer.

019160



## Article XI    Owner, Beneficiary, Assignment

**Section 11.1    Proposed Policyholder**

The Proposed Policyholder is the person so named on the Policy Data Page or his or her assignee in accordance with a valid assignment as provided in Section 11.2.

Under Bermuda law, the Proposed Policyholder or his personal representative, trustee in bankruptcy or legal assignee will be the owner of the rights to payments under the Policy. While the Proposed Policyholder is alive, all rights in the Policy belong to the Proposed Policyholder and may be exercised without the consent of any Beneficiary, provided that, once an irrevocable designation of Beneficiary is filed, changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary. All of the Proposed Policyholder's rights in the Policy belong to the estate of the Proposed Policyholder if the Proposed Policyholder dies before the Proposed Annuitant. Joint ownership is permitted.

**Section 11.2    Change of Proposed Policyholder**

The Proposed Policyholder may change the ownership of the Policy by submitting a request to the Insurer's Home Office and obtaining written approval of the Insurer. Any approved change will take effect on the date specified in the approval.

**Section 11.3    Proposed Annuitant**

The Proposed Policyholder has the right to designate one Proposed Annuitant or two Proposed Joint Annuitants. The Proposed Annuitants or Proposed Joint Annuitants will be as stated in the Annuity Application Form, unless otherwise endorsed at issue or subsequently changed.

**Section 11.4    Change of Proposed Annuitant**

Each Proposed Policyholder will have the right to designate and in some cases change the Proposed Annuitant or Proposed Joint Annuitant.



### Section 11.5     Beneficiary

The Proposed Policyholder shall initially designate one or more Beneficiaries on the Policy Data Page. All designations of Beneficiaries are revocable unless specified as irrevocable by the Proposed Policyholder. Once an irrevocable designation of Beneficiary is filed, any changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary under the Policy.

### Section 11.6     Change of Beneficiary

Except in the case of an irrevocable Beneficiary, the Proposed Policyholder may change the Beneficiaries by filing a written request from outside the U.S. with the Insurer at its Home Office at any time prior to the Annuity Starting Date. In the case of an irrevocable Beneficiary, the consent of the irrevocable Beneficiary to the change is also required. The change will take effect as of the date the notice is received by the Insurer subject to any payment made or action taken by the Insurer before the Insurer receives the document at its Home Office. A new Beneficiary designation will automatically revoke all prior designations (except an irrevocable Beneficiary designation where the consent of the irrevocable Beneficiary has not been obtained). The Insurer will not be liable for any payment made or action taken before the effective date of the change of Beneficiary.

### Section 11.7     Assignment

The Proposed Policyholder may transfer, assign, or pledge the Policy or any of their rights under the Policy, including a Section 1035 exchange of the Policy with another carrier, without the prior written consent of the Insurer, provided that the Policy may not be assigned unless (i) it is registered under the U.S. federal securities and/or state securities laws or the securities laws of any other jurisdiction unless such registration is not required or an exemption from registration is available and (ii) the assignee is a Qualified Purchaser and Accredited Investor. The Insurer may require satisfactory evidence as to the non-applicability of any such registration requirement or the availability of an exemption from any applicable registration requirement and the Insurer may in its discretion for this purpose request, at the transferor's expense, a favourable legal opinion from transferor's counsel that the provisions of this Section 11.7 have been met.

019162



The Insurer represents and warrants that, subject to the foregoing, it will fully cooperate with any assignment, transfer or exchange, including a "1035" exchange of the Policy with another carrier and will cooperate to exchange underlying IDFs or sub-accounts with such carrier.  Failure by the Insurer to cooperate with the Proposed Policyholder in a proposed 1035 exchange or other transfer, assignment, or pledge of the Policy or any of the Proposed Policyholder's rights under the Policy, such failure to cooperate as determined by a final judgement in a Bermuda court or other court of relevant jurisdiction, among any other injunctive or other relief resulting therefrom, will result in liquidated damages to the Proposed Policyholder equal to the sum of the (a) then Policy Account Value and (b) any fees or charges, including Management and Expense Fees, accruing during the period that the non-cooperation (as determined by the a Bermuda court or other court of relevant jurisdiction) exists and is continuing, and the Insurer shall be strictly liable for payment of such amount to the Proposed Policyholder.  For the avoidance of doubt, the Proposed Policyholder shall be entitled to its Policy Account Value separate from the liquidated damages amount provided for herein.   The Proposed Policyholder (x) acknowledges that the Insurer's ordinary and customary process for 1035 exchanges includes obtaining satisfactory assurance from the transferor of compliance with relevant tax and disclosure laws with respect to the Policy and indemnification from the new carrier regarding any tax obligations relating to the Policy  and (y) agrees that following the Insurer's 1035 exchange process will not be considered to be a failure to cooperate by the Insurer.



## Article XII    Other General Provisions

### Section 12.1    Periodic Reports

The Insurer will make available to the Proposed Policyholder, for every calendar quarter or portion thereof during which the Policy is In Force, a report that shows activity in the Proposed Policyholder's Separate Account. The Proposed Policyholder expressly authorizes the Insurer to rely upon the information or valuations provided by the selected investment manager and custodian without further inquiry or verification of any kind, nature, or description. Each quarterly statement will set forth the Policy Account Value less applicable expenses and charges at the beginning and end of the reporting period and aggregate adjustments to the same throughout. These quarterly statements shall be made available to the Proposed Policyholder at the Insurer's Home Office. The Insurer will forward annual Separate Account statements to an address of the Proposed Policyholder outside of the U.S. if a request to do so is made by the Proposed Policyholder in writing and delivered to the Insurer's Home Office.

### Section 12.2    Currency and Place of Payment

All transactions between the Proposed Policyholder and the Insurer will be made in U.S. dollars unless otherwise confirmed by the Insurer in writing. All Payments will be made outside the U.S.

### Section 12.3    Notices, Requests and Elections

To be effective, all notices, requests, and elections the Proposed Policyholder makes under the Policy must be in writing, signed by the Proposed Policyholder or sent electronically or via facsimile by the Proposed Policyholder and received by the Insurer. Unless otherwise provided, all notices, requests and elections will be effective when received by the Insurer. Notices, requests and elections may be made by the Proposed Policyholder under the Policy in writing, signed by the Policyholder, sent by facsimile or electronic communication and received by the Insurer at its Home Office or administrative office, provided that the Insurer will not be liable for following instructions communicated by facsimile or electronically and, provided further that acceptance of facsimile or electronic communication by the Insurer will not impose any requirement on the Insurer to employ any procedures to confirm that instructions

019164



received by facsimile communication are genuine. Any notice or report required to be given by the Insurer to the Proposed Policyholder or any other person will be deemed given when sent to such person or such person's authorized representative.

**Section 12.4    Policy Settlement**

Prior to any payment of a Death Benefit, due certified proof of death must be submitted to the Insurer.

**Section 12.5    Deferment**

The Insurer will execute allowable requests for a transfer, Full Surrender or Partial Surrender by the Proposed Policyholder within 60 days of a request. Such requests may require conversion of certain Investment Option assets to cash or in-kind distributions, where possible. This may take longer than 60 days for a variety of reasons, including underlying restrictions on redemptions of assets held pursuant to an Investment Option. In such cases, the Insurer will take reasonable steps to comply with such requests at the earliest time possible.  The foregoing will be subject to time restrictions within the Insurance Dedicated Fund purchased by a Subaccount.

**Section 12.6    Incontestability**

Except as expressly provided in the Policy, the Insurer will not contest the validity of the Policy for misstatement, misrepresentation or non-disclosure after the Policy has been In Force for two years from the Issue Date during the lifetime of the Proposed Annuitant. The Policy will be voidable in the event of fraud at any time. If the validity of the Policy is so contested, then (1) the Insurer's obligation to pay Annuity Payments under the Policy will terminate as of the date the Insurer discovers such misstatement, misrepresentation or non-disclosure, and (2) the Policy Account Value will be determined as of the Next Available Liquidity Date occurring after the Insurer discovers such misstatement, misrepresentation or non-disclosure and returned to the Proposed Policyholder or the Beneficiaries within 90 days. The Insurer will notify the Proposed Policyholder that the Policy is so terminated and such notice will include the date of termination. The return of the Policy Account Value will be in full and final satisfaction of all the Insurer's obligations under the Policy. Following the return of the Policy Account Value, the Policy will be void.



### Section 12.7    Policyholder Information

The Insurer may disclose Policyholder information to third parties such as banks or independent asset managers. Specifically with respect to banking relationships in Switzerland and in accordance with FINMA Newsletter 18 (2010) "handling of Life insurance with separately managed accounts/portfolios" dated December 20, 2010, the Insurer may disclose Policyholder or source of funding information to banking partners including Policyholder name, date of birth, nationality and address. In any event, the Insurer may be required to confirm in accordance with FINMA Newsletter 18 (2010) that the insurance product related to account openings is set up as a life insurance product according to the legal provisions, including provisions concerning biometric risks, of the Insurer's domicile.

Each U.S. person who has a financial interest in or signature or other authority over any foreign financial accounts, including bank, securities, or other types of financial accounts, in a foreign country, if the aggregate value of these financial accounts exceeds $10,000 at any time during the calendar year, must report that relationship each calendar year by filing Form TD F 90-22.1 (Report of Foreign Bank and Financial Accounts), commonly referred to as an "FBAR", with the Department of the Treasury on or before June 30 of the succeeding year. In addition, and irrespective of the independent FBAR filing obligations that a Proposed Policyholder (or its owner) who is a U.S. person may have, U.S. person directors, officers, or employees of the Insurer who have signature authority over the Separate Account, Subaccounts, or other accounts with respect to the Policy would need to file an FBAR with respect to such accounts and so will the Insurer itself as a U.S. Person with a financial interest in such accounts. On the basis of such filings, the IRS could request information with respect to such filings and the Proposed Policyholder acknowledges that the Insurer may provide such FBAR-related information to the IRS if requested to do so.

### Section 12.8    Tax Matters

The Proposed Policyholder acknowledges that he or she is responsible for complying with all tax reporting, filing and payment obligations with respect to this Policy in any jurisdiction in which the Proposed Policyholder is subject to tax. The Proposed Policyholder must consult its own tax advisor with respect to such obligations. The Insurer has not provided, and shall have no responsibility for providing, advice to the Proposed Policyholder with respect to such issues.



**Section 12.9    Limitation on Liability of Insurer**

**THE LIABILITY OF THE INSURER FOR BENEFITS UNDER THE POLICY OR FOR ANY LOSS OR OTHER DAMAGES WITH RESPECT TO THE POLICY IS LIMITED TO THE POLICY ACCOUNT VALUE.**

019167

**CROWN GLOBAL**
INSURANCE

## Appendix I - Annuity Percentage Table

| Annuitant's Age | Life Expectancy | Annuity Percentage | Annuitant's Age | Life Expectancy | Annuity Percentage |
|---|---|---|---|---|---|
| 10 | 86.2 | 1.1601% | 63 | 33.9 | 2.9499% |
| 11 | 85.2 | 1.1737% | 64 | 33.0 | 3.0303% |
| 12 | 84.2 | 1.1876% | 65 | 32.0 | 3.1250% |
| 13 | 83.2 | 1.2019% | 66 | 31.1 | 3.2154% |
| 14 | 82.2 | 1.2165% | 67 | 30.2 | 3.3113% |
| 15 | 81.2 | 1.2315% | 68 | 29.2 | 3.4247% |
| 16 | 80.2 | 1.2469% | 69 | 28.3 | 3.5336% |
| 17 | 79.2 | 1.2626% | 70 | 27.4 | 3.6496% |
| 18 | 78.2 | 1.2788% | 71 | 26.5 | 3.7736% |
| 19 | 77.3 | 1.2937% | 72 | 25.6 | 3.9063% |
| 20 | 76.3 | 1.3106% | 73 | 24.7 | 4.0486% |
| 21 | 75.3 | 1.3280% | 74 | 23.8 | 4.2017% |
| 22 | 74.3 | 1.3459% | 75 | 22.9 | 4.3668% |
| 23 | 73.3 | 1.3643% | 76 | 22.0 | 4.5455% |
| 24 | 72.3 | 1.3831% | 77 | 21.2 | 4.7170% |
| 25 | 71.3 | 1.4025% | 78 | 20.3 | 4.9261% |
| 26 | 70.3 | 1.4225% | 79 | 19.5 | 5.1282% |
| 27 | 69.3 | 1.4430% | 80 | 18.7 | 5.3476% |
| 28 | 68.3 | 1.4641% | 81 | 17.9 | 5.5866% |
| 29 | 67.3 | 1.4859% | 82 | 17.1 | 5.8480% |
| 30 | 66.3 | 1.5083% | 83 | 16.3 | 6.1350% |
| 31 | 65.3 | 1.5314% | 84 | 15.5 | 6.4516% |
| 32 | 64.3 | 1.5552% | 85 | 14.8 | 6.7568% |
| 33 | 63.3 | 1.5798% | 86 | 14.1 | 7.0922% |
| 34 | 62.3 | 1.6051% | 87 | 13.4 | 7.4627% |
| 35 | 61.4 | 1.6287% | 88 | 12.7 | 7.8740% |
| 36 | 60.4 | 1.6556% | 89 | 12.0 | 8.3333% |
| 37 | 59.4 | 1.6835% | 90 | 11.4 | 8.7719% |
| 38 | 58.4 | 1.7123% | 91 | 10.8 | 9.2593% |
| 39 | 57.4 | 1.7422% | 92 | 10.2 | 9.8039% |
| 40 | 56.4 | 1.7730% | 93 | 9.6 | 10.4167% |
| 41 | 55.4 | 1.8051% | 94 | 9.1 | 10.9890% |
| 42 | 54.4 | 1.8382% | 95 | 8.6 | 11.6279% |
| 43 | 53.4 | 1.8727% | 96 | 8.1 | 12.3457% |
| 44 | 52.4 | 1.9084% | 97 | 7.6 | 13.1579% |
| 45 | 51.5 | 1.9417% | 98 | 7.1 | 14.0845% |
| 46 | 50.5 | 1.9802% | 99 | 6.7 | 14.9254% |
| 47 | 49.5 | 2.0202% | 100 | 6.3 | 15.8730% |
| 48 | 48.5 | 2.0619% | 101 | 5.9 | 16.9492% |
| 49 | 47.5 | 2.1053% | 102 | 5.5 | 18.1818% |
| 50 | 46.5 | 2.1505% | 103 | 5.2 | 19.2308% |
| 51 | 45.5 | 2.1978% | 104 | 4.9 | 20.4082% |
| 52 | 44.6 | 2.2422% | 105 | 4.5 | 22.2222% |
| 53 | 43.6 | 2.2936% | 106 | 4.2 | 23.8095% |
| 54 | 42.6 | 2.3474% | 107 | 3.9 | 25.6410% |
| 55 | 40.6 | 2.4631% | 108 | 3.7 | 27.0270% |
| 56 | 40.7 | 2.4570% | 109 | 3.4 | 29.4118% |
| 57 | 39.7 | 2.5189% | 110 | 3.1 | 32.2581% |
| 58 | 38.7 | 2.5840% | 111 | 2.9 | 34.4828% |
| 59 | 37.8 | 2.6455% | 112 | 2.6 | 38.4615% |
| 60 | 35.8 | 2.7933% | 113 | 2.4 | 41.6667% |
| 61 | 35.8 | 2.7933% | 114 | 2.1 | 47.6190% |
| 62 | 34.9 | 2.8653% | 115 | 1.9 | 52.6316% |

**EXHIBIT 99**

019169



## *TERMSHEET*

| | | |
|---|---|---|
| Policy Number | : | # 30218 Separate Account |
| Policyholder | : | Empower Dallas Foundation, Inc |
| Annuitant | : | Grant Scott |
| Beneficiary | : | Empower Dallas Foundation, Inc |
| Premiums planned | : | Approx. US$ 20'000'000 |
| Premium Date | : | TBA |
| Policy Date | : | TBA |
| Policy Type | : | Deferred Variable Annuity (DVA) |
| Issuing Company | : | Crown Global Life Insurance Ltd., Bermuda (953d) |
| Custodian Bank | : | n/a |
| Account/Portfolio Number | : | n/a |
| Investment Manager | : | n/a |
| Asset Allocation/Investment Profile | : | IDF: Atlas IDF, LP/ Rand Advisors LLC |
| Investment of Funds Model: | : | n/a |
| Acceptance Fee | : | Zero |
| Mgmt. & Expense Fee | : | 0.45% p.a  $10mm of  Premium<br>0.35% p.a. $11-20mm of Premium<br>0.25% p.a. $21mm+ of Premium, provided that if the Policy Account Value exceeds $50mm, the annual rate shall be 0.1% p.a. on the portion of Policy Account Value in excess of $50mm. |
| Policy Administration Fee | : | US$ 2,900 p.a. |
| DAC Tax | : | 0.25% of all premium payments |
| Federal Excise Tax – 1% of Premium | : | n/a |
| Surrender Charge | : | US$ 5'000 |
| Policy Audit (optional) | : | US$ 1'975 p.a. |

Place, Date                                    GRAND CAYMAN , DEC 9TH 2015 .

Signature

*Christopher Pizalla*
Policyholder

019170

# EXHIBIT 100

019171



**Deferred Variable Annuity Policy**

**This Policy is a Deferred Variable Annuity (DVA) Policy. This Policy is Non-Participating.** Crown Global Life Insurance Ltd., a Bermuda Class C insurance company, will pay, subject to the provisions of this Policy, the Annuity Payments to the Beneficiaries as provided by this Policy, provided that the Policy is In Force.

Signed for the Insurer at its Home Office located at Hamilton, Bermuda on the Issue Date.

12/15/15 Ken Greertcen,

12/16/15 Janita Burke,

**THIS IS A LEGAL CONTRACT.**

**PLEASE READ IT CAREFULLY.**

THE INSURER IS INCORPORATED IN BERMUDA AND IS REGISTERED AS A CLASS C INSURER IN BERMUDA PERMITTING IT TO WRITE DEFERRED VARIABLE ANNUITY POLICIES AND CONDUCT OTHER LONG-TERM INSURANCE BUSINESS. THE INSURER IS NOT AUTHORIZED IN ANY JURISDICTION OTHER THAN BERMUDA TO CARRY ON ANY INSURANCE BUSINESS. POLICY ACCOUNT VALUES UNDER THIS POLICY ARE BASED ON THE INVESTMENT EXPERIENCE OF A SEPARATE ACCOUNT ESTABLISHED UNDER THIS POLICY AND THE PRIVATE ACT. THE POLICY ACCOUNT VALUES UNDER THIS POLICY MAY INCREASE OR DECREASE IN AMOUNT. INVESTMENTS OF FUNDS HELD IN THE SEPARATE ACCOUNT MAY BE MADE IN NON-U.S. INVESTMENTS AS WELL AS U.S. INVESTMENTS. THE ASSETS IN THE SEPARATE ACCOUNT MAY BE ADVERSELY AFFECTED BY CHANGES IN FOREIGN GOVERNMENTS, AND OTHER ECONOMIC AND POLITICAL EVENTS, WHICH MIGHT NOT AFFECT U.S. INVESTMENTS OR ENTITIES, AND BY FLUCTUATIONS IN THE ENTITIES, AND BY FLUCTUATIONS IN THE VALUE OF FOREIGN CURRENCY.

*continued on next page*

**Crown Global Life Insurance Ltd.**

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com



**Deferred Variable Annuity Policy**

Crown Global
Life Insurance Ltd.

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com

THIS POLICY CANNOT BE TRANSFERRED, ASSIGNED, HYPOTHECATED, OR PLEDGED, WITHOUT THE INSURER'S PRIOR WRITTEN CONSENT, WHICH THE INSURER MAY WITHHOLD IN ITS SOLE AND ABSOLUTE DISCRETION. THIS POLICY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER U.S. FEDERAL OR STATE SECURITIES LAWS OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND, THEREFORE, CANNOT BE TRANSFERRED UNLESS SO REGISTERED OR UNLESS SUCH REGISTRATION IS NOT REQUIRED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE. THIS POLICY IS AN APPROPRIATE INVESTMENT ONLY FOR PURCHASERS WHO ARE QUALIFIED PURCHASERS WITHIN THE MEANING OF THE U.S. INVESTMENT COMPANY ACT OF 1940 AND ACCREDITED INVESTORS WITHIN THE MEANING OF RULE 501(a) OF REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933. THIS POLICY IS ALSO APPROPRIATE ONLY FOR SOPHISTICATED PURCHASERS WHO, AMONG OTHER THINGS, HAVE NO NEED FOR ACCESS TO AMOUNTS DESCRIBED IN THE POLICY. ADDITIONAL INFORMATION ON THE RISKS OF PURCHASING A POLICY APPEARS IN THE CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM, AS AMENDED THROUGH THE DATE HEREOF, DESCRIBING THE POLICY.

THE INSURER MAKES NO REPRESENTATION AS TO THE TAX TREATMENT OF THIS POLICY FOR U.S. FEDERAL INCOME TAX PURPOSES OR FOR THE PURPOSES OF THE TAX LAWS OF ANY OTHER JURISDICTION. NO REPRESENTATION IS MADE THAT A PROPOSED POLICYHOLDER WOULD NOT BE SUBJECT TO AUDIT OR EXAMINATION BY THE TAX AUTHORITIES OF ANY JURISDICTION AS A RESULT OF PURCHASING A POLICY.

NO REPRESENTATION IS MADE REGARDING THE LIKELIHOOD THAT THE CURRENT U.S. FEDERAL INCOME TAX LAWS, REGULATIONS AND OFFICIAL INTERPRETATIONS OF THE LAW MAY BE CHANGED IN THE FUTURE. IT IS POSSIBLE THAT SUCH CHANGES COULD OCCUR, AND THAT SUCH CHANGES COULD APPLY TO THE POLICY, AND COULD APPLY RETROACTIVELY. THE INSURER HAS RESERVED THE RIGHT IN ITS SOLE AND ABSOLUTE DISCRETION TO MAKE CHANGES TO THE POLICY THAT IT DEEMS NECESSARY TO PRESERVE THE EXPECTED TAX CONSEQUENCES OF THE OWNERSHIP OF THE POLICY AS A RESULT OF CHANGES IN THE LAWS OF THE U.S. OR ANY OTHER JURISDICTION.

019173



## Policy Data Page

### General Policy Data

**All amounts expressed in "$" or "dollars" are in United States dollars**

| Proposed Policyholder: | Proposed Annuitant: |
| --- | --- |
| The Okada Family Foundation, Inc | Mark Okada |

| Proposed Annuitant's Date of Birth: | Gender: |
| --- | --- |
| 11 May, 1962 | Male |

Policy Effective Date: 11 Dec, 2015    Issue Date: 11 Dec, 2015

Annuity Starting Date: Deferred

until Annuitant's 85th birthday

| Beneficiary: | Beneficiary Interest | Revocable/Irrevocable? |
| --- | --- | --- |
| The Okada Family Foundation, Inc | 100% | Irrevocable |

Separate Account number : 30219

**Premium Amounts**

| Initial Premium: | $ 5,301,065.12 |
| --- | --- |
| Premium Limit: | n/a |
| Premium Deposit: | n/a |

Net Premiums will be deposited to the Separate Account established by the Insurer with respect to the Policy.

019174



## Policy Data Page

**Initial Allocation of Payments to Investment Options**

| Investment Options | Initial Allocation |
|---|---|
| 1. IDF:  Atlas IDF, LP/ Rand Advisors LLC | 100% |

Custodian Bank:          n/a

Investment Manager:   n/a

019175



## Policy Data Page

**Policy Fees and Charges**

| Charge | Due Date | Amount of Charge |
|---|---|---|
| Policy Administration Fee | In equal installments in advance on each Liquidity Date | $2,900 per annum |
| Agreed Upon Procedures Fee | Annually | As charged by the outside auditors, currently $1,975. |
| DAC Charges | Each date the Insurer receives a Premium | 0.25% of the amount of Premium payment. *See* Section 9.2 of the Policy. |
| Management & Expense Fee | In advance on each Liquidity Date | The following annual rates expressed as a percentage of the Policy Account Value:<br><br>0.45% p.a  $10mm of  Premium<br><br>0.35% p.a. $11-20mm of Premium<br><br>0.25% p.a. $21mm+of Premium, provided that if the Policy Account Value exceeds $50mm, the annual rate shall be 0.1% p.a. on the portion of Policy Account Value in excess of $50mm<br><br>(adjusted for additional premium payments and withdrawals, as applicable)<br><br>*See* Section 9.3 of the Policy. |
| Policy Set-Up Deposit | Upon submission of the completed Annuity Application Form. | N/A |
| Acceptance Fee | Each date the Insurer receives a Premium payment | Zero |
| Taxes | When paid by the Insurer or its affiliate | *See* Section 9.7 of the Policy. |



## Table of Contents

General Policy Data ................................................................................. 3
Initial Allocation of Payments to Investment Options ............................... 4
Policy Fees and Charges .......................................................................... 5

**Article I    General Provisions** ............................................................**15**
Section 1.1    Consideration ................................................................ 15
Section 1.2    Entire Policy .................................................................. 15
Section 1.3    Survival of Representations, Warrants, Covenants ...... 15
Section 1.4    Amendment or Modification .......................................... 15
Section 1.5    Misstatement of Age ..................................................... 15
Section 1.6    Non-Participating Policy ............................................... 16
Section 1.7    Ownership of Assets ...................................................... 16
Section 1.8    Rule of Construction ...................................................... 16
Section 1.9    Governing Law ............................................................... 16
Section 1.10   Effective Date of Coverage ........................................... 16

**Article II    Premium Provisions** ......................................................**17**
Section 2.1    Premiums ....................................................................... 17
Section 2.2    Insurer's Right to Refuse Premiums ............................. 17
Section 2.3    Nonpayment of Premium .............................................. 18

**Article III    Termination Provisions** ..............................................**19**
Section 3.1    Insurer's Cancellation Rights ........................................ 19
Section 3.2    Reinstatement ............................................................... 20

**Article IV   Premium Investment; Policy Account Values** ..............**21**
Section 4.1    The Separate Account .................................................. 21
Section 4.2    Premiums ....................................................................... 21
Section 4.3    Allocations to Investment Options ................................ 21
Section 4.4    Compliance with Investor Control Rules ....................... 22
Section 4.5    Changes in Allocations to Investment Options ............. 23
Section 4.6    Responsibility for Selecting Investment Options ........... 23
Section 4.7    Appointment of Investment Manager and Custodian Bank .......... 24
Section 4.8    Timing of Allocations .................................................... 24
Section 4.9    Investment of Separate Account Assets ....................... 24
Section 4.10   Request for Extension of Investment Rights  With Respect
               to Adequate Diversification ........................................... 26
Section 4.11   Changes in Investment Options ................................... 26

019177



Section 4.12   Policy Account Value ........................................................ 27

**Article V   Transfers Among Investment Options ............................................28**
    Section 5.1   General .................................................................. 28
    Section 5.2   Conditions on Transfer ................................................ 28
    Section 5.3   Liability ................................................................ 29
    Section 5.4   Limits on Right of Transfer ......................................... 29

**Article VI   Annuity Provisions ...........................................................30**
    Section 6.1   Annuity Payments ...................................................... 30
    Section 6.2   Annuity Percentage .................................................... 30
    Section 6.3   No Guaranteed Payments ................................................ 30
    Section 6.4   Annuity Starting Date ................................................. 31
    Section 6.5   Change of Annuity Starting Date ..................................... 31
    Section 6.6   Annuity Income Options ............................................... 31
    Section 6.7   Maturity Payment ..................................................... 32

**Article VII   Loan Provisions ..............................................................33**
    Section 7.1   Policy Loans ......................................................... 33

**Article VIII   Surrender Provisions .......................................................34**
    Section 8.1   General ............................................................... 34
    Section 8.2   Full Surrender ....................................................... 34
    Section 8.3   Partial Surrender .................................................... 34

**Article IX   Policy Fees and Charges ......................................................36**
    Section 9.1   Policy Administration Fee ........................................... 36
    Section 9.2   DAC Charges .......................................................... 36
    Section 9.3   Management & Expense Fee ............................................ 36
    Section 9.4   Policy Set-Up Deposit ............................................... 36
    Section 9.5   Acceptance Fee ...................................................... 36
    Section 9.6   Surrender Charge .................................................... 37
    Section 9.7   Taxes ............................................................... 37
    Section 9.8   Agreed Upon Procedures Fee ......................................... 37
    Section 9.9   Deductions for Fees and Charges .................................... 37
    Section 9.10   Custodian Bank and Investment Manager Fees ....................... 37

**Article X   Death Benefit Provisions ......................................................39**
    Section 10.1   Death Benefit ...................................................... 39
    Section 10.2   Due Proof of Death ................................................. 40



**Article XI  Owner, Beneficiary, Assignment** .......................................................**41**
    Section 11.1   Proposed Policyholder ........................................ 41
    Section 11.2   Change of Proposed Policyholder ................... 41
    Section 11.3   Proposed Annuitant ......................................... 41
    Section 11.4   Change of Proposed Annuitant ....................... 41
    Section 11.5   Beneficiary ........................................................ 42
    Section 11.6   Change of Beneficiary ..................................... 42
    Section 11.7   Assignment ....................................................... 42

**Article XII Other General Provisions** ...................................................................**44**
    Section 12.1   Periodic Reports .............................................. 44
    Section 12.2   Currency and Place of Payment ..................... 44
    Section 12.3   Notices, Requests and Elections .................... 44
    Section 12.4   Policy Settlement ............................................. 45
    Section 12.5   Deferment ........................................................ 45
    Section 12.6   Incontestability ................................................ 45
    Section 12.7   Policyholder Information ................................... 46
    Section 12.8   Tax Matters ...................................................... 46
    Section 12.9   Limitation on Liability of Insurer ..................... 47



## Definitions

**Acceptance Fee** – The fee deducted by the Insurer as stated in the Policy Data Page and described in Section 9.5.

**Accredited Investor** – An "accredited investor" as defined in Rule 501(a) under Regulation D of the Securities Act.

**Age** – A Proposed Annuitant or Proposed Joint Annuitant's age on their last birthday.

**Agreed Upon Procedures ("AUP") Fee** – The fee deducted by the Insurer as stated on the Policy Data Page and described in Section 9.8.

**Annuity Application Form** – The annuity application provided by the Insurer as completed and signed by the Proposed Policyholder.

**Annuity Payments** – The benefits payable to the Beneficiary under Section 6.1 of this Policy (each an "Annuity Payment").

**Annuity Starting Date** – The date on which Annuity Payments under Section 6.4 of this Policy commence.

**Beneficiary** – The persons or entities designated as such on the Annuity Application Form, as amended from time to time, by the Proposed Policyholder, who is entitled to receive Annuity Payments under the Policy, and distributions following the death of the Proposed Policyholder as applicable, in accordance with the terms of the Policy.

**Business Day** – Any day on which banks in the U.S. and Bermuda are open for business.

**Claim Date** – The date on which the Insurer receives written notice and due proof of death of the Proposed Annuitant (or the survivor of the Proposed Joint Annuitants) in accordance with Section 10.2 at the Insurer's Home Office.

**Code** – The U.S. Internal Revenue Code of 1986, as amended.

**Confidential Private Placement Memorandum** – The confidential private placement memorandum describing the Policy including all schedules, appendices, attachments,



exhibits, amendments and supplements thereto, as amended and restated from time to time.

**Contestable Period** – The period of time described in Section 12.6 which extends for two (2) years from the Issue Date during the lifetime of the Proposed Annuitant.

**DAC Charges** – The amount deducted by the Insurer as set forth in the Policy Data Page and described in Section 9.2.

**Death Benefit** – The death benefit calculated and payable under the provisions of Article X of this Policy.

**Fees and Charges** – Any applicable fees and charges due under the Policy including, without limitation, the Policy Administration Fee, the DAC Charges, the Management & Expense Fee, the Acceptance Fee, Taxes, and the Agreed Upon Procedures Fee.

**FINMA** – The Swiss Financial Market Supervisory Authority.

**Full Surrender** – A Surrender pursuant to Section 8.2.

**Grace Period** – A period of thirty days following the date on which the Insurer makes available to the Proposed Policyholder information indicating that (i) the Policy Account Value is less than $250,000, or (ii) the Policy Account Value is insufficient to pay the Fees and Charges due under the Policy without the Policy Account Value becoming less than $250,000 following payment of such Fees and Charges.

**Home Office** – The Insurer's office in Hamilton, Bermuda. The Insurer's mailing address is Crown Global Life Insurance Ltd., Canon's Court, 22 Victoria Street, Hamilton HM 12, Bermuda, email: info@crownglobalinsurance.com, facsimile: +1-345-945-6121.

**IDF** – An insurance dedicated fund.

**In Force** – A condition that the Policy has not terminated.

**Initial Premium** – The first Premium payment by the Proposed Policyholder as shown on the Policy Data Page.

**Insurance Dedicated Fund** – An Investment Option involving investment in an investment fund generally formed as a limited partnership or limited liability company



(i) which is intended to operate as an insurance dedicated fund (an "IDF") and (ii) investment in which is available only to a U.S. or non-U.S. insurance company that regularly engages in the sale of life insurance policies and annuity policies in the ordinary course of its business and is acquiring interests in the IDF to hold in a Separate Account established in connection with a Policy and not as part of the general assets of the insurance company.

**Insurer** – Crown Global Life Insurance Ltd. The Insurer has elected under Code section 953(d) to be treated as a U.S. domestic corporation for U.S. federal income tax purposes.

**Investment Adviser Act** – The U.S. Investment Adviser Act of 1940, as amended.

**Investment Company Act** – The U.S. Investment Company Act of 1940, as amended.

**Investment Option** – A separate investment option consisting of all or a portion of the assets held in a Separate Account and managed by the investment manager identified therein directly or through an IDF.

**IRS** – The U.S. Internal Revenue Service.

**Issue Date** – The issue date of the Policy as stated on the Policy Data Page.

**Joint Life Annuity** – An annuity issued on the life of two Proposed Annuitants and under which payments continue as long as either Proposed Annuitant is alive.

**Liquid Asset Subaccount** – A Subaccount of the Separate Account, the funds in which are primarily invested in interest-bearing commercial bank accounts.

**Liquidity Date** – The last Business Day of each calendar quarter.

**Managed Subaccount** – An Investment Option where assets held in a Subaccount are managed by an investment manager unrelated to the Insurer.  For the avoidance of doubt, a Managed Subaccount does not include an IDF.

**Management & Expense Fee** – The Management & Expense Fee as stated on the Policy Data Page and described in Section 9.3.



**Minimum Liquid Asset Allocation** – An amount not in excess of the expected annual Fees and Charges related to the Policy that the Insurer may place in the Liquid Asset Subaccount.

**Net Premium** – A Premium payment less applicable Fees and Charges, including, without limitation, the Acceptance Fee set forth on the Policy Data Page and described in Section 9.5.

**Next Available Liquidity Date** – For any specified day, the Liquidity Date on or next following the 100th calendar day following the specified day.

**Partial Surrender** – A Surrender pursuant to Section 8.3.

**Policy** – This Deferred Variable Annuity (DVA) Policy offered by the Insurer.

**Policy Account Value** – The net fair market value of all assets in the Separate Account backing the Policy, less any accrued but unpaid Fees or Charges.

**Policy Administration Fee** – The fee deducted by the Insurer as stated on the Policy Data Page and described in Section 9.1.

**Policy Anniversary** – The anniversary of the Policy Effective Date.

**Policy Data Page** – The pages of this Policy titled "Policy Data Page." The Insurer will reissue these pages by means of an endorsement whenever the information on the Policy Data Page is amended, in accordance with the Policy.

**Policy Effective Date** – The "Policy Effective Date" of this Policy as stated on the Policy Data Page.

**Policy Set-Up Deposit** – A non-refundable screening deposit due upon submission of the completed Annuity Application Form as stated on the Policy Data Page and described in Section 9.4.

**Policy Year** – Any one year period beginning on the Policy Effective Date or a Policy Anniversary and ending on the day before the next Policy Anniversary.

**Premiums** – The Initial Premium and any subsequent Premiums paid to the Insurer under this Policy.



**Private Act** – The private act entitled "The Scottish Annuity & Life International Insurance Company (Bermuda) Ltd. Consolidation and Amendment Act 2001," as amended and consolidated from time to time.

**Proposed Annuitant** – The individual whose life is used to determine the duration of the period during which the Annuity Payments will be paid by the Insurer.

**Proposed Joint Annuitants** – Each Proposed Annuitant (each being a "Proposed Joint Annuitant") when a second Proposed Annuitant is designated under the Policy and a Joint Life Annuity is selected. Each Proposed Annuitant, including the second Proposed Annuitant, is to generally be designated by the Proposed Policyholder in the Annuity Application Form but may be designated by the Proposed Policyholder after the Issue Date with the consent of the Insurer. The second named Proposed Annuitant shall be designated as the Proposed Joint Annuitant by the Proposed Policyholder in the Annuity Application Form and reflected as such on the Policy Data Page.

**Proposed Policyholder** – Proposed Policyholder means the individual or entity that proposes or is considering the purchase of a Policy pursuant to the Confidential Private Placement Memorandum. This term shall include a person who has become an actual policyholder through the purchase of a Policy or pursuant to a change made pursuant to Section 11.2.

**Qualified Purchaser** – A Qualified Purchaser within the meaning of Section 2(a)(51) of the Investment Company Act.

**SEC** – The U.S. Securities and Exchange Commission.

**Securities Act** – The U.S. Securities Act of 1933, as amended.

**Separate Account** – A separate investment account established by the Insurer for this Policy pursuant to the terms hereof, and Bermuda law (including the Private Act), the assets of which can be used for the sole purpose of paying claims under this Policy. A Separate Account is not a legal entity under Bermuda law and any references to the Separate Account performing any tasks means the Insurer in respect of the Separate Account.

**Single Life Annuity** – An annuity measured by the life of a single Proposed Annuitant.



**Subaccount** – A subaccount established by the Insurer as a bookkeeping entry within the Separate Account.

**Surrender** – A surrender under Article VIII including a Full Surrender under Section 8.2 and a Partial Surrender under Section 8.3.

**Taxes** – The taxes defined in Section 9.7 of this Policy.

**Unscheduled Premium** – Any Premium payment other than the Initial Premium or a Premium scheduled on the Policy Data Page or as set forth in an endorsement or attachment to the Policy.

**U.S. Treasury Regulations** – The U.S. Treasury regulations promulgated under the Code, as amended.



# Article I     General Provisions

### Section 1.1     Consideration

This Policy is issued in consideration of the payment of the Initial Premium.

### Section 1.2     Entire Policy

This Policy, any endorsements or riders, and the Annuity Application Form constitute the entire contract between the Proposed Policyholder and the Insurer. The Proposed Policyholder, on behalf of the Proposed Policyholder, the Proposed Annuitant, and the Beneficiaries represents, acknowledges, and agrees that the Insurer has relied, and is entitled to rely, upon the accuracy of the information and statements made in the Annuity Application Form in deciding to issue this Policy.

### Section 1.3     Survival of Representations, Warrants, Covenants

The representations, warrants, covenants, and other statements made in the Annuity Application Form are incorporated herein by reference and shall survive the execution of this Policy.

### Section 1.4     Amendment or Modification

The Insurer cannot modify the Policy without the Proposed Policyholder's consent, provided that, the Insurer may take any action it deems necessary in order to preserve the U.S. tax treatment of the Policy without the Proposed Policyholder's consent, so long as the Insurer provides 90 days prior notice of any such proposed action to the Proposed Policyholder and discusses with the Proposed Policyholder the legal basis for such change.

### Section 1.5     Misstatement of Age

If the Age of any Proposed Annuitant or Proposed Joint Annuitant is misstated on the Annuity Application Form, the Insurer will adjust the Annuity Payments to reflect the correct Age. Any amount that the Insurer has overpaid as a result of any such misstatement shall be deducted from future Annuity Payments made under the Policy. The Insurer will require due proof of the Age or survival of any person on



whose continued life any payment or benefit under the Policy is dependent. It is the Proposed Policyholder's obligation to provide proof that is satisfactory to the Insurer.

### Section 1.6    Non-Participating Policy

This Policy is non-participating, which means that the Proposed Policyholder will not share in the Insurer's profits or surplus earnings and that the Insurer will not pay dividends on this Policy.

### Section 1.7    Ownership of Assets

Assets held in the Separate Account are the sole property of the Insurer. The Proposed Policyholder will have no direct proprietary interest in the assets held in any separate account, including, without limitation, the Separate Account with respect to this Policy.

### Section 1.8    Rule of Construction

For purposes of this Policy, the period denoted by the phrase "prior to a Liquidity Date" shall include the Liquidity Date.

### Section 1.9    Governing Law

The Policy will be governed by the laws of Bermuda without regard to its conflict of laws principles, including without limitation, the Private Act and the Life Insurance Act, 1978 as may be amended from time to time.

### Section 1.10    Effective Date of Coverage

Coverage of the Proposed Annuitants under this Policy will begin on the Policy Effective Date.



## Article II    Premium Provisions

**Section 2.1    Premiums**

The minimum Initial Premium payable under the Policy is $2 million. Such minimum may be met by aggregating Policies having initial Premiums of $1 million each and purchased by the same Proposed Policyholder. The Insurer has not placed a limitation on the maximum amount of Premiums that may be contributed by a Proposed Policyholder. Subject to Section 2.2, additional Premium Payments may be made at any time and from time to time as the Proposed Policyholder's financial situation permits, provided that the minimum additional Premium Payment may not be less than the minimum Unscheduled Premium.

The Initial Premium is due on the Issue Date. Premiums must be paid or mailed from outside the U.S. to the Insurer at its Home Office. Upon request, a receipt will be provided at the Insurer's Home Office (or other non-U.S. jurisdiction designated by the Insurer from time to time).

No Initial Premium or additional Premium payments may be made from the U.S. by any Proposed Policyholder (nor will the same be accepted by the Insurer) if said Proposed Policyholder is in the U.S. at the time the decision to make said Premium payment occurs. Further, the Proposed Policyholder may not direct that a Premium payment be made while the Proposed Policyholder is in the U.S. even if the Premium payment is made from outside the U.S.

Premium payments are generally to be made in U.S. Dollars. The Insurer may, in its sole and absolute discretion, accept certain in-kind asset contributions as Premium payments. The Insurer may reject in-kind asset contributions in its sole and absolute discretion.

**Section 2.2    Insurer's Right to Refuse Premiums**

The Insurer reserves the right to refuse Premiums and to return Premiums with interest if such Premiums would adversely affect the U.S. tax consequences the Policy is intended to provide or the tax consequences under the laws of any other applicable jurisdiction.



The Insurer reserves the right not to accept any Premium payments from a Proposed Policyholder who ceases to be a Qualified Purchaser or an Accredited Investor. The Insurer may require any Proposed Policyholder to provide confirmation of the Proposed Policyholder's status as a Qualified Purchaser or an Accredited Investor before accepting any additional Premium payments. However, subject to any other limitation set forth in this Section 2.2, Premium payments during a Policy Year that do not exceed the sum of expected Fees and Charges under the Policy for the Policy Year will be accepted.

**Section 2.3      Nonpayment of Premium**

If no Premiums are paid after the Initial Premium, the Policy will continue In Force as long as the Policy Account Value is sufficient to pay any applicable Fees and Charges and, following the payment of such Fees and Charges, the Policy Account Value is $500,000 or more.



## Article III    Termination Provisions

**Section 3.1    Insurer's Cancellation Rights**

The Insurer may, in its sole and absolute discretion, cancel the Policy and distribute the Policy Account Value to the Proposed Policyholder if:

1.    The Policy Account Value is less than $250,000 at the end of any calendar quarter prior to the Annuity Starting Date but following the Insurer's acceptance of the Initial Premium payment, notwithstanding any potential negative tax consequences to the Proposed Policyholder or any other person or entity; or

2.    The continuing existence of the Policy would require the Insurer, the Policy or the Separate Account backing the Policy to register, or make information filings, with the SEC under the Securities Act, the U.S. Investment Company Act, the U.S. Investment Adviser Act, each as amended from time to time, or the securities laws of any jurisdiction in which the Insurer, the Policy or the Separate Account is not currently registered or required to make information filings; or

3.    The Proposed Policyholder or the Proposed Annuitant (or any Proposed Joint Annuitant) changes his or her country of residence for tax, securities regulation, or other purposes; or

4.    Subject to the provisions of section 12.6 of the Policy, any declaration in the Annuity Application Form is not exact, truthful, and complete in all material respects; or

5.    If the Proposed Policyholder fails to comply with the terms of any of the covenants or declarations made in the Annuity Application Form.

Prior to the Policy termination, the Insurer will provide 90 day notice of such termination to the Proposed Policyholder, which notice shall include the reason for such termination.  The Insurer will pay to the Proposed Policyholder the amount, if any, of the Policy Account Value determined as of the Next Available Liquidity Date. Surrender charges will not apply.



**Section 3.2**    **Reinstatement**

If the Policy terminates as the result of the expiration of a Grace Period, it may not be
reinstated unless reinstatement is required by Bermuda law.



# Article IV    Premium Investment; Policy Account Values

## Section 4.1    The Separate Account

The Insurer will establish a Separate Account pursuant to the terms of the Private Act to hold assets that fund obligations arising under each Policy issued by it together with any supplementary contracts hereunder and certain other funds. Income, gains, or losses of each Separate Account are credited to or charged against the assets held in such Separate Account, without regard to other income, gains, or losses of any other Separate Account or business of the Insurer. Under the terms of this Policy and the laws of Bermuda, assets allocated or credited to each Separate Account are the property of the Insurer and the Proposed Policyholder has no direct proprietary interest in such assets.

## Section 4.2    Premiums

Net Premiums received by the Insurer with respect to the Policy will be credited to the related Separate Account. To the extent that Premiums are insufficient to pay all Fees and Charges due to the Insurer under the Policy, the Insurer will deduct Fees and Charges from the Separate Account.

Amounts payable to the Proposed Policyholder or any Beneficiary under the Policy will be made by the Insurer from the related Separate Account to the Proposed Policyholder or Beneficiary in accordance with the terms of this Policy. The Insurer will establish Subaccounts within the Separate Account for each Investment Option selected by the Proposed Policyholder. Each Subaccount will correspond to an Investment Option. The Insurer may from time to time change the Investment Options and investment managers available to Proposed Policyholders, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer's investment management or similar agreement with such investment manager).

## Section 4.3    Allocations to Investment Options

On the Annuity Application Form, the Proposed Policyholder will designate the initial allocation of Net Premiums among the available Investment Options and on each Liquidity Date a Proposed Policyholder's Net Premiums will be allocated among the



Investment Options according to the allocation percentages selected. Allocation percentages must be zero or a whole number not less than ten nor greater than 100. The sum of the allocation percentages must equal 100. The Insurer will document the initial allocation on the Policy Data Page. The Insurer has reserved the right to require allocation of an amount equal to the expected aggregate quarterly Fees and Charges related to the Policy to the Liquid Asset Subaccount before application of the allocation percentages designated by the Proposed Policyholder. In addition, the Insurer may transfer amounts from other Investment Options and Subaccounts to the Liquid Asset Subaccount equal to the expected quarterly Fees and Charges.

The specific Investment Options can generally be divided into two categories: IDFs and Managed Subaccounts. The Insurer is not obligated to offer both IDFs and Managed Subaccounts as Investment Options at any time. Accordingly, at any given time only one of these types of Investment Options may be available.

The Insurer and its affiliates make no recommendations, and provide no investment advice, as to the selection of, and allocations to, Investment Options. The Insurer has not evaluated any of the investment manager's investment performance and makes no recommendation regarding the selection of any investment manager or any IDF. The Insurer does not act as a custodian of cash or investments held in the Separate Account.

### Section 4.4    Compliance with Investor Control Rules

The Proposed Policyholder agrees that, except for the selection of the allocation of Separate Account assets among Investment Options as contemplated in Section 4.3, and changes to such allocations as contemplated in Section 4.5, it will not select, identify or recommend, nor will it contact any investment manager for the purpose of influencing, any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount, including, without limitation, an investment manager with respect to an IDF in which funds held in a particular Subaccount are invested.

A Proposed Policyholder may not have direct contact or communicate with the investment manager of either an IDF or a Managed Subaccount and may not directly participate in the management of the Separate Account or any IDF or Managed Subaccount.



### Section 4.5    Changes in Allocations to Investment Options

The Proposed Policyholder may, at quarterly intervals, reallocate funds among then available Investment Options but may do so no more than twice per calendar year. If a change in allocation percentages requires a transfer of funds between Investment Options, there may be a delay after the Separate Account receives the proceeds from one Investment Option until the next date on which it is possible to reinvest the funds in a different Investment Option. During this delay period (which may be up to one calendar quarter), funds will be invested in the Liquid Asset Subaccount. The Proposed Policyholder acknowledges that this delay may result in the funds having a lower return for this period.

In the event of such a delay, the funds from the liquidated investments will be invested in the Liquid Asset Subaccount until the next Liquidity Date at which time the funds will be re-allocated (together with any related earnings) to the applicable Subaccount originally designated by the Proposed Policyholder for the transfer.

Unless and until the Proposed Policyholder notifies the Insurer in writing of a new Net Premium allocation, the Net Premium allocations as specified in "Initial Allocation of Payment to Investment Options" on the Policy Data Page will continue to apply to any additional Premium payments.

### Section 4.6    Responsibility for Selecting Investment Options

The Insurer does not and will not make any recommendation as to the Proposed Policyholder's selection or retention of investment managers, allocation of assets among Subaccounts, Investment Options, or investments in particular securities or categories of securities, nor will it evaluate the investment performance of any investment manager. Inclusion of an Investment Option shall not be deemed to be a recommendation of that investment or as an indication that such an investment is suitable for the Proposed Policyholder.

Each Proposed Policyholder acknowledges, represents, warrants, and covenants that it is solely responsible for determining for themselves whether a particular Investment Option is suitable in light of their individual situations. The Insurer and its affiliates make no recommendations, and provide no advice, as to the selection of Investment Options and provide no warranty, representation, or indemnity with respect to the



performance of any Investment Option. Each Proposed Policyholder should consult his or her personal financial advisor concerning Premium allocations.

**Section 4.7    Appointment of Investment Manager and Custodian Bank**

The Insurer shall have the right, exercisable in its sole and absolute discretion, to appoint, change, or remove the investment manager and custodian bank with respect to each Investment Option or Separate Account, provided that an investment manager shall only be removed for cause (as described in the Insurer's investment management or similar agreement with such investment manager).  A Proposed Policyholder may recommend to the Insurer one or more investment managers or custodian banks who meet the Insurer's general requirements after the initial policy date, but the Insurer may accept or reject such recommendation in its sole and absolute discretion.

**Section 4.8    Timing of Allocations**

The Insurer will allocate the Proposed Policyholder's Net Premiums among one or more Investment Options in the percentages specified on the Policy Data Page, as amended from time to time at the written request of the Proposed Policyholder, within two business days  following the date the Insurer receives the Net Premiums. Net Premiums received and which are to be allocated to an Investment Option will be initially invested in the Liquid Asset Subaccount and subsequently allocated (together with any related earnings) within two business days to the applicable Investment Option (subject to deferral due to liquidity constraints imposed by the applicable investment manager or IDF and subject to such provisions as to valuation and unit calculation as may be specified by the applicable investment manager).

**Section 4.9    Investment of Separate Account Assets**

The Insurer will require each investment manager with respect to a portfolio of an IDF or Managed Account held in the Separate Account and the investment manager of each investment fund or other investment fund in which the assets of the Separate Account are invested, to comply with the following:

1.    Investment of assets held in each Subaccount will be sufficiently diversified to comply with the requirements of U.S. Treasury Regulation section 1.817-5(b). Assets of any investment fund relying upon a "look-through" basis for purposes



of meeting such diversification requirements will themselves be sufficiently diversified so as to allow the Subaccount to comply with such requirements.

2. The investment manager and its employees who are responsible for investment decisions will not accept investment recommendations or make any investment decisions regarding the direct or indirect investment of Separate Account assets based, in whole or in part, on information regarding any investment or group of investments received from any Proposed Policyholder or any representative or adviser of a Proposed Policyholder.

3. No Proposed Policyholder (or any representative or adviser of a Proposed Policyholder) will have the right or be permitted to select or identify any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount.

4. The investment manager will not commit to invest assets of any Subaccount (or of any underlying investment fund or Managed Account in which a Subaccount has invested directly or indirectly) in mutual funds or other collective investment funds or publicly available investment products (including, without limitation, market-linked deposits and flexible deposits) managed, advised and/or distributed by the investment manager or its affiliates and will only do so if (a) in the investment manager's sole judgment at the time the investment is made, such fund or product is appropriate within the investment objectives and policies of the Subaccount fund or Managed Account and (b) no more than 55% of the assets on an initial purchase basis (excluding market value increases) of the Subaccount fund or Managed Account are invested in such funds or products at any time. Subject to the foregoing, for the avoidance of doubt, assets may be invested in an IDF.

5. In accordance with Section 4.4, except for general descriptions of the investment policies of the Investment Options, there will not be any direct or indirect prearrangement, plan or agreement between any Proposed Policyholder (or any Proposed Policyholder's advisers or representatives) and the investment manager (or any of its employees) regarding the investments to be made directly or indirectly by any Subaccount.

Case 19-34054-sgj11    Doc 4255-100    Filed 06/20/25    Entered 06/20/25 21:39:29

Case 3:25-cv-02072-S    Document 15-25    Exhibit 100    Page 348 of 674    Page 348 of 674    PageID 20264
Desc Exhibit 100 Page 27 of 49



### Section 4.10     Request for Extension of Investment Rights With Respect to Adequate Diversification

A Proposed Policyholder may make a request for an extension of the Proposed Policyholder's investment rights described in Section 4.4 and partial or complete release of the investment manager's obligations in Section 4.9 to adequately diversify the assets held in the Separate Account by delivering a written request to the Insurer's Home Office expressing a specific desire for the same. The Insurer may grant or deny such requests in its sole and absolute discretion, for any reason or for no reason whatsoever. Any such request must be approved by the Insurer in writing (and, in the case of an IDF, may also require the consent of the IDF). Absent written approval of the request, the request shall be deemed to have been denied.

The Insurer expresses no opinion and makes no representations or warranties regarding the tax consequences under the laws of the U.S. or any other jurisdiction of the Insurer's decision to grant such requests. By making such a request, a Proposed Policyholder waives any claim against the Insurer, its shareholders, directors, officers, employees, agents or affiliates on behalf of the Proposed Policyholder, any Beneficiaries or any other person for any loss from the Insurer's decision to grant or deny the Proposed Policyholder's request and agrees to hold harmless hereunder the Insurer and its shareholders, directors, officers, employees, agents or affiliates for any such loss.

### Section 4.11     Changes in Investment Options

The Insurer at any time may add additional Investment Options, remove or restrict existing Investment Options, or add or eliminate an investment manager subject to any required regulatory approval, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer's investment management or similar agreement with such investment manager). If an Investment Option is removed or restricted or an investment manager is terminated, the Insurer may eliminate the Investment Option as an option for future Premium payments or transfers and may also transfer funds from the Subaccount in which assets invested in the terminated Investment Option were held, to the Liquid Asset Subaccount. An affected Proposed Policyholder may submit instructions to adjust the allocation of Net Premiums among the remaining Investment Options, without charge, for a period of 60 days following receipt of the Insurer's notice of any



such termination. The Insurer will implement those instructions on the Next Available Liquidity Date after receipt.

**Section 4.12     Policy Account Value**

The Policy Account Value is equal to the net fair market value of all assets in the Separate Account backing the Policy, less any accrued but unpaid fees or expenses. The Insurer will determine the Policy Account Value on each Liquidity Date. The Separate Account value will increase or decrease, depending upon the investment experience of the related Subaccounts.

Assets allocated or credited to a Separate Account may be commingled with assets allocated or credited to another Separate Account for purposes of investment. In such circumstances, the Insurer may determine the Policy Account Value of each such Separate Account by the use of accumulation units, which are calculated separately with respect to each commingled investment. The accumulation unit value for each commingled investment will vary to reflect the investment experience of the assets invested therein.

The value of an accumulation unit will be determined on each Liquidity Date. When a commingled investment is made, the Insurer will credit the Separate Account with a number of accumulation units determined by dividing the amount of the investment by the value of the accumulation unit. When assets allocated or credited to a Separate Account are withdrawn from an investment, the accumulation units are reduced.



## Article V    Transfers Among Investment Options

**Section 5.1    General**

The Proposed Policyholder may request one transfer among Investment Options per calendar quarter, but no more than twice per calendar year.

**Section 5.2    Conditions on Transfer**

To effect any transfer, the Proposed Policyholder must submit a transfer request to the Insurer. All transfers are subject to the following conditions:

1.    Any applicable Fees and Charges will be deducted from the Subaccount or from the amount which is transferred.

2.    Transfers will be effected within 60 days following receipt by the Insurer of a transfer request. Actual settlement of a disposition or redemption from the relevant Subaccount, and reinvestment of the proceeds may be delayed as described below.

3.    Any transfer request must clearly specify: (a) the amount which is to be transferred; and (b) the Subaccounts which are to be affected.

4.    Payments to effect a transfer are subject to the disbursement rules and restrictions of the Subaccount(s).

5.    The minimum amount that may be transferred in a single transfer will be the lesser of $250,000 or the entire interest in a Subaccount.

6.    No transfer may be made from the Liquid Asset Subaccount if the amount remaining therein would not equal or exceed the Minimum Liquid Asset Allocation.

7.    In the case of an IDF, any additional conditions set forth in the governing documents in the IDF must be satisfied.



## Section 5.3    Liability

Neither the Insurer nor any of the Insurer's affiliates will be liable for any losses incurred as a result of transfers made in accordance with a Proposed Policyholder's transfer request including lower returns which may result.

## Section 5.4    Limits on Right of Transfer

The Insurer may in its sole and absolute discretion defer the right of transfer for any period when it reasonably determines that additional time is necessary to obtain sufficient cash to make the transfer payments. Additional limitations on transfer may be imposed under the terms of any IDF in which assets held in a Separate Account are invested.  For the avoidance of doubt, a transfer described in this Section 5.4 is a situation where a change from one Investment Option to another Investment Option occurs.



## Article VI    Annuity Provisions

### Section 6.1    Annuity Payments

The Insurer will make periodic payments to the Beneficiaries beginning on the Annuity Starting Date and continuing thereafter on each Policy Anniversary to an account located outside the U.S. The amount of each Annuity Payment will equal the product of the applicable Annuity Percentage and the Policy Account Value (determined as of the end of the calendar quarter immediately preceding each Annuity Payment) and will vary depending upon the investment experience of the Investment Options in which the Separate Account assets are invested and the age of the Proposed Annuitant.

### Section 6.2    Annuity Percentage

The Annuity Percentages are listed in the Appendix I to this Policy. The applicable Annuity Percentage will, depend upon the benefit option selected by the Policyholder. In the case of a Single Life Annuity, the Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants. The Annuity Percentage is adjusted for each Annuity Payment.

### Section 6.3    No Guaranteed Payments

The Policy Account Value, and thus, the Annuity Payments may increase or decrease depending upon the investment experience of the Investment Options selected by the Proposed Policyholder. The sole source for the payment of the Annuity Payments are the assets held in the Separate Account backing the Policy. The Policy does not provide for guaranteed annuity or death benefits. All payments, including upon the death of the Proposed Policyholder or Proposed Annuitant (or Proposed Joint Annuitants) are strictly limited to the assets held in the Separate Account backing the Policy and no Annuity Payments or any other payments under the Policy are payable from any other source.



### Section 6.4      Annuity Starting Date

The Annuity Starting Date must be on the first day of a calendar quarter and may not be later than the first day of the calendar quarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant's or surviving Proposed Joint Annuitant's) eighty-fifth (85th) birthday. If the Proposed Policyholder has not chosen an Annuity Starting Date, then the first day of the calendar quarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant's or surviving Proposed Joint Annuitant's) eighty-fifth (85th) birthday shall be the Annuity Starting Date.

### Section 6.5      Change of Annuity Starting Date

The Proposed Policyholder may change the Annuity Starting Date prior to the then current Annuity Starting Date by delivering a written notice to the Insurer. The new Annuity Starting Date may not be before the Next Available Liquidity Date for any Investment Option under the Policy as of the date the Insurer receives the notice from the Proposed Policyholder, and may not be later than the first day of the calendar month following the Proposed Annuitant's 85th birthday. Distributions must commence after the Annuity Starting Date in accordance with requirements under the Code.

### Section 6.6      Annuity Income Options

Two (2) basic benefit options are offered under the Policy: (i) a Single Life Annuity, and (ii) a Joint Life Annuity. The benefit option may be changed by the Proposed Policyholder; however, no such change may be made at any time on or after the Annuity Starting Date. A Policyholder may change the selection of any benefit option by giving the Insurer at least thirty (30) calendar days' written notice prior to the Annuity Starting Date from outside the U.S.

In the case of a Single Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants.

Under both basic benefit options, the amount of each annual Annuity Payment made on or after the Annuity Starting Date will vary in accordance with the age of the Proposed Annuitant (or Proposed Joint Annuitant(s)) and the investment performance of the assets held in the Separate Account and shall be computed by the Insurer's



actuary each year (and recomputed on the annual anniversary date each year thereafter) by multiplying the applicable Annuity Percentage in the Annuity Percentage Table attached as Appendix I to this Policy by the then current Policy Account Value as of the Annuity Starting Date and predetermined on the annual anniversary date each year thereafter. If the Policy Account Value is zero, then all payments will cease.  All Annuity Payments shall be made to an account outside the U.S. The Insurer may consider the adoption of additional benefit options at the request of a Proposed Policyholder.

**Section 6.7    Maturity Payment**

Upon the death of the Proposed Annuitant (or survivor of the Proposed Joint Annuitants), the Insurer will pay to the Beneficiaries, or their successors as Beneficiaries, as the case may be, the balance of the Policy Account Value.



## Article VII    Loan Provisions

**Section 7.1    Policy Loans**

The Proposed Policyholder shall have no guaranteed rights or privileges with respect to loans under a Policy. The Insurer may, in its sole and absolute discretion consider whether to facilitate a Proposed Policyholder's request to pledge a Policy as collateral security for a loan to be made by the Insurer or institutional or other third party lenders. A pledge of a Policy as collateral security for a loan may be effected only with the prior written consent of the Insurer, which may be granted or denied in the Insurer's sole and absolute discretion.



## Article VIII    Surrender Provisions

### Section 8.1    General

At any time after the Issue Date and prior to the Annuity Starting Date, the Proposed Policyholder may request one or more withdrawals under the Policy from the Separate Account in the form of a Partial Surrender. Withdrawals are possible up to 100% of the Policy Account Value. Should the Policy Account Value be equal to or less than $250,000, the Policy will lapse. The rights of a Proposed Policyholder to make a Surrender under the Policy shall be subject to the consent of all Beneficiaries who have been irrevocably designated by the Proposed Policyholder under the Policy. Subject to this Article VIII, the Proposed Policyholder may Surrender the Policy, in whole or in part, by filing a written request with the Insurer at the Insurer's Home Office at any time during the lifetime of the Proposed Annuitant. The Policy Account Value which is the subject of the Surrender will be determined as of the Next Available Liquidity Date occurring after the Insurer receives the request to Surrender.

Although the amount of the Surrender proceeds will be determined as of the Next Available Liquidity Date after receipt of the Surrender request, the Insurer will use reasonable efforts to pay Surrender proceeds as soon as practicable whether on a Liquidity Date or another date (subject to such liquidity constraints and provisions as to valuation and unit calculation as may be specified by the investment manager of the applicable Investment Option).

### Section 8.2    Full Surrender

If the Proposed Policyholder requests a Full Surrender of the Policy Account Value of the Policy, the Policy will terminate on the date the Proposed Policyholder submits its Surrender request in accordance with Section 12.3.

### Section 8.3    Partial Surrender

The Proposed Policyholder may request a Partial Surrender of the Policy for up to and including 90% of the Policy Account Value of the Policy. No more than one Partial Surrender may be requested by the Proposed Policyholder during each quarter of a Policy Year. As provided in Section 3.1, any Partial Surrender that causes the Policy Account Value to be reduced to an amount that is less than



$250,000 may be deemed by the Insurer to be a request for Full Surrender and if so deemed will cause the Policy to be terminated, notwithstanding any potential negative tax consequences to the Proposed Policyholder or any other person or entity. If the Policy Account Value is reduced to an amount that is less than $250,000, then the Insurer shall have the right, exercisable in its sole and absolute discretion, to treat a Partial Surrender request as a Full Surrender request.

Each Partial Surrender will reduce the Policy Account Value and the amount of any Annuity Payment to be paid after the Annuity Starting Date. An amendment to the Policy will be sent to the Proposed Policyholder outside the U.S. for countersignature upon any request for a Partial Surrender under the Policy. Said amendment shall become a part of the Policy.

019206



## Article IX    Policy Fees and Charges

### Section 9.1    Policy Administration Fee

The Insurer will deduct the Policy Administration Fee from the Separate Account as set forth in the Policy Data Page for general administrative expenses.

### Section 9.2    DAC Charges

The amount deducted by the Insurer as set forth on the Policy Data Page to pay for the costs imposed by virtue of the treatment of certain deferred acquisition costs for U.S. federal income tax purposes under section 848 of the Code. The amount of the DAC Charge as set forth on the Policy Data Page shall be adjusted to reflect any change in the applicable U.S. federal income tax rate.  The Insurer shall provide the Proposed Policyholder notice of any change in the DAC Charge.

### Section 9.3    Management & Expense Fee

The Insurer will deduct the Management & Expense Fee from the Separate Account. The Management & Expense Fee is an on-going insurance administration fee described on the Policy Data Page.

### Section 9.4    Policy Set-Up Deposit

The Policy Set-Up Deposit is due to the Insurer as set forth on the Policy Data Page upon submission of the completed Annuity Application Form by the Proposed Policyholder. The Policy Set-Up Deposit will be paid into the General Account of the Insurer.  Upon issuing the Policy, an amount equal to the Policy Set-Up Deposit will be used to offset the Acceptance Fee.  If for any reason, a Policy is not issued, the Insurer will retain the Policy Set-Up Deposit to cover medical, underwriting, administration and any other costs incurred by the Insurer in the processing of the application.

### Section 9.5    Acceptance Fee

The Insurer will deduct the Acceptance Fee set forth in the Policy Data Page on each date the Insurer receives a Premium payment.



### Section 9.6    Surrender Charge

Surrender charges will not apply to this Policy.

### Section 9.7    Taxes

The Insurer will deduct only those Taxes (as defined below) paid by the Insurer or its affiliates to any governmental entity that relate to the Policy or the related Separate Account.  These taxes (the "Taxes") exclusively include withholding taxes, excise taxes, sales taxes, stamp taxes, value added taxes, state taxes imposed on the Insurer or its affiliates, and taxes imposed on Subpart F income of a Separate Account attributable to its investment in a controlled foreign corporation, as well as the deferred tax amount and any interest charge or other taxes imposed on the investments of a Separate Account in a passive foreign investment company, or under the corresponding tax laws of other jurisdictions.

The Insurer may, in its sole and absolute discretion, pay Taxes when due and deduct such amounts from the Separate Account at a later date. The Insurer will, in its absolute discretion, determine when Taxes have resulted from the investment experience of any Subaccount or receipt by the Insurer of Premiums.

### Section 9.8    Agreed Upon Procedures Fee

The Insurer will deduct the Agreed Upon Procedures Fee from the Separate Account if the Proposed Policyholder instructs the Insurer to engage a third party audit firm to review charges and provide an Agreed Upon Procedures (AUP) report.

### Section 9.9    Deductions for Fees and Charges

The Fees and Charges are paid to the Insurer under the Policy initially by making deductions from Premiums and then by making deductions from the Separate Account. To the extent that the Insurer deducts Fees and Charges from the Separate Account, amounts will be deducted first from the Liquid Asset Subaccount and then from the Subaccounts pursuant to the terms of the Policy.

### Section 9.10    Custodian Bank and Investment Manager Fees

Each custodian bank and investment manager will separately deduct any applicable fees charged by it from any Separate Account or Investment Option for which it is acting as custodian or investment manager, as the case may be. The fees of the



custodian bank and investment manager are calculated on an individual basis and may vary depending upon the investment manager and Investment Option(s) selected by the Proposed Policyholder. The list of investment managers and custodians retained by the Insurer is available from the Insurer upon request.



## Article X    Death Benefit Provisions

**Section 10.1    Death Benefit**

If all Beneficiaries and any alternative Beneficiaries predecease the Proposed Policyholder and Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected), then the benefits payable under the Policy to the Beneficiaries or alternative Beneficiaries shall be paid to the Proposed Policyholder until the first to die of the Proposed Policyholder or Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected).

If none of the Beneficiaries or alternative Beneficiaries survives the Proposed Annuitant(s), then the Policy Account Value shall be paid to the Proposed Policyholder upon the Proposed Annuitant's death (or survivor of the Proposed Joint Annuitants' death, in the case where a Joint Life Annuity benefit option is selected).

If the Proposed Policyholder is not living at the time any benefit under the Policy is payable to the Proposed Policyholder, then such benefit shall be paid to the Proposed Policyholder's estate, if then open, or if not then to his heirs *per stirpes*, in accordance with the laws of succession in the jurisdiction of the Proposed Policyholder's last known domicile on the date of the Proposed Policyholder's death.

If the Proposed Policyholder is not an individual, then the Proposed Annuitant (or the younger of the Proposed Joint Annuitants or the survivor of the Proposed Joint Annuitants) shall be recognized as the "primary Proposed Annuitant" and treated as the Proposed Policyholder of the Policy. Any change in the designation of such Proposed Annuitant (or Proposed Joint Annuitant) following the Issue Date (in the case where the Proposed Policyholder is not an individual) shall be treated as the death of the Proposed Policyholder.

If the Proposed Policyholder dies prior to the "annuity starting date" (defined under Code Section 72(c)(4) as the first day of the first period for which an amount is received as an annuity under the contract; such definition possibly differing from the Annuity Starting Date designated under the Policy), then the Proposed Policyholder's entire interest in the Policy shall be distributed to the Beneficiaries within five (5) years from the date of the Proposed Policyholder's death, unless the Beneficiaries



elect to receive such interest in distributions made over their life or lives (or over a period not extending beyond their respective life expectancies), and such distributions begin within one (1) year from the date of the Proposed Policyholder's death. Any such election must be made in writing and received by the Insurer at the Insurer's Home Office within 180 calendar days from the date of the Proposed Policyholder's death.

If the Proposed Policyholder dies on or after the "annuity starting date" (as defined under Code Section 72(c)(4)) and before the entire interest in the Policy has been distributed, the remaining portion of the Policy Account Value shall be distributed to the Beneficiaries at least as rapidly as under the method of distributions being used as of the date of the Proposed Policyholder's death.

Notwithstanding any provision of the Policy, all Death Benefits must be distributed in compliance with the provision of section 72(s) of the Code. Death Benefits payable hereunder will be includible in the gross income of the Beneficiary.

### Section 10.2    Due Proof of Death

Due proof of death is one of the following received at the Insurer's Home Office in a form satisfactory to the Insurer in its absolute discretion:

1.    A certified copy of a death certificate;

2.    A certified copy of a decree of a court of competent jurisdiction as to the finding of death; or

3.    Any other proof of death satisfactory to the Insurer.



## Article XI    Owner, Beneficiary, Assignment

### Section 11.1    Proposed Policyholder

The Proposed Policyholder is the person so named on the Policy Data Page or his or her assignee in accordance with a valid assignment as provided in Section 11.2.

Under Bermuda law, the Proposed Policyholder or his personal representative, trustee in bankruptcy or legal assignee will be the owner of the rights to payments under the Policy. While the Proposed Policyholder is alive, all rights in the Policy belong to the Proposed Policyholder and may be exercised without the consent of any Beneficiary, provided that, once an irrevocable designation of Beneficiary is filed, changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary. All of the Proposed Policyholder's rights in the Policy belong to the estate of the Proposed Policyholder if the Proposed Policyholder dies before the Proposed Annuitant. Joint ownership is permitted.

### Section 11.2    Change of Proposed Policyholder

The Proposed Policyholder may change the ownership of the Policy by submitting a request to the Insurer's Home Office and obtaining written approval of the Insurer. Any approved change will take effect on the date specified in the approval.

### Section 11.3    Proposed Annuitant

The Proposed Policyholder has the right to designate one Proposed Annuitant or two Proposed Joint Annuitants. The Proposed Annuitants or Proposed Joint Annuitants will be as stated in the Annuity Application Form, unless otherwise endorsed at issue or subsequently changed.

### Section 11.4    Change of Proposed Annuitant

Each Proposed Policyholder will have the right to designate and in some cases change the Proposed Annuitant or Proposed Joint Annuitant.



### Section 11.5    Beneficiary

The Proposed Policyholder shall initially designate one or more Beneficiaries on the Policy Data Page. All designations of Beneficiaries are revocable unless specified as irrevocable by the Proposed Policyholder. Once an irrevocable designation of Beneficiary is filed, any changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary under the Policy.

### Section 11.6    Change of Beneficiary

Except in the case of an irrevocable Beneficiary, the Proposed Policyholder may change the Beneficiaries by filing a written request from outside the U.S. with the Insurer at its Home Office at any time prior to the Annuity Starting Date. In the case of an irrevocable Beneficiary, the consent of the irrevocable Beneficiary to the change is also required. The change will take effect as of the date the notice is received by the Insurer subject to any payment made or action taken by the Insurer before the Insurer receives the document at its Home Office. A new Beneficiary designation will automatically revoke all prior designations (except an irrevocable Beneficiary designation where the consent of the irrevocable Beneficiary has not been obtained). The Insurer will not be liable for any payment made or action taken before the effective date of the change of Beneficiary.

### Section 11.7    Assignment

The Proposed Policyholder may transfer, assign, or pledge the Policy or any of their rights under the Policy, including a Section 1035 exchange of the Policy with another carrier, without the prior written consent of the Insurer, provided that the Policy may not be assigned unless (i) it is registered under the U.S. federal securities and/or state securities laws or the securities laws of any other jurisdiction unless such registration is not required or an exemption from registration is available and (ii) the assignee is a Qualified Purchaser and Accredited Investor. The Insurer may require satisfactory evidence as to the non-applicability of any such registration requirement or the availability of an exemption from any applicable registration requirement and the Insurer may in its discretion for this purpose request, at the transferor's expense, a favourable legal opinion from transferor's counsel that the provisions of this Section 11.7 have been met.



The Insurer represents and warrants that, subject to the foregoing, it will fully cooperate with any assignment, transfer or exchange, including a "1035" exchange of the Policy with another carrier and will cooperate to exchange underlying IDFs or sub-accounts with such carrier.  Failure by the Insurer to cooperate with the Proposed Policyholder in a proposed 1035 exchange or other transfer, assignment, or pledge of the Policy or any of the Proposed Policyholder's rights under the Policy, such failure to cooperate as determined by a final judgement in a Bermuda court or other court of relevant jurisdiction, among any other injunctive or other relief resulting therefrom, will result in liquidated damages to the Proposed Policyholder equal to the sum of the (a) then Policy Account Value and (b) any fees or charges, including Management and Expense Fees, accruing during the period that the non-cooperation (as determined by the a Bermuda court or other court of relevant jurisdiction) exists and is continuing, and the Insurer shall be strictly liable for payment of such amount to the Proposed Policyholder.  For the avoidance of doubt, the Proposed Policyholder shall be entitled to its Policy Account Value separate from the liquidated damages amount provided for herein.   The Proposed Policyholder (x) acknowledges that the Insurer's ordinary and customary process for 1035 exchanges includes obtaining satisfactory assurance from the transferor of compliance with relevant tax and disclosure laws with respect to the Policy and indemnification from the new carrier regarding any tax obligations relating to the Policy  and (y) agrees that following the Insurer's 1035 exchange process will not be considered to be a failure to cooperate by the Insurer.



# Article XII    Other General Provisions

### Section 12.1    Periodic Reports

The Insurer will make available to the Proposed Policyholder, for every calendar quarter or portion thereof during which the Policy is In Force, a report that shows activity in the Proposed Policyholder's Separate Account. The Proposed Policyholder expressly authorizes the Insurer to rely upon the information or valuations provided by the selected investment manager and custodian without further inquiry or verification of any kind, nature, or description. Each quarterly statement will set forth the Policy Account Value less applicable expenses and charges at the beginning and end of the reporting period and aggregate adjustments to the same throughout. These quarterly statements shall be made available to the Proposed Policyholder at the Insurer's Home Office. The Insurer will forward annual Separate Account statements to an address of the Proposed Policyholder outside of the U.S. if a request to do so is made by the Proposed Policyholder in writing and delivered to the Insurer's Home Office.

### Section 12.2    Currency and Place of Payment

All transactions between the Proposed Policyholder and the Insurer will be made in U.S. dollars unless otherwise confirmed by the Insurer in writing. All Payments will be made outside the U.S.

### Section 12.3    Notices, Requests and Elections

To be effective, all notices, requests, and elections the Proposed Policyholder makes under the Policy must be in writing, signed by the Proposed Policyholder or sent electronically or via facsimile by the Proposed Policyholder and received by the Insurer. Unless otherwise provided, all notices, requests and elections will be effective when received by the Insurer. Notices, requests and elections may be made by the Proposed Policyholder under the Policy in writing, signed by the Policyholder, sent by facsimile or electronic communication and received by the Insurer at its Home Office or administrative office, provided that the Insurer will not be liable for following instructions communicated by facsimile or electronically and, provided further that acceptance of facsimile or electronic communication by the Insurer will not impose any requirement on the Insurer to employ any procedures to confirm that instructions

019215



received by facsimile communication are genuine. Any notice or report required to be given by the Insurer to the Proposed Policyholder or any other person will be deemed given when sent to such person or such person's authorized representative.

**Section 12.4    Policy Settlement**

Prior to any payment of a Death Benefit, due certified proof of death must be submitted to the Insurer.

**Section 12.5    Deferment**

The Insurer will execute allowable requests for a transfer, Full Surrender or Partial Surrender by the Proposed Policyholder within 60 days of a request. Such requests may require conversion of certain Investment Option assets to cash or in-kind distributions, where possible. This may take longer than 60 days for a variety of reasons, including underlying restrictions on redemptions of assets held pursuant to an Investment Option. In such cases, the Insurer will take reasonable steps to comply with such requests at the earliest time possible.  The foregoing will be subject to time restrictions within the Insurance Dedicated Fund purchased by a Subaccount.

**Section 12.6    Incontestability**

Except as expressly provided in the Policy, the Insurer will not contest the validity of the Policy for misstatement, misrepresentation or non-disclosure after the Policy has been In Force for two years from the Issue Date during the lifetime of the Proposed Annuitant. The Policy will be voidable in the event of fraud at any time. If the validity of the Policy is so contested, then (1) the Insurer's obligation to pay Annuity Payments under the Policy will terminate as of the date the Insurer discovers such misstatement, misrepresentation or non-disclosure, and (2) the Policy Account Value will be determined as of the Next Available Liquidity Date occurring after the Insurer discovers such misstatement, misrepresentation or non-disclosure and returned to the Proposed Policyholder or the Beneficiaries within 90 days. The Insurer will notify the Proposed Policyholder that the Policy is so terminated and such notice will include the date of termination. The return of the Policy Account Value will be in full and final satisfaction of all the Insurer's obligations under the Policy. Following the return of the Policy Account Value, the Policy will be void.

019216



### Section 12.7    Policyholder Information

The Insurer may disclose Policyholder information to third parties such as banks or independent asset managers. Specifically with respect to banking relationships in Switzerland and in accordance with FINMA Newsletter 18 (2010) "handling of Life insurance with separately managed accounts/portfolios" dated December 20, 2010, the Insurer may disclose Policyholder or source of funding information to banking partners including Policyholder name, date of birth, nationality and address. In any event, the Insurer may be required to confirm in accordance with FINMA Newsletter 18 (2010) that the insurance product related to account openings is set up as a life insurance product according to the legal provisions, including provisions concerning biometric risks, of the Insurer's domicile.

Each U.S. person who has a financial interest in or signature or other authority over any foreign financial accounts, including bank, securities, or other types of financial accounts, in a foreign country, if the aggregate value of these financial accounts exceeds $10,000 at any time during the calendar year, must report that relationship each calendar year by filing Form TD F 90-22.1 (Report of Foreign Bank and Financial Accounts), commonly referred to as an "FBAR", with the Department of the Treasury on or before June 30 of the succeeding year. In addition, and irrespective of the independent FBAR filing obligations that a Proposed Policyholder (or its owner) who is a U.S. person may have, U.S. person directors, officers, or employees of the Insurer who have signature authority over the Separate Account, Subaccounts, or other accounts with respect to the Policy would need to file an FBAR with respect to such accounts and so will the Insurer itself as a U.S. Person with a financial interest in such accounts. On the basis of such filings, the IRS could request information with respect to such filings and the Proposed Policyholder acknowledges that the Insurer may provide such FBAR-related information to the IRS if requested to do so.

### Section 12.8    Tax Matters

The Proposed Policyholder acknowledges that he or she is responsible for complying with all tax reporting, filing and payment obligations with respect to this Policy in any jurisdiction in which the Proposed Policyholder is subject to tax. The Proposed Policyholder must consult its own tax advisor with respect to such obligations. The Insurer has not provided, and shall have no responsibility for providing, advice to the Proposed Policyholder with respect to such issues.



**Section 12.9**    **Limitation on Liability of Insurer**

**THE LIABILITY OF THE INSURER FOR BENEFITS UNDER THE POLICY OR FOR ANY LOSS OR OTHER DAMAGES WITH RESPECT TO THE POLICY IS LIMITED TO THE POLICY ACCOUNT VALUE.**

**019218**

CROWN GLOBAL
I N S U R A N C E

## Appendix I - Annuity Percentage Table

| Annuitant's Age | Life Expectancy | Annuity Percentage | Annuitant's Age | Life Expectancy | Annuity Percentage |
|---|---|---|---|---|---|
| 10 | 86.2 | 1.1601% | 63 | 33.9 | 2.9499% |
| 11 | 85.2 | 1.1737% | 64 | 33.0 | 3.0303% |
| 12 | 84.2 | 1.1876% | 65 | 32.0 | 3.1250% |
| 13 | 83.2 | 1.2019% | 66 | 31.1 | 3.2154% |
| 14 | 82.2 | 1.2165% | 67 | 30.2 | 3.3113% |
| 15 | 81.2 | 1.2315% | 68 | 29.2 | 3.4247% |
| 16 | 80.2 | 1.2469% | 69 | 28.3 | 3.5336% |
| 17 | 79.2 | 1.2626% | 70 | 27.4 | 3.6496% |
| 18 | 78.2 | 1.2788% | 71 | 26.5 | 3.7736% |
| 19 | 77.3 | 1.2937% | 72 | 25.6 | 3.9063% |
| 20 | 76.3 | 1.3106% | 73 | 24.7 | 4.0486% |
| 21 | 75.3 | 1.3280% | 74 | 23.8 | 4.2017% |
| 22 | 74.3 | 1.3459% | 75 | 22.9 | 4.3668% |
| 23 | 73.3 | 1.3643% | 76 | 22.0 | 4.5455% |
| 24 | 72.3 | 1.3831% | 77 | 21.2 | 4.7170% |
| 25 | 71.3 | 1.4025% | 78 | 20.3 | 4.9261% |
| 26 | 70.3 | 1.4225% | 79 | 19.5 | 5.1282% |
| 27 | 69.3 | 1.4430% | 80 | 18.7 | 5.3476% |
| 28 | 68.3 | 1.4641% | 81 | 17.9 | 5.5866% |
| 29 | 67.3 | 1.4859% | 82 | 17.1 | 5.8480% |
| 30 | 66.3 | 1.5083% | 83 | 16.3 | 6.1350% |
| 31 | 65.3 | 1.5314% | 84 | 15.5 | 6.4516% |
| 32 | 64.3 | 1.5552% | 85 | 14.8 | 6.7568% |
| 33 | 63.3 | 1.5798% | 86 | 14.1 | 7.0922% |
| 34 | 62.3 | 1.6051% | 87 | 13.4 | 7.4627% |
| 35 | 61.4 | 1.6287% | 88 | 12.7 | 7.8740% |
| 36 | 60.4 | 1.6556% | 89 | 12.0 | 8.3333% |
| 37 | 59.4 | 1.6835% | 90 | 11.4 | 8.7719% |
| 38 | 58.4 | 1.7123% | 91 | 10.8 | 9.2593% |
| 39 | 57.4 | 1.7422% | 92 | 10.2 | 9.8039% |
| 40 | 56.4 | 1.7730% | 93 | 9.6 | 10.4167% |
| 41 | 55.4 | 1.8051% | 94 | 9.1 | 10.9890% |
| 42 | 54.4 | 1.8382% | 95 | 8.6 | 11.6279% |
| 43 | 53.4 | 1.8727% | 96 | 8.1 | 12.3457% |
| 44 | 52.4 | 1.9084% | 97 | 7.6 | 13.1579% |
| 45 | 51.5 | 1.9417% | 98 | 7.1 | 14.0845% |
| 46 | 50.5 | 1.9802% | 99 | 6.7 | 14.9254% |
| 47 | 49.5 | 2.0202% | 100 | 6.3 | 15.8730% |
| 48 | 48.5 | 2.0619% | 101 | 5.9 | 16.9492% |
| 49 | 47.5 | 2.1053% | 102 | 5.5 | 18.1818% |
| 50 | 46.5 | 2.1505% | 103 | 5.2 | 19.2308% |
| 51 | 45.5 | 2.1978% | 104 | 4.9 | 20.4082% |
| 52 | 44.6 | 2.2422% | 105 | 4.5 | 22.2222% |
| 53 | 43.6 | 2.2936% | 106 | 4.2 | 23.8095% |
| 54 | 42.6 | 2.3474% | 107 | 3.9 | 25.6410% |
| 55 | 40.6 | 2.4631% | 108 | 3.7 | 27.0270% |
| 56 | 40.7 | 2.4570% | 109 | 3.4 | 29.4118% |
| 57 | 39.7 | 2.5189% | 110 | 3.1 | 32.2581% |
| 58 | 38.7 | 2.5840% | 111 | 2.9 | 34.4828% |
| 59 | 37.8 | 2.6455% | 112 | 2.6 | 38.4615% |
| 60 | 35.8 | 2.7933% | 113 | 2.4 | 41.6667% |
| 61 | 35.8 | 2.7933% | 114 | 2.1 | 47.6190% |
| 62 | 34.9 | 2.8653% | 115 | 1.9 | 52.6316% |

**EXHIBIT 101**

019220



## *TERMSHEET*

| | | |
|---|---|---|
| Policy Number | : | # 30219 Separate Account |
| Policyholder | : | The Okada Family Foundation, Inc |
| Annuitant | : | Mark Okada |
| Beneficiary | : | The Okada Family Foundation, Inc |
| Premiums planned | : | Approx. US$ 20'000'000 |
| Premium Date | : | TBA |
| Policy Date | : | TBA |
| Policy Type | : | Deferred Variable Annuity (DVA) |
| Issuing Company | : | Crown Global Life Insurance Ltd., Bermuda (953d) |
| Custodian Bank | : | n/a |
| Account/Portfolio Number | : | n/a |
| Investment Manager | : | n/a |
| Asset Allocation/Investment Profile | : | IDF: Atlas IDF, LP/ Rand Advisors LLC |
| Investment of Funds Model: | : | n/a |
| Acceptance Fee | : | Zero |
| Mgmt. & Expense Fee | : | 0.45% p.a  $10mm of  Premium<br>0.35% p.a. $11-20mm of Premium<br>0.25% p.a. $21mm+ of Premium, provided that if the Policy Account Value exceeds $50mm, the annual rate shall be 0.1% p.a. on the portion of Policy Account Value in excess of $50mm. |
| Policy Administration Fee | : | US$ 2,900 p.a. |
| DAC Tax | : | 0.25% of all premium payments |
| Federal Excise Tax – 1% of Premium | : | n/a |
| Surrender Charge | : | US$ 5'000 |
| Policy Audit (optional) | : | US$ 1'975 p.a. |

Place, Date        GRAND CAYMAN , DEC 9TH 2015 .

Signature

*Christopher Pezalla*

Policyholder

019221

**EXHIBIT 102**

019222

# PARTICIPATION AGREEMENT

among

**CROWN GLOBAL LIFE INSURANCE LTD.**

and

**CROWN GLOBAL LIFE INSURANCE LTD.** acting on behalf of each its Separate Accounts set out in Schedule A hereto as may be amended from time to time

and

**ATLAS IDF, LP**

and

**RAND ADVISORS, LLC**

**Dated as of**

**November 30, 2015**

{00290535.DOC; 3}

019223

## TABLE OF CONTENTS

**Page**

ARTICLE I. Certain Definitions ....................................................................... 1

ARTICLE II. Sale and Withdrawal of Interests ................................................ 3

ARTICLE III. Net Asset Value ........................................................................ 5

ARTICLE IV. Representations, Warranties and Covenants ............................ 6

ARTICLE V. Investment Restrictions; Information and Reports; Other
  Obligations ............................................................................................. 122

ARTICLE VI. Expenses. .................................................................................. 13

ARTICLE VII. Indemnification ....................................................................... 13

ARTICLE VIII. Termination ............................................................................ 15

ARTICLE IX. Notices, Requests or Consents ................................................. 16

ARTICLE X. Privacy Obligations ................................................................... 16

ARTICLE XI. Miscellaneous ........................................................................... 17

019224

**THIS PARTICIPATION AGREEMENT** (this "**Agreement**") is made and entered into by and among **CROWN GLOBAL LIFE INSURANCE LTD.** ("CGLI"), a Bermuda exempted company registered as a long term Class C insurer, the Company on behalf of each of its separate accounts (and subaccounts, if any, thereof) set forth on Schedule A hereto ("**Schedule A Separate Accounts**" and together with CGIL, the "**Company**"), as the same may be amended from time to time, **ATLAS IDF, LP**, a Delaware limited partnership (the "**Fund**"), and **RAND ADVISORS, LLC**, a Delaware limited liability company (the "**Adviser**") (collectively, the "**Parties**" and each, a "**Party**"), and shall be effective as of the date set forth on the counterpart signature page hereto.

**WITNESSETH:**

**WHEREAS**, the Fund was organized as a private investment vehicle and is offering its limited partnership interests ("**Interests**") to Eligible Insurance Funds and to separate accounts, or subaccounts thereof, that fund Variable Contracts offered by Eligible Insurance Companies, as such terms are defined below;

**WHEREAS**, the offering and sale of Interests will be exempt from registration or qualification under the U.S. Securities Act of 1933, as amended (the "**1933 Act**");

**WHEREAS**, the Company has established a Separate Account, and may in the future establish additional Separate Accounts (and subaccounts thereof) to hold one or more Interests; and

**WHEREAS**, the Company desires to purchase, and the Fund desires to issue, Interests in accordance with this Agreement.

**NOW, THEREFORE**, the Parties agree as follows:

**ARTICLE I. CERTAIN DEFINITIONS**

**1.1** "**Business Day**" means each day the NYSE is open for regular trading, unless defined differently on Schedule A-2 hereto.

**1.2** "**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

**1.3** "**Company Contracts**" means those Variable Contracts issued by the Company and listed on Schedule A hereto, as the same may be amended from time to time.

**1.4** "**Compliant Seed Investment**" means an investment in the Fund by the Adviser made in compliance with the Tax Requirements.

**1.5** "**Confidential Information**" as used in this provision means any term of this Agreement, any transaction in connection with this Agreement, and any other non-public information concerning the Parties and their respective businesses and affiliates that may be acquired by reason of this Agreement or any transaction in connection therewith, but shall not include any information that is in or has entered the public domain other than due to a breach of Section 10 hereof.

**1.6** "**Contract PPM**" means offering memorandum, including any amendment, supplement or addendum thereto, as amended from time to time, utilized in connection with the offering of the Company Contracts.

019225

    **1.7**   "**Customer Information**" means any "non-public personal information" (as defined in Regulation S-P of the U.S. Securities and Exchange Commission (the "**SEC**")) about a Policy Owner or prospective Policy Owner.  Customer Information includes, but is not limited to, a Policy Owner's (or prospective Policy Owner's) name, social security number and health and financial information.

    **1.8**   "**Eligible Insurance Company**" means a life insurance company that is taxed as a U.S. life insurance company under Subchapter L of the Code and is eligible to purchase and hold Interests under the Tax Requirements.

    **1.9**   "**Eligible Insurance Fund**" means a regulated investment company, real estate investment trust, limited liability company, limited partnership or trust that is eligible to purchase and hold Interests under the Tax Requirements and is in compliance with Revenue Ruling 2005-7.

    **1.10**   "**Fund PPM**" means offering memorandum, including any amendment, supplement or addendum thereto, as amended from time to time, provided by the Fund or the Adviser to the Company in connection with the offering of Interests.

    **1.11**   "**Fund Agreements**" means the Operating Agreement and the subscription documents of the Fund.

    **1.12**   "**Fund Reports**" shall have the meaning set forth in Section 5.2(b) hereof.

    **1.13**   "**Interest Owner**" means (a) any Eligible Insurance Fund that and (b) any separate account (or a subaccount thereof) of an Eligible Insurance Company on behalf of which the Eligible Insurance Company has invested in one or more Interests.

    **1.14**   "**Operating Agreement**" means the Fund's amended and restated limited partnership agreement dated as of the date set forth on Schedule A-2 hereto.

    **1.15**   "**Policy Owner**" means the owner of a Company Contract.

    **1.16**   "**Policy Representative**" means any agent or representative of a Policy Owner, the grantor or beneficiary of any Policy Owner that is a trust, or any agent or representative of such grantor or beneficiary.

    **1.17**   "**Privacy Law**" means any applicable privacy law.

    **1.18**   "**Sales Literature**" means (i) the Fund PPM and reports provided to the Company by the Fund or the Adviser, (ii) any written or other communication distributed or made available to existing or potential investors or their agents or employees, including brochures, circulars, research reports, market letters, form letters, seminar texts, or reprints of or excerpts from any other advertisement, sales literature, or published article, with respect to the Fund, and (iii) any other material regarding the Fund constituting sales literature or advertising, including all offering materials.

    **1.19**   "**Separate Accounts**" means those separate accounts (or subaccounts thereof) established by the Company for the purpose of holding one or more Interests and listed on

019226

Schedule A hereto, as the same may be amended from time to time.  Each Separate Account shall be a separate and distinct owner of Interest(s).

**1.20**  "**Tax Requirements**" means the requirements of Section 817(h) of the Code, Regulations 1.817-5 thereunder and any amendments or successor provisions thereto.

**1.21**  "**Valuation Date**" means the last Business Day of each calendar month.

**1.22**  "**Variable Contract**" means a variable life insurance policy, variable annuity policy or other variable insurance policy that is characterized as a "variable contract" under Section 817(d) of the Code.

### ARTICLE II. SALE AND WITHDRAWAL OF INTERESTS

**2.1**  **Offering and Sale of Interests**.

(a)  Subject to Section 8.2 and subject to and on the terms of the Fund PPM, the Fund may offer Interests for purchase in any amount by the Company on behalf of the Separate Accounts, subject to the minimum initial investment amount set forth on Schedule A-2 hereto.  The Fund may accept additional capital contributions in any amount, subject to the minimum additional investment amount set forth on Schedule A-2 hereto.  Capital contributions will be accepted as of the first Business Day of each calendar month or quarter (as specified on Schedule A-2 hereto) (each, a "**Subscription Date**").  The Company shall notify the Adviser of its intent to purchase Interests by providing notice no later than the date and time set forth on Schedule A-2 hereto.  The Company shall complete and send to the Fund the Subscription Form set forth in Appendix A.  The Company shall not be required to enter into any agreement other than this Agreement and the Fund Agreements in order to purchase Interests.

(b)  The Fund may suspend or discontinue its offering of Interests solely in conformity with the Fund PPM upon at least the number of days' prior written notice to the Company set forth on Schedule A-2 hereto.

(c)  The issuance and transfer of Interests shall be by book entry only, and certificates therefor shall not be issued to the Company or the Separate Accounts.

**2.2**  **Payment for Interests**.  The Company shall transmit by wire transfer federal funds in the amount of the purchased Interests to be received by the Fund no later than the date and time set forth on Schedule A-2 hereto.  Federal funds received after that time and date shall be held in a subscription account of the Fund's custodian until the next Subscription Date or returned to the Company upon its request.

**2.3**  **Withdrawal of Interests**.

(a)  **General Withdrawal Terms.**  Any withdrawal request shall specify the number and value of the Interest(s) to be withdrawn, shall not be less than the amount set forth on Schedule A-2 hereto and shall be subject to any other requirements set forth on Schedule A-2 hereto.  Any partial withdrawal of Interest(s) that leaves the value of the Interest(s) held by a Separate Account at less than the amount set forth on Schedule A-2 hereto as of the date of withdrawal shall be deemed a complete withdrawal.  (See Appendix

019227

B for Withdrawal Form.) The terms of this Section 2.3(a) shall apply unless otherwise provided in Sections 2.3(b) through 2.3(f) or on Schedule A-2 hereto.

(b)    **Standard Withdrawals.**  Subject to Section 2.3(f), the Company will be permitted to redeem for cash any Interest, in whole or in part, held by a Separate Account upon not less than the number of days' prior written notice to the Adviser set forth on Schedule A-2 hereto (each such notice, a "**Standard Withdrawal Request**") as of the last day of any calendar month or quarter as set forth on Schedule A-2 hereto (each, a "**Standard Withdrawal Date**") following the lock-up period set forth on Schedule A-2 hereto.  The Adviser may waive the notice period in its discretion.  The withdrawal proceeds in connection with a Standard Withdrawal Request shall be paid in accordance with the timeline set forth on Schedule A-2.

(c)    **Death Benefit Withdrawals.**  Subject to Section 2.3(f), with respect to withdrawals required for the payment of a death benefit, the Company may redeem for cash any Interest, in whole or in part, held by a Separate Account upon not less than the number of days' prior written notice to the Adviser set forth on Schedule A-2 hereto (each such notice, a "**Death Benefit Withdrawal Request**") as of the last day of any calendar month (each, a "**Death Benefit Withdrawal Date**").  The Adviser may waive the notice period in its discretion.  The withdrawal proceeds in connection with a Death Benefit Withdrawal Request shall be paid in accordance with the timeline set forth on Schedule A-2.

(d)    **Special Withdrawals.**  Subject to Section 2.3(f), with respect to withdrawals required for the payment of any insurance charges and/or expenses of the Company Contracts or as otherwise agreed upon by the Adviser, the Company may redeem for cash any Interest, in whole or in part, held by a Separate Account upon not less than the number of days' prior written notice to the Adviser set forth on Schedule A-2 hereto (each such notice, a "**Special Withdrawal Request**") as of the last day of any calendar month (each, a "**Special Withdrawal Date**").  The Adviser may waive the notice period in its discretion.  The withdrawal proceeds in connection with a Special Withdrawal Request shall be paid in accordance with the timeline set forth on Schedule A-2.

(e)    **Withdrawal Events.**  Subject to Section 2.3(f), the Company may redeem for cash Interests if any of the following events ("**Withdrawal Events**") occur: (i) the Fund fails to comply with the Tax Requirements, and such noncompliance cannot be cured in a reasonable period of time pursuant to the regulations and proceedings of the U.S. Department of the Treasury (the "**Treasury**") and the U.S. Internal Revenue Service; or (ii) there is a violation of the requirements set forth on Schedule D hereto.  The Adviser shall notify the Company as soon as any Withdrawal Event occurs.  Upon the occurrence of a Withdrawal Event, the Company may redeem its Interests as of the last day of any calendar month (each, an "**Event Withdrawal Date**") upon not less than 30 days' prior written notice to the Adviser (each such notice an "**Event Withdrawal Request**").  Upon an Event Withdrawal Request, the Fund shall pay 100% of the withdrawal proceeds within 30 days following the Event Withdrawal Date.  Event Withdrawal Requests shall not be subject to any lock-up withdrawal requests.

(f)    **Limitations on Withdrawal Rights Granted Hereunder.** Notwithstanding the foregoing provisions of this Section 2.3, and any other terms of this Agreement, if the

019228

Adviser determines that compliance with any of the withdrawal and payment rights granted pursuant to this Section 2.3 or any other provisions of this Agreement shall (i) cause it or the Fund to fail to adhere to the Tax Requirements, or (ii) require it to liquidate any asset which is then illiquid and/or part of a Side Pocket Account (as defined in the Operating Agreement), then it may defer such compliance until such failure or requirement shall no longer exist; *provided* that for so long as (x) such condition continues and (y) the Company shall not be receiving payment of any insurance charges and/or expenses of the Company Contracts as a result of such delayed compliance, the Adviser agrees that it shall defer its fees pursuant to Operating Agreement, and such amounts otherwise payable to the Adviser shall instead be paid by the Fund to the Company for such insurance charges and/or expenses.

**2.4** **Payment of Withdrawal Proceeds.**

**(a)** **Payment of Withdrawal Proceeds Generally.**  Subject always to any liquidity limitations set out in the Fund PPM, the Fund shall transfer to the Company, or to any person designated by the Company in writing, any withdrawal proceeds via wire transfer in the form of federal funds.

**(b)** **Payment of Withdrawal Proceeds In-Kind.**  The Fund may, but only if permitted by applicable law and in conformity with the Operating Agreement and the Fund PPM, transfer in-kind interests in an underlying investment of the Fund to (i) the Company and/or the Separate Accounts in full or partial satisfaction of any withdrawal request, or (ii) a Policy Owner in full or partial satisfaction of a full or partial surrender of a Company Contract, or to a beneficiary under a Company Contract in full or partial satisfaction of a death benefit payment under such Company Contract; provided, however, that such transfer to a Policy Owner is conducted as a transaction exempt from registration under the 1933 Act. For the avoidance of doubt, notwithstanding the foregoing, the provisions of this Section 2.4(b) shall be subject to the limitations on liquidity and withdrawals, and terms therein on payments with withdrawal proceeds (including, in particular, the payment of withdrawal proceeds in-kind) set forth in in the Fund Agreements.

**2.5** **Company Contracts.**  The Fund and the Adviser acknowledge and agree that, subject to each Company Contract, CGLI shall have the exclusive right, in its sole discretion, to suspend the offer or sale of any of the Company Contracts or to reject any application for the purchase of any Company Contract.

### ARTICLE III. Net Asset Value

**3.1** **NAV Generally.**  The Fund shall determine its net asset value (the "**NAV**") on each Valuation Date in the manner prescribed in the Operating Agreement and the Fund PPM. The Adviser shall make the NAV available to the Company in an electronic data file in a format specified by the Company, and shall do so as soon as reasonably practicable after each Valuation Date, and in any event no later than the date and time set forth on Schedule A-2 hereto.

**3.2** **Adjustments.**  The NAV information provided pursuant to Section 3.1 hereof may be based on estimated values and/or values determined by the Adviser acting in good faith and using reasonable judgment ("**Reasonable Valuations**"), and prospective adjustments shall be made, if necessary, to correct the NAV within a reasonable period of time after the Fund or

the Adviser is in receipt of the Fund's audited financials.  No retroactive adjustments shall be made.

### ARTICLE IV. REPRESENTATIONS, WARRANTIES AND COVENANTS

**4.1     Representations, Warranties and Covenants of the Company.**  The Company represents and warrants to, and for the benefit of, and covenants and agrees with the Fund and the Adviser that:

**(a)**     CGLI is an Eligible Insurance Company that is duly organized, validly existing and in good standing under the laws of Bermuda.

**(b)**     The Separate Account(s) are legally and validly established segregated asset accounts (or subaccounts thereof) under the laws of Bermuda (including, without limitation the Bermuda Insurance Act 1978, as amended ("Bermuda Insurance Act") and related rules and regulations and any Bermuda private act to which CGLI or the Separate Accounts are subject), applicable state insurance and tax laws and regulations, and were established by CGIL to set aside and invest premiums attributable to Company Contracts.

**(c)**     CGLI has the power and is duly qualified and has all necessary licences, consents, permits and authorities necessary (including those referred to in paragraph 4.1(a) above) to offer and sell the Company Contracts and for the Company to purchase the Interests, all of which are valid and subsisting.

**(d)**     The Company shall be an "accredited investor" within the meaning of Rule 501(a) of Regulation D under the 1933 Act (an "**Accredited Investor**"), a "qualified client" within the meaning of Rule 205-3 promulgated under the U.S. Investment Advisers Act of 1940, as amended, and a "qualified purchaser" within the meaning of Section 2(a)(51) of the U.S. Investment Company Act of 1940, as amended (a "**Qualified Purchaser**"; such statute, the "**1940 Act**").

**(e)**     The Company Contracts shall be offered and sold, and the Contract PPM and the Fund PPM shall be disseminated to prospective or existing Policy Owners, in compliance in all material respects with all applicable Bermuda, U.S. and other foreign securities, commodities, tax and insurance laws and regulations.

**(f)**     CGLI shall sell Company Contracts only to persons that CGLI or its agents reasonably believe to be Accredited Investors and Qualified Purchasers.

**(g)**     The Company Contracts shall be treated as Variable Contracts under the Code, provided that the Fund and the Adviser comply with all of the terms of the Operating Agreement and this Agreement, and CGLI shall promptly notify the Fund and the Adviser in writing upon forming a reasonable belief that the Company Contracts will or may no longer qualify for such treatment.

**(h)**     The Separate Accounts shall not be subject to the U.S. Employee Retirement Income Security Act of 1974, as amended ("**ERISA**").

**(i)**     The Contract PPM does not contain any untrue statement of material fact, other than with respect to information provided in writing by the Fund or the Adviser for

019230

inclusion in the Contract PPM. For the avoidance of doubt, the Company is not representing whether the Contract PPM meets the full standards of disclosure contemplated under the 1933 Act, and the U.S. Securities and Exchange Act, as amended, for issuers registered under such Acts, or for issuers that are not so registered.

(j)     The Company shall not disseminate any information, or make any representation or statement, to any person concerning the offer or sale of Interests or the Company Contracts other than the information, representations and statements contained in the Contract PPM, the Fund PPM, Fund Reports, or any Sales Literature approved by the Adviser for such purposes. This Section 4.1(j) shall not in any way restrict the right of the Company to disseminate materials (such as illustrations) describing the Company, its operations and its products, as well as those materials describing the insurance industry and insurance products generally.

(k)     The Company shall establish and implement policies and procedures reasonably designed to discharge its obligations under applicable federal laws and regulations regarding money laundering, including, but not limited the Company's Know Your Client (KYC) and due diligence requirements under the Bermuda Proceeds of Crime (Anti-Money Laundering and Anti-Terrorist Financing) Regulations 2008, as amended the regulations of the Treasury and the Executive Orders related to the Treasury's Office of Foreign Assets Control ("**OFAC**"; and, together, the "**AML Procedures**"). The Fund and the Adviser acknowledge that in connection with, and as a complement to its own AML Procedures, where permitted by applicable law, the Company shall be entitled to rely on AML Procedures implemented by third parties with respect to Policy Owners; provided that such acknowledgement shall not limit any rights of the Fund or the advisor relating to AML under the Fund Agreements.

The Company's AML Procedures shall include those reasonably designed to ensure the accuracy of the following representations of the Company:

(i)     the identity of each purchaser of a Company Contract has been established by evidence that the Company reasonably believes is genuine;

(ii)     the Company reasonably believes that no premium funds tendered for the purchase of a Company Contract are derived directly or indirectly from activities that may contravene relevant U.S. federal or state, or international, laws or regulations related to money laundering; and

(iii)     unless the Fund, in its sole discretion, lawfully waives such a requirement, CGIL shall not issue a Variable Contract to any person or entity that the Company reasonably believes, at the time of the possible purchase of the Company Contract, to be:

1. a country, territory, organization, person or entity named in OFAC's List of Specially Designated Nationals and Blocked Persons, as such list may be amended from time to time;

2. a person or entity that resides or has a place of business in a country or territory named on an OFAC list, or that is designated as a

019231

"Non-Cooperative Jurisdiction" by the Financial Action Task Force on Money Laundering, or whose premium funds tendered for the acquisition of a Company Contract are transferred from or through any such country or territory;

3. a "foreign shell bank" as such term is defined in 31 U.S.C. § 5318(j) and Treasury regulations thereunder;

4. a person or entity that resides in, or is organized under, the laws of a jurisdiction designated by the Secretary of the Treasury as a "jurisdiction of primary money laundering concern" pursuant to 31 U.S.C. § 5318A; or

5. a "senior foreign political figure," or a "family member" or "close associate" of a senior foreign political figure as such terms are defined in the *Guidance on Enhanced Scrutiny for Transactions that May Involve the Proceeds of Foreign Official Corruption* issued by the Treasury, unless CGIL has diligently scrutinized the proposed purchase of the Company Contract by or for the benefit of such person and has determined to permit such purchase.

(l)     The Company shall promptly notify the Fund and the Adviser of any change in the information set forth in this Section 4.1.

(m)     The Company is not aware of any conflict between this Agreement and any law or regulation to which it may be subject (including under any Bermuda private act).

4.2     **Of the Fund.**  The Fund represents and warrants to, and for the benefit of, and covenants and agrees with the Company that:

(a)     The Fund has been established under the laws of the jurisdiction of its formation and is in good standing thereunder, and qualifies for the exclusion from the definition of "investment company" provided by Section 3(c)(7) of the 1940 Act.

(b)     The Interests shall be offered and sold in compliance in all material respects with all applicable federal and state laws and regulations.

(c)     None of the Fund; any predecessor of the Fund; any affiliated issuer of the Fund; any director, executive officer, other officer who is participating in the offering of interests in the Fund, general partner or managing member of the Fund; any beneficial owner of 20% or more of the Fund's outstanding voting equity securities (calculated on the basis of voting power); any promoter connected with the Fund in any capacity; the Adviser; any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with the sale of interests in the Fund (a "**Solicitor**"); any general partner or managing member of the Adviser or a Solicitor; or any director, executive officer or other officer who is participating in the offering of interests in the Fund of the Adviser or a Solicitor or general partner or managing member of the Adviser or a Solicitor is subject to any event listed in Rule 506(d)(1).

(d)     The Fund shall offer and sell Interests only to Eligible Insurance Funds and Eligible Insurance Companies that have certified that they (i) are Accredited Investors and

019232

Qualified Purchasers and (ii) will purchase and hold Interests, directly or indirectly, solely for the benefit of policy owners that they reasonably believe are Accredited Investors and Qualified Purchasers; provided, however, that the Fund may offer and sell Interests to employee benefit plans and other funds subject to ERISA and/or Section 4975 of the Code that meet the requirements of clause (i). Further, the Fund shall, with the exception of any Compliant Seed Investment, issue Interests only to Eligible Insurance Funds and Eligible Insurance Companies with which it has entered into an agreement containing provisions substantially similar to those provisions of this Agreement listed on Schedule A-2 hereto.

(e)     The Fund shall invest, hold and dispose of its assets in compliance with the Tax Requirements. The Fund or the Adviser shall promptly notify the Company upon forming a reasonable belief that the Fund has ceased, or may cease, to comply with the Tax Requirements, and shall cure any non-conformance within the period for cure afforded by Regulations 1.817-5. The Fund and the Adviser acknowledge that the Fund's compliance with the Tax Requirements is material to their performance under this Agreement.

(f)     The Fund shall be operated so as to maintain its treatment for U.S. federal income tax purposes as a partnership, or if there is only one Interest Owner, a disregarded entity, under the Code, and the Fund or the Adviser shall promptly notify the Company upon forming a reasonable belief that the Fund has ceased, or may cease, to qualify for such tax treatment.

(g)     The Fund, the Adviser and their respective officers, directors, employees, principals, affiliates and other representatives shall comply with the requirements set forth on Schedule D hereto so as to prevent any Policy Owner from having "incidents of control" under the Investor Control Doctrine (as defined on Schedule D hereto).

(h)     The Fund's assets shall be invested in compliance with the investment restrictions set forth on Schedule B hereto, as the same may be modified from time to time pursuant to Section 5.1.

(i)     The Adviser is and will exercise commercially reasonable best efforts to remain registered with the SEC as an investment adviser; provided that the Adviser shall be deemed to be so registered if it qualifies as a "relying" Adviser. If the Adviser applies to withdraw its registration, the Adviser shall notify the Company at least thirty (30) days prior to the intended effective date of its withdrawal.

(j)     The Adviser is exempt from registration as a commodity pool operator ("**CPO**") pursuant to CFTC Rule 4.13(a)(3) and shall notify the Company as soon as reasonably practicable upon forming a reasonable belief that such exempt status will change.

(k)     The Adviser shall have the sole discretionary authority over the Fund's investments and shall manage the Fund in accordance with the Operating Agreement and the Fund PPM; provided that, for the avoidance of doubt, the Fund may invest in Portfolio Funds (as defined in the Fund PPM) and the like, in the manner contemplated in the Fund PPM.

(l)     The Fund PPM does not contain any untrue statement of material fact, other than with respect to information provided in writing by the Company for inclusion in the Fund PPM. For the avoidance of doubt, the Fund is not representing whether the Fund PPM

019233

meets the full standards of disclosure contemplated under the 1933 Act, and the U.S. Securities and Exchange Act, as amended, for issuers registered under such Acts, or for issuers that are not so registered.

(m)    No material change shall be made to the Operating Agreement or the Fund PPM (e.g., a change to the Fund's investment objective or strategies) without at least thirty (30) days' prior notice to the Company.  Any updates thereto shall be promptly delivered to the Company.

(n)    Subject to Section 4.1(k), the Fund shall be responsible for anti-money laundering compliance related to its activities, and shall maintain and implement policies and procedures reasonably designed to discharge its obligations under applicable federal laws and regulations regarding money laundering, including, but not limited to, the USA PATRIOT Act of 2001, the regulations of the Treasury and the Executive Orders related to OFAC; provided that for the avoidance of doubt the Fund may delegate such compliance in a manner that is substantially consistent with standard practices of private investment funds in the U.S.

(o)    The Company shall be provided the most recent audited financial statements of the Fund as soon as reasonably practicable after they become available.

(p)    Neither the Fund nor the Adviser shall disseminate any information, or make any representation or statement, to any person concerning the Company or the Company Contracts other than the information, representations and statements contained in the Contract PPM, the Fund PPM, any Sales Literature approved by the Company pursuant to Section 5.3, or available in the public domain.

(q)    Unless the Company otherwise consents, the Fund and the Adviser shall use its commercially reasonable best efforts to ensure that all communications related specifically to the Company Contracts, shall only be between the Company and a Policy Owner or Policy Representative.

(r)    The Fund shall maintain and implement commercially reasonable procedures to safeguard the confidentiality and integrity of their records with respect to the Fund and the Company.

(s)    The Fund shall promptly notify the Company upon any change to a service provider to the Company.

(t)    The Fund is not aware of any conflict between this Agreement and any law or other obligation to which it or the Advisor may not be subject.

(u)    The Fund shall promptly notify the Company of any change in the information set forth in this Section 4.2.

(v)    The Fund shall not invest in a "passive foreign investment company" (a "**PFIC**") as defined in Section 1297(a) of the Code unless, prior to making such investment, the Fund has certified to the Company that (i) such PFIC will comply with the requirements of Section 1295(a)(2) of the Code and the Treasury regulations thereunder (e.g., that the PFIC provide its "qualifying electing fund" ("**QEF**") shareholders with a PFIC Annual

019234

Information Statement) or (ii) the Fund will provide information reasonably equivalent to the information contained in a PFIC Annual Information Statement. If the Fund or the Company determines that a PFIC is not in compliance with its QEF reporting requirements, the Fund shall take any steps necessary to cause the PFIC to comply therewith.

**4.3** **Of the Adviser.** The Adviser represents, warrants and covenants to the Company that the Adviser shall use reasonable efforts to provide the Company with any information concerning the Adviser that the Company requires in making any filings with any government authority having regulatory authority over the Company.

**4.4** **Mutual Representations, Warranties and Covenants.** Each of the Company and the Fund hereto represents and warrants to, and for the benefit of, and covenants and agrees with the other Parties that:

(a) it shall use reasonable efforts to cooperate with each other Party and any governmental authority in respect of any such authority's investigation or inquiry concerning this Agreement or any of the transactions contemplated hereby;

(b) the Adviser and the Company are not in an affiliate or agency relationship;

(c) upon reasonable notice, the execution and delivery of this Agreement and the consummation of the transactions contemplated herein (i) have been duly authorized by all necessary corporate or other formal action by such Party and, when executed and delivered, this Agreement shall be a valid and binding obligation upon such Party enforceable in accordance with its terms; and (ii) the transactions contemplated thereto do not and will not violate, conflict with or constitute a default under any requirement of any law or any regulation of Bermuda, the U.S. or otherwise (including, without limitation, any Bermuda private act);

(d) except as otherwise set forth herein, the provisions of this Agreement shall be deemed to control in the case of any conflict between the provisions of this Agreement and the provisions of the Fund PPM, Operating Agreement, or any other agreement entered into between the Company and the Fund or the Adviser;

(e) the Operating Agreement and the Fund PPM, as currently in effect, shall have been delivered to the Company prior to the signing of this Agreement; and

(f) the representations, warranties and covenants contained in this Agreement and the Fund Agreements (collectively, the "**Party Documents**") are the only representations, warranties and covenants that have been made by any Party to any other Party, and in entering into this Agreement, each Party has relied solely on the information contained in the Party Documents or that it obtained by its own independent investigation.

**4.5** **Duration.** The representations, warranties and covenants contained in this Article IV shall be deemed continuing at all times until the termination of this Agreement.

019235

## ARTICLE V. INVESTMENT RESTRICTIONS; INFORMATION AND REPORTS; OTHER OBLIGATIONS

**5.1    Revision of Investment Restrictions.**    The investment restrictions of the Company are as set forth on Schedule B hereto.  The Company shall be permitted to request a change in such investment restrictions only if such change is necessitated by a change in the laws, regulations or interpretations thereof to which the Company is subject.  The Company shall make a request for a change in its investment restrictions in writing to the Fund and the Adviser.  If the Adviser determines in its absolute discretion that causing the Fund to comply with the revised investment restrictions proposed by the Company is in the best interests of the Interest Owners, the Parties shall amend Schedule B hereto accordingly.  If the Adviser determines otherwise, it shall notify the Company within thirty (30) days of such determination.

**5.2    Provision of Reports and Information.**    The Company shall provide to the Adviser, upon request, a specimen copy of the Contract PPM and each Company Contract.  The Fund shall on a timely basis provide to the Company the following without charge:

**(a)**    a current copy of the Fund PPM (and any amendment or supplement thereto) in any form the Company may reasonably request;

**(b)**    electronic copies of those reports and other communications that the Fund provides to its Interest Owners, including its periodic performance reports (collectively, the "**Fund Reports**");

**(c)**    any reports and information that the Company requires as a U.S. taxpayer; and

**(d)**    any other documents that the Company may reasonably request of the Fund, including, but not limited to, its governing instruments, tax reports, marketing materials, and any government filings and updates and amendments thereto, including, but not limited to, the Adviser's Form ADV; provided that neither the Fund nor the Adviser need supply any agreements or documents of the Fund or the Adviser that are confidential.

**5.3    Review of Sales Literature.**  Neither the Fund, the Adviser nor any person acting on their behalf shall use any Sales Literature in which the Company is named without the consent of the Company which shall not be unreasonably withheld or delayed.

**5.4    Distribution of Certain Information by the Company.**  The Company shall be permitted, without further review or consent of the Fund or the Adviser, to deliver to Policy Owners, prospective Policy Owners, and their agents and representatives, the Fund PPM (and any amendments or supplements thereto), Fund Reports and any Sales Literature approved for such purposes by the Adviser.

**5.5    Provision of Information Prior to Signing of Agreement.**  Prior to signing this Agreement, the Adviser has provided the Company with its most recent Form ADV, and any amendments thereto, as filed with the SEC.

Prior to signing this Agreement, the Fund or the Adviser has provided the Company with (a) the name and address of the Fund's independent auditor(s) and (b) upon the Company's

019236

request, a consent and authorization for the Company to contact the auditor(s) for information reasonably required about the auditor(s) and its/their relationship with the Fund and the Adviser. At any time the Fund retains a different independent auditor, the Fund or the Adviser shall provide the Company with the same consent and authorization upon request.  For avoidance of doubt, the Company shall not be entitled to obtain access to the Fund's books and records pursuant to this Section 5.5.

Prior to signing this Agreement, CGIL has provided the Fund with its Class C certificate of registration issued to it by the Bermuda Monetary Authority and any directions and/or approvals relating to it issued by the Bermuda Monetary Authority pursuant to the Bermuda Insurance Act.

**5.6    Certification of Investment Diversification.**  As soon as reasonably practicable after the end of each calendar quarter, but in no event later than the number of days after the end of such calendar quarter set forth on Schedule A-2 hereto, the Adviser shall deliver to the Company a written certification in the form of Schedule C hereto.

## ARTICLE VI. EXPENSES

**6.1    Expenses Borne by the Company.**  The Company shall bear all of the costs incurred in connection with the (i) filing and qualification of the Company Contracts under any applicable state insurance or securities laws; (ii) preparation of the Contract PPM and any other necessary disclosure documents or regulatory filings with respect to the Company Contracts or the Separate Accounts; (iii) preparation and dissemination to Policy Owners of Fund Reports and of all statements, notices or other documents required by applicable federal and state laws and regulations; (iv) dissemination of the Fund PPM to Policy Owners and prospective Policy Owners; and (v) performance of its obligations under this Agreement.

**6.2    Expenses Borne by the Fund.**  The Fund shall bear all of the costs incurred in connection with the offering and sale of Interests to Interest Owners and the performance of its obligations under this Agreement, in addition to the other expenses it bears pursuant to the Operating Agreement and the Fund PPM.

## ARTICLE VII. INDEMNIFICATION

**7.1    Indemnification of Fund Parties.**  The Company shall indemnify and hold harmless the Fund and the Adviser (collectively, the "**Fund Parties**" and each, a "**Fund Party**"), against any and all claims, losses, damages or expenses, including without limitation any judgment, settlement, reasonable attorney's and accountant's fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or proceeding (collectively, "**Claims**" and each, a "**Claim**"); provided, however, that a Fund Party shall be entitled to indemnification in respect of a Claim only if:

> **(a)**    the Claim does not arise out of its or another Fund Party's willful misfeasance, bad faith, gross negligence or breach of, or material failure to fulfill any of its representations, warranties or covenants contained herein, and

> **(b)**    the Claim arises out of, or is based upon, one of the following:

019237

(i) the Company's fraud, willful default or gross negligence in performing its obligations under this Agreement; or

(ii) the Company's breach of, or material failure to fulfill, any representation, warranty, or covenant contained herein, or any material misrepresentation in connection therewith.

**7.2    Indemnification of Company Parties.**  The Fund shall indemnify and hold harmless the Company and the Separate Accounts (collectively, the "**Company Parties**" and each, a "**Company Party**"), against any and all Claims; provided, however, that a Company Party shall be entitled to indemnification in respect of a Claim only if:

**(a)**    the Claim does not arise out of its or another Company Party's willful misfeasance, bad faith, gross negligence or breach of, or material failure to fulfill to satisfy any of its representations, warranties or covenants contained herein, and

**(b)**    the Claim arises out of, or is based upon, one of the following:

(i) the fraud, willful default or gross negligence of a Fund Party in performing its obligations under this Agreement; or

(ii) the breach of, or material failure to fulfill, by any Fund Party any representation, warranty, or covenant contained herein, or any material misrepresentation in connection therewith.

**7.3    Other Indemnification Provisions.**  No indemnification, hold harmless, limitation of liability or similar provision in the Fund's Certificate of Formation, the Operating Agreement or any agreement to which the Fund or the Adviser is a party shall preclude or serve as a defense to the indemnification by the Fund of a Company Party pursuant to Section 7.2.

**7.4    Notice of Claim of Indemnification.**  A Fund Party or Company Party seeking indemnification under this Article VII (an "**Indemnified Party**") shall give the Party obliged to provide indemnification under this Article VII (an "**Indemnifying Party**") written notice within a reasonable time after the Indemnified Party receives notice of a Claim; provided, however, that a failure to provide, or delay in providing, such notice shall not relieve the Indemnifying Party of any obligation it may have under this Article VII to indemnify the Indemnified Party, unless such failure or delay is the sole or primary cause of the Indemnifying Party's inability to effectively defend against the Claim and materially disadvantages the Indemnifying Party.

**7.5    Assumption of or Participation in Defense Against Claims.**  In any situation where an Indemnified Person is directly involved in defending against a Claim, an Indemnifying Party shall be entitled to, at its own expense, (i) participate in the defense of the Claim or (ii) assume the defense against the Claim with counsel reasonably satisfactory to the Indemnified Party.  If the Indemnifying Party elects to assume the defense of a Claim, the Indemnifying Party shall, after notice to the Indemnified Party of such election, have no obligation to bear any subsequent fees and expenses independently incurred by the Indemnified Party in connection with the defense of the Claim (excluding reasonable costs of investigation), except that the Indemnifying Party shall be liable for reasonable fees and expenses associated with additional counsel retained by the Indemnified Party where the Indemnifying Party and the Indemnified

019238

Person are both parties to the Claim and their representation by the same counsel would be inappropriate due to an actual or potential conflict of interests. Any assumption or participation in the defense of a Claim pursuant to this Section 7.5 shall not be construed as, or be deemed to create a presumption or inference of, an admission of liability or responsibility by the Indemnifying Party, and shall not estop or otherwise limit the Indemnifying Party from contesting liability in respect of the Claim.

**7.6    Settlements.**    An Indemnifying Party shall not be obliged to indemnify an Indemnified Party for the settlement of any Claim that is effected without the former's prior written consent. An Indemnifying Party may settle any Claim on behalf of an Indemnified Party without the Indemnified Party's consent; provided, however, that the settlement involves solely the payment of damages, such damages are fully paid and results in a total release of the Indemnified Party from the Claim. To the extent that its consent to a settlement is required, an Indemnified Party shall not unreasonably withhold its consent to any settlement not involving injunctive relief.

**7.7    Successors.**    A successor to any Party shall be entitled to all of the benefits, and shall be subject to the burdens, of this Article VII.

**7.8    Survival.**    This Article VII shall survive the termination of this Agreement including, without limitation, a termination by reason of the breach or alleged breach of any representation, warranty or covenant of this Agreement.

## ARTICLE VIII. TERMINATION

**8.1    Termination Generally.**    Except as otherwise set forth in this Article VIII, no term of this Agreement shall terminate until the Separate Accounts no longer hold any Interests.

**8.2    Effectiveness of Termination of Offering Obligation.**    A termination of the Offering Obligation pursuant to Section 8.2(a) shall take effect immediately. A termination pursuant to Section 8.2(b), (c), (d), (e) or (f) shall be effective immediately after the Fund provides notice to the Company of such termination.

**8.3    Mandatory Withdrawal.**    The Fund shall have the right to require the Company, upon at least the number of days' prior written notice to the Company set forth on Schedule A-2 hereto, to redeem any Interest(s) attributable to any Company Contract that ceases to qualify as a Variable Contract or that the Fund reasonably believes will fail to so qualify. The timing of such mandatory withdrawal shall be specified in the Fund's notice to the Company and shall be determined with reference to Section 817(h) of the Code.

**8.4    Termination by Company.**    Notwithstanding anything in this Agreement to the contrary, either the Fund or the Company may terminate this Agreement immediately and without penalty to such party:

> **(a)**    from the date hereof until November 30, 2017, upon at least 30 days' prior written notice to the Fund and the Adviser, or

> **(b)**    if the Fund or the Adviser has materially breached a representation, warranty or covenant under this Agreement and has failed to cure such breach after being given a reasonable opportunity to cure; provided, however, that the Company need not provide the

019239

Fund or the Adviser a reasonable opportunity to cure if the material breach may, in the Company's reasonable judgment, materially and adversely affect the Company or any of its Separate Accounts or Company Contracts, or any regulatory authority, including, but not limited to, the SEC and any state regulatory authority, has instituted a formal proceeding against the Fund or the Adviser, and the anticipated outcome of such proceeding would, in the Company's reasonable judgment, materially impair the Fund's or the Adviser's ability to perform its obligations under this Agreement or under the Operating Agreement.

## ARTICLE IX. NOTICES, REQUESTS OR CONSENTS

**9.1**    Any notice, consent, request or other communication required or permitted by this Agreement (a "**Communication**") to the Fund or the Adviser shall be sent to its address set forth on Schedule A-2 hereto or such other address as the Fund or the Adviser shall designate in writing to the other Parties.  Any Communication to the Company required or permitted by this Agreement shall be sent to the address set forth below.  Every Communication shall be in writing; shall be sent by registered or certified U.S. mail with return receipt requested, by overnight delivery with a nationally recognized courier, or by electronically transmitted facsimile or other electronic transmission, including electronic mail, with confirmed electronic receipt; and shall be effective upon the earlier of actual receipt and the 10th Business Day after sending.

**If to the Company:**    Crown Global Life Insurance Ltd.
Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

With a copy to:    Crown Global Life Insurance (Cayman) Ltd
Landmark Square, 2nd Floor
64 Earth Close, SMB, P.O. Box 10467
Grand Cayman  KY1-1004
Cayman Islands

**9.2**    Each Party may rely conclusively upon, and shall not incur any liability for any action taken in reliance upon, any Communication that it reasonably believes, in good faith, to be genuine and properly authorized by another Party.

## ARTICLE X. PRIVACY OBLIGATIONS

**10.1**    The Company is, and each of the Fund and the Adviser may be, a financial institution subject to Privacy Law.  To the extent that a Party is subject to Privacy Law, it shall not use or disclose any Customer Information received from another Party unless such use or disclosure is:

**(a)**    required by law, regulation or rule, or permitted by Privacy Law;

**(b)**    necessary to carry out the purposes for which the Party was given the Customer Information; or

019240

    **(c)**    authorized by the express written consent of the Policy Owner or prospective Policy Owner to which the Customer Information relates, where such consent specifies the purposes for which such Customer Information may be used or disclosed.

    **10.2**    Each Party shall establish and maintain safeguards against any unauthorized access to, or destruction, loss or alteration of, any Customer Information in its possession or control, which safeguards must be at least as rigorous as those the Party uses to secure its own information of a similar nature.

    **10.3**    Notwithstanding anything in this Agreement to the contrary, including Section 11.7, each Party is expressly authorized hereby to disclose to any person, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated herein and all materials related thereto that are or were provided to such Party.

    **10.4**    Each Party agrees to keep confidential any Confidential Information that such Party may acquire as a result of this Agreement or any transaction in connection therewith and to ensure that no such Confidential Information is disclosed to or utilized by any of such Party's affiliates or any of its or their respective officers, directors, employees, agents or other representatives (each, a "**Relevant Person**") except for the purpose of permitting a Party to perform its obligations and/or enforce such Party's rights under this Agreement, the Fund Agreements or any transaction in connection therewith or pursuant to this Section 10 and Section 11.4 hereof.

## ARTICLE XI. MISCELLANEOUS

    **11.1**    **Governing Law.**  It is the intention of the Parties that the internal laws of Bermuda, as the same may be amended from time to time, shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the Parties.

    **11.2**    **Entire Agreement.**  This Agreement, together with any amendments hereto and any other agreements referred to herein (including, without limitation, the Fund Agreements), shall constitute the entire agreement among the Parties with respect to the subject matter hereof, and shall supersede any prior agreement or understanding, oral or written, among the Parties with respect to the subject matter hereof.

    **11.3**    **Waiver.**  A Party's failure to insist, or delay in insisting, upon another Party's performance of any term of this Agreement shall not be construed as a waiver of the performance of such term.

    **11.4**    **Access to Books and Records.**  Each Party shall, upon request, provide each other Party and any governmental authority with reasonable access to its books and records to the extent that such request relates to a governmental authority's investigation or inquiry concerning this Agreement or any of the transactions contemplated herein.  To the extent permitted by applicable law, the access provided pursuant to this Section 11.4 shall not extend to any attorney work product or information protected by the attorney-client privilege.

    **11.5**    **Assignment.**  No Party shall assign any right or obligation under this Agreement to a third party without the prior written consent of all of the Parties, which consent shall not be unreasonably withheld.  Notwithstanding the previous sentence, the Company may assign,

019241

without the consent of the Fund or the Adviser, any right or obligation under this Agreement to another insurance company that controls, is controlled by or under common control with the Company; provided, however, that the Company provides the Fund and the Adviser with notice as soon as reasonably practicable after such assignment.

**11.6    Third-Party Beneficiary.**  This Agreement is not intended to and shall not convey any rights to persons not party to this Agreement.

**11.7    Confidentiality.**  No Party shall disclose the terms of this Agreement to any persons not party to this Agreement, except that a Party may disclose the terms of this Agreement to comply with a legal or regulatory requirement or request, or to its representatives where such disclosure is necessary to the Party's performance of its obligations under this Agreement; provided that the Company agrees and acknowledges the disclosures concerning the subject matter hereof set forth in the Fund PPM, and disclosures of a similar nature.

**11.8    Amendment.**  No amendment or modification to this Agreement shall be binding upon any Party unless reduced to a writing signed by all of the Parties.

**11.9    Rights and Remedies.**  The rights, remedies and obligations contained in this Agreement are in addition to any and all rights, remedies and obligations, at law or in equity, to which the Parties are entitled under state and federal laws.

**11.10    Severability.**  In the event that any provision of this Agreement shall be declared invalid or unenforceable, such invalidity or unenforceability shall not affect the validity or enforceability of the other provisions of this Agreement, it being hereby agreed that such provisions are severable and that this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

**11.11    Headings.**  The headings in this Agreement are inserted for convenience of reference only and shall not be considered part of this Agreement or affect this Agreement's interpretation.

**11.12    Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and which together shall constitute one and the same instrument.

**SIGNATURE PAGE FOLLOWS**

019242

IN WITNESS WHEREOF, each of the Parties hereto has caused this Participation Agreement to be executed in its name and on its behalf by its duly authorized representative hereto as of November 30, 2015.

CROWN GLOBAL LIFE INSURANCE LTD.,

By: _____

Name: TERRIA GODWIN

Title: Director

By: _____

Name: Avi Hasen

Title: Director

CROWN GLOBAL LIFE INSURANCE LTD., on behalf of each of its Separate Accounts, as set out in Schedule A hereto as may be amended from time to time.

By: _____

Name: TERRIA GODWIN

Title: Director

By: _____

Name: Avi Hasen

Title: Director

0012961335.DOC; 3}

019243

**ATLAS IDF, LP**

By: Atlas IDF GP, LLC, it general partner

By: _____

Name: _John Hwis_____

Title: _Managing Member___

**RAND ADVISORS, LLC**

By: _____

Name: _John Hwis_____

Title: _Managing Member___

{00290535.DOC; 3}

019244

## SCHEDULE A
### As of November 30, 2015

### SEPARATE ACCOUNTS AND ASSOCIATED POLICIES

| No. | Name of Separate Account and each Subaccount, if any, thereof: | Form Nos. of Policies Funded by Separate Account: |
|-----|------------------------------------------------------|--------------------------------------------------|
|     |                                                      |                                                  |

019245

## SCHEDULE A-2
**As of November 30, 2015**

## SUPPLEMENT TO PARTICIPATION AGREEMENT

FUND: Atlas IDF, LP
ADVISER: Rand Advisors, LLC

To the extent that the information below is also provided in the Fund PPM or the Operating Agreement, the parties agree that the information below is the same as the information contained in the Fund PPM or Operating Agreement and is provided for ease of reference.

| | |
|---|---|
| **Section 1.2**<br>"Business Day" | No change to standard definition. |
| **Section 1.13**<br>"Operating Agreement" | Dated as of November 30, 2015. |
| **Section 2.1(a)**<br>Minimum Initial and Additional Investment Amounts / Notice of Intent to Purchase / "Subscription Date" | Minimum initial investment amount: $500,000 or as otherwise consented to in writing by Adviser<br><br>Minimum additional investment amount: $500,000, or as determined by the Adviser in its sole discretion.<br><br>The Company shall notify the Adviser of its intent to purchase Interests by providing notice no later than 12:00 am Eastern time on the 3rd Business Day prior to the relevant Subscription Day.<br><br>The Subscription Date shall be the first Business Day of each calendar month. |
| **Section 2.1(b)**<br>Suspension or Discontinuation of Offering | The Fund may suspend or discontinue its offering of Interests at the discretion of the Adviser upon at least **30** Business Days' prior written notice to the Company. |
| **Section 2.2**<br>Payment for Interests | The Company shall transmit by wire transfer federal funds in the amount of the purchased Interests to be received by the Fund no later than 5:00pm Eastern time on the 3rd Business Day prior to the relevant Subscription Day. |
| **Section 2.3(a)**<br>General Withdrawal Terms | Minimum withdrawal amount: $100,000<br><br>Any partial withdrawal of Interest(s) that leaves the value of the Interest(s) held by a Separate Account at less than $500,000 as of the date of withdrawal shall be deemed a complete withdrawal.<br><br>Payment of Withdrawal Proceeds: For the avoidance of doubt, such withdrawals may be satisfied by payments in kind in accordance with the terms of this Agreement. |
| **Section 2.3(b)**<br>Standard Withdrawals | Notice Period: 91 days<br><br>Standard Withdrawal Date: Last day of each calendar quarter. |

019246

Lock-up Period: 12 months.

Payment of Withdrawal Proceeds: 90% of the withdrawal proceeds shall be paid within 90 days following the Standard Withdrawal Date. The balance of the amount payable upon such withdrawal will be paid, without interest, within 90 days after completion of the audited financial statements for the fiscal year in which the withdrawal occurs.

Payment of Withdrawal Proceeds: For the avoidance of doubt, such withdrawals may be satisfied by payments in kind in accordance with the terms of this Agreement.

| | |
|---|---|
| **Section 2.3(c)**<br>Death Benefit<br>Withdrawals | Notice Period: 91 days prior to Death Benefit Withdrawal Date on prior written notice to the Adviser.<br><br>Death Benefit Withdrawal Date: Last day of any calendar quarter.<br><br>Payment of Withdrawal Proceeds: 100% of the withdrawal proceeds shall be paid as soon as reasonably practicable, but in no case more than 330 days following the Death Benefit Withdrawal Date. For the avoidance of doubt, such withdrawals may be satisfied by payments in kind. |
| **Section 2.3(d)**<br>Special Withdrawals | Notice Period: 91 days prior to a Special Withdrawal Date prior written notice to the Adviser.<br><br>Special Withdrawal Date: Last day of each calendar quarter.<br><br>Payment of Withdrawal Proceeds: 100% of the withdrawal proceeds shall be paid within 90 days following the Special Withdrawal Date. |
| **Section 3.1**<br>NAV Generally | The Adviser shall make the NAV available to the Company no later than 12am Eastern time on the 20th Business Day following each Valuation Date. |
| **Section 4.3(a)**<br>Errors and Omissions<br>Insurance Policy | The Fund shall obtain commercially reasonable coverage in favor of the Adviser, within a reasonable period following the execution of this Agreement. |
| **Section 5.6**<br>Certification of<br>Investment<br>Diversification | The Adviser shall deliver the certification required by Section 5.6 no later than 20 Business Days after the end of the calendar quarter following the quarter to which such certification relates. |
| **Section 8.4**<br>Mandatory Withdrawal | The Fund must provide the Company with at least 5 days' prior written notice of a Mandatory Withdrawal. |
| **Section 9.1**<br>Notices, Consents,<br>Requests or Other<br>Communications | **If to the Fund:**<br>Atlas IDF, LP<br>c/o Atlas IDF GP, LLC<br>87 Railroad Place, Suite 403<br>Saratoga Springs, New York 12866    **If to the Adviser:**<br>Rand Advisors, LLC<br>87 Railroad Place, Suite 403<br>Saratoga Springs, New York 12866 |

019247

## SCHEDULE B
### As of November 30, 2015

### INVESTMENT RESTRICTIONS

The Company will not participate in the allocation of gains or losses derived from "New Issues" as defined in the Rules of the U.S. Financial Industry Regulatory Authority ("**FINRA**"), except that the Fund, in its sole discretion, may allocate de minimis levels of such gains or losses in a manner consistent with applicable FINRA Rules.

019248

## SCHEDULE C

## FORM OF COMPLIANCE CERTIFICATION

This compliance certificate ("**Compliance Certificate**") is given by Rand Advisors, LLC, as the adviser (the "**Adviser**") of Atlas IDF, LP (the "**Fund**"), pursuant to Section 5.6 of that Participation Agreement, dated as of November 30, 2015, among the Fund, the Adviser, Crown Global Life Insurance Ltd. ("**CGLI**"), a Bermuda exempted company registered as a long term Class C insurer, the Company (on behalf of each of its separate accounts (and subaccounts, if any, thereof) set forth on Schedule A of the Participation Agreement (as defined below), as such Schedule A may be amended from time to time) ("**Schedule A Separate Accounts**" and together with CGIL, the "**Company**")), as the same may be amended, restated, supplemented or otherwise modified from time to time (the "**Participation Agreement**").  Capitalized terms used, but not defined, in this Compliance Certificate shall have the meanings set forth in the Participation Agreement.

By executing this Compliance Certificate, the Adviser certifies that, as of the calendar quarter ended [March 31/June 30/September 30/December 31], 201[-]:

1.  The Fund's assets have been invested in compliance with the diversification requirements of Regulations 1.817-5(b) under the Code.

a.  No more than 55% of the value of the total assets of the Fund is represented by any one investment;

b.  No more than 70% of the value of the total assets of the Fund is represented by any two investments;

c.  No more than 80% of the value of the total assets of the Fund is represented by any three investments; and

d.  No more than 90% of the value of the total assets of the Fund is represented by any four investments.

| Diversification Test | Name of Issuer | % of Total Assets | Cum % | Test |
|---|---|---|---|---|
| Largest Issuer | [Issuer one] | x.xx% | x.xx% | < 55% TA |
| Second Largest Issuer | [Issuer two] | x.xx% | x.xx% | < 70% TA |
| Third Largest Issuer | [Issuer three] | x.xx% | x.xx% | < 80% TA |
| Fourth Largest Issuer | [Issuer four] | x.xx% | x.xx% | < 90% TA |

2.  If the Fund relied on the "look through" provision of Regulation 1.817-5(f), the investments of any underlying investment vehicle must be sufficiently diverse to permit the Fund to comply with the diversification requirements of Regulation 1.817-5(b).

3.  The Adviser has in all respects complied with the requirements set forth on Schedule D to the Participation Agreement.

4.  The Adviser has reviewed the foregoing statements and certifies that they are true and correct.

IN WITNESS WHEREOF, the Adviser has caused this Compliance Certificate to be executed by one of its authorized officers this _____ day of _____, 201__.

**Rand Advisors, LLC**

Authorized Signature:    _____

Name:    _____

019249

## SCHEDULE D

## INVESTOR CONTROL REQUIREMENTS

The Adviser and each of its officers, employees, agents, affiliates or sub-advisers that is in any capacity responsible for, or involved in the determination of, the Fund's investments or investment objective, strategies or policies (each, an "**Adviser Party**"), shall not take any action that would cause any Policy Owner or Policy Representative (together with such Policy Owner, a "**Policy Party**") to be deemed to have such incidents of control as would cause the Fund's income and gains to be currently taxable to the Policy Owner pursuant to the "Investor Control Doctrine" as set forth in Revenue Rulings 77-85, 80-274, 81-225, 82-54, 2003-91, 2003-92, or 2007-7, or described in other materials published by the U.S. Department of the Treasury or the U.S. Internal Revenue Service. In seeking to ensure that no Policy Party is deemed to have incidents of control, each Adviser Party shall at all times act in compliance with the requirements of this Schedule D, as set forth below:

1.  All decisions involving the investment of the Fund's assets shall be made by the relevant Adviser Party in its sole and absolute discretion, without any direct or indirect input from any Policy Party.

2.  No Adviser Party shall enter into, directly or indirectly, any agreement, plan or other arrangement, whether written or otherwise, with a Policy Party regarding (i) the Fund's investments or investment objective, strategies or policies; (ii) the availability of the Fund as an investment option under the Policy Owner's policy; or (iii) the assets to be held by the Fund.

3.  To the extent that the Adviser provides information (i) to a prospective Policy Owner or representative thereof as part of a direct or indirect sale of a Variable Contract, or (ii) to the Company for the Company to communicate with a Policy Party, any Adviser Party may describe: (a) the past performance of the Fund or related performance information with respect to the Fund; (b) its general view of market and industry trends (e.g., its belief that interest rates will rise in the short-term or that technology stocks are over-valued); (c) the background, education and past employment of its staff, including the performance of other funds under its management; and (d) other due diligence information that the Adviser generally provides to prospective investors with respect to the Adviser's other funds and accounts so long as such information does not relate to the quality or rate of return of any investment or group of investments of the Fund.

4.  Without limiting the foregoing, no Adviser Party shall knowingly discuss, communicate or solicit in any manner, whether directly or indirectly, the views of any Policy Party on the current or future investments, objectives, strategies or policies of the Fund, either in general or specific terms.

5.  No Adviser Party shall at any time be affiliated with a Policy Party; provided, however, that an Adviser Party may maintain such an affiliation if it establishes, pursuant to a legally binding written agreement, procedures to prevent any communication prohibited by this Schedule D.

6.  The Company understands that the Adviser provides investment management services to a variety of clients outside the context of Variable Contracts. The Company further understands that the Adviser may provide such services to clients that are Policy Parties. The Adviser recognizes that these relationships could present an opportunity for a Policy Party to communicate with any Adviser Party concerning the Fund in a manner prohibited by this Schedule D. The Adviser shall take appropriate steps to comply with this Schedule D in the context of any such relationships.

019250

## APPENDIX A

**Instructions:**

A completed and signed copy of the Subscription Form must be delivered by electronic mail to:

jhonis@randadvisors.com

**Payment Instructions for Subscription:**

All contributions should be made by wire transfer to the following account:

> [bank name/address]
> ABA:
> ABA:
> For the account of:
>
> Account No.:
> For further credit to the account of:    [            ]
> Account No.:            [     ]
> Ref:            [subscriber's name]

After you have given your bank these wire instructions, please notify the Fund of the exact amount and date of your wire using the contact information above. Doing so will help us identify your payment and credit it to the appropriate account.

019251

**APPENDIX A (Continued)**
**SUBSCRIPTION FORM**
**FOR ATLAS IDF, LP**

**Subscriber's Name:**

_____Crown Global Life Insurance Ltd._____ on Behalf of Separate Account _____, _____
Division [Fund #].

**Tax I.D. Number:** _____

**Type of entity (check one):**
☐ *Corporation*
☐ *Other (_____)*

**Subscription Amount in US $** _____      **Policy/Series Identifier (if any):** _____
☐ *Initial Subscription (minimum US $[_____])\**
☐ *Additional Subscription (minimum US $[_____])\**

**Date of Investment:**    ___/___/____

| **Subscriber's Domicile Address:** | **Subscriber's Mailing Address:** |
|---|---|
| Canon's Court | Landmark Square, 2nd Floor |

**Subscriber's Domicile Address:**                **Subscriber's Mailing Address:**
                 Canon's Court                              Landmark Square, 2^nd^ Floor
                 22 Victoria Street                         64 Earth Close
                 Hamilton HM 12                             P.O. Box 10467
                 Bermuda                                    Grand Cayman KY1-1004
                                                            Cayman Islands

*Contact Name:* [_____]    *Contact Name:* [_____]
*Tel:*          [_____]    *Tel:*          [_____]
*Fax:*          [_____]    *Fax:*          [_____]
*E-Mail:*       [_____]    *E-Mail*        [_____]

\*  Each subscription shall be treated as a separate Interest/Capital Account.

_____

**Subscriber's Wiring Instructions from which funds will originate:**
*Bank*                _____
*ABA #*               _____
*For the Account of* _____
*Account #:*          _____
*Reference:*          _____

019252

CROWN GLOBAL LIFE INSURANCE LTD., on behalf of itself and each of the Accounts named above.

By: _____     By: _____

Name:                                          Name:

Title:                                          Title:

_____

Date of Execution

**APPENDIX B**
**WITHDRAWAL FORM**
**FOR ATLAS IDF, LP**

Date:_____

To:

            [Tel.:  ]
            [Fax:  ]
            Attn:  [contact name]

The undersigned hereby requests to redeem the amounts specified below on the next available date following the Fund's receipt of this Withdrawal Request.

**Subscriber's Name:**

_____Crown Global Life Insurance Ltd._____   on Behalf of Separate Account _____, _____ Division [Fund #].

**Policy/Series Identifier (if any):** _____

**Withdrawal Amount:**
☐ *Full Withdrawal*
☐ *Partial Withdrawal\* – Amount in US$* _____
                               *(minimum US $100,000)*

**Type of Withdrawal:**
☐ *Standard Withdrawal*      ☐ *Special Withdrawal*
☐ *Death Benefit Withdrawal*    ☐ *Event Withdrawal*

**Date of Withdrawal** ____/___/____

| **Subscriber's Domicile Address:** | **Subscriber's Mailing Address:** |
|---|---|
| Canon's Court | Landmark Square, 2nd Floor |
| 22 Victoria Street | 64 Earth Close |
| Hamilton HM 12 | P.O. Box 10467 |
| Bermuda | Grand Cayman KY1-1004 |
| | Cayman Islands |

| | | | |
|---|---|---|---|
| *Contact Name:* | [_____] | *Contact Name:* | [_____] |
| *Tel:* | [_____] | *Tel:* | [_____] |
| *Fax:* | [_____] | *Fax:* | [_____] |
| *E-Mail:* | [_____] | *E-Mail* | [_____] |

*Crown Global Life Insurance Ltd.*

\* Any partial withdrawal of Interest(s) that leaves the value of the Interest(s) held by an Account at less than **$500,000** as of the date of withdrawal shall be deemed a complete withdrawal.

**Subscriber's Wiring Instructions from which funds will originate:**
*Bank* _____
*ABA #* _____
*For the Account of* _____
*Account #:* _____
*Reference:* _____

019254

CROWN GLOBAL LIFE INSURANCE LTD., on behalf of itself and each of the Accounts named above.

    By: _____    By: _____

    Name:                    Name:

    Title:                    Title:

_____
Date of Execution

019255

# EXHIBIT 103

019256

## CERTIFICATE OF HIGHLAND CAPITAL MANAGEMENT, LP

Reference is hereby made to that certain U.S. federal income tax opinion, dated January 29, 2016 (the "**Tax Opinion**"), attached hereto as Exhibit A, which Highland Capital Management, L.P. ("**HCM**") has requested from Sadis & Goldberg LLP ("**S&G**") to provide to HCM regarding certain U.S. federal income tax issues described in Part IV of such Tax Opinion.  Each term herein with an initial capital not required by standard capitalization rules is a defined term, and each such term not parenthetically defined herein shall have the meaning ascribed to it in the Tax Opinion.

HCM acknowledges and understands that S&G is relying upon the validity of each of the statements set forth below as the factual basis for the conclusions expressed in the Tax Opinion and that any inaccuracy in the matters set forth herein could adversely affect the conclusions in such Tax Opinion.

Pursuant to the foregoing, HCM hereby represents, warrants, covenants and certifies, after reasonable investigation and review and consultation as appropriate, as follows:

1. The Statement of Facts set forth in Part II of the Tax Opinion is accurate and complete in all material respects.  The Assumptions Made set forth in Part III of the Tax Opinion are believed by HCM to be reasonable, and to the extent that factual matters appear in Part III, they are accurate.

2. We have reviewed the Tax Opinion attached as Exhibit A hereto and, to the best of our knowledge, information and belief, there are no additional facts, conditions or circumstances which should have been disclosed to S&G for purposes of preparing this Tax Opinion.

3. S&G has been provided with true, correct and complete copies of the Relevant Documents as well as any other documents provided to S&G in connection with its services in connection with the Tax Opinion (collectively, "**Opinion Documents**").  Except to the extent made clear in the Opinion Documents themselves, each of the Opinion Documents has not been further amended, altered, modified, or restated and, to the extent that such document is an agreement, is in full force and effect on the date hereof and has been at all times since the date of such amendments.  No resolution, proceeding or other action has been taken for the further amendment, alteration, modification or restatement of such Opinion Documents.

[Signature Page follows.]

019257

Highland Capital Management, L.P.
Certificate of Representations

IN WITNESS WHEREOF, HCM has executed this Certificate under seal by its duly authorized representative as of January 29, 2016.

**HIGHLAND CAPITAL
MANAGEMENT, L.P.**

By: Strand Advisors, Inc.

Its:  General Partner

By: _____

Name and Title:

James Dondero, President

019258

**EXHIBIT 104**

019259

www.sglawyers.com

**SadisGoldberg**LLP

January 29, 2016

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, Texas  75201

Dear Sirs:

You have requested our ("our", "we" or "Sadis & Goldberg LLP" as the context may require) opinion concerning certain U.S. federal income tax issues relating to investments made by two tax-exempt supporting organizations identified herein in variable annuity contracts issued by Crown Global Life Insurance Ltd. under the facts discussed below.

Part I of this letter describes our factual investigation. Part II of this letter sets forth a statement of the relevant facts which you have reviewed and confirmed to us to be accurate and complete in all material respects.  Part III of this letter then lists certain assumptions that you have authorized us to make in rendering our opinion, and which you have confirmed are correct and reasonable, and Part IV of this letter states the opinion that is being requested.  In Part V of this letter, we describe the relevant U.S. federal income tax provisions, rulings of the Internal Revenue Service and relevant tax cases relating to the opinion requested.  Part VI of this letter sets forth our opinion, together with your permitted use of and reliance on this opinion letter.

I.      **FACTUAL INVESTIGATION**

**For purposes of rendering the opinions expressed below, we have been furnished and have reviewed the following documentation (the "Relevant Documents"):**

1.      The Okada Family Foundation, Inc. certificate of incorporation filed on February 10, 2015.

2.      The Okada Family Foundation, Inc. bylaws dated March 9, 2015.

3.      The Okada Family Foundation, Inc. draft IRS Form 1023 - Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code.

4.      The Supporting Organization Operating Agreement entered into between The Okada Family Foundation, Inc. and The Dallas Foundation.

5.      Empower Dallas Foundation, Inc. certificate of incorporation filed on February 10, 2015.

6.      Empower Dallas Foundation, Inc. bylaws dated March 9, 2015.

7.      Empower Dallas Foundation, Inc. draft IRS Form 1023 - Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code.

8.      The Supporting Organization Operating Agreement entered into between Empower Dallas Foundation, Inc. and The Dallas Foundation.

1

019260

9. Mark Okada 12/08/2015 donation of $5,345,021.50 to The Okada Family Foundation Inc. Nexbank Statement Transaction entries from 11/10/2015 to 12/10/2015

10. Mark Okada 12/22/2015 donation of $2,138,333.33 to The Okada Family Foundation Inc. Nexbank Statement Transaction entries from 11/28/2015 to 12/28/2015

**11.** Jim Dondero 12/08/2015 donation of $16,034.978.50 to Empower Dallas Foundation, Inc. Nexbank Statement Transaction entries from 11/10/2015 to 12/10/2015

**12.** Jim Dondero 12/22/2015 donation of $6,415,000 to Empower Dallas Foundation, Inc. Nexbank Statement Transaction entries from 11/28/2015 to 12/28/2015

13. The Okada Family Foundation, Inc. Unanimous Written Consent of Directors in Lieu of Special Meeting, December 9th, 2015.

14. Empower Dallas Foundation, Inc. Unanimous Written Consent of Directors in Lieu of Special Meeting, December 9th, 2015.

15. The Okada Family Foundation, Inc.: Crown Global Due Diligence Declaration Signed 12/09/2015

16. The Okada Family Foundation, Inc.: Crown Global Deferred Variable Annuity Policy #30219, effective December 11, 2015

17. The Okada Family Foundation, Inc.: Crown Global Deferred Variable Annuity Policy #30219, Term Sheet 12/09/2015

18. The Okada Family Foundation, Inc.: Crown Global Deferred Variable Annuity Application Form, 12/09/2015

19. The Okada Family Foundation, Inc.: Crown Global Deferred Variable Annuity Policy FATCA Waiver, 12/09/2015

20. The Okada Family Foundation, Inc.: Crown Global Deferred Variable Annuity Policy Structure Chart 12/09/2015

21. The Okada Family Foundation, Inc.: Crown Global Deferred Variable Annuity Policy: JPM Growth Series Supplement

22. The Okada Family Foundation, Inc.: Crown Global Deferred Variable Annuity Policy: JPM Hedge Series Supplement

23. The Okada Family Foundation, Inc.: Crown Global Deferred Variable Annuity Policy: Limited Power of Attorney, 12/09/2015

24. The Okada Family Foundation, Inc.: Crown Global Deferred Variable Annuity Policy: Atlas IDF, LP, Private Placement Memorandum

25. The Okada Family Foundation, Inc.: Crown Global Deferred Variable Annuity Policy: Rand PE Fund I, LP, Private Placement Memorandum

019261

26. The Okada Family Foundation, Inc.: Nexbank Wire Transfer Department: $5,301,065.12 wire premium to Crown Global on 12/10/2015

27. The Okada Family Foundation, Inc.: Nexbank Transaction detail entries from 11/28/2015 to 12/28/2015 for additional wire premium to Crown Global of $2,117,423.00 on 12/22/2015.

28. The Empower Dallas Foundation, Inc.: Crown Global Due Diligence Declaration Signed 12/09/2015

29. The Empower Dallas Foundation, Inc.: Crown Global Deferred Variable Annuity Policy #30218, effective December 11, 2015

30. The Empower Dallas Foundation, Inc.: Crown Global Deferred Variable Annuity Policy #30218, Term Sheet 12/09/2015

31. The Empower Dallas Foundation, Inc.: Crown Global Deferred Variable Annuity Application Form, 12/09/2015

32. The Empower Dallas Foundation, Inc.: Crown Global Deferred Variable Annuity Policy FATCA Waiver, 12/09/2015

33. The Empower Dallas Foundation, Inc.: Crown Global Deferred Variable Annuity Policy Structure Chart 12/09/2015

34. The Empower Dallas Foundation, Inc.: Crown Global Deferred Variable Annuity Policy: JPM Growth Series Supplement

35. The Empower Dallas Foundation, Inc.: Crown Global Deferred Variable Annuity Policy: JPM Hedge Series Supplement

36. The Empower Dallas Foundation, Inc.: Crown Global Deferred Variable Annuity Policy: Limited Power of Attorney, 12/09/2015

37. The Empower Dallas Foundation, Inc.: Crown Global Deferred Variable Annuity Policy: Atlas IDF, LP, Private Placement Memorandum

38. The Empower Dallas Foundation, Inc.: Crown Global Deferred Variable Annuity Policy: Rand PE Fund I, LP, Private Placement Memorandum

39. The Empower Dallas Foundation, Inc.: Nexbank Wire Transfer Department: $15,903,108.54 wire premium to Crown Global on 12/10/2015

40. Empower Dallas Foundation, Inc.: Nexbank Transaction Account detail from 11/28/2015 to 12/28/2015 indicating wire of $6,352,270 for additional premium to Crown Global on 12/22/2015

41. Back Office Shared Services Agreement by and among Highland Capital Management, L.P. and Rand Advisors, LLC dated October 10, 2013.

019262

42. Amendment to Back Office Shared Services Agreement between Highland Capital Management, L.P. and Rand Advisors, LLC dated October 14, 2014.

43. Contribution Agreement between Highland Capital Management, L.P. and Hunter Mountain Investment Trust, dated December 21, 2015

44. Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. dated December 21st, 2015

45. Partnership Interest Purchase Agreement among The Dugaboy Investment Trust, The Mark and Pamela Okada Family Trust-Exempt Trust #1, The Mark and Pamela Okada Family Trust-Exempt Trust #2, Mark K. Okada, and Hunter Mountain Investment Trust, dated December 24, 2015

46. Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. dated December 24th, 2015.

We are not aware of any documents other than the Relevant Documents that would alter our conclusions.  We have assumed the genuineness of all signatures, the legal capacity of natural persons, the authenticity of all documents submitted to us as originals and the conformity with original documents of all documents submitted to us as copies, the fact that each party to an agreement has the power and capacity to execute, deliver and perform all obligations under such documents, the due authorization of all requisite action with respect to such documents (including the execution and delivery thereof) by each party thereto, and the validity and binding effect of such documents upon each party.  We have also assumed that all factual assertions in the Relevant Documents are accurate and complete in all material respects.  We have no reason to believe that any of the foregoing assumptions are unreasonable.

## II. STATEMENT OF FACTS

A. The Dallas Foundation ("TDF") is a Texas non-profit corporation exempt from federal income taxation under Section 501(c)(3) of the U.S. Internal Revenue Code, as amended ("Code"), and a public charity described in Sections 509(a)(1) and 170(b)(1)(A)(vi) of the Code.

B. The principal objective of TDF is to solicit, receive and accept property to be administered, used and applied for charitable purposes, primarily, but not exclusively in or for the benefit of Dallas County, Texas.  TDF is not controlled by James Dondero, Mark Okada or Highland Capital Management, L.P.

C. Empower Dallas Foundation, Inc. ("Supporting Organization #1") is a Delaware non-profit non-stock charitable corporation which has been established to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of TDF.

D. The Okada Family Foundation, Inc. ("Supporting Organization #2") is a Delaware non-profit non-stock charitable corporation which has been established to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of TDF.

E. Supporting Organization #1 and Supporting Organization #2 each expect to obtain a determination letter from the U.S. Internal Revenue Service ("IRS") that each such Supporting Organization,

4

019263

respectively, is a tax-exempt organization described in Section 501(c)(3) of the Code and a "Type I" supporting organization described in Section 509(a)(3) of the Code.  For the avoidance of doubt, such tax-exempt status is expected to be effective retroactively to the date of each Supporting Organization's formation, respectively.

F.  As a result of qualifying as Type I supporting organizations under Section 509(a)(3) of the Code, Supporting Organization #1 and Supporting Organization #2 will each be exempted from private foundation status under Section 509(a) of the Code.

G.  Mary M. Jalonick is the President and Chief Executive Officer of TDF, and is the Incorporator of both Supporting Organization #1 and Supporting Organization #2.[1]

H.  Supporting Organization #1 has been formed at the request of James Dondero.  On December 8, 2015, Mr. Dondero contributed $16,034,978.50 to Supporting Organization #1.  On December 22, 2015, Mr. Dondero contributed $6,415,000 to Supporting Organization #1.  At the present time, Mr. Dondero is the only contributor to Supporting Organization #1.  Although Mr. Dondero made a recommendation to the Board as to how the Board should invest such contributions (as described below), the Board of Supporting Organization #1 is not contractually obligated to follow the investment recommendations of Mr. Dondero at the time such contributions are made or at any later date.

I.  Supporting Organization #2 has been formed at the request of Mark Okada.  On December 8, 2015, Mr. Okada contributed $5,345,021.50 to Supporting Organization #2.  On December 22, 2015 Mr. Okada contributed $2,138,333.33 to Supporting Organization #2.  Although Mr. Okada made a recommendation to the Board as to how such contributions should be invested (as described below), the Board of Supporting Organization #2 is not contractually obligated to follow the investment recommendations of Mr. Okada at the time such contributions are made or at any later date.

J.  Under the relevant governing documents, TDF has total control over both Supporting Organization #1 and Supporting Organization #2, as the institutional member ("Institutional Member") of each Supporting Organization.  The Institutional Member appoints the majority of each Supporting Organization's Board of Directors.  The Board of Directors of each Supporting Organization appoints the officers of the Supporting Organization.  The officers of each Supporting Organization can be removed with or without cause by the Board of Directors of such Supporting Organization.

K.  Supporting Organization #1 currently has a three-person Board of Directors.  Mary M. Jalonick and Gary W. Garcia are the institutional directors ("Institutional Directors") of the Board of Supporting Organization #1.  Gary W. Garcia currently serves as Senior Director of Development of TDF.  The third member of the Board is W. Grant Scott II.  Mr. Scott is an attorney engaged in private practice at Myers Bigel Sibley Sajovec, P.A. in Raleigh, North Carolina and knows Mr. Dondero from college.

L.  Supporting Organization #2 also currently has a three-person Board of Directors.  Mary M. Jalonick and Gary W. Garcia are the Institutional Directors.  Mark Okada is the third member of the Board.

M.  Mr. Dondero has recommended to the Board of Supporting Organization #1 that it invest its assets

---

[1] See Dallas Foundation's web page for background: www.dallasfoundation.org.

019264

in a private placement deferred variable annuity policy ( referred to herein as a "Variable Contract" or "Deferred Variable Annuity Policy") to be issued by Crown Global Life Insurance Ltd., a Bermuda-based insurance company ("Crown Global") that is a life insurance company within the meaning of the Code. Mr. Okada has made the same investment recommendation to the Board of Supporting Organization #2. However, the Boards of each Supporting Organization are not bound by those recommendations, and retain the authority to reallocate premiums or assets to different IDFs or managed accounts available under the Crown Global Variable Contracts.

N.  Crown Global maintains a segregated asset account ("Separate Account") pursuant to Bermuda law to hold assets that fund obligations arising under each Variable Contract issued by it. Under the terms of the Contracts and Bermuda law, assets allocated or credited to each Separate Account are the property of the insurance company and the policyholder has no direct proprietary interest in such assets. Rather, the Supporting Organizations have only a contractual claim against Crown Global to collect cash from Crown Global in the form of annuity payments or other withdrawals available under the Variable Contract. The performance of the investments held in the applicable Separate Account provide the measure for the economic return to the investor in the Variable Contract. The Crown Global Variable Contracts purchased by the Supporting Organizations provided that the investor was permitted to choose among certain "insurance dedicated funds" ("IDF" as further defined below) and managed accounts selected by Crown Global as available investments that could be held in the Separate Account identified in the Contract. One such IDF that was designated by Crown Global as an available investment option that the investors in the Variable Contract were permitted to select is Atlas IDF, LP ("Atlas IDF"), a newly formed Delaware "series" limited partnership managed by Rand Advisors, LLC ("Rand Advisors"). The Variable Contract also lists two other IDFs as investment options which the policyholder is able to select, JP Morgan Access Growth Strategies Insurance Fund, and JP Morgan Hedge Growth Strategies Insurance Fund. None of the IDFs or other managed funds available under the Variable Contracts will be funds that are offered to the general public under the IRS rulings discussed herein.

O.  The Variable Contract does not immediately payout distributions in accordance with a distribution schedule. The policyholders, Supporting Organization #1 and Supporting Organization #2 have the ability to make partial(s) or a full surrender of the Variable Contract at quarterly intervals, subject to applicable surrender charges. Further, as policyholders, Supporting Organization #1 and Supporting Organization #2 can decide at quarterly intervals (but no more than twice per calendar year) to reallocate funds from one investment option provided under the Variable Contract to another investment option offered by Crown Global under the Variable Contract.

P.  Crown Global, in its sole and exclusive discretion, can determine the investment offering within its offered insurance products and is under no legal requirement to make any particular offering of an investment strategy currently or in the future or to maintain an investment strategy offering. Crown Global, in its sole and absolute discretion, can terminate or remove an investment offering at any time in the future. All decisions as to the choice of IDFs or managed accounts that are made available for selection by the investor in the Variable Contract are made by Crown Global in its sole and absolute discretion. Mr. Dondero recommended to the Board of Supporting Organization #1 that it select Atlas IDF as the measuring investment under its Variable Contract. Mr. Okada made the same investment recommendations to the Board of Supporting Organization #2 as those made by Mr. Dondero to Supporting Organization #1.

Q.  On December 9, 2015, the Directors of Supporting Organization #1 and Supporting Organization #2 each unanimously approved resolutions authorizing the acquisition by the Supporting Organization

6

019265

of the Deferred Variable Annuity Policy from Crown Global, and authorized the officers of the Supporting Organization to take any and all further actions to carry out such acquisition.

R.  On December 10, 2015, Supporting Organization #1 wired an initial premium to Crown Global of $15,903,108.54 with respect to the Variable Contract.  On December 22, 2015, Supporting Organization #1 wired additional premium of $6,352,270 to Crown Global with respect to the Variable Contract.

S.  Effective December 11th, 2015, Crown Global issued Deferred Variable Annuity Policy #30218 to Supporting Organization #1.  Supporting Organization #1 is named the policyholder and irrevocably the sole beneficiary of the Variable Contract.

T.  On December 10, 2015, Supporting Organization #2 wired an initial premium to Crown Global of $5,301,065.12 with respect to the Variable Contract.  On December 22, 2015, Supporting Organization #2 wired additional premium of $2,117,423.00 to Crown Global with respect to the Variable Contract.

U.  Effective December 11th, 2015, Crown Global issued Deferred Variable Annuity Policy #30219 to Supporting Organization #2.  Supporting Organization #2 is named the policyholder and irrevocably the sole beneficiary of the Variable Contract.

V.  Crown Global is a subsidiary of Crown Global Insurance Group and is not affiliated with or controlled by Mr. Dondero or Mr. Okada, or Highland Capital Management, L.P. ("Highland"), which is the business conducted by Messrs. Dondero and Okada.  Highland is an investment manager business, with significant assets under management, located in Dallas, Texas.  Crown Global has made an election under the Code to be treated as a domestic life insurance company.

W.  In addition to acting as the investment manager of Atlas IDF, Rand Advisors will also act as the investment manager of Rand PE Fund I, L.P., a Delaware "series" limited partnership private investment fund ("PE Portfolio Fund"), to which Atlas IDF will initially allocate 55% of its investment portfolio and which: (x) is expected to initially invest in the Highland Transaction (as defined below), and (y) will potentially make investments in other private equity transactions.  The Supporting Organizations have not been offered the opportunity to invest directly in the PE Portfolio Fund, and Crown Global has not designated the PE Fund as an available investment option for inclusion in a Separate Account with respect to the Variable Contracts purchased by the Supporting Organizations.

X.  Atlas IDF has been organized by Rand Advisors as an "insurance-dedicated fund" (i.e., an investment fund that only admits institutional investors that are insurance companies and certain other eligible investors described in Treasury Regulation section 1.817(h)-5(f)(3)).  The confidential private placement memorandum of Atlas IDF provides that Series 1 of Atlas IDF will invest: (x) approximately 45% of its portfolio in traded assets (including, without limitation, distressed debt instruments), to be selected and managed by Rand Advisors, and (y) approximately (but not more than) 55% of its portfolio in private equity investments, to be selected and managed by Rand Advisors.  The percentage of Atlas IDF's assets invested in specific private equity investments is not fixed, and is subject to change by Rand Advisors.  However, Atlas IDF is required to satisfy the portfolio diversification requirements set forth in Section 1.817-5(b)(1) of the Treasury Regulations.

019266

Y.  At the outset, Crown Global will be the only insurance company owning a limited partnership interest in Atlas IDF.  However, the governing documents of Atlas IDF permit other insurance companies to invest directly in Atlas IDF on behalf of their separate accounts established in connection with variable annuities and insurance contracts. Thus, Interests in Atlas IDF are not being offered for sale to the "general public" (within the meaning of IRS Rulings and Regulations discussed below), and thus such other investors could invest in Atlas IDF only indirectly by purchasing a Variable Contract from Crown Global (if Crown Global were to make the Atlas IDF available as an eligible investment).  The PE Portfolio Fund in which Atlas IDF will invest is not an IDF. PE Portfolio Fund will have other direct investors that are not affiliates of Crown Global.  Rand Advisors anticipates that it will market PE Portfolio Fund, or subsequent series thereof, to other investors in the future.

Z.  Rand Advisors is owned and controlled by John Honis.  In addition, Mr. Honis owns and controls the general partner entities of Atlas IDF and PE Portfolio Fund.  Mr. Honis has over 25 years of investment management and business experience, and is not controlled by Highland, nor by Mr. Dondero, nor Mr. Okada.

AA. Mr. Honis was previously a Partner and Head of Private Equity at Highland.  Although Mr. Honis has retired from that position, he still currently serves on: (x) the Board of Trustees for each of Highland's affiliated registered investment companies, and receives compensation in connection with each of the foregoing, and (y) the Board of Directors for American HomePatient, Inc. and Turtle Bay Resort, LLC, which are portfolio companies for investment funds operated by Highland, and receives compensation in connection with each of the foregoing.  Mr. Honis does not currently own any limited partnership interests in Highland and does not have any direct share in the profits or revenues of such company.  However, as part of his retirement, Mr. Honis is in the process of receiving payments in the total amount of $3 million from certain affiliates of Highland.

BB. The governing documents of Atlas IDF require such fund to comply with the portfolio diversification requirements in Section 817(h) of the Code.  Similarly, the Variable Contracts each require the Separate Accounts established in connection with such Contracts to satisfy such portfolio diversification requirements.  Each of the Variable Contracts specifically provides that the policyholder is not permitted to have direct contact with the investment manager of any IDF or managed subaccount held in the Separate Account and may not participate in the management of the Separate Account or any IDF or managed subaccount.

CC. It was anticipated solely among Rand Advisors, Strand Advisors (the General Partner of Highland Capital Management), James Dondero, and Mark Okada that the first series of PE Portfolio Fund would acquire all or substantially all of the non-voting limited partnership interests in Highland from Highland, including newly-issued limited partnership interests, or from trusts or other affiliates of Mr. Dondero or Mr. Okada (collectively, the "Highland Transaction").  Although with respect to any trusts, the Trustees would have to evaluate and approve any transaction independently and during the time of the relevant acquisition.  During this time, the PE Portfolio Fund and Highland did not negotiate documentation for the legal terms of the Highland Transaction.  Further, there was no assurances that such transaction would be consummated as it was understood that it would have to be negotiated, the respective parties had not made any offer (and would not until after the PE Portfolio Fund had assets), and that all parties would be separately represented by legal counsel.  It was nonetheless the intention of such parties that the

019267

transaction should come about.

DD. At the time that the Supporting Organizations acquired their ownership interests in their Variable Contracts and had selected the Rand IDF as to investment to be held in the Separate Account, PE Portfolio Fund had not entered into a binding contract to acquire the previously described limited partnership interests in Highland, and the Institutional Members of the Boards of the Supporting Organizations did not have any knowledge of the terms of the investment subsequently made by the Rand PE Fund in Highland.

EE. On December 21, 2015, as part of the Highland Transaction, Hunter Mountain Investment Trust (a special purpose vehicle of PE Portfolio Fund) acquired through a contribution of cash and note, newly issued limited partnership interests in Highland Capital Management, L.P.

FF. On December 24, 2015, as part of the Highland Transaction, Hunter Mountain Investment Trust acquired through purchase from trusts affiliated with Mr. Dondero and Mr. Okada, and Mr. Okada individually, newly reclassified limited partnership interests in Highland Capital Management, L.P.

GG. Hunter Mountain Investment Trust's acquisition of substantially all the interests in Highland Capital Management, L.P. was at a substantial discount to book value.  The substantial discount offered reflects the overall donative intent of Mr. Dondero and Mr. Okada to engage in the transaction.

HH. The Variable Contract/Separate Account structure may provide a federal income tax advantage to the Supporting Organizations if the income realized by such Supporting Organizations as a result of ownership of their Variable Contracts would not be treated as taxable unrelated business taxable income ("UBTI") under the Code.  In contrast, if either Supporting Organization were to acquire a direct ownership interest in an investment partnership such as Atlas IDF, such Supporting Organization would almost certainly realize taxable UBTI if Atlas IDF owned, directly, or through other partnerships, equity interests in business partnerships (such as Highland) or debt-financed assets.

II. The Variable Contract/Separate Account structure may also provide state and local tax advantages to the Supporting Organizations since the structure enables the Supporting Organizations to avoid being treated as engaged in business in the states and localities in which the underlying portfolio companies that are partnerships are engaged in business.

JJ. Crown Global has represented that (1) it qualifies as a life insurance company under the Code; (2) it has made an effective election to be treated as a domestic corporation for U.S. federal income tax purposes; and (3) the terms of the Variable Contracts to be purchased by the Supporting Organizations would meet the requirements of Section 72 of the Code to be treated as annuity contracts under such Code Section if such Contracts were held by a "natural person" (within the meaning of Code Section 72(u)).

KK. Mr. Dondero and Mr. Okada (the "Donors") are entering into the transactions described herein based on a donative intent to provide funds to be used by TDF, a public charity.

LL. Prior to making any investments in the Variable Contracts to be issued by Crown Global, the Dallas Foundation had their independent financial consultant evaluate John Honis, as an investment

019268

manager acting through Rand Advisors, and the proposed investment strategy offered by him through an insurance dedicated fund that combined a private equity and liquid investment strategy for the Supporting Organizations.

MM.    The Dallas Foundation's independent financial consultant recommended to The Dallas Foundation that such investment strategies used by John Honis would be a prudent investment by each of the Supporting Organizations through a deferred variable contract policy issued by an insurance company.

NN.    Prior to making any investments in the Variable Contracts to be issued by Crown Global, the Board of each Supporting Organization received (1) the confidential private placement memorandum prepared by Crown Global with respect to the Variable Contracts, and (2) the confidential private placement memorandum detailing the terms of the Atlas IDF.

OO.    The decision made by each Board to invest in its Variable Contract and to designate the Atlas IDF as the designated investment to be made by the Separate Account of Crown Global were made on the basis of the anticipated investment returns on the underlying investments that will be made and managed by Rand Advisors.


## III. ASSUMPTIONS MADE

You have authorized us to make the following assumptions for the purpose of rendering our opinion stated herein:

A.    Mr. Honis will manage the investments of Rand IDF and the PE Portfolio Fund in order to provide attractive returns to the current and future investors in such funds.  Mr. Honis' performance will affect his ability to attract additional investors to such funds (including separate series funds) as well as any other funds subsequently managed by Rand Advisors.

B.    Atlas IDF will, at all times, comply with the applicable diversification requirements under Section 817(h) of the Code.  In order to achieve such compliance, Atlas IDF will restrict the ownership of equity interests in Atlas IDF to those investors described in Treasury Regulation 1.817-5(f).

C.    The Boards of the Supporting Organizations will control any decisions made to be made as the owner of the Variable Contract, including any decisions to withdraw funds from the Variable Contract, to move funds from Atlas IDF to other investments that Crown Global may offer under the Variable Contract, or to invest additional funds of the Supporting Organization in Atlas IDF through the Variable Contract.

D.    Highland is a successful investment management firm and it would be able to raise additional capital from other sources if it chose to do so.

E.    The intentions of the parties are that, for federal income tax purposes,: (1) Crown Global will at all times be treated as the owner of the limited partnership interests in Atlas IDF that provide an

019269

economic return for the Variable Contracts owned by the Supporting Organizations; (2) each Supporting Organization will be treated as the owner of its Variable Contract; (3) Mr. Dondero and Mr. Okada will each be treated as having made charitable contributions in cash to their Supporting Organizations in the amounts described in the facts above; (4) any sales of partnership interests in Highland by Mr. Dondero or Mr. Okada, any trust established by M. Dondero or Mr. Okada or any related party to such Donors, to the PE Portfolio Fund will be treated as sales occurring between the applicable seller and the PE Portfolio Fund.

F. Neither Supporting Organization will incur "acquisition indebtedness" within the meaning of Section 514 of the Code with respect to its Variable Contract at any time.

## IV. REQUESTED OPINIONS

You have asked us to render an opinion on the following issues:

1. Whether the Internal Revenue Service could successfully contend that, under the facts and assumptions described above, the owners of the Variable Contracts, i.e., the two Supporting Organizations, are to be treated as owners for federal income tax purposes of the underlying investments held in the Crown Global Separate Accounts established in connection with such Variable Contracts.

2. Whether the income realized by the Supporting Organizations from their investment in the Variable Contracts will be exempt from the tax imposed under Section 511 of the Code on the "unrelated business taxable income" of tax-exempt entities described in Section 511(a).

## V. LEGAL ANALYSIS

### Tax Benefits for Tax-Exempt Organizations Investing in Variable Annuity Contracts

U.S. tax-exempt entities described in Section 501 of the Code, such as the Supporting Organizations, are subject to federal income tax on their unrelated business taxable income (UBTI). UBTI is defined in Section 512 as income from a "trade or business" that is regularly carried on by the tax-exempt organization, or a partnership in which it a partner, and which is not substantially related to the exempt organization's exempt purpose or function. UBTI also includes income from "debt-financed property" as defined in Section 514. Debt-financed property is property held to produce income with respect to which "acquisition indebtedness" exists at any time in the taxable year (or, if the property is sold or disposed during the year, with respect to which there was any acquisition indebtedness at any time during the 12-month period ending on the date of such disposition).

Section 512(b)(1) specifically exempts "annuities" from UBTI, along with other notable categories of investment income, including interest, dividends, capital gains and rent from real property. However, the specific statutory exemptions from UBTI do not apply to the extent such income items are unrelated debt-financed income under Code Section 514. Where debt-financed property is involved, UBTI includes the income from the property multiplied by its "debt-basis percentage" (a percentage equal to "average acquisition indebtedness" divided by "average adjusted basis").

019270

The term "annuities" is not defined in Section 512 or the Treasury regulations ("Regulations") thereunder.  There is also no comprehensive definition of annuity or "annuity contract' in Section 72 (governing tax treatment of distributions from life insurance and annuity contracts) or elsewhere in the Code.  The Regulations under Section 72 provide that an annuity contract that is subject to the rules of Section 72 includes a contract that is recognizable as an annuity under the "customary" practices of life insurance companies.  See Treas. Reg. Section 1.72-2(a)(1).  Under Section 72, if the entire value of an annuity contract is applied to a stream of periodic payments, each of these payments will be partly included in income and (because of nondeductible premium payments) partly excludible as a return of capital, pursuant to an "exclusion ratio".  Under Section 72(e)(2)(A), any non-annuity amount received under an annuity contract (including withdrawals and partial surrenders) on or after the "annuity starting date" are treated as "gross income".  Any non-annuity amounts received **before** the annuity starting date may be treated as gross income or a return of the policyholder's investment in the contract under rules set forth in Section 72(e)(3).

**Tax Status of Separate Accounts**.  Life insurance companies have segregated asset accounts that are created and regulated under the laws of various states or foreign jurisdictions.  These accounts are typically formed for the purpose of segregating assets attributable to variable life insurance contracts, variable annuities and group contracts from the general assets of the life insurance company.  In Revenue Ruling 78-204, the IRS ruled that a segregated asset account established by a life insurance company is not an organization that can be taxed separately from the insurance company.  The Ruling states that if a segregated asset account holds assets pursuant to contracts described in former Code section 801(g)(1) (which includes variable annuity contracts or contracts with reserves based on a segregated asset account), it is taxed as part of the insurance company.

**Code Section 817: Statutory Diversification Requirements**.  To discourage consumer use of various insurance type products as investment vehicles, Congress in 1984 granted the Treasury authority to prescribe diversification standards for the investment of variable contract assets held in segregated asset accounts.  The legislative history states the Congress's goal in so doing was "to deny annuity or life insurance treatment for investments that are publicly available to investors and investments which are made, in effect, at the direction of the investor."  *H.R. Conf. Rep. No. 98-561, at p. 1055 (1984)*.

Under the Treasury Regulations, a separate account will be considered adequately diversified if no more than 55% of the total value of the account is represented by any one investment; no more than 70% of the total value of the account is represented by any two investments; no more than 80% of the total value is represented by any three investments; and no more than 90% of the total value is represented by any four investments. Treas. Regs. Sec. 1.817-5(b)(1).

For purposes of testing diversification, Section 817(h)(4) and Section 1.817-5(f) of the Regulations provide a look through for assets held in certain investment entities, including partnerships, trusts and investment companies, provided that the beneficial interest in the investment entity are held by one or more segregated asset accounts of one or more insurance companies, and public access to such investment entity is available exclusively (except as otherwise permitted by Regs. Sec. 1.817-5(f)(3)) through the purchase of a variable contract.   As previously discussed, the Separate Accounts established in connection with the Variable Contracts are expected to satisfy the diversification

019271

requirements of Code Section 817.  In order to satisfy the diversification requirements, Atlas IDF will satisfy the requirements of the Section 817 regulations to qualify for "look through" treatment.

## A. <u>INVESTOR CONTROL ISSUES.</u>

In the 1970's the IRS grew concerned that taxpayers were avoiding federal income tax by "wrapping" their investments in "investment annuity contracts" which created the possibility of major tax shelter abuse.  Such transactions were structured as follows:  Each investment annuity contract paid an annuity based on the investment return and market value of the contract's segregated asset account.  A third party custodian, typically a bank, held and invested the segregated account's assets according to the annuity owner's directions.  In response to such transactions, the IRS issued four revenue rulings between 1977 and 1982 describing the circumstances in which owners of variable annuity contracts or variable life insurance contracts would be treated and taxed as owners of the underlying assets because of their control of the investments.  The revenue rulings applied to variable annuity contracts and variable life insurance contracts the federal income tax principle that a person other than the person holding legal title to the property is treated as the owner for tax purposes if that other person possesses the "benefit and burdens" or "incidents of ownership" of such property.  See generally *Commissioner v. Sunnen*, 33 U.S. (1948); *Helvering v. Clifford*, 309 U.S. 331 (1940); *Corliss v. Bowers*, 281 U.S. 376 (1930).

**Revenue Ruling 77-85**.  This Ruling concludes that the annuity owner is, for federal income tax purposes, the owner of the separate account assets under the following conditions:

1.  the annuity owner controls the investment of the separate account assets;

2.  the annuity has the power to vote any securities in the account; and

3.  the annuity owner can withdraw any or all of the assets at any time.

**Revenue Ruling 80-274**.  The second Ruling similarly concludes that the investor in the annuity contract was treated as the owner of a bank certificate of deposit (CD) underlying a variable annuity contract when the contract owner transferred the CD to the life insurance company in exchange for the variable annuity contract and the insurance company is expected to hold the CD for the investor's benefit.

**Revenue Ruling 81-225**.  This Ruling applies the investor control principle to five different situations, and thus is considered the most important ruling on the principle.  In four of the fact patterns considered, the annuity owner- not the insurance company- is considered the owner of the mutual fund investments underlying the annuity contract because the mutual fund investments were available for direct purchase by the general public.  In the fifth fact pattern, the insurance company, rather than the annuity owner, is considered the owner of the mutual fund investments because such shares were not available for direct purchase by the general public; they were only available through the purchase of a variable contract.  The Ruling states that in factual situations one through four, the insurance company is "little more than a conduit between the policyholders and their mutual fund shares."

**Revenue Ruling 82-54**.  In this fourth "investor control" Ruling, the annuity owners direct the insurance company to invest in shares of any or all of three mutual funds that are **not** available to the public.  One mutual fund invests primarily in common stocks, another in bonds, and the third in money market

019272

instruments.  The investors chose the original allocation of the investments among the three funds and have the unlimited right reallocate before the annuity contract's maturity date.   The IRS held that the annuity owners' ability to choose the contract's investments did not constitute sufficient control to cause them to be treated as owners of the mutual fund shares.  In its analysis, the IRS reiterated its position in Revenue Ruling 81-225 that public availability of investments will cause annuity owners to be treated as owners of the underlying mutual fund shares.

**Christoffersen v. United States**.  In 1984, the United States Court of Appeals for the Eighth Circuit upheld the IRS's investor control theory of Revenue Ruling 81-225 in *Christoffersen v. United States*.  The taxpayers in *Christoffersen* had purchased a variable annuity contract that reflected the investment return and market value of the insurance company's separate account assets.  The taxpayers had the power to direct the investment of premiums in any one or all of six publicly available mutual funds, to reallocate their investment among such funds at any time, to make withdrawals, to surrender the contract, and to apply the contract's accumulated value to provide annuity payments.

**Post-Christoffersen Legislation**.   After the Eighth Circuit Court's decision in the *Christoffersen* case, the Congress enacted Code section 817, which aims to discourage use of variable annuities and life insurance primarily as investment vehicles.   Before the issuance of further revenue rulings in 2003 (discussed below), some commentators had suggested that the enactment of the diversification requirements under Code section 817(h) (and other measures) effectively rendered *Christoffersen* (and Revenue Ruling 81-225) obsolete.  This view was supported by language in the General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984 ("DEFRA Blue Book") indicating that the Congress introduced the diversification requirements in Section 817(h) to address any and all concerns with respect to investor control of assets underlying insurance company variable contracts.  The Joint Committee on Taxation wrote the following:

> In authorizing Treasury to prescribe diversification standards, the Congress intended that the standards be designed to deny annuity or life insurance treatment for investments that are publicly available to investors and investments which are made, in effect, at the direction of the investor.

When the Treasury issued its proposed regulations under Code section 817(h), it sidestepped the investor control issue.  In its preamble to such regulations, the Treasury expressly noted that the regulations "do not provide guidance concerning the circumstances in which investor control of the investments of a segregated asset account may cause the investor, rather than the insurance company, to be treated as the owner of the asset in the account."  The preamble further stated that guidance on investor control issues would be provided in separate regulations or rulings.

**Revenue Rulings 2003-91 and 2003-92**.  The subsequent major guidance issued by the IRS on the investor control issues with respect to variable contracts was in the form of two revenue rulings issued in 2003.  Revenue Ruling 2003-91 involved a life insurance company that offered variable life insurance and variable annuity contracts.  The assets that funded the contracts were held in a separate account that was divided into various sub-accounts.  Each sub-account offered a different strategy.  Under the facts of this ruling, an individual purchased a life insurance contract and at the time of purchase, the

019273

holder specified the allocation of premiums paid among the sub-accounts. The investments could be reallocated, at the direction of the holder, among the twelve sub-accounts, each representing a different investment strategy, at any time. Investment in the sub-accounts was available solely through the purchase of the insurance contract.

All decisions concerning the choice of the investment adviser, and any changes with respect to the sub-accounts offered, were made by the insurance company in its sole and absolute discretion. No arrangement, plan, contract, or agreement exists between the contract holder and the insurance company or between the contract holder and the investment advisor regarding the specific investments or investment objective of the sub-accounts. The contract holder could not communicate directly or indirectly with the insurance company concerning the selection or substitution of the investment advisor or other managers of the account or sub-accounts. The contract holder had no legal, equitable, direct, or indirect interest in any of the assets held by a sub-account; rather the contract holder had only a contractual claim against the insurance company to collect cash from the insurance company in the form of death benefits, or cash surrender values under the contract. Revenue Ruling 2003-91 concluded that the holder of a variable contract under such facts was not the owner of the assets that funded the variable contract for federal income tax purposes because the holder did not have direct or indirect control over the separate account.

Revenue Ruling 2003-92 clarified and amplified Revenue Ruling 81-22, by stating that a variable contract holder was the owner of interests in an unregistered partnership (e.g., a hedge fund or private equity fund) where the interests in such partnership were not available exclusively through the purchase of a life insurance policy or annuity contract. In effect this Ruling confirmed the position taken by the IRS in private letter rulings that the term "general public" included individuals purchasing partnership interests in private placement transactions. More recently, the IRS has confirmed that the fact that a similar fund is available to the public will not cause the fund held by the insurance company's separate account to be treated as being publicly available. See, e.g., Private Letter Ruling 20147007 (April 25, 2014).

**Webber v. Commissioner.** On June 30, 2015, the Tax Court issued a 92-page opinion in the case of *Webber v. Commissioner* affirming the enforceability of the IRS' investor control doctrine. Mr. Webber was a venture capital investor and private equity fund manager who established a grantor trust to purchase private placement variable life insurance policies insuring the lives of two elderly relatives. The policies were purchased from a Cayman life insurance company and the taxpayer and his family members were listed as the beneficiaries. The premiums paid for each policy, after deduction of a mortality risk premium and other applicable charges, were placed in a separate account underlying the policy. The Tax Court summarized the investor control doctrine[2] as follows:

> The "investor control" doctrine posits that, if a policyholder has sufficient "incidents of ownership" over the assets in a separate account underlying a variable life insurance or annuity policy, the policyholder rather than the insurance company will be considered the owner of those assets for Federal income tax purposes. The critical "incident of ownership" that emerges from these rulings is the power to decide what specific

---

[2] *Webber v. Com'r*, 144 T.C. No. 17 (2015), at pp. 55-56.

019274

investments will be held in the account. . . . Other "incidents of ownership" emerging from these rulings include the powers to vote securities in the separate account; to exercise other rights or options relative to these investments; to extract money from the account by withdrawal or otherwise; and to derive, in other ways, what the Supreme Court has termed "effective benefit" from the underlying assets.

The assets in these separate accounts purchased investments in startup companies which, as the Tax Court noted, the taxpayer was intimately familiar with, and also in which he invested personally and through the funds he managed. After examining the facts, including thousands of emails sent by Webber to parties acting as his agent with "recommendations" that were routinely followed by the "investment managers" of the accounts, the Tax Court determined that the taxpayer effectively dictated both the companies in which the separate accounts would invest and all actions taken with respect to these investments.

The IRS cited the "investor control" doctrine and other principles, and concluded that the taxpayer had retained sufficient control and incidents of ownership over the assets in the separate accounts to be treated as their owner for federal income tax purposes.  The IRS thus treated the taxpayer as having received the dividends, interest, capital gains, and other income realized by the separate accounts.  The IRS also assessed accuracy related penalties on the taxpayer under Code section 6662.

The Tax Court held that the IRS' pronouncements enunciating the investor control doctrine are entitled to deference and weight and that Webber "retained control and incidents of ownership over the assets" and was therefore "taxable on the income earned on those assets during the taxable years at issue."  In holding that the taxpayer was the owner of investments held under the variable annuity contract , as contract owner, the taxpayer had (a) unfettered ability to select investments for the separate accounts under the contract, and neither the issuer nor the investment manager of the separate account exercised any independent investment discretion, (b) dictated all actions the separate account took with respect to ongoing investments,[3] (c) had numerous ways to extract cash from the contract without a surrender of the contract[4] and without loans against the contract, and he frequently exercised such power (e.g., by selling assets to the separate accounts, by borrowing money from the separate accounts, and by having the separate account make investments that generated liquidity for the taxpayer), and (d) derived other economic benefits, including causing the separate accounts to make investments that were used for personal pleasure by the taxpayer (including a winery, a Big Sur resort, and a Canadian hunting lodge), that discharged the contract owner's personal commitments, and that bolstered investments held by the taxpayer outside the contract.

Consequently, the Tax Court upheld the IRS' deficiency determinations for the most part but concluded that the taxpayer as not liable for the penalty assessments (even though the taxpayer was widely believed by tax advisors to have flagrantly disregarded the most minimal of standards to avoid investor control).  The facts described herein concerning the investments made by the Supporting Organizations

---

[3] Giving the contract owner SEC-mandated voting rights with respect to underlying investments is not sufficient to establish investor control.  Rev. Rul. 81-225, 1981-2 C.B. 12.

[4] The contract owner's right to surrender the contract is not sufficient to establish investor control.  Rev. Rul. 81-225, 1981-2 C.B. 12.

019275

in the Variable Contracts issued by Crown Global in no way resemble the facts considered by the court in the *Webber* case.

**Application of the Investor Control Precedents to the Variable Contracts.**

Both Supporting Organizations certificates of incorporation state in the "Second" clause:

"The corporation is organized and shall be operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit The Dallas Foundation, a Texas nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by The Dallas Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. . . . [T]he corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code."

The "Second" paragraph quoted from each certificate of incorporation is clear that the respective Supporting Organization is formed to operate exclusively "to support and benefit" The Dallas Foundation. Further the "Eighth" paragraph of the certificate of incorporation for each Supporting Organization indicates that upon its dissolution, all of its assets are to be distributed to The Dallas Foundation.

Each Supporting Organization will be classified as a "Tier 1" supporting organization for federal income tax purposes. A "Tier 1" Supporting Organization, from time to time, will provide its supported organization, The Dallas Foundation, distributions of cash. The IRS web page describes the relationship as:

"**Type I.** A Type I supporting organization must be operated, supervised or controlled by its supported organization(s), typically by giving the supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization. The relationship between the supported organization(s) and the supporting organization is sometimes described as *similar to a parent-subsidiary relationship*. (emphasis added.)"[5]

 Section 2.13 "Control of Investments" within the bylaws of each Supporting Organization provide that The Dallas Foundation, as Institutional Member, "shall have the sole and exclusive power and authority to direct the management and investment of the assets" of each Supporting Organization. This power affirmatively rests exclusively in the hands of The Dallas Foundation's Institutional Members and no other officer or director of the respective Supporting Organization. This mandate is reflected in the bylaws' Section 2.13 as:

 "Such power and authority shall be exercised by the Institutional Member in its sole discretion and shall be separate and independent of any power and authority of the Board of Directors and officers of the

---

[5]See, https://www.irs.gov/Charities-&-Non-Profits/Charitable-Organizations/Supporting-Organizations-Requirements-and-Types

019276

Corporation **which have no power or authority** with respect to the matters delegated hereby to the Institutional Member with respect to investments" (emphasis added).

Therefore, the Supporting Organizations' Individual Directors and officers, including Grant Scott or Mark Okada, have no power or authority with respect to matters assigned to The Dallas Foundation with respect the decision to purchase the Variable Contracts.

This power within Section 2.13(d) vested with the Institutional Member includes control of decisions with respect to:

"the power to acquire life insurance policies, annuities, and/or other insurance or similar products (including the exercise or non-exercise or any rights, or the prosecution or defense of any disputes with the issuer or other parties regarding legal, regulatory, contractual, or other matters, arising under or relating to such products) ..."

Section 2.13(e) of the bylaws extends the power to the Institutional Members to include:

"the power to direct, and delegate to, the officers of the Corporation the taking of such acts and the execution of such documents as may be necessary to effectuate the decisions of the Institutional Member with respect to investments."

The Dallas Foundation holds the Institutional Member seats on the board of the Supporting Organizations per Section 2.1 of the respective bylaws. The Dallas Foundation has appointed as Directors Gary W. Garcia and Mary M. Jalonick per the respective "Statement of Incorporator."

Thus, the corporate provisions for each Supporting Organization's certificate of incorporation and bylaws is absolutely clear that The Dallas Foundation controls all of the respective Supporting Organization's activities, including investments, purchases of the Variable Contracts, grants, and operating costs and expenses, and is entitled solely and exclusively to the economic benefit of such Supporting Organization's investments, including from the Variable Contracts.

Supporting Organization #1 received a donation of cash of $16,034,978.50 on December 8, 2015 from Mr. Dondero. Supporting Organization #2 received a donation of cash of $5,345,021.50 from Mr. Okada on December 8, 2015. After the cash donation was made, the Board of Directors of each Supporting Organization authorized the purchase of a Variable Contract offered by Crown Global through a Resolution of Unanimous Consent on December 9, 2015. Effective December 11, 2015, Crown Global issued Variable Contracts #30218 and #30219 to Supporting Organization #1 and Supporting Organization #2, respectively. The Variable Contracts offered investment opportunities in three Insurance Dedicated Funds, including Atlas IDF. The Dallas Foundation, acting as the Institutional Board member of each Supporting Organization, directed the premiums to be allocated 100% to Atlas IDF.

Each Variable Contract, in the respective "Policy Data Page" to the Deferred Variable Annuity Policy, indicates under "Beneficiary" the sole beneficiary as the respective purchasing Supporting Organization #1 and Supporting Organization #2, and such designation is "irrevocable".

019277

Therefore, it is without question that the investment decision to purchase the Variable Contract and allocate the premium to Atlas IDF was made by The Dallas Foundation.  Through this decision by The Dallas Foundation, the investment performance of Atlas IDF will accrete to each respective Supporting Organization, and therefore, ultimately, to The Dallas Foundation.   Ultimately, The Dallas Foundation will solely and exclusively derive any and all of the economic benefits from the Variable Contracts issued by Crown Global.   Concomitantly, neither the Donors nor the Donors' agents, affiliates, related parties etc. derive any of the economic benefits from the Variable Contract's performance through the investment decisions made by Rand Advisors within Atlas IDF.

Each Variable Contract policy provides in Sections 4.5 and 5.1 the allowance that the Supporting Organization can reallocate funds, at quarterly intervals (but no more than twice per calendar year), among the available investment options provided in the Contract.  Therefore, The Dallas Foundation, should it no longer want exposure to Atlas IDF, has the right to reallocate funds to another investment offering.

Crown Global, through Sections 4.7 and 4.11 of each Variable Contract policy, has the sole and absolute discretion to terminate Atlas IDF as an investment offering available to each Supporting Organization. Each Supporting Organization has the right to fully or partially surrender the Variable Contract back to Crown Global, in accordance with Sections 8.2 and 8.3 of the policies.  No more than one partial surrender may be requested by the policyholder during each quarter of a policy year.

As discussed above, Atlas IDF will qualify for look through treatment for purposes of satisfying the diversification requirements of Section 817 of the Code.  In order to qualify for such look through treatment, it is essential to conclude that the equity interests in the Rand IDF have not been offered to the "general public".  Since the offering documents for the Rand IDF provide for such restricted access to the fund, we have assumed that the Rand IDF has satisfied, and will continue to satisfy this requirement.

The PPM for Atlas IDF provides that approximately 45 percent of its assets will be invested in a portfolio of high yield debt instruments and other securities selected by, and managed by the investment manager of the IDF, Rand Advisors.  Under the governing documents of the Variable Contracts and the Atlas IDF, the Supporting Organizations are not provided with any opportunities to participate in any purchase or sale or other investment decisions made with respect to the IDF's debt portfolio, and we have been instructed to assume that the Supporting Organizations and their agents will not attempt to do so.

The PPM for Atlas IDF further provides that approximately (but no more than) 55 percent of the IDF's portfolio will be invested in private equity investments through an investment made by the IDF in the Rand PE Fund 1.  Although it was anticipated that the Rand PE Fund would seek to make an investment in limited partnership interests in Highland, the terms of such investment were negotiated by Rand Advisors, as investment manager of the PE Fund, the Supporting Organizations were not provided with any opportunity to participate in such negotiations, and in fact purchased their Variable Contracts before any such investment in Highland was made by the PE Fund.  There was no guarantee that the Highland investment would in fact be made and there was no provision for unwinding the investment by

019278

Crown Global in Atlas IDF or the investments made by each Supporting Organization in its Variable Contract if such were the case.

Further, the governing documents of the Rand PE Fund provide that all investment decisions with respect to such Fund are to be made by Rand Advisors, and we have been instructed to assume that the Supporting Organizations and their agents will not attempt to participate in such decisions. The owners of the Variable Contracts will not have the ability to exercise any voting rights with respect to securities held by the Atlas IDF or Rand PE Fund, and such owners of the Variable Contracts will not have the ability to require any distributions by the insurance company pursuant to withdrawal rights in such contracts to be made in kind rather than in cash. Due to the nature of the illiquid private equity investments in the Separate Accounts, the Variable Contracts contain certain limitations on the ability of the owners of such contracts to withdraw funds.

On December 21, 2015, Rand Advisor's special purpose vehicle, Hunter Mountain Investment Trust, controlled by the Rand PE Fund, executed a Contribution Agreement with Highland Capital Management. L.P., in exchange for newly-issued limited partnership interests in Highland Capital Management, L.P. (the "Contribution Transaction"). On December 24, 2015, Rand Advisor's special purpose vehicle, Hunter Mountain Investment Trust, controlled by the Rand PE Fund, executed a Purchase and Sale Agreement to acquire interests in Highland Capital Management, L.P. from The Dugaboy Investment Trust, The Mark and Pamela Okada Family Trust-Exempt Trust #1, The Mark and Pamela Okada Family Trust-Exempt Trust #2, and Mark K. Okada (the "Purchase Transaction" and together with the Contribution Transaction, the "Highland Transaction").

The Highland Transaction was negotiated between Rand Advisors and the respective Highland counterparties and their legal representatives. Prior to consummation of the Highland Transaction, neither The Dallas Foundation nor the Supporting Organizations directed, compelled, or caused Rand Advisors to make the investment in the Highland Transaction.

The investor control doctrine was created to prevent the policyholder or beneficiary of an insurance product that qualifies under Section 72 of the Code from directly or indirectly making investment decisions with respect to the investment assets within the insurance product. The concern was that policyholders and beneficiaries should not be able to direct the investments and receive the economic benefit of those directions within an insurance product. That is the fundamental principle laid out in in the recent Tax Court case of *Webber v. Commissioner*.

Therefore, applying that *Webber* principle of the investor control doctrine to the Highland Transaction, it is not a legally significant fact that the Donors to each of the Supporting Organization are also participants in the Highland Transaction because the beneficiary of the economics from the investment performance of the Variable Contracts are not the Donors but rather are the Supporting Organizations and ultimately The Dallas Foundation.

As further support for our view, Rand Advisors made the independent investment decision to participate and negotiate the Highland Transaction. Moreover, it is clear that Rand Advisors was not taking directions nor compelled by The Dallas Foundation or the Supporting Organizations to enter into the Highland Transaction. Accordingly, there is no way the Highland Transaction can in any way be

019279

characterized as "control" by The Dallas Foundation or the Supporting Organizations over the investment activities of Atlas IDF and its respective investment accounts.

The facts and circumstances of the purchase of the Variable Contracts by the Supporting Organizations support the conclusion that Crown Global is the owner of Atlas IDF and its investments, and that the Supporting Organizations will not be treated as the owner of the investments. The facts present none of the factors that the Tax Court found determinative in *Webber*. In particular:

- Neither The Dallas Foundation nor the Supporting Organizations have any ability to select investments in Atlas IDF held by the Variable Contracts;
- Neither The Dallas Foundation nor the Supporting Organizations have any ability to vote securities owned by Atlas IDF or the ability to exercise other options with respect to such investments;
- Other than the right to partially or fully surrender the Variable Contracts, the Supporting Organizations cannot withdraw funds indirectly out of the Variable Contracts. In particular, neither The Dallas Foundation nor the Supporting Organizations can cause Atlas IDF to purchase assets from The Dallas Foundation or the Supporting Organizations. Nor can The Dallas Foundation or the Supporting Organizations borrow funds from Atlas IDF or otherwise engage in any transaction with Atlas IDF.

In addition, the facts and circumstances closely track the facts and circumstances of Revenue Ruling 2003-91's safe harbor provisions. In addition to the facts recited above:

- There is no arrangement, plan, contract, or agreement between The Dallas Foundation or the Supporting Organizations and Crown Global or Rand Advisers as to the investments to be held in Atlas IDF.
- The Dallas Foundation and the Supporting Organizations have no right to, and will not, communicate with any investment officer of Crown Global or its affiliates or with any Investment Manager regarding the selection, quality, or rate of return of any specific investment or group of investments held in Atlas IDF.
- The Dallas Foundation and the Supporting Organizations have no legal, equitable, direct, or indirect interest in any of the assets held by Atlas IDF. Rather the Supporting Organizations only have a contractual claim against Crown Global to collect cash from the Variable Contracts.
- All decisions concerning the choice of Insurance Dedicated Fund offerings, or any of Crown Global's investment officers involved in the investment activities of any Insurance Dedicated Fund, are made by Crown Global in its sole and absolute discretion.[6]

---

[6] See also, P.L.R. 9752061 (Dec. 24,1997) ("Policyholder influence over the way the investments are managed will be limited to selecting an investment manager from a pool of investment managers whose credentials have been evaluated and approved by Taxpayer. These investment managers may be recommended to Taxpayer by one or more Policyholders. Taxpayer will be under no obligation to approve any such recommendations. Moreover, once Policyholder makes an initial selection, the investment manager can only be changed by Taxpayer and not by Policyholder"; Taxpayer (the issuing insurance company) was held to be the owner of the assets held under the contract).

019280

- Neither The Dallas Foundation nor the Supporting Organizations have any right to, and will not, communicate with Crown Global concerning the selection or substitution of any investment manager or insurance dedicated fund involved in the investment activities of Atlas IDF.

In sum, based upon these facts, we believe that the Supporting Organizations will not be treated as the owners of the investments and other assets held in the Separate Accounts, since the Supporting Organizations will not have the types of control which the IRS has viewed as essential in order to apply the investor control doctrine to make another person other that the holder of the assets (i.e., the insurance company) the owner for tax purposes.

B.  **UNRELATED BUSINESS TAXABLE INCOME ISSUES FOR INVESTORS IN DEFERRED VARIABLE ANNUITY CONTRACTS**.

As discussed above, we have reached the conclusion that under the facts and assumptions set forth herein, for federal income tax purposes, the insurance company should be treated as the owner of the assets in the Separate Account (i.e., the equity interests in the Rand IDF), and each of the Supporting Organizations should be treated as owners of their respective Variable Contract.  We have also been instructed to assume that neither Supporting Organization has, or will ever, incur "acquisition indebtedness" with respect to its Variable Contract.

**Possible Application of Section 72(u) of the Code**.  In 1986, Congress was concerned that employers were utilizing deferred annuity contracts to fund nonqualified deferred compensation arrangements on a tax-favored basis, and that this was acting as a disincentive to employers to fund benefits through qualified retirement plans.  Section 72(u) was added to the Code to curtail such activity.  The legislative history to section 72(u) states:

> The committee believes that the present-law rules relating to deferred annuity contracts present an opportunity for employers to fund, on a tax-favored basis, significant amounts of deferred compensation for employees.  This favorable tax treatment may create a disincentive for employers to provide benefits to employees under qualified pension plans, which are subject to significantly greater restrictions.[7]

Section 72(u) states, in relevant part, that "any annuity contract" owned by "a person who is not a natural person" (e.g., a corporation) shall not be treated as an annuity contract for purposes of the income tax provisions of the Code (Sections 1-1563, known as Subtitle A), other than Subchapter L (i.e., Sections 801-848 relating to insurance companies).  The effect of this rule was to eliminate the deferral of income tax for the corporate investor in the contract on the "inside buildup" income of the annuity contract.  If a non-natural person does hold an annuity contract and no exception applies, then Section 72(u)(1)(B) provides that the "income of the contract" for any taxable year is "ordinary income" that the owner is treated as receiving or accruing during that taxable year.

---

[7] S. Rep. No. 99-313, at 567 (1986).

019281

**Exemptions under Section 72(u)**. We would also note that the drafters of Section 72(u) also inserted some specific exemptions in Section 72(u)(3). For example, Section 72(u)(3)(B) provides that Section 72(u) does not apply to any annuity contract held under a qualified plan described in Section 401(a) of the Code or an "individual retirement plan" (i.e., individual retirement accounts and individual retirement annuities described in Section 7701(a)(37)). Section 72(u) also contains an exemption for "immediate annuities" held by any non-natural person. The inclusion of these exemptions indicates that Section 72(u) is designed to eliminate the tax deferral benefit that taxable corporations could derive from investments in deferred annuity contracts. We are not aware of any policy reason why a deferred annuity contract held by a qualified plan or an IRA should be exempted from Section 72(u) but one held by a tax-exempt corporation should be covered, and we have found nothing in the brief legislative history of this Code provision that addresses this issue. Consequently, the failure of the drafters to include an exemption from Section 72(u) for other tax-exempt entities that are not qualified plans or IRAs appears to be an oversight or drafting error.

**Definition of "Income on the Contract"**. Section 72(u) provides its own special definition of "income on the contract" in Section 72(u)(2). Such income is defined as the *excess of* (1) the sum of the "net surrender value' of the contract at the close of the taxable year plus all distributions under the contract received during the taxable year or any prior taxable year, *over* (2) the sum of premiums paid on the contract (net of dividends) plus all amounts includible in income for prior taxable years under Section 72(u). It is significant that the income to be recognized by the owner of the annuity contract is the net change in value of the contract rather than the actual net income realized by the separate account of the insurance company that has issued the annuity contract backed by the separate account. In effect, Section 72(u) does **not** provide for income taxation of the holder of the contract as if the contract owner owned the underlying assets in the insurance company's separate account.

The Supporting Organizations are corporations, and thus non-natural persons within the meaning of Section 72(u). Section 512(b), which contains a specific exclusion from UBTI for "annuities" is in Subtitle A of the Code. Thus, the Section 72(u) could be interpreted to provide that the UBTI exclusion for "annuities" would not apply to a tax-exempt corporation that owned a variable annuity contract. We have found no evidence in the legislative history that would indicate that Section 72(u) was intended to change the character of the income recognized by tax-exempt corporations that owned variable annuity contracts. Even if the specific exclusion from UBTI for "annuities" were held inapplicable to the income derived by the Supporting Organizations from the Variable Contracts, there are alternative provisions of the tax law that could be cited to support an exclusion of the income from such Contracts from UBTI.

**Treasury Regulations Defining Investment Income Excluded from UBTI.** Section 512(b) of the Code states that certain income items, including "annuities", interest, dividends, royalties, real property rents and gains realized on sale, exchange or disposition of property (other than inventory or property held primarily for sale to customers in the ordinary course of a trade or business) are specifically excluded from UBTI. Congress subsequently amended Section 512(b)(1) to add "payments with respect to securities loans" and "amounts received or accrued as consideration for entering into agreements to make loans" to the list of items excluded from UBTI. In the 1990's there were many new types of financial instruments, including equity swaps and total return swaps, that were made available and tax counsel sought advice from the Treasury for further clarification of the UBTI rules for investments made

by tax-exempt entities in such financial instruments.  In 1992, the Treasury amended Section 1.512(b)-1 of the Regulations to provide that the specific exclusion from UBTI in Section 512(b)(1) also applies to "income from notional principal contracts" (as defined in the Regulations) and "other substantially similar income from ordinary and routine investments to the extent determined by the Commissioner…."

Thus, it can be argued that the income required to be recognized by a Supporting Organization under Section 72(u) as a result of its investment in the Variable Contract could still qualify for exclusion under this Treasury Regulation as "substantially similar income from ordinary and routine investments".  We have found no revenue ruling or case which has addressed this issue.  We would note, however, that Section 72(u) by its terms is only applicable to "annuity contracts".  Thus, if the Supporting Organizations had instead purchased variable life insurance policies, Section 72(u), by its terms, would not be applicable.  If Congress intended to eliminate the UBTI exemptions applicable to tax-exempt corporations that invested in variable contracts, it is unclear why the Section 72(u) provision by its terms is only applicable to "annuities" and not variable life insurance policies.

**Unrelated Trade or Business.**

The tax on UBTI was passed into law to rectify situations where an exempt organization could engage in any trade or business, secure in the knowledge that the profits generated from such trade or businesses would not be subject to tax, assuming the funds from such trade or business were received by the exempt organization.  As stated in the House Committee Report:

> The problem at which the tax on unrelated business income is directed here is primarily that of unfair competition.  The tax-free status of these section 101 organizations enables them to use their profits tax-free to expand operations, while their competitors can expand only with the profits remaining after taxes.  Also, a number of examples have arisen where these organizations have, in effect, used their tax exemption to buy an ordinary business.[8]

Under Section 511 of the Code, gross income of a tax-exempt organization will be treated as UBTI if:

1. It is income from a "trade or business";

2. The trade or business is "regularly carried on" by the organization or a partnership in which it is a member; and

3. The conduct of the "trade or business" is not substantially related to the purposes of the organization.

In order for the IRS to assert that some or all of the income from Variable Contracts constitutes UBTI, the IRS will need to establish that some or all of the income from the Variable Contracts is "trade or business" income.  Thus, unless the Variable Contracts were deemed to be partnership interests, or the

---

[8] H. Rep't No. 2319, 81st Cong., 2d Sess. 33-37 (1950).

019283

activity of acquiring such Variable Contracts were deemed to be a business activity, the income items recognized by the Supporting Organizations would not be treated as UBTI.

In general, a trade or business for UBTI purposes is based on Section 162 principles, and is viewed as an activity that produces income from the sale of a product or performance of services. In a 1969 Revenue Ruling, the IRS held that a tax-exempt entity's investment in insurance and annuity contracts was not a business activity. See Revenue Ruling 69-74. The IRS will not be able to establish an unrelated trade or business with respect to either Supporting Organization. The Variable Contracts are contractual entitlements only, and any economics paid or accrued are paid or accrued with respect to such contract.

As discussed in detail in this letter, we do not believe that the Supporting Organizations could be treated as the tax owners of the underlying partnership investments of the Separate Accounts under the IRS's "investor control" doctrine discussed in detail above. The facts and assumptions described above do not support treating the Supporting Organizations as partners in the Atlas IDF, the Rand PE Fund or the underlying Highland limited partnership.

**Code Section 514(g) Amendment**. Section 72(u) was added to the Code in 1986. Two years **earlier**, Congress had amended Code Section 514 (by adding a new subsection (g)) to specifically grant regulatory authority to the Treasury to issue regulations "necessary or appropriate" to prevent the avoidance of the debt-financed income rules through the use of "segregated asset accounts". The legislative history of the 1984 legislation specifically states that such regulations, if issued, shall only apply prospectively. We have found no reference to the 1984 amendment to Section 514 in the legislative history of Section 72(u). As of the date of this letter, the Treasury has not issued any proposed regulations to implement Section 514(g). Further, there have been no regulations issued or proposed under Section 72(u).

**Private Letter Rulings under Section 72(u).** There are two IRS private letter rulings, published in 2002 and 1997, that appear to have addressed the tax treatment of tax-exempt corporations that have made investments in variable annuities backed by separate accounts that held UBTI generating assets. PLR 20020647 (dated Nov. 13, 2001); PLR 9708022 (dated Nov. 26, 1996). These PLRs focus on the application of Section 72(u) and the use of group annuity contracts (GACs) purchased by a foundation or endowment (i.e., a non-natural person). The underlying investment of the GAC was a real estate partnership (presumably funded with debt financing). The PLRs state that while the GAC was subject to Section 72(u) in the hands of the tax-exempt organizations, the annuity continued to be treated as a valid variable contract under Section 817(d) of the Code. As a result of Section 72(u) being applicable, the life insurer would issue a Form 1099 to the endowment or foundation for any current income required to be recognized by reason of Section 72(u).

The tax issue is the character of the income to such tax-exempt entities. The two letter rulings, state, in essence, that in the view that the contract's status as an annuity contract under Subchapter L of the Code (relating to insurance company taxation), "the tax treatment of the contract holder under Section 72(u)(1)(A) does not preclude the contract from satisfying the requirements of Section 817(d)(2)(A) for purposes of determining the taxpayer's income." As such, the rulings conclude that the contracts do provide for the "payment of annuities." This would support the conclusion that the "income on the

019284

contract" received by the Supporting Organizations constitutes "annuity" income and therefore does not constitute UBTI. It is our understanding the counsel for insurance companies generally are of the view that such PLRs support the position that the character of the contract holder's income is "annuity" income or other investment income exempt from UBTI despite the fact that the GAC is subject to Section 72(u).

In addition, another private letter ruling, published in 1990, supports the contention that the income reportable by each Supporting Organization does not constitute UBTI. In PLR 9009047, a trust was requesting a ruling that it qualified as a charitable remainder unitrust. The trustee of the trust intended to invest all the trust's assets in a deferred annuity contract. The ruling acknowledges that the annuity contract to be acquired by the trust will be subject to Code section 72(u) because the trust is not a natural person and the trust is not holding the annuity as an agent for a natural person. The ruling concludes that the trust will qualify as a charitable remainder unitrust and therefore the trust "will be exempt from taxes imposed by subtitle A of the Code unless it has any unrelated business taxable income as defined in section 512 of the Code and the regulations applicable thereto." Immediately thereafter, the ruling states that the trust will include in its ordinary income for any tax year the "income on the [annuity] contract" in accordance with Code section 72(u). This again supports the conclusion that amounts reportable by a tax-exempt organization with respect to an annuity contract will not constitute UBTI.[9]

Private letter rulings of this type are issued to a particular taxpayer in response to a request from the taxpayer for an interpretation of the tax law to a particular set of facts. PLRs may not be cited as precedent and generally may not be relied upon by as taxpayer other than the taxpayer which applied for and received the PLR. However, PLRs are typically viewed by tax counsel as indicative of the interpretations of the tax law that IRS personnel would likely apply to other taxpayers with the same issue.

**Mark to Market Taxation of an Annuity Contract under Section 72(u) Supports Exclusion from UBTI.** Even if the "income on the contract" that will be reported to each Supporting Organization is not considered an amount from an annuity because of Code section 72(u), alternative arguments exist that support the contention that the "income on the contract" does not constitute UBTI.

As discussed above, the "income on the contract" that will be reportable to each Supporting Organization will represent the increase in value of the assets underlying the Variable Contracts. The manner in which the contract owner's annual income inclusion is calculated under Section 72(u) resembles a mark-to-market approach to determining the investor's gain from ownership of the contract during the applicable taxable year. Essentially, the "income on the contract" represents the amount that would be realized if all the assets underlying the Separate Accounts were sold for their fair market value at the close of each taxable year. As noted above, Section 512(b)(5) contains a broad exemption from UBTI for gains realized on sales, exchanges or "other dispositions" of property (other

---

[9] This conclusion is also supported by commentators. *See* Zaritsky, Lane & Danforth, <u>Federal Income Taxation of Estates and Trusts</u>, §14.03[6][a][iv] ("Because the income option CRUT is tax exempt, no tax is due on the current accumulations").

019285

than inventory or dealer assets). Furthermore, gain realized by tax-exempt investors under the mark-to-market rules of Code Section 1256 are entitled to the UBTI exclusion provided by Section 512(b)(5).

The UBTI exclusion does not apply to gains or losses from the sale, exchange, or other disposition of property that is (i) stock in trade or other property of a kind which would properly be included in the inventory of the organization if on hand at the close of the taxable year, or (ii) property held primarily for sale to customers in the ordinary course of the trade or business. The investments underlying the Variable Contracts should not constitute inventory or property held primarily for sale to customers in the ordinary course of a trade or business. Accordingly, even if the "income on the contract" does not constitute annuity income, it is analogous to gains from the sale, exchange or other disposition of property that is not inventory or held for sale to customers, which is excluded from UBTI.

**Notional Principal Contract or Other Ordinary or Routine Investment Income.** Additionally, each Supporting Organization is an owner of an investment contract issued by Crown Global. Even if such contract is excluded from being treated as an annuity contract under the literal reading of Section 72(u), such contract more closely resembles a "notional principal contract" or "other ordinary or routine investment" referred to in the exclusions from UBTI of Section 1.512(b)-1(a) of the Regulations.

**Failure to Qualify for the Section 512(b)(1) Exclusion Does Not Result in UBTI.** Section 512(b) provides a special exclusion for certain types of investment income, but the failure to qualify for the specific exclusions in such Section does not automatically result in UBTI classification for the income items. Section 72(u) provides that the income to be recognized by the non-natural owner of the annuity account is treated as "ordinary income". Ordinary income is not of necessity characterized as UBTI; interest income, royalties and real property rents, for example, are also items of ordinary income that qualify for exemption from UBTI.

**There is No Federal Income Tax Authority to Support an IRS Position that the Income from the Variable Contracts is UBTI.**

Unable to find an unrelated trade or business upon which to base a conclusion that the Supporting Organizations receive UBTI (as discussed above), the IRS would need to develop a legal theory that the character of trade or business income that flows to Crown Global maintains its character as the income (i.e., UBTI) received by the Supporting Organizations. The IRS would encounter at least three problems with any such legal theory.

First, corporate entities similar to Crown Global are regularly used to "block" a tax-exempt organization from receiving UBTI. Under this planning technique, the corporate blocker reports any income that would have been UBTI if received directly by the tax-exempt on its own corporate tax return. Any amounts distributed by such corporation to its shareholder are generally dividend income, which is excluded from UBTI.[10] In this instance, any trade or business income will be reported by Crown Global on its own federal income tax return. Therefore, any amounts received by the Supporting Organizations should be classified as a dividend or other distribution that would not constitute UBTI.

---

[10] Code § 512(b)(1).

019286

Second, the Variable Contracts are similar to a derivative contract, as both are contractual obligations between two unrelated parties who both rely on other party's credit quality and risk, which may be significantly different than the risk profile of the reference assets underlying the contract. Further, one party to the contract typically "hedges" its obligations, similar to Crown Global hedging its obligations by purchasing interests in Atlas IDF, L.P.[11] Derivative financial instruments are regularly used to convert or block certain types of income to the desired derivative income by changing the legal relationship and risks from holding the investments directly versus obtaining a counterparty's promise to return similar economics.

Similar examples are found in the context of FIRPTA assets[12] and a foreign investor investing in U.S. assets indirectly through derivative contracts. With respect to FIRPTA, foreign investors can avoid the application of FIRPTA withholding by acquiring a synthetic long position in U.S. real estate through a derivative product. The IRS has concluded that this type of position is not a U.S. real property interest that would be subject to FIRPTA withholding.[13] Another example is a foreign investor gaining exposure to U.S. investment assets by entering into a derivative contract with a foreign counterparty bank. The foreign bank will acquire the investment assets. From the foreign investor's standpoint, the derivative contract converts U.S. source income on the U.S. investment assets into foreign source income, thereby avoiding exposure to U.S. income tax or withholding tax.[14]

The above examples demonstrate that federal tax laws respect the difference between holding a certain investment asset directly and another where one has economic exposure to the investment asset indirectly through a contractual promise by a counterparty. These examples are closely analogous, if not nearly identical, to the issuance of a variable annuity contract by a life insurance company that provides the investor a return measured by a Separate Account owned by the insurance company. The only difference is that the contractual relationship is also regulated under an insurance regime.

Third, an IRS legal theory that some portion of the Variable Contract's income is UBTI would expose a significant flaw. Such a legal theory would require that the same amount of income be taxed twice, without reduction for the amount paid by the first party. Specifically, the income from the Variable Contract is reported on Crown Global's U.S. federal income tax return. To then require the Supporting Organizations to also report such income as UBTI would be axiomatic to tax law principles of not taxing different taxpayers on the same income received. Even double tax regimes, such as the corporate income and dividend tax, do not tax the same amount of income to two different taxpayers twice. Rather, first the corporate earnings are taxed at a corporate rate; then the corporation only has the after-tax dollars to distribute to shareholders in the form of a dividend.

---

[11] Generally, it does not make a difference from a tax perspective if one of the parties to the derivative is fully hedged or is not, or actually owns the referenced assets. The income from the derivative contract is not treated for tax purposes as income on the underlying referenced investment assets. *See* Rubinger, Jeffrey, *IRS Rules Total Return Swap Tied to Real Estate Index Is Not Subject to FIRPTA*, Journal of Taxation (Sept. 2008).
[12] FIRPTA refers to the provisions of the Code added by the Foreign Investment in Real Property Tax Act of 1980 (FIRPTA), which impose federal income tax on foreign persons disposing of United States real property interests.
[13] Rev. Rul. 2008-31, 2008-26 I.R.B.1180.
[14] Treas. Reg. § 1.863-7(b)(1).

019287

**A Possible Legal Theory Available to Support a UBTI Position by the IRS Would Be to Disregard the Variable Contracts Issued by Crown Global as Shams**

The discussion above indicates that the IRS would not have a strong legal basis to support the position that the Variable Contract income is UBTI.  Therefore, the only plausible legal theory the IRS could assert to cause the underlying UBTI earned within a Variable Contract flow directly to a Supporting Organization would be to make a sham transaction (*i.e.*, economic substance) argument.  Under such an argument, the IRS would treat each Supporting Organization as direct investors in Atlas IDF and ignore, for tax purposes, Crown Global and its contractual relationship with each Supporting Organization.  As discussed below, the IRS will encounter substantial factual hurdles to overcome before it could successfully apply such a legal theory to the Variable Contracts in order to treat any underlying UBTI received by Crown Global as taxable to the Supporting Organizations.

The focus of the sham transaction doctrine is to determine whether a transaction has economic effects other than the creation of tax benefits.[15]  Courts have stated that a multi-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, containing tax-independent considerations, and not structured solely by tax-avoidance features should be respected.[16]  Furthermore, "the existence of a tax benefit resulting from a transaction does not automatically make it a sham as long as the transaction is imbued with tax-independent considerations."[17]  If an investment is one for which Congress has specifically bestowed a tax incentive, the investment, if imbued with economic substance, will not be considered a sham merely because the taxpayer could not expect profits apart from tax benefits.[18]

The transactions between each Supporting Organization and Crown Global, as represented, appear to have ample economic substance and are far from empty transactions entered into solely to generate tax benefits.  In fact, the following facts support the assertion that the transactions between the Supporting Organizations and Crown Global have economic substance and are not "shams":

- Crown Global is a Bermuda-based insurance company subject to the insurance laws of Bermuda;
- Crown Global was not formed solely for the purpose of entering into the transactions; rather it has been existence for many years prior to issuing the Variable Contracts;
- Crown Global has customers beyond the Supporting Organizations;
- Crown Global continues to market a variety of insurance-based products;
- Crown Global has employees who are undertaking the respective roles befitting an insurance company, according to its website;
- The Variable Contracts were negotiated between Crown Global and each Supporting Organization with specified pricing and contractual terms being agreed upon;

---

[15] *Kirchman v. Com'r,* 862 F.2d 1486, 1492 (11th Cir. 1989).
[16] *Frank Lyon Co. v. United States,* 435 U.S. 561, 583-84 (1978).
[17] *Holladay v. Com'r,* 649 F.2d 1176, 1179 (5th Cir. 1981).
[18] Bittker & Lokken: <u>Federal Taxation of Income, Estates, and Gifts</u>, § 4.3.4A.  *But see In re CM Holdings, Inc.,* 301 F.3d 96, 105 (3rd Cir. 2002) ("Choosing a tax-favored investment vehicle is fine, but engaging in an empty transaction that shuffles payments for the sole purpose of generating a deduction is not.")

019288

- Crown Global received a premium for each Variable Contract which was deposited in accounts owned and controlled by Crown Global;
- Crown Global's fee charged within the Variable Contracts is based upon the value of the respective Variable Contracts and not upon any anticipated tax benefits;
- Crown Global's fee appears commensurate with fees charged by other insurers;
- Presumably, Crown Global will continue to operate as an insurance company after any termination of the Variable Contracts;
- Each Supporting Organization's creation and existence is not transitory;
- Crown Global negotiated and entered into a Participation Agreement with the investment manager for Atlas IDF; and
- Crown Global received the Atlas IDF Private Placement Memorandum and completed the applicable subscription documents when Crown Global received a premium that was allocated to Atlas IDF.

Based upon such facts, a court would likely determine that Crown Global (a) is a real third-party insurance company, independently owned, and not affiliated with the Supporting Organizations (or their respective principals and agents) in any form, (b) has many customers, (c) operates in a regulatory environment and that it offers a variety of insurance products, and (d) it was not formed for the specific purpose of entering into the transactions.  The Variable Contracts were intended to comply with the insurance regulatory laws governing Crown Global.  Any conflicts between Crown Global and each Supporting Organization would have to be resolved under the terms of the respective Variable Contracts.  Each Supporting Organization has no legal rights normally associated with a subscriber to the Atlas IDF.  Nor have the Supporting Organizations completed subscription documents with Atlas IDF.  Rather, Crown Global invested the premium received from each Supporting Organization in Atlas IDF, and has all the rights and entitlements normally associated with an investor in entities similar to Atlas IDF.

The foregoing demonstrates that a court would likely reject the application of the sham transaction or economic substance doctrine to the Variable Contracts issued by Crown Global to each Supporting Organization, and therefore reject any assertion that any UBTI realized with respect to the assets held in the Separate Account referenced in the Variable Contract should flow to the Supporting Organization.  Rather, the IRS would have to address analogous legal positions directly adverse to such an assertion.

**Overall Conclusion with Respect to UBTI.**

After reviewing the respective legal authorities, arguments, and positions that the IRS could attempt to assert, we believe there are at least three supportive arguments, when considered together and presented to a court, to support our opinion.  These supportive arguments are as follow: (1) the Variable Contracts income would not generate UBTI to the Supporting Organizations because such income is annuity income; 2) if the "income on the contract" was not considered annuity income, but rather (a) income reported on a "mark to market" method (which represents the changes in value of the Variable Contracts on year over year basis), (b) income from a notional principal contract, or (c) income from ordinary and routine investments, such "income on the contract" would still not be UBTI; and 3) IRS

019289

would have little, if any, legal support for its position supporting UBTI inclusion by the Supporting Organizations but rather have adverse legal authorities in other financial contexts.

Therefore, we feel that if challenged by the IRS, each of Supporting Organization #1 and Supporting Organization #2 would have a more likely than not (a greater than 50% chance of success) in a court of law, to uphold the position that any income from the Variable Contracts reported by each Supporting Organization would not be UBTI income.

Although we have reached this level of opinion, it is not to suggest that the likelihood of success is not much greater than may be indicated by our opinion level, but rather, reflects only upon the lack of direct legal precedents which we can refer for giving our opinion.   If the IRS were to litigate this position, we would anticipate that the taxpayer would likely win, and that legal authority would exist, such that if at that time we would have been able to reach a higher opinion level.  We reiterate that our opinion is a very strong "more likely than not" level of opinion.

## VI. OPINION RENDERED

Based upon the accuracy of the statement of facts contained herein and the assumptions set forth above, and the legal analysis set forth above it is our opinion that:

1. If the Internal Revenue Service were to assert, in reliance on the "investor control doctrine", as currently interpreted, that  Supporting Organization #1 and Supporting Organization #2 should be treated as the owners, for federal income tax purposes, of the investments held in the Separate Accounts of Crown Global associated with the Variable Contracts owned by Supporting Organization #1 and Supporting Organization #2, a court should conclude that such investor control doctrine should not apply to  Supporting Organization #1 and Supporting Organization #2 (a confidence level that there is a greater than 50% likelihood that the position will be upheld by a court if challenged by the Internal Revenue Service), but rather, for federal income tax purposes, a court should conclude Crown Global is the owner of the investments held in such Separate Accounts, including without limitation, to those investments held in Atlas IDF (a confidence level that there is a greater than 50% likelihood that the position will be upheld by a court if challenged by the Internal Revenue Service).

2. It is more likely than not (*i.e.*, a greater than 50% likelihood) that the position that the income realized by the Supporting Organization #1 and Supporting Organization #2 from their ownership of the Variable Contracts will not be classified as unrelated business table income within the meaning of Section 511 of the Code, will be upheld by a court if challenged by the Internal Revenue Service.

************

The legal opinion expressed above is subject to the assumptions, exceptions, restrictions, and qualifications stated herein as well as the following qualifications and limitations:

1.  **This letter and the legal opinion contained herein are limited to the matters expressly set forth herein, and no legal opinion shall be implied or may be inferred beyond the matters expressly so stated.   As such,**

019290

(a)  **The opinion is limited to the specific federal tax issues addressed herein;**

(b)  **Additional issues may exist that could affect the federal income tax treatment of matters that are the subject of this opinion and this opinion does not provide a conclusion with respect to any additional issues; and**

(c)  **With respect to any significant federal tax issues outside the limited scope of this opinion, this opinion was not written, and cannot be used by the taxpayer, for the purpose of avoiding penalties that may be imposed by the taxpayer.**

2.  The legal opinion set forth herein represents our best professional judgment and is not a guarantee or warranty of any of the matters discussed herein.

3.  This letter and the legal opinion expressed herein are rendered as of the date hereof, and are based upon relevant provisions of the Code and the Treasury regulations thereunder, and upon relevant judicial precedents and other authorities, as they exist as of the date of this legal opinion. These authorities are subject to change at any time, and if they do change, it may be necessary to re-examine this legal opinion.  In that regard, we expressly disclaim any undertaking to advise you of any changes in applicable law, facts or any other matters that may come to our attention after the date hereof which may alter, in whole or in part, the legal opinion expressed herein.  In addition, the legal opinion expressed in this letter is based solely on the accuracy of the facts and assumptions expressly stated herein, and the conclusions, statements and views expressed herein cannot be relied on, and may change, if any of the facts or assumptions described herein are, or later become, inaccurate or incomplete in any respect.

4.  This letter communicates legal advice, and has been prepared in anticipation of potential litigation concerning the tax consequences described herein.  It is intended that this letter be protected from discovery under the attorney-client privilege and work product doctrine to the extent provided by law. Disclosure of this letter and the information communicated in it should be carefully controlled so that disclosure is not made in a manner that will invalidate the protected status of the information.

5.  We confirm that there is no limitation on the disclosure by you or any other parties to the transaction discussed of the tax treatment or tax structure as described in this letter.  The implications of any such disclosure on attorney-client privilege or other applicable legal protections should be carefully considered prior to any such disclosure.

This letter may be relied upon by the addressee only and may not be relied upon by, nor may copies be delivered to, any other person without our prior written consent.

Very truly yours,

*Sadis & Goldberg LLP*

019291

# EXHIBIT 105

019292

**PROMISSORY NOTE**

**$24,268,621.69**                                                                 **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in its entirety that certain promissory note dated May 31, 2017, in the original face amount of **$24,198,069.28** (the "**Amended Note**"), which was in substitution for and superseded in its entirety that certain promissory note dated December 28, 2016, in the original face amount of **$23,817,639.58** (the "**Original Note**"), from The Dugaboy Investment Trust, as Maker, and The Get Good Non-Exempt Trust as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

WHEREAS, The Get Good Non-Exempt Trust sold, transferred and assigned 97.6835% of its interest in the Original Note to Highland Capital Management, L.P. pursuant to that Purchase and Sale Agreement dated December 28, 2016 between Highland Capital Management, L.P. and The Get Good Non-Exempt Trust.

FOR VALUE RECEIVED, THE DUGABOY INVESTMENT TRUST ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. and THE GET GOOD NON-EXEMPT TRUST (collectively, the "**Payee**"), in legal and lawful tender of the United States of America, the principal sum of TWENTY FOUR MILLION, TWO HUNDRED SIXTY-EIGHT THOUSAND, SIX HUNDRED TWENTY ONE AND 69/100 DOLLARS ($24,268,621.69), together with interest, on the terms set forth below. All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.       Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of three and twenty-six hundredths percent (3.26%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.       Payment of Principal and Interest. Principal and interest under this Note shall be payable as follows:

2.1     Annual Payment Dates. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. 97.6835% of each Annual Installment shall be paid to Highland Capital Management, L.P. and the remaining 2.3165% shall be paid to The Get Good Non-Exempt Trust. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2     Final Payment Date.  The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

019293

HCMLPHMIT00001327

3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.    <u>Prior Notes</u>.    The original of each of the Original Note and the Amended Note superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

THE DUGABOY INVESTMENT TRUST

By: _____
Name: Nancy Dondero
Title:  Trustee

2

019294

HCMLPHMIT00001328

**EXHIBIT 106**

019295

# THE DUGABOY INVESTMENT TRUST

## OFFERING[1] OF $18.17 MILLION PROMISSORY NOTE OWED TO HCMLP

## FEBRUARY 2024



[1] Any offering of the Dugaboy Note will be subject to Oversight Board approval

019296

HCMLPHMIT00002323

 **DUGABOY INVESTMENT TRUST**

## SUMMARY TERMS OF DUGABOY PROMISSORY NOTE

| | |
|---|---|
| **Maker:** | The Dugaboy Investment Trust |
| **Facility:** | Promissory Note dated 5/31/2017 in the principal amount of $24,268,621.69 payable to Highland Capital Management, LP (97.6835% = $23,706,439.07) and The Get Good Non-Exempt Trust (2.3165% = $562,182.62) |
| **Current Principal:** | Principal Payable to Highland Capital Management is currently $18,174,936.62 (76.67% of original principal amount following amortization payments which occurred between 2017 - 2023) |
| **Security:** | None |
| **Guarantor:** | None |
| **Maturity:** | 12/31/2046[1] |
| **Interest Rate:** | 3.26%, compounding annually on May 31 and payable annually on December 31 |
| **Amortization:** | 1 / 30 of original principal amount payable annually on December 31 (4.35% of current principal amount) |
| **Call Protection:** | None; Maker may prepay in whole or in part the unpaid principal or accrued interest of the Note |
| **Event of Default:** | Failure to pay this Note or any installment as it becomes due; immediate acceleration upon default |
| **Cost of Collection:** | Expressly included in note terms |
| **Covenants:** | None |

[1] Based on amortization schedule. The promissory note states the final payment date is 12/31/47 due to a scrivener's error

CONFIDENTIAL

1



019297
HCMLPHMIT00002324

 **DUGABOY INVESTMENT TRUST**

## POTENTIAL TRANSACTION EXECUTIVE SUMMARY [1]

The Dugaboy Investment Trust ("Dugaboy") is a Delaware Trust established in 2010 for the benefit of Jim Dondero ("Dondero")

Dugaboy is believed to be one of Dondero's most significant personal assets, holding among other items:

- 100% LP interest in NexPoint Advisors, Dondero's flagship real estate investment platform
- Significant portfolio of publicly traded Dondero-managed entities as well as privately held real estate investments and other private investments
- A potential claim to a contingent unvested derivative interest in the HCMLP estate through Dugaboy's purported claim on Hunter Mountain Investment Trust

Dugaboy was the Maker of a Promissory Note (the "Original Note") dated 12/28/16 in the face amount of $23,817,639.58 owed to The Get Good Non-Exempt Trust [2] as Payee

- The Get Good Non-Exempt Trust assigned 97.6835% of its interest in the original note to HCMLP on 12/28/16, retaining 2.3165%
- The Original Note was replaced by an Amended Note in the face amount of $24,198,069.28 dated 5/31/17 and further replaced by a Promissory Note (the "Note") in the face amount of $24,268,621.69, also dated 5/31/17
- The current face amount owed to HCMLP under the Note is $18,174,936.62 [3]
- Despite raising defenses with other notes owed by Dondero-affiliated entities, Dugaboy's trustee affirmed under oath that no similar oral agreements existed beyond those specific notes [4]
- Dugaboy's counsel in fact asserted that "there is no dispute that . . . Dugaboy has been making (and continues to make) payments on the Dugaboy Note and that there is little risk of Dugaboy defaulting on the Dugaboy Note" [5]

Terms of the Note:

- Unsecured note due 12/31/46 [6]
- Interest: 3.26% payable annually on December 31
- Amortization: 1 / 30 of original principal amount owed annually on December 31 ($790k owed annually to HCMLP, or 4.35% of the current principal amount)

---

[1] Any offering of the Dugaboy Note will be subject to Oversight Board approval
[2] Dondero trust which is currently not believed to hold significant assets
[3] Principal amount owed following the December 2023 amortization payment
[4] *Appendix in Support of Highland Capital Management, LP's Motion for Partial Summary Judgement in Notes Actions* (Adv Case No. 19-34054, Docket #0127)
[5] Dugaboy's *Brief in Support of the Motion to Dismiss, or in the alternative, Motion for More Definite Statement* entered on 4/30/21 (Adv Case No. 20-03195, Docket #30)
[6] The note states that the final maturity date is 12/31/47, however it also states the note principal is due in thirty equal annual installments beginning 12/31/17, which would make the final installment due 12/31/46

CONFIDENTIAL

2

019298
 HCMLPHMIT00002325



## DUGABOY INVESTMENT TRUST

### DUGABOY NOTE CASHFLOWS

| | Beginning Principal | Amort Payment | Interest Payment | Total Payment | Ending Principal |
|---|---|---|---|---|---|
| 12/31/2023 | | | | | $ 18,174,936.62 |
| 12/31/2024 | $ 18,174,936.62 | $ 790,214.64 | $ 594,126.23 | $ 1,384,340.87 | $ 17,384,721.98 |
| 12/31/2025 | $ 17,384,721.98 | $ 790,214.64 | $ 566,741.94 | $ 1,356,956.58 | $ 16,594,507.34 |
| 12/31/2026 | $ 16,594,507.34 | $ 790,214.64 | $ 540,980.94 | $ 1,331,195.58 | $ 15,804,292.70 |
| 12/31/2027 | $ 15,804,292.70 | $ 790,214.64 | $ 515,219.94 | $ 1,305,434.58 | $ 15,014,078.06 |
| 12/31/2028 | $ 15,014,078.06 | $ 790,214.64 | $ 490,799.93 | $ 1,281,014.57 | $ 14,223,863.42 |
| 12/31/2029 | $ 14,223,863.42 | $ 790,214.64 | $ 463,697.95 | $ 1,253,912.59 | $ 13,433,648.78 |
| 12/31/2030 | $ 13,433,648.78 | $ 790,214.64 | $ 437,936.95 | $ 1,228,151.59 | $ 12,643,434.14 |
| 12/31/2031 | $ 12,643,434.14 | $ 790,214.64 | $ 412,175.95 | $ 1,202,390.59 | $ 11,853,219.50 |
| 12/31/2032 | $ 11,853,219.50 | $ 790,214.64 | $ 387,473.63 | $ 1,177,688.27 | $ 11,063,004.86 |
| 12/31/2033 | $ 11,063,004.86 | $ 790,214.64 | $ 360,653.96 | $ 1,150,868.60 | $ 10,272,790.22 |
| 12/31/2034 | $ 10,272,790.22 | $ 790,214.64 | $ 334,892.96 | $ 1,125,107.60 | $ 9,482,575.58 |
| 12/31/2035 | $ 9,482,575.58 | $ 790,214.64 | $ 309,131.96 | $ 1,099,346.60 | $ 8,692,360.94 |
| 12/31/2036 | $ 8,692,360.94 | $ 790,214.64 | $ 284,147.33 | $ 1,074,361.97 | $ 7,902,146.30 |
| 12/31/2037 | $ 7,902,146.30 | $ 790,214.64 | $ 257,609.97 | $ 1,047,824.61 | $ 7,111,931.66 |
| 12/31/2038 | $ 7,111,931.66 | $ 790,214.64 | $ 231,848.97 | $ 1,022,063.61 | $ 6,321,717.02 |
| 12/31/2039 | $ 6,321,717.02 | $ 790,214.64 | $ 206,087.97 | $ 996,302.61 | $ 5,531,502.38 |
| 12/31/2040 | $ 5,531,502.38 | $ 790,214.64 | $ 180,821.02 | $ 971,035.66 | $ 4,741,287.74 |
| 12/31/2041 | $ 4,741,287.74 | $ 790,214.64 | $ 154,565.98 | $ 944,780.62 | $ 3,951,073.10 |
| 12/31/2042 | $ 3,951,073.10 | $ 790,214.64 | $ 128,804.98 | $ 919,019.62 | $ 3,160,858.46 |
| 12/31/2043 | $ 3,160,858.46 | $ 790,214.64 | $ 103,043.99 | $ 893,258.63 | $ 2,370,643.82 |
| 12/31/2044 | $ 2,370,643.82 | $ 790,214.64 | $ 77,494.72 | $ 867,709.36 | $ 1,580,429.18 |
| 12/31/2045 | $ 1,580,429.18 | $ 790,214.64 | $ 51,521.99 | $ 841,736.63 | $ 790,214.54 |
| 12/31/2046 | $ 790,214.54 | $ 790,214.54 | $ 25,760.99 | $ 815,975.53 | $ - |
| | | $ 18,174,936.62 | $ 7,115,540.26 | $ 25,290,476.88 | |



019299
HCMLPHMIT00002326

 **DUGABOY INVESTMENT TRUST**

## ESTIMATED DUGABOY BALANCE SHEET

The Dugaboy Investment Trust
*Est Current Non-GAAP Balance Sheet, Net of Secured Debt* [1]
*$ in 000*

| Assets | | Liabilities | |
|---|---|---|---|
| Private Investments | $ 111,067,696 | Note Owed to Jim Dondero [2] | $ 110,530,584 |
| Net Securities + Real Estate | $ 69,253,250 | Note Owed to HCMLP | $ 18,174,937 |
| Notes Receivable | $ 22,757,955 | Other Off Balance Sheet Debt | $ 11,401,584 |
| Cash | $ 17,710,240 | Note Owed to CDO Fund --> UBS | $ 2,603,822 |
| Other Assets | $ 46,586 | Accounts Payable, Other | $ 1,833,939 |
| | | Note Owed to HCM Services | $ 373,406 |
| | | Total Liabilities | $ 144,918,272 |
| | | | |
| | | Equity | $ 75,917,455 |
| Total Assets | $ 220,835,727 | Total Liabilities + Equity | $ 220,835,727 |
| | | | |
| | | LTV: | 65.6% |
| | | LTV excluding Dondero Note: | 15.6% |

[1] Adjust 9/30/20 Accrual Based Balance Sheet to Est Current FMV, Assets Shown Net of Corresponding Secured Debt
[2] Note potentially subject to creditor dispute

NOTE: Historical financial statement summaries are presented as prepared by Jim Dondero's accountant on an Accrual Basis. These financial statements are not audited, do not include a cashflow statement and do not include supporting notes. Adjustments to the most recently available financial statements (9/30/20) are made by HCMLP to as many items as can be supported to create a "Pro Forma" balance sheet which is intended to reflect a good faith estimate of current fair market value. HCMLP makes no representation as to the completeness or accuracy of these financial statements, and are included in this presentation for illustrative purposes.

CONFIDENTIAL

4

019300
HCMLPHMIT00002327

**EXHIBIT 107**

019301



**PARTICIPATION AGREEMENT FOR PAR/NEAR PAR TRADES**
_____

### TRANSACTION SPECIFIC TERMS

THIS PARTICIPATION AGREEMENT FOR PAR/NEAR PAR TRADES is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Participation in the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the LSTA Standard Terms and Conditions for Participations for Par/Near Par Trades, published as of July 21, 2023 (the "Standard Terms").  The Standard Terms and (if applicable) the Collateral Annex are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties as and specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below.  The Standard Terms, the Collateral Annex (if applicable) and the Transaction Specific Terms together constitute a single integrated Participation Agreement for Par/Near Par Trades governing the Transaction.  With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

| TRANSACTION SUMMARY | | |
|---|---|---|
| Trade Date: | **Agreement Date** | |
| Agreement Date: | **July 18, 2024** | |
| Seller: | **Highland Capital Management, L.P.** | |
| Buyer: | **HIGHLAND INDEMNITY TRUST** | |
| Credit Agreement: | **That certain Promissory Note dated May 31, 2017, in the original face amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as the Payee (the "Note")** | |
| Borrower: | **The Dugaboy Investment Trust** | |
| Purchase Amount(s): | **$18,174,936.62** | |
| Tranche(s): | | |
| CUSIP Number(s), if available: | | |
| Delivery of Credit Documents: | Yes ☒ | No ☐ |
| Netting Arrangements: | Yes ☐ | No ☒ |
| Set-Off Applicable: | Yes ☐ | No ☒ |
| Collateral Annex Applicable: | Yes ☐ | No ☒ |
| Elevation: | Yes ☒ | No ☐ |

### A.    DEFINITIONS

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement.  Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement.  Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement.  If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"Agent" means none.

    Copyright © LSTA 2023.  All rights reserved.

019302

HCMLPHMIT00002594

"Buyer Purchase Price" select one:

☒ not applicable.

☐ means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).

☐ means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

"Collateral Annex" means the Collateral Annex to the Participation Agreement for Par/Near Par Trades published by the LSTA as of July 21, 2023.

"Commitments" select one:

☒ none.

☐ means [identify applicable commitment tranche(s) using Credit Agreement definitions] in the principal amount of $/£/€_____ [in each case specify the aggregate amount of the Loans, the Unfunded Commitments and the portion, if any, of the Commitments that is irrevocably "frozen" (i.e., that is not subject to future drawing)].

"Elevation Transfer Fee" means none.

"Loans" means the outstanding principal amount of the Note as of the Trade Date payable to Seller pursuant to the Note (which amount, for the avoidance of doubt, equals 97.6835% of the total outstanding principal amount of the Note).

"Netting Letter" select one:

☒ not applicable.

☐ means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer [and] [,] Original Buyer [, Penultimate Buyer] and [describe any other parties to the Netting Letter]].

"Original Buyer" select one:

☒ not applicable.

☐ means [specify original buyer in the netting arrangement].

"Participation Required Consents" means none.

"Participation Transfer Fee" means the transfer fee (if any) set forth in Section E.1 payable to Seller in connection with the assignment by Buyer of all or any portion of the Participation, subject to Section 10.1 of the Standard Terms and Conditions.

"Penultimate Buyer" select one:

☒ not applicable.

☐ none ("none" is applicable if there are only three (3) parties involved in the netting arrangement).

☐ means [_____].

"Seller Purchase Price" select one:

☒ not applicable.

☐ means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"Unfunded Commitments" means none.

## B.    SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)

If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

019303

HCMLPHMIT00002595

**6.     SECTION 8 (DISTRIBUTIONS; INTEREST AND FEES; PAYMENTS; COMMITMENT REDUCTIONS)**

**C.1**     Section 8.3 (Wire Instructions).

Buyer's Wire Instructions:

Bank:  M&T Bank
ABA No.: 031100092
Acct.: Highland Indemnity Trust
Acct. No.: 150474-000
Attn.: Neumann Marlett III
Ref.: True Sale Participation 100% Dugaboy Note

Seller's Wire Instructions:

Bank:  East West Bank
ABA No.: 322070381
Acct.: Highland Capital Management, LP
Acct. No.: 5500014686
Attn.: Corporate Accounting
Ref.: True Sale Participation 100% Dugaboy Note

**C.2**     Section 8.8 (Set-Off).

If "Yes" is specified opposite "Set-Off" in the Transaction Summary, clause (i) of the proviso to the second sentence of Section 8.8 shall apply.

**D.     SECTION 9 (NOTICES; RECORDS)**

Buyer's Address for Notices and Delivery:

Highland Indemnity Trust
100 Crescent Court, Suite 1850
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Electronic Mail Address: jpseeryjr@gmail.com; jseery@highlandcapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, New York 10017
Attention: Highland Capital Lead Partner

Seller's Address for Notices and Delivery:

Highland Capital Management, L.P.
100 Crescent Court, Suite 1850
Dallas, Texas 75201
Attention: Chief Financial Officer
Electronic Mail Address: Notices@highlandcapital.com

**E.     SECTION 10 (FURTHER TRANSFERS)**

**E.1**     Select one:

☒     There is no Participation Transfer Fee.

☐     There is a Participation Transfer Fee, in the amount of $/£/€_____.

**E.2**     If an Affiliate of Buyer that is a buyer under a participation agreement with Seller entered into as of the same day as this Agreement makes a Pre-Elevation Transfer (whether or not such transfer is so defined under such participation agreement) of loans and commitments (if any) under the Credit Documents subject

019304

HCMLPHMIT00002596

Case 3:25-cv-02022-S   Document 36-28   Filed 10/03/25   Page 456 of 674   PageID 20372
to such participation agreement or the same day that Buyer executed substantially similar documents and to the same Entity as Buyer:

☐     Buyer and such Affiliate(s) of Buyer shall pay only one Participation Transfer Fee.

☐     Buyer and each such Affiliate of Buyer shall pay a separate Participation Transfer Fee in respect of each such Pre-Elevation Transfer.

☒     Not applicable (there is no Participation Transfer Fee).

**E.3**     Section 10.1 Right of Buyer to sell subparticipations:

☒     Buyer may sell subparticipations in respect of the Transferred Rights without Seller's prior consent. Section 10.1(b) of the Standard Terms and Conditions will apply.

☐     Buyer may not sell subparticipations in respect of the Transferred Rights without Seller's prior consent. Section 10.1(b) of the Standard Terms and Conditions will not apply.

**F.**     **SECTION 11 (VOTING)**

**F.1**     "<u>Voting</u>" select one:

☒     Buyer shall have voting rights with respect to the Transferred Rights, subject to Section 11.1(a) of the Standard Terms and Conditions.

☐     Buyer shall have no voting rights in respect of the Transferred Rights, subject to Section 11.1(b) of the Standard Terms and Conditions, except with respect to the following matters: _____.

**F.2**     For purposes of determining the Majority Holders or Majority Claims Holders pursuant to Section 11.1(a) of the Standard Terms and Conditions:

☐     the interests or claims held by Seller for its own account shall be counted;

☐     the interests or claims held by Seller for its own account shall not be counted;

☒     Not applicable;

<u>AND</u>

☐     the interests or claims held by Affiliates of Seller shall be counted.

☐     the interests or claims held by Affiliates of Seller shall not be counted.

☒     Not applicable.

**G.**     **SECTION 15 (ELEVATION)**

**G.1**     Select one:

☒     There is no Elevation Transfer Fee.

☐     The Elevation Transfer Fee shall be paid as follows:

      ☐     The Elevation Transfer Fee shall be paid by Seller to the Agent and Buyer shall reimburse Seller in an amount equal to
         ☐ one-half thereof.
         ☐ [other relevant fraction or percentage] _____ thereof.
      ☐     The Elevation Transfer Fee shall be paid by Buyer to the Agent and Seller shall reimburse Buyer in an amount equal to
         ☐ one-half thereof.
         ☐ [other relevant fraction or percentage] _____ thereof.

**G.2**     If "No" is specified opposite "Elevation" in the Transaction Summary, then select one:

019305

HCMLPHMIT00002597

☐ Subject to Section 15, Seller may at any time request an Elevation and Buyer may request an Elevation only in the following circumstances: _____
_____.

**H.    SECTION 31 (ADDITIONAL PROVISIONS)**

The following additional provisions, including any modifications to existing provisions, apply:

"**Claimant Trust**" has the meaning set forth in the Indemnity Trust Agreement

"**Direction Letter**" means that certain Direction Letter, dated as of the Agreement Date, by and among Seller, HCMLP GP LLC, Highland Claimant Trust, and Buyer.

"**Indemnity Trust Agreement**" means that certain First Amended and Restated Indemnity Trust Agreement, dated as of July 1, 2024, by and among the Highland Claimant Trust, as grantor (the "**Grantor**"), James P. Seery, Jr., as indemnity trust administrator, Wilmington Trust, National Association, a national banking association, as indemnity trustee, for the benefit of Beneficiaries, and as the Delaware trustee, as the same may be amended, modified or supplemented from time to time.

"**Lender**" means a Payee under the Note.

"**Purchase Price**" means none (for the avoidance of doubt, the Participation shall constitute a contribution by the Grantor to Buyer pursuant to the Direction Letter and in accordance with the Indemnity Trust Agreement).

"**Settlement Date**" means the Agreement Date.

For the avoidance of doubt, Buyer is entitled to all interest accrued and unpaid on the Note through the Agreement Date.

Until the earlier of (x) the termination of this Agreement and (y) thirty (30) day's prior written notice by either Party to the Party, Seller shall provide the following services for the benefit of Buyer with respect to the Note:

(i)     Maintain the schedule of Annual Installments (as defined in the Note);

(ii)    Monitor the Borrower's compliance with the terms of the Note;

(iii)   Confirm wire instructions and amounts for payments under the Note with the Borrower's personnel;

(iv)   Communicate with the Borrower as needed, including with respect to noticing any events of default;

(v)    Provide bookkeeping and fair value information to Buyer and perform other related miscellaneous requests with respect to the Note and the Participation, in each case, as reasonably requested by Buyer.

As consideration for providing such services, Buyer shall pay to Seller an annual fee equal to 10 bps of Buyer's share of the then outstanding principal amount of the Note.  Such fee shall be payable only to the extent the Borrower makes its required Annual Installment payment to Seller under the Note, and notwithstanding anything in this Agreement to the contrary, Seller shall be permitted to set-off the amount of such fee against Buyer's right to receive payments with respect to the Transferred Rights and the Participation.

019306

HCMLPHMIT00002598

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement by their duly authorized
officers or representatives as of the Agreement Date.

**SELLER**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

**By: HCMLP GP LLC, its General Partner**

By:_____
    Name: James P. Seery, Jr.
    Title: President

**BUYER**

**HIGHLAND INDEMNITY TRUST**

By:_____
    Name: James P. Seery, Jr.
    Title: Indemnity Trust Administrator

019307

HCMLPHMIT00002599

**ANNEX TO PARTICIPATION AGREEMENT FOR PAR/NEAR PAR TRADES**

This Participation is a "true-participation" intending to transfer all of Seller's right, title and beneficial interest in and to the Loans to Buyer.

The amount of any PIK Interest that accreted to the principal amount of the Loans on or after the Trade Date but on or prior to the Settlement Date is $0.

019308

HCMLPHMIT00002600

# EXHIBIT 108

019309

Case 19-34054-sgj11   Doc 4255-108   Filed 06/20/25   Entered 06/20/25 21:39:29
Desc Exhibit 108   Page 2 of 3

| $18.5mm Dugaboy Note Attempted Sale -- Process Update | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | |
| | | | | | | | |
| Potential Buyer Firm | Person Contacted | Title | Date Contacted | Information/Materials Provided | Initial Responses | Follow-Up | Notes |
| Riva Ridge Capital Management | Stephn Golden | Founding Partner- PM | 2/27/2024 | Over telephone  discussed information in HCMLP prepared materials and the opportunity | Asked questions regarding the counter-party; rejected receipt of the materials; no interest at all; "life's too short" | None | Acutally laughed; stated that while the note was performing, that was for now; in his view the note was an invitation to litigate |
| Cyrus Capital Partners | Svetoslav Nikov | Partner/Analyst | 2/27/2024 | Over telephone, discussed information in HCMLP materials and the opportunity | Very quick no; no interest in the materials; believes owning the note is asymetric risk to the downside -- if it pays back, a modest return for the risk; if it defaults, your investors will want to know why you would voluntarily become a creditor to Dondero. Compared the opportunity to the chance to lend money to Phil Falcone. Once again said "lifes too short to be a creditor of Dondero" | None | |
| Carronade Capital Management | Dan Gropper | Managing Partner/CIO | 2/23/2024 | Initial email mentioning note; lunch meeting with Gropper and head of research Andy Taylor on 2/29/24; reviewed materials at lunch meeting | Gropper and Taylor quickly expressed no interest in the note; upside vs. downside skewed (far too much downside); even if the upside was better balanced, the liklihood of litigation over such a small note made the investment unattactive (even if you got costs of collection); asset transfers out of maker also a concern | None.  Did not want to keep the materials | Small note with likely costly litigation that would be never ending makes the opportunity completely unattactive |
| UBS | Nader Attalla | Structured Credit Trading; responsible for day-to-day management of UBS actions against Dondero | 2/23/2024 | Initial email mentioning note; follow up call and emailing of "teaser" | Two calls in March and early April; He has been too busy to focus on it; troubled by the fact that it does not cross-default with other Dugaboy obligations | Has Teaser; follow-up discussion required | UBS is suing Dondero and Dugaboy on other obligations/torts; could be useful to them at the right price |

019310

| $18.5mm Dugaboy Note Attempted Sale -- Process Update | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | |
| | | | | | | | |
| Potential Buyer Firm | Person Contacted | Title | Date Contacted | Information/Materials Provided | Initial Responses | Follow-Up | Notes |
| NexPoint | Matt McGraner and DC Sauter | CIO / General Counsel | 5/16/2024 | Email with description of note. Indicated nonbinding offer price of $12mm, subject to approval of oversight board. | DC Sauter responded via email on 5/22/24 that they were not currently interested in the terms outlined. If the terms change, they would be interested in taking another look. | Dave Klos sent email on 5/23/24 thanking DC Sauter for response. "As you are not interested in the note, we will move forward with another transaction." | |
| Bardin Hill Investment Partners | Pratik Desai | Partner/Portfolio Manager | 6/7/2024 | Initial email with "teaser" and requesting follow-up call | 30 min call on June 10, 2024; reviewed teaser with Desai; questions regarding background of note; why it had not been accelerated; payment history; terms; Dugaboy assets and liabilities; payback period at various discounts; ultimately would require a material discount to 50% soft offer; Desai asks about lending against the note and other Claimant Trust assets with material hair-cuts. Bardin Hill would not be interested in being a direct counterpart to Dondero especially if that was their only recourse. | Desai and Claimant Trust to consider ways to lend against the note and other assets in the event the Claimant Trust desires $10 million to $20 million of liquidity | Thoughtful approach; no interest in Dondero as a counterparty but would like to provided liquidity to the Trust and use a variety of assets to secure the BH advances. |

019311

**EXHIBIT 109**

019312

PRIVILEGED AND CONFIDENTIAL

# THE DUGABOY INVESTMENT TRUST
## $18.17 MILLION PROMISSORY NOTE OWED TO HCMLP
### FEBRUARY 2024



019313

HCMLPHMIT00002602



**DUGABOY INVESTMENT TRUST**

## EXECUTIVE SUMMARY

- The Dugaboy Investment Trust ("Dugaboy") is a Delaware Trust established in 2010 for the benefit of Jim Dondero ("Dondero")
- ████████████████████████████████████████████:
  - 100% LP interest in NexPoint Advisors, Dondero's flagship real estate investment platform
  - Significant portfolio of publicly traded Dondero-managed entities as well as privately held real estate investments and other private investments
  - ████████████████████████████████████████████████████████████
- Dugaboy was the Maker of a Promissory Note (the "Original Note") dated 12/28/16 in the face amount of $23,817,639.58 owed to The Get Good Non-Exempt Trust [1] as Payee
  - The Get Good Non-Exempt Trust assigned 97.6835% of its interest in the original note to HCMLP on 12/28/16, retaining 2.3165%
  - The Original Note was replaced by an Amended Note in the face amount of $24,198,069.28 dated 5/31/17 and further replaced by a Promissory Note (the "Note") in the face amount of $24,268,621.69, also dated 5/31/17
  - The current face amount owed to HCMLP under the Note is $18,174,936.62 [2]
  - Despite raising defenses with other notes owed by Dondero-affiliated entities, Dugaboy's trustee affirmed under oath that no similar oral agreements existed beyond those specific notes [3]
  - Dugaboy's counsel in fact asserted that "there is no dispute that . . . Dugaboy has been making (and continues to make) payments on the Dugaboy Note and that there is little risk of Dugaboy defaulting on the Dugaboy Note" [4]
- Terms of the Note:
  - Unsecured note due 12/31/46 [5]
  - Interest: 3.26% payable annually on December 31
  - Amortization: 1 / 30 of original principal amount owed annually on December 31 ($790k owed annually to HCMLP, or 4.35% of the current principal amount)
- HCMLP is offering this Note at 50% of par, or $9,087,468.31 / IRR of 13.6%
  - Proposed sale process will include a $3mm overbid should another bidder come in at a higher price than initial bidder

[1] Dondero trust which is currently not believed to hold significant assets
[2] Principal amount owed following the December 2023 amortization payment
[3] *Appendix in Support of Highland Capital Management, LP's Motion for Partial Summary Judgement in Notes Actions* (Adv Case No. 19-34054, Docket #0127)
[4] Dugaboy's *Brief in Support of the Motion to Dismiss, or in the alternative, Motion for More Definite Statement* entered on 4/30/21 (Adv Case No. 20-03195, Docket #30)
[5] The note states that the final maturity date is 12/31/47, however it also states the note principal is due in thirty equal annual installments beginning 12/31/17, which would make the final installment due 12/31/46

**019314**

HCMLPHMIT00002603



## DUGABOY INVESTMENT TRUST

### SUMMARY PROPOSED SALE TIMELINE AND PROCESS

| Sale Period | • First Round marketing February – March, Executed Stalking Horse Agreement Signed by April 30 with $1mm deposit<br>• Second Round Marketing May, Auction week of June 10-14<br>• Closing week of June 24-28 |
|---|---|
| Materials / Documentation | • Initial outreach with one slide teaser (executive summary slide)<br>• Potential buyers sign NDA and receive full deck along with [the note; historical Dugaboy financials]<br>• Negotiate / sign Stalking Horse Agreement<br>• Negotiate / sign final PSA with winner of auction |
| ▮▮▮▮▮▮▮▮▮▮▮ | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| Sale Terms | • $1mm deposit due upon execution of Stalking Horse Agreement<br>• Stalking Horse bidder receives $2mm breakup fee from Seller<br>• Winning bid must be $3mm over Stalking Horse Bid<br>• Example: Stalking Horse Bid of $6mm, buyer puts up $1mm deposit, another party bids $9mm at auction, Seller nets $7mm (receives $9mm from buyer, refunds $1mm deposit to Stalking Horse bidder and pays Stalking Horse bidder $2m breakup fee)<br>• All sales are for cash only due at closing; all accrued interest travels to buyer<br>• 100% of purchase price due next business day<br>• Deposit due in advance of auction<br>• Second place bidder must agree that his bid must remain open and can be accepted 36 hours after the auction |

019315

HCMLPHMIT00002604



**DUGABOY INVESTMENT TRUST**

## DUGABOY NOTE CASHFLOWS

**Dugaboy promissory note owed to HCMLP**

| | |
|---|---|
| Beginning principal owed to HCMLP | $ 18,174,936.62 |
| Interest rate | 3.26% |
| Maturity | 12/31/2046 |
| Years to Maturity | 22.52 |
| Amort / Yr | 4.35% |
| WAL (years) | 10.48 |
| | |
| Purchase Price (% of Par) | 50.00% [Illustrative] |
| Purchase Price ($) | $ 9,087,468.31 [trades flat] |
| Closing Date | 6/30/2024 [Illustrative] |
| IRR: | 13.62% |
| Return % | 178.30% |
| P/L | $ 16,203,008.57 |
| Years to breakeven | 6.5 |

Amort schedule

| | Beg principal | Amort Payment | Interest Payment | Total Payment | Eding Principal |
|---|---|---|---|---|---|
| 12/31/2023 | | | | | $ 18,174,936.62 |
| 12/31/2024 | $ 18,174,936.62 | $ 790,214.64 | $ 594,126.23 | $ 1,384,340.87 | $ 17,384,721.98 |
| 12/31/2025 | $ 17,384,721.98 | $ 790,214.64 | $ 566,741.94 | $ 1,356,956.58 | $ 16,594,507.34 |
| 12/31/2026 | $ 16,594,507.34 | $ 790,214.64 | $ 540,980.94 | $ 1,331,195.58 | $ 15,804,292.70 |
| 12/31/2027 | $ 15,804,292.70 | $ 790,214.64 | $ 515,219.94 | $ 1,305,434.58 | $ 15,014,078.06 |
| 12/31/2028 | $ 15,014,078.06 | $ 790,214.64 | $ 490,799.93 | $ 1,281,014.57 | $ 14,223,863.42 |
| 12/31/2029 | $ 14,223,863.42 | $ 790,214.64 | $ 463,697.95 | $ 1,253,912.59 | $ 13,433,648.78 |
| 12/31/2030 | $ 13,433,648.78 | $ 790,214.64 | $ 437,936.95 | $ 1,228,151.59 | $ 12,643,434.14 |
| 12/31/2031 | $ 12,643,434.14 | $ 790,214.64 | $ 412,175.95 | $ 1,202,390.59 | $ 11,853,219.50 |
| 12/31/2032 | $ 11,853,219.50 | $ 790,214.64 | $ 387,473.63 | $ 1,177,688.27 | $ 11,063,004.86 |
| 12/31/2033 | $ 11,063,004.86 | $ 790,214.64 | $ 360,653.96 | $ 1,150,868.60 | $ 10,272,790.22 |
| 12/31/2034 | $ 10,272,790.22 | $ 790,214.64 | $ 334,892.96 | $ 1,125,107.60 | $ 9,482,575.58 |
| 12/31/2035 | $ 9,482,575.58 | $ 790,214.64 | $ 309,131.96 | $ 1,099,346.60 | $ 8,692,360.94 |
| 12/31/2036 | $ 8,692,360.94 | $ 790,214.64 | $ 284,147.33 | $ 1,074,361.97 | $ 7,902,146.30 |
| 12/31/2037 | $ 7,902,146.30 | $ 790,214.64 | $ 257,609.97 | $ 1,047,824.61 | $ 7,111,931.66 |
| 12/31/2038 | $ 7,111,931.66 | $ 790,214.64 | $ 231,848.97 | $ 1,022,063.61 | $ 6,321,717.02 |
| 12/31/2039 | $ 6,321,717.02 | $ 790,214.64 | $ 206,087.97 | $ 996,302.61 | $ 5,531,502.38 |
| 12/31/2040 | $ 5,531,502.38 | $ 790,214.64 | $ 180,821.02 | $ 971,035.66 | $ 4,741,287.74 |
| 12/31/2041 | $ 4,741,287.74 | $ 790,214.64 | $ 154,565.98 | $ 944,780.62 | $ 3,951,073.10 |
| 12/31/2042 | $ 3,951,073.10 | $ 790,214.64 | $ 128,804.98 | $ 919,019.62 | $ 3,160,858.46 |
| 12/31/2043 | $ 3,160,858.46 | $ 790,214.64 | $ 103,043.99 | $ 893,258.63 | $ 2,370,643.82 |
| 12/31/2044 | $ 2,370,643.82 | $ 790,214.64 | $ 77,494.72 | $ 867,709.36 | $ 1,580,429.18 |
| 12/31/2045 | $ 1,580,429.18 | $ 790,214.64 | $ 51,521.99 | $ 841,736.63 | $ 790,214.54 |
| 12/31/2046 | $ 790,214.54 | $ 790,214.54 | $ 25,760.99 | $ 815,975.53 | $ - |
| | | $ 7,115,540.26 | $ 25,290,476.88 | | |
| | | | Purchase Price: | $ (9,087,468.31) | [Illustrative] |
| | | | P/L: | $ 16,203,008.57 | [Illustrative] |

019316

HCMLPHMIT00002605

 **DUGABOY INVESTMENT TRUST**

## DUGABOY NOTE PURCHASE PRICE SENSITIVITY

| | | | | | |
|---|---|---|---|---|---|
| Note Purchase Price ($) | $ 6,361,227.82 | $ 7,269,974.65 | $ 8,178,721.48 | $ 9,087,468.31 | $ 9,996,215.14 |
| Note Purchase Price (% of Par) | 35.00% | 40.00% | 45.00% | 50.00% | 55.00% |
| IRR | 21.80% | 18.38% | 15.74% | 13.62% | 11.87% |
| Return | 297.57% | 247.88% | 209.22% | 178.30% | 153.00% |
| Total Cashflows Received | $ 25,290,476.88 | $ 25,290,476.88 | $ 25,290,476.88 | $ 25,290,476.88 | $ 25,290,476.88 |
| P/L | $ 18,929,249.06 | $ 18,020,502.23 | $ 17,111,755.40 | $ 16,203,008.57 | $ 15,294,261.74 |
| Years to Breakeven | 4.5 | 5.5 | 6.5 | 6.5 | 7.5 |

N    F r    rd    r

Assumes 6/30/2024 closing date

019317
HCMLPHMIT00002606

 **DUGABOY INVESTMENT TRUST**



019318
HCMLPHMIT00002607

# EXHIBIT 110

019319

HIGHLY CONFIDENTIAL

# THE DUGABOY INVESTMENT TRUST
## $18.17 MILLION PROMISSORY NOTE OWED TO HCMLP
## FEBRUARY 2024





019320

HCMLPHMIT00002608

 **DUGABOY INVESTMENT TRUST**

## EXECUTIVE SUMMARY

- The Dugaboy Investment Trust ("Dugaboy") is a Delaware Trust established in 2010 for the benefit of Jim Dondero ("Dondero")
- ████████████████████████████████████████████████████████████
  - 100% LP interest in NexPoint Advisors, Dondero's flagship real estate investment platform
  - Significant portfolio of publicly traded Dondero-managed entities as well as privately held real estate investments and other private investments
  - ████████████████████████████████████████████████████████████████████████████████████████
- Dugaboy was the Maker of a Promissory Note (the "Original Note") dated 12/28/16 in the face amount of $23,817,639.58 owed to The Get Good Non-Exempt Trust [1] as Payee
  - The Get Good Non-Exempt Trust assigned 97.6835% of its interest in the original note to HCMLP on 12/28/16, retaining 2.3165%
  - The Original Note was replaced by an Amended Note in the face amount of $24,198,069.28 dated 5/31/17 and further replaced by a Promissory Note (the "Note") in the face amount of $24,268,621.69, also dated 5/31/17
  - The current face amount owed to HCMLP under the Note is $18,174,936.62 [2]
  - Despite raising defenses with other notes owed by Dondero-affiliated entities, Dugaboy's trustee affirmed under oath that no similar oral agreements existed beyond those specific notes [3]
  - Dugaboy's counsel in fact asserted that "there is no dispute that . . . Dugaboy has been making (and continues to make) payments on the Dugaboy Note and that there is little risk of Dugaboy defaulting on the Dugaboy Note" [4]
- Terms of the Note:
  - Unsecured note due 12/31/46 [5]
  - Interest: 3.26% payable annually on December 31
  - Amortization: 1 / 30 of original principal amount owed annually on December 31 ($790k owed annually to HCMLP, or 4.35% of the current principal amount)
- HCMLP is offering this Note at 50% of par, or $9,087,468.31 / IRR of 13.6%
  - Proposed sale process will include a $3mm overbid should another bidder come in at a higher price than initial bidder

---

[1] Dondero trust which is currently not believed to hold significant assets
[2] Principal amount owed following the December 2023 amortization payment
[3] *Appendix in Support of Highland Capital Management, LP's Motion for Partial Summary Judgement in Notes Actions* (Adv Case No. 19-34054, Docket #0127)
[4] Dugaboy's *Brief in Support of the Motion to Dismiss, or in the alternative, Motion for More Definite Statement* entered on 4/30/21 (Adv Case No. 20-03195, Docket #30)
[5] The note states that the final maturity date is 12/31/47, however it also states the note principal is due in thirty equal annual installments beginning 12/31/17, which would make the final installment due 12/31/46

019321
HCMLPHMIT00002609



**DUGABOY INVESTMENT TRUST**

| SUMMARY PROPOSED SALE TIMELINE AND PROCESS |
|---|

| | |
|---|---|
| **Sale Period** | • First Round marketing February – March, Executed Stalking Horse Agreement Signed by April 30 with $1mm deposit<br>• Second Round Marketing May, Auction week of June 10-14<br>• Closing week of June 24-28 |
| **Materials / Documentation** | • Initial outreach with one slide teaser (executive summary slide)<br>• Potential buyers sign NDA and receive full deck along with [the note; historical Dugaboy financials]<br>• Negotiate / sign Stalking Horse Agreement<br>• Negotiate / sign final PSA with winner of auction |
| ▮▮▮▮▮▮▮▮ | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮<br>• |
| **Sale Terms** | • $1mm deposit due upon execution of Stalking Horse Agreement<br>• Stalking Horse bidder receives $2mm breakup fee from Seller<br>• Winning bid must be $3mm over Stalking Horse Bid<br>• Example: Stalking Horse Bid of $6mm, buyer puts up $1mm deposit, another party bids $9mm at auction, Seller nets $7mm (receives $9mm from buyer, refunds $1mm deposit to Stalking Horse bidder and pays Stalking Horse bidder $2m breakup fee)<br>• All sales are for cash only due at closing; all accrued interest travels to buyer<br>• 100% of purchase price due next business day<br>• Deposit due in advance of auction<br>• Second place bidder must agree that his bid must remain open and can be accepted 36 hours after the auction |

019322

HCMLPHMIT00002610



**DUGABOY INVESTMENT TRUST**

## SUMMARY TERMS OF DUGABOY PROMISSORY NOTE

| | |
|---|---|
| Maker | The Dugaboy Investment Trust |
| acility | Promissory Note dated 5/31/2017 in the principal amount of $24,268,621.69 payable to Highland Capital Management, LP (97.6835% $23,706,439.07) and The Get Good Non-Exempt Trust (2.3165%   $562,182.62) |
| Current Principal | Principal Payable to Highland Capital Management is currently $18,174,936.62 (76.67% of original principal amount following amortization payments which occurred between 2017 - 2023) |
| Security | None |
| uarantor | None |
| Maturity | 12/31/2046 |
| nterest  ate | 3.26%, compounding annually on May 31 and payable annually on December 31 |
| Amorti ation | 1 / 30 of original principal amount payable annually on December 31 (4.35% of current principal amount) |
| Call Protection | None. Maker may prepay in whole or in part the unpaid principal or accrued interest of the Note |
| vent o  De ault | Failure to pay this Note or any installment as it becomes due; immediate acceleration upon default. Cost of collection expressly included in note terms. |
| Covenants | None |

¹ Based on amortization schedule. The promissory note states the final payment date is 12/31/47 due to a scrivener's error

019323
HCMLPHMIT00002611

 **DUGABOY INVESTMENT TRUST**

## SUMMARY OF DONDERO AFFILIATED NOTES DUE TO HCMLP

Highland is in the process of collecting on notes owed by Dondero-affiliated entities, which are in default [1]

Dondero-affiliates raised a number of defenses, including the existence of an alleged oral agreement with Nancy Dondero as Trustee of Dugaboy and holder of a majority of HCMLP units that the notes would be forgiven contingent on Dondero's monetization of certain assets [2]

On 1/17/23, the Bankruptcy Court filed a supplemental report and recommendation finding the Dondero-affiliates liable for the notes under Highland's motion for summary judgement

On 7/6/23, the United States District Court, Northern District of Texas, Dallas Division adopted and approved the Bankruptcy Court's Report and Recommendation on HCMLP's motion for summary judgement on the notes and subsequently entered amended final judgements against the Dondero entities

Defendants have paid the judgement amounts into the court registry, pending appeal to the United States Court of Appeals for the Fifth Circuit

| Party | udgement Amount | ndividual Bond Amount |
|---|---|---|
| NexPoint Advisors, LP | $25,849,816.94 | $28,693,296.80 |
| NexPoint Real Estate Partners, LLC | $13,251,661.00 | $14,709,343.70 |
| James Dondero | $10,152,391.87 | $11,269,154.90 |
| NexPoint Asset Management, LP | $8,441,524.65 | $9,370,092.36 |
| Highland Capital Management Services, Inc. | $7,578,620.41 | $8,412,268.66 |
| NexPoint Asset Management, LP | $3,628,692.37 | $4,027,848.53 |
| Total | | |

[1] Nexpoint Assset Management, LP was a defendant in two adversary actions and final judgements were handed down in both, which is why there are two discrete judgements against this entity

[2] ████████████████████████████████████████████████████████

019324
HCMLPHMIT00002612



**DUGABOY INVESTMENT TRUST**

## DUGABOY NOTE CASHFLOWS

**Dugaboy promissory note owed to HCMLP**

| | |
|---|---|
| Beginning principal owed to HCMLP | $ 18,174,936.62 |
| Interest rate | 3.26% |
| Maturity | 12/31/2046 |
| Years to Maturity | 22.52 |
| Amort / Yr | 4.35% |
| WAL (years) | 10.48 |
| | |
| Purchase Price (% of Par) | 50.00% | [Illustrative] |
| Purchase Price ($) | $ 9,087,468.31 | [trades flat] |
| Closing Date | 6/30/2024 | [Illustrative] |
| IRR: | 13.62% |
| Return % | 178.30% |
| P/L: | $ 16,203,008.57 |
| Years to breakeven | 6.5 |

### Amort schedule

| | Beg principal | Amort Payment | Interest Payment | Total Payment | Eding Principal |
|---|---|---|---|---|---|
| 12/31/2023 | | | | | $ 18,174,936.62 |
| 12/31/2024 | $ 18,174,936.62 | $ 790,214.64 | $ 594,126.23 | $ 1,384,340.87 | $ 17,384,721.98 |
| 12/31/2025 | $ 17,384,721.98 | $ 790,214.64 | $ 566,741.94 | $ 1,356,956.58 | $ 16,594,507.34 |
| 12/31/2026 | $ 16,594,507.34 | $ 790,214.64 | $ 540,980.94 | $ 1,331,195.58 | $ 15,804,292.70 |
| 12/31/2027 | $ 15,804,292.70 | $ 790,214.64 | $ 515,219.94 | $ 1,305,434.58 | $ 15,014,078.06 |
| 12/31/2028 | $ 15,014,078.06 | $ 790,214.64 | $ 490,799.93 | $ 1,281,014.57 | $ 14,223,863.42 |
| 12/31/2029 | $ 14,223,863.42 | $ 790,214.64 | $ 463,697.95 | $ 1,253,912.59 | $ 13,433,648.78 |
| 12/31/2030 | $ 13,433,648.78 | $ 790,214.64 | $ 437,936.95 | $ 1,228,151.59 | $ 12,643,434.14 |
| 12/31/2031 | $ 12,643,434.14 | $ 790,214.64 | $ 412,175.95 | $ 1,202,390.59 | $ 11,853,219.50 |
| 12/31/2032 | $ 11,853,219.50 | $ 790,214.64 | $ 387,473.63 | $ 1,177,688.27 | $ 11,063,004.86 |
| 12/31/2033 | $ 11,063,004.86 | $ 790,214.64 | $ 360,653.96 | $ 1,150,868.60 | $ 10,272,790.22 |
| 12/31/2034 | $ 10,272,790.22 | $ 790,214.64 | $ 334,892.96 | $ 1,125,107.60 | $ 9,482,575.58 |
| 12/31/2035 | $ 9,482,575.58 | $ 790,214.64 | $ 309,131.96 | $ 1,099,346.60 | $ 8,692,360.94 |
| 12/31/2036 | $ 8,692,360.94 | $ 790,214.64 | $ 284,147.33 | $ 1,074,361.97 | $ 7,902,146.30 |
| 12/31/2037 | $ 7,902,146.30 | $ 790,214.64 | $ 257,609.97 | $ 1,047,824.61 | $ 7,111,931.66 |
| 12/31/2038 | $ 7,111,931.66 | $ 790,214.64 | $ 231,848.97 | $ 1,022,063.61 | $ 6,321,717.02 |
| 12/31/2039 | $ 6,321,717.02 | $ 790,214.64 | $ 206,087.97 | $ 996,302.61 | $ 5,531,502.38 |
| 12/31/2040 | $ 5,531,502.38 | $ 790,214.64 | $ 180,821.02 | $ 971,035.66 | $ 4,741,287.74 |
| 12/31/2041 | $ 4,741,287.74 | $ 790,214.64 | $ 154,565.98 | $ 944,780.62 | $ 3,951,073.10 |
| 12/31/2042 | $ 3,951,073.10 | $ 790,214.64 | $ 128,804.98 | $ 919,019.62 | $ 3,160,858.46 |
| 12/31/2043 | $ 3,160,858.46 | $ 790,214.64 | $ 103,043.99 | $ 893,258.63 | $ 2,370,643.82 |
| 12/31/2044 | $ 2,370,643.82 | $ 790,214.64 | $ 77,494.72 | $ 867,709.36 | $ 1,580,429.18 |
| 12/31/2045 | $ 1,580,429.18 | $ 790,214.64 | $ 51,521.99 | $ 841,736.63 | $ 790,214.54 |
| 12/31/2046 | $ 790,214.54 | $ 790,214.54 | $ 25,760.99 | $ 815,975.53 | $ - |
| | | $ 7,115,540.26 | $ 25,290,476.88 | | |
| | | | Purchase Price: | $ (9,087,468.31) | [Illustrative] |
| | | | P/L: | $ 16,203,008.57 | [Illustrative] |

D R A F T    P R I V I L E G E D   A N D   C O N F I D E N T I A L

019325
HCMLPHMIT00002613



**DUGABOY INVESTMENT TRUST**

## DUGABOY NOTE PURCHASE PRICE SENSITIVITY

| | | | | | |
|---|---|---|---|---|---|
| Note Purchase Price ($) | $ 6,361,227.82 | $ 7,269,974.65 | $ 8,178,721.48 | $ 9,087,468.31 | $ 9,996,215.14 |
| Note Purchase Price (% of Par) | 35.00% | 40.00% | 45.00% | 50.00% | 55.00% |
| IRR | 21.80% | 18.38% | 15.74% | 13.62% | 11.87% |
| Return | 297.57% | 247.88% | 209.22% | 178.30% | 153.00% |
| Total Cashflows Received | $ 25,290,476.88 | $ 25,290,476.88 | $ 25,290,476.88 | $ 25,290,476.88 | $ 25,290,476.88 |
| P/L | $ 18,929,249.06 | $ 18,020,502.23 | $ 17,111,755.40 | $ 16,203,008.57 | $ 15,294,261.74 |
| Years to Breakeven | 4.5 | 5.5 | 6.5 | 6.5 | 7.5 |

N    F  r    rd   r

Assumes 6/30/2024 closing date

DRAFT   PRIVILEGED AND CONFIDENTIAL

019326
HCMLPHMIT00002614



DRAFT - PRIVILEGED AND CONFIDENTIAL



019328

HCMLPHMIT00002616

 **DUGABOY INVESTMENT TRUST**



DRAFT - PRIVILEGED AND CONFIDENTIAL

9

019329
HCMLPHMIT00002617



## DUGABOY INVESTMENT TRUST



DRAFT - PRIVILEGED AND CONFIDENTIAL

10

019330

HCMLPHMIT00002618

 **DUGABOY INVESTMENT TRUST**

---

**THE DUGABOY INVESTMENT TRUST ORG CHART**



019331
HCMLPHMIT00002619

 **DUGABOY INVESTMENT TRUST**

**APPENDIX**

D R A F T   P R I V I L E G E D   A N D   C O N F I D E N T I A L

019332

HCMLPHMIT00002620



**DUGABOY INVESTMENT TRUST**



Current Share Count / Current Price



DRAFT - PRIVILEGED AND CONFIDENTIAL

019333

HCMLPHMIT00002621



## DUGABOY INVESTMENT TRUST

### DUGABOY SECURITIES PORTFOLIO  NXRT

#### Business   verview

NexPoint Residential Trust, Inc ("N  RT") is an externally advised, publicly traded real estate investment trust (REIT)focused on the acquisition, asset management, and disposition of multifamily assets, located primarily in the Sun Belt region of the United States.

The company pursues investments in class B multifamily real estate properties, typically with a value-add component, where it can invest significant amounts of capital to provde "life-style" amenities to "workforce" housing.

N  RT was formed via a spin-off from the predecessor to N  DT, which at the time was a closed end fund (NHF)

N  RT is NexPoint's flagship investment product

#### Capital Structure

NexPoint Residential Trust, Inc
*Capital Structure as of 9/30/23*

|  | $mm | x LTM EBITDA |
|---|---|---|
| Mortgages payable | $ 1,575 | |
| Credit Facility | $ 41 | |
| Total Debt | $ 1,616 | 11.7x |
| | | |
| Cash | $ 10 | |
| Net Debt | $ 1,606 | 11.6x |
| | | |
| Equity Value | $ 769 | |
| Enterprise Value | $ 2,375 | 17.2x |

####  T C art



NXRT US Equity (NexPoint Residential Trust Inc) Daily 08FEB2021-08FEB2024        Copyright 2024 Bloomberg Finance L.P.        08-Feb-2024 12:42:40

#### Considerations

Dugaboy owns 7.6% of outstanding N  RT shares

N  RT benefited from 2015-21 from era of low interest rates

Growth story has been challenged recently as company forced to sell assets to reduce leverage

Currently 36% of debt matures by 2026 and carries a weighted average floating rate of 6.3%

$21.6mm of run-rate annual fees are being waived by NexPoint Advisors, whose LP interest is 100% owned by Dugaboy, therefore if N  RT fundamentals can improve it represents significant upside to Dugaboy through both share appreciation and revenue

DRAFT  PRIVILEGED AND CONFIDENTIAL

019334
HCMLPHMIT00002622

 **DUGABOY INVESTMENT TRUST**

## DUGABOY REAL ESTATE PORTFOLIO



019335
HCMLPHMIT00002623



**DUGABOY INVESTMENT TRUST**



DRAFT - PRIVILEGED AND CONFIDENTIAL

16

019336
HCMLPHMIT00002624

 **DUGABOY INVESTMENT TRUST**





DRAFT - PRIVILEGED AND CONFIDENTIAL

019337
HCMLPHMIT00002625



## DUGABOY INVESTMENT TRUST



DRAFT - PRIVILEGED AND CONFIDENTIAL

019338

HCMLPHMIT00002626

 **DUGABOY INVESTMENT TRUST**





DRAFT - PRIVILEGED AND CONFIDENTIAL

019339

HCMLPHMIT00002627

 **DUGABOY INVESTMENT TRUST**







019340
HCMLPHMIT00002628



## DUGABOY INVESTMENT TRUST



019341
HCMLPHMIT00002629



**DUGABOY INVESTMENT TRUST**



DRAFT - PRIVILEGED AND CONFIDENTIAL

22

019342

HCMLPHMIT00002630

**EXHIBIT 111**

019343

# HIGHLAND CLAIMANT TRUST

## PRIVILEGED & CONFIDENTIAL
## RECOMMENDED DUGABOY NOTE CONTRIBUTION
## 6.27.24

HIGHLAND CAPITAL
M A N A G E M E N T

CONFIDENTIAL. INTERNAL USE ONLY. NOT FOR PUBLIC DISTRIBUTION.

019344

HCMLPHMIT00002631

 **SUMMARY OF BACKGROUND AND RECOMMENDATION**

- As has been discussed at several prior meetings, Dugaboy is the Maker and HCMLP is a Payee under a promissory note with a long-dated maturity and annual P&I payments

- The note has a current principal balance of approximately $18.2 million and has accrued interest of approximately $0.3 million as of June 30, 2024 and has no restrictions with respect to assignment.
  - The next payment is due December 31, 2024, with $0.8 million of principal and $0.6 million of interest due
  - Subsequent payments are due on December 31 of each year - $0.8 million of principal, plus accrued interest
  - See next slide for amortization schedule

- During 1H 2024, Highland has engaged with numerous parties in an attempt to determine the market for the note and ultimately to assign the note if a willing buyer was prepared to offer reasonable value in exchange

- These efforts (as described in greater detail herein) ultimately proved unsuccessful as neither Dondero parties nor third parties ultimately made any (let alone an attractive) bid for the note

- While the asset lacks a liquid market and carries with it all the stigma and risks associated with its Maker, the note is nevertheless currently performing and has some value
  - However, the time horizon to monetization is long and mismatched with the timing of other remaining assets of HCMLP and the Claimant Trust

- Separately, regarding reserves for indemnification obligations, the Indemnity Trust remains well short of it's 9-figure target



019345
HCMLPHMIT00002632

Case 19-34054-sgj11    Doc 4255-111    Filed 06/20/25    Entered 06/20/25 21:39:29
Desc Exhibit 111    Page 4 of 7



## AMORTIZATION SCHEDULE – PAYMENTS DUE TO HCMLP UNDER NOTE

| | Beg prin | Principal | Interest | End prin |
|---|---|---|---|---|
| Beginning principal owed to HCMLP | 18,174,937 | | | |
| Interest rate (fixed) | 3.26% | | | |
| WAL (years) | 10.48 | | | |
| | **Amortization schedule** | | | |
| 12/31/2023 | | | | 18,174,937 |
| 12/31/2024 | 18,174,937 | (790,215) | (594,126) | 17,384,722 |
| 12/31/2025 | 17,384,722 | (790,215) | (566,742) | 16,594,507 |
| 12/31/2026 | 16,594,507 | (790,215) | (540,981) | 15,804,293 |
| 12/31/2027 | 15,804,293 | (790,215) | (515,220) | 15,014,078 |
| 12/31/2028 | 15,014,078 | (790,215) | (490,800) | 14,223,863 |
| 12/31/2029 | 14,223,863 | (790,215) | (463,698) | 13,433,649 |
| 12/31/2030 | 13,433,649 | (790,215) | (437,937) | 12,643,434 |
| 12/31/2031 | 12,643,434 | (790,215) | (412,176) | 11,853,220 |
| 12/31/2032 | 11,853,220 | (790,215) | (387,474) | 11,063,005 |
| 12/31/2033 | 11,063,005 | (790,215) | (360,654) | 10,272,790 |
| 12/31/2034 | 10,272,790 | (790,215) | (334,893) | 9,482,576 |
| 12/31/2035 | 9,482,576 | (790,215) | (309,132) | 8,692,361 |
| 12/31/2036 | 8,692,361 | (790,215) | (284,147) | 7,902,146 |
| 12/31/2037 | 7,902,146 | (790,215) | (257,610) | 7,111,932 |
| 12/31/2038 | 7,111,932 | (790,215) | (231,849) | 6,321,717 |
| 12/31/2039 | 6,321,717 | (790,215) | (206,088) | 5,531,502 |
| 12/31/2040 | 5,531,502 | (790,215) | (180,821) | 4,741,288 |
| 12/31/2041 | 4,741,288 | (790,215) | (154,566) | 3,951,073 |
| 12/31/2042 | 3,951,073 | (790,215) | (128,805) | 3,160,858 |
| 12/31/2043 | 3,160,858 | (790,215) | (103,044) | 2,370,644 |
| 12/31/2044 | 2,370,644 | (790,215) | (77,495) | 1,580,429 |
| 12/31/2045 | 1,580,429 | (790,215) | (51,522) | 790,215 |
| 12/31/2046 | 790,215 | (790,215) | (25,761) | (0) |
| | | (18,174,937) | (7,115,540) | |
| Total Principal & Interest if paid current through maturity | | | | 25,290,477 |

CONFIDENTIAL. INTERNAL USE ONLY. NOT FOR PUBLIC DISTRIBUTION.

3

019346
HCMLPHMIT00002633



# SUMMARY OF OUTREACH EFFORTS

| Potential buyer | Person contacted | Title | Initial date contacted | Information/materials provided | Responses |
|---|---|---|---|---|---|
| Riva Ridge Capital Management | Stephen Golden | Founding Partner/PM | 2/27/24 | Over telephone, discussed information in HCMLP-prepared materials and the opportunity | Asked questions regarding the counter-party; rejected receipt of the materials; no interest at all; "life's too short"; actually laughed; stated that while the note was performing, that was for now; in his view the note was an invitation to litigate |
| Cyrus Capital Partners | Svetoslav Nikov | Partner/Analyst | 2/27/24 | Over telephone, discussed information in HCMLP materials and the opportunity | Very quick no; no interest in the materials; believes owning the note is asymmetric risk to the downside – if it pays back, a modest return for the risk; if it defaults, your investors will want to know why you would voluntarily become a creditor of Dondero. Compared the opportunity to the chance to lend money to Phil Falcone. Once again said "life's too short to be a creditor of Dondero" |
| Carronade Capital Management | Dan Gropper | Managing Partner/CIO | 2/23/24 | Initial email mentioning note; lunch meeting with Gropper and head of research Andy Taylor on 2/29/24; reviewed materials at lunch meeting | Gropper and Taylor quickly expressed no interest in the note; upside vs. downside skewed (far too much downside); even if the upside was better balanced, the likelihood of litigation over such a small note made the investment unattractive (even if you got costs of collection); asset transfers out of Maker also a concern; Gropper and Taylor did not want to keep the materials |
| UBS | Nader Attalla | Structured Credit Trading; responsible for day-to-day management of UBS actions against Dondero | 2/23/24 | Initial email mentioning note; follow-up call and emailing of "teaser" | Two calls in March and early April; he has been too busy to focus on it; troubled by the fact that it does not cross-default with other Dugaboy obligations; while UBS is suing Dondero and Dugaboy on other obligations torts, making this note potentially useful at the right price, UBS ultimately did not have a bid |
| Bardin Hill Investment Partners | Pratik Desai | Partner/PM | 6/7/24 | Initial email with "teaser" and requesting follow-up call | 30 minute call on June 10, 2024; reviewed teaser with Desai; questions regarding background of note; why it had not been accelerated; payment history; terms; Dugaboy's assets and liabilities; payback period at various discounts; ultimately would require a material discount to 50% soft offer; asked about lending against the note and/or other Claimant Trust assets with material haircuts. Bardin Hill would not be interested in being a direct counterpart to Dondero especially if that was their only recourse; Bardin Hill would consider ways to lend against the note or other assets if the Claimant Trust was in need of $10-$20 million of liquidity |
| NexPoint/affiliates | Matt McGraner & DC Sauter | CIO General Counsel | 5/16/24 | Email with description of note; Indicated nonbinding offer price of $12M, subject to approval of Oversight Board | DC Sauter responded via email of 5/22/24 that they were not currently interested in the terms outlined. If the terms change, they would be interested in taking another look. They did not have a bid of their own. |

CONFIDENTIAL. INTERNAL USE ONLY. NOT FOR PUBLIC DISTRIBUTION.

019347

HCMLPHMIT00002634

 **VALUATION AND DISCLOSURE DISCUSSION**



- Based on these and other factors considered, we believe the actual fair value of the note for a non-Dondero-related buyer is approximately **$3.9** million or **21.5%** of the current par value outstanding

CONFIDENTIAL. INTERNAL USE ONLY. NOT FOR PUBLIC DISTRIBUTION.                    5

019348
HCMLPHMIT00002635



CONFIDENTIAL. INTERNAL USE ONLY. NOT FOR PUBLIC DISTRIBUTION.

019349
HCMLPHMIT00002636

# EXHIBIT 112

019350

**From:** "David Klos" <DKlos@HighlandCapital.com>
**To:** "DC Sauter" <DSauter@Nexpoint.com>
**Cc:** "Matt McGraner" <mmcgraner@nexpoint.com>
**Subject:** RE: Dugaboy note and misc
**Date:** Thu, 23 May 2024 20:50:39 -0000
**Importance:** Normal
**Inline-Images:** image001.jpg

---

DC,
Thanks for the response. As you are not interested in the note, we will move forward with another transaction. With respect to other settlements, we would be happy to engage whenever you are ready. Thanks and have a nice long weekend.
-Dave

---

**From:** DC Sauter <DSauter@Nexpoint.com>
**Sent:** Wednesday, May 22, 2024 5:16 PM
**To:** David Klos <DKlos@HighlandCapital.com>; Matt McGraner <mmcgraner@nexpoint.com>
**Subject:** RE: Dugaboy note and misc

Dave, thanks for following up, and sorry for not responding. We're not currently interested in the terms you outline below, but I think it's a positive thing if we can continue to resolve some of these outlying issues on mutually agreeable terms. If the terms of your proposed transaction change, we'd certainly be interested in taking another look.

Regards,

D.C. Sauter

NEXPOINT

O: 214.550.8278  |  C: 469.877.6440
dsauter@nexpoint.com  |  https://www.nexpoint.com

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at NexPoint Advisors. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at NexPoint Advisors.

---

**From:** David Klos <DKlos@HighlandCapital.com>
**Sent:** Wednesday, May 22, 2024 6:11 PM
**To:** Matt McGraner <MMcGraner@Nexpoint.com>
**Cc:** DC Sauter <DSauter@Nexpoint.com>
**Subject:** RE: Dugaboy note and misc

Matt/DC,
I have not heard anything back from you on the Dugaboy note and other assets mentioned in my email last week. Please let me know if there is any interest in the assets for NexPoint or any of its affiliates. If not, we will go forward with other transactions. I understand you are likely busy but would appreciate if you would confirm that you are passing by tomorrow morning. Thanks.
-Dave

019351

HCMLPHMIT00002637

**From:** David Klos
**Sent:** Thursday, May 16, 2024 4:26 PM
**To:** Matt McGraner <MMcGraner@Nexpoint.com>
**Cc:** DC Sauter <DSauter@Nexpoint.com>
**Subject:** Dugaboy note and misc

Matt/DC,

I wanted to reach out to you on a few points to see if there was any interest amongst the NexPoint affiliated entities. While much of this doesn't fit neatly into your team's world like SE Multi and NHT, the fact that we were able to get those assets traded gives me some hope that traction may be possible in other places. Hoping you may have some feedback on the following:

Dugaboy Note
I'd be happy to provide more details on the note itself, or you could verify these points with Dugaboy's accountant, but the basics are as follows and it's quite a simple asset:

- Principal outstanding to Highland - $18,174,936.62
- Interest rate – 3.26% fixed
- WAL (yrs) – 10.5
- Payments – P+I Due December 31 each year (next payment due 12/31/24)
  - Minimum principal amort to Highland - $790,214.64 each year
  - Next interest payment to Highland is $594,126.23
  - Combined payment of $1,384,340.87 due 12/31/24
- Final payment date– December 31, 2046

This note wasn't part of the "notes litigation" and has not been accelerated because Dugaboy has stayed current on its payments.

Before we complete a transfer of the Dugaboy note, we wanted to at least check NexPoint's/Dondero's interest in buying it back. The following is a summary of the price and terms by which Highland would consider offering to sell the note. These terms are indicative and nonbinding and nothing in this email constitutes a firm commitment. Any firm offer to sell must be in a writing signed by Highland's CEO after approval of the Claimant Trust Oversight Board.

Purchaser – NexPoint Advisors, LP or its affiliates
Proposed purchase price (the "Purchase Price") - $12,000,000.00 in cash
    a. Purchase Price as % of principal outstanding – Approximately 66%
    b. Discount to current principal outstanding - $6,174,936.62
    c. Implied purchaser IRR – Approximately 9%

Trades flat – Purchase Price represents the total amount of consideration to be paid
Closing – on or before May 31, 2024
"As-is, where-is" with no reps or warranties, except ownership and authority to sell

Our willingness to consider any discount is simply to facilitate an immediate sale of the note and does not impact our view of value.

Please revert to us by close of business on Wednesday, May 22, 2024 with any feedback you may have. If you desire to move forward, we will promptly seek Oversight Board approval and prepare documentation with a firm offer. If we don't hear from you, we'll be taking that to mean there is no interest.

Ginn
It's a small stub position, but Highland/Highland-managed funds have ownership interests in Ginn (A & B loans and LLC units). We believe NexPoint also has ownership through its affiliated entities, and understand Matt DiOrio is currently serving as a Director of G-LA Resorts Holdings, LLC. We'd be willing to sell these interests to NexPoint or one of its affiliates for nominal consideration to facilitate the further wind down of entities, which will cost more to maintain than the prospective value that may eventually come out of Ginn, which we understand could take up to several more years. We thought this might be appealing to you since it wouldn't create incremental monitoring burden to your team. If interested, just let me know and I'd be happy to help coordinate documentation.

019352

HCMLPHMIT00002638

Global resolution
Since the unsuccessful mediation last October, it's been quiet on this front, but the framework that Highland would consider is essentially unchanged.  The level of indemnification reserves needed for indemnified parties and the cash on hand that needs to be maintained for future expenses could be reduced with agreement to broad, unequivocal releases and a permanent cessation of litigation.  Dondero's counsel has Highland's position with respect to the scope of these items, which have not changed since the mediation and remain the gating issue to begin a substantive conversation.   I raise this point only to highlight that the door is open if he'd like to engage at all – whether now or in the future.  I don't want to be wasting peoples' time, but it shouldn't be unsaid either.

Thank you,
Dave

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

DISCLAIMER-Securities offered through NexPoint Securities, Inc., ("NexPoint Securities") Member FINRA/SIPC. This email may contain privileged and/or confidential information. Use by other than intended recipients is prohibited. If received in error, please immediately delete this email from your computer, destroy any hard copies and notify the sender. NexPoint Securities archives email, which are subject to review by NexPoint Securities and various regulators. This email is for informational purposes only and is not an offer, recommendation or solicitation to purchase or sell any security nor is it an official confirmation of terms. NexPoint Securities makes no representation about the accuracy or completeness of information herein. Past performance is not indicative of future returns. Investments may lose money and such investment losses are not insured.

019353

# EXHIBIT 113

019354

# Highland Capital Management, L.P.

**(A Delaware Limited Partnership)**
**Consolidated Financial Statements and**
**Supplemental Information**
**December 31, 2018**

019355

HCMLPHMIT00002548

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Index**
**December 31, 2018**

|  | Page |
|---|---|
| **Report of Independent Auditors** | 1 |
| **Consolidated Financial Statements** | |
| Consolidated Balance Sheet | 2 |
| Consolidated Statement of Income | 3 |
| Consolidated Statement of Changes in Partners' Capital | 4 |
| Consolidated Statement of Cash Flows | 5 |
| Notes to Consolidated Financial Statements | 6-39 |
| Supplemental Information | 40-44 |

019356



## Report of Independent Auditors

To the General Partner of Highland Capital Management, L.P.

We have audited the accompanying consolidated financial statements of Highland Capital Management, L.P. and its subsidiaries (collectively, the "Partnership"), which comprise the consolidated balance sheet as of December 31, 2018, and the related consolidated statements of income, of changes in partners' capital and of cash flows for the year then ended.

### Management's Responsibility for the Consolidated Financial Statements

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

### Auditors' Responsibility

Our responsibility is to express an opinion on the consolidated financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, we consider internal control relevant to the Partnership's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Partnership's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### Opinion

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Highland Capital Management, L.P. and its subsidiaries as of December 31. 2018, and the results of their operations, changes in their partners' capital and their cash flows for the year then ended, in accordance with accounting principles generally accepted in the United States of America.

### Other Matter

Our audit was conducted for the purpose of forming an opinion on the consolidated financial statements taken as a whole. The Supplemental Consolidating Balance Sheet, the Supplemental Consolidating Statement of Income, the Supplemental Unconsolidated Balance Sheet and the Supplemental Unconsolidated Statement of Income are presented for purposes of additional analysis and are not a required part of the consolidated financial statements. The information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the consolidated financial statements. The information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the consolidated financial statements or to the consolidated financial statements themselves and other additional procedures, in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated, in all material respects, in relation to the consolidated financial statements taken as a whole.

*PricewaterhouseCoopers LLP*

June 3, 2019

*PricewaterhouseCoopers LLP, 2121 N Pearl Street, Suite 2000, Dallas, Texas 75201*
*T: (214) 999 1400, F: (214) 754 7991, www.pwc.com/us*

019357

HCMLPHMIT00002550

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Balance Sheet**
**December 31, 2018**

*(in thousands)*

**Assets**

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 5,034 |
| Investments at fair value (cost $922,027) | | 845,186 |
| Management and incentive fees receivable | | 2,393 |
| Due from broker for securities sold, not yet settled | | 598 |
| Other assets | | 9,255 |
| Notes and other amounts due from affiliates | | 173,398 |
| Intangible assets | | 3,022 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $11,197 | | 4,581 |
| **Total assets** | $ | 1,043,467 |

**Liabilities and partners' capital**

**Liabilities**

| | | |
|---|---|---:|
| Accounts payable | $ | 4,983 |
| Securities sold, not yet purchased (proceeds $26,135) | | 32,357 |
| Withdrawals payable | | 57,009 |
| Due to brokers | | 116,560 |
| Due to brokers for securities purchased, not yet settled | | 1,640 |
| Accrued and other liabilities | | 40,246 |
| Notes payable | | 55,752 |
| Investment liabilities | | 46,092 |
| **Total liabilities** | | 354,639 |
| Non-controlling interest | | 316,867 |
| **Partners' capital** | | 371,961 |
| **Total liabilities and partners' capital** | $ | 1,043,467 |

The accompanying notes are an integral part of these consolidated financial statements.

019358

HCMLPHMIT00002551

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Statement of Income**
**Year Ended December 31, 2018**

*(in thousands)*

**Revenue:**

| | | |
|---|---|---:|
| Management fees | $ | 36,600 |
| Interest and investment income | | 15,831 |
| Incentive fees | | 70 |
| Shared services fees | | 9,187 |
| Other income | | 2,622 |
| Total revenue | | 64,310 |

**Expenses:**

| | |
|---|---:|
| Compensation and benefits | 34,475 |
| Professional fees | 17,679 |
| Interest expense | 5,670 |
| Marketing and advertising expense | 2,413 |
| Depreciation and amortization | 1,317 |
| Investment and research consulting | 1,082 |
| Bad debt expense | 7,862 |
| Other operating expenses | 10,027 |
| Total expenses | 80,525 |

**Other Income/(Expense):**

| | |
|---|---:|
| Other income | 9,826 |
| Impairment on intangible assets | (2,830) |
| Total other income | 6,996 |

| | |
|---|---:|
| Loss before investment and derivative activities | (9,219) |

**Realized and unrealized loss on investments and derivatives:**

| | |
|---|---:|
| Net realized loss on investments and derivatives | (31,517) |
| Net change in unrealized loss on investments and derivatives | (93,755) |
| Net realized and unrealized loss on investments and derivatives | (125,272) |

| | | |
|---|---|---:|
| Net loss | | (134,491) |
| Net loss attributable to non-controlling interest | | (61,313) |
| Net loss attributable to Highland Capital Management, L.P. | $ | (73,178) |

The accompanying notes are an integral part of these consolidated financial statements.

019359

HCMLPHMIT00002552

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Statement of Changes in Partners' Capital**
**Year Ended December 31, 2018**

*(in thousands)*

|  | General Partner | | Limited Partners | | Total | |
|---|---|---|---|---|---|---|
| Partners' capital, December 31, 2017 | $ | 163 | $ | 450,014 | $ | 450,177 |
| Net loss attributable to Highland Capital Management, L.P. | $ | (183) | $ | (72,995) | $ | (73,178) |
| Partner distributions | $ | (13) | $ | (5,025) | $ | (5,038) |
| Partners' capital, December 31, 2018 | $ | (33) | $ | 371,994 | $ | 371,961 |

The accompanying notes are an integral part of these consolidated financial statements.

4

019360

HCMLPHMIT00002553

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Statement of Cash Flows**
**Year Ended December 31, 2018**

*(in thousands)*

| | | |
|---|---:|---:|
| **Cash flows from operating activities:** | | |
| Net loss | $ | (134,491) |
| Adjustment to reconcile net loss to net cash | | |
| provided from operating activities: | | |
| Net realized loss on investments and derivative transactions | | 31,517 |
| Net change in unrealized loss on investments and derivative transactions | | 93,755 |
| Amortization and depreciation | | 1,317 |
| Changes in assets and liabilities: | | |
| Management and incentive fee receivable | | 9,468 |
| Due from brokers | | 1,689 |
| Due from affiliate | | (10,989) |
| Other assets | | 4,272 |
| Intangible assets | | 3,308 |
| Accounts payable | | 546 |
| Accrued and other liabilities | | 1,214 |
| Due to brokers for securities purchased, not yet settled | | 1,886 |
| Due to brokers | | 11,665 |
| Net cash provided from operating activities | | 15,157 |
| **Cash flows from investing activities:** | | |
| Purchases of fixed assets and leasehold improvements, net | | (67) |
| Purchases of investments | | (195,263) |
| Proceeds from dispositions of investments | | 258,858 |
| Proceeds from securities sold, not yet purchased | | 46,550 |
| Issuance of notes receivable to affiliates | | (2,400) |
| Proceeds from repayments of notes receivable from affiliates | | 3,395 |
| Purchases of investments to cover securities sold, not yet purchased | | (127,954) |
| Net cash used in investing activities | | (16,881) |
| **Cash flows from financing activities:** | | |
| Payments on notes payable & investment liabilities | | (2,743) |
| Proceeds from long-term debt | | 38,501 |
| Capital contributions from minority interest investors of consolidated entities | | 14,615 |
| Capital withdrawals by minority interest investors of consolidated entities | | (141,986) |
| Partner distributions | | (5,060) |
| Net cash used in financing activities | | (96,673) |
| Net decrease in cash and cash equivalents | | (98,397) |
| **Cash and cash equivalents** | | |
| Beginning of year | | 103,479 |
| De-consolidating funds adjustment | | (48) |
| End of year | $ | 5,034 |
| **Supplemental disclosure of cash flow information:** | | |
| Interest paid during the year | $ | (5,629) |
| Taxes paid during the year | | (510,961) |
| Investments acquired for non-cash consideration | | 26,018 |
| Investments disposed for non-cash consideration | | 116 |

The accompanying notes are an integral part of these consolidated financial statements.

019361

HCMLPHMIT00002554

# Highland Capital Management, L.P.
## Notes to Consolidated Financial Statements
## December 31, 2018

1.  **Description of Business**

Highland Capital Management, L.P. (the "Partnership") was formed on July 7, 1997 as a limited partnership in the state of Delaware.  The Partnership is a registered investment adviser under the Investment Advisers Act of 1940 that manages collateralized loan obligations ("CLOs"), hedge funds, private equity funds, and other leveraged loan transactions that are collateralized predominately by senior secured bank debt and high-yield bonds.  The Partnership and its subsidiaries make direct investments in debt, equity, and other securities in the normal course of business.  The Partnership's general partner is Strand Advisors, Inc. (the "General Partner").  The Partnership is owned by an unaffiliated (other than through its direct ownership) trust as well as affiliated trusts and personal holdings of the senior management of the Partnership.

As of December 31, 2018, the Partnership provided investment advisory services for eighteen CLOs, five separate accounts, one master limited partnership, and nine hedge funds or private equity structures, with total fee-earning assets under management of approximately $3.1 billion. The Partnership also provides investment services on behalf of affiliate advisors.

2.  **Summary of Significant Accounting Policies**

The following is a summary of the significant accounting policies followed by the Partnership in preparation of its consolidated financial statements.

**Basis of Accounting**
The Partnership's consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles in the United States of America ("U.S. GAAP") as set forth in the Financial Accounting Standards Board's Accounting Standards Codification and are stated in the United States Dollar.

**Use of Estimates**
The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts and disclosures in the consolidated financial statements.  Actual results could differ from those estimates and those differences could be material.

**Principles of Consolidation**
The consolidated financial statements include the accounts of the Partnership and the Partnership's consolidated subsidiaries ("Consolidated Entities"), which are comprised of (i) those entities in which it has controlling investment and has control over significant operating, financial and investing decisions, (ii) those entities in which it, as the general partner, has control over significant operating, financial and investing decisions, and (iii) variable interest entities ("VIEs") in which it is the primary beneficiary as described below.

The Partnership determines whether an entity has equity investors who lack the characteristics of a controlling financial interest or does not have sufficient equity at risk to finance its expected activities without additional subordinated financial support from other parties.  If an entity has either of these characteristics, it is considered a VIE and must be consolidated by its primary beneficiary, which is the party that, along with its affiliates and de facto agents, absorbs a majority of the VIEs' expected losses or receives a majority of the expected residual returns as a result of holding variable interests.

019362

HCMLPHMIT00002555

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Partnership assesses consolidation requirements pursuant to ASU 2015-02: Consolidation, which was adopted using the modified retrospective method and resulted in an effective date of adoption of January 1, 2016.

The Partnership and its affiliate's involvement with unconsolidated VIEs is generally limited to that of an advisory services provider, and their investment, if any, represents an insignificant interest in the relevant investment entities' assets under management. The Partnership's affiliate's exposure to risk in these entities is generally limited to any capital contribution it has made or is required to make and any earned but uncollected asset based and performance fees. The Partnership has not issued any investment performance guarantees to these VIEs or their investors, except that the Partnership has agreed to subject the full value of its equity interest in Highland Prometheus Fund to dollar-for-dollar reduction to the extent the third party investor in such fund does not achieve an annual target return.

As of December 31, 2018, the net assets of the unconsolidated VIEs and the Partnership's maximum risk of loss were as follows:

*(in thousands)*

|  | Unconsolidated VIE Net Assets | | Carrying Value and Maximum Risk of Loss | |
|---|---|---|---|---|
| Sponsored investment funds | $ | 206,329 | $ | 12,178 |

**Consolidation of Variable Interest Entities**

The Partnership consolidates the following VIEs (along with majority owned funds: Highland Diversified Credit Fund, L.P., and Highland Select Equity Fund, L.P., collectively the "Consolidated Investment Funds"), as the Partnership (or its wholly owned subsidiaries) controls the general partner of the respective entities and is responsible for the daily operations of the following entities:

- Highland Multi Strategy Credit Fund, L.P. ("Multi Strategy Master"), formerly Highland Credit Opportunities CDO, L.P., a Delaware limited partnership that commenced operations on December 15, 2005 and changed its name on August 26, 2014;

- Highland Multi-Strategy Master Fund, L.P. ("Multi-Strategy Master"), a Bermuda limited partnership that commenced operations on July 18, 2006;

- Highland Multi-Strategy Fund, L.P. ("Multi-Strat Domestic Feeder"), a Delaware limited partnership that commenced operations on July 6, 2006;

- Highland Restoration Capital Partners Offshore, L.P. ("Restoration Offshore"), a Cayman limited partnership that commenced operations on September 2, 2008;

- Highland Restoration Capital Partners, L.P. ("Restoration Onshore"), a Delaware limited partnership that commenced operations on September 2, 2008; and

019363

HCMLPHMIT00002556

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Consolidation of Majority Owned Entities**

The Partnership consolidates the following entities as it has a controlling majority interest:

- 100% interest in Highland Capital Special Allocation, LLC ("HCSA"), a Delaware limited liability company that commenced operations on December 21, 2006;

- 100% interest in Highland Receivables Finance 1, LLC, a Delaware limited liability company that commenced operations on December 29, 2006;

- 100% interest in Highland Multi-Strategy Onshore Master SubFund, LLC, a Delaware limited liability company that commenced operations on July 19, 2006;

- 100% interest in Highland Multi-Strategy Onshore Master Subfund II, LLC, LLC, a Delaware limited liability company that commenced operations on February 22, 2007;

- 100% interest in Highland Brasil, LLC, a Delaware limited liability company that commenced operations on January 28, 2014;

- 100% interest in Highland Capital Management (Singapore) Pte, Ltd. ("HCM Singapore"), a company organized in the Republic of Singapore that commenced operations on April 2, 2008;

- 100% interest in Highland Capital Management Korea, Ltd. ("HCM Korea"), a company organized in the Republic of Korea that commenced operations on August 2, 2012;

- 100% interest in Highland Capital Management Latin America, L.P., ("HCM Latin America"), a Cayman company that was formed on April 13, 2017;

- 100% interest in HE Capital, LLC, a Delaware limited liability company that was formed on March 22, 2007;

- 100% interest in De Kooning, Ltd, a Cayman company that was formed on December 1, 2012;

- 100% interest in Hirst, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Hockney, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Oldenburg, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Eames, Ltd, a Cayman company that was formed on December 12, 2012;

- 99.9% interest in Penant Management, L.P., a Delaware limited partnership that was formed on December 12, 2012;

- 100% interest in Pollack, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Warhol, Ltd., a Cayman company that was formed on December 1, 2012;

019364

HCMLPHMIT00002557

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2018**

---

- 100% interest in HCREF-I Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in HCREF-XI Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in HCREF-XII Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in Highland ERA Management, LLC, a Delaware limited liability company that was formed on February 1, 2013;

- 100% interest in The Dondero Insurance Rabbi Trust., a trust that was formed on May 27, 2004;

- 100% interest in The Okada Insurance Rabbi Trust, a trust that was formed on May 27, 2004;

- 100% interest in Highland Employee Retention Assets ("HERA"), LLC, a Delaware limited liability company that was formed on October 26, 2009;

- 100% interest in Highland Diversified Credit Fund, L.P. ("Highland Offshore Partners"), a Delaware limited partnership which began operations on February 29, 2000 and was organized for the sole purpose of investing substantially all of its assets in Highland Offshore Partners, L.P.;

- 99.6% interest in Highland Select Equity Master Fund, LP, and Highland Select Equity Fund, LP Delaware limited partnerships which began operations on January 1, 2002 and was organized for the purpose of investing and trading in large and small cap stocks that trade for less than intrinsic value;

- 100% interest in Highland Fund Holdings, LLC, a Delaware limited liability company that was formed on May 24, 2016;

- 100% interest in Maple Avenue Holdings, LLC, a Texas limited liability company formed on August 17, 2016;

- 100% interest in Highland HCF Advisor, Ltd., a Cayman company that was formed on October 27, 2017;

- 100% interest in Asury Holdings, LLC, a Delaware limited liability company formed on February 14, 2017 and;

- 100% interest in Highland CLO Management, Ltd., a Cayman company that was formed on October 27, 2017.

All inter-partnership and intercompany accounts and transactions involving the above listed Consolidated Entities have been eliminated in all of the aforementioned consolidating schedules. All the Consolidated Investment Funds are, for U.S. GAAP purposes, investment companies under the American Institute of Certified Public Accountants (AICPA) Audit and Accounting Guide - Investment Companies.  The Partnership has retained the specialized accounting of these funds required under U.S. GAAP.

019365

HCMLPHMIT00002558

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The following table includes a rollforward of non-controlling interests from December 31, 2017, to December 31, 2018.

*(in thousands)*

| | |
|---|---:|
| Noncontrolling interest, December 31, 2017 | $ 424,844 |
| Net loss attributable to noncontrolling interest | (61,313) |
| Noncontrolling partner contributions | 14,615 |
| Noncontrolling partner distributions | (58,061) |
| Noncontrolling interest of deconsolidated entities | (3,218) |
| Noncontrolling interest, December 31, 2018 | $ 316,867 |

**Investment Transactions**
Investment transactions are recorded on a trade date basis. Investments in securities are valued at market or fair value at the date of the consolidated financial statements with the resulting net unrealized appreciation or depreciation reflected in the Consolidated Statement of Income. Realized gains and losses on the transactions are determined based on either the first-in, first-out or specific identification method.

See Note 5 for the Partnership's fair value process and hierarchy disclosures.

**Management and Incentive Fee Revenue**
The Partnership recognizes revenue as earned in connection with services provided under collateral and investment management agreements. Under these agreements, the Partnership earns management fees calculated as a percentage of assets under management or net asset value. The Partnership also has an opportunity to earn additional incentive fees and incentive allocations related to certain management agreements depending ultimately on the financial performance of the underlying assets the Partnership manages. During the year ended December 31, 2018, the Partnership and its Consolidated Entities recognized management fees and incentive fees of approximately $36.6 million and $0.1 million, respectively.

**Shared Services Revenue**
The Partnership recognizes revenue as earned in connection with services provided to related parties under various shared services agreements. Under these agreements, the Partnership earns fees for services including, but not limited to, back office support functions, marketing, and investment advisory services. During the year ended December 31, 2018, the Partnership and its Consolidated Entities recognized shared services revenue of approximately $9.2 million, which has been presented in *Shared services fees* in the Consolidated Statement of Income. See further discussion in Note 8.

019366

HCMLPHMIT00002559

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Income and Expense Recognition**

Interest on currently paying debt instruments is accrued as earned and dividend income and dividends on securities sold, not yet purchased are recorded on the ex-dividend date, net of withholding taxes. In certain instances where the asset has defaulted or some amount of the interest payment is deemed uncollectable, interest is recognized when received. Discounts and premiums associated with purchases of investments are accreted and amortized to interest income, except for deep-discounted debt where ultimate collection of interest and principal may be in doubt. Such accretion/amortization is calculated on an effective-yield basis over the life of the investment. Amendment fees are recognized when agreed to by the underlying company and all settlement contingencies are met. Operating expenses, including interest on securities sold short, not yet purchased, are recorded on the accrual basis as incurred.

**Income Taxes**

The Partnership is not subject to federal income taxes, and therefore, no provision has been made for such taxes in the accompanying consolidated financial statements. Income taxes are the responsibility of the partners. Certain consolidated subsidiaries are subject to federal income taxes.

Certain entities that are included in these consolidated financial statements are subject to federal and/or state income taxes. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the period that includes the enactment date. See further discussion in Note 13.

**Cash and Cash Equivalents**

Cash and cash equivalents consist of cash held at U.S. and foreign banks, deposits with original maturities of less than 90 days, and money market funds. Cash equivalents are carried at cost, which approximates market value. At December 31, 2018, the Partnership and Consolidated Entities held cash balances at certain financial institutions in excess of the federally insured limit of $0.3 million. The Partnership and Consolidated Entities regularly monitor the credit quality of these institutions.

**Notes Receivable**

Notes receivable consists of secured promissory notes with maturities greater than one year. When available, the Partnership uses observable market data, including pricing on recent closed transactions to value notes. When appropriate, these notes may be valued using collateral values. Adjustments to the value may be performed in circumstances where attributes specific to the collateral exist suggesting impairment.

**Other Intangible Assets**

Goodwill and other intangible assets are recorded on the Consolidated Balance Sheet at current carrying values. The Partnership and its Consolidated Entities perform an impairment test on an annual basis. Any impairment in the value of other intangible assets is accounted for in the year when it occurs.

**Fixed Assets and Leasehold Improvements**

Fixed assets and leasehold improvements are carried at cost, less accumulated depreciation. Depreciation is provided using the straight-line method over the shorter of the estimated useful life of the assets or the lease term.

019367

HCMLPHMIT00002560

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Partnership and its Consolidated Entities are depreciating fixed assets as follows:

|  | Period |
|---|---|
| Leasehold improvements | Lease term |
| Buildings | 29 - 40 years |
| Furniture and fixtures | 7 years |
| Computer and equipment | 3 - 5 years |
| Computer software | 3 years |

**Securities Sold, Not Yet Purchased**
Certain of the Partnership's Consolidated Investment Funds engage in "short sales" as part of their investment strategies.  Short selling is the practice of selling securities that are borrowed from a third party.  The Consolidated Investment Funds are required to return securities equivalent to those borrowed for the short sale at the lender's demand.

Pending the return of such securities, the Consolidated Investment Funds deposit with the lender as collateral the proceeds of the short sale plus additional cash.  The amount of the required deposit, which earns interest, is adjusted periodically to reflect any change in the market price of the securities that the Consolidated Investment Funds are required to return to the lender. A gain (which cannot exceed the price at which the Consolidated Investment Funds sold the security short) or a loss (which theoretically could be unlimited in size) will be settled upon termination of a short sale.

**Due to/from Brokers**
Due to and from broker balances recorded on the Consolidated Balance Sheet include liquid assets maintained with brokers and counterparties for margin account balances and the amounts due for or due from the settlement of purchase and sales transactions. Certain due to and from broker balances have been reported on a net-by-counterparty basis where, in accordance with contractual rights and the Partnership's opinion, there is a right of offset in the event of bankruptcy or default by a counterparty.

**Options Contracts**
The Partnership and the Consolidated Entities may purchase and write call and put options to gain market exposure or to hedge investments.  A call option gives the purchaser of the option the right (but not the obligation) to buy, and obligates the seller to sell (when the option is exercised), the underlying position at the exercise price at any time or at a specified time during the option period. A put option gives the holder the right to sell and obligates the writer to buy the underlying position at the exercise price at any time or at a specified time during the option period.  When the Partnership or the Consolidated Entities purchase (write) an option, an amount equal to the premium paid (received) by the entity is reflected as an asset (liability).  The amount of the asset (liability) is subsequently marked-to-market to reflect the current market value of the option purchased (written). When a security is purchased (or sold) through an exercise of an option, the related premium paid (or received) is added to (or deducted from) the basis of the security acquired or deducted from (or added to) the proceeds of the security sold.  When an option expires (or the Partnership or the Consolidated Entities enter into a closing transaction), the entity realizes a gain or loss on the option to the extent of the premiums received or paid (or gain or loss to the extent the cost of the closing transaction exceeds the premium received or paid).  Exercise of a written option could result in the Partnership or the Consolidated Entities purchasing a security at a price different from the current market value.

019368

HCMLPHMIT00002561

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Partnership and the Consolidated Entities are exposed to counterparty risk from the potential that a seller of an option contract does not sell or purchase the underlying asset as agreed under the terms of the option contract. The maximum risk of loss from counterparty risk to the Partnership and the Consolidated Entities is the greater of the fair value of its open option contracts or the premiums paid to purchase the open option contracts. The Partnership and the Consolidated Entities consider the credit risk of the intermediary counterparties to its option transactions in evaluating potential credit risk.

### Margin Transactions
To obtain more investable cash, certain of the Consolidated Entities may use various forms of leverage including purchasing securities on margin.  A margin transaction consists of purchasing an investment with money loaned by a broker and agreeing to repay the broker at a later date. Interest expense on the outstanding margin balance is based on market rates at the time of the borrowing.

### Withdrawals Payable
Withdrawals are recognized as liabilities, net of incentive allocations, when the amount requested in the withdrawal notice becomes fixed and determinable.  This generally may occur either at the time of receipt of the notice, or on the last day of a fiscal period, depending on the nature of the request. As a result, withdrawals paid after the end of the year, but based upon year-end capital balances are reflected as withdrawals payable at December 31, 2018.  Withdrawal notices received for which the dollar amount is not fixed remains in capital until the amount is determined. At December 31, 2018, the Consolidated Investment Funds had withdrawals payable of $57.0 million.

### Foreign Currency Transactions
The Partnership's subsidiaries HCM Singapore and HCM Korea use Singapore dollars and Korean won, respectively, as their functional currency.  All foreign currency asset and liability balances are presented in U.S. dollars in the consolidated financial statements, translated using the exchange rate as of December 31, 2018.  Revenues and expenses are recorded in U.S. dollars using an average exchange rate for the relative period.  Foreign currency transaction gains and losses resulting from transactions outside of the functional currency of an entity are included in *Other income* on the Consolidated Statement of Income.

The Consolidated Entities do not isolate that portion of the results of operations resulting from changes in foreign exchange rates or investment or fluctuations from changes in market prices of securities held.  Such fluctuations are included within the *Net realized and unrealized gains or loss from investments* on the Consolidated Statement of Income.

### Life Settlement Contracts
One of the Consolidated Investment Funds, through a subsidiary, holds life settlement contracts and accounts for them using the fair value method. These contracts are recorded as a component of "Investments at fair value" on the Consolidated Balance Sheet. Realized and unrealized gains (losses) on the contracts are recorded in the Consolidated Income Statement. Cash flows relating to the purchase and sale of the contracts are recorded as a component of *Purchase of investments* and *Proceeds from dispositions of investments* on the Consolidated Statement of Cash Flows. At December 31, 2018, the Consolidated Investment Fund was invested in 13 policies, which had a total face value of approximately $145.3 million and a fair value of $35.7 million.

019369

HCMLPHMIT00002562

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Financing**

The Partnership and its Consolidated Entities may finance the acquisition of its investments in securities and loans through financing arrangements which are classified in Notes payable and Investment liabilities on the Consolidated Balance Sheet. The Partnership and its Consolidated Entities recognize interest expense on all borrowings on the accrual basis in the Consolidated Statement of Income.

**Financial Instruments**

The Partnership and its Consolidated Entities determine fair value of financial instruments as required by U.S. GAAP. The carrying amounts for cash and cash equivalents, receivables, accounts payable, withdrawals payable, debt and notes payable, due to brokers, investment liabilities and accrued liabilities approximate their fair values. For fair value of investment, see Note 5.

**Accounts Payable, Accrued and Other Liabilities**

Expenses are recorded on an accrual basis, as incurred. Current liabilities are included in Accounts payable. Long-term liabilities are included in Accrued and other liabilities.

**Partners' Capital**

The Partnership agreement requires that income or loss of the Partnership be allocated to the partners in accordance with their respective partnership interests.

019370

HCMLPHMIT00002563

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

3.    **Fixed Assets and Leasehold Improvements**

Fixed assets and leasehold improvements are comprised of the following as of December 31, 2018:

*(in thousands)*

| | | |
|---|---:|---:|
| Leasehold improvements | $ | 7,193 |
| Buildings | | 2,595 |
| Furniture and fixtures | | 2,796 |
| Computer and equipment | | 2,863 |
| Computer software | | 331 |
| Accumulated depreciation | | (11,197) |
| | $ | 4,581 |

Depreciation expense in 2018 totaled approximately $1.3 million for the Partnership and its subsidiaries.

4.    **Investments**

Detailed below is a summary of the Partnership and its Consolidated Entities' investments at December 31, 2018:

| *(in thousands)* | Amortized Cost/Cost | | Fair Value | |
|---|---:|---:|---:|---:|
| Common equity securities | $ | 423,306 | $ | 535,374 |
| Closed-end mutual funds | | 100,788 | | 94,845 |
| Floating rate syndicated bank loans | | 142,586 | | 72,622 |
| Real Estate Investment Trusts | | 28,271 | | 57,475 |
| Life settlement contracts | | 65,276 | | 35,744 |
| Limited partnership interests | | 24,892 | | 30,521 |
| Rights & warrants | | 26,661 | | 7,446 |
| LLC interests | | 10,629 | | 2,775 |
| Preferred equity | | 258 | | 8,282 |
| Asset-backed securities | | 7,350 | | 102 |
| Participation interests | | 6,590 | | - |
| Corporate bonds | | 85,421 | | - |
| Total investments | $ | 922,027 | $ | 845,186 |
| | Proceeds | | Fair Value | |
| Securities sold, not yet purchased | $ | (26,135) | $ | (32,357) |

019371

HCMLPHMIT00002564

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

---

5.   **Fair Value of Financial Instruments**

**Fair Value Measurement**
U.S. GAAP defines fair value as the price an entity would receive to sell an asset or pay to transfer a liability in an orderly transaction between market participants as of the measurement date. The standard requires fair value measurement techniques to reflect the assumptions market participants would use in pricing an asset or liability and, where possible, to maximize the use of observable inputs and minimize the use of unobservable inputs. It also establishes the following hierarchy that prioritizes the valuation inputs into three broad levels:

- Level 1 – Valuation based on unadjusted quoted prices in active markets for identical assets and liabilities that the Partnership and the Consolidated Entities have the ability to access as of the measurement date.  Valuations utilizing Level 1 inputs do not require any degree of judgment.

- Level 2 – Valuations based on (a) quoted prices for similar instruments in active markets; (b) quoted prices for identical or similar instruments in markets that are not active that are reflective of recent market transactions; or (c) models in which all significant inputs are observable, either directly or indirectly.

- Level 3 – Valuations based on indicative quotes that do not reflect recent market transactions and models or other valuation techniques in which the inputs are unobservable and significant to the fair value measurement, which includes situations where there is little, if any, market activity for the asset or liability.

The availability of observable inputs varies among financial instruments and is affected by numerous factors, including the type of instruments, the period of time in which the instrument has been established in the marketplace, market liquidity for an asset class and other characteristics particular to a transaction.  When the inputs used in a valuation model are unobservable, management is required to exercise a greater degree of judgment to determine fair value than it would for observable inputs.  For certain instruments, the inputs used to measure fair value may fall into different levels of the hierarchy discussed above.  In those cases, the instruments are categorized for disclosure purposes based on the lowest level of inputs that are significant to their fair value measurements.

The Partnership and Consolidated Entities use prices and inputs that are current as of the measurement dates.  The Partnership also considers the counterparty's non-performance risk when measuring the fair value of its investments.

During periods of market dislocation, the ability to observe prices and inputs for certain instruments may change. These circumstances may result in the instruments being reclassified to different levels within the hierarchy over time. They also create an inherent risk in the estimation of fair value that could cause actual amounts to differ from management's estimates. Whenever possible, the Partnership and its Consolidated Entities use actual market prices or relevant observable inputs to establish the fair value of its assets and liabilities.  In cases where observable inputs are not available, the Partnership and Consolidated Entities  develop methodologies that provide appropriate fair value estimates.  These methodologies are reviewed on a continuous basis to account for changing market conditions.

019372

HCMLPHMIT00002565

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Partnership has established policies, as described above, processes and procedures to ensure that valuation methodologies for investments and financial instruments that are categorized within all levels of the fair value hierarchy are fair and consistent. A Pricing Committee has been established to provide oversight of the valuation policies, processes and procedures, and is comprised of various personnel from the Partnership. The Pricing Committee meets monthly to review the proposed valuations for investments and financial instruments. The Pricing Committee is responsible for establishing the valuation policies and evaluating the overall fairness and consistent application of those policies.

As of December 31, 2018, the Partnership and its Consolidated Entities' investments consisted primarily of common equity securities, closed-end mutual funds, floating rate syndicated bank loans, real estate investment trusts, life settlement contracts, limited partnership interests, rights and warrants, LLC interests, asset-backed securities, and preferred equity. In addition, certain of the Consolidated Entities engage in short sale transactions. The majority of these financial instruments are not listed on national securities exchanges and management is required to use significant judgment to estimate their values.

**Public Equity Investments**
Publicly traded equities, including closed-end mutual funds and publicly traded REITs are valued at the closing price at the date of the financial statements. The fair value of equity investments that are not traded on national exchanges or through real-time quotation services are derived from methodologies that provide appropriate fair value estimates. Equity investments with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets.

**Private Equity Investments**
The Partnership and Consolidated Entities hold private equity investments which often resulted from the restructuring of other instruments which are classified as common equity securities. These assets are valued using market data obtained from a third-party pricing service and/or quotes from other parties dealing in the specific assets when available. In the event both a reliable market quote and third-party pricing service data are not available for such assets, the Partnership and Consolidated Entities will fair value the assets using various methodologies, as appropriate for individual investments, including comparable transaction multiples, comparable trading multiples, and/or discounted cash flow analysis. When utilizing comparable trading multiples, the Investment Manager determines comparable public companies (peers) based on industry, size, developmental stage, strategy, etc., and then calculates a trading multiple for each comparable company identified by using either a price to book ratio based on publically available information about the underlying comparable company or by dividing the enterprise value of the comparable company by its earnings before interest, taxes, depreciation and amortization (EBITDA) or similar metrics. In certain instances, the inputs used in the calculation of the trading multiples may vary based on the industry or development stage of the company. A multiple determined by the Investment Manager to be within a reasonable range as calculated amongst its peers is then applied to the underlying company's price to book ratio or EBITDA (which may be normalized to adjust for certain nonrecurring events), to calculate the fair value of the underlying company. The fair value may be further adjusted for entity specific facts and circumstances. Private equity investments with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Private equity investments that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

019373

HCMLPHMIT00002566

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Consolidated Entities also invest in warrant securities of publicly–traded companies. The fair value of these investments is based on an option pricing model. The option model bases warrant value on a number of factors including underlying equity price as of the valuation date, strike price, exercise date, time to expiration and volatility. Warrant investments that have observable volatility are classified as Level 2 assets. Warrant investments where volatility inputs are not observable are valued using an estimated volatility input, and are classified as Level 3 assets.

### Debt Securities

The Partnership and Consolidated Entities invest in various types of debt, including floating rate syndicated bank loans, which are almost exclusively valued using market data obtained from one or more third-party pricing services or brokers. In instances where a third-party pricing service does not provide pricing for a specific asset, the Partnership and Consolidated Entities first seek to obtain reliable market quotes from other parties dealing in the specific asset. Loans and bonds with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Loans and bonds that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

Absent both a reliable market quote and third-party pricing service date, the Partnership and Consolidated Entities may use various models to establish an estimated exit price. These investments are classified as Level 3 assets. Models used for debt securities are primarily based on identifying comparable assets for which market data is available and pricing the target asset consistent with the yields of the comparable assets. As circumstances require, other industry accepted techniques may be used in modeling debt assets.

### Life Settlement Contracts

Life Settlement contracts are valued using mortality tables and interest rate assumptions that are deemed by management to be appropriate for the demographic characteristics of the parties insured under the policies. Management generally utilizes an independent third party firm to perform these calculations and provide the relevant inputs. Management evaluates the results based on visible market activity and market research. Since these inputs are not readily observable, these contracts are classified as Level 3 assets.

At December 31, 2018, the Consolidated Entities' investments in life settlement contracts consisted of the following:

(U.S. dollars in thousands, except number of policies)

| Remaining Life Expectancy (in years) | Number of Policies | Face Value | Fair Value |
|---|---|---|---|
| 1-2 | - | $      - | $      - |
| 2-3 | 3 | 33,785 | 16,940 |
| 3-4 | - | - | - |
| 4-5 | - | - | - |
| Thereafter | 10 | 111,500 | 18,804 |
| Total | 13 | $ 145,285 | $ 35,744 |

019374

HCMLPHMIT00002567

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Asset-Backed Securities**

The Consolidated Entities invest in a variety of asset-backed securities. Asset-backed securities are generally valued based on complex cash flow models that analyze the cash flows generated by the investment's underlying assets after adjusting for expected default rates, prepayment rates, collateral quality, market liquidity among other factors. These models are then adjusted based on spreads available in the market place from various research firms, dealers, and trading activity.  The Consolidated Entities generally utilize an independent third parties to provide the relevant inputs. The Consolidated Entities evaluate the results based on visible market activity and market research. When appropriate, the Consolidated Entities may apply other techniques based on a specific asset's characteristics. Asset-backed securities with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Asset-backed securities that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

**Limited Partnership and LLC Interests**

The Partnership and its Consolidated Entities hold limited partnership and LLC interests in various entities. These assets are valued as the net asset value of the limited partnership interests because the entities utilize fair value accounting for their own financial statements. These interests are classified as Level 3 assets.

The Partnership categorizes investments recorded at fair value in accordance with the hierarchy established under U.S. GAAP. The following table provides a summary of the financial instruments recorded at fair value on a recurring basis by level within the hierarchy as of December 31, 2018:

*(in thousands)*

| Assets | Level 1 | Level 2 | Level 3 | Total Fair Value at 12/31/18 |
|---|---|---|---|---|
| Common equity securities | $ 139,236 | $ 296,695 | $ 99,443 | $ 535,374 |
| Closed-end mutual funds | 94,845 | - | - | 94,845 |
| Floating rate syndicated bank loans | - | 21 | 72,601 | 72,622 |
| Real Estate Investment Trusts | 46,594 | 10,881 | - | 57,475 |
| Life settlement contracts | - | - | 35,744 | 35,744 |
| Limited partnership interests | - | - | 30,521 | 30,521 |
| Rights & warrants | 20 | 123 | 7,303 | 7,446 |
| LLC interests | - | - | 2,775 | 2,775 |
| Preferred equity | 8,282 | - | - | 8,282 |
| Asset-backed securities | - | - | 102 | 102 |
| **Total** | $ 288,977 | $ 307,720 | $ 248,489 | $ 845,186 |

| Liabilities | | | | |
|---|---|---|---|---|
| Common stock & Options sold short | $ 32,357 | $ - | - | $ 32,357 |

019375

HCMLPHMIT00002568

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The classification of a financial instrument within Level 3 is based on the significance of the unobservable inputs to the overall fair value measurement. The following table provides a roll forward of the investments classified within Level 3 for the year ended December 31, 2018:

(in thousands)

| | Fair Value at December 31, 2017 | Purchases | Sales and Maturities | Restructures | Transfers Into Level 3 | Net Realized Gains / (Losses) | Net Unrealized Gains / (Losses) | Fair Value at December 31, 2018 |
|---|---|---|---|---|---|---|---|---|
| Common equity securities | $ 141,201 | $ 1,058 | $ (116) | $ - | $ - | $ - | $ (42,700) | $ 99,443 |
| Floating rate syndicated bank loans | 64,307 | 12,146 | (1,952) | - | - | (2,799) | 899 | 72,601 |
| Life settlement contracts | 28,959 | 7,353 | - | - | - | - | (568) | 35,744 |
| Limited partnership interests | 27,863 | 4,600 | (4,766) | - | 928 | 351 | 1,545 | 30,521 |
| Rights & warrants | 8,013 | - | - | - | - | - | (710) | 7,303 |
| LLC interests | 3,352 | 165 | (1,312) | - | - | 985 | (415) | 2,775 |
| Asset-backed securities | 6,477 | 1 | (3,051) | (2,171) | (928) | (39,580) | 39,354 | 102 |
| | $ 280,172 | $ 25,323 | $ (11,197) | $ (2,171) | $ - | $ (41,043) | $ (2,595) | $ 248,489 |

All net realized and unrealized gains and losses in the tables above are reflected in the accompanying Consolidated Income Statement. Approximately $41.8 million of the net unrealized losses presented in the table above relate to investments held as of December 31, 2018.

The following page includes a summary of significant unobservable inputs used in the fair valuations of assets and liabilities categorized within Level 3 of the fair value hierarchy.

019376

HCMLPHMIT00002569

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

| Category | Ending Balance at 12/31/2018 | Valuation Technique | Unobservable Inputs | Input Value(s) |
|---|---|---|---|---|
| Common equity securities | $ 99,443 | Multiples Analysis | Multiple of EBITDA | 2.5x - 7.0x |
| | | | Cap Rate | 8.0 - 10.0% |
| | | | Multiple of Revenue | 0.20x - 0.30x |
| | | | Liquidity Discount | 25% |
| | | Discounted Cash Flow | Discount Rate | 10.5 - 40.0% |
| | | | Terminal Multiple | 1.25 - 6.50x |
| | | | Long-Term Grow th Rate | 2% |
| | | Transaction Analysis | Multiple of EBITDA | 4.0x - 7.75x |
| | | | Cap Rate | 8 - 10% |
| | | Bid Indications | Enterprise Value ($mm) | $720.0 - $765.0 |
| | | Impairment Analysis | Recoverable Value | 0% |
| | | Appraisal | N/A | N/A |
| Floating rate syndicated bank loans | 72,601 | Multiples Analysis | Multiple of EBITDA | 2.0x - 5.0x |
| | | | Multiple of Revenue | 0.35x - 0.50x |
| | | Escrow Recovery Analysis | Risk Discount | 40% |
| | | Appraisal | N/A | N/A |
| | | Bid Indications | Transaction Price | 10% |
| | | Sales Proceeds Analysis | Discount Rate | 6.0% |
| | | Discounted Cash Flow | Discount Rate | 12.3% - 40.0% |
| | | | Terminal Multiple | 1.25x |
| | | | Spread Adjustment | 0.0% - 6.3% |
| Life settlement contracts | 35,744 | Discounted Cash Flow | Discount Rate | 15.0 - 16.0% |
| Limited partnership interests | 30,521 | Net Asset Value | Various models including liquidation analysis, and third-party pricing vendor | N/A |
| Rights & w arrants | 7,303 | Discounted Cash Flow | Discount Rate | 11.0% - 17.0% |
| | | | Terminal Multiple | 6.5x |
| | | Multiples Analysis | Multiple of EBITDA | 6.0x - 7.0x |
| | | Transaction Analysis | Multiple of EBITDA | 7.25x - 7.75x |
| | | Bid Indication of Value | Enterprise Value (in millions) | $720.0 - $765.0 |
| LLC interests | 2,775 | Discounted Cash Flow | Discount Rate | 6% |
| | | Adjusted Appraisal | Minority Discount | 25% |
| | | Bid Indication | Total Purchase Price (in millions) | $130.00 |
| Asset-backed securities | 102 | Adjusted NAV | N/A | N/A |
| **Total** | **$ 248,489** | | | |

In addition to the unobservable inputs utilized for various valuation methodologies, the Partnership often uses a combination of two or more valuation methodologies to determine fair value for a single holding. In such instances, the Partnership assesses the methodologies and ascribes weightings to each methodology. The selection of weightings is an inherently subjective process, dependent on professional judgement. These selections may have a material impact to the concluded fair value for such holdings.

The significant unobservable inputs used in the fair value measurement of the Partnership's assets could fluctuate significantly, resulting in a significantly higher or lower fair value measurement.

019377

HCMLPHMIT00002570

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

6.    **Financial Instruments with Concentration of Credit and Other Risks**

**Financial Instruments**
The Partnership and its Consolidated Entities' investments include, among other things, equity securities, debt securities (both investment and non-investment grade) and bank loans.   The Consolidated Entities may also invest in derivative instruments, including total return and credit default swaps.   Investments in these derivative instruments throughout the year subject the Consolidated Entities to off-balance sheet market risk, where changes in the market or fair value of the financial instruments underlying the derivative instruments may be in excess of the amounts recognized in the Consolidated Balance Sheet.

**Market Risk**
Market risk represents the potential loss that may be incurred by the Partnership and its Consolidated Entities due to a change in the market value of its investments or the value of the investments underlying swap agreements.   The Partnership and its Consolidated Entities' exposure to market risk is affected by a number of macroeconomic factors, such as interest rates, availability of credit, inflation rates, economic uncertainty and changes in laws and regulations.   These factors may affect the level and volatility of securities prices and the liquidity of the Partnership and its Consolidated Entities investments. Volatility or illiquidity could impair the Partnership and its Consolidated Entities performance or result in losses.   The Partnership and its Consolidated Entities may maintain substantial trading positions that can be adversely affected by the level of volatility in the financial markets.   The performance of life settlement contracts may be adversely impacted by the under estimation of mortality and other rates.

**Credit Risk**
Credit risk is the potential loss the Partnership and its Consolidated Entities may incur as a result of the failure of a counterparty or an issuer to make payments according to the terms of a contract. Because the Consolidated Entities enter into over-the-counter derivatives such as swaps, it is exposed to the credit risk of their counterparties.   To limit the credit risk associated with such transactions, the Consolidated Entities execute transactions with financial institutions that the Investment Manager believes to be financially viable.

**Liquidity Risk**
The Consolidated Entities' limited partner interests have not been registered under the Securities Act of 1933 or any other applicable securities law.   There is no public market for the interests, and neither the Consolidated Entities nor their manager expects such a market to develop.

**Business Risk**
The Partnership provides advisory services to the Consolidated Entities.   Consolidated Entities could be materially affected by the liquidity, credit and other events of the Partnership.

019378

HCMLPHMIT00002571

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**High Yield Bonds and Loans**

The Partnership and its Consolidated Entities' investment portfolios consist of floating rate syndicated bank loans and fixed income securities that are not listed on a national securities exchange.  These investments trade in a limited market and it may not be possible to immediately liquidate them if needed.  In addition, certain of the Partnership and its Consolidated Entities' investments have resale or transfer restrictions that further reduce their liquidity.  Because of the inherent uncertainty of these investments, the Investment Manager's best estimates may differ significantly from values that would have been used had a broader market for the investments existed.

When the Partnership and its Consolidated Entities purchase a senior secured syndicated bank loan, it enters into a contractual relationship directly with the corporate borrower, and as such, is exposed to certain degrees of risk, including interest rate risk, market risk and the potential non-payment of principal and interest, including default or bankruptcy of the corporate borrower or early payment by the corporate borrower.  Typically, senior secured syndicated bank loans are secured by the assets of the corporate borrower and the Partnership and its Consolidated Entities  have a policy of regularly reviewing the adequacy of each corporate borrower's collateral.

The Partnership and its Consolidated Entities may invest in high-yield bonds that have been assigned lower rating categories or are not rated by the various credit rating agencies.  Bonds in the lower rating categories are generally considered to be speculative with respect to the issuer's ability to repay principal and pay interest.  They are also subject to greater risks than bonds with higher ratings in the case of deterioration of general economic conditions.  Due to these risks, the yields and prices of lower-rated bonds are generally volatile, and the market for them is limited, which may affect the ability to liquidate them if needed.

**Debt Obligations**

The Partnership and its Consolidated Entities' investment portfolio consists of collateralized loan obligations that are not listed on a national securities exchange. These investments trade in a limited market and it may not be possible to immediately liquidate them if needed. Because of the inherent uncertainty of these investments, the Partnership's best estimates may differ significantly from values that would have been used had broader market for the investments existed.

**Distressed Investments**

A portion of the high yield corporate bonds and senior secured syndicated bank loans in which the Partnership and its Consolidated Entities invest have been issued by distressed companies in an unstable financial condition that have experienced poor operating performance and may be involved in bankruptcy or other reorganization and liquidation proceedings.  These investments have substantial inherent risks.  Many of these distressed companies are likely to have significantly leveraged capital structures, which make them highly sensitive to declines in revenue and to increases in expenses and interest rates.  The leveraged capital structure also exposes the companies to adverse economic factors, including macroeconomic conditions, which may affect their ability to repay borrowed amounts on schedule.

019379

HCMLPHMIT00002572

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Corporate Bonds, Preferred Securities, and Loans**

The Consolidated Entities may invest in corporate bonds, floating rate syndicated bank loans, and preferred securities which are rated in the lower rating categories by the various credit rating agencies (or in comparable non-rated securities). Securities in the lower rating categories are subject to greater risk of loss of principal and interest than higher-rated securities and are generally considered to be predominantly speculative with respect to the issuer's capacity to pay interest and repay principal. They are also subject to greater risks than securities with higher ratings in the case of deterioration of general economic conditions. Because of these greater risks associated with the lower-rated securities, the yields and prices of such securities may be more volatile than those for higher-rated securities. The market for lower-rated securities is thinner and less active than that for higher-rated securities, which could adversely affect the prices at which these securities may be sold by the Consolidated Entities.

**Limited Diversification**

The Investment Manager attempts to diversify the Consolidated Entities' investments. However, the Consolidated Entities' portfolios could become significantly concentrated in any one issuer, industry, sector strategy, country or geographic region, and such concentration of credit risk may increase the losses suffered by the Consolidated Entities. In addition, it is possible that the Investment Manager may select investments that are concentrated in certain classes of financial instruments. This limited diversity could expose the Consolidated Entities to losses that are disproportionate to market movements as a whole.

At December 31, 2018, the Consolidated Entities' investments were predominantly concentrated in the United States and Cayman Islands.

**Exit Difficulties**

The Partnership and its Consolidated Entities cannot assure investors that it will be able to exit its investments by sale or other disposition at attractive prices, if at all. The mergers and acquisitions and public securities markets are highly cyclical, which means that the Consolidated Entities' investments, even its best performing investments, may be illiquid for extended periods of time despite the Consolidated Entities' efforts to identify attractive exit opportunities. Additionally, a significant portion of the Consolidated Entities' assets at any time will likely consist of debt obligations and other securities that are thinly-traded, for which no market exists and/or are restricted as to their transferability under applicable law and/or documents governing particular transactions of the Consolidated Entities. In some cases, the Consolidated Entities may be unable to realize an investment prior to the date on which the Consolidated Entities are scheduled to terminate and/or have to sell or otherwise dispose of one or more investments on disadvantageous terms as a result of the Consolidated Entities' termination, or distribute such investments in kind.

**Custody Risk**

The clearing operations for the Partnership and its Consolidated Entities are provided by major financial institutions. In addition, all of the Partnership and its Consolidated Entities' cash and investments are held with banks or brokerage firms, which have worldwide custody facilities and are members of all major securities exchanges. The Partnership or its Consolidated Entities may lose all or a portion of the assets held by these banks or brokerage firms if they become insolvent or fail to perform pursuant to the terms of their obligations. While both the U.S. Bankruptcy Code and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a broker-dealer's failure, insolvency or liquidation, the Partnership and its Consolidated Entities might be unable to recover the full value of their assets or incur losses due to their assets being unavailable for a period of time.

019380

HCMLPHMIT00002573

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Leverage Risk**
The Consolidated Entities may borrow funds from brokers, banks and other lenders to finance its trading operations.  The use of leverage can, in certain circumstances, magnify the losses to which the Consolidated Entities' investment portfolio may be subject.  The use of margin and short-term borrowings creates several risks for the Consolidated Entities.  If the value of the Consolidated Entities' securities fall below the margin level required by a counterparty, additional margin deposits would be required.  If the Consolidated Entities are unable to satisfy a margin call, the counterparty could liquidate the Consolidated Entities' positions in some or all of the financial instruments that are in the account at the prime broker and cause the Consolidated Entities to incur significant losses.  In addition, to the extent the Consolidated Entities have posted excess collateral for margin transactions, there is a risk that the counterparty will fail to fulfill its obligation to return the full value of that collateral.

The failure to satisfy a margin call, or the occurrence of other material defaults under margin or other financing agreements, may trigger cross-defaults under the Consolidated Entities' agreements with other brokers, lenders, clearing firms or other counterparties, multiplying the adverse impact to the Consolidated Entities.  In addition, because the use of leverage allows the Consolidated Entities to control positions worth significantly more than its investment in those positions, the amount that the Consolidated Entities may lose in the event of adverse price movements is high in relation to the amount of their investment.

In the event of a sudden drop in the value of the Consolidated Entities' assets, the Consolidated Entities may not be able to liquidate assets quickly enough to satisfy their margin or collateral requirements.  As a result, the Consolidated Entities may become subject to claims of financial intermediaries, and such claims could exceed the value of its assets.  The banks and dealers that provide financing to the Consolidated Entities have the ability to apply discretionary margin, haircut, and financing and collateral valuation policies.  Changes by banks and dealers in any of the foregoing may result in large margin calls, loss of financing and forced liquidations of positions and disadvantageous prices.

**Foreign Currency Risk**
The Partnership and its Consolidated Entities may invest in securities or maintain cash denominated in currencies other than the U.S. dollar.  The Partnership and its Consolidated Entities are exposed to risk that the exchange rate of the U.S. dollar relative to other currencies may change in a manner that has an adverse effect on the reported value of the Partnership and its Consolidated Entities' assets and liabilities denominated in currencies other than the U.S. dollar.

**Concentration of Investments**
At December 31, 2018, the Consolidated Entities' investments and derivative contracts were predominantly concentrated in the United States and Cayman Islands and across several industries.

**Litigation Risk**
The Partnership and its Consolidated Entities are periodically subject to legal actions arising from the ordinary course of business.  The ultimate outcome of these cases is inherently uncertain and could result in additional losses to the Partnership and/or its Consolidated Entities.  Refer to Note 14 for a discussion of open litigation.

019381
HCMLPHMIT00002574

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

---

7.   **Intangible Assets**

On May 12, 2017, HCM Latin America, as manager, purchased all rights and obligations for management of a certain hedge fund. As of December 31, 2018, the current carrying value of these rights and obligations is $3.0 million, which consists of the original purchase price of $2.0 million and a deferred purchase price of $1.0 million and is reflected in the Consolidated Balance Sheet.

The Partnership and its Consolidated Entities perform an impairment test as required by U.S. GAAP on a yearly basis.  The Partnership has determined that an impairment charge was necessary for the value obtained on December 19, 2017, for subadvisory and shared servicing rights from an affiliate. As of December 31, 2018, the asset was determined to be fully impaired and an impairment expense of $2.8 million is reflected in the Consolidated Statement of Income.

8.   **Related Party Transactions**

**Investments Under Common Control**
Certain members of the Partnership's management serve as members on the Boards of Directors for some of the companies with which it invests.  Because these individuals participate in the management of these companies, investments held by the Partnership and its subsidiaries in these companies may, from time to time, not be freely tradable.  As of December 31, 2018, the Partnership and its Consolidated Entities held the following investments in these companies:

*(in thousands)*

| Issuer | Type of Investment | Fair Value |
|---|---|---|
| Metro-Goldwyn-Mayer, Inc. | Common Stock | 296,695 |
| Cornerstone Healthcare Group Holding, Inc. | Common Equity | 59,539 |
| OmniMax International, Inc. | Term Loan | 52,464 |
| JHT Holdings Inc. | Common Stock | 25,099 |
| OmniMax International, Inc. | Common Equity | 7,804 |
| Carey International, Inc. | Term Loan | 5,401 |
| CCS Medical, Inc. | Loan | 5,960 |
| Trussway Holdings, LLC | Common Equity | 4,582 |
| JHT Holdings Inc. | Term Loan | 4,160 |
| OmniMax International, Inc. | Warrants | 551 |

019382

HCMLPHMIT00002575

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Certain investments are issued and managed by affiliates of the Partnership. These investments are subject to the same valuation policies and procedures as similar investments within the same level of the fair value hierarchy. As of December 31, 2018, the Partnership and the Consolidated Entities held the following investments that were issued and managed by affiliates of the Partnership:

*(in thousands)*

| Issuer | Type of Investment | Fair Value |
|---|---|---:|
| Harko, LLC | LLC Units | $ 2,721 |
| Highland CLO Funding | Partnership Interest | 610 |
| Highland Energy MLP Fund | Mutual Fund Shares | 1,363 |
| Highland Floating Rate Opportunities Fund | Closed-end mutual fund shares | 832 |
| Highland Global Allocation Fund | Mutual Fund Shares | 2,173 |
| Highland Long/Short Equity Fund | Mutual Fund Shares | 267 |
| Highland Long/Short Healthcare Fund | Mutual Fund Shares | 2,963 |
| Highland Master Loan Fund | Limited Partnership interest | 106 |
| Highland Merger Arbitrage Fund | Mutual Fund Shares | 1,321 |
| Highland Opportunistic Credit Fund | Mutual Fund Shares | 5,477 |
| Highland Premier Growth Equity Fund | Mutual Fund Shares | 64 |
| Highland Small Cap Equity Fund | Mutual Fund Shares | 465 |
| NexPoint Strategic Opportunities Fund | Mutual Fund Shares | 36,563 |
| NexPoint Multi Family Capital Trust | REIT | 10,881 |
| NexPoint Real Estate Strategies Fund | Closed-end mutual fund shares | 1,454 |
| NexPoint Residential Trust | REIT | 85,223 |

### Expenses Reimbursable by Funds Managed

In the normal course of business, the Partnership typically pays invoices it receives from vendors for various services provided to the investment funds the Partnership manages. A summary of these eligible reimbursable expenses are then submitted to the trustee/administrator for each respective fund, typically on a quarterly basis, and the Partnership receives payment as reimbursement for paying the invoices on behalf of the respective funds. As of December 31, 2018, approximately $6.4 million in reimbursable expenses were due from various affiliated funds and entities for these eligible expenses, and is included in *Other Assets* in the accompanying Consolidated Balance Sheet.

### Accounts Held with Related Party

During the year the Partnership and its Consolidated Entities maintained bank accounts at NexBank, SSB ("NexBank"), a related party by way of common control. As of December 31, 2018, balances in these accounts were approximately $0.5 million, a portion of which exceeds Federal deposit insurance limits.

### Investment in Affiliated Loans

During the year, certain subsidiaries of the Partnership were invested in several bank loans in which NexBank was the agent bank. Interest earned on the loans during the year was approximately $10.4 million and is included in interest and investment income in the Consolidated Statement of Income. At December 31, 2018, these subsidiaries were invested in NexBank agented loans with commitments and market values totaling approximately $83.3 million and $56.5 million, respectively.

019383

HCMLPHMIT00002576

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Notes and Other Amounts Due from Affiliates**

During the year ended December 31, 2018, Highland Capital Management Fund Advisors, L.P. ("HCMFA") did not issue any new promissory notes to the Partnership. The outstanding promissory notes accrue interest at a rate ranging from of 1.97 - 2.62%, the mid-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $5.3 million and is payable on demand. The Partnership will not demand payment on amounts owed that exceed HCMFA's excess cash availability prior to May 31, 2021. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, NexPoint Advisors, L.P. ("NPA") did not issue any new promissory notes to the Partnership. The outstanding promissory note accrues interest at a rate of 6.0%. As of December 31, 2018 total interest and principal due on the outstanding promissory note was approximately $28.6 million and is payable in annual installments throughout the term of the loan. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, HCRE Partners, LLC ("HCRE") issued a promissory note to the Partnership in the amount of $0.8 million. The note accrues interest at a rate of 8.0%. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $9.4 million and is generally payable in annual installments throughout the term of the note. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, Highland Capital Management Services, Inc. ("HCMSI") issued promissory notes to the Partnership in the aggregate amount of $0.4 million. All outstanding promissory notes accrue interest at a rate ranging from 2.75% – 3.05%, the long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $14.0 million and is generally payable in annual installments throughout the term of the notes. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, James Dondero ("Dondero") issued promissory notes to the Partnership in the aggregate amount of $14.9 million. The outstanding promissory notes accrue interest at a rate ranging from 2.03% – 2.95%, the average long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $29.2 million and is generally payable in annual installments throughout the term of the note. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, Mark Okada ("Okada") did not issue any new promissory notes to the Partnership. All outstanding promissory notes accrue interest at a rate of 2.25%, the average long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $1.3 million and is payable on demand. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

019384
HCMLPHMIT00002577

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

During the year ended December 31, 2018, The Dugaboy Investment Trust ("Dugaboy") did not issue any new promissory notes to the Partnership. All outstanding promissory notes accrue interest at a rate of 3.26%, the average long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $20.1 million and is payable in annual installments throughout the term of the note. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

On December 21, 2015, the Partnership entered into a contribution agreement (the "Contribution Agreement") with an affiliated trust.  Pursuant to the Contribution Agreement, a note (the "Note Receivable") in the amount of $63.0 million was due to the Partnership.  The Note Receivable will mature on December 21, 2030.  The Note Receivable accrues interest at a rate of 2.61% per annum. Accrued interest is paid-in-kind, with principal receipts occurring pursuant to a note amortization schedule, with such annual receipts commencing December 21, 2019. During the year, the trust pre-paid $2.1 million. As of December 31, 2018 total interest and principal due on the Note Receivable was approximately $60.2 million.

**Services Performed by or on Behalf of an Affiliate**
In March 2007, Highland Capital of New York, Inc. a New York corporation ("Highland New York"), was formed and has performed marketing services for the Partnership and its affiliates in connection with the Partnership's investment management and advising business, including, but not limited to, assisting Highland Capital in the marketing and sales of interests in investment pools for which Highland Capital serves as the investment manager.  The Partnership is charged a marketing services fee for the services that Highland New York performs on the Partnership's behalf. Separately, the Partnership pays for, and seeks reimbursement for, various operating expenses on behalf of Highland New York. For the year ended December 31, 2018, total marketing fee expense charged to the Partnership by Highland New York was approximately $0.9 million. Because the Partnership funded Highland New York's operations, including amounts above the marketing fee, as of December 31, 2018, net amounts owed to the Partnership by Highland New York was approximately $4.9 million.

Effective December 15, 2011, the Partnership commenced performing services on behalf of HCMFA, a Delaware limited partnership and registered investment advisor. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to HCMFA was approximately $2.7 million and as of December 31, 2018, amount owed to the Partnership by HCMFA was approximately $0.2 million.

Effective July 29, 2010, the Partnership commenced performing services on behalf of Falcon E&P Opportunities GP, LLC. ("Falcon"), a Delaware limited liability company and registered investment advisor. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to Falcon was approximately $0.2 million and as of December 31, 2018, no amounts were owed to the Partnership by Falcon for services rendered.

019385

HCMLPHMIT00002578

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Effective March 17, 2017, pursuant to the Third Amended and Restated Sub-Advisory Agreement and the Fourth Amended and Restated Shared Services Agreement, the Partnership continued performing services on behalf of Acis Capital Management, L.P. ("Acis"), a Delaware limited partnership and registered investment advisor. Subadvisory services include investment advisory services and shared services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fees charged by the Partnership to Acis for shared services and subadvisory fees were approximately $2.6 million and $3.4 million, respectively. As of December 31, 2018, amount owed to the Partnership by Acis was approximately $6.0 million. Although such fees were earned in 2018, all related revenues and receivables recorded by the Partnership have been fully reserved against based on estimated collectability.

Effective January 1, 2018, pursuant to the Third Amended and Restated Shared Services Agreement, the Partnership commenced performing services on behalf of NPA. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to NexPoint was approximately $2.0 million and as of December 31, 2018, no amounts were owed to the Partnership by NexPoint for services rendered.

Effective September 1, 2017, pursuant to the Third Amended and Restated Shared Services Agreement dated September 26, 2017, the Partnership commenced performing services on behalf of NexBank Capital, Inc. ("NexBank Capital"), financial services company. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to NexBank Capital was approximately $0.2 million and as of December 31, 2018, $0.1 million was owed to the Partnership by NexBank Capital for services rendered.

Effective September 1, 2017, pursuant to the Third Amended and Restated Investment Advisory Agreement dated September 26, 2017, the Partnership commenced performing services on behalf of NexBank SSB, ("NexBank"), a Texas savings bank. Services include investment advisory services. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to NexBank was approximately $3.6 million and as of December 31, 2018, amounts owed by NexBank to the Partnership for services rendered were approximately $0.9 million.

Effective April 1, 2015, the Partnership commenced performing services on behalf of NexPoint Real Estate Advisors, L.P. ("NREA"). Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. NREA is charged a fee for the services provided. For the year ended December 31, 2018, the total fee charged to NREA by the Partnership was approximately $1.0 million and as of December 31, 2018, no amounts were owed by NREA to the Partnership for services rendered.

Effective January 1, 2018, the Partnership entered in to a Payroll Reimbursement Agreement (the "Agreement") with HCMFA. Under the Agreement, HCMFA reimburses the Partnership for the cost of any dual employees of the Partnership and HCMFA and who provide advice to registered investment companies advised by HCMFA. For the year ended December 31, 2018, the total fees charged by the Partnership to HCMFA was approximately $6.2 million and as of December 31, 2018, no amounts were owed by HCMFA to the Partnership for services rendered.

019386

HCMLPHMIT00002579

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Effective January 1, 2018, the Partnership entered in to a Payroll Reimbursement Agreement (the "Agreement") with NPA. Under the Agreement, NPA reimburses the Partnership for the cost of any dual employees of the Partnership and NPA and who provide advice to registered investment companies advised by NPA. For the year ended December 31, 2018, the total fees charged by the Partnership to NPA was approximately $4.3 million and as of December 31, 2018, no amounts were owed by NPA to the Partnership for services rendered.

**Investment liability**

On December 28, 2016, the Partnership entered into a purchase and sale agreement with The Get Good Nonexempt Trust ("Get Good"). In consideration for a note receivable from an affiliate, the Partnership sold or participated certain investments that it already held, with the participated investments carrying an aggregate market value of $21.3 million as of the date of the transaction. The fair value of the Agreement will fluctuate with the fair value of the securities, throughout the term of the Agreement. As of December 31, 2018, the fair value of the participated investments was $12.1 million.

On December 5, 2016, Select entered in to Stock Purchase Agreements with two counterparties for shares of Trussway Industries ("Trussway"), in exchange for promissory notes in the aggregate amount of $15.4 million. The promissory notes accrue interest at a rate of 2.07%, the long-term Applicable Federal Rate, compounded annually. Select must pay one-twenty-fifth of the initial note amounts, plus any additional principal attributable to the sale of Trussway, along with accumulated interest on an annual basis. The promissory notes will mature on December 5, 2041. As of December 31, 2018 the remaining principal payable on the promissory notes was $14.8 million. The fair value of Select's outstanding notes payable approximates the carrying value of the notes payable.

During 2014 and 2015, Select received multiple master securities loan agreements (the "Securities Agreements") for securities borrowed from an affiliate. The Securities Agreements accrue interest at a rate ranging from 0.38 - 0.48%, the short term Applicable Federal Rate. The fair value of the securities loans will fluctuate with the fair value of the borrowed securities, throughout the term of the Securities Agreements. As of December 31, 2018, the fair value of the loans was $19.2 million. The fair value of Select's securities loans approximates the carrying value of the securities loans.

9.    **Notes Payable**

**Promissory Notes and Loan Agreements**

On August 17, 2015, the Partnership entered in to a promissory note with Frontier State Bank ("Frontier") in the amount of $9.5 million. Pursuant to the First Amended and Restated Loan Agreement, dated March 29, 2018, Frontier made an additional loan to the Partnership in the amount of $1.0 million. The promissory note accrues interest at the 3 month LIBOR rate plus 4.75%, adjusted each date of change, per annum. Accrued interest shall be paid quarterly. The promissory note is collateralized by shares of voting common stock of MGM Holdings, Inc and will mature on August 17, 2021. As of December 31, 2018 the remaining principal payable on the promissory note was $7.2 million. The fair value of the Partnership's outstanding notes payable approximates the carrying value of the notes payable.

On August 25, 2015, Highland Select Equity Fund, L.P. ("Select") entered in to a promissory note with Dugaboy in the amount of $1.0 million. The promissory note accrues interest at a rate of 2.82%, the long-term Applicable Federal Rate, compounded annually. The accrued interest and principal of the promissory note is due and payable on demand. As of December 31, 2018 the remaining principal payable on the promissory note was $1.0 million.  The fair value of Select's outstanding notes payable approximates the carrying value of the notes payable.

019387

HCMLPHMIT00002580

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

On October 7, 2016, the Partnership entered in to a promissory note with Acis in the amount of $12.7 million. The Partnership is required to make certain payments of the initial note amount, plus accumulated interest on May 31 of each year, until maturity. The promissory note is set to mature on May 31, 2020.  The promissory note accrues interest at a rate of 3.00% per annum. Pursuant to an Assignment and Transfer Agreement dated November 3, 2017, between Acis and an affiliate of the Partnership, Acis transferred the promissory note to the affiliate. As of December 31, 2018 the remaining principal payable on the promissory note was $9.5 million.

On August 29, 2016, Maple Avenue Holdings, LLC ("Maple") entered in to a promissory note with Great Southern Bank in the amount of $3.9 million. Maple must pay principal and accrued interest installments on a monthly basis until maturity. The promissory note will mature on August 29, 2019. The promissory note accrues interest at a rate of 3.26% per annum. As of December 31, 2018 the remaining principal payable on the promissory note was $3.4 million. The fair value of Maple's outstanding notes payable approximates the carrying value of the notes payable.

On May 1, 2018, Multi Strategy Master executed a loan agreement (the "Loan Agreement") with NexBank SSB, an affiliate of the Partnership.  The original principal borrowed under the Loan Agreement was $36.5 million.  The loan bears interest at the 1-month LIBOR rate plus 3.25%.  The maturity date is May 1, 2021.  For the year ended December 31, 2018, the Multi Strategy Master incurred and paid approximately $1.3 million of interest expense, and made aggregate principal payments of approximately $1.9 million. Shares of Metro-Goldwyn Mayer, Inc. are pledged as collateral on the loan.  The loan was used to purchase an outstanding redemption of $38.7 million at a discount resulting in a reallocation of partners' capital on the Statement of Changes in Partners' Capital. As of December 31, 2018 the remaining principal payable on the loan was $34.6 million. The fair value of Multi Strategy Master's outstanding loan approximates the carrying value of the loan.

## 10.   Due to Broker

As of December 31, 2018 the due to broker balance of approximately $116.6 million is payable to financing counterparties for margin transactions.

## 11.   Commitments and Contingencies

### Contracts in the Normal Course of Business
In the normal course of business the Partnership and its subsidiaries may enter into contracts which provide general indemnifications and contain a variety of presentations and warranties that may expose the Partnership and its subsidiaries to some risk of loss.   The Partnership regularly co-invests in vehicles it advises. The amounts committed are within the Partnerships capacity to fund when capital is called. In addition to the other financial commitments discussed in the consolidated financial statements, the amount of future losses arising from such undertakings, while not quantifiable, is not expected to be significant. Also refer to Note 8 for commitments of certain subsidiaries in affiliated loans.

### Loans as Co-Borrower
The Partnership is a named co-borrower in a Bridge Loan Agreement ("Loan") dated September 26, 2018 with Key Bank for $556.3 million. The Loan accrues interest at the 3 month LIBOR rate plus 3.75%, per annum. Accrued interest shall be paid monthly by a borrower other than the Partnership ("Lead Borrower"). The Loan will mature on September 26, 2019. The carrying value of the Loan is reflected on the financial statements of the Lead Borrower.

019388

HCMLPHMIT00002581

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

---

**Legal Proceedings**

The Partnership is a party to various legal proceedings arising in the ordinary course of business. While any proceeding or litigation has an element of uncertainty, management believes that the final outcome will not have a materially adverse effect on the Partnership's Consolidated Balance Sheet, Consolidated statement of Income, or its liquidity.  See Note 14.

**Operating Leases**

The Partnership has an operating lease and associated commitments related to its main office space. Future minimum lease payments under operating lease commitments with initial or non-cancelable terms in excess of one year, at inception, are as follows:

*(in thousands)*

| Years Ending December 31, | |
|---|---|
| 2019 | 1,550 |
| 2020 | 1,566 |
| 2021 | 1,567 |
| 2022 | 522 |
| Total | $ 5,205 |

Total rental expense of the Partnership and its Consolidated Entities for operating leases was approximately $1.5 million for the year ended December 31, 2018.

**12.   Post Retirement Benefits**

In December 2006, the Partnership created a defined benefit plan to which all employees and certain affiliated persons could participate if they met the eligibility requirements.  The Partnership uses a December 31 measurement date for its defined benefit plan.

Effective December 31, 2008, the Partnership amended the plan by freezing it to new participants and additional benefit accruals.  A new amendment became effective on January 1, 2011 in which a named participant was admitted to the plan and is eligible to earn benefit accrual. 2018 expense reflects a service cost charge for the value of the new participant's benefit earned during 2018.

The Partnership's benefit plan obligation and plan assets for the year ended December 31, 2018 are reconciled in the tables below.

019389

HCMLPHMIT00002582

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

*(in thousands)*

| **Change in projected benefit obligation** | | **2018** |
|---|---|---|
| Benefit obligation at beginning of year | $ | 2,578 |
| Service cost | | 6 |
| Interest cost | | 80 |
| Plan participants' contributions | | - |
| Amendments | | - |
| Actuarial loss/(gain) | | 386 |
| Acquisition/(divestiture) | | - |
| Benefits paid | | (121) |
| Benefit obligation at end of year | $ | 2,929 |

| **Change in plan assets** | | **2018** |
|---|---|---|
| Fair value of plan assets at beginning of year | $ | 2,924 |
| Actual return on plan assets | | 449 |
| Acquisition/(divestiture) | | - |
| Employer contribution | | - |
| Plan participants' contributions | | - |
| Benefits paid | | (121) |
| Other increase/(decrease) | | - |
| Fair value of plan assets at year end | $ | 3,252 |

| **Reconciliation of Funded Status** | | **2018** |
|---|---|---|
| Accumulated benefit obligation at end of year | $ | 2,929 |
| Projected benefit obligation at end of year | | 2,929 |
| Fair value of assets at end of year | | 3,252 |
| Funded status at end of year | $ | 323 |

The Partnership did not contribute to the plan during 2018.

**Assumptions**

Weighted-average assumptions used to determine benefit obligations at December 31, 2018:

| | |
|---|---|
| Discount rate | 3.19% |
| Rate of compensation increase | N/A |

019390

HCMLPHMIT00002583

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Weighted-average assumptions used to determine net periodic benefit cost at December 31, 2018:

| | |
|---|---|
| Discount rate | 3.19% |
| Expected long-term return on plan assets | 3.19% |
| Rate of compensation increase | N/A |

As of December 31, 2018, there were no plan assets categorized as Level 3.

## 13.   Income Taxes

### The Partnership
For U.S. income tax purposes, the Partnership is treated as a pass-through-entity, which means it is not subject to income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on their share of the Partnership's net taxable income.

The Partnership files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Partnership is subject to examination by federal and foreign jurisdictions, where applicable.  As of December 31, 2018, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2015 forward (with limited exceptions).

Authoritative guidance on accounting for and disclosure of uncertainty in tax positions requires the General Partner to determine whether a tax position of the Partnership is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position.  For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that as a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority.  The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2018.

### Multi Strategy Master
For U.S. income tax purposes, Multi Strategy Master is treated as a pass-through entity, which means it is not subject to federal income taxes under current Internal Revenue Service guidelines. However, each investor may be individually liable for income taxes, if any, on its share of the partnership's net taxable income.

Multi Strategy Master trades in senior secured syndicated bank loans for its own account and, as such, non-U.S. Investment Vehicle investors are generally not subject to U.S. tax on such earnings (other than certain withholding taxes indicated below). The Partnership intends to conduct Multi Strategy Master business in such a manner that it does not constitute a U.S. trade or business, nor does it create a taxable presence in any of the jurisdictions in which the Partnership has offices.

Dividends as well as certain interest and other income received by Multi Strategy Master from sources within the United States may be subject to, and reflected net of, United States withholding tax at a rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by Multi Strategy Master from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced. As of December 31, 2018, a minimal withholding tax liability of $0.9 million is classified within accrued and other liabilities on the Consolidated Balance Sheet.

019391

HCMLPHMIT00002584

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Multi Strategy Master applies authoritative guidance which requires management to determine whether a tax position Multi Strategy Master is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the consolidated financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. Management does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2018.

Multi Strategy Master files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, Multi Strategy Master is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2018, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2015 forward (with limited exceptions).

### Restoration Onshore
Restoration Onshore is treated as a pass-through entity for tax purposes, which means it is not subject to U.S. income taxes under current Internal Revenue Service or state and local guidelines. Each Partner is individually liable for income taxes, if any, on its share of the Restoration Onshore's net taxable income. Interest, dividends and other income realized by Restoration Onshore from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

Restoration Onshore applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions, which requires the General Partner to determine whether a tax position of Restoration Onshore is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority.

The General Partner has determined that there was no effect on the financial statements from the Partnership's application of this authoritative guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2018. Restoration Onshore files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Partnership is subject to examination by federal, state, local and foreign jurisdictions, where applicable. As of December 31, 2018, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2015 forward (with limited exceptions).

### Restoration Offshore
Restoration Offshore is a Cayman Islands exempted company. Under the current laws of the Cayman Islands, there is no income, estate, transfer, sales or other tax payable by Restoration Offshore. Restoration Offshore has elected to be treated as a corporation for U.S. tax purposes and files a protective 1120-F.

The General Partner intends to conduct the business of Restoration Offshore in such a way that Restoration Offshore's activities do not constitute a U.S. trade or business and any income or realized gains earned by Restoration Offshore do not become "effectively connected" with a trade or business carried on in the United States for U.S. federal income tax purposes.

019392

HCMLPHMIT00002585

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Dividends as well as certain interest and other income received by the master partnership of Restoration Offshore from sources within the United States may be subject to, and reflected net of, United States withholding tax at a rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by the master partnership of Restoration Offshore from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

Restoration Offshore applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions, which requires the General Partner to determine whether a tax position of Restoration Offshore is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position.  For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority. The General Partner has determined that there was no effect on the financial statements from the Partnership's application of this authoritative guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2018. As of December 31, 2018, the tax years that remain subject to examination by major tax jurisdictions under the statute of limitations is from the year 2015 forward (with limited exceptions).

The remaining entities consolidated by the Partnership had no uncertain tax positions which required accrual under U.S. GAAP.

019393

HCMLPHMIT00002586

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

---

**14.    Legal Proceedings**

The Partnership and certain affiliated investment vehicles are defendants in a complaint filed on February 24, 2009 New York state court by UBS Securities LLC and UBS AG, London Branch relating to a CLO warehouse facility with respect to which UBS is attempting to extend liability beyond the two entities that bore sole risk of loss under the governing documents.  On February 19, 2010, the court dismissed all claims against the Partnership.  UBS since has filed additional claims against the Partnership and certain additional investment vehicles.  On July 21, 2011, the First Appellate Division again dismissed two of UBS's four claims against the Partnership, severely limiting the remaining two claims.  Additional claims were dismissed in a further appellate ruling on October 31, 2017.  Certain claims were tried in July 2018 against two Highland-affiliated defendants, but the trial court has neither ruled on those claims nor indicated when it will set UBS's remaining claims for trial.  The second trial, if it occurs, will try all claims against the Partnership and certain affiliated investment vehicles.

From time to time the Partnership is party to disputes with disgruntled former employees.  One such matter involves a former employee that improperly recorded internal conversations in violation of the Partnership's internal policies and procedures and potentially certain criminal and regulatory provisions.  The former employee obtained a $7.9 million judgment against Highland affiliate Acis Capital Management, L.P. ("Acis").  The employee currently is attempting to collect this judgment through various proceedings in Texas state and federal court, including claims against Highland for receipt of assets from Acis.

In another matter, a Court ruled that a former employee breached his fiduciary duty to the Partnership, owed damages to the Partnership, and ordered the former employee to cease using or disclosing the Partnership's confidential information.   Additionally, an award was entered in favor of the employee against a separate incentive compensation entity for an interest that was already escrowed in his name prior to trial and in which he was already vested.  The dispute over the amount of his vested interest is on-going.  Additionally, the Partnership from time to time must take action to enforce the permanent injunction against the former employee's continuing improper disclosures of the Partnership's confidential information.

The Partnership is engaged in litigation and arbitration with a group of investors relating to the post-financial crisis wind down and distribution of the remaining assets in the Crusader hedge fund vehicle.

The Partnership currently is and has been previously subject to various legal proceedings, many of which have been due to the nature of operating in the distressed loan business in the U.S. The legal process is often the route of last resort to recover amounts due from delinquent borrowers. We currently do not anticipate these proceedings will have a material negative impact to the Partnership.

**15.    Subsequent Events**

On March 18, 2019, SSP Holdings, LLC issued a promissory note to the Partnership in the amount of $2.0 million. The note accrues interest at a rate of 18%.

On March 26, 2019, Trussway Holdings, LLC issued a promissory note to the Partnership in the amount of $1.0 million. The note accrues interest at a rate of 10%.

019394

HCMLPHMIT00002587

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

On March 28, 2019, the Partnership distributed equity to its partners in the aggregate amount of $3.7 million.

On March 28, 2019, the Partnership received a $3.7 million pay down on the outstanding Contribution Agreement.

Over the course of 2019, through the report date, HCMFA issued promissory notes to the Partnership in the aggregate amount of $7.4 million. The notes accrue interest at a rate of 2.39%.

The Partnership has performed an evaluation of subsequent events through June 3, 2019, which is the date the consolidated financial statements were available to be issued, and has determined that there are no other material subsequent events that would require disclosure in the Partnership's consolidated financial statements.

019395

HCMLPHMIT00002588

**Highland Capital Management, L.P.**

**(A Delaware Limited Partnership)**

**As of And Year Ended December 31, 2018**

**Supplemental Information**

019396

HCMLPHMIT00002589

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Supplemental Consolidating Balance Sheet**
**December 31, 2018**

| (in thousands) | Highland Capital Management, L.P. | | All Other Consolidated Entities | | Eliminations | | Total Consolidated | |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | |
| Cash and cash equivalents | $ | 2,567 | $ | 2,467 | $ | - | $ | 5,034 |
| Investments at fair value (cost $922,027) | | 161,939 | | 683,247 | | - | | 845,186 |
| Equity method investees | | 121,936 | | - | | (121,936) | | - |
| Management and incentive fees receivable | | 2,242 | | 158 | | (7) | | 2,393 |
| Due from brokers | | - | | 598 | | - | | 598 |
| Other assets | | 8,421 | | 5,660 | | (4,826) | | 9,255 |
| Notes and other amounts due from affiliates | | 176,963 | | - | | (3,565) | | 173,398 |
| Intangible assets | | - | | 3,022 | | - | | 3,022 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $11,197 | | 4,538 | | 43 | | - | | 4,581 |
| **Total assets** | $ | 478,606 | $ | 695,195 | $ | (130,334) | $ | 1,043,467 |
| | | | | | | | | |
| **Liabilities and partners' capital** | | | | | | | | |
| | | | | | | | | |
| **Liabilities** | | | | | | | | |
| Accounts payable | $ | 4,838 | $ | 145 | $ | - | $ | 4,983 |
| Securities sold, not yet purchased (proceeds $26,135) | | - | | 32,357 | | - | | 32,357 |
| Withdrawals payable | | - | | 57,009 | | - | | 57,009 |
| Due to affiliates | | 4,542 | | - | | (4,542) | | - |
| Due to brokers | | 31,194 | | 86,108 | | (742) | | 116,560 |
| Due to brokers for securities purchased, not yet settled | | 1,640 | | - | | - | | 1,640 |
| Accrued and other liabilities | | 35,574 | | 4,276 | | 396 | | 40,246 |
| Notes payable | | 16,722 | | 42,540 | | (3,510) | | 55,752 |
| Investment liabilities | | 12,135 | | 33,957 | | - | | 46,092 |
| **Total liabilities** | | 106,645 | | 256,392 | | (8,398) | | 354,639 |
| | | | | | | | | |
| Non-controlling interest | | - | | 316,867 | | - | | 316,867 |
| | | | | | | | | |
| Commitments and contingencies | | | | | | | | |
| | | | | | | | | |
| **Partners' capital** | | 371,961 | | 121,936 | | (121,936) | | 371,961 |
| **Total liabilities and partners' capital** | $ | 478,606 | $ | 695,195 | $ | (130,334) | $ | 1,043,467 |

019397

HCMLPHMIT00002590

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
## Supplemental Consolidating Statement of Income
## Year Ended December 31, 2018

| (in thousands) | Highland Capital Management, L.P. | All Other Consolidated Entities | Eliminations | Total Consolidated |
|---|---|---|---|---|
| **Revenue:** | | | | |
| Management fees | $ 35,264 | $ 1,336 | $ - | $ 36,600 |
| Interest and investment income | 4,857 | 10,974 | - | 15,831 |
| Incentive fees | 17 | 53 | - | 70 |
| Shared services fees | 9,187 | - | - | 9,187 |
| Other income | 1,038 | 1,584 | - | 2,622 |
| Total revenue | 50,363 | 13,947 | - | 64,310 |
| **Expenses:** | | | | |
| Compensation and benefits | 33,670 | 805 | - | 34,475 |
| Professional fees | 14,624 | 3,055 | - | 17,679 |
| Interest expense | 1,695 | 3,975 | - | 5,670 |
| Marketing and advertising expense | 2,413 | - | - | 2,413 |
| Depreciation and amortization | 1,304 | 13 | - | 1,317 |
| Investment and research consulting | 1,082 | - | - | 1,082 |
| Bad debt expense | 7,862 | - | - | 7,862 |
| Other operating expenses | 6,786 | 3,241 | - | 10,027 |
| Total expenses | 69,436 | 11,089 | - | 80,525 |
| **Other Income/(Expense):** | | | | |
| Other income | 9,816 | 10 | - | 9,826 |
| Impairment on intangible assets | (2,830) | - | - | (2,830) |
| Total other income | 6,986 | 10 | - | 6,996 |
| Income/(loss) before investment and derivative activities | (12,087) | 2,868 | - | (9,219) |
| **Realized and unrealized gain/(loss) on investments and derivatives:** | | | | |
| Net realized gain/(loss) on investments and derivatives | 13,397 | (44,914) | - | (31,517) |
| Net change in unrealized loss on investments and derivatives | (406) | (93,349) | - | (93,755) |
| Net realized and unrealized loss on investments and derivatives | 12,991 | (138,263) | - | (125,272) |
| Net unrealized losses from equity method investees | (74,082) | - | 74,082 | - |
| Net loss | (73,178) | (135,395) | 74,082 | (134,491) |
| Net loss attributable to non-controlling interest | - | (61,313) | - | (61,313) |
| Net loss attributable to Highland Capital Management, L.P. | $ (73,178) | $ (74,082) | $ 74,082 | $ (73,178) |

019398

HCMLPHMIT00002591

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Supplemental Unconsolidated Balance Sheet**
**December 31, 2018**

*(in thousands)*

**Assets**

Current assets:

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 2,567 |
| Investments at fair value (cost $263,008*) | | 259,460 |
| Equity method investees | | 24,415 |
| Management and incentive fees receivable | | 2,242 |
| Intangible assets | | 8,421 |
| Notes and other amounts due from affiliates | | 176,963 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $11,177 | | 4,538 |
| **Total assets** | $ | 478,606 |

**Liabilities and partners' capital**

**Liabilities**

| | | |
|---|---|---:|
| Accounts payable | $ | 4,838 |
| Due to affiliate | | 4,542 |
| Due to brokers | | 31,194 |
| Due to brokers for securities purchased not yet settled | | 1,640 |
| Accrued and other liabilities | | 35,574 |
| Notes payable | | 16,722 |
| Investment liabilities | | 12,135 |
| Total liabilities | | 106,645 |
| Partners' capital | | 371,961 |
| **Total liabilities and partners' capital** | $ | 478,606 |

*Investments, at fair value includes $97.5 million of limited partnership interest ownership of Consolidated Investment Funds, which are discussed in Footnote 2. These entities are consolidated because the Partnership controls the general partner of the respective entities and is responsible for the daily operations of the entities.

The above information was derived from the audited December 31, 2018 consolidated financial statements of Highland Capital Management, L.P. This information should be read in conjunction with such audited financial statements.

019399

HCMLPHMIT00002592

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Supplemental Unconsolidated Statement of Income**
**Year Ended December 31, 2018**

*(in thousands)*

| | | |
|---|---|---:|
| **Revenue:** | | |
| Management fees | $ | 35,264 |
| Incentive fees | | 17 |
| Shared services fees | | 9,187 |
| Interest and investment income | | 4,857 |
| Miscellaneous income | | 1,038 |
| Total revenue | | 50,363 |
| | | |
| **Expenses:** | | |
| Compensation and benefits | | 33,670 |
| Professional fees | | 14,624 |
| Marketing and advertising expense | | 2,413 |
| Interest expense | | 1,695 |
| Depreciation and amortization | | 1,304 |
| Investment and research consulting | | 1,082 |
| Bad debt expense | | 7,862 |
| Other operating expenses | | 6,786 |
| Total expenses | | 69,436 |
| | | |
| **Other Income/(Expense):** | | |
| Other income | | 9,816 |
| Impairment on intangible assets | | (2,830) |
| Total other income | | 6,986 |
| | | |
| Loss before investment activities | | (12,087) |
| | | |
| **Realized and unrealized gains/losses on investments:** | | |
| Net realized gain on sale of investments | | 13,397 |
| Net change in unrealized loss on investments* | | (56,529) |
| Total realized and unrealized loss on investments | | (43,132) |
| | | |
| Loss from equity method investees: | | (17,959) |
| | | |
| **Net loss** | $ | (73,178) |

*Net change in unrealized gain on investments includes $56.1 million of unrealized loss from holdings of limited partnership interests of Consolidated Investment Funds, which are discussed in Footnote 2. These entities are consolidated because the Partnership controls the general partner of the respective entities and is responsible for the daily operations of the entities.

The above information was derived from the audited December 31, 2018 consolidated financial statements of Highland Capital Management, L.P.  This information should be read in conjunction with such audited consolidated financial statements.

019400

HCMLPHMIT00002593

# EXHIBIT 114

# FOURTH AMENDED AND RESTATED

## AGREEMENT OF LIMITED PARTNERSHIP

### OF

## HIGHLAND CAPITAL MANAGEMENT, L.P.

THE PARTNERSHIP INTERESTS REPRESENTED BY THIS LIMITED PARTNERSHIP
AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OP 1933 OR
UNDER ANY STATE SECURITIES ACTS IN RELIANCE UPON EXEMPTIONS UNDER THOSE
ACTS. THE SALE OR OTHER DISPOSITION OF THE PARTNERSHIP INTERESTS IS
PROHIBITED UNLESS THAT SALE OR DISPOSITION IS MADE IN COMPLIANCE WITH ALL
SUCH APPLICABLE ACTS. ADDITIONAL RESTRICTIONS ON TRANSFER OF THE
PARTNERSHIP INTERESTS ARE SET FORTH IN THIS AGREEMENT.

019402

HCMLPHMIT00002641

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

<u>TABLE OF CONTENTS</u>

| | | |
|---|---|---|
| ARTICLE 1 | GENERAL | 1 |
| 1.1. | Continuation | 1 |
| 1.2. | Name | 1 |
| 1.3. | Purpose | 1 |
| 1.4. | Term. | 1 |
| 1.5. | Partnership Offices; Addresses of Partners. | 1 |
| | | |
| ARTICLE 2 | DEFINITIONS | 2 |
| 2.1. | Definitions | 2 |
| 2.2. | Other Definitions | 6 |
| | | |
| ARTICLE 3 | FINANCIAL MATTERS | 6 |
| 3.1. | Capital Contributions | 6 |
| 3.2. | Allocations of Profits and Losses | 8 |
| 3.3. | Allocations on Transfers | 9 |
| 3.4. | Special Allocations | 9 |
| 3.5. | Curative Allocations | 10 |
| 3.6. | Code Section 704(c) Allocations | 10 |
| 3.7. | Capital Accounts | 11 |
| 3.8. | Distributive Share for Tax Purpose | 12 |
| 3.9. | Distributions. | 12 |
| 3.10. | Compensation and Reimbursement of General Partner | 14 |
| 3.11. | Books, Records, Accounting, and Reports | 14 |
| 3.12. | Tax Matters | 14 |
| | | |
| ARTICLE 4 | RIGHTS AND OBLIGATIONS OF PARTNERS | 15 |
| 4.1. | Rights and Obligations of the General Partner | 15 |
| 4.2. | Rights and Obligations of Limited Partners | 19 |
| 4.3. | Transfer of Partnership Interests | 19 |
| 4.4. | Issuances of Partnership Interests to New and Existing Partners | 21 |
| 4.5. | Withdrawal of General Partner | 21 |
| 4.6. | Admission of Substitute Limited Partners and Successor General Partner | 21 |
| | | |
| ARTICLE 5 | DISSOLUTION AND WINDING UP | 22 |
| 5.1. | Dissolution | 22 |
| 5.2. | Continuation of the Partnership | 23 |
| 5.3. | Liquidation | 23 |
| 5.4. | Distribution in Kind | 24 |
| 5.5. | Cancellation of Certificate of Limited Partnership | 24 |
| 5.6. | Return of Capital | 24 |
| 5.7. | Waiver of Partition. | 24 |
| | | |
| ARTICLE 6 | GENERAL PROVISIONS | 24 |
| 6.1. | Amendments to Agreement | 24 |

019403

HCMLPHMIT00002642

| | | |
|---|---|---|
| 6.2. | Addresses and Notices | 25 |
| 6.3. | Titles and Captions | 25 |
| 6.4. | Pronouns and Plurals | 25 |
| 6.5. | Further Action | 25 |
| 6.6. | Binding Effect | 25 |
| 6.7. | Integration | 25 |
| 6.8. | Creditors | 25 |
| 6.9. | Waiver | 25 |
| 6.10. | Counterparts | 25 |
| 6.11. | Applicable Law | 25 |
| 6.12. | Invalidity of Provisions | 25 |
| 6.13. | Mandatory Arbitration | 26 |

019404

HCMLPHMIT00002643

# FOURTH AMENDED AND RESTATED
# AGREEMENT OF LIMITED PARTNERSHIP
# OF
# HIGHLAND CAPITAL MANAGEMENT, L.P.

THIS FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is entered into on this 24th day of December, 2015, to be effective as of December 24, 2015, by and among Strand Advisors, Inc., a Delaware corporation (*"Strand"*), as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner.

Certain terms used in this Agreement are defined in Article 2.

## ARTICLE 1

## GENERAL

**1.1.    Continuation.** Subject to the provisions of this Agreement, the Partners hereby continue the Partnership as a limited partnership pursuant to the provisions of the Delaware Act. Except as expressly provided herein, the rights and obligations of the Partners and the administration and termination of the Partnership shall be governed by the Delaware Act.

**1.2.    Name.** The name of the Partnership shall be, and the business of the Partnership shall be conducted under the name of Highland Capital Management, L.P. The General Partner, in its sole and unfettered discretion, may change the name of the Partnership at any time and from time to time and shall provide Limited Partners with written notice of such name change within twenty (20) days after such name change.

**1.3.    Purpose.** The purpose and business of the Partnership shall be the conduct of any business or activity that may lawfully be conducted by a limited partnership organized pursuant to the Delaware Act. Any or all of the foregoing activities may be conducted directly by the Partnership or indirectly through another partnership, joint venture, or other arrangement.

**1.4.    Term.** The Partnership was formed as a limited partnership on July 7, 1997, and shall continue until terminated pursuant to this Agreement.

**1.5.    Partnership Offices; Addresses of Partners.**

(a)    Partnership Offices. The registered office of the Partnership in the State of Delaware shall be 1013 Centre Road, Wilmington, Delaware 19805-1297, and its registered agent for service of process on the Partnership at that registered office shall be Corporation Service Company, or such other registered office or registered agent as the General Partner may from time to time designate. The principal office of the Partnership shall be 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other place as the General Partner may from time to time designate. The Partnership may maintain offices at such other place or places as the General Partner deems advisable.

(b)    Addresses of Partners. The address of the General Partner is 300 Crescent Court, Suite 700, Dallas, Texas 75201. The address of each Limited Partner shall be the address of that Limited Partner appearing on the books and records of the Partnership. Each Limited Partner agrees to provide the General Partner with prompt written notice of any change in his/her/its address.

HCMLPHMIT00002644

# ARTICLE 2

## DEFINITIONS

**2.1.** **Definitions.** The following definitions shall apply to the terms used in this Agreement, unless otherwise clearly indicated to the contrary in this Agreement:

"*Additional Capital Contribution*" has the meaning set forth in <u>Section 3.1(b)</u> of this Agreement.

"*Adjusted Capital Account Deficit*" means, with respect *to* any Partner, the deficit balance, if any, in the Capital Account of that Partner as of the end of the relevant Fiscal Year, or other relevant period, giving effect to all adjustments previously made thereto pursuant to <u>Section 3.7</u> and further adjusted as follows: (i) credit to that Capital Account, any amounts which that Partner is obligated or deemed obligated to restore pursuant to any provision of this Agreement or pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c); (ii) debit to that Capital Account, the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and (iii) to the extent required under the Treasury Regulations, credit to that Capital Account (A) that Partner's share of "minimum gain" and (B) that Partner's share of "partner nonrecourse debt minimum gain." (Each Partner's share of the minimum gain and partner nonrecourse debt minimum gain shall be determined under Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5), respectively.)

"*Affiliate*" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question. As used in this definition, the term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting Securities, by contract or otherwise.

"*Agreement*" means this Fourth Amended and Restated Agreement of Limited Partnership, as it may be amended, supplemented, or restated from time to time.

"*Business Day*" means Monday through Friday of each week, except that a legal holiday recognized as such by the government of the United States or the State of Texas shall not be regarded as a Business Day.

"*Capital Account*" means the capital account maintained for a Partner pursuant to <u>Section 3.7(a)</u>.

"*Capital Contribution*" means, with respect to any Partner, the amount of money or property contributed to the Partnership with respect to the interest in the Partnership held by that Person.

"*Certificate of Limited Partnership*" means the Certificate of Limited Partnership filed with the Secretary of State of Delaware by the General Partner, as that Certificate may be amended, supplemented or restated from time to time.

"*Class A Limited Partners*" means those Partners holding a Class A Limited Partnership Interest, as shown on <u>Exhibit A</u>.

"*Class A Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class A Limited Partner."

2

019406

HCMLPHMIT00002645

*"Class B Limited Partner"* means those Partners holding a Class B Limited Partnership Interest, as shown on Exhibit A.

*"Class B Limited Partnership Interest"* means a Partnership Interest held by a Partner in its capacity as a Class B Limited Partner."

*"Class B NAV Ratio Trigger Period"* means any period during which the Class B Limited Partner's aggregate capital contributions, including the original principal balance of the Contribution Note, and reduced by the aggregate amount of distributions to the Class B Limited Partner, exceed 75 percent of the product of the Class B Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class B NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class B NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class B NAV Ratio Trigger Period.

*"Class C Limited Partner"* means those Partners holding a Class C Limited Partnership Interest, as shown on Exhibit A.

*"Class C Limited Partnership Interest"* means a Partnership Interest held by a Partner in its capacity as a Class C Limited Partner."

*"Class C NAV Ratio Trigger Period"* means any period during which an amount equal to $93,000,000.00 reduced by the aggregate amount of distributions to the Class C Limited Partner after the Effective Date exceeds 75 percent of the product of the Class C Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class C NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class C NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class C NAV Ratio Trigger Period.

*"Code"* means the Internal Revenue Code of 1986, as amended and in effect from time to time.

*"Contribution Note"* means that certain Secured Promissory Note dated December 21, 2015 by and among Hunter Mountain Investment Trust, as maker, and the Partnership as Payee.

*"Default Loan"* has the meaning set forth in Section 3.1(c)(i).

*"Defaulting Partner"* has the meaning set forth in Section 3.1(c).

*"Delaware Act"* means the Delaware Revised Uniform Limited Partnership Act, Part IV, Title C, Chapter 17 of the Delaware Corporation Law Annotated, as it may be amended, supplemented or restated from time to time, and any successor to that Act.

*"Effective Date"* means the date first recited above.

*"Fiscal Year"* has the meaning set forth in Section 3.11(b).

019407

HCMLPHMIT00002646

"*Founding Partner Group*" means, all partners holding partnership interests in the Partnership immediately before the Effective Date.

"*General Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a General Partner pursuant to the terms of this Agreement; and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement.

"*Limited Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a Limited Partner pursuant to the terms of this Agreement, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement.

"*Liquidator*" has the meaning set forth in Section 5.3.

"*Losses*" means, for each Fiscal Year, the losses and deductions of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any expenditures described in Code Section 705(a)(2)(B).

"*Majority Interest*" means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners.

"*NAV Ratio Trigger Period*" means a Class B NAV Ratio Trigger Period or a Class C NAV Ratio Trigger Period.

"*Net Increase in Working Capital Accounts*" means the excess of (i) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the end of the period being measured over (ii) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the beginning of the period being measured; provided, however, that amounts within each of the aforementioned categories shall be excluded from the calculation to the extent they are specifically identified as being derived from investing or financing activities. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership and appropriate adjustments may be made to the extent the Partnership adds new ledger accounts to its books and records that are current assets or current liabilities.

"*New Issues*" means Securities that are considered to be "new issues," as defined in the Conduct Rules of the National Association of Securities Dealers, Inc.

"*Nonrecourse Deduction*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1), as computed under Treasury Regulations Section 1.704-2(c).

"*Nonrecourse Liability*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"*Operating Cash Flow*" means Total Revenue less Total Operating Expenses plus Depreciation & Amortization less Net Increase in Working Capital Accounts year over year. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership.

019408

HCMLPHMIT00002647

"*Partner*" means a General Partner or a Limited Partner.

"*Partner Nonrecourse Debt*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"*Partner Nonrecourse Deductions*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"*Partner Nonrecourse Debt Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(5).

"*Partnership*" means Highland Capital Management, L.P., the Delaware limited partnership established pursuant to this Agreement.

"*Partnership Capital*" means, as of any relevant date, the net book value of the Partnership's assets.

"*Partnership Interest*" means the interest acquired by a Partner in the Partnership including, without limitation, that Partner's right: (a) to an allocable share of the Profits, Losses, deductions, and credits of the Partnership; (b) to a distributive share of the assets of the Partnership; (c) if a Limited Partner, to vote on those matters described in this Agreement; and (d) if the General Partner, to manage and operate the Partnership.

"*Partnership Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(d).

"*Percentage Interest*" means the percentage set forth opposite each Partner's name on Exhibit A as such Exhibit may be amended from time to time in accordance with this Agreement.

"*Person*" means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity.

"*Priority Distributions*" has the meaning set forth in Section 3.9(b).

"*Profits*" means, for each Fiscal Year, the income and gains of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any income described in Code Section 705(a)(1)(B).

"*Profits Interest Partner*" means any Person who is issued a Partnership Interest that is treated as a "profits interest" for federal income tax purposes.

"*Purchase Notes*" means those certain Secured Promissory Notes of even date herewith by and among Hunter Mountain Investment Trust, as maker, and The Dugaboy Investment Trust, The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #2, each as Payees of the respective Secured Promissory Notes.

5

HCMLPHMIT00002648

"**Record Date**" means the date established by the General Partner for determining the identity of Limited Partners entitled to vote or give consent to Partnership action or entitled to exercise rights in respect of any other lawful action of Limited Partners.

"**Second Amended Buy-Sell and Redemption Agreement**" means that certain Second Amended and Restated Buy-Sell and Redemption Agreement, dated December 21, 2015, to be effective as of December 21, 2015 by and between the Partnership and its Partners, as may be amended, supplemented, or restated from time to time.

"**Securities**" means the following: (i) securities of any kind (including, without limitation, "securities" as that term is defined in Section 2(a)(1) of the Securities Act; (ii) commodities of any kind (as that term is defined by the U.S. Securities Laws and the rules and regulations promulgated thereunder); (iii) any contracts for future or forward delivery of any security, commodity or currency; (iv) any contracts based on any securities or group of securities, commodities or currencies; (v) any options on any contracts referred to in clauses (iii) or (iv); or (vi) any evidences of indebtedness (including participations in or assignments of bank loans or trade credit claims). The items set forth in clauses (i) through (vi) herein include, but are not limited to, capital stock, common stock, preferred stock, convertible securities, reorganization certificates, subscriptions, warrants, rights, options, puts, calls, bonds, mutual fund interests, debentures, notes, certificates of deposit, letters of credit, bankers acceptances, trust receipts and other securities of any corporation or other entity, whether readily marketable or not, rights and options, whether granted or written by the Partnership or by others, treasury bills, bonds and notes, any securities or obligations issued or guaranteed by the United States or any foreign country or any state or possession of the United States or any foreign country or any political subdivision or agency or instrumentality of any of the foregoing, and derivatives of any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended, and any successor to such statute.

"**Substitute Limited Partner**" has the meaning set forth in Section 4.6(a).

"**Transfer**" or derivations thereof, of a Partnership Interest means, as a noun, the transfer, sale, assignment, exchange, pledge, hypothecation or other disposition of a Partnership Interest, or any part thereof, directly or indirectly, and as a verb, voluntarily or involuntarily to transfer, sell, assign, exchange, pledge, hypothecate or otherwise dispose of.

"**Treasury Regulations**" means the Department of Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of succeeding regulations).

2.2.    **Other Definitions**. All terms used in this Agreement that are not defined in this Article 2 have the meanings contained elsewhere in this Agreement.

## ARTICLE 3

### FINANCIAL MATTERS

3.1.    **Capital Contributions**.

(a)    Initial Capital Contributions. The initial Capital Contribution of each Partner shall be set forth in the books and records of the Partnership.

(b)    Additional Capital Contributions.

6

019410

HCMLPHMIT00002649

(i)    The General Partner, in its reasonable discretion and for a *bona fide* business purpose, may request in writing that the Founding Partner Group make additional Capital Contributions in proportion to their Percentage Interests (each, an "***Additional Capital Contribution***").

(ii)    Any failure by a Partner to make an ·Additional Capital Contribution requested under Section 3.1(b)(i) on or before the date on which that Additional Capital Contribution was due shall result in the Partner being in default.

(c)    Consequences to Defaulting Partners.  In the event a Partner is in default under Section 3.1(b) (a "***Defaulting Partner***"), the Defaulting Partner, in its sole and unfettered discretion, may elect to take either one of the option set forth below.

(i)    Default Loans.  If the Defaulting Partner so elects, the General Partner shall make a loan to the Defaulting Partner in an amount equal to that Defaulting Partner's additional capital contribution (a "***Default Loan***").  A Default Loan shall be deemed advanced on the date actually advanced. Default Loans shall earn interest on the outstanding principal amount thereof at a rate equal to the Applicable Federal Mid-Term Rate (determined by the Internal Revenue Service for the month in which the loan is deemed made) from the date actually advanced until the same is repaid in full. The term of any Default Loan shall be six (6) months, unless otherwise extended by the General Partner in its sole and unfettered discretion.  If the General Partner makes a Default Loan, the Defaulting Partner shall not receive any distributions pursuant to Section 3.9(a) or Section 5.3 or any proceeds from the Transfer of all or any part of its Partnership Interest while the Default Loan remains unpaid.  Instead, the Defaulting Partner's share of distributions or such other proceeds shall (until all Default Loans and interest thereon shall have been repaid in full) first be paid to the General Partner. Such payments shall be applied first to the payment of interest on such Default Loans and then to the repayment of the principal amounts thereof, but shall be considered, for all other purposes of this Agreement, to have been distributed to the Defaulting Partner.  The Defaulting Partner shall be liable for the reasonable fees and expenses incurred by the General Partner (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any enforcement or foreclosure upon any Default Loan and such costs shall, to the extent enforceable under applicable law, be added to the principal amount of the applicable Default Loan.  In addition, at any time during the term of such Default Loan, the Defaulting Partner shall have the right to repay, in full, the Default Loan (including interest and any other charges).  If the General Partner makes a Default Loan, the Defaulting Partner shall be deemed to have pledged to the General Partner and granted to the General Partner a continuing first priority security interest in, all of the Defaulting Partner's Partnership Interest to secure the payment of the principal of, and interest on, such Default Loan in accordance with the provisions hereof, and for such purpose this Agreement shall constitute a security agreement.  The Defaulting Partner shall promptly execute, acknowledge and deliver such financing statements, continuation statements or other documents and take such other actions as the General Partner shall request in writing in order to perfect or continue the perfection of such security interest; and, if the Defaulting Partner shall fail to do so within seven (7) days after the Defaulting Partner's receipt of a notice making demand therefor, the General Partner is hereby appointed the attorney-in-fact of, and is hereby authorized on behalf of, the Defaulting Partner, to execute, acknowledge and deliver all such documents and take all such other actions as may be required to perfect such security interest.  Such appointment and authorization are coupled with an interest and shall be irrevocable. The General Partner shall, prior to exercising any right or remedy (whether at law, in equity or pursuant to the terms hereof) available to it in connection with such security interest, provide to the Defaulting Partner a notice, in reasonable detail, of the right or remedy to be exercised and the intended timing of such exercise which shall not be less than five (5) days following the date of such notice.

7

HCMLPHMIT00002650

(ii)    Reduction of Percentage Interest.  If the Defaulting Partner does not elect to obtain a Default Loan pursuant to Section 3.1(c)(i), the General Partner shall reduce the Defaulting Partner's Percentage Interest in accordance with the following formula:

> The Defaulting Partner's new Percentage Interest shall equal the product of (1) the Defaulting Partner's current Percentage Interest, multiplied by (2) the quotient of (a) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), divided by (b) the sum of (i) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), plus (ii) the amount of the additional capital contribution that such Defaulting Partner failed to make when due.

To the extent any downward adjustment is made to the Percentage Interest of a Partner pursuant to this Section 3.1(c)(ii), any resulting benefit shall accrue to the Partners (other than the Defaulting Partner) in proportion to their respective Percentage Interests.

**3.2.    Allocations of Profits and Losses.**

(a)    Allocations of Profits.  Except as provided in Sections 3.4, 3.5, and 3.6, Profits for any Fiscal Year will be allocated to the Partners as follows:

(i)    First, to the Partners until cumulative Profits allocated under this Section 3.2(a)(i) for all prior periods equal the cumulative Losses allocated to the Partners under Section 3.2(b)(iii) for all prior periods in the inverse order in which such Losses were allocated; and

(ii)    Next, to the Partners until cumulative Profits allocated under this Section 3.2(a)(ii) for all prior periods equal the cumulative Losses allocated to the Partners under Section 3.2(b)(ii) for all prior periods in the inverse order in which such Losses were allocated; and

(iii)    Then, to all Partners in proportion to their respective Percentage Interests.

(b)    Allocations of Losses.  Except as provided in Sections 3.4, 3.5, and 3.6, Losses for any Fiscal Year will be will be allocated as follows:

(i)    First, to the Partners until cumulative Losses allocated under this Section 3.2(b)(i) for all prior periods equal the cumulative Profits allocated to the Partners under Section 3.2(a)(iii) for all prior periods in the inverse order in which such Profits were allocated; and

(ii)    Next, to the Partners in proportion to their respective positive Capital Account balances until the aggregate Capital Account balances of the Partners (excluding any negative Capital Account balances) equal zero; *provided, however,* losses shall first be allocated to reduce amounts that were last allocated to the Capital Accounts of the Partners; and

(iii)    Then, to all Partners in proportion to their respective Percentage Interests.

8

019412
HCMLPHMIT00002651

(c)    Limitation on Loss Allocations.  If any allocation of Losses would cause a Limited Partner to have an Adjusted Capital Account Deficit, those Losses instead shall be allocated to the General Partner.

3.3.    Allocations on Transfers.  Taxable items of the Partnership attributable to a Partnership Interest that has been Transferred (including the simultaneous decrease in the Partnership Interest of existing Partners resulting from the admission of a new Partner) shall be allocated in accordance with Section 4.3(d).

3.4.    Special Allocations.  If the requisite stated conditions or facts are present, the following special allocations shall be made in the following order:

(a)    Partnership Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 3, if there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, prior to any other allocation under this Agreement, each Partner shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to that Partner's share of the net decrease in Partnership Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 3.4(a) is intended to comply with the partnership minimum gain chargeback requirements of the Treasury Regulations and shall be subject to all exceptions provided therein.

(b)    Partner Nonrecourse Debt Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 3 (other than Section 3.4(a)), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Partner with a share of such Partner Nonrecourse Debt Minimum Gain as of the beginning of the year shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods in an amount equal to that Partner's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 3.4(b) is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations, shall be interpreted consistently with the Treasury Regulations and shall be subject to all exceptions provided therein.

(c)    Qualified Income Offset.  If a Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), then items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible; provided, however, an allocation pursuant to this Section 3.4(c) shall be made if and only to the extent that the Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 3 have been tentatively made without considering this Section 3.4(c).

(d)    Gross Income Allocation.  If a Partner has a deficit Capital Account at the end of any Fiscal Year of the Partnership that exceeds the sum of (i) the amount the Partner is obligated to restore, and (ii) the amount the Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), then each such Partner shall be specially allocated items of income and gain of the Partnership in the amount of the excess as quickly as possible; provided, however, an allocation pursuant to this Section 3.4(d) shall be made if and only to

9

019413

HCMLPHMIT00002652

the extent that the Partner would have a deficit Capital Account in excess of that sum after all other allocations provided for in this Article 3 have been tentatively made without considering Section 3.4(c) or 3.4(d).

(e)    Nonrecourse Deductions.    Nonrecourse Deductions for any taxable year or other period for which allocations are made shall he allocated among the Partners in accordance with their Percentage interests.

(f)    Partner Nonrecourse Deductions.    Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

(g)    Section 754 Adjustments.    To the extent an adjustment to the adjusted tax basis of any asset of the Partnership under Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and that gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Treasury Regulations.

(h)    Section 481 Adjustments.    Any allocable items of income, gain, expense, deduction or credit required to be made by Section 481 of the Code as the result of the sale, transfer, exchange or issuance of a Partnership Interest will be specially allocated to the Partner receiving said Partnership Interest whether such items are positive or negative in amount.

3.5.    Curative Allocations.    The "*Basic Regulatory Allocations*" consist of (i) the allocations pursuant to Section 3.2(c), and (ii) the allocations pursuant to Sections 3.4.    Notwithstanding any other provision of this Agreement, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of the allocations of other items and the Basic Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Basic Regulatory Allocations had not occurred.    For purposes of applying the foregoing sentence, allocations pursuant to this Section 3.5 shall be made with respect to allocations pursuant to Section 3.4 (g) and (h) only to the extent that it is reasonably determined that those allocations will otherwise be inconsistent with the economic agreement among the Partners. To the extent that a special allocation under Section 3.4 is determined not to comply with applicable Treasury Regulations, then the Partners intend that the items shall be allocated in accordance with the Partners' varying Percentage Interests throughout each tax year during which such items are recognized for tax purposes.

3.6.    Code Section 704(c) Allocations.    In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation at the time of the contribution between the tax basis of the property to the Partnership and the fair market value of that property.    Except as otherwise provided herein, any elections or other decisions relating to those allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intent of this Agreement.    Allocations of income, gain, loss and deduction pursuant to this Section 3.6 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, the Capital Account of any Partner or the share

10

HCMLPHMIT00002653

of Profits, Losses, other tax items or distributions of any Partner pursuant to any provision of this Agreement.

3.7.    **Capital Accounts**.

(a)    <u>Maintenance of Capital Accounts</u>.  The Partnership shall establish and maintain a separate capital account (*"Capital Account"*) for each Partner in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), subject to and in accordance with the provisions set forth in this <u>Section 3.7</u>.

(i)    The Capital Account balance of each Partner shall be credited (increased) by (A) the amount of cash contributed by that Partner to the capital of the Partnership, (B) the fair market value of property contributed by that Partner to the capital of the Partnership (net of liabilities secured by that contributed property that the Partnership assumes or takes subject to under Code Section 752), and (C) that Partner's allocable share of Profits and any items in the nature of income or gain which are specially allocated pursuant to <u>Sections 3.4</u> and <u>3.5</u>; and

(ii)    The Capital Account balance of each Partner shall be debited (decreased) by (A) the amount of cash distributed to that Partner by the Partnership, (B) the fair market value of property distributed to that Partner by the Partnership (net of liabilities secured by that distributed property that such Partner assumes or takes subject to under Code Section 752), (C) that Partner's allocable share of expenditures of the Partnership described in Code Section 705(a)(2)(B), and (D) that Partner's allocable share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to <u>Sections 3.2</u>, <u>3.4</u> and <u>3.5</u>.

The provisions of this <u>Section 3.7</u> and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Code Section 704(b) and the Treasury Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions.  The General Partner may modify the manner in which the Capital Accounts are maintained under this <u>Section 3.7</u> in order to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions.

(b)    <u>Negative Capital Accounts</u>.  If any Partner has a deficit balance in its Capital Account, that Partner shall have no obligation to restore that negative balance or to make any Capital Contribution by reason thereof, and that negative balance shall not be considered an asset of the Partnership or of any Partner.

(c)    <u>Interest</u>.  No interest shall be paid by the Partnership on Capital Contributions or on balances in Capital Accounts.

(d)    <u>No Withdrawal</u>.  No Partner shall be entitled to withdraw any part of his/her/its Capital Contribution or his/her/its Capital Account or to receive any distribution from the Partnership, except as provided in <u>Section 3.9</u> and <u>Article 5</u>.

(e)    <u>Loans From Partners</u>.  Loans by a Partner to the Partnership shall not be considered Capital Contributions.

(f)    <u>Revaluations</u>.  The Capital Accounts of the Partners shall not be "booked-up" or "booked-down" to their fair market values under Treasury Regulations Section 1.704(c)-1(b)(2)(iv)(f) or otherwise.

11

019415

HCMLPHMIT00002654

**3.8.   Distributive Share for Tax Purpose.** All items of income, deduction, gain, loss or credit that are recognized for federal income tax purposes will be allocated among the Partners in accordance with the allocations of Profits and Losses hereunder as determined by the General Partner in its sole and unfettered discretion. Notwithstanding the foregoing, the General Partner may (i) as to each New Issue, specially allocate to the Partners who were allocated New Issue Profit from that New Issue any short-term capital gains realized during the Fiscal Year upon the disposition of such New Issue during that Fiscal Year, and (ii) specially allocate items of gain (or loss) to Partners who withdraw capital during any Fiscal Year in a manner designed to ensure that each withdrawing Partner is allocated gain (or loss) in an amount equal to the difference between that Partner's Capital Account balance (or portion thereof being withdrawn) at the time of the withdrawal and the tax basis for his/her/ its Partnership Interest at that time (or proportionate amount thereof); *provided, however,* that the General Partner may, without the consent of any other Partner, (a) alter the allocation of any item of taxable income, gain, loss, deduction or credit in any specific instance where the General Partner, in its sole and unfettered discretion, determines such alteration to be necessary or appropriate to avoid a materially inequitable result *(e.g.,* where the allocation would create an inappropriate tax liability); and/or (b) adopt whatever other method of allocating tax items as the General Partner determines is necessary or appropriate in order to be consistent with the spirit and intent of the Treasury Regulations under Code Sections 704(b) and 704(c).

**3.9.   Distributions.**

(a)   <u>General</u>.   The General Partner may make such pro rata or non-pro rata distributions as it may determine in its sole and unfettered discretion, without being limited to current or accumulated income or gains, but no such distribution shall be made out of funds required to make current payments on Partnership indebtedness; provided, however, that the General Partner may not make non-pro rata distributions under this Section 3.9(a) during an NAV Ratio Trigger Period without the consent of the Class B Limited Partner (in the case of a Class B NAV Ratio Trigger Period) and/or the Class C Limited Partner (in the case of a Class C NAV Ratio Trigger Period); provided, further this provision should not be interpreted to limit in any way the General Partner's ability to make non-pro rata tax distributions under Section 3.9(c) and Section 3.9(f). The Partnership has entered into one or more credit facilities with financial institutions that may limit the amount and timing of distributions to the Partners. Thus, the Partners acknowledge that distributions from the Partnership may be limited. Any distributions made to the Class B Limited Partner or the Class C Limited Partner pursuant to Section 3.9(b) shall reduce distributions otherwise allocable to such Partners under this Section 3.9(a) until such aggregate reductions are equal to the aggregate distributions made to the Class B Partners and the Class C Partners under Section 3.9(b).

(b)   <u>Priority Distributions</u>.   Prior to the distribution of any amounts to Partners pursuant to Section 3.9(a), and notwithstanding any other provision in this Agreement to the contrary, the Partnership shall make the following distributions ("**Priority Distributions**") pro-rata among the Class B Limited Partner and the Class C Limited Partner in accordance with their relative Percentage Interests:

(i)   No later than March 31st of each calendar year, commencing March 31, 2017, an amount equal to $1,600,000.00;

(ii)   No later than March 31st of each year, commencing March 31, 2017, an amount equal to three percent (3%) of the Partnership's investment gain for the prior year, as reflected in the Partnership's books and records within ledger account number 90100 plus three percent (3%) of the gross realized investment gains for the prior year of Highland Select Equity Fund, as reflected in its books and records;

12

019416

HCMLPHMIT00002655

(iii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to ten percent (10%) of the Partnership's Operating Cash Flow for the prior year; and

(iv)    No later than December 24th of each year, commencing December 24, 2016, an amount equal to the aggregate annual principal and interest payments on the Purchase Notes for the then current year.

(c)    <u>Tax Distributions</u>.  The General Partner may, in its sole discretion, declare and make cash distributions pursuant hereto to the Partners to allow the federal and state income tax attributable to the Partnership's taxable income that is passed through the Partnership to the Partners to be paid by such Partners (a "***Tax Distribution***").  The General Partner may, in its discretion, make Tax Distributions to the Founding Partner Group without also making Tax Distributions to other Partners; provided, however, that if the General Partner makes Tax Distributions to the Founding Partner Group, Tax Distributions must also be made the Class B Limited Partner to the extent the Class B Limited Partner provides the Partnership with documentation showing it is subject to an entity-level federal income tax obligation.  Notwithstanding anything else in this Agreement, the General Partner may declare and pay Tax Distributions even if such Tax Distributions cause the Partnership to be unable to make Priority Distributions under <u>Section 3.9(b)</u>.

(d)    <u>Payments Not Deemed Distributions</u>.    Any amounts paid pursuant to <u>Sections 4.1(e)</u> or <u>4.1(h)</u> shall not be deemed to be distributions for purposes of this Agreement.

(e)    <u>Withheld Amounts</u>.  Notwithstanding any other provision of this <u>Section 3.9</u> to the contrary, each Partner hereby authorizes the Partnership to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership with respect to that Partner as a result of that Partner's participation in the Partnership.  If and to the extent that the Partnership shall be required to withhold or pay any such taxes, that Partner shall be deemed for all purposes of this Agreement to have received a payment from the Partnership as of the time that withholding or tax is paid, which payment shall be deemed to be a distribution with respect to that Partner's Partnership Interest to the extent that the Partner (or any successor to that Partner's Partnership Interest) is then entitled to receive a distribution.  To the extent that the aggregate of such payments to a Partner for any period exceeds the distributions to which that Partner is entitled for that period, the amount of such excess shall be considered a loan from the Partnership to that Partner.  Such loan shall bear interest (which interest shall be treated as an item of income to the Partnership) at the "Applicable Federal Rate" (as defined in the Code), as determined hereunder from time to time, until discharged by that Partner by repayment, which may be made in the sole and unfettered discretion of the General Partner out of distributions to which that Partner would otherwise be subsequently entitled.  Any withholdings authorized by this <u>Section 3.9(d)</u> shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel or other evidence satisfactory to the General Partner to the effect that a lower rate is applicable, or that no withholding is applicable.

(f)    <u>Special Tax Distributions</u>.  The Partnership shall, upon request of such Founding Partner, make distributions to the Founding Partners (or loans, at the election of the General Partner) in an amount necessary for each of them to pay their respective federal income tax obligations incurred through the effective date of the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., the predecessor to this Agreement.

(g)    <u>Tolling of Priority Distributions</u>.  In the event of a "Honis Trigger Event," as defined in the Second Amended Buy-Sell and Redemption Agreement, the Partnership shall not make any distributions, including priority distributions under <u>Section 3.9(b)</u>, to the Class B Limited Partner or the Class C Limited Partner until such time as a replacement trust administrator, manager and general partner,

13

HCMLPHMIT00002656

as applicable, acceptable to the Partnership in its sole discretion, as indicated by an affirmative vote of consent by a Majority Interest, shall be appointed to the Class B Limited Partner/Class C Limited Partner and any of its direct or indirect owners that have governing documents directly affected by a Honis Trigger Event.

### 3.10.    Compensation and Reimbursement of General Partner.

(a)    Compensation.  The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements unless approved by a Majority Interest; provided, however, that no compensation above five million dollars per year may be approved, even by a Majority Interest, during a NAV Ratio Trigger Period.

(b)    Reimbursement for Expenses.  In addition to amounts paid under other Sections of this Agreement, the General Partner and its Affiliates shall be reimbursed for all expenses, disbursements, and advances incurred or made, and all fees, deposits, and other sums paid in connection with the organization and operation of the Partnership, the qualification of the Partnership to do business, and all related matters.

### 3.11.    Books, Records, Accounting, and Reports.

(a)    Records and Accounting.  The General Partner shall keep or cause to be kept appropriate books and records with respect to the Partnership's business, which shall at all times be kept at the principal office of the Partnership or such other office as the General Partner may designate for such purpose.  The books of the Partnership shall be maintained for financial reporting purposes on the accrual basis or on a cash basis, as the General Partner shall determine in its sole and unfettered discretion, in accordance with generally accepted accounting principles and applicable law.  Upon reasonable request, the Class B Limited Partner or the Class C Limited Partner may inspect the books and records of the Partnership.

(b)    Fiscal Year.  The fiscal year of the Partnership shall be the calendar year unless otherwise determined by the General Partner in its sole and unfettered discretion.

(c)    Other Information.  The General Partner may release information concerning the operations of the Partnership to any financial institution or other Person that has loaned or may loan funds to the Partnership or the General Partner or any of its Affiliates, and may release such information to any other Person for reasons reasonably related to the business and operations of the Partnership or as required by law or regulation of any regulatory body.

(d)    Distribution Reporting to Class B Limited Partner and Class C Limited Partner.  Upon request, the Partnership shall provide the Class B Limited Partner and/or the Class C Limited Partner information on any non-pro rata distributions made under Section 3.9 to Partners other than the Partner requesting the information.

### 3.12.    Tax Matters.

(a)    Tax Returns.  The General Partner shall arrange for the preparation and timely filing of all returns of Partnership income, gain, loss, deduction, credit and other items necessary for federal, state and local income tax purposes.  The General Partner shall deliver to each Partner as copy of his/her/its IRS Form K-1 as soon as practicable after the end of the Fiscal Year, but in no event later than October 1.  The classification, realization, and recognition of income, gain, loss, deduction, credit and

14

019418

HCMLPHMIT00002657

other items shall be on the cash or accrual method of accounting for federal income tax purposes, as the General Partner shall determine in its sole and unfettered discretion. The General Partner in its sole and unfettered discretion may pay state and local income taxes attributable to operations of the Partnership and treat such taxes as an expense of the Partnership.

(b)    Tax Elections. Except as otherwise provided herein, the General Partner shall, in its sole and unfettered discretion, determine whether to make any available tax election.

(c)    Tax Controversies. Subject to the provisions hereof, the General Partner is designated the Tax Matters Partner (as defined in Code Section 6231), and is authorized and required to represent the Partnership, at the Partnership's expense, in connection with all examinations of the Partnership's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith. Each Partner agrees to cooperate with the General Partner in connection with such proceedings.

(d)    Taxation as a Partnership. No election shall be made by the Partnership or any Partner for the Partnership to be excluded from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws.

## ARTICLE 4

## RIGHTS AND OBLIGATIONS OF PARTNERS

4.1.    **Rights and Obligations of the General Partner.** In addition to the rights and obligations set forth elsewhere in this Agreement, the General Partner shall have the following rights and obligations:

(a)    Management. The General Partner shall conduct, direct, and exercise full control of over all activities of the Partnership. Except as otherwise expressly provided in this Agreement, all management powers over the business and affairs of the Partnership shall be exclusively vested in the General Partner, and Limited Partners shall have no right of control over the business and affairs of the Partnership. In addition to the powers now or hereafter granted to a general partner of a limited partnership under applicable law or that are granted to the General Partner under any provision of this Agreement, the General Partner shall have full power and authority to do all things deemed necessary or desirable by it to conduct the business of the Partnership, including, without limitation: (i) the determination of the activities in which the Partnership will participate; (ii) the performance of any and all acts necessary or appropriate to the operation of any business of the Partnership (including, without limitation, purchasing and selling any asset, any debt instruments, any equity interests, any commercial paper, any note receivables and any other obligations); (iii) the procuring and maintaining of such insurance as may be available in such amounts and covering such risks as are deemed appropriate by the General Partner; (iv) the acquisition, disposition, sale, mortgage, pledge, encumbrance, hypothecation, of exchange of any or all of the assets of the Partnership; (v) the execution and delivery on behalf of, and in the name of the Partnership, deeds, deeds of trust, notes, leases, subleases, mortgages, bills of sale and any and all other contracts or instruments necessary or incidental to the conduct of the Partnership's business; (vi) the making of any expenditures, the borrowing of money, the guaranteeing of indebtedness and other liabilities, the issuance of evidences of indebtedness, and the incurrence of any obligations it deems necessary or advisable for the conduct of the activities of the Partnership, including, without limitation, the payment of compensation and reimbursement to the General Partner and its Affiliates pursuant to Section 3.10; (vii) the use of the assets of the Partnership (including, without limitation, cash on hand) for any Partnership purpose on any terms it sees fit, including, without limitation, the financing of operations of the Partnership, the lending of funds to other Persons, and the repayment of obligations

15

HCMLPHMIT00002658

of the Partnership; (viii) the negotiation, execution, and performance of any contracts that it considers desirable, useful, or necessary to the conduct of the business or operations of the Partnership or the implementation of the General Partner's powers under this Agreement; (ix) the distribution of Partnership cash or other assets; (x) the selection, hiring and dismissal of employees, attorneys, accountants, consultants, contractors, agents and representatives and the determination of their compensation and other teens of employment or hiring; (xi) the formation of any further limited or general partnerships, joint ventures, or other relationships that it deems desirable and the contribution to such partnerships, ventures, or relationships of assets and properties of the Partnership; and (xii) the control of any matters affecting the rights and obligations of the Partnership, including, without limitation, the conduct of any litigation, the incurring of legal expenses, and the settlement of claims and suits.

(b)    Certificate of Limited Partnership.  The General Partner caused the Certificate of Limited Partnership of the Partnership to be filed with the Secretary of State of Delaware as required by the Delaware Act and shall cause to be filed such other certificates or documents (including, without limitation, copies, amendments, or restatements of this Agreement) as may be determined by the General Partner to be reasonable and necessary or appropriate for the formation, qualification, or registration and operation of a limited partnership (or a partnership in which Limited Partners have limited liability) in the State of Delaware and in any other state where the Partnership may elect to do business.

(c)    Reliance by Third Parties.  Notwithstanding any other provision of this Agreement to the contrary, no lender or purchaser or other Person, including any purchaser of property from the Partnership or any other Person dealing with the Partnership, shall be required to verify any representation by the General Partner as to its authority to encumber, sell, or otherwise use any assess or properties of the Partnership, and any such lender, purchaser, or other Person shall be entitled to rely exclusively on such representations and shall be entitled to deal with the General Partner as if it were the sole party in interest therein, both legally and beneficially.  Each Limited Partner hereby waives any and all defenses or other remedies that may be available against any such lender, purchaser, or other Person to contest, negate, or disaffirm any action of the General Partner in connection with any such sale or financing.  In no event shall any Person dealing with the General Partner or the General Partner's representative with respect to any business or property of the Partnership be obligated to ascertain that the terms of this Agreement have been complied with, and each such Person shall be entitled to rely on the assumptions that the Partnership has been duly formed and is validly in existence.  In no event shall any such Person be obligated to inquire into the necessity or expedience of any act or action of the General Partner or the General Partner's representative, and every contract, agreement, deed, mortgage, security agreement, promissory note, or other instrument or document executed by the General Partner or the General Partner's representative with respect to any business or property of the Partnership shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i), at the time of the execution and delivery thereof, this Agreement was in full force and effect; (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Partnership; and (iii) the General Partner or the General Partner's representative was duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership.

(d)    Partnership Funds.  The funds of the Partnership shall be deposited in such account or accounts as are designated by the General Partner.  The General Partner may, in its sole and unfettered discretion, deposit funds of the Partnership in a central disbursing account maintained by or in the name of the General Partner, the Partnership, or any other Person into which funds of the General Partner, the Partnership, on other Persons are also deposited; *provided, however,* at all times books of account are maintained that show the amount of funds of the Partnership on deposit in such account and interest accrued with respect to such funds as credited to the Partnership.  The General Partner may use the funds of the Partnership as compensating balances for its benefit; *provided, however,* such funds do

16

HCMLPHMIT00002659

not directly or indirectly secure, and are not otherwise at risk on account of, any indebtedness or other obligation of the General Partner or any director, officer, employee, agent, representative, or Affiliate thereof. Nothing in this Section 4.1(d) shall be deemed to prohibit or limit in any manner the right of the Partnership to lend funds to the General Partner or any Affiliate thereof pursuant to Section 4.1(e)(i). All withdrawals from or charges against such accounts shall be made by the General Partner or by its representatives. Funds of the Partnership may be invested as determined by the General Partner in accordance with the terms and provisions of this Agreement.

(e)     Loans to or from General Partner; Contracts with Affiliates; Joint Ventures.

(i)     The General Partner or any Affiliate of the General Partner may lend to the Partnership funds needed by the Partnership for such periods of time as the General Partner may determine; *provided, however,* the General Partner or its Affiliate may not charge the Partnership interest at a rate greater than the rate (including points or other financing charges or fees) that would be charged the Partnership (without reference to the General Partner's financial abilities or guaranties) by unrelated lenders on comparable loans. The Partnership shall reimburse the General Partner or its Affiliate, as the case may be, for any costs incurred by the General Partner or that Affiliate in connection with the borrowing of funds obtained by the General Partner or that Affiliate and loaned to the Partnership. The Partnership may loan funds to the General Partner and any member of the Founding Partner Group at the General Partner's sole and exclusive discretion.

(ii)    The General Partner or any of its Affiliates may enter into an agreement with the Partnership to render services, including management services, for the Partnership. Any service rendered for the Partnership by the General Partner or any Affiliate thereof shall be on terms that are fair and reasonable to the Partnership.

(iii)   The Partnership may Transfer any assets to joint ventures or other partnerships in which it is or thereby becomes a participant upon terms and subject to such conditions consistent with applicable law as the General Partner deems appropriate; provided, however, that the Partnership may not transfer any asset to the General Partner or one of its Affiliates during any NAV Ratio Trigger Period for consideration less than such asset's fair market value.

(f)     Outside Activities' Conflicts of Interest. The General Partner or any Affiliate thereof and any director, officer, employee, agent, or representative of the General Partner or any Affiliate thereof shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership, including, without limitation, business interests and activities in direct competition with the Partnership. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement or the partnership relationship created hereby in any business ventures of the General Partner, any Affiliate thereof, or any director, officer, employee, agent, or representative of either the General Partner or any Affiliate thereof.

(g)     Resolution of Conflicts of Interest. Unless otherwise expressly provided in this Agreement or any other agreement contemplated herein, whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Limited Partner, on the other hand, any action taken by the General Partner, in the absence of bad faith by the General Partner, shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein or under the Delaware Act or any other applicable law, rule, or regulation.

(h)     Indemnification. The Partnership shall indemnify and hold harmless the General Partner and any director, officer, employee, agent, or representative of the General Partner (collectively,

019421

HCMLPHMIT00002660

the "*GP Party*"), against all liabilities, losses, and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the Partnership, or in connection with the Partnership's business, including, without limitation, attorneys' fees and any amounts expended in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by the Delaware Act; *provided, however,* the Partnership shall have no obligation to indemnify and hold harmless a GP Party for any action or inaction that constitutes gross negligence or willful or wanton misconduct. The Partnership, in the sole and unfettered discretion of the General Partner, may indemnify and hold harmless any Limited Partner, employee, agent, or representative of the Partnership, any Person who is or was serving at the request of the Partnership acting through the General Partner as a director, officer, partner, trustee, employee, agent, or representative of another corporation, partnership, joint venture, trust, or other enterprise, and any other Person to the extent determined by the General Partner in its sole and unfettered discretion, but in no event shall such indemnification exceed the indemnification permitted by the Delaware Act. Notwithstanding anything to the contrary in this Section 4.1(h) or elsewhere in this Agreement, no amendment to the Delaware Act after the date of this Agreement shall reduce or limit in any manner the indemnification provided for or permitted by this Section 4.1(h) unless such reduction or limitation is mandated by such amendment for limited partnerships formed prior to the enactment of such amendment. In no event shall Limited Partners be subject to personal liability by reason of the indemnification provisions of this Agreement.

       (i)    Liability of General Partner.

           (i)    Neither the General Partner nor its directors, officers, employees, agents, or representatives shall be liable to the Partnership or any Limited Partner for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful or wanton misconduct.

           (ii)    The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its directors, officers, employees, agents, or representatives, and the General Partner shall not be responsible for any misconduct or negligence on the part of any agent or representative appointed by the General Partner.

       (j)    Reliance by General Partner.

           (i)    The General Partner may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

           (ii)    The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it, and any opinion of any such Person as to matters which the General Partner believes to be within such Person's professional or expert competence shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by the General Partner hereunder in good faith and in accordance with such opinion.

       (k)    The General Partner may, from time to time, designate one or more Persons to be officers of the Partnership. No officer need be a Partner. Any officers so designated shall have such authority and perform such duties as the General Partner may, from time to time, delegate to them. The General Partner may assign titles to particular officers, including, without limitation, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer. Each officer shall hold office until such Person's successor shall be duly designated and shall qualify or until such Person's death or

019422

HCMLPHMIT00002661

until such Person shall resign or shall have been removed in the manner hereinafter provided. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Partnership shall be fixed from time to time by the General Partner. Any officer may be removed as such, either with or without cause, by the General Partner whenever in the General Partner's judgment the best interests of the Partnership will be served thereby. Any vacancy occurring in any office of the Partnership may be filled by the General Partner.

    **4.2.**    **Rights and Obligations of Limited Partners.** In addition to the rights and obligations of Limited Partners set forth elsewhere in this Agreement, Limited Partners shall have the following rights and obligations:

    (a)    <u>Limitation of Liability</u>. Limited Partners shall have no liability under this Agreement except as provided herein or under the Delaware Act.

    (b)    <u>Management of Business</u>. No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

    (c)    <u>Return of Capital</u>. No Limited Partner shall be entitled to the withdrawal or return of its Capital Contribution except to the extent, if any, that distributions made pursuant to this Agreement or upon termination of the Partnership may be considered as such by law and then only to the extent provided for in this Agreement.

    (d)    <u>Second Amended Buy-Sell and Redemption Agreement</u>. Each Limited Partner shall comply with the terms and conditions of the Second Amended Buy-Sell and Redemption Agreement.

    (e)    <u>Default on Priority Distributions</u>. If the Partnership fails to timely pay Priority Distributions pursuant to Section 3.9(b), and the Partnership does not subsequently make such Priority Distribution within ninety days of its due date, the Class B Limited Partner or the Class C Limited Partner may require the Partnership to liquidate publicly traded securities held by the Partnership or Highland Select Equity Master Fund, L.P., a Delaware limited partnership controlled by the Partnership; provided, however, that the General Partner may in its sole discretion elect instead to liquidate other non-publicly traded securities owned by the Partnership in order to satisfy the Partnership's obligations under <u>Section 3.9(b)</u> and this <u>Section 4.2(e)</u>. In either case, Affiliates of the General Partner shall have the right of first offer to purchase any securities liquidated under this <u>Section 4.2(e)</u>.

    **4.3.**    **Transfer of Partnership Interests.**

    (a)    <u>Transfer</u>. No Partnership Interest shall be Transferred, in whole or in part, except in accordance with the terms and conditions set forth in this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement. Any Transfer or purported Transfer of any Partnership Interest not made in accordance with this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement shall be null and void. An alleged transferee shall have no right to require any information or account of the Partnership's transactions or to inspect the Partnership's books. The Partnership shall be entitled to treat the alleged transferor of a Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability to any alleged transferee for distributions to the Partner owning that Partnership Interest of record or for allocations of Profits, Losses, deductions or credits or for transmittal of reports and notices required to be given to holders of Partnership Interests.

019423

HCMLPHMIT00002662

(b)      Transfers by General Partner.  The General Partner may Transfer all, but not less than all, of its Partnership Interest to any Person only with the approval of a Majority Interest; provided, however, that the General Partner may not Transfer its Partnership Interest during any NAV Ratio Trigger Period except to the extent such Transfers are for estate planning purposes or resulting from the death of the individual owner of the General Partner.  Any Transfer by the General Partner of its Partnership Interest under this Section 4.3(b) to an Affiliate of the General Partner or any other Person shall not constitute a withdrawal of the General Partner under Section 4.5(a), Section 5.1(b), or any other provision of this Agreement.  If any such Transfer is deemed to constitute a withdrawal under such provisions or otherwise and results in the dissolution of the Partnership under this Agreement or the laws of any jurisdiction to which the Partnership of this Agreement is subject, the Partners hereby unanimously consent to the reconstitution and continuation of the Partnership immediately following such dissolution, pursuant to Section 5.2.

(c)      Transfers by Limited Partners.  The Partnership Interest of a Limited Partner may not be Transferred without the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), and in accordance with the Second Amended Buy-Sell and Redemption Agreement.

(d)      Distributions and Allocations in Respect of Transferred Partnership Interests.  If any Partnership Interest is Transferred during any Fiscal Year in compliance with the provisions of Article 4 and the Second Amended Buy-Sell and Redemption Agreement, Profits, Losses, and all other items attributable to the transferred interest for that period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner; provided that no allocations shall be made under this Section 4.3(d) that would affect any special allocations made under Section 3.4.  All distributions declared on or before the date of that Transfer shall be made to the transferor.  Solely for purposes of making such allocations and distributions, the Partnership shall recognize that Transfer not later than the end of the calendar month during which it is given notice of that Transfer; provided, however, if the Partnership does not receive a notice stating the date that Partnership Interest was Transferred and such other information as the General Partner may reasonably require within thirty (30) days after the end of the Fiscal Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the Partnership, on the last day of the Fiscal Year during which the Transfer occurs, was the owner of the Partnership Interest.  Neither the Partnership nor any Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 4.3(d), whether or not any Partner or the Partnership has knowledge of any Transfer of ownership of any Partnership Interest.

(e)      Forfeiture of Partnership Interests Pursuant to the Contribution Note.  In the event any Class B Limited Partnership Interests are forfeited in favor of the Partnership as a result of any default on the Contribution Note, the Capital Accounts and Percentage Interests associated with such Class B Limited Partnership Interests shall be allocated pro rata among the Class A Partners.  The Priority Distributions in Section 3.9(b) made after the date of such forfeiture shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the Class B Limited Partnership Interest transferred pursuant to this Section 4.3(e) over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any forfeiture of such Class B Limited Partnership Interest.

(f)      Transfers of Partnership Interests Pursuant to the Purchase Notes. Notwithstanding any other provision in this Agreement, the Partnership shall respect, and the General Partner hereby provides automatic consent for, any transfers (in whole or transfers of partial interests) of

20

019424

HCMLPHMIT00002663

the Class C Limited Partnership Interests, or a portion thereof, if such transfer occurs as a result of a default on the Purchase Notes. Upon the transfer of any Class C Limited Partnership Interest to any member of the Founding Partner Group (or their assigns), such Class C Limited Partnership Interest shall automatically convert to a Class A Partnership Interest. The Priority Distributions in Section 3.9(b) shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the transferred Class C Limited Partnership Interest over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any transfer of such Class C Limited Partnership Interest.

### 4.4.    Issuances of Partnership Interests to New and Existing Partners.

(a)    Issuance of Partnership Interests to New Limited Partners. The General Partner may admit one or more additional Persons as Limited Partners ("Additional Limited Partners") to the Partnership at such times and upon such terms as it deems appropriate in its sole and unfettered discretion; provided, however, that the General Partner may only admit additional Persons as Limited Partners in relation to the issuance of equity incentives to key employees of the Partnership; provided, further that the General Partner may not issue such equity incentives to the extent they entitle the holders, in the aggregate, to a Percentage Interest in excess of twenty percent without the consent of the Class B Limited Partner and the Class C Limited Partner. All Class A Limited Partners, the Class B Limited Partner and the Class C Limited Partner shall be diluted proportionately by the issuance of such limited partnership interests. No Person may be admitted to the Partnership as a Limited Partner until he/she/it executes an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.

(b)    Issuance of an Additional Partnership Interest to an Existing Partner. The General Partner may issue an additional Partnership Interest to any existing Partner at such times and upon such terms as it deems appropriate in its sole and unfettered discretion. Upon the issuance of an additional Partnership Interest to an existing Partner, the Percentage Interests of the members of the Founding Partner Group shall be diluted proportionately. Any additional Partnership Interest shall be subject to all the terms and conditions of this Agreement and the Second Amended Buy-Sell and Redemption Agreement.

### 4.5.    Withdrawal of General Partner

(a)    Option. In the event of the withdrawal of the General Partner from the Partnership, the departing General Partner (the "*Departing Partner*") shall, at the option of its successor (if any) exercisable prior to the effective date of the departure of that Departing Partner, promptly receive from its successor in exchange for its Partnership Interest as the General Partner, an amount in cash equal to its Capital Account balance, determined as of the effective date of its departure.

(b)    Conversion. If the successor to a Departing Partner does not exercise the option described in Section 4.5(a), the Partnership Interest of the Departing Partner as the General Partner of the Partnership shall be converted into a Partnership Interest as a Limited Partner.

### 4.6.    Admission of Substitute Limited Partners and Successor General Partner.

(a)    Admission of Substitute Limited Partners. A transferee (which may be the heir or legatee of a Limited Partner) or assignee of a Limited Partner's Partnership Interest shall be entitled to receive only the distributive share of the Partnership's Profits, Losses, deductions, and credits attributable to that Partnership Interest. To become a substitute Limited Partner (a "*Substitute Limited Partner*"),

21

HCMLPHMIT00002664

that transferee or assignee shall (1) obtain the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), (ii) comply with all the requirements of this Agreement and the Second Amended Buy-Sell and Redemption Agreement with respect to the Transfer of the Partnership Interest at issue, and (iii) execute an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement. Upon admission of a Substitute Limited Partner, that Limited Partner shall be subject to all of the restrictions applicable to, shall assume all of the obligations of, and shall attain the status of a Limited Partner under and pursuant to this Agreement with respect to the Partnership Interest held by that Limited Partner.

(b)     Admission of Successor General Partner. A successor General Partner selected pursuant to Section 5.2 or the transferee of or successor to all of the Partnership Interest of the General Partner pursuant to Section 4.3(b) shall be admitted to the Partnership as the General Partner, effective as of the date of the withdrawal or removal of the predecessor General Partner or the date of Transfer of that predecessor's Partnership Interest.

(c)     Action by General Partner. In connection with the admission of any substitute Limited Partner or successor General Partner or any additional Limited Partner, the General Partner shall have the authority to take all such actions as it deems necessary or advisable in connection therewith, including the amendment of Exhibit A and the execution and filing with appropriate authorities of any necessary documentation.

# ARTICLE 5

# DISSOLUTION AND WINDING UP

5.1.     **Dissolution.** The Partnership shall be dissolved upon:

(a)     The withdrawal, bankruptcy, or dissolution of the General Partner, or any other event that results in its ceasing to be the General Partner (other than by reason of a Transfer pursuant to Section 4.3(b));

(b)     An election to dissolve the Partnership by the General Partner that is approved by the affirmative vote of a Majority Interest; *provided, however,* the General Partner may dissolve the Partnership without the approval of the Limited Partners in order to comply with Section 14 of the Second Amended Buy-Sell and Redemption Agreement; or

(c)     Any other event that, under the Delaware Act, would cause its dissolution.

For purposes of this Section 5.1, the bankruptcy of the General Partner shall be deemed to have occurred when the General Partner: (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding: (iv) files a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the General Partner in a proceeding of the type described in clauses (i) through (iv) of this paragraph; (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties; or (vii) one hundred twenty (120) days expire after the date of the commencement of a proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or

019426

HCMLPHMIT00002665

similar relief under any law if the proceeding has not been previously dismissed, or ninety (90) days expire after the date of the appointment, without the General Partner's consent or acquiescence, of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties if the appointment has not previously been vacated or stayed, or ninety (90) days expire after the date of expiration of a stay, if the appointment has not previously been vacated.

**5.2.    Continuation of the Partnership.**  Upon the occurrence of an event described in <u>Section 5.1(a)</u>, the Partnership shall be deemed to be dissolved and reconstituted if a Majority Interest elect to continue the Partnership within ninety (90) days of that event.  If no election to continue the Partnership is made within ninety (90) days of that event, the Partnership shall conduct only activities necessary to wind up its affairs.  If an election to continue the Partnership is made upon the occurrence of an event described in <u>Section 5.1(a)</u>, then:

(a)    Within that ninety (90)-day period a successor General Partner shall be selected by a Majority Interest;

(b)    The Partnership shall be deemed to be reconstituted and shall continue until the end of the term for which it is formed unless earlier dissolved in accordance with this <u>Article 5</u>;

(c)    The interest of the former General Partner shall be converted to an interest as a Limited Partner; and

(d)    All necessary steps shall be taken to amend or restate this Agreement and the Certificate of Limited Partnership, and the successor General Partner may for this purpose amend this Agreement and the Certificate of Limited Partnership, as appropriate, without the consent of any Partner.

**5.3.    Liquidation.**  Upon dissolution of the Partnership, unless the Partnership is continued under <u>Section 5.2</u>, the General Partner or, in the event the General Partner has been dissolved, becomes bankrupt (as defined in <u>Section 5.1</u>), or withdraws from the Partnership, a liquidator or liquidating committee selected by a Majority Interest, shall be the Liquidator.  The Liquidator (if other than the General Partner) shall be entitled to receive such compensation for its services as may be approved by a Majority Interest.  The Liquidator shall agree not to resign at any time without fifteen (15) days' prior written notice and (if other than the General Partner) may be removed at any time, with or without cause, by notice of removal approved by a Majority Interest.  Upon dissolution, removal, or resignation of the Liquidator, a successor and substitute Liquidator (who shall have and succeed to all rights, powers, and duties of the original Liquidator) shall within thirty (30) days thereafter be selected by a Majority Interest.  The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator shall be deemed to refer also to any such successor or substitute Liquidator appointed in the manner provided herein.  Except as expressly provided in this <u>Article 5</u>, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto, all of the powers conferred upon the General Partner under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Partnership as provided herein.  The Liquidator shall liquidate the assets of the Partnership and apply and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

019427

HCMLPHMIT00002666

(a)      To the payment of the expenses of the terminating transactions including, without limitation, brokerage commission, legal fees, accounting fees and closing costs;

(b)      To the payment of creditors of the Partnership, including Partners, in order of priority provided by law;

(c)      To the Partners and assignees to the extent of, and in proportion to, the positive balances in their respective Capital Accounts as provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2); *provided, however,* the Liquidator may place in escrow a reserve of cash or other assets of the Partnership for contingent liabilities in an amount determined by the Liquidator to be appropriate for such purposes; and

(d)      To the Partners in proportion to their respective Percentage Interests.

**5.4.    Distribution in Kind.**  Notwithstanding the provisions of Section 5.3 that require the liquidation of the assets of the Partnership, but subject to the order of priorities set forth therein, if on dissolution of the Partnership the Liquidator determines that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners and assignees, the Liquidator may defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Partnership (other than those to Partners) and/or may distribute to the Partners and assignees, in lieu of cash, as tenants in common and in accordance with the provisions of Section 5.3, undivided interests in such Partnership assets as the Liquidator deems not suitable for liquidation.  Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any joint operating agreements or other agreements governing the operation of such properties at such time.  The Liquidator shall determine the fair market value of any property distributed in kind using such reasonable method of valuation as it may adopt.

**5.5.    Cancellation of Certificate of Limited Partnership.**  Upon the completion of the distribution of Partnership property as provided in Sections 5.3 and 5.4, the Partnership shall be terminated, and the Liquidator (or the General Partner and Limited Partners if necessary) shall cause the cancellation of the Certificate of Limited Partnership in the State of Delaware and of all qualifications and registrations of the Partnership as a foreign limited partnership in jurisdictions other **than** the State of Delaware and shall take such other actions as may be necessary to terminate the Partnership.

**5.6.    Return of Capital.**  The General Partner shall not be personally liable for the return of the Capital Contributions of Limited Partners, or any portion thereof, it being expressly understood that any such return shall be **made** solely from Partnership assets.

**5.7.    Waiver of Partition.**  Each Partner hereby waives any rights to partition of the Partnership property.

## ARTICLE 6

## GENERAL PROVISIONS

**6.1.    Amendments to Agreement.**  The General Partner may amend this Agreement without the consent of any Partner if the General Partner reasonably determines that such amendment is necessary and appropriate; *provided, however, any* action taken by the General Partner shall be subject to its fiduciary duties to the Limited Partners under the Delaware Act; provided further that any amendments

24

019428

HCMLPHMIT00002667

that adversely affect the Class B Limited Partner or the Class C Limited Partner may only be made with the consent of such Partner adversely affected.

**6.2. Addresses and Notices.** Any notice, demand, request, or report required or permitted to be given or made to a Partner under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by United States registered or certified mail to the Partner at his/her/its address as shown on the records of the Partnership, regardless of any claim of any Person who may have an interest in any Partnership Interest by reason of an assignment or otherwise.

**6.3. Titles and Captions.** All article and section titles and captions in the Agreement are for convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend, or describe the scope or intent of any provisions hereof. Except as specifically provided otherwise, references to "Articles," "Sections" and "Exhibits" are to "Articles," "Sections" and "Exhibits" of this Agreement. All Exhibits hereto are incorporated herein by reference.

**6.4. Pronouns and Plurals.** Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns, and verbs shall include the plural and vice versa.

**6.5. Further Action.** The parties shall execute all documents, provide all information, and take or refrain from taking all actions as may be necessary or appropriate to achieve the purposes of this Agreement.

**6.6. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns.

**6.7. Integration.** This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

**6.8. Creditors.** None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership.

**6.9. Waiver.** No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement, or condition.

**6.10. Counterparts.** This agreement may be executed in counterparts, all of which together shall constitute one agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

**6.11. Applicable Law.** This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to the principles of conflicts of law.

**6.12. Invalidity of Provisions.** If any provision of this Agreement is declared or found to be illegal, unenforceable, or void, in whole or in part, then the parties shall be relieved of all obligations arising under that provision, but only to the extent that it is illegal, unenforceable, or void, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying that provision to the extent necessary to make it legal and enforceable while preserving its intent or, if that is

25

019429

HCMLPHMIT00002668

not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives.

6.13.   **General Partner Discretion.**  Whenever the General Partner may use its sole discretion, the General Partner may consider any items it deems relevant, including its own interest and that of its affiliates.

6.14.   **Mandatory Arbitration.**  In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief.  The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service.  A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas.  The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.  The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules.  All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site.  Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees.  The duty to arbitrate described above shall survive the termination of this Agreement.  Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.  All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

26

019430

HCMLPHMIT00002669

*Remainder of Page intentionally Left Blank.*
*Signature Page Follows.*

019431

HCMLPHMIT00002670

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

STRAND ADVISORS, INC.,
a Delaware corporation

By:  _____
       James D. Dondero,
       President


LIMITED PARTNERS:

THE DUGABOY INVESTMENT TRUST

By:  _____
Name:  Nancy M. Dondero
Its:      Trustee

THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1

By:  _____
Name:  Lawrence Tonomura
Its:      Trustee

THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2

By:  _____
Name:  Lawrence Tonomura
Its:      Trustee


MARK K. OKADA

_____
Mark K. Okada


*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

019432

HCMLPHMIT00002671

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____

    James D. Dondero,
    President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated
Agreement of Limited Partnership*

019433

HCMLPHMIT00002672

**HUNTER MOUNTAIN INVESTMENT TRUST**
By: Beacon Mountain LLC, Administrator

By:
Name: John Honis
Its:    President

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

019434

HCMLPHMIT00002673

## EXHIBIT A

| CLASS A PARTNERS | Percentage Interest | |
|---|---|---|
| | By Class | Effective % |
| GENERAL PARTNER: | | |
| Strand Advisors | 0.5573% | 0.2508% |
| LIMITED PARTNERS: | | |
| The Dugaboy Investment Trust | 74.4426% | 0.1866% |
| Mark K. Okada | 19.4268% | 0.0487% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #1 | 3.9013% | 0.0098% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #2 | 1.6720% | 0.0042% |
| Total Class A Percentage Interest | 100.0000% | 0.500% |
| **CLASS B LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 55.0000% |
| **CLASS C LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 44.500% |
| **PROFIT AND LOSS AMONG CLASSES** | | |
| Class A Partners | 0.5000% | |
| Class B Partners | 55.0000% | |
| Class C Partners | 44.5000% | |

019435

HCMLPHMIT00002674

## EXHIBIT B

### ADDENDUM
### TO THE
### FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP
### OF
### HIGHLAND CAPITAL MANAGEMENT, L.P.

THIS ADDENDUM (this "**Addendum**") to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, to be effective as of December 24, 2015, as amended from time to time (the "Agreement"), is made and entered into as of the ___ day of _____, 20_, by and between Strand Advisors, Inc., as the sole General Partner (the "**General Partner**") of Highland Capital Management, L.P. (the "**Partnership**") and _____ ("_____") (except as otherwise provided herein, all capitalized terms used herein shall have the meanings set forth in the Agreement).

### RECITALS:

WHEREAS, the General Partner, in its sole and unfettered discretion, and without the consent of any Limited Partner, has the authority under (i) Section 4.4 of the Agreement to admit Additional Limited Partners, (ii) Section 4.6 of the Agreement to admit Substitute Limited Partners and (iii) Section 6.1 of the Agreement to amend the Agreement;

WHEREAS, the General Partner desires to admit _____ as a Class __ Limited Partner holding a __% Percentage Interest in the Partnership as of the date hereof;

WHEREAS, _____ desires to become a Class __ Limited Partner and be bound by the terms and conditions of the Agreement; and

WHEREAS, the General Partner desires to amend the Agreement to add _____ as a party thereto.

### AGREEMENT:

RESOLVED, as a condition to receiving a Partnership Interest in the Partnership, _____ acknowledges and agrees that he/she/it (i) has received and read a copy of the Agreement, (ii) shall be bound by the terms and conditions of the Agreement; and (iii) shall promptly execute an addendum to the Second Amended Buy-Sell and Redemption Agreement; and be it

FURTHER RESOLVED, the General Partner hereby amends the Agreement to add _____ as a Limited Partner, and the General Partner shall attach this Addendum to the Agreement and make it a part thereof; and be it

FURTHER RESOLVED, this Addendum may be executed in any number of counterparts, all of which together shall constitute one Addendum binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

019436

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the day and year above written.

GENERAL PARTNER:

**STRAND ADVISORS, INC.**

By: _____
Name: _____
Title: _____


NEW LIMITED PARTNER:

[_____]


AGREED AND ACCEPTED:

In consideration of the terms of this Addendum and the Agreement, in consideration of the Partnership's allowing the above signed Person to become a Limited Partner of the Partnership, and for other good and valuable consideration receipt of which is hereby acknowledged, the undersigned shall be bound by the terms and conditions of the Agreement as though a party thereto.

SPOUSE OF NEW LIMITED PARTNER:

[_____]

019437

HCMLPHMIT00002676

# EXHIBIT 115

019438

# Form 1065

**Department of the Treasury
Internal Revenue Service**

## U.S. Return of Partnership Income

For calendar year 2018, or tax year beginning _____ , 2018, ending _____ , 20 ____.

▶ Go to *www.irs.gov/Form1065* for instructions and the latest information.

OMB No. 1545-0123

**2018**

| | | |
|---|---|---|
| **A** Principal business activity<br>INVESTMENT MANAGEMENT | Name of partnership<br>HIGHLAND CAPITAL MANAGEMENT, LP | **D** Employer identification number<br>75-2716725 |
| **B** Principal product or service<br>INVESTMENT SERVICES | **Type or Print** — Number, street, and room or suite no. If a P.O. box, see instructions.<br>300 CRESCENT COURT, SUITE 700 | **E** Date business started<br>07/07/1997 |
| **C** Business code number<br>523900 | City or town, state or province, country, and ZIP or foreign postal code<br>DALLAS, TX 75201 | **F** Total assets (see instructions)<br>$ 1,043,466,149. |

**G** Check applicable boxes: **(1)** ☐ Initial return **(2)** ☐ Final return **(3)** ☐ Name change **(4)** ☐ Address change **(5)** ☐ Amended return

**H** Check accounting method: **(1)** ☐ Cash **(2)** ☒ Accrual **(3)** ☐ Other (specify) ▶ _____

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year. ▶ 6

**J** Check if Schedules C and M-3 are attached . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☒

**Caution:** Include **only** trade or business income and expenses on lines 1a through 22 below. See instructions for more information.

### Income

| | | | |
|---|---|---|---|
| **1a** | Gross receipts or sales . . . . . . . . . . . . | **1a** 45,840,305. | |
| **b** | Returns and allowances . . . . . . . . . . . | **1b** | |
| **c** | Balance. Subtract line 1b from line 1a . . . . . . . . . . . . . . . . | **1c** | 45,840,305. |
| **2** | Cost of goods sold (attach Form 1125-A) . . . . . . . . . . . . . . | **2** | |
| **3** | Gross profit. Subtract line 2 from line 1c . . . . . . . . . . . . . . | **3** | 45,840,305. |
| **4** | Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) STMT. 1 | **4** | -17,273,319. |
| **5** | Net farm profit (loss) (attach Schedule F (Form 1040)) . . . . . . . . | **5** | |
| **6** | Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) . . | **6** | |
| **7** | Other income (loss) (attach statement) . . . . . . SEE STATEMENT 1 | **7** | 1,286,935. |
| **8** | **Total income (loss).** Combine lines 3 through 7 . . . . . . . . . . | **8** | 29,853,921. |

### Deductions (see instructions for limitations)

| | | | |
|---|---|---|---|
| **9** | Salaries and wages (other than to partners) (less employment credits) . | **9** | 33,449,969. |
| **10** | Guaranteed payments to partners . . . . . . . . . . . . . . . . | **10** | |
| **11** | Repairs and maintenance . . . . . . . . . . . . . . . . . . . | **11** | 26,410. |
| **12** | Bad debts . . . . . . . . . . . . . . . . . . . . . . . . . | **12** | 6,583,982. |
| **13** | Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **13** | 1,615,192. |
| **14** | Taxes and licenses . . . . . . . . . . SEE STATEMENT 1 | **14** | 1,918,825. |
| **15** | Interest (see instructions) . . . . . . . SEE STATEMENT 1 | **15** | 1,674,962. |
| **16a** | Depreciation (if required, attach Form 4562) . . . | **16a** 539,809. | |
| **b** | Less depreciation reported on Form 1125-A and elsewhere on return | **16b** | 16c 539,809. |
| **17** | Depletion **(Do not deduct oil and gas depletion.)** . . . . . . . . | **17** | |
| **18** | Retirement plans, etc. . . . . . . . . . . . . . . . . . . . . | **18** | |
| **19** | Employee benefit programs . . . . . . . . . . . . . . . . . . | **19** | 1,890,053. |
| **20** | Other deductions (attach statement) . . . . . . . . . . . . . . | **20** | 23,266,179. |
| **21** | **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 . . . | **21** | 70,965,581. |
| **22** | **Ordinary business income (loss).** Subtract line 21 from line 8 . . . | **22** | -41,111,460. |

### Tax and Payment

| | | | |
|---|---|---|---|
| **23** | Interest due under the look-back method - completed long-term contracts (attach Form 8697) . | **23** | |
| **24** | Interest due under the look-back method - income forecast method (attach Form 8866) . . | **24** | |
| **25** | BBA AAR imputed underpayment (see instructions) . . . . . . . . | **25** | |
| **26** | Other taxes (see instructions) . . . . . . . . . . . . . . . . | **26** | |
| **27** | Total balance due. Add lines 23 through 27 . . . . . . . . . . . | **27** | |
| **28** | Payment (see instructions) . . . . . . . . . . . . . . . . . | **28** | |
| **29** | Amount owed. If line 28 is smaller than line 27, enter amount owed . | **29** | |
| **30** | Overpayment. If line 28 is larger than line 27, enter overpayment . . | **30** | |

### Sign Here

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

▶ _____   Date ▶ 9-15-19

Signature of partner or limited liability company member

May the IRS discuss this return with the preparer shown below? See instructions. ☒ Yes ☐ No

### Paid Preparer Use Only

| | | | |
|---|---|---|---|
| Print/Type preparer's name<br>TODD CRAWFORD | Preparer's signature<br>Todd Crawford | Date<br>09/12/2019 | Check ☐ if self-employed   PTIN<br>P00848788 |
| Firm's name ▶ DELOITTE TAX LLP | | | Firm's EIN ▶ 86-1065772 |
| Firm's address ▶ 1111 BAGBY STREET, SUITE 4500<br>HOUSTON, TX 77002-2591 | | | Phone no.<br>713-982-2000 |

For Paperwork Reduction Act Notice, see separate instructions.

JSA 8P1010 2.000

1128CM   1216

V18-6.3F

Form **1065** (2018)

019439

HCMLPHMIT00001332

Form **1065**

Department of the Treasury
Internal Revenue Service

### U.S. Return of Partnership Income

For calendar year 2018, or tax year beginning _____, 2018, ending _____, 20 _____.
▶ Go to *www.irs.gov/Form1065* for instructions and the latest information.

OMB No. 1545-0123

**2018**

| | | |
|---|---|---|
| **A** Principal business activity<br>INVESTMENT MANAGEMENT | Name of partnership<br>HIGHLAND CAPITAL MANAGEMENT, LP | **D** Employer identification number<br>75-2716725 |
| **B** Principal product or service<br>INVESTMENT SERVICES | Type<br>or<br>Print<br>Number, street, and room or suite no. If a P.O. box, see instructions.<br>300 CRESCENT COURT, SUITE 700 | **E** Date business started<br>07/07/1997 |
| **C** Business code number<br>523900 | City or town, state or province, country, and ZIP or foreign postal code<br>DALLAS, TX  75201 | **F** Total assets (see instructions)<br>$ 1,043,466,149. |

**G** Check applicable boxes: **(1)** ☐ Initial return **(2)** ☐ Final return **(3)** ☐ Name change **(4)** ☐ Address change **(5)** ☐ Amended return

**H** Check accounting method: **(1)** ☐ Cash **(2)** ☒ Accrual **(3)** ☐ Other (specify) ▶ _____

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year. ▶ 6

**J** Check if Schedules C and M-3 are attached . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☒

**Caution:** Include **only** trade or business income and expenses on lines 1a through 22 below. See instructions for more information.

| | | | | |
|---|---|---|---:|---:|
| **Income** | **1a** Gross receipts or sales . . . . . . . . . . . . . . . . | **1a** | 45,840,305. | |
| | **b** Returns and allowances . . . . . . . . . . . . . . . | **1b** | | |
| | **c** Balance. Subtract line 1b from line 1a . . . . . . . . . . . . . . . . . | **1c** | | 45,840,305. |
| | **2** Cost of goods sold (attach Form 1125-A) . . . . . . . . . . . . . . | **2** | | |
| | **3** Gross profit. Subtract line 2 from line 1c . . . . . . . . . . . . . . | **3** | | 45,840,305. |
| | **4** Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) STMT. 1 | **4** | | −17,273,319. |
| | **5** Net farm profit (loss) (attach Schedule F (Form 1040)) . . . . . . . . . | **5** | | |
| | **6** Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) . . . . | **6** | | |
| | **7** Other income (loss) (attach statement) . . . . . . . SEE STATEMENT 1 . . | **7** | | 1,286,935. |
| | **8** **Total income (loss).** Combine lines 3 through 7 . . . . . . . . . . . | **8** | | 29,853,921. |
| **Deductions** (see instructions for limitations) | **9** Salaries and wages (other than to partners) (less employment credits) . . . | **9** | | 33,449,969. |
| | **10** Guaranteed payments to partners . . . . . . . . . . . . . . . . . . | **10** | | |
| | **11** Repairs and maintenance . . . . . . . . . . . . . . . . . . . . . | **11** | | 26,410. |
| | **12** Bad debts . . . . . . . . . . . . . . . . . . . . . . . . . . . | **12** | | 6,583,982. |
| | **13** Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **13** | | 1,615,192. |
| | **14** Taxes and licenses . . . . . . . . . . . . . . SEE STATEMENT 1 . . | **14** | | 1,918,825. |
| | **15** Interest (see instructions) . . . . . . . . . . . SEE STATEMENT 1 . . | **15** | | 1,674,962. |
| | **16a** Depreciation (if required, attach Form 4562) . . . . . . . | **16a** | 539,809. | |
| | **b** Less depreciation reported on Form 1125-A and elsewhere on return | **16b** | | **16c** 539,809. |
| | **17** Depletion (**Do not deduct oil and gas depletion.**) . . . . . . . . . . | **17** | | |
| | **18** Retirement plans, etc. . . . . . . . . . . . . . . . . . . . . . | **18** | | |
| | **19** Employee benefit programs . . . . . . . . . . . . . . . . . . . | **19** | | 1,890,053. |
| | **20** Other deductions (attach statement) . . . . . . . . SEE STATEMENT 1 . . | **20** | | 23,266,179. |
| | **21** **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 | **21** | | 70,965,381. |
| | **22** **Ordinary business income (loss).** Subtract line 21 from line 8 . . . . . | **22** | | −41,111,460. |
| **Tax and Payment** | **23** Interest due under the look-back method - completed long-term contracts (attach Form 8697) . | **23** | | |
| | **24** Interest due under the look-back method - income forecast method (attach Form 8866) . . | **24** | | |
| | **25** BBA AAR imputed underpayment (see instructions) . . . . . . . . . . | **25** | | |
| | **26** Other taxes (see instructions) . . . . . . . . . . . . . . . . . . | **26** | | |
| | **27** **Total balance due.** Add lines 23 through 27 . . . . . . . . . . . . | **27** | | |
| | **28** Payment (see instructions) . . . . . . . . . . . . . . . . . . . | **28** | | |
| | **29** **Amount owed.** If line 28 is smaller than line 27, enter amount owed . . . | **29** | | |
| | **30** **Overpayment.** If line 28 is larger than line 27, enter overpayment . . . . | **30** | | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

_____   _____
Signature of partner or limited liability company member   Date

May the IRS discuss this return with the preparer shown below? See instructions. ☒ Yes ☐ No

**Paid Preparer Use Only**

| | | | |
|---|---|---|---|
| Print/Type preparer's name<br>TODD CRAWFORD | Preparer's signature<br>*Todd Crawford* | Date<br>09/12/2019 | Check ☐ if self-employed   PTIN<br>P00848788 |
| Firm's name ▶ DELOITTE TAX LLP | | | Firm's EIN ▶ 86-1065772 |
| Firm's address ▶ 1111 BAGBY STREET, SUITE 4500<br>HOUSTON, TX 77002-2591 | | | Phone no.<br>713-982-2000 |

For Paperwork Reduction Act Notice, see separate instructions.

JSA   8P1010 2.000

JSA   1128CM   1216

V18-6.3F

Form **1065** (2018)

019440

HCMLPHMIT00001336

# Schedule K-1
## (Form 1065)

Department of the Treasury
Internal Revenue Service

**2018**

For calendar year 2018, or tax year

beginning ___/___/ 2018  ending ___/___/___

☐ Final K-1   ☐ Amended K-1   OMB No. 1545-0123

## Partner's Share of Income, Deductions, Credits, etc.

➤ **See back of form and separate instructions.**

### Part I  Information About the Partnership

**A**  Partnership's employer identification number
75-2716725

**B**  Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C**  IRS Center where partnership filed return
OGDEN

**D**  ☐ Check if this is a publicly traded partnership (PTP)

### Part II  Information About the Partner

**E**  Partner's identifying number
95-4440863

**F**  Partner's name, address, city, state, and ZIP code
STRAND ADVISORS, INC
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**G**  ☒ General partner or LLC member-manager  ☐ Limited partner or other LLC member

**H**  ☒ Domestic partner  ☐ Foreign partner

**I1**  What type of entity is this partner?  S - CORPORATION

**I2**  If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here  ☐

**J**  Partner's share of profit, loss, and capital (see instructions):

|  | Beginning | Ending |
|---|---|---|
| Profit | 0.250795 % | 0.250795 % |
| Loss | NONE % | NONE % |
| Capital | 0.250795 % | 0.250795 % |

**K**  Partner's share of liabilities:

|  | Beginning | Ending |
|---|---|---|
| Nonrecourse . . $ | 467,696 | $ 310,721 |
| Qualified nonrecourse financing . . $ | NONE | $ 102,634 |
| Recourse . . $ | 150,598,314 | $ 136,641,607 |

**L**  Partner's capital account analysis:

| Beginning capital account . . . $ | 1,129,023 |
|---|---|
| Capital contributed during the year . $ | |
| Current year increase (decrease) . . $ | (183,519) |
| Withdrawals & distributions . . $( | 12,637) |
| Ending capital account . . . $ | 932,867 |

☐ Tax basis   ☐ GAAP   ☐ Section 704(b) book
☒ Other (explain)  BOOK

**M**  Did the partner contribute property with a built-in gain or loss?
☐ Yes  ☒ No
If "Yes," attach statement (see instructions)

### Part III  Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| # | Item | Amount |
|---|---|---|
| 1 | Ordinary business income (loss) | (103,105) |
| 2 | Net rental real estate income (loss) | 10,876 |
| 3 | Other net rental income (loss) | |
| 4 | Guaranteed payments | |
| 5 | Interest income | 25,256 |
| 6a | Ordinary dividends | 10,556 |
| 6b | Qualified dividends | 1,549 |
| 6c | Dividend equivalents | |
| 7 | Royalties | 2,603 |
| 8 | Net short-term capital gain (loss) | (80,700) |
| 9a | Net long-term capital gain (loss) | 68,910 |
| 9b | Collectibles (28%) gain (loss) | |
| 9c | Unrecaptured section 1250 gain | |
| 10 | Net section 1231 gain (loss) | 12,132 |
| 11 | Other income (loss) | A 4,351 |
| | | I 5,119 |
| 12 | Section 179 deduction | |
| 13 | Other deductions | A 89 |
| | | H 20,910 |
| | | * SEE STMT |
| 14 | Self-employment earnings (loss) | |

| # | Item | Amount |
|---|---|---|
| 15 | Credits | |
| 16 | Foreign transactions | A VARIOUS |
| | | B 213,008 |
| | | C 203,560 |
| | | G 9,448 |
| | | I 25,111 |
| | | J 238,918 |
| | | * SEE STMT |
| 17 | Alternative minimum tax (AMT) items | A 7 |
| | | D 5,475 |
| | | * SEE STMT |
| 18 | Tax-exempt income and nondeductible expenses | C 9,036 |
| 19 | Distributions | A 12,637 |
| 20 | Other information | A 42,819 |
| | | B (2,330) |
| | | T 742 |
| | | * SEE STMT |

*See attached statement for additional information.

For IRS Use Only

**For Paperwork Reduction Act Notice, see Instructions for Form 1065.**   www.irs.gov/Form1065   Cat. No. 11394R   Schedule K-1 (Form 1065) 2018

P10180B265567 08/21/2019 14:26

Partner # 1

019441

HCMLPHMIT00001414

**Schedule K-1**
**(Form 1065)**
Department of the Treasury
Internal Revenue Service

□ Final K-1    □ Amended K-1
OMB No. 1545-0123

**20 18**

For calendar year 2018, or tax year

beginning ___ / ___ / 2018    ending ___ / ___ / ___

**Partner's Share of Income, Deductions, Credits, etc.**    ➤ See back of form and separate instructions.

## Part I  Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return
OGDEN

**D** □ Check if this is a publicly traded partnership (PTP)

## Part II  Information About the Partner

**E** Partner's identifying number
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

**F** Partner's name, address, city, state, and ZIP code
MARK OKADA
3800 WENTWOOD DRIVE
DALLAS, TX 75225

**G** □ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H** ☒ Domestic partner   □ Foreign partner

**I1** What type of entity is this partner?  INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here  □

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 0.048684 % | 0.048684 % |
| Loss | NONE % | NONE % |
| Capital | 0.048684 % | 0.048684 % |

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse $ | 90,788 | $ 60,316 |
| Qualified nonrecourse financing $ | NONE | $ 19,923 |
| Recourse $ | 12,000,000 | $ 12,000,000 |

**L** Partner's capital account analysis:

| | |
|---|---|
| Beginning capital account $ | 219,163 |
| Capital contributed during the year $ | |
| Current year increase (decrease) $ | (35,622) |
| Withdrawals & distributions $ | ( 2,455) |
| Ending capital account $ | 181,086 |

□ Tax basis   □ GAAP   □ Section 704(b) book
☒ Other (explain)  BOOK

**M** Did the partner contribute property with a built-in gain or loss?
□ Yes   ☒ No
If "Yes," attach statement (see instructions)

## Part III  Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| # | Item | Amount | # | Item | Amount |
|---|---|---|---|---|---|
| 1 | Ordinary business income (loss) | (20,015) | 15 | Credits | |
| 2 | Net rental real estate income (loss) | 2,111 | | | |
| 3 | Other net rental income (loss) | | 16 | Foreign transactions | |
| | | | A | | VARIOUS |
| 4 | Guaranteed payments | | B | | 41,349 |
| 5 | Interest income | 4,903 | C | | 39,515 |
| 6a | Ordinary dividends | 2,049 | G | | 1,834 |
| 6b | Qualified dividends | 301 | I | | 4,875 |
| 6c | Dividend equivalents | | J | | 46,378 |
| 7 | Royalties | 505 | * | | SEE STMT |
| 8 | Net short-term capital gain (loss) | (15,665) | 17 | Alternative minimum tax (AMT) items | |
| | | | A | | 1 |
| 9a | Net long-term capital gain (loss) | 13,377 | D | | 1,063 |
| 9b | Collectibles (28%) gain (loss) | | * | | SEE STMT |
| 9c | Unrecaptured section 1250 gain | | 18 | Tax-exempt income and nondeductible expenses | |
| 10 | Net section 1231 gain (loss) | 2,355 | C | | 1,754 |
| 11 | Other income (loss) | | | | |
| A | | 845 | | | |
| I | | 994 | 19 | Distributions | |
| | | | A | | 2,455 |
| 12 | Section 179 deduction | | 20 | Other information | |
| 13 | Other deductions | | A | | 8,312 |
| A | | 17 | B | | (452) |
| H | | 4,059 | | | |
| * | | SEE STMT | T | | 144 |
| 14 | Self-employment earnings (loss) | | * | | SEE STMT |
| | | | | | |

*See attached statement for additional information.

For IRS Use Only

For Paperwork Reduction Act Notice, see Instructions for Form 1065.    www.irs.gov/Form1065    Cat. No. 11394R    Schedule K-1 (Form 1065) 2018

P10180B265567 08/21/2019 14:26

Partner # 2

019442

HCMLPHMIT00001419

**Schedule K-1**
**(Form 1065)**
Department of the Treasury
Internal Revenue Service

**2018**

For calendar year 2018, or tax year

beginning  /  / 2018   ending  /  /

Final K-1 ☐   Amended K-1 ☐
OMB No. 1545-0123

**Partner's Share of Income, Deductions, Credits, etc.**   ► See back of form and separate instructions.

## Part I — Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return
OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

## Part II — Information About the Partner

**E** Partner's identifying number
74-6494106

**F** Partner's name, address, city, state, and ZIP code
THE MARK AND PAMELA OKADA
FAMLY TRUST, EXEMPT TRUST #1
3800 WENTWOOD DRIVE
DALLAS, TX 75225

**G** ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H** ☒ Domestic partner   ☐ Foreign partner

**I1** What type of entity is this partner?  TRUST

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

|  | Beginning | Ending |
|---|---|---|
| Profit | 0.009777 % | 0.009777 % |
| Loss | NONE % | NONE % |
| Capital | 0.009777 % | 0.009777 % |

**K** Partner's share of liabilities:

|  | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ 18,232 | $ 12,113 |
| Qualified nonrecourse financing | $ NONE | $ 4,001 |
| Recourse | $ NONE | $ NONE |

**L** Partner's capital account analysis:

| | |
|---|---|
| Beginning capital account | $ 44,012 |
| Capital contributed during the year | $ |
| Current year increase (decrease) | $ (7,153) |
| Withdrawals & distributions | $ ( 494 ) |
| Ending capital account | $ 36,365 |

☐ Tax basis   ☐ GAAP   ☐ Section 704(b) book
☒ Other (explain) BOOK

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No
If "Yes," attach statement (see instructions)

## Part III — Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| Box | Description | Amount |
|---|---|---|
| 1 | Ordinary business income (loss) | (4,019) |
| 2 | Net rental real estate income (loss) | 424 |
| 3 | Other net rental income (loss) | |
| 4 | Guaranteed payments | |
| 5 | Interest income | 985 |
| 6a | Ordinary dividends | 412 |
| 6b | Qualified dividends | 60 |
| 6c | Dividend equivalents | |
| 7 | Royalties | 101 |
| 8 | Net short-term capital gain (loss) | (3,146) |
| 9a | Net long-term capital gain (loss) | 2,686 |
| 9b | Collectibles (28%) gain (loss) | |
| 9c | Unrecaptured section 1250 gain | |
| 10 | Net section 1231 gain (loss) | 473 |
| 11 | Other income (loss) A | 170 |
| | I | 200 |
| 12 | Section 179 deduction | |
| 13 | Other deductions A | 3 |
| | H | 815 |
| | * | SEE STMT |
| 14 | Self-employment earnings (loss) | |

| Box | Description | Amount |
|---|---|---|
| 15 | Credits | |
| 16 | Foreign transactions A | VARIOUS |
| | B | 8,304 |
| | C | 7,936 |
| | G | 368 |
| | I | 979 |
| | J | 9,314 |
| | * | SEE STMT |
| 17 | Alternative minimum tax (AMT) items A | |
| | D | 213 |
| | * | SEE STMT |
| 18 | Tax-exempt income and nondeductible expenses C | 352 |
| 19 | Distributions A | 494 |
| 20 | Other information A | 1,670 |
| | B | (91) |
| | T | 29 |
| | * | SEE STMT |

*See attached statement for additional information.

For IRS Use Only

For Paperwork Reduction Act Notice, see Instructions for Form 1065.   www.irs.gov/Form1065   Cat. No. 11394R   **Schedule K-1 (Form 1065) 2018**

**Schedule K-1**
**(Form 1065)**

Department of the Treasury
Internal Revenue Service

2018

For calendar year 2018, or tax year

beginning ___/___/2018  ending ___/___/___

| | Final K-1 | | Amended K-1 | OMB No. 1545-0123 |

**Partner's Share of Income, Deductions, Credits, etc.**

➤ See back of form and separate instructions.

### Part I  Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return
OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II  Information About the Partner

**E** Partner's identifying number
68-6203494

**F** Partner's name, address, city, state, and ZIP code
THE MARK AND PAMELA OKADA
FAMLY TRUST, EXEMPT TRUST #2
3800 WENTWOOD DRIVE
DALLAS, TX 75225

**G** ☐ General partner or LLC member-manager  ☒ Limited partner or other LLC member

**H** ☒ Domestic partner  ☐ Foreign partner

**I1** What type of entity is this partner?  TRUST

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 0.004190 % | 0.004190 % |
| Loss | NONE % | NONE % |
| Capital | 0.004190 % | 0.004190 % |

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse . . $ | 7,814 | $ 5,191 |
| Qualified nonrecourse financing . . $ | NONE | $ 1,715 |
| Recourse . . $ | NONE | $ NONE |

**L** Partner's capital account analysis:

| | |
|---|---|
| Beginning capital account . . . $ | 18,862 |
| Capital contributed during the year . $ | |
| Current year increase (decrease) . . $ | (3,065) |
| Withdrawals & distributions . . $ ( | 212 ) |
| Ending capital account . . . $ | 15,585 |

☐ Tax basis  ☐ GAAP  ☐ Section 704(b) book
☒ Other (explain)  BOOK

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes  ☒ No
If "Yes," attach statement (see instructions)

### Part III  Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) | 15 | Credits |
| | (1,723) | | |
| 2 | Net rental real estate income (loss) | 16 | Foreign transactions |
| | 182 | A | VARIOUS |
| 3 | Other net rental income (loss) | B | 3,559 |
| 4 | Guaranteed payments | C | 3,401 |
| 5 | Interest income | G | 158 |
| | 422 | I | 420 |
| 6a | Ordinary dividends | J | 3,992 |
| | 176 | * | SEE STMT |
| 6b | Qualified dividends | 17 | Alternative minimum tax (AMT) items |
| | 26 | A | |
| 6c | Dividend equivalents | D | 91 |
| 7 | Royalties | * | SEE STMT |
| | 43 | | |
| 8 | Net short-term capital gain (loss) | 18 | Tax-exempt income and nondeductible expenses |
| | (1,348) | C | 151 |
| 9a | Net long-term capital gain (loss) | | |
| | 1,151 | | |
| 9b | Collectibles (28%) gain (loss) | | |
| 9c | Unrecaptured section 1250 gain | 19 | Distributions |
| 10 | Net section 1231 gain (loss) | A | 212 |
| | 203 | | |
| 11 | Other income (loss) | 20 | Other information |
| A | 73 | A | 715 |
| I | 85 | B | (39) |
| 12 | Section 179 deduction | T | 12 |
| 13 | Other deductions | * | SEE STMT |
| A | 1 | | |
| H | 349 | | |
| * | SEE STMT | | |
| 14 | Self-employment earnings (loss) | | |

*See attached statement for additional information.

For IRS Use Only

**For Paperwork Reduction Act Notice, see Instructions for Form 1065.**    www.irs.gov/Form1065    Cat. No. 11394R    **Schedule K-1 (Form 1065) 2018**

Partner # 4

019444

HCMLPHMIT00001429

# Schedule K-1
## (Form 1065)

Department of the Treasury
Internal Revenue Service

For calendar year 2018, or tax year

beginning \_\_/\_\_/ 2018   ending \_\_/\_\_/\_\_

**2018**

☐ Final K-1   ☐ Amended K-1   OMB No. 1545-0123

## Partner's Share of Income, Deductions, Credits, etc.

➤ See back of form and separate instructions.

### Part I   Information About the Partnership

**A**   Partnership's employer identification number
75-2716725

**B**   Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C**   IRS Center where partnership filed return
OGDEN

**D**   ☐ Check if this is a publicly traded partnership (PTP)

### Part II   Information About the Partner

**E**   Partner's identifying number
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

**F**   Partner's name, address, city, state, and ZIP code
THE DUGABOY INVESTMENT TRUST
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**G**   ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H**   ☒ Domestic partner   ☐ Foreign partner

**I1**   What type of entity is this partner?   TRUST

**I2**   If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J**   Partner's share of profit, loss, and capital (see instructions):

|  | Beginning | Ending |
|---|---|---|
| Profit | 0.186554 % | 0.186554 % |
| Loss | NONE % | NONE % |
| Capital | 0.186554 % | 0.186554 % |

**K**   Partner's share of liabilities:

|  | Beginning | Ending |
|---|---|---|
| Nonrecourse . . $ | 347,896 | $ 231,130 |
| Qualified nonrecourse financing . . $ | NONE | $ 76,344 |
| Recourse . . $ | 35,000,000 | $ 35,000,000 |

**L**   Partner's capital account analysis:

| | |
|---|---|
| Beginning capital account . . . $ | 839,824 |
| Capital contributed during the year . $ | |
| Current year increase (decrease) . . $ | (136,505) |
| Withdrawals & distributions . . $ | (9,406) |
| Ending capital account . . . $ | 693,914 |

☐ Tax basis   ☐ GAAP   ☐ Section 704(b) book
☒ Other (explain) BOOK

**M**   Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No
If "Yes," attach statement (see instructions)

### Part III   Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) | 15 | Credits |
| | (76,695) | | |
| 2 | Net rental real estate income (loss) | | |
| | 8,090 | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| | | A | VARIOUS |
| 4 | Guaranteed payments | B | 158,446 |
| 5 | Interest income | C | 151,418 |
| | 18,786 | | |
| 6a | Ordinary dividends | G | 7,028 |
| | 7,852 | | |
| 6b | Qualified dividends | I | 18,679 |
| | 1,153 | | |
| 6c | Dividend equivalents | J | 177,719 |
| | | * | SEE STMT |
| 7 | Royalties | | |
| | 1,936 | | |
| 8 | Net short-term capital gain (loss) | 17 | Alternative minimum tax (AMT) items |
| | (60,028) | A | 5 |
| 9a | Net long-term capital gain (loss) | D | 4,073 |
| | 51,259 | | |
| 9b | Collectibles (28%) gain (loss) | * | SEE STMT |
| 9c | Unrecaptured section 1250 gain | 18 | Tax-exempt income and nondeductible expenses |
| 10 | Net section 1231 gain (loss) | C | 6,722 |
| | 9,024 | | |
| 11 | Other income (loss) | | |
| A | 3,236 | | |
| I | 3,808 | 19 | Distributions |
| | | A | 9,406 |
| 12 | Section 179 deduction | 20 | Other information |
| 13 | Other deductions | A | 31,850 |
| A | 66 | | |
| H | 15,554 | B | (1,733) |
| * | SEE STMT | T | 552 |
| 14 | Self-employment earnings (loss) | * | SEE STMT |

*See attached statement for additional information.

For IRS Use Only

P10180B265567 08/21/2019 14:26

Partner #5

019445

HCMLPHMIT00001434

**Schedule K-1**
**(Form 1065)**
Department of the Treasury
Internal Revenue Service

2018

☐ Final K-1　☐ Amended K-1　OMB No. 1545-0123

| Part III | Partner's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

For calendar year 2018, or tax year

beginning ___ / ___ / 2018　ending ___ / ___ / ___

## Partner's Share of Income, Deductions, Credits, etc.
➤ See back of form and separate instructions.

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) (40,905,903) | 15 | Credits |
| 2 | Net rental real estate income (loss) 4,314,785 | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4 | Guaranteed payments | A | VARIOUS |
| 5 | Interest income 10,019,919 | B | 84,508,257 |
| 6a | Ordinary dividends 4,187,952 | C | 80,759,899 |
| 6b | Qualified dividends 614,699 | G | 3,748,358 |
| 6c | Dividend equivalents | I | 9,962,559 |
| 7 | Royalties 1,032,631 | J | 94,787,981 |
| 8 | Net short-term capital gain (loss) (32,016,601) | * | SEE STMT |
| 9a | Net long-term capital gain (loss) 27,339,116 | 17 | Alternative minimum tax (AMT) items |
| 9b | Collectibles (28%) gain (loss) | A | 2,588 |
| 9c | Unrecaptured section 1250 gain | D | 2,172,179 |
| 10 | Net section 1231 gain (loss) 4,813,197 | * | SEE STMT |
| 11 | Other income (loss) A 1,726,088 I 2,030,832 | 18 | Tax-exempt income and nondeductible expenses C 3,585,104 |
| 12 | Section 179 deduction | 19 | Distributions A 5,015,296 |
| 13 | Other deductions A 35,183 H 8,295,974 * SEE STMT | 20 | Other information A 16,987,726 B (924,462) T 294,297 |
| 14 | Self-employment earnings (loss) | * | SEE STMT |

### Part I　Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return
OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II　Information About the Partner

**E** Partner's identifying number
47-5145562

**F** Partner's name, address, city, state, and ZIP code
HUNTER MOUNTAIN INVESTMENT TRUST
F/B/O BEACON MOUNTAIN, LLC
87 RAILROAD PLACE, SUITE 403
SARATOGA SPRINGS, NY 12866

**G** ☐ General partner or LLC member-manager　　☒ Limited partner or other LLC member

**H** ☒ Domestic partner　　☐ Foreign partner

**I1** What type of entity is this partner?　TRUST

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 99.500000 % | 99.500000 % |
| Loss | NONE % | NONE % |
| Capital | 99.500000 % | 99.500000 % |

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ 185,553,010 | $ 123,274,967 |
| Qualified nonrecourse financing | $ NONE | $ 40,718,835 |
| Recourse | $ NONE | $ NONE |

**L** Partner's capital account analysis:

| | |
|---|---|
| Beginning capital account | $ 447,926,317 |
| Capital contributed during the year | $ |
| Current year increase (decrease) | $ (72,807,286) |
| Withdrawals & distributions | $ ( 5,015,296) |
| Ending capital account | $ 370,103,735 |

☐ Tax basis　☐ GAAP　☐ Section 704(b) book
☒ Other (explain) BOOK

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes　☒ No
If "Yes," attach statement (see instructions)

*See attached statement for additional information.

For IRS Use Only

For Paperwork Reduction Act Notice, see Instructions for Form 1065.　www.irs.gov/Form1065　Cat. No. 11394R　**Schedule K-1 (Form 1065) 2018**

# EXHIBIT 116

019447

| Form **1065** | **U.S. Return of Partnership Income** | OMB No. 1545-0123 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | For calendar year 2019, or tax year beginning _____, 2019, ending _____, 20 ___. ▶ Go to *www.irs.gov/Form1065* for instructions and the latest information. | **2019** |

| | | | |
|---|---|---|---|
| **A** Principal business activity<br>INVESTMENT MANAGEMENT | Name of partnership<br>HIGHLAND CAPITAL MANAGEMENT, LP | | **D** Employer identification number<br>75-2716725 |
| **B** Principal product or service<br>INVESTMENT SERVICES | **Type or Print** Number, street, and room or suite no. If a P.O. box, see instructions.<br>300 CRESCENT COURT, SUITE 700 | | **E** Date business started<br>07/07/1997 |
| **C** Business code number<br>523900 | City or town, state or province, country, and ZIP or foreign postal code<br>DALLAS, TX 75201 | | **F** Total assets (see instructions)<br>$ 1,015,968,222. |

**G** Check applicable boxes: **(1)** ☐ Initial return **(2)** ☐ Final return **(3)** ☐ Name change **(4)** ☐ Address change **(5)** ☐ Amended return
**H** Check accounting method: **(1)** ☐ Cash **(2)** ☒ Accrual **(3)** ☐ Other (specify) ▶ _____
**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ▶ 6
**J** Check if Schedules C and M-3 are attached . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☒
**K** Check if Partnership: **(1)** ☐ Aggregated activities for section 465 at-risk purposes **(2)** ☐ Grouped activities for section 469 passive activity purposes

**Caution:** Include **only** trade or business income and expenses on lines 1a through 22 below. See instructions for more information.

| | | | | |
|---|---|---|---|---|
| **Income** | **1a** Gross receipts or sales . . . . . . . . . . . . . . . . | **1a** | 32,009,311. | |
| | **b** Returns and allowances . . . . . . . . . . . . . . . | **1b** | | |
| | **c** Balance. Subtract line 1b from line 1a . . . . . . . . . . . . . . . . . . . . . . . . . | **1c** | | 32,009,311. |
| | **2** Cost of goods sold (attach Form 1125-A) . . . . . . . . . . . . . . . . . . . . . . | **2** | | |
| | **3** Gross profit. Subtract line 2 from line 1c . . . . . . . . . . . . . . . . . . . . . . . | **3** | | 32,009,311. |
| | **4** Ordinary income (loss) from other partnerships, estates, and trusts (attach statement)STMT. 1 | **4** | | -3,799,517. |
| | **5** Net farm profit (loss) (attach Schedule F (Form 1040 or 1040-SR)) . . . . . . . . . | **5** | | |
| | **6** Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) . . . . . . . . | **6** | | |
| | **7** Other income (loss) (attach statement) . . . . . . . . SEE. STATEMENT. 1. | **7** | | -2,886,805. |
| | **8** Total income (loss). Combine lines 3 through 7 . . . . . . . . . . . . . . . . . . . | **8** | | 25,322,989. |
| **Deductions** (see instructions for limitations) | **9** Salaries and wages (other than to partners) (less employment credits) . . . . . . . | **9** | | 28,941,198. |
| | **10** Guaranteed payments to partners . . . . . . . . . . . . . . . . . . . . . . . . . | **10** | | |
| | **11** Repairs and maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **11** | | 18,389. |
| | **12** Bad debts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **12** | | 5,139,915. |
| | **13** Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **13** | | 1,377,540. |
| | **14** Taxes and licenses . . . . . . . . . . . . . . . . . . . SEE. STATEMENT. 1. | **14** | | 1,761,610. |
| | **15** Interest (see instructions) . . . . . . . . . . . . . . . SEE. STATEMENT. 1. | **15** | | 1,910,445. |
| | **16a** Depreciation (if required, attach Form 4562) . . . . . . | **16a** | 423,258. | |
| | **b** Less depreciation reported on Form 1125-A and elsewhere on return | **16b** | | |
| | | **16c** | | 423,258. |
| | **17** Depletion (**Do not deduct oil and gas depletion.**) . . . . . . . . . . . . . . . . | **17** | | |
| | **18** Retirement plans, etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **18** | | |
| | **19** Employee benefit programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **19** | | 1,808,577. |
| | **20** Other deductions (attach statement) . . . . . . . . . . . SEE. STATEMENT. 1. | **20** | | 15,611,953. |
| | **21** Total deductions. Add the amounts shown in the far right column for lines 9 through 20 | **21** | | 56,992,885. |
| | **22** Ordinary business income (loss). Subtract line 21 from line 8 . . . . . . . . . . . | **22** | | -31,669,896. |
| **Tax and Payment** | **23** Interest due under the look-back method - completed long-term contracts (attach Form 8697) . | **23** | | |
| | **24** Interest due under the look-back method - income forecast method (attach Form 8866) . . . . | **24** | | |
| | **25** BBA AAR imputed underpayment (see instructions) . . . . . . . . . . . . . . . . | **25** | | |
| | **26** Other taxes (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . | **26** | | |
| | **27** Total balance due. Add lines 23 through 26 . . . . . . . . . . . . . . . . . . . . | **27** | | |
| | **28** Payment (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **28** | | |
| | **29** Amount owed. If line 28 is smaller than line 27, enter amount owed . . . . . . . . | **29** | | |
| | **30** Overpayment. If line 28 is larger than line 27, enter overpayment . . . . . . . . . | **30** | | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

▶ _[signature]_ Signature of partner or limited liability company member    ▶ Date 9/10/20

May the IRS discuss this return with the preparer shown below? See instructions. ☒ Yes ☐ No

| **Paid Preparer Use Only** | Print/Type preparer's name<br>TODD CRAWFORD | Preparer's signature<br>_T W Crawford_ | Date<br>9/6/2020 | Check ☐ if self-employed | PTIN<br>P00848788 |
|---|---|---|---|---|---|
| | Firm's name ▶ DELOITTE TAX LLP | | | Firm's EIN ▶ 86-1065772 | |
| | Firm's address ▶ 1111 BAGBY STREET, SUITE 4500<br>HOUSTON, TX 77002-2591 | | | Phone no.<br>713-982-2000 | |

For Paperwork Reduction Act Notice, see separate instructions.                                Form **1065** (2019)

JSA   9P1010 1.000
1128CM    1216                                V19-6.4F

019448

HCMLPHMIT00001762

Form **1065**

**U.S. Return of Partnership Income**

For calendar year 2019, or tax year beginning _____, 2019, ending _____, 20____.

▶ Go to *www.irs.gov/Form1065* for instructions and the latest information.

Department of the Treasury
Internal Revenue Service

20**19**

| A Principal business activity | Name of partnership | D Employer identification number |
|---|---|---|
| INVESTMENT MANAGEMENT | HIGHLAND CAPITAL MANAGEMENT, LP | 75-2716725 |
| B Principal product or service | Type or Print | Number, street, and room or suite no. If a P.O. box, see instructions. | E Date business started |
| INVESTMENT SERVICES | | 300 CRESCENT COURT, SUITE 700 | 07/07/1997 |
| C Business code number | City or town, state or province, country, and ZIP or foreign postal code | F Total assets (see instructions) |
| 523900 | DALLAS, TX 75201 | $ 1,015,968,222. |

**G** Check applicable boxes: **(1)** ☐ Initial return **(2)** ☒ Final return **(3)** ☐ Name change **(4)** ☐ Address change **(5)** ☐ Amended return

**H** Check accounting method: **(1)** ☐ Cash **(2)** ☒ Accrual **(3)** ☐ Other (specify) ▶ _____

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ▶ 6

**J** Check if Schedules C and M-3 are attached . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☒

**K** Check if Partnership: **(1)** ☐ Aggregated activities for section 465 at-risk purposes **(2)** ☐ Grouped activities for section 469 passive activity purposes

**Caution:** Include **only** trade or business income and expenses on lines 1a through 22 below. See instructions for more information.

| | | | | |
|---|---|---|---|---|
| **Income** | **1a** Gross receipts or sales . . . . . . . . . . . . . . . . . | **1a** | 32,009,311. | |
| | **b** Returns and allowances . . . . . . . . . . . . . . . . | **1b** | | |
| | **c** Balance. Subtract line 1b from line 1a . . . . . . . . . . . . . . . . . . . . . . . . . . | | **1c** | 32,009,311. |
| | **2** Cost of goods sold (attach Form 1125-A) . . . . . . . . . . . . . . . . . . . . . . . | | **2** | |
| | **3** Gross profit. Subtract line 2 from line 1c . . . . . . . . . . . . . . . . . . . . . . . | | **3** | 32,009,311. |
| | **4** Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) STMT 1 | | **4** | -3,799,517. |
| | **5** Net farm profit (loss) (attach Schedule F (Form 1040 or 1040-SR)) . . . . . . . . . | | **5** | |
| | **6** Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) . . . . . . . . . | | **6** | |
| | **7** Other income (loss) (attach statement) . . . . . . . . . . SEE STATEMENT 1 . . | | **7** | -2,886,805. |
| | **8** **Total income (loss).** Combine lines 3 through 7 . . . . . . . . . . . . . . . . . . . | | **8** | 25,322,989. |
| **Deductions** (see instructions for limitations) | **9** Salaries and wages (other than to partners) (less employment credits) . . . . . . . | | **9** | 28,941,198. |
| | **10** Guaranteed payments to partners . . . . . . . . . . . . . . . . . . . . . . . . . | | **10** | |
| | **11** Repairs and maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **11** | 18,389. |
| | **12** Bad debts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **12** | 5,139,915. |
| | **13** Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **13** | 1,377,540. |
| | **14** Taxes and licenses . . . . . . . . . . . . . . . . . SEE STATEMENT 1 . . | | **14** | 1,761,610. |
| | **15** Interest (see instructions) . . . . . . . . . . . . . . . SEE STATEMENT 1 . . | | **15** | 1,910,445. |
| | **16a** Depreciation (if required, attach Form 4562) . . . . . . . . | **16a** | 423,258. | |
| | **b** Less depreciation reported on Form 1125-A and elsewhere on return | **16b** | | **16c** | 423,258. |
| | **17** Depletion (**Do not deduct oil and gas depletion.**) . . . . . . . . . . . . . . . . . | | **17** | |
| | **18** Retirement plans, etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **18** | |
| | **19** Employee benefit programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **19** | 1,808,577. |
| | **20** Other deductions (attach statement) . . . . . . . . . . SEE STATEMENT 1 . . | | **20** | 15,611,953. |
| | **21** **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 | | **21** | 56,992,885. |
| | **22** **Ordinary business income (loss).** Subtract line 21 from line 8 . . . . . . . . . . | | **22** | -31,669,896. |
| **Tax and Payment** | **23** Interest due under the look-back method - completed long-term contracts (attach Form 8697) . | | **23** | |
| | **24** Interest due under the look-back method - income forecast method (attach Form 8866) . . | | **24** | |
| | **25** BBA AAR imputed underpayment (see instructions) . . . . . . . . . . . . . . . . | | **25** | |
| | **26** Other taxes (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . | | **26** | |
| | **27** **Total balance due.** Add lines 23 through 26 . . . . . . . . . . . . . . . . . . . | | **27** | |
| | **28** Payment (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **28** | |
| | **29** **Amount owed.** If line 28 is smaller than line 27, enter amount owed . . . . . . . . | | **29** | |
| | **30** **Overpayment.** If line 28 is larger than line 27, enter overpayment . . . . . . . . . | | **30** | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

▶ _____
Signature of partner or limited liability company member

▶ _____
Date

May the IRS discuss this return with the preparer shown below? See instructions. ☒ **Yes** ☐ **No**

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|
| TODD CRAWFORD | *Todd Crawford* | 9/6/2020 | | P00848788 |
| Firm's name ▶ DELOITTE TAX LLP | | | | Firm's EIN ▶ 86-1065772 |
| Firm's address ▶ 1111 BAGBY STREET, SUITE 4500 HOUSTON, TX 77002-2591 | | | | Phone no. 713-982-2000 |

For Paperwork Reduction Act Notice, see separate instructions.

JSA    9P1010 1.000

Form **1065** (2019)

1128CM    1216

V19-6.4F

019449

HCMLPHMIT00001766

# Schedule K-1 (Form 1065)

Department of the Treasury
Internal Revenue Service

For calendar year 2019, or tax year

beginning _____ / _____ / 2019   ending _____ / _____ / _____

**2019**

☐ Final K-1   ☐ Amended K-1   OMB No. 1545-0123

## Partner's Share of Income, Deductions, Credits, etc.

▶ See back of form and separate instructions.

| Part III | Partner's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

| # | Item | Amount |
|---|---|---|
| 1 | Ordinary business income (loss) | (79,427) |
| 2 | Net rental real estate income (loss) | 59,057 |
| 3 | Other net rental income (loss) | |
| 4a | Guaranteed payments for services | |
| 4b | Guaranteed payments for capital | |
| 4c | Total guaranteed payments | |
| 5 | Interest income | 24,413 |
| 6a | Ordinary dividends | 6,149 |
| 6b | Qualified dividends | 332 |
| 6c | Dividend equivalents | |
| 7 | Royalties | 2,891 |
| 8 | Net short-term capital gain (loss) | (22,160) |
| 9a | Net long-term capital gain (loss) | 53,724 |
| 9b | Collectibles (28%) gain (loss) | |
| 9c | Unrecaptured section 1250 gain | 7 |
| 10 | Net section 1231 gain (loss) | (3,439) |
| 11 | Other income (loss) | |
| A | | 38 |
| * | SEE STMT | |
| 12 | Section 179 deduction | |
| 13 | Other deductions | |
| A | | 11 |
| H | | 14,992 |
| * | SEE STMT | |
| 14 | Self-employment earnings (loss) | |

| # | Item | Amount |
|---|---|---|
| 15 | Credits | |
| 16 | Foreign transactions | |
| A | | VARIOUS |
| B | | 271,740 |
| C | | 275,214 |
| G | | (3,473) |
| I | | 19,783 |
| J | | 167,808 |
| * | SEE STMT | |
| 17 | Alternative minimum tax (AMT) items | |
| A | | (8) |
| D | | 5,336 |
| * | SEE STMT | |
| 18 | Tax-exempt income and nondeductible expenses | |
| C | | 14,285 |
| 19 | Distributions | |
| A | | 9,351 |
| 20 | Other information | |
| A | | 38,729 |
| B | | 623 |
| T | | 717 |
| * | SEE STMT | |

21 ☐ More than one activity for at-risk purposes*
22 ☐ More than one activity for passive activity purposes*

*See attached statement for additional information.

## Part I   Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return ▶ OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

## Part II   Information About the Partner

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)
95-4440863

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.
STRAND ADVISORS, INC
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**G** ☒ General partner or LLC member-manager   ☐ Limited partner or other LLC member

**H1** ☒ Domestic partner   ☐ Foreign partner

**H2** ☐ If the partner is a disregarded entity (DE), enter the partner's:
TIN _____ Name _____

**I1** What type of entity is this partner?   S CORPORATION

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 0.250795 % | 0.250795 % |
| Loss | NONE % | NONE % |
| Capital | 0.250795 % | 0.250795 % |

Check if decrease is due to sale or exchange of partnership interest ☐

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ 310,721 | $ 294,988 |
| Qualified nonrecourse financing | $ 102,634 | $ 352,799 |
| Recourse | $ 136,641,607 | $ 211,263,413 |

☒ Check this box if Item K includes liability amounts from lower tier partnerships.

**L**   Partner's Capital Account Analysis

| | |
|---|---|
| Beginning capital account | $ 932,867 |
| Capital contributed during the year | $ |
| Current year net income (loss) | $ (46,485) |
| Other increase (decrease) (attach explanation) | $ 95 |
| Withdrawals & distributions | $ ( 9,351 ) |
| Ending capital account | $ 877,126 |

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No   If "Yes," attach statement. See instructions.

**N**   Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning . . . . . . $ _____
Ending . . . . . . $ _____

For IRS Use Only

For Paperwork Reduction Act Notice, see Instructions for Form 1065.   www.irs.gov/Form1065   Cat. No. 11394R   Schedule K-1 (Form 1065) 2019

P14409B330613 08/26/2020 18:00

Partner # 1

019450

HCMLPHMIT00001865

# Schedule K-1
## (Form 1065)

Department of the Treasury
Internal Revenue Service

**20│19**

For calendar year 2019, or tax year

beginning __/__/2019   ending __/__/__

| ☐ Final K-1 | ☐ Amended K-1 | OMB No. 1545-0123 |

## Partner's Share of Income, Deductions, Credits, etc.

► See back of form and separate instructions.

### Part I — Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return ► OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II — Information About the Partner

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)
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

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.
MARK OKADA
3800 WENTWOOD DRIVE
DALLAS, TX 75225

**G** ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H1** ☒ Domestic partner   ☐ Foreign partner

**H2** ☐ If the partner is a disregarded entity (DE), enter the partner's:
TIN _____  Name _____

**I1** What type of entity is this partner?   INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 0.048684 % | 0.048684 % |
| Loss | NONE % | NONE % |
| Capital | 0.048684 % | 0.048684 % |

Check if decrease is due to sale or exchange of partnership interest ☐

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ 60,316 | $ 57,262 |
| Qualified nonrecourse financing | $ 19,923 | $ 68,484 |
| Recourse | $ 12,000,000 | $ 12,000,000 |

☒ Check this box if Item K includes liability amounts from lower tier partnerships.

**L** Partner's Capital Account Analysis

| | |
|---|---|
| Beginning capital account | $ 181,086 |
| Capital contributed during the year | $ _____ |
| Current year net income (loss) | $ (9,024) |
| Other increase (decrease) (attach explanation) | $ 16,149 |
| Withdrawals & distributions | $ ( 17,945 ) |
| Ending capital account | $ 170,265 |

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No   If "Yes," attach statement. See instructions.

**N** Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning _____ $ _____
Ending _____ $ _____

### Part III — Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| Box | Item | Amount |
|---|---|---|
| 1 | Ordinary business income (loss) | (15,418) |
| 2 | Net rental real estate income (loss) | 11,464 |
| 3 | Other net rental income (loss) | |
| 4a | Guaranteed payments for services | |
| 4b | Guaranteed payments for capital | |
| 4c | Total guaranteed payments | |
| 5 | Interest income | 4,739 |
| 6a | Ordinary dividends | 1,194 |
| 6b | Qualified dividends | 64 |
| 6c | Dividend equivalents | |
| 7 | Royalties | 561 |
| 8 | Net short-term capital gain (loss) | (4,302) |
| 9a | Net long-term capital gain (loss) | 10,429 |
| 9b | Collectibles (28%) gain (loss) | |
| 9c | Unrecaptured section 1250 gain | 1 |
| 10 | Net section 1231 gain (loss) | (668) |
| 11 | Other income (loss) | |
| A | | 7 |
| * | SEE STMT | |
| 12 | Section 179 deduction | |
| 13 | Other deductions | |
| A | | 2 |
| H | | 2,910 |
| * | SEE STMT | |
| 14 | Self-employment earnings (loss) | |

| Box | Item | Amount |
|---|---|---|
| 15 | Credits | |
| 16 | Foreign transactions | |
| A | | VARIOUS |
| B | | 52,750 |
| C | | 53,424 |
| G | | (674) |
| I | | 3,840 |
| J | | 32,575 |
| * | SEE STMT | |
| 17 | Alternative minimum tax (AMT) items | |
| A | | (2) |
| D | | 1,036 |
| * | SEE STMT | |
| 18 | Tax-exempt income and nondeductible expenses | |
| C | | 2,773 |
| 19 | Distributions | |
| A | | 17,945 |
| 20 | Other information | |
| A | | 7,518 |
| B | | 121 |
| T | | 139 |
| * | SEE STMT | |

**21** ☐ More than one activity for at-risk purposes*
**22** ☐ More than one activity for passive activity purposes*

*See attached statement for additional information.*

*For IRS Use Only*

# Schedule K-1
## (Form 1065)

Department of the Treasury
Internal Revenue Service

**2019**

☐ Final K-1    ☐ Amended K-1    OMB No. 1545-0123

For calendar year 2019, or tax year

beginning ___/___/ 2019  ending ___/___/___

## Partner's Share of Income, Deductions, Credits, etc.

▶ See back of form and separate instructions.

| Part III | Partner's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) (3,096) | 15 | Credits |
| 2 | Net rental real estate income (loss) 2,302 | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4a | Guaranteed payments for services | A | VARIOUS |
| 4b | Guaranteed payments for capital | B | 10,594 |
| 4c | Total guaranteed payments | C | 10,729 |
| | | G | (135) |
| 5 | Interest income 952 | I | 771 |
| 6a | Ordinary dividends 240 | J | 6,542 |
| 6b | Qualified dividends 13 | * | SEE STMT |
| 6c | Dividend equivalents | 17 | Alternative minimum tax (AMT) items |
| | | A | NONE |
| 7 | Royalties 113 | D | 208 |
| 8 | Net short-term capital gain (loss) (864) | * | SEE STMT |
| 9a | Net long-term capital gain (loss) 2,094 | 18 | Tax-exempt income and nondeductible expenses |
| 9b | Collectibles (28%) gain (loss) | C | 557 |
| 9c | Unrecaptured section 1250 gain NONE | | |
| 10 | Net section 1231 gain (loss) (134) | 19 | Distributions |
| 11 | Other income (loss) A  1 | A | 366 |
| * | SEE STMT | 20 | Other information |
| 12 | Section 179 deduction | A | 1,510 |
| 13 | Other deductions A  NONE | B | 24 |
| | H  584 | T | 28 |
| * | SEE STMT | * | SEE STMT |
| 14 | Self-employment earnings (loss) | | |

## Part I  Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return ▶ OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

## Part II  Information About the Partner

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)
74-6494106

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.
THE MARK AND PAMELA OKADA
FAMLY TRUST, EXEMPT TRUST #1
3800 WENTWOOD DRIVE
DALLAS, TX 75225

**G** ☐ General partner or LLC member-manager    ☒ Limited partner or other LLC member

**H1** ☒ Domestic partner    ☐ Foreign partner

**H2** ☐ If the partner is a disregarded entity (DE), enter the partner's:
TIN ___ Name ___

**I1** What type of entity is this partner?  TRUST

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 0.009777 % | 0.009777 % |
| Loss | NONE % | NONE % |
| Capital | 0.009777 % | 0.009777 % |

☐ Check if decrease is due to sale or exchange of partnership interest

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ 12,113 | $ 11,499 |
| Qualified nonrecourse financing | $ 4,001 | $ 13,753 |
| Recourse | $ NONE | $ NONE |

☒ Check this box if Item K includes liability amounts from lower tier partnerships.

**L**  Partner's Capital Account Analysis

| | |
|---|---|
| Beginning capital account | $ 36,365 |
| Capital contributed during the year | $ |
| Current year net income (loss) | $ (1,812) |
| Other increase (decrease) (attach explanation) | $ 5 |
| Withdrawals & distributions | $ (366) |
| Ending capital account | $ 34,192 |

21 ☐ More than one activity for at-risk purposes*
22 ☐ More than one activity for passive activity purposes*

*See attached statement for additional information.

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes    ☒ No    If "Yes," attach statement. See instructions.

**N**  Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning ___ $ ___
Ending ___ $ ___

*For IRS Use Only*

For Paperwork Reduction Act Notice, see Instructions for Form 1065.    www.irs.gov/Form1065    Cat. No. 11394R    Schedule K-1 (Form 1065) 2019

| Schedule K-1 | **2019** | | | | | | OMB No. 1545-0123 |
|---|---|---|---|---|---|---|---|

☐ Final K-1   ☐ Amended K-1

**Schedule K-1 (Form 1065)**
Department of the Treasury
Internal Revenue Service

For calendar year 2019, or tax year

beginning ___/___/ 2019 ending ___/___/___

## Partner's Share of Income, Deductions, Credits, etc.

▶ See back of form and separate instructions.

### Part I — Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return ▶ OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II — Information About the Partner

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)
64-62039K9

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.
THE MARF AND PAMELA OFADA
YAML# TRUST, EXEMPT TRUST 82
3400 WENTWOOD DRIVE
DALLAS, TX 75225

**G** ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H1** ☒ Domestic partner   ☐ Foreign partner

**H2** ☐ If the partner is a disregarded entity (DE), enter the partner's:
TIN _____  Name _____

**I1** What type of entity is this partner?  TRUST

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 0.0091K0 % | 0.0091K0 % |
| Loss | NONE % | NONE % |
| Capital | 0.0091K0 % | 0.0091K0 % |

Check if decrease is due to sale or exchange of partnership interest ☐

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ 5,1K1 | $ 9,K24 |
| Qualified nonrecourse financing | $ 1,715 | $ 5,4K9 |
| Recourse | $ NONE | $ NONE |

☒ Check this box if Item K includes liability amounts from lower tier partnerships.

**L** Partner's Capital Account Analysis

| | |
|---|---|
| Beginning capital account | $ 15,545 |
| Capital contributed during the year | $ |
| Current year net income (loss) | $ (777) |
| Other increase (decrease) (attach explanation) | $ 3 |
| Withdrawals & distributions | $ ( 157 ) |
| Ending capital account | $ 19,659 |

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No   If "Yes," attach statement. See instructions.

**N** Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning ......... $
Ending ........... $

### Part III — Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| # | Description | Amount |
|---|---|---|
| 1 | Ordinary business income (loss) | (1,327) |
| 2 | Net rental real estate income (loss) | K47 |
| 3 | Other net rental income (loss) | |
| 4a | Guaranteed payments for services | |
| 4b | Guaranteed payments for capital | |
| 4c | Total guaranteed payments | |
| 5 | Interest income | 904 |
| 6a | Ordinary dividends | 103 |
| 6b | Qualified dividends | 6 |
| 6c | Dividend equivalents | |
| 7 | Royalties | 94 |
| 8 | Net short-term capital gain (loss) | (370) |
| 9a | Net long-term capital gain (loss) | 4K4 |
| 9b | Collectibles (28%) gain (loss) | |
| 9c | Unrecaptured section 1250 gain | NONE |
| 10 | Net section 1231 gain (loss) | (57) |
| 11 | Other income (loss) | |
| A | | 1 |
| * | SEE STMT | |
| 12 | Section 179 deduction | |
| 13 | Other deductions | |
| A | NONE | |
| H | | 250 |
| * | SEE STMT | |
| 14 | Self-employment earnings (loss) | |

| # | Description | Amount |
|---|---|---|
| 15 | Credits | |
| 16 | Foreign transactions | |
| A | VARIOUS | |
| B | | 9,590 |
| C | | 9,5K4 |
| G | | (54) |
| I | | 331 |
| J | | 2,409 |
| * | SEE STMT | |
| 17 | Alternative minimum tax (AMT) items | |
| A | NONE | |
| D | | 4K |
| * | SEE STMT | |
| 18 | Tax-exempt income and nondeductible expenses | |
| C | | 23K |
| 19 | Distributions | |
| A | | 157 |
| 20 | Other information | |
| A | | 697 |
| B | | 10 |
| T | | 12 |
| * | SEE STMT | |

**21** ☐ More than one activity for at-risk purposes*
**22** ☐ More than one activity for passive activity purposes*

*See attached statement for additional information.

For IRS Use Only

For Paperwork Reduction Act Notice, see Instructions for Form 1065.    www.irs.gov/Form1065    Cat. No. 11394R    Schedule K-1 (Form 1065) 2019

# Schedule K-1
**(Form 1065)**

Department of the Treasury
Internal Revenue Service

2019

For calendar year 2019, or tax year

beginning __/__/ 2019   ending __/__/

□ Final K-1    □ Amended K-1    OMB No. 1545-0123

## Part III — Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) | 15 | Credits |
| | )5(.0V1E | | |
| 2 | Net rental real estate income (loss) | | |
| | . 3.( 2( | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| | | A | 4ARIOUS |
| 4a | Guaranteed payments for services | | |
| | / | | 202,13. |
| 4b | Guaranteed payments for capital | | |
| | | C | 20. ,71V |
| 4c | Total guaranteed payments | | |
| | | G | )2,5V. E |
| 5 | Interest income | | |
| | 1V,160 | I | 1. ,716 |
| 6a | Ordinary dividends | | |
| | . ,57. | 9 | 12. ,V2. |
| 6b | Qualified dividends | | |
| | 2. 7 | I | SEE STMT |
| 6c | Dividend equivalents | 17 | Alternative minimum tax (AMT) items |
| | | A | )6E |
| 7 | Royalties | | |
| | 2,151 | D | 3,( 6( |
| 8 | Net short-term capital gain (loss) | | |
| | )16,. V. E | | SEE STMT |
| 9a | Net long-term capital gain (loss) | 18 | Tax-exempt income and nondeductible expenses |
| | 3(.( 63 | | |
| 9b | Collectibles (28%) gain (loss) | C | 10,626 |
| 9c | Unrecaptured section 1250 gain | | |
| | 5 | | |
| 10 | Net section 1231 gain (loss) | 19 | Distributions |
| | )2,55VE | A | 151,7V5 |
| 11 | Other income (loss) | | |
| A | 2V | | |
| I | SEE STMT | 20 | Other information |
| 12 | Section 179 deduction | A | 2V,V0( |
| 13 | Other deductions | | |
| A | V | / | . 63 |
| H | 11,152 | T | 53. |
| | SEE STMT | I | SEE STMT |
| 14 | Self-employment earnings (loss) | | |

## Partner's Share of Income, Deductions, Credits, etc.

▶ See back of form and separate instructions.

### Part I — Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return ▶ OGDEN

**D** □ Check if this is a publicly traded partnership (PTP)

### Part II — Information About the Partner

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)
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

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.
9AMES DONDERO
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**G** □ General partner or LLC member-manager    ☒ Limited partner or other LLC member

**H1** ☒ Domestic partner    □ Foreign partner

**H2** ☒ If the partner is a disregarded entity (DE), enter the partner's:
TIN NONE    Name THE DUGABOY INVESTMENT TRUST

**I1** What type of entity is this partner?    INDI4 IDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here □

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 08IV655. % | 08IV655. % |
| Loss | NONE % | NONE % |
| Capital | 08IV655. % | 08IV655. % |

Check if decrease is due to sale or exchange of partnership interest  □

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse . . . $ | 231,130 | $ 21(.. 27 |
| Qualified nonrecourse financing . . . $ | 76,3. . | $ 262,. 30 |
| Recourse . . . $ | 35,000,000 | $ 35,000,000 |

☒ Check this box if Item K includes liability amounts from lower tier partnerships.

**L** Partner's Capital Account Analysis

| | |
|---|---|
| Beginning capital account . . . $ | 6( 3,( 1. |
| Capital contributed during the year . . $ | |
| Current year net income (loss) . . $ | )3. ,57VE |
| Other increase (decrease) (attach explanation) $ | 1. . ,( 00 |
| Withdrawals & distributions . . $ ( | 151,7V5) |
| Ending capital account . . . $ | 652,. 51 |

**M** Did the partner contribute property with a built-in gain or loss?
□ Yes    ☒ No    If "Yes," attach statement. See instructions.

**N** Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning . . . . . . . . . . $
Ending . . . . . . . . . . $

**21** □ More than one activity for at-risk purposes*
**22** □ More than one activity for passive activity purposes*

*See attached statement for additional information.

For IRS Use Only

For Paperwork Reduction Act Notice, see Instructions for Form 1065.    www.irs.gov/Form1065    Cat. No. 11394R    Schedule K-1 (Form 1065) 2019

P1. . 0( / 330613 0V:26:2020 1V:00    Pr1nt# 5

019454

HCMLPHMIT00001885

**Schedule K-1**
**(Form 1065)**
Department of the Treasury
Internal Revenue Service

2019

For calendar year 2019, or tax year

beginning ___ / ___ / 2019   ending ___ / ___ / ___

☐ Final K-1   ☐ Amended K-1   OMB No. 1545-0123

**Partner's Share of Income, Deductions, Credits, etc.** ▶ See back of form and separate instructions.

| Part III | Partner's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

| # | Item | Amount |
|---|---|---|
| 1 | Ordinary business income (loss) | (31,511,547) |
| 2 | Net rental real estate income (loss) | 23,429,983 |
| 3 | Other net rental income (loss) | |
| 4a | Guaranteed payments for services | |
| 4b | Guaranteed payments for capital | |
| 4c | Total guaranteed payments | |
| 5 | Interest income | 9,685,521 |
| 6a | Ordinary dividends | 2,439,576 |
| 6b | Qualified dividends | 131,590 |
| 6c | Dividend equivalents | |
| 7 | Royalties | 1,147,036 |
| 8 | Net short-term capital gain (loss) | (8,791,920) |
| 9a | Net long-term capital gain (loss) | 21,314,362 |
| 9b | Collectibles (28%) gain (loss) | |
| 9c | Unrecaptured section 1250 gain | 2,880 |
| 10 | Net section 1231 gain (loss) | (1,364,433) |
| 11 | Other income (loss) | |
| A | | 14,893 |
| * | | SEE STMT |
| 12 | Section 179 deduction | |
| 13 | Other deductions | |
| A | | 4,238 |
| H | | 5,947,873 |
| * | | SEE STMT |
| 14 | Self-employment earnings (loss) | |

| # | Item | Amount |
|---|---|---|
| 15 | Credits | |
| 16 | Foreign transactions | |
| A | | VARIOUS |
| B | | 107,809,792 |
| C | | 109,187,851 |
| G | | (1,378,061) |
| I | | 7,848,766 |
| J | | 66,575,961 |
| * | | SEE STMT |
| 17 | Alternative minimum tax (AMT) items | |
| A | | (3,101) |
| D | | 2,116,810 |
| * | | SEE STMT |
| 18 | Tax-exempt income and nondeductible expenses | |
| C | | 5,667,593 |
| 19 | Distributions | |
| A | | 3,711,456 |
| 20 | Other information | |
| A | | 15,365,420 |
| B | | 247,031 |
| T | | 284,597 |
| * | | SEE STMT |

| Part I | Information About the Partnership |
|---|---|

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return ▶ OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

| Part II | Information About the Partner |
|---|---|

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)
47-5261938

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.
RAND PE FUND I, LP
87 RAILROAD PLACE, SUITE 403
SARATOGA SPRINGS, NY 12866

**G** ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H1** ☒ Domestic partner   ☐ Foreign partner

**H2** ☒ If the partner is a disregarded entity (DE), enter the partner's:
TIN  47-5145562   Name  HNTR MNTN INV TRST FBO BCN MN

**I1** What type of entity is this partner?  PARTNERSHIP

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 99.500000 % | 99.500000 % |
| Loss | NONE % | NONE % |
| Capital | 99.500000 % | 99.500000 % |

Check if decrease is due to sale or exchange of partnership interest ☐

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ 123,274,967 | $ 117,033,004 |
| Qualified nonrecourse financing | $ 40,718,835 | $ 139,968,727 |
| Recourse | $ NONE | $ NONE |

☒ Check this box if Item K includes liability amounts from lower tier partnerships.

| L | Partner's Capital Account Analysis |
|---|---|

Beginning capital account   $ 370,103,735
Capital contributed during the year   $ 
Current year net income (loss)   $ (18,442,312)
Other increase (decrease) (attach explanation) $ 39,227
Withdrawals & distributions   $ ( 3,711,456 )
Ending capital account   $ 347,989,195

**21** ☐ More than one activity for at-risk purposes*

**22** ☐ More than one activity for passive activity purposes*

*See attached statement for additional information.

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No   If "Yes," attach statement. See instructions.

**N** Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning   $ 
Ending   $ 

For IRS Use Only

For Paperwork Reduction Act Notice, see Instructions for Form 1065.   www.irs.gov/Form1065   Cat. No. 11394R   Schedule K-1 (Form 1065) 2019
P14409B330613 08/26/2020 18:00

Partner # 6

019455

HCMLPHMIT00001890

# EXHIBIT 117

019456

**Monthly Operating Report**
ACCRUAL BASIS-1

| CASE NAME: | Highland Capital Management, LP |
| --- | --- |
| CASE NUMBER: | 19-12239-CSS |

**Comparative Balance Sheet**
(in thousands)

| | 10/15/2019 | 10/31/2019 | 11/30/2019 |
| --- | --- | --- | --- |
| **Assets** | | | |
| Cash and cash equivalents | 2,529 | 2,286 | 6,343 |
| Investments, at fair value [3] | 232,620 | 235,144 | 233,776 |
| Equity method investees [3] | 161,819 | 161,813 | 175,381 |
| Management and incentive fee receivable | 2,579 | 3,202 | 1,223 |
| Fixed assets, net | 3,754 | 3,672 | 3,601 |
| Due from affiliates [1] | 151,901 | 152,124 | 152,523 |
| Other assets | 11,311 | 11,260 | 10,621 |
| **Total assets** | $    566,513 | $    569,501 | $    583,468 |
| | | | |
| **Liabilities and Partners' Capital** | | | |
| Pre-petition accounts payable [4] | 1,176 | 1,135 | 1,250 |
| Post-petition accounts payable [4] | - | 102 | 236 |
| Secured debt: | | | |
| Frontier | 5,195 | 5,195 | 5,195 |
| Jefferies | 30,328 | 30,315 | 30,268 |
| Accrued expenses and other liabilities [4] | 59,203 | 59,184 | 60,848 |
| Accrued re-organization related fees [5] | - | - | - |
| Claim accrual [2] | 73,997 | 73,997 | 73,997 |
| Partners' capital | 396,614 | 399,573 | 411,674 |
| **Total liabilities and partners' capital** | $    566,513 | $    569,501 | $    583,468 |

[1] Includes various notes receivable at carrying value (fv undetermined).

[2] Uncontested portion of claim less applicable offsets. Potential for additional liability based on future events. No interest has been accrued beyond petition date.

[3] Mark to market gains/(losses) on investments include pricing updates for publicly traded securities and other positions with readily available market price information.  Limited partnership interests normally marked to a NAV statement have not been updated as of period end as statements are generally available on a one-month lag.

[4] Note on accruals: expenses recorded in Accounts Payable and Accrued Expenses and Other Liabilities reflect invoices recorded through accounts payable, legal invoice accruals, and normal course operating accruals, but do not reflect estimates for other incurred, but not yet received invoices.  For balance sheet dates other than the Petition Date, amounts include both pre-petition and post-petition liabilities.

[5] Debtor funded various retainers totaling $790k prior to the petition date, which were entirely expensed prior to the petition date.  No additional amounts were accrued between October 16, 2019 and November 30, 2019

Assets

Cash and cash equivalents

| | | |
|---|---|---:|
| 10010 10010 | 10010 OPERATING | 4,399,685.76 |
| 10011 10011 | 10011 OPERATING - CASH CLEARING | (5,357,965.85) |
| 10012 10012 | 10012 OPERATING - DEPOSITS IN TRANSIT | 3,058,753.60 |
| 10020 10020 | 10020 INSURANCE ACCT | 291,109.28 |
| 10030 10030 | 10030 MONEY MARKET | 136,658.61 |
| 10060 10060 | 10060 BROKERAGE | 93.74 |
| 10100 10100 | 10100 MISC OPERATING 1 | (1,132,704.16) |
| 10102 10102 | 10102 MISC OPERATING 1 - DEPOSITS IN TRANSIT | 1,132,895.00 |
| | Total cash and cash equivalents | 2,528,525.98 |

Investments, at fair value

| | | |
|---|---|---:|
| 11100 11100 | 11100 INVESTMENT SECURITIES - COST | 66,751,143.30 |
| 11150 11150 | 11150 INVESTMENT SECURITIES - MARK TO MARKET | (7,702,195.68) |
| 17140 17140 | 17140 LT INVSTMT - HIGHLAND CLO FUNDING | 481,354.43 |
| 17207 17207 | 17207 LT INVSTMT - NXRT | 49,648,257.65 |
| 17209 17209 | 17209 LT INVSTMT - NHT | 10,718,068.67 |
| 17210 17210 | 17210 LT INVSTMT - NEXPOINT REAL ESTATE STRATEGIES FUND | 1,721,458.16 |
| 17405 17405 | 17405 LT INVSTMT - CRUSADER | 5,431,955.00 |
| 17440 17440 | 17440 LT INVSTMT - CREDIT STRATEGIES FUND | 132,002.75 |
| 17445 17445 | 17445 LT INVSTMT - MULTI STRAT CREDIT FUND | 20,244,908.67 |
| 17460 17460 | 17460 LT INVSTMT - RESTORATION CAPITAL PARTNERS | 36,949,197.43 |
| 17462 17462 | 17462 LT INVSTMT - PETROCAP PARTNERS II | 12,065,754.32 |
| 17466 17466 | 17466 LT INVSTMT - PETROCAP INCENTIVE PARTNERS III | 380.00 |
| 17467 17467 | 17467 LT INVSTMT - PETROCAP PARTNERS III | 1,254,168.41 |
| 17471 17471 | 17471 LT INVSTMT - HIGHLAND LOAN FUND | 261,889.71 |
| 17474 17474 | 17474 LT INVSTMT - HIGHLAND MERGER ARBITRAGE FUND | 1,397,752.04 |
| 17540 17540 | 17540 LT INVSTMT - HIGHLAND OPPORTUNISTIC CREDIT FUND | 5,427,536.32 |
| 17542 17542 | 17542 LT INVSTMT - HIGHLAND PREMIER GROWTH EQUITY FUND | 67,639.33 |
| 17543 17543 | 17543 LT INVSTMT - HIGHLAND SMALL CAP EQUITY FUND | 533,357.32 |
| 17550 17550 | 17550 LT INVSTMT - NEXPOINT CREDIT STRATEGIES | 13,275,503.51 |
| 17555 17555 | 17555 LT INVSTMT - L/S EQUITY FUND | - |
| 17560 17560 | 17560 LT INVSTMT - ENERGY AND MATERIALS FUND | 8,928.17 |
| 17561 17561 | 17561 LT INVSTMT - FLOATING RATE OPPORTUNITIES | 792,313.43 |
| 17562 17562 | 17562 LT INVSTMT - GLOBAL ALLOCATION | 1,573,054.32 |
| 17592 17592 | 17592 LT INVSTMT - HEALTH CARE FUND | 2,752,533.87 |
| | Total investments, at fair value | 223,786,961.13 |

Equity method investees

| | | |
|---|---|---:|
| 17410 17410 | 17410 LT INVSTMT - SELECT EQUITY FUND | 130,213,244.86 |
| 17475 17475 | 17475 LT INVSTMT - EAMES, LTD | 5,908,796.26 |
| 17480 17480 | 17480 LT INVSTMT - STARCK, LTD | 6,960,671.89 |
| 17485 17485 | 17485 LT INVSTMT - WRIGHT, LTD | 22,303,199.33 |
| 17835 17835 | 17835 LT INVSTMT - HIGHLAND CAPITAL MANAGEMENT LATIN AMERICA | - |
| 17840 17840 | 17840 LT INVSTMT - HIGHLAND CAPITAL MANAGEMENT SINGAPORE | 457,809.57 |
| 17850 17850 | 17850 LT INVSTMT - HIGHLAND CAPITAL MANAGEMENT KOREA | 1,011,300.61 |
| 17880 17880 | 17880 LT INVSTMT - PENANT MANAGEMENT | 302,358.21 |
| 17881 17881 | 17881 LT INVSTMT - EAGLE EQUITY ADVISORS | 22,803.05 |
| 17885 17885 | 17885 LT INVSTMT - MAPLE AVENUE HOLDINGS | 547,633.82 |
| 17900 17900 | 17900 LT INVSTMT - OTHER LONG-TERM INVESTMENTS | 2,924,323.00 |
| | Total equity method investees | 170,652,140.60 |

Management and incentive fees receivable

| | | |
|---|---|---:|
| 12145 12145 | 12145 MGMT FEES RECVBL - VALHALLA | 12,287.85 |
| 12150 12150 | 12150 MGMT FEES RECVBL - SOUTHFORK | 7,941.94 |
| 12160 12160 | 12160 MGMT FEES RECVBL - JASPER | 35,443.91 |
| 12165 12165 | 12165 MGMT FEES RECVBL - GLENEAGLES | 19,494.83 |
| 12170 12170 | 12170 MGMT FEES RECVBL - LIBERTY | 45,288.78 |
| 12175 12175 | 12175 MGMT FEES RECVBL - ROCKWALL | 18,213.61 |

019458

| | | | |
|---|---|---|---|
| 12180 12180 | 12180 MGMT FEES RECVBL - RED RIVER | | 30,118.03 |
| 12190 12190 | 12190 MGMT FEES RECVBL - GRAYSON | | 99,945.24 |
| 12210 12210 | 12210 MGMT FEES RECVBL - EASTLAND | | 83,341.49 |
| 12215 12215 | 12215 MGMT FEES RECVBL - BRENTWOOD | | 36,565.44 |
| 12225 12225 | 12225 MGMT FEES RECVBL - ROCKWALL II | | 121,756.83 |
| 12230 12230 | 12230 MGMT FEES RECVBL - WESTCHESTER | | 130,594.11 |
| 12235 12235 | 12235 MGMT FEES RECVBL - HIGHLAND PARK | | 24,144.35 |
| 12265 12265 | 12265 MGMT FEES RECVBL - STRATFORD | | 42,557.64 |
| 12270 12270 | 12270 MGMT FEES RECVBL - GREENBRIAR | | 60,028.30 |
| 12280 12280 | 12280 MGMT FEES RECVBL - ABERDEEN | | 15,288.93 |
| 12445 12445 | 12445 MGMT FEES RECVBL - MULTI STRAT CREDIT FUND | | 20,567.91 |
| 12466 12466 | 12466 MGMT FEES RECVBL - PROMETHEUS | | 22,237.17 |
| 12471 12471 | 12471 MGMT FEES RECVBL - HIGHLAND LOAN FUND | | 1,736.85 |
| 12475 12475 | 12475 MGMT FEES RECVBL - LIFE SETTLEMENTS PROGRAM | | 0.01 |
| 12635 12635 | 12635 MGMT FEES RECVBL - LONGHORN A | | 8,439.48 |
| 12640 12640 | 12640 MGMT FEES RECVBL - LONGHORN B | | 128,482.29 |
| 12660 12660 | 12660 MGMT FEES RECVBL - BANDERA STRATEGIC CREDIT PARTNERS | | 4.10 |
| 12665 12665 | 12665 MGMT FEES RECVBL - PENSION DENMARK | | 430,691.12 |
| 12670 12670 | 12670 MGMT FEES RECVBL - NEXBANK | | 813,275.89 |
| 12675 12675 | 12675 MGMT FEES RECVBL - DAF | | 163,043.48 |
| 12680 12680 | 12680 MGMT FEES RECVBL - TRUSSWAY | | 10,080.65 |
| 12685 12685 | 12685 MGMT FEES RECVBL - SSP | | 197,173.42 |
| 14125 14125 | 14125 SUBADVISOR FEES RECEIVABLE - HCLOH | | 53,863.81 |
| | Total management and incentive fees receivable | | 2,632,607.46 |
| | Investment income receivable | | |
| 14010 14010 | 14010 CASH INTEREST RECEIVABLE | | 1,243,304.26 |
| | Total investment income receivable | | 1,243,304.26 |
| | Deferred incentive fees | | |
| 12906 12906 | 12906 INCTV FEES RECVBL - CRUSADER - OFFSHORE | | 15,020,930.06 |
| 12999 12999 | 12999 ALLOWANCE FOR UNCOLLECTIBLE ACCOUNTS | | (15,020,930.06) |
| | Fixed assets | | |
| 16100 16100 | 16100 BUILDINGS | | 2,594,846.58 |
| 16150 16150 | 16150 BUILDINGS - ACCUM DEPRECIATION | | (891,978.45) |
| 16200 16200 | 16200 FURNITURE AND FIXTURES | | 2,796,433.00 |
| 16250 16250 | 16250 FURNITURE AND FIXTURES - ACCUM DEPRECIATION | | (2,678,004.27) |
| 16300 16300 | 16300 COMPUTERS AND EQUIPMENT | | 2,805,720.49 |
| 16350 16350 | 16350 COMPUTERS AND EQUIPMENT - ACCUM DEPRECIATION | | (2,484,405.74) |
| 16400 16400 | 16400 COMPUTER SOFTWARE | | 331,195.05 |
| 16450 16450 | 16450 COMPUTER SOFTWARE - ACCUM DEPRECIATION | | (269,706.55) |
| 16500 16500 | 16500 LEASEHOLD IMPROVEMENTS | | 7,191,571.54 |
| 16550 16550 | 16550 LEASEHOLD IMPROVEMENTS - ACCUM DEPRECIATION | | (5,641,290.05) |
| | Total fixed assets | | 3,754,381.60 |
| | Other assets | | |
| 13110 13110 | 13110 REIMB EXP - PAMCO CAYMAN | | 151,270.77 |
| 13115 13115 | 13115 REIMB EXP - PAM CAPITAL | | 1,071.55 |
| 13120 13120 | 13120 REIMB EXP - LEGACY | | 146,431.94 |
| 13125 13125 | 13125 REIMB EXP - HIGHLAND V | | 19,535.41 |
| 13140 13140 | 13140 REIMB EXP - BRISTOL BAY | | 2,187.28 |
| 13145 13145 | 13145 REIMB EXP - VALHALLA | | 5,832.60 |
| 13150 13150 | 13150 REIMB EXP - SOUTHFORK | | 5,978.91 |
| 13160 13160 | 13160 REIMB EXP - JASPER | | 25,365.46 |
| 13165 13165 | 13165 REIMB EXP - GLENEAGLES | | 39,707.18 |
| 13170 13170 | 13170 REIMB EXP - LIBERTY | | 39,248.30 |
| 13175 13175 | 13175 REIMB EXP - ROCKWALL | | 13,040.05 |
| 13180 13180 | 13180 REIMB EXP - RED RIVER | | 17,189.51 |
| 13190 13190 | 13190 REIMB EXP - GRAYSON | | 42,151.73 |
| 13200 13200 | 13200 REIMB EXP - HIGHLAND FINANCIAL TRUST | | 8,381.53 |

| | | | |
|---|---|---|---|
| 13210 13210 | 13210 REIMB EXP - EASTLAND | 41,315.16 |
| 13215 13215 | 13215 REIMB EXP - BRENTWOOD | 91,010.17 |
| 13225 13225 | 13225 REIMB EXP - ROCKWALL II | 45,707.94 |
| 13230 13230 | 13230 REIMB EXP - WESTCHESTER | 115,662.06 |
| 13235 13235 | 13235 REIMB EXP - HIGHLAND PARK | 17,797.31 |
| 13265 13265 | 13265 REIMB EXP - STRATFORD | 15,332.69 |
| 13270 13270 | 13270 REIMB EXP - GREENBRIAR | 27,252.17 |
| 13276 13276 | 13276 REIMB EXP - ACIS CLO MANAGEMENT | 3,946.72 |
| 13280 13280 | 13280 REIMB EXP - ABERDEEN | 4,861.52 |
| 13281 13281 | 13281 REIMB EXP - HEWETT'S ISLAND | - |
| 13282 13282 | 13282 REIMB EXP - ACIS CLO 2018-VIII | 12,297.70 |
| 13284 13284 | 13284 REIMB EXP - ACIS CLO 2017-VII | 34,229.54 |
| 13285 13285 | 13285 REIMB EXP - ACIS CLO 2013-1 | 115,828.83 |
| 13286 13286 | 13286 REIMB EXP - ACIS CLO 2013-II | 0.03 |
| 13287 13287 | 13287 REIMB EXP - ACIS CLO 2014-III | 141,187.64 |
| 13288 13288 | 13288 REIMB EXP - ACIS CLO 2014-IIII | 161,700.16 |
| 13289 13289 | 13289 REIMB EXP - ACIS CLO 2014-V | 175,460.76 |
| 13290 13290 | 13290 REIMB EXP - ACIS CLO 2015-VI | 210,400.78 |
| 13298 13298 | 13298 REIMB EXP - ACIS CLO 2017-VII | 86,292.45 |
| 13403 13403 | 13403 REIMB EXP - HIGHLAND PROMETHEUS FUND | 2,390.26 |
| 13404 13404 | 13404 REIMB EXP - HIGHLAND LATIN AMERICA OPPORTUNITY FUND | (300.00) |
| 13410 13410 | 13410 REIMB EXP - SELECT EQUITY FUND | 44,673.00 |
| 13420 13420 | 13420 REIMB EXP - REAL ESTATE FUND | 8.92 |
| 13435 13435 | 13435 REIMB EXP - CDO OPPORTUNITIES FUND | 21,722.21 |
| 13440 13440 | 13440 REIMB EXP - CREDIT STRATEGIES FUND | 21.24 |
| 13445 13445 | 13445 REIMB EXP - MULTI STRAT CREDIT FUND | 71,217.26 |
| 13450 13450 | 13450 REIMB EXP - MULTI-STRAT INSURANCE DEDICATED FUND | 600.00 |
| 13460 13460 | 13460 REIMB EXP - RESTORATION CAPITAL PARTNERS | 32,683.10 |
| 13462 13462 | 13462 REIMB EXP - GRANITE BAY | 2,150.79 |
| 13465 13465 | 13465 REIMB EXP - CLO VALUE FUND | 47.62 |
| 13467 13467 | 13467 REIMB EXP - BB HIGHLAND FLOATING RATE FUND I | 250.00 |
| 13468 13468 | 13468 REIMB EXP - BB VOTORANTIM HIGHLAND INFRASTRUCTURE LLC | 8,604.01 |
| 13471 13471 | 13471 REIMB EXP - HIGHLAND LOAN FUND | 10,569.33 |
| 13475 13475 | 13475 REIMB EXP - LIFE SETTLEMENTS PROGRAM | 4,606.55 |
| 13515 13515 | 13515 REIMB EXP - FLOATING RATE | 6,607.38 |
| 13521 13521 | 13521 REIMB EXP - FLOATING RATE OPPORTUNITIES | 2,042.05 |
| 13540 13540 | 13540 REIMB EXP - HIGHLAND OPPORTUNISTIC CREDIT FUND | 139.53 |
| 13550 13550 | 13550 REIMB EXP - NEXPOINT CREDIT STRATEGIES | 48,761.50 |
| 13580 13580 | 13580 REIMB EXP - HIGHLAND INCOME FUND | 23,648.49 |
| 13591 13591 | 13591 REIMB EXP - HC MULTI-STRATEGY FUND | 9,120.88 |
| 13592 13592 | 13592 REIMB EXP - HEALTH CARE FUND | 10.21 |
| 13610 13610 | 13610 REIMB EXP - CALPERS DISTRESSED | 11.56 |
| 13635 13635 | 13635 REIMB EXP - LONGHORN A | 10,220.09 |
| 13640 13640 | 13640 REIMB EXP - LONGHORN B | 24,732.66 |
| 13660 13660 | 13660 REIMBURSABLE FUND EXPNESES - PYXIS L/S EQUITY FUND | 1,263.26 |
| 13661 13661 | 13661 REIMBURSABLE FUND EXPNESES - PYXIS L/S HEALTHCARE FUND | 12,331.25 |
| 13665 13665 | 13665 REIMBURSABLE FUND EXPNESES - PYXIS SMALL CAP EQUITY FU | 342.25 |
| 13670 13670 | 13670 REIMBURSABLE FUND EXPNESES - HIGHLAND OPPORTUNISTIC CR | 858.02 |
| 13672 13672 | 13672 REIMBURSABLE FUND EXPNESES - PYXIS ENERGY & MATERIALS | 219.00 |
| 13676 13676 | 13676 EXP REIMB GLOBAL ALLOCATION FUND | 7,509.40 |
| 13685 13685 | 13685 EXP REIMB IBOXX SENIOR LOAN ETF | 4,857.87 |
| 13690 13690 | 13690 EXP REIMB - NEXPOINT RESIDENTIAL TRUST | 35,354.89 |
| 13691 13691 | 13691 EXP REIMB - NEXPOINT CAPITAL | 62,057.74 |
| 13692 13692 | 13692 EXP REIMB - NEXPOINT MULTI FAMILY REALTY TRUST | 168.38 |
| 13905 13905 | 13905 REIMBURSABLE FUND EXPENSES - COMPANY REIMB | 4,176,204.78 |
| 13910 13910 | 13910 REIMBURSABLE FUND EXPENSES - OTHER | (1,166,137.22) |
| 13990 13990 | 13990 REIMBURSABLE FUND EXPNESES - OTHER | 662,179.33 |
| 13999 13999 | 13999 REIMBURSABLE FUND EXPNESES - CLEARING | 1,726,654.35 |
| 14130 14130 | 14130 MISCELLANEOUS RECEIVABLE | 8,900.00 |
| 14135 14135 | 14135 SHARED SVCS FEE RECVBL - FALCON | 0.09 |
| 14140 14140 | 14140 SHARED SVCS FEE RECVBL - PYXIS | 143,384.01 |
| 14142 14142 | 14142 SHARED SVCS FEE RECVBL - HCLOH | 37,290.33 |
| 14143 14143 | 14143 SHARED SVCS FEE RECVBL - HCM LATIN AMERICA | 10,000.00 |
| 14148 14148 | 14148 SHARED SVCS FEE RECVBL - RAND ADVISORS | 9,999.92 |
| 14149 14149 | 14149 SHARED SVCS FEE RECVBL - NREA | (0.01) |
| 14199 14199 | 14199 UNAPPLIED RECEIPTS | (20,825.39) |

019460

| | | | | |
|---|---|---|---|---|
| 14520 14520 | 14520 DUE FROM HIGHLAND CAPITAL MANAGEMENT EUROPE LTD. | - | | |
| 14530 14530 | 14530 DUE FROM HIGHLAND CAPITAL MANAGEMENT SERVICES | 7,482,480.88 | | |
| 14531 14531 | 14531 DUE FROM HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS | 10,413,539.53 | | |
| 14532 14532 | 14532 DUE FROM NEXPOINT ADVISORS | 24,534,644.03 | | |
| 14533 14533 | 14533 DUE FROM HCRE PARTNERS | 10,394,680.47 | | |
| 14535 14535 | 14535 DUE FROM HERA | 3,349,587.22 | | |
| 14540 14540 | 14540 DUE FROM SSP | 2,198,610.05 | | |
| 14545 14545 | 14545 DUE FROM TRUSSWAY | 1,056,956.03 | | |
| 14555 14555 | 14555 DUE FROM HIGHLAND CAPITAL MANAGEMENT SINGAPORE PTE LTD | 35,158.50 | | |
| 14565 14565 | 14565 DUE FROM OTHER - TAX LOANS | 10,670,299.84 | | |
| 14575 14575 | 14575 DUE FROM HIGHLAND CAPITAL OF NEW YORK | 5,023,073.12 | | |
| 14580 14580 | 14580 DUE FROM NEXBANK | 69,677.42 | | |
| 14585 14585 | 14585 DUE FROM HUNTER MOUNTAIN INVESTMENT TRUST | 56,873,209.22 | | |
| 14590 14590 | 14590 DUE FROM OTHER AFFILIATE | 5,288,256.35 | | |
| 14595 14595 | 14595 DUE FROM HIGHLAND CAPITAL KOREA | 3,132,278.05 | | |
| 14750 14750 | 14750 LONG TERM NOTES RECEIVABLE | 18,286,268.16 | | |
| 14900 14900 | 14900 INTERCOMPANY RECEIVABLE | 1,663.65 | | |
| 15010 15010 | 15010 PREPAID INSURANCE | 316,404.81 | | |
| 15020 15020 | 15020 PREPAID RENT | (708,213.81) | | |
| 15025 15025 | 15025 PREPAID RESEARCH | 496,846.51 | | |
| 15030 15030 | 15030 OTHER PREPAID EXPENSES | 11,250.00 | | |
| 15490 | 15490 PREPAID EXPENSE CLEARING | 27,223.80 | | |
| 15510 15510 | 15510 DEPOSITS | 129,871.65 | | |
| | Total other assets | 166,938,592.22 | | |
| | Total assets | 571,536,513.25 | | |

Liabilities and Partners' Capital

Current liabilities:

Securities sold, not yet purchased

| | | | | |
|---|---|---|---|---|
| 22010 22010 | 22010 SECURITIES SOLD, NOT YET PURCHASED - PROCEEDS | (180.71) x | | pre |
| | Total securities sold, not yet purchased | (180.71) | | |

Due to broker

| | | | | |
|---|---|---|---|---|
| 20700 20700 | 20700 DUE TO BROKERS | (30,328,462.58) | | |
| | Total due to broker | | | |

Due to broker for securities purchased, not yet settled
Payable to Highland Capital Management Services, Inc.

| | | | | |
|---|---|---|---|---|
| 23015 23015 | 23015 DUE TO MAPLE AVENUE HOLDINGS | (4,975,000.00) x | | pre |
| 23035 23035 | 23035 DUE TO HIGHLAND CAPITAL OF NEW YORK | 5,446.00 x | | |
| 23045 23045 | 23045 DUE TO HIGHLAND CAPITAL MANAGEMENT SINGAPORE PTE LTD | (248,745.28) x | | pre |
| 23050 23050 | 23050 DUE TO AFFILIATE - OTHER | (208,051.44) x | | |
| 23099 23099 | 23099 PAYABLES - OTHER AFFILIATE | (2,059,337.01) x | | pre |
| | Total payable to Highland Capital Management Services, Inc | (7,485,687.73) | | |

Accounts payable

| | | | | |
|---|---|---|---|---|
| 20100 20100 | 20100 ACCOUNTS PAYABLE | (1,176,300.44) | | |
| 20200 20200 | 20200 INTEREST PAYABLE | (613,638.07) x | | mix |
| | Total accounts payable | | | |

Accrued and other liabilities

| Code | Code | Description | Amount | |
|------|------|-------------|--------|---|
| 20900 | 20900 | 20900 INTERCOMPANY PAYABLE | - | |
| 21010 | 21010 | 21010 ACCRUED LIABILITIES - INTEREST | 225.00 | x |
| 21030 | 21030 | 21030 ACCRUED LIABILITIES - LEGAL | (8,761,799.69) | x |
| 21040 | 21040 | 21040 ACCRUED LIABILITIES - AUDIT FEES | (165,967.74) | x |
| 21080 | 21080 | 21080 ACCRUED LIABILITIES - INCOME TAX | (175,023.00) | x |
| 21090 | 21090 | 21090 ACCRUED LIABILITIES - OTHER | (3,166.60) | x |
| 21110 | 21110 | 21110 ACCRUED LIABILITIES - HCNY HEALTH INS PREMIUMS | (119,062.29) | x |
| 21111 | 21111 | 21111 ACCRUED LIABILITIES - HCMFA HEALTH INS PREMIUMS | (95,045.39) | x |
| 21113 | 21113 | 21113 ACCRUED LIABILITIES - HC FUNDS DISTRIBUTOR HEALTH INS | (754,170.28) | x |
| 21114 | 21114 | 21114 ACCRUED LIABILITIES - NEXBANK HEALTH INS PREMIUMS | 544,043.98 | x |
| 21115 | 21115 | 21115 ACCRUED LIABILITIES - DRUGCRAFTERS HEALTH INS PREMIUMS | 206,721.33 | x |
| 21116 | 21116 | 21116 ACCRUED LIABILITIES - MARKHAM HEALTH INS PREMIUMS | 196,640.32 | x |
| 21117 | 21117 | 21117 ACCRUED LIABILITIES - NEXBANK SECURITIES HEALTH INS PR | 38,116.34 | x |
| 21118 | 21118 | 21118 ACCRUED LIABILITIES - HCMLP HEALTH INS PREMIUMS | 68,737.06 | x |
| 21119 | 21119 | 21119 ACCRUED LIABILITIES - PCP HEALTH INS PREMIUMS | (8,854.67) | x |
| 21120 | 21120 | 21120 ACCRUED LIABILITIES - JMJM HEALTH INS PREMIUMS | (6,252.54) | x |
| 21121 | 21121 | 21121 ACCRUED LIABILITIES - NXRT HEALTH INS PREMIUMS | (9,034.91) | x |
| 21122 | 21122 | 21122 ACCRUED LIABILITIES - NPA HEALTH INS PREMIUMS | (25,017.59) | x |
| 21123 | 21123 | 21123 ACCRUED LIABILITIES - EAGLE EQUITY HEALTH INS PREMIUMS | (4,458.02) | x |
| 21124 | 21124 | 21124 ACCRUED LIABILITIES - VINEBROOK HEALTH INS PREMIUMS | (592.82) | x |
| 21125 | 21125 | 21125 ACCRUED LIABILITIES - NHT HEALTH INS PREMIUMS | (1,185.64) | x |
| 21200 | 21200 | 21200 ACCRUED LIABILITIES - HCMLP SHARED SERVICES | (18,014.97) | x |
| 21205 | 21205 | 21205 ACCRUED LIABILITIES - HCFD SHARED SERVICES | (36,698.75) | x |
| 21510 | 21510 | 21510 ACCRUED PAYROLL LIABILITIES - BONUS | (13,688,973.83) | x |
| 21520 | 21520 | 21520 ACCRUED PAYROLL LIABILITIES - FEDERAL INC TAX W/H | - | x |
| 21550 | 21550 | 21550 ACCRUED PAYROLL LIABILITIES - FICA | - | x |
| 21560 | 21560 | 21560 ACCRUED PAYROLL LIABILITIES - MEDICARE | (13,310.19) | x |
| 21600 | 21600 | 21600 ACCRUED PAYROLL LIABILITIES - 401(K) EE CONTRIBUTION | 3,262.35 | x |
| 21630 | 21630 | 21630 ACCRUED PAYROLL LIABILITIES - LIFE INSURANCE | (13,761.35) | x |
| 21640 | 21640 | 21640 ACCRUED PAYROLL LIABILITIES - FLEXIBLE SPENDING ACCOUN | (354,881.89) | x |
| 21670 | 21670 | 21670 ACCRUED PAYROLL LIABILITIES - EE EXPENSE REIMBURSEMENT | (5,000.00) | x |
| 21680 | 21680 | 21680 ACCRUED PAYROLL LIABILITIES - VACATION | (939,324.00) | x |
| 21695 | 21695 | 21695 ACCRUED PAYROLL LIABILITY - SUSPENSE | 21,811.26 | x |
| 25445 | 25445 | 25445 DEFERRED MANAGEMENT FEES - MULTI STRAT CREDIT | (431,483.88) | x |
| 25461 | 25461 | 25461 DEFERRED INCENTIVE FEES - UNEARNED RCP CARRY | (4,392,937.00) | x |
| 25500 | 25500 | 25500 DEFERRED MANAGEMENT FEES - DAF | 0.02 | x |

|  |  | Total accrued and other liabilities | (28,944,459.38) | |

Other current liabilities

| 24150 | 24150 | 24150 CLAIMS PAYABLE | (73,997,399.28) | |

|  |  | Total other current liabilities | (73,997,399.28) | |

|  |  | Total current liabilities | | |

Debt and notes payable

| 26100 | 26100 | 26100 NOTES PAYABLE | (5,194,651.00) | |
| 26110 | 26110 | 26110 CLASS A TERM NOTES PAYABLE | (9,541,446.00) | x |
| 26200 | 26200 | 26200 REVOLVING CREDIT FACILITY | (11,340,751.26) | x |

|  |  | Total debts and notes payable | (26,076,848.26) | |

|  |  |  | (64,225,759) | |
|  |  | Payable to Highland Capital Management Services, Inc. | 5,023,073 | |
|  |  | Deferred compensation | (59,202,686) | |

| 27200 | 27200 | 27200 PROFIT SHARING PLAN | (632,258.10) | x |
| 27265 | 27265 | 27265 2017 DEFERRED SHARES | (3,411,606.44) | x |
| 27266 | 27266 | 27266 2018 DEFERRED SHARES | (1,758,391.79) | x |
| 27267 | 27267 | 27267 2019 DEFERRED SHARES | (497,339.23) | x |

| | | | |
|---|---|---|---|
| | | Total deferred compensation | (6,299,595.56) |
| | | Other liabilities | |
| | | Total liabilities | (174,922,572.01) |
| | | Commitments | |
| | | Partners' capital | |
| 31000 | 31000 | 31000 PARTNERS' CAPITAL | (6,509,576.64) |
| 32000 | 32000 | 32000 SUBSCRIPTIONS | (91,499,999.99) |
| 33000 | 33000 | 33000 REDEMPTIONS | 503,589,902.86 |
| 39000 | 39000 | 39000 RETAINED EARNINGS | (765,702,051.50) |
| 40145 | 40145 | 40145 MGMT FEE REV - VALHALLA | (50,628.85) |
| 40150 | 40150 | 40150 MGMT FEE REV - SOUTHFORK | (27,757.53) |
| 40160 | 40160 | 40160 MGMT FEE REV - JASPER | (145,851.77) |
| 40165 | 40165 | 40165 MGMT FEE REV - GLENEAGLES | (140,043.03) |
| 40170 | 40170 | 40170 MGMT FEE REV - LIBERTY | (165,929.40) |
| 40175 | 40175 | 40175 MGMT FEE REV - ROCKWALL | (66,518.03) |
| 40180 | 40180 | 40180 MGMT FEE REV - RED RIVER | (189,123.14) |
| 40190 | 40190 | 40190 MGMT FEE REV - GRAYSON | (465,501.18) |
| 40210 | 40210 | 40210 MGMT FEE REV - EASTLAND | (436,949.87) |
| 40215 | 40215 | 40215 MGMT FEE REV - BRENTWOOD | (190,598.12) |
| 40225 | 40225 | 40225 MGMT FEE REV - ROCKWALL II | (524,333.53) |
| 40230 | 40230 | 40230 MGMT FEE REV - WESTCHESTER | (328,847.76) |
| 40235 | 40235 | 40235 MGMT FEE REV - HIGHLAND PARK | (96,479.77) |
| 40265 | 40265 | 40265 MGMT FEE REV - STRATFORD | (178,461.48) |
| 40270 | 40270 | 40270 MGMT FEE REV - GREENBRIAR | (258,673.40) |
| 40280 | 40280 | 40280 MGMT FEE REV - ABERDEEN | (41,945.72) |
| 40445 | 40445 | 40445 MGMT FEE REV - MULTI STRAT CREDIT FUND | (484,270.56) |
| 40466 | 40466 | 40466 MGMT FEE REV - PROMETHEUS | (86,688.68) |
| 40471 | 40471 | 40471 MGMT FEE REV - HIGHLAND LOAN FUND | (180,409.31) |
| 40473 | 40473 | 40473 MGMT FEE REV - HIGHLAND FLEXIBLE INCOME UCITS FUND | (41,013.32) |
| 40635 | 40635 | 40635 MGMT FEE REV - LONGHORN A | (39,412.35) |
| 40640 | 40640 | 40640 MGMT FEE REV - LONGHORN B | (518,445.68) |
| 40644 | 40644 | 40644 MGMT FEE REV - PENSION DENMARK | (1,163,257.92) |
| 40646 | 40646 | 40646 MGMT FEE REV - NEXBANK | (2,505,695.14) |
| 40647 | 40647 | 40647 MGMT FEE REV - DAF | (3,596,743.32) |
| 40684 | 40684 | 40684 MGMT FEE REV - TRUSSWAY | (114,247.30) |
| 40685 | 40685 | 40685 MGMT FEE REV - SSP | (197,173.42) |
| 40690 | 40690 | 40690 SUBADVISORY FEES - HCLOH | (206,475.99) |
| 41455 | 41455 | 41455 INCTV FEE REV - HIGHLAND DYNAMIC INCOME FUND | (150,925.36) |
| 45100 | 45100 | 45100 INTEREST INCOME | (96.17) |
| 45200 | 45200 | 45200 DIVIDEND INCOME | (2,625,125.09) |
| 45445 | 45445 | 45445 ROYALTY FEES | (875,539.73) |
| 45509 | 45509 | 45509 SUBADVISOR FEES - HCMFA | (3,945,290.32) |
| 45511 | 45511 | 45511 SUBADVISOR FEES - NEXPOINT ADVISORS | (2,389,935.48) |
| 45515 | 45515 | 45515 SHARED SVCS FEE REV - NEXPOINT | (1,593,290.32) |
| 45530 | 45530 | 45530 SHARED SVCS FEE REV - NEXBANK | (189,677.42) |
| 45535 | 45535 | 45535 SHARED SVCS FEE REV - FALCON | (135,000.00) |
| 45540 | 45540 | 45540 SHARED SVCS FEE REV - PYXIS | (2,950,803.13) |
| 45541 | 45541 | 45541 SHARED SVCS FEE REV - HCLOH | (142,944.91) |
| 45543 | 45543 | 45543 SHARED SVCS FEE REV - HCM LATIN AMERICA | (100,000.00) |
| 45555 | 45555 | 45555 SHARED SVCS FEE REV - RAND ADVISORS | (171,053.46) |
| 45560 | 45560 | 45560 SHARED SVCS FEE REV - NREA | (720,000.00) |
| 45690 | 45690 | 45690 ADMIN FEES - ALL CAP EQUITY FUND | - |
| 45900 | 45900 | 45900 MISCELLANEOUS INCOME | (69,625.13) |
| 50110 | 50110 | 50110 SALARIES | 9,150,582.76 |
| 50130 | 50130 | 50130 OVERTIME | 443,209.60 |
| 50150 | 50150 | 50150 SEVERANCE | 480,800.00 |
| 50210 | 50210 | 50210 CASH BONUS | 9,248,793.64 |
| 50230 | 50230 | 50230 PROFIT SHARING | 632,258.10 |
| 50240 | 50240 | 50240 401(K) MATCH | 333,561.32 |
| 50255 | 50255 | 50255 SHORT-TERM INCENTIVE PLAN | (436,285.82) |
| 50265 | 50265 | 50265 2017 DEFERRED SHARES | 1,097,191.17 |

019463

| 50266 50266 | 50266 2018 DEFERRED SHARES | 822,120.61 |
| 50267 50267 | 50267 2019 DEFERRED SHARES | 497,339.14 |
| 50268 50268 | 50268 2016 DEFERRED SHARES | (25,311.95) |
| 50290 50290 | 50290 OTHER COMPENSATION | 1,155,780.58 |
| 50310 50310 | 50310 HEALTH INSURANCE | 1,523,588.77 |
| 50320 50320 | 50320 LIFE INSURANCE | 54,361.18 |
| 50410 50410 | 50410 EMPLOYER FICA | 583,174.17 |
| 50420 50420 | 50420 EMPLOYER MEDICARE | 375,760.29 |
| 50430 50430 | 50430 EMPLOYER FUTA | 4,744.82 |
| 50440 50440 | 50440 EMPLOYER SUTA | 12,959.77 |
| 60100 60100 | 60100 PERIODICALS | 22,386.10 |
| 60200 60200 | 60200 RESEARCH | 916,140.49 |
| 61100 61100 | 61100 LEGAL | 4,595,085.91 |
| 61200 61200 | 61200 AUDIT | 169,967.74 |
| 61300 61300 | 61300 CONSULTING | 3,452,054.35 |
| 61325 61325 | 61325 ASSET PLACEMENT FEES | 104,945.38 |
| 61350 61350 | 61350 ADMINISTRATION FEES | 57,121.04 |
| 61355 61355 | 61355 DATA SERVICE FEES | 43,875.13 |
| 61400 61400 | 61400 PAYROLL SERVICE | 19,604.39 |
| 61450 61450 | 61450 PLACEMENT FEES | 38,750.00 |
| 61510 61510 | 61510 VIRTUAL RECRUITING | 16,255.54 |
| 61530 61530 | 61530 CANDIDATE REIMBURSEMENT | 745.33 |
| 61540 61540 | 61540 TRAINING | 3,078.00 |
| 62100 62100 | 62100 DEPRECIATION EXPENSE - BUILDING | 48,653.37 |
| 62200 62200 | 62200 DEPRECIATION EXPENSE - FURNITURE AND FIXTURES | 100,107.56 |
| 62300 62300 | 62300 DEPRECIATION EXPENSE - COMPUTERS AND EQUIPMENT | 151,012.94 |
| 62400 62400 | 62400 DEPRECIATION EXPENSE - COMPUTER SOFTWARE | (13,361.00) |
| 62500 62500 | 62500 DEPRECIATION EXPENSE - LEASEHOLD IMPROVEMENTS | 498,088.99 |
| 69110 69110 | 69110 RENT - DALLAS | 994,874.28 |
| 69140 69140 | 69140 RENT - STORAGE | 11,023.33 |
| 69210 69210 | 69210 UTILITIES | 55,034.52 |
| 69220 69220 | 69220 OFFICE SUPPLIES | 143,507.22 |
| 69232 69232 | 69232 TELEPHONES - OFFICE | 86,573.03 |
| 69234 69234 | 69234 TELEPHONES - MOBILE | 102,030.73 |
| 69238 69238 | 69238 INTERNET | 213,470.37 |
| 69240 69240 | 69240 COMPUTER HARDWARE | 66,426.65 |
| 69250 69250 | 69250 COMPUTER SOFTWARE | 400,694.97 |
| 69260 69260 | 69260 MAINTENANCE | 18,021.65 |
| 69270 69270 | 69270 POSTAGE | 19,179.88 |
| 69280 69280 | 69280 TEMPORARY SERVICES | 2,579.33 |
| 69281 69281 | 69281 FOOD SUPPLIES | 144,648.14 |
| 69282 69282 | 69282 PARKING | 138,958.85 |
| 69290 69290 | 69290 OFFICE OVERHEAD - OTHER | 227,701.36 |
| 69310 69310 | 69310 DIRECTORS AND OFFICERS | 247,662.00 |
| 69320 69320 | 69320 WORKERS COMPENSATION | 34,662.88 |
| 69330 69330 | 69330 BUY/SELL | 14,875.00 |
| 69340 69340 | 69340 ADDITIONAL LIFE INSURANCE | 41,601.38 |
| 69350 69350 | 69350 OTHER INSURANCE | 88,305.83 |
| 69410 69410 | 69410 AIRFARE | 136,385.18 |
| 69420 69420 | 69420 MEALS | 64,817.22 |
| 69430 69430 | 69430 LODGING | 44,258.29 |
| 69440 69440 | 69440 ENTERTAINMENT | 509,735.88 |
| 69450 69450 | 69450 EMPLOYEE LUNCH | 283,814.86 |
| 69460 69460 | 69460 GROUND TRANSPORTATION | 23,557.78 |
| 69490 69490 | 69490 TRAVEL - OTHER | 5,972.71 |
| 69500 69500 | 69500 MARKETING AND ADVERTISING | 561,172.46 |
| 69600 69600 | 69600 CHARITABLE CONTRIBUTIONS | 67,700.00 |
| 69610 69610 | 69610 BUSINESS GIFTS | 116,780.19 |
| 69722 69722 | 69722 STATE CORPORATE TAX | 50.00 |
| 69730 69730 | 69730 TAXES - OTHER | 537,045.85 |
| 69832 69832 | 69832 CONFERENCE REGISTRATION | 12,420.78 |
| 69910 69910 | 69910 FEES AND DUES | 208,428.87 |
| 69920 69920 | 69920 BANK CHARGES | 14,052.09 |
| 69950 69950 | 69950 BAD DEBT | 79,835.57 |
| 69990 69990 | 69990 MISCELLANEOUS - OTHER | 684.72 |
| 80100 80100 | 80100 INTEREST INCOME - NON-OPERATING | (5,765,215.32) |

| | | | |
|---|---|---|---:|
| 80200 | 80200 | 80200 INTEREST EXPENSE - NON-OPERATING | 1,344,399.09 |
| 80800 | 80800 | 80800 COMPANY DISCOUNT ON SHARE PURCHASES | (768,566.33) |
| 80900 | 80900 | 80900 OTHER INCOME/EXPENSE | 74,007,399.28 |
| 90100 | 90100 | 90100 REALIZED CAPITAL GAINS/LOSSES | (3,959,534.93) |
| 91100 | 91100 | 91100 INVESTMENT SECURITIES | 5,784,240.27 |
| 91207 | 91207 | 91207 NXRT | (15,997,586.35) |
| 91209 | 91209 | 91209 NHT | 163,219.32 |
| 91403 | 91403 | 91403 HIGHLAND PROMETHEUS FUND | 20.00 |
| 91410 | 91410 | 91410 SELECT EQUITY FUND | (109,058,363.77) |
| 91445 | 91445 | 91445 CREDIT OPPORTUNITIES FUND | 6,830,992.36 |
| 91460 | 91460 | 91460 RESTORATION CAPITAL PARTNERS | 9,909,464.57 |
| 91462 | 91462 | 91462 PETROCAP PARTNERS II | (468,147.29) |
| 91463 | 91463 | 91463 PETROCAP PARTNERS III | 9,472.57 |
| 91471 | 91471 | 91471 HIGHLAND LOAN FUND | (4,746.24) |
| 91480 | 91480 | 91480 STARCK | 2,346,668.27 |
| 91485 | 91485 | 91485 WRIGHT | (19,196,588.45) |
| 91495 | 91495 | 91495 HIGHLAND CLO FUNDING, LTD | 129,003.42 |
| 91835 | 91835 | 91835 HIGHLAND CAPITAL MANAGEMENT LATIN AMERICA, LP | 4,004,360.11 |
| 91840 | 91840 | 91840 HIGHLAND CAPITAL MANAGEMENT SINGAPORE | (9,123.39) |
| 91850 | 91850 | 91850 HIGHLAND CAPITAL MANAGEMENT KOREA | 225,509.80 |
| 91881 | 91881 | 91881 EAGLE EQUITY ADVISORS | 247,196.95 |
| 91885 | 91885 | 91885 MAPLE AVENUE HOLDINGS | (83,374.05) |
| 91900 | 91900 | 91900 OTHER INVESTMENTS | 424,641.00 |
| 99990 | 99990 | 99990 SYSTEM DEFAULT | (4,458.02) |

Total partners capital          (396,613,941.24)

Total liabilities and partners' capital          (571,536,513.25)          -

# EXHIBIT 118

019466

Case 19-34054-sgj11   Doc 4255-118   Filed 06/20/25   Entered 06/20/25 21:39:29
Desc Exhibit 118   Page 2 of 3
20191015 Hunter Mountain Note Receivable

| Balance Type | | | Actual | | | | | |
|---|---|---|---|---|---|---|---|---|
| Ledger | * List - Text | Highland Capital Management US | | | | | | |
| Category | * List - Text | Adjustment | | | | | | |
| Source | * List - Text | Spreadsheet | | | | | | |
| Currency | * List - Text | USD | | | | | | |
| Accounting Date | * List - Date | 10/15/2019 | | | | | | |
| Journal Name | Text | 20191015 Hunter Mountain Note R | | | | | | |
| Journal Description | Text | Hunter Mountain Note Receivable | | | | | | |

Uploaded by:_____

Posted by:_____

| Upl | Entity | Department | Account | Business Unit | Future | Debit | Credit | Line Description | Messages |
|---|---|---|---|---|---|---|---|---|---|
| | * List - Text | | | | | * Number | * Number | Text | |
| ○ | 0010 | 000 | 14010 | 00 | 0000 | 61,002.36 | | Hunter Mountain Note Receivable - Interest | ⊕ |
| ○ | 0010 | 000 | 14010 | 00 | 0000 | | - | Hunter Mountain Note Receivable Update - PIK | ⊕ |
| ○ | 0010 | 000 | 14585 | 00 | 0000 | - | | Hunter Mountain Note Receivable Update - PIK | ⊕ |
| ○ | 0010 | 210 | 80100 | 10 | 0000 | | 61,002.36 | Hunter Mountain Note Receivable - Interest | ⊕ |
| Totals: | | | | | | 61002.36 | 61002.36 | | |

Tip: This is not the end of the Template.  Unprotect the sheet and insert as many rows as needed.

019467

**"Contribution Note" Amortization Table**
**Interest and principal payable on the anniversaries of the effective date of the notes**

| | | |
|---|---|---|
| Beginning Principal | 63,000,000 | |
| Interest Rate | 2.61% | December 2015 Long-term AFR |
| Effective Date | 12/21/2015 | |

**Revised Schedule Incorporating Prepayments as of 01/05/17**

| Date | Interest Accrual | Interest Paid | Accrued Interest | Beg Prin Bal | Principal Paid | PIK | Ending Prin Bal | Total Paid |
|---|---|---|---|---|---|---|---|---|
| 12/31/17 | 43,260.12 | - | 43,260.12 | 60,663,611.75 | - | - | 60,663,611.75 | - |
| 03/31/18 | 390,407.74 | - | 433,667.86 | 60,663,611.75 | - | - | 60,663,611.75 | - |
| 06/30/18 | 394,745.60 | - | 828,413.46 | 60,663,611.75 | - | - | 60,663,611.75 | - |
| 09/30/18 | 399,083.46 | - | 1,227,496.92 | 60,663,611.75 | - | - | 60,663,611.75 | - |
| 10/31/18 | 134,473.78 | - | 1,361,970.70 | 60,663,611.75 | - | - | 60,663,611.75 | |
| 11/30/18 | 130,135.91 | - | 1,492,106.61 | 60,663,611.75 | - | - | 60,663,611.75 | |
| 12/19/18 | 82,419.41 | (1,574,526.02) | - | 60,663,611.75 | (504,879.98) | - | 60,158,731.77 | (2,079,406.00) prepayment |
| 12/21/18 | 8,603.52 | (8,603.52) | - | 60,158,731.77 | | 8,603.52 | 60,167,335.29 | - |
| 12/31/18 | 43,023.77 | - | 43,023.77 | 60,167,335.29 | - | - | 60,167,335.29 | - |
| 01/31/19 | 133,373.67 | - | 176,397.44 | 60,167,335.29 | - | - | 60,167,335.29 | |
| 02/28/19 | 120,466.54 | - | 296,863.98 | 60,167,335.29 | - | - | 60,167,335.29 | |
| 03/28/19 | 120,466.54 | (417,330.52) | - | 60,167,335.29 | (3,294,125.95) | - | 56,873,209.34 | (3,711,456.47) prepayment |
| 03/31/19 | 12,200.47 | - | 12,200.47 | 56,873,209.34 | - | - | 56,873,209.34 | |
| 04/30/19 | 122,004.72 | - | 134,205.19 | 56,873,209.34 | - | - | 56,873,209.34 | |
| 05/31/19 | 126,071.54 | - | 260,276.73 | 56,873,209.34 | - | - | 56,873,209.34 | |
| 06/30/19 | 122,004.72 | - | 382,281.45 | 56,873,209.34 | - | - | 56,873,209.34 | |
| 07/31/19 | 126,071.54 | - | 508,352.99 | 56,873,209.34 | - | - | 56,873,209.34 | |
| 08/31/19 | 126,071.54 | - | 634,424.53 | 56,873,209.34 | - | - | 56,873,209.34 | |
| 09/30/19 | 122,004.72 | - | 756,429.25 | 56,873,209.34 | - | - | 56,873,209.34 | |
| 10/15/19 | 61,002.36 | | 817,431.61 | 56,873,209.34 | | | 56,873,209.34 | |
| 10/31/19 | 65,069.18 | - | 882,500.79 | 56,873,209.34 | - | - | 56,873,209.34 | |
| 11/30/19 | 122,004.72 | - | 1,004,505.51 | 56,873,209.34 | - | - | 56,873,209.34 | |
| 12/21/19 | 85,403.30 | (1,089,908.81) | - | 56,873,209.34 | | 1,089,908.81 | 57,963,118.15 | - |
| 12/21/20 | 1,516,982.14 | (1,516,982.14) | - | 57,963,118.15 | - | 1,516,982.14 | 59,480,100.29 | - |
| 12/21/21 | 1,552,430.62 | (1,552,430.62) | - | 59,480,100.29 | (4,033,126.51) | 1,552,430.62 | 56,999,404.40 | (4,033,126.51) |
| 12/21/22 | 1,487,684.45 | (1,487,684.45) | - | 56,999,404.40 | (5,000,000.00) | 1,487,684.45 | 53,487,088.85 | (5,000,000.00) |
| 12/21/23 | 1,396,013.02 | (1,396,013.02) | - | 53,487,088.85 | (5,000,000.00) | 1,396,013.02 | 49,883,101.87 | (5,000,000.00) |

019468

**EXHIBIT 119**

019469



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

FSD NO.      OF 2025 (    )

**IN THE MATTER OF SECTION 92 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO LTD AND THE CHARITABLE DAF FUND LP**

---

**AFFIDAVIT OF JAMES DAVID DONDERO**

---

I, **JAMES DAVID DONDERO**, of 300 Crescent Court, Suite 700, Dallas, Texas, United States, 75201, **MAKE OATH AND SAY** as follows:

1.    I am the President of NexPoint Advisors, L.P. (**NexPoint**), an investment advisor registered with the U.S. Securities and Exchange Commission (**SEC**). I am a Certified Public Accountant and Chartered Financial Analyst with over forty years of investment advisory experience managing billions of dollars of investments across various assets classes.

2.    I make this affidavit in support of the petition (the **Petition**) filed by the Supporting Organizations (as defined below) seeking the winding up on the just and equitable basis of Charitable DAF HoldCo, Ltd (the **LP**) and the Charitable DAF Fund, LP (the **Fund**) pursuant to section 92(e) of the Companies Act (2025 Revision) (the **Act**) and Order 3, rule 3 of the Companies Winding Up Rules (2025 Consolidation) (the **CWR**).

3.    I make this affidavit from matters within my own personal knowledge and believe the information contained herein to be true and accurate in all respects.

4.    Now produced and shown to me and marked "**JDD-1**" is a bundle of true copy documents to which I refer in this affidavit. References to page numbers in this affidavit are references to that exhibit unless otherwise specified.

019470

HCMLPHMIT00003429

Case 19-34054-sgj11   Doc 4255-119   Filed 06/20/25   Entered 06/20/25 21:39:29
Case 3:25-cv-02072-S   Document 55-26 Exhibit Filed 10/08/25   Page 622 of 674   PageID 20538

FSD2025-0099                        **Page 2 of 10**                        2025-04-16

#### BACKGROUND

5.  I founded NexPoint in 2012. NexPoint is an alternative investment firm, with a particular focus on investment in the real estate sector. NexPoint has assets under management exceeding US$16 billion in value.

6.  I was formerly the President of Highland Capital Management, L.P. (**Highland**), also an SEC registered investment advisor which I founded in 1993. From that time until 2015, Highland was majority owned by me and/or my affiliates. In December 2015, I divested my majority stake of Highland (**2015 Transaction**). On 16 October 2019, Highland filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code (**Highland Bankruptcy**) in the Northern District of Texas. The Highland Bankruptcy plan was confirmed in February 2021, and the estate remains open as it makes distributions to creditors.

7.  In February 2021, as part of the Highland Bankruptcy, the employment contracts of the majority of Highland's employees were terminated. Many of the former back-office employees of Highland thereafter became employees of a newly formed company called Skyview Group (**Skyview**) that provides middle and back-office services to various clients, including companies in which I hold an interest such as NexPoint.

#### THE FUND

8.  In addition to my business interests, I am a regular donor to philanthropic and charitable causes. The Fund is one of the vehicles I utilize to donate such funds to charitable organizations.

9.  In 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated to a charitable foundation. In 2011, I requested the Donor Advised Fund (or DAF) to be formed and structured in a way that allowed these donations to be receipted and distributed to certain charitable foundations, as the ultimate beneficial owners of the Fund's economic interest. The structure proposed by the tax and legal advisors to effect this was for the Fund to have one limited partner (i.e. the LP) which would issue 'participation shares' to be held by certain charitable supporting organizations (together, the **Supporting Organizations**) and in turn each of those entities would provide funding directly to certain charitable foundations in the U.S. (together, the **Charities**).

10. The Amended and Restated Limited Partnership Agreement of the Fund dated 7 November 2011 (**ARLPA**), and the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (**Articles**), govern the Fund and its partners.

11. The LP holds 99% ninety-nine percent (99%) of the economic interest in the Fund. The remaining one percent (1%) is (or at least was as at the time of the Fund's formation) held by its general partner, Charitable DAF GP, LLC (the **GP**), a Delaware company incorporated on 25 October 2011.

019471

HCMLPHMIT00003430

12.   In addition to the Participation Shares, the LP issued 100 management shares (the **Management Shares**) with the only voting rights for any and all shareholders in the LP. In essence, the Articles and ARLPA therefore grant complete control of the Fund structure to the holder of the Management Shares in the LP and the entirety of the issued share capital of the GP. Those shares have at all material times been held by a single individual, who as a result has substantial control over the entire Fund structure (the **Control Position**).

13.   The ARLPA provides that the Fund was formed to make investments, directly or indirectly, on behalf of certain entities "*for the economic benefit of the Limited Partner and its Indirect Charitable Owners*" and contemplates the engagement of investment (and other service) advisors to effect this. In this context, the Control Position is responsible for the governance and management functions of the Fund as required in order for the Fund to carry out its sole purpose of benefiting the Supporting Organizations and the Charities they support.

**GRANT SCOTT**

14.   I initially selected Grant Scott for the Control Position, a person I have known for years who also has great integrity.

15.   From 2010 until the 2015 Transaction, the Fund operated as a non-discretionary advised account of Highland, meaning Highland provided back-and-middle-office staff to the Fund and also provided recommendations regarding potential investments to Mr Scott as the Control Person. However, Mr Scott had complete discretion in adopting or rejecting the investment recommendations provided to the Fund by Highland. He also had final discretion over payments made by the Fund to third parties. In his position as the Control Person, Mr Scott was paid $60,000 USD per annum.

16.   After the 2015 Transaction, my affiliates and I no longer owned a majority stake in Highland. Subsequently, I was advised that, as a result of the change of ownership, the Fund was permitted to enter into a paying Investment Advisory Agreement with Highland. This form of investment advisory agreement was in place from January 2017 until it was terminated effective March 2021.

**MARK PATRICK**

17.   Mark Patrick was hired as Tax Counsel at Highland in 2008. His job duties included maximizing tax saving to Highland's limited partners, including me and my affiliates. In that role, Mr. Patrick directly represented me as my personal tax counsel. He represented me in tax efficiency planning and tax-deductible charitable giving, among other things. He provided the same services for various trusts and companies affiliated with me. Mr Patrick served that role at Highland from 2008 until his departure in February 2021.

18.   In March 2021, Mr Patrick was hired by Skyview as Tax Counsel and continued to perform

019472

HCMLPHMIT00003431

Case 19-34054-sgj11 Doc 4255-119 Filed 06/20/25 Entered 06/20/25 21:39:29
Case 3:25-cv-02072-S Document 51-19 Desc Exhibit Filed 10/06/25 Page 29 of 11 Page 624 of 674 PageID 20540

FSD2025-0099      **Page 4 of 10**      2025-04-16

substantially similar tax counsel duties for me. At Mr Patrick's request, his job title was changed to "Managing Director, Tax" in September 2021, although his role with respect to me and my affiliates remained substantially the same.

19. The legal structure of the Fund (including as regards its partners and ultimate beneficiaries as discussed above) was created in 2011 on the advice of Mr Patrick working with outside counsel. Mr Patrick advised me that, to avoid potential negative findings by the U.S. Internal Revenue Service, as the donor/grantor of assets to the Fund, I could not have any control over the Fund or its entities. I followed his advice as my tax counsel.

20. In March 2021, Mr Scott informed me that he wanted to resign from the Control Position. The Fund had become engaged in certain disputes arising from the Highland Bankruptcy, and he did not believe he was equipped to handle those disputes. Mr Patrick suggested to Mr Scott and me that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected the Fund. At the time, Mr Patrick was my attorney and Mr Scott was my trusted friend, and I was happy for Mr Scott to pass the Control Position to Mr Patrick.

21. On 25 March 2021, Mr Scott: (i) resigned as director of the LP, (ii) appointed Mr Patrick as director of the LP, and (iii) transferred to Mr Patrick the Management Shares for nominal consideration. Mr Patrick therefore assumed the Control Position from that date.

22. At some point, I understand that a person named Paul Murphy based in the Cayman Islands also was appointed as director to the LP and a portion of the Fund's subsidiaries, giving those entities two directors. However, I understand that in the event of a dissenting vote by Mr Murphy, Mr Patrick's vote counts as the tiebreaker for corporate voting.

**MR PATRICK'S CONTROL OF THE FUND**

23. In the initial period following Mr Patrick's assumption of the Control Position, there was no noticeable change in the management of the Fund. NexPoint provided, without charge, investment ideas to the Fund, as Highland previously had done, and Mr Patrick was free (as Mr Scott had been) to decide whether or not the Fund wished to follow NexPoint's recommendations. This approach was similar to the non-discretionary advised account status of the Fund prior to 2017.

24. Subsequently, however, communications between Mr Patrick and Skyview and me began to become less frequent, and over time I came to suspect that Mr Patrick was utilizing the Control Position not for the benefit of the Supporting Organizations, the Charities or the Fund, but rather for his own personal enrichment.

25. On 28 June 2023, Mr Patrick sent an email to Lauren Short, an employee of NexPoint, requesting that the Highland Dallas Foundation (i.e. the Supporting Organization that supports the Dallas

019473

HCMLPHMIT00003432

Foundation) "*direct $10,000*" to Creative HEARTS TX, a non-profit entity formed on 13 June 2023. Following due diligence, Ms Short learned that the directors of the entity were Mr Patrick, Darees Patrick and Alyse Patrick (his daughter and wife). Mr Patrick had made the grant request without disclosing his and/or his family's involvement.

26.    Ms Short discussed the matter with Mr Patrick, who did not provide many details, but said the non-profit was formed to facilitate paying for trainers or speakers on self-defense training for teenage girls. Ms Short understood that Patrick's expectation was that this would be an annual donation to a "club" at his daughter's school. While Ms Short inquired, there was no detail forthcoming as to whether or not Creative Hearts would be a pass-through donating the monies to other charities or would directly do any work with the trainers or speakers itself. There also was not clarity if Creative Hearts' members intended to take a salary from the grant.  The grant payment was authorized on 5 September 2023, but Mr Patrick was informed that further payments were unlikely. I was informed of this process by Ms Short and her supervisor.  Contemporaneously with the grant approval, my team also informed the Dallas Foundation of the situation.

27.    As another example, in or around September 2023, I was contacted by Kevin Cronin of Fortaris Capital Advisors (**Fortaris**). Fortaris provides litigation support services including due diligence, internal investigations, fraud detection, asset verification and in-depth background checks. Mr Cronin is a former police sergeant and Special Agent with the Department of Homeland Security.

28.    Fortaris was at the time engaged by the Fund in respect of an unrelated matter and Mr Cronin was known to me personally. In September 2023, Mr Cronin and I met, and he informed me that he had been approached by Mr Patrick with a proposition whereby Mr Patrick (on behalf of the Fund) would engage an entity controlled by Mr Cronin (other than Fortaris) at a monthly fee of between $25,000 and $50,000, and that this fee would be split between Fortaris and Mr Patrick as a supplement to Mr Patrick's compensation. Mr Cronin informed me that he had asked Mr Patrick if this arrangement would amount to fraud, and that Mr Patrick's response had been: "*you can't steal from yourself.*"

29.    Mr Cronin informed me that he understood from this statement that Mr Patrick believed he owned the Fund and could use the funds controlled by it however he pleased. Mr Cronin further informed me that he was uncomfortable about Mr Patrick's proposal and that he subsequently communicated this to Mr Patrick, Mr Patrick cut off all further communications between them.

30.    Mr Cronin's allegations that Mr Patrick was seeking to make a secret, undisclosed personal profit from the Fund were extremely concerning. I have subsequently been informed by my U.S. attorneys that, had Mr Cronin agreed with this proposal, it would have likely constituted U.S. federal wire fraud, and/or violations of the Texas Penal Code's prohibitions on bribery and misapplication of fiduciary property.  Shortly after Mr Cronin contacted me, I met with Mr Patrick and confronted him about the allegations, which he admitted to me were true.  I informed the Supporting Organizations

019474

HCMLPHMIT00003433

about the matter and Mr Patrick's admission. However, at the time, both the Supporting Organizations and I were concerned that under the Articles, the Supporting Organizations did not have the power (in their capacity as Participating Shareholders) to limit Mr Patrick's powers or remove him from his position.

31.   Given the situations described above, and the lack of communication about the Fund, I became increasingly concerned about Mr Patrick's management of the Fund, including the potential misuse and/or misappropriation of its assets. In June 2024 therefore I requested that my team at NexPoint analyze the financial information of the Fund that I had in my possession, covering the calendar years ending 2018 to 2023 and the first half of 2024. My team produced an annual expense summary of that information (the **Expense Summary**) which indicated substantial increases in expenditures during Mr Patrick's tenure, particularly during early 2023 and mid-2024, as follows:

(a)   Directors' fees increased from around US$40,000 in 2022 to almost US$600,000 in 2023 – and increased even further to around US$2.25 million in the first half of 2024 alone.

(b)   Expenses overall for the first half of 2024 were around US$18.3 million – roughly the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

32.   The Expense Summary reinforced my concern that Mr Patrick is using the Control Position for his own enrichment rather than to benefit the Supporting Organizations and the causes they support. I therefore directed my employees at NexPoint to provide the Expense Summary to the Supporting Organizations, and which they promptly did.

33.   In August 2024, I became aware of yet another issue concerning Mr Patrick. NexPoint and its affiliates, through their investment activities, regularly obtain material non-public information (**MNPI**) related to those investments.   As a service provider to NexPoint and its affiliates, Skyview employees also obtain the same MNPI. Trading on the basis of MNPI amounts to 'insider trading' which is prohibited under U.S. securities laws. As a result, NexPoint and its affiliates, and Skyview, all have the same robust regulatory compliance program to prevent, among other things, insider trading (**Compliance Policy**). NexPoint and its affiliates, and Skyview, require their employees to abide by the Compliance Policy at all times and employees are required to confirm in writing on a quarterly basis that they will not use MNPI while trading.   Mr Patrick completed the annual 2023, Q4 2023, Q1 2024, and Q2 2024 certifications, among others.

34.   I was informed that my director of charitable giving had been contacted by Ms Diaz, the CEO of the Highland Dallas Foundation, Inc. (**Dallas Foundation**), one of the Charities. Ms Diaz stated that on 28 August 2024, Mr Patrick contacted the Dallas Foundation's attorney to provide information about an asset held by the Dallas Foundation, which was held directly and separately from the Fund. This information was obtained by Mr Patrick through his employment at Skyview and constituted MNPI,

019475

HCMLPHMIT00003434

which is prohibited by U.S. securities laws from being disclosed and/or acted upon. On the basis of this MNPI, Mr Patrick advised the Dallas Foundation to exercise a put option it held in a NexPoint affiliated asset. The Dallas Foundation did not act on the information or recommendation provided by Mr Patrick, but in the event it had exercised the put option, both the Dallas Foundation and Mr Patrick would have committed violations of the U.S. securities laws that prohibit insider trading.

35.   Upon receipt of the allegations against Mr Patrick, Skyview's compliance department commenced an internal investigation which, due to the serious nature of the allegations, was conducted without Mr Patrick's knowledge, so as to avoid potentially tipping off Mr Patrick about the investigation. By the end of September 2024, the investigation was substantially complete, and the conclusion had been reached that Mr Patrick's actions constituted a serious breach of his compliance and employee obligations. On 1 October 2024, as part of the finalisation of the investigation report, Skyview's chief compliance officer interviewed Ms Diaz about the allegations against Mr Patrick, which I understand confirmed Skyview's conclusions. The final investigation report was issued on 11 October 2024 and concluded that Mr Patrick had attempted a serious breach of U.S. securities laws. A copy of the report and its attachments is at **page 1**.

36.   On 2 October 2024, Mr Patrick abruptly resigned his position from Skyview and thereafter became openly hostile towards the Charities, my affiliated companies, and me. Although neither I nor anyone at Skyview has direct evidence of Mr Patrick having been tipped off about the investigation, the timing of his resignation causes me to conclude that Mr Patrick became aware of the investigation into his behaviour and resigned before the report was published.

37.   On the same day that Mr Patrick resigned his position at Skyview, he also terminated Skyview's service agreement with the Fund, and as a result all legal, compliance, back office and other services provided to the Fund. Mr. Patrick and Mr. Murphy have stated that that they intend to take on the role of investment advisors for the Fund. I am not aware of Mr. Murphy's qualifications for this role, nor am I aware of any third-party investment advisor that has been retained by the Fund to fill this role. Based on my knowledge and expertise in investment management, and my sixteen years working with Mr Patrick as my counsel, I believe that Mr Patrick is a well-qualified tax counsel, but does not have the experience, training, or expertise to be an investment professional.

38.   After his resignation from Skyview and the termination of Skyview's services agreement with the Fund, I have received repeated reports and evidence of Mr Patrick causing certain DAF entities to liquidate their assets, some at below-market value. For example, on 20 February 2025, Mr Patrick's subordinate Shawn Raver asked for the in-bound wire instructions for one of my affiliates that owned a position in a trust called Hunter Mountain. Hunter Mountain owns most of the distribution rights of the equity position in the Highland Bankruptcy, meaning most of the residual value of the estate should be distributed to Hunter Mountain at the close of the Highland Bankruptcy. According to

019476
HCMLPHMIT00003435

Case 19-34054-sgj11    Doc 4255-119    Filed 06/20/25    Entered 06/20/25 21:39:29
Case 3:25-cv-02072-S    Document 55 Exhibit Filed 119 Page 25 of 11    Page 628 of 674    PageID 20544

**FSD2025-0099**                    **Page 8 of 10**                    2025-04-16

Hunter Mountain's own filings, this value has been calculated in excess of $100 million gross, with approximately $17 million net value.

39.  After additional inquiries from accounting staff, Mr Raver disclosed that the entire Hunter Mountain position had been sold to an unidentified party for $1 million. The Fund has not disclosed the identity of the purchaser. I am familiar with the Highland Bankruptcy estate and there is no valuation, net, gross, or otherwise, that I can imagine that would support a $1 million sales price. Additionally, given my founding and my affiliates' ownership of Highland, Mr Patrick would know that I was one of a few natural buyers of the Hunter Mountain position. While Mr Patrick of course would not be obliged to sell Hunter Mountain to me, the fact that Mr Patrick authorized the sale of Hunter Mountain at a below-market value without even approaching a natural buyer indicates a non-market, non-fiduciary reason for the sale.

40.  Atlas IDF, L.P. is a fund controlled by its general partner Atlas IDF GP, LLC, a wholly owned subsidiary of the DAF. The economic beneficiaries of Atlas IDF are the holders of annuity policies issued by Crown Global Insurance Company. The majority annuity policy holder is Empower Dallas Foundation, a charitable foundation for which I serve as President whose purpose is to benefit the Dallas Foundation.

41.  On 20 February 2025, Mr Patrick in his capacity as the general partner of Atlas IDF GP, LLC, sent a letter to Crown Global Insurance advising of the intention to dissolve Atlas in accordance with the partnership agreement dated 30 November 2015 on the basis of (i) concerns about the long-term availability and viability of back-office support; (ii) unsuccessful efforts to sell the defaulted Notes issued by HCRE Partners (one of my affiliates) dated 7 May 2014 in the amount of $2,3M and 27 May 2014 in the amount of $5M, held by the Partnership; and (iii) the decision by an affiliate of the GP to purchase the Notes at a price above their appraised value of zero dollars to facilitate an orderly wind-up. At the time, the amounts outstanding on the two Notes, including accumulated interest, was in excess of $13M. The intention was to sell the Notes collectively for $500,000. Mr Patrick launched litigation related to these Notes prior to the 20 February 2025 attempted sale of the Notes to an affiliate.

42.  On 27 February 2025, H&K as counsel for the Empower Dallas Foundation (the policyholder), sent an email to Crown Global advising that the foundation was gathering information and requested that Crown Global therefore withdraw its consent to the proposed sale of the Notes to CLO Holdco. On 28 February 2025, Mr Patrick sent a further letter to Crown Global noting the revocation of consent to sell the Notes, and noting that: "*in addition to the purchase of the "Notes" for $500,000, we also intend to include a provision in the purchase and sale documents that, if the Notes are repaid in full within 12 months, all amounts received (minus fees and expenses of collection and purchase price) will be remitted to you as the sole limited partner of Atlas IDF, LP.*" The initial zero valuation and

019477

HCMLPHMIT00003436

proposed $500,000 sale price was confusing given that HCRE Partners had offered to pay the full amounts due in an amortizing schedule. After the withholding of consent, the revised offer of 28 February 2025 still is confusing given that the amortization schedule is longer than 12 months.

**ATTORNEY GENERAL INVESTIGATION**

43. I have become aware that, on 14 March 2025, the Texas Attorney General (*Texas AG*) commenced an investigation into Charitable DAF GP, LLC (the Fund's former general partner) in relation to the organization, conduct and management of Charitable DAF GP, LLC, and its related entities.

44. I understand that the Texas AG has the power to investigate a charity, should it deem necessary, to determine whether a charity is complying with Texas law.

45. I understand that the Charities have requested information about the investigation from the Texas AG, but do not have knowledge of any further details.

**DONATIONS TO THE CHARITIES**

46. Until Mr Patrick's departure in October 2024, I regularly donated to through the Charities to the Fund as part of my charitable giving program. My affiliates and I, which donated through the Charities to the DAF entities in 2023 and in various years prior, and are the primary funding source for the Fund. As allowed pursuant to US law, I direct the Charities to utilize the Fund's assets to sponsor charitable causes I particularly value, including underprivileged youth education, cancer research, heart health, veterans' services, and local institutions such as zoos and museums. Though I wish to continue to support these charitable causes, I will not give any future donations through the Charities to the Fund while it is under Mr Patrick's management and/or control.

**FUNDING OF PROCEEDINGS**

47. As stated above, I do not hold a controlling interest in any of the Charities or the Supporting Organizations. However, I sit on the boards of the Supporting Organizations simply for the purpose of overseeing how the Charities are deploying the Fund's assets for charitable purposes, and the impact of those donations in the community. In this context, I became aware that the Supporting Organizations were meeting to vote on the decision to take legal action to take steps to preserve the assets of the Charities they exist to support. Given my connection with the Fund and personal relationship with Mr Patrick, I recused myself from that meeting and was not otherwise involved in the decision taken by the Supporting Organizations to commence these proceedings.

48. The Supporting Organizations approached me about the costs associated with legal action and their reticence to use funds that should and otherwise would be used for charitable purposes, and asked whether I would be prepared to fund the action personally. I agreed to do so. I have not and will not

019478

HCMLPHMIT00003437

Case 19-34054-sgj11 Doc 4255-119 Filed 06/20/25 Entered 06/20/25 21:39:29
Case 3:25-cv-02072-S Document 15-45 Exhibit Filed 06/06/25 Page 630 of 674 PageID 20546

**FSD2025-0099** **Page 10 of 10** 2025-04-16

at any time receive a benefit, nor do I have control of the proceedings, because of this funding arrangement. The Supporting Organizations have decision making authority in relation to these proceedings. My concern is solely to ensure that the Fund, and the funds that I have donated over time that are held in the Fund, are used only to benefit the Charities and the causes they support.

SWORN by the above named )
**JAMES DAVID DONDERO** )
This 9th day of April 2025 )
at 4:46 pm )



JAMES DAVID DONDERO

BEFORE ME:

NOTARY PUBLIC

KRYSTAL HUGHES
Notary ID #129488160
My Commission Expires
July 12, 2025

THIS AFFIDAVIT was presented by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (Ref:AJ/RZ/0016)

019479

HCMLPHMIT00003438

**EXHIBIT 120**

019480

**From:**     John A. Morris
**Sent:**     Thursday, June 19, 2025 6:10 PM
**To:**       Andrea T. Bates; Hayley R. Winograd
**Subject:**  FW: Highland -- Request to File Rule 2019 Statement

---

**From:** Jeff Pomerantz <jpomerantz@pszjlaw.com>
**Sent:** Monday, June 16, 2025 4:24 PM
**To:** David Curry <dcurry@okinadams.com>; Matthew Okin <mokin@okinadams.com>
**Cc:** John A. Morris <jmorris@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>
**Subject:** Highland -- Request to File Rule 2019 Statement

Gentlemen –

As your law firm purports to represent  multiple parties in connection with the Highland bankruptcy case and next week's hearing we hereby request that you comply with your obligations to file promptly a Rule 2019 statement with the Bankruptcy Court.

Best,
Jeff

**Jeff Pomerantz**
Pachulski Stang Ziehl & Jones LLP
Tel: 310.277.6910 | Cell: 310.489.0285 | Fax: 310.201.0760
jpomerantz@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

019481

# EXHIBIT 121

019482

Case 19-34054-sgj11 Doc 1808 Filed 01/22/21 Entered 01/22/21 Page 1 of 66
Case 3:25-cv-02072-S    Document 52-25  Filed 10/06/25    Page 634 of 674    PageID 20550
Docket #1808  Date Filed: 01/22/2021

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
| Debtor. | ) |

## FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND
## CAPITAL MANAGEMENT, L.P. (AS MODIFIED)

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
           ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

- 1 -

1934054210122000000000013

Article IV.B.1-5

019484

cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

**B.**     **The Claimant Trust**[2]

> 1.           *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

019485

Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2.        *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3.        *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and

27

019486

monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4.        *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims.  Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

5.        *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

(i)       the payment of the Claimant Trust Expenses;

(ii)      the payment of other reasonable expenses of the Claimant Trust;

(iii)     the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv)      the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

(v)       the orderly monetization of the Claimant Trust Assets;

(vi)      litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(vii)     the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(viii)    the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

(ix)      the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

019487

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expense (including, without limitation, any reserve for potential indemnification claims as authorized and provided under the Claimant Trust Agreement), and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. The Litigation Sub-Trust Agreement generally will provide for, among other things:

> (i)       the payment of other reasonable expenses of the Litigation Sub-Trust;

> (ii)      the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

> (iii)     the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

*6.*          *Compensation and Duties of Trustees.*

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust

019488

Article IV.B.7

Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7.         *Cooperation of Debtor and Reorganized Debtor.*

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

8.         *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as: (a) a transfer of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9.         *Tax Reporting.*

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

019490

Article IV.B.10

019491

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10.     _Claimant Trust Assets._

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

11.     _Claimant Trust Expenses._

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12.     _Trust Distributions to Claimant Trust Beneficiaries._

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, _provided_ that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13.     _Cash Investments._

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; _provided, however,_ that such investments are

31

019492

Article IV.D

019493

5.        *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6.        *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7.        *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement. As set forth in the Reorganized Limited Partnership Agreement, the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor. Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

**D.    Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in

019494

the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

## E. Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of

35

019495

Article VII.D.1-2

019496

damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

### A.    Filing of Proofs of Claim

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

### B.    Disputed Claims

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, request the Bankruptcy Court subordinate any Claims to Subordinated Claims, or any other appropriate motion or adversary proceeding with respect to the foregoing by the Claims Objection Deadline or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

### C.    Procedures Regarding Disputed Claims or Disputed Equity Interests

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

### D.    Allowance of Claims and Equity Interests

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

019497

### 1. *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

### 2. *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

### 3. *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH**

019498

Article XI

019499

Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

## ARTICLE XI.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan to the maximum extent legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or

53

019500

expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such

54

019501

orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A.    Payment of Statutory Fees and Filing of Reports

All outstanding Statutory Fees shall be paid on the Effective Date.  All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed.  The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee.  The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### B.    Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:  (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

### C.    Revocation of Plan

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee.  If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then:  (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement

019502

**EXHIBIT 122**

019503

*DRAFT*

## CLAIMANT TRUST AGREEMENT

This Claimant Trust Agreement, effective as of _____ , 2021 (as may be amended, supplemented, or otherwise modified in accordance with the terms hereof, this "Agreement"), by and among Highland Capital Management, L.P. (as debtor and debtor-in-possession, the "Debtor"), as settlor, and James P. Seery, Jr., as trustee (the "Claimant Trustee"), and [____] as Delaware trustee (the "Delaware Trustee," and together with the Debtor and the Claimant Trustee, the "Parties") for the benefit of the Claimant Trust Beneficiaries entitled to the Claimant Trust Assets.

## RECITALS

WHEREAS, on October 16, 2019, Highland Capital Management, L.P. filed with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") and captioned *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (the "Chapter 11 Case");

WHEREAS, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[1] which was confirmed by the Bankruptcy Court on _____, 2021, pursuant to the Findings of Fact and Order Confirming Plan of Reorganization for the Debtor [Docket No. •] (the "Confirmation Order");

WHEREAS, this Agreement, including all exhibits hereto, is the "Claimant Trust Agreement" described in the Plan and shall be executed on or before the Effective Date in order to facilitate implementation of the Plan; and

WHEREAS, pursuant to the Plan and Confirmation Order, the Claimant Trust Assets are to be transferred to the Claimant Trust (each as defined herein) created and evidenced by this Agreement so that (i) the Claimant Trust Assets can be held in a trust for the benefit of the Claimant Trust Beneficiaries entitled thereto in accordance with Treasury Regulation Section 301.7701-4(d) for the objectives and purposes set forth herein and in the Plan; (ii) the Claimant Trust Assets can be monetized; (iii) the Claimant Trust will transfer Estate Claims to the Litigation Sub-Trust to be prosecuted, settled, abandoned, or resolved as may be determined by the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement, for the benefit of the Claimant Trust; (iv) proceeds of the Claimant Trust Assets, including Estate Claims, may be distributed to the Claimant Trust Beneficiaries[2] in accordance with the Plan; (v) the Claimant Trustee can resolve Disputed Claims as set forth herein and in the Plan; and

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[2] For the avoidance of doubt, and as set forth in the Plan, Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests will be Claimant Trust Beneficiaries only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest in accordance with the terms and conditions set forth herein and in the Plan.

(vi) administrative services relating to the activities of the Claimant Trust and relating to the implementation of the Plan can be performed by the Claimant Trustee.

## DECLARATION OF TRUST

NOW, THEREFORE, in order to declare the terms and conditions hereof, and in consideration of the premises and mutual agreements herein contained, the confirmation of the Plan and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Debtor, the Claimant Trustee, and the Delaware Trustee have executed this Agreement for the benefit of the Claimant Trust Beneficiaries entitled to share in the Claimant Trust Assets and, at the direction of such Claimant Trust Beneficiaries as provided for in the Plan.

TO HAVE AND TO HOLD unto the Claimant Trustee and his successors or assigns in trust, under and subject to the terms and conditions set forth herein and for the benefit of the Claimant Trust Beneficiaries, and for the performance of and compliance with the terms hereof and of the Plan; provided, however, that upon termination of the Claimant Trust in accordance with Article IX hereof, this Claimant Trust Agreement shall cease, terminate, and be of no further force and effect, unless otherwise specifically provided for herein.

IT IS FURTHER COVENANTED AND DECLARED that the Claimant Trust Assets are to be strictly held and applied by the Claimant Trustee subject to the specific terms set forth below.

## ARTICLE I.
## DEFINITION AND TERMS

1.1   Certain Definitions.   Unless the context shall otherwise require and except as contained in this Section 1.1 or as otherwise defined herein, the capitalized terms used herein shall have the respective meanings assigned thereto in the "Definitions," Section 1.1 of the Plan or if not defined therein, shall have the meanings assigned thereto in the applicable Section of the Plan.   For all purposes of this Agreement, the following terms shall have the following meanings:

(a)   "Acis" means collectively, Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

(b)   "Bankruptcy Court" has the meaning set forth in the Recitals hereof.

(c)   "Cause" means (i) a Person's willful failure to perform his material duties hereunder (which material duties shall include, without limitation, with respect to a Member, or to the extent applicable, the Claimant Trustee, regular attendance at regularly scheduled meetings of the Oversight Board), which is not remedied within 30 days of notice; (ii) a Person's commission of an act of fraud, theft, or embezzlement during the performance of his or her duties hereunder; (iii) a Person's conviction of a felony (other than a felony that does not involve fraud, theft, embezzlement, or jail time) with all appeals having been exhausted or appeal periods lapsed; or (iv) a Person's gross negligence, bad faith, willful misconduct, or knowing violation of law in the performance of his or her duties hereunder.

019505

Section 2.2(a)-(b)

2.2   <u>Objectives</u>.

(a)   The Claimant Trust is established for the purpose of satisfying Allowed General Unsecured Claims and Allowed Subordinated Claims (and only to the extent provided herein, Allowed Class A Limited Partnership Interests and Class B/C Limited Partnership Interests) under the Plan, by monetizing the Claimant Trust Assets transferred to it and making distributions to the Claimant Trust Beneficiaries. The Claimant Trust shall not continue or engage in any trade or business except to the extent reasonably necessary to monetize and distribute the Claimant Trust Assets consistent with this Agreement and the Plan and act as sole member and manager of New GP LLC. The Claimant Trust shall provide a mechanism for (i) the monetization of the Claimant Trust Assets and (ii) the distribution of the proceeds thereof, net of all claims, expenses, charges, liabilities, and obligations of the Claimant Trust, to the Claimant Trust Beneficiaries in accordance with the Plan. In furtherance of this distribution objective, the Claimant Trust will, from time to time, prosecute and resolve objections to certain Claims and Interests as provided herein and in the Plan.

(b)   It is intended that the Claimant Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations. In furtherance of this objective, the Claimant Trustee shall, in his business judgment, make continuing best efforts to (i) dispose of or monetize the Claimant Trust Assets and resolve Claims, (ii) make timely distributions, and (iii) not unduly prolong the duration of the Claimant Trust, in each case in accordance with this Agreement.

2.3   <u>Nature and Purposes of the Claimant Trust</u>.

(a)   The Claimant Trust is organized and established as a trust for the purpose of monetizing the Claimant Trust Assets and making distributions to Claimant Trust Beneficiaries in a manner consistent with "liquidating trust" status under Treasury Regulation Section 301.7701-4(d). The Claimant Trust shall retain all rights to commence and pursue all Causes of Action of the Debtor other than (i) Estate Claims, which shall be assigned to and commenced and pursued by the Litigation Trustee pursuant to the terms of the Litigation Sub-Trust Agreement, and (ii) Causes of Action constituting Reorganized Debtor Assets, if any, which shall be commenced and pursued by the Reorganized Debtor at the direction of the Claimant Trust as sole member of New GP LLC pursuant to the terms of the Reorganized Limited Partnership Agreement. The Claimant Trust and Claimant Trustee shall have and retain, and, as applicable, assign and transfer to the Litigation Sub-Trust and Litigation Trustee, any and all rights, defenses, cross-claims and counter-claims held by the Debtor with respect to any Claim as of the Petition Date. On and after the date hereof, in accordance with and subject to the Plan, the Claimant Trustee shall have the authority to (i) compromise, settle or otherwise resolve, or withdraw any objections to Claims against the Debtor, <u>provided</u>, <u>however</u>, the Claimant Trustee shall only have the authority to compromise or settle any Employee Claim with the unanimous consent of the Oversight Board and in the absence of unanimous consent, any such Employee Claim shall be transferred to the Litigation Sub-Trust and be litigated, comprised, settled, or otherwise resolved exclusively by the Litigation Trustee and (ii) compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court, which authority may be shared with or transferred to the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement. For the avoidance of doubt, the Claimant Trust,

019507

Section 3.2(a)-(b)

019508

2.5    <u>Principal Office</u>.  The principal office of the Claimant Trust shall be maintained by the Claimant Trustee at the following address:[_____].

2.6    <u>Acceptance</u>.  The Claimant Trustee accepts the Claimant Trust imposed by this Agreement and agrees to observe and perform that Claimant Trust, on and subject to the terms and conditions set forth herein and in the Plan.

2.7    <u>Further Assurances</u>.  The Debtor, Reorganized Debtor, and any successors thereof will, upon reasonable request of the Claimant Trustee, execute, acknowledge and deliver such further instruments and do such further acts as may be necessary or proper to transfer to the Claimant Trustee any portion of the Claimant Trust Assets intended to be conveyed hereby and in the Plan in the form and manner provided for hereby and in the Plan and to vest in the Claimant Trustee the powers, instruments or funds in trust hereunder.

2.8    <u>Incidents of Ownership</u>.  The Claimant Trust Beneficiaries shall be the sole beneficiaries of the Claimant Trust and the Claimant Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein.

## <u>ARTICLE III.</u>
## <u>THE TRUSTEES</u>

3.1    <u>Role</u>.  In furtherance of and consistent with the purpose of the Claimant Trust, the Plan, and this Agreement, the Claimant Trustee, subject to the terms and conditions contained herein, in the Plan, and in the Confirmation Order, shall serve as Claimant Trustee with respect to the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries and maintain, manage, and take action on behalf of the Claimant Trust.

3.2    <u>Authority</u>.

(a)    In connection with the administration of the Claimant Trust, in addition to any and all of the powers enumerated elsewhere herein, the Claimant Trustee shall, in an expeditious but orderly manner, monetize the Claimant Trust Assets, make timely distributions and not unduly prolong the duration of the Claimant Trust.  The Claimant Trustee shall have the power and authority and is authorized to perform any and all acts necessary and desirable to accomplish the purposes of this Agreement and the provisions of the Plan and the Confirmation Order relating to the Claimant Trust, within the bounds of this Agreement, the Plan, the Confirmation Order, and applicable law.  The Claimant Trustee will monetize the Claimant Trust Assets with a view toward maximizing value in a reasonable time.

(b)    The Claimant Trustee, subject to the limitations set forth in Section 3.3 of this Agreement shall have the right to prosecute, defend, compromise, adjust, arbitrate, abandon, estimate, or otherwise deal with and settle any and all Claims and Causes of Action that are part of the Claimant Trust Assets, other than the Estate Claims transferred to the Litigation Sub-Trust, as the Claimant Trustee determines is in the best interests of the Claimant Trust; <u>provided</u>, <u>however</u>, that if the Claimant Trustee proposes a settlement of an Employee Claim and does not obtain unanimous consent of the Oversight Board of such settlement, such Employee Claim shall be transferred to the Litigation Sub-Trust for the Litigation Trustee to litigate.  To the extent that any action has been taken to prosecute, defend, compromise, adjust, arbitrate, abandon, or

019509

otherwise deal with and settle any such Claims and Causes of Action prior to the Effective Date, on the Effective Date the Claimant Trustee shall be substituted for the Debtor in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable by Rule 7025 of the Federal Rules of Bankruptcy Procedure, and the caption with respect to such pending action shall be changed to the following "[Claimant Trustee], not individually but solely as Claimant Trustee for the Claimant Trust, et al. v. [Defendant]".

(c)    Subject in all cases to any limitations contained herein, in the Confirmation Order, or in the Plan, the Claimant Trustee shall have the power and authority to:

(i)    solely as required by Section 2.4(c), hold legal title to any and all rights of the Claimant Trust and Beneficiaries in or arising from the Claimant Trust Assets, including collecting and receiving any and all money and other property belonging to the Claimant Trust and the right to vote or exercise any other right with respect to any claim or interest relating to the Claimant Trust Assets in any case under the Bankruptcy Code and receive any distribution with respect thereto;

(ii)    open accounts for the Claimant Trust and make distributions of Claimant Trust Assets in accordance herewith;

(iii)    as set forth in Section 3.11, exercise and perform the rights, powers, and duties held by the Debtor with respect to the Claimant Trust Assets (other than Estate Claims), including the authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting as a representative of the Debtor's Estate with respect to the Claimant Trust Assets, including with respect to the sale, transfer, or other disposition of the Claimant Trust Assets;

(iv)    settle or resolve any Claims in Class 8 and Class 9 other than the Material Claims and any Equity Interests;

(v)    sell or otherwise monetize any publicly-traded asset for which there is a marketplace and any other assets (other than the Other Assets (as defined below)) valued less than or equal to $3,000,000 (over a thirty-day period);

(vi)    upon the direction of the Oversight Board, fund the Litigation Sub-Trust on the Effective Date and as necessary thereafter;

(vii)    exercise and perform the rights, powers, and duties arising from the Claimant Trust's role as sole member of New GP LLC, and the role of New GP LLC, as general partner of the Reorganized Debtor, including the management of the Managed Funds;

(viii)    protect and enforce the rights to the Claimant Trust Assets by any method deemed appropriate, including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(ix)    obtain reasonable insurance coverage with respect to any liabilities and obligations of the Trustees, Litigation Trustee, and the Members of the Oversight Board solely in their capacities as such, in the form of fiduciary liability insurance, a directors and

019510

Section 3.2(c)(iv)

otherwise deal with and settle any such Claims and Causes of Action prior to the Effective Date, on the Effective Date the Claimant Trustee shall be substituted for the Debtor in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable by Rule 7025 of the Federal Rules of Bankruptcy Procedure, and the caption with respect to such pending action shall be changed to the following "[Claimant Trustee], not individually but solely as Claimant Trustee for the Claimant Trust, et al. v. [Defendant]".

(c)     Subject in all cases to any limitations contained herein, in the Confirmation Order, or in the Plan, the Claimant Trustee shall have the power and authority to:

(i)     solely as required by Section 2.4(c), hold legal title to any and all rights of the Claimant Trust and Beneficiaries in or arising from the Claimant Trust Assets, including collecting and receiving any and all money and other property belonging to the Claimant Trust and the right to vote or exercise any other right with respect to any claim or interest relating to the Claimant Trust Assets in any case under the Bankruptcy Code and receive any distribution with respect thereto;

(ii)     open accounts for the Claimant Trust and make distributions of Claimant Trust Assets in accordance herewith;

(iii)     as set forth in Section 3.11, exercise and perform the rights, powers, and duties held by the Debtor with respect to the Claimant Trust Assets (other than Estate Claims), including the authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting as a representative of the Debtor's Estate with respect to the Claimant Trust Assets, including with respect to the sale, transfer, or other disposition of the Claimant Trust Assets;

(iv)     settle or resolve any Claims in Class 8 and Class 9 other than the Material Claims and any Equity Interests;

(v)     sell or otherwise monetize any publicly-traded asset for which there is a marketplace and any other assets (other than the Other Assets (as defined below)) valued less than or equal to $3,000,000 (over a thirty-day period);

(vi)     upon the direction of the Oversight Board, fund the Litigation Sub-Trust on the Effective Date and as necessary thereafter;

(vii)     exercise and perform the rights, powers, and duties arising from the Claimant Trust's role as sole member of New GP LLC, and the role of New GP LLC, as general partner of the Reorganized Debtor, including the management of the Managed Funds;

(viii)     protect and enforce the rights to the Claimant Trust Assets by any method deemed appropriate, including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(ix)     obtain reasonable insurance coverage with respect to any liabilities and obligations of the Trustees, Litigation Trustee, and the Members of the Oversight Board solely in their capacities as such, in the form of fiduciary liability insurance, a directors and

019512

Section 2.3(b)(ix)

019513

pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state trust law, is appointed as the successor-in-interest to, and representative of, the Debtor and its Estate for the retention, enforcement, settlement, and adjustment of all Claims other than Estate Claims, the Employee Claims, and those Claims constituting Reorganized Debtor Assets.

       (b)    The Claimant Trust shall be administered by the Claimant Trustee, in accordance with this Agreement, for the following purposes:

       (i)    to manage and monetize the Claimant Trust Assets in an expeditious but orderly manner with a view towards maximizing value within a reasonable time period;

       (ii)    to litigate and settle Claims in Class 8 and Class 9 (other than the Employee Claims, which shall be litigated and/or settled by the Litigation Trustee if the Oversight Board does not unanimously approve of any proposed settlement of such Employee Claim by the Claimant Trustee) and any of the Causes of Action included in the Claimant Trust Assets (including any cross-claims and counter-claims); provided, however, that Estate Claims transferred to the Litigation Sub-Trust shall be litigated and settled by the Litigation Trustee pursuant to the terms of the Litigation Sub-Trust Agreement;

       (iii)    to distribute net proceeds of the Claimant Trust Assets to the Claimant Trust Beneficiaries;

       (iv)    to distribute funds from the Disputed Claims Reserve to Holders of Trust Interests or to the Reorganized Debtor for distribution to Holders of Disputed Claims in each case in accordance with the Plan from time to time as any such Holder's Disputed Claim becomes an Allowed Claim under the Plan;

       (v)    to distribute funds to the Litigation Sub-Trust at the direction the Oversight Board;

       (vi)    to serve as the limited partner of, and to hold the limited partnership interests in, the Reorganized Debtor;

       (vii)    to serve as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner;

       (viii)    to oversee the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement, in its capacity as the sole member and manager of New GP LLC pursuant to the terms of the New GP LLC Documents, all with a view toward maximizing value in a reasonable time in a manner consistent with the Reorganized Debtor's fiduciary duties as investment adviser to the Managed Funds; and

       (ix)    to perform any other functions and take any other actions provided for or permitted by this Agreement and the Plan, and in any other agreement executed by the Claimant Trustee.

019514

**EXHIBIT 123**

019515

*Draft*

## LITIGATION SUB-TRUST AGREEMENT

This Litigation Sub-Trust Agreement, effective as of _____, 2021 (as may be amended, supplemented, or otherwise modified in accordance with the terms hereof, this "Agreement"), by and among James P. Seery, Jr., as trustee of the Highland Claimant Trust (the "Claimant Trustee"), [____] as Delaware Trustee, and Marc S. Kirschner as trustee (the "Litigation Trustee," and together with the Claimant Trustee and Delaware Trustee, the "Parties") of the Litigation Sub-Trust for the benefit of the Claimant Trust as sole Litigation Sub-Trust Beneficiary.

## RECITALS

WHEREAS, on October 16, 2019, Highland Capital Management, L.P. (the "Debtor") filed with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") and captioned *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (the "Chapter 11 Case");

WHEREAS, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[1] which was confirmed by the Bankruptcy Court on _____, 2021, pursuant to the Findings of Fact and Order Confirming Plan of Reorganization for the Debtor [Docket No. •] (the "Confirmation Order");

WHEREAS, this Agreement, including all exhibits hereto, is the "Litigation Sub-Trust Agreement" described in the Plan and shall be executed on or before the Effective Date in order to facilitate implementation of the Plan; and

WHEREAS, pursuant to the Plan and Confirmation Order, the Litigation Sub-Trust Assets are hereby to be transferred by the Claimant Trust to the Litigation Sub-Trust (each as defined herein) created and evidenced by this Agreement so that (i) Estate Claims can be investigated, prosecuted, settled, abandoned, resolved, and otherwise monetized as may be determined by the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement; (ii) proceeds of Estate Claims can be remitted to the Claimant Trust as Claimant Trust Assets for distribution to the Claimant Trust Beneficiaries (as defined in the Claimant Trust Agreement) in accordance with the Plan and Claimant Trust Agreement; (iii) the Litigation Trustee can investigate, litigate, settle, or otherwise resolve any Filed Claims relating to the Estate Claims, including the Employee Claims; and (iv) administrative services relating to the activities of the Litigation Sub-Trust can be performed by the Litigation Trustee.

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

019516

Section 2.2

## ARTICLE II.
## ESTABLISHMENT OF THE LITIGATION SUB-TRUST

2.1     Establishment of Sub-Trust.

(a)     The Parties, pursuant to the Plan and the Confirmation Order and in accordance with the applicable provisions of the Bankruptcy Code, hereby establish a statutory trust under the Delaware Statutory Trust Act on behalf of the Claimant Trust as the sole Litigation Sub-Trust Beneficiary, which shall be known as the "Highland Litigation Sub-Trust," on the terms set forth herein. The Litigation Trustee may use this name in accordance with the terms and conditions set forth herein as the Litigation Trustee sees fit.

(b)     The Litigation Trustee shall cause to be executed and filed in the office of the Secretary of State of the State of Delaware the Certificate of Trust and agree to execute, acting solely in his capacity as Litigation Trustee, such certificates as may from time to time be required under the Delaware Statutory Trust Act or any other Delaware law.

2.2     Nature and Purposes of the Litigation Sub-Trust.  The Litigation Sub-Trust is organized and established as a trust for the purpose of monetizing the Estate Claims and making distributions to Litigation Sub-Trust Beneficiary in a manner consistent with "liquidating trust" status under Treasury Regulation Section 301.7701-4(d). The Litigation Sub-Trust shall serve as a mechanism for investigating, prosecuting, settling, resolving, and otherwise monetizing all Estate Claims and distributing the proceeds of such Estate Claims to the Claimant Trust in a timely fashion in accordance with the Plan, the Confirmation Order, and this Agreement. The Litigation Sub-Trust and Litigation Trustee shall have and retain any and all rights, defenses, cross-claims and counter-claims held by the Debtor with respect to any Estate Claim as of the Petition Date. Except as otherwise provided herein, the Litigation Sub-Trust shall have the sole responsibility for the pursuit and settlement of the Estate Claims, and, subject to the terms of the Claimant Trustee Agreement, the sole power and authority to allow or settle and compromise any Claims related to the Estate Claims, including, without limitation, Employee Claims. For the avoidance of doubt, the Litigation Sub-Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state trust law, is appointed as the successor-in-interest to, and representative of, the Debtor and its Estate for the retention, enforcement, settlement, and adjustment of all Estate Claims and Employee Claims (in accordance with the terms of the Claimant Trust Agreement).

2.3     Transfer of Assets and Rights to the Litigation Sub-Trust.

(a)     On or as soon as practicable after the Effective Date, the Claimant Trust shall automatically an irrevocably transfer, assign, and deliver, and shall be deemed to have transferred, assigned, and delivered, all Estate Claims, Employee Claims, and Privileges. For purposes of the transfer of documents, the Litigation Sub-Trust is an assignee and successor to the Debtor in respect of the Estate Claims and Employee Claims and shall be treated as such in any review of confidentiality restrictions in requested documents. For the avoidance of doubt, following the Effective Date, the Litigation Trustee shall have the power to waive the Privileges being so assigned and transferred.

019518

Section 3.2(a)
Section 3.2(b)
Section 3.2(c)(v)

019519

3.2 <u>Authority</u>.

(a) In connection with the administration of the Litigation Sub-Trust, in addition to any and all of the powers enumerated elsewhere herein, the Litigation Trustee shall, in an expeditious but orderly manner, investigate, prosecute, settle, and otherwise resolve the Estate Claims. The Litigation Trustee shall have the power and authority and is authorized to perform any and all acts necessary and desirable to accomplish the purposes of this Agreement and the provisions of the Plan and the Confirmation Order relating to the Litigation Sub-Trust, within the bounds of this Agreement, the Plan, the Confirmation Order, and applicable law.

(b) The Litigation Trustee, subject to the limitations set forth in Section 3.3 of this Agreement shall have the right to prosecute, defend, compromise, adjust, arbitrate, abandon, estimate, or otherwise deal with and settle any and all Estate Claims and Employee Claims (in accordance with the terms of the Claimant Trust Agreement). To the extent that any action has been taken to prosecute, defend, compromise, adjust, arbitrate, abandon, or otherwise deal with and settle any such Estate Claims or Employee Claims prior to the Effective Date, on the Effective Date the Litigation Trustee shall be substituted for the Debtor in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable by Rule 7025 of the Federal Rules of Bankruptcy Procedure, and the caption with respect to such pending action shall be changed to the following "Marc Kirschner, not individually but solely as Litigation Trustee for the Highland Litigation Sub-Trust, et al. v. [Defendant]".

(c) Subject in all cases to any limitations contained herein, in the Confirmation Order, or in the Plan, the Litigation Trustee shall have the power and authority to:

(i) hold legal title to any and all rights in or arising from the Litigation Sub-Trust Assets, including, but not limited to, the right to collect any and all money and other property belonging to the Litigation Sub-Trust (including any proceeds of the Litigation Sub-Trust Assets);

(ii) perform the duties, exercise the powers, and asserts the rights of a trustee under sections 1123(b)(3)(B) of the Bankruptcy Code with respect to the Litigation Sub-Trust Assets, including the right to assert claims, defenses, offsets, and privileges;

(iii) subject to any approval of the Oversight Board that may be required under Section 3.3(b), protect and enforce the rights of the Litigation Sub-Trust with respect to any Litigation Sub-Trust Assets by any method deemed appropriate, including, without limitation, by judicial proceeds, or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law and general principles of equity;

(iv) determine and satisfy any and all liabilities created, incurred, or assumed by the Litigation Sub-Trust;

(v) subject to any approval of the Oversight Board that may be required under Section 3.3(b), investigate, analyze, compromise, adjust, arbitrate, mediate, sue on or defend, prosecute, abandon, dismiss, exercise rights, powers and privileges with respect to or otherwise deal with and settle, in accordance with the terms set forth in this Agreement, all

7

019520

Estate Claims, Employee Claims, or any other Causes of Action in favor of or against the Litigation Sub-Trust;

    (vi) with respect to any Estate Claim, avoid and recover transfers of the Debtor's property as may be permitted by the Bankruptcy Code or applicable state law;

    (vii) subject to applicable law, seek the examination of any Entity or Person with respect to the Estate Claims;

    (viii) make all payments relating to the Litigation Sub-Trust Assets;

    (ix) assess, enforce, release, or waive any privilege or defense on behalf of the Litigation Sub-Trust, the Litigation Sub-Trust Assets, or the Litigation Sub-Trust Beneficiary, if applicable;

    (x) prepare, or have prepared, and file, if necessary, with the appropriate taxing authority any and all tax returns, information returns, and other required documents with respect to the Litigation Sub-Trust, and pay taxes properly payable by the Litigation Sub-Trust;

    (xi) if not otherwise covered by insurance coverage obtained by the Claimant Trust, obtain reasonable insurance coverage with respect to any liabilities and obligations of the Litigation Trustee, solely in his capacity as such, in the form of fiduciary liability insurance, a directors and officers policy, an errors and omissions policy, or otherwise. The cost of any such insurance shall be a Litigation Sub-Trust Expense and paid by the Litigation Trustee from the Litigation Sub-Trust Expense Reserve;

    (xii) without further order of the Bankruptcy Court, but subject to the terms of this Agreement, employ various consultants, third-party service providers, and other professionals, including counsel, tax advisors, consultants, brokers, investment bankers, valuation counselors, and financial advisors, as the Litigation Trustee deems necessary to aid him in fulfilling his obligations under this Agreement; such consultants, third-party service providers, and other professionals shall be retained pursuant to whatever fee arrangement the Litigation Trustee deems appropriate, including contingency fee arrangements and any fees and expenses incurred by such professionals engaged by the Litigation Trustee shall be Litigation Sub-Trust Expenses and paid by the Litigation Trustee from the Litigation Sub-Trust Expense Cash Reserve;

    (xiii) to the extent applicable, assert, enforce, release, or waive any Privilege or defense on behalf of the Litigation Sub-Trust (including as to any Privilege that the Debtor held prior to the Effective Date), including to provide any information to insurance carriers that the Litigation Trustee deems necessary to utilize applicable insurance coverage for any Claim or Claims;

    (xiv) take all steps and execute all instruments and documents necessary to effectuate the purpose of the Litigation Sub-Trust and the activities contemplated herein and in the Confirmation Order and the Plan, and take all actions necessary to comply with the

019521

Section 3.3(b)(iii)

019522

Confirmation Order, the Plan, and this Agreement and the obligations thereunder and hereunder; and

(xv)　　exercise such other powers and authority as may be vested in or assumed by the Litigation Trustee by any Final Order (the foregoing subparagraphs (i)-(xv) being collectively, the "Authorized Acts").

(d)　　The Litigation Trustee has the power and authority to act as trustee of the Litigation Sub-Trust and perform the Authorized Acts through the date such Litigation Trustee resigns, is removed, or is otherwise unable to serve for any reason.

(e)　　Any determinations by the Liquidation Trustee, under the direction of the Oversight Board, with respect to the amount or timing of settlement or other disposition of any Estate Claims settled in accordance with the terms of this Agreement shall be conclusive and binding on the Litigation Sub-Trust Beneficiary and all other parties of interest following the entry of an order of a court of competent jurisdiction approving such settlement or other disposition to the extent required or obtained.

3.3　　Limitation of Authority.

(a)　　Notwithstanding anything herein to the contrary, the Litigation Sub-Trust and the Litigation Trustee shall not (i) be authorized to engage in any trade or business, (ii) take any actions inconsistent with the management of the Estate Claims as required or contemplated by applicable law, the Confirmation Order, the Plan, and this Agreement, or (iii) take any action in contravention of the Confirmation Order, the Plan, or this Agreement.

(b)　　Notwithstanding anything herein to the contrary, and in no way limiting the terms of the Plan, the Litigation Trustee must receive the consent by vote of a simple majority of the Oversight Board pursuant to the notice and quorum requirements set forth in Section 4.5 of the Claimant Trust Agreement, in order to:

(i)　　terminate or extend the term of the Litigation Sub-Trust;

(ii)　　commence litigation with respect to any Estate Claims and, if applicable under the terms of the Claimant Trust Agreement, the Employee Claims, including, without limitation, to (x) litigate, resolve, or settle coverage and/or the liability of any insurer under any insurance policy or legal action related thereto, or (y) pursue avoidance, recovery, or similar remedies that may be brought under chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes or common law, including fraudulent transfer law;

(iii)　　settle, dispose of, or abandon any Estate Claims (including any counterclaims to the extent such counterclaims are set off against the proceeds of any such Estate Claim);

(iv)　　borrow funds as may be necessary to fund litigation or other costs of the Litigation Sub-Trust;

9

019523